EXHIBIT 256

LexisNexis®

Caution
As of: August 12, 2014 9:02 AM EDT

# 3M v. Appleton Papers Inc.

United States District Court for the District of Minnesota
February 16, 1999, Decided
Civil No. 4-95-786 (DSD/RLE)

**Reporter:** 35 F. Supp. 2d 1138; 1999 U.S. Dist. LEXIS 1644; 50 U.S.P.Q.2D (BNA) 1091; 1999-1 Trade Cas. (CCH) P72,463

Minnesota Mining and Manufacturing Company and Imation Corp., Plaintiffs, v. Appleton Papers Inc., Defendant.

**Disposition:** **[**1]** Defendant's motion for partial summary judgment on antitrust issues (Doc. No. 167) denied; Defendant's motion to strike (Doc. No. 190) denied; Plaintiffs' motion to strike (Doc. No. 197) denied; Defendant's motion for summary judgment on issue of public use (Doc. No. 161) granted; Plaintiffs' motion for summary judgment on issues of infringement and public use (Doc. No. 156) denied.

**Core Terms**

invent, patent, inventor, summary judgment, public use, carbonless, sheet, antitrust, foreclosure, relevant market, market power, anticompetitive, competitor, distributor, anti trust law, experiment, consumer, merchant, antitrust claim, monopoly, prevail, brand, manufacture, supplier, frozen, seller, rival, experimental use, genuine issue, terminable

**Case Summary**

### Procedural Posture

In plaintiff companies' patent infringement and antitrust case, brought under § 3 of the Clayton Act and § 2 of the Sherman Act, defendant corporation filed a partial summary judgment motion on the federal antitrust issues and a summary judgment motion on the patent public use issue. Plaintiffs filed a summary judgment motion on the patent infringement and public use issues.

### Overview

Plaintiff companies sued defendant corporation for patent infringement regarding carbonless paper, and raised antitrust claims under § 3 of the Clayton Act and § 2 of the Sherman Act. Defendant filed a partial summary judgment motion on the federal antitrust issues and a summary judgment motion on the patent public use issue. Plaintiffs filed a summary judgment motion on the patent infringement and public use issues. The court held that genuine issues of material fact existed regarding the claims raised under § 3 of the Clayton Act and § 2 of the Sherman Act. Specifically, there was sufficient evidence of a question of fact regarding if defendant's sole source arrangements were exclusive dealing arrangements. Furthermore, there was evidence to suggest that defendant engaged in unlawful conduct to exclude competition and to create a monopoly. In addition, a question of fact existed regarding existence of an antitrust injury. The court held,

however, that defendant established a prima facie case for public use on the patent claim because there was no control over the invention. Therefore, defendant was granted summary judgment on the public use issue. All other motions were denied.

**Outcome**
The court granted defendant corporation summary judgment on the patent public use issue in a patent infringement and antitrust case because defendant established a prima facie case for public use. All other motions for summary judgment and partial summary judgment on the antitrust and patent infringement claims were denied, however, because genuine issues of material fact existed.

**LexisNexis® Headnotes**

Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > General Overview
Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > Appropriateness
Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > Genuine Disputes
Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > Legal Entitlement
Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > Materiality of Facts
Civil Procedure > ... > Summary Judgment > Supporting Materials > General Overview

***HN1*** *Fed. R. Civ. P. 56(c)* provides that summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. In order for the moving party to prevail, it must demonstrate to the court that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *Fed. R. Civ. P. 56(c)*. A fact is material only when its resolution affects the outcome of the case. A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party.

Civil Procedure > ... > Summary Judgment > Burdens of Proof > General Overview
Civil Procedure > ... > Summary Judgment > Motions for Summary Judgment > General Overview
Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > General Overview
Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > Appropriateness
Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > Genuine Disputes

***HN2*** On a motion for summary judgment, all evidence and inferences are to be viewed in a light most favorable to the nonmoving party. The nonmoving party, however, may not rest upon mere denials or allegations in the pleadings, but must set forth specific facts sufficient to raise a genuine issue for trial. Moreover, if a plaintiff cannot support each essential element of its claim, summary judgment must be granted because a complete failure of proof regarding an essential element necessarily renders all other facts immaterial.

Antitrust & Trade Law > Regulated Practices > Market Definition > General Overview
Antitrust & Trade Law > ... > Price Fixing & Restraints of Trade > Exclusive & Reciprocal Dealing > General Overview
Antitrust & Trade Law > ... > Price Fixing & Restraints of Trade > Exclusive & Reciprocal Dealing > Exclusive Dealing

***HN3*** In antitrust cases involving exclusive dealing arrangements, a court must initially determine the line of commerce and the area of effective competition in the known line of commerce.

Antitrust & Trade Law > Clayton Act > General Overview
Antitrust & Trade Law > ... > Price Fixing & Restraints of Trade > Exclusive & Reciprocal Dealing > General Overview
Contracts Law > Types of Commercial Transactions > Sales of Goods > General Overview
Contracts Law > Types of Contracts > Lease Agreements > General Overview
Contracts Law > Personal Property > Personalty Leases > General Overview

***HN4*** Section 3 of the Clayton Act provides that it shall be unlawful for any person to lease or make a sale or contract for sale of goods on the condition, agreement, or understanding that the lessee or purchaser shall not use or deal in the goods of a competitor of the lessor or seller where the effect may be to substantially lessen competition or tend to create a monopoly.

Antitrust & Trade Law > ... > Price Fixing & Restraints of Trade > Exclusive & Reciprocal Dealing > General Overview
Antitrust & Trade Law > ... > Price Fixing & Restraints of Trade > Exclusive & Reciprocal Dealing > Exclusive Dealing

***HN5*** The Supreme Court instructs that exclusive dealing does not violate § 3 of the Clayton Act unless the court believes it will foreclose competition in a substantial share of the line of commerce affected.

Antitrust & Trade Law > ... > Price Fixing & Restraints of Trade > Exclusive & Reciprocal Dealing > General Overview
Antitrust & Trade Law > ... > Price Fixing & Restraints of Trade > Exclusive & Reciprocal Dealing > Exclusive Dealing

***HN6*** In determining whether an exclusive dealing contract is unreasonable, the proper focus is on the structure of the market for the products or services in question, that is, the number of sellers and buyers in the market, the volume of their business, and the ease with which buyers and sellers can redirect their purchases or sales to others. Exclusive dealing is an unreasonable restraint on trade only when a significant fraction of buyers or sellers are frozen out of a market by the exclusive deal.

Antitrust & Trade Law > ... > Price Fixing & Restraints of Trade > Exclusive & Reciprocal Dealing > General Overview
Contracts Law > ... > Consideration > Enforcement of Promises > General Overview

***HN7*** Where the degree of foreclosure caused by the exclusivity provisions is so great that it invariably indicates that the supplier imposing the provisions has substantial market power, a court may rely on the foreclosure rate alone to establish an antitrust violation. However, where the foreclosure rate is neither substantial nor even apparent, a plaintiff must demonstrate that other factors in the market exacerbate the detrimental effect of the challenged restraints.

Antitrust & Trade Law > ... > Price Fixing & Restraints of Trade > Exclusive & Reciprocal Dealing > General Overview
Antitrust & Trade Law > ... > Price Fixing & Restraints of Trade > Exclusive & Reciprocal Dealing > Exclusive Dealing

***HN8*** There is a two-step process for evaluating whether an exclusive dealing arrangement has frozen out an unacceptably high portion of the competition. First, a court must determine the baseline foreclosure rate. Generally speaking, a foreclosure rate of at least 30 percent to 40 percent

must be found to support a violation of the antitrust laws. Second, unless the foreclosure rate is so great that it invariably indicates that competitors are frozen out of the relevant market, a court must weigh a number of other factors in measuring the actual anticompetitive effect of the exclusivity arrangements. Perhaps most important among the factors is the duration and terminability of an arrangement. The shorter an agreement's term and the easier it is to terminate, the more likely that it will be upheld. In fact, courts increasingly view at-will exclusive arrangements as presumptively valid.

Antitrust & Trade Law > ... > Price Fixing & Restraints of Trade > Exclusive & Reciprocal Dealing > General Overview

***HN9*** The following factors should be considered in gauging whether an exclusive dealing restraint has a probable adverse effect on interbrand competition: the willingness of consumers to comparison shop and their loyalty to existing distributors; the existence of entry barriers to new distributors; the availability of alternative methods of distribution; and any trend toward growth, or decline, in the level of competition at the supplier level.

Antitrust & Trade Law > ... > Price Fixing & Restraints of Trade > Exclusive & Reciprocal Dealing > General Overview

Antitrust & Trade Law > ... > Price Fixing & Restraints of Trade > Exclusive & Reciprocal Dealing > Exclusive Dealing

***HN10*** Courts examine procompetitive effects that may justify exclusive dealing agreements in the relevant market, consistent with the rule of reason analysis conducted in other antitrust settings.

Antitrust & Trade Law > ... > Price Fixing & Restraints of Trade > Exclusive & Reciprocal Dealing > General Overview

***HN11*** When ascertaining the characteristics of an exclusive dealing arrangement, courts look to the practical effect of the agreement, not merely to its form.

Antitrust & Trade Law > Sherman Act > General Overview

Antitrust & Trade Law > Sherman Act > Claims

***HN12*** To prevail on a claim under § 2 of the Sherman Act, a party must prove: (1) possession of monopoly power in the market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident.

Antitrust & Trade Law > Sherman Act > General Overview

***HN13*** The Supreme Court defines unlawful conduct under § 2 of the Sherman Act in the following way: the question whether a defendant's conduct may properly be characterized as exclusionary cannot be answered by simply considering its effect on a plaintiff. In addition, it is relevant to consider its impact on consumers and whether it has impaired competition in an unnecessarily restrictive way. If a firm has been attempting to exclude rivals on some basis other than efficiency, it is fair to characterize its behavior as predatory.

Antitrust & Trade Law > Sherman Act > General Overview

***HN14*** The Eighth Circuit adopts a definition for unlawful conduct. To be labeled anti-competitive, the conduct involved must be such that its anticipated benefits are dependent upon its tendency

to discipline or eliminate competition and thereby enhance the firm's long term ability to reap the benefits of monopoly power.

Antitrust & Trade Law > Regulated Practices > Trade Practices & Unfair Competition > General Overview

***HN15*** The Supreme Court states that evidence of intent is relevant to the question whether the challenged conduct is fairly characterized as "exclusionary" or "anticompetitive."

Antitrust & Trade Law > ... > Monopolies & Monopolization > Attempts to Monopolize > General Overview
Antitrust & Trade Law > Sherman Act > General Overview
Antitrust & Trade Law > Sherman Act > Claims
Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > Genuine Disputes
Criminal Law & Procedure > ... > Acts & Mental States > Mens Rea > Specific Intent

***HN16*** To prevail on an unlawful attempt claim under § 2 of the Sherman Act, a plaintiff must prove (1) a specific intent by defendant to control prices or destroy competition; (2) predatory or anticompetitive conduct undertaken by defendant directed to accomplishing the unlawful purpose; and (3) a dangerous probability of success.

Antitrust & Trade Law > ... > Monopolies & Monopolization > Attempts to Monopolize > General Overview

***HN17*** The Supreme Court states that to determine whether there is a dangerous probability of monopolization, courts find it necessary to consider the relevant market and defendant's ability to lessen or destroy competition in that market. Proof of "market power" in a monopolization claim and proof of "dangerous probability of success" in an attempt claim attempt are of the same character.

Antitrust & Trade Law > Regulated Practices > Private Actions > General Overview
Antitrust & Trade Law > ... > Private Actions > Remedies > General Overview
Antitrust & Trade Law > ... > Private Actions > Standing > General Overview
Antitrust & Trade Law > ... > Private Actions > Standing > Requirements
Civil Procedure > ... > Justiciability > Standing > General Overview

***HN18*** To prevail on an antitrust claims, a party must prove injury of the type the antitrust laws were intended to prevent and that flows from that which makes an acts unlawful. The injury should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation. When evaluating the related issue of a private plaintiff's antitrust standing, a court considers a number of factors: (1) the causal connection between the alleged antitrust violation and the harm to plaintiff; (2) improper motive; (3) whether the injury was of a type that Congress seeks to redress with the antitrust laws; (4) the directness between the injury and the market restraint; (5) the speculative nature of the damages; and (6) the risk of duplicate recoveries or complex damage apportionment.

Antitrust & Trade Law > ... > Price Fixing & Restraints of Trade > Exclusive & Reciprocal Dealing > General Overview
Antitrust & Trade Law > ... > Price Fixing & Restraints of Trade > Exclusive & Reciprocal Dealing > Exclusive Dealing
Antitrust & Trade Law > ... > Private Actions > Remedies > General Overview
Civil Procedure > ... > Justiciability > Standing > General Overview

***HN19*** The frequently dispositive threshold consideration is whether plaintiff has suffered antitrust injury. Courts have consistently held that competitors frozen out by exclusive dealing arrangements have suffered an antitrust injury and possess antitrust standing to sue for redress of this injury.

Patent Law > Invention Date & Priority > General Overview
Patent Law > Statutory Bars > General Overview
Patent Law > Statutory Bars > Experimental Use Exception > Elements
Patent Law > Statutory Bars > Public Use Bar > General Overview

***HN20*** The Federal Circuit repeatedly defines "public use" as including any use of a claimed invention by a person other than the inventor who is under no limitation, restriction, or obligation of secrecy to the inventor. If a challenging party makes a prima facie showing of public use, a patentee may negate a showing of public use by coming forward with evidence that its use of the invention was experimental.

Evidence > Inferences & Presumptions > General Overview
Patent Law > Statutory Bars > Experimental Use Exception > General Overview
Patent Law > Statutory Bars > Public Use Bar > General Overview

***HN21*** Both public use and experimental use are questions of law, although the challenging party must prove subsidiary questions of fact by clear and convincing evidence.

Patent Law > Statutory Bars > Public Use Bar > General Overview

***HN22*** Under the Egbert approach, a single use of an invention by a single third party, even though the invention is not discernable to the unpracticed eye, will be a public use unless the inventor exercises adequate control over that use by the third party.

Patent Law > Statutory Bars > Experimental Use Exception > General Overview
Patent Law > Statutory Bars > Experimental Use Exception > Elements

***HN23*** A court's analysis of a purported experimental use requires consideration of the totality of the circumstances and the policies underlying the patent bar. Because the expression by an inventor of his subjective intent to experiment, particularly after institution of litigation, is generally of minimal value, the Federal Circuit identifies a number of objective indicia of experimentation: the number of prototypes and the duration of the testing; the degree of secrecy existing between patentee and the party carrying out the experiment; the amount of compensation received by the patentee; and the degree of control the inventor maintained over the testing.

Patent Law > Infringement Actions > General Overview
Patent Law > Statutory Bars > Experimental Use Exception > General Overview
Patent Law > Statutory Bars > Experimental Use Exception > Elements
Patent Law > Statutory Bars > Public Use Bar > General Overview

***HN24*** When one distributes his invention to members of the public under circumstances that evidence a near total disregard for supervision and control concerning its use, the absence of these minimal indicia of experimentation require a conclusion that the invention was in public use.

Patent Law > Jurisdiction & Review > Standards of Review > General Overview
Patent Law > Statutory Bars > Public Use Bar > General Overview

***HN25*** A court must consider how the totality of the circumstances of a case comports with the policies underlying the patent use bar. Among these policies are: (1) discouraging the removal, from the public domain, of inventions that the public reasonably has come to believe are freely available; (2) favoring the prompt and widespread disclosure of inventions; (3) allowing the inventor a reasonable amount of time following sales activity to determine the potential economic value of the patent; and (4) prohibiting the inventor from commercially exploiting the invention for a period greater than the statutorily prescribed time.

Patent Law > Statutory Bars > Experimental Use Exception > General Overview
Patent Law > Statutory Bars > Experimental Use Exception > Elements

***HN26*** The Federal Circuit states that the experimental use exception does not include market testing where the inventor is attempting to gauge consumer demand for his claimed invention.

**Counsel:** For MINNESOTA MINING AND MANUFACTURING COMPANY, plaintiff: Susan C Laine, Peggy Kubicz Hall, Carolyn A Bates, Joseph Henry Otterstetter, 3M Company, St Paul, MN.

For MINNESOTA MINING AND MANUFACTURING COMPANY, plaintiff: Frank P Porcelli, Alan D Smith, Jeffrey L Snow, Fish & Richardson, Boston, MA.

For MINNESOTA MINING AND MANUFACTURING COMPANY, plaintiff: Ralph A Mittelberger, Fish & Richardson, Washington, DC.

For MINNESOTA MINING AND MANUFACTURING COMPANY, plaintiff: Daniel R Shulman, Shulman Walcott & Shulman, Mpls, MN.

For MINNESOTA MINING AND MANUFACTURING COMPANY, plaintiff: Michael Eugene Florey, Stephen Reynold Schaefer, Fish & Richardson, Mpls, MN.

For IMATION CORP, plaintiff: Daniel R Shulman, David Lawrence Shulman, Shulman Walcott & Shulman, Mpls, MN.

For APPLETON **[**2]** PAPERS, INC, defendant: Charles Andrew Mays, Douglas Bruce Greenswag, Harold D Field, Jr, Robert Lee DeMay, Steven L Belton, Keith S Moheban, Elizabeth A Cumming, Laurie J Dechery, Leonard Street and Deinard, Mpls, MN.

For APPLETON PAPERS, INC, defendant: Steven P Petersen, William J Birmingham, Theodore W Anderson, Allen E Hoover, Mark Joy, Leydig Voit & Mayer, Chicago, IL.

For APPLETON PAPERS, INC, defendant: Edwin F Bush, II, Bush Law Office, Appleton, WI.

For APPLETON PAPERS, INC, defendant: Ben Mieliulis, Not Admitted.

KEITH P WILSON, movant, Pro se, St Paul, MN.

KENNETH J PERRINGTON, movant, Pro se, Cold Springs, MN.

For APPLETON PAPERS, INC, counter-claimant: Charles Andrew Mays, Douglas Bruce Greenswag, Harold D Field, Jr, Robert Lee DeMay, Keith S Moheban, Leonard Street and Deinard, Mpls, MN.

For APPLETON PAPERS, INC, counter-claimant: Steven P Petersen, William J Birmingham, Theodore W Anderson, Allen E Hoover, Leydig Voit & Mayer, Chicago, IL.

For MINNESOTA MINING AND MANUFACTURING COMPANY, counter-defendant: Carolyn A Bates, Joseph Henry Otterstetter, 3M Company, St Paul, MN.

For MINNESOTA MINING AND MANUFACTURING COMPANY, counter-defendant: **[**3]** Frank P Porcelli, Alan D Smith, Jeffrey L Snow, Fish & Richardson, Boston, MA.

For MINNESOTA MINING AND MANUFACTURING COMPANY, counter-defendant: Daniel R Shulman, Shulman Walcott & Shulman, Mpls, MN.

For MINNESOTA MINING AND MANUFACTURING COMPANY, counter-defendant: Michael Eugene Florey, Stephen Reynold Schaefer, Fish & Richardson, Mpls, MN.

For HOME INSURANCE COMPANY, THE, intervenor: Sandra Jean Grove, Castor Klukas Scherer & Logren, Mpls, MN.

For HOME INSURANCE COMPANY, THE, intervenor: James J Dries, Dries Law Office, Brookfield, WI.

For HOME INSURANCE COMPANY, THE, intervenor: April Rockstead Barker, Liebmann Conway Olejniczak & Jerry, Green Bay, WI.

For ROYAL SURPLUS LINES INSURANCE COMPANY, ROYAL INDEMNITY COMPANY, intervenors: Jerome R Klukas, Castor Klukas Scherer & Logren, Mpls, MN.

**Judges:** David S. Doty, Judge, United States District Court.

**Opinion by:** David S. Doty

**Opinion**

**[*1140] ORDER**

This matter is before the court on (1) defendant's motion for partial summary judgment on the federal antitrust issues in this case; (2) parties' cross-motions to strike certain material submitted during the briefing of the partial summary judgment motion; (3) plaintiffs' **[**4]** motion for summary judgment on the infringement and public use issues; and (4) defendant's motion for summary judgment on the public use issue. Based on a review of the file, record, and proceedings herein, and for the reasons stated, the court grants defendant's motion for summary judgment on the public use issue and denies all other motions.

The court will address the antitrust and patent motions separately.

**I. Motions Relating to Plaintiffs' Antitrust Claims**

**A. Background to Antitrust Claims**

The antitrust portion of this case involves the national market for carbonless paper sheets. Carbonless paper is the raw material for multi-part business forms and credit card charge slips. It is coated on one or both sides so that when pressure is applied to a top sheet, images are

produced on the sheets laying underneath. Carbonless paper is sold in both rolls and sheets, although the market characteristics of the two vary significantly in terms of pricing, customers, distribution, uses, and manufacture. Carbonless roll products make up about 87 percent of the overall carbonless paper market in the United States. They are sold to mass-volume business form manufacturers. **[**5]** Carbonless sheet products make up the remaining 13 percent of the national market. They are sold to fine paper merchants for resale to thousands of "sheet printers," who use lower volume presses to fill smaller orders.

In 1954, the NCR Corporation invented carbonless paper and introduced it to the U.S. market under the trademark "NCR Paper." Appleton Papers Inc. ("Appleton") was spun off from NCR in 1978 and continues to sell the NCR Paper brand of carbonless paper. The manufacture and marketing of carbonless paper, in both roll and sheet form, remains Appleton's primary line of business. Minnesota Mining and Manufacturing Company ("3M") began producing carbonless sheets in the 1970s, although it did not enter the market for carbonless rolls. In July 1996, 3M's carbonless paper division was spun off into the newly created Imation Corporation. Imation continues to sell carbonless sheet products. For convenience, the court will collectively refer to 3M and Imation as "3M."

Largely because of the emergence of non-impact printing, the carbonless sheet market is currently in decline. It is also highly concentrated. Since 1989, only four firms have competed for market share: Appleton, **[**6]** 3M, Mead, and Nashua. During this period, Appleton's aggregate nationwide share has gone from 50 percent to 67 percent, while 3M's share has declined from 26 percent to 13 percent. 3M alleges that Appleton's increasingly dominant position in the market since 1989 is the result of Appleton's new corporate strategy of forming sole-source relationships with paper merchants. By saturating local markets with these agreements, 3M claims, Appleton has increased its market share by blocking its rivals' avenues of distribution. While freely acknowledging that it **[*1141]** has adopted the goal of becoming the largest supplier in a declining market, Appleton insists that its rising market share is the result of superior products and greater efficiency, not anticompetitive tactics.

On September 29, 1995, 3M filed a complaint against Appleton in federal district court, claiming patent infringement. On November 3, 1995, 3M amended its complaint to add federal antitrust and state common law claims. Now Appleton moves for partial summary judgment on 3M's federal antitrust claims. The parties have also brought cross-motions to strike materials submitted during the briefing of the antitrust motion.

**B. Motions [**7] to Strike**

To begin, the court will address the parties' cross-motions to strike. Appleton moves to strike the affidavit of David L. Shulman, which disputes, paragraph by paragraph, the factual accuracy of many of the contentions made by Appleton in its initial summary judgment brief. Appleton argues that this affidavit is supplemental lawyer's argument that violates (1) Local Rule 7.1(c), which provides that parties must keep their memoranda within 35 pages, and (2) *Federal Rule of Civil Procedure 56(e)*, which requires that any affidavit opposing summary judgment "shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated herein." 3M responds that the Local Rules explicitly permit affidavit and that, consistent with *Rule 56(e)*, Shulman's affidavit statements were made on his personal knowledge, after carefully reviewing both Appleton's memorandum and the evidentiary record.

Although Appleton makes a good argument that 3M has violated the spirit, if not the letter, of these rules, the court will not strike the affidavit. First, the record evidence **[**8]** in this case is unusually voluminous and it is understandable that a party opposing summary judgment would want to ensure that the court does not lose track of what facts are contested and what are not. Second, any legal arguments contained in the affidavit appear to replicate arguments already contained in 3M's response memorandum.

The court will also deny 3M's motion to strike certain statements contained in Appleton's reply memorandum and Catharine Lawton's Second Affidavit, for reasons to be explained in Parts I.C.2 and I.C.5 below.

**C. Appleton's Partial Motion for Summary Judgment on 3M's Antitrust Claims**

**1. Standard for Summary Judgment**

***HN1*** *Rule 56(c) of the Federal Rules of Civil Procedure* provides that summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." In order for the moving party to prevail, it must demonstrate to the court that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment **[**9]** as a matter of law." *Celotex Corp. v. Catrett, 477 U.S. 317, 325, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986)*; *Fed. R. Civ. P. 56(c)*. A fact is material only when its resolution affects the outcome of the case. *See Anderson, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202*. A dispute is genuine if the evidence is such that it cou ld cause a reasonable jury to return a verdict for either party. *See id. at 252*.

***HN2*** On a motion for summary judgment, all evidence and inferences are to be viewed in a light most favorable to the nonmoving party. *See id. at 250*. The nonmoving party, however, may not rest upon mere denials or allegations in the pleadings, but must set forth specific facts sufficient to raise a genuine issue for trial. *See Celotex, 477 U.S. at 324*. Moreover, if a plaintiff cannot support each essential element of its claim, summary judgment must be granted because a complete failure of proof regarding an essential element necessarily renders all other facts immaterial. *See id. at 322-23*.

**2. Definition of the Relevant Market**

There is a threshold dispute between the parties as to how the relevant market should be defined for purposes of summary judgment. ***HN3*** In antitrust cases involving **[**10]** exclusive dealing arrangements, a court must initially **[*1142]** determine "the line of commerce" and "the area of effective competition in the known line of commerce." *See Tampa Electric Co. v. Nashville Coal Co., 365 U.S. 320, 327, 5 L. Ed. 2d 580, 81 S. Ct. 623 (1961)*. The parties agree that the line of commerce at issue in this case is the market for carbonless paper sheets. They disagree, though, over how the geographic market should be defined.

To summarize the conflict: During the pretrial phase of the litigation, 3M adopted varying definitions of the geographic market, ranging from "the United States," as described in its first amended complaint, to a nationwide "aggregation" of local markets, as described at later points in the litigation. Faced with this inconsistency, Appleton stated the following in its initial summary judgment brief:

> While Appleton does not consent to try claims inconsistent with 3M's pleading, it will not challenge 3M's or its expert's market definitions for purposes of this motion. Appleton will also assume that [3M's expert] is accurate in concluding that demand in the relevant market(s) is steadily declining and that, due to the decline and high **[**11]** capital costs, there will be no future entry. Appleton's motion further assumes the existence of issues of fact as to whether Appleton has market power in the relevant market(s) and has demonstrated an intent to exclude competitors.Appleton Partial Summary Judgment Memo. at 2-3. In its response brief, 3M continued to refer to both national and local markets, stating that under any definition Appleton possesses market power. In its reply memorandum, however, Appleton asserted that by not specifying the relevant market in its response brief, 3M had failed to establish a prima facie element of each of its antitrust claims. 3M now brings a motion to strike the portion of Appleton's reply brief in which this assertion is made.

As stated, the court will not grant 3M's motion to strike. In fact, it shares some of Appleton's frustration with 3M's shifting market definition. At the same time, however, the court will not accept Appleton's invitation to dispose of 3M's antitrust claims based on its alleged failure to define the relevant market. In its initial brief, Appleton stated, unequivocally, that for purposes of summary judgment, it would assume "the existence of issues of fact **[**12]** as to whether Appleton has market power in the relevant market(s)." Having conceded the issue of market power for purposes of its motion, Appleton cannot now claim that 3M has failed to make out its prima facie case.

For purposes of this motion, the court will assume that the relevant geographic market is the entire United States. Not only does 3M's complaint indicate that the scope of its claim is national, most of the evidence in the record and the arguments in 3M's response memorandum direct the court toward considering the national market as a whole. [1]

**3. Exclusive Dealing Claims**

Appleton seeks summary judgment on 3M's claim that Appleton's sole sourcing policy is a form of exclusive dealing that violates § 3 of the Clayton Act and § 1 of the Sherman Act. [2]***HN4*** Section 3 of the Clayton Act provides:

> It shall be unlawful for any person … to lease **[**13]** or make a sale or contract for sale of goods … on the condition, agreement, or understanding that the lessee or purchaser shall not use or deal in the goods … of a competitor … of the lessor or seller … where the effect may be to substantially lessen competition or tend to create a monopoly.Exclusive dealing arrangements raise antitrust concerns insofar as they operate to foreclose "competition in the covered portion of the relevant market during the term of the agreement." *Omega Environmental, Inc. v. Gilbarco, Inc., 127 F.3d 1157 (9th Cir. 1997)*. However, because these arrangements often have procompetitive effects, *id.; Ryko Manufacturing* **[*1143]** *Co. v. Eden Services, 823 F.2d 1215, 1235 n.17 (8th Cir. 1987)*, ***HN5*** the Supreme

---

1 The court strongly suggests that 3M settle on a geographic definition quickly. It will not be permitted to waffle on market definition at trial.

2 The parties apparently agree that analysis under § 1 of the Sherman Act should track the analysis under § 3 of the Clayton Act. Below, the court addresses whether a claim under § 2 of the Sherman Act is similarly subsumed by the Clayton Act analysis.

Court has instructed that exclusive dealing "does not violate [§ 3 of the Clayton Act] unless the court … believes it will foreclose competition in a substantial share of the line of commerce affected." Tampa Electric, 365 U.S. at 327. As more recently articulated:

> ***HN6*** In determining whether an exclusive dealing contract is unreasonable, the proper focus is on the structure of the market for the products or services in question -- the **[**14]** number of sellers and buyers in the market, the volume of their business, and the ease with which buyers and sellers can redirect their purchases or sales to others. Exclusive dealing is an unreasonable restraint on trade only when a significant fraction of buyers or sellers are frozen out of a market by the exclusive deal.*Jefferson Parish Hosp. Dist. No. 2 v. Hyde, 466 U.S. 2, 45, 80 L. Ed. 2d 2, 104 S. Ct. 1551 (1984)* (O'Connor, J., concurring).

In *Ryko*, the Eighth Circuit outlined the procedure for evaluating whether an exclusive dealing arrangement has frozen out an unacceptably high portion of the competition:

> ***HN7*** Where the degree of foreclosure caused by the exclusivity provisions is so great that it invariably indicates that the **[**15]** supplier imposing the provisions has substantial market power, we may rely on the foreclosure rate alone to establish the violation. However, where … the foreclosure rate is neither substantial nor even apparent, the plaintiff must demonstrate that other factors in the market exacerbate the detrimental effect of the challenged restraints.*823 F.2d at 1235*. Thus, *Ryko* contemplates ***HN8*** a two-step process. First, the court must determine the baseline foreclosure rate. Generally speaking, a foreclosure rate of at least 30 percent to 40 percent must be found to support a violation of the antitrust laws. *See United States v. Microsoft, 1998 U.S. Dist. LEXIS 14231, 1998-2 Trade Cas. (CCH) P72,261, 1998 WL 614485 at *19 (D.D.C. Sept. 14, 1998)* (citing cases and stating that "plaintiffs must establish foreclosure on the order of greater than 40 percent to prevail on their exclusive dealing claims"); ABA Section of Antitrust Law, Antitrust Law Developments 222-23 (4th ed. 1997) (stating that "judicial decisions have established a virtual safe harbor for market foreclosure of 20 percent or less" and noting that the current trend is toward even "higher market thresholds as a prerequisite to finding exclusive **[**16]** dealing unlawful"). Second, unless the foreclosure rate is so great that it "invariably indicates" that competitors are frozen out of the relevant market, the court must weigh a number of other factors in measuring the actual anticompetitive effect of the exclusivity arrangements. Perhaps most important among the factors is the duration and terminability of the arrangement: the shorter an agreement's term and the easier it is to terminate, the more likely that it will be upheld. *See In re Beltone Electronics Corp., 100 F.T.C. 68, 210 (1982)*; *Gilbarco, 127 F.3d at 1163*; *Barry Wright Corp. v. ITT Grinnell Corp., 724 F.2d 227, 236 (1st Cir. 1983)*. In fact, courts increasingly view at-will exclusive arrangements as presumptively valid. *See Roland Mach. Co. v. Dresser Indus., 749 F.2d 380, 395 (1984)*, *cited in Gilbarco, 127 F.3d at 1163*.

*Ryko* also instructs that ***HN9*** the following factors should be considered in gauging whether an exclusive dealing restraint "'has a probable adverse effect on interbrand competition'":

> the willingness of consumers to comparison shop and their loyalty to existing distributors; the existence of entry barriers to new distributors; **[**17]** the availability

> of alternative methods of distribution; and any trend toward growth (or decline) in the level of competition at the supplier level.823 F.2d at 1234 (quoting *Beltone*, 100 F.T.C. at 208). In addition to these specific factors, ***HN10*** courts will also examine procompetitive effects that may justify exclusive dealing agreements in the relevant market, consistent with the rule of reason analysis conducted in other antitrust settings. *See Tampa Electric, 365 U.S. at 334*; *Roland Mach. Co., 749 F.2d at 395-96*.

In the present case, Appleton contends that 3M has failed under the foregoing framework to show a substantial foreclosure of the carbonless sheet market caused by Appleton's exclusive dealing arrangements with distributors. Appleton concedes, for purposes of this motion, that it currently possesses market power on the order of two-thirds **[*1144]** of the carbonless sheet market. Further, Appleton's own marketing analysis states that, within this market, there is a "nearly precise correlation between distribution coverage/share and manufacturer/brand market share." *See* Appleton Memo, Carbonless Sheets Marketing, at 2. Nevertheless, Appleton insists that its sole-sourcing **[**18]** agreements with carbonless sheet distributors freeze out nobody. Rather, Appleton argues, because these agreements are terminable at will, 3M (or any other competitor) is free to attempt to convert exclusive Appleton distributors to non-Appleton carbonless sheets whenever it chooses.

However, there are genuine issues of fact as to whether Appleton's agreements are actually terminable at will. ***HN11*** When ascertaining the characteristics of an exclusive dealing arrangement, courts look to the "practical effect" of the agreement, not merely to its form. *Tampa Electric*, 365 U.S. at 628; *see also Eastman Kodak Co. v. Image Technical Servs., Inc., 504 U.S. 451, 466-67, 119 L. Ed. 2d 265, 112 S. Ct. 2072 (1992)* ("Legal presumptions that rest on formalistic distinctions rather than actual market realities are generally disfavored in antitrust law. This court has preferred to resolve antitrust claims on a case-by-case basis, focusing on the 'particular facts disclosed by the record.'"). Here, 3M has produced evidence that Appleton's sole-sourcing agreements often include incentives that have the practical effect of tying up the paper sheet inventory of a merchant over a period of several **[**19]** years. 3M also points to unique distribution factors, like the high costs a paper merchant must incur to switch completely from one brand to another, that make it very difficult for a supplier to dislodge a competitive brand from an exclusively dealing merchant. Further, 3M asserts that Appleton's high market share and the deeply rooted customer preference for the NCR brand of paper prevent merchants from surrendering Appleton as a supplier, which they must do under these agreements if they desire to distribute non-Appleton brands. Finally, 3M contends that, at the instance of Appleton, major distributors have agreed among themselves that they will remain loyal to Appleton carbonless sheets regardless of competitors' pricing or product innovations. While Appleton sharply disputes most of these allegations, 3M has produced sufficient evidence to create a fact question as to whether Appleton's sole-source arrangements are truly terminable at will.

Regardless of whether its exclusive dealing arrangements are construed as at-will or not, Appleton argues that they benefit competition in the carbonless sheet market. In support of this contention, Appleton relies on the widely accepted principle **[**20]** that exclusive dealing "may be beneficial by focusing the distributor's efforts on one product line and, in turn, removing the 'free rider' threat to the manufacturer's own selling efforts." *Ryko*, 823 F.2d at 1235 n.17. Consistent with this theory, Appleton has shown that, in the past, some dual-source paper merchants have acted as mere "order takers" who avoid trying to convert customers to a different brand.

As 3M points out, however, the procompetitive justification for exclusive dealing arrangements can be extended only so far: when these arrangements serve to freeze otherwise viable brands out of the market, the competitive benefit of focusing distributors' efforts on one product is lost. This is why the *Ryko* court identified specific factors for measuring whether exclusive dealing arrangements help or hinder competition in a particular market. Under each of these factors, 3M has produced substantial evidence that the market for carbonless sheets is vulnerable to foreclosure. First, 3M has shown that because of one-stop convenience and special credit arrangements, most printers remain loyal to their distributors and do not comparison shop. Second, 3M has demonstrated **[**21]** that because of a strong trend toward consolidation at the merchant level, entry barriers at the distribution level are likely to be high. Third, 3M has created a fact issue as to whether there are practicable alternative methods of distribution for carbonless sheets beside paper merchants. [3] Fourth, it **[*1145]** is virtually undisputed that: (1) consumer demand for carbonless sheets is declining, (2) the possibility of future entry by other suppliers is low, and (3) Appleton's market share is rapidly on the rise.

**[**22]** In sum, Appleton contends that its emergence as the dominant player in the declining carbonless sheet market is the result of its superior efficiency and product quality, and that it should not be punished for its success. However, 3M has brought forward substantial evidence that Appleton may have succeeded by improperly shutting out the competition. Accordingly, 3M's claims under § 3 of the Clayton Act and § 1 of the Sherman Act are not amenable to summary judgment.

**4. Claims under § 2 of the Sherman Act**

Appleton also seeks summary judgment on the claims that 3M has brought under § 2 of the Sherman Act. At the outset, Appleton argues that any § 2 claim involving exclusive dealing should be collapsed into the analytical framework discussed above. The court does not agree. In *Tampa Electric*, the Supreme Court stated that when an exclusive dealing contract "does not fall within the broader proscriptions of § 3 of the Clayton Act it follows that it is not forbidden by [§§ 1 and 2 of the Sherman Act]." However, in *Tampa Electric* there was no indication that the defendant's allegedly unlawful behavior involved more than an exclusive dealing contract. Further, there **[**23]** was no explicit finding that the defendant possessed market power. Here, in contrast, 3M has alleged both that Appleton possesses market power and that its sole-source strategy is one part of a pattern of predatory conduct. Viewed from the perspective of § 2 precedent, therefore, 3M's claims are similar to those addressed in refusal-to-deal cases like *Aspen Skiing Co. v. Aspen Highlands Skiing Corp., 472 U.S. 585, 86 L. Ed. 2d 467, 105 S. Ct. 2847 (1985)* and *Lorain Journal Co. v. United States, 342 U.S. 143, 96 L. Ed. 162, 72 S. Ct. 181 (1951)*. *See* Phillip E. Areeda et al., Antitrust Law P 768e6 (equating "extraction of an agreement not to deal with any competitor" with "refusing to deal with buyers who do"). Thus, without speculating as to whether, in the context of this case, § 3 of the Clayton Act proscribes more or less anticompetitive conduct than § 2 of the Sherman Act, the court will consider 3M's § 2 claims on

---

[3] Because of the high correlation between distribution and overall market share in the carbonless sheet market, the following observation in *Ryko* may not be applicable to this case:

> Where the exclusive dealing restraint operates at the distributor level, rather than at the consumer level, we require a higher standard of proof of "substantial foreclosure," because it is less clear that a restraint involving a distributor will have a corresponding impact on the level of competition in the consumer market. 823 F.2d at 1235.

their own terms. *See Pepsico, Inc. v. The Coca-Cola Co., 1998 U.S. Dist. LEXIS 13440, 1998-2 Trade Cas. (CCH) P72,257, 1998 WL 547088 (S.D.N.Y. August 27, 1998)* (denying motion to dismiss where plaintiff brings § 2 claim against defendant based on defendant's at-will exclusive **[**24]** dealing arrangement with distributor); *General Indus. Corp. v. Hartz Mountain Corp., 810 F.2d 795, 803 (8th Cir. 1987)* (affirming jury determination that defendant had violated § 2 by, inter alia, attempting to procure an exclusive dealing arrangement).

***HN12*** To prevail on a § 2 claim, 3M must prove: (1) Appleton's possession of monopoly power in the carbonless sheet market and (2) the "willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *United States v. Grinnell Corp., 384 U.S. 563, 570-71, 16 L. Ed. 2d 778, 86 S. Ct. 1698 (1966)*. Because Appleton has conceded for purposes of this motion that it possesses market power in the carbonless sheet market, the court will focus on whether plaintiff has demonstrated a genuine factual issue as to Appleton's "willful acquisition or maintenance of that power."

***HN13*** The Supreme Court has defined unlawful conduct under § 2 in the following way:

> The question whether [a defendant's] conduct may properly be characterized as exclusionary cannot be answered by simply considering its effect on [a plaintiff]. In addition, **[**25]** it is relevant to consider its impact on consumers and whether it has impaired competition in an unnecessarily restrictive way. If a firm has been "attempting to exclude rivals on some basis other than efficiency," it is fair to characterize its behavior as predatory.*Aspen Skiing, 472 U.S. at 605*. ***HN14*** The Eighth Circuit has also adopted a definition for unlawful conduct: "To be labeled anti-competitive, the conduct involved must be such that its 'anticipated benefits **[*1146]** were dependent upon its tendency to discipline or eliminate competition and thereby enhance the firm's long term ability to reap the benefits of monopoly power.'" *Hartz, 810 F.2d at 803* (quoting *Trace X Chemical, Inc. v. Canadian Indus., Ltd., 738 F.2d 261, 266 (8th Cir. 1984))*.

Applying these standards to the current record, the court concludes that a genuine question exists as to whether Appleton acted to exclude its rivals in the carbonless sheet market on some basis other than efficiency. There is substantial evidence suggesting that Appleton has engaged in the following conduct: creating and enforcing sole-sourcing agreements having the effect of closing distribution channels to its rivals; paying **[**26]** merchants not to deal with competitors; starting rumors regarding the viability of 3M's carbonless paper business; attempting to buy rival carbonless paper manufacturers. On similar facts in *Hartz*, the Eighth Circuit upheld a jury finding that the defendant had violated § 2:

> The jury could reasonably find that Hartz's activities did not tend to allow products to compete against each other on their own terms, but rather that Hartz invoked its considerable market power to cause superior competing products to fail to reach retail shelves, preempting any opportunity for the consumer to make a real choice.*810 F.2d at 803-04*. Moreover, Appleton has conceded that there is a fact issue as to its specific intent to exclude competitors from the market. As ***HN15*** the Supreme Court stated

in *Aspen Skiing*, "evidence of intent is … relevant to the question whether the challenged conduct is fairly characterized as 'exclusionary' or 'anticompetitive.'" *472 U.S. at 602*. Considering the evidence as a whole, then, a jury might reasonably conclude that Appleton (1) possesses monopoly power and (2) has deliberately acted to exclude 3M and other rivals from the market.

For similar **[**27]** reasons, the court concludes that 3M's attempted monopolization claim must also survive summary judgment. ***HN16*** To prevail on an unlawful attempt claim under § 2, a plaintiff must prove "(1) a specific intent by the defendant to control prices or destroy competition; (2) predatory or anticompetitive conduct undertaken by the defendant directed to accomplishing the unlawful purpose; and (3) a dangerous probability of success." *Hartz, 810 F.2d at 801*. First, Appleton concedes the specific intent element for purposes of summary judgment. Second, the court has already found that a genuine fact issue exists as to the lawfulness of Appleton's conduct and purpose. Third, ***HN17*** the Supreme Court has stated that "to determine whether there is a dangerous probability of monopolization, courts have found it necessary to consider the relevant market and the defendant's ability to lessen or destroy competition in that market." *Spectrum Sports, Inc. v. McQuillan, 506 U.S. 447, 456, 122 L. Ed. 2d 247, 113 S. Ct. 884 (1993)*; *Hartz, 810 F.2d at 804*. Proof of "market power" in a monopolization claim and proof of "dangerous probability of success" in an attempt claim attempt are "of the same character." **[**28]** *See McGahee v. Northern Propane Gas Co., 858 F.2d 1487, 1505 (11th Cir. 1988)*. Thus, Appleton's concession on the issue of market power means that there is a fact question as to whether any attempt to monopolize would have a dangerous probability of success. Accordingly, both § 2 claims are properly left for the jury.

**5. Antitrust Standing and Antitrust Injury**

Appleton also challenges 3M's ability to bring this suit on the ground that 3M can show neither antitrust injury nor antitrust standing. ***HN18*** To prevail on its antitrust claims, 3M must prove injury "of the type the antitrust laws were intended to prevent and that flows from that which makes [Appleton's] acts unlawful. The injury should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 489, 50 L. Ed. 2d 701, 97 S. Ct. 690 (1977)*. When evaluating the related issue of a private plaintiff's antitrust standing, a court considers a number of factors:

> (1) The causal connection between the alleged antitrust violation and the harm to the plaintiff; (2) Improper motive; (3) Whether the injury **[**29]** was of a type that Congress sought to redress with the antitrust laws; (4) The directness between the **[*1147]** injury and the market restraint; (5) The speculative nature of the damages; (6) The risk of duplicate recoveries or complex damage apportionment.*McDonald v. Johnson & Johnson*, 722 F.2d 1370, 1374 (8th Cir. 1983). However, ***HN19*** the frequently dispositive threshold consideration is whether the plaintiff has suffered antitrust injury. *See Midwest Communications, Inc. v. Minnesota Twins, Inc., 779 F.2d 444, 450 (8th Cir. 1985)* (citing *Brunswick Corp., 429 U.S. at 489*). Courts have consistently held that competitors frozen out by exclusive dealing arrangements have suffered an antitrust injury and possess antitrust standing to sue for redress of this injury. *See* Areeda & Hovencamp, Antitrust Law, P 373d1, at 278 (1995) ("Standing is clear and seldom challenged when the plaintiff alleges that its rival engaged in an exclusionary practice designed to rid the market

of the plaintiff ... so that the defendant could maintain or create a monopoly"); *Amarel v. Connell, 102 F.3d 1494, 1509 (9th Cir. 1996)* ("When defendants engage in ... anticompetitive acts in an attempt **[**30]** to gain a monopoly, the competitor who is being driven out of the market is the party with standing.").

Appleton nonetheless argues that 3M has failed to show that any of Appleton's allegedly unlawful activities have artificially raised the price of carbonless sheets. In its reply memorandum, Appleton attacks the validity of the findings of 3M's economic expert, William S. Comaner, relying on a second affidavit by its own expert, Catharine M. Lawton. 3M, in turn, moves the court to strike this affidavit, claiming that it contradicts the earlier representations made by Lawton when she was deposed by 3M. As stated, the court will not grant the motion to strike. Since filing the motion to strike, 3M has had the opportunity to depose Lawton on the issues raised in her late-filed affidavit, and the transcript of that deposition is now lodged in the record. Regardless, this episode only underscores what is clear from the record evidence in this case: the existence of antitrust injury, like the existence of antitrust violation, is a hotly disputed issue of fact. As a consequence, summary judgment cannot be granted.

**II. Motions Related to Patent Issues**

**A. Background to the [**31] Patent Dispute**

The patent dispute in this case arises out of the following events: In the spring of 1989, inventors Kenneth Perrington and Robert Kampfer devised a method for perforating carbonless paper with a laser. With the help of Thomas Hunter, a 3M employee supervising in-plant printing operations, Perringtion devised a pilot program for the manufacture and distribution of laser-perforated forms. Perrington supplied approximately 30,000 laser-perforated sheets of carbonless paper for use in preparing 10,000 sets of Form 7676E, a standard form used throughout the 3M organization. 3M's in-plant print shop placed the 7676E imprint on the laser-perforated sheets, which were then assembled into pads consisting of more than 10,000 form sets. The sample forms were then shipped to 3M's central distribution center to be circulated throughout the company when ordered by 3M employees. The employees would not know that the forms were made using a new process. Beginning in July 1989, and for up to six weeks afterward, the sample forms were distributed throughout 3M, for use by potentially thousands of 3M employees. Although he avers that his goal in disseminating the forms was to receive **[**32]** feedback from 3M employees regarding the performance of the laser-perforated forms, Perrington did not keep any records of where the forms were distributed or what any specific end user thought of the form. Perrington does claim to have inquired as to whether there were any complaints about the product.

On August 17, 1990, 3M filed a patent application for a laser-perforation process to be used in making carbonless paper. Continuation applications were filed on August 16, 1991 and June 23, 1994. In October 1991, 3M launched its laser-perforated carbonless paper product, marketed as "Scotchmark Laser Pre-Perfed." In February 1993, Appleton launched its own brand of pre-perforated carbonless paper. On August 22, 1995, 3M was issued United States Patent No. 5,444,035 ("the '035 patent").

3M's infringement suit followed, with Appleton raising invalidity defenses. On September **[*1148]** 12, 1996, District Court Judge John Tunheim issued an order denying 3M's motion for a preliminary injunction. After an extended period of discovery, the parties have now brought cross-motions for summary judgment on the patent issues in this case.

**B. Cross-Motions on the Issue of Public Use**

Appleton contends **[**33]** that the '035 patent owned by 3M is invalid because "the invention was … in public use … more than one year prior to the date of the application for patent." *35 U.S.C. § 102(b)*. ***HN20*** The Federal Circuit has repeatedly defined "'public use' as including 'any use of [the claimed] invention by a person other than the inventor who is under no limitation, restriction or obligation of secrecy to the inventor.'" *Baxter International, Inc. v. Cobe Labs., Inc., 88 F.3d 1054, 1058 (Fed. Cir. 1996)* and *Lough v. Brunswick Corp., 86 F.3d 1113, 1119 (Fed. Cir. 1996)* (both cases quoting *In re Smith, 714 F.2d 1127, 1134 (Fed. Cir. 1983))*. If a challenging party makes a prima facie showing of public use, "[a] patentee may negate a showing of public use by coming forward with evidence that its use of the invention was experimental." *Lough, 86 F.3d at 1120*.

***HN21*** Both public use and experimental use are questions of law, *see id.*, although the challenging party must prove subsidiary questions of fact by clear and convincing evidence. *See Tone Bros. v. Sysco Corp., 28 F.3d 1192, 1197 (Fed. Cir. 1994)*. Regarding these issues of fact, in the context of summary judgment, the moving **[**34]** party must meet the standards stated in Part I.B above. 3M does not dispute, however, that 10,000 sample form sets embodying the '035 patent were distributed to an unknown number of end users throughout the company via the standard in-house ordering process. 3M also does not dispute that the earliest arguable date of filing for the '035 patent was August 17, 1990, more than one year after this large-scale distribution in July of 1989. Instead, 3M contends that when an invention is distributed to employees within the confines of the patentee company, that use is nonpublic as a matter of law.

The court cannot accept this constricted interpretation of *§ 102(b)*. In *Egbert v. Lippman*, the Supreme Court discussed the broad scope of the public use bar:

> We observe, in the first place, that to constitute the public use of an invention it is not necessary that more than one of the patented articles should be publicly used….
>
> We remark, secondly, that, whether the use of an invention is public or private does not necessarily depend upon the number of persons to whom its use is known. If an inventor, having made his device, gives or sells it to another … without limitation or restriction, **[**35]** or injunction of secrecy, and it is so used, such use is public, even though the use and knowledge of the use may be confined to one person.
>
> We say, thirdly, that some inventions are by their very character only capable of being used where they cannot be seen or observed by the public eye. … Nevertheless, if its inventor sells a machine which his invention forms a part, and allows it to be used without restriction of any kind, the use is a public one.*104 U.S. 333, 336, 26 L. Ed. 755, 14 Otto 333 (1881)*. ***HN22*** Under *Egbert*, then, a single use of an invention by a single third party, even though the invention is not discernable to the unpracticed eye, will be a public use unless the inventor exercises adequate control over that use by the third party. In *Baxter International, Inc. v. Cobe Labs., Inc.*, a recent case involving the use of a centrifuge by an NIH researcher in his personal laboratory, the Federal Circuit demonstrated the continued vitality of the *Egbert* approach: The researcher's "lack of effort to maintain the centrifuge as confidential coupled with the free flow into his laboratory of people, including visitors to NIH, who observed the centrifuge in operation and who

were under no **[**36]** duty of confidentiality supports only one conclusion: that the centrifuge was in public use." *88 F.3d at 1058*. Likewise, in *The Beachcombers, International Inc. v. WildeWood Creative Prods. Inc., 31 F.3d 1154 (Fed. Cir. 1994)*, the court found a public use where a designer demonstrated a kaleidoscope invention to twenty or so guests during a private party at her home. The court explained that the inventor "did not retain control over the **[*1149]** use of the device and the future dissemination of information about it." *Id. at 1160*. *See also Electric Storage Battery Co. v. Shimadzu, 307 U.S. 5, 20, 83 L. Ed. 1071, 59 S. Ct. 675* (1939 ("[Public use is] the ordinary use of a machine or the practice of a process ? in the usual course of producing articles for commercial purposes."); *Lough, 86 F.3d at 1122* ("Those to whom [the inventor] gave the prototypes constituted 'the public,' in the absence of meaningful evidence of the experimentation."); *Moleculon Research Corp., v. CBS, Inc., 793 F.2d 1261, 1266 (Fed. Cir. 1986)* (holding that inventor did not place puzzle device in public use when he showed invention to co-workers because "the personal relationships and surrounding **[**37]** circumstances [indicate that the inventor] at all times retained control over the puzzle's use and the distribution of information concerning it"); *Gennodie v. Metro N. Commuter R.R., 1995 U.S. Dist. LEXIS 8432, 37 U.S.P.Q.2D (BNA) 1263 (S.D.N.Y. 1995)* (finding public use when company used railroad equipment prototypes in the ordinary course of business, even though that use was outside the view of the general public).

Instructed by these cases, the court concludes that Appleton has made a prima facie showing of public use. Over a span of several weeks, thousands of the sample forms were distributed to an unknown number of employees throughout the 3M corporation. During this period, the inventors exercised no control over where the forms were sent, who received them, or how they were used. While 3M argues that employees who received the forms owed a duty not to disclose confidential business information, there is no indication in the record that any employee would have understood the use and circulation of the form to be a confidential matter. The forms were not denominated as confidential. No 3M employee was asked to sign a secrecy agreement before using them. And 3M announced no **[**38]** special company-wide policy regarding their use or circulation. All 3M can show is that the form selected to embody the '035 patent was described as an "inter-office communication memo" in a 3M office product catalog. However, at least one 3M employee, a customer services manager, frequently used the 7676E form to communicate with parties outside the company. In short, 3M employees were free to use the sample forms however they wanted in the ordinary course of business, which would almost inevitably include contact with parties outside the company. [4] These undisputed facts easily establish a prima facie case of public use.

**[**39]** 3M may negate this showing of public use by coming forward with convincing evidence that its activities prior to the critical date were experimental. *Lough, 86 F.3d 1113, 1120*; *TP Labs. v. Professional Positioners, Inc., 724 F.2d 965, 971 (Fed. Cir. 1984)* (also pointing out that the ultimate burden of proof remains with the party challenging the patent). ***HN23*** A court's analysis of a purported experimental use requires consideration of the totality of the

---

[4] 3M places great emphasis on the fact that, after months of discovery, Appleton has been unable to locate a single form from the relevant 1989 print run that actually made it outside the company. Yet this fact is important only if the court accepts the premise that, in order to constitute a public use, the invention must have physically fallen into the hands of someone who works outside 3M. As discussed above, the court rejects this novel and unduly narrow conceptualization of "public use." Indeed, the fact that during discovery Appleton and 3M were unable to locate a single specimen of the thousands of distributed sample forms, even within 3M files, demonstrates how unrestricted their 1989 dissemination really was.

circumstances and the policies underlying the patent bar. *See* Baxter, 88 F.3d 1054. Because "the expression by an inventor of his subjective intent to experiment, particularly after institution of litigation, is generally of minimal value," *TP Labs., 724 F.2d at 972*, the Federal Circuit has identified a number of "objective indicia of experimentation": the number of prototypes and the duration of the testing; the degree of secrecy existing between patentee and the party carrying out the experiment; the amount of compensation received by the patentee; and the degree of control the inventor maintained over the testing. *See* *Lough, 86 F.3d at 1120*. In *Lough*, the court emphasized that the "last factor of control is critically **[**40]** important, because, if the inventor has no control over the alleged experiments, he is not experimenting. If he does not inquire about the testing or receive reports concerning the results, similarly, he is not experimenting." *Id.* Further, testing protocol **[*1150]** is expected to be especially formal when a large company conducts the experiment. *See* *id. at 1120-21*; *id. at 1123* (Plager, J., dissenting) ("We could expect the combination of engineering and legal staffs [at large corporations] to be punctilious about observing the niceties of our prior opinions on how to conduct experiments so as to avoid any possible running afoul of the public use bar.").

Here, 3M has produced no evidence that the inventors of the '035 patent exercised any experimental control whatsoever over the 1989 form set distribution. [5] Over 10,000 sample forms were widely distributed throughout the organization without regard to who received them or how they were used. The inventors never sought specific feedback from the end users or received reports concerning the results of their alleged test. In fact, the inventors cannot identify a single end user who actually received a sample form. On similar facts **[**41]** in *Lough*, where an individual inventor distributed prototypes of his invention to six friends and then failed to follow up with inquiries or keep records of the experiment, the Federal Circuit reversed an infringement verdict by the district court below and granted the defendant judgment as a matter of law: ***HN24*** "When one distributes his invention to members of the public under circumstances that evidence a near total disregard for supervision and control concerning its use, the absence of these minimal indicia of experimentation require a conclusion that the invention was in public use." *Id. at 1122*. The conclusion in *Lough* applies with equal force to the facts of this case.

**[**42]** Finally, ***HN25*** the court must consider "how the totality of the circumstances of the case comports with the policies underlying the patent use bar." *Tone Bros., 28 F.3d at 1198*, *quoted in* *Baxter, 88 F.3d at 1058*, and *Lough, 86 F.3d at 1119*. Among these policies are:

> (1) discouraging the removal, from the public domain, of inventions that the public reasonably has come to believe are freely available; (2) favoring the prompt and widespread disclosure of inventions; (3) allowing the inventor a reasonable amount of time following sales activity to determine the potential economic value of the patent; and (4) prohibiting the inventor from commercially exploiting the invention for a period greater than the statutorily prescribed time.*Id.* In the present case, 3M contends that the in-company distribution of an invention, whether performed as part of a valid experiment or not, is not a public use. If the court were to read a safe-harbor provision of this kind into *§ 102(b)*, however, it would undermine

---

[5] In fact, even if the court were to consider evidence of the subjective intentions of the inventors in this case, much of it would support the finding that the decision to disseminate forms throughout the company was for a purpose other than experimental validation. For example, even before the distribution of the sample form sets, Perrington told 3M management that he was "convinced … that we had all the necessary information" about the invention's technical feasibility. Perrington Depo. at 703.

at least three of the policies stated above. First, it would discourage prompt and widespread disclosure of inventions. Second, it would unreasonably extend the period **[**43]** of time an inventor has to assess the economic viability of pursuing a particular patent. The Federal Circuit has already spoken on this issue:

> The experimental use doctrine operates in the inventor's favor to allow *the inventor* to refine his invention or to assess its value relative to the time and expense of prosecuting a patent application. If it is not the inventor or someone under his control or 'surveillance' who does these things, there appears to us no reason why he should be entitled to rely on them to avoid the statute.*In re Hamilton, 882 F.2d 1576, 1581 (Fed. Cir. 1989)* (emphasis in the original). Third, adopting 3M's proposed public use exception for in-house distribution would grant a significant commercial advantage to companies whose employees are able stand in for an invention's potential consumers. Here, for example, 3M's large-scale, unmonitored distribution of sample forms could not have produced useful technical data. However, it may well have produced useful marketing information, particularly regarding the level of consumer demand and acceptance. *See* Perrington Depo. at 703 ( '035 patent co-inventor stating that even prior to the distribution **[**44]** of samples he was convinced that the **[*1151]** invention "*was* technically feasible. It definitely *appeared* to be market feasible." (emphasis added)). Addressing precisely this point, ***HN26*** the Federal Circuit has stated that "the experimental use exception … does not include market testing where the inventor is attempting to gauge consumer demand for his claimed invention. The purpose of such activities is commercial exploitation and not experimentation." *In re Smith, 714 F.2d 1127, 1134 (Fed. Cir. 1983)*.

In sum, Appleton has forcefully demonstrated, on the undisputed evidence, that the '035 patent was in public, nonexperimental use more than a year before the patent application was filed. When the totality of the circumstances is viewed in light of the policies underlying the public use bar, the court can reach no other conclusion but that the '035 patent is invalid. Accordingly, the court need not address 3M's motion on the issue of infringement.

**CONCLUSION**

Based on the foregoing discussion, **IT IS HEREBY ORDERED** that:

1. Defendant's motion for partial summary judgment on the antitrust issues (Doc. No. 167) is denied;

2. Defendant's motion to strike (Doc. No. 190) is **[**45]** denied;

3. Plaintiffs' motion to strike (Doc. No. 197) is denied;

4. Defendant's motion for summary judgment on the issue of public use (Doc. No. 161) is granted;

5. Plaintiffs' motion for summary judgment on the issues of infringement and public use (Doc. No. 156) is denied.

Dated: February 16, 1999

David S. Doty, Judge

United States District Court

EXHIBIT 257

LexisNexis

Caution
As of: August 11, 2014 6:22 PM EDT

**American Tobacco Co. v. United States**

Supreme Court of the United States

November 7, 8, 1945, Argued ; June 10, 1946, Decided

No. 18

**Reporter:** 328 U.S. 781; 66 S. Ct. 1125; 90 L. Ed. 1575; 1946 U.S. LEXIS 3066

AMERICAN TOBACCO CO. ET AL. v. UNITED STATES

**Prior History:** CERTIORARI TO THE CIRCUIT COURT OF APPEALS FOR THE SIXTH CIRCUIT. *

Petitioners were convicted of violating *§§ 1* and *2* of the Sherman Anti-Trust Act. The Circuit Court of Appeals affirmed. *147 F.2d 93*. This Court granted certiorari "limited to the question whether actual exclusion of competitors is necessary to the crime of monopolization under *§ 2* of the Sherman Act." *324 U.S. 836*. A petition for rehearing and enlargement of the scope of review in No. 20 was denied. *324 U.S. 891*. Affirmed, p. 815.

**Disposition:** *147 F.2d 93*, affirmed.

**Core Terms**

tobacco, cigarette, conspiracy, monopolize, competitor, brand, monopoly, dealer, list price, advertize, grade, commerce, buyer, crop, manufacture, bid, conspiracy to monopolize, restraint of trade, burley, leaf, retail price, flue-cured, interstate, conspire, domestic, power to exclude, differential, cheaper, belt, auction

**Case Summary**

### Procedural Posture

Certiorari was granted to the United States Circuit Court of Appeals for the Sixth Circuit to determine whether, as that court held, actual exclusion of competitors was not essential to the crime of monopolization under *§ 2* of the Sherman Act, *15 U.S.C.S. § 2*.

### Overview

Petitioners dominated the market for domestic cigarettes and engaged in collusive practices to ensure that all of them would buy tobacco at the same price and in the same markets. The appellate court affirmed a judgment finding petitioners guilty of monopolization and related offenses. The United States Supreme Court affirmed because lack of proof of actual exclusion of existing or potential competitors was not fatal to the charge of monopolization. Proof that a monopolist had both the power to monopolize and the intent to monopolize was sufficient. It was not necessary

---

* Together with No. 19, Liggett & Myers Tobacco Co. et al. v. United States, and No. 20, R. J. Reynolds Tobacco Co. et al. v. United States, on certiorari to the same court, argued and decided on the same dates.

that such power actually be exercised. The monopolization convictions under *§ 2* of the Sherman Act, *15 U.S.C.S. § 2*, were affirmed because exclusion of competitors was not an essential element of the crime of monopolization.

**Outcome**
The Court affirmed the convictions.

**LexisNexis® Headnotes**

Antitrust & Trade Law > ... > Monopolies & Monopolization > Conspiracy to Monopolize > Sherman Act
Antitrust & Trade Law > Sherman Act > General Overview
Criminal Law & Procedure > ... > Inchoate Crimes > Conspiracy > General Overview
Criminal Law & Procedure > ... > Inchoate Crimes > Conspiracy > Elements

***HN1*** *Sections 1* and *2* of the Sherman Act, *15 U.S.C.S. §§ 1-2*, require proof of conspiracies which are reciprocally distinguishable from and independent of each other although the objects of the conspiracies may partially overlap.

Antitrust & Trade Law > ... > Monopolies & Monopolization > Conspiracy to Monopolize > General Overview
Criminal Law & Procedure > ... > Inchoate Crimes > Conspiracy > General Overview
Criminal Law & Procedure > ... > Inchoate Crimes > Conspiracy > Elements

***HN2*** A conspiracy to commit a crime is a different offense from the crime that is the object of the conspiracy.

Antitrust & Trade Law > ... > Monopolies & Monopolization > Actual Monopolization > General Overview
Antitrust & Trade Law > ... > Monopolies & Monopolization > Conspiracy to Monopolize > Sherman Act
Antitrust & Trade Law > Sherman Act > Scope > Monopolization Offenses
International Trade Law > General Overview

***HN3*** Actual exclusion of competitors is not necessary to the crime of monopolization under *§ 2* of the Sherman Act, *15 U.S.C.S. § 2*. The crime of monopolizing occurs when parties combine or conspire to acquire or maintain the power to exclude competitors from any part of the trade or commerce among the several states or with foreign nations, provided they also have such a power that they are able, as a group, to exclude actual or potential competition from the field and provided that they have the intent and purpose to exercise that power.

Antitrust & Trade Law > ... > Monopolies & Monopolization > Actual Monopolization > General Overview
Criminal Law & Procedure > ... > Inchoate Crimes > Conspiracy > General Overview
Criminal Law & Procedure > ... > Inchoate Crimes > Conspiracy > Elements

***HN4*** It is not the form of the combination or the particular means used but the result to be achieved that the statute condemns. It is not of importance whether the means used to accomplish the unlawful objective are in themselves lawful or unlawful. Acts done to give effect to the conspiracy may be in themselves wholly innocent acts. Yet, if they are part of the sum of the acts which are relied upon to effectuate the conspiracy which the statute forbids, they come within its prohibition. No formal agreement is necessary to constitute an unlawful conspiracy. Often crimes are a matter of inference deduced from the acts of the person accused and done in pursuance of a criminal purpose. Where the conspiracy is proved from the evidence of the action taken in

concert by the parties to it, it is all the more convincing proof of an intent to exercise the power of exclusion acquired through that conspiracy.

Antitrust & Trade Law > ... > Monopolies & Monopolization > Actual Monopolization > General Overview
Antitrust & Trade Law > ... > Monopolies & Monopolization > Conspiracy to Monopolize > Sherman Act
Criminal Law & Procedure > ... > Inchoate Crimes > Conspiracy > General Overview
Criminal Law & Procedure > ... > Inchoate Crimes > Conspiracy > Elements

***HN5*** The essential combination or conspiracy in violation of the Sherman Act, *15 U.S.C.S. § 2*, may be found in a course of dealing or other circumstances as well as in an exchange of words. Where the circumstances are such as to warrant a jury in finding that the conspirators had a unity of purpose or a common design and understanding, or a meeting of minds in an unlawful arrangement, the conclusion that a conspiracy is established is justified. Neither proof of exertion of the power to exclude nor proof of actual exclusion of existing or potential competitors is essential to sustain a charge of monopolization under the Sherman Act.

Antitrust & Trade Law > ... > Monopolies & Monopolization > Actual Monopolization > General Overview
Antitrust & Trade Law > ... > Monopolies & Monopolization > Attempts to Monopolize > Sherman Act
International Trade Law > General Overview

***HN6*** A combination may be one in restraint of interstate trade or commerce or to monopolize a part of such trade or commerce in violation of the Sherman Act, *15 U.S.C.S. § 2*, although such restraint or monopoly may not have been actually attempted to any harmful extent. The material consideration in determining whether a monopoly exists is not that prices are raised and that competition actually is excluded but that power exists to raise prices or to exclude competition when it is desired to do so. Trade and commerce are "monopolized" when, as a result of efforts to that end, such power is obtained that a few persons acting together can control the prices of a commodity moving in interstate commerce. It is not necessary that the power thus obtained should be exercised. Its existence is sufficient.

Antitrust & Trade Law > ... > Monopolies & Monopolization > Actual Monopolization > General Overview
Antitrust & Trade Law > ... > Monopolies & Monopolization > Attempts to Monopolize > General Overview
Antitrust & Trade Law > Sherman Act > General Overview
Antitrust & Trade Law > Sherman Act > Scope > General Overview
Criminal Law & Procedure > ... > Acts & Mental States > Mens Rea > Specific Intent

***HN7*** In order to fall within the Sherman Act, *15 U.S.C.S. § 2*, the monopolist must have both the power to monopolize and the intent to monopolize. To read the passage as demanding any "specific" intent makes nonsense of it, for no monopolist monopolizes unconscious of what he is doing.

**Lawyers' Edition Display**

**Headnotes**

CRIMINAL LAW, §37 > double jeopardy -- convictions under different counts -- violation of Anti-trust Act. --

***LEdHN[1]*** [1]

Separate convictions under different counts charging (1) a conspiracy in restraint of trade, and (2) a conspiracy to monopolize trade, in an indictment under 1 and 2 respectively of the Sherman

Anti-trust Act, do not amount to double jeopardy or to a multiplicity of punishment in a single proceeding, in violation of the *Fifth Amendment to the Federal Constitution*, even where there was no showing of an actual exclusion of competition, the claim being that, unless there was such a showing, a conspiracy to monopolize would be the same as a conspiracy in restraint of trade.

CONSPIRACY, §18 > under Anti-trust Act -- different offenses. --

***LEdHN[2]*** [2]

The offenses of conspiracy in restraint of trade and conspiracy to monopolize trade, made punishable under 1 and 2 respectively of the Sherman Antitrust Act, are reciprocally distinguishable from and independent of each other, although the objects of the conspiracies may partially overlap.

CRIMINAL LAW, §37 > double jeopardy -- separate convictions under different counts -- violations of Anti-trust Acts. --

***LEdHN[3]*** [3]

Separate convictions under different counts charging (1) monopolization, and (2) conspiracy to monopolize, in an indictment under 1 and 2 of the Sherman Anti-Trust Act, do not amount to multiple punishment in violation of the *Fifth Amendment to the Federal Constitution*, even where, under the government's theory of the case, the charge of monopolization called for proof of a joint enterprise with power and intent to exclude competitors, thereby making conspiracy to monopolize a part of the proof of monopolization.

CONSPIRACY, §1 > nature of offense. --

***LEdHN[4]*** [4]

Conspiracy to commit a crime is a different offense from the crime that is the object of the conspiracy.

RESTRAINTS OF TRADE, §18 > size of combination. --

***LEdHN[5]*** [5]

Size sufficient to afford opportunity for abuse is not to be ignored in determining whether a combination constitutes an illegal monopoly when such opportunity is proved to have been utilized in the past.

RESTRAINTS OF TRADE, §7 > violation of Anti-trust Act -- necessity of actual exclusion of competition. --

***LEdHN[6]*** [6]

Neither exertion of power to exclude competition nor actual exclusion of existing or potential competitors is essential to sustain a charge of monopolization under 2 of the Sherman Anti-trust Act, so long as the power of exclusion is shown to exist, together with the intent to exercise such power when desired.

RESTRAINTS OF TRADE, §7 > Anti-trust Act -- lawful means to attain unlawful objective. --

***LEdHN[7]*** [7]

It is immaterial, in a prosecution under the Sherman Anti-trust Act, whether the means used to attain the unlawful objective were in themselves lawful or unlawful, so long as they were part of the sum of the acts relied upon to effectuate the conspiracy forbidden by the Act.

CONSPIRACY, §1 > necessity of formal agreement. --

***LEdHN[8]*** [8]

No formal agreement is necessary to constitute an unlawful conspiracy.

RESTRAINTS OF TRADE, §7 > Anti-trust Act -- circumstances as showing conspiracy. --

***LEdHN[9]*** [9]

The essential combination or conspiracy, sufficient to support a charge of violation of the Sherman Anti-trust Act, may be found in a course of dealings or other circumstances as well as in any exchange of words.

EVIDENCE, §986 > sufficiency -- violation of Anti-trust Act. --

***LEdHN[10]*** [10]

A conspiracy in violation of the Sherman Anti-trust Act is established where the circumstances are such as to warrant the jury in finding that the conspirators had a unity of purpose or common design and understanding or a meeting of minds in an unlawful arrangement.

**Syllabus**

1. When there is a combination or conspiracy to control and dominate interstate trade and commerce in a commodity, coupled with the power and intent to exclude competitors to a substantial extent, the crime of monopolization under *§ 2* of the Sherman Anti-Trust Act is complete; and the actual exclusion of competitors is not necessary to the crime. Pp. 784-787, 798, 808-815.

2. To support a conviction for conspiring to monopolize certain trade in violation of the Sherman Act, it is not necessary to show power and intent to exclude *all* competitors, nor to show a conspiracy to exclude *all* competitors. P. 789.

3. Under *§ 2* of the Sherman Act, it is the crime of monopolizing for parties to combine or conspire to acquire or maintain the power to exclude competitors from any part of the trade or commerce among the several States or with foreign nations, provided (a) they also have such a power that they are able, as a group, to exclude actual or potential competition from the field and (b) they have the intent and purpose to exercise that power. P. 809.

4. It is not the form of the combination or the particular means used but the result to be achieved that the statute condemns. P. 809.

5. It is not important whether the means used to accomplish the unlawful objective are in themselves lawful or unlawful. P. 809.

6. No formal agreement is necessary to constitute an unlawful conspiracy. P. 809.

7. The essential combination or conspiracy in violation of the Sherman Act may be found in a course of dealing or other circumstances as well as in an exchange of words. Pp. 809, 810.

8. Neither proof of exertion of the power to exclude nor proof of actual exclusion of existing or potential competitors is essential to sustain a charge of monopolization under the Sherman Act. P. 810.

9. A combination may be one in restraint of interstate trade or commerce or to monopolize a part of such trade or commerce in violation of the Sherman Act, although such restraint or monopoly may not have been actually attained to any harmful extent. P. 811.

10. The material consideration in determining whether a monopoly exists is not that prices are raised and that competition actually is excluded but that power exists to raise prices or to exclude competition when it is desired to do so. P. 811.

11. *United States v. Aluminum Co. of America, 148 F.2d 416*, approved. Pp. 811-814.

12. Separate convictions for a conspiracy to restrain trade and for a conspiracy to monopolize trade do not amount to double jeopardy or to a multiplicity of punishment in a single proceeding contrary to the *Fifth Amendment*, since they are separate statutory offenses, one being made criminal by *§ 1* and the other by *§ 2* of the Sherman Act. *Braverman v. United States, 317 U.S. 49*, distinguished. Pp. 787, 788.

13. Separate convictions for monopolization and for conspiring to monopolize in violation of the Sherman Act do not result in multiple punishment contrary to the *Fifth Amendment*, since they are separate offenses. *United States v. Rabinowich, 238 U.S. 78*; *Pinkerton v. United States, 328 U.S. 640*. Pp. 788, 789.

**Counsel:** George W. Whiteside and Milton Handler argued the cause for petitioners in No. 18. With them on the brief was John A. V. Murphy.

Bethuel M. Webster argued the cause for petitioners in No. 19. With him on the brief was Francis H. Horan.

Harold F. McGuire argued the cause for petitioners in No. 20. With him on the brief were B. S. Womble, Thomas Turner Cooke and Richard C. Stoll.

Assistant Attorney General Berge argued the cause for the United States. With him on the brief were Solicitor General McGrath, Charles H. Weston and Robert L. Stern.

**Judges:** Black, Frankfurter, Douglas, Murphy, Rutledge, Burton; Reed and Jackson took no part in the consideration or decision of this case.

**Opinion by:** BURTON

**Opinion**

**[*783] [**1126] [***1580]** MR. JUSTICE BURTON delivered the opinion of the Court.

The petitioners are The American Tobacco Company, Liggett & Myers Tobacco Company, R. J. Reynolds Tobacco Company, [1] American Suppliers, Inc., a subsidiary of American, and certain officials of the respective companies who were convicted by a jury, in the District Court of the

---

[1] Here referred to as American, Liggett and Reynolds.

United States for the Eastern District of Kentucky, of violating *§§ 1* and *2* of the Sherman Anti-Trust Act, pursuant to an information filed July 24, 1940, and modified October 31, 1940.

Each petitioner was convicted on four counts: (1) conspiracy in restraint of trade, (2) monopolization, (3) attempt to monopolize, and (4) conspiracy to monopolize. Each count related to interstate and foreign trade and commerce in tobacco. No sentence was imposed under the third count as the Court held that that count was merged in the second. Each petitioner was fined $ 5,000 on each of the other counts, making $ 15,000 for each petitioner and a total of $ 255,000. Seven other defendants were found not guilty and a number of the original defendants were severed from the proceedings pursuant to stipulation.

The Circuit Court of Appeals for the Sixth Circuit, on December 8, 1944, affirmed each conviction. *147 F.2d 93*. **[*784]** All the grounds urged for review of those judgments were considered here on petitions for certiorari. On March 26, 1945, this Court granted the petitions but each was "limited to the question whether actual exclusion of competitors is necessary to the crime of monopolization under *§ 2* of the Sherman Act." *324 U.S. 836*. On April 19, 1945, Reynolds, et al., filed a petition for rehearing and enlargement of the scope of review in their case but it was denied. *324 U.S. 891*. **[**1127]** This opinion is limited to the convictions under *§ 2* of the Sherman Act [2] and deals especially with those for **[***1581]** monopolization under the second count of the information.

The issue thus emphasized in the order allowing certiorari and primarily argued by the parties has not been previously decided by this Court. It is raised by the following instructions which were especially applicable to the second count [3] but were related also to the other counts under *§ 2* of the Sherman Act:

"Now, the term '*monopolize*' as used in *Section 2* of the Sherman Act, as well as in the last three counts **[*785]** of the Information, means the joint acquisition or maintenance by the members of a conspiracy formed for that purpose, of the *power to control and dominate interstate trade*

---

[2] "*SEC. 2*. Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a misdemeanor, and, on conviction thereof, shall be punished by fine not exceeding five thousand dollars, or by imprisonment not exceeding one year, or by both said punishments, in the discretion of the court." 26 Stat. 209, *15 U. S. C. § 2*.

[3] The second count included particularly the following:

"Before and during the period of three years next preceding the filing of this information, . . . defendants, . . . well knowing the foregoing facts, have, . . . unlawfully monopolized the aforesaid interstate and foreign trade and commerce in tobacco, in violation of Section Two of the Act of Congress of July 2, 1890, . . .

. . . .

"In adopting and exercising such methods, means and practices, each defendant has acted with full knowledge that unanimity of action with reference thereto was and would be the policy, intent and practice of the others, that such unanimity of action would necessarily result in drawing to defendant major tobacco companies as a group the power to dominate, control, and exclude others from the aforesaid interstate and foreign trade and commerce, has intended such result, and such result has in fact been achieved.

"Said unlawful monopolization has had the effects, among others, of permitting a few companies to attain control of a bottleneck in a great industry, through which a major farm commodity, on which several million are dependent, must pass, on its way through the hands of jobbers and retailers, to the many millions of people who use tobacco products; of enabling these few companies to abuse their resulting strategic and dominant position, by making the income of growers of leaf tobacco lower than it otherwise would have been; by making the income of distributors and other manufacturers of tobacco products lower than it otherwise would have been; and by keeping from all other groups in the industry, and from consumers, the benefits which otherwise would flow from free, vigorous and normal competition."

*and commerce in a commodity to such an extent that they are able, as a group, to exclude actual or potential competitors from the field, accompanied with the intention and purpose to exercise such power*.

"The phrase 'attempt to monopolize' means the employment of methods, means and practices which would, if successful, accomplish monopolization, and which, though falling short, nevertheless approach so close as to create a dangerous probability of it, which methods, means and practices are so employed by the members of and pursuant to a combination or conspiracy formed for the purpose of such accomplishment.

"It is in no respect a violation of the law that a number of individuals or corporations, each acting for himself or itself, may own or control a large part, or even all of a particular commodity, or all the business in a particular commodity.

"*An essential element* of the illegal monopoly or monopolization charged *in this case is the existence* **[*786]** *of a combination or conspiracy to acquire and maintain the power to exclude competitors to a substantial extent*.

"Thus you will see that *an indispensable ingredient of each of the offenses charged in the Information is a combination or conspiracy*." (Italics supplied.)

While the question before us, as briefly **[**1128]** stated in the Court's order, makes no express reference to the inclusion, in the crime of "monopolization," of the element of "a combination or conspiracy to acquire and maintain the power to exclude competitors to a substantial extent," yet the trial court, in its above quoted instructions to the **[***1582]** jury, described such a combination or conspiracy as an "essential element" and an "indispensable ingredient" of that crime in the present cases. We therefore include that element in determining whether the foregoing instructions correctly stated the law as applied to these cases. In discussing the legal issue we shall assume that such a combination or conspiracy to monopolize has been established. Because of the presence of that element, we do not have here the hypothetical case of parties who themselves have not "achieved" monopoly but have had monopoly "thrust upon" them. See *United States v. Aluminum Co. of America, 148 F.2d 416, 429*.

The present cases are not comparable to cases where the parties, for example, merely have made a new discovery or an original entry into a new field and unexpectedly or unavoidably have found themselves enjoying a monopoly coupled with power and intent to maintain it. In the *Aluminum Co*. case, discussed later, there was a use of various unlawful means to establish or maintain the monopoly. Here we have the additional element of a combination or conspiracy to acquire or maintain the power to exclude competitors that is charged in the fourth count.

**[*787]** The present opinion is not a finding by this Court one way or the other on the many closely contested issues of fact. The present opinion is an application of the law to the facts as they were found by the jury and which the Circuit Court of Appeals held should not be set aside. [4] The trial court's instruction did not call for proof of an "actual exclusion" of competitors on the part of the petitioners. For the purposes of this opinion, we shall assume, therefore, that an actual exclusion of competitors by the petitioners was not claimed or established by the prosecution. Simply stated the issue is: Do the facts called for by the trial court's definition of monopolization amount to a violation of *§ 2* of the Sherman Act?

---

[4] The verdict in a criminal case is sustained only when there is "relevant evidence from which the jury could properly find or infer, beyond a reasonable doubt," that the accused is guilty. *Mortensen* v. *United States*, 322 U.S. 369, 374.

***LEdHN[1]*** [1]Before reaching that issue we shall touch upon another contention which the petitioners have made and which the Government has undertaken to answer. This is the contention that the separate convictions returned under the conspiracy count in restraint of trade and under the conspiracy count to monopolize trade amount to double jeopardy, or to a multiplicity of punishment in a single proceeding, and therefore violate the *Fifth Amendment to the Federal Constitution*. [5] The petitioners argue that *§ 2* of the Sherman Act should be interpreted to require proof of actual exclusion of competitors in order to show "monopolization," and they claim that only thus can a "conspiracy to monopolize" trade be sufficiently differentiated from a "conspiracy in restraint of" trade as to avoid subjecting the parties accused under those counts to double jeopardy.

**[*788]** Petitioners seek support for these contentions as to the two conspiracy counts from the principles stated in *Braverman v. United States, 317 U.S. 49*, and in *Blockburger v. United States, 284 U.S. 299*. On the authority of the *Braverman* case, petitioners claim that there is but one conspiracy, namely, a conspiracy to fix prices. In contrast to the single conspiracy described in that case in separate counts, all charged under the general conspiracy statute, § 37, Criminal Code, 35 Stat. 1096, *18 U. S. C. § 88*, we have here separate **[***1583]** statutory offenses, one a conspiracy in restraint of trade that may stop short of monopoly, and the other a conspiracy to monopolize that may not be content **[**1129]** with restraint short of monopoly. One is made criminal by *§ 1* and the other by *§ 2* of the Sherman Act.

***LEdHN[2]*** [2]We believe also that in accordance with the *Blockburger* case, *§§ 1* and *2* of the Sherman Act ***HN1*** require proof of conspiracies which are reciprocally distinguishable from and independent of each other although the objects of the conspiracies may partially overlap. Cf. *United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 226*. In the present cases, the court below has found that there was more than sufficient evidence to establish a conspiracy in restraint of trade by price fixing and other means, and also a conspiracy to monopolize trade with the power and intent to exclude actual and potential competitors from at least a part of the tobacco industry.

***LEdHN[3]*** [3]***LEdHN[4]*** [4]Petitioners further suggest that the second count (to monopolize), and the fourth count (to conspire to monopolize), may lead to multiple punishment, contrary to the principle of the *Blockburger* case. Petitioners argue that the Government's theory of monopolization calls for proof of a joint enterprise with power and intent to exclude competitors and, therefore, that the conspiracy to monopolize **[*789]** must be a part of that proof. It long has been settled, however, that ***HN2*** a "conspiracy to commit a crime is a different offense from the crime that is the object of the conspiracy. " *United States v. Rabinowich, 238 U.S. 78, 85*; *Pinkerton v. United States, 328 U.S. 640, 643*. Petitioners, for example, might have been convicted here of a conspiracy to monopolize without ever having acquired the power to carry out the object of the conspiracy, *i. e.*, to exclude actual and potential competitors from the cigarette field. Cf. *United States v. Shapiro, 103 F.2d 775, 776*.

Although there is no issue of fact or question as to the sufficiency of the evidence to be discussed here, nevertheless, it is necessary to summarize the principal facts of that conspiracy to monopolize certain trade, which was charged in the fourth count. These facts demonstrate also the vigor and nature of the intent of the petitioners to exclude competitors in order to maintain that monopoly if need or occasion should offer itself to attempt such an exclusion. To support the

---

[5] ". . . nor shall any person be subject for the same offence to be twice put in jeopardy of life or limb; . . ."

verdicts it was not necessary to show power and intent to exclude *all* competitors, or to show a conspiracy to exclude *all* competitors. The requirement stated to the jury and contained in the statute was only that the offenders shall "monopolize any part of the trade or commerce among the several States, or with foreign nations." This particular conspiracy may well have derived special vitality, in the eyes of the jury, from the fact that its existence was established, not through the presentation of a formal written agreement, but through the evidence of widespread and effective conduct on the part of petitioners in relation to their existing or potential competitors.

The three years at issue in the charges made were those immediately preceding the filing of the informations on **[*790]** July 24, 1940, [6] but for convenience the statistics relied **[***1584]** upon generally have been those for the calendar years 1937, 1938 and 1939. Because of the circumstantial nature of most of the evidence and because of the essentiality of figures for comparative years in establishing any restraint of trade or monopoly, the record also contains much important material drawn from earlier years. Some appreciation of the history and development of the cigarette industry is essential to an understanding of the cases. However, in applying the law to the central issue in these cases, the variations among the several petitioners participating in each step are not material in reaching the conclusion on the legal question before us. There were many variations in the business **[**1130]** activities of the several petitioners. It would be cumbersome and difficult to state exactly which petitioners and what combination of petitioners did each of the acts mentioned. It is, however, not fair to refer, without explanation, to all the acts simply as having been done by "the petitioners." In its usual sense, "the petitioners" would include all of them. Obviously, however, the corporate and individual petitioners did not and could not all act precisely alike. To refer only to "the corporate petitioners" would be unsatisfactory because, in addition to American, Liggett and Reynolds, there is the corporate petitioner, American Suppliers, Inc. It participated in only a limited number of activities and then only as a subsidiary of American. Furthermore, as pointed out by Reynolds in its petition for rehearing and for enlargement of scope of review in its **[*791]** case, Reynolds' participation in some parts of the combination or conspiracy differs in many respects from that of American and Liggett.

The fact is that Reynolds, in 1913, actually broke into the cigarette field with its Camel cigarettes, and, as a vigorous competitor of American, Liggett and P. Lorillard Company, revolutionized the cigarette industry. Gradually Reynolds grew to be one of the "Big Three" with American and Liggett. The later evidence then tends to show that those three, in spite of the earlier competitive history of Reynolds, have operated together in recent years in violation of the Sherman Act. Similarly, much of the evidence relating to the purchase of tobacco at auction does not apply in precisely equal degree to each petitioner. However, taking the story as a whole, each petitioner now has been convicted of the same offense under like counts and the problem before us is only to state the rule of law to be applied in defining monopolization under the Sherman Act as applied to all of the petitioners alike. To distinguish among them at each stage would not change the legal conclusion on the one issue here presented but would confuse what should be a clear summary of the facts essential to an understanding of that legal issue. Accordingly, each reference to "petitioners" in this recital will mean "some or all of the petitioners as disclosed by the record."

---

[6] "No person shall be prosecuted, tried, or punished for any offense, not capital. . . . unless the indictment is found, or the information is instituted, within three years next after such offense shall have been committed." Rev. Stat. § 1044, as amended by 45 Stat. 51, 18 U. S. C. § 582.

First of all, the monopoly found by the jury to exist in the present cases appears to have been completely separable from the old American Tobacco Trust which was dissolved in 1911. [7] The conspiracy **[***1585]** to monopolize and **[*792]** the monopolization charged here do not depend upon proof relating to **[**1131]** the old tobacco trust but upon a dominance and control by petitioners in recent years over purchases **[*793]** of the raw material and over the sale of the finished product in the form of cigarettes. The fact, however, that the purchases of leaf tobacco and the sales of so many products of the tobacco industry have remained largely within the same general group of business organizations for over a generation, inevitably has contributed to the ease with which control over competition within the industry and the mobilization of power to resist new competition can be exercised. A friendly relationship within such a long established industry is, in itself, not only natural but commendable and beneficial, as long as it does not breed illegal activities. Such a community of interest in any industry, however, provides a natural foundation for working policies and understandings favorable to the insiders and unfavorable to outsiders. The verdicts indicate that practices of an informal and flexible nature were adopted and that the results were so uniformly beneficial to the petitioners in protecting their common interests as against those of competitors that, entirely from circumstantial evidence, the jury found that a combination or conspiracy existed among the petitioners from 1937 to 1940, with power and intent to exclude competitors to such a substantial extent as to violate the Sherman Act as interpreted by the trial court. [8]

---

[7] The history of the tobacco industry in America and of the litigation which resulted in the dissolution of the tobacco trust in 1911 is set forth in *United States* v. *American Tobacco Co.*, 221 U.S. 106-193. See also, *United States* v. *American Tobacco Co.*, 191 F. 371-431, containing the decree of dissolution and see 164 F. 700-728, 1024, for the report of the case in the Circuit Court. While the names of some of the parties in the earlier case are those of the present petitioners, the present proceedings do not reflect a failure on their part to observe the requirements of the 1911 decree. Although the decree of dissolution resulted in the separation of assets among the American, Liggett and Reynolds companies, as well as P. Lorillard Company and others, there is no contention here that common ownership of stock and the interlocking of officers and directors among those companies have continued to exist. The tobacco industry also has changed from one dealing primarily in the distribution of smoking tobacco, chewing tobacco, little cigars and cigarettes to one dealing primarily in cigarettes. The record shows that in 1910 the weight of the tobacco used in the domestic manufacture of cigarettes was about 31,000,000 pounds out of 522,000,000 pounds, or less than 6%, whereas in 1939, it was 509,000,000 pounds out of 885,000,000 pounds, or 57.5%.

By the 1911 decree, the cigarette brands of the trust were distributed as follows: To American: Sweet Caporal, Pall Mall, Hassan and Mecca. To Liggett: American Beauty, Fatima, Piedmont, Imperiales, Home Run and King Bee. To P. Lorillard Company: Helmar, Murad, Mogul, Turkish Trophies and Egyptian Deities. Neither the old trust nor the petitioners in the present cases have ever done much general cigar business. Reynolds in 1911 had no cigarette business and it received none by the decree. It then was small in comparison with the other companies named. In 1913, it put its Camel cigarettes on the market. These were neither Turkish, pseudo-Turkish, nor Virginia cigarettes. They were made largely of burley tobacco which had not been used in any successful cigarette up to that time. They were "cased" or flavored -- an old process in preparing plug tobacco but an innovation in cigarettes. That competition was highly successful. Reynolds' sales rose to where, in 1919, it made about 40% of all domestic cigarette sales in the United States. By 1917 its total production exceeded by 50% the total national production of cigarettes in 1911. In 1916, American launched a new brand of burley cigarettes -- Lucky Strikes. Liggett changed its Chesterfield brand from a Virginia type cigarette to a burley blend. Lorillard, in 1926, launched a new brand of Old Gold cigarettes. By that time the "Big Three" were American, Liggett and Reynolds and those companies are the three cigarette-producing companies that are parties to the present proceedings.

[8] The identity of the parties referred to in the present cases is more readily recognizable when they are identified with their products as follows:

American -- Lucky Strike, Pall Mall (by a subsidiary), Herbert Tareyton cigarettes, Bull Durham tobacco, about 50 brands of chewing tobacco and hundreds of brands of smoking tobacco.

Liggett -- Chesterfield and about 15 other brands of cigarettes, 45 brands of smoking tobacco, including Velvet and Duke's Mixture and over 25 brands of chewing tobacco.

Reynolds -- Camel cigarettes, 12 brands of smoking tobacco, including Prince Albert, and 88 brands of chewing tobacco.

**[*794] [**1132] [***1586]** The position of the petitioners in the cigarette industry from 1931 to 1939 is clear from the following tables:

**PERCENTAGE OF TOTAL U.S. PRODUCTION OF SMALL CIGARETTES -- 1931-1939.**

| | 1931 | 1932 | 1933 | 1934 | 1935 | 1936 | 1937 | 1938 | 1939 |
|---|---|---|---|---|---|---|---|---|---|
| American | 39.5 | 36.6 | 33.0 | 26.1 | 2 4.0 | 22.5 | 21.5 | 22.7 | 22.9 |
| Liggett | 22.7 | 23.0 | 28.1 | 27.4 | 26.0 | 24.6 | 23.6 | 22.9 | 21.6 |
| Reynolds | 28.4 | 21.8 | 22.8 | 26.0 | 28.1 | 29.5 | 28.1 | 25.3 | 23.6 |
| Lorillard | 6.5 | 5.2 | 4.7 | 4.1 | 3.8 | 4.3 | 4.7 | 5.1 | 5.8 |
| Brown & Williamson | 0.2 | 6.9 | 5.5 | 8.3 | 9.6 | 9.6 | 9.9 | 9.9 | 10.6 |
| Philip Morris | 0.9 | 1.4 | 0.8 | 2.0 | 3.1 | 4.1 | 5.4 | 5.7 | 7.1 |
| Stephano | 0.1 | 0.1 | 0.2 | 0.5 | 1.4 | 1.9 | 2.5 | 3.1 | 3.3 |
| Axton-Fisher | 0.7 | 3.1 | 4.4 | 4.4 | 3.0 | 2.2 | 2.4 | 2.7 | 2.4 |
| Larus | 0.2 | 1.0 | 0.2 | 0.6 | 0.7 | 0.8 | 1.0 | 1.3 | 1.3 |
| Combined Percentages of American, Liggett and Reynolds | 90.7 | 81.4 | 83.9 | 79.5 | 78.0 | 76.7 | 73.3 | 71.0 | 68.0 |

**[*795]**

**VOLUME OF CIGARETTE PRODUCTION -- 1931-1939.**

**(Billions of cigarettes.)**

| | 1931 | 1932 | 1933 | 1934 | 1935 | 1936 | 1937 | 1938 | 1939 |
|---|---|---|---|---|---|---|---|---|---|
| Total U.S. production | 117.1 | 106.6 | 114.9 | 130.0 | 140.0 | 158.9 | 170.0 | 171.7 | 180.7 |
| American | 46.2 | 39.0 | 37.9 | 33.9 | 33.5 | 35.8 | 36.6 | 39.0 | 41.4 |
| Liggett | 26.6 | 24.6 | 32.2 | 35.6 | 36.3 | 39.1 | 40.2 | 39.3 | 39.0 |
| Reynolds | 33.3 | 23.2 | 26.2 | 33.8 | 39.4 | 46.9 | 47.8 | 43.5 | 42.6 |
| Lorillard | 7.6 | 5.5 | 5.4 | 5.3 | 5.3 | 6.8 | 8.1 | 8.8 | 10.5 |
| Brown & Williamson | 0.3 | 7.3 | 6.3 | 10.8 | 13.4 | 15.2 | 16.8 | 17.1 | 19.1 |
| Philip Morris | 1.0 | 1.5 | 0.9 | 2.6 | 4.4 | 6.4 | 9.2 | 9.7 | 12.8 |
| Stephano | 0.1 | 0.1 | 0.2 | 0.7 | 2.0 | 3.0 | 4.2 | 5.4 | 6.0 |
| Axton-Fisher | 0.8 | 3.3 | 5.0 | 5.7 | 4.2 | 3.5 | 4.1 | 4.5 | 4.3 |
| Larus | 0.3 | 1.0 | 0.3 | 0.7 | 1.0 | 1.2 | 1.7 | 2.2 | 2.3 |
| Combined volume of American, Liggett and Reynolds | 106.1 | 86.8 | 96.3 | 103.3 | 109.2 | 121.8 | 124.6 | 121.8 | 123.0 |

The first table shows that, although American, Liggett and Reynolds gradually dropped in their percentage of the national domestic cigarette production from 90.7% in 1931 to 73.3%, 71% and 68%, respectively, in 1937, 1938 and 1939, they have

---

P. Lorillard Company -- Old Gold, and Sensation cigarettes, as well as other tobacco products.

Philip Morris & Co., Ltd., Incorporated -- Philip Morris, and Paul Jones cigarettes.

British-American Tobacco Company, Limited -- Many tobacco products, including those of its subsidiary, Brown & Williamson Tobacco Corporation.

Brown & Williamson Tobacco Corporation -- Raleigh cigarettes.

The Imperial Tobacco Company, Ltd. -- Tobacco products sold in Great Britain and Ireland.

Universal Leaf Tobacco Company, Inc. -- Dealers in leaf tobacco.

Stephano Brothers, Axton-Fisher Tobacco Company and Larus Bro. Co., Inc., are all producers of the so-called "10 cent cigarettes." Their cigarettes, like certain comparable cigarettes produced by P. Lorillard Company and by Philip Morris & Co., Ltd., Incorporated, generally sell for 10 cents a package in contrast to 13 or 15 cents or more for the leading brands of burley blend cigarettes.

accounted at all times for more than 68%, and usually for more than 75%, of the national production. The balance of the cigarette production has come from six other companies. No one of those six ever has produced more than the 10.6% once reached by Brown & Williamson in 1939. The second table shows that, while the percentage of cigarettes produced by American, Liggett and Reynolds in the United States dropped gradually from 90.7% to 68%, their combined volume of production actually increased from 106 billion in 1931 to about 125 billion, 122 billion and 123 billion, respectively, in 1937, 1938 and 1939. The remainder of the production was divided among the other six companies. No one of those six ever has produced more than about 19 billion cigarettes a year, which was the high point reached by Brown & Williamson in 1939.

The further dominance of American, Liggett and Reynolds within their special field of burley blend **[***1587]** cigarettes, as **[*796]** compared with the so-called "10 cent cigarettes," is also apparent. In 1939, the 10 cent cigarettes constituted about 14 1/2% of the total domestic cigarette production. Accordingly, the 68% of the total cigarette production enjoyed by American, Liggett and Reynolds amounted to 80% of that production within their special field of cigarettes. The second table shows a like situation. In 1939, the 10 cent cigarettes accounted for 25.6 billion of the **[**1133]** cigarettes produced. Deducting this from the 57.7 billion cigarettes produced by others than American, Liggett and Reynolds left only about 32 billion cigarettes of a comparable grade produced in that year by competitors of the "Big Three" as against the 123 billion produced by them. In addition to the combined production by American, Liggett and Reynolds in 1939 of over 68% of all domestic cigarettes, they also produced over 63% of the smoking tobacco and over 44% of the chewing tobacco. They never were important factors in the cigar or snuff fields of the tobacco industry.

***LEdHN[5]*** [5]The foregoing demonstrates the basis of the claim of American, Liggett and Reynolds to the title of the "Big Three." The marked dominance enjoyed by each of these three, in roughly equal proportions, is emphasized by the fact that the smallest of them at all times showed over twice the production of the largest outsider. Without adverse criticism of it, comparative size on this great scale inevitably increased the power of these three to dominate all phases of their industry. "Size carries with it an opportunity for abuse that is not to be ignored when the opportunity is proved to have been utilized in the past." *United States v. Swift & Co., 286 U.S. 106, 116*.An intent to use this power to maintain a monopoly was found by the jury in these cases.

The record further shows that the net worth of American, Liggett and Reynolds in terms of their total assets, **[*797]** less current liabilities, rose from $ 277,000,000 in 1912 to over $ 551,000,000 in 1939. Their net annual earnings, before payment of interest and dividends, rose from about $ 28,000,000 in 1912 to over $ 75,000,000 in 1939. The record is full of evidence of the close relationship between their large expenditures for national advertising of cigarettes and resulting volumes of sales. In each of the years 1937, 1938 and 1939, American, Liggett and Reynolds expended a total of over $ 40,000,000 a year for advertising. Such advertising is not here criticized as a business expense. Such advertising may benefit indirectly the entire industry, including the competitors of the advertisers. Such tremendous advertising, however, is also a widely published warning that these companies possess and know how to use a powerful offensive and defensive weapon against new competition. New competition dare not enter such a field, unless it be well supported by comparable national advertising. Large inventories of leaf tobacco, and large sums required for payment of federal taxes in advance of actual sales, further emphasize the effectiveness of a well financed monopoly in this field against potential competitors if there merely exists an intent to exclude such competitors. Prevention of all potential competition is the natural program for maintaining a monopoly here, rather than any program of actual exclusion. "Prevention" is cheaper and more effective than any amount of "cure."

With this background of a substantial monopoly, amounting to over two-thirds of the entire domestic field of cigarettes, and to over 80% of the field of comparable cigarettes, and with the opposition confined to several small competitors, the jury could have **[***1588]** found from the actual operation of the petitioners that there existed a combination or conspiracy among them not only in restraint of trade, but to monopolize a part of the tobacco **[*798]** industry. The trial court described this combination or conspiracy as an "essential element" and "indispensable ingredient" of the offenses charged. It is therefore only in conjunction with such a combination or conspiracy that these cases will constitute a precedent. The conspiracy so established by the verdicts under the second count appears to have been one to fix and control prices and other material conditions relating to the purchase of raw material in the form of leaf tobacco for use in the manufacture of cigarettes. It also appears to have been one to fix and control prices and other material conditions relating to the distribution and sale of the product of such tobacco in the form of cigarettes. The jury found a conspiracy to monopolize to a substantial degree the leaf market and the cigarette market. The jury's verdicts also found a **[**1134]** power and intent on the part of the petitioners to exclude competition to a substantial extent in the tobacco industry.

I.

The verdicts show that the jury found that the petitioners conspired to fix prices and to exclude undesired competition against them in the purchase of the domestic type of flue-cured tobacco and of burley tobacco. These are raw materials essential to the production of cigarettes of the grade sold by the petitioners and also, to some extent, of the 10 cent grade of cigarettes which constitutes the only substantial competition to American, Liggett and Reynolds in the cigarette field of the domestic tobacco industry. The tobaccos involved in these cases are the flue-cured, burley and Maryland tobaccos. The flue-cured or bright tobacco

is grown in a number of areas called "belts." These are in Virginia, North Carolina, South Carolina, Georgia and Florida. The tobacco takes its name of flue-cured from the "curing" process to which **[*799]** it is subjected and which consists of hanging the tobacco leaves in barns heated by a system of flues. Between 50% and 60% of the total flue-cured product is for export to England. The petitioners purchased a combined total of between 50% and 80% of the domestic flue-cured tobacco. The burley tobacco is produced largely in the burley belt in Kentucky and Tennessee. It is cured without heating, by exposing the leaves to the air in barns in which they are hung. The petitioners purchased from 60% to 80% of the annual crop of burley. The Maryland tobacco is grown in the southern part of that State. Some of it is sold in auction markets, the rest is packed in hogsheads and sold in two Baltimore warehouses by the Maryland Tobacco Growers' Association and by commercial merchants. The greater part of the Maryland tobacco was purchased by petitioners. The crops in the more southerly belts mature first and the burley crops are not ready for market until late fall. When the tobacco is ready for market the farmers strip, sort and grade the leaves according to their judgment as to quality, tie them into bundles called "hands" (except in Georgia where the tobacco remains loose), and truck them to tobacco auction markets. In the possession of the farmers the crops are perishable as they require a redrying process. Under the modern system of marketing, the tobacco cannot be stored to await another season. The farmers have no facilities for redrying the tobacco and therefore must sell their crops in the season in which those crops are raised or they will lose them. The petitioners kept large enough tobacco stocks on hand to last about three years. The value of these stocks was over $ 100,000,000 for each company and these stocks assured their **[***1589]** independence of the market in any one year. Auction markets for the sale of leaf tobacco have been in operation for many years and were well established long before the dissolution of **[*800]** the tobacco trust in 1911. [9] Such markets are located in 75 towns in the flue-cured region and 42 towns in the burley area. There are four Maryland markets. Since the crop in the Georgia Belt matures first, the markets in that belt open first, usually about August 1. The auctioneers then follow the marketing seasons to the North, reaching the "Old Belt" in North Carolina and Virginia in the latter part of September. The dates for opening the markets in the flue-cured belts are set by the Tobacco Association of the United States of which buyers, including petitioners, warehousemen and others connected with the industry, but not including farmers, are members. Burley sales begin in Lexington, Kentucky, which is the principal market, on the first Monday in December. The other burley markets open the next day. Sales continue, **[**1135]** excepting at Christmas time, for the next few months.

The Government introduced evidence showing that, although there was no written or express agreement discovered among American, Liggett and Reynolds, their practices included a clear course of dealing. This evidently convinced the jury of the existence of a combination or conspiracy to fix and control prices and practices as to domestic leaf tobacco, both in restraint of trade as such, and to establish a substantially impregnable defense against any attempted intrusion by potential competitors into these markets.

It appeared that petitioners refused to purchase tobacco on these markets unless the other petitioners were also represented thereon. There were attempts made by **[*801]** others to open new tobacco markets but none of the petitioners would participate in them unless the other petitioners were present. Consequently, such markets were failures due to the absence of buyers. It appeared that the tobacco farmers did not want to sell their tobacco on a market in which the only purchasers were speculators or dealers. The prices paid under such circumstances were likely to be low in order that the purchasers eventually might resell the tobacco to the manufacturing companies. The foreign purchasers likewise would not participate without the presence of the petitioners. In this way the new tobacco markets and their locations were determined by the unanimous consent of the petitioners and, in arriving at their determination, the petitioners consulted with each other as to whether or not a community deserved a market.

The Government presented evidence to support its claim that, before the markets opened, the petitioners placed limitations and restrictions on the prices which their buyers were permitted to pay for tobacco. None of the buyers exceeded these price ceilings. Grades of tobacco were formulated in such a way as to result in the absence of competition between the petitioners. There was manipulation of the price of lower grade tobaccos in order to restrict competition from manufacturers of the lower priced cigarettes. Methods used included the practice of the petitioners of calling their respective buyers in, prior to the opening of the annual markets, and giving them instructions as to the prices to be paid for leaf tobacco in each of the markets. These **[***1590]** instructions were in terms of top prices or price ranges. The price ceilings thus established for the buyers were the same for each of them. In case of tie bids the auctioneer awarded the sale customarily to the buyer who bid first. Under this custom the buyers representing the petitioners often made bids on various baskets of tobacco **[*802]** before an opening price could be announced so that they might have their claim to the tobacco recognized at the understood ceiling price in the case of tie bids. Often a buyer would bid ahead by indicating that he wanted a certain basket further along in the line of baskets and, in such cases, the tobacco in question was awarded to such buyer without the mention of any price, it being understood that it was sold at the top price theretofore previously determined upon.

Where one or two of the petitioners secured their percentage of the crop on a certain market or were not interested in the purchase of certain offerings of tobacco, their buyers, nevertheless, would enter the bidding in order to force the other petitioners to bid up to the maximum price. The petitioners were not so much concerned with the prices they paid for the leaf tobacco as

---

[9] For a description of the auction methods of selling in Georgia, see *Townsend* v. *Yeomans*, 301 U.S. 441, 445, and in North Carolina, see *Currin* v. *Wallace*, 306 U.S. 1, 7-8. See also, market practices described in the report of the Committee on Agriculture of the House of Representatives, June 5, 1935, to accompany H. R. 8026. H. Rep. No. 1102, 74th Cong., 1st Sess.

that each should pay the same price for the same grade and that none would secure any advantage in purchasing tobacco. They were all to be on the same basis as far as the expenses of their purchases went. The prices which were set as top prices by petitioners, or by the first of them to purchase on the market, became, with few exceptions, the top prices prevailing on those markets. Competition also was eliminated between petitioners by the purchase of grades of tobacco in which but one of them was interested. To accomplish this, each company formulated the grades which it alone wished to purchase. The other companies recognized the grades **[**1136]** so formulated as distinctive grades and did not compete for them. While the differences between the grades so formulated were distinguishable by the highly trained special buyers, they were in reality so minute as to be inconsequential. This element, however, did not mean that a company could bid any price it wished for its especially formulated grades of tobacco. The other companies prevented that by bidding up the tobacco, at least to a point where they did not risk being **[*803]** awarded the sale to themselves. Each company determined in advance what portion of the entire crop it would purchase before the market for that season opened. The petitioners then separately informed their buyers of the percentage of the crop which they wished to purchase and gave instructions that only such a percentage should be purchased on each market. The purchases were spread evenly over the different markets throughout the season. No matter what the size of the crop might be, the petitioners were able to purchase their predetermined percentages thereof within the price limits determined upon by them, thus indicating a stabilized market. The respective petitioners employed supervisors whose functions were to see that the prices were the same on one market as on another. Where, because of difference in appraisals of grades or other similar factors, the bidding was out of line with the predetermined price limits or there was a tendency for prices to vary from those on other markets, the supervisors sought to maintain the same prices and grades on different markets. This was sought to be achieved by instructions to buyers to change the prices bid or the percentages purchased, and such actions proved to be successful in maintaining and equalizing the prices on the different markets.

At a time when the manufacturers of lower priced cigarettes were beginning to manufacture them in quantity, the petitioners commenced to make large purchases of **[***1591]** the cheaper tobacco leaves used for the manufacture of such lower priced cigarettes. No explanation was offered as to how or where this tobacco was used by petitioners. The compositions of their respective brands of cigarettes calling for the use of more expensive tobaccos remained unchanged during this period of controversy and up to the end of the trial. The Government claimed that such purchases of cheaper tobacco evidenced a combination and a purpose among the petitioners to deprive the manufacturers **[*804]** of cheaper cigarettes of the tobacco necessary for their manufacture, as well as to raise the price of such tobacco to such a point that cigarettes made therefrom could not be sold at a sufficiently low price to compete with the petitioners' more highly advertised brands.

II.

The verdicts show also that the jury found that the petitioners conspired to fix prices and to exclude undesired competition in the distribution and sale of their principal products. The petitioners sold and distributed their products to jobbers and to selected dealers who bought at list prices, less discounts. Almost all of the million or more dealers who handled the respective petitioners' products throughout the country consisted of such establishments as small storekeepers, gasoline station operators and lunch room proprietors who purchased the cigarettes from jobbers. The jobbers in turn derived their profits from the difference between the wholesale price paid by them and the price charged by them to local dealers. A great advantage therefore accrued to any dealer buying at the discounted or wholesale list prices. Selling to dealers at jobbers' prices was called "direct selling" and the dealers as well as the jobbers getting those prices were referred to as being on the "direct list." The list prices charged and the discounts allowed by petitioners have been practically identical since 1923 and absolutely identical since 1928. Since the latter date, only seven changes have been made by the three companies and those have been identical in amount. The increases were first announced by Reynolds. American and Liggett thereupon increased their list prices in identical amounts.

**[**1137]** The following record of price changes is circumstantial evidence of the existence of a conspiracy and of a power and intent to exclude competition coming from cheaper **[*805]** grade cigarettes. During the two years preceding June, 1931, the petitioners produced 90% of the total cigarette production in the United States. In that month tobacco farmers were receiving the lowest prices for their crops since 1905. The costs to the petitioners for tobacco leaf, therefore, were lower than usual during the past 25 years, and their manufacturing costs had been declining. It was one of the worst years of financial and economic depression in the history of the country. On June 23, 1931, Reynolds, without previous notification or warning to the trade or public, raised the list price of Camel cigarettes, constituting its leading cigarette brand, from $ 6.40 to $ 6.85 a thousand. The same day, American increased the list price for Lucky Strike cigarettes, its leading brand, and Liggett the price for Chesterfield cigarettes, its leading brand, to the identical price of $ 6.85 a thousand. No economic justification for this raise was demonstrated. The president of Reynolds stated that it was "to express our own courage for the future and our own confidence in our industry." The president of American gave as his reason for the increase, "the opportunity of making some money." See *147 F.2d 93, 103*. He further claimed that because Reynolds had raised its list price, Reynolds would therefore have additional funds for advertising and American had raised its price in **[***1592]** order to have a similar amount for advertising. The officials of Liggett claimed that they thought the increase was a mistake as there did not seem to be any reason for making a price advance but they contended that unless they also raised their list price for Chesterfields, the other companies would have greater resources to spend in advertising and thus would put Chesterfield cigarettes at a competitive disadvantage. This general price increase soon resulted in

higher retail prices and in a loss in volume of sales. Yet in 1932, in the midst of the national depression with the sales of the petitioners' cigarettes falling off greatly in number, the **[*806]** petitioners still were making tremendous profits as a result of the price increase. Their net profits in that year amounted to more than $ 100,000,000. This was one of the three biggest years in their history.

Before 1931, certain smaller companies had manufactured cigarettes retailing at 10 cents a package, which was several cents lower than the retail price for the leading brands of the petitioners. Up to that time, the sales of the 10 cent cigarettes were negligible. However, after the above described increase in list prices of the petitioners in 1931, the 10 cent brands made serious inroads upon the sales of the petitioners. These cheaper brands of cigarettes were sold at a list price of $ 4.75 a thousand and from 1931 to 1932 the sales of these cigarettes multiplied 30 times, rising from 0.28% of the total cigarette sales of the country in June, 1931, to 22.78% in November, 1932. In response to this threat of competition from the manufacturers of the 10 cent brands, the petitioners, in January, 1933, cut the list price of their three leading brands from $ 6.85 to $ 6 a thousand. In February, they cut again to $ 5.50 a thousand. The evidence tends to show that this cut was directed at the competition of the 10 cent cigarettes. Reports that previously had been sent in by various officials and representatives to their companies told of the petitioners' brands losing in competition with the 10 cent brands. The petitioners were interested in a sufficiently low retail price for their products so that they would defeat the threat from the lower priced cigarettes and found that, in order to succeed in their objective, it was necessary that there be not more than a 3 cent differential on each package at retail between the cheaper cigarettes and their own brands. The petitioners' cuts in their list prices and the subsequent reductions in the retail prices of their products resulted in a victory over the 10 cent brands. The letters of petitioners' representatives to their companies reported upon the progress of **[*807]** this battle, giving an account **[**1138]** of the decline in sales of the 10 cent brands because of the price reductions in the "15-cent brands," and prophesying that certain of the 10 cent brands would "pass out of the picture." Following the first price cut by petitioners, the sales of the 10 cent brands fell off considerably. After the second cut they fell off to a much greater extent. When the sale of the 10 cent brands had dropped from 22.78% of the total cigarette sales in November, 1932, to 6.43% in May, 1933, the petitioners, in January, 1934, raised the list price of their leading brands from $ 5.50 back up to $ 6.10 a thousand. During the period that the list price of $ 5.50 a thousand was in effect, Camels and Lucky Strikes were being sold at a loss by Reynolds and American. Liggett at the same time was forced to curtail all of its normal business activities and cut its advertising to the bone in order to sell at this price. The petitioners, in 1937, again increased the list prices of their above named brands to $ 6.25 a thousand and in July, 1940, to $ 6.53 a thousand.

Certain methods used by the petitioners to secure a reduction in **[***1593]** the retail prices of their cigarettes were in evidence. Reynolds and Liggett required their retailers to price the 10 cent brands at a differential of not more than 3 cents below Camel and Chesterfield cigarettes. They insisted upon their dealers correcting a greater differential by increasing the retail price of the 10 cent brands to 11 cents with petitioners' brands at 14 cents a package, or by requiring that petitioners' brands be priced at 13 cents with the lower priced cigarettes at 10 cents a package. Salesmen for Liggett were instructed to narrow the differential to 3 cents, it being deemed of no consequence whether the dealer raised the price of the 10 cent brands or reduced the price of Chesterfields. Reynolds referred to a differential of more than 3 cents as "discriminatory" on the ground that the dealer then **[*808]** would make a higher gross profit on the higher priced cigarettes than on the 10 cent brands. After the list price reductions were made and at the height of the price war, the petitioners commenced the distribution of posters advertising their brands at 10 cents a package and made attempts to have dealers meet these prices. Among the efforts used to achieve their objectives, petitioners gave dealers direct list privileges of purchase, together with discounts, poster advertising displays, cash subsidies and free goods. In addition to the use of these inducements, petitioners also used threats and penalties to enforce compliance with their retail price program, removed dealers from the direct lists, cancelled arrangements for window advertising, changed credit terms with a resulting handicap to recalcitrant dealers, discontinued cash allowances for advertising, refused to make deals giving free goods, and made use of price cutters to whom they granted advantageous privileges to drive down retail prices where a parity, or price equalization, was not maintained by dealers between brands of petitioners or where the dealers refused to maintain the 3 cent differential between the 10 cent brands and the leading brands of petitioners' cigarettes. There was evidence that when dealers received an announcement of the price increase from one of the petitioners and attempted to purchase some of the leading brands of cigarettes from the other petitioners at their unchanged prices before announcement of a similar change, the latter refused to fill such orders until their prices were also raised, thus bringing about the same result as if the changes had been precisely simultaneous.

III.

***LEdHN[6]*** [6]It was on the basis of such evidence that the Circuit Court of Appeals found that the verdicts of the jury were sustained by sufficient evidence on each count. The question squarely presented here by the order of this **[*809]** Court in allowing the writs of certiorari is whether ***HN3*** actual exclusion of competitors is necessary to the crime of monopolization in these cases under *§ 2* of the Sherman Act. We agree with the lower courts that such actual exclusion of competitors is not necessary to that crime in these cases and that the instructions given to the jury, and hereinbefore quoted, correctly defined the crime. A correct interpretation **[**1139]** of the statute and of the authorities makes it the crime of monopolizing, under *§ 2* of the Sherman Act, for parties, as in these cases, to combine or conspire to acquire or maintain the power to exclude competitors from any

part of the trade or commerce among the several states or with foreign nations, provided they also have such a power that they are able, as a group, to exclude actual or potential competition from the field and provided that they have the intent and purpose to exercise that power. See *United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 226, n. 59* **[***1594]** and authorities cited.

***LEdHN[7]*** [7]***LEdHN[8]*** [8]***LEdHN[9]*** [9]***LEdHN[10]*** [10]***HN4*** It is not the form of the combination or the particular means used but the result to be achieved that the statute condemns. It is not of importance whether the means used to accomplish the unlawful objective are in themselves lawful or unlawful. Acts done to give effect to the conspiracy may be in themselves wholly innocent acts. Yet, if they are part of the sum of the acts which are relied upon to effectuate the conspiracy which the statute forbids, they come within its prohibition. No formal agreement is necessary to constitute an unlawful conspiracy. Often crimes are a matter of inference deduced from the acts of the person accused and done in pursuance of a criminal purpose. Where the conspiracy is proved, as here, from the evidence of the action taken in concert by the parties to it, it is all the more convincing proof of an intent to exercise the power of exclusion acquired through that conspiracy. ***HN5*** The essential combination or conspiracy in violation of the Sherman Act may be found in a course **[*810]** of dealing or other circumstances as well as in an exchange of words. *United States v. Schrader's Son, 252 U.S. 85*. Where the circumstances are such as to warrant a jury in finding that the conspirators had a unity of purpose or a common design and understanding, or a meeting of minds in an unlawful arrangement, the conclusion that a conspiracy is established is justified. Neither proof of exertion of the power to exclude nor proof of actual exclusion of existing or potential competitors is essential to sustain a charge of monopolization under the Sherman Act.

In *Apex Hosiery Co*. v. *Leader, 310 U.S. 469, 496*, this Court said in a footnote, "On finding . . . a power to control the output, supply of the market and the transportation facilities of potential competitors, in the anthracite coal market, the arrangement was held void in *United States v. Reading Co., 253 U.S. 26, 47-48*." It has been held that regardless of the use made of it, a power resulting from the deliberately calculated purchase of a control, which enables a holding company to dominate two great competing interstate railroad carriers and two great competing coal companies engaged extensively in mining and selling anthracite coal which must be distributed over these railroads, is a menace and an undue restraint upon interstate commerce within the meaning of the Anti-Trust Act and is in flagrant violation of the prohibition against monopoly in the Second Section of that Act. *United States v. Reading Co., 253 U.S. 26*. In *Northern Securities Co*. v. *United States, 193 U.S. 197*, in referring to the holding company device there in issue, this Court said that the mere existence of such a combination and the power acquired by the holding company as its trustee constituted a menace to and a direct restraint upon that freedom of commerce which Congress intended to recognize and protect and which the public is entitled to have **[*811]** protected. ***HN6*** A combination may be one in restraint of interstate trade or commerce or to monopolize a part of such trade or commerce in violation of the Sherman Act, although such restraint or monopoly may not have been actually attempted to any harmful extent. See *United States v. International Harvester Co., 214 F. 987*, *id., 274 U.S. 693*. The authorities support the view that the material consideration in determining whether a monopoly exists is not that prices **[**1140]** are raised **[***1595]** and that competition actually is excluded but that power exists to raise prices or to exclude competition when it is desired to do so. *United States v. American Tobacco Co., 164 F. 700, 721*, remanded for further proceedings, *221 U.S. 106, 188*. "It is undoubtedly true . . . that trade and commerce are 'monopolized' within the meaning of the federal statute, when, as a result of efforts to that end, such power is obtained that a few persons acting together can control the prices of a commodity moving in interstate commerce. It is not necessary that the power thus obtained should be exercised. Its existence is sufficient." *United States v. Patten, 187 F. 664, 672*, reversed on other grounds, *226 U.S. 525*. Cf. *North American Co*. v. *S. E. C., 327 U.S. 686*.

The precise question before us has not been decided previously by this Court. However, on March 12, 1945, two weeks before the grant of the writs of certiorari in the present cases, a decision rendered in a suit in equity brought under *§§ 1* and *2* of the Sherman Anti-Trust Act against the Aluminum Company of America closely approached the issue we have here. That case was decided by the Circuit Court of Appeals for the Second Circuit under unique circumstances which add to its weight as a precedent. *United States v. Aluminum Co. of America, 148 F.2d 416*. That court sat in that case under a new statute authorizing it to render a decision "in lieu of a **[*812]** decision by the Supreme Court" and providing that such decision "shall be final and there shall be no review of such decision by appeal or certiorari or otherwise." [10]

**[*813]** **[***1596]** We find the following statements from the opinion of the court in that case to be especially appropriate here and we welcome this opportunity to endorse them:

---

10 "In every suit in equity brought in any district court of the United States under any of said Acts [including the Sherman Anti-Trust Act], wherein the United States is complainant, an appeal from the final decree of the district court will lie only to the Supreme Court and must be taken within sixty days from the entry thereof: *Provided, however*. That if, upon any such appeal, it shall be found that, by reason of disqualification, there shall not be a quorum of Justices of the Supreme Court qualified to participate in the consideration of the case on the merits, then, in lieu of a decision by the Supreme Court, the case shall be immediately certified by the Supreme Court to the circuit court of appeals of the circuit in which is located the district in which the suit was brought which court shall thereupon have jurisdiction to hear and determine the appeal in such case, and it shall be the duty of the senior circuit judge of said circuit court of appeals, qualified to participate in the consideration of the case on the merits, to designate immediately three circuit judges of said court, one of whom shall be himself and the other two of whom shall be the two circuit judges next in order of seniority to himself, to hear and determine the appeal in such case and it shall be the duty of the court, so comprised, to assign the case for argument at the earliest practicable date and to hear and determine

"Many people believe that possession of unchallenged economic power deadens initiative, discourages thrift and depresses energy; that immunity from competition is a narcotic, and rivalry is a stimulant, to industrial progress; that the spur of constant stress is necessary to counteract an inevitable disposition to let well enough **[**1141]** alone. . . . These considerations, which we have suggested only as possible purposes of the Act, we think the decisions prove to have been in fact its purposes. [*148 F.2d at 427*.]

. . . .

"Starting, however, with the authoritative premise that all contracts fixing prices are unconditionally prohibited, the only possible difference between them and a monopoly is that while a monopoly necessarily involves an equal, or even greater, power to fix prices, its mere existence might be thought not to constitute an exercise of that power. That distinction is nevertheless purely formal; it would be valid only so long as the monopoly remained wholly inert; it would disappear as soon as the monopoly began to operate; for, when it did -- that is, as soon as it began to sell at all -- it must sell at some price and the only price at which it could sell is a price which it itself fixed. Thereafter the power and its exercise must needs coalesce. Indeed it would be absurd to condemn such contracts unconditionally, and not to extend the condemnation to monopolies; for the contracts are only steps toward that entire control which monopoly confers: they are really partial monopolies. [*Id. 427-428*.]

. . . .

"It does not follow because 'Alcoa' had such a monopoly, that it 'monopolized' the ingot market: it may not have achieved monopoly; monopoly may have been thrust upon it. If it had been a combination of existing smelters which united the whole industry **[*814]** and controlled the production of all aluminum ingot, it would certainly have 'monopolized' the market. In several decisions the Supreme Court has decreed the dissolution of such combinations, although they had engaged in no unlawful trade practices. . . . We may start therefore with the premise that to have combined ninety per cent of the producers of ingot would have been to 'monopolize' the ingot market; and, so far as concerns the public interest, it can make no difference whether an existing competition is put an end to, or whether prospective competition is prevented. The Clayton Act itself speaks in that alternative: 'to injure, destroy, or prevent competition.' *§ 13 (a), 15 U. S. C. A.* [*Id. 429*.]

. . . .

"It insists that it never excluded competitors; but we can think of no more effective exclusion than progressively to embrace each new opportunity as it opened, and to face every newcomer with new capacity already geared into a great organization, having the advantage of experience, trade connections and the elite of personnel. Only in case we interpret 'exclusion' as limited to manoeuvers not honestly industrial, but actuated solely by a desire to prevent competition, can such a course, indefatigably pursued, be deemed not 'exclusionary.' So to limit it would in our judgment emasculate the Act; would permit just such consolidations as it was designed to prevent. [*Id. 431*.]

. . . .

***HN7*** "In order to fall within *§ 2*, the monopolist must have both the power to monopolize, and the intent to monopolize. To read the passage as demanding any 'specific' intent, makes nonsense of it, for no monopolist **[***1597]** monopolizes unconscious of what he is doing." [*Id. 432*.]

In the present cases, the petitioners have been found to have conspired to establish a monopoly and also to have the power and intent to establish and maintain the monopoly. **[*815]** To hold that they do not come within the prohibition of the Sherman Act would destroy the force of that Act. Accordingly, the instructions of the trial court under *§ 2* of the Act are approved and the judgment of the Circuit Court of Appeals is

---

the same, and the decision of the three circuit judges so designated, or of a majority in number thereof, shall be final and there shall be no review of such decision by appeal or certiorari or otherwise. . . ." 32 Stat. 823, as amended by 58 Stat. 272, 15 U. S. C. Supp. IV, § 29.

The proviso in the above section was added by Public Law 332, 78th Cong., 2d Sess., approved June 9, 1944, which also made the Act applicable "to every case pending before the Supreme Court of the United States on the date of its enactment." 58 Stat. 272. The case against the Aluminum Company of America was then pending in this Court and, on June 12, 1944, this Court certified it to the Circuit Court of Appeals for the Second Circuit because of the lack of a quorum of Justices of the Supreme Court qualified to participate in the consideration of it on its merits. It was tried before the three senior judges of the Circuit Court of Appeals (Judges Learned Hand, Swan and Augustus N. Hand) and is the only case that has been tried under that proviso.

*Affirmed*. [11]

**[**1142]** MR. JUSTICE FRANKFURTER entirely agrees with the judgment and the opinion in these cases. He, however, would have enlarged the scope of the orders allowing the petitions for certiorari so as to permit consideration of the alleged errors in regard to the selection of the jury.

MR. JUSTICE REED and MR. JUSTICE JACKSON took no part in the consideration or decision of these cases.

**Concur by:** RUTLEDGE

**Concur**

MR. JUSTICE RUTLEDGE, concurring.

I concur in the Court's opinion and judgment. In doing so, however, I express no judgment concerning other questions determined on the appeal to the *Circuit Court of Appeals, 147 F.2d 93*, and presented in the application for certiorari or the later petition for rehearing and enlargement of the scope of review here, including the question whether upon the particular facts the law has been applied in such a manner as to bring about, in substantial effect, multiple punishment for the same offense. Cf. *Pinkerton* v. *United States, ante*, pp. 640, 648, dissenting opinion.

**[*816]** That question has been discussed in the briefs and the argument, for its bearing upon the disposition of the single question which certiorari was granted to review, namely, "whether actual exclusion of competitors is necessary to the crime of monopolization under *§ 2* of the Sherman Act." *324 U.S. 836*. On this issue I have no doubt of the correctness of the Court's conclusion that the offense of monopolization is complete when power is acquired to exclude competitors and therefore that actual exclusion need not be shown, for the reasons set forth in the opinion. Whether, in this view, multiple punishment may arise upon application of the law to particular facts under counts charging conspiracy in restraint of trade, monopolization, and conspiracy to monopolize presents a different question which can be determined only by examination of the manner in which the particular application has been made. Since, in view of the limited character of our action in granting certiorari, neither the issue of multiple punishment nor the facts of record upon which it arises are before us for review, it would be inappropriate to express opinion on that question.

---

11 Upon suggestion of the death of Edward H. Thurston, a petitioner in case No. 19, a motion to dismiss the writ of certiorari as to him was granted by the Court on February 11, 1946. *327 U.S. 764*. It remains for the Circuit Court of Appeals and the District Court of the United States for the Eastern District of Kentucky to take such further action as law and justice may require. See *Singer* v. *United States*, 323 U.S. 338, 346; *United States* v. *Johnson*, 319 U.S. 503, 520.

EXHIBIT 258

LexisNexis®

Positive
As of: August 12, 2014 9:09 AM EDT

# Barry Wright Corp. v. ITT Grinnell Corp.

United States Court of Appeals for the First Circuit
December 29, 1983, Decided
No. 83-1292

**Reporter:** 724 F.2d 227; 1983 U.S. App. LEXIS 14061; 1984-1 Trade Cas. (CCH) P65,787
BARRY WRIGHT CORPORATION, Plaintiff, Appellant, v. ITT GRINNELL CORPORATION, ET AL., Defendants, Appellees

**Prior History:** **[**1]** APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS [Hon. Walter Jay Skinner, U.S. District Judge].

**Disposition:** Affirmed.

**Core Terms**

prices, snubbers, costs, anti trust law, exclusionary, Predatory, buy, incremental, price cut, requirements, competitive, competitors, mechanical, discount, district court, damages, buyer, total cost, anticompetitive, industries, contracts, courts, cuts, foreclosure, antitrust, price cutting, concentrated, suggests, seller, price fixing

**LexisNexis® Headnotes**

Antitrust & Trade Law > Regulated Practices > Monopolies & Monopolization > General Overview
Antitrust & Trade Law > ... > Monopolies & Monopolization > Attempts to Monopolize > General Overview
Antitrust & Trade Law > Sherman Act > General Overview
Antitrust & Trade Law > Sherman Act > Scope > General Overview
Antitrust & Trade Law > Sherman Act > Scope > Monopolization Offenses

***HN1*** 15 U.S.C.S. § 2 makes it unlawful to monopolize any part of the trade or commerce among the several states.

Antitrust & Trade Law > Regulated Practices > Monopolies & Monopolization > General Overview
Antitrust & Trade Law > Sherman Act > General Overview

***HN2*** Monopolization, under 15 U.S.C.S. § 2, has two elements: First, the possession of monopoly power in the relevant market, and; second, the acquisition or maintenance of that power by other than such legitimate means as patents, superior product, business acumen, or historic accident.

Antitrust & Trade Law > Regulated Practices > Monopolies & Monopolization > General Overview
Antitrust & Trade Law > Sherman Act > General Overview

***HN3*** Under 15 U.S.C.S. § 2, a practice, a method, a means, is "improper" if it is exclusionary.

Antitrust & Trade Law > Regulated Practices > Monopolies & Monopolization > General Overview
Antitrust & Trade Law > Sherman Act > General Overview

***HN4*** "Exclusionary" conduct is conduct, other than competition on the merits or restraints reasonably "necessary" to competition on the merits, that reasonably appear capable of making a significant contribution to creating or maintaining monopoly power.

Antitrust & Trade Law > Regulated Industries > Higher Education & Professional Associations > General Overview
Antitrust & Trade Law > Regulated Practices > Monopolies & Monopolization > General Overview
Antitrust & Trade Law > Sherman Act > General Overview

***HN5*** A legal precedent or rule of law that prevents a firm from unilaterally cutting its prices risk interference with one of the Sherman Act's, *15 U.S.C.S. § 1 et seq.*, most basic objectives: The low price levels that one would find in well-functioning competitive markets.

Antitrust & Trade Law > Regulated Practices > Monopolies & Monopolization > General Overview
Antitrust & Trade Law > Regulated Practices > Price Fixing & Restraints of Trade > General Overview
Antitrust & Trade Law > Sherman Act > General Overview

***HN6*** The modern antitrust courts look to the relation of price to "avoidable" or "incremental" costs as a way of segregating price cuts that are "suspect" from those that are not.

Antitrust & Trade Law > Regulated Practices > Monopolies & Monopolization > General Overview
Antitrust & Trade Law > Regulated Practices > Price Fixing & Restraints of Trade > General Overview
Antitrust & Trade Law > Sherman Act > General Overview
Evidence > Relevance > Preservation of Relevant Evidence > Exclusion & Preservation by Prosecutors

***HN7*** When prices exceed "average variable cost," but are "below average total cost," plaintiff must prove by a preponderance of the evidence that defendant's pricing policy depends on its exclusionary or disciplinary tendency. And, in a case involving "prices above average total cost," plaintiff can still win if it proves by clear and convincing evidence, i.e., that it is highly probably true that defendant's pricing policy was predatory.

Antitrust & Trade Law > Regulated Practices > Monopolies & Monopolization > General Overview
Antitrust & Trade Law > Regulated Practices > Price Fixing & Restraints of Trade > General Overview
Antitrust & Trade Law > Sherman Act > General Overview

***HN8*** The Sherman Act, *15 U.S.C.S. § 1 et seq.*, does not make unlawful prices that exceed both incremental and average costs.

Antitrust & Trade Law > ... > Price Fixing & Restraints of Trade > Exclusive & Reciprocal Dealing > General Overview
Antitrust & Trade Law > ... > Price Fixing & Restraints of Trade > Per Se Rule & Rule of Reason > General Overview
Antitrust & Trade Law > Sherman Act > General Overview

***HN9*** Virtually every contract to buy "forecloses" or "excludes" alternative sellers from some portion of the market, namely the portion consisting of what was bought. It is not surprising then that the courts have judged the lawfulness of contracts to purchase not under per se rules but under a rule of reason.

Antitrust & Trade Law > ... > Price Fixing & Restraints of Trade > Exclusive & Reciprocal Dealing > General Overview
Antitrust & Trade Law > ... > Price Fixing & Restraints of Trade > Exclusive & Reciprocal Dealing > Requirements Contracts
Antitrust & Trade Law > ... > Price Fixing & Restraints of Trade > Per Se Rule & Rule of Reason > General Overview
Contracts Law > Types of Commercial Transactions > Sales of Goods > Output, Exclusive & Requirements Agreements
Healthcare Law > Healthcare Litigation > Antitrust Actions > Facilities

***HN10*** In determining the probable effect of a requirements contract on the relevant area of effective competition, a court is to take into account both the extent of the foreclosure and the buyer's and seller's business justifications for the arrangement. A court must look both to the severity of the foreclosure (a fact which, other things being equal, suggests anticompetitive harm) and the strength of the justifications in determining whether the "size" of the contract to purchase is reasonable.

Antitrust & Trade Law > ... > Price Fixing & Restraints of Trade > Exclusive & Reciprocal Dealing > General Overview
Contracts Law > Types of Commercial Transactions > Sales of Goods > Output, Exclusive & Requirements Agreements

***HN11*** There is an important difference between a requirements' contract and a contract which calls for the purchase of a definite quantity over a period of time which the buyer estimates to be sufficient to meet his requirements. A true requirements contract flatly eliminates the buyer from the market for its duration; a fixed quantity contract leaves open the possibility that the buyer's needs will exceed his contractual commitment; he is free to purchase from others any excess amount that he may want.

Antitrust & Trade Law > ... > Price Fixing & Restraints of Trade > Exclusive & Reciprocal Dealing > General Overview
Commercial Law (UCC) > ... > Application & Construction > Remedies > Damages
Commercial Law (UCC) > Sales (Article 2) > General Overview
Commercial Law (UCC) > ... > Remedies > Limitations & Modifications > General Overview
Commercial Law (UCC) > ... > Remedies > Limitations & Modifications > Liquidated Damages
Contracts Law > ... > Types of Damages > Compensatory Damages > General Overview
Contracts Law > ... > Measurement of Damages > Foreseeable Damages > General Overview
Contracts Law > ... > Damages > Types of Damages > Liquidated Damages

***HN12*** The parties to a contract have a right to collect damages for breach. And, they can insert a liquidated damages provision in the contract as a measure of damages. *U.C.C. § 2-718*.

Antitrust & Trade Law > ... > Price Fixing & Restraints of Trade > Exclusive & Reciprocal Dealing > General Overview
Commercial Law (UCC) > ... > Application & Construction > Remedies > Damages
Commercial Law (UCC) > Sales (Article 2) > General Overview
Commercial Law (UCC) > ... > Remedies > Limitations & Modifications > General Overview
Commercial Law (UCC) > ... > Remedies > Limitations & Modifications > Liquidated Damages
Contracts Law > ... > Types of Damages > Compensatory Damages > General Overview
Contracts Law > ... > Measurement of Damages > Foreseeable Damages > General Overview

Contracts Law > ... > Damages > Types of Damages > Liquidated Damages

***HN13*** A liquidated damages provision is enforceable only if it is reasonable in the light of the anticipated or actual harm caused by the breach, the difficulties of proof of loss, and the inconvenience or non-feasibility of otherwise obtaining an adequate remedy. A term fixing unreasonably large liquidated damages is void as a penalty. *U.C.C. § 2-718(1)*.

Antitrust & Trade Law > ... > Price Fixing & Restraints of Trade > Exclusive & Reciprocal Dealing > General Overview

Antitrust & Trade Law > ... > Price Fixing & Restraints of Trade > Exclusive & Reciprocal Dealing > Requirements Contracts

Contracts Law > Contract Conditions & Provisions > General Overview

Contracts Law > ... > Damages > Types of Damages > Liquidated Damages

Contracts Law > Types of Commercial Transactions > Sales of Goods > Output, Exclusive & Requirements Agreements

***HN14*** If the cancellation clause in a requirements contract provides only for lawful liquidated damages, it is no more "exclusionary" than the underlying substantive agreement that it helps to enforce.

Antitrust & Trade Law > ... > Monopolies & Monopolization > Attempts to Monopolize > General Overview

Antitrust & Trade Law > ... > Price Fixing & Restraints of Trade > Exclusive & Reciprocal Dealing > General Overview

Antitrust & Trade Law > ... > Price Fixing & Restraints of Trade > Per Se Rule & Rule of Reason > General Overview

Antitrust & Trade Law > Sherman Act > General Overview

***HN15*** A monopolist's conduct that from a competitive point of view is unreasonable, is "exclusionary." Thus, conduct that is not "exclusionary" is not "unreasonable."

Torts > ... > Commercial Interference > Contracts > General Overview

***HN16*** Under Massachusetts law, one essential element of the tort of tortious interference is that defendant's conduct be either per se unlawful or conducted with malice.

**Counsel:** Donald B. Gould, Kenneth A. Cohen, Jonathan P. Feltner, Andrew S. Hogeland, and Goodwin, Procter & Hoar, for Appellant.

Joseph J. O'Malley, Norman A. Dupont, Paul, Hastings, Janofsky & Walker, John A. Nadas, and Choate, Hall & Stewart, for Appellee Pacific Scientific Company.

**Judges:** Campbell, Chief Judge, Skelton, * Senior Circuit Judge, and Breyer, Circuit Judge.

**Opinion by:** BREYER

**Opinion**

**[*228]** BREYER, Circuit Judge. The question that this case presents is whether defendant Pacific Scientific Company ("Pacific") engaged in "exclusionary practices" in violation of the anti-monopoly law, Sherman Act *§ 2*, *15 U.S.C. § 2*. The practices at issue are embodied in

---

* Of the Federal Circuit, sitting by designation.

agreements between Pacific and ITT Grinnell ("Grinnell"), under which Pacific agreed to sell its product (mechanical snubbers) to Grinnell at a specially low price and Grinnell agreed to take nearly all its snubber requirements from Pacific. The district court, *555 F. Supp. 1264,* **[**2]** found that the relevant contract provisions did not violate the antitrust laws. We agree with the district court on this matter, and on others less important; and we affirm its judgment.

I

On appeal from a judgment in defendant's favor, we must, of course, accept the district court's findings insofar as they determine, or rest upon, the facts, unless they are "clearly erroneous." *Fed. R. Civ. P. 52(a)*. Our reading of the record, in light of this standard, suggests the following somewhat simplified account of the most important factual matters:

**[*229]** Pacific produces mechanical snubbers; they are shock absorbers used in building pipe systems for nuclear power plants. No other domestic firm makes mechanical snubbers; foreign mechanical snubbers do not satisfy Nuclear Regulatory Commission standards; and snubber users have found the closest substitute, namely *hydraulic* snubbers, to be less reliable than the mechanical version. Thus, in 1976, Pacific's sales accounted for 47 percent of all snubbers sold; in 1977, 83 percent; in 1978, 84 percent, and in 1979, 94 percent.

Grinnell makes and installs nuclear plant pipe systems; it is a major snubber user. Its snubber **[**3]** purchases accounted for 51 percent of all mechanical snubbers and related hardware sold domestically in 1977; 52 percent in 1978; and 43 percent in 1979. By 1976, most of Grinnell's pipe system customers were requiring Grinnell to use mechanical snubbers. Recognizing Pacific's strong market position, Grinnell sought to develop an alternate mechanical snubber source. Hence, it entered into a contract with Barry Wright Corporation ("Barry"), the plaintiff here, under which it would help Barry develop a full mechanical snubber line. Grinnell agreed to contribute to Barry's development costs. It also agreed to use Barry as an exclusive source of supply between 1977 and 1979, promising to buy between $9 million and $15 million worth of snubbers during that period. Barry was to have its full line of six snubber sizes in production by the first quarter of 1977.

While waiting for Barry, Grinnell satisfied its current needs by buying mechanical snubbers from Pacific at Pacific's ordinary "discount" price -- 20 percent below list. Pacific noticed that Grinnell's orders seemed small in relation to its likely needs. And, by September, 1976, Pacific realized that Grinnell was trying to **[**4]** develop its own supply source through Barry. In August, 1976, Pacific offered Grinnell a special price break -- a 30 percent discount from list for small snubbers, 25 percent for larger ones -- in return for a large $5.7 million order that would have met Grinnell's snubber needs through 1977. Grinnell, after tentatively accepting this proposal, consulted with Barry and then rejected Pacific's offer. Instead, it placed a smaller $1 million order at the standard 20 percent discount.

Barry coult not meet the required January, 1977 production schedule. By mid-January, 1977, it told Grinnell that it would not be able to produce small snubbers until August, 1977 nor large ones until February, 1978. Grinnell then met with Pacific and (at the end of January, 1977) negotiated a $4.3 million snubber contract -- enough snubbers to meet Grinnell's estimated needs for the next twelve months. Pacific gave Grinnell the large 30 percent/25 percent discounts. It also gave Grinnell an option -- open until July, 1977 -- to buy its 1978 requirements at the same price (as long as Grinnell agreed to buy as much as in 1977). Grinnell, in turn, agreed to a

non-cancellation clause that would have made **[**5]** it especially onerous for Grinnell to break the agreement.

Grinnell then told Barry that is production delays were unacceptable and that Barry had breached its development contract. Grinnell wanted Barry to continue its efforts, but it would not promise to buy more than $3.6 million worth of snubbers through 1979. Barry said this modification of the development contract was unjustified. It continued to try to develop snubbers. The extent of its progress is in dispute, but there is considerable evidence that it fell further behind its production schedules.

At the end of May, 1977, Grinnell and Pacific agreed further that Grinnell would buy $6.9 million worth of Pacific's snubbers for 1978 and $5 million for 1979. Grinnell predicted snubber "needs" of $6.9 million for each of the two years. On July 5, 1977 and July 14, 1977, Grinnell finalized the agreements for 1978 and 1979 by issuing purchase orders in these amounts. Pacific granted the special 30 percent/25percent price discounts; and the contracts contained the special cancellation clause.

In June, 1977, Grinnell told Barry that their collaboration was at an end. Barry looked for other potential snubber buyers and then **[**6]** abandoned its snubber efforts. **[*230]** Subsequently, Barry brought this lawsuit against Pacific (and against Grinnell, as well, although Barry and Grinnell have reached a settlement). Barry charged that Pacific's efforts to sell snubbers to Grinnell and the terms of its contracts violated *Sections 1* and *2* of the Sherman Act, *15 U.S.C. §§ 1*, *2*, and *Section 3* of the Clayton Act, *15 U.S.C. § 14*. It added a claim that Pacific had tortiously interfered with Barry's snubber-development contract with Grinnell.

The district court found that Barry failed to establish that Pacific's conduct was improper. The court also found that Barry had breached its contract with Grinnell before Grinnell placed its 1977 order with Pacific (in late January, 1977). And, it found that Barry would not have been capable of supplying Grinnell in 1977-79 regardless. Barry appeals all these findings. We need not consider the latter two, however, for we find the district court's conclusion about the lawfulness of Pacific's behavior adequately supported. And that conclusion is dispositive.

II

Barry's central claim is that Pacific's conduct violates Sherman **[**7]** Act *§ 2*, which ***HN1*** makes it unlawful to "monopolize . . . any part of the trade or commerce among the several States." *15 U.S.C. § 2*. ***HN2*** Monopolization has two elements: first, the "possession of monopoly power in the relevant market" and, second, the "acquisition or maintenance of that power" by other than such legitimate means as patents, "superior product, business acumen, or historic accident." *United States v. Grinnell Corp., 384 U.S. 563, 570-71, 16 L. Ed. 2d 778, 86 S. Ct. 1698 (1966)*. On this appeal, the parties do not dispute Pacific's monopoly power in the relevant market, which the district court identified as the domestic market for snubbers (whether mechanical or hydraulic). Nor do they dispute the legitimacy of Pacific's *acquisition* of this power. Whether its acquisition rested upon the fact that Pacific possessed an important mechanical snubber patent, upon a "superior product," or upon the "historic accident" that users began to find hydraulic **[**8]** snubbers unsatisfactory, no one alleges that Pacific acted unlawfully in acquiring its dominant position. Accepting these two assumptions, we turn to the issue that is in dispute, whether Pacific *maintained* its monopoly position against the threat of Barry's entry through improper means.

In this context, ***HN3*** a practice, a method, a means, is "improper" if it is "exclusionary." *United States v. United Shoe Machinery Corp., 110 F. Supp. 295, 342 (D. Mass. 1953)*, *aff'd per curiam*, *347 U.S. 521, 74 S. Ct. 699, 98 L. Ed. 910 (1954)*. To decide whether Pacific's conduct was exclusionary, we should ask whether its dealings with Grinnell went beyond the needs of ordinary business dealings, beyond the ambit of ordinary business skill, and "unnecessarily excluded competition" from the snubber market. *Greyhound Computer Corp. v. International Business Machines Corp., 559 F.2d 488, 498 (9th Cir. 1977)*, *cert. denied*, *434 U.S. 1040, 54 L. Ed. 2d 790, 98 S. Ct. 782 (1978)*. Professors Areeda and Turner have put the matter nicely: " **[**9]** ***HN4*** 'Exclusionary' conduct is conduct, other than competition on the merits or restraints reasonably 'necessary' to competition on the merits, that reasonably appear capable of making a significant contribution to creating or maintaining monopoly power." 3 P. Areeda and D. Turner, *Antitrust Law* para. 626 at 83 (1978). Was Pacific's conduct reasonable in light of its business needs or did it unreasonably restrict competition? *California Computer Products, Inc. v. International Business Machines Corp., 613 F.2d 727, 735-36 (9th Cir. 1979)*. Barry points to three specific aspects of Pacific's conduct -- its offer of special discounts to Grinnell, its insistence on a long-term large-volume contract, and its inclusion of the special non-cancellation clause -- which it claims show that Pacific acted in an exclusionary manner.

A

Barry first attacks the special 30 percent/25 percent discounts that Pacific granted Grinnell. It argues that Pacific's **[*231]** discounted prices were unreasonably low. This argument founders, however, on the district court finding that these prices, while lower than normal, nonetheless **[**10]** generated revenues more than sufficient to cover the total cost of producing the goods to which they applied. Barry does not attack that finding; but, instead, it argues that price cutting by a monopolist may still prove unlawful, even if prices remain above total cost. While some circuits have accepted a form of Barry's argument, *see, e.g.*, *Transamerica Computer Co. v. International Business Machines Corp., 698 F.2d 1377* (9th Cir.), *cert. denied*, *464 U.S. 955, 52 U.S.L.W. 3343, 78 L. Ed. 2d 329, 104 S. Ct. 370 (1983)*; *International Air Industries, Inc. v. American Excelsior Co., 517 F.2d 714, 724 (5th Cir. 1975)*, *cert. denied*, *424 U.S. 943, 47 L. Ed. 2d 349, 96 S. Ct. 1411 (1976)*, we do not.

To understand the basis of our disagreement, one must ask why the Sherman Act ever forbids price cutting. After all, lower prices help consumers. The competitive marketplace that the antitrust laws encourage and protect is characterized by firms willing and able to cut prices in order to take customers from their rivals. And, in an economy with a significant number of concentrated industries, price cutting limits the **[**11]** ability of large firms to exercise their "market power," *see* J. Bain, *Industrial Organization* ch. 5 (2d ed. 1968); F. Scherer, *Industrial Market Structure and Economic Performance* 56-70, 222-25 (2d ed. 1980); at a minimum it likely moves "concentrated market" prices in the "right" direction -- towards the level they would reach under competitive conditions. See 2 P. Areeda & D. Turner, *Antitrust Law* para. 404; J. Bain, *supra*, at 118-23; F. Scherer, *supra*, ch. 5. Thus, ***HN5*** a legal precedent or rule of law that prevents a firm from unilaterally cutting its prices risk interference with one of the Sherman Act's most basic objectives: the low price levels that one would find in well-functioning competitive markets. *See, e.g.*, *National Society of Professional Engineers v. United States, 435 U.S. 679, 692-96, 55 L. Ed. 2d 637, 98 S. Ct. 1355 (1978)*; *MCI Communications Corp. v. American Telephone and Telegraph Co., 708 F.2d 1081, 1114* (7th Cir.), *cert. denied*, *464 U.S. 891, 52 U.S.L.W. 3291, 78 L. Ed. 2d 226, 104 S. Ct. 234 (1983)*; **[**12]** 1 P. Areeda and D. Turner, *Antitrust Law* paras. 103-05, 111-12.

Despite these considerations, courts have reasoned that it is sometimes possible to identify circumstances in which a price cut will make consumers worse off, not better off. *See, e.g., Northeastern Telephone Co. v. American Telephone and Telegraph Co., 651 F.2d 76, 88 (2d Cir. 1981), cert. denied,* 455 U.S. 943, 71 L. Ed. 2d 654, 102 S. Ct. 1438 (1982). Suppose, for example, a firm cuts prices to unsustainably low levels -- prices below "incremental" costs. Suppose it drives competitors out of business, and later on it raises prices to levels higher than it could have sustained had it competitors remained in the market. Without special circumstances there is little to be said in economic or competitive terms for such a price cut. Yet, how often firms engage in such "predatory" price cutting, whether they ever do so, and precisely when, is all much disputed -- a dispute that is not surprising given the difficulties of measuring costs, discerning intent, and predicting future market conditions. *See, e.g.*, Koller, *The Myth of Predatory Pricing: An Empirical Study*, 4 Antitrust L. & Econ. Rev. 105 (1971); **[**13]** McGee, *Predatory Pricing Revisited*, 23 J.L. & Econ. 289 (1980); Posner, *Exclusionary Practices and the Antitrust Laws*, 41 U. Chi. L. Rev. 506, 516-17 (1974); F. Scherer, *supra*, at 335-40.

Despite this dispute, there is general agreement that a profit-maximizing firm might sometimes find it rational to engage in predatory pricing; it might do so if it knows (1) that it can cut prices deeply enough to outlast and to drive away all competitors, and (2) that it can then raise prices high enough to recoup lost profits (and then some) before new competitors again enter the market. *See* Areeda & Turner, *Predatory Pricing and Related Practices Under Section 2* of the Sherman Act , 88 Harv. L. Rev. 697, 698-99 (1975) [hereafter cited as Areeda & Turner, *Predatory Pricing*]. There is also general agreement that the antitrust courts' major task **[*232]** is to set rules and precedents that can segregate the economically harmful price-cutting goats from the more ordinary price-cutting sheep, in a manner precise enough to avoid discouraging desirable price-cutting activity. *See* P. Areeda & D. Turner, *Antitrust Law* paras. **[**14]** 711.1a-b, 714.1b, 714.5 (1982 Supp.). See also Paul L. Joskow & Alvin K. Klevorick, A Framework for Analyzing Predatory Pricing Policy, 89 Yale L.J. 213 (1979).

Barry, of course, suggests that Pacific's price cut is a "goat", arguing that Pacific "intended" to drive Barry from the market place. Some courts have written as if one might look to a firm's "intent to harm" to separate "good" from "bad." *See, e.g., D.E. Rogers Associates, Inc. v. Gardner-Denver Co., 718 F.2d 1431, 1435-36 (6th Cir. 1983)*; *Forster Manufacturing Co. v. FTC, 335 F.2d 47 (1st Cir. 1964), cert. denied, 380 U.S. 906, 85 S. Ct. 887, 13 L. Ed. 2d 794 (1965)*. But "intent to harm" without more offers too vague a standard in a world where executives may think no further than "Let's get more business," and long-term effects on consumers depend in large measure on competitors' responses. *See* Zerbe & Cooper, *An Empirical and Theoretical Comparison of Alternative Predation Rules*, 61 Tex. L. Rev. 655, 659-677 (1982). Moreover, if the search for intent means a search for documents or statements specifically reciting the likelihood **[**15]** of anticompetitive consequences or of subsequent opportunities to inflate prices, the knowledgeable firm will simply refrain from overt description. If it is meant to refer to a set of objective economic conditions that allow the court to "infer" improper intent, *see, e.g., D.E. Rogers Associates, Inc. v. Gardner-Denver Co., 718 F.2d at 1436*; *cf. O. Hommel Corp. v. Ferro Corp., 659 F.2d 340, 347 (3rd Cir. 1981), cert. denied, 455 U.S. 1017, 72 L. Ed. 2d 134, 102 S. Ct. 1711 (1982)*, then, using Occam's razor, we can slice "intent" away. Thus, most courts now find their standard, not in intent, but in the relation of the suspect price to the firm's costs. And, despite the absence of any perfect touchstone, ***HN6*** modern antitrust courts look to the relation of price to "avoidable" or "incremental" costs as a way of segregating price cuts that are "suspect" from those that are not. *See, e.g., Northeastern Telephone Co. v. American Telephone and Telegraph Co.,*

*651 F.2d at 86-91*; *cf.* *Americana Industries, Inc. v. Wometco de Puerto Rico, Inc., 556 F.2d 625, 628 (1st Cir. 1977)*; **[**16]** *see generally* Areeda & Turner, *Predatory Pricing*.

One can understand the intuitive idea behind this test by supposing, for example, that a firm charges prices that fail to cover these "avoidable" or "incremental" costs -- the costs that the firm would save by not producing the additional product it can sell at that price. Suppose further that the firm cannot show that this low price is "promotional," *e.g.* a "free sample." Nor can it show that it expects costs to fall when sales increase. Then one would know that the firm cannot rationally plan to maintain this low price; if it does not expect to raise its price, it would do better to discontinue production. Moreover, equally efficient competitors cannot permanently match this low price and stay in business. Further, competitive industries are typically characterized by prices that are roughly equal to, not below, "incremental" costs. *See* F. Scherer, *supra*, at 13-14; Areeda & Turner, *Predatory Pricing* at 702-03, 712. At a minimum, one would wonder why this firm would cut prices on "incremental production" below its "avoidable" costs unless it later expected to raise its prices and recoup its losses. When **[**17]** prices exceed incremental costs, one cannot argue that they must rise for the firm to stay in business. Nor will such prices have a tendency to exclude or eliminate equally efficient competitors. Moreover, a price *cut* that leaves prices above incremental costs was probably moving prices in the "right" direction -- towards the competitive norm. *See* J. Bain, *supra*, at 14; Areeda & Turner, *Predatory Pricing*, at 704-07. These considerations have typically led courts to question, and often to forbid, price cuts below "incremental costs," (or "avoidable costs"), while allowing those where the resulting price is higher. *See, e.g.*, *Northeastern Telephone Co. v. American Telephone and Telegraph Co., 651 F.2d at 88*; *International Air Industries, Inc. v. American Excelsior Co., 517 F.2d at 723-24*; *cf.* *William Inglis & Sons* **[*233]** *Baking Co. v. ITT Continental Baking Co., Inc.* , 668 F.2d 1014, 1035-36 (9th Cir. 1981) (price below average variable cost supports "inference" of predatory pricing), *cert. denied*, *459 U.S. 825, 103 S. Ct. 57, 74 L. Ed. 2d 61, 103 S. Ct. 58 (1982)*.

In fact, the use of **[**18]** cost-based standards is more complicated than this brief discussion suggests. But, we need not explore here the arguments about how best to measure "incremental" or "avoidable" costs (*e.g.*, whether "average variable cost" is an appropriate surrogate). Nor need we consider the theoretical difficulties that arise when prices fall *between* "incremental costs" and "average (total) costs," a circumstance that can arise either when production is at a level below full capacity and the firm lowers prices to levels that do not cover a "fair share" of fixed costs or when a plant is pushed beyond its "full" capacity at prices that do not cover the specially high costs of the extraordinary production levels. *See, e.g.*, *William Inglis & Sons Baking Co. v. ITT Continental Baking Co.*, 668 F.2d at 1034-36; *Pacific Engineering and Production Co. v. Kerr-McGee Corp., 551 F.2d 790, 795-97* (10th Cir.), *cert. denied*, *434 U.S. 879, 54 L. Ed. 2d 160, 98 S. Ct. 234 (1977)*; Areeda & Turner, *Predatory Pricing*, at 709-12; Scherer, *Predatory Pricing and the Sherman Act: A Comment*, 89 Harv. L. Rev. 869 (1976); Zerbe & Cooper, **[**19]** *supra*, at 681-84. Here we have a price that exceeds *both* "average cost" and "incremental cost" -- that exceeds cost however plausibly measured. And as to those prices, "virtually every court and commentator agrees" that they are lawful, "perhaps conclusively, but at least presumptively." P. Areeda & D. Turner, *Antitrust Law* para. 711.1c at 118 (1982 Supp.).

Barry points, however, to a possible exception to this rule -- an "exception" created by the Ninth Circuit making certain price cuts unlawful even when the resulting revenues exceed total costs. In *Inglis*, that circuit held that a price cut is unlawful if

> the anticipated benefits of defendant's price depended on its tendency to discipline or eliminate competition and thereby enhance the firm's long-term ability to reap the benefits of monopoly power.

668 F.2d at 1035. In the Ninth Circuit's view, prices below "average variable costs" (a surrogate for "incremental costs") produce a presumption of "predatory pricing." ***HN7*** When prices exceed "average variable cost," but are "below average **[**20]** total cost," the plaintiff must prove by a preponderance of the evidence that the defendant's pricing policy depends on its exclusionary or disciplinary tendency. And, in a case like this one -- a case that the Ninth Circuit would describe as "prices above average total cost" -- the plaintiff can still win if it proves "by clear and convincing evidence -- *i.e.*, that it is highly probably true -- that the defendant's pricing policy was predatory," in the sense defined in *Inglis. Transamerica Computer Co. v. International Business Machines Corp., 698 F.2d at 1388*.

The virtue of the Ninth Circuit test is that it recognizes an economic circumstance in which even "above total cost" price cutting might not be procompetitive and might, in theory hurt the consumer. *See Transamerica Computer Corp. v. International Business Machines Corp., 698 F.2d at 1387*. For instance, if a dominant firm's costs are lower than its competitors', it could use an "above cost" price cut to drive out competition, and then later raise prices to levels higher than they otherwise would be. Moreover, if the price cut meant *less* profit for the firm *unless* (1) it **[**21]** drove out competitors *and* (2) higher prices later followed, the cut might be viewed as lying outside the range of normal, desirable, competitive processes. Even though such a price cut would only injure or eliminate firms that were less efficient than the price-cutters, one could argue that, other things being equal, their continued presence helps the competitive process (say, by constraining price rises) and may lead to greater efficiency in the future. Why should the antitrust laws not forbid this potentially harmful behavior? Indeed, economists have identified this type of pricing behavior (and certain other forms of above-cost pricing behavior) as potentially harmful, *see, e.g.*, Brodley & Hay, *Predatory Pricing: Competing* **[*234]** *Economic Theories and the Evolution of Legal Standards*, 66 Cornell L. Rev. 738, 743-46 (1981); Scherer, *supra* (discussing other, more complex anticompetitive pricing strategies involving above-cost prices); Williamson, *Predatory Pricing: A Strategic Welfare Analysis*, 87 Yale L. J. 284 (1977) (same).

Nonetheless, while technical economic discussion helps to inform the antitrust laws, those laws cannot **[**22]** precisely replicate the economists' (sometimes conflicting) views. For, unlike economics, law is an administrative system the effects of which depend upon the content of rules and precedents only as they are applied by judges and juries in courts and by lawyers advising their clients. Rules that seek to embody every economic complexity and qualification may well, through the vagaries of administration, prove counter-productive, undercutting the very economic ends they seek to serve. Thus, despite the theoretical possibility of finding instances in which horizontal price fixing, or vertical price fixing, are economically justified, the courts have held them unlawful per se, concluding that the administrative virtues of simplicity outweigh the occasional "economic" loss. *See United States v. Trenton Potteries Co., 273 U.S. 392, 71 L. Ed. 700, 47 S. Ct. 377 (1927)* (horizontal price fixing); *United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 84 L. Ed. 1129, 60 S. Ct. 811 (1940)* (same); *Dr. Miles Medical Co. v. John D. Park & Sons Co., 220 U.S. 373, 55 L. Ed. 502, 31 S. Ct. 376 (1911)* (vertical price fixing); *see also National Society of Professional Engineers v. United States, 435 U.S. 679, 687-92, 55 L. Ed. 2d 637, 98 S. Ct. 1355 (1978)*; **[**23]** Bok, *Section 7 of the Clayton Act and the Merging of Law and*

*Economics,* 74 Harv. L. Rev. 226 (1960). Conversely, we must be concerned lest a rule or precedent that authorizes a search for a particular type of undesirable pricing behavior end up by discouraging legitimate price competition. Indeed, it is this risk that convinces us not to follow the Ninth Circuit's approach.

Thus, we believe we should not adopt the Ninth Circuit's exception because of the *combined effect* of the following considerations. For one thing, a price cut that ends up with a price exceeding total cost -- in all likelihood a cut made by a firm with market power -- is almost certainly moving price in the "right" direction (towards the level that would be set in a competitive marketplace). The antitrust laws very rarely reject such beneficial "birds in hand" for the sake of more speculative (future low-price) "birds in the bush." To do so opens the door to similar speculative claims that might seek to legitimate even the most settled unlawful practices. (Should a price-fixer be allowed to argue that a cartel will help weaker firms survive bad times, leaving them as a competitive force **[**24]** when times are good? Suppose the price-fixer offers to "prove it" by "clear and convincing evidence?" *See United States v. Socony-Vacuum Oil Co., 310 U.S. at 220-23*.)

For another thing, the scope of the Ninth Circuit's test is vague. Is it meant to include, for example, "limit pricing" -- the common practice of firms in concentrated industries not to price "too high" for fear of attracting new competition? *See Transamerica Computer Corp. v. International Business Machines Corp., 698 F.2d at 1387*; Areeda & Turner, *Predatory Pricing*, at 705-06. The "anticipated benefits" of such a price arguably depend "on its tendency to discipline or eliminate competition" thereby enhancing "the firm's long-term ability to reap the benefits of monopoly power." Does the test mean to include every common instance of a firm (with market power) deciding not to raise its prices? If it means to include either of these sorts of circumstances, the rule risks making of the antitrust laws a powerful force for price increases. But, if the rule does not mean to include these sorts of circumstance, which prices do, and which do not, fall within the test's proscription?

**[**25]** Further, even were the test more specific, it seems to us as a practical matter most difficult to distinguish in any particular case between a firm that is cutting price to "discipline" or to displace a rival and one cutting price "better to compete." No one would condemn a price cut designed to **[*235]** maximize profits in the short run, *i.e.*, by increasing sales at the lower price, not by destroying competition and then raising prices. But the general troubles surrounding proof of firm costs, *see, e.g., Transamerica Computer Co. v. International Business Machines Corp., 698 F.2d at 1387*; P. Areeda & D. Turner, *Antitrust Law* paras. 711.1d, 715.2 (1982 Supp.), only hint at the difficulty of deciding whether or not a firm's price cut is profit-maximizing in the short-run, a determination that hinges not only on cost data, but also on elasticity of demand, competitors' responses to price shifts, and changes in unit costs with variations in production volume. Direct statements by firm executives concerning their expectations will probably not be found; and, one might ask, in light of uncertain and changing market conditions, how much will the firm itself **[**26]** know? One can foresee conflicting testimony by economic experts, with the eventual determination made, not by economists or accountants, but by a jury. Of course, one might claim that such are the dangers inherent in many antitrust cases. But the consequence of a mistake here is not simply to force a firm to forego legitimate business activity it wishes to pursue; rather, it is to penalize a procompetitive price cut, perhaps the most desirable activity (from an antitrust perspective) that can take place in a concentrated industry where prices typically exceed costs. *See United States v. Container Corporation of America, 393 U.S. 333, 21 L. Ed.*

2d 526, 89 S. Ct. 510 (1969); O. Hommel Co. v. Ferro Corp., 659 F.2d at 346-47; Pacific Engineering & Production Co. v. Kerr-McGee Corp., 551 F.2d at 796-97; 2 P. Areeda & D. Turner, *Antitrust Law* paras. 404-05; J. Bain, *supra*, at 118-23; F. Scherer, *supra*, ch. 5.

Additionally, if private plaintiffs are allowed to attack the "above total cost disciplinary price," we are unlikely to lack for plaintiffs willing to make the effort. After all, even the most competitive of price **[**27]** cuts may hurt rivals; indeed, such may well be its object. And those rivals, if seriously damaged, may well bring suit, hoping or believing they can fit within the *Inglis/Transamerica* standard.

Finally, we ask ourselves what advice a lawyer, faced with the *Transamerica* rule, would have to give a client firm considering procompetitive price-cutting tactics in a concentrated industry. Would he not have to point out the risks of suit -- whether ultimately successful or not -- by an injured competitor claiming that the cut was "disciplinary?" Price cutting in concentrated industries seems sufficiently difficult to stimulate that we hesitate before embracing a rule that could, in practice, stabilize "tacit cartels" and further encourage interdependent pricing behavior. *See* 2 P. Areeda & D. Turner, *Antitrust Law* para. 404b3; F. Scherer, *supra*, at 190-93; Turner, *Definition of Agreement under the Sherman Act: Conscious Parallelism and Refusals to Deal*, 75 Harv. L. Rev. 655 (1962); *cf.* Hay & Kelley, *An Empirical Survey of Price Fixing Conspiracies*, 17 J.L. & Econ. 13, 20-24 (1974). This risk could be minimized only if the conditions **[**28]** imposed by the words "clear and convincing evidence" were so stringent that the claim could almost never be proved. But then, one might ask, would the *Transamerica* "exception" be worth the trouble? *See* Transamerica Computer Co. v. International Business Machines Corp., 698 F.2d at 1390-91 (Lucas, J., dissenting).

We reiterate that these considerations might not prove sufficient to make the difference were we dealing with a price that, although above average total costs, was *below* incremental costs -- a price that in the absence of special circumstances proves unsustainable. But, here we deal with a price that is *above* both incremental and total cost.

In sum, we believe that such above-cost price cuts are typically sustainable; that they are normally desirable (particularly in concentrated industries); that the "disciplinary cut" is difficult to distinguish in practice; that it, in any event, primarily injures only higher cost competitors; that its presence may well be "wrongly" asserted in a host of cases involving legitimate competition; and that to allow its assertion threatens to "chill" highly desirable procompetitive **[*236]** price cutting. **[**29]** For these reasons, we believe that a precedent allowing this type of attack on prices that exceed both incremental and average costs would more likely interfere with the procompetitive aims of the antitrust laws than further them. Hence, we conclude that ***HN8*** the Sherman Act does not make unlawful prices that exceed both incremental and average costs.

Even if we are wrong, however, and *Inglis and Transamerica* contain the correct legal standard, Barry would fail. Barry has not demonstrated by "clear and convincing evidence" that Pacific offered Grinnell an additional 5 or 10 percent price discount only because it wished to keep Barry out of the market. Rather, Pacific testified that the additional discount was related to additional cost savings. Grinnell's firm order for snubbers in 1977 was larger than the total volume of Pacific sales of snubbers in any previous year. Pacific had excess snubber capacity. The price discount, by securing the firm order, allowed Pacific to operate this capacity more efficiently, saved Pacific money, and thereby produced more profit than a higher price (without **[**30]** the firm order) could have done, without regard to any impact on Barry. At least there is evidence this was

so -- that this was the sort of price cut a firm would have made under competitive conditions in a fully competitive industry. And, the evidence in the record to this effect precludes the possibility of "clear and convincing evidence" to the contrary. Thus, even under the *Transamerica* test, Pacific's price cut would not be found anticompetitive or exclusionary.

B

Barry argues next that Pacific's "requirements contract" with Grinnell was exclusionary, that it was more restrictive of competition than legitimate business considerations could justify. The district court, however, disagreed. And so do we.

The antitrust problem that courts have found lurking in requirements contracts grows out of their tendency to "foreclose" other sellers from the market by "tying up" potential purchases of the buyer. Arguably, under certain circumstances substantial foreclosure might discourage sellers from entering, or seeking to sell in, a market at all, thereby reducing the amount of competition that would otherwise be available. Of course, the connection between "foreclosure" **[**31]** and lessened entry is somewhat distant, since it depends on how potential competitors perceive the foreclosure's likely effects on their opportunities. Moreover, ***HN9*** virtually *every* contract to buy "forecloses" or "excludes" alternative sellers from some portion of the market, namely the portion consisting of what was bought. It is not surprising, then, that courts have judged the lawfulness of contracts to purchase not under per se rules but under a "rule of reason." *Tampa Electric Co. v. Nashville Coal Co., 365 U.S. 320, 333, 5 L. Ed. 2d 580, 81 S. Ct. 623 (1961)*; *Bob Maxfield, Inc. v. American Motors Corp., 637 F.2d 1033, 1036* (5th Cir.), *cert. denied, 454 U.S. 860, 70 L. Ed. 2d 158, 102 S. Ct. 315 (1981)*; *United States v. American Can Co., 87 F. Supp. 18, 31 (N.D. Cal. 1949)*. And this is so whether those contracts involve a buyer's promise to buy "exclusively" from the seller, *see, e.g., Bob Maxfield, Inc. v. American Motors Corp., supra*;*American Motor Inns, Inc. v. Holiday Inns, Inc., 521 F.2d 1230, 1246-53 (3d Cir. 1975)*, **[**32]** a promise to buy all his "requirements" from the seller for a specified time, *see, e.g., Tampa Electric Co. v. Nashville Coal Co., supra*, or a promise to buy a large dollar amount, *see, e.g., Magnus Petroleum Co. v. Skelly Oil Co., 599 F.2d 196* (7th Cir.), *cert. denied, 444 U.S. 916, 62 L. Ed. 2d 171, 100 S. Ct. 231 (1979)*; *White & White, Inc. v. American Hospital Supply Corp., 540 F. Supp. 951, 1032 (W.D. Mich. 1982)*. *See Perington Wholesale, Inc. v. Burger King Corp., 631 F.2d 1369, 1374 (10th Cir. 1979)*; 3 P. Areeda & D. Turner, *Antitrust Law* para. 732a. Thus, ***HN10*** in determining "the probable effect of the contract on the relevant area of effective competition," *Tampa Electric Co. v. Nashville Coal Co., 365 U.S. at 329*, we are to take into account both the extent of the foreclosure and the **[*237]** buyer's and seller's business justifications for the arrangement. *Id. at 333-34*. We must look both to the severity of the foreclosure (a fact which, other things being equal, **[**33]** suggests anticompetitive harm) and the strength of the justifications in determining whether the "size" of the contract to purchase is reasonable.

Barry would like to characterize the agreements before us as consisting of a Grinnell promise to buy all its snubber requirements from Pacific for three years. And, if Barry correctly describes Grinnell as accounting for half the snubber market, this characterization suggests a three-year "foreclosure" of 50 percent of the relevant market. In terms of the case law, this sounds like a significant foreclosure. *See, e.g., Standard Oil Co. v. United States, 337 U.S. 293, 93 L. Ed. 1371, 69 S. Ct. 1051 (1949)*; *Lessig v. Tidewater Oil Co., 327 F.2d 459, 468* (9th Cir.), *cert. denied, 377 U.S. 993, 84 S. Ct. 1920, 12 L. Ed. 2d 1046 (1964)*; *Mytinger & Casselberry, Inc. v. FTC, 112 U.S. App. D.C. 210, 301 F.2d 534 (D.C. Cir. 1962)*. But this description considerably overstates the size of the foreclosure and its likely anticompetitive effect for several reasons.

First, Grinnell did not actually promise to buy all its requirements from Pacific; it entered into a contract for **[**34]** a fixed dollar amount. ***HN11*** There is "an important difference between a requirements' contract and a contract which calls for the purchase of a definite quantity over a period of time which the buyer estimates to be sufficient to meet his requirements." *Tampa Electric Co. v. Nashville Coal Co., 276 F.2d 766, 771 (6th Cir. 1960)*, *rev'd on other grounds*, *365 U.S. 320, 5 L. Ed. 2d 580, 81 S. Ct. 623 (1961)*. A true requirements contract flatly eliminates the buyer from the market for its duration; a fixed quantity contract leaves open the possibility that the buyer's needs will exceed his contractual commitment; he is free to purchase from others any excess amount that he may want. This flexibility is important here, for it left Grinnell the legal power to buy small (and then in 1979, larger) amounts from Barry should they have become available.

Second, the Grinnell-Pacific contract was not a single three-year agreement. The district court found that the contract consummated in late January, 1977, bound Grinnell to take $4.3 million worth of snubbers -- its **[**35]** estimated needs for the next twelve months. Grinnell then separately promised -- in May 1977 -- to buy $6.9 million worth of snubbers for 1978 (its estimated requirements) and $5 million for 1979 (considerably less than its estimated requirements). Even if we view the 1978 and 1979 purchases as a single agreement, the scope of this agreement's preclusive effect then extended over something less than Grinnell's expected requirements and lasted about two years.

Third, Grinnell's contract with Barry suggests that a snubber buyer typically places orders for snubbers well in advance of expected delivery. In fact, normally Grinnell would be required to place orders with Barry (once Barry developed the product) at least six months before delivery. Moreover, the record demonstrates the long delay that any new entrant would have to anticipate between the time it decided to enter the snubber market and the time it would be ready to deliver a product. Under these circumstances, a Grinnell decision to buy a year or two's worth of snubbers from Pacific *at one shot* instead of *from time to time* seems likely, as a practical matter, to have had, at most, limited anticompetitive effects.

**[**36]** At the same time, the record suggests the existence of legitimate business justifications for the agreements from the perspectives of both buyer and seller. For Grinnell, the contracts guaranteed a stable source of supply, and, perhaps, more important, they assured Grinnell a stable, favorable price. For Pacific, they allowed use of considerable excess snubber capacity; and they allowed production planning that was likely to lower costs. (At least Pacific executives testified as much and the record contains no refutation of this testimony.) Finally, Grinnell is not a small firm that Pacific could likely bully into accepting a contract that might foreclose new competition. **[*238]** *See Tampa Electric Co. v. Nashville Coal Co., 365 U.S. at 329*; *cf. Standard Oil Co. v. United States, 337 U.S. at 308*; *Lessig v. Tidewater Oil Co., 327 F.2d at 467*; *United States v. American Can Co., supra.* To the contrary, it was Grinnell, not Pacific, that sought the extensions for 1978 and 1979. Moreover, Grinnell had every interest in promoting new competition. It agreed to provide Barry with several hundred thousand dollars **[**37]** expressly to develop a new source of supply. Grinnell could have obtained snubbers without placing such large orders had it given up the "special" extra 5 to 10 percent price discount, a matter of a few hundred thousand dollars per year. Had Grinnell believed that the long-term nature of the contracts significantly interfered with new entry, or inhibited the development of a new source of supply, it is difficult to understand why it would have sought the agreements.

In sum, in light of the nature of the contracts and the market, their fairly short time period, their business justifications, the characteristics of the parties, and their likely motives as revealed by

their business interests, we believe that the district court could reasonably have concluded they were not "exclusionary."

C

Barry also argues that the "noncancellation" clauses were exclusionary. The clauses stated that "quantities [mentioned in the contract] . . . are considered to be minimum with pricing based accordingly. For this reason, full cancellation charges would apply if all or any portion of the requirements were cancelled or rescheduled by ITT Grinnell beyond [the contract period]." Those clauses, **[**38]** as the parties (and, we think, as the district court) interpreted them, would require Grinnell to pay the *entire* price of the yearly order (*i.e.* $4.3 million for 1977, $6.9 million for 1978, etc.) whether Grinnell took all, some or none of the snubbers that the order covered. The noncancellation clause thus acted as a powerful economic incentive for Grinnell to stick to its bargain; and Barry says this incentive was "too powerful" to the point where it is "exclusionary."

Of course, ***HN12*** the parties to a contract have a right to collect damages for breach. And, they can insert a liquidated damages provision in the contract as a measure of damages. *See**U.C.C. § 2-718*. Yet, "the central objective behind the system of contract remedies is compensatory, not punitive." *Restatement (Second) of Contracts § 356 comment (a)* (1979). Thus, ***HN13*** a liquidated damages provision is enforceable only if it "is reasonable in the light of the anticipated or actual harm caused by the breach, the difficulties **[**39]** of proof of loss, and the inconvenience or non-feasibility of otherwise obtaining an adequate remedy. A term fixing unreasonably large liquidated damages is void as a penalty." *U.C.C. § 2-718(1)*. ***HN14*** If the cancellation clause provides only for lawful liquidated damages, it is no more "exclusionary" than the underlying substantive agreement that it helps to enforce. But Barry argues that the cancellation clause is a "penalty" and that it therefore has no legitimate place in the substantive agreement. We shall assume for the sake of argument that Barry is correct. If so, the clause *in principle* might have an unjustified anticompetitive effect. It might discourage a buyer from pursuing a course of action otherwise open to him under the law of contracts, namely to breach the purchase agreement, to pay damages, and to buy from a new entrant instead. While the presence of the clause could not legally *forbid* this course of action -- as it would be unenforceable as a penalty at law -- its presence does still threaten the buyer with the lawsuit that would be needed to prove that it is **[**40]** unenforceable. And it is this threat, and the consequent *additional* deterrence to the "breach and pay damages" course of action that constitutes the "unreasonably anticompetitive" aspect of the clause. *Cf.* *United States v. United Shoe Machinery Corp., 110 F. Supp. 295, 320, 344 (D. Mass. 1953)* (lease provisions deterring early terminations are exclusionary), *aff'd per curiam*, **[*239]** *347 U.S. 521, 74 S. Ct. 699, 98 L. Ed. 910 (1954)*.

This argument, while logical, strikes us as of virtually no practical importance in this case. Even if one heroically assumed that Grinnell might have wished to breach and to buy elsewhere in 1977, 1978 or 1979, it is virtually impossible to believe that the presence of this clause could have stopped it from doing so. Given Grinnell's size and the competence of its legal staff, it is most unlikely to have been deterred by Pacific's assertion of unusually high damages resting upon a legally invalid provision in the contract. (And, if the provision is not legally invalid -- that is, if it does reasonably reflect Pacific's likely actual damages -- then it is not, from an antitrust perspective, unreasonable). **[**41]** This is simply to say that the anticompetitive consequence to which Barry might point is too remote, too speculative in the context of this case, to warrant

classifying the clause as significantly anticompetitive. And, the district court's conclusion that its presence did not transform otherwise lawful purchase agreements into unlawful, exclusionary ones, is adequately supported.

III

If Pacific's challenged conduct is not "exclusionary," for purpose of Sherman Act § 2, then a *fortiori*, it does not violate the other provisions of law that Barry cites. ***HN15*** A monopolist's conduct that from a competitive point of view is unreasonable, is "exclusionary." *California Computer Products, Inc. v. International Business Machines Corp., 613 F.2d 727, 735-36 (9th Cir. 1979)*; 3 P. Areeda & D. Turner, *Antitrust Law* para. 626 at 83; *see United States v. United Shoe Machinery Corp., 110 F. Supp. at 342*. Thus, conduct that is not "exclusionary" is not "unreasonable." And we do not see how ordinarily that conduct could be forbidden by Sherman Act § 1's prohibition **[**42]** of "unreasonable" restraints of trade. *See Standard Oil Co. v. United States, 221 U.S. 1, 61-64, 55 L. Ed. 619, 31 S. Ct. 502 (1911)* (Sherman Act § 1's "restraint of trade" language interpreted according to "rule of reason"). We see no conduct here that is subject to any section 1-based rule of "per se" illegality. *See, e.g., United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 84 L. Ed. 1129, 60 S. Ct. 811 (1940)* (price fixing); *Addyston Pipe & Steel Co. v. United States, 175 U.S. 211, 44 L. Ed. 136, 20 S. Ct. 96 (1899)*, *aff'g85 F. 271 (6th Cir. 1898)* (market division). Barry cites *Engine Specialties, Inc. v. Bombardier Ltd., 605 F.2d 1 (1st Cir. 1979)*, *cert. denied*, *446 U.S. 983, 64 L. Ed. 2d 839, 100 S. Ct. 2964 (1980)*, in an effort to find precedent for application of a per se rule, but that case involved competitors who explicitly divided territories -- a circumstance absent here.

Nor can Barry show tortious interference with Barry's Grinnell contract. ***HN16*** Under Massachusetts **[**43]** law, one essential element of the tort is that defendant's conduct be "either per se unlawful" or "conducted with malice." *Araserv, Inc. v. Bay State Harness Horse Racing and Breeding Association, Inc., 437 F. Supp. 1083, 1094 (D.Mass. 1977)* (quoting *Old Colony Donuts, Inc. v. American Broadcasting Companies, 368 F. Supp. 785, 787 (D. Mass. 1974))*. The only basis for claiming "per se" unlawfulness that we can find is "antitrust" unlawfulness -- a matter that we have disposed of.

Barry cannot show "malice" without showing that Pacific knew its conduct "would result in injury to [Barry's] contract rights." *Goldsmith v. Traveler Shoe Corp., 236 Mass. 111, 116, 127 N.E. 606 (1921)*; *cf. Beekman v. Marsters, 195 Mass. 205, 212, 80 N.E. 817 (1907)* (showing of knowledge of contract necessary to obviate showing of express malice). And the district court correctly found the evidence here insufficient. The trial court found that, although Pacific officers became aware, by September, 1976, of the existence of an agreement between Barry and Grinnell for the development of a mechanical snubber, they did not know the terms **[**44]** of that agreement. Moreover, the terms of the Barry-Grinnell contract permitted Grinnell to purchase from other suppliers if "Barry is unable to fulfill required delivery schedules." This provision at least arguably could have protected Grinnell **[*240]** from a breach of contract claim by Barry on account of Grinnell's purchases from Pacific; and the simple possibility that it would have done so precludes attribution to Pacific of *knowledge* that Grinnell's purchases from it would breach the Barry-Grinnell contract. Similarly, the trial court found that Barry was in breach at the time of the first Pacific-Grinnell agreement. Even if we assume purely for the sake of argument that it was wrong, the claim of breach is strong enough to preclude the requisite finding of *knowing* interference by Pacific. In short, while Pacific might have been aware that its sales to Grinnell

would undermine Barry's prospects for its new line of snubbers, there was no basis for concluding that Pacific knew that those sales would interfere with Barry's contractual rights.

The judgment of the district court is

*Affirmed.*

# EXHIBIT 259

LexisNexis®

Caution
As of: August 12, 2014 9:09 AM EDT

**Cashmere & Camel Hair Mfrs. Inst. v. Saks Fifth Ave.**
United States Court of Appeals for the First Circuit
April 1, 2002, Decided
No. 00-2341

**Reporter:** 284 F.3d 302; 2002 U.S. App. LEXIS 5361; 2002-1 Trade Cas. (CCH) P73,628
CASHMERE & CAMEL HAIR MANUFACTURERS INSTITUTE, F/K/A CAMEL HAIR & CASHMERE INSTITUTE OF AMERICA, INC., AND L.W. PACKARD & CO., INC., Plaintiffs, Appellants, v. SAKS FIFTH AVENUE, HARVE BENARD, LTD. AND FILENES BASEMENT, Defendants, Appellees.

**Subsequent History:** **[**1]** Writ of certiorari denied: *Saks Fifth Ave. v. Cashmere & Camel Hair Mfrs. Institute, 2002 U.S. LEXIS 8095 (U.S. Nov. 4, 2002)*.

**Prior History:** APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS. Hon. Reginald C. Lindsay, U.S. District Judge.

**Disposition:** Reversed and remanded.

**Core Terms**

cashmere, consumer, garments, recycled, deception, literal, fabric, falsity, deceived, district court, advertisement, plaintiffs', labeled, defendants', misrepresentation, injunctive relief, misleading, customers, blazers, manufacturers, summary judgment, requirements, damages, purchasing, voluntary dismissal, cashmere-blend, mislabeling, prices, Wool, false advertising

**LexisNexis® Headnotes**

Civil Procedure > Judgments > Summary Judgment > General Overview
Civil Procedure > Appeals > Summary Judgment Review > General Overview
Civil Procedure > Appeals > Summary Judgment Review > Standards of Review
Civil Procedure > Remedies > Damages > Monetary Damages
Civil Procedure > Appeals > Standards of Review > De Novo Review
Environmental Law > Solid Wastes > Resource Recovery & Recycling

***HN1*** The court of appeals reviews de novo the district court's summary judgment dismissing a plaintiff's claims.

Civil Procedure > ... > Discovery > Methods of Discovery > General Overview
Civil Procedure > ... > Summary Judgment > Burdens of Proof > Movant Persuasion & Proof
Civil Procedure > ... > Summary Judgment > Motions for Summary Judgment > General Overview
Civil Procedure > ... > Summary Judgment > Opposing Materials > General Overview

Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > General Overview

Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > Appropriateness

Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > Genuine Disputes

Civil Procedure > ... > Summary Judgment > Supporting Materials > General Overview

Civil Procedure > ... > Summary Judgment > Supporting Materials > Discovery Materials

Civil Procedure > Appeals > Standards of Review > General Overview

***HN2*** Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *Fed. R. Civ. P. 56(c)*. To defeat a properly supported motion for summary judgment, the nonmoving party must establish a trial-worthy issue by presenting enough competent evidence to enable a finding favorable to the nonmoving party. In exercising its review, the court of appeals construes the record evidence in the light most favorable to, and drawing all reasonable inferences in favor of, the nonmoving party.

Civil Procedure > Dismissal > Voluntary Dismissals > General Overview

Civil Procedure > Dismissal > Voluntary Dismissals > Appellate Review

Civil Procedure > Appeals > Appellate Jurisdiction > Interlocutory Orders

Civil Procedure > Appeals > Reviewability of Lower Court Decisions > Adverse Determinations

***HN3*** A plaintiff may not appeal a voluntary dismissal because there is no involuntary or adverse judgment against him. However, there is a narrow exception which permits appeals from voluntary dismissals where the dismissal was sought to expedite review of a prejudicial interlocutory ruling.

Antitrust & Trade Law > Consumer Protection > False Advertising > General Overview

Trademark Law > ... > Unfair Competition > Federal Unfair Competition Law > General Overview

Trademark Law > Likelihood of Confusion > Consumer Confusion > Surveys as Evidence of Confusion

***HN4*** Absent a presumption, an implied falsity claim can be established only by actual evidence of deception, usually in the form of market research or consumer surveys, showing exactly what message ordinary customers received from the ad.

Antitrust & Trade Law > Consumer Protection > False Advertising > General Overview

Trademark Law > ... > Federal Unfair Competition Law > False Advertising > General Overview

Trademark Law > ... > Federal Unfair Competition Law > False Advertising > Elements of False Advertising

Trademark Law > ... > Federal Unfair Competition Law > False Designation of Origin > Elements of False Designation of Origin

Trademark Law > ... > Entertainment Industry Falsity & Performance Misattribution > Trade Dress Protection > General Overview

Trademark Law > ... > Entertainment Industry Falsity & Performance Misattribution > Trade Dress Protection > Causes of Action

***HN5*** The false advertising provisions of the Lanham Act provide: Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or

geographic origin of his or her or another person's goods, services, or commercial activities, shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act. *15 U.S.C.S. § 1125(a)(1)*.

Antitrust & Trade Law > Consumer Protection > False Advertising > General Overview
Trademark Law > ... > Federal Unfair Competition Law > False Advertising > Elements of False Advertising

***HN6*** To prove a false advertising claim under the Lanham Act, a plaintiff must demonstrate that (1) the defendant made a false or misleading description of fact or representation of fact in a commercial advertisement about his own or another's product; (2) the misrepresentation is material, in that it is likely to influence the purchasing decision; (3) the misrepresentation actually deceives or has the tendency to deceive a substantial segment of its audience; (4) the defendant placed the false or misleading statement in interstate commerce; and (5) the plaintiff has been or is likely to be injured as a result of the misrepresentation, either by direct diversion of sales or by a lessening of goodwill associated with its products.

Antitrust & Trade Law > Consumer Protection > False Advertising > General Overview
Civil Procedure > Judgments > Relief From Judgments > General Overview

***HN7*** A plaintiff can succeed on a false advertising claim by proving either that the defendant's advertisement is literally false or implicitly false -- that is, the advertisement is true or ambiguous yet misleading. Where the advertisement is literally false, a violation may be established without evidence of consumer deception. Where the advertisement is implicitly false, however, an additional burden is placed upon the plaintiff to show that the advertisement conveys a misleading message to the viewing public.

Antitrust & Trade Law > Consumer Protection > False Advertising > General Overview
Civil Procedure > Remedies > Damages > General Overview
Civil Procedure > Remedies > Damages > Monetary Damages
Evidence > Inferences & Presumptions > General Overview
Evidence > Inferences & Presumptions > Presumptions > Effects
Trademark Law > ... > Remedies > Equitable Relief > General Overview

***HN8*** There is a difference in the burdens of proof between injunctive relief claims and monetary damages claims under the Lanham Act. Where a showing that the defendant's activities are likely to cause confusion or to deceive customers is sufficient to warrant injunctive relief, a plaintiff seeking damages must show actual harm to its business. Furthermore, unlike a plaintiff seeking injunctive relief who only has to show that the misrepresentation had the tendency to deceive, a plaintiff seeking monetary damages must show that consumers were actually deceived by the misrepresentation unless he can avail himself of a presumption to that effect.

Antitrust & Trade Law > Consumer Protection > False Advertising > General Overview
Trademark Law > ... > Unfair Competition > Federal Unfair Competition Law > General Overview
Trademark Law > ... > Factors for Determining Confusion > Intent of Defendant to Confuse > General Overview

***HN9*** The materiality component of a false advertising claim requires a plaintiff to prove that the defendant's deception is likely to influence the purchasing decision. One method of establishing materiality involves showing that the false or misleading statement relates to an inherent quality or characteristic of the product. Whether a misrepresentation is material has nothing to do with the nature of the relief sought or the defendant's intent. Rather, materiality focuses on whether the false

or misleading statement is likely to make a difference to purchasers. Thus, even when a statement is literally false or has been made with the intent to deceive, materiality must be demonstrated in order to show that the misrepresentation had some influence on consumers.

Antitrust & Trade Law > Consumer Protection > False Advertising > General Overview
Antitrust & Trade Law > Consumer Protection > False Advertising > Lanham Act
Trademark Law > ... > Federal Unfair Competition Law > False Advertising > Elements of False Advertising
Trademark Law > Likelihood of Confusion > Consumer Confusion > Surveys as Evidence of Confusion

***HN10*** The consumer deception element of a false advertising claim under the Lanham Act requires a plaintiff to demonstrate that the alleged misrepresentation deceived a substantial portion of the consuming public. Usually consumer deception is demonstrated through surveys, which establish that consumers were misled by the alleged misrepresentations. However, a plaintiff who alleges a claim that is literally false does not have to shoulder the burden of presenting such evidence because he is allowed to avail himself of a presumption of consumer deception.

Antitrust & Trade Law > Consumer Protection > False Advertising > General Overview
Civil Procedure > Remedies > Damages > Monetary Damages

***HN11*** Though there was once support for the assertion that consumer deception cannot be presumed simply because a plaintiff alleges a literal falsity claim for money damages as opposed to injunctive relief, it is the practice of most circuits to apply the presumption to all literal falsity claims.

Antitrust & Trade Law > Consumer Protection > False Advertising > General Overview
Civil Procedure > Judgments > Relief From Judgments > General Overview
Evidence > Inferences & Presumptions > General Overview

***HN12*** A presumption of consumer deception is applied to all literal falsity claims, irrespective of the type of relief sought. When a plaintiff demonstrates that a defendant has made a material misrepresentation that is literally false, there is no need to burden the plaintiff with the onerous task of demonstrating how consumers perceive the advertising.

Antitrust & Trade Law > Consumer Protection > False Advertising > General Overview

***HN13*** Although factfinders usually base literal falsity claims upon the explicit claims made by an advertisement, they may also consider any claims the advertisement conveys by "necessary implication." A claim is conveyed by necessary implication when, considering the advertisement in its entirety, the audience would recognize the claim as readily as if it had been explicitly stated.

Antitrust & Trade Law > Consumer Protection > Deceptive Labeling & Packaging > General Overview
Environmental Law > Solid Wastes > Resource Recovery & Recycling

***HN14*** The Wool Products Labeling Act, *15 U.S.C.S. § 68 et seq.*, requires recycled garments and fabrics, including cashmere, to be labeled as such. As a result, whenever a label represents that a garment contains the unqualified term "cashmere," the law requires that the garment contain only virgin cashmere. The Act is essentially telling consumers that garments labeled "cashmere" can be presumed to be virgin cashmere as if it had been explicitly stated.

Antitrust & Trade Law > Consumer Protection > False Advertising > General Overview
Evidence > Inferences & Presumptions > General Overview

***HN15*** If there is proof that a defendant intentionally set out to deceive or mislead consumers, a presumption arises that customers in fact have been deceived.

Antitrust & Trade Law > Consumer Protection > False Advertising > General Overview

Trademark Law > ... > Unfair Competition > Federal Unfair Competition Law > General Overview

Trademark Law > ... > Federal Unfair Competition Law > False Advertising > General Overview

Trademark Law > ... > Federal Unfair Competition Law > False Advertising > Elements of False Advertising

Trademark Law > ... > Federal Unfair Competition Law > False Designation of Origin > Elements of False Designation of Origin

Trademark Law > ... > Entertainment Industry Falsity & Performance Misattribution > Trade Dress Protection > General Overview

***HN16*** In order to prove causation under the Lanham Act, *15 U.S.C.S. § 1125(a)*, the aggrieved party must demonstrate that the false advertisement actually harmed its business. A precise showing is not required, and a diversion of sales, for example, would suffice.

**Counsel:** Robert J. Kaler, with whom Gadsby Hannah, LLP, was on brief, for appellants.

David B. Bassett, with whom William F. Lee, Michael J. Summersgill, Colleen E. Dunham, Hale and Dorr, LLP, Robert P. Lynn, Jr. and Robert P. Lynn, Jr. LLC, were on brief, for appellees.

**Judges:** Before Torruella, Circuit Judge, Rosenn, * Senior Circuit Judge, and Stahl, Senior Circuit Judge.

**Opinion by:** TORRUELLA

**Opinion**

**[*306] TORRUELLA, *Circuit Judge*.** Plaintiffs-appellants L.W. Packard & Co. ("Packard") and Cashmere & Camel Hair Manufacturers Institute (the "Institute") appeal from the district court's entry of partial summary judgment dismissing their false advertising claims under the Lanham Act, *15 U.S.C. § 1125(a)*, and Massachusetts state law. In particular, Packard challenges the dismissal of its claims for money damages, while the Institute argues that the district court erred in dismissing one of its claims for injunctive relief. Because we conclude that the district court relied on impermissible **[**2]** inferences in favor of the moving party in reaching its conclusions, we reverse and remand the case for action consistent with this opinion.

***Background***[1]

The Institute is a trade association of cashmere manufacturers dedicated to preserving the name and reputation of cashmere as a speciality fiber. Packard is a member of the Institute and a manufacturer of cashmere and cashmere-blend fabric.

In 1993, defendant-appellee Harve Benard, Ltd. ("Harve Benard") began manufacturing a line of women's blazers that were labeled as containing 70 percent wool, 20 percent nylon, and 10 percent cashmere. Its labels also portrayed the blazers as "A Luxurious Blend of Cashmere and

---

* Of the Third Circuit, sitting by designation.

1 We recite the facts in the light most favorable to plaintiffs, the nonmoving party. *See* *Champagne v. Servistar Corp.*, 138 F.3d 7, 8 (1st Cir. 1998).

Wool," "Cashmere and Wool," or "Wool and Cashmere." Harve Benard sold large quantities of these cashmere-blend garments to retail customers, including **[*307]** defendants Saks Fifth **[**3]** Avenue ("Saks") and Filene's Basement.

In 1995, plaintiffs began purchasing random samples of the Harve Benard garments and giving them to Professor Kenneth Langley and Dr. Franz-Josef Wortmann, experts in the field of cashmere identification and textile analysis. After conducting separate tests on the samples, the experts independently concluded that, despite Harve Benard's labels to the contrary, the garments contained no cashmere. [2] In addition, Dr. Wortmann found that approximately 10 to 20% of the fibers in the Harve Benard garments were recycled -- that is, reconstituted from the deconstructed and chemically-stripped remnants of previously used or woven garments.

Relying on their experts' findings, plaintiffs filed this suit in district court claiming that defendants falsely advertised their garments in violation of § 43(a) of the Lanham Act, *15 U.S.C. § 1125(a)*, the Massachusetts **[**4]** Unfair and Deceptive Trade Practices Act, Mass. Gen. Laws ch. 93A, and the common law of unfair competition. More specifically, plaintiffs claim that the garments were mislabeled in two material respects: (1) the Harve Benard blazers contained significantly less than the 10% cashmere they were represented as having ("cashmere content claim"); and (2) any cashmere that the blazers did contain was not virgin, as the unqualified word "cashmere" on the label suggests, but recycled ("recycled cashmere claim"). [3] Each plaintiff seeks a different form of relief for these alleged misrepresentations: whereas the Institute seeks a permanent injunction against any future mislabeling, Packard seeks monetary damages on the theory that it lost sales as a result of the manufacture and sale of the mislabeled garments.

The district court granted partial summary judgment in favor of defendants, **[**5]** dismissing both of Packard's claims for money damages and seemingly dismissing the Institute's request for injunctive relief on its recycled cashmere claim. [4] The only ruling in plaintiffs' favor -- and thus the only ruling that they do not appeal -- was the district court's denial of defendants' summary judgment motion on the Institute's cashmere content claim for injunctive relief.

After the district court's summary judgment ruling, however, the Institute chose to voluntarily dismiss this remaining claim so that it could expedite the appeal of its recycled cashmere claim for injunctive relief.

***Standard of Review***

Plaintiffs appeal the district court's summary judgment dismissing Packard's cashmere content claim for money damages; Packard's recycled cashmere claim for money damages; and **[**6]** the Institute's recycled cashmere claim for injunctive relief. ***HN1*** We review de novo the district court's summary judgment dismissing plaintiffs' claims. *See* *Straughn v. Delta Air Lines, Inc., 250 F.3d 23, 33 (1st Cir. 2001)*.

***HN2*** Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, **[*308]** together with the affidavits, if any, show that

---

[2] The experts found that, at most, the garments contained only trace levels (less than 0.1%) of cashmere.

[3] After this suit was filed, Harve Benard agreed to label its 1996 and subsequent line of blazers as being made from recycled cashmere.

[4] As discussed further below, it is not entirely clear from the summary judgment order whether the district court intended to dismiss the Institute's request for injunctive relief on its recycled cashmere claim.

there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Fed. R. Civ. P. 56(c)*. "To defeat a properly supported motion for summary judgment, the nonmoving party must establish a trial-worthy issue by presenting enough competent evidence to enable a finding favorable to the nonmoving party." *LeBlanc v. Great Am. Ins. Co., 6 F.3d 836, 842 (1st Cir. 1993)* (internal quotation marks omitted). In exercising our review, we construe the record evidence "in the light most favorable to, and drawing all reasonable inferences in favor of, the nonmoving party." *Feliciano de la Cruz v. El Conquistador Resort & Country Club*, 218 F.3d 1, 5 (1st Cir. 2000).

For the purposes of this appeal, defendants concede **[**7]** that the issue of whether the garments were mislabeled is both material and genuinely in dispute. They argue, however, that there is no evidence that their mislabeling deceived any members of the consuming public or caused plaintiffs any harm. Defendants thus seek summary judgment on the grounds that plaintiffs cannot adduce sufficient evidence of consumer deception or causation to satisfy the requirements of the applicable law.

***Discussion***

**I.**

Before delving into the merits of plaintiffs' appeal, we pause to address a jurisdictional challenge. Defendants argue that the Institute has no legal standing to seek appellate review because the Institute is impermissibly attempting to appeal from its own voluntary dismissal. After the district court's grant of summary judgment, the Institute had at least one remaining claim against defendants. Rather than pursuing that claim to trial, however, the Institute voluntarily moved to dismiss its claim with prejudice. Shortly thereafter, the Institute timely filed the instant appeal. Since it is well known that generally ***HN3*** "a plaintiff may not appeal a voluntary dismissal because there is no involuntary or adverse judgment against **[**8]** him," *Bell v. City of Kellogg, 922 F.2d 1418, 1421 (9th Cir. 1991)*, defendants contend that this Court lacks jurisdiction over the Institute's improper appeal.

Defendants acknowledge in their brief, however, that there is a narrow exception which permits appeals from voluntary dismissals where the dismissal was sought to expedite review of a prejudicial interlocutory ruling. *See John's Insulation, Inc. v. L. Addison & Assocs. Inc., 156 F.3d 101, 107 (1st Cir. 1998)* (noting that "most circuits hold that voluntary dismissals, and especially those with prejudice, are appealable final orders," and holding that "a plaintiff that deems an interlocutory ruling to be so prejudicial as to deserve immediate review . . . has the alternative of dismissing the complaint voluntarily"); *Martin v. Franklin Capital Corp., 251 F.3d 1284, 1288 (10th Cir. 2001)* (same holding). Nevertheless, defendants assert that the Institute does not fall within this exception because its voluntary dismissal was not sought for the purposes of obtaining immediate appellate review of a prior order, but rather because the Institute realized that its remaining claim was **[**9]** without merit.

Defendants' argument is undermined, however, by that portion of the record establishing that the Institute voluntarily dismissed its remaining claim, in part, so that it could appeal adverse rulings in the summary judgment order. In its motion to dismiss, the Institute unequivocally stated:

> "[The Institute] has determined that the most appropriate course of action is to dismiss [its remaining claim] with prejudice to avoid an unnecessary trial on **[*309]** that

> issue, without prejudice to the plaintiffs' right to appeal the broader rulings dismissing the bulk of their claims."The Institute's motion thus demonstrates that (1) it believed that the summary judgment order significantly prejudiced its case by dismissing "the bulk of [its] claims," and (2) the Institute sought the voluntary dismissal to expedite appellate review of the prior order. Because the Institute has satisfied the prerequisites for appealing a voluntary dismissal, *see* *John's Insulation, 156 F.3d at 107* (noting that "the proper course of action is to file a motion for voluntary dismissal with prejudice, stating explicitly that the purpose is to seek immediate review of **[**10]** the interlocutory order in question"), we conclude that the Institute is properly before this Court.

At oral argument, defendants unveiled a new contention: they claimed that the Institute could not avail itself of the exception because the summary judgment order did not substantially prejudice the Institute, as is required by existing caselaw. *See id.* In particular, defendants argued that since the summary judgment order did not dismiss any of the Institute's claims for injunctive relief, there is insufficient prejudice to allow the Institute to appeal its voluntary dismissal.

Defendants' argument fails for two reasons. First, defendants waived this argument by failing to raise it in their brief. *See* *Frazier v. Bailey, 957 F.2d 920, 932 (1st Cir. 1992)* (ruling that arguments not fully presented in appellate brief are waived). Defendants cannot utilize oral argument as a forum for unveiling new arguments of which plaintiffs did not have proper notice or opportunity to challenge.

Second, it appears that the district court actually dismissed the Institute's recycled cashmere claim for injunctive relief, thereby giving the Institute sufficient prejudice to appeal **[**11]** its voluntary dismissal. As discussed in more detail below, for a plaintiff to succeed on a false advertising claim under the Lanham Act, he must demonstrate, among other things, that the alleged misrepresentation deceived the public or had a tendency to deceive the public. *See* *Clorox Co. P.R. v. Proctor & Gamble Commercial Co., 228 F.3d 24, 33 n.6 (1st Cir. 2000)*. In some limited circumstances, however, the law absolves the Lanham Act plaintiff of this burden and allows him to benefit from a presumption of consumer deception. *See* *id. at 33* (noting that a court "may grant relief without considering evidence of consumer reaction"). In assessing whether the Institute demonstrated consumer deception, the district court determined that the Institute was entitled to a presumption of consumer deception on its claim that defendants overstated the cashmere content, but was not entitled to such a presumption on its recycled cashmere claim. [5] The district court then concluded that "based on the presumption alone, Defendants' motion for summary judgment should be denied . . . " It is clear, then, that the district court explicitly denied summary judgment only **[**12]** on the Institute's cashmere content claim, as that is the only claim to which the district court applied "the presumption."

The district court, however, neglected to determine whether the Institute demonstrated consumer deception, absent a presumption, **[*310]** on its recycled cashmere claim. The parties draw opposite conclusions from the district court's ambiguous resolution of this matter: ironically,

---

[5] The district court mistakenly referred to this presumption as a "presumption of materiality." For the sake of clarity, we refer to materiality only as that element which requires a plaintiff to show that the alleged misrepresentations "influenced the purchasing decision." *Clorox*, 228 F.3d at 33 n.6. Whether a misrepresentation is material is thus a separate inquiry from whether a misrepresentation deceived the consuming public. *See id.*

plaintiffs argue that the claim was dismissed for failure to demonstrate consumer deception, while defendants assert that it was not.

Though both arguments are equally **[**13]** plausible given the district court's silence on the issue, we conclude that plaintiffs' assertion that the claim was dismissed more persuasive in light of the circumstances. Immediately after skipping over the issue of whether the Institute demonstrated consumer deception on its recycled cashmere claim, the court assessed whether Packard had proved consumer deception on its claims for money damages. After analyzing the proffered evidence, the district court found that Packard's proof of consumer deception was insufficient. Since the district court dismissed Packard's claims, in part, because Packard was unable to demonstrate consumer deception, it is reasonable to assume that the district court intended to dismiss the Institute's remaining claim for the same reason, especially because plaintiffs were relying on the same evidence to prove both. [6]

**[**14]** Considering the ambiguity surrounding the district court's order on this issue, the apparent intention of the district court to dismiss the Institute's recycled cashmere claim, and the Institute's dismissal of its remaining claim to seek immediate appellate review of the summary judgment order, we find that the Institute has satisfied the prerequisites to appeal its voluntary dismissal.

**II.**

The Lanham Act prohibits false and misleading descriptions of products and services in interstate commerce. *See*15 U.S.C. § 1125(a). The statute was designed to protect consumers and competitors from any duplicitous advertising or packaging which results in unfair competition. *See id.*[7]

**[**15]** ***HN6*** To prove a false advertising claim under the Lanham Act, a plaintiff must demonstrate that (1) the defendant made a false or misleading description of fact or representation of fact in a commercial advertisement **[*311]** about his own or another's product; (2) the misrepresentation is material, in that it is likely to influence the purchasing decision; (3) the misrepresentation actually deceives or has the tendency to deceive a substantial segment of its audience; (4) the

---

[6] Furthermore, the district court ruled that plaintiffs' recycled cashmere claim was one of implied falsity. ***HN4*** Absent a presumption, an implied falsity claim can be established only by actual evidence of deception, "usually in the form of market research or consumer surveys, showing exactly what message ordinary customers received from the ad." J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 27:55 (4th ed. 2001); *see also Camel Hair & Cashmere Inst. of Am., Inc. v. Associated Dry Goods Corp.*, 799 F.2d 6, 15 (1st Cir. 1986) (noting that "consumers' reaction is the starting point when the allegation is based merely on the tendency of the defendant's representation to deceive"). Plaintiffs failed to offer any evidence of surveys or market research to demonstrate consumer deception. Given this lack of evidence, it is reasonable to assume that the district court intended to rule -- if it did not actually -- that the Institute could not meet its burden of demonstrating consumer deception on its recycled cashmere claim.

[7] ***HN5*** The false advertising provisions of the Lanham Act provide:

> Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which . . . in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities, shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.*15 U.S.C. § 1125(a)(1)*.

defendant placed the false or misleading statement in interstate commerce; and (5) the plaintiff has been or is likely to be injured as a result of the misrepresentation, either by direct diversion of sales or by a lessening of goodwill associated with its products. *See* Clorox, 228 F.3d at 33 n.6.

***HN7*** A plaintiff can succeed on a false advertising claim by proving either that the defendant's advertisement is literally false or implicitly false -- that is, the advertisement is true or ambiguous yet misleading. *See id.* Where the advertisement is literally false, a violation may be established without evidence of consumer deception. *See id.*; Balance Dynamics Corp. v. Schmitt Indus., 204 F.3d 683, 693 (6th Cir. 2000) **[**16]** (noting that when a statement is literally false, "a plaintiff need not demonstrate actual customer deception in order to obtain relief "). Where the advertisement is implicitly false, however, "an additional burden is placed upon the plaintiff to show that the advertisement . . . conveys a misleading message to the viewing public." Clorox, 228 F.3d at 33. [8]

In addition, this Court has recognized **[**17]** ***HN8*** a difference in the burdens of proof between injunctive relief claims and monetary damages claims under the Lanham Act. In Quabaug Rubber Co. v. Fabiano Shoe Co., Inc., 567 F.2d 154 (1st Cir. 1977), we held that whereas a showing that the defendant's activities are likely to cause confusion or to deceive customers is sufficient to warrant injunctive relief, a plaintiff seeking damages must show actual harm to its business. *See* id. at 160-61. [9]

With these elaborate and intricate statutory requirements in mind, we assess plaintiffs' claims to determine if there is enough competent **[**18]** evidence for a reasonable factfinder to conclude that they have satisfied their burdens of proof under the Lanham Act.

**A. Concessions**

For the purposes of this appeal, defendants concede that they have made a false or misleading statement of fact in describing their blazers. Defendants also concede that they placed these misrepresentations in interstate commerce.

**B. Materiality**

***HN9*** The materiality component of a false advertising claim requires a plaintiff to prove that the defendant's deception is "likely to influence the purchasing decision." Clorox, 228 F.3d at 33 n.6. One method of establishing materiality involves showing that the false or misleading statement relates to an "inherent quality or **[*312]** characteristic" of the product. Nat'l Basketball Ass'n v. Motorola, Inc., 105 F.3d 841, 855 (2d Cir. 1997). [10]

---

[8] As discussed below, a plaintiff alleging an implied falsity claim, however, is relieved of the burden of demonstrating consumer deception when there is evidence that defendants intentionally deceived the consuming public. *See* Resource Developers, Inc. v. Statue of Liberty-Ellis Island Found., Inc., 926 F.2d 134, 140 (2d Cir. 1991) (ruling, with respect to an implied falsity claim, that "once it is shown that a defendant deliberately engaged in a deceptive commercial practice, we agree that a powerful inference may be drawn that the defendant has succeeded in confusing the public").

[9] Furthermore, unlike a plaintiff seeking injunctive relief who only has to show that the misrepresentation had the tendency to deceive, a plaintiff seeking monetary damages must show that consumers were actually deceived by the misrepresentation. PPX Enter., Inc. v. Audiofidelity Enter., Inc., 818 F.2d 266, 271 (2d Cir. 1987), unless he can avail himself of a presumption to that effect.

[10] Whether a misrepresentation is material has nothing to do with the nature of the relief sought or the defendant's intent. Rather, materiality focuses on whether the false or misleading statement is likely to make a difference to purchasers. *See* J. Thomas

**[**19]** On their first claim, plaintiffs argue that overstating the cashmere content of cashmere-blend blazers is material because the misrepresentation relates to an inherent characteristic of the product sold. Indeed, it seems obvious that cashmere is a basic ingredient of a cashmere-blend garment; without it, the product could not be deemed a cashmere-blend garment or compete in the cashmere-blend market. Thus, it seems reasonable to conclude that defendants' misrepresentation of the blazers' cashmere content is material because it relates to a characteristic that defines the product at issue, as well as the market in which it is sold.

Moreover, defendants prominently labeled their garments as "Cashmere and Wool," "A Luxurious Blend of Cashmere and Wool," "Cashmere Blend," or "Wool and Cashmere," and their garments were conspicuously advertised in stores and catalogues as "Cashmere Blazers." It seems reasonable to infer from defendants' aggressive marketing strategy highlighting the "cashmere" nature of the blazers that defendants themselves believed cashmere to be an inherent and important characteristic of the blazers.

With respect to their second claim, plaintiffs argue that defendants' **[**20]** misrepresentation of the recycled nature of their cashmere also relates to an inherent characteristic of the garments. To substantiate this point, plaintiffs offer the affidavit of Karl Spilhaus, the Institute's president, in which he explains:

> The process of recycling . . . involves the use of machinery to tear apart existing garments, during or after which they are subjected to a wet processing with the resulting wool fibers dried out, frequently carbonized (subjected to heat and sulphuric acid), and then re-used in the manufacture of other fabric.
>
> In the process of tearing apart existing garments, considerable damage is inevitably done to the fibers in those garments, and additional damage is also done by the acid or other chemical treatments applied to them during the recycling process. The result is that recycled fibers frequently have substantial surface damage to their scale structure which effects [sic] their ability to felt, or bind together, thereby effecting [sic] the ability of a recycled fiber fabric to hold together as well or as long as fibers which are being used in the fabric for the first time. Such fabric will be rougher to the touch and lack "handle, **[**21]** " plushness or softness normally associated with quality woolen or cashmere products.

Given the degree to which recycled fibers affect the quality and characteristics of a garment, a rational factfinder could conclude that consumers, especially experienced ones like retail stores, would likely be influenced in their purchasing decisions by labeling that gave the false impression that the garments contained virgin cashmere. [11]

**[**22]** **[*313]** In fact, plaintiffs offer anecdotal evidence as corroboration for this very assertion. In January 1996, Saks, one of Harve Benard's largest customers, learned that the

---

McCarthy, *McCarthy on Trademarks and Unfair Competition* § 27:35 (4th ed. 2001). Thus, even when a statement is literally false or has been made with the intent to deceive, materiality must be demonstrated in order to show that the misrepresentation had some influence on consumers.

[11] The relevant "consumers" are those groups of people to whom the advertisement was addressed. *See Johnson & Johnson Merck Consumer Pharm. Co. v. Smithkline Beecham Corp.*, 960 F.2d 294, 297 (2d Cir. 1992) (noting that "the question in such cases is -- what does the person to whom the advertisement is addressed find to be the message?") (internal quotations and citations omitted). In this case, the relevant consumers include, but are not limited to, the retail stores that purchased Harve Benard garments instead of buying from Packard's garment manufacturer customers and individual purchasers.

cashmere blazers it had purchased from Harve Benard might contain recycled cashmere. Shortly thereafter, Lynne Ronon, the merchandise manager at Saks, met with representatives of Harve Benard to inform them that Saks did not wish to sell garments containing recycled cashmere. After the meeting, Carole Sadler, the associate counsel for Saks, sent Harve Benard a letter restating Saks' position as set forth by Ronon: "Saks does not wish to sell jackets containing recycled cashmere."

Rather than viewing this anecdote as evidence of how an actual consumer's purchasing decision was influenced by the misrepresentation, defendants draw the opposite conclusion by focusing on Saks' ultimate purchasing decision. Notwithstanding its earlier position, Saks eventually decided to sell Harve Benard garments containing recycled cashmere. Moreover, Sadler testified that Saks' initial refusal to sell recycled cashmere garments was merely a strategic move on an issue "that could ripen into a negotiation or a renegotiation" between the **[**23]** parties.

The problem with defendants' rebuttal argument, however, is that it ignores what a rational juror could find after drawing all reasonable inferences in plaintiffs' favor. Saks' initial refusal to sell the recycled cashmere garments; Saks' belief that the matter could lead to a negotiation; and the actual negotiations that took place before Saks agreed to continue selling the garments are competent evidence from which a reasonable juror could conclude that the issue related to an inherent quality or characteristic of the garment. Indeed, it makes little sense that Saks and Harve Benard would spend so much time and effort resolving a matter they deemed immaterial.

Furthermore, it is important to reiterate, as the caselaw explicitly states, that plaintiffs are not required to present evidence that defendants' misrepresentation actually influenced consumers' purchasing decisions, but that it was *likely* to influence them. *See Clorox, 228 F.3d at 33 n.6*. Given the significant degree to which using recycled fibers adversely impacts the quality, texture, and characteristics of cashmere, and considering Saks' erratic behavior upon learning of the mislabeling, **[**24]** we find that plaintiffs have presented sufficient evidence to demonstrate that defendants' recycled cashmere misrepresentation was material.

**C. Consumer Deception**

***HN10*** The next element of a false advertising claim under the Lanham Act requires plaintiffs to demonstrate that the alleged misrepresentation deceived a substantial portion of the consuming public. *See Clorox, 228 F.3d at 33 n.6*. [12] Usually consumer deception is demonstrated through surveys, which establish that consumers **[*314]** were misled by the alleged misrepresentations. *See Johnson & Johnson Merck, 960 F.2d at 298*. Plaintiff-appellant Packard argues, however, that it does not have to shoulder the burden of presenting this evidence because existing caselaw allows plaintiffs like it who allege claims that are literally false to avail themselves of a presumption of consumer deception. *See Castrol Inc. v. Pennzoil Co.*, 987 F.2d 939, 943 (3d Cir. 1993) (ruling that "a plaintiff must prove *either* literal falsity *or* consumer confusion, but not both"); *Johnson & Johnson v. GAC Int'l, Inc., 862 F.2d 975, 977 (2d Cir. 1988)* ("When a . . . representation is **[**25]** literally or explicitly false, the court may grant relief without reference to the advertisement's impact on the buying public.").

In response, defendants recognize that a presumption of consumer deception is available to plaintiffs seeking injunctive relief for literal falsity claims; however, they argue that the presumption does not apply, without more, to plaintiffs seeking money damages for literal falsity claims.

---

[12] Since Packard is seeking monetary damages, it must demonstrate that consumers were actually deceived by the misrepresentations. Only plaintiffs seeking injunctive relief face the lesser burden of demonstrating a tendency to deceive. *See supra* note 9.

***HN11*** Though there was once support for the assertion that consumer deception cannot be presumed simply because a plaintiff alleges a literal falsity claim for money damages, *see* *PPX, 818 F.2d at 272* (noting that as of 1987 the presumption had only been applied to literal falsity claims for injunctive relief), it has become the practice **[**26]** of most circuits to apply the presumption to all literal falsity claims. *See* *Pizza Hut, Inc. v. Papa John's Int'l, Inc., 227 F.3d 489, 497 (5th Cir. 2000)* (holding, on a claim for damages and injunctive relief, that "when the statements of fact at issue are shown to be literally false, the plaintiff need not introduce evidence on the issue of the impact the statements had on consumers. . . . [However] plaintiffs looking to recover monetary damages for false or misleading advertising that is not literally false must prove actual deception"); *EFCO Corp. v. Symons Corp., 219 F.3d 734, 740 (8th Cir. 2000)* (ruling, on a claim for damages, that "when an advertisement is literally false . . . the plaintiff need not prove that any of its customers were actually persuaded by the advertising"); *Balance, 204 F.3d at 693* (noting that a presumption of consumer deception applies to a literal falsity claim for damages so long as there is other proof of marketplace damages); *B. Sanfield, Inc. v. Finlay Fine Jewelry Corp., 168 F.3d 967, 971 (7th Cir. 1999)* (ruling, on a damages claim, that "where the statement in question is actually **[**27]** false, then the plaintiff need not show that the statement either actually deceived consumers or was likely to do so").

In fact, defendants' argument contradicts this Court's explicit pronouncements on the issue. In assessing whether a Lanham Act claim for injunctive relief and money damages had been properly dismissed, we stated, "If the advertisement is literally false, the court may grant relief without considering evidence of consumer reaction. In the absence of such literal falsity, an additional burden is placed upon plaintiff to show that the advertisement . . . conveys a misleading message to the viewing public." *Clorox, 228 F.3d at 33* (internal citations omitted).

Moreover, applying ***HN12*** a presumption of consumer deception to all literal falsity claims, irrespective of the type of relief sought, makes sense. When a plaintiff demonstrates that a defendant has made a material misrepresentation that is literally false, there is no need to burden the plaintiff with the onerous task of demonstrating how consumers perceive the advertising. *See* *Balance Dynamics, 204 F.3d at 693* (noting that "because proof of 'actual confusion' may be difficult to obtain, **[**28]** most of the circuits have ruled that when a statement is literally false, a plaintiff **[*315]** need not demonstrate actual customer deception in order to obtain relief under the Lanham Act"). Common sense and practical experience tell us that we can presume, without reservation, that consumers have been deceived when a defendant has explicitly misrepresented a fact that relates to an inherent quality or characteristic of the article sold. To presume as much requires neither a leap of faith nor the creation of any new legal principle. [13]

**[**29]** Because defendants do not dispute that overstating cashmere content is a literal falsity claim, we apply a presumption of consumer deception in plaintiffs' favor on this claim. Based on this presumption, and defendants' failure to present evidence to rebut it, Packard has satisfied its burden of demonstrating consumer deception on its cashmere content claim.

---

13 Defendants also argue that before the presumption of consumer deception can apply to a literal falsity claim for damages, the plaintiff must demonstrate that the defendant intentionally deceived the consuming public. None of the five circuit cases cited *supra*, however, speaks of the intent to deceive as a prerequisite to applying a presumption of consumer deception on a literal falsity claim. As discussed in more detail below, the intent to deceive is an independent basis for triggering a presumption of consumer deception. *See* *William H. Morris Co. v. Group W, Inc.*, 66 F.3d 255, 258 (9th Cir. 1995) (ruling, on an implied falsity claim, that "if [defendant] intentionally misled consumers, we would presume consumers were in fact deceived and [defendant] would have the burden of demonstrating otherwise").

Whether literal falsity is involved in plaintiffs' claim that defendants improperly labeled their goods as cashmere rather than recycled cashmere, however, is a contentious issue. Defendants argue that this claim is, by definition, one of implied falsity -- that is, a representation that is literally true but in context becomes likely to mislead. *See Clorox, 228 F.3d at 33* (defining an implied falsity claim as one in which the "advertisement, though explicitly true, nonetheless conveys a misleading message to the viewing public"). As further support for their argument, defendants offer a simple syllogism: all suits based on implied messages are implied falsity claims; since plaintiffs assert that the term "cashmere" on the garments' labels implicitly conveys the false message that the garments contain virgin **[**30]** cashmere, their claim must be one of implicit falsity.

We agree with defendants that normally a claim like plaintiffs', in which the representation at issue is literally true (the garments do contain cashmere as the label states) but is misleading in context (defendants failed to disclose that the cashmere is recycled), is evaluated as an implied falsity claim. *See id.* However, we disagree with defendants' assertion that all claims that rely on implied messages are necessarily implied falsity claims. In *Clorox*, this Court noted that ***HN13*** "although factfinders usually base literal falsity claims upon the explicit claims made by an advertisement, they may also consider any claims the advertisement conveys by 'necessary implication.'" *Id. at 34-35*. We explained that "[a] claim is conveyed by necessary implication when, considering the advertisement in its entirety, the audience would recognize the claim as readily as if it had been explicitly stated." *Id. at 35*.

After drawing all reasonable inferences in favor of the nonmoving party, a rational factfinder could conclude that plaintiffs' recycled cashmere claim is one of literal falsity. ***HN14*** The Wool **[**31]** Products Labeling Act, *15 U.S.C. § 68 et seq.*, requires recycled garments and fabrics, including cashmere, to be labeled as such. As a result, whenever a label represents that a garment **[*316]** contains the unqualified term "cashmere," the law requires that the garment contain only virgin cashmere. The Act, then, is essentially telling consumers that garments labeled "cashmere" can be presumed to be virgin cashmere "as if it had been explicitly stated." *Clorox, 228 F.3d at 35*. Plaintiffs also presented evidence demonstrating that experienced retailers, like Saks, were aware of the Act's requirements. Based on this evidence, we conclude that plaintiffs have presented sufficient evidence to demonstrate that consumers would view the term "virgin" as necessarily implicated when a garment was labeled "cashmere."

The district court rejected this argument because "it is at least equally plausible to infer that Congress [in enacting the Wool Product Labeling Act] was concerned that it would be misleading for a seller to fail to distinguish between virgin and recycled cashmere, even though it would not be literally false to do so." The district court's **[**32]** argument, however, substitutes an irrelevant inquiry for the required analysis. Rather than assessing what consumers would necessarily infer from the unqualified term "cashmere" in light of the Act's requirements, the district court delved into issues of congressional intent and statutory interpretation. *See Johnson & Johnson Merck, 960 F.2d at 297* ("The question in such cases is -- what does the person to whom the advertisement is addressed find to be the message?"). Because the Act necessarily implies the term "virgin" anytime the unmodified word "cashmere" appears on a garment's label and experienced retailers, like Saks, were aware of the Act's requirements, we rule that plaintiffs' recycled cashmere claim can be reasonably seen as one of literal falsity. Therefore, plaintiffs may benefit from a presumption of consumer deception on this claim.

Even if plaintiffs' recycled cashmere claim did not involve literal falsity, plaintiffs would still be able to avail themselves of a presumption of consumer deception on alternative grounds. It is

well established that ***HN15*** if there is proof that a defendant intentionally set out to deceive or mislead consumers, a presumption **[**33]** arises that customers in fact have been deceived. *See Porous Media Corp. v. Pall Corp., 110 F.3d 1329, 1333 (8th Cir. 1997)* (approving of a presumption of consumer deception upon a finding that defendant acted deliberately to deceive); *see also U-Haul Int'l, Inc. v. Jartran, Inc., 793 F.2d 1034, 1041 (9th Cir. 1986)* (same).

As evidence of defendants' intentional mislabeling of the blazers' recycled cashmere, plaintiffs introduced a letter dated January 13, 1995, addressed to Harve Benard's president, Bernard Holtzman, from one of Harve Benard's testing laboratories. On the top of the letter, there is a handwritten note from "L. Pedell," an agent for Harve Benard, which states, "Also see note from mill below. This is an on-going saga." The note that Pedell is referring to reads, in pertinent part, "FOR YOUR INFO PLS NOTE MILL IS USING RECICLED CHASMERE [sic]." [14] Despite receiving notice that its blazers were being made from recycled cashmere, Harve Benard continued to market its garments **[*317]** without any "recycled" designation, as required by law, until months after the commencement of this lawsuit in 1996. Thus, Harve Benard's unwillingness to comply **[**34]** with the law, despite being on notice of its violation, can be seen as an attempt deliberately to deceive the consuming public.

In response, defendants offer several factual and legal arguments, none of which we find persuasive. First, defendants argue that a presumption of consumer deception cannot be triggered on an implied falsity claim, even if there is evidence of an intent to deceive. Defendants' claim, however, is undermined by several circuit cases that **[**35]** have explicitly held otherwise. *See Porous, 110 F.3d at 1337* (applying presumption of consumer deception to an implied falsity claim when there is intent to deceive); *William H. Morris, 66 F.3d at 258-59* (stating that a presumption of consumer deception applies to an implied falsity claim where there is sufficient evidence of an intent to deceive); *Johnson & Johnson Merck, 960 F.2d at 298-99* (same); *Resource Developers, 926 F.2d at 140* (same). The justification for applying the presumption whenever there is evidence of intentional deception is perspicuous: "The expenditure by a competitor of substantial funds in an effort to deceive customers and influence their purchasing decisions justifies the existence of a presumption that consumers are, in fact, being deceived." *U-Haul, 793 F.2d at 1041*. This reasoning holds true regardless of whether the claim that plaintiffs allege involves an implied or literal falsity.

Second, defendants argue that the fact that an Italian mill stated that it was using recycled cashmere has little bearing on whether the mill was using cashmere that would be considered recycled **[**36]** under the definitions of the Wool Products Labeling Act. Defendants seem to misunderstand or underestimate the import of the letter. One of Harve Benard's mills informed the president of the company that its cashmere-blend garments contained recycled fabric. Rather than investigating the matter to determine whether Harve Benard was violating the law by not properly labeling its cashmere as "recycled," Harve Benard did nothing. It did not finally change the garments' labels until more than one year later when plaintiffs sought a temporary restraining order on the issue. One reasonable explanation, which a juror may choose to credit, for Harve Benard's refusal to investigate or act on the letter is that Harve Benard intended to deceive the

---

[14] Defendants argue that since Holtzman testified that "it is very possible that I didn't get [the letter]," and because there is no evidence to contradict his assertion, it cannot be inferred that he received it. The evidence to cast doubt on Holtzman's testimony, however, comes from his own tongue. He also stated that "I couldn't be sure either way [whether I received the letter]." Given Holtzman's equivocal responses, we find that plaintiffs are entitled to the reasonable inference that a facsimile letter addressed to Holtzman was received by him.

consuming public about the recycled nature of its cashmere. *Cf. Amirmokri v. Baltimore Gas & Elec. Co., 60 F.3d 1126, 1133 (4th Cir. 1995)* (noting that intent may be inferred from a failure to act).

Lastly, defendants argue that Harve Benard's failure to act on the letter for one year does not meet the intent requirement set forth in applicable precedent. Defendants read *Resource Developers, 926 F.2d at 140*, as standing **[**37]** for the proposition that a defendant's failure to dispel confusion caused by its advertising circular for four months is insufficient evidence of intent. Since Harve Benard's failure to act is comparable to the defendant's in *Resource Developers*, defendants conclude that there is insufficient evidence to support a finding of intent.

Even if we were to adopt defendants' reading of *Resource Developers*, we remain unpersuaded by their argument because the circumstances of this case are far more compelling. First, the fact that defendants waited for more than a year before changing the blazers' mislabeling is far more probative of intentional deceit than waiting for four months. Second, when referring to the Italian mill's use of recycled cashmere, Pedell noted on the top of **[*318]** the letter, "This is an on-going saga." Drawing all reasonable inferences in plaintiffs' favor, a rational juror could conclude from this sentence that the recycled cashmere issue had been encountered before and -- as the word "saga" suggests -- on a continuing basis. Because this "saga" probably began or could have begun a considerable amount of time before January 1995, we decline defendants' invitation to **[**38]** place a time constraint on plaintiffs' evidence of intent.

With respect to the Institute's recycled cashmere claim for injunctive relief, the district court dismissed the claim because the Institute failed to demonstrate evidence of consumer deception. Because the foregoing analysis applies with equal force to the Institute's recycled cashmere claim, we rule that the Institute can avail itself of a presumption of consumer deception. Thus, the district court erred in granting defendants' motion for summary judgment on the Institute's recycled cashmere claim.

Nothing in this opinion, however, is meant to preclude defendants from rebutting the presumption of consumer deception at trial by showing that the labeling did not actually deceive consumers.

**D. Causation and Damages**

Before delving into the merits of plaintiffs' proffered evidence of causation, we address a threshold evidentiary issue. Defendants argue that since plaintiffs failed to appeal the district court's order striking their experts' reports, plaintiffs have nothing upon which to base a finding of causation. We agree with defendants that plaintiffs did not properly appeal the district court's ruling, but this does not signify that plaintiffs' case on causation necessarily fails. [15] Plaintiffs may still rely on anecdotal statements from prospective customers, evidence of cost differential between fabrics, **[**39]** and factual testimony of expert witnesses to demonstrate causation.

***HN16*** In order to prove causation under *§ 1125(a)* of the Lanham Act, the aggrieved party must demonstrate that the false advertisement actually harmed its business. "A precise showing is

---

[15] Whether plaintiffs will be permitted to present new expert reports on remand is a matter best left for the district court, as we have not been properly briefed on the issue.

not required, and a diversion of sales, for example, would suffice." [Quabaug, 567 F.2d at 161](#) (internal citations omitted). [16]

**[**40]** To satisfy this requirement, plaintiffs present two pieces of interrelated evidence. First, plaintiffs point to Harve Benard's purchase orders which demonstrate that Harve Benard was paying $ 5 per yard less for the fabric it was using to make its garments than Packard's customers, who were paying for legitimate 10% cashmere fabric. Next, plaintiffs offer uncontradicted evidence that Packard's customers actually reduced their purchases of Packard's cashmere-blend fabric because they could not compete with Harve Benard's lower-priced garments. Specifically, Peter Warshaw, a sales agent for Packard, testified that three of Packard's customers -- Gilmore, RCM, and Perfect Petite -- notified him that they could no longer purchase Packard's cashmere-blend fabric because Harve Benard's lower-priced garments were driving them out of the market. This evidence supports the plaintiffs' claim **[*319]** that Harve Benard's low prices caused Packard lost sales.

The critical question, then, is what enabled Harve Benard to lower its prices to the point that prospective competitors refused to purchase Packard fabric. Based on the evidence presented, a rational factfinder could reasonably infer that the substantial **[**41]** cost savings Harve Benard enjoyed from using non-cashmere or recycled cashmere fabric allowed Harve Benard to lower the price of its blazers, thereby preventing Packard's customers from competing in the market. Indeed, using inexpensive materials that are represented as something more valuable would generally create a substantial competitive advantage by undercutting competitors who correctly represent their products. *See* [Camel Hair, 799 F.2d at 13](#) (approving the district court's commonsense "inference that the sale of cashmere-blend coats which overstated their cashmere content could cause a loss of sales of cashmere-blend coats which correctly stated their cashmere content"). This reasonable inference, to which plaintiffs are entitled at summary judgment, enables plaintiffs to demonstrate the causal link between the harm they suffered and defendants' misrepresentations.

In response, defendants argue that it is unreasonable to infer that Harve Benard's lower fabric costs translated into lower garment prices given that evidence in the record suggests otherwise. In his affidavit, Harve Benard's vice-president Harvey Schutzbank stated that Harve Benard's garment prices **[**42]** would have remained the same even if it had used the more expensive Packard fabric to manufacture its garments. Based on this evidence, Harve Benard claims it would still have enjoyed the same price advantage that prevented Packard's customers from competing in the market even if the garments had been properly labeled and manufactured with legitimate 10% cashmere fabric. In short, defendants cite Schutzbank's affidavit as proof that it was Harve Benard's low prices -- not its mislabeling -- that caused Packard's lost sales.

We agree with defendants that if they were to present undisputed evidence establishing that their garment prices would have remained the same even if they had used Packard fabric, it would be unreasonable to infer that Harve Benard's lower fabric costs translated into lower garment prices. However, plaintiffs present competent evidence which casts serious doubt on Schutzbank's

---

[16] Defendants at oral argument suggested that plaintiffs could not be damaged by Harve Benard's alleged mislabeling because the parties operate in different markets: whereas Harve Benard sells finished garments to retailers, Packard sells fabric to manufacturers. Defendants later conceded, however, that if Packard were to demonstrate that manufacturers refused to purchase its fabric because of defendants' false advertising and concomitant low prices, causation would be proved. Thus, the fact that the two parties are in different markets does not affect the analysis, so long as plaintiffs can prove the causal connection between the misrepresentations and the harm sustained.

testimony. Packard's president John Glidden testified to the relationship between fabric cost and garment price:

> Because Harve Benard was not putting the cashmere in the fabric, they had a tremendously reduced cost. . . . The added expense of putting cashmere in a garment or in a **[**43]** fabric increases the garment's cost; and when [Packard] legitimately labeled [its] fabrics, [the fabrics] were too expensive for the marketplace which Harve Benard was selling to.Moreover, Warshaw, who has years of experience working with garment manufacturers, testified that "Harve Benard had an unfair competitive advantage in fabric that is the major component of a garment . . . . *By far and away the largest component of the total costs of a garment is the fabric*." (emphasis added). He also testified to Harve Benard's comparative advantage:

> The garment manufacturers that are available to compete with Harve Benard are savvy, smart, sharp manufacturers who have at their disposal cheap labor, cheap trim, cheap transportation. They have available to them the same range of possibilities for plugging in to a garment, **[*320]** except that if those sharp competitors use a Packard product that's $ 11.25, they're going to get blown out of the water by Harve Benard['s use of] inexpensive [] fabric.

After weighing all of this evidence, a rational jury could choose to discredit Schutzbank's affidavit, especially considering (1) the commonsense inference that a lower fabric **[**44]** cost translates into a price advantage; (2) the fact that Schutzbank does not provide any quantitative analysis to substantiate his bald assertion that the garments' prices would have remained the same even if Harve Benard were to have used the more expensive Packard fabric; (3) several "savvy, smart, sharp" garment manufacturers could not do what Harve Benard claims it can -- that is, use Packard fabric and still keep its low prices; and (4) two of plaintiffs' witnesses assert that fabric cost has a substantial impact on garment price.

In the end, the parties present witnesses who hold inconsistent positions on a crucial issue of fact. Rather than weighing in on the matter, we conclude that this dispute is one which a jury is best suited to resolve.

**III.**

The district court dismissed plaintiffs' state law claims because it found that since plaintiffs were unable to satisfy the requirements of a Lanham Act claim, they would not be able to prove their state law claims, as the two have overlapping requirements. Because the district court erred in concluding that plaintiffs' proof was insufficient to qualify for relief under the Lanham Act, we reverse its decision to dismiss plaintiffs' **[**45]** state law claims.

***Conclusion***

Based on the foregoing analysis, a reasonable factfinder could conclude that the defendants' material mislabeling of their garments deceived the consuming public, enabled defendants to lower their garment prices, and caused Packard to lose sales. For these reasons, we find summary

judgment inappropriate, reverse the district court's judgment, and remand the case for action consistent with this opinion.

***Reversed and remanded.***

# EXHIBIT 260

LexisNexis

Caution
As of: August 12, 2014 9:09 AM EDT

# Clorox Co. v. Proctor & Gamble Commer. Co.

United States Court of Appeals for the First Circuit
October 3, 2000, Decided
No. 99-1608

**Reporter:** 228 F.3d 24; 2000 U.S. App. LEXIS 24764; 56 U.S.P.Q.2D (BNA) 1385; 2000-2 Trade Cas. (CCH) P73,068; 47 Fed. R. Serv. 3d (Callaghan) 1166
THE CLOROX COMPANY PUERTO RICO, Plaintiff, Appellant, v. THE PROCTOR & GAMBLE COMMERCIAL COMPANY, Defendant, Appellee.

**Prior History:** **[**1]** APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF PUERTO RICO. Hon. Jose Antonio Fuste, U.S. District Judge.

**Disposition:** Vacated and remanded to the district court for further proceedings consistent with this opinion.

**Core Terms**

advertisement, bleach, detergent, literally, chlorine, consumers, allegations, whitening, Blanqueador, Whiter, district court, liquid, misleading, campaign, tag line, false advertising, falsity, message, motion to dismiss, conveyed, summary judgment, commercials, modified, clothes, consumer survey, sua sponte, promotional, factfinder, brochure, parties

**LexisNexis® Headnotes**

Civil Procedure > ... > Defenses, Demurrers & Objections > Motions to Dismiss > Failure to State Claim

Civil Procedure > Appeals > Standards of Review > De Novo Review

Trademark Law > ... > Federal Unfair Competition Law > False Advertising > General Overview

Trademark Law > ... > Federal Unfair Competition Law > False Designation of Origin > Elements of False Designation of Origin

Trademark Law > ... > Federal Unfair Competition Law > Lanham Act > General Overview

Trademark Law > ... > Federal Unfair Competition Law > Lanham Act > Remedies

Trademark Law > ... > Entertainment Industry Falsity & Performance Misattribution > Trade Dress Protection > General Overview

***HN1*** Appellate courts review de novo a district court's dismissal of a § 43(a) of the Lanham Act, *15 U.S.C.S. § 1125(a)*, claim pursuant to *Fed. R. Civ. P. 12(b)(6)*. The appellate court will affirm the dismissal of the complaint if, and only if, accepting all well-pleaded facts as true and drawing all reasonable inferences in favor of the plaintiff, the complaint fails to state a claim upon which relief can be granted. *Fed. R. Civ. P. 12(b)(6)*. That is, the complaint is properly dismissed only when the allegations are such that the plaintiff can prove no set of facts to support the claim for relief.

Civil Procedure > ... > Defenses, Demurrers & Objections > Motions to Dismiss > Failure to State Claim
Civil Procedure > ... > Responses > Defenses, Demurrers & Objections > Motions to Dismiss
Civil Procedure > Dismissal > Involuntary Dismissals > Failure to State Claims
Governments > Legislation > Initiative & Referendum

***HN2*** Courts must move cautiously when dismissing a complaint sua sponte. Although it is occasionally appropriate for a district court to note the inadequacy of the complaint and, on its own initiative, dismiss the complaint, a court may not do so without at least giving plaintiffs notice of the proposed action and affording them an opportunity to address the issue. The general rule is that a district court has no authority to dismiss a complaint for failure to state a claim upon which relief can be granted without giving the plaintiff an opportunity to be heard.

Trademark Law > ... > Federal Unfair Competition Law > False Advertising > General Overview
Trademark Law > ... > Federal Unfair Competition Law > False Advertising > Elements of False Advertising
Trademark Law > ... > Federal Unfair Competition Law > False Designation of Origin > Elements of False Designation of Origin
Trademark Law > ... > Entertainment Industry Falsity & Performance Misattribution > Trade Dress Protection > General Overview

***HN3*** See *15 U.S.C.S. § 1125(a)*.

Antitrust & Trade Law > Consumer Protection > False Advertising > Lanham Act
Trademark Law > ... > Unfair Competition > Federal Unfair Competition Law > General Overview
Trademark Law > ... > Federal Unfair Competition Law > False Advertising > General Overview
Trademark Law > ... > Federal Unfair Competition Law > False Advertising > Elements of False Advertising
Trademark Law > ... > Federal Unfair Competition Law > False Designation of Origin > Elements of False Designation of Origin
Trademark Law > ... > Entertainment Industry Falsity & Performance Misattribution > Trade Dress Protection > General Overview

***HN5*** The elements of a false advertising claim under the § 43(a) of the Lanham Act, *15 U.S.C.S. § 1125(a)*, are: (1) a false or misleading description of fact or representation of fact by the defendant in a commercial advertisement about its own or another's product; (2) the statement actually deceives or has the tendency to deceive a substantial segment of its audience; (3) the deception is material, in that it is likely to influence the purchasing decision; (4) the defendant placed the false or misleading statement in interstate commerce; and (5) the plaintiff has been or is likely to be injured as a result of the false or misleading statement, either by direct diversion of sales from itself to defendant or by a lessening of goodwill associated with its products.

Antitrust & Trade Law > Consumer Protection > False Advertising > General Overview
Antitrust & Trade Law > Sherman Act > Claims
Trademark Law > ... > Unfair Competition > Federal Unfair Competition Law > General Overview
Trademark Law > ... > Federal Unfair Competition Law > False Advertising > General Overview
Trademark Law > ... > Federal Unfair Competition Law > False Designation of Origin > Elements of False Designation of Origin
Trademark Law > ... > Federal Unfair Competition Law > Lanham Act > Remedies
Trademark Law > ... > Entertainment Industry Falsity & Performance Misattribution > Trade Dress Protection > General Overview

***HN4*** A plaintiff can succeed on a false advertising claim under *15 U.S.C.S. § 1125(a)* by proving either that an advertisement is false on its face or that the advertisement is literally true or ambiguous but likely to mislead and confuse consumers. If the advertisement is literally false, the court may grant relief without considering evidence of consumer reaction. In the absence of such literal falsity, an additional burden is placed upon the plaintiff to show that the advertisement, though explicitly true, nonetheless conveys a misleading message to the viewing public. To satisfy its burden, the plaintiff must show how consumers have actually reacted to the challenged advertisement rather than merely demonstrating how they could have reacted.

Civil Procedure > Appeals > Standards of Review > Clearly Erroneous Review
Trademark Law > ... > Federal Unfair Competition Law > False Advertising > General Overview

***HN6*** Whether an advertisement is literally false is typically an issue of fact. At least two factual questions must be answered in evaluating the accuracy of any particular advertisement. First, a factfinder must determine the claim conveyed by the advertisement. Once the claim made by the advertisement has been determined, the factfinder must then evaluate whether that claim is false.

Trademark Law > ... > Federal Unfair Competition Law > False Advertising > General Overview

***HN7*** Although factfinders usually base literal falsity determinations upon the explicit claims made by an advertisement, they may also consider any claims the advertisement conveys by necessary implication. A claim is conveyed by necessary implication when, considering the advertisement in its entirety, the audience would recognize the claim as readily as if it had been explicitly stated.

Trademark Law > ... > Federal Unfair Competition Law > False Advertising > General Overview

***HN8*** The greater the degree to which a message relies upon the viewer or consumer to integrate its components and draw the apparent conclusion, however, the less likely it is that a finding of literal falsity will be supported. Commercial claims that are implicit, attenuated, or merely suggestive usually cannot fairly be characterized as literally false.

Antitrust & Trade Law > Consumer Protection > False Advertising > General Overview
Antitrust & Trade Law > Consumer Protection > False Advertising > Lanham Act
Trademark Law > ... > Federal Unfair Competition Law > False Advertising > General Overview

***HN9*** Unlike the requirements of a claim of literal falsity, the plaintiff alleging a misleading advertisement has the burden of proving that a substantial portion of the audience for that advertisement was actually misled. An advertisement's propensity to deceive the viewing public is most often proven by consumer survey data.

Trademark Law > ... > Federal Unfair Competition Law > False Advertising > General Overview

***HN10*** The probative value of a consumer survey is a highly fact-specific determination.

Governments > Agriculture & Food > Product Promotions
Trademark Law > ... > Federal Unfair Competition Law > False Advertising > General Overview

***HN11*** "Puffing" is exaggerated advertising, blustering, and boasting upon which no reasonable buyer would rely. A specific and measurable advertisement claim of product superiority is not puffery.

**Counsel:** Armando Llorens, with whom Dora M. Penagariciano and McConnell Valdes were on brief, for appellant.

Harold P. Weinberger, with whom Jonathon M. Wagner, Gabrielle L. Gould, Kramer Levin Naftalis & Frankel, LLP, Pedro J. Santa-Sanchez, and O'Neill & Borges were on brief, for appellee.

**Judges:** Before Lynch, Circuit Judge, Cyr, Senior Circuit Judge, and Lipez, Circuit Judge.

**Opinion by:** LIPEZ

**Opinion**

**[*28] LIPEZ, *Circuit Judge***. "Mas blanco no se puede" (Whiter is not possible) was the advertising tag line used by the defendant, the Proctor and Gamble Commercial Company, to sell its detergent, Ace con Blanqueador (Ace with whitener), in Puerto Rico. The Clorox Company Puerto Rico cried foul, complaining that no detergent brings out the white like its chlorine bleach when used with a detergent. Proctor & Gamble modified its pitch, inviting consumers to "Compare con su detergente . . . Mas blanco no se puede" (Compare with your detergent . . . Whiter is not possible). **[**2]** Unimpressed by this change, Clorox sued, alleging, inter alia, that the advertisements were false and misleading in violation of Section 43(a) of the Lanham Act, *15 U.S.C. § 1125(a)*. After Clorox moved for a preliminary injunction, the district court dismissed the false advertising claim sua sponte. Concluding that Clorox has stated a claim under § 43(a) of the Lanham Act, we vacate the dismissal and remand to the district court for further proceedings.

**I.**

We present the facts in the light most favorable to Clorox, the party opposing the dismissal of the complaint. *See Langadinos v. American Airlines, Inc., 199 F.3d 68, 69 (1st Cir. 2000)*. In 1989, Proctor & Gamble introduced in Puerto Rico Ace con Blanqueador, a powdered laundry detergent that contains a non-chlorine whitening agent described as a "color-safe oxygen bleach" with a patented "activator," the same formula used in powdered Tide with Bleach marketed in the continental United States. In 1997, Proctor & Gamble introduced a liquid version of Ace containing a "compound of high levels of sulfactants and enzymes which function as a whitener and a color enhancer," the same formula **[**3]** used in liquid Tide with Bleach Alternative.

*The Original Doorstep Challenge Campaign*

Proctor & Gamble conducted some consumer studies in 1997 and determined that an obstacle to obtaining an enhanced market share for Ace con Blanqueador was the public's perception that chlorine bleach was necessary to get clothes white. Using this new information, Proctor & Gamble implemented an advertising campaign to counter the perception of consumers that chlorine bleach was necessary, and to convince them that Ace was a superior option to using a lower-priced detergent in conjunction with chlorine bleach. This "Doorstep Challenge" included a series of television advertisements in which Francisco Zamora, a television celebrity in Puerto Rico, visited women in their homes to ask them about their laundry practices and to elicit their praise for Ace. In the commercials depicting powdered Ace, the overriding theme was that chlorine bleach was not necessary to get clothes white if washed with Ace. The commercials pitching liquid Ace also emphasized its enhanced whitening capacity, but did not specifically mention chlorine bleach. Each commercial closed with the tag line, "Whiter is not possible, **[**4]** " a slogan Proctor & Gamble had been using since powdered Ace arrived on the market in 1989.

**[*29]** For instance, the "Evelyn" commercial for powdered Ace went as follows:

Francisco: Do you use Ace?

She: No . . .

Fco: What is your laundry routine?

She: I put in the three detergents I use, I throw in a bit of chlorine and I let it soak until the next day. I waste a lot of time . . . but to accomplish what I want I have to do it that way.

Fco: I dare you to wash your white garments with Ace and nothing else!

She: Without chlorine?

. . . .

Fco: Without chlorine . . . we're going to wash all these.

She: I don't think so . . .

She: The truth is . . . that's whiteness, that's whiteness! So now I'm going to save money, time . . .

. . . .

[VISUAL: Whiter is not possible.]Certified Translation.

*The Promotional Mailing*

As part of its campaign to sell Ace, Proctor & Gamble sent a promotional brochure and product sample to consumers in Puerto Rico. The first page of the brochure depicted a bowling ball imprinted with the word "Ace" standing in front of several bowling pins that resembled Clorox bottles. The caption read: "Da en el blanco con una sola tirada," (hit the **[**5]** [white] spot with just one shot). The second and third pages of the brochure contained additional pictures surrounded by punchy statements in Spanish like, "Dare to pass the test. Wash with Ace and nothing else," "Say goodbye to the complications of chlorine and other cleaners," and "Resist the 'bombs.' [1] Put your ACE con Blanqueador to the test." Like the television commercials, the brochure ended with the tag line, "Whiter is not possible!"

*The Modified Campaign*

In January 1998, the Clorox Company, which markets in Puerto Rico a brand of chlorine-based liquid bleach called Clorox, sent a letter to Proctor & Gamble complaining that the Doorstep Challenge campaign was false and misleading, and demanding that Proctor & Gamble stop running the television advertisements. Although Proctor & Gamble would not alter the theme of

---

[1] The combination of detergent and chlorine bleach is called "la bomba" in Puerto Rico.

its advertising, it agreed to soften the tag line by adding the qualification, "compare with **[**6]** your detergent," before the phrase "whiter is not possible." [2]

The qualification did not satisfy Clorox. In March 1998, Clorox filed this lawsuit, alleging in its complaint violations of Section 43(a) of the Lanham Act, *15 U.S.C. § 1125(a)*, the Federal Trademark Dilution Act, *15 U.S.C. § 1125(c)*, the Federal Trade Commission Act and regulations, *15 U.S.C. § 45(a)*, Article 1802 of the Puerto Rico Civil Code, *P.R. Laws Ann. tit. 31 § 5141*, and regulations issued by the Puerto Rico Department of Consumer Affairs ("DACO"). Clorox later amended the complaint by dropping the claims pled under the FTC Act and the FTC and DACO regulations, and adding a claim under Article 1802 predicated solely on Proctor & Gamble's alleged violations of those **[**7]** laws and regulations. [3] Proctor & Gamble moved to dismiss all of the claims except the Lanham Act claim. Clorox then sought leave to amend the complaint again **[*30]** to add Proctor & Gamble's alleged violation of the Lanham Act as another predicate for its Article 1802 claim. [4]

Clorox sought to permanently enjoin Proctor & Gamble from "making any claims that Ace gets clothes 'the whitest possible,' *without* the use of Clorox." (Emphasis in original). Additionally, Clorox sought damages and attorneys' fees under § 43(a) of the Lanham Act. [5] Finally, Clorox moved for a preliminary injunction on its Lanham Act claim. In connection **[**8]** with the motion for a preliminary injunction, the parties conducted document production and depositions and submitted to the court relevant evidentiary materials, including consumer surveys, statements of experts, and the testimony of various witnesses. The district court did not hear oral argument.

In March 1999, while Clorox's motion to amend its amended complaint and its motion for preliminary injunction were pending, the district court granted Proctor & Gamble's motion to dismiss both the Dilution Act and Article 1802 claims. Additionally, the district court dismissed the Lanham Act claim sua sponte. This appeal followed, limited to the dismissal of the Lanham Act and Article 1802 claims.

**II.**

**A. The Sua Sponte Dismissal**

**[**9]** ***HN1*** We review de novo the district court's dismissal of Clorox's Lanham Act claim pursuant to *Fed. R. Civ. P. 12(b)(6)*. *See* *Beddall v. State St. Bank & Trust Co., 137 F.3d 12, 16 (1st Cir. 1998)*. We will affirm the dismissal of the complaint if, and only if, accepting all well-pleaded facts as true and drawing all reasonable inferences in favor of the plaintiff, the complaint "fails to state a claim upon which relief can be granted." *Fed. R. Civ. P. 12(b)(6)*. That is, the complaint is properly dismissed only when the allegations are such that "the plaintiff can prove no set of facts to support [the] claim for relief." *Rockwell v. Cape Cod Hosp., 26 F.3d 254, 260 (1st Cir. 1994)*.

---

[2] For advertisements depicting liquid detergent, the new tag line read, "Compare con su detergente liquido . . . Mas blanco no se puede." (Compare with your liquid detergent . . . Whiter is not possible).

[3] Presumably, Clorox did this because it worried that the FTC Act and FTC and DACO regulations do not authorize private rights of action.

[4] This Second Amended Complaint also assailed a new series of advertisements, first aired by Proctor & Gamble in September 1998, depicting the celebrity interviewer Zamora wrapped in chains and exclaiming, "Free yourself from chlorine bleach!"

[5] Section 35 of the Lanham Act, 15 U.S.C. § 1117(a), allows for the recovery of damages and attorney's fees for false advertising in violation of § 43(a). *See* 4 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 27:40 (4th ed. 1997).

***HN2*** Courts must move cautiously when dismissing a complaint sua sponte. *See, e.g.*, *Baker v. Cuomo, 58 F.3d 814, 818 (2d Cir. 1995)*. Although it is occasionally appropriate for a district court to "note the inadequacy of the complaint and, on its own initiative, dismiss the complaint[,] a court may not do so without at least giving plaintiffs notice of the proposed action and affording them an opportunity to address the issue." *Wyatt v. City of Boston, 35 F.3d 13, 14-15 (1st Cir. 1994)* **[**10]** (quoting *Literature, Inc. v. Quinn, 482 F.2d 372, 374 (1st Cir. 1973))*. *See also Perez v. Ortiz, 849 F.2d 793, 797 (2d Cir. 1988)* (noting that "the general rule is that a 'district court has no authority to dismiss a complaint for failure to state a claim upon which relief can be granted without giving the plaintiff an opportunity to be heard'"). Clorox was given no opportunity to argue the validity of its claim to the district court. Moreover, the court's dismissal was done in the face of Proctor & Gamble's acknowledgment that "the complaint states a claim under the federal false advertising statute[--]Section 43(a) of the Lanham Act." Clorox had no reason to suspect, therefore, that its Lanham Act claim was in danger of dismissal.

There are limited exceptions to the general rule barring dismissal without notice, applicable to frivolous claims or to claims whose defects could not be cured by amendment. *See Wyatt, 35 F.3d at 15 n.1* (noting that reversal of a sua sponte dismissal without notice may not be "mandated **[*31]** if amendment [of the complaint] would be futile or if it is patently obvious that the plaintiff could not prevail"); **[**11]** *Street v. Fair, 918 F.2d 269, 272 (1st Cir. 1990)* (per curiam) (noting that procedural protections may be unnecessary when the court dismisses in forma pauperis actions as frivolous). As our discussion *infra* indicates, Clorox's Lanham Act claim does not fall within any of these exceptions.

Recognizing the procedural vulnerability of the court's dismissal, Proctor & Gamble points out that Clorox submitted substantial evidence in conjunction with its complaint and its preliminary injunction motion--evidence that the district court presumably could have used to convert, sua sponte, a motion to dismiss into a motion for summary judgment. *See* 5A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1366, at 470 (West Supp. 2000) (explaining that it may be appropriate for a court to convert a motion to dismiss into one for summary judgment sua sponte when parties offer material outside of the pleadings in conjunction with a motion to dismiss). Proctor & Gamble now urges us to treat the district court's ruling as a summary judgment, inviting us to affirm on any alternative ground supported by a full examination of the record. *See Frillz, Inc. v. Lader, 104 F.3d 515, 516 (1st Cir. 1997)* **[**12]** (stating that we may "affirm an entry of summary judgment on any alternative ground made manifest by the record").

There are several problems with this approach. Even if we were to agree that it would have been appropriate for the district court to consider material outside the pleadings in connection with its sua sponte dismissal of the Lanham Act claim, this is not what the district court did. The court's opinion and order sets forth its analysis in a section entitled "Motion to Dismiss," which it prefaces with a discussion of the 12(b)(6) motion to dismiss standards. The court expressly grants "Defendant's motion to dismiss Plaintiff's complaint for failure to state a claim upon which relief can be granted pursuant to *Fed. R. Civ. P. 12(b)*." More significantly, the district court did not conduct the searching review of the record necessary to rule on summary judgment. *See Garita Hotel Ltd. Partnership v. Ponce Fed. Bank, F.S.B., 958 F.2d 15, 18-19 (1st Cir. 1992)* (stating that the test for deciding whether a district court's ruling is a 12(b)(6) dismissal or an entry of summary judgment is "whether the court actually took cognizance of" supplementary materials). **[**13]** The district court looked only to the face of the complaint. It did not purport to dismiss Clorox's Lanham Act claim based on an evaluation of the record as a whole.

Moreover, Proctor & Gamble's suggestion fails to address the fundamental problem with the district court's sua sponte actions: the failure to give Clorox notice and an opportunity to be heard. Even if the district court had converted the motion to dismiss into a motion for summary judgment--which it did not--such conversion usually requires that "all parties shall be given reasonable opportunity to present all material made pertinent to such a motion." *Fed. R. Civ. P. 12(b)*. Although we do not "mechanically enforce the requirement of express notice of a district court's intention to convert a *Rule 12(b)(6)* motion into a motion for summary judgment," we do guard against allowing such a conversion where it would come as a "surprise" or be "unfair" to the party against whom judgment is rendered. *Chaparro-Febus v. International Longshoremen Ass'n, Local 1575, 983 F.2d 325, 332 (1st Cir. 1992)*. In light of Proctor & Gamble's acknowledgment that the complaint stated a claim under § 43(a) of the Lanham Act, **[**14]** the district court's conversion without notice would have been both surprising and unfair.

It would only compound the unfairness to Clorox if we accepted the invitation of Proctor & Gamble to indulge the fiction that the district court's ruling was a summary judgment determination and then affirm **[*32]** on any basis that seems appropriate. Clorox has now tailored its appellate advocacy to address the legal standards that it reasonably expected would govern this appeal--i.e., the standards governing review of a 12(b)(6) dismissal. Clorox has never had an adequate opportunity to argue the relationship between the record evidence and its Lanham Act claim. Also, it would be imprudent to evaluate the voluminous filings in this case in light of the summary judgment standard without advocacy from both parties on the relationship between this evidence and the legal standards governing liability under the Lanham Act.

Our refusal to review the entire record based upon summary judgment standards does not mean, however, that we will not examine any of the filings in this case. The record includes hundreds of pages of exhibits appended to the various complaints and submitted in support of motions to **[**15]** dismiss and motions for and against a preliminary injunction. These exhibits include the full text of the advertising copy, internal company memoranda, letters exchanged between the parties, market research and consumer survey data, and declarations and deposition testimony of experts and other witnesses. Although much of the evidence contained in the record is out-of-bounds in reviewing a 12(b)(6) dismissal, it is well-established that in reviewing the complaint, we "may properly consider the relevant entirety of a document integral to or explicitly relied upon in the complaint, even though not attached to the complaint, without converting the motion into one for summary judgment." *Shaw v. Digital Equip. Corp., 82 F.3d 1194, 1220 (1st Cir. 1996)* (citing *Watterson v. Page, 987 F.2d 1, 3-4 (1st Cir. 1993)* (explaining that the main problem of looking to documents outside the complaint--lack of notice to plaintiff--is dissipated "where plaintiff has actual notice . . . and has relied upon these documents in framing the complaint")). "Were the rule otherwise, a plaintiff could maintain a claim . . . by excising an isolated statement from a document and **[**16]** importing it into the complaint . . . ." *Id.*; *see also* *Northern Indiana Gun & Outdoor Shows, Inc. v. City of South Bend, 163 F.3d 449, 454 (7th Cir. 1998)* ("It is a well-settled rule that when a written instrument contradicts allegations in the complaint to which it is attached, the exhibit trumps the allegations."). Accordingly, in determining whether Clorox has stated a claim for relief for false advertising, we read the allegations in the complaint in light of the full text of the advertising copy contained in the record. We limit our evaluation of material outside the complaint to the advertisement copy because that is the only material we deem "integral" to assessing the sufficiency of the allegations in the complaint.

In closing our discussion of the sua sponte dismissal, we must reiterate that basic fairness and sound prudential reasons underlie our insistence on the involvement of the parties in any dismissal.

"Adequate notice helps the court secure a just determination, by giving parties moved against the opportunity to present their best arguments in opposition." *Perez, 849 F.2d at 797* (internal citations and quotations omitted). This **[**17]** case aptly illustrates the wisdom of that insistence. The relationship between the allegations in the complaint and the Lanham Act false advertising claim is complex and contested. By dismissing Clorox's Lanham Act claim without the benefit of the parties' advocacy in addressing these complex issues, the district court misunderstood the relationship between the allegations in Clorox's complaint and the relevant legal standards. We turn now to those standards.

**B. The Lanham Act False Advertising Claims**

***HN3*** The false advertising prong of the Lanham Act provides:

> (1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination **[*33]** thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which--
>
> . . . .
>
> (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities, shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged **[**18]** by such act.

*15 U.S.C. § 1125(a)*. [6]***HN4*** A plaintiff can succeed on a false advertising claim by proving either that an advertisement is false on its face or that the advertisement is literally true or ambiguous but likely to mislead and confuse consumers. *See* *Southland Sod Farms v. Stover Seed Co., 108 F.3d 1134, 1139 (9th Cir. 1997)*; *Castrol, Inc. v. Pennzoil Co.*, 987 F.2d 939, 943 (3d Cir. 1993); *Abbott Labs. v. Mead Johnson & Co., 971 F.2d 6, 13 (7th Cir. 1992)*. If the advertisement is literally false, the court may grant relief without considering evidence of consumer reaction. *See* *United Indus. Corp. v. Clorox Co., 140 F.3d 1175, 1180 (8th Cir. 1998)*. In the absence of such literal falsity, an additional burden is placed upon the plaintiff to show that the advertisement, though explicitly true, nonetheless conveys a misleading message to the viewing public. *See* *Sandoz Pharms. Corp. v. Richardson-Vicks, Inc., 902 F.2d 222, 228-29 (3d Cir. 1990)*. To satisfy its burden, the plaintiff must show how consumers have actually reacted to the challenged advertisement rather **[**19]** than merely demonstrating how they could have reacted. *See* *id. at 229*.

**[**20]** Clorox's amended complaint alleged that Proctor & Gamble's original and modified Doorstep Challenge television campaigns, as well as the promotional brochure, were false and

---

[6] ***HN5*** The elements of a false advertising claim under the Lanham Act are: (1) a false or misleading description of fact or representation of fact by the defendant in a commercial advertisement about its own or another's product; (2) the statement actually deceives or has the tendency to deceive a substantial segment of its audience; (3) the deception is material, in that it is likely to influence the purchasing decision; (4) the defendant placed the false or misleading statement in interstate commerce; and (5) the plaintiff has been or is likely to be injured as a result of the false or misleading statement, either by direct diversion of sales from itself to defendant or by a lessening of goodwill associated with its products. *See* *Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1139 (9th Cir. 1997); *see also* *Johnson & Johnson-Merck Consumer Pharms. Co. v. Rhone-Poulenc Rorer Pharms., Inc.*, 19 F.3d 125, 129 (3d Cir. 1994); 4 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 27:24 (4th ed. 1997).

misleading. Specifically, Clorox alleged that the Doorstep Challenge advertisements and promotions conveyed the false and misleading message to the Puerto Rican public that Ace con Blanqueador gets clothes as white or whiter than a detergent used with chlorine bleach. [7] Clorox also alleged that the name "Ace con Blanqueador" is literally false with respect to Ace liquid detergent.

**[**21]** The district court's analysis of the Lanham Act claim consisted of two paragraphs in which it reasoned that Clorox "has failed to state a claim" under the Lanham Act because it could not establish that Proctor & Gamble's advertisements contained false or misleading statements. In **[*34]** particular, it found that the tag line appearing in the modified campaign commercials, "Compare with your detergent . . . Whiter is not possible," was not false because it compared Ace only to other detergents, not to detergents used with chlorine bleach. The court also stated that, "Ace's comparison claim" was not actionable under the Lanham Act because it was "mere puffing."

The district court's dismissal was erroneous for several reasons. First, it ignored many of the allegations on the face of the complaint. It did not address Clorox's allegations directed at the advertisements in the original Doorstep Challenge campaign, or the promotional brochure, nor did it address Clorox's allegation that the name "Ace con Blanqueador" as applied to the liquid detergent is literally false. Second, it applied an overly-restrictive view of the requirements for pleading a false advertising claim under the Lanham Act, **[**22]** dismissing the allegation that the modified campaign was not false or misleading simply because it found the tag line, read in isolation, to be literally true. Finally, the district court erred in concluding that Clorox's allegations were directed at non-actionable puffery. We analyze Clorox's various allegations de novo, *see* *Beddall, 137 F.3d at 16*, focusing on (1) the allegations of literal falsity, (2) the allegations of misleading advertising, and (3) the concept of "puffery."

1. *Claims of Literal Falsity*

Clorox challenged two features of Proctor & Gamble's advertising campaign as literally false. First, Clorox alleged that the television commercials that aired in the original and modified campaign claimed that Ace gets clothes as white or whiter than chlorine bleach. According to Clorox, that claim is literally false because tests prove that chlorine bleach whitens better than detergent used alone. Second, Clorox alleged that the name, "Ace con Blanqueador," is literally false with respect to Ace liquid detergent because it falsely suggests that Ace liquid contains whitener or bleach.

a. *The Television Advertisements*

***HN6*** Whether an advertisement is literally **[**23]** false is typically an issue of fact. *See* *Mead Johnson & Co. v. Abbott Labs., 209 F.3d 1032, 1034 (7th Cir. 2000)* (denying petition for rehearing and amending prior panel opinion). At least two factual questions must be answered in evaluating the accuracy of any particular advertisement. First, a factfinder must determine the claim

---

[7] Significantly, the Lanham Act false advertising claim was directed at the alleged comparison between Ace and chlorine bleach. Unlike the Dilution Act claim, therefore, the false advertising claim is not directed at a dilution, disparagement, tarnishment, or diminishment of Clorox's *brand name*. That is, Clorox alleged that it was false and misleading to claim the superiority of Ace over chlorine bleach, generically, not Clorox bleach, in particular. To the extent that such false advertising would lead to a reduction in market share for Clorox as the leading producer of chlorine-based "cleansing bleach" in Puerto Rico (Clorox alleged that it controls 74 of the Puerto Rican market), Clorox may be in a position to show that it was significantly damaged by false claims of superiority with respect to chlorine bleach.

conveyed by the advertisement. *See United Indus. Corp., 140 F.3d at 1181* (applying clearly erroneous standard to review of district court's factual determination regarding the claim conveyed by an advertisement for roach bait); *Johnson & Johnson v. GAC Int'l, Inc., 862 F.2d 975, 979 (2d Cir. 1988)*. Once the claim made by the advertisement has been determined, the factfinder must then evaluate whether that claim is false. *See Castrol*, 987 F.2d at 944.

In the case at hand, the parties focus their attention solely upon the first of these factual determinations. The complaint asserts that in head-to-head whitening tests, Clorox achieved "by far, superior results" to Ace. Clorox also emphasizes that "Ace's own boxes" state that in certain cases, for better results, the consumers must use chlorine **[**24]** bleach. In reviewing the motion to dismiss, we therefore assume as true that chlorine bleach whitens better than Ace and that a contrary claim would be literally false. The primary dispute between the parties is not which product whitens better, [8] but rather whether any of Proctor & Gamble's advertisements make a claim of whitening superiority over chlorine bleach.

***HN7***

Although factfinders usually base literal falsity determinations upon the **[*35]** explicit claims made by an advertisement, they may also consider any claims the advertisement conveys by "necessary implication." *See Southland Sod Farms, 108 F.3d at 1139*; *Rhone-Poulenc Rorer, 19 F.3d at 129*. A claim is conveyed by necessary implication when, considering the advertisement in its entirety, the audience would recognize the claim as readily as if it had been **[**25]** explicitly stated. For instance, a factfinder found that an advertisement that claimed a motor oil provided "longer engine life and better engine protection" without explicitly mentioning competitors nonetheless drew a comparison by necessary implication vis a vis those competitors. *See Castrol*, 987 F.2d at 941, 946. This is not to say, however, that all messages implied by an advertisement will support a finding of literal falsity by a factfinder:

> ***HN8*** The greater the degree to which a message relies upon the viewer or consumer to integrate its components and draw the apparent conclusion, however, the less likely it is that a finding of literal falsity will be supported. Commercial claims that are implicit, attenuated, or merely suggestive usually cannot fairly be characterized as literally false.*United Indus. Corp., 140 F.3d at 1181*. Similarly, a factfinder might conclude that the message conveyed by a particular advertisement remains so balanced between several plausible meanings that the claim made by the advertisement is too uncertain to serve as the basis of a literal falsity claim, though even in that case it could still form the **[**26]** basis for a claim that the advertisement is misleading. *See id. at 1182*; *Abbott Labs., 971 F.2d at 14*.

In reviewing the dismissal in the present case, however, we are not required to determine what claim was actually conveyed by the advertisements because we are not factfinders. Instead, we must evaluate whether the complaint, as supplemented by the advertising copy, alleges facts that would allow a rational factfinder to conclude that Proctor & Gamble's advertisements make a superiority claim either explicitly or by necessary implication. We must draw all reasonable inferences as to the claim made in the advertisements in favor of Clorox. *See Southland Sod Farms,*

---

[8] Indeed. Proctor & Gamble does not challenge on appeal Clorox's assertion that chlorine bleach in combination with a detergent gets clothes whiter than its Ace detergent.

*108 F.3d at 1139*; *see also* *Rhone-Poulenc Rorer, 19 F.3d at 129*; *U.S. Healthcare, Inc. v. Blue Cross, 898 F.2d 914, 922 (3d Cir. 1990)*. Dismissal would only be proper if no reasonable factfinder could conclude that the advertisements, viewed in the light most favorable to Clorox, make a claim of whitening superiority for Proctor & Gamble's product.

We conclude that Clorox has stated a claim that Proctor & Gamble's original Doorstep Challenge **[**27]** commercials are literally false. These commercials juxtapose a tag line, "Whiter is not possible," with images of consumers who normally used bleach to achieve white clothes and who are favorably impressed by the results obtained from using Ace alone. The overall theme of the commercials is that bleach is unnecessary if clothes are washed with Ace, and, in fact, many of the consumers visited by Zamora are congratulated at the end of the commercials for passing "the Ace whiteness challenge without chlorine." Some of the commercials also suggest that eliminating chlorine from the laundry process will save consumers time or money, or curtail the negative side effects of washing clothes with chlorine. A factfinder could reasonably conclude that, viewed in their entirety, these advertisements claim that Ace is equal or superior in whitening ability to a detergent and bleach combination.

The modified Doorstep Challenge campaign continued the same visual comparisons, as well as the congratulatory comments for passing the "Ace whiteness challenge without chlorine," but added the words "Compare your detergent" to the "Whiter is not possible" tag line shown at the bottom of the screen at the **[**28]** end of the commercials. Although this change may render the comparative claim of the advertisements more ambiguous, we nonetheless **[*36]** conclude that it remains reasonable to interpret these advertisements as making by necessary implication a superiority claim for Ace over chlorine bleach. Consequently, the court erred in dismissing Clorox's literal falsity claims with respect to both Doorstep Challenge campaigns.

b. *The Name "Ace con Blanqueador"*

Clorox also alleged that the name, "Ace con Blanqueador," as applied to liquid Ace, is literally false. According to Clorox, the word "blanqueador" implies that liquid Ace has whitening capabilities like bleach. Clorox alleged that this is literally false because in its liquid form Ace does not contain bleach or whitening agents. Instead, it contains only a "color enhancer." Clorox emphasizes that liquid Ace uses the same formula as "Tide with Bleach Alternative" whose name, unlike "blanqueador," clearly signifies the absence of bleach. Proctor & Gamble responds that "blanqueador" means "whitener," and that the name cannot be literally false because tests show that the agents added to liquid Ace produce greater whiteness than detergents **[**29]** without those agents.

Clorox's allegations about the use of the name "Ace con Blanqueador" for the liquid detergent state a claim for literal falsity. Although "blanqueador," meaning "whitener," is broad enough to encompass both bleach and non-bleach whitening agents, the question remains whether liquid Ace is properly described as containing "whitening agents" of any sort. Clorox has alleged that it is not, insisting that Ace's ingredients are properly termed "color enhancers." Although the distinction between a "whitening agent" and a "color enhancer" eludes us, we must credit that allegation in this appeal from a 12(b)(6) dismissal. If Clorox succeeds in proving that liquid Ace contains only an "enhancer," rather than a "whitener," and if it further establishes the other elements of a false advertising claim, *see supra* note 6, it will be entitled to relief under the Lanham Act because Proctor & Gamble's designation of Ace liquid detergent as "Ace *con Blanqueador*" would be literally false.

2. *Claims of Misleading Advertising*

In addition to its claims of literal falsity, Clorox has alleged in its complaint that the Ace advertising campaign, even if true or ambiguous, **[**30]** makes an implied claim that is misleading to consumers. This second theory of recovery under the Lanham Act is independent of a literal falsity theory. *See, e.g., Coca-Cola, Co. v. Tropicana Prods., Inc., 690 F.2d 312, 317 (2d Cir. 1982)*. ***HN9*** Unlike the requirements of a claim of literal falsity, the plaintiff alleging a misleading advertisement has the burden of proving that a substantial portion of the audience for that advertisement was actually misled. *See Rhone-Poulenc Rorer, 19 F.3d at 134* (citing *U.S. Healthcare v. Blue Cross, 898 F.2d 914, 922 (3d Cir. 1990))*. An advertisement's propensity to deceive the viewing public is most often proven by consumer survey data. *See id.19 F.3d at 129-30*. [9] **[**32]** Clorox appended to the amended complaint a consumer survey prepared by David Whitehouse of Gaither International/Puerto Rico, Inc. [10] The survey consisted of a series of open-ended **[*37]** questions followed by several follow-up probes. In reliance on the survey, the complaint alleges that:

> In open-ended questions, 35% of respondents of its scientifically valid survey responded that the main message of the Doorstep Challenge Campaign was that, **[**31]** with ACE, there is no need to use other products for maximum whitening performance. In addition, when the respondents were asked if 'the Detergent in the Ad (ACE) Leaves Clothes as White or Whiter than If One Uses Bleach,' 47% totally agreed and 20% somewhat agreed with that statement. Plainly, the Doorstep Challenge Campaign has been amply shown to be likely to cause consumer deception.Clorox has also alleged in its complaint that "in its promotional activities and advertisements," Proctor & Gamble "deceived and confused the public, causing consumers to wrongly believe they are buying a detergent that possesses the same qualities and characteristics as a detergent used with CLOROX."

The court was required to credit Clorox's allegations. It could not conduct its own evaluation of the advertising copy because whether advertising is misleading depends on "what message was actually conveyed to the viewing audience." *Smithkline Beecham Corp., 960 F.2d at 298*; *see also Rhone-Poulenc Rorer, 19 F.3d at 129*. In deciding whether a message is "misleading," the message conveyed is discerned by "public reaction," not by judicial evaluation. McCarthy § 27:56; *see also* Castrol, 987 F.2d at 947 ("In cases where the issue is whether a statement . . . has a tendency to mislead, confuse, or deceive . . . [,] the court's reaction is at best not determinative and at worst irrelevant.") (internal quotation marks omitted). That is, absent some other defect in its proof of the elements of a false advertising claim, *see supra* note 6, if Clorox's **[**33]** consumer survey data (or Proctor & Gamble's own market research data) shows that the advertisements "deceived a substantial portion of the intended audience," *U.S. Healthcare, 898*

---

[9] In some circuits, if the defendant "intentionally set out to deceive the public," using "deliberate conduct" of an "egregious nature" in light of the advertising culture of the marketplace in which the defendant competes, a presumption arises that customers were, in fact, deceived, dispensing with the need for the plaintiff to commission a consumer survey. *See* Rhone-Poulenc Rorer, 19 F.3d at 131-32; *Johnson & Johnson** Merck Consumer Pharms. Co. v. Smithkline Beecham Corp., 960 F.2d 294, 298-99 (2d Cir. 1992); McCarthy § 27:58. Because Clorox has proffered a consumer survey, we need not decide whether Clorox's allegations that Proctor & Gamble intentionally acted in bad faith creates a presumption of consumer deception.

[10] In addition to its own survey, Clorox contends that Proctor & Gamble's market research, commissioned three months into the Doorstep Challenge campaign, demonstrates that consumers have been misled.

F.2d at 922, Clorox is entitled to relief under the Lanham Act. [11] Hence, the claims asserting misleading advertising were improperly dismissed. [12]

**[**34]** Proctor & Gamble offers one last defense of the court's ruling, pointing to *Mead Johnson & Co. v. Abbott Labs., 201 F.3d 883*, modified by, *209 F.3d 1032 (7th Cir. 2000)* as a case that stands for the proposition that "a consumer survey could not be used to show that an advertisement that is clear and unequivocal on its face otherwise conveyed a misleading message." **[*38]** According to Proctor & Gamble, its tag line in the modified campaign "clearly and unequivocally" does not compare Ace with Clorox and, therefore, *Mead Johnson* prevents Clorox from using a survey to prove that a comparison was made. We need not decide whether we would agree with *Mead Johnson* in a factually similar case. This case is of a different order.

*Mead Johnson* addressed whether a label was misleading in claiming its product to be the "1st Choice of Doctors." *See201 F.3d at 883-84*. The plaintiff argued that its surveys demonstrated that consumers interpreted "first" to mean that "more than 50%" of doctors preferred that brand rather than interpreting "first" to mean that a plurality of doctors preferred the brand. *See id. at 884-85*. These **[**35]** distinctions were important because, though the latter interpretation of the label was true, the former was false. *See id. at 884*.

After first finding the plaintiff's survey "misleading if not meaningless," the court identified a "deeper problem: the use of a survey in the first place." *Id. at 885*. Although agreeing that surveys are "accepted ways to probe for things such as confusion about the source of goods, for confusion depends on the effect of a phrase or trade dress on the consumer," the court reasoned that surveys should not be used "to determine the meaning of words, or to set the standard to which objectively verifiable claims must be held." *Id. at 886*. Based upon these objections, the court held that the survey could not "support a conclusion . . . that [the message conveyed by the advertisement] either was false or implied a falsehood." *Mead Johnson, 209 F.3d at 1034*.

Procedurally, *Mead Johnson* is different than this case. That court's evaluation of the merits of the survey was based on a record established during a three day hearing on a motion for a preliminary injunction, which was granted. **[**36]** *See Mead Johnson, 201 F.3d at 884*. As noted, *see supra* note 12, it would not be appropriate to undertake a similar analysis of the Clorox survey on the limited record subject to review after a 12(b)(6) dismissal.

---

[11] Although we have quoted Clorox's allegations relying on the results of its own consumer survey, we do not mean to suggest that a Lanham Act plaintiff must identify the particular consumer survey that will be used to support its allegations to survive a motion to dismiss. For the purposes of a motion to dismiss, a court must credit the type of allegations of misleading advertising set forth here. Obviously, if confronted with a motion for summary judgment, the plaintiff can no longer rest on the allegations in the complaint.

[12] Proctor & Gamble vigorously disputes the validity of Clorox's survey. In opposing Clorox's motion for a preliminary injunction, Proctor & Gamble supplied its own expert, Dr. Michael Rappeport, who testified that the responses to the open-ended questions in Clorox's survey do not "by any stretch of the imagination" show that the commercial's message was that there is no need to use products other than Ace con Blanqueador for maximum whitening performance. Dr. Rappeport concluded, moreover, that the methodology used to conduct the survey was "so biased as to have no value whatsoever." Proctor & Gamble also argues that Clorox's own expert, Whitehouse, failed to vouch for the survey results when asked about it in his deposition. Finally, Proctor & Gamble insists that even if the survey were valid, it tests only one advertisement, and therefore could not support Clorox's claim that the whole advertising campaign was misleading. We express no view on the merits of Proctor & Gamble's arguments. ***HN10*** The "probative value of a consumer survey is a highly fact-specific determination." *Rhone-Poulenc Rorer*, 19 F.3d at 134 (quotations omitted). It is not the type of determination that we may make as a matter of law upon review of a motion to dismiss.

Also, the advertising slogan in *Mead Johnson* was a single phrase printed on the label of a can of infant formula. Proctor & Gamble points us to a similar phrase in its advertising, the tag line "Compare with your detergent . . . Whiter is not possible," as though the two slogans were comparable. Proctor & Gamble's tag line, however, is an integral part of a television commercial with substantial text and images. There is a fundamental difference between a slogan on a can label that communicates its meaning to consumers solely through the printed text, and a tag line shown on the screen at the end of a television commercial that communicates its message to consumers through a combination of audio-visual and textual media. Because we decline to read Proctor & Gamble's tag line separately from the entirety of the commercials, *Mead Johnson* is factually inapplicable to the present case.

3. *Puffery*

Finally, the statements, "Compare with your detergent **[**37]** . . . Whiter is not possible," and "Whiter is not possible," are not non-actionable puffing. "***HN11*** 'Puffing' is exaggerated advertising, blustering, and boasting upon which no reasonable buyer would rely . . . ." McCarthy § 27:38. "A specific and measurable advertisement claim of product superiority . . . is not puffery." *Southland Sod Farms, 108 F.3d at 1145* (claim that turfgrass seed requires "50% less mowing" was not puffery); *see also* *Castrol, Inc.*, 987 F.2d at 946 (claim that motor oil provides "longer engine life and better engine protection" was not puffery). Whether the "Doorstep Challenge" campaign conveys the message that Ace gets clothes whiter than chlorine bleach, or compares Ace with other detergents without implying that it whitens better than chlorine bleach, the claim is specific and measurable, not the kind of vague or subjective statement that characterizes puffery. Indeed, Proctor & Gamble concedes **[*39]** in its brief that its claim in its modified campaign, "Compare with your detergent . . . Whiter is not possible," is not puffery. It contends that it is a true statement supported by its studies comparing Ace con Blanqueador with other detergents.

**[**38]** The original campaign tag line, "Whiter is not possible," is a closer call on the puffing issue. Standing alone, that statement might well constitute an unspecified boast, and hence puffing. In context, however, the statement invites consumers to compare Ace's whitening power against either other detergents acting alone or detergents used with chlorine bleach. Despite this ambiguity, it is a specific, measurable claim, and hence not puffing.

Proctor & Gamble's promotional brochure, on the other hand, contained statements like, "hit the white spot with just one shot," "Dare to pass the test. Wash with Ace and nothing else," "Say goodbye to the complications of cloro and other cleaners," and "Resist the 'bombs.' Put your ACE con Blanqueador to the test." We agree with Proctor & Gamble that each of these statements, viewed in isolation, is precisely the type of vague, unspecified boasting that typifies puffery. Nonetheless, the promotional brochure also states, "Whiter is not possible," the same statement that appears as the tag line on the original Doorstep Challenge television commercials. As in the television commercials, that statement may be literally false. Accordingly, the brochure **[**39]** cannot be dismissed as mere puffery.

**III.** Pursuant to § 43(a) of the Lanham Act, Clorox has stated a claim for literal falsity relating to the name of the Ace liquid detergent, "Ace con Blanqueador." Clorox has also stated claims for literal falsity and for misleading advertising with respect to the commercials aired in both the original and modified Doorstep Challenge advertising campaigns, as well as the promotional brochure. The district court erred by dismissing these claims pursuant to *Rule 12(b)(6)*. We must

vacate its judgment and remand the Lanham Act claims to the district court for further proceedings consistent with this decision. [13]

**[**40]** Clorox has also appealed the dismissal of its claim pursuant to Article 1802 of the Puerto Rico Civil Code. Although Clorox in its Second Amended Complaint sought to have the alleged violation of the Lanham Act added as a predicate for liability under Article 1802, the motion for leave to file the second amended complaint was still pending at the time Clorox's case was dismissed. Accordingly, the district court never ruled on that motion, and hence Clorox's Article 1802 claim predicated on a violation of the Lanham Act is not properly before us at this time. [14] On remand, Clorox should be given the opportunity to resubmit its motion for leave to amend.

***Vacated and remanded to the district court for further proceedings consistent with this opinion.***

---

[13] We did not deal with every statement alleged by Clorox to be false and misleading. The effect of the district court's decision was to dismiss the Lanham Act claim in its entirety. If any specific allegation in the complaint does not justify that outcome, we must vacate. We have chosen to focus in this appeal on what seem to be the most important of Clorox's allegations. That focus does not mean that we are deciding the merits of any of the allegations by Clorox not addressed in this decision.

[14] For the same reason, we also decline to express any opinion on the validity of Clorox's claims in its Second Amended Complaint relating to Proctor & Gamble's September 1998 Ace con Blanqueador advertising campaign.

EXHIBIT 261

LexisNexis

Caution
As of: August 12, 2014 9:09 AM EDT

# Coastal Fuels Inc. v. Caribbean Petroleum Corp.

United States Court of Appeals for the First Circuit
March 12, 1996, Decided
No. 95-1460

**Reporter:** 79 F.3d 182; 1996 U.S. App. LEXIS 4365; 1996-1 Trade Cas. (CCH) P71,335; 34 Fed. R. Serv. 3d (Callaghan) 622
COASTAL FUELS OF PUERTO RICO, INC., Plaintiff - Appellee, v. CARIBBEAN PETROLEUM CORPORATION, Defendant - Appellant.

**Prior History:** **[**1]** APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF PUERTO RICO. Hon. Juan M. Perez-Gimenez, U.S. District Judge.

**Core Terms**

price discrimination, fuel, prices, district court, Oil, antitrust, damages, bunker, relevant market, monopolization, resellers, secondary-line, competitors, residual, argues, primary-line, new trial, competitive, customers, sales, costs, purchasers, consumers, vessels, seller, actual injury, discriminating, geographic, discounts, commerce

**LexisNexis® Headnotes**

Civil Procedure > Trials > Judgment as Matter of Law > General Overview
Civil Procedure > Appeals > Standards of Review > De Novo Review

***HN1*** An appellate court reviews matters of law de novo.

Antitrust & Trade Law > Clayton Act > General Overview
Antitrust & Trade Law > ... > Price Discrimination > Competitive Injuries > General Overview
Antitrust & Trade Law > Robinson-Patman Act > General Overview

***HN2*** See *15 U.S.C.S. § 13(a)*.

Antitrust & Trade Law > Clayton Act > General Overview
Antitrust & Trade Law > ... > Price Discrimination > Competitive Injuries > General Overview
Antitrust & Trade Law > Robinson-Patman Act > Claims

***HN3*** A pair of sales at different prices makes out a prima facie case for a violation of price discrimination under *section 2(a)* of the Clayton Act, *15 U.S.C.S. § 13(a)*.

Antitrust & Trade Law > Clayton Act > General Overview
Antitrust & Trade Law > Clayton Act > Scope
Antitrust & Trade Law > Regulated Practices > Price Discrimination > General Overview

Antitrust & Trade Law > ... > Price Discrimination > Competitive Injuries > General Overview
Antitrust & Trade Law > ... > Price Discrimination > Competitive Injuries > Primary Line Injuries
Antitrust & Trade Law > ... > Price Discrimination > Competitive Injuries > Secondary & Tertiary Line Injuries
Antitrust & Trade Law > Robinson-Patman Act > General Overview

***HN4*** *Section 2(a)* of the Clayton Act includes two offenses that differ substantially, but are covered by the same statutory language. *15 U.S.C.S. § 13(a)*. A "primary-line" violation occurs where the discriminating seller's price discrimination adversely impacts competition with the seller's direct competitors. In contrast, a "secondary-line" violation occurs where the discriminating seller's price discrimination injures competition among his customers, that is, purchasers from the seller. The theory of injury is generally that the defendant's lower-price sales to the plaintiff's competitor (the favored purchaser) placed the plaintiff at a competitive disadvantage and caused it to lose business.

Civil Procedure > ... > Jury Trials > Jury Instructions > General Overview
Civil Procedure > ... > Jury Trials > Jury Instructions > Objections
Civil Procedure > Appeals > Reviewability of Lower Court Decisions > Preservation for Review

***HN7*** See *Fed. R. Civ. P. 51*.

Civil Procedure > ... > Jury Trials > Jury Instructions > General Overview
Civil Procedure > Appeals > Reviewability of Lower Court Decisions > Preservation for Review

***HN5*** Under *Fed. R. Civ. P. 51* the grounds for objection must be stated "distinctly" after the charge to give the judge an opportunity to correct his or her error.

Civil Procedure > Appeals > Reviewability of Lower Court Decisions > Preservation for Review

***HN6*** When an argument is not properly preserved for appeal, an appellate court will reverse or award a new trial only if the error resulted in a miscarriage of justice or seriously affected the fairness, integrity, or public reputation of the judicial proceedings.

Antitrust & Trade Law > Clayton Act > General Overview
Antitrust & Trade Law > Clayton Act > Scope
Antitrust & Trade Law > ... > Price Discrimination > Competitive Injuries > General Overview
Antitrust & Trade Law > Robinson-Patman Act > General Overview

***HN8*** For a transaction to qualify for coverage under *15 U.S.C.S. § 13(a)* for price discrimination, the product at issue must physically cross a state boundary in either the sale to the favored buyer or the sale to the buyer allegedly discriminated against.

Antitrust & Trade Law > Clayton Act > General Overview
Antitrust & Trade Law > Regulated Practices > Price Discrimination > General Overview
Antitrust & Trade Law > Robinson-Patman Act > Coverage > Commerce Requirement
Antitrust & Trade Law > Sherman Act > Jurisdiction

***HN9*** *Section 263* of the Puerto Rico Anti-Monopoly Act, *10 P.R. Laws Ann. § 263*, is identical to *Section 2(a)* of the Clayton Act, *15 U.S.C.S. § 13(a)*, except that it contains no interstate commerce requirement.

Antitrust & Trade Law > ... > Price Discrimination > Competitive Injuries > General Overview

Antitrust & Trade Law > Public Enforcement > State Civil Actions

***HN12*** See *10 P.R. Laws Ann. § 263* (1976).

Civil Procedure > ... > Justiciability > Case & Controversy Requirements > General Overview
Civil Procedure > ... > Jurisdiction > Subject Matter Jurisdiction > General Overview
Civil Procedure > ... > Subject Matter Jurisdiction > Supplemental Jurisdiction > General Overview
Civil Procedure > ... > Subject Matter Jurisdiction > Supplemental Jurisdiction > Same Case & Controversy

***HN10*** See *28 U.S.C.S. § 1367*.

Civil Procedure > ... > Subject Matter Jurisdiction > Supplemental Jurisdiction > General Overview

***HN11*** In applying the jurisdictional mandates of *28 U.S.C.S. § 1367*, if, considered without regard to their federal or state character, a plaintiff's claims are such that it would ordinarily be expected to try them all in one judicial proceeding, then, assuming substantiality of the federal issues, there is power in federal courts to hear the whole.

Antitrust & Trade Law > Clayton Act > General Overview
Antitrust & Trade Law > Clayton Act > Scope
Antitrust & Trade Law > Robinson-Patman Act > Claims
Antitrust & Trade Law > Robinson-Patman Act > Coverage > General Overview
Antitrust & Trade Law > Public Enforcement > State Civil Actions

***HN13*** Because *§ 263* of the Puerto Rico Anti-Monopoly Act, *10 P.R. Laws Ann. § 263*, is patterned after and is almost identical to *section 2(a)* of the Clayton Act, *15 U.S.C.S. § 13(a)*, the United States Court of Appeals for the First Circuit looks to the jurisprudence interpreting federal law as a guide in applying the Puerto Rico statute.

Antitrust & Trade Law > Clayton Act > General Overview
Antitrust & Trade Law > Clayton Act > Scope
Energy & Utilities Law > Pipelines & Transportation > Eminent Domain Proceedings

***HN14*** Under the Clayton Act, the statutory structure that prohibits primary-line price discrimination stands on an entirely different footing than the statutory scheme that proscribes secondary-line discrimination.

Antitrust & Trade Law > Clayton Act > General Overview
Antitrust & Trade Law > Regulated Practices > Price Discrimination > General Overview
Antitrust & Trade Law > ... > Price Discrimination > Competitive Injuries > General Overview
Antitrust & Trade Law > ... > Price Discrimination > Competitive Injuries > Primary Line Injuries
Antitrust & Trade Law > ... > Price Discrimination > Competitive Injuries > Secondary & Tertiary Line Injuries
Antitrust & Trade Law > Robinson-Patman Act > General Overview
Antitrust & Trade Law > Robinson-Patman Act > Claims

***HN15*** While the original Clayton Act only proscribed conduct that may "substantially lessen competition or tend to create a monopoly," amendments to the statute exist to relieve secondary-line plaintiffs from having to prove harm to competition marketwide, allowing them instead to impose liability simply by proving effects on individual competitors.

Antitrust & Trade Law > ... > Price Discrimination > Competitive Injuries > General Overview

Antitrust & Trade Law > ... > Price Discrimination > Competitive Injuries > Secondary & Tertiary Line Injuries

Antitrust & Trade Law > Robinson-Patman Act > General Overview

Antitrust & Trade Law > Robinson-Patman Act > Claims

***HN16*** For the purposes of secondary-line price discrimination claims under *15 U.S.C.S. § 13(a)*, injury to competition is established prima facie by proof of a substantial price discrimination between competing purchasers over time. If the plaintiff makes such a showing, then this inference may be overcome by evidence breaking the causal connection between a price differential and lost sales or profits. Barring evidence breaking that connection, however, for a plaintiff to prove competitive injury under the statute, he need only show that a substantial price discrimination existed as between himself and his competitors over a period of time.

Civil Procedure > Trials > Jury Trials > Province of Court & Jury

Civil Procedure > Appeals > Standards of Review > General Overview

Criminal Law & Procedure > ... > Challenges to Jury Venire > Equal Protection Challenges > Tests for Equal Protection Violations

***HN17*** In reviewing a jury verdict, an appellate court is compelled, even in a close case, to uphold the verdict unless the facts and inferences, when viewed in a light most favorable to the party for whom the jury held, point so strongly and overwhelmingly in favor of the movant that a reasonable jury could not have arrived at this conclusion. Thus, an appellant must persuade a reviewing court that the facts of the case so conclusively point to a verdict in its favor that fair-minded people could not disagree about the outcome.

Antitrust & Trade Law > Clayton Act > General Overview

Antitrust & Trade Law > ... > Price Discrimination > Competitive Injuries > General Overview

***HN18*** Neither *15 U.S.C.S. § 13(a)*, *10* P.R. Laws Ann. *§ 263*, nor their attendant case law, requires that the price discrimination in question be directly factored into the prices that favored and disfavored purchaser-resellers offered to their customers.

Antitrust & Trade Law > ... > Price Discrimination > Competitive Injuries > General Overview

***HN19*** In order to collect damages for price discrimination under *10 P.R. Laws Ann. § 263*, a private plaintiff must show both competitive injury and that defendant's violation was a "material cause" of the injury. As part of this, the plaintiff is required to show that, as a result of defendant's price discrimination, plaintiff lost sales and profits.

Evidence > ... > Testimony > Credibility of Witnesses > General Overview

***HN20*** Whether or not to credit testimony is a decision best left to the factfinder.

Antitrust & Trade Law > ... > Monopolies & Monopolization > Actual Monopolization > General Overview

Antitrust & Trade Law > ... > Monopolies & Monopolization > Attempts to Monopolize > General Overview

Antitrust & Trade Law > Sherman Act > General Overview

***HN21*** See *15 U.S.C.S. § 2*.

Antitrust & Trade Law > ... > Monopolies & Monopolization > Actual Monopolization > General Overview

Antitrust & Trade Law > ... > Monopolies & Monopolization > Attempts to Monopolize > General Overview

Antitrust & Trade Law > Sherman Act > General Overview

***HN22*** The language of *10 P.R. Laws Ann. § 263* tracks the language of *§ 2* of the Sherman Act, *15 U.S.C.S. § 2*. Claims under this Puerto Rico analogue are to be analyzed in the same manner as claims under *§ 2* of the Sherman Act.

Antitrust & Trade Law > ... > Monopolies & Monopolization > Actual Monopolization > General Overview
Antitrust & Trade Law > ... > Monopolies & Monopolization > Attempts to Monopolize > General Overview

***HN23*** To successfully prove a monopolization offense under either *10 P.R. Laws Ann. § 263* or *15 U.S.C.S. § 2*, a plaintiff must show that: (1) the defendant has monopoly power and (2) the defendant has engaged in impermissible "exclusionary" practices with the design or effect of protecting or enhancing its monopoly position.

Antitrust & Trade Law > Regulated Practices > Market Definition > General Overview
Antitrust & Trade Law > ... > Monopolies & Monopolization > Actual Monopolization > General Overview

***HN24*** To determine whether a party has or could acquire monopoly power in a market under either *10 P.R. Laws Ann. § 263* or *15 U.S.C.S. § 2*, courts consider the relevant market and the defendant's ability to lessen or destroy competition in that market.

Antitrust & Trade Law > Regulated Practices > Market Definition > General Overview

***HN25*** For purposes of determining a monopoly violation under either *10 P.R. Laws Ann. § 263* or *15 U.S.C.S. § 2*, the relevant geographic market generally consists of the geographic area in which the defendant faces competition and to which consumers can practically turn for alternative sources of the product.

Antitrust & Trade Law > Regulated Practices > Market Definition > General Overview
Civil Procedure > Trials > Judgment as Matter of Law > General Overview
Civil Procedure > Appeals > Standards of Review > General Overview

***HN26*** In antitrust law, market definition is a question of fact and an appellate court must affirm the jury's conclusion unless the record is devoid of evidence upon which the jury might reasonably base its conclusion.

Antitrust & Trade Law > Regulated Practices > Market Definition > General Overview
Antitrust & Trade Law > Regulated Practices > Market Definition > Relevant Market
Antitrust & Trade Law > ... > Monopolies & Monopolization > Actual Monopolization > General Overview

***HN27*** In order to show that a defendant has monopoly power, a plaintiff is required to show that the defendant has sufficient market power to raise price by restricting output. Substantial market power that concerns antitrust law arises when the defendant: 1) can profitably set prices well above its costs and 2) enjoys some protection against a rival's entry or expansion that would erode such supra-competitive prices and profits. Market power can be shown through two types of proof. A plaintiff can either show direct evidence of market power or circumstantial evidence of market power. Market power may be proved circumstantially by showing that the defendant has a dominant share in a well-defined relevant market, there are significant barriers to entry in that market, and that existing competitors lack the capacity to increase their output in the short run.

Antitrust & Trade Law > Regulated Practices > Market Definition > General Overview
Antitrust & Trade Law > ... > Market Definition > Relevant Market > Geographic Market Definition
Antitrust & Trade Law > Regulated Practices > Market Definition > Relevant Market

***HN28*** In antitrust law, before determining market share, the relevant geographic market must be defined. Although finding the relevant market and its structure is not a goal in itself but a surrogate of market power, market definition is crucial. Without a definition of the relevant market, it is impossible to determine market share. Proving market definition is the plaintiff's burden. Although the question of market definition is one of fact for the jury, a plaintiff must present sufficient evidence from which a reasonable jury could find the existence of the proposed relevant market.

Antitrust & Trade Law > Regulated Practices > Market Definition > General Overview
Antitrust & Trade Law > Regulated Practices > Market Definition > Relevant Market
Mergers & Acquisitions Law > Antitrust > General Overview
Mergers & Acquisitions Law > Antitrust > Market Definition

***HN29*** In antitrust law, a market may be any grouping of sales whose sellers, if unified by a hypothetical cartel or merger, could profitably raise prices significantly above the competitive level. If the sales of other producers substantially constrain the price-increasing ability of the hypothetical cartel, these others are part of the market. The definition of relevant market depends upon economic restraints that prevent sellers from raising prices above competitive levels.

Antitrust & Trade Law > Regulated Practices > Market Definition > General Overview

***HN30*** The touchstone of market definition under antitrust law is whether a hypothetical monopolist could raise prices.

Antitrust & Trade Law > Regulated Practices > Market Definition > General Overview

***HN31*** In antitrust law, while under most circumstances the immobility of the sellers would be of considerable importance in defining the market, it does not control where the mobility of the ultimate consumers protects the immobile sellers.

Civil Procedure > Trials > Judgment as Matter of Law > General Overview
Civil Procedure > Appeals > Reviewability of Lower Court Decisions > Preservation for Review
Criminal Law & Procedure > ... > Reviewability > Waiver > Admission of Evidence

***HN32*** A party that fails to move at trial for a judgment as a matter of law under *Fed. R. Civ. P. 50(a)*, waives an argument on appeal challenging the sufficiency of the evidence supporting the judgment.

Antitrust & Trade Law > ... > Private Actions > Remedies > General Overview

***HN33*** With respect to the issue of how accurately damages must be measured, there is a clear distinction between the relatively high measure of proof necessary to establish that a plaintiff has sustained some damage and the relatively low measure of proof necessary to enable the jury to fix the amount. In the antitrust context, the most elementary conceptions of justice require that the wrongdoer shall bear the risk of the uncertainty that his own wrong has created. Nonetheless, the plaintiff must still produce evidence from which the jury can make a just and reasonable inference.

Antitrust & Trade Law > ... > Private Actions > Remedies > General Overview

***HN34*** Under the yardstick approach for calculating damages in an antitrust claim, a plaintiff attempts to identify a firm similar to the plaintiff in all respects but for the impact of the antitrust

violation. By contrast, under the "before-and-after" method of damage calculation, a court looks at the plaintiff's business before the violation occurred, during the violation period, and after the violation ended, and estimates the amount by which the violation reduced the plaintiff's profits.

Antitrust & Trade Law > ... > Private Actions > Remedies > General Overview

***HN35*** The United States Court of Appeals for the First Circuit holds that the determination of whether a yardstick damages measure must be used in antitrust cases ultimately requires an appraisal of the reliability of a firm's track record, and the length of that track record is one factor to consider.

Antitrust & Trade Law > ... > Private Actions > Remedies > General Overview

Civil Procedure > ... > Jury Trials > Jury Instructions > General Overview

***HN36*** Ultimately, the proper method to calculate damages in an antitrust action should be determined by the district court in accord with the facts of the situation.

Civil Procedure > Remedies > Damages > General Overview

***HN37*** The law abhors duplicative recoveries and a damage award should be vacated if there is a strong possibility of duplicative recovery.

Civil Procedure > Remedies > Damages > General Overview

Civil Procedure > Appeals > Standards of Review > Abuse of Discretion

***HN38*** A district court's award is reviewed for an abuse of discretion unless it relies on an erroneous legal determination.

Civil Procedure > Judicial Officers > Judges > Discretionary Powers

Civil Procedure > Judgments > Relief From Judgments > General Overview

Civil Procedure > Judgments > Relief From Judgments > Motions for New Trials

Civil Procedure > Appeals > Standards of Review > Abuse of Discretion

***HN39*** The authority to grant a new trial is confided almost entirely to the exercise of discretion on the part of the trial court. Only abuse of discretion will trigger reversal of a denial of a motion for new trial. In reviewing for abuse of discretion, an appellate court must bear in mind that the trial court's discretion is quite limited concerning motions for new trials. A trial judge may not upset the jury's verdict merely because he or she would have decided the case differently.

Civil Procedure > ... > Jury Trials > Verdicts > General Overview

Civil Procedure > Appeals > Reviewability of Lower Court Decisions > Preservation for Review

Criminal Law & Procedure > ... > Reviewability > Preservation for Review > Failure to Object

***HN40*** A failure to object at trial to the form or content of the special interrogatories to which a jury answers results in a waiver of the objection on appeal.

Civil Procedure > Judgments > Entry of Judgments > General Overview

Civil Procedure > Appeals > Reviewability of Lower Court Decisions > Preservation for Review

***HN41*** A party may not argue verdict inconsistency if he or she failed to object after the verdict was read and before the jury was discharged.

Civil Procedure > ... > Jury Trials > Verdicts > General Overview

Civil Procedure > ... > Jury Trials > Verdicts > Special Verdicts
Civil Procedure > Appeals > Standards of Review > General Overview

***HN42*** A special verdict will be upheld if there is a view of the case which makes the jury's answers consistent.

Civil Procedure > Discovery & Disclosure > Disclosure > Mandatory Disclosures
Civil Procedure > Discovery & Disclosure > Discovery > Misconduct During Discovery
Criminal Law & Procedure > Trials > Witnesses > Presentation

***HN43*** A trial court may readily exclude a witness or exhibit if some previous order had set a deadline for identification and the proponent has, without adequate excuse, failed to list the witness or exhibit.

Antitrust & Trade Law > Clayton Act > Defenses
Antitrust & Trade Law > ... > Price Discrimination > Defenses > General Overview
Antitrust & Trade Law > ... > Price Discrimination > Defenses > Meeting Competition Defense
Antitrust & Trade Law > Robinson-Patman Act > Claims
Antitrust & Trade Law > Robinson-Patman Act > Defenses

***HN44*** *Section 2(b)* of Clayton Act permits a defendant to rebut a prima facie case of violation by showing that its lower price was made in good faith to meet an equally low price of a competitor. *15 U.S.C.S. § 13(b)*. The "meeting competition" defense can be raised only by a defendant who responds in good faith to the believed lower price of a competitor.

Antitrust & Trade Law > Clayton Act > Defenses
Antitrust & Trade Law > ... > Price Discrimination > Defenses > General Overview
Antitrust & Trade Law > ... > Price Discrimination > Defenses > Meeting Competition Defense
Antitrust & Trade Law > Robinson-Patman Act > Defenses

***HN45*** The United States Supreme Court holds that Congress intends the "meeting competition" defense of *15 U.S.C.S. § 13(b)* to allow reasonable pricing responses on an area-specific basis where competitive circumstances warrant them.

**Counsel:** William L. Patton, with whom Thomas B. Smith, Kenneth A. Galton, Ropes & Gray, Ruben T. Nigaglioni and Ledesma, Palou & Miranda were on brief for appellant.

Michael S. Yauch, with whom Neil O. Bowman, Roberto Boneta and Munoz Boneta Gonzalez Arbona Benitez & Peral were on brief for appellee.

**Judges:** Before Torruella, Chief Judge, Watson, * Senior Judge, and Lynch, Circuit Judge.

**Opinion by:** TORRUELLA

**Opinion**

**[*186] TORRUELLA, *Chief Judge*.** This appeal involves claims of price discrimination, *15 U.S.C. § 13(a) (1994)*; *10 L.P.R.A. § 263* (1976), monopolization, *15 U.S.C. § 2 (1994)*; *10 L.P.R.A. § 260* (1976), and Puerto Rico law tort, *31 L.P.R.A. § 5141* (1976), brought against appellant

* Of the United States Court of International Trade.

Caribbean Petroleum Corp. by appellee Coastal Fuels of Puerto Rico, Inc. After a jury trial, the district court entered judgment for $ 5,000,000 -- $ 1.5 million in antitrust damages trebled plus $ 500,000 in tort damages. CAPECO seeks that the judgment of the district court be reversed and judgment be granted to CAPECO **[**2]** on all counts, or alternatively, that the judgment be reversed and the case remanded for a new trial. We affirm the price discrimination and Puerto Rico law tort verdicts, as well as the tort damage verdict. However, we reverse the monopolization verdict, vacate the antitrust damages verdict, and accordingly remand for further proceedings on price discrimination damages.

***BACKGROUND***

We relate the evidentiary background in the light most favorable to the jury verdicts. *See Kerr-Selgas v. American Airlines, Inc., 69 F.3d 1205, 1206 (1st Cir. 1995)*.

Coastal Fuels of Puerto Rico, Inc. ("Coastal") was formed in 1989 as a wholly-owned subsidiary of Coastal Fuels Marketing, Inc. ("CFMI"), a company that ran marine fuel operations in numerous ports using a staff of sales agents in Miami, Florida. Caribbean Petroleum Corp. ("CAPECO") owns and operates a refinery in Bayamon, Puerto Rico, which produces a number of fuel products, as well as residual fuel. A principal use of residual fuel is in the production of "bunker fuel," which is used by cruise ships and other ocean-going vessels outfitted with internal combustion or steam engines.

At trial, Coastal introduced testimony **[**3]** and letters showing that CAPECO had committed **[*187]** to supply Coastal on the same terms and conditions as other resellers in San Juan, Puerto Rico, in 1990, but Coastal deferred the start of its operations because of uncertainty due to the Gulf War. Eventually, Coastal began business operations in Puerto Rico in October 1991, buying bunker fuel in San Juan and reselling it to ocean-going liners at berth in San Juan Harbor. Based on CFMI's experience and reputation, Coastal produced a business plan which shows that it expected to reach a sales volume of 100,000 barrels a month, approximately 25-30% of the sales volume in San Juan Harbor. The plan also shows that Coastal assumed it could obtain an average gross margin (sales revenues less product costs) of $ 1.65 a barrel.

In September 1991, CAPECO agreed to charge Coastal prices based on a formula involving the previous Thursday/Friday New York market postings, minus discounts that varied by volume. These prices were to cover the six month period from October 1991 to March 1992. Unknown to Coastal, CAPECO was almost simultaneously offering Coastal's two competitors in San Juan Harbor, Caribbean Fuel Oil Trading, Inc. ("Caribbean") and Harbor **[**4]** Fuel Services, Inc. ("Harbor"), new contracts that gave Caribbean and Harbor bigger discounts from the formula price than Coastal received. [1] Trial evidence introduced by CAPECO's own expert witness quantified the total price discrimination in favor of Caribbean and Harbor as $ 682,451.78 for the period from October 1991 to April 1992.

Coastal filed this suit in May of 1992 when it learned of CAPECO's price discrimination against it. This court affirmed the district court's denial of a preliminary **[**5]** injunction requiring

---

[1] CAPECO tried to argue below and again argues here, that the contracts it executed with Caribbean and Harbor were qualitatively different in their non-price terms and conditions from CAPECO's arrangement with Coastal, justifying the discounts. Coastal responds that it was never offered the terms and conditions that Caribbean and Harbor received. In light of the jury's verdict for Coastal on the price discrimination claim, from conflicting evidence such as this, we draw the (reasonable) conclusion in Coastal's favor.

that CAPECO end its price discrimination. *See Coastal Fuels of Puerto Rico, Inc. v. Caribbean Petroleum Corp., 990 F.2d 25, 26 (1st Cir. 1993)*. After Coastal filed suit, CAPECO proposed a new price formula to Coastal. According to trial testimony introduced by Coastal, CAPECO basically made a "take it or leave it" offer, which Coastal took. Expert testimony Coastal offered at trial contended that competitively significant price discrimination continued until Spring of 1993, when CAPECO cut Coastal off entirely.

Additionally, Coastal presented evidence that, while throughout this period CAPECO would from time to time inform Coastal that it had no fuel available, in fact, CAPECO had available fuel. Coastal also presented evidence that it was discriminated against in terms of the quality of fuel that it received from CAPECO. Finally, on March 31, 1993, CAPECO informed Coastal in writing that it would not sell any more product to Coastal, and shortly thereafter, Coastal went out of business.

The case was tried to a jury on claims (1) that CAPECO discriminated in price in violation of *Section 2(a)* of the Clayton Act, 38 Stat. 730 (1914) (current version at **[**6]** *15 U.S.C. § 13(a)*), as amended by the Robinson-Patman Act, 49 Stat. 1526 (1936), and in violation of *Section 263(a)* of Title 10 of the Laws of Puerto Rico; (2) that CAPECO monopolized trade or commerce in violation of *Section 2* of the Sherman Act and *Section 260* of Title 10 of the Laws of Puerto Rico; (3) that CAPECO violated *Section 5141* of Title 31 of the Puerto Rico Civil Code by engaging in tortious conduct that injured Coastal; and (4) that CAPECO committed a breach of contract in violation of Sections 3371 *et seq.* of Title 31 of the Puerto Rico Civil Code. As reflected in the jury's answers to the Special Interrogatories, the jury found for Coastal on the first three of these claims, but found for CAPECO on the breach of contract claim. The jury awarded damages of $ 1,500,000 for the antitrust violations combined and $ 500,000 for the Puerto Rico tort violation. The antitrust damages were trebled, *see15 U.S.C. § 15(a)*, bringing the total award to $ 5,000,000.

**[*188]** ***DISCUSSION***

CAPECO argues for a reversal of the district court's judgment, or alternatively, for a new trial. We address the arguments for reversal first.

**I. Arguments for Reversal**

The first **[**7]** set of issues involves the district court's denial of CAPECO's motions for judgment as a matter of law under *Fed. R. Civ. P. 50*. ***HN1*** With respect to matters of law, our review is *de novo*. *Sandy River Nursing Care v. Aetna Casualty, 985 F.2d 1138, 1141 (1st Cir. 1993)*.

Seeking judgment as a matter of law, CAPECO has raised a set of issues on appeal that concern the application of federal and Puerto Rico law on price discrimination and monopoly, as well as Puerto Rico tort law, to the facts of this case. With respect to these issues, we review the court's decision *de novo*, using the same stringent decisional standards that controlled the district court. *See Sullivan v. National Football League, 34 F.3d 1091, 1096 (1st Cir. 1994)*; *Gallagher v. Wilton Enterprises, Inc., 962 F.2d 120, 125 (1st Cir. 1992)*. Under these standards, judgment for CAPECO can only be ordered if the evidence, viewed in the light most favorable to Coastal, points so strongly and overwhelmingly in favor of CAPECO, that a reasonable jury could not have arrived at a verdict for Coastal. *See Sullivan, 34 F.3d at 1096*; *Gallagher, 962 F.2d at 124-25*.

**A. Price Discrimination**

**[**8]** *Section 2(a)* of the Clayton Act, amended in 1936 by the Robinson-Patman Act, makes it

> ***HN2*** unlawful for any person . . . to discriminate in price between different purchasers of commodities of like grade and quality, where either or any of the purchases involved in such discrimination are in commerce, . . . where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy, or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination . . . .*15 U.S.C. § 13(a)*. ***HN3*** A pair of sales at different prices makes out a *prima facie* case. *See Falls City Indus., Inc. v. Vanco Beverage, Inc., 460 U.S. 428, 444 n.10, 75 L. Ed. 2d 174, 103 S. Ct. 1282 (1983)*; *FTC v. Anheuser-Busch, Inc., 363 U.S. 536, 549, 4 L. Ed. 2d 1385, 80 S. Ct. 1267 (1960)* ("[A] price discrimination within the meaning of [the statute] is merely a price difference.").

*Section 2(a)****HN4*** includes two offenses that differ substantially, but are covered by the same statutory language. A "primary-line" violation occurs where the discriminating seller's price discrimination adversely impacts competition with the seller's direct **[**9]** competitors. *See, e.g., Brooke Group Ltd. v. Brown & Williamson Tobacco Corp., 509 U.S. 209, 113 S. Ct. 2578, 2586, 125 L. Ed. 2d 168, reh'g denied, 509 U.S. 940, 125 L. Ed. 2d 765, 114 S. Ct. 13 (1993). See generally* Herbert Hovenkamp, *Federal Antitrust Policy: The Law of Competition and its Practice* § 8.8 (1994). In contrast, a "secondary-line" violation occurs where the discriminating seller's price discrimination injures competition among his customers, that is, purchasers from the seller. *See, e.g., FTC v. Sun Oil Co., 371 U.S. 505, 519, 9 L. Ed. 2d 466, 83 S. Ct. 358 (1963)*; *Caribe BMW, Inc. v. Bayerische Motoren Werke, A.G., 19 F.3d 745, 748 (1st Cir. 1994)*; *J.F. Feeser, Inc. v. Serv-A-Portion, Inc., 909 F.2d 1524, 1535-38 (3d Cir. 1990), cert. denied, 499 U.S. 921, 113 L. Ed. 2d 246, 111 S. Ct. 1313 (1991). See generally* Hovenkamp § 14.6. The theory of injury is generally that the defendant's lower price sales to the plaintiff's competitor (the favored purchaser) placed the plaintiff at a competitive disadvantage and caused it to lose business. *Id.*

We address first CAPECO's contention that the district court erred in treating this case as one of secondary-line price discrimination rather than primary-line price discrimination. **[**10]** Specifically, CAPECO protests the district court's instruction to the jury that injury to competition among competing purchaser-resellers may be inferred from **[*189]** proof of substantial price discrimination by a producer among competing purchaser-resellers, an inference appropriate to secondary-line discrimination. See FTC v. *Morton Salt Co., 334 U.S. 37, 50-51, 92 L. Ed. 1196, 68 S. Ct. 822 (1948)*. CAPECO argues that Coastal is affiliated with an organization that competes with CAPECO, and therefore this was a primary-line case; as a result, the *Morton Salt* inference would not apply.

We do not consider the argument that this is a primary-line case, because CAPECO has chosen to make this argument for the first time on appeal. While CAPECO did object to the *Morton Salt* instruction at the district court, that objection was directed at the use of the word "infer" couched in a generalized attack on the instruction as suggesting a presumption not borne out by case law. [2] We have noted before that "*Rule 51*[3] **[**12]** means what it says: ***HN5*** the grounds for

---

[2] We address this distinct argument below.

[3] Fed. R. Civ. P. 51 states, in pertinent part, that

objection must be stated 'distinctly' after the charge to give the judge an opportunity to correct his [or her] error." *Linn v. Andover Newton Theological School,* **[**11]** *Inc., 874 F.2d 1, 5 (1st Cir. 1989)*; *see also Jordan v. United States Lines, Inc., 738 F.2d 48, 51 (1st Cir. 1984)*. Leaving aside whether the district court in fact erred in making the questioned instruction, it seems clear that CAPECO did not set forth the argument it now advances when it objected to the instruction at issue. And if CAPECO did intend to express this argument, it neither advised the district court judge of this problem in a manner that would allow him to make a correction, nor informed him what a satisfactory cure would be. *Linn, 874 F.2d at 5*. ***HN6*** Because the argument was thus not preserved, we will reverse or award a new trial only if the error "resulted in a miscarriage of justice or 'seriously affected the fairness, integrity or public reputation of the judicial proceedings.'" *Scarfo v. Cabletron Systems, Inc., 54 F.3d 931, 945 (1st Cir. 1995)* (quoting *Lash v. Cutts, 943 F.2d 147, 152 (1st Cir. 1991))*. We fail to find such concerns of judicial propriety implicated here. [4]

As a result, we analyze this case as one of secondary-line discrimination. Thus, the theory of injury is that CAPECO sold bunker fuel to Coastal at an unfavorable price relative to Harbor and Caribbean, and consequently, competition between Coastal, Harbor and Caribbean was thereby injured. On appeal, CAPECO makes three arguments based on what it purports to be required elements for Coastal's price discrimination damages claim: first, that the sales in question were not "in commerce" and so *section 2(a)*'s prohibitions do not apply; second, that Coastal failed to make the requisite showing of competitive injury to prevail; **[**13]** and third, that Coastal failed to carry its burden of proving actual injury in order to be entitled to an award of money damages.

**1. "In Commerce"**

CAPECO argues, correctly we conclude, that *section 2(a)* of the Clayton Act does not apply because in the instant case, neither of the two transactions which evidence the alleged price discrimination crossed a state line. *Gulf Oil Corp. v. Copp Paving Co., 419 U.S. 186, 200-201, 200 n.17, 42 L. Ed. 2d 378, 95 S. Ct. 392 (1974)*. ***HN8*** For a transaction to qualify, the product at issue must physically cross a state boundary in either the sale to the favored buyer or the sale to the buyer allegedly discriminated against. *See, e.g., Misco, Inc. v. United States Steel Corp., 784 F.2d 198, 202 (6th Cir. 1986)*; *Black Gold Ltd. v. Rockwool Industries, Inc., 729 F.2d 676, 683* (10th Cir.), *cert. denied*, *469 U.S. 854, 105 S. Ct.* **[*190]** *178, 83 L. Ed. 2d 113 (1984)*; *William Inglis & Sons Baking Co.* v. *ITT Continental Baking Co.*, 668 F.2d 1014, 1043-44 (9th Cir. 1981), *cert. denied*, *459 U.S. 825, 74 L. Ed. 2d 61, 103 S. Ct. 57, 103 S. Ct. 58 (1982)*; *S&M Materials Co. v. Southern Stone Co., 612 F.2d 198, 200* (5th Cir.), *cert. denied*, *449 U.S. 832, 66 L. Ed. 2d 37, 101 S. Ct. 101 (1980)*; *Rio Vista Oil, Ltd. v. Southland Corp., 667 F. Supp. 757, 763* **[**14]** (D. Utah 1987).

---

***HN7*** no party shall assign as error the giving or the failure to give an instruction unless that party objects thereto before the jury retires to consider its verdict, stating distinctly the matter objected to and the grounds of the objection.

[4] While this court has admitted "occasional" exceptions to the "raise-or-waive" principle, *see National Assoc. of Social Workers* v. *Harwood*, 69 F.3d 622 at 627-28, the concerns that justify an exception are not implicated here, *see id.*, 69 F.3d at 627-28 (finding exception given certain circumstances including the fact that failure to raise issue did not deprive court of appeals of useful factfinding, and the fact that the issue in question raises constitutional concerns).

However, this issue is not dispositive, because the jury found that CAPECO violated the ***HN9*** Puerto Rico price discrimination statute, which is identical to *Section 2(a)* except that it contains no interstate commerce requirement. [5] CAPECO has not challenged the district court's supplemental jurisdiction stemming from Coastal's Sherman Act claims. The relevant statute states that ***HN10*** "in any civil action over which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action . . . that they form part of the same case or controversy." *28 U.S.C. § 1367 (1994)*. ***HN11*** In application, "if, considered without regard to their federal or state character, a plaintiff's claims are such that [it] would ordinarily be expected to try them all in one judicial proceeding, then, assuming substantiality of the federal issues, there is power in federal courts to hear the whole." *United Mine Workers of America v. Gibbs, 383 U.S. 715, 16 L. Ed. 2d 218, 86 S. Ct. 1130*, (1966); *see* *Rodriguez v. Doral Mortgage Corp., 57 F.3d 1168, 1175-76 (1st Cir. 1995)* (interpreting and applying *28 U.S.C. § 1367*). **[**15]** In the instant case, the price discrimination claims flow out of the same set of facts and require the same evidence as the Sherman Act claims. Because we uphold the district court's jurisdiction over the Sherman Act claims, *see15 U.S.C. § 4 (1994)* (investing "the several district courts of the United States . . . with jurisdiction to prevent and restrain violations of [Title 15] sections 1 to 7[,]" which includes the Sherman Act), we also must conclude that the district court properly exercised supplementary jurisdiction over the price discrimination claims.

**[**16]** Thus, we conclude that the district court erred in applying *section 2(a)* of the Clayton Act to the conduct at issue, and accordingly reverse that part of its opinion. However, we find applicable *section 263* of the Puerto Rico Anti-Monopoly Act, *10 L.P.R.A. § 263*. ***HN13*** Because *section 263* was patterned after and is almost identical to *section 2(a)* of the Clayton Act, as amended by the Robinson-Patman Act, we look to the jurisprudence interpreting federal law as a guide in applying the statute. [6] Given that the one key difference between the federal and Puerto Rico statutes is the lack of an "in commerce" requirement in the Puerto Rico analogue, we conclude that we should interpret *section 263* as intended to extend the provisions of *section 2(a)* of the Clayton Act to price discrimination within Puerto Rico, the situation which we confront in the instant case. Given the relative lack of applicable *section 263* case law and the well-developed jurisprudence concerning Clayton Act *section 2(a)*, we will focus on the latter in assessing the price discrimination claims.

---

[5] The relevant language is as follows:

> ***HN12*** It shall be unlawful for any person, either directly or indirectly, to discriminate in price between different purchasers of commodities of like grade and quality, where such commodities are sold for use, consumption, or resale in Puerto Rico, and where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce in Puerto Rico, or to injure, destroy, or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination, or with customers of either of them.*10 L.P.R.A. 263* (1976). Furthermore, Puerto Rico law includes a counterpart for the section 4 of the Clayton Act's authorization of treble damages. *See10 L.P.R.A. 268* (1976).

[6] *See Caribe BMW, Inc.*, 19 F.3d at 753 (1st Cir. 1994) (interpreting "Puerto Rico's laws as essentially embodying the jurisprudence relevant to the parallel federal law," where antitrust plaintiff asserted claims under a Puerto Rico antitrust law that paralleled its federal antitrust law claim); *Whirlpool Corp.* v. *U.M.C.O. Int'l Corp.*, 748 F. Supp. 1557, 1565 n.4 (S.D. Fla. 1990) (noting that "federal precedents construing the [Clayton Act, as amended by the] Robinson-Patman Act are applicable to the interpretation of *Section 263*" of the Puerto Rico Anti-Monopoly Act); *see also* Diario de Sesiones, 1964, Vol. 18, Part 4, pp. 1425-26, 1509, 1512, 1707-09; Arturo Estrella, *Antitrust Law in Puerto Rico*, 28 Rev. Jur. del Col. Ab. P.R. 615 (stating that interpretations of the Federal Robinson-Patman Act are to be looked to in construing *section 263*).

**[**17] [*191] 2. Injury to Competition**

CAPECO's second argument in support of reversing the price discrimination portion of the judgment is that Coastal failed to demonstrate injury to competition. As noted above, we analyze this case as one of secondary-line price discrimination, and thus Coastal bears the burden of showing injury to competition between Coastal and its rival bunker fuel resellers, Harbor and Caribbean. Addressing the burden of the secondary-line plaintiff, the Supreme Court has stated that

> it would greatly handicap effective enforcement of the Act to require testimony to show that which we believe to be self-evident, namely, that there is a "reasonable possibility" that competition may be adversely affected by a practice under which manufacturers and producers sell their goods to some customers substantially cheaper than they sell like goods to the competitors of these customers.*Morton Salt Co., 334 U.S. at 50*. As a result, the Supreme Court has held that "for the purposes of *section 2(a)*, injury to competition is established prima facie by proof of a substantial price discrimination between competing purchasers over time." *Falls City, 460 U.S. at 435* **[**18]** (citing *Morton Salt, 334 U.S. 37 at 46, 50-51)*; *see also* *Texaco, Inc. v. Hasbrouck, 496 U.S. 543, 559, 110 L. Ed. 2d 492, 110 S. Ct. 2535 (1990)*; *Monahan's Marine, Inc. v. Boston Whaler, Inc., 866 F.2d 525, 528-529 (1st Cir. 1989)* (noting lower burden for antitrust plaintiff under Clayton Act, as amended by the Robinson-Patman Act, than under Sherman Act); *Boise Cascade Corp. v. FTC, 267 U.S. App. D.C. 124, 837 F.2d 1127, 1139 (D.C. Cir. 1988)*.

CAPECO challenges the district court's finding of competitive injury in two ways, arguing that the *Morton Salt* rule is no longer good law, or alternatively, that the *Morton Salt* rule was incorrectly applied in this case. We first address CAPECO's direct challenge to the vitality of the *Morton Salt* rule, a challenge based on the Supreme Court's opinion in *Brooke Group, 509 U.S. 209, 113 S. Ct. 2578, 125 L. Ed. 2d 168*. In that case, the Supreme Court ruled that, because primary-line price discrimination injury is of the "same general character" as predatory pricing schemes actionable under Sherman Act *section 2*, *Brooke Group, 509 U.S. 209, 113 S. Ct. at 2587*, a primary-line injury plaintiff bears the same substantive burden as under the Sherman Act, that is, the plaintiff must show **[**19]** that the predator stands some chance of recouping his losses, *id.* U.S. at , 113 S. Ct. at 2588. In so deciding, the Supreme Court implicitly overruled *Utah Pie Co. v. Continental Baking Co., 386 U.S. 685, 18 L. Ed. 2d 406, 87 S. Ct. 1326 (1967)*, in which the Supreme Court had set forth different standards for primary-line injury. *Brooke Group*, 509 U.S. at , 113 S. Ct. at 2587 (explaining that *Utah Pie* was merely an "early judicial inquiry").

According to CAPECO, the Supreme Court's recent emphasis in *Brooke Group* on reconciling the area of price discrimination with other antitrust law requires that we find that the *Morton Salt* rule no longer is good law. CAPECO notes that both primary-line and secondary-line price discrimination are prohibited by the same language of *section 2(a)* as amended by the Robinson-Patman Act. Furthermore, CAPECO contends that the Supreme Court in *Brooke Group* apparently undercut any reliance on a principled distinction between the aims of *section 2* of the Clayton Act and other antitrust laws' purported emphasis on protecting "*competition*, not *competitors*," *Brooke Group, 113 S. Ct. at 2588* (emphasis in original) (citation omitted); *see* **[**20]**

*also* Monahan's Marine, Inc., 866 F.2d at 528-29 (not discussing the *Morton Salt* rule, but noting that "unlike the Sherman Act, which protects '*competition* not *competitors*,' . . . the [Robinson-Patman] Act protects *those who compete* with a favored seller, not just the overall competitive process." (emphasis in original)). Thus, according to CAPECO, precedent that pre-dates *Brooke Group* and applies the *Morton Salt* rule must be reexamined. *See, e.g.*, 496 U.S. at 544; Falls City, 460 U.S. at 436; Boise Cascade v. FTC, 267 U.S. App. D.C. 124, 837 F.2d 1127, 1153 (D.C. Cir. 1988).

While CAPECO's argument has merit, we join the two other circuits that have addressed competitive injury in secondary-line **[*192]** cases since *Brooke Group* in refusing to disregard the rule the Supreme Court formulated in *Morton Salt*, for three reasons. [7] First, ***HN14*** the statutory structure that prohibits primary-line price discrimination "stands on an entirely different footing" than the statutory scheme that proscribes secondary-line discrimination. *See* Rebel Oil Co., 51 F.3d 1421 at 1446. Congress first forbade primary-line price discrimination with the Clayton Act of 1914, which originally **[**21]** condemned discrimination that might "substantially . . . lessen competition or tend to create a monopoly in any line of commerce." Clayton Antitrust Act, 38 Stat. 730 (1914) (codified as amended at 15 U.S.C. § 13(a) (1994)). The statute was intended to prevent large corporations from invading markets of small firms and charging predatory prices for the purpose of destroying marketwide competition, and thus specifically applied only to primary-line injury. *See* H.R. Rep. No. 627, 63rd Cong., 2d Sess. § 8 (1914); E. Thomas Sullivan & Jeffrey L. Harrison, *Understanding Antitrust and Its Economic Implications* § 8.03 (1988).

**[**22]** By contrast, secondary-line discrimination is forbidden by the Robinson-Patman Act, 49 Stat. 1526 (1936), 15 U.S.C. §§ 13-13b, 21a (1988), which amended the original Clayton Act's price discrimination proscriptions. Congress clearly intended the Robinson-Patman Act's provision to apply only to secondary-line cases, not to primary-line cases. *See* H.R. Rep. No. 2287, 74th Cong., 2d Sess. § 8 (1936), [8]*cited in* Rebel Oil Co., 51 F.3d at 1446. In contrast to the Sherman Act and the Clayton Act, which were intended to proscribe only conduct that threatens consumer welfare, the Robinson-Patman Act's framers "intended to punish perceived economic evils not necessarily threatening to consumer welfare per se." Rebel Oil Co., 51 F.3d at 1445. *See generally* Hovenkamp § 2.1a. In particular, the Robinson-Patman Act's amendments to the Clayton Act stemmed from dissatisfaction with the original Clayton Act's inability to prevent large retail chains from obtaining volume discounts from big suppliers, at the disadvantage of small retailers who competed with the chains. *See* S. Rep. No. 1502, 74th Cong., 2d Sess. § 4 (1936); H.R. Rep. No. 2287, 74th Cong., 2d Sess. §§ 3-4 (1936); **[**23]** *see also* Morton Salt, 334 U.S. at 49 ("Congress intended to protect a merchant from competitive injury attributable to discriminatory prices"); Rebel Oil Co., 51 F.3d 1421, 1446; Monahan's Marine, Inc., 866 F.2d at 528-29.

Second, we are persuaded by the reasoning of the Ninth Circuit's opinion in *Rebel Oil Co.* that the amendment to the Clayton Act effected by the Robinson-Patman Act supports the continued

---

[7] *See Stelwagon Manufacturing Co.* v. *Tarmac Roofing Systems, Inc.*, 63 F.3d 1267, 1271 (3d Cir. 1995) (applying *Morton Salt* rule without discussion of *Brooke Group*); *Rebel Oil Co.* v. *Atlantic Richfield Co.*, 51 F.3d 1421, 1446 (9th Cir. 1995) (noting in dicta that "in holding that a primary-line plaintiff must demonstrate an injury flowing from an aspect of the defendant's conduct injurious to consumer welfare, we intend in no way to affect the standard for antitrust injury in secondary-line cases"). *But see also* Bob Nicholson Appliance, Inc. v. *Maytag Co.*, 883 F. Supp. 321, 326 (S.D. Ind. 1994) (holding that "we are persuaded that the Seventh Circuit would extend the reasoning of *Brooke Group* and require actual injury to competition").

[8] The Robinson-Patman Act "attaches to competitive relations between a given seller and his several customers. It concerns discrimination between customers of the same seller. It has nothing to do with . . . requiring the maintenance of any relationship in prices charged by a competing seller." H.R. Rep. No. 2287, 74th Cong., 2d Sess. § 8 (1936).

vitality of the *Morton Salt* rule, even in the face of *Brooke Group*'s alteration of standards for primary-line price discrimination. ***HN15*** While the Clayton Act only proscribed conduct that may "substantially lessen competition or tend to create **[**24]** a monopoly[,]" the new law added the following passage: "or to injure, destroy, or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination, or with customers of either of them." *See* *Rebel Oil Co., 51 F.3d at 1447*. The purpose of this passage was to relieve secondary-line plaintiffs -- small retailers who are disfavored by discriminating suppliers -- from having to prove harm to competition marketwide, allowing them instead to impose liability simply by proving effects on individual competitors. *See id.*; H.R. Rep. No. 2287, 74th Cong., 2d Sess. § 8 (1936). Such legislative intent directly supports maintaining **[*193]** the *Morton Salt* rule, which puts into practice Congress' concern with placing the same burden on secondary-line plaintiffs that other antitrust plaintiffs face. Thus, the comparison that the Supreme Court drew between primary-line price discrimination and predatory pricing in *Brooke Group* stands on a different, and stronger, footing than any comparison that could be made between secondary-line price discrimination and other area of antitrust law, including, but not only, predatory pricing.

Third, and finally, **[**25]** the holding of the *Brooke Group* opinion on its face applies only to primary-line cases, not secondary-line cases. As a result, given the legislative history and statutory language distinctions, we will not presume, without more guidance, that the Supreme Court intended in *Brooke Group* to alter the well-established rule that it adopted in *Morton Salt*. [9] Thus, we hold that the *Morton Salt* rule continues to apply to secondary-line injury cases such as the present one.

**[**26]** The *Morton Salt* rule provides that, ***HN16*** for the purposes of secondary-line claims under *section 2(a)*, "injury to competition is established prima facie by proof of a substantial price discrimination between competing purchasers over time." *Falls Cities Industries v. Vanco Beverage, Inc., 460 U.S. 428, 435, 75 L. Ed. 2d 174, 103 S. Ct. 1282 (1983)* (citing *Morton Salt, 334 U.S. at 46, 50-51)*. If the plaintiff makes such a showing, then "this inference may be overcome by evidence breaking the causal connection between a price differential and lost sales or profits." *Falls City, 460 U.S. at 435*. Barring evidence breaking that connection, however, "for a[] plaintiff to prove competitive injury under Robinson-Patman, he [or she] need only show that a substantial price discrimination existed as between himself [or herself] and his [or her] competitors over a period of time." *Hasbrouck v. Texaco, Inc., 842 F.2d 1034, 1041 (9th Cir. 1987)*, *aff'd*, *496 U.S. 543, 110 L. Ed. 2d 492, 110 S. Ct. 2535 (1990)*.

Here the jury properly inferred *prima facie* injury to competition since Coastal produced sufficient evidence before the jury to conclude (1) that the discrimination in question was continuous and substantial and (2) that **[**27]** the discrimination occurred in a business where profit margins were low and competition was keen. 4 Von Kalinowski, *Antitrust Laws and Trade Regulation* § 31.04(1). First, the discrimination lasted all 18 months that Coastal was in business, and always exceeded the five cents per barrel that witnesses testified was competitively significant. Additionally, there was ample testimony that the marine fuel oil business, in which Coastal competed against Caribbean and Harbor, was characterized by thin margins and intense competition.

---

[9] While concerns about overenforcement harming overall consumer welfare may be valid, the Supreme Court retains the option of speaking further on this issue. *See generally* Paul Larule, *Robinson-Patman Act in the Twenty-First Century: Will the Morton Salt Rule Be Retired?*48 S.M.U. L. Rev. 1917, 1927 (1995) (concluding that "when an appropriate case comes before it, the [Supreme] Court may well decide to make the final cut"); Hovenkamp § 14.6a (arguing that, after *Brooke Group*, "a reinterpretation of Robinson-Patman so as to permit secondary-line injury only when competition itself is threatened is long overdue").

At any rate, on appeal, CAPECO does not make the argument that Coastal failed to produce evidence required for a *prima facie* showing of injury to competition under the *Morton Salt* rule.

However, CAPECO argues that the *Morton Salt* inference was undercut by evidence "breaking the causal connection" between CAPECO's price discrimination and Coastal's lost sales or profits, *Falls City, 460 U.S. at 435*, and showing an absence of competitive injury, *Boise Cascade Corp. v. FTC, 267 U.S. App. D.C. 124, 837 F.2d 1127, 1146 (D.C. Cir. 1988)*. According to CAPECO, overall market forces depressed the price for bunker fuel more than 30 percent between late 1991 and early **[**28]** 1992, and it was this fact, rather than CAPECO's price discrimination, that led to Coastal's demise. CAPECO points to the admission of Coastal's CEO that Coastal's sales agents based their price quotes to ships on the prices being charged by competitors in San Juan and other ports, often without even knowing the cost of the fuel that was to be delivered. According to CAPECO, if prices were set when costs were unknown, then discounts from CAPECO **[*194]** could not have been a material factor in setting prices.

We reject the argument that this evidence rebuts Coastal's *prima facie* showing of price discrimination. ***HN17*** In reviewing the jury verdict, "we are compelled . . . even in a close case, to uphold the verdict unless the facts and inferences, when viewed in a light most favorable to the party for whom the jury held, point so strongly and overwhelmingly in favor of the movant that a reasonable jury could not have arrived at this conclusion." *Chedd-Angier Production Co. v. Omni Publications Int'l Ltd., 756 F.2d 930, 934 (1st Cir. 1985)*; *see also* *Rodriguez v. Montalvo, 871 F.2d 163, 165 (1st Cir. 1989)*; *Castro v. Stanley Works, 864 F.2d 961, 963 (1st Cir. 1989)*; *Brown* **[**29]** v. *Freedman Baking Co., 810 F.2d 6, 12 (1st Cir. 1987)*. Thus, in this case, the appellants must "persuade us that the facts of this case so conclusively point to a verdict in [their] favor that fair-minded people could not disagree about the outcome." *Chedd-Angier Production Co., 756 F.2d at 934*.

Here, ***HN18*** neither section 2(a), section 263, nor their attendant case law, requires that the price discrimination in question be directly factored into the prices that favored and disfavored purchaser-resellers offered to their customers. Presumably, regardless of whether these costs were factored directly into the prices that Coastal offered, or were later calculated into Coastal's bottom line, these costs affected Coastal's pricing. Certainly, no argument can be made from this evidence alone that bunker fuel costs, no matter when accounted for, were not causally connected to Coastal's lost profits. *See, e.g.*, *Hasbrouck v. Texaco, Inc., 842 F.2d 1034, 1039-41 (9th Cir. 1987)*, *aff'd*, *496 U.S. 543, 110 L. Ed. 2d 492, 110 S. Ct. 2535 (1990)* (finding that evidence that "some portion" of small extra discounts of 2 cents -5 cents on gasoline was passed on by favored customers sufficient, particularly when **[**30]** retail gasoline market was "strongly price sensitive"). Additionally, the fact that Coastal's sales agents operated without complete knowledge of the prices at which other Coastal agents were purchasing the bunker fuel that would later be delivered does not, without more, show an absence of competitive injury.

**3. Actual Injury**

CAPECO also contends that Coastal failed to present adequate evidence of actual injury to support the verdict. On appeal, CAPECO does not complain that the court's instructions to the jury on the actual injury requirement were erroneous. Thus, the only question regarding this issue is whether the evidence that Coastal presented to the jury was adequate to permit a reasonable inference of actual injury.

Although we have concluded that Coastal has proved competitive injury under Title 10, *Section 263* of the Laws of Puerto Rico, ***HN19*** in order to collect damages as a private plaintiff, Coastal must show that CAPECO's offense was a "material cause" of injury. *See Zenith Radio Corp. v. Hazeltine Research, 395 U.S. 100, 114 n.9, 23 L. Ed. 2d 129, 89 S. Ct. 1562 (1969)*; *Hasbrouck, 842 F.2d at 1042*; *Allen Pen Co. v. Springfield Photo Mount Co., 653 F.2d 17, 21-22 (1st Cir. 1981)*. **[**31]** Coastal was required to show that, as a result of CAPECO's price discrimination, it "lost sales and profits." *Hasbrouck, 842 F.2d at 1042*; *see Allen Pen Co., 653 F.2d 17, 21-22 (1st Cir. 1981)*. CAPECO contends that, to do so, Coastal was required to "indicate and document specific losses of business [for Coastal] and corresponding gains by [favored competitors], or otherwise show that [Coastal's] losses were caused by [CAPECO's] practices." *Foremost-McKesson, Inc. v. Instrumentation Laboratory, Inc., 527 F.2d 417, 420 (5th Cir. 1976)*; *see also Falls City, 460 U.S. at 437-38* (ruling that findings based on "direct evidence of diverted sales" "more than established the competitive injury required for a prima facie case under *section 2(a)*").

Assuming arguendo that CAPECO correctly claims that Coastal needed to show specific losses of business, CAPECO's argument fails to persuade us. [10] CAPECO concedes **[*195]** that a Coastal employee, Andrew McIntosh ("McIntosh") testified that Coastal was getting "feedback" from its customers that its prices were not competitive. ***HN20*** Whether or not to credit such testimony is a decision best left to the factfinder. *See Wytrwal v.* **[**32]** *Saco School Bd., 70 F.3d 165, 171 (1st Cir. 1995)*; *Flanders & Medeiros, Inc. v. Bogosian, 65 F.3d 198, 204 n.4 (1st Cir. 1995)*. McIntosh's testimony, if believed, could lead a jury to reasonably infer actual injury in the form of lost sales.

CAPECO also contends that because McIntosh's testimony was based on statements other Coastal employees had made to him, it was both inadmissible hearsay evidence, *seeFed. R. Evid. 802*, and even if admissible, legally insufficient to support a finding of actual injury. In making this **[**33]** argument, CAPECO cites two cases, *Stelwagon Manufacturing Co.* v. *Tarmac Roofing Systems, Inc.*, 63 F.3d 1267, 1275-76 (3d Cir. 1995), and *Chrysler Credit Corp. v. J. Truett Payne Co., 670 F.2d 575, 581 (5th Cir. 1982)*. However, the two cases are inapposite. Apparently unlike the defendant in *Stelwagon*, CAPECO did not make a lower court hearsay objection to the testimony in question. *See Stelwagon Mfg. Co.*, 63 F.3d at 1275, n.17.

Additionally, the Fifth Circuit's opinion in *J. Truett Payne* is distinguishable in a significant manner from the instant case. In a preceding Supreme Court opinion, the Court noted that

> although [Payne Co.'s owner] asserted that his salesmen and customers told him that the dealership was being undersold, he admitted that he did not know if his competitors did in fact pass on their lower costs to their customers.*J. Truett Payne, Co. v. Chrysler Motors Corp., 451 U.S. 557, 564, 68 L. Ed. 2d 442, 101 S. Ct. 1923 (1981)*. Likewise, Payne Co.'s expert witness did not testify that the lower costs were passed on in the retail price. *Id.* The Court found important the lack of evidence that competitors passed on discounts to customers. *Id.* **[**34]** at 564, n.4. On remand, the Fifth

---

[10] There is conflicting authority for the proposition that a jury may infer actual injury from circumstantial evidence. *See Continental Ore Co. v. Union Carbide Corp.*, 370 U.S. 690, 697-700, 8 L. Ed. 2d 777, 82 S. Ct. 1404 (1962). However, we need not consider here whether this standard, which is more favorable to Coastal, applies rather than the standard that CAPECO advocates, since Coastal actually did proffer evidence, albeit only employee testimony, that its prices were causing it to lose business.

Circuit noted, in finding the evidence insufficient, that Payne Co.'s witnesses only "spoke to either the supposed or hypothesized effect of the programs." *J. Truett Payne, 670 F.2d at 581*. By contrast, while Coastal offered similar testimony of feedback about being undersold, it also put forth expert testimony that Caribbean and Harbor had fully passed on their lower costs to the ships purchasing marine fuel. Coastal's expert testified that "CAPECO gave discriminatory low prices to Harbor and Caribbean . . . [that] were fully passed on . . . to the ships purchasing marine fuel." Thus, because Coastal proffered evidence linking the discounts in question to actual, not hypothetical, effects, *J. Truett Payne* is inapposite.

We conclude that, once admitted, this evidence could have led the jury to reasonably infer actual injury to competition.

**B. Monopolization**

*Section 2* of the Sherman Act, *15 U.S.C. § 2*, ***HN21*** condemns "every person who shall monopolize, or attempt to monopolize . . . any part of the trade or commerce among the several States." ***HN22*** Similarly, Title 10, *Section 260* of the Laws of Puerto Rico tracks this language. Claims under **[**35]** this Puerto Rico analogue are to be analyzed in the same manner as claims under *section 2* of the Sherman Act. *See R.W. Intern. Corp. v. Welch Food, Inc., 13 F.3d 478, 486-88 (1st Cir. 1994)*; *Americana Indus., Inc. v. Wometco de Puerto Rico, 556 F.2d 625, 626-28 (1st Cir. 1977)*; *see also Pressure Vessels of Puerto Rico* v. *Empire Gas of Puerto Rico*, 94 JTS 144, *432 (P.R. 1994). ***HN23*** To successfully prove a monopolization offense, a plaintiff must show that (1) the defendant has monopoly power and (2) the defendant "has engaged in impermissible 'exclusionary' practices with the design or effect of protecting or enhancing its monopoly position." Hovenkamp § 6.4a. On appeal, CAPECO challenges the jury's verdict that it had monopoly **[*196]** power, and also contends that it did not engage in impermissible 'exclusionary' practices in order to protect or gain a monopoly.

***HN24*** To determine whether a party has or could acquire monopoly power in a market, "courts have found it necessary to consider the relevant market and the defendant's ability to lessen or destroy competition in that market." *Spectrum Sports v. McQuillan, 506 U.S. 447, 456, 122 L. Ed. 2d 247, 113 S. Ct. 884 (1993)*. CAPECO's first argument is **[**36]** that the jury erred in finding San Juan Harbor as the relevant geographic market for bunker fuel. ***HN25*** In general, the relevant geographic market consists of "the geographic area in which the defendant faces competition and to which consumers can practically turn for alternative sources of the product." *Baxley-DeLamar v. American Cemetery Assn., 938 F.2d 846, 850 (8th Cir. 1991)*; *see also Tampa Electric Co. v. Nashville Coal Co., 365 U.S. 320, 327, 5 L. Ed. 2d 580, 81 S. Ct. 623 (1961)*.

In its monopolization claim, Coastal argued that CAPECO took steps to drive it out of San Juan Harbor because Coastal is affiliated with a refinery in Aruba. Coastal apparently had the capacity to import the residual oil and diesel into San Juan from Aruba. Coastal also had storage capacity. CAPECO feared, so Coastal's theory went, that this would allow the refinery in Aruba to compete with CAPECO and threaten CAPECO's ability to sell its targeted 10,000 barrels of residual oil per day to dealers. Coastal's argument is that CAPECO, fearing that Coastal's affiliate posed a competitive threat, decided to drive Coastal out by (1) engaging in price discrimination against Coastal, (2) discriminating in the provision of residual **[**37]** oil, (3) discriminating in the quality of the residual oil available, and (4) threatening to cut off plaintiff entirely, eventually doing so.

Coastal successfully argued to the jury that the relevant geographic market was San Juan Harbor, since neither it nor its competitors, Caribbean and Harbor, could practicably obtain supplies in San Juan Harbor from anyone other than CAPECO. Coastal produced evidence that CAPECO made 90% of the sales of bunker fuel to resellers in the San Juan Harbor market -- and CAPECO does not dispute this figure on appeal.

CAPECO's main argument regarding monopoly power is that the choice of San Juan Harbor as the relevant market was incorrect. Instead, it maintains that because the broader market for bunker fuel among cruise ships and other vessels plying the waters of the Caribbean and the southeastern United States constrains the prices CAPECO can charge resellers in San Juan Harbor, the proper geographic market should have been defined to include a much wider area. A larger geographic market would of course lead to a lower figure for the percentage of sales in the market made by CAPECO, likely defeating the monopoly power prong of the monopolization **[**38]** offense.

In assessing CAPECO's argument, we must bear in mind that ***HN26*** "market definition is a question of fact" and "we therefore must affirm the jury's conclusion unless the record is devoid of evidence upon which the jury might reasonably base its conclusion." *Weiss v. York Hospital, 745 F.2d 786, 825 (3d Cir. 1984)*; *see also* *Rebel Oil Co., 51 F.3d at 1435* (stating that standard upon motion for directed verdict, judgment notwithstanding the verdict, and summary judgment is "whether the jury, drawing all inferences in favor of the nonmoving party, could reasonably render a verdict in favor of the nonmoving party in light of the substantive law") (citing *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-52, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986))*.

***HN27*** In order to show that CAPECO had monopoly power, Coastal was required to show that CAPECO had sufficient market power to raise price by restricting output. IIA Phillip E. Areeda et al., *Antitrust Law* P 501 (1995). "Substantial market power that concerns antitrust law arises when the defendant (1) can profitably set prices well above its costs and (2) enjoys some protection against [a] rival's entry or expansion that would erode such supracompetitive **[**39]** prices and profits." *Id.* Market power can be shown through two types of proof. A plaintiff can either show direct evidence of market power (perhaps by showing actual supracompetitive prices and restricted output) **[*197]** or circumstantial evidence of market power. *Rebel Oil Co., Inc. v. Atlantic Richfield Co., 51 F.3d 1421, 1434* (9th Cir.), *cert. denied*, *133 L. Ed. 2d 424, 116 S. Ct. 515 (1995)*. Market power may be proved circumstantially by showing that the defendant has a dominant share in a well-defined relevant market and that there are significant barriers to entry in that market and that existing competitors lack the capacity to increase their output in the short run. *Id.* Coastal's evidence at trial was of the circumstantial type and thus the question the parties have presented on appeal is whether Coastal supplied sufficient evidence for that CAPECO had a dominant share in the relevant market.

***HN28*** Before determining market share, however, the relevant geographic market must be defined. [11] Although, "finding the relevant market and its structure is not a goal in itself but a surrogate of market power," *see* Areeda, *supra*, P 531a, "market definition is crucial." *Rebel Oil Co.,* **[**40]** 51 F.3d at 1434. "Without a definition of the relevant market, it is impossible to determine market share." *Id.* Proving market definition is the plaintiff's burden. *See* *H.J., Inc. v.*

---

[11] The plaintiff must also define the relevant product market. *H.J., Inc.* v. *Int'l Tel. & Tel. Corp.*, 867 F.2d 1531, 1537 (8th Cir. 1989). The parties agree that the relevant product market is residual fuel oil sold by all refineries for use as bunker fuel for ocean-going vessels.

Int'l Tel. & Tel. Corp., 867 F.2d 1531 (8th Cir. 1989) ("The plaintiff carries the burden of describing a well-defined relevant market, both geographically and by product, which the defendants monopolized."); Neumann v. Reinforced Earth Co., 252 U.S. App. D.C. 11, 786 F.2d 424 (D.C. Cir.) ("The plaintiff bears the burden of establishing the relevant market."), *cert. denied*, 479 U.S. 851, 107 S. Ct. 181, 93 L. Ed. 2d 116 (1986); M.A.P. Oil Co., Inc. v. Texaco, Inc., 691 F.2d 1303, 1306 (9th Cir. 1982) ("the proponent of [the monopolization] theory must identify the relevant product and geographic markets as a threshold requirement"). Although Coastal has properly pointed out that the question of market definition is one of fact for the jury, a plaintiff must present sufficient evidence from which a reasonable jury could find the existence of the proposed relevant market. *Cf.* Flegel v. Christian Hosp. Northeast-Northwest, 4 F.3d 682 (8th Cir. 1993) (affirming grant of summary judgment on grounds that there was insufficient **[**41]** evidence to support plaintiffs' proposed market definition).

***HN29*** A market may be any grouping of sales whose sellers, if unified by a hypothetical cartel or merger, could profitably raise prices significantly above the competitive level. If the sales of other producers substantially constrain the price-increasing ability of the hypothetical cartel, these others are part of the market. Areeda, *supra*, P 533b; *see also* Rebel Oil Co., 51 F.3d at 1434 (relying on Professor Areeda's formulation of the test for the relevant market). "The definition of relevant market depends upon economic restraints which prevent sellers from raising prices above competitive levels." H.J., Inc., 867 F.2d at 1537.

Coastal and CAPECO have **[**42]** presented two competing conceptions of the relevant market. Coastal argues, and the jury found, [12] that the relevant market was the market for residual oil for bunker fuel in San Juan. Coastal presented evidence that resellers in San Juan (Harbor, Caribbean and Coastal) purchased 90% of their supplies for bunker fuel from CAPECO. CAPECO, in contrast, has argued that the relevant market is broader, consisting of all sales of residual oil for bunker fuel in the Caribbean and Southeastern United States. Our review of the issue leads us to conclude that it would be unreasonable for a juror to infer from the evidence presented that the sales of residual oil for bunker fuel outside of San Juan should be excluded from the relevant market.

**[**43]** The residual oil CAPECO sells is blended with diesel into bunker fuel and sold by resellers like Coastal, Harbor and Caribbean to large ocean-going vessels. Residual oil refiners and bunker fuel resellers exist throughout the Caribbean and Southeastern United States. The parties agree that the **[*198]** ocean-going vessels can choose to refuel from whatever supplier in the Caribbean and Southeastern United States offers the best terms as to price, quality and dependability. The market for bunker fuel is therefore extremely fluid and competitive, as the parties agree.

Coastal argues that, because of this competition, margins for resellers are razor thin and it is virtually impossible for a reseller in San Juan, like Coastal, to obtain residual oil from anyone other than CAPECO. Transporting supplies from other refineries, such as the refinery Coastal is affiliated with in Aruba, would increase the cost of the fuel to such an extent (transportation costs, import taxes, risk of price changes, and storage costs) that it is not an economically viable alternative. (Of course, this is, it might be observed, somewhat inconsistent with the theory that CAPECO was so afraid of the 'threat' from Coastal **[**44]** and its Aruba affiliate, that it drove Coastal out of business.) Consequently, Coastal argues, resellers of bunker fuel must purchase from CAPECO

---

[12] The jury answered "yes" to the special interrogatory asking "Did Coastal establish that there is a relevant market comprising of the sale of residual fuel oil or diesel to bunker fuel resellers in the port of San Juan and that CAPECO has monopoly power in the relevant market?"

when they do business in San Juan. In Coastal's view, the San Juan resellers' inability to purchase from suppliers outside of San Juan makes San Juan the relevant market.

We do not agree. ***HN30*** The touchstone of market definition is whether a hypothetical monopolist could raise prices. *See Rebel Oil Co., 51 F.3d at 1434*. Although a reseller based in San Juan may have nowhere else to turn to in San Juan for its fuel, Coastal did not produce sufficient evidence that this meant CAPECO has the ability to restrict supply and raise prices in San Juan to supracompetitive levels. Indeed, the evidence points in the other direction. CAPECO cannot sell its residual oil for bunker fuel unless it does so at a price at which the resellers will be able to sell the fuel to its ultimate consumers, the ocean-going vessels. Those ocean-going vessels can go anywhere in the Caribbean and Southeastern United States to get their bunker fuel. If CAPECO were to raise its prices to the resellers, the resellers could not offer the bunker fuel to the ocean-going vessels **[**45]** at competitive prices and the ocean-going vessels would simply get their fuel at another port.

Given these facts, the immobility of the resellers does not mean that CAPECO could maximize profits by raising prices significantly above the competitive level. Raising prices in San Juan would repel the ultimate consumers, who would seek other suppliers. The resellers would either stop purchasing residual fuel or cease business, or both. CAPECO would then lose its ability to sell its residual oil for bunker fuel and this would redound to the benefit of CAPECO's competitors. ***HN31*** While under most circumstances the immobility of the resellers would be of considerable importance in defining the market, it does not control here where the mobility of the ultimate consumers protects the immobile resellers. *Cf. Ball Memorial Hosp., Inc. v. Mutual Hosp. Ins., Inc., 784 F.2d 1325 (7th Cir. 1986)* (Easterbrook, J.) (relevant market for purposes of health insurance coverage to Indiana consumers was "regional or national" not simply Indiana, even though Indiana consumers could not get insurance from any source other than defendant doing business in Indiana; the mobility of potential rivals to the **[**46]** defendant protected the consumers whose mobility was restricted). Under the circumstances here, defining the market as San Juan is too narrow. It does not capture the likelihood of expanded sales by CAPECO's rivals in the event that CAPECO were to raise prices in San Juan.

Once the relevant market is defined to include a geographic region larger than San Juan (*i.e.*, the Caribbean and Southeastern United States), Coastal has not satisfied its burden of showing that CAPECO had a dominant market share. While Coastal might, at least in theory, have shown that all refineries throughout the Caribbean and the Southeastern United States behaved like a cartel and priced their residual oil to capture the transportation and other costs of getting oil from sources outside the local ports, it has not done so here and it has failed to produce evidence sufficient for a reasonable jury to infer that such was the case. In short, Coastal has not shown that CAPECO had monopoly power over the relevant market. *Cf. Zoslaw v. MCA Distrib. Corp., 693 F.2d 870, 886-87 (9th Cir. 1982)* (secondary-line price discrimination under Robinson-Patman **[*199]** Act does not necessarily violate Sherman Act), *cert.* **[**47]** *denied*, 103 S. Ct. 1777 (1983). Accordingly, Coastal's monopolization claims fail under both *section 2* of the Sherman Act and Title 10, *Section 260* of the Laws of Puerto Rico and we reverse the monopolization verdicts. We note that because we affirm the price discrimination verdict, the reversal on the monopolization theory, by itself, leaves unchanged the amount of antitrust damages awarded, subject to our discussion on damage evidentiary sufficiency in Part I.D., *infra*.

**C. Puerto Rico Law Tort**

CAPECO also challenges the judgment on Coastal's claim under 31 L.P.R.A. 5141 ("Article 1802"). [13] CAPECO claims that Coastal was required to allege and prove the elements of a recognized tort, and failed to do so. According to CAPECO, because the Supreme Court of Puerto Rico has recently declined to rule that violation of an antitrust statute will also necessarily give rise to a violation of Article 1802, the violation of an antitrust statute does not give rise to a *per se* violation of Article 1802. *See Pressure Vessels of Puerto Rico*, 94 JTS 144, *438-39. Additionally, CAPECO challenges the sufficiency of the evidence supporting the judgment on this issue. CAPECO asks **[**48]** for a reversal of the verdict on these grounds.

CAPECO's arguments may well have merit. However, we need express no opinion regarding CAPECO's arguments as CAPECO waived them by failing to object to the jury instructions regarding the Article 1802 claim. *See Linn v. Andover Newton Theological School, Inc., 874 F.2d 1, 5*. These are not simply technical requirements. By failing to object to the jury instructions, CAPECO denied "the judge an opportunity to correct his error," assuming that CAPECO rightly contends that an error was made. *Id.* While CAPECO may correctly contend that antitrust violations do not fall within the scope of Article 1802, the district court's jury instructions were not strictly limited to antitrust offenses. It is entirely possible that, had an objection been made, the **[**49]** district court could have charged the jury with antitrust offenses as an Article 1802 ground separately from other Article 1802 grounds that may have applied in the present case. For example, it could have charged the jury with tortious interference with contractual relations, since CAPECO may well have intentionally complicated, via its refusal to deal, Coastal's efforts to meet its obligations to deliver bunker fuel. *See General Office Products Corp. v. A.M. Capen's Sons, Inc., 780 F.2d 1077, 1081 (1st Cir. 1986)* (noting that even in the absence of a contract, liability may be incurred under other judicial principles) (citing *General Office Products Corp.* v. *A.M. Capen's Sons, Inc.*, No. 0-84-278, Trans. Op. at 6-7 (P.R. June 29, 1984)). By failing to object to the instructions in question, CAPECO has deprived us of factual findings that would aid in the resolution of these issues. Because of the generality of the instruction, we conclude that evidence existed of CAPECO's possibly tortious conduct sufficient for the jury to reasonably reach the verdict that it did.

CAPECO also challenges the sufficiency of the evidence supporting the Article 1802 findings. ***HN32*** However, **[**50]** CAPECO has waived review here of this argument too by failing to move at any time for a judgment as a matter of law on this ground under *Fed. R. Civ. P. 50(a)*, *see Wells Real Estate, Inc. v. Greater Lowell Board of Realtors, 850 F.2d 803, 810 (1st Cir. 1988)* ("appellate review may be obtained only on the specific ground stated in the motion for directed verdict"). [14]

As a result of CAPECO's failure to preserve its arguments for review on appeal, we **[*200]** affirm the judgment on the Article 1802 claim.

---

[13] Article 1802 states, in pertinent part, that:

> [a] person who by an act or omission causes damage to another through fault or negligence shall be obliged to repair the damage so done.*Id.*

[14] In 1991, *Rule 50* was amended, and the term "judgment as a matter of law" was adopted "to refer to preverdict" (directed verdict) and "postverdict" (judgment notwithstanding the verdict) "motions with a terminology that does not conceal the common identity of two motions made at different times in the proceeding." *See Fed. R. Civ. P. 50* advisory committee's note.

**D. Sufficient Evidence on Damages**

CAPECO also argues that Coastal's evidence on damages was inadequate as a matter of law, and therefore, **[**51]** the jury's verdict on damages must be reversed. In particular, CAPECO argues that, as a new market entrant, Coastal was required to use the "yardstick" method of estimating damages.

***HN33*** With respect to the issue of how accurately damages must be measured, "there is a clear distinction between the [relatively high] measure of proof necessary to establish that [a plaintiff] has sustained some damage and the [relatively low] measure of proof necessary to enable the jury to fix the amount." *Story Parchment Co. v. Paterson Parchment Paper Co., 282 U.S. 555, 562, 75 L. Ed. 544, 51 S. Ct. 248 (1931)*. In the antitrust context, "the most elementary conceptions of justice and public policy require that the wrongdoer shall bear the risk of the uncertainty which his own wrong has created." *Bigelow v. RKO Radio Pictures, 327 U.S. 251, 256, 90 L. Ed. 652, 66 S. Ct. 574 (1946)*. Nonetheless, the plaintiff must still produce evidence from which the jury can make a just and reasonable inference. *Wells Real Estate, Inc. v. Greater Lowell Board of Realtors, 850 F.2d 803, 816* (1st Cir.), *cert. denied*, *488 U.S. 955, 102 L. Ed. 2d 381, 109 S. Ct. 392 (1988)*.

Citing *Home Placement Service v. The Providence Journal Co., 819 F.2d 1199 (1st Cir. 1987)*, CAPECO argues **[**52]** that Coastal was required to use the yardstick method for calculating lost profits, rather than the "before-and-after" method. *Id. at 1205-06*. ***HN34*** Under the yardstick approach, the plaintiff attempts to identify a firm similar to the plaintiff in all respects but for the impact of the antitrust violation. Hovenkamp § 17.6b2. By contrast, under the "before-and-after" method, the court looks at the plaintiff's business before the violation occurred, during the violation period, and after the violation ended, and estimates the amount by which the violation reduced the plaintiff's profits. *Id.* § 17.6b1.

We conclude that ***HN35*** whether a yardstick record must be used ultimately requires an appraisal of the reliability of a firm's track record, and the length of that track record is one factor to consider. The plaintiff in *Home Placement Services* had operated as planned only weeks before the alleged violations began. *Home Placement Services* can best be read as demonstrating both the type of situation in which a yardstick method is preferable, and the factors that should go into a court's evaluation of the comparability of the yardstick firm or firms with the plaintiff. [15]

**[**53]** ***HN36*** Ultimately, the proper method should be determined by the district court in accord with the facts of the situation. In this case, the district court will have exactly that opportunity, since we must vacate the district court's damages award and remand for further proceedings. The district court charged the jury with an instruction to find an amount for "antitrust damages," comprising awards for both price discrimination and monopolization claims. [16] Because we reverse the monopolization verdict, if left to stand, the jury's antitrust damages award would likely

---

[15] We note in passing that the plaintiff-appellant in *Home Placement Services* was challenging the district court's award of nominal damages and instead sought damages based on a yardstick analysis; the appeals court upheld the nominal damages finding because the evidence was "not 'sufficient to get the Court beyond the guessing stage.'" *Id.* at 1209 (quoting *William Goldman Theatres, Inc. v. Loew's, Inc.*, 69 F. Supp. 103, 106 (E.D. Pa. 1946), *aff'd*, 164 F.2d 1021, 1022 (3d Cir. 1947), *cert. denied*, *334 U.S. 811, 92 L. Ed. 1742, 68 S. Ct. 1016 (1948))*.

[16] We understand the difficult choice that the district court faced. As a practical matter, it would be difficult, if not impossible, for a juror to segregate antitrust damages due to a monopolization offense but not due to illegal price discrimination from antitrust damages due only to price discrimination, where as here, the facts and conduct involved in both allegations greatly overlap.

constitute an excessive recovery. In coming to its conclusion, the jury may well have weighed harms resulting from conduct that was pleaded with respect to the monopolization offense (*e.g.* refusal to deal with a customer, lying, etc.) but would have been **[*201]** additional to harms resulting from price discrimination, the claim we uphold. Furthermore, were we to allow the verdict to stand despite our reversal of the monopolization verdict, there would exist the strong likelihood that the jury had granted Coastal a duplicative recovery under monopolization and tort law, for injury caused by the same conduct, such as refusal to deal **[**54]** and lying. ***HN37*** The law "abhors duplicative recoveries." *Dopp v. HTP Corp., 947 F.2d 506, 517 (1st Cir. 1991)* (vacating damage award for, among other reasons, "a strong likelihood that the remedies thus far conferred overlap"). Thus, we find that the district court's award rests on an error of law. *See* *Adams v. Zimmerman, 73 F.3d 1164,* , slip op. at 17 (1st Cir. 1996) (stating that ***HN38*** a "district court's award is reviewed for an abuse of discretion unless it relies on an erroneous legal determination"). As a result, we must vacate the antitrust damage award of $ 4.5 million ($ 1.5 million trebled), and remand for further proceedings.

**[**55] II. Arguments for a New Trial**

In addition to its arguments for reversal of the district court's findings, CAPECO makes several arguments for reversal of the district court's denial of its motion for a new trial.

***HN39*** "The authority to grant a new trial . . . is confided almost entirely to the exercise of discretion on the part of the trial court." *Allied Chem. Corp. v. Daiflon, Inc., 449 U.S. 33, 36, 66 L. Ed. 2d 193, 101 S. Ct. 188 (1980)*, *cited in* *Wells Real Estate, Inc. v. Greater Lowell Bd. of Realtors, 850 F.2d 803, 810 (1st Cir. 1988)*. "Only abuse of discretion will trigger reversal of a denial of a motion for new trial." *Velazquez v. Figueroa-Gomez, 996 F.2d 425, 427 (1993)*. In reviewing for abuse of discretion, we must bear in mind that the trial court's discretion is quite limited concerning motions for new trials. "A trial judge may not upset the jury's verdict merely because he or she would have decided the case differently." *Id.*

**A. Duplicative Judgment**

In support of its request for a new trial, CAPECO argues that the damages awards constituted an impermissible double recovery. CAPECO contends that both Coastal's antitrust and tort claims were grounded in the same **[**56]** set of acts. Because we vacate and remand the antitrust damages for further findings on price discrimination damages, we construe CAPECO's argument that price discrimination and tort damages would constitute duplicative damage recoveries, see Borden v. *Paul Revere Life Ins. Co., 935 F.2d 370, 382 (1st Cir. 1991)* ("recovery against a defendant under one tort theory precludes any duplicative recovery for the same damages under some other tort theory"), and so a new trial or remittitur is required, *see* *Dopp v. HTP Corp., 947 F.2d 506, 516 (1st Cir. 1991)*.

We reject this argument for three reasons. First, CAPECO ***HN40*** failed to object to the form or content of the special interrogatories to which the jury answered. Second, CAPECO may well have waived its right to raise this issue here, since it failed to raise the issue in a timely manner with the trial court. Previously, we have held that ***HN41*** a defendant may not argue verdict inconsistency if he or she failed to object "after the verdict was read and before the jury was discharged." *See* *McIsaac v. Didriksen Fishing Corp., 809 F.2d 129, 134 (1st Cir. 1987)*. This rule is grounded in the realization that "to decide otherwise **[**57]** would countenance 'agreeable acquiescence to perceivable error as a weapon of appellate advocacy.'" *Id.* (quoting *Merchant v. Ruhle, 740 F.2d*

*86, 92 (1st Cir. 1984))*. The same concern should make us hesitate to consider arguments about verdict redundancy that were similarly not put forth below.

Finally, ***HN42*** "[a] special verdict will be upheld if there is a view of the case which makes the jury's answers consistent." *McIsaac, 809 F.2d at 133*. As we have noted above, Coastal may have had a legitimate Article 1802 claim apart from any overlap with antitrust law. Had CAPECO chosen to object to the district court's instructions, the district court may have corrected this problem. Accordingly, giving the district court the benefit of the doubt, had it responded to a timely objection by CAPECO and given an Article 1802 instruction that did not overlap with antitrust claims, the jury's damages verdicts **[*202]** on tort and antitrust claims could have been consistent. Even assuming, *arguendo*, that CAPECO correctly asserts that such overlap occurred, to grant CAPECO a new trial now on the basis of duplicative recovery would allow it to avoid the result of its own failure to object to **[**58]** the Article 1802 instruction.

**B. CAPECO's Experts**

Additionally, CAPECO argues that the district court's refusal to allow its two experts, Dr. Jorge Freyre ("Dr. Freyre") and Dr. Elias Gutierrez ("Dr. Gutierrez"), to testify was based on a fundamental error of law and was an abuse of discretion that requires that we reverse the district court and order a new trial.

In order to evaluate CAPECO's contentions, we must review the district court's orders leading up to the exclusion of the relevant testimony. The district court's June 22, 1993 Scheduling Order stated that "the parties will announce the names and qualifications of their experts by October 1, 1993." This date was modified subsequently to December 1, 1993. In compliance with this order, CAPECO named Cesar Figueroa ("Figueroa") and Rafael Martinez-Margarida ("Martinez-Margarida"). On March 1, 1994, pursuant to a motion by new counsel for Caribbean, the district court modified the previous order and issued a revised scheduling order stating "all experts are to be announced by March 30," and also specifying that expert reports to be used "during each party's case-in-chief" were to be exchanged on June 3, 1994, and that **[**59]** expert rebuttal reports were to be exchanged on July 1, 1994. Upon CAPECO's June 1 motion, the date for reports to be exchanged was extended by an "Omnibus Order" to ten days after service of that order, dated August 15, 1994. On August 29, 1994, Coastal delivered to CAPECO expert reports prepared by Dr. Sherwin and Dr. Zalacain, and CAPECO provided Coastal with an expert report prepared by Figueroa. These experts were deposed between September 9 and September 14, and thereafter CAPECO retained experts Dr. Freyre and Dr. Gutierrez ostensibly as rebuttal witnesses under *Fed. R. Civ. P. 26(a)(2)(C)*. CAPECO informed Coastal on September 20, 1994, that it had retained Dr. Freyre as a rebuttal witness, and similarly informed Coastal of Dr. Gutierrez on or about October 4, 1994. CAPECO informed the district court about Dr. Freyre and Dr. Gutierrez on October 5, 1995.

The district court instructed CAPECO to produce Dr. Freyre and Dr. Gutierrez and to make them available for depositions. On October 5 and October 6, Coastal filed motions in limine to exclude Dr. Freyre and Dr. Gutierrez, respectively, on the theory that neither witness could properly be characterized as a "rebuttal" witness **[**60]** within the meaning of *Rule 26(a)(2)(C)*, and thus both should have been disclosed previously. After oral argument, the district court granted Coastal's motion and excluded the testimony of Dr. Freyre and Dr. Gutierrez. The district court, upon CAPECO's admission that it planned to use Dr. Freyre and Dr. Gutierrez in its case-in-chief, noted that "you got a problem with my orders because you have not complied with

my orders insofar as Freyre and Gutierrez [are] concerned," apparently referring to the previous scheduling order deadline for experts in the case-in-chief to be disclosed.

CAPECO argues (1) that because the Omnibus Order did not provide a deadline for the exchange of rebuttal expert reports, no scheduling order applied, and therefore the disclosure of Dr. Freyre and Dr. Gutierrez was controlled by *Rule 26(a)(2)(C)*; [17] and (2) that the district court misconstrued *Rule 26(a)(2)(C)* to signify that a defendant cannot offer testimony to "contradict or rebut" under *Rule 26(a)(2)(C)*. We need not consider whether the district court in fact misconstrued *Rule 26(a)(2)(C)*, because, for three reasons, we find no abuse of discretion in its exclusion of these witnesses as rebuttal witnesses. **[**61]** First, at no time did **[*203]** CAPECO ever seek leave of the court to announce the names of experts not disclosed by December 1, 1993, as originally required, or by March 30, 1994, as permitted by the trial court. CAPECO's motion of June 1 sought extension principally due to alleged noncooperation by Coastal in discovery, making CAPECO's experts' task difficult to complete by the deadline then in effect. We cannot conclude, as CAPECO does, that the Omnibus Order's extension rendered all other orders unbinding. Because CAPECO did not ask for its extension on the grounds it now argues, the district court could not have had such an effect in mind, nor was it given an opportunity to consider such effect. ***HN43*** A trial court may "readily exclude a witness or exhibit if some previous order had set a deadline for identification and the proponent [has], without adequate excuse, failed to list the witness or exhibit." *Fusco v. General Motors Corp., 11 F.3d 259, 265 (1st Cir. 1993)*; *see also* *Freund v. Fleetwood Enter., Inc., 956 F.2d 354 (1st Cir. 1992)*.

**[**62]** Additionally, we cannot agree that the district court's March 1, 1994, Scheduling Order was necessarily superceded, given that that order scheduled trial for October 24, 1994, and in fact, trial began on that date. The proximity in time between CAPECO's attempts to bring in Dr. Freyre and Dr. Gutierrez and actual trial casts doubt on any argument that CAPECO was somehow misled into thinking that previous Scheduling Orders did not apply. Finally, even assuming that CAPECO is correct that the Scheduling Order's provisions regarding rebuttal witnesses had been superceded and thus *Rule 26(a)(2)(B)* applied, the district court might still have enforced its previous deadlines regarding experts in the case-in-chief. For better or for worse, at oral argument on October 21, 1994 (three days before trial was to start), counsel for CAPECO identified Dr. Freyre and Dr. Gutierrez as witnesses in its case-in-chief. [18]

**[**63]** Given the circumstances, we cannot conclude that the exclusion of the testimony of Dr. Freyre and Dr. Gutierrez was an abuse of discretion warranting a new trial.

## C. CAPECO's Meeting Competition Defense

CAPECO also argues that the district court should have given jury instructions on the affirmative defense of meeting competition. *Section 2(b)* of Clayton Act, as amended by the Robinson-Patman Act, ***HN44*** permits a defendant to rebut a *prima facie* case of violation by showing that its lower price "was made in good faith to meet an equally low price of a competitor." *15 U.S.C. § 13(b)*. The "meeting competition" defense can be raised only by a defendant who responds in good

---

[17] *Rule 26*'s schedule concerning the duty to disclose information concerning expert witnesses and their opinions may be altered by the court. *SeeFed. R. Civ. P. 26(a)(2)(C)* (setting forth schedule of disclosure of expert testimony "in the absence of other directions from the court or stipulation by the parties").

[18] At one point in the oral argument over Coastal's motion in limine to exclude Dr. Freyre and Dr. Gutierrez, the court asked "And when are you going to bring them?" To this question, counsel for CAPECO directly responded, "We are going to use [them] in our case [in] chief."

faith to the believed lower price of a competitor. *United States v. United States Gypsum Co., 438 U.S. 422, 57 L. Ed. 2d 854, 98 S. Ct. 2864 (1978)*, *appeal after remand*, *600 F.2d 414 (3d Cir. 1979)*, *cert. denied*, *444 U.S. 884 (1979)*.

We need not consider CAPECO's argument that it believed in good faith that it was responding to a competitive threat posed by Coastal in combination with its parent CFMI, because we conclude that even assuming that Coastal and CFMI were a single entity, they do not constitute a competitor in the **[**64]** same specific area as CAPECO, *see Falls City, 460 U.S. at 448*. In *Falls City*, ***HN45*** the Supreme Court concluded that Congress intended the meeting competition defense "to allow reasonable pricing responses on an area-specific basis where competitive circumstances warrant them." *Id. at 448*. Here, the district court could reasonably conclude that the defense did not apply, since there was a lack of evidence, beyond CAPECO's own employees' testimony about what they believed to be the case, that CFMI offered lower prices on bunker fuel in San Juan than CAPECO. *See Rose Confections, Inc. v. Ambrosia Chocolate Co., 816 F.2d 381, 391-93 (8th Cir. 1987)* (ruling defense rejected where seller relied on "assumption or speculation" without verification that competitor's prices were in fact **[*204]** lower). Therefore, we do not find abuse of discretion in the district court's denial of a new trial based on its refusal to issue a jury instruction on the meeting competition defense.

**D. CAPECO's Puerto Rico Law Tort Counterclaim**

CAPECO contends that the district court erred in dismissing its counterclaim grounded in Article 1802, *31 L.P.R.A. § 5141*. According to CAPECO, it was a compulsory **[**65]** counterclaim and was thus not barred by the one year statute of limitations, at least to the extent of defeating the main claim.

We reject CAPECO's argument for two reasons. First, in opposition to Coastal's motion for summary judgment on the counterclaim, it failed to inform the district court of the theory it now advances, that it is entitled to recoupment notwithstanding the statute of limitations. Additionally, the gist of CAPECO's counterclaim argument was that the threat posed by Coastal and CFMI allegedly working in concert forced CAPECO to give Harbor and Caribbean discounts, costing CAPECO potential profits. Given that we uphold the district court's finding that these discounts were illegal price discrimination, it appears at least doubtful under Puerto Rico law that CAPECO can collect for any lost profits thereby incurred. *See, e.g.*, *Rubio-Sacarello v. Roig, 84 P.R. Dec. 344, 351 (P.R. 1962)* (stating, in a contract context, that one who is guilty of illegality cannot bring an action). As a result, we fail to find abuse of discretion by the district court in its decision not to grant a new trial on this basis.

***CONCLUSION***

Coastal succeeded below on **[**66]** three claims: price discrimination, monopolization and tort. CAPECO's failure to make the points below that it now argues on appeal hamstrung its attempt to obtain reversal of the price discrimination and tort claims. But the definition of relevant market Coastal espoused could not be reasonably adopted by the jury, since this definition was legally insufficient in neglecting to account for downstream constraints on the proposed monopoly, and in failing to draw on sufficient evidence regarding those constraints.

For the foregoing reasons, the judgment of the district court is affirmed in part, *reversed in part*, and *remanded*.

EXHIBIT 262

LexisNexis

Caution
As of: August 12, 2014 9:09 AM EDT

# Colorado Interstate Gas Co. v. Natural Gas Pipeline Co.

United States Court of Appeals for the Tenth Circuit
September 11, 1989
Nos. 87-2109, 87-2123

**Reporter:** 885 F.2d 683; 1989 U.S. App. LEXIS 13559; 1989-2 Trade Cas. (CCH) P68,751
COLORADO INTERSTATE GAS COMPANY, Plaintiff/Counterclaim-Defendant/Appellee, v. NATURAL GAS PIPELINE COMPANY OF AMERICA; NGPL-TRAILBLAZER, Inc. Defendants/Counter-claimants/Appellants, v. WYOMING INTERSTATE COMPANY, LTD.; THE COASTAL CORPORATION, Counterclaim-Defendants/Appellees. MIDCON VENTURES, INC., Counterclaimant. FEDERAL ENERGY REGULATORY COMMISSION, Amicus Curiae

**Prior History:** **[**1]** Appeal from the United States District Court, For the District of Wyoming D.C. No. C84-0139-B.

**Core Terms**

monopolization, service agreement, market share, purchasing, market power, damages, fixed cost, monopoly, probability, monopolistic, provisions, antitrust, competitor, courts, tortious interference, anti trust law, transportation, contractual, volumes, district court, unpurchased, modified, sellers, prices, good faith, reserved, orders, proceedings, argues, monopoly power

**LexisNexis® Headnotes**

Constitutional Law > Supremacy Clause > General Overview
Constitutional Law > Supremacy Clause > Federal Preemption
Governments > Federal Government > Claims By & Against

***HN1*** The Supremacy Clause requires state regulation not thwart federal policy. Common law claims that seek to litigate matters already decided by a federal agency are therefore preempted.

Torts > ... > Commercial Interference > Contracts > General Overview

***HN2*** Motive can be a determinative factor in converting otherwise lawful behavior into improper conduct for which the defendant will be liable.

Antitrust & Trade Law > Exemptions & Immunities > Noerr-Pennington Doctrine > General Overview
Antitrust & Trade Law > Exemptions & Immunities > Noerr-Pennington Doctrine > Right to Petition Immunity
Antitrust & Trade Law > Sherman Act > Scope > Exemptions

***HN3*** The Noerr-Pennington doctrine requires that attempts to influence the government, including attempts to influence administrative agencies, be exempt from attack under the Sherman Act.

Antitrust & Trade Law > ... > Monopolies & Monopolization > Attempts to Monopolize > General Overview

Energy & Utilities Law > Antitrust Issues > General Overview

***HN4*** If a party does not have monopolistic control over a market, its unfair business conduct implicates the attempt provision of the antitrust laws only if that conduct threatens to create a monopoly.

Antitrust & Trade Law > ... > Monopolies & Monopolization > Attempts to Monopolize > General Overview

Antitrust & Trade Law > ... > Monopolies & Monopolization > Attempts to Monopolize > Sherman Act

***HN5*** Four elements must be proven to establish an attempt to monopolize under § 2 of the Sherman Act: (1) relevant market, including geographic market and relevant product market, in which the alleged attempt occurred; (2) dangerous probability of success in monopolizing the relevant market; (3) specific intent to monopolize; and (4) conduct in furtherance of such an attempt.

Antitrust & Trade Law > Clayton Act > General Overview

Antitrust & Trade Law > Clayton Act > Claims

Antitrust & Trade Law > Clayton Act > Remedies > General Overview

Antitrust & Trade Law > Clayton Act > Remedies > Damages

Antitrust & Trade Law > ... > Private Actions > Remedies > General Overview

Antitrust & Trade Law > Regulated Practices > Private Actions > Prioritizing Resources & Organization for Intellectual Property Act

Commercial Law (UCC) > Sales (Article 2) > Remedies > General Overview

***HN6*** Any private plaintiff seeking treble damages under § 4 of the Clayton Act must show antitrust injury.

Antitrust & Trade Law > ... > Monopolies & Monopolization > Attempts to Monopolize > General Overview

***HN7*** In order to satisfy the dangerous probability of success element of an attempt claim, the plaintiff must show that there was a dangerous probability the defendant would achieve monopoly status as the result of the predatory conduct alleged by the plaintiff. The likelihood of successful monopolization is typically evaluated by examining the defendant's share of the relevant market. Reformulated in terms of market share, the plaintiff must show that there was a dangerous probability that the defendant's conduct would propel it from a non-monopolistic share of the market to a share that would be large enough to constitute a monopoly for purposes of the monopolization offense. The higher the firm's initial market share, the greater the likelihood that it will eventually gain monopolistic control over the market.

Antitrust & Trade Law > ... > Monopolies & Monopolization > Attempts to Monopolize > General Overview

***HN8*** A 41 percent market share typically indicates that a firm has substantial economic power in the market, and, therefore, has the tools at its disposal to elevate its market share to monopolistic levels. In other words, a high market share indicates that the defendant has the economic capacity to monopolize the market. However, proximity to monopolistic status is not enough; the defendant must also have the ability to propel itself to monopolistic control over the market.

Antitrust & Trade Law > ... > Monopolies & Monopolization > Attempts to Monopolize > General Overview

Energy & Utilities Law > Antitrust Issues > General Overview

***HN9*** In evaluating the probability of successful monopolization, the court considers the firm's capacity to commit the offense, the scope of its objective, and the character of its conduct.

Antitrust & Trade Law > ... > Monopolies & Monopolization > Attempts to Monopolize > General Overview

***HN10*** Market share statistics are a useful measure of market power, in large part, because they indicate the relative durability of supracompetitive pricing capacity. The greater a firm's market share, the longer it will be able to charge monopoly prices because it will take longer for its small competitors to increase their output enough to discipline prices.

Antitrust & Trade Law > ... > Monopolies & Monopolization > Attempts to Monopolize > General Overview

***HN11*** The durability of a firm's ability to charge supracompetitive prices also underlies another factor used to evaluate the degree of market power. Barriers to entry are often used by courts to determine whether an alleged monopolist has sufficient market power for purposes of the monopolization offense. Barriers to entry are market characteristics which make it difficult or time-consuming for new firms to enter a market.

Antitrust & Trade Law > Sherman Act > General Overview

Antitrust & Trade Law > Sherman Act > Remedies > General Overview

Commercial Law (UCC) > Sales (Article 2) > Remedies > General Overview

***HN12*** The Sherman Act does not purport to afford remedies for all torts committed by or against persons engaged in interstate commerce.

Antitrust & Trade Law > Clayton Act > General Overview

Antitrust & Trade Law > Clayton Act > Penalties

Antitrust & Trade Law > Clayton Act > Remedies > General Overview

Antitrust & Trade Law > Clayton Act > Remedies > Damages

***HN13*** The court believes the triple damage sanction of the Clayton Act is too harsh a remedy for unfair methods of competition that only threaten to have a transitory impact on the marketplace.

**Counsel:** Michael L. Beatty of Colorado Interstate Gas Company, Colorado Springs, Colorado, (Rebecca H. Noecker of Colorado Interstate Gas Company, Colorado Springs, Colorado, William F. Baxter of Shearman & Sterling, Stanford, California, William C. McClearn, James E. Hartley, Joseph W. Halpern, Elizabeth A. Phelan, and Timothy M. Rastello of Holland & Hart, Denver, Colorado, J. Kent Rutledge of Lathrop & Uchner, P.C., Cheyenne, Wyoming, with him on the briefs) for Plaintiff/Counterclaim Defendants/Appellees.

Phillip Areeda, Cambridge, Massachusetts, (William H. Brown of Brown & Drew, Casper, Wyoming, Paul J. Hickey of Rooney, Bagley, Hickey, Evans & Statkus, Cheyenne, Wyoming, Gerald M. Stern and Charles E. Foster, Los Angeles, California, Joseph M. Wells and Paul E. Goldstein, Lombard, Illinois, John T. Cusack and Michael P. Padden of Gardner, Carton & Douglas, Chicago, Illinois; J. Curtis Moffatt and Paul Korman of Gardner, Carton & Douglas, Washington, District of Columbia, Harvey I. Saferstein and Steven A. Marenberg of Irell & Manella, Los Angeles, California, and Louis Nizer **[**2]** and Paul Martinson of Phillips, Nizer, Benjamin, Krim & Ballon, New York, New York, with him on the brief) for Defendants/Counterclaimants/Appellants.

Catherine C. Cook, General Counsel, Jerome M. Fe it, Solicitor, and Joshua Z. Rokach, Attorney, of the Federal Energy Regulatory Commission, Washington, District of Columbia, for Amicus Curiae.

**Judges:** Moore, Anderson, and Baldock, Circuit Judges.

**Opinion by:** MOORE

**Opinion**

**[*685]** MOORE, Circuit Judge.

This is an appeal from an order of the district court refusing to grant judgment notwithstanding the verdict or a new trial for the defendants, *Natural Gas Pipeline Company of America (Natural) and NGPL-Trailblazer, 661 F. Supp. 1448*. The jury awarded the plaintiff, Colorado Interstate Gas Company (CIG), $ 724,033,361 in damages based on CIG's claim that Natural attempted to monopolize the market for long distance transportation of Wyoming gas, breached its contract with CIG, and tortiously interfered with CIG's contractual relations. While the district court reduced the jury award to $ 412,237,972, Natural argues that the district court failed to rectify the underlying legal errors on which the judgment was based.

**[**3]** Natural deploys a two-pronged attack against each of CIG's claims. First, it asserts that the award of damages for conduct approved by the Federal Energy Regulatory Commission (FERC) impermissibly interferes with FERC's authority to regulate gas sales and transportation markets. Second, Natural argues, in the alternative, that the substantive law of contracts, torts, and antitrust, requires the reversal of the jury's verdict on each claim. We hold that in light of FERC's orders concerning the basic issues underlying the breach of contract dispute, deference to FERC authority requires that we reverse the breach of contract verdict. We further hold that CIG failed to establish there was a dangerous probability that Natural would monopolize the long distance transportation market. Therefore, we reverse the antitrust verdict. The claim for tortious interference with contractual relations neither interferes with FERC's authority nor is substantively flawed; thus, the jury's verdict on that claim will stand.

I. *Introduction*

CIG and Natural are owners of pipelines which transport natural gas. For many years, Natural has purchased gas from CIG and transported that gas to markets **[**4]** in the Midwest and East. In July 1982, CIG and Natural entered into a new contract (the Service Agreement or Agreement) which obliged CIG to deliver and Natural to purchase specified quantities of natural gas. CIG sold two types of gas to Natural. Field gas was sold at a lower rate (F-1 rate) than gas which was delivered from CIG's main transmission line (H-1 rate). The contract set forth how much gas Natural was required to purchase, both on a annual and on a daily basis. Like previous service agreements between Natural and CIG, the 1982 Service Agreement also contained a minimum bill provision which allowed CIG to bill Natural at a predetermined **[*686]** rate for gas which Natural reserved but did not purchase.

Because CIG's Service Agreement with Natural involved the interstate sale of natural gas, the rates and terms specified in the Agreement required approval by FERC. When, in 1982, CIG sought FERC approval, Natural intervened to protest both the rate increase and its contractual obligation

to pay CIG for gas it did not purchase. In response to Natural's intervention, FERC modified the terms of the Service Agreement to reduce the price Natural was required to pay for unpurchased **[**5]** gas.

In July 1983, Natural sharply reduced its gas purchases from CIG. Natural paid CIG what Natural determined to be the FERC modified rate for unpurchased gas. Natural's decrease in purchases forced CIG to stop purchasing gas from some of its suppliers. One of those suppliers, Champlin Petroleum, supplied gas to CIG from the Whitney Canyon gas fields in southern Wyoming. Although Natural claimed that it quit purchasing gas from CIG because it had an oversupply of gas, the evidence made this claim problematical. As soon as CIG ceased purchasing Whitney Canyon gas, Natural made arrangements to purchase that gas directly from Champlin. Indeed, CIG presented evidence that Natural purchased gas from many sources to replace lost volumes from CIG. This substitute gas was often more expensive than CIG's gas. On occasion, Natural resumed purchases of gas from CIG when CIG was attempting to sell gas to new customers. Natural's decision to stop purchasing gas and the losses CIG experienced as a result of that decision form the basis of this litigation.

II. *CIG's Common Law Claims*

A. Breach of Contract

The district court instructed the jury that it could find Natural breached the **[**6]** Service Agreement only if Natural failed to purchase gas *and* refused to pay CIG the rate that FERC decided was appropriate for volumes not purchased. Neither party disputes that Natural refused to purchase gas. The parties dispute the rate FERC determined to be appropriate for gas not taken. Natural argues that the district court should have directed a verdict on the breach of contract claim in its favor because it paid CIG the FERC determined rate for gas not purchased. We agree.

In order to apprehend the parties' arguments on this issue, it is necessary to examine the long history of the dispute over Natural's minimum purchase obligation before FERC. [1] **[**7]** For many years the service agreements between CIG and Natural contained two provisions which, together, defined Natural's minimum purchase obligation. [2] Section 2 of the Service Agreement, the "minimum daily take provision," required Natural to accept *each day* 90% of its General Daily Entitlement. [3] Section 4 **[*687]** of the Service Agreement, the "minimum annual bill,"

---

[1] The difficulty that CIG and Natural faced with the minimum purchase obligation was not unique. Minimum purchase obligations in gas contracts became a problem for the industry in the early 1980's, as a nationwide gas surplus forced many purchasers to curtail their takes. The huge liability incurred by purchasers forced FERC to take action on two procedural levels. First, FERC considered purchasers' objections to minimum purchase requirements on a case by case basis and modified service agreement provisions where necessary. Second, because minimum purchase obligations were widespread in the natural gas industry, FERC issued general orders that modified certain provisions in all gas contracts. Thus, the conflict between CIG and Natural was just a small part of a significant problem which required FERC's continued attention.

[2] For purposes of this opinion we are using the term "minimum purchase obligation" to refer to contract terms which seek to insure that gas buyers purchase a minimum volume of gas. These provisions are sometimes called "take or pay," "minimum bill," or "minimum take" provisions. Although the precise details or mechanisms of these provisions might differ, they have similar effects.

[3] Section 2 of the Service Agreement entitled "POINTS OF DELIVERY, MAXIMUM DAILY VOLUME OBLIGATIONS, AND PRESSURES" includes Natural's daily purchase obligation. It states:

required Natural to purchase *each year* 90% of its Total Annual Entitlement, or pay CIG a predetermined rate for gas not purchased. [4]

**[**8]** Natural first objected to the minimum purchase obligation in the Service Agreement when CIG sought approval of the rates and terms of the Agreement from FERC in 1982. The reasonableness of the minimum purchase obligation was considered in administrative proceedings before an administrative law judge in 1983. The judge found the "minimum bill provisions" to be unreasonable and ordered CIG to modify the Service Agreement so that CIG could collect from Natural only the fixed costs [5] associated with the sale of gas. This decision was appealed to FERC, which, in response, modified the precise mechanism by which CIG could collect money for unpurchased gas but left unchanged the basic ruling that CIG could collect only fixed costs for unpurchased gas. [6]

**[**9]** In response to FERC's ruling, CIG submitted to FERC a modification of its Service Agreement by which it sought to collect F-1 fixed costs for F-1 gas which Natural did not purchase and H-1 fixed costs for unpurchased H-1 gas. Since the fixed cost component of gas rates included profits on the sale of gas, CIG's submitted rate would have insured full profits on unsold gas. However, FERC did not approve this rate for unpurchased gas. [7] It ruled that CIG could collect only F-1 fixed costs for whichever type of gas Natural did not purchase. CIG appealed FERC's order to this court asserting that it should collect full profits on unsold gas. We rejected this appeal. *Colorado Interstate Gas Co. v. FERC, 791 F.2d 803 (10th Cir. 1986)*, *cert. denied*, *479 U.S. 1043, 93 L. Ed. 2d 857, 107 S. Ct. 907 (1987)*.

**[**10]** CIG now argues that these extensive proceedings only considered one aspect of the minimum purchase obligation, namely, the minimum annual bill provision (Section 4) of the Service Agreement. It insists FERC simply overlooked the minimum daily take requirement (Section 2) in the individual proceedings. CIG asserts that the minimum daily take requirement was later modified by FERC's Order No. 380-C which ruled that minimum take provisions were meant to be governed by Order No. 380.

---

> Variations in daily takes may be made at Buyer's election at H-1 delivery points to meet its varying load conditions, however, Buyer shall not request total daily volumes on any day hereunder less than 90 percent of the General Daily Entitlement.

[4] Section 4 entitled "MINIMUM BILL" states, in relevant part:

> The minimum bill shall be . . . determined by multiplying the Total Annual Entitlement by a factor of 90 percent, such volume hereinafter referred to as "Minimum Volume." . . . *In the event the Buyer's actual purchases for the fiscal year are less than the Minimum Volume, then any deficiency shall be billed at the unit fixed cost component under Rate Schedule F-1*. . . .(Emphasis added.)

[5] Fixed costs are costs which CIG must incur regardless of the volume of gas it sells. The fixed cost component of the commodity charge also includes a sum representing profits on CIG's operations. The major nonfixed (variable) cost, which CIG was forced to eliminate from the rate it could charge Natural, was the cost of gas.

[6] On the same day, FERC issued Order No. 380 which required gas sellers to modify their minimum bill provisions to collect only fixed costs for unpurchased gas.

[7] FERC explained that allowing CIG to collect only F-1 fixed costs for the more expensive H-1 gas would give CIG a strong incentive to sell H-1 gas instead of merely collecting fees for undelivered gas.

Although FERC's general orders treated minimum bill provisions identically with minimum take provisions, CIG argues that because FERC Order No. 380-C states sellers may collect fixed costs, [8] CIG may collect F-1 fixed costs for unsold F-1 gas and H-1 fixed costs for unsold H-1 gas. If we were to accept CIG's argument, CIG could collect a higher rate for each year that Natural failed to purchase gas by adding up its compensation for Natural's *daily* failure to take gas than it could by using the individually tailored FERC formula for determining CIG's compensation for Natural's **[*688]** *annual* failure to purchase gas. Aside from the irrationality of this result, we think it ignores the fact that **[**11]** FERC has plainly examined both the minimum annual bill and the minimum daily take requirements in the Service Agreement since the original ALJ decision.

As noted earlier, the ALJ stated that he found the minimum bill provisions to be unjust and unreasonable. CIG apparently assumes this reference to the minimum bill provisions meant that the ALJ only considered the minimum annual bill (Section 4) of the contract. Yet, the rest of the opinion makes clear that the ALJ considered both Sections 2 and 4 of the Service Agreement. For instance, in describing the Service Agreement the ALJ stated, "CIG's mode of billing to Natural under the F-1 and H-1 Rate Schedules is explained for the situation when the minimum bill provisions operate because Natural failed to take 90 percent of its *daily* or *annual* volumetric entitlements." *Colorado Interstate Gas* **[**12]** *Co.*, 25 F.E.R.C. paras. 63,012, 65,015 (Oct. 18, 1983) (emphasis added). The ALJ clearly understood that the Service Agreement provided a single rate of compensation for failure to purchase gas on a *daily or annual* basis and that he was modifying that rate.

This conclusion is confirmed by subsequent FERC orders. In its order of June 1985, FERC surveyed the entire history of CIG's proceedings before the agency on the minimum purchase issue. FERC stated the ALJ found "*both* the minimum annual volume and the minimum daily take requirement in CIG's Service Agreement" to be unreasonable. *Colorado Interstate Gas Co.*, 31 F.E.R.C. P. 61,325 (June 19, 1985). FERC further noted that the *individualized proceedings* required CIG to modify both the minimum annual bill and the minimum daily take provisions to eliminate variable costs. *Id.* The only formula for the elimination of variable costs approved in the individualized proceedings required CIG to charge F-1 fixed costs for failure to purchase either F-1 or H-1 gas. The inescapable conclusion is that FERC regarded this as the sole remedy for failure to purchase gas under either contractual provision.

Finally, **[**13]** FERC's amicus brief explains its current interpretation of the FERC proceedings on the minimum purchase issue. The amicus brief states:

> The district court erred in holding that the Commission did not deal with the minimum purchase obligation and that therefore CIG may litigate that issue in this case . . . the Commission treated the minimum bill as the remedy for Natural's failure to live up to its minimum purchase obligation . . . therefore, the district court erred in its perception that the minimum bill and take provisions were separate and discrete matters establishing distinct remedies.

In light of the deference we owe to FERC's interpretations of its own orders, *Colorado Interstate Gas, 791 F.2d at 810*; *Distrigas of Massachusetts Corp. v. Boston Gas Co., 693 F.2d 1113, 1119 (1st Cir. 1982)*, and the plain meaning of the orders themselves, there is simply

---

[8] Since Order No. 380-C was a general order, it did not specify the precise value of the fixed cost CIG, or any other sellers, could collect for unsold gas.

no room for CIG's assertion that FERC's individualized proceedings left the minimum daily take provision (Section 2) of the Service Agreement unaffected.

B. Breach of Duty of Good Faith and Fair Dealing

Natural argues the jury's verdict on bad faith breach of contract **[**14]** must be reversed because FERC's modification of the rate Natural was required to pay CIG for unpurchased gas gave Natural the *unqualified* right to stop purchasing gas, provided it paid CIG the FERC established price for unpurchased gas. Natural insists that by awarding CIG damages for bad faith failure to purchase gas that were greater than FERC's established rate for failure to purchase, the district court allowed state common law to impinge upon FERC's regulatory authority. CIG asserts that Natural's bad faith alters the character of Natural's conduct so that the FERC rate for unpurchased gas does not apply. While we are unwilling to embrace Natural's claim that FERC's orders shield it from all liability for failure to purchase gas, we do agree that Natural is free from liability for failure to purchase gas based upon the implied **[*689]** duty of good faith and fair dealing in the Service Agreement.

The Supreme Court is wary of attempts by parties, dissatisfied with determinations of federal agencies, to neutralize the effect of those determinations through common-law actions for damages. *Chicago & N.W. Transp. Co. v. Kalo Brick & Tile Co., 450 U.S. 311, 324, 67 L. Ed. 2d 258, 101 S. Ct. 1124 (1981)*; **[**15]** *Arkansas Louisiana Gas Co. v. Hall, 453 U.S. 571, 577, 69 L. Ed. 2d 856, 101 S. Ct. 2925 n. 6 (1981)*. These cases are bottomed on the principle that ***HN1*** the Supremacy Clause requires state regulation not thwart federal policy. *Kalo Brick & Tile, 450 U.S. at 326*. Common-law claims that seek to litigate matters already decided by a federal agency are therefore preempted.

For instance, in *Kalo Brick & Tile, 450 U.S. at 311*, a shipper of goods by rail, sought to assert a state, common-law tort action for damages caused by a regulated rail carrier's decision to eliminate service on a rail line. The Supreme Court unanimously held that because the Interstate Commerce Commission had, in approving the cessation of service in administrative proceedings, ruled on all the issues underlying the shippers state-court suit, the common-law action was preempted. The Court stated: "It is difficult to escape the conclusion that the instant litigation represents little more than an attempt by a disappointed shipper to gain from the Iowa courts the relief it was **[**16]** denied by the commission." *Id. at 324*.

Through its common-law claim of breach of the contractual duty of good faith and fair dealing, CIG obtained an award of damages that allowed it to collect H-1 fixed costs for unpurchased H-1 gas. FERC and this court have repeatedly denied CIG's request to modify the minimum purchase obligation of the Service Agreement to allow it to collect this rate for failure to purchase gas. *Colorado Interstate Gas, 791 F.2d at 808-09*. By allowing CIG to press this claim, the district court gave CIG a second chance to which it was not entitled.

Nevertheless, CIG argues that this case is distinguishable from *Kalo Brick & Tile*[9] and is not a collateral attack upon FERC's decision because FERC denied CIG H-1 fixed costs for unpurchased H-1 gas only if Natural decided not to purchase gas in good faith. CIG contends, once Natural

---

[9] The Court in *Kalo Brick & Tile* emphasized that the "commission has actually addressed the matters [the customer] wishes to raise in state court." 450 U.S. at 327. The Court reserved the question of whether "a state court suit is barred when the commission is empowered to rule on the underlying issues." *Id.* In this case, FERC was not explicitly confronted with the question of whether Natural's motive for not purchasing gas would be relevant to the rate CIG could collect for that gas.

decided to "shut in" CIG's gas in order to harm CIG, FERC's remedy for failure to purchase gas, a remedy which did not allow collection of H-1 fixed costs, was no longer intended by FERC to apply. Essentially, CIG is asking us to imply a good faith limitation upon the scope of FERC's remedy **[**17]** for failure to purchase gas.

While we find CIG's argument forceful, we cannot ignore the Supreme Court's vigorous effort to insure agency action is not blunted by state regulation. *See, e.g., Nantahala Power and Light Co. v. Thornburg, 476 U.S. 953, 90 L. Ed. 2d 943, 106 S. Ct. 2349 (1986)* (state regulated rate for retail sale of gas did not give enough *weight* to FERC determined rate for wholesale gas sales); *Kalo Brick & Tile, 450 U.S. at 326*. We think that limiting **[**18]** the scope of the FERC developed remedy for failure to purchase gas in the manner suggested by CIG would permit circumvention of FERC authority through state contract law. In order for FERC's remedy to be effective, it must have room to breathe. As the Supreme Court has stated, "Respondents' theory of the case would give inordinate importance to the role of contracts between buyers and sellers in the federal scheme for regulating the sale of natural gas." *Arkansas Louisiana Gas, 453 U.S. at 582*. We think this statement applies with equal force to this case.

**[*690]** Further, the limited evidence we have suggests FERC intended the collection of F-1 fixed costs to be the exclusive contract remedy for failure to purchase gas. FERC's amicus brief notes the jury awarded damages for antitrust, tort, and breach of contract claims. Nevertheless, FERC *only* sought to have the damages for breach of contract reversed. FERC did not distinguish between the breach of contract damages awarded for bad faith failure to purchase gas and those awarded for failure to purchase gas under Section 2 of the Service Agreement. [10]

**[**19]** This interpretation of FERC's intent mirrors FERC's interpretation of the scope of its actions in a closely analogous context. During the gas shortage of the early 1970's, FERC permitted sellers of gas to curtail their contractually agreed upon deliveries of gas, if the curtailment was carried out in accordance with plans on file with FERC. *See, e.g., United Gas Pipe Line Co. v. FERC, 824 F.2d 417, 421 (5th Cir. 1987)*. Buyers who did not receive gas they contracted for sued sellers based upon breach of contract and various tort theories. *Id.; see also CF Industries v. Transcontinental Gas Pipe Line, 614 F.2d 33 (4th Cir. 1980)*. In response, sellers sought to have FERC modify their service agreements to exculpate them from liability for failure to deliver gas to buyers curtailed under curtailment plans. FERC declined to deny the purchasers all remedies for the sellers' failure to deliver gas stating:

> Claims that are essentially "*breach of contract*" in nature and arise because of curtailments initiated and conducted in accordance with effective curtailment tariffs are preempted by federal law, which nullifies them. But claims that require **[**20]** a finding of *negligence* to permit recovery remain unaffected.

---

[10] The district court did not ask the jury to award damages separately for breach of Section 2 of the Service Agreement and breach of the contractual obligation of good faith and fair dealing. This is troubling because we cannot determine what damages, if any, the jury intended to award for each breach.

Further, the jury incorrectly found that Natural breached its obligation to purchase gas under Section 2 of the Service Agreement. Having found that Natural deliberately breached the Service Agreement by deciding not to purchase gas, it is difficult to see how the jury could objectively consider the question of whether Natural acted in good faith.

Thus, even if we were to find that the bad faith claim was not preempted, we would have to order a new trial. First, the jury would have to evaluate CIG's bad faith claim in light of the fact that Natural did not breach Section 2 of the Service Agreement. Second, even if the jury still found that Natural breached its contractual obligation of good faith and fair dealing, it would have to determine the appropriate damages for this breach.

*Transcontinental Gas Pipe Line*, 35 F.E.R.C. PP. 61,043, 61,080 (April 7, 1986) (emphasis added). [11]

We believe FERC intended to draw the same line for failure to take gas as it drew for failure to purchase. Actions based upon **[**21]** tort were not meant to be preempted by FERC's modification of the contract, while actions based upon breach of contract were. Any other distinction would impermissibly undermine the effectiveness of FERC orders. Thus, the jury's verdict for bad faith breach of contract must be reversed.

C. Tortious Interference with Contract

The gravamen of CIG's tortious interference with contract claim is that Natural intentionally stopped taking gas from CIG in order to force CIG to relinquish its contractual right to purchase Whitney Canyon gas from Champlin Petroleum. CIG alleged Natural was motivated by a desire to acquire the rights to purchase Whitney Canyon gas. After CIG gave up its rights to the Whitney Canyon reserves, Natural did, in fact, acquire the gas.

**[*691]** Natural argues that the jury's verdict, awarding damages for tortious conduct, must be reversed because CIG's claim is preempted by FERC's modification of the minimum purchase provisions. Natural also asserts that because the Service Agreement allowed it to stop purchasing gas, it may not be held liable for tortious interference based on that conduct. We disagree.

FERC's modification of the contract remedy for failure **[**22]** to purchase gas does not limit CIG's right to seek damages for tortious interference with contract. As noted above, in an analogous situation, FERC decided that although it eliminated a gas seller's *contractual* liability for failure to sell gas to curtailed customers, buyers who did not receive contractually agreed upon volumes of gas could maintain suits based upon a seller's *negligent or willful misconduct. United Gas Pipe Line, 824 F.2d at 430*. By not contesting tortious interference damages, FERC apparently made the same distinction in this case. Although *Kalo Brick & Tile* requires preemption of tort actions which conflict with agency orders, *450 U.S. at 326-27*, we decline to find preemption where FERC currently perceives no conflict.

More difficult to evaluate is Natural's assertion that its contractual right to choose between purchasing gas or paying CIG for gas not purchased immunized it from a tortious interference claim based upon failure to purchase. There is some support for the proposition that conduct which is otherwise lawful ought not form the basis of a tortious interference claim simply because the alleged tort-feasor is motivated **[**23]** by a desire to interfere with the plaintiff's contractual relations. *See Circo v. Spanish Gardens Food Mfg. Co., 643 F. Supp. 51, 56 (W.D.Mo. 1985)*; Perlman, *Interference with Contract and Other Economic Expectancies: A Clash of Tort and Contract Doctrine*, 49 U.Chi. L. Rev. 61, 128 (1982). Advocates of this position are reluctant to impose limitations on conduct which is otherwise permitted in an economy based upon vigorous competition. Perlman, *supra* at 78.

While we are sympathetic to this view and recognize that the law of tortious interference is evolving, *see Restatement (Second) of Torts*, ch. 37, introductory note at 5 (1977), we believe

---

[11] Significantly, one seller challenged FERC's decision alleging that if buyers were permitted to sue based upon a seller's negligent or willful misconduct, some state courts might conclude that actions for "breach of a good faith duty" were *not* preempted. *United Gas Pipe Line*, 824 F.2d at 428. The Fifth Circuit rejected the suggestion that state courts could interpret FERC orders which allowed actions based upon negligence to permit actions for "breach of a good faith duty." Thus, at least one other court has interpreted FERC orders prohibiting suits based upon breach of contract to also forbid suits based upon breach of the contractual obligation of good faith and fair dealing.

that the better position is that taken by the Restatement and followed by many courts. This line of authority holds that ***HN2*** motive can be a determinative factor in converting otherwise lawful behavior into "improper" conduct for which the defendant will be liable. *Restatement (Second) of Torts § 767 comment d* (1977); *Alyeska Pipeline Serv. Co. v. Aurora Air Serv., Inc., 604 P.2d 1090, 1093 (Alaska 1979)*; **[**24]** *see also* Perlman, *Interference with Contract*, 49 U.Chi.L.Rev. 61, 78 (1982). Indeed, Professor Prosser has described the contours of the tort stating that "no specific conduct is prohibited . . . and liability turns on the purpose for which the defendant acts." W. Prosser, *Law of Torts* § 129, at 979 (5th ed. 1984).

Natural's interest in being free to adjust its purchases of gas is not so strong that it cannot be limited by a requirement not to exercise its discretion for the purpose of interfering with CIG's contractual relationships. *Alyeska Pipeline, 604 P.2d at 1093* (right to terminate contract at will did not prevent liability for tortious interference based upon termination of that contract). The tortious interference verdict will stand. [12]

**[**25]** III. *CIG's Antitrust Claim*

CIG claims that in addition to being a violation of the Service Agreement and a **[*692]** means of stealing CIG's customers, Natural's decision to stop purchasing gas was also the cornerstone of an attempt by Natural to monopolize the market for the long distance transportation of natural gas. [13] **[**26]** Since an attempt to monopolize typically involves an attempt by a firm which does not possess monopolistic control over a market to become a monopolist in that market, CIG's claim is unusual because it does not allege that Natural was attempting to gain control of the transportation market for itself. Rather, CIG alleges Natural stopped purchasing gas in order to give CIG's chief competitor, the Trailblazer System [14], a monopoly in the long distance gas transportation market.

---

[12] Natural also asserts the award of $ 8,000,839 in restitutionary damages was inappropriate. It argues that restitutionary damages are unavailable for tortious interference claims under Section 766A of the Restatement. While it cites one case to this effect, *Marcus, Stowell & Beve Gov't Secs., Inc. v. Jefferson Inv. Corp.*, 797 F.2d 227, 231-32 (5th Cir. 1986), the weight of authority holds that restitutionary damages are available for tortious interference with contract. *See Zippertubing Co. v. Teleflex, Inc.*, 757 F.2d 1401, 1411-12 (3rd Cir. 1985); *Federal Sugar Ref. Co. v. United States Sugar Equalization Bd.*, 268 F. 575, 582 (D.C.N.Y. 1920); *National Merchandising Corp. v. Leyden*, 370 Mass. 425, 348 N.E.2d 771, 775-76 (1976); D. Dobbs, *Remedies* § 6, at 465 (1973).

[13] Natural also asserted an antitrust counterclaim against CIG. Natural alleged that CIG monopolized or attempted to monopolize the purchase of Wyoming natural gas by intervening and threatening to intervene in FERC proceedings in which CIG's competitors proposed building new pipelines leading out of Wyoming. The district court ruled that the *Noerr-Pennington* doctrine barred evidence of CIG's activities before FERC.

***HN3*** The *Noerr-Pennington* doctrine requires that attempts to influence the government, including attempts to influence administrative agencies, be exempt from attack under the Sherman Act. *California Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 511-12, 30 L. Ed. 2d 642, 92 S. Ct. 609 (1972); *Bright v. Moss Ambulance Serv., Inc.*, 824 F.2d 819 (10th Cir. 1987). We agree with the district court that nothing in CIG's activities before FERC so corrupts the judicial or administrative process that those activities amount to a sham and therefore are exempt from the *Noerr-Pennington* doctrine. *Hydro-Tech Corp. v. Sundstrand Corp.*, 673 F.2d 1171, 1176-77 & n. 7 (10th Cir. 1982).

[14] It is important to distinguish between NGPL-Trailblazer, one of the defendants, and the Trailblazer System. The Trailblazer System is a series of three separately owned and operated pipelines joined end-to-end which stretches from Wyoming to Nebraska. When built in 1982, the Trailblazer System greatly expanded the capacity of producers to move their gas from Wyoming to eastern markets. The westernmost segment of the Trailblazer System, Overthrust, is owned by CIG and Natural, as well as four other companies. The middle segment, WIC, is owned by CIG alone. The easternmost and longest segment of the system, Trailblazer, is owned jointly by NGPL-Trailblazer and two other companies. The Trailblazer System, the alleged beneficiary of Natural's predatory conduct, is not even a party to this case.

Natural asserts that a party may not be held liable for attempting to give monopoly power to another party which it does not control. This is especially true, it asserts, when the intended beneficiary of the monopolist is not a single entity but three separately operated entities owned in significant **[**27]** part by the alleged victim of the monopolistic scheme.

Nevertheless, Section 2 of the Sherman Act does not explicitly state that a party can only monopolize for itself. We need not decide this thorny issue because even if we assume that it is possible to create a monopoly for the benefit of a third party, CIG did not establish each of the elements of an attempted monopolization claim. [15]

**[**28]** CIG alleges that Natural attempted to monopolize the market by preventing CIG from offering gas transportation services to customers who might choose between CIG and the Trailblazer System. Because CIG was required to maintain capacity in its pipeline for the volume of gas Natural chose to reserve under the Service Agreement, CIG was not able to replace lost income from Natural's reduced purchases by offering "firm" [16] transportation services to new customers. In the summer of 1984, after Natural had stopped taking gas **[*693]** from CIG, CIG offered Natural the opportunity to reduce the capacity it reserved on the CIG system. Instead of reducing its reservation, Natural chose to increase it. Thus, Natural continued to tie up CIG's capacity, while refusing to purchase gas.

**[**29]** Further, CIG attempted to offer interruptible service to new customers to utilize the capacity left vacant by Natural's decreased purchases. Soon after CIG began to service the new customers, Natural resumed purchases of gas, forcing CIG to interrupt its service to the new customers. Because the Trailblazer System could offer inexpensive, uninterrupted service, CIG's new customers switched to the Trailblazer System.

While Natural's alleged manipulation of its gas purchases in an effort to disrupt CIG's ability to service new customers may be reprehensible conduct, the antitrust laws cannot be invoked to punish all forms of unseemly business activity. ***HN4*** If a party does not have monopolistic control over a market, its unfair business conduct implicates the attempt provision of the antitrust laws only if that conduct threatens to create a monopoly. *Indiana Grocery, Inc. v. Super Valu Stores, Inc., 864 F.2d 1409, 1413 (7th Cir. 1989)*; *cf. Continental T.V., Inc. v. GTE Sylvania, Inc., 433 U.S. 36, 54, 53 L. Ed. 2d 568, 97 S. Ct. 2549 (1977)* ("an antitrust policy **[**30]** divorced from market considerations would lack any objective benchmarks"). The defendant need face the added sanction of antitrust triple damages only if the plaintiff can establish each element of an antitrust offense.

In this circuit, ***HN5*** four elements must be proven to establish an attempt to monopolize under Section 2 of the Sherman Act: (1) relevant market (including geographic market and relevant product market) in which the alleged attempt occurred; (2) dangerous probability of success in

---

[15] The difficulty with punishing a firm for attempting to create a monopoly for a third party which does not act as a single entity, is that the threat to competition after the monopoly is achieved is obscure. In a more typical case in which a firm is attempting, through unfair means, to gain control of a market for itself, one can be quite certain the firm will not hesitate to exercise its newly acquired monopoly power. In this case, the alleged monopolist's (Natural's) conduct says little about its *intended beneficiary's* (the Trailblazer System's) proclivity or ability to monopolize. Section 2 of the Sherman Act does not punish the mere possession of monopoly power. *Standard Oil Co. of New Jersey v. United States*, 221 U.S. 1, 62, 55 L. Ed. 619, 31 S. Ct. 502 (1911).

[16] Gas can be sold on either a firm or interruptible basis. Firm sales guarantee the purchaser that he will receive the volumes of gas he reserves, while interruptible sales only guarantee deliveries if customers with higher priority do not demand the gas. Since CIG had a firm obligation to sell gas to Natural, CIG could only offer to sell interruptible service to new customers.

monopolizing the relevant market; (3) specific intent to monopolize; and (4) conduct in furtherance of such an attempt. *Shoppin' Bag of Pueblo, Inc. v. Dillon Companies, 783 F.2d 159, 161 (10th Cir. 1986)*. In addition, ***HN6*** any private plaintiff seeking treble damages under Section 4 of the Clayton Act must show antitrust injury. *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 488, 50 L. Ed. 2d 701, 97 S. Ct. 690*, *cert. denied*, *429 U.S. 1090, 97 S. Ct. 1099, 51 L. Ed. 2d 535 (1977)*. **[**31]** While Natural argues that CIG has failed to establish each element of the attempted monopolization claim, CIG's failure to show a dangerous probability of successful monopolization reveals the fundamental difficulty in CIG's claim. [17]

**[**32]** ***HN7*** In order to satisfy the dangerous probability of success element of an attempt claim, the plaintiff must show that there was a dangerous probability the defendant would achieve monopoly status as the result of the predatory conduct alleged by the plaintiff. *Shoppin' Bag, 783 F.2d at 162*; **[*694]** *Lektro-Vend Corp. v. Vendo Co., 660 F.2d 255, 271 (7th Cir. 1981)*, *cert. denied*, *455 U.S. 921, 71 L. Ed. 2d 461, 102 S. Ct. 1277 (1982)*. The likelihood of successful monopolization is typically evaluated by examining the defendant's share of the relevant market. *Shoppin' Bag, 783 F.2d at 161*. Reformulated in terms of market share, the plaintiff must show that there was a dangerous probability that the defendant's conduct would propel it from a non-monopolistic share of the market to a share that would be large enough to constitute a monopoly for purposes of the monopolization offense. [18] The higher the firm's initial market share, the greater the likelihood that it will eventually gain monopolistic control over the market. **[**33]** *Id. at 162*.

CIG asserts the fact that the Trailblazer System's market share rose from 41% to 53% is sufficient evidence to support the jury's finding that there was a dangerous probability that the Trailblazer System would attain a monopoly. If this were a typical attempted monopolization case in which the defendant was attempting to acquire a monopoly for itself through the use of economic coercion, we would have little difficulty in affirming the jury's finding of dangerous probability. First, a market share at the commencement of the defendant's predatory conduct of 41% would show that the defendant would not have to acquire much additional market share in order to attain monopoly control over the market.

---

[17] Several commentators have noted approvingly that the dangerous probability of success element of the attempt to monopolize offense prevents courts from expanding the Sherman Act into a broad unfair competition statute. For instance, Handler & Steuer state:

> There is ample reason for excluding single-firm behavior from the serious penalties of the antitrust laws when no dangerous probability of monopolization exists. When one firm monopolizes an economically significant market or threatens such a monopoly, competition is immediately and seriously jeopardized. It was largely to combat this peril that section 2 of the Sherman Act was passed, fortified with the formidable deterrent of treble damages and criminal penalties. Short of this situation, however, single firm behavior does not present so significant a threat to competition as to warrant such harsh consequences.

Handler & Steuer, *Attempts to Monopolize and No Fault Monopolization*, 129 U.Pa.L.Rev. 125, 175 (1980) (footnote omitted); *see also* 3 P. Areeda & D. Turner, *Antitrust Law* para. 833 (1978) (hereinafter Areeda & Turner); *cf.* Cooper, *Attempts and Monopolization: A Mildly Expansionary Answer to the Prophylactic Riddle of Section Two*, 72 Mich.L.Rev. 373, 454-55 (1974) (warning against expansion of the attempt provision into an unfair competition statute); *but see* Blecher, *Attempt to Monopolize Under Section 2 of the Sherman Act: "Dangerous Probability" of Monopolization Within the "Relevant Market,"* 38 Geo.Wash.L.Rev. 215, 222 (1969); Note, *Attempt to Monopolize Under the Sherman Act: Defendant's Market Power as a Requisite to a Prima Facie Case*, 73 Colum.L.Rev. 1451, 1459-61 (1973).

[18] While the Supreme Court has refused to specify a minimum market share necessary to indicate a defendant has monopoly power, lower courts generally require a minimum market share of between 70% and 80%. 2 E. Kintner, *Federal Antitrust Law* § 12.6 (1980); Areeda & Turner, para. 803.

**[**34]** More importantly, however, ***HN8*** a 41% market share typically indicates that a firm has substantial economic power in the market, and, therefore, has the tools at its disposal to elevate its market share to monopolistic levels. In other words, a high market share indicates that the defendant has the economic capacity to monopolize the market. *Id.* However, proximity to monopolistic status is not enough; the defendant must also have the ability to propel itself to monopolistic control over the market. *Indiana Grocery, Inc., v. Super Valu Stores, Inc., 864 F.2d 1409 (7th Cir. 1989)* (50% market share insufficient to show dangerous probability of successful monopolization); *Richter Concrete Corp. v. Hilltop Concrete Corp., 691 F.2d 818, 827 (6th Cir. 1982)* ("the real test is whether [the defendant] possessed sufficient market power to achieve its aims"); *United States v. Empire Gas Corp., 537 F.2d 296, 305 (8th Cir. 1976)*, *cert. denied*, *429 U.S. 1122, 51 L. Ed. 2d 572, 97 S. Ct. 1158 (1977)* (50% market share insufficient to **[**35]** show dangerous probability of successful monopolization). While the *Trailblazer System's* substantial market share demonstrates its *proximity* to monopoly status, it does not indicate *Natural's capacity* to raise the Trailblazer System's market share to a monopolistic level.

CIG did not attempt to offer evidence of Natural's share of the transportation market. One might initially imagine that evidence of a firm's market share would be required in order to assess that firm's ability to obtain or confer market power, but this is not necessarily true. In this case, Natural's capacity to create a monopoly for the Trailblazer System cannot be measured by Natural's market share because Natural did not use economic coercion in its attempt to monopolize. Rather, Natural took advantage of its contractual right to stop purchasing gas from CIG to magnify the Trailblazer System's position in the market. [19]***HN9*** In evaluating the probability of successful monopolization "we must consider the firm's capacity to commit the offense, the scope of its objective, and the character of its conduct." *Kearney & Trecker Corp. v. Giddings & Lewis, Inc., 452 F.2d 579, 598 (7th Cir. 1971)*, **[**36]** *cert. denied*, *405 U.S. 1066, 31 L. Ed. 2d 796, 92 S. Ct. 1500, 173 U.S.P.Q. (BNA) 385 (1972)*. **[*695]** In this case each of these factors is strictly determined and ultimately limited by the Service Agreement between Natural and CIG.

Natural's predatory conduct consisted of exercising its contract rights with CIG to prevent CIG from offering transportation services to long distance customers. Because Natural reserved a certain amount of space in CIG's pipeline, CIG could not offer that space to others. By continuing to reserve large amounts of gas and taking gas when CIG threatened to sell Natural's reserved capacity, Natural insured that CIG could not offer Natural's **[**37]** reserved capacity to the market. Yet, Natural's ability to exclude CIG was strictly limited by Natural's ability to insure its reserved capacity went empty. By exercising *all* its rights under the Service Agreement to tie up the *entire* capacity it had reserved, Natural was still only able to raise the Trailblazer System's market share to 54%.

Thus, *from the beginning*, Natural's decision to quit purchasing gas presented no danger that Natural could do anything more than shift 13% of the market to the Trailblazer System. The necessarily limited scope of Natural's objective leaves no room for speculation about the probability that the Trailblazer System would gain a monopoly. There was simply no reasonable chance, let

---

[19] The record does not clearly disclose how much of the Trailblazer System's market share gain reflected increased transportation volumes because CIG was unavailable as a competitor, and how much the market share gain simply resulted from the Trailblazer System's constant sales level in comparison with CIG's sales losses.

alone a dangerous probability, that Natural, through the exercise of its contractual rights, could imbue the Trailblazer System with sufficient market share to be a monopolist. [20]

**[**38]** Further, market share statistics sometimes overestimate a firm's market power. *See, e.g., Ball Memorial Hosp., Inc. v. Mutual Hosp. Ins., Inc., 784 F.2d 1325, 1335 (7th Cir. 1986)*; Landes & Posner, *Market Power in Antitrust Cases*, 94 Harv.L.Rev. 937, 950 (1981). In this case, if we look beyond market share statistics, we are further convinced that Natural's conduct did not threaten to give the Trailblazer System the degree of market power that would constitute a monopoly for purposes of the monopolization offense. One measure of the degree of market power is the persistence of a firm's ability to profitably charge monopoly prices. [21] **[**40]** If the evidence **[*696]** demonstrates that a firm's ability to charge monopoly prices will necessarily be temporary, the firm will not possess the degree of market power required for the monopolization offense. [22] 3 P. Areeda & D. Turner, *Antitrust Law*, at para. 807; *Williamsburg Wax Museum, Inc. v. Historic Figures, Inc., 258 U.S. App. D.C. 124, 810 F.2d 243, 252 (D.C.Cir. 1987)*; *Dimmitt*

---

[20] We agree with the proposition that it is no defense to an attempted monopolization charge that the defendant's attempt to monopolize proved to be unsuccessful. *United States v. American Airlines, Inc.*, 743 F.2d 1114, 1119 (5th Cir. 1984). Simply because a plan fails to succeed does not mean there was no probability that it could have succeeded. A flipped coin which lands heads still had a 50% chance of landing tails before it was flipped. The capacity of the defendant to monopolize must be evaluated at the commencement of the predatory scheme.

We also note our holding in this case does not require that in every instance where a party intends to eliminate a competitor through unfair means, the elimination of the competitor must give the predator a monopolistic market share. For instance, when a party with a substantial market share eliminates a smaller competitor through economic coercion, increased market power will give it even greater coercive power to eliminate other competitors. There is no reason to wait until the predator attacks a competitor that would put it just over the brink of monopolization before it can be stopped. *See* Note, *Attempt to Monopolize Under The Sherman Act: Defendants Market Power as a Requisite to a Prima Facie Case*, 73 Colum.L.Rev. 1451, 1462-63 (1973).

In this case, Natural sought to take advantage of a unique opportunity its contract afforded to temporarily harm a competitor of an entity in which it had an economic stake. Unlike the ordinary situation in which a firm's market share is crucial to the firm's ability to engage in predatory conduct and every predatory act makes future predation easier, Natural's ability to engage in predatory conduct would not be enhanced by conferring market share upon the Trailblazer System.

[21] Although most courts do not explicitly discuss the persistence of a firm's ability to charge supracompetitive prices as a measure of a firm's market power, courts indirectly consider the potential longevity of supracompetitive pricing whenever they use market share to evaluate the degree of market power. ***HN10*** Market share statistics are a useful measure of market power, in large part, because they indicate the relative durability of supracompetitive pricing capacity. The greater a firm's market share, the longer it will be able to charge monopoly prices because it will take longer for its small competitors to increase their output enough to discipline prices. *See* H. Hovencamp, *Economics and Federal Antitrust Law* § 3.1, at 58 (1985).

***HN11*** The durability of a firm's ability to charge supracompetitive prices also underlies another factor used to evaluate the degree of market power. Barriers to entry are often used by courts to determine whether an alleged monopolist has sufficient market power for purposes of the monopolization offense. 2 E. Kintner, *Federal Antitrust Law* § 12.9 (1980). Barriers to entry are market characteristics which make it difficult or time-consuming for new firms to enter a market. For instance, if market entry requires the construction of large manufacturing plants, *Cargill, Inc. v. Monfort of Colorado, Inc.*, 479 U.S. 104, 119, 93 L. Ed. 2d 427, 107 S. Ct. 484 (1986), or obtaining governmental approval to enter the market, *United States v. Marine Bancorporation, Inc.*, 418 U.S. 602, 628-29, 41 L. Ed. 2d 978, 94 S. Ct. 2856 (1974), the market is said to have high barriers to entry. Often courts refuse to find a sufficient degree of market power for the monopolization offense when they determine that a market has low barriers to entry. *See, e.g.*, *Ball Memorial Hosp.*, 784 F.2d at 1335. While a firm may have the capacity to charge supracompetitive prices in a market with low barriers to entry, that capacity is likely to be temporary.

[22] Some courts and commentators label the degree of market power necessary for the monopolization offense as "monopoly power." *See* L. Sullivan, *Antitrust* § 22, at 75 (1977) ("Monopoly power can be distinguished from a lesser amount of market power only in degree."); *Dimmitt Agri Indus., Inc. v. CPC Int'l, Inc.*, 679 F.2d 516, 529 (5th Cir. 1982), *cert. denied*, *460 U.S. 1082, 76 L. Ed. 2d 344, 103 S. Ct. 1770 (1983)*. One commentator has suggested that in the future courts might more precisely define monopoly power by "focus[ing] on the *permanence* of market power, with mere market power suggesting that supranormal profits will be *quickly eroded* by new entry, and monopoly power suggesting significantly greater insulation from the *long-run* forces of entry." G. Hay, *Single Firm Conduct*, 57 Antitrust L.J. 75, 81 (1988) (emphasis added). While we do not adopt this commentator's

*Agri Indus., Inc. v. CPC Int'l, Inc., 679 F.2d 516, 530 (5th Cir. 1982)*, *cert. denied* **[**39]** , *460 U.S. 1082, 76 L. Ed. 2d 344, 103 S. Ct. 1770 (1983)*; *Metro Mobile CTS, Inc. v. Newvector Communications, Inc., 661 F. Supp. 1504, 1523-24 (1987)*; *cf. Copperweld v. Independence Tube Corp., 467 U.S. 752, 767-68, 81 L. Ed. 2d 628, 104 S. Ct. 2731 (1984)* (antitrust laws are only meant to condemn conduct with long-run anticompetitive effects). [23]

**[**41]** In this case, the Trailblazer System's ability to charge supracompetitive prices could last only as long as Natural had the contractual right to tie up CIG's pipeline capacity. This right was strictly limited by the duration of the Service Agreement. [24] **[**42]** Once Natural's control over CIG's capacity ended, the market would return to the status quo [25] since the Trailblazer System **[*697]** would be helpless to compete against the unused and inexpensive capacity of CIG's system.

This analysis, which requires a plaintiff to show that an attempted monopolist's conduct [26] threatened to create substantial and persistent changes in the marketplace, may allow some unfair and potentially harmful methods of competition to go unpunished by the antitrust laws. But the Supreme Court, in a now oft quoted phrase, has stated "the antitrust laws . . . were enacted for 'the protection of competition not competitors.'" *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 488, 50 L. Ed. 2d 701, 97 S. Ct. 690* (quoting *Brown Shoe Co. v. United States, 370 U.S.*

---

nomenclature, we do agree with his assertion that market power must be persistent to make a firm a monopolist for purposes of the antitrust laws.

[23] A suggestion that unidentified market forces will eventually correct supracompetitive pricing will not suffice to show that market power will be temporary. Only when an alleged monopolist faces substantial competition from a *known competitor* who will enter the market in a *definite period of time*, ought courts to decline to find sufficient market power to satisfy the requirement for the monopolization offense. *Williamsburg Wax Museum*, 810 F.2d at 252 (defendant did not have monopoly in the wax figure market because a *known competitor* could, within a year, begin to deliver wax figures); *Metro Mobile CTS*, 661 F. Supp. at 1523-24 (defendant did not possess monopoly power for purposes of the monopolization or attempted monopolization offense even though it controlled 100% of the market because a known competitor had both the plans and capacity to enter the market within three years). *Cf.* Landes & Posner, *Market Power in Antitrust Cases*, 94 Harv.L.Rev.937, 950, n. 28 (1981) (difficulty in identifying potential competitors forces courts to assume that a firm's ability to charge monopoly prices will be persistent).

[24] The Service Agreement was to expire in 1989. Thus, the Trailblazer System would be free from competition for a longer period of time than the defendants in either *Williamsburg Wax Museum* (1 year) or *Metro Mobile CTS* (3 years). Yet, the actual number of years that the Trailblazer System would be free from competition from CIG is not the deciding factor in this case. Rather the certainty that the market will return to the status quo at a predetermined date and the fact that the Trailblazer System has no power to prevent the erosion of its market share, convince us that the market implications of Natural's conduct are not the subject of the antitrust laws.

[25] There is no suggestion in the record that Natural was in danger of driving CIG completely out of the transportation business before the expiration of the Service Agreement. Indeed, considering CIG's financial resources and record profitability during Natural's tie-up, it is unlikely that Natural could have completely excluded CIG. By attacking CIG, Natural could not alter the competitive structure of the industry which is based on a permanent superstructure. *See Cargill v. Monfort*, 479 U.S. at 119, n. 15.

[26] One treatise has stressed that courts ought to take a long-run view when evaluating allegedly anticompetitive conduct. In attempting to distinguish between conduct that should be addressed by the antitrust laws and conduct which should be regulated by tort law, Professors Areeda and Turner state:

> Most important, is our doubt that the torts and other activities considered in this paragraph would very often seriously impair the competitive opportunities of rivals in any significant or *permanent* way. We must beware of the inclination to condemn a monopolist on the basis of antisocial behavior that could possibly give him an improper advantage in the market. . . . The antitrust court must, therefore, insist on . . . significant and *more-than-temporary* harmful effects on *competition*.Areeda & Turner, para. 737b (emphasis added).

*294, 320, 8 L. Ed. 2d 510, 82 S. Ct. 1502 (1962))*, **[**43]** *cert. denied*, *429 U.S. 1090 (1977)*. The Court has long recognized that ***HN12*** the Sherman Act "does not purport to afford remedies for all torts committed by or against persons engaged in interstate commerce." *Hunt v. Crumboch, 325 U.S. 821, 826, 89 L. Ed. 1954, 65 S. Ct. 1545 (1945)*. ***HN13*** We believe the triple damage sanction of the Clayton Act is too harsh a remedy for unfair methods of competition that only threaten to have a transitory impact on the marketplace. Since there was no dangerous probability that Natural would bestow upon the Trailblazer System the degree of market power, either in terms of market share or persistence, necessary for the monopolization offense, the jury's antitrust verdict must be reversed.

**[**44]** IV. *Conclusion*

In conclusion, we hold that because FERC has already determined the appropriate contractual rate for failure to purchase gas, and Natural has paid CIG that rate, the verdicts for breach of contract and bad faith breach of contract awarding a different rate are reversed. The antitrust verdict is reversed because CIG failed to present sufficient evidence for a jury to find a dangerous probability of successful monopolization. The verdict for tortious interference with contract is affirmed.

EXHIBIT 263

LexisNexis®

Caution
As of: August 12, 2014 9:44 AM EDT

**Conwood Co., L.P. v. U.S. Tobacco Co.**
United States Court of Appeals for the Sixth Circuit
November 27, 2001, Argued ; May 15, 2002, Decided ; May 15, 2002, Filed
No. 00-6267

**Reporter:** 290 F.3d 768; 2002 U.S. App. LEXIS 9158; 2002 FED App. 0171P (6th Cir.); 2002-1 Trade Cas. (CCH) P73,675; 58 Fed. R. Evid. Serv. (Callaghan) 1566
CONWOOD COMPANY, L.P.; CONWOOD SALES COMPANY, L.P., Plaintiffs-Appellees, v. UNITED STATES TOBACCO COMPANY; UNITED STATES TOBACCO SALES AND MARKETING COMPANY, INC.; UNITED STATES TOBACCO MANUFACTURING COMPANY, INC.; UST, Inc., Defendants-Appellants.

**Subsequent History: ; 2002 FED App. 0171P (6th Cir.), ***Cir.) [**1]** Rehearing En Banc Denied July 10, 2002, Reported at: *2002 U.S. App. LEXIS 14731*. Writ of certiorari denied, Motion granted by: *U.S. Tobacco Co. v. Conwood Co., L.P., 2003 U.S. LEXIS 268 (U.S. Jan. 13, 2003)*.
Rehearing, en banc, denied by *Conwood Co., L.P. v. United States Tobacco Co., 2002 U.S. App. LEXIS 14731 (6th Cir., July 19, 2002)*
*Writ of certiorari denied, Motion granted by U.S. Tobacco Co. v. Conwood Co., L.P., 537 U.S. 1148, 123 S. Ct. 876, 154 L. Ed. 2d 850, 2003 U.S. LEXIS 268 (2003)*
Related proceeding at *In re Mass. Smokeless Tobacco Litig., 2008 Mass. Super. LEXIS 126 (Mass. Super. Ct., Apr. 7, 2008)*

**Prior History:** Appeal from the United States District Court for the Western District of Kentucky at Paducah. No. 98-00108. Thomas B. Russell, District Judge.

*Conwood Co., L.P. v. United States Tobacco Co., 2000 U.S. Dist. LEXIS 12797 (W.D. Ky., Aug. 10, 2000)*.
*Conwood Co., L.P. v. United States Tobacco Co., 2000 U.S. Dist. LEXIS 12797 (W.D. Ky., Aug. 10, 2000)*

**Disposition:** The court of appeals found that the district court did not err in submitting this case to the jury and denying defendant, United States Tobacco Company's, motion for judgment as a matter of law. Judgement of the district court affirmed.

**Core Terms**

racks, retailers, snuff, moist, products, market share, damages, argues, district court, competitors', competitive, brands, sales, manufacturer, consumer, facings, antitrust, sales representative, anti-competitive, advertising, exclusionary, removing, prices, monopoly power, regression, practices, displays, vending, contends, monopolization

**LexisNexis® Headnotes**

Civil Procedure > Trials > Judgment as Matter of Law > General Overview
Civil Procedure > Appeals > Standards of Review > De Novo Review

***HN1*** The appellate court reviews a district court's denial of a motion for judgment as a matter of law pursuant to *Fed. R. Civ. P. 50(b)* de novo.

Civil Procedure > Trials > Judgment as Matter of Law > General Overview
Civil Procedure > Appeals > Standards of Review > General Overview

***HN2*** In a federal question case, the standard of review for a *Fed. R. Civ. P. 50* motion based on sufficiency of the evidence is identical to that used by the district court. The evidence should not be weighed, and the credibility of the witnesses should not be questioned. Further, the evidence is viewed in the light most favorable to the non-movant, and all reasonable inferences are drawn in that party's favor. The appellate court should grant the motion only if reasonable minds could not come to a conclusion other than one favoring the movant. The appellate court's task also embodies assuring that the district court indulged all presumptions in favor of the validity of the jury's verdict, and refrained from interfering with the jury's verdict unless it was clear that the jury reached a seriously erroneous result.

Civil Procedure > Appeals > Standards of Review > Abuse of Discretion
Criminal Law & Procedure > ... > Standards of Review > Abuse of Discretion > General Overview
Criminal Law & Procedure > ... > Standards of Review > Abuse of Discretion > Evidence
Evidence > ... > Testimony > Expert Witnesses > General Overview
Evidence > Admissibility > Expert Witnesses

***HN3*** The appellate court considers the district court's decision to admit or exclude expert testimony for abuse of discretion, recognizing, of course, that such review calls for deference to the district court's decision. Thus, it will reverse a district court only where it is left with a definite and firm conviction that it committed a clear error of judgment.

Antitrust & Trade Law > ... > Monopolies & Monopolization > Actual Monopolization > Monopoly Power
Antitrust & Trade Law > Sherman Act > General Overview
Antitrust & Trade Law > Sherman Act > Claims

***HN4*** A claim under *§ 2* (*15 U.S.C.S. § 2*) of the Sherman Act requires proof of two elements: (1) the possession of monopoly power in a relevant market; and (2) the willful acquisition, maintenance, or use of that power by anti-competitive or exclusionary means as opposed to growth or development resulting from a superior product, business acumen, or historic accident.

Antitrust & Trade Law > Regulated Practices > Monopolies & Monopolization > General Overview

***HN5*** To establish the offense of monopolization a plaintiff must demonstrate that a defendant either unfairly attained or maintained monopoly power. Monopoly power consists of the power to control prices or exclude competition.

Antitrust & Trade Law > ... > Monopolies & Monopolization > Actual Monopolization > General Overview
Antitrust & Trade Law > ... > Monopolies & Monopolization > Attempts to Monopolize > General Overview
Antitrust & Trade Law > ... > Monopolies & Monopolization > Attempts to Monopolize > Elements
Criminal Law & Procedure > ... > Acts & Mental States > Mens Rea > General Intent

***HN6*** In a case pursuant to *§ 2* (*15 U.S.C.S. § 2*) of the Sherman Act, only a thorough analysis of each fact situation will reveal whether the monopolist's conduct is unreasonably anti-competitive and thus unlawful. Moreover, in order for a "completed" monopolization claim to succeed, the plaintiff must prove a general intent on the part of the monopolist to exclude; while by contrast, to prevail on a "mere" attempt claim, the plaintiff must prove a specific intent to destroy competition or build a monopoly. However, no monopolist monopolizes unconscious of what he is doing. Thus, improper exclusion, i.e., exclusion not the result of superior efficiency, is always deliberately intended.

Antitrust & Trade Law > Regulated Practices > Market Definition > General Overview
Antitrust & Trade Law > ... > Market Definition > Relevant Market > Geographic Market Definition
Antitrust & Trade Law > Regulated Practices > Monopolies & Monopolization > General Overview
Antitrust & Trade Law > ... > Monopolies & Monopolization > Attempts to Monopolize > General Overview
Antitrust & Trade Law > Sherman Act > General Overview

***HN7*** The first step in any action brought under *§ 2* (*15 U.S.C.S. § 2*) of the Sherman Act is for the plaintiff to define the relevant product and geographic markets in which it competes with the alleged monopolizer, and with respect to the monopolization claim, to show that the defendant, in fact, possesses monopoly power. A geographic market is defined as an area of effective competition. It is the locale in which consumers of a product or service can turn for alternative sources of supply.

Antitrust & Trade Law > Regulated Practices > Market Definition > Relevant Market
Antitrust & Trade Law > Regulated Practices > Monopolies & Monopolization > General Overview
Evidence > Types of Evidence > Circumstantial Evidence
Evidence > Admissibility > Circumstantial & Direct Evidence

***HN9*** Whether a company has monopoly or market power may be proven directly by evidence of the control of prices or the exclusion of competition, or it may be inferred from one firm's large percentage share of the relevant market. The material consideration in determining whether a monopoly exists is not that prices are raised and that competition is excluded, but that power exists to raise prices or to exclude competition when it is desired to do so. Courts have increasingly leaned toward using circumstantial evidence as a shortcut to determine whether monopoly power exists. Such circumstantial evidence may encompass a high market share within a defined market.

Antitrust & Trade Law > ... > Actual Monopolization > Anticompetitive & Predatory Practices > General Overview

***HN8*** In determining whether conduct may be characterized as exclusionary, it is relevant to consider its impact on consumers and whether it has impaired competition in an unnecessarily restrictive way. If a firm has been attempting to exclude rivals on some basis other than efficiency, it is fair to characterize its behavior as predatory or exclusionary. However, merely because an entity has monopoly power does not bar it from taking advantage of its scale of economies because of its size. Such advantages are a consequence of size and not the exercise of monopoly power.

Antitrust & Trade Law > Sherman Act > General Overview

***HN10*** Isolated tortious activity alone does not constitute exclusionary conduct for purposes of a violation of *§ 2* (*15 U.S.C.S. § 2*) of the Sherman Act, absent a significant and more than a temporary

effect on competition, and not merely on a competitor or customer. However, this is not to say that tortious conduct may never violate the antitrust laws. Moreover, merely because a particular practice might be actionable under tort law does not preclude an action under the antitrust laws as well. Anticompetitive conduct can come in too many different forms, and is too dependent upon context, for any court or commentator ever to have enumerated all the varieties.

Antitrust & Trade Law > Sherman Act > General Overview

***HN11*** In an action for damages for violation of the antitrust laws plaintiff is not limited to recover only for specific items of damage which he can prove with reasonable certainty. On the contrary, the trier of the facts may make a just and reasonable estimate based on relevant data and may act upon probable and inferential proof.

Antitrust & Trade Law > Sherman Act > General Overview

Governments > Agriculture & Food > Product Promotions

***HN12*** Only a case-by-case analysis of each fact situation will determine whether the monopolist's conduct is anti-competitive.

Evidence > ... > Testimony > Expert Witnesses > General Overview

***HN13*** Experts are entitled to rely on documents, even hearsay documents that are otherwise inadmissible.

Antitrust & Trade Law > ... > Actual Monopolization > Anticompetitive & Predatory Practices > General Overview

***HN14*** Excluding rivals on a basis other than efficiency may be characterized as predatory or anti-competitive.

Antitrust & Trade Law > Sherman Act > General Overview

Healthcare Law > Healthcare Litigation > Antitrust Actions > Facilities

***HN15*** The antitrust laws are intended to protect competition, not competitors. To prevail, a plaintiff must prove antitrust injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes the defendants' acts unlawful. Specifically, to recover damages, an antitrust plaintiff must show (1) that the alleged violation tends to reduce competition in some market and (2) that the plaintiff's injury would result from a decrease in that competition rather than from some other consequence of the defendant's actions. An antitrust plaintiff bears the burden of showing that the alleged violation was a material cause of its injury, a substantial factor in the occurrence of damage or that the violation was the proximate cause of the damage.

Antitrust & Trade Law > Sherman Act > General Overview

***HN16*** Although an antitrust plaintiff need not show that the defendant's wrongful actions were the sole proximate cause of his injuries, the causal link must be provided as a matter of fact and with a fair degree of certainty. To be one of several causes is not enough. The evidence linking the violation to the injury must be more precise than that needed to establish the amount of damages.

Antitrust & Trade Law > Sherman Act > General Overview

***HN17*** Higher prices and reduced consumer choice are harmful to competition.

Antitrust & Trade Law > Sherman Act > General Overview

***HN18*** To show antitrust injury, the plaintiff must show more than economic injury. An analysis of the directness or indirectness of the injury is appropriate. An injury does not exist for purposes of antitrust suits if it does not flow directly from the antitrust violation.

Antitrust & Trade Law > Sherman Act > General Overview

***HN19*** In an antitrust case, while the link between the injury and violation must be proved as a matter of fact and with a fair degree of certainty, it need not be the sole proximate cause.

Civil Procedure > Appeals > Reviewability of Lower Court Decisions > Preservation for Review
Evidence > Admissibility > Expert Witnesses > Daubert Standard

***HN20*** The appellate court reviews the case presented to the district court, and not a better one fashioned on appeal, and will not decide issues the parties failed to litigate before the district court.

Civil Procedure > Appeals > Reviewability of Lower Court Decisions > Preservation for Review
Evidence > ... > Procedural Matters > Objections & Offers of Proof > General Overview
Evidence > ... > Procedural Matters > Objections & Offers of Proof > Objections
Evidence > ... > Procedural Matters > Objections & Offers of Proof > Timeliness
Evidence > Admissibility > Procedural Matters > Rulings on Evidence

***HN21*** Where a trial court has made a definitive ruling on the record of the evidentiary issues to be decided, and has not indicated that the ruling is subject to other circumstances or evidence, then counsel need not renew the objection at the time the evidence is offered at trial to preserve the error for appeal.

Civil Procedure > Appeals > Reviewability of Lower Court Decisions > Preservation for Review
Evidence > ... > Procedural Matters > Objections & Offers of Proof > General Overview
Evidence > Admissibility > Procedural Matters > Rulings on Evidence
Evidence > Admissibility > Expert Witnesses > Daubert Standard

***HN22*** See *Fed. R. Evid. 103(a)(2)*.

Evidence > Admissibility > Scientific Evidence > General Overview
Evidence > ... > Testimony > Expert Witnesses > General Overview
Evidence > Admissibility > Expert Witnesses > Daubert Standard
Evidence > Admissibility > Expert Witnesses > Helpfulness
Evidence > ... > Testimony > Expert Witnesses > Qualifications

***HN23*** Pursuant to *Fed. R. Evid. 702*, if scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

Evidence > Admissibility > Scientific Evidence > General Overview
Evidence > Types of Evidence > Testimony > General Overview
Evidence > ... > Testimony > Expert Witnesses > General Overview

Evidence > Admissibility > Expert Witnesses
Evidence > Admissibility > Expert Witnesses > Helpfulness

***HN24*** The United States Supreme Court has established a general gatekeeping or screening obligation for trial courts to exclude from trial expert testimony that is unreliable and irrelevant. The district court must determine whether the evidence both rests on a reliable foundation and is relevant to the task at hand. In assessing relevance and reliability, the district court must examine whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue. This involves a preliminary inquiry as to whether the reasoning or methodology underlying the testimony is scientifically valid and whether that reasoning or methodology properly can be applied to the facts in issue. Some of the factors that may be used in such an inquiry include: (1) whether the theory or technique has been tested and subjected to peer review and publication, (2) whether the potential rate of error is known, and (3) its general acceptance. This inquiry is a flexible one, with an overarching goal of assessing the scientific validity and thus the evidentiary relevance and reliability of the principles and methodology underlying the proposed expert testimony.

Evidence > Admissibility > Scientific Evidence > General Overview
Evidence > Admissibility > Scientific Evidence > Standards for Admissibility
Evidence > ... > Testimony > Expert Witnesses > General Overview
Evidence > Admissibility > Expert Witnesses > Daubert Standard

***HN25*** A trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable.

Antitrust & Trade Law > ... > Private Actions > Remedies > General Overview

***HN26*** Regression analyses, a yardstick test and the before-and-after test are all generally accepted methods for proving antitrust damages.

Energy & Utilities Law > Utility Companies > Liability
Evidence > Relevance > Relevant Evidence

***HN27*** Testimony is relevant where there is a valid connection to the pertinent inquiry.

Evidence > ... > Testimony > Expert Witnesses > General Overview
Evidence > Admissibility > Expert Witnesses

***HN28*** In order to be admissible on the issue of causation, an expert's testimony need not eliminate all other possible causes of the injury.

Evidence > ... > Testimony > Credibility of Witnesses > General Overview
Evidence > Admissibility > Expert Witnesses > Daubert Standard

***HN29*** Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.

Civil Procedure > ... > Jury Trials > Jury Instructions > General Overview
Civil Procedure > ... > Jury Trials > Jury Instructions > Objections

***HN30*** Juries are presumed to follow the instructions given.

Antitrust & Trade Law > ... > Private Actions > Remedies > General Overview

***HN31*** An award of damages may be awarded on a plaintiff's estimate of sales it could have made absent the antitrust violation. The vagaries of the marketplace usually deny the court sure knowledge of what plaintiff's situation would have been in the absence of the defendant's antitrust violation. The antitrust cases are legion which reiterate the proposition that, if the fact of damages is proven, the actual computation of damages may suffer from minor imperfections.

**Counsel:** ARGUED: Ernest Gellhorn, LAW OFFICE OF ERNEST GELLHORN, Washington, D.C., for Appellants.

Mark C. Hansen, KELLOGG, HUBER, HANSEN, TODD & EVANS, Washington, D.C., for Appellees.

ON BRIEF: Ernest Gellhorn, LAW OFFICE OF ERNEST GELLHORN, Washington, D.C., Neal R. Stoll, James A. Keyte, SKADDEN, ARPS, SLATE, MEAGHER & FLOM, New York, New York, John S. Reed, Ridley M. Sandidge, Jr., Lynn K. Fieldhouse, REED, WEITKAMP, SCHELL & VICE, Louisville, Kentucky, for Appellants.

Mark C. Hansen, Neil M. Gorsuch, KELLOGG, HUBER, HANSEN, TODD & EVANS, Washington, D.C., L. Clifford Craig, TAFT, STETTINIUS & HOLLISTER, Cincinnati, Ohio, Richard C. Roberts, WHITLOW, ROBERTS, HOUSTON & STRAUB, Paducah, Kentucky, for Appellees.

**Judges:** Before: CLAY and GILMAN, Circuit Judges; EDGAR, Chief District Judge. *

**Opinion by:** CLAY

**Opinion**

**[***2] [*772]** CLAY, Circuit Judge. Defendants-Appellants, United States Tobacco Company, **[**2]** United States Tobacco Sales and Marketing Company, Inc., United States Tobacco Manufacturing Company, Inc., and UST, Inc. (herein collectively referred to as "USTC") appeal from the March 29, 2000 order, after trial by jury, entering judgment in favor of Plaintiffs, Conwood Company, L.P. and Conwood Sales Company, L.P. ("Conwood") for Defendants' violations of **[***3]** the Sherman Anti-Trust Act, *15 U.S.C. § 2*. Conwood alleged that USTC violated the Act by using its monopoly position to exclude competitors from the moist snuff market. We **AFFIRM**.

## BACKGROUND

### Procedural History

On April 22, 1998, Conwood filed an eight-count complaint against USTC alleging **[*773]** the following causes of action: (1) Unlawful Monopolization, in violation of *§ 2* of the Sherman Act; (2) Violations of § 43(a) of the Lanham Act; (3) Tortious Interference with contract; (4) Tortious Interference with prospective advantage; (5) Violations of the *Kentucky Revised Statute, § 365.050*; (6) Product Defamation; (7) Unjust Enrichment; and (8) Conversion/Trover. USTC filed counterclaims for conversion and violations of the Lanham Act and Sherman Act.

---

* The Honorable R. Allan Edgar, Chief United States District Judge for the Eastern District of Tennessee, sitting by designation.

In November 1999, USTC moved **[**3]** for summary judgment as to Conwood's federal claims and dismissal without prejudice as to the pendent state law claims. USTC also filed a motion in limine to exclude the testimony of Conwood's expert witness, Dr. Richard Leftwich, and moved separately to exclude Leftwich's damages study and future testimony during trial. The district court denied USTC's summary judgment motion on February 17, 2000. On February 23, 2000, the district court also denied USTC's motions with respect to Leftwich.

In February 2000, the case proceeded to trial. Before the case went to the jury, Conwood agreed to dismiss the state law claims and both parties agreed to dismiss their respective Lanham Act claims asserted against one another. The jury deliberated for four hours, returning a $ 350 million verdict in favor of Conwood. The district court entered judgment on March 29, 2000, and therein trebled the amount of the award to $ 1.05 billion, pursuant to *15 U.S.C. § 15(a)*. The jury also **[***4]** ruled in favor of Conwood on USTC's conversion and Sherman Act claims.

Conwood moved for a permanent injunction, pursuant to *15 U.S.C. § 26*, to prevent USTC from, among **[**4]** other things, removing or eliminating any competitors' advertising material in retail stores, without the prior consent of the retailer. The district court granted the motion on August 10, 2000. USTC moved for judgment as a matter of law, or for a new trial or reduction in damages, arguing that its conduct was not exclusionary, competition was not harmed and that Conwood had not established causation and damages. The district court denied the motion on August 10, 2000. On September 11, 2000, USTC filed this timely notice of appeal challenging the district court's (1) February 17, 2000 denial of its motion for summary judgment; (2) February 23, 2000 order denying its motion to exclude the damages study and testimony of Leftwich; (3) March 29, 2000 judgment on the jury verdict; (4) August 10, 2000 order denying its motion for judgment as a matter of law, or in the alternative for a new trial or reduction of damages; and (5) August 10, 2000 order granting Conwood's motion for permanent injunctive relief.

**Facts**

Both Conwood and USTC are manufacturers of moist snuff, a finely chopped smokeless tobacco that the user consumes by placing a small amount between the gum and cheek. The **[**5]** product is sold in small round cans, at a price of between $ 1.50 and $ 3. USTC produces the industry staples "Skoal" and "Copenhagen." Conwood's brands include "Kodiak" and "Cougar."

USTC's predecessor, Duke Trust, started the moist snuff industry in 1822, with its Copenhagen brand. In 1911, a judicial decree broke up the Duke Trust monopoly, which spawned three companies: American Snuff Company (Conwood's predecessor); USTC; and "Helme" (which is now known as Swisher International Group, hereinafter, **[***5]** "Swisher"). American Snuff Company changed its name to Conwood sometime during the 1950s. Conwood and Swisher were involved for many years in the "dry snuff" market. For sixty years, **[*774]** USTC was the sole manufacturer of moist snuff. Swisher and Conwood entered the moist snuff market in the late 1970s. The only other competitor in the moist snuff market is Swedish Match ("Swedish"). Thus, there are only four competitors in the moist snuff market in the United States.

After Conwood, Swisher, and Swedish entered the market, USTC's market share, which at one point was virtually 100 percent, declined. By 1990, the four manufacturers sold 28 different brands of moist snuff and USTC's **[**6]** market share was approximately 87 percent. During the 1990s, market growth accelerated in the moist snuff industry, and USTC's market share continued to drop. At trial, one of Conwood's expert witnesses, Morton Kamien, a professor at Northwestern

University's Kellogg Graduate School of Business, testified that USTC currently controls 77 percent of the moist snuff market; Conwood controls approximately 13 1/2 percent of the market and Swedish and Swisher comprise approximately 6 percent and 4 percent of the market, respectively.

In 1999, total moist snuff sales amounted to $ 1.68 billion. Also, in 1999, USTC earned approximately $ 813 million in revenues before taxes, interest and amortization. The company has the highest profit margin of any public company in the country. Kamien testified that because USTC is one of the most profitable companies in the country, and because of the amount of profit at stake in the moist snuff market, it "would be a ripe opportunity for other firms to come in and try to get into the market . . . ." However, there have been no new entrants in the market since 1990. In addition, although USTC declined in market share about 1 percent per year between 1979 **[**7]** and 1999, Kamien testified that had there been true competition in the moist snuff industry, the decline would have gone much faster. He found it remarkable that while USTC's market share decreased, the company raised its **[***6]** prices. Testimony revealed that USTC had raised its prices approximately 8 to 10 percent per year between 1979 and 1998.

**The Importance of In-store Advertising**

Moist snuff is generally sold from racks. The racks have gravity fed slots or facings, from which consumers may select a can of the product. Each facing is filled with cans of a single brand of moist snuff. In addition to dispensing cans, the racks also provide "point of sale" ("POS") advertising, generally carried out by a "header card" -- a cardboard sign attached to the front of the rack. The header card may contain such information as the name of the brand of moist snuff, any promotions running with the product, and a picture of the product.

The parties agree that POS in-store advertising is critical in the moist snuff industry because unlike with other products, such as soft drinks or snacks, tobacco advertising is restricted. Tobacco products cannot be advertised on TV or radio, and **[**8]** some places have restrictions on other forms of advertising outside of a retail store, such as on billboards. Further, the number of people who use smokeless tobacco products is relatively small in relation to those who consume other tobacco products. Thus, according to Harold Price, Swedish's vice president of sales and marketing, the point at which the buyer makes his purchase decision is the optimal time to convince the buyer to purchase a particular brand of moist snuff. Price testified that the "single most important" tool for advertising is the merchandise rack, "because that's where we have the greatest opportunity and the last point to reach the consumer before [the consumer] makes [his or her] purchase decision."

**[*775] Exclusive Racks, Category Management and CAP**

Conwood showed at trial that beginning in 1990, USTC pursued strategies, emanating from high-level management, to exclude competition in the moist snuff market.

**[***7]** According to trial testimony, USTC had been able to convince "a number of major retailers" to allow it to have "exclusive racks" in their stores. An "exclusive rack" refers to one manufacturer supplying a rack to display its moist snuff products **[**9]** and those of all other manufacturers. Kroger's Steven Luckett testified that while his store permits each moist snuff company to have its own rack, an advantage of allowing only one rack to store all similar products

is uniformity. It also allows retailers to stack products in a manner that looks more attractive and neat. According to Alan Hart, a former USTC salesman, less than 10 percent of stores carried USTC racks exclusively, and of those that did "most all of them" did so because the store authorized it. Several retailers testified that they requested exclusive racks. In fact, Mary Stevens, who managed a Kiwi store in Billings, Montana, testified that she used only a Conwood rack. [1]

**[**10]** During the 1990s, many retailers adopted the practice of category management. This practice varies from store to store, and involves managing product groups and business units and customizing them on a store-by-store basis to satisfy customer demands. The process can determine the quantity of items a store sells. For instance, it allows retailers, based on such data as sales volume, to determine which items should be allocated more shelf space. Manufacturers support the efforts of retailers by presenting to them products or a combination of products that are more profitable and "plan-o-grams" describing how, and which, products should be displayed. At Wal-Mart, Swedish and USTC were involved with category management, which entailed suggesting which items should be on the racks. Swisher at one point was also involved in the process.

**[***8]** As part of the category management process, retailers review plan-o-gram information provided by the manufacturer and compare the products they suggest be sold to the retailer's own independent analysis. The process is designed to ensure the best selling products are included in the plan-o-gram. Larry Luckett, who decides which moist snuff products **[**11]** will be sold at Kroger Company, testified that any supplier trying to use category management practices to control competition, in his store anyway, would be "committing suicide." USTC points out that no retailer testified that the company required shelf space allocations equal to its market share. Apparently, Wal-Mart rejected such a request from USTC.

However, according to Conwood, around 1990, USTC perceived it as a threat in the moist snuff market and took steps to eliminate it as a competitor and to "reject competition on the merits." USTC's president, Vincent Gierer, testified that around that time his company was losing market share and Conwood's volume was increasing. In the mid-1990s Conwood and Swedish introduced "price value" or half-priced brands of moist snuff. To show that USTC believed that such "price valued" products would erode its profits, Conwood **[*776]** points to a 1996 internal USTC report in which the company stated that one of its goals was to "minimze the growth in [price value] we have been experiencing over the past five years to the point where USTC can still grow the market and achieve desired growth for USTC." The report stated that USTC would "need to be more **[**12]** aggressive where [price value] has a higher share of the segment and will actively pursue strategies to limit the growth of the price value market segment."

Conwood also claims that USTC, in its role as category manager, deliberately provided false information to stores to exclude competitors from the market. For instance, David Waller, a wholesale distributor, testified that USTC has provided "skewed" national sales figures to retailers that do not always represent local product movement in stores. A report drafted by a division manager in Houston also shows **[***9]** that USTC sometimes provided false information to retailers to get them to maintain USTC's poor selling items while dropping competitors' products. Conwood employees also testified that USTC provided false information to retailers, such as by inflating actual sales data.

---

[1] USTC also points out that in 1996, Wal-Mart asked it and other moist snuff manufacturers to design a rack for the store to use for its moist snuff products. (J.A. at 492.) Conwood decided not to participate in the contest. *Id.* USTC's design won. *Id.* Swisher also won similar competitions for exclusive rack systems in K-Mart and Tom Thumb stores. (J.A. at 2859, 518-19, 1447-48.)

According to Conwood expert witness Robert Blattberg, an expert on category management and a professor of retailing at Northwestern's Kellogg Graduate Business School, many retailers consider moist snuff a small category and give it little attention. By "small," Blattberg explained that it is only consumed by about seven percent of the population, **[**13]** almost all male. However, it is a highly profitable item on a linear foot basis because it takes up so little space. He testified that no store, not even Wal-Mart, according to him the largest retailer in the world, has anyone solely devoted to the management of moist snuff. From reviewing USTC documents, he testified that USTC employees understood that retail category managers did not know as much as USTC did about pricing, product knowledge and profitability of the products. He stated that manufacturers often have access to data that retailers do not, such as Nielsen data, which tracks product movement. He stated that because of their time constraints, retailers are most likely to delegate the task of category management with respect to such items as moist snuff. He testified that when a retailer does delegate category management responsibilities to a manufacturer, the latter has significant responsibility. The retailer will look to the manufacturer to provide such information as assortment recommendations for which items to stock, consumer information, sales, and which stores are stocking what items. He further testified that a retailer will rely on a large manufacturer to be its **[**14]** category captain because if a manufacturer controls 75 or 80 percent of the market many retailers will assume that the manufacturer will and can devote the resources to the category to help build it. For instance, Blattberg pointed to documents in which a USTC representative stated that "most retailers want the top dog **[***10]** running things because the dominant share of market customers will look to us for leadership."

Swedish's McClure also testified that "there's only one category manager in the moist snuff business" -- USTC. He also stated that while he would like to compete for the job of category manager, his company does not have shelf presence, consumer base or money. He also testified that USTC had not used its position fairly, had used its power "to keep [Swedish's] products off the shelf, and once it's there to get rid of it . . . ."

Terry Williams, Conwood's national sales manager, testified that in 1997 he was informed by one retailer that in order **[*777]** to obtain extra facings or a facing for a new item, the retailer first would have to consult with USTC. He also testified that before 1997, Conwood's market share in Wal-Mart was approximately 12 percent, but by the time **[**15]** of trial it was 6.5 percent. He explained that USTC's exclusive racks and its restrictions on Conwood's distribution began in Wal-Mart around 1997.

There is also documentary evidence that USTC sought to use its position as category manager to control and limit the number of price value products introduced in stores and to control the merchandising and POS placements in stores. In one 1997 report, a USTC regional vice president stated that "it is imperative that we continue with this Category Management action plan to eliminate competitive products." In another document, a 1998 letter to David Untiedt, USTC national accounts director, a USTC employee stated that his biggest competitive concern with several stores in the Washington state area was the "availability of [Swedish's] Timberwolf [brand] and price differential between" that product and USTC's. The letter went on to state that "although we control the merchandising and the POS placements, which will make the consumer awareness of the price differential difficult, some of the Circle K shoppers are always looking for a bargain." After reviewing this **[***11]** document, Blattberg testified that USTC apparently realized that **[**16]** customers were looking for a bargain, and that limiting the amount of POS and information makes it more difficult for the consumer to find price value brands. In yet

another document Blattberg discussed, a USTC chain accounts manager in North Carolina wrote "Our objective with exclusive vending rights with this and other chains is to control expanded competitive distribution and competitive POS . . . we will continue to focus on merchandising rights to promote the growth of our product line and inhibit competitive growth . . . to the best of our ability." Blattberg testified that the obvious objective in having exclusive vending rights, according to the letter, is to reduce the amount of competitive items that can be offered.

According to Blattberg, documentary evidence showed that USTC intended to use its position as category captain to "control the number of price value product introductions." Blattberg testified that after reviewing numerous documents drafted by USTC staff, he saw instances where USTC provided misleading information to retailers, including falsely reporting that some of their products were selling better than their competitors in an effort to thwart competition. **[**17]** He testified that by limiting the availability of the price value brands, USTC limits the choices for consumers. He also testified that it limits the ability of competitors to enter the market because it limits what the consumer can see. He stated that USTC's practices were inconsistent with the concept of category management.

Kamien also testified that USTC's conduct harmed consumers by limiting variety and raising prices. He produced a chart showing that for every 10 percent increase in USTC facings, retail prices for moist snuff rose by $ .07. A Wal-Mart manager testified that after USTC eliminated competitors' POS and facings, the number of other moist snuff items available to the store's customers declined.

**[***12]** Conwood introduced numerous documents drafted over several years by various USTC personnel, including chain accounts managers and others, that indicate USTC may have used its exclusive vending rights to hurt competition. *See e.g.*, J.A. at 2182 ("objective with exclusive vending rights with this and other chains is to control expanded competitive distribution and competitive P.O.S. Department . . . . We will continue to focus on merchandising **[*778]** rights to . . . **[**18]** inhibit competitive growth (to the best of our ability));" J.A. at 2185 ("We stressed in our Department Meeting the importance of cutting competitive distribution. In many stores, especially supermarkets, distribution of competitive brands is much too high . . . ."); J.A. at 2375 ( "Even though Conwood does not like the fact that we sometimes house their product in our vending, I have encountered more and more retailers that are surprised when I include the comp[etitions'] products. I feel it is better for them to be lost in our vending than to have their own and no point of sale on the vendor."); J.A. at 2401 ("Our objective is to control the smokeless home, . . . provide facings for competitive, control facings and positioning, and make our presence larger via P.O.S."); J.A. at 2523 ("With arrogance and grace, I have taken a personal vendetta against the Conwood Reps. in my areas. I am devoting an extra effort toward eliminating as many laggard Conwood brands at retail as possible . . . Since I am offering a cash counter payment for exclusive UST vending on our 2908 displays, I am giving Kodiak . . . [a Conwood brand] one facing . . . .").

In 1998, USTC introduced its Consumer **[**19]** Alliance Program ("CAP"), which entails granting retailers a maximum discount of .3% for providing USTC with sales data, and participating in USTC promotion programs, and/or giving the best placement to USTC racks and POS. According to Conwood, however, CAP is another means by which USTC excludes competition. For example, in "a monthly competitive letter" dated March 27, 1998, a USTC employee stated that the CAP "has become a great incentive in securing space for our vendors and for the elimination of competition products."

**[***13]** There was testimony that the CAP can be used to exclude competitive POS advertising, and that USTC was extremely successful in signing up retailers to enter into these agreements. In the first couple of months of the program, USTC was able to sign 37,000 retailers to the CAP, which represents 80 percent of its overall volume in moist snuff sales.

**Unauthorized Removal of Conwood Racks**

According to Conwood, when USTC sales representatives restocked or rearranged their own displays, they would routinely discard hundreds of thousands of Conwood racks and their accompanying POS. William Rosson, Conwood's Chairman, testified that after 1990, Conwood **[**20]** spent $ 100,000 a month on replacement racks. Rosson testified that the company had "monumental problems" keeping their moist snuff on the shelf. A Conwood sales representative testified that when displays were removed, Conwood was successful in restoring them about 95 percent of the time. Rosson testified that about 50 percent of sales representative's staff time was spent repairing racks destroyed by USTC representatives. Because two to three months would sometimes pass before a sales representative could return to the same store, Conwood lost sales even when it was able to restore racks.

Conwood also asserts that USTC would remove its POS and racks under the guise that retailers had given it permission to do so. Conwood argues that any permission to remove its products was done under a ruse of organizing or straightening stores. It argues that USTC supervisors trained their staff to take advantage of inattentive store clerks, apparently so that they could destroy Conwood's racks and headers in retail stores. For instance, Shawn Ulizio, a former USTC employee testified that most clerks did not understand or care that there were different manufacturers of snuff products. Another **[**21]** former USTC sales representative testified that after he **[*779]** got permission from a store manager, he **[***14]** would remove Conwood racks and put Conwood's products in USTC racks. Former USTC representative Lawrence Borrowdale testified that he was instructed, apparently by his supervisor, that if a competitor's rack was in the way, he should remove it. Borrowdale testified that on occasion he would remove competitors' racks and bag up their fresh products and place them under a counter. Several other former USTC employees gave similar testimony. Kamien testified that the documentary evidence showed that the problem of USTC removing competitors' racks was widespread over a period of time.

One Conwood employee testified that except for moist snuff, he never encountered problems with his displays regarding any Conwood product. He testified that he would place moist snuff racks in stores only to return later to have the displays gone and any remaining Conwood brands stuffed in USTC's rack. Another Conwood employee gave similar testimony. He also stated that once the USTC representative in his area told him that he intended to "bury" him. Later, he witnessed that same representative breaking **[**22]** down his rack one day, while USTC's regional vice president, then a USTC department manager, observed. Conwood did not encounter this problem with its displays of smokeless tobacco products in markets in which USTC did not compete.

Gayleen Rusk, who manages an Amoco Pronto Express, testified that she had experienced a USTC sales representative removing Conwood's racks and putting the products in the USTC rack. She testified that when she first started working at the store and did not know any better, she would allow it. Upon learning that the USTC representative was not supposed to bother competitors'

racks, she would tell him not to do so when he visited the store. She stated that he would then come when she was not on duty and remove Conwood's rack anyway. Regarding the effect of not having Conwood brands in her store, Amoco manager Rusk stated that when customers request the items, they do not have them to sell. According to Conwood representative Brett Jeffery, when he **[***15]** told the USTC representative to stop removing his racks, Conwood's sales "dramatically increased." One former USTC representative, who witnessed the removal and destruction of Conwood's POS and racks **[**23]** stated that it had an effect on sales. According to him, no exposure meant no sale. Three other store witnesses also testified that they had seen or experienced USTC representatives removing Conwood racks.

According to USTC, however, retailers rely on manufacturers and wholesaler representatives to perform certain merchandising tasks for them, such as cleaning and rearranging items where a retailer may require more space to add or expand a section. USTC claims that during the 1990s, its more than 600 sales personnel visited 8 to 10 retail stores per day, totaling more than 7 million sales calls. These visits may involve, among other things, removing a competitor's products, racks, or POS, but only at the retailer's direction. USTC also points out that three of the former USTC employees that said that they removed Conwood racks and/or displays at the direction of their supervisors testified that they did so with the retailer's permission. Further, one had not worked for USTC since 1987, before the challenged conduct began. USTC concedes, however, that four witnesses testified that they removed racks and POS materials without retailer authorization. Further, Conwood sales representatives **[**24]** testified that their USTC counterparts told them they had orders from their supervisors to eliminate Conwood racks or facings, and in **[*780]** some cases, their compensation or bonuses depended on such rack destruction.

**Damages**

Rosson testified that had Conwood not been subjected to USTC tactics, it would have had a national market share of approximately 22 to 23 percent. Rosson testified that he had carefully tracked Conwood's market share over the past 20 years. Conwood's actual market share in its first 10 years in the moist snuff industry was 11 percent. In the next decade, starting from 1990, that figure increased by roughly 2.5 **[***16]** percent. Rosson testified that the lack of growth that occurred during the second decade largely resulted from USTC's tactics. He testified that his numbers are based on his studying markets where the company had a foothold and those in which it did not. In places where the company had a "foothold," i.e., a relatively high market share in a given area, it saw its market share increase during the 1990s to a market share above 20 percent. Rosson testified that each additional point (one percent) of market share translates into approximately $ **[**25]** 10 million in annual profits.

Williams testified concerning Conwood's market share with respect to the ten retail locations for which USTC offered evidence at trial. In those locations where USTC did not have rack exclusivity, Conwood's moist brands market share was well above its national average. For those locations where USTC had rack exclusivity, Conwood's market share was below its national average. Conwood argues that from these figures, a jury could have concluded that in unimpeded competition, Conwood's market share would have been approximately 25 percent instead of 13.5 percent nationally.

Finally, to prove damages, Conwood relied on the expert testimony of Professor Richard Leftwich of the University of Chicago Graduate School of Business, who is recognized as an

expert on business valuation and lost profits. Leftwich apparently tested Rosson's hypothesis that Conwood's market share increased in areas in which it did not face USTC exclusivity.

Using a regression analysis, Leftwich found a statistically significant difference between states in which Conwood had a foothold and those in which it did not. Under Leftwich's model, in states where Conwood had a market share **[**26]** in 1990 of 20 percent or more, the market share grew on average an additional 8.1 percent from 1990 to 1997. In states where Conwood's market share in 1990 was at least 15 percent, it grew an additional 6.5 percent. In states below these **[***17]** thresholds, Conwood's growth was considerably lower. As the district court noted:

> Leftwich applied a regression analysis to test Conwood's hypotheses. He determined that Conwood's share in a state in 1990 is statistically related to the change in Conwood's market share between 1990 and 1997. The regression model predicts that where Conwood had a higher market share (e.g. 15-20%) in 1990, Conwood's market share grew during the period 1990 to 1997. In contrast, in states where Conwood had a lower market share, the regression predicts that its share would grow very little.(J.A. at 87-88.)

Leftwich then determined that Conwood's low market growth was due to USTC's behavior. Leftwich's model also found that increases in USTC's exclusionary behavior in a state reduced Conwood's share of sales by a statistically significant amount. He found that Conwood's damages as a result of USTC's actions amounted to a figure between $ 313 **[**27]** million and $ 488 million, depending on whether Conwood's market share would have grown by 6.5 percent or 8.1 percent. The jury awarded damages of $ 350 million.

**[*781] DISCUSSION**

**I.**

***HN1*** This Court reviews a district court's denial of a motion for judgment as a matter of law pursuant to _Fed. R. Civ. P. 50(b)_*de novo*. *Williams v. Nashville Network, 132 F.3d 1123, 1130 (6th Cir. 1997)* (citing *K & T Enterprises, Inc. v. Zurich Ins. Co., 97 F.3d 171, 175 (6th Cir. 1996))*. "***HN2*** In a federal question case, the standard of review for a _Rule 50_ motion based on sufficiency of the evidence is identical to that used by the district court. The evidence should not be weighed, and the credibility of the witnesses should not be questioned." *Williams, 132 F.3d at 1130-31*. Further, the evidence is **[***18]** viewed in the light most favorable to the non-movant, and all reasonable inferences are drawn in that party's favor. *Id. at 1131*. This Court should grant the motion only if "reasonable minds could not come to a conclusion other than one favoring the movant." *Id*. Our task also embodies assuring that the district court "indulged **[**28]** all presumptions in favor of the validity of the jury's verdict," and "refrained from interfering with [the] jury's verdict unless it [was] clear that the jury reached a seriously erroneous result." *Id*. (citing *Brooks v. Toyotomi Co., 86 F.3d 582, 588 (6th Cir. 1996))*.

***HN3*** This court considers the district court's decision to admit or exclude expert testimony for abuse of discretion, recognizing, of course, that such review calls for deference to the district court's decision. *See Clay v. Ford Motor Co., 215 F.3d 663, 666 (6th Cir. 2000)* (citing *General Elec. Co. v. Joiner, 522 U.S. 136, 138-139, 143, 139 L. Ed. 2d 508, 118 S. Ct. 512 (1997))*. Thus, we will reverse a district court only where we are left with a definite and firm conviction that it

committed a clear error of judgment. *Singleton v. United States, 277 F.3d 864, 870 (2002)* (citing *Trepel v. Roadway Express, Inc., 194 F.3d 708, 716 (6th Cir. 1999))*.

**II**.

USTC argues that the evidence presented at trial amounted to no more than "insignificant" tortious behavior and acts of ordinary marketing services. It contends that tortious **[**29]** activity cannot form the basis for liability under the Sherman Act unless "that activity is pervasive and accompanied by other anti-competitive conduct." USTC also argues that Conwood failed to show that it was foreclosed from the market, was unable to compete for shelf space, that competition among moist snuff suppliers was injured, or, generally, that any harm alleged was caused by anything other than competition itself. It contends that its category management services and promotional programs are common marketing practices. These services, among other things, (1) enhance demand for USTC's products and help to ensure that retailers use shelf **[***19]** space efficiently, (2) build consumer loyalty, and (3) improve presentation of the products. USTC states that trial testimony showed that, during the relevant period, retailers retained control of shelf space allocation, and which racks and POS materials were used. Further, during the relevant period (1990-1998), it argues that market output increased, its competitors' market shares doubled, and Conwood's sales and profits grew.

Conwood argues that the evidence in this case was sufficient to support the jury's verdict. Conwood contends **[**30]** that the jury heard and rejected USTC's argument that its conduct was ordinary "demand enhancing" business behavior. It argues that the evidence showed an "orchestrated USTC campaign to eliminate rival distribution and promotion with no competitive justification." Conwood argues that while **[*782]** USTC points to increased sales in the moist snuff market, it ignores the fact that in the "but for world of unimpeded competition, consumers and Conwood would have done substantially better." We agree with Conwood, and despite USTC's arguments in support of its position, we believe there was sufficient evidence to support the jury's verdict.

**III**.

***HN4*** A claim under *§ 2* of the Sherman Act requires proof of two elements: (1) the possession of monopoly power in a relevant market; and (2) the willful acquisition, maintenance, or use of that power by anti-competitive or exclusionary means as opposed to "growth or development resulting from a superior product, business acumen, or historic accident." *Aspen Skiing Co. v. Aspen Highlands Skiing Corp., 472 U.S. 585, 595-96, 86 L. Ed. 2d 467, 105 S. Ct. 2847 (1985)*; *Re/Max Int'l, Inc. v. Realty One, Inc., 173 F.3d 995, 1016 (6th Cir. 1999)* **[**31]** (citing *United States v. Grinnell Corp., 384 U.S. 563, 570-71, 16 L. Ed. 2d 778, 86 S. Ct. 1698 (1966))*. "***HN5*** To establish the offense of monopolization a plaintiff must demonstrate that a defendant either unfairly attained or maintained monopoly power." *Potters Med. Ctr. v. City Hosp. Ass'n, 800 F.2d 568, 574 (6th Cir. 1986)* (citation omitted); *Beverage Mgmt., Inc. v. Coca-Cola* **[***20]** *Bottling Corp., 653 F. Supp. 1144, 1151 (S.D. Ohio 1986)*. "Monopoly power consists of 'the power to control prices or exclude competition.'" *Potters, 800 F.2d at 574* (citing *Grinnell, 384 U.S. at 571*). "An attempted monopolization [under *§ 2*] occurs when a competitor, with a dangerous probability of success, engages in anti-competitive practices the specific design of which are, to build a monopoly or exclude or destroy competition." *Smith v. N. Michigan Hosps., Inc., 703 F.2d 942, 954 (6th Cir. 1983)* (citations and internal quotation marks omitted). ***HN6*** In a *§ 2* case, "only a thorough analysis of each fact situation will reveal whether the monopolist's conduct is

unreasonably anti-competitive and **[**32]** thus unlawful." *Byars v. Bluff City News Co., 609 F.2d 843, 860 (6th Cir. 1979)* (citations omitted); *see also* *Eastman Kodak Co. v. Image Technical Servs., Inc., 504 U.S. 451, 467, 119 L. Ed. 2d 265, 112 S. Ct. 2072 (1992)* ("This Court has preferred to resolve antitrust claims on a case-by-case basis, focusing on the particular facts disclosed by the record.") (citations and internal quotation marks omitted). Moreover, in order for a "completed" monopolization claim to succeed, the plaintiff must prove a general intent on the part of the monopolist to exclude; while by contrast, to prevail on a "mere" attempt claim, the plaintiff must prove a specific intent to "destroy competition or build a monopoly." *Tops Markets, Inc. v. Quality Markets, Inc., 142 F.3d 90, 101 (2d Cir. 1998)*. However, "no monopolist monopolizes unconscious of what he is doing." *Aspen, 472 U.S. at 602*. Thus, "improper exclusion (exclusion not the result of superior efficiency) is always deliberately intended." *Id. at 603* (citation omitted).

***HN7*** The first step in any action brought under *§ 2* of the Sherman Act is for the plaintiff **[**33]** to define the relevant product and geographic markets in which it competes with the alleged monopolizer, and with respect to the monopolization claim, to show that the defendant, in fact, possesses monopoly power. *Berkey Photo, Inc. v. Eastman Kodak Co., 603 F.2d 263, 268-69 (2d Cir. 1979)*. "A geographic market is defined as an area of effective competition." *Re/Max, 173 F.3d at 1016* (citation omitted). "It is the locale in which **[***21]** consumers of a product or service can turn for alternative sources of supply." *Id*.

In the instant case, USTC does not challenge that it has monopoly power; nor is there an issue as to the **[*783]** relevant product (moist snuff) and geographic markets (nationwide). [2] On appeal, USTC contends that Conwood has failed to establish whether USTC's power was acquired or maintained by exclusionary practices as opposed to its legitimate business practices, and a superior product. *Aspen, 472 U.S. at 595-97*. ***HN8*** In determining whether conduct may be characterized as exclusionary, "it is relevant to consider its impact on consumers and whether it has impaired competition in an unnecessarily restrictive way." *Aspen, 472 U.S. at 605*. **[**34]** "If a firm has been attempting to exclude rivals on some basis other than efficiency, it is fair to characterize its behavior as predatory [or exclusionary.]" *Id.* However, merely because an entity has monopoly power, does not bar it from taking advantage of its scale of economies because of its size. *Id. at* **[***22]** 597. Such advantages "are a consequence of size and not the exercise of monopoly power." *Id*.

**[**35]** USTC contends that none of the practices Conwood complains of amount to antitrust violations, but are no more than isolated sporadic torts. We disagree. Conwood presented evidence that beginning in 1990 USTC began a systematic effort to exclude competition from the moist snuff market. Conwood presented sufficient evidence that USTC sought to achieve its goals of

---

[2] ***HN9*** Whether a company has monopoly or market power "may be proven directly by evidence of the control of prices or the exclusion of competition, or it may be inferred from one firm's large percentage share of the relevant market." *Tops Market*, 142 F.3d at 97-98 (citation omitted); *see also* *Re/Max*, 173 F.3d at 1016 (citation omitted). "The material consideration in determining whether a monopoly exists is not that prices are raised and that competition is excluded, but that power exists to raise prices or to exclude competition when it is desired to do so." *Byars*, 609 F.2d 843, 850 (citations omitted). Courts have increasingly leaned toward using circumstantial evidence as a shortcut to determine whether monopoly power exists. *Re/Max*, 173 F.3d at 1016. Such circumstantial evidence may encompass a high market share within a defined market. *Id.* at 1018. At trial there was evidence that USTC enjoyed 74 to 77 percent market power nationwide in the moist snuff industry. As previously stated, USTC neither challenges this finding nor argues that it does not possess monopoly power. To that end, we agree with USTC that the monopolization and attempt to monopolize claims are coterminous inasmuch as USTC concedes monopoly power. *See* *Northeastern Tel. Co. v. American Tel. and Tel. Co.*, 651 F.2d 76, 85 (2d Cir. 1981) (explaining that where *ability* to exclude entry and control prices is present, the two offenses are coterminous).

excluding competition and competitors' products by numerous avenues. Conwood principally complains that USTC (1) removed racks from stores without the permission of store management and discarded and/or destroyed these racks, while placing Conwood products in USTC racks in an effort to bury Conwood's products and reduce their facings; (2) trained their "operatives to take advantage of inattentive store clerks with various 'ruses' such as obtaining nominal permission to reorganize or neaten the moist snuff section," in an effort to destroy Conwood racks; (3) misused its position as category manager by providing misleading information to retailers in an effort to dupe retailers into believing, among other things, that USTC products were better selling so that retailers would carry USTC products and discontinue carrying Conwood **[**36]** products; and (4) entered into exclusive agreements with retailers in an effort to exclude rivals' products.

***HN10*** Isolated tortious activity alone does not constitute exclusionary conduct for purposes of a *§ 2* violation, absent a significant and more than a temporary effect on competition, and not merely on a competitor or customer. *See* 3A Areeda & Turner, Antitrust Law, P 782(a), at 272 **[*784]** (2002). Business torts will be violative of *§ 2* only in "rare gross cases." *Id*. As USTC recognizes, however, this is not to say that tortious conduct may never violate the antitrust laws. *See e.g.*, *Byars, 609 F.2d at 854 n.30* (holding that acts by defendant, a wholesale periodical distributor, against a smaller company attempting to compete against it, may be deemed exclusionary, including removing plaintiff's periodicals from **[***23]** sales racks at various retail outlets, covering up plaintiff's periodicals on racks so that prospective buyers could not see them, and disparaging plaintiff, his financial condition and the magazine's financial condition); 3A Areeda & Turner, *supra*, P 782(a) at 272. Moreover, merely because a particular practice might be actionable under **[**37]** tort law does not preclude an action under the antitrust laws as well. *Id. at 271*. "'Anticompetitive conduct' can come in too many different forms, and is too dependent upon context, for any court or commentator ever to have enumerated all the varieties." *Caribbean Broad. Sys. Ltd. v. Cable & Wireless PLC, 331 U.S. App. D.C. 226, 148 F.3d 1080, 1087 (D.C. Cir. 1998)* (reversing district court's dismissal of complaint and holding that radio station owner stated *§ 2* Sherman Act claim where defendants' anti-competitive conduct consisted of making misrepresentations to advertisers and the government in order to protect their monopoly).

USTC contends that the rack and POS removal activity was isolated and sporadic. It contends that the record identifies a *de minimis* number of improper incidents. USTC points out that it has 600 sales personnel which made approximately 8 to 9 million sales calls during the 1990s. It argues that the district court "disregarded the fact that conduct and circumstances "differed greatly from chain to chain and store to store." *See* *In re Airport Car Rental Antitrust Lit., 474 F. Supp. 1072 (N.D. Cal. 1979)* (holding that **[**38]** rental car company would be required to prove damages on airport by airport basis for each airport for which plaintiff sought damages by reason of its exclusion).

In the instant case, the district court rejected USTC's argument, essentially describing it as impractical. At issue in this case are 300,000 separate retail establishments across the country. We believe the district court correctly determined that to have required the parties to investigate activity at specific retail establishments would have been so costly as to have effectively ended this suit, despite substantial evidence of anti-competitive activity. In addition, "***HN11*** in an action for **[***24]** damages for violation of the antitrust laws plaintiff is [not] limited to recover only for specific items of damage which he can prove with reasonable certainty. On the contrary, the trier of the facts may make a just and reasonable estimate . . . based on relevant data and may act upon probable and inferential . . . proof." *Elyria-Lorain Broad. Co. v. Lorain Journal Co., 358 F.2d 790, 793 (6th Cir. 1966)* (citation omitted).

It is undisputed that POS advertising and a manufacturer's ability to sell its moist **[**39]** snuff from its own racks are critical to success in the moist snuff market. *See* Byers, 609 F.2d at 860 (explaining that ***HN12*** only a case-by-case analysis of each fact situation will determine whether the monopolist's conduct is anti-competitive). Because of restrictions on advertising in the tobacco industry, and the critical nature of POS advertising in the relevant market, efforts by USTC, a conceded monopolist, to exclude Conwood's racks and POS advertising from retail locations through any means other than legitimate competition could certainly support Conwood's § 2 Sherman Act claim. *See* Aspen, 472 U.S. at 605. Conwood presented evidence that USTC sales representatives continuously removed and discarded Conwood POS and racks after 1990 without **[*785]** store authorization. While the number of witnesses who actually testified was limited, the acts testified to were widespread. Douglas Hyaneck, a Conwood district manager, testified that when he served as a sales representative, he had trouble with rack removals in his stores in the northern Michigan area. He also stated that from the time he became a district manager until 1998, 40 to 50 percent of his sales **[**40]** staff's time was spent replacing racks. Gary Ryan, another Conwood sales representative in the Sikeston, Missouri area, says that about 1,200 of his racks were removed. He stated that the problem continued even after a new USTC sales representative was hired in his area. Both men testified that their racks were removed by USTC sales representatives. John Falevsky, a Conwood sales representative in the Milwaukee, Wisconsin and Southeastern Wisconsin area, and Sales Representative Jeffrey Dring also **[***25]** testified about rampant incidents of rack removal by USTC representatives in their areas. Falevsky testified that he once approached his USTC counterpart about the matter and was told that the latter's bonus depended on how many Conwood racks he could get out of the stores. There is no indication that any of these acts were authorized by the stores at which they occurred. Morever, Rosson, Conwood's Chairman, testified that he would receive estimates that as much as 50 percent of his employees' time was being spent on repairing damaged or discarded racks. He stated that some months, beginning in 1990, Conwood was spending as much as $ 100,000 a month to replace racks, which constituted **[**41]** as many as 20,000 racks a month being replaced. USTC did not challenge any of this evidence at trial. Construing the evidence in the light most favorable to Conwood, these incidents were neither sporadic nor isolated. *Cf.* *Abcor Corp. v. AM Int'l, Inc., 916 F.2d 924, 931 (4th Cir. 1990)* (holding that "'sporadic activity' identified by the plaintiffs does not amount to an antitrust violation").

In terms of retailer testimony, Gayleen Rusk, who manages an Amoco Pronto Express, testified that she had experienced a USTC sales representative removing Conwood's racks and putting its products in the USTC rack. She testified that she allowed it to happen when she first started working at the store because she did not know any better. Upon learning that the USTC representative was not supposed to bother competitors' racks, she would tell him not to do so when he visited the store. She stated that he would then come when she was not on duty and remove Conwood's rack. Three other store witnesses also testified that they had seen or experienced USTC representatives removing Conwood racks.

Conwood also alleged that USTC used its role as category captain and/or manager to exclude **[**42]** competition. USTC points out that retailers testified that they alone, not USTC, determined and controlled what racks and POS were used in their stores. Conwood's Rosson admitted that he could not name one store that gives final decision-making power over **[***26]** its snuff section to his company's competitors. Other retailers verified this assertion. Kroger's Luckett testified that USTC did not receive all the facings in the plan-o-grams that it requested and that Kroger's retains ultimate authority about product placement. Retailer Paul McGuire also testified that he welcomed input from suppliers but retained final authority about product placement.

However, there was other evidence, which USTC ignores, that USTC used its position as category manager to exclude competition by suggesting that retailers carry fewer products, particularly competitor's products; by attempting to control the number of price value brands **[*786]** introduced in stores; and by suggesting that stores carry its slower moving products instead of better selling competitor products. Much of the evidence Conwood highlights was documentary, interpreted by experts. However, that evidence is nevertheless probative of USTC's **[**43]** intent to exclude competition. [3]

In one such instance, Blattberg opined that an e-mail sent by a USTC regional vice president and USTC director of national accounts showed that the company abused its position of category manager. The e-mail stated that USTC believed it could continue to be the category captain in certain stores in the Texas area, and "we may be able to control the number of price value product introductions **[**44]** and their pursuit of a private label brand." (J.A. at 1610.) Blattberg testified that the significance of this document is that it shows that USTC planned to control competition. It shows USTC **[***27]** intended to control the number of price value brands and other products, which he stated meant that if USTC could convince retailers not to stock those items, the result would be to prevent rapidly growing or lower priced items from entering the marketplace. He testified that this is not consistent with the concept of category management, which is based on trust.

As for other abuses, Blattberg noted that the 1997 weekly activity report from a USTC division manager in Houston to a department manager stated that the company was receiving pressure from retailers to drop "Flavor Packs" in accounts where USTC was discontinuing competitive brands due to slow movement. (J.A. at 2559.) The report states:

> Last week at Fiesta Supermarkets, I was able to get them to drop all competitive brands (12 total) and keep only Redwood and Kodiak. The buyer argued with me that we should be dropping Flavor Packs too because FP are selling less than most of the products we discontinued despite **[**45]** our counter displays. We were able to maintain our counter display and the product, but he makes a very valid point that we are not being total [sic] honest with our partners when we sell them on share for space concept if we don't include our poor selling brands in the mix. I am afraid that we are using up our partnerships and good will when we talk about partnerships and sell our concept only to turn right around and ask them to go against what we just convinced them was in their best interest just to keep Flavor Packs in account. *Id.* Blattberg testified that this document shows that USTC tried to gerrymander the data to this retailer. (J.A. at 1614.) Again, he opined that such practices violate the trust central to a category management relationship. Further, such evidence counters USTC's argument that only retailers controlled facing decisions.

**[***28]** Conwood does not appear to challenge USTC's role as category manager *per se*, but rather the manner in which it used its position as a monopolist providing category management

---

[3] USTC complains that Conwood was allowed to rely on numerous hearsay documents that detailed conduct that is routinely rejected as not being very probative of anti-competitive intent and that showed nothing more than statements about competitive objectives. However, ***HN13*** experts are entitled to rely on documents, even hearsay documents that are otherwise inadmissible. *Kingsley Associates, Inc. v. Del-Met, Inc.*, 918 F.2d 1277, 1286-87 (6th Cir. 1990) (holding that Federal Rules allow experts to base their opinions on hearsay and other evidence otherwise inadmissible at trial).

services, i.e., to exclude it from competition. *See Aspen, 472 U.S. at 605* (explaining that ***HN14*** excluding rivals on a basis **[**46]** other than efficiency may be characterized as predatory or anti-competitive); *see also Eastman Kodak,* **[*787]** 504 U.S. at 483 (holding that under the willful-maintenance-of-monopoly power prong, defendant's liability in *§ 2* Sherman Antitrust claim turned on whether defendant could present a "valid business reason[] for its exclusionary conduct). [4] As explained above, Conwood presented evidence that the **[***29]** category management program was used to place USTC racks exclusively in retail stores and hide competitor products in its racks. *See e.g.,* J.A. at 2375 ("Even though Conwood does not like the fact that we sometimes house their product in our vending, I have encountered more and more retailers that are surprised when I include the competition's products. I feel it is better for them to be lost in our vending then to have their own and no point of sale on the vendor.").

**[**47]** USTC's chairman Gierer testified that if his company's "goal . . . was to go into a store and reduce . . . competitive facings, then that shouldn't have happened. That's not a legitimate goal." Yet, Gierer later admitted that his company had endorsed a "strategy of eliminating competitive distribution." (J.A. at 2024.) Despite USTC's claims that its actions amounted to no more than competition and that "everybody does it," Gierer admitted that he was embarrassed by some of the testimony presented at trial, especially the testimony of Mr. Untiedt, USTC's director of national accounts, who apparently could not answer whether it was appropriate to mislead retailers. Gierer further testified that as a result of the evidence presented at trial, he was going to conduct an investigation into his company's practices. Gierer essentially admitted that the activities about which Conwood complains, particularly the misrepresentations to retailers to obtain exclusive vending, was not competitive conduct spurred by efficiency. Moreover, USTC has failed to offer any valid business reason for its representatives' pervasive destruction of Conwood racks. Instead, it merely has chosen to argue that **[**48]** such destruction can never form the basis for an antitrust claim.

The evidence Conwood presented in this case regarding USTC's exclusionary conduct must be considered in the context of Conwood's theory. *See Caribbean Broad.* **[*788]** *Sys.,148 F.3d at 1087*. The theory Conwood advanced at trial is that USTC engaged in a concerted effort, directed from the highest levels of a national monopoly, to shut Conwood out from effective competition through the elimination of its racks and **[***30]** POS advertising, all in the unusual moist snuff market, where POS is the central marketplace battleground. *See e.g., R.J. Reynolds Tobacco Co. v. Phillip Morris Inc.*, 60 F. Supp. 2d 502 (M.D.N.C. 1999) (granting preliminary injunction

---

[4] To the extent that USTC complains that evidence of its unlawful anti-competitive conduct, and its lawful conduct to take advantage of scale of economies, offer category management services or engage in other promotional activity in general were commingled, the district court properly instructed the jury that USTC could not be held liable for conduct that was part of the normal competitive process. The jury is deemed to have followed these instructions. *Aspen*, 472 U.S. at 604-05. In addition to that argument, USTC also contends that Conwood has failed to show that its practices foreclosed competition. It further contends that its exclusive dealing arrangements with retailers cannot be invalid, absent a "particularized showing of unreasonableness." *See, e.g., Tri-State Rubbish, Inc. v. Waste Mgmt., Inc.*, 998 F.2d 1073, 1080 (1st Cir. 1993) (explaining that a complaint that alleges, *inter alia*, no more than exclusive dealing arrangements may be susceptible to dismissal for failure to state a claim). However, Conwood's claim is broader than merely challenging the exclusive agreements USTC entered into with retailers for exclusive racks. As explained in the text of this opinion, among other things, Conwood presented evidence that USTC pervasively destroyed Conwood's racks, and used its monopoly power to misrepresent sales activity of moist snuff products for purposes of obtaining exclusive racks and to bury competitors' products therein, all of which affected competition in the moist snuff market. Moreover, Conwood's claims are distinguishable from those asserted in several of the cases USTC cites, wherein plaintiffs alleged that exclusive arrangements violated § 3 of the Clayton Act, 15 U.S.C. § 14 or other sections of the antitrust statutes. *See e.g., Omega Envtl., Inc. v. Gilbarco, Inc.*, 127 F.3d 1157, 1162 (9th Cir. 1997) (holding that "only those arrangements whose 'probable' effect is to 'foreclose competition in a substantial share of the line of commerce affected' violate Section 3").

barring cigarette manufacturer in *§ 2* action from implementing program with retailers that would allow its product to hold most visible position in sales racks; and noting that in cigarette market product visibility and advertising at the point of purchase are essential to remaining competitive). There was ample documentary and testimonial evidence supporting this theory. The jury could have found, and apparently did find, that USTC's pervasive **[**49]** practice of destroying Conwood's racks and POS materials and reducing the number of Conwood facings through exclusive agreements with and misrepresentations to retailers was exclusionary conduct without a sufficient justification, and that USTC maintained its monopoly power by engaging in such conduct. Therefore, the district court did not err in holding that there was sufficient evidence for a jury to find willful maintenance of monopoly power.

**IV.**

USTC argues that Conwood has failed to show that it or competition was harmed in the national moist snuff sales market. It argues that there was no injury to competition because the number of moist snuff brands actually increased during the 1990s, including the price-value products. It also argues that no injury to competition in the moist snuff market is shown because during the same period, other tobacco products decreased. USTC argues that where the market has actually expanded, there can be no showing of injury to competition. Further, USTC argues that Conwood has failed to show injury. It argues that during the relevant period, Conwood's market share actually increased. It also argues that there were other factors in the market, **[**50]** such as retailers' choices not to display Conwood's racks and POS, that caused Conwood's injury.

**[***31]** Conwood counters that it produced expert testimony showing that USTC's exclusion of rivals' POS racks and facings caused an increase in prices, reduced sales and limited choice. It also claims that but for USTC's actions, the market would have grown more. Finally, it argues that the fact that its own profits increased during the relevant period is not dispositive of the issue of injury.

***HN15*** The antitrust laws are intended to protect competition, not competitors. *See Andrx Pharmaceuticals, Inc. v. Biovail Corp. Intern., 256 F.3d 799, 812 (D.C. Cir. 2001)* (citation omitted); *Tennessean Truckstop, Inc. v. NTS, Inc., 875 F.2d 86, 88 (6th Cir. 1989)* (citations and internal quotation marks omitted). To prevail, a "plaintiff[] must prove antitrust injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes the defendants' acts unlawful." *Valley Prods. Co., Inc. v. Landmark, A Division of Hospitality Franchise Sys., Inc., 128 F.3d 398, 402 (6th Cir. 1997)* (citation omitted). **[**51]** Specifically, to recover damages, an "antitrust plaintiff must show (1) that the alleged violation tends to reduce competition in some market and (2) that the plaintiff's injury would result from a decrease in that competition rather than from some other consequence of the defendant's actions." *Id.* An antitrust plaintiff bears the burden of showing that the alleged violation was a material cause of its injury, a substantial factor in the occurrence **[*789]** of damage or that the violation was the proximate cause of the damage. *See Ezzo's Inv., Inc. v. Royal Beauty Supply, Inc., 243 F.3d 980, 990 (6th Cir. 2001)*. As this Court stated,

> ***HN16*** although a plaintiff need not show that the defendant's wrongful actions were the sole proximate cause of his injuries, the causal link must be provided as a matter of fact and with a fair degree of certainty. To be one of several causes is not enough. The evidence linking the violation to the injury must be more precise than that needed to establish the amount of damages.

**[***32]** *Id*.

USTC first argues that Conwood failed to show harm to competition in the market because output increased and new products were introduced **[**52]** into the market. There was evidence at trial that total market output increased in the moist snuff industry during the relevant period. Between 1990 and 1999, overall sales volume of moist snuff increased 16 million pounds. Also, during this period, new products entered the market, and by 1999, there were 40 brands of moist snuff, 24 of which came from USTC competitors. (J.A. at 474-76.) In *Omega Envtl., Inc. v. Gilbarco, Inc., 127 F.3d 1157 (9th Cir. 1997)*, the Ninth Circuit held that antitrust plaintiffs had failed to produce "credible evidence to support their contention" that the defendant's actions had "deterred entry into this market," because during the relevant period industry output in the relevant market had substantially expanded. *Id. at 1164*; *see also* *Campus Ctr. Discount Den, Inc. v. Miami Univ., 1997 U.S. App. LEXIS 12017*, No. 96-4002, 1997 WL 271742, at *2 (6th Cir. May 21, 1997) (holding that convenience store plaintiff failed to state a claim under the antitrust laws because it failed to show that any alleged anti-competitive conduct on behalf of the defendant reduced overall demand for convenience store market).

Conwood, however, argues that **[**53]** the issue is whether the market would have grown more absent USTC's antitrust violation. In *Brook Group Ltd. v. Brown & Williamson Tobacco Corp., 509 U.S. 209, 125 L. Ed. 2d 168, 113 S. Ct. 2578 (1993)*, the evidence showed that following the defendant's alleged predation, output in the relevant market and market shares for others grew. *509 U.S. at 233-34*. The Court stated, however, that the fact that the defendant's entry in the market did not restrict output was not dispositive. *Id. at 234*. "One could speculate . . . that the rate of growth would have tripled, instead of doubled [absent the] alleged predation." *Id. at 234*. However, the Court stated that there was no evidence that this was so. *Id*.

**[***33]** In the instant case, Kamien, Conwood's expert, testified that as a result of USTC's exclusionary conduct, the consumer suffered by having to pay higher prices, and that there was less variety in the market. (J.A. at 525.) The district court noted that much of the evidence regarding injury to competition was based, in part, on Kamien's testimony, which the jury obviously believed. Thus, although output in the **[**54]** moist snuff market grew, there was evidence showing that USTC's actions caused ***HN17*** higher prices and reduced consumer choice, both of which are harmful to competition. *See* *Brook Group, 509 U.S. at 234*. Conwood's market share did grow slightly between 1990 and 1998; however, growth during that period, which was about 2.5 percent, stands in stark contrast to the growth in market share of approximately 11 percent that Conwood experienced in the ten years prior to 1990. In addition, Swedish's chairman also testified that USTC's activity restricted its growth. He testified that USTC used its power "to keep [Swedish's] products off the shelf, and once it's there **[*790]** to get rid of it . . . ." Thus, there was sufficient evidence that during the relevant period, the growth of two of the three other manufacturers of moist snuff aside from USTC slowed, and that the restricted growth resulted from USTC's conduct. In addition, Kamien testified that since 1990, no new firm had entered the moist snuff market, which he found odd because of the high amount of potential profit at stake in that market and the fact that USTC was the most profitable company in the country. He further testified **[**55]** that had there been true competition in the moist snuff market, USTC's market share, which dropped approximately 1 percent per year between 1979 and 1990, would have fallen much faster. We believe that construing the evidence in the light most favorable to Conwood, as we must, it was sufficient to show that competition suffered during the relevant period. *Williams, 132 F.3d at 1131*.

USTC also argues that its conduct was not the "necessary predicate" of any injury Conwood suffered, and thus Conwood cannot recover under the antitrust laws. USTC argues that any injury Conwood suffered was the result of **[***34]** retailers' decisions to enter into contracts with it and others to serve as category managers. For support, USTC primarily relies on *Valley Products, 128 F.3d 398*. In that case, a plaintiff who made and sold soap for use in hotels and motels under franchises granted by defendants brought suit under the Clayton Act, *15 U.S.C. § 15*, when plaintiff was denied permission to continue using on its items logos owned by the defendants. *128 F.3d at 400-01*. The defendants had ended their agreement with plaintiff after **[**56]** it granted two other manufacturers "preferred supplier status," which meant they alone could place the trademarks owned by one of the defendants on their amenities. *Id.* This Court affirmed the district court, which found that the plaintiff had not shown an antitrust injury. *Id. at 400*. This Court noted that ***HN18*** to show antitrust injury, the plaintiff must show more than economic injury. *Id. at 402*. The Court stated that an analysis of the "the directness or indirectness of the injury was appropriate." *Id. at 403*. The Court noted that an injury does not exist for purposes of antitrust suits if it does not flow directly from the antitrust violation. *Id.* The Court found no injury because the violation alleged was not the "necessary predicate" of the plaintiff's injury. *Id. at 404*. The injury did not flow directly from the defendants' actions, but rather, the plaintiff's loss of sales resulted from the cancellation of the agreement to use the trademarks, which defendants had a right to do, and not from any anti-competitive activity.

USTC argues in this case that Conwood's injury flowed from the retail agreements that **[**57]** granted exclusive rights to USTC and to others at the expense of Conwood. This argument is unconvincing because there was evidence that Conwood's injury flowed directly from USTC's unauthorized removal and destruction of its racks and POS. Conwood's Rosson also testified that USTC's activity restricted its growth. There was evidence that USTC and not retailers controlled facing decisions and that in making those decisions, USTC sales representatives purposely attempted to bury Conwood's products in USTC racks. (*See e.g.*, J.A. at 2375.) Further, there was evidence that USTC **[***35]** misrepresented the sales activity of its own products to retailers in order to increase the number of facings of its slower moving products despite the fact that other brands by its competitors, including those of Conwood, were better selling. Such activity encompasses the anti-competitive acts about which Conwood complains. Thus, there was sufficient evidence showing that Conwood's injury did flow from USTC's **[*791]** anti-competitive activity. *Valley Products, 128 F.3d at 404*. Further, ***HN19*** while the link between the injury and violation must be "proved as a matter of fact and with a fair degree **[**58]** of certainty," it need not be the "sole proximate cause." *See Ezzo's, 243 F.3d at 990*. In sum, there was sufficient evidence for a jury to find that USTC's anti-competitive activity harmed competition in the moist snuff market and Conwood; and USTC is not entitled to judgment as a matter of law on this ground.

**V.**

USTC challenges the district court's decision to allow Leftwich to testify as to the damages sustained by USTC's conduct. USTC argues that the district court made no findings regarding the admissibility of Leftwich's report under *Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 125 L. Ed. 2d 469, 113 S. Ct. 2786 (1993)*. USTC argues that Leftwich's methodology fails because it was constructed solely for this case. USTC also argues that Leftwich's study did not attempt to segregate the effects of other factors that could have contributed to Conwood's low sales in some states, and it made no attempt to test whether the slow growth in certain states was

causally linked to any of USTC's conduct. Thus, USTC argues the study did not and could not fit the case at hand.

As a preliminary matter, Conwood argues that USTC waived any challenge **[**59]** to Leftwich's testimony because after the district court ruled that Leftwich's testimony was admissible on a preliminary basis, the court explained that USTC could contest Leftwich's testimony at trial. Conwood asserts that because USTC failed to object to Leftwich's **[***36]** testimony at trial, it has waived our review of the district court's decision to allow Leftwich to testify. We disagree. [5]

USTC filed a motion in limine challenging the admissibility **[**60]** of Leftwich's testimony, and the district court correctly concluded that its admissibility was governed by the Supreme Court's opinion in *Daubert*. *See* *Nelson v. Tennessee Gas Pipeline Co., 243 F.3d 244, 250 (6th Cir. 2001)*. The district court considered USTC's arguments regarding admissibility under *Fed. R. Evid. 702*, pertaining to the admissibility of expert witnesses, and found that "Leftwich's testimony satisfies *Daubert*." (J.A. at 90.) USTC also argued that Leftwich's testimony should be excluded under *Rule 403* because it lacked probative value and would mislead the jury. [6] Specifically, USTC challenged the factual assumptions that Leftwich tested. The district court held that it could not at that time say that Leftwich's assumptions had no basis in fact, but that USTC might prove differently at trial. In *United States v. Brawner, 173 F.3d 966 (6th Cir. 1999)*, we held that ***HN21*** where a trial court has made a definitive ruling on the record of the evidentiary issues to be decided, and has not indicated that the ruling is subject to other circumstances or evidence, then **[*792]** counsel need not renew the objection at the time the evidence is offered **[**61]** at trial to preserve the error for appeal. *Id. at 970*; *see also* *Fed. R. Evid. 103(a)(2)* (***HN22*** holding that once a **[***37]** court makes a *definitive* ruling on the record to either admit or exclude evidence, at or before trial, a party need not renew an objection at trial to preserve any alleged error for appeal). In the instance case, the district court's opinion unequivocally stated that "Leftwich's testimony satisfies *Daubert*." Moreover, after Conwood rested its case, USTC moved for judgment as a matter of law challenging the assumptions of Leftwich's damages theory. We therefore do not believe that USTC waived appellate review of Leftwich's damages theory. [7]

**[**62]** USTC does not challenge Leftwich's qualifications as an expert, but only his testimony and damages study. ***HN23*** Pursuant to *Rule 702 of the Federal Rules of Evidence*, "if scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience,

---

[5] However, apparently for the first time on appeal, USTC argues that Leftwich's regression model cannot be tested, is not subject to ascertainable rate of error and has no basis in the literature. These arguments were not raised below and may not be asserted now on appeal. *See White v. Anchor Motor Freight, Inc.*, 899 F.2d 555, 559 (6th Cir. 1990) (noting that ***HN20*** this Court reviews the case presented to the district court, and not a better one fashioned on appeal, and will not decide issues the parties failed to litigate before the district court).

[6] *Fed. R. Evid. 403* provides: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

[7] We also note that even if USTC had failed to adequately preserve this issue, we would still review it for plain error, and USTC would only be entitled to relief if we determined that its "substantial rights" had been affected. *Brawner*, 173 F.3d at 970 (citations omitted). Regardless of whether we review the issue for plain error or for abuse of discretion, as we explain in the text of this opinion, we believe that the district court did not err in allowing Leftwich to testify regarding the damages Conwood sustained.

training, or education, may testify thereto in the form of an opinion or otherwise . . . ." *Fed. R. Evid. 702*. In *Daubert*, ***HN24*** the Supreme Court "established a general gatekeeping [or screening] obligation for trial courts" to exclude from trial expert testimony that is unreliable and irrelevant. *Hardyman v. Norfolk & W. Ry. Co., 243 F.3d 255, 260 (6th Cir. 2001)* (citation and internal quotation marks omitted). The district court must determine whether the evidence "both rests on a reliable foundation and is relevant to the task at hand." *Id*. (citation omitted). In assessing relevance and reliability, the district court must examine "whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand **[***38]** or determine a fact in **[**63]** issue." *Jahn v. Equine Servs., PSC, 233 F.3d 382, 388 (6th Cir. 2000)* (citations omitted). This involves a preliminary inquiry as to whether the reasoning or methodology underlying the testimony is scientifically valid and whether that reasoning or methodology properly can be applied to the facts in issue. *Id.* (citation and internal quotation marks omitted). Some of the factors that may be used in such an inquiry include: (1) whether the theory or technique has been tested and subjected to peer review and publication, (2) whether the potential rate of error is known, and (3) its general acceptance. *Hardyman, 243 F.3d at 260*. "This inquiry is a flexible one, with an overarching goal of assessing the 'scientific validity and thus the evidentiary relevance and reliability' of the principles and methodology underlying the proposed expert testimony." *United States v. Langan, 263 F.3d 613, 621 (6th Cir. 2001)* (citation omitted). "[***HN25*** A] trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable." *Kumho Tire Co., LTD v. Carmichael, 526 U.S. 137, 152, 143 L. Ed. 2d 238, 119 S. Ct. 1167 (1999)*; **[**64]** *see also Jahn, 233 F.3d at 388* (explaining that *Daubert* made clear that *Rule 702* relaxes the "traditional barriers" to admitting opinion testimony).

USTC presents no reasoned basis for us to find that the district court abused its discretion in determining that Leftwich's methodology was sufficiently **[*793]** reliable or relevant to survive a *Daubert* challenge. USTC asserts two principal challenges to Leftwich's study and testimony. USTC claims that Leftwich did not relate any of Conwood's loss to specific bad acts by USTC and failed to account for other factors that could have had a negative effect on Conwood's sales. Leftwich used a regression analysis to test Rosson's hypothesis that Conwood's growth was suppressed most in states where it had only a small market share when USTC began its exclusionary practices. He also tested whether the intensity of USTC's misconduct increased in or around 1990. Rosson testified that once his company reached a 15 percent **[***39]** market share, USTC's exclusive vending practices were not as effective.

Leftwich employed three methods to test Conwood's claims: ***HN26*** regression analyses, a yardstick test and a before-and-after test. All **[**65]** three are generally accepted methods for proving antitrust damages. *See e.g., Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co., 998 F.2d 1224, 1238 (3d Cir. 1993)* (explaining that if performed properly multiple regression analysis is a reliable means by which economists may prove antitrust damages); *Eleven Line, Inc. v. North Texas State Soccer Ass'n, 213 F.3d 198, 207 (5th Cir. 2000)* (noting that the two most common methods of quantifying antitrust damages are the "before and after" and "yardstick" measures of lost profits). [8]

---

[8] "The before and after theory compares the plaintiff's profit record prior to the violation with that subsequent to it [and] the yardstick test . . . consists of a study of the profits of business operations that are closely comparable to the plaintiff's." *Eleven Line, Inc.*, 213 F.3d at 207 n.17. A regression analysis looks at the relationship between two variables. *Rollins v. Fort Bend Independent School Dist.*, 89 F.3d 1205, 1210 n.6 (5th Cir. 1996). The point of a regression analysis is to determine whether the relationship

**[**66]** Leftwich found a statistically significant difference in Conwood's market share between those states in which Conwood had a foothold and those in which it did not. In those states in which Conwood enjoyed a market share of 15 and 20 percent or more, Conwood grew in share, between 1990 and 1997, on an average of 6.5 percent and 8.1 percent, respectively. He concluded that but for USTC's exclusionary acts, Plaintiff's market share would have grown by these same amounts in non-foothold states. Contrary to USTC's arguments, the record indicates that Leftwich ruled out the possibility that the statistical relationship was caused by factors other than USTC's conduct. We find particularly relevant the undisputed evidence that Leftwich examined the **[***40]** possible explanations that USTC's own expert suggested as possible explanations for Conwood's low market share. Leftwich testified that he tested all "plausible explanations" for his results for which he had data. Employing a regression analysis, Leftwich analyzed whether these other factors could explain Conwood's laggard growth in non-foothold states and concluded that they could not.

Leftwich also employed a before-and-after test **[**67]** to investigate Conwood's claims. Specifically, he tested whether the relationship between Conwood's share of moist snuff sales in a state and the rate of growth in Conwood's share of sales in that same state was the same or different for the seven year period before 1990 as it was for the seven year period after 1990. He found that Conwood's moist snuff market share did not grow significantly more in foothold states in the seven year period before 1990. Thus, there was no correlation in the pre-1990 period between Conwood's **[*794]** foothold status and market share growth rate.

Further, Leftwich employed a yardstick test to examine whether in the related loose leaf tobacco market, in which USTC does not participate, Conwood would always grow more in states where they started out with a high market share. He did not find a statistically significant relationship in Conwood's increase in market share in the loose leaf market between 1990 and 1997 and its share in 1990. In other words, where Conwood enjoyed a high market share or foothold in 1990 in the loose leaf market, it did not necessarily grow more in the period between 1990 and 1997.

USTC complains that Leftwich failed to take into account **[**68]** any USTC "bad act." However, this is not completely accurate. Using USTC's expert's own regression model, Leftwich used sworn affidavits compiled from 241 Conwood sales representatives detailing USTC's unethical activity in their areas. He used this information to construct three alternate measures of USTC's bad acts by state. (J.A. at 4415.) Thus, his damages study was relevant to the issues of **[***41]** this case. *See* *Jahn v. Equine Servs, PSC, 233 F.3d 382, 388 (6th Cir. 2000)* (***HN27*** testimony is relevant where there is a valid connection to the pertinent inquiry).

USTC also complains that Leftwich's regression analysis ignored other market variables that could have caused Conwood's harm. However, as explained above, Leftwich ruled out all plausible alternatives for which he had data. Moreover, he accounted for all variables raised by USTC's own expert. In any event, "***HN28*** in order to be *admissible* on the issue of causation, an expert's testimony need not eliminate all other possible causes of the injury." *Jahn, 233 F.3d at 390* (emphasis added); *see also* *Bazemore v. Friday, 478 U.S. 385, 400, 92 L. Ed. 2d 315, 106 S. Ct. 3000 (1986)* **[**69]** (failure to include variables will normally affect the analysis' probativeness, not its admissibility). In sum, after reviewing the record and giving due deference to the district

---

between the two variables is statistically meaningful. *Engineering Contractors Ass'n of South Florida Inc. v. Metropolitan Dade County, 122 F.3d 895, 917 (11th Cir. 1997).*

court's decision, we believe that the district court did not abuse its discretion in concluding that Leftwich's study satisfied *Daubert* and allowing him to testify, subject to vigorous cross examination and an opportunity for Defendant to introduce countervailing evidence of its own. *See* *Daubert, 509 U.S. at 596* (holding that "***HN29*** vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence") (citation omitted).

Finally, USTC contends that Rosson's testimony regarding damages and Leftwich's study were speculative and failed to support the damages awarded. We disagree. USTC essentially argues that a more rigorous standard of proof of damages was warranted. However, it is undisputed that USTC did not object to the jury instructions regarding damages. The jury was instructed that it could not award damages for injuries caused by other factors. As ***HN30*** juries are presumed **[**70]** to follow the instructions given, we reject USTC's argument that Conwood failed to disaggregate the injury caused by USTC as opposed to that caused by other factors. *See* *Aspen, 472 U.S. at 604-05*.

**[***42]** In addition, ***HN31*** an award of damages may be awarded on a plaintiff's estimate of sales it could have made absent the antitrust violation. *J. Truett Payne Co., v. Chrysler Motors Corp., 451 U.S. 557, 565, 68 L. Ed. 2d 442, 101 S. Ct. 1923 (1981)*. While USTC demands a more exacting standard, "the vagaries of the marketplace usually deny us sure knowledge of what plaintiff's situation would have been **[*795]** in the absence of the defendant's antitrust violation." *451 U.S. at 566*. "The antitrust cases are legion which reiterate the proposition that, if the fact of damages is proven, the actual computation of damages may suffer from minor imperfections." *South-East Coal Co. v. Consolidation Coal Co., 434 F.2d 767, 794 (6th Cir. 1970)* (citation omitted).

We believe that there was sufficient evidence to support the jury's award of damages in this case. There was testimony that absent USTC's unlawful conduct, Conwood would have achieved **[**71]** market share in the mid-20s. For instance, Rosson testified that had Conwood not been subjected to USTC tactics, it would have had a national market share of approximately 22 to 23 percent. Rosson testified that he had carefully tracked the growth of Conwood's market share over the past 20 years, and its sharp decline in the 1990s was largely due to USTC's tactics. Williams, Conwood's national sales manager, also testified that in those stores where USTC practiced rack exclusivity, Conwood's market share was well below its national average. Such evidence supported Leftwich's damages analysis, and he estimated that Conwood's damages ranged between $ 313 million and $ 488 million. The jury awarded damages well within that range. Although USTC argues that there was evidence that undermined Rosson's testimony regarding whether USTC's conduct caused Conwood's injury, the jury heard all of the evidence presented to it, and apparently found other testimony supporting the award of damages more credible. *South-East Coal Co., 434 F.2d at 794* (explaining that whether plaintiff's losses resulted from defendants' conduct or other market factors was for the jury to determine, as **[**72]** was witness credibility). In sum, we believe that there was sufficient evidence to sustain the award in this case.

**[***43] CONCLUSION**

The district court did not err in submitting this case to the jury and denying USTC's motion for judgment as a matter of law. Conwood presented sufficient evidence that USTC's conduct rose above isolated tortious activity and was exclusionary without a legitimate business justification.

The evidence also sufficiently showed that USTC's actions injured Conwood and competition in the moist snuff market. Finally, the district court did not abuse its discretion in admitting the testimony of Conwood's damages expert, subject to cross examination and presentation of countervailing evidence. Therefore, we **AFFIRM**.

EXHIBIT 264

LexisNexis

Warning
As of: August 12, 2014 9:09 AM EDT

# Curtis Mfg. Co. v. Plasti-Clip Corp.

United States District Court for the District of New Hampshire
November 21, 1994, Decided
Civil No. 89-430-SD

**Reporter:** 888 F. Supp. 1212; 1994 U.S. Dist. LEXIS 16699
Curtis Manufacturing Company, Inc. v. Plasti-Clip Corporation, et al

**Core Terms**

patent, infringement, clip, summary judgment, finger, spring, plaintiffs', arm, summary judgment motion, defendants', monopolize, holder, conversion, inventor, patent infringement, confirmation, parties, jaws, cause of action, invention, specific intent, post-confirmation, exemption, drawing, antitrust, genuine, rights, unfair, cases, court finds

**LexisNexis® Headnotes**

Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > General Overview
Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > Genuine Disputes
Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > Materiality of Facts

***HN1*** See *Fed. R. Civ. P. 56(c)*.

Civil Procedure > ... > Summary Judgment > Burdens of Proof > General Overview
Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > General Overview
Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > Appropriateness
Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > Genuine Disputes

***HN2*** Since the purpose of summary judgment is issue finding, not issue determination, a court's function is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial. Although summary judgment may well be appropriate if the nonmovant chooses to merely rely upon some combination of conclusory allegations, improbable inferences, and unsupported speculation, the entire record will be scrutinized in the light most favorable to the nonmovant, with all reasonable inferences indulged in that party's favor.

Civil Procedure > ... > Summary Judgment > Burdens of Proof > General Overview
Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > General Overview

***HN3*** A summary judgment movant must put the ball in play, averring an absence of evidence to support the nonmoving party's case. The burden then shifts to the nonmovant to establish the existence of at least one factual issue which is both genuine and material. A "genuine" issue is one that properly can be resolved only by a finder of fact because it may reasonably be resolved in favor of either party. Put another way, a "genuine" issue exists if there is sufficient evidence

supporting the claimed factual dispute to require a choice between the parties' differing versions of the truth at trial. A "material" issue is one that affects the outcome of the suit, that is, an issue which, perforce, needs to be resolved before the related legal issues can be decided.

Civil Procedure > ... > Summary Judgment > Burdens of Proof > General Overview
Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > General Overview
Evidence > Burdens of Proof > Ultimate Burden of Persuasion

***HN4*** Motions for summary judgment must be decided on the record as it stands, not on litigants' visions of what the facts might some day reveal. Thus, on issues as to which the nonmovant bears the ultimate burden of proof, he must present definite, competent evidence to rebut the motion.

Patent Law > Infringement Actions > Summary Judgment > General Overview

***HN5*** Summary judgment, and its concomitant standard, is as available in patent cases as in other areas of litigation.

Bankruptcy Law > Discharge & Dischargeability > Reorganizations
Bankruptcy Law > ... > Plans > Postconfirmation Effects > Effects of Confirmation

***HN6*** See *11 U.S.C.S. § 1141(a)-(d)(1)(A)*.

Bankruptcy Law > Discharge & Dischargeability > General Overview
Bankruptcy Law > Discharge & Dischargeability > Effect of Discharge > General Overview
Bankruptcy Law > Discharge & Dischargeability > Effect of Discharge > Protection of Debtors

***HN7*** See *11 U.S.C.S. § 524(a)(1)-(3)*.

Bankruptcy Law > Discharge & Dischargeability > Effect of Discharge > General Overview
Bankruptcy Law > Discharge & Dischargeability > Reorganizations
Bankruptcy Law > ... > Plans > Postconfirmation Effects > Effects of Confirmation

***HN8*** Even if *11 U.S.C.S. § 1141(a)* binds creditors of corporate and individual debtors with respect to claims that arose before confirmation, It cannot bind any creditor with respect to post-confirmation claims.

Patent Law > Infringement Actions > Infringing Acts > General Overview
Patent Law > Remedies > Equitable Relief > Injunctions

***HN9*** Each act of patent infringement constitutes a separate cause of action.

Bankruptcy Law > Discharge & Dischargeability > Reorganizations
Patent Law > Infringement Actions > Infringing Acts > General Overview

***HN10*** Alleged acts of patent infringement that occur post-confirmation are separate causes of action from those that occur pre-confirmation, and the former necessarily give rise only to post-confirmation claims.

Bankruptcy Law > Discharge & Dischargeability > General Overview
Bankruptcy Law > Discharge & Dischargeability > Reorganizations

***HN11*** A discharge does not cancel an obligation; the obligation still exists. A discharge merely disables a creditor from enforcing its claim.

Bankruptcy Law > Discharge & Dischargeability > General Overview
Bankruptcy Law > Discharge & Dischargeability > Reorganizations

***HN12*** *11 U.S.C.S. § 1141(d)(1)(A)* does not discharge any claim which arises from a debtor's use post-confirmation.

Bankruptcy Law > Discharge & Dischargeability > General Overview
Bankruptcy Law > Discharge & Dischargeability > Reorganizations

***HN13*** The "new opportunity" afforded by a bankruptcy proceeding cannot and does not absolve a debtor of liability incurred due to post-confirmation activities. Likewise, nowhere can there be found a literal prohibition regarding the use of pre-confirmation facts to support a cause of action based on post-confirmation acts.

Civil Procedure > Judgments > Summary Judgment > General Overview
Civil Procedure > ... > Summary Judgment > Motions for Summary Judgment > General Overview
Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > General Overview
Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > Genuine Disputes
Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > Materiality of Facts
Patent Law > Infringement Actions > Infringing Acts > General Overview
Patent Law > Infringement Actions > Summary Judgment > General Overview

***HN14*** Because patent infringement is itself a factual issue, a court must approach a motion for summary judgment of infringement or non-infringement with a care proportioned to the likelihood of its being inappropriate. Moreover, although the same standard for summary judgment is used in patent cases as in other cases, the standard is somewhat more difficult to meet in patent cases, because not only must no genuine issues of material fact exist, but to grant summary judgment properly, a court must, in addition, construe the claim correctly and conclude that it would be not possible for the trier of fact to find infringement.

Patent Law > Infringement Actions > Claim Interpretation > General Overview
Patent Law > Infringement Actions > Claim Interpretation > Fact & Law Issues
Patent Law > Infringement Actions > Infringing Acts > General Overview
Patent Law > Infringement Actions > Summary Judgment > General Overview

***HN15*** It is an undisputed principle of law that in order to make a finding of patent infringement a two-step analysis is required: (1) the claim must be properly construed to determine its scope and meaning, and (2) the claim, as properly construed, must be compared to the accused device or process. The former inquiry is a question of law for a court, while the latter is a question of fact. The latter determination of whether the claims cover the accused device has been characterized as "the ultimate determination of infringement" and, as an issue of fact, should be approached with great care by a court when ruling on a motion for summary judgment.

Civil Procedure > ... > Jury Trials > Jury Instructions > General Overview
Patent Law > Infringement Actions > Claim Interpretation > General Overview
Patent Law > Infringement Actions > Infringing Acts > General Overview
Patent Law > Infringement Actions > Summary Judgment > General Overview

***HN16*** Construction of a claim, a question of law, is necessary to define the metes and bounds of the protection afforded by the claims. If the language of a claim is not disputed, then the scope of the claim may be construed as a matter of law. But when the meaning of a term in the claim is disputed and extrinsic evidence is necessary to explain that term, then an underlying factual question arises, and construction of the claim should be left to the trier or jury under appropriate instruction.

Patent Law > Infringement Actions > Claim Interpretation > General Overview
Patent Law > Infringement Actions > Infringing Acts > General Overview

***HN17*** In order to properly construe the scope of a patent claim, courts must look to the language of the claim, and the patent's specification and prosecution history. Any factual disputes that arise must be resolved before a claim may be properly interpreted.

Patent Law > Infringement Actions > Claim Interpretation > General Overview
Patent Law > Infringement Actions > Infringing Acts > General Overview

***HN18*** In delineating the boundaries of a patented invention and the scope of a patentee's rights, a court begins by examining the precise words of the claim.

Patent Law > Infringement Actions > Claim Interpretation > General Overview
Patent Law > Infringement Actions > Infringing Acts > General Overview
Patent Law > Infringement Actions > Infringing Acts > Offers to Sell & Sales
Patent Law > Infringement Actions > Infringing Acts > Use

***HN19*** Liability for patent infringement is set out in *35 U.S.C.S. § 271*. Infringement is the unlicensed making, using, or selling of a claimed invention. *35 U.S.C.S. § 271(a)*. In addition, one who induces an infringement is similarly liable.

Patent Law > Infringement Actions > Infringing Acts > General Overview
Patent Law > Infringement Actions > Infringing Acts > Offers to Sell & Sales
Patent Law > Infringement Actions > Infringing Acts > Use

***HN20*** See *35 U.S.C.S. § 271(a)*.

Patent Law > Infringement Actions > Infringing Acts > General Overview
Patent Law > Infringement Actions > Infringing Acts > Indirect Infringement

***HN21*** See *35 U.S.C.S. § 271(b)*.

Patent Law > Infringement Actions > Defenses > Marking
Patent Law > Infringement Actions > Infringing Acts > General Overview

***HN22*** It is indisputable that patent infringement is a tort. In this regard, the language of *35 U.S.C.S. § 271(a)* is generally interpreted to allow a finding of infringement against any entity be it an individual, corporation, or otherwise.

Business & Corporate Law > ... > Corporate Governance > Directors & Officers > General Overview
Business & Corporate Law > ... > Directors & Officers > Management Duties & Liabilities > General Overview
Business & Corporate Law > ... > Management Duties & Liabilities > Causes of Action > General Overview
Business & Corporate Law > ... > Management Duties & Liabilities > Causes of Action > Negligent Acts of Directors & Officers

***HN23*** Officers of a corporation are personally liable for tortious conduct of the corporation if they personally took part in the commission of the tort or specifically directed other officers, agents, or employees of the corporation to commit the tortious acts. Moreover, courts endorse the general rule that an officer of a corporation is liable for torts in which he personally participated, whether or not he was acting within the scope of his authority, and that such direct personal involvement by the officer is causally related to the alleged injury.

Business & Corporate Law > ... > Directors & Officers > Management Duties & Liabilities > General Overview
Business & Corporate Law > ... > Shareholder Duties & Liabilities > Piercing the Corporate Veil > General Overview
Patent Law > Infringement Actions > Corporate & Government Infringers
Patent Law > Infringement Actions > Infringing Acts > General Overview
Patent Law > Infringement Actions > Infringing Acts > Indirect Infringement

***HN24*** Courts recognize and impose personal liability on corporate officers for participating in, inducing, and approving acts of patent infringement.

Business & Corporate Law > ... > Directors & Officers > Management Duties & Liabilities > General Overview
Business & Corporate Law > ... > Shareholder Duties & Liabilities > Piercing the Corporate Veil > General Overview
Patent Law > Infringement Actions > Infringing Acts > General Overview

***HN25*** A corporate officer can be liable for direct infringement without piercing the corporate veil.

Patent Law > Infringement Actions > Infringing Acts > General Overview

***HN26*** Willfulness or specific intent to infringe is not a prerequisite to a finding of infringement.

Business & Corporate Law > ... > Directors & Officers > Management Duties & Liabilities > General Overview
Patent Law > Infringement Actions > Infringing Acts > General Overview

***HN27*** Active participation sufficient to invoke personal liability is characterized as the moving, active, conscious force behind the infringement, or direct participation in and control of the infringing design, manufacture, and sale.

Business & Corporate Law > ... > Directors & Officers > Management Duties & Liabilities > General Overview
Patent Law > Infringement Actions > Corporate & Government Infringers
Patent Law > Infringement Actions > Infringing Acts > General Overview
Patent Law > Remedies > Damages > Increased Damages

***HN28*** Advice of counsel has no relevance in determining whether a corporate officer induced infringement under *35 U.S.C.S. § 271(b)*.

Torts > Business Torts > Fraud & Misrepresentation > General Overview
Torts > Business Torts > Unfair Business Practices > General Overview

***HN29*** See N.H. Rev. Stat. Ann. § 358-A.

Torts > Business Torts > Unfair Business Practices > General Overview

***HN30*** A business practice is "unfair" if: (1) it is within at least the penumbra of some common-law, statutory, or other established concept of unfairness, (2) it is immoral, unethical, oppressive, or unscrupulous, or (3) it causes substantial injury to consumers.

Torts > Business Torts > Fraud & Misrepresentation > General Overview
Torts > Business Torts > Unfair Business Practices > General Overview

***HN31*** A business practice may be "deceptive" if it can reasonably be found to cause a person to act differently from the way he otherwise would act.

Torts > Business Torts > Fraud & Misrepresentation > General Overview
Torts > Business Torts > Unfair Business Practices > General Overview

***HN32*** Whether a party has committed an unfair or deceptive act is a question of fact.

Governments > Legislation > Statute of Limitations > General Overview
Torts > Procedural Matters > Statute of Limitations > General Overview

***HN33*** See *N.H. Rev. Stat. Ann. § 358-A:3*, IV-a.

Civil Procedure > ... > Pleadings > Counterclaims > General Overview
Torts > Business Torts > Fraud & Misrepresentation > General Overview
Torts > Business Torts > Unfair Business Practices > General Overview

***HN34*** A party may preserve their rights under N.H. Rev. Stat. Ann. § 358-A, whether such violation is alleged in an original complaint or by way of counterclaim.

Antitrust & Trade Law > Sherman Act > General Overview

***HN35*** See *15 U.S.C.S. § 2*.

Antitrust & Trade Law > ... > Monopolies & Monopolization > Actual Monopolization > General Overview
Antitrust & Trade Law > ... > Monopolies & Monopolization > Conspiracy to Monopolize > Elements
Antitrust & Trade Law > ... > Monopolies & Monopolization > Conspiracy to Monopolize > Sherman Act
Antitrust & Trade Law > Sherman Act > General Overview

***HN36*** *15 U.S.C.S. § 2* addresses the actions of single firms that monopolize or attempt to monopolize, as well as conspiracies and combinations to monopolize. Proof of attempted monopolization requires: (1) that the defendant has engaged in predatory or anticompetitive conduct, with (2) a specific intent to monopolize, and (3) a dangerous probability of achieving monopoly power.

Antitrust & Trade Law > ... > Monopolies & Monopolization > Actual Monopolization > General Overview
Antitrust & Trade Law > Sherman Act > General Overview

***HN37*** Monopoly power, in violation of the Sherman Act, *15 U.S.C.S. § 2*, is such power that arises as a result of the willful acquisition or maintenance of monopoly power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident.

Antitrust & Trade Law > Sherman Act > General Overview
Patent Law > ... > Defenses > Inequitable Conduct > Anticompetitive Conduct

***HN38*** To be "anticompetitive," a practice must harm the competitive process rather than merely harm competitors. Harm to the process occurs when conduct at issue obstructs the achievement of competition's basic goals--lower prices, better products, and more efficient production methods.

Antitrust & Trade Law > Regulated Practices > Intellectual Property > General Overview
Antitrust & Trade Law > ... > Intellectual Property > Bad Faith, Fraud & Nonuse > General Overview
Antitrust & Trade Law > ... > Intellectual Property > Bad Faith, Fraud & Nonuse > Fraud
Antitrust & Trade Law > Regulated Practices > Trade Practices & Unfair Competition > General Overview
Mergers & Acquisitions Law > Antitrust > General Overview
Patent Law > ... > Defenses > Inequitable Conduct > Anticompetitive Conduct

***HN39*** Where the acquisition of a patent itself is unlawful, the subsequent exercise of the ordinarily lawful exclusionary power inherent in the patent would be a continuing wrong, a continuing unlawful exclusion of potential competitors.

Antitrust & Trade Law > ... > Monopolies & Monopolization > Attempts to Monopolize > General Overview
Antitrust & Trade Law > ... > Monopolies & Monopolization > Conspiracy to Monopolize > General Overview
Patent Law > ... > Defenses > Inequitable Conduct > Anticompetitive Conduct

***HN40*** Liability for attempted monopolization must be predicated upon proof of specific intent to monopolize. Specific intent to obtain a monopoly includes an intent to unreasonably restrict competition.

Antitrust & Trade Law > ... > Monopolies & Monopolization > Attempts to Monopolize > General Overview
Antitrust & Trade Law > ... > Monopolies & Monopolization > Conspiracy to Monopolize > General Overview
Civil Procedure > Trials > Jury Trials > Province of Court & Jury
Patent Law > ... > Defenses > Inequitable Conduct > Anticompetitive Conduct

***HN41*** The determination of specific intent is itself a question of fact, not law. As a question of fact, such an inquiry is within the exclusive province of a jury.

Antitrust & Trade Law > Regulated Practices > Market Definition > Relevant Market
Antitrust & Trade Law > ... > Monopolies & Monopolization > Actual Monopolization > General Overview
Antitrust & Trade Law > Sherman Act > General Overview
Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > Genuine Disputes
Healthcare Law > Healthcare Litigation > Antitrust Actions > Facilities
Patent Law > ... > Defenses > Inequitable Conduct > Anticompetitive Conduct

***HN42*** An act can be wrongful in the context of the Sherman Act, *15 U.S.C.S. § 2*, only where it has or threatens to have a significant exclusionary impact. To determine exclusionary impact, a court must first determine the relevant market. Put simply, the relevant market is composed of the product market and the geographic area involved. The relevant product market generally consists of products that have reasonable interchangeability for the purposes for which they are produced, taking into consideration price, use and quality. Moreover, the extent to which one market prevents exploitation of another market depends on the extent to which consumers will change their consumption of one product in response to a price change in another; i.e., the cross-elasticity of demand.

Patent Law > Infringement Actions > Exclusive Rights > General Overview
Patent Law > Infringement Actions > Infringing Acts > General Overview

***HN43*** A United States Letters Patent only protects inventors from infringing articles marketed in the United States .

Civil Procedure > ... > Summary Judgment > Burdens of Proof > General Overview
Patent Law > Infringement Actions > Summary Judgment > General Overview

***HN44*** Summary judgment is a procedural device used to pierce the boilerplate of pleadings and assay parties' proof in order to determine whether trial is actually required.

Mergers & Acquisitions Law > General Overview
Patent Law > Infringement Actions > Exclusive Rights > General Overview
Patent Law > Remedies > Damages > General Overview
Torts > Intentional Torts > Conversion > General Overview
Torts > Intentional Torts > Conversion > Remedies

***HN45*** Conversion is an intentional exercise of dominion or control over a chattel which so seriously interferes with the right of another to control it that the actor may justly be required to pay the other the full value of the chattel. Chattels subject to conversion can be classified as either tangibles or intangibles. With respect to intangible chattels: (1) where there is conversion of a document in which intangible rights are merged, the damages include the value of such rights; and (2) one who effectively prevents the exercise of intangible rights of the kind customarily merged in a document is subject to a liability similar to that for conversion, even though the document is not itself converted. Under such circumstances, the document may be the subject of conversion as the embodiment of and as representing the title to the chattel or the obligation.

**Counsel: [**1]** For CURTIS MANUFACTURING COMPANY, INC., plaintiff: Craig L. Staples, Esq., Cleveland, Waters & Bass, PA, Concord, NH. Jack R. Pirozzolo, Esq., Willcox, Pirozzolo & McCarthy, Boston, MA.

For PLASTI-CLIP CORPORATION, consolidated plaintiff: W. Wright Danenbarger, Esq., Wiggin & Nourie, Manchester, NH. For DANIEL FANEUF, consolidated plaintiff: W. Wright Danenbarger, Esq., Wiggin & Nourie, Manchester, NH. Jamie N. Hage, Esq., Roussos, Hage & Hodes, Manchester, NH.

For PLASTI-CLIP CORPORATION, DANIEL FANEUF, defendants: William O. Hennessey, Esq., Hayes, Soloway, Hennessey, Grossman & Hage, Manchester, NH. Jamie N. Hage, Esq., Roussos, Hage & Hodes, Manchester, NH.

For THOMAS W. JUDD, consolidated defendant: Craig L. Staples, Esq., Cleveland, Waters & Bass, PA, Concord, NH. Jack R. Priozzolo, Esq., Willcox, Pirozzolo & McCarthy, Boston, MA.

**Judges:** Devine

**Opinion by:** SHANE DEVINE

**Opinion**

**[*1215]** ORDER

In this consolidated civil action, the parties raise a number of issues relating to bankruptcy, patent infringement, and certain business-related competitive torts. The court has federal question jurisdiction, which encompasses supplemental state law issues as well. *28 U.S.C. §§ 1331*,

*1334*, *1338*, *1367*. Presently before the court is the motion to dismiss or for summary judgment filed by both Curtis and Judd, [1] to which Plasti-Clip and Faneuf object.

**[**2]** Factual History

Daniel Faneuf invented a plastic clip device which is manufactured and sold through a company of which he is the president and sole stockholder, Plasti-Clip Corporation (Plasti-Clip). The Faneuf clip was issued United States Letters Patent Number 4,277,863 ( '863 patent) on July 14, 1981. In late March or early April of 1989, Faneuf entered into negotiations with Curtis Manufacturing Company (Curtis), a computer peripheral products company, and its president, Thomas W. Judd, at Curtis's instigation regarding the feasibility of adapting the Faneuf clip to accommodate Curtis's document holder application. Prior to the complete breakdown of negotiations between Faneuf and Curtis in September of 1989, Curtis's patent counsel filed a patent application which incorporated Faneuf's revised clip design but indicated Judd as the inventor. On February 12, 1990, United States Letters Patent Number 4,902,078 ( '078 patent) was issued to Curtis as the assignee of Judd for a plastic clip document holder device which incorporates the accused plastic clip.

Procedural History

On September 8, 1989, Curtis brought action against Plasti-Clip and Faneuf under federal patent **[**3]** law seeking a declaration of noninfringement and invalidity as to the '863 Patent. For the nearly five years thereafter, plaintiffs and defendants have been litigating the validity of the patents at issue. Plasti-Clip and Faneuf filed counterclaims against Curtis and Judd on October 19, 1989. Said action, Curtis Manufacturing Company, Inc. v. Plasti-Clip Corporation, et al, Civil No. 89-430-SD, was automatically stayed on March 1, 1991, based on Curtis's filing for reorganization pursuant to Chapter 11 of the Bankruptcy Act, *11 U.S.C. § 1101, et seq.*

Plasti-Clip and Faneuf brought direct action against Judd on July 13, 1992, and amended their complaint on August 11, 1992. Plasti-Clip Corporation, et al v. Judd, Civ. No. 92-360-B. The amended complaint contains claims under federal patent law for infringement of the '863 Patent and fraudulent procurement of the '078 Patent and claims for violation of federal and New Hampshire antitrust laws, and for violation of New Hampshire prohibitions on unfair trade practices, as well as common law claims for breach of contract/quantum meruit, tortious **[*1216]** interference with contractual relations, and conversion/idea **[**4]** misappropriation.

On September 22, 1992, Judd filed counterclaims against Plasti-Clip and Faneuf under federal patent law for noninfringement and invalidity as to the '863 Patent. In their amended counterclaim, Plasti-Clip and Faneuf brought claims for infringement of the '863 and/or the '078 Patent since April 1, 1993, fraudulent procurement of the '078 Patent, violation of federal and New Hampshire antitrust claims, violation of New Hampshire prohibitions on unfair trade practices, as well as a common-law claim for conversion/idea misappropriation.

Plasti-Clip and Faneuf moved to consolidate the two actions on March 2, 1994. On March 31, 1994, this court, recognizing the substantial similarity between the factual allegations and legal

---

[1] Counsel for Curtis and Judd request oral argument in order to address the particulars of the instant motion. Standard practice under the local rules is for motions to be decided "without oral argument on the basis of papers filed." Local Rule 11(g). Further, in its discretion the court may allow oral argument "after consideration of a written statement by counsel outlining the unusual reasons why oral argument" would be of assistance to the court. Id. (emphasis added). The court finds that in light of the volume of papers filed in conjunction with the instant motion, oral argument is unnecessary to a proper determination of the motion. Therefore, the request for oral argument must be and herewith is denied.

theories supporting the claims raised in each of the respective actions, ordered their consolidation pursuant to *Rule 42(a), Fed. R. Civ. P.*[2] In addition, since plaintiffs argued that defendants' claims were barred by operation of the Bankruptcy Act at *11 U.S.C. 524(a)(2)* and *1141(d)(1)(A)*, they were ordered by the court to file a motion for summary judgment to that effect. On May 16, 1994, plaintiffs, complying **[**5]** with the court's order, submitted the instant motion to dismiss or for summary judgment, along with a substantial number of materials outside the pleadings. Defendants, in turn, filed a motion in opposition thereto, similarly appended. In light of the voluminous materials presented in conjunction with the briefs, the court will treat the motion as one for summary judgment pursuant to *Rule 12(b), Fed. R. Civ. P.*

Discussion

1. Summary Judgment Standard

Summary judgment shall be ordered when ***HN1*** "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." *Rule 56(c), Fed. R. Civ. P.****HN2*** Since the purpose of summary judgment is issue finding, not issue determination, the court's function at this stage "'is not [] to **[**6]** weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.'" *Stone & Michaud Ins., Inc. v. Bank Five for Savings, 785 F. Supp. 1065, 1068 (D.N.H. 1992)* (quoting *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986))*. Although summary judgment may well be appropriate if the nonmovant chooses to merely rely upon some combination of "conclusory allegations, improbable inferences, and unsupported speculation," *Medina-Munoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990)*, the entire record will be scrutinized in the light most favorable to the nonmovant, with all reasonable inferences indulged in that party's favor. *Maldonado-Denis v. Castillo-Rodriguez, 23 F.3d 576, 581 (1st Cir. 1994)*; see also *Brennan v. Hendrigan, 888 F.2d 189, 191 (1st Cir. 1989)*; *Mack v. Great Atlantic & Pacific Tea Co., 871 F.2d 179, 181 (1st Cir. 1989)*.

The respective roles of the movant and the nonmovant in summary judgment practice are precisely choreographed. **[**7]** The First Circuit has described the steps in the following manner:

***HN3*** The movant must put the ball in play, averring "an absence of evidence to support the nonmoving party's case." The burden then shifts to the nonmovant to establish the existence of at least one fact issue which is both "genuine" and "material." A "genuine" issue is one "that properly can be resolved only by a finder of fact because [it] may reasonably be resolved in favor of either party." Put another way, a "genuine" issue exists if there is "sufficient evidence supporting the claimed factual dispute" to require a choice between "the parties' differing versions of the truth at trial." A "material" issue is one that "affects the outcome of the suit," that is, an issue which, perforce, "needs to be resolved before the related legal issues can be decided."

**[*1217]** *Garside v. Osco Drug, Inc., 895 F.2d 46, 48 (1st Cir. 1990)* (citing and quoting, inter alia, *Celotex Corp. v. Catrett, 477 U.S. 317, 325, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)*, and *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)* (other citations omitted)).

*Maldonado-Denis, supra* **[**8]** , 23 F.3d at 581.

---

[2] Since the April 4, 1994, Order of Consolidation denominated Civil No. 89-430-SD as the main case, Curtis and Judd will hereinafter be referred to as "plaintiffs", and Plasti-Clip and Faneuf will hereinafter be referred to as "defendants."

***HN4*** "Motions for summary judgment must be decided on the record as it stands, not on litigants' visions of what the facts might some day reveal." Id. Thus, on issues as to which the nonmovant bears the ultimate burden of proof, he must "'present definite, competent evidence to rebut the motion.'" Id. (quoting *Mesnick v. General Elec. Co., 950 F.2d 816, 822 (1st Cir. 1991)*, cert. denied, *504 U.S. 985, 112 S. Ct. 2965, 119 L. Ed. 2d 586 (1992))*. Finally, ***HN5*** summary judgment, and its concomitant standard, "is as available in patent cases as in other areas of litigation." *Continental Can Co. U.S.A., Inc. v. Monsanto Co., 948 F.2d 1264, 1265 (Fed. Cir. 1991)*.

2. The Effect of Curtis's Bankruptcy

As a preliminary matter, plaintiffs allege that the Curtis reorganization (1) bars Plasti-Clip from asserting claims based upon pre-petition events and (2) vests in Curtis its property (the '078 patent) free of all claims by Plasti-Clip. Defendants oppose these contentions, arguing that Curtis's bankruptcy discharge neither operates as a bar to post-confirmation causes of action nor prevents the **[**9]** use of pre-confirmation facts to establish said post-confirmation causes of action. Moreover, defendants assert that regardless of the effect a discharge from bankruptcy has on the property of the debtor, the validity of the '078 patent is at issue and reasonable doubt exists concerning who is the rightful "owner" of said patent.

Two sections of the Bankruptcy Act are implicated by plaintiffs' motion. *Section 1141* outlines the effect of confirmation of the reorganization. In pertinent part, *section 1141* provides as follows:

***HN6*** (a) Except as provided in subsections (d)(2) and (d)(3) of this section, the provisions of a confirmed plan bind the debtor, any entity issuing securities under the plan, any entity acquiring property under the plan, and any creditor, equity security holder, or general partner in the debtor, whether or not the claim or interest of such creditor, equity security holder, or general partner is impaired under the plan and whether or not such a creditor, equity security holder, or general partner has accepted the plan.

(b) Except as otherwise provided in the plan or the order confirming the plan, the confirmation of a plan vests all of the property of the estate in the **[**10]** debtor.

(c) Except as provided in subsections (d)(2) and (d)(3) of this section and except as otherwise provided in the plan or in the order confirming the plan, after confirmation of a plan, the property dealt with by the plan is free and clear of all claims and interests of creditors, equity security holders, and of general partners in the debtor.

(d)(1) Except as otherwise provided in this subsection, in the plan, or in the order confirming the plan, the confirmation of a plan--

(A) discharges the debtor from any debt that arose before the date of such confirmation . . . .

*11 U.S.C. § 1141(a)-(d)(1)(A)*. Similarly, *section 524* details the effect of discharge from bankruptcy as follows:

(a) A discharge in a case under this

title--

***HN7*** (1) voids any judgment at any time obtained, to the extent that such judgment is a determination of the personal liability of the debtor with respect to any debt discharged under section 727, 944, 1141, 1228, or 1328 of this title, whether or not discharge of such debt is waived;

(2) operates as an injunction against the commencement or continuation of an action, the employment of process, or an act, to collect, **[**11]** recover or offset any such debt as a personal liability of the debtor, whether or not discharge of such debt is waived; and

(3) operates as an injunction against the commencement or continuation of an action, the employment of process, or an act, **[*1218]** to collect or recover from, or offset against, property of the debtor of the kind specified in section 541(a)(2) of this title that is acquired after the commencement of the case . . . .

*11 U.S.C. § 524(a)(1)-(3)*.

Plaintiffs place great weight on the general understanding that "one of the primary purposes of the Bankruptcy Code is to afford debtors a new opportunity and a clear chance for the future, unhampered by pressures of debts from the past." *In re France, 63 Bankr. 777, 780 (D.N.H. 1986)*. Indeed,

The act of plan confirmation is, perhaps, the major event in a Chapter 11 proceeding. At that point, the debtor receives an unencumbered fresh start, being discharged of pre-confirmation debts and vested with all property of the estate to the extent specified in Title *11, United States Code, Section 1141*.

*In re Dahlgren Int'l, Inc., 147 Bankr. 393, 404 (N.D. Tex. 1992).* **[**12]** Pre-confirmation, however, "does not encompass a post-confirmation time frame." Id.

Acknowledgement of the distinction between these two time frames is particularly apposite to the resolution of the instant issue. That this is a distinction with a difference is bolstered by the notion that bankruptcy "'was intended to protect the debtor from the continuing costs of pre-bankruptcy acts but not to insulate the debtor from the costs of post-bankruptcy acts.'" *In re Sure-Snap Corp., 983 F.2d 1015, 1018 (11th Cir. 1993)* (quoting *In re Hadden, 57 Bankr. 187, 190 (Bankr. W.D. Wis. 1986))*.

Reinforcing this conclusion, the Supreme Court has noted that "even ***HN8*** if *§ 1141(a)* binds creditors of the corporate and individual debtors with respect to claims that arose before confirmation, we do not see how it can bind . . . any . . . creditor with respect to postconfirmation claims." *Holywell Corp. v. Smith, 503 U.S. 47*, ___, *112 S. Ct. 1021, 1028, 117 L. Ed. 2d 196 (1992)* (emphasis added).

Plaintiffs assert that due to the confirmation of Curtis's reorganization plan, defendants are enjoined from using pre-confirmation **[**13]** facts to establish a post-confirmation cause of action. However, patent law provides that ***HN9*** each act of patent infringement constitutes a separate cause of action. See *A.C. Aukerman Co. v. R.L. Chaides Constr. Co., 960 F.2d 1020, 1031 (Fed. Cir. 1992)* (patent infringement is a continuing tort). ***HN10*** "Alleged acts of infringement that occur post-confirmation are separate causes of action from those that occur pre-confirmation, and the former necessarily give rise only to post-confirmation claims." *In re Dahlgren, supra, 147 Bankr. at 404 n.16*.

By virtue of the discharge, although the infringement may have taken place and damages incurred, defendants' pre-confirmation causes of action have been extinguished. See, e.g., *Wagner v. United States, 573 F.2d 447, 453 (7th Cir. 1978)****HN11*** ("[A] discharge does not cancel the

obligation; the obligation still exists. A discharge merely disables the creditor from enforcing its claim."). Recognizing this, defendants only assert damages for plaintiffs' continuing use of the subject patented clip after April 1, 1993, the date when plaintiffs emerged from the protective cloak of bankruptcy. **[**14]** It is this continuous, rather than pre-confirmation, usage which distinguishes this case from those cited in plaintiffs' motion. It is clear to this court that ***HN12*** "*section 1141(d)(1)(A)* [does] not discharge any claim . . . which arises from the debtor's use . . . postconfirmation." *In re Polysat, 152 Bankr. 886, 891 (Bankr. E.D. Pa. 1993)* (citing *Holywell Corp., supra*). As such, the court finds that ***HN13*** the "new opportunity" afforded by a bankruptcy proceeding cannot and does not absolve a debtor of liability incurred due to post-confirmation activities. Likewise, nowhere in the Bankruptcy Act can there be found a literal prohibition regarding the use of pre-confirmation facts to support a cause of action based on post-confirmation acts.

Furthermore, the court is unpersuaded by plaintiffs bare allegation that the proprietary rights to the '078 patent vested in Curtis upon confirmation of the reorganization plan. Although a discharge terminates the bankruptcy estate and the remaining property returns to the debtor, said property is assumed to have rightfully belonged to the **[*1219]** debtor originally. Since it is the validity of the '078 patent which is squarely **[**15]** at issue, questions remain that are inappropriate for resolution at the summary judgment stage.

Plaintiffs' motion for summary judgment, insofar as it seeks to enjoin defendants' post-confirmation causes of action as barred by the Bankruptcy Act, therefore must be and herewith is denied.

3. Patent Infringement

***HN14*** "Because . . . [patent] infringement is itself a fact issue, a district court must approach a motion for summary judgment of infringement or non-infringement with a care proportioned to the likelihood of its being inappropriate." *SRI Int'l v. Matsushita Elec. Corp. of America, 775 F.2d 1107, 1116 (Fed. Cir. 1985)* (citations omitted); see also *Gillette Co. v. Warner-Lambert Co., 690 F. Supp. 115 (D. Mass. 1988)* (summary judgment usually inappropriate in fact-driven patent infringement cases); *Precision Metal Fabricators, Inc. v. Jetstream Systems, Co., 693 F. Supp. 814, 815 (N.D. Cal. 1988)* ("Summary judgment is rarely appropriate in patent infringement actions"). Moreover,

although the same standard for summary judgment is used in patent cases as in other cases, the standard **[**16]** is somewhat more difficult to meet in patent cases, because not only must no genuine issues of material fact exist, but to grant summary judgment properly, the trial court must in addition construe the claim correctly and conclude that it would be not possible for the trier of fact to find infringement.

*Safe Flight Instrument Corp. v. Sundstrand Data Control, Inc., 706 F. Supp. 1146, 1149 (D. Del. 1989)*, aff'd without opinion, *899 F.2d 1228 (Fed. Cir.)*, cert. denied, *498 U.S. 919, 111 S. Ct. 295, 112 L. Ed. 2d 249 (1990)*.

***HN15*** It is an undisputed principle of law that in order to make a finding of infringement a two-step analysis is required: (1) the claim must be properly construed to determine its scope and meaning, and (2) the claim as properly construed must be compared to the accused device

or process. [3] **[**18]** *Conroy v. Reebok Int'l, Ltd., 14 F.3d 1570, 1572 (Fed. Cir. 1994)*; *Carroll Touch, Inc. v. Electro Mechanical Sys., 15 F.3d 1573, 1576 (Fed. Cir. 1993)*. The former inquiry is a question of law for the court, while the latter is a question of fact. *Minnesota Mining & Mfg. Co. v. Johnson & Johnson Orthopaedics, Inc., 976 F.2d 1559, 1570 (Fed. Cir. 1992)* **[**17]** (citing *C.R. Bard, Inc. v. Advanced Cardiovascular Sys., Inc., 911 F.2d 670, 673 (Fed. Cir. 1990))*. [4] This latter determination--whether the claims cover the accused device--has been characterized as "the ultimate determination of infringement" and, as an issue of fact, "should be approached with great care by the district court" when ruling on a motion for summary judgment. *Palumbo v. Don-Joy Co., 762 F.2d 969, 974 (Fed. Cir. 1985)* (citing *D.M.I., Inc. v. Deere & Co., 755 F.2d 1570, 1573 (Fed. Cir. 1985))*.

Despite the fact that claim interpretation is generally considered to be a question of law, such interpretation "may depend upon conflicting evidentiary material which can give rise to a genuine factual dispute." *C.R. Bard, supra, 911 F.2d at 673*; see also *Aid Pack, supra note 3, 641 F. Supp. at 694* ("Even though claim interpretation is a legal issue, if the meaning of a term of art in the claim is disputed and extrinsic **[**19]** evidence is **[*1220]** needed, summary judgment is not appropriate.").

The Palumbo court summarized this rationale as follows:

***HN16*** Construction of a claim, a question of law, is necessary to define the metes and bounds of the protection afforded by the claims. If the language of a claim is not disputed, then the scope of the claim may be construed as a matter of law. But when the meaning of a term in the claim is disputed and extrinsic evidence is necessary to explain that term, then an underlying factual question[] arises, and construction of the claim should be left to the trier or jury under appropriate instruction.

*Palumbo, supra, 762 F.2d at 974* (citation omitted). [5]

**[**20]** ***HN17*** In order to properly construe the scope of a patent claim, courts "must look to the language of the claim, and the patent's specification and prosecution history . . . ." *Read Corp. v. Portec, Inc., 970 F.2d 816, 823 (Fed. Cir. 1992)*; see also *Whittaker Corp. v. UNR Indus., Inc.,*

---

[3] This comparison itself may involve a two-step process: First, it must be determined whether the accused structure literally infringes the claims. Second, if there is no literal infringement, the doctrine of equivalents must be applied to determine whether the accused device performs substantially the same function in substantially the same way for substantially the same purpose. See Aid Pack, Inc. v. Beecham, Inc., 641 F. Supp. 692, 694 (D. Mass. 1986), aff'd without opinion, *826 F.2d 1071 (Fed. Cir. 1987)*.

[4] Dividing the analysis into this dichotomy was mandated by the Supreme Court as early as Winans v. Denmead, 56 U.S. (15 How.) 330, 14 L. Ed. 717 (1854). In this regard, the Court noted,

Two questions arise. The first is, what is the thing patented; the second, has that thing been constructed, used, or sold by the defendants.

The first is a question of law, to be determined by the court, construing the letters-patent, and the description of the invention and specification of claim annexed to them. The second is a question of fact, to be submitted to a jury.

Id. at 338 (emphasis added).

[5] This is not to say that simple disagreement over the meaning of a term in a claim rises to the level of a factual dispute sufficient to prevent summary judgment. See *Johnston v. IVAC Corp., 885 F.2d 1574, 1579-80 (Fed. Cir. 1989)*. In such an instance, the court should attempt to resolve the facial conflict through resort to the prosecution and specification history or other extrinsic evidence. *Id. at 1579*. If, however, the underlying probative evidence continues to be susceptible to genuine evidentiary conflict, the resolution of which can only be resolved by way of expert testimony or complex scientific principles, then the term is considered an issue of fact, and summary judgment is inappropriate. Id. (citing Howes v. Medical Components, Inc., 814 F.2d 638, 643 (Fed Cir. 1987)).

*911 F.2d 709, 711 (Fed. Cir. 1990)* ("Proper interpretation of claims requires consideration of the specification, the prosecution history, the other claims and expert testimony where appropriate"); *SRI Int'l, supra, 775 F.2d at 1118* ("A claim is construed in the light of the claim language, the other claims, the prior art, the prosecution history, and the specification, not in light of the accused device"). Any factual disputes that arise must be resolved before a claim may be properly interpreted. *C.R. Bard, supra, 911 F.2d at 673*.

Thus, ***HN18*** in delineating the boundaries of a patented invention and the scope of a patentee's rights, the court begins by examining the precise words of the claim. See, e.g., *Amgen, Inc. v. Chugai Pharmaceutical Co., Ltd., 706 F. Supp. 94, 99 (D. Mass. 1989)* ("'In **[**21]** determining whether an accused device or composition infringes a valid patent, resort must be had in the first instance to the words of the claim.'" (quoting *Graver Tank & Mfg. Co. v. Linde Air Prods. Co., 339 U.S. 605, 607, 70 S. Ct. 854, 94 L. Ed. 1097 (1950))*).

The '863 patent contains five claims, with claims 2-4 dependent on independent claim 1 and claim 5 dependent on claim 4. The claims recite as follows:

1. A spring clip comprising: two elongate, relatively stiff members; a relatively flexible web forming a hinge joining the two members intermediate their ends; opposed jaw portions on respective members at one side of the hinge; and a spring finger on one member at the other side of the hinge resiliently biased into engagement against the other member so as yieldingly to hold the jaws closed, the spring finger forming an open loop disengageable from the other member for insertion through an aperture in an article, whereby the finger serves both as a spring to close the jaws and a holder for the article.

2. A clip according to claim **1** wherein the loop is offset from the members so that the sheet may hang parallel to the members.

3. A clip according to claim **1**, in **[**22]** combination with a sheet having an aperture receiving the finger.

4. A clip according to claim **1** wherein said spring finger is intergral [sic] with and extends from one of said members reentrantly between said members into engagement inside the other member thereby to prevent the article from sliding off the spring finger.

5. A clip according to claim **4** wherein said spring finger slides along the other member when said spring finger is compressed **[*1221]** to open the jaws, and said other member includes a stop limiting sliding of the finger and opening of the jaws.

The '078 patent contains nine claims, with claims 2-8 wholly dependent on claim 1 and claim 9 partially dependent on claim 1. Claim 1, which describes the clip element, recites, in pertinent part, as follows:

1. A document holder clip adapted to hold a document adjacent a monitor screen, which comprises in combination:

. . . .

(d) a slidably mounted document clip means to retain a document, which holder means comprises:

(i) a pair of generally parallel clip arm elements having a one and an other end, that the one end forming opposing jaws on either side of the extending arm;

(ii) a resilient hinge means generally intermediate **[**23]** the generally parallel clip arm elements;

(iii) a clip retaining means between the clip arm elements and below the hinge means which extend and fit over flanges of the arm to retain the clip means on the arm and to permit the slidable movement along the upper edge of the arm of the document clip in use;

(iv) a resilient, bent spring finger at the other end of one of the clip arm elements, the spring finger inclined inwardly toward the hinge means; and

(v) a spring finger retainer at the other end of the other arm clip element whereby the one end of the resilient spring finger is engaged in the spring finger retainer so that the opposing jaw elements are biased in closed, inward, document retaining position adjacent to the surface of the extending arm so as to retain a document between at least one jaw end and the surface of the extending arm and whereby upon the application of finger pressure on the heads of the clip arm element, one end of the spring finger moves downwardly toward the hinge means and away from the retaining stop to place the opposing jaws in an open position for the removal of the document.

. . . .

6. The clip of claim 1 wherein the spring finger retainer at **[**24]** the other end of the other clip arm element also includes an inner flange extending to the spring finger retainer whereby on the occasion of finger pressure by the user to the other end of the clip arm elements, one end of the spring finger element moves from a retaining position slidably downwardly on the inner flange to permit the opposing jaw edges to move to an open position.

7. The clip of claim 1 wherein the spring finger element includes at the one end thereof a slightly raised, short arm, which short arm is placed against the spring finger retainer to place the opposing jaw edges in a resiliently biased, closed position.

After reviewing the above-recited claim language, as well as the prosecution history and drawings included in both the '078 and '863 patents, the court finds that both patents describe a clip device comprised of two parallel clip arms joined centrally by a stiffly flexible hinge. The unibody construction and spring biasing element uniquely disclosed in the '863 patent is substantially replicated in the device evidenced in the '078 patent. In both, it is this spring finger which serves the dual purpose of resiliently holding the opposing jaws in a closed position **[**25]** while likewise, when compressed, moves slidably inward so as to open the opposing jaws.

Thus delineating the scope of the claims, the court now compares same to the accused device, *Conroy, supra, 14 F.3d at 1572*, mindful of the "great care" the district court must exercise in making this comparison. *Palumbo, supra, 762 F.2d at 974*. Defendants maintain that the '078 patent literally infringes claims 1, 4, and 5 of the '863 patent. Since all claims in the '863 patent are dependent on claim 1, should the court make a finding of noninfringement as to that claim, then summary judgment would follow.

In the view of the court, the integral component of both the '863 patent and the accused device is the spring finger which, configured as an extended loop, serves a variety of functions, not the least

of which is providing resilient bias. Defendants' experts contend **[*1222]** that "movants found extended loop configuration more advantageous than what they showed to the public in the '078 Patent" and "thus, the accused clip infringes at least claim 1 of the ['863] Patent." Declaration of Jerry Cohen, Esq., at 8 (attached to Defendants' Memorandum Opposing Motion for Summary Judgment). Whether **[**26]** the spring finger of the '863 patent is the equivalent of the spring finger disclosed in the '078 patent is not for this court to say. See *Conroy, supra, 14 F.3d at 1577* (district court improperly resolved a genuine issue of material fact in finding equivalence between two patented articles). Rather, the court finds that the evidence before it evinces the existence of a factual dispute that is both genuine and material. In consequence thereof, plaintiffs' motion for summary judgment with respect to the patent infringement claims alleged against Curtis (Count I) is herewith denied.

4. Individual Liability of Judd

***HN19*** Liability for patent infringement is set out in *35 U.S.C. § 271*. Infringement is the unlicensed making, using, or selling of a claimed invention. *35 U.S.C. § 271(a)*; [6] **[**27]** see also *Rohm and Haas Co. v. Mobil Oil Corp., 718 F. Supp. 274, 329 (D. Del. 1989)*; *S.R.I Int'l, supra, 775 F.2d at 1123*. In addition, one who induces an infringement is similarly liable. [7]

Plaintiffs allege that Judd is not liable under a direct infringement theory because it is Curtis, not he, who is manufacturing and selling the document holder at issue. Plaintiffs further allege that there can be no claim of infringement by inducement because defendants fail to demonstrate any specific intent on the part of Judd to encourage infringement by Curtis.

Plaintiffs' arguments miss the mark on several levels. To begin, ***HN22*** it is indisputable that patent infringement is a tort. *Carbice Corp. of Am. v. American Patents Dev. Corp., 283 U.S. 27, 33, 51 S. Ct. 334, 75 L. Ed. 819 (1931)*; *Orthokinetics, Inc. v. Safety Travel Chairs Inc., 806 F.2d 1565, 1579 (Fed. Cir. 1986)*. In this regard, the language of *section 271(a)* "has generally been interpreted to allow a finding of infringement against any entity be it an individual, corporation or otherwise." *Symbol Technologies, Inc. v. Metrologic Instruments, Inc., 771 F. Supp. 1390, 1402 (D.N.J. 1993).* **[**28]** ***HN23*** Officers of a corporation are personally liable for tortious conduct of the corporation if they personally took part in the commission of the tort or specifically directed other officers, agents, or employees of the corporation to commit the tortious acts. See, e.g., *United States v. Mottolo, 629 F. Supp. 56, 60 (D.N.H. 1984)*; *Orthokinetics, supra, 806 F.2d at 1579*. Moreover, this court has endorsed the "general rule that an officer of a corporation is liable for torts in which he personally participated, whether or not he was acting within the scope of his authority, and that such direct personal involvement by the officer is causally related to the alleged injury." *Mottolo, supra, 629 F. Supp. at 60* (citing *Escude Cruz v. Ortho Pharmaceutical Corp., 619 F.2d 902, 907 (1st Cir. 1980))*.

Under such circumstances, there is no need to pierce the corporate veil. "'The cases are legion in which ***HN24*** courts have recognized and imposed personal liability on corporate officers for participating in, inducing, and approving acts of patent infringement.'" *Symbol Technologies, supra, 771 F. Supp. at 1402* **[**29]** (quoting *Orthokinetics, supra, 806 F.2d at 1579*); see generally 4 DONALD S. *CHISUM, PATENTS § 16.06[2]*, at 16-168 to 16-182 (1994).

---

[6] Direct infringement is defined under *section 271(a)* as follows: ***HN20*** "Except as otherwise provided in this title, whoever without authority makes, uses or sells any patented invention, within the United States during the term of the patent therefor, infringes the patent." *35 U.S.C. § 271(a)*.

[7] *35 U.S.C. § 271(b)* provides, ***HN21*** "Whoever actively induces infringement of a patent shall be liable as an infringer."

In support of their argument, plaintiffs cite *Manville Sales Corp. v. Paramount Sys., Inc., 917 F.2d 544 (Fed. Cir. 1990)*. Without reason, Manville seemingly departed from generally settled law and sought to create a new standard for *section 271(a)*, necessitating piercing the corporate veil in **[*1223]** order to find an officer of a corporation personally liable for patent infringement. *Manville, supra, 917 F.2d at 552-53*; see also *Symbol Technologies, supra, 771 F. Supp. at 1403*. Plaintiffs are unable to avail themselves of the Manville court's recasting of settled law for two reasons.

First, as the court in Symbol Technologies noted,

It is not clear that the Federal Circuit intended in Manville to overturn the long-standing precedent that a corporate officer can be liable for direct infringement without piercing the corporate veil. If Manville does establish a new rule, it is not binding on this court as the Federal Circuit follows the rule that "prior decisions of a panel of the **[**30]** court are binding precedent on subsequent panels unless and until overturned *in banc*." *Newell Cos., Inc. v. Kenney Mfg. Co., 864 F.2d 757, 765 (Fed. Cir. 1988)*[, cert. denied, *493 U.S. 814, 110 S. Ct. 62, 107 L. Ed. 2d 30 (1989)]*. There has been no overturning *en banc* of the previous standard of determining personal liability for infringement nor was there any reason given by the Manville court for any overturning of the previous standard in Manville. "Where there is direct conflict, the precedential decision is the first." *Newell, 864 F.2d at 765*. Therefore, until changed by

an *en banc* decision, the court finds that the long-established rule that ***HN25*** a corporate officer can be liable for direct infringement without piercing the corporate veil remains in effect.

*Symbol Technologies, supra, 771 F. Supp. at 1403*. The court is persuaded by the analysis in Symbol Technologies and concurs in the finding.

More specifically, however, the court notes the factual dissimilarity between the instant case and the situation in Manville. In reversing the district court's finding of personal liability **[**31]** on the part of Paramount's corporate officers for direct infringement, the Federal Circuit emphasized the fact that Paramount's officers were unaware of any patent held by Manville until the commencement of the infringement action. *Manville, supra, 917 F.2d at 553*.

In contrast, the deposition testimony taken from Ed Hames, a Curtis designer, and Richard Crowley, Curtis's patent counsel, reveals that Judd was, in the least, possessed of the knowledge that Faneuf's clip was patented. [8] Regarding Judd's knowledge, Hames testified as follows:

**[**32]** Q. Did you [Hames] have any discussions or any meetings within the company between the time you received this [schematic clip drawing] facsimile from Mr. Faneuf, Plaintiff's Exhibit 29, and the time that this print was sent to the mold maker?

A. Oh, it's very possible that I was asked how the clip is going or day-to-day questions, but anything that I can remember in any special meetings, no.

. . . .

---

[8] The inability of the parties to schedule and take Judd's deposition does no violence to the validity of defendants' allegations. Proof of "knowingly induced" infringement by "circumstantial evidence is not only sufficient, but may also be more certain, satisfying and persuasive than direct evidence." Moleculon Research Corp. v. CBS, Inc., 793 F.2d 1261, 1272 (Fed. Cir. 1986), cert. denied, *479 U.S. 1030, 107 S. Ct. 875, 93 L. Ed. 2d 829 (1987)* (quoting Michalic v. Cleveland Tankers, Inc., 364 U.S. 325, 330, 81 S. Ct. 6, 5 L. Ed. 2d 20 (1960)).

Q. And who would have inquired of you regarding how it was going?

A. Oh, the president of the company, the vice president of operations of the company.

Q. And that is Thomas Judd?

A. Thomas Judd, Greg Iaquinto. Those would be the main people.

. . . .

Q. And it -- and what did -- did you evaluate that prototype at that time?

A. Yes, I did, and so didn't some other people in the company.

Q. Who else evaluated that clip?

A. Greg Iaquinto, Thomas Judd. I might have shown it to John Lagace, the purchaser. But the primary targets would have been Tom and Greg.

. . . .

Q. And what was your -- what was your opinion regarding this prototype?

**[*1224]** A. Well, that it had the aesthetics that we liked, not exactly like we liked. It's not the same thing, but it was close enough and we were pleased. We liked **[**33]** the sliding function of it. And I think the only real negative at that point was that it wouldn't fit in our existing package.

Q. And I guess this was -- this was the feeling of everyone__

A. Everyone, yeah.

Q. -- at the meeting, meaning Mr. Judd and Mr. Iaquinto?

A. It wasn't really a meeting. Just an informal discussion. Whether or not I got them both at the same time, I don't know.

. . . .

Q. Now, based on -- based on that -- the advice you received from Mr. Crowley, -- or the opinion you received from Mr. Crowley, what did you do next?

. . . .

A. Okay. I shared some of the knowledge with Greg Iaquinto and Thomas Judd and Greg Iaquinto -- that's it. That answers the question.

Deposition of Edward Hames, Vol. II, pp. 52-53, 58-59, 88.

Excerpts from the Crowley deposition provide further circumstantial proof regarding the extent of Judd's knowledge.

Q. But you [Crowley] recall receiving some instruction from Hames at Curtis to file a utility patent application?

A. I'm not sure. Either Hames or Mr. Judd. Those were the two people that instructed, that usually instruct me to file applications.

. . . .

Q. . . . What happened on this, with respect to the 078 patent application? **[**34]** What information did you receive from Curtis in order to prepare this application?

A. To the best of my knowledge, I believe I had a drawing of how the clip -- a blueprint or a drawing of this clip.

Q. The clip that's the subject of the 078 --

A. 078 patent, right.

. . . .

Q. . . . You specify in the application Thomas Judd as the inventor; is that correct?

A. That's correct.

Q. And how did you make that determination?

A. To the best of my knowledge, I either spoke to Mr. Judd or Mr. Hames or both of them.

. . . .

Q. Were you aware, at the time of your preparation of this application, that Curtis had had communications and contact with the plaintiff, Daniel Faneuf and Plasti-clip, regarding a document holder.

A. I believe so, yes.

Q. What did you know at the time that you filed--that you were preparing this patent application about that?

A. To the best of my knowledge, there was some dispute concerning whether a clip was to be marked with the Faneuf patent number.

Q. And you were aware of that as an issue at the time or prior to filing the patent application?

(Witness examining file.)

A. I'm looking through the documents to just refer to. Yes, I was aware of the Faneuf patent prior **[**35]** to filing.

Deposition of Richard P. Crowley, Esq., pp. 34, 36, 38-43.

Plaintiffs' contention notwithstanding, ***HN26*** willfulness or specific intent to infringe is not a prerequisite to a finding of infringement. See*35 U.S.C. § 271*; see also *Ziggity Sys., Inc. v. Val Watering Sys., 769 F. Supp. 752, 795 (E.D. Pa. 1990)*. Although the statute is void of any reference to "knowing", such a standard has been judicially imposed. *Water Technologies Corp. v. Calco,*

Ltd., 850 F.2d 660, 668 (Fed. Cir.), cert. denied, 488 U.S. 968, 109 S. Ct. 498, 102 L. Ed. 2d 534 (1988). However, "knowledge" has generally been construed as "knowledge of an infringement controversy." Symbol Technologies, supra, 771 F. Supp. at 1404; see also, Aro Mfg. Co., Inc. v. Convertible Top Replacement Co., Inc., 377 U.S. 476, 514, 84 S. Ct. 1526, 12 L. Ed. 2d 457 (1964) (White, J., concurring) (plurality decision). As such,

**[*1225]** Corporate officers are presumably aware of what they are doing, and in that sense they can be said to have acted "willfully." However, that does not mean that their acts must rise to the level **[**36]** recognized by the law as constituting willful infringement before they can be liable for infringement by their corporation. Hence the district court erred in positing willful infringement as a prerequisite for the imposition of personal liability for the corporation's direct infringement.

Orthokinetics, supra, 806 F.2d at 1579.

In this regard, the court reiterates that liability has been imposed on a corporate officer or director based on the effective control the individual held over the corporation and his active participation in the infringement activities. [9]

***HN27*** Active participation sufficient to invoke personal liability has been characterized as "the moving **[**37]** force" behind the infringement, White v. Mar-Bel, Inc., 509 F.2d 287, 292 (5th Cir. 1975); "the moving, active, conscious force behind the infringement," Superior Testers, Inc. v. Damco Testers, Inc., 315 F. Supp. 934, 935 (E.D. La. 1970), Rohm and Haas Co. v. Dawson Chemical Co., 557 F. Supp. 739, 819 (S.D. Tex. 1983); or "direct participation in and control of the infringing design, manufacture, and sale," A. Stucki Co. v. Schwam, 634 F. Supp. 259, 265 (E.D. Pa. 1986).

*Ziggity, supra, 769 F. Supp. at 796.*

Finally Judd's good-faith reliance on counsel as to non-infringement is legally insufficient and irrelevant. As the Federal Circuit has held, "'a duty exists to obtain competent legal advice before initiating possibly infringing action.'" Amicus, Inc. v. Alosi, 723 F. Supp. 429, 432 (N.D. Cal. 1989) (quoting Rosemount, Inc. v. Beckman Instruments, Inc., 727 F.2d 1540, 1548 (Fed. Cir. 1984) (emphasis added)). Put differently, "when a potential infringer has actual notice of another's **[**38]** patent rights, he has the duty to 'exercise due care to determine whether or not he is infringing.'" Bott v. Four Star Corp., 807 F.2d 1567, 1572 (Fed. Cir. 1986), partially rev'd on other grounds by, A.C. Aukerman Co., supra, 960 F.2d at 1038 (emphasis added); see also Ceeco Mach. Mfg., Ltd. v. Intercole, Inc., 817 F. Supp. 979, 986 (D. Mass. 1992). Although such advice may be of relevance in determining willful infringement for the purposes of increased damages under 35 U.S.C. § 284, Central Soya Co., Inc. v. Geo. A. Hormel & Co., 723 F.2d 1573, 1577 (Fed. Cir. 1983), ***HN28*** advice of counsel "has no relevance here in determining whether [the corporate officer] induced infringement under § 271(b)." Symbol Technologies, supra, 771 F. Supp. at 1405.

In light of the testimony hereinabove set forth, and assuming arguendo that the Manville "knowing" standard is the rule, "'intent is a factual determination particularly within the province

---

[9] Moreover, Judd's status as the assignor of the '078 patent does not insulate him from potential infringement liability. See Rohm & Haas, supra, 718 F. Supp. at 331-32 (assignor of patents who encouraged and induced assignee activities infringing existing patent can be liable under 35 U.S.C. § 271(b)).

of the trier of fact.'" *Dow Chemical Co. v. Eby Mine Serv., 813 F. Supp. 749, 753 (D. Colo. 1993)* **[**39]** (quoting *Allen Organ Co. v. Kimball Int'l, Inc., 839 F.2d 1556, 1567 (Fed. Cir. 1988))*.

With due regard to the generous construction given to the facts as they relate to the nonmoving party on summary judgment and the evidentiary burden embodied in the *section 271* infringement analysis, the court hereby finds and rules that genuine issues of material fact remain to be resolved, and thus plaintiff's motion for summary judgment as to the individual liability of Judd (Count II) must be and herewith is denied.

5. Infringement of the '078 Patent

Counts I and II of the Consolidated Complaint allege, respectively, that both Judd, by his direction and participation, and Curtis have infringed and are still infringing "Faneuf's '863 patent and/or the '078 patent which belongs to Faneuf." Curtis moves for summary judgment regarding the '078 patent, to which it holds legal title as the assignee of Judd, based on defendants' lack of standing. See, e.g., *Arachnid, Inc. v. Merit Indus, Inc., 939 F.2d 1574, 1579 (Fed. Cir.* **[*1226]** 1991) ("general rule is that one seeking to recover money damages for infringement of a United States **[**40]** patent (an action 'at law') must have held the legal title to the patent during the time of the infringement"); see also *Crown Die & Tool Co. v. Nye Tool & Mach. Works, 261 U.S. 24, 40-41, 43 S. Ct. 254, 67 L. Ed. 516 (1923)*; *CHISUM, supra, § 21.03[2][f]* ("The issue in determining standing is whether the claimant possesses legal title ownership of the patent").

Contrary to plaintiffs' contention, Arachnid does not control the issue. Plaintiffs misconstrue the germ of defendants' complaint. The record clearly evinces that Faneuf is the legal owner of the '863 patent, and as such is conferred thereby with the authority to protect his property against infringement by recourse to the law. See*35 U.S.C. § 281* (patentee shall have remedy by civil action for infringement of his patent). With regard to the '078 patent, defendants do not contest the fact that Curtis, as Judd's assignee, presently holds legal title.

Rather, defendants argue that equitable title to the '078 patent, [10] acquired through the appropriation of design modifications to the '863 patent, is held by Faneuf. As a combined consequence of the equitable title and **[**41]** the malappropriation, defendants seek an assignment of legal title to the '078 patent to Faneuf as the rightful patentee. [11] It is this equitable nature of the remedy sought that renders irrelevant the issue of standing.

The remedy of equitable assignment of a malappropriated patent is not a unique circumstance. See *Becher v. Contoure Labs., Inc., 29 F.2d 31 (2d Cir. 1928),* **[**42]** aff'd, *279 U.S. 388, 49 S. Ct. 356, 73 L. Ed. 752 (1929)*; *Richardson v. Suzuki Motor Co., Ltd., 868 F.2d 1226, 1250 (Fed. Cir.)*, cert. denied, *493 U.S. 853, 110 S. Ct. 154, 107 L. Ed. 2d 112 (1989)* (district courts empowered to redress wrongful appropriation of intellectual property by those subject to the court's jurisdiction). Becher is more closely analogous to the issue at bar than Arachnid and thus controls its resolution.

---

[10] Equitable title has been defined as "the beneficial interest of one person whom equity regards as the real owner, although the legal title is vested in another." BLACK'S LAW DICTIONARY 1486 (6th ed. 1990).

[11] Although the practical effect of such a finding may result in the assignment of a void patent, see Wise v. Hubbard, 769 F.2d 1, 3 (1st Cir. 1985) (citing Kennedy v. Hazelton, 128 U.S. 667, 672, 9 S. Ct. 202, 32 L. Ed. 576 (1888)), the Supreme Court has admonished that "establishing a fact and giving a specific effect to it by judgment are quite distinct." Becher v. Contoure Labs., Inc., 279 U.S. 388, 391, 49 S. Ct. 356, 73 L. Ed. 752 (1928).

In Becher, the proprietor of an invention was making improvements thereto and engaged another to manufacture some of the components. It was agreed that any information obtained during the improvement process was to be kept secret and confidential. *Becher, supra, 29 F.2d at 31*. Despite this understanding, the parts manufacturer took the inventor's ideas and invention, submitted an application based thereon to the Patent and Trademark Office (PTO), falsely indicating himself as the inventor, and was subsequently issued a United States letters patent number. *Id. at 32*.

Recognizing that the mere fact of receiving an idea from another is not a tort, the Second Circuit emphasized that certain ideas "may have been **[**43]** obtained under circumstances which forbid the borrower to make use of it for his own benefit." Id. Further, were the invention a trade secret, the inventor would have been empowered to enjoin the appropriator from using the invention for his own benefit and could have compelled him to account for any value obtained based on wrongful use. Such a result "should be equally true when the secret is an invention." Id.

When cast in this light, the court found that the inventor's complaint set up no right under the patent laws as ground for a recovery. Rather, the "cause of action is based on equitable principles applicable to any wrongful use of confidential information which [another] had argued to keep secret." *Id. at 33*. Thus, by seeking the assignment of the '078 patent, defendants do not seek any right under the patent laws, but "rely[] solely upon common-law and equitable principles to prevent a wrongdoer from profiting by the disclosure of information obtained under circumstances which bound him to keep it secret, **[*1227]** and to account for such profit as he has made by wrongful use of the information." *Id. at 34*.

Although defendants in the case at bar seek damages under **[**44]** the patent laws for infringement of their '863 patent, the relief sought respecting the '078 patent is the above-noted equitable remedy of assignment. Curtis and Plasti-Clip were actively engaged in contractual negotiations whereby Plasti-Clip would design and produce a clip for the "Curtis Clip" document holder. As a part of this relationship, Plasti-Clip submitted several design drawings and proposals for Curtis's review and consideration. Design drawing D-1809, provided to Curtis for approval of the specifications, included the following notice:

Confidential and Proprietary Information

This document is the property of Plasti-Clip Corporation, Amherst, N.H., and contains confidential and trade secret information. This information may not be transferred from the custody or control of Plasti-Clip Corporation, except as authorized by Plasti-Clip Corporation, and then only [by] way of loan for limited purposes. It must not be reproduced in whole or part and must be returned to Plasti-Clip Corporation upon request and in all events upon completion of the purpose of the loan.

Neither this document nor the information it contains may be used or disclosed to the person not having **[**45]** need for such use or discharge consistent with the purpose of the loan without the prior express written consent of Plasti-Clip Corporation.

Hames Exhibit 33 (attached to Defendants' Motion in Opposition to Summary Judgment).

Based on the evidence presented, the court finds that standing is not at issue with respect to defendants' claim on the '078 patent due to the equitable nature of the relief sought. See *Becher,*

*supra note 11, 279 U.S. at 391* (inventor's right was "independent of and prior to any arising out of the patent law"). Since "it inheres in the principles of equity jurisprudence to obstruct and prevent the enjoyment of the fruits of [] fraud," *Becher, supra, 29 F.2d at 34*, the court further finds that a reasonable jury could determine that a confidential relationship existed between the parties and that Curtis and Judd, by their concerted actions, breached that confidence. As equity delights in doing justice, and not by halves, *Innersprings, Inc. v. Joseph Aronauer, Inc., 27 F.R.D. 32, 35 (E.D.N.Y. 1961)*, plaintiffs' motion for summary judgment as to the issue of standing is hereby denied.

**[**46]** 6. Applicability of RSA 358-A

a. Scope

***HN29*** New Hampshire Revised Statutes Annotated (RSA) 358-A, entitled Regulation of Business Practices for Consumer Protection (Consumer Protection Act or CPA), evinces a "'comprehensive statute designed to regulate business practices for consumer protection by making it unlawful for persons engaged in trade or commerce to use various methods of unfair competition and deceptive business practices.'" *Gilmore v. Bradgate Assocs., 135 N.H. 234, 238, 604 A.2d 555, 557 (1992)* (quoting *Chase v. Dorais, 122 N.H. 600, 601, 448 A.2d 390, 391 (1982))*; see also *Chroniak v. Golden Investment Corp., 983 F.2d 1140, 1146 (1st Cir. 1993)*. Despite this recognition by both the New Hampshire Supreme Court and the First Circuit, plaintiffs assert that since their actions are not specifically delineated by section 358-A:2, their act of marketing the allegedly infringing article does not come within the prohibitive scope of the statute.

As the First Circuit has observed, the "current version of *section 2* [of the CPA] lists thirteen unfair **[**47]** or deceptive acts or practices, but the listing is expressly made non-exhaustive." *Chroniak, supra, 983 F.2d at 1146* (emphasis added). [12] Continuing, the **[*1228]** Circuit limned that "[a] ***HN30*** practice is 'unfair' if (1) it is "'within at least the penumbra of some common-law, statutory, or other established concept of unfairness," (2) "it is immoral, unethical, oppressive, or unscrupulous," or (3) "it causes substantial injury to consumers."'" Id. (quoting *Rizzuto v. Joy Mfg. Co., 834 F.2d 7, 8 (1st Cir. 1987)* (quoting *Purity Supreme, Inc. v. Attorney General, 380 Mass. 762, 407 N.E.2d 297, 301 (Mass. 1980)))*. Likewise, ***HN31*** "'[a] practice may be "deceptive" . . . if it "could reasonably be found to have caused a person to act differently from the way he otherwise would have acted."'" *Chroniak, supra, 983 F.2d at 1146* (quoting *Kazmaier v. Wooten, 761 F.2d 46, 51 (1st Cir. 1985)* (quoting *Purity Supreme, supra, 407 N.E.2d at 301*)).

**[**48]** When applying these definitions, the court is chastened that "'whether ***HN32*** a party has committed an unfair or deceptive act, within the meaning of [the consumer protection act], is a question of fact.'" *Chroniak, supra, 983 F.2d at 1146* (quoting *Brennan v. Carvel Corp., 929 F.2d 801, 813 (1st Cir. 1991)* (citing *USM Corp. v. Arthur D. Little Sys., Inc., 28 Mass. App. Ct. 108, 546 N.E.2d 888, 897 (Mass. 1989)* (emphasis added and alteration in original))); see also *Pan American World Airways, Inc. v. United States, 371 U.S. 296, 306-07, 83 S. Ct. 476, 9 L. Ed. 2d 325 (1963)* (whether an act is "unfair" as contemplated by the Federal Trade Commission

---

[12] To the extent that the statute and New Hampshire caselaw provide little insight, consultation with both federal and Massachusetts precedent is encouraged. SeeRSA 358-A:13 (courts should "be guided by the interpretation and construction given Section 5(a)(1) of the Federal Trade Commission Act (15 U.S.C. 45(a)(1)), by the Federal Trade Commission and the Federal courts"); see also Chase, supra, 122 N.H. at 602, 448 A.2d at 391-92 (New Hampshire invited to utilize interpretive comparisons with the "well developed" caselaw construing the analogous Massachusetts "unfair and deceptive practices act," Mass. Gen Laws. ch. 93A).

Act is subject to a case-by-case determination). As such, and in light of the expansive embrace contemplated by the Legislature in enacting the CPA, the court finds that a factfinder would not be unwarranted in finding that plaintiffs' conduct fell within the "penumbra" of the CPA, and thus plaintiffs' motion for summary judgment as it pertains to the scope of section 358-A:2 is hereby denied.

b. Exemptions

In the alternative, plaintiffs allege that the Consumer Protection Act claim brought **[**49]** against Judd is barred by operation of *RSA 358-A:3*, IV-a. This section exempts from the CPA those ***HN33*** "transactions entered into more than 2 years prior to the complaint." Styled as such, it is clear that the New Hampshire Legislature sought to delineate a class of actions exempt from the provisions of the statute, rather than create a statute of limitations. See Zee-Bar, Inc. - *N.H. v. Kaplan, 792 F. Supp. 895, 901 (D.N.H. 1992)*.

Plaintiffs filed their declaratory action on September 8, 1989, seeking a declaration of noninfringement and/or invalidity of the '863 patent. By way of answer, defendants alleged on October 19, 1989, several counterclaims, including a violation of RSA 358-A by both Curtis and Judd. Defendants reasserted the RSA 358-A violation in their July 13, 1992, direct action against Judd. By order of this court, the original September 8, 1989, action and the subsequent July 13, 1992, action were consolidated on April 4, 1994. Plaintiffs' contend that the July 13, 1992, action is the relevant pleading insofar as the exemption period of the statute is concerned and since the infringement by Judd alleged therein occurred more than two years **[**50]** prior to the commencement of said action, suit based thereon is barred by operation of law.

Plaintiffs, the parties claiming the IV-a exemption, bear the burden of proof in establishing the two-year exemption. [13] *RSA 358-A:3*, V; see also *McMullin v. Downing, 135 N.H. 675, 680, 609 A.2d 1226, 1230 (1992)*. The court, however, decides as a matter of law whether the exemption is applicable. See *McMullin, supra, 135 N.H. at 680, 609 A.2d at 1230*; see also *Gilmore, supra, 135 N.H. at 239, 604 A.2d at 557*.

**[**51]** Since neither the Legislature nor the New Hampshire Supreme Court has specified the precise manner in which a violation of RSA **[*1229]** 358-A must be pled so as to avoid the *section 358-A:3*, IV-a, exemption, this court declines to read enhanced pleading requirements into the CPA. See Zee-Bar, supra, 792 F. Supp. at 902. Under the present legislative scheme, only transactions entered into "more than 2 years prior to the complaint" are entitled to the statutory exemption. *RSA 358-A:3*, IV-a (emphasis added).

The court, therefore, finds and rules that ***HN34*** a party may preserve their rights under the CPA whether such violation is alleged in an original complaint or by way of counterclaim. See, e.g., *American Hosp. Supply Corp. v. Roy Lapidus, Inc., 493 F. Supp. 1076, 1077 (D. Mass. 1980)* (counterclaim allegation sufficient to invoke protection of Massachusetts CPA, but claim dismissed due to satisfaction of interstate commerce percentage exemption). The court further finds that the October 19, 1989, answer and counterclaim filed by defendants was statutorily sufficient to

---

[13] The cases cited by plaintiffs in their brief are inapposite and provide little assistance toward resolution of the issue, since all involved a delay of greater than two years between the offending incidents and the filing of any complaint or counterclaim. See, e.g., Zee-Bar, supra, 792 F. Supp. at 895 (3 1/2 years elapsed); Lerer v. Ultra Scan, Inc., 770 F. Supp. 51 (D.N.H. 1990) (3 years elapsed); City of Manchester v. National Gypsum Co., 637 F. Supp. 646 (D.R.I. 1986) (8 years elapsed). But cf. Gilmore v. Bradgate Assoc., Inc., No. 89-189-D, slip op. at 5 (D.N.H. July 27, 1990) (17-month lapse insufficient to bar action).

avoid operation of the two-year exemption period. Consequently, **[**52]** plaintiffs' motion for summary judgment as to unfair or deceptive trade practices (Count V) must be and herewith is denied.

7. The Attempted Monopolization Anti-Trust Claims

*Section 2* of the Sherman Act, codified at *15 U.S.C. § 2 (1994)*, provides,

***HN35*** Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony, . . . .

In the words of the Supreme Court, ***HN36*** *section 2* "addresses the actions of single firms that monopolize or attempt to monopolize, as well as conspiracies and combinations to monopolize." Spectrum Sports, Inc. v. McQuillan, ___ U.S. ___, ___, *113 S. Ct. 884, 889, 122 L. Ed. 2d 247 (1993)*. Proof of attempted monopolization requires "(1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent [14] to monopolize and (3) a dangerous probability of achieving monopoly power." Id. at ___, 113 S. Ct. at 890-91; see also *George R. Whitten, Jr., Inc. v. Paddock Pool Builders, Inc., 508 F.2d 547, 550 (1st Cir. 1974),* **[**53]** cert. denied, *421 U.S. 1004, 95 S. Ct. 2407, 44 L. Ed. 2d 673 (1975)*.

In **[**54]** their motion for summary judgment, plaintiffs contend that no genuine issues of material fact exist concerning whether Curtis and/or Judd "engaged in predatory or anticompetitive conduct" or whether such "dangerous probability" of monopoly power is imminent, and therefore said motion should be granted. In opposition, defendants principally rely on the allegedly surreptitious application for the '078 patent as well as their inability to depose Judd.

a. Anti-Competitive Conduct

***HN37*** Monopoly power in violation of *section 2* of the Sherman Act is such power that arises as a result of "the willful acquisition or maintenance of [monopoly] power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *United States v. Grinnell Corp., 384 U.S. 563, 570-71, 86 S. Ct. 1698, 16 L. Ed. 2d 778 (1966)*; see also *Eastman Kodak Co. v. Image Technical Servs., Inc., 504 U.S. 451*, ___, *112 S. Ct. 2072, 2089, 119 L. Ed. 2d 265 (1992)*. In the First Circuit, such "willful acquisition or maintenance" has been denominated "exclusionary conduct" and defined as "'conduct, other than competition on the merits or restraints reasonably **[**55]** "necessary" to competition on the merits, that reasonably appears **[*1230]** capable of making a significant contribution to creating or maintaining monopoly power.'" *Barry Wright Corp. v. ITT Grinnell Corp., 724 F.2d 227, 230 (1st Cir. 1983)* (quoting 3 PHILIP AREEDA & DONALD TURNER, ANTITRUST LAW § 626, at 83 (1978)) (emphasis added); see also Clamp-All Corp. v. Cast Iron Soil Pipe Inst., 851 F.2d 478, 491 (1st Cir. 1988), cert. denied, *488 U.S. 1007, 109 S. Ct. 789, 102 L. Ed. 2d 780 (1989)*.

---

14 Despite the fact that the Supreme Court has noted, in dictum, that summary judgment procedures, especially in complex antitrust actions, should be used cautiously when motive and intent are integral elements of the cause of action, see Poller v. Columbia Broadcasting Sys., Inc., 368 U.S. 464, 491, 82 S. Ct. 486, 7 L. Ed. 2d 458 (1962), most courts, including the Supreme Court, are now less hesitant to apply the customary summary judgment standard in antitrust cases. See, e.g., Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986). The First Circuit "specifically has rejected special summary judgment treatment in antitrust cases, holding that the particular circumstances involved are what control." Texaco Puerto Rico, Inc. v. Medina, 834 F.2d 242, 247 (1st Cir. 1987) (citing White v. Hearst Corp., 669 F.2d 14, 17 (1st Cir. 1982)).

***HN38*** To be "anticompetitive," a practice must harm the competitive process rather than merely harm competitors. *R.W. Int'l Corp. v. Welch Food, Inc., 13 F.3d 478, 487 (1st Cir. 1994)*; see also *Spectrum Sports, supra, ___ U.S. at ___, 113 S. Ct. at 892* ("The law directs itself not against conduct which is competitive, even severely so, but against conduct which unfairly tends to destroy competition itself."); *Copperweld Corp. v. Independence Tube Corp., 467 U.S. 752, 767 n.14, 104 S. Ct. 2731, 81 L. Ed. 2d 628 (1984)* ("'The antitrust laws . . . were enacted for "the protection of competition **[**56]** , not competitors."'" (citations omitted)). Harm to this process occurs "when the conduct at issue 'obstructs the achievement of competition's basic goals--lower prices, better products, and more efficient production methods.'" *Picker Int'l, Inc. v. Leavitt, 865 F. Supp. 951, 961, 1994 WL 548058, at * 9 (D. Mass. 1994)* (quoting *Town of Concord v. Boston Edison Co., 915 F.2d 17, 22 (1st Cir. 1990)*, cert. denied, *499 U.S. 931, 111 S. Ct. 1337, 113 L. Ed. 2d 268*, and reh'g denied, *500 U.S. 930, 111 S. Ct. 2047, 114 L. Ed. 2d 131 (1991))*; see also *J.H. Westerbeke Corp. v. Onan Corp., 580 F. Supp. 1173, 1189 (D. Mass. 1984)* (anticompetitive quality of an act may depend upon the purpose with which it was done).

Congress intended that the economic incentive afforded by the patent laws were to benefit "only those persons who lawfully acquire the rights granted under our patent system." *SCM Corp. v. Xerox Corp., 645 F.2d 1195, 1206 (2d Cir. 1981)*, cert. denied, *455 U.S. 1016, 102 S. Ct. 1708, 72 L. Ed. 2d 132 (1982)*; cf., *Walker Process Equip., Inc. v. Food Mach. & Chem. Corp., 382 U.S. 172, 86 S. Ct. 347, 15 L. Ed. 2d 247 (1965)* **[**57]** (fraudulent procurement of patent). ***HN39*** "Where . . . the acquisition [of the patent] itself is unlawful, the subsequent exercise of the ordinarily lawful exclusionary power inherent in the patent would be a continuing wrong, a continuing unlawful exclusion of potential competitors." *SCM Corp., supra, 645 F.2d at 1206*.

The purpose of the Sherman Act "is not to protect businesses from the working of the market; it is to protect the public from the failure of the market. . . . It does so not out of solicitude for private concerns but out of concern for the public interest." Spectrum Sports, supra, ___ U.S. at ___, 113 S. Ct. at 891-92. Plaintiffs, attempting to limit the harm to mere competitors rather than to competition itself, comment, "the only actions alleged by Plasti-Clip to support its [Sherman Act] claim are that Curtis and Mr. Judd obtained the '078 Patent improperly and that Curtis since has manufactured and sold document holders that are within the scope of the '078 Patent." [15] Motion to Dismiss or for Summary Judgment of Curtis Manufacturing Company, Inc., and Thomas W. Judd (Plaintiffs' Motion for Summary Judgment) at 26. However, **[**58]** if the patent was wrongfully obtained, plaintiffs will have likewise wrongfully acquired the power of exclusion and deprived Faneuf of the license power he would ordinarily hold as the true inventor.

If Faneuf held the patent, it would be within his rights to license the superior clip to other entities in the computer peripheral market. **[**59]** Stripped of this power by Curtis's and Judd's allegedly fraudulent acts, Curtis can effectively keep other market participants **[*1231]** from using their clip. The evidence indicates that such exclusion has already occurred in at least one instance. The court therefore finds that a genuine issue exists as to whether plaintiffs have engaged in anticompetitive conduct.

---

[15] The court notes here in passing that

"[a] patent by its very nature is affected with a public interest. . . . [It] is an exception to the general rule against monopolies and to the right to access to a free and open market. The far-reaching social and economic consequences of a patent, therefore, give the public a paramount interest in seeing that patent monopolies spring from backgrounds free from fraud or other inequitable conduct and that such monopolies are kept within their legitimate scope."

Walker Process, supra, 382 U.S. at 177 (quoting Precision Instrument Mfg. Co. v. Automotive Maintenance Mach. Co., 324 U.S. 806, 816, 65 S. Ct. 993, 89 L. Ed. 1381 (1945)).

b. Specific Intent

***HN40*** Liability for attempted monopolization must also be predicated upon proof of specific intent to monopolize. *Spectrum Sports, supra, ___ U.S. at ___, 113 S. Ct. at 892*. Specific intent to obtain a monopoly includes an intent to unreasonably restrict competition. See, e.g., *Onan Corp., supra, 580 F. Supp. at 1190*. The First Circuit has recognized that "a specific intent to monopolize or restrain competition can often be inferred from a finding of bad faith." *CVD, Inc. v. Raytheon Co., 769 F.2d 842, 851 (1st Cir. 1985)*, cert. denied, *475 U.S. 1016, 106 S. Ct. 1198, 89 L. Ed. 2d 312 (1986)*.

"In antitrust cases, questions of motive, or intent, credibility, or conspiracy frequently prevent summary judgment from being entered, since **[**60]** these issues involve subjective questions regarding state of mind that can only be decided after a full trial." 10A CHARLES A. WRIGHT, ET AL, FEDERAL PRACTICE AND PROCEDURE § 2732.1, at 313-19 (1983). This court has previously recognized that ***HN41*** the determination of specific intent is itself a question of fact, not law. *Varney v. Coleman Co., Inc., 385 F. Supp. 1337, 1343 (D.N.H. 1974)*. As a question of fact, such an inquiry is within the exclusive province of the jury.

The inability of the parties to schedule Judd's deposition necessarily leaves genuine issues regarding specific intent unresolved and summary judgment particularly inappropriate. This is so

since the information relating to state of mind generally is within the exclusive knowledge of one of the litigants and can be evaluated only on the basis of circumstantial evidence, the other parties normally should have an opportunity to engage in discovery before a summary judgment is rendered. But even this may not be enough. Inasmuch as a determination of someone's state of mind usually entails the drawing of factual inferences as to which reasonable men might differ--a function traditionally left **[**61]** to the jury--summary judgment often will be an inappropriate means of resolving an issue of this character.

*WRIGHT, supra*, § 2730, at 238; see also *Nash v. Keene Publishing Corp., 127 N.H. 214, 224, 498 A.2d 348, 354-55 (1985)* (issue of intent in libel action inappropriate for resolution at summary judgment). The court therefore finds genuine issues with respect to the specific intent element of the Sherman Act claim.

c. Dangerous Probability

To withstand plaintiffs' motion for summary judgment on the attempted monopolization claim, defendants must further demonstrate, beyond mere facial averments, that genuine issues exist concerning the probability of plaintiffs' attaining monopoly power. See Spectrum Sports, supra, ___ U.S. at ___, 113 S. Ct. at 891. "After all, ***HN42*** an act can be wrongful in the context of *section 2* [of the Sherman Act] only where it has or threatens to have a significant exclusionary impact." *U.S. Healthcare, Inc. v. Healthsource, Inc., 986 F.2d 589, 597-98 (1st Cir. 1993)*.

To determine exclusionary impact, the court must first determine the **[**62]** relevant market. [16] Put simply, the relevant market is composed of (1) the product market and (2) the geographic area involved. See *Lee v. Life Ins. Co. of North America, 829 F. Supp. 529, 539 (D.R.I. 1993)*, aff'd *23 F.3d 14 (1st Cir. 1994)*; see also *United States v. E.I. du Pont de Nemours & Co., 351*

---

[16] "Because market power is often inferred from market share, market definition generally determines the result of the case." Kodak, supra, ___ U.S. at ___, 112 S. Ct. at 2083 n.15.

*U.S. 377, 404, 76 S. Ct. 994, 100 L. Ed. 1264 (1956)*; *Brown Shoe Co. v. United States, 370 U.S. 294, 324, 82 S. Ct. 1502, 8 L. Ed. 2d 510 (1962)*. "The relevant product market generally consists 'of products that have reasonable interchangeability for the purposes for which they are produced,' taking into consideration price, use and quality." *Lee, supra, 829 F. Supp. at 539* (quoting *E.I. du* **[*1232]** Pont, *supra, 351 U.S. at 404*). Moreover, "the extent to which one market prevents exploitation of another market depends on the extent to which consumers will change their consumption of one product in response to a price change in another; i.e., the 'cross-elasticity of demand.'" Kodak, supra, ___ U.S. at ___, 112 S. Ct. at 2083.

**[**63]** Defendants allege that the relevant product market is comprised of "all document holders for use as a computer peripheral," Consolidated Complaint P 49, and plaintiffs assume arguendo this definition. Plaintiffs' Motion for Summary Judgment at 26. For the purposes of this motion, the court takes the evidence in the light most favorable to the nonmovant and as such finds that defendants have properly characterized the relevant market for the disputed clip. [17] The relevant geographic market at issue, as conceded by plaintiffs, is the entire United States. Plaintiffs' Motion for Summary Judgment at 25.

**[**64]** In response to interrogatories propounded by defendants regarding the size of the market and Curtis's market share, plaintiffs provided sales figures for the past four years, the current year (1994) to date, and projected sales figures for the remainder of 1994. Included in this information was the following handwritten note: "have 15% of world mkt (educated guess)." No evidence has been submitted by any of the parties regarding Curtis's share of the United States market for computer peripheral document holders. Since ***HN43*** a United States Letters Patent only protects inventors from infringing articles marketed in the United States, see *Deepsouth Packing Co. v. Laitram Corp., 406 U.S. 518, 530, 92 S. Ct. 1700, 32 L. Ed. 2d 273*, reh'g denied, *409 U.S. 902, 93 S. Ct. 94, 34 L. Ed. 2d 165 (1972)* ("our patent system makes no claim to extraterritorial effect"), the dearth of evidence on this point places the court in a decisional bind.

***HN44*** Summary judgment, as previously noted, is a procedural device used "'to pierce the boilerplate of the pleadings and assay the parties' proof in order to determine whether trial is actually required.'" *Snow v. Harnischfeger Corp., 12 F.3d 1154, 1157 (1st Cir. 1993)* **[**65]** (quoting *Wynne v. Tufts Univ. Sch. of Medicine, 976 F.2d 791, 794 (1st Cir. 1992))*. Although defendants have put forward enough evidence to sustain their attempted monopolization antitrust claims with respect to the "anticompetitive conduct" and "specific intent" prongs, the record before the court is completely devoid of any evidence pertaining to the market power of Curtis

---

[17] The First Circuit has previously commented on the market definition quandary, noting that

there is no subject in antitrust law more confusing than market definition. One reason is that the concept, even in the pristine formulation of economists, is deliberately an attempt to oversimplify--for working purposes --the very complex economic interactions between a number of differently situated buyers and sellers, each of whom in reality has different costs, needs, and substitutes. See United States v. E.I. du Pont De Nemours & Co., 351 U.S. 377, 76 S. Ct. 994, 100 L. Ed. 1264 (1956). Further, when lawyers and judges take hold of the concept, they impose on it nuances and formulas that reflect administrative and antitrust policy goals. This adaption is legitimate (economists have no patent on the concept), but it means that normative and descriptive ideas become intertwined in the process of market definition.

U.S. Healthcare, supra, 986 F.2d at 598. Given the ultimate disposition of the antitrust inquiry, the court is satisfied with defendants' asserted market definition.

in the United States. As such, the court is unable to determine the final aspect of an attempted monopolization claim--"dangerous probability of success." [18]

**[**66]** **[*1233]** As the party pressing the attempted monopolization claim, defendants "must plead facts sketching 'relevant details of a *§ 2* claim' including 'facts defining the market.'" *C.R. Bard, Inc. v. Medical Electronics Corp., 529 F. Supp. 1382, 1390 (D. Mass. 1982)* (quoting *Gilbuilt Homes, Inc. v. Continental Homes of New England, 667 F.2d 209, 211 (1st Cir. 1981))*. The court appreciates, however, that discovery has been primarily hampered by numerous unsuccessful efforts to depose Judd, the person identified by Curtis as "the most knowledgeable employee of Curtis regarding sales of the [document holders]." Letter of Attorney Pirozzolo to Attorney Danenbarger dated Jan. 18, 1994 (attached as Exhibit J to Defendants' Motion in Opposition to Summary Judgment).

Due to the important nature of this testimony, the court will defer its summary judgment ruling on the antitrust claim until the deposition of Judd has occurred. [19]See *Phillips v. Martin Marietta Corp., 400 U.S. 542, 544, 91 S. Ct. 496, 27 L. Ed. 2d 613 (1971)* (grant of summary judgment reversed and case remanded for further development on ground of inadequate record for summary **[**67]** judgment). The parties have until December 21, 1994, to depose Judd and file supplemental briefs on the narrow issue of antitrust liability.

8. Conversion and Idea Misappropriation

In the Consolidated Complaint, defendants also allege that plaintiffs converted the design of the plastic clip device and thereafter submitted said design to the PTO as part of the application which ultimately resulted in the '078 Patent. Plaintiffs contend that the design of the clip is merely an idea, and as such cannot be the subject of an action for conversion. In view of the present record, as well as New Hampshire and First Circuit precedent, **[**68]** the court finds plaintiffs' argument unpersuasive. [20]

It has become settled law in New Hampshire that ***HN45*** "'conversion is an intentional exercise of dominion or control over a chattel which so seriously interferes with the right of another to control it that the actor may justly be required to pay the other the full value of the chattel.'" *LFC Leasing & Fin. Corp. v. Ashuelot Nat'l Bank, 120 N.H. 638, 640, 419 A.2d 1120, 1121 (1980)*

---

[18] Based on the facts and circumstances presently before the court, unless defendants can demonstrate that Curtis held 50 percent or more of the United States domestic market, their antitrust claims will fail as a matter of law. See, e.g., Advanced Health-Care Servs. v. Giles Memorial Hosp., 846 F. Supp. 488, 497 (W.D. Va. 1994) ("Where, as in this case, evidence of intent and predatory conduct is weak and entry barriers are low, the plaintiff must show a market share above 50 percent to show a 'dangerous probability of success.'"); M & M Medical Supplies & Serv., Inc. v. Pleasant Valley Hosp., Inc., 981 F.2d 160, 168 (4th Cir. 1992), cert. denied, ___ *U.S.* ___, *113 S. Ct. 2962, 125 L. Ed. 2d 662 (1993)* (claims involving less than a 50 percent market share should usually be rejected, "except where conduct is very likely to achieve monopoly or where conduct is invidious"); Barr Labs., Inc. v. Abbott Labs., 978 F.2d 98, 112-15 (3d Cir. 1992) (defendant's 50 percent market share insufficient to show dangerous probability of success).

[19] In the complaint, defendants asserted antitrust violations under both federal and state law. To the extent that the New Hampshire Legislature has encouraged the uniform construction of RSA 356 (Combinations & Monopolies) with federal antitrust law, any determination of liability under the state statute is likewise deferred. SeeRSA 356:14; U.S. Healthcare, supra, 986 F.2d at 599.

[20] Plaintiffs further alleged that defendants' claims of conversion were preempted by operation of 35 U.S.C. §§ 116 (Inventors) and 256 (Correction of named inventor). This federal scheme for the correction of patents only applies when a joint inventor has not been named in the application through error which arises without any deceptive intention on the part of the named inventor. See35 U.S.C. §§ 116, 256. Since the record clearly indicates that such error was not due to mere inadvertence, the court finds said sections of title 35 to be inapplicable in the present dispute.

**[**69]** (quoting *Muzzy v. Rockingham County Trust Co., 113 N.H. 520, 523, 309 A.2d 893, 894 (1973))*; see also*RESTATEMENT (SECOND) OF TORTS § 222A(a)* (1965).

Chattels subject to conversion can be classified as either tangibles or intangibles. With respect to intangible chattels, the RESTATEMENT provides:

(1) Where there is conversion of a document in which intangible rights are merged, the damages include the value of such rights.

(2) One who effectively prevents the exercise of intangible rights of the kind customarily merged in a document is subject to a liability similar to that for conversion, even though the document is not itself converted.

RESTATEMENT, supra, § 242; see also *Triple-A Baseball Club Ass'n v. Northeastern Baseball, Inc., 655 F. Supp. 513, 539 (D. Me.)*, rev'd on other grounds, *832 F.2d 214 (1st Cir. 1987)*, cert. denied, *485 U.S. 935, 108 S. Ct. 1111, 99 L. Ed. 2d 272 (1988)* (citing § 242 and noting Maine's recognition that intangible rights may be converted). "Under such circumstances, the document may be the subject of conversion as the embodiment of and as **[**70]** representing the title to the chattel or the **[*1234]** obligation." RESTATEMENT, supra, § 242 cmt. a. [21]

Put differently,

where information is gathered and arranged at some cost and sold as a commodity on the market, it is properly protected as property. Where ideas are formulated with labor and inventive genius, as in the case of literary works or scientific researches, they are protected. Where they constitute instruments of fair and effective commercial competition, those who develop them may gather their fruits under the **[**71]** protection of the law.

*Pearson v. Dodd, 410 F.2d 701, 707-08, 133 U.S. App. D.C. 279 (D.C. Cir.)*, cert. denied, *395 U.S. 947, 89 S. Ct. 2021, 23 L. Ed. 2d 465 (1969)* (emphasis added and footnotes omitted). [22]

As discussed above in part 5, supra, regarding defendants' standing to sue for infringement, defendants had a proprietary **[**72]** interest in design drawing D-1809. See Hames Exhibit 33, supra. Although the resultant clips were to be marketed by Curtis, neither the idea embodied in the design drawing nor the molds used to produce the clips were to leave Plasti-Clip's exclusive control. See Hames Exhibit 33, supra (proprietary disclaimer of drawing); see also Hames Exhibit 30 (propriety disclaimer of molds) (attached to Defendants' Motion in Opposition to Summary Judgment); Deposition of Hames at 137 ("'Charges for molds and tools only cover a portion of the cost. Title and possession of molds and tools remain with Plasti-Clip.' That's something we would never agree to if that was caught . . . I know it's after the fact . . . ."

---

[21] The court pauses here to note that although plaintiffs are correct in their assertion that conversion of an intangible right has been applied to the conversion of bank books, bonds, checks, and the like, "such documents do not constitute an all-inclusive catalogue of those to which the rule stated in [] Section [242] is applicable . . . . The law is evidently undergoing a process of expansion, the ultimate limits of which cannot as yet be determined." RESTATEMENT, supra, § 242 cmt. b.

[22] At least one court has indicated that the inquiry should focus "on what proof is necessary to establish the existence of the allegedly converted property; not the form it has taken or its identification within a larger quantity of identical property." Northcraft v. Edward C. Michener Assocs., Inc., 319 Pa. Super. 432, 466 A.2d 620, 625 (Pa. Super. 1983) (holding that cause of action exists for wrongfully retained plans and specifications, but suggested that more amenable cause of action would lie for breach of contract or misrepresentation). See also 7 STUART M. SPEISER, ET AL, THE AMERICAN LAW OF TORTS § 24:5, at 715 (1990) (noting paucity of authority on subject).

(emphasis added)). The court therefore finds that since the ideas embodied in design drawing D-1809 were formulated through defendants' "labor and inventive genius," *Pearson, supra, 410 F.2d at 707-08*, defendants thus had a right to the "possession" of their property, both tangible and intangible. See, e.g., *Quincy Cablesystems, Inc. v. Sully's Bar, Inc., 650 F. Supp. 838, 848 (D. Mass. 1986)* (plaintiff had rights **[**73]** to "possession" of satellite transmissions); *Wise, supra note 11, 769 F.2d at 2* (claims of conversion and misappropriation against fraudulent inventor permissible but denied due to expiration of limitations period).

Moreover, despite plaintiffs' assertion that Judd's assignment of the patent to Curtis relieves him of conversion liability, the court further finds that, on the evidence before it, Judd's participation in the '078 patent application scheme serves as a sufficient predicate for the imposition of personal liability. See *Mottolo, supra, 629 F. Supp. at 60* (personal participation standard for corporate officer liability).

In light of these findings, therefore, plaintiffs' motion for summary judgment as to conversion and idea misappropriation (Count VI) must be and herewith is denied.

Conclusion

For the reasons set forth herein, plaintiffs' motion to dismiss or for summary judgment (document 57) is denied in all respects with the exception of the antitrust claims brought against both Curtis and Judd (Count IV). The parties shall have until December 21, 1994, to obtain Judd's deposition and file supplemental briefs with the court **[**74]** on the **[*1235]** narrow issue of antitrust liability as set out in Count IV of the Consolidated Complaint.

SO ORDERED.

Shane Devine, Senior Judge

United States District Court

November 21, 1994

EXHIBIT 265

LexisNexis

Neutral
As of: August 12, 2014 9:09 AM EDT

# Dillon Materials Handling, Inc. v. Albion Industries, Div. of King-Seeley Thermos Co.

United States Court of Appeals for the Fifth Circuit
February 16, 1978
No. 76-3670

**Reporter:** 567 F.2d 1299; 1978 U.S. App. LEXIS 12577; 1978-1 Trade Cas. (CCH) P61,874
DILLON MATERIALS HANDLING, INC., Plaintiff-Appellant, v. ALBION INDUSTRIES, DIVISION OF KING-SEELEY THERMOS COMPANY, Defendant-Appellee

**Subsequent History: [**1]** As Amended

**Prior History:** Appeal from the United States District Court for the Northern District of Texas.

**Disposition:** AFFIRMED.

**Core Terms**

casters, distributors, sales, distributorship, terminated, manufactured, products, competitive, industrial, Handling, competitors, district court, commerce, Materials, conversation, exclusivity, seller, jury's finding, non-Albion, antitrust, wheel, cart

**LexisNexis® Headnotes**

Antitrust & Trade Law > ... > Price Fixing & Restraints of Trade > Exclusive & Reciprocal Dealing > General Overview
Antitrust & Trade Law > ... > Price Fixing & Restraints of Trade > Exclusive & Reciprocal Dealing > Exclusive Dealing
Antitrust & Trade Law > ... > Price Fixing & Restraints of Trade > Per Se Rule & Rule of Reason > General Overview

***HN1*** Exclusive dealing arrangements are not per se illegal.

Antitrust & Trade Law > ... > Price Fixing & Restraints of Trade > Exclusive & Reciprocal Dealing > General Overview

***HN2*** See *15 U.S.C.S. § 14*.

Antitrust & Trade Law > ... > Price Fixing & Restraints of Trade > Exclusive & Reciprocal Dealing > General Overview

***HN3*** In the absence of an express exclusivity requirement, however, an antitrust plaintiff is not foreclosed from making out a case. A course of dealing between seller and buyer may ripen into an implied or informal agreement or understanding. The existence of such an agreement or

understanding, of course, must be evaluated in light of all the circumstances peculiar to the case at hand.

Antitrust & Trade Law > Clayton Act > General Overview
Antitrust & Trade Law > Clayton Act > Scope
Antitrust & Trade Law > ... > Price Fixing & Restraints of Trade > Exclusive & Reciprocal Dealing > General Overview
Contracts Law > Types of Commercial Transactions > Sales of Goods > General Overview
Contracts Law > ... > Sales of Goods > Performance > General Overview
Contracts Law > ... > Sales of Goods > Performance > Rights of Buyers
Contracts Law > Types of Contracts > Lease Agreements > General Overview
Contracts Law > Personal Property > Personalty Leases > General Overview

***HN4*** In the absence of any forbidden agreement a seller may unilaterally refuse to do business with a buyer without running afoul of the antitrust laws. *Section 3* of the Clayton Act, *15 U.S.C.S. § 14*, by its express terms, covers only leases, sales or contracts actually made on the condition, agreement, or understanding that the lessee or purchaser thereof shall not use or deal in the goods of a competitor of the lessor or seller. There is nothing whatever in the Act to suggest that it covers a situation where the manufacturer refuses to make a sale or enter into a contract, and it has been stated time and again that a manufacturer has the unquestioned right to refuse to deal with anyone for reasons sufficient to himself. There is a real difference between the act of refusing to deal and the execution of a contract which prevents a person from dealing with another.

**Counsel:** Paul Thorp, Dallas, Texas.

Jack N. Price, Austin, Texas, for Appellant.

Richard G. Rogers, Dallas, Texas.

Stanley E. Neely, Dallas, Texas, for Appellee.

**Judges:** Tuttle, Coleman and Roney, Circuit Judges.

**Opinion by:** TUTTLE

**Opinion**

**[*1300]** TUTTLE, Circuit Judge:

This is an appeal from a judgment n.o.v. entered by the district court in an antitrust case. The appellant, Dillon Materials Handling, Inc. (hereinafter "Dillon"), was the exclusive stocking distributor for the appellee, Albion Industries, Division of King-Seeley Thermos Co. (hereinafter "Albion"), in the Dallas, Texas area from November 1971 until March 1974. Albion terminated Dillon's distributorship in March 1974, and Dillon responded with this law suit, alleging violations of *section 1* of the Sherman Act and *section 3* of the Clayton Act. Following an 11-day trial, the district court submitted the case to the jury, which held for the defendant on the Sherman Act claim [1] and for the plaintiff on the Clayton Act claim. [2] The district court, however, granted

---

[1] Dillon's First Amended Complaint alleged that Albion had violated *section 1* of the Sherman Act, *15 U.S.C. § 1*, by imposing territorial restrictions on the sale of Albion products through its distributors, including Dillon. The jury concluded that although

defendant's motion for **[**2]** judgment n.o.v. on the Clayton Act claim, precipitating this appeal. We affirm.

This litigation involves the caster industry, which may be divided into three basic categories: decorative, institutional and commercial, and industrial. Within each category, different types of casters are further identifiable by capacity and application. "Decorative" casters normally are used on furniture, while "institutional and commercial" casters are used **[**3]** on various carts and other rolling equipment commonly found in hospitals, schools and department stores. "Industrial" casters encompass those products whose attributes include a higher load capacity and rollability. At least 25 manufacturers [3] compete on a nationwide basis for a share of the markets represented by each of the three categories described above. During the relevant time period, Albion did not offer an institutional line, but did produce the "most complete line" of industrial casters.

Around January 1969, Dick Davis, who later became president of Dillon, was appointed a distributor for the "Colson" line of casters in the Dallas, Texas **[**4]** area. Specifically, Davis purchased the "Colson Southwest Branch" in Dallas, thereby acquiring $ 34,000 worth of inventory, a place of business and three employees. At the time Colson did not offer a decorative line and its industrial line, in Davis' opinion, was not "complete." Over two years later, in May 1971, Davis purchased Dillon Scale and Equipment Company, which he combined with the Colson Southwest Branch. Davis eventually acquired a line of decorative casters manufactured by Shepherd Products, U.S., Inc. and began marketing Colson and Shepherd casters under a new corporate name, Dillon Materials Handling, Inc.

Davis thereafter surveyed his competition and determined that no other company in the Dallas market was offering a complete line of casters or emphasizing casters as a primary product in the materials handling field. [4] He decided to capitalize on this void and began a search for a more complete line of industrial casters to combine with the Colson and Shepherd lines. Other distributors suggested that he attempt to secure the Albion line, since it was considered to be "the most complete line in the market." Davis' initial attempt to secure the Albion distributorship **[**5]** in Dallas failed. However, when the extent distributor, A. C. Andrews Co., went bankrupt in 1971, Davis initiated negotiations which led to the appointment **[*1301]** of Dillon as an Albion distributor. After meeting with Albion's sales manager, Bud Fierke, and president, John Karmalski, Davis secured the Dallas distributorship for Dillon in November 1971.

Davis characterized Dillon's relationship with Albion during 1972 as "super." Sales of Albion's products approached $ 100,000 for that year. In March 1973, however, Davis was visited by Albion's newly appointed sales manager, Bob Brettelle, who told Davis that "Albion [wanted] some more business from Dillon." [5] Brettelle suggested that "you can start by giving us some of

---

Albion had established exclusive territories for the resale of its products. Dillon's distributorship was not cancelled in an effort to effectuate that system. The jury's findings in this regard are not challenged on appeal.

[2] The money damages awarded Dillon by the jury totalled $ 121,833.

[3] The evidence as to the exact number was inconclusive. Mr. Dick Davis, the president of Dillon, testified that there probably are 20 to 25 caster and wheel manufacturers and an additional 12 companies that manufacture only wheels. However, Albion's president, Mr. Richard H. Dobbins, said in his deposition that there are over 100 caster manufacturers nationwide.

[4] Dillon's arrangement with Colson included, in addition to casters, the sale of wheel cars, stretchers and other products.

[5] In its brief, Dillon attempts to negate any inference of an inadequate sales volume by pointing out that its 1972 sales ($ 100,000) far exceeded the 1971 sales of its predecessor, A. C. Andrews Co. Although it is true that Andrews sold only $ 12,000 worth of

that Colson business." He also complained about the fact that Davis had opened a cart fabrication business in Oklahoma. [6] Brettelle did not return to Dallas in **[**6]** 1973.

**[**7]** After Brettelle's vist, the relationship between Albion and Dillon "deteriorated." Dillon experienced increased delays in obtaining shipments from Albion and, in addition, lost two sizeable accounts during the year. [7] Finally, in February 1974, Brettelle made a return visit to Dallas and terminated Dillon's distributorship. Subsequent conversations between Davis and Richard Dobbins, who succeeded Karmalski as president of Albion on January 1, 1972, failed to alter Albion's position. The Dallas distributorship subsequently was awarded to Casters of Dallas, Inc. (hereinafter "Casters"), a materials handling concern formed by Wes Hale and Truman Powers. Hale served as president of Casters, while Powers was president of B & F Casters, a Houston, Texas company that held the Albion distributorship in Houston.

**[**8]** On September 19, 1974, Dillon filed suit against Albion, alleging numerous violations of the federal antitrust laws. The specific allegation involved in this appeal is that Albion imposed on its distributors an exclusive dealing policy which required the distributors not to sell casters manufactured by Albion's competitors, in violation of *section 3* of the Clayton Act. [8] **[**9]** Dillon claimed that its distributorship was terminated because of non-compliance with the policy and that it lost sales as a result. [9] The jury concluded that Albion had violated *section 3* in the manner alleged and awarded **[*1302]** damages to Dillon. A judgment n.o.v. was entered by the district court because there was "insufficient evidence to support the jury's implicit finding that the effect of any exclusive dealing agreement may have been to substantially lessen competition or tend to create a monopoly in a line of commerce." [10] It is from this judgment that Dillon appeals and to which we must now turn our attention.

**[**10]** In pertinent part, *section 3* of the Clayton Act provides:

---

Albion products in 1971, the company was on the verge of bankruptcy early in 1971 and did finally declare bankruptcy later that year. Thus, although Davis may have thought that Brettelle had no reason to complain about the first-year sales, a quantitative comparison of Andrews' and Dillon's annual sales is of little value.

[6] In early 1973, Davis established a cart fabrication operation called Materials Handling, Inc., expecting to thereby increase his caster sales. Brettelle's concern in this regard was that other cart manufacturers which purchased Albion casters might object to competition from a company as closely associated with Albion as was Dillon. Later, after the fabrication plant began production, Brettelle objected to the amount of time Davis spent at the plant.

[7] The record shows that the 1973 shipment delays were attributable at least in part to an industry-wide materials shortage and a sudden influx of new business. There also was testimony that Dillon had a similar problem with other manufacturers. We mention this evidence only to negate any inference that the shipping delays were a form of retaliation for any of Dillon's business practices to which Albion objected.

[8] The complaint charged that this policy constituted a "per se" violation of the Clayton Act; however, it is well settled that ***HN1*** exclusive dealing arrangements are not per se illegal. *Hoopes v. Union Oil Co.*, 374 F.2d 480, 486 (9th Cir. 1967), *citing Tampa Electric Co. v. Nashville Coal Co.*, 365 U.S. 320, 333, 335, 81 S. Ct. 623, 5 L. Ed. 2d 580 (1961).

[9] Dillon's expert witness, Dr. Stanley Block, testified that the company experienced a "rather precipitous dropoff of caster sales" after the termination. There were decreased sales of the Albion line and of other lines, although both categories of losses were said to be attributable to the termination. As a nondistributor, Dillon still had access to the Albion line but enjoyed a lower discount and had to absorb some additional freight expenses. Davis testified that because of these increased prices Dillon could not offer the Albion line on a competitive basis, resulting in decreased sales. Some customers dropped Dillon altogether because of its inability to supply Albion, supposedly causing lost sales of other casters.

[10] The district court recited an additional basis for the j.n.o.v. - insufficient evidence to support the jury's finding of damages attributable to Dillon's lost profits from the sale of non-Albion casters. Although Dillon disputes this finding, our disposition of the appeal makes it unnecessary for us to consider the question.

> ***HN2*** It shall be unlawful for any person engaged in commerce, in the course of such commerce, to lease or make a sale or contract for sale of goods, . . . on the condition, agreement, or understanding that the lessee or purchaser thereof shall not use or deal in the goods . . . of a competitor or competitors of the lessor or seller, where the effect of such lease, sale, or contract for sale or such condition, agreement, or understanding may be to substantially lessen competition or tend to create a monopoly in any line of commerce.*15 U.S.C. § 14*. Since there was no question that Albion was engaged in commerce or that the Dillon-Albion distributorship agreement was a contract for the sale of goods, Dillon's burden of proof at trial was two-fold. First, it was required to show that its purchases as a distributor of Albion casters were made on the "condition, agreement, or understanding" that it would not sell non-Albion casters. Second, it had to show the requisite effect on competition. As previously mentioned, the district court held that the **[**11]** evidence was insufficient to support the jury's finding that the latter showing had been made. Our review is governed by the standards announced in *Boeing Co. v. Shipman, 411 F.2d 365, 374-75 (5th Cir. 1969)* (en banc). After a careful study of the entire record, we agree with the findings of the district court and, in addition, hold that there was insufficient evidence to support the jury's finding that sales to Albion distributors were made upon a condition, agreement or understanding of exclusivity.

As an initial matter, it is important to note that the written distributorship agreement between Albion and Dillon in no way restricted Dillon's right to sell competitive goods. And none of the correspondence between the two companies mentioned such a restriction. ***HN3*** In the absence of an express exclusivity requirement, however, an antitrust plaintiff is not foreclosed from making out a case. A course of dealing between seller and buyer may "ripen into an implied or informal agreement or understanding." *McElhenney Co. v. Western Auto Supply Co., 269 F.2d 332, 337 (4th Cir. 1959)*. **[**12]** The existence of such an agreement or understanding, of course, must be evaluated in light of all the circumstances peculiar to the case at hand. *Cf. Frey & Son, Inc. v. Cudahy Packing Co., 256 U.S. 208, 41 S. Ct. 451, 65 L. Ed. 892 (1921)*; *United States v. A. Schrader's Son, Inc., 252 U.S. 85, 40 S. Ct. 251, 64 L. Ed. 471 (1920)*.

Dillon's proof in this regard consisted almost entirely of comments made during several conversations between Davis and Albion management. And although Dillon sold casters manufactured by companies other than Colson, [11] the evidence primarily relates to Dillon's sales of the Colson line. First, Dillon points to the October 1971 negotiating session between Davis, Fierke and Karmalski. It must be remembered that Davis initiated these discussions and, to ensure that his bid for the distributorship **[*1303]** was successful, Davis had to sell himself and Dillon to Albion's management.

**[**13]** Davis initially met with Albion's sales manager, Bud Fierke. He told Fierke about Dillon's operation and that Dillon was a Colson distributor. Davis testified that Fierke was "very interested in our relationship with Colson," although it is plain that Fierke never directed or asked Davis either to quit selling or phase out the Colson line. Davis, however, in what obviously

---

[11] Davis testified that in addition to Albion and Colson, Dillon sold casters manufactured by Jarvis & Jarvis, Fairbanks, Hamilton, Devine, Bridge Wheel, Gleason, Saginaw, Rapistan and Jakes. Charles S. Rhoads, Dillon's sales manager, added to this list the names of other "major" lines, including Bassick, Nutting, Midwest, Shepherd and R & K. The record makes it clear that Colson, Fairbanks, Nutting and Hamilton marketed industrial casters similar to at least part of the Albion line.

was a purely gratuitous sales pitch, told Fierke that Albion would receive all of Dillon's caster sales in the Albion "62 series and up," since in Davis' opinion Colson did not manufacture industrial casters competitive with that portion of the Albion line. Fierke apparently was impressed with Davis' presentation, and the two men proceeded to a meeting with Albion's president, John Karmalski.

Davis' recollection of the meeting with Karmalski was as follows:

> The Colson line was brought up again and I reiterated to Mr. Karmalski - he was concerned, he told me that Colson distributors - they felt that Colson was a potential competitor for them and that where they had gone with Colson distributors before, they weren't pleased with it. I told [Karmalski and Fierke] again that Colson's line does not compete **[**14]** with Albion's line for what my needs were in [the Dallas] market, which was an industrial caster. . . .Karmalski never stated or intimated that Dillon would be required to discontinue sales of Colson casters or any other products manufactured by Albion's competitors. Even when considered in the light most favorable to Dillon, these conversations evidence no more than an unsolicited pledge on Davis' part that Dillon would not sell certain Colson products that he considered *not* to be competitive with Albion's line.

Davis, of course, was successful in his bid for the distributorship, which was confirmed by a November 23, 1971 letter from Bud Fierke. Neither that letter nor Davis' response mentioned any restriction on the sale of non-Albion casters. And, according to Davis' own testimony, during 1972 nobody at Albion complained that Dillon was handling Colson or selling items that were competitive with Albion's line. The Colson topic, however, did surface during Bob Brettelle's March 1973 visit, although there is some dispute as to exactly what was said. Davis testified that Brettelle requested more business from Dillon and that Dillon could start by "giving [Albion] **[**15]** some of that Colson business." Brettelle's recollection of the conversation differed. He testified that although he mentioned that it "was unusual for Colson and Albion to be in the same house," he did not suggest any diversion of sales to Albion. Brettelle testified that Dillon's sales for the first few months of 1973 were down and that he simply told Davis that sales of Albion products had to increase. The jury, of course, was free to believe Davis' testimony rather than Brettelle's. Even so, it would not have been reasonable to interpret Brettelle's remarks as a suggestion or demand that Dillon discontinue its sales of competitive goods.

The final phase of Dillon's proof centers around Albion's termination of the distributorship and the appointment of Casters of Dallas as Dillon's successor. According to Davis, when Brettelle cancelled the distributorship [12] in February 1974, he told Davis: "Dick, everyone knows you are married to Colson. You are just giving us problems. You are even running around making speeches for Colson. [13] **[**17]** " And in a subsequent telephone conversation with Richard Dobbins, Albion's president, Dobbins told **[*1304]** Davis that "if it wasn't for Colson **[**16]** we

---

[12] The distributorship agreement required 30-days written notice of termination. It is agreed that Albion satisfied this contractual requirement.

[13] The speech referred to by Brettelle was given by Davis at one of Colson's annual sales meetings for field sales personnel and management. The text was introduced into evidence as Plaintiff's Exhibit 1. Although Davis encouraged the group to complete their line by offering Albion's industrial casters, he also listed "married to Colson" as one of three "musts" in distributor marketing. He also noted that 50 percent of Dillon's annual sales went to Colson.

wouldn't have been having a problem in the first place. [14]" Dillon also asserts that Casters of Dallas was awarded the Dallas distributorship on the condition that non-Albion products not be sold. The record, however, does not support this assertion. Although Wes Hale and Truman Powers testified that in light of Dillon's experience they did not think it would have been "a good idea" to handle Colson and that they promised to place their "major emphasis" on Albion in Dallas, the record shows that Casters of Dallas actually sold and continues to sell competitive goods. [15]

At trial, Brettelle did not deny that Dillon's sale of Colson casters was one of the reasons [16] **[**19]** for termination. **[**18]** He insisted, however, that Dillon was not terminated because it sold competitive goods but because Dillon was not selling enough Albion. A memorandum Brettelle wrote after his meeting with Davis confirms Brettelle's concern that Dillon had not been "pushing" the Albion line as it should have. [17] To be sure, Dobbins testified that one reason for the termination was Dillon's "inability or refusal to promote Albion's full line of products." Dobbins' testimony was reiterated by Wes Hale and Truman Powers, who said that in their discussions with Brettelle and Dobbins, both had expressed the feeling that most of Dillon's sales were going to Colson. In short, the evidence is at least as consistent with Albion's claim that Dillon was terminated in part because of a lack of Albion sales as with Dillon's contention that it was terminated for the mere sale of Colson casters.

On the basis of the evidence outlined above, we think it clear that there was insufficient proof for a reasonable jury to have concluded that Dillon and Albion had even an informal agreement or understanding of exclusivity. [18] **[**21]** Even more unsubstantiated were Dillon's claim and the **[*1305]** jury's conclusion that Albion's alleged exclusivity requirement bound all of its distributors. During the period in question, Albion had from 35 to 41 stocking distributors nationwide. Dillon attempted to make its case by introducing correspondence with Albion

---

[14] Davis' response was "that never was the deal with the company and [Albion isn't] losing any business because I [have] Colson." During an earlier conversation with Dobbins, Davis attempted to salvage the distributorship by offering to "set up a separate company strictly to handle Albion." Both statements underscore the fact that Dillon in fact sold non-Albion casters.

[15] Wes Hale, the president of Casters of Dallas, initially approached Truman Powers to secure financial assistance for his company. At the time, Hale was attempting to secure the Faultless line in Dallas. Hale testified that although Faultless had a heavy-duty industrial line, he went after Albion because Powers "was having success in the Albion product *in conjunction with Faultless* in the Houston area." Powers testified that his company, which serves as the Albion distributor in Houston, and Casters of Dallas handle essentially the same lines, including Albion, Faultless, Hamilton, Nutting and others.

[16] Brettelle testified that in addition to Dillon's relationship with Colson, the following factors entered into the decision to terminate: (1) decreased sales, (2) inadequate advertising, and (3) credit difficulties. Significantly, Brettelle stated that Dillon's distributorship would have been cancelled even if Dillon had ceased all sales of Colson casters.

[17] In particular Brettelle noted that most of Dillon's inventory appeared to be Colson rather than Albion. In addition, the record shows that in 1973 Dillon sold $ 147,000 worth of Colson casters and only $ 58,622.05 worth of Albion. Dillon did sell some $ 21,000 worth of Albion's products to Materials Handling, Inc., the cart fabrication concern.

[18] We have based our discussion almost entirely upon the evidence claimed by Dillon to establish a practice of exclusive dealing and have found that evidence insufficient. To further substantiate our conclusion, we need only point to the testimony of Dillon's own employees. Jim Bussard, a "territory manager" for Dillon, was responsible for Dillon's promotion and sales. He testified that he never had heard of any restrictions on the types of products Dillon was permitted to sell after becoming an Albion distributor. James D. Brock, a Dillon salesman, also testified that he knew of no such restriction and that he felt free to sell whatever product he needed to sell in order to meet the customers' needs. Finally, Dillon's purchasing agent, Charles S. Rhoads, testified as follows:

> We had a number of customers that [were] strictly Colson-oriented. This happened back when we had nothing else to offer them but Colson and *if they asked for Colson we gave them Colson*. And we bought where we could get delivery.

distributors from as far back as 1951. The vast majority of these letters, which concerned the establishment and maintenance of various distributors, made no mention of an exclusive dealing requirement. **[**20]** Four of the letters, however, contained a similar phrase which in essence said that Albion "assumed" the distributor would not sell competitive goods for the duration of the distributorship agreements. These letters were dated November 1, 1954, August 26, 1954, June 30, 1955, and May 8, 1964. Although the most recent letter was written eight years before Dillon became a distributor, Dillon attempts to propel them into the future by pointing out that both Karmalski and Dobbins testified that they did not change any of Albion's basic sales policies after becoming president. The weakness of Dillon's position should be obvious - the letters alone fall far short of establishing a "policy" of any sort in existence before 1971. Indeed, Richard Dobbins, who became Albion's president one month after Dillon became a distributor, testified that he knew of no such restrictive policy in effect when he took over and that no such policy had been in force during his tenure. [19]

---

> And so *if Colson wheels were slow we bought Albion . . . or . . . Jakes or . . . R & K, whoever we could get them from*." [emphasis added].

[19] In fact, Dobbins testified that "most of our distributors handle our competitor's and many, many of them are competitive." Dillon was unable to produce any other distributors to refute this testimony or to present any evidence that Albion had ever terminated a distributor for selling competitive goods.

Dillon's inability to show that Albion's distributors were bound by any sort of exclusive dealing agreement, of course, makes clear the correctness of the district court's conclusion concerning the effect-on-competition prerequisite. The basic evil meant to be curbed by section 3 is the foreclosure of the market to competitors of the seller. Dillon produced no evidence, either directly or indirectly, that Albion's competitors were precluded or discouraged from entering the market because of any practice or policy of Albion.

On the record before us, we need not resolve one of the basic disputes in this litigation - whether Dillon's showing that Albion enjoyed from 8 to 12 percent of the nationwide caster market and sold from $ 3 to $ 8 million worth of casters annually suffices to show a "substantial lessening of competition." The parties in this case, the courts and commentators have debated whether the "quantitative substantiality" test announced by the Supreme Court in *Standard Oil v. United States*, 337 U.S. 293, 299-315, 69 S. Ct. 1051, 1055, 93 L. Ed. 1371 (1949) (test is whether competition may be foreclosed "in a substantial share of the line of commerce affected"), was in any way changed by the apparently broader inquiry outlined in *Tampa Electric Co. v. Nashville Coal Co.*, 365 U.S. 320, 81 S. Ct. 623, 5 L. Ed. 2d 580 (1960):

> To determine substantiality in a given case, it is necessary to weigh the probable effect of the contract on the relevant area of effective competition, taking into account the relative strength of the parties, the proportionate volume of commerce involved in relation to the total volume of commerce in the relevant market area, and the probable immediate and future effects which pre-emption of that share of the market might have on effective competition therein. It follows that a mere showing that the contract itself involves a substantial number of dollars is ordinarily of little consequence.*Id.* at 329, 81 S. Ct. at 629. The Supreme Court has not attempted to reconcile the approaches, and we need not attempt to do so here, since it is plain that Dillon failed to satisfy the less exacting inquiry made in *Standard Oil.*

In *Standard Oil* the government, which complained of contracts requiring dealers to purchase gasoline and TBA exclusively from the defendant, showed that the challenged contracts bound some 6,000 service stations in the geographic market involved. 337 U.S. 293 at 295, 69 S. Ct. 1051, 93 L. Ed. 1371. Similar showings were made in other Clayton Act cases ultimately decided by the Court. *E. g.*, *Fashion Originators' Guild of America, Inc. v. FTC*, 312 U.S. 457, 461-62, 61 S. Ct. 703, 85 L. Ed. 949 (1941); *see International Salt Co. v. United States*, 332 U.S. 392, 394-95, 68 S. Ct. 12, 92 L. Ed. 20 (1947); *International Business Machines Corp. v. United States*, 298 U.S. 131, 132-36, 56 S. Ct. 701, 80 L. Ed. 1085 (1936); *United Shoe Machinery Corp. v. United States*, 258 U.S. 451, 454-57, 42 S. Ct. 363, 66 L. Ed. 708 (1922). Dillon, on the other hand, proved Albion's percentage market share but did not show what portion, if any, of the market had been pre-empted by an exclusivity arrangement with the distributors. We do not mean to intimate that a seller cannot violate the Clayton Act by entering an exclusive dealing contract with a single buyer, *see Standard Fashion Co. v. Magrane-Houston Co.*, 258 U.S. 346, 42 S. Ct. 360, 66 L. Ed. 653 (1922), or that

**[**22]** **[*1306]** In light of our holding that there was insufficient evidence for a reasonable jury to conclude that the sale of Albion casters to Dillon was based on a "condition, agreement, or understanding" of exclusivity, Dillon's Clayton Act claim is reduced, at best, to a termination of its distributorship in part because of its promotion of the Colson line. It is well settled, however, that ***HN4*** in the absence of any forbidden agreement a seller may unilaterally refuse to do business with a buyer without running afoul of the antitrust laws. *United States v. Colgate & Co., 250 U.S. 300, 307, 39 S. Ct. 465, 63 L. Ed. 992 (1919)*. [20] As this court held in *Nelson Radio & Supply Co. v. Motorola, 200 F.2d 911 (5th Cir. 1952)*, *cert. denied*, *345 U.S. 925, 73 S. Ct. 783, 97 L. Ed. 1356 (1953)*:

> *Section 3* of the Clayton Act, by its express terms, covers only leases, sales or contracts actually made on the condition, agreement, or understanding that the lessee or purchaser thereof shall not use or deal in the goods of a competitor of the lessor **[**23]** or seller. There is nothing whatever in the Act to suggest that it covers a situation where the manufacturer refuses to make a sale or enter into a contract, and it has been stated time and again that a manufacturer has the unquestioned right to refuse to deal with anyone for reasons sufficient to himself. . . . There is a real difference between the act of refusing to deal and the execution of a contract which prevents a person from dealing with another.*Id. at 915-16* (footnote and citations omitted); *accord* *Timken Roller Bearing Co. v. FTC, 299 F.2d 839, 842* (6th Cir.), *cert. denied*, *371 U.S. 861, 83 S. Ct. 118, 9 L. Ed. 2d 99 (1962)*; *Associated Beverages Co. v. P. Ballantine & Sons, 287 F.2d 261, 265 (5th Cir. 1961)*; *McElhenney Co. v. Western Auto Supply Co., 269 F.2d 332, 337-39 (4th Cir. 1959)*; *Leo J. Meyberg Co. v. Eureka Williams Co., 215 F.2d 100, 100* (9th Cir.) (per curiam), *cert. denied*, *348 U.S. 875, 75 S. Ct. 113, 99 L. Ed. 689 (1954)*; *Elliott & Frantz, Inc. v. Raygo, Inc., 379 F. Supp. 498, 501-502 (E.D.Pa.1974)*. **[**24]** *Cf.* *Scanlan v. Anheuser-Busch, Inc., 388 F.2d 918, 921* (9th Cir.), *cert. denied*, *391 U.S. 916, 88 S. Ct. 1810, 20 L. Ed. 2d 654 (1968)* (unilateral change of distributors without effect on availability of competing goods not violation of antitrust laws). The thrust of these cases is clear - a refusal to deal is by definition a refusal to enter into the requisite sale or lease.

**[**25]** In summary, we conclude that there was wholly insufficient evidence to support the jury's finding that Albion violated *section 3* of the Clayton Act. We see no reason to discuss Dillon's other arguments on appeal. Accordingly, the judgment of the district court is AFFIRMED.

---

Dillon was bound to prove such an arrangement with each and every one of Albion's distributors. However, proof of percentage market share and dollar volume alone, without any proof of the breadth of exclusive dealing, is inadequate.

[20] The *Colgate* doctrine has been re-examined by the Supreme Court on numerous occasions. *See Simpson v. Union Oil Co.*, 377 U.S. 13, 17, 84 S. Ct. 1051, 12 L. Ed. 2d 98 (1964); *United States v. Parke, Davis & Co.*, 362 U.S. 29, 38-49, 80 S. Ct. 503, 4 L. Ed. 2d 505 (1960); *United States v. Bausch & Lomb Optical Co.*, 321 U.S. 707, 722-23, 64 S. Ct. 805, 88 L. Ed. 1024 (1944); *FTC v. Beech-Nut Packing Co.*, 257 U.S. 441, 451-54, 42 S. Ct. 150, 66 L. Ed. 307 (1922); *Frey & Son, Inc. v. Cudahy Packing Co.*, 256 U.S. 208, 209-11, 41 S. Ct. 451, 65 L. Ed. 892 (1921); *United States v. A. Schrader's Son, Inc.*, 252 U.S. 85, 96-100, 40 S. Ct. 251, 64 L. Ed. 471 (1920). Although the basic principle has been narrowed considerably in recent history, we find nothing in the record to indicate that Albion did not successfully traverse the narrow path cleared by the Court.

EXHIBIT 266

LexisNexis®

Caution
As of: August 12, 2014 9:09 AM EDT

**Domed Stadium Hotel, Inc. v. Holiday Inns, Inc.**
United States Court of Appeals for the Fifth Circuit
May 21, 1984
No. 83-3074

**Reporter:** 732 F.2d 480; 1984 U.S. App. LEXIS 22306; 1984-1 Trade Cas. (CCH) P66,008
The DOMED STADIUM HOTEL, INC., d/b/a Holiday Inn-Superdome, Plaintiff-Appellant, v. HOLIDAY INNS, INC., Defendant-Appellee

**Prior History:** **[**1]** Appeal from the United States District Court for the Eastern District of Louisiana.

**Disposition:** AFFIRMED.

**Core Terms**

Hotel, market share, monopolization, hotel room, district court, cases, concentration, relevant market, acquisition, downtown, reservations, antitrust, franchise agreement, summary judgment, franchise, license, merger, entity, brand, acquiring, monopoly, matter of law, construct, fiduciary, site, summary judgment motion, anti-competitive, probability, submarket, conspire

**LexisNexis® Headnotes**

Contracts Law > Contract Interpretation > General Overview
Contracts Law > Defenses > Ambiguities & Mistakes > General Overview
Contracts Law > Remedies > Ratification

***HN1*** Under Louisiana law the court must enforce a contract to ratify the intent of the parties. The court must ascertain intent by referring to the words of the contract, as long as the words are clear, explicit, and lead to no absurd consequences. The words also must be interpreted consistently with their common and usual significance, and any doubt or ambiguity in their meaning must be resolved by referring to other words or phrases in the contract and to the contract as a whole.

Business & Corporate Law > ... > Corporate Finance > Franchise Tax > General Overview
Business & Corporate Law > Distributorships & Franchises > Causes of Action > Fiduciary Duties
Business & Corporate Law > Distributorships & Franchises > Franchise Relationships > Franchise Agreements
Business & Corporate Law > Distributorships & Franchises > Termination > General Overview
Contracts Law > Contract Interpretation > Fiduciary Responsibilities
Governments > Fiduciaries

***HN2*** Except in cases of franchise termination, in which courts have refused to give literal effect to the language of the franchise agreement, courts have not imposed general fiduciary obligations upon franchisors.

Civil Procedure > ... > Summary Judgment > Burdens of Proof > General Overview

***HN3*** Simply because a case is based upon the antitrust law does not suspend the application of *Fed. R. Civ. P. 56*. The reason summary judgments may seem less common in antitrust cases is because such cases are ripe with issues of motive, intent and credibility which often must be inferred from the total circumstances.

Antitrust & Trade Law > ... > Monopolies & Monopolization > Conspiracy to Monopolize > General Overview
Antitrust & Trade Law > ... > Monopolies & Monopolization > Conspiracy to Monopolize > Sherman Act
Antitrust & Trade Law > Sherman Act > General Overview
Antitrust & Trade Law > Sherman Act > Claims

***HN4*** The Sherman Act, *15 U.S.C.S. § 1* forbids every contract, combination, or conspiracy, in restraint of trade and requires the plaintiff to prove that separate business entities acted in concert. Conduct by a single firm cannot violate *§ 1*.

Antitrust & Trade Law > ... > Monopolies & Monopolization > Conspiracy to Monopolize > General Overview
Criminal Law & Procedure > ... > Inchoate Crimes > Conspiracy > Elements

***HN5*** Although a corporation and its franchisees may combine or conspire to restrain trade, a point well established in this circuit is that a corporation cannot conspire or combine with its own officers, employees, or wholly owned sales divisions and outlets in violation of *15 U.S.C.S. § 1*.

Antitrust & Trade Law > ... > Monopolies & Monopolization > Conspiracy to Monopolize > General Overview

***HN6*** The one exception to the general rule that a corporation cannot conspire with its own employees in violation of *15 U.S.C.S. § 1* occurs in the rare instances in which employees have an independent personal stake in achieving the object of the conspiracy.

Antitrust & Trade Law > ... > Monopolies & Monopolization > Actual Monopolization > General Overview
Antitrust & Trade Law > ... > Monopolies & Monopolization > Attempts to Monopolize > General Overview
Antitrust & Trade Law > Sherman Act > Scope > General Overview

***HN7*** See *15 U.S.C.S. § 2*.

Antitrust & Trade Law > ... > Monopolies & Monopolization > Actual Monopolization > General Overview

***HN8*** Monopoly power is the power to control price or exclude competition.

Antitrust & Trade Law > ... > Monopolies & Monopolization > Actual Monopolization > General Overview

***HN9*** The offense of monopoly under *15 U.S.C.S. § 2* has two elements: (1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident.

Antitrust & Trade Law > Regulated Practices > Market Definition > General Overview

***HN10*** Commodities reasonably interchangeable by consumers for the same purposes make up that part of the trade of commerce, monopolization of which may be illegal.

Antitrust & Trade Law > Regulated Practices > Market Definition > General Overview

***HN11*** Antitrust law recognizes that economically significant sub-markets may exist which themselves constitute relevant product markets.

Antitrust & Trade Law > Regulated Practices > Market Definition > General Overview

***HN12*** One can theorize that we have monopolistic competition in every non-standardized commodity with each manufacturer having power over the price and production of his own product. However, this power that, let us say, automobile or soft-drink manufacturers have over their trade-marked products is not the power that makes an illegal monopoly. Illegal power must be appraised in terms of the competitive market for the product.

Antitrust & Trade Law > Regulated Practices > Market Definition > General Overview

***HN13*** The exception to the general rule prohibiting single-market definition applies when the manufacturer of a unique product uses his control over one market, or level of competition, to eliminate competition at another level, or sub-market.

Antitrust & Trade Law > Regulated Practices > Market Definition > General Overview

***HN14*** Market domination may result solely from control of a large share of the market, or from control of some significant part of a market containing characteristics that allow it to be controlled by a participant not having a grossly disproportionate share of it.

Antitrust & Trade Law > ... > Monopolies & Monopolization > Actual Monopolization > General Overview

***HN15*** While a 90 percent market share definitely is enough to constitute monopolization, it is doubtful whether 60 or 64 percent would be enough; and certainly, 33 percent is not.

Antitrust & Trade Law > ... > Monopolies & Monopolization > Actual Monopolization > General Overview

***HN16*** Recent cases by this court hold that market shares of between seventeen and twenty-five percent are legally insufficient to uphold a finding of monopolization, at least absent other compelling evidence that the defendant had monopoly power.

Antitrust & Trade Law > ... > Monopolies & Monopolization > Attempts to Monopolize > General Overview

Criminal Law & Procedure > ... > Inchoate Crimes > Attempt > General Overview

Criminal Law & Procedure > ... > Inchoate Crimes > Attempt > Elements

Criminal Law & Procedure > ... > Acts & Mental States > Mens Rea > Specific Intent

***HN17*** The offense of attempted monopolization has two elements: (1) specific intent to accomplish the illegal result; and (2) a dangerous probability that the attempt to monopolize the relevant market will be successful.

Antitrust & Trade Law > ... > Monopolies & Monopolization > Attempts to Monopolize > General Overview

***HN18*** A defendant must have some legally significant share of the market before he approaches the level of dangerous probability of success condemned by the attempt provision of *15 U.S.C.S. § 2*.

Antitrust & Trade Law > ... > Monopolies & Monopolization > Attempts to Monopolize > General Overview

***HN19*** Dangerous probability of success may be shown either by direct proof of market power or by inference from proven specific intent.

Antitrust & Trade Law > ... > Monopolies & Monopolization > Actual Monopolization > General Overview
Antitrust & Trade Law > ... > Monopolies & Monopolization > Attempts to Monopolize > General Overview

***HN20*** A market share of less than the fifty percent generally required for actual monopolization may support a claim for attempted monopolization if other factors such as concentration of market, high barriers to entry, consumer demand, strength of the competition, or consolidation trend in the market are present.

Antitrust & Trade Law > ... > Monopolies & Monopolization > Attempts to Monopolize > General Overview

***HN21*** While the exact market share percentage necessary to prove attempt to monopolize may vary under differing market conditions, absent a showing of special market conditions, a market share of less than ten percent, as a matter of law, usually will not support a finding of attempt to monopolize.

Antitrust & Trade Law > Clayton Act > General Overview
Antitrust & Trade Law > Clayton Act > Scope

***HN22*** See *15 U.S.C.S. § 7*.

Antitrust & Trade Law > Clayton Act > General Overview
Antitrust & Trade Law > Regulated Practices > Market Definition > General Overview

***HN23*** A defendant need not have a market share approaching monopoly proportions to be within the reach of *15 U.S.C.S. § 7*.

Antitrust & Trade Law > Clayton Act > General Overview
Mergers & Acquisitions Law > Antitrust > Antitrust Statutes > Clayton Act
Mergers & Acquisitions Law > Antitrust > General Overview

***HN24*** Courts, in applying *15 U.S.C.S. § 7*, must assess the probability of anti-competitive results flowing from the challenged merger or acquisition.

Antitrust & Trade Law > Clayton Act > General Overview
Mergers & Acquisitions Law > Antitrust > Antitrust Statutes > Clayton Act
Mergers & Acquisitions Law > Antitrust > General Overview

***HN25*** The plaintiff in a *15 U.S.C.S. § 7* suit may make a prima facie showing of probable anti-competitive impact in one of two ways. He may show merely that the size of the entities involved makes them "inherently suspect" in light of Congress' design to prevent undue economic concentration, thereby resulting in a "significant" increase in market share and an "undue" market concentration. If, however, the size of the entities involved is not "inherently suspect," then the plaintiff may show that other characteristics of the market make the merger or acquisition more economically harmful than the bare market share and market concentration statistics otherwise indicate.

Antitrust & Trade Law > Clayton Act > General Overview
Antitrust & Trade Law > Regulated Practices > Market Definition > General Overview
Mergers & Acquisitions Law > Antitrust > General Overview
Mergers & Acquisitions Law > Antitrust > Market Definition

***HN26*** If a plaintiff in a *15 U.S.C.S. § 7* case fails to make a prima facie case on the basis of bar market share and concentration statistics, he still may survive a motion for summary judgment if he shows other factors indicating that the merger or acquisition threatens competition in the relevant market.

**Counsel:** Leach, Paysee & Baldwin, New Orleans, Louisiana, for J. Dieth, Kaye, Scholer, Fierman, Hays & Handler, New York, New York, for Appellant/Petitioner.

Sessions, Fishman, Rosenson, Snellings, & Boisfontaine, Curtis R. Boisfontaine, New Orleans, Louisiana, Robert E. Barkley, Jr., for Appellee-Respondent.

**Judges:** Politz, Randall and Jolly, Circuit Judges.

**Opinion by:** JOLLY

**Opinion**

**[*482]** E. GRADY JOLLY, Circuit Judge:

The Domed Stadium Hotel, Inc. (Superdome Hotel), a Louisiana corporation, brought this action against Holiday Inns, Inc., a Tennessee corporation, alleging that Holiday Inns' acquisition of the Chateau LeMoyne Hotel in downtown New Orleans breached its franchise agreement with Holiday Inns and also violated sections one and two of the Sherman Act, *15 U.S.C. §§ 1*, *2*, and section seven of the Clayton Act, *15 U.S.C. § 18*. After lengthy discovery the district court orally granted Holiday Inns' motion for summary judgment on both the antitrust claims and the contract claims. We agree with the district court that the contract claims, Clayton Act claims and section one Sherman **[**2]** Act claims are without merit. We also hold that as a matter of law, the relevant product market is hotel rooms generally, and not the submarket of Holiday Inn hotel rooms. We agree with the district court that Holiday Inns does not have legally sufficient market power **[*483]** within the hotel room product market so that its actions violate section two of the Sherman Act or Section seven of the Clayton Act. We therefore affirm the decision of the district court.

I.

In December of 1974, after more than a year of negotiating, Joseph M. Rault, Jr., President of The Domed Stadium Hotel, Inc., entered into a management agreement with Holidy Inns providing for Holiday Inns to manage the seventeen-story building he owned in downtown New Orleans as a Holiday Inn hotel. Dissatisfied with this arrangement, in 1976 the parties altered their relationship, and the Superdome Hotel became a franchised member of the Holiday Inn chain. The franchise agreement between the parties granted the Superdome Hotel the right to operate a Holiday Inn hotel at a specific site in downtown New Orleans, and explicitly reserved to Holiday Inns the right to construct and operate other Holiday Inn hotels **[**3]** "at any place other than on the site licensed." [1] As a franchised Holiday Inn hotel, the Superdome Hotel enjoyed all the benefits of Holiday Inns' nationwide advertising and marketing programs, and also obtained business through Holiday Inns' toll-free nationwide computerized reservations service known as "Holidex."

---

[1] The agreement, in part, provided:

IT IS MUTUALLY COVENANTED AND AGREED AS FOLLOWS:

**[**4]** Prior to 1974 when the Superdome Hotel first began operating as a Holiday Inn, Holiday Inns owned and operated the Holiday Inn-French Quarter, the only Holiday Inn hotel in downtown New Orleans. The approximately 250-room Holiday Inn-French Quarter enjoyed a high rate of occupancy and often could not accommodate all the patrons who, through Holidex, attempted to reserve hotel rooms in downtown New Orleans. After the Superdome Hotel became part of the Holiday Inns chain, Holiday Inns referred Holidex patrons to the Superdome Hotel. Some of these Holidex referrals were patrons whom the Holiday Inn-French Quarter could not accommodate.

In 1978 Holiday Inns entered into an agreement to acquire the Chateau Le-Moyne, a 172-room hotel located in the French Quarter area of New Orleans, between the Holiday Inn-French Quarter and the Superdome Hotel. Prior to acquiring the Chateau LeMoyne, Holiday Inns asked a private market research firm to conduct a routine market analysis to determine the impact of Holiday Inns' acquisition of the Chateau LeMoyne on other Holiday Inn hotels in the area. The study concluded that, because the Chateau LeMoyne added 172 rooms "to the market serviced **[**5]** by the Holidex reservation system," the Superdome Hotel would lose twelve to fifteen percent of its occupancy during the three-month tourist season, or three to five percent over a year. The study concluded, however, that if tourism continued to grow in New Orleans, the Superdome Hotel's losses would be temporary and could be minimized further by aggressive marketing. In 1979 Holiday Inns incorporated the Chateau LeMoyne into its system as a company-owned hotel. The rooms in the two company-owned Holiday Inn hotels -- the Chateau LeMoyne and the Holiday Inn-French **[*484]** Quarter -- gave Holiday Inns, at most, approximately four percent of the total number of hotel rooms in downtown New Orleans. [2]

**[**6]** In December of 1978 the Superdome Hotel filed this lawsuit against Holiday Inns. It alleged that by operating the Chateau LeMoyne as a company-owned Holiday Inn hotel, Holiday Inns competed against the Superdome Hotel in violation of the 1976 franchise agreement. The Superdome Hotel also alleged that Holiday Inns attempted to monopolize the Holiday Inn room market in downtown New Orleans by acquiring the Chateau LeMoyne and thereby violated the Sherman and Clayton antitrust acts. Finally, the Superdome Hotel alleged that by referring Holidex patrons to the company-owned Chateau LeMoyne rather than the franchised Superdome Hotel, Holiday Inns acted anti-competitively in violation of the Sherman Act.

---

First: Licensor hereby grants to licensee, subject to the terms and conditions hereof, a non-assignable, *non-exclusive license* to use said system in the operation of one Holiday Inn on the following described *specific site:*

> Existing 173 room (keys) Inn located at 1111 Gravier Street, New Orleans, Louisiana, 70112 known now and to continue to be operated as "Holiday Inn-Superdome".

It is further understood and agreed that the Licensor has, and shall continue to have during the life of this license agreement . . . the right to construct and operate one or more Holiday Inns at any place other than on the site licensed hereby.

Second: Licensee does acknowledge and recognize . . . that this license is *not exclusive*; that licensor is enabled in accordance with the provisions hereof, to construct and operate, or permit to be constructed and operated by other license applicants, additional Holiday Inns anywhere except at the site licensed hereby . . . (emphasis added).

[2] The record is not clear on exactly how many rooms the two company-owned Holiday Inn hotels together contained, but evidently the total is between 345 and 426. The record also is unclear about how many hotel rooms exist in downtown New Orleans, but evidently the total is between 10,000 and 11,605. Consequently, Holiday Inns owned between 2.97% and 4.26% of the hotel rooms in downtown New Orleans.

In 1980 Holiday Inns terminated the franchise agreement. The Superdome Hotel attempted to obtain a preliminary injunction in federal district court to prevent the termination, but, after more than three weeks of hearings, the district court denied the preliminary injunction, and this court affirmed that decision. *Domed Stadium Hotel v. Holiday Inns, Inc.*, 644 F.2d 32 (5th Cir.1982). Holiday Inns subsequently filed a motion for partial summary judgment, seeking dismissal of the **[**7]** Superdome Hotel's antitrust claims. On May 12, 1982, the district court granted this motion. Holiday Inns then brought a motion for summary judgment seeking dismissal of the Superdome Hotel's remaining claims, all of which were contract claims. On December 27, 1982, the district court granted this motion, thus disposing of the entire case. The Superdome Hotel filed a timely notice of appeal pursuant to *28 U.S.C. § 1291*.

II.

The Superdome Hotel argues that by acquiring the Chateau LeMoyne, Holiday Inns violated the express terms of their franchise agreement, breached the implied obligation of good faith that exists in every contractual relationship, and breached the fiduciary relationship existing between the parties. The district court correctly held that these claims are unmeritorious.

***HN1*** Under Louisiana law, which governs this franchise agreement, we must enforce the contract to ratify the intent of the parties. *Acree v. Shell Oil Co., 548 F. Supp. 1150, 1153 (M.D.La.1982)*; *Smith v. Moncrief, 421 So. 2d 1127, 1131 (La.Ct.App.1982)*. We must ascertain intent by referring to the words of the contract, as long as the words are clear, explicit, and lead to no absurd **[**8]** consequences. *Maloney v. Oak Builders, Inc.*, 256 La. 85, 235 So. 2d 386 (1970). The words also must be interpreted consistently with their common and usual significance, and any doubt or ambiguity in their meaning must be resolved by referring to other words or phrases in the contract and to the contract as a whole. *Lambert v. Maryland Casualty Company, 418 So. 2d 553 (La.1982)*.

The franchise agreement grants the Superdome Hotel the right to operate a Holiday Inn hotel at a specific site. It specifically states that the license is not exclusive, and that Holiday Inns may "construct and operate one or more Holiday Inns at any place other than on the site licensed." [3] Nothing could be clearer than the fact that Holiday Inns did not grant the Superdome Hotel a territorial license, and that consequently, Holiday Inns did not breach the express terms of the franchise agreement by acquiring the Chateau LeMoyne Hotel.

The Superdome Hotel argues that by using the terms "construct **[**9]** and operate," the **[*485]** franchise agreement reserved to Holiday Inns only the right to build new hotels and operate them as Holiday Inns hotels. By negative implication, the agreement does not allow Holiday Inns to purchase ongoing enterprises and convert them to Holiday Inn hotels. This creative interpretation of the words "construct and operate" is unsound under Louisiana's general principles of contract construction. Not only is it contrary to the common and usual significance of the words "construct and operate," but it also is inconsistent with other provisions of the agreement that specify the non-exclusivity of the Superdome Hotel's rights, and limit its right to a specific site in downtown New Orleans.

The Superdome Hotel's argument that Holiday Inns breached the implied general obligation of good faith that permeates every contractual relationship must fall with our holding that the terms

---

[3] *See supra* note 1.

of the franchise agreement do not grant the Superdome Hotel a territorial license. The implied obligation to execute a contract in good faith usually modifies the express terms of the contract and should not be used to override or contradict them. *Corenswet, Inc. v. Amana Refrigeration,* **[**10]** *Inc., 594 F.2d 129, 138 (5th Cir.1979)* (interpreting Uniform Commercial Code article I).

Finally, Holiday Inns did not breach any fiduciary obligation toward the Superdome Hotel by acquiring the Chateau LeMoyne and converting it into a Holiday Inn hotel. ***HN2*** Except in cases of franchise termination, in which courts have refused to give literal effect to the language of the franchise agreement, courts have not imposed general fiduciary obligations upon franchisors. *Murphy v. White Hen Pantry Co., 691 F.2d 350, 355 (7th Cir.1982)*; *Newark Motor Inn Corp v. Holiday Inns, Inc., 472 F. Supp. 1143, 1151-52 (D.N.J. 1979)*. *Cf.* *Carter Equipment Co. v. John Deere Industrial Equipment Co., 681 F.2d 386, 390-91 (5th Cir.1982)* (whether franchise relationship is fiduciary is a question of fact). We also refuse to do so. [4]

The Superdome Hotel relies upon *Arnott v. American Oil Company* **[**11]** , 609 F.2d 873 (8th Cir.1979) to support its argument that Holiday Inns had a fiduciary obligation toward the Superdome Hotel. This reliance is misplaced. The dispute in *Arnott* arose from an alleged wrongful franchise termination, rather than from harm alleged to have occurred during an ongoing franchise relationship. Although the court in *Arnott* said that a fiduciary duty inheres in a franchise relationship, a close examination of the court's analysis and of the challenged jury instructions it upheld reveals that it applied no more than basic contract principles to hold that the defendant breached a duty of good faith and fair dealing. *Id. at 880-84*. *See also* *Murphy, 691 F.2d at 355*.

Nothing in this case suggests that the Superdome Hotel and Holiday Inns' relationship was anything other than that of two business entities dealing at arms' length. In fact, Rault, owner of the Superdome Hotel, himself solicited Holiday Inns' support when he first opened the Superdome Hotel. In 1976, when the original management agreement proved unsatisfactory to him, he successfully convinced Holiday Inns to alter its relationship with the Superdome Hotel, and make the hotel a **[**12]** franchised Holiday Inn hotel operated by its own personnel.

Having examined the Superdome Hotel's contract arguments, and having found them to be without merit, we now turn to the antitrust issues presented by this case.

III.

The Superdome Hotel asserted violations of sections one and two of the Sherman Act, *15 U.S.C. §§ 1*, *2*, and section seven of the Clayton Act, *15 U.S.C. § 18*. The district court granted the defendant's motion for summary judgment on all of these claims.

**[*486]** The Superdome Hotel contends that summary judgments are inappropriate in complex, fact-sensitive antitrust cases. We agree that district courts should grant summary judgments sparingly in antitrust cases. *Transource International, Inc. v. Trinity Industries, Inc., 725 F.2d 274 (5th Cir.1984)*. Some antitrust cases, however, are approximately dismissed on motion for summary judgment because, despite their complexity, no dispute exists regarding an underlying material fact. *Bayou Bottling, Inc. v. Dr. Pepper Company, 725 F.2d 300 (5th Cir.1984)*; *Southway Theatres, Inc. v. Georgia Theatre Co., 672 F.2d 485 (5th Cir.1982)*; *Carlson Machine Tools,*

---

[4] The Superdome Hotel did not allege that Holiday Inns breached its fiduciary relationship when it terminated the franchise.

*Inc. v. American Tool, Inc.*, 678 F.2d **[**13]** 1253 (5th Cir.1982). In *Aladdin Oil v. Texaco, Inc., 603 F.2d 1107, 1111 (5th Cir.1979)*, the court observed that

> ***HN3*** simply because a case is based upon the antitrust law does not suspend the application of *Rule 56*. The reason summary judgments may seem less common in antitrust cases is because such cases are ripe with issues of motive, intent and credibility which often must be inferred from the total circumstances.

*See also First National Bank of Arizona v. Cities Service Co., 391 U.S. 253, 88 S. Ct. 1575, 20 L. Ed. 2d 569 (1968)*.

This case is one appropriately dismissed on motion for summary judgment because no dispute exists regarding the material facts dispositive of the legal issues involved.

A.

***HN4*** Section one of the Sherman Act forbids "every contract, combination . . ., or conspiracy, in restraint of trade . . . ." *15 U.S.C. § 1*. This section requires the plaintiff to prove that separate business entities acted in concert. Conduct by a single firm cannot violate section one. *E.g.*, *Spectrofuge Corp. v. Beckman Instruments, Inc., 575 F.2d 256, 286-88 (5th Cir.1978)*, *cert. denied*, *440 U.S. 939, 99 S. Ct. 1289, 59 L. Ed. 2d 499 (1979)*. The **[**14]** Superdome Hotel does not allege, and nothing in the record suggests, that Holiday Inns and the Chateau LeMoyne conspired or combined to restrain trade prior to the Chateau LeMoyne's becoming a Holiday Inn hotel. The Superdome Hotel also does not allege that Holiday Inns and the Chateau LeMoyne remained separate after the acquisition. Thus, the two, as part of the same economic enterprise, are incapable as a matter of law of conspiring to violate section one. Additionally, because we conclude in Section III C of this opinion that the acquisition of the Chateau LeMoyne did not violate section seven of the Clayton Act, a fortiori, no combination occurred in violation of section one of the Sherman Act.

***HN5*** Although a corporation and its franchisees may combine or conspire to restrain trade, *e.g.*, *Continental T.V., Inc. v. GTE Sylvania, Inc., 433 U.S. 36, 97 S. Ct. 2549, 53 L. Ed. 2d 568 (1977)*, a point well established in this circuit is that a corporation cannot conspire or combine with its own officers, employees, [5] or wholly owned sales divisions and outlets in violation of section one. *H & B Equipment Company, Inc. v. International Harvester Company, 577 F.2d 239, 244 (5th* **[**15]** Cir.1978) (citing cases). *See also Cliff Food Stores, Inc. v. Kroger, Inc., 417 F.2d 203, 205-06 (5th Cir.1969)*. The Chateau LeMoyne is not a franchised Holiday Inn; for purposes of section one liability, it is wholly owned by Holiday Inns, and indistinguishable from Holiday Inns itself. [6] Thus, the Superdome Hotel's **[*487]** section one claim is without merit; indeed, the Superdome Hotel itself failed to support it with any basis in fact. The district court properly granted Holiday Inns' motion for summary judgment.

---

[5] ***HN6*** The one arguable exception to the general rule that a corporation cannot conspire with its own employees in violation of *section 1* occurs in the rare instances in which employees have an independent personal stake in achieving the object of the conspiracy. *Poller v. Columbia Broadcasting System, Inc.*, 368 U.S. 464, 470, 82 S. Ct. 486, 489, 7 L. Ed. 2d 458 (1962). The Superdome Hotel has not alleged, nor do the facts uncovered in discovery suggest, that the exception might apply in this case.

[6] Thus, we need not determine when a wholly owned but separately incorporated subsidiary is an entity capable of conspiring with its parent. *See Photovest Corp. v. Fotomat Corp.*, 606 F.2d 704, 726-27 (7th Cir.1979)*cert. denied*, *445 U.S. 917, 100 S. Ct. 1278, 63 L. Ed. 2d 601 (1980)*. The Supreme Court recently heard oral argument in the case of *Copperweld Corp. v. Independence Tube Corp.*, (No. 82-1260; argued Dec. 5, 1983), involving the intra-enterprise conspiracy issue of whether a corporation can conspire with its wholly owned, separately incorporated subsidiary in violation of section one. We base our decision in this case

**[**16]** B.

***HN7*** Section two of the Sherman Act forbids "every person [to] monopolize, or attempt to monopolize any part of the trade or commerce . . . ." *15 U.S.C. § 2*. ***HN8*** Monopoly power is "the power to control price or exclude competition." *United States v. E.I. du Pont de Nemours & Co., 351 U.S. 377, 391, 76 S. Ct. 994, 1004, 100 L. Ed. 1264 (1956)*. To prove a completed monopolization offense, a plaintiff must prove the defendant had both the capacity and the intent to monopolize. As stated by the Supreme Court in *United States v. Grinnell Corp., 384 U.S. 563, 570-71, 86 S. Ct. 1698, 1704, 16 L. Ed. 2d 778 (1966)*, ***HN9*** the "offense of monopoly under *§ 2* . . . has two elements: (1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident."

Before the fact-finder can evaluate the defendant's market power, however, it must define the relevant market. *E.g., Dimmitt Agri Industries, Inc. v. CPC International, Inc., 679 F.2d 516, 521 (5th Cir.1982)*, *cert. denied*, *460 U.S. 1082, 103 S. Ct. 1770, 76 L.* **[**17]** *Ed. 2d 344 (1983)*. The relevant market has both geographic dimensions and product dimensions. *Fort Worth National Corp. v. Federal Savings and Loan Insurance Corp., 469 F.2d 47, 59 (5th Cir.1972)*; *Hornsby Oil Company, Inc. v. Champion Spark Plug Co., 714 F.2d 1384, 1393 (5th Cir.1983)*. In this case, the Superdome Hotel alleged the relevant geographic market to be downtown New Orleans, including the French Quarter, central business district, and area surrounding the New Orleans Superdome stadium. The district court adopted this definition for purposes of issuing its summary judgment, and Holiday Inns does not seriously contest the district court's holding on this point. Consequently, for purposes of this appeal, we also consider this area, covering all of downtown New Orleans, to be the relevant geographic market.

The district court defined the relevant product market as hotel rooms. The Supreme Court, in the *du Pont* case, articulated the classic test for defining the relevant product market when it said ***HN10*** "commodities reasonably interchangeable by consumers for the same purposes make up that 'part of the trade of commerce,' monopolization of which may be illegal." **[**18]** *E.I. du Pont de Nemours & Co., 351 U.S. at 395, 76 S. Ct. at 1007, 100 L. Ed. at 1280*. While Holiday Inns argues that the district court's definition obviously is correct, the Superdome Hotel correctly argues that product market definition generally presents a question of fact to which it is entitled to jury resolution. *See Dimmitt Agri Industries, 679 F.2d at 525*. Indeed, ***HN11*** antitrust law recognizes that economically significant submarkets may exist which themselves constitute relevant product markets. *Brown Shoe Co. v. United States, 370 U.S. 294, 325, 82 S. Ct. 1502, 1524, 8 L. Ed. 2d 510*; *Hornsby Oil Company, Inc. v. Champion Spark Plug Co., 714 F.2d 1384, 1393 (5th Cir.1983)*; *Heatransfer Corp. v. Volkswagenwerk, A.G., 553 F.2d 964 (5th Cir.1977)*, *cert. denied*, *434 U.S. 1087, 98 S. Ct. 1282, 55 L. Ed. 2d 792 (1978)*. The fact finder may determine a submarket exists by "examining such practical indicia as industry or public recognition of the sub-market as a separate economic entity, the product's peculiar characteristics **[*488]** and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors." **[**19]** *Brown Shoe, 370 U.S. at 325, 82 S. Ct. at 1524, 8 L. Ed. 2d at 535-36*.

According to the Superdome Hotel, a jury might conclude that the relevant market in this case is the submarket of Holiday Inn rooms, and not hotel rooms generally. The Superdome Hotel

---

on the uncontested fact that Holidav Inns and the Chateau LeMoyne are parts of a single entity. Thus, our opinion should not be affected by the Supreme Court's holding in the *Copperweld* case.

attempts to differentiate Holiday Inn hotel rooms from other hotel rooms on the basis that Holiday Inns provides a unique, nationwide, toll-free computerized reservation service known as "Holidex." In fact, Holiday Inns' own market impact analysis supports the Superdome Hotel's argument by referring to "the market serviced by the Holidex reservations system." [7]

**[**20]** The Superdome Hotel argues that the relevant market from which to analyze its claims is comprised only of Holiday Inn hotel rooms and that Holiday Inns has control over one hundred percent of this market. Its argument, however, is without merit as a matter of law, because absent exceptional market conditions, one brand in a market of competing brands cannot constitute a relevant product market.

In recognizing that a manufacturer's monopoly over the distribution of its own products is not illegal, the Supreme Court stated that:

> ***HN12*** one can theorize that we have monopolistic competition in every nonstandardized commodity with each manufacturer having power over the price and production of his own product. However, this power that, let us say, automobile or soft-drink manufacturers have over their trade-marked products is not the power that makes an illegal monopoly. Illegal power must be appraised in terms of the competitive market for the product.

*E.I. du Pont de Nemours & Co., 351 U.S. at 393, 76 S. Ct. at 1006, 100 L. Ed. at 1279*. Subsequent cases in this circuit express the same principle. In *Spectrofuge Corporation v. Beckman Instruments, Inc.*, 575 **[**21]** F.2d 256 (5th Cir.1978), *cert. denied*, *440 U.S. 939, 99 S. Ct. 1289, 59 L. Ed. 2d 499 (1979)*, we observed that "the fact that a company limits its competitive activity to a single firm's products (and at only one competitive level) cannot control the definition of the relevant market." *Id. at 282*. *See also* *Transource International, Inc. v. Trinity Industries, Inc., 725 F.2d 274 (5th Cir.1984)*; *Parsons v. Ford Motor Co., 669 F.2d 308* (5th Cir.), *cert. denied*, *459 U.S. 832, 103 S. Ct. 73, 74 L. Ed. 2d 72 (1982)*; *Sports Center, Inc. v. Riddell, Inc., 673 F.2d 786, 791 (5th Cir.1982)*. For purposes of our analysis here, no material distinction exists between Holiday Inns, which "produces" hotel rooms, and manufacturers of commodities who market their products nationally under trademarked brand names. [8]

**[**22]** The Superdome Hotel argues that an exception to the general rule prohibiting single-market **[*489]** definitions applies to this case. We do not agree. ***HN13*** The exception applies when the manufacturer of a unique product uses his control over one market, or level of competition,

---

[7] Holiday Inns rebuts the Superdome Hotel's argument by noting that Holiday Inns competes with several other hotel chains in New Orleans that offer Holidex-type services. These hotels include Hilton, Marriott, Ramada Inn, LaQuinta, Rodeway Inn, Travel Lodge, Best Western and Howard Johnson. This rebuttal argument suggests that a relevant submarket may exist comprised of rooms served by computerized, nationwide, toll-free reservations services. The Superdome Hotel, however, did not pursue this issue in district court, in its brief filed with this court, or at oral argument. Consequently, we do not address it. *See* *First National Bank of Arizona v. Cities Service Co.*, 391 U.S. 253, 289-90, 88 S. Ct. 1575, 1593, 20 L. Ed. 2d 569 (1968).

[8] The Superdome Hotel relies on the case of *Heatransfer Corp v. Volkswagenwerk, A.G.*, 553 F.2d 964, 979-81 (5th Cir.1977), *cert. denied*, *434 U.S. 1087, 98 S. Ct. 1282, 55 L. Ed. 2d 792 (1978)* for the proposition that it is entitled to have a jury decide if the relevant market is Holiday Inn hotel rooms. Its reliance on this case is misplaced. In the section two and section seven violations alleged in the *Heatransfer* case, the single-brand market involved was not the product marketed by the plaintiff, i.e., air conditioners, but the single brand or brands of products marketed by the plaintiff's customers, i.e., Volkswagen, Porsche, and Audi automobiles. *Id.* at 971. Such a situation in which one large customer-manufacturer creates a market is materially and analytically different from the present case in which one large seller allows different types of outlets to sell its products in a market in which many brands compete for customers.

to eliminate competition at another level, or submarket. [9] *See Eastman Kodak v. Southern Photo Materials Company, 273 U.S. 359, 47 S. Ct. 400, 71 L. Ed. 684 (1927)*; *Transource International, Inc., 725 F.2d at 283 n.9*; *Spectrofuge, 575 F.2d at 282*. The Superdome Hotel urges that a jury could conclude that Holiday Inns might have exercised monopolistic power over Holiday Inn hotel rooms by its leverage in the use of Holidex services. Even assuming that Holiday Inn rooms are the relevant market that Holidex reservations are a service representing a separate market over which Holiday Inns has control, rather than a marketing tool inseparable from Holiday Inn hotel rooms generally, the argument fails for lack of factual support. The evidence in the record clearly shows that in 1978 the Superdome Hotel received more than twice the number of reservations, and twice the revenue, from Holidex than did **[**23]** the Holiday Inn-French Quarter. In 1979 the Superdome Hotel received 13,000 "room nights" of reservations through Holidex, representing $586,019.00 in revenue, while the Holiday Inn-French Quarter received 8,975 room nights representing $501,898.00 in revenue, and the Chateau LeMoyne received 6,248 room nights representing $353,383.00 in revenue. [10] Thus, no material issue of fact exists; Holiday Inns did not use its control over Holidex reservations to the Superdome Hotel's detriment in violation of section two of the Sherman Act.

Hotel rooms, then, and not Holiday Inn hotel rooms, **[**24]** must be the relevant market. The offense of monopolization requires that the defendant dominate the relevant market. ***HN14*** Market domination may result solely from control of a large share of the market, or from control of some significant part of a market containing characteristics that allow it to be controlled by a participant not having a grossly disproportionate share of it. *See United States v. Columbia Steel Co., 334 U.S. 495, 527-28, 68 S. Ct. 1107, 1124, 92 L. Ed. 1533 (1948)*. The precise market share a defendant must control, absent supporting evidence of monopoly power before he is guilty of monopolization, remains undefined. In *United States v. Aluminum Company of America, 148 F.2d 416 (2d Cir.1945)*, *approved and adopted*, *American Tobacco Co. v. United States, 328 U.S. 781, 811-14, 66 S. Ct. 1125, 1139-41, 90 L. Ed. 1575 (1946)*, Judge Learned Hand created the widely accepted rule of thumb that ***HN15*** while a 90 percent market share definitely is enough to constitute monopolization, "it is doubtful whether 60 or 64 percent would be enough; and certainly, 33 percent is not." *148 F.2d at 424*. Supreme Court cases, as well as cases from this court, suggest that absent special **[**25]** circumstances, a defendant must have a market share of at least fifty percent before he can be guilty of monopolization. [11]

---

[9] Courts also have recognized an exception when one firm's product has total market dominance, as opposed to a monopoly over its own brand, so that any action to increase control over the market is inherently anti-competitive. *See* Spectrofuge, 575 F.2d at 282 (more detailed explanation; citations included).

[10] Actual revenue may have been lower due to cancellations of reservations not reflected in these figures.

[11] Illustrative Supreme Court cases include *Otter Tail Power Co. v. United States*, 410 U.S. 366, 93 S. Ct. 1022, 35 L. Ed. 2d 359 (1973) (91% market share); *United States v. Grinnell Corp.*, 384 U.S. 563, 86 S. Ct. 1698, 16 L. Ed. 2d 778 (1966) (87%); *International Boxing Club of New York, Inc. v. United States*, 358 U.S. 242, 79 S. Ct. 245, 3 L. Ed. 2d 270 (1959) (81%); *United States v. American Tobacco Co.*, 221 U.S. 106, 31 S. Ct. 632, 55 L. Ed. 663 (1911) (86%); *Standard Oil Co. v. United States*, 221 U.S. 1, 31 S. Ct. 502, 55 L. Ed. 619 (1911) (90%); *United States v. United Shoe Machinery Corp.*, 110 F. Supp. 295 (D.Mass. 1953), *aff'd per curiam*, 347 U.S. 521, 74 S. Ct. 699, 98 L. Ed. 910 (1954) (75%); *United States v. Paramount Pictures, Inc.*, 334 U.S. 131, 68 S. Ct. 915, 92 L. Ed. 1260 (1948) (70%); *United States v. Pullman Co.*, 50 F. Supp. 123 (E.D.Pa.1943)*aff'd per curiam*, *330 U.S. 806, 67 S. Ct. 1078, 91 L. Ed. 1263 (1947)* (100%).

Illustrative cases from this court include *Associated Radio Serv. Co. v. Page Airways, Inc.*, 624 F.2d 1342, 1352 & n. 18 (5th Cir.1980), *cert. denied*, *450 U.S. 1030, 101 S. Ct. 1740, 68 L. Ed. 2d 226 (1982)* (about 50%, coupled with evidence of low number of actual competitors and high barriers to market entry); *Heatransfer Corp. v. Volkswagenwerk A.G.*, 553 F.2d 964, 981 (5th Cir.1977), *cert. denied*, *434 U.S. 1087, 98 S. Ct. 1282, 55 L. Ed. 2d 792 (1978)* (71%-76%); *Woods Exploration & Producing*

**[**26]** **[*490]** Further, undisputed evidence of low market share may make monopolization an impossibility as a matter of law. *Dimmitt, 679 F.2d 516, 529*. ***HN16*** Recent cases by this court hold that market shares of between seventeen and twenty-five percent are legally insufficient to uphold a finding of monopolization, at least absent other compelling evidence that the defendant had monopoly power. *Id. at 521-31* (17%-25% market share); *American Telephone & Telegraph Co. v. Delta Communications Corp., 408 F. Supp. 1075, 1107 (S.D.Miss. 1976)*; *aff'd per curiam*, *579 F.2d 972 (5th Cir.1978)* (adopting district court opinion), *modified on other grounds*, *590 F.2d 100 (5th Cir.1979)* (41%); *Yoder Brothers, Inc. v. California-Florida Plant Corp., 537 F.2d 1347, 1368 (5th Cir.1976)*, *cert. denied*, *429 U.S. 1094, 97 S. Ct. 1108, 51 L. Ed. 2d 540 (1977)* (20%); *Sulmeyer v. Coca Cola Co., 515 F.2d 835, 850 (5th Cir.1975)*, *cert. denied*, *424 U.S. 934, 96 S. Ct. 1148, 47 L. Ed. 2d 341 (1976)* (22%). If a market share of seventeen percent will not support a finding of monopolization, then Holiday Inns' market share of approximately four percent [12] certainly will not, especially **[**27]** in the light of a record that contains no suggestion that Holiday Inns had monopoly power despite its low market share. *See, e.g., Fulton v. Hecht, 580 F.2d 1243, 1246-47 (5th Cir.1978)*, *cert. denied*, *440 U.S. 981, 99 S. Ct. 1789, 60 L. Ed. 2d 241 (1979)*.

The Superdome Hotel's claim that Holiday Inns attempted to monopolize the hotel room market must also fail because of Holiday Inns' low market share.

***HN17*** The offense of attempted monopolization has two elements: "(1) specific intent to accomplish the illegal result; and (2) a dangerous probability that the attempt to monopolize the relevant market will be successful." *Dimmitt, 679 F.2d at 525*; *Spectrofuge Corp., 575 F.2d at 276*. While we "must be particularly wary of the numbers game of market percentage when considering an 'attempt to monopolize' suit," *Cliff Food Stores, Inc. v. Kroger, Inc., 417 F.2d 203, 207 n. 2 (5th Cir.1969)*, ***HN18*** a defendant must have some legally significant share of the market before he **[**28]** approaches the level of dangerous probability of success condemned by the attempt provision of section two. *See generally H & B Equipment Co., Inc., 577 F.2d 239, 242*. *But see Sherman v. British Leyland Motors, Ltd., 601 F.2d 429, 453 n. 47 (9th Cir.1979)****HN19*** (dangerous probability of success may be shown either by direct proof of market power or by inference from proven specific intent).

We do not suggest here a market share percentage that of itself rises to the level of legal significance, but note that ***HN20*** a share of less than the fifty percent generally required for actual monopolization may support a claim for attempted monopolization if other factors such as concentration of market, high barriers to entry, consumer demand, strength of the competition, or consolidation trend in the market are present. [13]*United States v. Empire Gas Corp., 537 F.2d 296, 306-07 (8th Cir.1976)*, *cert. denied*, *429 U.S. 1122, 97 S. Ct. 1158, 51 L. Ed. 2d 572 (1977)*

---

*Co. v. Aluminum Co. of America*, 438 F.2d 1286, 1307 (5th Cir.1971); *cert. denied*, *404 U.S. 1047, 92 S. Ct. 701, 30 L. Ed. 2d 736 (1973)* (90%); *North Texas Producers Ass'n v. Metzger Dairies, Inc.*, 348 F.2d 189, 194 (5th Cir.1965), *cert. denied*, *382 U.S. 977, 86 S. Ct. 545, 15 L. Ed. 2d 468 (1966)* (85%-90%); *Credit Bureau Reports, Inc. v. Retail Credit Co.*, 358 F. Supp. 780, 790-91 (S.D.Tex.1971), *aff'd*476 F.2d 989 (5th Cir.1973) (85%).

Two important cases in which courts found actual monopolization include *United States v. Aluminum Co. of America*, 148 F.2d 416, 425 (2d Cir.1945) (90%) and *United States v. Eastman Kodak Co.*, 226 F. 62, 79 (W.D.N.Y.1915), *appeal dismissed*, *255 U.S. 578, 41 S. Ct. 321, 65 L. Ed. 795* (75-80%).

[12] *See supra*, note 2.

[13] Consideration of these factors is consistent with the case-by-case approach to monopolization and attempted monopolization cases suggested by the Supreme Court in *United States v. Columbia Steel Co.*, 334 U.S. 495, 537-28, 68 S. Ct. 1107, 1124, 92 L. Ed. 1533 (1948).

(approximate market share of 50% insufficient to show attempt in absence of other evidence); *Twin City* **[*491]** *Sportservice, Inc. v. Charles O. Finley & Co., 676 F.2d 1291, 1300-01, 1309 (9th Cir.1982)* (24% market share **[**29]** plus anti-competitive conduct supported finding of attempted monopolization); *Hiland Dairy, Inc. v. Kroger Company, 402 F.2d 968, 974 (8th Cir.1968)* (market share of less than 50% might support finding of attempted monopoly in some circumstances but 20% insufficient as a matter of law); *McDonald v. Johnson & Johnson, 537 F. Supp. 1282, 1345-46 (D.C.Minn.1982)* (37% sufficient to prove attempted monopoly under the specific market conditions shown). In *Yoder Brothers, Inc. v. California-Florida Plant Corp., 537 F.2d 1347 (5th Cir.1976)*, *cert. denied*, *429 U.S. 1094, 97 S. Ct. 1108, 51 L. Ed. 2d 540 (1977)*, a case in which the defendant controlled twenty percent of the market but barriers to entry were high, this court declined to find attempted monopolization. *Id. at 1368-69*.

**[**30]** ***HN21*** While the exact market share percentage necessary to prove attempt to monopolize may vary under differing market conditions, absent a showing of special market conditions, a market share of less than ten percent, as a matter of law, usually will not support a finding of attempt to monopolize. *See Whitten v. Paddock Pool Builders, 508 F.2d 547 (1st Cir.1974)*, *cert. denied*, *421 U.S. 1004, 95 S. Ct. 2407, 44 L. Ed. 2d 673 (1975)* (3%); *Mullis v. Arco Petroleum Corp., 502 F.2d 290, 297 (7th Cir.1974)* (3%); *Harris v. Atlantic-Richfield Company, 469 F. Supp. 759, 763 (E.D.N.C.1978)* (3%); *I. Haas Trucking Co. v. New York Fruit Auction Corp., 364 F. Supp. 868, 874-75 (S.D.N.Y.1973)* (10%). *See also Giant Paper & Film Corporation v. Albemarle Paper Co., 430 F. Supp. 981 (S.D.N.Y.1977)* (14% of the market insufficient to withstand defendant's motion for summary judgment). If ten percent of the market is insufficient as a matter of law, certainly the four percent held by Holiday Inns [14] also is insufficient. [15]

**[**31]** C.

***HN22*** Section seven of the Clayton Act prohibits a corporation from acquiring the stock or assets of another corporation "in any line of commerce" in which the effect "may be substantially to lessen competition, or to tend to create a monopoly." *15 U.S.C. § 18*. As under section two of the Sherman Act, the first step in analyzing a section seven claim is defining the relevant product and geographic markets. *See United States v. Pabst Brewing Company, 384 U.S. 546, 548, 86 S. Ct. 1665, 1667, 16 L. Ed. 2d 765 (1966)*. As previously explained, the relevant market in this case is hotel rooms in downtown New Orleans, [16] and Holiday Inns holds, at most, a little more than four percent of this market. **[**32]** [17] Our holding that on the facts of this case, Holiday Inns does not control enough of the market to violate the Sherman Act, however, does not dispose of the section seven issues, however, for section seven is much broader than the Sherman Act. *Universal Brands, Inc. v. Philip Morris Inc., 546 F.2d 30, 38 (5th Cir.1977)* (Tjoflat, dissenting). ***HN23*** A defendant need not have a market share approaching monopoly proportions to be within the reach of section seven.

---

[14] *See supra* note 2.

[15] We note also that the Superdome Hotel has failed to produce any evidence that Holiday Inns had the illegal intent necessary to find a section two violation when it acquired the Chateau LeMoyne.

[16] In *United States v. Marine Bancorporation, Inc.*, 418 U.S. 602, 94 S. Ct. 2856, 41 L. Ed. 2d 978 (1974), the Supreme Court noted that "without exception, the Court has treated 'section of the country' and 'relevant geographic market' as identical." *Id.* at 620, 94 S. Ct. at 2869, 41 L. Ed. 2d at 995 (footnote omitted).

[17] *See supra* note 2.

Congress enacted the current version of section seven out of concern over increasing economic concentration, and to address the problem of incipient monopolies not yet within the reach of the Sherman Act. [18] *Brown Shoe, 370 U.S. at 317-18,* **[*492]** 82 S. Ct. at 1520, 8 L. Ed. 2d at 531-32. Thus, ***HN24*** courts, in applying section seven, must assess the probability of anti-competitive results flowing from the challenged merger or acquisition. *United States v. General Dynamics Corporation, 415 U.S. 486, 505, 94 S. Ct. 1186, 1198, 39 L. Ed. 2d 530 (1974)*.

**[**33]** ***HN25*** The plaintiff in a section seven suit may make a prima facie showing of probable anti-competitive impact in one of two ways. He may show merely that the size of the entities involved "makes them inherently suspect in light of Congress' design to prevent undue [economic] concentration," thereby resulting in a "significant" increase in market share and an "undue" market concentration. *United States v. Philadelphia National Bank, 374 U.S. 321, 363, 83 S. Ct. 1715, 1741, 10 L. Ed. 2d 915, 945 (1963)*. If, however, the size of the entities involved is not "inherently suspect," then the plaintiff may show that other characteristics of the market make the merger or acquisition more economically harmful than the bare market share and market concentration statistics otherwise indicate. *Cf. Brown Shoe, 370 U.S. at 343-44, 82 S. Ct. at 1534, 8 L. Ed. 2d at 546-47*. *See generally L. Sullivan, Antitrust* § 204 at 616-26 (1977).

In the *Philadelphia National Bank* case the government challenged a merger of the second and third largest commercial banks in the Philadelphia metropolitan area. The resulting bank would have been the largest bank in the area, controlling approximately **[**34]** thirty percent of the commercial banking market. Before the merger, the two largest banks in the area controlled approximately forty-five percent of the market. After the merger, the two largest banks would have controlled approximately sixty percent. *374 U.S. at 331, 364-65, 83 S. Ct. at 1724, 1742, 10 L. Ed. 2d at 945, 946*. The Supreme Court, "without attempting to specify the smallest market share which would still be considered to threaten undue concentration," held that a market share of thirty percent and a concentration increase of fifteen percent threatened competition within the meaning of the Clayton Act. 374 U.S. at 364, 83 S. Ct. at 1742, 10 L. Ed. 2d at 945.

The record before us does not contain specific data regarding market concentration before or after Holiday Inns acquired the Chateau LeMoyne. The evidence does suggest, however, that the market is competitive, and not dominated by a few very powerful hotels or hotel chains. [19] In the light of this fact and the fact that Holiday Inns' holds four percent of the hotel room market, as a matter of law, this acquisition is not "inherently suspect" within the meaning of *Philadelphia National Bank.*

**[**35]** ***HN26*** If a plaintiff fails to make a prima facie case on the basis of bar market share and concentration statistics, he still may survive a motion for summary judgment if he shows other factors indicating that the merger or acquisition threatens competition in the relevant market. *See* Sullivan, § 204(b) at 616-622 (1977).

In *United States v. Pabst Brewing Company, 384 U.S. 546, 86 S. Ct. 1665, 16 L. Ed. 2d at 765 (1966)*, the Supreme Court reversed a summary judgment rendered in favor of the defendant when the plaintiff's evidence showed that the challenged merger would give the resulting entity 4.49

---

[18] As originally enacted in 1914, § 7 of the Clayton Act applied only to stock acquisitions. In 1950 Congress amended the Act to apply to asset acquisitions as well. The impetus for the amendment was the threat to economic and social values the perceived trend toward economic concentration throughout the nation was thought to pose. *See* *Brown Shoe*, 370 U.S. at 311-15, 82 S. Ct. at 1516-1519, 8 L. Ed. 2d at 527-530 (synopsizing legislative history).

[19] *See supra* note 6.

percent of the national market; 11.32 percent of the market in the three state area of Wisconsin, Illinois and Michigan, and 23.95 percent of the market in Wisconsin. 384 U.S. at 553-54, 86 S. Ct. at 1669, 16 L. Ed. 2d at 771-72. An additional factor that the Court considered relevant was the trend toward concentration in the industry. *Id. at 551, 86 S. Ct. at 1668, 16 L. Ed. 2d at 770*. *See also* Universal Brands, 546 F.2d at 38 (Tjoflat, dissenting).

**[*493]** In the *Brown Shoe* case the Supreme Court held that a merger giving a defendant control over only five percent **[**36]** of the relevant market violated section seven. The opinion, however, emphasized several factors that made the challenged merger anti-competitive within the meaning of section seven. The factors include the fact that in some cities in the relevant multi-city geographic market the merged entity would have controlled up to thirty-four percent of the product market, the fact that the acquiring entity was a large national chain with integrated manufacturing operations, and the fact that a history of, or trend toward, concentration already threatened the relevant product market. *370 U.S. at 343-45, 82 S. Ct. at 1534, 8 L. Ed. 2d at 546-47*.

In *United States v. General Dynamics Corporation, 415 U.S. 486, 94 S. Ct. 1186, 39 L. Ed. 2d 530 (1974)*, the Supreme Court affirmed the district court's grant of summary judgment for the defendant on the basis that raw market share and concentration statistics based on past production did not accurately reflect the likely trend of the industry in the future when the relevant product market was coal, a finite natural resource, and the industry as a whole was declining. *Id. at 501, 94 S. Ct. at 1195, 39 L. Ed. 2d at 544*. Though the holding in **[**37]** *General Dynamics* remains largely unexplained, [20] it underscores the importance in section seven cases of evidence of market conditions.

**[**38]** In this case the Superdome Hotel, even in the face of Holiday Inns' motion for summary judgment, has failed even to allege that the market is in such a condition that Holiday Inns' acquisition threatens competition. During the four years this case has been in litigation the Superdome Hotel has had ample opportunity to uncover any factors unfavorable to the merger, but the record indicates it has failed to do that as well. Given this total absence of material supporting data and legal argument, the district court correctly denied the Superdome Hotel's section seven claim.

IV.

In this opinion we have attempted to give full attention to each of the Superdome Hotel's allegations. In so doing, we have affirmed the district court's holding that Holiday Inns did not breach any explicit or implied term of its contract with the Superdome Hotel. We also have held that the relationship between a franchisor and franchisee generally is not a fiduciary relationship.

We also have affirmed the district court's granting of summary judgment on the Superdome Hotel's antitrust allegations. We have held that the Sherman Act section one claim is without merit

---

[20] In *United States v. Marine Bancorporation, Inc.*, 418 U.S. 602, 94 S. Ct. 2856, 41 L. Ed. 2d 978 (1974), the Court cited *General Dynamics* for the proposition that a defendant may rebut a prima facie showing of probable anti-competitive effect based on market and concentration statistics by showing that the statistics do not accurately reflect the probable effect of the merger or acquisition on competition. 418 U.S. at 631, 94 S. Ct. at 2874, 41 L. Ed. 2d at 1001. *See also* *Kaiser Aluminum & Chemical Corporation v. F.T.C.*, 652 F.2d 1324, 1336-37 (7th Cir.1981) (discussing *General Dynamics* in context of other section seven cases). The concentration of the affected market in *Marine Bancorporation* was high -- three banks controlled 92.3% of the relevant market. The target company held 86.6% of the market, and the acquiring company held none of the actual market, but was a significant potential competitor. 418 U.S. at 606-09, 94 S. Ct. at 2862-63, 41 L. Ed. 2d at 987-88. Apparently the market share and market concentration data was "inherently suspect" within the meaning of *Philadelphia National Bank*.

because this case does not involve **[**39]** conspiracy or concerted activity. We also have held that, absent unusual circumstances, one brand cannot constitute a relevant product market. We have held that in the hotel room product market, Holiday Inns' market share is not large enough to violate section two of the Sherman Act under either a monopolization claim or an attempted monopolization claim. Finally, we have held that the plaintiff had failed to allege or raise any facts which would prove that Holiday Inns' acquisition of a second independent hotel lessens competition within **[*494]** the meaning of section seven of the Clayton Act.

The decision of the district court granting summary judgment to the defendant Holiday Inns is, therefore,

AFFIRMED.

# EXHIBIT 267

LexisNexis®

Warning
As of: August 12, 2014 9:09 AM EDT

**Eastman Kodak Co. v. Image Tech. Servs.**
Supreme Court of the United States
December 10, 1991, Argued ; June 8, 1992, Decided
No. 90-1029

**Reporter:** 504 U.S. 451; 112 S. Ct. 2072; 119 L. Ed. 2d 265; 1992 U.S. LEXIS 3405; 60 U.S.L.W. 4465; 1992-1 Trade Cas. (CCH) P69,839; 92 Cal. Daily Op. Service 4823; 92 Daily Journal DAR 7688; 6 Fla. L. Weekly Fed. S 331
EASTMAN KODAK COMPANY, PETITIONER v. IMAGE TECHNICAL SERVICES, INC., ET AL.

**Prior History:** ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT.

**Disposition:** *903 F.2d 612*, affirmed.

**Core Terms**

market power, consumers, prices, customers, manufacturer, aftermarket, markets, machines, interbrand, sales, anti trust law, purchasers, tie, seller, summary judgment, costs, micrographic, competitors, products, antitrust, competitive, monopoly, brand, exploitation, tying arrangement, respondents', relevant market, per se rule, court of appeals, sophisticated

**LexisNexis® Headnotes**

Antitrust & Trade Law > ... > Price Fixing & Restraints of Trade > Tying Arrangements > General Overview

***HN1*** A tying arrangement is an agreement by a party to sell one product but only on the condition that the buyer also purchases a different (or tied) product, or at least agrees that he will not purchase that product from any other supplier.

Antitrust & Trade Law > ... > Price Fixing & Restraints of Trade > Tying Arrangements > General Overview
Antitrust & Trade Law > ... > Price Fixing & Restraints of Trade > Tying Arrangements > Clayton Act
Antitrust & Trade Law > ... > Price Fixing & Restraints of Trade > Tying Arrangements > Sherman Act Violations
Antitrust & Trade Law > Sherman Act > General Overview

***HN2*** A tying arrangement violates *15 U.S.C.S. § 1* if the seller has "appreciable economic power" in the tying product market and if the arrangement affects a substantial volume of commerce in the tied market.

Antitrust & Trade Law > ... > Price Fixing & Restraints of Trade > Tying Arrangements > General Overview
Antitrust & Trade Law > Sherman Act > General Overview

***HN3*** Market power is the power to force a purchaser to do something that he would not do in a competitive market; it has been defined as the ability of a single seller to raise price and restrict output. The existence of such power ordinarily is inferred from the seller's possession of a predominant share of the market.

Civil Procedure > Appeals > Summary Judgment Review > General Overview
Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > General Overview
Civil Procedure > Appeals > Standards of Review > De Novo Review

***HN4*** On summary judgment an appellate court may examine the record de novo without relying on the lower courts' understanding.

Evidence > Inferences & Presumptions > General Overview

***HN5*** Legal presumptions that rest on formalistic distinctions rather than actual market realities are generally disfavored in antitrust law.

Antitrust & Trade Law > Sherman Act > General Overview

***HN6*** In the context of *15 U.S.C.S. § 1*, power gained through some natural and legal advantage such as a patent, copyright, or business acumen can give rise to liability if a seller exploits his dominant position in one market to expand his empire into the next.

Antitrust & Trade Law > Sherman Act > General Overview
Antitrust & Trade Law > Sherman Act > Scope > Monopolization Offenses
Criminal Law & Procedure > ... > Acts & Mental States > Mens Rea > Willfulness

***HN7*** The offense of monopoly under *15 U.S.C.S. § 2* has two elements: the possession of monopoly power in the relevant market; and the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident.

Antitrust & Trade Law > ... > Monopolies & Monopolization > Actual Monopolization > Monopoly Power
Antitrust & Trade Law > Sherman Act > General Overview
Trademark Law > ... > Infringement Actions > Summary Judgment > General Overview
Trademark Law > ... > Infringement Actions > Summary Judgment > Standards

***HN8*** Monopoly power under *15 U.S.C.S. § 2* requires, of course, something greater than market power under *15 U.S.C.S. § 1*.

Antitrust & Trade Law > Sherman Act > General Overview

***HN9*** A market is composed of products that have reasonable interchangeability. In some instances one brand of a product can constitute a separate market.

Antitrust & Trade Law > Sherman Act > General Overview

***HN10*** In the context of *15 U.S.C.S. § 2*, as a general matter a firm can refuse to deal with its competitors. But such a right is not absolute; it exists only if there are legitimate competitive reasons for the refusal.

**Lawyers' Edition Display**

**Decision**

Photocopier manufacturer held not entitled to summary judgment dismissing federal antitrust claims as to (1) tying arrangement between parts and service, and (2) monopolization of sale of service.

**Summary**

A company which manufactured and sold photocopiers and micrographic equipment also sold service and noncompatible replacement parts for such equipment. In the early 1980's, a number of independent service organizations (ISOs) began servicing the company's equipment. In 1985 and 1986, the company allegedly adopted a policy under which the company supposedly (1) sold parts only to buyers of the company's equipment who either used the company's service or repaired their own equipment; and (2) limited access to other sources of parts by the ISOs by forbidding entities which manufactured parts for the company to sell such parts to anyone other than the company, pressuring other entities not to sell the company's parts to the ISOs, and taking steps to restrict the availability of used equipment. In 1987, the ISOs filed an action in the United States District Court for the Northern District of California against the company. The ISOs, proffering evidence that the company controlled nearly 100 percent of the parts market and 80 to 95 percent of the service market, alleged that the company had unlawfully (1) tied the sale of service for the company's equipment to the sale of parts, in violation of 1 of the Sherman Act (*15 USCS 1*); and (2) monopolized and attempted to monopolize the sale of service for the company's equipment, in violation of 2 of the Sherman Act (*15 USCS 2*). The company moved for summary judgment on both claims, and the District Court granted the company's motion. On appeal, the United States Court of Appeals for the Ninth Circuit, reversing, expressed the view that (1) the ISOs had presented sufficient evidence, for summary judgment purposes, to disprove the company's contention that its parts policy was justified; (2) with respect to the 1 claim, (a) there were disputed issues of fact whether service and parts were distinct markets, and whether a tying arrangement existed, and (b) the ISOs had presented evidence from which a trier of fact could conclude that the company had sufficient economic power in the parts market to restrain competition in the service market; and (3) with respect to the 2 claim, sufficient evidence existed to support a finding that the company's implementation of its parts policy involved a specific intent to monopolize (*903 F2d 612*).

On certiorari, the United States Supreme Court affirmed. In an opinion by Blackmun, J., joined by Rehnquist, Ch. J., and White, Stevens, Kennedy, and Souter, JJ., it was held that the company had not met the requirements of *Rule 56(c) of the Federal Rules of Civil Procedure* with respect to the company's motion for summary judgment as to either Sherman Act claim, because (1) as to the 1 claim, (a) the company did not dispute that its arrangement affected a substantial volume of interstate commerce in the parts market, (b) a reasonable trier of fact could find that the company's service and parts were two distinct products, (c) evidence of the company's policy on parts sales, along with allegations by the ISOs that the company's control over the parts market had excluded competition and boosted service prices, were sufficient to entitle the ISOs to a trial on their claim that the company had power in the parts market to force unwanted purchases of the company's service, and (d) notwithstanding the existence of competition in the equipment market, the company had failed to meet its burden of demonstrating that the inference of market power in the service and parts markets was unreasonable; and (2) as to the 2 claim, (a) the ISOs' evidence with respect to the company's control of the parts and service markets--which

evidence indicated the company's possession of monopoly power--was sufficient to survive summary judgment, (b) the relevant market from the perspective of an owner of the company's equipment was composed of only those companies that serviced such equipment, and (c) none of the company's asserted business justifications for its exclusionary action was sufficient to entitle the company to a judgment as a matter of law.

Scalia, J., joined by O'Connor and Thomas, JJ., dissenting, expressed the view that (1) neither logic nor experience suggested, let alone compelled, application of the per se prohibition against tying arrangements under 1, and the monopolization doctrine under 2, to a seller's behavior in its single-brand aftermarkets, where--as it had to be assumed in the case at hand--the seller was without power at the interbrand level; (2) although the aftermarket tie alleged in the case at hand could have instead been evaluated under the rule of reason, the case's disposition did not require such examination, where the ISOs apparently had waived their rule-of-reason claim in the District Court, and, accordingly, the Court of Appeals' judgment on the 1 claim ought to have been reversed outright; and (3) an antitrust defendant which lacked the relevant market power sufficient to permit invocation of the per se prohibition against tying under 1 all the more lacked the monopoly power that warranted heightened scrutiny under 2 of such defendant's allegedly exclusionary behavior.

**Headnotes**

EVIDENCE §343.5 > RESTRAINTS OF TRADE, MONOPOLIES, AND UNFAIR TRADE PRACTICES §42 > SUMMARY JUDGMENT AND JUDGMENT ON PLEADINGS §5 > summary judgment -- tying arrangement by equipment seller -- service and parts -- > Headnote:

***LEdHN[1A]*** [1A]***LEdHN[1B]*** [1B]***LEdHN[1C]*** [1C]***LEdHN[1D]*** [1D]***LEdHN[1E]*** [1E]***LEdHN[1F]*** [1F]***LEdHN[1G]*** [1G]***LEdHN[1H]*** [1H]***LEdHN[1I]*** [1I]***LEdHN[1J]*** [1J]***LEdHN[1K]*** [1K]

A company which manufactures and sells photocopiers and micrographic equipment, and which also sells service and noncompatible replacement parts for its equipment, has not met the requirements of *Rule 56(c) of the Federal Rules of Civil Procedure* with respect to the company's motion for summary judgment on a claim by independent service organizations (ISOs), which had begun servicing the company's equipment, that the company--by allegedly adopting a policy under which the company supposedly (1) sold parts only to buyers of the company's equipment who either used the company's service or repaired their own equipment, and (2) limited access to other sources of parts by the ISOs by forbidding entities which manufactured parts for the company to sell such parts to anyone other than the company, pressuring other entities not to sell the company's parts to the ISOs, and taking steps to restrict the availability of used equipment--unlawfully tied the sale of service for the company's equipment to the sale of its parts, in violation of 1 of the Sherman Act (*15 USCS 1*), where (1) the company does not dispute that its arrangement affects a substantial volume of interstate commerce in the parts market; (2) a reasonable trier of fact could find that the company's service and parts are two distinct products, because (a) evidence in the record indicates that service and parts had been sold separately in the past and still were sold separately to self-service equipment owners, and that the company sold parts to third parties only if the third parties agreed not to buy service from the ISOs, (b) enough doubt is cast on the company's claim of a unified market that such claim should be resolved by the trier of fact, and (c) as a factual matter, some consumers would purchase service without parts and some consumers would purchase parts without service; (3) evidence of the company's

policy on parts sales, along with allegations by the ISOs that the company's control over the parts market has excluded competition and boosted service prices, are sufficient to entitle the ISOs to a trial on their claim that the company has more than sufficient power in the parts market to force unwanted purchases of the company's service; and (4) notwithstanding the existence of competition in the photocopier and micrographic equipment market, the company has failed to meet its burden of demonstrating that the inference of its market power in the service and parts markets is unreasonable, because it is reasonable to infer that the company (a) has power in those markets to raise prices and drive out competition, and (b) chose to gain immediate profits by exerting such market power where locked-in customers, high information costs, and discriminatory pricing limited--and perhaps eliminated--any long-term loss. (Scalia, O'Connor, and Thomas, JJ., dissented from this holding.)

RESTRAINTS OF TRADE, MONOPOLIES, AND UNFAIR TRADE PRACTICES §42 > SUMMARY JUDGMENT AND JUDGMENT ON PLEADINGS §5 > summary judgment -- monopoly by equipment seller -- sale of service -- > Headnote:

***LEdHN[2A]*** [2A]***LEdHN[2B]*** [2B]***LEdHN[2C]*** [2C]***LEdHN[2D]*** [2D]***LEdHN[2E]*** [2E]***LEdHN[2F]*** [2F]

A company which manufactures and sells photocopiers and micrographic equipment, and which also sells service and noncompatible replacement parts for its equipment, has not met the requirements of *Rule 56(c) of the Federal Rules of Civil Procedure* with respect to the company's motion for summary judgment on a claim by independent service organizations (ISOs), which had begun servicing the company's equipment, that the company--by allegedly adopting a policy under which the company supposedly (1) sold parts only to buyers of the company's equipment who either used the company's service or repaired their own equipment, and (2) limited access to other sources of parts by the ISOs by forbidding entities which manufactured parts for the company to sell such parts to anyone other than the company, pressuring other entities not to sell the company's parts to the ISOs, and taking steps to restrict the availability of used equipment--unlawfully monopolized and attempted to monopolize the sale of service with respect to such equipment, in violation of 2 of the Sherman Act (*15 USCS 2*), where (1) the ISOs' evidence that the company controls nearly 100 percent of the parts market and 80 to 95 percent of the service market, with no readily available substitutes--and hence that the company possesses monopoly power--is sufficient to survive summary judgment; (2) the relevant market from the perspective of an owner of the company's equipment is composed of only those companies that service such equipment; and (3) none of the company's asserted business justifications for its exclusionary action--to provide quality service, to control inventory costs, and to prevent free riding on the company's capital investment--are sufficient to prove that the company is entitled to a judgment as a matter of law. (Scalia, O'Connor, and Thomas, JJ., dissented from this holding.)

SUMMARY JUDGMENT AND JUDGMENT ON PLEADINGS §5 > determination -- > Headnote:

***LEdHN[3]*** [3]

On a motion for summary judgment, the evidence of the nonmoving party is to be believed, and all justifiable inferences are to be drawn in such party's favor; for purposes of deciding such motion, the nonmoving party's version of any disputed issue is presumed correct.

RESTRAINTS OF TRADE, MONOPOLIES, AND UNFAIR TRADE PRACTICES §30.6 > tying arrangement -- elements -- > Headnote:

***LEdHN[4]*** [4]

A tying arrangement--that is, an agreement by a party to sell one product but only on the condition that the buyer also purchases a different, or tied, product, or at least agrees not to purchase that product from any other supplier--violates 1 of the Sherman Act (*15 USCS 1*) if (1) the seller has appreciable economic power in the tying product market, and (2) the arrangement affects a substantial volume of commerce in the tied market.

RESTRAINTS OF TRADE, MONOPOLIES, AND UNFAIR TRADE PRACTICES §42 > tying arrangement -- service and parts -- > Headnote:

***LEdHN[5]*** [5]

For service and parts to be considered two distinct products for purposes of determining whether a firm selling such service and parts has engaged in an unlawful tying arrangement prohibited by 1 of the Sherman Act (*15 USCS 1*), there must be sufficient consumer demand so that it is efficient for the firm to provide service separately from parts.

EVIDENCE §343.5 > presumption -- restraint of trade -- tying arrangement -- > Headnote:

***LEdHN[6]*** [6]

For purposes of determining whether a firm selling service and parts has engaged in an unlawful tying arrangement prohibited by 1 of the Sherman Act (*15 USCS 1*), the United States Supreme Court is unwilling to make the assumption that there cannot be separate markets for service and parts. (Scalia, O'Connor, and Thomas, JJ., dissented in part from this holding.)

SUMMARY JUDGMENT AND JUDGMENT ON PLEADINGS §5 > determination -- assertion not in record -- > Headnote:

***LEdHN[7A]*** [7A]***LEdHN[7B]*** [7B]

The factual assertion that parts and service are not separate products--for purposes of determining, under *Rule 56(c) of the Federal Rules of Civil Procedure*, whether a firm selling parts and service has engaged in an unlawful tying arrangement prohibited by 1 of the Sherman Act (*15 USCS 1*)--does not entitle the firm to summary judgment on the issue whether parts and service are distinct markets where the record does not support such assertion. (Scalia, O'Connor, and Thomas, JJ., dissented in part from this holding.)

RESTRAINTS OF TRADE, MONOPOLIES, AND UNFAIR TRADE PRACTICES §42 > refusal to deal -- service -- > Headnote:

***LEdHN[8A]*** [8A]***LEdHN[8B]*** [8B]

With respect to a company which manufactures and sells photocopiers and micrographic equipment, and which also sells service and noncompatible replacement parts for its equipment, the company's sale of parts to third parties on condition that the third parties buy service from the company is not a unilateral refusal to deal which, as such, would not violate the federal antitrust laws.

EVIDENCE §343.5 > RESTRAINTS OF TRADE, MONOPOLIES, AND UNFAIR TRADE PRACTICES §30.6 > tying arrangement -- inference -- > Headnote:

***LEdHN[9]*** [9]

A necessary feature of an unlawful tying arrangement prohibited by 1 of the Sherman Act (*15 USCS 1*) is appreciable economic power in the tying market; market power is the power to force a purchaser to do something that the purchaser would not do in a competitive market; the existence of such power ordinarily is inferred from the seller's possession of a predominant share of the market.

RESTRAINTS OF TRADE, MONOPOLIES, AND UNFAIR TRADE PRACTICES §30.6 > tying arrangement -- forced purchase -- > Headnote:

***LEdHN[10A]*** [10A]***LEdHN[10B]*** [10B]

For purposes of 1 of the Sherman Act (*15 USCS 1*), the essential characteristic of an invalid tying arrangement lies in the seller's exploitation of its control over the tying product to force the buyer into the purchase of a tied product that the buyer either did not want at all, or might have preferred to purchase elsewhere on different terms; when such forcing is present, competition on the merits in the market for the tied item is restrained and 1 is violated.

APPEAL §1477 > review of record -- antitrust -- > Headnote:

***LEdHN[11A]*** [11A]***LEdHN[11B]*** [11B]

On certiorari to review a Federal District Court's grant of summary judgment in a civil antitrust case, the United States Supreme Court may review the record de novo without relying on the lower courts' understanding.

APPEAL §1092 > certiorari -- waiver of objection -- > Headnote:

***LEdHN[12A]*** [12A]***LEdHN[12B]*** [12B]

On certiorari to review a Federal Court of Appeals decision, the United States Supreme Court will decide the questions presented in a certiorari petition--including the question whether a company which manufactured and sold photocopiers and micrographic equipment, and which also sold service and noncompatible replacement parts for its equipment, was entitled to summary judgment on a claim that the company had unlawfully tied the sale of service for such equipment to the sale of parts, in violation of 1 of the Sherman Act (*15 USCS 1*)--based on the same premise as stated by the Court of Appeals that competition exists in the equipment market, where the claimants failed to bring their objections to such premise to the attention of the Supreme Court in their opposition to the petition for certiorari.

EVIDENCE §343.5 > presumption -- antitrust -- > Headnote:

***LEdHN[13]*** [13]

Legal presumptions that rest on formalistic distinctions rather than actual market realities are generally disfavored in federal antitrust law.

SUMMARY JUDGMENT AND JUDGMENT ON PLEADINGS §4 > antitrust -- opposition -- determination -- > Headnote:

***LEdHN[14]*** [14]

In order for a federal antitrust case in which a motion for summary judgment has been filed to reach the jury, the nonmoving party's inferences need only be reasonable; however, if an antitrust plaintiff's theory is economically senseless, no reasonable jury could find in the plaintiff's favor, and summary judgment should be granted.

EVIDENCE §343.5 > RESTRAINTS OF TRADE, MONOPOLIES, AND UNFAIR TRADE PRACTICES §18 > relevant market -- market power -- > Headnote:

***LEdHN[15A]*** [15A]***LEdHN[15B]*** [15B]

Defining the relevant market generally determines the result of a federal antitrust case, because market power is often inferred from market share.

SUMMARY JUDGMENT AND JUDGMENT ON PLEADINGS §5 > restraint of trade -- question of fact -- > Headnote:

***LEdHN[16]*** [16]

For purposes of determining, under *Rule 56(c) of the Federal Rules of Civil Procedure*, whether a company which manufactures and sells photocopiers and micrographic equipment, and which also sells service and noncompatible replacement parts for its equipment, is entitled to summary judgment on a claim that the company unlawfully tied the sale of service for the company's equipment to the sale of its parts, in violation of 1 of the Sherman Act (*15 USCS 1*), it is a question of fact whether the company's competitors in the equipment markets would provide the necessary information to satisfy customer information needs with respect to the lifecycle costs of the company's equipment. (Scalia, O'Connor, and Thomas, JJ., dissented in part from this holding.)

EVIDENCE §343.5 > presumption -- restraint of trade -- purchasing decision -- > Headnote:

***LEdHN[17]*** [17]

For purposes of determining whether a company which manufactures and sells photocopiers and micrographic equipment, and which also sells service and noncompatible replacement parts for its equipment, is entitled to summary judgment on a claim that the company unlawfully tied the sale of service for the company's equipment to the sale of its parts, in violation of 1 of the Sherman Act (*15 USCS 1*), it makes little sense to assume, in the absence of any evidentiary support, that equipment-purchasing decisions are based on an accurate assessment of the total cost of equipment, service, and parts over the lifetime of the equipment.

EVIDENCE §343.5 > SUMMARY JUDGMENT AND JUDGMENT ON PLEADINGS §5 > restraint of trade -- question of fact -- presumption -- > Headnote:

***LEdHN[18]*** [18]

For purposes of determining, under *Rule 56(c) of the Federal Rules of Civil Procedure*, whether a company which manufactures and sells photocopiers and micrographic equipment, and which also sells service and noncompatible replacement parts for its equipment, is entitled to summary judgment on a claim that the company unlawfully tied the sale of service for the company's equipment to the sale of its parts, in violation of 1 of the Sherman Act (*15 USCS 1*), there is a question of fact whether the costs of obtaining pricing information and the costs of switching to a different product foil the assumption that the equipment and service markets act as pure complements to one another.

EVIDENCE §343.5 > RESTRAINTS OF TRADE, MONOPOLIES, AND UNFAIR TRADE PRACTICES §30.6 > presumption -- tying arrangement -- market power -- > Headnote:

***LEdHN[19]*** [19]

A company which manufactures and sells photocopiers and micrographic equipment, and which also sells service and noncompatible replacement parts for its equipment, is not entitled to a legal presumption on the company's lack of market power, for purposes of determining whether the company should be granted summary judgment on a claim that the company unlawfully tied the sale of service for the company's equipment to the sale of its parts, in violation of 1 of the Sherman Act (*15 USCS 1*), where there is a significant risk of deterring procompetitive conduct, in that the company's alleged conduct--higher service prices and market foreclosure--is facially anticompetitive and exactly the harm that antitrust laws aim to prevent.

RESTRAINTS OF TRADE, MONOPOLIES, AND UNFAIR TRADE PRACTICES §32 > marketing options -- service -- equipment -- > Headnote:

***LEdHN[20]*** [20]

The offering by a firm of various marketing options, including bundling of support and maintenance service with the sale of equipment, does not run afoul of the federal antitrust laws.

RESTRAINTS OF TRADE, MONOPOLIES, AND UNFAIR TRADE PRACTICES §42 > tying arrangement -- sale of service by manufacturer -- patents -- copyright -- > Headnote:

***LEdHN[21A]*** [21A]***LEdHN[21B]*** [21B]

There is no support for the view that per se immunity from 1 of the Sherman Act (*15 USCS 1*), which prohibits unlawful tying arrangements, should be granted to manufacturers competing in the service market in either (1) the United States Supreme Court's jurisprudence, since the Supreme Court has held many times that power gained through some natural and legal advantage such as a patent, copyright, or business acumen can give rise to liability if a seller exploits its dominant position in one market to expand the seller's empire into a derivative aftermarket; or (2) the record in the case, where the record--for purposes of determining whether a manufacturer selling service and parts for its photocopiers and micrographic equipment has engaged in an unlawful tying arrangement prohibited by 1 by unlawfully tying the sale of service to the sale of parts--supports the theory that the manufacturer is able to exploit some customers who in the absence of the tie would be protected from increases in parts prices by knowledgeable customers. (Scalia, O'Connor, and Thomas, JJ., dissented in part from this holding.)

RESTRAINTS OF TRADE, MONOPOLIES, AND UNFAIR TRADE PRACTICES §14 > monopoly -- elements -- > Headnote:

***LEdHN[22A]*** [22A]***LEdHN[22B]*** [22B]

The offense of monopoly under 2 of the Sherman Act (*15 USCS 2*) has two elements: (1) the possession of monopoly power in the relevant market; and (2) the willful acquisition or maintenance of such power--as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident--to foreclose competition, to gain a competitive advantage, or to destroy a competitor.

RESTRAINTS OF TRADE, MONOPOLIES, AND UNFAIR TRADE PRACTICES §18 > monopoly -- market power -- > Headnote:

***LEdHN[23]*** [23]

Monopoly power, for purposes of determining whether there has been a violation of 2 of the Sherman Act (*15 USCS 2*), requires something greater than market power for purposes of determining whether there has been a violation of 1 of the Sherman Act (*15 USCS 1*).

RESTRAINTS OF TRADE, MONOPOLIES, AND UNFAIR TRADE PRACTICES §19 > relevant market -- commercial realities -- > Headnote:

***LEdHN[24]*** [24]

For purposes of determining whether there has been a violation of the Sherman Act (*15 USCS 1 et seq.*), a single brand of a product or service can constitute a separate relevant market; the proper market definition can be determined only after a factual inquiry into the commercial realities faced by consumers.

RESTRAINTS OF TRADE, MONOPOLIES, AND UNFAIR TRADE PRACTICES §30.6 > refusal to deal -- > Headnote:

***LEdHN[25A]*** [25A]***LEdHN[25B]*** [25B]

As a general matter, for purposes of determining whether there has been a violation of 2 of the Sherman Act (*15 USCS 2*), a firm can refuse to deal with its competitors; however, such a right is not absolute, and it exists only if there are legitimate competitive reasons for the refusal.

RESTRAINTS OF TRADE, MONOPOLIES, AND UNFAIR TRADE PRACTICES §17 > monopoly -- business reasons -- > Headnote:

***LEdHN[26]*** [26]

A firm's liability on a claim of monopoly under 2 of the Sherman Act (*15 USCS 2*) turns on whether valid business reasons can explain the firm's exclusionary actions.

SUMMARY JUDGMENT AND JUDGMENT ON PLEADINGS §5 > monopoly -- determination -- quality justification -- > Headnote:

***LEdHN[27]*** [27]

With respect to a claim by independent service organizations (ISOs) that a company which manufactures and sells photocopiers and micrographic equipment, and which also sells service and noncompatible replacement parts for its equipment, unlawfully monopolized and attempted to monopolize the sale of service with respect to such equipment, in violation of 2 of the Sherman Act (*15 USCS 2*), the ISOs have presented evidence from which a reasonable trier of fact could conclude--so as to defeat the company's motion for summary judgment under *Rule 56(c) of the Federal Rules of Civil Procedure*--that the company's justification based on the provision of quality service is pretextual, because (1) evidence indicates that the ISOs provide quality service and are preferred by some owners of the company's equipment; and (2) the company's quality justification appears to be inconsistent with the company's (a) thesis that consumers are knowledgeable to "lifecycle price" the total cost of equipment, service, and parts, and (b) policy of allowing self-service by equipment owners.

SUMMARY JUDGMENT AND JUDGMENT ON PLEADINGS §5 > monopoly -- determination -- inventory cost justification -- > Headnote:

***LEdHN[28]*** [28]

With respect to a claim by independent service organizations (ISOs) that a company which manufactures and sells photocopiers and micrographic equipment, and which also sells service and noncompatible replacement parts for its equipment, unlawfully monopolized and attempted to monopolize the sale of service with respect to such equipment, in violation of 2 of the Sherman Act (*15 USCS 2*), the ISOs have presented a triable issue of fact--so as to defeat the company's motion for summary judgment under *Rule 56(c) of the Federal Rules of Civil Procedure*--on the company's asserted justification based on controlling inventory costs, because (1) the inventory of parts needed to repair the company's equipment turns only on breakdown rates, which should be the same whether the company or the ISOs perform the repair; and (2) such justification fails to explain evidence that the company forced independent equipment manufacturers, equipment owners, and parts brokers not to sell parts to ISOs, which actions would have no effect on the company's inventory costs.

RESTRAINTS OF TRADE, MONOPOLIES, AND UNFAIR TRADE PRACTICES §9 > entry barriers -- prohibition -- > Headnote:

***LEdHN[29]*** [29]

One of the evils proscribed by the federal antitrust laws is the creation of entry barriers to potential competitors by requiring them to enter two markets simultaneously.

**Syllabus**

After respondent independent service organizations (ISO's) began servicing copying and micrographic equipment manufactured by petitioner Eastman Kodak Co., Kodak adopted policies to limit the availability to ISO's of replacement parts for its equipment and to make it more difficult for ISO's to compete with it in servicing such equipment. Respondents then filed this action, alleging, *inter alia*, that Kodak had unlawfully tied the sale of service for its machines to the sale of parts, in violation of *§ 1* of the Sherman Act, and had unlawfully monopolized and attempted to monopolize the sale of service and parts for such machines, in violation of *§ 2* of that Act. The District Court granted summary judgment for Kodak, but the Court of Appeals reversed. Among other things, the appellate court found that respondents had presented sufficient evidence to raise a genuine issue concerning Kodak's market power in the service and parts markets, and rejected Kodak's contention that lack of market power in service and parts must be assumed when such power is absent in the equipment market.

*Held:*

1. Kodak has not met the requirements of *Federal Rule of Civil Procedure 56(c)* for an award of summary judgment on the *§ 1* claim. Pp. 461-479.

(a) A tying arrangement -- *i. e.*, an agreement by a party to sell one product on the condition that the buyer also purchases a different (or tied) product, or at least agrees that he will not purchase that product from any other supplier -- violates *§ 1* only if the seller has appreciable economic power in the tying product market. Pp. 461-462.

(b) Respondents have presented sufficient evidence of a tying arrangement to defeat a summary judgment motion. A reasonable trier of fact could find, first, that service and parts are two distinct

products in light of evidence indicating that each has been, and continues in some circumstances to be, sold separately, and, second, that Kodak has tied the sale of the two products in light of evidence indicating that it would sell parts to third parties only if they agreed not to buy service from ISO's. Pp. 462-463.

(c) For purposes of determining appreciable economic power in the tying market, this Court's precedents have defined market power as the power to force a purchaser to do something that he would not do in a competitive market, and have ordinarily inferred the existence of such power from the seller's possession of a predominant share of the market. P. 464.

(d) Respondents would be entitled under such precedents to a trial on their claim that Kodak has sufficient power in the parts market to force unwanted purchases of the tied service market, based on evidence indicating that Kodak has control over the availability of parts and that such control has excluded service competition, boosted service prices, and forced unwilling consumption of Kodak service. Pp. 464-465.

(e) Kodak has not satisfied its substantial burden of showing that, despite such evidence, an inference of market power is unreasonable. Kodak's theory that its lack of market power in the primary equipment market precludes -- as a matter of law -- the possibility of market power in the derivative aftermarkets rests on the factual assumption that if it raised its parts or service prices above competitive levels, potential customers would simply stop buying its equipment. Kodak's theory does not accurately describe actual market behavior, since there is no evidence or assertion that its equipment sales dropped after it raised its service prices. Respondents offer a forceful reason for this discrepancy: the existence of significant information and switching costs that could create a less responsive connection between aftermarket prices and equipment sales. It is plausible to infer from respondents' evidence that Kodak chose to gain immediate profits by exerting market power where locked-in customers, high information costs, and discriminatory pricing limited, and perhaps eliminated, any long-term loss. Pp. 465-478.

(f) Nor is this Court persuaded by Kodak's contention that it is entitled to a legal presumption on the lack of market power because there is a significant risk of deterring procompetitive conduct. Because Kodak's service and parts policy is not one that appears always, or almost always, to enhance competition, the balance tips against summary judgment. Pp. 478-479.

2. Respondents have presented genuine issues for trial as to whether Kodak has monopolized, or attempted to monopolize, the service and parts markets in violation of *§ 2*. Pp. 480-486.

(a) Respondents' evidence that Kodak controls nearly 100% of the parts market and 80% to 95% of the service market, with no readily available substitutes, is sufficient to survive summary judgment on the first element of the monopoly offense, the possession of monopoly power. Kodak's contention that, as a matter of law, a single brand of a product or service can never be a relevant market contravenes cases of this Court indicating that one brand of a product can constitute a separate market in some instances. The proper market definition in this case can be determined only after a factual inquiry into the commercial realities faced by Kodak equipment owners. Pp. 481-482.

(b) As to the second element of a *§ 2* claim, the willful use of monopoly power, respondents have presented evidence that Kodak took exclusionary action to maintain its parts monopoly and used its control over parts to strengthen its monopoly share of the service market. Thus,

liability turns on whether valid business reasons can explain Kodak's actions. However, none of its asserted business justifications -- a commitment to quality service, a need to control inventory costs, and a desire to prevent ISO's from free-riding on its capital investment -- are sufficient to prove that it is entitled to a judgment as a matter of law. Pp. 482-486.

**Counsel:** Donn P. Pickett argued the cause for petitioner. With him on the briefs were Daniel M. Wall, Alfred C. Pfeiffer, Jr., and Jonathan W. Romeyn.

Assistant Attorney General Rill argued the cause for the United States as amicus curiae urging reversal. With him on the brief were Solicitor General Starr, Deputy Solicitor General Wallace, Christopher J. Wright, Catherine G. O'Sullivan, and Robert B. Nicholson.

James A. Hennefer argued the cause for respondents. With him on the brief were A. Kirk McKenzie, Douglas E. Rosenthal, Jonathan M. Jacobson, and Elinor R. Hoffmann. *

---

* Briefs of amici curiae urging reversal were filed for the Computer and Business Equipment Manufacturers Association by Simon Lazarus III; for Digital Equipment Corp. et al. by Kurt W. Melchior, Robert A. Skitol, James A. Meyers, Marcia Howe Adams, Ivor Cary Armistead III, Ronald A. Stern, Stephen Wasinger, James W. Olson, Carter G. Phillips, Ralph I. Miller, and Florinda J. Iascone; for the Motor Vehicle Manufacturers Association of the United States, Inc., by Thomas B. Leary, William H. Crabtree, and Charles H. Lockwood II; and for the National Electrical Manufacturers Association by James S. Dittmar and James L. Messenger.

Briefs of amici curiae urging affirmance were filed for the State of Ohio et al. by Lee Fisher, Attorney General of Ohio, Simon Karas, and Elizabeth H. Watts and Marc B. Bandman, Assistant Attorneys General, James H. Evans, Attorney General of Alabama, and Marc Givhan, Assistant Attorney General, Charles E. Cole, Attorney General of Alaska, and James Forbes, Assistant Attorney General, Grant Woods, Attorney General of Arizona, and Jeri K. Auther, Assistant Attorney General, Winston Bryant, Attorney General of Arkansas, and Royce Griffin, Deputy Attorney General, Daniel E. Lungren, Attorney General of California, Roderick E. Walston, Chief Assistant Attorney General, Sanford N. Gruskin, Assistant Attorney General, and Kathleen E. Foote, Deputy Attorney General, Richard Blumenthal, Attorney General of Connecticut, and Robert M. Langer, Assistant Attorney General, Robert A. Butterworth, Attorney General of Florida, and Jerome W. Hoffman, Assistant Attorney General, Warren Price III, Attorney General of Hawaii, Robert A. Marks, Supervising Deputy Attorney General, and Ted Clause, Deputy Attorney General, Larry EchoHawk, Attorney General of Idaho, Roland W. Burris, Attorney General of Illinois, Rosalyn Kaplan, Solicitor General, and Christine Rosso, Senior Assistant Attorney General, Bonnie J. Campbell, Attorney General of Iowa, and John R. Perkins, Deputy Attorney General, Robert T. Stephan, Attorney General of Kansas, and Mary Ann Heckman, Assistant Attorney General, Frederic J. Cowan, Attorney General of Kentucky, and James M. Ringo, Assistant Attorney General, William J. Guste, Jr., Attorney General of Louisiana, and Anne F. Benoit, Assistant Attorney General, Michael E. Carpenter, Attorney General of Maine, and Stephen L. Wessler, Deputy Attorney General, J. Joseph Curran, Jr., Attorney General of Maryland, and Robert N. McDonald and Ellen S. Cooper, Assistant Attorneys General, Scott Harshbarger, Attorney General of Massachusetts, and George K. Weber, Assistant Attorney General, Frank J. Kelley, Attorney General of Michigan, Hubert H. Humphrey III, Attorney General of Minnesota, Thomas F. Pursell, Deputy Attorney General, and James P. Spencer and Susan C. Gretz, Special Assistant Attorneys General, Frankie Sue Del Pappa, Attorney General of Nevada, and Rob Kirkman, Deputy Attorney General, Robert J. Del Tufo, Attorney General of New Jersey, and Laurel A. Price, Deputy Attorney General, Robert Abrams, Attorney General of New York, O. Peter Sherwood, Solicitor General, and George W. Sampson, Assistant Attorney General, Lacy H. Thornburg, Attorney General of North Carolina, James C. Gulick, Special Deputy Attorney General, and K. D. Sturgis, Assistant Attorney General, Dan Morales, Attorney General of Texas, Will Pryor, First Assistant Attorney General, Mary F. Keller, Deputy Attorney General, and Mark Tobey, Assistant Attorney General, R. Paul Van Dam, Attorney General of Utah, and Arthur M. Strong, Assistant Attorney General, Jeffrey L. Amestoy, Attorney General of Vermont, and Geoff Yudien, Assistant Attorney General, Kenneth O. Eikenberry, Attorney General of Washington, and Carol A. Smith, Assistant Attorney General, and Mario J. Palumbo, Attorney General of West Virginia, and Donna S. Quesenberry, Assistant Attorney General; for the Automotive Warehouse Distributors Association et al. by Donald A. Randall, Louis R. Marchese, Robert J. Verdisco, and Basil J. Mezines; for Bell Atlantic Business Systems Services, Inc., by Richard G. Taranto, Joel I. Klein, and John M. Kelleher; for Grumman Corporation by Patrick O. Killian; for the National Association of State Purchasing Officials et al. by Richard D. Monkman; for the National Office Machine Dealers Association et al. by Mark P. Cohen; for the National Retail Federation by Michael J. Altier; for Public Citizen by Alan B. Morrison; for State Farm Mutual Automobile Insurance Co. et al. by Melvin Spaeth, James F. Fitzpatrick, and Melvin C. Garbow.

Briefs of amici curiae were filed for the California State Electronics Association et al. by Richard I. Fine; for Computer Service Network International by Ronald S. Katz; and for the National Electronics Sales and Service Dealers Association by Ronald S. Katz.

**Judges:** BLACKMUN, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and WHITE, STEVENS, KENNEDY, and SOUTER, JJ., joined. SCALIA, J., filed a dissenting opinion, in which O'CONNOR and THOMAS, JJ., joined, post, p. 486.

**Opinion by:** BLACKMUN

**Opinion**

**[*454]** **[***276]** **[**2076]** JUSTICE BLACKMUN delivered the opinion of the Court.

***LEdHN[1A]*** [1A] ***LEdHN[2A]*** [2A]This is yet another case that concerns the standard for summary judgment in an antitrust controversy. The **[*455]** principal issue here is whether a defendant's lack of market power in the primary equipment market precludes -- as a matter of law -- the possibility of market power in derivative aftermarkets.

Petitioner Eastman Kodak Company manufactures and sells photocopiers and micrographic equipment. Kodak also sells service and replacement parts for its equipment. Respondents **[***277]** are 18 independent service organizations (ISO's) that in the early 1980's began servicing Kodak copying and micrographic equipment. Kodak subsequently adopted policies to limit the availability of parts to ISO's and to make it more difficult for ISO's to compete with Kodak in servicing Kodak equipment.

**[*456]** Respondents instituted this action in the United States District Court for the Northern District of California, alleging that Kodak's policies were unlawful under both *§ 1* and *§ 2* of the Sherman Act, 26 Stat. 209, as amended, *15 U. S. C. §§ 1* and *2 (1988 ed., Supp. II)*. After truncated discovery, the District Court granted summary judgment for Kodak. The Court of Appeals for the Ninth Circuit reversed. The appellate court found that respondents had presented sufficient evidence to raise a genuine issue concerning Kodak's market power in the service and parts markets. It rejected Kodak's contention that lack of market power in service and parts must be assumed when such power is absent in the equipment market. Because of the importance of the issue, we granted certiorari. *501 U.S. 1216 (1991)*.

I

A

***LEdHN[3]*** [3]Because this case comes to us on petitioner Kodak's motion for summary judgment, **[**2077]** "the evidence of [respondents] is to be believed, and all justifiable inferences are to be drawn in [their] favor." *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986)*; *Matsushita* *Electric Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 89 L. Ed. 2d 538, 106 S. Ct. 1348 (1986)*. Mindful that respondents' version of any disputed issue of fact thus is presumed correct, we begin with the factual basis of respondents' claims. See *Arizona v. Maricopa County Medical Society, 457 U.S. 332, 339, 73 L. Ed. 2d 48, 102 S. Ct. 2466 (1982)*.

Kodak manufactures and sells complex business machines -- as relevant here, high-volume photocopiers and micrographic equipment. [1] Kodak equipment is unique; micrographic **[*457]**

---

[1] Kodak's micrographic equipment includes four different product areas. The first is capture products such as microfilmers and electronic scanners, which compact an image and capture it on microfilm. The second is equipment such as microfilm viewers

software programs that operate on Kodak machines, for example, are not compatible with competitors' machines. See App. 424-425, 487-489, 537. Kodak parts are not compatible with other manufacturers' equipment, and vice versa. See *id., at 432, 413-415*. Kodak equipment, although expensive when new, has little resale value. See *id., at 358-359, 424-425, 427-428, 467, 505-506, 519-521*.

Kodak provides service and parts for its machines to its customers. It produces some of the parts itself; the rest are made to order for Kodak by independent original-equipment manufacturers (OEM's). See *id., at 429, 465, 490, 496*. Kodak does not sell a complete system of original **[***278]** equipment, lifetime service, and lifetime parts for a single price. Instead, Kodak provides service after the initial warranty period either through annual service contracts, which include all necessary parts, or on a per-call basis. See *id., at 98-99*; Brief for Petitioner 3. It charges, through negotiations and bidding, different prices for equipment, service, and parts for different customers. See App. 420-421, 536. Kodak provides 80% to 95% of the service for Kodak machines. See *id., at 430*.

Beginning in the early 1980's, ISO's began repairing and servicing Kodak equipment. They also sold parts and reconditioned and sold used Kodak equipment. Their customers were federal, state, and local government agencies, banks, insurance companies, industrial enterprises, and providers of specialized copy and microfilming services. See *id., at 417, 419-421, 492-493, 499, 516, 539*. ISO's provide service at a price substantially lower than Kodak does. See *id., at 414, 451, 453-454, 469, 474-475, 488, 493, 536-537*; Lodging 133. Some customers found that the ISO service was of higher quality. See App. 425-426, 537-538.

**[*458]** Some ISO customers purchase their own parts and hire ISO's only for service. See Lodging 144-147. Others choose ISO's to supply both service and parts. See *id., at 133*. ISO's keep an inventory of parts, purchased from Kodak or other sources, primarily the OEM's. [2] See App. 99, 415-416, 490.

In 1985 and 1986, Kodak implemented a policy of selling replacement parts for micrographic and copying machines only to buyers of Kodak equipment who use Kodak service or repair their own machines. See Brief for Petitioner 6; App. 91-92, 98-100, 140-141, 171-172, 190, 442-447, 455-456, 483-484.

**[**2078]** As part of the same policy, Kodak sought to limit ISO access to other sources of Kodak parts. Kodak and the OEM's agreed that the OEM's would not sell parts that fit Kodak equipment to anyone other than Kodak. See *id., at 417, 428-429, 447, 468, 474, 496*. Kodak also pressured Kodak equipment owners and independent parts distributors not to sell Kodak parts to ISO's. See *id., at 419-420, 428-429, 483-484, 517-518, 589-590*. In addition, Kodak took steps to restrict the availability of used machines. See *id., at 427-428, 465-466, 510-511, 520*.

Kodak intended, through these policies, to make it more difficult for ISO's to sell service for Kodak machines. See *id., at 106-107, 171, 516*. It succeeded. ISO's were unable to obtain parts

---

and viewer/printers. This equipment is used to retrieve the images. The third is Computer Output Microform (COM) recorders, which are data-processing peripherals that record computer-generated data onto microfilm. The fourth is Computer Assisted Retrieval (CAR) systems, which utilize computers to locate and retrieve micrographic images. See App. 156-158.

[2] In addition to the OEM's, other sources of Kodak parts include (1) brokers who would buy parts from Kodak, or strip used Kodak equipment to obtain the useful parts and resell them, (2) customers who buy parts from Kodak and make them available to ISO's, and (3) used equipment to be stripped for parts. See *id., at 419, 517*; Brief for Petitioner 38.

from reliable sources, see *id., at 429, 468, 496*, and many were forced out of business, while others lost substantial revenue. See *id., at 422, 458-459, 464, 468, 475-477, 482-484, 495-496, 501, 521*. Customers were forced to switch to Kodak service even though they preferred ISO service. See *id., at 420-422*.

**[*459]** B

In 1987, the ISO's filed the present **[***279]** action in the District Court, alleging, *inter alia*, that Kodak had unlawfully tied the sale of service for Kodak machines to the sale of parts, in violation of *§ 1* of the Sherman Act, and had unlawfully monopolized and attempted to monopolize the sale of service for Kodak machines, in violation of *§ 2* of that Act. [3]

Kodak filed a motion for summary judgment before respondents had initiated discovery. The District Court permitted respondents to file one set of interrogatories and one set of requests for production of documents and to take six depositions. Without a hearing, the District Court granted summary judgment in favor of Kodak. App. to Pet. for Cert. 29B.

As to the *§ 1* claim, the court found that respondents had provided no evidence of a tying arrangement between Kodak equipment and service or parts. See *id.*, at 32B-33B. The court, however, did not address respondents' *§ 1* claim that is at issue here. Respondents allege a tying arrangement not between Kodak *equipment* and service, but between Kodak *parts* and service. As to the *§ 2* claim, the District Court concluded that although Kodak had a "natural monopoly over the market for parts it sells under its name," a unilateral refusal to sell those parts to ISO's did not violate *§ 2*.

**[*460]** The Court of Appeals for the Ninth Circuit, by a divided vote, reversed. *903 F.2d 612 (1990)*. With respect to the *§ 1* claim, the court first found that whether service and parts were distinct markets and whether a tying arrangement existed between them were disputed issues of fact. *Id., at 615-616*. Having found that a tying arrangement might exist, the Court of Appeals considered a question not decided by the District Court: Was there "an issue of material fact as to whether Kodak has sufficient economic power in the tying product market [parts] to restrain competition appreciably in the tied product market [service]." *Id., at 616*. The court agreed with Kodak that competition in the equipment market might prevent Kodak from possessing power in the parts market, but refused to uphold the District Court's grant of summary judgment "on this theoretical basis" because **[**2079]** "market imperfections can keep economic theories about how consumers will act from mirroring reality." *Id., at 617*. Noting that the District Court had not considered the market power issue, and that the record was not fully developed through discovery, the court declined to require respondents to conduct market analysis

---

[3] *Section 1* of the Sherman Act states in relevant part: "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal." *15 U. S. C. § 1 (1988 ed., Supp. II)*.

*Section 2* of the Sherman Act states: "Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony, and, on conviction thereof, shall be punished by fine not exceeding $ 10,000,000 if a corporation, or, if any other person, $ 350,000, or by imprisonment not exceeding three years, or by both said punishments, in the discretion of the court." *15 U. S. C. § 2 (1988 ed., Supp. II)*.

or to pinpoint specific imperfections in order to **[***280]** withstand summary judgment. [4] "It is enough that [respondents] have presented evidence of actual events from which a reasonable trier of fact could conclude that . . . competition in the [equipment] market does not, in reality, curb Kodak's power in the parts market." *Ibid.*

**[*461]** The court then considered the three business justifications Kodak proffered for its restrictive parts policy: (1) to guard against inadequate service, (2) to lower inventory costs, and (3) to prevent ISO's from free-riding on Kodak's investment in the copier and micrographic industry. The court concluded that the trier of fact might find the product quality and inventory reasons to be pretextual and that there was a less restrictive alternative for achieving Kodak's quality-related goals. *Id., at 618-619*. The court also found Kodak's third justification, preventing ISO's from profiting on Kodak's investments in the equipment markets, legally insufficient. *Id., at 619*.

As to the *§ 2* claim, the Court of Appeals concluded that sufficient evidence existed to support a finding that Kodak's implementation of its parts policy was "anticompetitive" and "exclusionary" and "involved a specific intent to monopolize." *Id., at 620*. It held that the ISO's had come forward with sufficient evidence, for summary judgment purposes, to disprove Kodak's business justifications. *Ibid.*

The dissent in the Court of Appeals, with respect to the *§ 1* claim, accepted Kodak's argument that evidence of competition in the equipment market "*necessarily* precludes power in the derivative market." *Id., at 622* (emphasis in original). With respect to the *§ 2* monopolization claim, the dissent concluded that, entirely apart from market power considerations, Kodak was entitled to summary judgment on the basis of its first business justification because it had "submitted extensive and undisputed evidence of a marketing strategy based on high-quality service." *Id., at 623*.

II

***LEdHN[4]*** [4]***HN1*** A tying arrangement is "an agreement by a party to sell one product but only on the condition that the buyer also purchases a different (or tied) product, or at least agrees that he will not purchase that product from any other supplier." *Northern Pacific R. Co. v. United States, 356 U.S. 1, 5-6, 2 L. Ed. 2d 545, 78 S. Ct. 514* **[*462]** (1958). ***HN2*** Such an arrangement violates *§ 1* of the Sherman Act if the seller has "appreciable economic power" in the tying product market and if the arrangement affects a substantial volume of commerce in the tied market. *Fortner Enterprises, Inc. v. United States Steel Corp., 394 U.S. 495, 503, 22 L. Ed. 2d 495, 89 S. Ct. 1252 (1969)*.

***LEdHN[1B]*** [1B] Kodak did not dispute that its arrangement affects a substantial **[***281]** volume of interstate commerce. It, however, did challenge whether its activities constituted a "tying arrangement" and whether Kodak exercised "appreciable economic power" in the tying market. We consider these issues in turn.

A

---

[4] Specifically, the Court of Appeals explained that the District Court had denied the request for further discovery made by respondents in their opposition to Kodak's summary judgment motion: "For example, [respondents] requested to depose two ISO customers who allegedly would not sign accurate statements concerning Kodak's market power in the parts market. Not finding it necessary to reach the market power issue in its decision, the district court, of course, had no reason to grant this request." 903 F.2d at 617, n. 4.

For respondents to defeat a motion for summary judgment on their claim of a tying **[**2080]** arrangement, a reasonable trier of fact must be able to find, first, that service and parts are two distinct products, and, second, that Kodak has tied the sale of the two products.

***LEdHN[1C]*** [1C] ***LEdHN[5]*** [5]For service and parts to be considered two distinct products, there must be sufficient consumer demand so that it is efficient for a firm to provide service separately from parts. *Jefferson Parish Hospital Dist. No. 2 v. Hyde, 466 U.S. 2, 21-22, 80 L. Ed. 2d 2, 104 S. Ct. 1551 (1984)*. Evidence in the record indicates that service and parts have been sold separately in the past and still are sold separately to self-service equipment owners. [5] Indeed, the development of the entire high-technology service industry is evidence of the efficiency of a separate market for service. [6]

**[*463]** ***LEdHN[6]*** [6]Kodak insists that because there is no demand for parts separate from service, there cannot be separate markets for service and parts. Brief for Petitioner 15, n. 3. By that logic, we would be forced to conclude that there can never be separate markets, for example, for cameras and film, computers and software, or automobiles and tires. That is an assumption we are unwilling to make. "We have often found arrangements involving functionally linked products at least one of which is useless without the other to be prohibited tying devices." *Jefferson Parish, 466 U.S. at 19, n. 30*.

***LEdHN[1D]*** [1D] ***LEdHN[7A]*** [7A]Kodak's assertion also appears to be incorrect as a factual matter. At least some consumers would purchase service without parts, because some service does not require parts, and some consumers, those who self-service for example, would purchase parts without service. [7] Enough doubt is cast on Kodak's claim of a unified market that it should be resolved by the trier of fact.

***LEdHN[1E]*** [1E] ***LEdHN[8A]*** [8A]Finally, respondents have presented sufficient evidence of a tie between service and parts. The record indicates that Kodak would sell **[***282]** parts to third parties only if they agreed not to buy service from ISO's. [8]

**[*464]** B

***LEdHN[9]*** [9] ***LEdHN[10A]*** [10A] Having found sufficient evidence of a tying arrangement, we consider the other necessary feature of an illegal tying arrangement: appreciable economic

---

[5] The Court of Appeals found: "Kodak's policy of allowing customers to purchase parts on condition that they agree to service their own machines suggests that the demand for parts can be separated from the demand for service." *Id., at 616*.

[6] *Amicus* briefs filed by various service organizations attest to the magnitude of the service business. See, *e. g.*, Brief for Computer Service Network International as *Amicus Curiae;* Brief for National Electronics Sales and Service Dealers Association as *Amicus Curiae;* Brief for California State Electronics Association et al. as *Amici Curiae;* Brief for National Office Machine Dealers et al. as *Amici Curiae*.

[7] ***LEdHN[7B]*** [7B]

The dissent suggests that parts and service are not separate products for tying purposes because all service may involve installation of parts. *Post*, at 494-495, n. 2. Because the record does not support this factual assertion, under the approach of both the Court and the concurrence in *Jefferson Parish Hospital Dist. No. 2* v. *Hyde*, 466 U.S. 2, 80 L. Ed. 2d 2, 104 S. Ct. 1551 (1984), Kodak is not entitled to summary judgment on whether parts and service are distinct markets.

[8] ***LEdHN[8B]*** [8B]

In a footnote, Kodak contends that this practice is only a unilateral refusal to deal, which does not violate the antitrust laws. See Brief for Petitioner 15, n. 4. Assuming, *arguendo*, that Kodak's refusal to sell parts to any company providing service can be characterized as a unilateral refusal to deal, its alleged sale of parts to third parties on condition that they buy service from Kodak is not. See 903 F.2d at 619.

power in the tying market. ***HN3*** Market power is the power "to force a purchaser to do something that he would not do in a competitive market." *Jefferson Parish, 466 U.S. at 14*. [9] It has been defined as "the ability of **[**2081]** a single seller to raise price and restrict output." *Fortner, 394 U.S. at 503*; *United States v. E. I. du Pont de Nemours & Co., 351 U.S. 377, 391, 100 L. Ed. 1264, 76 S. Ct. 994 (1956)*. The existence of such power ordinarily is inferred from the seller's possession of a predominant share of the market. *Jefferson Parish, 466 U.S. at 17*; *United States v. Grinnell Corp., 384 U.S. 563, 571, 16 L. Ed. 2d 778, 86 S. Ct. 1698 (1966)*; *Times-Picayune Publishing Co. v. United States, 345 U.S. 594, 611-613, 97 L. Ed. 1277, 73 S. Ct. 872 (1953)*.

I

***LEdHN[1F]*** [1F]Respondents contend that Kodak has more than sufficient power in the parts market to force unwanted purchases of the tied market, service. Respondents provide evidence that certain parts are available exclusively through Kodak. Respondents also assert that Kodak has control over the availability of parts it does not manufacture. According to respondents' evidence, Kodak has prohibited independent manufacturers from selling Kodak parts to ISO's, pressured Kodak equipment owners and independent parts distributors to deny ISO's the purchase of Kodak parts, and taken steps to restrict the availability of used machines.

**[*465]** Respondents also allege that Kodak's control over the parts market has excluded service competition, boosted service prices, and forced unwilling consumption of Kodak service. Respondents offer evidence that consumers have switched to Kodak service even though they preferred ISO service, that Kodak service was of higher price and lower quality than the preferred ISO service, and that ISO's were driven out of business by Kodak's policies. Under our prior precedents, this evidence would be sufficient to entitle respondents to a trial on their claim of market power.

2

***LEdHN[1G]*** [1G] ***LEdHN[11A]*** [11A] ***LEdHN[12A]*** [12A]Kodak counters that even if it concedes monopoly *share* **[***283]** of the relevant parts market, it cannot actually exercise the necessary market *power* for a Sherman Act violation. This is so, according to Kodak, because competition exists in the equipment market. [10] Kodak argues that it could not have **[*466]** the ability to raise prices of service and parts above the level that would be charged in a competitive market because any increase in profits from a higher price in the aftermarkets at least would be

---

[9] ***LEdHN[10B]*** [10B]

"The essential characteristic of an invalid tying arrangement lies in the seller's exploitation of its control over the tying product to force the buyer into the purchase of a tied product that the buyer either did not want at all, or might have preferred to purchase elsewhere on different terms. When such 'forcing' is present, competition on the merits in the market for the tied item is restrained and the Sherman Act is violated." *Jefferson Parish*, 466 U.S. at 12.

[10] In their brief and at oral argument, respondents argued that Kodak's market share figures for high-volume copy machines, CAR systems, and micrographic-capture equipment demonstrate Kodak's market power in the equipment market. Brief for Respondents 16-18, 32-33; Tr. of Oral Arg. 28-31.

In the Court of Appeals, however, respondents did not contest Kodak's assertion that its market shares indicated a competitive equipment market. The Court of Appeals believed that respondents "do not dispute Kodak's assertion that it lacks market power in the [equipment] markets." 903 F.2d at 616, n. 3. Nor did respondents question Kodak's asserted lack of market power in their brief in opposition to the petition for certiorari, although they acknowledged that Kodak's entire case rested on its understanding that respondents were not disputing the existence of competition in the equipment market. Brief in Opposition 8.

offset by a corresponding loss in profits from lower equipment sales **[**2082]** as consumers began purchasing equipment with more attractive service costs.

Kodak does not present any actual data on the equipment, service, or parts markets. Instead, it urges the adoption of a substantive legal rule that "equipment competition precludes any finding of monopoly power in derivative aftermarkets." Brief for Petitioner 33. Kodak argues that such a rule would satisfy its burden as the moving party of showing "that there is no genuine issue as to any material fact" on the market power issue. [11] See *Fed. Rule Civ. Proc. 56(c)*.

***LEdHN[13]*** [13]***HN5*** Legal presumptions that rest on formalistic distinctions rather than actual market realities are generally **[***284]** disfavored **[*467]** in antitrust law. This Court has preferred to resolve antitrust claims on a case-by-case basis, focusing on the "particular facts disclosed by the record." *Maple Flooring Manufacturers Assn. v. United States, 268 U.S. 563, 579, 45 S. Ct. 578, 69 L. Ed. 1093 (1925)*; *Du Pont, 351 U.S. at 395, n. 22*; *Continental T. V., Inc. v. GTE Sylvania Inc., 433 U.S. 36, 70, 53 L. Ed. 2d 568, 97 S. Ct. 2549 (1977)* (WHITE, J., concurring in judgment). [12] In determining the existence of market power, and specifically the "responsiveness of the sales of one product to price changes of the other," *Du Pont, 351 U.S. at 400*; see also *id., at 394-395*, and 400-401, this Court has examined closely the economic reality of the market at issue. [13]

Kodak contends that there is no need to examine the facts when the issue is market power in the aftermarkets. A legal presumption against a finding of market power is warranted in this situation, according to Kodak, because the existence of market power in the service and parts

---

***LEdHN[11B]*** [11B] ***LEdHN[12B]*** [12B]Recognizing that ***HN4*** on summary judgment we may examine the record *de novo* without relying on the lower courts' understanding, *United States* v. *Diebold, Inc.*, 369 U.S. 654, 655, 8 L. Ed. 2d 176, 82 S. Ct. 993 (1962), respondents now ask us to decline to reach the merits of the questions presented in the petition, and instead to affirm the Ninth Circuit's judgment based on the factual dispute over market power in the equipment market. We decline respondents' invitation. We stated in *Oklahoma City* v. *Tuttle*, 471 U.S. 808, 816, 85 L. Ed. 2d 791, 105 S. Ct. 2427 (1985): "Our decision to grant certiorari represents a commitment of scarce judicial resources with a view to deciding the merits of one or more of the questions presented in the petition." Because respondents failed to bring their objections to the premise underlying the questions presented to our attention in their opposition to the petition for certiorari, we decide those questions based on the same premise as the Court of Appeals, namely, that competition exists in the equipment market.

[11] Kodak argues that such a rule would be *per se*, with no opportunity for respondents to rebut the conclusion that market power is lacking in the parts market. See Brief for Petitioner 30-31 ("There is nothing that respondents could prove that would overcome Kodak's conceded lack of market power"); *id.*, at 30 (discovery is "pointless" once the "dispositive fact" of lack of market power in the equipment market is conceded); *id.*, at 22 (Kodak's lack of market power in the equipment market "dooms any attempt to extract monopoly profits" even in an allegedly imperfect market); *id., at 25* (it is "impossible" for Kodak to make more total profit by overcharging its existing customers for service).

As an apparent second-best alternative, Kodak suggests elsewhere in its brief that the rule would permit a defendant to meet its summary judgment burden under *Federal Rule of Civil Procedure 56(c)*; the burden would then shift to the plaintiffs to "prove . . . that there is specific reason to believe that normal economic reasoning does not apply." Brief for Petitioner 30. This is the United States' position. See Brief for United States as *Amicus Curiae* 10-11.

[12] See generally *Business Electronics Corp.* v. *Sharp Electronics Corp.*, 485 U.S. 717, 723-726, 99 L. Ed. 2d 808, 108 S. Ct. 1515 (1988); *FTC* v. *Indiana Federation of Dentists*, 476 U.S. 447, 458-459, 90 L. Ed. 2d 445, 106 S. Ct. 2009 (1986); *National Collegiate Athletic Assn.* v. *Board of Regents of Univ. of Okla.*, 468 U.S. 85, 100-104, 82 L. Ed. 2d 70, 104 S. Ct. 2948 (1984); *Continental T. V., Inc.* v. *GTE Sylvania Inc.*, 433 U.S. at 59.

[13] See, *e. g.*, *Jefferson Parish*, 466 U.S. at 26-29; *United States* v. *Connecticut National Bank*, 418 U.S. 656, 661-666, 41 L. Ed. 2d 1016, 94 S. Ct. 2788 (1974); *United States* v. *Grinnell Corp.*, 384 U.S. 563, 571-576, 16 L. Ed. 2d 778, 86 S. Ct. 1698 (1966); *International Boxing Club of New York, Inc.* v. *United States*, 358 U.S. 242, 250-251, 3 L. Ed. 2d 270, 79 S. Ct. 245 (1959); see also *Jefferson Parish*, 466 U.S. at 37, n. 6 (O'CONNOR, J., concurring) (citing cases and describing the careful consideration the Court gives to the particular facts when determining market power).

markets absent power in the equipment market "simply makes no economic sense," and the absence of a legal presumption would deter procompetitive behavior. *Matsushita*, 475 U.S. at 587; *id., at 594-595*.

Kodak analogizes this case to *Matsushita*, where a group of American corporations that manufactured or sold consumer electronic products alleged that their 21 Japanese counterparts were engaging in a 20-year conspiracy to price **[*468]** below cost in the United States in the hope of expanding their market **[**2083]** share sometime in the future. After several years of detailed discovery, the defendants moved for summary judgment. *Id., at 577-582*. Because the defendants had every incentive not to engage in the alleged conduct which required them to sustain losses for decades with no foreseeable profits, the Court found an "absence of any rational motive to conspire." *Id., at 597*. In that context, the Court determined that the plaintiffs' theory of predatory pricing made no practical sense, was "speculative," and was not "reasonable." *Id., at 588, 590, 593, 595, 597*. Accordingly, the Court held that a reasonable jury could not return a verdict for the plaintiffs and that summary judgment would be appropriate against them unless they came forward with more persuasive evidence to support their **[***285]** theory. *Id., at 587-588, 595-598*.

***LEdHN[14]*** [14]The Court's requirement in *Matsushita* that the plaintiffs' claims make economic sense did not introduce a special burden on plaintiffs facing summary judgment in antitrust cases. The Court did not hold that if the moving party enunciates *any* economic theory supporting its behavior, regardless of its accuracy in reflecting the actual market, it is entitled to summary judgment. *Matsushita* demands only that the nonmoving party's inferences be reasonable in order to reach the jury, a requirement that was not invented, but merely articulated, in that decision. [14] If the plaintiff's theory is economically **[*469]** senseless, no reasonable jury could find in its favor, and summary judgment should be granted.

***LEdHN[1H]*** [1H]Kodak, then, bears a substantial burden in showing that it is entitled to summary judgment. It must show that despite evidence of increased prices and excluded competition, an inference of market power is unreasonable. To determine whether Kodak has met that burden, we must unravel the factual assumptions underlying its proposed rule that lack of power in the equipment market necessarily precludes power in the aftermarkets.

***LEdHN[15A]*** [15A]The extent to which one market prevents exploitation of another market depends on the extent to which consumers will change their consumption of one product in response to a price change in another, *i. e.*, the "cross-elasticity of demand." See *Du Pont, 351 U.S. at*

---

[14] See, *e. g.*, *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 248, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986) ("Summary judgment will not lie . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party"); *Monsanto Co.* v. *Spray-Rite Service Corp.*, 465 U.S. 752, 768, 79 L. Ed. 2d 775, 104 S. Ct. 1464 (1984) (to survive summary judgment there must be evidence that "reasonably tends to prove" plaintiff's theory); *First National Bank of Arizona* v. *Cities Service Co.*, 391 U.S. 253, 288-289, 20 L. Ed. 2d 569, 88 S. Ct. 1575 (1968) (defendant meets his burden under *Rule 56(c)* when he "conclusively show[s] that the facts upon which [the plaintiff] relied to support his allegation were not susceptible of the interpretation which he sought to give them"); *Eastman Kodak Co. of New York* v. *Southern Photo Materials Co.*, 273 U.S. 359, 375, 71 L. Ed. 684, 47 S. Ct. 400 (1927). See also *H. L. Hayden Co. of New York, Inc.* v. *Siemens Medical Systems, Inc.*, 879 F.2d 1005, 1012 (CA2 1989) ("Only *reasonable* inferences can be drawn from the evidence in favor of the nonmoving party") (emphasis in original); *Arnold Pontiac-GMC, Inc.* v. *Budd Baer, Inc.*, 826 F.2d 1335, 1339 (CA3 1987) (*Matsushita* directs us "'to consider whether the inference of conspiracy is reasonable'"); *Instructional Systems Development Corp.* v. *Aetna Casualty & Surety Co.*, 817 F.2d 639, 646 (CA10 1987) (summary judgment not appropriate under *Matsushita* when defendants "could reasonably have been economically motivated").

*400*; P. Areeda & L. Kaplow, Antitrust Analysis P342(c) (4th ed. 1988). [15]
Kodak's **[*470] [***286]** proposed rule rests **[**2084]** on a factual assumption about the cross-elasticity of demand in the equipment and aftermarkets: "If Kodak raised its parts or service prices above competitive levels, potential customers would simply stop buying Kodak equipment. Perhaps Kodak would be able to increase short term profits through such a strategy, but at a devastating cost to its long term interests." [16] Brief for Petitioner 12. Kodak argues that the Court should accept, as a matter of law, this "basic economic reality," *id., at 24*, that competition in the equipment market necessarily prevents market power in the aftermarkets. [17]

Even if Kodak could not raise the price of service and parts one cent without losing equipment sales, that fact would not disprove market power in the aftermarkets. The sales of even a monopolist are reduced when it sells goods at a monopoly price, but the higher price more than compensates for the loss in sales. Areeda & Kaplow PP112 and 340(a). Kodak's claim that charging more for service and parts would be "a short-run game," Brief for Petitioner 26, is based on the false dichotomy that there are only two prices **[*471]** that can be charged -- a competitive price or a ruinous one. But there could easily be a middle, optimum price at which the increased revenues from the higher priced sales of service and parts would more than compensate for the lower revenues from lost equipment sales. The fact that the equipment market imposes a restraint on prices in the after-markets by no means disproves the existence of power in those markets. See Areeda & Kaplow P340(b) ("The existence of significant substitution in the event of *further* price increases or even at the *current* price does not tell us whether the defendant *already* exercises significant market power") (emphasis in original). Thus, contrary to Kodak's assertion, there is no immutable physical law -- no "basic economic reality" -- insisting that competition in the equipment market cannot coexist with market power in the aftermarkets.

We next consider the more narrowly drawn question: Does Kodak's theory describe actual market behavior so accurately that respondents' assertion of Kodak market power in the aftermarkets, if not impossible, is at least unreasonable? [18] Cf. *Matsushita Electric Industrial Co. v. Zenith Radio* **[**2085]** *Corp., 475 U.S. 574, 89 L. Ed. 2d 538, 106 S. Ct. 1348 (1986)*.

---

[15] What constrains the defendant's ability to raise prices in the service market is "the elasticity of demand faced by the defendant -- the degree to which its sales fall . . . as its price rises." Areeda & Kaplow P342(c), p. 576.

***LEdHN[15B]*** [15B]Courts usually have considered the relationship between price in one market and demand in another in defining the relevant market. Because market power is often inferred from market share, market definition generally determines the result of the case. Pitofsky, New Definitions of Relevant Market and the Assault on Antitrust, 90 Colum. L. Rev. 1805, 1806-1813 (1990). Kodak chose to focus on market power directly rather than arguing that the relationship between equipment and service and parts is such that the three should be included in the same market definition. Whether considered in the conceptual category of "market definition" or "market power," the ultimate inquiry is the same -- whether competition in the equipment market will significantly restrain power in the service and parts markets.

[16] The United States as *amicus curiae* in support of Kodak echoes this argument: "The ISOs' claims are implausible because Kodak lacks market power in the markets for its copier and micrographic equipment. Buyers of such equipment regard an increase in the price of parts or service as an increase in the price of the equipment, and sellers recognize that the revenues from sales of parts and service are attributable to sales of the equipment. In such circumstances, it is not apparent how an equipment manufacturer such as Kodak could exercise power in the aftermarkets for parts and service." Brief for United States as *Amicus Curiae* 8.

[17] It is clearly true, as the United States claims, that Kodak "cannot set service or parts prices without regard to the impact on the market for equipment." *Id., at 20*. The fact that the cross-elasticity of demand is not zero proves nothing; the disputed issue is how much of an impact an increase in parts and service prices has on equipment sales and on Kodak's profits.

[18] Although Kodak repeatedly relies on *Continental T. V.* as support for its factual assertion that the equipment market will prevent exploitation of the service and parts markets, the case is inapposite. In *Continental T. V.*, the Court found that a manufacturer's policy restricting the number of retailers that were permitted to sell its product could have a procompetitive effect. See 433 U.S.

**[*472]** **[***287]** To review Kodak's theory, it contends that higher service prices will lead to a disastrous drop in equipment sales. Presumably, the theory's corollary is to the effect that low service prices lead to a dramatic increase in equipment sales. According to the theory, one would have expected Kodak to take advantage of lower priced ISO service as an opportunity to expand equipment sales. Instead, Kodak adopted a restrictive sales policy consciously designed to eliminate the lower priced ISO service, an act that would be expected to devastate either Kodak's equipment sales or Kodak's faith in its theory. Yet, according to the record, it has done neither. Service prices have risen for Kodak customers, but there is no evidence or assertion that Kodak equipment sales have dropped.

Kodak and the United States attempt to reconcile Kodak's theory with the contrary actual results by describing a "marketing strategy of spreading over time the total cost to the buyer of Kodak equipment." Brief for United States as *Amicus Curiae* 18; see also Brief for Petitioner 18. In other words, Kodak could charge subcompetitive prices for equipment and make up the difference with supracompetitive prices for service, resulting in an overall competitive price. This pricing strategy would provide an explanation for the theory's descriptive failings -- if Kodak in fact had adopted it. But Kodak never has asserted that it prices its equipment or parts subcompetitively and recoups its profits through service. Instead, it claims that it prices its equipment comparably to its competitors and intends that both its equipment sales and service divisions be profitable. See App. 159-161, 170, 178, 188. Moreover, this hypothetical pricing strategy is inconsistent with Kodak's policy toward its self-service customers. If Kodak were underpricing its equipment, hoping to lock in customers and recover its losses in the service **[*473]** market, it could not afford to sell customers parts without service. In sum, Kodak's theory does not explain the actual market behavior revealed in the record.

Respondents offer a forceful reason why Kodak's theory, although perhaps intuitively appealing, may not accurately explain the behavior of the primary and derivative markets for complex durable goods: the existence of significant information and switching costs. These costs could create a less responsive connection between service and parts prices and equipment sales.

For the service-market price to **[***288]** affect equipment demand, consumers must inform themselves of the total cost of the "package" -- equipment, service, and parts -- at the time of purchase; that is, consumers must engage in accurate lifecycle pricing. [19] Life-cycle pricing of complex, durable equipment is difficult and costly. In order to arrive at an accurate price, a consumer must acquire a substantial amount of raw data and undertake sophisticated analysis. The necessary information would include data on price, quality, and availability of products needed to operate, upgrade, or enhance the initial equipment, as well as service and repair costs, including

---

at 55. The Court also noted that any negative effect of exploitation of the intrabrand market (the competition between retailers of the same product) would be checked by competition in the interbrand market (competition over the same generic product) because consumers would substitute a different brand of the same product. Unlike *Continental T. V.*, this case does not concern vertical relationships between parties on different levels of the same distribution chain. In the relevant market, service, Kodak and the ISO's are direct competitors; their relationship is horizontal. The interbrand competition at issue here is competition over the provision of service. Despite petitioner's best effort, repeating the mantra "interbrand competition" does not transform this case into one over an agreement the manufacturer has with its dealers that would fall under the rubric of *Continental T. V.*

[19] See Craswell, Tying Requirements in Competitive Markets: The Consumer Protection Issues, 62 B. U. L. Rev. 661, 676 (1982); Beales, Craswell, & Salop, The Efficient Regulation of Consumer Information, 24 J. Law & Econ. 491, 509-511 (1981); *Jefferson Parish*, 466 U.S. at 15.

estimates of breakdown frequency, nature of repairs, price of service and parts, length of "downtime," and losses incurred from downtime. [20]

**[**2086]** Much of this information is difficult -- some of it impossible -- to acquire at the time of purchase. During the life of a product, companies may change the service and parts prices, and develop products with more advanced features, a **[*474]** decreased need for repair, or new warranties. In addition, the information is likely to be customer specific; lifecycle costs will vary from customer to customer with the type of equipment, degrees of equipment use, and costs of downtime.

***LEdHN[16]*** [16]Kodak acknowledges the cost of information, but suggests, again without evidentiary support, that customer information needs will be satisfied by competitors in the equipment markets. Brief for Petitioner 26, n. 11. It is a question of fact, however, whether competitors would provide the necessary information. A competitor in the equipment market may not have reliable information about the lifecycle costs of complex equipment it does not service or the needs of customers it does not serve. Even if competitors had the relevant information, it is not clear that their interests would be advanced by providing such information to consumers. See 2 P. Areeda & D. Turner, Antitrust Law P*404b1* (1978). [21]

Moreover, even if consumers were capable of acquiring and processing the complex body of information, they may choose not to do so. Acquiring **[***289]** the information is expensive. If the costs of service are small relative to the equipment price, or if consumers are more concerned about equipment capabilities than service costs, they may not find it cost efficient to **[*475]** compile the information. Similarly, some consumers, such as the Federal Government, have purchasing systems that make it difficult to consider the complete cost of the "package" at the time of purchase. State and local governments often treat service as an operating expense and equipment as a capital expense, delegating each to a different department. These governmental entities do not lifecycle price, but rather choose the lowest price in each market. See Brief for National Association of State Purchasing Officials et al. as *Amici Curiae;* Brief for State of Ohio et al. as *Amici Curiae;* App. 429-430.

As Kodak notes, there likely will be some large-volume, sophisticated purchasers who will undertake the comparative studies and insist, in return for their patronage, that Kodak charge them competitive lifecycle prices. Kodak contends that these knowledgeable customers will hold down the package price for all other customers. Brief for Petitioner 23, n. 9. There are reasons, however, to doubt that sophisticated purchasers will ensure that competitive prices are charged to

---

[20] In addition, of course, in order to price accurately the equipment, a consumer would need initial purchase information such as prices, features, quality, and available warranties for different machinery with different capabilities, and residual value information such as the longevity of product use and its potential resale or trade-in value.

[21] To inform consumers about Kodak, the competitor must be willing to forgo the opportunity to reap supracompetitive prices in its own service and parts markets. The competitor may anticipate that charging lower service and parts prices and informing consumers about Kodak in the hopes of gaining future equipment sales will cause Kodak to lower the price on its service and parts, canceling any gains in equipment sales to the competitor and leaving both worse off. Thus, in an equipment market with relatively few sellers, competitors may find it more profitable to adopt Kodak's service and parts policy than to inform the consumers. See 2 Areeda & Turner, Antitrust Law P*404b1;* App. 177 (Kodak, Xerox, and IBM together have nearly 100% of relevant market).

Even in a market with many sellers, any one competitor may not have sufficient incentive to inform consumers because the increased patronage attributable to the corrected consumer beliefs will be shared among other competitors. Beales, Craswell, & Salop, 24 J. Law & Econ., at 503-504, 506.

unsophisticated purchasers, too. As an initial matter, if the number of sophisticated customers is relatively small, the amount of profits to be gained by supracompetitive pricing in the service market could make it profitable to let the knowledgeable consumers take their business elsewhere. More importantly, if a company is able to price discriminate between sophisticated and unsophisticated consumers, the sophisticated will be unable to prevent the exploitation of **[**2087]** the uninformed. A seller could easily price discriminate by varying the equipment/parts/service package, developing different warranties, or offering price discounts on different components.

***LEdHN[17]*** [17]Given the potentially high cost of information and the possibility that a seller may be able to price discriminate between knowledgeable and unsophisticated consumers, it makes little sense to assume, in the absence of any evidentiary support, that equipment-purchasing decisions are based **[*476]** on an accurate assessment of the total cost of equipment, service, and parts over the lifetime of the machine. [22]

Indeed, respondents have presented evidence that Kodak practices price discrimination by selling parts to customers who service their own equipment, but refusing to sell parts to customers who hire third-party service companies. Companies that have their own service staff are likely to be highvolume users, the same companies for whom it is most likely to be economically worthwhile to acquire the complex information needed for comparative lifecycle pricing.

A second factor undermining Kodak's claim that supracompetitive prices in the service market lead to ruinous losses in equipment sales is **[***290]** the cost to current owners of switching to a different product. See Areeda & Turner P519a. [23] If the cost of switching is high, consumers who already have purchased the equipment, and are thus "locked in," will tolerate some level of service-price increases before changing equipment brands. Under this scenario, a seller profitably could maintain supracompetitive prices in the aftermarket if the switching costs were high relative to the increase in service prices, and the number of locked-in customers were high relative to the number of new purchasers.

Moreover, if the seller can price discriminate between its locked-in customers and potential new customers, this strategy is even more likely to prove profitable. The seller could simply charge new customers below-marginal cost on the equipment and recoup the charges in service, or offer packages **[*477]** with lifetime warranties or long-term service agreements that are not available to locked-in customers.

Respondents have offered evidence that the heavy initial outlay for Kodak equipment, combined with the required support material that works only with Kodak equipment, makes switching costs very high for existing Kodak customers. And Kodak's own evidence confirms that it varies the package price of equipment/parts/service for different customers.

---

[22] See Salop & Stiglitz, Bargains and Ripoffs: A Model of Monopolistically Competitive Price Dispersion, 44 Rev. Econ. Studies 493 (1977); Salop, Information and Market Structure -- Information and Monopolistic Competition, 66 Am. Econ. Rev. 240 (1976); Stigler, The Economics of Information, 69 J. Pol. Econ. 213 (1961).

[23] A firm can exact leverage whenever other equipment is not a ready substitute. F. Scherer & D. Ross, Industrial Market Structure and Economic Performance 16-17 (3d ed. 1990).

***LEdHN[18]*** [18]In sum, there is a question of fact whether information costs and switching costs foil the simple assumption that the equipment and service markets act as pure complements to one another. [24]

***LEdHN[1I]*** [1I]We conclude, then, that Kodak has failed to demonstrate that respondents' inference of market power in the service and parts markets is unreasonable, and that, consequently, Kodak is entitled to summary judgment. It **[**2088]** is clearly reasonable to infer that Kodak has market power to raise prices and drive out competition in the aftermarkets, since respondents offer direct evidence that Kodak did so. [25] It is also plausible, as discussed above, to infer that Kodak chose to gain immediate profits by exerting that market power where locked-in customers, high information costs, and discriminatory pricing limited and perhaps eliminated any longterm **[*478]** loss. Viewing the evidence in the light most favorable to respondents, their allegations of market power "make . . . economic sense." Cf. *Matsushita, 475 U.S. at 587*.

**[***291]** ***LEdHN[19]*** [19]Nor are we persuaded by Kodak's contention that it is entitled to a legal presumption on the lack of market power because, as in *Matsushita*, there is a significant risk of deterring procompetitive conduct. Plaintiffs in *Matsushita* attempted to prove the antitrust conspiracy "through evidence of rebates and other price-cutting activities." *Id., at 594*. Because cutting prices to increase business is "the very essence of competition," the Court was concerned that mistaken inferences would be "especially costly" and would "chill the very conduct the antitrust laws are designed to protect." *Ibid.* See also *Monsanto Co. v. Spray-Rite Service Corp., 465 U.S. 752, 763, 79 L. Ed. 2d 775, 104 S. Ct. 1464 (1984)* (permitting inference of concerted action would "deter or penalize perfectly legitimate conduct"). But the facts in this case are just the opposite. The alleged conduct -- higher service prices and market foreclosure -- is facially anticompetitive and exactly the harm that antitrust laws aim to prevent. In this situation, *Matsushita* does not create any presumption in favor of summary judgment for the defendant.

***LEdHN[20]*** [20]Kodak contends that, despite the appearance of anticompetitiveness, its behavior actually favors competition because its ability to pursue innovative marketing plans will allow it to compete more effectively in the equipment market. Brief for Petitioner 40-41. A pricing strategy based on lower equipment prices and higher aftermarket prices could enhance equipment sales by making it easier for the buyer to finance the initial purchase. [26] It is undisputed that competition is enhanced when a firm is able to offer various marketing options, including bundling of support and maintenance service with the sale of equipment. Nor do such actions **[*479]** run

---

[24] The dissent disagrees based on its hypothetical case of a tie between equipment and service. "The only thing lacking" to bring this case within the hypothetical case, states the dissent, "is concrete evidence that the restrictive parts policy was . . . generally known." *Post*, at 492. But the dissent's "only thing lacking" is the crucial thing lacking -- evidence. Whether a tie between parts and service should be treated identically to a tie between equipment and service, as the dissent and Kodak argue, depends on whether the equipment market prevents the exertion of market power in the parts market. Far from being "anomalous," *post*, at 492-493, requiring Kodak to provide evidence on this factual question is completely consistent with our prior precedent. See, *e. g.*, n. 13, *supra*.

[25] Cf. *Instructional Systems*, 817 F.2d at 646 (finding the conspiracy reasonable under *Matsushita* because its goals were in fact achieved).

[26] It bears repeating that in this case Kodak has never claimed that it is in fact pursuing such a pricing strategy.

afoul of the antitrust laws. [27] But the procompetitive effect of the specific conduct challenged here, eliminating all consumer parts and service options, is far less clear. [28]

We need not decide whether Kodak's behavior has any procompetitive effects and, if so, whether they outweigh the anticompetitive effects. We note only that Kodak's service and parts policy is simply not one that appears always or almost always to enhance competition, and therefore to warrant a legal presumption without any evidence of its actual economic impact. In this case, when we weigh the risk of deterring procompetitive behavior by proceeding to trial against the risk that illegal behavior will go unpunished, the balance tips against summary judgment. **[***292] [**2089]** Cf. *Matsushita, 475 U.S. at 594-595*.

***LEdHN[1J]*** [1J] ***LEdHN[21A]*** [21A]For the foregoing reasons, we hold that Kodak has not met the requirements of *Federal Rule of Civil Procedure 56(c)*. We therefore affirm the denial of summary judgment on respondents' *§ 1* claim. [29]

---

[27] See *Jefferson Parish*, 466 U.S. at 12 ("Buyers often find package sales attractive; a seller's decision to offer such packages can merely be an attempt to compete effectively -- conduct that is entirely consistent with the Sherman Act"). See also Yates & DiResta, Software Support and Hardware Maintenance Practices: Tying Considerations, The Computer Lawyer, Vol. 8, No. 6, p. 17 (1991) (describing various service and parts policies that enhance quality and sales but do not violate the antitrust laws).

[28] Two of the largest consumers of service and parts contend that they are worse off when the equipment manufacturer also controls service and parts. See Brief for State Farm Mutual Automobile Insurance Co. et al. as *Amici Curiae;* Brief for State of Ohio et al. as *Amici Curiae*.

[29] ***LEdHN[21B]*** [21B]

The dissent urges a radical departure in this Court's antitrust law. It argues that because Kodak has only an "inherent" monopoly in parts for its equipment, *post*, at 489-490, the antitrust laws do not apply to its efforts to expand that power into other markets. The dissent's proposal to grant *per se* immunity to manufacturers competing in the service market would exempt a vast and growing sector of the economy from antitrust laws. Leaving aside the question whether the Court has the authority to make such a policy decision, there is no support for it in our jurisprudence or the evidence in this case.

Even assuming, despite the absence of any proof from the dissent, that all manufacturers possess some inherent market power in the parts market, it is not clear why that should immunize them from the antitrust laws in another market. The Court has held many times that ***HN6*** power gained through some natural and legal advantage such as a patent, copyright, or business acumen can give rise to liability if "a seller exploits his dominant position in one market to expand his empire into the next." *Times-Picayune Publishing Co.* v. *United States*, 345 U.S. 594, 611, 97 L. Ed. 1277, 73 S. Ct. 872 (1953); see, *e. g.*, *Northern Pacific R. Co.* v. *United States*, 356 U.S. 1, 2 L. Ed. 2d 545, 78 S. Ct. 514 (1958); *United States* v. *Paramount Pictures, Inc.*, 334 U.S. 131, 92 L. Ed. 1260, 68 S. Ct. 915 (1948); *Leitch Mfg. Co.* v. *Barber Co.*, 302 U.S. 458, 463, 82 L. Ed. 371, 58 S. Ct. 288 (1938). Moreover, on the occasions when the Court has considered tying in derivative aftermarkets by manufacturers, it has not adopted any exception to the usual antitrust analysis, treating derivative aftermarkets as it has every other separate market. See *International Salt Co.* v. *United States*, 332 U.S. 392, 92 L. Ed. 20, 68 S. Ct. 12 (1947); *International Business Machines Corp.* v. *United States*, 298 U.S. 131, 80 L. Ed. 1085, 56 S. Ct. 701 (1936); *United Shoe Machinery Corp.* v. *United States*, 258 U.S. 451, 66 L. Ed. 708, 42 S. Ct. 363 (1922). Our past decisions are reason enough to reject the dissent's proposal. See *Patterson* v. *McLean Credit Union*, 491 U.S. 164, 172-173, 105 L. Ed. 2d 132, 109 S. Ct. 2363 (1989) ("Considerations of *stare decisis* have special force in the area of statutory interpretation, for here, unlike in the context of constitutional interpretation, the legislative power is implicated, and Congress remains free to alter what we have done").

Nor does the record in this case support the dissent's proposed exemption for aftermarkets. The dissent urges its exemption because the tie here "does not permit the manufacturer to project power over a class of consumers distinct from that which it is already able to exploit (and fully) without the inconvenience of the tie." *Post*, at 498. Beyond the dissent's obvious difficulty in explaining why Kodak would adopt this expensive tying policy if it could achieve the same profits more conveniently through some other means, respondents offer an alternative theory, supported by the record, that suggests Kodak *is* able to exploit some customers who in the absence of the tie would be protected from increases in parts prices by knowledgeable customers. See *supra*, at 475-476.

At bottom, whatever the ultimate merits of the dissent's theory, at this point it is mere conjecture. Neither Kodak nor the dissent have provided any evidence refuting respondents' theory of forced unwanted purchases at higher prices and price discrimination. While it may be, as the dissent predicts, that the equipment market will prevent any harms to consumers in the aftermarkets, the

**[*480]** III

***LEdHN[22A]*** [22A]Respondents also claim that they have presented genuine issues for trial as to whether Kodak has monopolized, or attempted **[*481]** to monopolize, the service and parts markets in violation of *§ 2* of the Sherman Act. ***HN7*** "The offense of monopoly under *§ 2* of the Sherman Act has two elements: (1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development **[***293]** as a consequence of a superior product, business acumen, or historic accident." *United States v. Grinnell Corp., 384 U.S. at 570-571*.

A

***LEdHN[2B]*** [2B] ***LEdHN[23]*** [23]The existence of the first element, possession of monopoly power, is easily resolved. As has been noted, respondents have presented a triable claim that service and parts are separate markets, and that Kodak **[**2090]** has the "power to control prices or exclude competition" in service and parts. *Du Pont, 351 U.S. at 391*. ***HN8*** Monopoly power under *§ 2* requires, of course, something greater than market power under *§ 1*. See *Fortner, 394 U.S. at 502*. Respondents' evidence that Kodak controls nearly 100% of the parts market and 80% to 95% of the service market, with no readily available substitutes, is, however, sufficient to survive summary judgment under the more stringent monopoly standard of *§ 2*. See *National Collegiate Athletic Assn. v. Board of Regents of Univ. of Okla., 468 U.S. 85, 112, 82 L. Ed. 2d 70, 104 S. Ct. 2948 (1984)*. Cf. *United States v. Grinnell Corp., 384 U.S. at 571* (87% of the market is a monopoly); *American Tobacco Co. v. United States, 328 U.S. 781, 797, 90 L. Ed. 1575, 66 S. Ct. 1125 (1946)* (over two-thirds of the market is a monopoly).

***LEdHN[2C]*** [2C] ***LEdHN[24]*** [24] Kodak also contends that, as a matter of law, a single brand of a product or service can never be a relevant market under the Sherman Act. We disagree. The relevant market **[*482]** for antitrust purposes is determined by the choices available to Kodak equipment owners. See *Jefferson Parish, 466 U.S. at 19*. Because service and parts for Kodak equipment are not interchangeable with other manufacturers' service and parts, the relevant market from the Kodak equipment owner's perspective is composed of only those companies that service Kodak machines. See *Du Pont, 351 U.S. at 404****HN9*** ("The market is composed of products that have reasonable interchangeability"). [30] This Court's prior cases support the proposition that in some instances one brand of a product can constitute a separate market. See *National Collegiate Athletic Assn., 468 U.S. at 101-102, 111-112*; *International Boxing Club of New York, Inc. v. United States, 358 U.S. 242, 249-252, 3 L. Ed. 2d 270, 79 S. Ct. 245 (1959)*; *International Business Machines Corp. v. United States, 298 U.S. 131, 80 L. Ed. 1085, 56 S. Ct. 701 (1936)*. [31] The **[***294]** proper market definition in this case can be determined only after a factual

---

dissent never makes plain why the Court should accept that theory on faith rather than requiring the usual evidence needed to win a summary judgment motion.

[30] Kodak erroneously contends that this Court in *Du Pont* rejected the notion that a relevant market could be limited to one brand. Brief for Petitioner 33. The Court simply held in *Du Pont* that one brand does not *necessarily* constitute a relevant market if substitutes are available. 351 U.S. at 393. See also *Boxing Club*, 358 U.S. at 249-250. Here respondents contend there are no substitutes.

[31] Other courts have limited the market to parts for a particular brand of equipment. See, *e. g.*, *International Logistics Group, Ltd.* v. *Chrysler Corp.*, 884 F.2d 904, 905, 908 (CA6 1989) (parts for Chrysler cars is the relevant market), cert. denied, *494 U.S. 1066, 108 L. Ed. 2d 784, 110 S. Ct. 1783 (1990)*; *Dimidowich* v. *Bell & Howell*, 803 F.2d 1473, 1480-1481, n. 3 (CA9 1986), modified, 810 F.2d 1517 (1987) (service for Bell & Howell equipment is the relevant market); *In re General Motors Corp.*, 99 F. T. C. 464, 554, 584 (1982) (crash parts for General Motors cars is the relevant market); *Heatransfer Corp. v. Volkswagenwerk*

inquiry into the "commercial realities" faced by consumers. *United States v. Grinnell Corp., 384 U.S. at 572*.

B

***LEdHN[22B]*** [22B] ***LEdHN[25A]*** [25A]The second element of a *§ 2* claim is the use of monopoly power "to foreclose competition, to gain a competitive advantage, **[*483]** or to destroy a competitor." *United States v. Griffith, 334 U.S. 100, 107, 92 L. Ed. 1236, 68 S. Ct. 941 (1948)*. If Kodak adopted its parts and service policies as part of a scheme of willful acquisition or maintenance of monopoly power, it will have violated *§ 2*. *Grinnell Corp., 384 U.S. at 570-571*; *United States v. Aluminum Co. of America, 148 F.2d 416, 432 (CA2 1945)*; *Aspen Skiing Co. v. Aspen Highlands Skiing Corp., 472 U.S. 585, 600-605, 86 L. Ed.* **[**2091]** 2d 467, 105 S. Ct. 2847 (1985). [32]

***LEdHN[2D]*** [2D] ***LEdHN[26]*** [26]As recounted at length above, respondents have presented evidence that Kodak took exclusionary action to maintain its parts monopoly and used its control over parts to strengthen its monopoly share of the Kodak service market. Liability turns, then, on whether "valid business reasons" can explain Kodak's actions. *Id., at 605*; *United States v. Aluminum Co. of America, 148 F.2d at 432*. Kodak contends that it has three valid business justifications for its actions: "(1) to promote interbrand equipment competition by allowing Kodak to stress the quality of its service; (2) to improve asset management by reducing Kodak's inventory costs; and (3) to prevent ISOs from free-riding on Kodak's capital investment in equipment, parts and service." Brief for Petitioner 6. Factual questions exist, however, about the validity and sufficiency of each claimed justification, making summary judgment inappropriate.

***LEdHN[27]*** [27]Kodak first asserts that by preventing customers from using ISO's, "it [can] best maintain high quality service for its sophisticated equipment" and avoid being "blamed for an equipment malfunction, even if the problem is the result of improper diagnosis, maintenance or repair by an ISO." *Id., at 6-7*. Respondents have offered evidence that ISO's provide quality service and are preferred by some Kodak equipment owners. This is sufficient to raise a genuine issue of **[*484]** fact. See *International Business Machines Corp. v. United States, 298 U.S. at 139-140* (rejecting IBM's claim that it had to control the cards used in its machines to avoid "injury to the reputation of the machines and the good will of" IBM in the absence of proof that other companies could not make quality cards); *International* **[***295]** *Salt Co. v. United States, 332 U.S. 392, 397-398, 92 L. Ed. 20, 68 S. Ct. 12 (1947)* (rejecting International Salt's claim that it had to control the supply of salt to protect its leased machines in the absence of proof that competitors could not supply salt of equal quality).

Moreover, there are other reasons to question Kodak's proffered motive of commitment to quality service; its quality justification appears inconsistent with its thesis that consumers are knowledgeable enough to lifecycle price, and its self-service policy. Kodak claims the exclusive-service contract is warranted because customers would otherwise blame Kodak equipment for breakdowns resulting from inferior ISO service. Thus, Kodak simultaneously claims that its

---

*A. G.*, 553 F.2d 964 (CA5 1977) (air conditioners for Volkswagens is the relevant market), cert. denied, *434 U.S. 1087, 55 L. Ed. 2d 792, 98 S. Ct. 1282 (1978)*.

[32] ***LEdHN[25B]*** [25B]

It is true that ***HN10*** as a general matter a firm can refuse to deal with its competitors. But such a right is not absolute; it exists only if there are legitimate competitive reasons for the refusal. See *Aspen Skiing Co.*, 472 U.S. at 602-605.

customers are sophisticated enough to make complex and subtle lifecycle-pricing decisions, and yet too obtuse to distinguish which breakdowns are due to bad equipment and which are due to bad service. Kodak has failed to offer any reason why informational sophistication should be present in one circumstance and absent in the other. In addition, because self-service customers are just as likely as others to blame Kodak equipment for breakdowns resulting from (their own) inferior service, Kodak's willingness to allow self-service casts doubt on its quality claim. In sum, we agree with the Court of Appeals that respondents "have presented evidence from which a reasonable trier of fact could conclude that Kodak's first reason is pretextual." *903 F.2d at 618*.

***LEdHN[28]*** [28]There is also a triable issue of fact on Kodak's second justification -- controlling inventory costs. As respondents argue, Kodak's actions appear inconsistent with any need to control inventory costs. Presumably, the inventory of parts **[*485]** needed to repair Kodak machines turns only on breakdown rates, and those rates should be the same whether Kodak or ISO's perform the repair. More importantly, the justification fails to **[**2092]** explain respondents' evidence that Kodak forced OEM's, equipment owners, and parts brokers not to sell parts to ISO's, actions that would have no effect on Kodak's inventory costs.

***LEdHN[29]*** [29]Nor does Kodak's final justification entitle it to summary judgment on respondents' *§ 2* claim. Kodak claims that its policies prevent ISO's from "exploiting the investment Kodak has made in product development, manufacturing and equipment sales in order to take away Kodak's service revenues." Brief for Petitioner 7-8. Kodak does not dispute that respondents invest substantially in the service market, with training of repair workers and investment in parts inventory. Instead, according to Kodak, the ISO's are free-riding because they have failed to enter the equipment and parts markets. This understanding of free-riding has no support in our case law. [33] To the contrary, as the **[***296]** Court of Appeals noted, one of the evils proscribed by the antitrust laws is the creation of entry barriers to potential competitors by requiring them to enter two markets simultaneously. *Jefferson Parish, 466 U.S. at 14*; *Fortner, 394 U.S. at 509*.

***LEdHN[2E]*** [2E]None of Kodak's asserted business justifications, then, are sufficient to prove that Kodak is "entitled to a judgment as **[*486]** a matter of law" on respondents' *§ 2* claim. *Fed. Rule Civ. Proc. 56(c)*.

IV

***LEdHN[1K]*** [1K] ***LEdHN[2F]*** [2F]In the end, of course, Kodak's arguments may prove to be correct. It may be that its parts, service, and equipment are components of one unified market, or that the equipment market does discipline the aftermarkets so that all three are priced competitively overall, or that any anticompetitive effects of Kodak's behavior are outweighed by its competitive effects. But we cannot reach these conclusions as a matter of law on a record this sparse. Accordingly, the judgment of the Court of Appeals denying summary judgment is affirmed.

---

[33] Kodak claims that both *Continental T. V.* and *Monsanto* support its free-rider argument. Neither is applicable. In both *Continental T. V.*, 433 U.S. at 55, and *Monsanto*, 465 U.S. at 762-763, the Court accepted free-riding as a justification because without restrictions a manufacturer would not be able to induce competent and aggressive retailers to make the kind of investment of capital and labor necessary to distribute the product. In *Continental T. V.* the relevant market level was retail sale of televisions and in *Monsanto* retail sales of herbicides. Some retailers were investing in those markets; others were not, relying, instead, on the investment of the other retailers. To be applicable to this case, the ISO's would have to be relying on Kodak's investment in the service market; that, however, is not Kodak's argument.

*It is so ordered.*

**Dissent by:** SCALIA

**Dissent**

JUSTICE SCALIA, with whom JUSTICE O'CONNOR and JUSTICE THOMAS join, dissenting.

This is not, as the Court describes it, just "another case that concerns the standard for summary judgment in an antitrust controversy." *Ante*, at 454. Rather, the case presents a very narrow -- but extremely important -- question of substantive antitrust law: whether, for purposes of applying our *per se* rule condemning "ties," and for purposes of applying our exacting rules governing the behavior of would-be monopolists, a manufacturer's conceded lack of power in the interbrand market for its equipment is somehow consistent with its possession of "market," or even "monopoly," power in wholly derivative aftermarkets for that equipment. In my view, the Court supplies an erroneous answer to this question, and I dissent.

I

*Per se* rules of antitrust illegality are reserved for those situations where logic and experience show that the risk of injury to competition from the defendant's behavior is so pronounced that it is needless and wasteful to conduct the usual judicial inquiry into the balance between the behavior's procompetitive **[*487]** benefits and its anticompetitive **[**2093]** costs. See, *e. g.*, *Arizona v. Maricopa County Medical Society, 457 U.S. 332, 350-351, 73 L. Ed. 2d 48, 102 S. Ct. 2466 (1982)*. "The character of the restraint produced by [behavior to which a *per se* rule applies] is considered a sufficient basis for presuming unreasonableness without the necessity of any analysis of the market **[***297]** context in which the [behavior] may be found." *Jefferson Parish Hospital Dist. No. 2 v. Hyde, 466 U.S. 2, 9, 80 L. Ed. 2d 2, 104 S. Ct. 1551 (1984)*. The *per se* rule against tying is just such a rule: Where the conditions precedent to application of the rule are met, *i. e.*, where the tying arrangement is backed up by the defendant's market power in the "tying" product, the arrangement is adjudged in violation of *§ 1* of the Sherman Act, *15 U. S. C. § 1 (1988 ed., Supp. II)*, without *any* inquiry into the practice's actual effect on competition and consumer welfare. But see *United States v. Jerrold Electronics Corp., 187 F. Supp. 545, 560 (ED Pa. 1960)*, aff'd, *365 U.S. 567, 5 L. Ed. 2d 806, 81 S. Ct. 755 (1961)(per curiam)* (accepting affirmative defense to *per se* tying allegation).

Despite intense criticism of the tying doctrine in academic circles, see, *e. g.*, R. Bork, The Antitrust Paradox 365-381 (1978), the stated rationale for our *per se* rule has varied little over the years. When the defendant has genuine "market power" in the tying product -- the power to raise price by reducing output -- the tie potentially enables him to extend that power into a second distinct market, enhancing barriers to entry in each. In addition:

> "Tying arrangements may be used to evade price control in the tying product through clandestine transfer of the profit to the tied product; they may be used as a counting device to effect price discrimination; and they may be used to force a full line of products on the customer so as to extract more easily from him a monopoly return on one unique product in the line." *Fortner Enterprises, Inc. v. United States Steel Corp., 394 U.S. 495, 513-514, 22 L. Ed. 2d 495, 89 S. Ct. 1252 (1969)(Fortner I)* (WHITE, J., dissenting) (footnotes omitted).

**[*488]** For these reasons, as we explained in *Jefferson Parish*, "the law draws a distinction between the exploitation of market power by merely enhancing the price of the tying product, on the one hand, and by attempting to impose restraints on competition in the market for a tied product, on the other." *466 U.S. at 14*.

Our *§ 2* monopolization doctrines are similarly directed to discrete situations in which a defendant's possession of substantial market power, combined with his exclusionary or anticompetitive behavior, threatens to defeat or forestall the corrective forces of competition and thereby sustain or extend the defendant's agglomeration of power. See *United States v. Grinnell Corp., 384 U.S. 563, 570-571, 16 L. Ed. 2d 778, 86 S. Ct. 1698 (1966)*. Where a defendant maintains substantial market power, his activities are examined through a special lens: Behavior that might otherwise not be of concern to the antitrust laws -- or that might even be viewed as procompetitive -- can take on exclusionary connotations when practiced by a monopolist. 3 P. Areeda & D. Turner, Antitrust Law P813, pp. 300-302 (1978) (hereinafter 3 Areeda & Turner).

The concerns, however, that have led the courts to heightened scrutiny both of the "exclusionary conduct" practiced by a monopolist and of tying arrangements subject to *per se* prohibition, are completely without force when the participants lack market power. As to the former, **[***298]** "the [very] definition of exclusionary conduct," as practiced by a monopolist, is "predicated on the existence of substantial market power." *Id., P813, at 301*; see, *e. g.*, *Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp., 382 U.S. 172, 177-178, 15 L. Ed. 2d 247, 86 S. Ct. 347 (1965)* (fraudulent patent procurement); *Standard Oil Co. of New Jersey v. United States, 221 U.S. 1, 75, 55 L. Ed. 619, 31 S. Ct. 502 (1911)* (acquisition of competitors); 3 Areeda & Turner P724, at 195-197 (vertical integration). And with respect **[**2094]** to tying, we have recognized that bundling arrangements not coerced by the heavy hand of market power can serve the procompetitive functions of facilitating new entry into certain **[*489]** markets, see, *e. g.*, *Brown Shoe Co. v. United States, 370 U.S. 294, 330, 8 L. Ed. 2d 510, 82 S. Ct. 1502 (1962)*, permitting "clandestine price cutting in products which otherwise would have no price competition at all because of fear of retaliation from the few other producers dealing in the market," *Fortner I, supra, at 514, n. 9* (WHITE, J., dissenting), assuring quality control, see, *e. g.*, *Standard Oil Co. of Cal. v. United States, 337 U.S. 293, 306, 93 L. Ed. 1371, 69 S. Ct. 1051 (1949)*, and, where "the tied and tying products are functionally related, . . . reducing costs through economies of joint production and distribution." *Fortner I, supra, at 514, n. 9* (WHITE, J., dissenting). "Accordingly, we have [only] condemned tying arrangements [under the *per se* rule] when the seller has some special ability -- usually called 'market power' -- to force a purchaser to do something that he would not do in a competitive market." *Jefferson Parish, supra, at 13-14*.

The Court today finds in the typical manufacturer's inherent power over its own brand of equipment -- over the sale of distinctive repair parts for that equipment, for example -- the sort of "monopoly power" sufficient to bring the sledgehammer of *§ 2* into play. And, not surprisingly in light of that insight, it readily labels single-brand power over aftermarket products "market power" sufficient to permit an antitrust plaintiff to invoke the *per se* rule against tying. In my opinion, this makes no economic sense. The holding that market power can be found on the present record causes these venerable rules of selective proscription to extend well beyond the point where the reasoning that supports them leaves off. Moreover, because the sort of power condemned by the Court today is possessed by every manufacturer of durable goods with distinctive parts, the Court's opinion threatens to release a torrent of litigation and a flood of commercial intimidation that will do much more harm than good to enforcement of the antitrust laws and to genuine

competition. I shall explain, in Parts II and III, respectively, how neither logic *nor* experience suggests, let alone compels, application **[*490]** of the *per se* tying prohibition and monopolization doctrine to a seller's behavior in its single-brand aftermarkets, when that seller is without power at the interbrand level.

II

On appeal in the Ninth Circuit, respondents, having waived their "rule of reason" claim, were limited to arguing that the record, construed **[***299]** in the light most favorable to them, *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986)*, supported application of the *per se* tying prohibition to Kodak's restrictive parts and service policy. See *903 F.2d 612, 615, n. 1 (1990)*. As the Court observes, in order to survive Kodak's motion for summary judgment on this claim, respondents bore the burden of proffering evidence on which a reasonable trier of fact could conclude that Kodak possesses power in the market for the alleged "tying" product. See *ante*, at 464; *Jefferson Parish, 466 U.S. at 13-14*.

A

We must assume, for purposes of deciding this case, that petitioner is without market, much less monopoly, power in the interbrand markets for its micrographic and photocopying equipment. See *ante*, at 465-466, n. 10; *Oklahoma City v. Tuttle, 471 U.S. 808, 816, 85 L. Ed. 2d 791, 105 S. Ct. 2427 (1985)*. In the District Court, respondents did, in fact, include in their complaint an allegation which posited the interbrand equipment markets as the relevant markets; in particular, **[**2095]** they alleged a *§ 1* "tie" of micrographic and photocopying equipment to the parts and service for those machines. App. 22-23. Though this allegation was apparently abandoned in pursuit of *§§ 1* and *2* claims focused exclusively on the parts and service aftermarkets (about which more later), I think it helpful to analyze how that claim would have fared under the *per se* rule.

Had Kodak -- from the date of its entry into the micrographic and photocopying equipment markets -- included a lifetime parts and service warranty with all original equipment, **[*491]** or required consumers to purchase a lifetime parts and service contract with each machine, that bundling of equipment, parts, and service would no doubt constitute a tie under the tests enunciated in *Jefferson Parish, supra.* Nevertheless, it would be immune from *per se* scrutiny under the antitrust laws because the *tying* product would be *equipment*, a market in which (we assume) Kodak has no power to influence price or quantity. See *id., at 13-14*; *United States Steel Corp. v. Fortner Enterprises, Inc., 429 U.S. 610, 620, 51 L. Ed. 2d 80, 97 S. Ct. 861 (1977)(Fortner II); Northern Pacific R. Co. v. United States, 356 U.S. 1, 6-7, 2 L. Ed. 2d 545, 78 S. Ct. 514 (1958)*. The same result would obtain, I think, had Kodak -- from the date of its market entry -- consistently pursued an announced policy of limiting parts sales in the manner alleged in this case, so that customers bought with the knowledge that aftermarket support could be obtained only from Kodak. The foreclosure of respondents from the business of servicing Kodak's micrographic and photocopying machines in these illustrations would be undeniably complete -- as complete as the foreclosure described in respondents' complaint. Nonetheless, we would inquire no further than to ask whether Kodak's *market power* in the equipment market effectively forced consumers to purchase Kodak micrographic or photocopying machines **[***300]** subject to the company's restrictive aftermarket practices. If not, that would end the case insofar as the *per se* rule was concerned. See *Jefferson Parish, supra, at 13-14*; 9 P. Areeda, Antitrust Law P1709c5, pp. 101-102 (1991); Klein & Saft, The Law and Economics of Franchise Tying Contracts, 28 J. Law &

Econ. 345, 356 (1985). The evils against which the tying prohibition is directed would simply not be presented. Interbrand competition would render Kodak powerless to gain economic power over an additional class of consumers, to price discriminate by charging each customer a "system" price equal to the system's economic value to that customer, or to raise barriers to entry in the interbrand equipment markets. See 3 Areeda & Turner P829d, at 331-332.

**[*492]** I have described these illustrations as hypothetical, but in fact they are not far removed from this case. The record below is consistent -- in large part -- with just this sort of bundling of equipment on the one hand, with parts and service on the other. The restrictive parts policy, with respect to micrographic equipment at least, was not even alleged to be anything but prospective. See App. 17. As respondents summarized their factual proffer below:

> "Under this policy, Kodak cut off parts on new products to Kodak micrographics [independent service organizations] ISOs. The effect of this, of course, was that as customers of Kodak micrographics ISOs obtained new equipment, the ISOs were unable to service the equipment for that customer, and, service for these customers was lost by the Kodak ISOs. Additionally, as equipment became obsolete, and the equipment population became all "new equipment" (post April 1985 models), Kodak micrographics ISOs would be able to service no equipment at all." *Id.*, at 360.As to Kodak copiers, Kodak's restrictive parts policy had a broader foundation: Considered in the light most favorable to respondents, see *Anderson, supra, at 255*, the record suggests that, **[**2096]** from its inception, the policy was applied to new and existing copier customers alike. But at least all post-1985 purchasers of micrographic equipment, like all post-1985 purchasers of new Kodak copiers, could have been aware of Kodak's parts practices. The only thing lacking to bring all of these purchasers (accounting for the vast bulk of the commerce at issue here) squarely within the hypotheticals we have described is concrete evidence that the restrictive parts policy was announced or generally known. Thus, under the Court's approach the existence *vel non* of such evidence is determinative of the legal standard (the *per se* rule versus the rule of reason) under which the alleged tie is examined. In my judgment, this makes no sense. It is **[*493]** quite simply anomalous that a manufacturer functioning in a competitive equipment market should be exempt from the *per se* rule when it bundles equipment with parts and service, but not when it bundles parts with service. This vast difference in the treatment of what will ordinarily be economically similar phenomena is alone enough to call today's decision into question.

B

In the Court of Appeals, respondents **[***301]** sought to sidestep the impediment posed by interbrand competition to their invocation of the *per se* tying rule by zeroing in on the parts and service "aftermarkets" for Kodak equipment. By alleging a tie of *parts* to service, rather than of *equipment* to parts and service, they identified a tying product in which Kodak unquestionably held a near-monopoly share: the parts uniquely associated with Kodak's brand of machines. See *Jefferson Parish, 466 U.S. at 17*. The Court today holds that such a facial showing of market share in a single-brand aftermarket is sufficient to invoke the *per se* rule. The existence of even vibrant interbrand competition is no defense. See *ante*, at 470-471.

I find this a curious form of market power on which to premise the application of a *per se* proscription. It is enjoyed by virtually every manufacturer of durable goods requiring aftermarket

support with unique, or relatively unique, goods. See P. Areeda & H. Hovenkamp, Antitrust Law P525.1, p. 563 (Supp. 1991). "Such reasoning makes every maker of unique parts for its own product a holder of market power *no matter how unimportant its product might be in the market." Ibid.* (emphasis added). [1] Under **[*494]** the Court's analysis, the *per se* rule may now be applied to single-brand ties effected by the most insignificant players in fully competitive interbrand markets, as long as the arrangement forecloses aftermarket competitors from more than a *de minimis* amount of business, *Fortner I, 394 U.S. at 501*. This seems to me quite wrong. A tying arrangement "forced" through the exercise of such power no more implicates the leveraging and price discrimination concerns behind the *per se* tying prohibition than does a tie of the foremarket **[**2097]** brand to its aftermarket derivatives, which -- as I have explained -- would not be subject to *per se* condemnation. [2] As implemented, the Kodak **[***302]** arrangement challenged **[*495]** in this case may have implicated truth-in-advertising or other consumer protection concerns, but those concerns do not alone suggest an antitrust prohibition. See, *e. g.*, *Town Sound and Custom Tops, Inc. v. Chrysler Motors Corp., 959 F.2d 468 (CA3 1992)* (en banc).

In the absence of interbrand power, a seller's predominant or monopoly share of its single-brand derivative markets does not connote the power to raise derivative market prices *generally* by reducing quantity. As Kodak and its principal *amicus*, the United States, point out, a rational consumer considering the purchase of Kodak equipment will inevitably factor into his purchasing decision the expected cost of aftermarket support. "Both the price of the equipment and the price of parts and service over the life of the equipment are expenditures that are necessary to obtain copying and micrographic services." Brief for United States as *Amicus Curiae* 13. If Kodak set generally supracompetitive prices for either spare parts or repair services without making an off-setting reduction in the price of its machines, rational consumers would simply turn to Kodak's competitors for photo-copying and micrographic systems. See, *e. g.*, *Grappone, Inc. v. Subaru of New England, Inc., 858 F.2d 792, 796-798 (CA1 1988)*. True, there are -- as the Court notes, see *ante*, at 474-475 -- the occasional irrational consumers that consider only the hardware cost at

---

[1] That there exist innumerable parts and service firms in such industries as the automobile industry, see Brief for Automotive Warehouse Distributors Association et al. as *Amici Curiae* 2-3, does not detract from this point. The question whether power to control an aftermarket exists is quite distinct from the question whether the power has been exercised. Manufacturers in some markets have no doubt determined that exclusionary intrabrand conduct works to their disadvantage at the competitive interbrand level, but this in no way refutes the self-evident reality that control over unique replacement parts for single-branded goods is ordinarily available to such manufacturers for the taking. It confounds sound analysis to suggest, as respondents do, see Brief for Respondents 5, 37, that the asserted fact that Kodak manufactures only 10% of its replacement parts, and purchases the rest from original equipment manufacturers, casts doubt on Kodak's possession of an inherent advantage in the aftermarkets. It does no such thing, any more than Kodak's contracting with others for the manufacture of all constituent parts included in its original equipment would alone suggest that Kodak lacks power in the *interbrand* micrographic and photocopying equipment markets. The suggestion implicit in respondents' analysis -- that if a seller chooses to contract for the manufacture of its branded merchandise, it must permit the contractors to compete in the sale of that merchandise -- is plainly unprecedented.

[2] Even *with* interbrand power, I may observe, it is unlikely that Kodak could have incrementally exploited its position through the tie of parts to service alleged here. Most of the "service" at issue is inherently associated with the parts, *i. e.*, that service involved in incorporating the parts into Kodak equipment, and the two items tend to be demanded by customers in fixed proportions (one part with one unit of service necessary to install the part). When that situation obtains, "'no revenue can be derived from setting a higher price for the tied product which could not have been made by setting the optimum price for the tying product.'" P. Areeda & L. Kaplow, Antitrust Analysis P426(a), p. 706 (4th ed. 1988) (quoting Bowman, Tying Arrangements and the Leverage Problem, 67 Yale L. J. 19 (1957)). These observations strongly suggest that Kodak parts and the service involved in installing them should not be treated as distinct products for antitrust tying purposes. See *Jefferson Parish Hospital Dist. No. 2* v. *Hyde*, 466 U.S. 2, 39, 80 L. Ed. 2d 2, 104 S. Ct. 1551 (1984) (O'CONNOR, J., concurring in judgment) ("For products to be treated as distinct, the tied product must, at a minimum, be one that some consumers might wish to purchase separately *without also purchasing the tying product*") (emphasis in original) (footnote omitted); Ross, The Single Product Issue in Antitrust Tying: A Functional Approach, 23 Emory L. J. 963, 1009-1010 (1974).

the time of purchase (a category that regrettably includes the Federal Government, whose "purchasing system," we are told, assigns foremarket purchases and aftermarket purchases to different entities). But **[*496]** we have never before premised the application of antitrust doctrine on the lowest common denominator of consumer.

The Court attempts to counter this theoretical point with a theory of its own. It says that there are "information costs" -- the costs and inconvenience to the consumer of acquiring and processing life-cycle pricing data for Kodak machines -- that "could create a less responsive connection between service and parts prices and equipment sales." *Ante*, at 473. But this truism about the functioning of markets for sophisticated equipment cannot create "market power" of concern to the antitrust laws where otherwise there is none. "Information costs," or, more accurately, gaps in the availability and quality of consumer information, pervade real-world markets; and because consumers generally make do with "rough cut" judgments about price in such circumstances, in virtually any market there are zones within which otherwise **[***303]** competitive suppliers may overprice their products without losing appreciable market share. We have never suggested that the principal players in a market with such commonplace informational deficiencies (and, thus, bands of apparent consumer pricing indifference) exercise market power in any sense relevant **[**2098]** to the antitrust laws. "While [such] factors may generate 'market power' in some abstract sense, they do not generate the kind of market power that justifies condemnation of tying." *Jefferson Parish, 466 U.S. at 27*; see, *e. g.*, *Town Sound and Custom Tops, Inc. v. Chrysler Motors Corp., supra.*

Respondents suggest that, even if the existence of inter-brand competition prevents Kodak from raising prices *generally* in its single-brand aftermarkets, there remain certain consumers who are necessarily subject to abusive Kodak pricing behavior by reason of their being "locked in" to their investments in Kodak machines. The Court agrees; indeed, it goes further by suggesting that even a *general* policy of supracompetitive aftermarket prices might be profitable over the long run because of the "lock-in" phenomenon. "[A] **[*497]** seller profitably could maintain supracompetitive prices in the aftermarket," the Court explains, "if the switching costs were high relative to the increase in service prices, and the number of locked-in customers were high relative to the number of new purchasers." *Ante*, at 476. In speculating about this latter possibility, the Court is essentially repudiating the assumption on which we are bound to decide this case, viz., Kodak's lack of any power whatsoever in the interbrand market. If Kodak's *general* increase in aftermarket prices were to bring the total "system" price above competitive levels in the interbrand market, Kodak would be wholly unable to make further foremarket sales -- and would find itself exploiting an ever-dwindling aftermarket, as those Kodak micrographic and photocopying machines already in circulation passed into disuse.

The Court's narrower point, however, is undeniably true. There will be consumers who, because of their capital investment in Kodak equipment, "will tolerate some level of service-price increases before changing equipment brands," *ibid.;* this is *necessarily* true for "every maker of unique parts for its own product." Areeda & Hovenkamp, Antitrust Law P525.1b, at 563. But this "circumstantial" leverage created by consumer investment regularly crops up in smoothly functioning, even perfectly competitive, markets, and in most -- if not all -- of its manifestations, it is of no concern to the antitrust laws. The leverage held by the manufacturer of a malfunctioning refrigerator (which is measured by the consumer's reluctance to walk away from his initial investment in that device) is no different in kind or degree from the leverage held by the swimming pool contractor when he discovers a 5-ton boulder in his customer's backyard and

demands an additional sum of money to remove it; or the leverage held by an airplane manufacturer over an airline that has "standardized" its fleet around the manufacturer's models; or the leverage held by a drill press manufacturer whose customers have built their production lines around the **[*498]** manufacturer's **[***304]** particular style of drill press; or the leverage held by an insurance company over its independent sales force that has invested in company-specific paraphernalia; or the leverage held by a mobile home park owner over his tenants, who are unable to transfer their homes to a different park except at great expense, see generally *Yee v. Escondido, 503 U.S. 519, 118 L. Ed. 2d 153, 112 S. Ct. 1522 (1992)*. Leverage, in the form of *circumstantial* power, plays a role in each of these relationships; but in none of them is the leverage attributable to the dominant party's *market* power in any relevant sense. Though that power can plainly work to the injury of certain consumers, it produces only "a brief perturbation in competitive conditions -- not the sort of thing the antitrust laws do or should worry about." *Parts & Elec. Motors, Inc.* v. *Sterling Elec., Inc.*, 866 F.2d 228, 236 (CA7 1988) (Posner, J., dissenting).

The Court correctly observes that the antitrust laws do not permit even a *natural* monopolist to project its monopoly power into another market, *i. e.*, to "'exploit his **[**2099]** dominant position in one market to expand his empire into the next.'" *Ante*, at 480, n. 29 (quoting *Times-Picayune Publishing Co. v. United States, 345 U.S. 594, 611, 97 L. Ed. 1277, 73 S. Ct. 872 (1953))*. However, when a manufacturer uses its control over single-branded parts to acquire influence in single-branded service, the monopoly "leverage" is almost invariably of no practical consequence, because of perfect identity between the consumers in each of the subject aftermarkets (those who need replacement parts for Kodak equipment and those who need servicing of Kodak equipment). When that condition exists, the tie does not permit the manufacturer to project power over a class of consumers distinct from that which it is already able to exploit (and fully) without the inconvenience of the tie. Cf., *e. g.*, Bowman, Tying Arrangements and the Leverage Problem, 67 Yale L. J. 19, 21-27 (1957).

We have never before accepted the thesis the Court today embraces: that a seller's inherent control over the unique **[*499]** parts for its own brand amounts to "market power" of a character sufficient to permit invocation of the *per se* rule against tying. As the Court observes, *ante*, at 479-481, n. 29, we have applied the *per se* rule to manufacturer ties of *foremarket* equipment to aftermarket derivatives -- but only when the manufacturer's monopoly power in the equipment, coupled with the use of derivative sales as "counting devices" to measure the intensity of customer equipment usage, enabled the manufacturer to engage in price discrimination, and thereby more fully exploit its interbrand power. See *International Salt Co. v. United States, 332 U.S. 392, 92 L. Ed. 20, 68 S. Ct. 12 (1947)*; *International Business Machines Corp. v. United States, 298 U.S. 131, 80 L. Ed. 1085, 56 S. Ct. 701 (1936)*; *United Shoe Machinery Corp. v. United States, 258 U.S. 451, 66 L. Ed. 708, 42 S. Ct. 363 (1922)*. That sort of enduring opportunity to engage in price discrimination is unavailable to a manufacturer -- like Kodak -- that lacks power at the inter-brand level. A tie between two aftermarket derivatives does next to nothing to improve a competitive manufacturer's **[***305]** ability to extract monopoly rents from its consumers. [3]

---

[3] The Court insists that the record in this case suggests otherwise, *i. e.*, that a tie between parts and service somehow *does* enable Kodak to increase overall monopoly profits. See *ante*, at 479-481, n. 29. Although the Court does not identify the record evidence on which it relies, the suggestion, apparently, is that such a tie facilitates price discrimination between sophisticated, "high-volume" users of Kodak equipment and their unsophisticated counterparts. The sophisticated users (who, the Court presumes, invariably self-service their equipment) are permitted to buy Kodak parts without also purchasing supracompetitively priced Kodak service, while the unsophisticated are -- through the imposition of the tie -- compelled to buy both. See *ante*, at 475-476.

**[*500]** **[**2100]** Nor has any court of appeals (save for the Ninth Circuit panel below) recognized single-branded aftermarket power as a basis for invoking the *per se* tying prohibition. See *Virtual Maintenance, Inc. v. Prime Computer, Inc., 957 F.2d 1318, 1328 (CA6 1992)* ("Defining the market by customer demand *after* the customer has chosen a single supplier fails to take into account that the supplier . . . must compete with other similar suppliers to be designated the **[*501]** sole source in the first place"); *Grappone, Inc. v. Subaru of New England, Inc., 858 F.2d at 798* ("We do not see how such dealer investment [in facilities to sell Subaru products] . . . could easily translate into Subaru market power of a kind that, through tying, could ultimately lead to higher than competitive prices for consumers"); *A. I.* **[***306]** *Root Co. v. Computer/Dynamics, Inc., 806 F.2d 673, 675-677, and n. 3 (CA6 1986)* (competition at "small business computer" level precluded assertion of computer manufacturer's power over software designed for use only with manufacturer's brand of computer); *General Business Systems v. North American Philips Corp., 699 F.2d 965, 977 (CA9 1983)* ("To have attempted to impose significant pressure to buy [aftermarket hardware] by use of the tying service only would have hastened the date on which Philips surrendered to its competitors in the small business computer market"). See also *Parts & Elec. Motors, Inc.* v. *Sterling Elec., Inc.*, 866 F.2d at 233 (law-of-the-case doctrine compelled finding of market power in replacement parts for single-brand engine).

We have recognized in closely related contexts that the deterrent effect of *inter*brand competition on the exploitation of *intra*brand market power should make courts exceedingly reluctant to apply rules of *per se* illegality to intra-brand restraints. For instance, we have refused to apply a rule of *per se* illegality to vertical nonprice restraints "because of their potential for a simultaneous reduction of intra-brand competition and stimulation of interbrand competition," *Continental T. V., Inc. v. GTE Sylvania Inc., 433 U.S. 36, 51-52, 53 L. Ed. 2d 568, 97 S. Ct. 2549 (1977)*, the latter of which we described as "the primary concern of antitrust law," *id., at 52, n. 19*. We noted, for instance, that "new manufacturers and manufacturers entering new markets can use the restrictions in order to induce competent and aggressive retailers to make the kind of investment of capital and labor that is often required in the distribution of products unknown to the consumer," and that "established manufacturers can use them **[*502]** to induce retailers to

---

While superficially appealing, at bottom this explanation lacks coherence. Whether they self-service their equipment or not, rational foremarket consumers (those consumers who are not yet "locked in" to Kodak hardware) will be driven to Kodak's competitors if the price of Kodak equipment, together with the expected cost of aftermarket support, exceeds competitive levels. This will be true no matter how Kodak distributes the total system price among equipment, parts, and service. See *supra*, at 495. Thus, as to these consumers, Kodak's lack of interbrand power wholly prevents it from employing a tie between parts and service as a vehicle for price discrimination. Nor does a tie between parts and service offer Kodak incremental exploitative power over those consumers -- sophisticated or not -- who have the supposed misfortune of being "locked in" to Kodak equipment. If Kodak desired to exploit its circumstantial power over this wretched class by pressing them up to the point where the cost to each consumer of switching equipment brands barely exceeded the cost of retaining Kodak equipment and remaining subject to Kodak's abusive practices, it could plainly do so without the inconvenience of a tie, through supracompetitive parts pricing alone. Since the locked-in *sophisticated* parts purchaser is as helpless as the locked-in *unsophisticated* one, I see nothing to be gained by price discrimination in favor of the former. If such price discrimination were desired, however, it would not have to be accomplished indirectly, through a tie of parts to service. *Section 2(a)* of the Robinson-Patman Act, 15 U. S. C. § 13(a), would prevent giving lower parts prices to the sophisticated customers only "where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy, or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination, or with customers of either of them . . . ." *Ibid.*; see, *e. g.*, *Falls City Industries, Inc.* v. *Vanco Beverage, Inc.*, 460 U.S. 428, 434-435, 75 L. Ed. 2d 174, 103 S. Ct. 1282 (1983). That prohibited effect often occurs when price-discriminated goods are sold for resale (*i. e.*, to purchasers who are necessarily in competition with one another). *E. g.*, *FTC* v. *Morton Salt Co.*, 334 U.S. 37, 47, 92 L. Ed. 1196, 68 S. Ct. 822 (1948); see P. Areeda & L. Kaplow, Antitrust Analysis P600, p. 923 (1988) ("Secondary-line injury arises [under the Robinson-Patman Act] when a powerful firm buying supplies at favorable prices thereby gains a decisive advantage over its competitors that are forced to pay higher prices for their supplies"). It rarely occurs where, as would be the case here, the price-discriminated goods are sold to various businesses for consumption.

engage in promotional activities or to provide service and repair facilities necessary to the efficient marketing of their products." *Id., at 55*. See also *Business Electronics Corp. v. Sharp Electronics Corp., 485 U.S. 717, 726, 99 L. Ed. 2d 808, 108 S. Ct. 1515 (1988)*. The same assumptions, in my opinion, should govern our analysis of ties alleged to have been "forced" solely through *intra*brand market power. In the absence of interbrand power, a manufacturer's bundling of aftermarket products may serve a multitude of legitimate purposes: It may facilitate manufacturer efforts to ensure that the equipment remains operable and thus protect the seller's business reputation, see *United States v.* **[**2101]** *Jerrold Electronics Corp., 187 F. Supp. at 560*; it may create the conditions for implicit consumer financing of the acquisition cost of the tying equipment through supracompetitively-priced aftermarket purchases, see, *e. g.*, A. Oxenfeldt, Industrial Pricing and Market Practices 378 (1951); and it may, through the resultant manufacturer control of aftermarket activity, "yield valuable information about component or design weaknesses that will materially contribute to product improvement," 3 Areeda & Turner P733c, at 258-259; see also *id.*, P829d, at 331-332. Because the interbrand market will generally punish intra-brand restraints that consumers do not find in their interest, we should not -- under the guise of a *per se* rule -- condemn **[***307]** such potentially procompetitive arrangements simply because of the antitrust defendant's inherent power over the unique parts for its own brand.

I would instead evaluate the aftermarket tie alleged in this case under the rule of reason, where the tie's *actual* anticompetitive effect in the tied product market, together with its potential economic benefits, can be fully captured in the analysis, see, *e. g.*, *Jefferson Parish, 466 U.S. at 41* (O'CONNOR, J., concurring in judgment). Disposition of this case does not require such an examination, however, as respondents apparently waived any rule-of-reason claim they **[*503]** may have had in the District Court. I would thus reverse the Ninth Circuit's judgment on the tying claim outright.

III

These considerations apply equally to respondents' *§ 2* claims. An antitrust defendant lacking relevant "market power" sufficient to permit invocation of the *per se* prohibition against tying *a fortiori* lacks the monopoly power that warrants heightened scrutiny of his allegedly exclusionary behavior. Without even so much as asking whether the purposes of *§ 2* are implicated here, the Court points to Kodak's control of "100% of the parts market and 80% to 95% of the service market," markets with "no readily available substitutes," *ante*, at 481, and finds that the proffer of such statistics is sufficient to fend off summary judgment. But this showing could easily be made, as I have explained, with respect to virtually any manufacturer of differentiated products requiring aftermarket support. By permitting antitrust plaintiffs to invoke *§ 2* simply upon the unexceptional demonstration that a manufacturer controls the supplies of its single-branded merchandise, the Court transforms *§ 2* from a specialized mechanism for responding to extraordinary agglomerations (or threatened agglomerations) of economic power to an all-purpose remedy against run-of-the-mill business torts.

In my view, if the interbrand market is vibrant, it is simply not necessary to enlist *§ 2*'s machinery to police a seller's intrabrand restraints. In such circumstances, the interbrand market functions as an infinitely more efficient and more precise corrective to such behavior, rewarding the seller whose intrabrand restraints enhance consumer welfare while punishing the seller whose control of the aftermarkets is viewed unfavorably by interbrand consumers. See *Business Electronics Corp., supra, at 725*; *Continental T. V., Inc., supra, at 52, n. 19, 54*. Because this case comes to

us on the assumption **[*504]** that Kodak is without such interbrand power, I believe we are compelled to reverse the judgment of the Court of Appeals. I respectfully dissent.

**References**

54 Am Jur 2d, Monopolies, Restraints of Trade, and Unfair Trade Practices 34-42, 59-64, 284, 40924 Federal Procedure, L Ed, Monopolies and Restraints of Trade 54:254, 54:255; 28 Federal Procedure, L Ed, Pleadings and Motions 62:62412B Federal Procedural Forms, L Ed, Monopolies and Restraints of Trade 48:213, 48:215, 48:231, 48:2725 Am Jur Trials 105, Summary Judgment Practice; 24 Am Jur Trials 1, Defending Antitrust Lawsuits*15 USCS 1*, *2*; USCS Court Rules, *Federal Rules of Civil Procedure, Rule 56(c)*L Ed Digest, Restraints of Trade, Monopolies, and Unfair Trade Practices 30, 42, 43; Summary Judgment and Judgment on Pleadings 5L Ed Index, Restraints of Trade, Monopolies, and Unfair Trade Practices; Rules of Civil Procedure; Sherman Act; Tying ArrangementsIndex to Annotations, Civil Procedure Rules; Restraints of Trade and Monopolies; Services; Summary Judgment; Tying Arrangements Annotation References:What constitutes "sufficient economic power" to make tying arrangement unlawful restraint of trade violative of 1 of Sherman Act (*15 USCS 1*)-- Supreme Court cases. *51 L Ed 2d 826.What issues will the Supreme Court consider, though not, or not properly, raised by the parties. 42 L Ed 2d 946.What constitutes separate and distinct products or services for purposes of determining whether tying arrangement violates 1 of Sherman Act (15 USCS 1*) or 3 of Clayton Act (*15 USCS 14). 46 ALR Fed 516 .Refusals to deal as violations of the federal antitrust laws (15 USCS 1, 2, 13). 41 ALR Fed 175.Comment note.--What constitutes "attempt to monopolize" within meaning of 2 of Sherman Act (15 USCS 2*). *27 ALR Fed 762*.

EXHIBIT 268

LexisNexis

Caution
As of: August 12, 2014 9:09 AM EDT

**Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.**
Supreme Court of the United States
January 9, 1991, Argued ; March 27, 1991, Decided
No. 89-1909

**Reporter:** 499 U.S. 340; 111 S. Ct. 1282; 113 L. Ed. 2d 358; 1991 U.S. LEXIS 1856; 59 U.S.L.W. 4251; 18 U.S.P.Q.2D (BNA) 1275; Copy. L. Rep. (CCH) P26,702; 68 Rad. Reg. 2d (P & F) 1513; 18 Media L. Rep. 1889; 121 P.U.R.4th 1; 91 Cal. Daily Op. Service 2217; 91 Daily Journal DAR 3580
FEIST PUBLICATIONS, INC. v. RURAL TELEPHONE SERVICE CO., INC.

**Prior History:** CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE TENTH CIRCUIT.

**Disposition:** *916 F. 2d 718*, reversed.

**Core Terms**

compilations, directory, pages, copyright protection, courts, collection, creativity, listings, copying, coordination, sweat, brow, telephone number, subscribers, authorship, preexisting, arranged, telephone service, yellow pages, writings, authors, alphabetically, infringement, themselves, Universal, decisions, materials, revisions, Cases, telephone directory

**LexisNexis® Headnotes**

Copyright Law > ... > Statutory Copyright & Fixation > Originality Requirement > General Overview
Copyright Law > ... > Statutory Copyright & Fixation > Originality Requirement > Quantum of Originality

***HN1*** To qualify for copyright protection, a work must be original to the author. Original, as the term is used in copyright, means only that the work was independently created by the author and that it possesses at least some minimal degree of creativity. Originality does not signify novelty; a work may be original even though it closely resembles other works so long as the similarity is fortuitous, not the result of copying.

Constitutional Law > Congressional Duties & Powers > General Overview
Copyright Law > Constitutional Copyright Protections > Copyright Clause

***HN2*** U.S. Const. art. I, § 8, authorizes congress to secure for limited times to authors the exclusive right to their respective writings. The crucial terms "authors" and "writings" presuppose a degree of originality.

Constitutional Law > Congressional Duties & Powers > Copyright & Patent Clause
Copyright Law > Scope of Copyright Protection > Collective & Derivative Works > General Overview

Copyright Law > Scope of Copyright Protection > Collective & Derivative Works > Collective Works
Copyright Law > Scope of Copyright Protection > Collective & Derivative Works > Scope of Protection
Copyright Law > Constitutional Copyright Protections > General Overview
Copyright Law > ... > Protected Subject Matter > Limited Protection for Factual Works > General Overview
Copyright Law > ... > Protected Subject Matter > Limited Protection for Factual Works > Literal Forms of Expression
Copyright Law > ... > Statutory Copyright & Fixation > Originality Requirement > General Overview

***HN3*** A directory that contains absolutely no protectable written expression, only facts, meets the constitutional minimum for copyright protection if it features an original selection or arrangement.

Copyright Law > Scope of Copyright Protection > Collective & Derivative Works > Derivative Works
Copyright Law > ... > Protected Subject Matter > Limited Protection for Factual Works > General Overview
Copyright Law > ... > Protected Subject Matter > Limited Protection for Ideas > General Overview
Copyright Law > ... > Statutory Copyright & Fixation > Originality Requirement > General Overview

***HN4*** No author may copyright facts or ideas. The copyright is limited to those aspects of the work, termed expression, that display the stamp of the author's originality. Copyright does not prevent subsequent users from copying from a prior author's work those constituent elements that are not original, for example facts or materials in the public domain, as long as such use does not unfairly appropriate the author's original contributions.

Copyright Law > Scope of Copyright Protection > Collective & Derivative Works > General Overview
Copyright Law > Scope of Copyright Protection > Collective & Derivative Works > Collective Works
Copyright Law > ... > Protected Subject Matter > Limited Protection for Factual Works > General Overview

***HN5*** Facts, whether alone or as part of a compilation, are not original and therefore may not be copyrighted.

Copyright Law > Scope of Copyright Protection > Collective & Derivative Works > General Overview
Copyright Law > Scope of Copyright Protection > Collective & Derivative Works > Collective Works
Copyright Law > ... > Protected Subject Matter > Limited Protection for Factual Works > General Overview
Copyright Law > ... > Protected Subject Matter > Limited Protection for Factual Works > Arrangements & Selections
Copyright Law > ... > Statutory Copyright & Fixation > Unprotected Subject Matter > Unprotected Facts

***HN6*** A factual compilation is eligible for copyright if it features an original selection or arrangement of facts, but the copyright is limited to the particular selection or arrangement. In no event may copyright extend to the facts themselves.

Copyright Law > Scope of Copyright Protection > Subject Matter > General Overview
Copyright Law > ... > Protected Subject Matter > Limited Protection for Ideas > General Overview
Copyright Law > ... > Subject Matter > Statutory Copyright & Fixation > General Overview
Copyright Law > ... > Subject Matter > Statutory Copyright & Fixation > Original Works of Authorship

***HN7*** See *17 U.S.C.S. § 102*.

Copyright Law > Scope of Copyright Protection > Collective & Derivative Works > General Overview
Copyright Law > Scope of Copyright Protection > Collective & Derivative Works > Collective Works

***HN8*** *17 U.S.C.S. § 101* defines a "compilation" in the copyright sense as a work formed by the collection and assembling of preexisting materials or of data that are selected, coordinated, or

arranged in such a way that the resulting work as a whole constitutes an original work of authorship.

Copyright Law > ... > Statutory Copyright & Fixation > Originality Requirement > General Overview

***HN9*** Originality requires only that an author make a selection or arrangement independently, i. e., without copying that selection or arrangement from another work, and that it display some minimal level of creativity.

Copyright Law > Scope of Copyright Protection > Collective & Derivative Works > General Overview
Copyright Law > Scope of Copyright Protection > Collective & Derivative Works > Collective Works
Copyright Law > Scope of Copyright Protection > Collective & Derivative Works > Scope of Protection
Copyright Law > Scope of Copyright Protection > Subject Matter > General Overview
Copyright Law > ... > Statutory Copyright & Fixation > Unprotected Subject Matter > Unprotected Facts

***HN10*** *17 U.S.C.S. § 103(a)* states that the subject matter of copyright includes compilations, but that copyright protects only the author's original contributions, not the facts or information conveyed.

Copyright Law > Scope of Copyright Protection > Collective & Derivative Works > General Overview
Copyright Law > Scope of Copyright Protection > Collective & Derivative Works > Collective Works

***HN11*** The copyright in a compilation extends only to the material contributed by the author of such work, as distinguished from the preexisting material employed in the work, and does not imply any exclusive right in the preexisting material. *17 U.S.C.S. § 103(b)*.

Copyright Law > Copyright Infringement Actions > Civil Infringement Actions > General Overview
Copyright Law > ... > Civil Infringement Actions > Elements > General Overview
Copyright Law > ... > Civil Infringement Actions > Elements > Copying by Defendants
Copyright Law > ... > Civil Infringement Actions > Elements > Ownership
Copyright Law > ... > Protected Subject Matter > Limited Protection for Factual Works > General Overview

***HN12*** To establish copyright infringement, two elements must be proven: (1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original.

Copyright Law > Constitutional Copyright Protections > General Overview
Copyright Law > Constitutional Copyright Protections > Copyright Clause
Copyright Law > Scope of Copyright Protection > Subject Matter > General Overview
Copyright Law > ... > Protected Subject Matter > Limited Protection for Factual Works > General Overview
Copyright Law > ... > Statutory Copyright & Fixation > Originality Requirement > General Overview

***HN13*** As a constitutional matter, copyright protects only those constituent elements of a work that possess more than a de minimis quantum of creativity.

Copyright Law > ... > Statutory Copyright & Fixation > Originality Requirement > General Overview

***HN14*** *17 U.S.C.S. § 101* does not afford protection from copying to a collection of facts that are selected, coordinated, and arranged in a way that utterly lacks originality.

**Lawyers' Edition Display**

**Decision**

Alphabetical listings of names, accompanied by towns and telephone numbers, in telephone book white pages held not copyrightable; thus, nonconsensual copying of listings held not to infringe on copyright.

**Summary**

A telephone company that was a certified public utility providing telephone service to several communities in Kansas, and that was subject to a state regulation requiring all telephone companies operating in the state to issue annually an updated telephone directory, published a typical telephone directory, consisting of white pages and yellow pages. The white pages listed in alphabetical order the names of the telephone company's subscribers, together with their towns and telephone numbers. The telephone company obtained the data for its white pages from the company's subscribers, who were required to provide their names and addresses when applying for telephone service from the company. A publishing company, which specialized in areawide telephone directories covering a much larger geographical range than did directories such as that of the telephone company, offered to pay the telephone company for the right to use its white pages listings, but the telephone company refused to license its listings to the publishing company. Subsequently, the publishing company used the telephone company's white pages listings without the telephone company's consent. Although the publishing company sought to obtain additional information, such as street addresses, for the listings that it took from the telephone company's white pages, many of the listings in the publishing company's areawide directory that covered part of the telephone company's service area were identical to listings in the telephone company's white pages. In a copyright infringement suit brought by the telephone company against the publishing company, the United States District Court for the District of Kansas, explaining that courts had consistently held that telephone directories were copyrightable, granted summary judgment to the telephone company (*663 F Supp 214*). The United States Court of Appeals for the Tenth Circuit, in an unpublished opinion, affirmed the District Court judgment for substantially the reasons given by the *District Court (916 F2d 718)*.

On certiorari, the United States Supreme Court reversed. In an opinion by O'Connor, J., joined by Rehnquist, Ch. J., and White, Marshall, Stevens, Scalia, Kennedy, and Souter, JJ., it was held that (1) the names, towns, and telephone numbers listed in the white pages were not protected by the telephone company's copyright in its combined white and yellow pages directory, because the listings in the white pages were not original to the telephone company, since (a) the listings, rather than owing their origin to the telephone company, were uncopyrightable facts, and (b) the telephone company has not selected, coordinated, or arranged these uncopyrightable facts in an original way sufficient to satisfy the minimum standards for copyright protection--under either the *Federal Constitution's Article I, 8, cl 8*, which authorizes Congress to secure for limited times to authors the exclusive right to their respective writings, or the Copyright Act of 1976 (*17 USCS 101 et seq.*), which provides copyright protection for original works of authorship--given that the telephone company's selection and alphabetical arrangement of the listings lacked the creativity necessary to demonstrate originality; and (2) because the telephone company's white pages listings lacked the requisite originality for copyright protection, the publishing company's use of the listings could not constitute copyright infringement.

Blackmun, J., concurred in the judgment.

**Headnotes**

COPYRIGHT AND LITERARY PROPERTY §3 > subject of copyright -- telephone directory -- white pages -- > Headnote:

***LEdHN[1A]*** [1A]***LEdHN[1B]*** [1B]***LEdHN[1C]*** [1C]***LEdHN[1D]*** [1D]***LEdHN[1E]*** [1E]

Although a telephone company's combined white and yellow pages directory, considered as a whole, is subject to a valid copyright because it contains some foreword text, as well as original material in its yellow pages advertisements, the names, towns, and telephone numbers listed alphabetically according to name in the directory's white pages are not protected by the copyright in the directory, because the listings in the white pages are not original to the telephone company, since (1) the names, towns, and telephone numbers, rather than owing their origin to the telephone company, are uncopyrightable facts; and (2) the telephone company has not selected, coordinated, or arranged these uncopyrightable facts in an original way sufficient to satisfy the minimum standards for copyright protection--under either the *Federal Constitution's Article I, 8, cl 8*, which authorizes Congress to secure for limited times to authors the exclusive right to their respective writings, or the Copyright Act of 1976 (*17 USCS 101 et seq.*), which provides copyright protection for original works of authorship--given that (a) the telephone company's selection of listings--the name, town, and telephone number of each of the company's subscribers--lacks the modicum of creativity necessary to transform mere selection into copyrightable expression, and (b) there is nothing remotely creative about arranging names alphabetically in a white pages directory.

COPYRIGHT AND LITERARY PROPERTY §20 > infringement -- telephone directory -- white pages -- > Headnote:

***LEdHN[2A]*** [2A]***LEdHN[2B]*** [2B]

The nonconsensual copying, by a publishing company into its areawide telephone directory, of white pages listings from a combined white and yellow pages telephone directory published by a telephone company that serves part of the area covered by the areawide directory, cannot constitute copyright infringement, where the United States Supreme Court has determined that the telephone company's white pages listings lack the requisite originality to be protected by the copyright in the telephone company's combined white and yellow pages directory.

COPYRIGHT AND LITERARY PROPERTY §3 > subject of copyright -- facts -- > Headnote:

***LEdHN[3A]*** [3A]***LEdHN[3B]*** [3B]***LEdHN[3C]*** [3C]***LEdHN[3D]*** [3D]***LEdHN[3E]*** [3E]***LEdHN[3F]*** [3F]***LEdHN[3G]*** [3G]

Facts are not copyrightable, because (1) the *Federal Constitution's Article I, 8, cl 8*--which authorizes Congress to secure for limited times to authors the exclusive right to their respective writings--mandates that a work must be original to the author in order to qualify for copyright protection, and (2) no one may claim originality as to facts, since facts do not owe their origin to an act of authorship, given that the first person to find and report a particular fact has not created the fact, but has merely discovered its existence.

COPYRIGHT AND LITERARY PROPERTY §3 > subject of copyright -- factual compilations -- original selection or arrangement -- > Headnote:

***LEdHN[4A]*** [4A]***LEdHN[4B]*** [4B]***LEdHN[4C]*** [4C]***LEdHN[4D]*** [4D]

Factual compilations generally are copyrightable, because factual compilations may possess the originality required by the *Federal Constitution's Article I, 8, cl 8*--which authorizes Congress to secure for limited times to authors the exclusive right to their respective writings--for copyright protection, since (1) the compilation author typically chooses which facts to include, in what order to place them, and how to arrange the collected data so that they may be used effectively by readers, and (2) these choices as to selection and arrangement, so long as they are made independently by the compiler and entail a minimal degree of creativity, are sufficiently original that Congress may protect such compilations through the copyright laws; thus, even a directory that contains absolutely no protectable written expression, but only facts, meets the constitutional minimum for copyright protection if it features an original selection or arrangement; but, as a constitutional matter, copyright protects only those constituent elements of a work that possess more than a de minimis quantum of creativity.

COPYRIGHT AND LITERARY PROPERTY §3 > subject of copyright -- originality -- novelty -- > Headnote:

***LEdHN[5A]*** [5A]***LEdHN[5B]*** [5B]

The term "original," as it is used in copyright--where the United States Supreme Court has held that to qualify for copyright protection, a work must be original to the author--means only that the work was independently created by the author, as opposed to copied from other works, and that it possesses at least some minimal degree of creativity; because originality does not signify novelty, a work may be original even though it closely resembles other works, so long as the similarity is fortuitous, not the result of copying; thus, if two poets, each ignorant of the other, compose identical poems, although neither work is novel, both are original and, hence, copyrightable.

COPYRIGHT AND LITERARY PROPERTY §3 > subject of copyright -- facts -- census data -- originality -- > Headnote:

***LEdHN[6]*** [6]

Census data do not trigger copyright, because census data are not original in the constitutional sense--where the United States Supreme Court has held that the *Federal Constitution's Article I, 8, cl 8*, which authorizes Congress to secure for limited times to authors the exclusive right to their respective writings, mandates originality as a prerequisite for copyright protection--since census takers, rather than creating the population figures that emerge from their efforts, in a sense copy these figures from the world around them; the same is true of all facts--scientific, historical, biographical, and news of the day.

COPYRIGHT AND LITERARY PROPERTY §3 > subject of copyright -- facts -- factual compilations -- infringement -- > Headnote:

***LEdHN[7A]*** [7A]***LEdHN[7B]*** [7B]

Although a factual compilation is eligible for copyright if it features an original selection or arrangement of facts, and although a compilation author who clothes facts with an original collocation of words may be able to claim a copyright in this written expression, others may copy from the publication the underlying facts but not the precise words used to present them, because (1) the copyright is limited to the particular selection or arrangement, and (2) in no event may copyright extend to the facts themselves, since, no matter how original the format of

the selection or arrangement, the facts do not become original through association; thus, notwithstanding a valid copyright, a subsequent compiler remains free to use the facts contained in another's publication to aid in preparing a competing work, so long as the competing work does not feature the same selection and arrangement.

COPYRIGHT AND LITERARY PROPERTY §1 > copyright -- constitutional requirement -- primary objective -- > Headnote:

***LEdHN[8]*** [8]

That much of the fruit of a factual compiler's labor may be used by others without compensation is the essence of copyright and is required by the *Federal Constitution's Article I, 8, cl 8*--which authorizes Congress to secure for limited times to authors the exclusive right to their respective writings--because the primary objective of copyright is not to reward the labor of authors, but to promote the progress of science and useful arts, where to this end, copyright, under the principle known as the idea/expression or fact/expression dichotomy, which applies to all works of authorship, assures authors the right to their original expression, but encourages others to build freely upon the ideas and information conveyed by a work.

COPYRIGHT AND LITERARY PROPERTY §3 > RESTRAINTS OF TRADE, MONOPOLIES, AND UNFAIR TRADE PRACTICES §94 > subject of copyright -- ideas and facts -- "sweat of the brow" doctrine -- unfair competition -- > Headnote:

***LEdHN[9]*** [9]

Although protection for facts and ideas that are the fruits of an author's research may in certain circumstances be available under a theory of unfair competition, to accord copyright protection on the basis of the doctrine known as "sweat of the brow" or "industrious collection"--the underlying notion of which is that copyright is a reward for the hard work that goes into compiling facts--distorts basic copyright principles, in that it creates a monopoly in public domain materials without the necessary justification of protecting and encouraging the creation of writings by authors, where (1) the most fundamental axiom of basic copyright principles is that no one may copyright facts or ideas, and (2) it is just such wasted effort that would result from relying on facts contained in prior works that the proscription against the copyright of ideas and facts is designed to prevent.

COPYRIGHT AND LITERARY PROPERTY §3 > STATUTES §147 > subject of copyright -- collections of facts -- > Headnote:

***LEdHN[10A]*** [10A]***LEdHN[10B]*** [10B]***LEdHN[10C]*** [10C]

The purpose of the definition of "compilation" in 101 of the Copyright Act of 1976 (*17 USCS 101*)--which defines a compilation in the copyright sense as a work formed by the collection and assembly of pre-existing materials or of data that are selected, coordinated, or arranged in such a way that the resulting work as a whole constitutes an original work of authorship--is to emphasize that collections of facts are not copyrightable per se; this message is conveyed through 101's structure identifying three distinct elements required to be met for a work to qualify as a copyrightable compilation--(1) collection and assembly of pre-existing material, (2) selection, coordination, or arrangement of the material, and (3) originality based on selection, coordination, or arrangement; the plain language of 101 indicates that not every collection of facts receives copyright protection, since otherwise there would be a period in 101 after the word "data"; as

explained in House and Senate Reports, the goal of 101's requirement for a copyrightable compilation--that the compilation be an original work of authorship--is to make plain that the criteria of copyrightable subject matter stated in 102 of the Act (*17 USCS 102*)--which states that the originality requirement applies to all works--apply with full force to works containing pre-existing material; and 101 does not afford protection from copying to a collection of facts that are selected, coordinated, and arranged in a way that utterly lacks originality.

COPYRIGHT AND LITERARY PROPERTY §3 > subject of copyright -- infringement -- facts -- factual compilations -- > Headnote:

***LEdHN[11A]*** [11A]***LEdHN[11B]*** [11B]

The facts contained in existing works may be freely copied, because copyright protects only the elements that owe their origin to the compiler--the selection, coordination, and arrangement of facts--since (1) Congress enacted 103 of the Copyright Act of 1976 (*17 USCS 103*)--which provides that the copyright in a compilation extends to only the material contributed by the author of such work and does not imply any exclusive right in the pre-existing material employed in the work--to make clear that the copyright in a compilation does not extend to the facts themselves; (2) House and Senate Reports state that the most important point with respect to 103 is that copyright has no effect on the public domain status of the pre-existing material; and (3) the predecessor of the Copyright Act of 1976--the Copyright Act of 1909--did not require that each subsequent compiler must start from scratch and was precluded from relying on research undertaken by another.

COPYRIGHT AND LITERARY PROPERTY §3 > STATUTES §164 > subject of copyright -- collections of facts -- > Headnote:

***LEdHN[12]*** [12]

*Section 101* of the Copyright Act of 1976 (*17 USCS 101*)--which defines a "compilation" in the copyright sense as a work formed by the collection and assembly of pre-existing materials or of data that are selected, coordinated, or arranged in such a way that the resulting work as a whole constitutes an original work of authorship--envisions that there will be some fact-based works in which the selection, coordination, and arrangement are not sufficiently original to trigger copyright protection; because facts are never original, a compilation author can claim originality, if at all, in only the way the facts are presented; 101 dictates that the principal focus in determining copyrightability should be on whether the selection, coordination, and arrangement of facts are sufficiently original to merit protection; if every selection, coordination, or arrangement of facts will trigger copyright, the phrase "in such a way" in 101's definition of "compilation" is meaningless; and a court should give effect, if possible, to every clause and word of a statute.

COPYRIGHT AND LITERARY PROPERTY §3 > STATUTES §139 > subject of copyright -- originality -- revision of federal statute -- > Headnote:

***LEdHN[13]*** [13]

Under the Copyright Act of 1976 (*17 USCS 101 et seq.*) and the act that the 1976 Act revised--the Copyright Act of 1909--the touchstone of copyright protection in directories and other fact-based works is originality, not "sweat of the brow"--the hard work that goes into compiling facts--because (1) the 1976 revisions were a direct response to the Copyright Office's concern that many lower courts had misconstrued this basic principle, (2) Congress emphasized repeatedly

that the purpose of the revisions was to clarify, not change, existing law, and (3) the revisions explained in (a) 102(a) of the 1976 Act (*17 USCS 102(a)*) that copyright requires originality, (b) 102(b) of the 1976 Act (*17 USCS 102(b)*) that facts are never original, (c) 103(b) of the 1976 Act (*17 USCS 103(b)*) that a copyright in a compilation does not extend to the facts the compilation contains, and (d) in 101 of the 1976 Act (*17 USCS 101*) that a compilation is copyrightable to only the extent that it features an original selection, coordination, or arrangement.

COPYRIGHT AND LITERARY PROPERTY §20 > copyright infringement -- what constitutes -- > Headnote:

***LEdHN[14]*** [14]

To establish copyright infringement, the two elements that must be proven are (1) ownership of a valid copyright, and (2) copying of constituent elements of a work that are original.

COPYRIGHT AND LITERARY PROPERTY §3 > subject of copyright -- telephone directory -- white pages -- selection of facts -- > Headnote:

***LEdHN[15]*** [15]

A telephone company's selection of listings for the white pages of the telephone directory published by the company may--where the United States Supreme Court has determined that the company's selection of listings are not original and thus not copyrightable, because the selection lacks the creativity required for copyright protection--also fail the originality requirement for copyrightability under the theory that the telephone company did not truly "select" to publish the names and telephone numbers of its subscribers, because, where the company was required to do so by a state corporation commission, one could plausibly conclude that this selection was dictated by state law, not by the telephone company.

**Syllabus**

Respondent Rural Telephone Service Company, Inc., is a certified public utility providing telephone service to several communities in Kansas. Pursuant to state regulation, Rural publishes a typical telephone directory, consisting of white pages and yellow pages. It obtains data for the directory from subscribers, who must provide their names and addresses to obtain telephone service. Petitioner Feist Publications, Inc., is a publishing company that specializes in area-wide telephone directories covering a much larger geographic range than directories such as Rural's. When Rural refused to license its white pages listings to Feist for a directory covering 11 different telephone service areas, Feist extracted the listings it needed from Rural's directory without Rural's consent. Although Feist altered many of Rural's listings, several were identical to listings in Rural's white pages. The District Court granted summary judgment to Rural in its copyright infringement suit, holding that telephone directories are copyrightable. The Court of Appeals affirmed.

*Held*: Rural's white pages are not entitled to copyright, and therefore Feist's use of them does not constitute infringement. Pp. 344-364.

(a) *Article I, § 8, cl. 8, of the Constitution* mandates originality as a prerequisite for copyright protection. The constitutional requirement necessitates independent creation plus a modicum of creativity. Since facts do not owe their origin to an act of authorship, they are not original and, thus, are not copyrightable. Although a compilation of facts may possess the requisite originality

because the author typically chooses which facts to include, in what order to place them, and how to arrange the data so that readers may use them effectively, copyright protection extends only to those components of the work that are original to the author, not to the facts themselves. This fact/expression dichotomy severely limits the scope of protection in fact-based works. Pp. 344-351.

(b) The Copyright Act of 1976 and its predecessor, the Copyright Act of 1909, leave no doubt that originality is the touchstone of copyright protection in directories and other fact-based works. The 1976 Act explains that copyright extends to "original works of authorship," *17 U. S. C. § 102(a)*, and that there can be no copyright in facts, *§ 102(b)*. A compilation is not copyrightable *per se*, but is copyrightable only if its facts have been "selected, coordinated, or arranged *in such a way* that the resulting work as a whole constitutes an original work of authorship." *§ 101* (emphasis added). Thus, the statute envisions that some ways of selecting, coordinating, and arranging data are not sufficiently original to trigger copyright protection. Even a compilation that is copyrightable receives only limited protection, for the copyright does not extend to facts contained in the compilation. *§ 103(b)*. Lower courts that adopted a "sweat of the brow" or "industrious collection" test -- which extended a compilation's copyright protection beyond selection and arrangement to the facts themselves -- misconstrued the 1909 Act and eschewed the fundamental axiom of copyright law that no one may copyright facts or ideas. Pp. 351-361.

(c) Rural's white pages do not meet the constitutional or statutory requirements for copyright protection. While Rural has a valid copyright in the directory as a whole because it contains some forward text and some original material in the yellow pages, there is nothing original in Rural's white pages. The raw data are uncopyrightable facts, and the way in which Rural selected, coordinated, and arranged those facts is not original in any way. Rural's selection of listings -- subscribers' names, towns, and telephone numbers -- could not be more obvious and lacks the modicum of creativity necessary to transform mere selection into copyrightable expression. In fact, it is plausible to conclude that Rural did not truly "select" to publish its subscribers' names and telephone numbers, since it was required to do so by state law. Moreover, there is nothing remotely creative about arranging names alphabetically in a white pages directory. It is an age-old practice, firmly rooted in tradition and so commonplace that it has come to be expected as a matter of course. Pp. 361-364.

**Counsel:** Kyler Knobbe argued the cause and filed briefs for petitioner.

James M. Caplinger, Jr., argued the cause and filed a brief for respondent. *

---

* Briefs of amici curiae urging reversal were filed for the Association of North American Directory Publishers et al. by Theodore Case Whitehouse; for the International Association of Cross Reference Directory Publishers by Richard D. Grauer and Kathleen McCree Lewis; and for the Third-Class Mail Association by Ian D. Volner.

Briefs of amici curiae urging affirmance were filed for Ameritech et al. by Michael K. Kellogg, Charles Rothfeld, Douglas J. Kirk, Thomas P. Hester, and Harlan Sherwat; for Association of American Publishers, Inc., by Robert G. Sugarman and R. Bruce Rich; for GTE Corp. by Kirk K. Van Tine, Richard M. Cahill, and Edward R. Sublett; for the National Telephone Cooperative Association by L. Marie Guillory and David Cosson; for the United States Telephone Association by Richard J. Rappaport and Keith P. Schoeneberger; and for West Publishing Co. by Vance K. Opperman and James E. Schatz.

Briefs of amici curiae were filed for Bellsouth Corp. by Anthony B. Askew, Robert E. Richards, Walter H. Alford, and Vincent L. Sgrosso; for Direct Marketing Association, Inc., by Robert L. Sherman; for Haines and Co., Inc., by Jeremiah D. McAuliffe, Bernard A. Barken, and Eugene Gressman; and for the Information Industry Association et al. by Steven J. Metalitz and Angela Burnett.

**Judges:** O'Connor, J., delivered the opinion of the Court, in which Rehnquist, C. J., and White, Marshall, Stevens, Scalia, Kennedy, and Souter, JJ., joined. Blackmun, J., concurred in the judgment.

**Opinion by:** O'CONNOR

**Opinion**

**[*342] [***367] [**1286]** ***LEdHN[1A]*** [1A] ***LEdHN[2A]*** [2A]This case requires us to clarify the extent of copyright protection available to telephone directory white pages.

I

Rural Telephone Service Company, Inc., is a certified public utility that provides telephone service to several communities in northwest Kansas. It is subject to a state regulation that requires all telephone companies operating in Kansas to issue annually an updated telephone directory. Accordingly, as a condition of its monopoly franchise, Rural publishes a typical telephone directory, consisting of white pages and yellow pages. The white pages list in alphabetical order the names of Rural's subscribers, together with their towns and telephone numbers. The yellow pages list Rural's business subscribers alphabetically by category and feature classified advertisements of various sizes. Rural distributes its directory free of charge to its subscribers, but earns revenue by selling yellow pages advertisements.

Feist Publications, Inc., is a publishing company that specializes in area-wide telephone directories. Unlike a typical **[*343]** directory, which covers only a particular calling area, Feist's area-wide directories cover a much larger geographical range, reducing the need to call directory assistance or consult multiple directories. The Feist directory that is the subject of this litigation covers 11 different telephone service areas in 15 counties and contains 46,878 white pages listings -- compared to Rural's approximately 7,700 listings. Like Rural's directory, Feist's is distributed free of charge and includes both white pages and yellow pages. Feist and Rural compete vigorously for yellow pages advertising.

As the sole provider of telephone service in its service area, Rural obtains subscriber information quite easily. Persons desiring telephone service must apply to Rural and provide their names and addresses; Rural then assigns them a telephone number. Feist is not a telephone company, let alone one with monopoly status, and therefore lacks independent access to any subscriber information. To obtain white pages listings for its area-wide directory, Feist approached each of the 11 telephone companies operating in northwest Kansas and offered to pay for the right to use its white pages listings.

Of the 11 telephone companies, only Rural refused to license its listings to Feist. Rural's refusal created a problem for Feist, as omitting these listings would have left a gaping hole in its area-wide directory, rendering it less attractive to potential yellow pages advertisers. In a decision subsequent to that which we review here, the District Court determined that this was precisely the reason Rural refused to license its listings. The refusal was motivated by an unlawful purpose "to **[***368]** extend its monopoly in telephone service to a monopoly in yellow pages advertising." *Rural Telephone Service Co. v. Feist Publications, Inc., 737 F. Supp. 610, 622 (Kan. 1990)*.

Unable to license Rural's white pages listings, Feist used them without Rural's consent. Feist began by removing several thousand listings that fell outside the geographic range of its area-wide

directory, then hired personnel to investigate the 4,935 that remained. These employees verified **[*344]** the data reported by Rural and sought to obtain additional information. As a result, a typical Feist listing includes the individual's street address; most of Rural's listings do not. Notwithstanding these additions, however, **[**1287]** 1,309 of the 46,878 listings in Feist's 1983 directory were identical to listings in Rural's 1982-1983 white pages. App. 54 (P 15-16), 57. Four of these were fictitious listings that Rural had inserted into its directory to detect copying.

Rural sued for copyright infringement in the District Court for the District of Kansas taking the position that Feist, in compiling its own directory, could not use the information contained in Rural's white pages. Rural asserted that Feist's employees were obliged to travel door-to-door or conduct a telephone survey to discover the same information for themselves. Feist responded that such efforts were economically impractical and, in any event, unnecessary because the information copied was beyond the scope of copyright protection. The District Court granted summary judgment to Rural, explaining that "courts have consistently held that telephone directories are copyrightable" and citing a string of lower court decisions. *663 F. Supp. 214, 218 (1987)*. In an unpublished opinion, the Court of Appeals for the Tenth Circuit affirmed "for substantially the reasons given by the district court." App. to Pet. for Cert. 4a, judgt. order reported at *916 F. 2d 718 (1990)*. We granted certiorari, *498 U.S. 808 (1990)*, to determine whether the copyright in Rural's directory protects the names, towns, and telephone numbers copied by Feist.

II

A

***LEdHN[3A]*** [3A] ***LEdHN[4A]*** [4A]This case concerns the interaction of two well-established propositions. The first is that facts are not copyrightable; the other, that compilations of facts generally are. Each of these propositions possesses an impeccable pedigree. That there can be no valid copyright in facts is universally understood. The most fundamental axiom of copyright law is that **[*345]** "no author may copyright his ideas or the facts he narrates." *Harper & Row, Publishers, Inc. v. Nation Enterprises, 471 U.S. 539, 556 (1985)*. Rural wisely concedes this point, noting in its brief that "facts and discoveries, of course, are not themselves subject to copyright protection." Brief for Respondent 24. At the same time, however, it is beyond dispute that compilations of facts are within the subject matter of copyright. Compilations were expressly mentioned in the Copyright Act of 1909, and again in the Copyright Act of 1976.

There is an undeniable tension between these two propositions. Many compilations consist of nothing but raw data -- *i. e.*, wholly factual **[***369]** information not accompanied by any original written expression. On what basis may one claim a copyright in such a work? Common sense tells us that 100 uncopyrightable facts do not magically change their status when gathered together in one place. Yet copyright law seems to contemplate that compilations that consist exclusively of facts are potentially within its scope.

***LEdHN[3B]*** [3B] ***LEdHN[5A]*** [5A]The key to resolving the tension lies in understanding why facts are not copyrightable. The *sine qua non* of copyright is originality. ***HN1*** To qualify for copyright protection, a work must be original to the author. See *Harper & Row, supra, at 547-549*. Original, as the term is used in copyright, means only that the work was independently created by the author (as opposed to copied from other works), and that it possesses at least some minimal degree of creativity. 1 M. Nimmer & D. Nimmer, Copyright §§ 2.01[A], [B] (1990) (hereinafter Nimmer). To be sure, the requisite level of creativity is extremely low; even a slight amount will suffice. The vast majority of works make the grade quite easily, as they possess some creative spark, "no matter how crude, humble or obvious" it might be. *Id.*, § 1.08[C][1]. Originality does not signify novelty; a work may be original even though it closely resembles other works so long as the similarity is fortuitous, not the result of copying. To

illustrate, **[*346]** assume that two poets, each ignorant of the other, compose **[**1288]** identical poems. Neither work is novel, yet both are original and, hence, copyrightable. See *Sheldon v. Metro-Goldwyn Pictures Corp., 81 F. 2d 49, 54 (CA2 1936)*.

***LEdHN[3C]*** [3C]Originality is a constitutional requirement. The source of Congress' power to enact copyright laws is ***HN2*** *Article I, § 8, cl. 8, of the Constitution*, which authorizes Congress to "secure for limited Times to Authors . . . the exclusive Right to their respective Writings." In two decisions from the late 19th century -- *The Trade-Mark Cases, 100 U.S. 82 (1879)*; and *Burrow-Giles Lithographic Co. v. Sarony, 111 U.S. 53 (1884)* -- this Court defined the crucial terms "authors" and "writings." In so doing, the Court made it unmistakably clear that these terms presuppose a degree of originality.

In *The Trade-Mark Cases*, the Court addressed the constitutional scope of "writings." For a particular work to be classified "under the head of writings of authors," the Court determined, "originality is required." *100 U.S., at 94*. The Court explained that originality requires independent creation plus a modicum of creativity: "While the word *writings* may be liberally construed, as it has been, to include original designs for engraving, prints, &c., it is only such as are *original*, and are founded in the creative powers of the mind. The writings which are to be protected are *the fruits of intellectual labor*, embodied in the form of books, prints, engravings, and the like." *Ibid.* (emphasis in original).

In *Burrow-Giles*, the Court distilled the same requirement from the Constitution's use of the word "authors." The Court defined "author," in a constitutional sense, to mean "he to whom anything owes its origin; originator; maker." *111 U.S., at 58* (internal quotation marks omitted). As in **[***370]** *The Trade-Mark Cases*, the Court emphasized the creative component of originality. It described copyright as being limited to "original intellectual conceptions of the author," *111 U.S., at 58*, and stressed the importance of requiring an author who accuses another of infringement to prove "the existence **[*347]** of those facts of originality, of intellectual production, of thought, and conception." *Id., at 59-60*.

The originality requirement articulated in *The Trade-Mark Cases* and *Burrow-Giles* remains the touchstone of copyright protection today. See *Goldstein v. California, 412 U.S. 546, 561-562 (1973)*. It is the very "premise of copyright law." *Miller v. Universal City Studios, Inc., 650 F. 2d 1365, 1368 (CA5 1981)*. Leading scholars agree on this point. As one pair of commentators succinctly puts it: "The originality requirement is *constitutionally mandated* for all works." Patterson & Joyce, Monopolizing the Law: The Scope of Copyright Protection for Law Reports and Statutory Compilations, *36 UCLA L. Rev. 719, 763, n. 155 (1989)* (emphasis in original) (hereinafter Patterson & Joyce). Accord, *id.*, at 759-760, and n. 140; Nimmer § 1.06[A] ("Originality is a statutory as well as a constitutional requirement"); *id.*, § 1.08[C][1] ("[A] modicum of intellectual labor . . . clearly constitutes an essential constitutional element").

***LEdHN[3D]*** [3D] ***LEdHN[6]*** [6]It is this bedrock principle of copyright that mandates the law's seemingly disparate treatment of facts and factual compilations. "No one may claim originality as to facts." *Id.*, § 2.11[A], p. 2-157. This is because facts do not owe their origin to an act of authorship. The distinction is one between creation and discovery: The first person to find and report

a particular fact has not created the fact; he or she has merely discovered its existence. To borrow from *Burrow-Giles*, one who discovers a fact is not its "maker" or "originator." *111 U.S., at 58*. "The discoverer merely finds and records." Nimmer § 2.03[E]. Census takers, for example, do not "create" the population figures that emerge from their efforts; in a sense, they copy these figures **[**1289]** from the world around them. Denicola, Copyright in Collections of Facts: A Theory for the Protection of Nonfiction Literary Works, 81 Colum. L. Rev. 516, 525 (1981) (hereinafter Denicola). Census data therefore do not trigger copyright because these data are not "original" in the constitutional sense. Nimmer **[*348]** § 2.03[E]. The same is true of all facts -- scientific, historical, biographical, and news of the day. "They may not be copyrighted and are part of the public domain available to every person." *Miller, supra, at 1369*.

***LEdHN[4B]*** [4B]Factual compilations, on the other hand, may possess the requisite originality. The compilation author typically chooses which facts to include, in what order to place them, and how to arrange the collected data so that they may be used effectively by readers. These choices as to selection and arrangement, so long as they are made independently by the compiler and entail a minimal degree of creativity, are sufficiently original that Congress may protect such compilations through the copyright laws. Nimmer §§ 2.11[D], 3.03; Denicola 523, n. 38. Thus, even ***HN3*** a directory that contains absolutely no protectible written expression, only facts, meets the constitutional minimum **[***371]** for copyright protection if it features an original selection or arrangement. See *Harper & Row, 471 U.S., at 547*. Accord, Nimmer § 3.03.

***LEdHN[3E]*** [3E] ***LEdHN[7A]*** [7A]This protection is subject to an important limitation. The mere fact that a work is copyrighted does not mean that every element of the work may be protected. Originality remains the *sine qua non* of copyright; accordingly, copyright protection may extend only to those components of a work that are original to the author. Patterson & Joyce 800-802; Ginsburg, Creation and Commercial Value: Copyright Protection of Works of Information, *90 Colum. L. Rev. 1865, 1868*, and n. 12 (1990) (hereinafter Ginsburg). Thus, if the compilation author clothes facts with an original collocation of words, he or she may be able to claim a copyright in this written expression. Others may copy the underlying facts from the publication, but not the precise words used to present them. In *Harper & Row*, for example, we explained that President Ford could not prevent others from copying bare historical facts from his autobiography, see *471 U.S., at 556-557*, but that he could prevent others from copying his "subjective descriptions and portraits of public figures." **[*349]** *Id., at 563*. Where the compilation author adds no written expression but rather lets the facts speak for themselves, the expressive element is more elusive. The only conceivable expression is the manner in which the compiler has selected and arranged the facts. Thus, if the selection and arrangement are original, these elements of the work are eligible for copyright protection. See Patry, Copyright in Compilations of Facts (or Why the "White Pages" Are Not Copyrightable), 12 Com. & Law 37, 64 (Dec. 1990) (hereinafter Patry). No matter how original the format, however, the facts themselves do not become original through association. See Patterson & Joyce 776.

This inevitably means that the copyright in a factual compilation is thin. Notwithstanding a valid copyright, a subsequent compiler remains free to use the facts contained in another's publication to aid in preparing a competing work, so long as the competing work does not feature the same selection and arrangement. As one commentator explains it: "No matter how much original authorship the work displays, the facts and ideas it exposes are free for the taking. . . . The very same facts and ideas may be divorced from the context imposed by the author, and restated or reshuffled by second comers, even if the author was the first to discover the facts or to propose the ideas." Ginsburg 1868.

***LEdHN[8]*** [8]It may seem unfair that much of the fruit of the compiler's labor may be used by others without compensation. As Justice Brennan **[**1290]** has correctly observed, however, this is not "some unforeseen byproduct of a statutory scheme." *Harper & Row, 471 U.S., at 589* (dissenting opinion). It is, rather, "the essence of copyright," *ibid.*, and a constitutional requirement. The primary objective of copyright is not to reward the labor of authors, but "to promote the Progress of Science and useful Arts." Art. I, § 8, cl. 8. Accord, *Twentieth Century Music Corp. v. Aiken, 422 U.S. 151, 156* **[***372]** (1975). To this end, copyright assures authors the right to their original **[*350]** expression, but encourages others to build freely upon the ideas and information conveyed by a work. *Harper & Row, supra, at 556-557*. This principle, known as the idea/expression or fact/expression dichotomy, applies to all works of authorship. As applied to a factual compilation, assuming the absence of original written expression, only the compiler's selection and arrangement may be protected; the raw facts may be copied at will. This result is neither unfair nor unfortunate. It is the means by which copyright advances the progress of science and art.

This Court has long recognized that the fact/expression dichotomy limits severely the scope of protection in fact-based works. More than a century ago, the Court observed: "The very object of publishing a book on science or the useful arts is to communicate to the world the useful knowledge which it contains. But this object would be frustrated if the knowledge could not be used without incurring the guilt of piracy of the book." *Baker v. Selden, 101 U.S. 99, 103 (1880)*. We reiterated this point in *Harper & Row*:

> ***HN4*** "No author may copyright facts or ideas. The copyright is limited to those aspects of the work -- termed 'expression' -- that display the stamp of the author's originality.
>
> "Copyright does not prevent subsequent users from copying from a prior author's work those constituent elements that are not original -- for example . . . facts, or materials in the public domain -- as long as such use does not unfairly appropriate the author's original contributions." *471 U.S., at 547-548* (citation omitted).

***LEdHN[3F]*** [3F] ***LEdHN[4C]*** [4C] ***LEdHN[7B]*** [7B]This, then, resolves the doctrinal tension: Copyright treats facts and factual compilations in a wholly consistent manner. ***HN5*** Facts, whether alone or as part of a compilation, are not original and therefore may not be copyrighted. ***HN6*** A factual compilation is eligible for copyright if it features an original selection or arrangement of facts, but the copyright is limited to **[*351]** the particular selection or arrangement. In no event may copyright extend to the facts themselves.

B

***LEdHN[3G]*** [3G]As we have explained, originality is a constitutionally mandated prerequisite for copyright protection. The Court's decisions announcing this rule predate the Copyright Act of 1909, but ambiguous language in the 1909 Act caused some lower courts temporarily to lose sight of this requirement.

The 1909 Act embodied the originality requirement, but not as clearly as it might have. See Nimmer § 2.01. The subject matter of copyright was set out in §§ 3 and 4 of the Act. Section 4 stated that copyright was available to "all the writings of an author." 35 Stat. 1076. By using the words "writings" and "author" -- the same words used in Article I, § 8, of the Constitution and

defined by the Court in *The Trade-Mark Cases* and *Burrow-Giles* -- the statute necessarily incorporated the originality requirement articulated in the Court's decisions. It **[***373]** did so implicitly, however, thereby leaving room for error.

Section 3 was similarly ambiguous. It stated that the copyright in a work protected only "the copyrightable component parts of the work." It thus stated an important copyright principle, but failed to identify the specific **[**1291]** characteristic -- originality -- that determined which component parts of a work were copyrightable and which were not.

Most courts construed the 1909 Act correctly, notwithstanding the less-than-perfect statutory language. They understood from this Court's decisions that there could be no copyright without originality. See Patterson & Joyce 760-761. As explained in the Nimmer treatise: "The 1909 Act neither defined originality, nor even expressly required that a work be 'original' in order to command protection. However, the courts uniformly inferred the requirement from the fact that copyright protection may only be claimed by 'authors'. . . . It was reasoned that since an author is 'the . . . **[*352]** creator, originator' it follows that a work is not the product of an author unless the work is original." Nimmer § 2.01 (footnotes omitted) (citing cases).

But some courts misunderstood the statute. See, *e. g.*, *Leon v. Pacific Telephone & Telegraph Co., 91 F. 2d 484 (CA9 1937)*; *Jeweler's Circular Publishing Co. v. Keystone Publishing Co., 281 F. 83 (CA2 1922)*. These courts ignored §§ 3 and 4, focusing their attention instead on § 5 of the Act. Section 5, however, was purely technical in nature: It provided that a person seeking to register a work should indicate on the application the type of work, and it listed 14 categories under which the work might fall. One of these categories was "books, including composite and cyclopaedic works, directories, gazetteers, and other compilations." § 5(a). Section 5 did not purport to say that all compilations were automatically copyrightable. Indeed, it expressly disclaimed any such function, pointing out that "the subject-matter of copyright is defined in section four." Nevertheless, the fact that factual compilations were mentioned specifically in § 5 led some courts to infer erroneously that directories and the like were copyrightable *per se*, "without any further or precise showing of original -- personal -- authorship." Ginsburg 1895.

***LEdHN[9]*** [9]Making matters worse, these courts developed a new theory to justify the protection of factual compilations. Known alternatively as "sweat of the brow" or "industrious collection, " the underlying notion was that copyright was a reward for the hard work that went into compiling facts. The classic formulation of the doctrine appeared in *Jeweler's Circular Publishing Co., 281 F., at 88*:

> "The right to copyright a book upon which one has expended labor in its preparation does not depend upon whether the materials which he has collected consist or not of matters which are publici juris, or whether such materials show literary skill *or originality*, either in thought or in language, or anything more than industrious **[*353]** collection. The man who goes through the streets of a town and puts down the names of each of the inhabitants, with their occupations and their street number, acquires material of which he is the author" (emphasis added).

**[***374]** The "sweat of the brow" doctrine had numerous flaws, the most glaring being that it extended copyright protection in a compilation beyond selection and arrangement -- the compiler's original contributions -- to the facts themselves. Under the doctrine, the only defense to infringement was independent creation. A subsequent compiler was "not entitled to take one

word of information previously published," but rather had to "independently work out the matter for himself, so as to arrive at the same result from the same common sources of information." *Id., at 88-89* (internal quotations omitted). "Sweat of the brow" courts thereby eschewed the most fundamental axiom of copyright law -- that no one may copyright facts or ideas. See *Miller v. Universal City Studios, Inc., 650 F. 2d, at 1372* (criticizing "sweat of the brow" courts because "ensuring that later writers obtain the facts independently . . . is precisely the scope of protection given . . . copyrighted matter, and the law is clear **[**1292]** that facts are not entitled to such protection").

Decisions of this Court applying the 1909 Act make clear that the statute did not permit the "sweat of the brow" approach. The best example is *International News Service v. Associated Press, 248 U.S. 215 (1918)*. In that decision, the Court stated unambiguously that the 1909 Act conferred copyright protection only on those elements of a work that were original to the author. International News Service had conceded taking news reported by Associated Press and publishing it in its own newspapers. Recognizing that § 5 of the Act specifically mentioned "'periodicals, including newspapers,'" § 5(b), the Court acknowledged that news articles were copyrightable. *Id., at 234*. It flatly rejected, however, the notion that the copyright in an article extended to **[*354]** the factual information it contained: "The news element -- the information respecting current events contained in the literary production -- is not the creation of the writer, but is a report of matters that ordinarily are *publici juris*; it is the history of the day." *Ibid.**

Without a doubt, the "sweat of the brow" doctrine flouted basic copyright principles. Throughout history, copyright law has "recognized a greater need to disseminate factual works than works of fiction or fantasy." *Harper & Row, 471 U.S., at 563*. Accord, Gorman, Fact or Fancy: The Implications for Copyright, 29 J. Copyright Soc. 560, 563 (1982). But "sweat of the brow" courts took a contrary view; they handed out proprietary interests in facts and declared that authors are absolutely precluded from saving time and effort by relying upon the facts contained in prior works. In truth, "it is just such wasted effort that the proscription against the copyright of ideas and facts . . . [is] designed to prevent." *Rosemont Enterprises, Inc. v. Random House, Inc., 366 F. 2d 303, 310 (CA2 1966)*, cert. denied, *385 U.S. 1009 (1967)*. "Protection for the fruits of such research . . . may in certain circumstances be available under a **[***375]** theory of unfair competition. But to accord copyright protection on this basis alone distorts basic copyright principles in that it creates a monopoly in public domain materials without the necessary justification of protecting and encouraging the creation of 'writings' by 'authors.'" Nimmer § 3.04, p. 3-23 (footnote omitted).

C

"Sweat of the brow" decisions did not escape the attention of the Copyright Office. When Congress decided to overhaul the copyright statute and asked the Copyright Office to study existing problems, see *Mills Music, Inc. v. Snyder, 469 U.S. 153, 159 (1985)*, the Copyright Office promptly recommended **[*355]** that Congress clear up the confusion in the lower courts as to the basic standards of copyrightability. The Register of Copyrights explained in his first report to Congress that "originality" was a "basic requisite" of copyright under the 1909 Act, but that "the absence of any reference to [originality] in the statute seems to have led to misconceptions

---

* The Court ultimately rendered judgment for Associated Press on non-copyright grounds that are not relevant here. See 248 U.S., at 235, 241-242.

as to what is copyrightable matter." Report of the Register of Copyrights on the General Revision of the U.S. Copyright Law, 87th Cong., 1st Sess., p. 9 (H. Judiciary Comm. Print 1961). The Register suggested making the originality requirement explicit. *Ibid.*

Congress took the Register's advice. In enacting the Copyright Act of 1976, Congress dropped the reference to "all the writings of an author" and replaced it with the phrase "original works of authorship." *17 U. S. C. § 102(a)*. In making explicit the originality requirement, Congress announced that it was merely clarifying existing law: "The two fundamental criteria of copyright protection **[**1293]** [are] originality and fixation in tangible form. . . . The phrase 'original works of authorship,' which is purposely left undefined, is intended to incorporate without change *the standard of originality established by the courts under the present* [*1909*] *copyright statute*." H. R. Rep. No. 94-1476, p. 51 (1976) (emphasis added) (hereinafter H. R. Rep.); S. Rep. No. 94-473, p. 50 (1975) (emphasis added) (hereinafter S. Rep.). This sentiment was echoed by the Copyright Office: "Our intention here is to maintain the *established standards* of originality. . . ." Supplementary Report of the Register of Copyrights on the General Revision of U.S. Copyright Law, 89th Cong., 1st Sess., pt. 6, p. 3 (H. Judiciary Comm. Print 1965) (emphasis added).

To ensure that the mistakes of the "sweat of the brow" courts would not be repeated, Congress took additional measures. For example, § 3 of the 1909 Act had stated that copyright protected only the "copyrightable component parts" of a work, but had not identified originality as the basis for distinguishing **[*356]** those component parts that were copyrightable from those that were not. The 1976 Act deleted this section and replaced it with *§ 102(b)*, which identifies specifically those elements of a work for which copyright is not available: "***HN7*** In no case does copyright protection for an original work of authorship extend to any idea, procedure, process, system, method of operation, concept, principle, or discovery, regardless of the form in which it is described, explained, illustrated, or embodied in such work." *Section 102(b)* is universally understood to prohibit **[***376]** any copyright in facts. *Harper & Row, supra, at 547, 556*. Accord, Nimmer § 2.03[E] (equating facts with "discoveries"). As with *§ 102(a)*, Congress emphasized that *§ 102(b)* did not change the law, but merely clarified it: "*Section 102(b)* in no way enlarges or contracts the scope of copyright protection under the present law. Its purpose is to restate . . . that the basic dichotomy between expression and idea remains unchanged." H. R. Rep., at 57; S. Rep., at 54.

***LEdHN[10A]*** [10A] ***LEdHN[11A]*** [11A] Congress took another step to minimize confusion by deleting the specific mention of "directories . . . and other compilations" in § 5 of the 1909 Act. As mentioned, this section had led some courts to conclude that directories were copyrightable *per se* and that every element of a directory was protected. In its place, Congress enacted two new provisions. First, to make clear that compilations were not copyrightable *per se*, Congress provided a definition of the term "compilation." Second, to make clear that the copyright in a compilation did not extend to the facts themselves, Congress enacted *§ 103*.

***LEdHN[10B]*** [10B]The definition of "compilation" is found in *§ 101* of the 1976 Act. ***HN8*** It defines a "compilation" in the copyright sense as "a work formed by the collection and assembling of preexisting materials or of data *that* are selected, coordinated, or arranged *in such a way that* the resulting work as a whole constitutes an original work of authorship" (emphasis added).

**[*357]** The purpose of the statutory definition is to emphasize that collections of facts are not copyrightable *per se*. It conveys this message through its tripartite structure, as emphasized above by the italics. The statute identifies three distinct elements and requires each to be met for a work to qualify as a copyrightable compilation: (1) the collection and assembly of pre-existing

material, facts, or data; (2) the selection, coordination, or arrangement of those materials; and (3) the creation, by virtue of the particular selection, coordination, or arrangement, of an "original" work of authorship. "This tripartite conjunctive structure is self-evident, and should be assumed to 'accurately express the legislative purpose.'" Patry 51, quoting *Mills Music, 469 U.S., at 164*.

At first glance, the first requirement does not seem to tell us much. It merely describes what one normally thinks of as a **[**1294]** compilation -- a collection of pre-existing material, facts, or data. What makes it significant is that it is not the *sole* requirement. It is not enough for copyright purposes that an author collects and assembles facts. To satisfy the statutory definition, the work must get over two additional hurdles. In this way, the plain language indicates that not every collection of facts receives copyright protection. Otherwise, there would be a period after "data."

The third requirement is also illuminating. It emphasizes that a compilation, like any other work, is copyrightable only if it satisfies the originality requirement ("an *original* work of authorship"). Although *§ 102* states plainly that the originality requirement applies to all works, the point was emphasized with regard to compilations to ensure that **[***377]** courts would not repeat the mistake of the "sweat of the brow" courts by concluding that fact-based works are treated differently and measured by some other standard. As Congress explained it, the goal was to "make plain that the criteria of copyrightable subject matter stated in *section 102* apply with full force to works . . . containing preexisting material." H. R. Rep., at 57; S. Rep., at 55.

**[*358]** ***LEdHN[12]*** [12]The key to the statutory definition is the second requirement. It instructs courts that, in determining whether a fact-based work is an original work of authorship, they should focus on the manner in which the collected facts have been selected, coordinated, and arranged. This is a straight-forward application of the originality requirement. Facts are never original, so the compilation author can claim originality, if at all, only in the way the facts are presented. To that end, the statute dictates that the principal focus should be on whether the selection, coordination, and arrangement are sufficiently original to merit protection.

Not every selection, coordination, or arrangement will pass muster. This is plain from the statute. It states that, to merit protection, the facts must be selected, coordinated, or arranged "in such a way" as to render the work as a whole original. This implies that some "ways" will trigger copyright, but that others will not. See Patry 57, and n. 76. Otherwise, the phrase "in such a way" is meaningless and Congress should have defined "compilation" simply as "a work formed by the collection and assembly of preexisting materials or data that are selected, coordinated, or arranged." That Congress did not do so is dispositive. In accordance with "the established principle that a court should give effect, if possible, to every clause and word of a statute," *Moskal v. United States, 498 U.S. 103, 109-110 (1990)* (internal quotation marks omitted), we conclude that the statute envisions that there will be some fact-based works in which the selection, coordination, and arrangement are not sufficiently original to trigger copyright protection.

***LEdHN[5B]*** [5B]As discussed earlier, however, the originality requirement is not particularly stringent. A compiler may settle upon a selection or arrangement that others have used; novelty is not required. ***HN9*** Originality requires only that the author make the selection or arrangement independently (*i. e.*, without copying that selection or arrangement from another work), and that it display some minimal level of creativity. Presumably, **[*359]** the vast majority of compilations will pass this test, but not all will. There remains a narrow category of works in which the creative spark is utterly lacking or so trivial as to be virtually nonexistent. See generally

*Bleistein v. Donaldson Lithographing Co., 188 U.S. 239, 251 (1903)* (referring to "the narrowest and most obvious limits"). Such works are incapable of sustaining a valid copyright. Nimmer § 2.01[B].

***LEdHN[11B]*** [11B]Even if a work qualifies as a copyrightable compilation, it receives only limited protection. This is the point of *§ 103* of the Act. ***HN10*** **[**1295]** *Section 103* explains that "the subject matter of copyright . . . includes compilations," *§ 103(a)*, but that copyright protects only the author's original contributions -- not the facts or information conveyed:

> **[***378]** "***HN11*** The copyright in a compilation . . . extends only to the material contributed by the author of such work, as distinguished from the preexisting material employed in the work, and does not imply any exclusive right in the preexisting material." *§ 103(b)*.

As *§ 103* makes clear, copyright is not a tool by which a compilation author may keep others from using the facts or data he or she has collected. "The most important point here is one that is commonly misunderstood today: copyright . . . has no effect one way or the other on the copyright or public domain status of the preexisting material." H. R. Rep., at 57; S. Rep., at 55. The 1909 Act did not require, as "sweat of the brow" courts mistakenly assumed, that each subsequent compiler must start from scratch and is precluded from relying on research undertaken by another. See, *e. g.*, *Jeweler's Circular Publishing Co., 281 F., at 88-89*. Rather, the facts contained in existing works may be freely copied because copyright protects only the elements that owe their origin to the compiler -- the selection, coordination, and arrangement of facts.

***LEdHN[13]*** [13]In summary, the 1976 revisions to the Copyright Act leave no doubt that originality, not "sweat of the brow," is the **[*360]** touchstone of copyright protection in directories and other fact-based works. Nor is there any doubt that the same was true under the 1909 Act. The 1976 revisions were a direct response to the Copyright Office's concern that many lower courts had misconstrued this basic principle, and Congress emphasized repeatedly that the purpose of the revisions was to clarify, not change, existing law. The revisions explain with painstaking clarity that copyright requires originality, *§ 102(a)*; that facts are never original, *§ 102(b)*; that the copyright in a compilation does not extend to the facts it contains, *§ 103(b)*; and that a compilation is copyrightable only to the extent that it features an original selection, coordination, or arrangement, *§ 101*.

The 1976 revisions have proven largely successful in steering courts in the right direction. A good example is *Miller v. Universal City Studios, Inc., 650 F. 2d, at 1369-1370*: "A copyright in a directory . . . is properly viewed as resting on the originality of the selection and arrangement of the factual material, rather than on the industriousness of the efforts to develop the information. Copyright protection does not extend to the facts themselves, and the mere use of information contained in a directory without a substantial copying of the format does not constitute infringement" (citation omitted). Additionally, the Second Circuit, which almost 70 years ago issued the classic formulation of the "sweat of the brow" doctrine in *Jeweler's Circular Publishing Co.*, has now fully repudiated the reasoning of that decision. See, *e. g.*, *Financial Information, Inc. v. Moody's Investors Service, Inc., 808 F. 2d 204, 207 (CA2 1986)*, cert. denied, *484 U.S. 820 (1987)*; *Financial Information, Inc. v. Moody's Investors Service, Inc., 751 F. 2d 501, 510 (CA2 1984)* (Newman, J., concurring); *Hoehling v. Universal City Studios, Inc., 618 F. 2d 972, 979 (CA2 1980)*. Even those scholars who believe that "industrious collection" should be rewarded seem to recognize that this is beyond the scope of existing copyright law. See Denicola 516 ("The very

vocabulary of copyright **[***379]** is ill **[*361]** suited to analyzing property rights in works of nonfiction"); *id., at 520-521, 525*; Ginsburg 1867, 1870.

III

***LEdHN[1B]*** [1B] ***LEdHN[14]*** [14] There is no doubt that Feist took from the white pages of Rural's directory a substantial amount of factual information. At a minimum, Feist copied the names, **[**1296]** towns, and telephone numbers of 1,309 of Rural's subscribers. Not all copying, however, is copyright infringement. ***HN12*** To establish infringement, two elements must be proven: (1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original. See *Harper & Row, 471 U.S., at 548*. The first element is not at issue here; Feist appears to concede that Rural's directory, considered as a whole, is subject to a valid copyright because it contains some foreword text, as well as original material in its yellow pages advertisements. See Brief for Petitioner 18; Pet. for Cert. 9.

***LEdHN[1C]*** [1C]The question is whether Rural has proved the second element. In other words, did Feist, by taking 1,309 names, towns, and telephone numbers from Rural's white pages, copy anything that was "original" to Rural? Certainly, the raw data does not satisfy the originality requirement. Rural may have been the first to discover and report the names, towns, and telephone numbers of its subscribers, but this data does not "'owe its origin'" to Rural. *Burrow-Giles, 111 U.S., at 58*. Rather, these bits of information are uncopyrightable facts; they existed before Rural reported them and would have continued to exist if Rural had never published a telephone directory. The originality requirement "rules out protecting . . . names, addresses, and telephone numbers of which the plaintiff by no stretch of the imagination could be called the author." Patterson & Joyce 776.

Rural essentially concedes the point by referring to the names, towns, and telephone numbers as "preexisting material." Brief for Respondent 17. *Section 103(b)* states explicitly **[*362]** that the copyright in a compilation does not extend to "the preexisting material employed in the work."

The question that remains is whether Rural selected, coordinated, or arranged these uncopyrightable facts in an original way. As mentioned, originality is not a stringent standard; it does not require that facts be presented in an innovative or surprising way. It is equally true, however, that the selection and arrangement of facts cannot be so mechanical or routine as to require no creativity whatsoever. The standard of originality is low, but it does exist. See Patterson & Joyce 760, n. 144 ("While this requirement is sometimes characterized as modest, or a low threshold, it is not without effect") (internal quotation marks omitted; citations omitted). As this Court has explained, the Constitution mandates some minimal degree of creativity, see *The Trade-Mark Cases, 100 U.S., at 94*; and an author who claims infringement must prove "the existence of . . . intellectual production, of thought, and conception." *Burrow-Giles, supra, at 59-60*.

The selection, coordination, and arrangement of Rural's white pages **[***380]** do not satisfy the minimum constitutional standards for copyright protection. As mentioned at the outset, Rural's white pages are entirely typical. Persons desiring telephone service in Rural's service area fill out an application and Rural issues them a telephone number. In preparing its white pages, Rural simply takes the data provided by its subscribers and lists it alphabetically by surname. The end product is a garden-variety white pages directory, devoid of even the slightest trace of creativity.

Rural's selection of listings could not be more obvious: It publishes the most basic information -- name, town, and telephone number -- about each person who applies to it for telephone service.

This is "selection" of a sort, but it lacks the modicum of creativity necessary to transform mere selection into copyrightable expression. Rural expended sufficient effort **[*363]** to make the white pages directory useful, but insufficient creativity to make it original.

***LEdHN[15]*** [15]We note in passing that the selection featured in Rural's white pages may also fail the originality requirement for another reason. Feist points out that Rural did not truly "select" to publish the names and telephone numbers of its subscribers; rather, it was **[**1297]** required to do so by the Kansas Corporation Commission as part of its monopoly franchise. See *737 F. Supp., at 612*. Accordingly, one could plausibly conclude that this selection was dictated by state law, not by Rural.

***LEdHN[1D]*** [1D]Nor can Rural claim originality in its coordination and arrangement of facts. The white pages do nothing more than list Rural's subscribers in alphabetical order. This arrangement may, technically speaking, owe its origin to Rural; no one disputes that Rural undertook the task of alphabetizing the names itself. But there is nothing remotely creative about arranging names alphabetically in a white pages directory. It is an age-old practice, firmly rooted in tradition and so commonplace that it has come to be expected as a matter of course. See Brief for Information Industry Association et al. as *Amici Curiae* 10 (alphabetical arrangement "is universally observed in directories published by local exchange telephone companies"). It is not only unoriginal, it is practically inevitable. This time-honored tradition does not possess the minimal creative spark required by the Copyright Act and the Constitution.

***LEdHN[1E]*** [1E] ***LEdHN[4D]*** [4D] ***LEdHN[10C]*** [10C]We conclude that the names, towns, and telephone numbers copied by Feist were not original to Rural and therefore were not protected by the copyright in Rural's combined white and yellow pages directory. ***HN13*** As a constitutional matter, copyright protects only those constituent elements of a work that possess more than a *de minimis* quantum of creativity. Rural's white pages, limited to basic subscriber information and arranged alphabetically, fall short of the mark. As a statutory matter, ***HN14*** *17 U. S. C. § 101* does not afford protection **[*364]** from copying to a collection of facts that are selected, coordinated, and arranged in a way that utterly lacks originality. Given that some works must fail, we cannot imagine a more likely candidate. Indeed, were we to hold that Rural's white pages pass muster, it is hard to believe that any collection of facts could fail.

***LEdHN[2B]*** [2B] **[***381]** Because Rural's white pages lack the requisite originality, Feist's use of the listings cannot constitute infringement. This decision should not be construed as demeaning Rural's efforts in compiling its directory, but rather as making clear that copyright rewards originality, not effort. As this Court noted more than a century ago, "'great praise may be due to the plaintiffs for their industry and enterprise in publishing this paper, yet the law does not contemplate their being rewarded in this way.'" *Baker v. Selden, 101 U.S., at 105*.

The judgment of the Court of Appeals is

*Reversed*.

Justice Blackmun concurs in the judgment.

**References**

Supreme Court's views as to when books or other written or printed materials are copyrightable under federal law18 Am Jur 2d, Copyright and Literary Property 19, 20, 22, 42, 43, 47, 567 Federal

Procedure, L Ed, Copyrights 18:75, 18:766A Federal Procedural Forms, L Ed, Copyrights 17:51, 17:91, 17:927 Am Jur Pl & Pr Forms (Rev), Copyright and Literary Property, Forms 12, 41, 425A Am Jur Legal Forms 2d, Copyright and Literary and Artistic Property 72:7850 Am Jur Proof of Facts 2d 263, Damages for Copyright Infringement9 Am Jur Trials 293, Copyright Infringement Litigation*USCS, Constitution, Art I, 8, cl 8; 17 USCS 101 et seq.*L Ed Digest, Copyright and Literary Property 3, 20L Ed Index, Copyright and Literary Property ;Directories; Telephones and Telegraphs Index to Annotations, Copyright and Literary Property; Directories; Telecommunications Annotation References:Supreme Court's views as to what constitutes copyright infringement. *78 L Ed 2d 957.Measure of damages and profits to which copyright owner is entitled under 17 USCS 504(b). 100 ALR Fed 258.What constitutes a "compilation" subject to copyright protection--modern cases. 88 ALR Fed 151.Construction and application of 1(c) and 1(d) of Copyright Act (17 USCS 101(c), 101(d)),* providing for impounding of articles alleged to infringe copyright and for destruction of infringing copies or devices. *22 ALR Fed 487. Requirements as to deposit of copies of work in Copyright Office under 13 of Federal Copyright Act (17 USCS 13) as prerequisite to infringement action. 16 ALR Fed 595.*

EXHIBIT 269

LexisNexis

Caution
As of: August 12, 2014 9:13 AM EDT

# Fitzgerald v. CBS Broad., Inc.

United States District Court for the District of Massachusetts
June 22, 2007, Decided
Civil Action No. 04cv12138-NG, Civil Action No. 06cv11302-NG

**Reporter:** 491 F. Supp. 2d 177; 2007 U.S. Dist. LEXIS 45392; 83 U.S.P.Q.2D (BNA) 1460
CHRISTOPHER FITZGERALD, Plaintiff, v. CBS BROADCASTING, INC., Defendant.

**Core Terms**

photographs, fair use, broadcast, infringement, willfulness, station, statutory damages, summary judgment, transformative, arrest, licensing, creative, courts, copyright infringement, state of mind, argues, picture, videos, copyrighted work, employees, cropped, copies, weighs, news reporting, actual damage, freelance, purposes, parties, media, CONSOLIDATED

**LexisNexis® Headnotes**

Copyright Law > ... > Damages > Types of Damages > Compensatory Damages
Copyright Law > ... > Damages > Types of Damages > Statutory Damages

***HN1*** A plaintiff in a successful action for copyright infringement may elect to collect either actual damages and any additional profits of the infringer, or statutory damages. *17 U.S.C.S. § 504(a)*.

Copyright Law > ... > Damages > Types of Damages > Statutory Damages

***HN2*** When a plaintiff in a copyright suit elects statutory damages, the damages are calculated based on the number of copyrighted works and the number of infringers, not on the number of incidents of infringement. *17 U.S.C.S. § 504(c)(1)*. The calculation of statutory damages must be done by a jury. The question of how to construe *17 U.S.C.S. § 504(c)(1)*'s provisions for the method of calculating statutory damages is a legal question that must be resolved by the court.

Copyright Law > ... > Damages > Types of Damages > Statutory Damages

***HN3*** A copyright owner may elect, at any time before final judgment is rendered, to recover, instead of actual damages and profits, an award of statutory damages for all infringements involved in the action, with respect to any one work, for which any one infringer is liable individually, or for which any two or more infringers are liable jointly and severally, in a sum of not less than $ 750 or more than $ 30,000 as the court considers just. *17 U.S.C.S. § 504(c)(1)*.

Copyright Law > ... > Damages > Types of Damages > Statutory Damages

***HN4*** A tort plaintiff may not multiply defendants by breaking up a corporation or other institution into its organizational components when those components have no separate legal

identity. The United States Court of Appeals for the First Circuit has based the number of statutory awards available on the number of individually liable infringers, unaffected by the number of infringements.

Civil Procedure > ... > Summary Judgment > Burdens of Proof > Movant Persuasion & Proof
Civil Procedure > ... > Summary Judgment > Burdens of Proof > Nonmovant Persuasion & Proof
Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > General Overview

***HN5*** Pursuant to *Fed. R. Civ. P. 56*, summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *Fed. R. Civ. P. 56(c)*. Once the moving party demonstrates the absence of evidence to support the nonmoving party's case, the burden of production shifts to the nonmovant. The nonmovant must then affirmatively point to specific facts that demonstrate the existence of an authentic dispute. The court must view the entire record in the light most hospitable to the party opposing summary judgment, indulging all reasonable inferences in that party's favor, but paying no heed to conclusory allegations, improbable inferences, or unsupported speculation. If no genuine issue of material fact emerges, then the motion for summary judgment may be granted.

Copyright Law > ... > Defenses > Fair Use > General Overview

***HN6*** Fair use determinations usually present mixed questions of fact and law. However, where no material historical facts are at issue and the parties dispute only the ultimate conclusions to be drawn from the admitted facts, fair use can be decided by the court.

Copyright Law > ... > Fair Use > Fair Use Determination > Factors

***HN7*** Fair use permits courts to avoid rigid application of the copyright statute when, on occasion, it would stifle the very creativity which that law is designed to foster. Fair use is not defined by statute except in terms of the four factors courts must consider in determining whether the doctrine applies to a specific use: (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes; (2) the nature of the copyrighted work; (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and (4) the effect of the use upon the potential market for or value of the copyrighted work. *17 U.S.C.S. § 107*.

Copyright Law > ... > Fair Use > Fair Use Determination > Factors

***HN8*** Courts typically ask three questions to determine whether a defendant's use of copyrighted material is of the type that copyright is meant to prohibit, or whether it is instead the type that actually tends to advance copyright's goals of promoting the progress of science and the useful arts. *U.S. Const., art. I, § 8 cl. 8*. First, courts ask whether a defendant's use of the copyrighted material falls into a category specifically identified by Congress in the copyright statute as especially important to copyright's ends: criticism, comment, news reporting, teaching, scholarship or research. *17 U.S.C.S. § 107*. Second, courts ask whether the defendant's use was productive or transformative, whether it added anything to the copyrighted work in its use, and thus is treatable more as a new work referencing the old than as an instance of strict copying. Third, courts ask whether the use was commercial, whether it primarily served the defendant's private interests rather than the public interest in underlying copyright law. Those three questions are cumulative nature of the use.

Copyright Law > ... > Fair Use > Fair Use Determination > Factors

***HN9*** News reporting is one of the categories of use expressly mentioned in the Copyright Act, *17 U.S.C.S. § 501 et seq.*, as particularly appropriate to the application of fair use doctrine. *17 U.S.C.S. § 107*. However, the mere fact that a use falls into one of those categories does not by itself create a presumption of fair use. Rather, it is only one of the considerations that go into determining the first factor.

Copyright Law > ... > Fair Use > Fair Use Determination > Factors

***HN10*** Where copyrighted material adds something new, with a further purpose or a different character, altering the first with new expression, meaning or message, it blurs the line between plain copying, which tends to inhibit original creation, and development of a new work that builds on and references the old, and thus participates in the very progress that copyright is meant to promote. In general, for a use to be transformative, the copyrightable expression in the original work must be used as raw material, transformed in the creation of new information, new aesthetics, new insights and understandings. Copying that is complementary to the copyrighted work is fair use, but copying that is a substitute for the copyrighted work is not fair use. Of course all reuse of copyrighted material occurs in a somewhat different context from the original use, and so to some extent changes the material. There is no bright line marking the point at which the change is sufficient to become transformative.

Copyright Law > ... > Fair Use > Fair Use Determination > Factors

***HN11*** Fair use exists to further the public interest in promotion of creative work. Thus, courts ask to what extent a defendant's use promotes only the defendant's own private interests, whether it is commercial. While commercial motivation and fair use can exist side by side, the court may consider whether the alleged infringing use was primarily for public benefit or for private commercial gain.

Copyright Law > ... > Fair Use > Fair Use Determination > Factors

***HN12*** In determining whether it is appropriate to invoke fair use, courts ask two questions about the copyrighted work itself: whether the work has been previously published, and whether it is factual or creative. Previous publication is relevant because an author has a strong right to decide whether or not to release previously private material. Where a defendant has usurped an author's right to decide whether previously unpublished material should be made public, that weighs against fair use. Copyright is meant to encourage creative work and protect its fruits. Thus, creative works justify stronger copyright protection and are less amenable to fair use. Exclusive ownership of facts, on the other hand, does not promote the progress of the useful arts, and therefore a wider scope of fair use is appropriate for factual works.

Copyright Law > ... > Fair Use > Fair Use Determination > Factors

***HN13*** Minimal authorial control is necessary to make a work copyrightable at all. Creativity for the purposes of fair use is harder to establish than threshold copyrightability.

Copyright Law > ... > Fair Use > Fair Use Determination > Factors

***HN14*** In determining fair use, the amount of the work used factor weighs less when considering a photograph, where all or most of the work often must be used in order to preserve any

meaning at all, than a work such as a text or musical composition, where bits and pieces can be excerpted without losing all value. What matters is whether the alleged infringer used the "heart" of the material; in other words, superficial editing or cropping does not impact the court's consideration.

Copyright Law > ... > Fair Use > Fair Use Determination > Factors

***HN15*** Under the effect of the use upon the potential market factor, the courts ask whether the defendant's use actually inhibits the plaintiff's production by negatively impacting his market. Since that question goes to the heart of whether allowing or prohibiting a use furthers the ends of the Copyright Act, *17 U.S.C.S. § 501 et seq.*, market effect is undoubtedly the single most important element of fair use. In determining overall market impact, courts ask two questions: (i) the extent of the market harm caused by the specific infringing incident; and (ii) whether unrestricted and widespread conduct of the sort engaged in by the defendant would result in a substantially adverse impact on the potential market for the original. In making the first inquiry, the loss of the licensing fee sought in the case itself does not constitute market harm. If it did, circular reasoning would resolve all fair use cases for the plaintiff, who certainly profits less if the defendant wins.

Copyright Law > ... > Damages > Types of Damages > Statutory Damages
Copyright Law > ... > Civil Infringement Actions > Summary Judgment > General Overview

***HN16*** Infringement is willful when the infringer knew or should have known that her action was copyright infringement. If infringement is found to be willful, the maximum statutory award is increased from $ 30,000 to $ 150,000, *17 U.S.C.S. § 504(c)*, though even then it is still within the fact-finder's discretion to award less than the maximum, all the way down to the statutory minimum of $ 750. Though the *Seventh Amendment* requires that the final determination of statutory damages be made by a jury, the question of whether an infringement was willful or not is usually, like fair use, a mixed question of fact and law. Where material issues of fact remain as to a defendant's state of mind during infringement, the question of willfulness, unlike fair use, cannot be resolved on summary judgment. Willfulness is not an issue in determining actual damages.

Copyright Law > ... > Defenses > Fair Use > General Overview
Copyright Law > ... > Damages > Types of Damages > Statutory Damages

***HN17*** A defendant's good faith belief that its use of copyrighted material is fair use is enough to defeat a finding of willfulness. If a defendant believed it was engaging only in fair use, it cannot be said to have known that it was infringing. However, the belief in fair use must have existed at the time of the use, not merely at the time of the litigation.

Copyright Law > ... > Damages > Types of Damages > Statutory Damages

***HN18*** Supervisors can be liable for willful infringement if they knew that such a broadcast would be infringing and that there was a risk of broadcast occurring, and if they then acted with reckless disregard towards that risk and the plaintiff's rights. Mere negligence is insufficient for a finding of willfulness. Actual knowledge is not required; constructive knowledge is sufficient for willfulness.

**Counsel: [**1]** For CBS Broadcasting, Inc., Defendant: Jonathan M. Albano, LEAD ATTORNEY, Bingham McCutchen LLP, Boston, MA.

For Christoper Fitzgerald, Plaintiff: Andrew D. Epstein, LEAD ATTORNEY, Barker, Epstein & Loscocco, Boston, MA.

For CBS Broadcasting. Inc., Defendant: Mary B. Murrane, LEAD ATTORNEY, Bingham McCutchen LLP, Boston, MA.

**Judges:** NANCY GERTNER, U.S.D.C.

**Opinion by:** NANCY GERTNER

**Opinion**

**[*179] GERTNER, D.J.:**

**MEMORANDUM & ORDER RE: SUMMARY JUDGMENT**

June 22, 2007

**I. INTRODUCTION**

Christopher Fitzgerald ("Fitzgerald"), a freelance photographer, brings this copyright action (04-12138) against CBS Broadcasting, Inc. ("CBS") for its unauthorized broadcast of photographs he took of Stephen "the Rifleman" Flemmi. CBS argues that its broadcast of the photographs was fair use.

Fitzgerald has also brought a second, nearly identical copyright action (06-11302) against CBS on the same set of facts, seeking to collect double statutory damages because the broadcast at issue went out over two of CBS's Boston affiliate stations, CBS-4 and UPN-38.

CBS has moved to dismiss the second lawsuit and has moved for summary judgment in the first. Fitzgerald has moved for summary judgment as to liability in both lawsuits.

For the reasons set forth below, **[**2]** Defendant's Motion to Dismiss (document # 3) in the second lawsuit (06-11302) is **GRANTED IN PART:** Fitzgerald's statutory damage claims in that lawsuit are **DISMISSED,** and the remaining claim for actual damages is **CONSOLIDATED** with the first lawsuit (04-12138).

**[*180]** Further, Fitzgerald's motion for partial summary judgment (document # 24) in 04-12138 is **GRANTED** as to liability, but **DENIED** as to willfulness. The question of whether CBS's infringement was willful is for the jury to decide. Fitzgerald's motion for partial summary judgment in 06-11302 (document # 7) is **MOOT,** as the only surviving claims in that case are now consolidated with 04-12138.

Finally, Defendant's Motion for Summary Judgment (document # 32) in 04-12138 is **DENIED.**

**II. BACKGROUND**

**A. Facts**

**1. The Photographs**

Christopher Fitzgerald is a freelance photographer. On January 6, 1995, while on assignment for *The Boston Globe,* he photographed well-known mobster Stephen Flemmi while Flemmi was

being transferred from the Framingham State Police barracks to an undisclosed location shortly after his arrest. Walking backwards as Flemmi was led out of the barracks by state police troopers, Fitzgerald took two photographs, one showing Flemmi **[**3]** facing towards the left of the frame, and one showing him facing towards the right. Fitzgerald was the only photographer at the scene, and thus his are the only known publicly-available photographs of Flemmi's arrest. The left-facing photograph was published on the front page of the *The Boston Globe* on January 7, 1995. The *Boston Globe* paid Fitzgerald $ 150.00 for the assignment. Fitzgerald registered both photographs with the Copyright Office on February 10, 1998 (copyright # V au 411-320).

The photographs have been published multiple times since then (not including uses by defendant), including six times by *The Boston Globe*, twice by *The New York Times*, twice by the *Boston Herald,* and once by *The American Lawyer.* One of the photographs aired on *America's Most Wanted* in 1998. It is unclear which photograph was used in each of these instances. Fitzgerald has received $ 4,350 in fees for seventeen uses of the photographs, and has sued or threatened to sue six times for copyright infringement over unauthorized uses of the photographs, resulting in six settlements totaling $ 58,600.

**2. The Television Stations**

CBS Broadcasting Corporation owns two television stations in Boston, CBS-4 (previously **[**4]** known as WBZ-TV) and UPN-38 (now officially known as WSBK-TV, but still referred to popularly and by the parties by its old name). CBS-4 broadcasts over channel 4, and UPN-38 over channel 38. As is required for each separate frequency that an entity broadcasts over, each station has its own FCC license. The stations are not independently incorporated; they are assets of CBS, which is a publicly-traded corporation incorporated in Delaware.

The two stations share many resources: They have the same studio space, operate out of the same building, use the same video library, and share some staff, including writers, reporters, camera crew, and on-air news personalities. They broadcast the same news programs produced by the same employees. When a news segment is pre-produced, the tape is used on CBS-4's newscast and then re-used an hour later on UPN-38. For live news reporting and announcing, the anchors simply repeat their performance using the same notes an hour later with a different backdrop.

In other ways, the two stations operate as separate entities: They have different sales staffs and maintain their revenue separately (though all profit belongs to CBS and all staff are paid by CBS), **[**5]** and **[*181]** most of their non-news programming is different.

**3. The Prior Suit**

In 1998, CBS-4 (at that time called WBZ-TV) used the left-facing photo (taken from the front page of the January 7, 1995, *Boston Globe*) in a broadcast without Fitzgerald's authorization. Fitzgerald filed a lawsuit for copyright infringement. Fitzgerald v. CBS Corporation, U.S. District Court, District of Massachusetts, Docket Number 98-11510-JLT ("1998 action").

In March 1998, while the 1998 action was pending, CBS contacted Fitzgerald for permission to use the photographs on a broadcast of the television news show *60 Minutes.* Fitzgerald and CBS signed a stock photography contract authorizing CBS to use each photo for one screen exposure, and expressly withholding permission for CBS to republish the photographs on other programs or in other media. When the *60 Minutes* episode was aired, it included five separate screen

exposures of the right-facing photo. Fitzgerald amended the 1998 complaint to include claims for the four extra exposures.

In November 1999, Fitzgerald and CBS settled the 1998 action for $ 15,000. In the written settlement agreement, CBS admitted to the uses alleged by Fitzgerald, but did not concede **[**6]** that these uses constituted copyright infringement. Defs.' Ex. 13 in Supp't. of Mot. for S.J. (document # 37-17).

After the settlement, CBS took several measures to ensure that it would not accidentally broadcast the photographs again: CBS-4/UPN-38's librarian was instructed to review all of the station's archive tapes and remove any images of the photographs; all internal staff were instructed by email to search their files and destroy any copies of the photographs that they found.

However, a copy of the *60 Minutes* broadcast had been used by an unidentified CBS-4/UPN-38 staff person to create a "pitch reel" that included all five of the exposures. (A "pitch reel" is a tape of material organized by subject matter for later reference.) Four of the five exposures were purged following the settlement, but the fifth remained (defendant claims by accident; plaintiff does not offer evidence disputing this claim).

**4. <u>The 2004 Use of the Photographs</u>**

In 1995, John Martorano, a former member of the Winter Hill Gang, was arrested and agreed to cooperate with law enforcement officials in their investigation of Stephen Flemmi and Whitey Bulger. It was allegedly his cooperation that led in part to the **[**7]** arrest of Flemmi, which was the subject of Fitzgerald's photographs.

Martorano was sentenced on June 24, 2004. That day, CBS-4 reporter Christina Hager and video editor Scott Erdman prepared a news report on the sentencing. Erdman found the unpurged image of Flemmi on the pitch reel, cropped out the part of the photo showing the officers accompanying Flemmi, and used an exposure of the cropped image on the 11:00 news that evening on CBS-4. The report was broadcast again at 1:35 AM on June 25, and probably three times more, at 5:00 AM and 6:00 AM on CBS-4, and at 7:00 AM on UPN-38 that same day. The photograph was also posted on the CBS-4 website from June 25 to June 29.

**B. <u>Procedural History</u>**

Fitzgerald filed a complaint in the first action, 04-12138 ("'04 action"), on October 12, 2004 (document # 1) against CBS for copyright infringement based on the June 24-25 CBS-4 broadcasts. He moved for **[*182]** summary judgment as to liability on September 1, 2006 (document # 24). CBS cross-moved for summary judgment on September 20, 2006 (document # 32).

Fitzgerald also filed a complaint in a second action, 06-11302 ("'06 action"), against CBS on July 28, 2006 (document # 1). That complaint is absolutely **[**8]** identical to the '04 complaint, except that its copyright infringement claim is based on the broadcast over UPN-38. (This was a re-broadcast of the. CBS-4 broadcast at issue in the '04 suit.) Fitzgerald seeks either actual or statutory damages in both actions. CBS moved to dismiss the second action on September 7, 2006 (document # 3).

**C. <u>Claims</u>**

In both the '04 and '06 actions, Fitzgerald raises a claim of copyright infringement, seeking either actual or statutory damages. He seeks to enhance any statutory damages based on a claim that CBS's infringement was willful.

### III. DEFENDANT'S MOTION TO DISMISS IN THE 2006 ACTION

Plaintiff justifies filing two separate actions against this defendant - action # 04-12138, based on the broadcast of the photographs by CBS-4, and action # 06-11302, based on the broadcast of the photographs by UPN-38 -- by the argument that CBS-4 and UPN-38 are separate infringers. As such, he claims that he is entitled to a separate statutory damage award for each. Defendant argues that the two stations are in fact only closely-related divisions of the same corporation, and therefore that they can neither be sued separately nor give rise to separate awards. Defendant's **[**9]** argument is correct.

***HN1*** A plaintiff in a successful action for copyright infringement may elect to collect either "actual damages and any additional profits of the infringer," or statutory damages. *17 U.S.C. § 504(a)*. As actual damages in this case would likely be difficult to calculate and prove, Fitzgerald has indicated that he is likely to elect statutory damages. Pl.'s Memo in Supp't of Mot. for S.J. at 17-18 (document # 25-1).

***HN2*** When a plaintiff in a copyright suit elects statutory damages, the damages are calculated based on the number of copyrighted works and the number of infringers, not on the number of incidents of infringement. [1]See *Venegas-Hernandez v. Sonolux Records, 370 F. 3d 183, 194 (1st Cir. 2004)*; *17 U.S.C. 504(c)(1)*; H.R. Rep. No. 94-1476 at 162 (1976) ("A single infringer of a single work is liable for a single amount . . . no matter how many acts of infringement are involved in the action and regardless of whether the acts were separate, isolated, or occurred in a related series.") While the calculation of statutory damages must be done by a jury, *Segrets, Inc. v. Gillman Knitwear Co., Inc., 207 F.3d 56, 63-4 (1st Cir. 2000)* (citing *Feltner v. Columbia Pictures TV, 523 U.S. 340, 355, 118 S. Ct. 1279, 140 L. Ed. 2d 438 (1998))*, **[**10]** what is raised here is a legal question -- specifically, how to construe *17 U.S.C. 504(c)(1)*'s provisions for the method of calculating statutory damages. Thus, it must be resolved by the Court. *Sonolux, 370 F. 3d at 194*.

**[*183]** Unfortunately for plaintiff, ***HN4*** "a tort plaintiff may not multiply defendants by breaking up a corporation or other institution into its organizational components when those components have no separate legal identity." *Albers v. Church of Nazarene, 698 F. 2d 852, 857 (7th Cir 1983)*. In Sonolux, the First Circuit based the number of statutory awards available on "the number of individually liable infringers . . . unaffected by the number of infringements." *370 F. 3d at 194*. By this standard, CBS-4 and UPN-38 are **[**11]** not individually liable, because they are only different divisions of the CBS corporation. That they have separate FCC licenses is irrelevant. An FCC license is only an asset, analogous to a vehicle registration. Defendant CBS is the only alleged infringer that can be sued.

In fact, plaintiff does not bring claims against either CBS-4 or UPN-38, but only against parent corporation CBS, for exactly the reason that the stations, as mere operations of defendant, cannot sue or be sued. Therefore, there can be only one award of statutory damages.

---

1

***HN3*** [T]he copyright owner may elect, at any time before final judgment is rendered, to recover, instead of actual damages and profits, an award of statutory damages for all infringements involved in the action, with respect to any one work, for which any one infringer is liable individually, or for which any two or more infringers are liable jointly and severally, in a sum of not less than $ 750 or more than $ 30,000 as the court considers just.17 U.S.C. § 504(c)(1).

Accordingly, plaintiff's statutory damage claim in the '06 action is DISMISSED. The remaining claim for actual damages involves the same facts and the same parties as the claims in the '04 action, and is therefore CONSOLIDATED with that action.

**IV. FAIR USE**

Plaintiff and defendant have brought cross-motions for summary judgment (though plaintiff only seeks summary judgment as to liability, leaving the final calculation of damages for the jury). ***HN5*** Pursuant to *Fed. R. Civ. P. 56*, summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is **[**12]** no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Fed. R. Civ. P. 56(c)*.

Once the moving party demonstrates the "'absence of evidence to support the nonmoving party's case,' the burden of production shifts to the nonmovant." *Dow v. United Brotherhood of Carpenters, 1 F.3d 56, 58 (1st Cir. 1993)* (quoting *Celotex Corp. v. Catrett, 477 U.S. 317, 325, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986))*. The nonmovant must then "affirmatively point to specific facts that demonstrate the existence of an authentic dispute." *McCarthy v. Northwest Airlines, Inc., 56 F.3d 313, 315 (1st Cir. 1995)*. The court must:

> 'view the entire record in the light most hospitable to the party opposing summary judgment, indulging all reasonable inferences in that party's favor,' but paying no heed to 'conclusory allegations, improbable inferences, [or] unsupported speculation.' If no genuine issue of material fact emerges, then the motion for summary judgment may be granted.Id. (citations omitted).

Defendant does not dispute that the broadcasts at issue took place and that they were unauthorized by plaintiff. Defendant's sole defense is that its broadcasts were a fair use, not requiring authorization. **[**13]** Plaintiff, of course, disagrees. ***HN6*** Fair use determinations usually present mixed questions of fact and law. *Harper & Row, Publishers, Inc. v. Nation Enters., 471 U.S. 539, 560, 105 S. Ct. 2218, 85 L. Ed. 2d 588 (1985)*. However, where "no material historical facts are at issue" and "[t]he parties dispute only the ultimate conclusions to be drawn from the admitted facts," fair use can be decided by the Court. *Fisher v. Dees, 794 F.2d 432, 436 (9th Cir. 1986)*. Here, the parties are in substantial agreement as to the origin, history, content, and defendant's use of plaintiff's photographs. The only issue of fact **[*184]** remaining has to do with the state of mind of defendant's employees, which goes to the question of willfulness (see infra § V) but not fair use. As to fair use, the parties' disagreements are over the interpretation of facts. As these are questions of law, I analyze them below.

***HN7*** Fair use "permits courts to avoid rigid application of the copyright statute when, on occasion, it would stifle the very creativity which that law is designed to foster." *Campbell v. Acuff-Rose Music, Inc., 510 U.S. 569, 577, 114 S. Ct. 1164, 127 L. Ed. 2d 500 (1994)* (quoting *Stewart v. Abend, 495 U.S. 207, 236, 110 S. Ct. 1750, 109 L. Ed. 2d 184 (1990))*. Fair use is not defined by statute except in terms of the **[**14]** four factors courts must consider in determining whether the doctrine applies to a specific use: "(1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes; (2) the

nature of the copyrighted work; (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and (4) the effect of the use upon the potential market for or value of the copyrighted work." *17 U.S.C. § 107*. I consider each of these factors in turn.

**A. Purpose and Character of Use**

***HN8*** Courts typically ask three questions to determine whether a defendant's use of copyrighted material is of the type that copyright is meant to prohibit, or whether it is instead the type that actually tends to advance copyright's goals of "promot[ing] the progress of science and the useful arts." *U.S. Const., art. I, § 8 cl. 8*. First, courts ask whether a defendant's use of the copyrighted material falls into a category specifically identified by Congress in the copyright statute as especially important to copyright's ends: "criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship or research." **[**15]** *17 U.S.C. § 107*. Second, courts ask whether the defendant's use was "productive" or "transformative" - i.e. whether it added anything to the copyrighted work in its use, and thus is treatable more as a new work referencing the old than as an instance of strict copying. Third, courts ask whether the use was commercial - i.e. whether it primarily served defendant's private interests rather than the public interest in underlying copyright law. See*17 U.S.C. § 107*; *Arica Institute, Inc. v. Palmer, 970 F. 2d 1067, 1077 (2d Cir. 1992)*; *Rubin v. Brooks/Cole Publishing Co., 836 F. Supp. 909, 917 (D. Mass. 1993)*; *Campbell, 510 U.S. at 579*; *Triangle Publications, Inc. v. Knight-Ridder Newspapers, Inc., 626 F.2d 1171, 1175 (5th Cir. 1980)*. These three questions are cumulative nature of the use. Accordingly, I consider each below.

**1. Whether Defendants' Use Falls Into an Enumerated Category of the Statute**

***HN9*** News reporting is one of the categories of use expressly mentioned in the Copyright Act as particularly appropriate to the application of fair use doctrine. *17 U.S.C. § 107*. However, the mere fact that a use falls into one of those categories does not by itself create a presumption of fair use. **[**16]** *Harper & Row, 471 U.S. at 561* (citing H. R. Rep. No. 83 at 37 (1967)). Rather, it is only one of the considerations that go into determining the first factor.

Plaintiff argues that the 2004 use of the Flemmi photo was not "news," as Flemmi's actual arrest had occurred years before. Plaintiff asks that I make a determination as to how "new" something has to be in order to qualify as "news." I decline to **[*185]** make such a distinction. See *Harper & Row Publishers v. Nation Enterprises, 723 F. 2d 195, 207 (9th Cir. 1983)* ("[courts] should be chary of deciding what is and what is not news"), rev'd on other grounds,*471 U.S. 539, 105 S. Ct. 2218, 85 L. Ed. 2d 588 (1985)*; accord *Gertz v. Robert Welch, Inc., 418 U.S. 323, 346, 94 S. Ct. 2997, 41 L. Ed. 2d 789 (1974)*. The Martorano sentencing itself was undisputably news, Flemmi's arrest was undisputedly related to the Martorano sentencing (as Martorano's alleged cooperation led in part to Flemmi's arrest), and CBS's reference to Flemmi followed that relationship. That is enough to establish CBS's use as "news reporting" for fair use purposes.

**2. Whether Defendants' Use of the Photograph was Transformative**

***HN10*** Where copyrighted material "add[s] something new, with a further purpose or a different character, altering the **[**17]** first with new expression, meaning or message," it blurs the line between plain copying - which tends to inhibit original creation - and development of a new work that builds on and references the old, and thus participates in the very progress that copyright is meant to promote. *Campbell, 510 U.S. at 579*. In general, for a use to be transformative, the

"copyrightable expression in the original work [must be] used as raw material, transformed in the creation of new information, new aesthetics, new insights and understandings." *Castle Rock Ent. v. Carol Pub. Group, Inc., 150 F.3d 132, 141 (2d Cir. 1998)*. "[C]opying that is complementary to the copyrighted work (in the sense that nails are complements of hammers) is fair use, but copying that is a substitute for the copyrighted work (in the sense that nails are substitutes for pegs or screws) . . . is not fair use." *Ty, Inc. v. Publ'ns Int'l, 292 F.3d 512, 517 (7th Cir. 2002)*. Of course all reuse of copyrighted material occurs in a somewhat different context from the original use, and so to some extent changes the material. There is no bright line marking the point at which this change is sufficient to become "transformative."
A **[**18]** posed studio photograph of a model, intended to be part of the model's portfolio showing her modeling talent and versatility, was held to have been "transformed" for fair use purposes when it was published on the front page of a newspaper as part of a news story about controversy in the model's participation in a beauty contest. *Nunez v. Caribbean Int'l News Corp., 235 F. 3d 18, 22-23 (1st Cir. 2000)*. On the other hand, reuse of news videos of the 1992 Los Angeles riots was not "transformative" where the videos were simply re-transmitted in their entirety without comment, editing, or context. *Los Angeles News Serv. v. Reuters TV Int'l, 942 F. Supp. 1265 (C.D. Cal. 1996)*aff'd in part, rev'd on other grounds*149 F.3d 987*.

CBS's use of the Flemmi photographs in the instant case is somewhere between Nunez and LA News Service. It is less transformative than the use in *Nunez*, where the photo in question was recontextualized from one market - studio fashion imagery - to another - daily news - and from aesthetic use to documentary use. On the other hand, it is more transformative than was the use in *LA News Service*, where the videos were resold without being embedded in any news broadcast. **[**19]** To determine exactly how much transformation occurred in CBS's broadcast of the photo requires an analysis of the original, intended meaning and use of the photograph and its ultimate meaning and use on June 24-25, 2004.

Fitzgerald photographed the arrest of Stephen Flemmi for use in news reporting of the arrest. CBS argues that it transformed the meaning of the photo by cropping **[*186]** out some of the evidence of the arrest - the state troopers - and embedding the cropped photo in a narrative about John Martorano. This is slicing things a bit thinly. In its news report, CBS highlighted the importance of Martorano's sentencing partly by explaining that Martorano's testimony had led to Flemmi's arrest; CBS used Fitzgerald's photograph of the arrest to enhance this point. The only "transformation" was that Flemmi's arrest was downgraded from breaking news to a supplementary part of a larger story. The distinction that CBS argues for here is so fine that it ceases to have meaning in the context of ordinary news practice. [2] Therefore, I find its use to be non-transformative.

---

[2] If such a minor adjustment was transformative in the fair use sense, then it is hard to imagine any use of archived imagery **[**20]** in news reporting that would not be fair use. For perspective, below is an example of a typical freelance photojournalism transaction involving far more recontextualization than exists in the facts of the instant case. The use in this example was never litigated, and so there was no finding as to whether it was or was not fair use. It is cited here not as precedent, but to give some context as to the ordinary processes of the industry in which this case arose:

> [T]he November 18, 1991 issue of Newsweek carried an archival photograph of David Duke. The photograph's history began when free-lance photojournalist Chris Harris shot a picture in the late 1970's of a young Ku Klux Klan leader and his wife in Baton Rouge, Louisiana for The New York Times. As it turns out, the picture was of David Duke and his wife, Chloe. The photograph showed the couple in their Ku Klux Klan robes holding a picture of the first cross-burning they had participated in as a couple. The picture ran in The New York Times within a week of being taken.

### 3. Whether Defendant's Use was Commercial

***HN11*** Fair use exists to further the public interest in promotion of creative work. Thus, courts ask to what extent a defendant's use promotes only the defendant's own private interests - i.e. whether it is "commercial." "While commercial motivation and fair use can exist side by side, the court may consider whether the alleged infringing use was primarily for public benefit or for private commercial gain." *MCA, Inc. v. Wilson, 677 F.2d 180, 182 (2d Cir. 1981)*.

CBS, CBS-4 and UPN-38 are all undisputedly commercial entities. CBS operates the stations for profit, and the stations **[*187]** earn revenue from commercials that run during their newscasts. CBS does not argue that its newscasts are non-commercial, but instead argues that the use of the Flemmi photo had no commercial impact because the advertisements that ran during the broadcasts had been **[**23]** purchased months in advance, and were unaffected by the decision to use the photo.

CBS's argument is dubious both economically and legally. The decision to use the photo - and all the other decisions involved in the June 24-25 broadcasts - affected ratings and commercial revenues *in the future*, as all real-time broadcasts do. A district court pointed out this fact in holding that a television station's broadcast of a commercial-free program was commercial because it was aimed at increasing the station's viewership - and therefore ratings and revenue - in the long run. *Roy Export Co. Establishment v. Columbia Broadcasting Sys., Inc., 503 F. Supp. 1137, 1144 (S.D.N.Y. 1980)*. Similarly, though there were no advertisements on CBS-4's website at the time that it hosted the photo, the website's purpose was to attract viewers to the station and raise the station's profile, ratings, and commercial revenues. More broadly, "[t]he crux of the profit/nonprofit distinction is not whether the sole motive of the use is monetary gain' but whether the user stands to profit from exploitation of the copyrighted material without paying the customary price.'" *Harper & Row, 471 U.S. at 562*. CBS certainly **[**24]** stood to profit from its use of the photo on television and on the internet. Newscasts without imagery draw fewer viewers, ratings fall, and revenue falls in turn. CBS's use was commercial.

### 4. Conclusion as to First Factor

Though CBS's use of Fitzgerald's photographs was for news reporting, that use was nontransformative and commercial. Therefore, I find that the nature and character of the use weigh against a finding of fair use, and in favor of Fitzgerald.

---

> When Newsweek decided to do a piece on David Duke's political history for its November 18, 1991, issue, its photo editors contacted the major stock photo agencies in **[**21]** New York City requesting photographs of Duke . . . Newsweek selected, among others, the Harris photograph just described, ran it as a black and white picture and was billed by Gamma/Liaison [a stock photo agency] for its use . . . Upon payment by Newsweek, Gamma/Liaison retained fifty percent of the fee as its commission and sent the remaining fifty percent to Harris.Don E. Tomlinson & Christopher Harris, Free-Lance Photojournalism in a Digital World,45 Fed. Comm. L.J. 1, 5 (1992).

The recontextualization of a photo from a "local color" essay on an unknown young Klan couple to a background piece on a newly-elected Congressman is far more transformative than CBS's use in the instant case. Of course, the mere fact that Newsweek voluntarily licensed the Duke photo, in the above anecdote does not necessarily mean that its use would not have been fair use had it not obtained a license; but this excerpt does show that calling CBS's use transformative would contradict the regular and long-running practices and assumptions of photojournalists, media outlets, and intermediary agencies. To be sure, industry practices should not dictate copyright law. But where the Court is called on to make **[**22]** a pragmatic ruling about where to draw lines so as to best "promote the progress of science and the useful arts." U.S. Const., art. I, § 8 cl. 8., it is appropriate to consider how those useful arts actually progress. Otherwise, finer and finer distinctions of what is "transformative" degenerate into pure semiotics.

**B. Nature of the Copyrighted Work**

***HN12*** In determining whether it is appropriate to invoke fair use, courts ask two questions about the copyrighted work itself: whether the work has been previously published, and whether it is factual or creative.

Previous publication is relevant because an author has a strong right to decide whether or not to release previously private material. See *Harper & Row, 471 U.S. at 564*. Where a defendant has usurped an author's right to decide whether previously unpublished material should be made public, that weighs against fair use.

The photographs here had undisputedly been published previous to CBS's use in this case. See supra § II. A. 1. That does not mean that this inquiry weighs in favor of fair use, only **[**25]** that Fitzgerald's photographs do not fall into the category of private works to which the doctrine of fair use is especially unsuited. I turn therefore to the second inquiry: whether the photographs are primarily factual or creative works.

Copyright is meant to encourage creative work and protect its fruits. Thus, creative works justify stronger copyright protection and are less amenable to fair use. *Financial Information, Inc. v. Moody's Investors Service, Inc., 751 F.2d 501, 509 (2d Cir. 1984)*. Exclusive ownership of facts, on the other hand, does not "promote the progress of the useful arts," and therefore a wider scope of fair use is appropriate for factual works. Id.; *Feist Publications, Inc. v. Rural Telephone Service Co., Inc., 499 U.S. 340, 345, 111 S. Ct. 1282, 113 L. Ed. 2d 358 (1991)*.

**[*188]** Fitzgerald argues that his photographs are creative works because he made artistic decisions as to composition and timing. (He also claims to have made decisions as to lighting and location, but the photographs were taken outdoors in natural light during the brief moment when Flemmi was visible, so that Fitzgerald actually had no latitude or control over lighting and location). Fitzgerald incorrectly cites to Feist for the proposition **[**26]** that only minimal authorial control is necessary to make a work creative. Feist actually held that ***HN13*** minimal authorial control is necessary to make a work *copyrightable* at all. *499 U.S. at 345*. Creativity for the purposes of fair use is harder to establish than threshold copyrightability. In *Los Angeles News Service, 942 F. Supp. at 1273*, news videos of the Los Angeles riots taken on the scene were held to be factual works for the purposes of fair use; those videos involved all of the same authorial choices made by Fitzgerald here - framing, angle, timing, lighting, etc. Id. In *Nunez, 235 F. 3d at 23*, even though a photographer posed a model, chose her clothing, makeup and hairstyle, arranged lighting and backdrop, and gave her instructions on facial expression - all choices that Fitzgerald did not make here- the court still found that the "pictures could be categorized as either factual or creative" because they "were not artistic representations designed primarily to express [the photographer's] ideas, emotions, or feelings, but instead a publicity attempt to highlight [the model's] abilities as a potential model." Contrast *Haberman v. Hustler Magazine, Inc., 626 F. Supp. 201, 204, 211 (D: Mass. 1986)* **[**27]** (Wolf, J.) (staged surreal photographs, one a "social commentary on the traditional family gathering," the other "intended to surprise or shock the viewer by presenting a different perspective," were creative works for fair use purposes).

Here, Fitzgerald exercised no more than the minimum authorial decision-making necessary to make a work copyrightable under *Feist*. While arguably impressive and resourceful, Fitzgerald's getting the scoop was not a creative process for the purposes of fair use doctrine; the photographs are factual works, and therefore this factor weighs against him and in favor of fair use.

**C. Amount of the Work Used**

***HN14*** This factor weighs less when considering a photograph - where all or most of the work often must be used in order to preserve any meaning at all - than a work such as a text or musical composition, where bits and pieces can be excerpted without losing all value. *Nunez, 235 F. 3d at 24*; *Bill Graham Archives v. Dorling Kindersley Ltd., 448 F. 3d 605, 613 (2d Cir. 2006)*. What matters is whether the alleged infringer used the "heart" of the material; in other words, superficial editing or cropping does not impact the Court's consideration. *Harper & Row, 471 U.S. at 565*; **[**28]** *Campbell, 510 U.S. at 587*.

Here, CBS did edit the photo in a way that was arguably more than superficial: it cropped out the image of the state police officer's arm and torso visible in the original, thus removing the major visual cue that Flemmi was being arrested. But it did use most of the "heart" of the photo - the rare image of Flemmi. What is more, CBS did not use the cropping to change the photograph's meaning. The fact that Flemmi had previously been arrested was still part of the story.

Given the slight cropping of the photo but the preservation of most of the photo's meaning, this factor is balanced between fair use and infringement. In any event, **[*189]** the overall significance of this factor to the fair use determination is minor.

**D. Effect of the Use Upon the Potential Market**

***HN15*** Under this factor, courts ask whether the defendant's use actually inhibits the plaintiff's production by negatively impacting his market. Since this question goes to the heart of whether allowing or prohibiting a use furthers the ends of the Copyright Act, market effect is "undoubtedly the single most important element of fair use." *Harper & Row, 471 U.S. at 566*; *Robinson v. Random House, Inc., 877 F. Supp. 830, 842 & n.4, 843 (S.D.N.Y. 1995)* **[**29]** ; *Stewart v. Abend, 495 U.S. 207, 238, 110 S. Ct. 1750, 109 L. Ed. 2d 184 (1990)*; David Nimmer, *Nimmer on Copyright § 13.05(A)* (2005) (cases cited). In determining overall market impact, courts ask two questions: (i) the extent of the market harm caused by the specific infringing incident, and (ii) "whether unrestricted and widespread conduct of the sort engaged in by the defendant would result in a substantially adverse impact on the potential market for the original." *Infinity Broadcasting Corp. v. Kirkwood, 150 F. 3d 104, 110 (2d Cir. 1998)* (quoting *Nimmer, § 13.05(A)(4)*).

In making the first inquiry, the loss of the licensing fee sought in the case itself does not constitute "market harm." If it did, circular reasoning would resolve all fair use cases for the plaintiff, who certainly profits less if the defendant wins. *Ringgold v. Black Entertainment TV, 126 F.3d 70, 81 (2d Cir. 1977)* ("Since the issue is whether the copying should be compensable, the failure to receive licensing revenue cannot be determinative in the plaintiff's favor.") When Fitzgerald's loss of the licensing fee is removed, there is no showing that this specific infringing incident harmed the market for the Flemmi photographs. **[**30]** In fact, as plaintiff admits, the flashing of Flemmi's image on television may "heat up" interest in Flemmi, and therefore increase demand for plaintiff's photographs. Pl.'s Memo in Supp't of S.J. at 12-13 (document # 25-1).

The second inquiry, however, must go in plaintiff's favor. CBS's use of the photographs is paradigmatic of the only market the photographs could reasonably have: licensing to media outfits. There is no significant demand for 8x10 glossies of Flemmi sold directly to the public. The market for media licenses for these photographs clearly exists, and is the only market in which

the photographs have seen use: Various media outfits have used the photographs more than 20 times, resulting in over $ 60,000 in fees and settlements for exactly this kind of use. [3] Pl.'s Stmt. of Fact P 7 (document # 43). If the Court finds that CBS's use was fair use, then all of these media uses - and uses like them in the future - would also be fair use, destroying the only potential market that exists for the photographs. It is hard to imagine that freelance photojournalists would continue to seek out and capture difficult to achieve pictures if they could not expect to collect any licensing **[**31]** fees. This is exactly the kind of situation that copyright is meant to impact - where unrestricted use would likely dry up the source.

Thus the fourth and most important factor weighs against fair use and in favor of Fitzgerald.

**[*190] E. Conclusion as to Fair Use**

The two most important factors by far - nature of use and effect on potential market - weigh in favor of plaintiff. One factor - extent of the work used - is neutral, leaving only one other factor - the nature of the work - in favor of defendant. In short, a finding of fair use would destroy the expected market for Fitzgerald's photographs and fly in the face of the practical experience of the freelance photojournalism industry. The balance of the fair use inquiry is in favor of Fitzgerald and against fair use. **I therefore find that defendant's use of the photographs constituted copyright infringement.**

## V. WILLFUL INFRINGEMENT

In **[**32]** addition to defendant's basic liability, plaintiff also argues that he is entitled to heightened statutory damages because defendant's infringement was willful. ***HN16*** Infringement is willful when the infringer knew or should have known that her action was copyright infringement. *Princeton Univ. Press v. Michigan Document Servs., Inc., 99 F.3d 1381, 1392 (6th Cir. 1996)*; *Nimmer § 14.04*. If infringement is found to be willful, the maximum statutory award is increased from $ 30,000 to $ 150,000, *17 U.S.C. § 504(c)*, [4] though even then it is still within the fact-finder's discretion to award less than the maximum, all the way down to the statutory minimum of $ 750. Id. Though the *Seventh Amendment* requires that the final determination of statutory damages be made by a jury, *Segrets, Inc. v. Gillman Knitwear Co., Inc., 207 F.3d 56, 62-3, 66 (1st Cir. 2000)* (citing *Feltner v. Columbia Pictures TV, 523 U.S. 340, 355, 118 S. Ct. 1279, 140 L. Ed. 2d 438 (1998))*, the question of whether an infringement was willful or not (and thus the setting of the range in which the fact- finder's damages award may fall) is usually, like fair use, a mixed question of fact and law. As there remain material issues of fact as to defendant's state of mind **[**33]** during infringement, the question of willfulness, unlike fair use, cannot be resolved on summary judgment.

Plaintiff argues that CBS was on notice that it did not have license to broadcast the Flemmi photographs when it did, and so its infringement was willful. Defendant argues that the broadcast of the photographs was done in good faith belief that it was fair use. ***HN17*** A defendant's good faith belief that its use of copyrighted material is fair use is enough to defeat a finding of willfulness. If a defendant believed it was engaging only in fair use, it cannot be said to have known that it

---

[3] That most of this revenue has come from legal damages and settlements rather than from fees paid up front does not detract from the evidence that a market for the photographs exist. What is relevant is that media outlets have demonstrated demand by repeatedly using the photographs in the same way that CBS used them

[4] Willfulness is not an issue in determining actual damages. However, plaintiff has said that he is likely to elect statutory damages. Pl.'s Memo in Supp't of S.J. at 17-18 (document # 25-1).

was infringing. Princeton Univ. Press, 855 F. Supp. at 911. However, the belief in fair use must have existed at the time of the use, not merely at the time of the litigation. *International Korwin Corp. v. Kowalczyk, 855 F.2d 375, 382 (7th Cir. 1988)*.

CBS, as a corporation, can have no knowledge, belief, or state of mind of its own. Rather, some individual(s) at CBS must have had the requisite state of mind for willful **[**34]** infringement. [5] There are two sets **[*191]** of individuals whose state of mind may be relevant: (1) the supervisors and (2) the employees directly involved in the broadcast (video editor Scott Erdman and reporter Christina Hager).

The supervisors, of course, did not actually broadcast the photo; nevertheless, ***HN18*** they can be liable for willful infringement if they knew that such a broadcast would be infringing and that there was a risk of broadcast occurring, and if they then acted with reckless disregard towards that risk and plaintiff's **[**36]** rights. *Lauratex Textile Corp. v. Allton Knitting Mills, 519 F. Supp. 730, 733 (S.D.N.Y. 1981)*. Mere negligence is insufficient for a finding of willfulness.

Management at CBS-4 did know that they were not licensed to broadcast the photographs, but they took at least some steps to prevent such a broadcast: They emailed station staff with a notice never to broadcast the Flemmi photographs and instructed the video librarian to destroy all extant copies of the photographs. That their efforts failed does not necessarily establish reckless disregard - it is perfectly likely that they failed through mere negligence or simple accident, neither of which is sufficient to constitute willfulness. See *Martin v. City of Indianapolis, 192 F.3d 608, 614 (7th Cir. 1999)* (bureaucratic ineptitude did not constitute willfulness). Thus, the record at this stage does not support a finding of willfulness on the part of the supervisors.

On the other hand, the employees directly involved in the broadcast did commit an infringing act. The record does not establish whether they actually knew that their broadcast was unauthorized, but actual knowledge is not required; constructive knowledge is sufficient for willfulness. **[**37]** *Fitzgerald Pub. Co. v. Baylor Pub. Co., 807 F.2d 1110, 1115 (2d Cir 1986)* ("a defendant's actual or constructive knowledge proves willfulness"). The record establishes that the employees did have constructive knowledge that Fitzgerald had not authorized their broadcast of the photographs: They had received emails instructing them that CBS-4 was not authorized to broadcast the Flemmi photographs and that they must destroy any copies they found. Defs.' Stmt. of Facts P 50 (document # 33). However, there is nothing in the record suggesting the employees'

---

[5] District courts in similar cases have glossed over the difference between supervisors and the employees who actually carried out the infringement, and so it is difficult to determine exactly on whose state of mind they based their findings. For example, in Jobete Music Co. v. Johnson Communs., Inc., 285 F. Supp. 2d 1077, 1090 (S.D. Ohio 2003), the court held simply that where the supervisor of a radio station knew that the station was not licensed to play a particular song, and where the supervisor posted a notice in the DJ booth instructing DJs not to play the song, and where a DJ played the song anyway, the station was liable for willful infringement. The court in Jobete did not elaborate on exactly whose state of mind fulfilled the willfulness requirement; most likely it was the DJ whose infringement was willful, with the station being liable by *respondeat superior.*

In another radio station case with nearly identical facts, the station manager's "claims that he **[**35]** instructed the station's personnel not to play [copyrighted] material, and that he took other attempts to keep such material from being broadcast, do not raise a question of fact whether the infringement was willful." Barnaby Music Corp. v. Catoctin Broadcasting Corp., 1988 U.S. Dist. LEXIS 15394 *11 (W.D.N.Y. 1988). Again, the court glossed over the question of exactly whose state of mind created the willfulness, but the most likely explanation is the same as in Jobete.See also Broadcast Music, Inc. v. Hobi, Inc., 1993 WL 404152 (E.D. La. June 24, 1993).

Note that fair use was not an issue in any of these radio station cases, and so they do not resolve the question presented in this case, where defendants challenge willfulness by claiming that they believed their broadcast was fair use. They are presented here only to illustrate how willfulness is located in corporate defendants.

beliefs as to fair use. CBS had fair use guidelines in place, requiring that any use of copyrighted materials must be discussed in advance with the executive producer or bureau chief, Defs. Ex. H at 148 (document # 25-9). Hagerty and Erdman do not appear to have discussed their use of the photographs with their executive producer or bureau chief. **[*192]** Id. But while this may establish an infraction of CBS's internal rules, it does not put the employees' states of mind as to the law beyond dispute. The question remains whether the employees acted in good faith belief that they were engaging only in fair use.

Therefore, it must remain for the **[**38]** same jury that determines the extent of damages to determine whether defendant's copyright infringement was willful.

## VI. CONCLUSION

Because plaintiff cannot treat CBS-4 and UPN-38 - divisions of a single corporation - as separate infringers giving rise to separate statutory awards, defendant's motion to dismiss the '06 case (06-11302, document # 3) is hereby **GRANTED IN PART:** Plaintiff's statutory damages claims in that case are **DISMISSED,** and the remaining claims for actual damages in that case CONSOLIDATED with the claims in 04-12138. See Order of Consolidation and Dismissal accompanying this Memorandum.

Because the fair use analysis weighs against fair use, plaintiff's motion for summary judgment in the '04 case (04-12138, document # 24) is hereby **GRANTED AS TO LIABILITY,** and defendant's cross-motion for summary judgment (document # 32) is hereby **DENIED.** However, because the record does not resolve questions of the state of mind of CBS employees, plaintiff's motion for summary judgment is DENIED AS TO WILLFULNESS. Both willfulness and the final determination of damages are left to the jury.

Finally, plaintiff's motion for partial summary judgment in 06-11302 (document # 7) is **MOOT**, as **[**39]** the only surviving claims in that case are now consolidated with 04-12138.

**SO ORDERED.**

**Date: June 22, 2007**

**/s/ NANCY GERTNER, U.S.D.C.**

EXHIBIT 270

LexisNexis®

Caution
As of: August 12, 2014 9:13 AM EDT

# Ftc v. Staples

United States District Court for the District of Columbia
June 30, 1997, Decided ; June 30, 1997, FILED
Civ. No. 97-701 (TFH)

**Reporter:** 970 F. Supp. 1066; 1997 U.S. Dist. LEXIS 9322; 1997-2 Trade Cas. (CCH) P71,867
FEDERAL TRADE COMMISSION, Plaintiff, v. STAPLES, INC. and OFFICE DEPOT, INC., Defendants.

**Disposition:** **[**1]** Plaintiff's motion granted.

**Core Terms**

superstore, prices, merger, markets, office supplies, consumable, products, efficiencies, defendants', retailers, equities, zones, anti-competitive, savings, merits, costs, acquisition, preliminary injunction, submarket, compete, competitors, geographic, combined, sales, customers, firms, concentrated, sellers, Buy, projected

**LexisNexis® Headnotes**

Antitrust & Trade Law > Clayton Act > Remedies > General Overview
Antitrust & Trade Law > Clayton Act > Remedies > Injunctions
Antitrust & Trade Law > Federal Trade Commission Act > Remedies > General Overview
Antitrust & Trade Law > Federal Trade Commission Act > Remedies > Injunctions
Mergers & Acquisitions Law > Antitrust > Antitrust Statutes > General Overview
Mergers & Acquisitions Law > Antitrust > Antitrust Statutes > Clayton Act
Antitrust & Trade Law > Public Enforcement > US Federal Trade Commission Actions > General Overview
Antitrust & Trade Law > ... > US Federal Trade Commission Actions > Remedial Powers > Federal Trade Commission Act
Civil Procedure > Remedies > Injunctions > Preliminary & Temporary Injunctions
Mergers & Acquisitions Law > General Overview
Mergers & Acquisitions Law > Antitrust > General Overview
Mergers & Acquisitions Law > Antitrust > Market Definition
Mergers & Acquisitions Law > Antitrust > Remedies

***HN1*** *Section 7* of the Clayton Act, *15 U.S.C.S. § 18*, makes it illegal for two companies to merge where in any line of commerce or in any activity affecting commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly. Whenever the Federal Trade Commission (FTC) has reason to believe that a corporation is violating, or is about to violate, *section 7* of the Clayton Act, the FTC may seek a preliminary injunction to prevent a merger pending the an administrative adjudication of the

merger's legality. *Section 13(b)* of the Federal Trade Commission Act, *15 U.S.C. § 53(b)*. However, in a suit for preliminary relief, the FTC is not required to prove, nor is the court required to find, that the proposed merger would in fact violate *Section 7* of the Clayton Act.

Antitrust & Trade Law > Clayton Act > Remedies > General Overview
Antitrust & Trade Law > ... > US Federal Trade Commission Actions > Remedial Powers > Federal Trade Commission Act
Civil Procedure > ... > Injunctions > Grounds for Injunctions > Public Interest
Civil Procedure > Remedies > Injunctions > Preliminary & Temporary Injunctions
Civil Procedure > Remedies > Injunctions > Temporary Restraining Orders
Mergers & Acquisitions Law > Antitrust > Remedies

***HN2*** *Section 13(b)* of the Federal Trade Commission Act, *15 U.S.C.S. § 53(b)*, provides that upon a proper showing that, weighing the equities and considering the Federal Trade Commission's likelihood of ultimate success, such action would be in the public interest, and after notice to the defendant, a temporary restraining order or a preliminary injunction may be granted without bond. Courts have interpreted this to mean that a court must engage in a two-part analysis in determining whether to grant an injunction under *section 13(b)*: (1) First, the court must determine the commission's likelihood of success on the merits in its case under *Section 7* of the Clayton Act, *15 U.S.C.S. § 18*; and *(2)* second, the court must balance the equities.

Antitrust & Trade Law > Regulated Industries > Higher Education & Professional Associations > General Overview
Mergers & Acquisitions Law > Antitrust > Antitrust Statutes > Clayton Act
Mergers & Acquisitions Law > Antitrust > Remedies

***HN3*** The Federal Trade Commission satisfies its burden to show likelihood of success under *section 7* of the Clayton Act, *15 U.S.C.S. § 18*, if it raises questions going to the merits so serious, substantial, difficult, and doubtful as to make them fair ground for through investigation, study, deliberation and determination by the Commission in the first instance and ultimately by the Court of Appeals.

Admiralty & Maritime Law > Maritime Contracts > General Overview
Antitrust & Trade Law > ... > Market Definition > Relevant Market > Product Market Definition
Mergers & Acquisitions Law > General Overview
Mergers & Acquisitions Law > Antitrust > General Overview
Mergers & Acquisitions Law > Antitrust > Market Definition
Mergers & Acquisitions Law > Antitrust > Remedies

***HN4*** In order to determine whether the Federal Trade Commission (FTC) has met its burden with respect to showing its likelihood of success on the merits, that is, whether the FTC has raised questions going to the merits so serious, substantial, difficult and doubtful as to make them fair ground for thorough investigation, study, deliberation and determination by the FTC in the first instance and ultimately by the Court of Appeals and that there is a reasonable probability that the challenged transaction will substantially impair competition, the court must consider the likely competitive effects of the merger, if any. Analysis of the likely competitive effects of a merger requires determinations of (1) the line of commerce or product market in which to assess the transaction, (2) the section of the country or geographic market in which to assess the transaction, and (3) the transaction's probable effect on competition in the product and geographic markets.

Mergers & Acquisitions Law > Antitrust > Remedies

***HN5*** The general rule when determining a relevant product market is that the outer boundaries of a product market are determined by the reasonable interchangeability of use by consumers or the cross-elasticity of demand between the product itself and substitutes for it. Interchangeability of use and cross-elasticity of demand look to the availability of substitute commodities, i.e. whether there are other products offered to consumers which are similar in character or use to the product or products in question, as well as how far buyers will go to substitute one commodity for another. In other words, the general question is whether two products can be used for the same purpose, and if so, whether and to what extent purchasers are willing to substitute one for the other.

Civil Procedure > Remedies > Injunctions > Preliminary & Temporary Injunctions
Mergers & Acquisitions Law > Antitrust > Remedies

***HN6*** Where the court finds that the Federal Trade Commission (FTC) has established a likelihood of success on the merits, a presumption in favor of a preliminary injunction arises. Despite this presumption, however, once the court has determined the FTC's likelihood of success on the merits, it must still turn to and consider the equities.

Mergers & Acquisitions Law > Antitrust > Remedies

***HN7*** There are two types of equities which the court must consider in all cases under *section 13(b)* of the Federal Trade Commission Act, *15 U.S.C.S. § 53(b)*: private equities and public equities.

**Counsel:** For FEDERAL TRADE COMMISSION, plaintiff: James A. Fishkin, FEDERAL TRADE COMMISSION, Washington, DC.

For STAPLES, INC., defendant: John Mark Gidley, WHITE & CASE, Washington, DC.

For OFFICE DEPOT INC., defendant: James F. Basile, Mark L Kovner, KIRKLAND & ELLIS, Washington, DC.

For NONPARTY I, OFFICEMAX, INC., Non Parties: Lee Thomas Ellis, Jr., BAKER & HOSTETLER, L.L.P., Washington, DC.

For KINKO'S, INC., Non Party: Thomas William Queen, WILEY, REIN & FIELDING, Washington, DC.

For OFFICE NETWORK, SOUTH COAST STATIONERS, INC., Non Parties: Stephen P. Leara, Birmingham, AL.

For AVERY DENNISON CORPORATION, Non Party: Vivian C. Strache, LATHAM & WATKINS, Washington, DC.

For AMPAD, Non Party: John Michael Cooper, BRYAN CAVE, L.L.P., Washington, DC.

For COSTCO COMPANIES, INC., Non Party: Michael D. Sandler, SANDLER, AHERN & MCCONAUGHY, P.L.L.C., Seattle, WA.

For KMART CORPORATION, Non Party: Jeffrey Michael Petrash, DICKINSON, WRIGHT, MOON, VANDUSEN & FREEMAN, Washington, DC.

For QUILL CORPORATION, Non Party: James King Gardner, NEAL, GERBER & EISENBERG, Chicago, IL.

For VIKING OFFICE PRODUCTS, INC., Non Party: Peter Lee Winik, LATHAM & WATKINS, Washington, DC.

For ALBERT E. FONTENOT, JR., ATAPCO OFFICE PRODUCTS GROUP, Non Parties: Anthony M. Black, BELL, BOYD & LLOYD, Washington, DC.

For ACCO WORLD, INC., Non Party: Mary Kay McCalla Martire, HOPKINS & SUTTER, Chicago, IL.

For ROBERT L. COMPAGNO, FELLOWES CORPORATION, Non Parties: James Franklin Bendernagel, Jr., SIDLEY & AUSTIN, Washington, DC.

For WAL-MART STORES, INC., Non Party: Alan J. Weinschel, WEIL, GOTSHAL & MANGES, LLP, New York, NY.

For TARGET STORES, Non Party: John D. French, Minneapolis, MN.

For PETER J. SOLOMON COMPANY, LTD., Non Party: Theodore Case Whitehouse, WILLKIE FARR & GALLAGHER, Washington, DC.

For BLOOMBERG, L.P., Non Party: Laura R. Handman, LANKENAU, KOVNER & KURTZ, Washington, DC.

STATE OF MARYLAND, amicus: Alan M. Barr, Attorney General, Baltimore, MD.

STATE OF NEW YORK, amicus: Richard L. Schwartz, ATTORNEY GENERAL OF THE STATE OF NEW YORK, New York, NY.

THE STATE OF NORTH CAROLINA, amicus: K. D. Sturgis, NORTH CAROLINA DEPARTMENT OF JUSTICE, Raleigh, NC.

STATE OF CALIFORNIA, amicus: Kathleen E. Foote, San Francisco, CA.

STATE OF ILLINOIS, amicus: Christine H. Rosso, Chicago, IL.

STATE OF OHIO, amicus: Elizabeth Watts, Columbus, OH.

STATE OF PENNSYLVANIA, amicus: James A. Donahue, III, ATTORNEY GENERAL OF THE COMMONWEALTH OF PENNSYLVANIA, Harrisburg, PA.

STATE OF VIRGINIA, amicus: Frank Seales, Jr., U.S. ATTORNEY GENERAL FOR THE COMMONWEALTH OF VIRGINIA, Richmond, VA.

STATE OF WASHINGTON, amicus: Brian L. Dew, Seattle, WA.

For GLOBAL DIRECTMAIL CORP., MOVANT I, movants: Melinda Carolyn Burrows, HOLLAND & KNIGHT, L.L.P., Washington, DC.

For DOW JONES & COMPANY, INC., REUTERS AMERICA, INC., movants: Theodore J. Boutrous, Jr., GIBSON, DUNN & CRUTCHER, L.L.P., Washington, DC.

**Judges:** Thomas F. Hogan, United States District Judge

**Opinion by:** Thomas F. Hogan

**Opinion**

**[*1069] REDACTED MEMORANDUM OPINION**

Plaintiff, the Federal Trade Commission ("FTC" or "Commission"), seeks a preliminary injunction pursuant to *Section 13(b)* of the Federal Trade Commission Act, *15 U.S.C. § 53(b)*, to enjoin the consummation of any acquisition by defendant Staples, Inc. of defendant Office Depot, Inc., pending final disposition before the Commission of administrative proceedings to determine whether such acquisition may substantially lessen competition in violation of *Section 7* of the Clayton Act, *15 U.S.C. § 18*, and *Section 5* of the Federal Trade Commission Act, *15 U.S.C. § 45* The proposed acquisition has been postponed pending the Court's decision on the motion for a preliminary injunction, which is now before the Court for decision after a five-day evidentiary hearing and the filing of proposed findings of fact and conclusions of law. For the reasons set forth below, the Court will grant the plaintiff's motion. This Memorandum Opinion constitutes the Court's findings of fact and conclusions of law.

**BACKGROUND**

The FTC is an administrative agency **[**2]** of the United States organized and existing pursuant to the Federal Trade Commission Act, *15 U.S.C. §§ 41-77*. The Commission is responsible, inter alia for enforcing federal antitrust laws, particularly *Section 7* of the Clayton Act, and *Sections 5* and *13(b)* of the Federal Trade Commission Act.

Defendants are both corporations which sell office products--including office supplies, business machines, computers and furniture--through retail stores, commonly described as office supply superstores, as well as through direct mail delivery and contract stationer operations. Staples is the second largest office superstore chain in the United States with approximately 550 retail stores located in 28 states and the District of Columbia, primarily in the Northeast and California. In 1996 Staples' revenues from those stores were approximately $ 4 billion through all operations. Office Depot, the largest office superstore chain, operates over 500 retail office supply superstores that are located in 38 states and the District of Columbia, primarily in the South and Midwest. Office Depot's 1996 sales were approximately $ 6.1 billion. OfficeMax. Inc., is the only other office supply superstore **[**3]** firm in the United States.

On September 4, 1996, defendants Staples and Office Depot, and Marlin Acquisition Corp. ("Marlin"), a wholly-owned subsidiary of Staples, entered into an "Agreement and Plan of Merger" whereby Marlin would merge with and into Office Depot, and Office Depot would become a wholly-owned subsidiary of Staples. According to the Agreement and Plan of Merger, the transaction would be structured as a pooling of interests, in which each share of Office Depot common stock would be exchanged for 1.14 shares of Staples' **[*1070]** common stock. Pursuant to the Hart-Scott-Rodino Improvements Act of 1976, *15 U.S.C. § 18a*, Staples and Office Depot filed a Premerger Notification and Report Form with the FTC and Department of Justice

on October 2, 1996. This was followed by a seven month investigation by the FTC. The FTC issued a Second Request for Information on November 1, 1996, to both Staples and Office Depot. The Commission further initiated a second Second Request on January 10, 1997. In addition to the hundreds of boxes of documents produced to the FTC during this time, the FTC took depositions of 18 Staples and Office Depot officers and employees. The FTC also undertook extensive **[**4]** ex parte discovery of third-party documents and, in lieu of subpoenas, obtained at least 36 declarations from third parties.

On March 10, 1997, the Commission voted 4-1 to challenge the merger and authorized commencement of an action under *Section 13(b)* of the Federal Trade Commission Act, *15 U.S.C. § 53(b)*, to seek a temporary restraining order and a preliminary injunction barring the merger. Following this vote, the defendants and the FTC staff negotiated a consent decree that would have authorized the merger to proceed on the condition that Staples and Office Depot sell 63 stores to OfficeMax. However, the Commission voted 3-2 to reject the proposed consent decree on April 4, 1997. The FTC then filed this suit on April 9, 1997, seeking a temporary retraining order and preliminary injunction against the merger pursuant to *Section 13(b)* of the Federal Trade Commission Act, *15 U.S.C. § 53(b)*, pending the completion of an administrative proceeding pursuant to *Section 5* of the Federal Trade Commission Act, *15 U.S.C. § 45*, and *Sections 7* and *11* of the Clayton Act, *15 U.S.C. §§ 12*, *21*.

Because of the urgency of this matter, the Court authorized expedited discovery and held a five-day **[**5]** evidentiary hearing beginning on May 19, 1997. Closing arguments were heard on June 5, 1997. In the meantime, the defendants agreed to postpone the merger pending the Court's decision on the motion for a preliminary injunction, thus making the plaintiff's motion for a temporary restraining order moot. At the hearing, the FTC called a number of live witnesses, including three industry witnesses and two economic experts, Dr. Frederick R. Warren-Boulton and Dr. Orley Ashenfelter. Defendants offered testimony from eight live witnesses, including one economic expert, Dr. Jerry Hausman, as well as an expert in retailing, Maurice Segall. In addition to these live witnesses, the plaintiff and the defendants combined submitted over six thousands exhibits including declarations from consumers, industry analysts, economic experts, suppliers, and other sellers of office supplies. Following the conclusion of the hearing, nine states filed a joint amicus brief in support of the FTC's motion. [1]

**[**6] DISCUSSION**

***I. Section 13(B) Standard for Preliminary Injunctive Relief***

***HN1*** *Section 7* of the Clayton Act, *15 U.S.C. § 18*, makes it illegal for two companies to merge "where in any line of commerce or in any activity affecting commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly." Whenever the Commission has reason to believe that a corporation is violating, or is about to violate, *Section 7* of the Clayton Act, the FTC may seek a preliminary injunction to prevent a merger pending the Commission's administrative adjudication of the merger's legality. See *Section 13(b)* of the Federal Trade Commission Act, *15 U.S.C. § 53(b)*. However, in a suit

---

[1] The amicus brief filed by the states was unusual due to its inclusion of a declaration of an expert witness employed by the states. The Court read and considered the states' amicus brief. However, the Court did not rely on the declaration of Douglas F. Greer in any way in reaching its decision. Dr. Greer's declaration was submitted to the Court following the hearing. Thus, neither party had the opportunity for meaningful cross-examination of Dr. Greer. In fairness to the parties, therefore, the Court wishes to make it clear that the Court did not use or rely on Dr. Greer's declaration in reaching this decision.

for preliminary relief, the FTC is not required to prove, nor is the Court required to find, that the proposed merger would in fact violate *Section 7* of the Clayton Act. *FTC v. Alliant Techsystems Inc., 808 F. Supp. 9, 19 (D.D.C. 1992)*; **[*1071]** *FTC v. PPG Indus., 628 F. Supp. 881, 883 n.3* (D.D.C.), aff'd in part rev'd in part, *255 U.S. App. D.C. 69, 798 F.2d 1500 (D.C. Cir. 1986)*. The determination of whether the acquisition actually violates the antitrust **[**7]** laws is reserved for the Commission and is, therefore, not before this Court. See *Alliant, 808 F. Supp. at 19*. The only question before this Court is whether the FTC has made a showing which justifies preliminary injunctive relief.

***HN2*** *Section 13(b)* of the Federal Trade Commission Act, *15 U.S.C. § 53(b)*, provides that "upon a proper showing that, weighing the equities and considering the Commission's likelihood of ultimate success, such action would be in the public interest, and after notice to the defendant, a temporary restraining order or a preliminary injunction may be granted without bond." [2] Courts have interpreted this to mean that a court must engage in a two-part analysis in determining whether to grant an injunction under *section 13(b)*: (1) First, the Court must determine the Commission's likelihood of success on the merits in its case under *Section 7* of the Clayton Act; and (2) Second, the Court must balance the equities. See *FTC v. Freeman Hospital, 69 F.3d 260, 267 (8th Cir. 1995)*; *FTC v. University Health, Inc., 938 F.2d 1206, 1217-18 (11th Cir. 1991)*; *FTC v. Warner Communications Inc., 742 F.2d 1156, 1160 (9th Cir. 1984)*; *FTC v. Occidental Petroleum* **[**8]** *Corp., 1986-1 Trade Cas. (CCH) P67,071 (D.D.C. 1986)*.

**A. Likelihood of Success on the Merits**

Likelihood of success on the merits in cases such as this means the likelihood that the Commission will succeed in proving, after a full administrative trial on the merits, that the effect of a merger between Staples and Office Depot "may be substantially to lessen competition, or to tend to create a monopoly" in violation of *Section 7* of the Clayton Act. ***HN3*** The Commission satisfies its burden to show likelihood of success if it "raises questions going to the merits so serious, substantial, difficult, and doubtful as to make them fair ground for through investigation, study, deliberation and determination by the Commission in the first instance and ultimately by the Court of Appeals." **[**9]** *FTC v. University Health, Inc., 938 F.2d 1206, 1218 (11th Cir. 1991)* ("To show a likelihood of ultimate success, the FTC must 'raise [] questions going to the merits so serious, substantial, difficult and doubtful as to make them fair ground for thorough investigation, study, deliberation and determination by the FTC in the first instance and ultimately by the Court of Appeals.'"); *FTC v. Warner Communications, Inc., 742 F.2d 1156, 1162 (9th Cir. 1984)* ("The Commission meets its burden if it 'raise[s] questions going to the merits so serious, substantial, difficult and doubtful as to make them fair ground for thorough investigation, study, deliberation and determination by the FTC in the first instance and ultimately by the Court of Appeals.'"); *FTC v. National Tea Co., 603 F.2d 694, 698 (8th Cir. 1979)* (same language); *FTC v. Alliant Techsystems Inc., 808 F. Supp. 9, 19 (D.D.C. 1992)* (same language). See also *FTC v. Beatrice Foods Company, 190 U.S. App. D.C. 328, 587 F.2d 1225 (D.C. Cir. 1978)*. [3]

**[**10]** **[*1072]** It is not enough for the FTC to show merely that it has a "fair and tenable chance" of ultimate success on the merits as has been argued and rejected in other cases. See *FTC*

---

[2] The traditional "irreparable harm" element is absent from the Section 13(b) standard. In this respect, the section 13(b) standard is "lesser" than that which courts normally impose on private litigants seeking a preliminary injunction.

[3] The only time the D.C. Circuit has addressed the FTC's burden under Section 13(b) was in Beatrice Foods where Judges MacKinnon and Robb wrote:

*v. Freeman Hospital, 69 F.3d 260, 267 (8th Cir. 1995)* (rejecting the Commission's argument that it need only show a "fair and tenable chance of ultimate success on the merits" in order to qualify for injunctive relief because such a standard would run contrary to Congressional intent and reduce the judicial function to a mere "rubber stamp" of the FTC's decisions.). See also *FTC v. National Tea Co., 603 F.2d 694, 698 (8th Cir. 1979)* (reaching the same conclusions under the same reasoning). [4] However, the FTC need not prove to a certainty that the merger will have an anti-competitive effect. That is a question left to the Commission after a full administrative hearing. Instead, in a suit for a preliminary injunction, the government need only show that there is a "reasonable probability" that the challenged transaction will substantially impair competition. *FTC v. University Health, 938 F.2d 1206, 1218 (11th Cir. 1991)* ("The government must show a reasonable probability that the proposed transaction **[**11]** would substantially lessen competition in the future."); *Fruehauf Corp. v. FTC, 603 F.2d 345, 351 (2d Cir. 1979)* ("There must be 'the reasonable probability' of a substantial impairment of competition to render a merger illegal."). See also *United States v. Penn-Olin Chemical Co., 378 U.S. 158, 170-71, 12 L. Ed. 2d 775, 84 S. Ct. 1710 (1964)* ("The requirements of *[Section 7]* . . . are satisfied when a tendency toward monopoly of the reasonable likelihood of a substantial lessening of competition in the relevant market is shown); *FTC v. Great Lakes Chemical Corp., 528 F. Supp. 84, 86 (N.D. Ill. 1981)* ("The government must prove not that the merger in question may possibly have an anti-competitive effect, but rather that it will probably have such as effect.").

---

The appropriate definition of the Commission's burden under Section 13(b) was articulated in FTC v. Lancaster Colony Corp., 434 F. Supp. 1088, 1090 (S.D.N.Y. 1977), where the court held that "the FTC meets its burden on the 'likelihood of success' issue if it shows preliminarily, by affidavits or other proof, that it has a fair and tenable chance of ultimate success on the merits." It amplified this standard by stating that, if the FTC made the requisite showing on the equities a preliminary injunction should issue if the FTC has raised questions going to the merits so serious, substantial, difficult and doubtful as to make them fair ground for thorough investigation, study, deliberation and determination by the FTC in the first instance and ultimately by the Court of Appeals.Id. 587 F.2d at 1229 (emphasis added).

Defendants argued in their briefs that the Court may not rely on Beatrice Foods as precedent because it is a memorandum opinion appended to the statements of Judges MacKinnon and Robb explaining their votes on a motion for rehearing en banc. Judge Revercomb reached this same conclusion in *FTC v. Occidental Petroleum Corp., 1986-1 Trade Cases (CCH) P67,071 (D.D.C. 1986)*, vacated, No. 86-5254 (D.C. Cir. Oct. 23, 1986), where he found that Beatrice Foods could not be cited as precedent under the Local Rules, and, in fact, the FTC agrees that the opinion is technically "unpublished" even though it appears in the Federal Reporter, 2d Series. For these reasons, the Court has not relied on Beatrice Foods as precedent. Instead, the Court cites it only because it contains language identical to that from other circuits, and the discussion would be incomplete without mention of the case.

[4] It is clear that the defendants' primary objection to the Beatrice Foods case is the "fair and tenable chance" language contained in that opinion. For the reasons expressed in the Freeman and National Tea opinions, the Court finds that the defendants are correct that a "fair and tenable chance" of ultimate success on the merits is not the proper burden in this case. In addition, there is no case identified by either party which specifically holds that a "fair and tenable chance" of ultimate success on the merits is the proper standard. It is not clear that Beatrice Foods even supports such a conclusion. The "fair and tenable chance" language present in Beatrice Foods is followed by what the court describes as an "amplification" which provides a more stringent standard. Beatrice Foods, 587 F.2d at 1229.

To be fair to the plaintiff on this issue, the Court believes that the defendants misunderstood the FTC's argument with regard to the "fair and tenable chance" language in Beatrice Foods, and that the FTC did not in fact argue that a "fair and tenable chance" was the appropriate burden in this case. Rather, the FTC's citation of Beatrice Foods was to the later part of that opinion in which Judges MacKinnon and Robb wrote that a preliminary injunction should issue if the FTC has "raised questions going to the merits so serious, substantial, difficult and doubtful as to make them fair ground for thorough investigation, study, deliberation and determination by the FTC in the first instance and ultimately by the Court of Appeals."

**[**12]** ***HN4*** In order to determine whether the Commission has met its burden with respect to showing its likelihood of success on the merits, that is, whether the FTC has raised questions going to the merits so serious, substantial, difficult and doubtful as to make them fair ground for thorough investigation, study, deliberation and determination by the FTC in the first instance and ultimately by the Court of Appeals and that there is a "reasonable probability" that the challenged transaction will substantially impair competition, the Court must consider the likely competitive effects of the merger, if any. Analysis of the likely competitive effects of a merger requires determinations of (1) the "line of commerce" or product market in which to assess the transaction; (2) the "section of the country" or geographic market in which to assess the transaction; and (3) the transaction's probable effect on competition in the product and geographic markets. See *United States v. Marine Bancorporation*, **[*1073]** 418 U.S. 602, 618-23, 41 L. Ed. 2d 978, 94 S. Ct. 2856 (1974); *FTC v. Harbour Group Investments, L.P., 1990-2 Trade Cas. (CCH) P69,247 at 64,914 n. 3 (D.D.C. 1990)*.

## II. The Geographic Market [**13]

One of the few issue about which the parties to this case do not disagree is that metropolitan areas are the appropriate geographic markets for analyzing the competitive effects of the proposed merger. A geographic market is that geographic area "to which consumers can practically turn for alternative sources of the product and in which the antitrust defendant faces competition." *Morgenstern v. Wilson, 29 F.3d 1291, 1296 (8th Cir. 1994)*, cert. denied, *513 U.S. 1150, 130 L. Ed. 2d 1068, 115 S. Ct. 1100 (1995)*. In its first amended complaint, the FTC identified forty-two such metropolitan areas [5] as well as future areas which could suffer anti-competitive effects from the proposed merger. **[**14]** [6] Defendants have not challenged the FTC's geographic market definition in this proceeding. Therefore, the Court will accept the relevant geographic markets identified by the Commission.

## III. The Relevant Product Market

In contrast to the parties' agreement with respect to the relevant geographic market, the Commission and the defendants sharply disagree with respect to the appropriate definition of the relevant product market or line of commerce. As with many antitrust cases, the definition of the relevant product market in this case is crucial. In fact, to a great extent, this case hinges on the proper definition of the relevant product market.

---

[5] According to the FTC, the proposed merger would have an anti-competitive effect in the following geographic markets:

(1) in Salinas, California; San Diego, California; Visalia-Tulare-Porterville, California; Lakeland-Winter Haven, Florida; Ocala, Florida; Tampa-St. Petersburg-Clearwater, Florida; Fort Pierce-Port St. Lucie, Florida; Champaign-Urbana, Illinois; Louisville, Kentucky; Baltimore, Maryland, Greenville, North Carolina; Florence, South Carolina; Charlottesville, Virginia; Washington, D.C. and Spokane, Washington, where the number of office superstore firms would drop from two to one;

(2) in Los Angeles, California; Sacramento, California; San Francisco-Oakland-San Jose, California; Stockton-Lodi, California; Orlando, Florida; Sarasota-Bradenton, Florida; West Palm Beach-Boca Raton, Florida; Evansville, Indiana; Indianapolis, Indiana; South Bend, Indiana; Springfield, Illinois; Kalamazoo-Battle Creek, Michigan; Detroit-Ann Arbor-Flint, Michigan; Grand Rapids-Muskegon-Holland, Michigan; Middlesex County, New Jersey; Passaic County, New Jersey; Nassau-Suffolk, New York; Greensborough-Winston Salem- High Point, North Carolina; Raleigh-Durham, North Carolina; Cleveland, Ohio; Cincinnati- Hamilton, Ohio; Portland-Vancouver, Oregon-Washington; Pittsburgh, Pennsylvania; Columbia, South Carolina; Chattanooga, Tennessee; Nashville, Tennessee; and Salt Lake City-Ogden, Utah, where the number of superstore firms will be reduced from three to two.

[6] Metropolitan areas where Staples and Office Depot would have competed in the future include Bergen County, New Jersey; Fayetteville, North Carolina; Albany-Schenectady-Troy, New York; and Fredericksburg, Virginia, where Office Depot plans to open stores in Staples markets before the end of 1997. In addition, Staples predicted that it would face competition from Office Depot in 76% of its markets by the year 2000, compared to the 46% overlap between the two companies in 1996.

The Commission defines the relevant product market as "the sale of consumable office supplies through office superstores," [7] with "consumable" meaning **[**15]** products that consumers buy recurrently, i.e., items which "get used up" or discarded. For example, under the Commission's definition, "consumable office supplies" would not include capital goods such as computers, fax machines, and other business machines, or office furniture, but does include such products as paper, pens, file folders, post-it notes, computer disks, and toner cartridges. The defendants characterize the FTC's product market definition as "contrived" with no basis in law or fact, and counter that the appropriate product market within which to assess the likely competitive consequences of a Staples-Office Depot combination is simply the overall sale of office products, of which a combined Staples-Office Depot accounted for 5.5% of total sales in North America in 1996. In addition, **[*1074]** the defendants argue that the challenged combination is not likely "substantially to lessen competition" however the product market is defined. After considering the arguments on both sides and all of the evidence in this case and making evaluations of each witness's credibility as well as the weight that the Court should give certain evidence and testimony, the Court finds that the appropriate **[**16]** relevant product market definition in this case is, as the Commission has argued, the sale of consumable office supplies through office supply superstores.

***HN5*** The general rule when determining a relevant product market is that "the outer boundaries of a product market are determined by the reasonable interchangeability of use [by consumers] or the cross-elasticity of demand between the product itself and substitutes for it." *Brown Shoe v. United States, 370 U.S. 294, 325, 8 L. Ed. 2d 510, 82 S. Ct. 1502 (1962)*; see also *United States v. E.I. Du Pont de Nemours and Co., 351 U.S. 377, 395, 100 L. Ed. 1264, 76 S. Ct. 994 (1956)*. Interchangeability of use and cross-elasticity of demand look to the availability of substitute commodities, i.e. whether there are other products offered to consumers which are similar in character **[**17]** or use to the product or products in question, as well as how far buyers will go to substitute one commodity for another. *E.I. Du Pont de Nemours, 351 U.S. at 393*. In other words, the general question is "whether two products can be used for the same purpose, and if so, whether and to what extent purchasers are willing to substitute one for the other." *Hayden Pub. Co. v. Cox Broadcasting Corp., 730 F.2d 64, 70 n. 8 (2d Cir. 1984)*.

Whether there are other products available to consumers which are similar in character or use to the products in question may be termed "functional interchangeability." See e.g., *E.I. Du Pont de Nemours, 351 U.S. at 399* (recognizing "functional interchangeability" between cellophane and other flexible wrappings); *United States v. Archer-Daniels-Midland Co., 866 F.2d 242, 246 (8th Cir. 1988)* (discussing "functional interchangeability" between sugar and high fructose corn syrup), cert. denied, *493 U.S. 809, 107 L. Ed. 2d 20, 110 S. Ct. 51 (1989)*. This case, of course, is an example of perfect "functional interchangeability." The consumable office products at issue here are identical whether they are sold by Staples or Office Depot or another seller of office supplies. **[**18]** A legal pad sold by Staples or Office Depot is "functionally interchangeable" with a legal pad sold by Wal-Mart. A post-it note sold by Staples or Office Deport is "functionally interchangeable" with a post-it note sold by Viking or Quill. A computer disk sold by Staples-Office Deport is "functionally interchangeable" with a computer disk sold by CompUSA. No one disputes the functional interchangeability of consumable office supplies. However, as the government has argued, functional interchangeability should not end the Court's analysis.

---

[7] The Commission also offered an alternative product market, that of the sale of consumable office supplies through retail stores to small businesses and individuals with home offices.

The Supreme Court did not stop after finding a high degree of functional interchangeability between cellophane and other wrapping materials in the E. L. Du Pont de Nemours case. Instead, the Court also found that "an element for consideration as to cross- elasticity of demand between products is the responsiveness of the sales of one product to price changes of the other." *Id. at 400*. For example, in that case, the Court explained, "if a slight decrease in the price of cellophane causes a considerable number of customers of other flexible wrappings to switch to cellophane, it would be an indication that a high cross-elasticity of demand exists **[**19]** between [cellophane and other flexible wrappings]; [and therefore] that the products compete in the same market." Id. Following that reasoning in this case, the Commission has argued that a slight but significant increase in Staples-Office Depot's prices will not cause a considerable number of Staples-Office Depot's customers to purchase consumable office supplies from other non-superstore alternatives such as Wal-Mart, Best Buy, Quill, or Viking. On the other hand, the Commission has argued that an increase in price by Staples would result in consumers turning to another office superstore, especially Office Depot, if the consumers had that option. Therefore, the Commission concludes that the sale of consumable office supplies by **[*1075]** office supply superstores is the appropriate relevant product market in this case, and products sold by competitors such as Wal-Mart, Best Buy, Viking, Quill, and others should be excluded.

The Court recognizes that it is difficult to overcome the first blush or initial gut reaction of many people to the definition of the relevant product market as the sale of consumable office supplies through office supply superstores. The products in question are **[**20]** undeniably the same no matter who sells them, and no one denies that many different types of retailers sell these products. After all, a combined Staples-Office Depot would only have a 5.5% share of the overall market in consumable office supplies. Therefore, it is logical to conclude that, of course, all these retailers compete, and that if a combined Staples-Office Depot raised prices after the merger, or at least did not lower them as much as they would have as separate companies, that consumers, with such a plethora of options, would shop elsewhere.

The Court acknowledges that there is, in fact, a broad market encompassing the sale of consumable office supplies by all sellers of such supplies, and that those sellers must, at some level, compete with one another. However, the mere fact that a firm may be termed a competitor in the overall marketplace does not necessarily require that it be included in the relevant product market for antitrust purposes. The Supreme Court has recognized that within a broad market, "well-defined submarkets may exist which, in themselves, constitute product markets for antitrust purposes." *Brown Shoe Co. v. United States, 370 U.S. 294, 325, 8 L.* **[**21]** Ed. 2d 510, 82 S. Ct. 1502 (1962); see also *Rothery Storage & Van Co. v. Atlas Van Lines, Inc., 253 U.S. App. D.C. 142, 792 F.2d 210, 218 (D.C. Cir. 1986)*(Bork, J.), cert. denied, *479 U.S. 1033, 93 L. Ed. 2d 834, 107 S. Ct. 880 (1987)*. With respect to such submarkets, the Court explained "because *Section 7* of the Clayton Act prohibits any merger which may substantially lessen competition 'in any line of commerce,' it is necessary to examine the effects of a merger in each such economically significant submarket to determine if there is a reasonable probability that the merger will substantially lessen competition. If such a probability is found to exist, the merger is proscribed." Id. There is a possibility, therefore, that the sale of consumable office supplies by office superstores may qualify as a submarket within a larger market of retailers of office supplies in general.

The Court in Brown Shoe provided a series of factors or "practical indicia" for determining whether a submarket exists including "industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct

**[**22]** customers, distinct prices, sensitivity to price changes, and specialized vendors." Id. Since the Court described these factors as "practical indicia" rather than requirements, subsequent cases have found that submarkets can exist even if only some of these factors are present. See, e.g., *Beatrice Foods Co. v. FTC, 540 F.2d 303 (7th Cir. 1976)* (finding submarket based on industry recognition, peculiar characteristics of the product, and differences in production methods and prices); *International Telephone and Telegraph Corp. v. General Telephone & Electronics Corp., 518 F.2d 913, 932 (9th Cir. 1975)* (explaining that Brown Shoe's practical indicia were meant as "practical aids . . . rather than with the view that their presence or absence would dispose, in talismanic fashion, of the submarket issue").

The Commission discussed several of the Brown Shoe "practical indicia" in its case, such as industry recognition, and the special characteristics of superstores which make them different from other sellers of office supplies, including distinct formats, customers, and prices. Primarily, however, the FTC focused on what it termed the "pricing evidence," which the Court **[**23]** finds corresponds with Brown Shoe's "sensitivity to price changes" factor. First, the FTC presented evidence comparing Staples' prices in geographic markets where Staples is the only office superstore, to markets where Staples competes with Office Deport or OfficeMax, or both. Based on the FTC's calculations, in markets where Staples faces no office superstore competition at all, something which was termed a one firm market during the hearing, **[*1076]** prices are 13% higher than in three firm markets where it competes with both Office Depot and OfficeMax. The data which underly this conclusion make it compelling evidence. Prices were compared as of January 1997, which, admittedly, only provides data for one specific point in time. However, rather than comparing prices from only a small sampling or "basket" of goods, the FTC used an office supply sample accounting for 90% of Staples' sales and comprised of both price sensitive and non-price sensitive items. The FTC presented similar evidence based on Office Depot's prices of a sample of 500 items, also as of January 1997. Similarly, the evidence showed that Office Depot's prices are significantly higher, well over 5% higher, [8] in Depot-only **[**24]** markets than they are in three firm markets.

Other pricing evidence presented by the FTC is less convincing on its own, due to limitations in the underlying data. For example, relatively small samplings or "baskets" of goods may have been used or it may not be clear how many stock keeping units ("SKUs") of supplies were included. For example, the FTC also presented evidence comparing Staples' prices in Staples-only markets with Staples' prices in three-firm markets **[**25]** for four different time periods, August 1994, January 1995, August 1995, and May 1996. The result is startlingly similar to that found in the first two examples. Where Staples does not compete with other office superstores, it charges prices well over 5% higher than where it does so compete. While having the advantage of showing a trend over time, the Court recognizes that this evidence has some problems. These particular calculations were made based on a "basket" or sample of supplies comprised of supplies used by Staples to price check against Office Depot. The number of SKUs in the sample was not provided to the Court, and it appears that the components of the baskets may have changed over time. Therefore, the Court would not give much weight to this evidence standing alone. However, since additional evidence supports the same conclusion, the Court credits this evidence as confirmation of the general pricing trend.

---

[8] The analytical framework set forth in the Merger Guidelines approaches the inquiry regarding the reasonable interchangeability of use or cross-elasticity of demand by asking whether a "hypothetical monopolist . . . would profitably impose at least a 'small but significant and nontransitory' [price] increase." Merger Guidelines at § 1.11. The Merger Guidelines use 5% as the usual approximation of a "small but significant and nontransatory price increase." Id. For this reason, the Court's analysis will often refer to this 5% number.

The FTC also pointed to internal Staples documents which present price comparisons between Staples' prices and Office Depot's prices and Staples' prices and OfficeMax's prices within different price zones. [9] The comparisons between Staples and Office Depot were made **[**26]** in August 1994, January 1995, August 1995, and May 1996. Staples' prices were compared with OfficeMax's prices in August 1994, July 1995, and January 1996. For each comparison, Staples' calculations were based on a fairly large "basket" or sample of goods, approximately 2000 SKUs containing both price sensitive and non-price sensitive items. Using Staples' data, but organizing it differently to show which of those zones were one, two, or three firm markets, the FTC showed once again that Staples charges significantly higher prices, more than 5% higher, where it has no office superstore competition than where it competes with the two other superstores.

The FTC offered similar price comparison evidence for Office Depot, comparing Office Depot's prices **[**27]** across Staples' zones. The comparisons were made in August 1994, January 1995, August 1995, and May 1996. Again, a large sample, approximately 2000 SKUs, was considered. The results of this analysis are slightly less favorable to the FTC's position. Price differentials are significantly smaller and there are even a few instances where Office Depot's prices appear to be higher in one of its three firm markets than prices in its two firm markets and at least one point where prices in one of the **[*1077]** Depot-only zones were lower than prices in one of the three firm markets. On average, however, this evidence shows that Office Depot's prices are highest in its one firm markets, and lowest in its three firm markets.

This evidence all suggests that office superstore prices are affected primarily by other office superstores and not by non-superstore competitors such as mass merchandisers like Wal- Mart, Kmart, or Target, wholesale clubs such as BJ's, Sam's, and Price Costco, computer or electronic stores such as Computer City and Best Buy, independent retail office supply stores, mail orders firms like Qill and Viking, and contract stationers. Though the FTC did not present the Court with evidence **[**28]** regarding the precise amount of non-superstore competition in each of Staples' and Office Depot's one, two, and three firm markets, it is clear to the Court that these competitors, albeit in different combinations and concentrations, are present in every one of these markets. For example, it is a certainty that the mail order competitors compete in all of the geographic markets at issue in this case. Office products are available through the mail in all 50 states, and have been for approximately 30 years. Despite this mail order competition, however, Staples and Office Depot are still able to charge higher prices in their one firm markets than they do in the two firm markets and the three firm markets without losing a significant number of customers to the mail order firms. The same appears to be true with respect to Wal-Mart. Bill Long, Vice President for Merchandizing at Wal-Mart Stores, testifying through declaration; explained that price-checking by Wal-Mart of Staples' prices in areas where both Staples and Wal-Mart exist showed that, on average, Staples' prices were higher where there was a Staples and a Wal-Mart but no other superstore than where there was a Staples, a Wal-Mart, **[**29]** and another superstore. [10]

The evidence with respect to the wholesale club stores is consistent. Mike Atkinson, Vice President, Division Merchandise Manager of BJ's Wholesale Club, testified at the hearing regarding

---

[9] It was established at the hearing that Staples and Office Depot do not maintain nationally uniform prices in their stores. Instead, both companies currently organize their stores into price zones which are simply groups of one or more stores that have common prices.

[10] As the defendants pointed out and criticized during the hearing, Mr. Long submitted several declarations and/or revised declarations in which he modified portions of his declaration. However, his testimony remained unchanged on this particular issue. Therefore, the Court credited this particular testimony.

BJ's price checking of Staples and Office Depot in areas where BJ's competes with one or both of those superstores. Though his sample was small--he testified that less than 10% of BJ's 80 stores are located in the same area as a Staples and/or Office Depot--BJ's price checking found that, in general, office supply superstore prices were lowest where there was both a Staples and an Office Depot. In addition, Staples' own pricing information shows that warehouse clubs have very little effect **[**30]** on Staples' prices. For example, Staples' maintains a "warehouse club only" price zone, which indicates a zone where Staples exists with a warehouse club but without another office superstore. The data presented by the Commission on Staples' pricing shows only a slight variation in prices (1%-2%) between "warehouse club only" zones and one superstore markets without a warehouse club. Additionally, in May 1996, two price comparison studies done by Staples, first using 2,084 SKUs including both price sensitive and non-price sensitive items and then using only 244 SKUs of price sensitive items, showed that prices in the "club only" zones, on average, were over 10% higher than in zones where Staples competes with Office Depot and/or OfficeMax.

There is also consistent evidence with respect to computer and/or consumer electronics stores such as Best Buy. For example, Office Depot maintains a separate price zone, which it calls "zone 30," for areas with Best Buy locations but no other office supply superstores. However, the FTC introduced evidence, based on a January 1997 market basket of "top 500 items by velocity," that prices in Office Depot's "zone 30" price zone are almost as high **[**31]** as in its "non-competitive" price zone, the zone where it does not compete with another office superstore.

There is similar evidence with respect to the defendants' behavior when faced with entry of another "competitor." The evidence shows that the defendants change their price **[*1078]** zones when faced with entry of another superstore, but do not do so for other retailers. For example, Staples-changed its price zone for Cincinnati to a lower priced zone when Office Depot and OfficeMax entered that area. New entry by Staples and OfficeMax caused a decline in prices at Office Depot's Greensboro stores. In July 1996, after OfficeMax entered Jackson, Michigan, Staples moved its Jackson store to a new zone, cutting prices by 6%. There are numerous additional examples of zones being changed and prices falling as a result of superstore entry. There is no evidence that zones change and prices fall when another non-superstore retailer enters a geographic market.

Though individually the FTC's evidence can be criticized for looking at only brief snapshots in time or for considering only a limited number of SKUs, taken together, however, the Court finds this evidence a compelling showing that a small **[**32]** but significant increase in Staples' prices will not cause a significant number of consumers to turn to non-superstore alternatives for purchasing their consumable office supplies. Despite the high degree of functional interchangeability between consumable office supplies sold by the office superstores and other retailers of office supplies, the evidence presented by the Commission shows that even where Staples and Office Depot charge higher prices, certain consumers do not go elsewhere for their supplies. This further demonstrates that the sales of office supplies by non-superstore retailers are not responsive to the higher prices charged by Staples and Office Depot in the one firm markets. This indicates a low cross-elasticity of demand between the consumable office supplies sold by the superstores and those sold by other sellers.

Turning back to the other Brown Shoe "practical indicia" of submarkets that the Commission offered in this case, the Commission presented and the Court heard a great deal of testimony at

the hearing and through declarations about the uniqueness of office superstores, and the differences between the office superstores and other sellers of office supplies **[**33]** such as mass merchandisers, wholesale clubs, and mail order firms as well as the special characteristics of office superstore customers. In addition, the Court was asked to go and view many of the different types of retail formats. That evidence shows that office superstores are, in fact, very different in appearance, physical size, format, the number and variety of SKU's offered, and the type of customers targeted and served than other sellers of office supplies.

The Court has observed that office supply superstores look far different from other sellers of office supplies. Office supply superstores are high volume, discount office supply chain stores averaging in excess of 20,000 square feet, with over 11,000 of those square feet devoted to traditional office supplies, and carrying over 5,000 SKUs of consumable office supplies in addition to computers, office furniture, and other non-consumables. In contrast, stores such as Kmart devote approximately 210 square feet to the sale of approximately 250 SKUs of consumable office supplies. Kinko's devotes approximately 50 square feet to the sale of 150 SKUs. Target sells only 400 SKUs. Both Sam's Club and Computer City each sell approximately **[**34]** 200 SKUs. Even if these SKU totals are low estimates as the defendants have argued, there is still a huge difference between the superstores and the rest of the office supply sellers.

In addition to the differences in SKU numbers and variety, the superstores are different from many other sellers of office supplies due to the type of customer they target and attract. The superstores' customer base overwhelmingly consists of small businesses with fewer than 20 employees and consumers with home offices. In contrast, mail order customers are typically mid-sized companies with more than 20 employees. Another example is contract stationers who focus on serving customers with more than 100 employees. While the Court accepts that some small business with fewer than 20 employees as well as home office customers do choose other sellers of office supplies, the superstores' customers are different from those of many of the purported competitors.

**[*1079]** It is difficult to fully articulate and explain all of the ways in which superstores are unique. As the plaintiff and defendant requested, the Court viewed some of the various sellers of office supplies located in the Rockville, Maryland area, including **[**35]** Staples, Office Depot, CompUSA, Best Buy, CVS, Kmart, Giant Food, and Wal-Mart. Based on the Court's observations, the Court finds that the unique combination of size, selection, depth and breadth of inventory offered by the superstores distinguishes them from other retailers. Other retailers devote only a fraction of their square footage to office supplies as opposed to Staples or Office Depot. The evidence shows that the typical club, mass merchant, or computer store offers only 210 to 2000 square feet of office supplies, compared to over 11, 182 square feet at a typical Staples. This was evident to the Court when visiting the various stores. Superstores are simply different in scale and appearance from the other retailers. No one entering a Wal-Mart would mistake it for an office superstore. No one entering Staples or Office Depot would mistakenly think he or she was in Best Buy or CompUSA. You certainly know an office superstore when you see one. Cf. *Bon-Ton Stores, Inc. v. May Department Stores, 881 F. Supp. 860, 870 (W.D. NY 1994)* ("Customers know a department store when they see it.").

Another of the "practical indicia" for determining the presence of a submarket suggested **[**36]** by Brown Shoe is "industry or public recognition of the submarket as a separate economic entity." See also *Rothery Storage & Van Co. v. Atlas Van Lines, 253 U.S. App. D.C. 142, 792*

F.2d 210, 219 (D.C. Cir. 1986) (Bork, J.) ("The industry or public recognition of the submarket as a separate economic unit matters because we assume that economic actors usually have accurate perceptions of economic realities."), cert. denied, *479 U.S. 1033, 93 L. Ed. 2d 834, 107 S. Ct. 880 (1987)*; *FTC v. Coca-Cola Co., 641 F. Supp. 1128, 1132 (D.D.C. 1986)* ("Analysis of the market is a matter of business reality-a matter of how the market is perceived by those who strive for profit in it."), vacated as moot, *264 U.S. App. D.C. 406, 829 F.2d 191 (D.C. Cir. 1987)*. The Commission offered abundant evidence on this factor from Staples' and Office Depot's documents which shows that both Staples and Office Depot focus primarily on competition from other superstores. The documents reviewed by the Court show that the merging parties evaluate their "competition" as the other office superstore firms, without reference to other retailers, mail order firms, or independent stationers. In document after document, the parties **[**37]** refer to, discuss, and make business decisions based upon the assumption that "competition" refers to other office superstores only. For example, Staples uses the phrase "office superstore industry" in strategic planning documents. PX 15 at 3186. Staples' 1996 Strategy Update refers to the "Big Three" and "improved relative competitive position" since 1993 and states that Staples is "increasingly recognized as [the] industry leader." PX 15 at 3153. A document analyzing a possible acquisition of OfficeMax referenced the "benefits from pricing in [newly] noncompetitive markets," and also the fact that there was "a potential margin lift overall as the industry moves to 2 players." PX 33 at 8393, 8399.

When assessing key trends and making long range plans, Staples and Office Depot focus on the plans of other superstores. In addition, when determining whether to enter a new metropolitan area, both Staples and Office Depot evaluate the extent of office superstore competition in the market and the number of office superstores the market can support. When selecting sites and markets for new store openings, defendants repeatedly refer to markets without office superstores as "non-competitive," **[**38]** even when the new store is adjacent to or near a warehouse club, consumer electronics store, or a mass merchandiser such as Wal-Mart. In a monthly report entitled "Competitor Store Opening/Closing Report" which Office Depot circulates to its Executive Committee, Office Depot notes all competitor store closings and openings, but the only competitors referred to for its United States stores are Staples and OfficeMax. PX 75 at 1309.

While it is clear to the Court that Staples and Office Depot do not ignore sellers such as warehouse clubs, Best Buy, or Wal-Mart, the evidence clearly shows that **[*1080]** Staples and Office Depot each consider the other superstores as the primary competition. For example, Office Depot has a Best Buy zone and Staples has a warehouse club zone. However, each still refers to its one firm markets with no other office superstore as "non-competitive" zones or markets. In addition, it is clear from the evidence that Staples and Office Depot price check the other office superstores much more frequently and extensively than they price check other retailers such as BJ's or Best Buy, and that Staples and Office Depot are more concerned with keeping their prices in parity with **[**39]** the other office superstores in their geographic areas than in undercutting Best Buy or a warehouse club.

For the reasons set forth in the above analysis, the Court finds that the sale of consumable office supplies through office supply superstores is the appropriate relevant product market for purposes of considering the possible anti-competitive effects of the proposed merger between Staples and Office Depot. The pricing evidence indicates a low cross-elasticity of demand between consumable office products sold by Staples or Office Depot and those same products sold by other sellers of office supplies. This same evidence indicates that non-superstore sellers of office

supplies are not able to effectively constrain the superstores' prices, because a significant number of superstore customers do not turn to a non-superstore alternative when faced with higher prices in the one firm markets. In addition, the factors or "practical indicia" of Brown Shoe support a finding of a "submarket" under the facts of this case, and "submarkets," as Brown shoe established, may themselves be appropriate product markets for antitrust purposes. *370 U.S. at 325*. [11]

**[**40]** This Court is not the first to find a narrower submarket or relevant product market within a larger market. Judge Larimer found one in *Bon-Ton Stores, Inc. v. May Department Stores Co., 881 F. Supp. 860 (W.D. NY 1994)*, when he defined the relevant product market in that case as "traditional department stores including J.C. Penney's." Defendants had argued that the "traditional department stores" definition was underinclusive because it overlooked numerous businesses that compete with department stores. *Id. at 865*. Under the defendants' view, the relevant product market should have included all stores selling general merchandise, apparel, and furniture. Id. The court acknowledged that, in a broad sense, traditional department stores do compete in a vast marketplace encompassing retailers in general. *Id. at 868*. However, applying the Brown Shoe "practical idicia," the court found that there were qualitative differences between traditional department stores and other retailers, including the physical appearance and layout of the stores, distinctive customers, the wide range of brand-name merchandise, and service. *Id. 869-872*. Additionally, the court found that **[**41]** testimony at the hearing as well as internal company documents indicated that the department stores themselves recognize each other as competitors different from other retailers. *Id. at 873*. The court found that this evidence established that "traditional department stores including J.C. Penney's" constituted a proper submarket under the Brown Show criteria. *Id. at 874*. The court enjoined the merger. *Id. at 878*.

A similar, though not as detailed, analysis was undertaken in *State of California v. American Stores Co., 697 F. Supp. 1125 (C.D. CA 1988)*, aff'd in part and rev'd in part on other grounds, *872 F.2d 837 (9th Cir. 1989)*, rev'd on other grounds, *495 U.S. 271, 109 L. Ed. 2d 240, 110 S. Ct. 1853 (1990)*. In that case, the State of California brought an action to enjoin the merger of two supermarket chains. *Id. 697 F. Supp. at 1127*. The State defined the relevant product market as "supermarkets--full line grocery stores with more than **[*1081]** 10,000 square feet." *Id. 697 F. Supp. at 1129*. In contrast, defendants contended that the relevant product market included retail grocery purchases from "mom and pop" retail grocery stores, convenience stores, and non-grocery stores such as department stores, gasoline service **[**42]** stations, eating and drinking places, drug stores, and liquor stores. Id. The court credited evidence which showed that shoppers as well as the supermarkets themselves did not consider these other retailers as competition. Id. Thereafter, the court defined the relevant product market as the State had defined it. Id.

The Court is aware that litigants have not always been successful in proving submarkets similar to the one found by the Court in this case. See Thurman Industries, Inc. v. Pay ' *N Pak Stores, Inc., 875 F.2d 1369 (9th Cir. 1989)* (concluding that plaintiff failed to show that home centers were submarkets for purposes of its restraint of trade and monopolization claims). In addition, when the supermarket case went up on appeal, the Ninth Circuit did not set aside the relevant product

---

[11] As other courts have noted, use of the term "submarket" may be confusing. See Allen-Myland v. IBM Corp., 33 F.3d 194, 208 n. 16 (3rd Cir. 1994) (finding it less confusing to speak in terms of the relevant product market rather than the submarket), cert. denied, *513 U.S. 1066, 130 L. Ed. 2d 615, 115 S. Ct. 684 (1994)*. Olin Corp. v. FTC, 986 F.2d 1295, 1299 (9th Cir. 1993) ("Every market that encompasses less than all products is, in a sense, a submarket."), cert. denied, *510 U.S. 1110, 127 L. Ed. 2d 373, 114 S. Ct. 1051 (1994)*. Whatever term is used--market, submarket, relevant product market--the analysis is the same.

market definition, but did express some reservations about it. See *American Stores, 872 F.2d 837, 841 (9th Cir. 1989)* ("Were we to evaluate independently the evidence of the relevant product market, we might reach a different conclusion."). However, each of those cases is distinguishable on its facts. None, including Bon-Ton, possessed the compelling pricing evidence submitted **[**43]** to the Court in this case.

**IV. Probable Effect on Competition**

After accepting the Commission's definition of the relevant product market, the Court next must consider the probable effect of a merger between Staples and Office Depot in the geographic markets previously identified One way to do this is to examine the concentration statistics and HHIs within the geographic markets. [12] If the relevant product market is defined as the sale of consumable office supplies through office supply superstores, the HHIs in many of the geographic markets are at problematic levels even before the merger. Currently, the least concentrated market is that of Grand Rapids-Muskegon-Holland, Michigan, with an HHI of 3,597, while the most concentrated is Washington, D.C. with an HHI of 6,944. In contrast, after a merger of Staples and Office Depot, the least concentrated area would be Kalamazoo-Battle Creek Michigan, with an HHI of 5,003, and many areas would have HHIs of 10,000. The average increase in HHI caused by the merger would be 2,715 points. The concentration statistics show that a merged Staples-Office Depot would have a dominant market share in 42 geographic markets across the country. **[**44]** The combined shares of Staples and Office Depot in the office superstore market would be 100% in 15 metropolitan areas. It is in these markets the post-merger HHI would be 10,000. In 27 other metropolitan areas, where the number of office superstore competitors would drop from three to two, the post-merger market shares would range from 45% to 94% with post-merger HHIs ranging from 5,003 to 9,049. Even the lowest of these HHIs indicates a "highly concentrated" market.

According to the Department of Justice Merger Guidelines, a market with an HHI of less than 1000 in "unconcentrated." An HHI **[**45]** between 1000 and 1800 indicates a "moderately concentrated" market, and any market with an HHI over 1800 qualifies as "highly concentrated." See *FTC v. PPG Indus., Inc., 255 U.S. App. D.C. 69, 798 F.2d 1500, 1503 (D.C. Cir. 1986)* (citing the U.S. Department of Justice and Federal Trade Commission Horizontal Merger Guidelines) (hereinafter "Merger Guidelines"). Further, according to the Merger Guidelines, unless mitigated by other factors which lead to the conclusion that the merger is not likely to lessen competition, an increase in the HHI is excess of 50 points in a post-merger highly concentrated market may raise significant competitive concerns. In cases where the post-merger HHI is less **[*1082]** than 1,800, but greater than 1,000, the Merger Guidelines presume that a 100 point increase in the HHI is evidence that the merger will create or enhance market power. The Merger Guidelines, of course, are not binding on the Court, but, as this Circuit has stated, they do provide "a useful illustration of the application of the HHI," *Id. 798 F.2d 1500 at 1503 n. 4*, and the Court will use that guidance here. In addition, though the Supreme Court has established that there is no fixed threshold **[**46]** at which an increase in market concentration triggers the antitrust laws, see e.g., *United States v. Philadelphia National Bank, 374 U.S. 321, 363-65, 10 L. Ed. 2d 915, 83 S. Ct. 1715 (1963)*, this is clearly not a borderline case. The pre-merger markets

---

12 Market power or the lack of it is often determined by the Herfindahl-Hirschmann Index ("HHI") The HHI is calculated by squaring the individual market shares of all the firms in the market and adding up the squares. The HHI takes into account the relative size and distribution of the firms in a market, increasing both as the number of firms in the market decreases and as the disparity in size among those firms increases.

are already in the "highly concentrated" range, and the post-merger HHIs show an average increase of 2,715 points. Therefore, the Court finds that the Plaintiff's have shown a likelihood of success on the merits. With HHIs of this level, the Commission certainly has shown a "reasonable probability" that the proposed merger would have an anti-competitive effect. [13]

**[**47]** The HHI calculations and market concentration evidence, however, are not the only indications that a merger between Staples and Office Depot may substantially lessen competition. Much of the evidence already discussed with respect to defining the relevant product market also indicates that the merger would likely have an anti-competitive effect. The evidence of the defendants' own current pricing practices, for example, shows that an office superstore chain facing no competition from other superstores has the ability to profitably raise prices for consumable office supplies above competitive levels. The fact that Staples and Office Depot both charge higher prices where they face no superstore competition demonstrates that an office superstore can raise prices above competitive levels. The evidence also shows that defendants also change their price zones when faced with entry of another office superstore, but do not do so for other retailers. Since prices are significantly lower in markets where Staples and Office Depot compete, eliminating this competition with one another would free the parties to charge higher prices in those markets, especially those in which the combined entity **[**48]** would be the sole office superstore. In addition, allowing the defendants to merge would eliminate significant future competition. Absent the merger, the firms are likely, and in fact have planned, to enter more of each other's markets, leading to a deconcentration of the market and, therefore, increased competition between the superstores.

In addition, direct evidence shows that by eliminating Staples' most significant, and in many markets only, rival, this merger would allow Staples to increase prices or otherwise maintain prices at an anti-competitive level. [14] **[*1083]** The merger would eliminate significant head-to-head competition between the two lowest cost and lowest priced firms in the superstore market. Thus, the merger would result in the elimination of a particularly aggressive competitor in a highly concentrated market, a factor which is certainly an important consideration when analyzing possible anti-competitive effects. See e.g., *FTC v. Food Town Stores, Inc., 539 F.2d 1339, 1345 (4th Cir. 1976)* (enjoining merger when merging firms had been "aggressive competitors in the past," by

---

[13] The Court is also persuaded by the Commission's HHI calculations for its alternate relevant product market, that of the sale of consumable office supplies through retail stores to small businesses and individuals with home offices. In response to the defendants' arguments regarding the variety of competition in this larger office supply market, the Commission presented HHI calculations which included additional competitors. Besides Staples, Office Depot, and OfficeMax, the Commission included Price Costco, Sam's Club, BJ's, Best Buy, Wal-Mart, Kmart, Target, Circuit City, Computer City, CompUSA, and independent office supply dealers in this alternate HHI calculation. The result showed Sacramento, California as the least concentrated market post-merger with an HHI of 1,793, and Greenville, North Carolina as the most concentrated market post-merger with an HHI of 5,047. Overall, the HHIs increased by an average of 861 points post-merger, an increase that is still problematic according to the Merger Guidelines given that all the post-merger markets were in the "moderately" or "highly concentrated" range. Therefore, for this reason as well, the Court finds that the Commission has shown a "reasonable probability" that the merger would have an anti-competitive effect.

[14] There has been tremendous argument regarding whether the FTC actually contends that prices will go up after the merger. The Court understands that that is not precisely the Commission's contention. Rather, the Commission argues that the merger will have an anti-competitive effect such that the combined firm's prices will be higher after the merger than they would be absent the merger. This does not necessarily mean that prices would rise from the levels they are now. Instead, according to the Commission, prices would simply not decrease as much as they would have on their own absent the merger. It is only in this sense that the Commission has contended that prices would go up--prices would go up compared to where they would have been absent the merger. It is only in this sense that consumers would be faced with "higher" prices. Therefore, when the Court discusses "raising" prices it is also with respect to raising prices with respect to where prices would have been absent the merger, not actually an increase from present price levels.

opening stores in each other's markets and increasing sales by greater than the industry's **[**49]** sales average). It is based on all of this evidence as well that the Court finds that the Commission has shown a likelihood of success on the merits and a "reasonable probability" that the proposed transaction will have an anti-competitive effect.

**[**50]** By showing that the proposed transaction between Staples and Office Depot will lead to undue concentration in the market for consumable office supplies sold by office superstores in the geographic markets agreed upon by the parties, the Commission establishes a presumption that the transaction will substantially lessen competition. See *United States v. Citizens & Southern Nat'l Bank, 422 U.S. 86, 45 L. Ed. 2d 41, 95 S. Ct. 2099 (1975)*; *United States v. Philadelphia Nat'l Bank, 374 U.S. 321, 10 L. Ed. 2d 915, 83 S. Ct. 1715 (1963)*. Once such a presumption has been established, the burden of producing evidence to rebut the presumption shifts to the defendants. See, e.g., *United States v. Marine Bancorporation, 418 U.S. 602, 631, 41 L. Ed. 2d 978, 94 S. Ct. 2856 (1974)*; *United States v. General Dynamics Corp., 415 U.S. 486, 496-504, 39 L. Ed. 2d 530, 94 S. Ct. 1186 (1974)*. To meet this burden, the defendants must show that the market-share statistics give an inaccurate prediction of the proposed acquisition's probable effect on competition. See *United States v. Baker Hughes, Inc., 285 U.S. App. D.C. 222, 908 F.2d 981, 991 (D.C. Cir. 1990)* (rejecting argument that **[**51]** a defendant should be required to "clearly" disprove future anti-competitive effects, because that would impermissibly shift the ultimate burden of persuasion). See also *Marine Bancorporation, 418 U.S. at 631* (finding presumption may be overcome by a showing that the statistics do not accurately reflect the probable effect of the proposed merger on competition). In order to rebut the FTC's showing with respect to the likely anti-competitive effects of a merger, defendants challenged the FTC's market-share statistics in this case in various ways, such as criticizing the Commission's definition of the relevant product market and introducing evidence to counter the FTC's pricing information. Defendants' also made allegations of "cherry-picking" on the part of the Commission, pointing to data which tend to show the opposite from the Commission's contentions. Finally, the defendants argued that the price differentials between one, two, and three firm markets shown by the Commission do not accurately reflect market power because the Commission failed to take into account factors such as the differences in marketing costs between stores.

In their criticism of the Commission's pricing **[**52]** evidence, the defendants accused the FTC of "cherry-picking" its data and pointed to specific examples which contradict the Commission's conclusions. For example, the defendants focused on the FTC's comparison prices on manila folders in two Ohio towns, Columbus which has two superstores and Cincinnati which has all three superstore chains. For 1995-96, the prices of those manila folders were shown to be, on average, 51% higher in the two firm market than in the three firm market. [15] The defendants argued that in contrast to the Ohio example, a comparison of two Indiana towns, Kokomo with two firms and Elkhart/South Bend with all three firms, shows the opposite. In fact, the defendants' comparison **[*1084]** of the average prices of manila folders for 1996 in Kokomo and Elkhart/South Bend shows that the prices in Kokomo, the two firm market, were 30% lower than in the three firm market.

**[**53]** The Court acknowledges that there is some evidence of this type in the record, and the Court has considered all of it. However, the fact that there may be some examples with respect to individual items in individual cities which contradict the FTC's evidence does not overly

---

[15] The FTC also presented comparison prices in Columbus and Cincinnati for perforated pads (86% higher in Columbus), envelops (68% higher), computer paper (26% higher), hammermill paper (14% higher), and generic paper (12% higher).

concern the Court. A few examples of isolated products simply cannot refute the power of the FTC's evidence with respect to the overall trend over time, which is that Staples' and Office Depot's prices are lowest in three firm markets and highest where they do not compete with another office superstore. Neither does the fact that some two superstore areas have lower prices than some three firm markets. In addition, a closer examination of the price comparison study done by the defendants for Kokomo and Elkhart/South Bend shows that for four of the six products compared, the prices were actually higher in Kokomo. [16] Moreover, when Staples' total of price sensitive and non-price sensitive items are examined, Kokomo's prices are between 3 and 5% higher than Elkhart, which reconfirms the Commission's result rather than refuting it.

**[**54]** Defendants also argued that the regional price differences set forth in the FTC's pricing evidence do not reflect market power, because the reason for those differentials is not solely the presence or absence of other superstore competition. Instead, argued the defendants, these differentials are the result of a host of factors other than superstore competition. As examples of other factors which cause differences in pricing between geographic markets, the defendants offered sales volume, product mix, marketing or advertising costs, and distribution costs. Defendants also argued that there are differences in wages and rent which cause the differences in pricing between certain stores. The Court, however, cannot find that the evidence submitted by the defendants with respect to other reasons for the differences in pricing between one, two, and three firm markets is sufficient to rebut the Commission's evidence.

The Court generally accepts that per-store advertising costs, such as those incurred for a newspaper insert, will likely be lower in markets where Staples or Office Depot has a larger number of stores as those costs may be spread over a larger number of stores, and the defendants **[**55]** have provided some concrete evidence that the price differentials shown by the FTC may be somewhat affected by marketing costs. Donna Rosenberg, Vice President of Marketing Strategy at Staples, testified by declaration that Staples has the lowest average marketing costs per store in Staples/Office Depot areas and the highest marketing costs per store in Staples only areas. Exhibit H to her declaration shows, more specifically, that in 1996 Staples stores in three firm areas had an average marketing expense of 202,112. In Staples/Office Depot areas, Staples' stores had an average marketing expense of 185,905. Staples stores in Staples/OfficeMax areas paid an average of 218,500, and the stores in Staples only markets had an average marketing expense of 24(43,763. These numbers do suggest a correlation between the prices charged by Staples and marketing costs as average marketing costs are higher in the one firm markets than the three firm markets. However, the marketing cost evidence also shows that marketing costs are lower in Staples/Depot areas than in Staples/OfficeMax areas and, in fact, that costs are higher in Staples/OfficeMax areas than in the three firm markets, which does **[**56]** not correspond with the pricing trend. Staples generally charges lower prices where it competes with Office Depot than where it competes with OfficeMax and generally charges lower prices in three firm markets than in Staples/OfficeMax areas. In addition, the differences in marketing costs are not so large that they alone could account for the significant price differentials shown by the FTC.

**[*1085]** As the Court has already noted, the defendants, of course, point to other factors besides marketing costs. However, unlike the comparison of average marketing costs between one, two, and three firm markets, the defendants produced no concrete evidence in support of these other factors. For example, the Court believes that it is probably true that distribution costs are

---

[16] The Defendants also paralleled the FTC's evidence with respect to perforated pads (8% lower in Kokomo), envelopes (5% higher), computer paper (8% higher), hammermill paper (1% higher), and generic paper (1% lower)

higher for stores which are the farthest from either company's distribution centers. Yet, the defendants introduced no evidence to show that the one firm markets are, in fact, the farthest from distribution centers or that in the three firm markets, the stores are the closest to the distribution centers. Nor did the defendants introduce any evidence showing the actual differences in distribution costs based on a store's distance **[**57]** from a distribution center. The only evidence that the Court heard on this point was the testimony of Thomas Stemberg, Chairman and CEO of Staples, who testified at the hearing that "typically the smaller markets are further away from the distribution hubs. It costs you a lot more to haul freight up to Bangor, Maine, than it does from Hagerstown to Washington." The Court cannot find that the FTC's pricing evidence is seriously undermined by such a general statement.

The defendants' evidence is similar with respect to sales volume, rent and wages. For example, Steven Mandel, Senior Managing Director of Tiger Management Corporation, testified at the hearing that single store markets are typically smaller markets. He continued by explaining that even though the costs of rent and labor may be lower in a smaller market, they would be higher as a percentage of sales because the volume of sales are also typically lower in these smaller markets. Therefore, in order to come out with a decent return on investment, it will be necessary to have a modestly higher gross margin in those markets. While this seems logical to the Court, again, the only evidence presented on the point is very general **[**58]** and the Court cannot give it much weight. For example, Mr. Mandel testified that "typically" one firm areas are in smaller markets but offered no concrete evidence relating specifically to Staples' or Office Depot's one firm market stores. Also, the Court has heard evidence that Bangor, Maine, a one firm store in a smaller market, actually has an extremely high volume of sales which directly contradicts Mr. Mandel's testimony. Mr. Mandel is not employed by either Staples or Office Depot, and while he may be generally knowledgeable about the broader office supply industry, the Court questions his level of knowledge with respect to individual Staples and Office Depot stores. Finally, Mr. Mandel's testimony regarding the fact that he would generally expect higher gross margins in smaller one firm markets is contradicted by other evidence submitted by the defendants in their DX 1968 which states that in 1996, Staples' lowest gross margins were in the one superstore areas. For these reasons, the Court cannot find that the defendants' evidence regarding the different costs attributed to sales volume, rent, and wages shows that the Commission's evidence gives an inaccurate prediction of the **[**59]** proposed acquisition's probable effect on competition.

The defendants also argued that the variations in product mix between different stores account for some of the differences in prices between one, two, and three firm markets. For example, defendants argued that Staples' mix of general office supplies is highest in three superstore towns (37.29% of retail sales), lower in Staples/Office Depot areas (36.14%), lower yet in Staples/OfficeMax areas, and lowest in Staples-only areas (26.68%). On the other hand, defendants argue, computer mix is highest in Staples-only areas (30.36%), and lowest in three superstore areas (13.62%). Computer sales make up 40% of store sales in Bangor, Maine, for example, but only 10% in Los Angeles. Pointing to evidence showing that Staples' sale of computers in 1996 generated a net loss of 10.6%, defendants argued that stores with higher computer sales must have higher margins on their other products to generate sufficient total returns. Therefore, defendants explained that the higher prices of consumable office supplies in these areas are a result of economic costs and do not imply that Staples has more market power in Staples-only markets. The Court **[**60]** cannot agree. While the higher percentage of computer sales in a one firm market such as **[*1086]** Bangor, Maine, may be one of the reasons that Staples chooses

to charge higher prices for consumable office supplies in that location, it does not change the fact that Staples is able to charge those higher prices. The primary reason that computer sales generate a very small or even negative return is the competition among sellers of computers. Individual competitors are effectively constrained from raising prices on computers. The fact that Staples can raise its prices for consumable office supplies in order to offset the low or negative returns on the sale of computers shows the opposite -- that Staples is not constrained by non-superstore competitors from raising prices on consumable office supplies.

The above discussion covers some of the ways in which the defendants have challenged the FTC's market-share statistics in this case, including the highly debated issue of the relevant product market definition as well as the defendants' allegations of "cherry-picking" on the part of the Commission, and the defendants' argument that regional price differentials do not reflect market power because **[**61]** of the other factors such as marketing costs involved. However, in addition to attempting to discredit the Commission's evidence with respect to the combined company's market share and ability to raise prices, the defendants focused specifically on two other areas in an attempt to rebut the presumption that the proposed transaction will substantially lessen competition -- entry into the market and efficiencies.

**V. Entry Into the Market**

"The existence and significance of barriers to entry are frequently, of course, crucial considerations in a rebuttal analysis . . . [because] in the absence of significant barriers, a company probably cannot maintain supra-competitive pricing for any length of time." *Baker Hughes, Inc., 908 F.2d at 987*. Thus, the Court must consider whether, in this case, "entry into the . . . market would likely avert anticompetitive effects from [Staples'] acquisition of [Office Depot]" *Id. at 989*. If the defendants' evidence regarding entry showed that the Commission's market-share statistics give an incorrect prediction of the proposed acquisition's probable effect on competition because entry into the market would likely avert any anti-competitive **[**62]** effect by acting as a constraint on Staples-Office Depot's prices, the Court would deny the FTC's motion. The Court, however, cannot make such a finding in this case.

The defendants argued the hearing and in their briefs that the rapid growth in overall office supply sales has encouraged and will continue to encourage expansion and entry. One reason for this, according to Dr. Hausman's declaration, is that entry is more attractive when an industry is growing, because new entrants can establish themselves without having to take all of their sales away from existing competitors. In addition, the defendants' impressive retailing expert, Professor Maurice Segall, testified at the hearing that there are "no barriers to entry in retailing," and defendants pointed to the fact that all office superstore entrants have entered within the last 11 years.

In addition to this general testimony regarding entry, defendants emphasized specific examples of recent or planned entry. For example, defendants offered testimony from John Ledecky, Chairman and CEO of U.S. Office Products, regarding U.S. Office Products' acquisition of Mailboxes, Etc., an acquisition that was coincidentally announced the **[**63]** night before Mr. Ledecky's testimony in this case. Through this acquisition, U.S. Office Products, an organization or co-op of approximately 165 contract stationers located throughout the country, will acquire the 3300-unit Mailboxes, Etc. franchise operation. Defendants also offered testimony regarding Wal-Mart's plans to revamp and expand the office supply section in its stores. According to the deposition

testimony of William Long, Vice President for Merchandizing at Wal-Mart, and David Glass, President and CEO of Wal-Mart, Wal-Mart will modify its office supplies department, called "Department 3," beginning in May 1997 and continuing through the summer. Though Mr. Long was not certain of the exact number of SKUs of office supplies Wal-Mart's new Department 3 will offer, he estimated the range to **[*1087]** be 2,600 to 3,000 SKUs. [17] Finally, defendants offered testimony regarding the general ability of mass merchandisers, computer superstores, and warehouse clubs to change store configurations and shift shelf space to accommodate new demands or popular products.

**[**64]** There are problems with the defendants' evidence, however, that prevent the Court from finding in this case that entry into the market by new competitors or expansion into the market by existing firms would likely avert the anti-competitive effects from Staples' acquisition of Office Depot. For example, while it is true that all office superstore entrants have entered within the last 11 years, the recent trend for office superstores has actually been toward exiting the market rather than entering. Over the past few years, the number of office superstore chains has dramatically dropped from twenty-three to three. All but Staples, Office Depot, and OfficeMax have either closed or been acquired. The failed office superstore entrants include very large, well-known retail establishments such as Kmart, Montgomery Ward, Ames, and Zayres. A new office superstore would need to open a large number of stores nationally in order to achieve the purchasing and distribution economies of scale enjoyed by the three existing firms. Sunk costs would be extremely high. Economies of scale at the local level, such as in the costs of advertising and distribution, would also be difficult for a new superstore **[**65]** entrant to achieve since the three existing firms have saturated many important local markets. For example, according to the defendants' own saturation analyses, Staples estimates that there is room for less than two additional superstores in the Washington, D.C. area and Office Depot estimates that there is room for only two more superstores in Tampa, Florida.

The Commission offered Office 1 as a specific example of the difficulty of entering the office superstore arena. Office 1 opened its first two stores in 1991. By the end of 1994, Office 1 had 17 stores, and grew to 35 stores operating in 11 Midwestern states as of October 11, 1996. As of that date, Office 1 was the fourth largest office supply superstore chain in the United States. Unfortunately, also as of that date, Office 1 filed for Chapter 11 bankruptcy protection. Brad Zenner, President of Office 1, testified through declaration, that Office 1 failed because it was severely undercapitalized in comparison with the industry leaders, Staples, Office Depot, and OfficeMax. In addition, Mr. Zenner testified that when the three leaders ultimately expanded into the smaller markets where Office 1 stores were located, they seriously **[**66]** undercut Office 1's retail prices and profit margins. Because Office 1 lacked the capitalization of the three leaders and lacked the economies of scale enjoyed by those competitors, Office 1 could not remain profitable.

For the reasons discussed above, the Court finds it extremely unlikely that a new office superstore will enter the market and thereby avert the anti-competitive effects from Staples' acquisition of Office Depot. The defendants, of course, focused their entry argument on more than just the entry of additional superstores, pointing also to the expansion of existing companies such as U.S. Office Products and Wal-Mart. The Court also finds it unlikely that the expansions by U.S. Office Products and Wal-Mart would avert the anti-competitive effects which would result from the merger.

---

[17] Redacted.

The problems with the defendants' evidence regarding U.S. Office Products are numerous. In contrast to Staples and Office Depot, U.S. Office Products is a company which is focused on a contract stationers business servicing primarily the medium corporate segment. The Mailboxes stores recently acquired by U.S. Office Products carry only 50-200 SKUs of office supplies in stores of approximately **[**67]** 1,000-4,000 square feet with no more than half of that area devoted to consumable office supplies. In addition to their small size and limited number of SKUs, the Mailboxes stores would not actually be new entrants. U.S. Office Products is acquiring existing stores, and, besides Mr. Ledecky's plans to put a U.S. Office Products catalogue in every Mailboxes store, there was no testimony regarding plans to expand the **[*1088]** number of SKUs available in the retail stores themselves nor to increase the size of the average Mailboxes store. Finally, though Mr. Ledecky testified that if Staples and Office Depot were to raise prices after the merger he would look on that as an opportunity to take business away from the combined entity, he later clarified that statement by explaining that he meant in the contract stationer field.

The defendants' evidence regarding Wal-Mart's expansion of Department 3 has similar weaknesses. While the total number of SKUs expected to be carried by the new Department 3 is impressive, Mr. Glass estimated it to be between 2,600 to 3,000 SKUs, the evidence shows that this is only an increase of approximately 400 SKUs. The Court has already found that Wal-Mart's sales of **[**68]** office supplies are outside the relevant product market in this case primarily because the pricing evidence shows that Wal-Mart does not presently effectively constrain the superstores' prices. The Court cannot conclude that an addition of 400 SKUs and reconfigured shelf space will significantly change Wal-Mart's ability to constrain Staples' and Office Depot's prices. The superstores will continue to offer significantly more SKUs of consumable office supplies. For these reasons, the Court cannot find that Wal-Mart's expansion through Department 3 is likely to avert anti-competitive effects resulting from Staples' acquisition of Office Depot. [18]

The defendant.

The defendants' final argument with respect to entry was that existing retailers such as Sam's Club, Kmart, and Best Buy have the capability to reallocate their shelf space to include additional SKUs of office supplies. While stores such as these certainly do have the power to reallocate shelf space, there is no evidence that they will in **[**69]** fact do this if a combined Staples-Office Depot were to raise prices by 5% following a merger. In fact, the evidence indicates that it is more likely that they would not. For example, even in the superstores' anti-competitive zones where either Staples or Office Depot does not compete with other superstores, no retailer has successfully expanded its consumable office supplies to the extent that it constrains superstore pricing. Best Buy attempted such an expansion by creating an office supplies department in 1994, offering 2000 SKUs of office supplies, but found the expansion less profitable than hoped for and gave up after two years. For these reasons, the Court also cannot find that the ability of many sellers of office supplies to reconfigure shelf space and add SKUs of office supplies is likely to avert anti-competitive effects from Staples' acquisition of Office Depot. The Court will next consider the defendants' efficiencies defense.

**VI. Efficiencies**

Whether an efficiencies defense showing that the intended merger would create significant efficiencies in the relevant market, thereby offsetting any anti-competitive effects, may be used

---

[18] Redacted.

by a defendant to rebut the **[**70]** government's prima facie case is not entirely clear. The newly revised efficiencies section of the Merger Guidelines recognizes that, "mergers have the potential to generate significant efficiencies by permitting a better utilization of existing assets, enabling the combined firm to achieve lower costs in producing a given quality and quantity than either firm could have achieved without the proposed transactions." See Merger Guidelines § 4. This coincides with the view of some courts that "whether an acquisition would yield significant efficiencies in the relevant market is an important consideration in predicting whether the acquisition would substantially lessen competition. . . . Therefore, . . . an efficiency defense to the government's prima facie case in *section 7* challenges is appropriate in certain circumstances." *FTC v. University Health, 938 F.2d 1206, 1222 (11th Cir. 1991)*. The Supreme Court, however, in *FTC v. Procter & Gamble Co., 386 U.S. 568, 579, 18 L. Ed. 2d 303, 87 S. Ct. 1224 (1967)*, stated that "possible economies cannot be used as a defense to illegality in *section 7* merger cases." There has been great disagreement regarding the meaning of this **[**71]** precedent and whether an efficiencies defense is permitted. Compare *RSR Corp. v. FTC, 602 F.2d 1317, 1325* **[*1089]** *(9th Cir. 1979)* (finding that the efficiencies argument has been rejected repeatedly), cert. denied, *445 U.S. 927, 63 L. Ed. 2d 760, 100 S. Ct. 1313 (1980)*with *University Health, 938 F.2d at 1222* (recognizing the defense). Neither the Commission or the defendants could point to a case in which this Circuit has spoken on the issue. But see *FTC v. Coca-Cola Co., 641 F. Supp. 1128, 1141 (D.D.C. 1986)* (Gesell) (finding that Congress recognised as desirable efficiencies that benefit consumers, but that they were to be "developed by dominant concerns using their brains, not their money by buying out troubling competitors. The Court has no authority to move in a direction neither Congress nor the Supreme Court has accepted."), vacated as moot, *264 U.S. App. D.C. 406, 829 F.2d 191 (D.C. Cir. 1987)*. Assuming that it is a viable defense, however, the Court cannot find in this case that the defendants' efficiencies evidence rebuts the presumption that the merger may substantially lessen competition or shows that the Commission's evidence givees an inaccurate prediction of the proposed acquisition's probable effect.

The Court **[**72]** agrees with the defendants that where, as here, the merger has not yet been consummated, it is impossible to quantify precisely the efficiencies that it will generate. In addition, the Court recognizes a difference between efficiencies which are merely speculative and those which are based on a prediction backed by sound business judgment. Nor does the Court believe that the defendants must prove their efficiencies by "clear and convincing evidence" in order for those efficiencies to be considered by the Court. That would saddle *Section 7* defendants with the nearly impossible task of rebutting a possibility with a certainty, a burden which was rejected in *United States v. Baker Hughes, Inc. 285 U.S. App. D.C. 222, 908 F.2d 981, 992 (D.C. Cir. 1990)*. Instead, like all rebuttal evidence in *Section 7* cases, the defendants must simply rebut the presumption that the merger will substantially lessen competition by showing that the Commission's evidence gives an inaccurate prediction of the proposed acquisition's probable effect. See *id. at 991*. Defendants, however, must do this with credible evidence, and the Court with respect to this issue did not find the defendants' evidence **[**73]** to be credible.

Defendants' submitted an "Efficiencies Analysis" which predicted that the combined company would achieve savings of between $ 4.9 and $ 6.5 billion over the next five years. In addition, the defendants argued that the merger would also generate dynamic efficiencies. For example, defendants argued that as suppliers become more efficient due to their increased sales volume to the combined Staples-Office Depot, they would be able to lower prices to their other retailers. Moreover, defendants argued that two-thirds of the savings realized by the combined company would be passed along to consumers.

Evaluating credibility, as the Court must do, the Court credits the testimony and Report of the Commission's expert, David Painter, over the testimony and Efficiencies Study of the defendants' efficiencies witness, Shira Goodman, Senior Vice President of Integration at Staples. Mr. Painter's testimony was compelling, and the Court finds, based primarily on Mr. Painter's testimony, that the defendants' cost savings estimates are unreliable. First, the Court notes that the cost savings estimate of $ 4.947 billion over five years **[**74]** which was submitted to the Court exceeds by almost 500% the figures presented to the two Boards of Directors in September 1996, when the Boards approved the transaction. The cost savings claims submitted to the Court are also substantially greater than those represented in the defendants' Joint Proxy Statement/Prospectus "reflecting the best currently available estimate of management," and filed with the Securities and Exchange Commission on January 23, 1997, or referenced in the "fairness opinions" rendered by the defendants' investment bankers which are contained in the Proxy Statement.

The Court also finds that the defendants' projected "Base Case" savings of $ 5 billion are in large part unverified, or at least the defendants failed to produce the necessary documentation for verification. One example of this is the estimated cost savings from the Goods and Services category which projects cost savings of $ 553 million, about 10% of the **[*1090]** total cost savings attributed to the merger by the defendants. Ms. Goodman admitted that the entire backup, source, and the calculations of the Goods and Services' cost savings were not included in the Efficiencies Analysis. In addition, Ms. Goodman **[**75]** was unable to explain the methods used to calculate many of the cost savings. Similarly, the projected distribution cost savings, $ 883 million or 17% of the projected total cost savings, are problematic. Defendants' consultant A.T. Kearney estimated the savings, and Ms. Goodman admitted the Efficiency Analysis did not show that Kearney had deducted the projected Staples stand-alone savings from the new Hagerstown and Los Angeles full line distribution centers.

As with the failure to deduct the Staples stand-alone savings from the new Hagerstown and Los Angeles full line distribution centers from the projected distribution cost savings, the evidence shows that the defendants did not accurately calculate which projected cost savings were merger specific and which were, in fact, not related to the merger. For example, defendants' largest cost savings, over $ 2 billion or 40% of the total estimate, are projected as a result of their expectation of obtaining better prices from vendors. However, this figure was determined in relation to the cost savings enjoyed by Staples at the end of 1996 without considering the additional cost savings that Staples would have received in the future as **[**76]** a stand-alone company. Since Staples has continuously sought and achieved cost savings on its own, clearly the comparison that should have been made was between the projected future cost savings of Staples as a stand-alone company, not its past rate of savings, and the projected future cost savings of the combined company. Thus, the calculation in the Efficiencies Analysis included product cost savings that Staples and Office Depot would likely have realized without the merger. In fact, Mr. Painter testified that, by his calculation, 43% of the estimated savings are savings that Staples and Office Depot would likely have achieved as stand-alone entities.

There are additional examples of projected savings, such as the projected savings on employee health insurance, which are not merger specific, but the Court need not discuss every example here. However, in addition to the non-merger specific projected savings, Mr. Painter also revealed problems with the defendants' methodology in making some of the projections. For example, in calculating the projected cost savings from vendors, Staples estimated cost savings for a selected

group of vendors, and then extrapolated these estimated savings **[**77]** to all other vendors. Mr. Painter testified that, although Hewlett Packard is Staples' single largest vendor, it was not one of the vendors used for the savings estimate. In addition, the evidence shows that Staples was not confident that it could improve its buying from Hewlett Packard. Yet, Staples' purchases and sales of Hewlett Packard products were included in the "all other" vendor group, and defendants, thereby, attributed cost savings in the amount of $ 207 million to Hewlett Packard even though Staples' personnel did not believe that they could, in fact, achieve cost savings from Hewlett Packard.

In addition to the problems that the Court has with the efficiencies estimates themselves, the Court also finds that the defendants' projected pass through rate--the amount of the projected savings that the combined company expects to pass on to customers in the form of lower prices-is unrealistic. The Court has no doubt that a portion of any efficiencies achieved through a merger of the defendants would be passed on to customers. Staples and Office Depot have a proven track record of achieving cost savings through efficiencies, and then passing those savings to customers in the **[**78]** form of lower prices. However, in this case the defendants have projected a pass through rate of two-thirds of the savings while the evidence shows that, historically, Staples has passed through only 15-17%. Based on the above evidence, the Court cannot find that the defendants have rebutted the presumption that the merger will substantially lessen competition by showing that, because of the efficiencies which will result from the merger, the Commission's evidence gives an inaccurate prediction of the proposed acquisition's probable effect. Therefore, the only remaining issue for the Court is the balancing of the equities.

**[*1091] VII. The Equities**

***HN6*** Where, as in this case, the Court finds that the Commission has established a likelihood of success on the merits, a presumption in favor of a preliminary injunction arises. *FTC v. PPG Indus. Inc., 255 U.S. App. D.C. 69, 798 F.2d 1500, 1507 (D.C. Cir. 1986)*; *FTC v. Alliant Techsystems Inc., 808 F. Supp. 9, 22-23 (D.D.C. 1992)*. Despite this presumption, however, once the Court has determined the FTC's likelihood of success on the merits, it must still turn to and consider the equities. The D.C. Circuit has held that in cases such **[**79]** as the one now before the Court, a judge is obligated "to exercise independent judgment on the propriety of issuance of a temporary restraining order or preliminary injunction." *FTC v. Weyerhaeuser Co., 214 U.S. App. D.C. 254, 665 F.2d 1072, 1082 (D.C.Cir. 1981)* (quoting H.R.Rep.No. 624 at 31). "Independent judgment is not exercised when a court responds automatically to the agency's threshold showings. To exercise such judgment, the court must take genuine account of 'the equities.'" Id.

***HN7*** There are two types of equities which the Court must consider in all *Section 13(b)* cases, private equities and public equities. In this case, the private equities include the interests of the shareholders and employees of Staples and Office Depot. The public equities are the interests of the public, either in having the merger go through or in preventing the merger. An analysis of the equities properly includes the potential benefits, both public and private, that may be lost by a merger blocking preliminary injunction. *Id. at 1083*. In addition, the Court notes that in balancing the equities, it is important to keep in mind that while private equities are important, "when the Commission **[**80]** demonstrates a likelihood of ultimate success, a counter showing of private equities alone would not suffice to justify denial of a preliminary injunction barring the merger." *Id. at 1083*. After examining the evidence in this case, the Court finds that in light of the public equities advanced by the plaintiff, the equities, both public and private, set forth by the defendants are insufficient to overcome the presumption in favor of granting a preliminary injunction.

The strong public interest in effective enforcement of the antitrust laws weighs heavily in favor of an injunction in this case, as does the need to preserve meaningful relief following a full administrative trial on the merits. "Unscrambling the eggs" after the fact is not a realistic option in this case. Both the plaintiff as well as the defendants introduced evidence regarding the combined company's post-merger plans, including the consolidation of warehouse and supply facilities in order to integrate the two distribution systems, the closing of 40 to 70 Office Depot and Staples stores, changing the name of the Office Depot stores, negotiating new contracts with manufacturers and suppliers, and, lastly, the consolidation **[**81]** of management which is likely to lead to the loss of employment for many of Office Depot's key personnel. As a result, the Court finds that it is extremely unlikely, if the Court denied the plaintiff's motion and the merger were to go through, that the merger could be effectively undone and the companies divided if the agency later found that the merger violated the antitrust laws. It would not simply be a matter of putting the old Office Depot signs back on the stores. Office Depot would have lost its name, many of its stores, its distribution centers, and key personnel. It would also be behind in future plans to open new stores and expand on its own.

More importantly, in addition to the practical difficulties in undoing the merger, consumers would be at risk of serious anti-competitive harm in the interim. Without an injunction, consumers in the 42 geographic markets where superstore competition would be eliminated or significantly reduced face the prospect of higher prices than they would have absent the merger. These higher charges could never be recouped even if the administrative proceeding resulted in a finding that the merger violated the antitrust laws. Failure to grant a **[**82]** preliminary injunction also would deny consumers the benefit of any new competition that would have occurred, absent the merger, between Staples and Office Depot as those stores continued to enter and compete in each other's markets. Both parties had aggressive expansion plans before the merger, many of which have been put on hold pending the outcome of this case.

**[*1092]** The public equities raised by the defendants simply do not outweigh those offered by the FTC. In addition, given some of the Court's earlier findings, several of the public equities submitted by the defendants are without factual support. For example, the defendants argued that the public equities favor the merger because prices will fall for all products, in all markets, following the merger. Since the Court has already found that the Commission has shown a likelihood of success on the merits with respect to proving that the proposed merger will have anti-competitive effects, the Court cannot give any weight to this particular public equity advanced by the defendants. In addition, as the Court has previously explained, the fact that prices might be lower than current prices after the merger does not mean that the merger **[**83]** will not have an anti-competitive effect. Consumers would still be hurt if prices after the merger did not fall as far as they would have absent the merger. Similarly, the Court has already determined the defendants' efficiencies evidence to be unconvincing. On the public equities issue as it relates to efficiencies, Dr. Hausman testified that the merger will result in huge efficiencies to the U.S. economy, and that the cost savings realized as a result of those efficiencies will result in the creation of additional jobs. While the Court believes that there would be some efficiencies realized by the merger, though not at the level argued by the defendants, the Court cannot find that those efficiencies would result in the creation of so many additional jobs that this public equity would outweigh those argued by the plaintiff.

Finally, according to the defendants, the public equities also include the benefits consumers will derive from even greater product selection and the benefits the U.S. economy will derive from

increased international trade as the combined company through its increased efficiencies and improved distribution system will be poised for a dramatic expansion into foreign **[**84]** markets. Defendants, however, have provided no specific evidence regarding the probable increase in product selection or the likelihood that a combined Staples-Office Depot will expand overseas. In addition, the Court is not convinced that this is an appropriate equity which the Court may consider in this case. The Court, therefore, cannot find that the public equities regarding increased product selection for consumers and expansion into foreign markets overcome the public equities set forth by the FTC.

Turning finally to the private equities, the defendants have argued that the principal private equity at stake in this case is the loss to Office Depot shareholders who will likely lose a substantial portion of their investments if the merger is enjoined. The Court certainly agrees that Office Depot shareholders may be harmed, at least in the short term, if the Court granted the plaintiff's motion and enjoined the merger. This private equity alone, however, does not suffice to justify denial of a preliminary injunction.

The defendants have also argued that Office Depot itself has suffered a decline since the incipiency of this action. It is clear that Office Depot has lost key personnel, **[**85]** especially in its real estate department. This has hurt this year's projected store openings. The defendants argue, therefore, that Office Depot, as a separate company, will have difficulty competing if the merger is enjoined. While the Court recognizes that Office Depot has indeed been hurt or weakened as an independent stand-alone company, the damage is not irreparable. The evidence shows that Office Depot, which of the three superstores has been the low-priced aggressive maverick of the group, would continue generating sales volume and turning a substantial profit. In reaching this conclusion, the Court credits one of the defendants' own expert witnesses, Steven Mandel, who testified that, in his opinion, Office Depot would be fine even if the merger did not go through. He described Office Depot as a very strong and well-run company, and said that it would certainly have a little bit of a hole to dig out of if the merger were enjoined. However, his ultimate conclusion was that the company would recover. Certainly Office Depot is in a better position to recover and move forward now if the Court grants the plaintiff's motion than it would be if the merger was allowed to go forward **[**86]** and **[*1093]** then later the two companies were ordered to separate.

**<u>CONCLUSION</u>**

Thomas Stemberg pioneered the office supply superstore concept in 1985. He created a deep discount chain selling a broad array of office supplies primarily to small businesses which theretofore were undeniably "paying through the nose" for office supplies. Staples was to be a high volume chain operating at low gross margins, with higher volume leading to still lower costs for consumers. Staples' pricing as well as the pricing of other office supply superstores which soon followed Staples' lead, revolutionized the office products industry, impacting all channels of office products retailing. By selling office products at 30 to 60% off list price, Staples and the other superstores worked as a catalyst that forced everyone else in the industry to focus on cutting their prices. In a relatively short period of time, the office supply superstores caused a general decrease in the price of office products across the board. That decrease continued as the superstores have increased their buying power, forcing manufacturers and suppliers to implement efficiencies in their own businesses in order to compete in the **[**87]** sale of their products.

In light of the undeniable benefits that Staples and Office Depot have brought to consumers, it is with regret that the Court reaches the decision that it must in this case. This decision will most

likely kill the merger. The Court feels, to some extent, that the defendants are being punished for their own successes and for the benefits that they have brought to consumers. In effect, they have been hoisted with their own petards. See William Shakespeare, Hamlet act 3, sc. 4. In addition, the Court is concened with the broader ramifications of this case. The superstore or "category killer" like office supply superstores are a fairly recent phenomenon and certainly not restricted to office supplies. There are a host of superstores or "category killers" in the United States today, covering such areas as pet supplies, home and garden products, bed, bath, and kitchen products, toys, music, books, and electronics. Indeed, such "category killer" stores may be the way of retailing for the future. It remains to be seen if this case is sui generis or is the beginning of a new wave of FTC activism. For these reasons, the Court must emphasize that the ruling **[**88]** in this case is based strictly on the facts of this particular case, and should not be construed as this Court's recognition of general superstore relevant product markets.

Despite the Court's sympathy toward the plight of the defendants in this case, the Court finds that the Commission has shown a "reasonable probability" that the proposed merger between Staples and Office Depot may substantially impair competition and likewise has "raised questions going to the merits so serious, substantial, difficult and doubtful as to make them fair ground for thorough investigation, study, deliberation and determination by the FTC in the first instances and ultimately by the Court of Appeals." Therefore, the Court finds that the Commission has shown a likelihood that it will succeed in proving, after a full administrative trial on the merits, that the effect of the proposed merger between Staples and Office Depot "may be substantially to lessen competition" in violation of *Section 7* of the Clayton Act. In addition, the Court has weighed the equities and finds that they tip in favor of granting a preliminary injunction. A preliminary injunction is, therefore, found to be in the public interest. **[**89]** The FTC's motion for a preliminary injunction shall be granted.

The Court once again commends counsel on both sides for their excellent performances in this matter and the tremendous efforts made on both sides. Though this was an extremely complex matter, the issues were clearly presented to the Court by counsel possessing superior advocacy skills. Counsel also exhibited a high degree of professionalism in their ability to resolve peripheral matters so that the Court could focus on the important issues presented by this action.

An appropriate order accompanies this Memorandum Opinion.

June 30, 1997

Thomas F. Hogan

United States District Judge

**ORDER**

For the reasons set forth in the accompanying Memorandum Opinion, the Court finds that the Commission has shown a "reasonable probability" that the proposed merger between Staples and Office Depot may substantially impair competition and likewise has "raised questions going to the merits so serious, substantial, difficult and doubtful as to make them fair ground for thorough investigation, study, deliberation and determination by the FTC in the first instances and ultimately by the Court of Appeals." Therefore, the **[**90]** Court finds that the Commission has shown a likelihood that it will succeed in proving, after a full administrative trial on the

merits, that the effect of the proposed merger between Staples and Office Depot "may be substantially to lessen competition" in violation of *Section 7* of the Clayton Act. In addition, the Court has weighed the equities and finds that they tip in favor of granting a preliminary injunction. A preliminary injunction is, therefore, found to be in the public interest. It is therefore

ORDERED that the Federal Trade Commission's Motion for a Preliminary Injunction is GRANTED, and it is further

ORDERED that the defendants Staples, Inc. and Office Depot, Inc. are hereby ENJOINED from consummating the acquisition by defendant Staples, Inc. of defendant Office Depot, Inc., pending final disposition before the Commission of administrative proceedings to determine whether such acquisition may substantially lessen competition in violation of *Section 7* of the Clayton Act, *15 U.S.C. § 18*, and *Section 5* of the Federal Trade Commission Act, *15 U.S.C. § 45*.

June 30, 1997

Thomas F. Hogan

United States District **[**91]** Judge

EXHIBIT 271

LexisNexis®

Caution
As of: August 12, 2014 9:13 AM EDT

# Hipsaver Co. v. J.T. Posey Co.

United States District Court for the District of Massachusetts
July 19, 2007, Decided
CIVIL ACTION NO. 05-10917-PBS

**Reporter:** 497 F. Supp. 2d 96; 2007 U.S. Dist. LEXIS 51933; 2007-2 Trade Cas. (CCH) P75,851
THE HIPSAVER COMPANY, INC., Plaintiff, v. J.T. POSEY COMPANY, Defendant.

**Prior History:** *HipSaver Co. v. J.T. Posey Co., 490 F. Supp. 2d 55, 2007 U.S. Dist. LEXIS 35364 (D. Mass., May 15, 2007)*

**Core Terms**

sales, causation, damages, advertisements, discovery, comparative, products, parties, sales data, false advertising, willfulness, growth rate, hip, protector, profits, database, customers, literally, proffer, settlement agreement, actual harm, differential, argues, representations, competitor, chain, summary judgment motion, reasonable inference, disgorgement, settlement

**LexisNexis® Headnotes**

Civil Procedure > Discovery & Disclosure > Disclosure > Sanctions
Civil Procedure > ... > Discovery > Misconduct During Discovery > Motions to Compel

***HN1*** *Fed. R. Civ. P. 37(c)(1)* provides a "self-executing sanction" for failure to make evidentiary disclosures required by the Federal Rules.

Civil Procedure > Discovery & Disclosure > Disclosure > Sanctions
Civil Procedure > ... > Discovery > Misconduct During Discovery > Motions to Compel

***HN2*** See *Fed. R. Civ. P. 37(c)(1)*.

Civil Procedure > Discovery & Disclosure > Disclosure > Motions to Compel
Civil Procedure > Discovery & Disclosure > Disclosure > Sanctions
Civil Procedure > ... > Discovery > Misconduct During Discovery > Motions to Compel

***HN3*** A court may, in its discretion, preclude evidence if: (1) the offending parties were not substantially justified in failing to disclose information required by *Fed. R. Civ. P. 26(a)* or *Fed. R. Civ. P. 26(e)*; and (2) the failure to disclose was not harmless. In that analysis, courts consider a multiplicity of pertinent factors, including the history of the litigation, the proponent's need for the challenged evidence, the justification, if any, for the late disclosure, and the opponent's ability to overcome its adverse effects. Surprise and prejudice are important integers in this calculation. Because the Rule contemplates strict adherence to discovery rules and harsh sanctions for breaches, the required sanction in the ordinary case is mandatory preclusion.

Civil Procedure > Discovery & Disclosure > Disclosure > Mandatory Disclosures

***HN4*** Fed. R. Civ. P. 26(a) is an automatic disclosure provision, which obligates the parties, within 14 days of the Fed. R. Civ. P. 26(f) conference, to disclose all information relevant to its claims or defenses. Fed. R. Civ. P. 26(e) imposes a general obligation to supplement or correct disclosures or discovery responses to reflect accurate information.

Trademark Law > ... > Federal Unfair Competition Law > False Advertising > Elements of False Advertising

Trademark Law > ... > Remedies > Damages > General Overview

Trademark Law > ... > Remedies > Equitable Relief > General Overview

***HN5*** Section 1117(a) (15 U.S.C.S. § 1117(a)) of the Lanham Act provides that a successful plaintiff shall be entitled subject to the principles of equity, to recover: (1) the defendant's profits; (2) any damages sustained by the plaintiff; and (3) the costs of the action. The United States Court of Appeals for the First Circuit has recognized that, where literally false advertisements are at issue, if there is proof that a defendant intentionally set out to deceive or mislead consumers, a presumption arises that customers in fact have been deceived. In a two-firm market, where a competitor makes assertions of relative product superiority backed up by testing, a factfinder could reasonably conclude that the representations qualify as comparative advertisements.

Trademark Law > ... > Remedies > Damages > General Overview

Trademark Law > ... > Remedies > Equitable Relief > Equitable Accountings

***HN6*** The United States Court of Appeals for the First Circuit has developed a quartet of rules to govern Lanham Act claims seeking monetary relief: (1) a plaintiff seeking damages must prove actual harm, such as the diversion of sales to the defendant; (2) a plaintiff seeking an accounting of the defendant's profits must show that the products directly compete, such that the defendant's profits would have gone to the plaintiff if there was no violation; (3) the general rule of direct competition is loosened if the defendant acted fraudulently or palmed off inferior goods, such that actual harm is presumed; and (4) where the defendant's inequitable conduct warrants bypassing the usual rule of actual harm, damages may be assessed on an unjust enrichment or deterrence theory. Thus, a plaintiff seeking disgorgement must ordinarily prove both actual harm and direct competition. In the absence of those elements, damages may be awarded upon one of three conditions: the defendant acted fraudulently; to avoid unjust enrichment of the defendant; or to deter further willful misconduct.

Trademark Law > ... > Remedies > Equitable Relief > Equitable Accountings

***HN7*** The United States Court of Appeals for the First Circuit has articulated three justifications for awarding an accounting of a defendant's profits: (1) as a rough measure of the harm to the plaintiff; (2) to avoid unjust enrichment of the defendant; or (3) if necessary to protect the plaintiff by deterring a willful infringer from further infringement. In cases of at least some direct competition and willfulness, some role may exist for deterrence in an award of an accounting of profits. Willfulness is a question of fact, which must be submitted to a jury. Accordingly, if a plaintiff without specific evidence of injury proves direct competition and willfulness, an accounting may be available to the plaintiff subject to the principles of equity.

Trademark Law > ... > Federal Unfair Competition Law > False Advertising > Elements of False Advertising

Trademark Law > ... > Federal Unfair Competition Law > Lanham Act > Remedies

Trademark Law > ... > Remedies > Damages > General Overview

***HN8*** Though the United States Court of Appeals for the First Circuit has not addressed the rebuttable presumption of causation for wilfully false comparative advertisements head on, it has recognized in another context that in a two-firm market, harm is sufficiently apparent whenever material misrepresentations are made. However, the court later clarified that when it spoke of the inevitability of harm it was not addressing the availability of damages but of relief. Indeed, with respect to Lanham Act claims, the First Circuit has emphasized that *15 U.S.C.S. 1125(a)* was not intended to provide a windfall.

Trademark Law > ... > Federal Unfair Competition Law > False Advertising > Elements of False Advertising

Trademark Law > ... > Remedies > Damages > General Overview

***HN9*** Ultimately, while the law is not clear, Congress has stated that the principles of equity determine whether disgorgement is an appropriate remedy. *15 U.S.C.S. § 1117(a)*. Primary factors that courts look to include: (a) the degree of certainty that the actor benefitted from the unlawful conduct; (b) the relative adequacy to the plaintiff of other remedies, including an award of damages; (c) the interests of the public in depriving the actor of unjust gains and discouraging unlawful conduct; (d) the role of the actor in bringing about the infringement or deceptive marketing; (e) any unreasonable delay by the plaintiff in bringing suit or otherwise asserting its rights; and (f) any related misconduct on the part of the plaintiff. Courts have given great weight to whether the defendant had the intent to confuse or deceive. Those equitable factors adequately guard against a windfall to the plaintiff in the form of a speculative damage award. In sum, the weight of the caselaw in the United States Court of Appeals for the First Circuit supports a rebuttable presumption of causation and injury for willful literally false advertising in a two firm market where a defendant makes comparative statements targeting a direct competitor's products.

Contracts Law > Breach > Breach of Contract Actions > General Overview

Contracts Law > ... > Types of Damages > Compensatory Damages > General Overview

Contracts Law > Remedies > Equitable Relief > Injunctions

***HN10*** In the event of a breach of contract, a party may recover either damages or injunctive relief.

**Counsel: [**1]** For The HipSaver Company, Inc., Plaintiff: Lee C. Bromberg, Edward J. Dailey, Peter J. Karol, LEAD ATTORNEYS, Paul S. Kitchin, Bromberg & Sunstein LLP, Boston, MA.; Mark T. Palin, LEAD ATTORNEY, Atkinson, Andelson, Loya, Ruud & Romo, Cerritos, CA.

For J.T. Posey Company, Plaintiff: Katherine Young Fergus, Duane Morris LLP, Boston, MA.; Douglas G. Morseburg, LEAD ATTORNEY, Sheldon Mak Rose & Anderson PC, Pasadena, CA.

For J.T. Posey Company, Defendant: Anthony J. Fitzpatrick, LEAD ATTORNEY, Duane Morris LLP, Boston MA.; Shannon S. Sheldon, LEAD ATTORNEY, Sheldon Mak Rose & Anderson PC, Pasadena, CA.

For The HipSaver Company, Inc., Defendant: Aaron V. O'Donnell, LEAD ATTORNEY, Edward Cosmo Ho, Atkinson, Andelson, Loya, Ruud & Romo, Cerritos, CA.

For The HipSaver Company, Inc., Counter Defendant: Scott K. Dauscher, LEAD ATTORNEY, Atkinson, Andelson, Loya, Ruud & Romo, Cerritos, CA.

For J.T. Posey Company, Counter Defendant: Jeffrey G Sheldon, LEAD ATTORNEY, Sheldon Mak Rose & Anderson PC, Pasadena, CA.

**Judges:** PATTI B. SARIS, United States District Judge.

**Opinion by:** PATTI B. SARIS

**Opinion**

**[*98]**

**MEMORANDUM AND ORDER**

July 19, 2007

Saris, U.S.D.J.

This hard-fought case involves allegations of literally false comparative advertising **[**2]** about hip protectors in a two-company market. Defendant J.T. Posey Company ("Posey") has requested discovery sanctions as a result of plaintiff HipSaver, Inc.'s ("HipSaver") failure to disclose key documents and information relating to causation until the week before the scheduled trial on June 11, 2007. Specifically, Posey urges the Court to preclude the introduction of this evidence at trial. Without this evidence, it argues, there is insufficient proof to support HipSaver's claim of injury caused by the advertising.

After multiple hearings, the Court holds that HipSaver is precluded from introducing this newly produced evidence under *Fed. R. Civ. P. 37(c)*, and awards attorney's fees, as sanctions. However, while the issue is close, HipSaver has proffered evidence from which a reasonable inference of causation and injury can be drawn with respect to its claim for disgorgement.

**I. Background**

**A. Round I**

In 2004, HipSaver brought its initial action against Posey, making allegations of false advertising under the Lanham Act, **[*99]** *15 U.S.C. §§ 1117* & *1125*, and state law. [1] HipSaver and Posey are direct competitors in a two-firm market. That dispute centered on a series of UCLA advertisements (the **[**3]** "UCLA ads") which represented that testing had demonstrated that Posey's hip protector products, garments designed to prevent hip fractures in the elderly, were more effective than HipSaver's products at reducing the impact force associated with a fall. The ads were disseminated beginning in late 2003 or early 2004.

Another series of Posey advertisements that relied on different testing (the "Garwood ads") had been distributed earlier to support claims of product superiority. In these ads, Posey represented that testing had demonstrated that Posey's products were proven "*most effective*" and "reduced the impact force by 90%, the *best* results of any hip protector available." (emphasis added.)

The lawsuit settled in September 2004. Under the settlement, Posey agreed to pay HipSaver $ 360,000 and, among other things, the parties mutually released each other from all "known and

---

[1] For a more detailed introduction to this dispute, see *HipSaver Co. v. J.T. Posey Co.*, 490 F. Supp. 2d 55, 2007 U.S. Dist. LEXIS 35364 (D. Mass. May 15, 2007).

unknown" related claims which were or could have been asserted prior to the date of the settlement agreement. As part of the settlement, the parties also agreed not to press claims **[**4]** involving all known advertisements in existence at the time of the settlement that continued into the future. [2]

**B. Round II**

While the first litigation was proceeding, in 2004, Posey continued to run the Garwood ads. HipSaver's president, Edward Goodwin, states he believed that those ads had been abandoned when Posey began to publish the UCLA ads, and therefore did not press any claims about those ads in the first suit. The ads were in continuous use, throughout round one of the litigation, before, during, and after settlement negotiations. Posey disputes Goodwin's claims that he did not know about the ongoing Garwood ads.

HipSaver brought a second suit for false advertising under the Lanham Act and state law based on the Garwood ads, and Posey counterclaimed. The Garwood ads were terminated in 2005. On May 15, 2007 the Court issued an order allowing in part and denying in part Posey's motion for summary judgment on HipSaver's false advertising claims under the Lanham Act, *15 U.S.C. §§ 1117* & *1125*, and related state **[**5]** law claims. *See HipSaver Co., 490 F. Supp. 2d 55, 2007 U.S. Dist. LEXIS 35364*. Among other things, I held that all claims regarding advertisements run prior to September 2004 were barred by the settlement agreement, regardless of whether Goodwin knew about them, but permitted HipSaver to go forward with claims based on alleged false advertisements which pre-dated the agreement, but were unknown to Posey and continued to be run *See id. 2007 U.S. Dist. LEXIS 35364 at *22*. In addition, I concluded that there was sufficient evidence from which a factfinder could reasonably conclude that certain representations made by Posey in the Garwood ads were both literally false and material. *Id. 2007 U.S. Dist. LEXIS 35364 at *39*. I granted summary judgment for HipSaver on Posey's counterclaims because those claims involved known pre-settlement advertisements barred by the agreement and release.

Posey argued that HipSaver's evidence with respect to the remaining claims was insufficient to support a reasonable inference **[*100]** of causation of injury, a required element for Lanham Act claims seeking damages. *See, e.g., Cashmere & Camel Hair Mfrs. Inst. v. Saks Fifth Ave., 284 F.3d 302, 318 (1st Cir. 2002)*. I held:

> HipSaver's inability to identify specific lost opportunities or sales **[**6]** following [the settlement agreement] is not necessarily fatal at this point because it did not know the Court's ruling on this summary judgment motion. It contends it does not have the resources or record-keeping capacity to calculate its actual damages. HipSaver, however, must present admissible evidence of post-settlement damages and cannot invite jury speculation. Thus, HipSaver must supplement its pre-trial memorandum within two weeks to make a proffer of evidence supporting causation and a theory of damages consistent with this ruling. HipSaver will not be permitted to grab a pocketful of Posey's profits without some evidence linking the false advertisements to HipSaver's allegations of injury.*HipSaver, 490 F. Supp. 2d 55, 2007 U.S. Dist. LEXIS 35364, at *42-43*.

---

[2] According to the parties' submissions, the parties do not dispute this interpretation of the agreement but it is not expressly included in the written settlement agreement.

HipSaver's initial theory of causation was that it had lost customers and been shut out of national "big chain" health care facilities on account of Posey's false representations about its hip protector products, at least some of which made implicit false references to HipSaver's products. Edward Goodwin, president of HipSaver, submitted a declaration stating that HipSaver's sales in 2006 were "flat," and the sales data turned over to Posey **[**7]** during discovery supported this contention. (*See* Goodwin Decl. PP 2, 32 Docket No. 183-2.) Prior to the ruling on summary judgment, HipSaver had identified certain customers and opportunities which it alleged were lost as a result of Posey's false advertising, but all of these pre-dated the 2004 settlement agreement.

Posey argued in support of its motion for summary judgment that HipSaver had failed to demonstrate causation and injury. Posey's damages experts submitted reports concluding that HipSaver had suffered no harm as a result of the advertisements, and pointing out that one possible indication of harm would be a measurable increase in sales following withdrawal of the ads. *See* Hoffman & Green at 6.) The flat sales data produced by HipSaver did not reveal this "uptick." (*Id.*)

**C. HipSaver's Parry**

On May 24, 2007, HipSaver filed a supplemental report by its damages expert, Dr. Epstein. (Docket No. 271.) HipSaver identified: (1) new aggregate 2006 domestic sales data for its hip protector products, which purportedly showed an increase in sales following cessation of the Garwood ads; (2) a comparison of the respective average monthly growth rates of HipSaver (4.2%) and Posey (8.8%) **[**8]** in the 9 months following the 2004 settlement agreement; and (3) 2006 sales data for a different HipSaver product, the DermaSaver, which HipSaver was able to distribute to large national chains. DermaSaver is a sleeve-like garment worn over the skin to protect against skin tears in the elderly.

According to HipSaver, this data, some of which it characterized without explanation as "newly available," demonstrated that indeed HipSaver's sales rebounded after Posey's false Garwood advertisements had been withdrawn, proving causation, and countered Posey's suggestion that HipSaver's exclusion from the "big chain" market was the result of factors unrelated to the advertisements, such as brand loyalty. HipSaver has been unable to identify any specific lost customers, opportunities, or diverted sales resulting from the Garwood advertisements.

**[*101]** On May 29, 2007, at the final pre-trial conference, I ordered HipSaver to produce all of the sales invoices supporting its new causation theory through the final quarter of 2006 to Posey in CD form within 24 hours. HipSaver had represented that *all* sales data through September 13, 2006 had been previously handed over during discovery and had been available **[**9]** to Posey's experts when their reports were prepared. (*See, e.g,* Tr. 5/29/07 45:7-17.)

On May 30, Posey moved to strike HipSaver's proffer and supplemental expert submission on various grounds, pointing out that the data included sales to the Department of Veterans Affairs ("VA"), which HipSaver had previously characterized as unaffected by Posey's false advertising. (Referenced at Docket No. 276.) Posey also moved to strike the proffer because it consisted of new 2006 sales data that hadn't been produced before the close of discovery on May 1, 2007 and, in any event, because the data didn't support a viable theory of causation. The next day, on May 31, HipSaver voluntarily moved to withdraw its supplemental expert submission, conceding that inclusion of the VA sales was in error. (Docket No. 280.) HipSaver characterized the error as "inadvertent," and requested the opportunity to submit a revised expert report with the VA data

excised. On the same day, HipSaver produced an Excel spreadsheet listing summary data regarding 2006 hip protector sales. Trial was slated to begin June 11.

At a hearing on June 4, [3] the following Monday, the Court expressed concern that HipSaver was coming forward **[**10]** with a brand new theory and evidence of injury at such a late stage in the proceedings, but counsel for HipSaver responded: "I want to make very clear it's not a whole new theory. It is the exact same theory, and it is the same data that they already had." (6/4/07 Tr. 4:9-10.) Nonetheless, HipSaver had not produced invoices for the last quarter of 2006 in a form accessible to Posey and had not, by the time of the hearing, submitted its proposed revised expert report. Accordingly, with only a week until trial, I excluded all new sales data after September 13, 2006, and denied HipSaver's request to submit later a revised expert report. HipSaver agreed to stand on its supplemental expert submission, the underlying data through September 13, 2006, and the parties' differential growth rates in 2005.

Then, on June 5, HipSaver unexpectedly renewed its motion to withdraw its supplemental expert report on causation, which I allowed. (Docket No. 293.) HipSaver argued, nonetheless, that the 2006 sales data through September 13, 2006 (with VA sales now parsed out), the fact of DermaSaver "big chain" market penetration, and the 2005 growth rate differential (including VA sales) were sufficient to support a reasonable inference of causation. HipSaver also filed a declaration by Edward Goodwin with attachments summarizing, among other things, HipSaver's 2006 aggregate hip protector sales (with foreign sales included), total domestic sales, and domestic sales with VA sales excised. (Docket No. 292.)

The next day, June 6, I issued an order excluding any new evidence of DermaSaver sales as untimely. (Docket No. 298.) **[*102]** The same day, Posey filed a motion for sanctions alleging late production of altered evidence in connection with HipSaver's revised calculation of it 2006 average monthly sales. (Docket No. 296.) There were, at this point, at least two motions by Posey for discovery sanctions, as well as motions to strike HipSaver's proffer and for **[**12]** summary judgment on the causation issue. HipSaver, meanwhile, had a theory of causation and evidence of injury that were in flux. The record had become extremely messy, and the factual disputes regarding HipSaver's disclosures to Posey were opaque and poorly vetted. At a hearing on June 7, Posey requested, with some reluctance, to continue the trial.

On June 11, I held a fourth hearing to resolve the nettlesome claims of discovery abuses, and the overarching issue of the insufficiency of the evidence to support a claim of causation and damages. To clarify the procedural position of the case, I allowed Posey to renew its motions for summary judgment and to strike data not produced prior to the close of discovery on May 1 as a discovery sanction. At the hearing, the parties explained that HipSaver had produced two databases containing information regarding its hip protector sales. One was a 2006 FileMaker Pro database that contained summary information regarding sales invoices. The parties agree that Posey received this database with information through September 13, 2006 during discovery. (It had never requested the invoices underpinning this summary data and therefore, I do not regard **[**13]** HipSaver's failure to produce these invoices as a discovery violation.) The other database was an Excel spreadsheet, which contained the same summary data as the FileMaker Pro, but

---

[3] Previously, on June 1, Posey had moved for discovery sanctions against HipSaver on account of its failure to produce the relevant sales data. Posey also submitted an declaration from one of its damages experts stating that he was unable to reconcile the information contained in the initially-produced databases with the data contained in HipSaver's proffer, and identifying inconsistencies between **[**11]** the two sets of databases. (Docket No. 297-4.)

which also listed additional information, breaking the numbers down into corporate and individual charges. Posey stated that while it had received an Excel spreadsheet for other years, it had not received this important and different database for 2006.

Posey vigorously contended that the sales data recently produced by HipSaver differed substantially from that contained in the 2006 database disclosed during discovery. Posey submitted an affidavit from its damages expert, C.P.A. Phillip Green, which explained that total domestic sales for the eight months from January 1, 2006 through August 31, 2006 amounted to approximately $ 467,000 in the original FileMaker Pro Database produced during discovery, while the sales summary recently produced as part of its proffer listed sales of approximately $ 627,000 for the same period. (Green Decl. P 4.) In addition, he pointed out that the total domestic sales listed in HipSaver's second FileMaker Pro proffer ($ 627,000) differed from the total domestic sales listed in **[**14]** Mr. Goodwin's June 5 Declaration by approximately $ 24,000, or approximately 4% of the reported sales. (Id. P 6.)

HipSaver explained that the large $ 160,000 difference between the original FileMaker Pro database and that submitted in connection with the proffer was due to the inclusion of 2006 corporate charge data (*i.e.*, corporate purchases on credit) and "unequivocally" stated that this information had been available to Posey prior before May 1, which Posey vigorously denied. [4]

HipSaver now concedes that the corporate data was not produced until May 31, 2007, after discovery had closed and just **[*103]** before trial. (Docket No. 305.) HipSaver, through inadvertence, did not produce the excel spreadsheet listing all of the 2006 charge data. This discrepancy between $ 627,000 and $ 467,000 is the very uptick which HipSaver now claims proves its theory of injury and causation sufficient **[**15]** to support its request for disgorgement damages.

## II. Discussion

### A. *Rule 37(c)*

***HN1*** *Federal Rule of Civil Procedure 37(c)(1)* provides a "self-executing sanction" for failure to make evidentiary disclosures required by the Federal Rules. *Ortiz-Lopez v. Sociedad Espanola de Auxilio Mutuo y Beneficencia de P.R., 248 F.3d 29, 33 (1st Cir. 2001)*. The rule states:

> ***HN2*** A party that without substantial justification fails to disclose information required by *Rule 26 (a)* or *26(e)(1)*, or to amend a prior response to discovery as required by *Rule 26(e)(2)*, is not, unless such failure is harmless, permitted to use as evidence at a trial, at a hearing, or on a motion any witness or information not so disclosed.Thus ***HN3*** a court may, in its discretion, preclude evidence if (1) "the offending parties were not 'substantially justified' in failing to disclose information required by *Rule 26(a)* or

---

[4] *See* 6/11/07 Tr. 56:23-25; 57:1-2) ("My representation, your Honor, as clearly as I can state it and unequivocally, the representation we are making is solely and exclusively based on data that was provided to the other side during discovery. It is not on any more recent data.") (statement of counsel for Posey).

*Rule 26(e)*" [5] and (2) "the failure to disclose was not harmless." *Ortiz-Lopez, 248 F.3d at 33*. In this analysis, courts consider a "multiplicity of pertinent factors," including

> the history of the litigation, the proponent's need for the challenged evidence, the justification (if any) for the late disclosure, and the opponent's **[**16]** ability to overcome its adverse effects. Surprise and prejudice are important integers in this calculation.*Gagnon v. Teledyne Princeton, Inc., 437 F.3d 188, 197 (1st Cir. 2006)*. Because the Rule contemplates strict adherence to discovery rules and harsh sanctions for breaches, "the required sanction in the ordinary case is mandatory preclusion." *Klonoski v. Mahlab, 156 F.3d 255, 269 (1st Cir. 1998)*.

**B. *HipSaver's Failure to Produce the 2006 Corporate Charge Data***

HipSaver argues that its late production of evidence was in response to the Court's request, that it was inadvertent, and that Posey has not been prejudiced because Posey was granted a continuance. These arguments are unavailing.

First, late production of the 2006 corporate charge data was not "substantially justified" because the Court did not permit HipSaver to produce new documents which **[**17]** should have been disclosed during discovery in recasting its theory of injury after the summary judgment ruling. [6] The 2006 sales data, including corporate charges, has always been relevant to issues of causation, injury, and damages. Mr. Goodwin cited "flat" revenues in 2006 as an indication of the lasting effects of Posey's false **[*104]** advertisements. This statement was crucial to HipSaver's theory that it had been -- and continued to be -- shut out of big chain heath care facilities as a result of Posey's false ads. HipSaver maintains that the failure to disclose this information was inadvertent. HipSaver argues that it did not notice that it had turned over incomplete data because HipSaver's sales and revenue for 2006 had not been considered in the initial causation/injury analysis. However, negligence is not substantial justification for non-production.

Second, HipSaver's omissions were not harmless. Among other things, Posey prepared its export reports on the basis of incomplete data. Likewise, Posey (whose lawyers are from California) was forced to prepare for trial and multiple pretrial hearings on the basis of a new theory of causation based on new data, and was put to significant expense attempting to reconcile the new data with the old. HipSaver claims that Posey has not been prejudiced because the trial has been continued. However, the delay and additional expense (not to mention stress) occasioned by HipSaver's failure to produce the 2006 data are precisely the sort of harm contemplated by the Rule. *See Gagnon, 437 F.3d at 197* (explaining that the Rule envisions "a fairly limited concept of 'harmless,'" (citing advisory committee's notes)).

Finally, the history of this litigation has been contentious, and HipSaver has twice already been sanctioned for failure to comply with discovery obligations. Moreover, the summary sales data cited

---

[5] ***HN4*** *Fed. R. Civ. P. 26(a)* is an automatic disclosure provision, which obligates the parties, within 14 days of the *Rule 26(f)* conference, to disclose all information relevant to its claims or defenses. *Fed. R. Civ. P. 26(e)* imposes a general obligation to supplement or correct disclosures or discovery responses to reflect accurate information.

[6] At the initial hearing on the summary judgment motion, and repeatedly throughout the hearings after May 15, I made clear that HipSaver would be limited to evidence already in the record. HipSaver, recognizing this, repeatedly averred that the 2006 data had been disclosed. *See, e.g.*, 6/11/07 Tr. 46: 1-4 (court: ". . . I didn't want a **[**18]** whole new round of discovery so it had to be based on what you had"; counsel for HipSaver, responding: "Absolutely and I maintain that . . . .").

by Mr. Goodwin in his most recent submission to **[**19]** the court differs from the summary submitted just a few days earlier, which, as discussed, differs from that submitted during discovery. Hence, Posey reasonably has questions about the reliability of the new data which would necessitate additional depositions to resolve. Posey would suffer significant expense if it were required to crunch the 2006 sales data anew in order to determine the reliability of HipSaver's figures. [7]

Accordingly, as a discovery sanction, I exclude the newly produced 2006 sales data and order HipSaver to pay attorney's fees and reasonable expenses resulting from the discovery violations.

**III. Causation and Injury**

With the new 2006 sales data excluded, HipSaver now relies on the following as evidence of causation and actual harm: (1) a comparison of the respective average monthly growth **[**20]** rates of HipSaver (4.2%) and Posey (8.8%) in the nine months following the 2004 settlement agreement; (2) DermaSaver market penetration; and, finally, (3) a presumption of causation and consumer confusion if the jury finds that Posey has willfully made literally false comparative statements about a direct competitor in a two-firm market.

**A. Damage Claims**

**1. Differential Growth Rates**

Posey argues that the parties' differential growth rates in 2005 do not support a reasonable inference that HipSaver has been injured as a result of Posey's post-settlement advertising. First, that growth rate includes sales to VA facilities, which the parties concede are unaffected by false advertising. HipSaver has not demonstrated a differential rate of growth **[*105]** with VA sales parsed out. Thus, the 2005 growth rate differential using aggregated data cannot reasonably support an inference of causation with respect to non-VA sales.

Second, there are other independent variables that could equally explain these different growth rates which HipSaver and its expert have not addressed. Most saliently, the parties' 2005 sales followed on a settlement agreement in which Posey agreed pay HipSaver $ 360,000 to dispose **[**21]** of the false advertising UCLA claims, which were dropped. Moreover, the Garwood ads were running prior to the settlement. As HipSaver concedes, the effects of false advertising linger, and HipSaver has offered no way to distinguish between the after-effects of the pre-settlement false UCLA and Garwood ads and the impact of the post-settlement Garwood ads now at issue.

In his June 8 deposition, HipSaver's expert Dr. Epstein could not conclude that HipSaver's 2005 growth rate was caused by post-settlement advertisements; instead, he would only go so far as to say that the differential growth rates were "consistent with an effect of the ads." [8] Further, Dr. Epstein concedes that other factors could potentially have impacted sales, such as (1) a company's

---

[7] decline to hold another hearing on this issue because the parties have had ample opportunity to address the Court in the hearings on May 29, June 4, June 7, and June 11. Moreover, the Court was forced to continue the long-scheduled trial at the last minute because of the deep-seated uncertainty about the reliability of the 2006 sales data and concerns about unfair surprise to Posey.

[8]

Q: Can you conclude that HipSaver has suffered harm from Posey's accused ads from the analysis of sales **[**22]** trends alone?

allocation of marketing resources, (Epstein Dep. 59:22-24, 60:1-5 (6/8/07)); (2) customer buying habits, (*id.* 73:10-12); (3) changes in the selling price of the product, (*id.* 72:19-21); and (4) customer demand. (*Id.* 73:13-15). He did not consider these or any other potentially relevant variables in his analysis. (*Id.* 74:5-25; 75: 8-13.).

Without an expert opinion that this growth rate differential was the result of the post-settlement false Garwood ads, the growth rates alone cannot support a reasonable inference of causation. *Compare EFCO Corp. v. Symons Corp., 219 F.3d 734, 740 (8th Cir. 2000)* (actual injury may be proven by circumstantial evidence, where plaintiff "presented evidence of an erosion of its revenues during the period of misconduct. During this same period, [defendant's] revenues increased at a nearly identical rate. Further, [plaintiff] produced evidence that its sales force was losing clients to [defendant]. Taken together, this evidence supports an inference that the shift in the companies' market shares was due to [defendant's] misconduct"), *with Quabaug Rubber Co. v. Fabiano Shoe Co., 567 F.2d 154, 162 (1st Cir. 1977)* (plaintiff company's speculative "belief" that his company had been injured by defendant's **[**23]** false ads not enough).

**2. DermaSaver**

Second, HipSaver argues that its DermaSaver product has penetrated the market, demonstrating that if there had not been false advertising, the HipSaver product would have been purchased by the big nursing home chains. DermaSaver is not a hip protector garment, but a sleeve designed to protect fragile skin against tears and other causes of skin breakdown. It is made with a fabric that Mr. Goodwin characterizes as "unique" and for which a patent is now pending. (*See* Goodwin Dep. 22:2-24; 23:1-15 (6/8/06).) No other sleeve product of this sort displays this feature. Moreover, the market for sleeve products is estimated to be significantly larger than that for hip protectors. *Id.* **[*106]** 22:2; 103:17-24; 104:23.) While DermaSaver sales might be relevant in rebutting some of Posey's arguments that certain variables (like the size of its sales force) account for HipSaver's failure in the "big chain" hip protector market, the DermaSaver penetration does not establish that HipSaver's lack of marketing success in 2006 was due to the Garwood ads. HipSaver is not comparing apples with apples.

**3. Presuming Damages**

Finally, HipSaver contends that a factfinder could reasonable **[**24]** infer causation because Posey made willful and literally false statements comparing the effectiveness of its hip protectors to HipSaver's products, and because the parties are direct competitors in a two-firm market. Accordingly, HipSaver argues that despite its inability to point to any specific evidence of injury, for example, diverted sales or lost customers, it is entitled to a presumption of causation and injury which is sufficient to support its claim of disgorgement of Posey's lost profits.

***HN5*** *Section 1117(a)* of the Lanham Act provides that a successful plaintiff shall be entitled "subject to the principles of equity, to recover (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action." *15 U.S.C. § 1117(a)*. In *Cashmere & Camel*

---

A: . . . At this point, the only opinion I'm prepared to offer was what was in my September report, which is . . . [that] the rates of growth between HipSaver and Posey were consistent with an effect of the ads, and that's as far as I can go right now.Epstein Dep. 68: 8-17 (6/8/07).

*Hair Mfrs. Inst. v. Saks Fifth Ave., 284 F.3d 302, 316 (1st Cir. 2002)*, the First Circuit recognized that, where literally false advertisements are at issue, "if there is proof that a defendant intentionally set out to deceive or mislead consumers, a presumption arises that customers in fact have been deceived." HipSaver contends that it is entitled to an additional presumption of causation and injury because Posey **[**25]** willfully made literally false statements comparing the parties' directly competing products. Posey argues that the Garwood advertisements do not qualify as comparative advertisements because they do not specifically identify HipSaver or its products. Nonetheless, in a two-firm market, where a competitor makes assertions of relative product superiority backed up by testing, a factfinder could reasonably conclude that the representations qualify as comparative advertisements. *See* 5 J. T. McCarthy, *McCarthy on Trademarks and Unfair Competition* § 27:62 at 27-130 (4th ed. 2006) (explaining that "comparative advertising" includes a claim that "tests prove" a product's superiority).

***HN6*** The First Circuit has developed a quartet of rules to govern Lanham Act claims seeking monetary relief:

> 1) a plaintiff seeking damages must prove actual harm, such as the diversion of sales to the defendant; 2) a plaintiff seeking an accounting of defendant's profits must show that the products directly compete, such that defendant's profits would have gone to plaintiff if there was no violation; 3) the general rule of direct competition is loosened if the defendant acted fraudulently or palmed off inferior goods, **[**26]** such that actual harm is presumed; and 4) where defendant's inequitable conduct warrants bypassing the usual rule of actual harm, damages may be assessed on an unjust enrichment or deterrence theory.*Aktiebolaget Electrolux v. Armatron Int'l Inc., 999 F.2d 1, 5 (1st Cir. 1999)*. Thus, a plaintiff seeking disgorgement must ordinarily prove "both actual harm and direct competition. In the absence of those elements, damages may be awarded upon one of three conditions: the defendant acted fraudulently; to avoid unjust enrichment of the defendant; or to deter further willful misconduct." *Vt. Pure Holdings, Ltd. v. Nestle Waters N. Am., Inc., 2006 U.S. Dist. LEXIS 13683, at *36 (D. Mass. 2006)* (citing *Aktiebolaget* **[*107]** *Electrolux, 999 F.2d at 5*); *see also Nat'l Fire Prot. Ass'n v. Int'l Code Council, Inc., 2006 U.S. Dist. LEXIS 14360, at *91 (D. Mass. March 29, 2006)* (noting that actual harm may be presumed in cases of willful and fraudulent violations of the Lanham Act).

In *Tamko Roofing Prods., Inc. v. Ideal Roofing Co., Ltd., 282 F.3d 23, 35 (1st Cir. 2002)*, ***HN7*** the First Circuit articulated three justifications for awarding an accounting of defendant's profits: "(1) as a rough measure of the harm **[**27]** to plaintiff; (2) to avoid unjust enrichment of the defendant; or (3) if necessary to protect the plaintiff by deterring a willful infringer from further infringement." *Id. at 36*. The *Tamko* court further stated that "[i] n cases of at least some direct competition and willfulness, some role may exist for deterrence in an award of an accounting of profits." *Id. at 36*. Willfulness is a question of fact, which must be submitted to a jury. *Segrets, Inc. v. Gillman Knitwear Co., 207 F.3d 56, 66 (1st Cir. 2000)*. Accordingly, if a plaintiff without specific evidence of injury proves direct competition and willfulness, an accounting may be available to the plaintiff "subject to the principles of equity." *See Tamko, 282 F.3d at 35*.

Prior to 1999 amendments to the Lanham Act, courts had held that willful conduct was a prerequisite to an accounting of a defendant's profits. As the Third Circuit has explained,

> Prior to the amendment,[ *Section 35* of the Lanham Act] provided as follows:
>
> > When a violation of any right of the registrant of a mark registered in the Patent and Trademark Office, or a violation under section 43(a) [*15 U.S.C. § 1125(a)*], shall have been established . . . the plaintiff shall **[**28]** be entitled . . ., subject to the principles of equity, to recover (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action.
>
> The 1999 amendment replaced "or a violation under *section 43(a)*" with "a violation under *section 43(a)*, or a willful violation under *section 43(c)* [.]" The plain language of the amendment indicates that Congress intended to condition monetary awards for *§ 43(c)* violations, but not *§ 43(a)* violations, on a showing of willfulness.*Banjo Buddies, Inc. v. Renosky, 399 F.3d 168, 174 (3d Cir. 2005)* (citations omitted). As a result of this change, several courts have concluded that willfulness is "an important -- but not indispensable -- factor in evaluating whether equity supports disgorging a defendant's profits." *Id. at 175*; *see Quick Techs., Inc. v. Sage Group PLC, 313 F.3d 338, 349 (5th Cir. 2003)*; *R&R Partners, Inc. v. Tovar, 2007 U.S. Dist. LEXIS 29819, at *4-5 (D. Nev. April 23, 2007)*. The First Circuit has stated that "when the rationale for an award of defendant's profits is to deter some egregious conduct, willfulness is required," *Tamko, 282 F.3d at 36 n.11*, though the continued force of that statement has been called **[**29]** into question by the reasoning of the Third and Fifth Circuits. In any event, in the absence of evidence of actual harm, the better view of the evolving caselaw in this circuit is that a plaintiff must prove willfulness.

Other circuits have permitted a plaintiff to recover in Lanham Act cases, even in the absence of direct evidence of actual harm, under a similar "totality of the circumstances" approach. *See Southland Sod Farms v. Stover Seed Co., 108 F.3d 1134, 1146 (9th Cir. 1997)* (explaining that "an inability to show actual damages does not alone preclude a [monetary] recovery under *section 1117*"; district court may fashion relief based on "the totality of the **[*108]** circumstances"); *Badger Meter, Inc. v. Grinnell Corp., 13 F.3d 1145, 1157 (7th Cir. 1994)* (stating that, even if a plaintiff is unable to demonstrate damages resulting from the defendant's Lanham Act violation, *§ 1117* allows the district court to award the plaintiff any just monetary award so long as it constitutes "compensation" for the plaintiff's losses or the defendant's unjust enrichment and is not simply a "penalty" for the defendant's conduct). *But see Seven-Up Co. v. Coca-Cola Co., 86 F.3d 1379, 1389 (5th Cir. 1996)* **[**30]** (no reasonable inference of causation based on circumstantial evidence of chronology of events where defendant Coca-Cola made material false or misleading representations to bottling franchises comparing Sprite with close competitor Seven-Up because there was no direct evidence of any franchise switching to defendant's products *as a result of* the false representations and evidence established other explanations for franchises' switching over).

The Eighth and Sixth Circuits have expressly adopted a rebuttable presumption of causation for willfully false *comparative* advertisements. The key case relied on by HipSaver is *Porous Media Corp. v. Pall Corp.*, where the Eighth Circuit held that "in comparative advertising cases where money damages are sought and where there exists proof of willful deception," the plaintiff is entitled to a rebuttable presumption of causation and harm. *110 F.3d 1329, 1336 (8th Cir. 1997)*. The court elaborated,

> A predicate finding of intentional deception, as a major part of the defendant's marketing efforts, *contained in comparative advertising,* encompasses sufficient harm to justify a rebuttable presumption of causation and injury in fact.*Id.* (emphasis in original); **[**31]** *see* *U-Haul Int'l, Inc. v. Jartran, Inc., 793 F.2d 1034, 1040 (9th Cir. 1986)* (approving a presumption of actual deception and reliance for deliberately false comparative claims); *see also* *McNeilab, Inc. v. American Home Products Corp., 848 F.2d 34, 38 (2d Cir. 1988)* (holding that injury may be presumed for false comparative advertising claims where injunctive relief is sought).

In *Balance Dynamics Corp. v. Schmitt Indus., 204 F.3d 683, 694-95 (6th Cir. 2000)*, the Sixth Circuit approved this rebuttable presumption of causation and injury for willful comparative advertisements. However, the court held that an award of marketplace damages was unavailable where the evidence presented at trial rebutted the presumption by demonstrating that the plaintiff's "business was not harmed" as a result of the allegedly false representations. [9]*Id. at 694*. The court stated:

> The reasoning of *Porous Media* is applicable to the present case since [defendant] specifically targeted [plaintiff's] balancer, which was the only product of its kind in the market. However, . . . the evidence shows that [plaintiff] did not suffer marketplace injury as a result of [defendant's] advertisements. Therefore, even if **[**32]** the advertisements were found literally false and [plaintiff] presented evidence of willfulness or bad faith, the evidence defeats any presumption of damage to goodwill in the present case.*Id. at 694-95*. Further, the court cautioned that, even under a deterrence theory, the principles of equity did not support **[*109]** an award of defendant's profits "in the absence of harm to the plaintiff or benefit to the defendant." *Id. at 695 n.6*.

***HN8*** Though the First Circuit has not addressed this presumption head on, it has recognized in another context that "[i]n a two-firm market, harm is sufficiently apparent whenever material misrepresentations are made." *Elecs. Corp. of Am. v. Honeywell, Inc., 428 F.2d 191, 194 (1st Cir. 1970)* (reversing district court's denial of a preliminary injunction where plaintiff alleged that direct competitor engaged in unfair **[**33]** competition under state law by making false comparative statements about plaintiff's products in its brochures). However, the court later clarified that when it "spoke of the inevitability of harm [the court was] not addressing the availability of damages but of relief." *487 F.2d 513 (1st Cir. 1973)*. Indeed, with respect to Lanham Act claims, the First Circuit has emphasized that "*section 1125(a)* was not intended to provide a windfall." *Quabaug Rubber Co., 567 F.2d at 161* (despite deliberate literally false advertising and use of a mark deceptively similar to plaintiff's, no actual injury where plaintiff failed to adduce any specific evidence of lost sales or customer dissatisfaction relating to the infringing product).

***HN9*** Ultimately, while the law is not clear, Congress has stated that "the principles of equity" determine whether disgorgement is an appropriate remedy. *15 U.S.C. § 1117(a)*. "Primary" factors that courts look to include:

---

[9] At trial, the evidence demonstrated plaintiff's sales increased after the period in which the false representations were disseminated; there was no decrease in the price of its product; and, as plaintiff admitted, no customers had ever informed it that it was losing a sale due to the defendant's communications. *Balance Dynamics Corp.*, 204 F.3d at 694.

(a) the degree of certainty that the actor benefitted from the unlawful conduct;

(b) the relative adequacy to the plaintiff of other remedies, including an award of damages;

(c) the interests of the public in depriving the actor of unjust gains and discouraging **[**34]** unlawful conduct;

(d) the role of the actor in bringing about the infringement or deceptive marketing;

(e) any unreasonable delay by the plaintiff in bringing suit or otherwise asserting its rights; and

(f) any related misconduct on the part of the plaintiff.*Restatement (Third) of Unfair Competition § 37(2)*. Courts have given great weight to "whether the defendant had the intent to confuse or deceive." *Banjo Buddies, 399 F.3d at 175* (citation omitted). These equitable factors adequately guard against a "windfall" to the plaintiff in the form of a speculative damage award.

In sum, the weight of the caselaw in this circuit supports a rebuttable presumption of causation and injury for willful literally false advertising in a two firm market where a defendant makes comparative statements targeting a direct competitor's products.

**B. Breach of Contract**

Posey also argues that summary judgment should be granted on Posey's breach of contract claim because HipSaver has failed to provide evidence of damages. ***HN10*** In the event of a breach of contract, a party may recover either damages or injunctive relief. *See**Restatement (Second) of Contracts § 357* (1979) Here, HipSaver has alleged that Posey breached **[**35]** a provision of the settlement agreement requiring the parties to refrain from using the results of any "further" comparative testing of either's products without giving the other advanced (30 days) written notice. Even if HipSaver is unable to prove that it suffered damages as a result of Posey's breach of the notice provision, it may still seek an injunction to enforce this notice provision. *See**Restatement (Second) of Contracts, § 378* (Election Among Remedies). **[*110]** Accordingly,
Posey's motion for summary judgment on HipSaver's contract claim is ***DENIED.***

**ORDER**

For the reasons stated, as a discovery sanction, Hipsaver is precluded from introducing any evidence not produced to Posey prior to May 1, 2007, and ordered to pay attorney's fees. Posey shall submit an affidavit supporting all attorney's fees and expenses resulting from the discovery violations. Posey's renewed motion for summary judgment is ***DENIED.***[10]

S/PATTI B. SARIS

United States District Judge

---

[10] I will address the Chapter 93A claim after trial.

EXHIBIT 272

LexisNexis®

Neutral
As of: August 12, 2014 9:13 AM EDT

**Hewlett-Packard Co. v. Boston Sci. Corp.**

United States District Court for the District of Massachusetts

November 30, 1999, Decided

CIVIL ACTION NO. 99-10244-PBS

**Reporter:** 77 F. Supp. 2d 189; 1999 U.S. Dist. LEXIS 19089; 1999-2 Trade Cas. (CCH) P72,732
HEWLETT-PACKARD COMPANY, Plaintiff, v. BOSTON SCIENTIFIC CORPORATION, Defendant.

**Disposition: [**1]** Defendant's motion to dismiss state claims DENIED.

**Core Terms**

catheter, console, monopolize, antitrust, market share, monopoly, license agreement, monopoly power, license, technology, patent, acquisition, customer, anti trust law, exclusionary, manufacture, interface, competitor, pullback, relevant market, monopolist, ultrasound, discovery, consent order, bad faith, cooperate, hubcap

**LexisNexis® Headnotes**

Civil Procedure > ... > Defenses, Demurrers & Objections > Motions to Dismiss > Failure to State Claim

***HN1*** In determining whether to dismiss a complaint for failure to state a claim upon which relief may be granted under *Fed. R. Civ. P. 12(b)(6)*, the court must accept as true the well-pleaded facts as they appear in the complaint, extending the plaintiff every reasonable inference in his favor. The complaint may not be dismissed unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.

Antitrust & Trade Law > Regulated Practices > Private Actions > General Overview
Civil Procedure > ... > Defenses, Demurrers & Objections > Motions to Dismiss > Failure to State Claim
Healthcare Law > Healthcare Litigation > Antitrust Actions > Facilities

***HN2*** In antitrust cases where the proof is largely in the hands of the defendant, dismissals prior to giving the plaintiff ample opportunity for discovery should be granted sparingly. However, sparingly does not mean never. A plaintiff must allege sufficient facts in order to state each element of the antitrust violation.

Antitrust & Trade Law > Regulated Practices > Monopolies & Monopolization > General Overview
Antitrust & Trade Law > ... > Monopolies & Monopolization > Attempts to Monopolize > General Overview
Antitrust & Trade Law > ... > Monopolies & Monopolization > Attempts to Monopolize > Sherman Act
Antitrust & Trade Law > Sherman Act > Scope > General Overview
Antitrust & Trade Law > Sherman Act > Scope > Monopolization Offenses

***HN3*** The federal antitrust law, *§ 2* of the Sherman Act, makes it unlawful for a firm to monopolize, or attempt to monopolize, any part of the trade or commerce among the several states. *15 U.S.C.S. § 2(a)*. To state a claim of monopolization, a plaintiff must allege: 1) that the defendant possesses monopoly power in the relevant market; and 2) that the defendant willfully acquired, maintained or used that power by exclusionary means.

Antitrust & Trade Law > ... > Monopolies & Monopolization > Actual Monopolization > General Overview

***HN4*** Monopoly power is often defined as the power to raise prices and exclude competition. The existence of such power ordinarily may be inferred from the predominant share of the market. For pleading purposes, an allegation of market share of 70 percent has been held to be an adequate basis for an inference of power in a relevant market.

Antitrust & Trade Law > ... > Monopolies & Monopolization > Actual Monopolization > General Overview

Antitrust & Trade Law > Sherman Act > Claims

Patent Law > ... > Defenses > Inequitable Conduct > General Overview

***HN5*** The second element of a *§ 2* of the Sherman Act claim for monopolization is the acquisition or maintenance of monopoly power by other than such legitimate means as patents, superior product, business acumen, or historic accident. The complaint must allege that the monopolist acquired or maintained that monopoly through exclusionary conduct. Exclusionary conduct is conduct, other than competition on the merits, that reasonably appears capable of making a significant contribution to creating or maintaining a monopoly. Conduct is exclusionary if it exceeds the needs of ordinary business dealings and unnecessarily excludes competition from the relevant market. The First Circuit succinctly framed the question: Was defendant's conduct reasonable in light of its business needs or did it unreasonably restrict competition?

Antitrust & Trade Law > ... > Monopolies & Monopolization > Actual Monopolization > General Overview

Trade Secrets Law > Breach of Contract > Licensing Agreements

Trade Secrets Law > Federal Versus State Law > Antitrust Law

***HN6*** An agreement which purports to license trade secrets, but in reality, is no more than a sham, or device designed to restrict competition, may violate antitrust laws.

Antitrust & Trade Law > ... > Monopolies & Monopolization > Attempts to Monopolize > General Overview

***HN7*** To state a claim for attempted monopolization, a plaintiff must allege: 1) that the defendant engaged in exclusionary conduct; 2) with the specific intent to obtain monopoly power; and 3) a dangerous probability exists that the attempt will succeed. A specific intent to monopolize or restrain competition can often be inferred from a finding of bad faith.

Antitrust & Trade Law > ... > Monopolies & Monopolization > Attempts to Monopolize > General Overview

***HN8*** To satisfy the last element of a claim for attempted monopolization, a plaintiff must allege facts to show that there was a dangerous probability that defendant would achieve a monopoly as a result of the alleged actions. The probability of successfully monopolizing a market is usually assessed through market share. The greater share a defendant initially controls, the greater the probability of achieving monopoly status. However, proximity to monopoly status is not enough; the defendant must also have the ability to propel itself to monopolistic control over the market.

Antitrust & Trade Law > ... > Private Actions > Remedies > General Overview

***HN9*** Antitrust plaintiffs face an additional requirement to allege an "antitrust injury." Failure to make such a pleading is a fatal defect. The U.S. Supreme Court defined this term as an injury of the type the antitrust laws were intended to prevent and that flows from that which makes the defendants' conduct unlawful.

Antitrust & Trade Law > ... > Private Actions > Remedies > General Overview
Antitrust & Trade Law > ... > Private Actions > Standing > General Overview

***HN10*** The presumptive "proper" plaintiff in an antitrust action is a customer who obtains services in the threatened market or a competitor who seeks to serve that market. When a defendant engages in anticompetitive acts in an attempt to gain a monopoly, the competitor who is being driven out of the market has standing.

**Counsel:** For HEWLETT-PACKARD COMPANY, Plaintiff: Robert M. Buchanan, Jr., Kevin P. Light, Joshua Engel, Choate, Hall & Stewart, Boston, MA.

For BOSTON SCIENTIFIC CORPORATION, Defendant: Robert F. Ruyak, P. Todd Mullins, Howrey & Simon, Washington, DC.

For BOSTON SCIENTIFIC CORPORATION, Defendant: Steven M. Bauer, Kurt W. Lockwood, Testa, Hurwitz & Thibeault, Boston, MA.

**Judges:** PATTI B. SARIS, United States District Judge.

**Opinion by:** PATTI B. SARIS

**Opinion**

**[*191] MEMORANDUM AND ORDER**

November 30, 1999

Saris, U.S.D.J.

## I. INTRODUCTION

Plaintiff Hewlett-Packard Company ("HP") brings this action [1] against defendant Boston Scientific Corporation ("BSC") alleging that BSC unlawfully monopolized, or attempted to monopolize, the intravascular ultrasound ("IVUS") catheter and console markets in the United States, in violation of *Section 2* of the Sherman Antitrust Act, *15 U.S.C. § 2*, and state law. An IVUS catheter is a flexible tube-like device used in conjunction with a console to obtain sonographic images of arteries. HP also seeks a declaratory judgment that it is no longer obligated to make payments under a licensing **[**2]** agreement which the two companies entered into pursuant to a consent decree required by the Federal Trade Commission ("FTC") as a condition to allowing BSC's merger with two other medical technology companies.

---

[1] The complaint (corrected) alleges that BSC has unlawfully monopolized, or attempted to monopolize, the market for IVUS catheters and consoles in the United States in violation of *Section 2* of the Sherman Antitrust Act, *15 U.S.C. § 2* (Count I); violated Mass. Gen. L. ch. 93A (Count II); breached the licensing agreement (Count III); breached the implied covenant of good faith and fair dealing (Count IV); and has been unjustly enriched (Count V). The complaint seeks a declaratory judgment that HP is no longer required to make payments under the licensing agreement (Count VI), as well as treble damages and attorneys fees.

BSC has filed a motion to dismiss all counts pursuant to *Fed. R. Civ. P. 12(b)(6)* on the grounds, *inter alia*, that the antitrust claim is facially deficient because **[**3]** HP failed to allege: (1) that BSC has current monopoly power in the catheter or console markets in the United States; or (2) that BSC committed predatory acts that could reasonably be interpreted as causing antitrust injury to competition. After hearing and a review of the excellent briefing by both sides, the motion is ***DENIED***.

## II. FACTUAL BACKGROUND

When all reasonable inferences are drawn in the non-movant's favor, HP's complaint alleges the following facts:

### [*192] A. *The Products: Catheters and Consoles*

IVUS catheters are medical devices that are used to diagnose and treat cardiovascular ailments. They are flexible tube-shaped objects that are inserted into a blood vessel. A transducer, located at the forward end of the catheter, generates and transmits ultrasound waves. These waves reflect off the arterial walls, and a receiver measures the amount of returned energy. The catheter compares the transmitted and received energy and sends a signal to a console that displays a 360 degree image of the blood vessel. The image allows physicians to assess the amount of plaque deposits in blood vessels.

There are two types of IVUS catheters. Phased array catheters **[**4]** use several stationary transducers to create a 360 degree image of the blood vessel. Mechanical catheters also create a 360 degree image, but do so with a single transducer that is spun by an external motor drive unit. This case centers around mechanical catheters.

### B. *Market Conditions Prior to 1995*

BSC, headquartered in Natick, Massachusetts, develops and manufactures medical products. HP's headquarters is in Palo Alto, California, and its Medical Products Group is located in Andover, Massachusetts. Both companies have long been participants in IVUS markets -- BSC sold catheters and HP sold consoles. Until 1995, they had a cooperative history and on occasion have engaged in joint ventures to design BSC catheters specifically to operate on HP consoles. As of mid-1994, BSC and Cardiovascular Imaging Systems, Inc. ("CVIS") were the market leaders with respect to the development, manufacture, and sale of IVUS catheters. BSC held 40% of that market, and CVIS held 50%. The market for IVUS consoles was equally concentrated -- CVIS controlled 40% and HP controlled 50%.

In August 1994, BSC dramatically shifted the balance of power by seeking to acquire CVIS. Three months later, **[**5]** BSC took steps to acquire SCIMED Life Systems, Inc. ("SCIMED"), which was preparing to enter the IVUS catheter market within the next two to three years.

Believing that BSC's acquisitions would lessen competition and create monopoly power in the IVUS catheter market, in January 1995 the Federal Trade Commission filed suit against BSC for violation of the Clayton Act, *15 U.S.C. § 45*, and the Federal Trade Commission Act, *15 U.S.C. §§ 18* & *21*. The FTC sought an injunction to prevent the CVIS acquisition.

### C. *The Licensing Agreement*

As part of settlement negotiations with the FTC, BSC sought a suitable competitor in the IVUS catheter market. On February 21, 1995, the company entered into a licensing agreement granting HP

the right to use BSC's IVUS technology ("Licensed Technology") in conjunction with the manufacture and sale of certain products ("Licensed Products").

The licensing agreement defined Licensed Technology as all BSC, SCIMED, and CVIS patents used for the "development, manufacture and sale of Licensed Products . . . and all existing know-how" relating to the manufacture, sale, and distribution of those products. **[**6]** Licensed Products included "ultrasound imaging catheters, imaging cores and imaging guide wires which are designed for diagnostic or therapeutic use, or both, in the human heart and/or in the human coronary and peripheral vascular system."

The Licensed Products definition also referenced Exhibit A, stating that it "includes and is no narrower than the collective claims of the patents . . . listed on Exhibit A." Among several patents listed on Exhibit A was BSC's "pullback patent." [2] This technology allows physicians **[*193]** to retrieve an inserted catheter at a fixed rate of speed, enabling the physician to measure plaque accumulations more accurately.

The licensing agreement also included an "open interface" provision that required both parties to ensure that their consoles were able to be used with the other party's existing catheters. Each party assumed a responsibility to **[**7]** "cooperate . . . in furthering this open interface objective," but retained the option of upgrading its consoles. To facilitate this provision, prior to introducing a new IVUS product, the parties agreed to share technical information relating to new products.

The licensing agreement also contained an "interim supply commitment," which was designed to allow HP to compete in the catheter market while developing its own line of catheters. BSC agreed to supply HP with all BSC catheters at a below market price (average manufacturing cost plus 40%) for resale by HP. The agreement also required BSC, immediately after acquiring CVIS, to introduce its new "Spy" catheter, which was specifically developed for use with HP consoles.

In exchange for the right to use BSC's technology, HP agreed to pay a substantial fee. The parties agreed that one-third of the total fee was to be paid within 30 days of the agreement's effective date. The remaining fee was to be paid in three equal installments payable in May 1998, 2000, and 2002. To date, HP has made the initial payment and the May 1998 installment.

**D. *The FTC Consent Order***

The FTC agreed to withdraw its suit and allow the CVIS **[**8]** acquisition only after BSC entered into the licensing agreement with HP. On February 23, 1995, the FTC and BSC entered into a Consent Order, requiring BSC to license its IVUS technology portfolio to HP "pursuant to, and in accordance with, the February 21, 1995 agreement" between BSC and HP "which agreement is appended to this Order in Confidential Appendix II." (Pl. Exh. B at 12.) The order's stated purpose was to create an "independent competitor in the development, production and sale of IVUS catheters and to remedy the lessening of competition resulting from the CVIS acquisition and the SCIMED acquisition as alleged in the Commission's Complaint." (*Id.* at 5.) IVUS catheters were defined as "intravascular ultrasound catheters, intracardiac ultrasound catheters, removable imaging cores used in intravascular or intracardiac ultrasound imaging, and intravascular imaging guidewires." (*Id.* at 3)

---

[2] U.S. Patent No. 5,361,768. Patents for related technologies, U.S. Patent Nos. 5,485,846; 5,592,942; and 5,759,153, have since been issued.

The FTC's order contained four primary provisions. First, it required BSC to license its "IVUS Technology Portfolio" to HP or another suitable company. It defined IVUS technology portfolio to include: a) all rights to BSC, CVIS, and SCIMED United States and foreign IVUS catheter patents; **[**9]** b) all CVIS and SCIMED trade secrets, technology and know-how relating to IVUS catheters; and c) all IVUS catheter customer lists. Second, it required BSC to provide technical assistance to the licensee in manufacturing the catheters and obtaining regulatory approval. Third, BSC was required to provide HP with a supply of catheters for resale. Finally, the order prohibited BSC from entering into any arrangement that would make BSC's catheters compatible with only certain consoles.

In exchange for these commitments, the FTC withdrew its suit and request for an injunction. BSC acquired CVIS and SCIMED.

**E. *Alleged Unlawful Acts***

HP claims that BSC "consciously and willfully thwarted the purposes of the Consent Order and the License Agreement," and by doing so secured a "monopoly over IVUS catheters and acquired or attempted to acquire a monopoly over IVUS consoles." **[*194]** HP alleges the following predatory conduct:

**1. *Refusal to Provide Complete and Accurate Interface Specifications***

Prior to acquiring CVIS, BSC produced a line of catheters named "Sonicath." These catheters were designed to operate on HP consoles. At the same time, CVIS produced a line of catheters **[**10]** named "Microline" that were designed to operate on CVIS consoles. After the merger, BSC replaced these catheters with a new line called "Ultracross" that combined the features of the Microline and Sonicath catheters.

Customers advised HP that the Ultracross catheters did not spin properly when used with HP consoles. Similar problems were reported with BSC's Microview, Microrail, and Discovery catheters. HP claims this is a violation of the licensing agreement which required BSC to disclose "all necessary technical specifications, regulatory information and the like" for HP to ensure its consoles were compatible with BSC catheters. (Pl. Exh. C. at 8.) HP further alleges that BSC sales representatives exploited these problems to discourage customers from purchasing consoles or catheters from HP.

**2. *BSC Threatened to Sue HP and HP's Customers for Patent Infringement***

HP marketed a catheter with an automatic pullback device that was based on the pullback patent listed in Exhibit A of the licensing agreement, which was referenced in the Licensed Products definition. The HP catheter directly competed with a BSC catheter that had a pullback device. BSC claimed that HP was not **[**11]** authorized to use the pullback patent and threatened to sue HP for patent infringement. BSC also told customers that HP's pullback device infringed on a BSC patent and threatened to sue customers who continued to use the HP automatic pullback device. HP alleges that the BSC's threats caused some potential customers to decide not to purchase HP catheters or consoles. HP claims BSC's actions violated its agreement not to assert any of its patent rights in "a way that would prevent HP from practicing any of the Licensed Technology to manufacture, use, or sell Licensed Products." (Pl. Exh. C at 2-3.)

**3. *BSC Refused to Create a Console Interface for the HP Scout Catheter***

HP designed and developed a new catheter called "Scout" and provided its technical specifications to BSC so that BSC could ensure that the catheter would operate with BSC consoles. BSC did not create the requested interface. HP alleges that by not making a meaningful effort to do so, BSC sought to make the catheter commercially unsuccessful in furtherance of BSC's objective to monopolize the catheter and console markets. HP claims this refusal violated BSC's obligation to "provide on all its IVUS consoles . **[**12]** . . open interfaces to the IVUS products of the other party." (Pl. Exh. C at 7.)

**4. *BSC Discontinued the Sonicath Catheter, Refused to Provide HP with BSC's Discovery Catheter, and Failed to Sell its Spy Catheters***

In 1992, BSC and HP entered into a joint development agreement to design and market BSC's Sonicath catheters which were intended to be used exclusively with HP consoles. After the CVIS acquisition, BSC developed a new line of catheters called "Discovery" and decided to discontinue the Sonicath line. BSC did not supply HP with the Discovery catheter for resale, and decided not to introduce the Spy catheter line. HP claims this violates BSC's obligation to "make available to HP all BSC IVUS Catheters," (Pl. Exh. C. at 8), and "to begin sales of the 'Spy' catheter immediately upon consummation of the CVIS acquisition," (*Id.* at 11).

**[*195]** HP alleges that these decisions dramatically reduced the number of catheters that were compatible with HP consoles and discouraged customers from purchasing HP consoles.

**5. *BSC Failed to Provide HP With the Required Notice of Its Redesign of an IVUS Catheter Hub***

A hub is the fitting that connects the catheter to the console. **[**13]** It allows the console to spin the catheter at a fixed rate of speed. After acquiring CVIS, BSC redesigned the Sonicath hub to fit its (formerly CVIS's) consoles. BSC did not provide the technical specifications of the redesigned hub to HP prior to introducing it into the market. HP claims that BSC willfully breached the licensing agreement which required a party introducing a new product to provide the product's technical specifications to the other party "no later than 180 days prior to . . . commercial introduction" of that product. (Pl. Exh. C at 8.)

**III. DISCUSSION**

***HN1*** In determining whether to dismiss a complaint for failure to state a claim upon which relief may be granted under *Fed. R. Civ. P. 12(b)(6)*, the Court must accept as true "the well-pleaded facts as they appear in the complaint, extending [the] plaintiff every reasonable inference in his favor." *Coyne v. City of Somerville, 972 F.2d 440, 442-43 (1st Cir. 1992)* (citing *Correa-Martinez v. Arrillaga-Belendez, 903 F.2d 49, 51 (1st Cir. 1990))*; *see also* *Hospital Bldg. Co. v. Trustees of Rex Hosp., 425 U.S. 738, 740, 48 L. Ed. 2d 338, 96 S. Ct. 1848 (1976)*. The complaint **[**14]** may not be dismissed unless "'it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" *Roeder v. Alpha Indus., Inc., 814 F.2d 22, 25 (1st Cir. 1987)* (quoting *Conley v. Gibson, 355 U.S. 41, 45-46, 2 L. Ed. 2d 80, 78 S. Ct. 99 (1957))*.

This standard applies to an antitrust claim. *See* *Caribe BMW, Inc. v. Bayerische Motoren Werke Aktiengesellschaft, 19 F.3d 745, 748 (1st Cir. 1994)*. ***HN2*** In antitrust cases "where the proof is largely in the hands of the [defendant], dismissals prior to giving the plaintiff ample opportunity for discovery should be granted sparingly." *Hospital Bldg. Co., 425 U.S. at 746*. However, sparingly

does not mean never. A plaintiff must allege sufficient facts in order to state each element of the antitrust violation. *See* *C.R. Bard, Inc. v. Medical Elecs. Corp., 529 F. Supp. 1382, 1389 (D.Mass. 1982)*.

**A. *Monopoly Power***

BSC argues that the complaint fails to allege its current market power or define the market conditions during the relevant time period. ***HN3*** The antitrust law makes it unlawful for a firm **[**15]** to "monopolize, or attempt to monopolize, . . . any part of the trade or commerce among the several States." Sherman Act *§ 2*, *15 U.S.C. § 2(a)*. To state a claim of monopolization, a plaintiff must allege: 1) that the defendant possesses monopoly power in the relevant market; and 2) that the defendant willfully acquired, maintained or used that power by exclusionary means. *See* *United States v. Grinnell, 384 U.S. 563, 570-71, 16 L. Ed. 2d 778, 86 S. Ct. 1698 (1966)*; *Town of Concord v. Boston Edison Co., 915 F.2d 17, 21 (1st Cir. 1990)*. The two elements will be discussed separately.

**1. *Monopoly Power***

***HN4*** Monopoly power is often defined as "the power to raise prices and exclude competition." *United States v. E. I. du Pont de Nemours & Co., 351 U.S. 377, 391, 76 S. Ct. 994, 100 L. Ed. 1264 (1956)*; *see also* *Aspen Skiing Co. v. Aspen Skiing Highlands Corp., 472 U.S. 585, 596 n.20, 86 L. Ed. 2d 467, 105 S. Ct. 2847 (1985)* (same). "The existence of such power ordinarily may be inferred from the predominant share of the market." *Grinnell, 384 U.S. at 571*. For pleading purposes, **[*196]** an allegation of market share of 70 **[**16]** percent has been held to be an adequate basis for an inference of power in a relevant market. *International Audiotext Network, Inc. v. AT&T, 893 F. Supp. 1207, 1217 (S.D.N.Y. 1994)* (suggesting that a conclusory allegation of predominant market share, without more, would support dismissal, but dismissing on other grounds), *aff'd*, *62 F.3d 69 (2d Cir. 1995)*.

With respect to the IVUS catheter market, HP asserts that, once BSC acquired CVIS, BSC controlled 90% of the IVUS catheter market. (Compl. at PP 2, 38.) Now that HP has left that market supposedly because of BSC's anti-competitive behavior, HP alleges that BSC currently accounts for "substantially all" of the IVUS catheters sold in the market. (*Id. P107*).

Defendant argues that the market share prior to the licensing agreement is irrelevant because it is outdated, and that these allegations concerning today's market shares are insufficient. It asserts that the four year old market no longer exists, that the agreement substantially changed the competitive landscape, and that a third party (EndoSonics Corporation) has developed into a stronger competitor. Because BSC's allegations that its market **[**17]** share is declining and EndoSonics' share is growing are beyond the four corners of the complaint, they cannot be considered in resolving this motion -- although they will certainly be relevant at another stage of the litigation. *See* *Data Gen. Corp. v. Grumman Sys. Support Corp., 36 F.3d 1147, 1184 (1st Cir. 1994)* ("Antitrust law generally seeks to punish and prevent harm to consumers in particular markets, with a focus on relatively specific time periods."); *United States v. Sargent, 785 F.2d 1123, 1127 (3d Cir. 1986)* (discussing changes in market share between an indictment and trial); and *Richter Concrete Corp. v. Hilltop Concrete Corp., 691 F.2d 818, 826 (6th Cir. 1982)* (stating that a decline in an antitrust defendant's market share during the relevant period "belies whatever inference of capacity to monopolize that may be drawn from the size of its market share").

In light of the allegations concerning the pre-agreement market share, the high barriers to entry in the marketplace posed by the patents, the regulatory clearance requirements, the need for

technological expertise, and HP's precipitous withdrawal, these allegations **[**18]** that BSC controls "substantially all" the catheter market are more than ample to meet pleading requirements with respect to monopoly power in the IVUS catheter market in the United States. *See International Audiotext, 893 F. Supp. at 1217*; *C. R. Swaney Co. v. Atlas Copco N. Am., Inc., 1987 U.S. Dist. LEXIS 12470*, CIV.A. No. 85-587- *N, 1987 WL 33025*, *13 (D.Mass. 1987) ("While it may have been preferable to make more specific allegations as to market share, at this early stage of the litigation an allegation of 'market dominance' is sufficient to survive a motion to dismiss." (citation omitted)); *but cf. Walker Distrib. Co. v. Lucky Lager Brewing Co., 323 F.2d 1, 9 (9th Cir. 1963)* (finding the allegation that defendant "was one of the largest manufacturers of beer in the west" was deficient because nothing was said about its position in the market in question).

A somewhat closer issue involves the console market. The complaint states that as of 1995, HP controlled 50% of the console market, making it the market share leader, and CVIS controlled 40%. There were no other significant competitors. (Compl. PP 33-34.) Once BSC merged with CVIS, it gained control over **[**19]** 40% of this market. (*Id.*) The complaint alleges that HP was prevented from competing in that console market, and that BSC now accounts for "substantially all of the IVUS consoles sold in the United States." (*Id. P 107*). Because HP was the market leader in the manufacture of IVUS consoles, it is less clear whether its withdrawal from the market now catapults BSC into the current position of having monopoly power **[*197]** in that market. For example, nothing is alleged with respect to BSC's current activities in manufacturing IVUS consoles. However, the Court need not determine whether the complaint edges over the low pleading barrier with respect to the monopolization claim because plaintiff also asserts a claim of attempted monopolization, which easily salvages this claim.

**2. *Willful Acquisition and Maintenance of Monopoly Power***

***HN5*** The second element of a *Section 2* claim is the acquisition or maintenance of monopoly power by other than such legitimate means as patents, "superior product, business acumen, or historic accident." *Barry Wright Corp. v. ITT Grinnell Corp., 724 F.2d 227, 230 (1st Cir. 1983)* (citing *Grinnell, 384 U.S. at 570-71*). **[**20]** The complaint must allege that the monopolist acquired or maintained that monopoly through exclusionary conduct. *See id*. "'Exclusionary conduct is conduct, other than competition on the merits, that reasonably appears capable of making a significant contribution to creating or maintaining a monopoly.'" *Id.* (quoting 3 P. Areeda & D. Turner, *Antitrust Law* P 626, at 83 (1978)). Conduct is exclusionary if it exceeds the needs of ordinary business dealings and unnecessarily excludes competition from the relevant market. *Id.* The First Circuit succinctly framed the question: "Was [defendant's] conduct reasonable in light of its business needs or did it unreasonably restrict competition?" *Id.*

HP claims that BSC willfully acquired a monopoly by acquiring CVIS and SCIMED, and violating in bad faith the FTC's consent decree imposed as a condition of the merger. HP contends that BSC duped the FTC into allowing the acquisitions by licensing its technology to HP, and then, by systematically breaching the licensing agreement, BSC completely undercut any possible remedial effect of the consent decree. The complaint sets forth a litany of alleged breaches that HP contends were **[**21]** done with the calculated desire to exclude HP from the IVUS console and catheter markets. The alleged breaches are that BSC: unreasonably and in bad faith refused to provide accurate interface specifications for its catheters; threatened to sue customers who used HP's pullback device; refused to create an interface for an HP catheter; reduced the number of

catheters that are compatible with HP consoles; and failed to provide notice of the re-design of a catheter hub.

Defendant argues that by entering into the licensing agreement it released its monopoly position. However, the licensing agreement is a shield only if defendant acts in good faith to comply with its terms. *See* *CVD, Inc. v. Raytheon Co., 769 F.2d 842, 851 (1st Cir. 1985)* ("It is well established that ***HN6*** an agreement which purports to license trade secrets, but in reality, is no more than a sham, or device designed to restrict competition, may violate antitrust laws.").

BSC argues that HP has presented a laundry list of minor contract skirmishes under provisions of the licensing agreement which are not specifically mandated by the consent order, and do not rise to the level of predatory contract. It relies **[**22]** on *Olympia Equip. Leasing Co. v. Western Union Tel. Co., 797 F.2d 370, 374-76 (7th Cir. 1986)*, which provides false consolation, although it provides a useful comparison. In *Olympia*, a federal regulatory agency (the Federal Communications Commission) had required defendant to allow competition, and defendant voluntarily undertook acts to "foster competition by subsidizing its competitors' selling costs." *Id. at 375*. The Seventh Circuit rejected an antitrust claim generated when defendant stopped these affirmative steps not required by any antitrust obligation, stating: "A firm that voluntarily encourages new competition in a tributary market should not be penalized by being made to pay damages under the antitrust laws." *Id.*

**[*198]** In contrast to *Olympia*, the steps to promote competition here were not voluntary. They were contractual obligations which were incorporated into a FTC Consent Order as a remedy for the lessening of competition caused by the acquisitions. At this pleading stage, the allegation of a bad faith violation of the licensing agreement, specifically designed to promote a viable, independent competitor in the catheter market, permits an inference **[**23]** of exclusionary conduct.

BSC makes the fair point that the FTC's order was not designed to promote competition in the *console* market. It hints that HP's design of the Scout catheter was unreasonable because it had a new console interface that would not run on either party's installed base of consoles, and therefore, the breach of the agreement was not unreasonably restrictive. Again, BSC's argument that its refusal to provide an open interface was based on legitimate business reasoning might be a fair defense on an expanded record. The allegations of an unreasonable refusal to cooperate on the console interface are sufficient to support an inference of exclusionary conduct in the console market. *See* *Aspen Skiing, 472 U.S. at 603* (affirming the jury finding that defendant's refusal to cooperate, where some cooperation was indispensable to effective competition, was not based on legitimate business reasons and supported an "inference that the monopolist made a deliberate effort to discourage its customers from doing business with its smaller rival.").

**B.** ***Attempted Monopolization***

***HN7*** To state a claim for attempted monopolization, a plaintiff must allege: **[**24]** 1) that the defendant engaged in exclusionary conduct; 2) with the specific intent to obtain monopoly power; and 3) a dangerous probability exists that the attempt will succeed. *See* *Spectrum Sports v. McQuillan, 506 U.S. 447, 456, 122 L. Ed. 2d 247, 113 S. Ct. 884 (1993)*; *CVD, Inc., 769 F.2d at 851* ("[A] specific intent to monopolize or restrain competition can often be inferred from a finding of bad faith."). As shown above, allegations concerning the first two elements are sufficient.

***HN8*** To satisfy the last element of this claim, plaintiff must allege facts to show that there was a dangerous probability that BSC would achieve a monopoly as a result of the alleged actions. *See*

*Colorado Interstate Gas Co. v. Natural Gas Pipeline Co. of America, 885 F.2d 683, 693 (10th Cir. 1989)*. The probability of successfully monopolizing a market is usually assessed through market share. *See id. at 694*. The greater share a defendant initially controls, the greater the probability of achieving monopoly status. *See id.* ("[A] 41% market share typically indicates that a firm has substantial economic power in the market, and, therefore, **[**25]** has the tools at its disposal to elevate its market share to monopolistic levels."). However, "proximity to monopoly status is not enough; the defendant must also have the ability to propel itself to monopolistic control over the market." *Id. at 694*.

HP alleges that after acquiring CVIS, BSC purposely leveraged its IVUS catheter monopoly and engaged in anti-competitive conduct to monopolize or attempt to monopolize the IVUS console business as well. BSC's alleged 90 percent market share of catheters and 40 percent market share of consoles, together with the other allegations, are sufficient to demonstrate a dangerous probability that an attempted monopolization would succeed in either the catheter or console markets.

**C. *Antitrust Injury***

***HN9*** Antitrust plaintiffs face an additional requirement to allege an "antitrust injury." *See SAS of Puerto Rico v. Puerto Rico Tel. Co., 48 F.3d 39, 43-44 (1st Cir. 1995)*; *Caribe BMW v. Bayerische Motoren Werke Aktiengesellschaft, 19 F.3d 745, 752 (1st Cir. 1994)*. Failure to make such a pleading is a fatal defect. *See SAS* **[*199]** *Puerto Rico, 48 F.3d at 46* (affirming the dismissal **[**26]** of a complaint that failed to allege an antitrust injury). The Supreme Court defined this term as an "injury of the type the antitrust laws were intended to prevent and that flows from that which makes the defendants' conduct unlawful." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 489, 50 L. Ed. 2d 701, 97 S. Ct. 690 (1977)*.

Antitrust laws were designed to protect the "competitive process that brings to consumers the benefits of lower prices, better products, and more efficient production methods." *Clamp-All Corp. v. Cast Iron Soil Pipe Inst.*, 851 F.2d 478, 486 (1st Cir. 1988). Based on this objective, the ***HN10*** "presumptive[] 'proper' plaintiff is a customer who obtains services in the threatened market or a competitor who seeks to serve that market." *SAS Puerto Rico, 48 F.3d at 44*. When a defendant engages in anticompetitive acts in an attempt to gain a monopoly, the competitor who is being driven out of the market has standing. *See Wojcieszek v. New England Tel. & Tel. Co., 977 F. Supp. 527, 535 (D.Mass. 1997)*.

HP claims that BSC injured the competitive process by engaging in predatory acts which drove **[**27]** HP out of the market for both consoles and catheters, depriving consumers of a meaningful choice of competing innovative products. If proven, these allegations are sufficient to show that BSC injured competition, which is exactly the type of injury the antitrust laws were designed to prevent.

**D. *State Claims***

The motion to dismiss the state claims is ***DENIED***.

**IV. ORDER**

For the reasons discussed herein, the Court ***DENIES*** the motion to dismiss (Docket No. 10).

PATTI B. SARIS

United States District Judge

EXHIBIT 273

LexisNexis

Caution
As of: August 13, 2014 11:44 AM EDT

**In re Nexium (Esomeprazole) Antitrust Litig.**
United States District Court for the District of Massachusetts
September 11, 2013, Decided; September 11, 2013, Filed
CIVIL ACTION NO. 12-md-02409-WGY

**Reporter:** 968 F. Supp. 2d 367; 2013 U.S. Dist. LEXIS 129696; 2013-2 Trade Cas. (CCH) P78,588; 2013 WL 4832176
IN RE NEXIUM (ESOMEPRAZOLE) ANTITRUST LITIGATION

**Prior History:** *In re Nexium (Esomeprazole) Antitrust Litig., 2013 U.S. Dist. LEXIS 10455 (D. Mass., Jan. 24, 2013)*

**Core Terms**

generic, patent, antitrust, manufacturer, infringement, settlement, consent judgment, anticompetitive, motion to dismiss, brand, district court, settlement agreement, certificate, anti trust law, class action, statute of limitations, indirect, relevant market, market power, internal quotation marks, named plaintiff, brand-name, putative class, first-filer, orange, doctrine, invalidity, expire, reply, supracompetitive

**Case Summary**

**Overview**
HOLDINGS: [1]-The direct purchasers of a heartburn drug had pled facts sufficient at the motion to dismiss stage to establish violations of *15 U.S.C.S. §§ 1* and *2* under the rule of reason where the purchasers had identified the relevant market, sufficiently alleged that the drug manufacturers exercised market power that generated anticompetitive consequences, and the manufacturers offered no evidence of any countervailing pro-competitive benefits; [2]-Consent judgments sanctioning settlement agreements between the drug manufacturer and three generic competitors were not entitled to Noerr-Pennington immunity as the conduct was neither direct petitioning nor incidental to litigation; [3]-The Sherman Act claims were not time-barred under *15 U.S.C.S. § 15b* as each sale to the purchasers started the statutory period running again.

**Outcome**
Motions to dismiss denied in part and granted in part.

**LexisNexis® Headnotes**

Civil Procedure > ... > Defenses, Demurrers & Objections > Motions to Dismiss > Failure to State Claim

***HN1*** To survive a motion to dismiss under *Fed. R. Civ. P. 12(b)(6)*, a complaint must allege facts sufficient to state a claim to relief that is plausible on its face. The grounds of entitlement to relief set forth in the complaint must constitute more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. Nevertheless, a defendant's burden is a heavy one when a motion to dismiss is filed. In its consideration of a motion to dismiss, the

court is instructed to accept as true all well-pleaded facts in the complaint and draw all reasonable inferences in favor of the plaintiffs.

Antitrust & Trade Law > ... > Price Fixing & Restraints of Trade > Per Se Rule & Rule of Reason > General Overview

***HN2*** Rule-of-reason analysis demands a determination as to whether under all the circumstances of the case the restrictive practice imposes an unreasonable restraint on competition. Judges engaging in rule-of-reason analysis are directed to consider three primary factors: (1) whether the alleged agreement involved the exercise of power in a relevant economic market, (2) whether this exercise had anti-competitive consequences, and (3) whether those detriments outweighed efficiencies or other economic benefits.

Antitrust & Trade Law > Regulated Practices > Market Definition > Relevant Market

***HN3*** In order to state a claim under *15 U.S.C.S. § 1* of the Sherman Act, a plaintiff must demonstrate that the defendant had market power in the relevant market, and the specific intent to restrain competition. Relatedly, under *15 U.S.C.S. § 2* of the Sherman Act, a plaintiff must show that the defendant had the specific intent to monopolize the relevant market, and a dangerous probability of success. Judicial precedent declares that, for antitrust purposes, a relevant market is made up of commodities reasonably interchangeable by consumers for the same purposes. The reasonable interchangeability of a set of products is not dependent on the similarity of their forms or functions; instead, such limits are drawn according to the cross-elasticity of demand for the product in question, i.e., the extent to which purchasers will accept substitute products in instances of price fluctuation and other changes.

Antitrust & Trade Law > Regulated Practices > Market Definition > Relevant Market

***HN4*** Judicial precedent holds that a properly constituted market may indeed be comprised of a single product, and lower courts across the country have on numerous occasions ruled that both a brand-name drug and its generic analogs can fall within the bounds of a relevant market for purposes of antitrust claims.

Antitrust & Trade Law > Regulated Practices > Market Definition > Relevant Market

***HN5*** In the context of an antitrust claim, the proper market definition can be determined only after a factual inquiry into the commercial realities faced by consumers.

Antitrust & Trade Law > Regulated Practices > Market Definition > Relevant Market

***HN6*** In the context of an antitrust claim, market power can be proven in one of two ways: either by (1) direct evidence of market power (perhaps by showing actual supra-competitive prices and restricted output) or by (2) circumstantial evidence of market power, which shows that the defendant has a dominant share in a well-defined relevant market and that there are significant barriers to entry in that market and that existing competitors lack the capacity to increase their output in the short run.

Antitrust & Trade Law > Regulated Practices > Private Actions > Sherman Act

***HN7*** To state a claim under the federal antitrust laws, a plaintiff must sufficiently allege an antitrust injury. An antitrust injury is described as an injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful. An injury,

although causally related to an antitrust violation, nevertheless will not qualify as antitrust injury unless it is attributable to an anti-competitive aspect of the practice under scrutiny.

Antitrust & Trade Law > Regulated Practices > Private Actions > Sherman Act

***HN8*** Courts look with particular skepticism upon agreements that allow first-filers to exploit their 180-day exclusivity period by prohibiting other generic competitors from entering the market without a demonstrated intention to market their generic drug.

Antitrust & Trade Law > ... > Per Se Rule & Rule of Reason > Per Se Rule Tests > Manifestly Anticompetitive Effects

***HN9*** Judicial precedent explains that a rule-of-reason approach to reverse payment agreements is preferable to quick-look treatment because the likelihood of a reverse payment bringing about anticompetitive effects depends upon its size, its scale in relation to the payor's anticipated future litigation costs, its independence from other services for which it might represent payment, and the lack of any other convincing justification. In other words, only those reverse payment agreements whose anticompetitive consequences are sufficiently great and sufficiently unrelated to the settlement of a particular patent dispute will be censured by the courts.

Antitrust & Trade Law > ... > Per Se Rule & Rule of Reason > Per Se Rule Tests > Manifestly Anticompetitive Effects

***HN10*** Nowhere does judicial precedent explicitly require some sort of monetary transaction to take place for an agreement between a brand and generic manufacturer to constitute a reverse payment in the context of an antitrust claim.

Antitrust & Trade Law > ... > Per Se Rule & Rule of Reason > Per Se Rule Tests > Manifestly Anticompetitive Effects

***HN11*** Where a reverse payment reflects traditional settlement considerations, such as avoided litigation costs or fair value for services, there is not the same concern that a patentee is using its monopoly profits to avoid the risk of patent invalidation or a finding of noninfringement.

Patent Law > General Overview

***HN12*** Although patent holders enjoy broad exclusionary rights, these rights are not limitless.

Antitrust & Trade Law > Exemptions & Immunities > Noerr-Pennington Doctrine > Scope

***HN13*** The Noerr-Pennington doctrine grants antitrust immunity to persons and organizations who, with the intent to restrain trade and diminish competition, act in concert to petition the government to adopt laws and implement policies that are anticompetitive in nature. Although it originally arose in the context of an individual's right to entreat the legislature and the executive, the doctrine has since been deemed to cover advocacy before all organs of government, including courts. Moreover, judicial precedent holds that the Noerr-Pennington doctrine extends not only to direct petitioning but also to activities that are incidental to a valid effort to influence governmental action. Ultimately, though, the scope of the Noerr-Pennington doctrine's protection depends on the source, context, and nature of the anticompetitive restraint at issue.

Antitrust & Trade Law > Exemptions & Immunities > Noerr-Pennington Doctrine > Scope

***HN14*** Courts are largely uniform in their view that private settlement agreements entered into during the pendency of litigation that are neither presented to nor approved by the judge presiding over the dispute fall outside the ambit of Noerr-Pennington immunity. There is little guidance, however, on the question of whether a judge's entry of a consent judgment falls squarely within the scope of the Noerr-Pennington doctrine.

Antitrust & Trade Law > Exemptions & Immunities > Noerr-Pennington Doctrine > Scope

***HN15*** A decision of a court that serves merely to memorialize a bargained-for agreement that could have otherwise been resolved without judicial intervention ought not benefit from the exemption allowed by the Noerr-Pennington doctrine.

Antitrust & Trade Law > Exemptions & Immunities > Noerr-Pennington Doctrine > Scope

***HN16*** The prevailing rule under the Noerr-Pennington doctrine remains that if anticompetitive harm is caused by the decision of a court, even though granted at the request of a private party, no private restraint of trade occurs because the intervening government action breaks the causal chain.

Antitrust & Trade Law > Regulated Practices > Private Actions > General Overview

Governments > Legislation > Statute of Limitations > Time Limitations

***HN17*** Federal antitrust enforcement actions are subject to a four-year statute of limitations. *15 U.S.C.S. § 15b*. Any such action that is not brought within four years after the cause of action accrued is deemed forever barred. Generally, a cause of action accrues under the Sherman Act when the plaintiff suffers an injury that is traceable to the defendant's conduct. An exception to this default rule exists, however, where the defendant's conduct constitutes a continuing violation of the Sherman Act that inflicts continuing and accumulating harm.

Antitrust & Trade Law > Sherman Act > General Overview

Governments > Legislation > Statute of Limitations > Time Limitations

***HN18*** Courts are generally fairly hostile to invocations of the continuing-violation exception in instances where a plaintiff fails to allege that the defendant committed overt acts separate and apart from the initial act giving rise to the original injury. That said, judicial precedent observes the following: Antitrust law provides that, in the case of a continuing violation, say, a price-fixing conspiracy that brings about a series of unlawfully high priced sales over a period of years, each overt act that is part of the violation and that injures the plaintiff, e.g., each sale to the plaintiff, starts the statutory period running again, regardless of the plaintiff's knowledge of the alleged illegality at much earlier times.

Constitutional Law > ... > Case or Controversy > Standing > General Overview

***HN19*** U.S. Const. art. III contains a requirement of justiciability which limits the jurisdiction of article III courts to active cases and controversies. *U.S. Const. art. III, § 2, cl. 1*. Judicial precedent interprets this clause as articulating the irreducible constitutional minimum of standing.

Constitutional Law > ... > Case or Controversy > Standing > Elements

***HN20*** A court's inquiry into U.S. Const. art. III standing contains the three following elements: a plaintiff must allege (1) personal injury (2) fairly traceable to the defendant's allegedly unlawful conduct and (3) likely to be redressed by the requested relief. The burden is on the plaintiff to

show that these requirements are satisfied. But the court may construe the complaint in favor of the plaintiff, taking the allegations made therein as true.

Civil Procedure > ... > Class Actions > Class Members > Named Members
Constitutional Law > ... > Case or Controversy > Standing > Particular Parties

***HN21*** Generally speaking, named representatives in class actions must allege a personal injury. This requirement is not so clear cut with respect to putative class representatives in class action disputes.

Civil Procedure > ... > Class Actions > Prerequisites for Class Action > General Overview

***HN22*** Under *Fed. R. Civ. P. 23*, one or more members of a class may sue or be sued as representative parties, *Fed. R. Civ. P. 23(a)*, so long as the four requirements of numerosity, commonality, typicality, and adequacy of representation are satisfied.

Constitutional Law > ... > Case or Controversy > Standing > Elements

***HN23*** As the United States Court of Appeals for the Sixth Circuit has noted, once an individual has alleged a distinct and palpable injury to himself he has standing to challenge a practice even if the injury is of a sort shared by a large class of possible litigants.

Civil Procedure > ... > Class Actions > Prerequisites for Class Action > General Overview
Constitutional Law > ... > Case or Controversy > Standing > General Overview

***HN24*** Ordinarily, a U.S. Const. art. III court must be sure of its own jurisdiction before getting to the merits. But the class certification issues are logically antecedent to article III concerns, and themselves pertain to statutory standing, which may properly be treated before article III standing. Thus, the issue about *Fed. R. Civ. P. 23* certification should be treated first, mindful that the Rule's requirements must be interpreted in keeping with article III constraints.

Governments > Courts > Rule Application & Interpretation

***HN25*** *28 U.S.C.S. § 2072* provides that the general rules of practice which the Rules Enabling Act empowers the United States Supreme Court to prescribe for federal district courts shall not abridge, enlarge or modify any substantive right. *28 U.S.C.S. § 2072(b)*.

Antitrust & Trade Law > Public Enforcement > State Civil Actions

***HN26*** Illinois law states that no person shall be authorized to maintain a class action in any court of the state for indirect purchasers asserting claims under the Illinois Antitrust Act, *740 ILCS 10/1 et seq.*, with the sole exception of the Illinois Attorney General, who may maintain an action parens patriae as provided in *740 ILCS 10/7*.

Antitrust & Trade Law > Public Enforcement > State Civil Actions

***HN27*** The Illinois Antitrust Act, *740 ILCS 10/1 et seq.*, provides a procedure that is so bound up with the state-created right or remedy that it defines the scope of that substantive right or remedy.

Antitrust & Trade Law > Public Enforcement > State Civil Actions

***HN28*** Although a number of states have passed state laws known as Illinois Brick-repealers which specifically grant end-payors the right to sue for antitrust violations, the validity of which

was upheld by judicial precedent, end-payors cannot assert antitrust claims under the law of states which have not passed such repealers. Because Puerto Rico 's Antitrust Act, P.R. Laws tit. 10, § 257 et seq., is modeled after federal antitrust statutes, a number of courts hold that, just as indirect purchasers lack standing under federal law, so too do indirect purchasers lack standing under Puerto Rico law.

Antitrust & Trade Law > Public Enforcement > State Civil Actions

***HN29*** See *Utah Code Ann. § 76-10-3109(1)(a)*.

Antitrust & Trade Law > Public Enforcement > State Civil Actions

***HN30*** Utah's antitrust law appears to require that a person suing under the antitrust statute be a citizen or resident, *Utah Code Ann. § 76-10-3109(1)(a)*.

**Counsel:** **[**1]** For Allied Services Division Welfare Fund, Laborers International Union of North America Local 17 Health Care Fund, Consolidated Plaintiffs: David B. Franco, LEAD ATTORNEY, PRO HAC VICE, The Dugan Law Firm, APLC, New Orleans, LA; Douglas R. Plymale, James R. Dugan, II, LEAD ATTORNEYS, The Dugan Law Firm, New Orleans, LA; Bruce E. Gerstein, Garwin Gerstein & Fisher LLP, New York, NY; Glen DeValerio, Berman DeValerio, Boston, MA; Thomas G. Shapiro, Shapiro Haber & Urmy LLP, Boston, MA.

For Laborers International Union of North America Local 35 Health Care Fund, Consolidated Plaintiff: Bruce E. Gerstein, Garwin Gerstein & Fisher LLP, New York, NY; Glen DeValerio, Berman DeValerio, Boston, MA; Thomas G. Shapiro, Shapiro Haber & Urmy LLP, Boston, MA.

For A.F. of L. - A.G.C. Building Trades Welfare Plan, Consolidated Plaintiff: Bruce E. Gerstein, Garwin Gerstein & Fisher LLP, New York, NY; Glen DeValerio, Berman DeValerio, Boston, MA.

For American Sales Company, LLC, On behalf of itself and all others similarly situated, Consolidated Plaintiff: Andrew J. Vasicek, David S. Nalven, Thomas M. Sobol, LEAD ATTORNEYS, Donna M. Evans, Hagens Berman Sobol Shapiro LLP, Cambridge, MA; Kristen Johnson **[**2]** Parker, LEAD ATTORNEY, PRO HAC VICE, Hagens Berman Sobol Shapiro LLP, Cambridge, MA; Bruce E. Gerstein, Garwin Gerstein & Fisher LLP, New York, NY; Don Barrett, Barrett Law Office, Lexington, MS; John D. Radice, Radice Law Firm, PC, Long Beach, NJ.

For Value Drug Company, Consolidated Plaintiff: Brian D. Brooks, LEAD ATTORNEY, Smith Segura & Raphael LLP, New York, NY; Ephraim R. Gerstein, LEAD ATTORNEY, PRO HAC VICE, Garwin Gerstein & Fisher LLP, New York, NY; Joseph Opper, LEAD ATTORNEY, PRO HAC VICE, Garwin, Bronzaft, Gerstein & Fisher, New York, NY; Peter S. Pearlman, LEAD ATTORNEY, PRO HAC VICE, Cohn, Lifland, Pearlman, Herrmann & Knopf, Saddle Brook, NJ; Russell A. Chorush, LEAD ATTORNEY, PRO HAC VICE, Heim Payne & Chorush LLP, Houston, TX; Susan C. Segura, LEAD ATTORNEY, Smith Segura & Raphael, LLP, Alexandria, LA; Thomas M. Sobol, LEAD ATTORNEY, Donna M. Evans, Hagens Berman Sobol Shapiro LLP, Cambridge, MA; Elena Chan, PRO HAC VICE, Garwin Gerstein & Fisher LLP, New York, NY.

For Burlington Drug Company Inc., Consolidated Plaintiff: Brian D. Brooks, LEAD ATTORNEY, Smith Segura & Raphael LLP, New York, NY; Ephraim R. Gerstein, LEAD ATTORNEY, PRO HAC VICE, Garwin Gerstein & Fisher **[**3]** LLP, New York, NY; Peter S. Pearlman, LEAD

ATTORNEY, PRO HAC VICE, Cohn, Lifland, Pearlman, Herrmann & Knopf, Saddle Brook, NJ; Russell A. Chorush, LEAD ATTORNEY, PRO HAC VICE, Heim Payne & Chorush LLP, Houston, TX; Susan C. Segura, LEAD ATTORNEY, Smith Segura & Raphael, LLP, Alexandria, LA; Thomas M. Sobol, LEAD ATTORNEY, Donna M. Evans, Hagens Berman Sobol Shapiro LLP, Cambridge, MA; Elena Chan, PRO HAC VICE, Garwin Gerstein & Fisher LLP, New York, NY.

For Rochester Drug Co-Operative, Inc., On Behalf of itself and all others similarly situated, Consolidated Plaintiff: Archana Tamoshunas, LEAD ATTORNEY, Taus, Cebulash & Landau, LLP, New York, NY; Caitlin G. Coslett, Daniel C. Simons, David F. Sorensen, Nicholas Urban, LEAD ATTORNEYS, PRO HAC VICE, Berger & Montague, P.C., Philadelphia, PA; Eric L. Cramer, LEAD ATTORNEY, Berger & Montague PC, Philadelphia, PA; Joseph T. Lukens, LEAD ATTORNEY, FARUQI & FARUQI, JENKINTOWN, PA; Peter Kohn, LEAD ATTORNEY, PRO HAC VICE, Faruqi & Faruqi LLP, Jenkintown, PA; Thomas M. Sobol, LEAD ATTORNEY, Donna M. Evans, Hagens Berman Sobol Shapiro LLP, Cambridge, MA; Bruce E. Gerstein, Garwin Gerstein & Fisher LLP, New York, NY.

For Laborers International **[**4]** Union of North America Local 345 Health Care Fund, On behalf of itself and all others similarly situated, Consolidated Plaintiff: Douglas R. Plymale, James R. Dugan, II, LEAD ATTORNEYS, The Dugan Law Firm, New Orleans, LA; Frank R. Schirripa, LEAD ATTORNEY, PRO HAC VICE, Hach Rose Schirripa & Cheverie, LLP, New York, NY; Michael A London, LEAD ATTORNEY, Douglas & London, New York, NY; Michael Aaron Rose, LEAD ATTORNEY, Hach & Rose, New York, NY; Virginia E Anello, LEAD ATTORNEY, Douglas & London, P.C., New York, NY; Bruce E. Gerstein, Garwin Gerstein & Fisher LLP, New York, NY.

For Walgreen Co., The Kroger Co., Safeway Inc., Supervalu, Inc., HEB GROCERY CO. LP, Consolidated Plaintiffs: Anna T. Neill, LEAD ATTORNEY, PRO HAC VICE, Kenny Nachwalter, P.A., Miami, FL; Douglas H. Patton, Scott E. Perwin, LEAD ATTORNEYS, Kenny Nachwalter, P.A., Miami, FL.

For Giant Eagle, Inc, Consolidated Plaintiff: Bernard D. Marcus, Moira E. Cain-Mannix, LEAD ATTORNEYS, Marcus & Shapira, Pittsburgh, PA; Brian C. Hill, Jonathan D. Marcus, LEAD ATTORNEYS, Marcus & Shapira LLP, Pittsburgh, PA.

For Meijer, Inc., Meijer Distribution, Inc., Plaintiffs: David P. Germaine, John P. Bjork, LEAD ATTORNEYS, PRO HAC VICE, **[**5]** Vanek Vickers & Masini PC, Chicago, IL; JAMES E. CECCHI, LEAD ATTORNEY, CARELLA BYRNE CECCHI OLSTEIN BRODY & AGNELLO, P.C., ROSELAND, NJ; Linda P. Nussbaum, LEAD ATTORNEY, PRO HAC VICE, Grant & Eisenhofer PA; Lindsey H. Taylor, LEAD ATTORNEY, CARELLA, BYRNE, CECCHI, OLSTEIN, BRODY & AGNELLO, ROSELAND, NJ; Thomas M. Sobol, LEAD ATTORNEY, Donna M. Evans, Hagens Berman Sobol Shapiro LLP, Cambridge, MA; Bruce E. Gerstein, Garwin Gerstein & Fisher LLP, New York, NY; Peter A. Barile, III, Grant & Eisenhofer, P.A., New York, NY.

For Fraternal Order of Police Miami Lodge 20 Insurance Trust Fund, Plaintiff: Anne K. Fornecker, HILLIARD & SHADOWEN LLC, AUSTIN, TX; Bruce E. Gerstein, Garwin Gerstein & Fisher LLP, New York, NY; Glen DeValerio, Berman DeValerio, Boston, MA; Jayne A. Goldstein, Pomerantz Grossman Hufford Dahlstrom & Gross, LLP, Weston, FL; Natalie Finkelman Bennett, Shepherd, Finkelman, Miller & Shah, LLP, Media, PA; Steve D. Shadowen, Hilliard & Shadowen LLC, Mechanicsburg, PA.

For New York Hotel Trades Council and Hotel Assoc. of New York City, Inc. Health Benefits Fund, Plaintiff: Christopher Lometti, LEAD ATTORNEY, Cohen Milstein Sellers & Toll PLLC, Washignton, DC; J. Douglas **[**6]** Richards, Sharon K. Robertson, LEAD ATTORNEYS, PRO HAC VICE, Cohen Milstein Sellers & Toll PLLC, New York, NY; Bruce E. Gerstein, Garwin Gerstein & Fisher LLP, New York, NY; George Farah, PRO HAC VICE, Cohen Milstein, New York, NY; Glen DeValerio, Berman DeValerio, Boston, MA.

For United Food Workers and Commercial Workers Unions and Employers Midwest Health Benefits Fund, Plaintiff: Bethany R. Turke, Dawn M. Goulet, Edward A. Wallace, Justin N. Boley, Kenneth A. Wexler, LEAD ATTORNEYS, PRO HAC VICE, WEXLER WALLACE LLP, Chicago, IL; Bruce E. Gerstein, Garwin Gerstein & Fisher LLP, New York, NY; Glen DeValerio, Berman DeValerio, Boston, MA; Jonathan Shapiro, Stern, Shapiro, Weissberg & Garin, Boston, MA; Kimberly A. Dougherty, Janet Jenner & Suggs, LLC, Boston, MA.

For Michigan Regional Council of Carpenters Employee Benefits Fund, Plaintiff: Christopher M. Burke, LEAD ATTORNEY, PRO HAC VICE, Scott & Scott LLP, San Diego, CA; Donald A. Broggi, LEAD ATTORNEY, PRO HAC VICE, Scott & Scott LLP, New York, NY; Lisa J. Rodriguez, LEAD ATTORNEY, Rodriguez & Richards, LLC, Haddonfield, NJ; NICOLE M. ACCHIONE, LEAD ATTORNEY, TRUJILLO RODRIGUEZ & RICHARDS, LLP, HADDONFIELD, NJ; Penelope Abdiel, **[**7]** LEAD ATTORNEY, PRO HAC VICE, Scott + Scott, Attorneys at Law, LLP, New York, NY; Walter W. Noss, LEAD ATTORNEY, PRO HAC VICE, Scott+Scott LLP, San Diego, CA; Bruce E. Gerstein, Garwin Gerstein & Fisher LLP, New York, NY; Glen DeValerio, Berman DeValerio, Boston, MA; Joseph P. Guglielmo, Scott & Scott, LLP, New York, NY.

For International Union of Machinists and Aerospace Workers District No. 15 Health Fund, Plaintiff: Brian D. Penny, LEAD ATTORNEY, PRO HAC VICE, Goldman Scarlato Karon & Penny PC, Wayne, PA; Kevin P. Roddy, LEAD ATTORNEY, PRO HAC VICE, Wilentz, Goldman & Spitzer PA, Woodbridge, NJ; Bruce E. Gerstein, Garwin Gerstein & Fisher LLP, New York, NY; Glen DeValerio, Berman DeValerio, Boston, MA.

For International Brotherhood Of Electrical Workers Local 595 Health And Welfare Fund, Plaintiff: Aaron D. Kaufmann, LEAD ATTORNEY, PRO HAC VICE, Leonard Carder LLP, Oakland, CA; Christina C. Sharp, LEAD ATTORNEY, PRO HAC VICE, Girard Gibbs LLP, San Francisco, CA; Daniel C. Girard, LEAD ATTORNEY, PRO HAC VICE, Girard Gibbs & DeBartolomeo LLP, San Francisco, CA; Bruce E. Gerstein, Garwin Gerstein & Fisher LLP, New York, NY; Glen DeValerio, Berman DeValerio, Boston, MA.

For A.F. of L., **[**8]** Plaintiff: Bruce E. Gerstein, Garwin Gerstein & Fisher LLP, New York, NY; Glen DeValerio, Berman DeValerio, Boston, MA.

For Dr. Reddy's Laboratories Ltd., Dr. Reddy's Laboratories, Inc., Defendants: Andrew J. Miller, LEAD ATTORNEY, Budd Larner PC, Short Hills, NJ; Brian T. Moriarty, LEAD ATTORNEY, Christopher K. Albert, Hamilton Brook Smith & Reynolds, P.C., Concord, MA; Ellen T. Lowenthal, LEAD ATTORNEY, PRO HAC VICE, Budd Larner PC, Short Hills, NJ; Jonathan B. Berman, Kevin D. McDonald, Stephanie L. Resnik, LEAD ATTORNEYS, PRO HAC VICE, Jones Day, Washington, DC; Andrew D. Lazerow, Covington & Burling LLP, Washington, DC.

For AstraZeneca LP, Defendant: Ashley E. Bass, Thomas A. Isaacson, LEAD ATTORNEYS, PRO HAC VICE, Jonathan Gimblett, Covington & Burling LLP, Washington, DC; Adam R.

Tarosky, James H. Weingarten, John E. Schmidtlein, Paul B. Gaffney, PRO HAC VICE, Williams & Connolly LLP, Washington, DC; Andrew D. Lazerow, PRO HAC VICE, Covington & Burling LLP, Washington, DC; Dane H. Butswinkas, PRO HAC VICE, Williams & Connolly, Washington, DC; Michael P. Kelly, PRO HAC VICE, McCarter & English LLP, Wilmington, DE; Nicholas W. Allen, William A. Zucker, McCarter & English, LLP, Boston, **[**9]** MA; Timothy C. Hester, Covington & Burling, Washington, DC.

For RANBAXY LABORATORIES, LTD., Ranbaxy Inc., Ranbaxy Pharmaceuticals, Inc., Defendants: Lisa Jose Fales, Sarah Choi, LEAD ATTORNEYS, PRO HAC VICE, Danielle R. Foley, James Douglas Baldridge, Venable LLP, Washington, DC; Andrew D. Lazerow, Covington & Burling LLP, Washington, DC; Leslie F. Su, Minerva Law, P.C., Andover, MA.

For Astrazeneca AB, Aktiebolaget Hassle, Defendants: Ashley E. Bass, Thomas A. Isaacson, LEAD ATTORNEYS, PRO HAC VICE, Andrew D. Lazerow, Covington & Burling LLP, Washington, DC; Adam R. Tarosky, James H. Weingarten, John E. Schmidtlein, Paul B. Gaffney, PRO HAC VICE, Williams & Connolly LLP, Washington, DC; Dane H. Butswinkas, PRO HAC VICE, Williams & Connolly, Washington, DC; Michael P. Kelly, PRO HAC VICE, McCarter & English LLP, Wilmington, DE; Timothy C. Hester, Covington & Burling, Washington, DC.

For Ranbaxy Laboratories, LTD, Defendant: James Douglas Baldridge, Venable LLP, Washington, DC; Andrew D. Lazerow, Covington & Burling LLP, Washington, DC.

For TEVA USA, INC., Teva Pharmaceutical Industries, Ltd., Defendants: Adam L. Sisitsky, Laurence A. Schoen, LEAD ATTORNEYS, Mintz, Levin, Cohn, Ferris, **[**10]** Glovsky & Popeo, PC, Boston, MA; Katie Einspanier, Thea Cohen, LEAD ATTORNEYS, PRO HAC VICE, Kirkland & Ellis LLP, Washington, DC; Andrew D. Lazerow, Covington & Burling LLP, Washington, DC; Christopher M. Jackson, Karen N. Walker, Rebecca A. Koch, PRO HAC VICE, Kirkland & Ellis LLP, Washington, DC; Jay P. Lefkowitz, PRO HAC VICE, Kirkland & Ellis LLP, New York, NY.

For Value Drug Company, Burlington Drug Company Inc., Interested Parties: Bruce E. Gerstein, Garwin Gerstein & Fisher LLP, New York, NY; Elena Chan, PRO HAC VICE, Garwin Gerstein & Fisher LLP, New York, NY.

**Judges:** WILLIAM G. YOUNG, DISTRICT JUDGE.

**Opinion by:** WILLIAM G. YOUNG

**Opinion**

**[*375]** MEMORANDUM AND ORDER

**I. INTRODUCTION**

A group of wholesale drug distributors (the "Direct Purchasers") and health and welfare benefit funds (the "End-Payors" [1]) (collectively, the "Plaintiffs"), on behalf of themselves and all others similarly situated, brings this multidistrict, putative class action against AstraZeneca AB,

---

[1] On certain occasions in the briefs, the End-Payors are alternatively referred to as "indirect purchasers." See, e.g., Defs.' Mem. Supp. Their Mot. Dismiss Indirect Purchasers' Consol. Am. Compl. (Dkt. No. 114) Pursuant *Fed. Rule Civil Procedure 12(b)(6)*, ECF No. 156. The Court, however, believes the former appellation to be more apt than the latter.

Aktiebolaget Hassle, and AstraZeneca LP (collectively, "AstraZeneca"), Ranbaxy Pharmaceuticals, Inc., Ranbaxy Inc., and Ranbaxy Laboratories Ltd. (collectively, "Ranbaxy"); Teva Pharmaceutical Industries, Ltd. and Teva Pharmaceuticals USA, Inc. (collectively, **[**11]** "Teva"); and Dr. Reddy's Laboratories Ltd. and Dr. Reddy's Laboratories, Inc. (collectively, "Dr. Reddy's") (collectively, with Ranbaxy and Teva, the "Generic Defendants") (collectively, with AstraZeneca, the "Defendants") for alleged violations of state and federal antitrust laws. [2] Specifically, the Plaintiffs contend that AstraZeneca and each of the three Generic Defendants entered into reverse payment agreements to keep generic versions of AstraZeneca's heartburn medication —sold under the brand name Nexium — out of the market, thereby facilitating the extraction of supracompetitive rents by **[*376]** virtue of AstraZeneca's artificially secured monopoly market position.

The Defendants filed five motions to dismiss the Plaintiffs' claims under *Federal Rule of Civil Procedure 12(b)(6)* ("*Rule 12(b)(6)*"). The key issues in these motions can be subdivided into two groups: those relating to the Direct Purchasers and those relating to the End-Payors. With respect to the Direct Purchasers, the Defendants argue that (1) the exclusionary conduct at issue falls within the scope of AstraZeneca's Nexium-related patents, so no action for antitrust liability may lie; and (2) even if antitrust liability would otherwise attach to the Defendants' conduct, (a) the doctrine of Noerr-Pennington renders the challenged agreements immune from antitrust scrutiny and (b) the Direct Purchasers' challenge to the particular agreement between AstraZeneca and Ranbaxy is time-barred under the relevant federal statute of limitations. With respect to the End-Payors, the Defendants argue that (1) the applicable state-specific statutes of limitations **[**14]** bar the End-Payors' claims with respect to the agreement between AstraZeneca and Ranbaxy; (2) the End-Payors lack standing under both Article III and *Federal Rule of Civil Procedure 23* ("*Rule 23*") to bring their claims; and (3) the End-Payors' claims brought under the antitrust laws of eight states (Arizona, Illinois, Mississippi, New York, South Dakota, Tennessee, Utah, and West Virginia) and Puerto Rico and the consumer protection statutes of two states (Massachusetts and North Carolina) are deficient for various reasons. [3]

At a motion hearing held on April 18, 2013, the Court denied all of the Defendants' motions and asked for further briefing on the viability of the End-Payors' **[**15]** *Rule 23* standing and

---

[2] The Direct Purchasers have lodged the following charges against the Defendants: (1) conspiracy to monopolize, in violation of Sherman Act section 2, *15 U.S.C. § 2*, against AstraZeneca **[**12]** and Ranbaxy; (2) conspiracy to monopolize, in violation of Sherman Act section 2, against AstraZeneca and Teva; (3) conspiracy to monopolize, in violation of Sherman Act *section 2*, against AstraZeneca and Dr. Reddy's; (4) agreement in restraint of trade, in violation of Sherman Act section 1, *15 U.S.C. § 1*, against AstraZeneca and Ranbaxy; (5) agreement in restraint of trade, in violation of Sherman Act section 1, against AstraZeneca and Teva; (6) agreement in restraint of trade, in violation of Sherman Act section 1, against AstraZeneca and Dr. Reddy's; (7) monopolization, in violation of Sherman Act *section 2*, against AstraZeneca; (8) attempt to monopolize, in violation of Sherman Act *section 2*, against AstraZeneca; (9) agreement in restraint of trade, in violation of Sherman Act section 1, against all of the Defendants; and (10) conspiracy to monopolize, in violation of Sherman Act *section 2*, against all of the Defendants. See Consol. Am. Compl. & Demand Jury Trial ¶¶ 166-234, ECF No. 131.

For their part, the End-Payors' in their consolidated complaint have set forth state-based claims for relief that are largely analogous to the Direct Purchasers' federal claims, as well as a standalone **[**13]** claim for declaratory relief under sections 1 and 2 of the Sherman Act and injunctive relief under section 16 of the Clayton Act, 15 U.S.C. § 26. See Corrected Consol. Am. Class Action Compl. & Demand Jury Trial ¶¶ 157-195, ECF No. 114.

[3] The Defendants also assert that the End-Payors' claims should additionally be dismissed on the same grounds as those proffered in their motion to dismiss the Direct Purchasers. See Defs.' Mem. Supp. Their Mot. Dismiss Indirect Purchasers' Consol. Am. Compl. (Dkt. No. 114) Pursuant *Fed. Rule Civil Procedure 12(b)(6)*, at 2-4, ECF No. 156. Because of their expressly duplicative nature, these grounds will only be discussed in the section of this memorandum dealing with the Direct Purchasers. See infra section II.B.

claims under Illinois law. Upon reflection, however, the Court acknowledges that it may have acted hastily on some of the matters presented and, therefore, takes the time here to revisit some of its earlier conclusions. Moreover, at the time of the motion hearing, the parties — and, quite frankly, the Court — were waiting with bated breath for the Supreme Court's decision in *Federal Trade Commission v. Actavis, 133 S. Ct. 2223, 186 L. Ed. 2d 343, 2013 U.S. LEXIS 4545 (2013)*, which was anticipated to have significant implications for the instant case by resolving fundamental questions concerning the lawfulness of reverse payment agreements. Therefore, although the Court has no reason to modify its judgment with respect to the Defendants' motion to dismiss the Direct Purchasers' claims, the recent arrival of *Actavis*compels the Court to adjust its rationale in light of that opinion. Finally, armed with additional briefing supplied by the parties, the Court is now prepared to rule on the *Rule 23* standing and Illinois law issues left unaddressed at the motion hearing.

**A. Procedural Posture**

The End-Payors filed a consolidated complaint on February 1, 2013, Corrected Consol. Am. Class Action Compl. & Demand Jury **[**16]** Trial ("End-Payors' Compl."), ECF No. 114, after the Court was called upon to intercede in a dispute over which of the parties' attorneys would serve as **[*377]** lead class counsel, see *In re Nexium (Esomeprazole) Antitrust Litig., No. 12-md-02409-WGY, 2013 U.S. Dist. LEXIS 10455, 2013 WL 326215 (D. Mass. Jan. 24, 2013)*. One month later, on March 1, 2013, the Defendants filed their motion to dismiss the End-Payors' consolidated complaint, Defs.' Mot. Dismiss Indirect Purchasers' Consol. Am. Compl., ECF No. 155, together with their supporting memorandum of law, Defs.' Mem. Supp. Their Mot. Dismiss Indirect Purchasers' Consol. Am. Compl. (Dkt. No. 114) Pursuant *Fed. Rule Civil Procedure 12(b)(6)* ("Defs.' Mot. Dismiss End-Payors"), ECF No. 156. The End-Payors filed their memorandum in opposition to the Defendants' motion to dismiss on March 22, 2013. End-Payor Class Pls' Mem. Opp'n Defs.' Mot. Dismiss ("End-Payor's Mem. Opp'n"), ECF No. 189. The Defendants filed their reply to the End-Payors' opposition in further support of their motion on April 5, 2013. Defs.' Reply Mem. Further Supp. Their Mot. Dismiss Indirect Purchasers' Consol. Am. Compl. (Dkt. No. 114) Pursuant *Fed. Rule Civil Procedure 12(b)(6)* ("Defs.' Reply End-Payors"), **[**17]** ECF No. 208.

The Direct Purchasers, for their part, filed a consolidated complaint with this Court on February 21, 2013. Consol. Am. Compl. & Demand Jury Trial ("Direct Purchasers' Compl."), ECF No. 131. The following day, each of the Defendants separately moved to dismiss the Direct Purchasers' complaint, appending to their respective motions memoranda of law in support. Mot. Dr. Reddy's Labs. Dismiss Direct Purchasers' Consol. Am. Compl., ECF No. 132; Mem. Supp. Mot. Dr. Reddy's Labs. Dismiss Direct Purchasers' Consol. Am. Compl. ("Dr. Reddy's Mem."), ECF No. 133; AstraZeneca Defs.' Mot. Dismiss Direct Purchasers' Consol. Am. Compl., ECF No. 134; AstraZeneca Defs.' Mem. Supp. Their Mot. Dismiss Direct Purchasers' Consol. Am. Compl. (Dkt. No. 131) Pursuant *Fed. Rule Civil Procedure 12(b)(6)* ("AstraZeneca's Mem."), ECF No. 135; Teva Defs.' Mot. Dismiss, ECF No. 136; Teva Defs.' Mem. Supp. Its Mot. Dismiss Direct Purchaser Pls.' Consol. Am. Compl. ("Teva's Mem."), ECF No. 137; Def. Ranbaxy's Mot. Dismiss Direct Purchasers' Consol. Am. Compl., ECF No. 138; Def. Ranbaxy's Mem. Law Supp. Its Mot. Dismiss Direct Purchasers' Consol. Am. Compl. ("Ranbaxy's Mem."), ECF No. 139. On March 15, **[**18]** 2013, the Direct Purchasers filed four memoranda in opposition to each

of the Defendants' motions to dismiss. [4] Direct Purchaser Class Pls.' Opp'n Dr. Reddy's Mot. Dismiss, ECF No. 167; Direct Purchaser Class Pls.' Opp'n AstraZeneca's Mot. Dismiss ("Direct Purchasers' Opp'n AstraZeneca's Mot. Dismiss"), ECF No. 168; Direct Purchaser Class Pls.' Opp'n Teva's Mot. Dismiss ("Direct Purchasers' Opp'n Teva's Mot. Dismiss"), ECF No. 169; Direct Purchaser Class Pls.' Opp'n Ranbaxy's Mot. Dismiss ("Direct Purchasers' Opp'n Ranbaxy's Mot. Dismiss"), ECF No. 170. AstraZeneca filed a reply in further support of its motion to dismiss on March 29, 2013, AstraZeneca Defs.' Reply Mem. Further Supp. Mot. Dismiss Direct Purchasers' Consol. Am. Compl. (Dkt. No. 131) Pursuant *Fed. Rule Civil Procedure 12(b)(6)*, ECF No. **[*378]** 194, and on April 1, 2013, the Generic Defendants followed suit, Reply Mem. Law Supp. Def. Ranbaxy's Mot. Dismiss Direct Purchasers' Consol. Am. Compl. ("Ranbaxy's Reply"), ECF No. 199; Reply Supp. Mot. Dr. Reddy's Labs. Dismiss Direct Purchasers' Consol. Am. Compl., ECF No. 200; Teva Defs.' Reply Mem. Supp. Their Mot. Dismiss Direct Purchaser Pls.' Consol. Am. Compl., ECF No. 201.

At a motion hearing held on April 18, 2013, the Court denied all of the Defendants' motions, Elec. Clerk's Notes, Apr. 18, 2013, ECF No. 218, and requested further briefing on the End-Payors' Rule 23 standing and claims under Illinois law, Mot. Hr'g Tr. 42:16-17, Apr. 18, 2013, ECF No. 216. Per the Court's instructions, the parties submitted briefs on these two issues on May 2, 2013. Defs.' Supplemental Mem. Supp. Their Mot. Dismiss Indirect Purchasers' Consol. Am. Compl. (Dkt. No. 114) Pursuant *Fed. Rule Civil Procedure 12(b)(6)* **[**20]** ("Defs.' Supplemental Mem."), ECF No. 223; End-Payor Class Pls.' Supplemental Mem. Opp'n Defs.' Mot. Dismiss ("End-Payors' Supplemental Mem."), ECF No. 224.

**B. Regulatory and Transactional Background**

**1. Hatch-Waxman Regime**

Before a drug manufacturer may market a new drug to the public, it must first seek the approval of the United States Food and Drug Administration ("FDA") by filing a New Drug Application ("NDA") with the agency. *Actavis, 133 S. Ct. at 2228*. The road to NDA approval is long and fraught with expense, as the process requires applicants to submit, inter alia, a description of the proposed drug's components and composition; reports on the safety and effectiveness of the drug; and an explanation of how the drug will be manufactured, processed, and packaged. See*21 U.S.C. § 355(b)(1)*. Drugs that have been approved by the FDA are then listed in a publication known colloquially as the "Orange Book." See Approved Drug Products with Therapeutic Equivalence Evaluations (Orange Book), U.S. Food & Drug Admin., http://www.fda.gov/Drugs/InformationOnDrugs/ucm129662.htm (last updated Aug. 23, 2013).

The Drug Price Competition and Patent Term Restoration Act of 1984, *Pub. L. No. 98-417, 98 Stat. 1585* **[**21]** (codified as amended at 15, 21, 28, and 35 U.S.C.) — known more commonly by its popular title, the "Hatch-Waxman Act," derived from the surnames of the Act's principal sponsors — was passed with the express purpose of expediting the entry of noninfringing generic competitors into pharmaceutical drug markets in order to decrease healthcare costs for consumers.

---

[4] The **[**19]** Direct Purchasers moved to file a single, consolidated memorandum in opposition to the Defendants' motions to dismiss. Direct Purchaser Pls.' Mot. File Single Consol. Mem. Opp'n Four Mots. Dismiss, ECF No. 162, but the Court denied their request. Elec. Order, Mar. 13, 2013, ECF No. 165. As a result, in an attempt to minimize redundancy, each of the Direct Purchasers' four opposition memoranda respond to a different set of arguments raised in the Defendants' motions. See Direct Purchaser Class Pls.' Opp'n AstraZeneca's Mot. Dismiss 8 n.24, ECF No. 168 (matching each of the Direct Purchasers' opposition memoranda with corresponding arguments made by the Defendants).

See *PLIVA, Inc. v. Mensing, 131 S. Ct. 2567, 2574, 180 L. Ed. 2d 580 (2011)*. Under the Hatch-Waxman Act, generic drug manufacturers wishing to market a generic version of a brand-name drug need not undertake the extensive and expensive NDA process; instead, they may file an Abbreviated New Drug Application ("ANDA"). *Actavis, 133 S. Ct. at 2228*. An ANDA must show that the generic drug contains the same active ingredients, route of administration, dosage form, and strength as the brand-name drug, as well as demonstrate that the generic and brand-name drugs are bioequivalent. See*21 U.S.C. § 355(j)(2)(A)(ii)-(iv)*. In addition, an ANDA must contain one of four certifications: (1) that no patent for the brand-name drug has been filed, (2) that the patent for the brand-name drug has expired, (3) that the generic manufacturer will not seek to market its **[**22]** drug before the **[*379]** expiration of the patent for the brand-name drug, or (4) that the patent for the brand-name drug is invalid or will not be infringed by the proposed generic alternative. *Id.§ 355(j)(2)(A)(vii)*. Choosing the last of these options, referred to as a "paragraph IV" certification, "automatically counts as patent infringement, and often means provoking litigation." [5]*Actavis, 133 S. Ct. at 2228* (citation omitted) (quoting *Caraco Pharm. Labs., Ltd. v. Novo Nordisk A/S, 132 S. Ct. 1670, 1677, 182 L. Ed. 2d 678 (2012))* (internal quotation marks omitted) (citing *35 U.S.C. § 271(e)(2)(A)*).

To encourage generic manufacturers to bring their drugs to market and assume the potential risk of defending **[**23]** against a patent infringement action, the Hatch-Waxman Act grants 180 days of market exclusivity to the first generic manufacturer to file an ANDA containing a paragraph IV certification (the "first-filer"), *21 U.S.C. § 355(j)(5)(B)(iv)*, meaning that the FDA is disallowed from approving ANDAs from competing generic manufacturers for the same drug. The Medicare Prescription Drug, Improvement, and Modernization Act of 2003, *Pub. L. No. 108-173, 117 Stat. 2066* (codified as amended at 26 and 42 U.S.C.), however, provides a number of conditions under which a first-filer can forfeit its eligibility for 180-day exclusivity, see*21 U.S.C. § 355(j)(5)(D)(i)(I)-(VI)*, the most relevant of which for the purposes of this case is the so-called "failure-to-market" provision, see id.*§ 355(j)(5)(D)(i)(I)*. Once the first-filer forfeits its 180-day exclusivity, however, no other generic applicant may enjoy such a benefit. See id.*§ 355(j)(5)(D)(iii)(II)*.

**2. Authorized Generics and No-Authorized Generic Agreements**

An authorized generic is essentially a brand-name drug produced by a brand manufacturer but marketed under a generic label. See *Sanofi-Aventis v. Apotex Inc., 659 F.3d 1171, 1174 (Fed. Cir. 2011)*. **[**24]** Because brand manufacturers have already obtained FDA approval to sell their brand-name drugs, they are free to launch authorized generics during the first-filer's 180-day exclusivity window in an effort to recoup some of the monopoly profits that are inherently lost by generic market entry. See *id. at 1175*; Fed. Trade Comm'n, Authorized Generic Drugs: Short-Term Effects and Long-Term Impact i-iv (2011), available athttp://www.ftc.gov/os/2011/08/2011genericdrugreport.pdf [hereinafter FTC Report on Authorized Generics]. A brand manufacturer may, however, opt to forgo its right to market an authorized generic by entering into a "no-authorized generic" agreement with the first-filer. See Erica N. Andersen, Note, Schering the Market: Analyzing the Debate over Reverse-Payment Settlements in the Wake of the Medicare

---

[5] If a generic manufacturer files a paragraph IV certification and a brand manufacturer files a patent infringement suit against the generic manufacturer within forty-five days of receiving notice of the paragraph IV certification, the FDA will not grant final approval to the ANDA until either thirty months have passed or a court has issued a decision deeming the patent invalid or not infringed, whichever is earlier. See21 U.S.C. § 355(c)(3)(C); Eli Lilly & Co. v. Medtronic, Inc., 496 U.S. 661, 677-78, 110 S. Ct. 2683, 110 L. Ed. 2d 605 (1990).

Modernization Act of 2003 and In Re Tamoxifen Citrate Litigation, *93 Iowa L. Rev. 1015, 1063 (2008)*. Such agreements commonly take the form of an exclusive license that allows the first-filer to market a generic version of the brand manufacturer's brand-name drug during the 180-day exclusivity period. FTC Report on Authorized Generics, supra, at 21.

**[*380] C. Facts Alleged**[6]

**1. AstraZeneca's New Drug Application Filing**

On December 3, 1999, AstraZeneca filed NDA No. 21-153, by which it sought FDA approval to market under the brand name Nexium a proton pump inhibitor ("PPI") containing esomeprazole magnesium as its active ingredient. [7] End-Payors' Compl. ¶¶ 64-65. AstraZeneca received the FDA's approval for its NDA on February 20, 2001. Id. ¶ 65. In conjunction with its NDA, AstraZeneca listed fourteen patents in the FDA Orange Book as relating to Nexium or a way of using Nexium. Id. ¶ 66.

**2. The Generics' Abbreviated Drug Application Filings**

**a. Ranbaxy's ANDA Filing**

Four years later, the generic drug manufacturer Ranbaxy filed ANDA No. 77-830 and notified AstraZeneca that it sought to market generic versions of Nexium. Id. ¶ 73. In addition to its notice, Ranbaxy included **[**26]** a certification pursuant to paragraph IV that stated that the commercial manufacture, use, and/or sale of any generic Nexium product would not infringe any of AstraZeneca's valid patents listed in the Orange Book to the extent that they expired after October 2007. Id.

In response, AstraZeneca filed proceedings in the District Court for the District of New Jersey (the "New Jersey District Court") on November 21, 2005, bringing suit under the Hatch-Waxman Act. Id. ¶ 74. AstraZeneca claimed that Ranbaxy's generic version of Nexium would infringe six patents _U.S. Patent No. 5,714,504 (the "'504 patent"); U.S. Patent No. 5,877,192 (the "'192 patent"); U.S. Patent No. 6,875,872 (the "'872 patent"); U.S. Patent No. 6,428,810 (the "'810 patent"); U.S. Patent No. 6,369,085 (the "'085 patent"); and U.S. Patent No. 5,948,789 (the "'789 patent") — including five which were listed in the Orange Book. [8]Id.

Although AstraZeneca initiated proceedings against Ranbaxy, the End-Payors allege that AstraZeneca faced a high likelihood that the patents under which AstraZeneca sued would be invalidated once challenged by generic manufacturers. Id. This is because, the End-Payors' allege, the purported invention of esomeprazole, Nexium's active ingredient, is "prima facie obvious in light of the prior art," id. ¶ 67 — that is, it was obvious in light of the information that was already

---

[6] Because **[**25]** the facts alleged in the Direct Purchasers' and End-Payors' complaints largely mirror one another, this Court here adopts the facts alleged in the latter and largely excludes parallel citation references to similar provisions in the former.

[7] Nexium is recommended for individuals who suffer from erosive esophagitis and symptomatic gastroesophageal reflux disease. See End-Payors' Compl. ¶ 65.

[8] The following nine other Nexium patents listed in the Orange Book did not form the basis of AstraZeneca's litigation against Ranbaxy: U.S. Patent No. 4,786,505 (the "'505 patent"); U.S. Patent No. 4,853,230 (the "'230 patent"); U.S. Patent No. 4,738,974 (the "'974 patent"); U.S. Patent No. 5,690,960 **[**27]** (the "'960 patent"); U.S. Patent No. 5,900,424 (the "'424 patent"); U.S. Patent No. 7,411,070 (the "'070 patent"); U.S. Patent No. 6,147,103 (the "'103 patent"); U.S. Patent No. 6,191,148 (the "'148 patent"); and U.S. Patent No. 6,166,213 (the "'213 patent"). Id. ¶ 75.

in the public domain, including AstraZeneca's prior PPI, Prilosec, or so the End-Payors contend, id.[9]

**[*381] b. Teva's ANDA Filing**

Several months later, on January 26, 2006, Teva notified AstraZeneca that it had filed ANDA No. 78-003 and sought to market generic versions of Nexium, id. ¶ 77; as part of Teva's notification, it also included a paragraph IV certification stating that its intentions regarding generic manufacture would not infringe any of AstraZeneca's valid patents listed in the Orange Book, id.

In response, AstraZeneca filed proceedings in the New Jersey District Court on March 8, 2006, bringing suit under the Hatch-Waxman Act. Id. ¶ 78. AstraZeneca claimed that Teva's generic version of Nexium would infringe five patents listed in the Orange Book. [10]Id.

**c. Dr. Reddy's ANDA Filing**

Later that same year, on August 17, 2006, Dr. Reddy's filed ANDA No. 78-279 and similarly notified AstraZeneca that it sought to market generic versions of Nexium, id. ¶ 81; as part of Dr. Reddy's notification, it also included a paragraph IV certification that its intentions regarding generic manufacture would not infringe valid claims based on seven of AstraZeneca's patents listed in the Orange Book, id. On December 4, 2007, Dr. Reddy's amended its ANDA to state that it would not infringe the '504, '192, '872 patents, or that they were not valid. Id.

Once again, in response, AstraZeneca filed proceedings in the New Jersey District Court on January 17, 2008, bringing suit under the Hatch-Waxman Act. Id. ¶ 82. AstraZeneca claimed that Dr. Reddy's generic version of Nexium would infringe three patents listed in the Orange Book. [11]Id.

**3. AstraZeneca's Alleged [**30] Reverse Payment Agreements With the Generic Defendants**

**a. AstraZeneca's Alleged Reverse Payment Agreement With Ranbaxy**

After the parties had completed discovery, but before the New Jersey District Court could enter any rulings on the merits of the case, AstraZeneca allegedly entered into a reverse payment agreement with Ranbaxy on April 14, 2008 (the "AstraZeneca/Ranbaxy Agreement"). Id. ¶ 90. Under this agreement, AstraZeneca agreed to end its proceedings against Ranbaxy, and the court entered a consent judgment (the same day that the thirty-month stay on FDA approval of Ranbaxy's generic Nexium expired). Id.

In consideration for Ranbaxy's agreeing to (1) admit that the '504, '192, '789, '872, '810, and '085 patents were enforceable and valid; (2) admit that Ranbaxy's generic Nexium would infringe

---

[9] The End-Payors seek to substantiate this allegation by making reference to collateral rulings of the European Patent Office in 2006 and 2011 in connection with two European Nexium patents, in which the challenged patents were determined invalid on account of their failure to satisfy the "inventive-step" patentability requirement, the European equivalent **[**28]** of the U.S. nonobviousness requirement. Id. ¶ 71.

[10] AstraZeneca claimed Teva's generic Nexium would infringe the '504, '192, '872, '810, and '085 patents. But AstraZeneca subsequently amended its complaint to withdraw its allegation that Teva infringed the '810 patent and add an allegation that Teva infringed the '070 patent. Id. ¶ 78. Eight other Nexium patents listed in the Orange Book (the '505, '230, '974, '960, '424, '103, '148, and '213 patents) did not form the basis of AstraZeneca's litigation against Teva and would not **[**29]** have prevented Teva from entering the market in late 2008. See id. ¶ 79.

[11] AstraZeneca claimed that Dr. Reddy's generic Nexium would infringe the '504, '872, and '085 patents. Id. ¶ 82. In reply to Dr. Reddy's answer, AstraZeneca also alleged that Dr. Reddy's generic Nexium would infringe its '192 patent. Id.

the '504, '192, '789, and '872 patents; and (3) delay the launch of its generic Nexium until May 27, **[*382]** 2014, AstraZeneca agreed to pay Ranbaxy over $1,000,000,000. Id. ¶¶ 91-92.

After Ranbaxy allegedly entered into the reverse payment agreement with AstraZeneca, Malvinder Singh, Ranbaxy's chief executive officer, purportedly stated that Ranbaxy had secured as much as $1.5 billion in prospective **[**31]** revenue between the commencement of the reverse payment agreement and the end of Ranbaxy's 180-day period of marketing exclusivity in 2014 envisaged by the agreement. Id. ¶ 93. AstraZeneca, the Plaintiffs allege (upon information and belief), has already handed over millions of dollars to Ranbaxy under their reverse payment agreement. Id.; Direct Purchasers' Compl. ¶ 120. According to information gleaned from a press release issued two days after the alleged reverse payment agreement, however, the majority of the value accruing to Ranbaxy under the agreement will not become available until 2014. End-Payors' Compl. ¶ 94. The one billion dollars of value accruing to Ranbaxy, the End-Payors contend, consisted of AstraZeneca's agreeing to refrain from producing its own authorized generic version of Nexium during the 180-day exclusivity period, a product which would otherwise stand in direct competition with Ranbaxy's generic Nexium. Id.

The End-Payors allege that AstraZeneca and Ranbaxy's representation of these payments as the grant of an exclusive license, in return for Ranbaxy's rendering manufacturing and distribution services to AstraZeneca, however, is merely obfuscatory. Id. ¶ 95. **[**32]** In other words, they were structured to disguise the true value that Ranbaxy was conferring on AstraZeneca by virtue of Ranbaxy's agreement to delay entering the market in competition with Nexium. Id. AstraZeneca, the End-Payors contend, would never have agreed to refrain from competing with Ranbaxy within Ranbaxy's prospective market for the generic Nexium, nor would it have earmarked Ranbaxy as its supplier of Nexium and authorized generic distributor of two of AstraZeneca's other PPI drugs, had Ranbaxy not agreed to delay its competition with AstraZeneca for more than six years. Id.

Under the terms of AstraZeneca's alleged reverse payment agreement with Ranbaxy, Ranbaxy's 180-day market exclusivity period did not begin until May 27, 2014. Id. The End-Payors allege therefore that, were it not for the reverse payment agreement between AstraZeneca and Ranbaxy, Ranbaxy, the first-moving generic manufacturer, could have entered the market several years earlier (and perhaps as early as April 2008). Id. ¶ 75.

**b. Teva's and Dr. Reddy's Attempt to Break the Bottleneck Resulting from the Alleged AstraZeneca/Ranbaxy Reverse Payment Agreement**

After AstraZeneca and Ranbaxy allegedly entered into **[**33]** their reverse payment agreement, Teva moved for declaratory judgment against AstraZeneca on April 30, 2008. Id. ¶ 96. Teva sought to obtain a ruling of invalidity and noninfringement with respect to the patents listed in the Orange Book as to which AstraZeneca had not commenced proceedings against Teva following Teva's ANDA filing for its generic version of Nexium. [12]Id. The End-Payors argue that Teva's motivation for filing its motion for declaratory judgment was to obtain a favorable opinion with respect to all of the Nexium patents AstraZeneca **[*383]** had listed in the Orange Book. Id. Had Teva obtained what it sought, it would have succeeded in "uncork[ing] the FDA approval bottleneck"

[12] Dr. Reddy's subsequently filed its own motion for declaratory judgment in May 2008, by which it sought a similar judgment affirming the noninfringement of those patents listed in the Orange Book which AstraZeneca had failed to assert previously in its infringement actions against the Generic Defendants. Id. ¶ 96.

which had been previously fastened tight when AstraZeneca had settled with the first-filing generic, Ranbaxy. Id.

When AstraZeneca sought to dismiss Teva's motion for declaratory judgment for lack **[**34]** of jurisdiction, Teva accused AstraZeneca of manipulating the Hatch-Waxman regime by trying "to take advantage of what[, in Teva's view, was] an invalid and illegitimate patent monopoly." Id. ¶ 97 (emphasis omitted) (internal quotation marks omitted). This is because, were Teva not allowed to challenge AstraZeneca's Nexium patents, the AstraZeneca/Ranbaxy Agreement would have succeeded in maintaining the bottleneck for six years, which would prevent any generic manufacturer from entering the market despite the suspected invalidity of AstraZeneca's Nexium patents. [13]Id.

**c. AstraZeneca's Alleged Reverse Payment Agreement With Teva**

Before the court could enter a final judgment in the principal matter concerning Teva's alleged infringement of AstraZeneca's patents, [14] however, AstraZeneca allegedly entered into a reverse payment agreement with Teva (the "AstraZeneca/Teva Agreement"), which ended the litigation **[**35]** between the parties. Id. ¶ 99. The End-Payors allege that the parties entered into this agreement on (or about) January 7, 2010. Id. The New Jersey District Court memorialized the agreement in a consent judgment. AstraZeneca's Mem., Ex. 5, Consent J. ("AstraZeneca/Teva Consent J.") ¶ 8, at 3-4, ECF No. 135-7.

Teva, under the terms of the reverse payment agreement, allegedly agreed to (1) admit that the patents listed in the Orange Book at that time relating to Nexium would be "enforceable and valid with respect to certain products"; (2) admit that its generic Nexium would infringe the '504, '192, '789, '085, and '872 patents, as well as U.S. Patent No. 7,411,070; and (3) delay the launch of its generic Nexium until May 27, 2014. End-Payors' Compl. ¶ 100.

For Teva's part, the End-Payors allege that Teva had "an enormous contingent liability to AstraZeneca." Id. ¶ 102. This potential **[**36]** liability arose from Teva's decision on September 9, 2004, to begin manufacturing "at risk" a generic version of AstraZeneca's Prilosec through its partner, Impax. Id. Teva and Impax together shouldered the risk associated with their generic version of Prilosec. Id. When, in 2008, the Federal Circuit upheld a decision from the Southern District of New York that AstraZeneca's Prilosec patents were valid and thereby infringed by Impax's generic, *In re Omeprazole Patent Litig., 536 F.3d 1361, 1375, 2008 U.S. App. LEXIS 17691 (Fed. Cir. 2008)*, Teva was exposed to the risk of substantial liability. End-Payors' Compl. ¶ 102.

As part of the consideration for the reverse payment agreement, Teva and AstraZeneca allegedly agreed that Teva need only pay an amount to AstraZeneca for its **[*384]** prior infringement of AstraZeneca's patents that AstraZeneca determined would not be financially significant. Id. The End-Payors allege that AstraZeneca's forgiveness of a significant portion of Teva's contingent liability was tantamount to a payment from AstraZeneca to Teva. Id.

---

[13] Although the New Jersey District Court denied AstraZeneca's motion to dismiss Teva's declaratory judgment for lack of jurisdiction, it granted AstraZeneca's motion to stay declaratory judgment until AstraZeneca's principal infringement action against Teva had been resolved. Id. ¶ 98.

[14] The End-Payors allege that, despite the parties' briefing of claim construction in the summer of 2009, both parties requested that the court delay its construal of their claims to drag out litigation past January 7, 2010, by which time the parties had entered into the reverse payment agreements. Id. ¶ 99.

Whatever the pretextual reasons given for these corporate decisions, the import of AstraZeneca's agreement with Teva, the End-Payors allege, was to delay generic entry **[**37]** into the market for Nexium until May 27, 2014. Id. ¶ 103. Without Teva's alleged agreement to delay competition resulting from its launching a generic version of Nexium, the End-Payors contend, AstraZeneca would not have forgiven (so significant a portion of) Teva's contingent liability. Id.

**d. AstraZeneca's Alleged Reverse Payment Agreement With Dr. Reddy's**

AstraZeneca allegedly entered into a similar reverse payment agreement with Dr. Reddy's (the "AstraZeneca/Dr. Reddy's Agreement") on January 28, 2011, before the court could enter a final judgment concerning Dr. Reddy's alleged infringement of AstraZeneca's Nexium patents. Id. ¶ 104. This brought any Nexium-related litigation between AstraZeneca and Dr. Reddy's to an end. Id.

In consideration for Dr. Reddy's agreement to refrain from challenging AstraZeneca's Nexium patents and to defer its launching a generic version of Nexium until May 27, 2014, AstraZeneca allegedly agreed to forgive Dr. Reddy's contingent liability to AstraZeneca arising from Dr. Reddy's production of a generic version of AstraZeneca's Accolate "at risk" in November 2010. Id. ¶¶ 104-106. The End-Payors allege that, after AstraZeneca appealed the court's decision **[**38]** to grant Dr. Reddy's motion for summary judgment on the matter of its infringement of AstraZeneca's Accolate patents, Dr. Reddy's faced the risk of significant damages in connection with its possible patent infringement. Id. ¶ 106. AstraZeneca's agreement to forgive this contingent liability, the End-Payors allege, constituted a payment to Dr. Reddy's. Id.

Under the terms of AstraZeneca's alleged agreement with Dr. Reddy's, AstraZeneca withdrew its claim against Dr. Reddy's for infringement of the '085 patent, following which the parties entered a consent agreement endorsed by the court which maintained that Dr. Reddy's generic Nexium did not infringe the '085 patent. Id. ¶ 83.

Dr. Reddy's filed suit on May 19, 2008, seeking declaratory judgment confirming that its generic Nexium would not infringe the '960, '424, '103, '148, '213, and '810 patents, id. ¶ 84; AstraZeneca admitted in its answer that Dr. Reddy's generic Nexium would not infringe the '148 or '810 patents, id.

The End-Payors allege that the AstraZeneca/Dr. Reddy's Agreement was designed to foreclose generic entry into the market until AstraZeneca's patents expired on May 27, 2014. Id. ¶ 107. Had Dr. Reddy's not agreed to **[**39]** this delay, the End-Payors' submit, AstraZeneca would never have agreed to drop its case against Dr. Reddy's. Id.

The End-Payors allege that the effect of the AstraZeneca/Teva and AstraZeneca/Dr. Reddy's Agreements, between AstraZeneca and the second and third ANDA filers, was to ensure that the bottleneck resulting from the AstraZeneca/Ranbaxy Agreement remained securely in place. Id. ¶ 108.

**4. Anticompetitive Effects of AstraZeneca's Alleged Reverse Payment Agreements With the Generic Defendants**

The End-Payors allege that AstraZeneca's reverse payment agreements were **[*385]** anticompetitive. Id. ¶ 109. This is because the agreements were designed to deprive the putative

class members of a market in which generic drug manufacturers made commercial decisions based upon the strength of drug patents, balanced against the countervailing risks of litigation, free from the distortive influence of brand manufacturers' payments. Id. ¶ 110.

Such reverse payment agreements, the End-Payors further allege, are inconsistent with the purpose of the Hatch-Waxman Act, as they enabled AstraZeneca to (1) delay the entry of less expensive generic versions of Nexium, (2) fix the price of Nexium, (3) maintain a monopoly **[**40]** in the United States for Nexium, and (4) allocate the entirety of the market for delayed-release esomeprazole magnesium in the United States to AstraZeneca. Id.

Were it not for these reverse payment agreements, the End-Payors allege, a generic ANDA filer would have obtained FDA approval to begin marketing on (or about) April 14, 2008, and it would have been in a position to begin selling its generic version not long thereafter. Id. ¶ 111. After the end of the 180-day exclusivity period granted to this generic ANDA filer, other generics would be permitted to enter the market, resulting in further competition. Id.

The End-Payors therefore allege that the Defendants' action in concert unlawfully allowed AstraZeneca to sell Nexium at supracompetitive prices. Id. ¶ 112.

**II. ANALYSIS**

**A. Standard of Review**

***HN1*** To survive a motion to dismiss under *Rule 12(b)(6)*, a complaint must allege facts sufficient "to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)*. The grounds of entitlement to relief set forth in the complaint must constitute "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not **[**41]** do." *Id. at 555*. Nevertheless, a defendant's burden "is a heavy one when a motion to dismiss is filed." *Stein v. Smith, 270 F. Supp. 2d 157, 164 (D. Mass. 2003)* (Lindsay, J.). In its consideration of a motion to dismiss, the Court is instructed to "accept as true all well-pleaded facts in the complaint and draw all reasonable inferences in favor of the plaintiffs." *Gargano v. Liberty Int'l Underwriters, Inc., 572 F.3d 45, 48 (1st Cir. 2009)*.

**B. Direct Purchasers' Claims**

**1. Legality of Reverse Payment Agreements after Actavis**

Two of the remaining eleven active Nexium patents are set to expire on May 27, 2014, and the remainder of the active Nexium patents will expire on dates ranging from November 25, 2014, to November 3, 2019. [15] See Direct Purchasers' Compl. ¶ 73. The Defendants argue that the May 27, 2014, generic market entry date set out in the New Jersey District Court's consent judgments is the earliest date that any of the patents at issue would have expired and that any alleged anticompetitive effects flowing from the settlement agreements underlying the consent judgments would fall squarely within the term of AstraZeneca's otherwise exclusionary period of monopoly patent power. **[**42]** See AstraZeneca's Mem. 9-10; Teva's Mem. 13-14; Ranbaxy's Mem. 8.

**[*386]** Until recently, there was deep disagreement among the courts of appeals as to how reverse payment agreements ought be viewed under the law. To wit, one set of circuits followed the

---

15 Three of the formerly active Nexium patents listed in the FDA Orange Book in connection with AstraZeneca's NDA expired in 2007. See Direct Purchasers' Compl. ¶ 73.

"scope-of-the-patent" test (upon which the Defendants' argument is predicated), which held that "absent sham litigation or fraud in obtaining the patent, a reverse payment settlement is immune from antitrust attack so long as its anticompetitive effects fall within the scope of the exclusionary potential of the patent." *Federal Trade Comm'n v. Watson Pharms., Inc., 677 F.3d 1298, 1312 (11th Cir. 2012)*, rev'd sub nom., *Actavis, 133 S. Ct. 2223, 186 L. Ed. 2d 343*; accord *In re Ciprofloxacin Hydrochloride Antitrust Litig. ("Cipro"), 544 F.3d 1323, 1336 (Fed Cir. 2008)*, abrogated by *Actavis, 133 S. Ct. 2223, 186 L. Ed. 2d 343*; *In re Tamoxifen Citrate Antitrust Litig. ("Tamoxifen"), 466 F.3d 187, 212-13 (2d Cir. 2006)*, abrogated by *Actavis, 133 S. Ct. 2223, 186 L. Ed. 2d 343*. The Third Circuit in **[**43]** In re K-Dur Antitrust Litigation ("K-Dur"), *686 F.3d 197 (3d Cir. 2012)*, vacated, *Merck & Co. v. La. Wholesale Drug Co., 133 S. Ct. 2849, 186 L. Ed. 2d 904* (mem.), *Upsher-Smith Labs., Inc. v. La. Wholesale Drug Co., 133 S. Ct. 2849, 186 L. Ed. 2d 904* (mem.), adopted an alternative, "quick-look" rule-of-reason test that instructs juries to regard reverse payments as "prima facie evidence of an unreasonable restraint of trade, which could be rebutted by showing that the payment[s] (1) [were] for a purpose other than delayed entry or (2) offer[] some pro-competitive benefit." [16]*Id. at 218*.

The Supreme **[**44]** Court was called upon to address this circuit split, and in Actavis, it formally pronounced on the legality of reverse payments. See *133 S. Ct. 2223, 186 L. Ed. 2d 343*. In so doing, the Supreme Court rejected the widely followed scope-of-the-patent test. [17]*Id. at 2230-34*. The Supreme Court did not go so far as to endorse K-Dur's strict, presumptively-unlawful test, however. *Id. at 2237-38*. Instead, it adopted a rule-of-reason standard as a middle-of-the-road compromise, the contours of which have been left to the lower courts to etch. See id.

***HN2*** Rule-of-reason analysis demands a determination as to "whether under all the circumstances of the case the restrictive practice imposes an unreasonable restraint on competition." *Arizona v. Maricopa Cnty. Med. Soc'y, 457 U.S. 332, 343, 102 S. Ct. 2466, 73 L. Ed. 2d 48 (1982)*. **[*387]** Judges engaging in rule-of-reason analysis are directed to consider three primary factors: (1) whether "the alleged agreement involved the exercise of power in a relevant economic market," (2) whether "this exercise had anti-competitive consequences," and (3) whether "those detriments outweighed efficiencies or other economic benefits." [18]*Stop & Shop Supermarket Co. v. Blue Cross & Blue Shield of R.I., 373 F.3d 57, 61 (1st Cir. 2004)*. The Court now weighs each of these factors.

---

[16] Although the Third Circuit formally stood alone in opposition to its sister circuits, earlier jurisprudence in the Sixth and District of Columbia Circuits provides additional foundation for the Third Circuit's reasoning. See In re Cardizem CD Antitrust Litig., 332 F.3d 896, 908 (6th Cir. 2003) (ruling that an agreement effecting a delay in market entry by generic drug manufacturers is "a classic example of a per se illegal restraint of trade"); Andrx Pharms., Inc. v. Biovail Corp. Int'l, 256 F.3d 799, 811, 347 U.S. App. D.C. 178 (D.C. Cir. 2001) (holding that a reverse payment agreement "could reasonably be viewed as an attempt to allocate market share and preserve monopolistic conditions").

[17] The reasons for taking such action were fivefold: (1) reverse payments raise a "potential for genuine adverse effects on competition," Actavis, 133 S. Ct. at 2234 (quoting Federal Trade Comm'n v. Ind. Fed'n of Dentists, 476 U.S. 447, 460, 106 S. Ct. 2009, 90 L. Ed. 2d 445 (1986)) (internal quotation marks omitted); (2) "these anticompetitive consequences will at least sometimes prove unjustified," id. at 2235-36; (3) "where a reverse payment threatens to work unjustified anticompetitive harm, the patentee likely possesses the power to bring that harm about in practice," id. at 2236; (4) "[a]n unexplained large reverse payment itself would normally suggest that the patentee has serious doubts about **[**45]** the patent's survival," id.; and (5) "the fact that a large, unjustified reverse payment risks antitrust liability does not prevent litigating parties from settling their lawsuit," id. at 2237. See generally id. at 2234-37.

[18] Although this three-factor inquiry is set forth in a First Circuit case in which only section 1 of the Sherman Act was at issue, see Stop & Shop Supermarket Co. v. Blue Cross & Blue Shield of R.I., 373 F.3d 57, 61 (1st Cir. 2004), various other courts, **[**46]** including the Supreme Court, have held that the rule of reason applies with equal force to claims brought under section

### 2. Rule-of-Reason Analysis

### a. Market Power in the Relevant Market

The first rule-of-reason criterion to address is whether the Defendants exercised market power in the relevant market. The Defendants argue that the Direct Purchasers have failed to allege a plausible relevant market, see Dr. Reddy's Mem. 15-17; AstraZeneca's Mem. 10-17, suggesting that the Court need not even reach the question of whether the Defendants conceivably possess the market power necessary for the Direct Purchasers to state claims against them under the Sherman Act, *15 U.S.C. §§ 1-2*. Specifically, the Defendants contend that the Direct Purchasers' proposed market — namely, brand Nexium and generic equivalents that also share its active ingredient, esomeprazole magnesium — is far too narrow because it excludes other products that are either similar in chemical composition or used to treat comparable medical conditions. Dr. **[**47]** Reddy's Mem. 15-17 (noting that the Direct Purchasers' complaint "spends several paragraphs . . . describing the similarities in structure between Prilosec (omeprazole) and Nexium (esomeprazole)," id. at 16 (citing Direct Purchasers' Compl. ¶¶ 75-78)); AstraZeneca's Mem. 13-17 (noting that the Direct Purchasers' complaint alleges that other PPIs, as well as H2 blockers and non-prescription antacids, "are used to treat the same or similar conditions" as Nexium, id. at 14 (quoting Direct Purchasers' Compl. ¶ 71) (internal quotation marks omitted), and that "observed differences in healing rates and symptom relief for Nexium and Prilosec may reflect differences in dose rather than metabolic or pharmacologic differences," id. at 17 (quoting Direct Purchasers' Compl. ¶ 89) (internal quotation marks omitted)).

The Defendants' arguments ring hollow upon review of the case law. ***HN3*** In order to state a claim under section 1 of the Sherman Act, a plaintiff must demonstrate that "the defendant had market power in the relevant market, and the specific intent to restrain competition." *CVD, Inc. v. Raytheon Co., 769 F.2d 842, 851 (1st Cir. 1985)*. Relatedly, under section 2 of the Sherman Act, a plaintiff **[**48]** must show that "the defendant had the specific intent to monopolize the relevant market, and a dangerous probability of success."*Id.* The Supreme Court has declared that, for antitrust purposes, a "relevant market" is made up of "commodities reasonably interchangeable by consumers for the same purposes." *United States v. E.I. du Pont de Nemours & Co., 351 U.S. 377, 395, 76 S. Ct. 994, 100 L. Ed. 1264 (1956)*. The reasonable interchangeability of a set of products is not dependent on the similarity **[*388]** of their forms or functions; instead, "[s]uch limits are drawn according to the cross-elasticity of demand for the product in question — the extent to which purchasers will accept substitute products in instances of price fluctuation and other changes." *George R. Whitten, Jr., Inc. v. Paddock Pool Builders, Inc., 508 F.2d 547, 552 (1st Cir. 1974)*; see also *Brown Shoe Co. v. United States, 370 U.S. 294, 325, 82 S. Ct. 1502, 8 L. Ed. 2d 510 (1962)* ("The outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it.").

The Direct Purchasers' complaint expressly alleges that "Nexium does not exhibit significant, positive cross-elasticity of demand **[**49]** with respect to price with any product other than AB-rated generic versions of Nexium." Direct Purchasers' Compl. ¶ 145. The fact that other drugs may be used to treat heartburn and related conditions is immaterial to the present inquiry. See, e.g., *United States v. Archer-Daniels-Midland Co., 866 F.2d 242, 248 & n.1 (8th Cir. 1988)*

---

2. see. e.g.. Standard Oil Co. of N.J. v. United States. 221 U.S. 1. 61-62. 31 S. Ct. 502. 55 L. Ed. 619 (1911); cf., e.g., United States v. Microsoft Corp., 253 F.3d 34, 59, 346 U.S. App. D.C. 330 (D.C. Cir. 2001) (per curiam).

(concluding that, although high fructose corn syrup and sugar serve near-identical functional purposes, the absence of strong cross-price elasticity between the two products suggested that they were not in fact within the same market). ***HN4*** The Supreme Court has held that a properly constituted market may indeed be comprised of a single product, *Eastman Kodak Co. v. Image Technical Servs., Inc., 504 U.S. 451, 481-82, 112 S. Ct. 2072, 119 L. Ed. 2d 265 (1992)*, and lower courts across the country have on numerous occasions ruled that both a brand-name drug and its generic analogs can fall within the bounds of a relevant market, see, e.g., *In re Terazosin Hydrochloride Antitrust Litig., 352 F. Supp. 2d 1279, 1319 n.40 (S.D. Fla. 2005)* (deeming a relevant market to be composed of branded and generic terazosin hydrochloride); *In re Cardizem CD Antitrust Litig. ("Cardizem"), 105 F. Supp. 2d 618, 680-81 (E.D. Mich. 2000)* **[**50]** (accepting plaintiffs' contention that branded and generic versions of a heart medication with the chemical compound diltiazem hydrochloride constitute a single market), aff'd, *332 F.3d 896 (6th Cir. 2003)*. Although it may be beyond this Court's competence to confirm the accuracy of the Direct Purchasers' characterization of the reasonable interchangeability of brand Nexium with other drugs, such a factually intensive determination is better left for resolution by a jury, see *Eastman Kodak, 504 U.S. at 482* (observing that ***HN5*** "[t]he proper market definition . . . can be determined only after a factual inquiry into the 'commercial realities' faced by consumers," id. (quoting *United States v. Grinnell Corp., 384 U.S. 563, 572, 86 S. Ct. 1698, 16 L. Ed. 2d 778 (1966)*)); *Todd v. Exxon Corp., 275 F.3d 191, 199-200 (2d Cir. 2001)* (explaining that "[b]ecause market definition is a deeply fact-intensive inquiry, courts hesitate to grant motions to dismiss for failure to plead a relevant product market"), so, by definition, the Defendants' motions to dismiss cannot be sustained on this ground. [19]

**[*389]** Taking the relevant market to be comprised of brand and generic Nexium alone for the purposes of this memorandum, this Court reaches the conclusion that the Direct Purchasers' complaint alleges more than enough facts to enable a reasonable jury to find that the Defendants exercise market power. ***HN6*** Market power can be proven in one of two ways: either by (1) "direct evidence of market power (perhaps by showing actual supracompetitive prices and restricted output)" or by (2) "circumstantial evidence of market power . . . [which] show[s] that the defendant has a dominant share in a well-defined relevant market and that there are significant barriers to entry in that market and that existing competitors lack the capacity to increase their output in **[**53]** the short run." *Coastal Fuels of P.R., Inc. v. Caribbean Petroleum Corp., 79 F.3d 182, 196-97 (1st Cir. 1996)* (citation omitted). This Court need not engage in an extensive analysis of circumstantial evidence of market power because direct evidence of such power is available — the Direct Purchasers have thoroughly alleged that AstraZeneca, in its position as a monopolist, has

---

[19] What is more, in this particular case, the Direct Purchasers may not even need to allege a relevant market in order to state their Sherman **[**51]** Act claims. The relevant market serves merely as a proxy for market power when direct evidence of market power is unavailable. IIB Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law ¶ 531a, at 232 (3d ed. 2007) ("Finding the relevant market and its structure is typically not a goal in itself but a mechanism for considering the plausibility of antitrust claims that the defendants' business conduct will create, enlarge, or prolong market power."). But see id. ¶ 531a, at 233 ("Even when direct measures of power are feasible, courts would still find market definition useful . . . . Thus, while market definition and computation of market share is often said to be a surrogate for more 'direct' measures of market power, it is often more than a surrogate."). Where direct evidence of market power is available, however, a plaintiff need not attempt to define the relevant market. Id. ¶ 531f, at 241. Such appears to be the case here, see Direct Purchasers' Compl. ¶¶ 143-145, 147-151 (alleging that "[AstraZeneca] had the power to maintain the price of the drug it sold as Nexium at supracompetitive levels without losing substantial sales to other products prescribed and/or used for the same purposes **[**52]** as Nexium, with the exception of AB-rated generic versions of Nexium," id. ¶ 143, and that "AstraZeneca . . . enjoyed high barriers to entry with respect to competition . . . due to patent and other regulatory protections and high costs of entry and expansion," id. ¶ 150), which would tend to eliminate the need formally to define a relevant market, see Coastal Fuels of P.R., Inc. v. Caribbean Petroleum Corp., 79 F.3d 182, 196-97 (1st Cir. 1996).

been able to charge supracompetitive prices for brand Nexium. See Direct Purchasers' Compl. ¶¶ 143-145, 147-151 (alleging, inter alia, that "Nexium does not exhibit significant, positive cross-elasticity of demand with respect to price with any product other than AB-rated generic versions of Nexium," id. ¶ 145, and that "AstraZeneca . . . sold Nexium at prices well in excess of marginal costs, and substantially in excess of the competitive price, and enjoyed high profit margins," id. ¶ 148).

**b. Anticompetitive Consequences**

The second rule-of-reason criterion to address is whether the Defendants' exercise of market power generated anticompetitive consequences. The Generic Defendants argue that the Direct Purchasers have failed to allege how the settlement agreements between AstraZeneca and each of the Generic Defendants **[**54]** have caused a cognizable injury to competition. Ranbaxy's Mem. 12-13; Dr. Reddy's Mem. 11-15; Teva's Mem. 17-19. Specifically, the Generic Defendants claim that the Direct Purchasers' assertion that the Generic Defendants would have entered the market prior to the expiration of the Nexium patents but for the settlement agreements is far too speculative to state an actionable claim. The theories upon which this argument is founded differ slightly among the Generic Defendants: Ranbaxy and Teva contend that there is no indication that they would have prevailed in their patent litigations against AstraZeneca or that they would have launched "at-risk" generic versions of Nexium, Ranbaxy's Mem. 12-14; Teva's Mem. 17-19, whereas Dr. Reddy's raises identical arguments with respect to its own patent litigation with AstraZeneca but further contends that Ranbaxy's first-filing status **[*390]** would nevertheless have precluded it from entering the market at any time before the closing of Ranbaxy's 180-day exclusivity window (unless Dr. Reddy's received a favorable court decision and had tentative approval from the FDA). Dr. Reddy's Mem. 11-15.

***HN7*** To state a claim under the federal antitrust laws, a plaintiff **[**55]** must sufficiently allege an "antitrust injury." *Atlantic Richfield Co. v. USA Petroleum Co., 495 U.S. 328, 334, 110 S. Ct. 1884, 109 L. Ed. 2d 333 (1990)* (emphasis omitted) (quoting *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 489, 97 S. Ct. 690, 50 L. Ed. 2d 701 (1977))* (internal quotation mark omitted). An antitrust injury is described as an "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Id.* (quoting *Brunswick, 429 U.S. at 489*) (internal quotation mark omitted). "[An] injury, although causally related to an antitrust violation, nevertheless will not qualify as 'antitrust injury' unless it is attributable to an anti-competitive aspect of the practice under scrutiny." Id.

There is support in the case law for the proposition that allegations waxing poetic on the probability of successful patent invalidity or unenforceability claims and of a proposed would-have-been date of generic market entry that rest upon but-for theories of causation will not suffice to raise a triable antitrust issue. See, e.g., *Watson Pharms., 677 F.3d at 1312-13* ("[I]t is simply not true that an infringement claim that is 'likely' to fail actually will fail. . . . Rational parties settle **[**56]** to cap the cost of litigation and to avoid the chance of losing."); *In re Ciprofloxacin Hydrochloride Antitrust Litig. ("Cipro"), 261 F. Supp. 2d 188, 199-202 (E.D.N.Y. 2003)* (holding that plaintiffs' allegations that brand defendant's patent was invalid or unenforceable and that brand defendant "paid enormous sums of money to avoid a judicial determination of the patent infringement case," *id. at 200*, were not enough to state a triable claim). Certain authority cuts the other way, however. See, e.g., *Andrx Pharms., Inc. v. Biovail Corp. Int'l, 256 F.3d 799, 804, 808-09, 347 U.S. App. D.C. 178 (D.C. Cir. 2001)* ("One can fairly

infer from [the agreement providing for the payment of $10 million per quarter to a generic manufacturer] . . . that but for the Agreement, [the generic manufacturer] would have entered the market." *Id. at 809*). Moreover, the fact that each of the Generic Defendants have launched at-risk products in the past, see Direct Purchasers' Opp'n Teva's Mot. Dismiss 11 & nn.44-47, would seem to undermine the notion that they would not have done so in this case. Finally, in response to Dr. Reddy's separate allegation regarding first-filers, ***HN8*** courts have looked with particular skepticism upon agreements **[**57]** that allow first-filers to exploit their 180-day exclusivity period by prohibiting other generic competitors from entering the market without a demonstrated intention to market their generic drug. See, e.g., *Watson Pharms., 677 F.3d at 1311* (noting that a settlement whose purpose is to facilitate a bottleneck in generic market entry would "create[] anticompetitive effects beyond the scope of the patent"); *Andrx Pharms., 256 F.3d at 809* ("Although it is true that the first to file an ANDA is permitted to delay marketing as long as it likes, the statutory scheme does not envision the first applicant's agreeing with the patent holder of the pioneer drug to delay the start of the 180-day exclusivity period.").

Part III of the Supreme Court's opinion in *Actavis* added an additional gloss to standard antitrust-injury analysis, however. There, ***HN9*** the Supreme Court explained that a rule-of-reason approach to reverse payment agreements is preferable to **[*391]** quick-look treatment because "the likelihood of a reverse payment bringing about anticompetitive effects depends upon its size, its scale in relation to the payor's anticipated future litigation costs, its independence from other services for which **[**58]** it might represent payment, and the lack of any other convincing justification." *133 S. Ct. at 2237*. In other words, only those reverse payment agreements whose anticompetitive consequences are sufficiently great and sufficiently unrelated to the settlement of a particular patent dispute will be censured by the courts.

In the instant case, the Plaintiffs allege that AstraZeneca agreed to pay over $1,000,000,000 to Ranbaxy and enter into a no-authorized generic agreement with it, see End-Payors' Compl. ¶¶ 92, 94, which seems like outsize accommodation from a company to whom Ranbaxy was purportedly liable for patent infringement. It is also alleged that Teva and Dr. Reddy's were forgiven by AstraZeneca of contingent liabilities tied to their infringement of AstraZeneca's patents in Prilosec and Accolate, respectively, see id. ¶¶ 102-106, which is entirely disconnected from AstraZeneca's earlier Nexium-related suits against these parties. Moreover, as section II.B.1.c explains, there exists no persuasive procompetitive justification for the alleged agreements at issue. Taking all intendments in the light most favorable to the Direct Purchasers, then, the no-authorized generic agreement **[**59]** between AstraZeneca and Ranbaxy and AstraZeneca's forgiveness of Teva's and Dr. Reddy's contingent liabilities related to the infringement of non-Nexium-related patents sufficiently implicate adverse anticompetitive consequences to allow the Direct Purchasers' claims to proceed.

Yet even if it can be said that the Defendants' reverse payment agreements were sufficiently anticompetitive, it is not readily apparent that the Direct Purchasers have recourse under the antitrust laws, so the Generic Defendants claim, because the Generic Defendants did not receive any kind of monetary payment from AstraZeneca in exchange for their alleged commitment to stay out of the market.[20] See Dr. Reddy's Mem. 10-11; Teva's Mem. 14-17; Ranbaxy's Mem. 8-12. Instead, AstraZeneca and Ranbaxy allegedly entered into a "no-authorized generic agreement"

---

20 The **[**60]** Generic Defendants, however, pay no heed to the Direct Purchasers' allegation that "AstraZeneca has already paid Ranbaxy millions of dollars under their Agreement." Direct Purchasers' Compl. ¶ 120. That said, because this allegation was made simply upon information and belief — and, more importantly, because the inclusion of a monetary payment in the

granting Ranbaxy "an exclusive license . . . to market generic delayed-release esomeprazole magnesium during Ranbaxy's first-filer 180-day period of generic market exclusivity," Direct Purchasers' Compl. ¶ 121, while Teva and Dr. Reddy's were allegedly forgiven by AstraZeneca of contingent liabilities for past patent infringement, id. ¶¶ 129-130, 133-134.

It is true that some courts have opted for a narrow construal of the term "payment." See, e.g., *In re Lamictal Direct Purchaser Antitrust Litig., No. 12-995 (WHW), 2012 U.S. Dist. LEXIS 183627, 2012 WL 6725580, at *6 (D.N.J. Dec. 6, 2012)* (holding that "the term 'reverse payment' is not sufficiently broad to encompass any benefit that may fall to [a generic manufacturer] in a negotiated settlement" and that "[t]he Third Circuit's K-Dur opinion is directed towards settlements when a generic manufacturer is paid off with money"); *Asahi Glass Co. v. Pentech Pharms., Inc., 289 F. Supp. 2d 986, 994* **[*392]** (N.D. Ill. 2003) (reasoning that "[i]f any settlement agreement is thus to be classified as involving a forbidden 'reverse payment,' **[**61]** we shall have no more patent settlements"). This Court need not take the same tack, however. Cf. *In re Lipitor Antitrust Litig., No. 3:12-cv-2389 (PGS), 2013 U.S. Dist. LEXIS 126468, 2013 WL 4780496, at *26 (D.N.J. Sept. 5, 2013)* (allowing plaintiffs challenging an alleged reverse payment agreement to amend their complaint to include allegations beyond those of a purely monetary nature). ***HN10*** Nowhere in Actavis did the Supreme Court explicitly require some sort of monetary transaction to take place for an agreement between a brand and generic manufacturer to constitute a reverse payment. Admittedly, the Supreme Court spoke only to the merits of cash payouts as a quid pro quo for promises of delayed generic market entry. See, e.g., *133 S. Ct. at 2229* (describing a brand manufacturer's agreement with three generic manufacturers to "pay millions of dollars to each generic"); *id. at 2233* (noting that "[i]n reverse payment settlements, . . . a party with no claim for damages (something that is usually true of a paragraph IV litigation defendant) walks away with money simply so it will stay away from the patentee's market"). Yet Actavis only involved a brand manufacturer's bargain with three generic manufacturers "to pay **[**62]** millions of dollars to each generic," see *id. at 2229*, so the Supreme Court's confined analysis hardly seems surprising. This Court does not see fit to read into the opinion a strict limitation of its principles to monetary-based arrangements alone. [21] Adopting a broader interpretation of the word "payment," on the other hand, serves the purpose of aligning the law with modern-day realities. [22]

### c. Weighing Economic Detriments Against Economic Benefits

---

AstraZeneca/Ranbaxy agreement ultimately does not affect this Court's analysis — this Court has no qualms crediting the Generic Defendants' account.

[21] Indeed, even Chief Justice Roberts, who authored the dissenting opinion in the case, acknowledged that nonmonetary forms of consideration carry worth in the antitrust context. See id. at 2239 (Roberts, C.J., dissenting) (commenting that the brand defendant "gave its competitors something of value (money) and, in exchange, its competitors gave it something of value (dropping their legal claims)").

[22] The Federal Trade Commission, one of the two federal agencies responsible for enforcing federal antitrust laws, has published numerous studies suggesting that nonmonetary pay-for-delay agreements in which a brand drug manufacturer declines to sell an authorized generic during a first-filer's 180-day exclusivity period constitute reverse payments. See, e.g., FTC Report on Authorized Generics, supra, **[**63]** at 152 (concluding that "[a] review of recent brand-generic settlements reveals that agreements not to compete with ANDA-generics through an [authorized generic] have become a recognized mode for a brand to provide compensation to generics and, therefore, can be used as exclusion payments in patent settlement agreements"); Fed. Trade Comm'n, Pay-for-Delay: How Drug Company Pay-Offs Cost Consumer Billions 5 (2010), available at http://www.ftc.gov/os/2010/01/100112payfordelayrpt.pdf (acknowledging that not all pay-for-delay agreements involve cash payments). In addition, case law confirms that although contingent liabilities technically "depend[] on a future event that may not even occur[] to fix either [their] existence or [their] amount," Freeland v. Enodis Corp., 540 F.3d 721, 730 (7th Cir. 2008) (second alteration in original) (quoting In re Knight, 55 F.3d 231, 236 (7th Cir. 1995)) (internal quotation marks omitted), courts have nevertheless rejected the notion that

The final rule-of-reason criterion requires the Court to balance the economic detriments of the agreements at issue against the economic benefits thereof. The Defendants have not put forward a shred of affirmative evidence tending to show that the agreements into which they **[*393]** allegedly entered produced any countervailing procompetitive benefits whatsoever. See AstraZeneca's Mem.; Dr. Reddy's Mem.; Teva's Mem.; Ranbaxy's Mem. The lone conceivable benefit of reverse payment agreements — namely, the settlement of patent disputes — cannot overcome the anticompetitive consequences discussed earlier in section II.B.1.b. See *Actavis, 133 S. Ct. at 2234-37* (entertaining a number of arguments against the brand and generic respondents' position in that case and ultimately holding that "these considerations, taken together, outweigh the single strong consideration — the desirability of settlements — that led the Eleventh Circuit to provide near-automatic antitrust immunity to reverse payment settlements," *id. at 2237*). ***HN11*** "Where a reverse payment reflects traditional settlement considerations, such as avoided litigation **[**65]** costs or fair value for services, there is not the same concern that a patentee is using its monopoly profits to avoid the risk of patent invalidation or a finding of noninfringement." *Id. at 2236*. Such traditional settlement considerations do not appear to be present here, however. Moreover, the presumptive validity accorded to patents upon issuance has been cast in significant doubt by judges and empiricists alike, cf. *Lear, Inc. v. Adkins, 395 U.S. 653, 670, 89 S. Ct. 1902, 23 L. Ed. 2d 610 (1969)* (acknowledging that "the Patent Office is often obliged to reach its decision in an ex parte proceeding, without the aid of the arguments which could be advanced by parties interested in proving patent invalidity"); Fed. Trade Comm'n, Generic Drug Entry Prior to Patent Expiration: An FTC Study 16 (2002), available at http://www.ftc.gov/os/2002/07/genericdrugstudy.pdf (finding in a study of the success rate of paragraph IV challenges to brand-drug validity that "[g]eneric applicants prevailed 73 percent of the time"), and ***HN12*** although patent holders enjoy broad exclusionary rights, see, e.g., *U.S. Const. art. I, § 8, cl. 8* (granting to patent holders "the exclusive Right to their respective Writings and Discoveries" for limited **[**66]** periods of time); *Dawson Chem. Co. v. Rohm & Haas Co., 448 U.S. 176, 215, 100 S. Ct. 2601, 65 L. Ed. 2d 696 (1980)* (echoing "the long-settled view that the essence of a patent grant is the right to exclude others from profiting by the patented invention"), these rights are not limitless, see, e.g., *Standard Oil Co. (Ind.) v. United States, 283 U.S. 163, 169, 51 S. Ct. 421, 75 L. Ed. 926 (1931)* ("The limited monopolies granted to patent owners do not exempt them from the prohibitions of the Sherman Act and supplementary legislation.").

Accordingly, this Court holds that the Direct Purchasers have pled facts sufficient at the motion-to-dismiss stage to establish violations of sections 1 and 2 of the Sherman Act under the rule of reason.

### 3. Exceptions to Antitrust Liability

The Defendants contend that even if their actions are deemed anticompetitive, (1) all of the agreements between AstraZeneca and the Generic Defendants ought enjoy Noerr-Pennington immunity, see AstraZeneca's Mem. 4-8; and (2) the relevant statute of limitations bars any Sherman Act claims arising out of the AstraZeneca/Ranbaxy agreement, [23] Ranbaxy's **[*394]** Mem. 5-6; see also AstraZeneca's Mem. 17-20. The Court addresses each of these contentions in turn.

---

such liabilities are without any value whatsoever. see, e.g., id. ("[A] contingent liability is not valued at its full amount . . . . Rather, a contingent liability is valued at its face amount multiplied by the probability **[**64]** that it will become due.").

[23] The Court need not address the Defendants' **[**67]** contention that Federal Circuit law governs this dispute, see AstraZeneca's Mem. 8-9; Teva's Mem. 7-9, as the Supreme Court has already weighed in on this issue, see Actavis, 133 S. Ct. at 2231 ("[I]t would be incongruous to determine antitrust legality by measuring [a reverse payment] settlement's anticompetitive effects solely against patent law policy, rather than by measuring them against procompetitive antitrust policies as well. . . . [T]his Court has

**a. Noerr-Pennington Immunity**

***HN13*** The Noerr-Pennington doctrine grants antitrust immunity to persons and organizations who, with the intent to restrain trade and diminish competition, act in concert to petition the government to adopt laws and implement **[**68]** policies that are anticompetitive in nature. [24]See *Allied Tube & Conduit Corp. v. Indian Head, Inc., 486 U.S. 492, 499, 108 S. Ct. 1931, 100 L. Ed. 2d 497 (1988)*. Although it originally arose in the context of an individual's right to entreat the legislature and the executive, see *United Mine Workers of Am. v. Pennington, 381 U.S. 657, 669-70, 85 S. Ct. 1585, 14 L. Ed. 2d 626 (1965)*; *Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc., 365 U.S. 127, 136, 81 S. Ct. 523, 5 L. Ed. 2d 464 (1961)*, the doctrine has since been deemed to cover advocacy before all organs of government, including, most relevantly for the present inquiry, courts, see, e.g., *California Motor Transp. Co. v. Trucking Unlimited, 404 U.S. 508, 510, 92 S. Ct. 609, 30 L. Ed. 2d 642 (1972)*. Moreover, the Supreme Court has held that the Noerr-Pennington doctrine extends not only to "direct" petitioning but also to activities that are "'incidental' to a valid effort to influence governmental action." *Allied Tube, 486 U.S. at 499* (quoting *Noerr, 365 U.S. at 143*). Ultimately, though, "[t]he scope of [Noerr-Pennington's] protection depends . . . on the source, context, and nature of the anticompetitive restraint at issue." Id.

Writing on behalf of all of the Defendants, AstraZeneca argues that because the New Jersey District Court entered consent judgments sanctioning settlement agreements struck between AstraZeneca and each of the three Generic Defendants, any anticompetitive harms that flow from such agreements are properly attributable to governmental — not private — action. See AstraZeneca's Mem. 5-6. For support, AstraZeneca contends that the settlement agreements (1) imposed upon the Defendants only the obligation "to file an executed consent judgment in the [New Jersey District Court] within five business days of signing the agreement," (2) "would become effective only when the consent judgment was entered as an order by the [New Jersey District Court]," and (3) would have been rendered null and void in the event that the Defendants had failed to obtain the New Jersey District Court's blessing within forty-five days of the date of the consent judgment filings. AstraZeneca's Mem. 5; see also AstraZeneca's Mem., Ex. 1, Settlement Agreement ("AstraZeneca/Ranbaxy **[**70]** Settlement Agreement") §§ 2.1-2.3, at 5-6, ECF No. 157; AstraZeneca's Mem., Ex. 2, Settlement Agreement ("AstraZeneca/Teva Settlement Agreement") §§ 2.1-2.3, at 6-7, ECF No. 157-1; AstraZeneca's Mem., Ex. 3, Settlement Agreement ("AstraZeneca/Dr. Reddy's Settlement Agreement") §§ 2.1-2.3, at 6-7, ECF No. 157-2.
[25] **[*395]** Moreover, AstraZeneca stresses that it was the New Jersey District Court that formally enjoined the Generic Defendants from offering generic versions of Nexium in the marketplace

---

indicated that patent and antitrust policies are both relevant in determining the 'scope of the patent monopoly' — and consequently antitrust law immunity —that is conferred by a patent."); id. at 2236 ("[I]t is normally not necessary to litigate patent validity to answer the antitrust question . . . ."). But see id. at 2240 (Roberts, C.J., dissenting) (asserting that questions of patent invalidity and infringement, in the context of reverse payments, are "plainly a question of patent law").

[24] The rationale underlying the Noerr-Pennington doctrine is ostensibly rooted in the *First Amendment's Petition Clause*, **[**69]** which provides that "Congress shall make no law . . . abridging the right of the people . . . to petition the Government." *U.S. Const. amend. I*.

[25] Technically, AstraZeneca's memorandum in support of its motion to dismiss and the three partially redacted settlement agreements referenced therein were filed eleven days apart. The disparity in the filing dates is explained, however, by the fact that the Court denied AstraZeneca's motion to impound the settlement agreements, see Elec. Order, Feb. 28, 2013, ECF No. 153; see also AstraZeneca Defs.' Mot. Impoundment Confidential Materials, ECF No. 140, which led AstraZeneca **[**71]** to furnish these documents to the Court at a later date. Accordingly, for the purposes of citation, this Court effectively treats the redacted versions of the settlement agreements as though they were appended to AstraZeneca's support memorandum in the first instance.

before May 27, 2014. AstraZeneca's Mem. 6; see also AstraZeneca's Mem., Ex. 4, Consent Order & Final J. ¶ 7, ECF No. 135-6; AstraZeneca/Teva Consent J. ¶ 8, at 3-4; AstraZeneca's Mem., Ex. 6, Consent J. ¶ 3, at 32, ECF No. 135-8.

***HN14*** Courts are largely uniform in their view that private settlement agreements entered into during the pendency of litigation that are neither presented to nor approved by the judge presiding over the dispute fall outside the ambit of Noerr-Pennington immunity. See, e.g., *Andrx Pharms., 256 F.3d at 818-19*; *Cardizem, 105 F. Supp. 2d at 634-36*. There is little guidance, however, on the question of whether a judge's entry of a consent judgment falls squarely within the scope of Noerr-Pennington.

A thirteen-year-old law review article published in the Indiana Law Review proposes a sensible analytical approach whose adoption proves useful in determining whether the consent judgments at issue ought be covered under Noerr-Pennington. In the article, Raymond Ku draws upon language in the Supreme Court's decision in *Allied Tube & Conduit Corp. v. Indian Head, Inc., 486 U.S. 492* — to wit, that "[t]he scope of [Noerr-Pennington's] protection **[**72]** depends . . . on the source, context, and nature of the anticompetitive restraint at issue," *id. at 499* — to create a bidimensional framework:

> [T]he history of the right to petition and the Supreme Court's case law demonstrate that immunity is justified based upon the nature of the activity in question and the source of the injury to competition. This Article proposes that immunity attaches when:
>
> > 1) the conduct represents valid petitioning. Valid petitioning is defined as a formal or informal attempt to persuade an independent governmental decision maker consistent with the rules of the political forum in question, and
> >
> > 2) any anticompetitive harms flow directly or indirectly from those persuasive efforts.Raymond Ku, Antitrust Immunity, the First Amendment and Settlements: Defining the Boundaries of the Right to Petition, *33 Ind. L. Rev. 385, 404 (2000)*. Ku asserts that this self-described, two-pronged "means/source test" ultimately can be reduced to a single question: "Is the private conduct a valid effort to influence government?" *Id. at 421*.

Applying Ku's framework to the instant case, it becomes clear that the consent judgments entered by the New Jersey District Court are not eligible **[**73]** candidates for Noerr-Pennington coverage. Courts have acknowledged that the distinction between private settlements and consent judgments is far from obvious and modest at best. See, e.g., *Lorain NAACP v. Lorain Bd. of Educ., 979 F.2d 1141, 1148 (6th Cir. 1992)* (observing that a consent **[*396]** decree is best described as a "strange hybrid in the law," id. (quoting *Brown v. Neeb, 644 F.2d 551, 557 (6th Cir. 1981))* (internal quotation marks omitted), that "is at once a voluntary settlement agreement which could be fully effective without judicial intervention and a final judicial order . . . plac[ing] the power and prestige of the court behind the compromise struck by the parties," id. (alteration in original) (quoting *Williams v. Vukovich, 720 F.2d 909, 920 (6th Cir. 1983))* (internal quotation marks omitted)); cf., e.g., *Local No. 93, Int'l Ass'n of Firefighters, AFL-CIO C.L.C. v. City of Cleveland, 478 U.S. 501, 519, 106 S. Ct. 3063, 92 L. Ed. 2d 405 (1986)* ("[C]onsent decrees bear some of the earmarks of judgments entered after litigation. At the same time, because their terms are arrived at through mutual agreement of the parties, consent decrees also closely resemble

contracts."). Unlike an opinion, which is aided by an **[**74]** adversarial system that grants a judge the occasion formally to review the merits of the claims asserted, "the means employed in reaching [a consent judgment] are still the same as those used to enter into private settlement or any private commercial contract," *Ku, supra, at 427*, in that "the parties can be treated as orchestrating the decision-making process by privately negotiating the terms of the settlement and then presenting them to the court as a fait accompli which any court would be hard-pressed to reject," *id. at 428*. The ways in which parties maneuver to transform a settlement agreement into a judicially approved consent judgment, then, cannot be fairly characterized as direct "petitioning" — at least not as that word is commonly understood in the context of the political process. [26]Cf. *Sosa v. DIRECTV, Inc., 437 F.3d 923, 933 (9th Cir. 2006)* (observing that "only litigation activities which constitute 'communication[s] to the court' may be fairly described as 'petitions'" and that "[s]uch communications include [a] complaint, an answer, a counterclaim and other assorted documents and pleadings, in which plaintiffs or defendants make representations and present arguments **[**75]** to support their request that the court do or not do something," id. (first and third alteration in original) (quoting *Freeman v. Lasky, Haas & Cohler, 410 F.3d 1180, 1184 (9th Cir. 2005)*) (internal quotation marks omitted)).

The entry of a consent judgment **[**76]** cannot be construed as conduct that is "incidental" to litigation, either. A wide variety of activities — including the delivery of presuit demand letters, discovery communications, decisions to accept or reject settlement offers, and threats to litigate — have been held exempt from antitrust liability under Noerr-Pennington. See, e.g., *Sosa, 437 F.3d at 936-38* (presuit demand letters); *Freeman, 410 F.3d at 1184* (discovery communications); *Columbia Pictures Indus., Inc. v. Prof'l Real Estate Investors, Inc., 944 F.2d 1525, 1528 (9th Cir. 1991)* (decisions to accept or reject settlement offers), aff'd on other grounds, *508 U.S. 49, 113* **[*397]** S. Ct. 1920, 123 L. Ed. 2d 611 (1993); *Coastal States Mktg., Inc. v. Hunt, 694 F.2d 1358, 1367-68 (5th Cir. 1983)* (threats to litigate). Despite the breadth of their diversity, however, all of these activities share a common purpose and anticipate a common end: the persuasion of a judicial officer to obtain a redress of grievances. Consent judgments effected at the behest of private parties, on the other hand, do not share the same purpose. [27] Although certain resolutions to litigation require judicial approval, see, e.g., Antitrust Procedures and Penalties Act, *Pub. L. No. 93-528, 88 Stat. 1706* **[**77]** (codified at scattered sections of 15 U.S.C.) (mandating, in the resolution of antitrust actions, that "the court . . . determine that the entry of [a consent] judgment is in the public interest," *15 U.S.C. § 16(e)(1)*, by affirmatively considering the impact of such judgment on competition, id.*§ 16(e)(1)(A)-(B)*); *Fed. R. Civ. P. 23(e)* (allowing settlement of a class action only if a court "approve[s] [the proposed settlement agreement] . . . after a hearing and on finding that it is fair, reasonable, and adequate," *Fed. R. Civ. P. 23(e)(2)*), most settlements can

---

[26] In their memorandum in support of their motion to dismiss the End-Payors' complaint, the Defendants present an alternate interpretation of the relevant petitioning conduct, arguing that they "petition[ed] the [New Jersey District Court] to enter consent judgments as orders of the court enjoining Ranbaxy, Teva, and [Dr. Reddy's] from marketing a generic version of Nexium until May 2014." Defs.' Mot. Dismiss End-Payors 3. Even were this Court to adopt the Defendants' broader definition of "petitioning," the conclusion reached in this memorandum ultimately would be the same, as it is not the Defendants' mere efforts to obtain a consent judgment that the Plaintiffs are challenging. Rather, the Plaintiffs have taken particular issue with the settlement agreements undergirding the consent judgments and the purported use of the New Jersey District Court as an instrument to legitimate the Defendants' allegedly anticompetitive arrangement.

[27] The same argument can be made with respect to settlements alone. SeeKu, supra, at 421-26. Admittedly, courts have deemed settlements between private parties and the state to be incidental to the petitioning that takes place via litigation. See, e.g., A.D. Bedell Wholesale Co. v. Philip Morris Inc., 263 F.3d 239, 252-54 (3d Cir. 2001). These types of settlements are quite distinguishable from those assented to between two or more private parties, however, because, in the former case, the state is operating as an actor that is directly engaged in the decisionmaking process.

be made final without the stamp of a judge, see*Fed. R. Civ. P. 41(a)(1)(A)* (allowing the dismissal of an action by a plaintiff without a court order, so long as the plaintiff gains the signatures of all parties to the litigation on a stipulation of dismissal and files it, along with a notice of dismissal, with the court); cf. also *United States v. Cannons Eng'g Corp., 720 F. Supp. 1027, 1035 (D. Mass. 1989)* (Wolf, J.) ("Approval of a proposed consent decree is committed to the discretion of the district court. This discretion is to be exercised in light of the strong policy in favor of voluntary settlement of litigation." **[**78]** (citation omitted)), aff'd, *899 F.2d 79 (1st Cir. 1990)*.

Such was the case here. Nothing prohibited AstraZeneca and the Generic Defendants from simply stipulating to a dismissal of the patent infringement actions. ***HN15*** A decision of a court that serves merely to memorialize a bargained-for agreement that could have otherwise been resolved without judicial intervention ought not benefit from the exemption allowed by Noerr-Pennington. Cf. *MedImmune, Inc. v. Genentech, Inc., No. CV 03-2567 MRP, 2003 U.S. Dist. LEXIS 23443, 2003 WL 25550611, at *7 (C.D. Cal. Dec. 23, 2003)* (holding that an order and judgment executed by a judge was eligible for Noerr-Pennington **[**79]** immunity because the result achieved by the order and judgment — namely, the reversal of a priority decision by the U.S. Patent and Trademark Office's Board of Patent Appeals and Interferences — "could not have been accomplished through private agreement"). Adopting the alternative view would provide litigants with an avenue wholly impervious to antitrust scrutiny simply by seeking out a court's rubber-stamped approval.

Of course, ***HN16*** the prevailing rule under Noerr-Pennington remains that "[i]f anticompetitive harm is caused by the decision of a court, even though granted at the request of a private party, no private restraint of trade occurs because the intervening government action breaks the causal chain." *Andrx Pharms., 256 F.3d 799 at 818, 347 U.S. App. D.C. 178*; see also I Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law ¶ 202c, at 166-67 (3d ed. 2006). Some **[*398]** courts have suggested, however, that where a judge plays nothing more than a perfunctory role in branding a privately ordered settlement with the imprimatur of law, the protections of Noerr-Pennington are not implicated. See, e.g., *MedImmune, 2003 U.S. Dist. LEXIS 23443, 2003 WL 25550611, at *6* (noting, with approval, the parties' understanding that "a court's stamp of approval **[**80]** will not immunize private anti-competitive agreements; genuine petitioning is necessary for Noerr-Pennington immunity to apply"); *Cipro, 261 F. Supp. 2d at 212-13* (ruling that a consent judgment certifying agreements between a brand-name drug manufacturer and manufacturers of generic drugs to delay market competition and extinguish all patent litigation claims was not subject to Noerr-Pennington protection because the judge in the case "played no role other than signing the Consent Judgment," *id. at 212*, and "was . . . [not] even apprised of the terms before he 'so ordered' the Consent Judgment," *id. at 213*, and because "[t]he Consent Judgment did not include the terms of the agreements," *id. at 212-13*). The First Circuit has itself suggested that it is aware of the meaningful difference between action that is truly governmental in substance and action that is simply governmental in form. See *George R. Whitten, Jr., Inc. v. Paddock Pool Builders, Inc., 424 F.2d 25, 33 n.8 (1st Cir. 1970)* ("An anti-competitive practice may receive only the most cursory inspection by public officials, or public officials may approve conduct without consideration or awareness of its anti-competitive aspects. **[**81]** The issue in such cases is not whether the action was in form 'governmental', but whether the real decision makers were public officials or private businessmen." (citations omitted)).

Having reviewed the record made available by the parties, it is not apparent that the New Jersey District Court actually played an independent role in drafting the terms in the consent judgments.

Although AstraZeneca asserts that the New Jersey District Court exercised its discretion in enjoining the Generic Defendants from entering the market, AstraZenca's Mem. 6-8, the underlying settlement agreements are heavily redacted, see AstraZeneca/Ranbaxy Settlement Agreement; AstraZeneca/Teva Settlement Agreement; AstraZeneca/Dr. Reddy's Settlement Agreement, so it is unclear how much of the content found within the consent judgments is properly attributable to the New Jersey District Court judge's deliberation. Moreover, the entering of a consent decree does not, by itself, reflect a court's assent to the substantive terms found therein, see, e.g., *Liu v. Amerco, 677 F.3d 489, 497 (1st Cir. 2012)* (noting that "[a] consent decree is neither an adjudication nor an admission by [the defendant]"); *Ku, supra, at 429* **[**82]** ("[W]hen asked to approve a settlement agreement, a court is not being asked to determine liability or approve the substance of the agreement."), so it is unclear whether the judge could be fairly said to have endorsed the terms of the settlement agreements. [28] Therefore, this Court cannot in good conscience accord the consent judgment entered by the New Jersey District Court the aegis of antitrust immunity under Noerr-Pennington. [29]

**[*399] b. Federal Statute of [**83] Limitations**

***HN17*** Federal antitrust enforcement actions are subject to a four-year statute of limitations. *15 U.S.C. § 15b*. Any such action that is not brought "within four years after the cause of action accrued" is deemed "forever barred." Id. Generally, a cause of action accrues under the Sherman Act when the plaintiff suffers an injury that is traceable to the defendant's conduct. See *In re Relafen Antitrust Litig., 286 F. Supp. 2d 56, 61 (D. Mass. 2003)*. An exception to this default rule exists, however, where the defendant's conduct "constitute[s] a continuing violation of the Sherman Act . . . [that] inflict[s] continuing and accumulating harm." *Id. at 62* (first alteration in original) (quoting *Hanover Shoe, Inc. v. United Shoe Mach. Corp., 392 U.S. 481, 502 n.15, 88 S. Ct. 2224, 20 L. Ed. 2d 1231 (1968))* (internal quotation mark omitted).

The Defendants argue that the Direct Purchasers' Sherman Act claims relating to the AstraZeneca/Ranbaxy Agreement ought be dismissed because the consent judgment memorializing said agreement was entered by the New Jersey District Court on April 14, 2008, more than four years before the first direct purchaser complaint was filed (on August 27, 2012). Ranbaxy's Mem. 5-6; see also AstraZeneca's **[**84]** Mem. 18. The Defendants are correct. Therefore, to the extent that the Direct Purchasers seek to challenge the AstraZeneca/Ranbaxy reverse payment agreement itself, this Court holds that the Direct Purchasers' claims are barred by the four-year statute of limitations.

The Defendants further contend that the continuing-violation exception is not applicable in the instant case because the alleged post-settlement agreement harms — that is to say, the harms flowing from AstraZeneca's maintenance of supracompetitive brand Nexium prices — "are not overt, but are instead 'the unabated inertial consequences of the initial violation.'" Ranbaxy's Reply 3 (quoting *Midwestern Mach. Co. v. Nw. Airlines, Inc., 392 F.3d 265, 270 (8th Cir. 2004))*.

---

[28] Despite the Defendants' protestations to the contrary, the fact that the settlement agreements would have been null and void absent the approval of the New Jersey District Court has no bearing on the present analysis.

[29] Indeed, the very fact that the Defendants can with a straight face advance this Noerr-Pennington argument based on consent judgments emphasizes that judges must be exceptionally wary of exercising their equitable powers at the joint behest of the parties. Cf., e.g., United States v. Orthofix, Inc., Nos. 12-10169-WGY, 12-10374-WGY, 956 F. Supp. 2d 316, 2013 U.S. Dist. LEXIS 104948, 2013 WL 3853233 (D. Mass. July 26, 2013); SEC v. Citigroup Global Mkts., Inc., 827 F. Supp. 2d 328 (S.D.N.Y. 2011) (Rakoff, J.). Far better to let the parties simply agree among themselves.

This Court disagrees. Admittedly, ***HN18*** courts are generally fairly hostile to invocations of the continuing-violation exception in instances where a plaintiff fails to allege that the defendant committed overt acts separate and apart from the initial act giving rise to the original injury. See, e.g., *Midwestern Mach., 392 F.3d at 271* ("Only where the monopolist actively reinitiates the anti-competitive policy and enjoys benefits from that action can the continuing **[**85]** violation theory apply."); *Berkson v. Del Monte Corp., 743 F.2d 53, 55 (1st Cir. 1984)* (suggesting that the plaintiff's antitrust claims based upon the defendants' allegedly wrongful agreement regarding the sale of banana-growing properties in Guatemala were barred by the four-year statute of limitations because "no subsequent overt act in furtherance of the alleged conspiracy [was] described or even hinted at" in the plaintiff's complaint, id., so "any subsequent harm must be seen as the unabated inertial consequence[ ] of the earlier events," id. (alteration in original) (quoting *In re Multidistrict Vehicle Air Pollution, 591 F.2d 68, 72 (9th Cir. 1979)* (internal quotation marks omitted)). That said, the Supreme Court in *Klehr v. A.O. Smith Corp., 521 U.S. 179, 117 S. Ct. 1984, 138 L. Ed. 2d 373 (1997)*, observed the following:

> **[*400]** Antitrust law provides that, in the case of a "continuing violation," say, a price-fixing conspiracy that brings about a series of unlawfully high priced sales over a period of years, each overt act that is part of the violation and that injures the plaintiff, e.g., each sale to the plaintiff, starts the statutory period running again, regardless of the plaintiff's knowledge of the alleged illegality **[**86]** at much earlier times.*Id. at 189* (quoting 2 P. Areeda & H. Hovenkamp, Antitrust Law ¶ 338b, at 145 (rev. ed. 1995)) (internal quotation marks omitted). In this way, "[a]lthough the business of a monopolist's rival may be injured at the time the anticompetitive conduct occurs, a purchaser, by contrast, is not harmed until the monopolist actually exercises its illicit power to extract an excessive price." *Berkey Photo, Inc. v. Eastman Kodak Co., 603 F.2d 263, 295 (2d Cir. 1979)* (emphasis added). Indulging all inferences in the Plaintiffs' favor, then, it is reasonable to assume here that, every time the Direct Purchasers were overcharged for brand Nexium, they suffered a cognizable injury. See *Berkey Photo, 603 F.2d at 295* ("So long as a monopolist continues to use the power it has gained illicitly to overcharge its customers, it has no claim on the repose that a statute of limitations is intended to provide."); cf. also *Hanover Shoe, 392 U.S. at 489* ("As long as the seller continues to charge the illegal price, he takes from the buyer more than the law allows.").

**C. End-Payors' Claims**

**1. State-Specific Statutes of Limitations**

The Defendants argue that the End-Payors, who brought their **[**87]** actions under several state statutes, are precluded by those states' statutes of limitations from challenging the AstraZeneca/Ranbaxy Agreement. Defs.' Mot. Dismiss End-Payors 4-5. This is because the statutes of limitations, they argue, began running on the date the New Jersey District Court entered a consent judgment which affirmed the parties' decision to enter into the AstraZeneca/Ranbaxy Agreement. Id. Although the court entered the consent judgment on April 14, 2008, the End-Payors filed their complaint over four years after that date. Id.

The statute of limitations in the following twenty-three states and territories under which the End-Payors seek to bring antitrust civil enforcement actions is four years (or lower): Arizona; [30] California; [31] Washington, D.C.; [32] Florida; [33] Illinois; [34] **[*401]** Iowa; [35] Kansas; [36] Massachusetts; [37] Michigan; [38] Minnesota; [39] Mississippi; [40] Nebraska; [41] Nevada; [42] New Mexico; [43] New York; [44] North Carolina; [45] North Dakota; [46] Oregon; [47] Puerto Rico; [48] **[*402]**

---

30 Ariz. Rev. Stat. § 44-1410(A) **[**88]** ("An action . . . to recover a civil penalty [in the antitrust contest] is barred if it is not commenced within four years after the cause of action accrues." (emphasis added)).

31 Cal. Bus. & Prof. Code § 16750.1 ("Any civil action to enforce any cause of action for a violation of this chapter shall be commenced within four years after the cause of action accrued." (emphasis added)); id.§ 17208 ("Any action to enforce any cause of action pursuant to this chapter shall be commenced within four years after the cause of action accrued. No cause of action barred under existing law on the effective date of this section shall be revived by its enactment." (emphasis added)).

32 D.C. Code § 28-4511(b) ("An action [brought by private parties or the District of Columbia government to enforce restraint-of-trade provisions and] to recover damages is barred if the action is not commenced within four (4) years after the cause of action accrues . . . ." (emphasis added)).

33 Fla. Stat. § 501.207(5) ("No action may be brought by the enforcing authority under this section more than 4 years after the occurrence of a violation of this part or more than 2 years after the last payment in a transaction involved **[**89]** in a violation of this part, whichever is later." (emphasis added)).

34 740 Ill. Comp. Stat. § 10/7(2) ("Any action for damages under this subsection is forever barred unless commenced within 4 years after the cause of action accrued . . . ." (emphasis added)).

35 Iowa Code § 553.16(2) ("Suit under section 553.12[, allowing individuals injured by violation of the Iowa Competition Law to seek certain remedies,] must be commenced within four years after the cause of action accrues or, if there is a fraudulent concealment of this cause of action, within four years after the cause of action becomes known, whichever period is later." (emphasis added)).

36 Kan. Stat. § 60-512 ("The following actions shall be brought within three (3) years: (1) All actions upon contracts, obligations or liabilities expressed or implied but not in writing. (2) An action upon a liability created by a statute other than a penalty or forfeiture." (emphasis added)).

37 Mass. Gen. Laws ch. 260, § 5A ("Actions arising on account of violations of any law intended for the protection of consumers . . . shall be commenced only within four years next after the cause of action accrues." (emphasis added)).

38 Mich. Comp. Laws § 445.781(2) **[**90]** ("An action to recover damages under [the provision of the Michigan Antitrust Reform Act allowing injured parties to bring actions for relief] is barred if not commenced within 4 years after the claim for relief or cause of action accrues . . . ." (emphasis added)).

39 Minn. Stat. § 325D.64(1) ("An action under [the Minnesota Antitrust Law of 1971], shall be forever barred unless commenced within four years of the date upon which the cause of action arose." (emphasis added)).

40 Miss. Code. § 15-1-49(1) ("All actions for which no other period of limitation is prescribed shall be commenced within three (3) years next after the cause of such action accrued, and not after." (emphasis added)). But seeMiss. Code. § 15-1-49(2) ("In actions for which no other period of limitation is prescribed and which involve latent injury or disease, the cause of action does not accrue until the plaintiff has discovered, or by reasonable diligence should have discovered, the injury." (emphasis added)).

41 Neb. Rev. Stat. § 59-1612 ("Any action to enforce a claim for damages [for unfair competition] shall be forever barred unless commenced within four years after the cause of action accrues . . . ." (emphasis **[**91]** added)).

42 Nev. Rev. Stat. § 598A.220(2) ("An action brought [by private or public parties for the enforcement of unfair trade practices provisions] is barred if it is not commenced: (a) Within 4 years after the cause of action accrues, or if the cause of action is based upon a conspiracy in violation of this chapter, within 4 years after the plaintiff discovered, or by the exercise of reasonable diligence, should have discovered the facts relied upon for proof of the conspiracy . . . ." (emphasis added)).

43 N.M. Stat. § 57-1-12(B) ("An action brought under [New Mexico restraint-of-trade provisions] to recover damages is barred if it is not commenced within four years after the cause of action accrues or within four years after the plaintiff discovered, or by the exercise of reasonable diligence should have discovered, the facts relied upon for proof of the cause of action, whichever is later." (emphasis added)).

44 N.Y. Gen. Bus. Law § 340(5) ("An action to recover damages caused by a violation of this section must be commenced within four years after the cause of action has accrued." (emphasis added)).

South Dakota; [49] Tennessee; [50] Utah; [51] and West Virginia. [52] In the following three states, however, the statute of limitations is six years: Maine, [53] Vermont, [54] and Wisconsin. [55]

None of the relevant exceptions to the ordinary running of the four-year statutes of limitations in the initial twenty-three jurisdictions apply. The co-payers have not, for example, alleged that the Defendants were engaged in fraudulent concealment, nor have the End-Payors alleged any other ground for tolling the statute of limitations.

Therefore, to the extent that the End-Payors seek to challenge the AstraZeneca/Ranbaxy reverse payment agreement itself (as opposed to the continuing harm arising from this agreement, which claims may continue as discussed above, see supra section II.B.3.b), this Court holds that the End-Payors' claims are barred by the statute of limitations in the following twenty-three jurisdictions **[**95]** which are subject to a four-year, or lower, limitations period: Arizona; California; Washington, D.C.; Florida; Illinois; Iowa; Kansas; Massachusetts; Michigan; Minnesota; Mississippi; Nebraska; Nevada; New Mexico; New York; North Carolina; North Dakota; Oregon; Puerto Rico; South Dakota; Tennessee; Utah; and West Virginia. [56] **[*403]** The End-Payors, however, may still seek to challenge the AstraZeneca/Ranbaxy Agreement in the three states which have a six-year statute of limitations (Maine, Vermont, and Wisconsin).

---

[45] N.C. Gen. Stat. § 75-16.2 ("Any civil action brought under this Chapter to enforce **[**92]** the provisions thereof shall be barred unless commenced within four years after the cause of action accrues." (emphasis added)).

[46] N.D. Cent. Code § 51-08.1-10(2) ("An action under [provisions providing remedies for the enforcement of the Uniform State Antitrust Act] to recover damages is barred if it is not commenced within four years after the claim for relief accrues . . . ." (emphasis added)).

[47] Or. Rev. Stat. § 646.800(2) ("An action under [provisions providing civil penalties for violation of state antitrust laws] to recover damages shall be commenced within four years after the cause of action accrued . . . ." (emphasis added)).

[48] *P.R. Laws Ann. tit. 10, § 268 (c)* ("The judicial action to recover damages in accordance with the provisions of subsections (a) and (b) of this section shall be commenced within four (4) years after the cause of action accrued." (emphasis added)).

[49] S.D. Codified Laws § 37-1-14.4 ("An action [brought by private parties suffering antitrust harms] . . . to recover damages is barred if it is not commenced within four years after the claim for relief accrues . . . ." (emphasis added)).

[50] Tenn. Code § 28-3-105 ("The following actions shall be commenced within **[**93]** three (3) years from the accruing of the cause of action." (emphasis added)).

[51] Utah Code § 76-10-3117(2) ("Any other action pursuant to this act is barred if it is not commenced within four years after the cause of action accrues . . . ." (emphasis added)).

[52] W. Va. Code § 47-18-11 ("Any action brought to enforce the provisions of this article shall be barred unless commenced within four years after the cause of action arose, or if the cause of action is based upon a conspiracy in violation of this article, within four years after the plaintiff discovered, or by the exercise of reasonable diligence should have discovered the facts relied upon for proof of the conspiracy. For the purpose of this section, a cause of action for a continuing violation is deemed to arise at any time during the period of such violation." (emphasis added)).

[53] Me. Rev. Stat. tit. 14, § 752 ("All civil actions shall be commenced within 6 years after the cause of action accrues and not afterwards, except actions on a judgment or decree of any court of record of the United States, or of any state, or of a justice of the peace in this State, and except as otherwise specially provided." (emphasis added)).

[54] Vt. Stat. tit. 12, § 511 **[**94]** ("A civil action, except one brought upon the judgment or decree of a court of record of the United States or of this or some other state, and except as otherwise provided, shall be commenced within six years after the cause of action accrues and not thereafter." (emphasis added)).

[55] Wis. Stat. § 133.18(2) ("A civil action for damages or recovery of payments under this chapter is barred unless commenced within 6 years after the cause of action accrued." (emphasis added)).

[56] But cf. In re Buspirone Patent Litig., 185 F. Supp. 2d 363, 380 (S.D.N.Y. 2002) ("The parties have provided supplemental briefs indicating how the relevant statute of limitations provisions work in each of the fifty jurisdictions across the country. This motion is nevertheless premature because, as discussed above, the parties have not yet briefed the prior choice of law question, which

## 2. Standing

### a. Article III Standing

The Defendants argue that the majority of the twenty-six **[**96]** state claims ought be dismissed. Defs.' Mot. Dismiss End-Payors 5. This is because, the Defendants contend, the End-Payors only have Article III standing to assert antitrust or consumer protection claims in the states in which they suffered an injury. Id. 6; Defs.' Supplemental Mem. 1. The Defendants argue that, according to the relevant choice-of-law rules, the state in which the End-Payors suffered the alleged injury is the state in which they reside. Defs.' Mot. Dismiss End-Payors 5-6. Because the end-payor health and welfare benefit funds, the named plaintiffs, reside only in five states (California, Florida, Illinois, Michigan, and New York), the Defendants contend that the End-Payors only have standing to bring claims in those five states. Id.

The End-Payors' rejoinder, however, is two-fold: first, they argue, the putative class representatives have Article III standing to advance claims because they, as putative class representatives, have co-paid or reimbursed others for Nexium in seventeen of the twenty-six states which have passed Illinois Brick-repealer statutes, [57] End-Payors' Mem. Opp'n 6; and second, once Article III standing is established for the named representatives, **[**97]** the End-Payors argue, they need only satisfy the requirements of *Rule 23* under class action law to advance claims for the absent members of the putative class (at such time that this Court considers it appropriate to consider whether the proposed class may be certified), id.

***HN19*** Article III of the Constitution contains a requirement of justiciability which limits the jurisdiction of Article III courts to active "Cases" and "Controversies." *U.S. Const. art. III, § 2, cl. 1*. The Supreme Court has interpreted this clause as articulating the "irreducible constitutional minimum" of standing. *Bennett v. Spear, 520 U.S. 154, 162, 117 S. Ct. 1154, 137 L. Ed. 2d 281 (1997)*.

***HN20*** A court's inquiry into Article III standing contains the three following elements: a plaintiff must allege "[1] personal injury [2] fairly traceable to the defendant's allegedly unlawful conduct and [3] likely to be redressed by the requested relief." *Allen v. Wright, 468 U.S. 737, 751, 104 S. Ct. 3315, 82 L. Ed. 2d 556 (1984)*; accord *Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61, 112 S. Ct. 2130, 119 L. Ed. 2d 351 (1992)*. The burden is on the plaintiff to show that these requirements are satisfied. *Lujan, 504 U.S. at 561*; *Steel Co. v. Citizens for a Better Environment, 523 U.S. 83, 104, 118 S. Ct. 1003, 140 L. Ed. 2d 210 (1998)*. **[**98]** But the Court may construe the complaint in favor of the plaintiff, taking the allegations made therein as true. See *Warth v. Seldin, 422 U.S. 490, 501, 95 S. Ct. 2197, 45 L. Ed. 2d 343 (1975)*. ***HN21*** Generally speaking, named representatives in class actions must allege a personal injury. *Lewis v.* **[*404]** *Casey, 518 U.S. 343, 357, 116 S. Ct. 2174, 135 L. Ed. 2d 606 (1996)*. As the subsequent analysis will indicate, this requirement is not so clear cut with respect to putative class representatives in class action disputes. [58]See, e.g., *Glass Dimensions, Inc. v. State St. Bank &*

---

will determine which laws govern the respective claims of the different plaintiffs. This motion should thus be dismissed without prejudice to refiling once the class certification issues have been decided.").

[57] For further explanation of Illinois Brick-repealer statutes, see infra section II.C.3.b.

[58] Part of the reason for this confusion arises from the fact that the "named plaintiffs" and (putative) "class representatives" are not necessarily the same. This is because "[c]lass counsel need not put forward all named plaintiffs, or only named plaintiffs as proposed class representatives." 1 Newberg on Class Actions § 2:1, at 58 (5th ed. 2013).

*Trust Co., 285 F.R.D. 169, 174-75 (D. Mass. 2012)* (Tauro, J.); *In re Relafen Antitrust Litig., 221 F.R.D. 260, 267-70 (D. Mass. 2004)*.

The Defendants contend that (1) standing is a threshold issue which must be resolved at the motion-to-dismiss stage, Defs.' Mot. Dismiss End-Payors 6; and (2) the End-Payors' lack standing to pursue claims on behalf **[**99]** of absent class members (because they may only bring claims against the Defendants under the laws of states in which they have made reimbursements), id. at 8. In making both submissions, the Defendants erroneously conflate the requirements of Article III, for the purposes of assessing constitutional standing of the named plaintiffs, with the procedural requirements of *Rule 23*, [59] which are designed to determine whether a putative class representative for whom Article III standing has already been established may also raise the claims of the class which it purports to represent.

This Court agrees with the Defendants' contention that Article III standing must be resolved at the motion-to-dismiss stage. But the named plaintiffs' allegations that they paid or reimbursed others for Nexium, at supracompetitive prices, in seventeen of the twenty-six states which have passed Illinois Brick-repealer statutes, End-Payors' Mem. Opp'n 6; End-Payors' Compl. ¶ 179, **[**100]** is sufficient to establish these requirements of personal injury (overpayment). ***HN23*** As the Sixth Circuit has noted, "once an individual has alleged a distinct and palpable injury to himself he has standing to challenge a practice even if the injury is of a sort shared by a large class of possible litigants." *Senter v. Gen. Motors Corp., 532 F.2d 511, 517 (6th Cir. 1976)*. The End-Payors' reimbursement of, and simultaneous co-payment with, [60] their members for their purchase of drugs at supracompetitive prices, allegedly obtained through illegal means, is properly characterized as a monetary injury. See End-Payors' Compl. ¶ 179. It is fairly traceable from the Defendants' allegedly unlawful (anticompetitive) conduct to the named plaintiff End-Payors' obligation to pay the supracompetitive balance on their putative class members' co-payments for Nexium in various states. This injury is likely to be redressed through the requested compensatory and injunctive relief sought in the states where the putative class members made payments or reimbursements. [61]

---

[59] ***HN22*** Under *Rule 23*, "[o]ne or more members of a class may sue or be sued as representative parties." *Fed. R. Civ. P. 23(a)*, so long as the four requirements of numerosity, commonality, typicality, and adequacy of representation are satisfied.

[60] The End-Payors, in their supplemental brief, provide an interesting analysis whereby, they argue, the End-Payors, rather than reimbursing **[**101]** their members, "become[] obligated to pay the pharmacy the balance of the total price for the prescription" when their members make co-payments. End-Payors' Supplemental Mem. 1.

[61] Although the Defendants contend that this Court must engage in a choice-of-law analysis in order to determine what they characterize as the standing of the named class representatives, Defs.' Mot. Dismiss End-Payors 8-10; Defs.' Reply End-Payors 3, it would be premature for the Court to commence this analysis at this stage before the parties are able to engage in discovery. This is because the putative class consists of members who have suffered harm in many more states than the named plaintiffs; the End-Payors, indeed, describe the putative class as constituting the following:

> All persons or entities who purchased and/or paid for some or all of the purchase price for Nexium and/or its AB-rated generic equivalents in Arizona, California, Florida, Illinois, Iowa, Kansas, Massachusetts, Maine, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Mexico, New York, North Carolina, North Dakota, Oregon, South Dakota, Tennessee, Utah, Vermont, West Virginia, Wisconsin and the District of Columbia and Puerto Rico **[**102]** . . . .End-Payors' Compl. ¶ 113. The End-Payors' complaint futher alleges that, "[f]or purposes of the Class definition, persons or entities 'purchased' Nexium or its generic equivalent if they paid or reimbursed some or all of the purchase price." Id. To hold that the class representatives may only pursue claims in their principal place of business would be improvident

**[*405]** The Defendants reject this analysis because, they claim, the First Circuit's decision in *Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp., 632 F.3d 762 (1st Cir. 2011)*, stands for the proposition that "a named plaintiff may assert only those claims for which that plaintiff has Article III standing." Defs.' Supplemental Mem. 6. While the Court acknowledges this principle, the present facts are clearly distinguished from those in *Plumbers' Union.*

Plumbers' Union concerned a putative class action brought by institutional investors, pension funds, and welfare funds against eight trust funds for misrepresentations made in relation to the purchase of trust certificates **[**103]** representing mortgage-backed securities. The First Circuit held there that, where no named plaintiff had purchased six of the eight trust certificates in question, the named plaintiffs did not have Article III standing to pursue claims with respect to the six trusts that they had not purchased. *632 F.3d at 771*.

In Plumbers' Union, the First Circuit held that "named plaintiffs [had] no claim on their own behalf based on trust certificates that they did not buy; and they bought no certificates issued by six of the defendant trusts." *Id. at 768*. Here, by contrast, each of the named end-payor plaintiffs has claims against each of the defendants based on their alleged overpayments for Nexium. The End-Payors have therefore made out their Article III "requisite of an ordinary case or controversy [of] an injury to the plaintiff traceable to the defendant," id. (citing *Lujan, 504 U.S. at 560-61*), pleading sufficient facts to show Article III standing as to each of the named plaintiffs.

**b. Ortiz Exception**

Even if, contrary to this Court's holding, it were not the case that each of the Defendants were liable to each of the named end-payor plaintiffs by virtue of their having overpaid for Nexium, **[**104]** Plumbers' Union preserves an exception to the strict standing analysis in those unusual circumstances presented in class action disputes where the interests of the named plaintiffs, in bringing claims for which they do have Article III standing, are sufficiently aligned with the interests of the putative class over which they do not have Article III standing. *Id. at 770*. It is to this analysis of the exception laid down in Plumbers' Union that the Court now turns.

The rejoinder to the Defendants' two-fold contention has already been articulated by this Court in its previous opinion, *In re Relafen Antitrust Litig., 221 F.R.D. 260*. **[*406]** [62]See also *Glass Dimensions, 285 F.R.D. at 174* (noting that once a plaintiff establishes his own standing, the question of whether a plaintiff will be able to represent the putative class "depends solely on whether he is able to meet the additional criteria encompassed in *Rule 23 of the Federal Rules of Civil Procedure*" (quoting *Fallick v. Nationwide Mut. Ins. Co., 162 F.3d 410, 423 (6th Cir. 1998))* (internal quotation marks omitted)).

In*Relafen*, a multidistrict antitrust litigation previously before this Court, the defendant SmithKline made a similar argument that because the named end-payor plaintiffs only purchased the drug in question in certain of the states under whose laws the claims were made, they lacked standing to assert the claims of the other class members who purchased the drug in different states;

---

because it would risk jeopardizing the interests of other members of the putative class who purchased Nexium in a range of states.

[62] Although the Defendants claim that the law has changed since this Court's opinion in Relafen, this Court holds that any change **[**105]** in the law following recent rulings of the First Circuit in Plumbers' Union does not implicate the ability of the named end-payor plaintiffs to represent the putative class in this case for the reasons articulated below.

SmithKline contended therefore that the "named end payor plaintiffs' lack of standing renders them inadequate representatives." *221 F.R.D. at 267*. Citing to another of this Court's opinions in *Mowbray v. Waste Management Holdings, Inc., 189 F.R.D. 194 (D. Mass. 1999)*, where this Court held that a single named plaintiff bringing a contract claim under Illinois law could adequately represent the claims of class members arising under the laws of a plurality of states, the Court in Relafen duly rejected SmithKline's argument. This is because, the Court ruled in Relafen, "the Supreme Court's decision **[**106]** in *Ortiz v. Fibreboard Corp., 527 U.S. 815, 119 S. Ct. 2295, 144 L. Ed. 2d 715 (1999)*, created an exception to ordinary jurisdictional principles." *Relafen, 221 F.R.D. at 268*.

In Ortiz, the Supreme Court held that the typical order by reference to which an Article III court determines justiciability may be inverted in certain limited circumstances:

> ***HN24*** Ordinarily, of course, this or any other Article III court must be sure of its own jurisdiction before getting to the merits. But the class certification issues are . . . "logically antecedent" to Article III concerns, and themselves pertain to statutory standing, which may properly be treated before Article III standing. Thus the issue about Rule 23 certification should be treated first, "mindful that [the Rule's] requirements must be interpreted in keeping with Article III constraints. . . ."*Ortiz, 527 U.S. at 831* (alteration in original) (citations omitted) (quoting *Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 612-13, 117 S. Ct. 2231, 138 L. Ed. 2d 689 (1997)*); see also *Amchem, 521 U.S. at 612* ("We agree that '[t]he class certification issues are dispositive'; because their resolution here is logically antecedent to the existence of any Article III issues, it is appropriate to reach them first . . . ." (alteration **[**107]** in original) (citation omitted) (quoting *Georgine v. Amchem Prods., Inc., 83 F.3d 610 (3d Cir. 1996)*, aff'd sub nom., *Amchem, 521 U.S. 591, 117 S. Ct. 2231, 138 L. Ed. 2d 689 (1997)*); cf. also *Arizonans for Official English v. Arizona, 520 U.S. 43, 66, 117 S. Ct. 1055, 137 L. Ed. 2d 170 (1997)* ("[W]e need not definitively resolve the [Article III standing] issue. Rather, we will follow a path we have taken before and inquire, as a primary matter, whether originating plaintiff Yniguez still has a case to pursue."). See generally Daniel D. DeVougas, Note, Without A Leg to Stand on? Class Representatives, Federal Courts, and Standing **[*407]** Desiderata, *97 Cornell L. Rev. 627 (2012)* (noting that the more exacting form of standing scrutiny is not the best tool for addressing unmeritorious class actions). Other circuits have also interpreted Supreme Court precedent to allow for the determination of class certification prior to addressing issues of standing. See, e.g., *Payton v. Cnty. of Kane, 308 F.3d 673, 680, 682 (7th Cir. 2002)*.

Although the Defendants argue that the law has moved on since this Court's application of the Ortiz exception in Relafen, relying on the First Circuit decision in Plumbers' Union, in fact, the First Circuit opinion retains the *Ortiz* exception **[**108]** so that it can be applied in circumstances such as those presented by the present case. But see *Hoffman v. UBS-AG, 591 F. Supp. 2d 522, 530-32 (S.D.N.Y. 2008)* (noting that the determination of class certification before standing articulated in Ortiz and Amchem had been limited to the "unique context of global-mass settlements").

In Plumbers' Union, the First Circuit noted that it was inclined to follow its determination in *Barry v. St. Paul Fire & Marine Insurance Co., 555 F.2d 3 (1st Cir. 1977)*, aff'd, *438 U.S. 531, 98 S. Ct. 2923, 57 L. Ed. 2d 932 (1978)*, *Plumbers' Union, 632 F.3d at 770*, that there was "no error

in the district court's decision to adhere strictly to the traditional [standing] rules," *Barry, 555 F.2d at 13*. This prompted the First Circuit to conclude that, because "the necessary identity of issues and alignment of incentives is not present" with respect to the sales of certificates in the six trusts which no named plaintiff purchased, the claims based on those six trusts must fail. *Plumbers' Union, 632 F.3d at 771*.

The First Circuit, however, marked out the following significant exception:

> The qualification, on which we reserve judgment, is one where the claims of the named plaintiffs necessarily give **[**109]** them — not just their lawyers —essentially the same incentive to litigate the counterpart claims of the class members because the establishment of the named plaintiffs' claims necessarily establishes those of other class members.*Plumbers' Union, 632 F.3d at 770* (emphasis added). This Court holds that the requisite "identity of issues" and "alignment of incentives" is present amongst the End-Payors here. All members of the putative class have a common interest in litigating claims arising from the Defendants' allegedly anticompetitive collusion designed to cause the End-Payors to pay supracompetitive prices across the several states.

**c. Rules Enabling Act**

Defendants further contend that the Rules Enabling Act, *28 U.S.C. § 2072*, compels this Court to refrain from holding that the present facts are subsumable under the Ortiz exception. Defs.' Mot. Dismiss End-Payors 7. This argument is unpersuasive. ***HN25*** *28 U.S.C. section 2072* provides, in relevant part, that the general rules of practice which the Act empowers the Supreme Court to prescribe for federal district courts "shall not abridge, enlarge or modify any substantive right." *28 U.S.C. § 2072(b)*.

This Court, however, is not using *Rule 23* **[**110]** to modify any substantive rights; rather, it is relying on the line of Supreme Court authority leading to *Ortiz* and recognized as an exception in the First Circuit's opinion in *Plumbers' Union*. Because this Court relies on the Supreme Court's interpretation of Article III's standing requirements, it can hardly be charged with relying on *Rule 23* to modify any of the parties' substantive rights. Moreover, this Court has determined that the named plaintiffs have Article III standing to pursue their claims, see supra section II.C.2.a; the Court is merely deferring **[*408]** to the stage at which it will ask the questions relating to the prerequisites for class representation, which are governed not by the Constitution, but by class action law. Because the decision of this Court to defer its scrutiny of the Rule 23 requirements until the time for class certification is supported by the Supreme Court's interpretation in *Ortiz,* it does not fall foul of the Rules Enabling Act. This Court therefore postpones its determination as to whether the named representatives may pursue claims on behalf of its absent class members under *Rule 23* **[**111]** until the time it entertains the certification of the putative class.

**3. End-Payors' Claims Under State Antitrust and Consumer Protection Laws**

The Defendants argue that the End-Payors' claims brought under the antitrust laws of eight states and Puerto Rico, as well as under two state consumer protection statutes, are deficient for various reasons. The Court leaves intact its denials of the Defendants' motion to dismiss the

End-Payor claims arising under Arizona, Massachusetts, Mississippi, New York, North Carolina, South Dakota, Tennessee, and West Virginia law. Therefore, no further exposition on the claims relating to those states' laws will be provided here. Instead, the Court will furnish an answer on the End-Payors' Illinois-based claims and revisit its rulings with respect to those claims depending upon Puerto Rico and Utah law.

**a. Illinois-Based Claims**

The Defendants contend that the Illinois Antitrust Act, *740 Ill. Comp. Stat. §§ 10/1 to 10/12*, "requires that all indirect purchaser class suits be brought by the Illinois Attorney General." Defs.' Mot. Dismiss End-Payors 14. ***HN26*** Illinois law states that "no person shall be authorized to maintain a class action in any court of this State **[**112]** for indirect purchasers asserting claims under this Act, with the sole exception of this State's Attorney General, who may maintain an action parens patriae as provided in this subsection." *740 Ill. Comp. Stat. § 10/7*.

The End-Payors, however, argue that Illinois law is preempted by *Rule 23* where it purports to govern the procedural mechanism by which litigants can bring suit in federal courts. End-Payors' Mot. Opp'n 19. Although the End-Payors argue that the Illinois Antitrust Act must be preempted by *Rule 23* in accordance with the Supreme Court's analysis in *Shady Grove Orthopedic Associates, P.A. v. Allstate Insurance Co., 559 U.S. 393, 130 S. Ct. 1431, 176 L. Ed. 2d 311 (2010)*, this Court holds that *Shady Grove* is distinguishable, as there is an important distinction between the New York law the Supreme Court scrutinized in Shady Grove and the Illinois law in question here.

In Shady Grove, a plurality of the justices noted that the New York law excluding a particular kind of claim from eligibility for class actions within a section of New York procedural law governing the prerequisites for class action was preempted by *Rule 23*. *Id. at 399* (plurality opinion); see also *id. at 436* (Stevens, J., concurring in part and **[**113]** concurring in the judgment). Justice Scalia, writing for the plurality, noted that (1) the New York law purported to govern procedure; (2) federal procedural rules apply in federal courts; and (3) where state laws conflict with *Rule 23*, *Rule 23* governs, as it "provides a one-size-fits-all formula for deciding the class-action question." *Id. at 399* (plurality opinion).

The Illinois Antitrust Act, however, does not appear in a generally applicable section of that state's laws which merely governs **[*409]** procedure. Instead, it is contained in the state's antitrust statute, which confers substantive rights upon its citizens. Unlike the New York law, which purported to govern the prerequisites for class actions generally, the Illinois Antitrust Act relates to — and is informed by the state's policy decisions in relation to — the rights of those suffering injury as a result of anticompetitive conduct. As a judge in the Southern District of New York noted, quoting Justice Stevens's concurrence in Shady Grove, which, as the narrowest opinion, is controlling, ***HN27*** the Illinois statute "provides a procedure that is 'so bound up with the state-created right or remedy that it defines the scope of that substantive **[**114]** right or remedy.'" *In re Digital Music Antitrust Litig., 812 F. Supp. 2d 390, 416 (S.D.N.Y. 2011)* (quoting *Shady Grove, 559 U.S. at 420* (Stevens, J., concurring in part and concurring in the judgment)).

Were this Court to hold that *Rule 23* trumped the relevant provision of Illinois law here, it would be "an application of a federal rule that effectively abridges, enlarges, or modifies a state-created right or remedy." *Id. at 422*. Such a holding would go too far. For the foregoing reasons, the Illinois claims must be dismissed.

**b. Puerto Rico-Based Claims**

The Defendants argue that the End-Payors cannot assert antitrust claims under Puerto Rico law in light of the Supreme Court's opinion in *Illinois Brick Co. v. Illinois, 431 U.S. 720, 97 S. Ct. 2061, 52 L. Ed. 2d 707 (1977)*. Defs.' Mot. Dismiss End-Payors 15. In Illinois Brick, the Supreme Court held that indirect purchasers of goods produced by firms engaged in anticompetitive conduct were too remote from that conduct to be regarded as injured within the meaning of the Clayton Act. *431 U.S. at 746-48*.

***HN28*** Although a number of states have passed state laws known as Illinois Brick-repealers which specifically grant end-payors the right to sue for antitrust violations, the validity **[**115]** of which was upheld by Supreme Court in *California v. ARC America Corp., 490 U.S. 93, 109 S. Ct. 1661, 104 L. Ed. 2d 86 (1989)*, end-payors cannot assert antitrust claims under the law of states which have not passed such repealers, *Digital Music Antitrust Litig., 812 F. Supp. 2d at 413*. Because Puerto Rico's Antitrust Act, *P.R. Laws, tit. 10, §§ 257-276*, "is modeled after federal antitrust statutes," *Rivera-Muñiz v. Horizon Lines Inc., 737 F. Supp. 2d 57, 61 (D.P.R. 2010)* (citing *Pressure Vessels of P.R., Inc. v. Empire Gas de P.R., 137 D.P.R. 497, 509-18, 1994 Juris P.R. 144 (1994))*, [63] a number of courts have held that, just as indirect purchasers lack standing under federal law, so too do indirect purchasers lack standing under Puerto Rico law. See, e.g., *In re Static Random Access Memory (SRAM) Antitrust Litig., No. 07-md-01819 CW, 2010 U.S. Dist. LEXIS 131002, 2010 WL 5094289, at *4 (N.D. Cal. Dec. 8, 2010)*; *In re TFT-LCD (Flat Panel) Antitrust Litig., 599 F. Supp. 2d 1179, 1188 (N.D. Cal. 2009)* ("The Court finds . . . that the indirect purchaser plaintiffs lack standing under the Puerto Rico statute."). But see *Rivera-Muñiz, 737 F. Supp. 2d at 61* (noting that "[a]lthough federal jurisprudence has implied special standing requirements into private antitrust actions **[**116]** . . . , Puerto Rico explicitly rejects any such limitations" because, as the district court goes on to suggest, "Puerto Rico liberally construes its standing requirements in private antitrust cases" (citations omitted)).

**[*410]** For the foregoing reasons — in light of the fact that Puerto Rico antitrust law has been interpreted in accordance with federal antitrust law, which does not allow claims from indirect purchasers following *Illinois Brick*, and in the absence of evidence showing that Puerto Rico has repealed Illinois Brick — this Court dismisses the claims arising under the Puerto Rico law.

**c. Utah-Based Claims**

The Defendants argue that the End-Payors' claims brought under the Utah Antitrust Act, *Utah Code §§ 76-10-3101 to 76-10-3118*, [64] ought be dismissed for "failure to meet Utah's statutory citizenship or residency requirement." Defs.' Mot. Dismiss End-Payors 16.

The Utah Antitrust Act provides, in relevant part, as follows:

> ***HN29*** A person who is a citizen of this state or a resident of this state and who is injured or is threatened with injury in his business or property by a violation of the Utah Antitrust Act may bring an action for injunctive relief and damages, regardless of whether the person dealt directly or indirectly with the defendant. This remedy is in

---

[63] See also The Shell Co. (P.R.) Ltd. v. Los Frailes Serv. Station, Inc., 551 F. Supp. 2d 127, 135 (D.P.R. 2007) ("Puerto Rico courts generally follow federal antitrust law when interpreting local antitrust laws.").

[64] Since the Defendants' filing, the Utah Antitrust Act has been renumbered. Citations to said law reflect the current **[**117]** codification.

> addition to any other remedies provided by law. It may not diminish or offset any other remedy.*Utah Code § 76-10-3109(1)(a)* (emphasis added). A judge sitting in the District of New Jersey noted in *In re Magnesium Oxide Antitrust Litigation, No. CIV. 10-5943(DRD), 2011 U.S. Dist. LEXIS 121373, 2011 WL 5008090 (D.N.J. Oct. 20, 2011)*, that the plaintiffs "lack statutory standing to sue under Utah's antitrust laws because they have a citizenship/residency requirement." *2011 U.S. Dist. LEXIS 121373, [WL] at *8 n.10* (citing *Utah Code § 76-10-3109(1)(a)*).

***HN30*** Utah's antitrust law therefore appears to require that a person suing under the antitrust statute be a "citizen" or "resident," *Utah Code § 76-10-3109(1)(a)*; the End-Payors' complaint fails to plead that members of the putative class are citizens or residents of Utah. The End-Payors further **[**118]** argue that Shady Grove preempts the Utah residency requirement. See End-Payor's Mem. Opp'n 17-19. For similar reasons to those articulated above, this argument is unavailing. As with the foregoing analysis of the attorney general requirement under Illinois law, this Court holds that Utah's citizenship requirement is properly analyzed as defining the scope of plaintiffs' right to bring antitrust claims (a substantive right granted by the state) and is not merely a procedural provision relating to the litigants' management of claims. This Court therefore dismisses, without prejudice, the End-Payors' claims under Utah law and grants leave to file an amended complaint so that the End-Payors can, if possible, remedy the pleading deficiencies in their consolidated complaint.

## III. CONCLUSION

For the foregoing reasons, the Court:

GRANTS IN PART AND DENIES IN PART the Defendants' motions to dismiss the Direct Purchasers' and the End-Payors' claims challenging the AstraZeneca/Ranbaxy Agreement. Specifically, this Court GRANTS the Defendants' motions to dismiss insofar as the Direct Purchasers (on federal statute of limitations grounds) and the End-Payors (at least in the twenty-three states mentioned **[**119]** above which have a statute of limitations of four years or lower) seek to challenge the AstraZeneca/Ranbaxy Agreement. This Court DENIES **[*411]** the Defendants' motions to dismiss insofar as the Direct Purchasers and the End-Payors seek to challenge continuing harms flowing from the AstraZeneca/Ranbaxy Agreement. Additionally, this Court DENIES the Defendants' motion to dismiss the End-Payors insofar as the End-Payors seek to challenge the AstraZeneca/Ranbaxy Agreement in the three states mentioned above which have a six-year statute of limitations.

DENIES the Defendants' motions to dismiss with respect to the remainder of the Direct Purchasers' claims.

DENIES the Defendants' motion to dismiss the End-Payors' claims for lack of standing.

GRANTS IN PART AND DENIES IN PART the Defendants' motion to dismiss the End-Payors' claims under state antitrust and consumer protection laws. Specifically, the Court GRANTS WITH PREJUDICE the Defendants' motion to dismiss the End-Payor claims arising under Illinois and Puerto Rico law. The Court GRANTS WITHOUT PREJUDICE the Defendants' motion to dismiss the End-Payor claims arising under Utah law, with leave to file an amended complaint. The

Court reaffirms, **[**120]** without further explication, that the Defendants' motion to dismiss the End-Payor claims arising under Arizona, Massachusetts, Mississippi, New York, North Carolina, South Dakota, Tennessee, and West Virginia law is DENIED.

**SO ORDERED.**

By the Court,

/s/ William G. Young

WILLIAM G. YOUNG

DISTRICT JUDGE

EXHIBIT 274

LexisNexis

Neutral
As of: August 12, 2014 9:13 AM EDT

# In re Nexium Esomeprazole Antitrust Litig.

United States District Court for the District of Massachusetts
December 11, 2013, Decided; December 11, 2013, Filed
CIVIL ACTION NO. 12-md-02409-WGY

**Reporter:** 296 F.R.D. 47; 2013 U.S. Dist. LEXIS 173353; 87 Fed. R. Serv. 3d (Callaghan) 219; 2013-2 Trade Cas. (CCH) P78,612; 2013 WL 6486917
IN RE NEXIUM (ESOMEPRAZOLE) ANTITRUST LITIGATION

**Subsequent History:** Summary judgment granted, in part, summary judgment denied, in part by *In re Nexium (Esomeprazole) Antitrust Litig., 2014 U.S. Dist. LEXIS 17718 (D. Mass., Feb. 12, 2014)*

**Prior History:** *In re Nexium (Esomeprazole) Antitrust Litig., 2013 U.S. Dist. LEXIS 171273 (D. Mass., Nov. 27, 2013)*

**Core Terms**

generic, antitrust, class certification, class member, brand, calculate, bypass, overcharge, class action, wholesaler, assignee, joinder, but-for, methodology, erosion, expert report, pharmaceutical, predominance, numerosity, shoe, putative class member, class representative, net price, impracticable, yardstick, pill, uninjured, adequacy, discount, putative

**Counsel: [**1]** For Allied Services Division Welfare Fund, Laborers International Union of North America Local 17 Health Care Fund, Consolidated Plaintiffs: David B. Franco, LEAD ATTORNEY, PRO HAC VICE, The Dugan Law Firm, APLC, New Orleans, LA; Douglas R. Plymale, James R. Dugan, II, LEAD ATTORNEYS, The Dugan Law Firm, New Orleans, LA; Bruce E. Gerstein, Garwin Gerstein & Fisher LLP, New York, NY; Glen DeValerio, Berman DeValerio, Boston, MA; Nathaniel L. Orenstein, Berman DeValerio Pease Tabacco Burt & Pucillo, Boston, MA; Thomas G. Shapiro, Shapiro Haber & Urmy LLP, Boston, MA.

For Laborers International Union of North America Local 35 Health Care Fund, Consolidated Plaintiff: Bruce E. Gerstein, Garwin Gerstein & Fisher LLP, New York, NY; Glen DeValerio, Berman DeValerio, Boston, MA; Nathaniel L. Orenstein, Berman DeValerio Pease Tabacco Burt & Pucillo, Boston, MA; Thomas G. Shapiro, Shapiro Haber & Urmy LLP, Boston, MA.

For A.F. of L. - A.G.C. Building Trades Welfare Plan, Consolidated Plaintiff: Bruce E. Gerstein, Garwin Gerstein & Fisher LLP, New York, NY; Glen DeValerio, Berman DeValerio, Boston, MA; Nathaniel L. Orenstein, Berman DeValerio Pease Tabacco Burt & Pucillo, Boston, MA.

For American **[**2]** Sales Company, LLC, On behalf of itself and all others similarly situated, Consolidated Plaintiff: Andrew J. Vasicek, David S. Nalven, Thomas M. Sobol, LEAD ATTORNEYS, Donna M. Evans, Hagens Berman Sobol Shapiro LLP, Cambridge, MA; Kristen Johnson Parker, LEAD ATTORNEY, PRO HAC VICE, Hagens Berman Sobol Shapiro LLP,

Cambridge, MA; Bruce E. Gerstein, Garwin Gerstein & Fisher LLP, New York, NY; Don Barrett, Barrett Law Office, Lexington, MS; John D. Radice, Radice Law Firm, PC, Long Beach, NJ.

For Value Drug Company, Consolidated Plaintiff: Brian D. Brooks, LEAD ATTORNEY, Smith Segura & Raphael LLP, New York, NY; Ephraim R. Gerstein, LEAD ATTORNEY, PRO HAC VICE, Bruce E. Gerstein, Garwin Gerstein & Fisher LLP, New York, NY; Joseph Opper, LEAD ATTORNEY, PRO HAC VICE, Garwin, Bronzaft, Gerstein & Fisher, New York, NY; Peter S. Pearlman, LEAD ATTORNEY, PRO HAC VICE, Cohn, Lifland, Pearlman, Herrmann & Knopf, Saddle Brook, NJ; Russell A. Chorush, LEAD ATTORNEY, PRO HAC VICE, Heim Payne & Chorush LLP, Houston, TX; Susan C. Segura, LEAD ATTORNEY, Smith Segura & Raphael, LLP, Alexandria, LA; Thomas M. Sobol, LEAD ATTORNEY, Donna M. Evans, Hagens Berman Sobol Shapiro LLP, Cambridge, MA; Elena **[**3]** Chan, PRO HAC VICE, Garwin Gerstein & Fisher LLP, New York, NY.

For Burlington Drug Company Inc., Consolidated Plaintiff: Brian D. Brooks, LEAD ATTORNEY, Smith Segura & Raphael LLP, New York, NY; Ephraim R. Gerstein, LEAD ATTORNEY, PRO HAC VICE, Bruce E. Gerstein, Garwin Gerstein & Fisher LLP, New York, NY; Peter S. Pearlman, LEAD ATTORNEY, PRO HAC VICE, Cohn, Lifland, Pearlman, Herrmann & Knopf, Saddle Brook, NJ; Russell A. Chorush, LEAD ATTORNEY, PRO HAC VICE, Heim Payne & Chorush LLP, Houston, TX; Susan C. Segura, LEAD ATTORNEY, Smith Segura & Raphael, LLP, Alexandria, LA; Thomas M. Sobol, LEAD ATTORNEY, Donna M. Evans, Hagens Berman Sobol Shapiro LLP, Cambridge, MA; Elena Chan, PRO HAC VICE, Garwin Gerstein & Fisher LLP, New York, NY.

For Rochester Drug Co-Operative, Inc., On Behalf of itself and all others similarly situated, Consolidated Plaintiff: Archana Tamoshunas, LEAD ATTORNEY, Taus, Cebulash & Landau, LLP, New York, NY; Caitlin G. Coslett, Daniel C. Simons, David F. Sorensen, PRO HAC VICE, Eric L. Cramer, LEAD ATTORNEYS, Berger & Montague PC, Philadelphia, PA; Joseph T. Lukens, LEAD ATTORNEY, FARUQI & FARUQI, JENKINTOWN, PA; Nicholas Urban, LEAD ATTORNEY, Daniel Walker, PRO **[**4]** HAC VICE, Berger & Montague, PC, Philadelphia, PA; Peter Kohn, LEAD ATTORNEY, PRO HAC VICE, Faruqi & Faruqi LLP, Jenkintown, PA; Thomas M. Sobol, LEAD ATTORNEY, Donna M. Evans, Hagens Berman Sobol Shapiro LLP, Cambridge, MA; Bruce E. Gerstein, Garwin Gerstein & Fisher LLP, New York, NY.

For Laborers International Union of North America Local 345 Health Care Fund, On behalf of itself and all others similarly situated, Consolidated Plaintiff: Douglas R. Plymale, James R. Dugan, II, LEAD ATTORNEYS, The Dugan Law Firm, New Orleans, LA; Frank R. Schirripa, LEAD ATTORNEY, PRO HAC VICE, Hach Rose Schirripa & Cheverie, LLP, New York, NY; Michael A London, LEAD ATTORNEY, Douglas & London, New York, NY; Michael Aaron Rose, LEAD ATTORNEY, Hach & Rose, New York, NY; Virginia E Anello, LEAD ATTORNEY, Douglas & London, P.C., New York, NY; Bruce E. Gerstein, Garwin Gerstein & Fisher LLP, New York, NY.

For Walgreen Co., The Kroger Co., Safeway Inc., Supervalu, Inc., HEB GROCERY CO. LP, Consolidated Plaintiffs: Anna T. Neill, PRO HAC VICE, Douglas H. Patton, LEAD ATTORNEYS, Kenny Nachwalter, P.A., Miami, FL; Lauren C. Ravkind, PRO HAC VICE, Scott E. Perwin, LEAD ATTORNEYS, Kenny Nachwalter, P.A., Miami, **[**5]** FL.

For Giant Eagle, Inc, Consolidated Plaintiff: Bernard D. Marcus, Moira E. Cain-Mannix, LEAD ATTORNEYS, Marcus & Shapira, Pittsburgh, PA; Brian C. Hill, LEAD ATTORNEY, Marcus & Shapira LLP, Pittsburgh, PA; Erin Gibson Allen, James F. Rosenberg, PRO HAC VICE, Jonathan D. Marcus, LEAD ATTORNEYS, Marcus & Shapira LLP, Pittsburgh, PA; Anna T. Neill, Kenny Nachwalter, P.A., Miami, FL.

For Rite Aid Corporation, Rite Aid Headquarters Corporation, Maxi Drug, Inc., doing business as Brooks Pharmacy, Eckerd Corporation, Consolidated Plaintiffs: Barry L. Refsin, LEAD ATTORNEY, PRO HAC VICE, Hangley, Aronghick, Segal, Pudlin & Schiller, Philadelphia, PA; Douglas H. Patton, LEAD ATTORNEY, Anna T. Neill, Kenny Nachwalter, P.A., Miami, FL; Eric L. Bloom, Monica L. Rebuck, LEAD ATTORNEYS, PRO HAC VICE, Hangley Aronchick Segal Pudlin & Schiller, Harrisburg, PA.

For JCG (PJC) USA, LLC, Consolidated Plaintiff: Barry L. Refsin, LEAD ATTORNEY, PRO HAC VICE, Hangley, Aronghick, Segal, Pudlin & Schiller, Philadelphia, PA; Douglas H. Patton, LEAD ATTORNEY, Anna T. Neill, Kenny Nachwalter, P.A., Miami, FL; Monica L. Rebuck, LEAD ATTORNEY, PRO HAC VICE, Hangley Aronchick Segal Pudlin & Schiller, Harrisburg, **[**6]** PA.

For Amerisourcebergen Drug Corporation, Meijer Distribution, Inc., Intervenor Plaintiffs: Donald W. Myers, LEAD ATTORNEY, PRO HAC VICE, Buchanan Ingersoll & Rooney PC, Philadelphia, PA.

For Meijer, Inc., Plaintiff: Bradley J. Demuth, Linda P. Nussbaum, LEAD ATTORNEYS, PRO HAC VICE, Peter A. Barile, III, Grant & Eisenhofer PA, New York, NY; David P. Germaine, John P. Bjork, LEAD ATTORNEYS, PRO HAC VICE, Vanek Vickers & Masini PC, Chicago, IL; JAMES E. CECCHI, LEAD ATTORNEY, CARELLA BYRNE CECCHI OLSTEIN BRODY & AGNELLO, P.C., ROSELAND, NJ; Lindsey H. Taylor, LEAD ATTORNEY, CARELLA, BYRNE, CECCHI, OLSTEIN, BRODY & AGNELLO, ROSELAND, NJ; Thomas M. Sobol, LEAD ATTORNEY, Donna M. Evans, Hagens Berman Sobol Shapiro LLP, Cambridge, MA; Bruce E. Gerstein, Garwin Gerstein & Fisher LLP, New York, NY.

For Fraternal Order of Police Miami Lodge 20 Insurance Trust Fund, Plaintiff: Anne K. Fornecker, PRO HAC VICE, HILLIARD & SHADOWEN LLC, AUSTIN, TX; Bruce E. Gerstein, Garwin Gerstein & Fisher LLP, New York, NY; Glen DeValerio, Berman DeValerio, Boston, MA; Jayne A. Goldstein, Pomerantz Grossman Hufford Dahlstrom & Gross, LLP, Weston, FL; Natalie Finkelman Bennett, Shepherd, Finkelman, Miller & Shah, **[**7]** LLP, Media, PA; Nathaniel L. Orenstein, Berman DeValerio Pease Tabacco Burt & Pucillo, Boston, MA; Steve D. Shadowen, Hilliard & Shadowen LLC, Mechanicsburg, PA.

For New York Hotel Trades Council and Hotel Assoc. of New York City, Inc. Health Benefits Fund, Plaintiff: Christopher Lometti, LEAD ATTORNEY, Cohen Milstein Sellers & Toll PLLC, Washington, DC; J. Douglas Richards, Sharon K. Robertson, LEAD ATTORNEYS, PRO HAC VICE, Cohen Milstein Sellers & Toll PLLC, New York, NY; Bruce E. Gerstein, Garwin Gerstein & Fisher LLP, New York, NY; George Farah, Cohen Milstein Sellers & Toll PLLC, New York, NY; Glen DeValerio, Berman DeValerio, Boston, MA; Nathaniel L. Orenstein, Berman DeValerio Pease Tabacco Burt & Pucillo, Boston, MA.

For United Food Workers and Commercial Workers Unions and Employers Midwest Health Benefits Fund, Plaintiff: Bethany R. Turke, Edward A. Wallace, Justin N. Boley, Kenneth A. Wexler,

LEAD ATTORNEYS, PRO HAC VICE, Wexler Wallace LLP, Chicago, IL; Bruce E. Gerstein, Garwin Gerstein & Fisher LLP, New York, NY; Glen DeValerio, Berman DeValerio, Boston, MA; Jonathan Shapiro, Stern, Shapiro, Weissberg & Garin, Boston, MA; Kimberly A. Dougherty, Janet Jenner & Suggs, LLC, **[**8]** Boston, MA; Nathaniel L. Orenstein, Berman DeValerio Pease Tabacco Burt & Pucillo, Boston, MA.

For Michigan Regional Council of Carpenters Employee Benefits Fund, Plaintiff: Christopher M. Burke, Walter W. Noss, LEAD ATTORNEYS, PRO HAC VICE, Scott & Scott LLP, San Diego, CA; Donald A. Broggi, LEAD ATTORNEY, PRO HAC VICE, Joseph P. Guglielmo, Scott & Scott LLP, New York, NY; Lisa J. Rodriguez, LEAD ATTORNEY, Rodriguez & Richards, LLC, Haddonfield, NJ; NICOLE M. ACCHIONE, LEAD ATTORNEY, TRUJILLO RODRIGUEZ & RICHARDS, LLP, HADDONFIELD, NJ; Penelope Abdiel, LEAD ATTORNEY, PRO HAC VICE, Scott + Scott, Attorneys at Law, LLP, New York, NY; Bruce E. Gerstein, Garwin Gerstein & Fisher LLP, New York, NY; Glen DeValerio, Berman DeValerio, Boston, MA; Nathaniel L. Orenstein, Berman DeValerio Pease Tabacco Burt & Pucillo, Boston, MA.

For International Union of Machinists and Aerospace Workers District No. 15 Health Fund, Plaintiff: Brian D. Penny, LEAD ATTORNEY, PRO HAC VICE, Goldman Scarlato Karon & Penny PC, Wayne, PA; Kevin P. Roddy, LEAD ATTORNEY, PRO HAC VICE, Wilentz, Goldman & Spitzer PA, Woodbridge, NJ; Bruce E. Gerstein, Garwin Gerstein & Fisher LLP, New York, NY; Glen DeValerio, Berman **[**9]** DeValerio, Boston, MA; Nathaniel L. Orenstein, Berman DeValerio Pease Tabacco Burt & Pucillo, Boston, MA.

For International Brotherhood Of Electrical Workers Local 595 Health And Welfare Fund, Plaintiff: Aaron D. Kaufmann, LEAD ATTORNEY, PRO HAC VICE, Leonard Carder LLP, Oakland, CA; Christina C. Sharp, LEAD ATTORNEY, PRO HAC VICE, Girard Gibbs LLP, San Francisco, CA; Daniel C. Girard, LEAD ATTORNEY, PRO HAC VICE, Girard Gibbs & DeBartolomeo LLP, San Francisco, CA; Bruce E. Gerstein, Garwin Gerstein & Fisher LLP, New York, NY; Glen DeValerio, Berman DeValerio, Boston, MA; Nathaniel L. Orenstein, Berman DeValerio Pease Tabacco Burt & Pucillo, Boston, MA.

For A.F. of L., Plaintiff: Bruce E. Gerstein, Garwin Gerstein & Fisher LLP, New York, NY; Glen DeValerio, Berman DeValerio, Boston, MA.

For Plaintiffs, Plaintiff: David F. Sorensen, Berger & Montague, P.C., Philadelphia, PA.

For Dr. Reddy's Laboratories Ltd., Dr. Reddy's Laboratories, Inc., Defendants: Ajay Kayal, Ellen T. Lowenthal, LEAD ATTORNEYS, PRO HAC VICE, Budd Larner PC, Short Hills, NJ; Alan H. Pollack, LEAD ATTORNEY, PRO HAC VICE, Hopgood, Calimafde, Kalil, Blaustein & Judlowe, New York, NY; Andrew J. Miller, LEAD ATTORNEY, Budd **[**10]** Larner PC, Short Hills, NJ; Brian T. Moriarty, LEAD ATTORNEY, Hamilton Brook Smith & Reynolds, P.C., Boston, MA; John M. Gore, Jonathan B. Berman, Kevin D. McDonald, Stephanie L. Resnik, LEAD ATTORNEYS, PRO HAC VICE, Jones Day, Washington, DC; Andrew D. Lazerow, Covington & Burling LLP, Washington, DC; Christopher K. Albert, Hamilton Brook Smith & Reynolds, P.C., Concord, MA.

For AstraZeneca LP, Defendant: Ashley E. Bass, Courtney R. Forrest, Einar Stole, Enrique D. Longton, Evie Spanos, Thomas A. Isaacson, LEAD ATTORNEYS, Andrew D. Lazerow, Jonathan Gimblett, Peter Colwell, PRO HAC VICE, Covington & Burling LLP, Washington, DC;

Benjamin M. Greenblum, Jonathan B. Pitt, Kannon K. Shanmugam, Marcie R. Ziegler, Stanley E. Fisher, LEAD ATTORNEYS, Adam R. Tarosky, James H. Weingarten, John E. Joiner, John E. Schmidtlein, Paul B. Gaffney, PRO HAC VICE, Williams & Connolly LLP, Washington, DC; Dane H. Butswinkas, PRO HAC VICE, Williams & Connolly, Washington, DC; James Douglas Baldridge, Venable LLP, Washington, DC; Michael P. Kelly, PRO HAC VICE, Nicholas W. Allen, McCarter & English LLP, Wilmington, DE; Timothy C. Hester, Covington & Burling, Washington, DC; William A. Zucker, McCarter & **[**11]** English, LLP, Boston, MA.

For RANBAXY LABORATORIES, LTD., Ranbaxy Inc., Ranbaxy Pharmaceuticals, Inc., Defendants: Lisa Jose Fales, Sarah Choi, LEAD ATTORNEYS, PRO HAC VICE, Danielle R. Foley, Venable LLP, Washington, DC; Andrew D. Lazerow, Covington & Burling LLP, Washington, DC; James Douglas Baldridge, PRO HAC VICE, Venable LLP, Washington, DC; Leslie F. Su, Minerva Law, P.C., Andover, MA.

For Astrazeneca AB, Defendant: Ashley E. Bass, Courtney R. Forrest, Einar Stole, Enrique D. Longton, Evie Spanos, Thomas A. Isaacson, LEAD ATTORNEYS, Jonathan Gimblett, Peter Colwell, PRO HAC VICE, Covington & Burling LLP, Washington, DC; Benjamin M. Greenblum, Jonathan B. Pitt, Kannon K. Shanmugam, Marcie R. Ziegler, Stanley E. Fisher, LEAD ATTORNEYS, Adam R. Tarosky, James H. Weingarten, John E. Joiner, John E. Schmidtlein, Paul B. Gaffney, PRO HAC VICE, Williams & Connolly LLP, Washington, DC; Andrew D. Lazerow, Covington & Burling LLP, Washington, DC; Dane H. Butswinkas, PRO HAC VICE, Williams & Connolly, Washington, DC; James Douglas Baldridge, Venable LLP, Washington, DC; Michael P. Kelly, PRO HAC VICE, McCarter & English LLP, Wilmington, DE; Timothy C. Hester, Covington & Burling, Washington, **[**12]** DC.

For Ranbaxy Laboratories, LTD, Defendant: James Douglas Baldridge, LEAD ATTORNEY, PRO HAC VICE, Venable LLP, Washington, DC; Andrew D. Lazerow, Covington & Burling LLP, Washington, DC.

For TEVA USA, INC., Teva Pharmaceutical Industries, Ltd., Defendants: Adam L. Sisitsky, Laurence A. Schoen, LEAD ATTORNEYS, Mintz, Levin, Cohn, Ferris, Glovsky & Popeo, PC, Boston, MA; Katie Einspanier, Thea Cohen, LEAD ATTORNEYS, Christopher M. Jackson, Karen N. Walker, Rebecca A. Koch, PRO HAC VICE, Kirkland & Ellis LLP, Washington, DC; Andrew D. Lazerow, Covington & Burling LLP, Washington, DC; James Douglas Baldridge, Venable LLP, Washington, DC; Jay P. Lefkowitz, PRO HAC VICE, Kirkland & Ellis LLP, New York, NY.

For Aktiebolaget Hassle, Defendant: Ashley E. Bass, Courtney R. Forrest, Einar Stole, Enrique D. Longton, Evie Spanos, Thomas A. Isaacson, LEAD ATTORNEYS, PRO HAC VICE, Andrew D. Lazerow, Covington & Burling LLP, Washington, DC; Benjamin M. Greenblum, Jonathan B. Pitt, Kannon K. Shanmugam, Marcie R. Ziegler, Stanley E. Fisher, LEAD ATTORNEYS, Adam R. Tarosky, James H. Weingarten, John E. Joiner, John E. Schmidtlein, Paul B. Gaffney, PRO HAC VICE, Williams & Connolly LLP, Washington, DC; **[**13]** Dane H. Butswinkas, PRO HAC VICE, Williams & Connolly, Washington, DC; Jonathan Gimblett, Peter Colwell, PRO HAC VICE, Covington & Burling LLP, Washington, DC; Michael P. Kelly, PRO HAC VICE, McCarter & English LLP, Wilmington, DE; Timothy C. Hester, Covington & Burling, Washington, DC.

For Value Drug Company, Burlington Drug Company Inc., Interested Parties: Bruce E. Gerstein, Garwin Gerstein & Fisher LLP, New York, NY; Elena Chan, PRO HAC VICE, Garwin Gerstein & Fisher LLP, New York, NY.

For CaremarkPCS Health, LLC, Interested Party: Lawrence M. Kraus, LEAD ATTORNEY, Foley & Lardner LLP, Boston, MA.

For McKesson Corporation, Interested Party: Nicholas S. Napolitan, LEAD ATTORNEY, PRO HAC VICE, Morrison & Foerster LLP, San Francisco, CA.

For Express Scripts, Inc., Intervenor: Thomas E. Peisch, LEAD ATTORNEY, Conn, Kavanaugh, Rosenthal, Peisch & Ford, LLP, Boston, MA; Michael J. Rossi, Clark, Hunt, Ahern & Embry, Cambridge, MA.

For Cardinal Health, Inc., Intervenor: Robert J. Tucker, LEAD ATTORNEY, PRO HAC VICE, BakerHostetler, Columbus, OH.

**Judges:** WILLIAM G. YOUNG, DISTRICT JUDGE.

**Opinion by:** WILLIAM G. YOUNG

**Opinion**

**[*50]** YOUNG, D.J.

**MEMORANDUM AND ORDER**

**I. INTRODUCTION**

This case presents a multidistrict, putative class action **[**14]** against AstraZeneca AB, Aktiebolaget Hassle, and AstraZeneca LP (collectively, "AstraZeneca"), Ranbaxy Pharmaceuticals, Inc., Ranbaxy Inc. and Ranbaxy Laboratories, Ltd. (collectively, "Ranbaxy"); Teva Pharmaceutical Industries, Ltd. and Teva Pharmaceuticals USA, Inc. (collectively, "Teva"); and Dr. Reddy's Laboratories Ltd. and Dr. Reddy's Laboratories, Inc. (collectively, "Dr. Reddy's") (collectively, with Ranbaxy and Teva, the "Generic Defendants") (collectively, with AstraZeneca, the "Defendants") for alleged violations of federal antitrust laws involving **[*51]** AstraZeneca's heartburn medication, Nexium. This opinion addresses a motion for class certification of the Direct Purchaser plaintiffs. The putative Direct Purchaser class is comprised of wholesalers and retailers that purchased brand drug Nexium directly from AstraZeneca and that "will purchase generic Nexium directly from one or more of other Generic Defendants." Consolidated Am. Compl. & Demand Jury Trial ("Direct Purchasers Compl."), ¶ 19, ECF No. 131. They move for class certification under *Federal Rules of Civil Procedure ("Rules") 23(a)* and *(b)(3)*. Id. ¶ 19-23, 38.

**II. ANALYSIS**

The Defendants raise many of the same challenges **[**15]** to the Direct Purchasers' motion for class certification as they did against the End-Payors. Compare Defs.' Opp'n Direct Purchasers Class Pls.' Mot. Class Certification ("Defs.' Opp'n"), ECF No. 377, with Defs.' Mem. Law Opp'n End-Payor Pls.' Mot. Class Certification ("Defs.' End-Payor Mem."), ECF No. 376. On November 14, 2013, the Court granted the End-Payors class certification. Mem. & Order, ECF No. 519. Noting that the same analysis applies with full force and effect to the Direct Purchaser class, the Court here focuses on those matters germane to the Direct Purchasers.

**A.** *Rule 23(a)(1)*: Numerosity of the Class

In a motion for class certification, the moving party must establish the four threshold requirements under *Rule 23(a)*. *Wal-Mart Stores, Inc. v. Dukes, 131 S. Ct. 2541, 2548, 180 L. Ed. 2d 374 (2011)*. Unlike their opposition to the End-Payors' motion for class certification, here the Defendants strongly contest whether the Direct Purchaser plaintiffs satisfy the numerosity requirement. See Defs.' Opp'n 6-13. Numerosity requires the class to be "so numerous that joinder of all members is impracticable." *Fed. R. Civ. P. 23(a)*. Courts have generally held that classes exceeding forty plaintiffs are **[**16]** deemed sufficient, although courts within this circuit have certified classes with sizes similar to that presented here. See, e.g., *In re Prograf Antitrust Litig., No. 1:11-cv-10344-RWZ, 2013 U.S. Dist. LEXIS 62043, 2013 WL 2395083, at *1 (D. Mass. Apr. 23, 2013)* (Zobel, J.) (certifying a class of twenty-five pharmaceutical wholesalers); *In re Citigroup, Inc. Capital Accumulation Plan Litig., No. 00cv11912-NG, 2010 U.S. Dist. LEXIS 143405, 2010 WL 9067986, at *8-10 (D. Mass. Jan. 6, 2010)* (Gertner, J.), aff'd, *652 F.3d 88 (1st Cir. 2011)* (certifying a subclass of twenty participants in an employee stock compensation program).

**1. Class Below Forty Members**

The expert for the named Direct Purchasers, Dr. Raymond Hartman, measures the putative class according to two "but-for" generic entry dates, April 14, 2008 and January 1, 2012, resulting in either thirty-one or twenty-six class members, respectively. Notice Filing Unredacted Copy Decl. Raymond S. Hartman Supp. Certification Class Direct Purchasers Nexium, Ex. 1, Decl. Raymond S. Hartman Supp. Certification Class Direct Purchasers Nexium ("Hartman Decl."), ¶¶ 37, 65, ECF No. 401-1. The Court however, adopts the Defendants' figures of twenty-nine or twenty-four members, which account for the consolidation **[**17]** of two entities with their parent corporations. Decl. Thomas A. Isaacson Supp. Defs.' Opp'n Direct Purchaser Class Pls.' Mot. Class Certification (Dkt. No. 266), Ex. 1, Expert Report Dr. John H. Johnson, IV Direct Purchaser Class Certification, ("Johnson Rpt.") ¶ 11 n.11, ECF No. 356-1.

While the Defendants point out that this range falls well below the suggested threshold of forty members, Defs.' Opp'n 8, (citing *García-Rubiera v. Calderón, 570 F.3d 443, 460 (1st Cir. 2009)* and *In re Relafen Antitrust Litig., 218 F.R.D. 337, 342 (D. Mass. 2003)*, which relied on the suggested number of forty class members to satisfy numerosity), it is clear that district courts have taken a more flexible approach to the numerosity analysis. The named Direct Purchasers cite to cases from this circuit, and to numerous cases from other circuits, to demonstrate the frequency with which courts have certified classes of fewer than forty members. Reply Br. Further Supp. Direct Purchaser Class Pls.' Mot. Class Certification ("Pls.' Reply **[*52]** Brief"), 4-5 nn.11-13, ECF No. 395. For example, in a multidistrict generic delay case in this district, Judge Rya Zobel, after a "rigorous analysis" under the requirements **[**18]** of *Rule 23(a)*, certified a class of twenty-five pharmaceutical wholesalers suing as direct purchasers. *In re Prograf Antitrust Litig., 2013 U.S. Dist. LEXIS 62043, 2013 WL 2395083, at *1 n.2*. In another generic delay case, a class of thirty-three direct purchasers was certified "[b]ecause of the complexity and sheer volume of discovery in this case and because the 33 direct purchasers are located across the country." *In re Wellbutrin XL Antitrust Litig., Civ. Action No. 08-2431, 2011 U.S. Dist. LEXIS 90075, 2011 WL 3563385, at *3 (E.D. Pa. Aug. 11, 2011)*.

The test for numerosity requires the Court to address the question of whether "joinder of all members is impracticable." *Fed. R. Civ. P. 23(a)(1)*. The reasoning of this Court in a recent case is instructive. This Court, in *Liberty Media Holdings, LLC v. Swarm Sharing Hash File, 821 F. Supp. 2d 444 (D. Mass. 2011)*, held that permissive joinder of thirty-eight defendants was proper

under *Rule 20*. See *id. at 451-52*. The moving plaintiffs in Liberty Media met the dual requirements for *Rule 20*: first, their claims arose from the "same transaction or occurrence," because all defendants were "part of a BitTorrent swarm that infringed upon Liberty Media's rights by collectively downloading and distributing **[**19]** its copyrighted Motion Picture file," *id. at 451*; and second, their copyright infringement claims involved "common questions of law and fact" that were identical against all defendants. Id. Even though "certain defendants may later present different factual circumstances to support individual legal defenses, at this stage in the litigation, joinder is proper based on the common questions of law and fact . . . ." Id. The Court's joinder analysis in Liberty Media, relying on non-numeric factors like "same occurrence" and commonality, provides a comparative line of reasoning to the present question — whether numerosity is met.

Acknowledging that the size of the putative Direct Purchasers class alone does not establish a clear case for numerosity, the Court considers non-numeric factors to determine whether joinder of twenty-four or twenty-nine members is impracticable in this present case.

**2. Subjective Factors in Numerosity Analysis**

Subjective factors such as the geographic location of proposed class members, the nature of the action, and matters of judicial economy must be taken into account in this inquiry. See 5 James Wm. Moore et al., *Moore's Federal Practice § 23.22[1][a]*-[f] (3d ed. **[**20]** 1999) (listing subjective factors to consider when determining whether a class is sufficiently numerous); see also *Meijer, Inc. v. Warner Chilcott Holdings Co. III, 246 F.R.D. 293, 306 (D.D.C. 2007)* ("Significantly, 'the test for impracticability of joinder is not simply a test of the number of class members. When the class is large, numbers alone are dispositive, but when the class is small, factors other than numbers are significant.'") (quoting *Riordan v. Smith Barney, 113 F.R.D. 60, 62 (N.D. Ill. 1986))*. First, the named Direct Purchasers state that the putative class members are geographically dispersed "throughout the country," and joinder would be "difficult, inconvenient, and costly." Notice Filing Unredacted Copy Direct Purchasers Class Pls.' Mem. Supp. Mot. Class Certification, Ex. 1, Direct Purchasers Class Pls.' Mem. Law Supp. Mot. Class Certification ("Pls.' Mem.") 7, ECF No. 365-1. Second, the Court recognizes that many courts have given favorable treatment to class actions in the "private enforcement of antitrust laws." *Town of New Castle v. Yonkers Contracting Co., 131 F.R.D. 38, 41 (S.D.N.Y. 1990)* ("Since private enforcement of antitrust laws provides a supplement **[**21]** to governmental enforcement, it is our view that class action treatment of alleged antitrust violations is appropriate and desirable."); see, e.g., *In re Carbon Black Antitrust Litig., No. Civ.A. 03-10191-DPW, 2005 U.S. Dist. LEXIS 660, 2005 WL 102966 at *9 (D. Mass. 2005)* (Woodlock, J.) (explaining that class certification analysis was conducted "recognizing the interplay between the policy objectives of both the antitrust provisions and of class certification," and that "[c]ourts have noted that class actions are a particularly appropriate mechanism for achieving such enforcement . . . ."); *In re Vitamins Antitrust Litig., 209 F.R.D. 251, 258* **[*53]** (D.D.C. 2002) ("Moreover, it has long been recognized that class actions play an important role in the private enforcement of antitrust actions."). The Court adopts these views here. Third, judicial economy would best be served by certifying the Direct Purchaser class, primarily because all putative class members seek damages stemming from the same, identical transactions between AstraZeneca and the Generic Defendants. Despite the Defendants' arguments that modern discovery and litigation practices would lessen the costs of joinder, see Defs.' Opp'n 10, and

that individual **[**22]** class members are economically capable of bringing individual suits,[1] it seems here that litigating the same exact claims in multiple courts across the country is "impracticable."

The Court thus determines the numerosity requirement to have been sufficiently met under *Rule 23(a)(1)*, and accepts the Defendants' calculations for the class size to be twenty-four or twenty-nine members, depending on the determination of a "but-for" generic entry date.

As the Direct Purchaser plaintiffs have properly met the requirements under *Rule 23(a)(2)* and *(3)*, commonality and typicality, the Court will move on to address the fourth requirement, adequacy of class representation.

**B.** *Rule 23(a)(4)*: Adequacy of Representation

*Rule 23(a)(4)* requires that the representative parties will "fairly and adequately protect the interests of the class," *Fed. R. Civ. P. 23(a)(4)*, and that "the interests of the representative party will not conflict with the interests of any of the class members." *Andrews v. Bechtel Power Corp., 780 F.2d 124, 130 (1st Cir. 1985)*. **[**23]** Adequacy also requires that class counsel be "qualified, experienced and able to vigorously conduct the proposed litigation." *Id. at 130*.

The Defendants do not challenge the competency of class counsel, and the record contains no evidence impugning their qualifications. See Linda S. Mullenix, Taking Adequacy Seriously: The Inadequate Assessment of Adequacy in Litigation and Settlement Classes, *57 Vand. L. Rev. 1687 (2004)*. Rather, the Defendants dispute whether assignees of direct purchaser claims can be included in the proposed class and serve as class representatives. Defs.' Opp'n 20. Class representatives, of course, "must be part of the class." *Wal-Mart, 131 S. Ct. at 2550* (quoting *East Tex. Motor Freight Sys., Inc. v. Rodriguez, 431 U.S. 395, 403, 97 S. Ct. 1891, 52 L. Ed. 2d 453 (1977))*. Specifically, the Defendants argue that two of the five named Direct Purchaser plaintiffs, American Sales Company, LLC ("ASC") and Meijer, Inc. with Meijer Distribution, Inc. (collectively, "Meijer"), are improperly included in the proposed class because "[n]either bought Nexium from AstraZeneca." Defs.' Opp'n 20. To support this claim, the Defendants point out that ASC and Meijer were excluded from the list of direct purchasers **[**24]** in Dr. Hartman's expert report. Id.; see Hartman Decl., Attachment D.1, Direct Customer List Scenario 1, D.2, Direct Customer List Scenario 2. This argument is not compelling. This list, as the named Direct Purchasers note, is not a list of plaintiffs with legal standing to sue, but rather is a list of direct purchasers taken from AstraZeneca's sales data. Pls.' Reply Brief 19 n.68. As stated in the Direct Purchasers' complaint and expert report, ASC and Meijer are both assignees of the claims of direct purchasers that bought Nexium from AstraZeneca within the class period. ASC sues on behalf of itself and on behalf of McKesson Corp., and Meijer sues on behalf of Frank W. Kerr Co. Direct Purchasers Compl. ¶¶ 19-20; Johnson Rpt. ¶ 12. As a result, the Court holds that assignees ASC and Meijer can serve as class representatives.

Ample precedent exists for the proposition that assignees can be adequate class representatives. This Court in In re Relafen Antitrust Litigation, involving a generic delay antitrust case, allowed drugstore plaintiffs, who were assignees of the claims of several wholesalers, to sue for overcharge damages. **[*54]** *360 F. Supp. 2d 166, 187 (D. Mass. 2005)* ("[T]he drugstore **[**25]** plaintiffs had

---

[1] The Defendants concede that the median purchase of Nexium by each of the members of the putative Direct Purchaser class exceeded $22,000,000. Defs.' Opp'n 12.

been expressly assigned the rights of several national wholesalers, undisputed direct purchasers that had opted out of the direct purchaser plaintiffs' class."). More recently, the Second Circuit in Cordes & Co. Financial Services, Inc. v. A.G. Edwards & Sons, Inc., rejected a per se rule that assignees cannot serve as adequate class representatives. *502 F.3d 91, 101 (2d Cir. 2007)* (holding that assignees properly stood before the court "in the shoes of" class members as "assimilated members of the class."). This Court follows its decision in *In re Relafen, 360 F. Supp. 2d 166*, as well as numerous other decisions that have allowed for assignees to be included within a proposed class. Accord *In re Vitamin C Antitrust Litig., 279 F.R.D. 90, 102 (E.D.N.Y. 2012)* ("[T]here is no rule prohibiting the assignment of class membership. . . . Ranis's status as an assignee therefore does not prevent it from joining or representing the class."); *In re Wellbutrin Sr Direct Purchaser Antitrust Litig., No. 04-5525, 2008 U.S. Dist. LEXIS 36719, 2008 WL 1946848, at *4 (E.D. Pa. May 2, 2008)* (noting that the Third Circuit has "long recognized that antitrust claims can be assigned" and that "numerous courts have certified **[**26]** litigation classes in which the named plaintiffs were operating under an assignment."); *In re Cardizem CD Antitrust Litig., 200 F.R.D. 297, 305 (E.D. Mich 2001)* (permitting an assignee to "stand in [a direct purchaser's] shoes" for purposes of class certification).

Here, there is no reason to believe the actual assignments are invalid, nor does the Court find any evidence that ASC and Meijer do not share the same interests as the rest of the class (in fact, ASC also sues on behalf of itself as a direct purchaser). Direct Purchasers Compl. ¶ 19. Consistent with the case law of this Court and that of several other jurisdictions, the Direct Purchasers have fulfilled the requirements of *Rule 23(a)(4)*. ASC and Meijer are included in the proposed Direct Purchasers class and may serve as class representatives.

**C.** *Rule 23(b)(3)*: Predominance

The named Direct Purchasers seek class certification under *Rule 23(b)(3)*, which permits a class action where "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members" and where "a class action is superior to other available methods for fairly and efficiently adjudicating the **[**27]** controversy." *Fed. R. Civ. P. 23(b)(3)*. The named Direct Purchasers note that predominance has been established in "every antitrust case brought by direct purchasers seeking overcharge damages due to suppressed generic competition," because anticompetitive conduct uniformly deprives direct purchasers of less expensive generics. Pls.' Mem. 14. Countering this assertion, the Defendants argue that there is no common proof of injury and damages because the named Direct Purchasers' economic model fails to account for variations in price and generic switch rate and improperly relies on averages. Defs.' Opp'n 15-16.

The key inquiry is "whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Anchem Prods., Inc. v. Windsor, 521 U.S. 591, 623, 117 S. Ct. 2231, 138 L. Ed. 2d 689 (1997)*. The named Direct Purchasers' burden under this Rule and its recent interpretation in *Comcast Corp. v. Behrend, 133 S. Ct. 1426, 1430, 185 L. Ed. 2d 515 (2013)*, is simply to present a common damages model, limited to and reflecting only the theories of liability accepted by the Court.

This Court must subject the proffered arguments and expert reports to rigorous scrutiny to determine whether the named Direct Purchasers present a **[**28]** "reasonable, judicially recognized methodology for calculating damages and [show] that the data needed to make these calculations is available and common to the class." *In re Neurontin Antitrust Litig., Nos. 02-1830(FSH),*

*2011 U.S. Dist. LEXIS 7453, 2011 WL 286118, at *10 (D.N.J. Jan. 25, 2011)*. Arguments pertaining to specific damages allocation need not be entertained at this class certification stage; they are properly addressed upon the jury determination of liability.

As discussed in its End-Payors' class certification analysis, this Court follows the legal standards outlined in *Wal-Mart, 131 S. Ct at 2541*, and *Comcast, 133 S. Ct. at 1426*, in its **[*55]** "rigorous analysis" of the predominance of questions common to the class. *Wal-Mart, 131 S. Ct. at 2551*. *Rule 23* certification ought not turn into a "full-blown merits analysis." *In re: Cathode Ray Tube Antitrust Litig., No. C-07-5944-SC, 2013 U.S. Dist. LEXIS 137946, 2013 WL 5391159, at *5 (N.D. Cal. Sept. 19, 2013)*. The Court's conclusions here are not evidentiary "findings" of fact, but are merely preliminary conclusions that here allows this litigation to move beyond the class certification stage. See Mem. & Order 18 ("Fact-finding emerges only after full evidentiary exposition, including **[**29]** searching cross-examination, none of which has taken place here."). Upon review of the parties' filings and expert reports, the Court concludes that the named Direct Purchasers have sufficiently demonstrated antitrust impact and damages common to the class.

**1. Common Proof of Antitrust Impact**

Like the End-Payor plaintiffs, the named Direct Purchasers allege the Defendants "engineered an overarching scheme" of utilizing reverse payment agreements to delay generic entry, resulting in antitrust impact and injury to Nexium purchasers. Direct Purchasers Compl. ¶ 5; Corrected Consol. Am. Class Action Compl. & Demand Jury Trial ("End-Payors' Compl.") ¶ 5, ECF No. 114. This Court agrees that each member of the putative Direct Purchaser class alleges the same claims arising from a "unified course of anticompetitive conduct;" namely, AstraZeneca's lawsuits against its generic rivals and the resulting reverse payment agreements. Pls.' Mem. 15-16. Here, the theory of liability for antitrust violations is straightforward, but establishing proof of common impact and damages requires a closer look to determine that all class members suffered common impact as a result of the Defendants' actions.

The **[**30]** Court's standard of review, as outlined in the End-Payors' class certification analysis, see Mem. & Order 26-27, requires that the moving party demonstrate that "all class members were victims," *Wal-Mart, 131 S. Ct. at 2552, n.7*, but the party need not demonstrate the "precise amount of damages incurred by each class member." *In re Rail Freight Fuel Surcharge Antitrust Litig.-MDL No. 1869, 725 F.3d 244, 252, 406 U.S. App. D.C. 371 (D.C. Cir. 2013)*. As the First Circuit has acknowledged, the plaintiffs' theory

> must include some means of determining that each member of the class was in fact injured, even if the amount of each individual injury could be determined in a separate proceeding. Predominance is not defeated by individual damages questions as long as liability is still subject to common proof. This is because the class action can be limited to the question of liability, leaving damages for later individualized determinations.*In re New Motor Vehicles Canadian Export Antitrust Litig., 522 F.3d 6, 28 (1st Cir. 2008)* (internal citations omitted).

The Direct Purchasers present common proof of antitrust impact in the form of overcharges. The Supreme Court has "long recognized [overcharges] as the principal **[**31]** measure of damages

for plaintiffs injured as customers." *In re Relafen Antitrust Litig., 218 F.R.D. 337, 344 (D. Mass. 2003)*; see *Hanover Shoe, Inc. v. United Shoe Mach. Corp., 392 U.S. 481, 494, 88 S. Ct. 2224, 20 L. Ed. 2d 1231 (1968)* (accepting overcharges as the basis for calculating damages). Citing to findings from Dr. Hartman's expert report, the Direct Purchasers list three forms of antitrust impact they intend to prove at trial: (1) Defendants' conduct had a market-wide effect, artificially inflating esomeprazole prices; (2) all or nearly all class members would have purchased generics at a lower price; and (3) all or nearly all class members would have purchased brand Nexium at a lower price. Pls.' Mem. 16-17.

**a. Market Effect: Brand Erosion**

"Generics are priced substantially below their branded counterparts and quickly capture sales from the brand," id. at 17, and AstraZeneca, in its own internal forecasts, expected generic Nexium to have the same market effect. Hartman Decl. ¶ 32. AstraZeneca and the Generic Defendants are well-versed in this market phenomenon, as demonstrated by the Generic Defendants' own "brand erosion" predictions and by AstraZeneca's internal analyses and emails, estimating brand erosion **[**32]** of 90 percent within three **[*56]** months of generic entry. Id. The Generic Defendants predict the minimum first-year generic market share would fall within a range from 60 percent- Ranbaxy, 85 percent- Dr. Reddy's, to 90 percent- Teva. Id. Ranbaxy, for example, estimates 50 percent price erosion within a year and 95 percent erosion within two to six years. Id. Dr. Hartman repeatedly emphasizes that his own yardstick predictions are more "conservative" than those of the Defendants, although the Court is unsure whether this is a statement addressing the damages model as a whole or if Dr. Hartman is referring to his brand erosion calculations. Id. ("Compared to Teva, I use more conservative generic market share yardsticks and more conservative brand price yardsticks."). **[**33]** Whoever presents the more conservative yardstick measurement, it is indisputable that the Defendants, and specifically AstraZeneca, recognized that entry of an authorized generic would result in rapid brand erosion and in the price decline of both brand and generic Nexium. The next step turns on whether all putative class members suffered overcharge damages and whether these damages can be demonstrated with common proof of impact.

**b. Generic Bypass Effect**

Dr. Hartman calculates two sets of overcharge damages: $25,600,000,000 for a generic entry date in April 2008 and $8,200,000,000 for a generic entry date in January 2012. Id. at ¶¶ 62-66. These damages were calculated based on "yardstick" percentages, derived from sales data for Prevacid and its generic, lansoprazole, a similar proton pump inhibitor in the same category as Nexium. Id. at ¶ 61 (incorporating National Sales Perspective data from IMS Health, a vendor of pharmaceutical industry data). Overcharges were measured based on the number of units of Nexium purchased by direct purchasers during the class period, "regardless of whether some of those units would not have been purchased by those wholesalers during a period of earlier **[**34]** generic entry" due to "generic bypass." Id. at ¶ 55.

Generic bypass — where generic manufacturers sell directly to end-purchasers and retailers, bypassing the wholesale level — was addressed by this Court in *In re Relafen Antitrust Litig., 346 F. Supp. 2d 349, 368-69 (D. Mass. 2004)*, which held that reducing damages to plaintiff wholesalers under a bypass defense is inconsistent with *Hanover Shoe, 392 U.S. at 489*. In *Hanover Shoe, 392 U.S. at 489*, the Supreme Court rejected a "passing on" defense which, if allowed, would prevent plaintiffs from recovering damages based upon the amount of overcharges passed

through to final payors. Id. ("We hold that the buyer is equally entitled to damages if he raises the price for his own product. As long as the seller continues to charge the illegal price, he takes from the buyer more than the law allows."); see also *In re Relafen, 346 F. Supp. 2d 349, 369* ("Moreover, as Illinois Brick makes clear, Hanover Shoe permits a direct purchaser to recover the 'full amount of the overcharge,' *Illinois Brick Co. v. Illinois, 431 U.S. 720, 733, 745-46, 97 S. Ct. 2061, 52 L. Ed. 2d 707 (1977)*, even if he is otherwise benefited, *Sports Racing Servs., Inc. v. Sports Car Club of Am., Inc., 131 F.3d 874, 885 (10th Cir. 1997)*.").

Dr. **[**35]** Hartman states he was advised by the representative plaintiffs to assume the Court will rule that overcharge calculations need not account for generic bypass, although he is able to incorporate generic bypass into his model. Hartman Decl. ¶ 57. The Defendants respond by pointing out that Dr. Hartman "offered no methodology to account for the varying extent of generic bypass . . . . that would not require analysis for each individual direct purchaser." Johnson Rpt. ¶ 43.

The Court draws the following conclusions. First, the issue of generic bypass primarily affects the measure of damages, a matter exclusively reserved to jury determination at trial. Second, this Court adheres to its ruling in *In re Relafen* that generic bypass cannot preclude recovery and that plaintiffs only need a "viable method" for demonstrating damages common to the class. *In re Neurontin, 2011 U.S. Dist. LEXIS 7453, 2011 WL 286118, at *10*; see also *In re Wellbutrin XL Antitrust Litig., 2011 U.S. Dist. LEXIS 90075, 2011 WL 3563385 at *16*; *In re K-Dur Antitrust Litig., No. 01-1652 (JAG), 2008 U.S. Dist. LEXIS 118396, 2008 WL 2699390, at *15 (D.N.J. Apr. 14, 2008)* ("Moreover, because Defendants concede that 45 of the proposed Class members purchased some **[*57]** amount of generic K-Dur, they cannot contend that **[**36]** these Class members were entirely bypassed. . . . Defendants' arguments regarding the effects of generic bypass relate to the quantum of damages, rather than the fact of injury."), aff'd *In re K-Dur Antitrust Litig., 686 F.3d 197, 223 (3d Cir. 2012)*, vacated on other grounds sub nom., *Upsher-Smith Labs., Inc. v. Louisiana Wholesale Drug Co.*, 133 S. Ct. 2849, 186 L. Ed. 2d 904 (2013) (mem.), reinstated sub nom., *In re K-Dur Antitrust Litig., Nos. 10-2077, 10-2078, 10-2078, 10-4571, 2013 U.S. App. LEXIS 18859, 2013 WL 5180857 (3d Cir. Sept. 9, 2013)*. Finally, it is clear that proving the actual effects of generic bypass is not a burden that the named Direct Purchasers bear in demonstrating predominance of common issues of law or fact under *Rule 23(b)(3)*. At this stage, like questions of individualized damage, generic bypass cannot preclude certification of the plaintiff class.

**c. Variations in Sales Price and Use of Averages**

The Defendants challenge both the assertion of common antitrust impact and Dr. Hartman's methodologies by arguing that "fact of injury" requires individual inquiry into each class member's "purchase strategies, volumes, and net prices." Defs.' Opp'n 14 (stating that plaintiffs' common proof "must include some means **[**37]** of determining that each member of the class was in fact injured.") (quoting *In re New Motor Vehicles, 522 F.3d at 28*). Specifically, the Defendants point out two issues with the named Direct Purchasers' model: (1) the "enormous" variation in the sales price of Nexium; and (2) Dr. Hartman's use of averages in calculating net prices and rates of generic switching. Defs.' Opp'n 14-15.

The average net price paid for each brand Nexium pill, during the proffered class period of August 27, 2008 to May 30, 2013, is calculated to be $4.42, with the highest average net price peaking at $5.41 per pill and the lowest average prices at $0.43 and $1.94 per pill, paid by DMS

Pharmaceutical Group Inc. and Good Samaritan Hospital & Health, respectively. Johnson Rpt. ¶ 7, Ex. 6, Average Net Prices Nexium Direct Purchasers During Class Period. The Defendants use this range to argue that the two class members paying $0.43 and $1.94 per pill paid "far below the but-for generic price[s]" of "roughly $1.00-3.00/pill" and were thereby uninjured, defeating the predominance requirement. Defs.' Opp'n 14. The Defendants' expert, Dr. Johnson, further criticizes Dr. Hartman's damages model for failing to account **[**38]** for the widely varying deductions and discounts received by direct purchasers from AstraZeneca. Johnson Rpt. ¶ 20. Thus, failing to account for chargebacks, rebates, and discounts "will directly cause actual net prices paid by direct purchasers to diverge from the average price used by Dr. Hartman." Johnson Rpt. ¶ 23 (listing discounts ranging from 29 percent to 90 percent).

Moreover, the Defendants argue that averages are "inadequate" when "there is evidence that individual class members do not conform to the average." Defs.' Opp'n 16 (citing *In re New Motor Vehicles, 522 F.3d at 28*). In light of Dr. Johnson's finding that four putative class members made 94 percent of the total purchases of brand Nexium, the Defendants argue that the use of averages "unacceptably masks the significant variation" among class members. Defs.' Opp'n 16 (quoting *Reed v. Advocate Health Care, 268 F.R.D. 573, 592 (N.D. Ill. 2009))*. Dr. Johnson also points out that one putative class member, Good Samaritan Hospital & Health, made only a single purchase of 1,000 brand Nexium pills — for less than half the average Nexium brand price at the time — raising doubt as to whether Good Samaritan would have bought **[**39]** generic Nexium in a but-for world, "at a time when Dr. Hartman's but-for generic prices are not clearly lower than the price Good Samaritan actually paid for brand Nexium." Johnson Rpt. ¶ 37.

Upon consideration of the parties' expert reports and theories on brand erosion and generic bypass, this Court concludes that the Direct Purchasers are able to present a common impact theory at trial, and that at this stage of litigation, a showing of common impact has been satisfied. See supra section II.C.1.a. The Defendants' focus on the variations in purchase price among the putative class members directly challenges the Direct Purchasers' damages model, but it does not **[*58]** weaken their assertion of common impact. First, as discussed in the Court's End-Payor class analysis, antitrust impact "occurs the moment the purchaser incurs an overcharge" and is conceptually different from the task of assessing antitrust damages. Mem. & Order 26. Second, individualized damages are reserved for determination at trial. See supra section II.C.1.b.

As to the use of averages, Wal-Mart may have struck down the use of a "sample set" measurement, *131 S. Ct. at 2544, 2561*, but the Supreme Court did not bar the use **[**40]** of averages or aggregate damages measurements in class certification. The sample set in that case applied to a class of "some 1.5 million female employees" of Wal-Mart, *id. at 2544 —* a much different factual scenario than the one presented by the identifiable class members in the present case. Adhering to the Supreme Court's directive, this Court rejects the use of "Trial by Formula" in crafting a class and concludes that the Direct Purchasers' proffered methodology, utilizing both averages and "but-for" calculations, is both reasonable and judicially recognized.

The Court recognizes that uninjured direct purchasers may be included within the sweep of the proposed class, but emphasizes that the presence of uninjured class members is not fatal to class certification. See Mem. & Order 27 ("Several courts, however, have held that at this class certification stage of litigation, the inclusion of uninjured class members is not fatal to class certification."). Class certification does not turn on whether a moving party has addressed all possible variations and nuances in its damages calculations. The Defendants, in their attempt to

undercut Dr. Hartman's damages model, rely too heavily on **[**41]** pointing out missing factors in the damages model, arguing that Dr. Hartman failed to account for differences among types of customers, buying power of individual wholesalers, regional preferences for Nexium, and individual purchase price. Johnson Rpt. ¶ 20-24. At this stage of litigation, the Court recognizes that while it must address "considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action," *Wal-Mart, 131 S. Ct. at 2552* (quoting *General Tel. Co. of Southwest v. Falcon, 457 U.S. 147, 160, 102 S. Ct. 2364, 72 L. Ed. 2d 740 (1982))*, it should not engage in a "full-blown merits analysis," *In re: Cathode Ray Tube, 2013 U.S. Dist. LEXIS 137946, 2013 WL 5391159, at *5*. As in *In re: Cathode Ray Tube*, it appears the Defendants here are "trying to push . . . the Court toward a full-blown merits analysis, which is forbidden and unnecessary at this point." Id. (internal citation omitted).

**2. Common Proof of Damages**

Finally, the Direct Purchasers address common proof of damages under the rubric of *Comcast, 133 S. Ct. at 1433* (vacating class certification which failed properly to propose proof of damages "capable of measurement on a classwide basis."). In both *Comcast* and*Amgen, Inc. v. Connecticut Retirement Plans and Trust Funds, 133 S. Ct. 1184, 185 L. Ed. 2d 308 (2013)*, **[**42]** the Supreme Court held that predominance fails when "[q]uestions of individual damage calculations will inevitably overwhelm questions common to the class." See *Comcast, 133 S. Ct. at 1433*; *Amgen, 133 S. Ct. at 1196*. As discussed in this Court's End-Payors' analysis however, see Mem. & Order 32, this rule does not preclude the use of aggregate damages calculations. They are "implied by the very existence of the class action mechanism itself." *In re Pharm. Indus. Average Wholesale Price Litig., 582 F.3d 156, 197 (1st Cir. 2009)*. "Aggregate computation of class monetary relief is lawful and proper. Courts have not required absolute precision as to damages . . . ." Id. (quoting 3 Herbert B. Newberg & Alba Conte, Newberg on Class Actions § 10.5, at 483-86 (4th ed. 2002)).

The Direct Purchasers present two preliminary damages calculations based on the April 2008 and January 2012 but-for generic entry dates, with damages continuing to accrue to class members. Pls.' Mem. 19. First, they argue that Dr. Hartman's "yardstick" methodology has been endorsed by the First Circuit, and district courts within this circuit, in numerous delayed-generic cases. *Id. at 19 n.67*; Pls.' Reply Brief 15 n.56 **[**43]** (citing *In re Pharm., 582 F.3d at 197*, *New England Carpenters Health Benefits Fund v. First DataBank, Inc., 248 F.R.D. 363, 371* **[*59]** (D. Mass. 2008) (Saris, J.), *In re Tyco Int'l, Ltd. Multidistrict Litig., 535 F. Supp. 2d 249, 256 (D.N.H. 2007))*.

The Defendants challenge this assertion by arguing that "common issues . . . do not predominate when individualized inquiries are necessary" to measure varying damages among the class. Defs.' Opp'n 17. Similar to their criticisms of the End-Payors' expert methodology, see Defs.' End-Payor Mem. 13-14, the Defendants point out that Dr. Hartman fails to account for actual brand prices, but-for generic prices, purchases by brand loyalists, and generic and other-drug conversion rates. Defs.' Opp'n 17-18. For example, individual discounts to direct purchasers "ranged from less than 5% to more than 90%," and the generic conversion rates of Dr. Hartman's benchmark drug Prevacid ranged from "roughly 0% to 90%, depending upon the category of trade." Defs.' Opp'n 17-18. Less persuasive here are the Defendants' arguments pointing to the potential inaccuracies in the but-for pricing of Nexium due to factors like brand-loyal purchases and conversion to other **[**44]** drugs. Id. These variations, the Defendants argue, are ignored by the

use of averages calculations, see id. at 18, and without individualized inquiries, will result in the unlawful recovery of damages by uninjured direct purchasers.

The Court acknowledges that variation in actual price paid among the direct purchasers may preclude some class members from recovery if it is shown that various rebates, discounts, or buying practices did not result in net positive damages. At this stage, however, the Court looks to see whether the Direct Purchasers are able to show common damages with their proffered methodology. As with the End-Payors, the Direct Purchasers here advance a single, class-wide theory of harm: Defendants' unlawful conduct delayed the entry of lower-priced generic Nexium, see Direct Purchasers Compl. ¶¶ 10-12, clearly differentiating this case from the facts in Comcast, which rejected a damages model because it failed solely to incorporate the court's accepted theory of liability. *133 S. Ct. at 1430*. With respect to actual damages calculations, the Court notes that, in contrast with the End-Payors, here precise sales data for the purchases of brand Nexium are readily available **[**45]** for all direct purchasers. See Johnson Rpt. Ex. 2, Net Sales Nexium AstraZeneca Direct Purchasers. Echoing the suggestion made in the Court's End-Payor class certification opinion, see Mem. & Order 37, having this sales data will prove useful if a jury is able to establish a baseline supracompetitive overcharge, from which individual class members may calculate their recovery. Id. ("Perhaps, if liability is established, competent evidence may lead to a jury finding of the average amount of the supracompetitive overcharge on a capitation basis. It may then be appropriate to use this average as a baseline for further proceedings."); see Tobias Barrington Wolff, Managerial Judging and Substantive Law, *90 Wash. U. L. Rev. 1027 (2013)*.

Here, two sets of common damages are calculated and presented under a reasonable and judicially acceptable methodology, based upon existing sales data by the identifiable direct purchasers and benchmarked against a similar drug, Prevacid, and its generic. The Direct Purchasers have thus met the requirement of proving common damages under *Rule 23(b)(3)*.

3. **Superiority**

Lastly, the Direct Purchasers address the second prong of *Rule 23(b)(3)* and contend that class **[**46]** action treatment is superior to other methods to achieve "economies of time, effort, and expense." Pls.' Mem. 20 (quoting *In re Relafen, 218 F.R.D. at 346*). They argue in favor of the superiority of the class action device, based on the fact that, like the End-Payors in this case, the Direct Purchasers bring their antitrust allegations under a consolidated theory of liability, targeting three specific reverse payment agreements with a single entity, AstraZeneca. Because this case is "no more complicated than Relafen," the Direct Purchasers assert that class action treatment would be a superior method of adjudicating their claims. Id. at 20 n.71.

The Defendants' counterarguments are powerful: they first point out that class members are economically well-suited for individual suits because of the "nearly $1 billion" in damages claimed per plaintiff. Defs.' **[*60]** Opp'n 19. Further, the Defendants note that class claims are concentrated in three of the largest class members (who account for 87.7 percent of all class purchasers), and that these members have no need for class action treatment to resolve their claims. Id. at 19-20.

This is a close call. Even so, considering the complex nature of **[**47]** this litigation, the fact that complete joinder of the Direct Purchaser class is impracticable, and the "desirability" of concentrating litigation in this single forum, *Fed. R. Civ. P. 23(b)(3)*, the Court here concludes that

class action treatment is superior to other methods for "fairly and efficiently adjudicating the controversy." Id.

## III. CONCLUSION

Accordingly, this Court GRANTS the Direct Purchasers' Motion for Class Certification under *Federal Rule of Civil Procedure 23(a)* and *(b)(3)*. The Court certifies the following class:

All persons or entities in the United States, including U.S. territories, who purchased branded Nexium directly from AstraZeneca at any time during the period August 27, 2008, through the date the Court enters an order certifying the class (the "Class"). Excluded from the Class are the Defendants, their officers, directors, management, employees, subsidiaries, and affiliates, and all federal governmental entities.[2]

**SO ORDERED.**

/s/ William G. Young

WILLIAM G. YOUNG

DISTRICT JUDGE

---

[2] Pursuant to the Court's order denying AstraZeneca and Ranbaxy's motion for partial summary judgment, the Direct Purchasers' claims, relating to Ranbaxy's alleged exclusion from the market as a result of the AstraZeneca-Ranbaxy settlement agreement, **[**48]** are not yet time-barred under the four-year federal statute of limitations. Order, ECF No. 546.

EXHIBIT 275

LexisNexis®
Questioned
As of: August 12, 2014 9:13 AM EDT

# Interface Group, Inc. v. Massachusetts Port Authority

United States Court of Appeals for the First Circuit
March 30, 1987
No. 86-1467

**Reporter:** 816 F.2d 9; 1987 U.S. App. LEXIS 4014; 1987-1 Trade Cas. (CCH) P67,502

The Interface Group, Inc., Plaintiff, Appellant, v. Massachusetts Port Authority, Defendant, Appellee

**Prior History:** **[**1]** APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS, Honorable Andrew A. Caffrey, U.S. District Judge.

**Core Terms**

antitrust, airport, private right of action, Terminal, air carrier, air, anti trust law, arrangements, Airlines, suggests, district court, facilities, statutes, immune, firms, anticompetitive, municipality, travelers, Aviation, especial, purposes, services, antitrust claim, Transportation, manufacturer, monopolist, passenger, carrier, factors, courts

**LexisNexis® Headnotes**

Antitrust & Trade Law > Regulated Practices > Trade Practices & Unfair Competition > General Overview
Environmental Law > Administrative Proceedings & Litigation > Judicial Review

***HN1*** "Unreasonableness" in antitrust law has a rather special meaning. It means that the anticompetitive consequences of a particular action or arrangement outweigh its legitimate business purposes. "Anticompetitive" also has a special meaning: it refers not to actions that merely injure individual competitors, but rather to actions that harm the competitive process, a process that aims to bring consumers the benefits of lower prices, better products, and more efficient production methods.

Antitrust & Trade Law > ... > Monopolies & Monopolization > Attempts to Monopolize > General Overview
Antitrust & Trade Law > ... > Price Fixing & Restraints of Trade > Exclusive & Reciprocal Dealing > General Overview
Antitrust & Trade Law > ... > Price Fixing & Restraints of Trade > Exclusive & Reciprocal Dealing > Exclusive Dealing
Antitrust & Trade Law > ... > Price Fixing & Restraints of Trade > Per Se Rule & Rule of Reason > General Overview
Antitrust & Trade Law > ... > Price Fixing & Restraints of Trade > Per Se Rule & Rule of Reason > Sherman Act
Antitrust & Trade Law > Sherman Act > General Overview

***HN2*** Not all exclusive dealing contracts even by a monopolist are illegal. Because the arrangements often serve legitimate business purposes, courts apply a rule of reason in deciding whether particular instances violate the Sherman Act, *15 U.S.C.S. §§ 1* and *2*.

Antitrust & Trade Law > Regulated Practices > Monopolies & Monopolization > General Overview
Antitrust & Trade Law > ... > Monopolies & Monopolization > Actual Monopolization > General Overview
Antitrust & Trade Law > ... > Monopolies & Monopolization > Attempts to Monopolize > General Overview
Antitrust & Trade Law > Sherman Act > Scope > General Overview
Antitrust & Trade Law > Sherman Act > Scope > Monopolization Offenses

***HN3*** The essential facilities doctrine aims to prevent a firm with monopoly power from extending that power from one stage of production to another, and from one market into another.

Antitrust & Trade Law > ... > Monopolies & Monopolization > Actual Monopolization > General Overview

***HN4*** When a monopolist denies a competitor access to a facility it needs to compete, the denial is at least arguably "unreasonable" or "exclusionary" in the antitrust sense, and therefore unlawful.

Antitrust & Trade Law > Exemptions & Immunities > General Overview
Antitrust & Trade Law > Exemptions & Immunities > Parker State Action Doctrine > General Overview
Antitrust & Trade Law > Exemptions & Immunities > Parker State Action Doctrine > Scope
Antitrust & Trade Law > Exemptions & Immunities > Parker State Action Doctrine > Local Governments & Private Parties
Governments > State & Territorial Governments > Claims By & Against

***HN5*** The antitrust laws do not reach restraints of trade imposed by the state, rather than private parties.

Antitrust & Trade Law > Exemptions & Immunities > Parker State Action Doctrine > General Overview

***HN6*** A municipality is immune only when it acts pursuant to a clearly articulated and affirmatively expressed state policy.

Governments > Legislation > Interpretation

***HN7*** The powers given to a state agent are to be liberally construed to effect the purposes of the legislation.

Administrative Law > Separation of Powers > Jurisdiction

***HN8*** State administrative process is available to correct autonomy conduct involving ordinary errors of abuses in the administration of powers conferred by the state.

Governments > Legislation > Statutory Remedies & Rights
Transportation Law > Air Transportation > Airports > Head Taxes
Transportation Law > Air Transportation > Airports & Airways Development Act
Transportation Law > Air Transportation > Charters

***HN9*** The government alone has the right to enforce 49 U.S.C.S. §§ 1349(a), 1513, and 2210; the statutes do not provide private parties with a "private right of action."

Civil Procedure > ... > Federal & State Interrelationships > Federal Common Law > General Overview
Governments > Legislation > Interpretation
Governments > Legislation > Statutory Remedies & Rights

***HN10*** In determining whether Congress meant to create a private right of action when it enacted a statute that is silent on the subject, the court should ask: first, is the plaintiff one of the class for whose especial benefit the statute was enacted -- that is, does the statute create a federal right in favor of the plaintiff? Second, is there any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one? Third, is it consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff? And finally, is the cause of action one traditionally relegated to state law, in an area basically the concern of the States, so that it would be inappropriate to infer a cause of action based solely on federal law?

Transportation Law > Air Transportation > Airports & Airways Development Act

***HN11*** See 49 U.S.C.S. § 1349(a).

Civil Procedure > ... > Federal & State Interrelationships > Federal Common Law > General Overview
Governments > Legislation > Statutory Remedies & Rights

***HN12*** A private right of action should not be implied on the basis of the Cort factors alone.

Transportation Law > Air Transportation > Airports & Airways Development Act

***HN13*** See 49 U.S.C.S. § 2210.

Governments > Legislation > Statutory Remedies & Rights
Transportation Law > Air Transportation > Airport & Airway Improvement Act

***HN14*** That language of 49 U.S.C.S. § 2210 does not impose on airport developers a duty that arguably could run in favor of private plaintiffs. Rather, it imposes only the duty to give "assurances" to "the Secretary."

Tax Law > State & Local Taxes > Sales Taxes > General Overview
Transportation Law > Air Transportation > Airports > Head Taxes
Transportation Law > Air Transportation > Airports & Airways Development Act

***HN15*** See 49 U.S.C.S. § 1513.

Governments > Legislation > Statutory Remedies & Rights
Transportation Law > Air Transportation > Airports > Head Taxes
Transportation Law > Air Transportation > Airports & Airways Development Act

***HN16*** The language of 49 U.S.C.S. § 1513 impliedly confers a private right of action.

**Counsel:** James C. Burling with whom Richard J. Innis, Mark G. Matuschak and Hale and Dorr were on brief for Appellant.

Allyn O. Kreps, William T. Drescher and Jones, Day, Reavis & Pogue on brief for Air Transport Association of America, Amicus Curiae.

Scott P. Lewis with whom Thane D. Scott, Anne L. Gero, Palmer & Dodge and Richard J. Lettieri, Massachusetts Port Authority, were on brief for Appellee.

**Judges:** Coffin, Breyer and Torruella, Circuit Judges.

**Opinion by:** BREYER

**Opinion**

**[*10]** Breyer, Circuit Judge.

The Massachusetts Port Authority (Massport), which operates Logan airport, will not let the appellant, a charter airline operator called The Interface Group, Inc. (Interface), use Logan's Terminal C. Interface, believing that Massport's refusal violates the federal antitrust laws, *15 U.S.C. §§ 1*, *2 (1982)*, and several federal aviation statutes, 49 U.S.C. App. §§ 1349(a), 1513, 2210 (1982), sued Massport in federal district court. Interface also asked the court to assume pendent jurisdiction over two state claims that parallel **[**2]** its antitrust claims. *Mass. Gen. L. ch. 93, §§ 4*, *5*; ch. 93A, *§ 2* (1985). The district court dismissed the entire complaint for failure to state a federal claim. *Fed. R. Civ. P. 12(b)(6)*. *631 F. Supp. 483*. Interface appeals this dismissal. With one exception, we believe the district court was correct.

I.

Interface's antitrust claims amount to an imaginative, but unsuccessful, effort to dress its facts in the wrong suit of legal clothes. The facts that it asserts, in essence, are the following: (1) Interface bought two L1011 aircraft from TWA to use for charter service during the winter; (2) it leased them back to TWA for TWA's use during the peak summer season; (3) TWA promised Interface that during the winter Interface could use TWA ground services; (4) Massport allows TWA to service itself at Terminal C; (5) Massport permits two other private companies (called "fixed base operators" or "FBOs") to sell ground services at Terminal E; and (6) Massport requires all nontenant charter carriers, such as Interface, to use Terminal E; they cannot use Terminal C.

Interface asserts that Massport's policy, at least as applied in this instance, is unreasonable. Interface's basic legal problem is that it is not **[**3]** seeking judicial review of an unreasonable regulation under the state Administrative Procedure Act (as counsel at oral argument agreed it might have done). *SeeMass. Gen. L. ch. 30A, § 7* (1985). Rather, it has brought an antitrust claim. And ***HN1*** "unreasonableness" in antitrust law has a rather special meaning. It means that the anticompetitive consequences of a particular action or arrangement outweigh its legitimate business purposes. *See* 7 P. Areeda, *Antitrust Law* para. 1500, at 362-63 (1986). "Anticompetitive" also has a special meaning: it refers not to actions that merely injure individual competitors, but rather to actions that harm the competitive process, *Brown Shoe Co. v. United States, 370 U.S. 294, 320, 8 L. Ed. 2d 510, 82 S. Ct. 1502 (1962)*, a process that aims to bring consumers the benefits of lower prices, better products, and more efficient production methods. Once one recognizes these special meanings of the relevant terms, it becomes difficult, **[*11]** if not impossible, to see how the facts alleged in the complaint could make out a violation of the antitrust laws.

Interface says that Massport's requirement that it use Terminal E and the ground services provided there amounts to an unreasonable **[**4]** "exclusive dealing" arrangement between Massport and the FBOs, unlawful under Sherman Act *§ 1*. But ***HN2*** "not all exclusive dealing contracts even by a monopolist are illegal." *Smith v. Northern Michigan Hospitals, Inc., 703 F.2d 942, 953 (6th Cir. 1983)*. Because the arrangements often serve legitimate business purposes, courts apply a rule of reason in deciding whether particular instances violate the Sherman Act. *See Brown v. Hansen Publications, Inc., 556 F.2d 969, 970-71 (9th Cir. 1977)* (noting that "exclusive dealing arrangements are not per se illegal" because they "may be procompetitive in purpose");

*cf.* *Continental T.V., Inc. v. GTE Sylvania, Inc., 433 U.S. 36, 58-59, 53 L. Ed. 2d 568, 97 S. Ct. 2549 (1977)* (noting that vertical restrictions are presumptively governed by the rule of reason).

Exclusive dealing arrangements may *sometimes* be found unreasonable under the antitrust laws because they may place enough outlets, or sources of supply, in the hands of a single firm (or small group of firms) to make it difficult for new, potentially competing firms to penetrate the market. *See* 3 P. Areeda & D. Turner, *Antitrust Law* para. 732, at 253 (1978). To put the matter more technically, **[**5]** the arrangements may "foreclose" outlets or supplies to potential entrants, thereby raising entry barriers. *Cf.* *Tampa Elec. Co. v. Nashville Coal Co., 365 U.S. 320, 327-29, 5 L. Ed. 2d 580, 81 S. Ct. 623 (1961)* (applying the stricter standard of Clayton Act § 3). Higher entry barriers make it easier for existing firms to exploit whatever power they have to raise prices above the competitive level because they have less to fear from potential new entrants. Thus, for example, one might worry about long term exclusive dealing contracts between a small group of firms making most of the nation's light bulbs and the firms that make light bulb filaments; if potential light bulb manufacturers are deterred from entering the market by a fear that they will be unable to obtain filaments, the existing light bulb manufacturers may be able to keep prices high. *Cf.* *Standard Oil Co. v. United States, 337 U.S. 293, 93 L. Ed. 1371, 69 S. Ct. 1051 (1949)* (finding foreclosure of marketing outlets to be a *§ 1* violation).

The complaint before us, however, seems inadequate to raise an antitrust controversy. Certainly the kind of antitrust harm typically present in an unlawful exclusive dealing arrangement is missing here. Interface does not claim that **[**6]** the arrangement, by foreclosing entry into the FBO market, makes it easier for Massport to abuse its market power or more difficult for new firms to build competing airports. Nor does it allege any more exotic theory of antitrust harm. Even if we were to concoct on Interface's behalf an analogy between FBOs and dealers to which an important manufacturer assigns exclusive territories, we would not cure the deficiency, because a manufacturer is ordinarily free to decide just how many dealers it will place in any given geographic area. *See* *Packard Motor Car Co. v. Webster Motor Car Co., 100 U.S. App. D.C. 161, 243 F.2d 418* (D.C. Cir.), *cert. denied*, *355 U.S. 822, 78 S. Ct. 29, 2 L. Ed. 2d 38 (1957)*.

When there is no plausible connection between exclusive dealing and antitrust harm, courts have not hesitated to hold that dealing lawful. Thus, courts have explicitly permitted even private firms with effective monopoly control of a transportation facility to maintain exclusive dealing arrangements with even a single supplier. *See, e.g.*, *Donovan v. Pennsylvania Co., 199 U.S. 279, 50 L. Ed. 192, 26 S. Ct. 91 (1905)* (permitting a private railroad company to enter into an exclusive dealing arrangement with a single taxi company for provision of **[**7]** taxi services at the Chicago railroad station); *Export Liquor Sales, Inc. v. Ammex Warehouse Corp., 426 F.2d 251 (6th Cir. 1970)*, *cert. denied*, *400 U.S. 1000, 91 S. Ct. 460, 27 L. Ed. 2d 451 (1971)* (dismissing a *§ 2* claim challenging an exclusive lease between the Detroit & Canada Tunnel Corporation and a company selling **[*12]** duty-free liquor). We have found no case invalidating exclusive dealing arrangements in which the potential harm to competition (in the word's special antitrust sense) appeared as remote as a reasonable reading of the complaint suggests here. The cases Interface cites involved exclusive dealing arrangements with more obviously anticompetitive consequences. *See* *United States v. General Motors Corp., 384 U.S. 127, 144-45, 16 L. Ed. 2d 415, 86 S. Ct. 1321 (1966)* (finding a *§ 1* violation when manufacturer elicited agreements from dealers not to do business with discounters); *New York Airlines, Inc. v. Dukes County, 623 F. Supp. 1435, 1450-51 (D. Mass. 1985)* (finding a *§ 1* claim when plaintiff was excluded altogether from defendant's airport because of a threat by a competing airline to discontinue existing service).

The fact that Massport is a public rather than a private body makes any risk to competition **[**8]** yet more remote. Unlike a *private* owner, Massport does not directly profit from its ownership of Logan. *See* *Opinion of the Justices, 334 Mass. 721, 734, 136 N.E.2d 223, 231 (1956)*. It therefore has no economic motive to protect its market power in the airport operating business or to enter into anticompetitive arrangements. Given the absence of plausible allegations suggesting that the case raises the kinds of antitrust concerns typically present in unlawful exclusive dealing cases, and given the complaint's failure to raise any novel theory of illegality, the complaint simply does not state an antitrust exclusive dealing claim. *See* *Donovan, supra*;*Export Liquor Sales, supra*; *cf.* *Car Carriers, Inc. v. Ford Motor Co., 745 F.2d 1101, 1109-10 (7th Cir. 1984)* ("The complaint does not in any way set forth facts to support the conclusion that [the replacement of a firm in an exclusive dealing contract] had any anticompetitive effect."), *cert. denied*, *470 U.S. 1054, 105 S. Ct. 1758, 84 L. Ed. 2d 821 (1985)*.

Interface's alternative antitrust theory suffers from similar problems. Interface says that Massport's failure to make Terminal C ground facilities available to it violates Sherman Act **[**9]** *§ 2*'s prohibition of monopolization. It argues that because Massport has a monopoly of the airport business, it must make "essential facilities" available to anyone who wishes to use them. This view of the essential facilities doctrine, however, considerably overstates its ***HN3*** scope. The doctrine aims to prevent a firm with monopoly power from extending that power "from one stage of production to another, and from one market into another." *MCI Communications Corp. v. American Tel. & Tel. Co., 708 F.2d 1081, 1132* (7th Cir.), *cert. denied*, ***HN4*** *464 U.S. 891, 78 L. Ed. 2d 226, 104 S. Ct. 234 (1983)*. When a monopolist denies a competitor access to a facility it needs to compete, the denial is at least arguably "unreasonable" or "exclusionary" in the antitrust sense, and therefore unlawful. *See, e.g.*, *Otter Tail Power Co. v. United States, 410 U.S. 366, 35 L. Ed. 2d 359, 93 S. Ct. 1022 (1973)* (finding a *§ 2* violation when Otter Tail refused to permit competing municipal power companies to use its electrical distribution system); *cf.* *United States v. Terminal R.R. Association, 224 U.S. 383, 56 L. Ed. 810, 32 S. Ct. 507 (1912)* (holding that an association of railroads that controlled all the terminals in St. Louis could not exclude their competitors from those **[**10]** facilities). But it is difficult to see how denying a facility to one who, like Interface, is not an actual or potential competitor could enhance or reinforce the monopolist's market power. *See* P. Areeda & H. Hovenkamp, Antitrust Law paras. 736.2, 736.2e (Supp. 1986). If this is so in the case of a private monopolist, it is still more certain when the monopolist is a public agency, for the agency has neither the motive nor the need to solidify its monopoly position. Thus, we do not see how the facts alleged could make out the actual or potential injury to the competitive process necessary to show a violation of Sherman Act *§ 2*.

Interface fails to state a claim under Sherman Act *§ 1* or *§ 2* for an alternative reason: in our view, Massport is immune from antitrust liability under the state action doctrine of *Parker v. Brown, 317 U.S. 341, 87 L. Ed. 315, 63 S. Ct. 307 (1943)*. *Parker* established that ***HN5*** the antitrust **[*13]** laws do not reach restraints of trade imposed by the *state*, rather than private parties. In *E. W. Wiggins Airways, Inc. v. Massachusetts Port Authority, 362 F.2d 52* (1st Cir.), *cert. denied*, *385 U.S. 947, 87 S. Ct. 320, 17 L. Ed. 2d 226 (1966)*, this court found that Massport's decision to lease space to only **[**11]** one FBO was not subject to antitrust scrutiny because "it was acting as an instrumentality or agency of the state." *Id. at 55*.

We realize that since our decision in *Wiggins*, the Supreme Court has tightened the immunity rules for certain kinds of state instrumentalities, namely municipalities, *see* *Lafayette v. Louisiana*

*Power & Light Co., 435 U.S. 389, 55 L. Ed. 2d 364, 98 S. Ct. 1123 (1978)*, but Massport continues to qualify for immunity. Even if Massport is not the "state" itself, it at least is equivalent to a municipality. The Supreme Judicial Court has explicitly recognized that Massport resembles a municipal corporation and that Massport "is in no sense a private or business corporation." *Opinion of the Justices, 334 Mass. at 734, 136 N.E.2d at 231*. Massport also possesses such typical governmental attributes as the power of eminent domain, rulemaking authority, bonding authority, and tax exempt status. *See* Mass. Gen. L. Ann. ch. 91 App., §§ 1-3, 1-4, 1-8, 1-9, 1-17; *cf. Commuter Transportation Systems, Inc. v. Hillsborough County Aviation Authority, 801 F.2d 1286 (11th Cir. 1986)* (citing these powers as reasons for finding that the Authority was akin to a municipality).

Moreover, **[**12]** Massport satisfies Lafayette's rule that ***HN6*** a municipality is immune only when it acts pursuant to a "clearly articulated and affirmatively expressed" state policy. *Lafayette, 435 U.S. at 410*. Massachusetts has authorized Massport "to contract with any person . . . desiring the use of any part of [Logan Airport] . . . to fix the terms, conditions, rents and rates or charges for such use . . .," Mass. Gen. L. Ann. ch. 91 App., § 1-14, and to "establish rules and regulations for the use of [Logan]." *Id.* at § 1-3. ***HN7*** These powers, like the rest of Massport's authorizing legislation, are to be "liberally construed to effect the purposes" of the legislation. *Id.* at § 1-27. Setting policies that govern which airlines are to use which terminals, where and how they are to be serviced, and whether or when they can taxi from one terminal to another, lies close to the heart of Massport's basic purpose. Thus, the state has *clearly* indicated that Massport may engage in the activities here in question. *See Town of Hallie v. City of Eau Claire, 471 U.S. 34, 42-44, 85 L. Ed. 2d 24, 105 S. Ct. 1713 (1985)*.

Of course, one might argue to the contrary that technically Massachusetts did not delegate to Massport **[**13]** the authority to make *unreasonable* rules, and Interface has alleged that Massport's rules are "unreasonable" (in the ordinary, not the special antitrust, sense of the word). But this argument does not persuade us that Massport loses its antitrust immunity. If Massport's lawful activity in this area falls outside the Sherman Act, the fact that the activity may be (not obviously) unlawful under state law (for reasons having nothing to do with antitrust) cannot make a legal difference for the purposes of antitrust immunity. To hold otherwise would impose the antitrust laws' treble damage liability upon agencies that may have done no more than to misjudge difficult questions of state law or make administrative errors having nothing to do with antitrust policy. It would force antitrust courts to review state administrative law disputes.

> We should not lightly assume that Lafayette's authorization requirement dictates transformation of state administrative review into a federal antitrust job. Yet that would be the consequence of making antitrust liability depend on an undiscriminating and mechanical demand for "authority" in the full administrative law sense.

P. Areeda & H. Hovenkamp, **[**14]** *supra*, para. 212.3, at 104. A Congress that intended to permit states to authorize potentially anticompetitive activity would not have left outside that area of autonomy conduct involving "'ordinary' errors or abuses in the administration of powers conferred by the state." *Llewellyn v. Crothers, 765 F.2d 769, 774 (9th Cir. 1985)* (quoting Areeda, **[*14]** "Antitrust Immunity for 'State Action' After *Lafayette*," ***HN8*** 95 Harv. L. Rev. 435, 453 (1981)). State administrative process is available to correct this kind of mistake. *See id.; Scott v. Sioux City, 736 F.2d 1207, 1215-16 (8th Cir. 1984), cert. denied, 471 U.S. 1003, 85 L. Ed. 2d 158, 105 S. Ct. 1864 (1985)*.

In sum, *Wiggins* remains good law. And even were Massport not immune, the complaint would fail to state an antitrust claim. The district court therefore properly dismissed Interface's antitrust claims.

II.

Interface also claims that Massport violated three federal aviation statutes, 49 U.S.C. App. §§ 1349(a), 1513, and 2210. The district court dismissed these claims on the ground that ***HN9*** the government alone has the right to enforce these statutes; the statutes do not provide private parties such as Interface with a "private right of action." In **[**15]** two instances we agree with the district court; in one instance (49 U.S.C. App. § 1513) we do not.

A.

In *Cort v. Ash, 422 U.S. 66, 45 L. Ed. 2d 26, 95 S. Ct. 2080 (1975)*, the Supreme Court set forth criteria to help courts decide whether Congress meant to create a private right of action when it enacted a statute that is silent on the subject. *See N.A.A.C.P. v. Pierce, 817 F.2d 149 (1st Cir. 1987)*. The Supreme Court said ***HN10*** that we should ask:

> First, is the plaintiff "one of the class for whose *especial* benefit the statute was enacted" . . . -- that is, does the statute create a federal right in favor of the plaintiff? Second, is there any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one? . . . Third, is it consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff? . . . And finally, is the cause of action one traditionally relegated to state law, in an area basically the concern of the States, so that it would be inappropriate to infer a cause of action based solely on federal law?*Id. at 78* (citations omitted). We first ask these questions about 49 U.S.C. App. § **[**16]** 1349(a), which provides in relevant part:
>
> ***HN11*** No federal funds . . . shall be expended . . . . for the acquisition, establishment, construction, alteration, repair, maintenance, or operation of any landing area, or for the acquisition, establishment, construction, maintenance, or operation of air navigation facilities thereon, except upon written recommendation and certification by the Secretary of Transportation that such landing area or facility is reasonably necessary for use in air commerce or in the interests of national defense.
>
> . . . There shall be no exclusive right for the use of any landing area or air navigation facility upon which Federal funds have been expended.

The statutory language weighs slightly against appellants with respect to Cort's "especial benefit" test. We concede that the language about "exclusive rights," taken alone, supports the view that the statute (or at least the last sentence) aims at the "especial benefit" of those who operate planes as contrasted with those who fly as passengers in them. But the statutory provision taken as a whole suggests that Congress sought to benefit the public at large, not carriers in particular. *See Montauk-Caribbean* **[**17]** *Airways, Inc. v. Hope, 784 F.2d 91, 97 (2d Cir. 1986)*; *New York Airlines, 623 F. Supp. at 1448*; *Hill Aircraft & Leasing Corp. v. Fulton County, 561 F. Supp. 667, 673 (N.D. Ga. 1982)*, *aff'd without opinion, 729 F.2d 1467 (11th Cir. 1984)*.

The evidence weighs more strongly against appellant with respect to *Cort*'s second, "legislative intent," inquiry. There is nothing in the legislative history that suggests any intent to create a private right of action. At the same time, the statute as a whole provides an administrative and judicial enforcement scheme that suggests at least some Congressional wish for an element of administrative expertise at the enforcement stage, an expertise that **[*15]** tends to be lost when private parties can enforce the statute directly in federal court. This latter view is reinforced by the reference to the Secretary of Transportation in the first quoted sentence and by the fact that Congress created an express private right of right of action elsewhere in related provisions of the statute, but not here. *See* 49 U.S.C. App. § 1487 (1982) (creating a private right of action for violations of § 1371(a) of the same Act). Thus, if anything, **[**18]** the statute manifests legislative intent to deny, not to grant, a private right of action.

Although the third and fourth *Cort* factors better serve Interface's claim, these are minor factors that, here, cannot make a legal difference. Indeed, the Supreme court has said ***HN12*** that a private right of action should not be implied on the basis of these factors alone. *See* *Transamerica Mortgage Advisors, Inc. v. Lewis, 444 U.S. 11, 23, 62 L. Ed. 2d 146, 100 S. Ct. 242 (1979)*; *Touche Ross & Co. v. Redington, 442 U.S. 560, 575-76, 61 L. Ed. 2d 82, 99 S. Ct. 2479 (1979)*. We therefore agree with those courts that have held that § 1349(a) does not create a private right of action. *See* *Pumpkin Air, Inc. v. Addison, 608 F. Supp. 787, 794 (N.D. Tex. 1985)*; *IFC Aviation, Inc. v. Massachusetts Port Authority*, No. 84-1945-T, slip op. (D. Mass. May 22, 1985); *Guthrie v. Genesee County, 494 F. Supp. 950, 960 (W.D.N.Y. 1980)*. The sole case holding the contrary, *Niswonger v. American Aviation, Inc.*, 411 F. Supp. 763 (E.D. Tenn. 1975), *aff'd. mem.* 529 F.2d 526 (6th Cir. 1976), was decided before the Supreme Court decision in *Cort v. Ash.*

B.

Interface claims that Massport has violated 49 U.S.C. App. § 2210. That **[**19]** provision reads as follows:

> ***HN13*** As a condition precedent to approval of an airport development project . . . the Secretary shall receive assurances . . . that --
>
> (1) . . . (A) each air carrier using such airport . . . shall be subject to such nondiscriminatory and substantially comparable rates, fees, rentals, and other charges and such nondiscriminatory and substantially comparable rules, regulations, and conditions as are applicable to all such air carriers which make similar use of such airport facilities, subject to reasonable classifications such as tenants or nontenants . . ., and (C) each air carrier using such airport shall have the right to service itself or to use any fixed-base operator that is authorized to serve any such air carrier at such airport. . . .We see two relevant differences between this statute and 49 U.S.C. App. § 1349(a). First, the statute's language suggests more strongly that it was "enacted" for the "especial benefit" of air carriers such as Interface. Second (and conversely), the statute's language also suggests more strongly that Congress had in mind an alternative enforcement scheme inconsistent with a private right of action. ***HN14*** That language does **[**20]** not impose on airport developers a duty that arguably could run in favor of private plaintiffs. Rather, it imposes only the duty to give "assurances" to "the Secretary." The view that Congress intended to enact an exclusively administrative enforcement scheme is reinforced by legislative history that refers only to the right of air carriers "to consult" with the Secretary. *See* H. R.

Rep. No. 594, 94th Cong., 2d Sess., *reprinted in* 1976 U.S. Code Cong. & Admin. News 1600, 1614; H. R. Conf. Rep. No. 1292, 94th Cong., 2d Sess., *reprinted in* 1976 U.S. Code Cong. & Admin. News 1638, 1648. For this reason, we believe that Congress did not intend to create a private right of action under § 2210. *See* *Arrow Airways, Inc. v. Dade County, 749 F.2d 1489 (11th Cir. 1985)*; *IFC Aviation*, No. 84-1945-T, slip op. at 2; *Hill Aircraft, 561 F. Supp. at 671-73* (discussing § 2210's predecessor).

C.

Interface also says that Massport assesses, on flights departing through terminal E, a charge that amounts to nearly $ 10 per passenger flown. Interface claims that this charge violates the Anti-Head-Tax **[*16]** Act, 49 U.S.C. App. § 1513. The statute says

> ***HN15*** (a) No state (or political subdivision **[**21]** thereof . . .) shall levy or collect a tax, fee, head charge, or other charge, directly or indirectly, on persons traveling in air commerce or on the carriage of persons traveling in air commerce or on the sale of air transportation or on the gross receipts derived therefrom . . . .
>
> (b) . . . nothing in this section shall prohibit a State (or political subdivision thereof . . .) owning or operating an airport from levying or collecting reasonable rental charges, landing fees, and other service charges from aircraft operators for the use of airport facilities.In this case, we find that ***HN16*** the statute impliedly confers on Interface a private right of action.

The primary beneficiaries of this statute are obviously air travelers, not air carriers. Still, by prohibiting the levying of taxes on the *carriage of persons*, the statute at least in some instances gives air carriers a "benefit" that is "especial," at least when compared with the benefit conferred on the general public. The ban on head taxes means that air carriers will neither have to face diminished demand for costlier services nor have to absorb all or part of the charge by reducing ticket prices. *Cf.* *Indianapolis Airport* **[**22]** *Authority v. American Airlines, Inc., 733 F.2d 1262, 1267 (7th Cir. 1984)* ("Whether airline or passenger ultimately bears the cost of an airport fee depends on the conditions of supply and demand rather than on who is assessed the charge."). Given the close relation between traveler and carrier, it seems reasonable to give some weight to this "especial benefit."

Moreover, the second, third, and fourth *Cort* factors also support implication of a private right of action. With respect to the "legislative intent" to permit private enforcement actions, the absence of the word "Secretary" from the statute suggests that Congress did not consider it especially important to employ administrative expertise in the statute's enforcement. This suggestion is reinforced by the fact that Congress did not provide the extensive administrative and judicial enforcement scheme for § 1513 that it created for §§ 1349(a) and 2210. Moreover, the legislative history of § 1513 suggests that Congress viewed air carriers as a kind of surrogate for air passengers. Congress realized, for example, that in banning taxes on the carriage of persons, and thereby directly benefiting air carriers, it simultaneously **[**23]** protected air travelers from paying a tax "passed through" to their tickets. *See* S. Rep. No. 12, 93d Cong., 1st Sess., *reprinted in* 1973 U.S. Code Cong. & Admin. News 1434, 1451. Because the amount of tax imposed on each passenger is ordinarily small, individual travelers may prove unwilling to take the time

and trouble to determine whether the tax is unlawful. A carrier, on the other hand, will often have a significant financial incentive, and the expertise needed, to enforce the statute. Thus, private enforcement would further the purposes of § 1513. Finally, the area is one especially suited for federal action, in that the statute itself seeks to prohibit certain activity by the States. Because all four *Cort* factors argue to some degree in favor of the existence of a private right of action, we conclude that in this instance the Congress intended to grant a private right of action. *See Indianapolis Airport Authority, 733 F.2d 1262* (assuming without discussion that a private right of action exists under § 1513); *American Airlines, Inc. v. Philadelphia, 414 F. Supp. 1226 (E.D. Pa. 1976)* (same).

III.

On appeal, Interface also asserted several new claims. It **[**24]** alleged that Massport's actions violate the Supremacy and *Commerce Clauses of the United States Constitution*. Because these constitutional claims were not raised below, we will not consider them here. *See United States v. State Tax Commission, 481 F.2d 963, 976 (1st Cir. 1973)*; *Securities & Exchange Commission v. Milner, 474 F.2d 162, 166 (1st Cir. 1973)*. For the same reason, we also will not consider Interface's claims under *42 U.S.C. § 1983 (1982)*. *See Dobb v. Baker, 505 F.2d 1041, 1044 (1st Cir. 1974)*.

**[*17]** IV.

In sum, with the exception of the claim under 49 U.S.C. § 1513, we affirm the district court's dismissal of Interface's claims. The judgment of the district court with respect to § 1513 is vacated, and the case is remanded for proceedings not inconsistent with this opinion.

*So ordered.*

# EXHIBIT 276

LexisNexis

Caution
As of: August 12, 2014 9:13 AM EDT

**J. Truett Payne Co. v. Chrysler Motors Corp.**
Supreme Court of the United States
January 21, 1981, Argued ; May 18, 1981, Decided
No. 79-1944

**Reporter:** 451 U.S. 557; 101 S. Ct. 1923; 68 L. Ed. 2d 442; 1981 U.S. LEXIS 49; 49 U.S.L.W. 4516; 1981-1 Trade Cas. (CCH) P64,013
J. TRUETT PAYNE CO., INC. v. CHRYSLER MOTORS CORP.

**Prior History:** CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT.

**Disposition:** *607 F.2d 1133*, vacated and remanded.

**Core Terms**

damages, sales, competitors, purchaser, profits, antitrust, price discrimination, retail price, cases, favored, disfavored, programs, lowered, substantial evidence, anti trust law, district court, wrongdoer, commerce, dealer, retail, bonus, infer

**LexisNexis® Headnotes**

Antitrust & Trade Law > Robinson-Patman Act > General Overview

***HN1*** See *15 U.S.C.S. § 13(a)*.

Antitrust & Trade Law > Clayton Act > General Overview

***HN2*** See *15 U.S.C.S. § 15*.

Antitrust & Trade Law > Clayton Act > General Overview
Antitrust & Trade Law > Clayton Act > Claims
Antitrust & Trade Law > Clayton Act > Remedies > General Overview
Antitrust & Trade Law > Clayton Act > Remedies > Damages
Antitrust & Trade Law > ... > Price Discrimination > Competitive Injuries > General Overview
Antitrust & Trade Law > Regulated Practices > Private Actions > Prioritizing Resources & Organization for Intellectual Property Act
Antitrust & Trade Law > Robinson-Patman Act > General Overview
Antitrust & Trade Law > Robinson-Patman Act > Remedies > Damages

***HN3*** By its terms *15 U.S.C.S. § 13(a)* is a prophylactic statute which is violated merely upon a showing that the effect of such discrimination may be substantially to lessen competition. As cases have recognized, the statute does not require that the discriminations must in fact have harmed

competition. *15 U.S.C.S. § 15*, in contrast, is essentially a remedial statute. It provides treble damages to any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws. To recover treble damages, then, a plaintiff must make some showing of actual injury attributable to something the antitrust laws were designed to prevent.

Antitrust & Trade Law > Clayton Act > General Overview

***HN4*** Proof of a violation does not mean that a disfavored purchaser has been actually injured within the meaning of *15 U.S.C.S. § 15*.

Antitrust & Trade Law > ... > Private Actions > Remedies > General Overview

***HN5*** Damage issues in these cases are rarely susceptible of the kind of concrete, detailed proof of injury which is available in other contexts. The court has repeatedly held that in the absence of more precise proof, the factfinder may conclude as a matter of just and reasonable inference from the proof of defendants' wrongful acts and their tendency to injure plaintiffs' business, and from the evidence of the decline in prices, profits and values, not shown to be attributable to other causes, that defendants' wrongful acts had caused damage to the plaintiffs.

Antitrust & Trade Law > Robinson-Patman Act > General Overview

Antitrust & Trade Law > Robinson-Patman Act > Claims

Antitrust & Trade Law > Robinson-Patman Act > Remedies > General Overview

Antitrust & Trade Law > Robinson-Patman Act > Remedies > Damages

***HN6*** Even if there is a violation of the Robinson-Patman Act, a petitioner is not excused from its burden of proving antitrust injury and damages. It is simply that once a violation has been established, that burden is to some extent lightened.

**Lawyers' Edition Display**

## Decision

Recovery of treble damages in price discrimination case under 4 of Clayton Act (*15 USCS 15*), held dependent upon showing of actual injury resulting from price discrimination.

## Summary

A former automobile dealer brought suit in the United States District Court for the Northern District of Alabama under 2(a) of the Clayton Act, as amended by the Robinson-Patman Act (*15 USCS 13(a)*), alleging that an automobile manufacturer's sales incentive program violated the price discrimination prohibition of 2(a). The dealer argued that since the manufacturer's program, which assigned him a sales objective and paid him a bonus for each car sold in excess of his objective, was set higher than those of his competitors, he received fewer bonuses to the extent that he failed to meet his objectives while his competitors met theirs, resulting in price discrimination whereby he paid more for his automobiles than his competitors. The jury returned a verdict against the manufacturer and awarded the dealer damages which the District Court trebled pursuant to 4 of the Clayton Act (*15 USCS 15*). The United States Court of Appeals for the Fifth Circuit reversed, finding that in order to recover treble damages under 4, the dealer must prove (1) a violation of the antitrust law, (2) cognizable injury attributable to the violation, and (3) at least the approximate amount of damage. Further, it found it unnecessary to

consider whether the manufacturer's incentive program violated 2(a), since the dealer failed to introduce substantial evidence of injury attributable to the program (*607 F2d 1133*).

On certiorari, the United States Supreme Court vacated and remanded. In an opinion by Rehnquist, J., joined by Burger, Ch. J., and Stewart, White, and Stevens, JJ., it was held (1) that the dealer must prove actual injury resulting from a price discrimination prohibited by 2(a) if it is to recover treble damages under 4, and (2) that the case would be remanded so that the Court of Appeals could pass upon the manufacturer's contention that the evidence adduced at trial was insufficient to support a finding of violation of 2(a), where it was a close question whether the dealer's evidence would be sufficient to support a jury award, and where the Court of Appeals had bypassed the issue of whether the manufacturer in fact violated 2(a) and had gone directly to the issue of damages.

Powell, J., joined by Brennan, Marshall, and Blackmun, JJ., dissenting in part, expressed the view that the judgment of the Court of Appeals should have been affirmed, rather than being vacated and remanded, since, even if there were some reason for the Supreme Court to review the evidence in this case, the Court of Appeals was correct in finding the dealer's evidence insufficient to show a competitive injury of the kind that antitrust laws were enacted to prevent.

**Headnotes**

PRACTICES §36 > price discrimination -- treble damages -- proof of injury -- > Headnote:

***LEdHN[1]*** [1]

In a suit brought by a former automobile dealer under 2(a) of the Clayton Act, as amended by the Robinson-Patman Act (*15 USCS 13(a)*), alleging that an automobile manufacturer's sales incentive programs violated the price discrimination prohibition of 2(a), the dealer is not entitled to automatic damages in the amount of the price discrimination upon a showing of a violation of 2(a), and must prove more than a violation of 2(a) if he is to recover treble damages under 4 of the Clayton Act (*15 USCS 15*), since 2(a) is a prophylactic statute which is violated merely upon a showing that injury may result from the price discrimination prohibited under 2(a), whereas 4 is a remedial statute which provides treble damages upon some showing of actual injury attributable to something the antitrust laws were designed to prevent, and since proof of a violation of 2(a) does not mean that a disfavored purchaser has been actually injured within the meaning of 4.

ERROR §1692.1 > remand -- issue not passed on by court below -- > Headnote:

***LEdHN[2]*** [2]

The United States Supreme Court, in a case in which a former automobile dealer seeks treble damages under 4 of the Clayton Act (*15 USCS 15*), by alleging that an automobile manufacturer's sales incentive programs, which assigned the dealer a sales objective and paid it a bonus for each car sold in excess of its objective, violated the price discrimination prohibition of 2(a) of the Clayton Act, as amended by the Robinson-Patman Act (*15 USCS 13(a)*), by setting the dealer's sales objectives higher than those of its competitors, thereby causing the dealer to receive fewer bonuses and causing it to pay more for its automobiles, will remand the case so that the Federal Court of Appeals may pass upon the manufacturer's contention that the evidence adduced at trial was insufficient to support a finding of violation of 2(a), where, while it is a close question whether the dealer's evidence, consisting of testimony that it lost sales to its competitors, was

undersold by them, suffered a reduced market share of retail sales, had to force business so that it could meet it assigned quota, and had to overallow on trade-ins, as a result of the manufacturer's sales incentive programs, would be sufficient to support a jury award, the Court of Appeals bypassed the issue of whether the manufacturer in fact violated 2(a), and went directly to the issue of damages. (Powell, Brennan, Marshall, and Blackmun, JJ., dissented in part from this holding.)

ERROR §1750 > remand -- what may be considered -- > Headnote:

***LEdHN[3]*** [3]

On remand after the United States Supreme Court vacated the Federal Court of Appeals judgment, the Supreme Court having remanded the case so that the Court of Appeals may pass upon the manufacturer's contention that the evidence adduced at trial was insufficient to support a finding that it violated 2(a) of the Clayton Act, as amended by the Robinson-Patman Act (*15 USCS 13(a)*), as alleged by a former automobile dealer, where the Court of Appeals bypassed the issue, at trial, of whether the manufacturer in fact violated 2(a), if the Court of Appeals determines that the manufacturer did violate 2(a), it should then consider the sufficiency of the dealer's evidence of injury.

**Syllabus**

Petitioner, a former automobile dealer, brought suit against respondent automobile manufacturer in Federal District Court, alleging that respondent's "sales incentive" programs over a certain period violated the price-discrimination prohibition of § 2 (a) of the Clayton Act, as amended by the Robinson-Patman Act. Under its programs, respondent paid a bonus to its dealers if they exceeded their quotas -- set by respondent for each dealer -- of cars to be sold at retail or purchased from respondent. Petitioner alleged that respondent set petitioner's quotas higher than those of its competitors; that to the extent it failed to meet its quotas, and to the extent its competitors met their lower quotas, petitioner received fewer bonuses; and that the net effect was that it paid more for its automobiles than did its competitors. Petitioner contended that the amount of the price discrimination -- the amount of the price difference multiplied by the number of petitioner's purchases -- was $ 81,248, and that when petitioner went out of business, the going-concern value of the business ranged between $ 50,000 and $ 170,000. Respondent maintained that the sales incentive programs were nondiscriminatory, and that they did not injure petitioner or adversely affect competition. The jury returned a verdict awarding petitioner $ 111,247.48 in damages, which the District Court trebled. The Court of Appeals reversed, holding that it was unnecessary to consider whether a violation of § 2 (a) had been proved, since petitioner had failed to introduce substantial evidence of injury attributable to the programs, much less substantial evidence of the amount of such injury, as was required in order to recover treble damages under § 4 of the Clayton Act.

*Held*:

1. Petitioner's contention that once it has proved a price discrimination in violation of § 2 (a) it is entitled at a minimum to so-called "automatic damages" in the amount of the price discrimination is without merit. Section 2 (a), a prophylactic statute which is violated merely upon a showing that "the effect of such discrimination *may be* substantially to lessen competition," does not require, for purposes of injunctive actions, that the discrimination must in fact have harmed competition.

*Corn Products Co. v. FTC, 324 U.S. 726*; *FTC v. Morton Salt Co., 334 U.S. 37*. However, under § 4 of the Clayton Act, which is essentially a remedial statute providing treble damages to any person "who *shall be injured* in his business or property by reason of anything forbidden in the antitrust laws," a plaintiff must make some showing of actual injury attributable to something the antitrust laws were designed to prevent. Thus it must prove more than a violation of § 2 (a), since such proof establishes only that injury *may* result. Cf. *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477*. Pp. 561-563.

2. The rule excusing antitrust plaintiffs from an unduly rigorous standard of proving antitrust injury, see, *e. g.*, *Zenith Radio Corp. v. Hazeltine Research, Inc., 395 U.S. 100,* will not be applied here to determine whether petitioner, though not entitled to "automatic damages," has produced enough evidence of actual injury to sustain recovery. While it is a close question whether petitioner's evidence would be sufficient to support a jury award even under such rule, a more fundamental difficulty is that the cases relied upon by petitioner all depend in greater or lesser part on the inequity of a wrongdoer defeating the recovery of damages against him by insisting upon a rigorous standard of proof. In this case, it cannot be said with assurance that respondent is a "wrongdoer" since the Court of Appeals went directly to the issue of damages after bypassing the question whether respondent in fact violated § 2 (a). The proper course is to remand the case so that the Court of Appeals may pass upon respondent's contention that the evidence was insufficient to support a finding of such violation. If the court determines that respondent did violate the Act, it should then consider the sufficiency of petitioner's evidence of injury. Pp. 563-568.

**Counsel:** C. Lee Reeves argued the cause and filed briefs for petitioner.

J. Ross Forman III argued the cause and filed a brief for respondent. [*]

**Judges:** REHNQUIST, J., delivered the opinion of the Court, in which BURGER, C. J., and STEWART, WHITE, and STEVENS, JJ., joined. POWELL, J., filed an opinion dissenting in part, in which BRENNAN, MARSHALL, and BLACKMUN, JJ., joined, post, p. 569.

**Opinion by:** REHNQUIST

**Opinion**

**[*559] [***446] [**1925]** JUSTICE REHNQUIST delivered the opinion of the Court.

The question presented in this case is the appropriate measure of damages in a suit brought under § 2 (a) of the Clayton Act, as amended by the Robinson-Patman Act. [1]

---

[*] Robert H. Whaley filed a brief for Ricky Hasbrouck et al. as amici curiae urging reversal.

Briefs of amici curiae were filed by Thomas E. Deacy, Jr., E. Houston Harsha, and Alan I. Becker, for Cessna Aircraft Co.; and by John T. Cusack and Gordon B. Nash, Jr., for Vanco Beverage, Inc.

[1] Section 2 (a) of the Clayton Act, 38 Stat. 730, as amended by the Robinson-Patman Act, 49 Stat. 1526, 15 U. S. C. § 13 (a), provides in pertinent part:

***HN1*** "It shall be unlawful for any person engaged in commerce, in the course of such commerce, either directly or indirectly, to discriminate in price between different purchasers of commodities of like grade and quality, where either or any of the purchases involved in such discrimination are in commerce, where such commodities are sold for use, consumption, or resale within the United States . . . and where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy or prevent competition with any person who either grants or knowingly receives the benefits of such discrimination, or with customers of either of them . . . ."

**[**1926]** Petitioner, for several decades a Chrysler-Plymouth dealer in Birmingham, Ala., went out of business in 1974. It subsequently brought suit against respondent in the United States District Court for the Northern District of Alabama, alleging that from January 1970 to May 1974 respondent's various "sales incentive" programs violated § 2 (a). Under one type of program, respondent assigned to each participating dealer a sales objective and paid to the dealer a bonus on each car sold in excess of that objective. Under another type of program, respondent required each dealer to purchase from it a certain quota of automobiles before it would pay a bonus on the sale of automobiles sold at retail. The amount of the **[*560]** bonus depended on the number of retail sales (or wholesale purchases) made in excess of the dealer's objective, and could amount to several hundred dollars. Respondent set petitioner's objectives higher than those of its competitors, requiring it to sell (or purchase) more automobiles to obtain a bonus than its competitors. To the extent petitioner failed to meet those objectives and to the extent its competitors met their lower objectives, petitioner received fewer bonuses. The net effect of all this, according to petitioner, was that it paid more money for its automobiles than did its competitors. It contended that the amount of the price discrimination -- the amount of the price difference multiplied by the number of **[***447]** petitioner's purchases -- was $ 81,248. It also claimed that the going-concern value of the business as of May 1974 ranged between $ 50,000 and $ 170,000.

Respondent maintained that the sales incentive programs were nondiscriminatory, and that they did not injure petitioner or adversely affect competition. The District Court denied respondent's motion for a directed verdict. The jury returned a verdict against respondent and awarded petitioner $ 111,247.48 in damages, which the District Court trebled.

The Court of Appeals for the Fifth Circuit reversed with instructions to dismiss the complaint. *607 F.2d 1133 (1979)*. It found that in order to recover treble damages under § 4 of the Clayton Act, a plaintiff must prove (1) a violation of the antitrust laws, (2) cognizable injury attributable to the violation, and (3) at least the approximate amount of damage. It found it unnecessary to consider whether petitioner proved that respondent's incentive programs violated § 2 (a) because, in its view, petitioner had "failed to introduce substantial evidence of injury attributable to the programs, much less substantial evidence of the amount of such injury." *Id., at 1135*. Rejecting petitioner's theory of "automatic damages," under which mere proof of discrimination establishes the fact and amount of injury, the court held that injury must be proved by more than mere "[conclusory] statements **[*561]** by the plaintiff, without evidentiary support." *Id., at 1136-1137*. The court concluded that the District Court erred in refusing respondent's motion for a directed verdict and in denying its motion for judgment notwithstanding the verdict. We granted certiorari, *449 U.S. 819 (1980)*, to review the decision of the Court of Appeals.

I

***LEdHN[1]*** [1]Petitioner first contends that once it has proved a price discrimination in violation of § 2 (a) it is entitled at a minimum to so-called "automatic damages" in the amount of the price discrimination. Petitioner concedes **[**1927]** that in order to recover damages it must

---

Section 4 of the Clayton Act, 38 Stat. 731, 15 U. S. C. § 15, provides:

***HN2*** "Any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover three-fold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee."

establish cognizable injury attributable to an antitrust violation and some approximation of damage. Brief for Petitioner 9. It insists, however, that the jury should be permitted to infer the requisite injury and damage from a showing of a substantial price discrimination. Petitioner notes that this Court has consistently permitted such injury to be inferred in injunctive actions brought to enforce § 2 (a), *e. g., FTC v. Morton Salt Co., 334 U.S. 37 (1948)*, and argues that private suits for damages under § 4 should be treated no differently. We disagree. [2]

***HN3*** By **[***448]** its terms § 2 (a) is a prophylactic statute which is violated merely upon a showing that "the effect of such discrimination *may be* substantially to lessen competition." **[*562]** (Emphasis supplied.) As our cases have recognized, the statute does not "require that the discriminations must in fact have harmed competition." *Corn Products Refining Co*. v. *FTC, 324 U.S. 726, 742 (1945)*; *FTC v. Morton Salt Co., supra, at 46* ("the statute does not require the Commission to find that injury has actually resulted"). Section 4 of the Clayton Act, in contrast, is essentially a remedial statute. It provides treble damages to "[any] person who *shall be injured* in his business or property by reason of anything forbidden in the antitrust laws . . . ." (Emphasis supplied.) To recover treble damages, then, a plaintiff must make some showing of actual injury attributable to something the antitrust laws were designed to prevent. *Perkins v. Standard Oil Co., 395 U.S. 642, 648 (1969)* (plaintiff "must, of course, be able to show a causal connection between the price discrimination in violation of the Act and the injury suffered"). It must prove more than a violation of § 2 (a), since such proof establishes only that injury *may* result.

Our decision here is virtually governed by our reasoning in *Brunswick Corp*. v. *Pueblo Bowl-O-Mat, Inc., 429 U.S. 477 (1977)*. There we rejected the contention that the mere violation of § 7 of the Clayton Act, which prohibits mergers which *may* substantially lessen competition, gives rise to a damages claim under § 4. We explained that "to recover damages [under § 4] respondents must prove more than that the petitioner violated § 7, since such proof establishes only that injury may result." *Id., at 486*. Likewise in this case, ***HN4*** proof of a violation does not mean that a disfavored purchaser has been actually "injured" within the meaning of § 4.

The legislative history buttresses this view. Both the Patman bill, H. R. 8442, § 2 (d), 74th Cong., 1st Sess. (1935), as introduced in the House, and the Robinson bill, S. 3154, § 2 (d), 74th Cong., 2d Sess. (1935), as introduced in the Senate, provided that a plaintiff's damages for a violation of § 2 (a) shall be presumed to be the amount of the price discrimination. The provision, however, encountered such **[*563]** strong opposition in both Houses that the House Committee eliminated it from its bill, H. R. Rep. No. 2287, 74th Cong., 2d Sess., 16 (1936), and the Senate Committee modified the provision to authorize presumptive damages in the amount of the discrimination only when plaintiff shows the "fact of damage." S. Rep. No. 1502, 74th Cong., 2d Sess., 8 (1936). The Conference Committee eliminated even that compromise, and § 2 (a) was passed in its present form. Congress thus **[**1928]** has rejected the very concept which

---

[2] The automatic-damages theory has split the lower courts. The leading case approving the theory is *Fowler Manufacturing Co*. v. *Gorlick*, 415 F.2d 1248 (CA9 1969), cert. denied, *396 U.S. 1012 (1970)*. See also *Elizabeth Arden Sales Corp*. v. *Gus Blass Co*., 150 F.2d 988 (CA8) (involving §§ 2 (d) and 2 (e) of the Act), cert. denied, *326 U.S. 773 (1945)*; *Grace* v. *E. J. Kozin Co*., 538 F.2d 170 (CA7 1976) (involving § 2 (c) of the Act). The leading case rejecting the theory is *Enterprise Industries, Inc*. v. *Texas Co*., 240 F.2d 457 (CA2), cert. denied, *353 U.S. 965 (1957)*. Accord, *Edward J. Sweeney & Sons, Inc*. v. *Texaco, Inc*., 637 F.2d 105 (CA3 1980); *McCaskill* v. *Texaco, Inc*., 351 F.Supp. 1332 (SD Ala. 1972), affirmance order, *486 F.2d 1400 (CA5 1973)*; *Kidd* v. *Esso Standard Oil Co*., 295 F.2d 497 (CA6 1961).

petitioner seeks to have the Court judicially legislate. *Gulf Oil Corp*. v. *Copp Paving Co., 419 U.S. 186, 199-201 (1974)*. [3]

II

**[***449]** ***LEdHN[2]*** [2]Petitioner next contends that even though it may not be entitled to "automatic damages" upon a showing of a violation of § 2 (a), it produced enough evidence of actual injury to survive a motion for a directed verdict. That evidence consisted primarily of the testimony of petitioner's owner, Mr. Payne, and an expert witness, a professor of economics. Payne testified that the price discrimination was one of the causes of the dealership going out of business. In support of that contention, he testified that his salesmen told him that the dealership lost sales to its competitors, and that its market share of retail Chrysler-Plymouth sales in the Birmingham area was 24% in 1970, 27% in 1971, 23% in 1972, and 25% in 1973. Payne contended that it was proper to infer that the 4% drop in 1972 was a result of the incentive programs. **[*564]** He also testified that the discrimination caused him to "force" business so that he could meet his assigned quotas. That is, his desire to make a sale induced him to "overallow" on trade-ins, thus reducing his profits on his used car operation. App. 51-52. Payne adduced evidence showing that his average gross profit on used car sales was below that of his competitors, though that same evidence revealed that his average gross profit on new sales was higher. *Id., at 269*.

Neither Payne nor petitioner's expert witness offered documentary evidence as to the effect of the discrimination on retail prices. Although Payne asserted that his salesmen and customers told him that the dealership was being undersold, *id*., at 35-37, 92, 95, he admitted he did not know if his competitors did in fact pass on their lower costs to their customers. *Id., at 44, 57*. Petitioner's expert witness took a somewhat different position. He believed that the discrimination would ultimately cause retail prices to be held at an artificially high level since petitioner's competitors would not reduce their retail prices as much as they would have done if petitioner received an equal bonus from respondent. *Id., at 103, 135*. He also testified that petitioner was harmed by the discrimination even if the favored purchasers did not lower their retail prices, since petitioner in that case would make less money per car. [4]*Id., at 139*.

**[*565]** **[***450]** **[**1929]** Even construed most favorably to petitioner, the evidence of injury is weak. Petitioner nevertheless asks us to consider the sufficiency of its evidence in light of

---

[3] Relying on *Bruce's Juices*, *Inc*. v. *American Can Co*., 330 U.S. 743, 757 (1947), petitioner argues that this Court has previously accepted the automatic-damages theory. In that case, the Court stated that if petitioner can show an illegal price discrimination under the Act, "it would establish its right to recover three times the discriminatory difference without proving more than the illegality of the prices." *Ibid*. But that statement is merely dictum, since the only issue before the Court was whether a violation of § 2 (a) could be used as an affirmative defense to void a contract.

[4] Respondent suggests that petitioner's inability to show that his favored competitors lowered their retail sales price should defeat recovery. That argument assumes that evidence of a lower retail price is the ***sine qua non*** of antitrust injury, that the disfavored purchaser is simply not "injured" unless the favored purchaser has lowered his price. If the favored purchaser has lowered his retail price, for example, the disfavored purchaser will lose sales to the extent it does not match that lower price. Similarly, if the disfavored purchaser matches the lower price, it will lose profits. Because petitioner has not shown that the favored purchasers have lowered their retail price, petitioner is arguably foreclosed from showing that it lost either sales or profits. Justice Cardozo seemingly adopted this position in *ICC* v. *United States*, 289 U.S. 385, 390-391 (1933), a case involving rate discrimination under the Interstate Commerce Act:

"If by reason of the discrimination, the preferred producers have been able to divert business that would otherwise have gone to the disfavored shipper, damage has resulted to the extent of the diverted profits. If the effect of the discrimination has been to force the shipper to sell at a lowered price . . . damage has resulted to the extent of the reduction. But none of these consequences is a necessary inference from discrimination without more."

our traditional rule excusing antitrust plaintiffs from an unduly rigorous standard of proving antitrust injury. In *Zenith Radio Corp*. v. *Hazeltine Research, Inc., 395 U.S. 100, 123-124 (1969)*, for example, the Court discussed at some length the fixing of damages in a case involving market exclusion. We accepted the proposition that damages could be awarded on the basis of plaintiff's estimate of sales it could have made absent the violation:

***HN5*** "[Damage] issues in these cases are rarely susceptible of the kind of concrete, detailed proof of injury which is available in other contexts. The Court has repeatedly held that in the absence of more precise proof, the factfinder may 'conclude as a matter of just and reasonable inference from the proof of defendants' wrongful acts and their tendency to injure plaintiffs' business, and from the evidence of the decline in prices, profits and values, not shown to be attributable to other causes, **[*566]** that defendants' wrongful acts had caused damage to the plaintiffs.' *Bigelow* v. *RKO Pictures, Inc., supra*, at 264. See also *Eastman Kodak Co*. v. *Southern Photo Materials Co., 273 U.S. 359, 377-379 (1927)*; *Story Parchment Co*. v. *Paterson Parchment Paper Co., 282 U.S. 555, 561-566 (1931)*." *Ibid*.

In *Bigelow v. RKO Radio Pictures, Inc., 327 U.S. 251 (1946)*, relied on in *Zenith*, film distributors had conspired to deny the plaintiff theater access to first-run films. The jury awarded damages based on a comparison of plaintiff's actual profits with the contemporaneous profits of a competing theater with access to first-run films. Plaintiff had also adduced evidence comparing his actual profits during the conspiracy with his profits when he had been able to obtain first-runs. The lower court thought the evidence too imprecise to support the award, but we reversed because the evidence was sufficient to support a "just and reasonable inference" of damage. We explained:

"[Any] other rule would enable the wrongdoer to profit by his wrongdoing at the expense of his victim. It would be an inducement to make wrongdoing so effective and complete in every case as to preclude any recovery, by rendering the measure of damages uncertain. **[***451]** Failure to apply it would mean that the more grievous the wrong done, the less likelihood there would be of a recovery." *327 U.S., at 264-265*.

Our willingness to accept a degree of uncertainty in these cases rests in part on the difficulty of ascertaining business damages as compared, for example, to damages resulting from a personal injury or from condemnation of a parcel of land. The vagaries of the marketplace usually deny us sure knowledge of what plaintiff's situation would have been in the absence of the defendant's antitrust violation. But our willingness also rests on the principle articulated in cases such as *Bigelow*, that it does not "'come with very good grace'" for **[*567]** the wrongdoer to insist upon specific and certain proof of the injury which it has itself inflicted. *Hetzel v. Baltimore & Ohio R. Co., 169 U.S. 26, 39 (1898)* (quoting *United States Trust Co*. v. *O'Brien, 143 N. Y. 284, 289, 38 N. E. 266, 267 (1894)*. Accord, *Story Parchment Co*. v. *Paterson Parchment Paper Co., 282 U.S. 555, 563 (1931)* ("Where the tort itself is of such a nature as to preclude the ascertainment of the amount of damages with certainty, it would be a perversion of fundamental principles of justice to deny all relief to the injured person, and thereby relieve the wrongdoer from making any amend for his **[**1930]** acts"); *Eastman Kodak Co*. v. *Southern Photo Materials Co., 273 U.S. 359, 379 (1927)*.

---

Petitioner argues that is an overly narrow view of antitrust injury. To the extent a disfavored purchaser must pay more for its goods than its competitors, it is less able to compete. It has fewer funds available with which to advertise, make capital expenditures, and the like. Although the inability of petitioner to show that the favored retailers lowered their retail price makes petitioner's argument particularly weak, we find it unnecessary to decide in this case whether such failure as a matter of law demonstrates no competitive injury.

Applying the foregoing principles to this case is not without difficulty. In the first place, it is a close question whether petitioner's evidence would be sufficient to support a jury award even under our relaxed damages rules. In those cases where we have found sufficient evidence to permit a jury to infer antitrust injury and approximate the amount of damages, the evidence was more substantial than the evidence presented here. In *Zenith*, for example, plaintiff compared its sales in Canada, where it was subject to a violation, with its sales in the United States, where it was not. And in *Bigelow*, plaintiff adduced evidence not only comparing its profits with a competitor not subject to the violation but also comparing its profits during the time of the violation with the period immediately preceding the violation. [5]

**[*568]** But a more fundamental difficulty confronts us in this case. The cases relied upon by petitioner all depend in greater or lesser part on the inequity of a wrongdoer defeating the recovery of damages against him by insisting upon a rigorous standard of **[***452]** proof. In this case, however, we cannot say with assurance that respondent is a "wrongdoer." Because the court below bypassed the issue of liability and went directly to the issue of damages, we simply do not have the benefit of its views as to whether respondent in fact violated § 2 (a). Absent such a finding, we decline to apply to this case the lenient damages rules of our previous cases. Had the court below found a violation, we could more confidently consider the adequacy of petitioner's evidence.

***LEdHN[3]*** [3]Accordingly, we think the proper course is to remand the case so that the Court of Appeals may pass upon respondent's contention that the evidence adduced at trial was insufficient to support a finding of violation of the Robinson-Patman Act. We do not ordinarily address for the first time in this Court an issue which the Court of Appeals has not addressed, and we think this would be a poor case in which to depart from that practice. If the court determines on remand that respondent did violate the Act, the court should then consider the sufficiency of petitioner's evidence of injury in light of the cases discussed above. We, of course, intimate no views as to how that issue should be decided. We emphasize that ***HN6*** even if there has been a violation of the Robinson-Patman Act, petitioner is not excused from its burden of proving antitrust injury and damages. It is simply that once a violation has been established, that burden is to some extent lightened.

**[*569]** For the foregoing reasons, the judgment of the Court of Appeals is vacated, and the case is remanded for proceedings consistent with this opinion.

*It is so ordered.*

**Dissent by:** POWELL (In Part)

---

[5] *Story Parchment Co*. v. *Paterson Parchment Paper Co*., 282 U.S. 555 (1931), is similarly distinguishable. In upholding a jury verdict against respondents for a violation of § 2 of the Sherman Act, the Court observed:

"It is true that there was uncertainty as to the extent of damage, but there was none as to the fact of damage; and there is a clear distinction between the measure of proof necessary to establish the fact that petitioner had sustained some damage, and the measure of proof necessary to enable the jury to fix the amount. The rule which precludes the recovery of uncertain damages applies to such as are not the certain result of the wrong, not to those damages which are definitely attributable to the wrong and only uncertain in respect of their amount. . . ." *Id*., at 562.

"If the damage is certain, the fact that its extent is uncertain does not prevent a recovery." *Id*., at 566.

In this case, by contrast, the issue is not so much the amount of damages as whether petitioner has in fact been injured by an antitrust violation.

**Dissent**

JUSTICE POWELL, with whom JUSTICE BRENNAN, JUSTICE MARSHALL, and JUSTICE BLACKMUN join, dissenting in part.

I concur in Part I of the Court's opinion, but simply would affirm the judgment of the Court of Appeals.

The Court of Appeals concluded that petitioner "failed to introduce substantial evidence of injury attributable to [respondent's program], much less substantial evidence **[**1931]** of the amount of such injury." *607 F.2d 1133, 1135*. In Part II of its opinion, the Court today reviews the evidence, vacates the judgment of the Court of Appeals, and remands the case for a resifting of the evidence and determination of whether respondent violated the Clayton Act as amended by the Robinson-Patman Act. The Court identifies no error of fact or law in the judgment of the Court of Appeals, but vacates that judgment only because the Court finds it "unclear" whether there is sufficient evidence. I find no basis for this Court undertaking to second-guess the Court of Appeals as to the sufficiency of evidence.

Even if there were some satisfactory reason for us to review the evidence in this relatively uncomplicated case, I think the Court of Appeals was plainly correct in finding petitioner's evidence insufficient to show a competitive injury of the kind that the antitrust laws were enacted to prevent. See *Brunswick Corp*. v. *Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 488-489 (1977)*. Section 2 (a) **[***453]** is a prophylactic statute that makes unlawful price discrimination that "may . . . lessen competition." Thus, a court cannot infer from the fact of a violation that defendant's behavior has caused plaintiff any injury. A plaintiff must show, to recover damages for violation of § 2 (a), that unlawful discrimination in price allowed a favored competitor to draw sales or profits **[*570]** from him, the unfavored competitor. See *Enterprise Industries, Inc*. v. *Texas Co., 240 F.2d 457, 458* (CA2), cert. denied, 353 U.S. 965 (1957). Petitioner's evidence, which the Court concedes to be "weak," *ante*, at 565, amounts to nothing more than a showing that its market share declined temporarily 4% in 1972. Petitioner presented no substantial evidence that respondent's incentive program caused its market share to shrink. Indeed, over the 4-year period of the challenged programs its market share increased 1%. Rather, petitioner relied on its president's conclusory testimony, which consisted in major part of hearsay statements from petitioner's automobile salesmen. Hypothetical analysis of the "predicted effects" of respondent's program by an economics professor also was relied upon by petitioner to prove the actual cause of injury. One hardly would expect this Court to reject a Court of Appeals judgment that evidence as flimsy as this was insufficient to go to the jury.

My concern with the Court's opinion, however, goes beyond its reviewing the evidence. I have understood that in a Robinson-Patman Act case the plaintiff has the burden of proving the fact of antitrust injury by a preponderance of the evidence. See *Perkins v. Standard Oil Co., 395 U.S. 642, 648 (1969)*. Only when this fact has been proved may a court properly be lenient in the evidence it requires to prove the amount of damages. See *Story Parchment Co*. v. *Paterson Parchment Paper Co., 282 U.S. 555, 562 (1931)*. It is not at all apparent that the Court adequately recognizes this distinction.

It seems to me that today's remand measurably increases the uncertainty inherent in the generalities of the Robinson-Patman Act. Accordingly, I dissent.

**References**

54 Am Jur 2d, Monopolies, Restraints of Trade, and Unfair Trade Practices 140, 141, 153, 154, 186, 189, 362, 36312 Federal Procedural Forms L Ed, Monopolies and Restraints of Trade 48:61-48:14718 Am Jur Pl & Pr Forms (Rev), Monopolies, Restraints of Trade and Unfair Trade Practices, Forms 11-30*15 USCS 13*, *15US L Ed Digest, Appeal and Error 1692.1; Restraints of Trade, Monopolies, and Unfair Trade Practices 36, 67L Ed Index to Annos, Damages; Restraints of Trade and MonopoliesALR Quick Index, Double or Treble Damages; Restraints of Trade and MonopoliesFederal Quick Index, Double and Treble Damages; Monopolies and Restraints of Trade; Robinson-Patman Act Annotation References:Robinson-Patman Act as construed by the Supreme Court. 2 L Ed 2d 1737.Measure and elements of damages under 15 USCS 15 entitling person injured in his business or property by reason of anything forbidden in federal antitrust laws to recover treble damages. 16 ALR Fed 14.Measure and elements of damages for violation of Robinson-Patman Act (15 USC 13). 9 ALR Fed 279.*

EXHIBIT 277

LexisNexis®

Warning
As of: August 12, 2014 9:13 AM EDT

# Jefferson Parish Hosp. Dist. No. 2 v. Hyde

Supreme Court of the United States
November 2, 1983, Argued ; March 27, 1984, Decided
No. 82-1031

**Reporter:** 466 U.S. 2; 104 S. Ct. 1551; 80 L. Ed. 2d 2; 1984 U.S. LEXIS 49; 52 U.S.L.W. 4385; 1984-1 Trade Cas. (CCH) P65,908
JEFFERSON PARISH HOSPITAL DISTRICT NO. 2 ET AL. v. HYDE

**Prior History:** CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT.

**Disposition:** *686 F.2d 286*, reversed and remanded.

**Core Terms**

tying, patient, seller, market power, anesthesiologist, tying arrangement, anesthesiological, tying product, buyer, tied product, package, flour, consumer, sugar, anesthesia, anticompetitive, restrain, condemn, hospital service, tie-in, exclusive contract, northern, buy, anti trust law, rule of reason, exclusive-dealing, tied-product, threshold, exploit, staff

**LexisNexis® Headnotes**

Antitrust & Trade Law > Sherman Act > General Overview

***HN1*** See *15 U.S.C.S. § 15*.

Antitrust & Trade Law > ... > Price Fixing & Restraints of Trade > Tying Arrangements > General Overview

***HN2*** Not every refusal to sell two products separately can be said to restrain competition. If each of the products may be purchased separately in a competitive market, one seller's decision to sell the two in a single package imposes no unreasonable restraint on either market, particularly if competing suppliers are free to sell either the entire package or its several parts.

Antitrust & Trade Law > ... > Price Fixing & Restraints of Trade > Tying Arrangements > General Overview

***HN3*** The essential characteristic of an invalid tying arrangement lies in the seller's exploitation of its control over the tying product to force the buyer into the purchase of a tied product that the buyer either did not want at all, or might have preferred to purchase elsewhere on different terms. When such "forcing" is present, competition on the merits in the market for the tied item is restrained and the Sherman Act is violated.

Antitrust & Trade Law > ... > Price Fixing & Restraints of Trade > Per Se Rule & Rule of Reason > General Overview

***HN4*** Per se condemnation -- condemnation without inquiry into actual market conditions -- is only appropriate if the existence of forcing is probable. Thus, application of the per se rule focuses on the probability of anticompetitive consequences.

Antitrust & Trade Law > ... > Price Fixing & Restraints of Trade > Tying Arrangements > General Overview
Healthcare Law > Healthcare Litigation > Antitrust Actions > Facilities
Healthcare Law > Business Administration & Organization > Covenants not to Compete > General Overview

***HN5*** Any inquiry into the validity of a tying arrangement must focus on the market or markets in which the two products are sold, for that is where the anticompetitive forcing has its impact.

Antitrust & Trade Law > ... > Price Fixing & Restraints of Trade > Tying Arrangements > General Overview

***HN6*** A tying arrangement cannot exist unless two separate product markets have been linked.

Antitrust & Trade Law > ... > Price Fixing & Restraints of Trade > Tying Arrangements > General Overview

***HN7*** Tying arrangements need only be condemned if they restrain competition on the merits by forcing purchases that would not otherwise be made. A lack of price or quality competition does not create this type of forcing.

**Lawyers' Edition Display**

**Decision**

Hospital's exclusive contract with firm of anesthesiologists held not to violate Sherman Act.

**Summary**

A board-certified anesthesiologist who was denied admission to a hospital staff, because the hospital had an exclusive services contract with a firm of anesthesiologists, sued for a declaratory judgment that the contract was unlawful and an injunction ordering the hospital to appoint him to the hospital staff. The United States District Court for the Eastern District of Louisiana denied relief, finding that the anticompetitive consequences of the contract were minimal and outweighed by benefits in the form of improved patient care (*513 F Supp 532*). The United States Court of Appeals for the Fifth Circuit reversed on the ground that the contract was illegal per se (*686 F2d 286*).

On certiorari, the United States Supreme Court reversed. In an opinion by Stevens, J., joined by Brennan, White, Marshall, and Blackmun, JJ., it was held that (1) since 70 percent of the patients residing in the parish entered different hospitals, the hospital lacked sufficient market power to apply a rule of per se illegality to the tying arrangement, and (2) evidence that some surgeons and patients preferred the plaintiff's services to those of the firm, without evidence that any patient sophisticated enough to know the difference between two anesthesiologists was not able to go to a hospital that would provide him with the anesthesiologist of his choice, was insufficient to show that the contract unreasonably restrained competition.

Brennan, J., joined by Marshall, J., joined the court's opinion and judgment but filed a separate opinion stating that the court properly adhered to its long held view that tying arrangements are subject to evaluation for per se illegality.

O'Connor, J., joined by Burger, Ch. J., and by Powell and Rehnquist, JJ., concurred on the ground that the per se doctrine should no longer be applied in tying cases, and that the contract was lawful under the rule of reason.

**Headnotes**

RESTRAINTS OF TRADE, MONOPOLIES, AND UNFAIR TRADE PRACTICES §30 > tying arrangements --

***LEdHN[1A]*** [1A]***LEdHN[1B]*** [1B]

An exclusive contract between a hospital and a firm of anesthesiologists, which requires every patient undergoing surgery at the hospital to use the services of that firm of anesthesiologists, does not violate 1 of the Sherman Act (*15 USCS 1*) where 70 percent of the patients residing in the parish enter different hospitals so that the hospital lacks sufficient market power to force patients to buy services they would not otherwise purchase, and the contract does not unreasonably restrain competition.

RESTRAINTS OF TRADE, MONOPOLIES, AND UNFAIR TRADE PRACTICES §64 > parties --

***LEdHN[2A]*** [2A]***LEdHN[2B]*** [2B]

Under 4 of the Clayton Act (*15 USCS 15*), allowing an antitrust suit to be brought by "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws," a board-certified anesthesiologist denied admission to a hospital staff because of the hospital's exclusive services contract with a firm of anesthesiologists has standing to enforce 1 of the Sherman Act (*15 USCS 1*) against the hospital.

RESTRAINTS OF TRADE, MONOPOLIES, AND UNFAIR TRADE PRACTICES §36 > per se violations --

***LEdHN[3A]*** [3A]***LEdHN[3B]*** [3B]

Where a complaint charges that the defendants have engaged in price fixing, or have concertedly refused to deal with nonmembers of an association, or have licensed a patent device on condition that unpatented materials be employed in conjunction with the patented device, then the amount of commerce involved is immaterial because such restraints are illegal per se.

RESTRAINTS OF TRADE, MONOPOLIES, AND UNFAIR TRADE PRACTICES §36 > price fixing --

***LEdHN[4]*** [4]

A price-fixing agreement between competitors is such an arrangement as to be considered a sufficient basis for presuming unreasonableness without the necessity of any analysis of the market context in which the arrangement may be found.

RESTRAINTS OF TRADE, MONOPOLIES, AND UNFAIR TRADE PRACTICES §30 > package sales --

***LEdHN[5A]*** [5A]***LEdHN[5B]*** [5B]

If each of two products may be purchased separately in a competitive market, one seller's decision to sell the two in a single package imposes no unreasonable restraint on either market, particularly if competing suppliers are free to sell either the entire package or its several parts.

RESTRAINTS OF TRADE, MONOPOLIES, AND UNFAIR TRADE PRACTICES §30 > tying arrangements --

***LEdHN[6]*** [6]

The essential characteristic of an invalid tying arrangement lies in the seller's exploitation of its control over the tying product to force the buyer into the purchaser of a tied product that the buyer did not want at all, or might have preferred to purchase elsewhere on different terms; when such forcing is present, competition on the merits for the tied item is restrained and the Sherman Act is violated.

RESTRAINTS OF TRADE, MONOPOLIES, AND UNFAIR TRADE PRACTICES §30 > tying arrangements --

***LEdHN[7]*** [7]

Per se condemnation of a tying arrangement--condemnation without inquiry into actual market conditions--is only appropriate if it is probable that the seller has some special ability to force a purchaser to do something that he would not do in a competitive market.

RESTRAINTS OF TRADE, MONOPOLIES, AND UNFAIR TRADE PRACTICES §30 > tying arrangement -- competitive impact --

***LEdHN[8]*** [8]

To justify per se condemnation of a tying arrangement, as a threshold matter there must be a substantial potential for impact on competition.

RESTRAINTS OF TRADE, MONOPOLIES, AND UNFAIR TRADE PRACTICES §30 > tying arrangement -- single purchaser --

***LEdHN[9]*** [9]

If only a single purchaser is forced with respect to a tied item, the resultant impact on competition is insufficient to warrant the concern of the antitrust law.

RESTRAINTS OF TRADE, MONOPOLIES, AND UNFAIR TRADE PRACTICES §30 > tying arrangement -- undesired product --

***LEdHN[10]*** [10]

When a purchaser is forced to buy a product he would not have otherwise bought even from another seller in the tied product market, there can be no adverse impact on competition because no portion of the market which would otherwise have been available to other sellers has been foreclosed.

RESTRAINTS OF TRADE, MONOPOLIES, AND UNFAIR TRADE PRACTICES §55 > patents -- tying arrangements --

***LEdHN[11]*** [11]

The sale or lease of a patented item on condition that the buyer make all his purchases of a separate tied product from the patentee is unlawful.

RESTRAINTS OF TRADE, MONOPOLIES, AND UNFAIR TRADE PRACTICES §30 > tying arrangement -- market power --

***LEdHN[12]*** [12]

When a seller does not have either the degree or the kind of market power that enables him to force customers to purchase a second, unwanted product in order to obtain the tying product, an

antitrust violation can be established only by evidence of an unreasonable restraint on competition in the relevant market.

RESTRAINTS OF TRADE, MONOPOLIES, AND UNFAIR TRADE PRACTICES §30 > tying arrangement -- product market --

***LEdHN[13]*** [13]

The answer to the question whether one or two products are involved, for the purpose of determining whether an unlawful tying arrangement exists, turns not on the functional relationship between them but rather on the character of the demand for the two items; hence, a tying arrangement cannot exist unless two separate product markets have been linked.

RESTRAINTS OF TRADE, MONOPOLIES, AND UNFAIR TRADE PRACTICES §30 > tying arrangement -- market power --

***LEdHN[14]*** [14]

A hospital lacks the market power sufficient to justify per se condemnation of a tying arrangement where 70 percent of the patients residing in the parish enter different hospitals, even though the prevalence of third-party payment for health care costs reduces price competition and a lack of adequate information renders consumers unable to evaluate the quality of the medical care provided by competing hospitals.

RESTRAINTS OF TRADE, MONOPOLIES, AND UNFAIR TRADE PRACTICES §30 > tying arrangement -- per se illegality --

***LEdHN[15]*** [15]

A hospital's exclusive-services contract with a firm of anesthesiologists, so that every patient undergoing surgery at the hospital must use the services of that firm, is not per se illegal under the Sherman Act where 70 percent of the patients residing in the parish enter different hospitals, because the hospital lacks the market power sufficient to justify per se condemnation of the tying arrangement.

EVIDENCE §343.5 > Sherman Act -- burden of proof --

***LEdHN[16]*** [16]

In order to prevail in the absence of per se liability, a Sherman Act plaintiff has the burden of proving that the conduct in question violated the Sherman Act because it unreasonably restrained competition.

RESTRAINTS OF TRADE, MONOPOLIES, AND UNFAIR TRADE PRACTICES §50 > exclusive requirements contract --

***LEdHN[17A]*** [17A]***LEdHN[17B]*** [17B]

An exclusive requirements contract is unlawful under the Sherman Act if it forecloses so much of the market from penetration by competitors of the person who contracts to furnish exclusively all the other party's requirements, as to unreasonably restrain competition in the affected market.

EVIDENCE §979 > sufficiency -- anticompetitive effect --

***LEdHN[18]*** [18]

There is insufficient evidence to show an actual adverse effect on competition by a hospital's exclusive contract with a firm of anesthesiologists, under which no anesthesiologist outside the firm can provide anesthesiology services at the hospital, where the evidence indicates that some surgeons and patients prefer an outside anesthesiologist's services to those of the firm, but there is no evidence that any patient sophisticated enough to know the difference between two anesthesiologists is unable to go to a hospital that will provide him with the anesthesiologist of his choice.

**Syllabus**

A hospital governed by petitioners has a contract with a firm of anesthesiologists requiring all anesthesiological services for the hospital's patients to be performed by that firm. Because of this contract, respondent anesthesiologist's application for admission to the hospital's medical staff was denied. Respondent then commenced an action in Federal District Court, claiming that the exclusive contract violated § 1 of the Sherman Act, and seeking declaratory and injunctive relief. The District Court denied relief, finding that the anticompetitive consequences of the contract were minimal and outweighed by benefits in the form of improved patient care. The Court of Appeals reversed, finding the contract illegal "*per se*." The court held that the case involved a "tying arrangement" because the users of the hospital's operating rooms (the tying product) were compelled to purchase the hospital's chosen anesthesiological services (the tied product), that the hospital possessed sufficient market power in the tying market to coerce purchasers of the tied product, and that since the purchase of the tied product constituted a "not insubstantial amount of interstate commerce," the tying arrangement was therefore illegal "*per se*."

*Held*: The exclusive contract in question does not violate § 1 of the Sherman Act. Pp. 9-32.

(a) Any inquiry into the validity of a tying arrangement must focus on the market or markets in which the two products are sold, for that is where the anticompetitive forcing has its impact. Thus, in this case the analysis of the tying issue must focus on the hospital's sale of services to its patients, rather than its contractual arrangements with the providers of anesthesiological services. In making that analysis, consideration must be given to whether petitioners are selling two separate products that may be tied together, and, if so, whether they have used their market power to force their patients to accept the tying arrangement. Pp. 9-18.

(b) No tying arrangement can exist here unless there is a sufficient demand for the purchase of anesthesiological services separate from hospital services to identify a distinct product market in which it is efficient to offer anesthesiological services separately from hospital services. The fact that the exclusive contract requires purchase of two services that would otherwise be purchased separately does not make the contract illegal. Only if patients are forced to purchase the contracting firm's services as a result of the hospital's market power would the arrangement have anticompetitive consequences. If no forcing is present, patients are free to enter a competing hospital and to use another anesthesiologist instead of the firm. Pp. 18-25.

(c) The record does not provide a basis for applying the *per se* rule against tying to the arrangement in question. While such factors as the Court of Appeals relied on in rendering its decision -- the prevalence of health insurance as eliminating a patient's incentive to compare costs, and patients' lack of sufficient information to compare the quality of the medical care provided by competing

hospitals -- may generate "market power" in some abstract sense, they do not generate the kind of market power that justifies condemnation of tying. Tying arrangements need only be condemned if they restrain competition on the merits by forcing purchases that would not otherwise be made. The fact that patients of the hospital lack price consciousness will not force them to take an anesthesiologist whose services they do not want. Similarly, if the patients cannot evaluate the quality of anesthesiological services, it follows that they are indifferent between certified anesthesiologists even in the absence of a tying arrangement. Pp. 26-29.

(d) In order to prevail in the absence of *per se* liability, respondent has the burden of showing that the challenged contract violated the Sherman Act because it unreasonably restrained competition, and no such showing has been made. The evidence is insufficient to provide a basis for finding that the contract, as it actually operates in the market, has unreasonably restrained competition. All the record establishes is that the choice of anesthesiologists at the hospital has been limited to one of the four doctors who are associated with the contracting firm. If respondent were admitted to the hospital's staff, the range of choice would be enlarged, but the most significant restraints on the patient's freedom to select a specific anesthesiologist would nevertheless remain. There is no evidence that the price, quality, or supply or demand for either the "tying product" or the "tied product" has been adversely affected by the exclusive contract, and no showing that the market as a whole has been affected at all by the contract. Pp. 29-32.

**Counsel:** Frank H. Easterbrook argued the cause for petitioners. With him on the briefs were Lucas J. Giordano, Thomas J. Reed, and Henry S. Allen, Jr.

Jerrold J. Ganzfried argued the cause for the United States as amicus curiae urging reversal. With him on the brief were Solicitor General Lee, Assistant Attorney General Baxter, Deputy Solicitor General Wallace, Deputy Assistant Attorney General Lipsky, Barry Grossman, and Andrea Limmer.

John M. Landis argued the cause for respondent. With him on the brief was Phillip A. Wittman. *

**Judges:** STEVENS, J., delivered the opinion of the Court, in which BRENNAN, WHITE, MARSHALL, and BLACKMUN, JJ., joined. BRENNAN, J., filed a concurring opinion, in which MARSHALL, J., joined, post, p. 32. O'CONNOR, J., filed an opinion concurring in the judgment, in which BURGER, C. J., and POWELL and REHNQUIST, JJ., joined, post, p. 32.

**Opinion by:** STEVENS

**Opinion**

**[*4] [***8] [**1554]** JUSTICE STEVENS delivered the opinion of the Court.

---

* Briefs of amici curiae urging reversal were filed for the American Hospital Association by Richard L. Epstein, Robert W. McCann, and John J. Miles; for the College of American Pathologists by Jack R. Bierig; and for the National Association of Private Psychiatric Hospitals by Joel I. Klein.

Briefs of amici curiae urging affirmance were filed for the American Society of Anesthesiologists, Inc., by John Landsdale, Jr., and Michael Scott; for the Association of American Physicians & Surgeons, Inc., by Kent Masterson Brown; and for the Louisiana State Medical Society by Henry B. Alsobrook, Jr., Frank M. Adkins, and Richard B. Eason II.

Briefs of amici curiae were filed for the American Association of Nurse Anesthetists by Phil David Fine, Robert F. Sylvia, Richard E. Verville, and Susan M. Jenkins; and for the Louisiana Hospital Association et al. by Ricardo M. Guevara.

***LEdHN[1A]*** [1A] ***LEdHN[2A]*** [2A]At issue in this case is the validity of an exclusive contract between a hospital and a firm of anesthesiologists. We must decide whether the contract gives rise to a *per se* violation of *§ 1* of the Sherman Act [1] because every patient undergoing **[*5]** surgery at the hospital must use the services of one firm of anesthesiologists, and, if not, whether the contract is nevertheless illegal because it unreasonably restrains competition among anesthesiologists.

In July 1977, respondent Edwin G. Hyde, a board-certified anesthesiologist, applied for admission to the medical staff of East Jefferson Hospital. The credentials committee and the medical staff executive committee recommended approval, but the hospital board denied the application because the hospital was a party to a contract providing that all anesthesiological services required by the hospital's patients would be performed by Roux & Associates, a professional medical corporation. Respondent then commenced this action seeking a declaratory judgment that the contract is unlawful and an injunction ordering petitioners to appoint him to the hospital staff. [2] After trial, the District Court denied relief, finding that the anticompetitive consequences of the Roux contract were minimal and outweighed by benefits in the form of improved patient care. *513 F.Supp. 532 (ED La. 1981)*. The Court of Appeals reversed because it was persuaded that the contract was illegal "*per se*." *686 F.2d 286 (CA5 1982)*. We granted certiorari, *460 U.S. 1021 (1983)*, and now reverse.

I

In February 1971, shortly before East Jefferson Hospital opened, it entered into an "Anesthesiology Agreement" with Roux & Associates (Roux), a firm that had recently **[**1555]** been organized by Dr. Kermit Roux. The contract provided that any anesthesiologist designated by Roux would be admitted to the hospital's medical staff. The hospital agreed to **[*6]** provide the space, equipment, maintenance, and other supporting services **[***9]** necessary to operate the anesthesiology department. It also agreed to purchase all necessary drugs and other supplies. All nursing personnel required by the anesthesia department were to be supplied by the hospital, but Roux had the right to approve their selection and retention. [3] The hospital agreed to "restrict the use of its anesthesia department to Roux & Associates and [that] no other persons, parties or entities shall perform such services within the Hospital for the [term] of this contract." App. 19. [4]

The 1971 contract provided for a 1-year term automatically renewable for successive 1-year periods unless either party elected to terminate. In 1976, a second written contract was executed

---

[1] ***LEdHN[2B]*** [2B]

*Section 1* of the Sherman Act states: ***HN1*** "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal. . . ." 26 Stat. 209, as amended, *15 U. S. C. § 1*. Respondent has standing to enforce *§ 1* by virtue of § 4 of the Clayton Act, 38 Stat. 731, as amended, 15 U. S. C. § 15.

[2] In addition to seeking relief under the Sherman Act, respondent's complaint alleged violations of *42 U. S. C. § 1983* and state law. The District Court rejected these claims. The Court of Appeals passed only on the Sherman Act claim.

[3] The contract required all of the physicians employed by Roux to confine their practice of anesthesiology to East Jefferson.

[4] Originally Roux agreed to provide at least two full-time anesthesiologists acceptable to the hospital's credentials committee. Roux agreed to furnish additional anesthesiologists as necessary. The contract also provided that Roux would designate one of its qualified anesthesiologists to serve as the head of the hospital's department of anesthesia.

The fees for anesthesiological services are billed separately to the patients by the hospital. They cover the hospital's costs and the professional services provided by Roux. After a deduction of eight percent to provide a reserve for uncollectible accounts, the fees are divided equally between Roux and the hospital.

containing most of the provisions of the 1971 agreement. Its term was five years and the clause excluding other anesthesiologists from the hospital was deleted; [5] the hospital nevertheless continued to regard itself as committed to a closed anesthesiology department. Only Roux was permitted to practice anesthesiology at the hospital. At the **[*7]** time of trial the department included four anesthesiologists. The hospital usually employed 13 or 14 certified registered nurse anesthetists. [6]

The exclusive contract had an impact on two different segments of the economy: consumers of medical services, and providers of anesthesiological services. Any consumer of medical services who elects to have an operation performed at East Jefferson Hospital may not employ any anesthesiologist not associated with Roux. No anesthesiologists except those employed by Roux may practice at East Jefferson.

There are at least 20 hospitals in the New Orleans metropolitan area and about 70 percent of the patients living in Jefferson Parish go to hospitals other than East Jefferson. Because it regarded the entire New Orleans metropolitan area as the relevant geographic market in which hospitals compete, this evidence convinced the District Court that East Jefferson does not possess any significant "market power"; therefore it concluded that petitioners could not use the Roux contract to anticompetitive **[***10]** ends. [7] The same evidence led the Court of Appeals to draw a different conclusion. **[**1556]** Noting that 30 percent of the residents of the parish go to East Jefferson Hospital, and that in fact "patients tend to choose hospitals by location rather than price or quality," the Court of **[*8]** Appeals concluded that the relevant geographic market was the East Bank of Jefferson Parish. *686 F.2d, at 290*. The conclusion that East Jefferson Hospital possessed market power in that area was buttressed by the facts that the prevalence of health insurance eliminates a patient's incentive to compare costs, that the patient is not sufficiently informed to compare quality, and that family convenience tends to magnify the importance of location. [8]

The Court of Appeals held that the case involves a "tying arrangement" because the "users of the hospital's operating rooms (the tying product) are also compelled to purchase the hospital's

---

[5] "Roux testified that he requested the omission of the exclusive language in his 1976 contract because he believes a surgeon or patient is entitled to the services of the anesthesiologist of his choice. He admitted that he and others in his group did work outside East Jefferson following the 1976 contract but felt he was not in violation of the contract in light of the changes made in it." 513 F.Supp. 532, 537 (ED La. 1981).

[6] Approximately 875 operations are performed at the hospital each month; as many as 12 or 13 operating rooms may be in use at one time.

[7] The District Court found:

"The impact on commerce resulting from the East Jefferson contract is minimal. The contract is restricted in effect to one hospital in an area containing at least twenty others providing the same surgical services. It would be a different situation if Dr. Roux had exclusive contracts in several hospitals in the relevant market. As pointed out by plaintiff, the majority of surgeons have privileges at more than one hospital in the area. They have the option of admitting their patients to another hospital where they can select the anesthesiologist of their choice. Similarly a patient can go to another hospital if he is not satisfied with the physicians available at East Jefferson." *Id.*, at 541.

[8] While the Court of Appeals did discuss the impact of the contract upon patients, it did not discuss its impact upon anesthesiologists. The District Court had referred to evidence that in the entire State of Louisiana there are 156 anesthesiologists and 345 hospitals with operating rooms. The record does not tell us how many of the hospitals in the New Orleans metropolitan area have "open" anesthesiology departments and how many have closed departments. Respondent, for example, practices with two other anesthesiologists at a hospital which has an open department; he previously practiced for several years in a different New Orleans hospital and, prior to that, had practiced in Florida. The record does not tell us whether there is a shortage or a surplus of anesthesiologists in any part of the country, or whether they are thriving or starving.

chosen anesthesia service (the tied product)." *Id., at 289*. Having defined the relevant geographic market for the tying product as the East Bank of Jefferson Parish, the court held that the hospital possessed "sufficient market power in the tying market to coerce purchasers of the tied product." *Id., at 291*. Since the purchase of the tied product constituted a "not insubstantial amount of interstate commerce," under the Court of Appeals' reading of our decision in *Northern Pacific R. Co.* v. *United States, 356 U.S. 1, 11 (1958)*, the tying arrangement was therefore illegal "*per se*." [9]

**[*9]** II

***LEdHN[3A]*** [3A]***LEdHN[4]*** [4]Certain types of contractual arrangements are deemed unreasonable as a matter of law. [10] The character **[***11]** of the restraint produced by such an arrangement is considered a sufficient basis for presuming unreasonableness without the necessity of any analysis of the market context in which the arrangement may be found. [11] A price-fixing agreement between competitors is the classic example of such an arrangement. *Arizona v. Maricopa County Medical Society, 457 U.S. 332, 343-348 (1982)*.It is far too late in the history of our antitrust jurisprudence to question the proposition that certain tying arrangements pose an unacceptable risk of stifling competition and therefore are unreasonable "*per se*." [12] The rule was first enunciated in *International Salt Co.* v. *United States, 332 U.S. 392, 396* **[**1557]** (1947), [13] and has been endorsed **[*10]** by this Court many times since. [14] The rule also reflects congressional policies underlying the antitrust laws. In enacting § 3 of the Clayton Act, 38 Stat. 731, *15 U. S. C. § 14*, Congress expressed great concern about the anticompetitive character of tying arrangements. See H. R. Rep. No. 627, 63d Cong., 2d Sess., 10-13 (1914); S. Rep. No. 698, 63d Cong., 2d Sess., 6-9 (1914). [15] **[***12]** **[**1558]** While this case **[*11]** does not arise under

---

[9] The Court of Appeals rejected as "clearly erroneous" the District Court's finding that the exclusive contract was justified by quality considerations. See 686 F.2d, at 292.

[10] ***LEdHN[3B]*** [3B]

"For example, where a complaint charges that the defendants have engaged in price fixing, or have concertedly refused to deal with non-members of an association, or have licensed a patented device on condition that unpatented materials be employed in conjunction with the patented device, then the amount of commerce involved is immaterial because such restraints are illegal *per se*." *United States* v. *Columbia Steel Co.*, 334 U.S. 495, 522-523 (1948) (footnotes omitted).

[11] See, *e. g., Continental T. V., Inc.* v. *GTE Sylvania Inc.*, 433 U.S. 36, 49-50 (1977).

[12] The District Court intimated that the principles of *per se* liability might not apply to cases involving the medical profession. 513 F.Supp., at 543-544. The Court of Appeals rejected this approach. 686 F.2d, at 292-294. In this Court, petitioners "assume" that the same principles apply to the provision of professional services as apply to other trades or businesses. Brief for Petitioners 4, n. 2. See generally *National Society of Professional Engineers* v. *United States*, 435 U.S. 679 (1978).

[13] The roots of the doctrine date at least to *Motion Picture Patents Co.* v. *Universal Film Co.*, 243 U.S. 502 (1917), a case holding that the sale of a patented film projector could not be conditioned on its use only with the patentee's films, since this would have the effect of extending the scope of the patent monopoly. See also *Henry* v. *Dick Co.*, 224 U.S. 1, 70-73 (1912) (White, C. J., dissenting).

[14] See *United States Steel Corp.* v. *Fortner Enterprises*, 429 U.S. 610, 619-621 (1977); *Fortner Enterprises* v. *United States Steel Corp.*, 394 U.S. 495, 498-499 (1969); *White Motor Co* v. *United States*, 372 U.S. 253, 262 (1963); *Brown Shoe Co.* v. *United States*, 370 U.S. 294, 330 (1962); *United States* v. *Loew's Inc.*, 371 U.S. 38 (1962); *Northern Pacific R. Co.* v. *United States*, 356 U.S. 1, 5 (1958); *Black* v. *Magnolia Liquor Co.*, 355 U.S. 24, 25 (1957); *Times-Picayune Publishing Co.* v. *United States*, 345 U.S. 594, 608-609 (1953); *Standard Oil Co. of California v. United States*, 337 U.S. 293, 305-306 (1949).

[15] See also 51 Cong. Rec. 9072 (1914) (remarks of Rep. Webb); *id.*, at 9084 (remarks of Rep. Madden); *id.*, at 9090 (remarks of Rep. Mitchell); *id.*, at 9160-9164 (remarks of Rep. Floyd); *id.*, at 9184-9185 (remarks of Rep. Helvering); *id.*, at 9409 (remarks of Rep. Gardner); *id.*, at 9410 (remarks of Rep. Mitchell); *id.*, at 9553-9554 (remarks of Rep. Barkley); *id.*, at 14091-14097

the Clayton Act, the congressional finding made therein concerning the competitive consequences of tying is illuminating, and must be respected. [16]

***LEdHN[5A]*** [5A]It is clear, however, that ***HN2*** not every refusal to sell two products separately can be said to restrain competition. If each of the products may be purchased separately in a competitive market, one seller's decision to sell the two in a single package imposes no unreasonable restraint on either market, particularly **[*12]** if competing suppliers are free to sell either the entire package or its several parts. [17] For example, we have written that "if one of a dozen food stores in a community were to refuse to sell flour unless the buyer also took sugar it would hardly tend to restrain competition in sugar if its competitors were ready and able to sell flour by itself." *Northern Pacific R. Co*. v.*United States, 356 U.S., at 7*.[18] Buyers often find package sales attractive; **[***13]** a seller's decision to offer such packages can merely be an attempt to compete effectively -- conduct that is entirely consistent with the Sherman Act. See

---

(remarks of Sen. Reed); *id*., at 14094 (remarks of Sen. Walsh); *id*., at 14209 (remarks of Sen. Shields); *id*., at 14226 (remarks of Sen. Reed); *id*., at 14268 (remarks of Sen. Reed); *id*., at 14599 (remarks of Sen. White); *id*., at 15991 (remarks of Sen. Martine); *id*., at 16146 (remarks of Sen. Walsh); Spivack, The Chicago School Approach to Single Firm Exercises of Monopoly Power: A Response, 52 Antitrust L. J. 651, 664-665 (1983). For example, the House Report on the Clayton Act stated:

"The public is compelled to pay a higher price and local customers are put to the inconvenience of securing many commodities in other communities or through mail-order houses that can not be procured at their local stores. The price is raised as an inducement. This is the local effect. Where the concern making these contracts is already great and powerful, such as the United Shoe Machinery Co., the American Tobacco Co., and the General Film Co., the exclusive or 'tying' contract made with local dealers becomes one of the greatest agencies and instrumentalities of monopoly ever devised by the brain of man. It completely shuts out competitors, not only from trade in which they are already engaged, but from the opportunities to build up trade in any community where these great and powerful combinations are operating under this system and practice. By this method and practice the Shoe Machinery Co. has built up a monopoly that owns and controls the entire machinery now being used by all great shoe-manufacturing houses of the United States. No independent manufacturer of shoe machines has the slightest opportunity to build up any considerable trade in this country while this condition obtains. If a manufacturer who is using machines of the Shoe Machinery Co. were to purchase and place a machine manufacturered by any independent company in his establishment, the Shoe Machinery Co. could under its contracts withdraw all their machinery from the establishment of the shoe manufacturer and thereby wreck the business of the manufacturer. The General Film Co., by the same method practiced by the Shoe Machinery Co. under the lease system, has practically destroyed all competition and acquired a virtual monopoly of all films manufactured and sold in the United States. When we consider contracts of sales made under this system, the result to the consumer, the general public, and the local dealer and his business is even worse than under the lease system." H. R. Rep. No. 627, 63d Cong., 2d Sess., 12-13 (1914).

Similarly, Representative Mitchell said: "[Monopoly] has been built up by these 'tying' contracts so that in order to get one machine one must take all of the essential machines, or practically all. Independent companies who have sought to enter the field have found that the markets have been preempted. . . . The manufacturers do not want to break their contracts with these giant monopolies, because, if they should attempt to install machinery, their business might be jeopardized and all of the machinery now leased by these giant monopolies would be removed from their places of business. No situation cries more urgently for relief than does this situation, and this bill seeks to prevent exclusive 'tying' contracts that have brought about a monopoly, alike injurious to the small dealers, to the manufacturers, and grossly unfair to those who seek to enter the field of competition and to the millions of consumers." 51 Cong. Rec. 9090 (1914).

16 See generally, *e. g.*, *Hodel* v. *Virginia Surface Mining & Reclamation Assn*., 452 U.S. 264, 276-277 (1981); *New Orleans* v. *Dukes*, 427 U.S. 297, 303-304 (1976)*(per curiam)*.

17 ***LEdHN[5B]*** [5B]

"Of course where the buyer is free to take either product by itself there is no tying problem even though the seller may also offer the two items as a unit at a single price." *Northern Pacific R. Co*. v. *United States*, 356 U.S., at 6, n. 4.

18 Thus, we have held that a seller who ties the sale of houses to the provision of credit simply as a way of effectively competing in a competitive market does not violate the antitrust laws. "The unusual credit bargain offered to Fortner proves nothing more than a willingness to provide cheap financing in order to sell expensive houses." *United States Steel Corp*. v. *Fortner Enterprises*, 429 U.S., at 622 (footnote omitted).

*Fortner Enterprises v. United States Steel Corp., 394 U.S. 495, 517-518 (1969)(Fortner I)* (WHITE, J., dissenting); *id., at 524-525* (Fortas, J., dissenting).

***LEdHN[6]*** [6]Our cases have concluded that ***HN3*** the essential characteristic of an invalid tying arrangement lies in the seller's exploitation of its control over the tying product to force the buyer into the purchase of a tied product that the buyer either did not want at all, or might have preferred to purchase elsewhere on different terms. When such "forcing" is present, competition on the merits in the market for the tied item is restrained and the Sherman Act is violated.

"Basic to the faith that a free economy best promotes the public weal is that goods must stand the cold test of competition; that the public, acting through the market's impersonal judgment, shall allocate the Nation's resources and thus direct the course its economic development will take. . . . By conditioning his sale of one commodity on **[*13]** the purchase of another, a seller coerces the abdication of buyers' independent judgment as to the 'tied' product's merits and insulates it from the competitive stresses of the open market. But any intrinsic superiority of the 'tied' product would convince freely choosing buyers to select it over others anyway." *Times-Picayune Publishing Co*. v. *United States, 345 U.S. 594, 605 (1953)*. [19]

**[**1559]** Accordingly, **[***14]** we have condemned tying arrangements when the seller has some special ability -- usually called "market **[*14]** power" -- to force a purchaser to do something that he would not do in a competitive market. See *United States Steel Corp*. v. *Fortner Enterprises, 429 U.S. 610, 620 (1977)(Fortner II); Fortner I, 394 U.S., at 503-504*; *United States v. Loew's Inc., 371 U.S. 38, 45, 48, n. 5 (1962)*; *Northern Pacific R. Co*. v. *United States, 356 U.S., at 6-7*. [20] When "forcing" occurs, our cases have found the tying arrangement to be unlawful.

Thus, the law draws a distinction between the exploitation of market power by merely enhancing the price of the tying product, on the one hand, and by attempting to impose restraints on competition in the market for a tied product, on the other. When the seller's power is just used to maximize its return in the tying product market, where presumably its product enjoys some

---

[19] Accord, *Fortner I*, 394 U.S., at 508-509; *Atlantic Refining Co*. v. *FTC*, 381 U.S. 357, 369-371 (1965); *United States* v. *Loew's Inc*., 371 U.S., at 44-45; *Northern Pacific R. Co*. v. *United States*, 356 U.S., at 6. For example, JUSTICE WHITE has written:

"There is general agreement in the cases and among commentators that the fundamental restraint against which the tying proscription is meant to guard is the use of power over one product to attain power over another, or otherwise to distort freedom of trade and competition in the second product. This distortion injures the buyers of the second product, who because of their preference for the seller's brand of the first are artificially forced to make a less than optimal choice in the second. And even if the customer is indifferent among brands of the second product and therefore loses nothing by agreeing to use the seller's brand of the second in order to get his brand of the first, such tying agreements may work significant restraints on competition in the tied product. The tying seller may be working toward a monopoly position in the tied product and, even if he is not, the practice of tying forecloses other sellers of the tied product and makes it more difficult for new firms to enter that market. They must be prepared not only to match existing sellers of the tied product in price and quality, but to offset the attraction of the tying product itself. Even if this is possible through simultaneous entry into production of the tying product, entry into both markets is significantly more expensive than simple entry into the tied market, and shifting buying habits in the tied product is considerably more cumbersome and less responsive to variations in competitive offers. In addition to these anticompetitive effects in the tied product, tying arrangements may be used to evade price control in the tying product through clandestine transfer of the profit to the tied product; they may be used as a counting device to effect price discrimination; and they may be used to force a full line of products on the customer so as to extract more easily from him a monopoly return on one unique product in the line." *Fortner I*, 394 U.S., at 512-514 (dissenting opinion) (footnotes omitted).

[20] This type of market power has sometimes been referred to as "leverage." Professors Areeda and Turner provide a definition that suits present purposes. "'Leverage' is loosely defined here as a supplier's power to induce his customer for one product to buy a second product from him that would not otherwise be purchased solely on the merit of that second product." 5 P. Areeda & D. Turner, Antitrust Law para. 1134a, p. 202 (1980).

justifiable advantage over its competitors, the competitive ideal of the Sherman Act is not necessarily compromised. But if that power is used to impair competition on the merits in another market, a potentially inferior product may be insulated from competitive pressures. [21] This impairment could either harm existing competitors or create barriers to entry of new competitors in the market for the tied product, *Fortner I, 394 U.S., at 509*, [22] and can increase **[*15]** the social costs of market power by facilitating price discrimination, thereby increasing monopoly profits over what they would be absent the tie, *Fortner II, 429 U.S., at 617*. [23] And from the **[***15]** standpoint **[**1560]** of the consumer -- whose interests the statute was especially intended to serve -- the freedom to select the best bargain in the second market is impaired by his need to purchase the tying product, and perhaps by an inability to evaluate the true cost of either product when they are available only as a package. [24] In sum, to permit restraint of competition on the merits through tying arrangements would be, as we observed in *Fortner II*, to condone "the existence of power that a free market would not tolerate." *429 U.S., at 617* (footnote omitted).

***LEdHN[7]*** [7]***LEdHN[8]*** [8]***LEdHN[9]*** [9]***LEdHN[10]*** [10]***HN4*** Per se condemnation -- condemnation without inquiry into actual market conditions -- is only appropriate if the existence of forcing is probable. [25] Thus, application of the *per se* rule **[*16]** focuses on the probability of anticompetitive consequences. Of course, as a threshold matter there must be a substantial potential for impact on competition in order to justify *per se* condemnation. If only a single purchaser were "forced" with respect to the purchase of a tied item, the resultant impact on competition would not be sufficient to warrant the concern of antitrust law. It is for this reason that we have refused to condemn tying arrangements unless a substantial volume of commerce is foreclosed thereby. See *Fortner I, 394 U.S., at 501-502*; *Northern Pacific R. Co.* v. *United States, 356 U.S., at 6-7*; *Times-Picayune*, 345 U.S., at 608-610; *International Salt*, 332 U.S., at 396. Similarly, when a purchaser is "forced" to buy a product he would not have otherwise bought even from another seller in the tied-product market, there can be no adverse impact on competition because no portion of the market which would otherwise have been available to other sellers has been foreclosed.

---

[21] See Report of the Attorney General's National Committee to Study the Antitrust Laws 145 (1955); Craswell, Tying Requirements in Competitive Markets: The Consumer Protection Issues, 62 B. U. L. Rev. 661, 666-668 (1982); Slawson, A Stronger, Simpler Tie-In Doctrine, 25 Antitrust Bull. 671, 676-684 (1980); Turner, The Validity of Tying Arrangements under the Antitrust Laws, 72 Harv. L. Rev. 50, 60-62 (1958).

[22] See 3 Areeda & Turner, *supra* n. 20, para. 733e (1978); C. Kaysen & D. Turner, Antitrust Policy 157 (1959); L. Sullivan, Law of Antitrust § 156 (1977); O. Williamson, Markets and Hierarchies: Analysis and Antitrust Implications 111 (1975); Pearson, Tying Arrangements and Antitrust Policy, 60 Nw. U. L. Rev. 626, 637-638 (1965).

[23] Sales of the tied item can be used to measure demand for the tying item; purchasers with greater needs for the tied item make larger purchases and in effect must pay a higher price to obtain the tying item. See P. Areeda, Antitrust Analysis para. 533 (2d ed. 1974); R. Posner, Antitrust Law 173-180 (1976); Sullivan, *supra* n. 22, § 156; Bowman, Tying Arrangements and the Leverage Problem, 67 Yale L. J. 19 (1957); Burstein, A Theory of Full-Line Forcing, 55 Nw. U. L. Rev. 62 (1960); Dam, Fortner Enterprises v. United States Steel: "Neither a Borrower, Nor a Lender Be," 1969 S. Ct. Rev. 1, 15-16; Ferguson, Tying Arrangements and Reciprocity: An Economic Analysis, 30 Law & Contemp. Prob. 552, 554-558 (1965); Markovits, Tie-Ins, Reciprocity, and the Leverage Theory, 76 Yale L. J. 1397 (1967); Pearson, *supra* n. 22, at 647-653; Sidak, Debunking Predatory Innovation, 83 Colum. L. Rev. 1121, 1127-1131 (1983); Stigler, United States v. Loew's Inc.: A Note on Block-Booking, 1963 S. Ct. Rev. 152.

[24] Especially where market imperfections exist, purchasers may not be fully sensitive to the price or quality implications of a tying arrangement, and hence it may impede competition on the merits. See Craswell, *supra* n. 21, at 675-679.

[25] The rationale for *per se* rules in part is to avoid a burdensome inquiry into actual market conditions in situations where the likelihood of anticompetitive conduct is so great as to render unjustified the costs of determining whether the particular case at bar involves anticompetitive conduct. See, *e. g.*, *Arizona* v. *Maricopa County Medical Society*, 457 U.S. 332, 350-351 (1982).

***LEdHN[11]*** [11]Once this threshold is surmounted, *per se* prohibition is appropriate if anticompetitive forcing is likely. For example, if the Government has granted the seller a patent or similar monopoly over a product, it is fair to presume that the inability to buy the product elsewhere gives the seller market power. *United States v. Loew's Inc., 371 U.S., at 45-47*.Any effort to enlarge the scope of the patent monopoly by using the market power it confers to restrain competition in the market for a second product will undermine competition on the merits in that second market. Thus, the sale or lease of a patented item on condition that the buyer make all his purchases **[***16]** of a separate tied product from the patentee is unlawful. See *United States v. Paramount Pictures, Inc., 334 U.S. 131, 156-159 (1948)*; *International Salt*, 332 U.S., **[*17]** at 395-396; *International Business Machines Corp*. v. *United States, 298 U.S. 131 (1936)*.

***LEdHN[12]*** [12]The same strict rule is appropriate in other situations in which the existence of market power is probable. When the seller's share of the market is high, see *Times-Picayune Publishing Co*. v. *United States, 345 U.S., at 611-613*, or when the seller offers a unique product that competitors are not able to offer, see *Fortner I, 394 U.S., at 504-506*, and n. 2, the Court has held that the likelihood that market power exists and is being used to restrain competition in a separate market is sufficient to make *per se* condemnation appropriate. Thus, in *Northern Pacific R. Co*. v. *United States, 356 U.S. 1 (1958)*, we held that the railroad's control over vast tracts of western real estate, although not itself unlawful, gave the railroad a unique kind of bargaining power that enabled it to tie the sales of that land to exclusive, long-term commitments that fenced out competition in the transportation market over a protracted period.[26] When, however, the **[*18]** seller does not have either the degree or the kind of market power that enables him to force customers to purchase a second, unwanted product in order to obtain the tying product, an antitrust violation can be established only by evidence of an unreasonable restraint on competition in the relevant market. See *Fortner I, 394 U.S., at 499-500*; *Times-Picayune* **[**1561]** *Publishing Co*. v. *United States, 345 U.S., at 614-615*.

In sum, ***HN5*** any inquiry into the validity of a tying arrangement must focus on the market or markets in which the two products are sold, for that is where the anticompetitive forcing has its impact. Thus, in this case our analysis of the tying issue must focus on the hospital's sale of services to its patients, rather than its contractual arrangements with **[***17]** the providers of anesthesiological services. In making that analysis, we must consider whether petitioners are selling two separate products that may be tied together, and, if so, whether they have used their market power to force their patients to accept the tying arrangement.

III

---

[26] "As pointed out before, the defendant was initially granted large acreages by Congress in the several Northwestern States through which its lines now run. This land was strategically located in checkerboard fashion amid private holdings and within economic distance of transportation facilities. Not only the testimony of various witnesses but common sense makes it evident that this particular land was often prized by those who purchased or leased it and was frequently essential to their business activities. In disposing of its holdings the defendant entered into contracts of sale or lease covering at least several million acres of land which included 'preferential routing' clauses. The very existence of this host of tying arrangements is itself compelling evidence of the defendant's great power, at least where, as here, no other explanation has been offered for the existence of these restraints. The 'preferential routing' clauses conferred no benefit on the purchasers or lessees. While they got the land they wanted by yielding their freedom to deal with competing carriers, the defendant makes no claim that it came any cheaper than if the restrictive clauses had been omitted. In fact any such price reduction in return for rail shipments would have quite plainly constituted an unlawful rebate to the shipper. So far as the Railroad was concerned its purpose obviously was to fence out competitors, to stifle competition." 356 U.S., at 7-8 (footnote omitted).

The hospital has provided its patients with a package that includes the range of facilities and services required for a variety of surgical operations. [27] At East Jefferson Hospital the package includes the services of the anesthesiologist. [28] Petitioners argue that the package does not involve a tying arrangement **[*19]** at all -- that they are merely providing a functionally **[**1562]** integrated package of services. [29] Therefore, petitioners contend that it is inappropriate to apply principles concerning tying arrangements to this case.

***LEdHN[13]*** [13]Our cases indicate, however, that the answer to the question whether one or two products are involved turns not on the functional relation between them, but rather on the character of the demand for the two items. [30] In *Times-Picayune Publishing Co.* v. *United States, 345 U.S. 594 (1953)*, the Court held that a tying arrangement was not present because the arrangement did not link two distinct markets for products that were distinguishable in the eyes **[***18]** of buyers. [31] In **[*20]** *Fortner I*, the Court concluded that a sale involving two independent transactions, separately priced and purchased from the buyer's perspective, was a tying

---

[27] The physical facilities include the operating room, the recovery room, and the hospital room where the patient stays before and after the operation. The services include those provided by staff physicians, such as radiologists or pathologists, and interns, nurses, dietitians, pharmacists, and laboratory technicians.

[28] It is essential to differentiate between the Roux contract and the legality of the contract between the hospital and its patients. The Roux contract is nothing more than an arrangement whereby Roux supplies all of the hospital's needs for anesthesiological services. That contract raises only an exclusive-dealing question, see n. 51, *infra*. The issue here is whether the hospital's insistence that its patients purchase anesthesiological services from Roux creates a tying arrangement.

[29] See generally Dolan & Ralston, Hospital Admitting Privileges and the Sherman Act, 18 Hous. L. Rev. 707, 756-758 (1981); Kissam, Webber, Bigus, & Holzgraefe, Antitrust and Hospital Privileges: Testing the Conventional Wisdom, 70 Calif. L. Rev. 595, 666-667 (1982).

[30] The fact that anesthesiological services are functionally linked to the other services provided by the hospital is not in itself sufficient to remove the Roux contract from the realm of tying arrangements. We have often found arrangements involving functionally linked products at least one of which is useless without the other to be prohibited tying devices. See *Mercoid Corp.* v. *Mid-Continent Co.*, 320 U.S. 661 (1944) (heating system and stoker switch); *Morton Salt Co.* v. *Suppiger Co.*, 314 U.S. 488 (1942) (salt machine and salt); *International Salt Co.* v. *United States*, 332 U.S. 392 (1947) (same); *Leitch Mfg. Co.* v. *Barber Co.*, 302 U.S. 458 (1938) (process patent and material used in the patented process); *International Business Machines Corp.* v. *United States*, 298 U.S. 131 (1936) (tabulators and tabulating punch cards); *Carbice Corp.* v. *American Patents Development Corp.*, 283 U.S. 27 (1931) (ice cream transportation package and coolant); *FTC* v. *Sinclair Refining Co.*, 261 U.S. 463 (1923) (gasoline and underground tanks and pumps); *United Shoe Machinery Co.* v. *United States*, 258 U.S. 451 (1922) (shoe machinery and supplies, maintenance, and peripheral machinery); *United States* v. *Jerrold Electronics Corp.*, 187 F.Supp. 545, 558-560 (ED Pa. 1960) (components of television antennas), aff'd, *365 U.S. 567 (1961)(per curiam)*. In fact, in some situations the functional link between the two items may enable the seller to maximize its monopoly return on the tying item as a means of charging a higher rent or purchase price to a larger user of the tying item. See n. 23, *supra*.

[31] "The District Court determined that the Times-Picayune and the States were separate and distinct newspapers, though published under single ownership and control. But that readers consciously distinguished between these two publications does not necessarily imply that advertisers bought separate and distinct products when insertions were placed in the Times-Picayune and the States. So to conclude here would involve speculation that advertisers bought space motivated by considerations other than customer coverage; that their media selections, in effect, rested on generic qualities differentiating morning from evening readers in New Orleans. Although advertising space in the Times-Picayune, as the sole morning daily, was doubtless essential to blanket coverage of the local newspaper readership, nothing in the record suggests that advertisers viewed the city's newspaper readers, morning or evening, as other than fungible customer potential. We must assume, therefore, that the readership 'bought' by advertisers in the Times-Picayune was the selfsame 'product' sold by the States and, for that matter, the Item.

"The factual departure from the 'tying' cases then becomes manifest. The common core of the adjudicated unlawful tying arrangements is the forced purchase of a second distinct commodity with the desired purchase of a dominant 'tying' product, resulting in economic harm to competition in the 'tied' market. Here, however, two newspapers under single ownership at the same place, time, and terms sell indistinguishable products to advertisers; no dominant 'tying' product exists (in fact, since space in neither the Times-Picayune nor the States can be bought alone, one may be viewed as 'tying' as the other); no leverage in one market excludes sellers in the second, because for present purposes the products are identical and the market the same." 345 U.S., at 613-614 (footnote omitted).

arrangement. [32] These **[*21]** cases make it clear that ***HN6*** a tying arrangement cannot **[**1563]** exist unless two separate product markets have been linked.

The requirement that two distinguishable product markets be involved follows from the underlying rationale of the rule against tying. The definitional question depends on whether the arrangement may have the type of competitive consequences addressed by the rule. [33] The answer to the question whether petitioners **[***19]** have utilized a tying arrangement must be based on whether there is a possibility that the economic effect of the arrangement is that condemned by the rule against tying -- that petitioners have foreclosed competition on the merits in a product market distinct from the market for the tying item. [34] Thus, in this case no tying arrangement can exist unless there is a sufficient demand for the purchase of anesthesiological services separate from hospital services **[*22]** to identify a distinct product market in which it is efficient to offer anesthesiological services separately from hospital services. [35]

Unquestionably, the anesthesiological component of the package offered by the hospital could be provided separately and could be selected either by the individual patient or by one of the patient's doctors if the hospital did not insist on including anesthesiological services in the package it **[**1564]** offers to its customers. As a matter of actual practice, anesthesiological services

---

[32] "There is, at the outset of every tie-in case, including the familiar cases involving physical goods, the problem of determining whether two separate products are in fact involved. In the usual sale on credit the seller, a single individual or corporation, simply makes an agreement determining when and how much he will be paid for his product. In such a sale the credit may constitute such an inseparable part of the purchase price for the item that the entire transaction could be considered to involve only a single product. It will be time enough to pass on the issue of credit sales when a case involving it actually arises. Sales such as that are a far cry from the arrangement involved here, where the credit is provided by one corporation on condition that a product be purchased from a separate corporation, and where the borrower contracts to obtain a large sum of money over and above that needed to pay the seller for the physical products purchased. Whatever the standards for determining exactly when a transaction involves only a 'single product,' we cannot see how an arrangement such as that present in this case could ever be said to involve only a single product." 394 U.S., at 507 (footnote omitted).

[33] Professor Dam has pointed out that the *per se* rule against tying can be coherent only if tying is defined by reference to the economic effect of the arrangement.

"[The] definitional question is hard to separate from the question when tie-ins are harmful. Yet the decisions, in adopting the per se rule, have attempted to flee from that economic question by ruling that tying arrangements are presumptively harmful, at least whenever certain nominal threshold standards on power and foreclosure are met. The weakness of the per se methodology is that it places crucial importance on the definition of the practice. Once an arrangement falls within the defined limits, no justification will be heard. But a per se rule gives no economic standards for defining the practice. To treat the definitional question as an abstract inquiry into whether one or two products is involved is thus to compound the weakness of the per se approach." Dam, *supra* n. 23, at 19.

[34] Of course, the Sherman Act does not prohibit "tying"; it prohibits "[contracts] . . . in restraint of trade." Thus, in a sense the question whether this case involves "tying" is beside the point. The legality of petitioners' conduct depends on its competitive consequences, not on whether it can be labeled "tying." If the competitive consequences of this arrangement are not those to which the *per se* rule is addressed, then it should not be condemned irrespective of its label.

[35] This approach is consistent with that taken by a number of lower courts. See *Moore* v. *Jas. H. Matthews & Co.*, 550 F.2d 1207, 1214-1215 (CA9 1977); *Siegel* v. *Chicken Delight, Inc.*, 448 F.2d 43, 48-49 (CA9 1971), cert. denied, *405 U.S. 955 (1972)*; *Washington Gas Light Co.* v. *Virginia Electric & Power Co.*, 438 F.2d 248, 253 (CA4 1971); *Susser* v. *Carvel Corp.*, 332 F.2d 505, 514 (CA2 1964), cert. dism'd, 381 U.S. 125 (1965); *United States* v. *Mercedes-Benz of North America, Inc.*, 517 F.Supp. 1369, 1379-1381 (ND Cal. 1981); *In re Data General Corp. Antitrust Litigation*, 490 F.Supp. 1089, 1104-1110 (ND Cal. 1980); *Jones* v. *247 East Chestnut Properties*, 1975-2 Trade Cases para. 60,491, pp. 67,162-67,163 (ND Ill. 1974); *N. W. Controls, Inc.* v. *Outboard Marine Corp.*, 333 F.Supp. 493, 501-504 (Del. 1971); *Teleflex Industrial Products, Inc.* v. *Brunswick Corp.*, 293 F.Supp. 107, 109, and n. 6 (ED Pa. 1968). See generally Ross, The Single Product Issue in Antitrust Tying: A Functional Approach, 23 Emory L. J. 963 (1974); Wheeler, Some Observations on Tie-ins, the Single-Product Defense, Exclusive Dealing and Regulated Industries, 60 Calif. L. Rev. 1557, 1558-1567, 1572-1573 (1972); Note, Product Separability: A Workable Standard to Identify Tie-In Arrangements Under the Antitrust Laws, 46 S. Cal. L. Rev. 160 (1972). See also *Fortner I*, 394 U.S., at 525 (Fortas, J., dissenting); Note, Tying Arrangements and the Single Product Issue, 31 Ohio St. L. J. 861 (1970).

are billed separately from the hospital services petitioners provide. There was ample and uncontroverted testimony that patients or surgeons often request specific anesthesiologists to come to a hospital and provide anesthesia, and that the choice of an individual anesthesiologist separate from the choice of a hospital is particularly frequent in respondent's specialty, obstetric anesthesiology. [36] The District **[*23]** **[***20]** Court found that "[the] provision of anesthesia services is a medical service separate from the other services provided by the hospital." *513 F.Supp., at 540*. [37] The Court of Appeals agreed with this finding, and went on to observe: "[An] anesthesiologist is normally selected by the surgeon, rather than the patient, based on familiarity gained through a working relationship. Obviously, the surgeons who practice at East Jefferson Hospital do not gain familiarity with any anesthesiologists other than Roux and Associates." *686 F.2d, at 291*. [38] The record amply supports the conclusion that consumers differentiate between anesthesiological services and the other hospital services provided by petitioners. [39]

**[*24]** Thus, the hospital's requirement that its patients obtain necessary anesthesiological **[**1565]** services from Roux **[***21]** combined the purchase of two distinguishable services

---

36 Testimony that patients and their physicians frequently do differentiate between hospital services and anesthesiological services, and request specific anesthesiologists, was provided by Dr. Roux, Tr. 17, 20 (May 15, 1980, afternoon session), Dr. Hyde, *id.*, at 68-69, 72-74 (May 16, 1980), and other anesthesiologists as well, see *id.*, at 64, 87-88 (May 15, 1980, afternoon session) (testimony of Dr. Charles Eckert); *id.*, at 25-30, 33-34 (May 16, 1980) (testimony of Dr. John Adriani). There was no testimony that patients or their surgeons do not differentiate between anesthesiological services and hospital services when making purchasing decisions. As a statistical matter, only 27 percent of anesthesiologists have financial relationships with hospitals. American Medical Association, Socioeconomic Characteristics of Medical Practice: 1983, p. 12 (1983). In this respect anesthesiologists may differ from radiologists, pathologists, and other types of hospital-based physicians (HBPs). "In some respects anesthesiologists are more akin to office-based MDs (particularly surgeons) than other HBPs. Anesthesiologists' outputs are more discrete, and these HBPs are predominantly fee-for-service practitioners who directly provide services to patients." Steinwald, Hospital-Based Physicians: Current Issues and Descriptive Evidence, Health Care Financing Rev. 63, 69 (Summer 1980). See also *United States* v. *American Society of Anesthesiologists, Inc.*, 473 F.Supp. 147, 150 (SDNY 1979) ("By 1957 the salaried anesthesiologist had become the exception. Anesthesiologists began to establish independent practices and were able to obtain hospital privileges upon the same terms and conditions as other clinicians").

37 Accordingly, in its conclusions of law the District Court treated the case as involving a tying arrangement. 513 F.Supp., at 542.

38 Petitioners do not challenge these findings of the District Court and the Court of Appeals.

39 One of the most frequently cited statements on this subject was made by Judge Van Dusen in *United States* v. *Jerrold Electronics Corp.*, 187 F.Supp. 545 (ED Pa. 1960), aff'd, *365 U.S. 567 (1961)(per curiam)*. While this statement was specifically made with respect to § 3 of the Clayton Act, 15 U. S. C. § 14, its analysis is also applicable to *§ 1* of the Sherman Act, since with respect to the definition of tying the standards used by the two statutes are the same. See *Times-Picayune*, 345 U.S., at 608-609.

"There are several facts presented in this record which tend to show that a community television antenna system cannot properly be characterized as a single product. Others who entered the community antenna field offered all of the equipment necessary for a complete system, but none of them sold their gear exclusively as a single package as did Jerrold. The record also establishes that the number of pieces in each system varied considerably so that hardly any two versions of the alleged product were the same. Furthermore, the customer was charged for each item of equipment and not a lump sum for the total system. Finally, while Jerrold had cable and antennas to sell which were manufactured by other concerns, it only required that the electronic equipment in the system be bought from it." 187 F.Supp., at 559.

The record here shows that other hospitals often permit anesthesiological services to be purchased separately, that anesthesiologists are not fungible in that the services provided by each are not precisely the same, that anesthesiological services are billed separately, and that the hospital required purchases from Roux even though other anesthesiologists were available and Roux had no objection to their receiving staff privileges at East Jefferson. Therefore, the *Jerrold* analysis indicates that there was a tying arrangement here. *Jerrold* also indicates that tying may be permissible when necessary to enable a new business to break into the market. See *id.*, at 555-558. Assuming this defense exists, and assuming it justified the 1971 Roux contract in order to give Roux an incentive to go to work at a new hospital with an uncertain future, that justification is inapplicable to the 1976 contract, since by then Roux was willing to continue to service the hospital without a tying arrangement.

in a single transaction. [40] Nevertheless, the fact that this case involves a required **[*25]** purchase of two services that would otherwise be purchased separately does not make the Roux contract illegal. As noted above, there is nothing inherently anticompetitive about packaged sales. Only if patients are forced to purchase Roux's services as a result of the hospital's market power would the arrangement have anticompetitive consequences. If no forcing is present, patients are free to enter a competing hospital and to use another anesthesiologist instead of Roux. [41] The fact that petitioners' patients are required to purchase two separate items is only the beginning of the appropriate inquiry. [42]

**[*26]** IV

**[***22]** The question remains whether this arrangement involves the use of market power **[**1566]** to force patients to buy services they would not otherwise purchase. Respondent's only basis for invoking the *per se* rule against tying and thereby avoiding analysis of actual market conditions is by relying on the preference of persons residing in Jefferson Parish to go to East Jefferson, the closest hospital. A preference of this kind, however, is not necessarily probative of significant market power.

***LEdHN[14]*** [14]Seventy percent of the patients residing in Jefferson Parish enter hospitals other than East Jefferson. *513 F.Supp., at 539*.Thus East Jefferson's "dominance" over persons

---

40 This is not to say that *§ 1* of the Sherman Act gives a purchaser the right to buy a product that the seller does not wish to offer for sale. A grocer may decide to carry four brands of cookies and no more. If the customer wants a fifth brand, he may go elsewhere but he cannot sue the grocer even if there is no other in town. However, in such a case the customer is free to purchase no cookies at all, while buying other needed food. If the grocer required the customer to buy an unwanted brand of cookies in order to buy other items which the customer needs and cannot readily obtain elsewhere, then a tying question arises. Cf. *Northern Pacific R. Co.* v. *United States*, 356 U.S., at 7 (grocer selling flour can require customers to also buy sugar only "if its competitors were ready and able to sell flour by itself"). Here, the question is whether patients are forced to use an unwanted anesthesiologist in order to obtain needed hospital services.

41 An examination of the reason or reasons why petitioners denied respondent staff privileges will not provide the answer to the question whether the package of services they offered to their patients is an illegal tying arrangement. As a matter of antitrust law, petitioners may give their anesthesiology business to Roux because he is the best doctor available, because he is willing to work long hours, or because he is the son-in-law of the hospital administrator without violating the *per se* rule against tying. Without evidence that petitioners are using market power to force Roux upon patients there is no basis to view the arrangement as unreasonably restraining competition whatever the reasons for its creation. Conversely, with such evidence, the *per se* rule against tying may apply. Thus, we reject the view of the District Court that the legality of an arrangement of this kind turns on whether it was adopted for the purpose of improving patient care.

42 Petitioners argue and the District Court found that the exclusive contract had what it characterized as procompetitive justifications in that an exclusive contract ensures 24-hour anesthesiology coverage, enables flexible scheduling, and facilitates work routine, professional standards, and maintenance of equipment. The Court of Appeals held these findings to be clearly erroneous since the exclusive contract was not necessary to achieve these ends. Roux was willing to provide 24-hour coverage even without an exclusive contract and the credentials committee of the hospital could impose standards for staff privileges that would ensure staff would comply with the demands of scheduling, maintenance, and professional standards. 686 F.2d, at 292. In the past, we have refused to tolerate manifestly anticompetitive conduct simply because the health care industry is involved. See *Arizona* v. *Maricopa Medical Society*, 457 U.S., at 348-351; *National Gerimedical Hospital* v. *Blue Cross*, 452 U.S. 378 (1981); *American Medical Assn.* v. *United States*, 317 U.S. 519, 528-529 (1943). Petitioners seek no special solicitude. See n. 12, *supra*. We have also uniformly rejected similar "goodwill" defenses for tying arrangements, finding that the use of contractual quality specifications are generally sufficient to protect quality without the use of a tying arrangement. See *Standard Oil Co. of California* v. *United States*, 337 U.S., at 305-306; *International Salt Co.* v. *United States*, 332 U.S., at 397-398; *International Business Machines Corp.* v. *United States*, 298 U.S., at 138-140. See generally Comment, Tying Arrangements under the Antitrust Laws: The "Integrity of the Product" Defense, 62 Mich. L. Rev. 1413 (1964). Since the District Court made no finding as to why contractual quality specifications would not protect the hospital, there is no basis for departing from our prior cases here.

residing in Jefferson Parish is far from overwhelming. [43] The **[*27]** fact that a substantial majority of the parish's residents elect not to enter East Jefferson means that the geographic data do not establish the kind of dominant market position that obviates the need for further inquiry into actual competitive conditions. The Court of Appeals acknowledged as much; it recognized that East Jefferson's market share alone was insufficient as a basis to infer market power, and buttressed its conclusion by relying on "market imperfections" [44] that permit petitioners to charge noncompetitive prices for hospital services: the prevalence of third-party payment for health care costs reduces price competition, and a lack of adequate information renders consumers unable to evaluate the quality of the medical care provided by competing hospitals. *686 F.2d, at 290*. [45] While these factors may generate "market power" in some abstract sense, [46] they do not generate the kind of market power that justifies condemnation of tying.

***HN7*** Tying arrangements need only be condemned if they restrain competition on the merits by forcing purchases that would not otherwise be made. A lack of price or quality **[*28]** competition does not create this type of forcing. If consumers lack price consciousness, that fact will not **[***23]** force them to take an anesthesiologist whose services they do not want -- their indifference to price will have no impact on their willingness or ability to go to another hospital where they can utilize the services of the anesthesiologist of their choice. Similarly, if consumers cannot evaluate the quality of anesthesiological services, it follows that they are indifferent between certified anesthesiologists even in the absence of a tying arrangement -- such an arrangement cannot be said to have foreclosed a choice that would have otherwise been made "on the merits."

***LEdHN[15]*** [15]Thus, neither of the "market imperfections" relied upon by the Court of Appeals forces consumers to take anesthesiological services they would not select in the absence of a tie. It is safe to assume that every patient undergoing a surgical operation needs the services of an anesthesiologist; at least this record contains no evidence that the hospital "forced" any **[**1567]** such services on unwilling patients. [47] The record therefore **[*29]** does not provide a basis for applying the *per se* rule against tying to this arrangement.

---

[43] In fact its position in this market is not dissimilar from the market share at issue in *Times-Picayune*, which the Court found insufficient as a basis for inferring market power. See 345 U.S., at 611-613. Moreover, in other antitrust contexts this Court has found that market shares comparable to that present here do not create an unacceptable likelihood of anticompetitive conduct. See *United States* v. *Connecticut National Bank*, 418 U.S. 656 (1974); *United States* v. *E. I. du Pont de Nemours & Co.*, 351 U.S. 377 (1956).

[44] The Court of Appeals acknowledged that absent these market imperfections, there was no basis for applying the *per se* rule against tying. "The contract at issue here involved only one hospital out of at least twenty in the area. Under the analysis applied to a truly competitive market, appellant has failed to prove an illegal tying arrangement." 686 F.2d, at 290.

[45] Congress has found these market imperfections to exist. See *National Gerimedical Hospital* v. *Blue Cross*, 452 U.S., at 388, n. 13, 391-393, and n. 18; 42 U. S. C. §§ 300k, 300k-2(b); H. R. Conf. Rep. No. 96-420, pp. 57-58 (1979); S. Rep. No. 96-96, pp. 52-53 (1979).

[46] As an economic matter, market power exists whenever prices can be raised above the levels that would be charged in a competitive market. See *Fortner II*, 429 U.S., at 620; *Fortner I*, 394 U.S., at 503-504.

[47] Nor is there an indication in the record that petitioners' practices have increased the social costs of their market power. Since patients' anesthesiological needs are fixed by medical judgment, respondent does not argue that the tying arrangement facilitates price discrimination. Where variable-quantity purchasing is unavailable as a means to enable price discrimination, commentators have seen less justification for condemning tying. See Dam, *supra* n. 23, at 15-17; Turner, *supra* n. 21, at 67-72. While tying arrangements like the one at issue here are unlikely to be used to facilitate price discrimination, they could have the similar effect of enabling hospitals "to evade price control in the tying product through clandestine transfer of the profit to the tied product. . . ." *Fortner I*, 394 U.S., at 513 (WHITE, J., dissenting). Insurance companies are the principal source of price restraint in the hospital industry; they place some limitations on the ability of hospitals to exploit their market power. Through this arrangement, petitioners may be able to evade that restraint by obtaining a portion of the anesthesiologists' fees and therefore realize a greater return than they

V

***LEdHN[16]*** [16]In order to prevail in the absence of *per se* liability, respondent has the burden of proving that the Roux contract violated the Sherman Act because it unreasonably restrained competition. That burden necessarily involves an inquiry into the actual effect of the exclusive contract on competition among anesthesiologists. This competition takes place in a market that has not been defined. The market is not necessarily the same as the market in which hospitals compete in offering services to patients; it may encompass competition among anesthesiologists for exclusive contracts such as the Roux contract and might be statewide **[***24]** or merely local. [48] There is, however, insufficient evidence in this record to provide a basis for finding that the Roux contract, as it actually operates in the market, has unreasonably restrained competition. **[*30]** The record sheds little light on how this arrangement affected consumer demand for separate arrangements with a specific anesthesiologist. [49] The evidence indicates that some surgeons and patients preferred respondent's services to those of Roux, but there is no evidence that any patient who was sophisticated enough to know the difference between two anesthesiologists was not also able to go to a hospital that would provide him with the anesthesiologist of his choice. [50]

**[**1568]** ***LEdHN[17A]*** [17A] ***LEdHN[18]*** [18]In sum, all that the record establishes is that the choice of anesthesiologists at East Jefferson has been limited to one of the four doctors who are associated with Roux and therefore have staff privileges. [51] Even if Roux did not have an exclusive contract, the range of alternatives open to the patient would be severely limited by the nature of the transaction and the hospital's unquestioned right to exercise some control over the identity and the number of doctors to whom it accords staff privileges. If respondent is admitted to the staff of East Jefferson, the range of choice will be enlarged from **[*31]** four to five

---

could in the absence of the arrangement. This could also have an adverse effect on the anesthesiology market since it is possible that only less able anesthesiologists would be willing to give up part of their fees in return for the security of an exclusive contract. However, there are no findings of either the District Court or the Court of Appeals which indicate that this type of exploitation of market power has occurred here. The Court of Appeals found only that Roux's use of nurse anesthetists increased its and the hospital's profits, but there was no finding that nurse anesthetists might not be used with equal frequency absent the exclusive contract. Indeed, the District Court found that nurse anesthetists are utilized in all hospitals in the area. 513 F.Supp., at 537, 543. Moreover, there is nothing in the record which details whether this arrangement has enhanced the value of East Jefferson's market power or harmed quality competition in the anesthesiology market.

48 While there was some rather impressionistic testimony that the prevalence of exclusive contracts tended to discourage young doctors from entering the market, the evidence was equivocal and neither the District Court nor the Court of Appeals made any findings concerning the contract's effect on entry barriers. Respondent does not press the point before this Court. It is possible that under some circumstances an exclusive contract could raise entry barriers since anesthesiologists could not compete for the contract without raising the capital necessary to run a hospitalwide operation. However, since the hospital has provided most of the capital for the exclusive contractor in this case, that problem does not appear to be present.

49 While it is true that purchasers may not be fully sensitive to the price or quality implications of a tying arrangement, so that competition may be impeded, see n. 24, *supra*, this depends on an empirical demonstration concerning the effect of the arrangement on price or quality, and the record reveals little if anything about the effect of this arrangement on the market for anesthesiological services.

50 If, as is likely, it is the patient's doctor and not the patient who selects an anesthesiologist, the doctor can simply take the patient elsewhere if he is dissatisfied with Roux. The District Court found that most doctors in the area have staff privileges at more than one hospital. 513 F.Supp., at 541.

51 ***LEdHN[17B]*** [17B]

The effect of the contract, of course, has been to remove the East Jefferson Hospital from the market open to Roux's competitors. Like any exclusive-requirements contract, this contract could be unlawful if it foreclosed so much of the market from penetration by Roux's competitors as to unreasonably restrain competition in the affected market, the market for anesthesiological services. See generally *Tampa Electric Co.* v. *Nashville Coal Co.*, 365 U.S. 320 (1961); *Standard Oil Co. of California* v. *United States*, 337 U.S. 293 (1949). However, respondent has not attempted to make this showing.

doctors, but the most significant restraints on the patient's freedom to select a specific anesthesiologist will nevertheless remain. [52] Without a showing **[***25]** of actual adverse effect on competition, respondent cannot make out a case under the antitrust laws, and no such showing has been made.

VI

***LEdHN[1B]*** [1B]Petitioners' closed policy may raise questions of medical ethics, [53] and may have inconvenienced some patients who would prefer to have their anesthesia administered by someone other than a member of Roux & Associates, but it does not have the obviously unreasonable impact on purchasers that has characterized the tying arrangements that this Court has branded unlawful. There is no evidence that the price, the quality, or the supply or demand for either the "tying product" or the "tied product" involved in this case has been adversely affected by the exclusive contract between Roux and the hospital. It may well be true that the contract made it necessary for Dr. Hyde and others to practice elsewhere, rather than at East Jefferson. But there has been no showing that the market as a whole has been affected at all by the contract. Indeed, as we previously noted, the record tells us very little about the market for the services of anesthesiologists. **[*32]** Yet that is the market in which the exclusive contract has had its principal impact. There is simply no showing here of the kind of restraint on competition that is prohibited by the Sherman Act. Accordingly, the judgment of the Court of Appeals is reversed, and the case is remanded to that court for further proceedings consistent with this opinion. [54]

*It is so ordered*.

**Concur by:** BRENNAN; O'CONNOR

**Concur**

JUSTICE BRENNAN, with whom JUSTICE MARSHALL joins, concurring.

As the opinion for the Court demonstrates, we have long held that tying arrangements are subject to evaluation for *per se* illegality under *§ 1* of the Sherman Act. Whatever merit the policy arguments against this longstanding construction of the Act might have, Congress, presumably **[**1569]** aware of our decisions, has never changed the rule by amending the Act. In such circumstances, our practice usually has been to stand by a settled statutory interpretation and leave the task of modifying the statute's reach to Congress. See *Monsanto Co*. v. *Spray-Rite ServiceCorp., 465 U.S. 752, 769 (1984)* (BRENNAN, J., concurring). I see no reason to depart from that principle in this case and therefore join the opinion and judgment of the Court.

JUSTICE O'CONNOR, with whom THE CHIEF JUSTICE, JUSTICE POWELL, and JUSTICE REHNQUIST join, concurring in the judgment.

---

[52] The record simply tells us little if anything about the effect of this arrangement on price or quality of anesthesiological services. As to price, the arrangement did not lead to an increase in the price charged to the patient. 686 F.2d, at 291. As to quality, the record indicates little more than that there have never been any complaints about the quality of Roux's services, and no contention that his services are in any respect inferior to those of respondent. Moreover, the self-interest of the hospital, as well as the ethical and professional norms under which it operates, presumably protect the quality of anesthesiological services. See Joint Commission on Accreditation of Hospitals, Accreditation Manual for Hospitals 3-10, 151-154 (1983).

[53] See App. A to Brief for American Society of Anesthesiologists, Inc., as *Amicus Curiae*.

[54] The claims raised by respondent but not passed upon by the Court of Appeals remain open on remand. See n. 2, *supra*.

East Jefferson Hospital, a public hospital governed by petitioners, requires patients to use the anesthesiological services provided by Roux & Associates, as they are the only doctors authorized to administer anesthesia to patients in the hospital. The Court of Appeals found that this **[***26]** arrangement was a tie-in illegal under the *Sherman Act. 686 F.2d 286* **[*33]** (CA5 1982). I concur in the Court's decision to reverse but write separately to explain why I believe the hospital-Roux contract, whether treated as effecting a tie between services provided to patients, or as an exclusive dealing arrangement between the hospital and certain anesthesiologists, is properly analyzed under the rule of reason.

I

Tying is a form of marketing in which a seller insists on selling two distinct products or services as a package. A supermarket that will sell flour to consumers only if they will also buy sugar is engaged in tying. Flour is referred to as the *tying* product, sugar as the *tied* product. In this case the allegation is that East Jefferson Hospital has unlawfully tied the sale of general hospital services and operating room facilities (the tying service) to the sale of anesthesiologists' services (the tied services). The Court has on occasion applied a *per se* rule of illegality in actions alleging tying in violation of *§ 1* of the Sherman Act. *International Salt Co*. v. *United States, 332 U.S. 392 (1947)*.

Under the usual logic of the *per se* rule, a restraint on trade that rarely serves any purposes other than to restrain competition is illegal without proof of market power or anticompetitive effect. See, *e. g., Northern Pacific R. Co*. v. *United States, 356 U.S. 1, 5 (1958)*. In deciding whether an economic restraint should be declared illegal *per se*, "[the] probability that anticompetitive consequences will result from a practice and the severity of those consequences [is] balanced against its procompetitive consequences. Cases that do not fit the generalization may arise, but a *per se* rule reflects the judgment that such cases are not sufficiently common or important to justify the time and expense necessary to identify them." *Continental T. V., Inc*. v. *GTE Sylvania Inc., 433 U.S. 36, 50, n. 16 (1977)*. See also *Arizona v. Maricopa County Medical Society, 457 U.S. 332, 351 (1982)*. Only when there is very little loss to society from banning a restraint **[*34]** altogether is an inquiry into its costs in the individual case considered to be unnecessary.

Some of our earlier cases did indeed declare that tying arrangements serve "hardly any purpose beyond the suppression of competition." *Standard Oil Co. of California v. United States, 337 U.S. 293, 305-306 (1949)* (dictum). However, this declaration was not taken literally even by the cases that purported to rely upon it. In practice, a tie has been illegal only if the seller is shown to have "sufficient economic power with respect to the tying product to appreciably restrain free competition in the market for the tied product. . . ." *Northern Pacific R. Co.*, 356 U.S., at 6. Without "control or dominance over the tying product," the seller could not use the tying product as "an effectual weapon to pressure buyers into taking the tied **[**1570]** item," so that any restraint of trade would be "insignificant." *Ibid*. The Court has never been willing to say of tying arrangements, as it has of price fixing, division of markets, and other **[***27]** agreements subject to *per se* analysis, that they are always illegal, without proof of market power or anticompetitive effect.

The "*per se*" doctrine in tying cases has thus always required an elaborate inquiry into the economic effects of the tying arrangement. [1] As a result, tying doctrine incurs the costs of a rule-of-reason approach without achieving its benefits: the doctrine calls for the extensive and time-consuming economic analysis characteristic of the rule of reason, but then may be interpreted to prohibit arrangements that economic analysis would show to be beneficial. Moreover, the *per se* label in the tying context has generated more confusion **[*35]** than coherent law because it appears to invite lower courts to omit the analysis of economic circumstances of the tie that has always been a necessary element of tying analysis.

The time has therefore come to abandon the "*per se*" label and refocus the inquiry on the adverse economic effects, and the potential economic benefits, that the tie may have. The law of tie-ins will thus be brought into accord with the law applicable to all other allegedly anticompetitive economic arrangements, except those few horizontal or quasi-horizontal restraints that can be said to have no economic justification whatsoever. [2] This change will rationalize rather than abandon tie-in doctrine as it is already applied.

II

Our prior opinions indicate that the purpose of tying law has been to identify and control those tie-ins that have a demonstrable exclusionary impact in the tied-product market, see *Times-Picayune Publishing Co*. v. *United States, 345 U.S. 594, 605 (1953)*, or that abet the harmful exercise of market power that the seller possesses in the tying product market. [3] Under the rule of reason tying arrangements should be disapproved only in such instances.

Market power in the *tying* product may be acquired legitimately (*e. g*., through the grant of a patent) or illegitimately (*e. g*., as a result of unlawful monopolization). In either event, exploitation of consumers in the market for the tying **[*36]** product is a possibility that exists and that may be regulated under § 2 of the Sherman Act without reference to any **[***28]** tying arrangements that the seller may have developed. The existence of a tied product normally does not increase the profit that the seller with market power can extract from sales of the *tying* product. A seller with a monopoly on flour, for example, cannot increase the profit it can extract from flour consumers simply by forcing them to buy sugar along with their flour. Counterintuitive though that assertion may seem, it is easily demonstrated and widely accepted. See, *e. g*., R. Bork, The Antitrust Paradox 372-374 **[**1571]** (1978); P. Areeda, Antitrust Analysis 735 (3d ed. 1981).

---

[1] This inquiry has been required in analyzing both the prima facie case and affirmative defenses. Most notably, *United States* v. *Jerrold Electronics Corp*., 187 F.Supp. 545, 559-560 (ED Pa. 1960), aff'd *per curiam*, *365 U.S. 567 (1961)*, upheld a requirement that buyers of television systems purchase the complete system, as well as installation and repair service, on the grounds that the tie assured that the systems would operate and thereby protected the seller's business reputation.

[2] Tying law is particularly anomalous in this respect because arrangements largely indistinguishable from tie-ins are generally analyzed under the rule of reason. For example, the "*per se*" analysis of tie-ins subjects restrictions on a franchisee's freedom to purchase supplies to a more searching scrutiny than restrictions on his freedom to sell his products. Compare, *e. g*., *Siegel* v. *Chicken Delight, Inc*., 448 F.2d 43 (CA9 1971), cert. denied, *405 U.S. 955 (1972)*, with *Continental T. V., Inc*. v. *GTE Sylvania Inc*., 433 U.S. 36 (1977). And exclusive contracts that, like tie-ins, require the buyer to purchase a product from one seller are subject only to the rule of reason. See *infra*, at 44-45.

[3] See n. 4, *infra*.

Tying may be economically harmful primarily in the rare cases where power in the market for the tying product is used to create *additional* market power in the market for the *tied* product. [4] The antitrust law is properly concerned with **[*37]** tying when, for example, the flour monopolist threatens to use its market power to acquire additional power in the sugar market, perhaps by driving out competing sellers of sugar, or by making it more difficult for new sellers to enter the sugar market. But such extension of market power is unlikely, or poses no threat of economic harm, unless the two markets in question and the nature of the two products tied satisfy three threshold criteria. [5]

First, the seller must have power in the tying-product market. [6] Absent **[***29]** such power tying cannot conceivably have any adverse impact in the tied-product market, and can be only procompetitive in the tying-product market. [7] If the **[*38]** seller of flour has no **[**1572]** market power over flour, it will gain none by insisting that its buyers take some sugar as well. See

---

[4] Tying might be undesirable in two other instances, but the hospital-Roux arrangement involves neither one.

In a regulated industry a firm with market power may be unable to extract a supercompetitive profit because it lacks control over the prices it charges for regulated products or services. Tying may then be used to extract that profit from sale of the unregulated, tied products or services. See *Fortner Enterprises, Inc*. v. *United States Steel Corp.*, 394 U.S. 495, 513 (1969) (WHITE, J., dissenting).

Tying may also help the seller engage in price discrimination by "metering" the buyer's use of the tying product. Cf. *International Business Machines Corp*. v. *United States*, 298 U.S. 131 (1936); *International Salt Co*. v. *United States*, 332 U.S. 392 (1947). Price discrimination may be independently unlawful, see 15 U. S. C. § 13. Price discrimination may, however, *decrease* rather than increase the economic costs of a seller's market power. See, *e. g.*, R. Bork, The Antitrust Paradox 398 (1978); P. Areeda, Antitrust Analysis 608-610 (3d ed. 1981); O. Williamson, Markets and Hierarchies: Analysis and Antitrust Implications 11-13 (1975). *United States Steel Corp*. v. *Fortner Enterprises, Inc*., 429 U.S. 610, 617 (1977)*(Fortner II)*, did not hold that price discrimination in the form of a tie-in is always economically harmful; that case indicated only that price discrimination may indicate market power in the tying-product market. But there is no need in this case to address the problem of price discrimination facilitated by tying. The discussion herein is aimed only at tying arrangements as to which no price discrimination is alleged.

[5] Wholly apart from market characteristics, a prerequisite to application of the Sherman Act is an effect on interstate commerce. See, *e. g.*, *McLain* v. *Real Estate Board of New Orleans*, 444 U.S. 232, 246 (1980); *Burke* v. *Ford*, 389 U.S. 320, 322 (1967). It is not disputed that such an impact is present here.

[6] The Court has failed in the past to define how much market power is necessary, but in the context of this case it is inappropriate to attempt to resolve that question. In *International Salt Co*. v. *United States*, *supra*, the Court assumed that a patent conferred market power and therefore sufficiently established "the tendency of the arrangement to accomplishment of monopoly." *Id*., at 396. In its next tying case, *Times-Picayune Publishing Co*. v. *United States*, 345 U.S. 594 (1953), the Court distinguished *International Salt* in part by finding that there was no market "dominance," 345 U.S., at 610-613, after a careful consideration of the relevant market. Then, in *Northern Pacific R. Co*. v. *United States*, 356 U.S. 1, 6-8, 11 (1958), the Court required only a minimal showing of market power. More recently, in *Fortner II*, *supra*, the Court conducted a more extensive analysis of whether the tie was actually an exercise of market power, considering such factors as the size and profitability of the firm seeking to impose the tie, the character of the tying product, and the effects of the tie -- the price charged for the products, the number of customers affected, the functional relation between the tied and tying product.

[7] A common misconception has been that a patent or copyright, a high market share, or a unique product that competitors are not able to offer suffices to demonstrate market power. While each of these three factors might help to give market power to a seller, it is also possible that a seller in these situations will have no market power: for example, a patent holder has no market power in any relevant sense if there are close substitutes for the patented product. Similarly, a high market share indicates market power only if the market is properly defined to include all reasonable substitutes for the product. See generally Landes & Posner, Market Power in Antitrust Cases, 94 Harv. L. Rev. 937 (1981).

Nor does any presumption of market power find support in our prior cases. Although *United States* v. *Paramount Pictures, Inc*., 334 U.S. 131 (1948), considered the legality of "block-booking" of motion pictures, which ties the purchase of rights to copyrighted motion pictures to purchase of other motion pictures of the same copyright holder, the Court did not analyze the arrangement with the schema of the tying cases. Rather, the Court borrowed the patent law principle of "patent misuse," which prevents the holder of a patent from using the patent to require his customers to purchase unpatented products. *Id*., at 156-159. See, *e. g., Mercoid Corp*. v. *Mid-Continent Investment Co.*, 320 U.S. 661, 665 (1944). The "patent misuse" doctrine may have influenced the

*United States Steel Corp*. v. *Fortner Enterprises, Inc., 429 U.S. 610, 620 (1977)(Fortner II); Fortner Enterprises, Inc*. v. *United States Steel Corp., 394 U.S. 495, 503-504 (1969)(Fortner I); United States v. Loew's Inc., 371 U.S. 38, 45, 48, n. 5 (1962)*; *Northern Pacific R. Co*. v. *United States, 356 U.S., at 6-7*.

Second, there must be a substantial threat that the tying seller will acquire market power in the tied-product market. No such threat exists if the tied-product market is occupied by many stable sellers who are not likely to be driven out by the tying, or if entry barriers in the tied-product market are low. If, for example, there is an active and vibrant market for sugar -- one with numerous sellers and buyers who do not deal in flour -- the flour monopolist's tying of sugar to flour need not be declared unlawful. Cf. *Fortner II, supra, at 617-618*, and n. 8; *Fortner I, supra, at 498-499*; *Times-Picayune Publishing Co*. v. *United States, 345 U.S., at 611*; *Standard Oil Co. of California v. United States, 337 U.S., at 305-306*; *International Salt Co*. v. *United States, 332 U.S.,* **[*39]** at 396. If, on the other hand, the tying arrangement is likely to erect significant barriers to entry into the tied-product market, the tie remains suspect. *Atlantic Refining Co*. v. *FTC, 381 U.S. 357, 371 (1965)*.

**[***30]** Third, there must be a coherent economic basis for treating the tying and tied products as distinct. All but the simplest products can be broken down into two or more components that are "tied together" in the final sale. Unless it is to be illegal to sell cars with engines or cameras with lenses, this analysis must be guided by some limiting principle. For products to be treated as distinct, the tied product must, at a minimum, be one that some consumers might wish to purchase separately *without also purchasing the tying product*. [8] When the tied product has no use other than in conjunction with the tying product, a seller of the tying product can acquire no *additional* market power by selling the two products together. If sugar is useless to consumers except when used with flour, the flour seller's market power is projected into the sugar market whether or not the two products are actually sold together; the flour seller can exploit what market power it has over flour with or without the tie. [9] The flour seller will therefore have **[**1573]** little incentive to monopolize the sugar market unless it can produce and distribute sugar more cheaply than other sugar sellers. And in this unusual case, where flour is monopolized and sugar is useful only when **[*40]** used with flour, consumers will suffer no further economic injury by the monopolization of the sugar market.

Even when the tied product does have a use separate from the tying product, it makes little sense to label a package as two products without also considering the economic justifications for the sale of the package as a unit. When the economic advantages of joint packaging are substantial the package is not appropriately viewed as two products, and that should be the end of the tying inquiry. The lower courts largely have adopted this approach. [10] See, *e. g.,*

---

Court's willingness to strike down the arrangement at issue in *International Salt* as well, although the Court did not cite the doctrine in that case.

[8] Whether the tying product is one that consumers might wish to purchase without the tied product should be irrelevant. Once it is conceded that the seller has market power over the tying product it follows that the seller can sell the tying product on noncompetitive terms. The injury to consumers does not depend on whether the seller chooses to charge a supercompetitive price, or charges a competitive price but insists that consumers also buy a product that they do not want.

[9] Cf. Areeda, *supra* n. 4, at 735; Ross, The Single Product Issue in Antitrust Tying: A Functional Approach, 23 Emory L. J. 963, 1010 (1974); Bowman, Tying Arrangements and the Leverage Problem, 67 Yale L. J. 19, 21-23 (1957).

[10] The examination of the economic advantages of tying may properly be conducted as part of the rule-of-reason analysis, rather than at the threshold of the tying inquiry. This approach is consistent with this Court's occasional references to the problem.

**[***31]** *Foster v. Maryland State Savings and Loan Assn., 191 U. S. App. D. C. 226, 228-231, 590 F.2d 928, 930-933 (1978)*, cert. denied, 439 U.S. 1071 (1979); *Response of Carolina, Inc.* v. *Leasco Response, Inc., 537 F.2d 1307, 1330 (CA5 1976)*; *Kugler v. AAMCO Automatic Transmissions, Inc., 460 F.2d 1214 (CA8 1972)*; *ILC Peripherals Leasing Corp.* v. *International Business Machines Corp., 448 F.Supp. 228, 230* **[*41]** (ND Cal. 1978); *United States v. Jerrold Electronics Corp., 187 F.Supp. 545, 563 (ED Pa. 1960)*, aff'd *per curiam*, 365 U.S. 567 (1961).

These three conditions -- market power in the tying product, a substantial threat of market power in the tied product, and a coherent economic basis for treating the products as distinct -- are only threshold requirements. Under the rule of reason a tie-in may prove acceptable even when all three are met. Tie-ins may entail economic benefits as well as economic harms, and if the threshold requirements are met these benefits should enter the rule-of-reason balance.

"[Tie-ins] may facilitate new entry into fields where established sellers have wedded their customers to them by ties of habit and custom. *Brown Shoe Co.* v. *United States, 370 U.S. 294, 330 (1962)*. . . . They may permit clandestine price cutting in products which otherwise would have no price competition at all because of fear of retaliation from the few other producers dealing in the market. They may protect the reputation of the tying product if failure to use the tied product in conjunction with it may cause it to misfunction. . . . [Citing] *Pick Mfg. Co.* v. *General Motors Corp., 80 F.2d 641 (C. A. 7th Cir. 1935)*, aff'd, *299 U.S. 3 (1936)*. And, if the tied and tying products are functionally related, they may reduce costs through economies of joint production and distribution." *Fortner I, 394 U.S., at 514, n. 9* (WHITE, J., dissenting).

The ultimate decision whether a tie-in is illegal under the antitrust laws should depend upon the demonstrated economic effects **[**1574]** of the challenged agreement. It may, for example, be entirely innocuous that the seller exploits its control over the tying product to "force" the buyer to purchase the tied product. For when the seller exerts market power only in the tying-product market, it makes no difference to him or his customers whether he exploits that power by raising **[*42]** the price of the tying product or by "forcing" customers to buy a tied product. See Markovits, Tie-Ins, Reciprocity and the Leverage Theory, 76 Yale L. J. 1397, 1397-1398 (1967); Burstein, A Theory of Full-Line Forcing, 55 Nw. U. L. Rev. 62, 62-63 (1960). On the other hand, tying may make the provision of packages of goods and services more efficient. A tie-in should be condemned only when its anticompetitive impact outweighs its contribution to efficiency.

III

Application of these criteria to the case at hand is straightforward.

**[***32]** Although the issue is in doubt, we may assume that the hospital does have market power in the provision of hospital services in its area. The District Court found to the contrary,

---

The Court has not heretofore had occasion to set forth any general criteria for determining when two apparently separate products are components of a single product for tying analysis. In *Times-Picayune Publishing Co.*, the Court held that advertising space in a morning newspaper was the same product as advertising space in the evening newspaper -- access to readership of the respective newspapers -- because the subscribers had no reason to distinguish among the readers of the two papers. 345 U.S., at 613-616. In *Fortner I*, the Court, reversing the grant of a motion for summary judgment, rejected the contention that credit could never be separate from the product for whose purchase credit was extended. 394 U.S., at 506-507. The Court disclaimed any determination of "the standards for determining exactly when a transaction involves only a single product." *Id.*, at 507. These cases indicate that consideration of whether a buyer might prefer to purchase one component without the other is one of the factors in tying analysis and, more generally, that economic analysis rather than mere conventional separability into different markets should determine whether one or two products are involved in the alleged tie.

*513 F.Supp. 532, 541 (ED La. 1981)*, but the Court of Appeals determined that the hospital does possess market power in an appropriately defined market. While appellate courts should normally defer to the district courts' findings on such fact-bound questions, [11] I shall assume for the purposes of this discussion that the Court of Appeals' determination that the hospital does have some power in the provision of hospital services in its local market is accepted.

Second, in light of the hospital's presumed market power, we may also assume that there is a substantial threat that East Jefferson will acquire market power over the provision of anesthesiological services in its market. By tying the sale of anesthesia to the sale of other hospital services the hospital can drive out other sellers of those services who might otherwise operate in the local market. The hospital may thus gain local market power in the provision of anesthesiology: anesthesiological services offered in the hospital's market, narrowly defined, will be purchased only from Roux, under the hospital's auspices.

**[*43]** But the third threshold condition for giving closer scrutiny to a tying arrangement is not satisfied here: there is no sound economic reason for treating surgery and anesthesia as separate services. Patients are interested in purchasing anesthesia only in conjunction with hospital services, [12] so the hospital can acquire no *additional* market power by selling the two services together. Accordingly, the link between the hospital's services and anesthesia administered by Roux will affect neither the amount of anesthesia provided nor the combined price of anesthesia and surgery for those who choose to become the hospital's patients. In these circumstances, anesthesia and surgical services should probably not be characterized as distinct products for tying purposes.

Even if they are, the tying should not be considered a violation of *§ 1* of the Sherman Act because tying here cannot increase the seller's already absolute power over the volume of production of the tied product, which is an inevitable consequence of the fact that very few patients will choose to undergo surgery without receiving anesthesia. The hospital-Roux contract therefore has little potential to harm the patients. On the other side of the balance, the District Court found, and the Court of Appeals did not dispute, that the tie-in conferred significant benefits upon the hospital and the patients that it served.

The tie-in improves patient care and permits more efficient hospital operation in a number of ways. From the viewpoint of hospital management, the tie-in ensures 24-hour **[**1575]** anesthesiology coverage, aids in standardization of procedures and efficient use of equipment, facilitates flexible scheduling of operations, and permits the hospital more effectively **[***33]** to monitor the quality of anesthesiological services. Further, the tying arrangement is advantageous to patients because, as the District Court found, the closed anesthesiology department **[*44]** places upon the hospital, rather than the individual patient, responsibility to select the physician who is to provide anesthesiological services. The hospital also assumes the responsibility that the anesthesiologist will be available, will be acceptable to the surgeon, and will provide suitable care to the patient. In assuming these responsibilities -- responsibilities that a seriously ill patient frequently may be unable to discharge -- the hospital provides a valuable service to its patients. And there is no indication that patients were dissatisfied with the quality of anesthesiology that was provided at the hospital or that patients wished to enjoy the services of anesthesiologists other than those that the hospital employed. Given this evidence of the advantages and effectiveness of

---

[11] See Fed. Rule Civ. Proc. 52(a); *Inwood Laboratories, Inc.* v. *Ives Laboratories, Inc.*, 456 U.S. 844, 855-858 (1982).

[12] While the record appears to be devoid of factual findings on this point the assumption is a safe one, and certainly one that finds no contradiction in the record.

the closed anesthesiology department, it is not surprising that, as the District Court found, such arrangements are accepted practice in the majority of hospitals of New Orleans and in the health care industry generally. Such an arrangement, which has little anticompetitive effect and achieves substantial benefits in the provision of care to patients, is hardly one that the antitrust law should condemn. [13] This conclusion reaffirms our threshold determination that the joint provision of hospital services and anesthesiology should not be viewed as involving a tie between distinct products, and therefore should require no additional scrutiny under the antitrust law.

IV

Whether or not the hospital-Roux contract is characterized as a tie between distinct products, the contract unquestionably does constitute exclusive dealing. Exclusive-dealing arrangements are independently subject to scrutiny under *§ 1* of the Sherman Act, and are also analyzed under the rule of **[*45]** reason. *Tampa Electric Co.* v. *Nashville Coal Co., 365 U.S. 320, 333-335 (1961)*.

The hospital-Roux arrangement could conceivably have an adverse effect on horizontal competition among anesthesiologists, or among hospitals. Dr. Hyde, who competes with the Roux anesthesiologists, and other hospitals in the area, who compete with East Jefferson, may have grounds to complain that the exclusive contract stifles horizontal competition and therefore has an adverse, albeit indirect, impact on consumer welfare even if it is not a tie.

Exclusive-dealing arrangements may, in some circumstances, create or extend market power of a supplier or the purchaser party to the exclusive-dealing arrangement, and may thus restrain horizontal competition. Exclusive dealing can have adverse economic consequences by allowing one supplier of goods or services unreasonably to deprive other suppliers of a market for their goods, or by allowing one buyer of goods unreasonably to deprive other buyers of a needed source of supply. **[***34]** In determining whether an exclusive-dealing contract is unreasonable, the proper focus is on the structure of the market for the products or services in question -- the number of sellers and buyers in the market, the volume of their business, and the ease with **[**1576]** which buyers and sellers can redirect their purchases or sales to others. Exclusive dealing is an unreasonable restraint on trade only when a significant fraction of buyers or sellers are frozen out of a market by the exclusive deal. *Standard Oil Co. of California v. United States, 337 U.S. 293 (1949)*. When the sellers of services are numerous and mobile, and the number of buyers is large, exclusive-dealing arrangements of narrow scope pose no threat of adverse economic consequences. To the contrary, they may be substantially procompetitive by ensuring stable markets and encouraging long-term, mutually advantageous business relationships.

At issue here is an exclusive-dealing arrangement between a firm of four anesthesiologists and one relatively small hospital. **[*46]** There is no suggestion that East Jefferson Hospital is likely to create a "bottleneck" in the availability of anesthesiologists that might deprive other hospitals of access to needed anesthesiological services, or that the Roux associates have unreasonably narrowed the range of choices available to other anesthesiologists in search of a hospital or patients that will buy their services. Cf. *Associated Press v. United States, 326 U.S. 1 (1945)*. A firm of four anesthesiologists represents only a very small fraction of the total number of anesthesiologists whose services are available for hire by other hospitals, and East Jefferson is

---

[13] The Court of Appeals disregarded the benefits of the tie because it found that there were less restrictive means of achieving them. In the absence of an adequate basis to expect any harm to competition from the tie-in, this objection is simply irrelevant.

one among numerous hospitals buying such services. Even without engaging in a detailed analysis of the size of the relevant markets we may readily conclude that there is no likelihood that the exclusive-dealing arrangement challenged here will either unreasonably enhance the hospital's market position relative to other hospitals, or unreasonably permit Roux to acquire power relative to other anesthesiologists. Accordingly, this exclusive-dealing arrangement must be sustained under the rule of reason.

V

For these reasons I conclude that the hospital-Roux contract does not violate *§ 1* of the Sherman Act. Since anesthesia is a service useful to consumers only when purchased in conjunction with hospital services, the arrangement is not properly characterized as a tie between distinct products. It threatens no additional economic harm to consumers beyond that already made possible by any market power that the hospital may possess. The fact that anesthesia is used only together with other hospital services is sufficient, standing alone, to insulate from attack the hospital's decision to tie the two types of service.

Whether or not this case involves tying of distinct products, the hospital-Roux contract is subject to scrutiny under the rule of reason as an exclusive-dealing arrangement. Plainly, however, the arrangement forecloses only a small **[*47]** fraction of the markets in which anesthesiologists may sell their services, and a still smaller fraction of the market in which hospitals may secure anesthesiological **[***35]** services. The contract therefore survives scrutiny under the rule of reason.

The judgment of the Court of Appeals for the Fifth Circuit should be reversed, and the case should be remanded for any further proceedings on respondent's remaining claims. See *ante*, at 5, n. 2.

**References**

54 Am Jur 2d, Monopolies, Restraints of Trade and Unfair Trade Practices 59-72

*15 USCS 1*

US L Ed Digest, Restraints of Trade, Monopolies, and Unfair Trade Practices 30

L Ed Index to Annos, Restraints of Trade and Monopolies

ALR Quick Index, Restraints of Trade and Monopolies

Federal Quick Index, Tying arrangements

Annotation References:

What constitutes sufficient economic power to make tying arrangement unlawful restraint of trade violative of 1 of Sherman Act (*15 USCS 1*). *51 L Ed 2d 826*.

*What constitutes separate and distinct products or services for purposes of determining whether tying arrangement violates 1 of the Sherman Act (15 USCS 1)* or 3 of Clayton Act (*15 USCS 14*). *46 ALR Fed 516.*

EXHIBIT 278

LexisNexis®
Questioned
As of: August 12, 2014 9:13 AM EDT

# LePage's, Inc. v. 3M

United States Court of Appeals for the Third Circuit
October 30, 2002, Reargued En Banc ; March 25, 2003, Filed
Nos. 00-1368 and 00-1473

**Reporter:** 324 F.3d 141; 2003 U.S. App. LEXIS 5757; 2003-1 Trade Cas. (CCH) P73,989; 61 Fed. R. Evid. Serv. (Callaghan) 60
LEPAGE'S INCORPORATED; LEPAGE'S MANAGEMENT COMPANY, L.L.C., Appellees/Cross-Appellants v. 3M (MINNESOTA MINING AND MANUFACTURING COMPANY); KROLL ASSOCIATES, INC., Minnesota Mining and Manufacturing Company, Appellant/Cross-Appellee

**Subsequent History:** Later proceeding at *3M Co. v. LePage's Inc., 540 U.S. 807, 157 L. Ed. 2d 20, 124 S. Ct. 365, 2003 U.S. LEXIS 5480 (2003)*
US Supreme Court certiorari denied by *3M v. LePage's Inc., 159 L. Ed. 2d 835, 124 S. Ct. 2932, 2004 U.S. LEXIS 4768 (U.S., 2004)*

**Prior History:** **[**1]** On Appeal from the United States District Court for the Eastern District of Pennsylvania. (D.C. Civ. No. 97-03983). District Judge: The Honorable John R. Padova.
*Le Page's Inc. v. 3M, 2000 U.S. Dist. LEXIS 3087 (E.D. Pa., Mar. 14, 2000)*

**Disposition:** The court affirmed the judgment.

**Core Terms**

tape, rebate, customers, pricing, products, label, sales, exclusionary, discounts, bundled, competitor, monopolist, monopolization, monopoly, monopoly power, transparent, district court, anticompetitive, predatory, purchases, brand, programs, damages, manufacturer, supplier, Skiing, volume, targets, consumers, private-label

**LexisNexis® Headnotes**

Civil Procedure > Trials > Judgment as Matter of Law > General Overview
Civil Procedure > Appeals > Standards of Review > De Novo Review

***HN1*** An appellate court exercises plenary review over an order granting or denying a motion for judgment as a matter of law. When a defendant makes such a motion, a court should grant it only if, viewing the evidence in the light most favorable to the nonmovant and giving it the advantage of every fair and reasonable inference, there is insufficient evidence from which a jury reasonably could find liability.

Civil Procedure > Appeals > Standards of Review > De Novo Review

***HN2*** An appellate court reviews questions of law underlying the jury verdict on a plenary basis.

Civil Procedure > Appeals > Standards of Review > General Overview

***HN3*** The appellate court's review of a jury's verdict is limited to determining whether some evidence in the record supports the jury's verdict. A jury verdict will not be overturned unless the record is critically deficient of that quantum of evidence from which a jury could have rationally reached its verdict.

Antitrust & Trade Law > Sherman Act > General Overview
Criminal Law & Procedure > Sentencing > Fines

***HN4*** See *15 U.S.C.S. § 2*.

Antitrust & Trade Law > ... > Private Actions > Costs & Attorney Fees > Clayton Act
Antitrust & Trade Law > ... > Private Actions > Remedies > General Overview

***HN5*** A private party may sue for damages for violation of *15 U.S.C.S. § 2* and recover threefold the damages and counsel fees. *15 U.S.C.S. § 15*.

Antitrust & Trade Law > Sherman Act > General Overview

***HN6*** A defendant company which possesses monopoly power in the relevant market will be found in violation of *§ 2* (*15 U.S.C.S. § 2*) of the Sherman Act if the defendant willfully acquired or maintained that power.

Antitrust & Trade Law > ... > Monopolies & Monopolization > Actual Monopolization > General Overview

***HN7*** A monopolist willfully acquires or maintains monopoly power when it competes on some basis other than the merits.

Antitrust & Trade Law > ... > Monopolies & Monopolization > Actual Monopolization > General Overview

***HN8*** It does not follow that a company that has a monopoly has "monopolized" the market because it may not have achieved monopoly; monopoly may have been thrust upon it. Persons may unwittingly find themselves in possession of a monopoly, automatically so to say: that is, without having intended either to put an end to existing competition, or to prevent competition from arising when none had existed; they may become monopolists by force of accident. On the other hand, size carries with it an opportunity for abuse that is not to be ignored when the opportunity is proved to have been utilized in the past.

Antitrust & Trade Law > ... > Monopolies & Monopolization > Actual Monopolization > General Overview
Antitrust & Trade Law > Sherman Act > Scope > Monopolization Offenses

***HN9*** Neither proof of exertion of the power to exclude nor proof of actual exclusion of existing or potential competitors is essential to sustain a charge of monopolization under the Sherman Act.

Antitrust & Trade Law > ... > Monopolies & Monopolization > Actual Monopolization > General Overview
Antitrust & Trade Law > Sherman Act > General Overview

***HN10*** Monopolies can be "thrust" upon entities rather than achieved and specific intent under *15 U.S.C.S. § 2* is not required for no monopolist monopolizes unconscious of what he is doing.

Antitrust & Trade Law > Regulated Practices > Monopolies & Monopolization > General Overview

Antitrust & Trade Law > ... > Monopolies & Monopolization > Actual Monopolization > Monopoly Power
Antitrust & Trade Law > ... > Monopolies & Monopolization > Attempts to Monopolize > General Overview
Antitrust & Trade Law > Sherman Act > General Overview
Antitrust & Trade Law > Sherman Act > Scope > General Overview

***HN11*** Monopoly power alone is not necessarily unlawful. *Section 2* (*15 U.S.C.S. § 2*) of the Sherman Act requires two elements: (1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident.

Antitrust & Trade Law > ... > Monopolies & Monopolization > Actual Monopolization > General Overview

***HN12*** A monopolist's right to refuse to deal is not unqualified.

Antitrust & Trade Law > ... > Monopolies & Monopolization > Actual Monopolization > General Overview

***HN13*** When the issue is monopolization rather than an attempt to monopolize, evidence of intent is merely relevant to the question whether the challenged conduct is fairly characterized as "exclusionary" or "anticompetitive" -- to use the words in the trial court's instructions -- or "predatory," to use a word that scholars seem to favor. Whichever label is used, there is agreement on the proposition that no monopolist monopolizes unconscious of what he is doing.

Antitrust & Trade Law > ... > Monopolies & Monopolization > Actual Monopolization > General Overview

***HN14*** A monopolist is not free to take certain actions that a company in a competitive (or even oligopolistic) market may take, because there is no market constraint on a monopolist's behavior.

Antitrust & Trade Law > Sherman Act > General Overview
Antitrust & Trade Law > Sherman Act > Defenses

***HN15*** A monopolist will be found to violate *§ 2* (*15 U.S.C.S. § 2*) of the Sherman Act if it engages in exclusionary or predatory conduct without a valid business justification.

Antitrust & Trade Law > Regulated Industries > Communications > Sherman Act
Antitrust & Trade Law > Regulated Practices > Intellectual Property > General Overview
Antitrust & Trade Law > ... > Intellectual Property > Bad Faith, Fraud & Nonuse > General Overview
Antitrust & Trade Law > ... > Intellectual Property > Bad Faith, Fraud & Nonuse > Fraud
Antitrust & Trade Law > Sherman Act > General Overview
Antitrust & Trade Law > Sherman Act > Scope > General Overview
Patent Law > ... > Defenses > Inequitable Conduct > General Overview
Patent Law > ... > Defenses > Inequitable Conduct > Anticompetitive Conduct
Patent Law > Infringement Actions > General Overview

***HN16*** "Anticompetitive conduct" can come in too many different forms, and is too dependent upon context, for any court or commentator ever to have enumerated all the varieties. Numerous cases hold that the enforcement of the legal monopoly provided by a patent procured through fraud may violate *§ 2* (*15 U.S.C.S. § 2*) of the Sherman Act. Predatory pricing by a monopolist can provide a basis for *§ 2* liability. A monopolist's denial to competitors of access to its "essential" goods, services, or resources violates *§ 2*. An arbitrary refusal to deal by a monopolist may constitute a *§ 2* violation. Even unfair tortious conduct unrelated to a monopolist's pricing policies violates *§ 2*.

Antitrust & Trade Law > ... > Monopolies & Monopolization > Actual Monopolization > General Overview

***HN17*** The principal anticompetitive effect of bundled rebates is that when offered by a monopolist they may foreclose portions of the market to a potential competitor who does not manufacture an equally diverse group of products and who therefore cannot make a comparable offer.

Antitrust & Trade Law > ... > Monopolies & Monopolization > Actual Monopolization > General Overview
Antitrust & Trade Law > ... > Monopolies & Monopolization > Actual Monopolization > Claims
Antitrust & Trade Law > ... > Monopolies & Monopolization > Attempts to Monopolize > Elements
Antitrust & Trade Law > ... > Monopolies & Monopolization > Attempts to Monopolize > Sherman Act
Antitrust & Trade Law > Sherman Act > General Overview
Antitrust & Trade Law > Sherman Act > Claims

***HN18*** Even though exclusivity arrangements are often analyzed under *§ 1* (*15 U.S.C.S. § 1*) of the Sherman Act, such exclusionary conduct may also be an element in a *§ 2* (*15 U.S.C.S. § 2*) of the Sherman Act claim. Exclusivity may play a role as an element in attempted or actual monopolization.

Antitrust & Trade Law > ... > Price Fixing & Restraints of Trade > Exclusive & Reciprocal Dealing > General Overview
Antitrust & Trade Law > ... > Price Fixing & Restraints of Trade > Exclusive & Reciprocal Dealing > Exclusive Dealing
Antitrust & Trade Law > Sherman Act > General Overview

***HN19*** The foreclosure of markets through exclusive dealing contracts is of concern under the antitrust laws. Unilaterally imposed quantity discounts can foreclose the opportunities of rivals when a dealer can obtain its best discount only by dealing exclusively with the dominant firm. For example, discounts might be cumulated over lengthy periods of time, such as a calendar year, when no obvious economies result.

Antitrust & Trade Law > ... > Monopolies & Monopolization > Actual Monopolization > General Overview

***HN20*** Conduct that intentionally, significantly, and without business justification excludes a potential competitor from outlets (even though not in the relevant market), where access to those outlets is a necessary though not sufficient condition to waging a challenge to a monopolist and fear of the challenge prompts the conduct, is "anticompetitive."

Antitrust & Trade Law > ... > Monopolies & Monopolization > Actual Monopolization > General Overview

***HN21*** When a monopolist's actions are designed to prevent one or more new or potential competitors from gaining a foothold in the market by exclusionary, i.e. predatory, conduct, its success in that goal is not only injurious to the potential competitor but also to competition in general. Even the foreclosure of "one significant competitor" from the market may lead to higher prices and reduced output.

Antitrust & Trade Law > Sherman Act > General Overview

***HN22*** The courts must look to the monopolist's conduct taken as a whole rather than considering each aspect in isolation. In a case alleging *§§ 1* and *2* (*15 U.S.C.S. §§ 1*, *2*) of the Sherman Act violations, the duty of the jury is to look at the whole picture and not merely at the individual figures in it.

Antitrust & Trade Law > ... > Monopolies & Monopolization > Actual Monopolization > General Overview
Antitrust & Trade Law > ... > Monopolies & Monopolization > Attempts to Monopolize > General Overview

***HN23*** Intent is relevant to proving monopolization and attempt to monopolize.

Antitrust & Trade Law > Clayton Act > Defenses
Antitrust & Trade Law > ... > Monopolies & Monopolization > Actual Monopolization > General Overview
Antitrust & Trade Law > Sherman Act > Defenses

***HN24*** A defendant's assertion that its actions were carried out for valid business reasons is the only recognized justification for monopolizing. However, a defendant's assertion that it acted in furtherance of its economic interests does not constitute the type of business justification that is an acceptable defense to *§ 2* (*15 U.S.C.S. § 2*) of the Sherman Act monopolization.

Antitrust & Trade Law > ... > Monopolies & Monopolization > Actual Monopolization > General Overview

***HN25*** In general, a business justification is valid if it relates directly or indirectly to the enhancement of consumer welfare. Thus, pursuit of efficiency and quality control might be legitimate competitive reasons, while the desire to maintain a monopoly market share or thwart the entry of competitors would not.

Antitrust & Trade Law > ... > Monopolies & Monopolization > Actual Monopolization > General Overview

***HN26*** It can be assumed that a monopolist seeks to further its economic interests and does so when it engages in exclusionary conduct. Thus, for example, exclusionary practice is defined as a method by which a firm trades a part of its monopoly profits, at least temporarily, for a larger market share, by making it unprofitable for other sellers to compete with it. Once a monopolist achieves its goal by excluding potential competitors, it can then increase the price of its product to the point at which it will maximize its profit. This price is invariably higher than the price determined in a competitive market. That is one of the principal reasons why monopolization violates the antitrust laws.

Antitrust & Trade Law > ... > Monopolies & Monopolization > Actual Monopolization > General Overview

***HN27*** In a monopolization case, a defendant bears the burden of persuading the jury that its conduct was justified by any normal business purpose.

Civil Procedure > Appeals > Standards of Review > Abuse of Discretion
Evidence > ... > Testimony > Expert Witnesses > General Overview
Evidence > Admissibility > Expert Witnesses

***HN28*** An appellate court reviews the district court's decision to admit or exclude expert testimony for abuse of discretion.

Civil Procedure > Remedies > Damages > General Overview
Civil Procedure > Appeals > Standards of Review > De Novo Review

***HN29*** An appellate court reviews de novo a plaintiff's damages evidence to determine whether as a matter of law it can support the jury's verdict.

Civil Procedure > Remedies > Damages > General Overview
Evidence > ... > Testimony > Expert Witnesses > General Overview

***HN30*** An expert may construct a reasonable offense-free world as a yardstick for measuring what, hypothetically, would have happened "but for" the defendant's unlawful activities.

Antitrust & Trade Law > ... > Private Actions > Remedies > General Overview

***HN31*** In constructing a hypothetical world free of the defendants' exclusionary activities, the plaintiffs are given some latitude in calculating damages, so long as their theory is not wholly speculative. Once a jury has found that the unlawful activity caused the antitrust injury, the damages may be determined without strict proof of what act caused the injury, as long as the damages are not based on speculation or guesswork. It would be extremely difficult, if not impossible, to segregate and attribute a fixed amount of damages to any one act as the theory was not that any one act in itself was unlawful, but that all the acts taken together showed a *§ 2* (*15 U.S.C.S. § 2*) of the Sherman Act violation.

Civil Procedure > ... > Jury Trials > Jury Instructions > General Overview

Civil Procedure > Appeals > Standards of Review > Abuse of Discretion

***HN32*** In the absence of a misstatement of law, jury instructions are reviewed for abuse of discretion.

**Counsel:** Barbara W. Mather, Jeremy Heep, Pepper Hamilton LLP, Philadelphia, PA. Peter Hearn, Peter Hearn, P.C., Philadelphia, PA. Mark W. Ryan, Kerry Lynn Edwards, Donald M. Falk, Robert L. Bronston, David A.J. Goldfine, Mayer, Brown, Rowe & Maw, Washington, D.C. Roy T. Englert, Jr. (Argued), Robbins, Russell, Englert, Orseck & Untereiner, Washington, D.C., Attorneys for Appellees/Cross-Appellants.

M. Laurence Popofsky (Argued), Stephen V. Bomse, Paul Alexander, Marie L. Fiala, Heller Ehrman White & McAuliffe, San Francisco, CA. John G. Harkins, Jr.. Harkins Cunningham, Philadelphia, PA, Attorneys for Appellant/Cross-Appellee.

**Judges:** BEFORE: BECKER, Chief Judge, SLOVITER, SCIRICA, NYGAARD, ALITO, McKEE, AMBRO, FUENTES, SMITH and GREENBERG, Circuit Judges. GREENBERG, Circuit Judge, dissenting.

**Opinion by:** SLOVITER

**Opinion**

## [*144] OPINION OF THE COURT

SLOVITER, *Circuit Judge*, with whom Becker, *Chief Judge*, Nygaard, McKee, Ambro, Fuentes, and Smith, *Circuit Judges*, join:

Minnesota Mining and Manufacturing Company ("3M") appeals **[**2]** from the District Court's order entered March 14, 2000, declining to overturn the jury's verdict for LePage's in its suit against 3M under *Section 2 of the Sherman Act* (" *§ 2*"). 3M raises various objections to the trial court's decision but essentially its position is a legal one: it contends that a plaintiff cannot succeed in a *§ 2* monopolization case unless it shows that the conceded monopolist sold its product below cost. Because we conclude that exclusionary conduct, such as the exclusive dealing and bundled rebates proven here, can sustain a verdict under *§ 2* against a monopolist and because we find no other reversible error, we will affirm.

**I.**

**FACTUAL BACKGROUND**

3M, which manufactures Scotch tape for home and office use, dominated the United States transparent tape market with a market share above 90% until the early 1990s. It has conceded that it has a monopoly in that market. LePage's, [1] founded in 1876, has sold a variety of office products and, around 1980, decided to sell "second brand" and private label transparent tape, *i.e.*, tape sold under the retailer's name rather than under the name of the manufacturer. By 1992, LePage's sold 88% of private **[**3]** label tape sales in the United States, which represented but a small portion of the transparent tape market. Private label tape sold at a lower price to the retailer and the customer than branded tape.

Distribution patterns and consumer acceptance accounted for a shift of some tape sales from branded tape to private label tape. With the rapid growth of office superstores, such as Staples and Office Depot, and mass merchandisers, such as Wal-Mart and Kmart, distribution patterns for second brand and private label tape changed as many of the large retailers wanted to use their "brand names" to sell stationery products, including transparent tape. 3M also entered the private label business during the early 1990s and sold its own second brand under the name "Highland."

LePage's claims that, in response to the growth **[**4]** of this competitive market, 3M engaged in a series of related, anticompetitive acts aimed at restricting the availability of lower-priced transparent tape to consumers. It also claims that 3M devised programs that prevented LePage's and the other domestic company in the business, Tesa Tuck, Inc., from gaining or maintaining large volume sales and that 3M maintained its monopoly by stifling growth of private label tape and by coordinating efforts aimed at large distributors to keep retail prices for Scotch tape high. [2] LePage's claims that it barely was surviving at the time of trial and that it **[*145]** suffered large operating losses from 1996 through 1999.

LePage's brought this antitrust action asserting that 3M used its monopoly over its Scotch tape **[**5]** brand to gain a competitive advantage in the private label tape portion of the transparent tape market in the United States through the use of 3M's multi-tiered "bundled rebate" structure, which offered higher rebates when customers purchased products in a number of 3M's different product lines. LePage's also alleges that 3M offered to some of LePage's customers large lump-sum cash payments, promotional allowances and other cash incentives to encourage them to enter into exclusive dealing arrangements with 3M.

LePage's asserted claims for unlawful agreements in restraint of trade under *§ 1 of the Sherman Act*, monopolization and attempted monopolization under *§ 2 of the Sherman Act*, and exclusive dealing under *§ 3 of the Clayton Act*. After a nine week trial, the jury returned its verdict for LePage's on both its monopolization and attempted monopolization claims under *§ 2 of the Sherman Act*, and assessed damages of $ 22,828,899 on each. It found in 3M's favor on LePage's claims under *§ 1* of the Sherman Act and *§ 3 of the Clayton Act*. 3M filed its motions for judgment as a matter of law and for a new trial, arguing that its rebate and discount programs

---

[1] The plaintiffs in this action are LePage's Incorporated and LePage's Management Company, L.L.C. Inasmuch as we can discern no distinction between their interests, we refer to them jointly as LePage's.

[2] It appears that at least at the times material to this action, there were no other domestic manufacturers of transparent tape. There were, however, foreign manufacturers but they did not play a significant role in the domestic market and 3M does not contend otherwise.

and the other conduct of **[**6]** which LePage's complained did not constitute the basis for a valid antitrust claim as a matter of law and that, in any event, the court's charge to the jury was insufficiently specific and LePage's damages proof was speculative. [3] The District Court granted 3M's motion for judgment as a matter of law on LePage's "attempted maintenance of monopoly power" claim but denied 3M's motion for judgment as a matter of law in all other respects and denied its motion for new trial.

*LePage's Inc. v. 3M, 2000 U.S. Dist. LEXIS 3087, No.CIV. A. 97-3983, 2000 WL 280350 (E.D. Pa. Mar. 14, 2000)*. The Court subsequently entered a judgment for trebled damages of $ 68,486,697 to which interest was to be added. LePage's filed a cross appeal on the District Court's judgment dismissing its attempted maintenance of monopoly power claim.

On appeal, the panel of this court before which this case was originally **[**7]** argued reversed the District Court's judgment on LePage's *§ 2* claim by a divided vote. *LePage's Inc. v. 3M, 277 F.3d 365, (3d Cir. 2002)*. This court granted LePage's motion for rehearing *en banc* and, pursuant to its practice, vacated the panel opinion. *LePage's Inc. v. 3M, 2002 U.S. App. LEXIS 3254, Nos. 00-1368 and 00-1473 (3d Cir. Feb. 25, 2002)* (order vacating panel opinion). The appeal was then orally argued before the court *en banc*.

## II.

## JURISDICTION AND STANDARD OF REVIEW

The District Court had jurisdiction over this case pursuant to *28 U.S.C. §§ 1331 and 1337(a)* because LePage's brought these claims under the Sherman and Clayton Acts. We have jurisdiction over this appeal pursuant to *28 U.S.C. § 1291*.

***HN1*** We exercise plenary review over an order granting or denying a motion for judgment as a matter of law. *Shade v. Great Lakes Dredge & Dock Co.*, 154 F.3d 143, 149 (3d Cir. 1998). When, as here, a defendant makes such a motion, a court should grant it "only if, viewing the evidence in the light most favorable to the nonmovant **[*146]** and giving it the advantage of every fair and reasonable inference, **[**8]** there is insufficient evidence from which a jury reasonably could find liability." *Lightning Lube, Inc. v. Witco Corp., 4 F.3d 1153, 1166 (3d Cir. 1993)*. Thus, we review the evidence on the appeal in the light most favorable to LePage's. As the historical facts are not in sharp dispute, and our opinion turns largely on legal determinations, ***HN2*** we review questions of law underlying the jury verdict on a plenary basis. *Bloom v. Consolidated Rail Corp., 41 F.3d 911, 913 (3d Cir. 1994)*.

***HN3*** Our review of a jury's verdict is limited to determining whether some evidence in the record supports the jury's verdict. *See* *Swineford v. Snyder County, 15 F.3d 1258, 1265 (3d Cir. 1994)* ("A jury verdict will not be overturned unless the record is critically deficient of that quantum of evidence from which a jury could have rationally reached its verdict.").

## III.

## MONOPOLIZATION -- APPLICABLE LEGAL PRINCIPLES

*Section 2 of the Sherman Act* provides:

---

[3] 3M unsuccessfully had moved for a judgment as a matter of law at the close of LePage's case and after the close of the entire case.

> ***HN4*** Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, **[**9]** or with foreign nations, shall be deemed guilty of a felony, and, on conviction thereof, shall be punished by fine not exceeding $ 10,000,000 if a corporation, or, if any other person, $ 350,000, or by imprisonment not exceeding three years, or by both said punishments, in the discretion of the court.*15 U.S.C. § 2 (2002)*. ***HN5*** A private party may sue for damages for violation of this provision and recover threefold the damages and counsel fees. *Id.§ 15*.

Because this section is in sweeping language, suggesting the breadth of its coverage, we look to the Supreme Court decisions for elucidation of the standard to be used in cases alleging monopolization. Elucidation came in *United States v. Grinnell Corp., 384 U.S. 563, 16 L. Ed. 2d 778, 86 S. Ct. 1698 (1966)*, where the Court declared that ***HN6*** a defendant company which possesses monopoly power in the relevant market will be found in violation of *§ 2 of the Sherman Act* if the defendant willfully acquired or maintained that power. *Id. at 570-71*.

In this case, the parties agreed that the relevant product market is transparent tape and the relevant geographic market is the United **[**10]** States. [4] Moreover, as to the issue of monopoly power, as we noted above, 3M concedes it possesses monopoly power in the United States transparent tape market, with a 90% market share. In fact, the evidence showed that the household penetration of 3M's Scotch-brand tape is virtually 100%. Therefore we need not dwell on the oft-contested issue of market power. *See* Robert Pitofsky, *New Definitions of Relevant Market and the Assault on Antitrust*, *90 Colum. L. Rev. 1805, 1807 (1990)* ("In monopoly enforcement under *section 2 of the Sherman Act*, the pivotal inquiry is almost always whether the challenged party has substantial market power in its relevant market.").

**[**11]** The sole remaining issue and our focus on this appeal is whether 3M took steps to maintain that power in a manner **[*147]** that violated *§ 2 of the Sherman Act*. ***HN7*** A monopolist willfully acquires or maintains monopoly power when it competes on some basis other than the merits. *See Aspen Skiing Co. v. Aspen Highlands Skiing Corp., 472 U.S. 585, 605 n.32, 86 L. Ed. 2d 467, 105 S. Ct. 2847 (1985)*.

LePage's argues that 3M willfully maintained its monopoly in the transparent tape market through exclusionary conduct, primarily by bundling its rebates and entering into contracts that expressly or effectively required dealing virtually exclusively with 3M, which LePage's characterizes as *de facto* exclusive. 3M does not argue that it did not engage in this conduct. It agrees that it offered bundled rebates and entered into some exclusive dealing contracts, although it argues that only the few contracts that are expressly exclusive may be considered as such. Instead, 3M argues that its conduct was legal as a matter of law because it never priced its transparent tape below its cost. [5]

**[**12]** This is the most significant legal issue in this case because it underlies 3M's argument. In its brief, 3M states "above-cost pricing cannot give rise to an antitrust offense as a matter

---

[4] Although 3M originally challenged LePage's selection of the United States as the relevant geographic market, the District Court held that LePage's had introduced sufficient evidence from which the jury could properly find that the relevant geographic market is the United States and 3M does not challenge that market definition on appeal.

[5] 3M states that its pricing was above its costs however costs are calculated, and LePage's has not contested 3M's assertion.

of law, since it is the very conduct that the antitrust laws wish to promote in the interest of making consumers better off." Appellant's Br. at 30. For this proposition it relies on the Supreme Court's decision in *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp., 509 U.S. 209, 222, 125 L. Ed. 2d 168, 113 S. Ct. 2578 (1993)*. It is an argument 3M repeated frequently during its oral argument before the *en banc* court. Counsel stated, "if the big guy is selling above cost, it has done nothing which offends the Sherman Act . . . ." Tr. of Oral Argument, Oct. 30, 2002, at 11. This was the theory upon which 3M's counsel responded to all the questions from the court. When asked whether its theory is that because no one contended that 3M sold below its cost, that is "the end of the story," its counsel responded, "with the exception of the inconsequential express contract, absolutely." *Id.*

It is therefore necessary for us, at the outset, to examine whether we must accept 3M's **[**13]** legal theory that after *Brooke Group*, no conduct by a monopolist who sells its product above cost -- no matter how exclusionary the conduct -- can constitute monopolization in violation of *§ 2 of the Sherman Act*. The history of the interpretation of *§ 2 of the Sherman Act* demonstrates the lack of foundation for 3M's premise.

Although *§ 2 of the Sherman Act* may have received less judicial and scholarly attention than several of the other more frequently invoked antitrust provisions, the Supreme Court, in a series of decisions, has made clear the type of conduct that will be held to constitute monopolization in violation of *§ 2*.

The modern era begins with the decision by Judge Learned Hand in *United States v. Aluminum Co. of America, 148 F.2d 416 (2d Cir. 1945)* ("*Alcoa*"). Because four members of the Supreme Court were disqualified, the Supreme Court was required to apply the provision of the Expediting Act, *Section 29 of Title 15, U.S.C., 1940 ed.*, currently *28 U.S.C. § 2109*, to certify the case to the three most senior judges of the relevant circuit. [6] Under the statute, **[*148]** the decision of that court was "final **[**14]** and conclusive," thus equating it to a decision of the Supreme Court.

At the time in question, Alcoa was the sole domestic producer of aluminum and thus had a monopoly that the Government sought to disband. In the opinion on liability, the court enunciated certain principles that remain fully applicable today. One such principle is that ***HN8*** it does not follow that a company that has a monopoly has "monopolized" the market because "it may not have achieved monopoly; monopoly may have been thrust upon it." *Id. at 429*. As the court explained, "persons may unwittingly find themselves in possession of a monopoly, automatically so to say: that is, without having intended either to put an end to existing competition, or to prevent competition from arising when none had existed; they may become monopolists by force of accident." *Id. at 429-30*. On **[**15]** the other hand, the court then quoted Justice Cardozo's statement in *United States v. Swift & Co., 286 U.S. 106, 116, 76 L. Ed. 999, 52 S. Ct. 460 (1932)*, that "size carries with it an opportunity for abuse that is not to be ignored when the opportunity is proved to have been utilized in the past." *Alcoa, 148 F.2d at 430*.

The court determined that Alcoa, which controlled over 90% of the aluminum market, had utilized its size for abuse. The court, noting that there had been at least "one or two abortive attempts" by others to enter the industry, concluded that Alcoa "effectively anticipated and forestalled all competition, and succeeded in holding the field alone." *Id. at 430*. Finding Alcoa in violation of *§ 2*, the court continued:

---

[6] The three most senior judges of the circuit were, fortuitously, the legendary panel of Judges Learned Hand, Thomas Swan, and Augustus Hand.

> Nothing compelled it to keep doubling and redoubling its capacity before others entered the field. It insists that it never excluded competitors; but we can think of no more effective exclusion than progressively to embrace each new opportunity as it opened, and to face every newcomer with new capacity already geared into a great organization, having the advantage of experience, trade connections **[**16]** and the elite of personnel.*Id. at 431*.

One year later, in *American Tobacco Co. v. United States, 328 U.S. 781, 90 L. Ed. 1575, 66 S. Ct. 1125 (1946)*, the Supreme Court endorsed the *Alcoa* decision when upholding a jury verdict finding a *§ 2* violation. The government brought a criminal action against various tobacco companies that between 1931 and 1939 accounted at all times for more than 68%, and usually for more than 75%, of the nation's domestic cigarette production. Defendants were convicted and fined after the jury found they had violated *§§ 1 and 2* of the Sherman Act by conspiring to control the price of leaf tobacco, to acquire less expensive supplies of tobacco they did not need in order to deprive rival manufacturers of cheaper brands, to control cigarette prices, and to force cigarette distributors to treat rival brands less favorably.

The court of appeals affirmed, finding the verdicts to be supported by sufficient evidence. The Supreme Court granted the tobacco companies' petitions for certiorari only as to their *§ 2* claims, seeking to answer the specific question "whether actual exclusion of competitors is necessary to the **[**17]** crime of monopolization under *§ 2 of the Sherman Act*." *Id. at 784*. Answering that question in the negative, the Court stated that ***HN9*** "neither proof of exertion of the power to exclude nor proof of actual exclusion of existing or potential competitors is essential to sustain a charge of monopolization under the Sherman Act." *Id. at 810*. Furthermore, and importantly, the Court explicitly "welcomed this opportunity to endorse" certain passages from Judge Hand's opinion. *Id. at 813*.

**[*149]** Of particular relevance, the *American Tobacco* Court endorsed Judge Hand's understanding of the Sherman Act, namely that the Act contemplated the notion that "'unchallenged economic power deadens initiative'" and "'that immunity from competition is a narcotic, and rivalry is a stimulant, to industrial progress.'" *Id.* (quoting *Alcoa, 148 F.2d at 427*). It further quoted *Alcoa* for the previously mentioned propositions that ***HN10*** monopolies can be "thrust" upon entities rather than achieved and that specific intent under *§ 2* was not required "'for no monopolist monopolizes unconscious of what he is doing.'" *Id. at 813-14* (quoting *Alcoa, 148 F.2d at 432*). **[**18]**

*Section 2 of the Sherman Act* was next considered by the Supreme Court in *Lorain Journal Co. v. United States, 342 U.S. 143, 96 L. Ed. 162, 72 S. Ct. 181 (1951)*. The United States had brought a civil suit against the publisher of the Lorain Journal, the only business disseminating news and advertising in the town of Lorain, Ohio, alleging that it attempted to monopolize in violation of *§ 2 of the Sherman Act* because it refused to sell advertising to persons that patronized the small radio station that was established in a nearby community. The Supreme Court held that although a trader has discretion as to the parties with whom he will deal "in the absence of any *purpose* to create or maintain a monopoly," *id. at 155* (quoting *United States v. Colgate & Co., 250 U.S. 300, 307, 63 L. Ed. 992, 39 S. Ct. 465, 1919 Dec. Comm'r Pat. 460 (1919))*, the action of the Journal constituted a purposeful means of regaining its previous monopoly over the mass dissemination of news and advertising. *Id.* Because this was an attempt to monopolize in

violation of *§ 2*, the Court approved the entry of an injunction ordering the Journal to print the advertisements of the customers **[**19]** of the radio station.

Thereafter, in *United States v. Grinnell Corp., 384 U.S. 563, 16 L. Ed. 2d 778, 86 S. Ct. 1698 (1966)*, the Supreme Court reiterated that ***HN11*** monopoly power alone is not necessarily unlawful. The Court summarized its prior cases, stating that *§ 2 of the Sherman Act* required two elements: "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *384 U.S. at 570-71*.

In *Grinnell*, the United States filed a civil suit against several companies that offered central station protective services, such as fire and burglary protective devices, alleging violations of *§§ 1 and 2* of the Sherman Act. Referring to the two-pronged test under *§ 2*, the Court found that both prongs had been satisfied. Not only did the companies have monopoly power (87% of the accredited central station service business), but also they largely achieved this power through the aid of pricing practices, acquisitions of competitors, and noncompetition covenants, all of which were deemed **[**20]** to be "unlawful and exclusionary practices." *Id. at 576*.

The Court's later decision in *Aspen Skiing Co. v. Aspen Highlands Skiing Corp., 472 U.S. 585, 86 L. Ed. 2d 467, 105 S. Ct. 2847 (1985)*, is even more pertinent to the case before us. In *Aspen Skiing*, a case that also reached the Court only on the *§ 2* violation, Ski Co., the owner of three of the four major downhill skiing facilities in Aspen, Colorado, discontinued its prior practice of cooperating with the owner of the fourth facility by issuing an interchangeable 6-day pass that could be used on any of the four facilities. It replaced that pass with a 3-area, 6-day ticket featuring only its mountains. It offered the **[*150]** plaintiff, Highlands, owner of the fourth facility, reinstatement of the 4-area ticket only if Highlands would accept a fixed percentage of the revenue that was considerably below Highlands' historical average based on usage. Ski Co. took additional actions that made it extremely difficult for Highlands to market its own multi-area package to replace the joint offering, and Highlands' share of the market declined along with its revenues from associated skiing services. The **[**21]** jury found that Ski Co. possessed monopoly power and awarded Highlands a substantial money judgment as treble damages. The court of appeals affirmed, holding there was sufficient basis in Ski Co.'s actions to demonstrate an abuse of its monopoly power.

In the Supreme Court, Ski Co. argued "that even a firm with monopoly power has no duty to engage in joint marketing with a competitor, that a violation of *§ 2* cannot be established without evidence of substantial exclusionary conduct, and that none of its activities can be characterized as exclusionary." *Aspen Skiing, 472 U.S. at 600*. The Supreme Court agreed with the legal proposition, but referred to its earlier opinion in *Lorain Journal* where it held ***HN12*** that a monopolist's right to refuse to deal was not unqualified. *Id. at 600-01*. After reviewing all the circumstances, it affirmed the judgment for Highlands in a unanimous opinion. It held that the jury had ample basis to reject Ski Co.'s business justification defense and noted that Ski Co. failed to offer any efficiency justification whatever for its pattern of conduct. *Id. at 608*. The Court stated, "although Ski Co.'s pattern **[**22]** of conduct may not have been as 'bold, relentless, and predatory' as the publisher's actions in *Lorain Journal*, the record in this case comfortably supports an inference that the monopolist made a deliberate effort to discourage its customers from doing business with its smaller rival." *Id. at 610* (quoting *Lorain Journal, 342 U.S. at 149* (citation omitted)).

In a significant passage about the conduct that constitutes monopolization in violation of *§ 2*, the Court stated that ***HN13*** when the issue is monopolization rather than an attempt to monopolize, "evidence of intent is merely relevant to the question whether the challenged conduct is fairly characterized as 'exclusionary' or 'anticompetitive' -- to use the words in the trial court's instructions -- or 'predatory,' to use a word that scholars seem to favor." *Id. at 602*. The Court continued, "whichever label is used, there is agreement on the proposition that 'no monopolist monopolizes unconscious of what he is doing.'" *Id.* (quoting *Alcoa, 148 F.2d at 432*).

In *Eastman Kodak Co. v. Image Technical Servs., Inc., 504 U.S. 451, 119 L. Ed. 2d 265, 112 S. Ct. 2072(1992)* **[**23]** , 18 independent service organizations ("ISO's") that serviced Kodak copying and micrographic equipment brought an antitrust action against Kodak for its policies that sought to limit the availability of Kodak parts to ISO's. They alleged Kodak's policies were unlawful under both *§§ 1 and 2* of the Sherman Act. The Supreme Court considered the issues under the two provisions separately. In its analysis under *§ 2*, the Court first held that Kodak's control of nearly 100% of the parts market and 80% to 95% of the service market was sufficient to support a claim of monopoly power (an issue that is conceded here). As to the issue whether Kodak adopted its parts and service policies as part of a scheme of willful acquisition or maintenance of monopoly power, the Court stated that there was evidence that Kodak "took exclusionary action to maintain its parts monopoly and used its control over parts to strengthen **[*151]** its monopoly share of the Kodak service market." *Id. at 483*. Thus, Kodak could escape liability under *§ 2* only if it could explain its actions on the basis of valid business reasons, an issue as to which there were factual questions which made the district court's grant **[**24]** of summary judgment for Kodak inappropriate. *Id.*

This extensive review of the Supreme Court's *§ 2* decisions is set forth to provide the background under which we must evaluate 3M's contention that it was entitled to judgment as a matter of law on the basis of the decision in *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp., 509 U.S. 209, 125 L. Ed. 2d 168, 113 S. Ct. 2578 (1993)*, a decision that was primarily concerned with the Robinson-Patman Act, not *§ 2 of the Sherman Act*. In *Brooke Group*, Liggett, a cigarette manufacturer responsible for the "innovative development" of generic cigarettes, claimed that Brown & Williamson, which introduced its own line of generic cigarettes, "cut prices on generic cigarettes below cost and offered discriminatory volume rebates to wholesalers to force Liggett to raise its own generic cigarette prices and introduce oligopoly pricing in the economy segment [of the national cigarette market]." *Brooke Group, 509 U.S. at 212*. It filed a Robinson-Patman action on the basis of these allegations. Brown & Williamson's deep price discounts or rebates were concededly discriminatory, not cost justified, and **[**25]** resulted in substantial loss to it. The Supreme Court majority held that the defendant was entitled to judgment as a matter of law because there was no evidence of injury to competition. *Id. at 243*. The Court also held that the evidence did not show that Brown & Williamson's alleged scheme "was likely to result in oligopolistic price coordination and sustained supracompetitive pricing in the generic segment of the national cigarette market. Without this, Brown & Williamson had no reasonable prospect of recouping its predatory losses and could not inflict the injury to competition the antitrust laws prohibit." *Id.*[7]

**[**26]** Unlike 3M, Brown & Williamson was part of an oligopoly, six manufacturers whose prices for cigarettes "increased in lockstep" and who "reaped the benefits of prices above a competitive

---

[7] In contrast, the District Court here noted that 3M had conceded that it "'could later recoup the profits it has forsaken on Scotch tape and private label tape by selling more higher priced Scotch tape . . . if there would be no competition by others in the private label tape segment when 3M abandoned that part of the market to sell only higher-priced Scotch tape.'" *Le Page's*, 2000 U.S. Dist. LEXIS 3087, 2000 WL 280350, at *7 (quoting Defendant's Mem. at 30).

level." *Id. at 213*. Brown & Williamson had 12% of the oligopolistic market. Its conduct and pricing were at all times necessarily constrained by the presence of competitors who could, and did, react to its conduct by undertaking similar price cuts or pricing behavior. [8]

Assuming *arguendo* that *Brooke Group* should be read for the proposition that a company's pricing action is legal if its prices are not below its costs, nothing in the decision suggests that its discussion of the issue is applicable to a monopolist with its unconstrained market power. Moreover, LePage's, unlike the plaintiff **[**27]** in *Brooke Group*, does not make a predatory pricing claim. 3M is a monopolist; ***HN14*** a monopolist is not free to take certain actions that a company in a competitive (or even **[*152]** oligopolistic) market may take, because there is no market constraint on a monopolist's behavior. *See, e.g.*, *Aspen Skiing, 472 U.S. at 601-04*.

Nothing in any of the Supreme Court's opinions in the decade since the *Brooke Group* decision suggested that the opinion overturned decades of Supreme Court precedent that evaluated a monopolist's liability under *§ 2* by examining its exclusionary, i.e., predatory, conduct. *Brooke Group* has been cited only four times by the Supreme Court, three times in cases that were not even antitrust cases for propositions patently inapplicable here. [9] In the only antitrust case of the four, *NYNEX Corp. v. Discon, Inc., 525 U.S. 128, 137, 142 L. Ed. 2d 510, 119 S. Ct. 493 (1998)*, the Court considered whether the *per se* rule applicable to group boycotts under *§ 1 of the Sherman Act* should be applied "where a single buyer favors one seller over another, albeit for an improper reason." *Id. at 133*. Holding that the rule of **[**28]** reason applies, the Court quoted *Brooke Group* for the proposition that "even an act of pure malice by one business competitor against another does not, without more, state a claim under the federal anti-trust laws." *Id. at 137* (quoting *Brooke Group, 509 U.S. at 225*). The opinion does not discuss, much less adopt, the proposition that a monopolist does not violate *§ 2* unless it sells below cost. Thus, nothing that the Supreme Court has written since *Brooke Group* dilutes the Court's consistent holdings that ***HN15*** a monopolist will be found to violate *§ 2 of the Sherman Act* if it engages in exclusionary or predatory conduct without a valid business justification.

**[**29] IV.**

**MONOPOLIZATION -- EXCLUSIONARY CONDUCT**

**A.**

***Illustrative Cases***

Before turning to consider LePage's allegation that 3M engaged in exclusionary or anticompetitive conduct and the evidence it produced, we consider the type of conduct *§ 2* encompasses.

As one court of appeals has stated: ***HN16*** "'Anticompetitive conduct' can come in too many different forms, and is too dependent upon context, for any court or commentator ever to have enumerated all the varieties." *Caribbean Broad. Sys., Ltd. v. Cable & Wireless PLC, 331 U.S. App.*

---

[8] The *Brooke Group* opinions, both for the majority and the dissent, discuss the responses by members of the oligopoly to the introduction of discounted cigarettes. *Id.* at 239-40; *id.* at 247-48 (Stevens, J., dissenting).

[9] *Brooke Group* is cited in *Gustafson v. Alloyd Co.*, 513 U.S. 561, 570, 131 L. Ed. 2d 1, 115 S. Ct. 1061 (1995), for the statutory construction rule that identical words used in different parts of the same act are intended to have the same meaning; in *Strickler v. Greene*, 527 U.S. 263, 300 n.3, 144 L. Ed. 2d 286, 119 S. Ct. 1936 (1999), a federal habeas case, by Justice Souter in his partial concurrence/partial dissent, in discussing the term "reasonable probability;" and in *Weisgram v. Marley Co.*, 528 U.S. 440, 454, 145 L. Ed. 2d 958, 120 S. Ct. 1011 (2000), in connection with discussing the weight to be given an expert opinion.

D.C. 226, 148 F.3d 1080, 1087 (D.C. Cir. 1998) (reversing in part the district court's dismissal of complaint and holding that radio station's claim that defendants made misrepresentations to advertisers and the government in order to protect its monopoly stated *§ 2 Sherman Act* claim).

Numerous cases hold that the enforcement of the legal monopoly provided by a patent procured through fraud may violate *§ 2*. *Walker Process Equip., Inc. v. Food Mach. & Chem. Corp., 382 U.S. 172, 174, 15 L. Ed. 2d 247, 86 S. Ct. 347 (1965)*; *see also* **[**30]** *Medtronic AVE, Inc. v. Boston Scientific* **[*153]** *Corp., 2001 U.S. Dist. LEXIS 9056, No. CIV. A. 98-478- SLR, 2001 WL 652016 (D. Del. Mar. 30, 2001)* (patentee could have violated *§ 2* by bringing infringement action on patent procured by fraud). Predatory pricing by a monopolist can provide a basis for *§ 2* liability. *See U.S. Philips Corp. v. Windmere Corp., 861 F.2d 695 (Fed. Cir. 1988)* (reversing district court's directed verdict and ordering new trial on *§ 2* claims due to evidence that company had 90% of rotary electric shaver market, existence of substantial entry barriers, and company had drastically reduced prices to eliminate potential competitors). A monopolist's denial to competitors of access to its "essential" goods, services or resources has been held to violate *§ 2*. *See Otter Tail Power Co. v. United States, 410 U.S. 366, 35 L. Ed. 2d 359, 93 S. Ct. 1022 (1973)* (finding *§ 2* violation where monopolist utility company refused to sell wholesale to municipalities and refused to transfer competitors' power over its lines); *see also Fishman v. Estate of Wirtz, 807 F.2d 520 (7th Cir. 1986)* (finding corporation liable under *§ 2* for refusing to lease Chicago Stadium to plaintiff, a potential buyer of the Chicago Bulls **[**31]** basketball team, after determining Stadium to be essential to professional basketball in Chicago area). An arbitrary refusal to deal by a monopolist may constitute a *§ 2* violation. *See Byars v. Bluff City News Co., Inc., 609 F.2d 843 (6th Cir. 1979)* (remanding case to district court for fact-finding to determine whether defendant possessed monopoly power and unlawfully refused to deal in violation of *§ 2*). Even unfair tortious conduct unrelated to a monopolist's pricing policies has been held to violate *§ 2*. *See Int'l Travel Arrangers, Inc. v. Western Airlines, Inc., 623 F.2d 1255 (8th Cir. 1980)* (upholding treble damages antitrust award against airline with monopoly power after finding sufficient evidence that airline placed false, deceptive, and misleading advertisements discouraging public patronage of travel group charters).

A recent decision of the United States Court of Appeals for the Sixth Circuit, *Conwood Co., L.P. v. U.S. Tobacco Co., 290 F.3d 768 (6th Cir. 2002)*, *cert. denied*, *537 U.S. 1148, 123 S. Ct. 876, 154 L. Ed. 2d 850 (2003)*, presents a good illustration of the type of exclusionary conduct that will support **[**32]** a *§ 2* violation. That court upheld the jury's award to plaintiff Conwood of $ 350 million, which trebled was $ 1.05 billion, against United States Tobacco Company ("USTC") because of USTC's monopolization. USTC was the sole manufacturer of moist snuff until the 1970's when Conwood, Swisher, and Swedish Match, other moist snuff manufacturers, entered the moist snuff market. Not unexpectedly, USTC's 100% market share declined and it took the action that formed the basis of Conwood's complaint against USTC alleging, *inter alia*, unlawful monopolization in violation of *§ 2 of the Sherman Act*.

The evidence that the district court and the court of appeals held proved that USTC systematically tried to exclude competition from the moist snuff market included the following: USTC (1) removed and destroyed or discarded racks that displayed moist snuff products in the stores while placing Conwood products in USTC racks in an attempt to bury Conwood's products; (2) trained its "operatives to take advantage of inattentive store clerks with various 'ruses' such as obtaining nominal permission to reorganize or neaten the moist snuff section" in an effort to destroy

Conwood racks; (3) misused **[**33]** its position as category manager (manages product groups and business units and customizes them on a store by store basis) by providing misleading information to retailers in an effort to dupe them into carrying USTC products and to discontinue carrying Conwood **[*154]** products; and (4) entered into exclusive agreements with retailers in an effort to exclude rivals' products. *Id. at 783*.

On appeal, USTC -- like 3M -- did not challenge that it had monopoly power and agreed that the relevant product was moist snuff and the geographic market was nationwide. *Id. at 782-83*. Instead, USTC contended that Conwood had failed to establish that USTC's power was acquired or maintained by exclusionary practices rather than by its legitimate business practices and superior product. *Id. at 783*. Both the district court and the court of appeals rejected USTC's argument, finding that there was sufficient evidence for a jury to find willful maintenance by USTC of monopoly power by engaging in exclusionary practices in violation of § 2 of the Sherman Act. *290 F.3d at 788*.

Similarly, 3M sought to meet the competition that LePage's threatened by **[**34]** exclusionary conduct that consisted of rebate programs and exclusive dealing arrangements designed to drive LePage's and any other viable competitor from the transparent tape market.

**B.**

***Bundled Rebates***

In considering LePage's conduct that led to the jury's ultimate verdict, we note that the jury had before it evidence of the full panoply of 3M's exclusionary conduct, including both the exclusive dealing arrangements and the bundled rebates which could reasonably have been viewed as effectuating exclusive dealing arrangements because of the way in which they were structured.

Through a program denominated Executive Growth Fund ("EGF") and thereafter Partnership Growth Fund ("PGF"), 3M offered many of LePage's major customers substantial rebates to induce them to eliminate or reduce their purchases of tape from LePage's. Rather than competing by offering volume discounts which are concededly legal and often reflect cost savings, 3M's rebate programs offered discounts to certain customers conditioned on purchases spanning six of 3M's diverse product lines. The product lines covered by the rebate program were: Health Care Products, Home Care Products, Home Improvement **[**35]** Products, Stationery Products (including transparent tape), Retail Auto Products, and Leisure Time. Sealed App. at 2979. In addition to bundling the rebates, both of 3M's rebate programs set customer-specific target growth rates in each product line. The size of the rebate was linked to the number of product lines in which targets were met, and the number of targets met by the buyer determined the rebate it would receive on all of its purchases. If a customer failed to meet the target for any one product, its failure would cause it to lose the rebate across the line. This created a substantial incentive for each customer to meet the targets across all product lines to maximize its rebates.

The rebates were considerable, not "modest" as 3M states. Appellant's Br. at 15. For example, Kmart, which had constituted 10% of LePage's business, received $ 926,287 in 1997, Sealed App. at 2980, and in 1996 Wal-Mart received more than $ 1.5 million, Sam's Club received $ 666,620, and Target received $ 482,001. Sealed App. at 2773. Just as significant as the amounts received is the powerful incentive they provided to customers to purchase 3M tape rather than LePage's in order not to forego the **[**36]** maximum rebate 3M offered. The penalty would

have been $ 264,000 for Sam's Club, $ 450,000 for Kmart, and $ 200,000 to $ 310,000 for American Stores.

**[*155]** 3M does not deny that it offered these programs although it gives different reasons for the discounts to each customer. Instead it argues that they were no more exclusive than procompetitive lawful discount programs. And, as it responds to each of LePage's allegations, it returns to its central premise "that it is not unlawful to lower one's prices so long as they remain above cost." Appellant's Br. at 36 (citing *Brooke Group, 509 U.S. at 222*).

However, one of the leading treatises discussing the inherent anticompetitive effect of bundled rebates, even if they are priced above cost, notes that "the great majority of bundled rebate programs yield aggregate prices above cost. Rather than analogizing them to predatory pricing, they are best compared with tying, whose foreclosure effects are similar. Indeed, the 'package discount' is often a close analogy." Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law P 794, at 83 (Supp. 2002).

The treatise then discusses the anticompetitive effect as follows:

> The anticompetitive **[**37]** feature of package discounting is the strong incentive it gives buyers to take increasing amounts or even all of a product in order to take advantage of a discount aggregated across multiple products. In the anticompetitive case, which we presume is in the minority, the defendant rewards the customer for buying its product *B* rather than the plaintiff's *B*, not because defendant's *B* is better or even cheaper. Rather, the customer buys the defendant's *B* in order to receive a greater discount on *A*, which the plaintiff does not produce. In that case the rival can compete in *B* only by giving the customer a price that compensates it for the foregone *A* discount.*Id.*

The authors then conclude:

> Depending on the number of products that are aggregated and the customer's relative purchases of each, even an equally efficient rival may find it impossible to compensate for lost discounts on products that it does not produce.*Id.* at 83-84.

***HN17*** The principal anticompetitive effect of bundled rebates as offered by 3M is that when offered by a monopolist they may foreclose portions of the market to a potential competitor who does not manufacture **[**38]** an equally diverse group of products and who therefore cannot make a comparable offer. We recognized this in our decision in *SmithKline Corp. v. Eli Lilly & Co., 575 F.2d 1056 (3d Cir. 1978)*, where we held that conduct substantially identical to 3M's was anticompetitive and sustained the finding of a violation of *§ 2*. *SmithKline* is of interest not because the panel decision is binding on the *en banc* court but because the reasoning regarding the practice of bundled rebates is equally applicable here. The defendant in *SmithKline*, Eli Lilly & Company, the pharmaceutical manufacturer, sold three of its cephalosporins to hospitals under the trade names Kefzol, Keflin and Keflex. Cephalosporins are broad spectrum antibiotics that were at that time indispensable to hospital pharmacies. Lilly had a monopoly on both Keflin and Keflex because of its patents. However, those drugs faced competition from the generic

drug cefazolin which Lilly sold under the trade name Kefzol and which plaintiff SmithKline sold under the trade name Ancef.

Lilly's profits on the patented Keflin were far higher than those it received from its sales of Kefzol where its pricing was constrained **[**39]** by the existence of SmithKline. To preserve its market position in Keflin and discourage sales of Ancef and **[*156]** even of its own Kefzol, *id. at 1061*, Lilly instituted a rebate program that provided a 3% bonus rebate for hospitals that purchased specified quantities of any three of Lilly's five cephalosporins. SmithKline brought a *§ 2* monopolization claim, alleging that Lilly used these multi-line volume rebates to maintain its monopoly over the hospital market for cephalosporins.

The district court (Judge A. Leon Higginbotham, later a member of this court) found that Lilly's pricing policy violated *§ 2*. *SmithKline Corp. v. Eli Lilly & Co., 427 F. Supp. 1089 (E.D. Pa. 1976)*. We affirmed by a unanimous decision. Although customers were not forced to select which cephalosporins they purchased from Lilly, we recognized that the effect of the rebate program was to induce hospitals to conjoin their purchases of Kefzol with Keflin and Keflex, Lilly's "leading sellers." *SmithKline, 575 F.2d at 1061*. As we stated, "although eligibility for the 3% bonus rebate was based on the purchase of specified quantities of any three of Lilly's cephalosporins, **[**40]** in reality it meant the combined purchases of Kefzol and the leading sellers, Keflin and Keflex." *Id.* The gravamen of Lilly's *§ 2* violation was that Lilly linked a product on which it faced competition with products on which it faced no competition. *Id. at 1065*.

The effect of the 3% bundled rebate was magnified by the volume of Lilly products sold, so that "in order to offer a rebate of the same net dollar amount as Lilly's, SmithKline had to offer purchasers of Ancef rebates of some 16% to hospitals of average size, and 35% to larger volume hospitals." *Id. at 1062*. Lilly's rebate structure combining Kefzol with Keflin and Keflex "insulated Kefzol from true price competition with [its competitor] Ancef." *Id. at 1065*.

LePage's private-label and second-tier tapes are, as Kefzol and Ancef were in relation to Keflin, less expensive but otherwise of similar quality to Scotch-brand tape. Indeed, before 3M instituted its rebate program, LePage's had begun to enjoy a small but rapidly expanding toehold in the transparent tape market. 3M's incentive was thus the same as Lilly's in *SmithKline*: to preserve the market position of **[**41]** Scotch-brand tape by discouraging widespread acceptance of the cheaper, but substantially similar, tape produced by LePage's.

3M bundled its rebates for Scotch-brand tape with other products it sold in much the same way that Lilly bundled its rebates for Kefzol with Keflin and Keflex. In both cases, the bundled rebates reflected an exploitation of the seller's monopoly power. Just as "[cephalosporins] [were] carried in . . . virtually every general hospital in the country," *SmithKline, 575 F.2d at 1062*, the evidence in this case shows that Scotch-brand tape is indispensable to any retailer in the transparent tape market.

Our analysis of *§ 2 of the Sherman Act* in *SmithKline* is instructive here where the facts are comparable. Speaking through Judge Aldisert, we said:

> With Lilly's cephalosporins subject to no serious price competition from other sellers, with the barriers to entering the market substantial, and with the prospects of new competition extremely uncertain, we are confronted with a factual complex in which

> Lilly has the awesome power of a monopolist. Although it enjoyed the status of a legal monopolist when it was engaged in the manufacture **[**42]** and sale of its original patented products, that status changed when it instituted its [bundled rebate program]. The goal of that plan was to associate Lilly's legal monopolistic practices with an illegal activity that directly affected the price, supply, and demand of Kefzol **[*157]** and Ancef. Were it not for the [bundled rebate program], the price, supply, and demand of Kefzol and Ancef would have been determined by the economic laws of a competitive market. [Lilly's bundled rebate program] blatantly revised those economic laws and made Lilly a transgressor under *§ 2 of the Sherman Act*.*Id. at 1065*.

The effect of 3M's rebates were even more powerfully magnified than those in *SmithKline* because 3M's rebates required purchases bridging 3M's extensive product lines. In some cases, these magnified rebates to a particular customer were as much as half of LePage's entire prior tape sales to that customer. For example, LePage's sales to Sam's Club in 1993 totaled $ 1,078,484, while 3M's 1996 rebate to Sam's Club was $ 666,620. Similarly, LePage's 1992 sales to Kmart were $ 2,482,756; 3M's 1997 rebate to Kmart was $ 926,287. The jury could reasonably find that **[**43]** 3M used its monopoly in transparent tape, backed by its considerable catalog of products, to squeeze out LePage's. 3M's conduct was at least as anticompetitive as the conduct which this court held violated *§ 2* in *SmithKline.*

**C.**

***Exclusive Dealing***

The second prong of LePage's claim of exclusionary conduct by 3M was its actions in entering into exclusive dealing contracts with large customers. 3M acknowledges only the expressly exclusive dealing contracts with Venture and Pamida which conditioned discounts on exclusivity. It minimizes these because they represent only a small portion of the market. However, LePage's claims that 3M made payments to many of the larger customers that were designed to achieve sole-source supplier status.

3M argues that because the jury found for it on LePage's claims under *§ 1* of the Sherman Act and *§ 3 of the Clayton Act*, these payments should not be relevant to the *§ 2* analysis. The law is to the contrary.[10] ***HN18*** Even though exclusivity arrangements are often analyzed under *§ 1*, such exclusionary conduct may also be an element in a *§ 2* claim. *U.S. Healthcare, Inc. v. Healthsource, Inc., 986 F.2d 589, 593 (1st Cir. 1993)* **[**44]** (observing that exclusivity may also "play a role . . . as an element in attempted or actual monopolization").

3M also disclaims as exclusive dealing any arrangement that contained no express exclusivity requirement. Once again the law is to the contrary. No less an authority than the United States Supreme **[**45]** Court has so stated. In *Tampa Elec. Co. v. Nashville Coal Co., 365 U.S. 320, 327,*

---

10 The jury's finding against LePage's on its exclusive dealing claim under *§ 1* of the Sherman Act and § 3 of the Clayton Act does not preclude the application of evidence of 3M's exclusive dealing to support LePage's *§ 2* claim. *See, e.g., Barr Labs., Inc. v. Abbott Labs.,* 978 F.2d 98, 110-12 (3d Cir. 1992) (considering *§ 2 of the Sherman Act* claims after rejecting claims based on the same evidence under *§ 1* of the Sherman Act and § 3 of the Clayton Act); *SmithKline*, 427 F. Supp. at 1092, *aff 'd*, 575 F.2d 1056 (imposing *§ 2 Sherman Act* liability for exclusionary conduct, after rejecting an exclusive dealing claim under § 3 of the Clayton Act).

*5 L. Ed. 2d 580, 81 S. Ct. 623 (1961)*, a case that dealt with *§ 3 of the Clayton Act* rather than *§ 2 of the Sherman Act*, the Court took cognizance of arrangements which, albeit not expressly exclusive, effectively foreclosed the business of competitors. [11]

**[**46] [*158]** LePage's introduced powerful evidence that could have led the jury to believe that rebates and discounts to Kmart, Staples, Sam's Club, National Office Buyers and "UDI" were designed to induce them to award business to 3M to the exclusion of LePage's. Many of LePage's former customers refused even to meet with LePage's sales representatives. A buyer for Kmart, LePage's largest customer which accounted for 10% of its business, told LePage's: "I can't talk to you about tape products for the next three years" and "don't bring me anything 3M makes." App. at 302-03, 964. Kmart switched to 3M following 3M's offer of a $ 1 million "growth" reward which the jury could have understood to require that 3M be its sole supplier. Similarly, Staples was offered an extra 1% bonus rebate if it gave LePage's business to 3M. 3M argues that LePage's did not try hard enough to retain Kmart, its customer for 20 years, but there was evidence to the contrary. [12] In any event, the purpose and effect of 3M's payments to the retailers were issues for the jury which, by its verdict, rejected 3M's arguments.

**[**47]** ***HN19*** The foreclosure of markets through exclusive dealing contracts is of concern under the antitrust laws. As one of the leading treatises states:

> unilaterally imposed quantity discounts can foreclose the opportunities of rivals when a dealer can obtain its best discount only by dealing exclusively with the dominant firm. For example, discounts might be cumulated over lengthy periods of time, such as a calendar year, when no obvious economies result.3A Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* P 768b2, at 148 (2d Ed. 2002); *see also* 11 Herbert Hovenkamp, *Antitrust Law* P 1807a, at 115-16 (1998) (quantity discounts may foreclose a substantial portion of the market). Discounts conditioned on exclusivity are "problematic" "when the defendant is a dominant firm in a position to force manufacturers to make an all-or-nothing choice." *Id.* at 117 n.7 (citing *LePage's Inc. v 3M, 1997 U.S. Dist. LEXIS 18501, 1997 WL 734005 (E.D. Pa. 1997))*.

The Court of Appeals for the District of Columbia relied on the evidence of foreclosure of markets in reaching its decision on liability in *United States v. Microsoft Corp., 346 U.S. App. D.C. 330, 253 F.3d 34, 69 (D.C. Cir. 2001).* **[**48]** In that case, the court of appeals concluded

---

11 If the dissent's citation to *FTC v. Motion Picture Advertising Serv. Co.*, 344 U.S. 392, 97 L. Ed. 426, 73 S. Ct. 361, 49 F.T.C. 1730 (1953), suggests that a one year exclusive dealing contract should be considered as per se legal under *§ 2*, that is not supported by a reading of the decision. In that case, the FTC had appealed from a decision of the Fifth Circuit holding that exclusive contracts are not unfair methods of competition. The Supreme Court reversed, supporting the FTC's decision that the exclusive contracts of the respondent (a producer and distributor of advertising motion pictures), unreasonably restrain competition and tend to monopoly. It was the respondent who argued that exclusive contracts of a duration in excess of a year are necessary for the conduct of the business of the distributors. This argument was rejected by the Supreme Court. The Supreme Court's decision did not suggest that exclusive dealing arrangements entered into by a monopolist (which the respondent in that case was not), together with other exclusionary action, did not violate *§ 2 of the Sherman Act*.

12 At trial, LePage's presented the testimony of James Kowieski, its former senior vice president of sales, who described LePage's efforts following Kmart's rejection of its bid. LePage's made a desperate second sales presentation attended by its president. App. at 957 ("I felt it was very critical to our company's success or failure, so I insured that Mr. Les Baggett, our president, attended the meeting with me."), where LePage's vainly offered additional price concessions. App. at 959 ("We went through the cost savings, the benefits, and we came up with some, again, price concessions, and some programs of a special buy once a year, because, I mean, as far as we were concerned, we were on our last leg.").

that Microsoft, a monopolist in the operating system market, foreclosed rivals in the **[*159]** browser market from a "substantial percentage of the available opportunities for browser distribution" through the use of exclusive contracts with key distributors. *253 F.3d at 70-71*. Microsoft kept usage of its competitor's browser below "the critical level necessary for [its rival] to pose a real threat to Microsoft's monopoly." *253 F.3d at 71*. The *Microsoft* opinion does not specify what percentage of the browser market Microsoft locked up -- merely that, in one of the two primary distribution channels for browsers, Microsoft had exclusive arrangements with most of the top distributors. *253 F.3d at 70-71*. Significantly, the *Microsoft* court observed that Microsoft's exclusionary conduct violated *§ 2* "even though the contracts foreclose less than the roughly 40% or 50% share usually required in order to establish a *§ 1* violation." *253 F.3d at 70*.

One noted antitrust scholar has written:

> We might thus interpret the *Microsoft* holding as follows: ***HN20*** Conduct that intentionally, significantly, and without business justification excludes a potential **[**49]** competitor from outlets (even though not in the relevant market), where access to those outlets is a necessary though not sufficient condition to waging a challenge to a monopolist and fear of the challenge prompts the conduct, is "anticompetitive."Eleanor M. Fox, *What Is Harm to Competition? Exclusionary Practices and Anticompetitive Effect*, *70 Antitrust L. J. 371, 390 (2002)*.

LePage's produced evidence that the foreclosure caused by exclusive dealing practices was magnified by 3M's discount practices, as some of 3M's rebates were "all-or-nothing" discounts, leading customers to maximize their discounts by dealing exclusively with the dominant market player, 3M, to avoid being severely penalized financially for failing to meet their quota in a single product line. Only by dealing exclusively with 3M in as many product lines as possible could customers enjoy the substantial discounts. Accordingly, the jury could reasonably find that 3M's exclusionary conduct violated *§ 2*.

**V.**

**ANTICOMPETITIVE EFFECT**

It has been LePage's position in pursuing its *§ 2* claim that 3M's exclusionary "tactics foreclosed the competitive process by preventing rivals **[**50]** from competing to gain (or maintain) a presence in the market." Appellee's Br. at 45-46. ***HN21*** When a monopolist's actions are designed to prevent one or more new or potential competitors from gaining a foothold in the market by exclusionary, i.e. predatory, conduct, its success in that goal is not only injurious to the potential competitor but also to competition in general. It has been recognized, albeit in a somewhat different context, that even the foreclosure of "one significant competitor" from the market may lead to higher prices and reduced output. *Roland Mach. Co. v. Dresser Indus., Inc., 749 F.2d 380, 394 (7th Cir. 1984)*.

The *Microsoft* court treated exclusionary conduct by a monopolist as more likely to be anticompetitive than ordinary *§ 1* exclusionary conduct. The inquiry in *Microsoft* was whether the monopolist's conduct excluded a competitor (Netscape) from the essential facilities that would permit it to achieve the efficiencies of scale necessary to threaten the monopoly. *253 F.3d at*

70-71. [13] In *Microsoft*, the court of **[*160]** appeals determined that Microsoft had foreclosed enough distribution links to undermine the survival of Netscape **[**51]** as a viable competitor. *253 F.3d at 71*.

Similarly, in this case, the jury could have reasonably found that 3M's exclusionary conduct cut LePage's off from key retail pipelines necessary to permit it to compete profitably. [14] It was only after LePage's entry into the market that 3M introduced the bundled rebates programs. If 3M were successful in eliminating competition from LePage's **[**52]** second-tier or private-label tape, 3M could exercise its monopoly power unchallenged, as Tesa Tuck was no longer in the market.

The District Court, recognizing that "this case presents a unique bundled rebate program that the jury found had an anti-competitive effect," *Le Page's, 2000 U.S. Dist. LEXIS 3087, 2000 WL 280350, at *5*, denied 3M's motion for judgment as a matter of law ("JMOL"), stating:

> Plaintiff introduced evidence that Scotch is a monopoly product, and that 3M's bundled rebate programs caused distributors to displace Le Page's entirely, or in some cases, drastically reduce **[**53]** purchases from Le Page's. Tr. Vol. 30 at 105-106; Vol. 27 at 30. Under 3M's rebate programs, 3M set overall growth targets for unrelated product lines. *In the distributors' view, 3M set these targets in a manner which forced the distributor to either drop any non-Scotch products, or lose the maximum rebate*. PX 24 at 3M 48136. Thus, in order to qualify for the maximum rebate under the EGF/PGF programs, the record shows that most customers diverted private label business to 3M at 3M's suggestion. Tr. Vol. 28 at 74-75; PX23, 28, 32, 34, 715. Similarly, under the newer Brand Mix rebate program, 3M set higher rebates for tape sales which produced a shift from private label tape to branded tape. Tr. Vol. 31 at 79. PX 393 at 534906.
>
> *Furthermore, Plaintiff introduced evidence of customized rebate programs that similarly caused distributors to forego purchasing from Le Page's if they wished to obtain rebates on 3M's products*. Specifically, the trial record establishes that 3M offered Kmart a customized growth rebate and Market Development Funds payment. In order to reach the $ 15 million sales target and qualify for the $ 1 million rebate, however, Kmart had to increase its consumer **[**54]** stationary purchases by $ 5.5 million. Kmart substantially achieved this "growth" by dropping Le Page's and another private label manufacturer, Tesa. PX 51 at 3M 102175, PX 121 at 156838. Likewise, 3M customized a program with Staples that provided for an extra 1% bonus rebate on Scotch tape sales "if Le Page's business is given to 3M." PX 98 at 3M 149794. Finally, 3M provided a similar discount on Scotch tape to Venture Stores "based on the contingency of Venture dropping private label." PX 712 at 3M 450738.
> Thus, **[*161]** the jury could have reasonably concluded that 3M's customers were forced to forego purchasing Le

[13] In one of the two distribution channels available for browsers, Microsoft had locked up almost all the high volume distributors. *Microsoft*, 253 F.3d at 70-71. In the seminal *Terminal Railroad* case, an association of railroad operators locked up the cheapest route across the Mississippi river, the sole railroad bridge crossing at St. Louis. *United States v. Terminal R.R. Ass'n*, 224 U.S. 383, 56 L. Ed. 810, 32 S. Ct. 507 (1912). The Supreme Court determined that the defendant's agreement to provide access to the bridge to other railroads on discriminatory terms violated *§ 1 of the Sherman Act*.

[14] In the transparent tape market, superstores like Kmart and Wal-Mart provide a crucial facility to any manufacturer -- they supply high volume sales with the concomitant substantially reduced distribution costs. By wielding its monopoly power in transparent tape and its vast array of product lines, 3M foreclosed LePage's from that critical bridge to consumers that superstores provide, namely, cheap, high volume supply lines.

Page's private label tape in order to obtain the rebates on Scotch tape.*Id.* (emphasis added).

In the same opinion, the District Court found that "[LePage's] introduced substantial evidence that the anti-competitive effects of 3M's rebate programs caused Le Page's losses." *2000 U.S. Dist. LEXIS 3087, [WL] at *7*. The jury was capable of calculating from the evidence the amount of rebate a customer of 3M would lose if it failed to meet 3M's quota of sales in even one of the bundled products. The discount that LePage's would have had to provide to match the discounts offered by 3M through **[**55]** its bundled rebates can be measured by the discounts 3M gave or offered. For example, LePage's points out that in 1993 Sam's Club would have stood to lose $ 264,900, Sealed App. at 1166, and Kmart $ 450,000 for failure to meet one of 3M's growth targets in a single product line. Sealed App. at 1110. Moreover, the effect of 3M's rebates on LePage's earnings, if LePage's had attempted to match 3M's discounts, can be calculated by comparing the discount that LePage's would have been required to provide. That amount would represent the impact of 3M's bundled rebates on LePage's ability to compete, and that is what is relevant under *§ 2 of the Sherman Act*.

The impact of 3M's discounts was apparent from the chart introduced by LePage's showing that LePage's earnings as a percentage of sales plummeted to below zero -- to negative 10% -- during 3M's rebate program. App. at 7037; *see also* App. at 7044 (documenting LePage's healthy operating income from 1990 to 1993, rapidly declining operating income from 1993 to 1995, and large operating losses suffered from 1996 through 1999). Demand for LePage's tape, especially its private-label tape, decreased significantly following the introduction **[**56]** of 3M's rebates. Although 3M claims that customers participating in its rebate programs continued to purchase tape from LePage's, the evidence does not support this contention. Many distributors dropped LePage's entirely.

Prior to the introduction of 3M's rebate program, LePage's sales had been skyrocketing. Its sales to Staples increased by 440% from 1990 to 1993. Following the introduction of 3M's rebate program which bundled its private-label tape with its other products, 3M's private-label tape sales increased 478% from 1992 to 1997. [15] LePage's in turn lost a proportional amount of sales. It lost key large volume customers, such as Kmart, Staples, American Drugstores, Office Max, and Sam's Club. Other large customers, like Wal-Mart, drastically cut back their purchases.

As a result, LePage's manufacturing process became less efficient and its profit margins **[**57]** declined. In transparent tape manufacturing, large volume customers are essential to achieving efficiencies of scale. As 3M concedes, "'large customers were extremely important to [LePage's], to everyone.' . . . Large volumes . . . permitted 'long runs,' making the manufacturing process more economical and predictable." Appellant Br. at 10 (quoting trial testimony of Les Baggett, LePage's former president and CEO) (citation omitted).

There was a comparable effect on LePage's share of the transparent tape market. In the agreed upon relevant market for transparent tape in the United States, LePage's market share dropped 35% from 1992 to 1997. In 1992, LePage's net sales constituted 14.44% of the total transparent **[*162]** tape market. By 1997, LePage's sales had fallen to 9.35%. Sealed App. at 489. Finally,

---

[15] In 1992, 3M's private-label tape sales were $ 1,142,000. By 1997, its private-label tape sales had increased to $ 5,464,222. Sealed App. at 489.

in March of 1997, LePage's was forced to close one of its two plants. That same year, the only other domestic transparent tape manufacturer, Tesa Tuck, Inc., bowed out of the transparent tape business entirely in the United States. Had 3M continued with its program it could have eventually forced LePage's out of the market.

The relevant inquiry is the anticompetitive effect of 3M's exclusionary **[**58]** practices considered together. As the Supreme Court recognized in *Cont'l Ore Co. v. Union Carbide & Carbon Corp., 370 U.S. 690, 699, 8 L. Ed. 2d 777, 82 S. Ct. 1404 (1962)*, ***HN22*** the courts must look to the monopolist's conduct taken as a whole rather than considering each aspect in isolation. The Court stated, "'in a case like the one before us [alleging *§ 1* and *§ 2* violations], the duty of the jury was to look at the whole picture and not merely at the individual figures in it.'" *Id.* (citation omitted). *See also* City of Anaheim v. S. Cal. Edison Co., 955 F.2d 1373, 1376 (9th Cir. 1992) ("It would not be proper to focus on specific individual acts of an accused monopolist while refusing to *consider their overall combined effect*. . . We are dealing with what has been called the 'synergistic effect' of the mixture of the elements.") (emphasis added). This court, when considering the anticompetitive effect of a defendant's conduct under the Sherman Act, has looked to the increase in the defendant's market share, the effects of foreclosure on the market, benefits to customers and the defendant, and the extent to which customers felt they were precluded **[**59]** from dealing with other manufacturers. *Barr, 978 F.2d at 110-11*.

The effect of 3M's conduct in strengthening its monopoly position by destroying competition by LePage's in second-tier tape is most apparent when 3M's various activities are considered as a whole. The anticompetitive effect of 3M's exclusive dealing arrangements, whether explicit or inferred, cannot be separated from the effect of its bundled rebates. 3M's bundling of its products via its rebate programs reinforced the exclusionary effect of those programs.

3M's exclusionary conduct not only impeded LePage's ability to compete, but also it harmed competition itself, a *sine qua non* for a *§ 2* violation. LePage's presented powerful evidence that competition itself was harmed by 3M's actions. The District Court recognized this in its opinion, when it said:

> The jury could reasonably infer that 3M's planned elimination of the lower priced private label tape, as well as the lower priced Highland brand, would channel consumer selection to the higher priced Scotch brand and lead to higher profits for 3M. Indeed, Defendant concedes that "3M could later recoup the profits it has forsaken on Scotch **[**60]** tape and private label tape by selling more higher priced Scotch tape . . . if there would be no competition by others in the private label tape segment when 3M abandoned that part of the market to sell only higher-priced Scotch tape."*Le Page's, 2000 U.S. Dist. LEXIS 3087, 2000 WL 280350, at *7*.

3M could effectuate such a plan because there was no ease of entry. *See* *Advo, Inc. v. Phila. Newspapers, Inc., 51 F.3d 1191, 1200 (3d Cir. 1995)* (commenting that ease of entry would prevent monopolist's predatory pricing scheme from succeeding); *see also* Edward A. Snyder & Thomas E. Kauper, *Misuses of the Antitrust Laws: The Competitor Plaintiff*, *90 Mich. L. Rev. 551, 564 (1991)* (finding "barriers to entry" to be one of two necessary conditions for exclusionary conduct, the other being "market power").

**[*163]** The District Court found that there was "substantial evidence at trial that significant entry barriers prevent competitors from entering the . . . tape market in the United States. Thus,

this case presents a situation in which a monopolist remains unchecked in the market." *Le Page's, 2000 U.S. Dist. LEXIS 3087, 2000 WL 280350, at *7*. In the time period at issue here, **[**61]** there has never been a competitor that has genuinely challenged 3M's monopoly and it never lost a significant transparent tape account to a foreign competitor.

There was evidence from which the jury could have determined that 3M intended to force LePage's from the market, and then cease or severely curtail its own private-label and second-tier tape lines. For example, by 1996, 3M had begun to offer incentives to some customers to increase purchases of its higher priced Scotch-brand tapes over its own second-tier brand. The Supreme Court has made clear that ***HN23*** intent is relevant to proving monopolization, *Aspen Skiing, 472 U.S. at 602*, and attempt to monopolize, *Lorain Journal, 342 U.S. at 154-55*.

3M's interest in raising prices is well-documented in the record. In internal memoranda introduced into evidence by LePage's, 3M executives boasted that the large retailers like Office Max and Staples had no choice but to adhere to 3M's demands. *See* Sealed App. at 2585 ("Either they take the [price] increase . . . or we hold orders . . . ."); *see also* Sealed App. at 2571 (3M's directive when Staples objected to price increase was "orders will be held **[**62]** if pricing is not up to date on 1/1/98"). LePage's expert testified that the price of Scotch-brand tape increased since 1994, after 3M instituted its rebate program. App. at 3246-47. In its opinion, the District Court cited the deposition testimony of a 3M employee acknowledging that the payment of the rebates after the end of the year discouraged passing the rebate on to the ultimate customers. App. at 2092. The District Court thus observed, "the record amply reflects that 3M's rebate programs did not benefit the ultimate consumer." *Le Page's, 2000 U.S. Dist. LEXIS 3087, 2000 WL 280350, at *7*.

As the foregoing review of the evidence makes clear, there was sufficient evidence for the jury to conclude the long-term effects of 3M's conduct were anticompetitive. We must therefore uphold its verdict on liability unless 3M has shown adequate business justification for its practices.

**VI.**

**BUSINESS REASONS JUSTIFICATION**

***HN24*** It remains to consider whether defendant's actions were carried out for "valid business reasons," the only recognized justification for monopolizing. *See, e.g., Eastman Kodak, 504 U.S. at 483*. However, a defendant's assertion that it acted in furtherance **[**63]** of its economic interests does not constitute the type of business justification that is an acceptable defense to *§ 2* monopolization. Paraphrasing one corporate executive's well publicized statement, whatever is good for 3M is not necessarily permissible under *§ 2 of the Sherman Act*. As one court of appeals has explained:

> ***HN25*** In general, a business justification is valid if it relates directly or indirectly to the enhancement of consumer welfare. Thus, pursuit of efficiency and quality control might be legitimate competitive reasons . . ., while the desire to maintain a monopoly market share or thwart the entry of competitors would not.*Data Gen. Corp. v. Grumman Sys. Support Corp., 36 F.3d 1147, 1183 (1st Cir. 1994)* (citing *Eastman Kodak, 504 U.S. at 483* ; **[*164]** *Aspen Skiing, 472 U.S. at 608-11*).

***HN26*** It can be assumed that a monopolist seeks to further its economic interests and does so when it engages in exclusionary conduct. Thus, for example, exclusionary practice has been defined

as "a method by which a firm . . . trades a part of its monopoly profits, at least temporarily, for a larger market share, by making it unprofitable **[**64]** for other sellers to compete with it." Richard A. Posner, *Antitrust Law: An Economic Perspective* 28 (1976). Once a monopolist achieves its goal by excluding potential competitors, it can then increase the price of its product to the point at which it will maximize its profit. This price is invariably higher than the price determined in a competitive market. That is one of the principal reasons why monopolization violates the antitrust laws. The fact that 3M acted to benefit its own economic interests is hardly a reason to overturn the jury's finding that it violated *§ 2 of the Sherman Act*.

***HN27*** The defendant bears the burden of "persuading the jury that its conduct was justified by any normal business purpose." *Aspen Skiing, 472 U.S. at 608*. Although 3M alludes to its customers' desire to have single invoices and single shipments in defense of its bundled rebates, 3M cites to no testimony or evidence in the 55 volume appendix that would support any actual economic efficiencies in having single invoices and/or single shipments. It is highly unlikely that 3M shipped transparent tape along with retail auto products or home improvement products to customers such as Staples **[**65]** or that, if it did, the savings stemming from the joint shipment approaches the millions of dollars 3M returned to customers in bundled rebates.

There is considerable evidence in the record that 3M entered the private-label market only to "kill it." *See, e.g.*, Sealed App. at 809 (statement by 3M executive in internal memorandum that "I don't want private label 3M products to be successful in the office supply business, its distribution or our consumers/end users"). That is precisely what *§ 2 of the Sherman Act* prohibits by covering conduct that maintains a monopoly. Maintaining a monopoly is not the type of valid business reason that will excuse exclusionary conduct. 3M's business justification defense was presented to the jury, and it rejected the claim. The jury's verdict reflects its view that 3M's exclusionary conduct, which made it difficult for LePage's to compete on the merits, had no legitimate business justification.

**VII.**

**DAMAGES**

As an alternative to its argument that it is entitled to JMOL on liability, 3M claims that it is entitled to a new trial due to the District Court's error in sustaining LePage's damages award. It gives two reasons. First, it contends **[**66]** that the damage theory proffered by Terry Musika, LePage's damages expert, was based on improper assumptions and should have been excluded. [16] Second, 3M argues that Musika's theory failed to disaggregate the damages **[*165]** based on lawful versus unlawful conduct by 3M.

***HN28*** We review the District Court's decision to admit or exclude expert testimony for abuse of discretion. *Kumho Tire Co. v. Carmichael, 526 U.S. 137, 152, 143 L. Ed. 2d 238, 119 S. Ct. 1167 (1999)*. Furthermore, **[**67]** ***HN29*** we review *de novo* LePage's damages evidence to determine whether as a matter of law it can support the jury's verdict. *Stelwagon Mfg. Co. v. Tarmac Roofing Sys., Inc.*, 63 F.3d 1267, 1271 (3d Cir. 1995).

---

[16] 3M does not challenge Musika's expert qualifications. Nonetheless, we note that he holds a master's degree in public finance, is a former partner at a major accounting firm, and at the time of trial was President and CEO of a business consulting firm. Furthermore, Musika frequently has served as a court-appointed bankruptcy trustee, as an expert for various government agencies, including the Department of Justice and Securities and Exchange Commission, and as an expert witness in complex cases, including five antitrust cases.

To determine the amount of profits LePage's lost between 1993 and 2000 due to 3M's antitrust violations, Musika constructed a "lost market share" model. Appellant's Br. at 72. Musika first calculated the total United States transparent tape sales during the damages period, using actual financial data from 1992 to 1997 and projecting total sales from 1998 to 2000. Next, he determined how those sales would be divided between branded and private-label parts of the market, projecting a 1% shift each year from branded to private-label tape sales. In arriving at 1%, Musika considered the actual growth in private-label tape sales, the actual growth rate of all private-label products (i.e. not just tape), the growth rate of large customers, and 3M's internal projections.

After determining the size of both segments of the market, Musika estimated LePage's share of the market, predicting that LePage's would have retained its 3.5% share of the branded-label segment and its **[**68]** 88% share of the private-label segment. He opined that LePage's share of the overall market for transparent tape would have increased from 14.44% in 1992 to 21.2% in 2000 but for 3M's unlawful conduct. Finally, Musika subtracted LePage's actual sales from his projected sales to determine LePage's lost sales due to 3M's unlawful conduct. He calculated LePage's projected profit margin by looking at LePage's actual profit margin for each year and adjusting it to show declining prices and LePage's consequential decreasing efficiency due to decreasing sales. Based on those adjustments, LePage's profit margin decreased every year during the damages period. Musika concluded that but for 3M's unlawful conduct, LePage's would have earned an extra $ 36 million dollars.

Importantly, 3M does not challenge Musika's basic approach to calculating damages, conceding that ***HN30*** "an expert may construct a reasonable offense-free world as a yardstick for measuring what, hypothetically, would have happened 'but for' the defendant's unlawful activities." Appellant's Reply Br. at 37(citing *Callahan v. A.E.V., Inc., 182 F.3d 237, 254-58 (3d Cir. 1999)*; *Rossi v. Standard Roofing, Inc., 156 F.3d 452, 484-87 (3d Cir. 1998)).* **[**69]**

Instead, 3M's motion for judgment as a matter of law attacked Musika's underlying assumptions, the primary assumption being that 3M did not want to succeed in the private-label segment as it did not want to harm its high-margin sales of Scotch brand. The District Court rejected 3M's objections to LePage's damages claims, stating that "the record . . . demonstrates that Mr. Musika's assumptions were grounded in the past performances of Scotch, Highland and Le Page's tapes, as well as 3M's own internal projections for future growth." *LePage's, 2000 U.S. Dist. LEXIS 3087, 2000 WL 280350, at *8*.

The credibility of LePage's and 3M's experts was for the jury to determine. *Inter Med. Supplies, Ltd. v. EBI Med. Sys., Inc., 181 F.3d 446, 462-63 (3d Cir. 1999)*. Musika was extensively cross-examined and 3M presented testimony from its own damages expert who predicted more conservative losses to LePage's. In the end, the jury found Musika to be **[*166]** credible. 3M's disappointment as to the jury's finding of credibility does not constitute an abuse of discretion by the District Court in allowing Musika's testimony.

3M next argues that Musika improperly failed to disaggregate damages, thereby **[**70]** providing the jury with no mechanism to discern damages arising from 3M's lawful conduct or other facts from damages arising from 3M's unlawful conduct. According to 3M, this resulted in impermissible guesswork and speculation on the part of the jury.

In *Bonjorno v. Kaiser Aluminum & Chem. Corp.*, 752 F.2d 802, 812 (3d Cir. 1984), this court stated that ***HN31*** "in constructing a hypothetical world free of the defendants' exclusionary

activities, the plaintiffs are given some latitude in calculating damages, so long as their theory is not wholly speculative." *Id.* Once a jury has found that the unlawful activity caused the antitrust injury, the damages may be determined without strict proof of what act caused the injury, as long as the damages are not based on speculation or guesswork. *Id.* at 813. The *Bonjorno* court noted that it would be extremely difficult, if not impossible, to segregate and attribute a fixed amount of damages to any one act as the theory was not that any one act in itself was unlawful, but that all the acts taken together showed a *§ 2* violation. *Id.*

Similarly, 3M's actions, taken as a whole, were found to violate *§ 2*, thus **[**71]** making the disaggregation that 3M speaks of to be unnecessary, if not impossible. In any event, we fail to see how the jury engaged in speculation or guesswork. The District Court clearly charged the jury to disregard losses not caused by 3M: "You may not calculate damages based only on speculation or guessing . . . . You may not award damages for injuries or losses caused by other factors." App. at 5689. We find no evidence that the jury failed reasonably to follow these instructions.

For the foregoing reasons, we will not disturb the jury's damages award to LePage's.

**VIII.**

**JURY INSTRUCTIONS**

3M also argues that it should be awarded a new trial because of allegedly improper jury instructions. ***HN32*** In the absence of a misstatement of law, jury instructions are reviewed for abuse of discretion. *Bhaya v. Westinghouse Electric Corp., 922 F.2d 184, 191 (3d Cir. 1990)*. Because the District Court provided the jury with meticulous instructions, methodically explaining this area of the law in a manner understandable to lay persons, we conclude that it did not abuse its discretion.

The District Court, in instructing the jury on Count I, which encompassed LePage's **[**72]** claim of unlawful maintenance of monopoly power under *§ 2*, explained:

> Count I in this case is unlawful maintenance of monopoly power.
>
> LePage's alleges that it was injured by 3M's unlawful monopolization in the United States market for invisible and transparent tape for home and office use.
>
> To win on their claim of monopolization, LePage's must prove each of the following elements by a preponderance of the evidence.
>
> First, that 3M had monopoly power in the relevant market.
>
> Secondly, that 3M willfully maintained that power through predatory or exclusionary conduct. . . .
>
> And thirdly, that LePage's was injured in its business or property because **[*167]** of 3M's restrictive or exclusionary conduct.App. at 5663-64.

3M complains that the District Court failed to provide guidance that would instruct the jury how to distinguish between unlawful predation and lawful conduct. However, in explaining LePage's maintenance of monopoly claim, the District Court told the jury that in order to find for LePage's,

it would have to find by a preponderance of the evidence that 3M willfully maintained its monopoly power through exclusionary or predatory conduct. App. at 5663. It then summarized **[**73]** those of 3M's actions that LePage's contended were unlawfully exclusionary or predatory, including 3M's rebate program, market development fund, its efforts to control, reduce or eliminate private-label tape, and its efforts to raise the price consumers pay for Scotch tape. Thereafter, the judge provided the jury with the following factors to determine whether 3M's conduct was either exclusionary or predatory: "its effect on its competitors, such as LePage's, its impact on consumers, and whether it has impaired competition, in an unnecessarily restrictive way." App. at 5670.

Relevant portions of the charge were as follows:

> The law directs itself not against conduct which is competitive, even severely so, but rather against conduct which tends to destroy competition itself.App. at 5655.
>
> LePage's must prove that 3M willfully maintained monopoly power by predatory or exclusionary conduct, rather than by supplying better products or services, or by exercising superior business judgment, or just by chance. So willful maintenance of monopoly power, that's an element LePage's has to prove.App. at 5668.
>
> To prove that 3M acted willfully, LePage's must **[**74]** prove either that 3M engaged in predatory or exclusionary acts or practices, with the conscious objective of furthering the dominance of 3M in the relevant market, or that this was the necessary direct consequence of 3M's conduct or business arrangement.App. at 5668.
>
> I'm now giving you what LePage's contentions are as to what 3M did or did not do, that constituted predatory or exclusionary conduct. Number one, 3M's rebate program, such as the EGF, executive growth fund, or the PGF, the partnership growth fund, and the brand mix program. Number two, 3M's market development fund called the MDS in some of the testimony, and other payments to customers conditioned on customers achieving certain sales goals or growth targets. Third, 3M's efforts to control, or reduce, or eliminate private label tape. Four, 3M's efforts to switch customers to 3M's more expensive branded tape, and Five, 3M's efforts to raise the price consumers pay for Scotch tape. LePage's claims that all of these things that I've just gone through was predatory or exclusionary conduct. Now, 3M denies in every respect that these actions were predatory or exclusionary. 3M contends that these actions were, **[**75]** in fact, pro-competitive.App. at 5668-69.
>
> Exclusionary conduct and predatory conduct comprehends, at the most, behavior that not only, one, tends to impair the opportunities of its rivals, but also, number two, either

> does not further competition on the merits, or does so in an unnecessarily restrictive way. If 3M has been attempting to exclude rivals on **[*168]** some basis other than efficiency, you may characterize the behavior as predatory.App. at 5670.
>
> However, you may not find that a competent, willfully maintained monopoly power, if that company has maintained that power, solely through the exercise of superior foresight or skill in industry, or because of economic or technological efficiencies, or because of size, or because of changes in customer and consumer preferences, or simply because the market is so limited that it is impossible to efficiently produce the product, except by a plan large enough to supply the whole demand.App. at 5670-71.
>
> Now with respect to Count 1, unlawfully maintaining monopoly power, mere possession of monopoly power, if lawfully acquired, does not violate the antitrust laws.App. at 5671.
>
> In **[**76]** determining whether there has been an unlawful exercise of monopoly power, you must bear in mind that a company has not acted unlawfully simply because it has engaged in ordinary competitive behavior that would have been an effective means of competition if it were engaged in by a firm without monopoly power, or simply because it is a large company and a very efficient one.App. at 5672.

The trial court further noted that if the jury found the evidence to be insufficient to prove any of the elements, it had to find for 3M and against LePage's. It was careful to note that intense business competition was not considered predatory or exclusionary, explaining:

> The acts or practices that result in the maintenance of monopoly power must represent something other than the conduct of business that is part of the normal competitive process or even extraordinary commercial success. [3M] must represent conduct that has made it very difficult or impossible for competitors to engage in fair competition.App. at 5671.

The District Court closely followed the ABA sample instructions when instructing the jury as to predatory and exclusionary conduct, including its instructions **[**77]** distinguishing between procompetitive and anticompetitive conduct. *See* ABA, *Sample Jury Instructions in Civil Antitrust Cases* C-20 to C-21 (1999 Ed.). Furthermore, the jury instructions were a modified version of those given in *Aspen Skiing*, which the Supreme Court did not find objectionable. *472 U.S. at 596-97*.

3M contends that the District Court was obligated to take into account the decision in *Brooke Group* when crafting its jury instructions. As we have explained, *Brooke Group* involved claims

of predatory pricing, a claim LePage's never alleged against 3M. It follows that the District Court need not have, indeed should not have, instructed the jury as to claims not at issue in the case.

The jury was given the following questions on Count I:

> (1) Do you find that LePage's has proven, by a preponderance of the evidence, that the relevant market is invisible and transparent tape for home and office use in the United States?
>
> (2) Do you find that LePage's has proven, by a preponderance of the evidence, that 3M unlawfully maintained monopoly power as defined under the instructions for Count I?; [and]
>
> (2.1) Do you find that LePage's **[**78]** has proven, as a matter of fact and with a fair degree of certainty, that 3M's unlawful maintenance of monopoly power **[*169]** injured LePage's business or property as defined in these instructionsApp. at 6523. The jury answered "yes" to each of the three questions. It awarded LePage's more than $ 22 million before trebling.

The District Court gave the jury a thorough, clear charge as to the *§ 2* claim. Based on its sound instructions, the jury decided that LePage's had met its evidentiary burden as to its *§ 2* claim. Nothing in the jury charge constitutes reversible error.

**IX.**

**CROSS APPEAL**

**ATTEMPTED MONOPOLIZATION**

LePage's cross appeals from the District Court's order granting judgment as a matter of law to 3M on LePage's claim that 3M illegally attempted to maintain its monopoly. In overturning the jury's verdict for LePage's on this claim, the District Court stated that "'an attempted maintenance of monopoly power'" is "inherently illogical." *LePage's, 2000 U.S. Dist. LEXIS 3087, 2000 WL 280350, at *2*.

LePage's argues that the courts and commentators have repeatedly found that defendants can be guilty of both monopolization and attempted monopolization claims arising **[**79]** out of the same conduct. *See, e.g.*, *Am. Tobacco Co., 328 U.S. at 783* (affirming judgment that defendants were guilty of monopolization and attempted monopolization); Earl Kintner, 2 *Federal Antitrust Law* § 13.1 n.5 (1980). It emphasizes that in *Lorain Journal*, the Supreme Court upheld a *§ 2* attempted monopolization judgment against the defendant newspaper, holding that "a single newspaper, already enjoying a substantial monopoly in its area, violates the 'attempt to monopolize' clause of *§ 2* when it uses its monopoly to destroy threatened competition." *342 U.S. at 154*.

We need not consider the correctness of the District Court's ruling on the attempted monopolization claim because we uphold its decision on the monopolization claim. The jury returned the same amount of damages on both claims and LePage's concedes that under those circumstances discussion of the attempted monopolization is unnecessary.

**X.**

**CONCLUSION**

*Section 2*, the provision of the antitrust laws designed to curb the excesses of monopolists and near-monopolists, is the equivalent in our economic sphere of the guarantees of free and unhampered elections in the **[**80]** political sphere. Just as democracy can thrive only in a free political system unhindered by outside forces, so also can market capitalism survive only if those with market power are kept in check. That is the goal of the antitrust laws.

The jury heard the evidence and the contentions of the parties, accepting some and rejecting others. There was ample evidence that 3M used its market power over transparent tape, backed by its considerable catalog of products, to entrench its monopoly to the detriment of LePage's, its only serious competitor, in violation of *§ 2 of the Sherman Act*. We find no reversible error. Accordingly, we will affirm the judgment of the District Court.

**Dissent by:** GREENBERG

**Dissent**

GREENBERG, *Circuit Judge*, dissenting:

I respectfully dissent as I would reverse the district court's order denying the motion for judgment as a matter of law on the monopolization claim but affirm on LePage's's cross-appeal from the motion **[*170]** granting 3M a judgment as a matter of law on the attempted maintenance of monopoly claim. While I recognize that the majority opinion describes the factual background of this case, I nevertheless also will set forth its background as I believe that **[**81]** a more specific exposition of the facts leads to a conclusion that LePage's's case should not have survived 3M's motion for a judgment as a matter of law.

As the majority indicates, 3M dominated the United States transparent tape market with a market share above 90% until the early 1990s. LePage's around 1980 decided to sell "second brand" and private label tape, *i.e.*, tape sold under the retailer's, rather than the manufacturer's name, an endeavor successful to the extent that LePage's captured 88% of private label tape sales in the United States by 1992. Moreover, growth of "second brand" and private label tape accounted for a shift of some tape sales from branded tape to private label tape so the size of the private label tape business expanded. In the circumstances, not surprisingly, during the early 1990s, 3M also entered the private label tape business.

As the majority notes, LePage's claims that, in response to the growth of this competitive market, 3M engaged in a series of related, anticompetitive acts aimed at restricting the availability of lower-priced transparent tape to consumers. In particular, it asserts that 3M devised programs that prevented LePage's and the **[**82]** other domestic company in the business, Tesa Tuck, Inc., from gaining or maintaining large volume sales and that 3M maintained its monopoly by stifling growth of private label tape and by coordinating efforts aimed at large distributors to keep retail prices for Scotch tape high. LePage's barely was surviving at the time of trial and suffered large operating losses from 1996 through 1999.

This case centers on 3M's rebate programs that, beginning in 1993, involved offers by 3M of "package" or "bundled" discounts for various items ranging from home care and leisure products

to audio/visual and stationery products. Customers could earn rebates by purchasing, in addition to transparent tape, a variety of products sold by 3M's stationery division, such as Post-It Notes and packaging products. There is no doubt but that these programs created incentives for retailers to purchase more 3M products and enabled them to have single invoices, single shipments and uniform pricing programs for various 3M products. 3M linked the size of the rebates to the number of product lines in which the customers met the targets, an aggregate number that determined the rebate percentage the customer would receive **[**83]** on all of its 3M purchases across all product lines. Therefore, if customers failed to meet growth targets in multiple categories, they did not receive any rebate, and if they failed to meet the target in one product line, 3M reduced their rebates substantially. These requirements are at the crux of the controversy here, as LePage's claims that customers could not meet these growth targets without eliminating it as a supplier of transparent tape.

In practice, as 3M's rebate program evolved, it offered three different types of rebates: Executive Growth Fund, Partnership Growth Fund and Brand Mix Rebates. 3M developed a "test program" called Executive Growth Fund ("EGF") for a small number of retailers, 11 in 1993 and 15 in 1994. Under EGF, 3M negotiated volume and growth targets for each customer's purchases from the six 3M consumer product divisions involved in the EGF program. A customer meeting the target in three or more divisions earned a volume rebate of between 0.2-1.25% of total sales.

**[*171]** Beginning in 1995, 3M undertook to end the EGF test program and institute a rebate program called Partnership Growth Fund ("PGF") for the same six 3M consumer products divisions. Under this **[**84]** program, 3M established uniform growth targets applicable to all participants. Customers who increased their purchases from at least two divisions by $ 1.00 and increased their total purchases by at least 12% over the previous year qualified for the rebate, which ranged from 0.5% to 2%, depending on the number of divisions (between two to five divisions) in which the customer increased its purchases and the total volume of purchases.

In 1996 and 1997, 3M offered price incentives called Brand Mix Rebates to two tape customers, Office Depot and Staples, to increase purchases of Scotch brand tapes. 3M imposed a minimum purchase level for tape set at the level of Office Depot's and Staples's purchases the previous year with "growth" factored in. To obtain a higher rebate, these two customers could increase their percentage of Scotch purchases relative to certain lower-priced orders.

The evidence at trial focused on the parties' dealings with a limited number of customers and demonstrated that LePage's's problems were attributed to a number of factors, not merely 3M's rebate programs. Thus, I describe this evidence at length.

*Wal-Mart*

Before 1992, Wal-Mart bought private label tape **[**85]** only from LePage's but, in August 1992, decided to buy private label tape from 3M as well. In response, LePage's lowered its prices and increased its sales to Wal-Mart. In 1997, Wal-Mart stopped buying private label tape but offered LePage's's branded tape as its "second tier" offering. In 1998, however, Wal-Mart told LePage's that it was going to switch to a tape program from 3M. LePage's's president then visited Wal-Mart following which it changed its plans and retained LePage's as a supplier. Afterwards, Wal-Mart designed a test comparing LePage's's brand against a 3M Scotch utility tape to determine who would win Wal-Mart's "second tier" tape business. LePage's added more inches (approximately 20% more) to its rolls of tape and won the test. 3M continued, however, to sell

Scotch brand tapes to Wal-Mart, and LePage's saw its sales to Wal-Mart decline to approximately $ 2,000,000 annually by the time of trial. LePage's claims that Wal-Mart cut back on its tape purchases to qualify for 3M's bundled rebate of $ 1,468,835 in 1995.

*Kmart*

Kmart accounted for 10% of LePage's's annual tape sales when LePage's lost its business to 3M in 1993. Kmart asked its suppliers, including 3M, **[**86]** to provide a single bid on its entire private label tape business for the following year. LePage's's president believed, however, that Kmart was "too lazy to make a change," and that it would "never put their eggs in one basket" by giving all its business to 3M. LePage's offered the same price it had offered the previous year but also offered a volume rebate. 3M offered a lower price and won the bid. Kmart asked for rebates and "market development" funds as part of the private label tape bid process. 3M offered $ 200,000 for promotional activities and a $ 300,000 volume rebate if Kmart purchased $ 10,000,000 of 3M's Stationery Division products.

LePage's claims that 3M offered Kmart $ 1,000,000 to eliminate LePage's and Tesa as suppliers and to make 3M its sole tape supplier. LePage's points to a 3M document outlining 3M's goal for Kmart to **[*172]** exceed $ 15,000,000 in 3M purchases with the reward being that Kmart would receive $ 75,000 in each of the first two quarters and $ 100,000 in the last two quarters for promotional activities and would receive $ 650,000 as a volume rebate if the sales exceeded $ 15,000,000. If the sales were less, 3M would decrease the rebate accordingly, *e.* **[**87]** *g.*, a $ 400,000 rebate for $ 13,000,000 of sales. LePage's claims that, as a practical matter, Kmart had to eliminate LePage's and Tesa to reach the growth 3M required in order to qualify for the rebate. LePage's asserts that, despite its efforts to regain the private label business from Kmart, one Kmart buyer told it that he could not talk to LePage's about tape products for the next three years.

*Staples*

Staples had been a LePage's customer for several years. From 1990 to 1993, LePage's increased its sales to Staples by 440%, growing from $ 357,000 to $ 1,954,000. In 1994, Staples considered reducing suppliers and asked LePage's and 3M for their best offers in 1994. LePage's assumed that if 3M did make a good offer, LePage's would have a chance to make a better proposal. LePage's did not make its lowest offer, and 3M won the account. When LePage's went back to Staples with a new price, it was told that the decision had been made. LePage's claims that 3M offered an extra 1% bonus rebate on Scotch products if Staples eliminated LePage's as a supplier (a "growth" rebate that only could be met by converting all of Staple's private label business to 3M). 3M paid Staples an advertising **[**88]** allowance in four payments totalling $ 1,000,000 in 1995 and gave it $ 500,000 in free merchandise delivered during Staples's fiscal year 1994. 3M refers to a "$ 1.5 million settlement" with Staples and refers to multiple payments for different purposes. LePage's, however, implies that these payments bore some connection to Staples's award of its second-tier tape business to 3M.

*Office Max*

In 1998, after a dispute between Office Max and LePage's, Office Max accepted 3M's offer that matched but did not beat LePage's's price. LePage's objected to 3M's matching whatever price LePage's offered, and also objected to 3M's "clout" payment. Office Max required its suppliers to make payments to help advertise the Office Max name, and LePage's had paid this

"clout" payment in the years previous to 1998 when it refused to pay it because of its dispute with Office Max. Nevertheless, the buyer for Office Max testified that its decision to give its business to 3M was not related to its pricing and rebate program but rather to the consistency of its service.

*Walgreens*

Walgreens had purchased private label tape from LePage's from 1992 until 1998, when it decided to import tape from Taiwan. **[**89]** LePage's's chief executive officer acknowledged that LePage's did not lose the account due to 3M's activities.

*American Stores*

Until 1995, LePage's's sales of private label tape to American Stores exceeded $ 1,000,000 annually. According to LePage's, a month after American Stores decided that it would try to maximize 3M's PGF rebate, it shifted its tape business to 3M. In 1995, American Stores decided to stop buying LePage's tape, principally because of quality concerns. In a letter to James Kowieski, Senior Vice President of Sales at LePage's, Kevin Winsauer, the manager of the private label department at American, wrote: "After much deliberation comparing the pros and cons of LePage's **[*173]** program and 3M's program, I have decided to award the business to 3M. 3M's proposal was very competitive and I am sure LePage's would meet their costs to retain the business. *However, the decision to move to 3M is primarily based on Quality*." SJA 2050-51 (emphasis in original). When American Stores decided to purchase from 3M, it was not participating in any rebate programs, and Winsauer testified that he was not aware that there were rebate programs. He also testified that even without the **[**90]** volume incentive programs, 3M's price was still slightly lower than LePage's's.

*Dollar General, CVS, and Sam's Club*

LePage's lost Dollar General's private label business to a foreign supplier but later won the business back. According to LePage's's president, Dollar General used the bid for imported tape to leverage a price reduction from LePage's. 3M bid on the CVS account, but LePage's retained CVS as a customer by lowering its prices and increasing its rebate. At Sam's Club, LePage's tape had been selling well when its buyers were directed by senior management to "maximize" all purchases from 3M to maximize the EGF/PGF rebate. Subsequently, Sam's Club stopped purchasing from LePage's.

*Other distributors and buying groups*

LePage's claimed that 3M's pricing practices prevented or hindered it from selling private label tape to certain companies: (1) Costco. Costco, however, never has sold private label tape. (2) Office Depot. Office Depot also never has sold private label tape. LePage's tried to convince Office Depot to buy private label tape in 1991 or 1992 (before 3M implemented the rebate programs), but Office Depot decided to continue purchasing 3M brand tape. **[**91]** (3) Pamida and Venture Stores. LePage's claimed that 3M offered these stores discounts conditioned on exclusivity, thereby preventing LePage's from selling private label tape to them. LePage's lost Venture Stores' business in 1989, five years before 3M provided the discount at issue. (4) Office Buying Groups. 3M offered an optional 0.3% price discount to certain buying groups if they exclusively promoted certain 3M products in their catalogs. If the buying group carried a lower value

brand alternative to 3M's main brand (its second line), then the group would receive a lower annual volume rebate. LePage's viewed these kind of contract provisions as a "penalty" that coerced buying group members to purchase tape only from 3M. For example, if a buying group promoted the products of a competitor, it lost rebates for purchases in three categories of products. 3M argues that LePage's could have offered its own discount or rebate but instead refused in one instance to pay the standard promotional fee charged suppliers for inclusion in a catalog.

Notwithstanding the evidence which demonstrates that LePage's lost business for reasons that could not possibly be attributable to any unlawful **[**92]** conduct by 3M, it argues that 3M willfully maintained its monopoly through a "monopoly broth" of anticompetitive and predatory conduct. I would reject LePage's's argument as I agree with 3M that LePage's simply did not establish that 3M's conduct was illegal, as LePage's did not demonstrate that 3M's pricing was below cost (a point that is not in dispute) and, in the absence of such proof, the record does not supply any other basis on which we can uphold the judgment.

There are two elements of a monopolization claim under *section 2 of the Sherman Act*: "(1) the possession of monopoly power in the relevant market and (2) the **[*174]** willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *United States v. Grinnell Corp., 384 U.S. 563, 570-71, 86 S. Ct. 1698, 1704, 16 L. Ed. 2d 778 (1966)*. Willful maintenance involves using anticompetitive conduct to "foreclose competition, to gain a competitive advantage, or to destroy a competitor." *Eastman Kodak Co. v. Image Technical Servs., 504 U.S. 451, 482-83, 112 S. Ct. 2072, 2090, 119 L. Ed. 2d 265 (1992)* **[**93]** (internal quotation marks omitted). LePage's contends that 3M's bundled rebates were anticompetitive and predatory. It also argues that 3M's other practices, such as exclusionary contracts and the timing of its rebates, were also anticompetitive and predatory. I discuss these claims in the order I have stated them.

LePage's primarily complains of 3M's use of bundled rebates. While, as the majority recognizes, we have held that rebates on volume purchases are lawful, *see Advo, Inc. v. Philadelphia Newspapers, Inc., 51 F.3d 1191, 1203 (3d Cir. 1995)*, LePage's seeks to avoid that principle by pointing out that 3M offered higher rebates if customers met their target growth rate in different product categories, in effect linking the sale of private label tape with the sale of other products, such as Scotch tape, which customers had to buy from 3M. Thus, LePage's explains:

> 3M understood that, as a practical matter, every retailer in the country had to carry Scotch-brand tape . . . . It therefore decided to structure its rebates into bundles that linked that product with the product segment in which it did face competition from LePage's (second-line tape) . . . . **[**94]** To increase the leverage on the targeted segment, 3M further linked rebates on transparent tape with those for many other products . . . . The rival would have to 'compensate' the customer for the amount of rebate it would lose not only on the large volume of Scotch-brand tape it had to buy, but also for rebates on many other products purchased from 3M.Br. of Appellee at 40.

In making its argument LePage's relies in part on *SmithKline Corp. v. Eli Lilly & Co., 575 F.2d 1056 (3d Cir. 1978)*, which, as the majority notes, does not bind this en banc court but nevertheless can have precedential value. In *SmithKline*, Eli Lilly & Co. had two products, Keflin and

Keflex, on which it faced no competition, and one product, Kefzol, on which it faced competition from SmithKline's product, Ancef. *See* id. at 1061. Lilly offered a higher rebate of 3% to companies that purchased specified quantities of any three (which, practically speaking, meant combined purchases of Kefzol, Keflin and Keflex) of Lilly's cephalosporin products. *See id.* "Although hospitals were free to purchase SmithKline's Ancef with their Keflin and Keflex orders with Lilly, thus **[**95]** avoiding the penalties of a tie-in sale, [1] the practical effect of that decision would be to deny the Ancef purchaser the 3% bonus rebate on all its cephalosporin products." *Id. at 1061-62* (internal footnote added). Because of Lilly's volume advantage, to offer a rebate of the same net dollar amount as Lilly's, SmithKline would have had to offer **[*175]** companies rebates ranging from 16% for average size hospitals to 35% for larger volume hospitals for their purchase of Ancef. *See* id. at 1062.

**[**96]** We concluded that Lilly willfully acquired and maintained monopoly power by linking products on which it faced no competition (Keflin and Keflex) with a competitive product, resulting in the sale of all three products on a non-competitive basis in what otherwise would have been a competitive market between Ancef and Kefzol. *See* id. at 1065. Moreover, this arrangement would force SmithKline to pay rebates on one product equal to rebates paid by Lilly based on sales volume of three products. *See id.* Expert testimony and the evidence on pricing showed that in the circumstances SmithKline's prospects for continuing in the Ancef market were poor.

LePage's argues that it does not have to show that 3M's package discounts could prevent an equally efficient firm from matching or beating 3M's package discounts. In its brief, LePage's contends that its expert economist explained that 3M's programs and cash payments have the same anticompetitive impact regardless of the cost structure of the rival suppliers or their efficiency relative to that of 3M. *See* Br. of Appellee at 43. LePage's alleges that the relative efficiency or cost structure of the competitor simply affects how long **[**97]** it would take 3M to foreclose the rival from obtaining the volume of business necessary to survive. *See id.* "Competition is harmed just the same by the loss of the only existing competitive constraints on 3M in a market with high entry barriers." *Id*. The district court stated that LePage's introduced substantial evidence that the anticompetitive effects of 3M's rebate program caused its losses. *See* *LePage's Inc. v. 3M, No. Civ. A. 97-3983, 2000 U.S. Dist. LEXIS 3087, 2000 WL 280350, at *7-8 (E.D. Pa. Mar. 14, 2000)*. The majority finds that "3M's conduct was at least as anticompetitive as the conduct which [we] held violated *§ 2* in SmithKline." Maj. Op. at 24.

I disagree with the majority's use of *SmithKline*. SmithKline *showed* that it could not compete by explaining how much it would have had to lower prices for both small and big customers to do so. SmithKline ascertained the rebates that Lilly was giving to customers on all three products and calculated how much it would have had to lower the price of its product if the rebates were all attributed to the one competitive product. In contrast, LePage's did not even attempt to show that it could not compete by calculating the **[**98]** discount that it would have had to provide in order to match the discounts offered by 3M through its bundled rebates, and thus its brief does not point to evidence along such lines.

While I recognize that it is obvious from the size of 3M's rebates as compared to LePage's's sales that Lepage's would have had to make substantial reductions in prices to match the rebates

---

[1] 3M also avoids the penalties of a tie-in sale, because its customers were free to purchase its Scotch tape by itself. To prove an illegal tie-in, a plaintiff must establish that the agreement to sell one product was conditioned on the purchase of a different or tied product; the seller "has sufficient economic power with respect to the tying product to appreciably restrain free competition in the market for the tied product and a 'not insubstantial' amount of interstate commerce is affected." *Northern Pac. Ry. Co. v. United States*, 356 U.S. 1, 6, 78 S. Ct. 514, 518, 2 L. Ed. 2d 545 (1958).

3M paid to particular customers, Lepage's did not show the amount by which it lowered its prices in actual monetary figures or by percentage to compete with 3M and how its profitability thus was decreased. Rather, LePage's merely maintains, through the use of an expert, that it would have had to cut its prices drastically to compete and thus would have gone out of business. Furthermore, it is critically important to recognize that LePage's had 67% of the private label business at the time of the trial. Thus, notwithstanding 3M's rebates, LePage's was able to retain most of the private label business. In the circumstances, it is ironical that LePage's complains of 3M's use of monopoly power as the undisputed fact is that LePage's, not 3M, was the dominant supplier of private label tape both before and after 3M initiated **[**99] [*176]** its rebate programs. Indeed, the record suggests that inasmuch as LePage's could not make a profit with a 67% share of the private label sales, it must have needed to be essentially the exclusive supplier of such tape for its business to be profitable as it in fact was when it had an 88% share of the private label tape sales business.

Although I am not evaluating the expert's method of calculating damages as I would not reach the damages issue, I emphasize that simply pointing to an expert to support the contention that the company would have gone out of business, without providing even the most basic pricing information, is insufficient. "Expert testimony is useful as a guide to interpreting market facts, but it is not a substitute for them." *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp., 509 U.S. 209, 242, 113 S. Ct. 2578, 2598, 125 L. Ed. 2d 168 (1993)*; *see also* *Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 594 n.19, 106 S. Ct. 1348, 1360 n.19, 89 L. Ed. 2d 538 (1986)*; *Advo, 51 F.3d at 1198-99*; *Virgin Atlantic Airways Ltd. v. British Airways PLC, 69 F. Supp. 2d 571, 579 (S.D.N.Y. 1999)* **[**100]** ("An expert's opinion is not a substitute for a plaintiff 's obligation to provide evidence of facts that support the applicability of the expert's opinion to the case."), *aff 'd*, *257 F.3d 256 (2d Cir. 2001)*. Without such pricing information, it is difficult even to begin to estimate how much of the market share LePage's lost was due to 3M's bundled rebates. In fact, the evidence that I described above conclusively demonstrates that LePage's lost private sale tape business for reasons not related to 3M's rebates. Furthermore, some experts have questioned the validity of attributing all the rebates to the one competitive product in situations such as these. [2] I do not need, however, to decide the validity of that method of calculation, as LePage's does not even attempt to meet that less strict test by calculating

---

[2] One court has mentioned a hypothetical situation where a low-cost shampoo maker could not match a competitor's package discount for shampoo and conditioner even though both products were priced above their respective costs. *See* *Ortho Diagnostic Sys., Inc. v. Abbott Labs., Inc.*, 920 F. Supp. 455, 467 (S.D.N.Y. 1996). In that case, the court suggested that the bundled price could be unlawful under *section 2* even though neither item in the package was priced below cost. If the entire package discount were attributed to the one product where the two parties compete, the low-cost shampoo maker could not lower its prices on the product enough to match the total discount without selling below its cost. *See* *id*. at 467-69. Commentators, however, suggests that this analysis is incorrect. *See* III PHILLIP E. AREEDA & HERBERT HOVENKAMP, ANTITRUST LAW: AN ANALYSIS OF ANTITRUST PRINCIPLES AND THEIR APPLICATION P 749, at 467 n.6 (rev. ed. 1996).

One aspect of this method of calculation worth noting is that the volume of the products ordered has a drastic effect on how much the competitor would have to lower its prices to compete. For example, suppose in a similar rebate program, a company was the only producer of products A and B but faced competition in C. If a customer orders 100 units each of A, B, and C at a price of $ 1.00 each, a 3% rebate would be $ 9.00 (3% of the total of $ 300.00). If the rebate on all three products were attributed to product C, then the competitor would have to lower its price to $ 0.91 in order to compete with it. The results would be starkly different, however, if a customer orders 100 units of A and B but only needs 10 units of C. Then the 3% rebate on the total purchase amount of $ 210.00 would be $ 6.30. If the rebate was attributed solely to product C, then a competitor would have to lower its price to $ .37 on product C in order to match the company's price.

how much it would have had to lower its prices to match the rebates, even if they all were aggregated and attributed to private label tape. [3]

**[**101]**

**[*177]** LePage's also has not satisfied the stricter tests devised by other courts considering bundled rebates in situations such as that here. In a case brought by a manufacturer of products used in screening blood supply for viruses, *Ortho Diagnostic Systems, Inc. v. Abbott Laboratories, Inc., 920 F. Supp. 455 (S.D.N.Y. 1996)*, the district court held, *inter alia*, that the defendant's discount pricing of products in packages did not violate the Sherman Act. The defendant, Abbott Laboratories, manufactured all five of the commonly used tests to screen the blood supply for viruses. Ortho claimed that Abbott violated *sections 1 and 2* of the Sherman Act by contracting **[**102]** with the Council of Community Blood Centers to give those members advantageous pricing if they purchased a package of four or five tests from Abbott, thereby using its monopoly position in some of the tests to foreclose or impair competition by Ortho in the sale of those tests available from both companies. *See id. at 458*. The district court stated that to prevail on a monopolization claim in "a case in which a monopolist (1) faces competition on only part of a complementary group of products, (2) offers the products both as a package and individually, and (3) effectively forces its competitors to absorb the differential between the bundled and unbundled prices of the product in which the monopolist has market power," the plaintiff must allege and prove "either that (a) the monopolist has priced below its average variable cost or (b) the plaintiff is at least as efficient a producer of the competitive product as the defendant, but that the defendant's pricing makes it unprofitable for the plaintiff to continue to produce." *Id. at 469*.

Holding that the discount package pricing did not violate the Sherman Act, the *Ortho* court explained that any **[**103]** other rule would involve too substantial a risk that the antitrust laws would be used to protect an inefficient competitor against price competition that would benefit consumers. *See id. at 469-70* ("The antitrust laws were not intended, and may not be used, to require businesses to price their products at unreasonably high prices (which penalize the consumer) so that less efficient competitors can stay in business.") (internal quotation marks omitted).

In this case, as the majority acknowledges, LePage's now does not contend that 3M priced its products below average variable cost, an allegation which, if made, in any event would be difficult to prove. *See Advo, 51 F.3d at 1198-99*. Moreover, LePage's's economist conceded that LePage's is not as efficient a tape producer as 3M. Thus, in this case *section 2 of the Sherman Act* is being used to protect an inefficient producer from a competitor not using predatory pricing but rather selling above cost. While the majority contends that *Brooke Group*, a case on which 3M heavily relies, is distinguishable as none of the defendants there had a monopoly in the market, the fact remains that the Court in describing **[**104]** *section 2 of the Sherman Act* said flat out in *Brooke Group* that "a plaintiff seeking to establish competitive injury from a rival's low prices must prove that the prices complained of are below an appropriate measure of its rival's costs." *Brooke Group, 509 U.S. at 222, 113 S. Ct. at 2587*. LePage's simply did not do this.

I realize that the majority indicates that "LePage's unlike the plaintiff in *Brooke Group*, does not make a predatory pricing **[*178]** claim." Maj. Op. at 16. But that circumstance weakens

---

[3] The closest LePage's comes to supplying such information in its brief is its statement that "LePage's made repeated efforts to save its tape business with Staples, reducing its prices to 1990 levels, and then reducing them again, to keep its plant open and people working." Br. of Appellee at 11. This is not close enough. Of course, LePage's's prices overall were low enough for it to have 67% of the private label business.

rather than strengthens LePage's's position as it merely confirms the lawfulness of 3M's conduct. Furthermore, the circumstance that 3M is not dealing in an oligopolistic market should not matter as the harm that LePage's claims to have suffered from the bundled rebates would be no less if inflicted by multiple competitors. Moreover, monopolist or not, 3M, even in the absence of LePage's and Tesa from the private label business, would not be the only supplier of private label tape for there are foreign suppliers as is demonstrated plainly by the evidence that both Walgreens and Dollar General dealt with such suppliers.

Contrary to the majority's view, this is not **[**105]** a situation in which there is no business justification for 3M's actions. This point is important inasmuch as it is difficult to distinguish legitimate competition from exclusionary conduct that harms competition, *see United States v. Microsoft Corp., 346 U.S. App. D.C. 330, 253 F.3d 34, 58 (D.C. Cir.)*, *cert. denied*, 534 U.S. 952, 122 S. Ct. 350, 151 L. Ed. 2d 264 (2001), and some cases suggest that when a company acts against its economic interests and there is no valid business justification for its actions, then it is a good sign that its acts were intended to eliminate competition.

For example, *Aspen Skiing Co. v. Aspen Highlands Skiing Corp., 472 U.S. 585, 608, 105 S. Ct. 2847, 2860, 86 L. Ed. 2d 467 (1985)*, discussed by the majority, sets forth the lack of a valid business reason as a basis for finding liability. In that case, the Court affirmed a jury verdict for the plaintiff under *section 2 of the Sherman Act* where the defendant monopolist had stopped cooperating with the plaintiff to offer a multi-venue skiing package for Aspen skiers. The Court held that because the defendant had acted contrary to its economic interests, **[**106]** by losing business and customers, there was no other rationale for its conduct except that it wished to eliminate the plaintiff as a competitor. *See id. at 608, 105 S. Ct. at 2860*; *see also Eastman Kodak, 504 U.S. at 483, 112 S. Ct. at 2091* (exclusionary conduct properly is condemned if valid business reasons do not justify conduct that tends to impair the opportunities of a monopolist's rivals or if a valid asserted purpose would be served fully by less restrictive means).

On the other hand, in *Concord Boat Corp. v. Brunswick Corp., 207 F.3d 1039, 1043, 1063 (8th Cir.)*, *cert. denied*, *531 U.S. 979, 121 S. Ct. 428, 148 L. Ed. 2d 436 (2000)*, where boat builders brought an antitrust action against a stern drive engine manufacturer, the court held, *inter alia*, that the evidence was insufficient to find that the engine manufacturer's discount programs restrained trade and monopolized the market. Brunswick offered a higher percentage discount when boat builders bought a higher percentage of their engines from it, but there was no allegation that its pricing was below cost. *See id. at 1044, 1062.* **[**107]** In *Concord Boat* the district court cited the district court opinion in this case when 3M filed its motion to dismiss. *See LePage's Inc. v. 3M, 1997 U.S. Dist. LEXIS 18501, No. Civ. A. 97-3983, 1997 WL 734005 (E.D. Pa. Nov. 14, 1997)*. The *Concord Boat* district court agreed with the plaintiff that it was not the price (above cost or not) that was relevant but the "strings" attached to the price and that the district court here was correct to distinguish *Brooke Group* since there were no "strings" attached (bundled rebates) in *Brooke Group*. In *Concord Boat*, the "strings" attached were the exclusivity provisions. *See Concord Boat Corp. v. Brunswick Corp., 21 F. Supp. 2d 923, 930 (E.D. Ark. 1998)*.

The Court of Appeals for the Eighth Circuit, however, disagreed with the district **[*179]** court in *Concord Boat*. The court of appeals opinion reflected an application of *Brooke Group*'s strong stance favoring vigorous price competition and expressing skepticism of the ability of a court to separate anticompetitive from procompetitive actions when it comes to above-cost strategic pricing. *See Concord Boat, 207 F.3d at 1061*. More importantly, the court perceived **[**108]** that *Brooke Group* should be considered even with claims based on pricing with strings. *See id.* "If

a firm has discounted prices to a level that remains above the firm's average variable cost, the plaintiff must overcome a strong presumption of legality by showing other factors indicating that the price charged is anticompetitive." *Id.* (*citing* Morgan v. Ponder, 892 F.2d 1355, 1360 (8th Cir. 1989)) (internal quotation marks omitted). The court stated that a *section 2* defendant's proffered business justification is the most important factor in determining whether its challenged conduct is not competition on the merits. *See* id. at 1062. The court distinguished cases such as *SmithKline* and *Ortho* where products were bundled since they involved two markets. *See id.* Of course, here we are dealing with a single market.

Unlike the situation of the defendant in *Aspen*, 3M's pricing structure and bundled rebates were not contrary to its economic interests, as they likely increased its sales. In fact, that is exactly what LePage's is complaining about. Furthermore, other than the obvious reasons such as increasing bulk sales, market share and customer **[**109]** loyalty, there are several other potential "procompetitive" or valid business reasons for 3M's pricing structure and bundled rebates: efficiency in having single invoices, single shipments and uniform pricing programs for various products. Moreover, the record demonstrates that, with the biggest customers, 3M's rebates were not eliminating the competitive process, as LePage's still was able to retain some customers through negotiation, and even though it lost other customers, the losses were attributable to their switching to foreign suppliers or changing suppliers because of quality or service without regard to the rebates. Furthermore, overall LePage's was quite successful in holding its share of the private label sales as it had 67% of the business at the time of the trial.

In sum, I conclude that as a matter of law 3M did not violate *section 2 of the Sherman Act* by reason of its bundled rebates even though its practices harmed its competitors. The majority decision which upholds the contrary verdict risks curtailing price competition and a method of pricing beneficial to customers because the bundled rebates effectively lowered their costs. I regard this result as a significant **[**110]** mistake which cannot be justified by a fear that somehow 3M will raise prices unreasonably later. In this regard I reiterate that in addition to LePage's there are foreign suppliers of transparent tape so that with or without LePage's there will be constraints on 3M's pricing.

LePage's also claims that, through a variety of other allegedly anticompetitive actions, 3M prevented LePage's from competing. LePage's asserts that 3M foreclosed competition by directly purchasing sole-supplier status. There was some dispute as to whether the contracts were conditioned on 3M being the sole supplier, and 3M claims that there are only two customers for which there is any evidence of a sole supplier agreement. I recognize, however, that although most of 3M's contracts with customers were not conditioned on exclusivity, practically speaking some customers dropped LePage's as a supplier to maximize the rebates that 3M was offering. Moreover, *United Shoe Machinery Corp. v. United States, 258 U.S. 451, 458, 42 S. Ct. 363,* **[*180]** 365, 66 L. Ed. 708 (1922), explained that a contract that does not contain specific agreements not to use the products of a competitor still will come within the **[**111]** Clayton Act as to exclusivity if its practical effect is to prevent such use.

Even assuming, however, that 3M did have exclusive contracts with some of the customers, LePage's has not demonstrated that 3M acted illegally, as one-year exclusive contracts have been held to be reasonable and not unduly restrictive. *See Fed. Trade Comm'n v. Motion Picture Adver. Serv. Co., 344 U.S. 392, 395-96, 73 S. Ct. 361, 363-64, 97 L. Ed. 426, 49 F.T.C. 1730 (1953)* (holding that evidence sustained the Commission's finding that the distributor's exclusive

screening agreements with theater operators unreasonably restrained competition, but stating that the Commission had found that the term of one-year exclusive contracts had become a standard practice and would not be an undue restraint on competition). *See also* *Advo, 51 F.3d at 1204*. In *Tampa Electric Co. v. Nashville Coal Co., 365 U.S. 320, 327, 81 S. Ct. 623, 627-28, 5 L. Ed. 2d 580 (1961)*, the Court stated that even if in practical application a contract is found to be an exclusive-dealing arrangement, it does not violate *section 3 of the Clayton Act* unless the court believes it probable that performance of the **[**112]** contract will foreclose competition in a substantial share of the line of commerce affected. Using that standard, although LePage's's market share in private label tape has fallen from 88% to 67%, it has not been established that, as a result of the allegedly exclusive contracts, competition was foreclosed in a substantial share of the line of commerce affected. Indeed, in view of LePage's's two-thirds share of the private label business, its attack on exclusivity agreements is attenuated.

There appear to be very few cases supporting liability based on *section 2 of the Sherman Act for* exclusive dealing, as some cases suggest that if, as is the case here under the jury's findings, there is no liability under *section 3 of the Clayton Act*, it is more difficult to find liability under the Sherman Act since its scope is more restricted. [4] In any event, the record shows only two allegedly exclusive contracts (with the Venture and Pamida stores), and "because an exclusive deal affecting a small fraction of a market clearly cannot have the requisite harmful effect upon competition, the requirement of a significant degree of foreclosure serves a useful screening function." *Microsoft, 253 F.3d at 69.* **[**113]** The *Microsoft* court explained that although exclusive contracts are commonplace, particularly in the field of distribution, in certain circumstances the use of exclusive contracts may give rise to a *section 2* violation even though the contracts foreclose less than the roughly 40 to 50% share usually required to establish a *section 1* violation. *See* *id. at 69-70*. In this case, it cannot be concluded that the two contracts with Venture and Pamida were responsible for the total drop in LePage's's market share. Furthermore, even if all 3M's contracts were considered exclusive, LePage's's total drop in market share was only 21%, and some of this loss was shown in the record to be due to quality or service consistency concerns, as well as foreign competition, rather than to 3M's tactics. Therefore, there was not enough foreclosure of the market to have an anticompetitive effect.

**[**114]** LePage's also claims that by calculating the rebates only once a year, 3M made it **[*181]** more difficult for a purchaser to pass on the savings to its customers, thereby making it harder for companies to switch suppliers and keeping retail prices and margins high. As I discussed above, one-year contracts may be considered standard, and even if they make it more unlikely that rebates are passed on in the form of lower retail prices, the discounts could be applied towards lowering retail prices the following year or towards other costs by companies that are factored into the retail prices (such as advertising). In the circumstances, I am satisfied that this conduct does not qualify as predatory or anticompetitive so as to establish liability under *section 2 of the Sherman Act*.

LePage's also alleges that 3M entered the retail private label tape portion of the market to destroy the market and thereby increase its sales of branded tape, but the case law does not support liability under *section 2* for this type of action. In *Brooke Group, 509 U.S. at 215, 113 S. Ct. at 2584*, Liggett/Brooke Group alleged that Brown & Williamson Tobacco Corporation ("B&W") sold generic cigarettes **[**115]** in order to decrease losses of sales in its branded

---

[4] It is more common for charges of exclusive dealing to be brought under *section 1 of the Sherman Act* or the Clayton Act, which the jury found that 3M did not violate. *See, e.g.*, Barr Labs., Inc. v. Abbott Labs., 978 F.2d 98, 110 (3d Cir. 1992).

cigarettes. B&W sold generic cigarettes at the same list price as Liggett but also offered large volume rebates to certain wholesalers so they would buy their generic cigarettes from B&W. *See id. at 216, 113 S. Ct. at 2584*. B&W wanted to take a larger part of the generic market from Liggett and drive Liggett to raise prices on generic cigarettes, which B&W would match, thereby encouraging consumers to switch back to branded cigarettes. *See id. at 216-17, 113 S. Ct. at 2584*. The Court held that because B&W had no reasonable prospect of recouping its predatory losses and could not inflict the injury to competition that antitrust laws prohibit, it did not violate the Robinson-Patman Act or the Sherman Act. *See id. at 243, 113 S. Ct. at 2598*. In this case, however, 3M did not use below average variable cost pricing (LePage's does not charge predatory pricing) and therefore 3M did not have predatory costs to recoup.

I recognize that LePage's attempts to distinguish *Brooke Group* on the ground that "3M used other techniques [*i.e.*, techniques other than predatory pricing] to extinguish **[**116]** the private-label category subjecting itself to different legal standards," Br. of Appellee at 55, but I nevertheless cannot accept LePage's's argument on this point. While LePage's does not contend that 3M engaged in predatory pricing, it does contend that the goal of 3M's other conduct was "to extinguish the private-label category, subjecting itself to different legal standards" than those applicable in *Brooke Group*. *See id.* Moreover, though 3M denies that it was attempting to eliminate the private label category of transparent tape, the record supports a finding that it had that intent. I am satisfied, however, that its efforts to eliminate the private label aspect of the transparent tape market are not unlawful as, "examined without reference to its effects on competitors," it is evident that in view of 3M's dominance in brand tape, that it was rational for it to want the sale of tape to be concentrated in that category of the market. *See Stearns Airport Equip. Co. v. FMC Corp., 170 F.3d 518, 523 (5th Cir. 1999)*. Thus, we should not uphold the verdict on that basis.

Accordingly, I conclude that 3M's actions in the record, including the bundled rebates **[**117]** and other elements of the "monopoly broth," were not anticompetitive and predatory as to violate *section 2 of the Sherman Act*. [5] Thus, I would reverse the **[*182]** judgment of the district court and remand the case for entry of judgment in favor of 3M. Judge Scirica and Judge Alito join in this opinion.

---

5 While I do not discuss the point I agree with the district court's disposition of the attempted maintenance of monopoly claim.

EXHIBIT 279

LexisNexis®

Caution
As of: August 12, 2014 9:13 AM EDT

# Lorain Journal Co. v. United States

Supreme Court of the United States
October 17, 1951, Argued ; December 11, 1951, Decided
No. 26

**Reporter:** 342 U.S. 143; 72 S. Ct. 181; 96 L. Ed. 162; 1951 U.S. LEXIS 2488; 1951 Trade Cas. (CCH) P62,957; 1 Media L. Rep. 2697
LORAIN JOURNAL CO. ET AL. v. UNITED STATES

**Prior History:** APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF OHIO.

In a civil action brought by the United States under the Sherman Act, the District Court enjoined appellants from violation of the *Act. 92 F.Supp. 794*. A direct appeal to this Court was taken under the Expediting Act. Affirmed, p. 157.

**Disposition:** *92 F.Supp. 794*, affirmed.

**Core Terms**

advertising, publisher, interstate commerce, station, newspaper, monopoly, attempt to monopolize, injunction, monopolize, commerce, dissemination, interstate, broadcasting, radio station, medium, circulation, decree, out-of-state, destroy, radio, national advertising, Communications, contracts, license, parties, notice, terms

**LexisNexis® Headnotes**

Antitrust & Trade Law > Sherman Act > General Overview

***HN1*** See *15 U.S.C.S. § 2*.

Antitrust & Trade Law > Sherman Act > General Overview
Civil Procedure > ... > Subject Matter Jurisdiction > Jurisdiction Over Actions > General Overview

***HN2*** See *15 U.S.C.S. § 4*.

Antitrust & Trade Law > Sherman Act > General Overview

***HN3*** The provisions of *15 U.S.C.S. §§ 1* and *2* have both a geographical and distributive significance and apply to any part of the United States as distinguished from the whole and to any part of the classes of things forming a part of interstate commerce.

Antitrust & Trade Law > Sherman Act > General Overview

***HN4*** The immediate dissemination of news gathered from throughout the nation or the world by agencies specially organized for that purpose is a part of interstate commerce. The same is true of national advertising originating throughout the nation and offering products for sale on a national scale.

Antitrust & Trade Law > International Aspects > Commerce With Foreign Nations
Antitrust & Trade Law > ... > Monopolies & Monopolization > Conspiracy to Monopolize > Sherman Act
Antitrust & Trade Law > Sherman Act > General Overview
International Trade Law > General Overview

***HN5*** *15 U.S.C.S. § 2* is not restricted to conspiracies or combinations to monopolize but also makes it a crime for any person to monopolize or to attempt to monopolize any part of interstate or foreign trade or commerce. It is unreasonable, per se, to foreclose competitors from any substantial market. The anti-trust laws are as much violated by the prevention of competition as by its destruction. It follows a fortiori that the use of monopoly power, however lawfully acquired, to foreclose competition, to gain a competitive advantage, or to destroy a competitor, is unlawful.

Antitrust & Trade Law > Regulated Industries > Communications > Sherman Act
Antitrust & Trade Law > Sherman Act > General Overview

***HN6*** If all a media outlet in a city, in order to monopolize the dissemination of news and advertising by eliminating a competing media outlet, accepts no advertisements from anyone who advertised over the other media, such would violate *§§ 1* and *2* of the Sherman Act, *15 U.S.C.S. §§ 1* and *2*.

Antitrust & Trade Law > Regulated Industries > Communications > Sherman Act
Antitrust & Trade Law > ... > Monopolies & Monopolization > Attempts to Monopolize > Sherman Act
Antitrust & Trade Law > Sherman Act > General Overview

***HN7*** A single newspaper, already enjoying a substantial monopoly in its area, violates the "attempt to monopolize" clause of *§ 2* of the Sherman Act, *15 U.S.C.S. § 2*, when it uses its monopoly to destroy threatened competition.

Antitrust & Trade Law > Regulated Industries > Communications > Sherman Act
Antitrust & Trade Law > ... > Monopolies & Monopolization > Attempts to Monopolize > General Overview
Antitrust & Trade Law > Sherman Act > General Overview
Antitrust & Trade Law > Sherman Act > Scope > General Overview
Constitutional Law > ... > Freedom of Speech > Free Press > General Overview

***HN8*** In the absence of any purpose to create or maintain a monopoly, the Sherman Antitrust Act, *15 U.S.C.S. §§ 1-7*, does not restrict the long recognized right of trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal.

Antitrust & Trade Law > Sherman Act > General Overview
Constitutional Law > ... > Freedom of Speech > Free Press > General Overview

***HN9*** A publisher may not accept or deny advertisements in an attempt to monopolize any part of the trade or commerce among the several states.

**Lawyers' Edition Display**

## Summary

Prior to the licensing of the only nearby radio station, the publisher of the only daily local newspaper enjoyed a substantial local monopoly of the mass dissemination of news and advertising. To regain such monopoly, the publisher refused to accept local advertising from customers who also so advertised through the radio station. As a result of this practice, the continued existence of the radio station was endangered.

In an opinion by Burton, J., the Supreme Court held that the publisher's conduct was an attempt to monopolize interstate commerce and violated 2 of the Sherman Act, and that an injunction under this act did not infringe the freedom of the press.

Clark and Minton, JJ., did not participate.

**Headnotes**

RESTRAINTS OF TRADE AND MONOPOLIES §22 > interstate commerce -- attempt to monopolize. -- > Headnote:

***LEdHN[1]*** [1]

The refusal of the publisher of the only daily local newspaper to accept local advertising from customers so advertising through the only nearby radio station is an attempt to monopolize interstate commerce, where, because of the publisher's complete daily newspaper monopoly of local advertising and its practically indispensable coverage of 99 % of the families of the place of publication, this practice forced numerous advertisers to refrain from using the radio station for local advertising, and that result tended to destroy and eliminate the radio station altogether and automatically restore to the publisher its substantial local monopoly, enjoyed prior to the licensing of the radio station, of the mass dissemination of all news and advertising, interstate and national as well as local.

RESTRAINTS OF TRADE AND MONOPOLIES §27 > interstate commerce -- part thereof. -- > Headnote:

***LEdHN[2]*** [2]

The reference in 2 of the Sherman Anti-trust Act to an attempt to monopolize "any part of the trade or commerce among the several States" relates not merely to interstate commerce within any geographical part of the United States but also to any appreciable part of such commerce.

COMMERCE §56 > dissemination of news -- advertising. -- > Headnote:

***LEdHN[3]*** [3]

The immediate dissemination of news gathered from throughout the nation or the world by agencies specially organized for that purpose is a part of interstate commerce. The same is true of national advertising originating throughout the nation and offering products for sale on a national scale.

RESTRAINTS OF TRADE AND MONOPOLIES §32 > forcing advertisers to boycott competing radio station. -- > Headnote:

***LEdHN[4]*** [4]

A publisher's attempt to regain its former monopoly of local advertising by forcing advertisers to boycott the only nearby competing radio station violates 2 of the Sherman Anti-trust Act, where loss of the local advertising is a major threat to the existence of the radio station.

RESTRAINTS OF TRADE AND MONOPOLIES §14 > factors affecting applicability of Sherman Act -- success of attempt to monopolize. -- > Headnote:

***LEdHN[5]*** [5]

To establish a violation of 2 of the Sherman Anti-trust Act, it is not necessary to show that success rewarded an attempt to monopolize. The act directs itself against the dangerous probability of monopoly as well as against the completed result.

RESTRAINTS OF TRADE AND MONOPOLIES §9 > single newspaper's attempt to establish monopoly. -- > Headnote:

***LEdHN[6]*** [6]

A single newspaper, already enjoying a substantial monopoly in its area, violates the "attempt to monopolize" clause of 2 of the Sherman Anti-trust Act when it uses its monopoly to destroy threatened competition.

RESTRAINTS OF TRADE AND MONOPOLIES §30 > right to select customers. -- > Headnote:

***LEdHN[7]*** [7]

While a publisher, as a private business concern, has a right to select its customers and to refuse to accept advertisements from whomever it pleases, the exercise of such right as a purposeful means of monopolizing interstate commerce is prohibited by the Sherman Anti-trust Act.

CONSTITUTIONAL LAW §925 > freedom of press -- anti-trust injunction against publisher. -- > Headnote:

***LEdHN[8]*** [8]

An injunction restraining a publisher under the Sherman Anti-trust Act from refusing to accept local advertising from customers using a competing radio station for the same purpose does not violate the freedom of the press as a prior restraint upon what it may publish.

RESTRAINTS OF TRADE AND MONOPOLIES §75 > injunctive relief -- scope of decree. -- > Headnote:

***LEdHN[9]*** [9]

While a decree enjoining violations of the Sherman Anti-trust Act should anticipate probabilities of the future, it is equally important that it do not impose unnecessary restrictions and that the procedure prescribed for supervision, giving notice, keeping records, and making inspections be not unduly burdensome.

APPEAL AND ERROR §1641 > scope of decree restricting violations of Sherman Act. -- > Headnote:

***LEdHN[10]*** [10]

In the absence of an obvious error as to the form and substance of a decree enjoining violations of the Sherman Antitrust Act, the Supreme Court is content to rely upon the trial court's retention

of jurisdiction over the cause for whatever modification the decree may require in the light of the entire proceedings and of subsequent events.

**Syllabus**

For 15 years a newspaper publisher enjoyed a substantial monopoly of the mass dissemination of local and national news and advertising in its community, and 99% coverage of the community's families. After the establishment of a competing radio station, the publisher refused to accept local advertising from those who advertised over the radio station. The purpose of the publisher was to destroy the broadcasting company. *Held*: The publisher was engaged in an attempt to monopolize interstate commerce, in violation of *§ 2* of the Sherman Antitrust Act, and was properly enjoined under *§ 4* from continuing the attempt. Pp. 144-157.

1. The conduct of the publisher was an attempt to monopolize interstate commerce. Pp. 149-152.

(a) The distribution within the community of the news and advertising transmitted there in interstate commerce for the sole purpose of immediate and profitable reproduction and distribution to the reading public is an inseparable part of the flow of the interstate commerce involved. P. 152.

(b) Without the protection of competition at the outlets of the flow of interstate commerce, the protection of its earlier stages is of little worth. P. 152.

2. The publisher's attempt to regain its monopoly of interstate commerce by forcing advertisers to boycott a competing radio station violated *§ 2* of the Sherman Act. Pp. 152-155.

(a) In order to establish this violation of *§ 2*, it was not necessary to show that the publisher's attempt to monopolize was successful. Pp. 153-154.

(b) A lone newspaper, already enjoying a substantial monopoly in its area, violates the "attempt to monopolize" clause of *§ 2* when it uses its monopoly to destroy threatened competition. P. 154.

(c) The right claimed by the publisher as a private business concern to select its customers and to refuse to accept advertisements from whomever it pleases is neither absolute nor exempt from regulation. Its exercise as a purposeful means of monopolizing interstate commerce is prohibited by the Sherman Act. P. 155.

3. The injunction against the newspaper publisher's continuing to attempt to monopolize interstate commerce does not violate the *First Amendment's* guaranty of freedom of the press. Pp. 155-156.

4. There is no obvious error in the form or substance of the decree of the District Court; and, in the circumstances of the case, this Court relies upon that court's retention of jurisdiction over the cause for whatever modification the decree may need in the light of the entire proceedings and of subsequent events. Pp. 156-157.

**Counsel:** William E. Leahy argued the cause for appellants. With him on the brief were William J. Hughes, Jr., Parker Fulton and King E. Fauver. Robert M. Weh was also of counsel.

Solicitor General Perlman argued the cause for the United States. With him on the brief were Assistant Attorney General Morison, J. Roger Wollenberg, Robert L. Stern, Baddia J. Rashid and Victor H. Kramer.

**Judges:** Vinson, Black, Reed, Frankfurter, Douglas, Jackson, Burton; Clark and Minton took no part in the consideration or decision of this case.

**Opinion by:** BURTON

**Opinion**

**[*144] [**182] [***167]** MR. JUSTICE BURTON delivered the opinion of the Court.

The principal question here is whether a newspaper publisher's conduct constituted an attempt to monopolize interstate commerce, justifying the injunction issued against it under *§§ 2* and *4* of the Sherman Antitrust Act. [1] For the reasons hereafter stated, we hold that the injunction was justified.

**[*145]** This is a civil action, instituted by the United States in the District Court for the Northern District of Ohio, against The Lorain Journal Company, an Ohio corporation, publishing, daily except Sunday, in the City of Lorain, Ohio, a newspaper here called the Journal. The complaint alleged that the corporation, together with four of its officials, was engaging in a combination and conspiracy in restraint of interstate commerce in violation of *§ 1* of the Sherman Antitrust Act, and in a combination and conspiracy to monopolize such commerce in violation of *§ 2* of the Act, as well as attempting to monopolize such commerce in violation of *§ 2*. [2] The District Court declined to issue a temporary injunction but, after trial, found that the parties were engaging in an attempt to monopolize as charged. Confining itself to that issue, the court enjoined them from continuing the attempt. *92 F.Supp. 794*. They appealed to this Court under the Expediting Act of 1903, 32 Stat. 823, as amended, 62 Stat. 989, 15 U. S. C. (Supp. IV) § 29, and the issues before us are those arising from that finding and the terms of the injunction.

**[*146]** The appellant corporation, here called the publisher, has published the Journal in the City of Lorain since before 1932. In that year it, with others, purchased the Times-Herald which was the only competing daily paper published in that city. Later, without success, it sought a license to establish and operate a radio broadcasting station in Lorain. *92 F.Supp. 794, 796*, and see *Lorain Journal Co.* v. *Federal Communications Comm'n, 86 U. S. App. D. C. 102, 180 F.2d 28*.

The court below describes the position of the Journal, since 1933, as "a commanding and an overpowering one. It has a daily circulation in Lorain of over 13,000 copies and it reaches ninety-nine per cent of the families in the city." *92 F.Supp. at 796*. Lorain is an industrial city on

---

[1] "*SEC. 2*. ***HN1*** Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a misdemeanor . . . . .

. . . .

"SEC. 4. ***HN2*** The several district courts of the United States are hereby invested with jurisdiction to prevent and restrain violations of this act; and it shall be the duty of the several district attorneys of the United States, in their respective districts, under the direction of the Attorney-General, to institute proceedings in equity to prevent and restrain such violations. . . ." 26 Stat. 209, 36 Stat. 1167, *15 U. S. C. §§ 2* and 4.

[2] The individual defendants named in the complaint were Samuel A. Horvitz, vice president, secretary and a director of the corporation; Isadore Horvitz, president, treasurer and a director; D. P. Self, business manager; and Frank Maloy, editor. Each participated in the conduct alleged to constitute the attempt to monopolize. Maloy has died pending the appeal.

Lake Erie with a population of about 52,000 occupying 11,325 dwelling units. The Sunday News, appearing only on Sundays, is the only other newspaper published there. [3]

**[**183]** While but 165 out of the Journal's **[***168]** daily circulation of over 20,000 copies are sent out of Ohio, it publishes not only Lorain news but substantial quantities of state, national and international news. It pays substantial sums for such news and for feature material shipped to it from various parts of the United States and the rest of the world. It carries a substantial quantity of national advertising **[*147]** sent to it from throughout the United States. Shipments and payments incidental to the above matters, as well as the publisher's purchases of paper and ink, involve many transactions in interstate or foreign commerce.

From 1933 to 1948 the publisher enjoyed a substantial monopoly in Lorain of the mass dissemination of news and advertising, both of a local and national character. However, in 1948 the Elyria-Lorain Broadcasting Company, a corporation independent of the publisher, was licensed by the Federal Communications Commission to establish and operate in Elyria, Ohio, eight miles south of Lorain, a radio station whose call letters, WEOL, stand for Elyria, Oberlin and Lorain. [4] Since then it has operated its principal studio in Elyria and a branch studio in Lorain. Lorain has about twice the population of Elyria and is by far the largest community in the station's immediate area. Oberlin is much smaller than Elyria and eight miles south of it.

While the station is not affiliated with a national network it disseminates both intrastate and interstate news and advertising. About 65% of its program consists of music broadcast from electrical transcriptions. These are shipped and leased to the station by out-of-state suppliers. Most of them are copyrighted and the station pays royalties to the out-of-state holders of the copyrights. **[*148]** From 10 to 12% of the station's program consists of news, world-wide in coverage, gathered by United Press Associations. The news is received from outside of Ohio and relayed to Elyria through Columbus or Cleveland. From April, 1949, to March, 1950, the station broadcast over 100 sponsored sports events originating in various states.

Substantially all of the station's income is derived from its broadcasts of advertisements of goods or services. About 16% of its income comes from national advertising under contracts with advertisers outside of Ohio. This produces a continuous flow of copy, payments and materials moving across state lines. [5]

The court below found that appellants knew that a substantial number of Journal advertisers wished to **[***169]** use the facilities of the radio station as well. For some of **[**184]** them it

---

[3] The Sunday News has a weekly circulation of about 3,000 copies, largely in Lorain. The Chronicle-Telegram is a newspaper published daily, except Sunday, eight miles away in Elyria. It has a daily circulation in that city of about 9,000 but none in Lorain. The Cleveland Plain Dealer, News and Press are metropolitan newspapers published daily, except Sunday, in Cleveland, 28 miles east of Lorain. They have a combined daily circulation in Lorain of about 6,000. The Cleveland Sunday Plain Dealer has a Sunday circulation in Lorain of about 11,000. The Cleveland papers carry no Lorain advertising and little Lorain news. No reference has been made in the record or in the argument here to competition from any radio station other than WEOL.

[4] The license also covers WEOL-FM but the two stations are here treated as one. WEOL operates on a frequency of 930 kilocycles and WEOL-FM of 107.6 megacycles. The station outlines its primary listening or market area on the basis of a half millivolt daytime pattern and a two millivolt nighttime pattern. Its day pattern reaches an area containing all or part of 20 counties and an estimated population of over 2,250,000. Its night pattern reaches an area containing parts of nine of these counties and an estimated population of about 450,000. Lorain County, which includes the communities of Lorain, Elyria and Oberlin, contains about 120,000 people, 52,000 of whom live in the City of Lorain.

[5] Other findings show that the station broadcasts advertisements of goods and services on behalf of suppliers outside of Ohio. These sometimes result in interstate orders and shipments. Orders received by its local advertisers are sometimes filled by out-of-state suppliers. The station's broadcasts inevitably reach across state lines. They are heard with some regularity by many people in southeastern Michigan. The application which led to WEOL's license was considered by the Federal Communications Commission

found that advertising in the Journal was essential for the promotion of their sales in Lorain County. It found that at all times since WEOL commenced broadcasting, appellants had executed a plan conceived to eliminate the threat of competition from the station. Under this plan the publisher refused to accept local advertisements in the Journal from any Lorain County advertiser who advertised or who appellants believed to be about to advertise over WEOL. The court found expressly that the **[*149]** purpose and intent of this procedure was to destroy the broadcasting company.

The court characterized all this as "bold, relentless, and predatory commercial behavior." *92 F.Supp. at 796*. To carry out appellants' plan, the publisher monitored WEOL programs to determine the identity of the station's local Lorain advertisers. Those using the station's facilities had their contracts with the publisher terminated and were able to renew them only after ceasing to advertise through WEOL. The program was effective. Numerous Lorain County merchants testified that, as a result of the publisher's policy, they either ceased or abandoned their plans to advertise over WEOL.

> "Having the plan and desire to injure the radio station, no more effective and more direct device to impede the operations and to restrain the commerce of WEOL could be found by the Journal than to cut off its bloodstream of existence -- the advertising revenues which control its life or demise.
>
> . . . .
>
> ". . . the very existence of WEOL is imperiled by this attack upon one of its principal sources of business and income." *Id., at 798, 799*.

The principal provisions of the injunction issued by the District Court are not set forth in the published report of the case below but are printed in an Appendix, *infra*, pp. 157-159. Sections IV and V B of the decree, relating to notices, are stayed pending final disposition of this appeal.

***LEdHN[1]*** [1]1. *The conduct complained of was an attempt to monopolize interstate commerce*. It consisted of the publisher's practice of refusing to accept local Lorain advertising from parties using WEOL for local advertising. Because of the Journal's complete daily newspaper monopoly of local advertising in Lorain and its practically **[*150]** indispensable coverage of 99% of the Lorain families, this practice forced numerous advertisers to refrain from using WEOL for local advertising. That result not only reduced the number of customers available to WEOL in the field of local Lorain advertising and strengthened the Journal's monopoly in that field, but more significantly tended to destroy and eliminate WEOL altogether. Attainment of that sought-for elimination would automatically restore to the publisher of the Journal its substantial monopoly in Lorain of the mass dissemination of all news and advertising, interstate and national, as well as local. It would deprive not merely Lorain but Elyria and all surrounding communities of their only nearby radio station.

There is a suggestion that the out-of-state distribution of some copies of the Journal, coupled with the considerable interstate commerce engaged in by its publisher in the purchase of its operating supplies, provided, in any event, a sufficient basis for classifying the publisher's entire operation as one in interstate commerce. It is pointed out also that the Journal's daily publication

---

in conjunction with an application for another license, sought by a Michigan station, involving possible conflicts between its coverage and that of WEOL.

of local news and advertising was so inseparably integrated with its publication of interstate news and national advertising that any coercion used by it in securing local advertising inevitably operated to strengthen its entire operation, including **[**185]** **[***170]** its monopoly of interstate news and national advertising.

It is not necessary, however, to rely on the above suggestions. The findings go further. They expressly and unequivocally state that the publisher's conduct was aimed at a larger target -- the complete destruction and elimination of WEOL. The court found that the publisher, before 1948, enjoyed a substantial monopoly in Lorain of the mass dissemination not only of local news and advertising, but of news of out-of-state events transmitted to Lorain for immediate dissemination, and of **[*151]** advertising of out-of-state products for sale in Lorain. WEOL offered competition by radio in all these fields so that the publisher's attempt to destroy WEOL was in fact an attempt to end the invasion by radio of the Lorain newspaper's monopoly of interstate as well as local commerce. [6]

***LEdHN[2]*** [2]

***LEdHN[3]*** [3]There can be little doubt today that ***HN4*** the immediate dissemination of news gathered from throughout the nation or the world by agencies specially organized for that purpose is a part of interstate commerce. *Associated Press v. United States, 326 U.S. 1, 14*; *Associated Press v. Labor Board, 301 U.S. 103*. The same is true of national advertising originating throughout the nation and offering products for sale on a national scale. The local dissemination of such news and advertising requires continuous interstate transmission of materials and payments, to say nothing of the interstate commerce involved in the sale and delivery of products sold. The decision in *Blumenstock Bros*. v. *Curtis Pub. Co., 252 U.S. 436*, related to the making of contracts for advertising rather than to the preparation and dissemination of advertising. Moreover, the view there stated, that the making of contracts by parties outside of a state for the insertion of advertising material in periodicals of nationwide circulation did not amount to interstate commerce, rested expressly **[*152]** on a line of cases holding "that policies of insurance are not articles of commerce, and that the making of such contracts is a mere incident of commercial intercourse." *Id., at 443*. See *Paul v. Virginia, 8 Wall. 168*, and *New York Life Ins. Co*. v. *Deer Lodge County, 231 U.S. 495*. That line of cases no longer stands in the way. *United States v. South-Eastern Underwriters Assn., 322 U.S. 533*. See also, *North American Co*. v. *Securities & Exchange Comm'n, 327 U.S. 686*; *Indiana Farmer's Guide Pub. Co*. v. *Prairie Farmer Pub. Co., 293 U.S. 268*.

The distribution within Lorain of the news and advertisements transmitted to Lorain in interstate commerce for the sole purpose of immediate and profitable reproduction and distribution to the reading public is an inseparable part of the flow of the interstate commerce involved. See *Binderup v. Pathe Exchange, 263 U.S. 291, 309*; **[***171]** *Stafford v. Wallace, 258 U.S. 495, 516*; *Illinois Central R. Co*. v. *Louisiana R. Comm'n, 236 U.S. 157, 163*; **[**186]** *Swift & Co*. v. *United States, 196 U.S. 375, 398*. Unless protected by law, the consuming public is at the mercy of restraints and monopolizations of interstate commerce at whatever points they occur. Without

---

[6] The reference in *§ 2* to an attempt to monopolize "any part of the trade or commerce among the several States" relates not merely to interstate commerce within any geographical part of the United States but also to any appreciable part of such interstate commerce. ***HN3*** "The provisions of *§§ 1* and *2* have both a geographical and distributive significance and apply to any part of the United States as distinguished from the whole and to any part of the classes of things forming a part of interstate commerce." *Indiana Farmer's Guide Pub. Co*. v. *Prairie Farmer Pub. Co*., 293 U.S. 268, 279. See also, *United States* v. *Griffith*, 334 U.S. 100, 106; *United States* v. *Yellow Cab Co.*, 332 U.S. 218, 225; *Montague & Co*. v. *Lowry*, 193 U.S. 38.

the protection of competition at the outlets of the flow of interstate commerce, the protection of its earlier stages is of little worth.

***LEdHN[4]*** [4]2. *The publisher's attempt to regain its monopoly of interstate commerce by forcing advertisers to boycott a competing radio station violated § 2*. The findings and opinion of the trial court describe the conduct of the publisher upon which the Government relies. The surrounding circumstances are important. The most illuminating of these is the substantial monopoly which was enjoyed in Lorain by the publisher from 1933 to 1948, together with a 99% coverage of Lorain families. Those factors made the Journal an indispensable medium of advertising for many Lorain concerns. Accordingly, its **[*153]** publisher's refusals to print Lorain advertising for those using WEOL for like advertising often amounted to an effective prohibition of the use of WEOL for that purpose. Numerous Lorain advertisers wished to supplement their local newspaper advertising with local radio advertising but could not afford to discontinue their newspaper advertising in order to use the radio.

WEOL's greatest potential source of income was local Lorain advertising. Loss of that was a major threat to its existence. The court below found unequivocally that appellants' conduct amounted to an attempt by the publisher to destroy WEOL and, at the same time, to regain the publisher's pre-1948 substantial monopoly over the mass dissemination of all news and advertising.

***LEdHN[5]*** [5]To establish this violation of *§ 2* as charged, it was not necessary to show that success rewarded appellants' attempt to monopolize. The injunctive relief under *§ 4* sought to forestall that success. While appellants' attempt to monopolize did succeed insofar as it deprived WEOL of income, WEOL has not yet been eliminated. The injunction may save it. "When that intent [to monopolize] and the consequent dangerous probability exist, this statute [the Sherman Act], like many others and like the common law in some cases, directs itself against that dangerous probability as well as against the completed result." *Swift & Co*. v. *United States, 196 U.S. 375, 396*. See also, *American Tobacco Co*. v. *United States, 328 U.S. 781*; *United States v. Aluminum Co., 148 F.2d 416, 431*.

> "The second section [of the Sherman Act] seeks, if possible, to make the prohibitions of the act all the more complete and perfect by embracing all attempts to reach the end prohibited by the first section, that is, restraints of trade, by any attempt to monopolize, or monopolization thereof, even although the acts by which such results are attempted **[*154]** to be brought about or are brought about be not embraced within the general enumeration of the first section." *Standard Oil Co*. v. *United States, 221 U.S. 1, 61*. [7]

***LEdHN[6]*** [6]Assuming the interstate character **[***172]** of the commerce involved, it seems clear that ***HN6*** if all the newspapers in a city, in order to monopolize the dissemination of news and advertising by eliminating a competing **[**187]** radio station, conspired to accept no advertisements from anyone who advertised over that station, they would violate *§§ 1* and *2* of the Sherman Act. Cf. *Fashion Originators' Guild v. Federal Trade Comm'n, 312 U.S. 457, 465*;*Binderup v. Pathe Exchange, 263 U.S. 291*;*Federal Trade Comm'n v. Beech-Nut Packing*

---

[7] ***HN5*** "*Section 2* is not restricted to conspiracies or combinations to monopolize but also makes it a crime for any person to monopolize or to attempt to monopolize any part of interstate or foreign trade or commerce. . . . It is indeed 'unreasonable, *per se*, to foreclose competitors from any substantial market.' . . . The anti-trust laws are as much violated by the prevention of competition as by its destruction. . . . It follows *a fortiori* that the use of monopoly power, however lawfully acquired, to foreclose competition, to gain a competitive advantage, or to destroy a competitor, is unlawful." *United States* v. *Griffith*, 334 U.S. 100, 106-107.

*Co., 257 U.S. 441*;*Loewe v. Lawlor, 208 U.S. 274*;*William Goldman Theatres v. Loew's, Inc., 150 F.2d 738*. It is consistent with that result to hold here that ***HN7*** a single newspaper, already enjoying a substantial monopoly in its area, violates the "attempt to monopolize" clause of *§ 2* when it uses its monopoly to destroy threatened competition. [8]

**[*155]** ***LEdHN[7]*** [7]The publisher claims a right as a private business concern to select its customers and to refuse to accept advertisements from whomever it pleases. We do not dispute that general right. "But the word 'right' is one of the most deceptive of pitfalls; it is so easy to slip from a qualified meaning in the premise to an unqualified one in the conclusion. Most rights are qualified." *American Bank & Trust Co*. v. *Federal Bank, 256 U.S. 350, 358*. The right claimed by the publisher is neither absolute nor exempt from regulation. Its exercise as a purposeful means of monopolizing interstate commerce is prohibited by the Sherman Act. The operator of the radio station, equally with the publisher of the newspaper, is entitled to the protection of that Act. ***HN8*** "*In the absence of any purpose to create or maintain a monopoly*, the act does not restrict the long recognized right of trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal." (Emphasis supplied.) *United States v. Colgate & Co., 250 U.S. 300, 307*. See *Associated Press v. United States, 326 U.S. 1, 15*; *United States v. Bausch & Lomb Co., 321 U.S. 707, 721-723*.

***LEdHN[8]*** [8]3. *The injunction does not violate any guaranteed freedom of the press*. The publisher suggests that the injunction amounts to a prior restraint upon what it may publish. We find in it no restriction upon any **[***173]** guaranteed freedom of the press. The injunction applies to a publisher **[*156]** what the law applies to others. ***HN9*** The publisher may not accept or deny advertisements in an "attempt to monopolize . . . any part of the trade or commerce among the several States . . . ." *Associated Press v. United States, supra, at 6-7, 20*; *Indiana Farmer's Guide Pub. Co*. v. *Prairie Farmer Pub. Co., 293 U.S. 268*. See also, *Oklahoma Press Pub. Co*. v. *Walling, 327 U.S. 186, 192*; *Mabee v. White Plains Pub. Co., 327 U.S. 178, 184*; *Associated* **[**188]** *Press v. Labor Board, 301 U.S. 103*. Injunctive relief under *§ 4* of the Sherman Act is as appropriate a means of enforcing the Act against newspapers as it is against others.

4. *The decree is reasonably consistent with the requirements of the case and remains within the control of the court below*. [9] We have considered the objections made to the form and substance of the decree and do not find obvious error. It is suggested, for example, that the decree covers a broader scope of activities than is required by the evidence and requires unnecessary supervision of future conduct of the publisher, that notice of its terms must be published at least once a week for 25 weeks and that the publisher for five years must maintain records relating to the subject of the judgment and keep them accessible for governmental inspection.

***LEdHN[9]*** [9]While the decree should anticipate probabilities of the future, it is equally important that it does not impose unnecessary restrictions and that the procedure prescribed for supervision, giving notice, keeping records and making inspections be not unduly burdensome.

---

[8] Appellants have sought to justify their conduct on the ground that it was part of the publisher's program for the protection of the Lorain market from outside competition. The publisher claimed to have refused advertising from Elyria or other out-of-town advertisers for the reason that such advertisers might compete with Lorain concerns. The publisher then classified WEOL as the publisher's own competitor from Elyria and asked its Lorain advertisers to refuse to employ WEOL as an advertising medium in competition with the Journal. We find no principle of law which required Lorain advertisers thus to boycott an Elyria advertising medium merely because the publisher of a Lorain advertising medium had chosen to boycott some Elyria advertisers who might compete for business in the Lorain market. Nor do we find any principle of law which permitted this publisher to dictate to prospective advertisers that they might advertise either by newspaper or by radio but that they might not use both facilities.

[9] A substantial part of the decree is printed in the Appendix, *infra*, pp. 157-159.

***LEdHN[10]*** [10]In the instant case the printed record contains neither the entire testimony nor all the exhibits which were before the court below. It omits also material mentioned during the trial as having been considered by the court **[*157]** when denying the Government's motion for a temporary injunction. Under the circumstances we are content to rely upon the trial court's retention of jurisdiction over the cause for whatever modification the decree may require in the light of the entire proceedings and of subsequent events. See *Associated Press v. United States, supra, at 22-23*; *United States v. Bausch & Lomb Co., supra, at 727-729*.

The judgment accordingly is

*Affirmed*.

MR. JUSTICE CLARK and MR. JUSTICE MINTON took no part in the consideration or decision of this case.

APPENDIX.

"FINAL JUDGMENT -- . . .

. . . .

"III

"Defendant The Lorain Journal Company is enjoined and restrained from:

"A. Refusing to accept for publication or refusing to publish any advertisement or advertisements or discriminating as to price, space, arrangement, location, commencement or period of insertion or any other terms or conditions of publication of advertisement or advertisements where the reason for such refusal or discrimination is, in whole or in part, express or implied, that the person, firm or corporation submitting the advertisement or advertisements has advertised, advertises, has proposed or proposes to advertise **[***174]** in or through any other advertising medium.

"B. Accepting for publication or publishing any advertisement or making or adhering to any contract for the publication of advertisements on or accompanied by any **[*158]** condition, agreement or understanding, express or implied:

> "1. That the advertiser shall not use the advertising medium of any person, firm or corporation other than defendant The Lorain Journal Company;
>
> "2. That the advertiser use only the advertising medium of defendant The Lorain Journal Company;

"C. Cancelling, terminating, refusing to renew or in any manner impairing any **[**189]** contract, agreement or understanding, involving the publication of advertisements, between the defendants, or any of them, and any person, firm or corporation for the reason, in whole or in part, that such person, firm or corporation advertised, advertises or proposes to advertise in or through any advertising medium other than the newspaper published by the corporate defendant.

"IV

"Commencing fifteen (15) days after the entry of this judgment and at least once a week for a period of twenty-five weeks thereafter the corporate defendant shall insert in the newspaper

published by it a notice which shall fairly and fully apprise the readers thereof of the substantive terms of this judgment and which notice shall be placed in a conspicuous location.

"V

"Defendant The Lorain Journal Company and the individual defendants are ordered and directed to:

"A. Maintain for a period of five (5) years from the date of this judgment, all books and records, which shall include all correspondence, memoranda, reports and other writings, relating to the subject matter of this judgment;

"B. Advise in writing within ten (10) days from the date of this judgment any officers, agents, employees, and **[*159]** any other persons acting for, through or under defendants or any of them of the terms of this judgment and that each and every such person is subject to the provisions of this judgment. The defendants shall make readily available to such persons a copy of this judgment and shall inform them of such availability.

. . . .

"VII

"Jurisdiction of this cause is retained for the purpose of enabling any of the parties to this judgment to apply to the Court at any time for such further orders and directions as may be necessary or appropriate in relation to the construction of, or carrying out of this judgment, for the amendment or modification of any of the provisions thereof, or the enforcement of compliance therewith and for the punishment of violations thereof."

EXHIBIT 280

LexisNexis®

Caution
As of: August 12, 2014 9:17 AM EDT

# Morales-Villalobos v. Garcia-Llorens

United States Court of Appeals for the First Circuit
January 14, 2003, Decided
No. 02-1499

**Reporter:** 316 F.3d 51; 2003 U.S. App. LEXIS 464; 2003-1 Trade Cas. (CCH) P73,924

ALGA MORALES-VILLALOBOS, Plaintiff, Appellant, v. MIGUEL GARCIA-LLORENS; JOSE ARTURO GARCIA-LLORENS; MANUEL MATOS; HOSPITAL DR. SUSONI, INC.; DR. SUSONI HEALTH COMMUNITY SERVICES, INC.; ARECIBO RESPIRATORY CARE, INC., Defendants, Appellees.

**Prior History: [**1]** ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF PUERTO RICO. Hon. Hector M. Laffitte, U.S. District Judge.
*Morales-Villalobos v. Garcia-Llorens, 193 F. Supp. 2d 401, 2002 U.S. Dist. LEXIS 5657 (D.P.R. 2002)*.

**Disposition:** Reversed. Costs awarded to plaintiff-appellant.

**Core Terms**

hospitals, alleges, antitrust, services, anesthesiologist, Regional, exclusive contract, patients, provides, anesthesiology, privileges

**LexisNexis® Headnotes**

Civil Procedure > ... > Defenses, Demurrers & Objections > Motions to Dismiss > Failure to State Claim
Civil Procedure > Appeals > Standards of Review > De Novo Review

***HN1*** An appellate court reviews de novo a district court's dismissal of a complaint for failure to state a claim under *Fed. R. Civ. P. 12(b)(6)*. The court accepts as true the well-pleaded factual allegations of the complaint, draws all reasonable inferences therefrom in the plaintiff's favor and determines whether the complaint, so read, may justify recovery on any cognizable theory.

Antitrust & Trade Law > Regulated Practices > Price Fixing & Restraints of Trade > General Overview
Antitrust & Trade Law > ... > Private Actions > Remedies > General Overview

***HN2*** With regard to antitrust law, substantial foreclosure in a relevant market is not necessarily unlawful, but whether the restraint is horizontal or vertical, substantial foreclosure is ordinarily a requirement for a seller arguing that she or he has been unreasonably excluded from opportunities to sell.

Antitrust & Trade Law > ... > Private Actions > Standing > General Overview
Civil Procedure > ... > Justiciability > Standing > General Overview

***HN3*** The doctrine of antitrust standing is occasionally used to describe but-for causation, and perhaps more often to exclude indirectly injured parties who have suffered actual injury but as a result of violations that directly injured intermediate entities. Perhaps the most common use of the phrase is to describe cases where there is actual injury from an antitrust violation but the impact on the would-be plaintiff results from what closer analysis reveals to be a pro-competitive transaction.

**Counsel:** Alvaro R. Calderon, Jr., with whom John E. Mudd was on the brief, for appellant.

Luis A. Oliver, with whom Fiddler Gonzalez & Rodriguez LLP, McConnell Valdes, and Roberto C. Quinones Rivera were on the brief, for appellees.

**Judges:** Before Lynch, Circuit Judge, Howard, Circuit Judge, and Shadur, * Senior District Judge.

**Opinion by:** LYNCH

**Opinion**

**[*52] LYNCH, *Circuit Judge*.** Dr. Alga Morales-Villalobos, an anesthesiologist, brought antitrust claims under *15 U.S.C. § 1 (2000)* (*Section 1* of the Sherman Anti-Trust Act) and pendent state law claims against her former employers, the overlapping directors of an anesthesiology group and two hospitals. She alleged that the exclusive dealing arrangement between the hospitals and the group prevented her from competing to offer her services. She also alleged that the defendants engaged in a group boycott to exclude her from the anesthesiology group, which had an exclusive contract at local hospitals, and subsequently denied **[**2]** her certification to practice at those hospitals.

The defendants moved to dismiss for failure to state a claim, which the court allowed, with leave to amend. Morales-Villalobos then filed an amended complaint amplifying her allegations. The district court granted the motion to dismiss the amended complaint, holding that Morales-Villalobos had failed to sufficiently allege the relevant geographic market and an antitrust injury. *Morales-Villalobos v. Garcia-Llorens, 193 F. Supp. 2d 401, 405-09 (D.P.R. 2002)*(opinion and order). We reverse, though sympathetic to the difficulties posed by this area of law.

I.

***HN1*** We review de novo a district court's dismissal of a complaint for failure to state a claim under *Fed. R. Civ. P. 12(b)(6)*. *Chute v. Walker, 281 F.3d 314, 318 (1st Cir. 2002)*. "We accept as true the well-pleaded factual allegations of the complaint, **[*53]** draw all reasonable inferences therefrom in the plaintiff's favor and determine whether the complaint, so read, [may] justify recovery on any cognizable theory." *Martin v. Applied Cellular Tech., Inc., 284 F.3d 1, 6 (1st Cir. 2002)*. "The issue is whether the complaint states a claim **[**3]** under the Sherman Act, assuming the factual allegations to be true and indulging to a reasonable degree a plaintiff who has not yet had an opportunity to conduct discovery." *DM Research, Inc. v. Coll. of Am. Pathologists, 170 F.3d 53, 55 (1st Cir. 1999)*.

---

* Of the Northern District of Illinois, sitting by designation.

The facts as described in plaintiff's complaint are as follows. Morales-Villalobos is an anesthesiologist living in the town of Arecibo, approximately 56 miles west of San Juan. In July 1995 she became an employee of Arecibo Respiratory Care, Inc., ("ARC") one of the co-defendants. ARC provided anesthesiology services under an exclusive contract to the two hospitals in Arecibo performing surgeries: Hospital Dr. Susoni ("HDS") and Hospital Regional de Arecibo Cayetano Coll y Toste, which was managed by a subsidiary of HDS, Dr. Susoni Health Community Services. This subsidiary later purchased that hospital outright. The complaint provides no information on the length of the exclusive contract. The co-defendants -- Miguel Garcia-Llorens, Jose Arturo Garcia-Llorens, and Manuel Matos -- are the sole shareholders of ARC and members of the Board of Directors of HDS. ARC is, in turn, the majority shareholder of HDS. Jose **[**4]** Arturo Garcia-Llorens and Manuel Matos are themselves certified anesthesiologists.

Morales-Villalobos alleges that Jose Arturo Garcia-Llorens, Miguel Garcia-Llorens, and Manuel Matos were all involved -- as HDS directors -- in the decision to award an exclusive contract to ARC; indeed, no other HDS board members participated in the decision. The complaint alleges that the exclusive contract between ARC and HDS was motivated by corrupt self-dealing between the directors and stockholders of the two corporations, several of whom are themselves anesthesiologists and presumably benefitted from the exclusive agreement. The inference may be drawn that the reasons for the arrangement, accordingly, were not competitive. Morales-Villalobos received medical privileges as a physician at HDS in September 1995, which appear to have extended to the Hospital Regional de Arecibo as well. In September 1997, her privileges were renewed at HDS and the Hospital Regional de Arecibo for a further two years.

On December 1, 1998, Morales-Villalobos was fired from her position at ARC by Miguel Garcia-Llorens, the President of ARC, despite the absence of patient complaints (as alleged in the complaint, which **[**5]** we must take to be true). The following year, Morales-Villalobos was not recertified for privileges at HDS. Because of ARC's exclusive arrangement with HDS, once plaintiff was fired by ARC, she could not find work as an anesthesiologist at either hospital in Arecibo. HDS also rejected a request by Dr. Ramos Escoda, Morales-Villalobos's former husband and a surgeon who practices in Arecibo, to have her administer anesthesia to his private surgery patients at HDS. Other physicians in the area have also indicated their willingness to use Morales-Villalobos's services, but are prevented from doing so at these hospitals. Moreover, HDS prevented Morales-Villalobos from entering the medical facility by placing fliers on the walls and posting security guards at the hospital doors.

Morales-Villalobos alleges that HDS and the Hospital Regional de Arecibo have "complete market power" in the Arecibo region, because they are able to offer a **[*54]** complete line of medical services, and because they are the only hospitals approved as Medicare providers. They are the only hospitals within the Health Region of Arecibo, as defined by the Health Reform Program of the Government of Puerto Rico, which provides **[**6]** medical care for indigent patients. Patients covered under the Health Reform Program are not allowed to seek services in San Juan or other cities in Puerto Rico. Morales-Villalobos alleges she provides Medicare services to patients of Dr. Escoda. Half of the total revenue received by the Arecibo hospitals comes from Medicare, which provides health coverage for individuals 65 years old or older, *42 U.S.C. § 1395c (2002)*. An inference may be drawn that such patients are less likely to be able to make a 56-mile trip to hospitals in San Juan.

The other health region relatively near Arecibo is the Manati Health Region, which encompasses the city of Manati, in which there are three hospitals at which surgery is performed.

Morales-Villalobos says it would be impossible for her to practice in Manati, because all of these hospitals have exclusive contracts with anesthesiology groups. Perhaps more importantly, her referring physicians in the Arecibo region do not have privileges in Manati.

Morales-Villalobos also alleges that the quality of patient care has worsened as a result of ARC's exclusive contract. She cites understaffing, with one anesthesiologist routinely **[**7]** expected to cover two geographically-separated hospitals, and nurses administering anesthesia without the supervision of an anesthesiologist. She also alleges an increase in cost relative to other sectors of the market.

Morales-Villalobos alleges that she has been blocked from practicing anesthesiology in Arecibo, her hometown, and that she has also suffered damages to her professional reputation as a result of her termination by ARC. She alleges there are doctors who wish to use her as an anesthesiologist but cannot because she has been denied privileges at the only hospitals in Arecibo. She characterizes herself as a competitor of ARC. She requests either renewal of her medical privileges at HDS facilities and an order requiring defendants to allow her to administer to elective private patients, or a declaration that the exclusive contract is illegal, economic damages, and an order to open HDS to Medicare providers.

II.

The district court dismissed Morales-Villalobos's complaint on two bases: first, that she failed to adequately define the geographic market; and second, that she lacked antitrust standing. Neither issue can be evaluated without reference to plaintiff's theories **[**8]** of recovery. At this most preliminary stage, the bare bones of two different theories are suggested by plaintiff's complaint. The first is that, as an anesthesiologist in Arecibo, she is a direct competitor of ARC and is precluded by the exclusive dealing arrangement from offering her services to the only two hospitals in Arecibo. The second is that the defendants have engaged in a group boycott, in a horizontal arrangement excluding her through expulsion, which precludes her from offering her services. Neither theory is actionable as a per se violation.

The district court dismissed the claim first for lack of a proper geographic market. Here, the plaintiff's claim is that, as a seller of services, she was foreclosed from the outlets reasonably available. For an anesthesiologist, the primary outlets for her services are ordinarily hospitals and clinics. Of course, ***HN2*** even substantial foreclosure in a relevant market is not necessarily unlawful, *see Tampa Elec. Co. v.* **[*55]** *Nashville Coal Co., 365 U.S. 320, 328-29, 5 L. Ed. 2d 580, 81 S. Ct. 623 (1961)*, but whether the restraint is horizontal or vertical, substantial foreclosure is ordinarily a *requirement* for a seller **[**9]** arguing that she or he has been unreasonably excluded from opportunities to sell. *Id.*

In this instance, the *extent* of foreclosure depends greatly on whether the plaintiff's market is anesthesiology services within Arecibo, or whether the market encompasses the neighboring town of Manati, or whether it includes other parts or all of Puerto Rico, or whether it also includes part or all of the continental United States. Depending on the circumstances, foreclosure might range from nearly complete (in Arecibo) to a trivial percentage (if the market is the entire United States). There is no mechanical rule -- the issue depends on circumstances, *see* 2A P.E. Areeda & H. Hovenkamp, *Antitrust Law* P 570, at 342-44 (2d ed. 2002) -- and while there are arguments for a larger market, the matter cannot be resolved on the face of the complaint.

The district court also dismissed on grounds that the plaintiff lacked antitrust standing. ***HN3*** The doctrine of antitrust standing is occasionally used to describe but-for causation, *see SAS of*

*P.R., Inc. v. P.R. Tel. Co., 48 F.3d 39, 43 (1st Cir. 1995)*, and perhaps more often to exclude indirectly injured parties who have suffered **[**10]** actual injury but as a result of violations that directly injured intermediate entities, *e.g.*, *Hanover Shoe, Inc. v. United Shoe Mach. Corp., 392 U.S. 481, 494, 20 L. Ed. 2d 1231, 88 S. Ct. 2224 (1968)* (excluding indirect purchasers). Perhaps the most common use of the phrase is to describe cases where there is actual injury from an antitrust violation but the impact on the would-be plaintiff results from what closer analysis reveals to be a pro-competitive transaction. *E.g.*, *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 488, 50 L. Ed. 2d 701, 97 S. Ct. 690 (1977)*.

Here it is not apparent, on a motion to dismiss, why Morales-Villalobos lacks antitrust standing. She claims to be directly injured by exclusion from ARC and, in consequence of that exclusion and the exclusive dealing arrangement, by exclusion from the two Arecibo hospitals. There is thus alleged but-for causation, a direct injury to plaintiff as a supplier, and no obvious reason why -- if the exclusive dealing or group boycott charges amount to a violation -- the injury to her would not be of the kind that antitrust laws are intended to address. If some reason does **[**11]** exist, defendants can develop it on remand.

Of course, the defendants may be expected to argue that quality control and other legitimate concerns justify whatever exclusive dealing arrangements exist, as well as the exclusion of the plaintiff from ARC. [1] But these are matters that go to the question of whether the arrangements are violations of the antitrust laws and not whether the plaintiff is a proper party to vindicate those claims. As to whether the arrangements are anti-competitive, this is obviously a factual matter that -- given the allegations -- can hardly be resolved on the face of the complaint.

**[**12]** It is true that many of these antitrust cases brought by excluded medical care providers are ultimately decided against plaintiffs, usually after summary judgment or trial. *See, e.g.*, *Mathews v. Lancaster* **[*56]** *Gen. Hosp., 87 F.3d 624 (3d Cir. 1996)*; *Oksanen v. Page Mem'l Hosp., 945 F.2d 696 (4th Cir. 1991)*; *Benjamin v. Aroostook Med. Ctr., 937 F. Supp. 957 (D. Me. 1996)*; *Leak v. Grant Med. Ctr., 893 F. Supp. 757 (S.D. Ohio 1995)*. But that does not mean all such claims are hopeless and should be resolved by motion to dismiss the complaint.

***Reversed***. Costs are awarded to Morales-Villalobos.

---

[1] Going beyond the allegations of the complaint, defendants' memorandum in support of their motion to dismiss states that plaintiff was fired because "in [ARC's] principals' considered view, she was not performing her duties adequately." Yet defendants chose to test the complaint by *Rule 12(b)(6)* motion, and the district court judge quite appropriately considered the motion under the *Rule 12(b)(6)* standards.

EXHIBIT 281

LexisNexis

Caution
As of: August 12, 2014 9:17 AM EDT

# Rubin v. Brooks/Cole Publishing Co.

United States District Court for the District of Massachusetts
October 29, 1993, Decided
CIVIL ACTION No. 90-12011-Y

**Reporter:** 836 F. Supp. 909; 1993 U.S. Dist. LEXIS 19104; 29 U.S.P.Q.2D (BNA) 1335; Copy. L. Rep. (CCH) P27,212
ZICK RUBIN, Plaintiff, v. BROOKS/COLE PUBLISHING CO. and WADSWORTH, INC., Defendants.

**Core Terms**

Love, permission, Psychology, fair use, textbook, reproduction, authors, reprint, copies, copyrighted work, scientific, preemption, factors, markets, letters, copyright infringement, preempted, rights, Romantic, purposes, unfair competition, anthologies, unfair, cases, backdated, Magazine, misrepresentation, Publishers, infringing, deceptive

**LexisNexis® Headnotes**

Civil Procedure > Pleading & Practice > Pleadings > Rule Application & Interpretation

***HN1*** A "case stated" means that the parties have stipulated to all material facts. It remains for the court to review the record, draw such inferences as are reasonable and, applying the governing law, enter such judgment as may be appropriate.

Copyright Law > Copyright Infringement Actions > Civil Infringement Actions > General Overview
Copyright Law > ... > Civil Infringement Actions > Elements > General Overview
Copyright Law > ... > Civil Infringement Actions > Elements > Copying by Defendants
Copyright Law > ... > Civil Infringement Actions > Elements > Ownership
Copyright Law > ... > Civil Infringement Actions > Presumptions > General Overview

***HN4*** To establish a prima facie case of copyright infringement, two elements must be proved: ownership of a valid copyright; and copying of constituent elements of the work that are original.

Copyright Law > Copyright Infringement Actions > Civil Infringement Actions > General Overview
Copyright Law > ... > Defenses > Fair Use > General Overview
Copyright Law > ... > Civil Infringement Actions > Elements > Copying by Defendants

***HN2*** Under *17 U.S.C.S. § 107*, the fair use of a copyrighted work for purposes such as criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research, is not an infringement of copyright.

Copyright Law > ... > Defenses > Fair Use > General Overview

Copyright Law > ... > Fair Use > Fair Use Determination > Factors
Copyright Law > ... > Civil Infringement Actions > Elements > General Overview
Copyright Law > ... > Civil Infringement Actions > Elements > Copying by Defendants
Copyright Law > ... > Civil Infringement Actions > Elements > Ownership

***HN3*** The factors to be considered in determining whether use of a work is fair use include: the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes; the nature of the copyrighted work; the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and the effect of the use upon the potential market for or value of the copyrighted work.

Copyright Law > ... > Defenses > Fair Use > General Overview
Copyright Law > ... > Fair Use > Fair Use Determination > Factors

***HN5*** Under *17 U.S.C.S. § 107*, the "fair use" factors are neither exclusive nor should any one factor be determinative. Rather, the factors should be considered in light of the purpose of the fair use doctrine: to prevent strict enforcement of the copyright law when its enforcement would inhibit the very progress of science and useful arts that copyright is intended to promote. It is the defendant's burden to prove that the copying is justified under the fair use doctrine.

Copyright Law > Copyright Infringement Actions > Civil Infringement Actions > General Overview
Copyright Law > ... > Defenses > Fair Use > General Overview
Copyright Law > ... > Fair Use > Fair Use Determination > Factors

***HN6*** With respect to a "fair use" analysis under *17 U.S.C.S. § 107*, the courts typically consider three subfactors when examining the purpose and character of an alleged infringer's use of a copyrighted work: whether the use was productive; whether the use was commercial; and whether the alleged infringer's conduct was proper.

Copyright Law > ... > Defenses > Fair Use > General Overview
Copyright Law > ... > Fair Use > Fair Use Determination > Factors

***HN7*** A "productive use" of a copyrighted work, though not determinative, favors a finding of fair use. A "productive use" is one that results in some added benefit to the public beyond that produced by the first author's work. A defendant need not show that the use genuinely and substantially benefitted the public, but only that the use could have benefitted the public marginally. This factor has also been phrased as whether the copied material was published to supersede the use of the original work.

Copyright Law > ... > Defenses > Fair Use > General Overview

***HN8*** The commission of errors in an allegedly infringing work has been held relevant to whether a use is considered productive. However, inaccuracies are irrelevant as long as the alleged infringing work benefits the public marginally. The court notes the dangers in the copyright context of evaluating the merit of a publication.

Copyright Law > ... > Defenses > Fair Use > General Overview

***HN9*** When examining the purpose and character of an alleged infringer's use of a copyrighted work, as to the second "fair use" subfactor -- commercial use, the relevant question is not whether the sole motive of the use is monetary gain but whether the user stands to profit from exploitation

of the copyrighted material without paying the customary price. If a book falls into one of the enumerated fair use categories (i.e., criticism, teaching, scholarship or research), then there is a "strong presumption" that the use is productive even though, as will often be the case, the biographer and publisher anticipate profits.

Copyright Law > ... > Defenses > Fair Use > General Overview
Copyright Law > ... > Damages > Types of Damages > Infringement Profits

***HN10*** Whether the inclusion of copied material is made evident to prospective purchasers has been held relevant when considering whether the alleged infringer profited from use of the copied material.

Copyright Law > ... > Defenses > Fair Use > General Overview

***HN11*** When examining the purpose and character of an alleged infringer's use of a copyrighted work, the final "fair use" subfactor to be considered is the propriety of defendant's conduct.

Copyright Law > ... > Defenses > Fair Use > General Overview

***HN12*** Lack of permission is beside the point as long as the defendant's use meets the standards of fair use. In other words, the fair use defense is not precluded even though permission is denied.

Copyright Law > ... > Defenses > Fair Use > General Overview
Copyright Law > ... > Fair Use > Fair Use Determination > Factors

***HN13*** In analyzing the second statutory "fair use" factor under *17 U.S.C.S. § 107(2)* -- the nature of the copyrighted work, the law generally recognizes a greater need to disseminate (and thus provides lesser protection to) factual works than works of fiction or fantasy. Somewhat similarly, scientific works, when used for scientific, scholarly, or like purposes, receive somewhat less protection than do non-scientific works. Works in regard to the arts and sciences are given out as a development in the way of progress, and, to a certain extent, by common consent others interested in advancing the same art or science may commence where the prior author stopped. The scientific nature of the plaintiff's work will weigh in favor of the copier whose purposes are similarly scientific.

Copyright Law > ... > Defenses > Fair Use > General Overview

***HN14*** Scientific works, while clearly not subject to limitless fair use in the scientific arena, justifiably receive somewhat lesser protection when reproduced for similarly scientific purposes (such as the teaching of science).

Copyright Law > ... > Defenses > Fair Use > General Overview

***HN15*** Courts should also take care not to discourage authors from addressing important topics for fear of losing their copyright protection.

Copyright Law > ... > Defenses > Fair Use > General Overview

***HN16*** The scope of fair use is narrower with respect to unpublished as opposed to published works. The author's right to control the first public appearance of his expression weighs against use of the work before its release.

Copyright Law > ... > Defenses > Fair Use > General Overview
Copyright Law > ... > Fair Use > Fair Use Determination > Factors
Copyright Law > Scope of Copyright Protection > Subject Matter > General Overview

***HN17*** Under *17 U.S.C.S. § 107(3)*, with respect to the amount and substantiality of the portion used in relation to the copyrighted work as a whole, analysis of this "fair use" factor requires a determination of both the quantitative and qualitative substantiality of defendant's use of plaintiff's copyrighted work.

Copyright Law > ... > Defenses > Fair Use > General Overview
Copyright Law > ... > Fair Use > Fair Use Determination > Factors
Copyright Law > ... > Protected Subject Matter > Graphic, Pictorial & Sculptural Works > Photographs

***HN18*** Substantial copying by a defendant does not automatically preclude the fair use defense, for it has long been recognized that a commentator may fairly reproduce as much of the original, copyrighted work as is necessary to the defendant's proper purpose.

Copyright Law > ... > Defenses > Fair Use > General Overview
Copyright Law > ... > Fair Use > Fair Use Determination > Factors
Copyright Law > Scope of Copyright Protection > Collective & Derivative Works > General Overview
Copyright Law > Scope of Copyright Protection > Collective & Derivative Works > Derivative Works
Copyright Law > Scope of Copyright Protection > Ownership Interests > Governmental Works

***HN19*** Under *17 U.S.C.S. § 107(4)*, the final "fair use" factor -- market effect -- is undoubtedly the single most important element of fair use. In cases of noncommercial use of a copyrighted work, it is the plaintiff's burden to show proof either that the particular use is harmful, or that if the use should become widespread, it would adversely affect either the primary market for the copyrighted work or the current or potential markets for derivative works. If defendant's use of plaintiff's copyrighted work was primarily noncommercial, then it is plaintiff's burden to show at least some meaningful likelihood of future harm.

Copyright Law > ... > Defenses > Fair Use > General Overview
Copyright Law > ... > Fair Use > Fair Use Determination > Factors

***HN20*** Under the final "fair use" factor -- market effect -- contained in *17 U.S.C.S. § 107(4)*, the court must also consider whether finding defendant's use of plaintiff's copyrighted work will cause such use to "become widespread."

Copyright Law > ... > Defenses > Fair Use > General Overview
Copyright Law > ... > Fair Use > Fair Use Determination > Factors

***HN21*** Under *17 U.S.C.S. § 107*, even if the "fair use" factors are analyzed so that two favor a finding of fair use while two disfavor such a finding, the United States Supreme Court provides no guidance as to which conflicting factors prevail over others.

Copyright Law > Constitutional Copyright Protections > Federal & State Law Interrelationships > General Overview
Copyright Law > Constitutional Copyright Protections > Federal & State Law Interrelationships > Common Law
Copyright Law > Constitutional Copyright Protections > Federal & State Law Interrelationships > Federal Preemption
Copyright Law > ... > Deposit & Registration Requirements > Deposits > Mandatory Deposits

Copyright Law > ... > Deposit & Registration Requirements > Registration > General Overview
Copyright Law > Scope of Copyright Protection > Subject Matter > Common Law Copyrights

***HN22*** The Copyright Act (Act), *17 U.S.C.S. § 301*, establishes a bipartite test for determining whether a state statutory or common law claim is preempted. A state law claim is preempted if both parts of the test are satisfied. First, the work of authorship in which rights are claimed must fall within the subject matter of copyright as defined in §§ 102-03 of the Act. The second consideration for preemption is whether the state law creates legal or equitable rights that are equivalent to any of the exclusive rights within the general scope of copyright as specified in *§ 106* of the Act.

Copyright Law > Constitutional Copyright Protections > Federal & State Law Interrelationships > General Overview
Copyright Law > Constitutional Copyright Protections > Federal & State Law Interrelationships > Federal Preemption
Copyright Law > Scope of Copyright Protection > Subject Matter > Common Law Copyrights

***HN23*** See *17 U.S.C.S. § 301*.

Copyright Law > Scope of Copyright Protection > Ownership Rights > General Overview
Copyright Law > ... > Ownership Rights > Displays > General Overview
Copyright Law > ... > Ownership Rights > Distribution > General Overview
Copyright Law > ... > Ownership Rights > Performances > General Overview
Copyright Law > ... > Ownership Rights > Reproductions > General Overview
Copyright Law > ... > Protected Subject Matter > Literary Works > Scope of Protection

***HN24*** The rights provided by the Copyright Act, *17 U.S.C.S. §§ 106(1)-(5)*, are the rights of exclusive reproduction and distribution and, with respect to certain artistic works, the rights of exclusive performance and display.

Copyright Law > Scope of Copyright Protection > Ownership Rights > General Overview
Copyright Law > ... > Ownership Rights > Adaptations > General Overview
Copyright Law > ... > Ownership Rights > Distribution > General Overview
Copyright Law > ... > Ownership Rights > Reproductions > General Overview

***HN25*** See *17 U.S.C.S. §§ 106(1)-(3)*.

Copyright Law > Copyright Infringement Actions > Civil Infringement Actions > General Overview
Copyright Law > ... > Civil Infringement Actions > Online Infringement > Determinations
Copyright Law > Constitutional Copyright Protections > Federal & State Law Interrelationships > General Overview
Copyright Law > Constitutional Copyright Protections > Federal & State Law Interrelationships > Federal Preemption
Copyright Law > Scope of Copyright Protection > Ownership Rights > State Regulations
Copyright Law > Scope of Copyright Protection > Subject Matter > Common Law Copyrights

***HN26*** In order to avoid preemption under the Copyright Act, *17 U.S.C.S. § 301*, a state law claim must have an "extra element" that changes the nature of the action so that it is qualitatively different from a copyright infringement claim. In other words, a cause of action will not be saved from preemption merely by elements such as awareness, intent, or commercial immorality, which alter the action's scope but not its nature. Rather, a court must look beyond the "label

affixed" to the cause of action, and must determine what plaintiff seeks to protect, the theories in which the matter is thought to be protected and the rights sought to be enforced.

Antitrust & Trade Law > Consumer Protection > General Overview
Antitrust & Trade Law > Consumer Protection > Deceptive & Unfair Trade Practices > State Regulation
Banking Law > Consumer Protection > State Law > General Overview
Copyright Law > Copyright Infringement Actions > Civil Infringement Actions > General Overview
Copyright Law > Constitutional Copyright Protections > Federal & State Law Interrelationships > General Overview
Copyright Law > Constitutional Copyright Protections > Federal & State Law Interrelationships > Federal Preemption
Copyright Law > Scope of Copyright Protection > Ownership Rights > State Regulations
Copyright Law > Scope of Copyright Protection > Subject Matter > Common Law Copyrights
Torts > Business Torts > Unfair Business Practices > General Overview

***HN27*** Following the "extra element" test for preemption under the Copyright Act, *17 U.S.C.S. § 301*, courts have determined that state law unfair competition and unfair and deceptive trade practices claims based solely upon impermissible replication of copyrighted material are preempted. On the other hand, when unfair competition and unfair and deceptive trade practices claims require proof of an extra element such as likelihood of consumer confusion, misrepresentation, or deception, the claims survive preemption. Crucial to liability under a deceptive trade practices cause of action is the element of misrepresentation or deception, which is no part of a cause of action for copyright infringement. There is also no preemption of the state law of unfair competition of the "passing off" variety.

Copyright Law > Copyright Infringement Actions > Civil Infringement Actions > General Overview
Copyright Law > Constitutional Copyright Protections > Federal & State Law Interrelationships > General Overview
Copyright Law > Constitutional Copyright Protections > Federal & State Law Interrelationships > Federal Preemption
Copyright Law > Scope of Copyright Protection > Ownership Rights > State Regulations
Copyright Law > Scope of Copyright Protection > Subject Matter > Common Law Copyrights
Torts > Business Torts > Unfair Business Practices > General Overview

***HN28*** Although certain elements of a Mass. Gen. Laws ch. 93A claim may be preempted by the Copyright Act, *17 U.S.C.S. § 301*, other aspects of the claim may still survive preemption if they include the "extra element" necessary qualitatively to differentiate that portion of the Mass. Gen. Laws ch. 93A claim from the claim of copyright infringement.

Copyright Law > Copyright Infringement Actions > Civil Infringement Actions > General Overview
Copyright Law > Constitutional Copyright Protections > Federal & State Law Interrelationships > General Overview
Copyright Law > Constitutional Copyright Protections > Federal & State Law Interrelationships > Federal Preemption
Copyright Law > Scope of Copyright Protection > Ownership Rights > State Regulations
Copyright Law > Scope of Copyright Protection > Subject Matter > Common Law Copyrights
Torts > Business Torts > Unfair Business Practices > General Overview

***HN29*** Although most actions taken by a publisher to obtain authors' permissions are likely to be so closely intertwined with a claim for impermissible reproduction as to be preempted (such as

state law claims based upon failure to obtain permission at all or in a timely manner), the court agrees that a claim based upon the backdating of permissions letters may indeed involve an "extra element" of deception sufficient qualitatively to differentiate the claim from one for copyright infringement. In such case, preemption under the Copyright Act, *17 U.S.C.S. § 301*, is not applicable.

**Judges: [**1]** YOUNG

**Opinion by:** WILLIAM G. YOUNG

**Opinion**

**[*912]** *MEMORANDUM AND ORDER*

YOUNG, D.J.

"It is said that hard cases make bad law. This is a hard case." *Scarpa v. DuBois, No. Civ. A. 92-12948, 1993 WL 245655* (D. Mass. June 24, 1993). As such, it is one that cries out for a fact-specific judgment, not the application of a sweeping principle. The matter comes before the Court as ***HN1*** a case stated. That is, the parties have stipulated to all material facts and it remains for this Court to review the record, draw such inferences as are reasonable and, applying the governing law, enter such judgment as may be appropriate. *Continental Grain* v. *Puerto Rico Maritime Shipping Auth.*, 972 F.2d 426, 429 (1st Cir. 1992); *Boston Five Cents Sav. Bank v. Secretary of Housing & Urban Development, 768 F.2d 5, 12 (1st Cir. 1985)*.

Psychologist and author Zick Rubin ("Rubin") is the creator of a copyrighted psychological instrument known as the "Love Scale." Rubin here sues Brooks/Cole Publishing Co. ("Brooks/Cole") and its parent company Wadsworth, Inc. ("Wadsworth") for copyright infringement under *17 U.S.C. § 501*, and **[**2]** for unfair competition and unfair and deceptive business practices under Mass. Gen. L. ch. 93A. Rubin bases his claims upon Brooks/Cole's reproduction of the Love Scale without his permission in several editions of its textbook *Social Psychology*, initially published in 1986. In resolving Rubin's claims, this Court necessarily must address both the **[*913]** scope of the fair use doctrine and the preemptive reach of the Copyright Act upon related state law causes of action.

**I. FACTUAL BACKGROUND**

A. The Love Scale and its Market

In 1968 and 1969, Rubin, who is now an adjunct professor of psychology at Brandeis University, created a self-report instrument called a "Love Scale," together with a parallel "Liking Scale," as a central part of his doctoral work in social psychology at the University of Michigan. In 1969, Rubin published his Love and Liking Scales in his doctoral dissertation, "The Social Psychology of Romantic Love," (Joint Pre-Trial Mem. Ex. 2), for which he secured Copyright No. A146094 in his own name. Rubin's dissertation is based on the theory that love consists of three critical components -- "affiliative and dependent need," "pre-disposition to help," and "exclusiveness **[**3]** and absorption" -- and incorporates the Love and Liking Scales (which each consists of 13 questions designed to elicit and rate one's feelings toward another person) as research instruments designed to exemplify and validate his theory.

In 1970, Rubin again published the Love and Liking Scales in his article "Measurement of Romantic Love," (Defs.' Mem. Supp. Summ. J. Ex. B), appearing in the October 1970 issue of

*Journal of Personality and Social Psychology,* published by the American Psychological Association ("APA"). The APA secured Copyright No. B624309 on that issue, but in 1978 assigned to Rubin that portion of the copyright which covered his article. In 1973, Rubin published the Love Scale in his social psychology textbook, *Liking and Loving: An Approach to Social Psychology, (see* Rubin Aff. Ex. D), published by Holt, Rinehart & Winston. Holt, Rinehart & Winston originally secured copyright No. A582977 on the book, but transferred the copyright to Rubin in 1978. *Liking and Loving* has been widely adopted in social psychology courses and has sold more than 50,000 copies. (Rubin Aff. P 12.) In 1974, an excerpt from *Liking and Loving* that included the Love Scale was **[**4]** reprinted by permission in an anthology that Rubin edited entitled *Doing Unto Others: Joining, Molding, Conforming, Helping, Loving,* published by Prentice-Hall Spectrum Books. (Rubin Aff. P 20.) Rubin has received substantial royalties from the sales of *Doing Unto Others. (Id.)*

In February 1975, Reader's Digest expressed an interest in reprinting the Love Scale and offered to pay Rubin "well" in the event of such a use. (Rubin Aff. P 24 & Ex. K.) Rubin declined such permission. In August 1977, Boston Magazine reprinted the Love Scale (along with the parallel Liking Scale) as a self-test, without receiving permission from Rubin or any other copyright holder. (Rubin Aff. P 25.) Rubin sued Boston Magazine for copyright infringement and was awarded statutory damages and attorney fees. *(Id.)* The award was upheld by the Court of Appeals for the First Circuit. *Rubin v. Boston Magazine Co., 645 F.2d 80 (1st Cir. 1981)*. The Love Scale also appeared in two psychology texts in the mid-1970s without Rubin's permission, and Rubin obtained a promise from at least one of the authors that the Love Scale would be deleted from future editions of that author's **[**5]** book. (Rubin Dep. at 20-25.)

In 1981, Harper & Row published an introductory textbook written by Rubin and a co-author, *The Psychology of Being Human,* along with an accompanying activity book by William Gray and Brian Gerrard, *Understanding Yourself and Others: A Student Activity Book of Psychological Experiments and Activities. Understanding Yourself and Others* was marketed in conjunction with *The Psychology of Being Human* and included, with Rubin's permission, the full text of the Love Scale to be used as a student self-test. (Rubin Aff. PP 14-15 & Ex. H.) *The Psychology of Being Human* sold more than 130,000 copies and Rubin received substantial revenues from those sales. (Rubin Aff. P 16.)

Rubin has received (and continues to receive) many requests from publishing houses and authors to reprint the Love Scale (often together with his parallel Liking Scale) in textbooks and other publications. (Rubin Aff. P 18 & Ex. I; Rubin Dep. at 47.) Rubin has customarily declined such requests to reprint the Love Scale in full, but has consistently **[*914]** given authors and publishers permission to reprint up to three sample items for no fee, and has consistently allowed "legitimate **[**6]** researchers" to use the entire Love Scale in research for no fee. (Rubin Aff. P 19; Rubin Dep. at 57.) Rubin has also allowed the Love Scale to be reprinted in full on at least ten occasions since 1974 either by itself (sometimes together with the Liking Scale) or as part of a longer article or excerpt, on "many" of these occasions for a fee. (Rubin Aff. PP 19, 21; Rubin Dep. at 13-14.) Rubin's article "Measurement of Romantic Love," for example, has been reprinted in at least six anthologies and books of readings to date, including Wayne Lesko's *Readings in Social Psychology,* published in 1991. (Rubin Aff. P 21 & Ex. J.)

Rubin's Love Scale is considered by a large number of psychologists and social psychologists to be an important scientific work, (Rubin Aff. P 44), and both "Measurement of Romantic Love"

and *Liking and Loving* are widely available in libraries throughout the United States. (Rubin Aff. P 41; Pollender Aff.) The Love Scale has also been widely used in psychological research, (Rubin Dep. at 29, 58; Rubin Aff. P 43), and has been discussed in virtually every introductory social psychology textbook in the last 20 years (generally with a few sample items appearing). **[**7]** (Rubin Aff. P 44; Krupat Aff. P 3; Peplau Aff. P 4.)

As recently as 1988, the Love Scale was reprinted without Rubin's permission in both a trade book published by Andromeda Oxford Ltd. and in *Self* Magazine (which purportedly had acquired the right to reprint from Andromeda Oxford Ltd.). As a result of a February 1990 settlement, Rubin was paid $ 20,000 in damages and permission fees. (Rubin Aff. P 26.)

B. The Defendants' Use of the Love Scale

On three occasions prior to 1986, authors or agents of Brooks/Cole or Wadsworth requested Rubin's permission to publish the Love Scale in Brooks/Cole or Wadsworth textbooks. (Rubin Aff. PP 27-30 & Exs. M, N, O.) The last two times, in 1978 and 1979, permission was originally sought from the APA and the APA "granted" permission subject to Rubin's approval. *(See* Rubin Aff. Exs. M, N.) In neither case did the APA mention that it had transferred its Love Scale copyright (the "Measurement of Romantic Love" copyright) to Rubin sometime in 1978 (the 1978 request may have predated the transfer). *(See id.)* Rubin denied permission to print more than a sample of three items from the Love Scale in both cases. *(See id.)*

On September 4, **[**8]** 1986, Brooks/Cole sought permission from the APA to reprint the Love Scale in a social psychology textbook written by Donelson Forsyth ("Forsyth") entitled *Social Psychology,* (Recalde Aff. Ex. A), scheduled for publication by Brooks/Cole in early October of that same year. (Haga Aff. P 2 & Ex. 1.) Carline Haga ("Haga"), the Permissions Manager at Brooks/Cole since 1982, was unaware of the previous requests by Brooks/Cole or Wadsworth authors to reprint the Love Scale, and sought permission from the APA rather than from Rubin because she believed that the APA still held the copyright to Rubin's work. (Haga Suppl. Aff. PP 1, 2, 9.) Haga does not explain why she sought the APA's permission to reprint the Love Scale so late in the publication process.

The APA responded by letter to Haga's request several days before the publication of *Social Psychology,* stating that permission was waived for authors who wished to reproduce a single table or figure provided that the original author's approval was obtained, but also noting that it would waive permission entirely if Rubin could not be located. (Haga Aff. P 3 & Ex. 2.) The APA did not inform Brooks/Cole that it no longer owned the **[**9]** copyright to the Love Scale. *(See id.)* In view of the short time frame and because, based on the APA's letter, Haga believed that obtaining Rubin's permission was merely a courtesy, and also because Haga assumed that Brooks/Cole's use of the Love Scale was permissible fair use, Brooks/Cole did not seek Rubin's permission to reprint the Love Scale. (Haga Aff. P 5; Haga Suppl. Aff. PP 3-4.)

Brooks/Cole published *Social Psychology* on or about October 10, 1986, and sent Rubin a free examination copy. (Haga Aff. P 5.) **[*915]** On pages 310-312 of the 651-page text, Forsyth introduces "Zick Rubin's 'Love Scale'" as "the most widely used measure of love," and then discusses Rubin's work and the Love Scale in a "Focus" box before reproducing the Love Scale in its entirety along with self-scoring instructions. On page 325, in the "For More Information" section at the end of the chapter, Forsyth lists *"Liking and Loving,* by Zick Rubin" as suggested reading, and provides a brief and complementary description of the book. On page 649, in the

"Credits" section at the end to the text, Forsyth attributes the Love Scale to "'Measurement of Romantic Love,' by Z. Rubin. . . . Copyright 1970 by the **[**10]** American Psychological Association. Reprinted by Permission."

On November 13, 1986, Rubin wrote to the APA about the unpermitted use of the Love Scale in *Social Psychology*. (Rubin Aff. P 34.) Shortly thereafter, the APA notified Brooks/Cole of Rubin's objections. (Haga Aff. P 7.) On November 26, 1986, Haga sent Rubin a letter indicating that, while Brooks/Cole believed its use of the Love Scale was permissible and fair use given the scholarly purpose of the material in the text, Brooks/Cole would nevertheless be pleased to offer Rubin a permission fee of $ 150. (Haga Aff. PP 7-8 & Ex. 3.)

On April 16, 1987, having heard no response from Rubin, Haga wrote to Forsyth stating that she assumed that Rubin concurred that the use of Love Scale in *Social Psychology* was fair use, but requested that Forsyth consider using only items 1-6 of the Love Scale in the event that Rubin responded negatively to her November 26, 1986 letter. (Haga Suppl. Aff. P 7-8 & Ex. A.) Forsyth responded that he would prefer not to make the changes unless absolutely necessary since he feared that the whole Love Scale section would have to be rewritten. (Haga Suppl. Aff. Ex. B.) Rubin did not respond to Haga's **[**11]** November 26, 1986 letter for several years, however, (Rubin Dep. at 84), and in the meantime Brooks/Cole published the Love Scale in both the second and third printings of *Social Psychology. (See* Fine Aff. Exs. B, C.)

On November 21, 1989, Rubin finally responded to Brooks/Cole's November 26, 1986 letter, claiming that Brooks/Cole's use of the Love Scale was not fair use, and demanding that Brooks/Cole pay damages and withdraw all copies of *Social Psychology*. (Haga Aff. Ex. 4.) On January 2, 1990, Brooks/Cole's counsel sent Rubin a letter stating that Brooks/Cole would not cease publication of the textbook. (Rubin Aff. P 12.)

Rubin filed the instant Complaint on August 21, 1990, asserting a copyright infringement claim under *17 U.S.C. § 501*, and a claim for unfair competition and unfair and deceptive business practices under Mass. Gen. L. ch. 93A. On March 9, 1993, the Court denied the parties' cross-motions for summary judgment. On July 2, 1993, the parties agreed to submit the case before the Court for final disposition upon a "case stated" basis (i.e., on the record before the Court). [1]

**[**12] II. ANALYSIS**

A. Copyright Claim: Fair Use

Brooks/Cole concedes copying Rubin's copyrighted material, [2] so the Court jumps directly to considering the defense of fair use. ***HN2*** Under *17 U.S.C. § 107*, the "fair use of a copyrighted work . . . for purposes such as criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research, is not an infringement of copyright." ***HN3*** The factors to be considered in determining whether use of a work is fair use include:

> (1) the purpose and character of the use, including whether such use is of a commercial **[**13]** **[*916]** nature or is for nonprofit educational purposes;

---

[1] At oral argument on July 27, 1993, the Court, ruling from the bench, found in favor of Rubin on the issues of laches, estoppel, and waiver, but took the remaining issues discussed here under advisement.

[2] ***HN4*** To establish a prima facie case of copyright infringement, two elements must be proved: (1) ownership of a valid copyright; and (2) copying of constituent elements of the work that are original. *Feist Publications, Inc.* v. *Rural Tel. Serv. Co.*, 499 U.S. 340, 111 S. Ct. 1282, 1296, 113 L. Ed. 2d 358 (1991). The satisfaction of these two elements is not in dispute.

(2) the nature of the copyrighted work;

(3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and

(4) the effect of the use upon the potential market for or value of the copyrighted work.*17 U.S.C. § 107*. ***HN5*** These factors are neither exclusive nor should any one factor be determinative. Rather, the factors should be considered "in light of the purpose of the fair use doctrine: to prevent strict enforcement of the copyright law when its enforcement 'would inhibit the very Progress of Science and useful Arts that copyright is intended to promote.'" *Penelope v. Brown, 792 F. Supp. 132, 136 (D. Mass. 1992)* (quoting *Sony Corp. of Am. v. Universal City Studios, Inc., 464 U.S. 417, 477, 78 L. Ed. 2d 574, 104 S. Ct. 774* [1984] [Blackmun, J., dissenting]). It is the defendant's burden to prove that the copying is justified under the fair use doctrine. *Penelope, 792 F. Supp. at 136*.

*1. Purpose and Character of the Use*

***HN6*** Courts typically consider three subfactors when examining the purpose and **[**14]** character of an alleged infringer's use of a copyrighted work: (1) whether the use was productive; (2) whether the use was commercial; and (3) whether the alleged infringer's conduct was proper. *Penelope, 792 F. Supp. at 136*. Examination of these subfactors reveals that the purpose and character of Forsyth's copying favors a finding of fair use.

The Supreme Court has held that ***HN7*** a "productive use" of a copyrighted work, though not determinative, favors a finding of fair use. *Harper & Row Publishers, Inc. v. Nation Enterprises, 471 U.S. 539, 561, 85 L. Ed. 2d 588, 105 S. Ct. 2218 (1985)*; *Sony Corp., 464 U.S. at 455 n.40*; *Penelope, 792 F. Supp. at 136*. A "productive use" is one that "results in some added benefit to the public beyond that produced by the first author's work." *Sony Corp., 464 U.S. at 478* [Blackmun, J., dissenting]). A defendant need not show that the use "genuinely and substantially benefitted the public," but only that the use "could have benefitted the public marginally." *Penelope, 792 F. Supp. at 137*; *see Harper & Row, 471 U.S. at 561*. **[**15]** This factor has also been phrased as whether the copied material was published to supersede the use of the original work. *Penelope, 792 F. Supp. at 136*; *Haberman v. Hustler Magazine, Inc., 626 F. Supp. 201, 210 (D. Mass. 1986)*.

*Social Psychology* presents the Love Scale in a productive and scholarly manner, and does not supersede Rubin's work. As a college textbook, *Social Psychology* is circulated within an educational setting for the purposes of teaching and higher learning. "Rubin's 'Love Scale'" is introduced in Forsyth's chapter on "Personal Relationships," and appears amidst a "Focus" section in which Forsyth compares the two types of love discussed in the chapter, "passionate love" and "companionate love," with Rubin's tripartite theory of love -- "attachment," "caring" and "intimacy" (as restated by Forsyth) -- upon which Rubin's Love Scale is based. Forsyth then lists the Love Scale items in reorganized order, noting that "passionate love" encompasses Rubin's "attachment" component (and items 1-5 on the reorganized Love Scale), while "companionate love" consists of Rubin's "caring" and "intimacy" components **[**16]** (reorganized Love Scale items 6-9 and 10-13). Forsyth also encourages the reader to question the validity of the Love Scale, asking "do the items really measure love?," and suggests the possible implications of higher test results on items corresponding to any particular one of Rubin's three love components.

Rubin argues that Forsyth's full production of the Love Scale (as opposed to three sample items, each representing one of Rubin's components of love) was unnecessary, and that Forsyth incorporated the Love Scale only as "a self-test to entertain students" and as "a student involvement feature." *(See* Rubin Aff. PP 45-46; Krupat Aff. P 5; Peplau Aff. P 6; *but see* Forsyth Aff. P 9.) The Court agrees that the Love Scale acts as a student involvement feature, but fails to see how that use is necessarily inconsistent with the productive purposes of scholarship **[*917]** and teaching. Student involvement features such as the Love Scale are often powerful teaching devices, *see* Forsyth Aff. P 9, and perhaps particularly so when they are sufficiently entertaining to relieve the periodic doldrums of the average college textbook. Accordingly, although student readers might admittedly derive **[**17]** entertainment as well as erudition from Forsyth's inclusion of the Love Scale, Forsyth does use the Love Scale for scholarly and pedantic purposes.

Rubin also claims that Forsyth's use of the Love Scale cannot properly be considered productive because Forsyth incorrectly asserts that "[a] score of 90 is average for college-aged men and women in romantic heterosexual relationships." [3] ***HN8*** The commission of errors in an allegedly infringing work has been held relevant to whether a use is considered productive. *See Maxtone-Graham v. Burtchaell, 803 F.2d 1253, 1261 (2d Cir. 1986), cert. denied,*481 U.S. 1059, 95 L. Ed. 2d 856, 107 S. Ct. 2201 (1987). Even were the Court to find an inaccuracy in Forsyth's extrapolation, however, such an inaccuracy would fall far short of that necessary to discredit the entire productive application of Forsyth's use of the Love Scale. *See Penelope, 792 F. Supp. at 136-137* (inaccuracies irrelevant as long as the alleged infringing work benefits the public marginally); *Haberman, 626 F. Supp. at 210* (noting the dangers in the copyright context of evaluating the merit **[**18]** of a publication). Accordingly, the Court finds that Forsyth's use of the Love Scale is productive.

***HN9*** As to the second subfactor, commercial use, the relevant question "is not whether the sole motive of the use is monetary gain but whether the user stands to profit from exploitation of the copyrighted material without paying the customary price." *Penelope, 792 F. Supp. at 137*; *Haberman, 626 F. Supp. at 210-11*. If a book falls into one of the enumerated fair use categories [i.e., criticism, teaching, scholarship or research], as *Social Psychology* does, there is a "strong presumption" that the use is productive "even though, as will often be the case, the biographer and publisher **[**19]** 'anticipate profits.'" *See Wright v. Warner Books, Inc., 953 F.2d 731, 736-37 (2d Cir. 1991)* (citation omitted). Here, Forsyth included the Love Scale to strengthen the book's chapter on "Personal Relationships," as well as the book's student involvement theme which, in Forsyth's words, includes "a self-test in practically every chapter of the book." (Forsyth Aff. P 9.) The Love Scale alone, however, constitutes only one of many self-tests in *Social Psychology,*[4] and is reproduced on only one of 651 pages. Moreover, the book's student involvement theme, while clearly an enhancement to the text, is clearly not its sole and central attribute. In short, Forsyth's student involvement theme, let alone his book as a whole, can hardly be said to depend for its vitality on the Love Scale and thus, although the defendants certainly stood to profit from Forsyth's book, it is difficult to see how they stood to profit directly from the Love Scale. *See Penelope, 792 F. Supp. at 137* (copied material consisted of only a few scattered lines amongst five pages of a 218-page text).

---

[3] Rubin claims that Forsyth incorrectly extrapolates from the average score that Rubin reported for his initial sample of couples at the University of Michigan in the late 1960s. In response, the defendants claim that this is simply Forsyth's valid interpretation of Rubin's findings.

[4] As an example, Chapter 7 includes tests and exercises on affiliation, shyness, sexuality, loneliness, ingratiation, and love (the Love Scale), as well as discussing and presenting the results of numerous other tests and studies.

**[**20]** Rubin claims that the Love Scale was exploited in order to promote the sale of *Social Psychology*.***HN10*** Whether the inclusion of copied material was made evident to prospective purchasers has been held relevant when considering whether the alleged infringer profited from use of the copied material. *Penelope, 792 F. Supp. at 137*. Here, Brooks/Cole's advertising folder never specifically mentions the Love Scale, and the folder's "Table of Contents Summary" lists all of the book's "Focus" sections (including the Love Scale "Focus" section) in the same fine print. *(See* Joint Pre-Trial Mem. Ex. 4.) [5] It is also **[*918]** relevant to note that, while Brooks/Cole sent sample copies of *Social Psychology* to prospective purchasers as part of its marketing scheme, the Love Scale is not placed in a desirable marketing position in the book since it is printed inconspicuously on the backside of page 312 of a 651-page text, and Rubin has produced no evidence that Brooks/Cole's salespeople brought the Love Scale to the attention of prospective purchasers. Accordingly, the Court finds that Brooks/Cole did not exploit the Love Scale, and that its use of the Love Scale was **[**21]** primarily productive rather than commercial. *Compare Rubin, 645 F.2d at 82, 84* (Boston Magazine featured Love Scale article under the cover headline "How's Your Love Life?" and the sub-caption "Who Turns You On and Why? Science may have the answer," and included the Love Scale only "as a quiz to entertain readers of a magazine of general circulation").

**[**22]** ***HN11*** The final subfactor to be considered is the propriety of Brooks/Cole's and Wadsworth's conduct. *Harper & Row, 471 U.S. at 562*; *see, e.g., Marcus v. Rowley, 695 F.2d 1171, 1175-76 (9th Cir. 1983)* (no attempt to secure permission or to credit copyright owner weighs against fair use). Rubin claims that Brooks/Cole committed bad faith (and breached industry standards) [6] **[**23]** through the following acts: (1) attempting to obtain permission from the APA (rather than Rubin) only a month before publishing the text, despite the fact that Rubin had previously denied other Brooks/Cole and Wadsworth authors permission to reprint the Love Scale; (2) incorrectly stating that the Love Scale was "reprinted by permission"; and (3) "backdating" permission letters sent to thirty other authors whose works were also reprinted in *Social Psychology*.[7]

---

[5] The advertising folder's Table of Contents summary admittedly lists the title of the Love Scale's Focus section, *"Experiencing Social Psychology* -- Are you in love?," along with a small caption which promotes the chapter's "applications viewpoint," but these details do not exploit the Love Scale for the following reasons: (i) many of the book's focus sections (which are all listed in the folder's Table of Contents summary) are entitled with similarly inviting personalized questions (i.e., *"Experiencing Social Psychology* -- How can you get someone to like you?" [another focus section within the Love Scale chapter]), and thus the title of the Love Scale focus section does not draw particular attention to itself; (ii) the "applications viewpoint" caption is located decidedly above the Love Scale Focus section (i.e., at the top of the chapter summary), and thus also does not invite particular attention to the Love Scale focus section; and (iii) as discussed in the previous footnote *supra*, the Love Scale chapter includes many tests and exercises in addition to the Love Scale to which the "applications viewpoint" caption justifiably applies. Accordingly, the Table of Contents summary does not exploit the Love Scale.

[6] Rubin contends that Brooks/Cole violated both its own internal permissions standards, *(see The Brooks/Cole's Author's Guide*, Fine Suppl. Aff. Ex. C), as well as industry-wide practice. *(See* Houghton Mifflin's "Legal Considerations for Authors" brochure, DeRocco Aff. Ex. A.) The Court finds these industry-guidelines excerpts irrelevant for the following reasons. First, to the extent that the guidelines merely provide an interpretation of copyright law and the fair use doctrine, *(see, e.g.*, DeRocco Aff. Ex. A), they have no precedential impact either upon Brooks/Cole or upon this Court. Second, as explained below, lack of permission (whether or not in compliance with industry or internal company standards) is entirely beside the point in cases in which reproduction of copyrighted material is otherwise "fair use." *See Wright, 953 F.2d at 737*.

[7] The thirty permission letters to which Rubin refers are all dated "10/20/86," but are marked "received" by the authors as of various dates in early December 1986. *(See* Fine Aff. Ex. F.) The Court finds that Brooks/Cole sent these letters out in hindsight in late November or early December, 1986, after learning of Rubin's objections to its use of the Love Scale and, indeed, backdated the letters to make them appear more timely.

When viewed in the overall context, however, the acts complained of are insufficient to preclude a finding of fair use. *Cf.* *Harper & Row, 471 U.S. at 563* (the defendant "knowingly exploited a purloined manuscript"). As stated by the Court of Appeals for the Second Circuit, ***HN12*** "lack of permission is 'beside the point' as long as [the defendant's] use meets the standards of fair use." *Wright, 953 F.2d at 737*; *see* *Maxtone-Graham, 803 F.2d at 1257, 1264 (2d Cir. 1986)* (fair use defense upheld where defendant was denied permission to quote plaintiff's words but used quotes anyway **[**24]** and gave attribution to plaintiff); *Fisher v. Dees, 794 F.2d 432, 438 (9th Cir. 1986)* (fair use defense not precluded even though permission was denied); *compare* *Weissmann v. Freeman, 868 F.2d 1313, 1324* **[*919]** (2d Cir. 1989) (defendant not only neglected to credit author, but attempted to pass off the work as his own, substituting his name in place of author's), *cert. denied,493 U.S. 883, 107 L. Ed. 2d 172, 110 S. Ct. 219 (1989)*; *Marcus v. Rowley, 695 F.2d 1171, 1175-76 (9th Cir. 1983)* (no credit to author). Here, Brooks/Cole obtained the Love Scale through legitimate channels, credited Rubin clearly and favorably in the text, sent Rubin a free examination copy immediately after publishing the text, offered Rubin a $ 150 permission fee after hearing of his initial objection, and considered removing the Love Scale in the event that Rubin continued to protest. In addition, although Brooks/Cole incorrectly stated that the Love Scale was "reprinted with permission," the Court finds that, in view of the APA's former ownership of the copyright and its somewhat misleading reply to Brooks/Cole's **[**25]** September 4, 1986 letter, Brooks/Cole's error constituted at most negligent rather than intentional misrepresentation. Finally, although the Court is disturbed by Brooks/Cole's dishonest attempt to appease other authors who on hindsight might have shared Rubin's objections with respect to their own reprinted works, the Court finds that the backdated letters have little relevance to Brooks/Cole's controversy with Rubin. Accordingly, the Court does not believe that the acts complained of preclude a finding of fair use.

In sum, the Court finds that the productive and primarily noncommercial nature of the defendants' use of the Love Scale causes factor one -- the "character of the use" -- to favor the defendants.

*2. Nature of the Copyrighted Work*

***HN13*** In analyzing the second statutory factor, the law generally recognizes a greater need to disseminate (and thus provides lesser protection to) factual works than works of fiction or fantasy. *Harper & Row, 471 U.S. at 563*. Somewhat similarly, scientific works, when used for scientific, scholarly, or like purposes, receive somewhat less protection than do non-scientific works. *Sampson & Murdock Co. v. Seaver-Radford Co., 140 Fed. 539, 541 (1st Cir. 1905)* **[**26]** ("works in regard to the arts and sciences . . . [are] given out as a development in the way of progress, and, to a certain extent, by common consent . . . others interested in advancing the same art or science may commence where the prior author stopped"); *see* *Rubin, 645 F.2d at 84*; *Rosemont Enterprises, Inc. v. Random House, Inc., 366 F.2d 303, 307 (2d Cir. 1966)*, *cert. denied,385 U.S. 1009, 17 L. Ed. 2d 546, 87 S. Ct. 714 (1967)*; *Greenbie v. Noble, 151 F. Supp. 45, 67-68 (S.D.N.Y. 1957)*; *Loew's Inc. v. Columbia Broadcasting System, 131 F. Supp. 165, 175 (S.D. Cal. 1955)*, *aff'd,239 F.2d 532 (9th Cir. 1956)*, *aff'd,356 U.S. 43, 2 L. Ed. 2d 583, 78 S. Ct. 667 (1958)*; 2 Goldstein, *Copyright* § 10.2.2(a), at 227 (1989) ("the scientific nature of the plaintiff's work will weigh in favor of the copier whose purposes are similarly scientific"). [8] The Love Scale is an important and widely studied creative scientific construct that has been discussed in

---

[8] Rubin argues that the *Sampson* doctrine has fallen into disfavor, *see* 3 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 13.05[A][2] at 13-102.57 (1993) ("it seems doubtful that a modern court would apply the *Sampson* doctrine, based as it is upon the manifestly fictitious consent of the copyright owner"), but this Court, like other courts and commentators, *see*

virtually every social psychology text in the last twenty years, which **[**27]** Brooks/Cole has reproduced for similarly scientific and pedantic purposes. Thus, although as a creative work the Love Scale might normally receive heightened protection, the putative degree of enhanced protection is significantly outweighed by the Love Scale's scientific nature and the scientific nature of its reproduction.

**[**28]** ***HN16*** The scope of fair use is also narrower with respect to unpublished as opposed **[*920]** to published works. *Harper & Row, 471 U.S. at 564* ("the author's right to control the first public appearance of his expression weighs against . . . use of the work before its release"). Here, Rubin's Love Scale had been widely published in several articles and in numerous texts before its reproduction in *Social Psychology,* and thus it receives a much more limited protection than would an unpublished work. [9]

In sum, due to the Love Scale's previously published scientific nature, and the scientific and scholarly nature of its reproduction, the second statutory factor also **[**29]** favors a finding of fair use.

*3.* ***HN17*** *Amount and Substantiality of the Portion Used in Relation to the Copyrighted Work as a Whole*

Analysis of this factor requires a determination of both the quantitative and qualitative substantiality of Brooks/Cole's use of Rubin's copyrighted work. *Penelope, 792 F. Supp. at 138*. The Love Scale, while quantitatively only a small portion of Rubin's copyrighted works, was a critical and central component of two of these works Rubin's doctoral dissertation and his article "Measurement of Romantic Love" -- and thus Brooks/Cole's qualitatively substantial use of the Love Scale "militate[s] against a finding of fair use." *Sony Corp., 464 U.S. at 450*; *see Rubin, 645 F.2d at 84*. ***HN18*** Substantial copying by a defendant, however, "does not automatically preclude the fair use defense," *Fisher, 794 F.2d at 438*, for "it has long been recognized that a commentator may fairly reproduce as much of the original, copyrighted work as is necessary to his proper purpose." *Haberman, 626 F. Supp. at 212* (for purposes of commentary **[**30]** on copyrighted photographs, full reproduction was appropriate). Although Forsyth admittedly could have derived some productive application from the use of only a few sample items from the Love Scale (as other authors have), his full reproduction of the Love Scale provided a productive enhancement to his discussion of Rubin's work which could not have been fully accomplished had he used only a few sample items. *See* discussion of the first factor *supra.* Accordingly, Brooks/Cole's qualitatively substantial copying is ameliorated by Forsyth's beneficial use of the entire Love Scale, and the Court therefore finds that the third factor points only slightly in Rubin's favor.

*4. Effect of the Use upon the Potential Market For or Value of the Copyrighted Work*

---

citations in accompanying text *supra*, sees substantial merit in the *Sampson* court's reasoning, and agrees that ***HN14*** scientific works, while clearly not subject to limitless fair use in the scientific arena, *see Pacific and Southern Co. v. Duncan*, 744 F.2d 1490, 1497 (11th Cir. 1984)***HN15*** ("courts should also take care not to discourage authors from addressing important topics for fear of losing their copyright protection"), *cert. denied*,471 U.S. 1004, 85 L. Ed. 2d 161, 105 S. Ct. 1867 (1985), justifiably receive somewhat lesser protection when reproduced for similarly scientific purposes (such as the teaching of science). *See also Rubin*, 645 F.2d at 84 (in which the First Circuit factually distinguished but neither disavowed nor questioned the vitality of the *Sampson* doctrine).

9 Lack of availability may also lend greater justification for reproduction. *Penelope*, 792 F. Supp. at 138. Here, however, both Rubin's textbook *Liking and Loving* and his article "Measurement of Romantic Love" are available in libraries across the country, and thus this subfactor is non-dispositive.

***HN19*** The final factor, market effect, is "undoubtedly the single most important element of fair use." *Harper & Row, 471 U.S. at 566*; *Penelope, 792 F. Supp. at 138*. In cases of noncommercial use of a copyrighted work, it is the plaintiff's burden to show proof either that the particular use is harmful, or that if the use should become widespread, it would adversely affect **[**31]** either the primary market for the copyrighted work or the current or potential markets for derivative works. *Harper & Row, 471 U.S. at 568*; *Sony Corp., 464 U.S. at 451*; *Twin Peaks Productions, Inc.* v. *Publications Int'l Ltd.,* 21 Med. L. Rep. (BNA) 1545, 1552 (2d Cir. 1993). Since Brooks/Cole's use of the Love Scale in this case was primarily noncommercial (as discussed under the first factor *supra),* it is Rubin's burden to show at least *"some* meaningful likelihood of future harm." *Sony Corp., 464 U.S. at 451*; *Maxtone-Graham, 803 F.2d at 1264*.

As a starting point, the Court does not believe that Brooks/Cole's *particular* use of the Love Scale adversely affects either the current or potential markets for Rubin's textbooks and anthologies, or the current or potential markets for licensing of the Love Scale for use by others in the textbook, anthology, or derivative markets (e.g., the popular magazine market). The Love Scale was published in its entirety at least 4 times by Rubin in the late 1960s and early 1970s, at **[**32]** **[*921]** least 10 times since 1974 by other authors with Rubin's permission in anthologies and other scholarly books (one anthology as recently in 1991), in at least two textbooks published in the mid-1970s without Rubin's permission, and in numerous research studies, yet Rubin admits that he continues to receive many requests to reprint the Love Scale. (Rubin Aff. P 18 & Ex. I; Rubin Dep. at 47.) Moreover, Rubin admits in his 1992 deposition, taken *six years* after publication of *Social Psychology,* that he still cannot cite any specific instances in which he has suffered economic harm or has been adversely effected by Brooks/Cole's inclusion of the Love Scale in the book. (Rubin Dep. at 86.) [10] In short, despite Rubin's ominous claims and predictions to the contrary *(see* Rubin Aff. PP 17, 47-50; DeRocco Aff. 9, 15-19), the Court does not find that Brooks/Cole's *particular* use of the Love Scale on page 312 of its 651-page text creates or has created any meaningful likelihood of future harm to the Love Scale markets.

**[**33]** The Court's inquiry does not end here, however, for ***HN20*** the Court must also consider whether finding Brooks/Cole's use of the Love Scale will cause such use to "become widespread." *Harper & Row, 471 U.S. at 568*; *Sony Corp., 464 U.S. at 451*. For reasons similar to those discussed above, the Court does not believe that even widespread replication of Brooks/Cole's use creates a meaningful likelihood of harm to the current or potential markets for Rubin's existing or future textbooks and anthologies. There is simply no credible evidence that even widespread use of the Love Scale in comprehensive college textbooks, at least in the manner of Brooks/Cole's use, creates a meaningful likelihood of harm to those markets. [11]

**[**34]** Nor does the Court conclude that widespread replication of Brooks/Cole's use adversely affects Rubin's ability to license the Love Scale to others for a fee as part of a larger excerpt

---

10 Although Rubin need show only a likelihood of future harm, rather than actual harm, *Sony Corp.,* 464 U.S. at 451, the Court concludes that events occurring in the *six years* subsequent to Brooks/Cole's publication of *Social Psychology* bear some relevance to the likelihood of future harm.

11 Although both Rubin and Michael DeRocco, Houghton Mifflin's Senior Sponsoring Editor in psychology, claim that the Love Scale serves as a powerful marketing device in college textbooks, *(see* Rubin Aff. P 17; DeRocco Aff. PP 15-19), there is no evidence that Brooks/Cole used the Love Scale in such a manner, and thus a finding by this Court in favor of Brooks/Cole would not sanction such use. In addition, it is also interesting to note that, despite the Love Scale's purported market appeal, Rubin himself has declined to reprint the Love Scale in both the current and planned editions of his current introductory psychology textbook, *Psychology,* published by Houghton Mifflin, opting instead for reproduction of only a few sample items. (Rubin Aff. P 17; Rubin Dep. at 68.)

or article reprinted in an anthology or book of readings, or for use in alternate or derivative markets. These uses are even further removed from the market for Rubin's textbooks and, in fact, it is "not beyond the realm of possibility that [widespread publication of the Love Scale in college textbooks] might stimulate further interest [for the Love Scale in derivative markets]." *Wright, 953 F.2d at 739* (citation omitted).

A finding of "fair use," however, would appear necessarily to extinguish Rubin's ability to license the Love Scale to other authors who might wish to reprint the Love Scale for use in a textbook format. [12] From the record, the breadth and potential of this market is difficult to discern. Rubin claims that in "many . . . cases" he has "received income" from permission fees to reprint the Love Scale in full, but it appears that of the roughly 10 times that the Love Scale has been reprinted with Rubin's permission since 1974, (see Rubin Dep. at 14), at **[**35]** least 6 of these reprintings were in anthologies rather than in textbooks (for which Rubin received a fee in "most" cases). (Rubin Aff. P 21.) Rubin provides no further useful description either **[*922]** of the other publications in which the Love Scale has purportedly appeared, or the amounts, if any, paid for those additional reproductions. Indeed, although it appears that many textbook authors have *asked* (and been denied) Rubin's permission to reprint the Love Scale in full, it is unclear whether any *textbook* author has ever *paid* Rubin to reprint the Love Scale in full. In spite of these shortcomings, however, the Court is inclined to infer that at least some market exists for licensing the Love Scale to other textbook authors, and that at least some likelihood exists that this market will be adversely impacted by widespread application of Brooks/Cole's use of the Love Scale.

**[**36]** Accordingly, although based mainly on inference, the Court finds that *some* meaningful likelihood of market harm exists, and therefore finds that the market effect factor the most important factor -- points just a tad in Rubin's favor.

*5. Balancing the Factors*

In light of its analysis of the factors above, the Court considers this an extremely difficult case. The productive use of the Love Scale and its previously published scientific nature (i.e., the first and second factors) favor of a finding of fair use, while the market effect, the most significant factor, and the substantiality of the taking (the third and fourth factors) weigh slightly against fair use. The Supreme Court has provided little guidance in such circumstances. *See* 3 Nimmer § 13.05[A][5], at 13-102.66 ***HN21*** ("even if the factors are analyzed . . . so that two favor a finding of fair use while two disfavor such a finding, there is no guidance as to which conflicting factors prevail over others" [also commenting on slipperiness of all four factors]). In striking an equitable balance, therefore, the Court rules with respect to *past* conduct that the very slight preference of the final two factors is outweighed **[**37]** by the slightly more weighty preference of the first two factors. The Court therefore rules that the defendants have met their burden of showing that, with respect to their past conduct, Brooks/Cole's use of the Love Scale was fair use under *17 U.S.C. § 107*. The potential "widespread application" of this holding to the future conduct of these defendants and other similarly situated textbook publishers, however, warrants a second look at the four factors with respect to future use. As to the future, this Court, having

---

[12] Inherent in the Supreme Court's "widespread use" analysis is the requirement that Courts consider the direct consequential impact of a finding of fair use in the particular case. In many cases, as here, the plaintiff's copyright is most endangered, not by the challenged act of reproduction itself but by the danger of subsequent permissible reproductions likely to occur in response to a Court's ruling that the challenged reproduction is fair use.

re-weighed the factors, rules that the fourth and most important factor assumes a more hefty significance and the balance tips in Rubin's favor. Thus, while Brooks/Coles use may have been "fair" in the necessarily inchoate world of private ordering, once the historic rights of the parties are balanced by this Court, the very fact of judicial decision affects private conduct in ways that, if continued, will not be fair to Rubin. Accordingly, while Rubin is entitled to no damages from this action, the future unauthorized use of the Love Scale will be enjoined.

B. Massachusetts Unfair Business Practices Claim

Rubin also asserts a claim **[**38]** for unfair competition and unfair and deceptive business practices under Mass. Gen. L. ch. 93A, to which the defendants raise the defense of federal preemption by ***HN22*** the Copyright Act, *17 U.S.C. § 301*. [13]*Section 301* establishes a bipartite test for determining whether a state statutory or common law claim is preempted. *Harper & Row, Publishers, Inc. v. Nation Enterprises, 723 F.2d 195, 199-200 (2d Cir. 1983)*, *rev'd on other grounds,471 U.S. 539, 85 L. Ed. 2d 588, 105 S. Ct. 2218 (1985)*; *Patricia Kennedy & Co., Inc.* v. *Zam-Cul Enterprises*, **[*923]** *Inc.*, 830 F. Supp. 53, 1993 WL 259452, at *2 (D. Mass. 1993) (Collings, M.J.). A state law claim is preempted if both parts of the test are satisfied. First, the work of authorship in which rights are claimed must fall within the subject matter of copyright as defined in sections 102 and 103 of the Act. *Harper & Row, 723 F.2d at 200*; *Patricia Kennedy & Co.*, 1993 WL 259452, at *2. In the instant case, there is no dispute that the Love Scale is subject to copyright protection.

**[**39]** The second consideration for preemption, and the point of argument here, is whether the state law creates "legal or equitable rights that are equivalent to any of the exclusive rights within the general scope of copyright as specified in *section 106* of the Act." *17 U.S.C. § 301(a)*. This requirement has been construed to mean:

> when a right defined by state law may be abridged by an action which, in and of itself, would infringe one of the exclusive rights [in *section 106*], the state law in question must be deemed preempted. Conversely, when a state law violation is predicated upon an act incorporating elements beyond mere reproduction or the like, the rights involved are not equivalent and preemption will not occur.*Harper & Row, 723 F.2d at 200*; *Quincy Cablesystems, Inc. v. Sully's Bar, Inc., 650 F.*

---

[13] 17 U.S.C. § 301***HN23*** provides in pertinent part:

> (a) On and after January 1, 1978, all legal or equitable rights that are equivalent to any of the exclusive rights within the general scope of copyright as specified by *section 106* in works of authorship that are fixed in a tangible medium of expression and come within the subject matter of copyright as specified by section 102 and 103 . . . are governed exclusively by this title. Thereafter, no person is entitled to any such right or equivalent right in any such work under the common law or statutes of any State.
>
> (b) Nothing in this title annuls or limits any rights or remedies under the common law or statutes of any state with respect to --
>
> . . .
>
> (3) activities violating legal or equitable rights that are not equivalent to any of the exclusive rights within the general scope of copyright as specified by *Section 106*.

*Supp. 838, 849 (D. Mass. 1986)Patricia Kennedy & Co.*, 1993 WL 259452, at *2. ***HN24*** The rights provided by *section 106* are the rights of exclusive reproduction and distribution and, with respect to certain artistic works (not applicable here), the rights of exclusive performance **[**40]** and display. *See17 U.S.C. § 106(1)-(5)*. [14]

Thus, ***HN26*** in order to avoid preemption, a state law claim must have an "extra element" that changes the nature of the action so that it is *qualitatively* different from a copyright infringement claim. *Computer Associates Intern., Inc. v. Altai, Inc., 982 F.2d 693, 716 (2d Cir. 1992)*; *Harper & Row, 723 F.2d at 201*; *Patricia Kennedy & Co.*, 1993 WL 259452, **[**41]** at *2. In other words, a cause of action will not be saved from preemption merely by elements such as awareness, intent, or commercial immorality, which alter the action's scope but not its nature. *Computer Associates Intern., 982 F.2d at 717*; *Nash v. CBS, Inc., 704 F. Supp. 823, 832-33 (N.D. Ill. 1989)*, *aff'd,899 F.2d 1537 (7th Cir. 1990)*. Rather, a Court must look beyond the "label affixed" to the cause of action, and must determine "what plaintiff seeks to protect, the theories in which the matter is thought to be protected and the rights sought to be enforced." *Patricia Kennedy & Co.*, 1993 WL 259452, at *2-3 (citing *Computer Associates Intern., 982 F.2d at 716*).

***HN27*** Following the "extra element" test, courts have determined that state law unfair competition and unfair and deceptive trade practices claims based solely upon impermissible replication of copyrighted material are preempted. *See, e.g., M.G.B. Homes, Inc. v. Ameron Homes, Inc., 903 F.2d 1486, 1493-94 (11th Cir. 1990)*; *Patsy Aiken Designs, Inc. v. Baby Togs, Inc., 701 F. Supp. 108, 110-12 (E.D.N.C. 1988)*; **[**42]** *Patricia Kennedy & Co.*, 1993 WL 259452, at *4; *see also Donald Frederick Evans & Assocs., Inc. v. Continental Homes, Inc., 785 F.2d 897, 915-916 (11th Cir. 1986)*. On the other hand, when unfair competition and unfair and deceptive trade practices claims require proof of an extra element such as likelihood of consumer confusion, misrepresentation, or deception, the claims survive preemption. *See, e.g., Nash, 704 F. Supp. at 832-33*; *see also Donald Frederick Evans & Assoc., 785 F.2d at 915-916*; *Storer Cable Communications v. City of Montgomery, Ala., 806 F. Supp. 1518, 1532 (M.D. Ala. 1992)*; *Patricia Kennedy & Co.*, 1993 WL 259452, at *4; **[*924]** 1 Nimmer § 1.01[B][1][e], at 1-21 ("crucial to liability under a deceptive trade practices cause of action is the element of misrepresentation or deception, which is no part of a cause of action for copyright infringement. . . . There is [also] no preemption of . . . the state law of unfair competition of the 'passing off' variety.")

In *Patricia Kennedy & Co.*, 1993 WL 259452, a court in this district addressed **[**43]** the application of the extra element test to a claim asserted under Mass. Gen. L. ch. 93A. In that case, the plaintiff alleged that the defendant had improperly acquired and used an artistic logo

---

[14] *17 U.S.C. § 106**HN25*** provides in pertinent part:

> Subject to *sections 107 through 118*, the owner of copyright under this title has the exclusive rights to do and to authorize any of the following:
>
> (1) to reproduce the copyrighted work in copies or phonorecords;
>
> (2) to prepare derivative works based upon the copyrighted work;
>
> (3) to distribute copies or phonorecords of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending;

created by the plaintiff. Applying the extra element test, Magistrate Judge Collings bifurcated the plaintiff's chapter 93A claim, preempting the portion of the claim based upon the defendant's "subsequent use of the Logo," but allowing the portion of the claim based upon "the defendant's conduct in disputing the origination of the artwork and thus acquiring the logo without payment for services rendered." *Patricia Kennedy & Co.*, 1993 WL 259452, at *4. Thus, the court established, and this Court agrees, that ***HN28*** although certain elements of a chapter 93A claim may be preempted, other aspects of the claim may still survive preemption if they include the "extra element" necessary *qualitatively* to differentiate that portion of the chapter 93A claim from the claim of copyright infringement.

In the instant case, Rubin bases his claim for unfair competition and unfair and deceptive business practices under chapter 93A upon the entirety of Brooks/Cole's conduct. *See* Compl. PP 31-36. It is **[**44]** clear beyond per-adventure, however, that the claim is preempted to the extent it is based directly upon Brooks/Cole's reproduction of the Love Scale, Brooks/Cole's failure to obtain Rubin's permission (at all or in a timely fashion), and Brooks/Cole's continued use of the Love Scale after Rubin's initial and subsequent objections. A chapter 93A claim based upon these acts asserts rights subsumed within an action for copyright infringement.

Rubin's chapter 93A claim is not limited to these acts, however, for Rubin also claims that Brooks/Cole improperly represented that the Love Scale was "reprinted with permission." [15] Although the Court is aware of no case which has addressed preemption by the Copyright Act of a state law claim based upon improper representation of permission, the Court derives guidance from cases considering preemption of unfair competition and deceptive trade practices claims of the "passing off" variety. In these cases, the plaintiffs' claims are based upon mislabeling or misrepresentation by the defendant which fools consumers into thinking that the defendant's product (which might also be an infringing product) is made or authorized by the plaintiff. *See*, **[**45]** *e.g.*, *Warner Bros. v. American Broadcasting Cos., 720 F.2d 231, 247 (2d Cir. 1983)* (claim that *Greatest American Hero* series misled viewers into thinking that series was produced or authorized by those responsible for the *Superman* films); *Xerox Corp. v. Apple Computer, Inc., 734 F. Supp. 1542, 1550 (N.D. Cal. 1990)*; *Nash, 704 F. Supp. at 833* (applying unfair trade practices statute); 1 Nimmer § 1.01[B][1][e] at 1-21 n.110. Courts have determined that such claims are not preempted by the Copyright Act based as they are upon an element of misrepresentation and deceit beyond mere reproduction. *See* *Princess Fabrics, Inc. v. CHF, Inc., 922 F.2d 99, 104 (2d Cir. 1990)*; *Warner Bros., 720 F.2d at 247*; *Data General Corp. v. Grumman Systems Support Corp., 795 F. Supp. 501, 506 (D. Mass. 1992)*; *Xerox Corp., 734 F. Supp. at 1550*; *Nash, 704 F. Supp. at 833*; 1 Nimmer § 1.01[B][1][e] at 1-21 & n.110. Here, Rubin contends that Brooks/Cole's **[**46]** credit line improperly represented that Rubin or the APA had sponsored or endorsed Forsyth's reproduction and use of the Love Scale. Thus, although somewhat factually dissimilar from boilerplate "passing off" claims in which the defendant pretends that the *product* is the plaintiff's, *e.g.*, *Xerox* **[*925]** *Corp.*, 734 F. Supp. at 1550; *see also* 1 Nimmer § 1.01[B][1][e] at 1-21 n.110, Rubin's claim similarly contains an extra element of misrepresentation with regard to the sponsorship or authorization of the reproduction. *Cf.* *Warner Bros., 720 F.2d*

---

[15] The credit line reads in full at page 649 of the text:

> (Table 7-4): From "Measurement of Romantic Love," by Z. Rubin. In *Journal of Personality and Social Psychology*, 1970, 16, 265-273. Copyright 1970 by the American Psychological Association. Reprinted by permission.

at 247. Accordingly, based upon the extra element of misrepresentation, the Court rules that Rubin's chapter 93A claim survives preemption based upon Brooks/Cole's representation that the Love Scale was reprinted with permission.

**[**47]** Rubin also asserts that his chapter 93A claim survives preemption due to the backdated permission letters. [16]***HN29*** Although most actions taken by a publisher to obtain authors' permissions are likely to be so closely intertwined with a claim for impermissible reproduction as to be preempted (such as state law claims based upon failure to obtain permission at all or in a timely manner), the Court agrees that a claim based upon the backdating of permissions letters may indeed involve an "extra element" of deception sufficient qualitatively to differentiate the claim from one for copyright infringement. Therefore, although the Court questions whether these letters form an adequate basis on the merits for a claim by Rubin (as opposed to the recipient authors), the Court rules that Rubin's chapter 93A claim survives preemption to the extent that it is based directly upon the backdated letters.

**[**48]** In sum, the Court rules that Rubin's chapter 93A claim survives preemption to the extent that it is based upon Brooks/Cole's representation that the Love Scale was reprinted with permission and upon the backdated letters, but rules that the remainder of Rubin's chapter 93A claim is preempted. This said, and having exhausted all federal issues in the case, the Court declines to address the remaining portion of Rubin's chapter 93A claim on the merits, instead deferring such consideration to the expertise of the Massachusetts Superior Court. [17]

**[**49] CONCLUSION**

On Count I, alleging copyright infringement as to past conduct, the Court finds in favor of the defendants on the basis that the use of the Love Scale was permissible fair use under *17 U.S.C. § 107*. As to future conduct, the Court finds for Rubin and permanently enjoins Brooks/Cole and Wadsworth, their officers, employees, agents, and servants, and all persons acting in concert with either of them, from any further unauthorized publication or reprinting of the Love Scale. [18] On Count II, alleging unfair competition and unfair and deceptive business practices under Mass. Gen. L. ch. 93A, the Court finds the claim preempted in all respects except to the extent that it is based upon Brooks/Cole's representation that the Love Scale was reprinted with permission and upon the backdated letters. These remaining portions of Count II are remanded for further proceedings to the Massachusetts Superior Court sitting in and for the County of Suffolk.

**[**50]** WILLIAM G. YOUNG

UNITED STATES DISTRICT JUDGE

---

[16] For a description of these letters and the Court's relevant findings, see the Court's discussion of the first fair use factor and accompanying notes *supra*.

[17] *See United Mine Workers of America* v. *Gibbs*, 383 U.S. 715, 726, 16 L. Ed. 2d 218, 86 S. Ct. 1130 (1966) ("If the federal claims are dismissed before trial, . . . the state claims should be dismissed as well."); *Vega* v. *Kodak Caribbean Ltd.*, 3 F.3d 476, Civ. No. 93-1156, slip op. at 3 n.2 (1st Cir. Aug. 24, 1993); *Gilbert* v. *City of Cambridge*, 932 F.2d 51, 67 (1st Cir. 1991) (similar), *cert. denied*, *116 L. Ed. 2d 153, 112 S. Ct. 192 (1991)*.

[18] This injunction does not prevent future sales of Forsyth's *Social Psychology* in its present edition to the extent such volumes have already been printed upon the date of this decision.

EXHIBIT 282

LexisNexis®

Caution
As of: August 12, 2014 9:17 AM EDT

# Ryko Mfg. Co. v. Eden Services

United States Court of Appeals for the Eighth Circuit
November 13, 1986, Submitted ; June 29, 1987, Filed
Nos. 86-1312, 86-1393

**Reporter:** 823 F.2d 1215; 1987 U.S. App. LEXIS 8169; 1987-1 Trade Cas. (CCH) P67,614; 92 A.L.R. Fed. 387

Ryko Manufacturing Co., Appellant, v. Eden Services, a Maryland Partnership, Fred J. Eden, Jr. and J. Erik Eden, Appellees. and Eden Services, Fred J. Eden, Jr. and J. Erik Eden, Appellees, v. Ryko Manufacturing Co., Appellant. Ryko Manufacturing Co., Appellee, v. Eden Services, a Maryland Partnership, Fred J. Eden and J. Erik Eden, Appellants. and Eden Services, Fred J. Eden, Jr. and J. Erik Eden, Appellants, v. Ryko Manufacturing Co., Appellee

**Subsequent History:** **[**1]** Petition for Rehearing En Banc Denied, Petition for Rehearing Denied August 18, 1987.

**Prior History:** Appeal from the United States District Court for the Southern District of Iowa.

**Core Terms**

distributors, sales, customers, machines, distributorship, prices, purchase order, resale price, manufacturer, provisions, car-wash, products, damages, antitrust, reclaim, purchaser, market power, territory, sight draft, installation, transactions, supplier, district court, foreclosure, consumer, parties, risks, oil company, sight-draft, buyers

**LexisNexis® Headnotes**

Civil Procedure > Trials > Judgment as Matter of Law > General Overview
Civil Procedure > Appeals > Standards of Review > General Overview

***HN1*** When reviewing a district court's ruling on a motion for judgment notwithstanding the verdict, the court reviews the evidence and all reasonable inferences arising therefrom in the light most favorable to the nonmoving party. This standard requires the court to (1) resolve direct factual conflicts in favor of the nonmovant, (2) assume as true all facts supporting the nonmovant which the evidence tends to prove, (3) give the nonmovant the benefit of all reasonable inferences and (4) deny the motion if the evidence so viewed would allow reasonable jurors to differ as to the conclusions that could be drawn.

Civil Procedure > Judgments > Relief From Judgments > General Overview
Civil Procedure > Judgments > Relief From Judgments > Motions for New Trials
Civil Procedure > Appeals > Standards of Review > Abuse of Discretion

***HN2*** The denial of a motion for a new trial is within the sound discretion of the trial court, and its ruling will be reversed only upon a showing that the court abused its discretion.

Antitrust & Trade Law > ... > Price Fixing & Restraints of Trade > Per Se Rule & Rule of Reason > General Overview
Antitrust & Trade Law > ... > Price Fixing & Restraints of Trade > Vertical Restraints > General Overview
Antitrust & Trade Law > ... > Price Fixing & Restraints of Trade > Vertical Restraints > Price Fixing
Antitrust & Trade Law > ... > Price Fixing & Restraints of Trade > Vertical Restraints > Resale Price Maintenance
Antitrust & Trade Law > Sherman Act > General Overview
Antitrust & Trade Law > Sherman Act > Claims
Contracts Law > Types of Commercial Transactions > Sales of Goods > General Overview
Contracts Law > ... > Remedies > Buyer's Damages & Remedies > General Overview
Contracts Law > ... > Types of Damages > Consequential Damages > Actions for Price

***HN3*** Resale price maintenance, a form of vertical price fixing by which a seller of goods attempts to set the price at which his buyer resells the goods to a second buyer, is condemned as inevitably tending to have a pernicious effect on competition. As a result, resale price maintenance is subject to a rule of per se illegality under *§ 1* of the Sherman Act, *15 U.S.C.S. § 1*. Schemes to fix both minimum and maximum resale prices are subject to the rule, and no evidence of anticompetitive impact is required to prove a violation.

Antitrust & Trade Law > ... > Price Fixing & Restraints of Trade > Vertical Restraints > General Overview
Antitrust & Trade Law > Sherman Act > General Overview
Antitrust & Trade Law > ... > Price Fixing & Restraints of Trade > Per Se Rule & Rule of Reason > Per Se Violations
Business & Corporate Law > ... > Duties & Liabilities > Causes of Action & Remedies > General Overview
Business & Corporate Law > ... > Duties & Liabilities > Causes of Action & Remedies > Breach of Contract
Business & Corporate Law > Distributorships & Franchises > Causes of Action > Restraints of Trade
Criminal Law & Procedure > ... > Inchoate Crimes > Conspiracy > Elements

***HN4*** It is not the law that if someone hires a real estate broker to sell his house for $ 100,000 he and the broker have made an agreement to fix the resale price of the house and are therefore guilty of a per se violation of the Sherman Act. Whether expressed in terms of an agent's incapacity to engage in an antitrust conspiracy with his corporate principal or in terms of a direct sale between the antitrust defendant and the purchaser, in which case there is no resale by the distributor, the analysis is essentially the same. To establish a case of resale price maintenance by a manufacturer, the antitrust plaintiff must demonstrate that (1) the manufacturer has contracted, combined, or conspired (2) with a separate economic entity (3) to set the price at which the products are resold (4) in an independent commercial transaction with a subsequent purchaser.

Antitrust & Trade Law > Sherman Act > General Overview

***HN5*** By means of a genuine contract of agency, a manufacturer lawfully can dispose of his article directly to the consumer and fix the price by which his agents transfer the title from him directly to such consumer.

Antitrust & Trade Law > ... > Price Fixing & Restraints of Trade > Vertical Restraints > General Overview
Energy & Utilities Law > Oil & Petroleum Products > Gasoline Fuels > Gasoline Dealers & Distributors

***HN6*** A supplier cannot by clever manipulation of words restrain price competition between otherwise independent retail distributors.

Antitrust & Trade Law > ... > Price Fixing & Restraints of Trade > Vertical Restraints > General Overview
Business & Corporate Law > Agency Relationships > General Overview
Business & Corporate Law > ... > Duties & Liabilities > Authorized Acts of Agents > Scope of Authority
Business & Corporate Law > ... > Corporate Existence, Powers & Purpose > Powers > Acts Through Agents

***HN7*** An owner of an article may send it to a dealer who may in turn undertake to sell it only at a price determined by the owner because a sales agent, when acting within the scope of his agency, is incapable of engaging in an antitrust conspiracy with his corporate principal.

Antitrust & Trade Law > ... > Price Fixing & Restraints of Trade > Vertical Restraints > General Overview
Business & Corporate Law > Distributorships & Franchises > Causes of Action > Restraints of Trade
Contracts Law > Types of Commercial Transactions > Sales of Goods > General Overview
Contracts Law > ... > Sales of Goods > Title, Creditors & Good Faith Purchasers > General Overview

***HN8*** The court must examine the various substantive "indicia of entrepreneurship" and the allocation of business risks, rather than the mere form of the agreement, in evaluating the economic substance of an agency or consignment. If a distributor deals with his supplier as an "independent businessman" who bears most or all of the risks on transactions with purchasers, then an agency or consignment agreement is ineffective to insulate the manufacturer from antitrust liability for fixing resale prices. However, where the manufacturer bears the financial risks of transactions with the customers and continues to retain "title, dominion, and control over its goods," then it is likely that the distributor is merely an agent for the manufacturer.

Antitrust & Trade Law > ... > Price Fixing & Restraints of Trade > Vertical Restraints > General Overview
Evidence > Burdens of Proof > General Overview

***HN9*** Where the evidence shows that the distributor is not solely responsible for making the sales, the distributor must produce more substantial evidence of its independence under Simpson to justify submitting a resale price maintenance claim to a jury.

Antitrust & Trade Law > ... > Price Fixing & Restraints of Trade > Vertical Restraints > General Overview

***HN10*** Compensation by commission is totally consistent with a distributor's role as a sales agent; it does not, standing alone, illustrate entrepreneurial independence.

Antitrust & Trade Law > ... > Price Fixing & Restraints of Trade > Vertical Restraints > General Overview

***HN11*** Locus of title is not itself a sufficient basis on which to determine antitrust liability.

Antitrust & Trade Law > ... > Price Fixing & Restraints of Trade > Vertical Restraints > General Overview
Contracts Law > ... > Discharge & Payment > Defenses > Illegalities

***HN12*** Conduct as consistent with permissible competition as with illegal conspiracy does not, standing alone, support an inference of antitrust conspiracy.

Antitrust & Trade Law > ... > Price Fixing & Restraints of Trade > Per Se Rule & Rule of Reason > General Overview
Antitrust & Trade Law > ... > Price Fixing & Restraints of Trade > Vertical Restraints > General Overview
Antitrust & Trade Law > ... > Price Fixing & Restraints of Trade > Vertical Restraints > Nonprice Restraints

Business & Corporate Law > Distributorships & Franchises > Termination > General Overview
Business & Corporate Law > Distributorships & Franchises > Termination > Antitrust Issues
Contracts Law > Defenses > Illegal Bargains

***HN13*** Independent action by the manufacturer, and concerted action on nonporous restrictions must be distinguished from price-fixing agreements. The per se rule does not apply to a manufacturer's unilateral termination of a price-cutting distributor, nor does it apply to the manufacturer's contractual imposition of nonprice restrictions.

Antitrust & Trade Law > ... > Price Fixing & Restraints of Trade > Per Se Rule & Rule of Reason > General Overview
Antitrust & Trade Law > ... > Price Fixing & Restraints of Trade > Vertical Restraints > Nonprice Restraints

***HN14*** Contractual nonprice restrictions imposed by a single manufacturer on its distributors are to be judged under the rule of reason. In applying this rule to a particular nonprice restraint, the court must examine the relevant market and weigh any loss in intrabrand competition caused by the restraint against any corresponding gain in interbrand competition.

Antitrust & Trade Law > Regulated Practices > Price Fixing & Restraints of Trade > General Overview
Antitrust & Trade Law > ... > Price Fixing & Restraints of Trade > Vertical Restraints > General Overview
Antitrust & Trade Law > ... > Price Fixing & Restraints of Trade > Vertical Restraints > Nonprice Restraints

***HN15*** In dealing with vertical nonprice restraints the focus of antitrust concern is the impact of a particular restraint on interbrand competition, rather than its impact on intrabrand competition. This is especially true in cases where substantial competition in the interbrand market provides a check on the exploitation of intrabrand market power by providing a ready supply of adequate substitutes to consumers.

Antitrust & Trade Law > ... > Price Fixing & Restraints of Trade > Cartels & Horizontal Restraints > General Overview
Antitrust & Trade Law > ... > Price Fixing & Restraints of Trade > Vertical Restraints > General Overview

***HN16*** When competing distributors conspire with their supplier to impose restrictions that redound primarily to the benefit of the distributors, the agreement should be considered horizontal even though it is vertical in form. Absent such an attempt to disguise a conspiracy for the benefit of competitors, if the evidence is consistent with the hypothesis that the firm at the top of the vertical chain designed the restrictions for its own purposes, an inference of horizontal conspiracy is inappropriate.

Antitrust & Trade Law > Regulated Practices > Market Definition > General Overview
Antitrust & Trade Law > ... > Price Fixing & Restraints of Trade > Per Se Rule & Rule of Reason > General Overview

***HN17*** As a preliminary matter, the plaintiff's proof that defendant's activities had an impact upon competition in the relevant market is an absolutely essential element of the rule of reason case. It follows that a showing that the defendant has market power is equally essential, because firms lacking market power cannot adopt restraints that have anticompetitive effects and thus cannot have an effect on interbrand competition.

Antitrust & Trade Law > Regulated Practices > Market Definition > General Overview

***HN18*** Market power generally is defined as the power of a firm to restrict output and thereby increase the selling price of its goods in the market. Market power may be shown by a firm's percentage of sales in the market, especially where there is a strong consumer preference for the firm's product which decreases the competitive impact of substitutes and where there are significant barriers either to the entry of new firms or to increased output by existing firms. On the other hand, direct evidence of competitive pressure, demonstrated by a significant number of viable competitors in the market or by the entry of new competitors or even by the product's price sensitivity, indicates a lack of market power.

Antitrust & Trade Law > Regulated Practices > Market Definition > General Overview
Civil Procedure > ... > Jury Trials > Jury Instructions > General Overview

***HN19*** The determination of the relevant market is an issue for the trier of fact.

Antitrust & Trade Law > Clayton Act > General Overview
Antitrust & Trade Law > Clayton Act > Scope
Antitrust & Trade Law > Sherman Act > General Overview

***HN21*** If a contract is not prohibited by the broader proscription of § 3 of the Clayton Act it follows that it is not forbidden by those of the Sherman Act.

Antitrust & Trade Law > Clayton Act > General Overview
Antitrust & Trade Law > Regulated Practices > Market Definition > General Overview
Antitrust & Trade Law > ... > Price Fixing & Restraints of Trade > Exclusive & Reciprocal Dealing > General Overview
Antitrust & Trade Law > ... > Price Fixing & Restraints of Trade > Exclusive & Reciprocal Dealing > Exclusive Dealing
Business & Corporate Law > Distributorships & Franchises > Causes of Action > General Overview
Business & Corporate Law > Distributorships & Franchises > Causes of Action > Restraints of Trade
Contracts Law > ... > Consideration > Enforcement of Promises > General Overview

***HN20*** Contracts imposing an obligation on a distributor to deal only in goods of a single supplier will violate § 3 of the Clayton Act when contract performance will foreclose competition in a substantial share of the line of commerce affected. That is to say, the opportunities for other traders to enter or remain in that market must be significantly limited. The court must examine the character of the relevant market and assess the competitive impact of the alleged restraints. The court no longer evaluates foreclosure under the purely quantitative test of earlier decisions. Where degree of foreclosure caused by exclusivity provisions is so great that it invariably indicates supplier imposing provisions has substantial market power, court may rely on foreclosure rate alone to establish violation. However, where foreclosure rate is neither substantial nor even apparent, plaintiff must demonstrate that other factors in the market exacerbate detrimental effect of challenged restraints.

Antitrust & Trade Law > Regulated Practices > Market Definition > General Overview
Antitrust & Trade Law > ... > Price Fixing & Restraints of Trade > Exclusive & Reciprocal Dealing > General Overview
Antitrust & Trade Law > ... > Price Fixing & Restraints of Trade > Vertical Restraints > Nonprice Restraints

***HN22*** Exclusive dealing should be evaluated under an analysis which takes into account not only the market share of the firm but the dynamic nature of the market in which the foreclosure

occurs. Plaintiff must show that the restraint has a probable adverse effect on interbrand competition. This showing depends upon an analysis of such market factors as: the willingness of consumers to comparison shop and their loyalty to existing distributors; the existence of entry barriers to new distributors; the availability of alternative methods of distribution; and any trend toward growth (or decline) in the level of competition at the supplier level.

Antitrust & Trade Law > ... > Price Fixing & Restraints of Trade > Exclusive & Reciprocal Dealing > General Overview

***HN23*** Where the exclusive dealing restraint operates at the distributor level, rather than at the consumer level, the court requires a higher standard of proof of "substantial foreclosure," because it is less clear that a restraint involving a distributor will have a corresponding impact on the level of competition in the consumer market.

Civil Procedure > ... > Jury Trials > Verdicts > General Overview

Civil Procedure > ... > Jury Trials > Verdicts > General Verdicts

Torts > ... > Fraud & Misrepresentation > Actual Fraud > General Overview

***HN24*** The rule in the circuit is clear that when one of two theories has erroneously been submitted to the jury, a general verdict cannot stand.

Evidence > Burdens of Proof > General Overview

Torts > Business Torts > Fraud & Misrepresentation > General Overview

***HN25*** Under Iowa law, there are five distinct elements in an action for fraud: (1) a material misrepresentation (2) made knowingly (scienter) (3) with intent to induce the plaintiff to act or refrain from acting (4) upon which the plaintiff justifiably relies (5) with damages. Moreover, the plaintiff must establish these elements by a "preponderance of clear, satisfactory and convincing evidence," rather than by a mere preponderance of all the evidence. This heavier evidentiary burden is mandated in fraud actions by the presumption of fair dealing accompanying a transaction.

Civil Procedure > Appeals > Standards of Review > General Overview

***HN26*** The court is not free to substitute its view of the facts for the jury's unless the only reasonable conclusion from the evidence is contrary to the conclusion the jury reached.

Business & Corporate Law > Distributorships & Franchises > Termination > General Overview

Civil Procedure > Trials > Jury Trials > Province of Court & Jury

Commercial Law (UCC) > Sales (Article 2) > Form, Formation & Readjustment > General Overview

Contracts Law > Breach > Breach of Contract Actions > General Overview

Contracts Law > Breach > General Overview

Contracts Law > Breach > Material Breach

***HN27*** Under Iowa law, a breach must be material before it becomes a valid basis for unilateral termination of the contract by the non-breaching party, and materiality is an issue of fact for the jury.

Contracts Law > Breach > Breach of Contract Actions > General Overview

Contracts Law > ... > Types of Damages > Compensatory Damages > General Overview

***HN28*** A trial on damages alone would require essentially the same evidence as a trial on both liability and damages.

**Counsel:** Donald J. Polden, for Appellant.

David O. Stewart, for Appellee.

**Judges:** Heaney, Circuit Judge, Floyd R. Gibson, Senior Circuit Judge, and Bowman, Circuit Judge.

**Opinion by:** BOWMAN

**Opinion**

**[*1218]** BOWMAN, Circuit Judge.

Ryko Manufacturing Company (Ryko) appeals from the District Court's denial of its motions for directed verdict, judgment notwithstanding the verdict, and a new trial, following a jury trial of various claims stemming from a dispute with one of its distributors, Eden Services (Eden). Ryko initiated this lawsuit, seeking a declaratory judgment that Eden had breached the terms of its distributorship contract with Ryko. Eden counterclaimed, charging Ryko with federal antitrust and racketeering violations, breach of contract, and common law fraud. Eden later dropped its racketeering claim, but after a protracted trial, the jury returned verdicts for Eden on the antitrust, contract, and fraud claims. The jury awarded Eden damages only on the antitrust claims, which, when trebled, totalled approximately $ 1.1 million. Ryko challenges **[**2]** each of the verdicts, arguing that Eden has not produced evidence sufficient to support any of its claims. Alternatively, Ryko challenges the District Court's rulings on evidentiary matters pertaining to the computation of damages with respect to Eden's antitrust claims.

## FACTUAL BACKGROUND

Ryko is a manufacturer of automatic car-wash equipment. Ryko markets its products nationally, both through a network of distributors and by direct sales to larger purchasers such as major oil companies arranging for the purchase of car-wash equipment for their affiliated stations. In the past Ryko has granted its distributors exclusive geographic territories and has prohibited the distributors from selling competitive car-wash equipment. Although the newer contracts contain less restrictive provisions, Eden's distributorship contract includes the earlier, more restrictive provisions. The distributors are responsible for promoting and soliciting sales of Ryko equipment and for performing installation, maintenance, and repair work on machines sold in their exclusive territories. In some areas, Ryko is a direct **[*1219]** distributor and subcontracts the installation, maintenance, and repair work.

Sales **[**3]** of car-wash units are made in two ways, by sight draft and by purchase order. In sight-draft sales, the distributor takes an order for the equipment from the purchaser and forwards the purchase order to Ryko along with a down payment on the machine. Ryko then builds the equipment as ordered, and ships the equipment to a location specified on the distributor's purchase order. Before the equipment is unloaded at its destination, Ryko requires confirmation that the distributor's sight draft, which guarantees payment for the equipment, has been honored. In all material respects, these sales are thus the equivalent of cash transactions. Ryko provides its distributors with suggested retail prices for its equipment, but the distributors are free to charge whatever the market will bear when selling by sight draft to independent buyers unaffiliated with any of the major oil companies or other major buyers.

For sales by purchase order, Ryko requires no down payment. The customer issues a purchase order in its own name payable directly to Ryko, and this documentation is intended to exclude the distributor as an intermediate payor or payee. Ryko then ships the equipment to the customer and arranges **[**4]** for its installation by a distributor, without requiring immediate payment.

Sales to larger customers generally are made by purchase order through Ryko's National Account Program (NAP). Under the NAP, designated customers, most commonly major oil companies and other multiple purchasers of car-wash equipment, receive significant volume discounts from the prices that Ryko recommends its distributors charge on individual sales for the distributor's own account. Ryko's contracts with its distributors specify that Ryko retains sole control over pricing and other marketing decisions regarding the NAP.

Although the qualifications for NAP customer status are not entirely clear, Ryko appears to focus its NAP program on those customers who are likely to purchase a large number of car-wash machines and whose buying decisions are handled, at least initially, in some centralized manner. For example, the oil companies generally participate in the purchase of car-wash equipment by their affiliated service stations. In many cases, prior approval of the equipment by the oil company is necessary because the oil company is assisting the station owner or jobber with financing for the machines. Even where **[**5]** financial assistance from the oil company is not required, lease obligations or other contractual arrangements may require such approval before installation of equipment at a particular service station. Accordingly, very few of the individual station operators or jobbers affiliated with the major oil companies are likely to purchase equipment unless it first has been approved by central management. The oil companies naturally seek to use their potential for purchasing large quantities of machines, even if purchased one at a time, to demand the best possible prices and service arrangements from their equipment suppliers. Moreover, the oil companies generally expect to receive a single discounted price for equipment to be installed at any company location throughout the country. Joint Appendix (J.A.) 359; Trial Exhibits (Ex.) 23, 72, 81, 83, 87, 88, B-2, I-3.

In many respects, sales by the distributors and NAP sales are identical. The distributor often is involved in the NAP sale and frequently is responsible for promotion, planning, installation, and servicing of equipment sold to NAP customers. However, Ryko corporate sales personnel are involved to a greater degree in NAP sales **[**6]** than in the distributors' sales to non-NAP customers. Ryko makes sales presentations to oil company procurement personnel, arranges for installation of Ryko equipment on a trial-use basis, and negotiates volume discounts with the customers in an effort to receive the required oil company approvals for its equipment. Ryko's factory representatives maintain continuing contact with the NAP customers' national or regional headquarters, further promoting the products and monitoring **[*1220]** customer satisfaction with the equipment and services.

Although some companies issue orders for multiple machines based on these national presentations, the distributors' promotional efforts can be essential to the completion of individual NAP sales. The distributors make primary contact with (1) individual station owners affiliated with the major oil companies; (2) oil industry middlemen, known as "jobbers," who typically own a number of affiliated stations; and (3) middle level or district managers of the oil companies with direct responsibility for retailing operations within the distributors' areas. While an oil company might designate Ryko an approved equipment supplier as the result of a national **[**7]** sales presentation, many NAP sales cannot be completed until the distributor has convinced the local purchaser that installing Ryko car-wash equipment at his location is a profitable idea.

Nevertheless, there are important differences between NAP sales and other sales by the distributors. First, as noted above, the prices at which NAP sales are made are set by Ryko. In making a sales presentation under the NAP, the distributor is obliged to offer equipment at the NAP price. Sales by the distributors for their own accounts are not similarly restricted. Second, the method of payment differs. In the case of NAP sales, Ryko extends credit to the customer, shipping and arranging for installation of the goods solely on the basis of the customer's purchase order. On other sales, Ryko requires its distributors to issue sight drafts guaranteeing immediate payment for the machines. Third, the method of compensating the distributors differs. On sight-draft sales, the distributor receives payment directly from the customer, and earns a gross profit equal to the difference between the retail price he charges the customer and the wholesale price Ryko charges the distributor for the machine. On **[**8]** NAP sales, Ryko pays the distributors a commission for each machine sold in the distributor's exclusive territory. The commission on NAP sales is the difference between the NAP price to the customer and the wholesale price the distributor would have paid if purchasing the machine for its own account. Finally, the documentation for the transactions differs. The same purchase order forms, which bear Ryko's logo and billing address, are used in both sight-draft and NAP sales. However, the distributors are required by their contracts with Ryko to issue purchase orders for NAP sales in the name of the NAP customer; on sales for the distributor's own account, the orders are issued in the distributor's name.

Eden became a Ryko distributor in the summer of 1977 and was assigned in the distributorship contract an exclusive territory covering Maryland and the District of Columbia. Ryko recently had assigned all of Virginia to another distributor, but Eden repeatedly expressed a desire to distribute Ryko's products in the northern Virginia area near Washington, D.C. The precise nature of Ryko's assurances to Eden on this issue are a subject of sharp dispute between the parties. However, it is **[**9]** clear that Eden reached an agreement with the Virginia distributor regarding a division of commissions on sales in northern Virginia and that Eden actively promoted and sold Ryko's products there.

In 1980, Ryko terminated its Virginia distributor, and again the issue of Eden's territory arose. Eden claims that a Ryko factory representative assured it that its agreement with the former Virginia distributor would be honored; Ryko claims that the agreement allowed Eden to perform services in Virginia only on an "as needed" basis for Ryko. The dispute over Eden's territory and commissions continued into 1982, and business relations became increasingly strained. In April 1982 the parties met and came to an agreement regarding Eden's rights in northern Virginia, but both parties agree that the agreement was not adhered to. Whether the agreement effectively modified the distributorship contract and whether one or both of the parties breached the modified agreement are disputed. Following the April meeting, relations continued to deteriorate. Eden accused Ryko of unilaterally depriving the distributors of their customers by adopting **[*1221]** a new "special usage" account as part of the **[**10]** NAP. Eden shared its views with other Ryko distributors, and Ryko accused Eden of taking a "cheap shot" at Ryko.

In October 1982, Ryko informed Eden that it was returning to the literal terms of the 1977 contract, since Eden had refused to sign the new distributorship contracts offered in 1980 and 1982 and since, in Ryko's view, Eden had not adhered to the terms of the April 1982 agreement. Under Ryko's interpretation of the 1977 contract, Eden categorically was barred from distributing Ryko products in Virginia and was subject to a pricing structure that differed from the other distributors, who operated under newer contracts with different pricing provisions. Ryko also

read the contract to prohibit Eden from selling a water reclaim device (used to recycle water used in car-wash systems) developed by Eden, and directed Eden to sell only Ryko water reclaim units.

Eden wrote letters to Ryko in December 1982 and January 1983 accusing Ryko of harassing Eden, of taking over its territories, and of interfering in Eden's business relationships. Eden asserted its right to sell in Virginia as it saw fit and threatened legal action against Ryko if necessary. Both parties continued to make demands **[**11]** of the other regarding proposed contract changes, but by this time communication had become more conducive to litigation than to resolving a business dispute.

Following Eden's February 1983 bid to Crown McClean, a Virginia customer Eden had pursued for several years, Ryko brought its declaratory judgment action in District Court, which prompted Eden's extensive counterclaims. In December 1983 Ryko attempted to terminate Eden, citing alleged interference with Ryko's contractual relationships with both its customers and its distributors and Eden's alleged sale of competing products in violation of the exclusive dealing provision of the distributorship agreement. Eden sought and received an injunction against the termination and an order defining its rights in northern Virginia. Ryko appealed the order, and this Court modified the injunction in April 1985. *Ryko Mfg. Co. v. Eden Services, 759 F.2d 671 (8th Cir. 1985)*. The subsequent District Court trial on Eden's various common law and antitrust counterclaims resulted in multiple verdicts and a substantial damages award for Eden. Ryko made motions for a new trial and for judgment notwithstanding the verdict, which **[**12]** the District Court denied in most substantive respects. [1] Final judgment having been entered in favor of Eden, Ryko appeals the District Court's ruling on its post-trial motions, and the parties are again before us. Ryko contends that there is insufficient evidence to support any of the jury verdicts and, accordingly, that the District Court erred in denying its motion for judgment notwithstanding the verdict. Alternatively, Ryko argues that the verdicts are against the weight of the evidence, and that the District Court erred in denying its motion for a new trial.

## STANDARDS OF REVIEW

***HN1*** When reviewing a district court's ruling on a motion for judgment notwithstanding the verdict, we review the evidence and all reasonable inferences arising therefrom in the light most favorable to the nonmoving party. *Pumps & Power Co. v. Southern States Industries, 787 F.2d 1252, 1258 (8th Cir. 1986)*. This requires **[**13]** us to

> (1) resolve direct factual conflicts in favor of the nonmovant, (2) assume as true all facts supporting the nonmovant which the evidence tends to prove, (3) give the nonmovant the benefit of all reasonable inferences and (4) deny the motion if the evidence so viewed would allow reasonable jurors to differ as to the conclusions that could be drawn.

*McCabe's Furniture v. La-Z-Boy Chair Co., 798 F.2d 323, 327 (8th Cir. 1986)*.

Our review of a district court's denial of a motion for a new trial is even more limited. ***HN2*** The denial of a motion for a new trial is within the sound discretion of the **[*1222]** trial court, and its ruling will be reversed only upon a showing that the court abused its discretion.

---

[1] The jury appeared to have derived one of the damage awards from the wrong damages exhibit, and the District Court reduced this award to reflect the correct amount. Eden did not resist Ryko's j.n.o.v. motion with respect to the attempted monopolization claim. J.A. 799.

*Greenwood v. Dittmer, 776 F.2d 785, 790 (8th Cir. 1985)*; *see also Craft v. Metromedia, Inc., 766 F.2d 1205, 1221 (8th Cir. 1985)*, *cert. denied*, *475 U.S. 1058, 106 S. Ct. 1285, 89 L. Ed. 2d 592 (1986)*. We have thoroughly examined the extensive record, and we apply these standards, as appropriate, to each of the verdicts rendered against Ryko.

**ANTITRUST: Resale Price Maintenance**

**[**14]** Ryko's first argument on appeal is that the evidence was insufficient to submit Eden's resale price maintenance claim to a jury. ***HN3*** Resale price maintenance, a form of vertical price fixing by which a seller of goods attempts to set the price at which his buyer resells the goods to a second buyer, has been condemned as inevitably tending to have a pernicious effect on competition. *See, e.g., Arizona v. Maricopa County Medical Society, 457 U.S. 332, 351, 73 L. Ed. 2d 48, 102 S. Ct. 2466 (1982)*. As a result, resale price maintenance is subject to a rule of *per se* illegality under *Section 1* of the Sherman Act, *15 U.S.C. § 1*. *Continental T.V., Inc. v. GTE Sylvania, 433 U.S. 36, 51 n. 18, 53 L. Ed. 2d 568, 97 S. Ct. 2549 (1977)*. Schemes to fix both minimum, *Dr. Miles Medical Co. v. John D. Park & Sons Co., 220 U.S. 373, 55 L. Ed. 502, 31 S. Ct. 376 (1911)*, and maximum resale prices, *Albrecht v. Herald Co., 390 U.S. 145, 19 L. Ed. 2d 998, 88 S. Ct. 869 (1968)*, are subject to the rule, and no evidence **[**15]** of anticompetitive impact is required to prove a violation. Despite criticism regarding the theoretical justification for the *per se* treatment of vertical price restrictions, *see, e.g., Sylvania, 433 U.S. at 69-70* (White, J., concurring in judgment); Bork, *The Antitrust Paradox* 282-98 (1978), the Supreme Court recently has declined to reconsider the wisdom of the rule as it applies to resale price maintenance. *Monsanto Co. v. Spray-Rite Service Corp., 465 U.S. 752, 761 n. 7, 79 L. Ed. 2d 775, 104 S. Ct. 1464 (1984)*.

It follows that if, as Eden claims, Ryko's NAP is a resale price maintenance scheme, we would not be free to consider its actual effect on interbrand competition. However, we hold that Eden's evidence in this case is insufficient as a matter of law to establish that the NAP constitutes resale price maintenance.

Ryko designed the NAP to operate within its existing framework of independent distributors, because it had neither the desire nor the capital to establish a vertically integrated distribution network on a national scale. It is undisputed that without a comprehensive **[**16]** national sales approach, including standardized price quotations, Ryko would find it difficult, if not impossible, to obtain the required oil company approvals of its equipment. If the pricing system and purchasing mechanisms of Ryko's NAP are held to constitute resale price maintenance, the practical effect of such a holding will be to require direct distribution of car-wash equipment sold to major oil companies. This would pose a potentially insurmountable barrier -- in terms of the required capital and labor -- to the entry of new competitors. Such a result hardly would be consistent with sound antitrust policy.

As observed recently by the Seventh Circuit, ***HN4*** "it is not the law that if someone hires a real estate broker to sell his house for $100000 he and the broker have made an agreement to fix the resale price of the house and are therefore guilty of a per se violation of the Sherman Act. . . ." *Morrison*, 797 F.2d at 1436. Whether expressed in terms of an agent's incapacity to engage in an antitrust conspiracy with his corporate principal, *see, e.g., Pink Supply Corp. v. Hiebert, Inc., 788 F.2d 1313, 1316-18 (8th Cir. 1986)*, or in **[**17]** terms of a direct sale between the antitrust defendant and the purchaser (in which case there is no resale by the distributor), *see, e.g., Overhead Door Corp. v. Nordpal Corp.*, 1979-1 Trade Cas. (CCH) P 62,595 (D. Minn. 1978),

the analysis is essentially the same. To establish a case of resale price maintenance by a manufacturer, the antitrust plaintiff must demonstrate that (1) the manufacturer has contracted, combined, or conspired (2) with a separate economic entity (3) to set the price at which **[*1223]** the products are resold (4) in an independent commercial transaction with a subsequent purchaser. We find that as a matter of law Eden acts as Ryko's agent, for antitrust purposes, in those sales in which Ryko sets the retail price of its machines. Accordingly, we hold that Eden failed to present a submissible case for the jury on its claim of resale price maintenance.

In *United States v. General Electric Co., 272 U.S. 476, 71 L. Ed. 362, 47 S. Ct. 192 (1926)*, the Supreme Court held that a manufacturer could, without incurring liability for vertical price fixing, sell merchandise directly to the consumer **[**18]** through a network of distributors acting as sales agents of the manufacturer. General Electric employed a consignment plan whereby the company fixed the price of incandescent lamps sold by retailers to the public. The Court held that ***HN5*** by means of a "genuine contract[] of agency," a manufacturer lawfully could "dispose of his article directly to the consumer and fix[] the price by which his agents transfer the title from him directly to such consumer." *Id. at 488*.

Almost forty years later, in *Simpson v. Union Oil Co., 377 U.S. 13, 12 L. Ed. 2d 98, 84 S. Ct. 1051 (1964)*, the Court considered a similar consignment system employed by a number of the major oil companies. Union Oil Company sold gasoline nationally through over three thousand retail service stations. The company delivered gasoline on consignment to station operators, who sold it at prices determined by Union. Although Union retained title to the gasoline until it was sold at the pump, the operator was "responsible for all losses of the 'consigned' gasoline in his possession, save for specified acts of God." *Id. at 15*. **[**19]** This time, the Court was less sympathetic, holding that the consignment device was a mere sham that served to cover a vast gasoline distribution system that involved illegally fixing resale prices. *Id. at 21*. The Court concluded that ***HN6*** a supplier could not, "by clever manipulation of words," restrain price competition between otherwise independent retail distributors. *Id. at 22*.

*Simpson* does not mean that legitimate agency or consignment arrangements can give rise to antitrust liability. ***HN7*** "An owner of an article may send it to a dealer who may in turn undertake to sell it only at a price determined by the owner," *id. at 21*, because a sales agent, when acting within the scope of his agency, is incapable of engaging in an antitrust conspiracy with his corporate principal. *Pink Supply, 788 F.2d at 1316*; *Calculators Hawaii, Inc. v. Brandt, Inc., 724 F.2d 1332, 1336 & n.1 (9th Cir. 1983)*. *Simpson* thus did not overrule *General Electric*. *See* *Pogue v. International Industries, Inc., 524 F.2d 342, 345 (6th Cir. 1975)*. **[**20]** Rather, the Court limited the scope of its prior decision, and refined the courts' inquiry in evaluating similar agency claims.

Under *Simpson**HN8*** we are directed to examine the various substantive "indicia of entrepreneur[ship]" and the allocation of business risks, rather than the mere form of the agreement, in evaluating the economic substance of an agency or consignment. *377 U.S. at 20*. If a distributor deals with his supplier as an "independent businessman" who bears most or all of the risks on transactions with purchasers, then an agency or consignment agreement is ineffective to insulate the manufacturer from antitrust liability for fixing resale prices. *Id. at 20-21*; *Greene v. General Foods Corp., 517 F.2d 635, 652-53 (5th Cir. 1975)*, *cert. denied*, 424 U.S. 942, 96 S. Ct. 1409, 47 L. Ed. 2d 348 (1976). However, where the manufacturer bears the financial risks of transactions with the customers and continues to retain "title, dominion and control over its goods," *Pogue, 524 F.2d at 345*, then it is likely that **[**21]** the distributor is merely an agent for the

manufacturer. *See also* Mesirow v. Pepperidge Farm, Inc., 703 F.2d 339, 342-43 (9th Cir.) (no resale price maintenance where defendant bore "significantly greater risks" in sales of goods through plaintiff distributors), *cert. denied*, 464 U.S. 820, 78 L. Ed. 2d 93, 104 S. Ct. 83 (1983).

This analysis is limited to examining the distributor's role vis-a-vis transactions allegedly **[*1224]** involving an antitrust violation. A distributor may act as his supplier's agent when performing certain duties in a business relationship, but as an independent entrepreneur when performing others. Hence, in Hardwick v. Nu-Way Oil Co., 589 F.2d 806, 809-10 (5th Cir.), *cert. denied*, 444 U.S. 836, 100 S. Ct. 70, 62 L. Ed. 2d 46(1979), the operator of a drive-in convenience store and gas station was held to be a sales agent of the defendant when making sales of gasoline, although she was an independent entrepreneur when making grocery sales. The court noted that the operator bore none of the financial risks of the gasoline sales, **[**22]** *id. at 810-811*, and concluded that the operator "was, for purposes of the antitrust laws, operating a company station as an employee." *Id. at 809*. The court held that the economic substance of the relationship more closely resembled an agency, even though "the agreement [between the operator and the defendant] itself provided that the station operator was to be considered an independent contractor." *Id. at 809, 811*.

Here, as in *Hardwick*, our focus is not on Eden's entire business relationship with Ryko. Rather, we are concerned with Eden's role in sales for which Ryko fixed the price charged the purchaser of the equipment. Eden's role as agent or entrepreneur in making non-NAP sales, in which Eden is free to charge whatever the market will bear, therefore is irrelevant to our analysis of the resale price maintenance claim. Similarly, we are bound neither by Eden's nor Ryko's characterization of the distributorship relationship, nor by language in the distributorship contract disclaiming that Eden acts as Ryko's agent "for any purposes whatsoever." *Simpson* directs us to decide Eden's role based on the substance of **[**23]** the economic relationship, and not exclusively on the terms that the parties used to characterize Eden's role. *377 U.S. at 21-22*; *see also* *Illinois Corporate Travel, Inc. v. American Airlines, Inc., 806 F.2d 722, 725-26 (7th Cir. 1986)* (agency determined by reference to objective factors, rather than to parties' subjective intent).

We must examine Eden's role and the types of business risks it bears in two types of transactions involving NAP-designated customers: (1) sales by purchase order and (2) sales by sight draft. The parties agree that transactions of the first type are covered by the NAP and are subject to the program's pricing structure. Regarding the second type of transaction, there is disagreement. Eden argues that these sales to NAP-designated customers also were covered by the NAP, and accordingly were subject to Ryko's price controls. Ryko disputes this, contending that no sight-draft sales, including those to NAP-designated customers, were subject to NAP pricing policies. [2] We consider each type of transaction in turn.

**[**24]** Purchase Order Sales

We have no difficulty in deciding that, as a matter of law, Eden failed to produce sufficient evidence from which a jury reasonably could conclude that Eden acts as a separate business entity, independently bearing economic risks of independent commercial transactions in soliciting purchase order sales under the NAP. In both substance and form, Eden acts as Ryko's agent in

---

[2] Sight-draft sales to non-NAP designated customers clearly fall outside the NAP pricing structure. Eden was free to charge whatever price the market would bear on these types of transactions, and they therefore are irrelevant to our analysis of the resale price maintenance claim.

effecting purchase order sales between Ryko and the NAP customers, and Ryko therefore cannot be held liable for fixing the price of equipment so sold.

Eden repeatedly refers us to *Greene v. General Foods Corp., 517 F.2d 635 (5th Cir. 1975)*, *cert. denied*, *424 U.S. 942, 96 S. Ct. 1409, 47 L. Ed. 2d 348 (1976)*, urging that its business relationship with Ryko closely resembles the arrangement held to constitute resale price maintenance in that case. We are not persuaded that the similarities are sufficient to compel the same result here. In *Greene*, General Foods employed a similarly bifurcated program of both direct and national account sales to **[*1225]** service the entire market for its coffee products. *Id. at 640*. **[**25]** Distributors were free to charge any price for direct sales to ordinary customers, but sales to national account customers were priced according to a schedule set by General Foods. *Id. at 640-41*. The distributor in *Greene* "held title to all goods he acquired from General Foods," took possession of the goods, and "stored them in his warehouses at his own expense and at his risk of loss." *Id. at 641*. Deliveries for both direct and national account sales were made from the distributor's own stocks, and the distributor was responsible for billing national account purchasers, using invoices written in the name of General Foods. *Id.*

In contrast, Eden never took possession of Ryko machines sold under purchase order, nor did it bear any of the responsibility for billing the NAP purchasers. Eden merely filed the purchase order with Ryko and received its commission after Ryko collected on the account. Unlike General Foods, Ryko never parted with title, dominion, or control over the machines before passing them to the NAP customer. Eden's distributorship contract specifies that purchase orders for machines ordered under the NAP are to be issued **[**26]** in Ryko's name and not Eden's. [3] Ryko bears all the credit risks in the transactions and performs its own billing on NAP purchase order sales. Where required, Ryko secures the necessary electrical approvals, engineering inspections, and government operating permits for its equipment. Ex. 5, 38, P-3; Tr. 864-867. *Compare* *Hardwick, 589 F.2d at 810* (defendant acquired and maintained all necessary permits). Eden occasionally was involved in securing such approvals, but only to the extent necessary to have its own water reclaim system approved for use in connection with a Ryko car wash. Ex. B-3, Q-3.

Because the machines are never in Eden's possession, Eden bears none of the risks attendant to warehousing them prior to sale. Although Ryko requires its distributors to make minor repairs on machines damaged in transit, [4] the distributors may make claims against the carriers for repair expenses so incurred. While **[**27]** satisfactory resolution of these shipping damage claims is not always forthcoming, such obligations do not, without more, constitute a meaningful shifting of the risk of loss on purchase order transactions.

---

[3] This is more than a mere paper formality: Ryko uses the NAP purchase order as collateral for operational financing, relying on the creditworthiness of the major oil company buyers to secure loans approaching the face value of the purchase orders. Tr. 453.

[4] Ryko ships goods sold under the NAP in the name of the purchaser, FOB Des Moines, which means that the ultimate purchaser, rather than Eden, is legally responsible for the goods during shipment. *See*Iowa Code §§ 554.2319, 554.2401, 554.2509. However, Eden demonstrated that in practice Ryko requires its distributors to take responsibility for minor shipping damage. *See, e.g.*, Ex. R-4, U-4, Tr. 1446-49. Similarly, although the distributorship contract requires Eden to maintain liability insurance covering the machines and Eden's installation and service work, Eden admitted that Ryko has not strictly enforced the provision. Tr. 1109. Moreover, it is unclear whether Eden could be held legally responsible for damage caused by a machine to which Eden never holds title, and Eden has presented no evidence that it actually purchased the insurance coverage.

Eden repeatedly attempts to characterize NAP customers as its own, apparently relying on language from *Greene* **[**28]** regarding the distributors' sales efforts in that case. [5] **[*1226]** In *Greene*, General Foods apparently performed none of the solicitation and promotion of the national account customers and products. *517 F.2d at 657-58*. At trial, Eden asserted that Ryko similarly had no significant relationship with NAP customers and no involvement in most NAP sales. The evidence flatly contradicts such an assertion. Eden's contact with oil company district managers and individual station operators clearly gives it closer personal contact with individuals at the local level. However, Ryko submitted uncontradicted evidence demonstrating that it promotes and submits bids on equipment directly to NAP customers and that it has received orders for purchases of machines from the customers so solicited. *Cf. Mesirow, 703 F.2d at 343* (defendant promoted and serviced direct-billed accounts).

**[**29]** Testimony from a local franchisee of one of the national accounts -- that he had no real relationship with Ryko's central management -- is not a sufficient basis for the inference that Eden was solely responsible for NAP sales in its territory. Eden has demonstrated that its sales efforts are in some cases necessary, but it has not proved that they are ever sufficient to make sales to NAP customers. The situation here, where selling responsibility is divided among Ryko's central management, its regional sales representatives, and its local distributors, is far different from the situation in *Greene*, where "the actual 'selling' -- the solicitation of orders, the moving of merchandise, most of the risk of loss, and the day-to-day task of creating and maintaining customer satisfaction -- [was] performed by Greene and counterparts and not by some central selling staff of General Foods." *Greene, 517 F.2d at 657-58*. ***HN9*** Where the evidence shows that the distributor is not solely responsible for making the sales, we believe the distributor must produce more substantial evidence of its independence under *Simpson* to justify submitting a resale price maintenance claim to a jury. *Cf. Overhead Door Corp.*, 1979-1 Trade Cas. (CCH) P 62,595, at 77,431 **[**30]** (evidentiary burden greater where defendant participates in sales efforts to national customers and where plaintiff can set prices for sales on his own account).

We are unpersuaded that Eden's selling efforts to NAP customers would satisfy the *Simpson* test even if Ryko were not jointly responsible for the sales. Responsibility for soliciting and forwarding purchase orders and for maintaining and repairing equipment is consistent with Eden's status as Ryko's agent, and does not demonstrate Eden's entrepreneurial independence. *See Calculators Hawaii, 724 F.2d at 1336*. Similarly, Eden's required capital investment as a distributor apparently was limited to $ 500. Tr. 721. We do not believe this limited investment reflects the type of independent risk bearing that was present in *Simpson* or *Greene*. Finally,

---

[5] In *Greene*, the court suggested that one of the central issues in applying *Simpson* to the facts of that case was to decide "who was a customer of whom." 517 F.2d at 655. Indeed, the District Court here submitted the *Simpson* inquiry to the jury in exactly the same terms. Jury Instruction 19. Ryko has not objected to the form of this instruction, and because of our view of the evidence, we need not decide whether the instruction constitutes plain error. However, we note that the instruction seriously misstates the law and would be grounds for reversal if Ryko had objected to the form and content of the instruction, rather than relying solely on its objections regarding the sufficiency of the evidence. *Simpson* clearly directs our attention to the economic risks involved in the transactions, not to an ambiguous inquiry regarding the loyalties of the ultimate consumer. To instruct a jury to conduct a *Simpson* inquiry by deciding whose customers belong to whom is to invite the jury to speculate about personal relationships between the parties, and to draw conclusions based solely on evidence regarding promotional efforts, rather than on the actual assumption of economic risk. A jury reasonably could conclude, if put to the choice, that buyers of products from a manufacturer's sales representative were "customers" of the representative, rather than of his employer. Indeed, if the sales representative were to change employers, many of his former customers might be expected to continue to do business with him and to begin ordering goods from the representative's new supplier. However, as a matter of antitrust law, both of the representative's employers would be equally free to set the price at which he sold their goods, regardless of whether the ultimate buyers might be considered "customers" of the representative.

the method by which Ryko compensates Eden with respect to NAP sales -- a price-based commission with which Eden must cover its own operating expenses -- is a similarly insufficient basis for the conclusion that Eden acts as an independent entrepreneur with respect to NAP sales. ***HN10*** Such compensation by commission is totally consistent with Eden's role as a sales **[**31]** agent; it does not, standing alone, illustrate Eden's entrepreneurial independence. *Cf.* *Holter v. Moore and Co., 702 F.2d 854, 856* (10th Cir.), (citing *American Oil Co. v. McMullin, 508 F.2d 1345, 1351-52 (10th Cir. 1975))*, *cert. denied*, *464 U.S. 937, 104 S. Ct. 347, 78 L. Ed. 2d 313 (1983)*.

**Sight Draft Sales**

Eden points out that some of its sales to NAP customers have been made by sight draft, and in those sales Eden has taken title to the machines before "reselling" them to the customer. *See, e.g.*, Ex. C-7, D-7, L-7, V-7, W-7, X-7. Eden argues **[*1227]** that under *Simpson* and *Greene*, it bears the economic risks in these sight draft transactions, but is prohibited by the NAP provisions of the distributorship contract from negotiating a price different from the NAP price for machines so sold. Eden repeatedly asserts that NAP pricing is "mandatory" for all sales to NAP customers, regardless of whether Eden secures purchase orders for Ryko or sells the machines by sight draft. Ryko admits that Eden takes title to machines sold by sight draft, but argues that NAP pricing does not apply to any sight-draft sales, even those to NAP-designated **[**32]** customers.

The lesson of *Simpson* is that ***HN11*** locus of title is not itself a sufficient basis on which to determine antitrust liability. *377 U.S. at 21-22*. The real issues are whether Eden bears significantly greater economic risks in sight-draft transactions with NAP customers than it does in soliciting purchase orders, and, if so, whether Ryko conspired to fix Eden's resale price in sight-draft transactions. We believe that Eden again failed to submit sufficient evidence from which a jury reasonably could infer that Eden bears such risks, even on those sales in which it takes title to the machines and then passes them on to NAP-designated customers.

Eden apparently requires its purchasers in sight-draft transactions to deposit the purchase price with Eden's bank before Eden will issue the necessary sight draft to Ryko for final delivery. Ex. 93. This type of prepaid transaction does not involve significantly greater financial risks than purchase order transactions, because Eden incurs no liability for payment on the machines before it receives advance payment from the customer. Eden has not produced evidence suggesting that it buys machines **[**33]** on speculation, provides financing for, [6] **[**34]** or takes possession of machines sold to NAP customers by sight draft before final delivery to the customer. [7] Similarly, although Eden is responsible for the collection and payment of state sales taxes on

---

[6] In a sales proposal to a Gulf Oil Company district office, Eden referred to one prior sale in which it accepted a purchase order from Gulf covering the equipment, construction, plumbing and electrical work involved in the installation of a Ryko machine. Ex. 4; Ex. DDD. In the letter, Eden requests that the purchase order for the latest proposal be separated into its various components (and that the order for the machine be made out directly to Ryko) to relieve Eden "of the burden of financing the project up front, as we did for the Columbia project . . . ." Ex. 4. The letter makes clear that Eden did not wish to make a practice of providing such financing for the customer. Significantly, on the sale proposed in the letter, Ryko extended 30-day credit to Eden, thus relieving Eden of the responsibility of issuing a sight draft for delivery of the equipment before Eden received payment from the customer. Eden assured Ryko that "normal bid and contract procedures" would be followed on the next sale. Ex. 14. Given Eden's own characterization of such financing as an exception, we do not believe this single instance should be significant in our analysis of the entire economic relationship.

[7] Although Eden produced two invoices purporting to show that Ryko had delivered machines directly to Eden for installation at other locations, neither of these sales were to NAP customers. Ex. E-8, F-8. One of the sales was to a previous NAP customer,

sight-draft sales, we do not believe that this added responsibility significantly shifts the locus of risks in the transactions.

Finally, Eden has not demonstrated that Ryko is any less involved in promoting and soliciting national approval for its products sold to NAP customers by sight draft than for those sold by purchase order, nor has Eden shown that it bears significantly greater economic risks in these sales. Accordingly, for sight-draft sales to NAP customers, we also conclude that Eden has produced insufficient evidence of its independent entrepreneurial status to support a jury verdict. Moreover, even if we held that Eden produced sufficient evidence of risk bearing, we would be unable to affirm the resale price maintenance verdict, because Eden has failed to show that Ryko conspired to fix the prices that Eden charged its customers on sight-draft sales.

Eden bears the burden **[**35]** of "present[ing] direct or circumstantial evidence that reasonably tends to prove that the manufacturer and others 'had a conscious commitment **[*1228]** to a common scheme designed to achieve an unlawful objective.'" *Monsanto, 465 U.S. at 764* (citation omitted). The plaintiff must produce evidence that is "sufficient for the jury to determine not merely that the manufacturer . . . conspired, but that . . . [it] conspired to *maintain resale prices." McCabe's Furniture, 798 F.2d at 329* (citation omitted) (emphasis added). To meet this burden, Eden relies exclusively on its interpretation of the NAP provisions contained in its distributorship contract with Ryko and on the various NAP policy statements implementing those provisions. This is not a case involving complaints by other distributors about a price-cutting distributor or warnings from the manufacturer that it would not tolerate price deviations by its distributors. *Compare Monsanto, 465 U.S. at 763, 765*. In these circumstances, a jury could not reasonably find that Ryko entered into an agreement to fix Eden's resale **[**36]** prices unless the contract provisions and policy statements themselves fix those prices. [8]

Although Ryko has admitted that the NAP dictates the price at which goods are sold by purchase order directly to the NAP customers, Ryko denies that the NAP policies apply to sight draft sales. Eden argues that the contract provisions and the policy **[**37]** statements constitute an agreement to fix prices for all sales to NAP customers, either by sight draft or by purchase order. In the alternative, Eden argues that Ryko's "agreements" with the NAP customers regarding the availability of equipment at NAP prices satisfy the concerted action requirement. [9]

---

but the customer had been removed from the NAP approximately a year before the sale, and Ryko no longer required its distributors to give the customer NAP pricing. Ex. H-2.

[8] Ryko objected only to the sufficiency of the evidence on the proof of an antitrust agreement, and we therefore are extremely limited in our review of the instruction regarding the required finding. *See Denniston v. Burlington Northern, Inc.*, 726 F.2d 391, 393 (8th Cir. 1984) (citing *Board of Water Works Trustees v. Alvord, Burdick & Howson*, 706 F.2d 820, 824 (8th Cir. 1983)). We do not believe that, as a matter of Iowa law, the jury was the proper interpreter of Eden's legal obligations under the distributorship contract. *See, e.g., Farm Bureau Mutual Ins. Co. v. Sandbulte*, 302 N.W.2d 104, 107-08 (Iowa 1981). However, because of our view of the evidence, we need not decide whether submitting the interpretation of the NAP contract provisions to the jury constituted plain error.

[9] The instructions allowed the jury to find that Ryko had conspired with the final consumers to fix prices. Special Interrogatory 5(a), which the jury answered in the affirmative, asked the jury whether Ryko had agreed with "its distributors and/or its national account customers to fix the resale prices of Ryko's car washing equipment." Again, we are faced with an instruction to which no objection was raised, but which does not state the law. We do not agree with the suggestion that a supplier may be found to have conspired with the consumer to fix resale prices. *Compare Rea v. Ford Motor Co.*, 497 F.2d 577, 590-91 & n.29 (3d Cir.), *cert. denied*, *419 U.S. 868, 95 S. Ct. 126, 42 L. Ed. 2d 106 (1974)*. Ryko is perfectly free to fix a price for its products and to solicit sales at that price without incurring antitrust liability. *Dunn v. Phoenix Newspapers, Inc.*, 735 F.2d 1184, 1187-88 (9th Cir. 1984). "There is an obvious agreement between [a supplier] and its direct customer, the buying consumer. But such omnipresent agreements are not resale price restraints." P. Areeda, VII *Antitrust Law* para. 1451(f) (1986). However, because we hold

**[**38]** The evidence does not support Eden's interpretation of the relevant contract provisions. [10] At trial, Eden attempted to isolate the pricing provisions of the distributorship **[*1229]** contract and policy statements, *see, e.g.*, Tr. 433-40, while ignoring the provisions regarding the method of sale. This approach cannot withstand scrutiny, because it attempts to separate the NAP pricing structure from the rest of the NAP provisions. Eden must show that Ryko "*knowingly* participated in an arrangement *with an intent*" to engage in resale price fixing. *Impro Products, Inc. v. Herrick, 715 F.2d 1267, 1276 (8th Cir. 1983)*. Moreover, Eden must show that Ryko attempted to fix Eden's resale prices or attempted to terminate Eden as "part of or pursuant to" such an arrangement. *Monsanto, 465 U.S. at 767*. Neither of these inquiries may be answered by reference to a single provision of the NAP. The contract and the policy statements implementing the program should be construed as a whole, without focusing on one clause to the exclusion of the others. *See Allen v. Highway Equipment Co., 239 N.W.2d 135, 139 (Iowa 1976)*. **[**39]**

The contract clearly permits Ryko to determine prices for national accounts, but equally clearly establishes the transactional procedure to be followed in making NAP sales. The contract directs Eden to make NAP sales by soliciting customer purchase orders issued directly to Ryko. The program does not **[**40]** apply to sight-draft sales for Eden's own account; the contract plainly states that equipment ordered under the NAP "shall not require a deposit" and "will not be shipped on a sight draft." The NAP policy statements confirm the procedure, emphasizing that NAP sales are made on credit to the NAP purchaser, based on purchase orders issued in Ryko's name. Ex. 70, 78, 80, I; J.A. 255.

Eden's sight-draft sales to some NAP customers at NAP prices are not evidence to the contrary. While such sales might be consistent with an agreement regarding prices on sight-draft sales, they do not demonstrate that such an agreement exists. ***HN12*** "Conduct as consistent with permissible competition as with illegal conspiracy does not, standing alone, support an inference of antitrust conspiracy." *Matsushita Electric Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 106 S. Ct. 1348,*

---

that Eden did not produce sufficient evidence to demonstrate a conspiracy between Ryko and its NAP customers regarding the price for machines sold by sight draft, we need not address as plain error the validity of Eden's theory that Ryko may be found liable for entering into such an agreement with the ultimate consumer.

[10] The provisions of Eden's distributorship contract (Ex. 1) dealing with the NAP are as follows:

> IV. PRICE AND CREDIT STRUCTURE.
>
> . . . .
>
> E. Pricing structures for all major oil companies and national accounts shall be determined by the Company [Ryko]. Accounts may be declared national accounts at the Company's discretion.
>
> . . . .
>
> G. Purchase orders issued from major oil companies or national accounts headquarters will be issued in the name of the Company and shall be sent directly to the Company.
>
> H. Purchase orders issued from major oil companies or national accounts headquarters shall not require a deposit and goods concerned will not be shipped on a sight draft.
>
> I. Billing of purchase orders issued by major oil compan[ies] or national account headquarters will be handled by the Company. Commissions on said accounts will be paid to the Distributor upon collection of the purchase order price.

*1357, 89 L. Ed. 2d 538 (1986)*. Indeed, the evidence suggests that Eden was coerced not by Ryko but by the demands of informed consumers to charge NAP prices on these sales. Although it borders on the ridiculous to assert that a manufacturer's supply agreements with end-users could ever **[**41]** meet the concerted action requirement for resale price maintenance, [11] in this case Ryko's NAP customer agreements clearly do not attempt to fix Eden's prices on sales for its own account. Rather, the agreements merely assure the NAP customers of discounted prices for equipment purchased directly from Ryko. If potential buyers already knew the price at which they could purchase a machine directly from Ryko, distributors would find it extremely difficult to sell to those same buyers at a higher price. Eden's contractual duties to solicit and to accept NAP purchase orders for Ryko equipment at NAP prices do not transform the NAP customer agreements into conspiracies to fix Eden's resale prices.

Finally, although Ryko's initiation of a declaratory judgment action following Eden's bid to Crown McLean, a Virginia customer, may demonstrate Ryko's dissatisfaction with Eden's performance as a distributor, Eden has failed to produce evidence that Ryko's response was pursuant to an illegal price fixing agreement. *Monsanto* makes clear that ***HN13*** "independent action by the manufacturer, and concerted action on nonprice restrictions [must] be distinguished **[**42]** from price-fixing agreements." *465 U.S. at 763*. The *per se* rule does not apply to a manufacturer's unilateral termination of a price-cutting distributor, *United States v. Colgate & Co., 250 U.S. 300, 307, 63 L. Ed. 992, 39 S. Ct. 465 (1919)*; *Famous Brands, Inc. v. David Sherman Corp., 814 F.2d 517, 523 (8th Cir. 1987)*, nor does it apply to the manufacturer's contractual imposition of nonprice restrictions. *See Sylvania, 433 U.S. at 51 n.18*. **[*1230]** Eden's bid to Crown culminated a year-long deterioration in its business relationship with Ryko. More significantly, Eden's bidding tactics were not well received by Crown's central management, who informed Ryko that such tactics would "make it difficult to maintain the trust and credibility between our companies." Ex. 28. Eden's bid to Crown included a discount off the NAP price, which Eden suggests was the true reason for Ryko's response. However, the location of the proposed project was an exclusive territory that was the subject of an ongoing dispute between Eden and Ryko, and the **[**43]** bid included a proposal for the installation of Eden's own water reclaim system, which Ryko maintains was in violation of the exclusive dealing provisions of the distributorship contract.

Given these circumstances, we do not believe that Ryko's response to the bid reasonably can be viewed either as inconsistent with permissible defense of its business relationship with its NAP customers or as evidence of an agreement restricting Eden's resale prices on sight-draft sales. *Cf. Matsushita, 106 S. Ct. at 1357*. Eden has demonstrated the extent of its contractual dispute with Ryko. The evidence, however, simply does not support Eden's resale price maintenance claim. This case does not involve a dominant supplier's control of retail prices through a vast network of independent distributors who bear the primary risks of the distribution process. *Compare Simpson, 377 U.S. at 20-22*; *Green, 517 F.2d at 653*. We conclude that the evidence was not sufficient to place the resale price maintenance claim before the jury, and that with respect to this claim the District Court erred by denying **[**44]** Ryko's motion for judgment notwithstanding the verdict.

**Exclusive Territories**

Ryko next appeals the jury verdict in favor of Eden on its claim that the exclusive territory provisions of Ryko's distributorship contracts violate *Section 1* of the Sherman Act. These

---

[11] *See* footnote 9, *supra*.

provisions grant each distributor the exclusive right to sell Ryko products within an assigned territory [12] and prohibit the distributor from selling Ryko products outside that territory.

The Supreme Court recently has reaffirmed the well-established rule that ***HN14*** "[contractual] nonprice restrictions imposed by a single manufacturer [on its distributors] are to be judged under the rule of reason." *324 Liquor Corp. v. Thomas Duffy, 479 U.S. 335, 107 S. Ct. 720, 724, 93 L. Ed. 2d 667 (1987)*. In applying this rule to a particular nonprice restraint, we must examine the relevant market and weigh any loss in intrabrand competition caused by the restraint against any **[**45]** corresponding gain in interbrand competition. *Sylvania, 433 U.S. at 54-55*. Notwithstanding the broad applicability of the rule recognized in *Sylvania*, Eden urges here, as it did below, that a *per se* rule should apply to Ryko's exclusive territory provisions. Eden argues that Ryko's practice of acting as its own distributor in territories where it has no other distributor (such as Eden) [13] transforms the otherwise vertical distributorship contracts into horizontal agreements among competing distributors.

Although there is some support for Eden's position, especially where an agreement restricts a distributor who also competes with the supplier in the manufacture of certain products in the relevant market, *see, e.g., Hobart Brothers Co. v. Malcolm T. Gilliland, Inc., 471 F.2d 894, 899-900* (5th Cir.), *cert. denied*, *412 U.S. 923, 37 L. Ed. 2d 150, 93 S. Ct. 2736 (1973)*, **[**46]** we believe the better-reasoned cases examine nonprice restraints in the dual distribution context under the rule of reason. *See Dimidowich v. Bell & Howell, 803 F.2d 1473, 1481 (9th Cir. 1986), modified on other* **[*1231]** *grounds, 810 F.2d 1517 (9th Cir. 1987)*; *Davis-Watkins Co. v. Service Merchandise, 686 F.2d 1190, 1201-02 (6th Cir. 1982), cert. denied, 466 U.S. 931, 80 L. Ed. 2d 190, 104 S. Ct. 1718 (1984)*; *Krehl v. Baskin-Robbins Ice Cream Co., 664 F.2d 1348, 1355-57 (9th Cir. 1982)*; *Copy-Data Systems, Inc. v. Toshiba America, Inc., 663 F.2d 405, 409-11 (2d Cir. 1981)*; *Abadir & Co. v. First Mississippi Corp., 651 F.2d 422, 425-28 (5th Cir. 1981)*; *Donald B. Rice Tire Co. v. Michelin Tire Corp., 638 F.2d 15, 16* (4th Cir.), *cert. denied, 454 U.S. 864, 70 L. Ed. 2d 164, 102 S. Ct. 324 (1981)*; *Red Diamond Supply, Inc. v. Liquid Carbonic Corp., 637 F.2d 1001, 1005* (5th Cir.), *cert. denied, 454 U.S. 827, 70 L. Ed. 2d 102, 102 S. Ct. 119 (1981)*. **[**47]** We are mindful of the Supreme Court's directive that we depart from the rule of reason only "upon demonstrable economic effect rather than -- as in *Schwinn* -- upon formalistic line drawing." *Sylvania, 433 U.S. at 59*. Moreover, ***HN15*** in dealing with vertical nonprice restraints the focus of antitrust concern is the impact of a particular restraint on interbrand competition, rather than its impact on intrabrand competition. *Id., at 52 n.19*; *see also Copy-Data Systems, 663 F.2d at 409*. This is especially true in cases where substantial competition in the interbrand market provides a check on the exploitation of intrabrand market power by providing a ready supply of adequate substitutes to consumers. *Copy-Data Systems, 663 F.2d at 409*. *But see Eiberger v. Sony Corp., 622 F.2d 1068, 1081 (2d Cir. 1980)*.

***HN16*** When competing distributors conspire with their supplier to impose restrictions that redound primarily to the benefit of the distributors, the agreement should be considered horizontal even though it is vertical in form. *See United States v. Sealy, Inc., 388 U.S. 350, 353-54, 87 S. Ct. 1847, 18 L. Ed. 2d 1238 (1967)*. **[**48]** Absent such an attempt to disguise a conspiracy for the benefit of competitors, "if the evidence is consistent with the hypothesis that the firm at the

---

[12] Although Eden's contract designates only the District of Columbia and Maryland as Eden's exclusive territory, Eden's claim to distribution rights in certain portions of northern Virginia is a part of this lawsuit.

[13] This practice is known as dual distribution. The term is useful here only in discussing Ryko's sales to its distributors for their own account. As discussed earlier, for antitrust purposes the distributors act as Ryko's agents in making NAP sales.

top of the vertical chain designed the restrictions for its own purposes, an inference of [horizontal] conspiracy is inappropriate." *Illinois Corporate Travel, Inc. v. American Airlines, Inc., 806 F.2d 722, 726 (7th Cir. 1986)*. Accordingly, we conclude that the District Court correctly decided that the rule of reason applies to the exclusive territory provisions of Ryko's distributorship agreements.

Having carefully examined the record from a rule-of-reason perspective, we hold as a matter of law that Eden did not present a submissible case that the exclusive territory provisions were unreasonable. ***HN17*** As a preliminary matter, the plaintiff's "proof that defendant's activities had an impact upon competition in the relevant market is 'an absolutely essential element of the rule of reason case.'" *Supermarket of Homes, Inc. v. San Fernando Board of Realtors, 786 F.2d 1400, 1405, 230 U.S.P.Q. (BNA) 316 (9th Cir. 1986)* (quoting *Calculators Hawaii, 724 F.2d at 1338*). It **[**49]** follows that a showing that the defendant has market power is equally essential, because "firms lacking market power . . . cannot adopt restraints that have anticompetitive effects . . . [and thus] cannot have an effect on interbrand competition." *Assam Drug Co. v. Miller Brewing Co., 798 F.2d 311, 316 (8th Cir. 1986)*. Notwithstanding dicta from two of this Court's prior decisions, *see id. at 316 n.14* (citing *National Reporting Co. v. Alderson Reporting Co., 763 F.2d 1020, 1024-25 (8th Cir. 1985)* and *Hiland Dairy, Inc. v. Kroger Co., 402 F.2d 968 (8th Cir. 1968)*, *cert. denied*, *395 U.S. 961, 89 S. Ct. 2096, 23 L. Ed. 2d 748 (1969))*, we agree with the approach adopted by other circuits requiring "at the threshold that the plaintiff attacking a vertical nonprice restraint prove the defendant's substantial market power in a relevant market." *Assam, 798 F.2d at 316* (citing cases). [14]

**[**50]** **[*1232]** ***HN18*** Market power generally is defined as the power of a firm to restrict output and thereby increase the selling price of its goods in the market. *Ball Memorial Hospital, Inc. v. Mutual Hospital Insurance, Inc., 784 F.2d 1325, 1335 (7th Cir. 1986)*. Market power may be shown by a firm's percentage of sales in the market, especially where there is a strong consumer preference for the firm's product (which decreases the competitive impact of substitutes) and where there are significant barriers either to the entry of new firms or to increased output by existing firms. *Id. at 1335-36*. On the other hand, direct evidence of competitive pressure -- demonstrated by a significant number of viable competitors in the market, *see, e.g.*, *Red Diamond Supply, 637 F.2d at 1005*, or by the entry of new competitors, *Donald B. Rice Tire Co. v. Michelin Tire Corp., 483 F. Supp. 750, 761 (D. Md. 1980)*, *aff'd*, *638 F.2d 15* (4th Cir.), *cert. denied*, *454 U.S. 864, 70 L. Ed. 2d 164, 102 S. Ct. 324 (1981)*, or even by the product's price sensitivity-- indicates **[**51]** a lack of market power. It is incumbent on the plaintiff to present evidence of defendant's power in the relevant market, and we find as a matter of law that Eden failed to meet this requirement.

Eden devoted much of its time at trial attempting to convince the jury that Ryko was the dominant force in a small market consisting only of automatic "rollover" car-wash machines.

---

[14] Nothing in *NCAA v. Board of Regents*, 468 U.S. 85, 82 L. Ed. 2d 70, 104 S. Ct. 2948 (1984), or *FTC v. Indiana Federation of Dentists*, 476 U.S. 447, 106 S. Ct. 2009, 90 L. Ed. 2d 445 (1986), is to the contrary. In those cases, the Supreme Court observed in the context of horizontal combinations that "the absence of proof of market power does not justify a naked restriction on price or output." 468 U.S. at 109-10; *see also* 106 S. Ct. at 2018-19. The vertical restrictions at issue here obviously do not involve a "naked" attempt to restrict output or raise prices. Rather, they are "'ancillary' restraints, those that are part of a larger endeavor whose success they promote." *Polk Bros., Inc. v. Forest City Enterprises*, 776 F.2d 185, 188-89 (7th Cir. 1985). It is true that "'proof of actual detrimental effects, such as a reduction of output' can obviate the need for an inquiry into market power, which is but a 'surrogate for detrimental effects.'" *Indiana Federation*, 106 S. Ct. at 2019 (quoting VII P. Areeda, Antitrust Law para. 1511, at 429 (1986)). However, unless the plaintiff can demonstrate an "actual detrimental effect" on competition (which in a meaningful sense demonstrates the defendant's market power), the threshold market power requirement mitigates an otherwise "unlimited inquiry necessary under the rule of reason." *Assam*, 798 F.2d at 316. Here, Eden's own witness admitted that he had no evidence that the territorial restrictions had any impact on market price or output. Tr. 1728-29.

The jury specifically rejected this narrow characterization of the market, finding instead that the relevant product market encompassed car-washing equipment in general, "including automatic rollover machines, drive-thru machines, tunnel equipment and wand or hand-held equipment." Special Interrogatory 9. ***HN19*** The determination of the relevant market is an issue for the trier of fact, *General Industries Corp. v. Hartz Mountain Corp., 810 F.2d 795, 805 (8th Cir. 1987)*, and here the record adequately supports the jury's finding. [15]

**[**52]** Ryko clearly does not possess the type of market power that would allow it to restrict output or raise prices in the relevant market found by the jury. Eden's entire case regarding Ryko's market power rested on an assumption that the relevant product market consisted only of automatic rollover machines. Eden's expert witness focused exclusively on Ryko's share of the automatic rollover market, Tr. 1699-1700, 1709, and he admitted that he had insufficient data from which to draw conclusions regarding Ryko's market power in a more broadly defined market. Tr. 1725. The record shows that Ryko's share of the entire relevant market is at most between 8% and 10%. This makes it the second largest car-wash equipment manufacturer, which suggests a market whose supply side consists of many small competitors.

Although some of Eden's witnesses testified that equipment buyers have a strong preference for Ryko's rollover equipment, **[*1233]** such preferences are not, without more, a sufficient basis for finding the extent of market power. This is particularly true where, as here, the testimony regarding consumer preference for a particular item pertains to a narrow product submarket, rather than **[**53]** to the broader relevant product market. Similarly, although Ryko represents itself in sales material as the "recognized leader" or "the Cadillac" of the car-wash industry (and Eden's counsel repeatedly attempted at trial to characterize these types of statements as evidence of market dominance, Tr. 751-59), such self-serving promotional literature hardly can be viewed as evidence of market power. In any case, it clearly is not sufficient in this case. The evidence shows that Ryko has lost sales when its competitors lowered their prices in the submarket for rollover machines, Ex. 74, and that Ryko has little or no share of the submarket for drive-thru equipment. Ex. W. Finally, we note that the District Court was persuaded that Ryko could not safely post a supersedeas bond for more than $300,000 without jeopardizing its business. It seems absurd to suggest that such a company has substantial market power in a nationwide industry with annual revenues of between $150 and $225 million. Ex. 114-117.

The jury could not reasonably have concluded, based on the evidence presented, that Ryko possessed market power in a relevant product market including all types of car-wash equipment. Absent **[**54]** an adequate showing of market power, or of actual detrimental effects on competition, the jury did not have a sufficient basis from which to conclude that Ryko's territorial restrictions unreasonably restrained competition. Accordingly, the District Court erred in denying Ryko's motion for judgment notwithstanding the verdict on Eden's Sherman Act claim with respect to the exclusive territory provisions.

**Exclusive Dealing**

---

[15] There was ample evidence from which the jury could conclude that the various car-wash systems were essentially interchangeable in the eyes of consumers and that the systems formed one relevant product market. Tr. 2060-64. Eden's expert witness gave testimony regarding the distinct markets served by the various kinds of equipment and argued that rollovers, tunnel washes, and wand systems were not competitive substitutes for one another. However, on cross-examination, the same witness volunteered, without being asked, that locating the three types of systems in close proximity to one another "would have been a bad marketing decision." Tr. 1717. The jury could have concluded that if the three systems comprised distinct product markets and truly were not in competition with each other, then their proximity should not have any effect on their profitability.

Eden claims, and the jury found, that the exclusive dealing provisions of its distributorship contract, which prohibit the distributor from promoting or selling products that compete with Ryko's, violate *Section 1* of the Sherman Act and Section 3 of the Clayton Act. [16]***HN20*** Contracts imposing an obligation on a distributor to deal only in the goods of a single supplier will violate Section 3 when "performance of the contract will foreclose competition in a substantial share of the line of commerce affected. . . . That is to say, the opportunities for other traders to enter into or remain in that market must be significantly limited . . . ." *Tampa Electric Co. v. Nashville Coal Co., 365 U.S. 320, 327-28, 5 L. Ed. 2d 580, 81 S. Ct. 623 (1961)*. **[**55]** This test requires us to examine the character of the relevant market and to assess the competitive impact of the alleged restraints. We no longer evaluate foreclosure under the purely quantitative test of earlier decisions. *Compare Standard Oil Co. v. United States, 337 U.S. 293, 314, 93 L. Ed. 1371, 69 S. Ct. 1051 (1949)* (*Standard Stations*) (quantitative test) *with Tampa Electric, 365 U.S. at 329* (substantiality of foreclosure determined by more detailed analysis of the "probable effect of the contract on the relevant area of effective competition"). Where the degree of foreclosure caused by the exclusivity provisions is so great that it invariably indicates that the supplier imposing the provisions has substantial market power, we may rely on the foreclosure rate alone to establish the violation. However, where, as here, the foreclosure rate is neither substantial nor even apparent, the plaintiff must demonstrate that other factors in the market exacerbate the detrimental effect of the challenged restraints. *Cf.* *Beltone Electronics Corp. 100 F.T.C. 68, 204, 209-10 (1982)* **[**56]** (requiring more extensive analysis of the "dynamics of the affected market" even where rate of foreclosure is not "clearly insignificant").

**[*1234]** We agree with the conclusion reached by the FTC in *Beltone* that in light of *Sylvania* and its progeny, ***HN22*** exclusive dealing should be evaluated under an analysis "which takes into account not only the market share of the firm but the dynamic nature of the market in which the foreclosure occurs." *Id.* at 197. The inquiry is not precisely the same as the rule of reason employed to evaluate vertical nonprice restrictions under the Sherman Act. However, the plaintiff must show "that the restraint . . . has a probable adverse effect on interbrand competition." *Id.* at 208. This showing **[**57]** depends upon an analysis of such market factors as: the willingness of consumers to comparison shop and their loyalty to existing distributors; the existence of entry barriers to new distributors; the availability of alternative methods of distribution; and any trend toward growth (or decline) in the level of competition at the supplier level. *See id.* at 210; *see also Joyce Beverages v. Royal Crown Cola Co., 555 F. Supp. 271, 278 (S.D.N.Y. 1983)* (availability of alternative methods of distribution precludes finding that supplier is foreclosed from market); *see generally* Steuer, *Exclusive Dealing in Distribution*, 69 Cornell L. Rev. 101 (1983).

Eden has produced no evidence suggesting that Ryko's exclusive dealing provisions generally prevent Ryko's competitors from finding effective distributors for (or other means of promoting and selling) their products. Rather, Eden charges that these provisions foreclose competition by preventing Eden from marketing its own water reclaim unit. The short answer to Eden's argument is that the concern of antitrust law is the protection of competition, not individual competitors; the law is not designed **[**58]** to relieve a particular business of the burden of making the difficult choice between manufacturing its own product or distributing the product of another concern. *See Razorback Ready Mix Concrete Co. v. Weaver, 761 F.2d 484, 488 (8th*

---

[16] The parties did not extensively address the *Section 1* claim in this appeal, but our resolution of the Clayton Act claim disposes of the issue. ***HN21*** If a contract is not prohibited by "the broader proscription of § 3 of the Clayton Act it follows that it is not forbidden by those of the [Sherman Act]." *Tampa Electric Co. v. Nashville Coal Co.*, 365 U.S. 320, 335, 5 L. Ed. 2d 580, 81 S. Ct. 623 (1961).

Cir. 1985) (citing Brunswick Corp. v. Pueblo Bowl-O-Mat, 429 U.S. 477, 488, 50 L. Ed. 2d 701, 97 S. Ct. 690 (1977)). More generally, however, Eden's claim rests upon the assumption that car-wash equipment buyers prefer to engage in "one-stop shopping," and that to distribute an accessory product such as a water reclaim, a supplier must either employ a distributor who already carries a full line of car-wash equipment or must market a complete line of its own. Tr. 1702. Accepting this assumption at face value, we may conclude that manufacturers of accessory devices are foreclosed from the market to some extent by Ryko's exclusive dealing agreements with its distributors. However, Eden has not presented sufficient evidence from which a rational trier of fact could conclude that the foreclosure rate is "substantial" within the meaning of Section 3.

Eden argues that Ryko's 8% to 10% share of **[**59]** total sales in the relevant market demonstrates a corresponding rate of foreclosure sufficient to meet the test of *Tampa Electric*. We find this argument wholly unpersuasive. That Eden is prohibited from offering the products of competing manufacturers is not itself significant. [17] **[**61]** Ryko's other distributorship contracts are apparently less restrictive than Eden's, in terms of either the scope of the non-compete provision or its duration. [18] Accordingly, **[*1235]** any foreclosure resulting from the provisions of Eden's contract would not necessarily apply to Ryko's other distributors, and Eden has presented no evidence suggesting a foreclosure rate arising from Ryko's other distributorship contracts. Moreover, there is no evidence that a substantial segment of the equipment buying market will deal only with Ryko's distributors, or that the exclusive dealing provisions have any impact on the ability of Ryko's competitors to make sales presentations to any potential customer through their own distributors or through direct sales representation. ***HN23*** Where the exclusive dealing restraint operates at the distributor level, rather than at the consumer level, we require a higher standard **[**60]** of proof of "substantial foreclosure," because it is less clear that a restraint involving a distributor will have a corresponding impact on the level of competition in the consumer market. *Cf.* *Bowen v. New York News, Inc.*, 366 F. Supp. 651, 679-80 (S.D.N.Y. 1973) (Section 3 claim dismissed where plaintiffs made no showing that exclusive dealing contracts limited interbrand competition or that competitors could not enter market through other distributors), *aff'd in part, rev'd in part on other grounds*, *522 F.2d 1242 (2d Cir. 1975)*, *cert. denied*, *425 U.S. 936, 96 S. Ct. 1667, 48 L. Ed. 2d 177 (1976)*. Eden has failed to meet that standard here. Although it is possible that some level of foreclosure exists in the market for accessories such as water reclaim units, Eden has not demonstrated that this foreclosure is in any way "substantial." [19] The evidence of foreclosure was not sufficient to create an issue of fact for the jury. Accordingly,

---

[17] Indeed, the overall effect on interbrand competition in such cases may be beneficial by focusing the distributor's efforts on one product line and, in turn, removing the "free rider" threat to the manufacturer's own selling efforts. Where, as here, the manufacturer engages in promotional activity that is designed to dovetail with the distributor's efforts, an exclusive dealing clause guarantees that the manufacturer's marketing investment will not be lost to other firms when the distributor makes his sales presentation to potential buyers. This assurance encourages the manufacturer's investment in marketing activity, and thus encourages interbrand competition. That Ryko's concern over its investment in marketing was legitimate is aptly illustrated by Eden's attempt to sell its reclaim by comparing Ryko's unfavorably to its own. Tr. 1001, 1025-26.

[18] Ryko repeatedly offered Eden updated contracts containing less restrictive exclusivity provisions, but Eden refused to sign the newer versions, in part because it preferred the protection offered by the more restrictive exclusive dealing and exclusive territories provisions of the contract it already had. Tr. 362-66, 1164-65, 1327-29.

[19] Eden suggests that approximately 63% of its car-wash machine sales during 1982 and 1983 required a reclaim. Because this percentage is based on Eden's sales of Ryko rollover equipment, we have no way of knowing what percentage of the total car-wash market requires a reclaim system. Moreover, the "one-stop shopping" argument clearly applies only to buyers who purchase the accessories as original equipment. Buyers who decide to purchase additional equipment to upgrade previously installed car-wash machines -- for example, a water reclaim purchased to comply with a newly enacted local ordinance -- are free to

the District Court erred in denying Ryko's motion for judgment notwithstanding the verdict on Eden's exclusive dealing claim.

**[**62] Tying**

Eden's final antitrust claim is that Ryko tied sales of its water reclaim device to sales of rollover car-wash machines in those sales for which a water reclaim system was required. This claim clearly fails because Eden's evidence does not demonstrate that Ryko ever forced consumers "into the purchase of a tied product that the buyer either did not want at all, or might have preferred to purchase elsewhere on different terms." *Jefferson Parish Hospital District No. 2 v. Hyde, 466 U.S. 2, 12, 80 L. Ed. 2d 2, 104 S. Ct. 1551 (1984)*. The sole foundation for Eden's tying claim is a letter from Ryko to Eden which states that "any RYKO car wash equipment ordered to be installed in your territory cannot be supported by Eden water reclaim equipment sold by you." Ex. 76. One of Eden's witnesses also testified that Ryko had implemented the statement contained in the letter. Tr. 1249.

This evidence plainly is insufficient to establish an illegal tying arrangement. The statement clearly does not suggest that Ryko conditioned the sale of its rollover equipment upon either Eden's or the customer's purchase of a Ryko water reclaim device, but **[**63]** merely restates Eden's obligations under the exclusive dealing provisions discussed above. Neither Eden nor any of its customers was required to purchase a Ryko reclaim device in order to purchase a Ryko car-wash machine, and thus the challenged arrangement fails to meet the basic definition of a tying arrangement. *See Northern Pacific Ry. v.* **[*1236]** *United States, 356 U.S. 1, 5-6, 2 L. Ed. 2d 545, 78 S. Ct. 514 (1958)*; *Rosebrough Monument Co. v. Memorial Park Cemetery Ass'n., 666 F.2d 1130, 1140 (8th Cir. 1981)*, *cert. denied*, *457 U.S. 1111, 73 L. Ed. 2d 1321, 102 S. Ct. 2915 (1982)*. Customers were free to purchase a car-wash machine or water reclaim from Ryko and to purchase the other item separately from any other manufacturer. *See Northern Pacific, 356 U.S. at 6 n.4*. Eden merely was bound by its contractual obligation as a Ryko distributor not to promote or sell products that competed with Ryko products.

Eden refers us to *Bogosian v. Gulf Oil Corp., 561 F.2d 434 (3d Cir. 1977)*, *cert. denied*, *434 U.S. 1086, 55 L. Ed. 2d 791, 98 S. Ct. 1280 (1978)*, **[**64]** and the suggestion in that case that conditioning the lease of a service station to a franchisee upon the franchisee's agreement to purchase gasoline solely from the franchisor might constitute a tying arrangement. *Id. at 452*. Whatever the merits of this suggestion, we find *Bogosian* inapplicable here. Car-wash equipment is sufficiently differentiated to justify a manufacturer's concern for the quality of accessory products sold in conjunction with its equipment. *Compare id. at 453* (noting apparent fungibility of gasoline of similar octane rating); *see also* Austin, *The Tying Arrangement*, 1967 Wis. L. Rev. 88, 115-16. Moreover, as noted in *Jefferson Parish*, "if only a single purchaser were 'forced' with respect to the purchase of a tied item, the resultant impact on competition would not be sufficient to warrant the concern of antitrust law." *466 U.S. at 16*. Because Ryko's customers are free to shop elsewhere for a reclaim device, any "forcing" found here would affect only Ryko's distributors, and as we have already noted, the non-compete provisions of Ryko's newer distributorship **[**65]** contracts are substantially less restrictive than Eden's. Although we

---

purchase such accessories from manufacturers who do not offer a full line of equipment. In addition, Eden's testimony confirms that local regulations increasingly require reclaim systems. Tr. 1773. To the extent that this regulatory trend affects existing wash sites, the demand for separately purchased reclaim units can be expected to increase. This would, in turn, decrease the relative level of foreclosure in the entire market caused by foreclosure with respect to original equipment buyers. In these circumstances, there is insufficient evidence from which to conclude how much of the accessory market, if any, is actually foreclosed.

believe it is apparent that Eden has not demonstrated such forcing, it is absolutely certain that Eden has not shown that "a substantial volume of commerce" would be foreclosed if the requisite forcing were shown. *See id.* In these circumstances, a jury could not reasonably conclude that a tying arrangement existed. We therefore hold, as we already have held with respect to Eden's other antitrust claims, that the District Court erred in denying Ryko's motion for judgment notwithstanding the verdict on Eden's tying claim. [20]

**FRAUD**

Eden pursued several common law fraud theories at trial, and in a special interrogatory the jury found that Ryko had defrauded Eden. [21] Because we have no way of knowing which of the fraud theories the jury relied upon in rendering its verdict, each of the theories must be supported by sufficient evidence to create a jury question on that theory. If the evidence with respect to any of the theories is insufficient to make **[**66]** a submissible case as to that theory, we must set the fraud verdict entirely aside. *See* *Dudley v. Dittmer, 795 F.2d 669, 673 (8th Cir. 1986)* (citing cases) ***HN24*** ("The rule in this circuit is clear that when one of two theories has erroneously been submitted to the jury, a general verdict cannot stand."); *Ratner v. Sioux Natural Gas Corp., 770 F.2d 512, 518-19 (5th Cir. 1985)* (reversal of general verdict for plaintiff on common law fraud claim required where **[*1237]** necessary element of proof was lacking in connection with one of six alleged misrepresentations); *compare* *Hinkle v. Christensen, 733 F.2d 74, 76 (8th Cir. 1984)* (contrary rule where jury renders specific findings on submissible claims).

**[**67]** ***HN25*** Under Iowa law, there are five distinct elements in an action for fraud: "(1) a material misrepresentation (2) made knowingly (scienter) (3) with intent to induce the plaintiff to act or refrain from acting (4) upon which the plaintiff justifiably relies (5) with damages." *Beeck v. Kapalis, 302 N.W.2d 90, 94 (Iowa 1981)*. Moreover, the plaintiff must establish these elements by a "preponderance of clear, satisfactory and convincing evidence," rather than by a mere preponderance of all the evidence. *Omaha Bank for Cooperatives v. Siouxland Cattle Cooperative, 305 N.W.2d 458, 463 (Iowa 1981)*. This heavier evidentiary burden "is mandated in fraud actions by the presumption of fair dealing accompanying a transaction." *Sedco International, S.A. v. Cory, 522 F. Supp. 254, 322 (S. D. Iowa 1981)*, *aff'd*, *683 F.2d 1201* (8th Cir.), *cert. denied*, *459 U.S. 1017, 74 L. Ed. 2d 512, 103 S. Ct. 379 (1982)*. Under this standard, the evidence on at least three of Eden's fraud claims was insufficient to submit those claims to the jury.

---

[20] Our disposition of the antitrust claims necessarily requires a reversal of the District Court's award of attorney fees to Eden under Section 4 of the Clayton Act.

[21] Eden claims that Ryko made fraudulent misrepresentations to Eden in five different respects:

> (1) That Ryko was committed to building a strong network of distributors;
>
> (2) That Ryko would not establish competing distributors in Eden's territory;
>
> (3) That Eden could market and install non-Ryko water reclaim systems;
>
> (4) That Eden could sell, install and service Ryko equipment in Virginia; and
>
> (5) That the distributor price for Ryko products [would] allow a 30% margin for the distributor.Jury Instruction 14. Special Interrogatory 4, which the jury answered in the affirmative, asked simply whether Ryko had defrauded Eden. The Interrogatory makes no reference to and requires no findings regarding any of the individual theories of fraud. The fraud verdict thus is a general verdict, even though it took the form of an answer to a special interrogatory.

Eden's claim that Ryko fraudulently misrepresented **[**68]** its intent regarding the establishment of competing distributors in Eden's territory is Wholly unsupported by the evidence. Eden's 1977 distributorship contract includes a provision in which Ryko agrees that for the duration of the contract, "no other or different firm or corporation will be granted the privilege of selling [Ryko's] products in the [distributor's assigned] territory." In 1983, Ryko contracted with Texaco TBA, a corporation selling accessory equipment to Texaco Oil Company service station dealers, to become an approved supplier for the Texaco TBA program. Under the program, Ryko sells equipment to Texaco TBA for resale to individual Texaco dealers. Texaco Oil Company apparently provides some financial assistance to dealers in purchasing equipment from Texaco TBA, but Ryko deemed it necessary to provide Texaco TBA an additional discount below standard NAP pricing in order to become an approved supplier for the TBA program. The additional discount was absorbed jointly by Ryko and its distributors. Otherwise, the commission structure closely resembled the NAP, with the distributor receiving a commission on each machine sold by Ryko to Texaco TBA for installation in the **[**69]** distributor's territory. Eden's complaint thus is not that it received no commission on TBA sales. Rather, Eden complains that the profits earned by Texaco TBA (on its resale of the equipment to individual Texaco dealers) demonstrate that Eden could have received greater commissions by making sales directly to the dealers.

Viewing the evidence most favorably to Eden, and assuming *arguendo* that the Texaco TBA program constitutes a violation of Eden's exclusive distributorship, we find nothing in the evidence even remotely suggesting that Ryko knew its representations regarding Eden's exclusivity were false at the time they were made or that Ryko never intended to honor the exclusivity provision. Eden simply invited the jury to speculate that Ryko's alleged breach of the distributorship contract -- in establishing a "competing" distributor in 1983 -- demonstrates its fraudulent intent in securing Eden's agreement to the 1977 contract. Under Iowa law, such speculation is plainly impermissible.

The evidence supporting Eden's claim of fraud regarding its right to sell, install, and service Ryko equipment in northern Virginia suffers from a similar defect. The evidence shows clearly that **[**70]** Eden's original territory did not include the counties in northern Virginia to which Eden now asserts an exclusive distributorship right. Ex. 3, L-6; Tr. 585, 708, 1114, 1296, 1467. With Ryko's approval, Eden reached a separate agreement with the Virginia distributor regarding the territory, but the continuing validity of that arrangement was brought into doubt by the termination of the Virginia distributor in 1980. Over the next two years, the parties attempted to come to an accommodation regarding **[*1238]** the territory and eventually reached an agreement in April 1982. The agreement granted Eden the right to perform some distributor services in specified Virginia counties. For reasons that are disputed, the agreement never was honored. Whether this agreement effectively modified the parties' prior contract and whether the agreement subsequently was abandoned by one or both of the parties because of the other's nonperformance were questions for the jury. In any case, Eden presented no evidence, direct or circumstantial, from which a jury reasonably could conclude that Ryko misrepresented its intent to honor either the allocation of territories in the original distributorship contract **[**71]** or any subsequent agreement regarding Eden's right to distribute in northern Virginia. The evidence shows only that an extensive contract dispute arose between the parties, and that the dispute included a sharp disagreement over the scope of Eden's territory. That the jury ultimately rejected Ryko's position regarding Eden's contractual rights does not, without more, support an inference that Ryko acted with fraudulent intent. *Cf. Iconco v. Jensen Construction Co., 622 F.2d 1291, 1304 (8th Cir. 1980)* (contractor's unsuccessful dispute with SBA over contractor's status as small business does not support inference that contractor fraudulently certified itself as small business in bid for contract).

Finally, Eden claims that Ryko fraudulently misrepresented the margin of return on sales that Eden would earn as a Ryko distributor. This claim similarly lacks evidentiary support. The record shows that Ryko had a legitimate dispute over pricing with Eden, with much of the dispute arising from Eden's refusal to sign an updated version of the distributorship contract, which includes new pricing provisions. Eden's 1977 contract provides explicit prices on only two Ryko machines, **[**72]** and Ryko no longer manufactures either machine. The contract further specifies that Eden's price for all other Ryko equipment "shall be retail price (as per current price list) less 30%." Eden convinced the jury that this provision guarantees Eden the right to purchase Ryko equipment at the NAP price less 30%, rather than at the suggested retail price to non-NAP purchasers less 30%. We doubt that the jury's finding accurately reflects the intended meaning of this contractual provision, but the provision is ambiguous and we are unable to conclude that the jury's finding is based on insufficient evidence. However, Eden presented no evidence that Ryko knowingly encouraged Eden's contrary interpretation of the provision while intending to apply its own, or that Ryko possessed any intent to defraud Eden when agreeing that Eden's margin on sales of Ryko equipment would always be approximately 30%. Tr. 1110-11. Therefore, as in the case of the two fraud theories previously discussed, Eden did not make a submissible case on this theory of fraud.

Eden's two remaining fraud claims, regarding Ryko's commitment to a strong distributor network and Eden's right to develop and market a water reclaim **[**73]** device, rest on very thin evidence, but we cannot say that they are so lacking in evidentiary support as to justify removing them from the jury's consideration. Nevertheless, as noted above, the rule in this Circuit requires in these circumstances that we set the fraud verdict aside, and remand for a new trial on both liability and damages with respect to the two theories of fraud that properly were submitted. *Dudley, 795 F.2d at 673-74*.

**BREACH OF CONTRACT**

Eden's counterclaim also charged Ryko with breach of the distributorship contract, and the jury rendered a verdict in Eden's favor. We have discussed the evidence supporting two of Eden's theories of breach in connection with the fraud counterclaim. As observed above, the claims regarding the establishment of the Texaco TBA program and the parties' intent regarding pricing structure under the 1977 distributorship contract presented issues of fact for the jury. Although we may disagree with the verdict, ***HN26*** we are not free to substitute our view of the facts for the jury's unless the only reasonable conclusion **[*1239]** from the evidence is contrary to the conclusion the jury reached. *See Northwestern National Ins. Co. v. Pope, 791 F.2d 649, 652 (8th Cir. 1986)*. **[**74]** The evidence on these issues is conflicting, but is reasonably susceptible to the interpretation proffered by Eden.

Eden's third claim for breach of contract is that Ryko wrongfully terminated Eden. The sole justification for the termination urged by Ryko in this appeal is Eden's promotion of a competitor's car-wash equipment in violation of the exclusive dealing provisions of the distributorship contract. Eden admitted to having received inquiries from several of Ryko's competitors following the initiation of Ryko's original declaratory judgment action and to having provided some of its customers with information and price quotations on at least one competitor's equipment. However, Eden argued to the jury that such conduct was justified by Ryko's conduct, and did not amount to a material breach of the exclusive dealing provisions.

***HN27*** Under Iowa law, a breach must be material before it becomes a valid basis for unilateral termination of the contract by the non-breaching party, *see Beckman v. Carson, 372 N.W.2d 203, 208*

*(Iowa 1985)*; *see also* *Maytag Co. v. Alward, 253 Iowa 455, 112 N.W.2d 654, 660 (1962)*, and materiality is an issue **[**75]** of fact for the jury. *Cf.* *Des Moines Blue Ribbon Distributors v. Drewrys, Limited, U.S.A., Inc., 256 Iowa 899, 129 N.W.2d 731, 736-37 (1964)* (whether distributor's performance under distributorship contract justified supplier's unilateral termination was issue for jury). In the present case, there was testimony from which the jury could find that Ryko anonymously solicited at least some of the competitive information from Eden, and that despite its contact with other equipment manufacturers, Eden continued to promote Ryko's products. This evidence provides a sufficient factual basis from which a jury reasonably could conclude that Eden's conduct did not constitute a material breach of the distributorship contract and that Ryko's termination of Eden therefore was itself a material breach of the contract.

Although we find that each of Eden's contract claims was supported by sufficient evidence, we cannot simply affirm the jury verdict for Eden on these claims. The jury awarded Eden damages only on its antitrust claims; our reversal of the judgment entered with respect to those claims leaves Eden without any recovery for its successful contract **[**76]** claims. In such circumstances we normally would remand the contract claims to the District Court for a new trial solely on the issue of damages. *But cf.* *McDonald v. Johnson & Johnson*, 722 F.2d 1370, 1382 (8th Cir.), *modified on reh'g*, *722 F.2d at 1388-89 (8th Cir. 1983)* (requiring retrial of liability and damages on fraud claim where issues of liability and damages were inextricably intertwined), *cert. denied*, *469 U.S. 870, 83 L. Ed. 2d 149, 105 S. Ct. 219 (1984)*. The circumstances of this case, like those in *McDonald*, demand a departure from our normal procedure.

The amount of Eden's recovery on its contract claims depends upon the precise nature of its distribution rights in northern Virginia. Ryko premised its own breach of contract claim against Eden in part on the assumption that Eden had no distribution rights whatsoever in northern Virginia. The jury rejected this assumption when it rendered its verdict that Eden had not breached its contract with Ryko. However, that verdict tells us nothing about the nature or the scope of the distribution rights the jury recognized. If the April 1982 agreement modified the existing contract provisions covering **[**77]** northern Virginia, then Eden's damages for breach would be significantly different than under the original 1977 distributorship contract, or under any side agreement with the Virginia distributor to which Ryko succeeded. This differential has an impact not only on the measure of Eden's lost commissions on Virginia sales, but on the recovery for Eden's claim that Texaco TBA was a competing distributor operating in its exclusive territory.

In this case, the measure of damages is completely intertwined with the issue of **[*1240]** liability, and we are not free to sever the two issues and to order a new trial limited solely to determining Eden's damages. *Gasoline Products Co. v. Champlin Refining Co., 283 U.S. 494, 499-500, 75 L. Ed. 1188, 51 S. Ct. 513 (1931)*. ***HN28*** A trial on damages alone would require essentially the same evidence as a trial on both liability and damages, *see* *Colonial Leasing, Inc. v. Logistics Control International, 770 F.2d 479, 481-82 (5th Cir. 1985)*, and necessarily would require the jury to draw conclusions about the substantive nature of the parties' contractual agreements in northern Virginia. *See* **[**78]** *Gasoline Products, 283 U.S. at 499-500*. As a result, the interest of judicial economy would not be served by limiting the retrial to damages.

Moreover, our concern for fundamental fairness leads us to favor a complete retrial of Eden's contract claims. Our extensive review of the record convinces us there is a substantial likelihood that the jury's consideration of the contract claims improperly was influenced by Eden's evidence and arguments on its antitrust claims. In rendering its antitrust verdicts, the jury necessarily

concluded that under the antitrust laws Ryko could not enforce some of the key provisions in Eden's distributorship contract. That the antitrust verdicts -- which for the reasons set forth earlier in this opinion cannot be allowed to stand -- influenced the jury's decision regarding Eden's contract claims seems to us inescapable. This further supports our decision to remand the case for a new trial of the entire issue of Ryko's liability for breach of contract. *See* *Eximco, Inc. v. Trane Co., 748 F.2d 287, 290 (5th Cir. 1984)* (affirming district court's grant of new trial on distributor's contract claims, **[**79]** where district court believed jury was influenced by evidence on antitrust claims upon which directed verdict was granted), *modifying*, *737 F.2d 505, 513-14 (5th Cir. 1984)*. We therefore set aside the verdict for Eden on its contract claims and remand for a new trial on both liability and damages with respect to those claims.

**CONCLUSION**

To summarize, we hold that Eden's antitrust claims against Ryko are not supported by sufficient evidence and that the District Court therefore erred in denying Ryko's motion for judgment notwithstanding the verdict with respect to those claims. Accordingly, we reverse the judgment entered on the jury verdict awarding Eden damages on its antitrust claims.

Second, we hold that three of Eden's five theories of fraud lack sufficient evidentiary support to create a jury question on those three theories. Because the jury in effect rendered a general verdict on Eden's fraud claim, the entire fraud verdict must be set aside and the cause remanded for a new trial on both liability (with respect to the two remaining theories) and, if necessary, damages.

Third, we hold that the evidence supporting Eden's breach of contract claims is sufficient **[**80]** to support the jury's verdict for Eden on those claims. However, the jury did not determine Eden's damages with respect to its contract claims, and because the measure of damages on those claims cannot be separated from the substantive determination of Eden's contractual rights, we also must set aside the contract verdict and remand for a new trial on both liability and damages with respect to Eden's contract claims.

Fourth, our disposition of the case means that Eden is no longer entitled to attorney fees under Section 4 of the Clayton Act. We therefore reverse the District Court's award of attorney fees to Eden.

Finally, we dispose of Eden's motion on appeal challenging the length of Ryko's brief and the propriety under our rules of certain exhibits attached as addenda to the brief. We grant the motion with respect to Ryko's Supplemental Addendum B, but in all other respects the motion is denied. We wish to stress that all counsel are expected to adhere to this Court's rules regarding the length of briefs submitted, *see**Fed. R. App. P. 28(g)*, and scrupulously should review their briefs for references to the record that, by inclusion or omission, might be misleading to the Court. **[**81]** **[*1241]** The judgment of the District Court is reversed and the case is remanded for further proceedings consistent with this opinion.

EXHIBIT 283

LexisNexis

Positive
As of: August 12, 2014 9:17 AM EDT

# Sterling Merch., Inc. v. Nestlé, S.A.

United States Court of Appeals for the First Circuit
September 1, 2011, Decided
No. 10-1925

**Reporter:** 656 F.3d 112; 2011 U.S. App. LEXIS 18214; 2011-2 Trade Cas. (CCH) P77,586
STERLING MERCHANDISING, INC., Plaintiff, Appellant, v. NESTLÉ, S.A., PAYCO FOODS CORPORATION, AND NESTLÉ PUERTO RICO, INC., Defendants, Appellees.

**Prior History:** **[**1]** APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF PUERTO RICO. Hon. Salvador E. Casellas, U.S. District Judge.
*Sterling Merch., Inc. v. Nestle, S.A., 724 F. Supp. 2d 245, 2010 U.S. Dist. LEXIS 62814 (D.P.R., 2010)*

**Core Terms**

merger, ice cream, antitrust, prices, market share, distributors, retail, sales, consumers, district court, competitor, anticompetitive, brand, exclusivity, output, products, consumer price, monopolization, discount, damages, merged, manufacturer, competitive, impairments, foreclosure, argues, antitrust violation, increased price, anti trust law, per-unit

**LexisNexis® Headnotes**

Civil Procedure > Appeals > Summary Judgment Review > Standards of Review
Civil Procedure > Appeals > Standards of Review > De Novo Review

***HN1*** A court of appeals' review of a grant of summary judgment is de novo, taking all facts and reasonable inferences in the light most favorable to the nonmoving party.

Antitrust & Trade Law > ... > Private Actions > Standing > Requirements

***HN2*** The United States Supreme Court has articulated a six-factor test that governs whether a plaintiff has standing to bring an antitrust action. The relevant factors are: (1) the causal connection between the alleged antitrust violation and harm to the plaintiff; (2) an improper motive; (3) the nature of the plaintiff's alleged injury and whether the injury was of a type that Congress sought to redress with the antitrust laws (antitrust injury); (4) the directness with which the alleged market restraint caused the asserted injury; (5) the speculative nature of the damages; and (6) the risk of duplicative recovery or complex apportionment of damages. Although a court technically balances the six factors to determine if standing is appropriate, the United States Court of Appeals for the First Circuit has emphasized the causation requirement. Additionally, the absence of antitrust injury will generally defeat standing.

Antitrust & Trade Law > ... > Private Actions > Remedies > General Overview

Evidence > Burdens of Proof > Allocation

***HN3*** A plaintiff bears the burden of proving antitrust injury.

Antitrust & Trade Law > ... > Private Actions > Remedies > General Overview

***HN4*** Antitrust injury is injury of the type the antitrust laws were intended to prevent and that flows from that which makes the defendants' acts unlawful. The injury should be the type of loss that the claimed violations would be likely to cause, and should therefore reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation. The plaintiffs must show not only that they were injured as a result of the defendant's actions and that those actions constituted an antitrust violation, but also that their injury is the type of injury the antitrust violation would cause to competition.

Antitrust & Trade Law > ... > Private Actions > Remedies > General Overview

Antitrust & Trade Law > ... > Private Actions > Standing > Requirements

***HN5*** A competitor may suffer injury even when there is no injury to competition or to consumers, and so lack standing to bring an antitrust claim. Even if a competitor is hurt because the merger of its rivals makes them more efficient or able to compete more aggressively, that harm is not an antitrust violation, and the competitor lacks standing. Further, unlike consumers, competitors have incentives to bring antitrust suits for purposes which are anti-competitive, for example to induce the defendant competitor to moderate their competition. As a result, there is reason for courts to be properly skeptical of many rivals' suits, particularly when the practices are not obviously "exclusionary."

Antitrust & Trade Law > ... > Private Actions > Remedies > General Overview

***HN6*** Injury to competition is usually measured by a reduction in output and an increase in prices in the relevant market. The antitrust injury doctrine requires every plaintiff to show that its loss comes from acts that reduce output or raise prices to consumers.

Antitrust & Trade Law > ... > Private Actions > Remedies > General Overview

***HN7*** It is axiomatic that antitrust laws are concerned with protecting against impairments to a market's competitiveness and not impairments to any one market actor. It is also true that an antitrust plaintiff's post-violation successes do not necessarily preclude compensation for damages proximately caused by an antitrust violation.

Antitrust & Trade Law > ... > Private Actions > Remedies > General Overview

***HN8*** Even if a plaintiff makes an adequate showing of harms to competition through increased consumer prices or reduced output, the plaintiff has to show those market impairments were the result of antitrust violations in order to demonstrate antitrust injury.

Antitrust & Trade Law > ... > Price Fixing & Restraints of Trade > Exclusive & Reciprocal Dealing > Exclusive Dealing

Antitrust & Trade Law > ... > Price Fixing & Restraints of Trade > Per Se Rule & Rule of Reason > General Overview

***HN9*** Because vertical exclusive dealing agreements can achieve legitimate economic benefits (reduced cost, stable long-term supply, predictable prices), no presumption against such agreements

exists today. Given their capacity to enable markets to operate more efficiently and benefit consumers, such agreements are not subject to per se treatment, but are instead subject to rule of reason analysis. Indeed, courts tend to be skeptical of such claims because it is not in the long-term interest of the company that grants the "exclusive deal" to drive out of business competitors of the grantee.

Antitrust & Trade Law > ... > Per Se Rule & Rule of Reason > Per Se Rule Tests > Manifestly Anticompetitive Effects

***HN10*** The rule of reason calculus requires that an antitrust plaintiff make a burdensome showing that (1) the agreements in question involved the exercise of power in a particular economic market, (2) that this exercise impaired the competitiveness of the market, and (3) that those impairments outweighed efficiencies or other economic benefits.

Antitrust & Trade Law > ... > Price Fixing & Restraints of Trade > Exclusive & Reciprocal Dealing > Exclusive Dealing

Antitrust & Trade Law > ... > Price Fixing & Restraints of Trade > Per Se Rule & Rule of Reason > General Overview

***HN11*** In applying the rule of reason calculus to exclusive dealing arrangements, foreclosure levels are unlikely to be of concern where they are less than 30 or 40 percent, and while high numbers do not guarantee success for an antitrust claim, low numbers make dismissal easy.

Antitrust & Trade Law > ... > Price Fixing & Restraints of Trade > Exclusive & Reciprocal Dealing > Exclusive Dealing

***HN12*** For purposes of determining whether an antitrust violation arises from exclusive dealing arrangements, short contract terms and low switching costs generally allay most fears of injury to competition.

Antitrust & Trade Law > Regulated Practices > Market Definition > Relevant Market

Antitrust & Trade Law > ... > Price Fixing & Restraints of Trade > Per Se Rule & Rule of Reason > General Overview

***HN13*** It is not easy to think of a rule of reason antitrust analysis that does not depend on showing adverse effects on competition in a properly defined relevant market.

Antitrust & Trade Law > ... > Price Fixing & Restraints of Trade > Exclusive & Reciprocal Dealing > Exclusive Dealing

Antitrust & Trade Law > ... > Private Actions > Remedies > General Overview

***HN14*** Once a firm has integrated vertically into distribution by acquiring one or more existing distributors, it may reduce costs by dealing only with its wholly owned distributors. A distributor terminated for this reason might certainly suffer injury-in-fact, but it would not suffer antitrust injury as long as there were alternative sources of the product.

Antitrust & Trade Law > ... > Monopolies & Monopolization > Actual Monopolization > Claims

***HN15*** To prevail on a monopolization claim, a plaintiff must show that the defendant (1) has monopoly power in the market, and (2) has engaged in impermissible "exclusionary" practices with the design or effect of protecting or enhancing its monopoly position.

Antitrust & Trade Law > ... > Monopolies & Monopolization > Actual Monopolization > Monopoly Power

***HN16*** Whether a defendant has monopoly power depends on the defendant's ability to lessen or destroy competition in the relevant market.

Antitrust & Trade Law > ... > Monopolies & Monopolization > Actual Monopolization > Monopoly Power

***HN17*** Where a plaintiff remains profitable and in fact has expanded its market share since allegedly anticompetitive conduct has begun, it faces an uphill battle in proving such a dangerous probability of achieving monopoly power exists.

Antitrust & Trade Law > ... > Monopolies & Monopolization > Attempts to Monopolize > Elements

***HN18*** Under First Circuit law, attempted monopolization claims are presumptively implausible where the challenged conduct has been in place for at least two years and the remaining market remains robustly competitive as evidenced by ongoing entry, profitability of rivals, and stability of their aggregate market share.

**Counsel:** Daniel L. Goldberg, with whom Alicia L. Downey, Bingham McCutchen LLP, Jeffrey M. Williams, David C. Indiano, Seth A. Erbe, Indiano & Williams, PSC, Kevin J. O'Connor, David J. Gilles, Godfrey & Kahn, SC, and Javier A. Morales-Ramos were on brief, for appellant.

Carmine R. Zarlenga, with whom Mayer Brown LLP, Wm. Bradford Reynolds, Erik T. Koons, Howrey LLP, Luis A. Oliver, Roberto A. Cámara-Fuertes, and Fiddler González & Rodríguez, PSC were on brief, for appellees.

**Judges:** Before Lynch, Chief Judge, Lipez and Thompson, Circuit Judges.

**Opinion by:** LYNCH

**Opinion**

**[*115] LYNCH, Chief Judge**. Sterling Merchandising, Inc., sued Nestlé Puerto Rico, Inc. (Nestlé PR), and a group of Nestlé corporations including Nestlé, S.A., Nestlé Holdings, Inc. and Payco Foods Corporation (Payco). The suit alleges various federal Clayton Act, *15 U.S.C. §§ 12-27*, and Sherman Act, *15 U.S.C. §§ 1-7*, antitrust violations and pendent Puerto Rico law claims stemming from Nestlé PR's 2003 merger with Payco and later activities. Payco had been both Sterling's and Nestlé PR's competitor in the Puerto Rico ice cream distribution **[**2]** market.

The district court granted summary judgment on all of the federal antitrust claims on the grounds that Sterling lacked standing because its evidence failed to demonstrate, inter alia, that it had suffered a cognizable antitrust injury. See *Sterling Merch., Inc. v. Nestle, S.A.., 724 F. Supp. 2d 245 (D.P.R. 2010)*. As an alternative holding, the district court also granted summary judgment on the merits of Sterling's antitrust causes of action. Id. The pendent claims were then dismissed. Sterling appeals. We affirm on the ground of Sterling's lack of standing, particularly its failure to show antitrust injury.

I.

Nestlé, S.A. is the largest ice cream manufacturer in the world and operates in Puerto Rico through its sales and marketing subsidiary, Nestlé PR. Nestlé PR entered the ice cream distribution market in 1998. After Nestlé PR merged with Payco, another ice cream distributor, in June 2003, Nestlé PR and Sterling were the two largest ice cream distributors in Puerto Rico, though there were several other distributors and some retailers bypassed Puerto Rico distributors altogether.

Sterling, the smaller distributor, sued the larger, Nestlé PR, alleging Nestlé PR engaged in anti-competitive **[**3]** practices from June 2003 through at least October 2009, when the evidence closed.

A. The Pre-2003 Merger Ice Cream Distribution Market in Puerto Rico

Sterling was founded in 1993 as a Puerto Rico ice cream distributor. It immediately became the island-wide exclusive distributor of Edy's brand ice cream, the most popular brand in Puerto Rico. Other distributors in the ice cream market included Payco Foods Corporation, and Mantecados Nevada, Inc. In 1998, five years after Sterling's formation, Nestlé PR joined the distribution market by buying Mantecados Nevada's assets.

From 1998 until the 2003 merger of Payco and Nestlé PR, the ice cream distribution market in Puerto Rico was competitive, and neither Payco, Nestlé PR, nor Sterling dominated the market. Sterling maintained Edy's as its flagship brand, which Sterling received from the Dreyer's ice cream manufacturing company. In the late 1990s, Dreyer's began giving Sterling a per-unit discount, tying the discount to Sterling's previous-year sales. Before the merger at issue, Sterling and Dreyer's negotiated a $0.75 per unit promotional support for Edy's. Sterling says this was done to improve its position in competing with Payco and Nestlé **[**4]** PR/Nevada. In 2003, Dreyer's also assigned to Sterling its new "Skinny Cow" products. Despite the competitive market and its exclusive distribution rights to Edy's, Sterling's financial performance declined from 2001 until 2003. During that period, Sterling's sales dropped from $8.07 million to $7.01 million.

Nestlé PR also suffered from poor financial performance before its 2003 merger. It had roughly $8 million in losses as of May 2002, and sought ways to improve its financial outlook. It contemplated merger, including with Sterling, as a route to profitability, **[*116]** and eventually did merge with Payco.

B. The 2003 Nestlé PR/Payco Merger and the Separate Nestlé Acquisition of Dreyer's

In June 2003, Nestlé PR acquired 50 percent of Payco, which was only in the distribution business. Nestlé did not acquire the remaining 50 percent of Payco's shares until September 2005. The merger was reviewed by the Puerto Rico Office of Monopolistic Affairs (PROMA), which approved the merger conditioned on particular stipulations, none of which is alleged to have been subsequently breached, and which continue to be effective. For example, one stipulation is that Nestlé may not transfer Edy's to another distributor **[**5]** without the approval of PROMA unless Sterling has, in the interim, acquired distribution rights to either Breyer's or Blue Bunny ice cream.

Separately, but also in June 2003, Nestlé, S.A., Nestlé PR's parent, acquired a controlling interest in Dreyer's, the manufacturer of Edy's brand ice cream products. Nestlé, S.A. acquired 100 percent ownership of Dreyer's in January 2006. Sterling has remained Edy's exclusive distributor despite Nestlé, S.A.'s acquisition of Dreyer's. The end result is that Nestlé, S.A. manufactures Edy's, which is the most lucrative of Sterling's distribution products and its flagship brand, while Nestlé PR, Nestlé, S.A.'s subsidiary, is Sterling's largest competitor at the distribution level.

C. The Post-Merger Market

The merger of Nestlé PR and Payco appears to have had significant costs to the defendant merged companies. Immediately after the 2003 merger, the merged Nestlé PR (including Payco)

had an 85 percent market share in the ice cream distribution market; that share fell to 70 percent by 2007. The merged entities have also lost a number of their major exclusive arrangement retail customers to Sterling.

Shortly after the 2003 merger, for example, Sterling **[**6]** acquired exclusive rights to distribute ice cream products to Puerto Rico retail customers Grande and Pitusa, both of which were Payco customers prior to the merger. In 2007, Supermercados Econo, Inc., the largest retail seller of ice cream in Puerto Rico and formerly a retail customer of Payco, also signed exclusivity agreements with Sterling and others. Supermercados Econo's agreements have resulted in the merged Nestlé PR losing its sales with Econo stores. Further, the merger itself caused at least one of Payco's product lines, Wells' Dairy Inc.'s Blue Bunny brand, to terminate its distribution agreement with the merged Nestlé PR/Payco on the grounds that the merger constituted a material breach of the Blue Bunny distribution agreement and would, in Wells' Dairy Inc.'s view, negatively affect the distribution of Blue Bunny products.

As the district court found, "some products distributed by Nestlé PR/Payco lost market share and access to important locations," and during the first six months of joint Nestlé PR/Payco operations the merged company lost $5 million in revenue to Sterling and other competitors. *Id. at 260*. That trend has continued beyond the initial six-month period following **[**7]** the merger.

By contrast, Sterling's market share and sales, which were stagnant before the Nestlé PR/Payco merger, have significantly improved since the merger. Before the merger, Sterling's net sales had declined from $8.07 million in 2001 to $7.59 million in 2002, and to $7.01 million in 2003. After the merger of its competitors, Sterling's sales rose year over year from 2003 through 2008, at an average of 11 percent **[*117]** a year. Sterling's profits and operating revenue rose commensurately with sales.

Both before and after the merger, Sterling acquired distribution rights to other retailers and rights to distribute other brands, including Good Humor, J & J Snacks, Rich's Ice Cream, and Turkey Hill. Puerto Rico is not a market where only a small number of brands are sold. Rather, as Sterling's acquisitions of distribution rights to new brands demonstrate, there are a number of manufacturers of ice cream available to distributors in Puerto Rico. And during this period, on Sterling's own evidence, the overall sales of ice cream products in dollar terms increased in Puerto Rico.

Sterling put only limited evidence into the record of its market share, but its expert did acknowledge that "[i]t's **[**8]** grown over the 2003 to the present" time period. The record evidence shows that Sterling's share of the market has risen from 14.7 percent in 2003 to more than 22 percent in 2008. This data also shows a steady increase in Sterling's market share during the entire period of alleged monopolistic behavior by defendants.

Sterling's strong financial performance has led it to increase the size of its facilities and upgrade. Since the 2003 Nestlé PR/Payco merger, it has constructed a new warehouse with twice the square footage of its previous warehouse. Due both to the increased size of the facility and to technology upgrades, the new warehouse could increase Sterling's distribution capacity by as much as eight times over the previous warehouse.

Sterling has maintained its exclusive distribution agreement with Edy's after both Nestlé PR's merger with Payco, and Nestlé, S.A.'s acquisition of Dreyer's, Edy's manufacturer. In 2004, Dreyer's (already having been acquired by Nestlé, S.A.) reduced Sterling's per-unit discount from

$0.75 to $0.60, citing increased costs of raw materials. Also in 2004, Dreyer's took the line of "Skinny Cow" products from Sterling, but not the Edy's brand, and now distributes **[**9]** the Skinny Cow line through Nestlé PR.

Faced with the obvious problem that its growing success after the merger makes it difficult to show injury to itself, Sterling alleged that in a but-for-2003-merger world, it would have thrived even more than it did. Sterling presented a two-part injury and damages theory to explain how it would have been even better off absent Nestlé PR's allegedly anticompetitive behavior.

First, it alleged that Nestlé PR's post-merger exclusivity agreements with a large number of grocery stores, by foreclosing Sterling from those stores, cost it $21-29 million in sales it otherwise would have made. Second, Sterling argued that absent this market foreclosure, it would have earned higher profits on those sales it actually made because its increased market share would have allowed it to be a more efficient operation. Sterling also alleged it lost sales when Dreyer's took the "Skinny Cow" product line away from Sterling and assigned it to Payco a year after the Nestlé PR/Payco merger, and lost profits on actual sales when Dreyer's reduced its per-unit discount on Edy's products. These allegations are not supported by Sterling's expert's damages model, which does **[**10]** not specifically discuss damages from these alleged violations.

II.

The district court granted summary judgment on all counts largely because it found Sterling, on the undisputed evidence, had not demonstrated any antitrust injury.

As to injury to competition during the post-merger period, the district court concluded the Puerto Rico ice cream distribution **[*118]** market had in fact expanded. Id. The court found no evidence that the Nestlé PR/Payco merger or the merged companies' activities had resulted in restricted output. Nor did the court find any evidence that prices to consumers had in fact been raised in this period, much less that the raise could be tied to illegal anticompetitive behavior. Id. The court noted that no price study had been done by Sterling's experts, and that what little information there was available regarding pricing showed that consumer prices on some products had in fact decreased during the relevant period. Id.

The district court found that Sterling's claims of any injury to itself "either by [Nestlé PR's] exclusives or by product price increases" were severely undermined by its "increased profits, sales, and market share" in the post-merger period. *Id. at 259*.

The **[**11]** court concluded that in light of these facts, Sterling could not show that any antitrust injury resulted from Nestlé PR/Payco's behavior.

The district court also rejected Sterling's damages model. *Id. at 262*. That model attempted to extrapolate from Sterling's 42-50 percent market share in two small slivers of the market to the conclusion that Sterling would have had a 42-50 percent market share throughout Puerto Rico absent Nestlé PR's purportedly anticompetitive actions. The court held that the model failed to meet Sterling's burden of proving damages for two reasons. First, the model adopted sub-markets with no exclusive agreements whatsoever as the benchmark for comparison, but this was an inaccurate point of comparison as exclusivity agreements are not per se illegal and have long been a lawful part of the ice cream distribution market in Puerto Rico. *Id. at 260-62*. Second, Sterling's market share was not anywhere near 42-50 percent before the merger, "and it is unrealistic to posit that

the company's sales and market presence would have grown four-fold had the Nestlé PR/Payco merger never occurred." *Id. at 262*.

The court further concluded that even had Sterling shown any injury **[**12]** to itself, it had not shown any antitrust injury, that is, that it was injured by anticompetitive activity and that its injury was "sufficiently direct, nonspeculative, and measurable to the extent that causality is not in doubt." *Id. at 258*. The court found that Sterling failed to demonstrate that any of the allegedly anticompetitive activity charged by Sterling--purportedly illegal use of exclusivity agreements to excessively foreclose the market, a price squeeze from reducing Dreyer's per-unit discount to Sterling, and allegedly illegal foreclosure from distribution contracts for new Dreyer's products-had been proven to injure Sterling.

As to exclusivity contracts, the district court found that they had been used in Puerto Rico since the 1990s, that Nestlé PR's reliance on them had actually decreased in the years after the 2003 merger,[1] and that the agreements themselves did not have any anticompetitive hallmarks such as long duration, below-cost pricing, or excessive foreclosure of the market. *Id. at 260-61, 264-66*. The court noted **[*119]** that in the post-merger period, Sterling had acquired new distribution rights to new retail markets to which, before the merger, either Nestlé PR or **[**13]** Payco had exclusive access. The court also observed that the entry of additional distributors to the market since the 2003 merger indicated that Nestlé PR's exclusivity contracts have not served to impair the competitive structure of the market. *Id. at 264*.

As to Sterling's claims of a price squeeze after Nestlé PR acquired Dreyer's, the manufacturer of Edy's, the district court found that while Sterling's concerns were "legitimate from a business point of view, they do not involve any overt anti-competitive act" because the per-unit cost to Sterling had **[**14]** not "significantly increased." *Id. at 261*. It further reasoned that sales volume had increased and consumer prices stayed "stable," "strongly suggesting that the competitive structure of the market has not been harmed, thus precluding antitrust injury." Id.

As to the allegations that new Nestlé PR/Payco products had been denied to Sterling, the district court found Sterling could not show any "tangible damages" because it had expanded its sales and increased its market share following the merger despite the fact that it "was not in rapid expansion before the merger." Id. The court further reasoned that, in any event, Nestlé PR had no legal duty to offer its brands, such as the "Skinny Cow" line, to Sterling. *Id. at 270*. It also observed that Sterling had not been terminated as a distributor of Edy's brand ice cream even after Nestlé PR acquired Dreyer's and became Edy's manufacturer. *Id. at 271-72*. Nor had Nestlé PR taken "any steps to make distributing Edy's unprofitable for Sterling." *Id. at 272*.

Finally, the court also rejected Sterling's monopolization and attempted monopolization claims under *§ 2* of the Sherman Act on the merits because Sterling had failed to show, as it must, either **[**15]** that Nestlé PR wielded monopoly power, or that there was a "dangerous probability" that Nestlé PR would acquire such power. *Id. at 266-72*.

Finally, the court also rejected Sterling's monopolization and attempted monopolization claims under *§ 2* of the Sherman Act on the merits because Sterling had failed to show, as it must, either

---

[1] Rates of market foreclosure by Payco exclusive accounts rose from 28.2 percent in 2004 to 30.8 percent in 2005, but declined to 29.4 percent in 2006 and 19.5 percent in 2007; the agreements were mostly for one to two years. Sterling argued that foreclosure rates were higher than these figures in certain sub-regions of Puerto Rico. The district court rejected this attempt at "gerrymandering of markets . . . to artificially show high levels of foreclosure" given that Sterling had identified the relevant market as the entirety of Puerto Rico in its complaint. Sterling Merch., Inc. v. Nestle, S.A.., 724 F. Supp. 2d 245, 265 (D.P.R. 2010).

that Nestlé PR wielded monopoly power, or that there was a "dangerous probability" that Nestlé PR would acquire such power. *Id. at 266-72*.

III.

***HN1*** Our review of the grant of summary judgment is de novo, taking all facts and reasonable inferences in the light most favorable to Sterling, the nonmoving party. See *White v. R.M. Packer Co., 635 F.3d 571, 575 (1st Cir. 2011)*.

Sterling argues that its evidence sufficed to show that Nestlé PR has put a "stranglehold" on the Puerto Rico ice cream distribution market by: (1) acquiring its former competitor, Payco; (2) entering into "strategically deployed exclusivity contracts" that lock up lucrative and geographically efficient grocery stores albeit without foreclosing more than 30 percent of the market; and (3) acquiring Dreyer's, the manufacturer of Sterling's star product line, and causing Dreyer's to reduce from 75 cents **[**16]** to 60 cents the discount it once gave Sterling on its wholesale price. Sterling argues these practices have "harmed interbrand competition" and also "injured Sterling by foreclosing it from sales it would have made in the absence of exclusive dealing contracts and increasing Sterling's input and operational costs" by reducing the wholesale discount it once received and "forcing route structure inefficiencies."

Sterling insists it has demonstrated antitrust injury because it would have done even better for itself than it has were it not for the merger, the removal of a portion of Dreyer's wholesale discounts on Edy's products, and Nestlé PR's post-merger exclusivity arrangements. Sterling argues that in such a but-for world, purchasers would have been offered more choices in more locations at more competitive prices, and Sterling would have gained **[*120]** more market share. Sterling also argues that it would have been able to use more efficient delivery routes, thereby lowering its per-unit costs.[2] Sterling attributes its actual increased sales to the fact that Wells' Dairy Inc.'s Blue Bunny product and distribution line was "driven out" of the market after the Nestlé PR/Payco merger, which **[**17]** has benefitted Sterling in the short term.[3]

Nestlé PR responds **[**18]** that Sterling has failed to show either that it had suffered any injury or that Nestlé PR's allegedly anticompetitive actions had caused such injury. Nestlé PR cites the lack of evidence of injury to competition or consumers, Sterling's post-2003 financial performance, the evidence of Sterling's entry into outlets previously controlled by Payco, the merged Nestlé PR's declining use of exclusivity agreements, and the unrealistic and speculative economic forecast Sterling used as its but-for scenario.

Nestlé PR also argues that whatever Sterling might show about the effect of Nestlé PR's actions on Sterling, the case law requires Sterling to show that its loss comes from acts that reduce

---

[2] Sterling also claims that Nestlé PR's post-merger exclusivity agreements were "unremunerative," but Sterling does not develop the argument or cite to evidence to support this allusion to predatory pricing, and did not adequately raise this argument to the district court.

[3] Sterling also attributes its financial performance to the fact that the pendency of both this litigation and an investigation of Nestlé by the Department of Justice has caused Nestlé PR and its subsidiaries to "restrain themselves from unleashing the full brunt of their power to completely destroy competition."

At oral argument, Sterling raised for the first time the argument that the real danger of Nestlé PR's conduct is the injury that might come to pass in the future, whether or not it has suffered injury now, such as to entitle it to injunctive relief. No such argument was raised in the appellate briefs or in the district court. We decline to address this new argument that Sterling need not show antitrust injury to obtain injunctive relief. This argument has been doubly waived. See Cortés-Rivera v. Dep't of Corr. & Rehab, 626 F.3d 21, 27 (1st Cir. 2010).

output and/or raise prices to consumers. *Sullivan v. Nat'l Football League, 34 F.3d 1091, 1096-97 (1st Cir. 1994)*. Nestlé PR points out that while Sterling claims in its amended complaint that consumers saw "increased retail prices and constricted retail options," it never actually produced evidence to support either reduced output or increased prices to consumers. Sterling's expert, Dr. Overstreet, acknowledged in testimony that he had done no analysis of consumer pricing, or of any potential causes **[**19]** of any increased prices, preventing Sterling from proving that any increased price either existed or resulted from anticompetitive conduct by Nestlé PR. Nor did Sterling produce any evidence of reduced output. In fact, Nestlé argues, there was evidence to the contrary of increased output and reduced prices.

***HN2*** The Supreme Court has articulated a six-factor test that governs whether a plaintiff has standing to bring an antitrust action. The relevant factors are:

> (1) the causal connection between the alleged antitrust violation and harm to the plaintiff; (2) an improper motive; (3) the nature of the plaintiff's alleged injury and whether the injury was of a type that Congress sought to redress with the antitrust laws ("antitrust injury"); (4) the directness with which the alleged market restraint caused the asserted injury; (5) the speculative nature of the damages; and (6) the risk of duplicative recovery or complex apportionment of damages.*RSA Media, Inc. v. AK Media Grp., Inc., 260 F.3d 10, 14 (1st Cir. 2001)* (quoting **[*121]** *Serpa Corp. v. McWane, Inc., 199 F.3d 6, 10 (1st Cir. 1999))*; see also *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters, 459 U.S. 519, 537-45, 103 S. Ct. 897, 74 L. Ed. 2d 723 (1983)*. **[**20]** "Although we technically balance the six factors to determine if standing is appropriate, this Court has emphasized the causation requirement." *RSA Media, 260 F.3d at 14* (citation omitted). Additionally, "the absence of 'antitrust injury' will generally defeat standing." Id. Sterling has not satisfied these tests and particularly has not shown antitrust injury.

***HN3*** The plaintiff bears the burden of proving antitrust injury. *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 489, 97 S. Ct. 690, 50 L. Ed. 2d 701 (1977)*. ***HN4*** Antitrust injury is "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." Id. The injury should be "the type of loss that the claimed violations . . . would be likely to cause," id. (alteration in original) (quoting *Zenith Radio Corp. v. Hazeltine Research, Inc., 395 U.S. 100, 125, 89 S. Ct. 1562, 23 L. Ed. 2d 129 (1969))*, and should therefore "reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation," id. Plaintiffs must show not only that they were injured as a result of the defendant's actions and that those actions constituted an antitrust violation, but also that their injury is the type of injury **[**21]** the antitrust violation would cause to competition.

***HN5*** A competitor may suffer injury even when there is no injury to competition or to consumers, and so lack standing. Even if a competitor is hurt because the merger of its rivals makes them more efficient or able to compete more aggressively, that harm is not an antitrust violation, and the competitor lacks standing. See 2 Areeda & Hovenkamp, Antitrust Law, ¶ 348a, at 387 (2d. ed. 2000). Further, unlike consumers, competitors have incentives to bring antitrust suits for purposes which are anti-competitive, for example to induce the defendant competitor to moderate their competition. Id. As a result, there is reason for courts to be "properly skeptical of many rivals' suits, particularly when the practices are not obviously 'exclusionary.'" Id.

***HN6*** Injury to competition is "usually measured by a reduction in output and an increase in prices in the relevant market." *Sullivan, 34 F.3d at 1097* (emphasis in original); see also *Stamatakis Indus., Inc. v. King, 965 F.2d 469, 471 (7th Cir. 1992)* ("The [Supreme Court's] antitrust injury doctrine . . . 'requires every plaintiff to show that its loss comes from acts that reduce output or raise prices **[**22]** to consumers.'" (quoting *Chi. Prof'l Sports Ltd. P'ship v. Nat'l Basketball Ass'n, 961 F.2d 667, 670 (7th Cir. 1992)))*.

The overriding theme of Sterling's case is that, as a result of its merger with Payco, Nestlé PR has monopoly power in the Puerto Rico ice cream distribution market, and has exercised that power. What the undisputed facts demonstrate is that, together, Payco and Nestlé PR had an 85 percent share of the distribution market at the time of their 2003 merger, but that the market share of the merged entity has since fallen to 70 percent. This was not surprising; Nestlé PR's ice cream distribution division had been suffering heavy losses, and hoped the merger would give it viable ice cream distribution business. Still, a 70 percent market share is considerable. Nonetheless, we conclude, as did the district court, that Sterling has not shown the market has suffered a reduction in output or an increase in consumer prices. It has not shown an impairment of competition or antitrust injury from the sum of its theories.

**[*122]** Sterling failed to provide evidence that consumer prices increased during the relevant period. Its main economic expert, Dr. Overstreet, asserted, without evidentiary **[**23]** support, that Nestlé PR's acquisition of Payco allowed it to "maintain prices above . . . levels that likely would be found in a more competitive market." Dr. Overstreet testified, however, that he did not undertake an analysis of consumer ice cream prices in Puerto Rico, and he stated that there is "probably some dearth of consistent and reliable information about it." Sterling's attempt to show increased prices to consumers was unsupported by basic evidence such as price studies for the Puerto Rico ice cream market, and is unavailing.[4]

In fact, the evidence suggests that, if anything, consumer prices decreased during the relevant period. Evidence suggests that both Sterling and Blue Bunny adopted a strategy of reducing prices in order to entice retailers to break away from [Nestlé PR's] exclusive contracts. While there was no evidence offered of what happened to retail prices islandwide, there is reason to believe consumers benefitted from these price wars. And independent evidence at least shows that, in some supermarkets, the retail cost of Edy's was lowered. Further, the **[**25]** evidence is that, while inflation in Puerto Rico averaged 11.9 percent annually between 2003 and 2007, the consumer prices for both Blue Bunny and Edy's ice cream were lower in 2007 than they were in 2001.

The evidence regarding output is similar. Sterling did not set forth any evidence from which an inference can be drawn that there was a reduction in output within the relevant market during the relevant period, let alone a reduction attributable to Nestlé PR's alleged violations, or that

---

[4] At oral argument, Sterling pointed for the first time to evidence that purportedly shows consumer ice cream prices in Puerto Rico increased during the relevant period. Sterling had not cited these documents in its appellate brief. In any event, they do not show consumer prices increased. Sterling points to deposition testimony of its president, which indicates that Sterling had, at one time in 2006, increased prices by 15 percent to some of its retailers. But Sterling's president explicitly stated that the increase was limited, and that he "held pricing back at key retailers through 'roll backs.'" In any case, there is no evidence that the limited **[**24]** number of price increases to retailers were ever passed on to consumers. Sterling also points to a July 24, 2003 email from a Payco officer that opaquely refers to aligning Nestlé PR prices with Payco prices following the 2003 merger, but this evidence does not show such a price increase actually occurred, and again speaks only to prices to retailers, not consumers. The only evidence Sterling cites that actually relates to consumer prices is a chart detailing pricing of various ice cream brands at Econo supermarkets from June 2003 until August 2006. But that chart shows consumer prices remained relatively constant during the three year period.

Sterling consumers were "forced to choose between less preferred brands or visit[] another store" as a result of anti-competitive actions.

The lack of evidence of antitrust injury in the form of either increased consumer prices or reduced output is consistent with the lack of evidence that Sterling itself has been negatively affected by Nestlé PR's purported violations. ***HN7*** It is axiomatic that antitrust laws are concerned with protecting against impairments to a market's competitiveness and not impairments to any one market actor. See *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp., 509 U.S. 209, 224, 113 S. Ct. 2578, 125 L. Ed. 2d 168 (1993)*. It is also true that "an antitrust plaintiff's post-violation successes do not necessarily **[**26]** preclude compensation for damages proximately caused by an antitrust violation." *Pierce v. Ramsey Winch Co., 753 F.2d 416, 436 (5th Cir. 1985)*. Nonetheless, that Sterling's **[*123]** sales, profits, and market share have increased during the relevant period provides further indication that no antitrust injury exists here.[5]

Sterling tries to sidestep these deficiencies by arguing **[**27]** that the types of harm it alleges suffice as alternatives to the classic evidence of antitrust injuries. However, the cases Sterling cites as recognizing alternate types of antitrust injuries actually discuss behavior that would obviously result in higher prices and lower output. See *JTC Petroleum Co. v. Piasa Motor Fuels, Inc., 190 F.3d 775, 778-79 (7th Cir. 1999)* (total denial of an essential input, in service of a cartel that would raise prices and reduce output); *Engine Specialties, Inc. v. Bombardier Ltd., 605 F.2d 1, 12-15 (1st Cir. 1979)* (termination of an exclusive distributorship by competitors who had conspired to divide a retail market between them, which is per se illegal behavior designed to raise prices and reduce output). This case is nothing like the cases cited.

***HN8*** Even had Sterling made an adequate showing of harms to competition through increased consumer prices or reduced output, Sterling would have to show those market impairments were the result of antitrust violations in order to demonstrate antitrust injury. But Sterling has failed to show that any of Nestlé PR's conduct violates antitrust provisions.

We first reject Sterling's argument that Nestlé PR's exclusive **[**28]** dealing agreements have impaired competition in the market or caused any injury to Sterling. ***HN9*** Because vertical exclusive dealing agreements "can achieve legitimate economic benefits (reduced cost, stable long-term supply, predictable prices), no presumption against such agreements exists today." *Stop & Shop Supermarket Co. v. Blue Cross & Blue Shield of R.I., 373 F.3d 57, 65 (1st Cir. 2004)*. Given their capacity to enable markets to operate more efficiently and benefit consumers, such agreements are not subject to per se treatment, but are instead subject to rule of reason analysis. *Tampa Elec. Co. v. Nashville Coal Co., 365 U.S. 320, 327, 81 S. Ct. 623, 5 L. Ed. 2d 580 (1961)*; *Stop & Shop Supermarket, 373 F.3d at 62*; 11 Areeda & Hovenkamp, Antitrust Law, ¶¶ 1802-07 (2d. ed. 2005). "Indeed, courts tend to be skeptical of such claims because it is not in the long-term interest of the company that grants the 'exclusive deal' to drive out of business competitors of the grantee." *Stop & Shop Supermarket, 373 F.3d at 66*.

---

[5] Despite its increased sales, profits, and market share, Sterling argues it suffered damages because it would have earned far more were it not for Nestlé PR's exclusive agreements. It points to its 42 percent and 50 percent market share in retail stores that have no exclusive agreements as plausible benchmarks for what its market-wide performance would be in the absence of exclusive agreements. But this damages model assumes that the proper "but-for" market is one without any exclusive agreements. That assumption is erroneous, as these agreements are often efficient and pro-competitive, have been in use in Puerto Rico since before the merger, and, as discussed below, are not illegal in this case. In a market devoid of any exclusivity agreements, Sterling may perform better, but Sterling is not entitled to such a market.

***HN10*** The rule of reason calculus requires that Sterling make a burdensome showing that (1) the agreements in question involved the exercise of power in a particular economic market, (2) that this exercise impaired **[**29]** the competitiveness of the market, and (3) that those impairments "outweighed efficiencies or other economic benefits." *Id. at 61*. Sterling's argument fails under this test for a number of reasons.

As a practical matter, ***HN11*** in applying the rule of reason calculus to exclusive **[*124]** dealing arrangements, "foreclosure levels are unlikely to be of concern where they are less than 30 or 40 percent," and while high numbers do not guarantee success for an antitrust claim, "low numbers make dismissal easy." *Id. at 68*. It is undisputed that Nestlé PR/Payco's rates of market foreclosure through exclusivity arrangements with Puerto Rico retailers rose to a high of 30.8 percent for a single year, 2005, and have otherwise remained below 30 percent.

Significantly, the Nestlé PR/Payco agreements are almost all of one or two year duration, and there is turnover. ***HN12*** "Short contract terms and low switching costs generally allay most fears of injury to competition." 11 Areeda & Hovenkamp, Antitrust Law, ¶ 1802, at 94. Sterling points to Nestlé PR's five-year, 90 percent exclusive contract with Ralph's as support for its claim. But that agreement is not entirely exclusive; it allows other distributors at least limited **[**30]** access. In any event, its duration is aberrational, and is on its own insufficient to sustain Sterling's claim.

***HN13*** "It is not easy to think of a rule of reason analysis that does not depend on showing adverse effects on competition in a properly defined relevant market." *Stop & Shop Supermarket, 373 F.3d at 69*. Sterling has not shown that Nestlé PR's exclusive agreements have yielded adverse effects on competition. Sterling and Nestlé PR and other distributors compete to obtain such exclusivity agreements with retail vendors; such agreements have been present in the Puerto Rico market since at least the 1990s. Sterling was able to win over several of Nestlé PR's largest customers, including the large chains Grande and Pitusa, and in 2007, the largest retail seller of ice cream, Supermercados Econo, Inc., switched distributors and defendants lost all of their sales in those stores. It is also significant that there are other avenues of distribution available, and new competitors entering the market. And, as noted, Sterling's own market share has increased during the relevant market period.

There is no evidence that the challenged exclusivity agreements impair competition, nor that any such **[**31]** impairment outweighs gained market efficiencies. See *E. Food Servs., Inc. v. Pontifical Catholic Univ. Servs. Ass'n, 357 F.3d 1, 9 (1st Cir. 2004)* (rejecting distributor's antitrust claim regarding competitor's exclusive agreements because distributor failed to show "that so many potential outlets are foreclosed to it or other competitors by long-term exclusive dealing contracts or other tactics that survival or new entry is infeasible").

As to Dreyer's price support for Edy's, Sterling provides no authority supporting its argument that Dreyer's was required to maintain Sterling's $0.75 per-unit discount in perpetuity simply because Dreyer's had been purchased by Nestlé, S.A. There is no basis to conclude that Dreyer's would have continued the discount in perpetuity, whether or not it was acquired by Nestlé. Sterling attempts to analogize its case to JTC Petroleum to impose a stricter duty on Dreyer's now that it is a Nestlé subsidiary. But in that case the defendant successfully prevented the plaintiff's suppliers from selling it any of the needed input. See *JTC Petroleum, 190 F.3d at 778-79*. The $0.15 reduction in Sterling's discount is hardly analogous. Dreyer's stated legitimate **[**32]** business reasons not to continue this temporary arrangement. And as the district court

pointed out, the net present price of Edy's to Sterling is 10 percent less than it was in 2000, despite an annual inflation rate that averaged 11.9 percent between 2003 and 2007.

Further, we have previously noted that ***HN14*** "once a firm [like Nestlé PR] has integrated vertically into distribution by acquiring **[*125]** one or more existing distributors [like Payco], it may reduce costs by dealing only with its wholly-owned distributors. A distributor terminated for this reason might certainly suffer injury-in-fact, but it would not suffer antitrust injury as long as there were alternative sources of the product."[6] *Serpa Corp., 199 F.3d at 11*. (quoting 2 Areeda & Hovenkamp, Antitrust Law ¶ 381c, at 114 (Supp. 1999)) (internal quotation marks omitted). Given that, it is difficult to conceive how it could be illegal for Dreyer's to reduce a negotiated $0.75 per-unit discount to $0.60. This rationale disposes of Sterling's next argument as well: there is no antitrust violation lurking in Nestlé, S.A.'s reassignment of certain Dreyer's product lines from Sterling to Nestlé PR.

Our conclusion that Sterling has failed to show it has suffered the requisite injury to maintain this suit also encompasses its monopolization and attempted monopolization claims under *§ 2* of the Sherman Act.

***HN15*** To prevail on its monopolization claim, Sterling must show that Nestlé PR (1) has monopoly power in the Puerto Rico ice cream distribution market, and (2) "has engaged in impermissible 'exclusionary' practices with the design or effect of protecting or enhancing its monopoly position." *Coastal Fuels of P.R., Inc. v. Caribbean Petroleum Corp., 79 F.3d 182, 195 (1st Cir. 1996)* **[**34]** (quoting Hovenkamp, Federal Antitrust § 6.4a (1994)) (internal quotation marks omitted).

***HN16*** Whether a defendant has monopoly power depends on the defendant's "ability to lessen or destroy competition" in the relevant market. *Id. at 196* (quoting *Spectrum Sports, Inc. v. McQuillan, 506 U.S. 447, 456, 113 S. Ct. 884, 122 L. Ed. 2d 247 (1993))*. Despite Nestlé PR's significant market share, Sterling has failed to demonstrate Nestlé PR has such an ability, or that it has engaged in impermissible practices causing the required injury. If anything, the undisputed facts--that Nestlé PR's own market share is decreasing, that Sterling's market share is steadily on the rise, and that consumer prices have not increased--evidence the opposite conclusion.

Sterling nonetheless argues there are high barriers to entry which enhance Nestlé PR's ability to engage in market foreclosure. Although distribution businesses do not commonly involve high barriers to entry, Sterling says many exist here, including: the cost of establishing a Direct Store Delivery system; the substantial capital required to purchase trucks and freezers, particularly because ice cream products must be kept at minus 20 degrees Fahrenheit; and the difficulty of establishing **[**35]** route density. Sterling acknowledges that there have been new entries to distribution of ice cream in Puerto Rico, but says the new businesses, such as Palm Industries, Inc., are not successful.

However, there is other evidence of successful new entries. As the district court noted, Gianni New York, LLC, has entered the market since Nestlé PR's 2003 merger with Payco, distributing

---

[6] Alternative sources exist here. The parent **[**33]** company of Nestlé PR is Nestlé, S.A. The major competitor of Nestlé, S.A. on the manufacturing level is Unilever, which has used Sterling as a distributor in Puerto Rico during some of the time period at issue.

We note that the Puerto Rico Office of Monopolistic Affairs (PROMA) approved the 2003 Nestlé PR/Payco merger upon Nestlé PR's agreement to seek PROMA's approval before transferring the distribution rights to Edy's ice cream (but not any other Dreyer's brand) from Sterling to another competitor unless Sterling had, in the interim, acquired distribution rights to either Breyer's or Blue Bunny ice cream.

to Supermercados Amigo, Inc., one of the largest supermarket chains in Puerto Rico, as **[*126]** well as to two other large chains, Wal-Mart and Supermercados SuperMax. Also, retailers can import ice cream products directly from the United States, bypassing distributors. Both the United States military bases in Puerto Rico and Supermercados Econo, Inc. have adopted that practice. And some suppliers of ice cream in Puerto Rico have their own distribution operation, helping to ensure consumer access and choice.

Regarding the attempted monopolization claim, Sterling "must prove (1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power." *Spectrum Sports, 506 U.S. at 456*. Sterling alleges that Nestlé PR's **[**36]** market share, coupled with its corporate parent's control of Edy's brand ice cream, Sterling's largest product line, create a dangerous probability that it will achieve monopoly power. But ***HN17*** where a plaintiff remains profitable and in fact has expanded its market share since the allegedly anticompetitive conduct has begun, it faces an uphill battle in proving such a dangerous probability exists. See *Springfield Terminal Ry. Co. v. Canadian Pac. Ltd., 133 F.3d 103, 110 (1st Cir. 1997)* (rejecting attempt to monopolize claim on basis of plaintiff's strong financial performance).

***HN18*** Under our circuit law, attempted monopolization claims are "presumptively implausible" where, as is the case here, "the challenged conduct has been in place for at least two years and the remaining market remains robustly competitive as evidenced by ongoing entry, profitability of rivals, and stability of their aggregate market share." Id. (quoting Areeda & Hovenkamp, 3A Antitrust Law ¶ 807f, at 360-61). That rule applies here. More than six years have passed since the Nestlé PR/Payco merger, and Sterling has been unable to establish any injury to itself or the competitiveness of the market.[7]

We add that there was no abuse of discretion in the district court's striking of untimely sections of Sterling's expert's report. See *Macaulay v. Anas, 321 F.3d 45, 51-53 (1st Cir. 2003)* (finding no abuse of discretion where district court excluded "supplemental" expert report after close of lengthy discovery period).

IV.

Summary judgment was properly granted. We affirm.

---

[7] Given our conclusions, **[**37]** we need not consider the statements of Nestlé PR's officers that Sterling argues evidences Nestlé PR's specific intent to monopolize.

EXHIBIT 284

LexisNexis®

Positive
As of: August 12, 2014 9:17 AM EDT

**Sterling Merch., Inc. v. Nestle, S.A.**

United States District Court for the District of Puerto Rico
June 23, 2010, Decided; June 23, 2010, Filed
Civil No. 06-1015

**Reporter:** 724 F. Supp. 2d 245; 2010 U.S. Dist. LEXIS 62814; 2010-2 Trade Cas. (CCH) P77,123
STERLING MERCHANDISING, INC., Plaintiff v. NESTLE, S.A., et al., Defendants

**Subsequent History:** Counsel Amended December 10, 2010.
Affirmed by *Sterling Merch., Inc. v. Nestle, S.A., 2011 U.S. App. LEXIS 18214 (1st Cir. P.R., Sept. 1, 2011)*

**Prior History:** *Sterling Merch., Inc. v. Nestle, S.A., 2008 U.S. Dist. LEXIS 59384 (D.P.R., Aug. 5, 2008)*

**Core Terms**

ice cream, merger, antitrust, monopolize, brand, competitor, anti-competitive, retailer, relevant market, market share, distributor, foreclosure, conspiracy, acquisition, consumer, monopoly, summary judgment, relevant period, market power, supermarket, increased price, anti trust law, blue, pre-merger, barrier, squeeze, output, dairy, market place, manufacture

**Counsel:** **[**1]** For Sterling Merchandising, Inc., Plaintiff: David C. Indiano-Vicic, Jeffrey M. Williams-English, LEAD ATTORNEYS, Seth Erbe, Indiano & Williams, PSC, San Juan, PR; PHV Adam C. Briggs, LEAD ATTORNEY, PRO HAC VICE, PHV David J. Gilles, PHV Josh Johanningmeier, PRO HAC VICE, Godfrey & Kahn, S.C., Madison, WI; Javier A. Morales-Ramos, Javier A. Morales Ramos Law Office, San Juan, PR; PHV Jennifer Cotner, PHV Kevin J. O'Connor, PRO HAC VICE, LaFollete Godfrey & Kahn, Madison, WI.

For Nestle, S.A., Nestle Puerto Rico, Inc., Payco Foods Corporation, Defendants: Luis A. Oliver-Fraticelli, LEAD ATTORNEY, Roberto A. Camara-Fuertes, Fiddler, Gonzalez & Rodriguez, San Juan, PR; PHV Erik T. Koons, PHV, Carmine R. Zarlenga, LEAD ATTORNEYS, PRO HAC VICE, Howrey LLP, Washington, DC.

For Nestle Holdings, Inc., Defendant: Luis A. Oliver-Fraticelli, LEAD ATTORNEY, Roberto A. Camara-Fuertes, Fiddler, Gonzalez & Rodriguez, San Juan, PR; PHV Erik T. Koons, PHV, Carmine R. Zarlenga, LEAD ATTORNEYS, PRO HAC VICE, Howrey LLP, Washington, DC.

For Department of Justice, Amicus: Lavinia Aparicio-Lopez, Commonwealth Department of Justice, San Juan, **[**2]** PR.

For PMC Marketing Corp., Interested Party: Javier I. Arbona, LEAD ATTORNEY, Quinones, Sanchez & Guzman, PSC, San Juan, PR.

For Sterling Merchandising, Inc., Counter Defendant: Seth Erbe, LEAD ATTORNEY, Indiano & Williams, PSC, San Juan, PR.

**Judges:** SALVADOR E. CASELLAS, U.S. Senior District Judge.

**Opinion by:** SALVADOR E. CASELLAS

**Opinion**

**[*250] OPINION & ORDER**

Plaintiff, Sterling Merchandising, Inc. ("Sterling"), brings this action against defendant **[*251]** corporations, Nestle, S.A., Nestle Holdings, Inc., Nestle Puerto Rico, Inc. ("Nestle PR"), and Payco Foods Corporation ("Payco")(collectively, "Nestle" or "Defendants"), alleging antitrust violations and injury stemming from the merger of two local ice cream distributors, and several subsequent business practices. The complaint charges Defendants with: conspiracy to monopolize, and unlawful restraint of trade in violation of Sections 1 & 3 of the Sherman Antitrust Act ("Sherman Act"), *15 U.S.C. § 1*, *3*; monopolization in violation of Section 2 of the Sherman Act, *15 U.S.C. § 2*, exclusive dealing in violation of Section 3 of the Clayton Antitrust Act ("Clayton Act"), *15 U.S.C. § 14*; unlawful restraint of trade in violation of the Puerto Rico Anti-Monopoly Act, *10 P.R. Laws Ann., §§ 257-276*; **[**3]** and monopolization and attempted monopolization in violation of *Section 260* of the Puerto Rico Anti-Monopoly Act, *10 P.R. Laws. Ann., § 260*. Defendants have moved this court for summary judgment on Counts I through VIII of the Amended Complaint, which allege violations of Sherman Act Sections 1, 2, and 3 (*15 U.S.C. §§ 1-3*), Clayton Act § 3 (*15 U.S.C. § 14*), and the Puerto Rico Anti-Monopoly Act (*10 P.R. Laws Ann. §§ 257-276*).

Given the complex nature of the present suit, and after an unsuccessful effort at mediation, this Court held a special hearing for the parties to further present any relevant arguments regarding the motion currently under review. Docket # 221. Taking into account the arguments presented there, and after reviewing the facts and the pertinent law, summary judgment **DISMISSING WITH PREJUDICE** Sterling's federal claims shall be **GRANTED,** while all state law causes of action shall be **DISMISSED WITHOUT PREJUDICE.**

**Background**

1

*Relevant Cast*

Sterling is an ice cream distributor, founded by John Williams ("Williams") and Stanley Pasarell ("Pasarell") in 1993. PSUF # 1. From its beginnings, the company has had the exclusive rights to distribute Edy's Ice Cream ("Edy's") in Puerto Rico, a brand manufactured by Dreyer's Grand Ice Cream, Inc. ("Dreyer's"). Id. Williams and Pasarell each own 50% shares in Sterling. DSUF # 11(a)&(b). Williams is President and Pasarell is Chairman of the Board. Id.

Nestle S.A., headquartered in Vevey, Switzerland, is currently the largest ice cream manufacturer in the world. PSUF # 4. A subsidiary, Nestec S.A., is responsible for the analysis and review

---

1 Accompanying the Motion for Summary Judgment was Defendants' Statement of Uncontested Facts ("DSUF")(Docket # 191), to which Plaintiff replied with its Opposition to Statement of Uncontested Material Facts ("POSUF")(Docket # 198). Defendants replied **[**4]** (Docket # 208-3), and Plaintiff sur-replied (Docket # 212). Plaintiff also submitted its own Statement of Material Facts in Opposition to Defendants' Motion for Summary Judgment ("PSUF")(Docket # 197), Defendant replied (DOSUF)(Docket 208-33), and Plaintiff sur-replied (Docket # 213).

of merger, acquisition, and divestiture proposals within the Nestle corporate structure. DOSUF # 5. Nestle S.A. operates in Puerto Rico through separate marketing subsidiaries that sell their products in the market. DSUF # 166. These include Nestle PR, **[**5]** which owns 100% of the shares of Payco. DSUF # 2. Dreyer's, manufacturer of Edy's, is also a subsidiary of Nestle S.A. [2] DSUF # 182.

**[*252]** Thomas Ward ("Ward") was the President and principal owner of Payco until the merger with Nestle PR in 2003, with the exception of the period between 1999 and 2001. DSUF # 9(a); POSUF # 9(a). However, even during said period, Ward acted as Chief Executive Officer ("CEO") and Chairman of the Board. Id. Valerie Cornut ("Cornut") is currently CEO of Payco, a position she has held since 2005. POSUF # 9(b).

Dr. Thomas Overstreet ("Overstreet") is an economist at CRA International, where he holds the position of Vice President. Sterling retained his services "to conduct an economic analysis of the issues raised in the Complaint filed in this matter." DSUF # 15(a). Sterling's other expert is David W. Whitehouse, a marketing specialist, who conducted two surveys about the ice cream market in Puerto Rico. DSUF # 15 (b). [3] Defendants' experts are David Scheffman, an economist and **[**6]** Director of LECG, LLC, an international consulting company, and Jose J. Villamil, President and CEO of Estudios Tecnicos, Inc., an economics and planning consulting firm in Puerto Rico. DSUF # 16.

Unilever is a major Nestle competitor in the ice cream business, producing brands such as Breyers and Ben and Jerry's. DSUF # 6. Breyers is distributed by Payco, while Sterling distributes other Unilever products, such as Ben and Jerry's ice cream. See DSUF # 19, DUSF # 17, PSUF # 3.

*Market Structure*

Beginning in 2002, Nestle managers studied and discussed purchasing Payco, along with other strategies within the Puerto Rico market. PSUF # 8. Nestle also expanded its presence in the world wide ice cream market after 2000, and in 2003 acquired Dreyer's. DSUF # 182. The Federal Trade Commission ("FTC") investigated and approved Nestle Holdings, Inc.'s acquisition of Dreyer's, but did not include Puerto Rico in its analysis. PSUF # 60. The FTC also required Defendants to provide advance written notification of the acquisition of any direct store delivery ice cream distribution business for $ 7.5 million or more in the United States, except for those in Puerto Rico. PSUF # 61.

Dreyer's products first entered the Puerto Rico market in 1992, and in 1993 the company assigned the exclusive right to distribute its Edy's line to **[**8]** Sterling. DSUF # 176. Sterling

---

[2] Dreyer's entered into an agreement in 2002, with an effective date of June 26, 2003, whereby it combined with Nestle Ice Cream Company, LLC to form Dreyer's Grand Ice Cream Holdings, Inc.

[3] Defendants have also filed a Motion to Strike the Rebuttal Declaration of Dr. Thomas Overstreet (Docket # 206), which was filed in response to Defendant' Motion for Summary Judgment, and after the window for expert discovery had closed in the case management calendar. Inasmuch as said declaration incorporated sales data produced after his original report was delivered and expounded upon his existing theories, Defendants' motion is **DENIED.** However, the report also includes new theories of liability, including foreclosure in certain sub-segments of the ice cream market, which were presented after the closure of expert discovery. These are an improper attempt to reformulate arguments regarding the relevant market, and shall be struck from the record. The present case is not as extreme as Lohnes v. Level 3 Communications, Inc., 272 F.3d 49, 59 (1st. Cir. 2001), which is cited by Defendants. Nevertheless, the new theories regarding sub-regions would require new market definitions and expert work **[**7]** for both parties, and should thus not proceed at this advanced stage.

has distributed Dreyer's branded products in Puerto Rico since 1993. DSUF # 25. Since as early as April, 2001, Edy's has been, and continues to be, the number one selling ice cream brand in Puerto Rico. [4] DSUF # 26. In August, 2000, Sterling purchased selected assets from Caribbean Fruitti, an ice **[*253]** cream distributor in Puerto Rico, and thereby acquired the distribution rights to certain Unilever brands including Good Humor ice cream products. DSUF # 27. Sterling also added J & J Snacks, Rich's Ice Cream and Turkey Hill products to their offerings between 2005 and 2006. DSUF # 28. The amount and variety of ice cream brands and products offered in the relevant market has not diminished significantly since Nestle PR's acquisition of Payco. [5] DSUF ## 32-33.

Nestle PR entered the Puerto Rico ice cream distribution market in 1998 via the acquisition of Mantecados Nevada, Inc.'s ("Nevada") ice cream manufacturing and distribution business. DSUF # 21. Prior to the acquisition of a local distributor, Nestle PR sold its branded ice cream products, mostly imported from the U.S. mainland, via local distributors, including **[**10]** Sterling, Payco, and Nevada. PSUF # 9. Nevada ran an ice cream factory in addition to its distribution business, so Nestle PR offered ice cream products that were manufactured in the Puerto Rico factory, as well as Nestle branded products. PSUF # 10. The company's ice cream sales volume in this period (1999-2001) fluctuated between $ 18.1 million and $ 18.6 million. PSUF # 11. Nearly contemporaneously, Payco reported sales of $ 27.8 million, $ 29.1 million, and $ 31.1 million in 2000, 2001 and 2002, respectively. PSUF # 15.

From the time of the 1998 Nevada acquisition until the Payco merger in June 2003, Nestle PR's ice cream division suffered heavy losses. DSUF # 22. In response to this reality, and before the 2003 merger with Payco, Nestle PR approached Sterling about a possible joint approach for retail space, but this option was never seriously pursued. PSUF # 155. This did not lead to an agreement, and because Nestle PR was not economically successful, it began merger talks with Payco in 2001, and the two merged on June 11, or July 1, 2003 through Nestle's acquisition of 50% of Payco's stock, which was controlled by Ward. [6] DSUF ## 23 & 209; PSUF **[*254]** ## 22 & 27. On September 2, 2005, **[**11]** Nestle PR acquired the remaining 50% of Payco's shares from Ward. DSUF # 210. After the Nestle PR/Payco merger, Ward remained as President and CEO of Payco until 2005. PSUF # 53.

---

[4] This fact was not properly controverted with evidence to the contrary.

[5] Prior to the 2003 merger, the following brands, and possibly others, were available in Puerto Rico: Brever's, Haägen Dazs, Blue Bunny, M&M Mars (Snickers, Dove, M&Ms), Payco, Flav-o-Rich, various private labels, Healthy Choice, Lady Richmond, Rich & Creamy, Blue Bell, and Carrusel, Nestle imported range, Edy's, Ben & Jerry's, Unilever **[**9]** (Good Humor), Barbers, Nestle products: Budget Saver, Tofutti, Natural Fruit Corp, Parmalat -- Kinnett, Hood, Schoep's. As of 2008 the market included a similar number of options for the consumer: Brever's, Haägen Dazs, Nestle, Nestle Gold, Nestle Pavaso, Nestle Nevada, Nestle impulse products, Dole, M&M Mars (Snickers, Dove, M&Ms), Payco, Flav-o-Rich, various private labels, Healthy Choice, Lady Richmond, Rich & Creamy, Blue Bell, and Carrusel, Edy's, Unilever (Good Humor), Natural Fruit Corp., Rich Ice Cream and Products, Turkey Hill, Schoeps, Ben & Jerry's, Hunter Farms, Budget Saver, J&J Snack, Old Meeting House, Gianni of New York ("Gianni") ice cream, and Gianni Italian ice. Plaintiffs have disputed the presence of Blue Bunny, and the relevance of various limber companies. They have not been included in this Court's analysis.

[6] Plaintiffs allege that the motivation for this merger was ". . . that Nestle executives responsible for investigating and approving the acquisition of Payco intended to monopolize ice cream distribution business in Puerto Rico and exclude or limit competitors such as Sterling, Unilever and Wells Dairy." POSUF # 23. Contemporaneous to this merger, between 2002 and 2005, Sterling and Nestle management discussed different possibilities for merger, purchase, or the sharing of distribution rights. DSUF ## 203-208. No agreement was ever reached. Part of Nestle P.R.'s pre merger difficulties were due to Payco's distribution network. "As Nestle recognized that continued competition with Payco would likely lead to further losses, acquiring Payco became an attractive option," because the local company controlled the best locations and key distribution channels. PSUF ## 24 & 28. Furthermore, this Court notes that the exact date of the merger is contested, but finds said fact to be immaterial for present purposes.

The **[**12]** Puerto Rico Office of Monopolistic Affairs ("PROMA") reviewed and ultimately approved the Nestle PR / Payco transaction, conditioned upon various stipulations. [7] DSUF # 30. The then head of PROMA, Jose Diaz Tejera, has no knowledge that the terms of the agreement have ever been breached. DUSF # 31. After the merger, all of the sales of ice cream that were previously made by Nestle PR, including all Nestle brands, were shifted to Payco. DSUF # 214.

During the years prior to the Nestle PR/Payco merger, Nestle explored the possibility of strategic collaboration, and even a possible merger with Sterling. PSUF # 51. Nestle also studied the possibility of exchanging its Unilever line for Sterling's Edy's line in order to promote brand alliance rationalization. PSUF ## 86 & 90. This included discussions with Sterling's co-owner, Pasarell, about the possible purchase of his share of the company. PSUF # 88.

In the mid-1990s, Ward acquired Payco and began distributing various brands of ice cream. These came to include Payco, Lady Richmond, Carrusel, Flav-O-Rich, Unilever's Breyer's ice cream line, Masterfood Interamerica's Mars novelty ice cream line, and Wells' Dairy, Inc.'s ("Wells' Dairy") Blue Bunny line of ice cream products. DSUF ## 17-20; PSUF # 13. Prior to the Nestle PR / Payco merger in 2003, Blue Bunny ice cream **[**14]** products were Payco's most successful ice cream line. DSUF # 36. The merger caused Wells' Dairy to terminate its distributor agreement with Payco, because Payco started to distribute two of Blue Bunny ice cream's main competitors, Breyers and Nestle Gold. DSUF ## 36-37. Before Blue Bunny terminated its distribution agreement with Payco, it was at one time available in approximately 80 percent of stores selling take home ice cream in Puerto Rico. PSUF # 65. Wells' Dairy then granted a newly formed distributor, Palm Industries, Inc. ("Palm"), the right to distribute Blue Bunny ice cream products in Puerto Rico. DSUF # 38. Palm only survived until 2006, when Wells' Dairy formed a subsidiary in Puerto Rico, Wells' Dairy Puerto Rico, to self-distribute Blue Bunny take home products. DSUF # 38. On October 8, 2008, Wells Dairy informed Puerto Rico retailers that it would cease distributing Blue Bunny branded ice cream and novelty products no later than December 15, 2009. DSUF # 45.

**[*255]** After the 2003 Nestle PR/Payco merger there was analysis of whether Unilever would continue to provide Payco with some of its products, such as Breyer's ice cream. In undertaking this analysis, Unilever considered **[**15]** factors such as the reality that Defendants, by acquiring Dreyer's and Payco, became its distributor and also main competitor. Nevertheless, Breyer's was concerned that switching to Sterling could result in litigation due to breach of contract, and also the potential difficulties of single-brand self-distribution. PSUF # 113. After weighing its options, Unilever decided to stay with Payco, and in early 2006, entered into a new agreement with Nestle PR/Payco by which the company was appointed as the exclusive distributor of

---

[7] PROMA staff expressed concern about the transaction's potential anti-competitive effects. PSUF # 46. Plaintiffs dispute this fact, however, their objections are centered on the merits of the decision, and not its existence. PROMA staff noted that the Payco/Nestle PR combination could create restrictions on competition, but the transaction was eventually approved, in part due to the fact that the Commonwealth wanted Nestle to continue operating its local ice cream factory. POSUF # 30. The approval was made official on March 25, 2003 (DSUF # 223), and stipulated that Nestle PR and Payco would not enter into exclusive contracts which closed more than 35% of the market to competition. DSUF # 224. Nestle P.R. also agreed that it would seek PROMA's **[**13]** approval before granting the distribution rights over Edy's ice cream, unless Sterling should acquire the distribution rights to either Breyer's or Blue Bunny ice cream (or any other brand with similar sales). PSUF # 49. PROMA defined the relevant market as dedicated to the distribution and sale of ice cream. PSUF # 47.

Unilever's Breyers as well as Good Humor brand packaged ice cream products in Puerto Rico. [8] PSUF ## 116 & 117.

**Standard of Review**

The Court may grant a motion for summary judgment when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." *FED.R.CIV.P. 56 (c)*; See also *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)*; *Ramirez Rodriguez v. Boehringer Ingelheim, 425 F.3d 67, 77 (1st Cir. 2005)*. **[**16]** In reaching such a determination, the Court may not weigh the evidence. *Casas Office Machs., Inc. v. Mita Copystar Am., Inc., 42 F.3d 668 (1st Cir. 1994)*. At this stage, the court examines the record in the "light most favorable to the nonmovant," and indulges all "reasonable inferences in that party's favor." *Maldonado-Denis v. Castillo-Rodriguez, 23 F.3d 576, 581 (1st Cir. 1994)*.

Once the movant has averred that there is an absence of evidence to support the nonmoving party's case, the burden shifts to the nonmovant to establish the existence of at least one fact in issue that is both genuine and material. *Garside v. Osco Drug, Inc., 895 F.2d 46, 48 (1st Cir. 1990)* (citations omitted). "A factual issue is 'genuine' if 'it may reasonably be resolved in favor of either party and, therefore, requires the finder of fact to make 'a choice between the parties' differing versions of the truth at trial.'" *DePoutot v. Raffaelly, 424 F.3d 112, 116 (1st Cir. 2005)* (citing *Garside, 895 F.2d at 48 (1st Cir. 1990))*.

In order to defeat summary judgment, the opposing party may not rest on conclusory allegations, improbable inferences, and unsupported speculation. See *Hadfield v. McDonough, 407 F.3d 11, 15 (1st Cir. 2005)* **[**17]** (citing *Medina-Munoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990)*. Nor will "effusive rhetoric" and "optimistic surmise" suffice to establish a genuine issue of material fact. *Cadle Co. v. Hayes, 116 F.3d 957, 960 (1st Cir. 1997)*. Once the party moving for summary judgment has established an absence of material facts in dispute, and that he or she is entitled to judgment as a matter of law, the 'party opposing summary judgment must present definite, competent evidence to rebut the motion.' *Mendez-Laboy v. Abbott Labs., 424 F.3d 35, 37 (1st Cir. 2005)* (quoting *Maldonado-Denis v. Castillo Rodriguez, 23 F.3d 576, 581 (1st Cir. 1994)*. "The non-movant must 'produce specific facts, in suitable evidentiary form' sufficient to limn a trial-worthy issue. [. . .] Failure to do so allows the summary judgment engine to operate at full throttle." Id.; see also *Kelly v. United States, 924 F.2d 355, 358 (1st Cir.* **[*256]** *1991)* (warning that "the decision to sit idly by and allow the summary judgment proponent to configure the record is likely to prove fraught with consequence."); *Medina-Munoz, 896 F.2d at 8*, quoting *Mack v. Great Atl. & Pac. Tea Co., 871 F.2d 179, 181 (1st Cir. 1989)* (holding **[**18]** that "[t]he evidence illustrating the factual controversy cannot be conjectural or problematic; it must have substance in the sense that it limns differing versions of the truth which a fact finder must resolve.").

**Applicable Law & Analysis**

*Relevant Market*

There are three retail distribution channels in the ice cream market 1) take-home, 2) impulse (single-serving packages sold for immediate consumption), and 3) food service customers

---

8 Sterling alleges that Breyer's sales have stagnated as a result of the agreement, but this fact is in controversy, and not centrally relevant to the present motion.

(restaurants, hotels, ice cream parlors, etc.). PSMF # 189. The market shares of said distribution channels are approximately two thirds take-home, and one fourth impulse, with the remainder being food service customers, who make up less than one tenth of total ice cream consumption. [9]

Sterling has presented the relevant product market as the Puerto Rico market for the distribution and sale of ice cream products. DSUF # 46. PROMA also defined the relevant product market as the distribution of ice cream products, including the three segments in its definition. [10] POSUF # 47. Defendants have not offered a competing definition. Id. Moreover, Sterling's definition **[**19]** of the relevant geographic market, Puerto Rico, is unchallenged. Defendants' expert has not attempted to create a counter theory regarding the relevant product market. POSUF # 48; PSUF # 187.

Instead, Defendants signal that Sterling failed to include many important ice cream vendors in its relevant market definition, these include Baskin-Robbins [11] (DSUF ## 66-70), McDonald's (DSUF # 71-74), and "limbers," [12] a Puerto Rican version of the popsicle (DSUF ## 75-78). However, Defendants' own internal documents identify Sterling and Wells/Palm as principal competitors, and do not identify McDonald's, Baskin Robbins, or other retailers as part of the competitive landscape. POSUF # 58; DSUF # 58.

Defendants also criticize Sterling for not performing an econometric cross-elasticity of demand calculation to support its product market definition. Docket ## 47-48. They claim that Sterling has not performed an analysis of the reasonable interchangeability of use between products, or a price study, that are alleged to be part of the relevant market and potential substitutes. DSUF ## 49 & 52. Sterling does not deny that its expert ". . . has not produced econometric or regression computations relating specifically to cross-elasticity, but Plaintiff disputes Defendants' statement or implication that Plaintiff has not conducted an in-depth economic analysis concerning the characteristics and **[*257]** firms in the relevant product and geographic market." POSUF # 48.

The **rule of reason** governs this Court's analysis of the relevant market. *Recetas Por Menos, Inc. V. Five Development Corp., 368 F.Supp. 2d 124, 132 (D.P.R. 2005)*. When proving monopoly through indirect evidence, a market power analysis requires the prior identification of the relevant market, which is bifurcated into a test regarding the relevant product market and another focusing on the relevant geographic **[**21]** market. *Id. at 131*; *Eastern Food Services, Inc. v. Pontifical Catholic University Services Assn, 357 F.3d 1, 5-6 (1st Cir. 2004)*. Because Defendants do not contest Sterling's assertion that the relevant geographic market is the entire geographic territory of Puerto Rico, this Court will accept Sterling's definition for the purpose of all further analysis. However, Defendants' objection to Plaintiff's market definition requires this Court's review.

Supreme Court case law establishes that "[t]he outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between

---

[9] This Court notes that Plaintiff posits its relevant market as the combination of these three segments.

[10] This conclusion is buttressed by *practical idicia* used by Overstreet, Plaintiff's expert. Internal Nestle documents refer to its competitors as Sterling, and Palm industries, excluding ice cream retailers. Accordingly, Sterling's expert determined that the data was not amenable to econometric analysis. Id.

[11] Baskin-Robbins distributed to a limited number of grocery stores at one point, but has since terminated this facet of its business. POSUF # 68.

[12] The name comes from a visit to the Island by Charles **[**20]** Lindbergh in the 1920s.

the product itself and substitutes for it." *Brown Shoe Co. v. U.S., 370 U.S. 294, 325, 82 S.Ct. 1502, 1524, 8 L. Ed. 2d 510 (1962)*; see also *Broadcom Corp. v. Qualcomm Inc., 501 F.3d 297, 307 (3rd Cir. 2007)*. This analysis concerns the fact that the ". . .ability of customers to turn to other suppliers restrains a firm from raising prices above the competitive level, [so] the definition of the relevant market rests on a determination of available substitutes." *Federal Trade Comn v. Cardinal Health, Inc., 12 F.Supp. 2d 34, 46 (D.D.C. 1998)*. To wit, the competing products that **[**22]** customers in the market view as substitutes for the product in question.*Id.* Accordingly, the central question is whether there are reasonable alternatives to the product in question.

In addition to this first test, a practical, fact-driven, approach may also guide a court's analysis as to, "[t]he boundaries of [. . .] submarket[s], [which] may be determined by examining such practical indicia as industry or public recognition of the submarket as a separate economic entity, the products' peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors." *Brown Shoe Co., 370 U.S. at 325*. This entails taking into consideration the economic and commercial realities of a particular industry. *Cardinal Health, 12 F.Supp. 2d at 46*. Failure to define this market may lead to the dismissal of the anti-trust complaint. *Broadcom, 501 F.3d at 307*.

Sterling alleges that the market in question is a secondary market for the distribution and sale of ice cream, which is a market for distribution services and wholesale marketing to intermediaries, and not for the sale of ice cream directly to its end consumers. Defendants **[**23]** contest that ice cream retailers are direct competitors for their business, and that excluding retailers from the relevant market definition is a fatal flaw on Sterling's part. They argue that if the price of Edy's, or another similar brand, were to rise sufficiently at a supermarket or impulse location, consumers would migrate to retail firms such as McDonald's and Baskin-Robbins.

Whether one examines a sub-market, or a separate market for services, Sterling's arguments prevail on this point, at least so far as a genuine dispute of material fact exists. It is telling that during the relevant period, all of the companies involved have engaged in practically the same economic activity, which is importing **[*258]** ice cream into Puerto Rico and distributing it to supermarkets, restaurants, and impulse locations. None of the parties engages in significant retail activity, [13] and they mutually consider each other to be their primary competitors. It is doubtful that another unmentioned group of existing sellers and producers in the relevant geographic market could have, during the pendency of this action, deprived the parties in this complaint of significant amounts of business. *Newcal Instustries, Inc., 513 F.3d at 1045*. **[**24]** While Defendants allege that firms such as McDonald's and Baskin-Robbins should be included in the ice cream market, their internal business communications belie the relevance of the retail ice cream market for Sterling and Nestle/Payco's operations. The consumers in this market are the retailers, not the end customers for the product.

This Court understands that the parties involved in the lawsuit provide a specific service that is distinguishable from the business of selling ice cream directly to consumers. Furthermore, even if the relevant market includes competitors such as Baskin-Robbins and McDonald's, there is most certainly a dispute of fact as to the existence of a submarket. *Newcal Instustries, Inc. v. Ikon Office Solution, 513 F.3d 1038, 1045 (9th Cir. 2008)*. Therefore, Defendants' prayer for summary judgment dismissing all claims for failure to properly define the relevant product market is **DENIED.**

---

13 The "limber" companies could be different, but Defendants have not presented evidence that "limber" distribution has had anything but a *de minimis* effect on the ice cream distribution market.

*Antitrust Injury*

Sterling alleges damages on two main fronts. First it avers that Nestle **[**25]** PR/Payco's exclusive contracts with some Puerto Rico retailers have illegally restricted them from enjoying a market share commensurate with their products' performance in competitive scenarios. Secondly, Nestle allegedly coordinated a "price squeeze" and restricted product support for Dreyer's products that Sterling distributes (*i.e.* Edy's). The Nestle PR/Payco merger allegedly led to ". . . a panoply of anti-competitive conduct including price increases to Sterling, denial of new products, and so forth." Docket # 198. Sterling argues that "but for" these activities, it would have achieved greatly higher sales, and enjoyed the profits these sales would have produced.

Specific antitrust standing is dependent on Sterling being able to show a plausible antitrust injury, ". . . linked to an illegal presence in the market[,] . . . which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 489, 97 S. Ct. 690, 50 L. Ed. 2d 701 (1977)*. The injury must originate in proscribed anti-competitive activity, "by reason of that which made the [activity] unlawful," *id. at 488*, and it must also **[**26]** be sufficiently direct, non-speculative, and measurable to the extent that causality is not in doubt. Associated Gen. Contractors of Cal., Inc., v. Cal. State Council of Carpenters, 459 U.S. 533, 102 S.Ct. 8907, 906 (1983).

The need for direct causality born from a specific anti-competitive act is of special importance, because "antitrust claims are concerned not with wrongs directed against the private interest of an individual business but with conduct that stifles competition." E. Food Servs., 357 F.3d at 4 (citing *Brown Shoe Co., 370 U.S.* **[*259]** at 344). Antitrust ". . . harm does not mean a simple loss of business or even the demise of a competitor but an impairment of the competitive structure of the market." *Recetas Por Menos, Inc., 368 F.Supp. 2d at 132* (citing *Stop & Shop Supermarket Co. v. Blue Cross & Blue Shield of R.I., 373 F.3d 57 (1st Cir. 2004)*); see also *Brown Shoe Co., 370 U.S. at 344*. In sum, federal antitrust law seeks "the protection of competition, not competitors." *Leegin Creative Leather Products Inc. V. PSKS, Inc., 551 U.S. 877, 906, 127 S.Ct. 2705, 2724, 168 L. Ed. 2d 623 (2007)*(citing *Atlantic Richfield Co. v. USA Petroleum Co., 495 U.S. 328, 338, 110 S.Ct. 1884, 109 L.Ed.2d 333 (1990)*); **[**27]** see also *Spectrum Sports v. McQuillan, 506 U.S. 447, 458, 113 S. Ct. 884, 891, 122 L. Ed. 2d 247 (1993)*.

The law does not require that the illegal activity be the sole cause of the injury, "but only that it was a material cause." *Sullivan v. National Football League, 34 F.3d 1091, 1103 (1st Cir. 1994)*(citing *Engine Specialties, Inc. v. Bombardier Ltd., 605 F.2d 1, 14 (1st Cir. 1979)*). Furthermore, the First Circuit's standard includes "but-for causation," leading to a direct injury resulting from anti-competitive activity. *Morales-Villalobos v. Garcia-Llorens, 316 F.3d 51, 55 (1st Cir. 2003)*; see also *SAS of P.R., Inc. v. P.R. Tel. Co., 48 F.3d 39, 43 (1st Cir. 1995)*.

The Sterling damages model asks this Court to assume that "but for" the Nestle PR/Payco merger, the company would have had more than double the market share it had in 2003, when the period of Defendants' alleged anti-competitive and monopolistic actions began. Overstreet's damages model assumes that Sterling's sales accounted for roughly 50% of Supermax and Pueblo

ice cream volume, and uses this volume as a benchmark. [14] DSUF # 234. It concludes that Sterling could have enjoyed up to a 50% market share, "but for" Payco's allegedly anti-competitive **[**28]** exclusivity agreements. DSUF # 230. Another benchmark used are depot center sales, of which Sterling alleges it enjoys 50% market share, and Walmart, which does not use exclusives, where Sterling enjoys 42% market share. DSUF ## 226-231.

Consistent with Plaintiff's theory of the case, its expert, Overstreet affirms that none of the ice cream distributors in Puerto Rico had market power prior to the summer of 2003, and before said date the market was competitive. DSUF ## 79 & 80. Overstreet, concedes that Payco, Nestle PR, Wells', Sterling and Dreyer's did not have monopoly or unilateral market power prior to the Nestle PR/Payco merger. DSUF # 144. If the base-line for a competitive environment in the ice cream market was the pre-merger landscape (see DSUF ## 79 & 80, 144), then Sterling should have to show how it was harmed, and how "but for" the merger and the alleged illegal activity, it would have achieved, through legitimate competition, greater sales, market share, profits, etc.

The primary reality undermining **[**29]** Sterling's request for "but for" damages, is that the inference that the company has been unfairly hindered either by the exclusives or by product price increases is implausible in light of Sterling's increased profits, sales, and market share. Far from showing that the merger hurt their business, the record shows that Plaintiff was **better off** during the relevant period.

**[*260]** Despite the allegedly competitive marketplace, between fiscal years 2001 and 2003, Sterling's sales **declined from** $ 8.07 million to $ 7.01 million. DSUF # 90. However, after the Nestle PR/Payco merger, Sterling's sales **increased,** expanding to $ 12.02 million by the end of 2008, a 70% **increase** over the company's 2003 results. DSUF # 90. By contrast, some products distributed by Nestle PR/Payco lost market share and access to important locations. See, e.g., DSUF ## 119, 134, & 139

The same trend is observable in Sterling's gross profit, which rose by an annual rate of 12% between 2003 and 2008, and during which time its operating income **increased** by 300%. In 2007, Sterling's gross profit was 60% **higher** than in 2003. DSUF # 93. Moreover, Sterling's market share grew, from approximately 12.6% in 2002 to 20.7 % in 2007, and **[**30]** the company is expanding its ice cream distribution operations by building new and larger facilities. [15] DSUF ## 96-97 & 100; PSUF # 196. In contrast, the Nestle PR/Payco joint venture **lost** nearly $ 5 million in sales revenue to Sterling and other competitors in its first six months of operations. DSUF # 139.

Regarding the market as a whole, Puerto Rico's ice cream distribution industry has grown in terms of total sales since 2003. DSUF # 98. There is insufficient data in the record of the case to evaluate how much Puerto Rico consumers paid at the retail level before the 2003 Nestle PR/Payco merger, and whether during the pre-merger period price increases to consumers were

---

[14] Sterling's expert accepted on its face the report of the company's executives that Sterling's sales accounted for the ice cream volume in SuperMax and Pueblo stores. DSUF # 235.

[15] For much of the relevant period, Sterling did not carry "cheap and sweet" ice cream lines, which are an important seller at many supermarkets catering to lower income customer bases. DUSF ## 102-104. Furthermore, an important customer, Unilever, complained that Sterling does not have specific routes for impulse, single serving, ice cream sales. DSUF # 110. These factors may have limited Sterling's growth *vis a vis* Nestle PR/Payco.

greater than or less than the rate of inflation, and supplier price increases. [16] **[**31]** DSUF ## 82-85. What the record does show is that inflation in Puerto Rico averaged 11.9% annually between 2003 and 2007, encompassing the relevant period for this action. DSUF # 87. Despite this, both Blue Bunny and Edy's ice cream retailed for **lower** prices in 2007 than in 2001. DSUF # 141.

Furthermore, Sterling alleges that exclusivity contracts between Defendants and many Puerto Rico retailers after the Nestle PR/Payco merger caused it antitrust injury. However, exclusive contracts have been used in the Puerto Rico ice cream business since the 1990s. DSUF # 113. Payco's sales of ice cream to exclusive accounts **decreased** from $ 15.16 million in 2004 to $ 10.62 million in 2007. DSUF # 116. Sterling's internal documents show that Payco's exclusive accounts foreclosed 28.2% of the Puerto Rico ice cream market in 2004, 30.8% in 2005, 29.4% in 2006, and 19.5% in 2007. DSUF # 118. Moreover, these exclusive contracts were at the distribution level, and not directed at consumers. DSUF # 127. Defendants' **[**32]** 100% exclusive agreements are virtually all one or two years in duration. [17] Docket # 128. Additionally, Overstreet **[*261]** did not find any evidence that Defendants ever sold ice cream products at prices below their cost. DSUF # 142.

Nevertheless, it is not contested that Defendants' gross margins were higher in stores with exclusivity agreements. PSUF # 158.After the merger, Sterling managed to move into various supermarkets that had previously been covered by Payco exclusives. DSUF # 129. These stores included Grande and Pitusa supermarkets, and, in 2007, Sterling also obtained a 30% exclusive agreement with Econo stores, which had previously been a Nestle PR/Payco **[**33]** exclusive retailer. DSUF ## 132 & 133.

In terms of other competitors, Nestle PR/Payco distributes Unilever's Breyers brand to most retailers, but Econo and military bases receive the brand through other routes. DSUF ## 150-151. Matosantos Commercial Co. distributed Baskin Robins to Supermercados Grande, but stopped doing so in 2007. DSUF # 157. At the end of 2008, Gianni of New York ("Gianni"), an ice cream and Italian ice distributor entered the Puerto Rico market, distributing to various supermarkets. DSUF # 160.

If the market place was competitive when Payco alone utilized exclusives, why should the same practice, at very similar levels, somehow injure Plaintiff now that Payco and Nestle PR have merged? Exclusives have existed in the Puerto Rico marketplace since before the merger, and have not increased as a total percentage of market share since 2003. Beyond the fact that exclusive dealing is not *per se* illegal, and that in the present case Defendants' contracts have not violated the law, as will be discussed further below in Section II, the pre-existence of the practice prior to the merger weakens any claim for antitrust injury.

While Sterling's business concerns regarding Defendants' **[**34]** acquisition of Dreyer's, who manufactures its marquee product (Edy's), are legitimate from a business point of view, they do not involve any overt anti-competitive act. To wit, the acquisition was approved by the FTC (PSUF

---

[16] Sterling responds to this fact with an affidavit by one of its lawyers of a review of advertised prices. POSUF # 84. However, this Court finds said evidence insufficient to controvert these facts.

[17] A small number of Payco's agreements surpassed two years, including those with Mr. Special, Supermax, and Blockbuster that were for three years. See Docket # 191-88 at 30-33. Sterling points out Payco's 5 year deal with Ralph's as an example of an illegally long contract, but this was not 100% exclusive. Id. at 30. Plaintiff admits that it was 90% exclusive. POSUF # 211. Additionally, Plaintiff alleges that Payco and Nestle PR colluded regarding the terms of the Ralph's agreement about the payment terms to the supermarket chain. Id.

# 60), and Defendants have not withdrawn Edy's, nor have they significantly increased the unit price to Sterling. DSUF # 87. Accordingly, prices to consumers have stayed stable and volume of sales has increased, strongly suggesting that the competitive structure of the market has not been harmed, thus precluding antitrust injury.

Furthermore, allegations regarding price increases, along with the non-assignment of some product lines (*i.e.* Skinny Cow), also cannot be linked to tangible damages. The facts of the case show that Sterling's business was not in rapid expansion before the merger (DSUF # 90), nor did it appear to be in a position to dominate the local market. After the merger, however, Sterling's sales grew by 70% (see DSUF # 90), and its market share grew from the low teens to over 20% during the relevant period. More importantly, the company's gross profit increased by 60% (DSUF ## 96-97), and it has not faced significant increases in its input costs for **[**35]** the products it purchases from Dreyer's. (DSUF ## 82-85 & 141). This expansion has been made possible through aggressive price competition and the successful entry into new retail outlets, previously controlled by Payco in the pre-merger period and then by Defendants during the **[*262]** relevant period for this action. See,*e.g.*, DUSF # 129.

Sterling argues that the benchmark that should be used are those stores where no exclusives are in place, namely Walmart and depot centers, where they have achieved between 40% and 50% sales shares. This Court finds the suggested benchmark speculative for various reasons. Foremost is that exclusive dealing contracts are not illegal *per se*, and it is not reasonable to completely exclude their existence from the market when envisioning a competitive marketplace. Moreover, in the pre-merger period Sterling's market share was nowhere near this large, and it is unrealistic to posit that the company's sales and market presence would have grown four-fold had the Nestle PR/Payco merger never occurred.

Proving antitrust injury requires establishing a causal relationship between an illegal, anti-competitive act and actual damages, or at minimum plausible "but for" **[**36]** damages. This Court finds that Plaintiff has failed to present facts supporting a plausible theory of damages. As a result, Plaintiff's damages model is too speculative and improbable to survive summary judgment.

This holding alone would support dismissal of all of Plaintiff's federal antitrust claims. However, for the purpose of thoroughness, we will discuss each cause of action individually. The discussion will address Plaintiff's three factual groupings of claims. Namely:

I. Plaintiff's first and fourth causes of action for Unlawful Restraint of Trade in Violation of Sections 1 & 3 of the Sherman Act and Exclusive Dealing in Violation of Section 3 of the Clayton Act.

II. Plaintiff's second and third causes of action for Monopolization and Attempted Monopolization under Section 2 of the Sherman Act.

III. Plaintiff's fifth cause of action for Conspiracy to Monopolize in Violation of Sections 1 and 3 of the Sherman Act.

IV. Plaintiff's sixth, seventh, and eighth causes action, and Defendant's Counterclaim, brought under Commonwealth Antimonopoly law.

*I. Unlawful Restraint of Trade (Causes of Action I and IV: Sherman Act Section 1; Clayton Act Section 3)*

The central component of Sterling's **[**37]** claims for unlawful restraint of trade under Section 1 of the Sherman Act and Section 3 of the Clayton Act are Defendants' exclusivity agreements with some Puerto Rico retailers. Section 3 of the Clayton Act prohibits arrangements that have a probability to ". . . substantially lessen competition or tend to create a monopoly in any line of commerce." *18 U.S.C. § 15*. Likewise, Section 1 of the Sherman Act requires a similar, but subtly different showing, that ". . . the alleged agreement involved the exercise of power in a relevant economic market, that this exercise had anti-competitive consequences, and that those detriments outweighed efficiencies or other economic benefits. This is the rule of reason calculus." *Stop & Shop Supermarket Co. v. Blue Cross & Blue Shield of Rhode Island, 373 F.3d 57, 61 (1st Cir. 2004)*.

Sterling's claims for unlawful restraint of trade, and illegal exclusive dealing, are focused on contracts between Defendants and retailers for the exclusive use of freezer space in Puerto Rico stores and supermarkets. The Amended Complaint alleges that this practice has foreclosed, or cut off, a sufficient portion of the relevant market **[*263]** from the entrance of new competitors, **[**38]** violating antitrust law, and stifling meaningful competition. However, because the Amended Complaint has not alleged that the exclusive dealing arrangements in question (i.e. the "exclusives") are *per se* violations, this Court must balance the efficiencies gained by their implementation and contrast these with any harm to the structure of the market place. *Id. at 62* (citing *Tampa Electric Co. v. Nashville Coal Co., 365 U.S. 320, 81 S. Ct. 623, 5 L. Ed. 2d 580 (1961))*.

Section 1 of the Sherman Act requires substantial foreclosure. *Concord Boat Corp. v. Brunswick Corp., 207 F.3d 1039, 1059 (8th Cir. 2000)*. A similar analysis applies to exclusive dealing claims under Section 3 of the Clayton Act. In other words, some instances of limited foreclosure may be acceptable, and an antitrust plaintiff must show that the exclusivity has "anti-competitive effects outweighing the legitimate economic advantages that it might provide." *Eastern, 357 F.3d at 5*. Harm to competition requires that the practice ". . . create or enhance market power - meaning the power to control prices or exclude competition . . .," but market power is not in itself sufficient to "condemn the conduct" because potential benefits must also be weighed. Id. **[**39]** Therefore, when analyzing a practice, which is not *per se* illegal, under the rule of reason the courts must consider ". . . both a practice's likely anti-competitive effects and its beneficial business justifications." *Leegin Creative, 551 U.S. at 909*.

Case law has established that exclusivity agreements can promote reduced-costs, stable long-term supply, and "predictable prices," and as such are to be reviewed favorably. *Stop & Shop, 373 F.3d at 66*; see also *Eastern, 357 F.3d at 8* (elaborating "it is widely recognized that in many circumstances [exclusivity contracts] may be highly efficient - to assure supply, price stability, outlets, investment, best efforts or the like-and pose no competitive threat at all."). Accordingly, given the tendency to liberally review "exclusives," for them to be found illegal, they must have harmed the very structure of the relevant market, and not competitors or competing interests. This determination is made by examining if they have foreclosed a sufficiently large, or crucial, part of the market to effectively block competitors from entering or expanding to compete for new business.

First Circuit case law uses market share figures as initial guides **[**40]** for determining if foreclosure rates are facially dubious or presumably harmless, but a significant share is only a presumptive signal of market power as entry barriers may be low. *Eastern, 357 F.3d at 6*. The inference of market power requires an antitrust plaintiff to "plead and prove that a firm has a

dominant share in a relevant market, and that significant 'entry barriers' protect that market." Broadcom, 401 F.3d at 307. In the case at bar, Plaintiff challenges the levels of foreclosure caused by Nestle PR/Payco exclusives, which are ". . . unlikely to be of concern when they are less than 30 or 40 percent" of the market." *Stop & Shop, 373 F.3d at 68*. In other words, "low numbers make dismissal easy," but high numbers do not guarantee success for a plaintiff. Id. (citing *Jefferson Parish Hospital District No. 2 v. Hyde, 466 U.S. 2, 45-46, 104 S. Ct. 1551, 80 L. Ed. 2d 2 (1984)*; Areeda & Hovenkamp, Federal Antitrust Policy, The Law of Competition and Its Practice, 3d). Beyond First Circuit case law, PROMA's decision approving the Nestle PR/Payco merger echoes this threshold rule by proffering a 35% market share as the highest possible permissible limit for foreclosure due to the Nestle PR/Payco exclusives. This **[**41]** limit **[*264]** has never been exceeded on a Puerto Rico wide basis. DSUF # 118-119.

In the present case, sales from stores participating in Nestle PR/Payco exclusivity agreements have never exceed 30.8% of total market share and averaged just under 27% for the relevant period, **dropping** to under 20% for the final year. This fact weighs strongly in favor of Defendants because, as previously stated, ". . . foreclosure levels are unlikely to be of concern where they are less than 30 or 40 percent." [18]*Stop & Shop, 373 F.3d at 68*. These numbers are below the range of concern, and should not be considered anti-competitive. However, beyond this threshold approach, the practices underlying the abovementioned foreclosure percentages predate the Nestle PR/Payco merger, and have actually **decreased** since said merger.

In the post-merger period, the percentage of supermarkets covered by exclusives did not increase, and both Sterling's market share and total sales have grown. Presently, a Sterling brand, Edy's, is Puerto Rico's number one brand of ice cream. Sterling has also managed **[**42]** to enter (and establish preeminence with its Edy's brand) major Puerto Rico supermarkets, such as Grande, Pitusa, and Econo, where Defendants' brands had previously enjoyed exclusivity. DUSF # 129. Sterling's inroads into new Puerto Rico retailers are not isolated instances of competitive success in the ice cream market. Gianni products also entered various important supermarket chains since 2007, and have maintained their presence to date. In fact, Nestle PR/Payco's combined market share is currently **lower** than in the pre-merger period. [19]

In responding to the Motion for Summary Judgment, Sterling points to higher than acceptable foreclosure rates in some sub-regions of the Commonwealth. The argument is specious as the market Plaintiff defined for purposes of the present suit is the sale and distribution of ice-cream in all of Puerto Rico. Analyzing sub-regions or sub-markets would call for not only local data supporting individual claims for each region and market, but also fragmenting Plaintiff's broad claims into many market-specific ones. In addition, Plaintiff also makes arguments about foreclosure rates in take-home sales of ice cream (see PSUF # 203 (citing that these could have been as high as 36% during the relevant period)), but these too are misplaced as they do not address the relevant antitrust market. The problem with Plaintiff's analysis regarding take-home sales is not the

---

18 In fact, PROMA's guidelines would have allowed Nestle/Payco exclusive to have constituted up to 35% of the relevant market.

19 Even accepting *arguendo* that said agreements could be construed as illegal, the entry of Gianni, coupled with Sterling's strong growth, clearly suggest the competitive structure of the market has not been impaired, and the market appears to have equal or greater competitiveness than it did prior to the 2003 merger. It is therefore impossible for this Court to infer "but for" damages, where their calculation, even in the light most favorable to Sterling, "would 'necessitate wide ranging' speculation." Sullivan v. Tagliabue, 25 F.3d 43, 51 (1st Cir. 1991). The rule of reason does not permit an inference that Sterling has experienced real anti-competitive **[**43]** prejudice, and would have been any more or less successful had these agreements not existed.

veracity of the data they proffer; rather it is that their data describes markets beyond the scope of this case.

By agreeing with Plaintiff that the correct relevant market is the sale and distribution of ice cream in Puerto Rico, this Court precludes **[**44]** itself from making conclusions about antitrust violations in sub-markets, not properly established in the four corners of the complaint. Other courts **[*265]** have rejected similar gerrymandering of markets attempting to artificially show high levels of foreclosure. See *Queen City Pizza, Inc. v. Domino's Pizza, Inc., 124 F.3d 430 (3rd Cir. 1997)*. The Amended Complaint is not framed to include sub-regions or sub-markets, and it is therefore unnecessary to examine foreclosure rates outside those of the already defined relevant market. Doing so would lead to false analogies and unsubstantiated conclusions.

As mentioned above, exclusive dealing is only considered a threat to competition in "very discrete circumstances," mostly concerning long-term foreclosure (*i.e.* contracts for longer than two years). *Eastern, 357 F.3d at 8*. Even given market concentration, if the exclusionary contracts are short-term in nature, or entrance is easy, substantial foreclosure cannot be demonstrated. *Id. at 8-9*.

The tradition of exclusive dealing contracts in Puerto Rico ice cream distribution dates to at least the 1990s, and the undisputed facts reveal that the present levels are well below their pre-Nestle PR/Payco **[**45]** merger peak. In this context, low market-wide rates of foreclosure are sufficient for this Court to sustain the legality of the exclusives. Nevertheless, the record also reflects that most of the exclusivity agreements in question were for periods of between one and two years. The First Circuit has found that agreements of this length are lawful, because any possible interruption to competition that they might cause is only for a short period after which competitors may gain entry to foreclosed outlets. *Barry Wright Corp. v. ITT Grinnell Corp., 724 F.2d 227. 236-238 (1st Cir. 1983)*. This Court notes a small number of the exclusivity agreements are for more than three years. See Docket # 191-88 & 200-8 - 200-13. Nevertheless, these do not constitute a sufficient portion of the relevant market to sustain an antitrust claim.

Of course, this Court agrees with Plaintiff that there is no automatic percentage where market foreclosure rates either ratify the legality of exclusivity agreements or make them *per se* illegal. The law does not seek to immunize potentially illegal activity in restraint of trade, but exclusive dealing contracts are not disfavored, and the present case demonstrates **[**46]** no substantial harm to the market

Arguing against the low foreclosure rates' significance, Sterling repeatedly urges this Court to examine the practical effects of the exclusives, and not a more bright-line approach, and mentions various barriers to entry, [20] and suggest that the market has had no new entries since the 1990s. This is not supported by the record, which shows that Gianni is a recent, **[*266]** albeit smaller entry,

---

[20] To bolster its antitrust claims based on market foreclosure in detriment to competition, Sterling alleges that there are high entry barriers to the local ice cream distribution market, including: 1) the necessity of establishing a Direct Store Delivery System ("DSD system"), 2) purchasing trucks and freezers, 3) establishing sufficient route density, 4) obtaining ice cream brands to distribute, 5) failed entry by previous competitors, 6) market concentration between incumbents, 7) Puerto Rico Law 75, and 8) Payco's exclusivity agreements. PSUF # 198-199. Plaintiff alleges that Puerto Rico is a unique market because of its small size, and that local supermarkets, allegedly unlike those in the United States, do not have sufficient freezer warehouse capacity to store ice cream as inventory, requiring investment in a DSD system. As a result, ice cream must be frequently delivered in smaller quantities to in-store freezers, versus more infrequent deliveries to storage freezers, which is allegedly how the market works in the continental United States. Plaintiff alleges that this leads market entrants in Puerto Rico to face higher capital costs **[**48]** because they must invest in greater refrigeration technology and more frequent routes.

and those retailers such as Costco, Sam's, and Econo have begun to market their own private label brands, and that distribution channels remain open. *Omega Environmental v. Gilbarco, Inc., 127 F.3d 1157, 1164 (9th Cir. 1997)*. Furthermore, this Court disagrees with Plaintiff's proposition that Law 75 creates a disincentive to the entry of new ice cream brands to the local market. On the contrary, Law 75 can potentially protect smaller distributors by guaranteeing them a stable product supply and business relationship, granted they meet reasonable sales expectations. Furthermore, prices have remained relatively stable, volume has grown, and so have Sterling's revenues. Therefore, even adopting the holistic view of the illegal behavior, as put forth by Sterling, does not **[**47]** bolster its claims of unreasonable foreclosure.

In addition to the exclusive dealing charges, Plaintiff also refers to *per se* illegal horizontal agreements and the allegedly unlawful coordination of activities between Nestle PR and Payco before their merger. These both must be examined as part of a merger occurring nearly seven years ago. Absent other facts suggesting an intentional strategy to restrain trade and foreclose the market, Ward's statements about controlling the local marketplace (see supra at 12-13) can only be interpreted as isolated incidents (PSMF # 43) and do not constitute facts sufficient to support a claim under the relevant statutes, more so when market data does not support Plaintiff's conclusion that the exclusionary contracts "choked" competition.

In sum, exclusive dealing contracts are a frequent practice in retail/wholesale food sales and distribution. Given their long-term presence before the Nestle PR/Payco merger (DSUF # 113), there is minimal cause for concern. *Joyce Beverages, Inc.. 555 F.Supp. 271, 277-278 (S.D.N.Y. 1983)*. The exclusivity agreements under analysis are licit, and have not negatively affected the structure **[**49]** of the market. Moreover, the record does not reflect illegal horizontal agreements in the pre-merger period, and Plaintiff has not shown significant price increases to consumers, despite years of inflation. Therefore, Plaintiff's claims under Section 1 of the Sherman Act for illegal restraint of trade and under Section 3 of the Clayton Act for illegal exclusive dealing are **DISMISSED WITH PREJUDICE.**

*II. Monopolization and Attempted Monopolization (Causes of Action II and II: Section 2 of the Sherman Antitrust Act)*

As to the applicable law, ". . . § 2 addresses the actions of single firms that monopolize or attempt to monopolize, as well as conspiracies and combinations to monopolize." *Spectrum Sports, Inc. v. McQuillan, 506 U.S. 447, 455, 113 S.Ct. 884, 890, 122 L. Ed. 2d 247 (1993)*. The first is established by showing: "(1) the defendant has monopoly power and (2) the defendant has engaged in impermissible 'exclusionary' practices with the design or effect of protecting or enhancing its monopoly position." *Coastal Fuels of Puerto Rico, Inc. v. Caribbean Petroleum Corp., 79 F.3d 182, 196 (1st Cir. 1996)*; see also *Brunswick Corp v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 97 S.Ct. 690, 50 L. Ed. 2d 701 (1977)*; *United States v. Grinnell Corp., 384 U.S. 563, 570, 86 S. Ct. 1698, 16 L. Ed. 2d 778 (1966)*(stating **[**50]** "This is distinguished from growth or development as a consequence of a superior product, business acumen, or historical accident."). Case law has firmly established that "[t]he purpose of the [Sherman] Act is not to protect businesses from the working of the market; it is to protect the public from the failure of the market." *Spectrum Sports, 506 U.S. at 457*. Finding **[*267]** anti-competitive conduct requires identifying acts that ". . . harm the competitive process, and thereby harm consumers [. . .as opposed to] harm to one or more competitors . . ." *U.S. v. Microsoft, 253 F.3d 34, 58, 346 U.S. App. D.C. 330 (D.C. Cir. 2001)*; see also *Cargill v. Monfort of Colo., 479 U.S. 104, 107, 107 S. Ct. 484, 93 L.*

Ed. 2d 427 (1986)(stating "Plaintiffs must prove antitrust injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful. The injury should reflect the anti-competitive effect either of the violation or of anti-competitive acts made possible by the violation."). Such prohibited conduct includes exclusionary acts, or others with an anti-competitive exclusionary effect, which "tend[] to destroy competition itself." Spectrum, 506 U.S. at 447. Therefore, courts should **[**51]** not search for malice in business dealing, rather they should look for those which may lead to lessened competition, Brooke Group Ltd, 509 U.S. 209, 113 S. Ct. 2578, 125 L. Ed. 2d 168 (1993), in the sense that the potential injury is, as mentioned in the damages section, only "of the type that the statute was intended to forestall." Microsoft, 253 F.3d at 59 (citing Brunswick Corp., 429 U.S. at 487-488). If potentially anti-competitive conduct is found to exist, then this Court must discern if the conduct also has pro competitive effects, and using the rule of reason, balance the harms. Id. However, this must focus on the acts, and not on "the intent behind it." Id.

Establishing monopolization also requires a showing that the defendant possesses market power, which is the ability to negatively affect competition in the relevant market. Coastal Fuels, 79 F.3d at 196. Here, the relevant market has been established, so this Court must ask if Defendants are able to set prices substantially above costs, and also if they enjoy protection from the entry or expansion of rivals who could challenge potentially supra-competitive pricing. Id. (citing Rebel Oil Co. v. Atlantic Richfield Co., 51 F.3d 1421 (9th Cir. 1995). In other **[**52]** words, "[m]arket power is the power to 'force a purchaser to do something that he would not do in a competitive market.'" Eastman Kodak, 504 U.S. 451, 464, 112 S. Ct. 2072, 119 L. Ed. 2d 265 (1992)(citing Jefferson Parish, 466 U.S. at 14). Furthermore, "merely possessing monopoly power is not itself an anti-trust violation." Microsoft, 253 F.3d at 51.

Likewise, attempted monopolization under Section 2 requires showing that the defendant has acted in a predatory or anti-competitive manner within the market place, that this reflects a "specific intent to monopolize," and that there is a "dangerous probability of success." Ramallo Bros. Printing, Inc. v. El Dia, Inc., 392 F. Supp. 2d 118, 130 (D.P.R. 2005)(citing Spectrum Sports v. McQuillan, 506 U.S. 447, 113 S. Ct. 884, 122 L. Ed. 2d 247 (1993)). Actual monopolization must be dangerously threatened, because ". . .the notion that proof of unfair or predatory conduct alone is sufficient to make out the offense of attempted monopolization is contrary to the purpose and policy of the Sherman Act." Spectrum Sports, 506 U.S. at 456-457.

In light of this general framework for Section 2 of the Sherman Act, this Court must first ask if Defendants have market, or monopoly, power within the Puerto Rico ice cream **[**53]** market. The 2003 merger certainly created a dominant firm, which is also linked in a corporate relationship with the producer of Edy's, the star product for Sterling. While this market landscape certainly raises a red flag at first glance, it does not necessarily lead to **[*268]** Plaintiff's assertion that Defendants exercise market power. Market power exists only when competitors lack capacity to increase short run output, allowing for the monopolist to unilaterally restrict output in order to charge higher prices. Rebel Oil, 51 F.3d at 1434. Therefore, such a conclusion requires answering whether prices can be set to supra-competitive levels.

The record shows that Defendants cannot control prices, and that Sterling, and other competitors, continue to successfully compete. Namely, the uncontested facts do not reflect that prices are being set well above costs, nor does the record show that prices to consumers have grown significantly in the years following the merger. Furthermore, the price of ice cream offered to

Sterling from Dreyer's has **remained virtually flat for nearly a decade,** despite high rates of inflation. Such price stability suggests Nestle PR/Payco cannot set prices well above **[**54]** costs, which would be required for a finding of monopoly power. *Coastal, 79 F.3d at 196*. This, combined with the steady increase in sales volume in the whole relevant market, weighs heavily against any inference that Defendants are able to raise prices by restricting output.

In building its case that a monopoly exists in the relevant market, Plaintiff again reverts to arguments regarding alleged entry barriers, such as Puerto Rico's small size, the high fixed capital costs of distributing ice cream, and Law 75. It is established in antitrust law that an entry barrier is a cost that is greater for a new competitor than for established rivals. *Los Angeles Land Co. v. Brunswick Corp., 6 F.3d 1422, 1428 (9th Cir. 1993)*(referencing 2 Areeda & Hovencamp, Antitrust Law parr. 409e at 303). These factors are equally challenging to Nestle PR/Payco, and may play to Sterling's benefit, given that it distributes an already popular brand in a small market. Regarding the exclusives, these could potentially act as barriers, but as discussed in the previous section, this Court does not find them to be illegal, and they have not stopped Sterling's strong expansion, nor various new entries into the market. **[**55]** Sterling's sales and market share have increased during the relevant period to this action.[21] DSUF ## 97 & 129. Thus, the presence of new competitors, and Sterling's own expansion, weigh heavily against a finding of market power. *Ramallo Bros., 392 F. Supp. 2d 118*.

Nevertheless, it is illustrative to discuss Plaintiff's specific averments regarding anti-competitive conduct. Specifically, Sterling alleges: i) that the merger was an illegal attempt to create a monopoly, and that ii) Defendants directed Dreyer's to stop selling SkinnyCow to Sterling and that they increased the price of Edy's to weaken Sterling.

*A. The Merger*

A first obstacle faced by Sterling in questioning the merger, is that the uncontested facts of the case establish that Nestle PR purchased Payco after years of stagnation and losses in Puerto Rico. Accordingly, the company's share of the Puerto Rico ice cream distribution market may **[**56]** be attributed to an historical accident of necessity, or a legitimate boardroom decision, whereby Nestle PR had to acquire a more viable competitor in order to survive. Plaintiff points to various conversations, **[*269]** mostly involving Ward and other representatives of Defendants, both in Switzerland and Puerto Rico, that suggest the combination aimed at creating a dominant firm. These are insufficient to bear the weight of an anti-trust claim, where damage to competition, not malice, is the operative test.

Sterling has also pointed to many instances of market share being a *sine qua non* requirement for success in Puerto Rico. PSUF # 69. Of course, such an argument is facially incongruent with the position that the Nestle PR/Payco merger hurt competition, because, if 40% market share is necessary as suggested by this fact, then no more than two firms could exist. PSUF # 69. Sterling's claims further fall short because nothing on the record suggests the Puerto Rico consumer is paying monopoly prices for ice cream. Even more, as in Brunswick, the Nestle/Payco combination seems to have enhanced competition.

Beyond the record painting a picture of sustained growth for Sterling, entry into the market **[**57]** by a new competitor (Gianni), shows entry barriers are not insurmountable and that the

---

[21] As previously stated, Gianni recently entered the market, and while presumably on a smaller scale than both Plaintiff and Defendants' businesses, its entry is still significant for this Court's analysis, and Econo and Costco have also begun to self-distribute ice cream in their stores.

ice cream market remains highly competitive. Sterling argues as if it had a right to an ideal relationship with Dreyer's where its own business needs would dictate the price and variety of products supplied. Antitrust law does not pretend to provide such a guarantee, rather a competitive marketplace. Therefore, Sterling's monopolization claim simply cannot prosper. [22]

As to the charge that Dreyer's, Nestle S.A., and Nestle PR, illegally shared confidential data regarding Sterling's business, these facts do not substantiate any claim of an anti-competitive strategy by Defendants. The allegations of data sharing are too vague to point to any real harm to competition, and this, even if illegal for other reasons, does not point to an antitrust violation. In light of **[**58]** the above, this Court finds that Defendants do not possess and have not exercised monopoly power in the relevant market, and that the alleged anti-competitive acts were not illegal.

*B. Price Squeeze*

In both 2004 and 2005, Dreyer's reduced the price support for Edy's ice cream given to Sterling, first by $ 0.10 per unit (from seventy-five cents per unit to sixty-five cents per unit), and then by an additional five-cents per unit for a total of 15 cents. DSUF ## 190-194; PSUF ## 139&142. [23] Price changes during the relevant period were limited to 15 cents per gallon. These were the only increases over almost a decade, when inflation in Puerto Rico neared 11% annually. DSUF # 87. During the relevant period, the price of Edy's has remained stable at $ 2.36. Between 2000 and 2001, Sterling received a forty-cent promotional allowance, this increased to seventy five cents in 2002, which was reduced by fifteen cents between 2004-2005, as mentioned above. See Docket # 191-88 at 17. Accordingly, the present net price to Sterling for Edy's is 10% less than it was in 2000. Id.

There is a controversy of **[**59]** fact as to how and why Dreyer's, possibly in conjunction **[*270]** wth Nestle officials, made the decision to reduce the price support to Sterling in 2004 and 2005. See, e.g., PSUF ## 93 & 95. Plaintiff alleges that the company responded to Ward's plan to squeeze Sterling, while Defendants allege that price increases were due to raw material price increases. DOSUF # 146. Sterling also alleges that Dreyer's assigned a product line, Skinny Cow, to Nestle PR/Payco after having previously encouraged Sterling to distribute the product before the merger. PSUF # 147 & 149. Defendants deny this assertion, citing the existence of an existing agreement with Dreyer's. DOSUF # 149.

Plaintiff points to a range of documents regarding Defendants' business analysis of the Puerto Rico ice cream market, as proof of intent to monopolize. These ideas included the idea of swapping the Breyers line for the Edy's line (PSUF # 31), and eliminating Blue Bunny from the Payco portfolio (DSUF # 30), which eventually occurred due to Wells' initiative. Ward made comments to Nestle during the merger negotiations that he believed that this would eliminate Blue Bunny as a competitor in the Puerto Rico market. PSUF # 39. During **[**60]** the negotiations for the Nestle PR and Payco acquisition, Ward, who had a personal interest in Payco's market position, promoted eliminating Sterling's price subsidy as a way of pressuring the distributor and strengthening the company's value for the second stage of the Payco acquisition. PSUF # 121 &

---

[22] This Court also finds that Sterling's attempted monopolization claim must be dismissed for failing to establish a dangerous probability that Nestle will achieve market power. The merger occurred over 6 years ago and the market remains "robustly competitive." Springfield Terminal Ry. v. Canadian Pac. Ltd., 133 F.3d 103, 110 (1st Cir. 1997).

[23] Defendants allege that price increases were due to raw material price increases. DOSUF # 146.

127. Defendants allege these statements regarding price increases to Sterling were made by Ward acting as a self-interested party during the sale of Payco, and in no way reflected Nestle's position, nor did it reflect the fact that Dreyer's is a separate operational entity.

Ward continued his campaign to eliminate the Edy's price support after the merger. PSUF ## 134 & 138. However, Nestec and Nestle PR executives informed Ward that his language and tactics were not acceptable under the corporate guidelines of each entity, and that they did not conform to the companies' established marketing policies. DOSUF # 138.

Sterling argues that Defendants acted in an illegal predatory fashion when Dreyer's withheld SkinnyCow and increased the price per unit of Edy's in Puerto Rico. However, this Court can identify no antitrust case law supporting the proposition that Dreyer's was obliged to grant **[**61]** distributorship of SkinnyCow to Sterling. Doing so might have been a magnanimous act towards a successful business partner, but businesses do not have a legal obligation to act loyally and Sterling has not shown why Dreyer's had an antitrust duty to deal with them.

In further argumentation, Sterling also alleges size-reductions in the Edy's half-gallon product line. However, this has not been sufficiently established in the uncontested facts, and appears to reflect general marketing practices, not any specific strategy regarding the Puerto Rico market. Furthermore, the record does not show that Sterling had to reduce prices to consumers as a result of the size change, nor that sales decreased.

In the context of "price squeeze" claims, the Supreme Court has held that ". . . a defendant with no antitrust duty to deal with its rivals has no duty to deal under the terms and conditions preferred by those rivals." *Pacific Bell Telephone Co. v. Linkline Communications, Inc. 129 S.Ct. 1109, 1123, 172 L. Ed. 2d 836 (2009)*. Linkline reiterated that the courts are ". . . ill suited 'to act as central planners, identifying the proper price, quantity, and other terms of dealing.'" *129 S. Ct. at 1121* (citing *Verizon Communications Inc. v. Law Offices of* **[*271]** Curtis V. Trinko, *LLP, 540 U.S. 398, 410, 124 S. Ct. 872, 157 L. Ed. 2d 823 (2004))*. **[**62]** In the present action, Dreyer's and Defendants may well have a "duty to deal" with Sterling on the wholesale level that arises out of the Puerto Rico fair dealership law and their particular contract, but this is not an antitrust question. Thus, Linkline renders Sterling's price squeeze and denial of new products claims toothless, because "[a]n upstream monopolist with no duty to deal is free to charge whatever wholesale price it would like; anti-trust law does not forbid lawfully obtained monopolies from charging monopoly prices." *Id. at 1122*.

Even before Linkline, claims by distributors were disfavored. For example, the ramifications on efficiency of a vertical merger, such as a producing firm (Nestle PR) acquiring existing distributors (Payco), and then reducing costs by only dealing with wholly-owned distributors, may constitute an injury-in-fact, but not an antitrust injury as long as alternative sources of product exist. *Serpa Corp. v. McWane, Inc., 14 F.Supp.2d 147, 150 (D.Mass. 1998)*(citing Areeda & Hovenkamp, Antitrust Law 432-33 (1997 Supp.)). Accordingly, "an intermediary distributor may only bring anti-trust claims when it: i) is injured by the direct anti-trust violation **[**63]** of a rival; ii) suffers directly as a result of illegal distribution restraints, or iii) qualifies as an exception." Id.; see also *Florida Seed Co., Inc. V. Monsanto Co., 915 F.Supp. 1167, 1175 (M.D. Ala. 1995)*. Moreover, "[w]here, as here, output is expanding at the same time prices are increasing, rising prices are equally consistent with growing product demand. Under these conditions, a jury may not infer competitive injury from price and output data absent some evidence that tends to prove that output was restricted or prices were above a competitive level." *Brooke Group, 509 U.S. at 237*.

Dreyer's is a separate corporate entity from all Defendants, but they are nonetheless owned and ultimately controlled by said company, thus barring conspiracy claims involving these two entities for the alleged "panoply of anti-competitive conduct." [24] On the other hand, if Dreyer's pricing and product allocation activities are found anti-competitive then they could be liable for damages under *Illinois Brick Co. v. Illinois, 431 U.S. 720, 736, n. 16, 97 S. Ct. 2061, 52 L. Ed. 2d 707 (1977)*. This point of law is not in controversy, and the question remains if any acts seen as predatory or conspiratorial can be construed from the **[**64]** record of this case.

Sterling avers that Dreyer's decision to assign some new brands to Payco is proof of a conspiracy to cripple its distribution business. This Court can find no reason why new brands, such as Skinny Cow, must have necessarily been offered to Sterling. Under*Trinko* **[**65]** no claim on that front exists. Sterling has not been terminated as a distributor for Dreyer's products, and continues to distribute, Edy's, **[*272]** Puerto Rico's leading brand. Under such circumstances, the relationship can hardly be construed as predatory, and Sterling has brought no actions against Dreyer's for breach of contract or breach of fiduciary duty.

As has been discussed, Sterling's "price squeeze" and foreclosure claims are stymied by evidence of a competitive marketplace, and the merger of competitors is not in and of itself sufficient to prove antitrust damages. *Cargill, 479 U.S. at 107*. This Court agrees with Defendants that there is a dearth of evidence indicating increased consumer pricing or restricted output in the Puerto Rico ice cream market during the relevant period. Dreyer's never took any steps to make distributing Edy's unprofitable for Sterling. And there is even less indication that prices have risen to a supra-competitive level as required by the Clayton and Sherman Acts. *Pool Water Products v. Olin Corp, 258 F.3d 1024, 1034 (9th Cir. 2001)*(stating ". . . the antitrust laws are only concerned with acts that harm allocative efficiency and raise the price of goods **[**66]** above their competitive level or diminish their quality.")(internal citations omitted). Puerto Rico consumers have not been hurt by either increased prices or reduced selection.

In light of the foregoing, this Court concludes that no monopoly has existed during the relevant period. Therefore, Plaintiff's claims under Section 2 of the Sherman Act for monopolization are **DISMISSED WITH PREJUDICE.**

Furthermore, the attempted monopolization claims also fail. First Circuit case law establishes that the requisite "dangerous probability" of monopolization cannot be shown when a plaintiff continues to compete and expand in the relevant market. *Ramallo Bros., 392 F. Supp. 2d 118*. Here, Sterling's success and continued growth acts as a poison pill for their claims of attempted monopolization. Furthermore, *Springfield Terminal Railway v. Canadian Pacific, Ltd., 133 F.3d 103, 110 (1st Cir. 1997)*, held that an attempted monopolization claim is to be presumed implausible if the challenged conduct has continued for over two years without damage to the competitive structure of the relevant market. The challenged merger in the present case took place in 2003, the information sharing was contemporaneous **[**67]** to the merger, the alleged price squeeze

---

[24] Sterling also alleges conspiracy claims related to the price increase. These are unfounded because the parties are commonly owned, and any discussions regarding joint marketing strategies occurred during the process of the Nestle/Payco merger. Even if this were not the case Sterling's conspiracy claim would be very weak, because any price increases occurred after the merger and involve actions permitted under Linkline. Therefore, even Sterling's conspiracy claims are hindered by the need to show plausible causality between prohibited conduct and actual injury. Matsushita Electric Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986)(stating ". . . respondents must show more than a conspiracy in violation of the antitrust laws; they must show an injury to them resulting from the illegal conduct. . ." so injury does not result from ". . . alleged conspiracies . . . that tend to benefit respondents. . .").

occurred in 2005 and 2006, and Payco's exclusives have existed since the 1990s. These facts do not permit an inference that there is a dangerous probability of success in monopolizing the market in question. Therefore, Plaintiff's Section 2 Sherman Act attempted monopolization claims are **DISMISSED WITH PREJUDICE.**

*III. Conspiracy to Monopolize (Claim V; Sections 2 and 1 of the Sherman Antitrust Act)*

Sterling's final cause of action is for conspiracy under Sections 1 and 2 of the Sherman Act, for alleged collusion between Nestle PR and Payco beginning in 2001 up until their 2003 merger. The standard for a conspiracy claim under Section 1 of the Sherman Act, includes the following elements which require showing: "(1) a contract, combination, or conspiracy among two or more independent actors; 2) that unreasonably restrains trade; and 3) is in, or substantially affects, interstate or foreign commerce." *Dyno Nobel, Inc. v. Amotech Corp., 63 F.Supp. 2d 140, 147 (D.P.R. 1999)*(citing *Copperweld Corp. v. Independence Tube Corp., 467 U.S. 752, 768, 104 S. Ct. 2731, 81 L. Ed. 2d 628 (1984))*. The test for a Section 2 claim for conspiracy to monopolize is similar, although with a slightly higher **[**68]** burden of **[*273]** proof. *Id. at 150*. To wit, a plaintiff must show: "(1) the existence of a conspiracy, (2) an overt act in furtherance of the conspiracy, and (3) specific intent to monopolize." Id. (citing *United States v. Yellow Cab Co., 332 U.S. 218, 225, 67 S. Ct. 1560, 91 L. Ed. 2010 (1947))*. In other words, Sterling must show that the different Nestle actors and Payco shared a similar intent. However, Sterling's allegations that Nestle and Payco have illegally conspired to monopolize the ice cream distribution market necessarily fail as to all post-merger acts, because the coordinated acts of parent companies and their subsidiaries cannot constitute a Sherman Act claim for conspiracy. *Copperweld, 467 U.S. at 776*. This Court understands that said rule applies to both Section 1 and Section 2 claims.

Moreover, the record does not contain evidence of any conspiratorial acts, beyond the declarations of Ward during the process of promoting the sale of his business, Payco, to Nestle, a potential buyer. Such "boardroom ruminations" should not be construed as predatory behavior. *William Inglis / Sons Baking Co. v. ITT Cont'l Baking Co., 668 F.2d 1014, 1028 (9th Cir. 1981)*. Other discussions of coordinated marketing alluded **[**69]** to by Sterling occurred after Nestle and Payco had entered into the merger process with PROMA, and have caused no conceivable damage to Sterling, whose business has grown.

It is important to note that the two companies were in the process of exploring a merger, and conducting due diligence. In this sense, the allegation that the two were sharing financial information is specious. Antitrust law is not intended to stand as an obstacle to potential mergers and acquisitions. Adopting such a strict view, as proposed by Plaintiff, would substantially hinder legitimate business undertakings. Moreover, no link has been proffered between this alleged improper sharing of information and a cognizable injury to Sterling. Therefore, the company is not entitled to a favorable inference regarding this exchange of information, because they have failed to proffer a plausible theory of injury. As such, the required link of an act unreasonably restraining trade cannot be met.

The alleged illegal sharing of information led to the eventual combination of Nestle PR and Payco, which was approved by PROMA. This Court does not find that the merger itself was conspiratorial, and it did not lead to an uncompetitive **[**70]** market place. Such a merger, even if it creates a large or dominant firm, is not *per se* illegal. *Cargill, 479 U.S. at 116*.

Also at issue here is the sharing of financial information in the pre-merger period, and the acquisition of 90% of retail freezer space at Ralph's. Docket # 196 at 53-54. Defendants allegedly

colluded by discussing the possible ramifications of Payco potentially losing Unilever, a major Nestle competitor if the merger were to go through. See PSUF 106. Moreover, no valid conspiracy claim can be brought against commonly-owned companies. *Copperweld, 467 U.S. at 752*. Therefore, any claims based on acts occurring after the merger, which was finalized either on June 11 or July 2, 2003, are facially without merit. The undisputed facts of the case show that said agreement with Ralph's was signed in August, 2003, well after the merger. Even if discussions occurred in the months leading up to the combination, this Court finds that they could not sustain a charge of conspiracy as they would be an inextricable part of the acquisition.

The rhetoric cited by Plaintiff in its efforts to oppose summary judgment is eye-opening, but ultimately fails to sustain the **[*274]** theory of a pre-merger **[**71]** conspiracy alleged in the Amended Complaint.[25] Therefore, given the absence of facts plausibly supporting a clear conspiracy, and the apparent lack of antitrust damages related to these acts, Plaintiff's claims for conspiracy under both Sections 1 and 2 of the Sherman act are **DISMISSED WITH PREJUDICE.**

*IV. Commonwealth Antimonopoly Claims*

The remainder of Sterling's claims are grounded on Puerto Rico law. Exercising jurisdiction over pendent state law claims once the federal law claims are dismissed is discretional. See *Newman v. Burgin, 930 F. 2d 955, 963-964 (1st Cir. 1991)*(holding that "the power of a federal court to hear and to determine state-law claims in non-diversity cases depends upon the presence of at least one substantial federal claim in the lawsuit…[and] the district court has considerable authority whether or not to exercise this power, in light of such considerations **[**72]** as judicial economy, convenience, fairness to litigants, and comity). Because this Court will grant summary judgment as to the federal law claims, it will not exercise supplemental jurisdiction over the state law claims. Therefore, Sterling's claims arising from Puerto Rico law and Payco's Counterclaim for tortious interference are **DISMISSED without prejudice.**

**Conclusion**

The applicable law and the undisputed facts of this case demonstrate that Sterling has not established antitrust injury with respect to either its Sherman Act or Clayton Act claims, nor has it established the necessary elements for any of the federal antitrust violations alleged in the Amended Complaint. Accordingly, Defendants' motion for summary judgment is **GRANTED** and Plaintiff's federal claims are **DISMISSED WITH PREJUDICE.** Sterling's state law claims shall be **DISMISSED WITHOUT PREJUDICE,** as will be Defendant's Counterclaim.

**IT IS SO ORDERED.**

In San Juan, Puerto Rico, this 23rd day of June, 2010.

*/S/ Salvador E. Casellas*

SALVADOR E. CASELLAS

U.S. Senior District Judge

---

[25] The Court has not discussed in detail said allegations, or Defendants' replies thereto, because they have not been linked to any specific acts creating antitrust injury or affecting the relevant market. Such a lack of causality to any antitrust harm leaves the allegations moot, even if the facts were proven true.

EXHIBIT 285

LexisNexis®

Caution
As of: August 12, 2014 9:17 AM EDT

# Stop & Shop Supermarket Co. v. Blue Cross & Blue Shield

United States Court of Appeals for the First Circuit
June 24, 2004, Decided
No. 03-2061

**Reporter:** 373 F.3d 57; 2004 U.S. App. LEXIS 12493; 2004-1 Trade Cas. (CCH) P74,459
THE STOP & SHOP SUPERMARKET COMPANY; WALGREEN EASTERN COMPANY, INC., Plaintiffs, Appellants, v. BLUE CROSS & BLUE SHIELD OF RHODE ISLAND; COORDINATED HEALTH PARTNERS, INC., d/b/a BLUE CHIP; CVS CORPORATION; PHARMACARE MANAGEMENT SERVICES, INC., Defendants, Appellees. C. DANIEL HARON; RONALD BOCHNER; MAXI DRUG, INC., d/b/a BROOKS PHARMACY; PROVIDER HEALTH SERVICES, INC.; UNITED HEALTHCARE CORPORATION. Defendants.

**Prior History: [**1]** APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF RHODE ISLAND. [Hon. Ernest C. Torres, U.S. District Judge].
*Stop & Shop Supermarket Co. v. Blue Cross & Blue Shield, 239 F. Supp. 2d 180, 2003 U.S. Dist. LEXIS 4111 (D.R.I., 2003)*

**Disposition:** Affirmed.

**Core Terms**

pharmacies, network, customers, bidding, Shop, reimbursed, antitrust, competitors, plaintiffs', district court, benefits, subscribers, per se violation, rule of reason, ancillary, supplier, insurer, Food, prescription drug, summary judgment, anti trust law, foreclosure, retail, arrangements, negotiations, reciprocal, depending, purchases, prices, admit

**LexisNexis® Headnotes**

Civil Procedure > Appeals > Summary Judgment Review > General Overview
Civil Procedure > Appeals > Summary Judgment Review > Standards of Review
Civil Procedure > Judgments > Summary Judgment > Partial Summary Judgment
Civil Procedure > Trials > Judgment as Matter of Law > General Overview
Civil Procedure > Appeals > Standards of Review > De Novo Review

***HN1*** Rulings on summary judgment and directed verdicts are reviewed de novo. The standard for review of rulings excluding evidence depends on the nature of the underlying issue (fact, law, judgment call).

Antitrust & Trade Law > ... > Price Fixing & Restraints of Trade > Per Se Rule & Rule of Reason > General Overview
Antitrust & Trade Law > ... > Price Fixing & Restraints of Trade > Per Se Rule & Rule of Reason > Sherman Act

Civil Procedure > ... > Summary Judgment > Burdens of Proof > General Overview

***HN2*** Antitrust claims under *§ 1* of the Sherman Act, *15 U.S.C.S. § 1*, ordinarily require a burdensome multi-part showing: that the alleged agreement involved the exercise of power in a relevant economic market, that this exercise had anti-competitive consequences, and that those detriments outweighed efficiencies or other economic benefits. This is the so-called rule of reason calculus. This calculus is bypassed if the collusive arrangement falls instead within one of several categories (e.g., naked horizontal price fixing) in which liability attaches without need for proof of power, intent or impact. For that reason plaintiffs typically try to bring their claims within per se rubrics. Whether a plaintiff's alleged facts comprise a per se claim is normally a question of legal characterization that can often be resolved by the judge on a motion to dismiss or for summary judgment.

Antitrust & Trade Law > Regulated Practices > Price Fixing & Restraints of Trade > Horizontal Market Allocation

Antitrust & Trade Law > ... > Price Fixing & Restraints of Trade > Per Se Rule & Rule of Reason > General Overview

Antitrust & Trade Law > ... > Per Se Rule & Rule of Reason > Practices Governed by Per Se Rule > Boycotts

Antitrust & Trade Law > ... > Price Fixing & Restraints of Trade > Vertical Restraints > Price Fixing

***HN3*** The most important per se categories are naked horizontal price-fixing, market allocation, and output restrictions. Sometimes group boycotts are called per se violations, but the label here is only minimally useful since many arrangements that are literally concerted refusals to deal have potential efficiencies and are judged under the rule of reason. Minimum retail price fixing is a rare vertical arrangement still comprising a per se violation--that is why car makers only "suggest" a retail price to dealers.

Antitrust & Trade Law > Regulated Practices > Price Fixing & Restraints of Trade > General Overview

Antitrust & Trade Law > ... > Price Fixing & Restraints of Trade > Per Se Rule & Rule of Reason > General Overview

***HN4*** Bid rigging of a certain kind is a per se violation of the antitrust laws, but this refers to horizontal price fixing whereby two or more suppliers (or occasionally purchasers) secretly fix the price at which they will bid.

Antitrust & Trade Law > ... > Price Fixing & Restraints of Trade > Per Se Rule & Rule of Reason > General Overview

Insurance Law > Industry Practices > Federal Regulations > Antitrust Regulations

***HN5*** The antitrust laws are not meant to police bad management; the market (or the insurance regulator) is expected to do that.

Mergers & Acquisitions Law > Antitrust > Antitrust Statutes > General Overview

Business & Corporate Law > Joint Ventures > General Overview

Commercial Law (UCC) > Sales (Article 2) > Form, Formation & Readjustment > General Overview

Mergers & Acquisitions Law > Antitrust > Joint Ventures

***HN6*** Joint ventures involving direct competitors not infrequently exclude other competitors.

Antitrust & Trade Law > ... > Price Fixing & Restraints of Trade > Per Se Rule & Rule of Reason > General Overview

***HN7*** Restraints that are truly ancillary to a larger efficiency-gaining enterprise are not normally condemned per se without looking at likely consequences.

Antitrust & Trade Law > ... > Price Fixing & Restraints of Trade > Horizontal Refusals to Deal > Boycotts
Antitrust & Trade Law > ... > Price Fixing & Restraints of Trade > Per Se Rule & Rule of Reason > General Overview
Antitrust & Trade Law > ... > Per Se Rule & Rule of Reason > Practices Governed by Per Se Rule > Boycotts
Healthcare Law > Healthcare Litigation > Antitrust Actions > Facilities
Healthcare Law > Business Administration & Organization > Covenants not to Compete > General Overview

***HN8*** To the extent the group boycott label is useful at all to describe a per se violation, it is principally a warning against anticompetitive secondary boycotts--e.g., manufacturers who agree not to supply a store that buys from a discounting manufacturer.

Antitrust & Trade Law > ... > Price Fixing & Restraints of Trade > Per Se Rule & Rule of Reason > General Overview

***HN9*** Harm does not mean a simple loss of business or even the demise of a competitor but an impairment of the competitive structure of the market.

Antitrust & Trade Law > ... > Price Fixing & Restraints of Trade > Exclusive & Reciprocal Dealing > General Overview

***HN10*** For exclusive dealing, foreclosure levels are unlikely to be of concern where they are less than 30 or 40 percent. But while low numbers make dismissal easy, high numbers do not automatically condemn, but only encourage closer scrutiny.

**Counsel:** John J. Curtin, Jr. with whom Daniel L. Goldberg, Alicia L. Downey, Bingham McCutchen LLP, William M. Dolan III, Brown Rudnick Berlack Israels LLP, Gregg A. Hand and White & Case LLP were on brief for appellants.

Steven E. Snow with whom Robert K. Taylor, Daniel S. Crocker and Partridge Snow & Hahn LLP were on brief for appellees Blue Cross & Blue Shield of Rhode Island and Coordinated Health Partners, Inc., d/b/a Blue Chip.

Bruce D. Sokler with whom Yee Wah Chin, Noam B. Fischman, Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C., James A. Ruggieri and Higgins, Cavanagh & Cooney LLP were on brief for appellees CVS Corporation and Pharmacare Management Services, Inc.

**Judges:** Before Boudin, Chief Judge, Howard, Circuit Judge and Saris,* District Judge.

**Opinion by:** BOUDIN

**Opinion**

**[*59]** BOUDIN, *Chief Judge*. Stop & Shop Supermarket Company ("Stop & Shop") and Walgreen Eastern Co., Inc., ("Walgreen") brought an antitrust suit against a number of defendants primarily based on *section 1 of the Sherman Act*, **[**2]** *15 U.S.C. § 1 (2000)*, lost certain of their claims on summary judgment, and then suffered a directed verdict at the jury trial held on the balance of their claims. They now appeal on several grounds as to certain defendants (the other defendants settled). We begin with a description of background events and proceedings in the district court.

* Of the District of Massachusetts, sitting by designation.

Blue Cross and Blue Shield of Rhode Island ("Blue Cross") is the major health insurer in that state, offering various plans that cover, among other medical expenses, the cost of prescription drugs. Until 1997, Blue Cross managed drug benefits itself and provided a substantially "open" pharmacy system--that is to say, most subscribers could buy drugs at any pharmacy. Blue Cross determined what drugs it would reimburse, set (by negotiation) what would be paid to the pharmacies, and processed subscriber claims.

Beginning in 1997, Blue Cross decided to use a pharmacy benefits manager to administer its prescription drug benefits. Such managers often set up a "closed" network of pharmacies, providing greater insurance coverage to those subscribers who use network pharmacies. In exchange for inclusion in the network, and therefore **[**3]** increased volume of drug sales, the network pharmacies typically agree to provide drugs at lower prices, resulting in lower costs to the insurer.

In this case, Blue Cross invited bids from managers and received three, one of which Blue Cross disqualified. The second manager was PharmaCare, a subsidiary of CVS, a well known major drug store chain (52 pharmacies in Rhode Island). The third manager, Wellpoint, proposed a closed network limited to pharmacies operated by Stop & Shop (18 pharmacies) and Walgreen (15 pharmacies). After obtaining further bids from Wellpoint and PharmaCare, in December 1997 Blue Cross selected PharmaCare to manage a closed network that initially included the CVS pharmacies and most independent pharmacies in Rhode Island.

During this period, PharmaCare was itself negotiating with yet another benefit manager--Provider Health Services, Inc. ("Provider"). Provider managed a closed network, comprised mainly of Brooks Pharmacies (42 pharmacies in the state), serving another insurer--United Healthcare of New England, Inc. ("United")--doing business in Rhode Island. In February 1998, Provider agreed to allow CVS stores to join the United/Provider network; and in **[**4]** May 1998, PharmaCare allowed Brooks and other Provider pharmacies to join the Blue Cross/PharmaCare closed network.

Ancillary to these arrangements, Brooks and Provider's other pharmacies agreed--obviously for PharmaCare's benefit--not to join other networks competing for Blue Cross' business. PharmaCare in turn agreed not to admit into the Blue Cross/PharmaCare network new drug stores (beyond CVS, the independents, and the pharmacies in the United/Provider network). Blue Cross consented to the enlargement of its closed network and in November 1998 signed a formal three-year contract with PharmaCare.

Not all Blue Cross customers are covered by plans that effectively restrict them to closed network pharmacies. Blue Cross offers multiple plans, and one set allows customers to fill prescriptions at any pharmacy without economic penalty. Blue Cross' counsel estimated in oral argument **[*60]** that perhaps two-thirds of Blue Cross' customers are restricted to its closed network; our own review of the record suggests that the number--which obviously varies over time--may be closer to three-quarters.

Unhappy with losing the opportunity to serve many Blue Cross customers on competitive terms, Stop **[**5]** & Shop brought the present action on June 9, 1999, against Blue Cross, PharmaCare and CVS, charging violations of federal and state antitrust laws; in March 2000, Walgreen joined as co-plaintiff and an amended complaint was filed on May 2, 2000. United Health, Provider, and Brooks were also initially defendants but, they were dropped after agreeing to admit plaintiffs to the United/Provider network.

On motions for summary judgment, the district court wrote a detailed opinion rejecting plaintiffs' claims that any per se violation of the antitrust laws had been plausibly shown. *Stop & Shop*

*Supermarket Co. v. Blue Cross & Blue Shield of R.I., 239 F. Supp. 2d 180, 195 (D.R.I. 2003)*. It rejected claims that any of the arrangements comprised naked horizontal restraints such as a group boycott. *Id. at 189-91*. However, the court ruled that factual issues precluding summary judgment were raised as to whether any of defendants' conduct was actionable under the rule of reason. *Id. at 193*.

At this time, the district court said that Blue Cross represented about 60 percent of the customers in Rhode Island whose retail drug purchases were reimbursed; **[**6]** and United provided such benefits to about 25 percent. *Stop & Shop, 239 F. Supp. 2d at 183*. These figures were the lynch-pin of the pretrial report by plaintiffs' expert witness, Dr. Bruce Stangle, who stressed the 85 percent figure in concluding that "an out-of-network entrant would be precluded from competing in a substantial portion of the relevant market."

Thereafter the district court considered *in limine* motions filed by Blue Cross. Subject to reconsideration at trial, the court granted a motion to exclude certain evidence as to the bidding process leading to PharmaCare's selection and the related decisions of PharmaCare and Provider to expand their respective closed networks to include each other's present pharmacy members. The court denied, again subject to reconsideration at trial, a motion to exclude key testimony from plaintiffs' expert witness, Dr. Stangle.

Trial began in June 2003. On the sixth day of trial, the district court upheld a defense objection to Dr. Stangle's proposed testimony concerning the proper definition of the relevant market. Plaintiffs tendered a summary of the proposed testimony as an offer of proof and rested. The district **[**7]** court then granted a defense motion for judgment as a matter of law, holding (in an oral ruling from the bench) that absent an adequate market definition, the plaintiffs could not make out a rule of reason claim under the antitrust laws.

The plaintiffs now appeal, arguing that the district court erred in granting partial summary judgment on the per se claims, in excluding several items of evidence including Dr. Stangle's testimony on market definition, and in directing a verdict. ***HN1*** Rulings on summary judgment and directed verdicts are reviewed *de novo*, *Wolinetz v. Berkshire Life Ins. Co., 361 F.3d 44, 47 (1st Cir. 2004)* (summary judgment); *Ahern v. Scholz, 85 F.3d 774, 793 (1st Cir. 1996)* (directed verdict); the standard for review of rulings excluding evidence depends on the nature of the underlying issue (fact, law, judgment call), *see Blake v. Pellegrino, 329 F.3d 43, 46 (1st Cir. 2003)*.

**[*61]** *Per se claims*. Plaintiffs begin their brief by contesting the district court's summary judgment ruling that no legitimate per se claims were presented. As our prior decisions have explained, ***HN2*** antitrust claims under *section 1 of the Sherman Act* **[**8]** ordinarily require a burdensome multi-part showing: that the alleged agreement involved the exercise of power in a relevant economic market, that this exercise had anti-competitive consequences, and that those detriments outweighed efficiencies or other economic benefits. This is the so-called rule of reason calculus. *See, e.g., Eastern Food Servs. v. Pontifical Catholic Univ. Servs. Ass'n, 357 F.3d 1, 5 (1st Cir. 2004)*; *Fraser v. Major League Soccer, L.L.C., 284 F.3d 47, 59 (1st Cir. 2002)*, *cert. denied*, 537 U.S. 885, 154 L. Ed. 2d 144 (2002).

This calculus is bypassed if the collusive arrangement falls instead within one of several categories (*e.g.*, naked horizontal price fixing) in which liability attaches without need for proof of power, intent or impact. *Eastern Food Servs., 357 F.3d at 4* & n.1. For that reason plaintiffs typically try to bring their claims within per se rubrics. Whether a plaintiff's alleged facts

comprise a per se claim is normally a question of legal characterization that can often be resolved by the judge on a motion to dismiss or for summary judgment. *See, e.g.*, *Addamax Corp. v. Open Software Found., Inc., 152 F.3d 48, 50-51 (1st Cir. 1998).* **[**9]**

***HN3*** The most important per se categories are naked horizontal price-fixing, market allocation, and output restrictions. Sometimes group boycotts are called per se violations, but the label here is only minimally useful since many arrangements that are literally concerted refusals to deal have potential efficiencies and are judged under the rule of reason. *See U.S. Healthcare, Inc. v. Healthsource, Inc., 986 F.2d 589, 593 (1st Cir. 1993)*. Minimum retail price fixing is a rare vertical arrangement still comprising a per se violation--that is why car makers only "suggest" a retail price to dealers--but this offense is not charged by plaintiffs in this case. [1]

Because the defendants moved for summary judgment, the complaint **[**10]** allegations did not have to be taken as true, *see R.W. Intern Corp. v. Welch Food, Inc., 13 F.3d 478, 487 (1st Cir. 1994)*, but the plaintiffs were entitled to the benefit of the doubt: specifically, reasonable inferences were to be drawn in their favor and genuine factual disputes were properly reserved for trial so far as plaintiffs' sworn version of the facts conflicted with the defendants' sworn version. *SeeFed. R. Civ. P. 56(c)*; *Douglas v. York County, 360 F.3d 286, 290 (1st Cir. 2004)*. However, broadly speaking *what happened* in this case is largely undisputed, although some of the details are obscure.

In a nutshell, the arrangements that concern plaintiffs were two. First, Blue Cross contracted for a closed network for its subscribers that excluded the plaintiffs after a bidding contest that plaintiffs say was flawed and that they should have won. Second, Blue Cross and its pharmacy benefits manager agreed with United and its manager that their respective network pharmacies would be admitted to each other's closed networks; these arrangements included exclusionary restrictions and (plaintiffs suggest) **[**11]** other more sinister collaboration as to price.

We start with the creation of Blue Cross' closed network. The alleged unfair **[*62]** bidding aside, this is nothing other than an exclusive dealing arrangement, slightly complicated by the involvement of three or four sets of parties rather than the usual two. Blue Cross, either directly or indirectly, is buying prescription drugs for its subscribers. *See Kartell v. Blue Shield of Mass., Inc., 749 F.2d 922, 924-25 (1st Cir. 1984)*, *cert. denied*, *471 U.S. 1029, 85 L. Ed. 2d 322 (1985)*. Blue Cross' closed network effectively gives certain drug stores the exclusive right to supply such drugs to most of its customers.

This certainly inconveniences Blue Cross subscribers for whom more outlets are a benefit. But, if Blue Cross is a competent negotiator, the closed network should lower the cost to Blue Cross of supplying drugs to customers (because most suppliers will cut prices in exchange for increased volume, *cf. U.S. Healthcare, 986 F.2d at 591*). Blue Cross might pass the savings on to customers (lower premiums, smaller co-payments, broader coverage) or keep the savings itself and pay its executives **[**12]** more (if competition among health insurers is inadequate and state regulation absent).

Either way, the closed network is simply an exclusive dealing arrangement which is not a per se violation of the antitrust laws. *See Tampa Elec. Co. v. Nashville Coal Co., 365 U.S. 320, 327-29, 5 L. Ed. 2d 580, 81 S. Ct. 623 (1961)*; *Eastern Food Servs., 357 F.3d at 8*. The arrangement

---

[1] The per se categories are discussed with relevant citations in *Eastern Food Servs.* 357 F.3d at 4-5 & n.1, and other of our decisions. On minimum vertical price fixing, see *Augusta News Co. v. Hudson News Co.*, 269 F.3d 41, 47 (1st Cir. 2001).

might still be unlawful under the rule of reason depending upon the particular circumstances--that is, depending upon the balance between efficiencies gained and any harm to competition that could be shown, *id. at 5*, but we are concerned for the moment only with whether per se treatment was warranted. It was not.

Nothing is changed by plaintiffs' claim that the bidding was unfair. "***HN4*** Bid rigging" of a certain kind is a per se violation of the antitrust laws, *e.g.*, *JTC Petroleum Co. v. Piasa Motor Fuels, Inc., 190 F.3d 775, 777 (7th Cir. 1999)* (Posner, C.J.); but this refers to horizontal price fixing whereby two or more suppliers (or occasionally purchasers) secretly fix the price at which they will bid. *See id.* When Blue Cross, through its benefits manager, **[**13]** gave exclusive rights to CVS and certain other pharmacies, it was not bidding at all; it was inviting bids and making its own decision as to which bid to accept.

Ordinarily, it would be in Blue Cross' interest to accept the lowest cost bid, assuming services were equivalent. Plaintiffs say that Blue Cross manipulated the bidding (*e.g.*, by giving CVS information about Wellpoint's bid), which conceivably could happen if Blue Cross were corrupt or incompetent (an alternative, benign reason would be to press PharmaCare to improve its offer). But ***HN5*** the antitrust laws are not meant to police bad management; the market (or the insurance regulator) is expected to do that.

This brings us to the first part of the second transaction, namely, the agreements that let the Blue Cross and United pharmacies serve in each other's closed networks. These are undoubtedly horizontal agreements, Blue Cross and United being competitors (as are PharmaCare and Provider), and so draw closer scrutiny. But on their face, they are not exclusionary or otherwise anti-competitive: they allow *more* pharmacies to compete for the same consumer's business (*e.g.,* Brooks can supply Blue Cross customers) and give **[**14]** customers *more* options.

The main anti-competitive threat, to the extent it exists, lies not in admission of new pharmacies but in ancillary provisions that might exclude others by agreement. It appears that the United/Provider network remained free to admit other pharmacies: **[*63]** it did in fact admit the plaintiffs as part of an agreement to settle this lawsuit. But the district court says that the contracts precluded the Blue Cross/PharmaCare network from admitting any *other* new pharmacies (beyond the United/Provider pharmacies), *Stop & Shop, 239 F. Supp. 2d at 184*, so the contracts did for some period restrict Blue Cross/PharmaCare from admitting plaintiffs.

Like the original exclusive dealing contract, this is a possible antitrust violation, but it is not a per se violation. The reason is that the closed pharmacy arrangement is valuable to participating pharmacies in part because it directs volume to them; thus, the United/Provider pharmacies had a direct interest, in exchange for allowing CVS to compete for their captive subscribers, in not only being allowed to compete for Blue Cross' customers but in making sure that yet additional new member pharmacies **[**15]** did not unreasonably dilute this benefit.

This does *not* mean that the ancillary restriction is lawful but only that per se condemnation is not appropriate. ***HN6*** Joint ventures involving direct competitors not infrequently exclude other competitors. *Cf. N.W. Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co., 472 U.S. 284, 296-97, 86 L. Ed. 2d 202, 105 S. Ct. 2613 (1985)*. Imagine a research and development consortium between a dozen small manufacturers that by agreement excluded any new entrants; the arrangement might enhance competition with larger manufacturers, and yet the original members might be unwilling to commit resources to the venture if *other* competitors--even small ones--were able to enter at will and share in the inventions. *See* XIII Hovenkamp, *Antitrust Law* P 2115a (1999).

A further explicit provision of the reciprocal expansions barred the United/Provider pharmacies from participating in other networks competing for Blue Cross' business. *Stop & Shop, 239 F. Supp. 2d at 184*. This, too, is not a per se violation. By admitting the Brooks pharmacies into its own closed network, Blue Cross and PharmaCare were in effect including them **[**16]** in a joint venture. There are sometimes legitimate reasons why one party to a joint venture can insist as the price of entry that a new member limit its existing competitive freedom. XIII Hovenkamp P 2213.

Here, PharmaCare was creating and administering a network for Blue Cross and, in the course of doing so, it would be providing favored access to network pharmacies, bolstering their connection with subscribers, and conceivably giving them information valuable in their servicing of the customers. PharmaCare might legitimately be unwilling to expand the network to include pharmacies who were at the same time preparing to join a new consortium to *replace* PharmaCare as Blue Cross' manager.

Despite plaintiffs' looser description, the restraint does not prevent Brooks pharmacies from joining other networks but only from involving themselves in attempts to supplant PharmaCare with Blue Cross. The restraint might still be unjustified--with efficiency gains outweighed by competitive harm--and so perish after a rule of reason analysis. But ***HN7*** restraints that are truly ancillary to a larger efficiency-gaining enterprise--here, the expanded closed network--are not normally condemned per se **[**17]** without looking at likely consequences. *Addamax Corp., 152 F.3d at 52*; *see* XIII Hovenkamp P 2213c(1).

If the rhetoric of older group boycott cases were taken at face value, such agreements might appear to fall within a per se ban. *Cf. Associated Press v. United States, 326 U.S. 1, 13-14, 18,* **[*64]** 89 L. Ed. 2013, 65 S. Ct. 1416, 1419 (1945). After all, in two different aspects, the ancillary agreements are promises by one competitor or group of competitors to another not to deal with a third competitor (CVS, through PharmaCare, not to include Stop & Shop and Walgreen in the PharmaCare network; Brooks not to consort with Stop & Shop and Walgreen to compete for the Blue Cross contract). But the rhetoric cannot be taken literally.

After all, every joint venture among competitors that limits membership fits the lay definition of "an agreement not to deal," and at least in recent years the Supreme Court has flatly rejected the per se label for those that have some efficiency achieving benefits. *N.W. Wholesale Stationers, 472 U.S. at 295-98*. ***HN8*** To the extent the group boycott label is useful at all to describe a per se violation, it is principally a warning **[**18]** against anticompetitive secondary boycotts--*e.g.*, manufacturers who agree not to supply a store that buys from a discounting manufacturer. *Cf. Fashion Originators' Guild of Am., Inc. v. FTC, 312 U.S. 457, 465-67, 85 L. Ed. 949, 61 S. Ct. 703, 32 F.T.C. 1856 (1941)*; *U.S. Healthcare, 986 F.2d at 593*.

This brings us finally to the intimations in plaintiffs' brief of more sinister collaboration. In attacking the dismissal of per se claims, the plaintiffs accuse the district court of "ignoring compelling evidence of *per se* illegal, horizontal agreements and their anticompetitive motives and effects," a statement followed by bullet points that cross-reference back to the briefs' statement of facts. Putting aside the bid rigging and ancillary-agreement charges already dealt with above, the pertinent factual charge is as follows:

> After Blue Cross's selection of PharmaCare's bid in late 1997, representatives of CVS and representatives of PharmaCare, engaged in a series of meetings, discussions, and

> written correspondence with representatives of competing pharmacies Brooks and the independent pharmacy members of Provider. (J.A. 210-217, Stmt. PP 89-113). As a result, these competitors **[**19]** agreed to set identical prescription reimbursement rates, both directly and by an equalizing mechanism that entailed payments by CVS to Brooks and Provider's independent pharmacies for each United prescription that CVS filled. (J.A. 216, 218-19, Stmt. PP 108-10, 120; J.A. 1987-89; J.A. 3053-54; J.A. 3081-84; J.A. 3129-32.) The parties likewise discussed identical co-payment levels. (J.A. 2923.)

This description insinuates wrongdoing but without the precision needed to advance the argument. Obviously any arrangement that reciprocally admitted United's pharmacies into the Blue Cross network and Blue Cross' into United's would involve some arrangements as to various payment matters. This would not permit CVS and Brooks to agree in general on prices at which prescription drugs could be sold to the public. But the respective insurers and their benefit managers would be entitled to discuss with newly entering pharmacies reimbursement and co-payment rates; and there would be nothing startling about new-comers expecting the same reimbursement as earlier network members. [2]

**[**20]** **[*65]** Partial integration of the two networks--each operating at three levels, insurer, benefit manager, and retailer--involves settling on component payments which--at least within each network--may well involve identical payments to all participating pharmacies. It was plaintiffs' job to explain in detail to us just what the arrangements were and *why* they plausibly constituted antitrust violations. In the context of partial integration, simply to refer to "identical principal reimbursement rates," "an equalization mechanism," and "identical co-payment levels" is to substitute innuendo for analysis.

This fatal obscurity has one exception. Immediately after the paragraph quoted above, there is a further paragraph describing a February 1998 meeting between PharmaCare and two Stop & Shop representatives. PharmaCare had recently won the Blue Cross contract, and it was then negotiating with United pharmacies for reciprocal inclusion. Stop & Shop was asking to be included as well. According to a memorandum describing the meeting prepared by a Stop & Shop representative, the PharmaCare president said no.

The memorandum says that the reasons PharmaCare gave for this refusal were that the **[**21]** negotiations to set up the new PharmaCare network had been difficult, that it had required "horse trading" (apparently a reference to the United/Provider negotiations), and that adding a "third" chain (apparently referring to Stop & Shop on top of CVS and Brooks) would make the situation even more complex. The memorandum concluded its recitation by saying:

> [The PharmaCare president] also lectured John and I about our industry not being farsighted [sic] to stick together on pricing issues and that we had only ourselves to blame for the extremely low reimbursement rates in the market.

In their opening brief, plaintiffs describe this last statement as "another reason" for plaintiffs' exclusion from the expanded Blue Cross network. The intimation (by a benefits manager owned

---

[2] As for the "equalization" payments by CVS to Brooks and Provider's independent pharmacies, Blue Cross/Pharmacare apparently reimburses its pharmacies for certain prescription drugs at lower rates than those at which United/Provider reimburses its pharmacies for the same drugs. To compensate United's pharmacies for agreeing to the lower reimbursement rates, CVS and the other Blue Cross pharmacies agreed to pay United's pharmacies $ .25 for every United subscriber's prescription that they filled. This might or might not be a permissible arrangement, but it is not naked price fixing by competitors.

by CVS) that the retail pharmacies in general ought to stick together to raise reimbursement rates paid to them by insurers might well interest the Antitrust Division, but plaintiffs have a grievance only if their refusal to adhere was "another reason" for their exclusion. This claim is unsupported by the language of the memorandum or the follow-up depositions of the participants which we have ourselves **[**22]** read.

*The trial*. The absence of plausible per se claims in no way dooms the plaintiffs' case. The initial core arrangement--the creation of a closed network by Blue Cross and PharmaCare comprising CVS and various independent pharmacies--is a classic exclusive dealing arrangement. To simplify slightly (and without repeating details) Blue Cross, in exchange for better prices, gave its business exclusively to one group of pharmacies, agreeing for three years not to deal with others including Walgreen and Stop & Shop.

Such agreements are not universally forbidden by the *Sherman Act*--indeed, they are quite common--but may, depending on the circumstances, unreasonably restrain trade. XI Hovenkamp, *Antitrust Law* PP 1802-07, 1810-1814, 1821 (1998). Because such agreements can achieve legitimate economic benefits (reduced cost, stable long-term supply, predictable prices), no presumption against such agreements exists today. *Compare Standard Oil Co. of Cal. v. United States, 337 U.S. 293, 306-307, 313-14, 93 L. Ed. 1371, 69 S. Ct. 1051 (1949)*, **[*66]** *with Tampa Elec. Co., 365 U.S. at 334*.

Indeed, courts tend to be skeptical of such claims because it is not in the long-term **[**23]** interest of the company that grants the "exclusive deal" to drive out of business competitors of the grantee. Here, Blue Cross would be disserved by making CVS a monopolist, which could then exploit Blue Cross by demanding higher reimbursement. Still, an excluded supplier remains free to offer evidence that, in the individual instance, the anti-competitive consequences of an exclusive contract outweigh the benefits.

This almost always requires a showing of injury to competition; some savings are likely or else the buyer would ordinarily not agree to forego dealing with other suppliers, and in any event an agreement that caused no harm would not be worth condemning. But ***HN9*** harm does not mean a simple loss of business or even the demise of a competitor but an impairment of the competitive structure of the market. *See Brown Shoe Co. v. United States, 370 U.S. 294, 344, 8 L. Ed. 2d 510, 82 S. Ct. 1502 (1962)*.

If an exclusive dealing contract cuts off stores like Walgreen from an unduly large portion of the available market for its goods, it and others like it might cease to provide prescription drugs. And if this led or was likely to lead to a shortage of competing drug stores (and new **[**24]** entry was difficult), the few remaining existing competitors might then be able to conspire or otherwise misbehave without being disciplined by competition. Where such foreclosure and negative effects are the result of an agreement, the *Sherman Act* may condemn the agreement as unreasonable. *Eastern Food Servs., 357 F.3d at 8*; *see* XI Hovenkamp P1802b.

Accordingly, at trial, it was critical to any attack on the exclusive dealing arrangement--and almost any other non-per-se claim one could imagine--that plaintiffs establish a relevant market and harm within it. For the exclusive dealing contract, the first step would be to show the extent of foreclosure resulting from the Blue Cross contract with CVS and others in the PharmaCare network, taking account of other existing foreclosures (*e.g.*, by United/Provider until its settlement with plaintiffs). *Cf. Tampa Elec. Co., 365 U.S. at 327-29*; *Eastern Food Servs., 357 F.3d at 8*.

Plaintiffs sought to offer their market definition evidence primarily, as is typical, through an economist, Dr. Stangle. Dr. Stangle's position in his pretrial report was that the relevant market was "the retail **[**25]** sale of health care financed or insurance reimbursed pharmaceutical products" (the product dimension of the market) in Rhode Island (the geographic dimension). Obviously, excluding retail sales that are not financed or reimbursed increases the percentage size of the foreclosed market.

In explaining why he distinguished between reimbursed purchases and all others, Dr. Stangle pointed to the much smaller direct cost to the Blue Cross customer who purchased the same drug from a closed network pharmacy (*e.g.*, CVS) as opposed to a non-network pharmacy (*e.g.*, Walgreen). The defendants protested that this ignored the customer's "true" cost of the CVS drugs which included a share of the insurance premium that the subscriber (or his employer) paid to Blue Cross and also ignored other elements affecting the comparison, such as partial reimbursement for out-of- network purchases.

Pointing to these supposed flaws in Dr. Stangle's market definition, the district court refused to allow the jury to consider it. Then, as already recounted, the plaintiffs made a proffer of the testimony for **[*67]** the record and rested, the defense moved for a directed verdict, and the judge granted the motion and **[**26]** entered judgment for the defendants. The judge said that any remaining evidence in the record supporting the plaintiffs' market definition was too thin to permit the jury to find the proposed market in the absence of expert testimony.

Plainly, for high-cost prescription drugs, whether insurance will cover purchases at a particular pharmacy tends to be crucial to consumer choice, and Dr. Stangle was correct in retorting to the defense that a customer who has paid his insurance premium (or had it paid for him) will--at least for high priced drugs--seek out closed network pharmacies if reimbursement is higher and shun those not within the insurer's closed network. At the point of sale, the customer is interested in what he pays and gets reimbursed, not some imputed (and now sunk) insurance premium cost.

Unfortunately for Dr. Stangle's market definition, the concern in an ordinary exclusive dealing claim by a shut-out supplier is with the available market *for the supplier*. Here, for Walgreen and Stop & Shop, their potential customers are presumptively *all* retail customers for prescription drugs--not just that smaller sub-group who are insured or reimbursed. To say that some sub-group **[**27]** of customers is foreclosed proves nothing by itself about the impact on pharmacies. [3]

This is the same defect we recently addressed in *Eastern Food Services*. There, as here, a shut-out supplier complained that the foreclosed customers (in *Eastern*, they were students and faculty seeking food services on a university campus) were foreclosed by the university's exclusive dealing contract with another vendor. *357 F.3d at 3-4, 6-7*. But the impact of the foreclosure on *the supplier* depended not on the impact on the students and faculty but on how many unforeclosed vending machine customers remained elsewhere. *Id. at 6-7*.

Walgreen and Stop & Shop sell prescription drugs to lots of customers **[**28]** including those whose purchases are not reimbursed. Conceivably, the latter could be so small a group that

---

[3] One of the defendants suggests that Rhode Island is too large a geographic market because customers shop locally. Reflection will reveal that--whatever the correct market--this argument is a different version of the same mistake of focusing on the customer rather than the supplier.

foreclosure of a large percentage of reimbursed customers would still be fatal, or there might be some special circumstance that made separate consideration of the sub-group appropriate. But the former possibility would still have to be proved, normally by a proper market definition; and of the latter, there is no hint in this case.

Conceivably, some adjustment to account for the omission of self-paying customers could be devised from existing evidence: plaintiffs say that Blue Cross and United insure 70 percent of Rhode Islanders. But even if a figure representing the entire market could be derived, the number foreclosed by Blue Cross (and formerly by United) remains unknown because a significant portion of Blue Cross' customers have policies that do not effectively restrict them to the closed network. Nor is it our job to build plaintiffs' case for them.

The plaintiffs refer to other record evidence that they say was available to the jury to establish the same reimbursed-drugs product market *without* testimony from Dr. Stangle. The evidence is described in some detail; **[**29]** for example, the Stop & Shop executive in charge of pharmacy **[*68]** products testified to the same large differential in out of pocket costs to reimbursed and unreimbursed customers. But this simply repeats the same mistake in focus without the Ph.D.

It may be worth adding that even a high number would not necessarily establish an antitrust violation. XI Hovenkamp PP 1820b at 147, 1820d. How much of the market must remain open to support decent competition depends on scale economies (retail pharmacies are different than car makers), on ease of re-entry, and on other factors. *Cf. id.* at P 1820d. The still somewhat useful Learned Hand formula for monopoly power has no counterpart in exclusive dealing law. *United States v. Aluminum Co. of America, 148 F.2d 416, 424 (2d Cir. 1945)*. But reliable numbers are an essential starting point and were not supplied.

***HN10*** For exclusive dealing, foreclosure levels are unlikely to be of concern where they are less than 30 or 40 percent. *See Jefferson Parish Hosp. Dist. No. 2 v. Hyde, 466 U.S. 2, 45-46, 80 L. Ed. 2d 2, 104 S. Ct. 1551 (1984)* (O'Connor, J., concurring); Hovenkamp, *Federal Antitrust Policy* 436-37 & nn. 43-45 (2d ed. 1999) **[**30]** (collecting cases). But while low numbers make dismissal easy, high numbers do not automatically condemn, but only encourage closer scrutiny based on factors just mentioned. There are a few cases to the contrary, Hovenkamp, *Federal Antitrust Policy*, at 437 n. 49, but they cannot be reconciled with *Tampa, 365 U.S. at 329, 333*; *see also Roland Machinery Co. v. Dresser Indus., Inc., 749 F.2d 380, 393-94 (7th Cir. 1984)* (Posner, J.); XI Hovenkamp, P 1820b at 147, 1821d.

The plaintiffs also complain that the district court should have permitted them to offer at trial evidence on two other matters: "[first] that Blue Cross manipulated its bidding process and the selection of PharmaCare to manage its closed pharmacy network . . . [and second] evidence showing the mutual, concerted expansion of the defendants' closed pharmacy networks." This evidence, say the plaintiffs, was relevant to their broad rule of reason case even if neither incident was a per se violation.

Plaintiffs devote only three paragraphs (and one long quotation from an old warhorse) to explaining why or how this evidence might be relevant to their "broader challenge to the defendants' **[**31]** course of conduct . . . ." The warhorse is the reminder in *Chicago Board of Trade v. United States, 246 U.S. 231, 238, 62 L. Ed. 683, 38 S. Ct. 242 (1918)*, since repeated in other cases, that in assessing a restraint, a broad array of prior history of the restraint, motive, surrounding conditions and the like may be pertinent. Whether evidence was wrongly excluded depends in part

on what it was offered to prove. Plaintiffs' brief says that the two excluded incidents were relevant to show "deliberate, concerted action by the defendants" and "that the concerted action unreasonably restrained or tended to restrain trade in the relevant market." The former proposition is admitted (there are explicit agreements); and the latter is simply an abstract description of the Sherman Act's rule of reason and is not a honed antitrust theory for which specific evidence might or might not be relevant.

*Chicago Board of Trade* is not an endorsement of kitchen-sink antitrust in which anything that might alarm a jury is made admissible. Plaintiffs had, so far as appears, only one substantial and relevant antitrust theory--namely, that Blue Cross had adopted a competitively harmful exclusive dealing **[**32]** arrangement, made more fearsome by its reciprocal expansion and coupled with overbroad ancillary restraints. For this, collaboration was patent--no one **[*69]** denied the existence of the contracts. The allegedly flawed bidding process added nothing to proof of collaboration and had no demonstrated antitrust significance.

In their brief on appeal, plaintiffs suggest that the bid process evidence showed that Blue Cross was determined to exclude plaintiffs for the indefinite future and "would have permitted an inference that the three-year terms of the network agreements were illusory." The only "restraint" within the meaning of the Sherman Act was the *contractual* limitation on Blue Cross' ability to add new pharmacies; any unilateral decision thereafter to exclude plaintiffs would not extend the pertinent "restraint."

The reciprocal expansion incident was arguably more relevant. It did not affect the extent of total foreclosure-- United had not previously included plaintiffs; but (merely as an example) some of the ancillary terms seemingly made it harder for the plaintiffs to join either network or start a competing network. Yet the district judge's *in limine* ruling did not exclude **[**33]** proof of the terms--only proof of the details of negotiations, and at trial the district judge apparently reversed the tentative exclusion and allowed in some of the details.

There is yet another problem. As already noted, neither the alleged sham bidding process nor the reciprocal expansion of closed networks was a per se violation although the latter, particularly with its ancillary restraints, had a bearing on any rule of reason attack on the core exclusive dealing arrangement. It is not easy to think of a rule of reason analysis that does not depend on showing adverse effects on competition in a properly defined relevant market. *Cf.* *Augusta News Co., 269 F.3d at 47*. This predicate failed with Dr. Stangle's testimony.

Some antitrust cases are intrinsically hopeless because (as in *Eastern*) they merely dress up in antitrust garb what is, at best, a business tort or contract violation. By contrast, Blue Cross' adoption of a closed network whose impact was arguably reinforced by its reciprocal expansion coupled with ancillary restraints, might be an unreasonable foreclosure of a properly defined market. However, as plaintiffs omitted the proof, one simply cannot **[**34]** tell.

Whether or not there was an antitrust violation affecting the plaintiffs, some of Blue Cross' customers will doubtless be inconvenienced by restricting their purchases to the closed network. If use of a closed network reduces costs for Blue Cross and *also* reduces or holds down the price of a closed market policy, this may be a legitimate outcome--especially if an open market policy is also an available option. There are few free lunches in the world of commerce.

The possibility always remains that a dominant company may act inefficiently or may unfairly exploit its customers. The usual check for such abuses is competition (here, United is an obvious

competitor for Blue Cross) but competition may sometimes be inadequate. In such cases antitrust may not always offer customers much protection, *Aluminum Co. of America, 148 F.2d at 429*; but state regulation--sometimes wisely and sometimes not--is usually free to fill the gap.

*Affirmed*.

EXHIBIT 286

LexisNexis®

Positive
As of: August 12, 2014 9:23 AM EDT

**Storage Tech. Corp. v. Custom Hardware Eng'g & Consulting, Ltd.**

United States District Court for the District of Massachusetts

June 28, 2006, Decided

CIVIL ACTION NO. 02-12102-RWZ

**Reporter:** 2006 U.S. Dist. LEXIS 43690; 2006-2 Trade Cas. (CCH) P75,434

STORAGE TECHNOLOGY CORPORATION v. CUSTOM HARDWARE ENGINEERING & CONSULTING, LTD., DAVID YORK, AND PD PROPERTIES, LLC

**Prior History:** *Storage Tech. Corp. v. Custom Hardware Eng'g Consulting, Inc., 2005 U.S. Dist. LEXIS 20426 (D. Mass., Sept. 19, 2005)*

**Core Terms**

customers, Patent, summary judgment, upgrades, Counts, infringement, trade secret, microcode, changes, tie, alleges, argues, Counterclaim, summary judgment motion, Messages, aftermarket, calibration, engineering, Storage, license, operations, entitled to summary judgment, motions, unfair competition, antitrust, prices, services, parties, copies, disputes

**LexisNexis® Headnotes**

Civil Procedure > ... > In Rem & Personal Jurisdiction > In Personam Actions > Long Arm Jurisdiction

***HN1*** The Massachusetts long-arm statute provides courts with jurisdiction over persons or entities who (1) cause tortious injury by an act or omission inside the Commonwealth, or (2) cause tortious injury by an act or omission outside the Commonwealth, if the person or entity regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in this Commonwealth. *Mass. Gen. Laws ch. 223A, § 3(c)* , (d).

Copyright Law > ... > Civil Infringement Actions > Online Infringement > Determinations

***HN2*** In a typical infringement case involving computer code, the alleged infringer must be shown to have copied constituent, original elements of the program. That is, even if a plaintiff has copyrighted the computer program as a whole, it must still show that the particular elements that the defendant is alleged to have infringed are copyright-protected. As part of the showing, the plaintiff must, as a threshold matter, identify the particular elements allegedly copied.

Copyright Law > Copyright Infringement Actions > Digital Millennium Copyright Act > Remedies

***HN3*** A party who prevails in an action brought under *17 U.S.C.S. § 1203(a)* may be entitled to attorneys' fees under *§ 1203(b)(5)*.

Copyright Law > Copyright Infringement Actions > Digital Millennium Copyright Act > Prohibited Conduct

***HN4*** In order to prevail on a Digital Millenium Copyright Act claim, a plaintiff must prove that the circumvention of the technological measure facilitates infringing a right protected by the Copyright Act.

Trade Secrets Law > Misappropriation Actions > Elements of Misappropriation > General Overview

***HN5*** To establish trade secret misappropriation under Massachusetts law, a plaintiff must show (1) that the information in question is a trade secret, (2) that the plaintiff took reasonable steps to preserve the secrecy of that information, and (3) that defendants used improper means, in breach of a confidential relationship, to acquire and use the trade secret.

Trade Secrets Law > Misappropriation Actions > Elements of Misappropriation > Existence & Ownership

***HN6*** Trade secret status is based on numerous factors, including (1) the extent to which the information is known outside of the business; (2) the extent to which it is known by employees and others involved in the business; (3) the extent of measures taken by the employer to guard the secrecy of the information; (4) the value of the information to the employer and to his competitors; (5) the amount of effort or money expended by the employer in developing the information; and (6) the ease or difficulty with which the information could be properly acquired or duplicated by others. Where the evidence conflicts, trade secret status is a question of fact properly left to the jury.

Trade Secrets Law > Misappropriation Actions > Elements of Misappropriation > Confidentiality

***HN7*** Reasonableness of security precautions itself is determined by looking at multiple factors, including the existence or absence of an express agreement restricting disclosure, disclosures to employees and the circumstances of such disclosures, and the degree to which the information has been placed in the public domain or rendered readily ascertainable by the third parties through patent applications or unrestricted product marketing. The reasonableness determination is fact-specific and depends largely on the circumstances.

Trade Secrets Law > Misappropriation Actions > Elements of Misappropriation > Confidentiality

***HN8*** A plaintiffs security precautions must be reasonable, but it need not erect "an impenetrable fortress" or take "heroic measures."

Trade Secrets Law > Misappropriation Actions > General Overview

***HN9*** Obtaining information in violation of a license agreement may constitute trade secret misappropriation.

Antitrust & Trade Law > ... > Trade Practices & Unfair Competition > State Regulation > Scope

***HN10*** Mass. Gen. Laws ch. 93A prohibits parties from bringing actions under *Mass. Gen. Laws ch. 93A, § 11*, unless the actions and transactions constituting the alleged unfair method of competition or the unfair or deceptive act or practice occurred primarily and substantially within the commonwealth. Courts applying the requirement determine whether the center of gravity of the circumstances that give rise to the claim is primarily and substantially within the Commonwealth.

Torts > ... > Business Relationships > Intentional Interference > Elements

***HN11*** Under Massachusetts law, a plaintiff claiming tortious interference must show (1) a business relationship or contemplated contract of economic benefit; (2) the defendant's knowledge of such relationship; (3) the defendant's interference with the relationship through improper motive or means; and, (4) the plaintiff's loss of advantage as a direct result of the defendant's conduct.

Torts > ... > Business Relationships > Intentional Interference > Elements

***HN12*** "Improper means" is conduct that is wrongful by some measure beyond the fact of interference itself. *Restatement (Second) of Torts, § 767*, sets out a seven-factor test for determining whether conduct is "improper," and which defines such conduct as ranging from physical violence, fraudulent misrepresentation and threats of illegal conduct, to violation of recognized ethical codes and business customs.

Patent Law > Infringement Actions > Claim Interpretation > Aids & Extrinsic Evidence

Patent Law > Infringement Actions > Claim Interpretation > Fact & Law Issues

***HN13*** Claim construction presents purely legal questions. Claim terms are given their ordinary and customary meaning, which is the meaning that a person of ordinary skill in the art would give the term, not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification. A court's primary resource is intrinsic evidence, including the claim itself, other claims of the patent, both asserted and unasserted, the patent's specification or written description, and the prosecution history. The specification may teach and enable those of skill in the art to make and use the invention, but it does not define the scope of the claim terms, and courts therefore avoid importing limitations from the specification into the claims. Extrinsic evidence-though less significant than intrinsic evidence-may nevertheless shed useful light on a claim term. Such evidence may include dictionaries, treatises, and expert testimony. However, extrinsic evidence is considered less reliable than intrinsic evidence; courts assume it is unlikely to result in a reliable interpretation unless considered in the context of the intrinsic evidence.

Patent Law > Infringement Actions > Defenses > General Overview

Patent Law > Infringement Actions > Defenses > Implied Licenses

Patent Law > Ownership > Conveyances > General Overview

***HN14*** Under the doctrine of first sale, or patent exhaustion, a patentee abandons its statutory right to exclusivity through the unrestricted sale or license of the patent. By contrast, an implied license exists where no such unrestricted sale or license has necessarily been given, but where nevertheless the patentee may, through its own conduct, grant an implied license to practice the patent to certain downstream purchasers.

Patent Law > Infringement Actions > Defenses > Implied Licenses

***HN15*** A defendant seeking to show an implied license must demonstrate (1) that the equipment at issue has no non-infringing uses, and (2) that the patentee's conduct clearly supports the finding of an implied license. As to the latter factor, a mere sale does not import a license except where the circumstances plainly indicate that the grant of a license should be inferred. Moreover, an inquiry into the circumstances of the sale is necessarily fact-intensive, though the existence of an implied license is ultimately a question of law.

Patent Law > Infringement Actions > Claim Interpretation > Construction Preferences

***HN16*** An interpretation of a claim term that excludes the preferred embodiment is rarely, if ever, correct and requires highly persuasive evidentiary support.

Patent Law > Infringement Actions > Infringing Acts > Indirect Infringement

***HN17*** A defendant could be held liable for inducement even where the defendant claimed there was no evidence that it knew that the sales would result in actual infringement.

Trademark Law > ... > Federal Unfair Competition Law > Lanham Act > Scope

***HN18*** Under § 43(a) of the Lanham Act, *15 U.S.C.S. § 1125(a)(1)(B)*, plaintiff must show, inter alia, that defendant made a false or misleading description of fact or representation of fact in a commercial advertisement about its own or another's product. However, a crucial limitation exists: § 43(a) prohibits misrepresentations only in commercial advertising or promotions. Courts apply a multi-part test to determine whether speech falls within the specific forms of communication targeted by the Lanham Act. It must at a bare minimum target a class or category of purchasers or potential purchasers, not merely particular individuals. The Act covers more than classic advertising campaigns, including more informal types of promotion, but speech nevertheless must be disseminated sufficiently to the relevant purchasing public to constitute "advertising" or "promotion" within that industry.

Antitrust & Trade Law > ... > Private Actions > Standing > Requirements

***HN19*** Federal law confers standing on private citizens who suffer injury by reason of anything forbidden in the antitrust laws. The class of persons who possess "antitrust standing" has been limited by the courts. The U.S. Supreme Court has identified several factors that courts must weigh in determining whether antitrust standing exists. One factor is antitrust injury, which is injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful. Antitrust injury is a central factor in the standing calculus, and its absence weighs heavily against a grant of standing.

Evidence > Admissibility > Scientific Evidence > Standards for Admissibility

***HN20*** Under Daubert, courts conduct a preliminary assessment of whether the reasoning or methodology underlying the proposed expert testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue. However, the focus must be solely on principles and methodology, not on the conclusions that they generate, and courts should not be overly pessimistic about the capabilities of the jury, since vigorous cross examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.

Antitrust & Trade Law > ... > Private Actions > Remedies > General Overview

***HN21*** Lost profits generally need not be proved with "mathematical exactness," but rather with a reasonable degree of certainty. In antitrust cases, lost profits may have a lesser degree of certainty than in other arenas, since market uncertainties usually deny a court sure knowledge of what plaintiff's situation would have been in the absence of the defendant's antitrust violation.

Antitrust & Trade Law > ... > Price Fixing & Restraints of Trade > Tying Arrangements > General Overview

***HN22*** The amount of commerce foreclosed in a tying claim must be "not insubstantial," or "merely de minimis." The relevant figure is the total volume of sales tied by the sales policy under challenge, not the portion of the total accounted for by the particular plaintiff who brings suit.

Antitrust & Trade Law > ... > Price Fixing & Restraints of Trade > Tying Arrangements > Sherman Act Violations

***HN23*** *Section 1* of the Sherman Act prohibits every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States. *15 U.S.C.S. § 1*. When a seller ties the sale of one product to the purchase of a second product, thereby avoiding competition on the merits of the tied product, he may violate *§ 1*.

Antitrust & Trade Law > ... > Price Fixing & Restraints of Trade > Tying Arrangements > General Overview

***HN24*** To make out a tying claim, an antitrust plaintiff must establish that: (1) the tying and tied products are actually two distinct products; (2) there is an agreement or condition, express or implied, that establishes a tie; (3) the entity accused of tying has sufficient economic power in the market for the tying product to distort consumers' choices with respect to the tied product; and (4) the tie forecloses a substantial amount of commerce in the market for the tied product.

Antitrust & Trade Law > ... > Price Fixing & Restraints of Trade > Tying Arrangements > General Overview

***HN25*** Proof of a tying arrangement generally requires evidence that the supplier's sale of the tying product is conditioned upon the unwilling purchase of the tied product from the supplier or an unwilling promise not to purchase the tied product from any other supplier. Where no explicit tying arrangement exists, a plaintiff may establish the existence of a tie by showing that the supplier has actually coerced the purchase or non-purchase of another product. Whether the condition is explicit or implicit, however, courts will not consider the anti-competitive effects of a tie to be unreasonable per se unless there is evidence that the supplier of the tying product has actually used its market power to impose the condition.

Antitrust & Trade Law > ... > Price Fixing & Restraints of Trade > Tying Arrangements > General Overview

***HN26*** To establish the existence of two distinct products, a plaintiff must first identify the products at issue and then demonstrate sufficient demand for the tied product separate from the tying product, such that it is "efficient" to offer the two products separately.

Antitrust & Trade Law > ... > Price Fixing & Restraints of Trade > Tying Arrangements > General Overview

***HN27*** Illegal tie may be shown if the defendant's policy makes the purchasing of the tying and tied products together the only viable economic option.

Antitrust & Trade Law > ... > Price Fixing & Restraints of Trade > Tying Arrangements > General Overview

***HN28*** Implicit tie exists where facts and circumstances as a practical matter forced the buyer into purchasing the tied product with the tying product.

Antitrust & Trade Law > ... > Price Fixing & Restraints of Trade > Tying Arrangements > Sherman Act Violations

***HN29*** Any alleged tie must foreclose a "not insubstantial" amount of commerce to be actionable under *§ 1* of the Sherman Act, *15 U.S.C.S. § 1*.

Antitrust & Trade Law > ... > Price Fixing & Restraints of Trade > Tying Arrangements > General Overview

***HN30*** In all cases involving a tying arrangement, the plaintiff must prove that the defendant has market power in the tying product, and that no presumption of market power attaches to patent owners.

Antitrust & Trade Law > ... > Monopolies & Monopolization > Actual Monopolization > Claims
Antitrust & Trade Law > ... > Monopolies & Monopolization > Attempts to Monopolize > Elements

***HN31*** To prove a violation of *§ 2* of the Sherman Act, *15 U.S.C.S. § 2*, a plaintiff must establish (1) that the defendant has monopoly power in a relevant market, and (2) that the defendant has maintained or increased that power through anticompetitive conduct. With respect to attempted monopolization, the analysis is similar, except that the plaintiff must show a "dangerous probability" that the defendant will achieve monopoly power.

Antitrust & Trade Law > ... > Monopolies & Monopolization > Actual Monopolization > Claims
Antitrust & Trade Law > ... > Monopolies & Monopolization > Attempts to Monopolize > Elements

***HN32*** A service aftermarket may be the relevant market for purposes of *§ 2* of the Sherman Act, *15 U.S.C.S. § 2*. An aftermarket is by definition a single-brand market.

Antitrust & Trade Law > Regulated Practices > Monopolies & Monopolization > General Overview

***HN33*** Unilateral conduct by a monopolist may be exclusionary under *§ 2* of the Sherman Act, *15 U.S.C.S. § 2*, and a monopolist's unilateral refusal to deal with its competitors may be prima facie evidence of exclusionary conduct as long as the refusal harms the competitive process. A monopolist may, however, rebut such evidence by establishing a valid business justification for its conduct.

Antitrust & Trade Law > ... > Intellectual Property > Misuse of Rights > Copyright & Trademark Misuse Defenses

***HN34*** While exclusionary conduct can include a monopolist's unilateral refusal to license a copyright, an author's desire to exclude others from use of its copyrighted work is a presumptively valid business justification for any immediate harm to consumers. The presumption may be rebutted, but only in rare cases.

Antitrust & Trade Law > ... > Trade Practices & Unfair Competition > State Regulation > Scope

***HN35*** In Missouri, common law unfair competition encompasses several categories of legal claims, including palming or passing off, trademark violations, and misappropriation.

Antitrust & Trade Law > ... > Trade Practices & Unfair Competition > State Regulation > Scope

***HN36*** Missouri is not one of the states to have adopted *Restatement (Third) of Unfair Competition § 1*, which ostensibly extends common law unfair competition to include antitrust violations. Indeed, to the extent that Missouri courts have considered the relationship between antitrust violations and common law unfair competition, they have declined to rule that the former may be actionable as the latter.

Antitrust & Trade Law > ... > Trade Practices & Unfair Competition > State Regulation > Scope

***HN37*** Deceptive statements are actionable under Missouri law when they are intended to trade on another's reputation, or misappropriates the property of another while using his own name.

Torts > ... > Contracts > Intentional Interference > Elements
Torts > ... > Prospective Advantage > Intentional Interference > Elements

***HN38*** Tortious interference with a contract or business expectancy requires proof of: (1) a contract or valid business expectancy; (2) defendant's knowledge of the contract or relationship; (3) a breach induced or caused by defendant's intentional interference; (4) absence of justification; and (5) damages.

Torts > Business Torts > Commercial Interference > General Overview

***HN39*** Acts incidental to protected litigation, acts that are reasonably and normally attendant upon protected litigation, are entitled to immunity from interference claims to the same extent as the related litigation. Such acts include sending letters threatening court action. The litigator should not be protected only when he strikes without warning. Indeed, if litigation is in good faith, a token of that sincerity is a warning that it will be commenced and a possible effort to compromise the dispute.

Civil Procedure > Discovery & Disclosure > Disclosure > Mandatory Disclosures

***HN40*** *Fed. R. Civ. P. 26(a)(2)(B)* requires that an expert report be produced with respect to a witness who is retained or specially employed to provide expert testimony in the case or whose duties as an employee of the party regularly involve giving expert testimony.

Civil Procedure > Discovery & Disclosure > Disclosure > Mandatory Disclosures

***HN41*** To require employee experts to provide written reports is entirely consistent with the spirit of *Fed. R. Civ. P. 26(a)(2)(B)*, since it will undoubtedly serve to minimize the elements of surprise.

Civil Procedure > Discovery & Disclosure > Disclosure > Mandatory Disclosures
Evidence > ... > Lay Witnesses > Opinion Testimony > General Overview

***HN42*** Testimony that is expert testimony should not evade the expert witness disclosure requirements set forth in *Fed. R. Civ. P. 26*, simply because the testimony is proffered through a fact witness. *Fed. R. Evid. 701*, advisory committee's notes. Indeed, the Advisory Committee has emphasized that the key distinction in managing expert testimony is not between expert and lay witnesses, but rather between expert and lay testimony. *Fed. R. Evid. 701*, advisory committee's notes. Thus, any part of a witness' testimony that is based upon scientific, technical, or other specialized knowledge is governed by the corresponding disclosure requirements of the Civil Rules. *Fed. R. Evid. 701*, advisory committee's notes.

**Counsel: [*1]** For Custom Hardware Engineering & Consulting, Inc, Consolidated Plaintiff: Allan H. Norman, Edwin G. Harvey, Thompson Coburn LLP, St. Louis, MO.

For Storage Technology Corp., Plaintiff: Bobbee J. Musgrave, Perkins Coie, LLP, Denver, CO; Brian E. Whiteley, Joseph L. Stanganelli Scibelli, Whiteley and Stanganelli, LLP, Boston, MA; Charles W. Steese, Heather Beller, Steese & Evans PC, Denver, CO; Jerry A. Riedinger, Michael D. Broaddus, Perkins Coie LLP, Seattle, WA; Tracy L. Ashmore, Musgrave & Theis LLP, Denver, CO; Anthony Mirenda, Foley Hoag LLP, Boston, MA.

For Custom Hardware Engineering & Consulting, Inc, Defendant: Allan H. Norman, Edwin G. Harvey, Thompson Coburn LLP, St. Louis, MO; Anthony Mirenda, Foley Hoag LLP, Boston, MA;

Anthony G. Simon, Simon-Passanante, PC, St. Louis, MO; Dean L. Franklin, Nicholas B. Clifford, Thompson Coburn, St. Louis, MO; Joseph L. Stanganelli Scibelli, Whiteley and Stanganelli, LLP, Boston, MA.

For David York, Defendant: Anthony Mirenda, Foley Hoag LLP, Boston, MA; Marjorie S. Cooke, Barbara Gruenthal, Cooke, Clancy & Gruenthal, Boston, MA; Nicholas B. Clifford, Dean L. Franklin, Thompson Coburn, St. Louis, MO.

For PD Properties, **[*2]** LLC, Terry Neckar, Defendants: Marjorie S. Cooke, Barbara Gruenthal, Cooke, Clancy & Gruenthal, Boston, MA.

For Microcoders, Inc, an Arizona Corporation, Movant: Marjorie S. Cooke, Cooke, Clancy & Gruenthal, Boston, MA.

For Custom Hardware Engineering & Consulting, Inc, Counter Claimant: Allan H. Norman, Edwin G. Harvey, Thompson Coburn LLP, St. Louis, MO.

For David York, Counter Claimant: Anthony Mirenda, Foley Hoag LLP, Boston, MA; Nicholas B. Clifford, Dean L. Franklin, Thompson Coburn, St. Louis, MO.

For Storage Technology Corp., Counter Defendant: Joseph L. Stanganelli Scibelli, Whiteley and Stanganelli, LLP, Boston, MA.

**Judges:** RYA W. ZOBEL, UNITED STATES DISTRICT JUDGE.

**Opinion by:** RYA W. ZOBEL

**Opinion**

MEMORANDUM OF DECISION

In October 2002, plaintiff Storage Technology Corporation ("STK") filed suit against defendants Custom Hardware Engineering & Consulting, Inc. ("CHE"), PD Properties, LLC ("PDP"), and David York. STK manufactures automated libraries ("silos") that store large quantities of data on tape cartridges. Each silo houses numerous cartridges and is connected to a Library Control Unit ("LCU") that monitors and controls operation of the silo; each LCU is, **[*3]** in turn, connected via local area network ("LAN") to a Library Management Unit ("LMU"), which directs and controls multiple LCUs and silos. "To access data from the library, a user sends a request for the data to the [LMU]," which then "transmits commands to the appropriate [LCU]," which finds and reads the data, and then "sends the data over the network back to the [LMU]." *Storage Tech. Corp. v. Custom Hardware Eng'g & Consulting, Inc., 421 F.3d 1307, 1309 (Fed. Cir. 2005)* ("Storage Tech. II"), reh'g denied *431 F.3d 1374 (Fed. Cir. 2005)*. The computer code controlling these units is referred to as LMU Code (or "9330 Code") and LCU Code (or "9311 Code"), and it is copyrighted. Both LMU and LCU Code consist of two distinct but intertwined groups: Functional Code, which "cause[s] the [LMU and LCU] to run," and Maintenance Code, which "diagnose[s] malfunctions and maintain[s] . . . performance." *Id. at 1310*.

CHE repairs STK libraries. In order to diagnose problems, CHE intercepts and interprets error messages, which are generated by the LCU and transmitted to the LMU. These numeric error messages, known as Fault Symptom **[*4]** Codes ("FSCs"), are packaged within an "Event

Message." FSCs are generated all the time, but they are only sent only if the LCU is set at an enhanced maintenance level; they are not sent at maintenance level zero. STK tries to prevent others from using FSCs by setting the maintenance level of its silos to zero and requiring a password to change the maintenance level. The password protection scheme is known as "GetKey." To intercept and interpret FSCs, CHE must therefore bypass GetKey and change the maintenance level. CHE first used a device known as the Library Event Manager ("LEM") and a program called reverse.exe. Eventually, it switched to the Enhanced Library Event Manager ("ELEM"). Both devices allow CHE to overcome GetKey, change the maintenance level, and access FSCs and other STK diagnostic tools.

In 2002, STK filed suit. Its complaint, as subsequently amended, alleged copyright infringement, violation of the Digital Millenium Copyright Act ("DMCA"), *17 U.S.C. § 1201 (a)*, trade secret misappropriation, patent infringement, false advertising, and various state law claims. CHE counterclaimed, alleging that STK had committed antitrust and state law violations. **[*5]** In January 2003, STK moved for a preliminary injunction, which I granted upon finding that it had shown a substantial likelihood of success on its copyright, DMCA, and trade secret claims, and that CHE's antitrust counterclaims would likely fail. See *Storage Tech Corp. v. Custom Hardware Eng'g & Consulting, Inc., 2004 U.S. Dist. LEXIS 12391, No. 02-12102-RWZ, 2004 WL 1497688, at *5 (D. Mass. July 2, 2004)* ("Storage Tech. I"). CHE appealed, and in August 2005, the Federal Circuit vacated the preliminary injunction, upon finding that CHE was likely to prevail on all three of the claims at issue. See *Storage Tech. II, 421 F.3d at 1321*.

Currently before me are the parties' numerous pending motions. Before deciding them, I note once again the extreme excesses to which these parties have been prone. Not only have they asserted a total of thirty-eight counts against one another, in this most recent round they have filed no fewer than ten motions to dismiss and fifteen motions for summary judgment. To illustrate the overlapping, unwieldy nature of the litigation, consider one example. Count 9 of STK's Third Amended Complaint ("Compl.") alleges patent infringement. It is addressed **[*6]** in: PDP's Motion for Partial Summary Judgment (Docket # 609) as well as a supplemental motion (# 764). These filings have brought forth STK's oppositions (## 679, 779), PDP's reply (# 730), and the usual memoranda, statements of fact, and multi-volume sets of exhibits (## 611-13, 680, 690-91, 780, 783-86). Count 9 is also addressed by CHE in two separately filed Motions for Partial Summary Judgment (## 616 and 617), which are joined by York (# 614), and accompanied by two appendices (## 620-21), three separately filed oppositions from STK (## 681, 683, 687), supporting papers and exhibits (## 682, 684, 695, 699), and two replies (## 724, 725). Finally, STK has filed two motions to dismiss directed toward CHE's affirmative defenses to Count 9 and related counterclaims (## 338 and 622), which motions CHE has opposed (## 361 and 659), thereby eliciting STK's reply (# 731).

As the above example makes clear, deciding the motions seriatim would make little sense as multiple motions often address any one count. I therefore address the parties' submissions as they pertain to each count. First, however, I address a preliminary issue of personal jurisdiction.

***PDP's Motion to Dismiss* [*7] *for Lack of Personal Jurisdiction (# 310)***

PDP is a wholly owned subsidiary of CHE, which was allegedly established by CHE and York as a holding company for CHE's intellectual property rights. It moves to dismiss for lack of personal jurisdiction, contesting STK's ability to meet the requirements of either the Massachusetts

long-arm statute, *M.G.L. c. 223A, § 3*, or the *Fourteenth Amendment Due Process Clause*. STK bears the burden of proving personal jurisdiction, see *Boit v. Gar-Tec Prods., Inc., 967 F.2d 671, 675 (1st Cir. 1992)*, which the parties agree must in this case be specific. (# 310, at 2 n.1; # 354, at 5). In relevant part, ***HN1*** the Massachusetts long-arm statute provides courts with jurisdiction over persons or entities who (1) cause tortious injury by an act or omission inside the Commonwealth, or (2) cause tortious injury by an act or omission outside the Commonwealth, "if [the person or entity] regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in this Commonwealth." *M.G.L. c. 223A, § 3(c)* **[*8]** , *(d)*.

STK has asserted facts and submitted evidence giving rise to personal jurisdiction over PDP under any of the standards courts apply to a personal jurisdiction analysis. See *Boit, 967 F.2d at 675-78* (describing prima facie, preponderance of the evidence, and likelihood standards). PDP, which until the filing of suit was the holding company for CHE's intellectual property rights, is headed by York, who is also the head of CHE. In 2000, PDP contracted with a third party to create LEM and ELEM, which devices it then licensed to CHE. CHE, in turn, used LEM and ELEM to provide maintenance services to customers throughout the country, including Allmerica, a business located in Worcester, Massachusetts. In the course of providing these services, the record indicates that CHE accessed STK's Maintenance Code, Event Messages, and FSC Dictionaries, and additionally caused STK's silos to perform calibration operations. STK has alleged that CHE thereby misappropriated its trade secrets and infringed its patents and that PDP was both directly and indirectly involved in such wrongdoing. In relation to the Allmerica account, PDP's conduct occurred both outside and within the **[*9]** state, as is evidenced by the purchase order and invoice naming PDP, and not CHE, as the party that sold the LEM device and licensed the LEM technology to Allmerica. This evidence is sufficient to meet the requirements of both subsections of *§ 3* of the long-arm statute.

Furthermore, as discussed in greater detail below, STK is entitled to proceed to trial against both CHE and PDP on its trade secret and one of its patent infringement claims. In other words, STK has offered sufficient evidence of tortious injury within Massachusetts caused in part by PDP's conduct to proceed to trial. To the extent that "factual issues are common to both the jurisdictional question and the claim on the merits," *Boit, 967 F.2d 671*, STK's ability to withstand summary judgment scrutiny on these claims indicates it is entitled to prevail on the jurisdictional question as well. Finally, the Allmerica documents establish this court's jurisdiction under federal due process requirements. See *United Elec. Radio & Mach. Workers of Am. v. 163 Pleasant St. Corp., 960 F.2d 1080, 1089 (1st Cir. 1992)*. First, STK's trade secret misappropriation and patent infringement claims arise, in part, **[*10]** out of PDP's contacts with Allmerica, both directly and derivatively through CHE. Second, PDP's transactions with Allmerica demonstrate that it purposefully availed itself of the privilege of conducting activities within the Commonwealth and should therefore reasonably have foreseen that it was subject to the jurisdiction of the state's courts. And third, under the relevant "gestalt" factors, jurisdiction is reasonable.

Accordingly, the motion is denied.

***Motions Concerning STK's Third Amended Complaint***

**Counts 1 and 8: Direct and Indirect/Vicarious Copyright Infringement**

In Counts 1 and 8, STK alleges direct and indirect copyright infringement against CHE and PDP, and York, respectively. Specifically, STK alleges that devices developed by defendants and

used by CHE in servicing STK libraries infringe STK's copyrighted microcode. The motions addressing this claim are: PDP's Motion for Partial Summary Judgment (# 609), PDP's and York's Supplemental Motion for Summary Judgment (# 764), CHE's Supplemental Motion for Summary Judgment as to Count 1 (# 772), and STK's Motion for Summary Judgment on Count 1 (# 623).

Although the Federal Circuit held that CHE **[*11]** was "likely to prevail on the issue of copyright infringement," *Storage Tech. II, 421 F.3d at 1317*, STK still asserts that it is entitled to pursue Count 1, albeit on narrower grounds. CHE and PDP disagree, arguing that the Federal Circuit's decision disposed of STK's entire copyright claim, that STK is trying to expand Count 1 to encompass unpled claims, and that in any event its infringement claims fail. At issue are three allegedly infringing copies: [1] (1) reverse.exe, (2) Run Time Diagnostics, and (3) English translations of FSCs.

I. reverse.exe

According to STK, the reverse.exe program is a "copy of STK's LMU Code," or the 9330 code, which allows CHE to "create unauthorized GetKey passwords." (STK's Response, # 679, at 3). As noted above, GetKey **[*12]** is a password protection scheme with which STK tries to control the maintenance level, and thereby access to the fruits of the Maintenance Code. CHE uses reverse.exe to create passwords that satisfy GetKey. STK claims that reverse.exe is an "unauthorized copy of STK's LMU code." (# 679, at 3). Defendants respond that STK is impermissibly asserting an entirely new claim, and I agree.

STK's copyright claim has always been premised upon the copying of Maintenance Code. The complaint states that the action "arises out of CHE's blatant copying . . . of . . . STK's original computer Maintenance Code" (Compl. P 1), and Count 1 specifically asserts that defendants have "copied and reproduced and used the Maintenance Code." (Id. P 36). Indeed, STK has consistently focused upon infringement of the Maintenance Code, not only in its motion for preliminary injunction (# 39), but also in its motion for summary judgment on Count I (# 623, at 1 (characterizing claim as one to protect "copyrights in the Maintenance Code")).

The term "Maintenance Code" has been defined repeatedly throughout the litigation. Maintenance Code is a portion of 9330 and 9311 Code, distinct from Functional Code, and **[*13]** has three defining features. First, it detects, diagnoses, and analyzes equipment malfunctions. See *Storage Tech. II, 421 F.3d at 1310, 1313*. Second, it is anything that is enabled or disabled by GetKey. (See PDP's Reply, # 730, at 4). And third, it is any portion of STK's computer code that is only used to support maintenance functionality above maintenance level zero. (Id. at 5).

The reverse.exe program does not fit within any of these definitions. First, STK nowhere alleges that reverse.exe detects, diagnoses, displays, or analyzes equipment failures or otherwise falls within the Federal Circuit's definition of Maintenance Code. Second, reverse.exe is not enabled or disabled by GetKey, quite the opposite: reverse.exe allows users to bypass GetKey. Finally, reverse.exe does not support maintenance functionality above maintenance level zero. The program assists CHE in generating passwords, which in turn allows CHE to alter the maintenance level, but the record nowhere suggests that reverse.exe supports functionality once the maintenance

---

[1] STK concedes that two copies are not in dispute: the Maintenance Code copy created when the LCU and LMU are turned on, which was adjudicated by the Federal Circuit, and the copy of Event Messages, as to which STK has withdrawn its claim.

level has been changed. Instead, reverse.exe simply allows users to create passwords. By the time STK's machines are set **[*14]** to an enhanced maintenance level, however, reverse.exe has fulfilled its role and, from the record, apparently has no further function. Because no reasonable jury could find that reverse.exe is a copy of Maintenance Code, and because Count I is limited to infringement of Maintenance Code, the claim thus falls beyond the scope of Count 1. [2]

STK argues in the alternative that it should be allowed to amend its complaint to pursue its reverse.exe claim, in part, because it did not learn of reverse.exe until the parties had engaged in substantial discovery. Yet STK's summary judgment motion-filed after the close of discovery in July 2005-did not mention reverse.exe. **[*15]** (## 623, 640). Nor did STK seek leave to amend its complaint at any time after learning of reverse.exe. Its belated request comes nine months after the close of discovery, not to mention following two amendments to the complaint, a preliminary injunction motion that was amended, decided, and then appealed, as well as numerous dispositive motions. Although leave to amend is "ordinarily freely given," in this instance the request can only be described as "unduly delayed," and is therefore denied. *Saunders v. R.D. Werner Co., 1995 U.S. Dist. LEXIS 14886, No. 04-10782, 1995 WL 598959, at *3 (D. Mass. 1995)* (citing *Hayes v. New England Millwork Distributors, Inc., 602 F.2d 15, 19 (1st Cir. 1979))*.

II. RTD Code and FSCs

Run Time Diagnostics ("RTD Code") is "[t]he portion of the Maintenance Code that actually diagnoses troubles in the hardware." (# 39, at 8). Unlike the rest of the Maintenance Code, it is not automatically loaded upon power-up, but instead is loaded only when utilized. (# 757, at 9). STK asserts that it has "substantial evidence" that CHE has utilized (and therefore copied) RTD Code. STK also asserts infringement of the "exact English language interpretation **[*16]** of what the error code (Fault Symptom Code or FSC) means." (Id. at 9). It does not assert infringement of the numeric FSCs themselves or of the Event Messages within which they are contained, but solely infringement of the English-language translations of FSCs. Defendants seek summary judgment on numerous grounds, but their primary objection is that STK abandoned these claims earlier in the litigation.

STK argues that both RTD Code and English versions of FSCs are "portions" of the Maintenance Code and therefore fall within the scope of Count I, which pleads infringement of Maintenance Code. It also notes that RTD Code and English versions of FSCs were, unlike reverse.exe, identified by STK in its preliminary injunction motion as infringing copies. (# 39, at 8). Even accepting these assertions, however, I find nevertheless that STK has waived these claims. Specifically, by April 2004 when it filed its amended motion for preliminary injunction, STK had narrowed its copyright infringement claim to the copy of Maintenance Code created upon power-up (the "IPL copy") and copies of Event Messages. [3] (See # 282, at 2 (asking court "to enjoin CHE's blatant copying and willful use of **[*17]** StorageTek's intellectual property rights in its Maintenance Code and excerpts thereof known as Event Messages"); see also id., Ex. A, at 8-9). Thus, my

---

[2] It is telling that STK repeatedly characterizes reverse.exe as a copy of "STK's LMU Code" or "9330 Code," rather than as a copy of Maintenance Code. (E.g., # 679, at 2-3; # 680, P 7). As explained above, LMU Code includes both Functional and Maintenance Code. Even if reverse.exe is a copy of LMU Code, it is not necessarily a copy of Maintenance Code.

[3] Although FSCs are a portion of the Event Messages, STK's claim based on Event Messages cannot be construed as preserving a claim based on FSCs or English translations of FSCs. STK has always distinguished between FSCs and Event Messages. (# 39, at 8-9 (listing separately copies of Event Messages and copies of FSCs); # 757, at 9 (same)). Moreover, STK has voluntarily withdrawn its claim as to Event Messages, while seeking to maintain its claim as to English versions of FSCs (# 757), further highlighting the distinction between the two.

decision on the motion referred only to those copies. *Storage Tech. I, 2004 U.S. Dist. LEXIS 12391, 2004 WL 1497688, at *3 & n.3*.

STK argues that it should not be bound by the claims raised at the preliminary injunction stage. Even if STK is correct, however, the fact remains that STK's own summary judgment motion-filed in August 2005, **[*18]** after discovery was complete and long after the ruling on its request for a preliminary injunction-is also devoid of any reference to either RTD Code or FSCs. Instead, the summary judgment motion is focused entirely on the IPL copy. (# 640, at 6, 9, 12). Indeed, although STK took care to note that it was maintaining its Event Messages claim though not seeking summary judgment on it (*2004 U.S. Dist. LEXIS 12391, [WL] at 1 n.1*), it made no similar mention of a claim based on RTD Code or English versions of FSCs, as a subject either for summary judgment or for trial. [4]

In fact, STK has affirmatively sought to benefit by limiting its infringement claim to the IPL copy. ***HN2*** In a typical infringement case involving computer **[*19]** code, the alleged infringer must be shown to have copied "constituent, original elements" of the program. *Data Gen. Corp. v. Grumman Sys. Support, 36 F.3d 1147, 1160 n.19 (1st Cir. 1994)*. That is, even if a plaintiff has copyrighted the computer program as a whole (as STK has copyrighted the 9330 and 9311 Codes), it must still show that the "particular elements" that the defendant is alleged to have infringed are copyright-protected. *ILOG, Inc. v. Bell Logic, Inc., 181 F. Supp. 2d 3, 4 (D. Mass. 2002)*. As part of this showing, the plaintiff must-as a threshold matter-identify the particular elements allegedly copied. E.g., *id. at 8* (plaintiff had responded to defendant's interrogatory by identifying "every line of code" allegedly copied).

In this case, however, STK has consistently refused to so identify any particular element of the Code. Its refusal has been premised on the scope of its infringement claim: "Defendants are . . . copying each version of the 9330 and 9311 Maintenance Code in its entirety (thus obviating any need to analyze what portions are 'constituent, original elements')." (# 282, at 6 (footnote omitted, emphasis **[*20]** in original)). In other words, STK has maintained throughout that its copyright claim was based on the IPL copy of the entire Maintenance Code, thereby obviating any need to identify specific portions of the code, such as RTD Code or FSCs. On that basis, STK steadfastly refused to respond to CHE's repeated requests for analysis of those portions of the Maintenance Code that it had allegedly infringed, and its refusals were upheld by the court. Having strategically confined its infringement claim to "Maintenance Code in its entirety," and having thereby successfully limited CHE's discovery, STK cannot now seek to press an infringement claim based on precisely the elements of the Maintenance Code that it refused to disclose.

On this record, I find that STK has abandoned any infringement claim it may previously have asserted as to RTD Code and English translations of RTDs. See *Schneider v. Local 103 I.B.E.W. Health Plan, 442 F.3d 1, 2-3 (1st Cir. 2006)*; *Grenier v. Cyanamid Plastics, Inc., 70 F.3d 667, 668 (1st Cir. 1995)*. To the extent STK seeks to amend its complaint to include allegations based on RTD Code or English translations of FSCs, the request **[*21]** is denied, for reasons explained above in relation to reverse.exe.

III. Conclusion

---

[4] Similarly, to the extent that STK relies on its proposed order of permanent injunction (filed August 2003), that document preceded its amended preliminary injunction motion (filed in April 2004) as well as its summary judgment motion (filed August 2005), neither of which discusses RTD Code or English translations of FSCs.

Accordingly, STK has waived, withdrawn, or is foreclosed from pursuing any copyright infringement claim except its claim based on the IPL copy. Because it concedes that it cannot prevail on that claim, CHE and PDP are entitled to summary judgment on Count 1 and York is entitled to summary judgment on Count 8.

**Count 2: DMCA Violation**

The motions addressing Count 2 are PDP's Motion for Partial Summary Judgment (# 609), joined by CHE (# 608) and York (# 614), as well as PDP's and York's Supplemental Motion for Summary Judgment (# 764). STK acknowledges that the Federal Circuit's opinion, which dealt with circumvention in relation to the IPL copy, see *Storage Tech. II, 421 F.3d at 1318-19*, "impairs, as a practical matter, its ability to pursue those claims effectively." (# 757, at 2 n.2.). Defendants are therefore entitled to summary judgment on Count 2 insofar as it is based on the IPL copy. STK is further "willing to withdraw the remainder of its DMCA claim (i.e., all DMCA claims based on CHE copying other than the IPL copy), conditioned upon Defendants' agreement **[*22]** not toseek attorney fees." [5] (Id. at 10 (emphasis in original)). Defendants, however, are unwilling to concede their right to seek attorneys' fees. (# 766, at 3; # 764, at 7 & n.13). I must therefore address their motions.

The complaint alleges that all three defendants "circumvented STK's technological measures in order to gain access to all o[r] a portion of the Maintenance Code," in violation of *17 U.S.C. § 1201*. (Compl. P 45). The main thrust of the DMCA claim has always been that defendants circumvented GetKey in order to create the IPL copy. (Id. PP 44-48). However, STK now asserts that its DMCA claim was also based on circumvention of GetKey in order to access and copy (1) RTD Code, and (2) Event Messages. (# 679, at 4-5). Even assuming that such DMCA claims are properly in the case, defendants are still entitled **[*23]** to summary judgment.

***HN4*** In order to prevail on a DMCA claim, STK "must prove that the circumvention of the technological measure [here, the GetKey] 'facilitates infringing a right protected by the Copyright Act.'" *Storage Tech. II, 421 F.3d at 1318* (internal quotation marks omitted, emphasis added); see also *17 U.S.C. §§ 1201(a)(1)(A)*, *(a)(2)(A)*, *(b)(1)(A)* (prohibiting circumvention of measures protecting copyright-protected works). STK has, however, withdrawn its copyright claim as to Event Messages (# 757, at 9) and has therefore failed to establish that Event Messages are copyright-protected works. [6] Thus, STK's claim that defendants circumvented GetKey to access Event Messages fails because it has not shown that Event Messages are "protected by the Copyright Act." See *Storage Tech. II, 421 F.3d at 1318* ("To the extent that STK's rights under copyright law are not at risk, the DMCA does not create a new source of liability.").

**[*24]** Insofar as STK asserts circumvention of GetKey in order to copy RTD Code, it must show that GetKey "effectively" protects or controls access to RTD Code. For reasons articulated by the Sixth Circuit in *Lexmark Int'l, Inc. v. Static Control Components, Inc., 387 F.3d 522 (6th Cir. 2004)*, a decision cited with favor by the Federal Circuit in this case, see *Storage Tech. II, 421 F.3d at 1319*, STK cannot prevail. In that case, the plaintiff Lexmark claimed infringement of its Printer Engine Program ("PEP"), which was a copyrighted program that controlled the

---

[5] ***HN3*** A party who prevails in an action brought under 17 U.S.C. § 1203(a) may be entitled to attorneys' fees under § 1203(b)(5).

[6] Even if Event Messages are a portion of the copyright-protected 9330 or 9311 Codes, STK must still show that the "particular elements" that the defendant is alleged to have infringed are copyright-protected. ILOG, Inc., 181 F. Supp. 2d at 4.

printer's operation. *387 F.3d at 530*. Anyone who owned a Lexmark printer could download the PEP from the printer's microchip. However, Lexmark sought to control access to the PEP, and to printer operation, through use of an "authentication sequence," which was satisfied only when Lexmark-approved toner cartridges were used. Id. Without a Lexmark-approved cartridge, the authentication sequence would fail and PEP (and therefore the printer) would not operate properly. The defendant SCC sold a microchip that performed the authentication sequence, thereby allowing customers to use Lexmark **[*25]** printers without using Lexmark-approved toner. Id. Lexmark sued, claiming that SCC had circumvented the authentication sequence in violation of the DMCA. *Id. at 546*. The Sixth Circuit disagreed. It found that the authentication sequence did not effectively control access to the PEP within the meaning of the DMCA because "[a]nyone who buys a Lexmark printer may read the literal code of the Printer Engine Program directly from the printer memory, with or without the benefit of the authentication sequence, . . . after which copies may be freely distributed." Id. Thus, although the authentication sequence blocked "one form of 'access,'" it did not block "another relevant form of 'access,'" and it therefore did not constitute a "technological measure" that "effectively" controlled access within the meaning of the DMCA. *Id. at 547*.

In this case, RTD Code, along with the rest of the LMU Code, is contained either on the hard drive of the LMU or on floppy disks that STK sometimes ships with its products. CHE has asserted and STK has not denied that any customer who owns an STK system can access and copy RTD Code. Like the Lexmark customers who were **[*26]** able to copy PEP directly from the printers, STK's customers can access RTD Code regardless of the existence of GetKey protection. STK disputes the relevance of Lexmark and cites instead *Davidson & Assocs. v. Jung, 422 F.3d 630 (8th Cir. 2005)*. (# 679, at 6-7). In Davidson, however, the court found that the technological measure at issue did effectively control access to the copyrighted work; the copyrighted works were, unlike the PEP and unlike RTD Code, "not freely available," even to purchasers of the product. *Id. at 642*. *Davidson* is thus inapposite. Because GetKey does not effectively control access to RTD Code, circumvention of GetKey to access RTD Code cannot violate the DMCA. Therefore, defendants are entitled to summary judgment on Count 2 and may be entitled to attorneys' fees under *17 U.S.C. § 1203(b)(5)*.

**Counts 3 and 4: Trade Secret Misappropriation**

The relevant motions are (1) CHE's Supplemental Motion for Summary Judgment on Counts 3-6 and 10 (# 767); and (2) York's and PDP's Supplemental Motion for Summary Judgment (# 764). Counts 3 and 4 of the Third Amended Complaint allege trade **[*27]** secret misappropriation. They are identical, except that Count 4 is brought under the Uniform Trade Secrets Act ("UTSA"). (Compl. 17). Because Massachusetts has not adopted UTSA, see *Diomed, Inc. v. Vascular Solutions, Inc., 417 F. Supp. 2d 137 n.3 (D. Mass. 2006)*, and because the parties have cited only Massachusetts law in relation to STK's trade secret claim, Count 4 is dismissed and STK's trade secret claim is analyzed under Massachusetts trade secret law.

STK asserts that defendants misappropriated its trade secrets in various "data and information related to maintenance of [STK] library systems." (Compl. PP 52, 57). Specifically, STK alleges that defendants misappropriated its trade secrets in Event Messages, FSC Dictionaries, [7] and diagnostic manuals. ***HN5*** To establish trade secret misappropriation under Massachusetts law, STK

---

[7] FSC Dictionaries contain numeric FSCs and their English translations. Technicians use the Dictionaries to translate FSCs generated by the LCU.

must show (1) that the information in question is a trade secret, (2) that STK took reasonable steps to preserve the secrecy of that information, and (3) that defendants used improper means, in breach of a confidential relationship, to acquire and use the trade secret. *DB Riley, Inc. v. AB Eng'g Corp., 977 F. Supp. 84, 89 (D. Mass. 1997).* **[*28]** The Federal Circuit rejected STK's trade secret claim on two grounds: first, that STK's Event Messages and FSCs were publicly circulated before 1992 and therefore were not protectable trade secrets, and second, that STK had made "no showing that [CHE's] activities breached a confidential relationship." *Storage Tech. II, 421 F.3d at 1320-21*.

STK concedes that the Federal Circuit's decision disposes of its claim with respect to Event Messages and FSC Dictionaries that existed prior to 1992, known as the 4400 versions. (# 757, at 8). However, STK maintains that the Federal Circuit's decision did not foreclose its trade secret claim with respect to the later 9300 versions, which were introduced after 1992 and, importantly, after the institution of GetKey protection. As to the 9300 versions, STK argues, the Federal Circuit's decision is inapplicable.
On **[*29]** this point, STK is correct. The record indicates that the 9300 versions were introduced at the same time or after the introduction of the GetKey protection mechanism, and that the 9300 versions were different from the 4400 versions. (# 783, Ex. 9, at 94 (111:20-112:17); id., Ex. 4, PP 23-25; # 790, Ex. 42, P 6). These changes sufficiently distinguish the 9300 versions from the 4400 versions to render the Federal Circuit's decision inapplicable. In addition, STK seeks to pursue a trade secret claim as to its diagnostic manuals, a type of information not considered by the Federal Circuit at the preliminary injunction stage. (Id.). Accordingly, STK's trade secret claim is not foreclosed by the Federal Circuit's decision with respect to the 9300 versions and the diagnostic manuals. As to this information, defendants seek summary judgment on the basis of trade secret status and improper means.

I. Trade Secret Status

***HN6*** Trade secret status is based on numerous factors, including "(1) the extent to which the information is known outside of the business; (2) the extent to which it is known by employees and others involved in the business; (3) the extent of measures taken by the **[*30]** employer to guard the secrecy of the information; (4) the value of the information to the employer and to his competitors; (5) the amount of effort or money expended by the employer in developing the information; and (6) the ease or difficulty with which the information could be properly acquired or duplicated by others." *Jet Spray Cooler, Inc. v. Crampton, 361 Mass. 835, 840, 282 N.E.2d 921 (1972)*. Where the evidence conflicts, trade secret status is a question of fact properly left to the jury. See *Curtiss-Wright Corp. v. Edel-Brown Tool & Die, Co., 381 Mass. 1, 6-7, 407 N.E.2d 319* (trade secret status properly left to jury given conflicting evidence).

Such disputes exist in this case, precluding summary judgment. In particular, disputes exist as to the reasonableness of STK's security precautions, which is a key factor in trade secret status determination. E.g., *USM Corp. v. Marson Fastener Corp., 379 Mass. 90, 98, 393 N.E.2d 895 (1979)*. ***HN7*** Reasonableness itself is determined by looking at multiple factors, including "the existence or absence of an express agreement restricting disclosure," disclosures to employees and the circumstances of such disclosures, and "the degree to which **[*31]** the information has been placed in the public domain or rendered 'readily ascertainable' by the third parties through patent applications or unrestricted product marketing." Id. The reasonableness determination is fact-specific and depends largely on the circumstances. *Picker Int'l Corp. v. Imaging Equip. Servs., 931 F. Supp. 18, 23 (D. Mass. 1995)*. STK notes that in addition to instituting GetKey protection,

it also (1) required employees to sign confidentiality agreements that extended beyond an employee's termination (# 790, Ex. 45, PP 12-15); (2) required customers to sign license agreements, which expressly asserted the confidentiality of STK's intellectual property and required the customer not to access or use such materials (# 784, Ex. 14, § 4); and (3) required resellers to sign similar agreements (# 790, Ex. 46, §§ 3.6, 6.3). From these facts, a jury could reasonably conclude that STK had taken reasonable security precautions to protect the 9300 versions and diagnostic manuals. See *Picker Int'l Corp., 931 F. Supp. at 35-36* (finding "reasonable security precautions" where plaintiff had, inter alia, required confidentiality agreements **[*32]** from employees, customers, and resellers); *Harvard Apparatus, Inc. v. Cohen, 130 F. Supp. 2d 161, 176 (D. Mass. 2001)* (same).

CHE notes that STK's security measures have not been entirely successful. For example, STK has on multiple occasions, and as recently as January 2006, left its machines at an enhanced maintenance level. (# 768, PP 35-37). At an enhanced maintenance level, Event Messages and FSC Dictionaries may be viewed by anyone who connects a terminal to the LMU. (Id. P 37; # 793, P 37). By forgetting to disable Maintenance Code or by failing to do so before CHE took over maintenance, STK has arguably made the disputed information available to third parties. The record also shows that third-party technicians often arrive at sites where machines display FSCs and STK manuals are readily available. (# 770, Ex. 17, at 427-28). Thus, to the extent that STK's information has been rendered available to unauthorized parties, STK's carelessness has played a contributing role.

Under a reasonableness standard, however, STK's carelessness does not entitle defendants to prevail at summary judgment, though it may ultimately militate against a finding of trade secret **[*33]** status. ***HN8*** A plaintiffs security precautions must be reasonable, but it need not erect "an impenetrable fortress" or take "heroic measures." *Picker Int'l Corp., 931 F. Supp. at 23* (internal quotation marks omitted); *USM Corp., 379 Mass. at 101*. STK may have inadvertently disclosed certain information, but the various nondisclosure agreements into which it entered with customers and employees could lead a jury to conclude that information was "not placed entirely within the public domain." *Harvard Apparatus, Inc., 130 F. Supp. 2d at 176*. In any event, its conduct-leaving manuals at customer sites, failing to disable Maintenance Code by setting the maintenance level to zero-falls short of the type of disclosure that has traditionally been found to destroy trade secret status. See, e.g., *CVD, Inc. v. Raytheon Co., 769 F.2d 842, (1st Cir. 1985)* (information was "well known in the scientific community" and employees had published papers on the technology in scientific journals); *J. T. Healy & Son, Inc. v. James A. Murphy & Son, Inc., 357 Mass. 728, 737-38, 260 N.E.2d 723 (1970)* (information "not guarded at all").

Defendants **[*34]** raise two other arguments as to trade secret status. First, they argue that Event Messages and FSC Dictionaries ("the information") cannot constitute trade secrets because they are "raw data about a malfunction on a customer's machine." (# 767, at 13). But STK has offered evidence indicating that the information contains not only data about machine malfunctions, but also diagnosis and analysis (# 793, PP 42-44); such diagnostic material can constitute trade secret. See, e.g., *Picker Int'l Corp., 931 F. Supp. at 25*. Indeed, the Federal Circuit expressly found that "the meaning of the fault symptom codes might have been a trade secret if they had not been previously made public." *Storage Tech. II, 421 F.3d at 1320*. Second, defendants argue that the information is transient and thus not in "continuous use." However, it is unclear whether Massachusetts courts would still apply the continuous --use requirement. See*Restatement (Third) of Unfair Competition § 39, cmt. d*. In any event, the information is a standardized set of

terms that retains the same meanings over time and is therefore susceptible to "continuous **[*35]** use."

II. Improper Means

In rejecting STK's trade secret claim, the Federal Circuit also found that STK had made "no showing" that CHE had "breached a confidential relationship" in obtaining and using Event Messages and FSCs. *Storage Tech. II, 421 F.3d at 1321*. The court noted specifically that CHE had "developed the LEM and ELEM devices independently to diagnose problems in the silos," in a manner akin to "reverse engineering." Id. (emphasis added). Because independent development was not an "improper means," the court held there could be no misappropriation; defendants argue the same principle applies here. On the summary judgment record, [8] however, material factual disputes on this issue remain.

**[*36]** First, STK has offered evidence indicating that CHE used former STK employees to obtain STK information in breach of their confidentiality agreements. For example, Charles Zagorski, a former STK employee, obtained information for CHE-ostensibly from a "secret helper" at STK [9] -- that he thought "might solve our problems . . . in getting error codes [without a] way to interpret them." (# 790, Ex. 47). Zagorski believed the information "might give us [CHE] a way to get FSC call outs." (Id.). A reasonable jury could find that CHE had employed "improper means" in obtaining this information from Zagorski, a former STK employee, in breach of his confidentiality agreement. In addition, STK maintains that CHE was prohibited, under various customer and resale agreements, from accessing and using Maintenance Code except for purposes of activating the machines. (# 793, PP 14-16). See also *Storage Tech. II, 421 F.3d at 1310*. And yet the record shows that CHE technicians would access Maintenance Code not only to access the silos, but also to access diagnostic information, which they were able to do as long as the machines were at an enhanced maintenance level. (# 790, **[*37]** Ex. 41, at 153-55). At some point, CHE also downloaded onto its server a 58-page, FSC Dictionary containing 9300 FSCs and English translations. (# 783, Ex. 4, PP 28-29; id., # 784, Ex. 28). Based on these facts, a jury could reasonably infer that CHE had obtained the diagnostic information and FSC Dictionary by accessing Maintenance Code in violation of license and resale agreements. ***HN9*** Obtaining information in violation of a license agreement may constitute trade secret misappropriation. See, e.g., *Picker Int'l Corp., 931 F. Supp. at 42*. Accordingly, triable issues of fact persist on the matter of "improper means."

III. PDP and York

PDP and York also move for summary judgment separately. Because the record evidence **[*38]** shows that York corresponded with Zagorski about obtaining STK Code to aid in deciphering FSCs, his request for summary judgment is denied. As for PDP, it argues that it is entitled to summary judgment based on its assignment of interests to CHE, which it erroneously claims took place in 1992; in fact, PDP did not assign its interests to CHE until 2002. (# 764, P 5; # 780, PP 4-5). Accordingly, it is not entitled to summary judgment on that ground.

---

[8] At the preliminary injunction stage, STK was not required either to prove its case in full or to develop a complete evidentiary record. See Univ. of Texas v. Camenisch, 451 U.S. 390, 395, 101 S. Ct. 1830, 68 L. Ed. 2d 175 (1981). Therefore, the Federal Circuit's factual findings and legal conclusions are "not binding" at this stage, when the record is more fully developed. Id.

[9] Zagorski later revealed that the "secret helper" was not, as he had previously represented, an African-American woman named "Shelly Gramstaff," but was instead himself; he further revealed that he had "personally derived" the information contained in his emails. (# 790, Ex. 54).

IV. Conclusion

Count 4 is dismissed. Defendants' motions for summary judgment on Count 3 are denied.

**Count 5: Chapter 93A Unfair Competition**

The relevant motions are CHE's Motion for Partial Summary Judgment (# 619), and CHE's Supplemental Motion for Summary Judgment (# 767). Count 5 alleges that CHE engages in unfair competition when it deceives STK's former and prospective customers into believing that CHE's copying and/or use of the Maintenance Code is "legal or otherwise approved by, endorsed by, or authorized StorageTek," and when it "induce[s] and knowingly benefit[s] from interference with StorageTek's existing and prospective business relationships and/or contracts." (Compl. PP 63-64). ***HN10*** Chapter 93A [10] **[*39]** prohibits parties from bringing actions under *§ 11* "unless the actions and transactions constituting the alleged unfair method of competition or the unfair or deceptive act or practice occurred primarily and substantially within the commonwealth." Courts applying this requirement "determine whether the center of gravity of the circumstances that give rise to the claim is primarily and substantially within the Commonwealth." *Kuwaiti Danish Computer Co. v. Digital Equip. Corp., 438 Mass. 459, 472, 781 N.E.2d 787 (2003)*. CHE disputes that its alleged misconduct occurred "primarily and substantially" in Massachusetts.

In response, STK points to its **[*40]** allegations concerning the Allmerica Insurance account. Allmerica is a former STK customer for whom CHE subsequently provided maintenance services; it is located in Worcester, Massachusetts. STK argues that the Allmerica incident constitutes "a single instance of misconduct" that has "greater significance for [the] case as a whole than a multiplicity of instances of misconduct in another jurisdiction." *Kuwaiti Danish, 438 Mass. at 473*. This assertion is, however, belied by STK's own claim, which in essence accuses CHE of deceiving and then stealing various STK customers. To the extent that the relevant situs is the location of the customers, the Allmerica account alone is insufficient to warrant 93A jurisdiction. To the extent that the relevant situs is the location of CHE's planning and communications, there is no proof that CHE engaged in such planning anywhere except Colorado and Missouri, where it and York are located. (# 619, PP 32-34). Tellingly, of the forty-seven customers identified by STK's damages expert in her lost profits analysis, only Allmerica is located in Massachusetts. (# 619, Ex. N, at 14). Moreover, the lost profits associated with Allmerica **[*41]** amount to less than 2% of STK's total damages claim. (Id.). STK has simply failed to establish that the alleged misconduct occurred "primarily and substantially" within the Commonwealth. See *Straumann Co. v. Lifecore Biomedical Inc., 278 F. Supp. 2d 130, 140 (D. Mass. 2003)* (no 93A jurisdiction where only 2.3% of defendant's sales occurred in Massachusetts). Accordingly, summary judgment on Count 5 is allowed.

**Count 6: Tortious Interference with Business Relations**

CHE moves for summary judgment on Count 6 (# 767), which alleges tortious interference with business relationships. The parties argue at length about the scope of Count 6. The dispute arises from STK's recent assertion that CHE tortiously interfered not only by stealing STK's maintenance customers, but also by "caus[ing] many existing and prospective customers to breach their license agreements with StorageTek." (# 757, at 7). Specifically, STK asserts (1) that

---

[10] STK attempts to characterize Count 5 as pleading unfair competition "under the common law of each state in which CHE has either bid for, or performed service on [STK machines]." (# 757, at 4). Count 5, however, has always been limited to a claim under 93A, as its caption-"Unfair Competition in Violation of Mass. Gen. L. Ch. 93A"-clearly indicates. (Compl. 18).

under the license agreements, customers are prohibited from accessing or using Maintenance Code except to activate their machines, and (2) that CHE caused customers to breach their license agreements by accessing and using Maintenance **[*42]** Code on their behalf, for purposes other than activation. Count 6 does not encompass these allegations. STK's tortious interference claim is and has always been about whether CHE improperly took away STK's customers; it has never, until now, included a claim that CHE caused STK customers to breach their license agreements by accessing and using Maintenance Code on their behalf for non-activation purposes. In any event, by the time CHE accessed Maintenance Code on a customer's behalf, that customer had presumably already ended its maintenance relationship with STK. In sum, I agree with CHE as to the scope of the claim. Its entitlement to summary judgment, however, is another matter.

***HN11*** Under Massachusetts law, [11] a plaintiff claiming tortious interference must show "(1) a business relationship or contemplated contract of economic benefit; (2) the defendant's knowledge of such relationship; (3) the defendant's interference with the relationship through improper motive or means; and, (4) the plaintiff's loss of advantage as a direct result of the defendant's conduct." *Singh v. Blue Cross/Blue Shield of Mass., Inc., 308 F.3d 25, 47 (1st Cir. 2002)* (internal quotation marks **[*43]** omitted). CHE argues that STK has not shown that CHE employed "improper means" to interfere with STK's maintenance relationships. In *United Truck Leasing Corp. v. Geltman, 406 Mass. 811, 816, 551 N.E.2d 20 (1990)*, the Supreme Judicial Court expressly held that a plaintiff was not required to show malice in a tortious interference case. Instead, the court defined ***HN12*** "improper means" as conduct that "is wrongful by some measure beyond the fact of interference itself." Id. (internal quotation marks omitted). Although the court did not discuss at length what might constitute "improper means," it did cite the *Restatement (Second) of Torts, § 767*, which sets out a seven-factor test for determining whether conduct is "improper," and which defines such conduct as ranging from "physical violence, fraudulent misrepresentation and threats of illegal conduct," to "[v]iolation of recognized ethical codes" and business customs. Id. cmt. c; see also *Ary Jewelers, LLC v. IBJTC Business Credit Corp., 414 F. Supp. 2d 90, 94 (D. Mass. 2006)*.

**[*44]** In this case, STK has presented sufficient evidence of "improper means." The record indicates that CHE induced former STK employees to breach their confidentiality agreements by disclosing information about STK's intellectual property, which assisted CHE in developing its diagnostic capabilities. See discussion of Count 3, supra. In addition, STK has submitted evidence that a former STK employee provided CHE with leads on potential customers. (# 790, Ex. 50). It is not clear from the record whether the customers were being serviced at the time by STK, but at least some of the information about the customers came from relationships the employee formed while at STK. (Id. at AAI 047759, AAI 047343). From this evidence, a reasonable jury could find that CHE had developed both its diagnostic capabilities and its business contacts by inducing former STK employees to breach their confidentiality agreements, and thus that it had interfered with STK's business relationships through improper means.

Accordingly, summary judgment is denied.

**Count 7: Conversion**

---

[11] Both parties assume for purposes of summary judgment that Massachusetts law applies to STK's tortious interference claim. (# 767, at 19; # 792, at 8-9). CHE, however, asserts that Missouri law applies to its own tortious interference counterclaims, since its principal place of business is in Missouri. (# 661, at 4). STK contends that CHE's counterclaim fails under either state's law. (# 628, at 11 n.6). Accordingly, STK's tortious interference claim is analyzed under Massachusetts law, while CHE's tortious interference counterclaim is analyzed under Missouri law.

STK has unconditionally withdrawn its conversion claim. (# 757, at 10). Accordingly, it is dismissed with **[*45]** prejudice.

**Count 9: Patent Infringement**

The relevant motions are (1) PDP's Motion for Partial Summary Judgment (# 609); (2) two CHE Motions for Partial Summary Judgment (## 616 and 617), joined by York (# 614); and (3) two STK Motions to Dismiss (## 338 and 622), concerning CHE's assertions of invalidity and noninfringement, which I address first.

I. STK's Motions to Dismiss (## 338 and 622)

In its Second Amended Complaint (# 203), STK alleged patent infringement as to three patents, U.S. Patents 4,908,777, 5,850,569, and 6,550,391 ("'777, '569, and '391 patents," respectively). In response, CHE filed several counterclaims for invalidity and noninfringement of the three patents, sham litigation based on improper assertion of the patents, and patent misuse. Although STK amended its complaint to remove any claim as to the '391 Patent (# 253), CHE insisted on pursuing its counterclaims as to all three patents. STK has therefore moved to dismiss CHE's counterclaim for invalidity and noninfringement (Counterclaim Count 27) insofar as it concerns the '391 Patent. The issue has become moot because CHE now characterizes Counterclaim Count 27 as a defense. (# 760, **[*46]** at 2). As a defense, it is relevant only to the extent that STK asserts patent infringement; it does not provide an independent jurisdictional basis for assessing an unasserted patent. Since STK no longer asserts infringement of the '391 Patent, the defense is unnecessary.

A similar issue arises with respect to unasserted claims of the '569 and '777 patents, whose validity CHE seeks to undermine. STK has asserted only Claims 18 and 23 of the '569 Patent, and Claims 5, 12, 14, and 16 of the '777 Patent. Because Counterclaim Count 27 is now interposed only as a defense, it is relevant only with respect to asserted claims. Accordingly, both motions are denied as moot.

II. The '569 Patent

Defendants CHE and York move for summary judgment on the '569 Patent, claiming invalidity (# 617) and non-infringement (# 616). Both issues depend upon interpretation of the term "simulated LMU."

***HN13*** Claim construction presents purely legal questions. See *Markman v. Westview Instruments, Inc., 52 F.3d 967, 978 (Fed. Cir. 1995)*, aff'd*517 U.S. 370, 116 S. Ct. 1384, 134 L. Ed. 2d 577 (1996)*. Claim terms are given their "ordinary and customary meaning," which is the meaning that a "person of ordinary **[*47]** skill in the art" would give the term, "not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." *Phillips v. AWH Corp., 415 F.3d 1303, 1313 (Fed. Cir. 2005)* (en banc). The court's primary resource is intrinsic evidence, including the claim itself, other claims of the patent, "both asserted and unasserted," the patent's specification or written description, and the prosecution history. *Id. at 1314-15*. The specification may "teach and enable those of skill in the art to make and use the invention," but it does not define the scope of the claim terms, and courts therefore "avoid importing limitations from the specification into the claims." *Id. at 1321*. Extrinsic evidence-though "less significant" than intrinsic evidence-may nevertheless "shed

useful light" on a claim term. *Id. at 1317* (internal quotation marks omitted). Such evidence may include dictionaries, treatises, and expert testimony. However, extrinsic evidence is considered "less reliable" than intrinsic evidence; courts assume it is "unlikely to result in a reliable **[*48]** interpretation . . . unless considered in the context of the intrinsic evidence." *Id. at 1318-19*.

The Patent describes a method for testing the Library Storage Module ("LSM") component of an STK silo system. The LSM stores data cartridges, which are retrieved and read by a robotic arm. Several LSMs are controlled by an LMU, which in turn receives commands from host computers. The method is intended to aid STK library owners when they wish to add additional LSMs to an existing system. ('569 Patent 1:25-27). Before a new LSM is added, it must undergo diagnostic testing. (Id. at 1:39).

Such testing was previously accomplished after an LSM was assembled and connected to the library, but it required customers to "shut down . . . operations." (Id. at 1:47-48). The '569 Patent reduces this downtime. Instead of first connecting the new LSM to the system and thereafter performing diagnostic testing, the patent describes a method for testing a new LSM "prior to its incorporation into the library." (Id. at 2:6-7).

Such testing is accomplished by means of a "simulated LMU," a term that appears in each asserted claim. The parties offer divergent definitions of the **[*49]** term and hotly dispute each distinction. One of these disputes, however, is dispositive as to infringement. CHE argues that a simulated LMU must be "capable of being used to perform diagnostic testing on an LSM . . . before such LSM is ever connected to an LMU." This assertion is supported by the intrinsic record, though the diagnostic testing is perhaps more accurately described taking place before the LSM is connected to a library, rather than an LMU. As STK concedes (# 683, at 8-9), unasserted Claims 1 and 8 of the '569 Patent both specify that diagnostic testing be conducted via a simulated LMU before the LSM is connected to a library. ('569 Patent, 5:58, 6:37-39). Because Claims 1 and 8 therefore use the term "simulated LMU" to refer to a device that is capable of conducting diagnostic testing before the LSM is attached to a library, and because claim terms are "normally used consistently throughout the patent," *Phillips, 415 F.3d at 1314*, the same definition applies to the asserted claims. That the purpose of the simulated LMU is to perform such prior testing is further apparent from the rest of the patent. ('569 Patent, Abstract (simulated LMU "test[s] the **[*50]** new LSM prior to its incorporation into the library"); Summary, 2:4-7 (same)). I therefore conclude that term "simulated LMU" refers to a device capable of being used to perform diagnostic testing on an LSM before the LSM is connected to a library.

Having construed the disputed claim term, I now consider "whether the properly construed claim encompasses the accused structure." See *Bai v. L&L Wings, Inc., 160 F.3d 1350, 1353 (Fed. Cir. 1998)*. CHE argues that neither LEM or ELEM is a simulated LMU, specifically because neither LEM nor ELEM is capable of performing diagnostic testing on an LSM before the LSM is connected to a library. STK apparently agrees. (# 681, at 4 (noting that LEM and ELEM are two devices that do not have this capability)). If both LEM and ELEM lack this required capability, then neither can be a simulated LMU under the court's construction. Defendants are thus entitled to summary judgment on the '569 Patent on the basis of non-infringement, and it is therefore unnecessary to determine invalidity.

III. The '777 Patent

STK's tape libraries require the use of a robotic arm that retrieves the appropriate tape cartridge when it is needed. **[*51]** The libraries depend upon the accurate positioning and movement

of the robot arms. The '777 Patent claims a method for calibrating a robot arm to ensure accuracy. STK has asserted infringement of independent Claims 5 and 12, as well as dependent Claims 14 and 16. CHE moves for summary judgment on grounds of non-infringement (# 616).

A. Implied License

CHE first claims patent exhaustion and implied license, confusingly equating the two doctrines. (# 616, at 9). They are, however, distinguishable. ***HN14*** Under the doctrine of first sale, or patent exhaustion, a patentee abandons its statutory right to exclusivity through the unrestricted sale or license of the patent. See *Hewlett-Packard Co. v. Repeat-O-Type Stencil, 123 F.3d 1445, 1451 (Fed. Cir. 1997)*. By contrast, an implied license exists where no such unrestricted sale or license has necessarily been given, but where nevertheless "the patentee may, through its own conduct, grant an implied license to practice the patent to certain downstream purchasers." *LG Elecs., Inc. v. Asustek Computer, Inc., 2002 U.S. Dist. LEXIS 25956, No. 01-00326, 2002 WL 31996860, at *3 (N.D. Cal. 2002)*.

To the extent that CHE claims patent exhaustion, **[*52]** the doctrine is inapplicable in this case. The articles sold in this case were STK's libraries, which are "merely embodiments" of the patent at issue. *Glass Equipment Dev., Inc. v. Besten, Inc., 174 F.3d 1337, 1341 n.1 (Fed. Cir. 1999)*. (# 616, P 46-47). The asserted claims, however, are method claims. Therefore, the first sale doctrine is inapplicable. See id. (doctrine inapplicable where sale concerned equipment but claim involved patented method of using equipment); see also *Bandag, Inc. v. Al Bolser's Tire Stores, Inc., 750 F.2d 903, 924 (Fed. Cir. 1984)*.

Insofar as CHE claims an implied license, it has failed to meet its burden. See *Bandag, Inc., 750 F.2d at 924* (burden of proving implied license falls on defendant). ***HN15*** A defendant seeking to show an implied license must demonstrate (1) that the equipment at issue has no non-infringing uses, and (2) that the patentee's conduct clearly supports the finding of an implied license. *Id. at 924-25* (internal quotation marks omitted). As to this latter factor, "[a] mere sale does not import a license except where the circumstances plainly indicate that the grant **[*53]** of a license should be inferred." *Id. at 925*. Moreover, an inquiry into the circumstances of the sale is necessarily fact-intensive, though the existence of an implied license is ultimately a question of law, see *Met-Coil Sys. Corp. v. Korners Unlimited, Inc., 803 F.2d 684, 687 (Fed. Cir. 1986)*.

STK's storage systems are commercial embodiments of the '777 Patent. (# 682, P 46). CHE argues that by selling the systems, STK has granted its customers an implied license to use the systems and, therefore, to practice the robotic calibration operations covered by the '777 Patent. CHE's argument fails for multiple reasons. As an initial matter, CHE contradicts itself; to prove the existence of an implied license, CHE must show that there are no non-infringing uses of the STK equipment; and yet CHE itself argues that its own use of STK's equipment is non-infringing. See *Lifescan, Inc. v. Polymer Technology Int'l Corp., 1995 U.S. Dist. LEXIS 4916, No. 94-672R, 1995 WL 271599, at *8 (W.D. Wa. 1995)*. Second, because CHE is both the summary judgment movant and the party bearing the ultimate burden of proof, it is entitled to prevail only by producing "conclusive" evidence, which **[*54]** "establish[es] beyond peradventure all of the essential elements of the claim or defense to warrant judgment in [its] favor." *Vargas v. Cummings, 149 F.3d 29, 35-36 (1st Cir. 1998)* (internal quotation marks omitted, emphasis in original). CHE, however, has failed to offer any evidence, let alone conclusive evidence, on the issue of non-infringing uses. In addition, the circumstances in this case do not "plainly indicate that the grant of a license should be inferred." *Met-Coil Sys. Corp., 803 F.2d at 686*. On the

contrary, STK expressly declined to license certain aspects of its technology and software to its customers. See, e.g., *Storage Tech. II, 421 F.3d at 1310*. In light of these clear restrictions, CHE's assertion of an implied license is unwarranted.

B. Infringement

CHE's non-infringement argument focuses on the claim term "independent calibration operations," which appears in all of the asserted claims. Claim 5 describes a "method of calibrating" a robot arm, including the step of "storing a sequence of independent calibration operations, with each sequential calibration operation having a greater positional accuracy **[*55]** than the preceding operation." ('777 Patent, 11:8-13). Similarly, independent Claim 12 and dependent Claims 14 and 16 describe "a method of calibrating" an end effectuator upon a robot arm by, inter alia, "storing a hierarchical sequence of independent calibration operations." (Id. 12:21-25). CHE argues that STK's equipment itself does not engage in "independent calibration operations" and therefore CHE's use of the equipment cannot infringe the asserted claims.

1. Claim Construction

As explained above, claim construction is a matter of law, claims are generally given their ordinary and customary meaning, and intrinsic evidence is generally given greater weight than extrinsic evidence. The central dispute here concerns the word "independent." CHE argues that "independent" must mean "not dependent," "not reliant," or "not determined by." (# 616, at 15). It argues that STK's equipment does not conduct "independent calibration operations" because it "must perform the calibration operations in a particular order"; the operations are not "independent" because the "operations that have greater positional accuracy rely on and are influenced by the calibration operations of lesser **[*56]** positional accuracy." (Id. at 16). This interpretation of "independent" is inconsistent with the '777 Patent, not least because it would exclude the preferred embodiment (STK's libraries) from the scope of the claims. ***HN16*** An interpretation of a claim term that excludes the preferred embodiment is "rarely, if ever, correct" and requires "highly persuasive evidentiary support," which CHE has failed to offer. *Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576, 1583 (Fed. Cir. 1996)*.

The patented invention is described at the outset as a "hierarchical calibration arrangement," which is "used to provide ever-increasing levels of accuracy in positioning a robot arm end effectuator." ('777 Patent, Abstract). Thus, from the beginning, the patented calibration operation is envisioned in relational terms, as the words "hierarchy" and "sequence" indicate. The Specification also repeatedly describes the invention as a hierarchical arrangement, consisting of a sequence providing increasing levels of accuracy. (E.g., id. at 1:8-10, 1:45-50, 3:20-25). Finally, the asserted claims themselves describe functions that occur in relationship to other functions. For example, Claim **[*57]** 5 describes independent calibration operations that occur in a "sequence," and further specifies that within the sequence, "each sequential calibration operation ha[s] a greater positional accuracy than the preceding operation." (Id. at 11:10-14). Similarly, Claim 12 refers to a "hierarchical sequence of independent calibration operations." (Id. at 12:24-25). The intrinsic record therefore supports an interpretation of "independent calibration operations" that does not require the operations to be unrelated. *Phillips, 415 F.3d at 1313* (claim terms should be construed in context of particular claim and of entire patent). I therefore find that "independent calibration operations" are calibration operations that are separate from one another but are not necessarily unrelated.

2. Analysis

CHE's assertion of non-infringement is premised entirely upon its proposed claim construction, which I have rejected. Specifically, CHE argues that because STK's equipment performs calibration operations "in a particular order," in which later calibration operations "have greater positional accuracy" and "rely on and are influenced by the [earlier] calibration operations, **[*58]** " they cannot be independent. As explained above, the term "independent calibration operations" does not exclude operations that are related, as long as the operations are performed separately. Because CHE raises no other grounds for finding non-infringement, its motion for summary judgment is denied.

IV. PDP's Motion for Summary Judgment (# 609)

PDP separately moves for summary judgment on Count IX. STK originally alleged direct and indirect patent infringement by PDP as to both the '569 and '777 Patents, but its only remaining claim is active inducement of infringement by PDP as to the '777 Patent. [12] PDP now argues that STK has no evidence that PDP possessed the requisite intent. The parties hotly dispute precisely what level of intent STK is required to establish, and the source of their disagreement is Federal Circuit case law. In several cases, the Federal Circuit has applied a specific intent requirement, which requires the plaintiff to show that the defendant "the alleged infringer's actions induced infringing acts and that he knew or should have known his actions would induce actual infringements." *Manville Sales Corp. v. Paramount Sys., Inc., 917 F.2d 544, 553 (Fed. Cir. 1990)*; **[*59]** accord *Ferguson Beauregard/Logic Controls, Div. of Dover Resources, Inc. v. Mega Sys., LLC, 350 F.3d 1327, 1341-42 (Fed. Cir. 2003)*; *Warner-Lambert Co. v. Apotex Corp., 316 F.3d 1348, 1363 (Fed. Cir. 2003)*; *Minnesota Mining & Mfg. Co. v. Chemque, Inc., 303 F.3d 1294, 1304-05 (Fed. Cir. 2002)*. In a parallel line of cases, however, the Federal Circuit has required something less. Beginning with *Hewlett-Packard Co. v. Bausch & Lomb, Inc., 909 F.2d 1464, 1469 1468-69 (Fed. Cir. 1990)*, which was decided in the same year as Manville Sales, the Federal Circuit has sometimes held that only "intent to cause the acts which constitute infringement" is required. See *Metabolite Labs., Inc. v. Lab. Corp. of Am. Holdings, 370 F.3d 1354, 1365 (Fed. Cir. 2004)*, cert. dismissed as improvidently granted sub nom. *Lab. Corp. of Am. Holdings v. Metabolite Labs., Inc., 126 S. Ct. 2921, 165 L. Ed. 2d 399, 2006 U.S. LEXIS 4893, 2006 WL 1699360 (2006)*; *Moba, B.V. v. Diamond Automation, Inc., 325 F.3d 1306, 1318 (Fed. Cir. 2003)*. Thus, in some instances, the Federal Circuit has applied the Manville Sales specific **[*60]** intent standard, while in other cases, it has applied Hewlett-Packard's less stringent standard. Indeed, the court has expressly recognized the conflict among its precedents. See*Minnesota Mining & Mfg. Co., 303 F.3d at 1305*.

Given the unsettled state of the law, I look to recent Federal Circuit precedent. In its most recent case discussing inducement of infringement, the court ruled that ***HN17*** a defendant could be held liable for inducement even where the defendant claimed there was "no evidence that it knew that these sales would result in actual infringement. **[*61]** " *nCube Corp. v. SeaChange Int'l, Inc., 436 F.3d 1317, 1324 (Fed. Cir. 2006)*. The court cited the Hewlett-Packard intent standard and stated that in a case of indirect infringement, a plaintiff need show "at least that the alleged inducer had knowledge of the infringing acts." Id. (internal quotation marks omitted). To the extent that this decision represents the Federal Circuit's current stance on the intent question, it suggests that the *Hewlett-Packard* standard applies.

---

[12] STK has withdrawn its claims of direct and contributory infringement, but continues to pursue its claim of inducement of infringement under *35 U.S.C. § 271 (b)*. (# 679, at 16 n.17). PDP insists upon and is entitled to judgment on the withdrawn claims. (# 730, at 13). In addition, PDP is entitled to summary judgment on all claims as to the '569 Patent, for the same reasons that CHE is entitled to summary judgment.

PDP has presented no argument that STK cannot meet this standard. Its summary judgment motion is premised entirely upon its argument that STK must show that PDP had knowledge of the '777 Patent or specifically intended to induce its infringement. The fact that PDP's principals did not learn of the patent until suit was filed is not necessarily dispositive, since the Federal Circuit has previously found that a defendant may be liable for inducement of infringement in precisely such circumstances. See *Biotec Biologische Naturverpackungen GmbH & Co. KG v. Biocorp, Inc., 249 F.3d 1341, 1351, 1355 (Fed. Cir. 2001)*. PDP presents no reasons why it is entitled to summary judgment **[*62]** under the Hewlett-Packard standard, instead assuming that the specific intent standard applies. For that reason and because the question of intent is "particularly within the province of the trier of fact," *Metabolite Labs., Inc., 370 F.3d at 1365* (internal quotation marks omitted), the motion is denied.

**Count 10: False Advertising**

The relevant motions are CHE's Motion for Partial Summary Judgment (# 619) and its Supplemental Motion for Summary Judgment (# 767). Count 10 alleges false advertising in violation of § 43(a) of the Lanham Act, *15 U.S.C. § 1125(a)(1)(B)*. [13] **[*64]** ***HN18*** Under that section, STK must show, inter alia, that CHE "made a false or misleading description of fact or representation of fact in a commercial advertisement about [its] own or another's product." *Cashmere & Camel Hair Mfrs. Inst. v. Saks Fifth Ave., 284 F.3d 302, 310-11 (1st Cir. 2002)*. However, a "crucial" limitation exists: the statute "prohibits misrepresentations only in 'commercial advertising or promotions.'" *Podiatrist Ass'n, Inc. v. La Cruz Azul de Puerto Rico, Inc., 332 F.3d 6, 19 (1st Cir. 2003)* (quoting **[*63]** *15 U.S.C. § 1125(a)(1)(B)*); see also *First Health Group Corp. v. BCE Emergis Corp., 269 F.3d 800 (7th Cir. 2001)* (commercial advertising "an essential ingredient"). Courts apply a multi-part test [14] to determine whether speech falls within the "specific forms of communication" targeted by the Lanham Act. *Podiatrist Ass'n, Inc., 332 F.3d at 19*. It "must at a bare minimum target a class or category of purchasers or potential purchasers, not merely particular individuals." Id. The Act "covers more than classic advertising campaigns," *Podiatrist Ass'n, Inc., 332 F.3d at 20*, including "more informal types of 'promotion,'" but speech nevertheless "must be disseminated sufficiently to the relevant purchasing public to constitute 'advertising' or 'promotion' within that industry." *Seven-Up Co. v. Coca-Cola Co., 86 F.3d 1379, 1384 (5th Cir. 1996)*.

The ten documents that STK disclosed to CHE as the basis for its false advertising claim consist of (1) five emails or letters from a CHE marketing employee to a particular customer or individual, (2) internal CHE communications, and (3) CHE's Capabilities Statements. First, the five emails or letters are more akin to the "isolated, individual statements of opinion by a single sales representative to a single customer," *Seven-Up Co., 86 F.3d at 1386*, than they are to an "organized campaign to penetrate the relevant market." *Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc., 314 F.3d 48, 57 (2d Cir. 2002)*. Second, STK has offered no admissible evidence suggesting that the Capabilities Statements were "disseminated . . . to the relevant **[*65]**

---

[13] STK has also belatedly attempted to assert a claim under *§ 1125(a)(1)(A)* for false designation of origin. (# 757, at 5; # 686). However, Count 10 alleges false advertising only under *§ 1125(a)(1)(B)* and nowhere mentions false designation of origin. (Compl. PP 91-92). None of the paragraphs cited by STK assert such a claim, even if broadly construed. (# 792, at 14 (citing Compl. PP 24, 25, 31, 66, 77)). In other words, STK is yet again attempting to insert new claims into the case.

[14] STK claims that the Seventh Circuit has disagreed, but it is clear that the Seventh Circuit, although it has expressed doubts about administering a judicially-developed test, likewise recognizes the need to distinguish "between varieties of commercial speech." First Health Group Corp., 269 F.3d at 803.

purchasing public," while CHE has offered proof that in fact they were only disseminated to "specific individuals in response to a direct request." (# 619, Ex. A). Finally, CHE's internal communications clearly do not constitute advertising or promotion.

STK argues that its proof of false advertising is far more extensive than the ten documents referenced by CHE. But STK apparently chose not to disclose any of these documents to CHE, either in its initial response to CHE's interrogatories, nor in its supplemental response, nor at any time following a final request by CHE in May 2005. STK offers no satisfactory explanation for this failure. It notes that it informed CHE that its interrogatory was "unduly burdensome and premature." But even if the request was premature when first rendered, that condition was presumably resolved by the time CHE supplemented its request in May 2005. And in light of the fact that STK has identified numerous documents it says are relevant to its false advertising claim, CHE's request does not seem in fact to have been "unduly burdensome." In the absence of any other compelling justification for its failure to identify and disclose to CHE the documents upon **[*66]** which it now relies, STK may not refer to them for summary judgment purposes. Because STK cannot establish that CHE made false representations in "commercial advertising or promotion," summary judgment on Count 10 is allowed.

***Motions Concerning CHE's Counterclaim***

**Counts 3, 4, 5, 6, 7, 8, 9 and 10: Section 1 of the Sherman Act**

The relevant motions are STK's Motion for Summary Judgment (# 626), CHE's Motion for Partial Summary Judgment (# 618), and STK's Motion to Strike CHE's Expert Testimony and Reports (# 630). Counterclaim Counts 3 and 4 assert that STK illegally tied its parts to service, in violation of *Section 1 of the Sherman Act*; Count 3 alleges a per se violation, while Count 4 alleges a violation under the rule of reason. Similarly, Counts 5 and 6 allege illegal tying of functional microcode to service; Counts 7 and 8 allege illegal tying of maintenance microcode to service; and Counts 9 and 10 allege illegal tying of engineering changes to service. STK moves for summary judgment on Counts 3 through 10, and CHE cross-moves for summary judgment on Counts 5, 7, and 9.

I. Standing: Antitrust Injury

***HN19*** Federal law confers standing on private **[*67]** citizens who suffer injury "by reason of anything forbidden in the antitrust laws." The class of persons who possess "antitrust standing" has been limited by the courts. *Sullivan v. Tagliabue, 25 F.3d 43, 45 (1st Cir. 1994)*. The Supreme Court has identified several factors that courts must weigh in determining whether antitrust standing exists. See *Associated Gen. Contractors of Cal. Inc. v. California State Council of Carpenters, 459 U.S. 519, 537-45, 103 S. Ct. 897, 74 L. Ed. 2d 723 (1983)*. One factor is antitrust injury, which is "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 489, 97 S. Ct. 690, 50 L. Ed. 2d 701 (1977)*. Antitrust injury is a "central factor in the standing calculus," and its absence "weighs heavily against a grant of standing." *Sullivan, 25 F.3d at 47 & n.9*. STK argues that it is entitled to summary judgment because CHE is unable to show the requisite injury.

However, CHE has presented evidence that it and other independent service organizations ("ISOs") suffered injury flowing from STK's allegedly anticompetitive conduct. **[*68]** Specifically,

the record indicates that CHE experienced significant growth prior to 2003. CHE entered the private sector market in 2001, and during the spring and summer of 2002, CHE was awarded several significant accounts, including GE Capital, AT&T, and Boeing. (# 671, PP 27-31). The record further indicates that at some point in late 2002 or early 2003, STK changed several of its policies and that these changes affected ISOs and their ability to provide proper service. (# 700, Ex. 39, at 25; # 703, Ex. 154, at 222-27). These policies contributed to one ISO's decision to exit the service market (# 700, Ex. 39, at 25), and caused a measurable decline in CHE's-STK-related revenues. (# 704, Ex. 168). Such evidence supports an inference that STK's allegedly anticompetitive conduct caused injury to CHE.

STK of course disagrees with CHE's calculations and has filed a motion to strike the reports and testimony of CHE's damages expert, Dr. Vincent O'Brien, or for a Daubert hearing in the alternative. ***HN20*** Under *Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 592-93, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993)*, courts conduct a "preliminary assessment of whether the reasoning or methodology underlying **[*69]** the [proposed expert] testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." However, "[t]he focus . . . must be solely on principles and methodology, not on the conclusions that they generate," and courts should not be "overly pessimistic about the capabilities of the jury," since "[v]igorous cross examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Id. at 595-96*. In light of these principles, the motion is denied.

As an initial matter, the "before and after" analysis and regression conducted by Dr. O'Brien are accepted methodologies for demonstrating antitrust lost profits. *Cambridge Plating Co. v. Napco, Inc., 85 F.3d 752, 772 (1st Cir. 1996)* (internal quotation marks omitted); accord *Conwood Co., L.P. v. U.S. Tobacco Co., 290 F.3d 768, 793 (6th Cir. 2002)* (before-and-after and regression analyses are "generally accepted methods for proving antitrust damages"). To the extent that STK attacks the specificity or Dr. O'Brien's **[*70]** opinions, and, in particular, his failure to look solely at customer-specific data, its arguments are rejected. ***HN21*** Lost profits generally need not be proved with "mathematical exactness," but rather with a reasonable degree of certainty. *Cambridge Plating Co., 85 F.3d at 771*. In antitrust cases, lost profits may have a lesser degree of certainty than in other arenas, since market uncertainties "usually deny us sure knowledge of what plaintiff's situation would have been in the absence of the defendant's antitrust violation." *Hasbrouck v. Texaco, Inc., 842 F.2d 1034, 1044 (9th Cir. 1987)* (internal quotation marks omitted). To the extent that STK's expert, Dr. Sharon Oster, criticizes the growth rates or timeline employed by Dr. O'Brien, such questions are more properly decided by the jury, to whom STK may present its theory of damages through presentation of its own expert testimony and evidence, as well as through cross-examination. Thus, while aspects of Dr. O'Brien's analysis certainly appear to be "shaky," the methodologies he employs are valid, and his opinions therefore reach the threshold of admissibility. The motion to strike is denied.

II. **[*71]** Substantial Amount of Commerce

STK next argues that it is entitled to summary judgment because CHE has failed to establish that any alleged tying foreclosed a substantial amount of commerce. ***HN22*** The amount of commerce foreclosed must be "not insubstantial," or "merely de minimis." *Fortner Enterprises, Inc. v. United States Steel Corp., 394 U.S. 495, 501, 89 S. Ct. 1252, 22 L. Ed. 2d 495 (1969)* (internal quotation marks omitted). The "relevant figure is the total volume of sales tied by the

sales policy under challenge, not the portion of this total accounted for by the particular plaintiff who brings suit." *Id. at 502*. There can be no real dispute that in this case, the amount of sales in the tied product-STK maintenance service-is not insubstantial. STK's revenues for service of its tape libraries well exceeds $ 100 million annually. (# 700, Ex. 10).

III. Parts: Counterclaim Counts 3 and 4

In these counts, CHE alleges that STK ties the sales of its parts to its service. [15]***HN23*** Section 1 of the Sherman Act prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States." *15 U.S.C. § 1* **[*72]** . When a seller ties the sale of one product to the purchase of a second product, "thereby avoid[ing] competition on the merits of the 'tied' product," he may violate *Section 1*. *Data General v. Grumman Sys. Support Corp., 36 F.3d 1147, 1178 (1st Cir. 1994)*. CHE has asserted all of its tying claims under both the per se and rule-of-reason theories; in recent years, these theories have essentially merged, rendering separate analysis unnecessary. See *Lee v. Life Ins. Co. of North Am., 23 F.3d 14, 15 (1st Cir. 1994)*; see also *PSI Repair Servs., Inc. v. Honeywell, Inc., 104 F.3d 811, 815-16 (6th Cir. 1997)*. ***HN24*** To make out a tying claim, an antitrust plaintiff must establish that

> (1) the tying and tied products are actually two distinct products; (2) there is an agreement or condition, express or implied, that establishes a tie; (3) the entity accused of tying has sufficient economic power in the market for the tying product to distort consumers' choices with respect to the tied product; and (4) the tie forecloses a substantial amount of commerce in the market for the tied product.*Id. at 1178-79*. STK has moved for summary **[*73]** judgment on Counts 3 and 4 on numerous grounds. Its principal argument is that STK parts are available from numerous sources other than STK, disproving both STK's market power and the existence of a tie.

***HN25*** "Proof of a tying arrangement generally requires evidence that the supplier's sale of the tying product is conditioned upon the unwilling purchase of the tied product from the supplier or an unwilling promise not to purchase the tied product from any other supplier." *Data General, 36 F.3d at 1180*. Where no explicit tying arrangement exists, a plaintiff may establish the existence of a tie by showing "that the supplier has actually coerced the purchase or non-purchase of another product." Id. "Whether the condition is explicit or implicit," however, courts "will not consider the anti-competitive effects of a tie to be unreasonable per se unless there is evidence that **[*74]** the supplier of the tying product has actually used its market power to impose the condition." Id.

Here, CHE has failed to raise a triable issue of fact as to the existence of a tie. No explicit tie exists, and CHE has adduced no evidence that STK "actually coerced" customers into purchasing its services by leveraging its economic power in the parts market. Ample record evidence shows that customers are able to obtain STK replacement parts from numerous non-STK sources, including CHE itself, without having to purchase STK maintenance service. Such sources include ISOs, authorized distributors, resellers, brokers, used equipment that may be salvaged for parts, and internet auction sites. (# 632, P 42). CHE's service business itself proves that customers may obtain STK parts without having to purchase STK service; instead, they may

---

[15] Although STK's microcode is sometimes treated as a "part," the parties here confine "parts" to non-microcode items.

purchase both from CHE. Indeed, CHE's own materials tell customers that "[o]utside of STK themselves [sic], CHE probably has the largest inventory of STK parts in the industry." (# 634, Ex. 32).

CHE responds that STK has often disparaged used replacement parts; CHE does not argue that used parts should be excluded from the replacement parts market, **[*75]** but instead complains that it is unfair for STK, in the context of a tying analysis, to rely upon the availability of used parts that it previously characterized as inferior. The record shows, however, that in the relevant market for STK replacement parts, new and refurbished parts are treated interchangeably. Both CHE and STK rely on used parts to maintain STK equipment. (# 738, Exs. 2-6). STK does not distinguish between used and new parts (id., Ex. 7), and CHE's expert recognized that "used and/or refurbished parts" may "serve as commercially acceptable substitutes for new parts," that such parts are available from non-STK sources, and that STK therefore faces a "limited degree of competition" in the replacement parts market. (# 704, Ex. 170, P 15; # 702, Ex. 106, P 206).

CHE next points to various STK actions-STK's buy-back program, its refusal to sell parts directly, the higher prices it charges its authorized distributors, and its packaging of parts-that it claims support a tying claim. But none of these allegations proves the existence of a tie. CHE offers no proof that STK has recaptured a significant share of the replacement parts market through its buy-back program. **[*76]** Indeed, it was CHE and other ISOs who first began salvaging used equipment; STK, which also has difficulty sourcing some replacement parts, and which observed the potential cost savings, followed their lead. (# 633, Ex. 6, at 767-70; # 634, Ex. 30, at 29). To the extent that STK marks up parts sold to authorized distributors or bundles parts, rather than selling them individually, CHE has offered no evidence that these actions force customers to obtain parts from STK in conjunction with a service agreement; instead, the evidence indicates that customers may turn to resellers, brokers, or used machines as alternative sources of supply.

Viewing the record in the light most favorable to CHE, it shows unequivocally that STK replacement parts are available from non-STK sources and that CHE therefore cannot prove the existence of a tie. STK is therefore entitled to summary judgment on Counts 3 and 4.

IV. Functional Microcode: Counterclaim Counts 5 and 6

CHE's counterclaim alleges tying of both Functional Microcode (Counts 5 and 6) and Engineering Changes (Counts 9 and 10) to STK maintenance service. CHE concedes it has no tying claim with respect to Functional Microcode that is **[*77]** initially provided to customers when they purchase an STK library. (# 667, at 5; # 670, P 52). To the extent that CHE alleges tying of Functional Microcode updates, it concedes that this claim "overlaps" with its claim as to Engineering Changes, which it defines as "upgrades, updates, and [engineering changes]." (# 618, at 1 n.2). Accordingly, STK is entitled to summary judgment on Counts 5 and 6 insofar as they are based on originally-installed Functional Microcode. To the extent that Counts 5 and 6 are based on updates, upgrades, or engineering changes, those claims are merged with Counts 9 and 10 and are addressed in Section VI, infra.

V. Maintenance Code: Counterclaim Counts 7 and 8

The parties have cross-moved for summary judgment on Counts 7 and 8 of CHE's Counterclaim, which allege an illegal tie between STK's Maintenance Code and its maintenance service. Although this claim was rejected at the preliminary injunction stage, *Storage Tech. I, 2004 U.S.*

*Dist. LEXIS 12391, 2004 WL 1497688, at *5*, the parties' arguments require additional analysis upon the summary judgment record. See *Univ. of Texas v. Camenisch, 451 U.S. 390, 395, 101 S. Ct. 1830, 68 L. Ed. 2d 175 (1981)*.

STK moves for summary **[*78]** judgment first on the ground that Maintenance Code and maintenance service are not separate products. ***HN26*** To establish the existence of two distinct products, CHE must first identify the products at issue and then demonstrate sufficient demand for the tied product separate from the tying product, such that it is "efficient" to offer the two products separately. *Data General, 36 F.3d at 1179*. Maintenance service (the "tied" product) is the provision of maintenance and repair services to customers who own STK silos. Maintenance Code, which CHE alleges is the "tying" product, "consists of the portions of the [computer] program [i.e., microcode] that diagnose malfunctions and maintain performance of [STK silos]." *Storage Tech. II, 421 F.3d at 1310*. STK does not sell Maintenance Code, nor does it license Maintenance Code to its own maintenance customers; it does, however, license Maintenance Code to customers pursuant to its Customer Self-Maintenance ("CSM") program, under which customers can self-maintain or hire an ISO for maintenance service, while receiving certain service materials. (# 737, at 8, P 21).

The record contains evidence that Maintenance **[*79]** Code is a product separate from maintenance service. As CHE points out, the existence of the Customer Self Maintenance ("CSM") program itself indicates that some customers choose not to obtain maintenance service from STK, but still seek access to STK Maintenance Code. (# 696, P 7). Cf. *Data General, 36 F.3d at 1179-80* (finding two separate products where some customers wished to license diagnostic software from the seller without purchasing support services from the seller); *Bell Atl. Business Sys. Servs. v. Hitachi Data Sys. Corp., 1995 U.S. Dist. LEXIS 15531, 1995 WL 798935, at *7 (N.D. Cal. 1995)* (citing Data General and noting that not "all products used in the course of service are inseparable from service"). Accordingly, summary judgment on this ground is denied.

STK also argues that no tie can exist because STK does not sell its Maintenance Code; if it does not sell the tying product, it cannot have conditioned the sale of the tying product upon the sale of the tied product. Courts have previously agreed with this reasoning. See id. (seller did not tie service maintenance to service items it refused to sell). And this was the basis upon which I rejected **[*80]** CHE's tying claim at the preliminary injunction stage. *Storage Tech. I, 2004 U.S. Dist. LEXIS 12391, 2004 WL 1497688, at *5*. But the summary judgment record reveals that STK does license its Maintenance Code, pursuant to the CSM program. (# 737, at 8, P 21). Such licensing constitutes a "commercial transfer" sufficient to allow CHE to argue the existence of a tie. See *Bell Atl., 1995 U.S. Dist. LEXIS 15531, 1995 WL 798935, at *7*.

Whether or not such a tie exists presents a thornier question, but one that is ultimately answered in the negative. STK does not sell or license Maintenance Code to its maintenance customers. With respect to its maintenance customers, therefore, no tie between the two products exists. STK does license Maintenance Code to its CSM customers, but those customers-by definition-do not purchase STK maintenance services; they self-maintain or hire ISOs. Cf. *Service & Training, Inc. v. Data General Corp., 963 F.2d 680, 686 (4th Cir. 1992)*. Therefore, no tie exists with respect to CSM customers. In short, STK has structured its service offerings in a manner that prevents customers from ever purchasing or licensing both the tied and tying product at the same time: Under an **[*81]** STK maintenance agreement, customers purchase the tied product, but not the tying product; under a CSM agreement, customers license the tying product, but not the tied product. In the absence of any evidence of a tie, STK is entitled to summary judgment on Counts 7 and 8.

VI. Engineering Changes/Functional Code Upgrades: Counterclaim Counts 9 and 10

The parties cross-move for summary judgment on these counts as well, which, as explained above, have been merged with Counts 5 and 6 to cover upgrades, updates, and engineering changes. STK argues it is entitled to summary judgment because CHE cannot establish either the existence of a tie or that any alleged tie would foreclose a substantial amount of commerce. [16] Because material factual disputes persist as to both of these issues, summary judgment is denied.

**[*82]** A. Existence of a Tie

STK contends that it provides engineering changes, or Functional Code upgrades ("upgrades"), to customers through a variety of means-primarily on a "time and materials" basis and through the CSM program-without requiring that they purchase STK maintenance service. It maintains that such upgrade availability defeats the existence of a tie. In support of its claim, STK cites the deposition testimony of CHE's Vice President, CHE customers, STK employees, and STK's written policies.

However, material factual disputes on this point remain. First, it is not entirely clear that STK made upgrades available on a "time and materials" basis. The record contains evidence that STK emphatically told customers that upgrades were only available through STK maintenance agreements or CSM agreements. (E.g., # 700, Ex. 40; # 702, Ex. 120, at 203). Such evidence includes statements of STK employee David Jesuale, who was in charge of upgrade policy and to whom STK employees and customers turned for clarification; Jesuale repeatedly and unequivocally emphasized that upgrades were only available through STK maintenance or CSM. (# 700, Ex. 34; # 702, Ex. 81). Cf. *Datagate, Inc. v. Hewlett-Packard Co., 60 F.3d 1421, 1426 (9th Cir. 1995)* **[*83]** (triable issue remained on tying claim where HP threatened to withhold software service if customer purchased hardware service from ISO, that software service was necessary, and that ISO prices were lower than HP's prices). As for the specific instances upon which STK claims it provided engineering changes on a "time and materials" basis, CHE has presented evidence that these occasions were anomalies concerning newly installed tape drives, not routine upgrades. (# 701, Ex. 44, at 504).

Furthermore, record evidence indicates that in late 2002 or early 2003, shortly after CHE entered the market for servicing private sector STK equipment, STK implemented changes that were intended to make the CSM program expensive and unattractive to customers, and thereby to dissuade customers from choosing ISO service over STK service. (# 701, Ex. 58-59, 62, 64-65). STK imposed a fee equal to fifty percent of the fee charged for its most expensive level of maintenance service. (Id., Ex. 60). The record indicates that both ISOs and customers viewed the fee as prohibitively expensive. (Id., Exs. 66, 68-69). Moreover, CSM customers were entitled only to a one-time upgrade; additional upgrades **[*84]** were available only if customers paid the fee again. (Id., Ex. 58). From this evidence, a reasonable jury could conclude that purchasing upgrades through the CSM program was not an economically viable option and that a tie therefore did exist. See *Amerinet, Inc. v. Xerox Corp., 972 F.2d 1483, 1500 (8th Cir. 1992)* ***HN27*** (illegal tie may be shown "if the defendant's policy makes the purchasing of the tying and tied products together the only viable economic option" (internal quotation marks omitted)); *Data General,*

---

[16] For reasons that will later become apparent, it is significant that STK does not argue-as it does in relation to Maintenance Code-that it cannot be liable for any alleged tie involving engineering changes or upgrades, because upgrades are copyrighted material. (Compare # 643, at 14, with id. at 15).

*36 F.3d at 1180* ***HN28*** (implicit tie exists where "facts and circumstances . . . as a practical matter forced the buyer into purchasing the tied product" with the tying product (internal quotation marks omitted)). Because this evidence raises material disputes as to microcode availability, summary judgment on basis of lack of a tie is inappropriate.

B. Substantial Amount of Commerce

***HN29*** Any alleged tie must foreclose a "not insubstantial" amount of commerce to be actionable under *Section 1*. *Fortner Enterprises, 394 U.S. at 501*. As noted above, if STK does indeed tie upgrades to service, the total volume of sales of maintenance service **[*85]** for STK equipment exceeds $ 100 million, which is sufficient to satisfy the requirement. STK, however, additionally argues that upgrades are not needed or generally desired by STK silo owners and thus any alleged tie does not foreclose a substantial amount of commerce. In other words, STK argues that upgrades are not really necessary for or related to the service of STK equipment and thus, even if it did condition the sale of upgrades on the purchase of service, it would not foreclose a substantial enough portion of the service market.

On this point, the record is mixed. STK has presented evidence that upgrades are necessary only "to make some new piece of hardware function," and that there are no other circumstances in which customers need a code upgrade. (# 697, at 431). It has further presented evidence that upgrades generally are not necessary for mature silo systems, such as the 4400 and 9300 series, and that CHE did not believe such upgrades would be needed in the future. (# 696, P 51). To the extent that upgrades are generally not needed by silo owners for maintenance purposes and have "no diagnostic or repair function," but are needed only to upgrade hardware, its availability **[*86]** may be relevant only in the product market, but not in the service aftermarket. See *Telecom Tech. Servs., Inc. v. Rolm Co., 388 F.3d 820, 828 (11th Cir. 2004)*. CHE has, however, presented evidence that upgrades are required for maintaining silo performance, and that it was required to obtain upgrades while servicing STK machines. (# 647, Ex. 39, at 76; # 700, Ex. 37, at 138). Because factual disputes therefore exist as to the link between upgrades and the service market, I reject STK's argument that a substantial amount of commerce in the service market cannot be foreclosed by conditioning sales of upgrades on service.

C. Market Power

STK has also filed a supplement (# 765) in which it claims that the Supreme Court's recent decision in *Illinois Tool Works Inc. v. Independent Ink, 126 S. Ct. 1281, 164 L. Ed. 2d 26 (2006)*, defeats CHE's tying claims. Illinois Tool Works held (1) that ***HN30*** in all cases involving a tying arrangement, the plaintiff must prove that the defendant has market power in the tying product, and (2) that no presumption of market power attaches to patent owners. *Id. at 1293*. Summary judgment under Illinois Tool Works is denied, **[*87]** since a jury could reasonably conclude that STK-as the sole producer of upgrades-possesses market power.

D. Conclusion

Because STK has raised no other reason why it is entitled to summary judgment on Counts 9 and 10, its motion is denied. CHE's summary judgment motion is denied on the basis of the evidence proffered by STK tending to show that upgrades may have been available to customers on a "time and materials" basis, and that any alleged tie of upgrades to service may not have foreclosed a substantial amount of commerce in the service market because upgrades are not widely necessary to silo owners.

**Counts 1, 2, 13, and 15: Section 2 of the Sherman Act**

The relevant motion is STK's Motion for Summary Judgment (# 627). Counts 1, 2, 13, and 15 of CHE's counterclaim allege violations of Section 2 of the Sherman Act, *15 U.S.C. § 2*. [17] Counts 1 and 2 allege monopolization and attempt to monopolize the market for maintenance service of STK machines. Count 13 alleges monopolization of an essential facility, specifically STK's Functional and Maintenance Code. Count 15 alleges monopolization, based on refusal to deal in microcode.

**[*88]** ***HN31*** To prove a *Section 2* violation, CHE must establish (1) "that the defendant has monopoly power in a relevant market," and (2) that the defendant has maintained or increased that power through anticompetitive conduct. *SMS Sys. Maintenance Servs., Inc. v. Digital Equip. Corp., 188 F.3d 11, 15 (1st Cir. 1999)*. With respect to attempted monopolization, the analysis is similar, *Davric Maine Corp. v. Rancourt, 216 F.3d 143, 149-50 (1st Cir. 2000)*, except that the plaintiff must show a "dangerous probability" that the defendant will achieve monopoly power, *Spectrum Sports, Inc. v. McQuillan, 506 U.S. 447, 456, 113 S. Ct. 884, 122 L. Ed. 2d 247 (1993)*.

I. Monopoly Power: Relevant Market

The parties vigorously dispute the monopoly power question and, specifically, the definition of the relevant market. STK argues that the relevant market is the market for data storage equipment ("the primary market") and that it does not possess monopoly power in that market. CHE contends that the relevant market is the STK service market, which it defines as the market "for the maintenance and repair of STK Silo Systems in the United States," and which is also referred to as the "aftermarket. **[*89]** " (Counterclaim PP 17, 117).

As an initial matter, I disagree with STK's argument that a single-brand aftermarket must be rejected out of hand. As the Supreme Court recognized in *Eastman Kodak Co. v. Image Tech. Servs., 504 U.S. 451, 481-82, 112 S. Ct. 2072, 119 L. Ed. 2d 265 (1992)*, ***HN32*** a service aftermarket may be the relevant market for *Section 2* purposes. An aftermarket is by definition a single-brand market. See *id. at 482* (from equipment owner's perspective, aftermarket is "composed of only those companies that service [STK] machines"). Whether or not the aftermarket is the relevant market thus requires analysis under Kodak and its progeny; the answer cannot be based simply upon single-brand status.

In Kodak, the Supreme Court recognized that a competitive primary equipment market might not adequately protect against anticompetitive conduct in the aftermarket. In that case, a group of ISOs that serviced Kodak copiers alleged that Kodak had monopolized the aftermarket. Kodak argued that competition in the primary equipment market necessarily checked anticompetitive conduct in the aftermarket, since higher service prices in the aftermarket would cause customers to switch brands **[*90]** in the primary market. *Id. at 466*. The Supreme Court disagreed. It found that high information costs prevented customers from comprehending the cost of services they would eventually need at the time they purchased copying equipment. *Id. at 472-73*. Furthermore, high switching costs could inhibit consumers from changing brands even if Kodak were charging supracompetitive prices in the aftermarket. *Id. at 476-77*. These factors could insulate the aftermarket from competitive pressure in the foremarket.

Kodak does not, however, mean that the aftermarket is always the relevant market. As the First Circuit emphasized in SMS, "a litigant who envisions the aftermarket as the relevant market must

---

[17] CHE has withdrawn Count 17, which alleged violation of state antitrust laws. (# 760, at 2).

advance hard evidence dissociating the competitive situation in the aftermarket from activities occurring in the primary market." *188 F.3d at 17*. In that case, the First Circuit placed the burden on the plaintiff to bring forth "evidence show[ing] that the manufacturer can exert raw power in the aftermarket without regard for commercial consequences in the foremarket," without which the court declined to deem the aftermarket **[*91]** the relevant market. Id. STK argues that CHE has failed to provide such evidence, but material factual disputes exist.

First, supracompetitive pricing in the aftermarket can indicate that the aftermarket is insulated from competition in the foremarket. See *Kodak, 504 U.S. at 477*; *SMS, 188 F.3d at 24*. CHE has presented evidence that when STK discounted its prices by seventy percent, it was still able to maintain a nearly twenty percent profit margin. (# 700, Ex. 11, at 1336). A jury could reasonably infer from this evidence that STK's usual prices were supracompetitive, thus distinguishing this case from SMS, where the "record [wa]s devoid of any evidence of supracompetitive prices." *188 F.3d at 24*. STK disputes that it engaged in supracompetitive pricing, citing an internal STK document that instructed employees to "[f]ollow[] standard pricing practices," to "negotiate an acceptable pricing scheme" with customers, to be "flexible in pricing," and even to consider "[o]ffering to meet CHE pricing." (# 703, Ex. 138). STK provides no proof that these suggested strategies were followed, but in any event, none of **[*92]** them are necessarily inconsistent with supracompetitive pricing. Supracompetitive prices need not be unilateral or fixed and thus could be consistent with negotiations and flexible pricing. STK also argues that its prices were higher because its services were better. Yet the record contains evidence that CHE's customers thought that it provided high quality, "excellent" service. (E.g., id., # 700, Ex. 6, at 237; id., Ex. 14, at 502501). Thus, the degree to which STK's supracompetitive prices may be attributed to relative quality remains an issue of dispute.

Second, courts also tend to scrutinize retroactive policy changes, since they may indicate a manufacturer's power to engage in anticompetitive conduct in the aftermarket without regard to competition in the foremarket. For example, in Kodak, the defendant had retroactively changed its policy regarding its parts. *504 U.S. at 458*. This change increased the lack of transparency suffered by consumers who had purchased the equipment without comprehending the service options that would be available to them, or the full life cycle costs of their equipment. In other words, retroactive policy changes can indicate that customers **[*93]** in the "primary market [may not be] in possession of information that sufficiently reveals the anticompetitive tendencies of a manufacturer in its aftermarket." *SMS, 188 F.3d at 19 n.3*. This concern was not present in SMS, where the disputed warranty was entirely prospective and was therefore "obvious to any purchaser in the primary market." *Id. at 19*.

CHE alleges that STK implemented a number of retroactive changes, including (1) increasing the price and changing the terms of the CSM, which effectively discouraged customers from choosing ISOs; and (2) changing its Licensed Internal Code ("LIC") process, through which ISOs obtained STK microcode upgrades. Because upgrades are necessary for proper maintenance, these restrictions negatively impacted CHE's ability to provide maintenance service. Sufficient record evidence supports these allegations.

STK denies that it actually implemented changes to the CSM program, but the record contains STK documents referring to major policy changes in the program. (E.g., # 701, Exs. 58, 59 (referring to "a major face lift" in CSM program and "new CSM program")). Indeed, STK's assertion that its pricing policies **[*94]** remained the same are directly contradicted by STK correspondence that

"highlights" certain "changes to the [CSM] program," including pricing changes. (Id., Ex. 59). STK's contention that these "changes" were not actually changes, but were merely express statements of previously implicit policies, is entirely unconvincing. Similarly, record evidence shows that STK changed the LIC process to make it harder for CHE and other ISOs to obtain microcode updates. Correspondence and testimony of an employee of Fujitsu, another ISO, indicates that until the fall of 2003, STK provided upgrades through its LIC process to customers being serviced by ISOs for a $ 50 fee. (# 701, Ex. 46; id., Ex. 47, at 97-98). At some point in the fall of 2003, however, STK altered the LIC order process, thereby preventing ISOs like CHE and Fujitsu from obtaining updates. (Id. at 104).

STK does not dispute that it changed the LIC process, but instead argues that upgrades were not necessarily required for maintaining STK silos. This contention is belied by the record, which portrays a dispute between Fujitsu and STK about microcode update availability for Exxon Mobil, an STK customer whose **[*95]** silos were being serviced by Fujitsu. See also *Section 1* discussion of engineering changes, supra. When STK refused to provide the necessary updates, Fujitsu was unable to provide the requisite service, which placed its relationship with Exxon under significant pressure. Eventually, STK provided the needed microcode, but only after Fujitsu agreed to turn over maintenance on the Exxon account to STK. (Id. at 105-06). The urgent need that Exxon and Fujitsu expressed in the fall of 2003 for a functional code upgrade undermines STK's efforts to minimize upgrade importance. (E.g., id. at 113; see also # 700, Ex. 37, at 138). STK also objects to CHE's characterization of the Fujitsu-Exxon incident; but while the Exxon incident was not "the only reason" for Fujitsu's decision to exit the service industry, it was "certainly a factor." (# 701, Ex. 47, at 319). In short, CHE has presented evidence from which a reasonable jury could conclude that STK implemented changes to its LIC process that materially impacted the ability of ISOs to obtain upgrades and thus to compete in the service aftermarket.

Market definition is a factual question. *Coastal Fuels of P.R., Inc. v. Carribean Petroleum Corp., 79 F.3d 182, 196 (1st Cir. 1996).* **[*96]** In this case, evidence of supracompetitive pricing and retroactive policy changes raises the possibility that competition in the foremarket may not have provided a sufficient check on anticompetitive conduct in the aftermarket. A reasonable jury might conclude from this evidence that this case falls more within the ambit of Kodak rather than SMS, and that the relevant market is properly defined as the service aftermarket rather than the equipment foremarket. Accordingly, the issue of monopoly power remains in dispute.

II. Anticompetitive Conduct

To make out a *Section 2* claim, CHE must also prove that STK engaged in "improper exclusionary conduct." *SMS, 188 F.3d at 25*. STK moves for summary judgment on this element, arguing that CHE cannot raise a triable issue of fact as to anticompetitive conduct. CHE's asserts numerous types of anticompetitive conduct. (Counterclaim P 100; # 668, at 5). Because a triable issue of fact persists as to at least one alleged type, summary judgment is denied.

A number of CHE's allegations concern STK's refusal to provide access to its microcode. CHE asserts that STK has violated *Section 2* by (1) tying the availability of **[*97]** microcode to its maintenance service, in part through changes to the CSM program; (2) eliminating ISO access to microcode through authorized parts distributors; and (3) eliminating ISO access to microcode through the LIC Order Form process. (# 688, at 5, 23). These allegations form a partial basis for Counterclaim Counts 1 and 2, and are the sole basis for Counts 13 and 15.

As a general matter, ***HN33*** unilateral conduct by a monopolist may be exclusionary under *Section 2*, and a monopolist's unilateral refusal to deal with its competitors may be prima facie evidence of exclusionary conduct as long as the refusal harms the competitive process. *Data General, 36 F.3d at 1182-83*. A monopolist may, however, "rebut such evidence by establishing a valid business justification for its conduct." *Id. at 1183*. Relying on Data General, STK argues that its refusal to provide microcode is justified because its microcode is copyrighted. In that case, the First Circuit dealt with the tension between an intellectual property owner's right to exclude others from its property, and the potentially anticompetitive effect of unilateral refusal to deal. After analyzing the **[*98]** historical relationship between the intellectual property laws and antitrust liability, the First Circuit held that ***HN34*** "while exclusionary conduct can include a monopolist's unilateral refusal to license a copyright, an author's desire to exclude others from use of its copyrighted work is a presumptively valid business justification for any immediate harm to consumers." *Id. at 1187*. The presumption may be rebutted, but only in "rare cases." *Id. at 1187 n.64*.

Under Data General, STK argues that its refusal to provide access to copyrighted microcode cannot form the basis of *Section 2* liability, and it is correct with respect to Maintenance Code and Functional Code. CHE argues that STK is not entitled to the Data General presumption, but it has failed to present evidence that this is one of those cases "in which imposing antitrust liability is unlikely to frustrate the objectives of the Copyright Act." Id. CHE has presented no evidence, for example, that STK's copyright was unlawfully acquired. Cf. *id. at 1186* (noting that patent exception to antitrust laws does not apply where patent unlawfully acquired); *CSU, L.L.C. v. Xerox Corp. (In re Independent Serv. Orgs. Antitrust Litig.) , 203 F.3d 1322, 1329 (Fed. Cir. 2000)* **[*99]** (following Data General and noting that "in the absence of any evidence that the copyrights were obtained by unlawful means," defendant's refusal to sell or license copyrighted works was lawful). CHE notes that the Federal Circuit has indicated that the presumption may be overcome with evidence of an illegal tie. See *id. at 1327*. But I have already rejected CHE's tying claims with respect to Maintenance Code and Functional Code. CHE is, in short, unable to win the "uphill battle" that the *Data General* presumption creates. Accordingly, STK's motion for summary judgment is granted insofar as CHE's *Section 2* claims are based upon STK's refusal to license or provide access to Maintenance Code and Functional Code.

Engineering changes, or upgrades, are another matter. First, the copyright status of engineering changes is unclear. STK has repeatedly asserted-with respect to both *Sections 1* and *2*-that Maintenance Code and Functional Code, or microcode, is copyrighted. Thus, it expressly disputes *Section 1* liability with respect to Maintenance Code on the basis of its copyright. (# 643, at 13; # 735, at 8). But its *Section 1* briefs never raise a copyright argument **[*100]** with respect to upgrades or engineering changes. Similarly, in its response to CHE's *Section 1* motion, STK raises a copyright defense only for Maintenance Code, but mentions no such defense in relation to upgrades. (# 689, at 20). Instead, STK's *Section 1* defense for upgrades is throughout based upon (1) the availability of upgrades, and (2) the lack of market foreclosure. With respect to CHE's *Section 2* claims, the same is true. Its papers do not mention the copyright status of engineering changes or upgrades.

STK documents provide little clarification. For example, CP-8-5-3 is an STK document that describes how customers who are not under an STK service agreement will be treated, specifically, what access they will be given to STK's "support services, spare parts, tools and engineering changes." (# 647, Ex. 33, at STK 242716). The document emphasizes the proprietary status of

"Maintenance software," stating that it is "the sole property" of STK and that it may be licensed under the CSM program. (Id. at STK 242717). It likewise emphasizes the proprietary status of "Licensed internal code," which it notes is copyrighted. (Id.). No proprietary language is used, however, in **[*101]** describing engineering changes. While STK's silence does not mean that engineering changes and code upgrades are not copyrighted, I am hesitant to automatically conclude that they are, especially since STK has repeatedly emphasized the copyright status of Maintenance Code. It is certainly possible that STK has not copyrighted engineering changes, while it has copyrighted its microcode. In Bell Atlantic, the defendant Hitachi also produced storage systems. *1995 U.S. Dist. LEXIS 15531, 1995 WL 798935, at *1*. It copyrighted its maintenance documentation and diagnostic software, but did not copyright its microcode or engineering change notices. *1995 U.S. Dist. LEXIS 15531 at *1, 7*. In the absence of any affirmative evidence that STK's upgrades and engineering changes are copyrighted, I am disinclined to apply the *Data General* presumption at this stage of the case.

Even assuming that upgrades are copyrighted, it is still not clear that the *Data General* presumption applies. The presumption, after all, is not irrebuttable. See*36 F.3d at 1187 n.64* (expressly declining to adopt irrebuttable presumption). As mentioned earlier, the First Circuit explicitly noted that unilateral refusals to deal **[*102]** in copyrighted material could constitute exclusionary conduct in some circumstances. The Federal Circuit has further elaborated that a copyright holder cannot use its lawful right to exclude "with impunity to extend power in the marketplace beyond what Congress intended." *In re CSU, 203 F.3d at 1328*. Courts have enunciated few principles elucidating the boundary between lawful and unlawful conduct. But, as CHE points out, at least one court has found that the Data General presumption may not apply where there is an "indication of illegal tying." *Id. at 1327*. As explained above, CHE has presented evidence supporting a claim of illegal tying between upgrades and service. This evidence is therefore relevant not only because it precludes summary judgment on CHE's tying claim, but also because it raises the possibility that STK extended its statutory power beyond the permissible boundary established by its copyright and thereby relinquished its entitlement to the Data General presumption. [18]

**[*103]** To be sure, tension in the case law exists. The Federal Circuit has found that evidence of an illegal tie may rebut the Data General presumption. Therefore, if STK illegally tied upgrades to service, it may have exceeded the scope of any copyright it possesses with respect to upgrades. On the other hand, some courts have held that the right to exclude from copyrighted or patented parts or software that are necessary for service may include within its scope the right to exclude from the service aftermarket. See, e.g., *Telecomm Tech. Servs., Inc. v. Siemens Rolm Comms., Inc., 150 F. Supp. 2d 1365, 1369 (N.D. Ga. 2000)*, aff'd on different grounds, *388 F.3d 820 (11th Cir. 2004)* ("[A]s a matter of law the statutory scope of a patent extends beyond the original equipment market into the service market where service requires use of patented parts."). Nevertheless, at this stage in the litigation, I am unwilling to eliminate the possibility that an illegal tie between upgrades and service, if proved, might also be relevant to the validity of STK's business justification, by virtue of its copyright, for engaging in otherwise exclusionary conduct in the **[*104]** service market. At trial, STK may well disprove the existence of any tie between upgrades and service and thereby foreclose this line of argument. But CHE's proffered evidence is sufficient to avoid summary judgment.

---

[18] As a general matter, an illegal tie can be evidence of exclusionary conduct under *Section 2*. Heatransfer Corp. v. Volkswagenwerk, A.G., 553 F.2d 964, 981 (5th Cir. 1977).

Accordingly, summary judgment on Counts 1, 2, 13, and 15 is denied, except to the extent that such counts are based upon STK's refusal to license or provide access to microcode, summary judgment is allowed. STK's additional arguments under Counts 13 and 15 concerning the trade-secret status of Event Messages are therefore moot, since Event Messages are part of Maintenance Code. In light of these rulings, I need not consider CHE's lengthy catalogue of other anti-competitive conduct.

**Counts 18, 21, 23, and 25: Unfair Competition and Tort Claims**

STK moves for summary judgment on Counts 18, 21, and 23 of CHE's Counterclaim (# 625), and, somewhat repetitively, for summary judgment on Counts 23 and 25 (# 624). [19]

**[*105]** I. Counts 18 and 23: Unfair Competition

Count 18 alleges unfair competition based upon harm to competition in the service market. (Counterclaim PP 212-17). Count 23 alleges common law unfair competition, "under the common law and statutes of the various states where STK and CHE have business relationships including the common law and statutes of Missouri and Massachusetts." (Id. P 246). They are based upon STK's allegedly "false, deceptive or misleading and unfair descriptions of fact and/or misleading or deceptive representations of fact in connection with the sale of its goods and/or services about CHE and its services." (Id. P 247). STK challenges the sufficiency of CHE's claims on several grounds.

A preliminary matter concerns choice of law. CHE contends that Missouri law governs. STK apparently believes that Massachusetts law applies, but, more importantly, believes that choice of law is irrelevant "because the outcome . . . is the same regardless of choice of law." (# 732, at 2). I will therefore apply Missouri law. [20] In *Fred Wehrenberg Circuit of Theatres, Inc. v. Moviefone, Inc., 73 F. Supp. 2d 1044, 1047-48 (E.D. Mo. 1999)*, the federal **[*106]** court thoroughly canvassed the history of Missouri's common law of unfair competition and found that ***HN35*** "[i]n Missouri, common law unfair competition encompasse[s] several categories of legal claims, including palming or passing off, trademark violations, and misappropriation." Count 18, which alleges unfair competition based upon "monopolistic anticompetitive activity," does not fall within these categories. Notably, ***HN36*** Missouri is not one of the states to have adopted *Restatement (Third) of Unfair Competition § 1*, which ostensibly extends common law unfair competition to include antitrust violations. Indeed, to the extent that Missouri courts have considered the relationship between antitrust violations and common law unfair competition, they have declined to rule that the former may be actionable as the latter. For example, in *Essex v. Getty Oil Co., 661 S.W.2d 544, 555 (Mo. App. 1983)*, the court found that a claim concerning anticompetitive price discrimination did not fall within the scope of common law unfair competition. While recognizing that "any scheme that misappropriates the property of another may lie within the protection **[*107]** of the doctrine," the court found that conduct that allegedly "limit[ed] trade or competition" did not. *Id. at 554-55*. Accordingly, STK is entitled to summary judgment on Count 18, which claims common law unfair competition based upon harm to competition.

Count 23 alleges common law unfair competition based upon "false, deceptive or misleading and unfair descriptions . . . and/or . . . representations of fact . . . about CHE and its services."

---

[19] These motions also address Counts 22, 26, and 28, which have either been dismissed or withdrawn. (# 760, at 2).

[20] See also note 11, supra.

(Counterclaim P 247). CHE has asserted that STK made many deceptive or unfair statements about it to customers, but has not alleged facts falling within the scope of common law unfair competition in Missouri. ***HN37*** Deceptive statements are actionable under Missouri law when they are intended to "trade on another's reputation," or misappropriates the property of another while using his own name. CHE has not accused STK of trading on CHE's reputation, either by palming off STK goods as CHE property, or by misappropriating **[*108]** CHE property and associating it with STK's name. Perhaps recognizing this weakness, CHE now claims that STK misappropriated CHE's proprietary tools, namely, LEM and ELEM, and that such misappropriation constitutes unfair competition. (# 661, at 5). This claim is completely different from what was pled in Count 23, and in any event is insufficient. Even if STK misappropriated CHE's property, such misappropriation-while it might theoretically support a trade secret claim-would not constitute common law unfair competition, unless STK passed that property off as its own. Accordingly, STK is entitled to summary judgment on Count 23 as well.

II. Counts 21 and 25: Tortious Interference with Prospective Economic Advantage and with Contract

***HN38*** "Tortious interference with a contract or business expectancy requires proof of: (1) a contract or valid business expectancy; (2) defendant's knowledge of the contract or relationship; (3) a breach induced or caused by defendant's intentional interference; (4) absence of justification; and (5) damages." *Hensen v. Truman Medical Center, Inc., 62 S.W.3d 549, 553 (Mo. App. 2001)*. CHE cites five examples where STK allegedly interfered **[*109]** with a contract or valid business expectancy. STK challenges the sufficiency of the evidence in each case.

A. El Paso

CHE had a maintenance agreement with El Paso Corporation and claims that STK tortiously interfered with that contract by (1) sending threatening letters about the preliminary injunction, which was at that time in place, (2) threatening to bring litigation against El Paso litigation, and (3) unreasonably delaying its provision of microcode, thereby causing CHE to fall into disfavor of El Paso. CHE's allegations, however, lack support.

First, CHE has offered no evidence that any allegedly tortious conduct caused El Paso to terminate its relationship with CHE. CHE cites the deposition testimony of Richard Rutkoski, the IBM liaison, but Rutkoski actually testified that he did not know why El Paso terminated its CHE relationship. He specifically denied knowing whether the preliminary injunction contributed to El Paso's decision and even expressed doubt that its decision was based on lack of microcode availability through CHE. (# 734, Ex. 42, at 411-13). CHE also cites the testimony of Chris Carrier, a CHE employee, who states that he heard from someone at IBM, who **[*110]** heard from someone at El Paso, that STK had threatened El Paso with litigation. (# 703, Ex. 151, at 75). This statement, which concerns at least two levels of hearsay, is inadmissible insofar as it is offered for the purpose of proving that STK actually made such statements to El Paso. *Noviello v. City of Boston, 398 F.3d 76, 85 (1st Cir. 2005)*. In the absence of any evidence of a causal link between STK's conduct and El Paso's termination of its CHE contract, STK is entitled to summary judgment.

B. AT&T

CHE claims that STK harmed a prospective business relationship with AT&T by delaying its provision of microcode. AT&T was a customer serviced by CHE, as a subcontractor for IBM. CHE

has proffered evidence, primarily the testimony of Patti Summey, the IBM liaison, that STK refused to provide microcode to either IBM or CHE, and as a result, IBM decided to move the AT&T account back to STK for service. (# 646, Ex. 13, at 185). STK counters with evidence that microcode was available to AT&T directly and that IBM was aware of this option. (# 734, Exs. 41-42, 50-51). There is no evidence that AT&T ever made a direct request, and the IBM employees who handled the issue **[*111]** were unaware of such a request. (Id., Exs. 50-51). It is thus entirely possible that AT&T never received the necessary microcode because STK never received a request it was willing to honor. In any event, there is no evidence that STK would have refused to provide the microcode to AT&T, even knowing it was under a CHE agreement, had AT&T made a request. CHE cannot sustain a tortious interference claim where it lacks affirmative evidence that STK refused altogether to provide microcode to AT&T.

C. Bureau of Public Debt ("BPD")

STK argues that CHE cannot argue tortious interference with its BDP account because CHE never lost that account. CHE concedes that it "managed to hang on to the BDP account," but complains that it suffered "considerable damages," in the amount of $ 38,000, because it had to buy tape units that STK would not provide. (# 661, at 15; # 662, PP 160-62). In the absence of any evidence that BDP breached its agreement with CHE as a result of STK's conduct, or that CHE lost the economic advantage of a relationship with BDP, these allegations cannot support a tortious interference claim.

D. American Express

CHE contends that STK tortiously interfered with **[*112]** its American Express account by informing American Express of the preliminary injunction then in effect. The email in question describes this court's preliminary injunction decision and includes certain quoted language. It further encourages customers to ascertain the legality of CHE's maintenance practices and to "avoid participating" in any infringement, "to avoid any liability on the part of your company." (# 703, Ex. 160). This email cannot be the basis of tort liability. Under the Noerr-Pennington doctrine, ***HN39*** "acts incidental to protected litigation-acts that are 'reasonably and normally attendant upon protected litigation'-are entitled to immunity to the same extent as the related litigation." *Matsushita Elecs. Corp. v. Loral Corp., 974 F. Supp. 345, 359 (S.D.N.Y. 1997)*. Such acts include "sending letters threatening court action." Id. As the Fifth Circuit has noted, "[t]he litigator should not be protected only when he strikes without warning." *Coastal States Marketing, Inc. v. Hunt, 694 F.2d 1358, 1367 (5th Cir. 1983)*. Indeed, "[i]f litigation is in good faith, a token of that sincerity is a warning that it will be commenced and a **[*113]** possible effort to compromise the dispute." Id. Therefore, in the absence of any evidence that STK has engaged in sham litigation, [21]Noerr-Pennington immunity protects STK from liability on the basis of this communication.

E. Allmerica and Huntington National Bank

Finally, CHE asserts that STK interfered with its contracts with Allmerica and Huntington National Bank by disconnecting ELEM at those sites and by disparaging CHE. Even if STK did so, CHE has failed to adduce any evidence that such conduct caused either Allmerica or Huntington to end their relationships with CHE. On the contrary, the record contains a letter

[21] Indeed, the preliminary injunction decision in this court, as well as the split decisions issued by the Federal Circuit on appeal, underscore the seriousness, if not the ultimate success, of STK's claims.

stating that Allmerica decided to terminate its CHE relationship because it "believe[d] that it is in Allmerica's best interest long term to have our equipment serviced by **[*114]** the original manufacturer." (# 734, Ex. 45). CHE has presented no evidence indicating that Allmerica's decision was based on either the temporary disconnection of ELEM, or any disparaging comments STK allegedly made about CHE. Indeed, Allmerica's letter expressly states that "CHE's performance over the past two years has been satisfactory," that the relationship has been "positive," and that CHE consultants have been "responsive, professional and flexible." (Id.). As for Huntington, CHE has similarly presented no evidence as to the reasons for its decision. When asked whether the ELEM disconnection had anything to do with Huntington's decision to terminate, David York himself stated that he "would be speculating as to-if that was part of the process or not." (# 703, Ex. 152, at 217-18). In addition, here-as with the El Paso account-the only evidence of STK making disparaging comments are vague, hearsay statements offered by Christopher Carrier. Such evidence cannot support a tortious interference claim.

F. Conclusion

CHE has not supported its allegations as to these five incidents, and has proffered no other evidence to make out a tortious interference claim. Accordingly, **[*115]** STK is entitled to summary judgment on Counts 21 and 25 of CHE's counterclaim.

***Other Motions***

# 461: STK's Motion to Strike

STK has moved to strike the expert opinions of David York, or in the alternative to compel their production. ***HN40*** *Fed. R. Civ. P. 26(a)(2)(B)* requires that an expert report be produced "with respect to a witness who is retained or specially employed to provide expert testimony in the case or whose duties as an employee of the party regularly involve giving expert testimony." There is no dispute that York's duties as an employee of CHE do not include regularly giving testimony. STK, however, contends that York, who will unquestionably be testifying as a fact witness, may also be considered an expert "retained or specially employed to provide expert testimony." As the cases cited by STK explain, ***HN41*** to require employee experts to provide written reports "is entirely consistent with the spirit of [the Rule]," since it "will undoubtedly serve to minimize the elements of surprise." *3M v. Signtech USA, 177 F.R.D. 459, 461 (D. Minn. 1998)*; accord *Kw Plastics v. United States Can Co., 199 F.R.D. 687, 690 (N.D. Ala. 2000).* **[*116]** To the extent that York will be testifying as a traditional expert, in matters involving scientific, technical, or specialized knowledge, STK is entitled to a report disclosing his opinions.

CHE notes that the cases cited by STK are distinguishable, since in those cases, the court found that the witnesses should be subject to expert disclosure requirements in part because the witnesses were not hybrid witnesses. However, the principles underlying both these cases as well as the disclosure rules are clearly applicable here. ***HN42*** Testimony that is expert testimony should not "evade the expert witness disclosure requirements set forth in *Fed. R. Civ. P. 26*," simply because the testimony is proffered through a fact witness. *Fed. R. Evid.701*, Advisory Committee note (2000). Indeed, the Advisory Committee has emphasized that the key distinction in managing expert testimony is not between expert and lay witnesses, "but rather between expert and lay testimony." Id. Thus, "any part of a witness' testimony that is based upon scientific, technical, or other specialized knowledge . . . is governed by . . . the corresponding **[*117]** disclosure requirements of the Civil . . . Rules." Id. CHE also argues that STK cannot be unaware

of York's opinions because they have already extensively deposed him and have clearly scoured that testimony in preparing its various motions. I am inclined to agree that the risk of unfair surprise is relatively low in this case, given STK's considerable familiarity with Mr. York. Nevertheless, in an effort to streamline what will inevitably be contentious questioning at trial, I conclude that STK is entitled to an expert report on York's opinions, but only to the limited extent that his testimony will be based upon "scientific, technical, or other specialized knowledge." CHE shall therefore produce within twenty days a report limited accordingly. The motion is denied to the extent it seeks exclusion of York's testimony, but allowed to the extent that it seeks production of his opinions.

# 584: STK's Motion to Strike

STK also moves to strike new expert opinions allegedly espoused in CHE's expert's rebuttal reports. To the extent that the disputed material concerns the '569 Patent, the motion is denied as moot, as I have already granted CHE summary judgment on that patent **[*118]** for unrelated reasons. To the extent that the disputed material concerns the doctrine of implied license in relation to the '777 Patent, the motion is denied as moot because I have rejected CHE's implied license doctrine on the merits.

***Conclusion***

Rulings on the parties' pending motions are summarized below. Counsel are requested to forego the customary motions for reconsideration and/or clarification unless there is a sound legal basis for invoking such.

PDP's Motion to Dismiss (# 310) is denied.

STK's Motion to Dismiss (# 338) is denied as moot.

STK's Motion to Strike (# 461) is allowed in part and denied in part.

STK's Motion to Strike (# 584) is denied as moot.

CHE's Motion for Joinder (# 608) is allowed.

PDP's Motion for Partial Summary Judgment (# 609), in which York and CHE join as to Count 2 (## 608, 614), is allowed as to Counts 1 and 2. With respect to Count 9, it is allowed except as to inducement of infringement of the '777 Patent, as to which it is denied.

CHE's Motion for Partial Summary Judgment (# 616), joined by York (# 614), is allowed as to the '569 Patent and denied as to the '777 Patent.

CHE's Motion for Partial **[*119]** Summary Judgment (# 617), joined by York (# 614), is denied as moot.

CHE's Motion for Partial Summary Judgment (# 618) is denied.

CHE's Motion for Partial Summary Judgment (# 619) is allowed as to Counts 5 and 10.

STK's Motion to Dismiss (# 622) is denied as moot.

STK's Motion for Summary Judgment (# 623) is denied.

STK's Motion for Summary Judgment (# 624) is allowed.

STK's Motion for Summary Judgment (# 625) is allowed.

STK's Motion for Summary Judgment (# 626) is allowed as to Counterclaim Counts 3, 4, 5, 6, 7 and 8, and denied as to Counts 9 and 10.

STK's Motion for Summary Judgment (# 627) is allowed in part and denied in part.

STK's Motion to Strike (# 630) is denied.

York's and PDP's Supplemental Motion for Summary Judgment (# 764) is allowed as to Counts 1, 2, and 8, denied as to Count 3, and denied as moot as to Count 4.

CHE's Supplemental Motion for Summary Judgment (# 767) is allowed as to Counts 5 and 10; denied as to Counts 3 and 6, and denied as moot as to Count 4.

CHE's Supplemental Motion for Summary Judgment (# 772) is allowed.

STK's Request for Oral Argument (# 787) is denied as moot.

June 28, 2006

**[*120]** DATE

/s/ Rya W. Zobel

UNITED STATES DISTRICT JUDGE

EXHIBIT 287

LexisNexis®

Caution
As of: August 12, 2014 9:17 AM EDT

**Story Parchment Co. v. Paterson Parchment Paper Co.**
Supreme Court of the United States
January 19, 20, 1931, Argued ; February 24, 1931, Decided
No. 57

**Reporter:** 282 U.S. 555; 51 S. Ct. 248; 75 L. Ed. 544; 1931 U.S. LEXIS 27
STORY PARCHMENT COMPANY v. PATERSON PARCHMENT PAPER COMPANY ET AL.

**Prior History:** CERTIORARI TO THE CIRCUIT COURT OF APPEALS FOR THE FIRST CIRCUIT.

*CERTIORARI, 281 U.S. 711*, to review a judgment of the Circuit Court of Appeals which reversed a judgment for damages recovered by the present petitioner, in an action under the Sherman Anti-Trust Act.

**Disposition:** *37 F.2d 537*, reversed.

**Core Terms**

damages, prices, estimate, probable, cases, injured party, speculation, conspiracy, district court, unlawful act, depreciation, wrongdoer, measured, plant

**LexisNexis® Headnotes**

Antitrust & Trade Law > ... > Private Actions > Remedies > General Overview
Civil Procedure > Remedies > Damages > General Overview
Contracts Law > ... > Types of Damages > Compensatory Damages > General Overview

***HN1*** The rule which precludes the recovery of uncertain damages applies to such as are not the certain result of the wrong, not to those damages which are definitely attributable to the wrong and only uncertain in respect of their amount. The general rule is, that all damages resulting necessarily and immediately and directly from the breach are recoverable, and not those that are contingent and uncertain. The latter description embraces such only as are not the certain result of the breach, and does not embrace such as are the certain result, but uncertain in amount.

Civil Procedure > Remedies > Damages > General Overview
Torts > Remedies > Damages > General Overview

***HN2*** Where the tort itself is of such a nature as to preclude the ascertainment of the amount of damages with certainty, it would be a perversion of fundamental principles of justice to deny all relief to the injured person, and thereby relieve the wrongdoer from making any amend for his acts. In such case, while the damages may not be determined by mere speculation or guess, it will be enough if the evidence show the extent of the damages as a matter of just and reasonable

inference, although the result be only approximate. The wrongdoer is not entitled to complain that they cannot be measured with the exactness and precision that would be possible if the case, which he alone is responsible for making, were otherwise. The risk of the uncertainty should be thrown upon the wrongdoer instead of upon the injured party.

Antitrust & Trade Law > ... > Private Actions > Remedies > General Overview

Civil Procedure > Trials > Jury Trials > Province of Court & Jury

Civil Procedure > Remedies > Damages > General Overview

***HN3*** Juries are allowed to act upon probable and inferential, as well as direct and positive proof. And when, from the nature of the case, the amount of the damages cannot be estimated with certainty, or only a part of them can be so estimated, the court can see no objection to placing before the jury all the facts and circumstances of the case, having any tendency to show damages, or their probable amount; so as to enable them to make the most intelligible and probable estimate which the nature of the case will permit.

Antitrust & Trade Law > ... > Private Actions > Remedies > General Overview

Civil Procedure > Trials > Jury Trials > Province of Court & Jury

***HN4*** Whether the unlawful acts of respondents or conditions apart from them constitute the proximate cause of a depreciation in value is a question for the jury to be determined as a fact, in view of the circumstances of fact attending it. And a finding of the jury upon that question must be allowed to stand unless all reasonable men, exercising an unprejudiced judgment, would draw an opposite conclusion from the facts.

**Lawyers' Edition Display**

**Headnotes**

APPEAL, §1262 > questions reviewable -- respondent's failure to seek review. -- > Headnote:

***LEdHN[1]*** [1]

Failure of respondent to apply for certiorari does not preclude the Supreme Court from considering whether the decree of the court below may be supported upon a ground rejected by such court.

TRIAL, §311 > verdict -- effect as establishing fact necessary to recovery. -- > Headnote:

***LEdHN[2]*** [2]

The verdict of the jury and judgment rendered thereon by the trial court in favor of plaintiff in an action for damages under the Sherman Anti-trust Act have the effect of a finding that there was a conspiracy or combination to monopolize interstate trade.

DAMAGES, §159 > elements -- conspiracy in restraint of trade -- loss of profits. -- > Headnote:

***LEdHN[3]*** [3]

Damages recoverable against persons who have combined and conspired, in violation of the Sherman Anti-trust Act, to monopolize interstate trade by driving plaintiff as a competitor out of the field, may properly include the difference between the amounts actually realized by plaintiff

from sales during a price war and what would have been realized by it from sales at reasonable prices, where the evidence is such as to warrant the jury in finding that the price cutting and the resulting lower prices were directly attributable to the wrongful combination.

EVIDENCE, §958 > sufficiency -- amount of damages. -- > Headnote:

***LEdHN[4]*** [4]

There is a clear distinction between the measure of proof necessary to establish the fact that plaintiff has sustained some damage and the measure of proof necessary to enable the jury to fix the amount.

DAMAGES, §1 > uncertainty as precluding recovery. -- > Headnote:

***LEdHN[5]*** [5]

The rule which precludes the recovery of uncertain damages applies to such as are not the certain result of the wrong, not to those damages which are definitely attributable to the wrong, and only uncertain in respect of their amount.

EVIDENCE, §958 > sufficiency -- damages not ascertainable with certainty. -- > Headnote:

***LEdHN[6]*** [6]

Where a tort is of such a nature as to preclude the ascertainment of the amount of damages with certainty, it is enough if the evidence show the extent of the damages as a matter of just and reasonable inference, although the result be only approximate.

APPEAL, §1456 > review of verdict. -- > Headnote:

***LEdHN[7]*** [7]

The verdict of a jury for plaintiff in an action under the Sherman Anti-trust Act, in which damages are claimed for the depreciation in value of plaintiff's plant when it was forced out of business as a result of the alleged conspiracy, conclusively establishes, so far as the appellate court is concerned, that the failure of plaintiff's enterprise was due to the unlawful acts of the defendants rather than to lack of capital and inefficient management, unless all reasonable men, exercising an unprejudiced judgment, would draw an opposite conclusion from the facts.

EVIDENCE, §958 > sufficiency -- damages caused by unlawful combination. -- > Headnote:

***LEdHN[8]*** [8]

A jury in an action under the Sherman Anti-trust Act for damages for a conspiracy in restraint of trade, as a result of which plaintiff was forced out of business, are warranted in awarding damages based upon the depreciation in value of plaintiff's parchment paper plant where there was evidence that the plant had cost $ 235,000, of which $ 90,000 had been used to purchase and install a parchmentizing machine, and plaintiff's treasurer estimated the market value of the plant after it had been closed down at $ 75,000.

TRIAL, §46 > questions for jury -- credit to be given to testimony. -- > Headnote:

***LEdHN[9]*** [9]

It is for the jury to determine the weight and credit to be given to testimony of an interested witness, not an expert, as to the extent of depreciation in the value of a manufacturing plant through failure of the enterprise, claimed to have resulted from an unlawful combination in restraint of trade.

CERTIORARI, §19 > to circuit court of appeals -- determination. -- > Headnote:

***LEdHN[10]*** [10]

On writ of certiorari to review a judgment of a circuit court of appeals, the entire record is before the Supreme Court, with power to review the action of the circuit court of appeals and direct such disposition as that court might have made of it upon the appeal from the district court.

**Syllabus**

1. On review by certiorari, respondents, without necessity of a cross-petition, may invoke as an additional ground for sustaining the judgment of the lower court a ground which that court had found against them. P. 560.

2. In an action under the Sherman Anti-Trust Act, on an issue as to whether there was evidence of a conspiracy or combination to monopolize interstate trade, this Court, upon examination of the record, finds evidence sufficient to preclude interference with concurrent findings of courts below. P. 560.

3. Evidence held sufficient to show that petitioner in an action for damages under Sherman Anti-Trust Act was injured in its business and property as result of respondents' unlawful combination. P. 560.

4. Assumption indulged by the appellate court, that respondents' acts would have been the same if they had been acting independently of one another, rejected as unsound, in light of evidence and instruction warranting finding by jury that price-cutting and resulting lower prices were directly attributable to unlawful combination. P. 561.

5. Characterization of verdict under Sherman Act, which included damages measured by difference between amounts actually realized by petitioner and what would have been realized by it from sales at reasonable prices except for unlawful acts of respondents, as based upon mere speculation and conjecture, *held* unwarranted. P. 562.

6. The rule which precludes the recovery of uncertain damages applies to such as are not the certain result of the wrong, not to those damages which are definitely attributable to the wrong and only uncertain in respect of their amount. P. 562.

7. Where the tort itself is of such a nature as to preclude the ascertainment of the amount of damages with certainty, it is enough if the evidence show the extent of the damages as a matter of just and reasonable inference, although the result be only approximate. The wrong-doer is not entitled to complain that they cannot be measured with the exactness and precision that would be possible if the case, which he alone is responsible for making, were otherwise. P. 563.

8. Question whether acts of respondents in violation of Sherman Act or conditions apart from them constituted the proximate cause of depreciation in value of petitioner's property, *held*, upon evidence in record, for the jury. P. 566.

9. Finding of jury on question of proximate cause must be allowed to stand unless all reasonable men, exercising unprejudiced judgment, would draw an opposite conclusion from the facts. P. 566.

10. Evidence as to extent to which value of petitioner's property was diminished by acts of respondents in violation of Sherman Act *held* sufficiently certain and definite to support verdict of jury. P. 567.

11. On certiorari to review a judgment of the Circuit Court of Appeals, the entire record is before this Court with power to review the action of the appellate court and direct such disposition of the case as that court might have made of it upon the appeal from the District Court; accordingly, assignments of error made on the appeal from the District Court, which were not considered below, may be examined and disposed of here. P. 567.

**Counsel:** Messrs. Isadore Levin and Edward O. Proctor, with whom Mr. Edward C. Park was on the brief, for petitioner.

Damage may be caused by acts pursuant to an unlawful conspiracy, even though the consequences of such acts are no different from those which might or would have occurred in the absence of a conspiracy.

It was for the jury to determine whether the conditions existing in the trade were "natural conditions," or were conditions intentionally created in order to destroy the plaintiff. They were not bound to assume that, if it were certain that in the absence of a conspiracy similar conditions would have prevailed, the actual conditions were "natural conditions," for which the defendants would be in no wise responsible. Nor had the court below the right to assume as a matter of judicial knowledge that, in the absence of a conspiracy, conditions in the trade would have been substantially similar to those actually created by the conspirators.

The evidence was sufficient to enable the jury to ascertain the amount of the plaintiff's damages with reasonable certainty. *Eastman Kodak Co. v. Southern Photo Materials Co., 273 U.S. 359, 379*.

*The plaintiff was compelled to sell its product at reduced prices, and it was for the jury to determine whether those prices were below "the market or fair price . . . under natural conditions had the combination been out of the way." Straus v. Victor Talking Machine Co., 297 Fed. 791; Linen Thread Co. v. Shaw, 9 F.2d 17, 19.*

*"Going value" may, of course, be one element of damages. Des Moines Gas Co. v. Des Moines, 238 U.S. 153, 165; McCardle v. Indianapolis Water Co., 272 U.S. 400, 414.*

*The probable earning capacity of the plant is one of the factors for the basis of a judgment as to value. Minnesota Rate Cases, 230 U.S. 352, 434; Monongahela Navigation Co. v. United States, 148 U.S. 312, 328.*

*Mere difficulty in ascertaining the amount of damages will not bar a recovery. If there is difficulty, it is not greater than exists in many other cases. Rankin v. Associated Bill Posters, 42 F.2d 152, 155; Pennsylvania Sugar Refining Co. v. American Sugar Co., 166 Fed. 254, 260; Barrett Co. v. Panther Rubber Mfg. Co., 24 F.2d 329, 337; Hyer v. Richmond Traction Co., 168 U.S. 471, 483.*

The plaintiff was at least entitled to recover nominal damages and its costs. United States v. Mock, 149 U.S. 273. Distinguishing: Keogh v. Chicago & N. W. R. Co., 260 U.S. 156.

*The Circuit Court of Appeals had no power to order judgment for the defendants below.* Slocum v. New York Life Ins. Co., 228 U.S. 364.

*Mr. Edward F. McClennen, with whom Mr. Joseph M. Dohan was on the brief, for respondents.*

*It is not enough to show that the defendants did wrong. It must appear that the injury suffered by the plaintiff was caused by that wrong.* Atchison, T. & S. F. Ry. Co. v. Toops, 281 U.S. 351, 354, 357; Jack v. Armour, 291 Fed. 741, 745.

*The plaintiff has suffered the consequences of attempting to enter an overcrowded industry with insufficient capital. If it was injured by a reduction of prices, this was due to its own reduction of prices and not to any combination of the defendants. There is no evidence that the plaintiff, in the effort to get trade or meet competition, would not have reduced prices just as much as it did reduce them, even if the defendants had not combined; nor that if it had not reduced prices it would have succeeded in business.*

*There is no evidence as to the amount of goods the plaintiff would have sold if the plaintiff had not reduced its prices.*

*Damages resulting from the defendants' unlawful acts and in an amount susceptible of expression in figures proved by facts from which their existence is logically and legally inferable and not supplied by conjecture, is an essential element of a cause of private action under the* Anti-Trust Acts. Keogh v. Chicago & N. W. R. Co., 260 U.S. 156, 165, *semble;* American Sea Green Slate Co. v. O'Halloran, 229 Fed. 77, 80.

*What larger sum the plaintiff would have made during the time it was in business, if conditions had been different from what they were, is too speculative to warrant a recovery.* Keogh v. Chicago & N. W. R. Co., supra; American Sea Green Slate Co. v. O'Halloran, supra; Sussex Land & Live Stock Co. v. Midwest Refining Co., 276 Fed. 932; Chicago Life Ins. Co. v. Tiernan, 263 Fed. 325; McCornick v. U.S. Mining Co., 185 Fed. 748; Central Coal & Coke Co. v. Hartman, 111 Fed. 96.

*The fact that one manufacturer could make profits in a given line of business is not evidence that another in the same line with equal advantages would do so.* Keystone Mfg. Co. v. Adams, 151 U.S. 139. *Disbelief of evidence is not proof of the contrary.* Northern Ry. Co. v. Page, 274 U.S. 65, 76.

**Judges:** Hughes, Holmes, Van Devanter, McReynolds, Brandeis, Sutherland, Butler, Stone, Roberts

**Opinion by:** SUTHERLAND

**Opinion**

**[*559] [**249] [***546]** MR. JUSTICE SUTHERLAND delivered the opinion of the Court.

This is an action arising under the Sherman Anti-Trust Act to recover damages resulting from an alleged conspiracy between respondents and West Carrollton Parchment Company, not joined

for lack of jurisdiction, to monopolize interstate trade and commerce in vegetable parchment, exclude the petitioner therefrom, and destroy its business in such trade and commerce. A jury returned a verdict for petitioner in the sum of $ 65,000, but in the alternative for the respondents "if, as a matter of law, the plaintiff is not entitled to a verdict." The trial court approved the verdict and rendered judgment for treble the amount of the damages in accordance with § 7 of the **[***547]** act. On appeal to the circuit court of appeals, **[*560]** the judgment was vacated and the case remanded to the trial court with directions to enter judgment for respondents upon the ground that petitioner had not sustained the burden of proving that it had suffered recoverable damages. *37 F.2d 537*.

***LEdHN[1]*** [1]Respondents seek to sustain this judgment upon that ground and also upon the additional ground, which the lower court found against them, that there was no evidence of a conspiracy or combination to monopolize interstate trade. Because there was no cross-petition for certiorari, petitioner insists that the additional ground is not open here for consideration. But respondents do not invoke that ground in order to overthrow the judgment below, but to sustain it; and this they may do. *Langnes* v. *Green, ante*, p. 531.

***LEdHN[2]*** [2]The point, however, is readily disposed of. There is evidence in the record to the effect that the three companies named, prior to the time petitioner entered the field, had maintained uniform prices and enjoyed a substantial monopoly of the interstate trade in parchment paper. There is also evidence, sufficient to justify the action of the district court in submitting the issue to the jury, that after petitioner began business the three companies combined and conspired to continue this monopoly in violation of § 2 of the Sherman Anti-Trust Act, c. 647, 26 Stat. 209. The verdict of the jury and the judgment thereon of the district court have the effect of a finding in favor of petitioner upon that issue; and to that extent the verdict and judgment were **[**250]** sustained by the court below. There is enough evidence in the record to preclude an interference on our part with these concurrent findings. That the petitioner was injured in its business and property as a result of this unlawful combination we think also finds sufficient support in the evidence. Questions in respect of the liability of the wrongdoers to respond in damages alone remain to be considered.

**[*561]** The trial court submitted to the jury for consideration only two items of damages, (1) the difference, if any, between the amounts actually realized by petitioner and what would have been realized by it from sales at reasonable prices except for the unlawful acts of the respondents; and (2) the extent to which the value of petitioner's property had been diminished as the result of such acts.

***LEdHN[3]*** [3]The view of the court of appeals that no recovery could be had in respect of the first item apparently rests upon its conclusions that there was no basis for a reasonable inference that prices in excess of those actually realized would have prevailed if there had been no combination; and that, in any event, there was no damage which could be measured and expressed in figures not based on speculation and conjecture.

There was evidence from which the jury reasonably could have found that in pursuance of the conspiracy respondents sold their goods below the point of fair profit, and finally below the cost of production; that petitioner had an efficient plant and sales organization, and was producing a quality of paper superior to that produced by either of the three companies; and that current prices, shown in detail, were higher during a period antedating the unlawful combination and price cutting in pursuance of it than afterward. It does not necessarily follow, of course, that these higher

prices would have continued except for the conspiracy, but it is fair to say that the natural and probable effect of the combination and price cutting would be to destroy normal prices; and there was evidence of the prices received by petitioner before the cut prices were put into operation, and those received after, showing actual and substantial reductions, and evidence from which the probable amount of the loss could be approximated. The trial court fairly instructed the jury in substance **[***548]** that if they were satisfied that the old prices were **[*562]** reasonable and that they would not have changed by reason of any economic condition, but would have been maintained except for the unlawful acts of the respondents, the jury might consider as an element of damages the difference between the prices actually received and what would have been received but for the unlawful conspiracy.

Upon a consideration of the evidence we are of opinion that it was open to the jury to find that the price cutting and the resulting lower prices were directly attributable to the unlawful combination; and that the assumption indulged by the court below, that respondents' acts would have been the same if they had been acting independently of one another, with the same resulting curtailment of prices, must be rejected as unsound.

***LEdHN[4]*** [4]***LEdHN[5]*** [5]Nor can we accept the view of that court that the verdict of the jury, in so far as it included damages for the first item, cannot stand because it was based upon mere speculation and conjecture. This characterization of the basis for the verdict is unwarranted. It is true that there was uncertainty as to the extent of the damage, but there was none as to the fact of damage; and there is a clear distinction between the measure of proof necessary to establish the fact that petitioner had sustained some damage, and the measure of proof necessary to enable the jury to fix the amount. ***HN1*** The rule which precludes the recovery of uncertain damages applies to such as are not the certain result of the wrong, not to those damages which are definitely attributable to the wrong and only uncertain in respect of their amount. *Taylor* v. *Bradley*, 4 Abb. Ct. App. (N. Y.) 363, 366-367:

"It is sometimes said that speculative damages cannot be recovered, because the amount is uncertain; but such remarks will generally be found applicable to such damages as it is uncertain whether sustained at all from the breach. Sometimes the claim is rejected as being too **[*563]** remote. This is another mode of saying that it is uncertain whether such damages resulted necessarily and immediately from the breach complained of.

"The general rule is, that all damages resulting necessarily and immediately and directly from the breach are recoverable, and not those that are contingent and uncertain. The latter description embraces, as I think, such only as are not the certain result of the breach, and does not embrace such as are the certain result, but uncertain in amount."

***LEdHN[6]*** [6]***HN2*** Where the tort itself is of such a nature as to preclude the ascertainment of the amount of damages with certainty, it would be a perversion of fundamental principles of justice to deny all relief to the injured person, and thereby relieve the wrongdoer from making any amend for his acts. In such case, while the damages may not be determined by mere speculation or guess, it will be enough if the evidence show the extent of the damages as a matter of just and reasonable inference, although the result be only approximate. The wrongdoer is not entitled to complain that they cannot be measured with the exactness and precision that **[**251]** would be possible if the case, which he alone is responsible for making, were otherwise. *Eastman Kodak Co*. v. *Southern Photo Co., 273 U.S. 359, 379*. Compare *The Seven Brothers, 170 Fed. 126, 128*; *Pacific Whaling Co*. v. *Packers' Assn., 138 Cal. 632, 638*. As the Supreme Court of

Michigan has forcefully declared, the risk of the uncertainty should be thrown upon the wrongdoer instead of upon the injured party. *Allison v. Chandler, 11 Mich. 542, 550-556*. That was a case sounding in tort, and at page 555 the court, speaking through Christiancy, J., said:

"But shall the injured party in an action of tort, which may happen to furnish no element of certainty, be **[***549]** allowed to recover no damages (or merely nominal), because he can not show the exact amount with certainty, **[*564]** though he is ready to show, to the satisfaction of the jury, that he has suffered large damages by the injury? Certainty, it is true, would thus be attained; but it would be the certainty of injustice.

. . . .

***HN3*** "Juries are allowed to act upon probable and inferential, as well as direct and positive proof. And when, from the nature of the case, the amount of the damages can not be estimated with certainty, or only a part of them can be so estimated, we can see no objection to placing before the jury all the facts and circumstances of the case, having any tendency to show damages, or their probable amount; so as to enable them to make the most intelligible and probable estimate which the nature of the case will permit."

And again in *Gilbert v. Kennedy, 22 Mich. 117, 129et seq*., also a tort action, the court, through the same eminent judge, pointed out that cases will often occur in which it is evident that large damages have resulted, but where no reliable data or element of certainty can be found by which to measure with accuracy the amount. Rejecting the view that in such cases the jury should give only nominal, that is, in effect, no damages, leaving the injured party without redress, the court said (p. 130):

"To deny the injured party the right to recover any actual damages in such cases, because they are of a nature which cannot be thus certainly measured, would be to enable parties to profit by, and speculate upon, their own wrongs, encourage violence and invite depredation. Such is not, and cannot be the law, though cases may be found where courts have laid down artificial and arbitrary rules which have produced such a result."

After pointing out that there could be no just principle requiring a higher degree of certainty in the evidence upon which the damages are to be estimated than in reference to other branches of the case, the court said [p. 131] that **[*565]** where from the nature of the case damages could not be measured with certainty by a fixed rule, the facts and circumstances tending to show the probable amount of such damages should be submitted to the jury to enable them to form --

"such reasonable and probable estimate, as in the exercise of good sense and sound judgment they shall think will produce adequate compensation. There is no sound reason in such a case, as there may be, to some extent, in actions upon contract, for throwing *any part* of the loss upon the injured party, which the jury believe from the evidence he has sustained; though the precise amount cannot be ascertained by a fixed rule, but must be matter of opinion and probable estimate. And the adoption of any arbitrary rule in such a case, which will relieve the wrong-doer from any part of the damages, and throw the loss upon the injured party, would be little less than legalized robbery.

"Whatever of uncertainty there may be in this mode of estimating damages, is an uncertainty caused by the defendant's own wrongful act; and justice and sound public policy alike require that he should bear the risk of the uncertainty thus produced; . . ."

As was said by Judge Anderson in his dissenting opinion below, there are many cases in which damages are allowed where the element of uncertainty is at least equal to that in the present case -- as, for example, copyright and trade mark cases, cases of unfair competition, and many cases of personal injury. See also *Straus v. Victor Talking Mach. Co., 297 Fed. 791, 802*, a case very much like the present one, except that the plaintiffs were buyers and were compelled to pay higher prices for goods because of the unlawful acts of defendants, instead of being obliged, as here, to sell at lower prices. Numerous decisions are there cited in support of the statement, that "The constant tendency of the courts is to find some way **[*566]** in **[***550]** which damages can be awarded where a wrong has been done. Difficulty of ascertainment is no longer confused with right of recovery."

It is not easy to reconcile the decision in the present case with what was said by the same court in *Linen Thread Co*. v. *Shaw, 9 F.2d 17, 19*, namely, that "The rule that damages, if uncertain, cannot be recovered, applies to their nature, and not to their extent. If the damage is certain, the fact that its extent is uncertain does not prevent a recovery."

***LEdHN[7]*** [7]Disposing of the second item of damages, the court below, after referring to evidence tending to show that petitioner was not in a thriving financial condition, said that petitioner was without capital to meet the situation which it faced, even if there had **[**252]** been no conspiracy and there had been open competition; and that its failure was inevitable either from lack of capital or inefficient management or both. The court, therefore, concluded that petitioner had not sustained the burden of proving that the depreciation in value of its plant was due in any measurable degree to any violation of the Sherman Act by the respondents. But this conclusion rested upon inferences from facts within the exclusive province of the jury, and which could not be drawn by the court contrary to the verdict of the jury without usurping the functions of that fact finding body. ***HN4*** Whether the unlawful acts of respondents or conditions apart from them constituted the proximate cause of the depreciation in value, was a question, upon the evidence in this record, for the jury "to be determined as a fact, in view of the circumstances of fact attending it." *Milwaukee & St. Paul Ry. Co*. v. *Kellogg, 94 U.S. 469, 474*. And the finding of the jury upon that question must be allowed to stand unless all reasonable men, exercising an unprejudiced judgment, would draw an opposite conclusion from the facts. *Missouri, K. & T. Ry. Co*. v. *Byrne, 100 Fed. 359, 363*; *Travelers'* **[*567]** *Ins. Co*. v. *Melick, 65 Fed. 178, 181*; *Chicago G. W. Ry. Co*. v. *Price, 97 Fed. 423, 429*. It would be going far here to say that this qualifying exception has been met.

***LEdHN[8]*** [8]***LEdHN[9]*** [9]There was evidence to the effect that petitioner's plant had cost $ 235,000, of which $ 90,000 had been used to purchase and install a parchmentizing machine. After petitioner had been compelled to close its business, as a result, we must now assume, of the unlawful acts of the respondents, this property for the purpose of that business was abandoned. That some depreciation in the value of the plant must have resulted is obvious. The treasurer of petitioner estimated the market value of the plant after it had been closed down at $ 75,000. If this estimate be accepted, the depreciation was far more than the entire amount of the verdict, which included both items of damages. It is true that the treasurer was an interested witness and that he was not an expert; and the court in its charge expressly directed the attention of the jury to those facts. But it was for the jury to determine the weight of the evidence, the credit to be given the witness, and the extent to which his testimony should be acted upon. That there was actual damage due to depreciation in value was not a matter of speculation, but a fact which could not be gainsaid. The amount alone was in doubt; and, in the light of the foregoing discussion as to the

first item of damages, the proof is sufficiently certain and definite to support the verdict of the jury in that respect.

***LEdHN[10]*** [10]Other assignments of error made on the appeal from the district court were not considered by the court below. No argument in support of these assignments has been submitted here, and respondents assume that they will be remitted for the consideration of the court below if the **[***551]** judgment of that court be reversed. The entire record, however, is before this court with power to review the action of the court of appeals and direct such disposition of the case as that court might have made of it upon the **[*568]** appeal from the district court. *Lutcher & Moore Lumber Co*. v. *Knight, 217 U.S. 257, 267*; *Delk v. St. Louis & S. F. R. Co., 220 U.S. 580, 588*. And see *Langnes* v. *Green, supra*. Accordingly, we have examined these assignments, some eight in number. One or more of them involve questions which have been disposed of by the foregoing opinion. We find nothing in any of the others of sufficient substance or materiality to call for consideration.

*The judgment of the court of appeals is reversed and that of the district court affirmed*.

EXHIBIT 288

LexisNexis
**User Name:** Aaron S. Jacobs
**Date and Time:** 08/12/2014 4:33 PM EDT
**Job Number:** 11990273

**Document(1)**

Caution
As of: August 12, 2014 4:33 PM EDT

# Sullivan v. NFL

United States Court of Appeals for the First Circuit
September 16, 1994, Decided
No. 94-1031

**Reporter:** 34 F.3d 1091; 1994 U.S. App. LEXIS 25613; 1994-2 Trade Cas. (CCH) P70,720
WILLIAM H. SULLIVAN II, Plaintiff - Appellee, v. NATIONAL FOOTBALL LEAGUE, & MEMBERS OF THE NATIONAL FOOTBALL LEAGUE, Defendants - Appellants.

**Subsequent History: [**1]** The Name of this Case has been Amended by the Court September 29, 1994. As Amended on Denial of Rehearing October 26, 1994, Reported at: 1994 U.S. App. LEXIS 38394. Certiorari Denied February 27, 1995, Reported at: *1995 U.S. LEXIS 1685*.

**Prior History:** APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS. Hon. Edward F. Harrington, U.S. District Judge.

**Core Terms**

teams, public ownership, ownership interest, ownership, relevant market, league, cases, stock, public offering, involvement, rule of reason, benefits, antitrust, effects, instructions, football, output, franchises, football league, district court, stock sale, prices, matter of law, offering, compete, sports, procompetitive, restraint of trade, jury instructions, anticompetitive

**Case Summary**

## Procedural Posture

Appellant football association challenged a jury verdict rendered in favor of appellee owner from the United States District Court for the District of Massachusetts finding appellant's regulations in restraint of trade under *§1* of the Sherman Antitrust Act, *15 U.S.C.S. §§ 1-2*.

## Overview

Appellee owner sought to sell a portion of his football franchise to the public due to financial difficulties. However, as a result of appellant football association's rules and restrictions, appellee sold his franchise to a private buyer. In an effort to recoup profits he could have made through a public offering, appellee filed an action alleging that appellant violated *§1* of the Sherman Antitrust Act (Act), *15 U.S.C.S. §§ 1-2*, by restraining trade through its regulations. Litigation ensued and pursuant to a jury verdict a district court granted appellee a substantial award. Appellant challenged this verdict, arguing that appellee failed to prove the presence of injury to competition, a required element under the Act. Upon final determination, the court reversed and remanded the decision, holding that a new trial was required because the district court improperly allowed evidence concerning the fairness of appellant's policy, instead of manners concerning trade restraints.

**Outcome**
The court reversed and vacated the judgment and remanded the cause with a new trial ordered.

**LexisNexis® Headnotes**

Civil Procedure > Trials > Judgment as Matter of Law > General Overview
Civil Procedure > Appeals > Standards of Review > De Novo Review

***HN1*** The United States Court of Appeals for the First Circuit reviews lower courts' decisions de novo, using the same stringent decisional standards that controlled a district court.

Antitrust & Trade Law > ... > Monopolies & Monopolization > Actual Monopolization > General Overview
Antitrust & Trade Law > Regulated Practices > Trade Practices & Unfair Competition > General Overview

***HN2*** Anticompetitive effects, more commonly referred to as "injury to competition" or "harm to the competitive process," are usually measured by a reduction in output and an increase in prices in the relevant market.

Antitrust & Trade Law > ... > Monopolies & Monopolization > Actual Monopolization > General Overview
Antitrust & Trade Law > Regulated Practices > Trade Practices & Unfair Competition > General Overview

***HN3*** An action harms the competitive process when it obstructs the achievement of competition's basic goals lower prices, better products, and more efficient production methods.

Civil Procedure > Appeals > Reviewability of Lower Court Decisions > Preservation for Review
Criminal Law & Procedure > ... > Reviewability > Waiver > Admission of Evidence

***HN4*** Matters averted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived on appeal. The court will not consider arguments which could have been, but were not, advanced below.

Antitrust & Trade Law > ... > Monopolies & Monopolization > Actual Monopolization > General Overview
Antitrust & Trade Law > Regulated Practices > Trade Practices & Unfair Competition > General Overview

***HN5*** Overall consumer preferences in setting output and prices is more important than higher prices and lower output, per se, in determining whether there has been an injury to competition.

Antitrust & Trade Law > ... > Price Fixing & Restraints of Trade > Per Se Rule & Rule of Reason > General Overview

***HN6*** One basic tenet of the rule of reason is that a given restriction is not reasonable, that is, its benefits cannot outweigh its harm to competition, if a reasonable, less restrictive alternative to the policy exists that would provide the same benefits as the current restraint.

Antitrust & Trade Law > Regulated Industries > Sports > General Overview
Antitrust & Trade Law > Regulated Practices > Trade Practices & Unfair Competition > General Overview
Evidence > Inferences & Presumptions > General Overview

***HN7*** Under certain circumstances, an antitrust plaintiff must make a demand on the defendant to allow the plaintiff to take some action or obtain some benefit, which the defendant's challenged practice is allegedly preventing the plaintiff from taking or obtaining, in order to prove that the practice caused injury in fact to the plaintiff. Such a requirement only applies, however, where the plaintiff cannot otherwise prove that the illegal practice exists or that the practice is preventing

the plaintiff from competing in the relevant market; in such cases, a refused demand is the only reliable evidence of causation.

Civil Procedure > Judgments > Relief From Judgments > Motions for New Trials

Evidence > ... > Testimony > Expert Witnesses > General Overview

***HN8*** When an expert opinion is not supported by sufficient facts to validate it in the eyes of the law, or when indisputable record facts contradict or otherwise render the opinion unreasonable, it cannot support a jury's verdict.

Civil Procedure > Judicial Officers > Judges > General Overview

Civil Procedure > ... > Jury Trials > Jury Instructions > General Overview

Evidence > Relevance > Exclusion of Relevant Evidence > Confusion, Prejudice & Waste of Time

***HN9*** As long as a judge's instruction properly apprises the jury of the applicable law, failure to give the exact instruction requested does not prejudice the objecting party. A party, however, is entitled to have its legal theories on controlling issues, which are supported by the law and by the evidence, presented to the jury. An error in the jury instructions will warrant the reversal of the judgment and a new trial only if, upon review of the record as a whole, the error is determined to be prejudicial.

Antitrust & Trade Law > ... > Monopolies & Monopolization > Actual Monopolization > General Overview

Antitrust & Trade Law > Regulated Practices > Trade Practices & Unfair Competition > General Overview

Evidence > Relevance > Relevant Evidence

***HN10*** The true test of legality in connection with alleged monopolies is whether the restraint imposed is such as merely regulates and perhaps thereby promotes competition or whether it is such as may suppress or even destroy competition. To determine that question the court must ordinarily consider the facts peculiar to the business to which the restraint is applied; its condition before and after the restraint was imposed; the nature of the restraint and its effect, actual or probable. The history of the restraint, the evil believed to exist, the reason for adopting the particular remedy, the purpose or end sought to be attained, are all relevant facts.

Antitrust & Trade Law > Regulated Practices > Trade Practices & Unfair Competition > General Overview

Civil Procedure > Trials > Jury Trials > Province of Court & Jury

***HN11*** Courts should generally give a measure of latitude to antitrust defendants in their efforts to explain the pro-competitive justifications for their policies and practices; however, courts should also maintain some vigilance by excluding justifications that are so unrelated to the challenged practice that they amount to a collateral attempt to salvage a practice that is decidedly in restraint of trade.

**Counsel:** John Vanderstar, with whom Sonya D. Winner, Ethan M. Posner, Covington & Burling, Jeremiah T. O'Sullivan, Sarah Chapin Columbia, Choate, Hall & Stewart, Joseph W. Cotchett, and Cotchett, Illston & Pitre were on brief for appellants.

Joseph L. Alioto and Frederick P. Furth, with whom Angela M. Alioto, Law Offices of Joseph L. Alioto, Alan R. Hoffman, Lynch, Brewer, Hoffman & Sands, Bruce J. Wecker, Michael P. Lehmann and Furth, Fahrner & Mason, were on brief for appellees.

**Judges:** Before Torruella, Circuit Judge, Coffin, Senior Circuit Judge, and Stahl, Circuit Judge.

**Opinion by:** TORRUELLA

**Opinion**

**[*1095]** TORRUELLA, *Circuit Judge*. The National Football League and twenty-one organizations owning NFL franchises (referred to collectively as the "NFL") appeal the judgment entered against them after a jury found that the NFL violated the antitrust laws by restricting owners of member football clubs from selling shares in their teams to the public. Plaintiff-appellee, William H. Sullivan, former owner of the New England Patriots **[**2]** football team (the "Patriots"), was awarded a total of $ 51 million in damages for the losses Sullivan incurred when he had to sell the Patriots to a private buyer after the NFL prevented him from offering 49% of the team to the public in the form of publicly traded stock. Because several prejudicial errors were committed during the trial, we vacate the judgment and remand for a new trial.

## I. BACKGROUND

Under Article 3.5 of the NFL's constitution and by-laws, three-quarters of the NFL club owners must approve all transfers of ownership interests in an NFL team, other than transfers within a family. In conjunction with this rule is an uncodified policy against the sale of ownership interests in an NFL club to the public through offerings of publicly traded stock. The members, however, retain full authority to approve any given transfer by a three-quarters vote according to Article 3.5.

Sullivan owned the Patriots from the team's inception in 1959 until October of 1988. When Sullivan formed the Patriots, he and his partner sold non-voting shares of the team to the public beginning in 1960. At that time, the Patriots were in the old American Football League ("AFL"), which was separate **[**3]** from the NFL, and which had no policy against public ownership of teams. In 1966, the AFL and the old NFL merged into a single league. Under the terms of the merger, the new NFL would adopt the old NFL's policy against public ownership. The Patriots, however, were allowed to retain their level of public ownership as a special exception to the rule under a grandfather clause.

In 1976, Sullivan sought to acquire the publicly held shares of the Patriots through a merger of the club into a new Sullivan-owned company. Stockholders approved the transfer and the transaction was subsequently consummated, although some shareholders subsequently brought suit, challenging the sufficiency of the purchase price. After protracted litigation, the shareholders obtained a judgment requiring Sullivan to pay them a higher price for their shares. The Patriots then became a fully privately owned club.

Sullivan and his son, Chuck Sullivan, who owned the stadium where the Patriots played, began to experience financial difficulties and increasing debt burdens in the mid-1980s. The Sullivans decided that they needed to raise capital to alleviate their financial problems. After the Boston Celtics professional **[**4]** basketball franchise made a public offering of 40% of the team in December of 1986, the Sullivans decided to pursue a similar deal with the Patriots in order to raise cash to cover some of their debts.

On October 19, 1987, the Sullivans met with Stephens, Inc., a small investment banking firm in Little Rock, Arkansas. They discussed a debt financing deal whereby Stephens would loan the Sullivans $ 80 million dollars, with half going to the Patriots and the other half to Chuck Sullivan's

company which owned the Patriots' stadium. The Patriots' portion of the loan would be repaid out of the proceeds of the sale of 49% of the Patriots through the offering of public stock. Stephens agreed to look into the possibility of arranging the deal, but informed the Sullivans that they would first have to get NFL approval. Sullivan ultimately never obtained NFL approval and the deal with Stephens never progressed beyond some preliminary discussions.

At a meeting of the NFL owners on October 27, 1987, Sullivan raised his stock sale **[*1096]** idea with the other owners and asked for a modification of the NFL's policy against public ownership to allow for certain controlled sales of minority interests in NFL **[**5]** clubs. Alternatively, Sullivan requested a waiver from the public ownership policy for his contemplated public offering of the Patriots. Sullivan's request was eventually tabled at this meeting. Discussions continued among the owners and, at one point, Sullivan counted 17 of the 21 owners needed for approval as being in favor of allowing him to make his public offering (seven owners were still undecided). Pete Rozelle, NFL Commissioner at the time, told Sullivans that he was not in favor of Sullivan's proposals and that league approval was "very dubious." Sullivan ultimately never asked for a vote on amending the ownership policy or on waiving the policy for the Patriots, and the NFL never held such a vote. Sullivan claims that he did not ask for a vote because it would have been futile.

In October of 1988, Sullivan sold the Patriots for approximately $ 83.7 million to KMS Patriots L.P. ("KMS"), a limited partnership owned by Victor Kiam and Francis Murray. Sullivan alleges that, absent the NFL's public ownership policy, he would have been able to retain a majority share of a rapidly appreciating asset with a high potential for future profits. Instead, Sullivan asserts, he was forced **[**6]** to sell the Patriots at a depressed price to private buyers.

On May 16, 1991, Sullivan sued the NFL claiming that, among other things, the NFL had violated the Sherman Antitrust Act, *15 U.S.C. §§ 1-2*, by preventing him from selling 49% of the Patriots to the public in an equity offering. Sullivan alleged that, as a result, he was forced to sell the entire team to a private buyer at a fire sale price in order to pay off existing debts. Prior to trial, the district court dismissed Sullivan's claim under § 2 of the Sherman Act along with various state law claims. After a trial on Sullivan's claim under *§ 1* of the Sherman Act, the jury rendered a verdict for Sullivan in the amount of $ 38 million, which the judge later reduced through remittitur to $ 17 million. Pursuant to *15 U.S.C. § 15*, which provides for treble damages for antitrust violations, the court entered a final judgment for Sullivan of $ 51 million. II. ANALYSIS

The NFL has raised a number of issues on appeal concerning the application of *§ 1* of the Sherman Act to the facts of this case, which, according to the NFL, entitle it to judgment as a matter **[**7]** of law. We address these issues first to see if the present case should be dismissed, and we ultimately conclude that it should not. We next address the NFL's allegations of trial error and we find that several of them require that we overturn the verdict in this case and order a new trial.

The first set of issues involves the district court's denial of the NFL's motions for judgment as a matter of law under *Fed. R. Civ. P. 50*. ***HN1*** We review the court's decision *de novo*, using the same stringent decisional standards that controlled the district court. *Gallagher v. Wilton Enterprises, Inc., 962 F.2d 120, 125 (1st Cir. 1992)*; *Hendricks & Assocs., Inc. v. Daewoo Corp., 923 F.2d 209, 214 (1st Cir. 1991)*. Under these standards, judgment for the NFL can only be ordered if the evidence, viewed in the light most favorable to Sullivan, points so strongly

and overwhelmingly in favor of the NFL, that a reasonable jury could not have arrived at a verdict for Sullivan. *Gallagher, 962 F.2d at 124-25*; *Hendricks, 923 F.2d at 214*.

### III. ISSUES ALLEGEDLY REQUIRING JUDGMENT [**8] FOR THE NFL

### A. Lack of Antitrust Injury

To establish an antitrust violation under *§ 1* of the Sherman Act, Sullivan must prove that the NFL's public ownership policy is "in restraint of trade." *Monahan's Marine, Inc. v. Boston Whaler, Inc., 866 F.2d 525, 526 (1st Cir. 1989)*. Under antitrust law's "rule of reason," the NFL's policy is in restraint of trade if the anticompetitive effects of the policy outweigh the policy's legitimate business justifications. *Id. at 526-27* (citing *Business Electronics Corp. v. Sharp Electronics Corp., 485 U.S. 717, 723, 99 L. Ed. 2d 808, 108 S. Ct. 1515 (1988)*). ***HN2*** Anticompetitive effects, more commonly referred **[*1097]** to as "injury to competition" or "harm to the competitive process," are usually measured by a *reduction in output* and an *increase in prices* in the relevant market. *National Collegiate Athletic Ass'n v. Board of Regents of Univ. of Okla., 468 U.S. 85, 104-07, 82 L. Ed. 2d 70, 104 S. Ct. 2948 (1984)* ("Restrictions on price and output are **[**9]** the paradigmatic examples of restraints of trade") (hereinafter "*NCAA*"); *Chicago Professional Sports Ltd. Partnership v. National Basketball Association, 961 F.2d 667, 670 (7th Cir.)*, *cert. denied*, 121 L. Ed. 2d 334, 113 S. Ct. 409 (1992). Injury to competition has also been described more generally in terms of *decreased efficiency* in the marketplace which negatively impacts consumers. *Town of Concord v. Boston Edison Co., 915 F.2d 17, 21-22 (1st Cir. 1990)*, *cert. denied*, 499 U.S. 931, 113 L. Ed. 2d 268, 111 S. Ct. 1337 (1991); *Interface Group, Inc. v. Massachusetts Port Auth., 816 F.2d 9, 10 (1st Cir. 1987)*. Thus, ***HN3*** an action harms the competitive process "when it obstructs the achievement of competition's basic goals -- lower prices, better products, and more efficient production methods." *Town of Concord, 915 F.2d at 22*.

The jury determined in this case, via a special verdict form, that the relevant market is the "nationwide market **[**10]** for the sale and purchase of ownership interests in the National Football League member clubs, in general, and in the New England Patriots, in particular." The jury went on to find that the NFL's policy had an "actual harmful effect" on competition in this market.

The NFL argues on appeal that Sullivan has not established the existence of any injury to competition, and thus has not established a restraint of trade that can be attributed to the NFL's ownership policy. The league's attack is two-fold, asserting (1) that NFL clubs do not compete with each other for the sale of ownership interests in their teams so there exists no competition to be injured in the first place; and (2) Sullivan did not present sufficient evidence of injury to competition from which a reasonable jury could conclude that the NFL's policy restrains trade. Although we agree with the NFL that conceptualizing the harm to competition in this case is rather difficult, precedent and deference to the jury verdict ultimately require us to reject the NFL's challenge to the finding of injury to competition.

Critically, the NFL does *not* challenge on appeal the jury's initial finding of the relevant market and no **[**11]** corresponding challenge was raised at trial. [1] As a result, the NFL faces an uphill battle in its attack on the presence of an injury to competition. Given the existence of a relevant

---

[1] The NFL argues in passing that certain expert testimony related to the relevant market issue was inherently unreasonable and thus could not support the jury's relevant market finding. We do not consider this passing argument to be sufficient to raise the relevant market issue on appeal as ***HN4*** matters averted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived on appeal. *United States* v. *Innamorati*, 996 F.2d 456, 468 (1st Cir. 1993). More importantly,

market for ownership interests in NFL teams, it is reasonable to presume that a policy restricting the buying and selling of such ownership interests injures competition in that market. The NFL nevertheless maintains that NFL teams do not compete against each other for the sale of their ownership interests, even if we accept that a market exists for such ownership interests.

**[**12] 1. *No Competition Subject to Injury as Matter of Law***

The NFL correctly points out that member clubs must cooperate in a variety of ways, and may do so lawfully, in order to make the football league a success. *See United States Football League v. National Football League, 842 F.2d 1335, 1372 (2d Cir. 1988)*; *Los Angeles Memorial Coliseum Comm'n v. National Football League, 726 F.2d 1381, 1391-92 (9th Cir.)*, *cert. denied*, *469 U.S. 990 (1984)* (hereinafter "*L.A. Coliseum*"); *North American Soccer League v. National Football League, 670 F.2d 1249, 1251 (2d Cir.)*, *cert. denied*, *459 U.S. 1074, 103 S. Ct. 499, 74,* **[*1098]** L. Ed. 2d 639 (1982) (hereinafter "*NASL*"). On the other hand, it is well established that NFL clubs also compete with each other, both on and off the field, for things like fan support, players, coaches, ticket sales, local broadcast revenues, and the sale of team paraphernalia. *Mid-South Grizzlies v. National Football League, 720 F.2d 772, 786-87 (3d Cir. 1983),* **[**13]** *cert. denied*, *467 U.S. 1215, 81 L. Ed. 2d 364, 104 S. Ct. 2657 (1984)*; *L.A. Coliseum, 726 F.2d at 1390, 1393, 1395, 1397*. The question of whether competition exists between NFL teams for sale of their ownership interests, such that the NFL's ownership policy injures this competition, is ultimately a question of fact. The NFL would have us find, however, that, as a matter of law, NFL teams do not compete against each other for the sale of their ownership interests. We decline to make such a finding.

The NFL relies on a series of cases which allegedly stand for the "well established" rule that a professional sports league's restrictions on who may join the league or acquire an interest in a member club do not give rise to a claim under the antitrust laws. *Seattle Totems Hockey Club, Inc. v. National Hockey League, 783 F.2d 1347 (9th Cir.)*, *cert. denied*, *479 U.S. 932, 93 L. Ed. 2d 357, 107 S. Ct. 405 (1986)*; *Fishman v. Estate of Wirtz, 807 F.2d 520 (7th Cir. 1986)*; **[**14]** *Mid-South Grizzlies, 720 F.2d at 772*; *Levin v. National Basketball Ass'n, 385 F. Supp. 149 (S.D.N.Y. 1974)*. These cases, all involving a professional sport's league's refusal to approve individual transfers of team ownership or the creation of new teams, do not stand for the broad proposition that no NFL ownership policy can injure competition. *See, e.g., NASL*, 670 F.2d at 1259-61 (finding that the NFL's policy against cross-ownership of NFL teams and franchises in competing sports leagues, which also effectively barred certain owners who owned other sports franchises from purchasing NFL teams, injured competition between the NFL and competing sports leagues and thus violated *§ 1* of the Sherman Act).

None of the cases cited by the NFL considered the particular relevant market that was found by the jury in this case or a league policy against public ownership. *Seattle Totems* and *Mid-South Grizzlies* considered potential *inter*-league competition when a sports league rejected plaintiffs' applications for new league franchises. *Seattle Totems, 783 F.2d at 1349-50*; **[**15]** *Mid-South Grizzlies, 720 F.2d at 785-86*. Those decisions found no injury to competition because the plaintiffs were not competing with the defendant sports leagues, but rather, were seeking to join those leagues. *Seattle Totems, 783 F.2d at 1350*; *Mid-South Grizzlies, 720 F.2d at 785-86*. *Mid-South*

---

the NFL did not challenge the relevant market issue in either its directed verdict motion or in its motion for judgment as a matter of law. We will not consider arguments which could have been, but were not, advanced below. *Domegan* v. *Fair*, 859 F.2d 1059, 1065 (1st Cir. 1988).

*Grizzlies* left open the possibility that potential *intra*-league competition between NFL football clubs could be harmed by the NFL's action, but found that the plaintiff in that case had not presented sufficient evidence of harm to such competition. *Mid-South Grizzlies, 720 F.2d at 786-87*.

The *Fishman* and *Levin* cases concerned the National Basketball Association's ("N.B.A.") rejection of plaintiffs' attempts to buy an existing team. *Fishman, 807 F.2d at 525-31*; *Levin, 385 F. Supp. at 150-51*. Those cases also based their finding that there was no injury to competition on the fact that the plaintiffs were seeking to join with, rather than compete against, the N.B.A. *Fishman, 807 F.2d at 544*; **[**16]** *Levin, 385 F. Supp. at 152*. Neither case considered whether competition between teams for investment capital was injured. As pointed out in *Piazza v. Major League Baseball, 831 F. Supp. 420 (E.D.Pa. 1993)*, *Fishman* explicitly recognized the potential for competition in the market for ownership of teams, although the plaintiff had failed to raise the issue, and *Levin* simply presumed, incorrectly, that there could never be any competition among league members. *Piazza, 831 F. Supp. at 430-31* & n.16 (citing *Fishman, 807 F.2d at 532 n.9*; and *Levin, 385 F. Supp. at 152*).

The important distinction to make between the cases cited by the NFL and the present case is that here Sullivan alleges that the NFL's policy against public ownership generally restricts competition between clubs for the sale of their ownership interests, whereas in the aforementioned cases, a league's refusal to approve a given sale transaction or a new team merely prevented particular outsiders from joining the league, but did not **[*1099]** limit competition between **[**17]** the teams themselves. To put it another way, the NFL's public ownership policy allegedly does not merely prevent the replacement of one club owner with another -- an action having little evident effect on competition -- it compromises the entire process by which competition for club ownership occurs. [2]

**[**18]** We take a moment to briefly address a related argument raised by the NFL to the effect that NFL clubs are unable to conspire with each other under *§ 1* of the Sherman Act because they function as a single enterprise in relation to the league's public ownership policy. The NFL asserts that the Supreme Court's holding in *Copperweld Corp. v. Independence Tube Corp., 467 U.S. 752, 81 L. Ed. 2d 628, 104 S. Ct. 2731 (1984)*, controls the facts of this case and overturns prior caselaw holding that NFL clubs do not constitute a single enterprise but rather, are separate entities which were capable of conspiring with each other under *§ 1*. *See* *L.A. Coliseum, 726 F.2d at 1387-90*; *NASL*, 670 F.2d at 1256-58.

We do not agree that *Copperweld*, which found a corporation and its wholly owned subsidiary to be a single enterprise for purposes of *§ 1*, *Copperweld, 467 U.S. at 771*, applies to the facts of this case or affects the prior precedent concerning the NFL. *See* *McNeil v. National Football League, 790 F. Supp. 871, 879-80 (D.Minn. 1992)* **[**19]** (holding that *Copperweld* did not apply to the NFL and its member clubs and finding the clubs to be separate entities capable of conspiring together under *§ 1*). *Copperweld*'s holding turned on the fact that the subsidiary of a corporation, although legally distinct from the corporation itself, "pursued the common interests of the whole rather than interests separate from those of the corporation itself." *Copperweld, 467 U.S. at*

---

[2] This same argument distinguishes cases cited by the NFL for the proposition that a franchisor's disapproval of a proposed sale of a franchise does not give rise to an antitrust injury. *See* *Kestenbaum v. Falstaff Brewing Corp., 514 F.2d 690 (5th Cir. 1975)*, *cert. denied*, *424 U.S. 943, 47 L. Ed. 2d 349, 96 S. Ct. 1412 (1976)*; *McDaniel v. General Motors Corp., 480 F. Supp. 666 (E.D.N.Y. 1979)*. Individual decisions to block the sale of a franchise do not implicate the harm to competition that is caused by a policy restricting all sales of a certain type of ownership interest. Only the broad-based policy has the potential to compromise the entire competitive process for the buying and selling of a good in a relevant market.

*770*. As emphasized in *City of Mt. Pleasant, Iowa v. Associated Elec. Co-op., Inc., 838 F.2d 268 (8th Cir. 1988)*, upon which the NFL relies for the application of *Copperweld* to this case, the critical inquiry is whether the alleged antitrust conspirators have a "unity of interests" or whether, instead, "any of the defendants has pursued interests diverse from those of the cooperative itself." *Id. at 274-77* (defining "diverse" as "interests which tend to show that any two of the defendants are, or have been, actual or potential competitors"). As we have already noted, NFL member clubs compete in several ways off the field, which **[**20]** itself tends to show that the teams pursue diverse interests and thus are not a single enterprise under *§ 1*.

Ultimately, the NFL's *Copperweld* challenge is subsumed under the question of whether or not the evidence can support a finding that NFL teams compete against each other for the sale of their ownership interests. Proof of such competition defeats both the NFL's challenge to the existence of an injury to competition and the NFL's *Copperweld* argument as well. Insufficient proof of such competition would require a judgment in favor of the NFL anyway, regardless of the implications under *Copperweld*. As we discuss below, the jury's finding that there exists competition between teams for the sale of ownership interests was based on sufficient evidence.

**2. *Insufficient Evidence of Harm to Competition***

The NFL contends that Sullivan did not present sufficient evidence concerning: (1) the existence of competition between NFL clubs for the sale of ownership interests, or (2) a decrease in output, an increase in prices, a detrimental effect on efficiency or other incidents of harm to competition in the relevant market, from which a reasonable jury could conclude that **[**21]** the NFL's policy injured competition. Although we agree that **[*1100]** the evidence of all these factors is rather thin, we disagree that the evidence is too thin to support a jury verdict in Sullivan's favor.

With respect to evidence of the existence of competition for the sale of ownership interests, one of Sullivan's experts, Professor Roger Noll, testified that "one of the ways in which the NFL exercises monopoly power in the market for the franchises and ownership is by excluding certain people from owning all or part -- any type part of an NFL franchise." Dr. Noll explained that this "enables a group of owners, in this case, you only need eight owners, to exclude from the League and from competing with them, people who might be more effective competitors than they are." The record also contains statements from several NFL owners which could reasonably be interpreted as expressions of concern about their ability to compete with other teams in the market for investment capital in general, and for the sale of ownership interests in particular. For example, Arthur Rooney II of the Pittsburgh Steelers stated in a letter that he did not "believe that the individually or family owned teams will **[**22]** be able to compete with the consolidated groups." Ralph Wilson of the Buffalo Bills stated that big corporations should not own teams because it gives them an "unfair competitive advantage" over other teams since corporations will funnel money into the team and make it "more competitive" than the other franchises. Former NFL Commissioner Pete Rozelle admitted that similar sentiments had been expressed by NFL members.

Although it is not precisely clear that the "competition" about which Noll, Rooney, and Wilson were discussing is the same competition at issue here -- that is competition for the sale of ownership interests -- a jury could reasonably interpret these statements as expressing a belief that the competition exists between teams for the sale of ownership interests. The statements of the two NFL owners imply that greater access to capital for all teams will put increased pressure on some

teams to compete with others for that capital, and all the statements reveal that the ownership rules, particularly the rule against public ownership, is the main obstacle preventing such access. The fact that ownership by "consolidated groups" is not necessarily the same as public ownership **[**23]** does not affect the conclusion that teams face competitive pressure in selling their ownership interests generally to whoever might buy them. We also note that evidence of actual, present competition is not necessary as long as the evidence shows that the potential for competition exists. *See L. A. Coliseum, 726 F.2d at 1394* (discussing significance of *potential* competition, especially where challenged policy limits such competition so that it is not evident in practice). It would be difficult indeed to provide direct evidence of competition when the NFL effectively prohibits it.

The NFL focusses on the fact that Professor Noll testified that many of the purchasers of Patriots' stock would be New England sports fans and others in the New England area. The NFL points out that other NFL teams would not compete with the Patriots for the sale of stock to their own fans. This argument slightly distorts Professor Noll's testimony. Professor Noll stated that local souvenir buyers would be one portion of the market for Patriots stock. Professor Noll also testified several times that other investors would buy Patriots stock as well, for investment purposes. **[**24]** Noll's point was that the souvenir buyers would serve to bid up the price of the stock above what the price would normally be if the Patriots were a regular company. His testimony did not preclude a finding that NFL teams compete against each other for investment capital via the sale of ownership interests.

The record also contains sufficient evidence of the normal incidents of injury to competition from the NFL's policy -- reduced output, increased prices, and reduced efficiency -- to support the jury's verdict. As Dr. Noll pointed out in his testimony, the NFL's policy "excludes individuals . . . who might want to own a share of stock in a professional football team." Several NFL officials themselves admitted that the policy restricts the market for investment capital among NFL teams. There is thus little dispute that the NFL's ownership policy reduces the available output of ownership interests.

**[*1101]** The NFL is correct that, in one sense, the overall pool of potential output is fixed because there are only 28 NFL teams and, although their value may fluctuate, the quantity of their ownership interests cannot. However, the NFL's public ownership policy completely wipes out a certain type **[**25]** of ownership interest -- public ownership of stock. By restricting output in one *form* of ownership, the NFL is thereby reducing the output of ownership interests overall. In other words, the NFL is literally restricting the output of a product -- a share in an NFL team.

There was considerable testimony concerning the price effects of the NFL policy. Both of Sullivan's experts testified that the policy depressed the price of ownership interests in NFL teams because NFL franchises would normally command a premium on the public market relative to their value in the private market, which is all that the league currently permits. Professor Noll testified that fan loyalty would push up the price of ownership interests if sales to the public were allowed. Even former Commissioner Pete Rozelle acknowledged that "it was pointed out, with justification, it has been over the years, that [the ownership policy] does restrict your market and, very likely, the price you could get for one of our franchises if you wanted to sell it, because you are eliminating a very broad market . . . . And they have said that there is a depression on the price they could get for their franchise."

The NFL points **[**26]** out that the alleged effect of its ownership policy is to *reduce* prices of NFL team ownership interests, rather than to raise prices which is normally the measure of an injury to competition. *E.g.*, *Town of Concord, 915 F.2d at 22*. We acknowledge that it is not clear whether, absent some sort of dumping or predatory pricing, *see, e.g.*, *Monahan's Marine, Inc. v. Boston Whaler, Inc., 866 F.2d 525, 527 (1st Cir. 1989)*, a decrease in prices can indicate injury to competition in a relevant market. The Supreme Court has emphasized, however, that ***HN5*** overall consumer preferences in setting output and prices is more important than higher prices and lower output, *per se*, in determining whether there has been an injury to competition. *NCAA*, 468 U.S. at 107. In this case, regardless of the exact price effects of the NFL's policy, the overall market effects of the policy are plainly unresponsive to consumer demand for ownership interests in NFL teams. Dr. Noll testified that fans are interested in buying shares in NFL teams and that the NFL's policy deprives **[**27]** fans of this product. Moreover, evidence was presented concerning the public offering of the Boston Celtics professional basketball team which demonstrated, according to some of the testimony, fan interest in buying ownership of professional sports teams. Thus, a jury could conclude that the NFL's policy injured competition by making the relevant market "unresponsive to consumer preference." *Id.* [3]

**[**28]** As for overall efficiency of production in the relevant market, [4] Sullivan's experts testified that the NFL's policy hindered efficiency gains, and that allowing public ownership would make for better football teams. Professor Noll stated that the NFL's public ownership policy prevented individuals who **[*1102]** might be "more efficient and much better at running a professional football team" from owning teams. Dr. Noll also stated that publicly owned NFL teams would be better managed, and produce higher quality entertainment for the fans. Noll testified that the ownership rule excluded certain types of management structures which would likely be more efficient in running the teams, resulting in higher franchise values. One NFL owner, Lamar Hunt, acknowledged that increased access to capital can improve a team's operations and performance. A memorandum prepared by an NFL staff member stated that changes to the NFL's public ownership policy could contribute to each NFL team's own financial strength and viability, which in turn would benefit the entire NFL because the league has a strong interest in having strong, viable teams.

**[**29]** The NFL presented a large amount of evidence to the contrary and now claims on appeal that Sullivan's position was based on nothing more than sheer speculation. We have reviewed the record, however, and we cannot say that the evidence was so overwhelming that no reasonable jury could find against the NFL and in favor of Sullivan. We therefore refuse to enter judgment in favor of the NFL as a matter of law.

**B. Ancillary Benefits**

---

[3] The NFL maintains that price and output are not affected because its ownership policy does not limit the number of games or teams, does not raise ticket prices or the prices of game telecasts and does not affect the normal consumer of the NFL's product in any other way. Such facts might be relevant to an inquiry of whether the NFL's policy harms overall efficiency, *see infra* note [4], but it is not relevant to whether the policy affects output and prices *in the relevant market* for ownership interests. Just because consumers of "NFL football" are not affected by output controls and price increases does not mean that consumers of a product in the relevant market are not so affected. In this case, two types of consumers are denied products by the NFL policy: consumers who want to buy stock of the Patriots or other teams, and consumers like Sullivan who want to "purchase" investment capital in the market for public financing.

[4] Although the product at issue in the relevant market is "ownership interests," efficiency in production of that product can be measured by the value of the ownership interest. That is, an improved product produced more efficiently will be reflected in the value of the output in question (regardless of the price). In this case, the value of the product depends on the success of the Patriots' football team, the overall efficiency of its operations, and the success of the NFL in general.

The NFL next argues that even if its public ownership policy injures competition in a relevant market, it should be upheld as *ancillary* to the legitimate joint activity that is "NFL football" and thus not violative of the Sherman Act. We take no issue with the proposition that certain joint ventures enable separate business entities to combine their skills and resources in pursuit of a common goal that cannot be effectively pursued by the venturers acting alone. *See, e.g., Broadcast Music, Inc. v. Columbia Broadcasting System, Inc., 441 U.S. 1, 60 L. Ed. 2d 1, 99 S. Ct. 1551 (1979)*. We also do not dispute that a "restraint" that is ancillary to the functioning of such a joint **[**30]** activity -- i.e. one that is required to make the joint activity more efficient -- does not necessarily violate the antitrust laws. *Broadcast Music, 441 U.S. at 23-25*; *Rothery Storage & Van Co. v. Atlas Van Lines, Inc., 253 U.S. App. D.C. 142, 792 F.2d 210, at 223-24 (D.C. Cir. 1986)*, *cert. denied*, *479 U.S. 1033, 93 L. Ed. 2d 834, 107 S. Ct. 880 (1987)*; *see also Northwest Wholesale Stationers, Inc. v. Pacific Stationery & Printing Co., 472 U.S. 284, 295-96, 86 L. Ed. 2d 202, 105 S. Ct. 2613 (1985)*. We further accept, for purposes of this appeal, that rules controlling who may join a joint venture can be ancillary to a legitimate joint activity and that the NFL's own policy against *public* ownership constitutes one example of such an ancillary rule. Finally, we accept the NFL's claim that its public ownership policy contributes to the ability of the NFL to function as an effective sports league, and that the NFL's functioning would be impaired **[**31]** if publicly owned teams were permitted, because the short-term dividend interests of a club's shareholder would often conflict with the long-term interests of the league as a whole. That is, the policy avoids a detrimental conflict of interests between team shareholders and the league.

We disagree, however, that these factors are sufficient to establish as a matter of law that the NFL's ownership policy does not unreasonably restrain trade in violation of *§ 1* of the Sherman Act. The holdings in *Broadcast Music*, *Rothery Storage*, and *Northwest Stationers*, do not throw the "rule of reason" out the window merely because one establishes that a given practice among joint venture participants is ancillary to legitimate and efficient activity -- the injury to competition must still be weighed against the purported benefits under the rule of reason. *See, e.g., Broadcast Music, 441 U.S. at 24* (holding only that a particular ancillary restraint did not constitute a *per se* violation of the Sherman Act and remanding for a determination of the case under a rule of reason analysis); *Northwest Stationers, 472 U.S. at 293-98* **[**32]** (same); *see also SCFC ILC, Inc. v. Visa U.S.A. Inc., 819 F. Supp. 956, 979-80 (D.Utah 1993)* (finding that the existence of a joint **[*1103]** venture may save a restraint from *per se* illegality but not from the normal rule of reason scrutiny).

***HN6*** One basic tenet of the rule of reason is that a given restriction is not reasonable, that is, its benefits cannot outweigh its harm to competition, if a reasonable, less restrictive alternative to the policy exists that would provide the same benefits as the current restraint. *L.A. Coliseum, 726 F.2d at 1396*. The record contains evidence of a clearly less restrictive alternative to the NFL's ownership policy that would yield the same benefits as the current policy. Sullivan points to one proposal to amend the current ownership policy by allowing for the sale of minority, nonvoting shares of team stock to the public with restrictions on the size of the holdings by any one individual. Dividend payments, if any, would be within the firm control of the NFL majority owner. Under such a policy, it would be reasonable for a jury to conclude that private control of member clubs is maintained, **[**33]** conflicts of interest are avoided, and all the other "benefits" of the NFL's joint venture arrangement are preserved while at the same time teams would have access to the market for public investment capital through the sale of ownership interests. Whether this proposed amendment is indeed a less restrictive, equally beneficial policy, is a jury question we need not reach here. We merely point to it as one factor a jury may consider in its rule of reason analysis.

C. Causation of Injury in Fact

The NFL next argues that Sullivan did not present sufficient evidence to support a finding by the jury that the NFL's public ownership policy caused injury in fact to Sullivan. An antitrust plaintiff must prove that he or she suffered damages from an antitrust violation and that there is a causal connection between the illegal practice and the injury. *Associated General Contractors, Inc. v. California State Council of Carpenters, 459 U.S. 519, 532-33* & n.26, *74 L. Ed. 2d 723, 103 S. Ct. 897 (1983)*; *Blue Shield of Virginia v. McCready, 457 U.S. 465, 476-78, 73 L. Ed. 2d 149, 102 S. Ct. 2540 (1982)*; *Engine Specialties, Inc. v. Bombardier Ltd., 605 F.2d 1, 13 (1st Cir. 1979)*, *cert. denied, 446 U.S. 983, 64 L. Ed. 2d 839, 100 S. Ct. 2964 (1980).* **[**34]** "Plaintiffs need not prove that the antitrust violation was the sole cause of their injury, but only that it was a material cause." *Engine Specialties, 605 F.2d at 14*.

Sullivan asserted at trial that the NFL's ownership policy forced him to sell the Patriots at a depressed price, far below what the team would have been worth in a market that included public ownership of the team. "But for" the NFL's policy, Sullivan claims, he would have been able to offer 49% of the Patriots to the public for $ 70 million, pay off his debts, and retained ownership of a much more valuable and profitable team.

The NFL contends that Sullivan failed to establish a causal connection between his "forced" sale of the Patriots and the NFL's ownership policy because (1) Sullivan never officially requested a vote on his proposals to amend or waive the policy so there is no way of knowing whether the policy would have prevented a public offering in the first place; and (2) Sullivan never established that the public stock sale was feasible or potentially successful and thus an alternative to what ultimately happened (i.e., even if the NFL did not have a policy against public ownership, **[**35]** Sullivan would still have had to sell his team because the Patriots stock sale would not have happened or would not have raised enough money to pay off Sullivan's debts and prevent a fire sale of the team). Although the evidence of causation is not overwhelming, it is nevertheless sufficient to support the verdict.

Regarding the NFL's first claim that Sullivan never called for a vote from the owners to change or waive the ownership policy, Sullivan presented sufficient evidence to show that the NFL essentially rejected Sullivan's request, even though no official vote was taken. ***HN7*** Under certain circumstances, an antitrust plaintiff must make a demand on the defendant to allow the plaintiff to take some action or obtain some benefit, which the defendant's challenged practice is allegedly preventing the plaintiff from taking or obtaining, in order to prove that the practice caused injury in fact to the plaintiff. *See Wells Real Estate, Inc. v. Greater Lowell Bd. of Realtors, 850 F.2d 803, 816 (1st Cir.)*, *cert. denied, 488 U.S. 955, 102 L. Ed. 2d 381, 109 S. Ct. 392 (1988)*; *Out Front Productions, Inc. v. Magid, 748 F.2d 166, 170 (3d Cir. 1984).* **[**36]** Such a requirement only applies, however, where the plaintiff cannot otherwise prove that the illegal practice exists or that **[*1104]** the practice is preventing the plaintiff from competing in the relevant market; in such cases, a refused demand is the only reliable evidence of causation. *Out Front, 748 F.2d at 169-70*. In cases like the present one, an official request and official refusal is not necessary to establish causality because there is other evidence showing that defendant's practice caused injury in fact to the plaintiff. *Zenith Radio Corp. v. Hazeltine Research, 395 U.S. 100, 120 n.15, 23 L. Ed. 2d 129, 89 S. Ct. 1562 (1969)*; *Continental Ore Co. v. Union Carbide & Carbon Corp., 370 U.S. 690, 699-702, 8 L. Ed. 2d 777, 82 S. Ct. 1404 (1962)*. There is certainly no blanket requirement, as the NFL maintains, in *Wells* or any other case, that Sullivan must call for

a vote and obtain an official refusal from the NFL, even if such a request would be futile. *See, e.g.*, *Wells, 850 F.2d at 816* **[**37]** (finding failure to request access to multiple listing service was critical because "there was no evidence of a group boycott;" although court noted request "may have been futile," there was no evidence to indicate that it would have been, so an actual request was required); *Chicago Ridge Theatre Ltd. Partnership v. M & R Amusement Corp., 855 F.2d 465, 470 (7th Cir. 1988)* (futility obviates the need for a demand). Certainly, if Sullivan can prove futility independent of any official request, he need not show that he actually called for a vote and received a denial from the other NFL owners.

The jury in this case heard evidence that would allow it to conclude that the NFL effectively denied Sullivan's request for a waiver or amendment of the public ownership policy, and that an official vote would indeed have been futile. The NFL's policy against public ownership was long-standing, and the policy withstood several efforts to change it over the years as proffered amendment proposals were never brought to a vote. Sullivan requested a waiver of, or amendment to, the policy at a meeting of the owners on October 27, 1987. His request was tabled. After **[**38]** further discussions, then-Commissioner Pete Rozelle said that he opposed the proposal and that the chances for league approval were "very dubious." Although Sullivan was only four votes shy of winning a vote, with seven votes still undecided, the jury could reasonably conclude that, in light of the Commissioner's statement, Sullivan tried but failed to convince those undecided owners to vote in his favor and that an actual vote would have been futile. The evidence is thus sufficient to support a finding that the NFL's policy was effectively enforced against Sullivan and that the policy did in fact, when considered with the evidence discussed below, prevent Sullivan from making his public offering of 49% of the Patriots.

Sullivan also presented sufficient evidence to support a finding that the Patriots stock sale was both feasible and potentially successful. Sullivan met with Stephens, Inc., an investment banking firm, to discuss a deal whereby Stephens would arrange for a loan of $ 80 million to Sullivan and his son, half of which would be paid back out of the proceeds of the Patriots stock offering, which Stephens would also arrange. In a subsequent letter, Stephens stated that it **[**39]** had been retained to assist in the "private placement of $ 80 million of debt" and set out some preliminary terms and conditions. Although specifics of the public offering were not discussed, and Stephens did not determine whether the stock offering was ultimately feasible, Stephens repeatedly made it clear to Sullivan that NFL approval was required -- indeed Stephens specifically singled out NFL approval as *the* prerequisite -- before Stephens could proceed any further with efforts to prepare for the placement of Patriots stock.

As discussed above, NFL approval was never obtained. Therefore, the jury could conclude that lack of approval was the reason Stephens was unwilling to proceed with the deal, even though Stephens also expressed some concern about Sullivan's financial and legal troubles. The jury also heard testimony that Charles Allen, a prominent investment banker in New York, thought the Patriots public offering was feasible and that he was potentially interested in arranging the deal. Sullivan himself testified that the stock sale was feasible based on his experience with the previous public offering of Patriots stock in 1960, and based on the public offering of the **[**40]** Boston Celtics. Finally, one of Sullivan's experts, Patrick Brake, testified that the public offering would have been feasible had the NFL not blocked it.

In addition, despite significant financial and legal problems with the Patriots, the **[*1105]** evidence is sufficient to support a finding that Sullivan could have solved these problems in the

course of the public offering and, further, that he could have brought off a successful stock sale that would have raised at least $ 70 million.

The NFL focusses its challenge to the potential success of Sullivan's offering on the testimony of Patrick Brake, who provided the $ 70 million figure as the value for the stock sale. According to the NFL, Brake's testimony could not support the jury's finding on causation because it was not supported by any facts, it was not grounded in any rational methodology, and it ignored important factors indicating that the Patriots offering would not be a success. The NFL does not challenge the admissibility of Brake's opinion but, instead, claims that his opinion cannot support the jury's finding that the Patriots stock sale would have been a success if the NFL had allowed it to happen.

***HN8*** "When an expert opinion is **[**41]** not supported by sufficient facts to validate it in the eyes of the law, or when indisputable record facts contradict or otherwise render the opinion unreasonable, it cannot support a jury's verdict." *Brooke Group, Ltd. v. Brown & Williamson Tobacco Corp., 125 L. Ed. 2d 168, 113 S. Ct. 2578, 2589 (1993)*; *accord* *Price v. General Motors Corp., 931 F.2d 162, 165 (1st Cir. 1991)*; *Richardson v. Richardson-Merrell, Inc., 273 U.S. App. D.C. 32, 857 F.2d 823, 829 (D.C. Cir. 1988)*, *cert. denied*, *493 U.S. 882, 107 L. Ed. 2d 171, 110 S. Ct. 218 (1989)*. A jury verdict cannot rest solely on an expert's "bottom line" conclusion, without some underlying facts and reasons, or a logical inferential process to support the expert's opinion. *Mid-State Fertilizer Co. v. Exchange National Bank, 877 F.2d 1333, 1339 (7th Cir. 1989)*.

We agree that the facts and reasoning underlying Brake's opinions and testimony leave much to be desired from the standpoint of a factfinder charged **[**42]** with determining the facts. As a matter of law, however, Brake provided enough of a basis for his opinions and had sufficient facts to back his opinions up, to support, in combination with the evidence from other sources, a jury finding of potential success of the Patriots stock sale venture. To begin with, Brake stated in his testimony that his opinion was based on a review of documents and depositions in the case, a review of the prospectus for the Boston Celtics public offering, the fact that future television revenues for the Patriots were likely to increase due to the Patriots' appearance in the Super Bowl, and the fact that the public stock for NFL teams, like the Patriots, would trade at a premium value over what the club would otherwise be worth. Brake also stated that he looked at a financial statement of the Patriots and was apprised of some of the debt and loss history of the club. Other testimony and evidence at trial supported the claim that stock of NFL teams would sell for a premium above the club's private sale value and the claim that TV revenues to the NFL teams would increase. Sullivan himself testified that a public offering would be successful based upon the success **[**43]** of his earlier offering of Patriots stock and on the results of the Celtics public offering. There was also testimony -- highly disputed, but potentially credible testimony nonetheless -- to the effect that the Celtics' stock offering was a success and that the Patriots stock offering could be patterned after the Celtics offering.

As for the source of Brake's specific $ 70 million figure for the likely proceeds from a sale of 49% of the Patriots, Brake explained a two-step public offering process which, after subtracting underwriting fees, would yield the Sullivan's $ 70 million. Brake arrived at this figure after starting with a base value of $ 150 million for the Patriots. Given the $ 80 million private sale price of the Patriots obtained by Sullivan when he actually sold the team, and given the testimony by Brake and others that public stock of NFL teams would sell at a premium, we cannot say that the

opinion by Brake, an investment banking expert, was unreasonable or "not supported by sufficient facts to validate it in the eyes of the law." *Brooke Group, 113 S. Ct. at 2589*.

Brake's testimony was not merely conclusory. Rather, it was **[**44]** embellished by various explanations and justifications. His testimony was also not overwhelmingly contradicted by the weight of the evidence or inherently **[*1106]** contradictory, unreasonable or irrational. Brake did overlook some important factors that contradicted his opinion, but he was questioned about these factors on cross-examination and the NFL argued them before the jury. The factors do not invalidate Brake's opinion as a matter of law; rather, they merely go to the weight and credibility of his opinions which are matters for the jury to consider. The basis of the opinion regarding the success of the Patriots public offering may be flimsy, but it is not nonexistent or irrational as a matter of law.

Although we share the NFL's skepticism that Sullivan would have succeeded in his public offering if the NFL had allowed him to try it, we cannot say that, as a matter of law, the evidence was so overwhelming that no reasonable jury could find that the NFL's policy harmed Sullivan by preventing him from doing something he would otherwise have been able to do. We therefore reject the NFL's claim that it is entitled to a judgment in its favor on the basis that Sullivan failed to prove his **[**45]** injury was caused by the alleged antitrust violation.

### D. Assignment of Antitrust Claim

The NFL argues that Sullivan cannot bring this lawsuit because he sold his antitrust claim when he sold the Patriots. The sale contract between Sullivan and KMS Patriots, L.P., provided that Sullivan transferred to the buyers "all other assets" of the Patriots' and its holding company, [5] besides those specifically listed and those specifically excluded. None of the listed or excluded assets include an antitrust claim. According to the NFL, the term "all other assets" should be interpreted broadly to include the present antitrust cause of action. We disagree. Absent some express language to the effect that Sullivan was selling his football related "antitrust claims" or, at the very least, "causes of action," we cannot find that Sullivan assigned the present antitrust claim to the buyers of the Patriots. *Gulfstream III Assocs., Inc. v. Gulfstream Aerospace Corp., 995 F.2d 425, 437-40 (3d Cir. 1993)*; *see also* *Lerman v. Joyce Int'l, Inc., 10 F.3d 106, 112 (3d Cir. 1993)* (affirming requirement in *Gulfstream* that assignment **[**46]** of claim must be "express" but expanding definition of "express" language to include a grant of "all causes of action, claims and demands of whatsoever nature"). As no such express language appears in the contract for the sale of the Patriots, Sullivan did not transfer his interest in the present lawsuit to KMS Patriots when he sold the team.

The NFL's arguments concerning the application of *§ 1* of the Sherman Act to the facts of this case raise a substantial challenge to the jury verdict and are certainly weighty enough to give us pause. Upon careful consideration of the issues, however, we find Sullivan's **[**47]** theory of the case to be a plausible one and ultimately find the evidence sufficient to support it. For the foregoing reasons, therefore, we see no justification, as a matter of law, for ringing the death knell on this litigation.

## IV. TRIAL ERRORS

---

[5] The language of the contract actually states "all other assets of Selling Group," which includes Sullivan himself. However, neither party asserts that Sullivan intended to transfer all his personal assets with this clause and, anyway, the "all other assets" clause is number seventeen on a list of items referred to by the contract as "the following assets of the Club and Holdco [the Patriots' holding company]."

Having reviewed those issues which would have warranted a judgment in favor of the NFL, had we decided any of those issues in the NFL's favor, we now turn to the NFL's claim that it is entitled to a new trial because of allegedly erroneous jury instructions and other trial errors. In particular, the NFL asserts that the district court failed to provide the jury with several crucial jury instructions that were required in order to present to the jury certain legal theories that were potentially dispositive of the verdict. The NFL argues that the court's failure to give the instructions was prejudicial error requiring a new trial.

Determining whether the failure to give proffered jury instructions is error depends on whether the instructions actually given to the jury, taken as a whole, adequately explained the law or whether they tended **[*1107]** to confuse or mislead the jury on the controlling issues of the case. *Davet v. Maccarone, 973 F.2d 22, 26 (1st Cir. 1992)*; **[**48]** *Transnational Corp. v. Rodio & Ursillo, Ltd., 920 F.2d 1066, 1070 (1st Cir. 1990)*; *see also* *L.A. Coliseum, 726 F.2d at 1398* ("The question, then, is whether, viewing the jury instructions as a whole, the trial judge gave adequate instructions on each element of the case to insure that the jury fully understood the issues."). We must also consider whether the NFL's proposed instructions are accurate or misleading. *Shane v. Shane, 891 F.2d 976, 987 (1st Cir. 1989)*. ***HN9*** "As long as the judge's instruction properly apprises the jury of the applicable law, failure to give the exact instruction requested does not prejudice the objecting party." *Brown* v. *Trustees of Boston Univ.*, 891 F.2d 337, 354 (1st Cir. 1989), *cert. denied*, *496 U.S. 937, 110 L. Ed. 2d 664, 110 S. Ct. 3217 (1990)* (internal quotations omitted). A party, however, is entitled to have its legal theories on controlling issues, which are supported by the law and by the evidence, presented to the jury. *Jerlyn Yacht Sales, Inc.* v. *Roman Yacht Brokerage*, 950 F.2d 60, 68 (1st Cir. 1991); **[**49]** *L.A. Coliseum, 726 F.2d at 1398*. An error in the jury instructions will warrant the reversal of the judgment and a new trial only if, upon review of the record as a whole, the error is determined to be prejudicial. *Davet, 973 F.2d at 26*; *Jerlyn Yacht Sales*, 950 at 69; *Transnational Corp., 920 F.2d at 1070*.

In this case, we find that the failure to give certain instructions was prejudicial error [6] and we therefore vacate the judgment and order a new trial.

A. Equal Involvement Defense

The NFL argued before the district court that Sullivan was a complete and substantially equal participant in the NFL's ownership **[**50]** policy which he now challenges in the present lawsuit. As a result of Sullivan's involvement, the NFL claimed, Sullivan was barred from bringing a damages action under the antitrust laws pursuant to the "equal involvement defense" doctrine. The district court denied motions for summary judgment and a directed verdict on this issue and, further, refused to instruct the jury on the availability of the defense because it found that the evidence showed that Sullivan "had very little, if any, involvement in the formulation of [the public ownership] rule," and because the rule "was imposed on [Sullivan] by a preexisting National Football League rule." This ruling constituted prejudicial error because the "equal involvement defense" is an absolute defense to an antitrust claim and because the evidence warranted sending the issue to the jury.

A plaintiff's "complete, voluntary, and substantially equal participation" in an illegal practice under the antitrust laws precludes recovery for that antitrust violation. *CVD, Inc. v. Raytheon Co.,*

---

[6] The court's failure to instruct on the complete involvement defense was prejudicial error and, by itself, sufficient grounds for reversal and a new trial. We do not decide whether any of the other errors, standing alone, are prejudicial. We do hold, however, that all the errors taken together are prejudicial.

769 F.2d 842, 856 (1st Cir. 1985), *cert. denied*, 475 U.S. 1016, 89 L. Ed. 2d 312, 106 S. Ct. 1198 (1986); **[**51]** *General Leaseways, Inc. v. National Truck Leasing Ass'n, 830 F.2d 716, 720-23 (7th Cir. 1987)*; *THI-Hawaii, Inc. v. First Commerce Financial Corp., 627 F.2d 991, 995 (9th Cir. 1980)*; *see also* *Bateman Eichler, Hill, Richards, Inc. v. Berner, 472 U.S. 299, 310-11, 86 L. Ed. 2d 215, 105 S. Ct. 2622 (1985)* (applying equal involvement defense in securities law context). In order to establish an "equal involvement" defense, an antitrust defendant must prove, by a preponderance of the evidence, that the plaintiff bears at least substantially equal responsibility for an anticompetitive restriction by creating, approving, maintaining, continually and actively supporting, relying upon, or otherwise utilizing and implementing, that restriction to his or her benefit. [7] **[**53]** *General* **[*1108]** *Leaseways, 830 F.2d at 720-26*; *CVD, 769 F.2d at 856*. It is not essential to the defense that the plaintiff actually helped author or create the policy, although such facts would be highly probative, as long as the plaintiff was **[**52]** substantially responsible for maintaining and otherwise effectuating the policy. *See, e.g.*, *General Leaseways, 830 F.2d at 723* (applying equal involvement defense in case where plaintiff did not participate in the actual adoption of the policy although plaintiff was substantially involved in supporting, enforcing and maintaining the policy). [8] On the other hand, proof that the plaintiff benefitted from the challenged policy or failed to object to the policy, without more, is not sufficient to show "substantially equal participation." *See id.*, *830 F.2d at 725* (noting that "mere participation" in the challenged policy is not enough). Moreover, proof that the plaintiff was coerced ("economically" or otherwise) into supporting the policy, that the plaintiff attempted to oppose the illegal conduct, or that the plaintiff's participation was otherwise not voluntary, is highly probative of the absence of complete and equal involvement by the plaintiff in an antitrust violation. *E.g.*, *CVD, 769 F.2d at 856*.

In this case, the evidence in the record was sufficient to support a jury instruction on the equal involvement defense. Sullivan was one of the three AFL members on the Joint Committee that established the policies, including the ownership policies, that were to govern the new expanded NFL. That Committee agreed, in a merger agreement signed by Sullivan, to adopt the NFL's policy against public **[**54]** ownership for the new NFL. Sullivan's son, Chuck, stated that Sullivan was the central figure in the merger negotiations. Sullivan subsequently relied on the NFL's public ownership policy to justify his purchase, through the merger of his team into a wholly owned company, of the outstanding stock of the Patriots in 1976. In the proxy statement for that transaction, Sullivan listed the NFL's policy against public ownership as one of the "Reasons for the Merger", and he attached a letter from the NFL justifying the public ownership policy and explaining that the continued presence of public stockholders conflicted with the interests of the league. Sullivan also affirmatively supported the policy in sworn testimony during the litigation with his former shareholders following the Patriots merger. Sullivan stated that the NFL's public

---

[7] The Supreme Court in *Bateman* added an additional requirement to the "equal involvement" defense: that "preclusion of suit would not significantly interfere with the effective enforcement of" the antitrust laws. *Bateman*, 472 U.S. at 311. We do not see a preclusion of Sullivan's damages action as presenting any significant interference with antitrust law enforcement. The NFL's policy is still subject to challenge under the antitrust laws. Because the equal involvement defense only precludes a damages action, Sullivan could have requested injunctive relief when the public ownership policy was allegedly preventing him from selling 49% of his team. In addition, other owners who were not involved in the adoption or support of the policy may still bring suit should they desire to sell ownership interests in their team to the public.

[8] To the extent this conflicts with the "but for" standard applied in *THI-Hawaii*, 627 F.2d at 995 (finding that "a plaintiff's recovery is not barred unless the illegal conspiracy would not have been formed *but for* its participation"), we decline to follow that portion of the case. There is no evidence of such a rigid "but for" requirement in the Supreme Court's formulation of the equal involvement defense in *Bateman*, 472 U.S. at 310-11 (finding the defense applies where "as a direct result of his own actions, the plaintiff bears at least substantially equal responsibility for the violations he seeks to redress").

ownership policy, and the justifications underlying the policy, were the reasons for his desire to purchase all outstanding shares of the team. There is no evidence that Sullivan ever opposed or objected to the ownership policy prior to the circumstances surrounding this case.

Taken together, this evidence is sufficient for a reasonable jury to conclude **[**55]** that Sullivan bears substantially equal responsibility for the NFL's public ownership policy because Sullivan helped adopt the policy, he relied upon it, and he actively supported it. The jury, however, was never given an opportunity to consider this evidence in light of the equal involvement defense.

Sullivan claims that he was not at the meetings in which Lamar Hunt, the chairman of the AFL committee, agreed to the NFL's public ownership policy, and that he did not know in advance that the old NFL's public ownership rule would be adopted by the new NFL. Mr. Hunt himself testified, however, that he always spoke for the entire AFL committee at his various meetings with NFL owners, and that he discussed various **[*1109]** negotiating points with the other AFL owners, including Sullivan, before any decisions were made. Moreover, Sullivan's own team obtained a specific waiver from the ownership policy, which, a reasonably jury could infer, indicates that Sullivan was involved in the decision to adopt the policy. In any event, it is the jury's responsibility to weigh the evidence and make a choice in circumstances like this where the same evidence supports two different yet reasonable conclusions.

**[**56]** The district court erred by failing to give the jury the opportunity to choose between these versions of the facts. The court's "finding" that Sullivan's involvement in the public ownership policy was minimal ignores evidence in the record. The court's view that the NFL imposed the ownership policy on the AFL owners, rendering their participation involuntary, is largely unsupported by the record. Ultimately, however, these are factual questions for the jury and none of the instructions provided by the district court served to adequately instruct the jury on this issue or send the issue to the jury. Therefore, the district court erred in refusing to give the NFL's proffered instruction on the "equal involvement" defense.

The error was prejudicial. By refusing to instruct the jury on the equal involvement defense, the district court deprived the NFL of a complete defense from Sullivan's lawsuit. The NFL presented facts that could have led to a dismissal of the case if they were believed by a properly instructed jury. While the NFL could have highlighted, and in fact did highlight, some of the facts concerning Sullivan's support of, and reliance upon, the ownership policy in its closing **[**57]** argument before the jury, this effort was limited to the argument that the NFL's policy was "reasonable" for purposes of the rule of reason analysis. The NFL did not, and could not, argue to the jury that it should rule in favor of the NFL because Sullivan's participation in the adoption and maintenance of the public ownership policy was complete, voluntary and substantially equal. Without the proffered instruction, the jury had no occasion to consider whether Sullivan should be deprived of a damages remedy because of his involvement in the policy he now challenges. As a result, the district court's refusal to send the equal involvement defense to the jury was prejudicial error requiring a new trial.

B. Failure to Request an Official Vote of the Owners

As discussed in Section II.C. above, in order to establish that the policy actually caused injury to himself, Sullivan must prove that the NFL effectively denied his request to waive or amend its policy against public ownership. While there is evidence that supports a finding that the NFL's policy effectively blocked Sullivan from pursuing his public offering, there is also sufficient

evidence to support a contrary finding. **[**58]** Sullivan's failure to request a vote from the owners after he discovered that he was four votes shy of obtaining a waiver with seven owners still undecided, combined with former Commissioner Rozelle's testimony that he told Sullivan that Rozelle would put to the owners any plan that Sullivan wished, could support a finding that Sullivan was a "dormant plaintiff" who did not "spring into action" until it was "time to file suit." *Out Front, 748 F.2d at 170*. As such, a jury could conclude that the NFL did not prevent Sullivan from pursuing his stock sale, but instead, Sullivan simply dropped the idea for reasons unrelated to the NFL's policy. If the jury had reached such a conclusion, Sullivan would have failed to prove that his injury was caused by the antitrust policy, and judgment for the NFL would be required.

The NFL proposed instructions concerning Sullivan's failure to ask for a vote essentially stating that such a failure would result in judgment for the NFL if it was reasonable to require Sullivan to make such a request. The court refused to give the instruction because it felt that to do so would be to comment on the evidence, and the court did **[**59]** not want to comment on any of the evidence presented at trial. We understand the court's concern but believe that, under the facts of this case, there is a crucial point of law contained in the NFL's instruction that was not otherwise provided to the jury.

The jury was instructed generally on the issue of causation, but it was not told that it **[*1110]** had to determine whether the NFL's policy against public ownership was actually enforced against Sullivan; that is, whether the policy, the alleged antitrust restraint, actually restrained Sullivan in any way from making a 49% public offering of his team. Although the NFL could, and did, argue that Sullivan's failure to ask for a vote was evidence that the policy did not cause injury to Sullivan, there was no legal hook upon which the jury could hang the NFL's argument. The failure of Sullivan to request a vote is a critical and potentially dispositive issue in this case. If the alleged restraint of trade does not even exist in practice, the whole case essentially disappears. Therefore, the jury should have been directed to make a specific finding as to whether the public ownership policy was enforced against Sullivan.

If the jury is instructed **[**60]** that Sullivan must prove that the NFL's policy was enforced against him, the jury will have cause to consider the crucial matter of whether the NFL actually enforced its policy against Sullivan or rather, whether the NFL never had the chance to enforce its policy because Sullivan was never prepared to pursue his public offering. The instructions as proffered by the NFL may need to be tailored to avoid commenting on the evidence surrounding the "missing" vote by the NFL owners, but that does not excuse the court from giving no instruction at all on the issue. The failure to give some instruction concerning the failure of Sullivan to request a vote was error.

### C. The Murray Option

In 1986, prior to Sullivan's decision to sell Patriots stock to the public, Sullivan sold Fran Murray an option to buy the entire club. The NFL took the position that the Murray option would have been an absolute bar to any public sale of Patriots stock and that Sullivan therefore could not prove causation. The NFL's position was supported by evidence introduced at trial. Sullivan proffered evidence that the option was not a bar to sale because the option could be bought out and because it could not **[**61]** be legally enforced. The issue of whether Murray could have, or would have, blocked a public offering by the Patriots was ultimately disputed.

The option agreement and Murray's deposition testimony were received into evidence. The district court, however, refused to admit Murray's statement that he would indeed have stopped any public stock sale of the Patriots from going forward if he had been told about it. The court found the testimony to be too speculative to be admissible. While the court's decision to exclude Murray's "speculative" testimony is well within the court's wide latitude of discretion in making such evidentiary rulings, *United States v. Abel, 469 U.S. 45, 54, 83 L. Ed. 2d 450, 105 S. Ct. 465 (1984)*; *Doty v. Sewall, 908 F.2d 1053, 1058 (1st Cir. 1990)*, we note that Sullivan's entire case as to the causation of injury was equally speculative. Whether Sullivan's proposed stock sale could have proceeded and would have been successful in the absence of the NFL's public ownership policy was a matter of considerable conjecture. Fairness would seem to militate towards allowing **[**62]** the NFL to present its own version of the probable course of future events to counter Sullivans' theorizing.

In any event, the court's subsequent refusal to give the NFL's proffered jury instruction on the law of options, specifically the legal consequences of options under Massachusetts law, erroneously removed another crucial issue from the jury's purview. The Murray option was a key defense for the NFL, because if Sullivan did not have a legal right to sell Patriots stock to the public, he did not suffer any harm from the NFL's ownership policy and the NFL would have been entitled to judgment in its favor. Again, the NFL could make this argument to the jury, but the jury would still lack crucial information concerning the legal underpinnings of a crucial defense for the NFL.

Sullivan argues that the NFL's proposed instruction would have singled out one factual issue related to causation for the jury's special attention, something that would have unfairly prejudiced Sullivan. Sullivan adds that allowing the instruction would have generated countering instructions on other legal facets of option law that were relevant to Sullivan's position on the option issue and ultimately would **[**63]** have confused the jury. These arguments notwithstanding, we feel **[*1111]** that, as long as suitable instructions are provided covering the basic legal points relevant to each party's arguments, the jury would not be unduly confused. Furthermore, the risk of prejudice from the instruction -- due to the added attention afforded one of the NFL's defenses -- is not sufficient to justify effectively depriving the NFL of a crucial defense. Ultimately, it was for the jury to decide whether the Murray option constituted an insurmountable obstacle to Sullivan's case on causation, and the district court's refusal to instruct on the law of options virtually removed this issue from consideration by the jury.

**D. Balancing Procompetitive and Anticompetitive Effects**

**in the Relevant Market**

As we noted above, the rule of reason analysis requires a weighing of the injury and the benefits to competition attributable to a practice that allegedly violates the antitrust laws. *Monahan's Marine, 866 F.2d at 526*. The district court instructed the jury on its verdict form to balance the injury to competition in the relevant market with the benefits to competition in that same **[**64]** relevant market. The NFL protested, claiming that all procompetitive effects of its policy, even those in a market different from that in which the alleged restraint operated, should be considered. The NFL's case was premised on the claim that its policy against public ownership was an important part of the effective functioning of the league as a joint venture. Although it was not readily apparent that this beneficial effect applied to the market for ownership interests in NFL teams, the relevant market found by the jury, the NFL argued that its justification should

necessarily be weighed by the jury under the rule of reason analysis. Sullivan responded, and the district court agreed, that a jury cannot be asked to compare what are essentially apples and oranges, and that it is impossible to conduct a balancing of alleged anticompetitive and procompetitive effects of a challenged practice in every definable market.

The issue of defining the proper scope of a rule of reason analysis is a deceptive body of water, containing unforeseen currents and turbulence lying just below the surface of an otherwise calm and peaceful ocean. The waters are muddied by the Supreme Court's decision **[**65]** in *NCAA* -- one of the more extensive examples of the Court performing a rule of reason analysis -- where the Court considered the value of certain procompetitive effects that existed outside of the relevant market in which the restraint operated. *NCAA*, 468 U.S. at 115-20 (considering the NCAA's interest in protecting live attendance at untelevised games and the NCAA's "legitimate and important" interest in maintaining competitive balance between amateur athletic teams as a justification for a restraint that operated in a completely different market, the market for the telecasting of collegiate football games). [9] Other courts have demonstrated similar confusion. *See, e.g.*, *L.A. Coliseum, 726 F.2d at 1381, 1392, 1397, 1399* (stating that the "relevant market provides the basis on which to balance competitive harms and benefits of the restraint at issue" but then considering a wide variety of alleged benefits, and then directing the finder of fact to "balance the gain to interbrand competition against the loss of intrabrand competition", where the two types of competition operated in **[**66]** different markets).

To our knowledge, no authority has squarely addressed this issue. On the one hand, several courts have expressed concern over the use of wide ranging interests to justify an otherwise anticompetitive practice, and others have found particular justifications to be incomparable and not in correlation with the alleged restraint of trade. *Smith v. Pro Football, Inc., 193 U.S. App. D.C. 19, 593 F.2d 1173, 1186 (D.C. Cir. 1978)*; **[**67]** *Brown v. Pro Football, Inc., 812 F. Supp. 237, 238 (D.D.C. 1992)*; *Chicago Pro. Sports Ltd. Partnership v. National* **[*1112]** *Basketball Ass'n, 754 F. Supp. 1336, 1358 (N.D.Ill. 1991)*. We agree that the ultimate question under the rule of reason is whether a challenged practice promotes or suppresses competition. Thus, it seems improper to validate a practice that is decidedly in restraint of trade simply because the practice produces some unrelated benefits to competition in another market.

On the other hand, several courts, including this Circuit, have found it appropriate in some cases to balance the anticompetitive effects on competition in one market with certain procompetitive benefits in other markets. *See, e.g.*, *NCAA*, 468 U.S. at 115-20; *Grappone, Inc. v. Subaru of New England, Inc., 858 F.2d 792, 799 (1st Cir. 1988)*; *M & H Tire Co. v. Hoosier Racing Tire Corp., 733 F.2d 973, 986 (1st Cir. 1984)*; *L.A. Coliseum, 726 F.2d at 1381, 1392, 1397, 1399*. Moreover, **[**68]** the district court's argument that it would be impossible to compare the procompetitive effects of the NFL's policy in the *inter*brand market of competition between the NFL and other forms of entertainment, with the anticompetitive effects of the *intra*brand market of competition between NFL teams for the sale of their ownership interests, is arguably refuted by the Supreme Court's holding in *Continental T.V., Inc. v. GTE Sylvania Inc., 433 U.S. 36, 53 L. Ed. 2d 568, 97 S. Ct. 2549 (1977)*. *Continental T.V.* explicitly recognized that positive effects on

---

[9] The Supreme Court did not expressly consider the issue presented here. Therefore, it is impossible to tell whether the Court was consciously applying the rule of reason to include a broad area of procompetitive benefits in a variety of markets, or whether the Court was simply not being very careful and inadvertently extended the rule of reason past its proper scope. There is certainly no language, as Sullivan suggests, indicating that the Court was considering the alleged benefit of "competitive balance" only to the extent that it had procompetitive effects in the market for televised football games.

*inter*brand competition can justify anticompetitive effects on *intra*brand competition. *Id. at 51-59*. Although *Continental T.V.* can reasonably be interpreted as referring only to interbrand and intrabrand components of the *same relevant market*, *Hornsby Oil Co., Inc. v. Champion Spark Plug Co., 714 F.2d 1384, 1394 (5th Cir. 1983)*, there is also some indication that interbrand and intrabrand competition necessarily refer to distinct, yet related, markets. **[**69]** *Continental T.V., 433 U.S. at 52 n.19* ("The degree of intrabrand competition is wholly independent of the level of interbrand competition."). Arguably, the market put forward by the NFL -- that is the market for NFL football in competition with other forms of entertainment -- is closely related to the relevant market found by the jury such that the procompetitive benefits in one can be compared to the anticompetitive harms in the other. Clearly this question can only be answered upon a much more in-depth inquiry that we need not, nor find it appropriate to, embark upon at this time.

Finally, we note that although balancing harms and benefits in different markets may be unwieldy and confusing, such is the case with a number of balancing tests that a court or jury is expected to apply all the time. Indeed, Justice Brandeis' famous formulation of the rule of reason seems to contemplate the balancing of a wide variety of factors and considerations, many of which are not necessarily comparable or correlative:

> ***HN10*** The true test of legality is whether the restraint imposed is such as merely regulates and perhaps thereby promotes **[**70]** competition or whether it is such as may suppress or even destroy competition. To determine that question the court must ordinarily consider the facts peculiar to the business to which the restraint is applied; its condition before and after the restraint was imposed; the nature of the restraint and its effect, actual or probable. The history of the restraint, the evil believed to exist, the reason for adopting the particular remedy, the purpose or end sought to be attained, are all relevant facts.*Board of Trade of the City of Chicago v. United States, 246 U.S. 231, 238, 62 L. Ed. 683, 38 S. Ct. 242 (1918)*.

Although the issue of the proper scope of the rule of reason analysis is more appropriately resolved in a case where it is dispositive and more fully briefed, we can draw at least one general conclusion from the caselaw at this point: ***HN11*** courts should generally give a measure of latitude to antitrust defendants in their efforts to explain the procompetitive justifications for their policies and practices; however, courts should also maintain some vigilance by excluding justifications that are so unrelated to the **[**71]** challenged practice that they amount to a collateral attempt to salvage a practice that is decidedly in restraint of trade.

In any event, we need not enter these dangerous waters to resolve the instant dispute. The NFL wanted the jury to consider its proffered justifications for the public **[*1113]** ownership policy -- namely that the policy enhanced the NFL's ability to effectively produce and present a popular entertainment product unimpaired by the conflicting interests that public ownership would cause. These procompetitive justifications should have been considered by the jury, even under Sullivan's theory of the proper scope of the rule of reason analysis. As we point out in note [4] above, and as Sullivan himself points out, to the extent the NFL's policy strengthens and improves the league, resulting in increased competition in the market for ownership interests in NFL clubs through, for example, more valuable teams, the jury may consider the NFL's justifications as relevant factors in its rule of reason analysis. The danger of the proffered instructions on

the verdict form is that they may have mislead the jury into thinking that it was precluded from considering the NFL's justifications **[**72]** for its ownership policy. Therefore, the relevant market language on the verdict form should be removed, or else the jury should be informed that evidence of benefits to competition in the relevant market can include evidence of benefits flowing indirectly from the public ownership policy that ultimately have a beneficial impact on competition in the relevant market itself.

**E. References to Prior Antitrust Cases Against the NFL**

Despite a pretrial motion *in limine* and repeated objections by the NFL, the district court allowed the jury to hear numerous references to prior antitrust cases against the NFL. Evidence about prior antitrust violations by the defendant may, in appropriate cases, be admissible to show things like market power, intent to monopolize, motive, or method of conspiracy. *United States Football League v. National Football League, 842 F.2d 1335, 1371 (2d Cir. 1988)* (hereinafter "*USFL*"). Because of the inherently prejudicial nature of such evidence, however, evidence of prior antitrust cases involving the NFL are only admissible if Sullivan can demonstrate that the conduct underlying those prior judgments had a direct, **[**73]** logical relationship to the conduct at issue in the present case. *USFL*, 842 F.2d at 1371; *International Shoe Mach. Corp. v. United Shoe Mach. Corp., 315 F.2d 449, 454 (1st Cir.)*, *cert. denied*, *375 U.S. 820, 11 L. Ed. 2d 54, 84 S. Ct. 56 (1963)* (plaintiff must show "that his claimed injury stemmed directly and proximately from the same type of practice condemned in the prior Government action"); *see also Coleman Motor Co. v. Chrysler Corp., 525 F.2d 1338, 1351 (3d Cir. 1975)*. In many of the instances where Sullivan or his counsel made references to prior antitrust cases at trial, Sullivan failed to satisfy this burden.

Sullivan argues that the prior cases were relevant either to certain testimony regarding the reasonableness of the NFL's ownership policy and voting requirements or to the issue of defining the relevant market. Because none of the cases mentioned at trial concerned the NFL's ownership policy at issue here, evidence of those prior cases is not relevant to the reasonableness of the NFL's policy against public **[**74]** ownership. The general voting requirements are not in dispute, so cases touching solely upon them are also not relevant. Certain limited portions of some prior antitrust decisions are relevant to the issue of defining the relevant market. The testimony and commentary at trial concerning these prior cases, however, was not limited to the relevant market portions of these cases and, on the contrary, focussed primarily on the issue of whether the NFL's public ownership policy was unreasonable. As such, that evidence was prejudicial, without any balancing relevance to justify its admission into evidence.

The references to prior NFL cases were made in a number of different contexts during the trial (including during direct examination, cross-examination, and at closing argument), and they contained a variety of different information. These references are not likely to be repeated in precisely the same context upon a new trial. Therefore, instead of identifying which particular pieces of evidence were inadmissible, we think it would be more useful to point out more generally that references to prior NFL cases are not relevant to the issue of the reasonableness of the NFL's public ownership **[**75]** policy and such references should be excluded if they contain information about the unreasonableness of other policies of the NFL which were at issue in the other cases.

*Reversed and remanded*.

EXHIBIT 289

LexisNexis®
Questioned
As of: August 12, 2014 9:17 AM EDT

# Tamko Roofing Prods., Inc. v. Ideal Roofing Co., Ltd.

United States Court of Appeals for the First Circuit
March 7, 2002, Decided
Nos. 01-1382, 01-2273

**Reporter:** 282 F.3d 23; 2002 U.S. App. LEXIS 3578; 61 U.S.P.Q.2D (BNA) 1865
TAMKO ROOFING PRODUCTS, INC., Plaintiff, Appellee, v. IDEAL ROOFING COMPANY, LTD., Defendant, Appellant.

**Prior History:** **[**1]** APPEALS FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEW HAMPSHIRE. Hon. Joseph A. DiClerico, Jr., U.S. District Judge.

*Tamko Roofing Prods.,Inc. v. Ideal Roofing Co., 2000 DNH 219, 2000 U.S. Dist. LEXIS 16437 (D.N.H. 2000)*.

**Disposition:** Affirmed.

**Core Terms**

profits, district court, infringement, trademark, attorneys', roofing, accounting, willful, products, bad faith, preliminary injunction, argues, direct competition, injunction, compete, metal, sales, exceptional case, abuse of discretion, contempt order, mistrial, injunctive relief, awarding, cases, companies, asphalt, damages, manufacturer, deterrence, brochures

**LexisNexis® Headnotes**

Antitrust & Trade Law > ... > Private Actions > Costs & Attorney Fees > Clayton Act
Civil Procedure > Remedies > Costs & Attorney Fees > General Overview
Civil Procedure > ... > Attorney Fees & Expenses > Basis of Recovery > Statutory Awards
Patent Law > Remedies > Equitable Relief > Equitable Accountings
Patent Law > Remedies > Equitable Relief > Injunctions
Trademark Law > ... > Remedies > Damages > General Overview

***HN1*** Bad faith or fraud is not a necessary condition to an award of attorneys' fees under § 35 of the Lanham Act, *15 U.S.C.S. § 1117(a)*; willful conduct may be sufficient when the trial court takes into account all the facts and equities of the case.

Antitrust & Trade Law > ... > Private Actions > Costs & Attorney Fees > Clayton Act
Civil Procedure > Remedies > Costs & Attorney Fees > General Overview
Civil Procedure > ... > Attorney Fees & Expenses > Basis of Recovery > Statutory Awards
Civil Procedure > Appeals > Standards of Review > Clearly Erroneous Review
Civil Procedure > Appeals > Standards of Review > De Novo Review
Trademark Law > ... > Remedies > Damages > General Overview
Trademark Law > ... > Infringement Actions > Standards of Review > General Overview

Trademark Law > ... > Infringement Actions > Standards of Review > Abuse of Discretion

***HN2*** The appellate court reviews de novo the legal question of the meaning of "exceptional cases" in the context of § 35 of the Lanham Act, *15 U.S.C.S. § 1117(a)*.The appellate court reviews the district court's award of attorneys' fees under § 35 of the Lanham Act for abuse of discretion. To the extent that the district court's award rests on factual determinations, however, the appellate court reviews those for clear error.

Antitrust & Trade Law > ... > Private Actions > Costs & Attorney Fees > Clayton Act
Civil Procedure > Remedies > Costs & Attorney Fees > General Overview
Civil Procedure > ... > Attorney Fees & Expenses > Basis of Recovery > Statutory Awards
Trademark Law > ... > Remedies > Damages > General Overview

***HN3*** The Lanham Act provides: The court in exceptional cases may award reasonable attorneys fees to the prevailing party. *15 U.S.C.S. § 1117(a)*.

Civil Procedure > Judicial Officers > Judges > Discretionary Powers
Civil Procedure > Remedies > Costs & Attorney Fees > General Overview
Trademark Law > ... > Unfair Competition > Federal Unfair Competition Law > General Overview
Trademark Law > ... > Remedies > Damages > General Overview
Trademark Law > ... > Infringement Actions > Standards of Review > General Overview

***HN4*** Under the Lanham Act, the decision to award fees is committed to the district court, not the jury. Where the facts of record amply explain the decision, the appellate court will not find that the mere failure of the trial judge to be more explicit amounts to an abuse of discretion.

Civil Procedure > Remedies > Costs & Attorney Fees > General Overview
Trademark Law > ... > Remedies > Damages > General Overview

***HN5*** In exceptional cases, attorneys' fees may be appropriate under the Lanham Act in circumstances where the acts of infringement were "malicious," "fraudulent," "deliberate," or "willful." Attorneys' fees may be awarded when equitable considerations justify such awards.

Civil Procedure > Remedies > Costs & Attorney Fees > General Overview
Trademark Law > ... > Remedies > Damages > General Overview

***HN6*** Fraud or bad faith may justify an attorneys' fees award in some cases under the Lanham Act, but a finding of bad faith or fraud is not a necessary precondition. Willfulness short of bad faith or fraud will suffice when equitable considerations justify an award and the district court supportably finds the case exceptional.

Civil Procedure > Remedies > Costs & Attorney Fees > General Overview
Copyright Law > ... > Damages > Types of Damages > Compensatory Damages
Trademark Law > ... > Infringement Actions > Remedies > General Overview
Trademark Law > ... > Damages > Types of Damages > Costs & Attorney Fees
Trademark Law > ... > Remedies > Damages > General Overview
Trademark Law > ... > Factors for Determining Confusion > Intent of Defendant to Confuse > General Overview

***HN7*** The following factors should be considered in determining whether a case is exceptional to award attorneys' fees under the Lanham Act: the area of law is unclear and defendants might

reasonably think they did not infringe; there is a close legal question as to whether there is any trademark violation; defendant had no intent to deceive or confuse the public; the defendant made a concerted effort to create a non-infringing mark; the plaintiff suffered no actual damage. These are factors to be considered as part of a case-specific multi-factored analysis.

Civil Procedure > Remedies > Costs & Attorney Fees > General Overview
Criminal Law & Procedure > Search & Seizure > Search Warrants > General Overview
Trademark Law > ... > Remedies > Damages > General Overview

***HN8*** It is the totality of the circumstances, rather than a particular item alone, that suffices for an award of attorneys' fees under the Lanham Act. Mere failure to conduct a trademark search before using a mark may evidence nothing more than carelessness, and so may not warrant an award of fees.

Trademark Law > Causes of Action Involving Trademarks > Infringement Actions > General Overview
Trademark Law > ... > Infringement Actions > Remedies > General Overview
Trademark Law > ... > Remedies > Damages > General Overview
Trademark Law > ... > Damages > Types of Damages > Profits

***HN9*** When a trademark is infringed, trademark owners have more at stake than just the damages or loss of profits in that case. Their failure to enforce their rights may result in the weakening of these rights over time. The cost of enforcing the rights may well be larger than the lost profits in any particular case.

Civil Procedure > Appeals > Standards of Review > Clearly Erroneous Review
Trademark Law > Causes of Action Involving Trademarks > Infringement Actions > General Overview
Trademark Law > ... > Remedies > Damages > General Overview
Trademark Law > ... > Damages > Types of Damages > Profits
Trademark Law > ... > Infringement Actions > Standards of Review > General Overview
Trademark Law > ... > Infringement Actions > Standards of Review > De Novo Review

***HN10*** The appellate court reviews de novo the legal standard by which an award of defendant's profits for trademark infringement is calculated, and for clear error the factual findings supporting the award.

Copyright Law > ... > Damages > Types of Damages > Infringement Profits
Governments > Courts > Judicial Precedent
Trademark Law > Causes of Action Involving Trademarks > Infringement Actions > Determinations
Trademark Law > Likelihood of Confusion > Consumer Confusion > General Overview
Trademark Law > Likelihood of Confusion > Confusion Among Noncompeting Products > General Overview

***HN11*** Under the United States Court of Appeals for the First Circuit precedent, there may be infringement, as well as an accounting of defendant's profits, even when most of the products are not in competition, if there is evidence of likelihood of confusion.

Civil Procedure > Preliminary Considerations > Equity > Adequate Remedy at Law
Copyright Law > ... > Damages > Types of Damages > Compensatory Damages
Trademark Law > ... > Federal Unfair Competition Law > False Designation of Origin > General Overview
Trademark Law > ... > Federal Unfair Competition Law > False Designation of Origin > Palming Off

Trademark Law > Causes of Action Involving Trademarks > Infringement Actions > General Overview
Trademark Law > ... > Infringement Actions > Remedies > General Overview
Trademark Law > ... > Remedies > Damages > General Overview
Trademark Law > ... > Remedies > Equitable Relief > General Overview
Trademark Law > ... > Remedies > Equitable Relief > Equitable Accountings

***HN12*** An accounting of defendant's profits may be awarded in a trademark infringement action "subject to the principles of equity." *15 U.S.C.S. § 1117(a)*. If injunctive relief provides a complete and adequate remedy, then the equities of the case may not require an accounting of profits. Injunctive relief may be adequate if there has been no fraud or palming off and there is little likelihood of actual damage to the plaintiff or profit to the defendant.

Trademark Law > ... > Federal Unfair Competition Law > False Designation of Origin > General Overview
Trademark Law > ... > Federal Unfair Competition Law > False Designation of Origin > Palming Off
Trademark Law > Causes of Action Involving Trademarks > Infringement Actions > General Overview
Trademark Law > ... > Remedies > Damages > General Overview
Trademark Law > ... > Remedies > Equitable Relief > Equitable Accountings

***HN13*** An accounting of defendant's profits where the products directly compete does not require fraud, bad faith, or palming off in a trademark infringement action.

Copyright Law > ... > Damages > Types of Damages > Infringement Profits
Trademark Law > Causes of Action Involving Trademarks > Infringement Actions > General Overview
Trademark Law > ... > Infringement Actions > Remedies > General Overview
Trademark Law > ... > Remedies > Damages > General Overview
Trademark Law > ... > Remedies > Equitable Relief > Equitable Accountings

***HN14*** The United States Court of Appeals for the First Circuit articulates three justifications for awarding to a plaintiff an accounting of the defendant's profits in a trademark infringement action: (1) as a rough measure of the harm to a plaintiff; (2) to avoid unjust enrichment of the defendant; or (3) if necessary to protect the plaintiff by deterring a willful infringer from further infringement.

Copyright Law > ... > Damages > Types of Damages > Infringement Profits
Trademark Law > ... > Remedies > Damages > General Overview
Trademark Law > ... > Damages > Types of Damages > Profits

***HN15*** Once a plaintiff has shown direct competition and infringement, the Lanham Act places the burden on the infringer to show the limits of the direct competition. In assessing profits, the plaintiff shall be required to prove defendant's sales only; defendant must prove all elements of cost or deduction claimed. *15 U.S.C.S. § 1117(a)*.

Trademark Law > ... > Remedies > Damages > General Overview

***HN16*** The Lanham Act provides: If the court shall find that the amount of the recovery based on profits is either inadequate or excessive the court may in its discretion enter judgment for such sum as the court shall find to be just, according to the circumstances of the case. Such sum in the above circumstances shall constitute compensation and not a penalty. *15 U.S.C.S. § 1117(a)*.

Trademark Law > ... > Remedies > Damages > General Overview

Trademark Law > ... > Remedies > Equitable Relief > Equitable Accountings

***HN17*** In cases of at least some direct competition and willfulness, some role may exist for deterrence in an award of an accounting of profits. The role of deterrence must be carefully weighed in light of the statutory prohibition on the imposition of penalties. *15 U.S.C.S. § 1117(a)*. The rule that where there is willful infringement, an accounting of profits is not necessarily restricted to the particular area of direct competition is reinforced by the intention of the Lanham Act to provide nationwide protection of a mark, in contrast to the more limited geographic protection afforded by the common law. Nonetheless, the deterrence rationale is primarily served by the attorneys' fees award, and should not be the primary reason for an accounting of profits.

Trademark Law > ... > Remedies > Damages > General Overview

***HN18*** Under the Lanham Act, it may well be equitable for a court to include in the damages calculation an award of less than the defendant's complete profits in light of less than complete direct competition. On other facts, it may be inequitable to give defendants such a benefit. Mechanical rules are of little aid in this analysis. Equity must take account of the purposes served by the Lanham Act: One is to protect the public so it may be confident that, in purchasing a product bearing a particular trade-mark which it favorably knows, it will get the product which it asks for and wants to get. Secondly, where the owner of a trade-mark has spent energy, time, and money in presenting to the public the product, he is protected in his investment from its misappropriation by pirates and cheats.

Civil Procedure > Appeals > Standards of Review > Clearly Erroneous Review
Trademark Law > Causes of Action Involving Trademarks > Infringement Actions > General Overview
Trademark Law > ... > Remedies > Damages > General Overview
Trademark Law > ... > Damages > Types of Damages > Profits
Trademark Law > ... > Infringement Actions > Standards of Review > General Overview

***HN19*** The calculation of the profits award in a trademark infringement action is up to the trial court's discretion, and the appellate court will not disturb it unless it rests on clearly erroneous findings of fact, incorrect legal standards, or a meaningful error in judgment.

Trademark Law > Causes of Action Involving Trademarks > Infringement Actions > General Overview
Trademark Law > Causes of Action Involving Trademarks > Infringement Actions > Burdens of Proof
Trademark Law > Causes of Action Involving Trademarks > Infringement Actions > Determinations
Trademark Law > ... > Remedies > Damages > General Overview
Trademark Law > ... > Remedies > Equitable Relief > Equitable Accountings
Trademark Law > ... > Damages > Types of Damages > Profits

***HN20*** The defendant has the burden of producing evidence as to its costs in determining the amount of a profits award in a trademark infringement action. *15 U.S.C.S. § 1117(a)*.

Civil Procedure > Trials > Motions for Mistrial
Civil Procedure > Appeals > Standards of Review > Abuse of Discretion
Criminal Law & Procedure > ... > Standards of Review > Abuse of Discretion > Mistrial
Evidence > Admissibility > Procedural Matters > Rulings on Evidence

***HN21*** Where a mistrial motion is premised on the district court's admission of evidence and is denied, the appellant bears an unusually heavy appellate burden: a double burden of showing abuse of discretion, both as to the admission of evidence and as to the denial of the mistrial.

Civil Procedure > Trials > Motions for Mistrial
Civil Procedure > Appeals > Standards of Review > Abuse of Discretion
Criminal Law & Procedure > ... > Standards of Review > Abuse of Discretion > Mistrial
Evidence > Admissibility > Procedural Matters > Rulings on Evidence

***HN22*** Admission and exclusion of evidence, as well as the necessity (if any) for a mistrial, is committed to the sound discretion of the district court.

Civil Procedure > Remedies > Injunctions > General Overview
Civil Procedure > Appeals > Standards of Review > Abuse of Discretion
Civil Procedure > Appeals > Standards of Review > Clearly Erroneous Review
Governments > Legislation > Overbreadth
Trademark Law > ... > Remedies > Equitable Relief > General Overview

***HN23*** Injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to plaintiffs, and courts must closely tailor injunctions to the harm that they address. While generally the issuance of injunctive relief is reviewed for abuse of discretion, the appellate court reviews underlying factual determinations for clear error.

Civil Procedure > Remedies > Injunctions > Contempt
Governments > Legislation > Overbreadth
Trademark Law > Causes of Action Involving Trademarks > Infringement Actions > General Overview
Trademark Law > ... > Infringement Actions > Remedies > General Overview
Trademark Law > ... > Remedies > Equitable Relief > General Overview
Trademark Law > ... > Remedies > Equitable Relief > Safe Distance Rule

***HN24*** An infringer, once caught, must expect some fencing in. Thus, a court can frame an injunction which will keep a proven infringer safely away from the perimeter of future infringement.

Trademark Law > ... > Remedies > Equitable Relief > General Overview
Trademark Law > ... > Similarity of Marks > Appearance, Meaning & Sound > General Overview
Trademark Law > Subject Matter of Trademarks > Particular Subject Matter > Abbreviations, Acronyms & Monograms
Trademark Law > ... > Particular Subject Matter > Names > Nicknames

***HN25*** There are circumstances in which abbreviations of trademarks may be protectable as independent marks.

**Counsel:** H. Joseph Hameline with whom Rosemary M. Allen, Geri L. Haight, Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C., and Michael B. Clapp were on brief for appellant.

Christopher R. Benson with whom Marcy Hogan Greer, Susan J. Hightower, and Fulbright & Jaworski L.L.P., and John R. Keville and Howrey Simon Arnold & White, LLP, were on brief for appellee.

**Judges:** Before Selya, Circuit Judge, Campbell, Senior Circuit Judge, and Lynch, Circuit Judge.

**Opinion by:** LYNCH

**Opinion**

**[*26] LYNCH, *Circuit Judge*.** Tamko Roofing Products, Inc. won its trademark infringement case against Ideal Roofing Company, Ltd. after a six-day jury trial. The district court awarded Ideal's profits to Tamko, ordered Ideal to pay Tamko's attorneys' fees, which amounted to a sum larger than the profits, and issued **[*27]** a permanent injunction. Ideal now appeals each of these district court actions.

We affirm. We reject Ideal's argument that ***HN1*** bad faith or fraud is a necessary condition to an award of attorneys' fees under section 35 of the Lanham Act; willful conduct may be sufficient when the trial court takes into account all the facts and equities **[**2]** of the case. We reject Ideal's proposed limitation on the availability of an accounting of defendant's profits as a remedy for trademark infringement. The injunction, which covers a broader range of marks than those Tamko has registered with the United State Patent and Trademark Office (USPTO), is warranted by the "safe distance rule."

I.

The facts are described "as a jury might have found them, consistent with the record but in the light most favorable to the verdict." *Grajales-Romero v. Am. Airlines, Inc., 194 F.3d 288, 292 (1st Cir. 1999)*.

Tamko and Ideal each manufacture and sell roofing products. Tamko manufactures and sells asphalt roofing products, including shingles, in the United States and Canada. Ideal is based in Ottawa, Canada, and manufactures metal roofing and siding products, which it sells in Canada and the United States.

Since 1975, Tamko has been using the trademark "Heritage" in its roofing products business. By 1997, when Ideal began to use the Heritage mark, Tamko had registered ten marks in the Heritage family with the USPTO, including "The American Heritage Series" mark, and two Heritage family trademarks in Canada. Tamko has vigorously **[**3]** defended the Heritage marks, and has successfully enforced its trademark rights. [1]

In April 1997, Ideal selected the trademark "Heritage Series" for hidden fastener metal roofing panels, a new product it introduced to the market later that year. Ideal's "Heritage Series" mark used very similar cursive script to Tamko's "The American Heritage Series" mark. Ideal made the selection through a four-member executive committee: Marcel Laplante (President), Rene Laplante (Vice President), Pierre Tessier (Sales Manager), and Mark Lebreque (Quebec City Office Manager).

Before Ideal adopted the Heritage Series mark, Tessier attended several roofing trade shows where Tamko prominently displayed its Heritage mark. Ideal hired an advertising **[**4]** agency, Innovacom, to help in the selection and marketing of the new mark. Although the agency usually recommends a trademark search to its clients before they adopt a new mark, Rene Laplante

---

[1] For example, Tamko has been involved in disputes over the Heritage mark with MBCI, a metal roofing manufacturer, and Supradur, Inc., a slate roofing manufacturer. In both cases, the companies acknowledged that the rights to the Heritage mark used for roofing products belonged to Tamko.

of Ideal decided against conducting such a search through the agency, an attorney, or Ideal itself. Two other trademarks considered by Ideal were "Carriage" and "Royal Albert," both of which are similar to marks owned by other manufacturers in the roofing industry: Certain-Teed uses the mark "Carriage House," and IKO uses "Royal Victorian."

Although Tamko and Ideal produce and sell different types of roofing products, their products -- asphalt and metal roofing respectively -- are both appropriate for steep-slope roofs. They compete directly in the roofing industry market, particularly in the northeastern United States. For example, Ideal belongs to the Metal Roofing Alliance, which, among other things, **[*28]** attempts to persuade homeowners to install metal roofing instead of asphalt shingles. Ideal also tried to persuade consumers to use metal roofing rather than asphalt shingles in its brochure called "The Smartest Looking House."

When Tamko discovered that Ideal was using the Heritage mark for **[**5]** its new product line, its president, David Humphreys, wrote to Marcel Laplante on March 9, 1999. In the letter, Humphreys discussed the importance of the mark to Tamko, expressed his concern that Ideal's use of the mark would cause "confusion in the marketplace," and asked Ideal to "cease and desist all use of HERITAGE in connection with its building products." When Humphreys did not receive a response, he sent another letter to Ideal on March 26, 1999, demanding a response and warning Ideal that if Tamko did not receive a response, it would have "no choice but to seek legal help to resolve this matter." Ideal responded to the second letter, but the companies could not negotiate a mutually agreeable phase out period in which Ideal would stop using the Heritage mark. Ideal wanted a two-year period, while Tamko claimed that a few months would be sufficient.

Tamko gave Ideal notice that it was going to file a suit against it, and that the USPTO had previously rejected another metal roofing manufacturer's application for the Heritage mark. In response, Ideal suggested a one-year phase out as a compromise.

In August 1999, Tamko filed suit against Ideal for trademark infringement in violation **[**6]** of section 32(1)(a) of the Lanham Act, *15 U.S.C. § 1114(1)(a) (2000)*. [2] On November 3, 1999, Tamko filed a motion for a preliminary injunction to enjoin Ideal from using the Heritage mark until the trial resolved the infringement issue. The district court granted the preliminary injunction on February 29, 2000, adopting the report and recommendation from the magistrate judge, who was briefed and held an evidentiary hearing on the issue.

Despite the preliminary injunction, Ideal continued to use the Heritage mark in its brochures and on its web site. Ideal distributed brochures containing the Heritage mark at two trade shows which took place in March 2000 in the United States. Ideal also did not modify its web site which **[**7]** contained several references to the Heritage mark. As a result, on March 16, 2000, Tamko moved for contempt. After a hearing, the magistrate judge issued another report and recommendation that "Ideal should be held in contempt," finding Ideal distributed brochures that contained the Heritage mark at a trade show two weeks after the preliminary injunction issued, and "intentionally kept the 'Heritage' mark on its web site" after the injunction issued. The district court adopted the magistrate judge's report and recommendation and held Ideal in contempt on May 26, 2000. The contempt order provided that Ideal would be fined $ 200 for each day of

---

[2] Originally, Tamko had two other claims against Ideal: unfair competition under *15 U.S.C. § 1125(a) (2000)*, and trademark dilution under *15 U.S.C. § 1125(c) (2000)*. Tamko dropped these claims before the start of the trial.

noncompliance, starting on May 29, 2000. Ideal was fined $ 3,000 for its failure to comply with the contempt order until June 13, 2000.

In advance of trial, Ideal filed a motion in limine to preclude Tamko "from making reference in the presence of the jury to the Preliminary Injunction Order issued in this case." The issue was resolved by an agreement to a stipulated instruction to the jury. The instruction given to the jury at the start of the trial on May 16, 2000, **[*29]** was "after this case was filed in this court and pending the outcome of the **[**8]** case, the Court on February [2]9, [3] the year 2000, ordered Ideal to stop using the trademark in question in order to preserve the status quo pending the outcome of the case."

On the fourth day of trial, during the cross-examination of Rene Laplante, Ideal's attorney questioned Laplante about "the Court's order" and whether it made "any mention of the Internet site?" In response, during redirect, Tamko's attorney asked Laplante about the "magistrate's report" which said that "[Ideal's] use of Heritage Series in connection with the Internet is a violation of [the] order." Ideal's attorney objected to this line of questioning.

On the fifth day of the trial, Ideal moved for a mistrial. Ideal argued that the introduction of testimony about both the preliminary injunction and the contempt order prejudiced the jury and deprived Ideal of a fair trial. The district court denied the motion, stating that Ideal **[**9]** had opened the door to the evidence about the contempt order, and that a jury would not understand the significance of a preliminary injunction in any case.

At the end of the trial, the district court ruled that Tamko's Heritage trademarks were valid. The jury found: (i) "by a preponderance of the evidence that Ideal infringed Tamko's trademarks"; (ii) "by clear and convincing evidence that Ideal acted willfully in infringing Tamko's trademarks"; and (iii) "by a preponderance of the evidence that the roofing products of Ideal and Tamko directly competed with each other."

After the close of the trial, the judge requested briefing on the issues of an accounting of defendant's profits and attorneys' fees. On August 21, 2000, the district court issued an order that Tamko was entitled to both an accounting of Ideal's profits and attorneys' fees. On October 19, 2000, the court issued an order awarding $ 201,385.60 in profits. On August 30, 2000, the district court permanently enjoined Ideal from "using the term Heritage, Heritage Series, H Series, or any name or mark confusingly similar to Heritage."

On appeal, Ideal is represented by new counsel. It does not contest the jury's findings, **[**10]** but disputes the district court's rulings. Ideal argues, first, that Tamko should not have been awarded attorneys' fees because there was no evidence to support the court's findings that "exceptional circumstances" existed. In the alternative, Ideal argues that even if attorneys' fees were justified, the district court erred in calculating the fees. Second, Ideal argues that the district court should not have awarded Tamko an accounting of 100% of Ideal's profits because the two companies did not compete in 100% of their markets, and that the court erred in setting the amount of profits. Third, Ideal contends that the district court erred in denying its motion for a mistrial based on the prejudicial admission of testimony about the preliminary injunction and contempt order against Ideal. Fourth, Ideal argues that the scope of the district court's permanent injunction was too broad in that it enjoined it from using the term "H Series," which is not one of Tamko's registered trademarks.

---

[3] The court made an error in the date of the preliminary injunction and corrected itself immediately.

II.

A. Ideal's Challenges to the Award of Attorneys' Fees to Tamko

The district court awarded over $ 500,000 in attorneys' fees and expenses to Tamko. **[*30]** Ideal protests that no fees at all should **[**11]** have been awarded since this was not an "exceptional case," a requirement under section 35 of the Lanham Act, *15 U.S.C. § 1117(a) (2000)*, for an attorneys' fees award. The district court erred, Ideal says, by using an incorrect legal standard to determine exceptional circumstances and by concluding that the evidence supported such an award. The court's error of law, Ideal argues, is that fees may only be awarded in circumstances where the defendant acted deceitfully or with a degree of culpability; it claims the court's error of fact is that there was no such deceit or culpability here. Finally, Ideal argues that even if some award of attorneys' fees was justified, the sum awarded is too high.

***HN2*** We review de novo the legal question of the meaning of "exceptional cases" in the context of section 35 of the Lanham Act. *See Atl. Fish Spotters Ass'n v. Daley, 205 F.3d 488, 490 (1st Cir. 2000)* ("A legal ruling . . . as to the meaning of the statute is almost always an issue of law reviewed *de novo*."). We review the district court's award of attorneys' fees under section 35 of the Lanham Act for abuse of discretion. [4] To the extent that the district **[**12]** court's award rests on factual determinations, however, we review those for clear error. *See Pierce v. Underwood, 487 U.S. 552, 557-58, 101 L. Ed. 2d 490, 108 S. Ct. 2541 (1988)*; *De Allende v. Baker, 891 F.2d 7, 11 (1st Cir. 1989)*; *see also People for the Ethical Treatment of Animals v. Doughney, 263 F.3d 359, 370 (4th Cir. 2001)*. As noted in *Atlantic Fish Spotters*,

> many courts, including the Supreme Court, sum up the standard in . . . attorney's fee cases by referring to abuse of discretion. But since they then treat errors of law as an example of such an abuse, it seems more informative to recognize that the effective standard of review depends upon the precise claim of error being asserted and not the nature of the case.*205 F.3d at 491 n.2* (citations omitted).

**[**13]** 1. The Standard for Exceptional Cases

***HN3*** The Lanham Act provides: "The court in exceptional cases may award reasonable attorneys fees to the prevailing party." *15 U.S.C. § 1117(a)*. Ideal asserts that the district court erred by

---

[4] Although this court has not articulated before the standard of review for the award of attorneys' fees in the Lanham Act context, we use the abuse of discretion standard in reviewing an award of attorneys' fees in several other contexts. *See, e.g., Gay Officers Action League v. Puerto Rico*, 247 F.3d 288, 292 (1st Cir. 2001) (Civil Rights Act, *42 U.S.C. § 1988*); *O'Rourke v. City of Providence*, 235 F.3d 713, 737 (1st Cir. 2001) (Title VII); *Colortronic Reinhard & Co. v. Plastic Controls, Inc.*, 668 F.2d 1, 7-8 (1st Cir. 1981) (similar attorneys' fees provision of Patent Act, 35 U.S.C. § 285); *see also Dubois v. United States Dep't of Agric.*, 270 F.3d 77, 80 (1st Cir. 2001). Several other circuits also use the abuse of discretion standard in reviewing the award of attorneys' fees under the Lanham Act. *See, e.g., Waco Int'l, Inc. v. KHK Scaffolding Houston Inc.*, 278 F.3d 523, 529 (5th Cir. 2002); *People for the Ethical Treatment of Animals v. Doughney*, 263 F.3d 359, 370 (4th Cir. 2001); *Securacomm Consulting, Inc. v. Securacom Inc.*, 224 F.3d 273, 279 (3d Cir. 2000). *But see S Indus., Inc. v. Centra 2000, Inc.*, 249 F.3d 625, 627 (7th Cir. 2001) ("We review a grant of attorney fees to a prevailing defendant under the Lanham Act only for clear error."). The widespread use of this standard for awards of attorneys' fees "reflects the fact that only the district court has the 'intimate knowledge of the nuances of the underlying case.'" *Richardson v. Miller*, 279 F.3d 1, 2002 U.S. App. LEXIS 1203, 2002 WL 91406, at *2 (1st Cir. 2002) (quoting *Gay Officers Action League*, 247 F.3d at 292), and in "determining whether sanctions are warranted 'the district court is better situated than the court of appeals to marshal the pertinent facts and apply the fact-dependent legal standard,'" *Dubois*, 270 F.3d at 80 (citing *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 402, 110 L. Ed. 2d 359, 110 S. Ct. 2447 (1990)).

essentially **[*31]** converting the jury finding of willful infringement, without more, into a court finding of exceptional circumstances justifying a fee award. In truth, the district court referred to both the jury finding of willfulness and to other record evidence before it, so there was no automatic conversion of a jury willfulness finding into a finding of exceptional circumstances. [5] The district court said nothing one way or the other as to whether there was bad faith or fraud on Ideal's part.

**[**14]** ***HN4*** Under the statute, the decision to award fees is committed to the district court, not the jury. 5 J. T. McCarthy, *McCarthy on Trademarks and Unfair Competition* § 30:99, at 30-184 (4th ed. 2001). Ideal says that the trial court failed to make the necessary findings. [6] Where the facts of record amply explain the decision, we will not find that the mere failure of the trial judge to be more explicit amounts to an abuse of discretion. *See L.E.A. Dynatech, Inc. v. Allina, 49 F.3d 1527, 1531 (Fed. Cir. 1995)* ("Although the district court did not state the specific basis for its fee award, sufficient record evidence supports the award.").

**[**15]** Because the Lanham Act does not further explain the term "exceptional cases," this court and others have turned to the legislative history for a working definition. *See Volkswagenwerk Aktiengesellschaft v. Wheeler, 814 F.2d 812, 821 (1st Cir. 1987)*; *see also Ferrero U.S.A., Inc. v. Ozak Trading, Inc., 952 F.2d 44, 47 (3d Cir. 1991)*; *VIP Foods, Inc. v. Vulcan Pet, Inc., 675 F.2d 1106, 1107 (10th Cir. 1982)*. ***HN5*** In exceptional cases, attorneys' fees may be appropriate in circumstances where the acts of infringement were "'malicious,' 'fraudulent,' 'deliberate,' or 'willful.'" S. Rep. 93-1400, at 5 (1974), *reprinted in* 1974 U.S.C.C.A.N. 7132, 7133. The legislative history also explains that attorneys' fees may be awarded "when equitable considerations justify such awards," *id. at 6*, *reprinted in* 1974 U.S.C.C.A.N. at 7137, and so the list of four (for example, "malicious") may not be exclusive.

Ideal urges this court to adopt the "bad faith" standard utilized by some circuits. *See Conopco, Inc. v. Campbell Soup Co., 95 F.3d 187, 194 (2d Cir. 1996)* (reciting Second Circuit rule requiring a showing of fraud or **[**16]** bad faith on the part of the infringer); *Texas Pig Stands, Inc. v. Hard Rock Cafe Int'l, Inc., 951 F.2d 684, 697 (5th Cir. 1992)* ("requiring a showing of a high degree of culpability on the part of the infringer, for example, bad faith or fraud"); *Scotch Whisky Ass'n v. Majestic Distilling Co., 958 F.2d 594, 599 (4th Cir. 1991)* ("It is clear . . . that for a prevailing plaintiff to succeed in a request for attorney fees, she must show that the defendant acted in bad faith."). Other circuits hold that willfulness alone is an adequate basis for the award of attorneys' fees. *Bishop v. Equinox Int'l Corp., 154 F.3d 1220, 1224 (10th Cir. 1998)* ("deliberate or **[*32]** willful" conduct on part of defendant in "failing to cease and desist from use of [the trademark] despite its written commitment to do so" was enough to warrant award of attorneys' fees); *Hartman v. Hallmark Cards, Inc., 833 F.2d 117, 123 (8th Cir. 1987)* ("Bad faith is not a prerequisite to a Lanham Act fee award."). While conceding that an award may be made if the acts of infringement are willful, Ideal argues that "willful" must mean more than just voluntary and

---

[5] To the extent Ideal argues that it would be error for a district court to adopt a per se equivalence between "exceptional case" and a jury finding of willfulness, we would agree. Congress gave the attorneys' fees issue to the court, not to the jury, and the court must consider whether an award is equitable. However, here the court did decide the issue of whether this was an "exceptional case."

[6] Ideal relies on two cases in its claim that the lack of more explicit findings by the district court was an abuse of discretion which invalidates the fee award in this case. However, in both *Bandag, Inc. v. Al Bolser's Tire Stores, Inc.*, 750 F.2d 903, 921 (Fed. Cir. 1984), and *Ferrero U.S.A., Inc. v. Ozak Trading, Inc.*, 952 F.2d 44, 48 (3d Cir. 1991), the courts relied not only on the lack of *any* express findings by the district court, but also on the lack of clear facts from the record that showed exceptional circumstances. That is not the case here.

**[**17]** intentional. Ideal grafts on another requirement that the infringing act must be fraudulent or malicious; for example, the act must be done with an intent to deceive or confuse the public, by palming off inferior goods as though they were trademark holder's goods, or through "deliberate pirating."

Ideal's argument confuses sufficient conditions for an attorneys' fees award with necessary conditions for such an award. ***HN6*** Fraud or bad faith may justify an attorneys' fees award in some cases, [7] but a finding of bad faith or fraud is not a necessary precondition. Willfulness short of bad faith or fraud will suffice when equitable considerations justify an award and the district court supportably finds the case exceptional. There are two reasons we reject a bad faith or fraud requirement as a precondition to an award of attorneys' fees. First, the legislative history of section 35 links such exceptional cases to situations where the acts are malicious or fraudulent or deliberate or willful, and where equity justifies the award. Congress's list does not stop with "malicious" or "fraudulent," and we are loath to strip "deliberate" and "willful" of meaning. Second, the purpose of the attorneys' **[**18]** fees amendment to the Lanham Act was to provide for an award in exceptional cases in which equity called for an award in the sound discretion of the district judge. We would be hard pressed to say that such a case can never arise unless there is fraud or bad faith. As an example, one circuit has approved an award of fees in a case where there was no bad faith in the infringement but the subsequent litigation was oppressive and meant to delay. *See* *Securacomm Consulting, Inc. v. Securacom Inc., 224 F.3d 273, 279-83 (3d Cir. 2000)*. [8]

**[**19]** Still, awards may be made only in exceptional cases. In *Volkswagenwerk*, this court reversed an award where the plaintiff did not plead attorneys' fees in its complaint, defendant had no statutory constructive notice of plaintiff's claim of ownership of the marks because neither the trade name nor design mark were registered, and it would have been inequitable to visit an award on the defendant's small local automobile shop. *814 F.2d at 821*. Other circuits have identified as counseling against an award ***HN7*** the following factors: the area of law is unclear and defendants might reasonably think they did not infringe, *Ferrero U.S.A., 952 F.2d at 49*; there is a close legal question as to whether **[*33]** there is any trademark violation, *Martin's Herend Imps., Inc. v. Diamond & Gem Trading USA, Co., 112 F.3d 1296, 1305 (5th Cir. 1997)*; *Ferrero U.S.A., 952 F.2d at 49*; defendant had no intent to deceive or confuse the public, *VIP Foods, 675 F.2d at 1107*; the defendant made a concerted effort to create a non-infringing mark, *Roulo v. Russ Berrie & Co., 886 F.2d 931, 942 (7th Cir. 1989)*; the plaintiff **[**20]** suffered no actual damage, *Bishop, 154 F.3d at 1224*; *VIP Foods, 675 F.2d at 1107*. We agree that these are factors to be considered as part of a case-specific multi-factored analysis.

Here, there was adequate evidence of exceptional, willful behavior, both in the infringing acts and in Ideal's conduct after Tamko brought the infringement to Ideal's attention. We outline just some of the pertinent conduct.

---

[7] Nonetheless, it is also possible that a finding of bad faith by one party might not justify an award if equity required otherwise: for example, in a case where there is equivalent bad faith by the other party.

[8] Although this court has never held that bad faith is a requirement for an award of attorneys' fees under the Lanham Act and now rejects the notion, language in some of our cases about award of fees under the Patent Act, 35 U.S.C. § 285, refers to the need for "strong evidence of unfairness and bad faith." *Colortronic Reinhard & Co. v. Plastic Controls, Inc.*, 668 F.2d 1, 8 (1st Cir. 1981), in the context of determining whether the losing party has engaged in "inequitable conduct." *Codex Corp. v. Milgo Elec. Corp.*, 717 F.2d 622, 630 (1st Cir. 1983). The language of the two acts is identical; what is different is that here we have the benefit of the Lanham Act's legislative history.

1. Within several days of a 1997 trade show attended by Ideal, where Tamko's Heritage Mark was prominently displayed, Ideal adopted the Heritage name and told its advertising agency not to do a trademark search, which is usually done. Neither Ideal nor its patent attorney did a trademark search.

2. The other two names considered by Ideal for its new product were substantially similar to marks owned by other companies.

3. Ideal used an elaborate cursive script for its "Heritage Series" mark, very similar to the one used in Tamko's mark "The American Heritage Series" (which was displayed in a 1996 Tamko brochure).

4. Ideal's metal roofing competes directly with Tamko's asphalt roofing for steep-slope roofs and Ideal tried to increase **[**21]** its market in the residential marketplace, which is asphalt's primary market.

5. Ideal did not respond to the March 9, 1999 letter from Tamko, which notified Ideal of its infringement. Tamko sent another letter on March 26, 1999. Ideal responded and suggested a lengthy two-year phase out. When Tamko informed Ideal that the USPTO rejected a trademark application for Heritage for another company's metal roofing panels, Ideal still refused to stop its use of the mark.

6. Before filing suit, Tamko gave Ideal notice on August 17, 1999; Ideal asked for a one-year phase out.

7. In August 1999, Ideal nonetheless reprinted one of its brochures that continued the use of the Heritage Series name.

8. On February 29, 2000, the district court issued a preliminary injunction against Ideal, enjoining it from further use of the mark.

9. Nonetheless, Ideal used the brochures containing the mark in a trade show in mid-March 2000, after the preliminary injunction had issued against it.

10. Despite the preliminary injunction, Ideal continued to use the mark on its web site, which was accessed by users in the United States.

11. On May 15, 2000, the magistrate judge issued **[**22]** a report and recommendation, which found that Ideal was in contempt for violation of the preliminary injunction. The district court adopted the report and recommendation and held Ideal in contempt on May 26, 2000.

12. Ideal did not come into compliance with the preliminary injunction until June 13, 2000; in the course of its noncompliance it incurred fines of $ 3,000.

***HN8*** It is the totality of the circumstances, rather than a particular item alone, that suffices for an award of attorneys' fees. For example, mere failure to conduct a trademark search before using a mark **[*34]** may evidence nothing more than carelessness, and so may not warrant an award of fees. *Securacomm Consulting, 166 F.3d 182 at 188-89*. In combination, the facts above warrant the district court's conclusion that the initial infringement and continuing infringement, even in the face of court orders, was deliberate and willful and that equity required an award of fees.

2. Amount of the Fees

The district court determined the amount of attorneys' fees under the commonly used lodestar method, in which the number of hours reasonably spent by the attorneys on the case is multiplied by a reasonable hourly **[**23]** rate. *Hensley v. Eckerhart, 461 U.S. 424, 433, 76 L. Ed. 2d 40, 103 S. Ct. 1933 (1983)*; *Lipsett v. Blanco, 975 F.2d 934, 937 (1st Cir 1992)*. Tamko submitted a supporting declaration by an experienced trademark attorney. It also submitted detailed time records from lead counsel, house counsel, and local counsel. The court considered the time and labor required, the skill required, the nature and length of the professional relationship with the client, and time limitations imposed by the client. It is clear from the court's October 6, 2000 order that it reviewed the materials in some detail.

Because Ideal did not file any opposition to Tamko's attorneys' fees request and materials, it may well have forfeited this issue for appeal. *Hebert v. Wicklund, 744 F.2d 218, 223-24 (1st Cir. 1984)*. Ideal argues that because the size of the award is substantially larger than the award of profits in this case, an injustice might result if this court does not review the amount of fees. Neither the statute nor the legislative history limits the award of fees to an amount less than the award of profits or damages. To the contrary, the legislative intent **[**24]** was partly to encourage the enforcement of trademark rights in cases where "the measurable damages are nominal." S. Rep. 93-1400, *reprinted in* 1974 U.S.C.C.A.N. 7132, 7136. ***HN9*** When a trademark is infringed, trademark owners have more at stake than just the damages or loss of profits in that case. Their failure to enforce their rights may result in the weakening of these rights over time. 2 *McCarthy on Trademarks*, *supra*, § 17:17, at 17-31. The cost of enforcing the rights may well be larger than the lost profits in any particular case. In all events, the district court appears carefully to have scrutinized Tamko's filing, [9] and it articulated a clear understanding of the applicable lodestar principles. Given these facts, and given Ideal's failure to furnish the district court with any reasons why Tamko's fee application should have been pared down, we do not think that this is an issue that requires further review.

**[**25]** B. Award to Tamko of Ideal's Profits on the Heritage Series Products

The district court awarded Tamko Ideal's profits of $ 201,385.60, a sum calculated on the basis of conservative estimates of Ideal's actual profits from the Heritage Series products between November 1997 and February 2000. Ideal argues that no profits should be awarded and the district court committed errors of law; and if any award was justified, this award was too high.

***HN10*** We review de novo the legal standard by which an award of defendant's profits is calculated, and for clear error the factual findings supporting the award.

**[*35]** 1. Standard for an Award of Defendant's Profits

The jury found that Tamko and Ideal were in direct competition. Ideal does not argue that the factual finding was unsupported, but does argue that the district court was nonetheless obligated to inquire further as to the percent of direct market overlap in which such competition took place before it could award an accounting of profits. At most, Ideal says, the two companies competed in 20-30% of their business, so it was error to award 100% of Ideal's profits. Ideal's argument

---

[9] For example, the court did not initially approve the fees and expenses of Tamko's local counsel because their records were not sufficiently specific about the dates on which services were rendered, and "a number of invoices appeared to reflect that several lawyers performed the same work."

is based on product differentiation. That is, Ideal sold **[**26]** only metal roofing, while Tamko sold only asphalt roofing. Only customers with residential steep-slope roofs would consider buying each of the two types of roofing. Ideal says that only 20% of its sales are in this residential market; its remaining sales are in the commercial and agricultural buildings market, where the products do not compete.

The thrust of the argument is essentially that most of the products Ideal sold under the infringing mark should be considered to be noncompeting products and so it is inequitable to award 100% of the profits to Tamko. ***HN11*** Under circuit precedent, there may be infringement, as well as an accounting of defendant's profits, even when most of the products are not in competition, if there is evidence, as there was here, of likelihood of confusion. *See* *Baker v. Simmons Co., 325 F.2d 580, 582 (1st Cir. 1963)* (affirming an award of defendant's profits based on defendant's gross sales where some of goods sold by defendant did not compete with those sold by plaintiff); *Baker v. Simmons Co., 307 F.2d 458, 462-63 (1st Cir. 1962)* (affirming infringement finding where plaintiff held the mark Simmons for mattresses and sleep **[**27]** products and defendant used the name Simmonds for reupholstering services).

***HN12*** An accounting of defendant's profits may be awarded in a trademark infringement action "subject to the principles of equity." *15 U.S.C. § 1117(a)*. Here, Tamko did not seek its actual damages, but did seek an accounting as well as injunctive relief. If injunctive relief provides a complete and adequate remedy, then the equities of the case may not require an accounting of profits. *Aktiebolaget Electrolux v. Armatron Int'l, Inc., 999 F.2d 1, 5 (1st Cir. 1993)* ("We have found 'a clear distinction between the showing required to establish a right to injunctive relief and that required to establish a right to damages.'") (quoting *Camel Hair and Cashmere Inst. of Am., Inc. v. Associated Dry Goods Corp., 799 F.2d 6, 12 (1st Cir. 1986))*. For example, injunctive relief may be adequate if there has been no fraud or palming off and there is little likelihood of actual damage to the plaintiff or profit to the defendant. *Champion Spark Plug Co. v. Sanders, 331 U.S. 125, 131, 91 L. Ed. 1386, 67 S. Ct. 1136 (1947)*; *Valmor Prods. Co. v. Standard Prods. Corp., 464 F.2d 200, 204 (1st Cir. 1972)*; **[**28]** *see generally* J. Koelemay Jr., *Monetary Relief in Trademark Infringement Cases, in Litigating Copyright, Trademark and Unfair Competition Cases for the Experienced Practitioner* 287, 294 (1997).

Trying to fit itself into these shoes, Ideal suggests that injunctive relief should suffice, as it engaged in neither fraud nor palming off. Ideal's argument is misplaced. The presence of injunctive relief does not preclude an accounting here. There was adequate evidence that Tamko did suffer actual damages and that Ideal did benefit from its infringement. To boot, Ideal's contumacious behavior also raises a question of the adequacy of injunctive relief alone as a remedy.

**[*36]** Repeating its theme that it acted neither fraudulently nor in bad faith, Ideal says that an accounting of profits is unwarranted. Even if we were to accept this theme, it has been this circuit's rule that ***HN13*** an accounting of defendant's profits *where the products directly compete* does not require fraud, bad faith, or palming off. *AB Electrolux, 999 F.2d at 5-6*. Our rule is thus different from the Restatement rule that an accounting of profits is conditioned on a showing of bad faith. *Restatement* **[**29]** (Third) of Unfair Competition § 37 cmt. e (1995). Although *AB Electrolux* was silent on whether "willfulness" is a precondition for an accounting, the jury here found willfulness, [10] and so we need not reach the issue in this case. [11]

---

[10] As to the meaning of willfulness, the jury was instructed that "an act is done willfully if done voluntarily and intentionally."

***HN14*** This circuit and **[**30]** others have articulated three justifications for awarding to plaintiff an accounting of the defendant's profits: (1) as a rough measure of the harm to plaintiff; (2) to avoid unjust enrichment of the defendant; or (3) if necessary to protect the plaintiff by deterring a willful infringer from further infringement. *Estate of Bishop v. Equinox Int'l Corp., 256 F.3d 1050 at 1054*; *Minn. Pet Breeders, Inc. v. Schell & Kampeter, Inc., 41 F.3d 1242, 1247 (8th Cir. 1994)*; *AB Electrolux, 999 F.2d at 5-6*; *George Basch Co. v. Blue Coral, Inc., 968 F.2d 1532, 1537 (2d. Cir. 1992)*; *see generally* 5 *McCarthy on Trademarks, supra*, §§ 30:59, 30:64.

Ideal's most cogent argument is that it did not directly compete against Tamko in all the markets in which it profited from use of the mark, and so all of its profits should not go to Tamko. Ideal points to the articulated justification for the *AB Electrolux* rule, which is that the defendant acts as a "trustee" of profits that would otherwise belong to plaintiff. *999 F.2d at 5*; *see also Valmor Prods. Co., 464 F.2d at 204*. From this, Ideal argues that *AB Electrolux* **[**31]** established a "but for" rule: a defendant may be deemed to have acted as "trustee" for the plaintiff's profits, which, but for the infringement, would have been made by plaintiff. It follows then, Ideal argues, that it cannot be deemed to have acted as "trustee" for the plaintiff's profits as to the 70-80% of the market where, it says, the two companies were not in direct competition; that is, where asphalt roofing and metal roofing did not compete.

We reject any such limitation for an accounting of profits award, once there has been a finding of direct competition, for three reasons, each articulated in the Lanham Act, *15 U.S.C. § 1117(a)*. First, the limitation misplaces the burdens, in assuming plaintiffs must meet such a test as to remedy, once infringement and direct competition are established. The burden of showing that not all profits should be awarded is more akin to the burden of showing the amount of costs to be deducted from profits, which the Act places on defendant. Second, such a test ignores the three rationales for the remedy of accounting of profits. Third, the test is inconsistent with the inherent equitable power of the district court and **[**32]** the Lanham Act's designation of an accounting of defendant's profits as an equitable remedy.

**[*37]** First, we think ***HN15*** once plaintiff has shown direct competition and infringement, the statute places the burden on the infringer to show the limits of the direct competition: "In assessing profits the plaintiff shall be required to prove defendant's sales only; defendant must prove all elements of cost or deduction claimed." *15 U.S.C. § 1117(a)*. Even before the Lanham Act, the Supreme Court had squarely placed the burden on the infringer "to prove that his infringement had no cash value in sales made by him. If he does not do so, the profits made on sales of goods bearing the infringing mark properly belong to the owner of the mark." *Mishawaka Rubber & Woolen Mfg. Co. v. S.S. Kresge Co., 316 U.S. 203, 206-07, 86 L. Ed. 1381, 62 S. Ct. 1022 (1942)*; *see also* 5 *McCarthy on Trademarks*, *supra*, § 30:65, at 30-128 ("Under the federal Lanham Act, as well as the common law, it is the infringer's burden to prove any proportion of his total profits which may not have been due to his use of the infringing mark."); Koelemay, *supra*, at 322-23 ("The burden **[**33]** of apportionment [of profits resulting directly from infringement and those not], however, is on the infringer."). Here, the plaintiff proved the amount of defendant's

---

[11] Several circuits require a finding of willfulness to support an award of the infringing defendant's profits. *See, e.g.*, *Banff, Ltd. v. Colberts, Inc.*, 996 F.2d 33, 35 (2d Cir. 1993); *Frisch's Rests., Inc. v. Elby's Big Boy*, 849 F.2d 1012, 1016 (6th Cir. 1988); *Reader's Digest Ass'n v. Conservative Digest, Inc.*, 261 U.S. App. D.C. 312, 821 F.2d 800, 807-08 (D.C. Cir. 1987). We agree that when the rationale for an award of defendant's profits is to deter some egregious conduct, willfulness is required. *See Securacomm Consulting*, 166 F.3d at 190.

sales; we consider the defense of only partial direct competition to be very similar to an element of cost or deduction claimed, which defendant has the burden of showing. At trial, Ideal did not ask for a jury finding on the percentage of market overlap. Nor did it present the issue and evidence to the trial judge when he requested briefing from both parties on the accounting of profits. The trial judge was under no obligation to raise or resolve the issue sua sponte. In fact, Tamko disputes Ideal's assertions made on appeal about the percentage of direct competition in the market, and says there was 100% overlap. The place for resolution of this issue was the trial court.

Second, even ignoring momentarily Ideal's waiver at the district court level, the argument is inconsistent with the first rationale for providing an accounting of profits -- recompense to plaintiff for the harms it has suffered. Congress recognized that the defendant's profits may be an inexact proxy for the detriment suffered by plaintiffs. Toward **[**34]** this end, ***HN16*** the Act also provides:

> If the court shall find that the amount of the recovery based on profits is either inadequate or excessive the court may in its discretion enter judgment for such sum as the court shall find to be just, according to the circumstances of the case. Such sum in . . . the above circumstances shall constitute compensation and not a penalty.*15 U.S.C. § 1117(a)*. Here, Ideal provided little basis for the district court to conclude that an award of all of defendant's profits was excessive. In addition to its own loss of profits, a plaintiff may, for example, suffer harm to the goodwill associated with its mark. But beyond that, the district court, so long as the sum awarded was not a penalty, was entitled to consider two other policy objectives once it found that defendant's conduct was inequitable: awarding defendant's profits based on unjust enrichment to the defendant, or based on a deterrence theory. *AB Electrolux, 999 F.2d at 5* ("Where defendant's inequitable conduct warrants bypassing the usual rule of actual harm, damages may be assessed on an unjust enrichment or deterrence theory.").

Even assuming **[**35]** that Tamko and Ideal directly compete as to only a portion of Ideal's sales, and even if we were to give Ideal the benefit of plain error review, we could not say that there was an abuse of discretion in awarding defendant's profits in order to avoid unjust enrichment where the infringement was willful. The award **[*38]** itself was conservative. Further, the evidence is that the infringement was willful, intended to divert customers from Tamko, and, importantly, to trade on the goodwill Tamko had established, nurtured, and assiduously guarded in its Heritage mark. There was also evidence of customer confusion. Thus, even in the absence of palming off, it is reasonable to conclude that Ideal was unjustly enriched by trading on Tamko's goodwill beyond the two companies' areas of direct competition.

***HN17*** In cases of at least some direct competition and willfulness, some role may exist for deterrence in an award of an accounting of profits. The role of deterrence must be carefully weighed in light of the statutory prohibition on the imposition of penalties. *15 U.S.C. § 1117(a)* ("Such sum . . . shall constitute compensation and not a penalty."); Koelemay, *supra*, at 307; **[**36]** *see also* *ALPO Petfoods, Inc. v. Ralston Purina Co., 286 U.S. App. D.C. 192, 913 F.2d 958, 969 (D.C. Cir. 1990)* (criticizing deterrence rationale). In an analogous case, one circuit revised an award of 20% of defendant's profits and directed an award of 100% of the profits because it believed that 20% was "clearly inadequate to ensure that similar conduct will not reoccur in the future." *Truck Equip. Serv. Co. v. Fruehauf Corp., 536 F.2d 1210, 1223 (8th Cir. 1976)*. The rule that where

there is willful infringement, an accounting of profits is not necessarily restricted to the particular area of direct competition is reinforced by the intention of the Lanham Act to provide *nationwide* protection of a mark, in contrast to the more limited geographic protection afforded by the common law. *See Minn. Pet Breeders, 41 F.3d at 1246*. Tamko had an unusually strong interest in deterrence, given Ideal's track record, and it would not be an abuse of discretion to conclude that the accounting of profits should reflect some recognition of that interest. Nonetheless, the deterrence rationale is primarily served by the attorneys' fees award, and **[**37]** should not be the primary reason for an accounting of profits. Koelemay, *supra*, at 308.

Our third reason for rejecting Ideal's limitation on profits awards is that it is inconsistent with the equitable nature of the court's remedial power. ***HN18*** It may well be equitable for a court to include in the damages calculation an award of less than the defendant's complete profits in light of less than complete direct competition. *See, e.g.*, *Truck Equip. Serv. Co., 536 F.2d at 1221-22* (awarding defendant's profits only from geographical areas where parties directly competed). On other facts it may be inequitable to give defendants such a benefit. Mechanical rules are of little aid in this analysis.

Equity must take account of the purposes served by the Lanham Act:

> One is to protect the public so it may be confident that, in purchasing a product bearing a particular trade-mark which it favorably knows, it will get the product which it asks for and wants to get. Secondly, where the owner of a trade-mark has spent energy, time, and money in presenting to the public the product, he is protected in his investment from its misappropriation by pirates and cheats. **[**38]** S. Rep. No. 1333 (1946), *reprinted in* 1946 U.S.C.C.S. 1274, 1274. As another circuit cogently observed in a case raising the issue of less than 100% competition, either through product differentiation or geographical separation: "We think it doubtful whether even the second of these purposes, protection of the trademark owner, is adequately served by a rule which would allow accountings only where the parties directly compete." *Monsanto Chem. Co. v. Perfect Fit Prods. Mfg. Co., 349 F.2d 389, 395 (2d Cir. 1965)*; *see also Maltina Corp. v. Cawy Bottling Co., 613 F.2d 582, 585* **[*39]** (5th Cir. 1980) (holding that a "diversion of sales," or direct competition, is not necessary for an award of profits because of the need to protect a trademark as a property right).

The award of Ideal's entire profits was correct.

2. Amount of Award

This still leaves Ideal's attack on the amount of the profits award. This attack is also without merit. ***HN19*** The calculation of the award is up to the trial court's discretion, and we will not disturb it unless it rests on clearly erroneous findings of fact, incorrect legal standards, or a meaningful error in judgment.

**[**39]** The court awarded Tamko $ 201,385.60 as Ideal's profits from the sales of its Heritage Series products. To calculate this amount, the court accepted the $ 449,522 figure for Ideal's sales of the Heritage Series product in the United States between January 1, 1998 and January 31, 2000, which was provided by Rene Laplante (Ideal's Vice President) in response to an

interrogatory. The court prorated this amount "to account for sales made in November and December of 1997 and February 2000" to arrive at $ 503,464. The court then subtracted 60% from that amount because "LaPlante previously testified that Ideal's profit margin on sales of its 'Heritage Series' product [was] 40%." Thus, the court arrived at its final figure.

Ideal argues that the court used the wrong numbers for the amount of the costs. ***HN20*** The defendant has the burden of producing evidence as to its costs. *15 U.S.C. § 1117(a)*. Ideal only provided the district court with a conclusory earnings statement which included a number for costs. The court decided that this statement was unreliable without supporting documentation. Instead, it relied on a statement made by Ideal at trial as to its profit margin **[**40]** on the Heritage Series products. This was not an abuse of discretion, and the amount of the accounting award is affirmed.

C. Denial of the Motion for Mistrial

Upon redirect examination of Ideal's vice president, Tamko introduced some evidence concerning the existence of the preliminary injunction and of the magistrate judge's conclusion that Ideal failed to comply with the preliminary injunction. Ideal moved for a mistrial. The basis for the motion was that the trial judge erred in admitting the evidence, causing irreparable prejudice to Ideal. The court denied the motion.

***HN21*** Because the mistrial motion was premised on the district court's admission of evidence, Ideal bears an unusually heavy appellate burden: a double burden of showing abuse of discretion, both as to the admission of evidence and as to the denial of the mistrial. *United States v. Arias-Santana, 964 F.2d 1262, 1265 (1st Cir. 1992)* ("We normally review the denial of a request for the exclusion of evidence, or a motion for mistrial, under the same 'abuse of discretion' standard.").

There was no abuse in the admission of the evidence, and consequently could be no abuse in the denial of the mistrial. **[**41]** Initially, when Ideal moved in limine before the trial to exclude any mention of the preliminary injunction and the contempt order, the parties reached an agreement to a stipulated jury instruction, described earlier. The parties also agreed that they would not introduce evidence of the contempt order. However, during the cross-examination of Rene Laplante (Ideal's Vice President), *Ideal's* lawyer asked about the preliminary injunction and whether it referred to the web site. Then, on redirect, **[*40]** Tamko's lawyer asked about the court's contempt order and some of its contents.

In response to Ideal's objection to the testimony about the contempt order, the district judge stated that Ideal's lawyer had opened the door to this testimony by asking about the injunction and Ideal's compliance with it on cross-examination. The next day, when Ideal moved for mistrial based on the admission of the evidence of the contempt order, the judge repeated his finding that Ideal had opened the door, and said "it's unfortunate, but we will do everything reasonable to minimize any problems from it." The judge then suggested a curative instruction that would tell the jury "that they can use the evidence **[**42]** that they have received and focus as they should solely on the issue of willfulness. It has no relevance to the other issues in this case." During the jury instructions, the court instructed the jury "to disregard all evidence relating to the February 29, 2000, [preliminary injunction] order. Such evidence is not to be considered by you in any way in deciding any issue in this case."

In sum, the district court was admirably sensitive to the problem of potential prejudice to Ideal and set up ground rules to avoid the problem. Ideal transgressed those rules and tried to give the

impression that it had complied with the injunction. In this it went too far and its own examination of Laplante opened the door. Nevertheless, the district court continued to be sympathetic to the potential problems with the admission of the evidence and gave a strong curative instruction to the jury. *See United States v. Chamorro, 687 F.2d 1, 6 (1st Cir. 1982)* (cautionary jury instructions dispelled any significant risk of unfair prejudice). ***HN22*** Admission and exclusion of evidence, as well as the necessity (if any) for a mistrial is committed to the sound discretion of the district court and **[**43]** we see no error, much less an abuse of discretion.

D. The Permanent Injunction Against Ideal's Use of "H-Series"

The district court issued a permanent injunction against Ideal on August 30, 2000, barring Ideal "from using the term Heritage, Heritage Series, H Series, or any name or mark confusingly similar to Heritage in connection with the sale, offer to sell, promotion, marketing, or advertising of any roofing product or service in the United States."

Ideal argues that the injunction is overbroad in barring use of "H-Series" by Ideal, because H-Series is not one of Tamko's registered trademarks. ***HN23*** "Injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to plaintiffs," *Califano v. Yamasaki, 442 U.S. 682, 702, 61 L. Ed. 2d 176, 99 S. Ct. 2545 (1979)*, and courts must "closely tailor injunctions to the harm that they address," *ALPO Petfoods, 913 F.2d at 972*. While generally the issuance of injunctive relief is reviewed for abuse of discretion, we review underlying factual determinations for clear error. *I.P. Lund Trading ApS v. Kohler Co., 163 F.3d 27, 33 (1st Cir. 1998)*.

On different **[**44]** facts, we might have more sympathy for a claim that an injunction against the use of a mark not registered to plaintiff is overbroad. Not here. This case is a perfect example of the need for the "safe distance rule," which counsels that ***HN24*** "an infringer, once caught, must expect some fencing in. . . . Thus, a court can frame an injunction which will keep a proven infringer safely away from the perimeter of future infringement." 5 *McCarthy on Trademarks*, *supra*, § 30:4, at 30-12. Indeed, it was after Ideal faced contempt charges that it came up with "H-Series," effectively dropping the "eritage" of "Heritage Series." The district court, **[*41]** during the contempt proceedings, heard evidence that Ideal's use of "H-Series" would cause confusion: Tamko representatives and their customers used "H" as an abbreviated reference for Tamko Heritage products, and Tamko's "Heritage 25" product is often referred to as H25. *Cf. Forum Corp. of N. Am. v. Forum, Ltd., 903 F.2d 434, 441 (7th Cir. 1990)*; *Syrelec v. Pass & Seymour, Inc., 869 F.2d 838, 839 (5th Cir. 1989)*; *Purolator, Inc. v. EFRA Distribs., Inc., 687 F.2d 554, 560 (1st Cir. 1982)*. ***HN25*** There **[**45]** are circumstances in which abbreviations of trademarks may be protectable as independent marks. *See* 1 *McCarthy on Trademarks*, *supra*, § 7:18, at 7-48. Whether or not that is the case here, the evidence that Ideal's use of "H-Series" would cause confusion is sufficient to justify the injunction requiring Ideal to steer clear of this similar abbreviation of the mark.

III.

Although Ideal's counsel on appeal have striven mightily, the trial record dooms the appeal. The judgment is *affirmed*. Costs are awarded to Tamko.

EXHIBIT 290

LexisNexis®

Caution
As of: August 12, 2014 9:17 AM EDT

**Tampa Electric Co. v. Nashville Coal Co.**
Supreme Court of the United States
December 15, 1960, Argued ; February 27, 1961, Decided
No. 87

**Reporter:** 365 U.S. 320; 81 S. Ct. 623; 5 L. Ed. 2d 580; 1961 U.S. LEXIS 1959; 1961 Trade Cas. (CCH) P69,940
TAMPA ELECTRIC CO. v. NASHVILLE COAL CO. ET AL.

**Prior History:** CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT.

**Disposition:** *276 F.2d 766*, reversed.

**Core Terms**

coal, tons, Electric, requirements, Oil, fuel, commerce, Station, relevant market, competitors, producers, seller, volume, peninsular, consumed, contracts, effective, foreclose, counties, lessen, bituminous coal, competitive, consumption, purchaser, tons of coal, respondents', generating, annually, marketed, products

**LexisNexis® Headnotes**

Antitrust & Trade Law > Clayton Act > General Overview

***HN1*** See *15 U.S.C.S. § 14*.

Antitrust & Trade Law > Clayton Act > General Overview

***HN2*** Clayton Act, § 3, *15 U.S.C.S. § 14*, condemns sales or agreements where the effect of such sale or contract would under the circumstances disclosed probably lessen competition, or create an actual tendency to monopoly.

Antitrust & Trade Law > Clayton Act > General Overview

***HN3*** The Clayton Act is not intended to reach every remote lessening of competition, only those which are substantial.

Antitrust & Trade Law > Clayton Act > General Overview

***HN4*** Even though a contract does not contain specific agreements not to use the goods of a competitor, if the practical effect is to prevent such use, it comes within the condition of the section as to exclusivity.

Antitrust & Trade Law > Clayton Act > General Overview

***HN5*** A finding of domination of the relevant market by the lessor or seller is sufficient to support the inference that competition was or will be substantially lessened by the contracts involved there.

Antitrust & Trade Law > Clayton Act > General Overview

International Trade Law > General Overview

***HN6*** If the practical effect of the contract is to prevent a lessee or buyer from using the products of a competitor of the lessor or seller and the contract would thereby probably substantially lessen competition in a line of commerce, it is proscribed.

Antitrust & Trade Law > Clayton Act > General Overview

Antitrust & Trade Law > ... > Price Fixing & Restraints of Trade > Exclusive & Reciprocal Dealing > Requirements Contracts

Contracts Law > Types of Commercial Transactions > Sales of Goods > Output, Exclusive & Requirements Agreements

Contracts Law > Types of Contracts > Output & Requirements Contracts

***HN7*** The necessity of direct proof of the economic impact of such a contract is not necessary where it was established that the volume of business affected is not insignificant or insubstantial and that the effect is to foreclose competitors from any substantial market.

Antitrust & Trade Law > Clayton Act > General Overview

***HN8*** Contracts are proscribed by Clayton Act, § 3, *15 U.S.C.S. § 14*, if their practical effect is to prevent lessees or purchasers from using or dealing in the goods, etc., of a competitor or competitors of the lessor or seller and thereby competition has been foreclosed in a substantial share of the line of commerce affected.

Antitrust & Trade Law > Clayton Act > General Overview

Antitrust & Trade Law > ... > Price Fixing & Restraints of Trade > Exclusive & Reciprocal Dealing > General Overview

Antitrust & Trade Law > ... > Price Fixing & Restraints of Trade > Exclusive & Reciprocal Dealing > Exclusive Dealing

***HN9*** Even though a contract is found to be an exclusive-dealing arrangement, it does not violate Clayton Act, § 3, *15 U.S.C.S. § 14*, unless the court believes it probable that performance of the contract will foreclose competition in a substantial share of the line of commerce affected.

Antitrust & Trade Law > Clayton Act > General Overview

***HN10*** The line of commerce, i. e., the type of goods, wares, or merchandise, etc., involved must be determined, where it is in controversy, on the basis of the facts peculiar to the case.

Antitrust & Trade Law > Clayton Act > General Overview

***HN11*** The area of effective competition in the known line of commerce must be charted by careful selection of the market area in which the seller operates, and to which the purchaser can practicably turn for supplies. In short, the threatened foreclosure of competition must be in relation to the market affected.

Antitrust & Trade Law > Clayton Act > General Overview

***HN12*** The line of commerce affected need not be nationwide, at least where the purchasers cannot, as a practical matter, turn to suppliers outside their own area.

Antitrust & Trade Law > Clayton Act > General Overview

Antitrust & Trade Law > ... > Price Fixing & Restraints of Trade > Exclusive & Reciprocal Dealing > Requirements Contracts

Contracts Law > Types of Commercial Transactions > Sales of Goods > Output, Exclusive & Requirements Agreements

Contracts Law > Types of Contracts > Output & Requirements Contracts

Energy & Utilities Law > Oil & Petroleum Products > Franchising & Marketing

***HN13*** The competition foreclosed by the contract must be found to constitute a substantial share of the relevant market. That is to say, the opportunities for other traders to enter into or remain in that market must be significantly limited.

Antitrust & Trade Law > Clayton Act > General Overview

***HN14*** To determine substantiality in a given case, it is necessary to weigh the probable effect of the contract on the relevant area of effective competition, taking into account the relative strength of the parties, the proportionate volume of commerce involved in relation to the total volume of commerce in the relevant market area, and the probable immediate and future effects which pre-emption of that share of the market might have on effective competition therein. It follows that a mere showing that the contract itself involves a substantial number of dollars is ordinarily of little consequence.

Antitrust & Trade Law > Clayton Act > General Overview

***HN15*** The relevant market is the prime factor in relation to which the ultimate question, whether the contract forecloses competition in a substantial share of the line of commerce involved, must be decided.

Antitrust & Trade Law > Clayton Act > General Overview

Antitrust & Trade Law > ... > Price Fixing & Restraints of Trade > Exclusive & Reciprocal Dealing > General Overview

Antitrust & Trade Law > ... > Price Fixing & Restraints of Trade > Exclusive & Reciprocal Dealing > Requirements Contracts

Contracts Law > Types of Commercial Transactions > Sales of Goods > Output, Exclusive & Requirements Agreements

Contracts Law > Types of Contracts > Output & Requirements Contracts

***HN16*** Even though a single contract between single traders may fall within the initial broad proscription of the Clayton Act, § 3, *15 U.S.C.S. § 14*, it must also suffer the qualifying disability, tendency to work a substantial, not remote, lessening of competition in the relevant competitive market.

**Lawyers' Edition Display**

## Summary

An electric utility instituted the present action in the United States District Court for the Middle District of Tennessee for a declaratory judgment establishing that a contract by which the utility

purchased from a producer of coal all the coal the utility would require as boiler fuel at one of its generating plants in Florida over a 20-year period was valid, and did not, as alleged by the producer, violate 3 of the Clayton Act, which makes it unlawful for any person engaged in commerce to make a sale on the understanding that the purchaser shall not use the goods of a competitor of the seller, where the effect of such sale may be to substantially lessen competition or tend to create a monopoly in any line of commerce. *Both the District Court (168 F Supp 456)*, and on appeal, the Court of Appeals for the Sixth Circuit, one of the judges dissenting (*276 F2d 766*), agreed with the producer.

On certiorari, the Supreme Court reversed. In an opinion by Clark, J., expressing the views of seven members of the Court, it was held that the contract did not suffer the claimed antitrust illegality.

Black and Douglas, JJ., dissented without writing an opinion.

**Headnotes**

RESTRAINTS OF TRADE, MONOPOLIES, AND UNFAIR TRADE PRACTICES §51 > exclusive purchasing -- coal producers. -- > Headnote:

***LEdHN[1]*** [1]

A contract by which a public utility purchases from a producer of coal all the coal the utility would require as boiler fuel at one of its generating plants in Florida over a 20-year period does not violate 3 of the Clayton Act (*15 USC 14*), dealing with sales on agreement not to use the goods of competitors, where, considering the area in which the producer and 700 other coal producers effectively compete, the competition pre-empted by the contract is less than 1 per cent and hence this pre-emption does not tend to substantially foreclose competition in the relevant coal market.

RESTRAINTS OF TRADE, MONOPOLIES, AND UNFAIR TRAE PRACTICES §50 > exclusive dealing. -- > Headnote:

***LEdHN[2]*** [2]

Even though a contract is found to be an exclusive dealing arrangement, it does not violate 3 of the Clayton Act (*15 USC 14*) unless the court believes it probable that performance of the contract will foreclose competition in a substantial share of the line of commerce affected.

RESTRAINTS OF TRADE, MONOPOLIES, AND UNFAIR TRADE PRACTICES §50 > exclusive dealing -- effect on market. -- > Headnote:

***LEdHN[3A]*** [3A]***LEdHN[3B]*** [3B]

In determining whether an exclusive dealing arrangement violates 3 of the Clayton Act (*15 USC 14*), the line of commerce, that is, the type of goods involved, must be determined, where it is in controversy, on the basis of the facts peculiar to the case; the area of effective competition in the known line of commerce must be charted by careful selection of the market area in which the seller operates, and to which the purchaser can practicably turn for supplies; and the competition foreclosed by the contract must be found to constitute a substantial share of the relevant market.

RESTRAINTS OF TRADE, MONOPOLIES, AND UNFAIR TRADE PRACTICES §51 > exclusive dealing -- effect on market. -- > Headnote:

***LEdHN[4]*** [4]

Under 3 of the Clayton Act (*15 USC 14*), making it unlawful for any person engaged in commerce to make a sale of goods on the understanding that the purchaser shall not use the goods of a competitor of the seller, where the effect of such sale may be to substantially lessen competition or tend to create a monopoly in any line of commerce, the "line of commerce" affected need not be nationwide, at least where the purchaser cannot, as a practical matter, turn to suppliers outside his own area.

RESTRAINTS OF TRADE, MONOPOLIES, AND UNFAIR TRADE PRACTICES §51 > exclusive dealing -- proper test. -- > Headnote:

***LEdHN[5]*** [5]

Under 3 of the Clayton Act (*15 USC 14*), making it unlawful for any person engaged in commerce to make a sale of goods on the understanding that the purchaser shall not use the goods of a competitor of the seller, where the effect of such sale may be to substantially lessen competition or tend to create a monopoly in any line of commerce, a purely quantitative measure of the effect of competition is inadequate; since it is the preservation of competition which is at stake, the significant proportion of coverage is that within the area of effective competition.

RESTRAINTS OF TRADE, MONOPOLIES, AND UNFAIR TRADE PRACTICES §51 > exclusive dealing -- effect on market -- volume. -- > Headnote:

***LEdHN[6]*** [6]

To determine--for the purposes of 3 of the Clayton Act (*15 USC 14*), which makes it unlawful for any person engaged in commerce to make a contract for sale on the understanding that the purchaser shall not use the goods of a competitor of the seller, where the effect of the sale may be to substantially lessen competition or tend to create a monopoly in any line of commerce--whether the competition foreclosed by the contract constitutes a substantial share of the relevant market, it is necessary to weigh the probable effect of the contract on the relevant area of effective competition, taking into account the relative strength of the parties, the proportionate volume of commerce involved in relation to the total volume of commerce in the relevant market area, and the probable immediate and future effects which pre-emption of that share of the market might have on effective competition therein; a mere showing that the contract itself involves a substantial number of dollars is ordinarily of little consequence.

APPEAL §1530 > reversible error -- monopoly -- applying wrong test. -- > Headnote:

***LEdHN[7]*** [7]

The failure of the lower courts to give the required effect to the controlling factor of relevant competitive market area in an action under 3 of the Clayton Act (*15 USC 14*), which makes it unlawful for any person engaged in commerce to make a sale on the understanding that the purchaser shall not use the goods of a competitor of the seller, where the effect of such sale may be to substantially lessen competition or tend to create a monopoly in any line of commerce, requires, by itself, reversal of the judgment of the Court of Appeals.

RESTRAINTS OF TRADE, MONOPOLIES, AND UNFAIR TRADE PRACTICES §51 > exclusive dealing -- coal producers -- Florida market. -- > Headnote:

***LEdHN[8]*** [8]

In determining the legality, under 3 of the Clayton Act (*15 USC 14*), of a contract by which a public utility purchased from a producer of coal all the coal it would require as boiler fuel at one of its generating plants located in peninsular Florida over a 20-year period, the relevant market of effective competition is the area in which the producer and other producers of coal effectively compete, and neither peninsular Florida, nor the entire state of Florida, nor the Bituminous Coal Act area comprising Florida and Georgia, constitute the relevant market of effective competition.

RESTRAINTS OF TRADE, MONOPOLIES, AND UNFAIR TRADE PRACTICES §51 > exclusive dealing -- area of competition. -- > Headnote:

***LEdHN[9]*** [9]

While the competitive market relevant under 3 of the Clayton Act (*15 USC 14*), which makes it unlawful for any person engaged in commerce to make a sale on the understanding that the purchaser shall not use the goods of a competitor of the seller, where the effect of such sale may be to substantially lessen competition or tend to create a monopoly in any line of commerce, is not ordinarily susceptible to a "metes and bounds" definition, it is the area in which the seller and other sellers of the same goods effectively compete.

EVIDENCE §74.3 > judicial notice -- statistics -- government publications. -- > Headnote:

***LEdHN[10]*** [10]

In an action to determine the legality, under 3 of the Clayton Act (*15 USC 14*), of a contract by which an electric utility purchased from a producer of bituminous coal all the coal the utility would require as boiler fuel at one of its generating plants in Florida over a 20-year period, the Supreme Court of the United States will take judicial notice of pertinent statistical data contained in publications of the United States Bureau of the Census and of the United States Department of Interior, Bureau of Mines.

RESTRAINTS OF TRADE, MONOPOLIES, AND UNFAIR TRADE PRACTICES §51 > requirements contracts. -- > Headnote:

***LEdHN[11]*** [11]

While in the context of antitrust legislation protracted requirements contracts may be suspect, they are not illegal per se.

RESTRAINTS OF TRADE, MONOPOLIES, AND UNFAIR TRADE PRACTICES §51 > requirements contract -- effect on market. -- > Headnote:

***LEdHN[12]*** [12]

Even though a single protracted requirements contract between single traders may fall within the initial broad proscription of 3 of the Clayton Act (*15 USC 14*) as to sales on an agreement not to use goods of a competitor of the seller, the contract, to be illegal under the statute, must also suffer the qualifying disability, that is, a tendency to work a substantial, not remote, lessening of competition in the relevant competitive market.

RESTRAINTS OF TRADE, MONOPOLIES, AND UNFAIR TRADE PRACTICES §51 > exclusive purchasing -- coal producers -- amount. -- > Headnote:

***LEdHN[13]*** [13]

The pre-emption of competition, to the extent of total purchases worth perhaps $ 128,000,000, resulting from a contract by which a public utility purchased from a producer of coal all the coal the utility would require as boiler fuel at one of its generating plants over a 20-year period, does not tend to substantially foreclose competition in the relevant coal market so as to make the contract illegal under 3 of the Clayton Act (*15 USC 14*), where that market sees an annual trade in excess of 250,000,000 tons of coal and over a billion dollars, and the contract may well be of economic advantage to the buyer as well as to the seller.

RESTRAINTS OF TRADE, MONOPOLIES, AND UNFAIR TRADE PRACTICES §51 > requirements contract -- public utility. -- > Headnote:

***LEdHN[14]*** [14]

While public utilities are not immunized from the proscriptions of the Clayton Act, nevertheless, in judging, under 3 of the act (*15 USC 14*), the term of a requirements contract between a public utility and a producer of coal in relation to the substantiality of the foreclosure of competition, particularized considerations of the parties' operations are not irrelevant.

RESTRAINTS OF TRADE, MONOPOLIES, AND UNFAIR TRADE PRACTICES §51 > exclusive dealing -- Sherman Act. -- > Headnote:

***LEdHN[15]*** [15]

A contract which does not fall within the broader proscription of 3 of the Clayton Act (*15 USC 14*), which makes it unlawful for any person engaged in commerce to make a sale on the understanding that the purchaser shall not use the goods of a competitor of the seller, where the effect of such a sale may be to substantially lessen competition or tend to create a monopoly in any line of commerce, is not forbidden by 1 and 2 of the Sherman Antitrust Act (*15 USC 1*, *2*), which prohibit combinations in restraint of trade and monopolies.

**Syllabus**

Petitioner produces electric energy and sells it to a 60-mile by 30-mile service area in the vicinity of Tampa, Fla. In 1954, it had two generating plants which consumed only oil in their burners, as did all electric generating plants in peninsular Florida. It decided to construct a new generating plant and to try burning coal in at least two, and possibly all, units of that plant; and it contracted to purchase from respondents all coal it would require as boiler fuel at the new plant over a 20-year period. Petitioner's estimated maximum requirements exceeded the total consumption of coal in peninsular Florida; but it did not amount to more than 1% of the total amount of coal of the same type produced and marketed by the 700 coal suppliers in respondents' producing area. Respondents repudiated the contract on the ground that it was illegal under the antitrust laws, and petitioner sued for a declaratory judgment that it was valid and for its enforcement. The District Court declared the contract violative of § 3 of the Clayton Act and denied enforcement. The Court of Appeals affirmed. *Held*: The judgment is reversed. Pp. 321-335.

1. The contract here involved did not violate § 3 of the Clayton Act. Pp. 325-335.

(a) Even though a contract is an exclusive-dealing arrangement, it does not violate § 3 unless its performance probably would foreclose competition in a substantial share of the line of commerce affected. Pp. 325-328.

(b) In order for a contract to violate § 3 the competition foreclosed by it must constitute a substantial share of the relevant market. Pp. 328-329.

(c) On the record in this case, the relevant market is not peninsular Florida, the entire State of Florida or Florida and Georgia combined; it is the area in which respondents and the other 700 producers of the kind of coal here involved effectively compete. Pp. 330-333.

(d) In the competitive bituminous coal marketing area here involved, the contract sued upon does not tend to foreclose a substantial volume of competition. Pp. 333-335.

2. Since the contract does not fall within the broader proscription of § 3 of the Clayton Act, it is not forbidden by *§ 1* or *§ 2* of the Sherman Act. P. 335.

**Counsel:** William C. Chanler argued the cause and filed a brief for petitioner.

Abe Fortas argued the cause for respondents. With him on the brief was Norman Diamond.

**Judges:** Warren, Black, Frankfurter, Douglas, Clark, Harlan, Brennan, Whittaker, Stewart

**Opinion by:** CLARK

**Opinion**

**[*321]** **[***583]** **[**625]** MR. JUSTICE CLARK delivered the opinion of the Court.

***LEdHN[1]*** [1]We granted certiorari to review a declaratory judgment holding illegal under § 3 of the Clayton Act [1] a requirements contract between the parties providing for the purchase by petitioner of all the coal it would require as boiler fuel at its Gannon Station in Tampa, Florida, over a 20-year period. *363 U.S. 836*. *Both the District Court, 168 F.Supp. 456*, and the *Court of Appeals, 276 F.2d 766*, Judge Weick dissenting, agreed with respondents that the contract fell within the proscription of § 3 and therefore was illegal and unenforceable. We cannot agree that the contract suffers the claimed antitrust illegality [2] and, therefore, do not find it necessary to **[*322]** consider respondents' additional argument that such illegality is a defense to the action and a bar to enforceability.

*The* **[***584]** *Facts*.

Petitioner Tampa Electric Company is a public utility located in Tampa, Florida. It produces and sells electric energy to a service area, including the city, extending from Tampa Bay eastward 60 miles to the center of the State, and some 30 miles in width. As of 1954 petitioner operated

---

1 "***HN1*** It shall be unlawful for any person engaged in commerce, in the course of such commerce, to lease or make a sale or contract for sale of goods . . . for use, consumption, or resale within the United States . . . on the condition, agreement, or understanding that the lessee or purchaser thereof shall not use or deal in the goods . . . of a competitor or competitors of the . . . seller, where the effect of such lease, sale, or contract for sale or such condition, agreement, or understanding may be to substantially lessen competition or tend to create a monopoly in any line of commerce." 15 U. S. C. § 14.

2 In addition to their claim under § 3 of the Clayton Act, respondents argue the contract is illegal under the Sherman Act, *15 U. S. C. §§ 1-2*.

two electrical generating plants comprising a total of 11 individual generating units, all of which consumed oil in their burners. In 1955 Tampa Electric decided to expand its facilities by the construction of an additional generating plant to be comprised ultimately of six generating units, and to be known as the "Francis J. Gannon Station." Although every electrical generating plant in peninsular Florida burned oil at that time, Tampa Electric decided to try coal as boiler fuel in the first two units constructed at the Gannon Station. Accordingly, it contracted with the respondents [3] to furnish the expected coal requirements for the units. The agreement, dated May 23, 1955, embraced Tampa Electric's "total requirements of fuel . . . for the operation of its first two units to be installed at the Gannon Station . . . not less than 225,000 tons of coal per unit per year," for a period of 20 years. The contract further provided that "if during the first 10 years of the term . . . the Buyer constructs additional units [at Gannon] in which coal is used as the fuel, it shall give the Seller notice thereof two years prior to the completion of such unit or units and upon completion of same the fuel requirements thereof shall be added to this contract." It was understood and agreed, however, that "the Buyer has the option to be exercised two years prior **[*323]** to completion of said unit or units of determining whether coal or some other fuel **[**626]** shall be used in same." Tampa Electric had the further option of reducing, up to 15%, the amount of its coal purchases covered by the contract after giving six months' notice of an intention to use as fuel a by-product of any of its local customers. The minimum price was set at $ 6.40 per ton delivered, subject to an escalation clause based on labor cost and other factors. Deliveries were originally expected to begin in March 1957, for the first unit, and for the second unit at the completion of its construction.

In April 1957, soon before the first coal was actually to be delivered and after Tampa Electric, in order to equip its first two Gannon units for the use of coal, had expended some $ 3,000,000 more than the cost of constructing oil-burning units, and after respondents had expended approximately $ 7,500,000 readying themselves to perform the contract, the latter advised petitioner that the contract was illegal under the antitrust laws, would therefore not be performed, and no coal would be delivered. This turn of events required Tampa Electric to look elsewhere for its coal requirements. The first unit at Gannon began operating August 1, 1957, using coal purchased on a temporary basis, but on December 23, 1957, a purchase order contract for the total coal requirements of the Gannon Station was made with Love and Amos Coal Company. It was for an indefinite period cancellable on 12 months' notice by either party, or immediately upon tender of performance by respondents under the contract sued **[***585]** upon here. The maximum price was $ 8.80 per ton, depending upon the freight rate. In its purchase order to the Love and Amos Company, Tampa estimated that its requirements at the Gannon Station would be 350,000 tons in 1958; 700,000 tons in 1959 and 1960; 1,000,000 tons in 1961; and would increase thereafter, as required, to "about 2,250,000 tons per year." The second unit at Gannon **[*324]** Station commenced operation 14 months after the first, *i. e.*, October 1958. Construction of a third unit, the coal for which was to have been provided under the original contract, was also begun.

The record indicates that the total consumption of coal in peninsular Florida, as of 1958, aside from Gannon Station, was approximately 700,000 tons annually. It further shows that there were some 700 coal suppliers in the producing area where respondents operated, and that Tampa Electric's anticipated maximum requirements at Gannon Station, *i. e.*, 2,250,000 tons annually, would approximate 1% of the total coal of the same type produced and marketed from respondents' producing area.

---

[3] The original contract was with Potter Towing Company, and by subsequent agreements with Tampa Electric responsibility thereunder was assumed by respondent West Kentucky Coal Company.

Petitioner brought this suit in the District Court pursuant to *28 U. S. C. § 2201*, for a declaration that its contract with respondents was valid, and for enforcement according to its terms. In addition to its Clayton Act defense, respondents contended that the contract violated both *§§ 1* and *2* of the Sherman Act which, it claimed, likewise precluded its enforcement. The District Court, however, granted respondents' motion for summary judgment on the sole ground that the undisputed facts, recited above, showed the contract to be a violation of § 3 of the Clayton Act. The Court of Appeals agreed. Neither court found it necessary to consider the applicability of the Sherman Act.

*Decisions of District Court and Court of Appeals*.

Both courts admitted that the contract "does not expressly contain the 'condition'" that Tampa Electric would not use or deal in the coal of respondents' competitors. Nonetheless, they reasoned, the "total requirements" provision had the same practical effect, for it prevented Tampa Electric for a period of 20 years from buying coal from any other source for use at that station. Each court cast aside as "irrelevant" arguments citing the **[*325]** use of oil as boiler fuel by Tampa Electric at its other stations, and by other utilities in peninsular **[**627]** Florida, because oil was not in fact used at Gannon Station, and the possibility of exercise by Tampa Electric of the option reserved to it to build oil-burning units at Gannon was too remote. Found to be equally remote was the possibility of Tampa's conversion of existing oil-burning units at its other stations to the use of coal which would not be covered by the contract with respondents. It followed, both courts found, that the "line of commerce" on which the restraint was to be tested was coal -- not boiler fuels. Both courts compared the estimated coal tonnage as to which the contract pre-empted competition for 20 years, namely, 1,000,000 tons a year by 1961, with the previous annual consumption of peninsular Florida, 700,000 tons. Emphasizing that fact as well as the contract value of the coal covered by the 20-year term, *i. e*., $ 128,000,000, they held that such volume was not "insignificant or insubstantial" and that the effect of the contract would "be to substantially lessen competition," in violation of the Act. Both courts were of the opinion that in view of the executory nature of the **[***586]** contract, judicial enforcement of any portion of it could not be granted without directing a violation of the Act itself, and enforcement was, therefore, denied. [4]

*Application of § 3 of the Clayton Act*.

In the almost half century since Congress adopted the Clayton Act, this Court has been called upon 10 times, [5] including the present, to pass upon questions arising under § 3. *Standard Fashion Co*. v. *Magrane-Houston Co., 258 U.S. 346 (1922)*, the first of the cases, held that **[*326]** the Act "sought to reach the agreements embraced within its sphere in their incipiency, and in the section under consideration to determine their legality by specific tests of its own. . . ." At p. 356. In sum, it was declared, ***HN2*** § 3 condemned sales or agreements "where the effect of such sale or contract . . . would under the circumstances disclosed probably lessen competition, or create an actual tendency to monopoly." At pp. 356-357. ***HN3*** This was not to say, the Court emphasized, that the Act was intended to reach every "remote lessening" of competition -- only those which were substantial -- but the Court did not draw the line where "remote" ended and "substantial" began. There in evidence, however, was the fact that the activities of two-fifths of the Nation's

---

[4] Cf. *Kelly* v. *Kosuga*, 358 U.S. 516.

[5] For discussion of previous cases, see *Standard Oil Co*. v. *United States*, 337 U.S. 293, 300-305.

52,000 pattern agencies were affected by the challenged device. Then, one week later, followed *United Shoe Machinery Corp*. v. *United States, 258 U.S. 451 (1922)*, which held that ***HN4*** even though a contract does "not contain specific agreements not to use the [goods] of a competitor," if "the practical effect . . . is to prevent such use," it comes within the condition of the section as to exclusivity. At p. 457. The Court also held, as it had in *Standard Fashion, supra*, that ***HN5*** a finding of domination of the relevant market by the lessor or seller was sufficient to support the inference that competition had or would be substantially lessened by the contracts involved there. As of that time it seemed clear that ***HN6*** if "the practical effect" of the contract was to prevent a lessee or buyer from using the products of a competitor of the lessor or seller and the contract would thereby probably substantially lessen competition in a line of commerce, it was proscribed. A quarter of a century later, in *International Salt Co*. v. *United States, 332 U.S. 392 (1947)*, the Court held, at least in tying cases, that ***HN7*** the necessity of direct proof of the economic impact of such a contract was not necessary where it was established that "the volume of business **[*327]** affected" was not "insignificant or insubstantial" and that the effect was **[**628]** "to foreclose competitors from any substantial market." At p. 396. It was only two years later, in *Standard Oil Co*. v. *United States, 337 U.S. 293 (1949)*, that the Court again considered § 3 and its application to exclusive supply or, as they are commonly known, requirements contracts. It held that such ***HN8*** contracts are proscribed by § 3 if their practical effect is to prevent lessees or purchasers from using or dealing in the goods, etc., of a competitor or competitors of the lessor or seller and thereby "competition has been foreclosed in a substantial share of the line of commerce affected." At p. 314.

***LEdHN[2]*** [2]***LEdHN[3A]*** [3A]In practical application, ***HN9*** even **[***587]** though a contract is found to be an exclusive-dealing arrangement, it does not violate the section unless the court believes it probable that performance of the contract will foreclose competition in a substantial share of the line of commerce affected. Following the guidelines of earlier decisions, certain considerations must be taken. *First*, ***HN10*** the line of commerce, *i. e*., the type of goods, wares, or merchandise, etc., involved must be determined, where it is in controversy, on the basis of the facts peculiar to the case. [6]*Second*, ***HN11*** the area of effective competition in the known line of commerce must be charted by careful selection of the market area in which the seller operates, and to which the purchaser can practicably turn for supplies. In short, the threatened foreclosure of competition must be in relation to the market affected. As was said in *Standard Oil Co. v. United States, supra*:

***LEdHN[4]*** [4] ***LEdHN[5]*** [5]"It is clear, of course, that ***HN12*** the 'line of commerce' affected need not be nationwide, at least where the purchasers cannot, as a practical matter, turn to suppliers outside their own area. Although the effect on **[*328]** competition will be quantitatively the same if a given volume of the industry's business is assumed to be covered, whether or not the affected sources of supply are those of the industry as a whole or only those of a particular region, a purely quantitative measure of this effect is inadequate because the narrower the area of competition, the greater the comparative effect on the area's competitors. Since it is the preservation of competition which is at stake, the significant proportion of coverage is that within the area of effective competition." At p. 299, note 5.

In the *Standard Oil* case, the area of effective competition -- the relevant market -- was found to be where the seller and some 75 of its competitors sold petroleum products. Conveniently identified as the Western Area, it included Arizona, California, Idaho, Nevada, Oregon, Utah and

---

[6] See *International Boxing Club* v. *United States*, 358 U.S. 242.

Washington. Similarly, in *United States v. Columbia Steel Co., 334 U.S. 495 (1948)*, a *§ 1* Sherman Act case, this Court decided the relevant market to be the competitive area in which Consolidated marketed its products, *i. e.*, 11 Western States. The Court found Consolidated's share of the nationwide market for the relevant line of commerce, rolled steel products, to be less than 1/2 of 1%, an "insignificant fraction of the total market," at p. 508; and its share of the more narrow but only relevant market, 3%, was described as "a small part," at p. 511, not sufficient to injure any competitor of United States Steel in that area or elsewhere.

***LEdHN[3B]*** [3B]

*Third*, and last, ***HN13*** the competition foreclosed by the contract must be found to constitute a substantial share of the relevant market. That is to say, the opportunities for other traders to enter into or remain in that market must be significantly limited as was pointed out **[**629]** in *Standard Oil Co. v. United States, supra.* There the impact of the requirements contracts was studied in the setting of the large number of gasoline stations -- 5,937 or **[*329]** 16% of the retail outlets in the relevant market -- and the large number of contracts, over 8,000, together with the great volume of products involved. **[***588]** This combination dictated a finding that "Standard's use of the contracts [created] just such a potential clog on competition as it was the purpose of § 3 to remove" where, as there, the affected proportion of retail sales was substantial. At p. 314. As we noted above, in *United States v. Columbia Steel Co., supra*, substantiality was judged on a comparative basis, *i. e.*, Consolidated's use of rolled steel was "a small part" when weighed against the total volume of that product in the relevant market.

***LEdHN[6]*** [6]***HN14*** To determine substantiality in a given case, it is necessary to weigh the probable effect of the contract on the relevant area of effective competition, taking into account the relative strength of the parties, the proportionate volume of commerce involved in relation to the total volume of commerce in the relevant market area, and the probable immediate and future effects which pre-emption of that share of the market might have on effective competition therein. It follows that a mere showing that the contract itself involves a substantial number of dollars is ordinarily of little consequence.

*The Application of § 3 Here.*

***LEdHN[7]*** [7]In applying these considerations to the facts of the case before us, it appears clear that both the Court of Appeals and the District Court have not given the required effect to a controlling factor in the case -- the relevant competitive market area. This omission, by itself, requires reversal, for, as we have pointed out, ***HN15*** the relevant market is the prime factor in relation to which the ultimate question, whether the contract forecloses competition in a substantial share of the line of commerce involved, must be decided. For the purposes of this case, therefore, we need not decide two threshold questions pressed by Tampa **[*330]** Electric. They are whether the contract in fact satisfies the initial requirement of § 3, *i. e.*, whether it is truly an exclusive-dealing one, and, secondly, whether the line of commerce is boiler fuels, including coal, oil and gas, rather than coal alone. [7] We, therefore, for the purposes of this case, assume, but do not decide, that the contract is an exclusive-dealing arrangement within the compass of § 3, and that the line of commerce is bituminous coal.

---

[7] In support of these contentions petitioner urges us to consider that it remains free to convert existing oil-burning units at its other plants to coal-burning units, the fuel for which it would be free to purchase from any seller in the market; also that just as it is permitted to use oil at its other plants, so, too, it may construct all future Gannon units as oil burners; and that in any event it is free to draw a maximum of 15% of its Gannon fuel requirements from by-products of local customers. Petitioner further

*Relevant Market of Effective Competition*.

Neither the Court of Appeals nor the District Court considered in detail the question of the relevant market. They do seem, however, to have been satisfied with inquiring only as to competition within "Peninsular Florida." It was noted that the total consumption of peninsular Florida was 700,000 tons of coal per year, about equal to the estimated 1959 requirements of Tampa Electric. It was also pointed out that coal accounted for less than 6% of the fuel consumed in the entire **[***589]** State. [8] The District **[**630]** Court concluded that though the respondents were only one of 700 coal producers who could serve the same market, peninsular Florida, the contract for a period of 20 years excluded competitors from a substantial **[*331]** amount of trade. Respondents contend that the coal tonnage covered by the contract must be weighed against either the total consumption of coal in peninsular Florida, or all of Florida, or the Bituminous Coal Act area comprising peninsular Florida and the Georgia "finger," or, at most, all of Florida and Georgia. If the latter area were considered the relevant market, Tampa Electric's proposed requirements would be 18% of the tonnage sold therein. Tampa Electric says that both courts and respondents are in error, because the "700 coal producers who could serve" it, as recognized by the trial court and admitted by respondents, operated in the Appalachian coal area and that its contract requirements were less than 1% of the total marketed production of these producers; that the relevant effective area of competition was the area in which these producers operated, and in which they were willing to compete for the consumer potential.

***LEdHN[8]*** [8] ***LEdHN[9]*** [9] ***LEdHN[10]*** [10]We are persuaded that on the record in this case, neither peninsular Florida, nor the entire State of Florida, nor Florida and Georgia combined constituted the relevant market of effective competition. We do not believe that the pie will slice so thinly. By far the bulk of the overwhelming tonnage marketed from the same producing area as serves Tampa is sold outside of Georgia and Florida, and the producers were "eager" to sell more coal in those States. [9] While the relevant competitive market is not ordinarily susceptible to a "metes and bounds" definition, cf. *Times-Picayune Pub. Co*. v. *United States, 345 U.S. 594, 611*, it is of course the area in which respondents **[*332]** and the other 700 producers effectively compete. *Standard Oil Co. v. United States, supra.* The record shows that, like the respondents, they sold bituminous coal "suitable for [Tampa's] requirements," mined in parts of Pennsylvania, Virginia, West Virginia, Kentucky, Tennessee, Alabama, Ohio and Illinois. We take notice of the fact that the approximate total bituminous coal (and lignite) product in the year 1954 from the districts in which these 700 producers are located was 359,289,000 tons, of which some 290,567,000 tons were sold on the open market. [10] Of the latter amount some 78,716,000 tons were sold to electric utilities. [11] We also note that in 1954 Florida and Georgia combined consumed at least 2,304,000 tons, 1,100,000 of which were used by electric utilities, and the

---

argues that its novel reliance upon coal in fact created new fuel competition in an area that theretofore relied almost exclusively upon oil and, to a lesser extent, upon natural gas.

[8] Oil and, to a lesser extent, natural gas are the primary fuels consumed in Florida.

[9] Peabody Coal Company offered to supply petitioner with coal from its mines in western Kentucky, for use in the units at another of its Florida stations, and that offer prompted a renegotiation of the price petitioner was paying for the oil then being consumed at that station.

[10] U.S. Bureau of the Census. I U.S. Census of Mineral Industries: 1954, Series: MI-12B, p. 4 (1957).

[11] *Id*., at 12B-6.

sources of which were mines located in no less than seven States. [12] We take further notice that the production and marketing **[***590]** of bituminous coal (and lignite) from the same districts, and assumedly equally available to Tampa on a commercially feasible basis, is currently on a par with prior years. [13] In point of statistical fact, coal consumption in the combined Florida-Georgia area has increased significantly since 1954. In 1959 more than 3,775,000 tons were there consumed, 2,913,000 being used by electric utilities including, **[**631]** presumably, the coal used by the petitioner. [14] **[*333]** The coal continued to come from at least seven States. [15] From these statistics it clearly appears that the proportionate volume of the total relevant coal product as to which the challenged contract pre-empted competition, less than 1%, is, conservatively speaking, quite insubstantial. A more accurate figure, even assuming pre-emption to the extent of the maximum anticipated total requirements, 2,250,000 tons a year, would be .77%.

*Effect on Competition in the Relevant Market.*

***LEdHN[11]*** [11] ***LEdHN[12]*** [12]It may well be that in the context of antitrust legislation protracted requirements contracts are suspect, but they have not been declared illegal *per se*. ***HN16*** Even though a single contract between single traders may fall within the initial broad proscription of the section, it must also suffer the qualifying disability, tendency to work a substantial -- not remote -- lessening of competition in the relevant competitive market. It is urged that the present contract pre-empts competition to the extent of purchases worth perhaps $ 128,000,000, [16] and that this **[*334]** "is, of course, not insignificant or insubstantial." While $ 128,000,000 is a considerable sum of money, even in these days, the dollar volume, by itself, is not the test, as we have already pointed out.

***LEdHN[13]*** [13]***LEdHN[14]*** [14]The remaining determination, therefore, is whether the pre-emption of competition to the extent of the tonnage involved tends to substantially foreclose competition in the relevant coal market. We think not. That market sees an annual trade in excess of 250,000,000 tons of coal and over a billion dollars -- multiplied by 20 years it runs into astronomical **[***591]** figures. There is here neither a seller with a dominant position in the market as in *Standard Fashions, supra*; nor myriad outlets with substantial sales volume, coupled with an industry-wide practice of relying upon exclusive contracts, as in *Standard Oil, supra*; nor a plainly restrictive tying arrangement as in *International Salt, supra.* On the contrary, we seem to have only that type of contract which "may well be of economic advantage to

---

[12] 1,569,000 tons from counties in West Virginia, Virginia, Kentucky, Tennessee and North Carolina; 412,000 tons from counties in Alabama, Georgia and Tennessee; the balance was produced in other counties in West Virginia, Virginia and western Kentucky. *Id*., at 12B-10.

[13] United States Dept. of Interior, Bureau of Mines, II Minerals Yearbook (Fuels), 1959.

[14] United States Dept. of Interior, Bureau of Mines, Mineral Market Report, M. M. S. No. 3035, p. 23 (1960). These statistics were taken from sources cited by respondents.

[15] 1,787,000 tons from certain counties in West Virginia, Virginia, Kentucky, Tennessee and North Carolina; 1,321,000 tons from counties in Alabama, Georgia and elsewhere in Tennessee; 665,000 tons from the western Kentucky fields; 2,000 tons from other counties in West Virginia and Virginia. *Ibid*.

[16] In this connection we note incidentally that in *Appalachian Coals, Inc*., v. *United States*, 288 U.S. 344, 369 (1933), cited by respondents, Chief Justice Hughes quoted testimony showing that in 1932 it was nothing those days "for one interest or one concern to buy several million tons of coal." At n. 7. The findings of the District Court showed that one utility consumed 2,485,000 tons of coal a year. Other concerns had requirements running from 30,000 to 250,000 tons annually, while a textile manufacturer used 600,000 tons. At p. 370, n. 8. The Chief Justice also stated in his opinion that, within 24 counties in Kentucky, Tennessee (in both of which respondents operate) and their competitive States of Virginia and West Virginia, "there are over 1,620,000 acres of coal bearing land, containing approximately 9,000,000,000 net tons of recoverable coal . . . ." At p. 369.

buyers as well as to sellers." *Standard Oil Co.* v. *United States, supra, at p. 306*. In the case of the buyer it "may assure supply," while on the part of the seller it "may make possible the substantial reduction of selling expenses, give protection against price fluctuations, and . . . offer the possibility of a predictable market." *Id., at 306-307*. The 20-year period of the **[**632]** contract is singled out as the principal vice, but at least in the case of public utilities the assurance of a steady and ample supply of fuel is necessary in the public interest. Otherwise consumers are left unprotected against service failures owing to shutdowns; and increasingly unjustified costs might result in more burdensome rate structures eventually to be reflected in the consumer's bill. The compelling validity of such considerations has been recognized fully in the natural gas public utility field. This is not to say that utilities are immunized from Clayton Act proscriptions, but merely that, in judging the term **[*335]** of a requirements contract in relation to the substantiality of the foreclosure of competition, particularized considerations of the parties' operations are not irrelevant. In weighing the various factors, we have decided that in the competitive bituminous coal marketing area involved here the contract sued upon does not tend to foreclose a substantial volume of competition.

***LEdHN[15]*** [15]We need not discuss the respondents' further contention that the contract also violates *§ 1* and *§ 2* of the Sherman Act, for if it does not fall within the broader proscription of § 3 of the Clayton Act it follows that it is not forbidden by those of the former. *Times-Picayune Pub. Co.* v. *United States, supra, at pp. 608-609*.

The judgment is reversed and the case remanded to the District Court for further proceedings not inconsistent with this opinion.

*It is so ordered.*

MR. JUSTICE BLACK and MR. JUSTICE DOUGLAS are of the opinion that the District Court and the Court of Appeals correctly decided this case and would therefore affirm their judgments.

**References**

Validity, under 3 of the Clayton Act (*15 USC 14*), *of contract by purchaser of goods to take his entire requirements from the seller Annotation References:Contract by one party to sell his entire output to, or to take his entire requirements of a commodity from, the other party as contrary to public policy or antimonopoly statute, 83 ALR 1173.*

EXHIBIT 291

LexisNexis®

Caution
As of: August 12, 2014 9:20 AM EDT

# United States v. Dentsply Int'l, Inc.

United States Court of Appeals for the Third Circuit
September 21, 2004, Argued ; February 24, 2005, Filed
No. 03-4097

**Reporter:** 399 F.3d 181; 2005 U.S. App. LEXIS 3219; 2005-1 Trade Cas. (CCH) P74,706
UNITED STATES OF AMERICA, Appellant v. DENTSPLY INTERNATIONAL, INC.,

**Subsequent History:** US Supreme Court certiorari denied by *Dentsply Int'l, Inc. v. United States, 126 S. Ct. 1023, 163 L. Ed. 2d 853, 2006 U.S. LEXIS 33 (U.S., 2006)*
Judgment entered by *United States v. Dentsply Int'l, Inc., 2006 U.S. Dist. LEXIS 94907 (D. Del., Apr. 26, 2006)*

**Prior History:** **[**1]** APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE. (D.C. Civ. No. 99-00005). District Judge: Honorable Sue L. Robinson, Chief Judge.
*United States v. Dentsply Int'l, Inc., 277 F. Supp. 2d 387, 2003 U.S. Dist. LEXIS 14139 (D. Del., 2003)*

**Disposition:** Reversed and remanded for additional proceedings.

**Core Terms**

dealers, teeth, laboratories, manufacturers, dental, competitors, products, sales, artificial, selling, monopoly power, rivals, tooth, relevant market, prices, market share, distributors, exclusionary, consumers, customers, monopoly, competitive, practices, costs, buy, direct sale, monopolist, network, lines, labs

**LexisNexis® Headnotes**

Civil Procedure > Appeals > Standards of Review > Clearly Erroneous Review
Civil Procedure > Appeals > Standards of Review > De Novo Review

***HN1*** An appellate court exercises de novo review over the district court's conclusions of law. However, the appellate court will not disturb the district court's findings of fact unless they are clearly erroneous.

Antitrust & Trade Law > ... > Monopolies & Monopolization > Actual Monopolization > General Overview
Antitrust & Trade Law > ... > Monopolies & Monopolization > Attempts to Monopolize > General Overview
Antitrust & Trade Law > ... > Monopolies & Monopolization > Attempts to Monopolize > Sherman Act
Antitrust & Trade Law > ... > Monopolies & Monopolization > Conspiracy to Monopolize > General Overview
Antitrust & Trade Law > ... > Monopolies & Monopolization > Conspiracy to Monopolize > Sherman Act

Antitrust & Trade Law > Sherman Act > General Overview
Antitrust & Trade Law > Sherman Act > Penalties
Antitrust & Trade Law > Sherman Act > Remedies > General Overview
Antitrust & Trade Law > Sherman Act > Remedies > Injunctions
Antitrust & Trade Law > ... > US Department of Justice Actions > Civil Actions > Injunctions

***HN2*** *Section 2* of the Sherman Act, *15 U.S.C.S. § 2*, provides that every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person to monopolize any part of the trade is guilty of an offense and subject to penalties. In addition, the government may seek injunctive relief. *15 U.S.C.S. § 4*.

Antitrust & Trade Law > ... > Monopolies & Monopolization > Actual Monopolization > General Overview
Antitrust & Trade Law > ... > Monopolies & Monopolization > Actual Monopolization > Monopoly Power
Antitrust & Trade Law > ... > Price Fixing & Restraints of Trade > Vertical Restraints > General Overview

***HN3*** A violation of *§ 2* of the Sherman Act, *15 U.S.C.S. § 2*, consists of two elements: (1) possession of monopoly power and (2) maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident. Monopoly power under *§ 2* requires something greater than market power under *§ 1* of the Sherman Act, *15 U.S.C.S. § 1*.

Antitrust & Trade Law > ... > Monopolies & Monopolization > Actual Monopolization > General Overview
Antitrust & Trade Law > ... > Monopolies & Monopolization > Attempts to Monopolize > General Overview
Antitrust & Trade Law > Sherman Act > General Overview

***HN4*** To run afoul of *§ 2* of the Sherman Act, *15 U.S.C.S. § 2*, a defendant must be guilty of illegal conduct to foreclose competition, gain a competitive advantage, or to destroy a competitor. Behavior that otherwise might comply with antitrust law may be impermissibly exclusionary when practiced by a monopolist. A monopolist is not free to take certain actions that a company in a competitive (or even oligopolistic) market may take, because there is no market constraint on a monopolist's behavior.

Antitrust & Trade Law > ... > Monopolies & Monopolization > Actual Monopolization > General Overview
Antitrust & Trade Law > ... > Price Fixing & Restraints of Trade > Exclusive & Reciprocal Dealing > General Overview
Antitrust & Trade Law > ... > Price Fixing & Restraints of Trade > Exclusive & Reciprocal Dealing > Exclusive Dealing
Antitrust & Trade Law > Sherman Act > General Overview

***HN5*** Although not illegal in themselves, exclusive dealing arrangements can be an improper means of maintaining a monopoly. A prerequisite for such a violation is a finding that monopoly power exists. In addition, the exclusionary conduct must have an anti-competitive effect. If those elements are established, the monopolist still retains a defense of business justification.

Antitrust & Trade Law > ... > Monopolies & Monopolization > Actual Monopolization > General Overview
Antitrust & Trade Law > ... > Actual Monopolization > Anticompetitive & Predatory Practices > General Overview
Antitrust & Trade Law > ... > Price Fixing & Restraints of Trade > Exclusive & Reciprocal Dealing > General Overview
Antitrust & Trade Law > Sherman Act > General Overview

***HN6*** Unlawful maintenance of a monopoly is demonstrated by proof that a defendant has engaged in anti-competitive conduct that reasonably appears to be a significant contribution to maintaining monopoly power. Predatory or exclusionary practices in themselves are not sufficient. There must be proof that competition, not merely competitors, has been harmed.

Antitrust & Trade Law > ... > Monopolies & Monopolization > Actual Monopolization > General Overview
Antitrust & Trade Law > Sherman Act > General Overview

***HN7*** The concept of monopoly is distinct from monopoly power, which has been defined as the ability "to control prices or exclude competition." However, because such evidence is only rarely available, courts more typically examine market structure in search of circumstantial evidence of monopoly power. Thus, the existence of monopoly power may be inferred from a predominant share of the market, and the size of that portion is a primary factor in determining whether power exists.

Antitrust & Trade Law > ... > Monopolies & Monopolization > Actual Monopolization > General Overview
Antitrust & Trade Law > Sherman Act > General Overview

***HN8*** A less than predominant share of the market combined with other relevant factors may suffice to demonstrate monopoly power. Absent other pertinent factors, a share significantly larger than 55 percent has been required to established prima facie market power. Other germane factors include the (1) size and strength of competing firms, (2) freedom of entry, (3) pricing trends and practices in the industry, (4) ability of consumers to substitute comparable goods, and (5) consumer demand.

Antitrust & Trade Law > Regulated Practices > Market Definition > General Overview
Antitrust & Trade Law > ... > Monopolies & Monopolization > Actual Monopolization > General Overview
Antitrust & Trade Law > Sherman Act > General Overview

***HN9*** Defining the relevant market is an important part of the analysis under *§ 2* of the Sherman Act, *15 U.S.C.S. § 2*.

Antitrust & Trade Law > Regulated Practices > Market Definition > General Overview
Antitrust & Trade Law > ... > Monopolies & Monopolization > Actual Monopolization > General Overview
Antitrust & Trade Law > Sherman Act > General Overview

***HN10*** In evaluating monopoly power, it is not market share that counts, but the ability to maintain market share.

Antitrust & Trade Law > Regulated Practices > Market Definition > General Overview
Antitrust & Trade Law > ... > Monopolies & Monopolization > Actual Monopolization > General Overview
Antitrust & Trade Law > Sherman Act > General Overview

***HN11*** Economic realities rather than a formalistic approach must govern review of antitrust activity. Legal presumptions that rest on formalistic distinctions rather than actual market realities are generally disfavored in antitrust law in determining the existence of market power. Antitrust policy requires the courts to seek the economic substance of an arrangement, not merely its form.

Antitrust & Trade Law > Regulated Practices > Market Definition > General Overview
Antitrust & Trade Law > ... > Monopolies & Monopolization > Actual Monopolization > General Overview
Antitrust & Trade Law > Sherman Act > General Overview

***HN12*** An increase in pricing is a factor used in evaluating the existence of market power under *§ 2* of the Sherman Act, *15 U.S.C.S. § 2*.

Antitrust & Trade Law > ... > Monopolies & Monopolization > Actual Monopolization > General Overview
Antitrust & Trade Law > Sherman Act > General Overview

***HN13*** If monopoly power has been acquired or maintained through improper means, the fact that the power has not been used to extract a monopoly price provides no succor to the monopolist.

Antitrust & Trade Law > Regulated Practices > Market Definition > General Overview
Antitrust & Trade Law > ... > Monopolies & Monopolization > Actual Monopolization > General Overview
Antitrust & Trade Law > ... > Price Fixing & Restraints of Trade > Exclusive & Reciprocal Dealing > General Overview
Antitrust & Trade Law > Sherman Act > General Overview

***HN14*** Assessing anti-competitive effect is important in evaluating a challenge to a violation of *§ 2* of the Sherman Act, *15 U.S.C.S. § 2*. Under *§ 2*, it is not necessary that all competition be removed from the market. The test is not total foreclosure, but whether the challenged practices bar a substantial number of rivals or severely restrict the market's ambit. A set of strategically planned exclusive dealing contracts may slow the rival's expansion by requiring it to develop alternative outlets for its products or rely at least temporarily on inferior or more expensive outlets. Consumer injury results from the delay that the dominant firm imposes on the smaller rival's growth.

Antitrust & Trade Law > ... > Monopolies & Monopolization > Actual Monopolization > General Overview
Antitrust & Trade Law > ... > Actual Monopolization > Anticompetitive & Predatory Practices > General Overview
Antitrust & Trade Law > Sherman Act > General Overview

***HN15*** When a monopolist's actions are designed to prevent one or more new or potential competitors from gaining a foothold in the market by exclusionary, i.e. predatory, conduct, its success in that goal is not only injurious to the potential competitor but also to competition in general.

Antitrust & Trade Law > ... > Monopolies & Monopolization > Actual Monopolization > General Overview
Antitrust & Trade Law > Sherman Act > General Overview

***HN16*** Even if a company exerts monopoly power, it may defend its practices by establishing a business justification. Where the government has demonstrated harm to competition, the burden shifts to the company to show that its practice promotes a sufficiently pro-competitive objective.

Antitrust & Trade Law > Clayton Act > General Overview
Antitrust & Trade Law > ... > Price Fixing & Restraints of Trade > Exclusive & Reciprocal Dealing > General Overview
Antitrust & Trade Law > ... > Price Fixing & Restraints of Trade > Exclusive & Reciprocal Dealing > Exclusive Dealing
Antitrust & Trade Law > Sherman Act > General Overview

***HN17*** A finding in favor of the defendant under *§ 1* of the Sherman Act, *15 U.S.C.S. § 1*, and *§ 3* of the Clayton Act, *15 U.S.C.S. § 14*, does not preclude the application of evidence of exclusive dealing to support a 2 of the Sherman Act, *15 U.S.C.S. § 2*, claim.

Civil Procedure > Judicial Officers > Judges > Discretionary Powers

***HN18*** Different theories may be presented to establish a cause of action. A court's refusal to accept one theory rather than another neither undermines the claim as a whole, nor the judgment applying one of the theories.

**Counsel:** R. Hewitt Pate, Esquire, Assistant Attorney General, Makan Delrahim, Esquire, J. Bruce McDonald, Esquire, Deputy Assistant Attorneys General, Adam D. Hirsh, Esquire (ARGUED), Robert B. Nicholson, Esquire, Mark J. Botti, Esquire, Jon B. Jacobs, Esquire Attorneys, U.S. Department of Justice Antitrust Division, 601 D Street NW, Room 10535, Washington, DC 20530-0001, Attorneys for Appellant United States of America.

Margaret M. Zwisler, Esquire (ARGUED), Richard A. Ripley, Esquire, Kelly A. Clement, Esquire, Eric J. McCarthy, Esquire, Douglas S. Morrin, Esquire, Howrey, Simon, Arnold & White, LLP, 1299 Pennsylvania Avenue, N.W., Washington, D.C. 20004. William D. Johnston, Esquire. Christian D. Wright, Esquire. Young, Conaway, Stargatt & Taylor, 1000 West Street, 17th Floor Brandywine Building, Wilmington, Delaware 19801, Of Counsel: Brian M. Addison, Esquire, Dentsply International, Inc., Susquehanna Commerce Center, 221 West Philadelphia Street, York, Pennsylvania 17405, Attorneys for Appellee Dentsply International, **[**2]** Inc.

**Judges:** Before: McKEE, ROSENN and WEIS, Circuit Judges.

**Opinion by:** WEIS

**Opinion**

**[*184]** WEIS, Circuit Judge.

In this antitrust case we conclude that an exclusivity policy imposed by a manufacturer on its dealers violates *Section 2 of the Sherman Act.* We come to that position because of the nature of the relevant market and the established effectiveness of the restraint despite the lack of long term contracts between the manufacturer and its dealers. Accordingly, we will reverse the judgment of the District Court in favor of the defendant and remand with directions to grant the Government's request for injunctive relief.

The Government alleged that Defendant, Dentsply International, Inc., acted unlawfully to maintain a monopoly in violation of *Section 2 of the Sherman Act*, *15 U.S.C. § 2*; entered into illegal restrictive dealing agreements prohibited by Section 3 of the Clayton Act, *15 U.S.C. § 14*; and used unlawful agreements in restraint of interstate trade in violation of Section 1 of the Sherman Act, *15 U.S.C. § 1*. After a bench trial, the District Court denied the injunctive relief sought by the Government and entered judgment **[**3]** for defendant.

In its comprehensive opinion, the District Court found the following facts. Dentsply International, Inc. is a Delaware Corporation with its principal place of business in York Pennsylvania. It manufactures artificial teeth for use in dentures and other restorative appliances and sells them to dental products dealers. The dealers, in turn, supply the teeth and various other materials to dental laboratories, which fabricate dentures for sale to dentists.

The relevant market is the sale of prefabricated artificial teeth in the United States.

Because of advances in dental medicine, artificial tooth manufacturing is marked by a low or no-growth potential. Dentsply has long dominated the industry consisting of 12-13 manufacturers

and enjoys a 75% - 80% market share on a revenue basis, 67% on a unit basis, and is about 15 times larger than its next closest competitor. The other significant manufacturers and their market shares are:

| | |
|---|---|
| Ivoclar Vivadent, Inc. | 5% |
| Vita Zahnfabrik | 3% |
| * Myerson LLC | 3% |
| * American Tooth Industries | 2% |
| * Universal Dental Company | 1%-2% |
| Heraeus Kulzer GmbH | 1% |
| Davis, Schottlander & Davis, Ltd. | <1% |
| * These companies sell directly to dental laboratories as well as to dealers. | |

**[**4]** Dealers sell to dental laboratories a full range of metals, porcelains, acrylics, waxes, and other materials required to fabricate fixed or removal restorations. Dealers **[*185]** maintain large inventories of artificial teeth and carry thousands of products, other than teeth, made by hundreds of different manufacturers. Dentsply supplies $ 400 million of products other than teeth to its network of 23 dealers.

There are hundreds of dealers who compete on the basis of price and service among themselves, as well as with manufacturers who sell directly to laboratories. The dealer field has experienced significant consolidation with several large national and regional firms emerging.

For more than fifteen years, Dentsply has operated under a policy that discouraged its dealers from adding competitors' teeth to their lines of products. In 1993, Dentsply adopted "Dealer Criterion 6." It provides that in order to effectively promote Dentsply-York products, authorized dealers "may not add further tooth lines to their product offering." Dentsply operates on a purchase order basis with its distributors and, therefore, the relationship is essentially terminable at will. Dealer Criterion 6 was enforced **[**5]** against dealers with the exception of those who had carried competing products before 1993 and were "grandfathered" for sales of those products. Dentsply rebuffed attempts by those particular distributors to expand their lines of competing products beyond the grandfathered ones.

Dentsply's five top dealers sell competing grandfathered brands of teeth. In 2001, their share of Dentsply's overall sales were

| | |
|---|---|
| Zahn | 39% |
| Patterson | 28% |
| Darby | 8% |
| Benco | 4% |
| DLDS | <4% |
| TOTAL | 83% |

16,000 dental laboratories fabricate restorations and a subset of 7,000 provide dentures. The laboratories compete with each other on the basis of price and service. Patients and dentists value fast service, particularly in the case of lost or damaged dentures. When laboratories' inventories cannot supply the necessary teeth, dealers may fill orders for walk-ins or use over-night express mail as does Dentsply, which dropped-shipped some 60% of orders from dealers.

Dealers have been dissatisfied with Dealer Criterion 6, but, at least in the recent past, none of them have given up the popular Dentsply teeth to take on a competitive line. Dentsply at one time considered selling directly **[**6]** to the laboratories, but abandoned the concept because of fear that dealers would retaliate by refusing to buy its other dental products.

In the 1990's Dentsply implemented aggressive sales campaigns, including efforts to promote its teeth in dental schools, providing rebates for laboratories' increased usage, and deploying a sales force dedicated to teeth, rather than the entire product mix. Its chief competitors did not as actively promote their products. Foreign manufacturers were slow to alter their designs to cope with American preferences, and, in at least one instance, pursued sales of porcelain products rather than plastic teeth.

Dentsply has had a reputation for aggressive price increases in the market and has created a high price umbrella. Its artificial tooth business is characterized as a "cash cow" whose profits are diverted to other operations of the company. A report in 1996 stated its profits from teeth since 1990 had increased 32% from $ 16.8 million to $ 22.2 million.

The District Court found that Dentsply's business justification for Dealer Criterion 6 was pretextual and designed expressly to exclude its rivals from access to dealers. The Court however concluded **[**7]** that other dealers were available and direct sales

to **[*186]** laboratories was a viable method of doing business. Moreover, it concluded that Dentsply had not created a market with supra competitive pricing, dealers were free to leave the network at any time, and the Government failed to prove that Dentsply's actions "have been or could be successful in preventing 'new or potential competitors from gaining a foothold in the market.'" *United States v. Dentsply Int'l, Inc., 277 F. Supp. 2d 387, 453 (D. Del. 2003)* (quoting *LePage's, Inc. v. 3M, 324 F.3d 141, 159 (3d Cir. 2003)*). Accordingly, the Court concluded that the Government had failed to establish violations of *Section 3* of the Clayton Act and *Sections 1* or *2* of the Sherman Act.

The Government appealed, contending that a monopolist that prevents rivals from distributing through established dealers has maintained its monopoly by acting with predatory intent and violates *Section 2*. Additionally, the Government asserts that the maintenance of a 75% - 80% market share, establishment of a price umbrella, repeated aggressive price increases and exclusion of competitors from a major source of distribution, show **[**8]** that Dentsply possesses monopoly power, despite the fact that rivals are not entirely excluded from the market and some of their prices are higher. The Government did not appeal the rulings under *Section 1 of the Sherman Act* or *Section 3 of the Clayton Act*.

Dentsply argues that rivals had obtained a share of the relevant market, that there are no artificially high prices and that competitors have access to all laboratories through existing or readily convertible systems. In addition, Dentsply asserts that its success is due to its leadership in promotion and marketing and not the imposition of Dealer Criterion 6.

**I. STANDARD OF REVIEW**

***HN1*** We exercise *de novo* review over the District Court's conclusions of law. See *Allen-Myland, Inc. v. IBM Corp., 33 F.3d 194, 201 (3d Cir. 1994)*. See also *United States v. Microsoft, 346 U.S. App. D.C. 330, 253 F.3d 34, 50 (D.C. Cir. 2001)*. However, we will not disturb its findings of fact unless they are clearly erroneous. See *SmithKline Corp. v. Eli Lilly and Co., 575 F.2d 1056, 1062 (3d Cir. 1978)*.

**II. APPLICABLE LEGAL PRINCIPLES**

***HN2*** Section 2 of the Sherman Act, *15 U.S.C. § 2*, **[**9]** provides that "every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person . . . to monopolize any part of the trade" is guilty of an offense and subject to penalties. In addition, the Government may seek injunctive relief. *15 U.S.C. § 4*.

***HN3*** A violation of *Section 2* consists of two elements: (1) possession of monopoly power and (2) ". . . maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *Eastman Kodak Co. v Image Technical Servs., Inc., 504 U.S. 451, 480, 119 L. Ed. 2d 265, 112 S. Ct. 2072 (1992)* (citing *United States v. Grinnell Corp., 384 U.S. 563, 571, 16 L. Ed. 2d 778, 86 S. Ct. 1698 (1966)*). "Monopoly power under *§ 2* requires . . . something greater than market power under *§ 1*." *Eastman Kodak Co., 504 U.S. at 481*.

***HN4*** To run afoul of *Section 2*, a defendant must be guilty of illegal conduct "to foreclose competition, gain a competitive advantage, or to destroy a competitor." *Id. at 482-83* (quoting *United States v. Griffith, 334 U.S. 100, 107, 92 L. Ed. 1236, 68 S. Ct. 941 (1948)*). **[**10]** See generally *Lorain Journal Co. v. United States, 342 U.S. 143, 96* **[*187]** *L. Ed. 162, 72 S. Ct. 181 (1951)*. Behavior that otherwise might comply with antitrust law may be impermissibly exclusionary when practiced by a monopolist. As we said in *LePage's, Inc. v. 3M, LePage's, Inc. v. 3M, 324 F.3d 141, 151-52 (3d Cir. 2003)*, "a monopolist is not free to take certain actions that a company in a competitive (or even oligopolistic) market may take, because there is no market constraint on a monopolist's behavior." 3 Areeda & Turner, Antitrust Law P 813, at 300-02 (1978).

***HN5*** Although not illegal in themselves, exclusive dealing arrangements can be an improper means of maintaining a monopoly. *United States v. Grinnell Corp., 384 U.S. 563, 16 L. Ed. 2d 778, 86 S. Ct. 1698 (1966)*; *LePage's, 324 F.3d at 157*. A prerequisite for such a violation is a finding that monopoly power exists. See, e.g., *LePage's, 324 F.3d at 146*. In addition, the exclusionary conduct must have an anti-competitive effect. See *id. at 152, 159-63*. If those elements are established, the monopolist still retains a defense of business justification. See *id. at 152.* **[**11]**

***HN6*** Unlawful maintenance of a monopoly is demonstrated by proof that a defendant has engaged in anti-competitive conduct that reasonably appears to be a significant contribution to maintaining monopoly power. *United States v. Microsoft, 346 U.S. App. D.C. 330, 253 F.3d 34, 79 (D.C. Cir. 2001)*; 3 Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law, P 651c at 78 (1996). Predatory or exclusionary practices in themselves are not sufficient. There must be proof that competition, not merely competitors, has been harmed. *LePage's, 324 F.3d at 162*.

**III. MONOPOLY POWER**

***HN7*** The concept of monopoly is distinct from monopoly power, which has been defined as the ability "to control prices or exclude competition." *Grinnell, 384 U.S. at 571*; see also *United States v. E.I. du Pont de Nemours and Co., 351 U.S. 377, 100*

*L. Ed. 1264, 76 S. Ct. 994 (1956)*. However, because such evidence is "only rarely available, courts more typically examine market structure in search of circumstantial evidence of monopoly power." *Microsoft, 253 F.3d at 51*. Thus, the existence of monopoly power may be inferred from a predominant share of the **[**12]** market, *Grinnell, 384 U.S. at 571*, and the size of that portion is a primary factor in determining whether power exists. *Pennsylvania Dental Ass'n v. Med. Serv. Ass'n of Pa, 745 F.2d 248, 260 (3d Cir. 1984)*.

***HN8*** A less than predominant share of the market combined with other relevant factors may suffice to demonstrate monopoly power. *Fineman v. Armstrong World Indus., 980 F.2d 171, 201 (3d Cir. 1992)*. Absent other pertinent factors, a share significantly larger than 55% has been required to established prima facie market power. *Id. at 201*. Other germane factors include the size and strength of competing firms, freedom of entry, pricing trends and practices in the industry, ability of consumers to substitute comparable goods, and consumer demand. See *Tampa Elec. Co. v. Nashville Coal Co., 365 U.S. 320, 5 L. Ed. 2d 580, 81 S. Ct. 623 (1961)*; *Barr Laboratories, Inc. v. Abbott Laboratories, 978 F.2d 98 (3d Cir. 1992)*; *Weiss v. York Hosp., 745 F.2d 786, 827 n.72 (3d Cir. 1984)*.

A. The Relevant Market

***HN9*** Defining the relevant market is an important part of the analysis. The District Court found the market **[**13]** to be "the sale of prefabricated artificial teeth in the United States." *United States v. Dentsply Int'l Inc., 277 F. Supp. 2d. 387, 396 (D. Del. 2003)*. Further, the Court found that "the manufacturers participating in the United **[*188]** States artificial tooth market historically have distributed their teeth into the market in one of three ways: (1) directly to dental labs; (2) through dental dealers; or (3) through a hybrid system combining manufacturer direct sales and dental dealers." Finding of Fact 13. [1] The Court also found that the "labs are the relevant consumers for prefabricated artificial teeth." FF61.

There is no dispute that the laboratories are the ultimate consumers because they buy the teeth at the point in the process where they are incorporated into another product. Dentsply points out that its representatives concentrate their efforts at the laboratories as well as at dental schools and dentists. See **[**14]** *Dentsply Int'l Inc., 277 F. Supp. 2d. at 429-34*.

During oral argument, Dentsply's counsel said, "the dealers are not the market…the market is the dental labs that consume the product." Transcript of Oral Argument at 47. Emphasizing the importance of end users, Dentsply argues that the District Court understood the relevant market to be the sales of artificial teeth to dental laboratories in the United States. Although the Court used the word "market" in a number of differing contexts, the findings demonstrate that the relevant market is not as narrow as Dentsply would have it. In FF238, the Court said that Dentsply "has had a persistently high market share between 75% and 80% on a revenue basis, in the artificial tooth market." Dentsply sells only to dealers and the narrow definition of market that it urges upon us would be completely inconsistent with that finding of the District Court.

The Court went on to find that Ivoclar "has the second-highest share of the market, at approximately 5%." FF239. Ivoclar sells directly to the laboratories. Therefore, these two findings establish that the relevant market in this case includes sales to dealers and direct sales to **[**15]** the laboratories. Other findings on Dentsply's "market share" are consistent with this understanding. FF240-243.

These findings are persuasive that the District Court understood, as do we, the relevant market to be the total sales of artificial teeth to the laboratories and the dealers combined.

Dentsply's apparent belief that a relevant market cannot include sales both to the final consumer and a middleman is refuted in the closely analogous case of *Allen-Myland, Inc. v. IBM Corp., 33 F.3d 194 (3d Cir. 1994)*. In that case, IBM sold mainframe computers directly to the ultimate consumers and also sold to companies that leased computers to ultimate users. We concluded that the relevant market encompassed the sales directly to consumers as well as those to leasing companies. "…to the extent that leasing companies deal in used, non-IBM mainframes that have not already been counted in the sales market, these machines belong in the relevant market for large-scale mainframe computers." *Id. at 203*.

To resolve any doubt, therefore, we hold that the relevant market here is the sale of artificial teeth in the United States both to laboratories and to the **[**16]** dental dealers.

B. Power to Exclude

Dentsply's share of the market is more than adequate to establish a prima facie case of power. In addition, Dentsply has held its dominant share for more than ten years and has fought aggressively to maintain that imbalance. One court has commented that, ***HN10*** "in evaluating monopoly power, it is not market share that counts, **[*189]** but the ability to *maintain* market share." *United States v. Syufy Enters., 903 F.2d 659, 665-66 (9th Cir. 1990)*.

---

[1] The District Court's Findings of Fact will be referred to as "FF" hereafter.

The District Court found that it could infer monopoly power because of the predominant market share, but despite that factor, concluded that Dentsply's tactics did not preclude competition from marketing their products directly to the dental laboratories. "Dentsply does not have the power to exclude competitors from the ultimate consumer." *United States v. Dentsply Int'l, Inc., 277 F. Supp. 2d 387, 452 (D. Del. 2003)*.

Moreover, the Court determined that failure of Dentsply's two main rivals, Vident and Ivoclar, to obtain significant market shares resulted from their own business decisions to concentrate on other product lines, rather than implement active sales efforts for **[**17]** teeth.

The District Court's evaluation of Ivoclar and Vident business practices as a cause of their failure to secure more of the market is not persuasive. The reality is that over a period of years, because of Dentsply's domination of dealers, direct sales have not been a practical alternative for most manufacturers. It has not been so much the competitors' less than enthusiastic efforts at competition that produced paltry results, as it is the blocking of access to the key dealers. This is the part of the real market that is denied to the rivals.

The apparent lack of aggressiveness by competitors is not a matter of apathy, but a reflection of the effectiveness of Dentsply's exclusionary policy. Although its rivals could theoretically convince a dealer to buy their products and drop Dentsply's line, that has not occurred. In United States v. Visa U.S.A., Inc., 344 F.3d at 229, 240 (2d Cir. 2003), the Court of Appeals held that similar evidence indicated that defendants had excluded their rivals from the marketplace and thus demonstrated monopoly power.

The Supreme Court on more than one occasion has emphasized that ***HN11*** economic realities rather than a formalistic approach **[**18]** must govern review of antitrust activity. "Legal presumptions that rest on formalistic distinctions rather than actual market realities are generally disfavored in antitrust law . . . in determining the existence of market power . . . this Court has examined closely the economic reality of the market at issue." *Eastern Kodak Co. v. Image Technical Servs., Inc., 504 U.S. 451, 466-67, 119 L. Ed. 2d 265, 112 S. Ct. 2072 (1992)*. "If we look at substance rather than form, there is little room for debate." *United States v. Sealy, Inc., 388 U.S. 350, 352, 18 L. Ed. 2d 1238, 87 S. Ct. 1847 (1967)*. We echoed that standard in *Weiss v. York Hosp., 745 F.2d 786, 815 (3d Cir. 1984)*. "Antitrust policy requires the courts to seek the economic substance of an arrangement, not merely its form." Id.

The realities of the artificial tooth market were candidly expressed by two former managerial employees of Dentsply when they explained their rules of engagement. One testified that Dealer Criterion 6 was designed to "block competitive distribution points." He continued, "Do not allow competition to achieve toeholds in dealers; tie up dealers; do not 'free up' key players."

Another **[**19]** former manager said:

> You don't want your competition with your distributors, you don't want to give the distributors an opportunity to sell a competitive product. And you don't want to give your end user, the customer, meaning a laboratory and/or a dentist, a choice. He has to buy Dentsply teeth. That's the only thing that's available. The only place you can get it is through the distributor and the only one **[*190]** that the distributor is selling is Dentsply teeth. That's your objective.These are clear expressions of a plan to maintain monopolistic power.

The District Court detailed some ten separate incidents in which Dentsply required agreement by new as well as long-standing dealers not to handle competitors' teeth. For example, when the DLDS firm considered adding two other tooth lines because of customers' demand, Dentsply threatened to sever access not only to its teeth, but to other dental products as well. DLDS yielded to that pressure. The termination of Trinity Dental, which had previously sold Dentsply products other than teeth, was a similar instance. When Trinity wanted to add teeth to its line for the first time and chose a competitor, Dentsply refused to supply **[**20]** other dental products.

Dentsply also pressured Atlanta Dental, Marcus Dental, Thompson Dental, Patterson Dental and Pearson Dental Supply when they carried or considered adding competitive lines. In another incident, Dentsply recognized DTS as a dealer so as to "fully eliminate the competitive threat that [DTS locations] pose by representing Vita and Ivoclar in three of four regions."

The evidence demonstrated conclusively that Dentsply had supremacy over the dealer network and it was at that crucial point in the distribution chain that monopoly power over the market for artificial teeth was established. The reality in this case is that the firm that ties up the key dealers rules the market.

In concluding that Dentsply lacked the power to exclude competitors from the laboratories, "the ultimate consumers," the District Court overlooked the point that the relevant market was the "sale" of artificial teeth to both dealers and laboratories. Although

some sales were made by manufacturers to the laboratories, overwhelming numbers were made to dealers. Thus, the Court's scrutiny should have been applied not to the "ultimate consumers" who used the teeth, but to the "customers" who purchased **[**21]** the teeth, the relevant category which included dealers as well as laboratories. This mis-focus led the District Court into clear error.

The factual pattern here is quite similar to that in *LePage's, Inc. v. 3M, 324 F.3d 141 (3d Cir. 2003)*. There, a manufacturer of transparent tape locked up high volume distribution channels by means of substantial discounts on a range of its other products. *LePage's, 324 F.3d at 144, 160-62*. We concluded that the use of exclusive dealing and bundled rebates to the detriment of the rival manufacturer violated *Section 2*. See *LePage's, 324 F.3d at 159*. Similarly, in Microsoft, the Court of Appeals for the D. C. Circuit concluded that, through the use of exclusive contracts with key dealers, a manufacturer foreclosed competitors from a substantial percentage of the available opportunities for product distribution. See *Microsoft, 253 F.3d at 70-71*.

The evidence in this case demonstrates that for a considerable time, through the use of Dealer Criterion 6 Dentsply has been able to exclude competitors from the dealers' network, a narrow, but heavily traveled channel to the dental laboratories.

**[**22]** C. Pricing

***HN12*** An increase in pricing is another factor used in evaluating existence of market power. Although in this case the evidence of exclusion is stronger than that of Dentsply's control of prices, testimony about suspect pricing is also found in this record.

The District Court found that Dentsply had a reputation for aggressive price increases in the market. It is noteworthy that experts for both parties testified that **[*191]** were Dealer Criterion 6 abolished, prices would fall. A former sales manager for Dentsply agreed that the company's share of the market would diminish should Dealer Criterion 6 no longer be in effect. In 1993, Dentsply's regional sales manager complained, "we need to moderate our increases - twice a year for the last few years was not good." Large scale distributors observed that Dentsply's policy created a high price umbrella.

Although Dentsply's prices fall between those of Ivoclar and Vita's premium tooth lines, Dentsply did not reduce its prices when competitors elected not to follow its increases. Dentsply's profit margins have been growing over the years. The picture is one of a manufacturer that sets prices with little concern for its competitors, **[**23]** "something a firm without a monopoly would have been unable to do." *Microsoft, 253 F.3d at 58*. The results have been favorable to Dentsply, but of no benefit to consumers.

Moreover, even ***HN13*** "if monopoly power has been acquired or maintained through improper means, the fact that the power has not been used to extract [a monopoly price] provides no succor to the monopolist." *Microsoft, 253 F.3d at 57* (quoting *Berkey Photo, Inc. v. Eastman Kodak, Co., 603 F.2d 263, 274 (2d Cir. 1979))*. The record of long duration of the exclusionary tactics and anecdotal evidence of their efficacy make it clear that power existed and was used effectively. The District Court erred in concluding that Dentsply lacked market power.

**IV. ANTI-COMPETITIVE EFFECTS**

Having demonstrated that Dentsply possessed market power, the Government must also establish the second element of a *Section 2* claim, that the power was used "to foreclose competition." *United States v. Griffith, 334 U.S. 100, 107, 92 L. Ed. 1236, 68 S. Ct. 941 (1948)*. ***HN14*** Assessing anti-competitive effect is important in evaluating a challenge to a violation of *Section 2*. Under that Section of **[**24]** the Sherman Act, it is not necessary that all competition be removed from the market. The test is not total foreclosure, but whether the challenged practices bar a substantial number of rivals or severely restrict the market's ambit. *LePage's, 324 F.3d at 159-60*; *Microsoft, 253 F.3d at 69*.

A leading treatise explains,

> A set of strategically planned exclusive dealing contracts may slow the rival's expansion by requiring it to develop alternative outlets for its products or rely at least temporarily on inferior or more expensive outlets. Consumer injury results from the delay that the dominant firm imposes on the smaller rival's growth. Herbert Hovenkamp, Antitrust Law P 1802c, at 64 (2d ed. 2002).

By ensuring that the key dealers offer Dentsply teeth either as the only or dominant choice, Dealer Criterion 6 has a significant effect in preserving Dentsply's monopoly. It helps keep sales of competing teeth below the critical level necessary for any rival to pose a real threat to Dentsply's market share. As such, Dealer Criterion 6 is a solid pillar of harm to competition. See *LePage's, 324 F.3d 141, 159 (3d Cir. 2001)* **[**25]** ***HN15*** ("When a monopolist's actions are designed to prevent one or more new or potential competitors from gaining a foothold in the market by exclusionary, i.e. predatory, conduct, its success in that goal is not only injurious to the potential competitor but also to competition in general.").

A. Benefits of Dealers

Dentsply has always sold its teeth through dealers. Vita sells through Vident, its exclusive distributor and domestic **[*192]** affiliate, but has a mere 3% of the market. Ivoclar had some relationship with dealers in the past, but its direct relationship with laboratories yields only a 5% share.

A number of factors are at work here. For a great number of dental laboratories, the dealer is the preferred source for artificial teeth. Although the District Court observed that "labs prefer to buy direct because of potential cost savings attributable to the elimination of the dealer middleman[,]" FF81, in fact, laboratories are driven by the realities of the marketplace to buy far more heavily from dealers than manufacturers. This may be largely attributed to the beneficial services, credit function, economies of scale and convenience that dealers provide to laboratories, benefits **[**26]** which are otherwise unavailable to them when they buy direct. FF71, 81, 84.

The record is replete with evidence of benefits provided by dealers. For example, they provide laboratories the benefit of "one stop-shopping" and extensive credit services. Because dealers typically carry the products of multiple manufacturers, a laboratory can order, with a single phone call to a dealer, products from multiple sources. Without dealers, in most instances laboratories would have to place individual calls to each manufacturer, expend the time, and pay multiple shipping charges to fill the same orders.

The dealer-provided reduction in transaction costs and time represents a substantial benefit, one that the District Court minimized when it characterized "one stop shopping" as merely the ability to order from a single manufacturer all the materials necessary for crown, bridge and denture construction. FF84. Although a laboratory can call a manufacturer directly and purchase any product made by it, FF84, the laboratory is unable to procure from that source products made by its competitors. Thus, purchasing through dealers, which as a class traditionally carries the products of multiple vendors, **[**27]** surmounts this shortcoming, as well as offers other advantages.

Buying through dealers also enables laboratories to take advantage of obtaining discounts. Because they engage in price competition to gain laboratories' business, dealers often discount manufacturers' suggested laboratory price for artificial teeth. FF69, 70. There is no finding on this record that manufacturers offer similar discounts.

Another service dealers perform is taking back tooth returns. Artificial teeth and denture returns are quite common in dentistry. Approximately 30% of all laboratory tooth purchases are returned for exchange or credit. FF97. The District Court disregarded this benefit on the ground that all manufacturers except Vita accept tooth returns. FF97. However, in equating dealer and manufacturer returns, the District Court overlooked the fact that using dealers, rather than manufacturers, enables laboratories to consolidate their returns. In a single shipment to a dealer, a laboratory can return the products of a number of manufacturers, and so economize on shipping, time, and transaction costs.

Conversely, when returning products directly to manufacturers, a laboratory must ship each vendor's **[**28]** product separately and must track each exchange individually. Consolidating returns yields savings of time, effort, and costs.

Dealers also provide benefits to manufacturers, perhaps the most obvious of which is efficiency of scale. Using select high-volume dealers, as opposed to directly selling to hundreds if not thousands of laboratories, greatly reduces the manufacturer's distribution costs and credit risks. Dentsply, for example, currently sells to **[*193]** twenty three dealers. If it were instead to sell directly to individual laboratories, Dentsply would incur significantly higher transaction costs, extension of credit burdens, and credit risks.

Although a laboratory that buys directly from a manufacturer may be able to avoid the marginal costs associated with "middleman" dealers, any savings must be weighed against the benefits, savings, and convenience offered by dealers.

In addition, dealers provide manufacturers more marketplace exposure and sales representative coverage than manufacturers are able to generate on their own. Increased exposure and sales coverage traditionally lead to greater sales.

B. "Viability" of Direct Sales

The benefits that dealers provide manufacturers **[**29]** help make dealers the preferred distribution channels - in effect, the "gateways" - to the artificial teeth market. Nonetheless, the District Court found that selling direct is a "viable" method of distributing artificial teeth. FF71, 73, 74-81, CL26. But we are convinced that it is "viable" only in the sense that it is "possible," not that it is practical or feasible in the market as it exists and functions. The District Court's conclusion of "viability" runs counter to the facts and is clearly erroneous. On the entire evidence, we are "left with the definite and firm conviction that a mistake has been committed." *United States v. Igbonwa, 120 F.3d 437, 440 (3d Cir. 1997)* (citations and internal quotations omitted).

It is true that Dentsply's competitors can sell directly to the dental laboratories and an insignificant number do. The undeniable reality, however, is that dealers have a controlling degree of access to the laboratories. The long-entrenched Dentsply dealer network with its ties to the laboratories makes it impracticable for a manufacturer to rely on direct distribution to the laboratories in any significant amount. See *United States v. Visa U.S.A., 344 F.3d 229, 240 (2d Cir. 2003).* **[**30]**

That some manufacturers resort to direct sales and are even able to stay in business by selling directly is insufficient proof that direct selling is an effective means of competition. The proper inquiry is not whether direct sales enable a competitor to "survive" but rather whether direct selling "poses a real threat" to defendant's monopoly. See *Microsoft, 253 F.3d at 71*. The minuscule 5% and 3% market shares eked out by direct-selling manufacturers Ivoclar and Vita, Dentsply's "primary competitors," FF26, 36, 239, reveal that direct selling poses little threat to Dentsply.

C. Efficacy of Dealer Criterion 6

Although the parties to the sales transactions consider the exclusionary arrangements to be agreements, they are technically only a series of independent sales. Dentsply sells teeth to the dealers on an individual transaction basis and essentially the arrangement is "at-will." Nevertheless, the economic elements involved - the large share of the market held by Dentsply and its conduct excluding competing manufacturers - realistically make the arrangements here as effective as those in written contracts. See *Monsanto Co. v. Spray-Rite Serv. Corp., 465 U.S. 752, 764 n.9, 79 L. Ed. 2d 775, 104 S. Ct. 1464 (1984).* **[**31]**

Given the circumstances present in this case, there is no ground to doubt the effectiveness of the exclusive dealing arrangement. In *LePage's, 324 F.3d at 162*, we concluded that 3M's aggressive rebate program damaged LePage's ability to compete and thereby harmed competition itself. LePage's simply could not match the discounts that 3M provided. *LePage's, 324* **[*194]** F.3d at 161. Similarly, in this case, in spite of the legal ease with which the relationship can be terminated, the dealers have a strong economic incentive to continue carrying Dentsply's teeth. Dealer Criterion 6 is not edentulous. [2]

**[**32]** D. Limitation of Choice

An additional anti-competitive effect is seen in the exclusionary practice here that limits the choices of products open to dental laboratories, the ultimate users. A dealer locked into the Dentsply line is unable to heed a request for a different manufacturers' product and, from the standpoint of convenience, that inability to some extent impairs the laboratory's choice in the marketplace.

As an example, current and potential customers requested Atlanta Dental to carry Vita teeth. Although these customers could have ordered the Vita teeth from Vident in California, Atlanta Dental's tooth department manager believed that they were interested in a local source. Atlanta Dental chose not to add the Vita line after being advised that doing so would cut off access to Dentsply teeth, which constituted over 90% of its tooth sales revenue.

Similarly, DLDS added Universal and Vita teeth to meet customers' requests, but dropped them after Dentsply threatened to stop supplying its product. Marcus Dental began selling another brand of teeth at one point because of customer demand in response to supply problems with Dentsply. After Dentsply threatened to enforce **[**33]** Dealer Criterion 6, Marcus dropped the other line.

E. Barriers to Entry

Entrants into the marketplace must confront Dentsply's power over the dealers. The District Court's theory that any new or existing manufacturer may "steal" a Dentsply dealer by offering a superior product at a lower price, see *Omega Environmental, Inc. v. Gilbarco, 127 F.3d 1157 (9th Cir. 1997)*, simply has not proved to be realistic. To the contrary, purloining efforts have been thwarted by Dentsply's longtime, vigorous and successful enforcement actions. The paltry penetration in the market by competitors over the years has been a refutation of theory by tangible and measurable results in the real world.

The levels of sales that competitors could project in wooing dealers were minuscule compared to Dentsply's, whose long-standing relationships with these dealers included sales of other dental products. For example, Dentsply threatened Zahn with termination if it started selling Ivoclar teeth. At the time, Ivoclar's projected $ 1.2 million in sales were 85% lower than Zahn's $ 8 million in Dentsply's sales.

When approached by Leach & Dillon and Heraeus Kulzer, Zahn's sales of Dentsply **[**34]** teeth had increased to $ 22 - $ 23 million per year. In comparison, the president of Zahn expected that Leach & Dillon would add up to $ 200,000 (or less than 1% of its Dentsply's sales) and Heraeus Kulzer would contribute "maybe hundreds **[*195]** of thousands." Similarly, Vident's $ 1 million in projected sales amounted to 5.5% of its $ 18 million in annual Dentsply's sales.

---

[2] In some cases which we find distinguishable, courts have indicated that exclusive dealing contracts of short duration are not violations of the antitrust laws. See, e.g., CDC Techs., Inc. v. IDEXX Lab., Inc., 186 F.3d 74, 81 (2d Cir. 1999) ("distributors" only provided sales leads and sales increased after competitor imposed exclusive dealing arrangements); Omega Envtl., Inc. v. Gilbarco, Inc., 127 F.3d 1157, 1163 (9th Cir. 1997) (manufacturer with 55% market share sold both to consumers and distributors, market showed decreasing prices and fluctuating shares); Ryko Mfg. Co. v. Eden Servs., 823 F.2d 1215 (8th Cir. 1987) (manufacturer sold its products through both direct sales and distributors); Roland Mach. Co. v. Dresser Indus., Inc., 749 F.2d 380 (7th Cir. 1984) (contract between dealer and manufacturer did not contain exclusive dealing provision).

The dominant position of Dentsply dealers as a gateway to the laboratories was confirmed by potential entrants to the market. The president of Ivoclar testified that his company was unsuccessful in its approach to the two large national dealers and other regional dealers. He pointed out that it is more efficient to sell through dealers and, in addition, they offered an entre to future customers by promotions in the dental schools.

Further evidence was provided by a Vident executive, who testified about failed attempts to distribute teeth through ten identified dealers. He attributed the lack of success to their fear of losing the right to sell Dentsply teeth.

Another witness, the president of Dillon Company, advised Davis, Schottlander & Davis, a tooth manufacturer, "to go through the dealer network because anything **[**35]** else is futile…Dealers control the tooth industry. If you don't have distribution with the dealer network, you don't have distribution." Some idea of the comparative size of the dealer network was illustrated by the Dillon testimony: "Zahn does $ 2 billion, I do a million-seven. Patterson does over a billion dollars, I do a million-seven. I have ten employees, they have 6,000."

Dealer Criterion 6 created a strong economic incentive for dealers to reject competing lines in favor of Dentsply's teeth. As in*LePage's*, the rivals simply could not provide dealers with a comparable economic incentive to switch. Moreover, the record demonstrates that Dentsply added Darby as a dealer "to block Vita from a key competitive distribution point." According to a Dentsply executive, the "key issue" was "Vita's potential distribution system." He explained that Vita was "having a tough time getting teeth out to customers. One of their key weaknesses is their distribution system."

Teeth are an important part of a denture, but they are but one component. The dealers are dependent on serving all of the laboratories' needs and must carry as many components as practicable. The artificial teeth business **[**36]** cannot realistically be evaluated in isolation from the rest of the dental fabrication industry.

A leading treatise provides a helpful analogy to this situation:

> Suppose that mens's bow ties cannot efficiently be sold in stores that deal exclusively in bow ties * or even ties generally; rather, they must be sold in department stores where clerks can spread their efforts over numerous products and the ties can be sold in conjunction with shirts and suits. Suppose further that a dominant bow tie manufacturer should impose exclusive dealing on a town's only three department stores. In this case the rival bow tie maker cannot easily enter. Setting up another department store is an unneeded and a very large investment in proportion to its own production, which we assume is only bow ties, but any store that offers less will be an inefficient and costly seller of bow ties. As a result, such exclusive dealing could either exclude the nondominant bow tie maker or else raise its costs in comparison to the costs of the dominant firm. While the department stores might prefer to sell the ties of multiple manufacturers, if faced with an "all-or-nothing" choice they may accede to the dominant **[**37]** firm's wish for exclusive dealing. Herbert Hovenkamp, Antitrust Law P 1802e3, at 78-79 (2d ed. 2002).

**[*196]** Criterion 6 imposes an "all-or-nothing" choice on the dealers. The fact that dealers have chosen not to drop Dentsply teeth in favor of a rival's brand demonstrates that they have acceded to heavy economic pressure.

This case does not involve a dynamic, volatile market like that in *Microsoft, 253 F.3d at 70*, or a proven alternative distribution channel. The mere existence of other avenues of distribution is insufficient without an assessment of their overall significance to the market. The economic impact of an exclusive dealing arrangement is amplified in the stagnant, no growth context of the artificial tooth field.

Dentsply's authorized dealers are analogous to the high volume retailers at issue in LePage's. Although the dealers are distributors and the stores in LePage's **[**38]** , such as K-Mart and Staples, are retailers, this is a distinction in name without a substantive difference. *LePage's, 324 F.3d at 144*. Selling to a few prominent retailers provided "substantially reduced distribution costs" and "cheap, high volume supply lines." *Id. at 160 n.14*. The manufacturer sold to a few high volume businesses and benefitted from the widespread locations and strong customer goodwill that prominent retailers provided as opposed to selling directly to end-user consumers or to a multitude of smaller retailers. There are other ways across the "river" to consumers, but high volume retailers provided the most effective bridge.

The same is true here. The dealers provide the same advantages to Dentsply, widespread locations and long-standing relationships with dental labs, that the high volume retailers provided to 3M. Even orders that are drop-shipped directly from Dentsply to a dental lab originate through the dealers. This underscores that Dentsply's dealers provide a critical link to end-users.

Although the District Court attributed some of the lack of competition to Ivoclar's and Vident's bad business decisions, that weakness was **[**39]** not ascribed to other manufacturers. Logically, Dealer Criterion 6 cannot be both a cause of the competitors'

---

* The authors do not disclose whether the bow ties are blue polka-dot patterns or other designs.

lower promotional expenditures which hurt their market positions, and at the same time, be unrelated to their exclusion from the marketplace. Moreover, in Microsoft, in spite of the competitors' self-imposed problems, the Court of Appeals held that Microsoft possessed monopoly power because it benefitted from a significant barrier to entry. *Microsoft, 253 F.3d at 55*.

Dentsply's grip on its 23 authorized dealers effectively choked off the market for artificial teeth, leaving only a small sliver for competitors. The District Court erred when it minimized that situation and focused on a theoretical feasibility of success through direct access to the dental labs. While we may assume that Dentsply won its preeminent position by fair competition, that fact does not permit maintenance of its monopoly by unfair practices. We conclude that on this record, the Government established that Dentsply's exclusionary policies and particularly Dealer Criterion 6 violated *Section 2*.

**V. BUSINESS JUSTIFICATION**

As noted earlier, ***HN16*** even if a company exerts monopoly power, **[**40]** it may defend its practices by establishing a business justification. The Government, having demonstrated harm to competition, the burden shifts to Dentsply to show that Dealer Criterion 6 promotes a sufficiently pro-competitive objective. *United States v. Brown Univ., 5 F.3d 658, 669 (3d Cir. 1993)*. Significantly, Dentsply has not done so. The District Court found that "Dentsply's asserted justifications for its exclusionary policies are inconsistent with **[*197]** its announced reason for the exclusionary policies, its conduct enforcing the policy, its rival suppliers' actions, and dealers' behavior in the marketplace." FF356.

Some of the dealers opposed Dentsply's policy as exerting too much control over the products they may sell, but the grandfathered dealers were no less efficient than the exclusive ones, nor was there any difference in promotional support. Nor was there any evidence of existence of any substantial variation in the level of service provided by exclusive and grandfathered dealers to the laboratories.

The record amply supports the District Court's conclusion that Dentsply's alleged justification was pretextual and did not excuse its exclusionary practices.

**[**41] VI. AVAILABILITY OF SHERMAN ACT SECTION 2 RELIEF**

One point remains. Relying on *dicta* in *Tampa Electric Co. v. Nashville Coal Co., 365 U.S. 320, 5 L. Ed. 2d 580, 81 S. Ct. 623 (1961)*, the District Court said that because it had found no liability under the stricter standards of *Section 3 of the Clayton Act*, it followed that there was no violation of *Section 2 of the Sherman Act*. However, as we explained in *LePage's v. 3M, 324 F.3d at 157 n.10*, ***HN17*** a finding in favor of the defendant under *Section 1 of the Sherman Act and Section 3 of the Clayton Act*, did not "preclude the application of evidence of . . . exclusive dealing to support the *[Section] 2* claim." All of the evidence in the record here applies to the *Section 2* claim and, as in LePage's, a finding of liability under *Section 2* supports a judgment against defendant.

We pointed out in *Allegheny County Sanitary Authority v. EPA, 732 F.2d 1167, 1172-73 (3d Cir. 1984)*, that ***HN18*** different theories may be presented to establish a cause of action. A court's refusal to accept one theory rather than another neither undermines the claim as a whole, nor the judgment applying one of the theories. **[**42]** Here, the Government can obtain all the relief to which it is entitled under *Section 2* and has chosen to follow that path without reference to *Section 1 of the Sherman Act* or *Section 3 of the Clayton Act*. We find no obstacle to that procedure.

Accordingly, for the reasons set forth above, we will reverse the judgment in favor of Dentsply and remand the case to the District Court with directions to grant injunctive relief requested by the Government and for such other proceedings as are consistent with this opinion.

# EXHIBIT 292

LexisNexis®

Caution
As of: August 12, 2014 9:20 AM EDT

# United States v. E. I. Du Pont de Nemours & Co.

Supreme Court of the United States
October 11, 1955, Argued ; June 11, 1956, Decided
No. 5

**Reporter:** 351 U.S. 377; 76 S. Ct. 994; 100 L. Ed. 1264; 1956 U.S. LEXIS 1628; 1956 Trade Cas. (CCH) P68,369
UNITED STATES v. E. I. du PONT de NEMOURS & CO.

**Prior History:** APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE.

**Disposition:** *118 F.Supp. 41*, affirmed.

**Core Terms**

cellophane, flexible, wrap, packaging materials, monopolize, monopoly, manufacture, glassine, package, patent, monopoly power, commodity, moistureproof, relevant market, waxed paper, buyer, appendix, interchangeability, transparent, commerce, film, competitor, monopolist, aluminum, sulphite, foil, the Sherman Act, district court, trial court, cross-elasticity

**LexisNexis® Headnotes**

Antitrust & Trade Law > Regulated Practices > Monopolies & Monopolization > General Overview
Antitrust & Trade Law > Sherman Act > General Overview

***HN1*** In a Sherman Act case, the burden of proof is upon the government to establish monopoly.

Civil Procedure > Appeals > Standards of Review > Clearly Erroneous Review
Civil Procedure > ... > Jurisdiction on Certiorari > Considerations Governing Review > Federal Court Decisions

***HN2*** For an appellant to succeed in the United States Supreme Court , it must show that erroneous legal tests were applied to essential findings of fact or that the findings themselves were "clearly erroneous" within the Supreme Court's rulings on *Fed. R. Civ. P. 52(a)*. The Supreme Court does not try the facts of cases de novo.

Antitrust & Trade Law > Regulated Practices > Monopolies & Monopolization > General Overview
Antitrust & Trade Law > Sherman Act > General Overview

***HN3*** *Section 2* of the Sherman Act, *15 U.S.C.S. § 2*, states that every person who shall monopolize shall be deemed guilty.

Antitrust & Trade Law > Regulated Practices > Monopolies & Monopolization > General Overview

***HN4*** A party has monopoly power if it has, over any part of the trade or commerce among the several states, a power of controlling prices or unreasonably restricting competition.

Antitrust & Trade Law > Regulated Practices > Monopolies & Monopolization > General Overview

***HN5*** Monopoly power is the power to control prices or exclude competition.

Antitrust & Trade Law > Regulated Practices > Monopolies & Monopolization > General Overview

***HN6*** Illegal monopoly power must be appraised in terms of the competitive market for the product.

Antitrust & Trade Law > Regulated Practices > Market Definition > General Overview

***HN7*** Determination of the competitive market for commodities depends on how different from one another are the offered commodities in character or use, how far buyers will go to substitute one commodity for another.

Antitrust & Trade Law > Regulated Practices > Market Definition > General Overview
Antitrust & Trade Law > Regulated Practices > Monopolies & Monopolization > General Overview
Antitrust & Trade Law > Sherman Act > General Overview
Antitrust & Trade Law > Sherman Act > Defenses

***HN8*** When a product is controlled by one interest, without substitutes available in the market, there is monopoly power.

Antitrust & Trade Law > Regulated Practices > Market Definition > General Overview
Antitrust & Trade Law > Regulated Practices > Monopolies & Monopolization > General Overview

***HN9*** Where there are market alternatives that buyers may readily use for their purposes, illegal monopoly does not exist merely because the product said to be monopolized differs from others.

Antitrust & Trade Law > Regulated Practices > Market Definition > General Overview
Antitrust & Trade Law > Regulated Practices > Market Definition > Relevant Market
Antitrust & Trade Law > Regulated Practices > Monopolies & Monopolization > General Overview

***HN10*** In considering what is the relevant market for determining the control of price and competition, no more definite rule can be declared than that commodities reasonably interchangeable by consumers for the same purposes make up that part of the trade or commerce, monopolization of which may be illegal.

Antitrust & Trade Law > Regulated Practices > Market Definition > General Overview
Antitrust & Trade Law > Sherman Act > General Overview

***HN11*** In determining the market under the Sherman Act, it is the use or uses to which the commodity is put that control.

Antitrust & Trade Law > Regulated Practices > Market Definition > General Overview

***HN12*** An element for consideration as to cross-elasticity of demand between products is the responsiveness of the sales of one product to price changes of the other.

Antitrust & Trade Law > Regulated Practices > Market Definition > General Overview

Antitrust & Trade Law > Regulated Practices > Monopolies & Monopolization > General Overview

***HN13*** The market which one must study to determine when a producer has monopoly power will vary with the part of commerce under consideration. The tests are constant. That market is composed of products that have reasonable interchangeability for the purposes for which they are produced -- price, use and qualities considered.

**Lawyers' Edition Display**

## Summary

In civil litigation under the Sherman Act, a manufacturer of cellophane was charged with monopolization of trade in that product in violation of 2 of the statute. The District Court found that the relevant market, for determining the extent of the cellophane manufacturer's market control, was the market for flexible packaging materials, and that competition from other materials in that market prevented the cellophane manufacturer from possessing monopoly powers in its sales of cellophane.

On appeal, three members of the Supreme Court, in an opinion by Reed, J., affirmed the decision of the court below, viewing the evidence as fully supporting that court's finding that cellophane's interchangeability with other materials sufficed to make it a part of the flexible packaging material market and that the manufacturer of cellophane lacked monopoly control over that market.

Frankfurter, J., concurred in the judgment of the court and in so much of the opinion of Reed, J., as supported the conclusion that cellophane did not by itself constitute a closed market but was a part of the relevant market for flexible packaging materials.

Warren, Ch. J., joined by Black and Douglas, JJ., dissented, stating that the evidence clearly established that cellophane was not so indistinguishable from other packaging materials as to warrant its inclusion in the same market with those materials.

Clark and Harlan, JJ., did not participate.

**Headnotes**

RESTRAINTS OF TRADE AND MONOPOLIES §14 > test of monopoly. --

***LEdHN[1]*** [1]

The ultimate consideration in determining whether an alleged monopolist violates 2 of the Sherman Act (*15 USC 2*), is whether he controls the price and competition in the market for such part of trade or commerce as he is charged with monopolizing.

RESTRAINTS OF TRADE AND MONOPOLIES §19 > test of monopoly -- alternative commodities. --

***LEdHN[2]*** [2]

Although every manufacturer is the sole producer of the particular commodity it makes, whether its status is that of a monopolist violating 2 of the Sherman Act (*15 USC 2*) depends upon the availability of alternative commodities for buyers, such availability being largely gauged by the

purchase of competing products for similar uses, considering the price, characteristics, and adaptability of the competing commodities.

EVIDENCE §383 > burden of proof -- monopoly. --

***LEdHN[3]*** [3]

In an action in which the government charges that a manufacturer has monopolized trade in violation of 2 of the Sherman Act (*50 USC 2*), the burden of proof to establish monopoly is upon the government.

APPEAL AND ERROR §1304 > burden of proof -- findings -- monopoly. --

***LEdHN[4]*** [4]

On appeal from a District Court's judgment holding that the government, in an action under the Sherman Act, failed to sustain its burden of proof of establishing the existence of a monopoly, the government must show that the District Court applied erroneous legal tests to its essential findings of fact or that the findings themselves were clearly erroneous within the meaning of Supreme Court decisions interpreting *Rule 52(a)* of the Rules of Civil Procedure.

APPEAL AND ERROR §1276 > trial de novo -- monopoly. --

***LEdHN[5]*** [5]

On appeal from a District Court's judgment for the defendant in an action brought by the government charging violation of 2 of the Sherman Act (*15 USC 2*) the Supreme Court will not try the facts de novo.

RESTRAINTS OF TRADE AND MONOPOLIES §16 > rule of reason. --

***LEdHN[6]*** [6]

A workable content has been given to anti-trust legislation by the application, in Sherman Act litigation directed against enhancement of price or throttling of competition, of the rule of reason under which the standard of reason applied at common law and in the United States in dealing with subjects of the character embraced by the prohibitions of the Sherman Act is held to have been intended to be a measure used for the purpose of determining whether, in a given case, a particular act has or has not brought about the wrong against which the statute provides.

RESTRAINTS OF TRADE AND MONOPOLIES §16 > rule of reason. --

***LEdHN[7]*** [7]

There is no inconsistency between the rule of reason (by which the standard of reason applicable at common law and in the United States in dealing with subjects of the character embraced by the prohibitions of the Sherman Act is held to have been intended to be the measure used for the purpose of determining whether, in a given case, a particular act has, or has not, brought about the wrong against which the statute provides) and the development of the judicial theory that agreements as to the maintenance of prices or division of territory are in themselves a violation of the Sherman Act; it is logical that some agreements and practices are invalid per se, while others are illegal only as applied to particular situations.

RESTRAINTS OF TRADE AND MONOPOLIES §7 > STATUTES §154 > Sherman Act -- construction -- later exceptions. --

***LEdHN[8]*** [8]

Exceptions which Congress has made to the generality of monopoly prohibitions contained in the Sherman Act (the exceptions springing from the necessities or inconveniences of certain industries or business organizations, or from the characteristics of the members of certain groups of citizens) express the legislative determination of the national economy's need of reasonable limitations on cut throat competition or prohibition of monopoly; such exceptions modify the reach of the Sherman Act but do not change its prohibition of other monopolies.

COURTS §141 > making exceptions. --

***LEdHN[9]*** [9]

Where exceptions are made to the generality of monopoly prohibitions contained in the Sherman Act, Congress should make them.

RESTRAINTS OF TRADE AND MONOPOLIES §2 > definition. --

***LEdHN[10]*** [10]

Monopoly at common law was a grant by the sovereign to a person for the sole making or handling of anything so that others were restrained or hindered in their lawful trade.

RESTRAINTS OF TRADE AND MONOPOLIES §14 > test of monopoly. --

***LEdHN[11A]*** [11A]***LEdHN[11B]*** [11B]***LEdHN[11C]*** [11C]

Aparty has monopoly power, within the meaning of 2 of the Sherman Act barring monopolization, if it has, over any part of the trade or commerce among the several states, a power of controlling prices or unreasonably restricting competition.

RESTRAINTS OF TRADE AND MONOPOLIES §18 > use of fair means. --

***LEdHN[12]*** [12]

Monopoly resulting from extraordinary commercial success, and not involving use of means making it impossible for other persons to engage in fair competition, is not within the monopoly prohibitions contained in the Sherman Act. (Semble.)

RESTRAINTS OF TRADE AND MONOPOLIES §19 > extent of market. --

***LEdHN[13]*** [13]

A manufacturer of cellophane whose power to set the price of cellophane is only limited by the competition afforded by other flexible materials may be assumed to have monopoly power over the "market" if cellophane is the "market" that the manufacturer is found to dominate.

EVIDENCE §172 > presumptions -- monopoly. --

***LEdHN[14]*** [14]

When an alleged monopolist has power over price and competition, an intention to monopolize in a proper case may be assumed.

RESTRAINTS OF TRADE AND MONOPOLIES §18 > illegal power. --

***LEdHN[15]*** [15]

The power which the manufacturer of every nonstandardized commodity has over price and production of his own product is not the power that makes an illegal monopoly; illegal power must be appraised in terms of the competitive market for the product.

RESTRAINTS OF TRADE AND MONOPOLIES §19 > competitive commodities. --

***LEdHN[16]*** [16]

For purposes of Sherman Act litigation, determination of the competitive market for commodities depends upon how different from one another are the offered commodities in character or use and how far buyers will go to substitute one commodity for another.

RESTRAINTS OF TRADE AND MONOPOLIES §19 > competitive commodities. --

***LEdHN[17]*** [17]

Although building materials may be considered to be in commodity competition, brick may not be said to compete with steel or wood or cement or stone, in Sherman Act litigation; the products are too different. (Dictum.)

RESTRAINTS OF TRADE AND MONOPOLIES §16 > reasonable monopoly. --

***LEdHN[18]*** [18]

The prohibition of monopoly contained in 2 of the Sherman Act (*15 USC 2*) requires the application of a reasonable approach in determining the existence of monopoly power, but does not permit a "reasonable monopoly."

RESTRAINTS OF TRADE AND MONOPOLIES §19 > availability of substitutes. --

***LEdHN[19]*** [19]

When a product is controlled by one interest, without substitutes available in the market, there is monopoly power; but, because most products have possible substitutes, the definition of substitutes cannot be given infinite range.

RESTRAINTS OF TRADE AND MONOPOLIES §19 > availability of substitutes. --

***LEdHN[20]*** [20]

In determining whether there is control by one interest of a product lacking substitutes in the market, amounting to a violation of the Sherman Act's prohibition of monopolies, other products may be considered in the relevant market with the product in question notwithstanding that such products and the product in question are not fungible.

RESTRAINTS OF TRADE AND MONOPOLIES §19 > market alternatives. --

***LEdHN[21]*** [21]

Where there are market alternatives that buyers may readily use for their purposes, illegal monopoly does not exist merely because the product said to be monopolized differs from others; the market is not properly to be limited to physically identical products.

RESTRAINTS OF TRADE AND MONOPOLIES §19 > availability of substitutes. --

***LEdHN[22]*** [22]

Where monopoly power is alleged to exist with respect to a particular product, a determination whether similar products are available in the same market requires an appraisal of the cross-elasticity of demand in the trade.

RESTRAINTS OF TRADE AND MONOPOLIES §19 > availability of substitutes. --

***LEdHN[23]*** [23]

The varying circumstances of each case are determinative of the question whether, where monopoly power is alleged to exist with respect to a particular product, cross-elasticity of demand in the trade indicates the availability in the relevant market of substitute products.

COURTS §767 > precedents -- limited by facts of case. --

***LEdHN[24]*** [24]

Each case arising under the Sherman Act must be determined upon the particular facts disclosed by the record, and the opinions of the courts in such cases must be read in the light of their facts and of a clear recognition of the essential differences in the facts of the cases, and in the facts of any new case to which the rule of earlier decisions is to be applied.

RESTRAINTS OF TRADE AND MONOPOLIES §19 > relevant market. --

***LEdHN[25]*** [25]

In considering what is the relevant market for determining the existence of control of price and competition, no more definite rule can be declared than that commodities reasonably interchangeable by consumers for the same purposes make up that part of the trade or commerce monopolization of which may be illegal.

RESTRAINTS OF TRADE AND MONOPOLIES §19 > limited products. --

***LEdHN[26]*** [26]

Monopolies prohibited by 2 of the Sherman Act (*50 USC 2*) may well exist over limited products in narrow fields where competition is eliminated.

RESTRAINTS OF TRADE AND MONOPOLIES §19 > extent of market. --

***LEdHN[27]*** [27]

In determining, in monopoly litigation under the Sherman Act, the market for a particular commodity, it is the use or uses to which it is put that is controlling.

RESTRAINTS OF TRADE AND MONOPOLIES §19 > cross-elasticity of demand. --

***LEdHN[28]*** [28]

In determining, in monopoly litigation under the Sherman Act, whether there is cross-elasticity of demand between the product in question and other products, responsiveness of the sales of one product to price changes of the other is an element for consideration; proof that a slight decrease in the price of one product causes a considerable number of customers of other products to change to the product whose price has decreased indicates a high cross-elasticity of demand existing between them, that is, that the products compete in the same market.

EVIDENCE §979 > sufficiency -- monopoly. --

***LEdHN[29]*** [29]

In Sherman Act litigation in which a manufacturer of cellophane was alleged to have illegal monopoly power over the market in which that product is sold, the finding of the District Court that the great sensitivity of customers in the flexible packaging markets to price or quality changes prevented the manufacturer in question from possessing monopoly control over price was held supported by the record.

RESTRAINTS OF TRADE AND MONOPOLIES §19 > extent of market -- cellophane. --

***LEdHN[30]*** [30]

In Sherman Act litigation in which the manufacturer of cellophane is alleged to have illegal monopoly power over the market in which that product is sold, proof of the interchangeability of cellophane with other materials is sufficient to show that cellophane is a part of the flexible packaging material market.

RESTRAINTS OF TRADE AND MONOPOLIES §36 > price differences -- cellophane. --

***LEdHN[31]*** [31]

Mere differences between the price of cellophane and the price of other products in the flexible packaging market cannot be said to give the manufacturer of cellophane illegal monopoly power over prices where it appears that some users are sensitive to the cost of flexible packaging materials while others are not, that the cost factor slips accounts away from cellophane, that reductions in the price of cellophane were made by the manufacturer to expand the market for that product and were not motivated by the effect which a lower price might have on the manufacture by others, that the manufacturer never lowered cellophane prices below cost and never dropped the prices temporarily to gain a competitive advantage, and that the manufacturer increased and decreased cellophane prices in accordance with the rise and decline in manufacturing costs.

EVIDENCE §979 > sufficiency -- monopoly -- cellophane. --

***LEdHN[32]*** [32]

Evidence that cellophane is functionally interchangeable with other flexible packaging materials sold at the same time to the same customers for the same purpose at competitive prices, and that a manufacturer of cellophane has at all times competed with other cellophane manufacturers and

manufacturers of other flexible packaging materials in all aspects of its cellophane business, is sufficient to indicate that competitors have not been excluded from the packaging material market by the manufacturer of cellophane.

EVIDENCE §979 > sufficiency -- monopoly -- high profits. --

***LEdHN[33]*** [33]

Liberal profits enjoyed by the manufacturer of cellophane do not demonstrate the existence of an illegal monopoly with respect to that product in absence of proof of lack of comparable profits, during the years in question, in other prosperous industries.

RESTRAINTS OF TRADE AND MONOPOLIES §19 > extent of market. --

***LEdHN[34]*** [34]

Although the "market" which one must study to determine when a producer has a monopoly power will vary with the part of commerce under consideration, the tests are constant, "market" being composed of products that have reasonable interchangeability price, use, and qualities considered for the purposes for which they are produced.Points from Separate Opinions

RESTRAINTS OF TRADE AND MONOPOLIES §14 > test of monopoly. --

***LEdHN[35]*** [35]

The boundary between the course of events by which a business may reach a powerful position in an industry without offending the outlawry of "monopolizing" in 2 of the Sherman Act and the course of events which brings the attainment of that result within the condemnation of that section cannot be established by general phrases, but must be determined with reference to specific facts upon considerations analogous to those by which 1 of the Sherman Act is applied. [From separate opinion by Frankfurter, J.]

RESTRAINTS OF TRADE AND MONOPOLIES §14 > test of monopoly -- factors considered. --

***LEdHN[36]*** [36]

In Sherman Act litigation, the true test of legality of business conduct alleged to be an unlawful restraint is whether the restraint imposed is such as merely regulates and perhaps thereby promotes competition or whether it is such as may suppress or even destroy competition, and in applying that test the court must ordinarily consider the facts peculiar to the business to which the restraint is applied, its condition before and after the restraint was imposed, the nature of the restraint and its effect, actual or probable, the history of the restraint, the evil believed to exist, the reason for adopting the particular remedy, and the purpose sought to be attained. [From separate opinion by Frankfurter, J.]

RESTRAINTS OF TRADE AND MONOPOLIES §14 > factors considered. --

***LEdHN[37]*** [37]

Although 1 and 2 of the Sherman Act (*15 USC 1* and *2*) implicate different considerations, the so-called issues of fact and law that call for adjudication in this legal territory are united, and intrinsically so, with factors that entail social and economic judgment. [From separate opinion by Frankfurter, J.]

RESTRAINTS OF TRADE AND MONOPOLIES §14 > factors considered. --

***LEdHN[38]*** [38]

Any consideration of "monopoly" under the Sherman Act can hardly escape judgment, even if only implied, on social and economic issues. [From separate opinion by Frankfurter, J.]

RESTRAINTS OF TRADE AND MONOPOLIES §53 > dividing market. --

***LEdHN[39]*** [39]

An agreement between manufacturers of cellophane by which they agree to divide the world cellophane market is illegal per se. [From separate opinion by Warren, Ch. J., Black and Douglas, JJ.]

RESTRAINTS OF TRADE AND MONOPOLIES §33 > interchange of information. --

***LEdHN[40]*** [40]

The anti-trust laws are violated by an agreement between the sole manufacturers of cellophane which provides for the interchange of technological information, thereby tightening their cellophane monopoly, and denying to others any access to information that went into the common pool. [From separate opinion by Warren, Ch. J., Black and Douglas, JJ.]

RESTRAINTS OF TRADE AND MONOPOLIES §9 > prevention of competition. --

***LEdHN[41]*** [41]

The anti-trust laws are as much violated by the prevention of competition as by its destruction. [From separate opinion by Warren, Ch. J., Black and Douglas, JJ.]

RESTRAINTS OF TRADE AND MONOPOLIES §61 > patents -- cross-licensing -- cellophane. --

***LEdHN[42]*** [42]

The Sherman Act is violated by a cross-licensing agreement between the two sole American manufacturers of cellophane by which one obtains the right to exclude third persons from use of any patentable moistureproof invention made over a period of 15 years by the other, and the other, by a prohibitive royalty provision, is limited in moistureproof production to approximately 20 per cent of the industry's moistureproof sales. [From separate opinion by Warren, Ch. J., Black and Douglas, JJ.]

**Syllabus**

In a civil action under *§ 4* of the Sherman Act, the Government charged that appellee had monopolized interstate commerce in cellophane in violation of *§ 2* of the Act. During the relevant period, appellee produced almost 75% of the cellophane sold in the United States; but cellophane constituted less than 20% of all flexible packaging materials sold in the United States. The trial court found that the relevant market for determining the extent of appellee's market control was the market for flexible packaging materials and that competition from other materials in that market prevented appellee from possessing monopoly powers in its sales of cellophane. Accordingly, it dismissed the complaint. *Held*: The judgment is affirmed. Pp. 378-404.

(a) The ultimate consideration in determining whether an alleged monopolist violates § 2 of the Sherman Act is whether the defendant controls prices and competition in the market for such part of trade or commerce as he is charged with monopolizing. P. 380.

(b) A party has monopoly power contrary to § 2 of the Sherman Act if it has, over "any part of the trade or commerce among the several States," a power of controlling prices or unreasonably restricting competition. Pp. 389-394.

(c) Determination of the competitive market for commodities depends upon how different from one another are the offered commodities in character or use, how far buyers will go to substitute one commodity for another. P. 393.

(d) It is not a proper interpretation of the Sherman Act to require that products be fungible to be considered in the relevant market. P. 394.

(e) Where there are market alternatives that buyers may readily use for their purposes, illegal monopoly does not exist merely because the product said to be monopolized differs from others. P. 394.

(f) In considering what is the relevant market for determining the control of price and competition, no more definite rule can be declared than that commodities reasonably interchangeable by consumers for the same purposes make up that "part of the trade or commerce" monopolization of which may be illegal. P. 395.

(g) Cellophane's interchangeability with numerous other materials suffices to make it a part of the market for flexible packaging materials. Pp. 395-400.

(h) On the record in this case, it cannot be said that the variations in price between cellophane and other flexible packaging materials prevent them from being competitive or gave appellee monopoly power over prices. Pp. 400-401.

(i) On the record in this case, it cannot be said that appellee has excluded competitors from the flexible packaging material market. Pp. 402-404.

**Counsel:** Charles H. Weston argued the cause for the United States. With him on the brief were Solicitor General Sobeloff, Assistant Attorney General Barnes, Ralph S. Spritzer and William J. Lamont.

Gerhard A. Gesell argued the cause for appellee. With him on the brief were James H. McGlothlin, Burke Marshall, Hugh M. Morris and Frank J. Zugehoer.

**Judges:** Warren, Black, Reed, Frankfurter, Douglas, Burton, Minton; Clark and Harlan took no part in the consideration or decision of this case.

**Opinion by:** REED

**Opinion**

**[*378] [**998] [***1271]** MR. JUSTICE REED delivered the opinion of the Court.

The United States brought this civil action under § 4 of the Sherman Act against E. I. du Pont de Nemours and Company. The complaint, filed December 13, 1947, in the United States District

Court for the District of Columbia, charged du Pont with monopolizing, attempting to monopolize and conspiracy to monopolize interstate commerce in cellophane and cellulosic caps and bands in violation of *§ 2* of the Sherman Act. Relief by injunction was sought against defendant and **[***1272]** its officers, forbidding monopolizing or attempting to monopolize interstate trade in cellophane. The prayer also sought action to dissipate the effect of the monopolization by divestiture or other steps. On defendant's motion under *28 U. S. C. § 1404 (a)*, the case was transferred to the District of **[*379]** Delaware. After a lengthy trial, judgment was entered for du Pont on all issues. [1]

The Government's direct appeal here does not contest the findings that relate to caps and bands, nor does it raise any issue concerning the alleged attempt to monopolize or conspiracy to monopolize interstate commerce in cellophane. The appeal, as specifically stated by the Government, "attacks only the ruling that du Pont has not monopolized trade in cellophane." At issue for determination is only this alleged violation by du Pont of *§ 2* of the Sherman Act. [2]

During the period that is relevant to this action, du Pont produced almost 75% of the cellophane sold in the United States, and cellophane constituted less than 20% of all "flexible packaging material" sales. This was the designation accepted at the trial for the materials listed in Finding 280, Appendix A, this opinion, *post*, p. 405.

**[*380]** The Government contends that, by so dominating cellophane production, du Pont monopolized a "part of the trade or commerce" in violation of *§ 2*. Respondent agrees that cellophane is a product which constitutes "a 'part' of commerce within the meaning of *Section 2*." Du Pont brief, pp. 16, 79. But it contends that the prohibition of *§ 2* against monopolization is not violated because it does not have the power to control the price of cellophane or to exclude competitors from the market in which cellophane is sold. The court below found that the "relevant market for determining the extent of du Pont's market control is the market for flexible packaging materials," and that competition from those other materials prevented du Pont from possessing **[**999]** monopoly powers in its sales of cellophane. Finding 37. **[***HR1]**

***LEdHN[2]*** [2]The Government asserts that cellophane and other wrapping materials are neither substantially fungible nor like priced. For these reasons, it argues that the market for other wrappings is distinct from the market for cellophane and that the competition afforded cellophane by other wrappings is not strong enough to be considered in determining whether du Pont has monopoly powers. Market delimitation is necessary under du Pont's theory to determine whether an alleged monopolist violates *§ 2*. The ultimate consideration in such a determination is whether

---

[1] *United States* v. *E. I. du Pont de Nemours & Co.*, 118 F.Supp. 41. The opinion occupies 192 pages of the volume. The Findings of Fact, 854 in number, cover 140 pages. The citations to findings in our opinion, where references are not made to our appendices (*post*, p. 405 *et seq.*), are to the Federal Supplement. We noted probable jurisdiction October 14, 1954, *348 U.S. 806*.

[2] "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal . . . ." *15 U. S. C. (1952 ed. Supp. III) § 1*.

"Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a misdemeanor, and, on conviction thereof, shall be punished by fine not exceeding fifty thousand dollars, or by imprisonment not exceeding one year, or by both said punishments, in the discretion of the court." *Id.*, *§ 2*.

"The several district courts of the United States are invested with jurisdiction to prevent and restrain violations of sections 1-7 of this title . . . ." 15 U. S. C. § 4.

the defendants control the price and competition in the market for such part of trade or commerce as they are charged with **[***1273]** monopolizing. Every manufacturer is the sole producer of the particular commodity it makes but its control in the above sense of the relevant market depends upon the availability of alternative commodities for buyers: *i. e.*, whether there is a cross-elasticity of demand between cellophane and the other wrappings. This interchangeability is largely gauged by the purchase of competing products for similar uses considering the price, characteristics and adaptability of the **[*381]** competing commodities. The court below found that the flexible wrappings afforded such alternatives. This Court must determine whether the trial court erred in its estimate of the competition afforded cellophane by other materials.

***LEdHN[3]*** [3]***LEdHN[4]*** [4]***LEdHN[5]*** [5]***HN1*** The burden of proof, of course, was upon the Government to establish monopoly. See *United States v. Aluminum Co. of America, 148 F.2d 416, 423, 427*.This the trial court held the Government failed to do, upon findings of fact and law stated at length by that court. ***HN2*** For the United States to succeed in this Court now, it must show that erroneous legal tests were applied to essential findings of fact or that the findings themselves were "clearly erroneous" within our rulings on *Rule 52 (a)* of the Rules of Civil Procedure. See *United States v. United States Gypsum Co., 333 U.S. 364, 393-395*. We do not try the facts of cases *de novo. Timken Roller Bearing Co*. v. *United States, 341 U.S. 593, 597*. [3]

Two additional questions were raised in the record and decided by the court below. That court found that, even if du Pont did possess monopoly power over sales of cellophane, it was not subject to Sherman Act prosecution, because (1) the acquisition of that power was protected by patents, and (2) that power was acquired solely through du Pont's business expertness. It was thrust upon du Pont. 118 F.Supp., at 213-218.

Since the Government specifically excludes attempts and conspiracies to monopolize from consideration, a conclusion that du Pont has no monopoly power would obviate examination of these last two issues.

I. *Factual Background*. -- For consideration of the issue as to monopolization, a general summary of the development of cellophane is useful.

**[*382]** In the early 1900's, Jacques Brandenberger, a Swiss chemist, attempted to make tablecloths impervious to dirt by spraying them with liquid viscose (a cellulose solution available in quantity from wood pulp, Finding 361) and by coagulating this coating. His idea failed, but he noted that the coating peeled off in a transparent film. This first "cellophane" was thick, hard, and not perfectly transparent, **[**1000]** but Brandenberger apparently foresaw commercial possibilities in his discovery. By 1908 he developed the first machine for the manufacture of transparent sheets of regenerated cellulose. The 1908 product was not satisfactory, but by 1912 Brandenberger was making a saleable thin flexible film used in gas masks. He obtained patents to cover the machinery and the essential ideas of his process.

It seems to be agreed, however, that the disclosures of these early patents were not sufficient to make possible the manufacture of commercial cellophane. The inadequacy of the patents is partially attributed to the fact that the essential machine **[***1274]** (the Hopper) was improved after it

---

[3] See also *United States* v. *Yellow Cab Co.*, 338 U.S. 338; *United States* v. *Oregon Med. Soc.*, 343 U.S. 326, 339; *United Shoe Machinery Corp*. v. *United States*, 347 U.S. 521.

was patented. But more significant was the failure of these patents to disclose the actual technique of the process. This technique included the operational data acquired by experimentation. [4]

In 1917 Brandenberger assigned his patents to La Cellophane Societe Anonyme and joined that organization. **[*383]** Thereafter developments in the production of cellophane somewhat paralleled those taking place in artificial textiles. Chemical science furnished the knowledge for perfecting the new products. The success of the artificial products has been enormous. Du Pont was an American leader in the field of synthetics and learned of cellophane's successes through an associate, Comptoir des Textiles Artificiel.

In 1923 du Pont organized with La Cellophane an American company for the manufacture of plain cellophane. The undisputed findings are that:

"On December 26, 1923, an agreement was executed between duPont Cellophane Company and La Cellophane by which La Cellophane licensed duPont Cellophane Company exclusively under its United States cellophane patents, and granted duPont Cellophane Company the exclusive right to make and sell in North and Central America under La Cellophane's secret processes for cellophane manufacture. DuPont Cellophane Company granted to La Cellophane exclusive rights for the rest of the world under any cellophane patents or processes duPont Cellophane Company might develop." Finding 24.

Subsequently du Pont and La Cellophane licensed several foreign companies, allowing them to manufacture and vend cellophane in limited areas. Finding 601. Technical exchange agreements with these companies were entered into at the same time. However, in 1940, du Pont notified these foreign companies that sales might be made in any country, [5] and **[**1001]** by 1948 all the technical exchange agreements were canceled.

**[*384]** Sylvania, an American affiliate of a Belgian producer of cellophane not covered by the license agreements above referred to, began the manufacture of cellophane in the United States in 1930. Litigation between the French and Belgian companies resulted in a settlement whereby La Cellophane came to have a stock interest in Sylvania, contrary to the La Cellophane-du Pont

---

4 Initially, the proper cellulose content of the viscose must be determined. This viscous fluid is ripened according to a "ripening index," a test whereby viscose is put in a salt solution and shaken to bring out the coagulation point. The requisite strength of this solution varies according to the ripening time. Fourteen additional baths follow the first coagulating bath. The most advantageous ripening time, temperature, size, composition, and duration of each of the baths were all determined by the trials and errors of Brandenberger and La Cellophane, the corporation he directed. It was estimated that in 1923 it would have taken four or five years of experimentation by a new producer of cellophane to attain this production technique.

5 Substantially identical letters were sent in this form:

"Question has been raised within our organization as to the existence of territorial limitations under our agreements with your company relating to regenerated cellulose film. In order that our position may be clearly and frankly established, we desire to record with you our conclusions.

"Based upon the provisions of the contracts, and in the light of legal developments in this country, we construe these agreements as imposing no restrictions upon the sale of regenerated cellulose film in any country in which the public is free to sell. Thus we regard each party as free to export such film to any country in the world, subject only to such limitations as lawfully may be based upon the unauthorized use of patented inventions or trade-marks in the country of manufacture, or in the country of use or sale.

"This letter is not intended to modify any of the provisions of our agreements involving the exchange of technical information." R. 3323.

agreement. This resulted in adjustments **[***1275]** as compensation for the intrusion into United States of La Cellophane that extended du Pont's limited territory. The details do not here seem important. Since 1934 Sylvania has produced about 25% of United States cellophane.

An important factor in the growth of cellophane production and sales was the perfection of moistureproof cellophane, a superior product of du Pont research and patented by that company through a 1927 application. Plain cellophane has little resistance to the passage of moisture vapor. Moistureproof cellophane has a composition added which keeps moisture in and out of the packed commodity. This patented type of cellophane has had a demand with much more rapid growth than the plain.

In 1931 Sylvania began the manufacture of moistureproof cellophane under its own patents. After negotiations over patent rights, du Pont in 1933 licensed Sylvania to manufacture and sell moistureproof cellophane produced **[*385]** under the du Pont patents at a royalty of 2% of sales. These licenses, with the plain cellophane licenses from the Belgian company, made Sylvania a full cellophane competitor, limited on moistureproof sales by the terms of the licenses to 20% of the combined sales of the two companies of that type by the payment of a prohibitive royalty on the excess. Finding 552. There was never an excess production. The limiting clause was dropped on January 1, 1945, and Sylvania was acquired in 1946 by the American Viscose Corporation with assets of over two hundred million dollars.

Between 1928 and 1950, du Pont's sales of plain cellophane increased from $ 3,131,608 to $ 9,330,776. Moistureproof sales increased from $ 603,222 to $ 89,850,416, although prices were continuously reduced. Finding 337. It could not be said that this immense increase in use was solely or even largely attributable to the superior quality of cellophane or to the technique or business acumen of du Pont, though doubtless those factors were important. The growth was a part of the expansion of the commodity-packaging habits of business, a by-product of general efficient competitive merchandising to meet modern demands. The profits, which were large, apparently arose from this trend in marketing, the development of the industrial use of chemical research and production of synthetics, rather than from elimination of other producers from the relevant market. That market is discussed later at p. 394. Tables appearing at the end of this opinion (Appendix A, Findings 279-292, inclusive, *post*, pp. 405-410) show the uses of cellophane in comparison with other wrappings. [6] See the discussion, *infra*, p. 399 *et seq*.

**[**1002]** II. *The Sherman Act and the Courts.* -- The Sherman Act has received long and careful application by this Court to achieve for the Nation the freedom of enterprise **[*386]** from monopoly or restraint envisaged by the Congress that passed the Act in 1890. Because the Act is couched in broad terms, it is adaptable to the changing types of commercial production and distribution that have evolved since its passage. Chief Justice Hughes wrote for the Court that "As a charter of freedom, the Act has a generality and adaptability comparable to that found to be desirable in constitutional provisions." *Appalachian Coals, Inc*. v. *United States, 288 U.S. 344, 359-360*. Compare on remedy, Judge Wyzanski in *United States v. United Shoe Machinery Corp., 110 F.Supp. 295, 348*. It was said in *Standard Oil Co*. v. *United States, 221 U.S. 1, 50*, that fear of the power of rapid accumulations of individual and corporate wealth from the trade and industry **[***1276]** of a developing national economy caused its passage. Units of traders and producers snowballed by combining into so-called "trusts." Competition was threatened. Control of prices was feared. Individual initiative was dampened. While the economic picture has changed,

---

[6] Further information from the findings as to competition will be found in Findings 150-278.

large aggregations of private capital, with power attributes, continue. Mergers go forward. Industries such as steel, automobiles, tires, chemicals, have only a few production organizations. A considerable size is often essential for efficient operation in research, manufacture and distribution.

***LEdHN[6]*** [6]***LEdHN[7]*** [7]Judicial construction of antitrust legislation has generally been left unchanged by Congress. This is true of the Rule of Reason. [7] While it is fair to say that the Rule **[*387]** is imprecise, its application in Sherman Act litigation, as directed against enhancement of price or throttling of competition, has given a workable content to antitrust legislation. See note 18, *infra*. It was judicially declared a proper interpretation of the Sherman Act in 1911, with a strong, clear-cut dissent challenging its soundness on the ground that the specific words of the Act covered every contract that tended to restrain or monopolize. [8] This Court has not receded from its position on the Rule. [9] There is not, we think, any inconsistency between it and the development of the judicial theory that agreements as to maintenance of prices or division of territory are in themselves a violation of the Sherman Act. [10] It is logical that some agreements and practices are invalid *per se*, while others are illegal only as applied to particular situations. [11]

**[**1003]** ***LEdHN[8]*** [8]***LEdHN[9]*** [9]Difficulties of interpretation have arisen in the application of the Sherman Act in view of the technical changes in production of commodities and the new distribution practices. [12] They have called forth reappraisal of the effect of the Act by business and government. [13] **[*388]** That reappraisal has so far left the problems with which we are **[***1277]** here concerned to the courts rather than to administrative agencies. Cf. Federal Trade Commission Act, 38 Stat. 721. It is true that Congress has made exceptions to the generality of monopoly prohibitions, exceptions that spring from the necessities or conveniences of certain industries or business organizations, or from the characteristics of the members of certain groups of citizens. [14] But those exceptions express legislative **[*389]** determination of the national economy's need of reasonable limitations on cutthroat competition or prohibition of monopoly. "Where

---

[7] This was set forth and defined in *Standard Oil Co*. v. *United States*, 221 U.S. 1, 58-62. It was based on the generality of *§§ 1* and *2* of the Sherman Act, which were said to be "broad enough to embrace every conceivable contract or combination which could be made concerning commerce" and therefore required a "standard." The standard of reason, drawn from the common law, was adopted. See Adams, The "Rule of Reason," 63 Yale L. J. 348; and Oppenheim, Federal Antitrust Legislation, 50 Mich. L. Rev., at 1156, notes 11 and 13, *infra*.

[8] 221 U.S., at 86*et seq*.

[9] *United States* v. *Columbia Steel Co*., 334 U.S. 495, 529; *Times-Picayune Co*. v. *United States*, 345 U.S. 594, 614-615.

[10] See *United States* v. *Trenton Potteries Co*., 273 U.S. 392; *American Tobacco Co*. v. *United States*, 328 U.S. 781, 813; *Timken Roller Bearing Co*. v. *United States*, 341 U.S. 593.

[11] Cf. Oppenheim, Federal Antitrust Legislation, 50 Mich. L. Rev. 1139, 1151-1152; Adams, The "Rule of Reason," 63 Yale L. J. 348; and The Schwartz Dissent, 1 Antitrust Bulletin 37, 47.

[12] *United States* v. *Columbia Steel Co*., 334 U.S. 495, 526.

[13] Final Report, Investigation of Concentration of Economic Power, S. Doc. No. 35, 77th Cong., 1st Sess.; Monograph No. 38 of that Investigation, Handler, A Study of the Construction and Enforcement of the Federal Antitrust Laws, 76th Cong., 3d Sess.; Effective Competition, Report to the Secretary of Commerce, Charles Sawyer, by his Business Advisory Council, December 18, 1952; Report of the Attorney General's National Committee to Study the Antitrust Laws, March 31, 1955; Oppenheim, Federal Antitrust Legislation, 50 Mich. L. Rev. 1139; Kahn, A Legal and Economic Appraisal of the "New" Sherman and Clayton Acts, 63 Yale L. J. 293; Adams, The "Rule of Reason," 63 Yale L. J. 348; Rostow, Monopoly Under the Sherman Act: Power or Purpose?, 43 Ill. L. Rev. 745.

[14] Numerous Acts contain specific exemptions from the operation of the antitrust laws: Clayton Act, 15 U. S. C. § 17 (1946) (all labor organizations); McCarran-Ferguson Act, 15 U. S. C. § 1013 (1952) (insurance companies); Webb-Pomerene Act, 15 U. S. C. § 62 (1946) (limited exemption for foreign trade associations); Capper-Volstead Act, 7 U. S. C. §§ 291, 292 (1927) (farm

exceptions are **[**1004]** made, Congress should make them." *United States v. Line Material Co., 333 U.S. 287, 310*. They modify the reach of the Sherman Act but do not change its prohibition of other monopolies. We therefore turn to *§ 2* (note 2, *supra*) to determine whether du Pont has violated that section by its dominance in the manufacture of cellophane in the before-stated circumstances.

***LEdHN[10]*** [10]***[11A]*** [11A]III. ***HN3*** *The Sherman Act, § 2 -- Monopolization.* **--** The only statutory language of *§ 2* pertinent on this review is: "Every person who shall monopolize . . . shall be deemed guilty . . . ." This Court has pointed out that monopoly at common law was a grant by the sovereign to any person for the sole making or handling of anything so that others were restrained or hindered in their lawful trade. *Standard Oil Co*. v. *United States, 221 U.S. 1, 51*. However, as in England, it came to be recognized here that acts bringing the evils of authorized monopoly -- unduly diminishing competition and enhancing prices -- were undesirable ( *id*., at 56, 57, 58) and were declared illegal by *§ 2*. *Id*., at 60-62. Our cases determine that ***HN4*** a party has monopoly power if it has, over "any part of the trade or commerce among the several States," a power of controlling prices or unreasonably restricting competition. *Id*., at 58.

**[*390]** ***LEdHN[12]*** [12]Senator Hoar, in discussing *§ 2*, **[***1278]** pointed out that monopoly involved something more than extraordinary commercial success, "that it involved something like the use of means which made it impossible for other persons to engage in fair competition." [15] This exception to the **[*391]** Sherman Act prohibitions of monopoly **[**1005]** power is perhaps the monopoly "thrust upon" one of *United States v. Aluminum Co. of America, 148 F.2d*

---

cooperatives); Interstate Commerce Act, 49 U. S. C. § 5 (11) (1952) (carriers participating in an approved transaction); Civil Aeronautics Act, 49 U. S. C. § 494 (1952) (exemption for acts ordered by the CAB).

Market entry is carefully regulated in some of the country's largest businesses: Natural Gas Act, 15 U. S. C. § 717f (natural gas companies); Federal Communications Act, 47 U. S. C. § 307 (a) (1952) (limits new stations); Civil Aeronautics Act, 49 U. S. C. § 481 (d) (1951) (limits market entry); Motor Carrier Act, *49 U. S. C. § 307 (1952)* (motor vehicle common carriers). Price fixing in some areas is authorized by the legislature: Reed-Bulwinkle Act, 49 U. S. C. § 5b (1952) (railroad rate agreements); Civil Aeronautics Act, 49 U. S. C. § 492 (1952) (approval of transportation rate agreements); Miller-Tydings Act, *15 U. S. C. § 1 (1946)* (resale price maintenance); Shipping Act, 46 U. S. C. § 814 (1952) (water carriers' rate agreements).

Combination of strong competitors in some major instances has been encouraged: Federal Communications Act, 47 U. S. C. §§ 221 (a), 222 (c)(1) (1952); Federal Power Act, 16 U. S. C. § 824a (b) (1952); Interstate Commerce Act, 49 U. S. C. § 5b (1952) (all common carriers).

That competition is not always to be encouraged is made evident by noting that the farmers have been actually barred from production in most major crops and some groups of workers are told that they may not, in production of commodities for commerce, work for less than a minimum wage. Fair Labor Standards Act, 29 U. S. C. § 206 (1952).

See Report of Attorney General's National Committee to Study the Antitrust Laws, pp. 261-313, for discussion of "Exemptions From Antitrust Coverage."

[15] 21 Cong. Rec. 3151:

"Mr. KENNA. Mr. President, I have no disposition to delay a vote on the bill, but I would like to ask, with his permission, the Senator from Vermont a question touching the second section:

"'Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade, etc.'

"Is it intended by the committee, as the section seems to indicate, that if an individual engaged in trade between States or between States and Territories, or between States or Territories and the District of Columbia, or between a State and a foreign country, by his own skill and energy, by the propriety of his conduct generally, shall pursue his calling in such a way as to monopolize a trade, his action shall be a crime under this proposed act? To make myself understood, if I am not clear --

"Mr. EDMUNDS. I think I understand the Senator.

*416, 429*, left as an undecided possibility by *American Tobacco Co*. v. *United States, 328 U.S. 781*. Compare *United States v. United Shoe Machinery Corp., 110 F.Supp. 295, 342*.[16]

***LEdHN[11B]*** [11B]***LEdHN[13]*** [13]***LEdHN[14]*** [14]If cellophane is the "market" that du Pont is found to dominate, it may be assumed it does have monopoly power over that "market." [17]***HN5*** Monopoly power is the power to control prices or exclude competition. [18] It seems apparent **[*392]** that **[***1279]** du Pont's power to set the price of cellophane has been limited only by the competition afforded by other flexible packaging materials. Moreover, it may be practically impossible for anyone to commence manufacturing cellophane without full access to du Pont's technique. However, du Pont has no power to prevent competition from other wrapping materials. The trial court consequently had to determine whether competition from the other wrappings prevented du Pont from possessing monopoly power in violation of *§ 2*. Price and competition are so intimately entwined that any discussion of theory must treat them as one. It is inconceivable that price could be controlled without power over competition or vice versa. This approach to the determination of monopoly power is strengthened by this Court's conclusion in prior cases that, when an alleged monopolist has power over price and competition, an intention to monopolize in a proper case may be assumed. [19]

---

"Mr. KENNA. Suppose a citizen of Kentucky is dealing in shorthorn cattle and by virtue of his superior skill in that particular product it turns out that he is the only one in the United States to whom an order comes from Mexico for cattle of that stock for a considerable period, so that he is conceded to have a monopoly of that trade with Mexico; is it intended by the committee that the bill shall make that man a culprit?

"Mr. EDMUNDS. It is not intended by it and the bill does not do it. Anybody who knows the meaning of the word 'monopoly,' as the courts apply it, would not apply it to such a person at all; and I am sure my friend must understand that."

*Id*., at 3152:

"Mr. HOAR. I put in the committee, if I may be permitted to say so (I suppose there is no impropriety in it), the precise question which has been put by the Senator from West Virginia, and I had that precise difficulty in the first place with this bill, but I was answered, and I think all the other members of the committee agreed in the answer, that 'monopoly' is a technical term known to the common law, and that it signifies -- I do not mean to say that they stated what the signification was, but I became satisfied that they were right and that the word 'monopoly' is a merely technical term which has a clear and legal signification, and it is this: It is the sole engrossing to a man's self by means which prevent other men from engaging in fair competition with him.

"Of course a monopoly granted by the King was a direct inhibition of all other persons to engage in that business or calling or to acquire that particular article, except the man who had a monopoly granted him by the sovereign power. I suppose, therefore, that the courts of the United States would say in the case put by the Senator from West Virginia that a man who merely by superior skill and intelligence, a breeder of horses or raiser of cattle, or manufacturer or artisan of any kind, got the whole business because nobody could do it as well as he could was not a monopolist, but that it involved something like the use of means which made it impossible for other persons to engage in fair competition, like the engrossing, the buying up of all other persons engaged in the same business."

[16] See p. 381.

[17] Compare *Standard Oil Co*. v. *United States*, 221 U.S. 1, 74, and *American Tobacco Co*. v. *United States*, 328 U.S. 781, 813-814; *United States* v. *Socony-Vacuum Oil Co*., 310 U.S. 150, 226, last paragraph, note 59.

[18] See *American Tobacco Co*. v. *United States*, 328 U.S. 781, 811; *Apex Hosiery Co*. v. *Leader*, 310 U.S. 469, 501; *Standard Oil Co*. v. *United States*, 221 U.S. 1, 58. See Stocking and Mueller, The Cellophane Case and the New Competition, XLV American Economic Rev. 29, 54; Cole, An Appraisal of Economic Change, XLIV American Economic Rev. 35, 61; Wilcox, TNEC Monograph No. 21, pp. 9, 11; The Schwartz Dissent, 1 Antitrust Bulletin, at 39; Report of Attorney General's National Committee to Study the Antitrust Laws, p. 43; Neal, The Clayton Act and the Transamerica Case, 5 Stan. L. Rev. 179, 205, 213.

[19] *United States* v. *Columbia Steel Co*., 334 U.S. 495, 525; *United States* v. *Paramount Pictures*, 334 U.S. 131, 173; *Apex Hosiery Co*. v. *Leader*, 310 U.S. 469, 501; cf. Rostow, 43 Ill. L. Rev. 745, 753-763; Oppenheim, Federal Antitrust Legislation, 50 Mich. L. Rev. 1139, 1193.

***LEdHN[15]*** [15]If a large number of buyers and sellers deal freely in a standardized product, such as salt or wheat, we have complete or pure competition. Patents, on the other hand, furnish the most familiar type of classic monopoly. As the producers of a standardized product bring about significant differentiations of quality, **[**1006]** design, or packaging in the product that permit differences of use, competition becomes to a greater or less degree incomplete and the producer's power over price and competition greater over his article and its use, according to the differentiation he is able to create and maintain. A retail seller may have in one sense a monopoly on certain trade because of location, as an isolated country store or filling station, or because no **[*393]** one else makes a product of just the quality or attractiveness of his product, as for example in cigarettes. Thus one can theorize that we have monopolistic competition in every nonstandardized commodity with each manufacturer having power over the price and production of his own product. [20] However, this power that, let us say, automobile or soft-drink manufacturers have over their trademarked products is not the power that makes an illegal monopoly. ***HN6*** Illegal power must be appraised in terms of the competitive market for the product. [21]

***LEdHN[16]*** [16]***LEdHN[17]*** [17]***[11C]*** [11C]***LEdHN[18]*** [18]***HN7*** Determination of the competitive market for commodities depends on how different from one another are the offered commodities in character or use, how far buyers will go to substitute one commodity for another. For example, one can think of building materials as in commodity competition but one **[***1280]** could hardly say that brick competed with steel or wood or cement or stone in the meaning of Sherman Act litigation; the products are too different. This is the interindustry competition emphasized by some economists. See Lilienthal, Big Business, c. 5. On the other hand, there are certain differences in the formulae for soft drinks but one can hardly say that each one is an illegal monopoly. Whatever the market may be, we hold that control of price or competition establishes the existence of monopoly power under *§ 2*. *Section 2* requires the application of a reasonable approach in determining the existence of monopoly power just as surely as did *§ 1*. This of course does not mean that there can be a reasonable monopoly. See notes 7 and 9, *supra*. Our next step is to determine whether du Pont has monopoly power over cellophane: that is, power over its price in relation to or competition with **[*394]** other commodities. The charge was monopolization of cellophane. The defense, that cellophane was merely a part of the relevant market for flexible packaging materials.

***LEdHN[19]*** [19]***LEdHN[20]*** [20]IV. *The Relevant Market.* -- ***HN8*** When a product is controlled by one interest, without substitutes available in the market, there is monopoly power. Because most products have possible substitutes, we cannot, as we said in *Times-Picayune Co.* v. *United States, 345 U.S. 594, 612*, give "that infinite range" to the definition of substitutes. Nor is it a proper interpretation of the Sherman Act to require that products be fungible to be considered in the relevant market.

The Government argues:

"We do not here urge that in *no* circumstances may competition of substitutes negative possession of monopolistic power over trade in a product. The decisions make it clear at the least that the courts will not consider substitutes other than those which are substantially fungible with the monopolized product and sell at substantially the same price."

---

[20] See Chamberlin, Theory of Monopolistic Competition, c. IV.

[21] See *United States* v. *Columbia Steel Co.*, 334 U.S. 495, 527; *Times-Picayune Co.* v. *United States*, 345 U.S. 594, 610; *Standard Oil Co.* v. *United States*, 283 U.S. 163, 179.

***LEdHN[21]*** [21]***LEdHN[22]*** [22]***LEdHN[23]*** [23]***LEdHN[25]*** [25]***HN9*** But where there are market alternatives that buyers may readily use **[**1007]** for their purposes, illegal monopoly does not exist merely because the product said to be monopolized differs from others. If it were not so, only physically identical products would be a part of the market. To accept the Government's argument, we would have to conclude that the manufacturers of plain as well as moistureproof cellophane were monopolists, and so with films such as Pliofilm, foil, glassine, polyethylene, and Saran, for each of these wrapping materials is distinguishable. These were all exhibits in the case. New wrappings appear, generally similar to cellophane: is each a monopoly? What is called for is an appraisal of the "cross-elasticity" of demand in the trade. See Note, 54 Col. L. Rev. 580. **[*395]** The varying circumstances of each case determine the result. [22]***HN10*** In considering what is the relevant market for determining the control of price and competition, no more definite rule can be declared than that commodities **[***1281]** reasonably interchangeable by consumers for the same purposes make up that "part of the trade or commerce," monopolization of which may be illegal. As respects flexible packaging materials, the market geographically is nationwide.

***LEdHN[24]*** [24]

***LEdHN[26]*** [26]***LEdHN[27]*** [27]Industrial activities cannot be confined to trim categories. Illegal monopolies under *§ 2* may well exist over limited products in narrow fields where competition is eliminated. [23] That does **[**1008]** not settle the issue here. ***HN11*** In **[*396]** determining the market under the Sherman Act, it is the use or uses to which the commodity is put that control. The selling price between commodities with similar uses and different characteristics may vary, so that the cheaper product can drive out the more expensive. Or, the

---

[22] *Maple Flooring Assn*. v. *United States*, 268 U.S. 563, 579:

"It should be said at the outset, that in considering the application of the rule of decision in these cases to the situation presented by this record, it should be remembered that this Court has often announced that each case arising under the Sherman Act must be determined upon the particular facts disclosed by the record, and that the opinions in those cases must be read in the light of their facts and of a clear recognition of the essential differences in the facts of those cases, and in the facts of any new case to which the rule of earlier decisions is to be applied."

[23] The Government notes that the prohibitions of *§ 2* of the Sherman Act have often been extended to producers of single products and to businesses of limited scope. But the cases to which the Government refers us were not concerned with the problem that is now before the Court. In *Story Parchment Co*. v. *Paterson Co*., 282 U.S. 555, a conspiracy to monopolize trade in vegetable parchment was held to be a violation of *§ 2*. Parchment paper is obviously no larger a part of commerce than cellophane. Recovery, however, was based on proven allegations of combination and conspiracy to monopolize, and the scope of the market was not in issue. P. 560. Similarly, *Indiana Farmer's Guide Co*. v. *Prairie Farmer Publishing Co*., 293 U.S. 268, ruled that a combination or conspiracy for the purpose of monopolizing the farm-paper business in the north central part of the Nation would be illegal by reason of the second section of the Sherman Act. *Lorain Journal Co*. v. *United States*, 342 U.S. 143, a case not cited by the Government, was concerned with even a smaller geographical area (dissemination of news in a community and surrounding territory). But the Court held only that defendant had attempted to monopolize, not that he had in fact monopolized. Also, this Court found in *United States* v. *Columbia Steel Co*., 334 U.S. 495, that the "relevant competitive market" for determining whether there had been an unreasonable restraint of trade (or an attempt to monopolize) was the market for "rolled steel" products in an 11-state area. Women's dresses of "original design." *Fashion Originators' Guild* v. *Federal Trade Comm'n*, 312 U.S. 457; "first run" motion pictures, *United States* v. *Paramount Pictures*, 334 U.S. 131; the news services of one news agency, *United States* v. *Associated Press*, 52 F.Supp. 362 (S. D. N. Y.), aff'd 326 U.S. 1; and newspaper advertising as distinguished from other means of news dissemination, *Times-Picayune Co*. v. *United States*, 345 U.S. 594, have all been designated as parts of commerce. All four were concerned only with the question of whether there had been an attempt to monopolize. *United States* v. *Aluminum Co. of America*, 148 F.2d 416 (C. A. 2d Cir.), did involve the question of monopolization. Judge Hand found that the relevant market for measuring Alcoa's power was the market for "virgin" aluminum; he refused to consider the close competition offered by "secondary" (used) aluminum. The reason for the narrow definition was that Alcoa's control over virgin aluminum permitted it to regulate the supply of used aluminum even though the latter should be actually sold by a competitor. Consequently, the case is not particularly helpful in the problem of market definition now before the Court.

superior quality of higher priced articles may make dominant the more desirable. Cellophane costs more than many competing products and less than a few. But whatever the price, there are various flexible wrapping materials that are bought by manufacturers for packaging their goods in their own plants or are sold to converters who shape and print them for use in the packaging of the commodities to be wrapped.

**[*397]** Cellophane differs from other flexible packaging materials. From some it differs more than from others. The basic materials from which the wrappings are made and the advantages and disadvantages of the products to the packaging industry **[***1282]** are summarized in Findings 62 and 63. They are aluminum, cellulose acetate, chlorides, wood pulp, rubber hydrochloride, and ethylene gas. It will adequately illustrate the similarity in characteristics of the various products by noting here Finding 62 as to glassine. [24] Its use is almost as extensive as cellophane, Appendix C, *post*, p. 412, and many of its characteristics equally or more satisfactory to users. [25]

**[*398]** It may be admitted that cellophane combines the desirable elements of transparency, strength and cheapness more **[**1009]** definitely than any of the others. Comparative characteristics have been noted thus:

"Moistureproof cellophane is highly transparent, tears readily but has high bursting strength, is highly impervious to moisture and gases, and is resistant to grease and oils. Heat sealable, printable, and adapted to use on wrapping machines, it makes an excellent packaging material for both display and protection of commodities.

"Other flexible wrapping materials fall into four major categories: (1) opaque nonmoistureproof wrapping *paper* designed primarily for convenience and protection in handling packages; (2)

---

[24] "62. . . . *Greaseproof paper* is made by beating wood pulp in a vat filled with water until the fibers become saturated and gelatinous in texture. Resulting product is translucent and resistant to oil and grease.

"*Glassine* is produced by finishing greaseproof paper between highly polished metal rollers under heat and at pressure. This process develops the transparency and surface gloss which are characteristic of glassine. It is greaseproof, and can be sealed by heat, if coated. It is made moistureproof by coating and with appropriate lacquers or waxes and may be printed."

[25] "63. There are respects in which other flexible packaging materials are as satisfactory as cellophane:

. . . .

"*Glassine*.

"Glassine is, in some types, about 90% transparent, so printing is legible through it.

"Glassine affords low cost transparency.

"Moisture protection afforded by waxed or lacquered glassine is as good as that of moistureproof cellophane.

"Glassine has greater resistance to tearing and breakage than cellophane.

"Glassine runs on packaging machinery with ease equal to that of cellophane.

"Glassine can be printed faster than cellophane, and can be run faster than moistureproof cellophane on bag machines.

"Glassine has greater resistance than cellophane to rancidity-inducing ultraviolet rays.

"Glassine has dimensional stability superior to cellophane.

"Glassine is more durable in cold weather than cellophane.

"Printed glassine can be sold against cellophane on the basis of appearance.

"Glassine may be more easily laminated than cellophane.

"Glassine is cheaper than cellophane in some types, comparable in others."

moistureproof *films* of varying degrees of transparency designed primarily either to protect, or to display and protect, the products they encompass; (3) nonmoistureproof transparent *films* designed primarily to display and to some extent protect, but which obviously do a poor protecting job where exclusion or retention of moisture is important; and (4) moistureproof *materials* other than films of varying degrees of transparency (foils and paper products) designed to protect and display." [26]

An examination of Finding 59, Appendix B, *post*, p. 411, will make this clear.

**[*399]** But, despite cellophane's advantages, it has to meet competition from other materials in every one of its uses. Cellophane's principal uses are analyzed in Appendix A, Findings 281 and 282. Food products are the chief outlet, with cigarettes next. The Government makes no challenge to Finding 283 that cellophane furnishes less than 7% of wrappings for bakery products, 25% for candy, 32% for snacks, 35% for meats and **[***1283]** poultry, 27% for crackers and biscuits, 47% for fresh produce, and 34% for frozen foods. Seventy-five to eighty percent of cigarettes are wrapped in cellophane. Finding 292. Thus, cellophane shares the packaging market with others. The over-all result is that cellophane accounts for 17.9% of flexible wrapping materials, measured by the wrapping surface. Finding 280, Appendix A, *post* , p. 405.

Moreover a very considerable degree of functional interchangeability exists between these products, as is shown by the tables of Appendix A and Findings 150-278. [27] It will be noted, Appendix B, that except as to permeability to gases, cellophane has no qualities that are not possessed by a number of other materials. Meat will do as an example of interchangeability. Findings 205-220. Although du Pont's sales to the meat industry have reached 19,000,000 pounds annually, nearly 35%, this volume is attributed "to the rise of self-service retailing of fresh meat." Findings 212 and 283. In fact, since the popularity of self-service meats, du Pont has lost "a considerable proportion" of this packaging business to Pliofilm. Finding 215. Pliofilm is more expensive than cellophane, but its superior physical characteristics apparently offset cellophane's price advantage. While retailers **[*400]** shift continually between the two, the trial court found that Pliofilm is increasing its share of the business. Finding 216. One further example is worth noting. Before World War II, du Pont cellophane wrapped between 5 and 10% of baked and smoked meats. The peak year was **[**1010]** 1933. Finding 209. Thereafter du Pont was unable to meet the competition of Sylvania and of greaseproof paper. Its sales declined and the 1933 volume was not reached again until 1947. Findings 209-210. It will be noted that greaseproof paper, glassine, waxed paper, foil and Pliofilm are used as well as cellophane, Finding 218. Findings 209-210 show the competition and 215-216 the advantages that have caused the more expensive Pliofilm to increase its proportion of the business.

***LEdHN[28]*** [28]***LEdHN[29]*** [29]***HN12*** An element for consideration as to cross-elasticity of demand between products is the responsiveness of the sales of one product to price changes of the other. [28] If a slight decrease in the price of cellophane causes a considerable number of customers of other flexible wrappings to switch to cellophane, it would be an indication that a high cross-elasticity of demand exists between them; that the products compete in the same market.

---

[26] Stocking and Mueller, The Cellophane Case, XLV Amer. Economic Rev. 29, 48-49.

[27] There are eighteen classifications: White Bread; Specialty Breads; Cake and Sweet Goods; Meat; Candy; Crackers and Biscuits; Frozen Foods; Potato Chips, Pop Corn and Snacks; Cereals; Fresh Produce; Paper Goods and Textiles; Cigarettes; Butter; Chewing Gum; Other Food Products; Other Tobacco Products; Cheese; Oleomargarine.

[28] Scitovsky, Welfare and Competition (1951), 396; Bain, Pricing, Distribution, and Employment (1953 rev. ed.), 52.

The court below held that the "great sensitivity of customers in the flexible packaging markets to price or quality changes" prevented du Pont from possessing monopoly control over price. 118 F.Supp., at 207. The record sustains these findings. See references made by the trial court in Findings 123-149.

***LEdHN[30]*** [30]We conclude that cellophane's interchangeability with the other materials mentioned suffices to make it a part of this flexible packaging material market.

***LEdHN[31]*** [31]The Government stresses the fact that the variation in price between cellophane and other materials demonstrates they are noncompetitive. As these products are **[*401]** all flexible wrapping materials, it seems reasonable to consider, as was done at the trial, their comparative cost to the **[***1284]** consumer in terms of square area. This can be seen in Finding 130, Appendix C. Findings as to price competition are set out in the margin. [29] Cellophane costs two or three times as much, surface measure, as its chief competitors for the flexible wrapping market, glassine and greaseproof papers. Other forms of cellulose wrappings and those from other chemical or mineral substances, with the exception of aluminum foil, are more expensive. The uses of these materials, as can be observed by Finding 283 in Appendix A, are largely to wrap small packages for retail distribution. The wrapping is a relatively small proportion of the entire cost of the article. [30] Different producers need different qualities in wrappings and their need may vary from time to time as their products undergo change. But the necessity for flexible wrappings is the central and unchanging demand. We cannot say that these differences in cost gave du Pont monopoly power over prices in view of the findings of fact on that subject. [31]

---

[29] "132. The price of cellophane is today an obstacle to its sales in competition with other flexible packaging materials.

"133. Cellophane has always been higher priced than the two largest selling flexible packaging materials, wax paper and glassine, and this has represented a disadvantage to sales of cellophane.

"134. DuPont considered as a factor in the determination of its prices, the prices of waxed paper, glassine, greaseproof, vegetable parchment, and other flexible packaging materials.

"135. DuPont, in reducing its prices, intended to narrow price differential between cellophane and packaging papers, particularly glassine and waxed paper. The objective of this effort has been to increase the use of cellophane. Each price reduction was intended to open up new uses for cellophane, and to attract new customers who had not used cellophane because of its price."

[30] See, *e. g.*, R. 4846.

[31] "140. Some users are sensitive to the cost of flexible packaging materials: others are not. Users to whom cost is important include substantial business: for example, General Foods, Armour, Curtiss Candy Co., and smaller users in the bread industry, cracker industry, and frozen food industry. These customers are unwilling to use more cellophane because of its relatively high price, would use more if the price were reduced, and have increased their use as the price of cellophane has been reduced.

"141. The cost factor slips accounts away from cellophane. This hits at the precarious users, whose profit margins on their products are low, and has been put in motion by competitive developments in the user's trade. Examples include the losses of business to glassine in candy bar wraps in the 30's, frozen food business to waxed paper in the late 40's, and recent losses to glassine in cracker packaging.

"142. The price of cellophane was reduced to expand the market for cellophane. DuPont did not reduce prices for cellophane with intent of monopolizing manufacture or with intent of suppressing competitors.

"143. DuPont reduced cellophane prices to enable sales to be made for new uses from which higher prices had excluded cellophane, and to expand sales. Reductions were made as sales volume and market conditions warranted. In determining price reductions, duPont considered relationship between its manufacturing costs and proposed prices, possible additional volume that might be gained by the price reduction, effect of price reduction upon the return duPont would obtain on its investment. It considered the effect its lowered price might have on the manufacture by others, but this possible result of a price reduction was never a motive for the reduction.

**[*402]** **[**1011]** It is the variable characteristics of the different flexible wrappings and the energy and ability with which the manufacturers push their wares that determine choice. A glance at "Modern Packaging," a **[***1285]** trade journal, will give, by its various advertisements, examples of the competition among manufacturers for the flexible packaging market. The trial judge visited the 1952 Annual Packaging **[*403]** Show at Atlantic City, with the consent of counsel. He observed exhibits offered by "machinery manufacturers, converters and manufacturers of flexible packaging materials." He states that these personal observations confirmed his estimate of the competition between cellophane and other packaging materials. Finding 820. From this wide variety of evidence, the Court reached the conclusion expressed in Finding 838:

"The record establishes plain cellophane and moistureproof cellophane are each flexible packaging materials which are functionally interchangeable with other flexible packaging materials and sold at same time to same customers for same purpose at competitive prices; there is no cellophane market distinct and separate from the market for flexible packaging materials; the market for flexible packaging materials is the relevant market for determining nature and extent of duPont's market control; and duPont has at all times competed with other cellophane producers and manufacturers of other flexible packaging materials in all aspects of its cellophane business."

***LEdHN[32]*** [32]***LEdHN[33]*** [33]The facts above considered dispose also of any contention that competitors have been excluded by du Pont from the packaging material market. That market has many producers and there is no proof du Pont ever has possessed power to exclude any of them from the rapidly expanding flexible packaging market. The Government apparently concedes as much, for it states that "lack **[**1012]** of power to inhibit entry into this so-called market [*i. e.*, flexible packaging materials], comprising widely disparate products, is no indicium of absence of power to exclude competition in the manufacture and sale of cellophane." The record shows the multiplicity of competitors and the financial strength of some with individual assets running to the hundreds of millions. Findings 66-72. Indeed, the **[*404]** trial court found that du Pont could not exclude competitors even from the manufacture of cellophane, Finding 727, an immaterial matter if the market is flexible packaging material. Nor can we say that du Pont's profits, while liberal (according to the Government 15.9% net after taxes on the 1937-1947 average), demonstrate the existence of a monopoly without proof of lack of comparable profits during those years in other prosperous industries. Cellophane was a leader, over 17%, in the flexible packaging materials market. There is no showing that du Pont's rate of return was greater or less than that of other producers of flexible packaging materials. Finding 719.

***LEdHN[34]*** [34]***HN13*** The "market" which one must study to determine when a producer has monopoly power will vary with the part of commerce under consideration. The tests are constant. That market is composed of products that have reasonable interchangeability for the purposes for which they are produced -- price, use and qualities considered. While the application of the tests remains uncertain, it seems to us that du Pont should not be found to monopolize cellophane when that product has the competition and interchangeability with other wrappings that this record shows.

---

"144. DuPont never lowered cellophane prices below cost, and never dropped cellophane prices temporarily to gain a competitive advantage.

"145. As duPont's manufacturing costs declined, 1924 to 1935, duPont reduced prices for cellophane. When costs of raw materials increased subsequent to 1935, it postponed reductions until 1938 and 1939. Subsequent increases in cost of raw material and labor brought about price increases after 1947."

On the findings of the District Court, its judgment is

*Affirmed*.

MR. JUSTICE CLARK and MR. JUSTICE HARLAN took no part in the consideration or decision of this case.

[For concurring opinion of MR. JUSTICE FRANKFURTER, see *post*, p. 413.]

**[***1286]** [For dissenting opinion of THE CHIEF JUSTICE, joined by MR. JUSTICE BLACK and MR. JUSTICE DOUGLAS, see *post*, p. 414.]

**[*405]** APPENDIX A.

VIII. RESULTS OF DU PONT'S COMPETITION WITH OTHER MATERIALS.

(Findings 279-292.)

279. During the period du Pont entered the flexible packaging business, and since its introduction of moistureproof cellophane, sales of cellophane have increased. Total volume of flexible packaging materials used in the United States has also increased. Du Pont's relative percentage of the packaging business has grown as a result of its research, price, sales and capacity policies, but du Pont cellophane even in uses where it has competed has not attained the bulk of the business, due to competition of other flexible packaging materials.

280. Of the production and imports of flexible packaging materials in 1949 measured in wrapping surface, du Pont cellophane accounted for less than 20% of flexible packaging materials consumed in the United States in that year. The figures on this are:

| | **Thousands of Square Yards** |
|---|---|
| Glassine, Greaseproof and Vegetable Parchment Papers | 3,125,826 |
| Waxing Papers (18 Pounds and over) | 4,614,685 |
| Sulphite Bag and Wrapping Papers | 1,788,615 |
| Aluminum Foil | 1,317,807 |
| Cellophane | 3,366,068 |
| Cellulose Acetate | 133,982 |
| Pliofilm, Polyethylene, Saran and Cry-O-Rap | 373,871 |
| Total | 14,720,854 |
| Total du Pont Cellophane Production | 2,629,747 |
| Du Pont Cellophane Per Cent of Total United States Production and Imports of These Flexible Packaging Materials | 17.9% |

**[*406]** 281. Eighty percent of cellophane made by du Pont is sold for packaging **[**1013]** in the food industry. Of this quantity, 80% is sold for packaging baked goods, meat, candy, crackers and biscuits, frozen foods, fresh vegetables and produce, potato chips, and "snacks," such as peanut butter sandwiches, popcorn, etc. A small amount is sold for wrapping of textiles and paper products, etc. Largest non-food use of cellophane is the overwrapping of cigarette packages.

The breakdown of du Pont cellophane sales for the year 1949 was:

| **Use** | **Sales** | **Percent of** |
|---|---|---|
| **TOBACCO** | **(M pounds)** | **Total Sales** |
| Cigarettes | 20,584 | 11.6 |
| Cigars | 3,195 | 1.8 |

| Use TOBACCO | Sales (M pounds) | Percent of Total Sales |
|---|---|---|
| Other Tobacco | 1,657 | 0.9 |
| Total | 25,436 | 14.3 |
| FOOD PRODUCTS | | |
| Candy & Gum | 17,054 | 9.6 |
| Bread & Cake | 40,081 | 22.5 |
| Crackers & Biscuits | 12,614 | 7.1 |
| Meat | 11,596 | 6.5 |
| Noodles & Macaroni | 2,602 | 1.5 |
| Tea & Coffee | 1,380 | 0.8 |
| Cereals | 2,487 | 1.4 |
| Frozen Foods | 5,234 | 2.9 |
| Dried Fruit | 333 | 0.2 |
| Nuts | 2,946 | 1.7 |
| Popcorn & Potato Chips | 6,929 | 3.9 |
| Dairy Products | 3,808 | 2.1 |
| Fresh Produce | 4,564 | 2.6 |
| Unclassified Foods | 8,750 | 4.9 |
| Total | 120,478 | 67.7 |

**[*407]**

| Use MISCELLANEOUS | Sales (M pounds) | Percent of Total Sales |
|---|---|---|
| Hosiery | 1,370 | 0.7 |
| Textiles | 3,141 | 1.8 |
| Drugs | 1,031 | 0.6 |
| Rubber | 317 | 0.2 |
| Paper | 2,736 | 1.5 |
| Unclassified | 18,602 | 10.5 |
| Total | 27,197 | 15.3 |
| Domestic Total | 173,011 | 97.3 |
| Export | 4,820 | 2.7 |
| Grand Total | 177,831 | 100.0 |

**[***1287]** 282. Sales of cellophane by du Pont in 1951, by principal uses, were approximately as follows:

| | Pounds |
|---|---|
| White bread | between 8 and 9,000,000 |
| Specialty breads | 15,700,000 |
| Cake and other baked sweet goods | 22,000,000 |
| Meat | 19,000,000 |
| Candy (including chewing gum) | 20,000,000 |
| Crackers and biscuits | 17,000,000 |
| Frozen foods | 5,800,000 |
| Cigarettes | 23,000,000 |

283. 1949 sales of 19 major representative converters whose business covered a substantial segment of the total converting of flexible packaging materials for that year showed the following as to their sales of flexible packaging materials, classified by end use:

| End Use BAKERY PRODUCTS | Quantity (Millions sq. in.) | Percent of Total End Use |
|---|---|---|
| Cellophane | 109,670 | 6.8 |
| Foil | 2,652 | .2 |
| Glassine | 72,216 | 4.4 |

| End Use | Quantity (Millions sq. in.) | Percent of Total End Use |
|---|---|---|
| BAKERY PRODUCTS | | |
| Papers | 1,440,413 | 88.6 |
| Films | 215 | .0 |
| | 1,625,166 | 100.0 |

**[*408]**

| End Use | Quantity (Millions sq. in.) | Percent of Total End Use |
|---|---|---|
| CANDY | | |
| Cellophane | 134,280 | 24.4 |
| Foil | 178,967 | 32.5 |
| Glassine | 117,634 | 21.4 |
| Papers | 119,102 | 21.6 |
| Films | 484 | .1 |
| | 550,467 | 100.0 |
| SNACKS | | |
| Cellophane | 61,250 | 31.9 |
| Foil | 1,571 | .8 |
| Glassine | 120,556 | 62.8 |
| Papers | 8,439 | 4.4 |
| Films | 79 | .1 |
| | 191,895 | 100.0 |
| MEAT AND POULTRY | | |
| Cellophane | 59,016 | 34.9 |
| Foil | 88 | .1 |
| Glassine | 4,524 | 2.7 |
| Papers | 97,255 | 57.5 |
| Films | 8,173 | 4.8 |
| | 169,056 | 100.0 |
| CRACKERS AND BISCUITS | | |
| Cellophane | 29,960 | 26.6 |
| Foil | 192 | .2 |
| Glassine | 11,253 | 10.0 |
| Papers | 71,147 | 63.2 |
| Films | 8 | .0 |
| | 112,560 | 100.0 |
| FRESH PRODUCE | | |
| Cellophane | 52,828 | 47.2 |
| Foil | 43 | .1 |
| Glassine | 96 | .1 |
| Papers | 51,035 | 45.6 |
| Films | 7,867 | 7.0 |
| | 111,869 | 100.0 |

**[*409]**

| End Use | Quantity (Millions sq. in.) | Percent of Total End Use |
|---|---|---|
| FROZEN FOODS EXCLUDING DAIRY PRODUCTS | | |
| Cellophane | 31,684 | 33.6 |
| Foil | 629 | .7 |
| Glassine | 1,943 | 2.1 |
| Papers | 56,925 | 60.3 |

| End Use FROZEN FOODS EXCLUDING DAIRY PRODUCTS | Quantity (Millions sq. in.) | Percent of Total End Use |
|---|---|---|
| Films | 3,154 | 3.3 |
| | 94,335 | 100.0 |

**[**1014]** 284. About 96% of packaged white bread produced in the United States is wrapped in waxed paper or glassine, and about 6% in cellophane. The cellophane figure includes sales by all U.S. producers.

285. Forty-eight percent of specialty breads are wrapped in du Pont cellophane, the remainder in other cellophane or other materials. Most of this balance is wrapped in waxed paper and glassine.

286. Approximately 45% of cake and baked sweet goods packaged by wholesale bakers is wrapped in du Pont cellophane. The balance is wrapped in other cellophane or in waxed paper or glassine.

287. Between 25 and 35% of packaged candy units sold in the United States are wrapped in du Pont cellophane.

**[***1288]** 288. Of sponge and sweet crackers and biscuits combined approximately 25% to 30% of the packaged units produced in 1951 were wrapped in du Pont cellophane.

289. Du Pont cellophane at the present time is used on approximately 20 to 30% of packaged retail units of frozen foods. The remainder use waxed paper, waxed glassine, polyethylene, Pliofilm, Cry-O-Vac, or vegetable parchment.

290. Approximately 20 to 30% of packages of potato chips and other snacks are wrapped in du Pont cellophane. Most of the remainder are packaged in glassine and other flexible wraps.

**[*410]** 291. Approximately 4 to 6% of the packaged units of cereal are wrapped in du Pont cellophane. The principal flexible packaging materials used are waxed paper and glassine.

292. Du Pont cellophane is used as an outer wrap on the paper-foil packages for approximately 75 to 80% of cigarettes sold in the United States. Sales for this use represent about 11.6% of du Pont's total sales of cellophane.

**[*411]** **[**1015]** [SEE TABLE IN ORIGINAL TEXT]

**[*412]** **[***1290]** APPENDIX C.

(Finding of Fact 130.)

1949 average wholesale prices of flexible packaging materials in the United States were:

| Packaging Material Saran | Price per 1,000 sq.in. (cents) | Price per lb. (cents) | Yield per lb. (sq. in.) |
|---|---|---|---|
| 100 Gauge #517 | 6.1 | 99.0 | 16,300 |
| Cellulose Acetate | | | |
| .00088" | 3.3 | 82.0 | 25,000 |
| Polyethylene | | | |
| .002" - 18" Flat Width | 5.4 | 81.0 | 15,000 |
| Pliofilm | | | |
| 120 Gauge N 2 | 3.8 | 80.8 | 21,000 |
| Aluminum Foil | | | |
| .00035' | 1.8 | 52.2 | 29,200 |
| Moistureproof Cellophane | | | |
| 300 MST-51 | 2.3 | 47.8 | 21,000 |
| Plain Cellophane | | | |
| 300 PT | 2.1 | 44.8 | 21,500 |
| Vegetable Parchment | | | |
| 27# | 1.4 | 22.3 | 16,000 |
| Bleached Glassine | | | |

| Packaging Material Saran | Price per 1,000 sq.in. (cents) | Price per lb. (cents) | Yield per lb. (sq. in.) |
|---|---|---|---|
| 25# | 1.0 | 17.8 | 17,280 |
| Bleached Greaseproof | | | |
| 25# | .9 | 15.8 | 17,280 |
| Plain Waxed Sulphite | | | |
| 25# Self-Sealing | 1.1 | 15.2 | 14,400 |
| Plain Waxed Sulphite | | | |
| 25# Coated Opaque | .7 | 11.9 | 17,280 |
| Cry-O-Rap | Sold only in converted form. No unconverted quotations. | | |

**Concur by:** FRANKFURTER

**Concur**

**[*413] [**1016]** MR. JUSTICE FRANKFURTER, concurring.

I concur in the judgment of the Court and in so much of MR. JUSTICE REED'S opinion as supports the conclusion that cellophane did not by itself constitute a closed market but was a part of the relevant market for flexible packaging materials.

MR. JUSTICE REED has pithily defined the conflicting claims in this case. "The charge was monopolization of cellophane. The defense, that cellophane was merely a part of the relevant market for flexible packaging materials." Since this defense is sustained, the judgment below must be affirmed and it becomes unnecessary to consider whether du Pont's power over trade in cellophane would, had the defense failed, come within the prohibition of "monopolizing" under *§ 2* of the Sherman Act. Needless disquisition on the difficult subject of single-firm monopoly should be avoided since the case may be disposed of without consideration of this problem.

***LEdHN[35]*** [35]The boundary between the course of events by which a business may reach a powerful position in an industry without offending the outlawry of "monopolizing" under *§ 2* of the Sherman Act and the course of events which brings the attainment of that result within the condemnation **[**1017]** of that section, cannot be established by general phrases. It must be determined with reference to specific facts upon considerations analogous to those by which *§ 1* of the Sherman Act is applied. These were illuminatingly stated by Mr. Justice Brandeis for the Court:

***LEdHN[36]*** [36]"The true test of legality is whether the restraint imposed is such as merely regulates and perhaps thereby promotes competition or whether it is such as may suppress or even destroy competition. To determine that question the court must ordinarily consider the facts peculiar to the business to which **[*414]** the restraint is applied; its condition before and after the restraint was imposed; the nature of the restraint and its effect, actual or probable. The history of the restraint, the evil believed to exist, the reason for adopting the particular remedy, the purpose or end sought to be attained, are all relevant facts. . . ." *Board of Trade of the City of Chicago v. United States, 246 U.S. 231, 238*.

***LEdHN[37]*** [37]***LEdHN[38]*** [38]*Sections 1* and *2* of course implicate different considerations. But the so-called issues of fact and law that call for adjudication in this legal territory are united, and intrinsically so, with factors that entail social and economic **[***1291]** judgment. Any

consideration of "monopoly" under the Sherman law can hardly escape judgment, even if only implied, on social and economic issues. It had best be withheld until a case inescapably calls for it.

**Dissent by:** WARREN

**Dissent**

MR. CHIEF JUSTICE WARREN, with whom MR. JUSTICE BLACK and MR. JUSTICE DOUGLAS join, dissenting.

This case, like many under the Sherman Act, turns upon the proper definition of the market. In defining the market in which du Pont's economic power is to be measured, the majority virtually emasculate *§ 2* of the Sherman Act. They admit that "cellophane combines the desirable elements of transparency, strength and cheapness more definitely than any of" a host of other packaging materials. Yet they hold that all of those materials are so indistinguishable from cellophane as to warrant their inclusion in the market. We cannot agree that cellophane, in the language of *Times-Picayune Publishing Co*. v. *United States, 345 U.S. 594, 613*, is "the selfsame product" as glassine, greaseproof and vegetable parchment papers, waxed papers, sulphite papers, **[*415]** aluminum foil, cellulose acetate, and Pliofilm and other films. [1]

The majority opinion states that "It will adequately illustrate the similarity in characteristics of the various products by noting here Finding 62 as to glassine. " But Finding 62 merely states the respects in which the selected flexible packaging materials are as satisfactory as cellophane; it does not compare all the physical properties of cellophane and other materials. The Table incorporated in Finding 59 does make such a comparison, and enables us to note cellophane's unique combination of qualities lacking among less expensive materials in varying degrees. [2] A glance at this Table reveals that cellophane has a high **[**1018]** bursting strength while glassine's is low; that cellophane's permeability to gases is lower than that of glassine; and that both its transparency and its resistance to grease and oils are greater than glassine's. **[*416]** Similarly, we see that waxed paper's bursting strength is less than cellophane's and that it is highly permeable to gases and offers no resistance whatsoever to grease and oils. With respect to the two other major products held to be close substitutes for cellophane, Finding 59 makes the majority's market definition more dubious. In contrast to cellophane, aluminum foil is actually opaque and has a low bursting strength. And sulphite papers, in addition to being opaque, are highly permeable to both moisture and gases, have no resistance to grease and oils, have a lower bursting strength than cellophane, and are not even heat sealable. Indeed, the majority go further than placing cellophane in the same market with such products. **[***1292]** They also include the transparent films, which are more expensive than cellophane. These bear even less resemblance to the

---

[1] In *Times-Picayune Publishing Co*. v. United States, 345 U.S. 594, 612, note 31, the Court said:

"For every product, substitutes exist. But a relevant market cannot meaningfully encompass that infinite range. The circle must be drawn narrowly to exclude any other product to which, within reasonable variations in price, only a limited number of buyers will turn; in technical terms, products whose 'cross-elasticities of demand' are small."

[2] See *118 F.Supp., at 64*. The majority opinion quotes at length from Stocking and Mueller, The Cellophane Case, XLV Amer. Economic Rev. 29, 48-49, in noting the comparative characteristics of cellophane and other products. Unfortunately, the opinion fails to quote the conclusion reached by these economists. They state: "The [trial] court to the contrary notwithstanding, the market in which cellophane meets the 'competition' of other wrappers is narrower than the market for all flexible packaging materials." *Id*., at 52. And they conclude that ". . . cellophane is so differentiated from other flexible wrapping materials that its cross elasticity of demand gives du Pont significant and continuing monopoly power." *Id*., at 63.

lower priced packaging materials than does cellophane. The juxtaposition of one of these films, Cry-O-Rap, with sulphite in the Table facilitates a comparison which shows that Cry-O-Rap is markedly different and far superior.

If the conduct of buyers indicated that glassine, waxed and sulphite papers and aluminum foil were actually "the selfsame products" as cellophane, the qualitative differences demonstrated by the comparison of physical properties in Finding 59 would not be conclusive. But the record provides convincing proof that businessmen did not so regard these products. During the period covered by the complaint (1923-1947) cellophane enjoyed phenomenal growth. Du Pont's 1924 production was 361,249 pounds, which sold for $ 1,306,662. Its 1947 production was 133,502,858 pounds, which sold for $ 55,339,626. Findings 297 and 337. Yet throughout this period the price of cellophane was far greater than that of glassine, waxed paper or sulphite paper. Finding 136 states that in 1929 cellophane's price was seven times that of glassine; in 1934, four times, and in 1949 still more than twice **[*417]** glassine's price. Reference to DX-994, the graph upon which Finding 136 is based, shows that cellophane had a similar price relation to waxed paper and that sulphite paper sold at even less than glassine and waxed paper. We cannot believe that buyers, practical businessmen, would have bought cellophane in increasing amounts over a quarter of a century if close substitutes were available at from one-seventh to one-half cellophane's price. That they did so is testimony to cellophane's distinctiveness.

The inference yielded by the conduct of cellophane buyers is reinforced by the conduct of sellers other than du Pont. Finding 587 states that Sylvania, the only other cellophane producer, absolutely and immediately followed every du Pont price change, even dating back its price list to the effective date of du Pont's change. Producers of glassine and waxed paper, on the other hand, displayed apparent indifference to du Pont's repeated and substantial price cuts. DX-994 shows that from 1924 to 1932 du Pont dropped the price of plain cellophane 84%, while the price of glassine remained constant. [3] And during the period 1933-1946 the prices for glassine **[**1019]** and waxed paper actually increased in the face of a further 21% decline in the price of cellophane. If "shifts of business" due to "price sensitivity" had been substantial, glassine and waxed paper producers who wanted to stay in business would have been compelled by market forces to meet du Pont's price challenge just as Sylvania was. The majority correctly point out that:"An element for consideration as to cross-elasticity of demand between products is the responsiveness of the sales of one product to price changes of the other. If a slight decrease in the price of cellophane causes a considerable number of customers of other flexible wrappings to switch to cellophane, it would be an **[*418]** indication that a high cross-elasticity of demand exists between them; that the products compete in the same market."

Surely there was more than "a slight decrease in the price of cellophane" during the period covered by the complaint. That producers of glassine and waxed paper remained dominant in the flexible packaging materials market without meeting cellophane's tremendous price cuts convinces us that cellophane was not in effective competition with their products. [4]

**[***1293]** Certainly du Pont itself shared our view. From the first, du Pont recognized that it need not concern itself with competition from other packaging materials. For example, when du Pont was contemplating entry into cellophane production, its Development Department reported that

---

[3] The record provides no figures for waxed paper prior to 1933.

[4] See Stocking and Mueller, The Cellophane Case, XLV Amer. Economic Rev. 29, 56.

glassine "is so inferior that it belongs in an entirely different class and has hardly to be considered as a competitor of cellophane." [5] This was still du Pont's view in 1950 when its survey of competitive prospects wholly omitted reference to glassine, waxed paper or sulphite paper and stated that "Competition for du Pont cellophane will come from competitive cellophane and from non-cellophane films made by us or by others." [6]

Du Pont's every action was directed toward maintaining dominance over cellophane. Its 1923 agreements with La Cellophane, the French concern which first produced commercial cellophane, gave du Pont exclusive **[*419]** North and Central American rights to cellophane's technology, manufacture and sale, and provided, without any limitation in time, that all existing and future information pertaining to the cellophane process be considered "secret and confidential," and be held in an exclusive common pool. [7] In its subsequent agreements with foreign licensees, du Pont was careful to preserve its continental market inviolate. [8] In 1929, while it was still the sole domestic **[**1020]** producer of cellophane, du Pont won its long struggle to raise the tariff from 25% to 60%, ad valorem, on cellophane imports, [9] substantially foreclosing foreign competition. When Sylvania became the second American cellophane producer the following year and du Pont filed suit claiming infringement of its moistureproof patents, they settled the suit by entering into a cross-licensing agreement. Under this agreement, du Pont obtained the right to exclude third persons from use of any patentable moistureproof invention made during the next 15 years by the sole other domestic cellophane producer, and, by a prohibitive royalty provision, it limited Sylvania's moistureproof production to approximately **[*420]** 20% of the industry's moistureproof sales. [10] The record shows that du Pont and Sylvania were aware that, by settling the infringement suit, they avoided the possibility **[***1294]** that the courts might hold the patent claims invalid and thereby open cellophane manufacture to additional competition. [11] If close substitutes for cellophane had been commercially available, du Pont, an enlightened enterprise, would not have gone to such lengths to control cellophane.

***LEdHN[39]*** [39]***LEdHN[40]*** [40]***LEdHN[41]*** [41]***LEdHN[42]*** [42]

As predicated by its 1923 market analysis, [12] du Pont's dominance in cellophane proved enormously profitable from the outset. After only five years of production, when du Pont bought

---

5 R. 3549, GX-392. The record contains many reports prepared by du Pont from 1928 to 1947. They virtually ignore the possibility of competition from other packaging materials. *E. g*., R. 3651, 3678, 3724, 3739.

6 R. 4070. It is interesting to note that du Pont had almost 70% of the market which this report considered relevant.

7 See Finding 24; GX-1001, R. 3253; and GX-1002, R. 3257-3260. The agreement of June 9, 1923, in which the parties agreed to divide the world cellophane market, is illegal *per se* under *Timken Roller Bearing Co*. v. *United States*, 341 U.S. 593, 596-599. The supplementary agreement providing for the interchange of technological information tightened the cellophane monopoly and denied to others any access to what went into the common pool -- all in violation of *United States* v. *National Lead Co*., 332 U.S. 319, 328. As was said in *United States* v. *Griffith*, 334 U.S. 100, 107: "The anti-trust laws are as much violated by the prevention of competition as by its destruction."

8 See Finding 602; GX-1087, R. 3288; and GX-1109, R. 3301.

9 Finding 633. On appeal from an adverse decision by the Commissioner of Customs, du Pont persuaded the United States Customs Court to order reclassification of cellophane.

10 The agreement is summarized in Finding 545 and appears in full in GX-2487, R. 3383-3408. We believe that under the principles set forth in *Transparent-Wrap Machine Corp*. v. *Stokes & Smith Co*., 329 U.S. 637, 646, this agreement violated the Sherman Act.

11 GX-2811, R. 6073-6074.

12 R. 3563.

out the minority stock interests in its cellophane subsidiary, it had to pay more than fifteen times the original price of the stock. [13] But such success was not limited to the period of innovation, limited sales and complete domestic monopoly. A confidential du Pont report shows that during the period 1937-1947, despite great expansion of sales, du Pont's "operative return" (before taxes) averaged 31%, while its average "net return" (after deduction of taxes, bonuses, and fundamental research expenditures) was 15.9%. [14] Such profits provide a powerful incentive for the entry of competitors. [15] **[*421]** Yet from 1924 to 1951 only one new firm, Sylvania, was able to begin cellophane production. And Sylvania could not have entered if La Cellophane's secret process had not been stolen. [16] It **[**1021]** is significant that for 15 years Olin Industries, a substantial firm, was unsuccessful in its attempt to produce cellophane, finally abandoning the project in 1944 after having spent about $ 1,000,000. [17] When the Government brought this suit, du Pont, "to reduce the hazard of being judged to have a monopoly of the U.S. cellophane business," [18] decided to let Olin enter the industry. Despite this demonstration of the control achieved by du Pont through its exclusive dominion over the cellophane process, the District Court found that du Pont could not exclude competitors from the manufacture of cellophane. Finding 727. This finding is "clearly erroneous." [19] The majority avoid **[*422]** passing upon Finding 727 by stating that it is "immaterial . . . if the market is flexible packaging material." They do not appear to disagree with our conclusion, however, since they concede that ". . . it may be practically impossible for anyone to commence manufacturing cellophane without full access to du Pont's technique."

The trial court found that

"Du Pont has no power to set **[***1295]** cellophane prices arbitrarily. If prices for cellophane increase in relation to prices of other flexible packaging materials it will lose business to manufacturers of such materials in varying amounts for each of du Pont cellophane's major end uses." Finding 712.

This further reveals its misconception of the antitrust laws. A monopolist seeking to maximize profits cannot raise prices "arbitrarily." Higher prices of course mean smaller sales, but they also mean higher per-unit profit. Lower prices will increase sales but reduce per-unit profit. Within

---

13 When du Pont Cellophane was organized in 1923, du Pont received 52,000 shares of its stock in return for $ 866,666.67 in cash, or $ 16.67 per share. F. 22; DX-735, R. 5402. In 1929 du Pont had to surrender stock having a market value of $ 12,129,600 in order to obtain the 48,000 shares held by French interests, a sum equal to $ 252.70 per share. DX-735, R. 5403.

14 R. 4155.

15 See Stocking and Mueller, The Cellophane Case, XLV Amer. Economic Rev. 29, 60-63, where the authors compare the domestic economic history of rayon with that of cellophane. The first American rayon producer earned 64.2% on its investment in 1920, thereby attracting du Pont. After a loss in 1921, du Pont's average return for the next four years was roughly 32%. As more firms began rayon production, du Pont's and the industry's return on investment began to drop. When 6 new firms entered the industry in 1930, bringing the number of producers to 20, average industry earnings for that year declined to 5% and du Pont suffered a net loss. "From the beginning of the depression in 1929 through the succeeding recovery and the 1938 recession du Pont averaged 29.6 per cent before taxes on its cellophane investment. On its rayon investment it averaged only 6.3 per cent." *Id.*, at 62-63.

16 In 1924 two of La Cellophane's principal officials absconded with complete information on the cellophane process. A Belgian concern was then set up to use this process in making cellophane, and it later organized Sylvania as an American affiliate. Findings 615-618.

17 R. 2733-2736.

18 See memorandum du Pont submitted to prospective entrants. R. 3893.

19 See Rule 52 (a), Federal Rules of Civil Procedure.

these limits a monopolist has a considerable degree of latitude in determining which course to pursue in attempting to maximize profits. The trial judge thought that, if du Pont raised its price, the market would "penalize" it with smaller profits as well as lower sales. [20] Du Pont proved him wrong. When 1947 operating earnings dropped below 26% for the first time in 10 years, it increased cellophane's price 7% and boosted its earnings in 1948. Du Pont's division manager then reported that "If an operative return of 31% is considered inadequate then an upward revision in prices will be necessary to improve the return." [21] It is this latitude with respect to price, this broad power of choice, that the antitrust **[*423]** laws forbid. [22] Du Pont's independent pricing policy and the great profits consistently yielded by that policy leave no room for doubt that it had power to control the price of cellophane. The findings of fact cited by the majority cannot affect this conclusion. [23] For they merely demonstrate that, during the period covered by the complaint, du Pont was a "good monopolist," *i. e.*, that it did not engage in predatory practices and that it chose to maximize profits by lowering price and expanding sales. Proof of enlightened exercise of monopoly power certainly does not refute the existence of that power.

The majority opinion purports to reject the theory of "interindustry competition." Brick, steel, wood, cement and stone, it says, are "too different" to be placed in the same market. But cellophane, **[**1022]** glassine, wax papers, sulphite papers, greaseproof and vegetable parchment papers, aluminum foil, cellulose acetate, Pliofilm and other films are not "too different," the opinion concludes. The majority approach would apparently enable a monopolist of motion picture exhibition to avoid Sherman Act consequences by showing that motion pictures compete in substantial measure with legitimate theater, television, radio, sporting events and other forms of entertainment. Here, too, "shifts of business" undoubtedly accompany fluctuations in price and "there are market alternatives that buyers may readily use for their purposes." Yet, in *United States v. Paramount Pictures, 334 U.S. 131*, where the District Court had confined the relevant market to that for nationwide movie exhibition, this Court remanded the case to the District Court with directions to determine whether there was a monopoly on the part of the five major distributors "in the *first-run* field for the entire **[*424]** country, in the *first-run* field in the 92 largest cities of the country, or in the *first-run* field in separate localities." *334 U.S., at 172*. Similarly, it is difficult to square the majority view with *United States v. Aluminum Co. of America, 148 F.2d 416*, a landmark *§ 2* case. There Judge Learned Hand, reversing a district court, held that the close competition which "secondary" (used) aluminum offered to "virgin" aluminum did not justify including the former **[***1296]** within the relevant market for measuring Alcoa's economic power. Against these and other precedents, which the Court's opinion approves but does not follow, the formula of "reasonable interchangeability," as applied by the majority, appears indistinguishable from the theory of "interindustry competition." The danger in it is that, as demonstrated in this case, it is "perfectly compatible with a fully monopolized economy." [24]

The majority hold in effect that, because cellophane meets competition for many end uses, those buyers for other uses who need or want only cellophane are not entitled to the benefits of competition within the cellophane industry. For example, Finding 282 shows that the largest

---

[20] 118 F.Supp., at 206.

[21] R. 4154-4155.

[22] See, *e. g., American Tobacco Co*. v. United States, 328 U.S. 781, 805-806.

[23] See note 31, majority opinion.

[24] Adams, The "Rule of Reason": Workable Competition or Workable Monopoly?, 63 Yale L. J. 348, 364.

single use of cellophane in 1951 was for wrapping cigarettes, and Finding 292 shows that 75 to 80% of all cigarettes are wrapped with cellophane. As the recent report of the Attorney General's National Committee to Study the Antitrust Laws states: "In the interest of rivalry that extends to *all* buyers and *all* uses, competition among rivals within the industry is always important." [25] (Emphasis added.) Furthermore, those buyers who have "reasonable alternatives" between cellophane **[*425]** and other products are also entitled to competition within the cellophane industry, for such competition may lead to lower prices and improved quality.

The foregoing analysis of the record shows conclusively that cellophane is the relevant market. Since du Pont has the lion's share of that market, it must have monopoly power, as the majority concede. [26] This being so, we think it clear that, in the circumstances of this case, du **[**1023]** Pont is guilty of "monopolization." The briefest sketch of du Pont's business history precludes it from falling within the "exception to the Sherman Act prohibitions of monopoly power" (majority opinion, pp. 390-391) by successfully asserting that monopoly was "thrust upon" it. Du Pont was not "the passive beneficiary of a monopoly" within the meaning of *United States v. Aluminum Co. of America, supra, at 429-430*. It sought and maintained dominance through illegal agreements dividing the world market, concealing and suppressing technological information, and restricting its licensee's production by prohibitive royalties, [27] and through numerous maneuvers which might have been "honestly industrial" but whose necessary effect was nevertheless exclusionary. [28] Du Pont cannot bear "the burden of **[*426]** proving that it owes its monopoly *solely* to superior skill. . . ." (Emphasis supplied.) *United States v. United Shoe Machinery Corp., 110 F.Supp. 295, 342*, aff'd *per curiam*, *347 U.S. 521*.

Nor can du Pont rely upon its moistureproof patents as a defense to the charge of monopolization. Once du Pont acquired the basic **[***1297]** cellophane process as a result of its illegal 1923 agreements with La Cellophane, development of moistureproofing was relatively easy. Du Pont's moistureproof patents were fully subject to the exclusive pooling arrangements and territorial restrictions established by those agreements. And they were the subject of the illicit and exclusionary du Pont-Sylvania agreement. Hence, these patents became tainted as part and parcel of du Pont's illegal monopoly. Cf., *Mercoid Corp*. v. *Mid-Continent Co., 320 U.S. 661, 670*. Any other result would permit one who monopolizes a market to escape the statutory liability by patenting a simple improvement on his product.

If competition is at the core of the Sherman Act, we cannot agree that it was consistent with that Act for the enormously lucrative cellophane industry to have no more than two sellers from 1924 to 1951. The conduct of du Pont and Sylvania illustrates that a few sellers tend to act like one and that an industry which does not have a competitive structure will not have competitive

---

[25] Report of Attorney General's National Committee to Study the Antitrust Laws, p. 322. The majority decision must be peculiarly frustrating to the cigarette industry, whose economic behavior has been restrained more than once by this Court in the interest of competition. See *American Tobacco Co*. v. *United States*, 328 U.S. 781; *United States* v. *American Tobacco Co*., 221 U.S. 106.

[26] "If cellophane is the 'market' that du Pont is found to dominate, it may be assumed it does have monopoly power over that 'market.' Monopoly power is the power to control prices or exclude competition. It seems apparent that du Pont's power to set the price of cellophane has only been limited by the competition afforded by other flexible packaging materials. Moreover, it may be practically impossible for anyone to commence manufacturing cellophane without full access to du Pont's technique." Majority opinion, *ante*, pp. 391-392.

[27] See notes 7 and 10, our dissent.

[28] See *United States* v. *Aluminum Co. of America*, 148 F.2d 416, 431.

behavior. The public should not be left to rely upon the dispensations of management in order to obtain the benefits which normally accompany competition. Such beneficence is of uncertain tenure. Only actual competition can assure long-run enjoyment of the goals of a free economy.

We would reverse the decision below and remand the cause to the District Court with directions to determine the relief which should be granted against du Pont.

EXHIBIT 293

LexisNexis®
Questioned
As of: August 12, 2014 9:20 AM EDT

# United States v. Grinnell Corp.

Supreme Court of the United States
March 28-29, 1966, Argued ; June 13, 1966, Decided *
No. 73

**Reporter:** 384 U.S. 563; 86 S. Ct. 1698; 16 L. Ed. 2d 778; 1966 U.S. LEXIS 2988; 1966 Trade Cas. (CCH) P71,459; 1966 Trade Cas. (CCH) P71,789
UNITED STATES v. GRINNELL CORP. ET AL.

**Prior History:** APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF RHODE ISLAND.

**Disposition:** *236 F.Supp. 244*, affirmed and remanded.

**Core Terms**

central station, accredit, protective services, decree, alarm, monopoly, relevant market, customer, commerce, geographical, monopoly power, monopolize, automatic, burglar alarm, trial court, burglary, stock, divestiture, competitor, water flow, nationwide, station, restraint of trade, exclusive right, fire alarm, interchangeable, differentiate, sprinkler, buyer, bias

**LexisNexis® Headnotes**

Antitrust & Trade Law > ... > Monopolies & Monopolization > Actual Monopolization > General Overview
Antitrust & Trade Law > Sherman Act > General Overview

***HN1*** The offense of monopoly under the Sherman Act, *15 U.S.C.S. § 2*, has two elements: (1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident.

Antitrust & Trade Law > ... > Monopolies & Monopolization > Actual Monopolization > General Overview

***HN2*** Monopoly power is defined as the power to control prices or exclude competition. The existence of such power ordinarily may be inferred from the predominant share of the market.

Antitrust & Trade Law > Regulated Practices > Market Definition > General Overview

***HN3*** Commodities reasonably interchangeable make up that "part" of trade or commerce which *15 U.S.C.S. § 2* protects against monopoly power.

Antitrust & Trade Law > Regulated Practices > Market Definition > General Overview

---

* Together with No. 74, Grinnell Corp. v. United States, No. 75, American District Telegraph Co. v. United States, No. 76, Holmes Electric Protective Co. v. United States and No. 77, Automatic Fire Alarm Co. of Delaware v. United States, also on appeal from the same court.

***HN4*** There is no barrier to combining in a single market a number of different products or services where that combination reflects commercial realities.

Antitrust & Trade Law > Regulated Industries > Financial Institutions > Bank Mergers
Mergers & Acquisitions Law > Antitrust > Antitrust Statutes > General Overview
Mergers & Acquisitions Law > Antitrust > Antitrust Statutes > Clayton Act
Antitrust & Trade Law > Regulated Practices > Market Definition > General Overview

***HN5*** There is no reason to differentiate between "line" of commerce in the context of the Clayton Act and "part" of commerce for purposes of the Sherman Act.

Antitrust & Trade Law > ... > Monopolies & Monopolization > Actual Monopolization > General Overview
Antitrust & Trade Law > ... > Monopolies & Monopolization > Attempts to Monopolize > General Overview
Antitrust & Trade Law > Sherman Act > General Overview

***HN6*** Adequate relief in a monopolization case should put an end to the combination and deprive the defendants of any of the benefits of the illegal conduct, and break up or render impotent the monopoly power found to be in violation of the Sherman Act.

Civil Procedure > ... > Inability to Proceed > Disqualification & Recusal > General Overview
Civil Procedure > ... > Inability to Proceed > Disqualification & Recusal > Federal Judges

***HN7*** See *28 U.S.C.S. § 144*.

Civil Procedure > Judicial Officers > Judges > General Overview
Civil Procedure > ... > Inability to Proceed > Disqualification & Recusal > General Overview

***HN8*** The alleged bias and prejudice to be disqualifying must stem from an extrajudicial source and result in an opinion on the merits on some basis other than what the judge learned from his participation in the case.

**Lawyers' Edition Display**

## Summary

In a civil antitrust action instituted by the United States in the United States District Court for the District of Rhode Island, the defendants were a manufacturer of plumbing supplies and fire sprinkler systems and three of its affiliated companies, which were in the business of providing central station protection services, whereby electrical devices installed on customers' premises would notify a central station of burglaries or fires. The District Court found that under 2 of the Sherman Act the relevant market was the national market for central station protection services which were accredited by insurance underwriters, that the defendants controlled more than 87 percent of the market, and that the defendants had monopolized the market in violation of 2; and the court granted the government a decree enjoining the defendants in general terms from further restraints of trade or monopolization, requiring the affiliated companies to file certain information with the Department of Justice, ordering the parent company to divest itself of its stock in each of the affiliated companies, and enjoining each of the defendants from employing in any capacity the president of the parent company. (*236 F Supp 244*.)

On appeal, the United States Supreme Court affirmed on the merits, but reversed and remanded the case for further hearing on the nature of the relief. In an opinion by Douglas, J., expressing the

view of six members of the Court, it was held that (1) the District Court had properly defined the relevant market and found the defendants guilty of monopolization, (2) extensive changes in the decree were necessary, and (3) the defendants' contention that the trial judge was biased and should have been disqualified was without merit.

Harlan, J., and Fortas, J., who was joined by Stewart, J., each dissenting in a separate opinion, disagreed with the majority's conclusion as to the definition of the relevant market.

**Headnotes**

RESTRAINTS OF TRADE, MONOPOLIES, AND UNFAIR TRADE PRACTICES §14 > monopolization -- elements --

***LEdHN[1]*** [1]

The offense of monopoly under 2 of the Sherman Act ( *15 USC 2*), which makes it an offense to monopolize any part of the trade or commerce among the several states, has two elements: (1) the possession of monopoly power in the relevant market, and (2) the wilful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident.

RESTRAINTS OF TRADE, MONOPOLIES, AND UNFAIR TRADE PRACTICES §8 > RESTRAINTS OF TRADE, MONOPOLIES, AND UNFAIR TRADE PRACTICES §14 > monopoly power --

***LEdHN[2]*** [2]

Monopoly power is the power to control prices or exclude competition, and the existence of such power ordinarily may be inferred from the predominant share of the market.

RESTRAINTS OF TRADE, MONOPOLIES, AND UNFAIR TRADE PRACTICES §42 > burglary of fire protection service -- monopolization --

***LEdHN[3]*** [3]

A parent company and its affiliated companies which control 87 percent of the nation's accredited central station protection service business, involving protection from such hazards as burglary or fire, have monopoly power, if such business is the relevant market.

RESTRAINTS OF TRADE, MONOPOLIES, AND UNFAIR TRADE PRACTICES §19 > relevant market -- part of trade or commerce --

***LEdHN[4]*** [4]

A product may be of such a character that substitute products must also be considered in determining the relevant market in a monopolization case; commodities reasonably interchangeable make up that "part" of trade or commerce which 2 of the Sherman Act ( *15 USC 2*), making it an offense to monopolize any "part" of the trade or commerce among the several states, protects against monopoly power.

RESTRAINTS OF TRADE, MONOPOLIES, AND UNFAIR TRADE PRACTICES §19 > relevant market -- burglary or fire protection service --

***LEdHN[5]*** [5]

In determining whether a parent company and its affiliated companies which control more than 87 percent of the nation's accredited central station protection service business have monopolized the relevant market, in violation of 2 of the Sherman Act ( *15 USC 2*), it is proper to treat the national market for accredited central station protection service as the relevant market, although (1) different central station services, such as burglar alarm service and fire alarm service, are not interchangeable, (2) unaccredited central station services, as well as services and alarm devices other than central station services, are available as possible substitutes for accredited central station services, and (3) the activities of individual central stations are in a sense local rather than national.

RESTRAINTS OF TRADE, MONOPOLIES, AND UNFAIR TRADE PRACTICES §19 > relevant market -- burglary or fire protection service --

***LEdHN[6]*** [6]

For purposes of defining the relevant market in a monopolization case, the accredited service of protecting property through a central station that receives electrical signals notifying it of burglary or fire is a single, unique service that must be compared with all other forms of property protection.

RESTRAINTS OF TRADE, MONOPOLIES, AND UNFAIR TRADE PRACTICES §19 > relevant market -- combination of different products or services --

***LEdHN[7]*** [7]

With respect to the determination of the relevant market in a monopolization case, a number of different products or services may properly be combined in a single market where such combination reflects commercial realities.

RESTRAINTS OF TRADE, MONOPOLIES, AND UNFAIR TRADE PRACTIES §42 > monopolization -- burglary or fire protection service --

***LEdHN[8]*** [8]

Domination or control of the relevant market consisting of the nation's accredited central station protection service business, involving protection from such hazards as burglary or fire, constitutes a monopoly of a "part" of trade or commerce within the meaning of 2 of the Sherman Act ( *15 USC 2*), making it an offense to monopolize any "part" of the trade or commerce among the several states.

RESTRAINTS OF TRADE, MONOPOLIES, AND UNFAIR TRADE PRACTICES §19 > relevant market -- burglary or fire protection service --

***LEdHN[9]*** [9]

For purposes of defining the relevant market with respect to monopolization of central station protective services, involving protection from such hazards as burglary or fire, the different forms of such protective services constitute a cluster of services, may properly be lumped together, and need not be broken down into submarkets consisting of individual kinds of services.

RESTRAINTS OF TRADE, MONOPOLIES, AND UNFAIR TRADE PRACTICES §19 > relevant market -- exclusion of substitutes --

***LEdHN[10]*** [10]

Although there are substitutes for accredited central station protection services, protecting against such hazards as burglary or fire, none of these substitutes appears to operate on the same level as the central station services so as to be reasonably interchangeable and includible in the same relevant market as such services in a monopolization case, where the substitutes, consisting of other services and devices, differ from the central station services in utility, efficiency, reliability, responsiveness, and continuity, and insurance underwriters generally allow a greater reduction in the premiums for accredited central station service than for other types of protection.

RESTRAINTS OF TRADE, MONOPOLIES, AND UNFAIR TRADE PRACTICES §19 > relevant market -- accredited protection services --

***LEdHN[11]*** [11]

Nonaccredited central station protection services, protecting against such hazards as burglary or fire, may properly be excluded from the relevant market used in determining whether the domination of accredited central station protection services constitutes unlawful monopolization, where the accredited services must meet numerous requirements of insurance underwriters in order to be accredited and are considered superior to non- accredited services both by insurance carriers and by customers.

RESTRAINTS OF TRADE, MONOPOLIES, AND UNFAIR TRADE PRACTICES §19 > relevant market as local or national --

***LEdHN[12]*** [12]

Although the activities of the individual stations of accredited central station protective services, protecting against such hazards as burglary or fire, are, in a sense, local, where each station serves only that area which is within a radius of 25 miles, the existence of national planning, nationwide contracts, and other interstate activities, warrants the treatment of the national market, rather than local markets, as the relevant market in a monopolization case.

RESTRAINTS OF TRADE, MONOPOLIES, AND UNFAIR TRADE PRACTICES §42 > protection services -- monopolization of national market -- liability of local affiliate --

***LEdHN[13]*** [13]

The fact that one of the affiliated companies in a monopolization case is more nearly local than the other affiliated companies does not save it from being subject to liability for monopolization of a relevant market consisting of the national market for accredited central station protection services, protecting against such hazards as burglary or fire, where the company is part and parcel of the combine presided over and controlled by the affiliates' parent company.

RESTRAINTS OF TRADE, MONOPOLIES, AND UNFAIR TRADE PRACTICES §19 > monopoly -- percentage of market --

***LEdHN[14]*** [14]

Companies controlling more than 87 percent of the relevant market control a percentage so high as to justify a finding of monopoly.

RESTRAINTS OF TRADE, MONOPOLIES, AND UNFAIR TRADE PRACTICES §15 > acquiring monopoly power -- unlawful means --

***LEdHN[15A]*** [15A]***LEdHN[15B]*** [15B]

Monopoly power to exclude competitors and fix prices may properly be considered to have been consciously acquired by a parent company and its affiliated companies, through unlawful and exclusionary practices, so as to render consideration of the companies' skill, acumen, and the like unnecessary, where there have been restrictive agreements pre-empting for each company a segment of the market in which it was free of competition of the others, there have been pricing practices that contained competitors, and the parent company has purchased the affiliated companies in order to eliminate any possibility of competition from them.

RESTRAINTS OF TRADE, MONOPOLIES, AND UNFAIR TRADE PRACTICES §75 > monopolization case -- scope of relief --

***LEdHN[16]*** [16]

For the relief granted in favor of the government in a monopolization case to be adequate, the decree should put an end to the combination and deprive the defendants of any of the benefits of the illegal conduct, and break up or render impotent the monopoly power found to be in violation of the antitrust laws.

RESTRAINTS OF TRADE, MONOPOLIES, AND UNFAIR TRADE PRACTICES §78 > divestiture --

***LEdHN[17]*** [17]

Dissolution of a monopolistic combination merely through the divestiture by a parent company of its interest in its affiliated companies is insufficient where one of the affiliated companies controls 73 percent of the market; there should be some divestiture of this affiliated company.

APPEAL §1693 > remand for further hearing --

***LEdHN[18]*** [18]

An antitrust case will be remanded to the trial court for further hearing and for determination of the details of divestiture of a corporation, where no divestiture of the corporation has been ordered by the trial court, but where such divestiture is held necessary on appeal and the details of divestiture cannot be resolved by the reviewing court on the record.

RESTRAINTS OF TRADE, MONOPOLIES, AND UNFAIR TRADE PRACTICES §42 > RESTRAINTS OF TRADE, MONOPOLIES, AND UNFAIR TRADE PRACTICES §75 > burglary and fire protection service -- relief against monopolistic practices --

***LEdHN[19]*** [19]

The requirement by a burglary and fire protection service company that its customers sign 5-year contracts and the company's retention of title to protective services equipment installed on its customers' premises constitute substantial barriers to competition, and relief is appropriate, consisting of suitable provisions to deprive these practices of the coercive power they have had toward restraining competition and creating a monopoly.

APPEAL §1693 > remand for further hearing --

***LEdHN[20A]*** [20A]***LEdHN[20B]*** [20B]

An antitrust case will be remanded to the trial court for further hearing and for determination of suitable provisions to be decreed as relief against a monopolistic burglary and fire protection service company's requirement that its customers sign 5-year contracts and its retention of title to equipment installed on its customers' premises, and the trial court will be instructed to explore the questions whether the company's customers may wish to have long-term contracts and whether there will be a loss of insurance accreditation if the company does not retain title to the equipment it instals, where no provisions to deal with such practices by the company were included in the trial court's decree, but where such provisions are held necessary on appeal and the details of such provisions cannot be resolved by the reviewing court on the record.

RESTRAINTS OF TRADE, MONOPOLIES, AND UNFAIR TRADE PRACTICES §74 > relief -- relevant factors --

***LEdHN[21A]*** [21A]***LEdHN[21B]*** [21B]

A relevant factor, which the trial judge may properly take into account upon remand of a monopolization case for changes in the form of relief, is the pretrial concession by the defendants that a decree in favor of the government be permitted to include a provision requiring the defendants to sell to their competitors, on nondiscriminatory terms, any devices manufactured by the defendants for use in furnishing central station protection services, protecting against such hazards as burglary or fire.

APPEAL §1688 > directions on remand --

***LEdHN[22]*** [22]

In an antitrust case remanded for changes in the scope of the relief granted, the trial court, which gave no explanation for its refusal to include in the decree a provision granting the government visitation rights--consisting of requiring reports, examining documents, and interviewing company personnel--for the purpose of determining whether the defendants have complied with the decree, will be instructed to reconsider such a provision.

RESTRAINTS OF TRADE, MONOPOLIES, AND UNFAIR TRADE PRACTICES §75 > extent of relief -- employment restriction --

***LEdHN[23]*** [23]

Although a decree barring a person from employment by any of the defendants in an antitrust case may be appropriate where the predatory conduct in which he has participated is conspicuous, such relief is improper where no showing of such conduct has been made.

APPEAL §1688 > RESTRAINTS OF TRADE, MONOPOLIES, AND UNFAIR TRADE PRACTICES §75 > antitrust violations -- specific relief -- directions on remand --

***LEdHN[24]*** [24]

Broad and generalized terms in a restraining order in an antitrust case are improper, the precise practices found to have violated the antitrust laws should be specifically enjoined, and a trial court which has failed to take the latter course will be instructed upon remand to do so.

RESTRAINTS OF TRADE, MONOPOLIES, AND UNFAIR TRADE PRACTICES §78 > RESTRAINTS OF TRADE, MONOPOLIES, AND UNFAIR TRADE PRACTICES §79 > divestiture -- dissolution of combination --

***LEdHN[25]*** [25]

A provision requiring a parent company to divest itself of its holdings in its affiliated companies is wholly justified where the companies have monopolized the market and control more than 87 percent of it; dissolution of the combination is essential.

RESTRAINTS OF TRADE, MONOPOLIES, AND UNFAIR TRADE PRACTICES §75 > injunction -- acquisition of competitors --

***LEdHN[26]*** [26]

An injunction restraining the defendants in a monopolization case from acquiring interests in other firms in the same business is fully warranted where acquisition was one of the methods by which the defendants acquired their market power and was the method by which the parent company put the monopolistic combination together.

APPEAL §1681 > leaving question open on reversal --

***LEdHN[27]*** [27]

The propriety of a provision in a trial court decree requiring that the defendants in an antitrust case report to the Department of Justice any deviation which they make from their list prices will be left open on appeal, to rest finally in the discretion of the trial court upon remand, where the case is being reversed and remanded because of the necessity of extensive changes in other provisions in the decree, which changes might result in the trial court's deeming it unnecessary to include the provision in question.

JUDGES §10 > disqualification -- bias --

***LEdHN[28]*** [28]

Although the trial judge in an antitrust case informed the defendants in pretrial proceedings that his views on a certain matter were more extreme than those of the government, the contention that he was biased and should have been disqualified is without merit, especially where, in granting relief, he was too lenient with the defendants in several critical respects.

JUDGES §10 > disqualification -- bias --

***LEdHN[29]*** [29]

To be disqualifying, the alleged bias and prejudice of a judge must stem from an extrajudicial source and result in an opinion on the merits on some basis other than what the judge learned from his participation in the case.

**Syllabus**

The Government brought a civil action against Grinnell Corporation and three affiliated companies, which it controlled through preponderant stock ownership, alleging violations of §§ 1 and 2 of the Sherman Act. Grinnell manufactures plumbing supplies and fire sprinkler systems and its affiliates supply subscribers with fire and burglar alarm services from central stations through automatic alarm systems installed on subscribers' premises. The affiliates, which had participated in market allocation agreements, discriminatory price manipulation to forestall competition, and the

acquisition of competitors, had acquired 87% of the country's insurance-company-accredited central station protective service market. One affiliated company, American District Telegraph Co. (ADT), itself controls 73% of the national market. The District Court treated the accredited central station service business as a single "market" and held that the geographic market is national. It found that the four companies had violated §§ 1 and 2 of the Sherman Act and entered a decree enjoining them from restraining trade or monopolizing the market, ordering the filing of price information, enjoining them from acquiring any other enterprise in that market, requiring divestiture by Grinnell of its affiliates, and enjoining them from employing the president of Grinnell. All parties challenged the decree. *Held*:

1. The existence of monopoly power may be inferred from the predominant share of the market, and where Grinnell and its affiliates have 87% of the accredited central station service business there is no doubt they have monopoly power, which they achieved in part by unlawful and exclusionary practices. Pp. 570-571, 576.

2. The District Court was justified in treating the accredited central station service business as a single market. Pp. 571-575.

(a) There is no barrier to combining in a single market a number of different products or services where the combination reflects commercial realities. Here there is a single basic service, the protection of property through use of a central station, that must be compared with all other forms of property protection. P. 572.

(b) Just as under § 7 of the Clayton Act's "line of commerce," a "cluster of services" marks the appropriate market for "part" of commerce within the meaning of *§ 2* of the Sherman Act. Pp. 572-573.

(c) Accredited, as distinguished from nonaccredited central station service, is a relevant part of commerce, with specific requirements, recognition and approval by insurance companies, and distinct customer needs and demands. P. 575.

3. The geographic market for the accredited central station service, as the District Court found, is a national one. While the main activities of an individual central station may be local, the business of providing such service is operated on a national level, with national planning and agreements covering activities in many States. Pp. 575-576.

4. Adequate relief in a monopolization case should terminate the combination and eliminate the illegal conduct, and render impotent the monopoly power found to be in violation of the Act. *Schine Theatres v. United States, 334 U.S. 110, 128-129*. Pp. 577-580.

(a) The mere dissolution of the combination by Grinnell's divestiture of its affiliates will not reach the root of the evil; there must be some divestiture on the part of ADT, with 73% of the market, to be determined by the District Court. Pp. 577-578.

(b) On the record it appears that ADT's requirements of five-year contracts and retention of title to equipment installed on subscribers' premises constitute substantial barriers to competition and relief against them by the District Court is appropriate. P. 578.

(c) A provision that the companies be required to sell devices manufactured by them for use in furnishing central station service is inadequate unless purchasers are assured of replacement parts to maintain those systems. P. 579.

(d) The District Court should reconsider its denial of the Government's request for "visitation rights," that is, requiring reports, examining documents and interviewing company personnel, relief commonly granted to determine compliance with an antitrust decree. P. 579.

(e) While the barring of Grinnell's president from employment might have been appropriate in a case where predatory conduct was conspicuous, such is not the situation here. P. 579.

(f) On remand the general terms of the restraining order should be recast so that the precise practices in violation of the Act are specifically enjoined. Pp. 579-580.

(g) The dissolution of the combination and the proscription against acquiring firms in the accredited central station business are fully warranted. P. 580.

5. The claim of bias and prejudice against the District Judge who tried the case below is not made out. Pp. 580-583.

**Counsel:** Daniel M. Friedman argued the cause for the United States in all cases. With him on the brief were Solicitor General Marshall, Assistant Attorney General Turner, Robert B. Hummel, Gerald Kadish and Noel E. Story.

John F. Sonnett argued the cause for appellant in No. 74 and for appellees in No. 73. With him on the briefs for Grinnell Corp. were Denis G. McInerney, Roger T. Clapp, Harold F. Reindel, Jerrold G. Van Cise and Robert F. Martin.

Macdonald Flinn argued the cause for appellant in No. 75 and for appellees in No. 73. With him on the briefs for American District Telegraph Co. were Robert O. Donnelly and Thomas B. Leary.

John W. Drye, Jr., argued the cause for appellant in No. 76 and for appellees in No. 73. With him on the briefs for Holmes Electric Protective Co. were Francis S. Bensel and Bud G. Holman.

J. Francis Hayden argued the cause for appellant in No. 77 and for appellees in No. 73. Mr. Hayden also filed a brief for Automatic Fire Alarm Co. of Delaware.

**Judges:** Warren, Black, Douglas, Clark, Harlan, Brennan, Stewart, White, Fortas

**Opinion by:** DOUGLAS

**Opinion**

**[*566] [***783] [**1701]** MR. JUSTICE DOUGLAS delivered the opinion of the Court.

This case presents an important question under *§ 2* of the Sherman Act, [1] which makes it an offense for any person to "monopolize . . . any part of the trade or commerce among the several States." This is a civil suit brought by the United States against Grinnell Corporation (Grinnell), American District Telegraph Co. (ADT), Holmes Electric Protective Co. (Holmes) and Automatic Fire Alarm Co. of Delaware (AFA). The District Court held for the Government and entered a

---

[1] 26 Stat. 209, as amended, *15 U. S. C. § 2 (1964 ed.)*.

decree. All parties appeal, [2] the United States because it deems the relief inadequate and the defendants both on the merits and on the relief **[***784]** and on the ground that the District Court denied them a fair trial. We noted probable jurisdiction. *381 U.S. 910*.

Grinnell manufactures plumbing supplies and fire sprinkler systems. It also owns 76% of the stock of ADT, 89% of the stock of AFA, and 100% of the stock of Holmes. [3] ADT provides both burglary and fire protection services; Holmes **[**1702]** provides burglary services alone; AFA supplies only fire protection service. Each offers a central station service under which hazard-detecting devices installed on the protected premises automatically **[*567]** transmit an electric signal to a central station. [4] The central station is manned 24 hours a day. Upon receipt of a signal, the central station, where appropriate, dispatches guards to the protected premises and notifies the police or fire department direct. There are other forms of protective services. But the record shows that subscribers to accredited central station service (*i. e.*, that approved by the insurance underwriters) receive reductions in their insurance premiums that are substantially greater than the reduction received by the users of other kinds of protection service. In 1961 accredited companies in the central station service business grossed $ 65,000,000. ADT, Holmes, and AFA are the three largest companies in the business in terms of revenue: ADT (with 121 central stations in 115 cities) has 73% of the business; Holmes (with 12 central stations in three large cities) has 12.5%; AFA (with three central stations in three large cities) has 2%. Thus the three companies that Grinnell controls have over 87% of the business.

Over the years ADT purchased the stock or assets of 27 companies engaged in the business of providing burglar or fire alarm services. Holmes acquired the stock or assets of three burglar alarm companies in New York City using a central station. Of these 30, the officials **[*568]** of seven agreed not to engage in the protective service business in the area for periods ranging from five years to permanently. After Grinnell acquired control of the other defendants, the latter continued in their attempts to acquire central station companies -- offers being made to at least eight companies between the years 1955 and 1961, including four of the five largest nondefendant companies in the business. When the present suit was filed, each of those defendants had outstanding an offer to purchase one of the four largest nondefendant companies.

In 1906, prior to the affiliation of ADT and Holmes, they made a written agreement whereby ADT transferred to Holmes its burglar alarm business in a major part of the Middle Atlantic States and agreed to refrain forever from engaging in that business in that area, while **[***785]** Holmes transferred to ADT its watch signal business and agreed to limit its activities to burglar alarm service and night watch service for financial institutions. While this agreement was modified

---

[2] Expediting Act *§ 2*, 32 Stat. 823, as amended, 15 U. S. C. § 29 (1964 ed.); *United States* v. *Loew's, Inc.*, 371 U.S. 38.

[3] These are the record figures. Since the time of the trial, Grinnell's holdings have increased. Counsel for Grinnell has advised this Court that Grinnell now holds 80% of ADT's stock and 90% of the stock of AFA.

[4] Among the various central station services offered are the following:

(1) *automatic burglar alarms*;

(2) *automatic fire alarms*;

(3) *sprinkler supervisory service* (any malfunctions in the fire sprinkler system -- *e. g.*, changes in water pressure, dangerously low water temperatures, etc. -- are reported to the central station); and

(4) *watch signal service* (night watchmen, by operating a key-triggered device on the protected premises, indicate to the central station that they are making their rounds and that all is well; the failure of a watchman to make his electrical report alerts the central station that something may be amiss).

several times and terminated in 1947, in 1961 Holmes still restricted its business to burglar alarm service and operated only in those areas which had been allocated to it under the 1906 agreement. Similarly, ADT continued to refrain from supplying burglar alarm service in those areas earlier allocated to Holmes.

In 1907 Grinnell entered into a series of agreements with the other defendant companies and with Automatic Fire Protection Co. to the following effect:

AFA received the exclusive right to provide central station sprinkler supervisory and waterflow alarm and automatic fire alarm service in New York City, Boston and Philadelphia, and agreed not to provide burglar alarm service **[**1703]** in those cities or central station service elsewhere in the United States.

**[*569]** Automatic Fire Protection Co. obtained the exclusive right to provide central station sprinkler supervisory and waterflow alarm service everywhere else in the United States except for the three cities in which AFA received that exclusive right, and agreed not to engage in burglar alarm service.

ADT received the exclusive right to render burglar alarm and nightwatch service throughout the United States. (Under ADT's 1906 agreement with Holmes, however, it could not provide burglar alarm services in the areas for which it had given Holmes the exclusive right to do so.) It agreed not to furnish sprinkler supervisory and waterflow alarm service anywhere in the country and not to furnish automatic fire alarm service in New York City, Boston or Philadelphia (the three cities allocated to AFA). ADT agreed to connect to its central stations the systems installed by AFA and Automatic.

Grinnell agreed to furnish and install all sprinkler supervisory and waterflow alarm actuating devices used in systems that AFA and Automatic would install, and otherwise not to engage in the central station protection business.

AFA and Automatic received 25% of the revenue produced by the sprinkler supervisory waterflow alarm service which they provided in their respective territories; ADT and Grinnell received 50% and 25%, respectively, of the revenue which resulted from such service. The agreements were to continue until February 1954.

The agreements remained substantially unchanged until 1949 when ADT purchased all of Automatic Fire Protection Co.'s rights under it for $ 13,500,000. After these 1907 agreements expired in 1954, AFA continued to honor the prior division of territories; and ADT and AFA entered into a new contract providing for the continued sharing of revenues on substantially the same **[*570]** basis as before. [5] In 1954 **[***786]** Grinnell and ADT renewed an agreement with a Rhode Island company which received the exclusive right to render central station service within Rhode Island at prices no lower than those of ADT and which agreed to use certain equipment supplied by Grinnell and ADT and to share its revenues with those companies. ADT had an informal

[5] In 1959, ADT complained that AFA's share of the revenues was excessive. AFA replied, in a letter to the president of Grinnell (which by that time controlled both ADT and AFA), that its share was just compensation for its continued observance of the service and territorial restrictions: "*The geographic restrictions placed upon us plus the requirement that we confine our activities to sprinkler and fire alarm services exclusively*, since 1907 and presumably into the future, has definitely retarded our expansion in the past to the benefit of ADT growth. . . . [AFA's] contribution must also include the many things that helped make ADT big." (Emphasis added.)

agreement with a competing central station company in Washington, D. C., "that we would not solicit each other's accounts."

ADT over the years reduced its minimum basic rates to meet competition and renewed contracts at substantially increased rates in cities where it had a monopoly of accredited central station service. ADT threatened retaliation against firms that contemplated inaugurating central station service. And the record indicates that, in contemplating opening a new central station, ADT officials frequently stressed that such action would deter their competitors from opening a new station in that area.

The District Court found that the defendant companies had committed *per se* violations of § 1 of the Sherman Act as well as § 2 and entered a decree. 236 F.Supp. 244.

**[**1704]** I.

***LEdHN[1]*** [1]***LEdHN[2]*** [2]***LEdHN[3]*** [3]***HN1*** The offense of monopoly under § 2 of the Sherman Act has two elements: (1) the possession of monopoly power in the relevant market and (2) the willful acquisition **[*571]** or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident. We shall see that this second ingredient presents no major problem here, as what was done in building the empire was done plainly and explicitly for a single purpose. In *United States* v. *du* Pont & Co., 351 U.S. 377, 391, we defined ***HN2*** monopoly power as "the power to control prices or exclude competition." The existence of such power ordinarily may be inferred from the predominant share of the market. In *American Tobacco Co.* v. United States, 328 U.S. 781, 797, we said that "over two-thirds of the entire domestic field of cigarettes, and . . . over 80% of the field of comparable cigarettes" constituted "a substantial monopoly." In United States v. Aluminum Co. of America, 148 F.2d 416, 429, 90% of the market constituted monopoly power. In the present case, 87% of the accredited central station service business leaves no doubt that the congeries of these defendants have monopoly power -- power which, as our discussion of the record indicates, they did not hesitate to wield -- if that business is the relevant market. The only remaining question therefore is, what is the relevant market?

***LEdHN[4]*** [4]In case of a product it may be of such a character that substitute products must also be considered, as customers may turn to them if there is a slight increase in the price of the main product. That is the teaching of the *du Pont* case (supra, at 395, 404), *viz*., that ***HN3*** commodities reasonably interchangeable make up that "part" of trade or commerce **[***787]** which § 2 protects against monopoly power.

***LEdHN[5]*** [5]The District Court treated the entire accredited central station service business as a single market and we think it was justified in so doing. Defendants argue that the different central station services offered are so diverse that they cannot under *du Pont* be lumped together to **[*572]** make up the relevant market. For example, burglar alarm services are not interchangeable with fire alarm services. They further urge that *du Pont* requires that protective services other than those of the central station variety be included in the market definition.

***LEdHN[6]*** [6] ***LEdHN[7]*** [7]But there is here a single use, *i. e.*, the protection of property, through a central station that receives signals. It is that service, accredited, that is unique and that competes with all the other forms of property protection. ***HN4*** We see no barrier to combining in a single market a number of different products or services where that combination reflects

commercial realities. To repeat, there is here a single basic service -- the protection of property through use of a central service station -- that must be compared with all other forms of property protection.

***LEdHN[8]*** [8]***LEdHN[9]*** [9] In § 2 cases under the Sherman Act, as in § 7 cases under the Clayton Act (*Brown Shoe Co*. v. *United States, 370 U.S. 294, 325)* there may be submarkets that are separate economic entities. We do not pursue that question here. First, we deal with services, not with products; and second, we conclude that the accredited central station is a type of service that makes up a relevant market and that domination or control of it makes out a monopoly of a "part" of trade or commerce within the meaning of § 2 of the Sherman Act. The defendants have not made out a case for fragmentizing the types of services into lesser units.

**[**1705]** Burglar alarm service is in a sense different from fire alarm service; from waterflow alarms; and so on. But it would be unrealistic on this record to break down the market into the various kinds of central station protective services that are available. Central station companies recognize that to compete effectively, they must offer all or nearly all types of service. [6] The different **[*573]** forms of accredited central station service are provided from a single office and customers utilize different services in combination. We held in *United States v. Philadelphia Nat. Bank, 374 U.S. 321, 356*, that "the cluster" of services denoted by the term "commercial banking" is "a distinct line of commerce." There is, in our view, a comparable cluster of services here. That bank case arose under § 7 of the Clayton Act where the question was whether the effect of a merger **[***788]** "in any line of commerce" may be "substantially to lessen competition." ***HN5*** We see no reason to differentiate between "line" of commerce in the context of the Clayton Act and "part" of commerce for purposes of the Sherman Act. See *United States v. First Nat. Bank & Trust Co., 376 U.S. 665, 667-668*. In the § 7 national bank case just mentioned, *services*, not *products* in the mercantile sense, were involved. In our view the lumping together of various kinds of *services* makes for the appropriate market here as it did in the § 7 case.

***LEdHN[10]*** [10]There are, to be sure, substitutes for the accredited central station service. But none of them appears to operate on the same level as the central station service so as to meet the interchangeability test of the *du Pont* case. Nonautomatic and automatic local alarm systems appear on this record to have marked differences, not the low degree of differentiation required of substitute services as well as substitute articles.

**[*574]** Watchman service is far more costly and less reliable. Systems that set off an audible alarm at the site of a fire or burglary are cheaper but often less reliable. They may be inoperable without anyone's knowing it. Moreover, there is a risk that the local ringing of an alarm will not attract the needed attention and help. Proprietary systems that a customer purchases and operates are available; but they can be used only by a very large business or by government and are not realistic alternatives for most concerns. There are also protective services connected directly to a municipal police or fire department. But most cities with an accredited central station do not permit direct, connected service for private businesses. These alternate services and devices differ,

---

[6] Thus, of the 38 nondefendant firms operating a central service station protective service in the United States in 1961, 24 offered all of the following services: automatic fire alarm; waterflow alarm and sprinkler supervision; watchman's reporting and manual fire alarm; and burglar alarm. Of the other firms, 11 provided no watchman's reporting and manual fire alarm service; six provided no automatic fire alarm service; and two offered no sprinkler supervisory and waterflow alarm service. Moreover, of the 14 firms not providing the full panoply of services, 10 lacked only *one* of the above-described services. Appellant ADT's assertion that "very few accredited central stations furnish the full variety of services" is flatly contradicted by the record.

we are told, in utility, efficiency, reliability, responsiveness, and continuity, and the record sustains that position. And, as noted, insurance companies generally allow a greater reduction in premiums for accredited central station service than for other types of protection.

Defendants earnestly urge that despite these differences, they face competition from these other modes of protection. They seem to us seriously to overstate the degree of competition, but we recognize that (as the District Court found) they "do not have unfettered power to **[**1706]** control the price of their services . . . due to the fringe competition of other alarm or watchmen services." *236 F.Supp., at 254*. What defendants overlook is that the high degree of differentiation between central station protection and the other forms means that for many customers, only central station protection will do. Though some customers may be willing to accept higher insurance rates in favor of cheaper forms of protection, others will not be willing or able to risk serious interruption to their businesses, even though covered by insurance, and will thus be unwilling to consider anything but central station protection.

**[*575]** ***LEdHN[11]*** [11]The accredited, as distinguished from nonaccredited service, is a relevant part of commerce. Virtually the only central station companies in the status of the nonaccredited are those that have not yet been able to meet the standards of the rating bureau. The accredited ones are indeed those that have achieved, in the eyes of underwriters, superiorities that other central stations do not have. The accredited central station is located in a **[***789]** building of approved design, provided with an emergency lighting system and two alternate main power sources, manned constantly by at least a required minimum of operators, provided with a direct line to fire headquarters and, where possible, a direct line to a police station; and equipped with all the devices, circuits and equipment meeting the requirements of the underwriters. These standards are important as insurance carriers often require accredited central station service as a condition to writing insurance. There is indeed evidence that customers consider the unaccredited service as inferior.

***LEdHN[12]*** [12] ***LEdHN[13]*** [13]We also agree with the District Court that the geographic market for the accredited central station service is national. The activities of an individual station are in a sense local as it serves, ordinarily, only that area which is within a radius of 25 miles. But the record amply supports the conclusion that the business of providing such a service is operated on a national level. There is national planning. The agreements we have discussed covered activities in many States. The inspection, certification and rate-making is largely by national insurers. The appellant ADT has a national schedule of prices, rates, and terms, though the rates may be varied to meet local conditions. It deals with multistate businesses on the basis of nationwide contracts. The manufacturing business of ADT is interstate. The fact that Holmes is more nearly local than the others does not **[*576]** save it, for it is part and parcel of the combine presided over and controlled by Grinnell.

As the District Court found, the relevant market for determining whether the defendants have monopoly power is not the several local areas which the individual stations serve, but the broader national market that reflects the reality of the way in which they built and conduct their business.

***LEdHN[14]*** [14] ***LEdHN[15A]*** [15A]We have said enough about the great hold that the defendants have on this market. The percentage is so high as to justify the finding of monopoly. And, as the facts already related indicate, this monopoly was achieved in large part by unlawful and exclusionary practices. The restrictive agreements that pre-empted for each company a segment

of the market where it was free of competition of the others were one device. Pricing practices that contained competitors were another. The acquisitions by Grinnell of ADT, AFA, and Holmes were still another. Grinnell long faced a problem of competing with ADT. That was one reason it acquired AFA and Holmes. Prior to settlement of its dispute and controversy with ADT, Grinnell prepared to go into the central station service business. By acquiring ADT in 1953, Grinnell eliminated that alternative. Its control of the three other defendants eliminated any possibility of an outbreak of competition that might have occurred **[**1707]** when the 1907 agreements terminated. By those acquisitions it perfected the monopoly power to exclude competitors and fix prices. [7]

***LEdHN[15B]*** [15B]

**[*577]** II.

The final decree enjoins the defendants **[***790]** in general terms from restraining trade or attempting or conspiring to restrain trade in this particular market, from further monopolizing, and attempting or conspiring to monopolize. The court ordered the alarm companies to file with the Department of Justice standard lists of prices and terms and every quotation to customers that deviated from those lists and enjoined the defendants from acquiring stock, assets, or business of any enterprise in the market. Grinnell was ordered to file, not later than April 1, 1966, a plan of divestiture of its stock in each of the other defendant companies. It was given the option either to sell the stock or distribute it to its stockholders or combine or vary those methods. [8] The court further enjoined any of the defendants from employing in any capacity the President and Chairman of the Board of Grinnell, James D. Fleming. Both the Government and the defendants challenge aspects of the decree.

***LEdHN[16]*** [16]We start from the premise that ***HN6*** adequate relief in a monopolization case should put an end to the combination and deprive the defendants of any of the benefits of the illegal conduct, and break up or render impotent the monopoly power found to be in violation of the Act. That is the teaching of our cases, notably *Schine Theatres v. United States, 334 U.S. 110, 128-129*.

***LEdHN[17]*** [17]***LEdHN[18]*** [18]We largely agree with the Government's views on the relief aspect of the case. We start with ADT, which presently does 73% of the business done by accredited central stations throughout the country. It is indeed the keystone of the defendants' monopoly power. The mere **[*578]** dissolution of the combination through the divestiture by Grinnell of its interests in the other companies does not reach the root of the evil. In 92 of the 115 cities in which ADT operates there are no other accredited central stations. Perhaps some cities could not support more than one. Defendants recognized prior to trial that at least 13 cities can; the Government urged divestiture in 48 cities. That there should be some divestiture on the part of ADT seems clear; but the details of such divestiture must be determined by the District Court as the matter cannot be resolved on this record.

---

[7] Since the record clearly shows that this monopoly power was consciously acquired, we have no reason to reach the further position of the District Court that once monopoly power is shown to exist, the burden is on the defendants to show that their dominance is due to skill, acumen, and the like.

[8] Although the Government originally urged that the decree was inadequate as to divestiture in that it permitted Grinnell to distribute the stock of the other companies to Grinnell's shareholders, it has abandoned that point in this Court.

***LEdHN[19]*** [19] ***LEdHN[20A]*** [20A]Two of the means by which ADT acquired and maintained its large share of the market are the requirement that subscribers sign five-year contracts and the retention by ADT of title to the protective services equipment installed on a subscriber's premises. On this record it appears that these practices constitute substantial barriers to competition and that relief against them is appropriate. The *pros* and *cons* are argued with considerable vehemence here. [9] **[**1708]** Again, we cannot **[***791]** resolve them on this record. The various aspects of this controversy must be explored by the District Court and suitable protective provisions included in the decree that deprive these two devices of the coercive power that they apparently have had towards restraining competition and creating a monopoly.

***LEdHN[20B]*** [20B]

**[*579]** **[***HR21A]** ***LEdHN[21A]*** [21A]The Government proposed that the defendants be required to sell, on nondiscriminatory terms, any devices manufactured by them for use in furnishing central station service. It seems clear that if the competitors are to be able to compete effectively for the existing customers of the defendants when the present service contracts expire, they must be assured of replacement parts to maintain those systems. [10]

***LEdHN[21B]*** [21B]

***LEdHN[22]*** [22] The Government urges visitation rights, that is, requiring reports, examining documents, and interviewing company personnel, a relief commonly granted for the purpose of determining whether a defendant has complied with an antitrust decree. See *United States v. United States Gypsum Co., 340 U.S. 76, 95*. The District Court gave no explanation for its refusal to grant this relief. [11] It is so important and customary a provision that the District Court should reconsider it.

***LEdHN[23]*** [23]Defendants urge and the Government concedes that the barring of Mr. Fleming from the employment of any of the defendants is unduly harsh and quite unnecessary on this record. While relief of that kind may be appropriate where the predatory conduct is conspicuous, we cannot see that any such case was made out on this record.

***LEdHN[24]*** [24] The Government objects, as do the defendants, to the broad and generalized terms of the restraining order. They properly point out, as we emphasized in *Schine Theatres v. United States, supra, at 125-126*, that the precise practices found to have violated the Act should **[*580]** be specifically enjoined. On remand we suggest that that course be taken.

***LEdHN[25]*** [25]***LEdHN[26]*** [26]***LEdHN[27]*** [27]The defendants object to the requirements that Grinnell divest itself of its holdings in the three alarm company defendants, but we think that provision is wholly justified. Dissolution of the combination is essential as indicated by many of

---

[9] Specifically, the areas of disagreement are: (1) Defendants urge that barring them from offering five-year contracts would put them at a competitive disadvantage *vis-a-vis* nondefendant firms; the Government responds that since they violated the law, they may properly be subjected to restrictions not borne by others. See *United States* v. *Bausch & Lomb Co.*, 321 U.S. 707, 723-724. (2) Some customers of defendants may wish to have long-term contracts; the Government responds that this may be explored on remand. (3) There is some dispute as to whether, if the central station company cannot retain title to the equipment it installs, the insurance companies will accredit the system. This, too, is a proper subject for inquiry on remand.

[10] Prior to trial, the defendants agreed that this would be an appropriate provision in a decree were the Government to prevail in all its claims of antitrust violations. Although defendants now maintain that this pretrial discussion was "settlement talk," that earlier concession is a relevant factor that the District Judge can properly take into account on remand.

[11] This provision, too, gained pretrial acceptance. See n. 10, *supra*.

our cases, starting with *Standard Oil Co*. v. *United States, 221 U.S. 1, 78*.The defendants object to that portion of the decree that bars them from acquiring interests in firms in the accredited central station business. But since acquisition was one of the methods by which the defendants acquired their market power and was the method by which Grinnell put the combination together, an injunction against the repetition of the practice seems fully warranted. The defendants further object to the requirement in the decree that the alarm company defendants report to the Department of Justice any deviation they make from their list prices. We make no comment on that because in view of the other **[***792]** extensive changes necessary in the decree, the District Court might well **[**1709]** deem it to be unnecessary in the fashioning of the new decree. In other words, we leave that matter open, to rest finally in the discretion of the District Court.

III.

***LEdHN[28]*** [28]The defendants contend that Judge Wyzanski, who tried the case, was personally biased and prejudiced and should have been disqualified from sitting in the case, and that he denied them a fair trial. We think this point is without merit.

The complaint was filed in April 1961, the answers in July 1961. Shortly thereafter extensive taking of depositions began. The District Court in January 1963 directed that no depositions be taken after September 1, 1963. In response to an inquiry from the court both sides suggested that the trial be set no earlier than January 1964.

**[*581]** At a pretrial conference in December 1963, government counsel told the court that the parties had been trying to reach agreement on a consent decree but were far apart and asked how the court would like to handle the presentation of the evidence in the event a settlement was not reached. Grinnell's lawyer suggested that the next appropriate procedure would be a pretrial on the question of relief -- a suggestion that the District Court construed as an invitation to the court to discuss the relief apart from the merits. The Government objected. The court then asked for a brief from each side setting forth its views on relief if the Government prevailed on the merits. In response to the court's statement that "as I understand it, you want to find out what kind of relief I would be likely to allow if the government's case stood virtually uncontradicted," Grinnell's counsel replied: "That is what I had in mind, your Honor, yes."

Thereupon the court set a day for such a hearing. At the next pretrial conference Grinnell's counsel stated that "if your Honor would indicate the relief that might be appropriate in this case that would help both sides to come to a better understanding."

Then the following colloquy occurred:

"THE COURT. I don't think it would help very much.

"MR. McINERNEY. Well, your Honor, I think it would help both the plaintiff and the defendants to know what is really at stake here in this trial.

"THE COURT. I assure you that you would not be helped by anything I would say. You would do better to get together with the government rather than run the risk of what I would say from what I have seen. Let me just assure you of that. . . ."

The case was then set for trial on June 15, 1964. When Grinnell's counsel sought to argue further, the court stated: "There is no use in discussing it with me. I have **[*582]** read enough

to know that if I have to decide this case on what I have seen from the government you will not be in a position at this stage to agree to it."

On June 3, 1964, defendants argued for a postponement of the trial, saying they needed more time. The court denied the motion. Then they argued that the relief issues to be tried be limited to those raised by the pleadings so as to eliminate what they considered to be extraneous **[***793]** issues raised by the Government. To that the court replied:

"I can't understand frankly why you don't realize that you have forced me to look at the documents in this case, which I dislike doing in advance of trial. You have invited me, therefore, into what I regard as, from your point of view, a rather undesirable situation. I think I made that clear at the beginning. I have told you that, forced by you to look, my views are more extreme than those of the government; and I have also made you realize that if I am required to make Findings and reach Conclusions I am opening up **[**1710]** third-party suits that will make, in view of the size of the industry, the percentage of people involved higher than in the electrical cases."

Shortly thereafter defendants filed a motion [12] for the disqualification of Judge Wyzanski on the grounds of personal bias and prejudice. [13]

**[*583]** ***LEdHN[29]*** [29]***HN8*** The alleged bias and prejudice to be disqualifying must stem from an extrajudicial source and result in an opinion on the merits on some basis other than what the judge learned from his participation in the case. *Berger v. United States, 255 U.S. 22, 31*. Any adverse attitudes that Judge Wyzanski evinced toward the defendants were based on his study of the depositions and briefs which the parties had requested him to make. What he said reflected no more than his view that, if the facts were as the Government alleged, stringent relief was called for.

During the trial he repeatedly stated that he had not made up his mind on the merits. During the trial he ruled certain evidence to be irrelevant to the issues and when the lawyer persisted in offering it Judge Wyzanski said, "Maybe you will persuade somebody else. And if you think so, all right. I just assure you it is a great ceremonial act, as far as I am concerned." We do not read this statement as manifesting a closed mind on the merits of the case but consider it merely a terse way of repeating the previously stated ruling that this particular evidence was irrelevant.

We have examined all the other claims of the defendants made against Judge Wyzanski and find that the claim of bias and prejudice is not made out. Our discussion of the relief which he granted shows indeed that he was, in several critical respects, too lenient with those who now charge him with bias and prejudice.

The judgment below is affirmed except as to the decree. We remand for further hearings on the nature of the relief consistent with the views expressed herein.

---

12 *28 U. S. C. § 144 (1964 ed.)* provides in relevant part:

***HN7*** "Whenever a party to any proceeding in a district court makes and files a timely and sufficient affidavit that the judge before whom the matter is pending has a personal bias or prejudice either against him or in favor of any adverse party, such judge shall proceed no further therein, but another judge shall be assigned to hear such proceeding."

13 Judge Wyzanski referred the question of his disqualification to Chief Judge Woodbury of the Court of Appeals for the First Circuit who after hearing oral argument held that no case of bias and prejudice had been made out under *§ 144*.

*It is so ordered.*

**Dissent by:** HARLAN; FORTAS

**Dissent**

**[***794]** MR. JUSTICE HARLAN, dissenting.

I cannot agree with the Court that the relevant market has been adequately proved. I do not dispute that a **[*584]** national market may be found even though immediate competition takes place only within individual communities, some of which are themselves natural monopolies. For a national monopoly of such local enterprises may still have serious long-term impact on competition and be vulnerable on its own plane to the antitrust laws. In the product market also the Court seems to me to make out a good enough case for lumping together the different kinds of central station protective service (CSPS). But I cannot agree that the facts so far developed warrant restricting the product market to accredited CSPS.

Because the ultimate issue is the effective power to control price and competition, this Court has always recognized that the market must include products or services "reasonably interchangeable" with those of the alleged monopolist. **[**1711]** *United States* v. *du Pont & Co., 351 U.S. 377, 395*. In this instance, there is no doubt that the accredited CSPS business does compete in some measure with many other forms of hazard protection: watchmen, local alarms, proprietary systems, telephone-connected services, unaccredited CSPS, direct-connected (to police and fire stations) systems, and so forth. The critical question, then, is the extent of competition from these rivals.

The Government and the majority have stressed that differences in cost, reliability and insurance discounts may disqualify a competing form of protection for a particular customer. For example, it is said that proprietary systems are too expensive for any but large companies and local alarms may go unanswered in some neighborhoods. But if in general a CSPS customer has *a* feasible alternative to CSPS, it does not much matter that other ones are foreclosed to him, nor that other CSPS customers have different second choices. From this record, it may well be that other forms of protection are each competitive enough with segments of the CSPS **[*585]** market so that in sum CSPS rarely has a monopoly position.

From the defense standpoint, there is substantial evidence showing that the defendants do feel themselves under pressure from other forms of protection, that they do compete for customers, and that they do lower prices even in areas where no CSPS competition is present. This concrete evidence of market behavior seems to me to rank higher than the kind of inference proof heavily relied on by the Government -- physical differences between competing forms of protection, self-advertising claims of CSPS companies that they represent a superior service, and varying insurance discounts. Given that the burden of proof rests upon the Government, the record leaves me with such misgivings as to the validity of the District Court's findings on this score that I am not prepared to agree that the Government has made the showing of market domination that the law demands before a business is sundered.

At the same time the case must be recognized as a close one, and I am not ready to say at this stage that the findings and conclusions of the District Court might not be supportable. **[***795]** All things considered, I join with my Brothers FORTAS and STEWART to the extent of voting to remand the case for further proceedings so that new findings can be made as to the relevant

*product* market. This course seems to me the more appropriate in light of the fact that because of the Expediting Act, *15 U. S. C. § 29 (1964 ed.)*, we have not had the benefit of any intermediate appellate sifting of this record. In view of the disposition I propose, I do not consider any of the other questions in the case.

MR. JUSTICE FORTAS, with whom MR. JUSTICE STEWART joins, dissenting.

I agree that the judgment below should be remanded, but I do not agree that the remand should be limited to **[*586]** reshaping the decree. Because I believe that the definition of the relevant market here cannot be sustained, I would reverse and remand for a new determination of this basic issue, subject to proper standards.

We have here a case under both § 1 and *§ 2* of the Sherman Act, which proscribe combinations in restraint of trade, and monopolies and attempts to monopolize. The judicial task is not difficult to state: Does the record show a combination in restraint of trade or a monopoly or attempt to monopolize? If so, what are its characteristics, scope and effect? And, finally, what is the appropriate remedy for a court of equity to decree?

Each of these inquiries depends upon two basic referents: definition of the geographical area of trade or commerce restrained or monopolized, and of the products or services involved. In § 1 **[**1712]** cases this problem ordinarily presents little difficulty because the combination in restraint of trade itself delineates the "market" with sufficient clarity to support the usual injunctive form of relief in those cases. See, *e. g.*, *United States v. Griffith, 334 U.S. 100*. In the present case, however, the essence of the offense is monopolization, achieved or attempted, and the major relief is divestiture. For these purposes, "market" definition is of the essence, just as in § 7 cases [1] the kindred definition of the "line of commerce" is fundamental. We must define the area of commerce that is allegedly engrossed before we can determine its engrossment; and we must define it before a decree can be shaped to deal with the consequences of the monopoly, and to restore or produce competition. See *United States* v. *du Pont & Co. (the Cellophane Case), 351 U.S. 377, 389-396*; **[*587]** *United States v. Aluminum Co. of America, 148 F.2d 416 (C. A. 2d Cir. 1945)*.

In *§ 2* cases, the search for "the relevant market" must be undertaken and pursued with relentless clarity. It is, in essence, an economic task put to the uses of the law. Unless this task is well done, the results will be distorted in terms of the conclusion as to whether the law has been violated and what the decree should contain.

In this case, the relevant geographical and product markets have not been defined on the basis of the economic facts of the industry concerned. **[***796]** They have been tailored precisely to fit defendants' business. The Government proposed and the trial court concluded that the relevant market is not the business of fire protection, or burglary protection, or protection against waterflow, etc., or all of these together. It is not even the business of furnishing these from a central location. It is the business, viewed nationally, of supplying "insurance accredited central station protection services" (CSPS) -- that is, fire, burglary and other kinds of protection furnished from a central station which is accredited by insurance companies. The business of defendants

---

[1] *United States* v. *Continental Can Co.*, 378 U.S. 441, 447-458; *United States* v. *Alcoa*, 377 U.S. 271, 273-277; *United States* v. *Philadelphia Nat. Bank*, 374 U.S. 321, 356; *Brown Shoe Co.* v. *United States*, 370 U.S. 294, 324.

fits neatly into the product and geographic market so defined. In fact, it comes close to filling the market so defined. [2] This Court has now approved this Procrustean definition.

The geographical market is defined as nationwide. But the need and the service are intensely local -- more local by far, for example, than the market which this Court found to be local in *United States v. Philadelphia Nat. Bank, 374 U.S. 321, 357-362*. [3] The premises protected **[*588]** do not travel. They are fixed locations. They must be protected where they are. Protection must be provided on the spot. It must be furnished by local personnel able to bring help to the scene within minutes. Even the central stations can provide service only within a 25-mile radius. Where the tenants of the premises turn to central stations for this service, they must make their contracts locally with the central station and purchase their services from it on the basis of local conditions.

But **[**1713]** because these defendants, the trial court found, are connected by stock ownership, interlocking management and some degree of national corporate direction, and because there is some national participation in selling as well as national financing, advertising, purchasing of equipment, and the like, [4] the court concluded that the competitive area to be considered is national. This Court now affirms that conclusion.

This is a non sequitur. It is not permissible to seize upon the nationwide scope of defendants' operation and to bootstrap a geographical definition of the market from this. The purpose of the search for the relevant geographical market is to find the area or areas to which a potential buyer may rationally look for the goods or services that he seeks. The test, as this Court said in *United States* v. *Philadelphia Nat. Bank*, is "the geographic structure of supplier-customer relations," *374 U.S. 321, 357*, quoting Kaysen & Turner, Antitrust Policy 102 (1959). And, as MR. JUSTICE CLARK put it in *Tampa Electric Co*. v. *Nashville Coal Co., 365 U.S. 320, 327*, the definition of the relevant market requires **[*589]** "careful **[***797]** selection of the market area in which the seller operates, and to which the purchaser can practicably turn for supplies." [5] The central issue is where does a potential buyer look for potential suppliers of the service -- what is the geographical area in which the buyer has, or, in the absence of monopoly, would have, a real choice as to price and alternative facilities? This depends upon the facts of the market place, taking into account such economic factors as the distance over which supplies and services may be feasibly furnished, consistently with cost and functional efficiency.

The incidental aspects of defendants' business which the court uses cannot control the outcome of this inquiry. They do not measure the market area in which buyer and sellers meet. They have little impact upon the ascertainment of the geographical areas in which the economic and legal questions must be answered: have defendants "monopolized" or "restrained" trade; have they eliminated or can they eliminate competitors or prevent or obstruct new entries into the business; have they controlled or can they control price for the services? These are the issues; and, in defendants' business, a finding that the "relevant market" is national is nothing less than a studied

---

[2] The defendants constitute 87% of the market as defined. One of the defendants alone, ADT, has 73%.

[3] See also *United States* v. *First Nat. Bank*, 376 U.S. 665, 668 (per DOUGLAS, J.); *American Crystal Sugar Co*. v. *Cuban-American Sugar Co., 152 F.Supp. 387, 398 (D. C. S. D. N. Y. 1957)*, aff'd, 259 F.2d 524 (C. A. 2d Cir. 1958).

[4] There is a danger that this Court's opinion, *ante*, at 575-576, will be read as somewhat overstating the case. There is neither finding nor record to support the implication that rates are to any substantial extent fixed on a nationwide basis, or that there are nationwide contracts with multistate businesses in any significant degree, or that insurers inspect or certify central stations on a nationwide basis.

[5] See also *Brown Shoe Co*. v. *United States, 370 U.S. 294, 336-337*.

failure to assess the effect of defendants' position and practices in the light of the competition which exists, or could exist, in economically defined areas -- in the real world.

Here, there can be no doubt that the correct geographic market is local. The services at issue are intensely local: they can be furnished only locally. The business as it is done is local -- not nationwide. If, as might well be the case on this record, defendants were found to have violated the Sherman Act in a number of these local areas, a proper decree, directed to those markets, as well as to **[*590]** general corporate features relevant to the condemned practices, could be fashioned. On the other hand, a gross definition of the market as nationwide leads to a gross, nationwide decree which does not address itself to the realities of the market place. That is what happened here: The District Court's finding that the market was *nationwide* logically led it to a decree which operated on the only *national* aspect of the situation, the parent company nexus, instead of on the economically realistic areas -- the local situations. This **[**1714]** Court now directs the trial court to require "some [unspecified] divestiture" locally by the alarm companies. This is a recognition of the economic reality that the relevant competitive areas are local. In plain terms, the Court's direction to the trial court means a "market-by-market" analysis for the purpose of breaking up defendants' monopoly position and creating competitors and competition wherever feasible in particular cities. In my view, however, by so directing, the Court implies that which it does not command: that the case should be reconsidered at the trial court level because of the improper standard it used to define the relevant geographic markets.

The trial court's definition of the "product" market even more dramatically demonstrates that its action has been Procrustean -- that it has tailored the market to the dimensions of the defendants. It recognizes that a person seeking protective services has many alternative **[***798]** sources. It lists "watchmen, watchdogs, automatic proprietary systems confined to one site, (often, but not always,) alarm systems connected with some local police or fire station, often unaccredited CSPS [central station protective services], and often accredited CSPS." The court finds that even in the same city a single customer seeking protection for several premises may "exercise its option" differently for different locations. It may choose **[*591]** accredited CSPS for one of its locations and a different type of service for another.

But the court isolates from all of these alternatives only those services in which defendants engage. It eliminates all of the alternative sources despite its conscientious enumeration of them. Its definition of the "relevant market" is not merely confined to "central station" protective services, but to those central station protective services which are "accredited" by insurance companies.

There is no pretense that these furnish peculiar services for which there is no alternative in the market place, on either a price or a functional basis. The court relies solely upon its finding that the services offered by accredited central stations are of better quality, and upon its conclusion that the insurance companies tend to give "noticeably larger" discounts to policyholders who use accredited central station protective services. This Court now approves this strange red-haired, bearded, one-eyed man-with-a-limp classification.

The unreality of the trial court's market definition may best be illustrated by an example. Consider the situation of a retail merchant in Pittsburgh who wishes to protect his store against burglary. The Holmes Electric Protective Company, a subsidiary of Grinnell, operates an accredited central station service in Pittsburgh. It provides only burglary protection.

The gerrymandered market definition approved today totally excludes from the market consideration of the availability in Pittsburgh of cheaper but somewhat less reliable local alarm systems, or of more expensive (although the expense is reduced by greater insurance discounts) watchman service, or even of unaccredited central station service which virtually duplicates the Holmes service.

Instead, and in the name of "commercial realities," we are instructed that the "relevant market" -- which totally **[*592]** excludes these locally available alternatives -- requires us to look only to accredited central station service, and that we are to include in the "market" central stations which do not furnish burglary protection and even those which serve such places as Boston and Honolulu. [6]

Moreover, we are told that the "relevant market" must assume this strange and curious configuration despite evidence **[**1715]** in the record and a finding of the trial court that "fringe competition" from such locally available alternatives as watchmen, local alarm systems, proprietary systems, and unaccredited central stations has, in at least 20 cities, forced the defendants to operate at a "loss" even though defendants have a total monopoly in **[***799]** these cities of the "market" -- namely, the "accredited central station protective services." And we are led to this odd result even though there is in the record abundant evidence that customers switch from one form of property protection to another, and not always in the direction of accredited central station service.

I believe this approach has no justification in economics, reason or law. It might be supportable if it were found that the accredited central stations offer services which are unique in the sense that potential buyers -- or at least a substantial, identifiable part of the trade -- look only to them for the services in question, and that neither cost, type, quality of service nor other factors bring competing services into the market. The findings here and the record do not permit this conclusion.

The Government's market definition, accepted by the trial court, is a distortion which inevitably leads to a superficial and distorted result even in the hands of a highly skilled judge. As this Court held in *Brown Shoe, supra*, the "reasonable interchangeability of use or the **[*593]** cross-elasticity of demand," determines the boundaries of a product market. *370 U.S., at 325*. See also the *Cellophane Case, 351 U.S., at 380*. In plain language, this means that the court should have defined the relevant market here to include all services which, in light of geographical availability, price and use characteristics, are in realistic rivalry for all or some part of the business of furnishing protective services to premises. In the present situation, however, the court's own findings show that practical alternatives are available to potential users -- although they vary from market to market and possibly from user to user. These have been arbitrarily excluded from the court's definition.

I do not suggest that wide disparities in quality, price and customer appeal could never affect the definition of the market. But this follows only where the disparities are so great that they create separate and distinct categories of buyers and sellers. The record here and the findings do not approach this standard. They fall far short of justifying the narrowing of the market as practiced here. I need refer only to the exclusion of nonaccredited central stations, which the court seeks to justify by reference to differentials in insurance discounts. These differentials may

---

[6] None of the stations operated by defendant Automatic Fire Alarm Company offers burglary protection, just as none of Holmes' stations protects against the risk of fire.

indeed affect the relative cost to the consumer of the competing modes of protection. But, in the absence of proof that they result in eliminating the competing services from the category of those to which the purchaser "can practicably turn" for supplies, [7] they do not justify such total exclusion. This sort of exclusion of the supposedly not-quite-so-attractive service from the basic definition of the kinds of business and service against which defendants' activity will be measured, is entirely unjustified on this record. [8]

**[*594]** The **[***800]** **[**1716]** importance of this kind of truncated market definition vividly appears if we are to say, as the trial court here held, that if defendant has so large a fraction of the market as to constitute a "predominant" share, a rebuttable presumption of monopolization follows. The fraction depends upon the denominator (the "market") as well as the numerator (the defendants' volume). Clearly, this "presumption" is unwarranted unless the "market" is defined to include all competitors. The contrary is not supported by this Court's decisions in either the *Cellophane Case, supra*, or *United States* v. *du Pont & Co. (General Motors), 353 U.S. 586*. The latter case defined the market in terms of the *total* products which could be used for the defined purposes: automobile fabrics and finishes. This embraces the total range of options for customers seeking these products. On the contrary, as the record here shows and as the findings, candidly read, imply, substantial options exist for services other than through accredited central stations providing protective services. Those options, whether for all or a part of the services in issue, must be included in the assessment of the market.

In the opinion which this Court hands down today, there is considerable discussion of defendants' argument that the market should be "broken down" by different **[*595]** type of service: *e. g.*, burglar protection, fire protection, etc. The Court rejects this on the ground that it is appropriate to evaluate a "cluster" of services as such. It points to *Philadelphia Nat. Bank, supra*, for support for its approach. In that case, MR. JUSTICE BRENNAN's opinion for the Court carefully set out the distinctive characteristics of banking services: that some of these services (*e. g.*, checking accounts) are virtually free of competition from other types of institutions, and that other services are distinctive in cost or other characteristics. *374 U.S., at 356-357*. See also *United States v. First Nat. Bank, 376 U.S. 665, 668* (per DOUGLAS, J.). Similarly, in *United States v. Paramount Pictures, 334 U.S. 131*, and *International Boxing Club v. United States, 358 U.S. 242, 249-252*, "first-run" moving pictures and championship boxing matches were held sufficiently distinctive in terms of demand in the market place to warrant consideration as separate markets.

But no such distinctiveness exists here. As I have discussed, neither this record nor the trial court's findings show either a distinctive demand or a separable market for "insurance accredited central station protective services." The contrary is evident. None of the services furnished by accredited central stations is unique, as I have discussed. Nor is there even a common or predominant "cluster" of services offered by the central stations. One of the defendants, Holmes, is engaged only in the burglary alarm business. Another, AFA, furnishes only fire and waterflow

---

[7] *Tampa Electric Co*. v. Nashville Coal Co., 365 U.S., at 327.

[8] The example used by the court in its findings is illuminating and disturbing. In explanation of its narrow market definition, the court says that the difference between the accredited central station protective services and all others "could be compared" to the difference between a compact six-cylinder car and a chauffeur-driven sedan. It is probably true that the degree of direct competition between luxury automobiles and compacts is slight. But it is by no means as clear-cut as the trial court seems to suggest. The question would require careful analysis in light of the total facts and issues. For example, if the antitrust problem at hand involved an acquisition of the business of a manufacturer of compacts by a maker of luxury cars, it is by no means inconceivable that sufficient competitive overlap would be found to place both products in the "relevant market."

service. Only ADT among the defendants **[***801]** makes available to its customers the full "cluster."

I do not mean to suggest that the Government must prove its case, service by service. But in defining the market, individual services, even if furnished in isolation, ought to be specified and here, as distinguished from the conclusion impelled by the circumstances in **[*596]** *Philadelphia Nat. Bank, supra*, competitors for individual services ought to be taken into account.

I do not intend by any of the foregoing to suggest that, on this record, the relief granted by the trial court and the substantially more drastic relief ordered by this Court would necessarily be unjustified. It is entirely possible that monopoly or attempt to monopolize may be found -- and perhaps found with greater force -- in local situations. Relief on a pervasive, system-wide, national basis might **[**1717]** follow, as decreed by the trial court, as well as divestiture in appropriate local situations, as directed by this Court. It is impossible, I submit, to make these judgments on the findings before us because of the distortion due to an incorrect and unreal definition of the "relevant market." Now, because of this Court's mandate, the market-by-market inquiry must begin for purposes of the decree. But this should have been the foundation of judgment, not its superimposed conclusion. This inquiry should -- in my opinion, it must -- take into account the *total* economic situation -- all of the options available to one seeking protection services. It should not be limited to central stations, and certainly not to "insurance accredited central station protective services" which this Court sanctions as the relevant market. Since I am of the opinion that defendants and the courts are entitled to a reappraisal of the liability consequences as well as the appropriate provisions of the decree on the basis of a sound definition of the market, I would reverse and remand for these purposes.

**References**

Annotation References:

Right of one corporation to acquire stock in another, as affected by the antitrust acts. 74 L ed 431.

Validity under federal antitrust laws of agreement conferring exclusive sales agency for designated territory. 9 L ed 2d 1235.

EXHIBIT 294

LexisNexis
Warning
As of: August 12, 2014 9:20 AM EDT

**United States v. Microsoft Corp.**

United States Court of Appeals for the District of Columbia Circuit
February 27, 2001, Argued ; June 28, 2001, Decided
No. 00-5212, Consolidated with 00-5213

**Reporter:** 253 F.3d 34; 2001 U.S. App. LEXIS 14324; 346 U.S. App. D.C. 330; 2001-1 Trade Cas. (CCH) P73,321
UNITED STATES OF AMERICA, APPELLEE v. MICROSOFT CORPORATION, APPELLANT

**Subsequent History:** **[**1]** Rehearing Denied August 2, 2001, Reported at: *2001 U.S. App. LEXIS 17137*. Certiorari Denied October 9, 2001, Reported at: *2001 U.S. LEXIS 9509*.
Rehearing denied by *United States v. Microsoft Corp., 2001 U.S. App. LEXIS 17137 (D.C. Cir., Aug. 2, 2001)*
*Motion denied by United States v. Microsoft Corp., 2001 U.S. App. LEXIS 18715 (D.C. Cir., Aug. 17, 2001)*
*Writ of certiorari denied Microsoft Corp. v. United States, 534 U.S. 952, 122 S. Ct. 350, 151 L. Ed. 2d 264, 2001 U.S. LEXIS 9509 (2001)*
On remand at, Findings of fact/conclusions of law at *New York v. Microsoft Corp., 224 F. Supp. 2d 76, 2002 U.S. Dist. LEXIS 21185 (D.D.C., 2002)*
Related proceeding at *Charles I. Friedman, P.C. v. Microsoft Corp., 213 Ariz. 344, 141 P.3d 824, 2006 Ariz. App. LEXIS 101 (Ariz. Ct. App., 2006)*
*Related proceeding at Novell, Inc. v. Microsoft Corp., 2012 U.S. Dist. LEXIS 98710 (D. Utah, July 16, 2012)*

**Prior History:** Appeals from the United States District Court for the District of Columbia. (No. 98cv01232). (No. 98cv01233).
*United States v. Microsoft Corp., 97 F. Supp. 2d 59, 2000 U.S. Dist. LEXIS 7583 (D.D.C., 2000)*
*United States v. Microsoft Corp., 97 F. Supp. 2d 59, 2000 U.S. Dist. LEXIS 7582 (D.D.C., 2000)*
*United States v. Microsoft Corp., 87 F. Supp. 2d 30, 2000 U.S. Dist. LEXIS 4014 (D.D.C., 2000)*

**Disposition:** Judgment of the District Court affirmed in part, reversed in part, and remanded in part. Vacated in full the Final Judgment embodying the remedial order, and remanded the case to the District Court for reassignment to a different trial judge for further proceedings consistent with this opinion.

**Core Terms**

district court, Windows, browser, operating system, software, consumers, fact finding, applications, bundling, monopoly, Java, integration, conclusions of law, monopoly power, barriers, anticompetitive, developers, users, products, remedies, rival, monopolization, platform, competitive, plaintiffs', middleware, license, technological, cases, restrictions

**LexisNexis® Headnotes**

Antitrust & Trade Law > Regulated Practices > Monopolies & Monopolization > General Overview
Antitrust & Trade Law > ... > Monopolies & Monopolization > Actual Monopolization > General Overview
Antitrust & Trade Law > ... > Monopolies & Monopolization > Attempts to Monopolize > General Overview
Antitrust & Trade Law > Sherman Act > General Overview
Antitrust & Trade Law > Sherman Act > Scope > General Overview
Antitrust & Trade Law > Sherman Act > Scope > Monopolization Offenses

***HN1*** *Section 2* of the Sherman Act makes it unlawful for a firm to "monopolize." *15 U.S.C.S. § 2*. The offense of monopolization has two elements: (1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident.

Civil Procedure > Appeals > Standards of Review > Clearly Erroneous Review

***HN2*** An appellate court defers to a district court's findings of fact, setting them aside only if clearly erroneous. *Fed. R. Civ. P. 52(a)*.

Civil Procedure > Appeals > Standards of Review > De Novo Review

***HN3*** An appellate court reviews legal questions de novo.

Antitrust & Trade Law > ... > Monopolies & Monopolization > Actual Monopolization > General Overview

***HN4*** While merely possessing monopoly power is not itself an antitrust violation, it is a necessary element of a monopolization charge. Monopoly power is the power to control prices or exclude competition. More precisely, a firm is a monopolist if it can profitably raise prices substantially above the competitive level. Where evidence indicates that a firm has in fact profitably done so, the existence of monopoly power is clear. Because such direct proof is only rarely available, courts more typically examine market structure in search of circumstantial evidence of monopoly power. Under this structural approach, monopoly power may be inferred from a firm's possession of a dominant share of a relevant market that is protected by entry barriers. Entry barriers are factors (such as certain regulatory requirements) that prevent new rivals from timely responding to an increase in price above the competitive level.

Antitrust & Trade Law > Regulated Practices > Market Definition > General Overview

***HN5*** In an antitrust action, because the ability of consumers to turn to other suppliers restrains a firm from raising prices above the competitive level, the relevant market must include all products reasonably interchangeable by consumers for the same purposes.

Civil Procedure > Appeals > Standards of Review > Clearly Erroneous Review

***HN6*** A general, conclusory statement falls far short of what is required to challenge findings as clearly erroneous.

Antitrust & Trade Law > Regulated Practices > Market Definition > General Overview
Antitrust & Trade Law > Regulated Practices > Market Definition > Relevant Market

***HN7*** In defining the market in an antitrust action, the test of reasonable interchangeability, however, requires the district court to consider only substitutes that constrain pricing in the reasonably foreseeable future, and only products that can enter the market in a relatively short time can perform this function. Because the ability of consumers to turn to other suppliers restrains a firm from raising prices above the competitive level, the definition of the 'relevant market' rests on a determination of available substitutes.

Antitrust & Trade Law > Regulated Practices > Market Definition > General Overview

***HN8*** Nothing in *§ 2* of the Sherman Act limits its prohibition to actions taken against threats that are already well-developed enough to serve as present substitutes. Market definition is meant to identify products reasonably interchangeable by consumers.

Antitrust & Trade Law > Regulated Practices > Market Definition > General Overview

***HN9*** Although the existence of monopoly power ordinarily may be inferred from the predominant share of the market, because of the possibility of competition from new entrants, looking to current market share alone can be misleading. Market share reflects current sales, but today's sales do not always indicate power over sales and price tomorrow.

Antitrust & Trade Law > Regulated Practices > Market Definition > General Overview

***HN10*** In an antitrust case, structural market power analyses are meant to determine whether potential substitutes constrain a firm's ability to raise prices above the competitive level; only threats that are likely to materialize in the relatively near future perform this function to any significant degree. Only substitutes that can enter the market "promptly" should be considered.

Antitrust & Trade Law > ... > Monopolies & Monopolization > Actual Monopolization > General Overview

***HN11*** If monopoly power has been acquired or maintained through improper means, the fact that the power has not been used to extract a monopoly price provides no succor to the monopolist.

Antitrust & Trade Law > ... > Monopolies & Monopolization > Actual Monopolization > General Overview
Antitrust & Trade Law > ... > Monopolies & Monopolization > Attempts to Monopolize > Sherman Act

***HN12*** A firm violates *§ 2* of the Sherman Act only when it acquires or maintains, or attempts to acquire or maintain, a monopoly by engaging in exclusionary conduct, as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident. The successful competitor, having been urged to compete, must not be turned upon when he wins.

Antitrust & Trade Law > ... > Monopolies & Monopolization > Actual Monopolization > General Overview

***HN13*** To be condemned as exclusionary, a monopolist's act must have an "anticompetitive effect." That is, it must harm the competitive process and thereby harm consumers. In contrast, harm to one or more competitors will not suffice. The Sherman Act directs itself not against conduct which is competitive, even severely so, but against conduct which unfairly tends to destroy competition itself. Even an act of pure malice by one business competitor against another does not, without more, state a claim under the federal antitrust laws.

Antitrust & Trade Law > ... > Monopolies & Monopolization > Actual Monopolization > General Overview

***HN14*** In an antitrust action, the plaintiff, on whom the burden of proof rests, must demonstrate that the monopolist's conduct indeed has the requisite anticompetitive effect. In a case brought by a private plaintiff, the plaintiff must show that its injury is of the type that the statute was intended to forestall; no less in a case brought by the Government, it must demonstrate that the monopolist's conduct harmed competition, not just a competitor.

Antitrust & Trade Law > ... > Monopolies & Monopolization > Actual Monopolization > General Overview
Antitrust & Trade Law > Sherman Act > Defenses

***HN15*** In an antitrust action, if a plaintiff successfully establishes a prima facie case under *§ 2* of the Sherman Act by demonstrating anticompetitive effect, then the monopolist may proffer a "procompetitive justification" for its conduct. If the monopolist asserts a procompetitive justification--a nonpretextual claim that its conduct is indeed a form of competition on the merits because it involves, for example, greater efficiency or enhanced consumer appeal--then the burden shifts back to the plaintiff to rebut that claim.

Antitrust & Trade Law > ... > Price Fixing & Restraints of Trade > Per Se Rule & Rule of Reason > General Overview
Antitrust & Trade Law > ... > Price Fixing & Restraints of Trade > Per Se Rule & Rule of Reason > Sherman Act
Antitrust & Trade Law > Sherman Act > Claims

***HN16*** In an antitrust action, if a monopolist's procompetitive justification stands unrebutted, then the plaintiff must demonstrate that the anticompetitive harm of the conduct outweighs the procompetitive benefit. In cases arising under § 1 of the Sherman Act, the courts routinely apply a similar balancing approach under the rubric of the "rule of reason." The rule of reason is the term used to describe the proper inquiry under both sections of the Sherman Act. When the second section of the Sherman Act is harmonized with the first, it becomes obvious that the criteria to be resorted to in any given case for the purpose of ascertaining whether violations of the section have been committed, is the rule of reason guided by the established law. The analysis under *§ 2* of the Sherman Act is similar to that under § 1 regardless whether the rule of reason label is applied.

Antitrust & Trade Law > Regulated Practices > Monopolies & Monopolization > General Overview
Antitrust & Trade Law > ... > Monopolies & Monopolization > Actual Monopolization > General Overview
Antitrust & Trade Law > ... > Monopolies & Monopolization > Attempts to Monopolize > General Overview
Antitrust & Trade Law > Sherman Act > General Overview

***HN17*** In an antitrust action, in considering whether the monopolist's conduct on balance harms competition and is therefore condemned as exclusionary for purposes of *§ 2* of the Sherman Act, the court's focus is upon the effect of that conduct, not upon the intent behind it. Evidence of the intent behind the conduct of a monopolist is relevant only to the extent it helps the court understand the likely effect of the monopolist's conduct. Knowledge of intent may help the court to interpret facts and to predict consequences.

Antitrust & Trade Law > Regulated Industries > Sports > General Overview
Antitrust & Trade Law > ... > Monopolies & Monopolization > Actual Monopolization > General Overview

***HN18*** Intellectual property rights do not confer a privilege to violate the antitrust laws.

Antitrust & Trade Law > ... > Monopolies & Monopolization > Actual Monopolization > General Overview

***HN19*** As a general rule, courts are properly very skeptical about claims that competition has been harmed by a dominant firm's product design changes. In a competitive market, firms routinely innovate in the hope of appealing to consumers, sometimes in the process making their products incompatible with those of rivals; the imposition of liability when a monopolist does the same thing will inevitably deter a certain amount of innovation. This is all the more true in a market, in which the product itself is rapidly changing. Judicial deference to product innovation, however, does not mean that a monopolist's product design decisions are per se lawful.

Antitrust & Trade Law > ... > Monopolies & Monopolization > Actual Monopolization > General Overview

***HN20*** In an antitrust action, the plaintiff bears the burden not only of rebutting a proffered justification but also of demonstrating that the anticompetitive effect of the challenged action outweighs it.

Antitrust & Trade Law > ... > Actual Monopolization > Anticompetitive & Predatory Practices > General Overview

***HN21*** Although offering a customer an attractive deal is the hallmark of competition, in very rare circumstances a price may be unlawfully low, or "predatory."

Antitrust & Trade Law > ... > Monopolies & Monopolization > Actual Monopolization > General Overview

***HN22*** The rare case of price predation aside, the antitrust laws do not condemn even a monopolist for offering its product at an attractive price. Likewise, a monopolist does not violate the Sherman Act simply by developing an attractive product. Growth or development as a consequence of a superior product or business acumen is no violation.

Antitrust & Trade Law > Clayton Act > General Overview

Antitrust & Trade Law > ... > Price Fixing & Restraints of Trade > Exclusive & Reciprocal Dealing > General Overview

Antitrust & Trade Law > ... > Price Fixing & Restraints of Trade > Exclusive & Reciprocal Dealing > Requirements Contracts

Antitrust & Trade Law > Sherman Act > General Overview

Contracts Law > Types of Commercial Transactions > Sales of Goods > Output, Exclusive & Requirements Agreements

***HN23*** An exclusive contract does not violate the Clayton Act unless its probable effect is to foreclose competition in a substantial share of the line of commerce affected. The share of the market foreclosed is important because, for the contract to have an adverse effect upon competition, the opportunities for other traders to enter into or remain in that market must be significantly limited. If the contract does not fall within the broader prescription of § 3 of the Clayton Act it follows that it is not forbidden by those of the Sherman Act.

Antitrust & Trade Law > Regulated Practices > Market Definition > Relevant Market

Antitrust & Trade Law > ... > Monopolies & Monopolization > Actual Monopolization > General Overview

Antitrust & Trade Law > ... > Price Fixing & Restraints of Trade > Exclusive & Reciprocal Dealing > General Overview

Antitrust & Trade Law > ... > Price Fixing & Restraints of Trade > Exclusive & Reciprocal Dealing > Exclusive Dealing

***HN24*** In determining whether opportunities for other traders to enter into or remain in a market are significantly limited, though what is "significant" may vary depending upon the antitrust

provision under which an exclusive deal is challenged, it is clear that in all cases the plaintiff must both define the relevant market and prove the degree of foreclosure.

Antitrust & Trade Law > ... > Price Fixing & Restraints of Trade > Exclusive & Reciprocal Dealing > General Overview
Antitrust & Trade Law > ... > Price Fixing & Restraints of Trade > Exclusive & Reciprocal Dealing > Exclusive Dealing
Business & Corporate Law > Distributorships & Franchises > Causes of Action > Restraints of Trade

***HN25*** That a company's exclusive deals have the anticompetitive effect of preserving its monopoly does not, in itself, make them unlawful. A monopolist, like a competitive firm, may have a perfectly legitimate reason for wanting an exclusive arrangement with its distributors.

Antitrust & Trade Law > ... > Monopolies & Monopolization > Actual Monopolization > General Overview

***HN26*** A monopolist does not violate the antitrust laws simply by developing a product that is incompatible with those of its rivals. In order to violate the antitrust laws, the incompatible product must have an anticompetitive effect that outweighs any procompetitive justification for the design.

Antitrust & Trade Law > Sherman Act > General Overview

***HN27*** In Sherman Act cases, plaintiffs should be given the full benefit of their proof without tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each.

Antitrust & Trade Law > ... > Monopolies & Monopolization > Actual Monopolization > General Overview
Antitrust & Trade Law > ... > Monopolies & Monopolization > Actual Monopolization > Monopoly Power

***HN28*** With respect to antitrust actions seeking injunctive relief, courts infer "causation" from the fact that a defendant has engaged in anticompetitive conduct that reasonably appears capable of making a significant contribution to maintaining monopoly power. To require that liability under *§ 2* of the Sherman Act turn on a plaintiff's ability or inability to reconstruct the hypothetical marketplace absent a defendant's anticompetitive conduct would only encourage monopolists to take more and earlier anticompetitive action. The court may infer causation when exclusionary conduct is aimed at producers of nascent competitive technologies as well as when it is aimed at producers of established substitutes. Admittedly, in the former case there is added uncertainty, inasmuch as nascent threats are merely potential substitutes. But the underlying proof problem is the same--neither plaintiffs nor the court can confidently reconstruct a product's hypothetical technological development in a world absent the defendant's exclusionary conduct.

Antitrust & Trade Law > ... > Monopolies & Monopolization > Actual Monopolization > General Overview
Civil Procedure > Remedies > General Overview
Torts > ... > Elements > Causation > General Overview

***HN29*** Divestiture is a remedy that is imposed only with great caution, in part because its long-term efficacy is rarely certain. Absent some measure of confidence that there has been an actual loss to competition that needs to be restored, wisdom counsels against adopting radical structural relief. More extensive equitable relief, particularly remedies such as divestiture designed to eliminate the monopoly altogether, raise more serious questions and require a clearer indication

of a significant causal connection between the conduct and creation or maintenance of the market power. But these queries go to questions of remedy, not liability.

Antitrust & Trade Law > ... > Monopolies & Monopolization > Attempts to Monopolize > General Overview
Antitrust & Trade Law > ... > Monopolies & Monopolization > Attempts to Monopolize > Elements
Antitrust & Trade Law > ... > Monopolies & Monopolization > Attempts to Monopolize > Sherman Act
Antitrust & Trade Law > Sherman Act > Claims
Criminal Law & Procedure > ... > Inchoate Crimes > Attempt > General Overview
Criminal Law & Procedure > ... > Inchoate Crimes > Attempt > Elements

***HN30*** To establish a violation under *§ 2* of the Sherman Act for attempted monopolization, a plaintiff must prove (1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power. A deficiency on any one of the three will defeat plaintiffs' claim. The determination whether a dangerous probability of success exists is a particularly fact-intensive inquiry. Because the Sherman Act does not identify the activities that constitute the offense of attempted monopolization, the court must examine the facts of each case, mindful that the determination of what constitutes an attempt, is a question of proximity and degree.

Antitrust & Trade Law > Regulated Practices > Market Definition > Relevant Market
Antitrust & Trade Law > ... > Monopolies & Monopolization > Attempts to Monopolize > General Overview

***HN31*** A court's evaluation of an attempted monopolization claim must include a definition of the relevant market. Such a definition establishes a context for evaluating the defendant's actions as well as for measuring whether the challenged conduct presented a dangerous probability of monopolization. Defining a market for an attempted monopolization claim involves the same steps as defining a market for a monopoly maintenance claim, namely a detailed description of the purpose of a browser--what functions may be included and what are not--and an examination of the substitutes that are part of the market and those that are not.

Antitrust & Trade Law > Regulated Practices > Market Definition > General Overview
Antitrust & Trade Law > Regulated Practices > Market Definition > Relevant Market

***HN32*** In defining a market for an attempted monopolization claim, the determination of a relevant market is a factual question to be resolved by the District Court.

Antitrust & Trade Law > Regulated Practices > Market Definition > General Overview

***HN33*** A remand on market definition is unnecessary, where the district court's imprecision in defining the market is directly traceable to plaintiffs' failure to articulate and identify evidence before that court as to (1) what constitutes a browser (i.e., what are the technological components of or functionalities provided by a browser) and (2) why certain other products are not reasonable substitutes.

Antitrust & Trade Law > Regulated Practices > Market Definition > General Overview

***HN34*** The separate products analysis for tying purposes is not a substitute for the type of market definition that Spectrum Sports requires.

Antitrust & Trade Law > Regulated Practices > Market Definition > Relevant Market
Antitrust & Trade Law > ... > Monopolies & Monopolization > Attempts to Monopolize > General Overview

***HN35*** Because a firm cannot possess monopoly power in a market unless that market is also protected by significant barriers to entry, it follows that a firm cannot threaten to achieve monopoly power in a market unless that market is, or will be, similarly protected. In order to determine whether there is a dangerous probability of monopolization, courts have found it necessary to consider the defendant's ability to lessen or destroy competition in that market. Plaintiffs have the burden of establishing barriers to entry into a properly defined relevant market. Plaintiffs must not only show that barriers to entry protect the properly defined browser market, but that those barriers are "significant." Whether there are significant barriers to entry cannot, of course, be answered absent an appropriate market definition.

Antitrust & Trade Law > ... > Price Fixing & Restraints of Trade > Per Se Rule & Rule of Reason > General Overview
Antitrust & Trade Law > ... > Price Fixing & Restraints of Trade > Tying Arrangements > General Overview

***HN36*** The rule of reason, rather than per se analysis, should govern the legality of tying arrangements involving platform software products. It is only after considerable experience with certain business relationships that courts classify them as per se violations. While every business relationship will in some sense have unique features, some represent entire, novel categories of dealings.

Antitrust & Trade Law > ... > Price Fixing & Restraints of Trade > Tying Arrangements > General Overview

***HN37*** There is merit to the argument in an antitrust action that using the consumer demand test to determine whether tying has occurred would chill innovation to the detriment of consumers by preventing firms from integrating into their products new functionality previously provided by standalone products--and hence, by definition, subject to separate consumer demand.

Antitrust & Trade Law > ... > Price Fixing & Restraints of Trade > Per Se Rule & Rule of Reason > General Overview

***HN38*** It is only after considerable experience with certain business relationships that courts classify them as per se violations.

Antitrust & Trade Law > ... > Price Fixing & Restraints of Trade > Tying Arrangements > General Overview

***HN39*** Judicial experience provides little basis for believing that, because of their pernicious effect on competition and lack of any redeeming virtue, a software firm's decisions to sell multiple functionalities as a package should be conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use.

Antitrust & Trade Law > ... > Price Fixing & Restraints of Trade > Per Se Rule & Rule of Reason > General Overview
Antitrust & Trade Law > ... > Price Fixing & Restraints of Trade > Tying Arrangements > General Overview

***HN40*** Rule of reason analysis affords the first firm to merge previously disting functionalities or to eliminate entirely the need for a second function an opportunity to demonstrate that an efficiency gain from its "tie" adequately offsets any distortion of consumer choice.

Antitrust & Trade Law > ... > Price Fixing & Restraints of Trade > Tying Arrangements > General Overview
Antitrust & Trade Law > ... > Price Fixing & Restraints of Trade > Tying Arrangements > Sherman Act Violations
Civil Procedure > Appeals > Remands

***HN41*** Where findings are infirm because of an erroneous view of the law, a remand is the proper course unless the record permits only one resolution of the factual issue.

Antitrust & Trade Law > ... > Price Fixing & Restraints of Trade > Per Se Rule & Rule of Reason > General Overview

***HN42*** The rule-of-reason more freely permits consideration of the benefits of bundling in software markets than the per se rule, particularly those for operating systems, and a balancing of these benefits against the costs to consumers whose ability to make direct price/quality tradeoffs in the tied market may have been impaired. The per se rule does not broadly permit consideration of procompetitive justifications.

Antitrust & Trade Law > ... > Price Fixing & Restraints of Trade > Tying Arrangements > General Overview

***HN43*** Showing that a company's conduct unreasonably restrained competitioninvolves an inquiry into the actual effect of the company's conduct on competition in the tied good market. To the extent that certain aspects of tying injury may depend on a careful definition of the tied good market and a showing of barriers to entry other than the tying arrangement itself, plaintiffs would have to establish these points.

Antitrust & Trade Law > ... > Price Fixing & Restraints of Trade > Tying Arrangements > General Overview
Antitrust & Trade Law > ... > Price Fixing & Restraints of Trade > Tying Arrangements > Sherman Act Violations

***HN44*** In order for the district court to conclude that a company's practices constitute tying violations under § 1 of the Sherman Act, the plaintiff must demonstrate that their benefits--if any--are outweighed by the harms in the tied product market. If the district court is convinced of net harm, it must then consider whether any additional remedy is necessary.

Antitrust & Trade Law > ... > Price Fixing & Restraints of Trade > Per Se Rule & Rule of Reason > General Overview
Antitrust & Trade Law > ... > Price Fixing & Restraints of Trade > Tying Arrangements > General Overview

***HN45*** Because courts applying the rule of reason are free to look at both direct and indirect evidence of efficiencies from a tie, there is no need for a screening device as such; thus the separate-products inquiry serves merely to classify arrangements as subject to tying law, as opposed to, say, liability for exclusive dealing.

Civil Procedure > Appeals > Standards of Review > Abuse of Discretion

***HN46*** Trial courts have extraordinarily broad discretion to determine the manner in which they will conduct trials. This is particularly true in a case where the proceedings are being tried to the court without a jury. In such cases, an appellate court will not interfere with the trial court's exercise of its discretion to control its docket and dispatch its business except upon the clearest showing that the procedures have resulted in actual and substantial prejudice to the complaining litigant.

Civil Procedure > Trials > Bench Trials
Civil Procedure > Appeals > Standards of Review > General Overview

***HN47*** A presumption exists that a judge who conducts a bench trial has ignored any inadmissible evidence.

Civil Procedure > Remedies > Injunctions > General Overview

Civil Procedure > Remedies > Injunctions > Preliminary & Temporary Injunctions
Civil Procedure > Remedies > Injunctions > Temporary Restraining Orders
Constitutional Law > ... > Fundamental Rights > Procedural Due Process > Scope of Protection

***HN48*** Factual disputes must be heard in open court and resolved through trial-like evidentiary proceedings. Any other course would be contrary to the spirit which imbues our judicial tribunals prohibiting decision without hearing. A party has the right to judicial resolution of disputed facts not just as to the liability phase, but also as to appropriate relief. Other than a temporary restraining order, no injunctive relief may be entered without a hearing. A hearing on the merits-- i.e., a trial on liability--does not substitute for a relief-specific evidentiary hearing unless the matter of relief was part of the trial on liability, or unless there are no disputed factual issues regarding the matter of relief. This rule is no less applicable in antitrust cases. A full exploration of facts is usually necessary in order for the district court properly to draw an antitrust decree so as to prevent future violations and eradicate existing evils.

Constitutional Law > ... > Fundamental Rights > Procedural Due Process > Scope of Protection

***HN49*** A prediction about future events is not, as a prediction, any less a factual issue. Drafting an antitrust decree by necessity involves predictions and assumptions concerning future economic and business events. Trial courts are not excused from their obligation to resolve such matters through evidentiary hearings simply because they consider the bedrock procedures of our justice system to be of little use.

Civil Procedure > Remedies > Injunctions > Permanent Injunctions
Civil Procedure > Appeals > Standards of Review > General Overview

***HN50*** Claimed surprise at a district court's decision to consider permanent injunctive relief does not, alone, merit reversal.

Antitrust & Trade Law > Sherman Act > General Overview
Civil Procedure > Remedies > General Overview
Labor & Employment Law > Wrongful Termination > Remedies > General Overview

***HN51*** A remedies decree in an antitrust case must seek to unfetter a market from anticompetitive conduct, to terminate the illegal monopoly, deny to the defendant the fruits of its statutory violation, and ensure that there remain no practices likely to result in monopolization in the future.

Antitrust & Trade Law > ... > Monopolies & Monopolization > Attempts to Monopolize > General Overview
Antitrust & Trade Law > ... > Price Fixing & Restraints of Trade > Tying Arrangements > Sherman Act Violations
Civil Procedure > Appeals > Standards of Review > Abuse of Discretion

***HN52*** Ordinarily, the court reviews the grant or denial of equitable relief under the abuse of discretion standard.

Civil Procedure > Judgments > Relief From Judgments > General Overview
Civil Procedure > Remedies > General Overview
Civil Procedure > Remedies > Damages > Monetary Damages

***HN53*** A court in both the context of money damages and equitable relief must base its relief on some clear indication of a significant causal connection between the conduct enjoined or

mandated and the violation found directed toward the remedial goal intended. In a case where sweeping equitable relief is employed to remedy multiple violations, and some--indeed most--of the findings of remediable violations do not withstand appellate scrutiny, it is necessary to vacate the remedy decree since the implicit findings of causal connection no longer exist to warrant our deferential affirmance.

Antitrust & Trade Law > Sherman Act > General Overview
Civil Procedure > Appeals > Standards of Review > Abuse of Discretion
Criminal Law & Procedure > Trials > Judicial Discretion
Criminal Law & Procedure > ... > Standards of Review > Abuse of Discretion > General Overview

***HN54*** As a general matter, a district court is afforded broad discretion to enter that relief it calculates will best remedy the conduct it has found to be unlawful. An appellate court reviews a trial court's decision whether or not to grant equitable relief only for an abuse of discretion. This is no less true in antitrust cases. The district court is clothed with large discretion to fit the decree to the special needs of the individual case. And divestiture is a common form of relief in successful antitrust prosecutions: it is indeed the most important of antitrust remedies.

Antitrust & Trade Law > Sherman Act > General Overview
Antitrust & Trade Law > Sherman Act > Remedies > General Overview
Civil Procedure > Remedies > General Overview
Mergers & Acquisitions Law > Antitrust > General Overview
Mergers & Acquisitions Law > Antitrust > Remedies

***HN55*** Divestiture has traditionally been the remedy for Sherman Act violations whose heart is intercorporate combination and control, and complete divestiture is particularly appropriate where asset or stock acquisitions violate the antitrust laws.

Antitrust & Trade Law > ... > Monopolies & Monopolization > Actual Monopolization > General Overview
Civil Procedure > Remedies > General Overview

***HN56*** Mere existence of an exclusionary act does not itself justify full feasible relief against the monopolist to create maximum competition. Rather, structural relief, which is designed to eliminate the monopoly altogether requires a clearer indication of a significant causal connection between the conduct and creation or maintenance of the market power. Absent such causation, the antitrust defendant's unlawful behavior should be remedied by an injunction against continuation of that conduct. More extensive equitable relief, particularly remedies such as divestiture designed to eliminate the monopoly altogether, require a clearer indication of significant causal connection between the conduct and creation or maintenance of the market power.

Legal Ethics > Judicial Conduct

***HN57*** The Code of Conduct for United States Judges, Canon 3A(6) requires federal judges to avoid public comment on the merits of pending or impending cases.

Legal Ethics > Judicial Conduct

***HN58*** The Code of Conduct for United States Judges, Canon 2 tells judges to avoid impropriety and the appearance of impropriety in all activities, on the bench and off.

Legal Ethics > Judicial Conduct

***HN59*** The Code of Conduct for United States Judges, Canon 3A(4) forbids judges to initiate or consider ex parte communications on the merits of pending or impending proceedings.

Civil Procedure > ... > Inability to Proceed > Disqualification & Recusal > General Overview
Civil Procedure > ... > Inability to Proceed > Disqualification & Recusal > Federal Judges
Legal Ethics > Judicial Conduct

***HN60*** Judges are required to recuse themselves when their impartiality might reasonably be questioned. *28 U.S.C.S. § 455(a)*.

Civil Procedure > ... > Inability to Proceed > Disqualification & Recusal > General Overview

***HN61*** The federal judicial disqualification provisions reflect a strong federal policy to preserve the actual and apparent impartiality of the federal judiciary. Judicial misconduct may implicate that policy regardless of the means by which it is disclosed to the public.

Civil Procedure > Appeals > Reviewability of Lower Court Decisions > Preservation for Review

***HN62*** The matter of what questions may be taken up and resolved for the first time on appeal is one left primarily to the discretion of the courts of appeals, to be exercised on the facts of individual cases.

Civil Procedure > Judicial Officers > Judges > General Overview
Legal Ethics > Judicial Conduct

***HN63*** In forbidding federal judges to comment publicly on the merits of a pending or impending action, the Code of Conduct for United States Judges, Canon 3A(6) applies to cases pending before any court, state or federal, trial or appellate. As "impending" indicates, the prohibition begins even before a case enters the court system, when there is reason to believe a case may be filed. An action remains pending until completion of the appellate process. Code of Conduct for United States Judges, Canon 3A(6) cmt.

Legal Ethics > Judicial Conduct

***HN64*** A judge should accord to every person who is legally interested in a proceeding, or the person's lawyer, full right to be heard according to law, and, except as authorized by law, neither initiate nor consider ex parte communications on the merits, or procedures affecting the merits, of a pending or impending proceeding. Code of Conduct for United States Judges, Canon 3A(4).

Civil Procedure > Judicial Officers > Judges > General Overview
Governments > Courts > Judges
Legal Ethics > Judicial Conduct

***HN65*** A judge should avoid impropriety and the appearance of impropriety in all activities. Code of Conduct for United States Judges, Canon 2. Canon 2A requires federal judges to respect and comply with the law and to act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary. Code of Conduct for United States Judges, Canon 2A. The Code of Conduct is the law with respect to the ethical obligations of federal judges.

Civil Procedure > Judicial Officers > Judges > General Overview

Civil Procedure > ... > Inability to Proceed > Disqualification & Recusal > General Overview

Civil Procedure > ... > Inability to Proceed > Disqualification & Recusal > Federal Judges

Governments > Courts > Clerks of Court

Governments > Courts > Judges

Legal Ethics > Judicial Conduct

***HN66*** The Code of Conduct for United States Judges contains no enforcement mechanism. The Canons, including the one that requires a judge to disqualify himself in certain circumstances, Code of Conduct for United States Judges, Canon 3C, are self-enforcing. There are, however, remedies extrinsic to the Code. One is an internal disciplinary proceeding, begun with the filing of a complaint with the clerk of the court of appeals pursuant to *28 U.S.C.S. § 372(c)*. Another is disqualification of the offending judge under either *28 U.S.C.S. § 144*, which requires the filing of an affidavit while the case is in the District Court, or *28 U.S.C.S. § 455*, which does not. The standard for disqualification under *§ 455(a)* is an objective one. The question is whether a reasonable and informed observer would question the judge's impartiality.

Civil Procedure > ... > Inability to Proceed > Disqualification & Recusal > Federal Judges

Legal Ethics > Judicial Conduct

***HN67*** The very purpose of *28 U.S.C.S. § 455(a)* is to promote confidence in the judiciary by avoiding even the appearance of impropriety whenever possible. As such, violations of the Code of Conduct for United States Judges may give rise to a violation of *28 U.S.C.S. § 455(a)* if doubt is cast on the integrity of the judicial process.

Civil Procedure > ... > Inability to Proceed > Disqualification & Recusal > Federal Judges

Evidence > ... > Judicial Intervention in Trials > Comments by Judges > General Overview

Legal Ethics > Judicial Conduct

***HN68*** While *28 U.S.C.S. § 455(a)* is concerned with actual and apparent impropriety, the statute requires disqualification only when a judge's impartiality might reasonably be questioned. *28 U.S.C.S. § 455(a)*. Although United States Court of Appeals for the District of Columbia Circuit condemns public judicial comments on pending cases, the court does not go so far as to hold that every violation of the Code of Conduct for United States Judges, Canon 3A(6) or every impropriety under that Code of Conduct inevitably destroys the appearance of impartiality and thus violates *28 U.S.C.S. § 455(a)*.

Governments > Courts > Judges

Legal Ethics > Judicial Conduct

***HN69*** Judges are obligated to resist the passion for publicity. Indulging it compromises the cold neutrality of an impartial judge. Cold or not, federal judges must maintain the appearance of impartiality. What was true two centuries ago is true today: Deference to the judgments and rulings of courts depends upon public confidence in the integrity and independence of judges. Code of Conduct for United States Judges, Canon 1 cmt.

Legal Ethics > Judicial Conduct

***HN70*** An exception to the prohibition on public comments exists for statements made in the course of the judge's official duties. Code of Conduct for United States Judges, Canon 3A(6).

Civil Procedure > Judicial Officers > Judges > General Overview

Civil Procedure > ... > Inability to Proceed > Disqualification & Recusal > General Overview
Civil Procedure > ... > Inability to Proceed > Disqualification & Recusal > Federal Judges
Governments > Courts > Judges
Legal Ethics > Judicial Conduct

***HN71*** Disqualification is mandatory for conduct that calls a judge's impartiality into question. *28 U.S.C.S. § 455(a)*. *Section 455* does not prescribe the scope of disqualification. Rather, Congress delegated to the judiciary the task of fashioning the remedies that will best serve the purpose of the disqualification statute. At a minimum, *§ 455(a)* requires prospective disqualification of the offending judge, that is, disqualification from the judge's hearing any further proceedings in the case.

Civil Procedure > ... > Inability to Proceed > Disqualification & Recusal > General Overview
Civil Procedure > ... > Inability to Proceed > Disqualification & Recusal > Federal Judges
Civil Procedure > ... > Disqualification & Recusal > Grounds for Disqualification & Recusal > General Overview
Civil Procedure > Judgments > Relief From Judgments > General Overview
Civil Procedure > Remedies > General Overview
Legal Ethics > Judicial Conduct

***HN72*** There need not be a draconian remedy for every violation of *28 U.S.C.S. § 455(a)*. Three factors are relevant to the question whether vacatur is appropriate. In determining whether a judgment should be vacated for a violation of *§ 455(a)*, it is appropriate to consider the risk of injustice to the parties in the particular case, the risk that the denial of relief will produce injustice in other cases, and the risk of undermining the public's confidence in the judicial process.

Civil Procedure > Appeals > Standards of Review > Clearly Erroneous Review
Civil Procedure > Appeals > Standards of Review > De Novo Review

***HN73*** The Federal Rules require that district court findings of fact not be set aside unless they are clearly erroneous. *Fed. R. Civ. P. 52(a)*. Ordinarily, there is no basis for doubting that the district court's factual findings are entitled to the substantial deference the clearly erroneous standard entails. Deference to a district court's factfindings presumes impartiality on the lower court's part. When impartiality is called into question, how much deference is due? The question implies that there is some middle ground, but we believe there is none. As the rules are written, district court factfindings receive either full deference under the clearly erroneous standard or they must be vacated. There is no de novo appellate review of factfindings and no intermediate level between de novo and clear error, not even for findings the court of appeals may consider sub-par.

Civil Procedure > Appeals > Standards of Review > Clearly Erroneous Review

***HN74*** *Fed R. Civ. P. 52(a)* mandates clearly erroneous review of all district court factfindings: Findings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses. The rule does not make exceptions or purport to exclude certain categories of factual findings from the obligation of a court of appeals to accept a district court's findings unless clearly erroneous. In applying the clearly erroneous standard to the findings of a district court sitting without a jury, appellate courts must constantly have in mind that their function is not to decide factual issues de novo.

Civil Procedure > Trials > Bench Trials

Civil Procedure > Appeals > Remands
Civil Procedure > Appeals > Standards of Review > Clearly Erroneous Review

***HN75*** The mandatory nature of *Fed. R. Civ. P. 52(a)* does not compel the appellate court to accept factfindings that result from the district court's misapplication of governing law or that otherwise do not permit meaningful appellate review. Nor must the court accept findings that are utterly deficient in other ways. In such a case, the appellate court vacates and remands for further factfinding. When there is fair room for argument that the district court's factfindings should be vacated in toto, the court of appeals should be especially careful in determining that the findings are worthy of the deference *Rule 52(a)* prescribes.

Governments > Courts > Authority to Adjudicate

***HN76*** Appellate decisions command compliance, not agreement.

**Counsel:** Richard J. Urowsky and Steven L. Holley argued the causes for appellant. With them on the briefs were John L. Warden, Richard C. Pepperman, II, William H. Neukom, Thomas W. Burt, David A. Heiner, Jr., Charles F. Rule, Robert A. Long, Jr., and Carter G. Phillips. Christopher J. Meyers entered an appearance.

Lars H. Liebeler, Griffin B. Bell, Lloyd N. Cutler, Louis R. Cohen, C. Boyden Gray, William J. Kolasky, William F. Adkinson, Jr., Jeffrey D. Ayer, and Jay V. Prabhu were on the brief of amici curiae The Association for Competitive Technology and Computing Technology Industry Association in support of appellant.

David R. Burton was on the brief for amicus curiae Center for the Moral Defense of Capitalism in support of appellant.

Robert S. Getman was on the brief **[**2]** for amicus curiae Association for Objective Law in support of appellant.

Jeffrey P. Minear and David C. Frederick, Assistants to the Solicitor General, United States Department of Justice, and John G. Roberts, Jr., argued the causes for appellees. With them on the brief were A. Douglas Melamed, Acting Assistant Attorney General, United States Department of Justice, Jeffrey H. Blattner, Deputy Assistant Attorney General, Catherine G. O'Sullivan, Robert B. Nicholson, Adam D. Hirsh, Andrea Limmer, David Seidman, and Christopher Sprigman, Attorneys, Eliot Spitzer, Attorney General, State of New York, Richard L. Schwartz, Assistant Attorney General, and Kevin J. O'Connor, Office of the Attorney General, State of Wisconsin.

John Rogovin, Kenneth W. Starr, John F. Wood, Elizabeth Petrela, Robert H. Bork, Jason M. Mahler, Stephen M. Shapiro, Donald M. Falk, Mitchell S. Pettit, Kevin J. Arquit, and Michael C. Naughton were on the brief for amici curiae America Online, Inc., et al., in support of appellee. Paul T. Cappuccio entered an appearance.

Lee A. Hollaar, appearing pro se, was on the brief for amicus curiae Lee A. Hollaar.

Carl Lundgren, appearing pro se, was on the **[**3]** brief for amicus curiae Carl Lundgren.

**Judges:** Before: EDWARDS, Chief Judge, WILLIAMS, GINSBURG, SENTELLE, RANDOLPH, ROGERS and TATEL, Circuit Judges.

**Opinion**

**[*44] TABLE OF CONTENTS**


Summary

I. Introduction

A. Background

B. Overview

II. Monopolization

A. Monopoly Power

1. Market Structure

a. Market definition

b. Market power

2. Direct Proof

B. Anticompetitive Conduct

1. Licenses Issued to Original Equipment Manufacturers

a. Anticompetitive effect of the license restrictions

b. Microsoft's justifications for the license restrictions

2. Integration of IE and Windows

a. Anticompetitive effect of integration

b. Microsoft's justifications for integration

3. Agreements with Internet Access Providers

4. Dealings with Internet Content Providers, Independent Software Vendors, and Apple Computer

5. Java

a. The incompatible JVM

b. The First Wave Agreements

c. Deception of Java developers

d. The threat to Intel

6. Course of Conduct

C. Causation

III. Attempted Monopolization

A. Relevant Market

B. Barriers to Entry

IV. Tying

A. Separate-Products Inquiry **[**4]** Under the Per Se Test

B. Per Se Analysis Inappropriate for this Case

C. On Remand

V. Trial Proceedings and Remedy

A. Factual Background

B. Trial Proceedings

C. Failure to Hold an Evidentiary Hearing

D. Failure to Provide an Adequate Explanation

E. Modification of Liability

F. On Remand

G. Conclusion

VI. Judicial Misconduct

A. The District Judge's Communications with the Press

B. Violations of the Code of Conduct for United States Judges

C. Appearance of Partiality

D. Remedies for Judicial Misconduct and Appearance of Partiality

1. Disqualification

2. Review of Findings of Fact and Conclusions of Law

VII. Conclusion

**[*45]** *Per Curiam*: Microsoft Corporation appeals from judgments of the District Court finding the company in violation of §§ 1 and 2 of the Sherman Act and ordering various remedies.

The action against Microsoft arose pursuant to a complaint filed by the United States and separate complaints filed by individual States. The District Court determined that Microsoft had maintained a monopoly in the market for Intelcompatible PC operating systems in violation of *§ 2*; attempted to gain **[**5]** a monopoly in the market for internet browsers in violation of *§ 2*; and illegally tied two purportedly separate products, Windows and Internet Explorer ("IE"), in violation of § 1. *United States v. Microsoft Corp., 87 F. Supp. 2d 30 (D.D.C. 2000)* ("*Conclusions of Law*"). The District Court then found that the same facts that established liability under §§ 1 and 2 of the Sherman Act mandated findings of liability under analogous state law antitrust provisions. *Id.* To remedy the Sherman Act violations, the District Court issued a Final Judgment requiring Microsoft to submit a proposed plan of divestiture, with the company to be split into an operating systems business and an applications business. *United States v. Microsoft Corp.*, 97 F. Supp. 2d 59, 64-65 (D.D.C. 2000) ("*Final Judgment*"). The District Court's remedial order also contains a number of interim restrictions on Microsoft's conduct. *Id.* at 66-69. **[*46]**

Microsoft's appeal contests both the legal conclusions and the resulting remedial order. There are three principal aspects of this appeal. First, Microsoft challenges the District Court's legal conclusions as to all **[**6]** three alleged antitrust violations and also a number of the procedural and factual foundations on which they rest. Second, Microsoft argues that the remedial order must be set aside, because the District Court failed to afford the company an evidentiary hearing on disputed facts and, also, because the substantive provisions of the order are flawed. Finally, Microsoft asserts that the trial judge committed ethical violations by engaging in impermissible *ex parte* contacts and making inappropriate public comments on the merits of the case while it was pending. Microsoft argues that these ethical violations compromised the District Judge's appearance of impartiality, thereby necessitating his disqualification and vacatur of his Findings of Fact, Conclusions of Law, and Final Judgment.

After carefully considering the voluminous record on appeal--including the District Court's Findings of Fact and Conclusions of Law, the testimony and exhibits submitted at trial, the parties' briefs, and the oral arguments before this court--we find that some but not all of Microsoft's liability challenges have merit. Accordingly, we affirm in part and reverse in part the District Court's judgment that **[**7]** Microsoft violated *§ 2* of the Sherman Act by employing anticompetitive means to maintain a monopoly in the operating system market; we reverse the District Court's determination that Microsoft violated *§ 2* of the Sherman Act by illegally attempting to monopolize the internet browser market; and we remand the District Court's finding that Microsoft violated § 1 of the Sherman Act by unlawfully tying its browser to its operating system. Our judgment extends to the District Court's findings with respect to the state law counterparts of the plaintiffs' Sherman Act claims.

We also find merit in Microsoft's challenge to the Final Judgment embracing the District Court's remedial order. There are several reasons supporting this conclusion. First, the District Court's Final Judgment rests on a number of liability determinations that do not survive appellate review; therefore, the remedial order as currently fashioned cannot stand. Furthermore, we would vacate and remand the remedial order even were we to uphold the District Court's liability determinations in their entirety, because the District Court failed to hold an evidentiary hearing to address remedies-specific factual disputes.

**[**8]** Finally, we vacate the Final Judgment on remedies, because the trial judge engaged in impermissible *ex parte* contacts by holding secret interviews with members of the media and made numerous offensive comments about Microsoft officials in public statements outside of the courtroom, giving rise to an appearance of partiality. Although we find no evidence of actual bias, we hold that the actions of the trial judge seriously tainted the proceedings before the District Court and called into question the integrity of the judicial process. We are therefore constrained to vacate the Final Judgment on remedies, remand the case for reconsideration of the remedial order, and require that the case be assigned to a different trial judge on remand. We believe that this disposition will be adequate to cure the cited improprieties.

In sum, for reasons more fully explained below, we affirm in part, reverse in part, and remand in part the District Court's judgment assessing liability. We vacate in full the Final Judgment embodying the remedial order and remand the case to a **[*47]** different trial judge for further proceedings consistent with this opinion.

## I. INTRODUCTION

### *A. Background*

**[**9]** In July 1994, officials at the Department of Justice ("DOJ"), on behalf of the United States, filed suit against Microsoft, charging the company with, among other things, unlawfully maintaining a monopoly in the operating system market through anticompetitive terms in its licensing and software developer agreements. The parties subsequently entered into a consent decree, thus avoiding a trial on the merits. *See* *United States v. Microsoft Corp., 312 U.S. App. D.C. 378, 56 F.3d 1448 (D.C. Cir. 1995)* ("*Microsoft I*"). Three years later, the Justice Department filed a civil contempt action against Microsoft for allegedly violating one of the decree's provisions. On appeal from a grant of a preliminary injunction, this court held that Microsoft's technological bundling of IE 3.0 and 4.0 with Windows 95 did not violate the relevant provision of the consent decree. *United States v. Microsoft Corp., 331 U.S. App. D.C. 121, 147 F.3d 935 (D.C. Cir. 1998)* ("*Microsoft II*"). We expressly reserved the question whether such bundling might independently violate §§ 1 or 2 of the Sherman Act. 147 F.3d at 950 n.14.

On May 18, 1998, shortly before issuance of **[**10]** the *Microsoft II* decision, the United States and a group of State plaintiffs filed separate (and soon thereafter consolidated) complaints, asserting antitrust violations by Microsoft and seeking preliminary and permanent injunctions against the company's allegedly unlawful conduct. The complaints also sought any "other preliminary and permanent relief as is necessary and appropriate to restore competitive conditions in the markets affected by Microsoft's unlawful conduct." Gov't's Compl. at 53, *United States v. Microsoft Corp., 84 F. Supp. 2d 9, 19 (D.D.C. 1999)*. Relying almost exclusively on Microsoft's varied efforts to unseat Netscape Navigator as the preeminent internet browser, plaintiffs charged four distinct violations of the Sherman Act: (1) unlawful exclusive dealing arrangements in violation of § 1; (2) unlawful tying of IE to Windows 95 and Windows 98 in violation of § 1; (3) unlawful maintenance of a monopoly in the PC operating system market in violation of *§ 2*; and (4) unlawful attempted monopolization of the internet browser market in violation of *§ 2*. The States also brought pendent claims charging Microsoft with violations of various State antitrust laws.

The District **[**11]** Court scheduled the case on a "fast track." The hearing on the preliminary injunction and the trial on the merits were consolidated pursuant to *FED. R. CIV. P. 65(a)(2)*. The trial was then scheduled to commence on September 8, 1998, less than four months after the complaints had been filed. In a series of pretrial orders, the District Court limited each side to a maximum of 12 trial witnesses plus two rebuttal witnesses. It required that all trial witnesses' direct testimony be submitted to the court in the form of written declarations. The District Court also made allowances for the use of deposition testimony at trial to prove subordinate or predicate issues. Following the grant of three brief continuances, the trial started on October 19, 1998.

After a 76-day bench trial, the District Court issued its Findings of Fact. *United States v. Microsoft Corp., 84 F. Supp. 2d 9 (D.D.C. 1999)* ("*Findings of Fact*"). This triggered two independent courses of action. First, the District Court established a schedule for briefing on possible legal conclusions, inviting Professor Lawrence Lessig to participate as *amicus curiae*. Second, the District Court referred the case **[**12]** to mediation to afford the parties an opportunity to settle their differences.
The **[*48]** Honorable Richard A. Posner, Chief Judge of the United States Court of Appeals for the Seventh Circuit, was appointed to serve as mediator. The parties concurred in the referral to mediation and in the choice of mediator.

Mediation failed after nearly four months of settlement talks between the parties. On April 3, 2000, with the parties' briefs having been submitted and considered, the District Court issued its conclusions of law. The District Court found Microsoft liable on the § 1 tying and *§ 2* monopoly

maintenance and attempted monopolization claims, *Conclusions of Law*, at 35-51, while ruling that there was insufficient evidence to support a § 1 exclusive dealing violation, *id. at 51-54*. As to the pendent State actions, the District Court found the State antitrust laws conterminous with §§ 1 and 2 of the Sherman Act, thereby obviating the need for further Statespecific analysis. *Id. at 54-56*. In those few cases where a State's law required an additional showing of *intrastate* impact on competition, the District Court found the requirement easily satisfied **[**13]** on the evidence at hand. *Id. at 55*.

Having found Microsoft liable on all but one count, the District Court then asked plaintiffs to submit a proposed remedy. Plaintiffs' proposal for a remedial order was subsequently filed within four weeks, along with six supplemental declarations and over 50 new exhibits. In their proposal, plaintiffs sought specific conduct remedies, plus structural relief that would split Microsoft into an applications company and an operating systems company. The District Court rejected Microsoft's request for further evidentiary proceedings and, following a single hearing on the merits of the remedy question, issued its Final Judgment on June 7, 2000. The District Court adopted plaintiffs' proposed remedy without substantive change.

Microsoft filed a notice of appeal within a week after the District Court issued its Final Judgment. This court then ordered that any proceedings before it be heard by the court sitting *en banc*. Before any substantive matters were addressed by this court, however, the District Court certified appeal of the case brought by the United States directly to the Supreme Court pursuant to *15 U.S.C. § 29* **[**14]** *(b)*, while staying the final judgment order in the federal and state cases pending appeal. The States thereafter petitioned the Supreme Court for a *writ of certiorari* in their case. The Supreme Court declined to hear the appeal of the Government's case and remanded the matter to this court; the Court likewise denied the States' petition for *writ of certiorari*. Microsoft Corp. v. United States, 530 U.S. 1301 (2000). This consolidated appeal followed.

*B. Overview*

Before turning to the merits of Microsoft's various arguments, we pause to reflect briefly on two matters of note, one practical and one theoretical.

The practical matter relates to the temporal dimension of this case. The litigation timeline in this case is hardly problematic. Indeed, it is noteworthy that a case of this magnitude and complexity has proceeded from the filing of complaints through trial to appellate decision in a mere three years. *See, e.g., Data Gen. Corp. v. Grumman Sys. Support Corp., 36 F.3d 1147, 1155 (1st Cir. 1994)* (six years from filing of complaint to appellate decision); *Transamerica Computer Co., Inc. v. IBM, 698 F.2d 1377, 1381 (9th Cir. 1983)* **[**15]** (over four years from start of trial to appellate decision); *United States v. United Shoe Mach. Corp., 110 F. Supp. 295, 298 (D. Mass. 1953)* (over five years from filing of complaint to trial court decision).

**[*49]** What is somewhat problematic, however, is that just over six years have passed since Microsoft engaged in the first conduct plaintiffs allege to be anticompetitive. As the record in this case indicates, six years seems like an eternity in the computer industry. By the time a court can assess liability, firms, products, and the marketplace are likely to have changed dramatically. This, in turn, threatens enormous practical difficulties for courts considering the appropriate measure of relief in equitable enforcement actions, both in crafting injunctive remedies in the first instance and reviewing those remedies in the second. Conduct remedies may be unavailing in such cases, because innovation to a large degree has already rendered the anticompetitive conduct

obsolete (although by no means harmless). And broader structural remedies present their own set of problems, including how a court goes about *restoring* competition to a dramatically changed, and constantly **[**16]** changing, marketplace. That is just one reason why we find the District Court's refusal in the present case to hold an evidentiary hearing on remedies--to update and flesh out the available information before seriously entertaining the possibility of dramatic structural relief--so problematic. *See infra* Section V.

We do not mean to say that enforcement actions will no longer play an important role in curbing infringements of the antitrust laws in technologically dynamic markets, nor do we assume this in assessing the merits of this case. Even in those cases where forward-looking remedies appear limited, the Government will continue to have an interest in defining the contours of the antitrust laws so that law-abiding firms will have a clear sense of what is permissible and what is not. And the threat of private damage actions will remain to deter those firms inclined to test the limits of the law.

The second matter of note is more theoretical in nature. We decide this case against a backdrop of significant debate amongst academics and practitioners over the extent to which "old economy" *§ 2* monopolization doctrines should apply to firms competing in dynamic technological markets **[**17]** characterized by network effects. In markets characterized by network effects, one product or standard tends towards dominance, because "the utility that a user derives from consumption of the good increases with the number of other agents consuming the good." Michael L. Katz & Carl Shapiro, *Network Externalities, Competition, and Compatibility*, 75 AM. ECON. REV. 424, 424 (1985). For example, "an individual consumer's demand to use (and hence her benefit from) the telephone network … increases with the number of other users on the network whom she can call or from whom she can receive calls." Howard A. Shelanski & J. Gregory Sidak, *Antitrust Divestiture in Network Industries*, *68 U. CHI. L. REV. 1, 8 (2001)*. Once a product or standard achieves wide acceptance, it becomes more or less entrenched. Competition in such industries is "for the field" rather than "within the field." *See* Harold Demsetz, *Why Regulate Utilities*?, 11 J.L. & ECON. 55, 57 & n.7 (1968) (emphasis omitted).

In technologically dynamic markets, however, such entrenchment may be temporary, because innovation may alter the field altogether. *See* JOSEPH A. SCHUMPETER, **[**18]** CAPITALISM, SOCIALISM AND DEMOCRACY 81-90 (Harper Perennial 1976) (1942). Rapid technological change leads to markets in which "firms compete through innovation for temporary market dominance, from which they may be displaced by the next wave of product advancements." Shelanski & Sidak, at 11-12 (discussing Schumpeterian competition, which proceeds "sequentially over time rather than **[*50]** simultaneously across a market"). Microsoft argues that the operating system market is just such a market.

Whether or not Microsoft's characterization of the operating system market is correct does not appreciably alter our mission in assessing the alleged antitrust violations in the present case. As an initial matter, we note that there is no consensus among commentators on the question of whether, and to what extent, current monopolization doctrine should be amended to account for competition in technologically dynamic markets characterized by network effects. *Compare* Steven C. Salop & R. Craig Romaine, *Preserving Monopoly: Economic Analysis, Legal Standards, and Microsoft*, *7 GEO. MASON L. REV. 617, 654-55, 663-64 (1999)* (arguing that exclusionary conduct in high-tech networked **[**19]** industries deserves heightened antitrust scrutiny in part because it may threaten to deter innovation), *with* Ronald A. Cass & Keith N. Hylton, *Preserving*

*Competition: Economic Analysis, Legal Standards and Microsoft*, 8 GEO. MASON L. REV. 1, 36-39 (1999) (equivocating on the antitrust implications of network effects and noting that the presence of network externalities may actually encourage innovation by guaranteeing more durable monopolies to innovating winners). Indeed, there is some suggestion that the economic consequences of network effects and technological dynamism act to offset one another, thereby making it difficult to formulate categorical antitrust rules absent a particularized analysis of a given market. *See* Shelanski & Sidak, at 6-7 ("High profit margins might appear to be the benign and necessary recovery of legitimate investment returns in a Schumpeterian framework, but they might represent exploitation of customer lock-in and monopoly power when viewed through the lens of network economics.... The issue is particularly complex because, in network industries characterized by rapid innovation, both forces may be operating and can be difficult **[**20]** to isolate.").

Moreover, it should be clear that Microsoft makes no claim that anticompetitive conduct should be assessed differently in technologically dynamic markets. It claims only that the measure of monopoly power should be different. For reasons fully discussed below, we reject Microsoft's monopoly power argument. *See infra* Section II.A.

With this backdrop in mind, we turn to the specific challenges raised in Microsoft's appeal.

**II. MONOPOLIZATION**

***HN1*** Section 2 of the Sherman Act makes it unlawful for a firm to "monopolize." 15 U.S.C. § 2. The offense of monopolization has two elements: "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *United States v. Grinnell Corp., 384 U.S. 563, 570-71, 16 L. Ed. 2d 778, 86 S. Ct. 1698 (1966)*. The District Court applied this test and found that Microsoft possesses monopoly power in the market for Intel-compatible PC operating systems. Focusing primarily on Microsoft's efforts to suppress Netscape Navigator's **[**21]** threat to its operating system monopoly, the court also found that Microsoft maintained its power not through competition on the merits, but through unlawful means. Microsoft challenges both conclusions. ***HN2*** We defer to the District Court's findings of fact, setting them aside only if clearly erroneous. *FED R. CIV. P. 52(a)*. ***HN3*** We review legal questions *de novo*. *United States ex rel. Modern* **[*51]** *Elec., Inc. v. Ideal Elec. Sec. Co., 317 U.S. App. D.C. 145, 81 F.3d 240, 244 (D.C. Cir. 1996)*.

We begin by considering whether Microsoft possesses monopoly power, *see infra* Section II.A, and finding that it does, we turn to the question whether it maintained this power through anticompetitive means. Agreeing with the District Court that the company behaved anticompetitively, *see infra* Section II.B, and that these actions contributed to the maintenance of its monopoly power, *see infra* Section II.C, we affirm the court's finding of liability for monopolization.

*A. Monopoly Power*

***HN4*** While merely possessing monopoly power is not itself an antitrust violation, *see Northeastern Tel. Co. v. AT & T, 651 F.2d 76, 84-85 (2d Cir. 1981)*, it is a necessary element of a monopolization **[**22]** charge, *see Grinnell, 384 U.S. at 570*. The Supreme Court defines monopoly power as "the power to control prices or exclude competition." *United States v. E.I. du Pont de Nemours*

*& Co., 351 U.S. 377, 391, 100 L. Ed. 1264, 76 S. Ct. 994 (1956)*. More precisely, a firm is a monopolist if it can profitably raise prices substantially above the competitive level. 2A PHILLIP E. AREEDA ET AL., ANTITRUST LAW [PARA.] 501, at 85 (1995); *cf.* *Ball Mem'l Hosp., Inc. v. Mut. Hosp. Ins., Inc., 784 F.2d 1325, 1335 (7th Cir. 1986)* (defining market power as "the ability to cut back the market's total output and so raise price"). Where evidence indicates that a firm has in fact profitably done so, the existence of monopoly power is clear. *See* *Rebel Oil Co. v. Atl. Richfield Co., 51 F.3d 1421, 1434 (9th Cir. 1995)*; *see also* *FTC v. Indiana Fed'n of Dentists, 476 U.S. 447, 460-61, 90 L. Ed. 2d 445, 106 S. Ct. 2009 (1986)* (using direct proof to show market power in Sherman Act § 1 unreasonable restraint of trade action). Because such direct proof is only rarely available, courts more typically examine market structure in **[**23]** search of circumstantial evidence of monopoly power. 2A AREEDA ET AL., ANTITRUST LAW P 531a, at 156; *see also, e.g.,* *Grinnell, 384 U.S. at 571*. Under this structural approach, monopoly power may be inferred from a firm's possession of a dominant share of a relevant market that is protected by entry barriers. *SeeRebel Oil, 51 F.3d at 1434*. "Entry barriers" are factors (such as certain regulatory requirements) that prevent new rivals from timely responding to an increase in price above the competitive level. *See* *S. Pac. Communications Co. v. AT & T, 238 U.S. App. D.C. 309, 740 F.2d 980, 1001-02 (D.C. Cir. 1984)*.

The District Court considered these structural factors and concluded that Microsoft possesses monopoly power in a relevant market. Defining the market as Intel-compatible PC operating systems, the District Court found that Microsoft has a greater than 95% share. It also found the company's market position protected by a substantial entry barrier. *Conclusions of Law*, at 36.

Microsoft argues that the District Court incorrectly defined the relevant market. It also claims that there is no barrier to entry in that market. **[**24]** Alternatively, Microsoft argues that because the software industry is uniquely dynamic, direct proof, rather than circumstantial evidence, more appropriately indicates whether it possesses monopoly power. Rejecting each argument, we uphold the District Court's finding of monopoly power in its entirety.

**1. Market Structure**

a. *Market definition*

"***HN5*** Because the ability of consumers to turn to other suppliers restrains a firm from raising prices above the competitive level," *Rothery Storage & Van Co. v. Atlas Van Lines, Inc., 253 U.S. App. D.C. 142, 792 F.2d 210, 218* **[*52]** (D.C. Cir. 1986), the relevant market must include all products "reasonably interchangeable by consumers for the same purposes." *du* *Pont, 351 U.S. at 395*. In this case, the District Court defined the market as "the licensing of all Intel-compatible PC operating systems worldwide," finding that there are "currently no products--and … there are not likely to be any in the near future--that a significant percentage of computer users worldwide could substitute for [these operating systems] without incurring substantial costs." *Conclusions of Law*, at 36. Calling this market definition **[**25]** "far too narrow," Appellant's Opening Br. at 84, Microsoft argues that the District Court improperly excluded three types of products: non-Intel compatible operating systems (primarily Apple's Macintosh operating system, Mac OS), operating systems for non-PC devices (such as handheld computers and portal websites), and "middleware" products, which are not operating systems at all.

We begin with Mac OS. Microsoft's argument that Mac OS should have been included in the relevant market suffers from a flaw that infects many of the company's monopoly power claims:

the company fails to challenge the District Court's factual findings, or to argue that these findings do not support the court's conclusions. The District Court found that consumers would not switch from Windows to Mac OS in response to a substantial price increase because of the costs of acquiring the new hardware needed to run Mac OS (an Apple computer and peripherals) and compatible software applications, as well as because of the effort involved in learning the new system and transferring files to its format. *Findings of Fact* P 20. The court also found the Apple system less appealing to consumers because it costs considerably **[**26]** more and supports fewer applications. *Id.* P 21. Microsoft responds only by saying: "the district court's market definition is so narrow that it excludes Apple's Mac OS, which has competed with Windows for years, simply because the Mac OS runs on a different microprocessor." Appellant's Opening Br. at 84. ***HN6*** This general, conclusory statement falls far short of what is required to challenge findings as clearly erroneous. *Pendleton v. Rumsfeld, 202 U.S. App. D.C. 102, 628 F.2d 102, 106 (D.C. Cir. 1980)*; *see also* *Terry v. Reno, 322 U.S. App. D.C. 124, 101 F.3d 1412, 1415 (D.C. Cir. 1996)* (holding that claims made but not argued in a brief are waived). Microsoft neither points to evidence contradicting the District Court's findings nor alleges that supporting record evidence is insufficient. And since Microsoft does not argue that even if we accept these findings, they do not support the District Court's conclusion, we have no basis for upsetting the court's decision to exclude Mac OS from the relevant market.

Microsoft's challenge to the District Court's exclusion of non-PC based competitors, such as information appliances (handheld devices, etc.) and **[**27]** portal websites that host serverbased software applications, suffers from the same defect: the company fails to challenge the District Court's key factual findings. In particular, the District Court found that because information appliances fall far short of performing all of the functions of a PC, most consumers will buy them only as a supplement to their PCs. *Findings of Fact* P 23. The District Court also found that portal websites do not presently host enough applications to induce consumers to switch, nor are they likely to do so in the near future. *Id. P 27*. Again, because Microsoft does not argue that the District Court's findings do not support its conclusion that information appliances and portal websites are outside the relevant market, we adhere to that conclusion.

**[*53]** This brings us to Microsoft's main challenge to the District Court's market definition: the exclusion of middleware. Because of the importance of middleware to this case, we pause to explain what it is and how it relates to the issue before us.

Operating systems perform many functions, including allocating computer memory and controlling peripherals such as printers and keyboards. *See* Direct Testimony **[**28]** of Frederick Warren-Boulton P 20, *reprinted in* 5 J.A. at 3172-73. Operating systems also function as platforms for software applications. They do this by "exposing"--*i.e.*, making available to software developers--routines or protocols that perform certain widely-used functions. These are known as Application Programming Interfaces, or "APIs." *See* Direct Testimony of James Barksdale P 70, *reprinted in* 5 J.A. at 2895-96. For example, Windows contains an API that enables users to draw a box on the screen. *See* Direct Testimony of Michael T. Devlin P 12, *reprinted in* 5 J.A. at 3525. Software developers wishing to include that function in an application need not duplicate it in their own code. Instead, they can "call"--*i.e.*, use--the Windows API. *See* Direct Testimony of James Barksdale P P 70-71, *reprinted in* 5 J.A. at 2895-97. Windows contains thousands of APIs, controlling everything from data storage to font display. *See* Direct Testimony of Michael Devlin P 12, *reprinted in* 5 J.A. at 3525.

Every operating system has different APIs. Accordingly, a developer who writes an application for one operating system and wishes to sell the application **[**29]** to users of another must modify,

or "port," the application to the second operating system. *Findings of Fact* P 4. This process is both timeconsuming and expensive. *Id. P 30*.

"Middleware" refers to software products that expose their own APIs. *Id.* P 28; Direct Testimony of Paul Maritz P P 234-36, *reprinted in* 6 J.A. at 3727-29. Because of this, a middleware product written for Windows could take over some or all of Windows's valuable platform functions--that is, developers might begin to rely upon APIs exposed by the middleware for basic routines rather than relying upon the API set included in Windows. If middleware were written for multiple operating systems, its impact could be even greater. The more developers could rely upon APIs exposed by such middleware, the less expensive porting to different operating systems would be. Ultimately, if developers could write applications relying exclusively on APIs exposed by middleware, their applications would run on any operating system on which the middleware was also present. *See* Direct Testimony of Avadis Tevanian, Jr. P 45, *reprinted in* 5 J.A. at 3113. Netscape Navigator and Java--both at issue in this case--are **[**30]** middleware products written for multiple operating systems. *Findings of Fact* P 28.

Microsoft argues that, because middleware could usurp the operating system's platform function and might eventually take over other operating system functions (for instance, by controlling peripherals), the District Court erred in excluding Navigator and Java from the relevant market. The District Court found, however, that neither Navigator, Java, nor any other middleware product could now, or would soon, expose enough APIs to serve as a platform for popular applications, much less take over all operating system functions. *Id.* P P 28-29. Again, Microsoft fails to challenge these findings, instead simply asserting middleware's "potential" as a competitor. Appellant's Opening Br. at 86. ***HN7*** The test of reasonable interchangeability, however, required the District Court to consider only substitutes that constrain pricing in the reasonably foreseeable **[*54]** future, and only products that can enter the market in a relatively short time can perform this function. *See* *Rothery, 792 F.2d at 218* ("Because the ability of consumers to turn to other suppliers restrains a firm from raising prices **[**31]** above the competitive level, the definition of the 'relevant market' rests on a determination of available substitutes."); *see also Findings of Fact* P 29 ("It would take several years for middleware … to evolve" into a product that can constrain operating system pricing.). Whatever middleware's ultimate potential, the District Court found that consumers could not now abandon their operating systems and switch to middleware in response to a sustained price for Windows above the competitive level. *Findings of Fact* P P 28, 29. Nor is middleware likely to overtake the operating system as the primary platform for software development any time in the near future. *Id.*

Alternatively, Microsoft argues that the District Court should not have excluded middleware from the relevant market because the primary focus of the plaintiffs' *§ 2* charge is on Microsoft's attempts to suppress middleware's threat to its operating system monopoly. According to Microsoft, it is "contradictory," 2/26/2001 Ct. Appeals Tr. at 20, to define the relevant market to exclude the "very competitive threats that gave rise" to the action. Appellant's Opening Br. at 84. The purported contradiction lies between **[**32]** plaintiffs' *§ 2* theory, under which Microsoft preserved its monopoly against middleware technologies that threatened to become viable substitutes for Windows, and its theory of the relevant market, under which middleware is not presently a viable substitute for Windows. Because middleware's threat is only nascent, however, no contradiction exists. ***HN8*** Nothing in *§ 2* of the Sherman Act limits its prohibition to actions taken against threats that are already well-developed enough to serve as present substitutes. *See infra* Section II.C. Because market definition is meant to identify products "reasonably interchangeable

by consumers," *du Pont, 351 U.S. at 395*, and because middleware is not now interchangeable with Windows, the District Court had good reason for excluding middleware from the relevant market.

b. *Market power*

Having thus properly defined the relevant market, the District Court found that Windows accounts for a greater than 95% share. *Findings of Fact* P 35. The court also found that even if Mac OS were included, Microsoft's share would exceed 80%. *Id.* Microsoft challenges neither finding, nor does it argue that such a market share is not predominant. **[**33]** *Cf. Grinnell, 384 U.S. at 571* (87% is predominant); *Eastman Kodak Co. v. Image Technical Servs., Inc., 504 U.S. 451, 481, 119 L. Ed. 2d 265, 112 S. Ct. 2072 (1992)* (80%); *du Pont, 351 U.S. at 379, 391* (75%).

Instead, Microsoft claims that even a predominant market share does not by itself indicate monopoly power. ***HN9*** Although the "existence of [monopoly] power ordinarily may be inferred from the predominant share of the market," *Grinnell, 384 U.S. at 571*, we agree with Microsoft that because of the possibility of competition from new entrants, *see Ball Mem'l Hosp., Inc., 784 F.2d at 1336*, looking to current market share alone can be "misleading." *Hunt-Wesson Foods, Inc. v. Ragu Foods, Inc., 627 F.2d 919, 924 (9th Cir. 1980)*; *see also Ball Mem'l Hosp., Inc., 784 F.2d at 1336* ("Market share reflects current sales, but today's sales do not always indicate power over sales and price tomorrow.") In this case, however, the District Court was not misled. Considering **[*55]** the possibility of new rivals, the court focused not only on Microsoft's present market share, but also on the **[**34]** structural barrier that protects the company's future position. *Conclusions of Law*, at 36. That barrier--the "applications barrier to entry"--stems from two characteristics of the software market: (1) most consumers prefer operating systems for which a large number of applications have already been written; and (2) most developers prefer to write for operating systems that already have a substantial consumer base. *See Findings of Fact* P P 30, 36. This "chicken-and-egg" situation ensures that applications will continue to be written for the already dominant Windows, which in turn ensures that consumers will continue to prefer it over other operating systems. *Id.*

Challenging the existence of the applications barrier to entry, Microsoft observes that software developers do write applications for other operating systems, pointing out that at its peak IBM's OS/2 supported approximately 2,500 applications. *Id.* P 46. This misses the point. That some developers write applications for other operating systems is not at all inconsistent with the finding that the applications barrier to entry discourages many from writing for these less popular platforms. Indeed, the District **[**35]** Court found that IBM's difficulty in attracting a larger number of software developers to write for its platform seriously impeded OS/2's success. *Id.* P 46.

Microsoft does not dispute that Windows supports many more applications than any other operating system. It argues instead that "it defies common sense" to suggest that an operating system must support as many applications as Windows does (more than 70,000, according to the District Court, *id.* P 40) to be competitive. Appellant's Opening Br. at 96. Consumers, Microsoft points out, can only use a very small percentage of these applications. *Id.* As the District Court explained, however, the applications barrier to entry gives consumers reason to prefer the dominant operating system even if they have no need to use all applications written for it:

> The consumer wants an operating system that runs not only types of applications that he knows he will want to use, but also those types in which he might develop an interest later. Also, the consumer knows that if he chooses an operating system with enough demand to support multiple applications in each product category, he will be less likely to find himself straitened **[**36]** later by having to use an application whose features disappoint him. Finally, the average user knows that, generally speaking, applications improve through successive versions. He thus wants an operating system for which successive generations of his favorite applications will be released--promptly at that. The fact that a vastly larger number of applications are written for Windows than for other PC operating systems attracts consumers to Windows, because it reassures them that their interests will be met as long as they use Microsoft's product.*Findings of Fact* P 37. Thus, despite the limited success of its rivals, Microsoft benefits from the applications barrier to entry.

Of course, were middleware to succeed, it would erode the applications barrier to entry. Because applications written for multiple operating systems could run on any operating system on which the middleware product was present with little, if any, porting, the operating system market would become competitive. *Id*. P P 29, 72. But as the District Court found, middleware will not expose a sufficient number of APIs to erode the applications barrier to entry in the foreseeable future. *See id*. P **[**37]** P 28-29.

**[*56]** Microsoft next argues that the applications barrier to entry is not an entry barrier at all, but a reflection of Windows' popularity. It is certainly true that Windows may have gained its initial dominance in the operating system market competitively--through superior foresight or quality. But this case is not about Microsoft's initial acquisition of monopoly power. It is about Microsoft's efforts to maintain this position through means other than competition on the merits. Because the applications barrier to entry protects a dominant operating system irrespective of quality, it gives Microsoft power to stave off even superior new rivals. The barrier is thus a characteristic of the operating system market, not of Microsoft's popularity, or, as asserted by a Microsoft witness, the company's efficiency. *See* Direct Testimony of Richard Schmalensee P 115, *reprinted in* 25 J.A. at 16153-14.

Finally, Microsoft argues that the District Court should not have considered the applications barrier to entry because it reflects not a cost borne disproportionately by new entrants, but one borne by all participants in the operating system market. According to Microsoft, it had to **[**38]** make major investments to convince software developers to write for its new operating system, and it continues to "evangelize" the Windows platform today. Whether costs borne by all market participants should be considered entry barriers is the subject of much debate. C*ompare* 2A AREEDA & HOVENKAMP, ANTITRUST LAW § 420c, at 61 (arguing that these costs are entry barriers), *and* JOE S. BAIN, BARRIERS TO NEW COMPETITION: THEIR CHARACTER AND CONSEQUENCES IN MANUFACTURING INDUSTRIES 6-7 (1956) (considering these costs entry barriers), *with* *L.A. Land Co. v. Brunswick Corp., 6 F.3d 1422, 1428 (9th Cir. 1993)* (evaluating cost based on "the disadvantage of new entrants as compared to incumbents"), *and* GEORGE STIGLER, THE ORGANIZATION OF INDUSTRY 67 (1968) (excluding these costs). We need not resolve this issue, however, for even under the more narrow definition it is clear that there are barriers. When Microsoft entered the operating system market with MS-DOS and the first version of Windows, it did not confront a dominant rival operating system with as massive

an installed base and as vast an existing array of applications as the Windows operating systems have **[**39]** since enjoyed. *Findings of Fact* P P 6, 7, 43. Moreover, when Microsoft introduced Windows 95 and 98, it was able to bypass the applications barrier to entry that protected the incumbent Windows by including APIs from the earlier version in the new operating systems. *See* *id. P 44*. This made porting existing Windows applications to the new version of Windows much less costly than porting them to the operating systems of other entrants who could not freely include APIs from the incumbent Windows with their own.

**2. Direct Proof**

Having sustained the District Court's conclusion that circumstantial evidence proves that Microsoft possesses monopoly power, we turn to Microsoft's alternative argument that it does not behave like a monopolist. Claiming that software competition is uniquely "dynamic," Appellant's Opening Br. at 84 (quoting *Findings of Fact* P 59), the company suggests a new rule: that monopoly power in the software industry should be proven directly, that is, by examining a company's actual behavior to determine if it reveals the existence of monopoly power. According to Microsoft, not only does no such proof of its power exist, but record evidence demonstrates **[**40]** the absence of monopoly power. The company claims that it invests heavily in research and development, *id. at 88-89* (citing **[*57]** Direct Testimony of Paul Maritz P 155, *reprinted in* 6 J.A. at 3698 (testifying that Microsoft invests approximately 17% of its revenue in R&D)), and charges a low price for Windows (a small percentage of the price of an Intelcompatible PC system and less than the price of its rivals, *id. at 90* (citing *Findings of Fact* P P 19, 21, 46)).

Microsoft's argument fails because, even assuming that the software market is uniquely dynamic in the long term, the District Court correctly applied the structural approach to determine if the company faces competition in the short term. ***HN10*** Structural market power analyses are meant to determine whether potential substitutes constrain a firm's ability to raise prices above the competitive level; only threats that are likely to materialize in the relatively near future perform this function to any significant degree. *Rothery, 792 F.2d at 218* (quoting LAWRENCE SULLIVAN, ANTITRUST § 12, at 41 (1977)) (only substitutes that can enter the market "promptly" should be considered). The District Court expressly **[**41]** considered and rejected Microsoft's claims that innovations such as handheld devices and portal websites would soon expand the relevant market beyond Intel-compatible PC operating systems. Because the company does not challenge these findings, we have no reason to believe that prompt substitutes are available. The structural approach, as applied by the District Court, is thus capable of fulfilling its purpose even in a changing market. Microsoft cites no case, nor are we aware of one, requiring direct evidence to show monopoly power in any market. We decline to adopt such a rule now.

Even if we were to require direct proof, moreover, Microsoft's behavior may well be sufficient to show the existence of monopoly power. Certainly, none of the conduct Microsoft points to--its investment in R&D and the relatively low price of Windows--is inconsistent with the possession of such power. *Conclusions of Law*, at 37. The R&D expenditures Microsoft points to are not simply for Windows, but for its entire company, which most likely does not possess a monopoly for all of its products. Moreover, because innovation can increase an already dominant market share and further delay the emergence **[**42]** of competition, even monopolists have reason to invest in R&D. *Findings of Fact* P 61. Microsoft's pricing behavior is similarly equivocal. The company claims only that it never charged the short-term profit-maximizing price for Windows. Faced with conflicting expert testimony, the District Court found that it could not accurately determine

what this price would be. *Id*. P 65. In any event, the court found, a price lower than the short-term profit-maximizing price is not inconsistent with possession or improper use of monopoly power. *Id*. P P 65-66. *Cf. Berkey Photo, Inc. v.Eastman Kodak Co., 603 F.2d 263, 274 (2d Cir. 1979)* ("***HN11*** If monopoly power has been acquired or maintained through improper means, the fact that the power has not been used to extract [a monopoly price] provides no succor to the monopolist."). Microsoft never claims that it did not charge the longterm monopoly price. Micosoft does argue that the price of Windows is a fraction of the price of an Intel-compatible PC system and lower than that of rival operating systems, but these facts are not inconsistent with the District Court's finding that Microsoft has monopoly power. *See Findings* **[**43]** *of Fact* P 36 ("Intel-compatible PC operating systems other than Windows [would not] attract[] significant demand ... even if Micosoft held its prices substantially above the competitive level.").

More telling, the District Court found that some aspects of Microsoft's behavior are difficult to explain unless Windows is a monopoly product. For instance, according **[*58]** to the District Court, the company set the price of Windows without considering rivals' prices, *Findings of Fact* P 62, something a firm without a monopoly would have been unable to do. The District Court also found that Microsoft's pattern of exclusionary conduct could only be rational "if the firm knew that it possessed monopoly power." *Conclusions of Law*, at 37. It is to that conduct that we now turn.

*B. Anticompetitive Conduct*

As discussed above, having a monopoly does not by itself violate *§ 2*. ***HN12*** A firm violates *§ 2* only when it acquires or maintains, or attempts to acquire or maintain, a monopoly by engaging in exclusionary conduct "as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *Grinnell, 384 U.S. at 571*; **[**44]** *see also United States v. Aluminum Co. of Am., 148 F.2d 416, 430 (2d Cir. 1945)* (Hand, J.) ("The successful competitor, having been urged to compete, must not be turned upon when he wins.").

In this case, after concluding that Microsoft had monopoly power, the District Court held that Microsoft had violated *§ 2* by engaging in a variety of exclusionary acts (not including predatory pricing), to maintain its monopoly by preventing the effective distribution and use of products that might threaten that monopoly. Specifically, the District Court held Microsoft liable for: (1) the way in which it integrated IE into Windows; (2) its various dealings with Original Equipment Manufacturers ("OEMs"), Internet Access Providers ("IAPs"), Internet Content Providers ("ICPs"), Independent Software Vendors ("ISVs"), and Apple Computer; (3) its efforts to contain and to subvert Java technologies; and (4) its course of conduct as a whole. Upon appeal, Microsoft argues that it did not engage in any exclusionary conduct.

Whether any particular act of a monopolist is exclusionary, rather than merely a form of vigorous competition, can be difficult to discern: the means of illicit exclusion, **[**45]** like the means of legitimate competition, are myriad. The challenge for an antitrust court lies in stating a general rule for distinguishing between exclusionary acts, which reduce social welfare, and competitive acts, which increase it.

From a century of case law on monopolization under *§ 2*, however, several principles do emerge. ***HN13*** First, to be condemned as exclusionary, a monopolist's act must have an "anticompetitive effect." That is, it must harm the competitive *process* and thereby harm consumers. In contrast, harm to one or more *competitors* will not suffice. "The [Sherman Act] directs itself not against conduct which is competitive, even severely so, but against conduct which unfairly tends

to destroy competition itself." *Spectrum Sports, Inc. v. McQuillan, 506 U.S. 447, 458, 122 L. Ed. 2d 247, 113 S. Ct. 884 (1993)*; *see also* *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp., 509 U.S. 209, 225, 125 L. Ed. 2d 168, 113 S. Ct. 2578 (1993)* ("Even an act of pure malice by one business competitor against another does not, without more, state a claim under the federal antitrust laws….").

Second, ***HN14*** the plaintiff, on whom the burden of proof **[**46]** of course rests, *see, e.g.*, *Monsanto Co. v. Spray-Rite Serv. Corp., 465 U.S. 752, 763, 79 L. Ed. 2d 775, 104 S. Ct. 1464 (1984)*; *see also* *United States v. Arnold, Schwinn & Co., 388 U.S. 365, 374 n.5, 18 L. Ed. 2d 1249, 87 S. Ct. 1856 (1967)*, *overruled on other grounds*, *Cont'l T.V., Inc. v. GTE Sylvania Inc., 433 U.S. 36, 97 S. Ct. 2549, 53 L. Ed. 2d 568 (1977)*, must demonstrate that the monopolist's conduct indeed has the requisite anticompetitive **[*59]** effect. *See generally* *Brooke Group, 509 U.S. at 225-26*. In a case brought by a private plaintiff, the plaintiff must show that its injury is "of 'the type that the statute was intended to forestall,' " *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 487-88, 50 L. Ed. 2d 701, 97 S. Ct. 690 (1977)* (quoting *Wyandotte Transp. v. United States, 389 U.S. 191, 202, 19 L. Ed. 2d 407, 88 S. Ct. 379 (1967))*; no less in a case brought by the Government, it must demonstrate that the monopolist's conduct harmed competition, not just a competitor.

Third, ***HN15*** if a plaintiff successfully establishes a *prima facie* case under *§ 2* by demonstrating anticompetitive effect, then **[**47]** the monopolist may proffer a "procompetitive justification" for its conduct. *See* *Eastman Kodak, 504 U.S. at 483*. If the monopolist asserts a procompetitive justification--a nonpretextual claim that its conduct is indeed a form of competition on the merits because it involves, for example, greater efficiency or enhanced consumer appeal--then the burden shifts back to the plaintiff to rebut that claim. *Cf.* *Capital Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs., Inc., 996 F.2d 537, 543 (2d Cir. 1993)*.

Fourth, ***HN16*** if the monopolist's procompetitive justification stands unrebutted, then the plaintiff must demonstrate that the anticompetitive harm of the conduct outweighs the procompetitive benefit. In cases arising under § 1 of the Sherman Act, the courts routinely apply a similar balancing approach under the rubric of the "rule of reason." The source of the rule of reason is *Standard Oil Co. v. United States, 221 U.S. 1, 55 L. Ed. 619, 31 S. Ct. 502 (1911)*, in which the Supreme Court used that term to describe the proper inquiry under both sections of the Act. *See* *id. at 61-62* ("When the second section [of the Sherman **[**48]** Act] is thus harmonized with … the first, it becomes obvious that the criteria to be resorted to in any given case for the purpose of ascertaining whether violations of the section have been committed, is the rule of reason guided by the established law…."). As the Fifth Circuit more recently explained, "it is clear … that the analysis under *section 2* is similar to that under section 1 regardless whether the rule of reason label is applied…." *Mid-Texas Communications Sys., Inc. v. AT & T, 615 F.2d 1372, 1389 n.13 (5th Cir. 1980)* (citing *Byars v. Bluff City News Co., 609 F.2d 843, 860 (6th Cir. 1979))*; *see also* *Cal. Computer Prods., Inc. v. IBM Corp., 613 F.2d 727, 737 (9th Cir. 1979)*.

Finally, ***HN17*** in considering whether the monopolist's conduct on balance harms competition and is therefore condemned as exclusionary for purposes of *§ 2*, our focus is upon the effect of that conduct, not upon the intent behind it. Evidence of the intent behind the conduct of a monopolist is relevant only to the extent it helps us understand the likely effect of the monopolist's conduct. *See, e.g.*, *Chicago Bd. of Trade v. United States, 246 U.S. 231, 238, 62 L. Ed. 683, 38 S. Ct. 242 (1918)* **[**49]** ("knowledge of intent may help the court to interpret facts and to predict

consequences"); *Aspen Skiing Co. v. Aspen Highlands Skiing Corp., 472 U.S. 585, 603, 86 L. Ed. 2d 467, 105 S. Ct. 2847 (1985)*.

With these principles in mind, we now consider Microsoft's objections to the District Court's holding that Microsoft violated *§ 2* of the Sherman Act in a variety of ways.

**1. Licenses Issued to Original Equipment Manufacturers**

The District Court condemned a number of provisions in Microsoft's agreements licensing Windows to OEMs, because it **[*60]** found that Microsoft's imposition of those provisions (like many of Microsoft's other actions at issue in this case) serves to reduce usage share of Netscape's browser and, hence, protect Microsoft's operating system monopoly. The reason market share in the browser market affects market power in the operating system market is complex, and warrants some explanation.

Browser usage share is important because, as we explained in Section II.A above, a browser (or any middleware product, for that matter) must have a critical mass of users in order to attract software developers to write applications relying upon the APIs it exposes, **[**50]** and away from the APIs exposed by Windows. Applications written to a particular browser's APIs, however, would run on any computer with that browser, regardless of the underlying operating system. "The overwhelming majority of consumers will only use a PC operating system for which there already exists a large and varied set of … applications, and for which it seems relatively certain that new types of applications and new versions of existing applications will continue to be marketed…." *Findings of Fact* P 30. If a consumer could have access to the applications he desired--regardless of the operating system he uses--simply by installing a particular browser on his computer, then he would no longer feel compelled to select Windows in order to have access to those applications; he could select an operating system other than Windows based solely upon its quality and price. In other words, the market for operating systems would be competitive.

Therefore, Microsoft's efforts to gain market share in one market (browsers) served to meet the threat to Microsoft's monopoly in another market (operating systems) by keeping rival browsers from gaining the critical mass of users necessary **[**51]** to attract developer attention away from Windows as the platform for software development. Plaintiffs also argue that Microsoft's actions injured competition in the browser market--an argument we will examine below in relation to their specific claims that Microsoft attempted to monopolize the browser market and unlawfully tied its browser to its operating system so as to foreclose competition in the browser market. In evaluating the *§ 2* monopoly maintenance claim, however, our immediate concern is with the anticompetitive effect of Microsoft's conduct in preserving its monopoly in the operating system market.

In evaluating the restrictions in Microsoft's agreements licensing Windows to OEMs, we first consider whether plaintiffs have made out a *prima facie* case by demonstrating that the restrictions have an anticompetitive effect. In the next subsection, we conclude that plaintiffs have met this burden as to all the restrictions. We then consider Microsoft's proffered justifications for the restrictions and, for the most part, hold those justifications insufficient.

a. *Anticompetitive effect of the license restrictions*

The restrictions Microsoft places upon Original Equipment **[**52]** Manufacturers are of particular importance in determining browser usage share because having an OEM pre-install a

browser on a computer is one of the two most cost-effective methods by far of distributing browsing software. (The other is bundling the browser with internet access software distributed by an IAP.) *Findings of Fact* P 145. The District Court found that the restrictions Microsoft imposed in licensing Windows to OEMs prevented many OEMs from distributing browsers other than IE. **[*61]** *Conclusions of Law*, at 39-40. In particular, the District Court condemned the license provisions prohibiting the OEMs from: (1) removing any desktop icons, folders, or "Start" menu entries; (2) altering the initial boot sequence; and (3) otherwise altering the appearance of the Windows desktop. *Findings of Fact* P 213.

The District Court concluded that the first license restriction--the prohibition upon the removal of desktop icons, folders, and Start menu entries--thwarts the distribution of a rival browser by preventing OEMs from removing visible means of user access to IE. *Id. P 203*. The OEMs cannot practically install a second browser in addition to IE, the court found, in part **[**53]** because "pre-installing more than one product in a given category … can significantly increase an OEM's support costs, for the redundancy can lead to confusion among novice users." *Id. P 159*; *see also id. P 217*. That is, a certain number of novice computer users, seeing two browser icons, will wonder which to use when and will call the OEM's support line. Support calls are extremely expensive and, in the highly competitive original equipment market, firms have a strong incentive to minimize costs. *Id. P 210*.

Microsoft denies the "consumer confusion" story; it observes that some OEMs do install multiple browsers and that executives from two OEMs that do so denied any knowledge of consumers being confused by multiple icons. *See* 11/5/98 pm Tr. at 41-42 (trial testimony of Avadis Tevanian of Apple), *reprinted in* 9 J.A. at 5493-94; 11/18/99 am Tr. at 69 (trial testimony of John Soyring of IBM), *reprinted in* 10 J.A. at 6222.

Other testimony, however, supports the District Court's finding that fear of such confusion deters many OEMs from pre-installing multiple browsers. *See, e.g.*, 01/13/99 pm Tr. at 614-15 (deposition of Microsoft's Gayle McClain played to **[**54]** the court) (explaining that redundancy of icons may be confusing to end users); 02/18/99 pm Tr. at 46-47 (trial testimony of John Rose of Compaq), *reprinted in* 21 J.A. at 14237-38 (same); 11/17/98 am Tr. at 68 (deposition of John Kies of Packard Bell-NEC played to the court), *reprinted in* 9 J.A. at 6016 (same); 11/17/98 am Tr. at 67-72 (trial testimony of Glenn Weadock), *reprinted in* 9 J.A. at 6015-20 (same). Most telling, in presentations to OEMs, Microsoft itself represented that having only one icon in a particular category would be "less confusing for endusers." *See* Government's Trial Exhibit ("GX") 319 at MS98 0109453. Accordingly, we reject Microsoft's argument that we should vacate the District Court's Finding of Fact 159 as it relates to consumer confusion.

As noted above, the OEM channel is one of the two primary channels for distribution of browsers. By preventing OEMs from removing visible means of user access to IE, the license restriction prevents many OEMs from pre-installing a rival browser and, therefore, protects Microsoft's monopoly from the competition that middleware might otherwise present. Therefore, we conclude that the license restriction at **[**55]** issue is anticompetitive. We defer for the moment the question whether that anticompetitive effect is outweighed by Microsoft's proffered justifications.

The second license provision at issue prohibits OEMs from modifying the initial boot sequence--the process that occurs the first time a consumer turns on the computer. Prior to the imposition of

that restriction, "among the programs that many OEMs inserted into the boot sequence were Internet sign-up procedures that encouraged users to choose from a list of IAPs assembled by the OEM." *Findings of Fact* P 210. Microsoft's prohibition on any alteration of the boot sequence thus **[*62]** prevents OEMs from using that process to promote the services of IAPs, many of which--at least at the time Microsoft imposed the restriction--used Navigator rather than IE in their internet access software. *See id. P 212*; GX 295, *reprinted in* 12 J.A. at 14533 (Upon learning of OEM practices including boot sequence modification, Microsoft's Chairman, Bill Gates, wrote: "Apparently a lot of OEMs are bundling non-Microsoft browsers and coming up with offerings together with [IAPs] that get displayed on their machines in a FAR more prominent way than **[**56]** MSN or our Internet browser."). Microsoft does not deny that the prohibition on modifying the boot sequence has the effect of decreasing competition against IE by preventing OEMs from promoting rivals' browsers. Because this prohibition has a substantial effect in protecting Microsoft's market power, and does so through a means other than competition on the merits, it is anticompetitive. Again the question whether the provision is nonetheless justified awaits later treatment.

Finally, Microsoft imposes several additional provisions that, like the prohibition on removal of icons, prevent OEMs from making various alterations to the desktop: Microsoft prohibits OEMs from causing any user interface other than the Windows desktop to launch automatically, from adding icons or folders different in size or shape from those supplied by Microsoft, and from using the "Active Desktop" feature to promote third-party brands. These restrictions impose significant costs upon the OEMs; prior to Microsoft's prohibiting the practice, many OEMs would change the appearance of the desktop in ways they found beneficial. *See, e.g., Findings of Fact* P 214; GX 309, *reprinted in* 22 J.A. at 14551 (March **[**57]** 1997 letter from Hewlett-Packard to Microsoft: "We are responsible for the cost of technical support of our customers, including the 33% of calls we get related to the lack of quality or confusion generated by your product.... We must have more ability to decide how our system is presented to our end users. If we had a choice of another supplier, based on your actions in this area, I assure you [that you] would not be our supplier of choice.").

The dissatisfaction of the OEM customers does not, of course, mean the restrictions are anticompetitive. The anticompetitive effect of the license restrictions is, as Microsoft itself recognizes, that OEMs are not able to promote rival browsers, which keeps developers focused upon the APIs in Windows. *Findings of Fact* P 212 (quoting Microsoft's Gates as writing, "winning Internet browser share is a very very important goal for us," and emphasizing the need to prevent OEMs from promoting both rival browsers and IAPs that might use rivals' browsers); *see also* 01/13/99 Tr. at 305-06 (excerpts from deposition of James Von Holle of Gateway) (prior to restriction Gateway had pre-installed non-IE internet registration icon that was larger **[**58]** than other desktop icons). This kind of promotion is not a zero-sum game; but for the restrictions in their licenses to use Windows, OEMs could promote multiple IAPs and browsers. By preventing the OEMs from doing so, this type of license restriction, like the first two restrictions, is anticompetitive: Microsoft reduced rival browsers' usage share not by improving its own product but, rather, by preventing OEMs from taking actions that could increase rivals' share of usage.

b. *Microsoft's justifications for the license restrictions*

Microsoft argues that the license restrictions are legally justified because, in imposing them, Microsoft is simply "exercising its rights as the holder of valid copyrights." Appellant's Opening

Br. at **[*63]** 102. Microsoft also argues that the licenses "do not unduly restrict the opportunities of Netscape to distribute Navigator in any event." *Id.*

Microsoft's primary copyright argument borders upon the frivolous. The company claims an absolute and unfettered right to use its intellectual property as it wishes: "If intellectual property rights have been lawfully acquired," it says, then "their subsequent exercise cannot give rise to antitrust liability. **[**59]** " Appellant's Opening Br. at 105. That is no more correct than the proposition that use of one's personal property, such as a baseball bat, cannot give rise to tort liability. As the Federal Circuit succinctly stated: "***HN18*** Intellectual property rights do not confer a privilege to violate the antitrust laws." *In re Indep. Serv. Orgs. Antitrust Litig., 203 F.3d 1322, 1325 (Fed. Cir. 2000)*.

Although Microsoft never overtly retreats from its bold and incorrect position on the law, it also makes two arguments to the effect that it is not exercising its copyright in an unreasonable manner, despite the anticompetitive consequences of the license restrictions discussed above. In the first variation upon its unqualified copyright defense, Microsoft cites two cases indicating that a copyright holder may limit a licensee's ability to engage in significant and deleterious alterations of a copyrighted work. *See Gilliam v. ABC, 538 F.2d 14, 21 (2d Cir. 1976)*; *WGN Cont'l Broad. Co. v. United Video, Inc.*, 693 F.2d 622, 625 (7th Cir. 1982). The relevance of those two cases for the present one is limited, however, both because those cases involved substantial **[**60]** alterations of a copyrighted work, *see Gilliam, 538 F.2d at 18*, and because in neither case was there any claim that the copyright holder was, in asserting its rights, violating the antitrust laws, *see WGN Cont'l Broad.*, 693 F.2d at 626; *see also Cmty. for Creative Non-Violence v. Reid, 270 U.S. App. D.C. 26, 846 F.2d 1485, 1498 (D.C. Cir. 1988)* (noting, again in a context free of any antitrust concern, that "an author [] may have rights against" a licensee that "excessively mutilated or altered" the copyrighted work).

The only license restriction Microsoft seriously defends as necessary to prevent a "substantial alteration" of its copyrighted work is the prohibition on OEMs automatically launching a substitute user interface upon completion of the boot process. *See Findings of Fact* P 211 ("[A] few large OEMs developed programs that ran automatically at the conclusion of a new PC system's first boot sequence. These programs replaced the Windows desktop either with a user interface designed by the OEM or with Navigator's user interface."). We agree that a shell that automatically prevents the Windows desktop from ever being **[**61]** seen by the user is a drastic alteration of Microsoft's copyrighted work, and outweighs the marginal anticompetitive effect of prohibiting the OEMs from substituting a different interface automatically upon completion of the initial boot process. We therefore hold that this particular restriction is not an exclusionary practice that violates *§ 2* of the Sherman Act.

In a second variation upon its copyright defense, Microsoft argues that the license restrictions merely prevent OEMs from taking actions that would reduce substantially the value of Microsoft's copyrighted work: that is, Microsoft claims each license restriction in question is necessary to prevent OEMs from so altering Windows as to undermine "the principal value of Windows as a stable and consistent platform that supports a broad range of applications and that is familiar to users." Appellant's Opening Br. at 102. Microsoft, however, never substantiates this claim, and, because an OEM's altering **[*64]** the appearance of the desktop or promoting programs in the boot sequence does not affect the code already in the product, the practice does not self-evidently affect either the "stability" or the "consistency" of the platform. **[**62]** *See Conclusions of Law*,

at 41; *Findings of Fact* P 227. Microsoft cites only one item of evidence in support of its claim that the OEMs' alterations were decreasing the value of Windows. Defendant's Trial Exhibit ("DX") 2395 at MSV0009378A, *reprinted in* 19 J.A. at 12575. That document, prepared by Microsoft itself, states: "there are quality issues created by OEMs who are too liberal with the pre-install process," referring to the OEMs' installation of Windows and additional software on their PCs, which the document says may result in "user concerns and confusion." To the extent the OEMs' modifications cause consumer confusion, of course, the OEMs bear the additional support costs. *See Findings of Fact* P 159. Therefore, we conclude Microsoft has not shown that the OEMs' liberality reduces the value of Windows except in the sense that their promotion of rival browsers undermines Microsoft's monopoly--and that is not a permissible justification for the license restrictions.

Apart from copyright, Microsoft raises one other defense of the OEM license agreements: It argues that, despite the restrictions in the OEM license, Netscape is not completely blocked from distributing **[**63]** its product. That claim is insufficient to shield Microsoft from liability for those restrictions because, although Microsoft did not bar its rivals from all means of distribution, it did bar them from the cost-efficient ones.

In sum, we hold that with the exception of the one restriction prohibiting automatically launched alternative interfaces, all the OEM license restrictions at issue represent uses of Microsoft's market power to protect its monopoly, unredeemed by any legitimate justification. The restrictions therefore violate *§ 2* of the Sherman Act.

**2. Integration of IE and Windows**

Although Microsoft's license restrictions have a significant effect in closing rival browsers out of one of the two primary channels of distribution, the District Court found that "Microsoft's executives believed … its contractual restrictions placed on OEMs would not be sufficient in themselves to reverse the direction of Navigator's usage share. Consequently, in late 1995 or early 1996, Microsoft set out to bind [IE] more tightly to Windows 95 as a technical matter." *Findings of Fact* P 160.

Technologically binding IE to Windows, the District Court found, both prevented OEMs from **[**64]** pre-installing other browsers and deterred consumers from using them. In particular, having the IE software code as an irremovable part of Windows meant that pre-installing a second browser would "increase an OEM's product testing costs," because an OEM must test and train its support staff to answer calls related to every software product preinstalled on the machine; moreover, pre-installing a browser in addition to IE would to many OEMs be "a questionable use of the scarce and valuable space on a PC's hard drive." *Id. P 159*.

Although the District Court, in its Conclusions of Law, broadly condemned Microsoft's decision to bind "Internet Explorer to Windows with … technological shackles," *Conclusions of Law*, at 39, its findings of fact in support of that conclusion center upon three specific actions Microsoft took to weld IE to Windows: excluding IE from the "Add/Remove Programs" utility; designing Windows so as in certain circumstances to override the user's choice of a default browser other than IE; and commingling code related **[*65]** to browsing and other code in the same files, so that any attempt to delete the files containing IE would, at the same time, cripple the operating **[**65]** system. As with the license restrictions, we consider first whether the suspect actions had an anticompetitive effect, and then whether Microsoft has provided a procompetitive justification for them.

a. *Anticompetitive effect of integration*

***HN19*** As a general rule, courts are properly very skeptical about claims that competition has been harmed by a dominant firm's product design changes. *See, e.g., Foremost Pro Color, Inc. v. Eastman Kodak Co., 703 F.2d 534, 544-45 (9th Cir. 1983)*. In a competitive market, firms routinely innovate in the hope of appealing to consumers, sometimes in the process making their products incompatible with those of rivals; the imposition of liability when a monopolist does the same thing will inevitably deter a certain amount of innovation. This is all the more true in a market, such as this one, in which the product itself is rapidly changing. *See Findings of Fact* P 59. Judicial deference to product innovation, however, does not mean that a monopolist's product design decisions are per se lawful. *See Foremost Pro Color, 703 F.2d at 545*; *see also Cal. Computer Prods., 613 F.2d at 739, 744*; *In re IBM Peripheral EDP Devices Antitrust Litig., 481 F. Supp. 965, 1007-08 (N.D. Cal. 1979)*. **[**66]**

The District Court first condemned as anticompetitive Microsoft's decision to exclude IE from the "Add/Remove Programs" utility in Windows 98. *Findings of Fact* P 170. Microsoft had included IE in the Add/Remove Programs utility in Windows 95, *see id.* P P 175-76, but when it modified Windows 95 to produce Windows 98, it took IE out of the Add/Remove Programs utility. This change reduces the usage share of rival browsers not by making Microsoft's own browser more attractive to consumers but, rather, by discouraging OEMs from distributing rival products. *See id. P 159*. Because Microsoft's conduct, through something other than competition on the merits, has the effect of significantly reducing usage of rivals' products and hence protecting its own operating system monopoly, it is anticompetitive; we defer for the moment the question whether it is nonetheless justified.

Second, the District Court found that Microsoft designed Windows 98 "so that using Navigator on Windows 98 would have unpleasant consequences for users" by, in some circumstances, overriding the user's choice of a browser other than IE as his or her default browser. *Id.* P P 171-72. Plaintiffs argue that **[**67]** this override harms the competitive process by deterring consumers from using a browser other than IE even though they might prefer to do so, thereby reducing rival browsers' usage share and, hence, the ability of rival browsers to draw developer attention away from the APIs exposed by Windows. Microsoft does not deny, of course, that overriding the user's preference prevents some people from using other browsers. Because the override reduces rivals' usage share and protects Microsoft's monopoly, it too is anticompetitive.

Finally, the District Court condemned Microsoft's decision to bind IE to Windows 98 "by placing code specific to Web browsing in the same files as code that provided operating system functions." *Id. P 161*; *see also id.* P P 174, 192. Putting code supplying browsing functionality into a file with code supplying operating system functionality "ensures that the deletion of any file containing browsing-specific routines would also delete vital operating system routines and thus cripple Windows…." *Id. P 164*. As noted above, **[*66]** preventing an OEM from removing IE deters it from installing a second browser because doing so increases the OEM's product testing and **[**68]** support costs; by contrast, had OEMs been able to remove IE, they might have chosen to pre-install Navigator alone. *See id. P 159*.

Microsoft denies, as a factual matter, that it commingled browsing and non-browsing code, and it maintains the District Court's findings to the contrary are clearly erroneous. According to Microsoft, its expert "testified without contradiction that 'the very same code in Windows 98

that provides Web browsing functionality' also performs essential operating system functions--not code in the same files, but the very same software code." Appellant's Opening Br. at 79 (citing 5 J.A. 3291-92).

Microsoft's expert did not testify to that effect "without contradiction," however. A Government expert, Glenn Weadock, testified that Microsoft "designed [IE] so that some of the code that it uses co-resides in the same library files as other code needed for Windows." Direct Testimony P 30. Another Government expert likewise testified that one library file, SHDOCVW.DLL, "is really a bundle of separate functions. It contains some functions that have to do specifically with Web browsing, and it contains some general user interface functions as well." 12/14/98 am **[**69]** Tr. at 60-61 (trial testimony of Edward Felten), *reprinted in* 11 J.A. at 6953-54. One of Microsoft's own documents suggests as much. *See* Plaintiffs' Proposed Findings of Fact P 131.2.vii (citing GX 1686 (under seal) (Microsoft document indicating some functions in SHDOCVW.DLL can be described as "IE only," others can be described as "shell only" and still others can be described as providing both "IE" and "shell" functions)).

In view of the contradictory testimony in the record, some of which supports the District Court's finding that Microsoft commingled browsing and non-browsing code, we cannot conclude that the finding was clearly erroneous. *See* *Anderson v. City of Bessemer City, 470 U.S. 564, 573-74, 84 L. Ed. 2d 518, 105 S. Ct. 1504 (1985)* ("If the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently."). Accordingly, we reject Microsoft's argument that we should vacate Finding of Fact 159 as it relates to the commingling of code, and we conclude that **[**70]** such commingling has an anticompetitive effect; as noted above, the commingling deters OEMs from pre-installing rival browsers, thereby reducing the rivals' usage share and, hence, developers' interest in rivals' APIs as an alternative to the API set exposed by Microsoft's operating system.

b. *Microsoft's justifications for integration*

Microsoft proffers no justification for two of the three challenged actions that it took in integrating IE into Windows--excluding IE from the Add/Remove Programs utility and commingling browser and operating system code. Although Microsoft does make some general claims regarding the benefits of integrating the browser and the operating system, *see, e.g.,* Direct Testimony of James Allchin P 94, *reprinted in* 5 J.A. at 3321 ("Our vision of deeper levels of technical integration is highly efficient and provides substantial benefits to customers and developers."), it neither specifies nor substantiates those claims. Nor does it argue that either excluding IE from the Add/Remove Programs utility or commingling code achieves any integrative **[*67]** benefit. Plaintiffs plainly made out a *prima facie* case of harm to competition in the operating system **[**71]** market by demonstrating that Microsoft's actions increased its browser usage share and thus protected its operating system monopoly from a middleware threat and, for its part, Microsoft failed to meet its burden of showing that its conduct serves a purpose other than protecting its operating system monopoly. Accordingly, we hold that Microsoft's exclusion of IE from the Add/Remove Programs utility and its commingling of browser and operating system code constitute exclusionary conduct, in violation of *§ 2*.

As for the other challenged act that Microsoft took in integrating IE into Windows--causing Windows to override the user's choice of a default browser in certain circumstances--Microsoft

argues that it has "valid technical reasons." Specifically, Microsoft claims that it was necessary to design Windows to override the user's preferences when he or she invokes one of "a few" out "of the nearly 30 means of accessing the Internet." Appellant's Opening Br. at 82. According to Microsoft:

> The Windows 98 Help system and Windows Update feature depend on ActiveX controls not supported by Navigator, and the now-discontinued Channel Bar utilized Microsoft's Channel Definition Format, **[**72]** which Navigator also did not support. Lastly, Windows 98 does not invoke Navigator if a user accesses the Internet through "My Computer" or "Windows Explorer" because doing so would defeat one of the purposes of those features--enabling users to move seamlessly from local storage devices to the Web *in the same browsing window.Id.* (internal citations omitted). ***HN20*** The plaintiff bears the burden not only of rebutting a proffered justification but also of demonstrating that the anticompetitive effect of the challenged action outweighs it. In the District Court, plaintiffs appear to have done neither, let alone both; in any event, upon appeal, plaintiffs offer no rebuttal whatsoever. Accordingly, Microsoft may not be held liable for this aspect of its product design.

**3. Agreements with Internet Access Providers**

The District Court also condemned as exclusionary Microsoft's agreements with various IAPs. The IAPs include both Internet Service Providers, which offer consumers internet access, and Online Services ("OLSs") such as America Online ("AOL"), which offer proprietary content in addition to internet access and other services. *Findings of Fact* P 15. The District **[**73]** Court deemed Microsoft's agreements with the IAPs unlawful because:

> Microsoft licensed [IE] and the [IE] Access Kit [(of which, more below)] to hundreds of IAPs for no charge. [*Findings of Fact*] P P 250-51. Then, Microsoft extended valuable promotional treatment to the ten most important IAPs in exchange for their commitment to promote and distribute [IE] and to exile Navigator from the desktop. *Id.* P P 255-58, 261, 272, 288-90, 305-06. Finally, in exchange for efforts to upgrade existing subscribers to client software that came bundled with [IE] instead of Navigator, Microsoft granted rebates--and in some cases made outright payments--to those same IAPs. *Id.* P P 259-60, 295.*Conclusions of Law*, at 41.

The District Court condemned Microsoft's actions in (1) offering IE free of charge to IAPs and (2) offering IAPs a bounty for each customer the IAP signs up for service using the IE browser. In effect, the court concluded that Microsoft is **[*68]** acting to preserve its monopoly by offering IE to IAPs at an attractive price. Similarly, the District Court held Microsoft liable for (3) developing the IE Access Kit ("IEAK"), a software package that allows **[**74]** an IAP to "create a distinctive identity for its service in as little as a few hours by customizing the [IE] title bar, icon, start and search pages," *Findings of Fact* P 249, and (4) offering the IEAK to IAPs free of charge, on the ground that those acts, too, helped Microsoft preserve its monopoly. *Conclusions of Law*, at 41-42. Finally, the District Court found that (5) Microsoft agreed to provide easy access to IAPs' services from the Windows desktop in return for the IAPs' agreement to promote IE

exclusively and to keep shipments of internet access software using Navigator under a specific percentage, typically 25%. *See Conclusions of Law*, at 42 (citing *Findings of Fact* P P 258, 262, 289). We address the first four items--Microsoft's inducements--and then its exclusive agreements with IAPs.

***HN21*** Although offering a customer an attractive deal is the hallmark of competition, the Supreme Court has indicated that in very rare circumstances a price may be unlawfully low, or "predatory." *See generally Brooke Group, 509 U.S. at 220-27*. Plaintiffs argued before the District Court that Microsoft's pricing was indeed predatory; but instead of making the usual **[**75]** predatory pricing argument--that the predator would drive out its rivals by pricing below cost on a particular product and then, sometime in the future, raise its prices on that product above the competitive level in order to recoup its earlier losses--plaintiffs argued that by pricing below cost on IE (indeed, even paying people to take it), Microsoft was able simultaneously to preserve its stream of monopoly profits on Windows, thereby more than recouping its investment in below-cost pricing on IE. The District Court did not assign liability for predatory pricing, however, and plaintiffs do not press this theory on appeal.

***HN22*** The rare case of price predation aside, the antitrust laws do not condemn even a monopolist for offering its product at an attractive price, and we therefore have no warrant to condemn Microsoft for offering either IE or the IEAK free of charge or even at a negative price. Likewise, as we said above, a monopolist does not violate the Sherman Act simply by developing an attractive product. *See Grinnell, 384 U.S. at 571* ("Growth or development as a consequence of a superior product [or] business acumen" is no violation.). Therefore, Microsoft's **[**76]** development of the IEAK does not violate the Sherman Act.

We turn now to Microsoft's deals with IAPs concerning desktop placement. Microsoft concluded these exclusive agreements with all "the leading IAPs," *Findings of Fact* P 244, including the major OLSs. *Id. P 245*; *see also id.* P P 305, 306. The most significant of the OLS deals is with AOL, which, when the deal was reached, "accounted for a substantial portion of all existing Internet access subscriptions and … attracted a very large percentage of new IAP subscribers." *Id. P 272*. Under that agreement Microsoft puts the AOL icon in the OLS folder on the Windows desktop and AOL does not promote any non-Microsoft browser, nor provide software using any non-Microsoft browser except at the customer's request, and even then AOL will not supply more than 15% of its subscribers with a browser other than IE. *Id. P 289*.

The Supreme Court most recently considered an antitrust challenge to an exclusive contract in *Tampa Electric Co. v. Nashville Coal Co., 365 U.S. 320, 5 L. Ed. 2d 580, 81 S. Ct. 623 (1961)*. That case, **[*69]** which involved a challenge to a requirements contract, was brought under § 3 of the **[**77]** Clayton Act and §§ 1 and 2 of the Sherman Act. The Court held that ***HN23*** an exclusive contract does not violate the Clayton Act unless its probable effect is to "foreclose competition in a substantial share of the line of commerce affected." *Id. at 327*. The share of the market foreclosed is important because, for the contract to have an adverse effect upon competition, "the opportunities for other traders to enter into or remain in that market must be significantly limited." *Id. at 328*. Although "neither the Court of Appeals nor the District Court [had] considered in detail the question of the relevant market," *id. at 330*, the Court in *Tampa Electric* examined the record and, after defining the relevant market, determined that the contract affected less than one percent of that market. *Id. at 333*. After concluding, under the Clayton Act, that this share was "conservatively speaking, quite insubstantial," *id.*, the Court went on

summarily to reject the Sherman Act claims. *Id. at 335* ("If [the contract] does not fall within the broader prescription of § 3 of the Clayton Act it follows that it is **[**78]** not forbidden by those of the [Sherman Act].").

Following *Tampa Electric*, courts considering antitrust challenges to exclusive contracts have taken care to identify the share of the market foreclosed. Some courts have indicated that § 3 of the Clayton Act and § 1 of the Sherman Act require an equal degree of foreclosure before prohibiting exclusive contracts. *See, e.g., Roland Mach. Co. v. Dresser Indus., Inc., 749 F.2d 380, 393 (7th Cir. 1984)* (Posner, J.). Other courts, however, have held that a higher market share must be foreclosed in order to establish a violation of the Sherman Act as compared to the Clayton Act. *See, e.g., Barr Labs. v. Abbott Labs., 978 F.2d 98, 110 (3d Cir.1992)*; 11 HERBERT HOVENKAMP, ANTITRUST LAW P 1800c4 (1998) ("The cases are divided, with a likely majority stating that the Clayton Act requires a smaller showing of anticompetitive effects.").

***HN24*** Though what is "significant" may vary depending upon the antitrust provision under which an exclusive deal is challenged, it is clear that in all cases the plaintiff must both define the relevant market and prove the degree of foreclosure. This is a prudential requirement; **[**79]** exclusivity provisions in contracts may serve many useful purposes. *See, e.g., Omega Envtl., Inc. v. Gilbarco, Inc., 127 F.3d 1157, 1162 (9th Cir. 1997)* ("There are, however, well-recognized economic benefits to exclusive dealing arrangements, including the enhancement of interbrand competition."); *Barry Wright Corp. v. ITT Grinnell Corp., 724 F.2d 227, 236 (1st Cir. 1983)* (Breyer, J.) ("Virtually *every* contract to buy 'forecloses' or 'excludes' alternative sellers from *some* portion of the market, namely the portion consisting of what was bought."). Permitting an antitrust action to proceed any time a firm enters into an exclusive deal would both discourage a presumptively legitimate business practice and encourage costly antitrust actions. Because an exclusive deal affecting a small fraction of a market clearly cannot have the requisite harmful effect upon competition, the requirement of a significant degree of foreclosure serves a useful screening function. *Cf.* Frank H. Easterbrook, *The Limits of Antitrust*, *63 TEX. L. REV. 1, 21-23 (1984)* (discussing use of presumptions in antitrust law to screen out cases in which loss **[**80]** to consumers and economy is likely outweighed by cost of inquiry and risk of deterring procompetitive behavior).

**[*70]** In this case, plaintiffs challenged Microsoft's exclusive dealing arrangements with the IAPs under both §§ 1 and 2 of the Sherman Act. The District Court, in analyzing the § 1 claim, stated, "unless the evidence demonstrates that Microsoft's agreements excluded Netscape altogether from access to roughly forty percent of the browser market, the Court should decline to find such agreements in violation of § 1." *Conclusions of Law*, at 52. The court recognized that Microsoft had substantially excluded Netscape from "the most efficient channels for Navigator to achieve browser usage share," *id.* at 53; *see also Findings of Fact* P 145 ("No other distribution channel for browsing software even approaches the efficiency of OEM pre-installation and IAP bundling."), and had relegated it to more costly and less effective methods (such as mass mailing its browser on a disk or offering it for download over the internet); but because Microsoft has not "completely excluded Netscape" from reaching any potential user by some means of distribution, however ineffective, **[**81]** the court concluded the agreements do not violate § 1. *Conclusions of Law*, at 53. Plaintiffs did not cross-appeal this holding.

Turning to *§ 2*, the court stated: "the fact that Microsoft's arrangements with various [IAPs and other] firms did not foreclose enough of the relevant market to constitute a § 1 violation in no way detracts from the Court's assignment of liability for the same arrangements under *§ 2*.... All of

Microsoft's agreements, including the non-exclusive ones, severely restricted Netscape's access to those distribution channels leading most efficiently to the acquisition of browser usage share." *Conclusions of Law*, at 53.

On appeal Microsoft argues that "courts have applied the same standard to alleged exclusive dealing agreements under both Section 1 *and*Section 2," Appellant's Opening Br. at 109, and it argues that the District Court's holding of no liability under § 1 necessarily precludes holding it liable under § 2. The District Court appears to have based its holding with respect to § 1 upon a "total exclusion test" rather than the 40% standard drawn from the caselaw. Even assuming the holding is correct, however, we nonetheless reject Microsoft's **[**82]** contention.

The basic prudential concerns relevant to §§ 1 and 2 are admittedly the same: exclusive contracts are commonplace-particularly in the field of distribution--in our competitive, market economy, and imposing upon a firm with market power the risk of an antitrust suit every time it enters into such a contract, no matter how small the effect, would create an unacceptable and unjustified burden upon any such firm. At the same time, however, we agree with plaintiffs that a monopolist's use of exclusive contracts, in certain circumstances, may give rise to a § 2 violation even though the contracts foreclose less than the roughly 40% or 50% share usually required in order to establish a § 1 violation. *See generally* Dennis W. Carlton, *A General Analysis of Exclusionary Conduct and Refusal to Deal--Why* Aspen *and* Kodak *Are Misguided*, *68 ANTITRUST L.J. 659 (2001)* (explaining various scenarios under which exclusive dealing, particularly by a dominant firm, may raise legitimate concerns about harm to competition).

In this case, plaintiffs allege that, by closing to rivals a substantial percentage of the available opportunities for browser distribution, **[**83]** Microsoft managed to preserve its monopoly in the market for operating systems. The IAPs constitute one of the two major channels by which browsers can be distributed. *Findings of Fact* P 242. Microsoft has exclusive deals with **[*71]** "fourteen of the top fifteen access providers in North America[, which] account for a large majority of all Internet access subscriptions in this part of the world." *Id. P 308*. By ensuring that the "majority" of all IAP subscribers are offered IE either as the default browser or as the only browser, Microsoft's deals with the IAPs clearly have a significant effect in preserving its monopoly; they help keep usage of Navigator below the critical level necessary for Navigator or any other rival to pose a real threat to Microsoft's monopoly. *See, e.g., id. P 143* (Microsoft sought to "divert enough browser usage from Navigator to neutralize it as a platform."); *see also* Carlton, at 670.

Plaintiffs having demonstrated a harm to competition, the burden falls upon Microsoft to defend its exclusive dealing contracts with IAPs by providing a procompetitive justification for them. Significantly, Microsoft's only explanation for its exclusive dealing is **[**84]** that it wants to keep developers focused upon its APIs--which is to say, it wants to preserve its power in the operating system market. 02/26/01 Ct. Appeals Tr. at 45-47. That is not an unlawful end, but neither is it a procompetitive justification for the specific means here in question, namely exclusive dealing contracts with IAPs. Accordingly, we affirm the District Court's decision holding that Microsoft's exclusive contracts with IAPs are exclusionary devices, in violation of § 2 of the Sherman Act.

**4. Dealings with Internet Content Providers, Independent Software Vendors, and Apple Computer**

The District Court held that Microsoft engages in exclusionary conduct in its dealings with ICPs, which develop websites; ISVs, which develop software; and Apple, which is both an OEM and

a software developer. *See Conclusions of Law*, at 42-43 (deals with ICPs, ISVs, and Apple "supplemented Microsoft's efforts in the OEM and IAP channels"). The District Court condemned Microsoft's deals with ICPs and ISVs, stating: "By granting ICPs and ISVs free licenses to bundle [IE] with their offerings, and by exchanging other valuable inducements for their agreement to distribute, promote[, **[**85]** ] and rely on [IE] rather than Navigator, Microsoft directly induced developers to focus on its own APIs rather than ones exposed by Navigator." *Id*. (citing *Findings of Fact* P P 334-35, 340).

With respect to the deals with ICPs, the District Court's findings do not support liability. After reviewing the ICP agreements, the District Court specifically stated that "there is not sufficient evidence to support a finding that Microsoft's promotional restrictions actually had a substantial, deleterious impact on Navigator's usage share." *Findings of Fact* P 332. Because plaintiffs failed to demonstrate that Microsoft's deals with the ICPs have a substantial effect upon competition, they have not proved the violation of the Sherman Act.

As for Microsoft's ISV agreements, however, the District Court did not enter a similar finding of no substantial effect. The District Court described Microsoft's deals with ISVs as follows:

> In dozens of "First Wave" agreements signed between the fall of 1997 and the spring of 1998, Microsoft has promised to give preferential support, in the form of early Windows 98 and Windows NT betas, other technical information, and the right to use **[**86]** certain Microsoft seals of approval, to important ISVs that agree to certain conditions. One of these conditions is that the ISVs use Internet Explorer as the default browsing software for any software they develop with a hypertext-based user interface. **[*72]** Another condition is that the ISVs use Microsoft's "HTML Help," which is accessible only with Internet Explorer, to implement their applications' help systems.*Id. P 339*. The District Court further found that the effect of these deals is to "ensure [] that many of the most popular Web-centric applications will rely on browsing technologies found only in Windows," *id. P 340*, and that Microsoft's deals with ISVs therefore "increase[] the likelihood that the millions of consumers using [applications designed by ISVs that entered into agreements with Microsoft] will use Internet Explorer rather than Navigator." *Id. P 340*.

The District Court did not specifically identify what share of the market for browser distribution the exclusive deals with the ISVs foreclose. Although the ISVs are a relatively small channel for browser distribution, they take on greater significance because, as discussed above, Microsoft **[**87]** had largely foreclosed the two primary channels to its rivals. In that light, one can tell from the record that by affecting the applications used by "millions" of consumers, Microsoft's exclusive deals with the ISVs had a substantial effect in further foreclosing rival browsers from the market. (Data introduced by Microsoft, *see* Direct Testimony of Cameron Myhrvold P 84, *reprinted in* 6 J.A. at 3922-23, and subsequently relied upon by the District Court in its findings, *see, e.g., Findings of Fact* P 270, indicate that over the two-year period 1997-98, when Microsoft entered into the First Wave agreements, there were 40 million new users of the internet.) Because, by keeping rival browsers from gaining widespread distribution (and potentially attracting the attention of developers away from the APIs in Windows), the deals have a substantial effect in preserving Microsoft's monopoly, we hold that plaintiffs have made a *prima facie* showing that the deals have an anticompetitive effect.

***HN25*** Of course, that Microsoft's exclusive deals have the anticompetitive effect of preserving Microsoft's monopoly does not, in itself, make them unlawful. A monopolist, like a competitive **[**88]** firm, may have a perfectly legitimate reason for wanting an exclusive arrangement with its distributors. Accordingly, Microsoft had an opportunity to, but did not, present the District Court with evidence demonstrating that the exclusivity provisions have some such procompetitive justification. *See Conclusions of Law*, at 43 (citing *Findings of Fact* P P 339-40) ("With respect to the ISV agreements, Microsoft has put forward no procompetitive business ends whatsoever to justify their exclusionary terms."). On appeal Microsoft likewise does not claim that the exclusivity required by the deals serves any legitimate purpose; instead, it states only that its ISV agreements reflect an attempt "to persuade ISVs to utilize Internet-related system services in Windows rather than Navigator." Appellant's Opening Br. at 114. As we explained before, however, keeping developers focused upon Windows--that is, preserving the Windows monopoly-is a competitively neutral goal. Microsoft having offered no procompetitive justification for its exclusive dealing arrangements with the ISVs, we hold that those arrangements violate *§ 2* of the Sherman Act.

Finally, the District Court held that Microsoft's **[**89]** dealings with Apple violated the Sherman Act. *See Conclusions of Law*, at 42-43. Apple is vertically integrated: it makes both software (including an operating system, Mac OS), and hardware (the Macintosh line of computers). Microsoft primarily makes software, including, in addition to its operating system, **[*73]** a number of popular applications. One, called "Office," is a suite of business productivity applications that Microsoft has ported to Mac OS. The District Court found that "ninety percent of Mac OS users running a suite of office productivity applications [use] Microsoft's Mac Office." *Findings of Fact* P 344. Further, the District Court found that:

> In 1997, Apple's business was in steep decline, and many doubted that the company would survive much longer.... Many ISVs questioned the wisdom of continuing to spend time and money developing applications for the Mac OS. Had Microsoft announced in the midst of this atmosphere that it was ceasing to develop new versions of Mac Office, a great number of ISVs, customers, developers, and investors would have interpreted the announcement as Apple's death notice.*Id. P 344*. Microsoft recognized the importance to **[**90]** Apple of its continued support of Mac Office. *See id. P 347* (quoting internal Microsoft e-mail) ("[We] need a way to push these guys[, *i.e.*, Apple] and [threatening to cancel Mac Office] is the only one that seems to make them move."); *see also id.* ("[Microsoft Chairman Bill] Gates asked whether Microsoft could conceal from Apple in the coming month the fact that Microsoft was almost finished developing Mac Office 97."); *id. at P 354* ("I think ... Apple should be using [IE] everywhere and if they don't do it, then we can use Office as a club.").

In June 1997 Microsoft Chairman Bill Gates determined that the company's negotiations with Apple " 'have not been going well at all.... Apple let us down on the browser by making Netscape the standard install.' Gates then reported that he had already called Apple's CEO ... to ask 'how we should announce the cancellation of Mac Office....' " *Id. at P 349*. The District Court further found that, within a month of Gates' call, Apple and Microsoft had reached an agreement pursuant to which

> Microsoft's primary obligation is to continue releasing up-to-date versions of Mac Office for at least five years.. **[**91]** .. [and] Apple has agreed ... to "bundle the most

> current version of [IE] … with [Mac OS]"… [and to] "make [IE] the default [browser]"…. Navigator is not installed on the computer hard drive during the default installation, which is the type of installation most users elect to employ…. [The] Agreement further provides that … Apple may not position icons for non-Microsoft browsing software on the desktop of new Macintosh PC systems or Mac OS upgrades.*Id*. P P 350-52. The agreement also prohibits Apple from encouraging users to substitute another browser for IE, and states that Apple will "encourage its employees to use [IE]." *Id. P 352*.

This exclusive deal between Microsoft and Apple has a substantial effect upon the distribution of rival browsers. If a browser developer ports its product to a second operating system, such as the Mac OS, it can continue to display a common set of APIs. Thus, usage share, not the underlying operating system, is the primary determinant of the platform challenge a browser may pose. Pre-installation of a browser (which can be accomplished either by including the browser with the operating system or by the OEM installing **[**92]** the browser) is one of the two most important methods of browser distribution, and Apple had a not insignificant share of worldwide sales of operating systems. *See id*. P 35 (Microsoft has 95% of the market not counting Apple and "well above" 80% with Apple included in the relevant market). Because Microsoft's exclusive contract with Apple **[*74]** has a substantial effect in restricting distribution of rival browsers, and because (as we have described several times above) reducing usage share of rival browsers serves to protect Microsoft's monopoly, its deal with Apple must be regarded as anticompetitive. *See Conclusions of Law*, at 42 (citing *Findings of Fact* P 356) ("By extracting from Apple terms that significantly diminished the usage of Navigator on the Mac OS, Microsoft helped to ensure that developers would not view Navigator as truly cross-platform middleware.").

Microsoft offers no procompetitive justification for the exclusive dealing arrangement. It makes only the irrelevant claim that the IE-for-Mac Office deal is part of a multifaceted set of agreements between itself and Apple, *see* Appellant's Opening Br. at 61 ("Apple's 'browsing software' obligation was [not] **[**93]** the quid pro quo for Microsoft's Mac Office obligation[;] … *all* of the various obligations … were part of one 'overall agreement' between the two companies."); that does not mean it has any procompetitive justification. Accordingly, we hold that the exclusive deal with Apple is exclusionary, in violation of *§ 2* of the Sherman Act.

**5. Java**

Java, a set of technologies developed by Sun Microsystems, is another type of middleware posing a potential threat to Windows' position as the ubiquitous platform for software development. *Findings of Fact* P 28. The Java technologies include: (1) a programming language; (2) a set of programs written in that language, called the "Java class libraries," which expose APIs; (3) a compiler, which translates code written by a developer into "bytecode"; and (4) a Java Virtual Machine ("JVM"), which translates bytecode into instructions to the operating system. *Id. P 73*. Programs calling upon the Java APIs will run on any machine with a "Java runtime environment," that is, Java class libraries and a JVM. *Id*. P P 73, 74.

In May 1995 Netscape agreed with Sun to distribute a copy of the Java runtime environment with every copy **[**94]** of Navigator, and "Navigator quickly became the principal vehicle by which Sun placed copies of its Java runtime environment on the PC systems of Windows users."

*Id. P 76*. Microsoft, too, agreed to promote the Java technologies--or so it seemed. For at the same time, Microsoft took steps "to maximize the difficulty with which applications written in Java could be ported from Windows to other platforms, and vice versa." *Conclusions of Law*, at 43. Specifically, the District Court found that Microsoft took four steps to exclude Java from developing as a viable cross-platform threat: (a) designing a JVM incompatible with the one developed by Sun; (b) entering into contracts, the so-called "First Wave Agreements," requiring major ISVs to promote Microsoft's JVM exclusively; (c) deceiving Java developers about the Windows-specific nature of the tools it distributed to them; and (d) coercing Intel to stop aiding Sun in improving the Java technologies.

a. *The incompatible JVM*

The District Court held that Microsoft engaged in exclusionary conduct by developing and promoting its own JVM. *Conclusions of Law*, at 43-44. Sun had already developed a JVM for the Windows operating **[**95]** system when Microsoft began work on its version. The JVM developed by Microsoft allows Java applications to run faster on Windows than does Sun's JVM, *Findings of Fact* P 389, but a Java application designed to work with Microsoft's JVM does not work with Sun's JVM and vice versa. *Id. P 390*. The District Court found that Microsoft "made a large **[*75]** investment of engineering resources to develop a high-performance Windows JVM," *id. P 396*, and, "by bundling its ... JVM with every copy of [IE] ... Microsoft endowed its Java runtime environment with the unique attribute of guaranteed, enduring ubiquity across the enormous Windows installed base," *id. P 397*. As explained above, however, ***HN26*** a monopolist does not violate the antitrust laws simply by developing a product that is incompatible with those of its rivals. *See supra* Section II.B.1. In order to violate the antitrust laws, the incompatible product must have an anticompetitive effect that outweighs any procompetitive justification for the design. Microsoft's JVM is not only incompatible with Sun's, it allows Java applications to run faster on Windows than does Sun's JVM. Microsoft's faster JVM lured Java developers into **[**96]** using Microsoft's developer tools, and Microsoft offered those tools deceptively, as we discuss below. The JVM, however, does allow applications to run more swiftly and does not itself have any anticompetitive effect. Therefore, we reverse the District Court's imposition of liability for Microsoft's development and promotion of its JVM.

b. *The First Wave Agreements*

The District Court also found that Microsoft entered into First Wave Agreements with dozens of ISVs to use Microsoft's JVM. *See Findings of Fact* P 401 ("In exchange for costly technical support and other blandishments, Microsoft induced dozens of important ISVs to make their Java applications reliant on Windows-specific technologies and to refrain from distributing to Windows users JVMs that complied with Sun's standards."). Again, we reject the District Court's condemnation of low but non-predatory pricing by Microsoft.

To the extent Microsoft's First Wave Agreements with the ISVs conditioned receipt of Windows technical information upon the ISVs' agreement to promote Microsoft's JVM exclu-sively, they raise a different competitive concern. The District Court found that, although not literally exclusive, the **[**97]** deals were exclusive in practice because they required developers to make Microsoft's JVM the default in the software they developed. *Id. P 401*.

While the District Court did not enter precise findings as to the effect of the First Wave Agreements upon the overall distribution of rival JVMs, the record indicates that Microsoft's

deals with the major ISVs had a significant effect upon JVM promotion. As discussed above, the products of First Wave ISVs reached millions of consumers. *Id. P 340*. The First Wave ISVs included such prominent developers as Rational Software, *see* GX 970, *reprinted in* 15 J.A. at 9994-10000, "a world leader" in software development tools, *see* Direct Testimony of Michael Devlin P 2, *reprinted in* 5 J.A. at 3520, and Symantec, *see* GX 2071, *reprinted in* 22 J.A. at 14960-66 (sealed), which, according to Microsoft itself, is "the leading supplier of utilities such as anti-virus software," Defendant's Proposed Findings of Fact P 276, *reprinted in* 3 J.A. at 1689. Moreover, Microsoft's exclusive deals with the leading ISVs took place against a backdrop of foreclosure: the District Court found that "when Netscape announced in May 1995 **[**98]** [prior to Microsoft's execution of the First Wave Agreements] that it would include with every copy of Navigator a copy of a Windows JVM that complied with Sun's standards, it appeared that Sun's Java implementation would achieve the necessary ubiquity on Windows." *Findings of Fact* P 394. As discussed above, however, Microsoft undertook a number of anticompetitive actions that seriously reduced the distribution of Navigator, and the District **[*76]** Court found that those actions thereby seriously impeded distribution of Sun's JVM. *Conclusions of Law*, at 43-44. Because Microsoft's agreements foreclosed a substantial portion of the field for JVM distribution and because, in so doing, they protected Microsoft's monopoly from a middleware threat, they are anticompetitive.

Microsoft offered no procompetitive justification for the default clause that made the First Wave Agreements exclusive as a practical matter. *See Findings of Fact* P 401. Because the cumulative effect of the deals is anticompetitive and because Microsoft has no procompetitive justification for them, we hold that the provisions in the First Wave Agreements requiring use of Microsoft's JVM as the default are exclusionary, **[**99]** in violation of the Sherman Act.

c. *Deception of Java developers*

Microsoft's "Java implementation" included, in addition to a JVM, a set of software development tools it created to assist ISVs in designing Java applications. The District Court found that, not only were these tools incompatible with Sun's cross-platform aspirations for Java--no violation, to be sure-but Microsoft deceived Java developers regarding the Windows-specific nature of the tools. Microsoft's tools included "certain 'keywords' and 'compiler directives' that could only be executed properly by Microsoft's version of the Java runtime environment for Windows." *Id. P 394*; *see also* Direct Testimony of James Gosling P 58, *reprinted in* 21 J.A. at 13959 (Microsoft added "programming instructions … that alter the behavior of the code."). As a result, even Java "developers who were opting for portability over performance … unwittingly [wrote] Java applications that [ran] only on Windows." *Conclusions of Law*, at 43. That is, developers who relied upon Microsoft's public commitment to cooperate with Sun and who used Microsoft's tools to develop what Microsoft led them to believe were cross-platform **[**100]** applications ended up producing applications that would run only on the Windows operating system.

When specifically accused by a *PC Week* reporter of fragmenting Java standards so as to prevent cross-platform uses, Microsoft denied the accusation and indicated it was only "adding rich platform support" to what remained a crossplatform implementation. An e-mail message internal to Microsoft, written shortly after the conversation with the reporter, shows otherwise:

> Ok, i just did a followup call…. [The reporter] liked that i kept pointing customers to w3c standards [(commonly observed internet protocols)]…. [but] he accused us of being

> schizo with this vs. our java approach, i said he misunderstood [--] that [with Java] we are merely trying to add rich platform support to an interop layer.... this plays well.... at this point its [sic] not good to create MORE noise around our win32 java classes. instead we should just quietly grow j [(Microsoft's development tools)] share and assume that people will take more advantage of our classes without ever realizing they are building win 32-only java apps.GX 1332, *reprinted in* 22 J.A. at 14922-23.

**[**101]** Finally, other Microsoft documents confirm that Microsoft intended to deceive Java developers, and predicted that the effect of its actions would be to generate Windows-dependent Java applications that their developers believed would be cross-platform; these documents also indicate that Microsoft's ultimate objective was to thwart Java's threat to Microsoft's monopoly in the market for operating systems. One Microsoft document, for example, states as a strategic goal: "Kill cross-platform **[*77]** Java by growing the polluted Java market." GX 259, *reprinted in* 22 J.A. at 14514; *see also id.* ("Cross-platform capability is by far *the* number one reason for choosing/using Java.") (emphasis in original).

Microsoft's conduct related to its Java developer tools served to protect its monopoly of the operating system in a manner not attributable either to the superiority of the operating system or to the acumen of its makers, and therefore was anticompetitive. Unsurprisingly, Microsoft offers no procompetitive explanation for its campaign to deceive developers. Accordingly, we conclude this conduct is exclusionary, in violation of *§ 2* of the Sherman Act.

d. *The threat to Intel*

**[**102]** The District Court held that Microsoft also acted unlawfully with respect to Java by using its "monopoly power to prevent firms such as Intel from aiding in the creation of cross-platform interfaces." *Conclusions of Law*, at 43. In 1995 Intel was in the process of developing a highperformance, Windows-compatible JVM. Microsoft wanted Intel to abandon that effort because a fast, cross-platform JVM would threaten Microsoft's monopoly in the operating system market. At an August 1995 meeting, Microsoft's Gates told Intel that its "cooperation with Sun and Netscape to develop a Java runtime environment ... was one of the issues threatening to undermine cooperation between Intel and Microsoft." *Findings of Fact* P 396. Three months later, "Microsoft's Paul Maritz told a senior Intel executive that Intel's [adaptation of its multimedia software to comply with] Sun's Java standards was as inimical to Microsoft as Microsoft's support for non-Intel microprocessors would be to Intel." *Id. P 405*.

Intel nonetheless continued to undertake initiatives related to Java. By 1996 "Intel had developed a JVM designed to run well ... while complying with Sun's cross-platform standards." **[**103]** *Id. P 396*. In April of that year, Microsoft again urged Intel not to help Sun by distributing Intel's fast, Suncompliant JVM. *Id.* And Microsoft threatened Intel that if it did not stop aiding Sun on the multimedia front, then Microsoft would refuse to distribute Intel technologies bundled with Windows. *Id. P 404*.

Intel finally capitulated in 1997, after Microsoft delivered the *coup de grace.*

> One of Intel's competitors, called AMD, solicited support from Microsoft for its "3DX" technology.... Microsoft's Allchin asked Gates whether Microsoft should support

> 3DX, despite the fact that Intel would oppose it. Gates responded: "If Intel has a real problem with us supporting this then they will have to stop supporting Java Multimedia the way they are. I would gladly give up supporting this if they would back off from their work on JAVA."*Id. P 406*.

Microsoft's internal documents and deposition testimony confirm both the anticompetitive effect and intent of its actions. *See, e.g.*, GX 235, *reprinted in* 22 J.A. at 14502 (Microsoft executive, Eric Engstrom, included among Microsoft's goals for Intel: "Intel to stop helping Sun create Java Multimedia **[**104]** APIs, especially ones that run well ... on Windows."); Deposition of Eric Engstrom at 179 ("We were successful [in convincing Intel to stop aiding Sun] for some period of time.").

Microsoft does not deny the facts found by the District Court, nor does it offer any procompetitive justification for pressuring Intel not to support cross-platform Java. Microsoft lamely characterizes its threat to Intel as "advice." The District Court, **[*78]** however, found that Microsoft's "advice" to Intel to stop aiding cross-platform Java was backed by the threat of retaliation, and this conclusion is supported by the evidence cited above. Therefore we affirm the conclusion that Microsoft's threats to Intel were exclusionary, in violation of *§ 2* of the Sherman Act.

**6. Course of Conduct**

The District Court held that, apart from Microsoft's specific acts, Microsoft was liable under *§ 2* based upon its general "course of conduct." In reaching this conclusion the court relied upon *Continental Ore Co. v. Union Carbide & Carbon Corp., 370 U.S. 690, 699, 8 L. Ed. 2d 777, 82 S. Ct. 1404 (1962)*, where the Supreme Court stated, "***HN27*** in [Sherman Act cases], plaintiffs should be given the full **[**105]** benefit of their proof without tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each."

Microsoft points out that *Continental Ore* and the other cases cited by plaintiffs in support of "course of conduct" liability all involve conspiracies among multiple firms, not the conduct of a single firm; in that setting the "course of conduct" is the conspiracy itself, for which all the participants may be held liable. *See* Appellant's Opening Br. at 112-13. Plaintiffs respond that, as a policy matter, a monopolist's unilateral "campaign of [acts intended to exclude a rival] that in the aggregate has the requisite impact" warrants liability even if the acts viewed individually would be lawful for want of a significant effect upon competition. Appellees' Br. at 82-83.

We need not pass upon plaintiffs' argument, however, because the District Court did not point to any series of acts, each of which harms competition only slightly but the cumulative effect of which is significant enough to form an independent basis for liability. The "course of conduct" section of the District Court's opinion contains, with one exception, only broad, **[**106]** summarizing conclusions. *See, e.g., Conclusions of Law*, at 44 ("Microsoft placed an oppressive thumb on the scale of competitive fortune...."). The only specific acts to which the court refers are Microsoft's expenditures in promoting its browser, *see id.* ("Microsoft has expended wealth and foresworn opportunities to realize more...."), which we have explained are not in themselves unlawful. Because the District Court identifies no other specific acts as a basis for "course of conduct" liability, we reverse its conclusion that Microsoft's course of conduct separately violates *§ 2* of the Sherman Act.

*C. Causation*

As a final parry, Microsoft urges this court to reverse on the monopoly maintenance claim, because plaintiffs never established a causal link between Microsoft's anticompetitive conduct, in particular its foreclosure of Netscape's and Java's distribution channels, and the maintenance of Microsoft's operating system monopoly. *See Findings of Fact* P 411 ("There is insufficient evidence to find that, absent Microsoft's actions, Navigator and Java already would have ignited genuine competition in the market for Intel-compatible PC operating systems."). This **[**107]** is the flip side of Microsoft's earlier argument that the District Court should have included middleware in the relevant market. According to Microsoft, the District Court cannot simultaneously find that middleware is not a reasonable substitute *and* that Microsoft's exclusionary conduct contributed to the maintenance of monopoly power in the operating system market. Microsoft claims that the first finding depended on the court's view that middleware does not pose a serious threat to Windows, *see supra* Section II.A, while the **[*79]** second finding required the court to find that Navigator and Java would have developed into serious enough cross-platform threats to erode the applications barrier to entry. We disagree.

Microsoft points to no case, and we can find none, standing for the proposition that, as to *§ 2liability* in an equitable enforcement action, plaintiffs must present direct proof that a defendant's continued monopoly power is precisely attributable to its anticompetitive conduct. As its lone authority, Microsoft cites the following passage from Professor Areeda's antitrust treatise: "The plaintiff has the burden of pleading, introducing evidence, and presumably proving **[**108]** by a preponderance of the evidence that reprehensible behavior has *contributed significantly* to the … maintenance of the monopoly." 3 PHILLIP E. AREEDA & HERBERT HOVENKAMP, ANTITRUST LAW P 650c, at 69 (1996) (emphasis added).

***HN28*** But, with respect to actions seeking injunctive relief, the authors of that treatise also recognize the need for courts to infer "causation" from the fact that a defendant has engaged in anticompetitive conduct that "reasonably appears capable of making a significant contribution to … maintaining monopoly power." *Id*. P 651c, at 78; *see also* *Morgan v. Ponder, 892 F.2d 1355, 1363 (8th Cir. 1989)*; *Barry Wright, 724 F.2d at 230*. To require that *§ 2* liability turn on a plaintiff's ability or inability to reconstruct the hypothetical marketplace absent a defendant's anticompetitive conduct would only encourage monopolists to take more and earlier anticompetitive action.

We may infer causation when exclusionary conduct is aimed at producers of nascent competitive technologies as well as when it is aimed at producers of established substitutes. Admittedly, in the former case there is added uncertainty, inasmuch as nascent **[**109]** threats are merely *potential* substitutes. But the underlying proof problem is the same--neither plaintiffs nor the court can confidently reconstruct a product's hypothetical technological development in a world absent the defendant's exclusionary conduct. To some degree, "the defendant is made to suffer the uncertain consequences of its own undesirable conduct." 3 AREEDA & HOVENKAMP, ANTITRUST LAW P 651c, at 78.

Given this rather edentulous test for causation, the question in this case is not whether Java or Navigator would actually have developed into viable platform substitutes, but (1) whether as a general matter the exclusion of nascent threats is the type of conduct that is reasonably capable of contributing significantly to a defendant's continued monopoly power and (2) whether Java and Navigator reasonably constituted nascent threats at the time Microsoft engaged in the anticompetitive conduct at issue. As to the first, suffice it to say that it would be inimical to the

purpose of the Sherman Act to allow monopolists free reign to squash nascent, albeit unproven, competitors at will--particularly in industries marked by rapid technological advance and frequent paradigm **[**110]** shifts. *Findings of Fact* P P 59-60. As to the second, the District Court made ample findings that both Navigator and Java showed potential as middleware platform threats. *Findings of Fact* P P 68-77. Counsel for Microsoft admitted as much at oral argument. 02/26/01 Ct. Appeals Tr. at 27 ("There are no constraints on output. Marginal costs are essentially zero. And there are to some extent network effects. So a company like Netscape founded in 1994 can be by the middle of 1995 clearly a potentially lethal competitor to Windows because it can supplant its position in the market because of the characteristics of these markets.").

**[*80]** Microsoft's concerns over causation have more purchase in connection with the appropriate remedy issue, *i.e.*, whether the court should impose a structural remedy or merely enjoin the offensive conduct at issue. As we point out later in this opinion, ***HN29*** divestiture is a remedy that is imposed only with great caution, in part because its long-term efficacy is rarely certain. *See infra* Section V.E. Absent some measure of confidence that there has been an actual loss to competition that needs to be restored, wisdom counsels against adopting radical structural **[**111]** relief. *See* 3 AREEDA & HOVENKAMP, ANTITRUST LAW P 653b, at 91-92 ("More extensive equitable relief, particularly remedies such as divestiture designed to eliminate the monopoly altogether, raise more serious questions and require a clearer indication of a significant causal connection between the conduct and creation or maintenance of the market power."). But these queries go to questions of remedy, not liability. In short, causation affords Microsoft no defense to liability for its unlawful actions undertaken to maintain its monopoly in the operating system market.

## III. ATTEMPTED MONOPOLIZATION

Microsoft further challenges the District Court's determination of liability for "attempting to monopolize … any part of the trade or commerce among the several States." *15 U.S.C. § 2 (1997)*. ***HN30*** To establish a *§ 2* violation for attempted monopolization, "a plaintiff must prove (1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power." *Spectrum Sports, Inc. v. McQuillan, 506 U.S. 447, 456, 122 L. Ed. 2d 247, 113 S. Ct. 884 (1993)*; **[**112]** *see also* *Times-Picayune Pub. Co. v. United States, 345 U.S. 594, 626, 97 L. Ed. 1277, 73 S. Ct. 872 (1953)*; *Lorain Journal Co. v. United States, 342 U.S. 143, 153-55, 96 L. Ed. 162, 72 S. Ct. 181 (1951)*. Because a deficiency on any one of the three will defeat plaintiffs' claim, we look no further than plaintiffs' failure to prove a dangerous probability of achieving monopoly power in the putative browser market.

The determination whether a dangerous probability of success exists is a particularly fact-intensive inquiry. Because the Sherman Act does not identify the activities that constitute the offense of attempted monopolization, the court "must examine the facts of each case, mindful that the determination of what constitutes an attempt, as Justice Holmes explained, 'is a question of proximity and degree.' " *United States v. Am. Airlines, Inc., 743 F.2d 1114, 1118 (5th Cir. 1984)* (quoting *Swift & Co. v. United States, 196 U.S. 375, 402, 49 L. Ed. 518, 25 S. Ct. 276 (1904))*. The District Court determined that "the evidence supports the conclusion that Microsoft's actions did pose such a danger." *Conclusions* **[**113]** *of Law*, at 45. Specifically, the District Court concluded that "Netscape's assent to Microsoft's market division proposal would have, *instanter*, resulted in Microsoft's attainment of monopoly power in a second market," and that "the

proposal itself created a dangerous probability of that result." *Conclusions of Law*, at 46 (citation omitted). The District Court further concluded that "the predatory course of conduct Microsoft has pursued since June of 1995 has revived the dangerous probability that Microsoft will attain monopoly power in a second market." *Id.*

At the outset we note a pervasive flaw in the District Court's and plaintiffs' discussion of attempted monopolization. Simply put, plaintiffs have made the same argument under two different headings--monopoly maintenance and attempted monopolization. **[*81]** They have relied upon Microsoft's *§ 2* liability for monopolization of the operating system market as a presumptive indicator of attempted monopolization of an entirely different market. The District Court implicitly accepted this approach: It agreed with plaintiffs that the events that formed the basis for the *§ 2* monopolization claim "warranted *additional* liability **[**114]** as an illegal attempt to amass monopoly power in 'the browser market.' " *Id.* at 45 (emphasis added). Thus, plaintiffs and the District Court failed to recognize the need for an analysis wholly independent of the conclusions and findings on monopoly maintenance.

To establish a dangerous probability of success, plaintiffs must as a threshold matter show that the browser market can be monopolized, *i.e.*, that a hypothetical monopolist in that market could enjoy market power. This, in turn, requires plaintiffs (1) to define the relevant market and (2) to demonstrate that substantial barriers to entry protect that market. Because plaintiffs have not carried their burden on either prong, we reverse without remand.

*A. Relevant Market*

***HN31*** A court's evaluation of an attempted monopolization claim must include a definition of the relevant market. *See Spectrum Sports, 506 U.S. at 455-56*. Such a definition establishes a context for evaluating the defendant's actions as well as for measuring whether the challenged conduct presented a dangerous probability of monopolization. *See id.* The District Court omitted this element of the *Spectrum Sports* inquiry.

**[**115]** Defining a market for an attempted monopolization claim involves the same steps as defining a market for a monopoly maintenance claim, namely a detailed description of the purpose of a browser--what functions may be included and what are not--and an examination of the substitutes that are part of the market and those that are not. *See also supra* Section II.A. The District Court never engaged in such an analysis nor entered detailed findings defining what a browser is or what products might constitute substitutes. In the Findings of Fact, the District Court (in a section on whether IE and Windows are separate products) stated only that "a Web browser provides the ability for the end user to select, retrieve, and perceive resources on the Web." *Findings of Fact* P 150. Furthermore, in discussing attempted monopolization in its Conclusions of Law, the District Court failed to demonstrate analytical rigor when it employed varying and imprecise references to the "market for browsing technology for Windows," "the browser market," and "platform-level browsing software." *Conclusions of Law*, at 45.

Because ***HN32*** the determination of a relevant market is a factual question to be resolved **[**116]** by the District Court, *see, e.g., All Care Nursing Serv., Inc. v. High Tech Staffing Servs., Inc., 135 F.3d 740, 749 (11th Cir. 1998)*; *Tunis Bros. Co., Inc. v. Ford Motor Co., 952 F.2d 715, 722-23 (3d Cir. 1991)*; *Westman Comm'n Co. v. Hobart Int'l, Inc., 796 F.2d 1216, 1220 (10th Cir. 1986)*, we would normally remand the case so that the District Court could formulate an appropriate definition. *See Pullman-Standard v. Swint, 456 U.S. 273, 291-92* & n.22, *72 L. Ed.*

*2d 66, 102 S. Ct. 1781 (1982)*; *Janini v. Kuwait Univ., 310 U.S. App. D.C. 109, 43 F.3d 1534, 1537 (D.C. Cir. 1995)*; *Palmer v. Shultz, 259 U.S. App. D.C. 246, 815 F.2d 84, 103 (D.C. Cir. 1987)*. ***HN33*** A remand on market definition is unnecessary, however, because the District Court's imprecision is directly traceable to plaintiffs' failure to articulate and identify evidence before the District Court as to (1) what constitutes a browser (*i.e.*, what are the technological components of or functionalities **[*82]** provided by a browser) and (2) why certain other products are not reasonable substitutes (*e.g.*, browser shells or viewers for **[**117]** individual internet extensions, such as Real Audio Player or Adobe Acrobat Reader). *See* Plaintiffs' Joint Proposed Findings of Fact, at 817-19, *reprinted in* 2 J.A. at 1480-82; Plaintiffs' Joint Proposed Conclusions of Law § IV (No. 98-1232); *see also* *Lee v. Interstate Fire & Cas. Co., 86 F.3d 101, 105 (7th Cir. 1996)* (stating that remand for development of a factual record is inappropriate where plaintiff failed to meet burden of persuasion and never suggested that additional evidence was necessary). Indeed, when plaintiffs in their Proposed Findings of Fact attempted to define a relevant market for the attempt claim, they pointed only to their separate products analysis for the tying claim. *See, e.g.*, Plaintiffs' Joint Proposed Findings of Fact, at 818, *reprinted in* 2 J.A. at 1481. ***HN34*** However, the separate products analysis for tying purposes is not a substitute for the type of market definition that *Spectrum Sports* requires. *See infra* Section IV.A.

Plaintiffs' proposed findings and the District Court's actual findings on attempted monopolization pale in comparison to their counterparts on the monopoly maintenance claim. *Compare Findings of* **[**118]** *Fact* P 150, *and* Plaintiffs' Joint Proposed Findings of Fact, at 817-819, *reprinted in* 2 J.A. at 1480-82, *with Findings of Fact* P P 18-66, *and* Plaintiffs' Joint Proposed Findings of Fact, at 20-31, *reprinted in* 1 J.A. at 658-69. Furthermore, in their brief and at oral argument before this court, plaintiffs did nothing to clarify or ameliorate this deficiency. *See, e.g.,* Appellees' Br. at 93-94.'

*B. Barriers to Entry*

***HN35*** Because a firm cannot possess monopoly power in a market unless that market is also protected by significant barriers to entry, *see supra* Section II.A, it follows that a firm cannot threaten to achieve monopoly power in a market unless that market is, or will be, similarly protected. *See* *Spectrum Sports, 506 U.S. at 456* ("In order to determine whether there is a dangerous probability of monopolization, courts have found it necessary to consider … the defendant's ability to lessen or destroy competition in that market.") (citing cases). Plaintiffs have the burden of establishing barriers to entry into a properly defined relevant market. *See* 2A PHILLIP E. AREEDA ET AL., ANTITRUST LAW P 420b, at 57-59 (1995); 3A **[**119]** PHILLIP E. AREEDA & HERBERT HOVENKAMP, ANTITRUST LAW P 807g, at 361-62 (1996); *see also* *Neumann v. ReinforcedEarth Co., 252 U.S. App. D.C. 11, 786 F.2d 424, 429 (D.C. Cir. 1986)*. Plaintiffs must not only show that barriers to entry protect the properly defined browser market, but that those barriers are "significant." *See* *United States v. Baker Hughes Inc., 285 U.S. App. D.C. 222, 908 F.2d 981, 987 (D.C. Cir. 1990)*. Whether there are significant barriers to entry cannot, of course, be answered absent an appropriate market definition; thus, plaintiffs' failure on that score alone is dispositive. But even were we to assume a properly defined market, for example browsers consisting of a graphical interface plus internet protocols, plaintiffs nonetheless failed to carry their burden on barriers to entry.

Contrary to plaintiffs' contention on appeal, *see* Appellees' Br. at 91-93, none of the District Court's statements constitutes a finding of barriers to entry into the web browser market. Finding of Fact 89 states:

> At the time Microsoft presented its proposal, Navigator was the only browser product with a significant share of the market **[**120]** and thus the only one with the potential to weaken the applications barrier to entry. Thus, had it convinced **[*83]** Netscape to accept its offer of a "special relationship," Microsoft quickly would have gained such control over the extensions and standards that network-centric applications (including Web sites) employ as to make it all but impossible for any future browser rival to lure appreciable developer interest away from Microsoft's platform.

This finding is far too speculative to establish that competing browsers would be unable to enter the market, or that Microsoft would have the power to raise the price of its browser above, or reduce the quality of its browser below, the competitive level. Moreover, it is ambiguous insofar as it appears to focus on Microsoft's response to the perceived platform threat rather than the browser market. Finding of Fact 144, on which plaintiffs also rely, is part of the District Court's discussion of Microsoft's alleged anticompetitive actions to eliminate the platform threat posed by Netscape Navigator. This finding simply describes Microsoft's reliance on studies indicating consumers' reluctance to switch browsers, a reluctance not shown to be **[**121]** any more than that which stops consumers from switching brands of cereal. Absent more extensive and definitive factual findings, the District Court's legal conclusions about entry barriers amount to nothing more than speculation.

In contrast to their minimal effort on market definition, plaintiffs did at least offer proposed findings of fact suggesting that the possibility of network effects could potentially create barriers to entry into the browser market. *See* Plaintiffs' Joint Proposed Findings of Fact, at 822-23, 825-27, *reprinted in* 2 J.A. at 1485-86, 1488-90. The District Court did not adopt those proposed findings. *See Findings of Fact* P 89. However, the District Court did acknowledge the possibility of a different kind of entry barrier in its Conclusions of Law:

> In the time it would have taken an aspiring entrant to launch a serious effort to compete against Internet Explorer, Microsoft *could have* erected the same type of barrier that protects its existing monopoly power by adding proprietary extensions to the browsing software under its control and by extracting commitments from OEMs, IAPs and others similar to the ones discussed in [the monopoly **[**122]** maintenance section].*Conclusions of Law*, at 46 (emphasis added).

Giving plaintiffs and the District Court the benefit of the doubt, we might remand if the *possible existence* of entry barriers resulting from the *possible creation* and *exploitation* of network effects in the browser market were the only concern. That is not enough to carry the day, however, because the District Court did not make two key findings: (1) that network effects were a necessary or even probable, rather than merely possible, consequence of high market share in the browser market and (2) that a barrier to entry resulting from network effects would be "significant" enough to confer monopoly power. Again, these deficiencies are in large part traceable to plaintiffs' own failings. As to the first point, the District Court's use of the phrase "could have" reflects the same uncertainty articulated in testimony cited in plaintiffs' proposed findings. *See* Plaintiffs' Joint Proposed Findings of Fact, at 822 (citing testimony of Frederick Warren-Boulton), at 826 (citing testimony of Franklin Fisher), *reprinted in* 2 J.A. at 1485, 1489. As to the second point, the cited testimony in plaintiffs' **[**123]** proposed findings offers little more than conclusory

statements. *See id. at 822-27*, *reprinted in* 2 J.A. at 1485-90. The proffered testimony contains no evidence regarding the **[*84]** cost of "porting" websites to different browsers or the potentially different economic incentives facing ICPs, as opposed to ISVs, in their decision to incur costs to do so. Simply invoking the phrase "network effects" without pointing to more evidence does not suffice to carry plaintiffs' burden in this respect.

Any doubt that we may have had regarding remand instead of outright reversal on the barriers to entry question was dispelled by plaintiffs' arguments on attempted monopolization before this court. Not only did plaintiffs fail to articulate a website barrier to entry *theory* in either their brief or at oral argument, they failed to point the court to evidence in the record that would support a finding that Microsoft would *likely* erect *significant* barriers to entry upon acquisition of a dominant market share.

Plaintiffs did not devote the same resources to the attempted monopolization claim as they did to the monopoly maintenance claim. But both claims require evidentiary and theoretical **[**124]** rigor. Because plaintiffs failed to make their case on attempted monopolization both in the District Court and before this court, there is no reason to give them a second chance to flesh out a claim that should have been fleshed out the first time around. Accordingly, we reverse the District Court's determination of *§ 2* liability for attempted monopolization.

**IV. TYING**

Microsoft also contests the District Court's determination of liability under § 1 of the Sherman Act. The District Court concluded that Microsoft's contractual and technological bundling of the IE web browser (the "tied" product) with its Windows operating system ("OS") (the "tying" product) resulted in a tying arrangement that was per se unlawful. *Conclusions of Law*, at 47-51. We hold that ***HN36*** the rule of reason, rather than per se analysis, should govern the legality of tying arrangements involving platform software products. The Supreme Court has warned that " 'it is only after considerable experience with certain business relationships that courts classify them as *per se* violations....' " *Broad. Music, Inc. v. CBS, 441 U.S. 1, 9, 60 L. Ed. 2d 1, 99 S. Ct. 1551 (1979)* (quoting *United States v. Topco Assocs., 405 U.S. 596, 607-08, 92 S. Ct. 1126, 31 L. Ed. 2d 515 (1972))*. **[**125]** While every "business relationship" will in some sense have unique features, some represent entire, novel categories of dealings. As we shall explain, the arrangement before us is an example of the latter, offering the first up-close look at the technological integration of added functionality into software that serves as a platform for third-party applications. There being no close parallel in prior antitrust cases, simplistic application of per se tying rules carries a serious risk of harm. Accordingly, we vacate the District Court's finding of a per se tying violation and remand the case. Plaintiffs may on remand pursue their tying claim under the rule of reason.

The facts underlying the tying allegation substantially overlap with those set forth in Section II.B in connection with the *§ 2* monopoly maintenance claim. The key District Court findings are that (1) Microsoft required licensees of Windows 95 and 98 also to license IE as a bundle at a single price, *Findings of Fact* P P 137, 155, 158; (2) Microsoft refused to allow OEMs to uninstall or remove IE from the Windows desktop, *id.* P P 158, 203, 213; (3) Microsoft designed Windows 98 in a way that withheld from consumers **[**126]** the ability to remove IE by use of the Add/Remove Programs utility, *id. P 170*; *cf. id. P 165* (stating that IE was subject to Add/Remove Programs utility in Windows 95); and (4) Microsoft **[*85]** designed Windows 98

to override the user's choice of default web browser in certain circumstances, *id*. P P 171, 172. The court found that these acts constituted a per se tying violation. *Conclusions of Law*, at 47-51. Although the District Court also found that Microsoft commingled operating system-only and browser-only routines in the same library files, *Findings of Fact* P P 161, 164, it did not include this as a basis for tying liability despite plaintiffs' request that it do so, Plaintiffs' Proposed Findings of Fact, P P 131-32, *reprinted in* 2 J.A. at 941-47.

There are four elements to a per se tying violation: (1) the tying and tied goods are two separate products; (2) the defendant has market power in the tying product market; (3) the defendant affords consumers no choice but to purchase the tied product from it; and (4) the tying arrangement forecloses a substantial volume of commerce. *See* *Eastman Kodak Co. v. Image Tech. Servs., Inc., 504 U.S. 451, 461-62, 119 L. Ed. 2d 265, 112 S. Ct. 2072 (1992)*; **[**127]** *Jefferson Parish Hosp. Dist. No. 2 v. Hyde, 466 U.S. 2, 12-18, 80 L. Ed. 2d 2, 104 S. Ct. 1551 (1984)*.

Microsoft does not dispute that it bound Windows and IE in the four ways the District Court cited. Instead it argues that Windows (the tying good) and IE browsers (the tied good) are not "separate products," Appellant's Opening Br. at 69-79, and that it did not substantially foreclose competing browsers from the tied product market, *id. at 79-83*. (Microsoft also contends that it does not have monopoly power in the tying product market, *id. at 84-96*, but, for reasons given in Section II.A, we uphold the District Court's finding to the contrary.)

We first address the separate-products inquiry, a source of much argument between the parties and of confusion in the cases. Our purpose is to highlight the poor fit between the separate-products test and the facts of this case. We then offer further reasons for carving an exception to the per se rule when the tying product is platform software. In the final section we discuss the District Court's inquiry if plaintiffs pursue a rule of reason claim on remand.

*A. Separate-Products* **[**128]** *Inquiry Under the Per Se Test*

The requirement that a practice involve two separate products before being condemned as an illegal tie started as a purely linguistic requirement: unless products are separate, one cannot be "tied" to the other. Indeed, the nature of the products involved in early tying cases--intuitively distinct items such as a movie projector and a film, *Motion Picture Patents Co. v. Universal Film Mfg. Co., 243 U.S. 502, 61 L. Ed. 871, 37 S. Ct. 416 (1917)*-led courts either to disregard the separate-products question, *see, e.g.*, *United Shoe Mach. Corp. v. United States, 258 U.S. 451, 66 L. Ed. 708, 42 S. Ct. 363 (1922)*, or to discuss it only in passing, *see, e.g.*, *Motion Picture Patents, 243 U.S. at 508, 512, 518*. It was not until *Times-Picayune Publishing Co. v. United States, 345 U.S. 594, 97 L. Ed. 1277, 73 S. Ct. 872 (1953)*, that the separate-products issue became a distinct element of the test for an illegal tie. *Id. at 614*. Even that case engaged in a rather cursory inquiry into whether ads sold in the morning edition of a paper were a separate product from ads **[**129]** sold in the evening edition.

The first case to give content to the separate-products test was *Jefferson Parish, 466 U.S. 2, 80 L. Ed. 2d 2, 104 S. Ct. 1551*. That case addressed a tying arrangement in which a hospital conditioned surgical care at its facility on the purchase of anesthesiological services from an affiliated **[*86]** medical group. The facts were a challenge for casual separate-products analysis because the tied service--anesthesia--was neither intuitively distinct from nor intuitively contained within the tying service--surgical care. A further complication was that, soon after the Court enunciated the per se rule for tying liability in *International Salt Co. v. United States, 332 U.S.*

392, 396, 92 L. Ed. 20, 68 S. Ct. 12 (1947), and Northern Pacific Railway Co. v. United States, 356 U.S. 1, 5-7, 2 L. Ed. 2d 545, 78 S. Ct. 514 (1958), new economic research began to cast doubt on the assumption, voiced by the Court when it established the rule, that " 'tying agreements serve hardly any purpose beyond the suppression of competition,' " id. at 6 (quoting Standard Oil of Cal. v. United States, 337 U.S. 293, 305-06, 93 L. Ed. 1371, 69 S. Ct. 1051 (1949)); **[**130]** *see also* Jefferson Parish, 466 U.S. at 15 n.23 (citing materials); Fortner Enters. v. U.S. Steel Corp., 394 U.S. 495, 524-25, 22 L. Ed. 2d 495, 89 S. Ct. 1252 (1969) (Fortas, J., dissenting) ("*Fortner I*").

The *Jefferson Parish* Court resolved the matter in two steps. First, it clarified that "the answer to the question whether one or two products are involved" does not turn "on the functional relation between them…." Jefferson Parish, 466 U.S. at 19; *see also*466 U.S. at 19 n.30. In other words, the mere fact that two items are complements, that "one … is useless without the other," *id*., does not make them a single "product" for purposes of tying law. *Accord* Eastman Kodak, 504 U.S. at 463. Second, reasoning that the "definitional question [whether two distinguishable products are involved] depends on whether the arrangement may have the type of competitive consequences addressed by the rule [against tying]," Jefferson Parish, 466 U.S. at 21, the Court decreed that "no tying arrangement can exist unless there is a sufficient *demand* for the purchase of anesthesiological **[**131]** services separate from hospital services to identify a distinct product market in which it is *efficient* to offer anesthesiological services separately from hospital service," id. at 21-22 (emphasis added); *accord* Eastman Kodak, 504 U.S. at 462.

The Court proceeded to examine direct and indirect evidence of consumer demand for the tied product separate from the tying product. Direct evidence addresses the question whether, when given a choice, consumers purchase the tied good from the tying good maker, or from other firms. The Court took note, for example, of testimony that patients and surgeons often requested specific anesthesiologists not associated with a hospital. Jefferson Parish, 466 U.S. at 22. Indirect evidence includes the behavior of firms without market power in the tying good market, presumably on the notion that (competitive) supply follows demand. If competitive firms always bundle the tying and tied goods, then they are a single product. *See* id. at 22 n.36; *see also* Eastman Kodak, 504 U.S. at 462; Fortner I, 394 U.S. at 525 (Fortas, J., dissenting), *cited in* **[**132]** Jefferson Parish, 466 U.S. at 12, 22 n.35; United States v. Jerrold Elecs. Corp., 187 F. Supp. 545, 559 (E.D. Pa. 1960), *aff'd per curiam*, 365 U.S. 567 (1961); 10 PHILLIP E. AREEDA ET AL., ANTITRUST LAW P 1744, at 197-201 (1996). Here the Court noted that only 27% of anesthesiologists in markets other than the defendant's had financial relationships with hospitals, and that, unlike radiologists and pathologists, anesthesiologists were not usually employed by hospitals, *i.e.*, bundled with hospital services. Jefferson Parish, 466 U.S. at 22 n.36. With **[*87]** both direct and indirect evidence concurring, the Court determined that hospital surgery and anesthesiological services were distinct goods.

To understand the logic behind the Court's consumer demand test, consider first the postulated harms from tying. The core concern is that tying prevents goods from competing directly for consumer choice on their merits, *i.e.*, being selected as a result of "buyers' independent judgment," id. at 13 (internal quotes omitted). With a tie, a buyer's "freedom to select the best bargain in the second market [could **[**133]** be] impaired by his need to purchase the tying product, and perhaps by an inability to evaluate the true cost of either product…." Id. at 15. Direct competition on the merits of the tied product is foreclosed when the tying product either is sold only in a bundle with the tied product or, though offered separately, is sold at a bundled price, so that the

buyer pays the same price whether he takes the tied product or not. In both cases, a consumer buying the tying product becomes entitled to the tied product; he will therefore likely be unwilling to buy a competitor's version of the tied product even if, making his own price/quality assessment, that is what he would prefer.

But not all ties are bad. Bundling obviously saves distribution and consumer transaction costs. 9 PHILLIP E. AREEDA, ANTITRUST LAW P 1703g2, at 51-52 (1991). This is likely to be true, to take some examples from the computer industry, with the integration of math co-processors and memory into microprocessor chips and the inclusion of spell checkers in word processors. 11/10/98 pm Tr. at 18-19 (trial testimony of Steven McGeady of Intel), *reprinted in* 9 J.A. at 5581-82 (math co-processor); **[**134]** *Cal. Computer Prods., Inc. v. IBM Corp., 613 F.2d 727, 744 & n.29 (9th Cir. 1979)* (memory). Bundling can also capitalize on certain economies of scope. A possible example is the "shared" library files that perform OS and browser functions with the very same lines of code and thus may save drive space from the clutter of redundant routines and memory when consumers use both the OS and browser simultaneously. 11/16/98 pm Tr. at 44 (trial testimony of Glenn Weadock), *reprinted in* 9 J.A. at 5892; Direct Testimony of Microsoft's James Allchin P P 10, 97, 100, 106-116, app. A (excluding P P f, g.vi), *reprinted in* 5 J.A. at 3292, 3322-30, 3412-17. Indeed, if there were no efficiencies from a tie (including economizing on consumer transaction costs such as the time and effort involved in choice), we would expect distinct consumer demand for each individual component of every good. In a competitive market with zero transaction costs, the computers on which this opinion was written would only be sold piecemeal--keyboard, monitor, mouse, central processing unit, disk drive, and memory all sold in separate transactions and likely by different manufacturers.

Recognizing **[**135]** the potential benefits from tying, *see Jefferson Parish, 466 U.S. at 21 n.33*, the Court in *Jefferson Parish* forged a separate-products test that, like those of market power and substantial foreclosure, attempts to screen out false positives under per se analysis. The consumer demand test is a rough proxy for whether a tying arrangement may, on balance, be welfare-enhancing, and unsuited to per se condemnation. In the abstract, of course, there is always direct separate demand for products: assuming choice is available at zero cost, consumers will prefer it to no choice. Only when the efficiencies from bundling are dominated by the benefits to choice for enough consumers, however, will we actually observe consumers making independent purchases. In other words, perceptible separate demand **[*88]** is inversely proportional to net efficiencies. On the supply side, firms without market power will bundle two goods only when the cost savings from joint sale outweigh the value consumers place on separate choice. So bundling by all competitive firms implies strong net efficiencies. If a court finds either that there is no noticeable separate demand for the tied product or, there **[**136]** being no convincing direct evidence of separate demand, that the entire "competitive fringe" engages in the same behavior as the defendant, 10 AREEDA ET AL., ANTITRUST LAW P 1744c4, at 200, then the tying and tied products should be declared one product and per se liability should be rejected.

Before concluding our exegesis of *Jefferson Parish*'s separate-products test, we should clarify two things. First, *Jefferson Parish* does not endorse a direct inquiry into the efficiencies of a bundle. Rather, it proposes easy-toadminister proxies for net efficiency. In describing the separate-products test we discuss efficiencies only to explain the rationale behind the consumer demand inquiry. To allow the separate-products test to become a detailed inquiry into possible welfare consequences would turn a screening test into the very process it is expected to render unnecessary. 10 AREEDA ET AL., ANTITRUST LAW P P 1741b & c, at 180-85; *see also Jefferson Parish, 466 U.S. at 34-35* (O'Connor, J., concurring).

Second, the separate-products test is not a one-sided inquiry into the cost savings from a bundle. Although *Jefferson Parish* acknowledged that prior lower court **[**137]** cases looked at cost-savings to decide separate products, *see* id. at 22 n.35, the Court conspicuously did not adopt that approach in its disposition of tying arrangement before it. Instead it chose proxies that balance costs savings against reduction in consumer choice.

With this background, we now turn to the separateproducts inquiry before us. The District Court found that many consumers, if given the option, would choose their browser separately from the OS. *Findings of Fact* P 151 (noting that "corporate consumers … prefer to standardize on the same browser across different [OSs]" at the workplace). Turning to industry custom, the court found that, although all major OS vendors bundled browsers with their OSs, these companies either sold versions without a browser, or allowed OEMs or end-users either not to install the bundled browser or in any event to "uninstall" it. *Id. P 153*. The court did not discuss the record evidence as to whether OS vendors other than Microsoft sold at a bundled price, with no discount for a browserless OS, perhaps because the record evidence on the issue was in conflict. *Compare, e.g.*, Direct Testimony of Richard Schmalensee **[**138]** P 241, *reprinted in* 7 J.A. at 4315 ("All major operating system vendors do in fact include Web-browsing software with the operating system at *no extra charge*.") (emphasis added), *with, e.g.*, 1/6/99 pm Tr. at 42 (trial testimony of Franklin Fisher of MIT) (suggesting all OSs but Microsoft offer discounts).

Microsoft does not dispute that many consumers demand alternative browsers. But on industry custom Microsoft contends that no other firm requires non-removal because no other firm has invested the resources to integrate web browsing as deeply into its OS as Microsoft has. Appellant's Opening Br. at 25; *cf.* Direct Testimony of James Allchin P P 262-72, *reprinted in* 5 J.A. at 3385-89 (Apple, IBM); 11/5/98 pm Tr. at 55-58 (trial testimony of Apple's Avadis Tevanian, Jr.), *reprinted in* 9 J.A. at 5507-10 (Apple). (We here use the term "integrate" in the rather simple sense of converting individual goods into components of a single physical object **[*89]** (*e.g.*, a computer as it leaves the OEM, or a disk or sets of disks), without any normative implication that such integration is desirable or achieves special advantages. *Cf.* *United States v. Microsoft Corp., 331 U.S. App. D.C. 121, 147 F.3d 935, 950 (D.C. Cir. 1998)* **[**139]** ("*Microsoft II*").) Microsoft contends not only that its integration of IE into Windows is innovative and beneficial but also that it requires non-removal of IE. In our discussion of monopoly maintenance we find that these claims fail the efficiency balancing applicable in that context. But the separate-products analysis is supposed to perform its function as a proxy *without* embarking on any direct analysis of efficiency. Accordingly, Microsoft's implicit argument--that in this case looking to a competitive fringe is inadequate to evaluate fully its potentially innovative technological integration, that such a comparison is between apples and oranges--poses a legitimate objection to the operation of *Jefferson Parish*'s separate-products test for the per se rule.

***HN37*** In fact there is merit to Microsoft's broader argument that *Jefferson Parish*'s consumer demand test would "chill innovation to the detriment of consumers by preventing firms from integrating into their products new functionality previously provided by standalone products--and hence, by definition, subject to separate consumer demand." Appellant's Opening Br. at 69. The per se rule's direct consumer demand and **[**140]** indirect industry custom inquiries are, as a general matter, backward-looking and therefore systematically poor proxies for overall efficiency in the presence of new and innovative integration. *See* 10 AREEDA ET AL., ANTITRUST LAW P 1746, at 224-29; Amicus Brief of Lawrence Lessig at 24-25, and sources cited therein (brief submitted regarding Conclusions of Law). The direct consumer demand test

focuses on historic consumer behavior, likely before integration, and the indirect industry custom test looks at firms that, unlike the defendant, may not have integrated the tying and tied goods. Both tests compare incomparables--the defendant's decision to bundle in the presence of integration, on the one hand, and consumer and competitor calculations in its absence, on the other. If integration has efficiency benefits, these may be ignored by the *Jefferson Parish* proxies. Because one cannot be sure beneficial integration will be protected by the other elements of the per se rule, simple application of that rule's separate-products test may make consumers worse off.

In light of the monopoly maintenance section, obviously, we do not find that Microsoft's integration is welfare-enhancing **[**141]** or that it should be absolved of tying liability. Rather, we heed Microsoft's warning that the separate-products element of the per se rule may not give newly integrated products a fair shake.

*B. Per Se Analysis Inappropriate for this Case.*

We now address directly the larger question as we see it: whether standard per se analysis should be applied "off the shelf" to evaluate the defendant's tying arrangement, one which involves software that serves as a platform for thirdparty applications. There is no doubt that "it is far too late in the history of our antitrust jurisprudence to question the proposition that *certain* tying arrangements pose an unacceptable risk of stifling competition and therefore are unreasonable '*per se*.' " *Jefferson Parish, 466 U.S. at 9* (emphasis added). But there are strong reasons to doubt that the integration of additional software functionality into an OS falls among these arrangements. Applying per se analysis to such an amalgamation creates undue risks of **[*90]** error and of deterring welfare-enhancing innovation.

The Supreme Court has warned that " ***HN38*** 'it is only after considerable experience with certain business relationships **[**142]** that courts classify them as *per se* violations....' " *Broad. Music, 441 U.S. at 9* (quoting *Topco Assocs., 405 U.S. at 607-08*); *accord* *Cont'l T.V., Inc. v. GTE Sylvania Inc., 433 U.S. 36, 47-59, 97 S. Ct. 2549, 53 L. Ed. 2d 568 (1977)*; *White Motor Co. v. United States, 372 U.S. 253, 263, 9 L. Ed. 2d 738, 83 S. Ct. 696 (1963)*; *Jerrold Elecs., 187 F. Supp. at 555-58, 560-61*; *see also* Frank H. Easterbrook, *Allocating Antitrust Decisionmaking Tasks*, *76 GEO. L.J. 305, 308 (1987)*. Yet the sort of tying arrangement attacked here is unlike any the Supreme Court has considered. The early Supreme Court cases on tying dealt with arrangements whereby the sale or lease of a patented product was conditioned on the purchase of certain unpatented products from the patentee. *See* *Motion Picture Patents, 243 U.S. 502, 61 L. Ed. 871, 37 S. Ct. 416 (1917)*; *United Shoe Mach., 258 U.S. 451, 66 L. Ed. 708, 42 S. Ct. 363 (1922)*; *IBM Corp. v. United States, 298 U.S. 131, 56 S. Ct. 701, 80 L. Ed. 1085 (1936)*; *Int'l Salt, 332 U.S. 392, 92 L. Ed. 20, 68 S. Ct. 12 (1947)*. Later Supreme Court tying cases **[**143]** did not involve market power derived from patents, but continued to involve contractual ties. *See* *Times-Picayune, 345 U.S. 594, 97 L. Ed. 1277, 73 S. Ct. 872 (1953)* (defendant newspaper conditioned the purchase of ads in its evening edition on the purchase of ads in its morning edition); *N. Pac. Ry. v. United States, 356 U.S. 1, 78 S. Ct. 514, 2 L. Ed. 2d 545 (1958)* (defendant railroad leased land only on the condition that products manufactured on the land be shipped on its railways); *United States v. Loew's Inc., 371 U.S. 38, 9 L. Ed. 2d 11, 83 S. Ct. 97 (1962)* (defendant distributor of copyrighted feature films conditioned the sale of desired films on the purchase of undesired films); *U.S. Steel Corp. v. Fortner Enters., Inc., 429 U.S. 610, 51 L. Ed. 2d 80, 97 S. Ct. 861 (1977)* ("*Fortner II*") (defendant steel company conditioned access to low interest loans on the purchase of the defendant's prefabricated homes); *Jefferson Parish, 466*

*U.S. 2, 80 L. Ed. 2d 2, 104 S. Ct. 1551 (1984)* (defendant hospital conditioned use of its operating rooms on the purchase of anesthesiological services from a medical group associated with the hospital); *Eastman Kodak, 504 U.S. 451, 119 L. Ed. 2d 265, 112 S. Ct. 2072 (1992)* **[**144]** (defendant photocopying machine manufacturer conditioned the sale of replacement parts for its machines on the use of the defendant's repair services).

In none of these cases was the tied good physically and technologically integrated with the tying good. Nor did the defendants ever argue that their tie improved the value of the tying product to users *and* to makers of complementary goods. In those cases where the defendant claimed that use of the tied good made the tying good more valuable to users, the Court ruled that the same result could be achieved via quality standards for substitutes of the tied good. *See, e.g.*, *Int'l Salt, 332 U.S. at 397-98*; *IBM, 298 U.S. at 138-40*. Here Microsoft argues that IE and Windows are an integrated physical product and that the bundling of IE APIs with Windows makes the latter a better applications platform for third-party software. It is unclear how the benefits from IE APIs could be achieved by quality standards for different browser manufacturers. We do not pass judgment on Microsoft's claims regarding the benefits from integration of its APIs. We merely note that these and other novel, purported **[**145]** efficiencies suggest that ***HN39*** judicial "experience" provides little basis for believing that, "because of their pernicious **[*91]** effect on competition and lack of *any* redeeming virtue," a software firm's decisions to sell multiple functionalities as a package should be "conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use." *N. Pac. Ry., 356 U.S. at 5* (emphasis added).

Nor have we found much insight into software integration among the decisions of lower federal courts. Most tying cases in the computer industry involve bundling with hardware. *See, e.g.*, *Digital Equip. Corp. v. Uniq Digital Techs., Inc., 73 F.3d 756, 761 (7th Cir. 1996)* (Easterbrook, J.) (rejecting with little discussion the notion that bundling of OS with a computer is a tie of two separate products); *Datagate, Inc. v. Hewlett-Packard Co., 941 F.2d 864, 870 (9th Cir. 1991)* (holding that plaintiff's allegation that defendant conditioned its software on purchase of its hardware was sufficient to survive summary judgment); *Digidyne Corp. v. Data Gen. Corp., 734 F.2d 1336, 1341-47 (9th Cir. 1984)* **[**146]** (holding that defendant's conditioning the sale of its OS on the purchase of its CPU constitutes a per se tying violation); *Cal. ComputerProds., 613 F.2d at 743-44* (holding that defendant's integration into its CPU of a disk controller designed for its own disk drives was a useful innovation and not an impermissible attempt to monopolize); *ILC Peripherals Leasing Corp. v. IBM Corp., 448 F. Supp. 228, 233 (N.D. Cal. 1978)* (finding that defendant's integration of magnetic disks and a head/disk assembly was not an unlawful tie), *aff'd per curiam sub. nom. Memorex Corp. v. IBM Corp., 636 F.2d 1188 (9th Cir. 1980)*; *see also Transamerica Computer Co. v. IBM Corp., 698 F.2d 1377, 1382-83 (9th Cir. 1983)* (finding lawful defendant's design changes that rendered plaintiff peripheral maker's tape drives incompatible with the defendant's CPU). The hardware case that most resembles the present one is *Telex Corp. v. IBM Corp., 367 F. Supp. 258 (N.D. Okla. 1973)*, *rev'd on other grounds*, *510 F.2d 894 (10th Cir. 1975)*. Just as Microsoft integrated web browsing into its OS, IBM in the 1970s integrated **[**147]** memory into its CPUs, a hardware platform. A peripheral manufacturer alleged a tying violation, but the District Court dismissed the claim because it thought it inappropriate to enmesh the courts in product design decisions. *Id. at 347*. The court's discussion of the tying claim was brief and did not dwell on the effects of the integration on competition or efficiencies. Nor did the court consider whether per se analysis of the alleged tie was wise.

We have found four antitrust cases involving arrangements in which a software program is tied to the purchase of a software platform--two district court cases and two appellate court cases,

including one from this court. The first case, *Innovation Data Processing, Inc. v. IBM Corp., 585 F. Supp. 1470 (D.N.J. 1984)*, involved an allegation that IBM bundled with its OS a utility used to transfer data from a tape drive to a computer's disk drive. Although the court mentioned the efficiencies achieved by bundling, it ultimately dismissed the per se tying claim because IBM sold a discounted version of the OS without the utility. *Id. at 1475-76*. The second case, *A.I. Root Co. v. Computer/Dynamics, Inc., 806 F.2d 673 (6th Cir. 1986)*, **[**148]** was brought by a business customer who claimed that an OS manufacturer illegally conditioned the sale of its OS on the purchase of other software applications. The court quickly disposed of the case on the ground that defendant Computer/Dynamics had no market power. *Id. at 675-77*. There was no mention of the efficiencies from the tie. The third case, *Caldera, Inc. v. Microsoft Corp., 72 F. Supp. 2d 1295* **[*92]** (D. Utah 1999), involved a complaint that the technological integration of MS-DOS and Windows 3.1 into Windows 95 constituted a per se tying violation. The court formulated the "single product" issue in terms of whether the tie constituted a technological improvement, ultimately concluding that Microsoft was not entitled to summary judgment on that issue. *Id. at 1322-28*.

The software case that bears the greatest resemblance to that at bar is, not surprisingly, *Microsoft II, 331 U.S. App. D.C. 121, 147 F.3d 935*, where we examined the bundling of IE with Windows 95. But the issue there was whether the bundle constituted an "integrated product" as the term was used in a 1994 consent decree between the *Department of Justice* **[**149]** and Microsoft. 147 F.3d at 939. We did not consider whether Microsoft's bundling should be condemned as per se illegal. We certainly did not make any finding that bundling IE with Windows had "no purpose except stifling of competition," *White Motor, 372 U.S. at 263*, an important consideration in defining the scope of any of antitrust law's per se rules, *see Cont'l T.V., 433 U.S. at 57-59*. While we believed our interpretation of the term "integrated product" was consistent with the test for separate products under tying law, we made clear that the "antitrust question is of course distinct." *Microsoft II, 147 F.3d at 950 n.14*. We even cautioned that our conclusion that IE and Windows 95 were integrated was "subject to reexamination on a more complete record." *Id. at 952*. To the extent that the decision completely disclaimed judicial capacity to evaluate "high-tech product design," *id.*, it cannot be said to conform to prevailing antitrust doctrine (as opposed to resolution of the decree-interpretation issue then before us). In any case, mere review of asserted breaches of a consent decree hardly constitutes enough "experience" **[**150]** to warrant application of per se analysis. *See Broad. Music, 441 U.S. at 10-16* (refusing to apply per se analysis to defendant's blanket licenses even though those licenses had been thoroughly investigated by the Department of Justice and were the subject of a consent decree that had been reviewed by numerous courts).

While the paucity of cases examining software bundling suggests a high risk that per se analysis may produce inaccurate results, the nature of the platform software market affirmatively suggests that per se rules might stunt valuable innovation. We have in mind two reasons.

First, as we explained in the previous section, the separateproducts test is a poor proxy for net efficiency from newly integrated products. Under per se analysis the first firm to merge previously distinct functionalities (*e.g.*, the inclusion of starter motors in automobiles) or to eliminate entirely the need for a second function (*e.g.*, the invention of the stainresistant carpet) risks being condemned as having tied two separate products because at the moment of integration there will appear to be a robust "distinct" market for the tied product. *See* 10 AREEDA ET AL., **[**151]** ANTITRUST LAW P 1746, at 224. ***HN40*** Rule of reason analysis, however, affords the first mover an opportunity to demonstrate that an efficiency gain from its "tie" adequately offsets any distortion of consumer choice. *See Grappone, Inc. v. Subaru of New England, Inc., 858 F.2d*

*792, 799 (1st Cir. 1988)* (Breyer, J.); *see also* *Town Sound & Custom Tops, Inc. v. Chrysler Motors Corp., 959 F.2d 468, 482 (3d Cir. 1992)*; *Kaiser Aluminum & Chem. Sales, Inc. v. Avondale Shipyards, Inc., 677 F.2d 1045, 1048-49 n.5 (5th Cir. 1982)*.

The failure of the separate-products test to screen out certain cases of productive integration is particularly troubling in platform **[*93]** software markets such as that in which the defendant competes. Not only is integration common in such markets, but it is common among firms without market power. We have already reviewed evidence that nearly all competitive OS vendors also bundle browsers. Moreover, plaintiffs do not dispute that OS vendors can and do incorporate basic internet plumbing and other useful functionality into their OSs. *See* Direct Testimony of Richard Schmalensee P 508, *reprinted in* 7 J.A. at 4462-64 (disk **[**152]** defragmentation, memory management, peer-to-peer networking or file sharing); 11/19/98 am Tr. at 82-83 (trial testimony of Frederick Warren-Boulton), *reprinted in* 10 J.A. at 6427-28 (TCP/IP stacks). Firms without market power have no incentive to package different pieces of software together unless there are efficiency gains from doing so. The ubiquity of bundling in competitive platform software markets should give courts reason to pause before condemning such behavior in less competitive markets.

Second, because of the pervasively innovative character of platform software markets, tying in such markets may produce efficiencies that courts have not previously encountered and thus the Supreme Court had not factored into the per se rule as originally conceived. For example, the bundling of a browser with OSs enables an independent software developer to count on the presence of the browser's APIs, if any, on consumers' machines and thus to omit them from its own package. *See* Direct Testimony of Richard Schmalensee P P 230-31, 234, *reprinted* in 7 J.A. at 4309-11, 4312; Direct Testimony of Michael Devlin P P 12-21, *reprinted in* 5 J.A. at 3525-29; *see also Findings of* **[**153]** *Fact* P 2. It is true that software developers can bundle the browser APIs they need with their own products, *see* *id. P 193*, but that may force consumers to pay twice for the same API if it is bundled with two different software programs. It is also true that OEMs can include APIs with the computers they sell, *id.*, but diffusion of uniform APIs by that route may be inferior. First, many OEMs serve special subsets of Windows consumers, such as home or corporate or academic users. If just one of these OEMs decides not to bundle an API because it does not benefit enough of its clients, ISVs that use that API might have to bundle it with every copy of their program. Second, there may be a substantial lag before all OEMs bundle the same set of APIs--a lag inevitably aggravated by the first phenomenon. In a field where programs change very rapidly, delays in the spread of a necessary element (here, the APIs) may be very costly. Of course, these arguments may not justify Microsoft's decision to bundle APIs in this case, particularly because Microsoft did not merely bundle with Windows the APIs from IE, but an entire browser application (sometimes even without APIs, *see id.*). **[**154]** A justification for bundling a component of software may not be one for bundling the entire software package, especially given the malleability of software code. *See id.* P P 162-63; 12/9/98 am Tr. at 17 (trial testimony of David Farber); 1/6/99 am Tr. at 6-7 (trial testimony of Franklin Fisher), *reprinted in* 11 J.A. at 7192-93; Direct Testimony of Joachim Kempin P 286, *reprinted in* 6 J.A. at 3749. Furthermore, the interest in efficient API diffusion obviously supplies a far stronger justification for simple price-bundling than for Microsoft's contractual or technological bars to subsequent *removal* of functionality. But our qualms about redefining the boundaries of a defendant's product and the possibility of consumer gains from simplifying the work of applications developers makes us question any hard and fast approach to tying in OS software markets.

**[*94]** There may also be a number of efficiencies that, although very real, have been ignored in the calculations underlying the adoption of a per se rule for tying. We fear that these efficiencies are common in technologically dynamic markets where product development is especially unlikely to follow an easily foreseen linear **[**155]** pattern. Take the following example from *ILC Peripherals, 448 F. Supp. 228*, a case concerning the evolution of disk drives for computers. When IBM first introduced such drives in 1956, it sold an integrated product that contained magnetic disks and disk heads that read and wrote data onto disks. *Id. at 231*. Consumers of the drives demanded two functions--to store data and to access it all at once. In the first few years consumers' demand for storage increased rapidly, outpacing the evolution of magnetic disk technology. To satisfy that demand IBM made it possible for consumers to remove the magnetic disks from drives, even though that meant consumers would not have access to data on disks removed from the drive. This componentization enabled makers of computer peripherals to sell consumers removable disks. *Id. at 231-32*. Over time, however, the technology of magnetic disks caught up with demand for capacity, so that consumers needed few removable disks to store all their data. At this point IBM reintegrated disks into their drives, enabling consumers to once again have immediate access to all their data without a sacrifice in capacity. **[**156]** *Id*. A manufacturer of removable disks sued. But the District Court found the tie justified because it satisfied consumer demand for immediate access to all data, and ruled that disks and disk heads were one product. *Id. at 233*. A court hewing more closely to the truncated analysis contemplated by *Northern Pacific Railway* would perhaps have overlooked these consumer benefits.

These arguments all point to one conclusion: we cannot comfortably say that bundling in platform software markets has so little "redeeming virtue," *N. Pac. Ry., 356 U.S. at 5*, and that there would be so "very little loss to society" from its ban, that "an inquiry into its costs in the individual case [can be] considered [] unnecessary." *Jefferson Parish, 466 U.S. at 33-34* (O'Connor, J., concurring). We do not have enough empirical evidence regarding the effect of Microsoft's practice on the amount of consumer surplus created or consumer choice foreclosed by the integration of added functionality into platform software to exercise sensible judgment regarding that entire class of behavior. (For some issues we have no data.) "We need to know more than **[**157]** we do about the actual impact of these arrangements on competition to decide whether they … should be classified as *per se* violations of the Sherman Act." *White Motor, 372 U.S. at 263*. Until then, we will heed the wisdom that "easy labels do not always supply ready answers," *Broad. Music, 441 U.S. at 8*, and vacate the District Court's finding of per se tying liability under Sherman Act § 1. We remand the case for evaluation of Microsoft's tying arrangements under the rule of reason. *See Pullman-Standard v. Swint, 456 U.S. 273, 292, 72 L. Ed. 2d 66, 102 S. Ct. 1781 (1982)* ("***HN41*** Where findings are infirm because of an erroneous view of the law, a remand is the proper course unless the record permits only one resolution of the factual issue."). ***HN42*** That rule more freely permits consideration of the benefits of bundling in software markets, particularly those for OSs, and a balancing of these benefits against the costs to consumers whose ability to make direct price/quality tradeoffs in the tied market may have been impaired. *See Jefferson Parish, 466 U.S. at 25* nn.41-42 (noting **[*95]** that per se rule does not broadly permit **[**158]** consideration of procompetitive justifications); *id. at 34-35* (O'Connor, J., concurring); *N. Pac. Ry., 356 U.S. at 5*.

Our judgment regarding the comparative merits of the per se rule and the rule of reason is confined to the tying arrangement before us, where the tying product is software whose major purpose is to serve as a platform for third-party applications and the tied product is complementary software functionality. While our reasoning may at times appear to have broader force, we do

not have the confidence to speak to facts outside the record, which contains scant discussion of software integration generally. Microsoft's primary justification for bundling IE APIs is that their inclusion with Windows increases the value of third-party software (and Windows) to consumers. *See* Appellant's Opening Br. at 41-43. Because this claim applies with distinct force when the tying product is *platform* software, we have no present basis for finding the per se rule inapplicable to software markets generally. Nor should we be interpreted as setting a precedent for switching to the rule of reason every time a court identifies an efficiency justification **[**159]** for a tying arrangement. Our reading of the record suggests merely that integration of new functionality into platform software is a common practice and that wooden application of per se rules in this litigation may cast a cloud over platform innovation in the market for PCs, network computers and information appliances.

*C. On Remand*

Should plaintiffs choose to pursue a tying claim under the rule of reason, we note the following for the benefit of the trial court:

First, on remand, plaintiffs must show that Microsoft's conduct unreasonably restrained competition. ***HN43*** Meeting that burden "involves an inquiry into the actual effect" of Microsoft's conduct on competition in the tied good market, *Jefferson Parish, 466 U.S. at 29*, the putative market for browsers. To the extent that certain aspects of tying injury may depend on a careful definition of the tied good market and a showing of barriers to entry other than the tying arrangement itself, plaintiffs would have to establish these points. *See* *Jefferson Parish, 466 U.S. at 29* ("This competition [among anesthesiologists] takes place in a market that has not been defined."); *id. at 29 n.48* **[**160]** ("Neither the District Court nor the Court of Appeals made any findings concerning the contract's effect on entry barriers."). But plaintiffs were required--and had every incentive--to provide both a definition of the browser market and barriers to entry to that market as part of their *§ 2* attempted monopolization claim; yet they failed to do so. *See supra* Section III. Accordingly, on remand of the § 1 tying claim, plaintiffs will be precluded from arguing any theory of harm that depends on a precise definition of browsers or barriers to entry (for example, network effects from Internet protocols and extensions embedded in a browser) other than what may be implicit in Microsoft's tying arrangement.

Of the harms left, plaintiffs must show that Microsoft's conduct was, on balance, anticompetitive. Microsoft may of course offer procompetitive justifications, and it is plaintiffs' burden to show that the anticompetitive effect of the conduct outweighs its benefit.

Second, the fact that we have already considered some of the behavior plaintiffs allege to constitute tying violations **[*96]** in the monopoly maintenance section does not resolve the § 1 inquiry. The two practices that plaintiffs **[**161]** have most ardently claimed as tying violations are, indeed, a basis for liability under plaintiffs' *§ 2* monopoly maintenance claim. These are Microsoft's refusal to allow OEMs to uninstall IE or remove it from the Windows desktop, *Findings of Fact* P P 158, 203, 213, and its removal of the IE entry from the Add/Remove Programs utility in Windows 98, *id. P 170*. *See supra* Section II.B. ***HN44*** In order for the District Court to conclude these practices also constitute § 1 tying violations, plaintiffs must demonstrate that their benefits--if any, *see supra* Sections II.B.1.b and II.B.2.b; *Findings of Fact* P P 176, 186, 193--are outweighed by the harms in the *tied product* market. *See* *Jefferson Parish, 466 U.S. at 29*. If the District Court is convinced of net harm, it must then consider whether any additional remedy is necessary.

In Section II.B we also considered another alleged tying violation--the Windows 98 override of a consumer's choice of default web browser. We concluded that this behavior does not provide a distinct basis for § 2 liability because plaintiffs failed to rebut Microsoft's proffered justification by demonstrating that harms in the **[**162]** operating system market outweigh Microsoft's claimed benefits. *See supra* Section II.B. On remand, however, although Microsoft may offer the same procompetitive justification for the override, plaintiffs must have a new opportunity to rebut this claim, by demonstrating that the anticompetitive effect in the *browser* market is greater than these benefits.

Finally, the District Court must also consider an alleged tying violation that we did not consider under § 2 monopoly maintenance: price bundling. First, the court must determine if Microsoft indeed price bundled--that is, was Microsoft's charge for Windows and IE higher than its charge would have been for Windows alone? This will require plaintiffs to resolve the tension between *Findings of Fact* P P 136-37, which Microsoft interprets as saying that no part of the bundled price of Windows can be attributed to IE, and *Conclusions of Law*, at 50, which says the opposite. *Compare* Direct Testimony of Paul Maritz P P 37, 296, *reprinted in* 6 J.A. at 3656, 3753-54 (Microsoft did not "charge separately" for IE, but like all other major OS vendors included browsing software at "no extra charge"), *with* GX 202 at MS7 **[**163]** 004343, esp. 004347, *reprinted in* 22 J.A. at 14459, esp. 14463 (memo from Christian Wildfeuer describing focus group test used to price Windows 98 with IE 4), *and* GX 1371 at MS7 003729-30, 003746, 003748, esp. 003750, *reprinted in* 15 J.A. at 10306-07, 10323, 10325, esp. 10327 (Windows 98 pricing and marketing memo), *and Findings of Fact* P 63 (identifying GX 202 as the *basis* for Windows 98 pricing).

If there is a positive price increment in Windows associated with IE (we know there is no claim of price predation), plaintiffs must demonstrate that the anticompetitive effects of Microsoft's price bundling outweigh any procompetitive justifications the company provides for it. In striking this balance, the District Court should consider, among other things, indirect evidence of efficiency provided by "the competitive fringe." *See supra* Section IV.A. Although this inquiry may overlap with the separate-products screen under the per se rule, that is not its role here. ***HN45*** Because courts applying the rule of reason are free to look at both direct and indirect evidence of efficiencies from a tie, there is no need for a screening device as such; thus the separate-products **[**164]** inquiry serves merely to classify arrangements as subject to tying law, as opposed to, say, **[*97]** liability for exclusive dealing. *See Times-Picayune, 345 U.S. at 614* (finding a single product and then turning to a general rule of reason analysis under § 1, though not using the term "tying"); *Foster v. Md. State Sav. & Loan Ass'n, 191 U.S. App. D.C. 226, 590 F.2d 928, 931, 933 (D.C. Cir. 1978)*, *cited in Jefferson Parish, 466 U.S. at 40* (O'Connor, J., concurring) (same); *see also Chawla v. Shell Oil Co., 75 F. Supp. 2d 626, 635, 643-44 (S.D. Tex. 1999)* (considering a rule of reason tying claim after finding a single product under the per se rule); *Montgomery County Ass'n of Realtors v. Realty Photo Master Corp., 783 F. Supp. 952, 961 & n.26 (D. Md. 1992)*, *aff'd mem. 993 F.2d 1538 (4th Cir. 1993)* (same).

If OS vendors without market power also sell their software bundled with a browser, the natural inference is that sale of the items as a bundle serves consumer demand and that unbundled sale would not, for otherwise a competitor could profitably offer the two products separately and capture **[**165]** sales of the tying good from vendors that bundle. *See* 10 AREEDA ET AL., ANTITRUST LAW P 1744b, at 197-98. It does appear that most if not all firms have sold a browser with their OSs at a bundled price, beginning with IBM and its OS/2 Warp OS in September

1994, *Findings of Fact* P 140; *see also* Direct Testimony of Richard Schmalensee P 212, *reprinted in* 7 J.A. at 4300-01, and running to current versions of Apple's Mac OS, Caldera and Red Hat's Linux OS, Sun's Solaris OS, Be's BeOS, Santa Cruz Operation's UnixWare, Novell's NetWare OS, and others, *see Findings of Fact* P 153; Direct Testimony of Richard Schmalensee P P 215-23, 230, esp. table 5, *reprinted in* 7 J.A. at 4302-05, 4310; Direct Testimony of James Allchin P P 261-77, *reprinted in* 5 J.A. at 3384-92.

Of course price bundling by competitive OS makers would tend to exonerate Microsoft only if the sellers in question sold their browser/OS combinations *exclusively* at a bundled price. If a competitive seller offers a discount for a browserless version, then--at least as to *its* OS and browser--the gains from bundling are outweighed by those from separate choice. The evidence on discounts appears **[**166]** to be in conflict. *Compare* Direct Testimony of Richard Schmalensee P 241, *reprinted in* 7 J.A. at 4315, *with* 1/6/99 pm Tr. at 42 (trial testimony of Franklin Fisher). If Schmalensee is correct that nearly all OS makers do not offer a discount, then the harm from tying--obstruction of direct consumer choice--would be theoretically created by virtually all sellers: a customer who would prefer an alternate browser is forced to pay the full price of that browser even though its value to him is only the increment in value over the bundled browser. (The result is similar to that from non-removal, which forces consumers who want the alternate browser to surrender disk space taken up by the unused, bundled browser.) If the failure to offer a price discount were universal, any impediment to direct consumer choice created by Microsoft's price-bundled sale of IE with Windows would be matched throughout the market; yet these OS suppliers on the competitive fringe would have evidently found this price bundling on balance efficient. If Schmalensee's assertions are ill-founded, of course, no such inference could be drawn.

## V. TRIAL PROCEEDINGS AND REMEDY

Microsoft additionally challenges **[**167]** the District Court's procedural rulings on two fronts. First, with respect to the trial phase, Microsoft proposes that the court mismanaged its docket by adopting an expedited trial schedule and receiving evidence through summary witnesses. Second, **[*98]** with respect to the remedies decree, Microsoft argues that the court improperly ordered that it be divided into two separate companies. Only the latter claim will long detain us. The District Court's trial-phase procedures were comfortably within the bounds of its broad discretion to conduct trials as it sees fit. We conclude, however, that the District Court's remedies decree must be vacated for three independent reasons: (1) the court failed to hold a remedies-specific evidentiary hearing when there were disputed facts; (2) the court failed to provide adequate reasons for its decreed remedies; and (3) this Court has revised the scope of Microsoft's liability and it is impossible to determine to what extent that should affect the remedies provisions.

### *A. Factual Background*

On April 3, 2000, the District Court concluded the liability phase of the proceedings by the filing of its Conclusions of Law holding that Microsoft had violated **[**168]** §§ 1 and 2 of the Sherman Act. The court and the parties then began discussions of the procedures to be followed in the imposition of remedies. Initially, the District Court signaled that it would enter relief only after conducting a new round of proceedings. In its Conclusions of Law, the court stated that it would issue a remedies order "following proceedings to be established by further Order of the Court." *Conclusions of Law*, at 57. And, when during a post-trial conference, Microsoft's counsel asked whether the court "contemplated further proceedings," the judge replied, "Yes. Yes. I assume that there would be further proceedings." 4/4/00 Tr. at 8-9, 11, *reprinted in* 4 J.A.

at 2445-46, 2448. The District Court further speculated that those proceedings might "replicate the procedure at trial with testimony in written form subject to crossexamination." Id. at 11, *reprinted in* 4 J.A. at 2448.

On April 28, 2000, plaintiffs submitted their proposed final judgment, accompanied by six new supporting affidavits and several exhibits. In addition to a series of temporary conduct restrictions, plaintiffs proposed that Microsoft be split into two independent corporations, **[**169]** with one continuing Microsoft's operating systems business and the other undertaking the balance of Microsoft's operations. Plaintiffs' Proposed Final Judgment at 2-3, *reprinted in* 4 J.A. at 2473-74. Microsoft filed a "summary response" on May 10, contending both that the proposed decree was too severe and that it would be impossible to resolve certain remedies-specific factual disputes "on a highly expedited basis." Defendant's Summary Response at 6-7, *reprinted in* 4 J.A. at 2587-88. Another May 10 submission argued that if the District Court considered imposing plaintiffs' proposed remedy, "then substantial discovery, adequate time for preparation and a full trial on relief will be required." Defendant's Position as to Future Proceedings at 2, *reprinted in* 4 J.A. at 2646.

After the District Court revealed during a May 24 hearing that it was prepared to enter a decree without conducting "any further process," 5/24/00 pm Tr. at 33, *reprinted in* 14 J.A. at 9866, Microsoft renewed its argument that the underlying factual disputes between the parties necessitated a remedies-specific evidentiary hearing. In two separate offers of proof, Microsoft offered to produce a number **[**170]** of pieces of evidence, including the following:

. Testimony from Dr. Robert Crandall, a Senior Fellow at the Brookings Institution, that divestiture and dissolution orders historically have "failed to improve economic welfare by reducing prices or increasing output." Defendant's Offer of Proof at 2, *reprinted in* 4 J.A. at 2743.

**[*99]**

. Testimony from Professor Kenneth Elzinga, Professor of Economics at the University of Virginia, that plaintiffs' proposed remedies would not induce entry into the operating systems market. *Id. at 4*, *reprinted in* 4 J.A. at 2745.

. Testimony from Dean Richard Schmalensee, Dean of MIT's Sloan School of Management, that dividing Microsoft likely would "harm consumers through higher prices, lower output, reduced efficiency, and less innovation" and would "produce immediate, substantial increases in the prices of both Windows and Office." *Id. at 8*, *reprinted in* 4 J.A. at 2749. Indeed, it would cause the price of Windows to triple. *Id.*

. Testimony from Goldman, Sachs & Co. and from Morgan Stanley Dean Witter that dissolution would adversely affect shareholder value. *Id. at 17, 19*, *reprinted in* 4 J.A. at 2758 **[**171]** 2760, .

. Testimony from Microsoft Chairman Bill Gates that dividing Microsoft "along the arbitrary lines proposed by the Government" would devastate the company's proposed Next Generation Windows Services platform, which would allow software developers to write web-based applications that users could access from a wide range of devices. *Id. at 21-22*, *reprinted in* 4 J.A. at 2762-63.

. Testimony from Steve Ballmer, Microsoft's President and CEO, that Microsoft is organized as a unified company and that "there are no natural lines along which Microsoft

could be broken up without causing serious problems." *Id. at 23*, *reprinted in* 4 J.A. at 2764.

. Testimony from Michael Capellas, CEO of Compaq, that splitting Microsoft in two "will make it more difficult for OEMs to provide customers with the tightly integrated product offerings they demand" in part because "complementary products created by unrelated companies do not work as well together as products created by a single company." Defendant's Supplemental Offer of Proof at 2, *reprinted in* 4 J.A. at 2823.Over Microsoft's objections, the District Court proceeded to consider the merits of the remedy **[**172]** and on June 7, 2000 entered its final judgment. The court explained that it would not conduct "extended proceedings on the form a remedy should take," because it doubted that an evidentiary hearing would "give any significantly greater assurance that it will be able to identify what might be generally regarded as an optimum remedy." *Final Judgment*, at 62. The bulk of Microsoft's proffered facts were simply conjectures about future events, and "in its experience the Court has found testimonial predictions of future events generally less reliable even than testimony as to historical fact, and crossexamination to be of little use in enhancing or detracting from their accuracy." *Id.* Nor was the court swayed by Microsoft's "profession of surprise" at the possibility of structural relief. *Id. at 61*. "From the inception of this case Microsoft knew, from well-established Supreme Court precedents dating from the beginning of the last century, that a mandated divestiture was a possibility, if not a probability, in the event of an adverse result at trial." *Id.*

The substance of the District Court's remedies order is nearly identical to plaintiffs' proposal. The decree's centerpiece **[**173]** is the requirement that Microsoft submit a proposed plan of divestiture, with the company to be split into an "Operating Systems **[*100]** Business," or "OpsCo," and an "Applications Business," or "AppsCo." *Final Judgment*, Decree §§ 1.a, l.c.i, at 64. OpsCo would receive all of Microsoft's operating systems, such as Windows 98 and Windows 2000, while AppsCo would receive the remainder of Microsoft's businesses, including IE and Office. The District Court identified four reasons for its "reluctant[]" conclusion that "a structural remedy has become imperative." *Id. at 62*. First, Microsoft "does not yet concede that any of its business practices violated the Sherman Act." *Id*. Second, the company consequently "continues to do business as it has in the past." *Id*. Third, Microsoft "has proved untrustworthy in the past." *Id.* And fourth, the Government, whose officials "are by reason of office obliged and expected to consider-and to act in--the public interest," won the case, "and for that reason alone have some entitlement to a remedy of their choice." *Id. at 62-63*.

The decree also contains a number of interim restrictions on Microsoft's conduct. For instance, Decree § **[**174]** 3.b requires Microsoft to disclose to third-party developers the APIs and other technical information necessary to ensure that software effectively interoperates with Windows. *Id.* at 67. "To facilitate compliance," § 3.b further requires that Microsoft establish "a secure facility" at which third-party representatives may "study, interrogate and interact with relevant and necessary portions of [Microsoft platform software] source code." *Id.* Section 3.e, entitled "Ban on Exclusive Dealing," forbids Microsoft from entering contracts which oblige third parties to restrict their "development, production, distribution, promotion or use of, or payment for" non-Microsoft platformlevel software. *Id. at 68*. Under Decree § 3.f--"Ban on Contractual Tying"--the company may not condition its grant of a Windows license on a party's agreement "to license, promote, or distribute any other Microsoft software product." *Id.* And § 3.g imposes

a "Restriction on Binding Middleware Products to Operating System Products" unless Microsoft also offers consumers "an otherwise identical version" of the operating system without the middleware. *Id.*

*B. Trial Proceedings*

Microsoft's **[**175]** first contention--that the District Court erred by adopting an expedited trial schedule and receiving evidence through summary witnesses--is easily disposed of. ***HN46*** Trial courts have extraordinarily broad discretion to determine the manner in which they will conduct trials. "This is particularly true in a case such as the one at bar where the proceedings are being tried to the court without a jury." *Eli Lilly & Co., Inc. v. Generix Drug Sales, Inc., 460 F.2d 1096, 1105 (5th Cir. 1972)*. In such cases, "an appellate court will not interfere with the trial court's exercise of its discretion to control its docket and dispatch its business ... except upon the clearest showing that the procedures have resulted in actual and substantial prejudice to the complaining litigant." *Id*. Microsoft fails to clear this high hurdle. Although the company claims that setting an early trial date inhibited its ability to conduct discovery, it never identified a specific deposition or document it was unable to obtain. And while Microsoft now argues that the use of summary witnesses made inevitable the improper introduction of hearsay evidence, the company actually agreed to the District **[**176]** Court's proposal to limit each side to 12 summary witnesses. 12/2/98 am Tr. at 11, *reprinted in* 21 J.A. at 14083 (court admonishing Microsoft's counsel to "keep in mind that both sides agreed to the number of witnesses"). Even absent Microsoft's agreement, the company's challenge fails to show that this use of summary **[*101]** witnesses falls outside the trial court's wide latitude to receive evidence as it sees fit. *General Elec. Co. v. Joiner, 522 U.S. 136, 141-42, 139 L. Ed. 2d 508, 118 S. Ct. 512 (1997)*. This is particularly true given the ***HN47*** presumption that a judge who conducts a bench trial has ignored any inadmissible evidence, *Harris v. Rivera, 454 U.S. 339, 346, 70 L. Ed. 2d 530, 102 S. Ct. 460 (1981)*--a presumption that Microsoft makes no serious attempt to overcome. Indeed, under appropriate circumstances with appropriate instructions, we have in the past approved the use of summary witnesses even in jury trials. *See, e.g., United States v. Lemire, 232 U.S. App. D.C. 100, 720 F.2d 1327 (D.C. Cir. 1983)*. Therefore, neither the use of the summary witnesses nor any other aspect of the District Court's conduct of the trial phase **[**177]** amounted to an abuse of discretion.

*C. Failure to Hold an Evidentiary Hearing*

The District Court's remedies-phase proceedings are a different matter. ***HN48*** It is a cardinal principle of our system of justice that factual disputes must be heard in open court and resolved through trial-like evidentiary proceedings. Any other course would be contrary "to the spirit which imbues our judicial tribunals prohibiting decision without hearing." *Sims v. Greene, 161 F.2d 87, 88 (3d Cir. 1947)*.

A party has the right to judicial resolution of disputed facts not just as to the liability phase, but also as to appropriate relief. "Normally, an evidentiary hearing is required before an injunction may be granted." *United States v. McGee, 714 F.2d 607, 613 (6th Cir. 1983)*; *see also Charlton v. Estate of Charlton, 841 F.2d 988, 989 (9th Cir. 1988)* ("Generally the entry or continuation of an injunction requires a hearing. Only when the facts are not in dispute, or when the adverse party has waived its right to a hearing, can that significant procedural step be eliminated." (citation and internal quotation marks omitted)). Other than a temporary restraining **[**178]** order, no injunctive relief may be entered without a hearing. *See generallyFED. R. CIV. P. 65*. A hearing on the merits-- *i.e.*, a trial on liability--does not substitute for a relief-specific evidentiary hearing

unless the matter of relief was part of the trial on liability, or unless there are no disputed factual issues regarding the matter of relief.

This rule is no less applicable in antitrust cases. The Supreme Court "has recognized that a 'full exploration of facts is usually necessary in order (for the District Court) properly to draw (an antitrust) decree' so as 'to prevent future violations and eradicate existing evils.' " *United Statesv. Ward Baking Co., 376 U.S. 327, 330-31, 11 L. Ed. 2d 743, 84 S. Ct. 763 (1964)* (quoting *Associated Press v. United States, 326 U.S. 1, 22, 89 L. Ed. 2013, 65 S. Ct. 1416 (1945))*. Hence a remedies decree must be vacated whenever there is "a bona fide disagreement concerning substantive items of relief which could be resolved only by trial." *376 U.S. at 334*; *cf. Sims, 161 F.2d at 89* ("It has never been supposed that a temporary injunction could issue under the Clayton Act without **[**179]** giving the party against whom the injunction was sought an opportunity to present evidence on his behalf.").

Despite plaintiffs' protestations, there can be no serious doubt that the parties disputed a number of facts during the remedies phase. In two separate offers of proof, Microsoft identified 23 witnesses who, had they been permitted to testify, would have challenged a wide range of plaintiffs' factual representations, including the feasibility of dividing Microsoft, the likely impact on consumers, and the effect of divestiture on shareholders. To take **[*102]** but two examples, where plaintiffs' economists testified that splitting Microsoft in two would be socially beneficial, the company offered to prove that the proposed remedy would "cause substantial social harm by raising software prices, lowering rates of innovation and disrupting the evolution of Windows as a software development platform." Defendant's Offer of Proof at 6, *reprinted in* 4 J.A. at 2747. And where plaintiffs' investment banking experts proposed that divestiture might actually increase shareholder value, Microsoft proffered evidence that structural relief "would inevitably result in a significant loss of shareholder **[**180]** value," a loss that could reach "tens--possibly hundreds--of billions of dollars." *Id. at 19*, *reprinted in* 4 J.A. at 2760.

Indeed, the District Court itself appears to have conceded the existence of acute factual disagreements between Microsoft and plaintiffs. The court acknowledged that the parties were "sharply divided" and held "divergent opinions" on the likely results of its remedies decree. *Final Judgment*, at 62. The reason the court declined to conduct an evidentiary hearing was not because of the absence of disputed facts, but because it believed that those disputes could be resolved only through "actual experience," not further proceedings. *Id.* But ***HN49*** a prediction about future events is not, as a prediction, any less a factual issue. Indeed, the Supreme Court has acknowledged that drafting an antitrust decree by necessity "involves predictions and assumptions concerning future economic and business events." *Ford Motor Co. v. United States, 405 U.S. 562, 578, 31 L. Ed. 2d 492, 92 S. Ct. 1142 (1972)*. Trial courts are not excused from their obligation to resolve such matters through evidentiary hearings simply because they consider the bedrock procedures **[**181]** of our justice system to be "of little use." *Final Judgment*, at 62.

The presence of factual disputes thus distinguishes this case from the decisions plaintiffs cite for the proposition that Microsoft was not entitled to an evidentiary hearing. Indeed, far from assisting plaintiffs, these cases actually confirm the proposition that courts must hold evidentiary hearings when they are confronted with disputed facts. In *Ford Motor Co.*, the Supreme Court affirmed a divestiture order after emphasizing that the District Court had "held nine days of hearings on the remedy." *405 U.S. at 571*. In *Davoll v. Webb, 194 F.3d 1116 (10th Cir. 1999)*, the defendant both failed to submit any offers of proof, and waived its right to an evidentiary

hearing by expressly agreeing that relief should be determined based solely on written submissions. *Id. at 1142-43*. The defendants in *American Can Co. v. Mansukhani, 814 F.2d 421 (7th Cir. 1987)*, were not entitled to a hearing on remedies because they failed "to explain to the district court what new proof they would present to show" that the proposed remedy was unwarranted. *Id. at 425*. **[**182]** And in *Socialist Workers Party v. Illinois State Board of Elections, 566 F.2d 586 (7th Cir. 1977)*, *aff'd*, *440 U.S. 173, 59 L. Ed. 2d 230, 99 S. Ct. 983 (1979)*, the Seventh Circuit held that a remedies-specific hearing was unnecessary because that case involved a pure question of legal interpretation and hence "there was no factual dispute as to the ground on which the injunction was ordered." *Id. at 587*.

Unlike the parties in *Davoll, American Can,* and *Socialist Workers Party,* Microsoft both repeatedly asserted its right to an evidentiary hearing and submitted two offers of proof. The company's "summary response" to the proposed remedy argued that it would be "impossible" to address underlying factual issues "on a highly expedited basis," Defendant's Summary Response at 6-7, *reprinted in* 4 J.A. at 2587-88, **[*103]** and Microsoft further maintained that the court could not issue a decree unless it first permitted "substantial discovery, adequate time for preparation and a full trial on relief." Defendant's Position as to Future Proceedings at 2, *reprinted in* 4 J.A. at 2646. And in 53 pages of submissions, Microsoft identified **[**183]** the specific evidence it would introduce to challenge plaintiffs' representations.

Plaintiffs further argue--and the District Court held--that no evidentiary hearing was necessary given that Microsoft long had been on notice that structural relief was a distinct possibility. It is difficult to see why this matters. Whether Microsoft had advance notice that dissolution was in the works is immaterial to whether the District Court violated the company's procedural rights by ordering it without an evidentiary hearing. To be sure, "***HN50*** claimed surprise at the district court's decision to consider permanent injunctive relief does not, alone, merit reversal." *Socialist Workers, 566 F.2d at 587*. But in this case, Microsoft's professed surprise does not stand "alone." There is something more: the company's basic procedural right to have disputed facts resolved through an evidentiary hearing.

In sum, the District Court erred when it resolved the parties' remedies-phase factual disputes by consulting only the evidence introduced during trial and plaintiffs' remediesphase submissions, without considering the evidence Microsoft sought to introduce. We therefore vacate the District **[**184]** Court's final judgment, and remand with instructions to conduct a remedies-specific evidentiary hearing.

*D. Failure to Provide an Adequate Explanation*

We vacate the District Court's remedies decree for the additional reason that the court has failed to provide an adequate explanation for the relief it ordered. The Supreme Court has explained that ***HN51*** a remedies decree in an antitrust case must seek to "unfetter a market from anticompetitive conduct," *Ford Motor Co., 405 U.S. at 577*, to "terminate the illegal monopoly, deny to the defendant the fruits of its statutory violation, and ensure that there remain no practices likely to result in monopolization in the future," *United States v. United Shoe Mach. Corp., 391 U.S. 244, 250, 20 L. Ed. 2d 562, 88 S. Ct. 1496 (1968)*; *see also* *United States v. Grinnell Corp., 384 U.S. 563, 577, 16 L. Ed. 2d 778, 86 S. Ct. 1698 (1966)*.

The District Court has not explained how its remedies decree would accomplish those objectives. Indeed, the court devoted a mere four paragraphs of its order to explaining its reasons for the

remedy. They are: (1) Microsoft "does not yet concede that any of its **[**185]** business practices violated the Sherman Act"; (2) Microsoft "continues to do business as it has in the past"; (3) Microsoft "has proved untrustworthy in the past"; and (4) the Government, whose officials "are by reason of office obliged and expected to consider--and to act in--the public interest," won the case, "and for that reason alone have some entitlement to a remedy of their choice." *Final Judgment*, at 62-63. Nowhere did the District Court discuss the objectives the Supreme Court deems relevant.

*E. Modification of Liability*

Quite apart from its procedural difficulties, we vacate the District Court's final judgment in its entirety for the additional, independent reason that we have modified the underlying bases of liability. Of the three antitrust violations originally identified by the District Court, one is no longer viable: attempted monopolization of the browser market in violation of Sherman Act *§ 2*. One will be remanded for **[*104]** liability proceedings under a different legal standard: unlawful tying in violation of § 1. Only liability for the *§ 2* monopolymaintenance violation has been affirmed--and even that we have revised. ***HN52*** Ordinarily, of course, we review the **[**186]** grant or denial of equitable relief under the abuse of discretion standard. *See, e.g.*, *Doran v. Salem Inn, Inc., 422 U.S. 922, 931-32, 45 L. Ed. 2d 648, 95 S. Ct. 2561 (1975)* ("The standard of appellate review is simply whether the issuance of the injunction, in the light of the applicable standard, constituted an abuse of discretion."). For obvious reasons, the application of that standard is not sufficient to sustain the remedy in the case before us. We cannot determine whether the District Court has abused its discretion in remedying a wrong where the court did not exercise that discretion in order to remedy the properly determined wrong. That is, the District Court determined that the conduct restrictions and the pervasive structural remedy were together appropriate to remedy the three antitrust violations set forth above. The court did not exercise its discretion to determine whether all, or for that matter, any, of those equitable remedies were required to rectify a *§ 2* monopoly maintenance violation taken alone. We therefore cannot sustain an exercise of discretion not yet made.

By way of comparison, in *Spectrum Sports, Inc. v. McQuillan, 506 U.S. 447, 122 L. Ed. 2d 247, 113 S. Ct. 884 (1993)*, **[**187]** the Supreme Court reviewed a damages award in a Sherman Act case. In that case, the trial court entered judgment upon a jury verdict which did not differentiate among multiple possible theories of liability under *§ 2*. The Supreme Court ultimately determined that the trial record could not legally support a finding that the defendant had committed an illegal attempt to monopolize, and that "the trial instructions allowed the jury to infer specific intent and dangerous probability of success from the defendants' predatory conduct, without any proof of the relevant market or of a realistic probability that the defendants could achieve monopoly power in that market." *Id. at 459*. Therefore, the High Court reversed the Ninth Circuit's judgment affirming the District Court and remanded for further proceedings, expressly because "the jury's verdict did not negate the possibility that the *§ 2* verdict rested on the attempt to monopolize grounds alone…." *Id.* Similarly, here, we cannot presume that a District Court would exercise its discretion to fashion the same remedy where the erroneous grounds of liability were stripped from its consideration.

The Eighth Circuit **[**188]** confronted a similar problem in *Concord Boat Corp. v. Brunswick Corp., 207 F.3d 1039* (8th Cir.), *cert. denied*, *531 U.S. 979, 148 L. Ed. 2d 436, 121 S. Ct. 428 (2000)*. In that case, a group of boat builders brought an action against an engine manufacturer alleging violations of Sherman Act §§ 1 and 2, and Clayton Act § 7. After a 10-week trial, the jury found

Brunswick liable on all three counts and returned a verdict for over $ 44 million. On appeal, the Eighth Circuit reversed the Clayton Act claim. *Id.* at 1053. That court held that, as a consequence, it was required to vacate the jury's remedy in its entirety. Because the "verdict form did not require the jury to consider what damages resulted from each type of violation," the court could not "know what damages it found to have been caused by the acquisitions upon which the Section 7 claims were based." *Id.* at 1054. The court rejected the proposition that "the entire damage award may be upheld based on Brunswick's Sherman Act liability alone," *id.* at 1053, holding that, because "there is no way to know what damages the jury assigned to the Section 7 claims," **[**189]** the defendant **[*105]** "would be entitled at the very least to a new damages trial on the boat builders' Sherman Act claims," *id.* at 1054.

*Spectrum Sports* and *Concord Boat* are distinguishable from the case before us in that both involved the award of money damages rather than equitable relief. Nonetheless, their reasoning is instructive. ***HN53*** A court in both contexts must base its relief on some clear "indication of a significant causal connection between the conduct enjoined or mandated and the violation found directed toward the remedial goal intended." 3 PHILLIP E. AREEDA & HERBERT HOVENKAMP, ANTITRUST LAW P 653(b), at 91-92 (1996). In a case such as the one before us where sweeping equitable relief is employed to remedy multiple violations, and some--indeed most--of the findings of remediable violations do not withstand appellate scrutiny, it is necessary to vacate the remedy decree since the implicit findings of causal connection no longer exist to warrant our deferential affirmance.

In short, we must vacate the remedies decree in its entirety and remand the case for a new determination. This court has drastically altered the District Court's conclusions on liability. **[**190]** On remand, the District Court, after affording the parties a proper opportunity to be heard, can fashion an appropriate remedy for Microsoft's antitrust violations. In particular, the court should consider which of the decree's conduct restrictions remain viable in light of our modification of the original liability decision. While the task of drafting the remedies decree is for the District Court in the first instance, because of the unusually convoluted nature of the proceedings thus far, and a desire to advance the ultimate resolution of this important controversy, we offer some further guidance for the exercise of that discretion.

*F. On Remand*

***HN54*** As a general matter, a district court is afforded broad discretion to enter that relief it calculates will best remedy the conduct it has found to be unlawful. *See, e.g., Woerner v. United States Small Bus. Admin., 290 U.S. App. D.C. 105, 934 F.2d 1277, 1279 (D.C. Cir. 1991)* (recognizing that an appellate court reviews a trial court's decision whether or not to grant equitable relief only for an abuse of discretion). This is no less true in antitrust cases. *See, e.g., Ford Motor Co., 405 U.S. at 573* **[**191]** ("The District Court is clothed with 'large discretion' to fit the decree to the special needs of the individual case."); *Md. & Va. Milk Producers Ass'n, Inc. v. United States, 362 U.S. 458, 473, 4 L. Ed. 2d 880, 80 S. Ct. 847 (1960)* ("The formulation of decrees is largely left to the discretion of the trial court…."). And divestiture is a common form of relief in successful antitrust prosecutions: it is indeed "the most important of antitrust remedies." *See, e.g., United States v. E.I. du Pont de Nemours & Co., 366 U.S. 316, 331, 6 L. Ed. 2d 318, 81 S. Ct. 1243 (1961)*.

On remand, the District Court must reconsider whether the use of the structural remedy of divestiture is appropriate with respect to Microsoft, which argues that it is a unitary company.

By and large, cases upon which plaintiffs rely in arguing for the split of Microsoft have involved the dissolution of entities formed by mergers and acquisitions. On the contrary, the Supreme Court has clarified that ***HN55*** divestiture "has traditionally been the remedy for Sherman Act violations whose heart is intercorporate *combination and control*," *du Pont, 366 U.S. at 329* **[**192]** (emphasis added), and that "complete divestiture is particularly appropriate where asset or stock *acquisitions* violate the antitrust laws," *Ford Motor Co., 405 U.S. at 573* (emphasis added).

**[*106]** One apparent reason why courts have not ordered the dissolution of unitary companies is logistical difficulty. As the court explained in *United States v. ALCOA, 91 F. Supp. 333, 416 (S.D.N.Y. 1950)*, a "corporation, designed to operate effectively as a single entity, cannot readily be dismembered of parts of its various operations without a marked loss of efficiency." A corporation that has expanded by acquiring its competitors often has preexisting internal lines of division along which it may more easily be split than a corporation that has expanded from natural growth. Although time and corporate modifications and developments may eventually fade those lines, at least the identifiable entities preexisted to create a template for such division as the court might later decree. With reference to those corporations that are not acquired by merger and acquisition, Judge Wyzanski accurately opined in *United Shoe*:

> United conducts all machine manufacture **[**193]** at one plant in Beverly, with one set of jigs and tools, one foundry, one laboratory for machinery problems, one managerial staff, and one labor force. It takes no Solomon to see that this organism cannot be cut into three equal and viable parts.*United States v. United Shoe Machine Co., 110 F. Supp. 295, 348 (D. Mass. 1953)*.

Depending upon the evidence, the District Court may find in a remedies proceeding that it would be no easier to split Microsoft in two than United Shoe in three. Microsoft's Offer of Proof in response to the court's denial of an evidentiary hearing included proffered testimony from its President and CEO Steve Ballmer that the company "is, and always has been, a unified company without free-standing business units. Microsoft is not the result of mergers or acquisitions." Microsoft further offered evidence that it is "not organized along product lines," but rather is housed in a single corporate headquarters and that it has

> only one sales and marketing organization which is responsible for selling all of the company's products, one basic research organization, one product support organization, one operations department, one information **[**194]** technology department, one facilities department, one purchasing department, one human resources department, one finance department, one legal department and one public relations department.Defendant's Offer of Proof at 23-26, *reprinted in* 4 J.A. at 2764-67. If indeed Microsoft is a unitary company, division might very well require Microsoft to reproduce each of these departments in each new entity rather than simply allocate the differing departments among them.

In devising an appropriate remedy, the District Court also should consider whether plaintiffs have established a sufficient causal connection between Microsoft's anticompetitive conduct and its dominant position in the OS market. "***HN56*** Mere existence of an exclusionary act does not itself justify full feasible relief against the monopolist to create maximum competition." 3

AREEDA & HOVENKAMP, ANTITRUST LAW P 650a, at 67. Rather, structural relief, which is "designed to eliminate the monopoly altogether … requires a clearer indication of a *significant causal connection* between the conduct and creation or maintenance of the market power." *Id.* P 653b, at 91-92 (emphasis added). Absent such causation, the antitrust **[**195]** defendant's unlawful behavior should be remedied by "an injunction against continuation of that conduct." *Id.* P 650a, at 67.

As noted above, *see supra* Section II.C, we have found a causal connection between Microsoft's exclusionary conduct and its continuing position in the operating systems **[*107]** market only through inference. *See* 3 AREEDA & HOVENKAMP, ANTITRUST LAW P 653(b), at 91-92 (suggesting that "more extensive equitable relief, particularly remedies such as divestiture designed to eliminate the monopoly altogether, … require a clearer indication of significant causal connection between the conduct and creation or maintenance of the market power"). Indeed, the District Court expressly did not adopt the position that Microsoft would have lost its position in the OS market but for its anticompetitive behavior. *Findings of Fact* P 411 ("There is insufficient evidence to find that, absent Microsoft's actions, Navigator and Java already would have ignited genuine competition in the market for Intelcompatible PC operating systems."). If the court on remand is unconvinced of the causal connection between Microsoft's exclusionary conduct and the company's position in the **[**196]** OS market, it may well conclude that divestiture is not an appropriate remedy.

While we do not undertake to dictate to the District Court the precise form that relief should take on remand, we note again that it should be tailored to fit the wrong creating the occasion for the remedy.

*G. Conclusion*

In sum, we vacate the District Court's remedies decree for three reasons. First, the District Court failed to hold an evidentiary hearing despite the presence of remedies-specific factual disputes. Second, the court did not provide adequate reasons for its decreed remedies. Finally, we have drastically altered the scope of Microsoft's liability, and it is for the District Court in the first instance to determine the propriety of a specific remedy for the limited ground of liability which we have upheld.

**VI. JUDICIAL MISCONDUCT**

***HN57*** Canon 3A(6) of the Code of Conduct for United States Judges requires federal judges to "avoid public comment on the merits of [] pending or impending" cases. ***HN58*** Canon 2 tells judges to "avoid impropriety and the appearance of impropriety in all activities," on the bench and off. ***HN59*** Canon 3A(4) forbids judges to initiate or consider *ex parte* communications **[**197]** on the merits of pending or impending proceedings. ***HN60*** Section 455(a) of the Judicial Code requires judges to recuse themselves when their "impartiality might reasonably be questioned." *28 U.S.C. § 455(a)*.

All indications are that the District Judge violated each of these ethical precepts by talking about the case with reporters. The violations were deliberate, repeated, egregious, and flagrant. The only serious question is what consequences should follow. Microsoft urges us to disqualify the District Judge, vacate the judgment in its entirety and toss out the findings of fact, and remand for a new trial before a different District Judge. At the other extreme, plaintiffs ask us to do nothing. We agree with neither position.

*A. The District Judge's Communications with the Press*

Immediately after the District Judge entered final judgment on June 7, 2000, accounts of interviews with him began appearing in the press. Some of the interviews were held after he entered final judgment. *See* Peter Spiegel, *Microsoft Judge Defends Post-trial Comments*, FIN. TIMES (London), Oct. 7, 2000, at 4; John R. Wilke, *For Antitrust Judge, Trust, or Lack of It, Really* **[**198]** *Was the Issue--In an Interview, Jackson Says Microsoft Did the Damage to Its Credibility in Court*, WALL ST. J., June 8, 2000, at A1. The District Judge also aired his views about the case to larger audiences, giving **[*108]** speeches at a college and at an antitrust seminar. *See* James V. Grimaldi, *Microsoft Judge Says Ruling at Risk; Every Trial Decision Called 'Vulnerable'*, WASH. POST, Sept. 29, 2000, at E1; Alison Schmauch, *Microsoft Judge Shares Experiences*, THE DARTMOUTH ONLINE, Oct. 3, 2000.

From the published accounts, it is apparent that the Judge also had been giving secret interviews to select reporters before entering final judgment--in some instances long before. The earliest interviews we know of began in September 1999, shortly after the parties finished presenting evidence but two months before the court issued its Findings of Fact. *See* Joel Brinkley & Steve Lohr, *U.S. vs. Microsoft: Pursuing a Giant; Retracing the Missteps in the Microsoft Defense*, N.Y. TIMES, June 9, 2000, at A1. Interviews with reporters from the *New York Times* and Ken Auletta, another reporter who later wrote a book on the Microsoft case, continued throughout late 1999 and the first **[**199]** half of 2000, during which time the Judge issued his Findings of Fact, Conclusions of Law, and Final Judgment. *See id.*; Ken Auletta, *Final Offer*, THE NEW YORKER, Jan. 15, 2001, at 40. The Judge "embargoed" these interviews; that is, he insisted that the fact and content of the interviews remain secret until he issued the Final Judgment.

Before we recount the statements attributed to the District Judge, we need to say a few words about the state of the record. All we have are the published accounts and what the reporters say the Judge said. Those accounts were not admitted in evidence. They may be hearsay. *See*FED. R. EVID. 801(c); Metro. Council of NAACP Branches v. FCC, 310 U.S. App. D.C. 237, 46 F.3d 1154, 1165 (D.C. Cir. 1995) ("We seriously question whether a New York Times article is admissible evidence of the truthfulness of its contents.").

We are of course concerned about granting a request to disqualify a federal judge when the material supporting it has not been admitted in evidence. Disqualification is never taken lightly. In the wrong hands, a disqualification motion is a procedural weapon to harass opponents and delay proceedings. If supported **[**200]** only by rumor, speculation, or innuendo, it is also a means to tarnish the reputation of a federal judge.

But the circumstances of this case are most unusual. By placing an embargo on the interviews, the District Judge ensured that the full extent of his actions would not be revealed until this case was on appeal. Plaintiffs, in defending the judgment, do not dispute the statements attributed to him in the press; they do not request an evidentiary hearing; and they do not argue that Microsoft should have filed a motion in the District Court before raising the matter on appeal. At oral argument, plaintiffs all but conceded that the Judge violated ethical restrictions by discussing the case in public: "On behalf of the governments, I have no brief to defend the District Judge's decision to discuss this case publicly while it was pending on appeal, and I have no brief to defend the judge's decision to discuss the case with reporters while the trial was proceeding, even given the embargo on any reporting concerning those conversations until after the trial." 02/27/01 Ct. Appeals Tr. at 326.

We must consider too that ***HN61*** the federal disqualification provisions reflect a strong federal policy **[**201]** to preserve the actual and apparent impartiality of the federal judiciary. Judicial misconduct may implicate that policy regardless of the means by which it is disclosed to the public. *Cf. The Washington Post v. Robinson, 290 U.S. App. D.C. 116, 935 F.2d 282, 291 (D.C. Cir. 1991)* (taking judicial **[*109]** notice of newspaper articles to ascertain whether a fact was within public knowledge). Also, in our analysis of the arguments presented by the parties, the specifics of particular conversations are less important than their cumulative effect.

For these reasons we have decided to adjudicate Microsoft's disqualification request notwithstanding the state of the record. The same reasons also warrant a departure from our usual practice of declining to address issues raised for the first time on appeal: ***HN62*** the "matter of what questions may be taken up and resolved for the first time on appeal is one left primarily to the discretion of the courts of appeals, to be exercised on the facts of individual cases." *Singleton v. Wulff, 428 U.S. 106, 121, 49 L. Ed. 2d 826, 96 S. Ct. 2868 (1976)*; *accord* *Hormel v. Helvering, 312 U.S. 552, 556-57, 85 L. Ed. 1037, 61 S. Ct. 719 (1941)*; **[**202]** *Nat'l Ass'n of Mfrs. v. Dep't of Labor, 333 U.S. App. D.C. 7, 159 F.3d 597, 605-06 (D.C. Cir. 1998)*. We will assume the truth of the press accounts and not send the case back for an evidentiary hearing on this subject. We reach no judgment on whether the details of the interviews were accurately recounted.

The published accounts indicate that the District Judge discussed numerous topics relating to the case. Among them was his distaste for the defense of technological integration-one of the central issues in the lawsuit. In September 1999, two months before his Findings of Fact and six months before his Conclusions of Law, and in remarks that were kept secret until after the Final Judgment, the Judge told reporters from the *New York Times* that he questioned Microsoft's integration of a web browser into Windows. Stating that he was "not a fan of integration," he drew an analogy to a 35millimeter camera with an integrated light meter that in his view should also be offered separately: "You like the convenience of having a light meter built in, integrated, so all you have to do is press a button to get a reading. But do you think camera makers should also serve photographers **[**203]** who want to use a separate light meter, so they can hold it up, move it around?" JOEL BRINKLEY & STEVE LOHR, U.S. V. MICROSOFT 263 (2001). In other remarks, the Judge commented on the integration at the heart of the case: "It was quite clear to me that the motive of Microsoft in bundling the Internet browser was not one of consumer convenience. The evidence that this was done for the consumer was not credible…. The evidence was so compelling that there was an ulterior motive." Wilke, WALL ST. J. As for tying law in general, he criticized this court's ruling in the consent decree case, saying it "was wrongheaded on several counts" and would exempt the software industry from the antitrust laws. BRINKLEY & LOHR, U.S. V. MICROSOFT 78, 295; Brinkley & Lohr, N.Y. TIMES.

Reports of the interviews have the District Judge describing Microsoft's conduct, with particular emphasis on what he regarded as the company's prevarication, hubris, and impenitence. In some of his secret meetings with reporters, the Judge offered his contemporaneous impressions of testimony. He permitted at least one reporter to see an entry concerning Bill Gates in his "oversized green notebook." KEN AULETTA, WORLD **[**204]** WAR 3.0, at 112 (2001). He also provided numerous after-the-fact credibility assessments. He told reporters that Bill Gates' "testimony is inherently without credibility" and "if you can't believe this guy, who else can you believe?" BRINKLEY & LOHR, U.S. V. MICROSOFT 278; Brinkley & Lohr, N.Y. TIMES; *see also* Auletta, THE NEW YORKER, at 40. As for the company's other witnesses, the Judge is reported as saying that there **[*110]** "were times when I became impatient with Microsoft

witnesses who were giving speeches." "They were telling me things I just flatly could not credit." Brinkley & Lohr, N.Y. TIMES. In an interview given the day he entered the break-up order, he summed things up: "Falsus in uno, falsus in omnibus": "Untrue in one thing, untrue in everything." "I don't subscribe to that as absolutely true. But it does lead one to suspicion. It's a universal human experience. If someone lies to you once, how much else can you credit as the truth?" Wilke, WALL ST. J.

According to reporter Auletta, the District Judge told him in private that, "I thought they [Microsoft and its executives] didn't think they were regarded as adult members of the community. I thought they would learn. **[**205]** " AULETTA, WORLD WAR 3.0, at 14. The Judge told a college audience that "Bill Gates is an ingenious engineer, but I don't think he is that adept at business ethics. He has not yet come to realise things he did (when Microsoft was smaller) he should not have done when he became a monopoly." Spiegel, FIN. TIMES. Characterizing Gates' and his company's "crime" as hubris, the Judge stated that "if I were able to propose a remedy of my devising, I'd require Mr. Gates to write a book report" on Napoleon Bonaparte, "because I think [Gates] has a Napoleonic concept of himself and his company, an arrogance that derives from power and unalloyed success, with no leavening hard experience, no reverses." Auletta, THE NEW YORKER, at 41; *see also* AULETTA, WORLD WAR 3.0, at 397. The Judge apparently became, in Auletta's words, "increasingly troubled by what he learned about Bill Gates and couldn't get out of his mind the group picture he had seen of Bill Gates and Paul Allen and their shaggy-haired first employees at Microsoft." The reporter wrote that the Judge said he saw in the picture "a smart-mouthed young kid who has extraordinary ability and needs a little discipline. I've often said to **[**206]** colleagues that Gates would be better off if he had finished Harvard." AULETTA, WORLD WAR 3.0, at 168-69; *see also* Auletta, THE NEW YORKER, at 46 (reporting the District Judge's statement that "they [Microsoft and its executives] don't act like grownups!" "To this day they continue to deny they did anything wrong.").

The District Judge likened Microsoft's writing of incriminating documents to drug traffickers who "never figure out that they shouldn't be saying certain things on the phone." BRINKLEY & LOHR, U.S. V. MICROSOFT 6; Brinkley & Lohr, N.Y. TIMES. He invoked the drug trafficker analogy again to denounce Microsoft's protestations of innocence, this time with a reference to the notorious Newton Street Crew that terrorized parts of Washington, D.C. Reporter Auletta wrote in *The New Yorker* that the Judge

> went as far as to compare the company's declaration of innocence to the protestations of gangland killers. He was referring to five gang members in a racketeering, drug-dealing, and murder trial that he had presided over four years earlier. In that case, the three victims had had their heads bound with duct tape before they were riddled with bullets from semi-automatic **[**207]** weapons. "On the day of the sentencing, the gang members maintained that they had done nothing wrong, saying that the whole case was a conspiracy by the white power structure to destroy them," Jackson recalled. "I am now under no illusions that miscreants will realize that other parts of society will view them that way."Auletta, THE NEW YORKER, at 40-41; AULETTA, WORLD WAR 3.0, at 369-70 (same); *see also* Auletta, THE NEW YORKER, at 46.

**[*111]** The District Judge also secretly divulged to reporters his views on the remedy for Microsoft's antitrust violations. On the question whether Microsoft was entitled to any process at

the remedy stage, the Judge told reporters in May 2000 that he was "not aware of any case authority that says I have to give them any due process at all. The case is over. They lost." Brinkley & Lohr, N.Y. TIMES. Another reporter has the Judge asking "were the Japanese allowed to propose terms of their surrender?" Spiegel, FIN. TIMES. The District Judge also told reporters the month before he issued his break-up order that "assuming, as I think they are, [] the Justice Department and the states are genuinely concerned about the public interest," "I know they **[**208]** have carefully studied all the possible options. This isn't a bunch of amateurs. They have consulted with some of the best minds in America over a long period of time." "I am not in a position to duplicate that and re-engineer their work. There's no way I can equip myself to do a better job than they have done." Brinkley & Lohr, N.Y. TIMES; *cf. Final Judgment*, at 62-63.

In February 2000, four months before his final order splitting the company in two, the District Judge reportedly told *New York Times* reporters that he was "not at all comfortable with restructuring the company," because he was unsure whether he was "competent to do that." Brinkley & Lohr, N.Y. TIMES; *see also* BRINKLEY & LOHR, U.S. V. MICROSOFT 277-78 (same); *cf.* AULETTA, WORLD WAR 3.0, at 370 (comment by the Judge in April 2000 that he was inclining toward behavioral rather than structural remedies). A few months later, he had a change of heart. He told the same reporters that "with what looks like Microsoft intransigence, a breakup is inevitable." Brinkley & Lohr, N.Y. TIMES; *see also* BRINKLEY & LOHR, U.S. V. MICROSOFT 315. The Judge recited a "North Carolina mule trainer" story to explain his **[**209]** change in thinking from "if it ain't broken, don't try to fix it" and "I just don't think that [restructuring the company] is something I want to try to do on my own" to ordering Microsoft broken in two:

> He had a trained mule who could do all kinds of wonderful tricks. One day somebody asked him: "How do you do it? How do you train the mule to do all these amazing things?" "Well," he answered, "I'll show you." He took a 2-by-4 and whopped him upside the head. The mule was reeling and fell to his knees, and the trainer said: "You just have to get his attention."BRINKLEY & LOHR, U.S. V. MICROSOFT 278. The Judge added: "I hope I've got Microsoft's attention." *Id.*; *see also* Grimaldi, WASH. POST (comments by the Judge blaming the break-up on Microsoft's intransigence and on what he perceived to be Microsoft's responsibility for the failure of settlement talks); Spiegel, FIN. TIMES (the Judge blaming break-up on Microsoft's intransigence).

*B. Violations of the Code of Conduct for United States Judges*

The Code of Conduct for United States Judges was adopted by the Judicial Conference of the United States in 1973. It prescribes ethical norms for federal **[**210]** judges as a means to preserve the actual and apparent integrity of the federal judiciary. Every federal judge receives a copy of the Code, the Commentary to the Code, the Advisory Opinions of the Judicial Conference's Committee on Codes of Conduct, and digests of the Committee's informal, unpublished opinions. *See* II GUIDE TO JUDICIARY POLICIES AND PROCEDURES (1973). The material is periodically updated. Judges who have questions about whether their conduct would be consistent with the **[*112]** Code may write to the Codes of Conduct Committee for a written, confidential opinion. *See* Introduction, CODE OF CONDUCT. The Committee traditionally responds promptly. A judge may also seek informal advice from the Committee's circuit representative.

While some of the Code's Canons frequently generate questions about their application, others are straightforward and easily understood. Canon 3A(6) is an example of the latter. ***HN63*** In forbidding federal judges to comment publicly "on the merits of a pending or impending action," Canon 3A(6) applies to cases pending before any court, state or federal, trial or appellate. *See* JEFFREY M. SHAMAN ET AL., JUDICIAL CONDUCT AND ETHICS § 10.34, at 353 **[**211]** (3d ed. 2000). As "impending" indicates, the prohibition begins even before a case enters the court system, when there is reason to believe a case may be filed. *Cf.* E. WAYNE THODE, REPORTER'S NOTES TO CODE OF JUDICIAL CONDUCT 54 (1973). An action remains "pending" until "completion of the appellate process." CODE OF CONDUCT Canon 3A(6) cmt.; Comm. on Codes of Conduct, Adv. Op. No. 55 (1998).

The Microsoft case was "pending" during every one of the District Judge's meetings with reporters; the case is "pending" now; and even after our decision issues, it will remain pending for some time. The District Judge breached his ethical duty under Canon 3A(6) each time he spoke to a reporter about the merits of the case. Although the reporters interviewed him in private, his comments were public. Court was not in session and his discussion of the case took place outside the presence of the parties. He provided his views not to court personnel assisting him in the case, but to members of the public. And these were not just any members of the public. Because he was talking to reporters, the Judge knew his comments would eventually receive widespread dissemination.

It is clear that the District **[**212]** Judge was not discussing purely procedural matters, which are a permissible subject of public comment under one of the Canon's three narrowly drawn exceptions. He disclosed his views on the factual and legal matters at the heart of the case. His opinions about the credibility of witnesses, the validity of legal theories, the culpability of the defendant, the choice of remedy, and so forth all dealt with the merits of the action. It is no excuse that the Judge may have intended to "educate" the public about the case or to rebut "public misperceptions" purportedly caused by the parties. *See* Grimaldi, WASH. POST; *Microsoft Judge Says He May Step down from Case on Appeal*, WALL ST. J., Oct. 30, 2000. If those were his intentions, he could have addressed the factual and legal issues as he saw them--and thought the public should see them--in his Findings of Fact, Conclusions of Law, Final Judgment, or in a written opinion. Or he could have held his tongue until all appeals were concluded.

Far from mitigating his conduct, the District Judge's insistence on secrecy--his embargo--made matters worse. Concealment of the interviews suggests knowledge of their impropriety. Concealment also **[**213]** prevented the parties from nipping his improprieties in the bud. Without any knowledge of the interviews, neither the plaintiffs nor the defendant had a chance to object or to seek the Judge's removal before he issued his Final Judgment.

Other federal judges have been disqualified for making limited public comments about cases pending before them. *See* *In re Boston's Children First, 244 F.3d 164 (1st Cir. 2001)*; *In re IBM Corp., 45 F.3d 641 (2d Cir. 1995)*; *United States v. Cooley, 1 F.3d 985 (10th Cir. 1993)*. Given the **[*113]** extent of the Judge's transgressions in this case, we have little doubt that if the parties had discovered his secret liaisons with the press, he would have been disqualified, voluntarily or by court order. *Cf.* *In re Barry, 292 U.S. App. D.C. 39, 946 F.2d 913 (D.C. Cir. 1991)* (per curiam); *946 F.2d at 915* (Edwards, J., dissenting).

In addition to violating the rule prohibiting public comment, the District Judge's reported conduct raises serious questions under Canon 3A(4). That Canon states that ***HN64*** a "judge

should accord to every person who is legally interested in a proceeding, or the person's lawyer, **[**214]** full right to be heard according to law, and, except as authorized by law, neither initiate nor consider *ex parte* communications on the merits, or procedures affecting the merits, of a pending or impending proceeding." CODE OF CONDUCT Canon 3A(4).

What did the reporters convey to the District Judge during their secret sessions? By one account, the Judge spent a total of ten hours giving taped interviews to one reporter. AULETTA, WORLD WAR 3.0, at 14 n.*. We do not know whether he spent even more time in untaped conversations with the same reporter, nor do we know how much time he spent with others. But we think it safe to assume that these interviews were not monologues. Interviews often become conversations. When reporters pose questions or make assertions, they may be furnishing information, information that may reflect their personal views of the case. The published accounts indicate this happened on at least one occasion. Ken Auletta reported, for example, that he told the Judge "that Microsoft employees professed shock that he thought they had violated the law and behaved unethically," at which time the Judge became "agitated" by "Microsoft's 'obstinacy'." *Id. at 369.* **[**215]** It is clear that Auletta had views of the case. As he wrote in a *Washington Post* editorial, "anyone who sat in [the District Judge's] courtroom during the trial had seen ample evidence of Microsoft's sometimes thuggish tactics." Ken Auletta, *Maligning the Microsoft Judge*, WASH. POST, Mar. 7, 2001, at A23.

The District Judge's repeated violations of Canons 3A(6) and 3A(4) also violated Canon 2, which provides that "***HN65*** a judge should avoid impropriety and the appearance of impropriety in all activities." CODE OF CONDUCT Canon 2; *see also In re Charge of Judicial Misconduct, 47 F.3d 399, 400 (10th Cir. Jud. Council 1995)* ("The allegations of extra-judicial comments cause the Council substantial concern under both Canon 3A(6) and Canon 2 of the Judicial Code of Conduct."). Canon 2A requires federal judges to "respect and comply with the law" and to "act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary." CODE OF CONDUCT Canon 2A. The Code of Conduct is the law with respect to the ethical obligations of federal judges, and it is clear the District Judge violated it on multiple occasions in this case. The **[**216]** rampant disregard for the judiciary's ethical obligations that the public witnessed in this case undoubtedly jeopardizes "public confidence in the integrity" of the District Court proceedings.

Another point needs to be stressed. Rulings in this case have potentially huge financial consequences for one of the nation's largest publicly-traded companies and its investors. The District Judge's secret interviews during the trial provided a select few with inside information about the case, information that enabled them and anyone they shared it with to anticipate rulings before the Judge announced them to the world. Although he "embargoed" his comments, the Judge had no way of policing the reporters. For all he knew there may have been trading on the basis **[*114]** of the information he secretly conveyed. The public cannot be expected to maintain confidence in the integrity and impartiality of the federal judiciary in the face of such conduct.

*C. Appearance of Partiality*

***HN66*** The Code of Conduct contains no enforcement mechanism. *See* THODE, REPORTER'S NOTES TO CODE OF JUDICIAL CONDUCT 43. The Canons, including the one that requires a judge to disqualify himself in certain circumstances, **[**217]** *see* CODE OF CONDUCT Canon 3C, are self-enforcing. There are, however, remedies extrinsic to the Code. One is an internal disciplinary proceeding, begun with the filing of a complaint with the clerk of the court

of appeals pursuant to *28 U.S.C. § 372(c)*. Another is disqualification of the offending judge under either *28 U.S.C. § 144*, which requires the filing of an affidavit while the case is in the District Court, or *28 U.S.C. § 455*, which does not. Microsoft urges the District Judge's disqualification under *§ 455(a)*: a judge "shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned." *28 U.S.C. § 455(a)*. The standard for disqualification under *§ 455(a)* is an objective one. The question is whether a reasonable and informed observer would question the judge's impartiality. *See In re Barry, 946 F.2d at 914*; *see also In re Aguinda, 241 F.3d 194, 201 (2d Cir. 2001)*; RICHARD E. FLAMM, JUDICIAL DISQUALIFICATION § 24.2.1 (1996).

"***HN67*** The very purpose of *§ 455(a)* is to promote confidence in the judiciary by avoiding even **[**218]** the appearance of impropriety whenever possible." *Liljeberg v. Health Servs. Acquisition Corp., 486 U.S. 847, 865, 100 L. Ed. 2d 855, 108 S. Ct. 2194 (1988)*. As such, violations of the Code of Conduct may give rise to a violation of *§ 455(a)* if doubt is cast on the integrity of the judicial process. It has been argued that any "public comment by a judge concerning the facts, applicable law, or merits of a case that is *sub judice* in his court or any comment concerning the parties or their attorneys would raise grave doubts about the judge's objectivity and his willingness to reserve judgment until the close of the proceeding." William G. Ross, *Extrajudicial Speech: Charting the Boundaries of Propriety*, 2 GEO. J. LEGAL ETHICS 589, 598 (1989). Some courts of appeals have taken a hard line on public comments, finding violations of *§ 455(a)* for judicial commentary on pending cases that seems mild in comparison to what we are confronting in this case. *See Boston's Children First, 244 F.3d 164* (granting writ of mandamus ordering district judge to recuse herself under *§ 455(a)* because of public comments on class certification and standing **[**219]** in a pending case); *In re IBM Corp., 45 F.3d 641* (granting writ of mandamus ordering district judge to recuse himself based in part on the appearance of partiality caused by his giving newspaper interviews); *Cooley, 1 F.3d 985* (vacating convictions and disqualifying district judge for appearance of partiality because he appeared on television program *Nightline* and stated that abortion protestors in a case before him were breaking the law and that his injunction would be obeyed).

***HN68*** While *§ 455(a)* is concerned with actual and apparent impropriety, the statute requires disqualification only when a judge's "impartiality might reasonably be questioned." *28 U.S.C. § 455(a)*. Although this court has condemned public judicial comments on pending cases, we have not gone so far as to hold that every violation of Canon 3A(6) or every impropriety under the Code of Conduct inevitably destroys the appearance of impartiality and thus violates *§ 455(a)*. *See In re Barry, 946 F.2d at 914*; *see also Boston's Children First, 244 F.3d at 168*; *United States v.* **[*115]** *Fortier, 242 F.3d 1224, 1229 (10th Cir. 2001)*. **[**220]**

In this case, however, we believe the line has been crossed. The public comments were not only improper, but also would lead a reasonable, informed observer to question the District Judge's impartiality. Public confidence in the integrity and impartiality of the judiciary is seriously jeopardized when judges secretly share their thoughts about the merits of pending cases with the press. Judges who covet publicity, or convey the appearance that they do, lead any objective observer to wonder whether their judgments are being influenced by the prospect of favorable coverage in the media. Discreet and limited public comments may not compromise a judge's apparent impartiality, but we have little doubt that the District Judge's conduct had that effect. Appearance may be all there is, but that is enough to invoke the Canons and *§ 455(a)*.

Judge Learned Hand spoke of "this America of ours where the passion for publicity is a disease, and where swarms of foolish, tawdry moths dash with rapture into its consuming fire…."

LEARNED HAND, THE SPIRIT OF LIBERTY 132-33 (2d ed. 1953). ***HN69*** Judges are obligated to resist this passion. Indulging it compromises what Edmund Burke justly regarded as the **[**221]** "cold neutrality of an impartial judge." Cold or not, federal judges must maintain the appearance of impartiality. What was true two centuries ago is true today: "Deference to the judgments and rulings of courts depends upon public confidence in the integrity and independence of judges." CODE OF CONDUCT Canon 1 cmt. Public confidence in judicial impartiality cannot survive if judges, in disregard of their ethical obligations, pander to the press.

We recognize that it would be extraordinary to disqualify a judge for bias or appearance of partiality when his remarks arguably reflected what he learned, or what he thought he learned, during the proceedings. *See* *Liteky v. United States, 510 U.S. 540, 554-55, 127 L. Ed. 2d 474, 114 S. Ct. 1147 (1994)*; *United States v. Barry, 295 U.S. App. D.C. 173, 961 F.2d 260, 263 (D.C. Cir. 1992)*. But this "extrajudicial source" rule has no bearing on the case before us. The problem here is not just what the District Judge said, but to whom he said it and when. His crude characterizations of Microsoft, his frequent denigrations of Bill Gates, his mule trainer analogy as a reason for his remedy--all of these remarks and **[**222]** others might not have given rise to a violation of the Canons or of *§ 455(a)* had he uttered them from the bench. *See* *Liteky, 510 U.S. at 555-56*; ***HN70*** CODE OF CONDUCT Canon 3A(6) (exception to prohibition on public comments for "statements made in the course of the judge's official duties"). But then Microsoft would have had an opportunity to object, perhaps even to persuade, and the Judge would have made a record for review on appeal. It is an altogether different matter when the statements are made outside the courtroom, in private meetings unknown to the parties, in anticipation that ultimately the Judge's remarks would be reported. Rather than manifesting neutrality and impartiality, the reports of the interviews with the District Judge convey the impression of a judge posturing for posterity, trying to please the reporters with colorful analogies and observations bound to wind up in the stories they write. Members of the public may reasonably question whether the District Judge's desire for press coverage influenced his judgments, indeed whether a publicity-seeking judge might consciously or subconsciously seek the publicity-maximizing outcome. We believe, therefore, **[**223]** that the District Judge's interviews with reporters created an appearance that he was not acting impartially, **[*116]** as the Code of Conduct and *§ 455(a)* require.

*D. Remedies for Judicial Misconduct and Appearance of Partiality*

**1. Disqualification**

***HN71*** Disqualification is mandatory for conduct that calls a judge's impartiality into question. *See* *28 U.S.C. § 455(a)*; *In re School Asbestos Litig., 977 F.2d 764, 783 (3d Cir. 1992)*. *Section 455* does not prescribe the scope of disqualification. Rather, Congress "delegated to the judiciary the task of fashioning the remedies that will best serve the purpose" of the disqualification statute. *Liljeberg, 486 U.S. at 862*.

At a minimum, *§ 455(a)* requires prospective disqualification of the offending judge, that is, disqualification from the judge's hearing any further proceedings in the case. *See* *United States v. Microsoft Corp., 312 U.S. App. D.C. 378, 56 F.3d 1448, 1463-65 (D.C. Cir. 1995)* (per curiam) ("*Microsoft I*"). Microsoft urges retroactive disqualification of the District Judge, which would entail disqualification antedated to an earlier part of **[**224]** the proceedings and vacatur of all subsequent acts. *Cf.* *In re School Asbestos Litig., 977 F.2d at 786* (discussing remedy options).

"***HN72*** There need not be a draconian remedy for every violation of *§ 455(a)*." *Liljeberg, 486 U.S. at 862*. *Liljeberg* held that a district judge could be disqualified under *§ 455(a)* *after* entering

final judgment in a case, even though the judge was not (but should have been) aware of the grounds for disqualification before final judgment. The Court identified three factors relevant to the question whether vacatur is appropriate: "in determining whether a judgment should be vacated for a violation of *§ 455(a)*, it is appropriate to consider the risk of injustice to the parties in the particular case, the risk that the denial of relief will produce injustice in other cases, and the risk of undermining the public's confidence in the judicial process." *Id. at 864*. Although the Court was discussing *§ 455(a)* in a slightly different context (the judgment there had become final after appeal and the movant sought to have it vacated under Rule 60(b)), we believe the test it propounded applies as well to cases **[**225]** such as this in which the full extent of the disqualifying circumstances came to light only while the appeal was pending. *See In re School Asbestos Litig., 977 F.2d at 785*.

Our application of *Liljeberg* leads us to conclude that the appropriate remedy for the violations of *§ 455(a)* is disqualification of the District Judge retroactive only to the date he entered the order breaking up Microsoft. We therefore will vacate that order in its entirety and remand this case to a different District Judge, but will not set aside the existing Findings of Fact or Conclusions of Law (except insofar as specific findings are clearly erroneous or legal conclusions are incorrect).

This partially retroactive disqualification minimizes the risk of injustice to the parties and the damage to public confidence in the judicial process. Although the violations of the Code of Conduct and *§ 455(a)* were serious, full retroactive disqualification is unnecessary. It would unduly penalize plaintiffs, who were innocent and unaware of the misconduct, and would have only slight marginal deterrent effect.

Most important, full retroactive disqualification is unnecessary to protect Microsoft's **[**226]** right to an impartial adjudication. The District Judge's conduct destroyed the appearance of impartiality. Microsoft neither alleged nor demonstrated that it rose to the level of actual bias or prejudice. There is no reason to presume that everything the District Judge did is suspect. **[*117]** *See In re Allied-Signal Inc., 891 F.2d 974, 975-76 (1st Cir. 1989)*; *cf. Liberty Lobby, Inc. v. Dow Jones & Co., 267 U.S. App. D.C. 337, 838 F.2d 1287, 1301-02 (D.C. Cir. 1988)*. Although Microsoft challenged very few of the findings as clearly erroneous, we have carefully reviewed the entire record and discern no basis to suppose that actual bias infected his factual findings.

The most serious judicial misconduct occurred near or during the remedial stage. It is therefore commensurate that our remedy focus on that stage of the case. The District Judge's impatience with what he viewed as intransigence on the part of the company; his refusal to allow an evidentiary hearing; his analogizing Microsoft to Japan at the end of World War II; his story about the mule--all of these out-ofcourt remarks and others, plus the Judge's evident efforts to please the press, would give **[**227]** a reasonable, informed observer cause to question his impartiality in ordering the company split in two.

To repeat, we disqualify the District Judge retroactive only to the imposition of the remedy, and thus vacate the remedy order for the reasons given in Section V and because of the appearance of partiality created by the District Judge's misconduct.

**2. Review of Findings of Fact and Conclusions of Law**

Given the limited scope of our disqualification of the District Judge, we have let stand for review his Findings of Fact and Conclusions of Law. The severity of the District Judge's misconduct

and the appearance of partiality it created have led us to consider whether we can and should subject his factfindings to greater scrutiny. For a number of reasons we have rejected any such approach.

***HN73*** The Federal Rules require that district court findings of fact not be set aside unless they are clearly erroneous. *SeeFED. R. CIV. P. 52(a)*. Ordinarily, there is no basis for doubting that the District Court's factual findings are entitled to the substantial deference the clearly erroneous standard entails. But of course this is no ordinary case. Deference to a district court's factfindings **[**228]** presumes impartiality on the lower court's part. When impartiality is called into question, how much deference is due?

The question implies that there is some middle ground, but we believe there is none. As the rules are written, district court factfindings receive either full deference under the clearly erroneous standard or they must be vacated. There is no *de novo* appellate review of factfindings and no intermediate level between *de novo* and clear error, not even for findings the court of appeals may consider sub-par. *See Amadeo v. Zant, 486 U.S. 214, 228, 100 L. Ed. 2d 249, 108 S. Ct. 1771 (1988)* ("The District Court's lack of precision, however, is no excuse for the Court of Appeals to ignore the dictates of *Rule 52(a)* and engage in impermissible appellate factfinding."); *Anderson v. City of Bessemer City, 470 U.S. 564, 571-75, 84 L. Ed. 2d 518, 105 S. Ct. 1504 (1985)* (criticizing district court practice of adopting a party's proposed factfindings but overturning court of appeals' application of "close scrutiny" to such findings).

***HN74*** *Rule 52(a)* mandates clearly erroneous review of all district court factfindings: "Findings of fact, whether **[**229]** based on oral or documentary evidence, shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses." *FED. R. CIV. P. 52(a)*. The rule "does not make exceptions or purport to exclude certain categories of factual findings from the obligation of a court of **[*118]** appeals to accept a district court's findings unless clearly erroneous." *Pullman-Standard v. Swint, 456 U.S. 273, 287, 72 L. Ed. 2d 66, 102 S. Ct. 1781 (1982)*; *see also Anderson, 470 U.S. at 574-75*; *Inwood Labs., Inc. v. Ives Labs., Inc., 456 U.S. 844, 855-58, 72 L. Ed. 2d 606, 102 S. Ct. 2182 (1982)*. The Supreme Court has emphasized on multiple occasions that "in applying the clearly erroneous standard to the findings of a district court sitting without a jury, appellate courts must constantly have in mind that their function is not to decide factual issues *de novo*." *Zenith Radio Corp. v. Hazeltine Research, Inc., 395 U.S. 100, 123, 23 L. Ed. 2d 129, 89 S. Ct. 1562 (1969)*; *Anderson, 470 U.S. at 573* (quoting *Zenith*).

***HN75*** The mandatory nature of **[**230]** *Rule 52(a)* does not compel us to accept factfindings that result from the District Court's misapplication of governing law or that otherwise do not permit meaningful appellate review. *See Pullman-Standard, 456 U.S. at 292*; *Inwood Labs., 456 U.S. at 855 n.15*. Nor must we accept findings that are utterly deficient in other ways. In such a case, we vacate and remand for further factfinding. *See* 9 *MOORE'S FEDERAL PRACTICE § 52.12[1]* (Matthew Bender 3d ed. 2000); 9A CHARLES A. WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 2577, at 514-22 (2d ed. 1995); *cf. Icicle Seafoods, Inc. v. Worthington, 475 U.S. 709, 714, 89 L. Ed. 2d 739, 106 S. Ct. 1527 (1986)*; *Pullman-Standard, 456 U.S. at 291-92*.

When there is fair room for argument that the District Court's factfindings should be vacated *in toto*, the court of appeals should be especially careful in determining that the findings are worthy of the deference *Rule 52(a)* prescribes. *See, e.g.*, *Thermo Electron Corp. v. Schiavone Constr.*

*Co., 915 F.2d 770, 773 (1st Cir. 1990)*; *cf.* *Bose Corp. v. Consumers Union of United States, Inc., 466 U.S. 485, 499, 80 L. Ed. 2d 502, 104 S. Ct. 1949 (1984)*. **[**231]** Thus, although Microsoft alleged only appearance of bias, not actual bias, we have reviewed the record with painstaking care and have discerned no evidence of actual bias. *See* *S. Pac. Communications Co. v. AT & T, 238 U.S. App. D.C. 309, 740 F.2d 980, 984 (D.C. Cir. 1984)*; *Cooley, 1 F.3d at 996* (disqualifying district judge for appearance of partiality but noting that "the record of the proceedings below … discloses no bias").

In light of this conclusion, the District Judge's factual findings both warrant deference under the clear error standard of review and, though exceedingly sparing in citations to the record, permit meaningful appellate review. In reaching these conclusions, we have not ignored the District Judge's reported intention to craft his factfindings and Conclusions of Law to minimize the breadth of our review. The Judge reportedly told Ken Auletta that "what I want to do is confront the Court of Appeals with an established factual record which is a fait accompli." AULETTA, WORLD WAR 3.0, at 230. He explained: "part of the inspiration for doing that is that I take mild offense at their reversal of my preliminary injunction in the consent-decree **[**232]** case, where they went ahead and made up about ninety percent of the facts on their own." *Id.* Whether the District Judge takes offense, mild or severe, is beside the point. ***HN76*** Appellate decisions command compliance, not agreement. We do not view the District Judge's remarks as anything other than his expression of disagreement with this court's decision, and his desire to provide extensive factual findings in this case, which he did.

**VII. CONCLUSION**

The judgment of the District Court is affirmed in part, reversed in part, and **[*119]** remanded in part. We vacate in full the Final Judgment embodying the remedial order, and remand the case to the District Court for reassignment to a different trial judge for further proceedings consistent with this opinion.

EXHIBIT 295

LexisNexis®

Caution
As of: August 12, 2014 9:20 AM EDT

# United States v. Parke

Supreme Court of the United States
November 10, 1959, Argued ; February 29, 1960, Decided
No. 20

**Reporter:** 362 U.S. 29; 80 S. Ct. 503; 4 L. Ed. 2d 505; 1960 U.S. LEXIS 2013; 1960 Trade Cas. (CCH) P69,611
UNITED STATES v. PARKE, DAVIS & CO.

**Prior History:** APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA.

**Disposition:** *164 F.Supp. 827*, reversed.

**Core Terms**

retailer, wholesaler, announce, customer, resale price, manufacturer, adherence, doctrine, The Sherman Act, conspiracy, advertize, dart, minimum retail price, concerted action, seller, cooperation, unlawful combination, retail price, acquiescence, suppress, cutoff, indictment, unilateral, discount, contractual arrangement, distributor, competitor, antitrust, jobber, trader

**LexisNexis® Headnotes**

Antitrust & Trade Law > Sherman Act > General Overview

***HN1*** See *15 U.S.C.S. §§ 1*, *3*, *4*.

Antitrust & Trade Law > Sherman Act > General Overview
Antitrust & Trade Law > Sherman Act > Scope > General Overview
Antitrust & Trade Law > Public Enforcement > State Civil Actions
Contracts Law > Defenses > Illegal Bargains

***HN2*** Where a state adopts a Fair Trade Law which permits sellers under certain circumstances to make price-fixing agreements with purchasers, such agreements are not illegal under the Sherman Act, *15 U.S.C.S. § 1*.

Antitrust & Trade Law > ... > Monopolies & Monopolization > Attempts to Monopolize > General Overview
Antitrust & Trade Law > ... > Monopolies & Monopolization > Conspiracy to Monopolize > General Overview
Antitrust & Trade Law > Sherman Act > General Overview
Antitrust & Trade Law > Sherman Act > Scope > General Overview

***HN3*** The purpose of the Sherman Act, *15 U.S.C.S. § 1 et seq.* is to prohibit monopolies, contracts, and combinations which probably would unduly interfere with the free exercise of

their rights by those engaged, or who wish to engage, in trade and commerce, in a word to preserve the right of freedom to trade. In the absence of any purpose to create or maintain a monopoly, the statute does not restrict the long recognized right of trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal. And, of course, he may announce in advance the circumstances under which he will refuse to sell.

Antitrust & Trade Law > ... > Price Fixing & Restraints of Trade > Vertical Restraints > General Overview

***HN4*** An unlawful combination is not just such as arises from a price maintenance agreement, express or implied; such a combination is also organized if the producer secures adherence to his suggested prices by means which go beyond his mere declination to sell to a customer who will not observe his announced policy.

Antitrust & Trade Law > Sherman Act > General Overview

***HN5*** The Sherman Act, *15 U.S.C.S. § 1 et seq.* forbids combinations of traders to suppress competition.

Antitrust & Trade Law > ... > Monopolies & Monopolization > Conspiracy to Monopolize > Sherman Act
Antitrust & Trade Law > ... > Price Fixing & Restraints of Trade > Vertical Restraints > General Overview
Antitrust & Trade Law > Sherman Act > Claims

***HN6*** When the manufacturer's actions go beyond mere announcement of his policy and the simple refusal to deal, and he employs other means which effect adherence to his resale prices, he has put together a combination in violation of the Sherman Act, *15 U.S.C.S. § 1 et seq.* Thus, whether an unlawful combination or conspiracy is proved is to be judged by what the parties actually did rather than by the words they used.

Antitrust & Trade Law > International Aspects > Commerce With Foreign Nations
Antitrust & Trade Law > ... > Monopolies & Monopolization > Conspiracy to Monopolize > Sherman Act
Antitrust & Trade Law > ... > Price Fixing & Restraints of Trade > Per Se Rule & Rule of Reason > General Overview
International Trade Law > General Overview

***HN7*** Under the Sherman Act, *15 U.S.C.S. § 1 et seq.*, competition not combination is the law of trade, and a combination formed for the purpose and with the effect of raising, depressing, fixing, pegging, or stabilizing the price of a commodity in interstate or foreign commerce is illegal per se.

Antitrust & Trade Law > ... > US Department of Justice Actions > Civil Actions > General Overview

***HN8*** The courts have an obligation, once a violation of the antitrust laws has been established, to protect the public from a continuation of the harmful and unlawful activities. A trial court's wide discretion in fashioning remedies is not to be exercised to deny relief altogether by lightly inferring an abandonment of the unlawful activities from a cessation which seems timed to anticipate suit.

**Lawyers' Edition Display**

**Summary**

In order to carry out its program for the maintenance of minimum retail prices, the defendant, a manufacturer of pharmaceutical products, discussed this program with retailers who sold below such minimum prices and told them that if they continued to do so it would refuse to deal with them. The defendant also informed wholesalers in the area that it would refuse to deal with them if they sold defendant's products to offending retailers. Similar tactics were followed to induce retailers not to advertise defendant's products at prices below its minimum retail prices. This program was carried out until the Department of Justice started an investigation under the Sherman Antitrust Act.

In the present action the government sought an injunction under the Sherman Act against the defendant, alleging that defendant conspired and combined, in violation of 1 and 3 of the act, with retail and wholesale druggists in Washington, D. C., and Richmond, Virginia, to maintain the wholesale and retail prices of its products. The violation was alleged to have occurred during the summer of 1956 when there was no Fair Trade Law in the District of Columbia or State of Virginia. At the close of the government's evidence, the District Court dismissed the complaint on the ground that the government's proofs did not establish a violation of the act, because defendant's actions were merely a refusal to have business relations with retailers who disregarded its price policy, and hence were sanctioned under the doctrine laid down in *United States v Colgate Co. 250 US 300, 63* L ed 992, *39 S Ct 465, 7 ALR 443*. Alternatively, the District Court rested its judgment of dismissal on the ground that in view of defendant's discontinuance of the practices attacked in the complaint there was no reason to believe that the alleged unlawful acts could possibly be repeated. (*164 F Supp 827*.)

On appeal, the United States Supreme Court reversed and remanded the case to the District Court with directions to enter an appropriate injunction unless defendant elected to submit evidence in defense and refuted the government's right to injunctive relief established by the present record. In an opinion by Brennan, J., expressing the views of five members of the Court, it was held that defendant's practices, as described above, went beyond a mere refusal to deal with offending customers, even if there was no agreement, express or implied, concerning price maintenance. It was also held that the mere discontinuance by defendant of its practices after investigation by the Department of Justice had been commenced did not preclude injunctive relief.

Stewart, J., concurred in the judgment. He found no occasion to question, even by innuendo, the continuing validity of the Colgate decision.

Harlan, J., with the concurrence of Frankfurter and Whittaker, JJ., dissented. He expressed the view that the opinion of the court, in effect, overruled the Colgate decision, and that under that decision the government had not established a violation of the antitrust laws, the defendant having merely exercised his right to refuse to deal with offending customers.

**Headnotes**

MONOPOLIES §41 > resale price maintenance -- refusal to sell. --

***LEdHN[1]*** [1]

While a unilateral refusal to sell to customers who will not resell at prices suggested by the seller may be permissible under the Sherman Antitrust Act (*15 USC 1 et seq.*), an unlawful combination is not just such as arises from a price maintenance agreement, express or implied;

such a combination is also organized if the producer secures adherence to his suggested prices by means which go beyond his mere declination to sell to a customer who will not observe his announced policy.

ERROR §1477 > review of findings -- antitrust action. --

***LEdHN[2]*** [2]

Federal Civil Procedure *Rule 52 (a)*, under which findings of fact shall not be set aside unless clearly erroneous, has no application to a finding, made by the District Court in an antitrust action, that there were no contractual arrangements for price maintenance, where the District Court premised its ultimate finding that the defendant did not violate the Sherman Act on an erroneous interpretation of the standard to be applied.

MONOPOLIES §41 > resale price maintenance. --

***LEdHN[3]*** [3]

Judicial inquiry into the legality, under the Sherman Antitrust Act, of a producer's attempts toward price maintenance, does not stop with a search of the record for evidence of purely contractual arrangements made between the producer on the one hand and wholesalers and retailers on the other.

MONOPOLIES §14 > test of combination. --

***LEdHN[4]*** [4]

Whether an unlawful combination or conspiracy in violation of the Sherman Antitrust Act is proved is to be judged by what the parties actually did rather than by the words they used.

ERROR §1318 > question of law. --

***LEdHN[5]*** [5]

For the purposes of appellate review, the question whether the District Court applied the proper standard to essentially undisputed facts is a question of law.

MONOPOLIES §41 > resale price maintenance -- unlawful combination. --

***LEdHN[6]*** [6]

A producer creates a combination, prohibited by the Sherman Antitrust Act (*15 USC 1 et seq.*), with retailers and wholesalers to maintain retail prices, where he does not content himself with announcing his policy regarding retail prices and following this with a simple refusal to have business relations with any offending customer, and instead uses the refusal to deal with the wholesalers in order to elicit their willingness to deny his products to offending retailers and thereby help gain the retailers' adherence to his suggested minimum retail prices, and where the offending retailers are promptly cut off when the producer supplied the wholesalers with their names, and a large retailer who said he would abide by the price policy, is not cut off.

MONOPOLIES §41 > resale price maintenance -- unlawful combination. --

***LEdHN[7]*** [7]

A manufacturer is the organizer of a price-maintenance combination or conspiracy in violation of the Sherman Antitrust Act (*15 USC 1 et seq.*) where he, with a view to inducing retailers to suspend advertising of his product at prices below his suggested minimum retail prices, does not rest with the simple announcement to the trade of his policy in that regard followed by a refusal to sell to offending retailers, but seeks and obtains assurances of compliance as well as compliance itself by using the willingness of one of the retailers to co-operate as a lever to gain acquiescence of other retailers in his program.

MONOPOLIES §5 > competition. --

***LEdHN[8]*** [8]

Under the Sherman Antitrust Act (*15 USC 1 et seq.*) competition, not combination, should be the law of trade.

MONOPOLIES §36 > control of prices. --

***LEdHN[9]*** [9]

Under the Sherman Antitrust Act (*15 USC 1 et seq.*) a combination formed for the purpose and with the effect of raising, depressing, fixing, pegging, or stabilizing the price of a commodity in interstate or foreign commerce is illegal per se.

MONOPOLIES §68 > cessation of unlawful conditions -- findings -- evidence. --

***LEdHN[10]*** [10]

A finding, made by the District Court in an antitrust action, that the unlawful conditions alleged in the complaint no longer exist and that there is no reason to believe that the unlawful acts alleged can possibly be repeated is not justified by the evidence, where there is no evidence that the compelling reason for defendant's ceasing these acts was forced upon it by business and economic conditions in its field, and it does not appear that defendant has announced to the trade that it will abandon its unlawful practices, and, moreover, there is evidence showing that defendant stopped its practices because the Department of Justice had instituted an investigation.

MONOPOLIES §68 > judicial relief. --

***LEdHN[11]*** [11]

The courts have an obligation, once a violation of the antitrust laws has been established, to protect the public from a continuation of the harmful and unlawful activities.

MONOPOLIES §68 > cessation of unlawful activities. --

***LEdHN[12]*** [12]

A trial court's wide discretion in fashioning remedies under the antitrust laws is not to be exercised to deny relief altogether by lightly inferring an abandonment of the unlawful activities from a cessation which seems timed to anticipate suit.

**Syllabus**

In a civil suit under *§ 4* of the Sherman Act charging appellee with combining and conspiring to maintain resale prices of its products in areas which have no "fair trade" laws, the Government

introduced evidence showing that appellee had (1) announced a policy of refusing to deal with retailers who failed to observe appellee's suggested minimum resale prices or who advertised discount prices on appellee's products, (2) discontinued direct sales to those retailers who failed to abide by the announced policy, (3) induced wholesale distributors to stop selling appellee's products to the offending retailers, (4) secured unanimous adherence by informing a number of the retailers that if each of them would adhere to the announced policy one of their principal competitors would also do so, and (5) permitted the retailers to resume purchasing its products after they had indicated willingness to observe the policy. The evidence further established that appellee had terminated these practices after becoming aware that the Department of Justice had begun an investigation of its price maintenance activities. The District Court dismissed the complaint on the ground that the Government had not shown a right to relief. *Held*: The judgment is reversed and the case remanded with directions to enter an appropriate judgment enjoining appellee from further violations of the Sherman Act, unless it elects to submit evidence in defense and refutes the Government's right to injunctive relief established by the present record. Pp. 30-49.

(a) The District Court erred in holding that these practices constituted only unilateral action by appellee in selecting its customers, as permitted by *United States v. Colgate & Co., 250 U.S. 300*. Appellee did not merely announce its policy and then decline to have further dealings with retailers who failed to abide by it, but, by utilizing wholesalers and other retailers, it actively induced unwilling retailers to comply with the policy. The resulting concerted action to maintain the resale prices constituted a conspiracy or combination in violation of the Sherman Act, although it was not based on any contract, express or implied. Pp. 36-47.

(b) *Rule 52 of the Federal Rules of Civil Procedure* does not require affirmance of the District Court's ultimate finding that respondent did not violate the Sherman Act, because that conclusion was based on an erroneous interpretation of the law. Pp. 43-45.

(c) The District Court's alternative holding that dismissal of the complaint was warranted because there was no reasonable probability that appellee would resume its attempts to maintain resale prices is erroneous, because it is not supported by the evidence. Pp. 47-48.

**Counsel:** Daniel M. Friedman argued the cause for the United States. With him on the brief were Solicitor General Rankin, Acting Assistant Attorney General Bicks, Richard A. Solomon, Edward R. Kenney and Henry Geller.

Gerhard A. Gesell argued the cause for appellee. With him on the brief were Edward S. Reid, Jr. and Weaver W. Dunnan.

**Judges:** Warren, Black, Frankfurter, Douglas, Clark, Harlan, Brennan, Whittaker, Stewart

**Opinion by:** BRENNAN

**Opinion**

**[*30] [***507] [**505]** MR. JUSTICE BRENNAN delivered the opinion of the Court.

The Government sought an injunction under *§ 4* of the Sherman Act against the appellee, Parke, Davis & Company, on a complaint alleging that Parke Davis conspired and **[***508]** combined,

in violation of *§§ 1* and *3* of the Act, [1] with **[*31]** retail and wholesale druggists in Washington, D. C., and Richmond, Virginia, to maintain the wholesale and retail prices of Parke Davis pharmaceutical products. The violation was alleged to have occurred during the summer of 1956 when there was no Fair Trade Law in the District of Columbia or the State of Virginia. [2] After the Government completed the presentation of its evidence at the trial, and without hearing Parke Davis in defense, the District Court for the District of Columbia dismissed the complaint under Rule 41 (b) on the ground that upon the facts and the law the Government had not shown a right to relief. *164 F.Supp. 827*. We noted probable jurisdiction of the Government's direct appeal under § 2 of the Expediting Act. [3]*359 U.S. 903*.

Parke Davis makes some 600 pharmaceutical products which it markets nationally through drug wholesalers and **[*32]** drug retailers. The retailers buy these products from the drug wholesalers or make large quantity purchases directly from Parke Davis. Sometime before 1956 Parke Davis announced a resale price maintenance policy in its wholesalers' and retailers' catalogues. The wholesalers' catalogue contained a Net Price Selling Schedule listing suggested minimum resale prices on Parke Davis products sold by wholesalers to retailers. The catalogue stated that it was Parke Davis' continuing policy to deal only with drug wholesalers who observed that schedule and who sold only to drug retailers authorized by law to fill prescriptions. Parke Davis, when selling directly to retailers, quoted the same prices listed in the wholesalers' Net Price Selling Schedule but granted retailers discounts for volume purchases. Wholesalers were not authorized to grant similar discounts. The retailers' **[**506]** catalogue contained a schedule of minimum retail prices applicable in States with Fair Trade Laws and stated that this schedule was suggested **[***509]** for use also in States not having such laws. These suggested minimum retail prices usually provided a 50% markup over cost on Parke Davis products purchased by retailers from wholesalers but, because of the volume discount, often in excess of 100% markup over cost on products purchased in large quantities directly from Parke Davis.

There are some 260 drugstores in Washington, D. C., and some 100 in Richmond, Virginia. Many of the stores are units of Peoples Drug Stores, a large retail drug chain. There are five drug wholesalers handling Parke Davis products in the locality who do business with the drug retailers. The wholesalers observed the resale prices suggested by Parke Davis. However, during

---

[1] The pertinent provision of *Sections 1*, 3 and 4 of the Act of July 2, 1890, 26 Stat. 209, as amended (*15 U. S. C. §§ 1*, 3, 4), commonly known as the Sherman Act, are as follows:

***HN1*** "*Sec. 1*. Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is hereby declared to be illegal . . . . Every person who shall make any contract or engage in any combination or conspiracy hereby declared to be illegal shall be deemed guilty of a misdemeanor . . . ."

"Sec. 3. Every contract, combination in form of trust or otherwise, or conspiracy, in restraint of trade or commerce in . . . the District of Columbia, or in restraint of trade or commerce . . . between the District of Columbia and any State or States or foreign nations, is hereby declared illegal. Every person who shall make any such contract or engage in any such combination or conspiracy, shall be deemed guilty of a misdemeanor . . . .

"Sec. 4. The several district courts of the United States are hereby invested with jurisdiction to prevent and restrain violations of this act; and it shall be the duty of the several United States attorneys, in their respective districts, under the direction of the Attorney-General, to institute proceedings in equity to prevent and restrain such violations. . . ."

[2] Congress has provided that ***HN2*** where a State adopts a "Fair Trade Law" which permits sellers under certain circumstances to make price-fixing agreements with purchasers, such agreements shall not be held illegal under the Sherman Act. *15 U. S. C. § 1*. The Fair Trade Laws adopted in 16 States have been invalidated by their state courts on state grounds. H. R. Rep. No. 467, 86th Cong., 1st Sess. 6-7. On June 9, 1959, the House Committee on Interstate Commerce favorably reported a bill which, if passed, would enact a National Fair Trade Practice Act.

[3] 32 Stat. 823, 15 U. S. C. § 29, as amended by § 17 of the Act of June 25, 1948, 62 Stat. 989.

the spring and early summer of 1956 drug retailers in the two cities advertised and sold several Parke Davis vitamin products at prices substantially below the suggested minimum retail prices; in some instances the prices apparently **[*33]** reflected the volume discounts on direct purchases from Parke Davis since the products were sold below the prices listed in the wholesalers' Net Price Selling Schedule. The Baltimore office manager of Parke Davis in charge of the sales district which included the two cities sought advice from his head office on how to handle this situation. The Parke Davis attorney advised that the company could legally "enforce an adopted policy arrived at unilaterally" to sell only to customers who observed the suggested minimum resale prices. He further advised that this meant that "we can lawfully say 'we will sell you only so long as you observe such minimum retail prices' but cannot say 'we will sell you only if you agree to observe such minimum retail prices,' since except as permitted by Fair Trade legislations [*sic*] agreements as to resale price maintenance are invalid." Thereafter in July the branch manager put into effect a program for promoting observance of the suggested minimum retail prices by the retailers involved. The program contemplated the participation of the five drug wholesalers. In order to insure that retailers who did not comply would be cut off from sources of supply, representatives of Parke Davis visited the wholesalers and told them, in effect, that not only would Parke Davis refuse to sell to wholesalers who did not adhere to the policy announced in its catalogue, but also that it would refuse to sell to wholesalers who sold Parke Davis products to retailers who did not observe the suggested minimum retail prices. Each wholesaler was interviewed individually but each was informed that his competitors were also being apprised of this. The wholesalers without exception indicated a willingness to go along.

Representatives called contemporaneously upon the retailers involved, individually, and told each that if he did not observe the suggested minimum retail prices, Parke Davis would refuse to deal with him, and that furthermore **[*34]** he would be unable to purchase any Parke Davis products from the wholesalers. Each of the retailers was also told that his competitors were being similarly informed.

Several retailers refused to give any assurances of compliance and continued after these July interviews to advertise and sell Parke Davis products at prices below the suggested minimum retail prices. Their names were furnished by Parke Davis to the wholesalers. Thereafter Parke Davis refused to fill direct orders from such retailers **[***510]** and the wholesalers likewise refused to fill their orders. [4] This ban was not limited **[**507]** to the Parke Davis products being sold below the suggested minimum prices but included all the company's products, even those necessary to fill prescriptions.

The president of Dart Drug Company, one of the retailers cut off, protested to the assistant branch manager of Parke Davis that Parke Davis was discriminating against him because a drugstore across the street, one of the Peoples Drug chain, had a sign in its window advertising Parke Davis products at cut prices. The retailer was told that if this were so the branch manager "would see Peoples and try to get them in line." The branch manager testified at the trial that thereafter he talked to a vice-president of Peoples and that the following occurred:

"Q. Well, now, you told Mr. Downey [the vice-president of Peoples] at this meeting, did you not, Mr. Powers, [the assistant branch manager of Parke Davis] that you noticed that Peoples were cutting prices?

---

[4] When Parke Davis learned from a wholesaler's invoice that he had filled an order of one of the retailers, Parke Davis protested but was satisfied when the wholesaler explained that this was an oversight.

"A. Yes.

**[*35]** "Q. And you told him, did you not, that it had been the Parke, Davis policy for many years to do business only with individuals that maintained the scheduled prices?

"A. I told Mr. Downey that we had a policy in our catalog, and that anyone that did not go along with our policy, we were not interested in doing business with them.

. . . .

"Q. . . . Now, Mr. Downey told you on the occasion of this visit, did he not, that Peoples would stop cutting prices and would abide by the Parke-Davis policy, is that right?

"A. That is correct.

. . . .

"Q. When you went to call on Mr. Downey, you solicited his support of Parke, Davis policies, is not that right?

"A. That is right.

"Q. And he said, I will abide by your policy?

"A. That is right."

The District Court found, apparently on the basis of this testimony, that "The Peoples' representative stated that Peoples would stop cutting prices on Parke, Davis' products and Parke, Davis continued to sell to Peoples."

But five retailers continued selling Parke Davis products at less than the suggested minimum prices from stocks on hand. Within a few weeks Parke Davis modified its program. Its officials believed that the selling at discount prices would be deterred, and the effects minimized of any isolated instances of discount selling which might continue, if all advertising of such prices were discontinued. In August the Parke Davis representatives again called on the retailers individually. When interviewed, the president of Dart Drug Company indicated **[*36]** that he might be willing to stop advertising, although continuing to sell at discount prices, if shipments to him were resumed. Each of the other retailers was then told individually by Parke Davis representatives that Dart was ready to discontinue advertising. Each thereupon said that if Dart stopped advertising he would also. On August 28 Parke Davis reported this reaction to Dart. Thereafter all of the retailers discontinued **[***511]** advertising of Parke Davis vitamins at less than suggested minimum retail prices and Parke Davis and the wholesalers resumed sales of Parke Davis products to them. However, the suspension of advertising lasted only a month. One of the retailers again started newspaper advertising in September and, despite efforts of Parke Davis to prevent it, the others quickly followed suit. Parke Davis then stopped trying to promote the retailers' adherence to its suggested resale prices, and neither it nor the wholesalers have since declined further dealings with **[**508]** them. [5] A reason for this was that the Department of Justice,

---

[5] Except that in December 1957, Parke Davis informed Dart Drug Company that it did not intend to have any further dealings with Dart. The latter has, however, continued to purchase Parke Davis products from wholesalers. Thus, Dart Drug cannot receive the volume discount on large quantity purchases.

on complaint of Dart Drug Company, had begun an investigation of possible violation of the antitrust laws.

The District Court held that the Government's proofs did not establish a violation of the Sherman Act because "the actions of [Parke Davis] were properly unilateral and sanctioned by law under the doctrine laid down in the case of *United States v. Colgate & Co., 250 U.S. 300* . . . ." *164 F.Supp., at 829*.

The *Colgate* case came to this Court on writ of error under the Criminal Appeals Act, 34 Stat. 1246, from a District Court judgment dismissing an indictment for violation of the Sherman Act. The indictment proceeded **[*37]** solely upon the theory of an unlawful combination between Colgate and its wholesale and retail dealers for the purpose and with the effect of procuring adherence on the part of the dealers to resale prices fixed by the company. However, the District Court construed the indictment as not charging a combination by *agreement* between Colgate and its customers to maintain prices. This Court held that it must disregard the allegations of the indictment since the District Court's interpretation of the indictment was binding and that without an allegation of unlawful *agreement* there was no Sherman Act violation charged. The Court said:

***HN3*** "The purpose of the Sherman Act is to prohibit monopolies, contracts and combinations which probably would unduly interfere with the free exercise of their rights by those engaged, or who wish to engage, in trade and commerce -- in a word to preserve the right of freedom to trade. In the absence of any purpose to create or maintain a monopoly, the act does not restrict the long recognized right of trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal. And, of course, he may announce in advance the circumstances under which he will refuse to sell." *250 U.S., at 307*.

The Government concedes for the purposes of this case that under the *Colgate* doctrine a manufacturer, having announced a price maintenance policy, may bring about adherence to it by refusing to deal with customers who do not observe that policy. The Government contends, however, that subsequent decisions of this Court compel the holding that what Parke Davis did here by entwining the wholesalers and retailers in a program to promote general compliance with its price maintenance policy went **[*38]** beyond mere customer selection and **[***512]** created combinations or conspiracies to enforce resale price maintenance in violation of *§§ 1* and *3* of the Sherman Act.

The history of the *Colgate* doctrine is best understood by reference to a case which preceded the *Colgate* decision, *Dr. Miles Medical Co*. v. *Park & Sons Co., 220 U.S. 373*. Dr. Miles entered into written contracts with its customers obligating them to sell its medicine at prices fixed by it. The Court held that the contracts were void because they violated both the common law and the Sherman Act. The *Colgate* decision distinguished *Dr. Miles* on the ground that the *Colgate* indictment did not charge that company with selling its products to dealers *under agreements* which obligated the latter not to resell except at prices fixed by the seller. The **[**509]** *Colgate* decision created some confusion and doubt as to the continuing vitality of the principles announced in *Dr. Miles*. This brought *United States v. Schrader's Son, Inc., 252 U.S. 85*, to the Court. The case involved the prosecution of a components manufacturer for entering into price-fixing agreements with retailers, jobbers and manufacturers who used his products. The District Court dismissed, saying:

"Granting the fundamental proposition stated in the Colgate case, that the manufacturer has an undoubted right to specify resale prices and refuse to deal with any one who fails to maintain the same, or, as further stated, the act does not restrict the long-recognized right of a trader or manufacturer engaged in an entirely private business freely to exercise his own independent discretion as to parties with whom he will deal, and that he of course may announce in advance the circumstances under which he will refuse to sell, it seems to me that it is a distinction without a difference to say that he may do so by the subterfuges **[*39]** and devices set forth in the [*Colgate*] opinion and not violate the Sherman Anti-Trust Act, yet if he had done the same thing in the form of a written agreement, adequate only to effectuate the same purpose, he would be guilty of a violation of the law. . . ." 264 F. 175, 184.

This Court reversed, and said:

"The court below misapprehended the meaning and effect of the opinion and judgment in [*Colgate*]. We had no intention to overrule or modify the doctrine of *Dr. Miles Medical Co.* v. *Park & Sons Co.*, where the effort was to destroy the dealers' independent discretion through restrictive agreements." *252 U.S., at 99*.

The Court went on to explain that the statement from *Colgate* quoted earlier in this opinion meant no more than that a manufacturer is not guilty of a combination or conspiracy if he merely "indicates his wishes concerning prices and declines further dealings with all who fail to observe them . . ."; however there is unlawful combination where a manufacturer "enters into agreements -- whether express or implied from a course of dealing or other circumstances -- with all customers . . . which undertake to bind them to observe fixed resale prices." *Ibid.*

The next decision was *Frey & Son, Inc., v. Cudahy Packing Co., 256 U.S. 208*. That was a treble damage suit alleging a conspiracy in violation of the Sherman Act between the manufacturer and jobbers to maintain resale prices. The plaintiff recovered a judgment. The Court of Appeals for the Fourth Circuit reversed on the **[***513]** authority of *Colgate* . The Court of Appeals concluded: "There was no formal written or oral agreement with jobbers for the maintenance of prices" and in that circumstance held **[*40]** that under *Colgate* the trial court should have directed a verdict for the defendant. In holding that the Court of Appeals erred, this Court referred to the decision in *Schrader* as holding that the "essential agreement, combination or conspiracy might be implied from a course of dealing or other circumstances," so that in *Cudahy*, "Having regard to the course of dealing and all the pertinent facts disclosed by the present record, we think whether there existed an unlawful combination or agreement between the manufacturer and jobbers was a question for the jury to decide, and that the Circuit Court of Appeals erred when it held otherwise." *256 U.S., at 210*.

But the Court also held improper an instruction which was given to the jury that a violation of the Sherman Act **[**510]** might be found if the jury should find as facts that the defendant "indicated a sales plan to the wholesalers and jobbers, which plan fixed the price below which the wholesalers and jobbers were not to sell to retailers, and . . . [that] . . . defendant called this particular feature of this plan to their attention on very many different occasions, and . . . [that] . . . the great majority of them not only [expressed] no dissent from such plan, but actually [cooperated] in carrying it out by themselves selling at the prices named . . . ." 256 U.S. 210-211. However, the authority of this holding condemning the instruction has been seriously undermined by subsequent decisions which we are about to discuss. Therefore, *Cudahy* does not support the District Court's action in this case, and we cannot follow it here. Less than a year after *Cudahy*

was handed down, the Court decided *Federal Trade Comm'n v. Beech-Nut Packing Co., 257 U.S. 441*, which presented a situation bearing a marked resemblance to the Parke Davis program.

In *Beech-Nut* the company had adopted a policy of refusing to sell its products to wholesalers or retailers who did not adhere to a schedule of resale prices. Beech-Nut **[*41]** later implemented this policy by refusing to sell to wholesalers who sold to retailers who would not adhere to the policy. To detect violations the company utilized code numbers on its products and instituted a system of reporting. When an offender was cut off, he would be reinstated upon the giving of assurances that he would maintain prices in the future. The Court construed the Federal Trade Commission Act to authorize the Commission to forbid practices which had a "dangerous tendency unduly to hinder competition or create monopoly." *257 U.S., at 454*. The Sherman Act was held to be a guide to what constituted an unfair method of competition. The company had urged that its conduct was entirely legal under the Sherman Act as interpreted by *Colgate*. The Court rejected this contention, saying that "the Beech-Nut system goes far beyond the simple refusal to sell goods to persons who will not sell at stated prices, which in the *Colgate Case* was held to be within the legal right of the producer." *Ibid*. The Court held further that the nonexistence of contracts covering the practices was irrelevant since "the specific facts found show suppression of the freedom of competition by methods in which the company secures the cooperation **[***514]** of its distributors and customers, which are quite as effectual as agreements express or implied intended to accomplish the same purpose." *Id., at 455*. That the Court considered that the Sherman Act violation thus established was dispositive of the issue before it is shown by the ground taken by Mr. Justice McReynolds in dissent. The parties had stipulated that there were no contracts covering the policy. Relying on his view of *Colgate*, he asked: "How can there be methods of cooperation . . . when the existence of the essential contracts is definitely excluded?" *Id., at 459*. The majority did not read *Colgate* as requiring such contracts; rather, the Court dispelled the confusion over whether a combination effected by contractual arrangements, **[*42]** express or implied, was necessary to a finding of Sherman Act violation by limiting *Colgate* to a holding that when the only act specified in the indictment amounted to saying that the trader had exercised his right to determine those with whom he would deal, and to announce the circumstances under which he would refuse to sell, no Sherman Act violation was made out. However, because Beech-Nut's methods were as effective as agreements in producing the result that "all who would deal in the company's products are constrained to sell at the suggested prices," *257 U.S., at 455*, the Court held that **[**511]** the securing of the customers' adherence by such methods constituted the creation of an unlawful combination to suppress price competition among the retailers.

That *Beech-Nut* narrowly limited *Colgate* and announced principles which subject to Sherman Act liability the producer who secures his customers' adherence to his resale prices by methods which go beyond the simple refusal to sell to customers who will not resell at stated prices, was made clear in *United States v. Bausch & Lomb Optical Co., 321 U.S. 707, 722*:

"The *Beech-Nut* case recognizes that a simple refusal to sell to others who do not maintain the first seller's fixed resale prices is lawful but adds as to the Sherman Act, 'He [the seller] may not, consistently with the act, go beyond the exercise of this right, and by contracts or combinations, express or implied, unduly hinder or obstruct the free and natural flow of commerce in the channels of interstate trade.' *257 U.S. at 453*. The Beech-Nut Company, without agreements, was found to suppress the freedom of competition by coercion of its customers through special agents of the company, by reports of competitors about customers who violated resale prices, and by boycotts of price cutters. . . ."

**[*43]** ***LEdHN[1]*** [1]*Bausch & Lomb*, like the instant case, was an action by the United States to restrain alleged violations of *§§ 1* and *3* of the Sherman Act. The Court, relying on *Beech-Nut*, held that a distributor, Soft-Lite Lens Company, Inc., violated the Sherman Act when, as was the case with Parke Davis, the refusal to sell to wholesalers was not used simply to induce acquiescence of the wholesalers in the distributor's published resale price list; the wholesalers "accepted Soft-Lite's proffer of a plan of distribution by cooperating in prices, limitation of sales to and approval of retail licensees. That is sufficient. . . . Whether this conspiracy and combination was achieved by agreement or by acquiescence of the wholesalers coupled with assistance in effectuating its purpose is immaterial." *321 U.S., at 723*. **[***515]** Thus, whatever uncertainty previously existed as to the scope of the *Colgate* doctrine, *Bausch & Lomb* and *Beech-Nut* plainly fashioned its dimensions as meaning no more than that a simple refusal to sell to customers who will not resell at prices suggested by the seller is permissible under the Sherman Act. In other words, ***HN4*** an unlawful combination is not just such as arises from a price maintenance *agreement*, express or implied; such a combination is also organized if the producer secures adherence to his suggested prices by means which go beyond his mere declination to sell to a customer who will not observe his announced policy.

***LEdHN[2]*** [2] ***LEdHN[3]*** [3] ***LEdHN[4]*** [4] ***LEdHN[5]*** [5]In the cases decided before *Beech-Nut* the Court's inquiry was directed to whether the manufacturer had entered into illicit contracts, express or implied. The District Court in this case apparently assumed that the Government could prevail only by establishing a contractual arrangement, albeit implied, between Parke Davis and its customers. Proceeding from the same premise Parke Davis strenuously urges that *Rule 52* of the Rules of Civil Procedure compels an affirmance of the **[*44]** District Court since under that Rule the finding that there were no contractual arrangements should "not be set aside unless clearly erroneous." But *Rule 52* has no application here. The District Court premised its ultimate finding that Parke Davis did not violate the Sherman Act on an erroneous interpretation of the standard to be applied. The *Bausch & Lomb* and *Beech-Nut* decisions cannot be read as merely limited to particular fact complexes justifying the inference of an **[**512]** agreement in violation of the Sherman Act. Both cases teach that judicial inquiry is not to stop with a search of the record for evidence of purely contractual arrangements. The Sherman Act ***HN5*** forbids combinations of traders to suppress competition. True, there results the same economic effect as is accomplished by a prohibited combination to suppress price competition if each customer, although induced to do so solely by a manufacturer's announced policy, independently decides to observe specified resale prices. So long as *Colgate* is not overruled, this result is tolerated but only when it is the consequence of a mere refusal to sell in the exercise of the manufacturer's right "freely to exercise his own independent discretion as to parties with whom he will deal." ***HN6*** When the manufacturer's actions, as here, go beyond mere announcement of his policy and the simple refusal to deal, and he employs other means which effect adherence to his resale prices, this countervailing consideration is not present and therefore he has put together a combination in violation of the Sherman Act. Thus, whether an unlawful combination or conspiracy is proved is to be judged by what the parties actually did rather than by the words they used. See *Eastern States Retail Lumber Dealers' Assn*. v. *United States, 234 U.S. 600, 612*. Because of the nature of the District Court's error we are reviewing a question of law, namely, whether the District Court applied the proper standard to essentially undisputed facts. See *Interstate* **[*45]** *Circuit v. United States, 306 U.S. 208*; *United States v. Masonite Corp., 316 U.S. 265*; *United States v. United States Gypsum Co., 333 U.S. 364*; **[***516]** *United States* v. *du Pont, 353 U.S. 586*; and also *United States v. Felin & Co., 334 U.S. 624*; *Great Atlantic & Pacific Tea Co*. v. *Supermarket Equipment Corp., 340 U.S. 147*.

***LEdHN[6]*** [6]The program upon which Parke Davis embarked to promote general compliance with its suggested resale prices plainly exceeded the limitations of the *Colgate* doctrine and under *Beech-Nut* and *Bausch & Lomb* effected arrangements which violated the Sherman Act. Parke Davis did not content itself with announcing its policy regarding retail prices and following this with a simple refusal to have business relations with any retailers who disregarded that policy. Instead Parke Davis used the refusal to deal with the wholesalers in order to elicit their willingness to deny Parke Davis products to retailers and thereby help gain the retailers' adherence to its suggested minimum retail prices. The retailers who disregarded the price policy were promptly cut off when Parke Davis supplied the wholesalers with their names. The large retailer who said he would "abide" by the price policy, the multi-unit Peoples Drug chain, was not cut off. [6] In thus involving the wholesalers to stop the flow of Parke Davis products to the retailers, thereby inducing retailers' adherence to its suggested retail prices, Parke Davis created a combination with the retailers and the wholesalers to maintain retail prices and violated the Sherman Act. Although Parke Davis' originally announced wholesalers' policy would not under *Colgate* have violated the **[*46]** Sherman Act if its action thereunder **[**513]** was the simple refusal without more to deal with wholesalers who did not observe the wholesalers' Net Price Selling Schedule, that entire policy was tainted with the "vice of . . . illegality," cf. *United States v. Bausch & Lomb Optical Co., 321 U.S. 707, 724*, when Parke Davis used it as the vehicle to gain the wholesalers' participation in the program to effectuate the retailers' adherence to the suggested retail prices.

***LEdHN[7]*** [7]***LEdHN[8]*** [8]***LEdHN[9]*** [9]Moreover, Parke Davis also exceeded the "limited dispensation which [*Colgate*] confers," *Times-Picayune Pub. Co*. v. *United States, 345 U.S. 594, 626*, in another way, which demonstrates how far Parke Davis went beyond the limits of the *Colgate* doctrine. With regard to the retailers' suspension of advertising, Parke Davis did not rest with the simple announcement to the trade of its policy in that regard followed by a refusal to sell to the retailers who would not observe it. First it discussed the subject with Dart Drug. When Dart indicated willingness to go along the other retailers were approached and Dart's apparent willingness to cooperate was used as the lever to gain their acquiescence in the program. Having secured those acquiescences Parke Davis returned to Dart Drug with the report of that accomplishment. Not until all this was done was the advertising suspended and sales to all the retailers resumed. In this manner Parke Davis sought assurances of compliance **[***517]** and got them, as well as the compliance itself. It was only by actively bringing about substantial unanimity among the competitors that Parke Davis was able to gain adherence to its policy. It must be admitted that a seller's announcement that he will not deal with customers who do not observe his policy may tend to engender confidence in each customer that if he complies his competitors will also. But if a manufacturer is unwilling to rely on individual self-interest to bring **[*47]** about general voluntary acquiescence which has the collateral effect of eliminating price competition, and takes affirmative action to achieve uniform adherence by inducing each customer to adhere to avoid such price competition, the customers' acquiescence is not then a matter of individual free choice prompted alone by the desirability of the product. The product then comes packaged in a competition-free wrapping -- a valuable feature in itself -- by virtue of concerted action induced by the manufacturer. The manufacturer is thus the organizer of a price-maintenance combination or conspiracy in violation of the Sherman Act. ***HN7*** Under that Act "competition not combination, should be the law of trade," *National Cotton Oil Co*. v. *Texas,*

---

[6] Indeed, if Peoples resumed adherence to the Parke Davis price scale after the interview between its vice-president and Parke Davis' assistant branch manager, p. 34, *supra*, shows that Parke Davis and Peoples entered into a price maintenance agreement, express, tacit or implied, such agreement violated the Sherman Act without regard to any wholesalers' participation.

*197 U.S. 115, 129*, and "a combination formed for the purpose and with the effect of raising, depressing, fixing, pegging, or stabilizing the price of a commodity in interstate or foreign commerce is illegal *per se." United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 223*. And see *United States v. McKesson & Robbins, Inc., 351 U.S. 305*; *Kiefer-Stewart Co.* v. *Seagram & Sons, Inc., 340 U.S. 211*; *Eastern States Retail Lumber Dealers' Assn.* v. *United States, 234 U.S. 600*.

***LEdHN[10]*** [10]The District Court also alternatively rested its judgment of dismissal on the holding that ". . . even if the unlawful conditions alleged in the Complaint had actually been proved, since 1956 they no longer existed, and [there is] no reason to believe, or even surmise, the unlawful acts alleged can possibly be repeated . . . ." *164 F.Supp. 827, 830*.We are of the view that the evidence does not justify any such finding. The District Court stated that "the compelling reason for defendant's so doing [ceasing its efforts] was forced upon it by business and economic conditions in its field." There is no evidence in the record that this was **[**514]** the reason and any such conclusion must rest on speculation. It does not appear even that **[*48]** Parke Davis has announced to the trade that it will abandon the practices we have condemned. So far as the record indicates any reason, it is that Parke Davis stopped its efforts because the Department of Justice had instituted an investigation. The president of Dart Drug Company testified that he had told the Parke Davis representatives in August that he had just been talking to the Department of Justice investigators. He stated that the Parke Davis representatives had said that "they [knew] that the Antitrust Division was investigating them all over town," and that this was one of their reasons for visiting him. The witness testified that it was on this occasion, after the discussion of the investigation, that the Parke Davis representatives finally stated that if Dart would stop advertising, Parke Davis "would resume shipment, in so far as there was an Antitrust investigation going **[***518]** on." Moreover Parke Davis' own employees, who were called by the Government as witnesses at the trial, admitted that they were aware of the investigation at the time and that the investigation was a reason for the discontinuance of the program. It seems to us that if the investigation would prompt Parke Davis to discontinue its efforts, even more so would the litigation which ensued.

***LEdHN[11]*** [11]***LEdHN[12]*** [12]On the record before us the Government is entitled to the relief it seeks. ***HN8*** The courts have an obligation, once a violation of the antitrust laws has been established, to protect the public from a continuation of the harmful and unlawful activities. A trial court's wide discretion in fashioning remedies is not to be exercised to deny relief altogether by lightly inferring an abandonment of the unlawful activities from a cessation which seems timed to anticipate suit. See *United States v. Oregon State Medical Society, 343 U.S. 326, 333*.

The judgment is reversed and the case remanded to the District Court with directions to enter an appropriate **[*49]** judgment enjoining Parke Davis from further violations of the Sherman Act unless the company elects to submit evidence in defense and refutes the Government's right to injunctive relief established by the present record.

*It is so ordered.*

**Concur by:** STEWART

**Concur**

MR. JUSTICE STEWART, concurring.

I concur in the judgment. The Court's opinion amply demonstrates that the present record shows an illegal combination to maintain retail prices. I therefore find no occasion to question, even by innuendo, the continuing validity of the *Colgate* decision, *250 U.S. 300*, or of the Court's ruling as to the jury instruction in *Cudahy*, 256 U.S. 210-211.

**Dissent by:** HARLAN

**Dissent**

MR. JUSTICE HARLAN, whom MR. JUSTICE FRANKFURTER and MR. JUSTICE WHITTAKER join, dissenting.

The Court's opinion reaches much further than at once may meet the eye, and justifies fuller discussion than otherwise might appear warranted. Scrutiny of the opinion will reveal that the Court has done no less than send to its demise the *Colgate* doctrine which has been a basic part of antitrust law concepts since it was first announced in 1919 in *United States v. Colgate, 250 U.S. 300*.

I begin with that doctrine and how it was applied by the District Court in this case. In the words of the Court's opinion, *Colgate* held that in the absence of a monopolistic setting, "a manufacturer, having announced a price maintenance policy, may bring about adherence to it by refusing to deal with customers who do not observe that policy." "And," **[**515]** as said in *Colgate* (at 307), "of course, he may announce in advance the circumstances under which he will refuse to sell."

**[*50]** The Government's complaint, seeking to enjoin alleged violations of *§§ 1* and *3* of the Sherman Act, [1] in substance charged Parke Davis with having combined and conspired with wholesalers and retailers of its products in the District of Columbia and Virginia, in four respects: (1) with retailers, to fix retail prices; **[***519]** (2) with retailers, to suppress advertising of cut prices; (3) with wholesalers, to fix wholesale prices; and (4) with wholesalers, to boycott retail price cutters. The Company's defense was that the activities complained of simply constituted a legitimate exercise of its rights under the *Colgate* doctrine. The detailed findings of the District Court are epitomized in its opinion as follows:

(1) Parke Davis "had well-established policies concerning the prices at which [its] products were to be sold by wholesalers and retailers, and the type of retailers to whom the wholesalers could re-sell"; [2]

(2) Parke Davis' "representatives . . . notified retailers concerning the policy under which its goods must be sold, but the retailers were free either to do without such goods or sell them in accordance with defendant's policy";

(3) Parke Davis' "representatives likewise contacted wholesalers, notifying them of its policy and the wholesalers were likewise free to refuse to comply and thus risk being cut off by the defendant";

(4) "every visit made by the representatives to the retailers and wholesalers was, to each of them, separate and apart from all others";

---

[1] These are the "restraint of trade," not the "monopoly," provisions of the Sherman Act. See Note 1 of the Court's opinion.

[2] Those "authorized by law to fill or dispense prescriptions."

(5) "the evidence is clear that both wholesalers and retailers valued [Parke Davis'] business so highly that they acceded to its policy";

**[*51]** (6) "there was no coercion by defendant and no agreement with [wholesaler or retailer] co-conspirators as alleged in the Complaint";

(7) as to the Government's contention that proof of the alleged conspiracy "is implicit in (1) defendant's calling the attention of both retailers and wholesalers to its policy, and (2) the distributors' acquiescence to the policy . . . the Court cannot agree to such a nebulous deduction from the record before it."

On these premises the District Court concluded: "Clearly, the actions of defendant were properly unilateral and sanctioned by law under the doctrine laid down in the case of *United States v. Colgate & Co., 250 U.S. 300*. . . ."

The Court appears to recognize that as the *Colgate* doctrine was originally understood, the District Court's findings would require affirmance of its judgment here. It is said, however, that reversal is required because *Federal Trade Comm'n v. Beech-Nut Packing Co., 257 U.S. 441*, and *United States v. Bausch & Lomb Optical Co., 321 U.S. 707*, subsequently "narrowly limited" the *Colgate* rule. The claim is that whereas prior to *Beech-Nut* it was considered that, fair trade laws apart, resale price maintenance came within the ban of the Sherman Act only if it was brought about by express or implied agreement between the parties -- which the Court says meant "contractual arrangements" -- *Beech-Nut*, which was carried forward by *Bausch & Lomb*, later established that such agreements or contractual arrangements need not be **[**516]** shown. Recognizing that *§§ 1* and *3* of the Sherman Act explicitly require a "contract, combination . . . or conspiracy," the Court says this requirement is satisfied by conduct which falls short of express or implied agreement, if it goes beyond the seller's mere announcement of terms and his refusal to deal with those who will not comply with them. Concluding that the District **[*52]** Court in the present case mistakenly **[***520]** proceeded solely on the "agreement" view of *Colgate*, it is then said that its findings of fact are not binding on us because they were based on an erroneous legal standard, and that therefore "*Rule 52* has no application here." [3]

I think this reasoning not only misconceives the *Beech-Nut* and *Bausch & Lomb* cases, but also mistakes the premises on which the District Court decided this case, and its actual findings of fact.

*First*. I cannot read *Beech-Nut* or *Bausch & Lomb* as introducing a new narrowing concept into the *Colgate* doctrine. Until today I had not supposed that any informed antitrust practitioner or judge would have had to await *Beech-Nut* to know that the concerted action proscribed by the Sherman Act need not amount to a contractual agreement. But neither do I think it would have been supposed that the Sherman Act does not require concerted action in some form. In *Beech-Nut* itself the Court stated the rule to be that a seller may not restrain trade "by contracts or combinations, express or implied," and there found suppression of competition "by methods in which the company secures the cooperation of its distributors and customers, which are quite as effectual as agreements express or implied intended to accomplish the same purpose." *257 U.S., at 453, 455*. It is obvious that the "methods" thus referred to were the "cooperative methods" which the Federal Trade Commission had found to exist, for the Court expressly limited the Commission's order to the granting of relief against such methods. *Id., 455-456*. Far from

[3] Rule 52 (a), Fed. Rules Civ. Proc. provides in relevant part: "Findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses."

announcing that no concerted action need be shown, the Court accepted the Commission's factual determination that such action did exist.

**[*53]** Similarly, in *Bausch & Lomb*, the District Court had found that Soft-Lite had entered into "agreements with wholesale customers" to fix prices and boycott unlicensed retailers. *321 U.S., at 717*. This Court held that the facts "all amply support, indeed require, the inference of the trial court that a conspiracy to maintain prices down the distribution system existed between the wholesalers and Soft-Lite." *Id., 720*. The Court reiterated that resale price maintenance could not be achieved "by agreement, express or implied." *Id., 721*. In rejecting the applicability of the *Colgate* doctrine, it said that none of the cases applying the doctrine "involve, as the present case does, an agreement between the seller and purchaser to maintain resale prices." *Ibid*. It justified the finding of concerted action on the ground that "the wholesalers accepted Soft-Lite's proffer of a plan of distribution by cooperating in prices, limitation of sales to and approval of retail licensees." *Id., 723*.

The results in *Beech-Nut* and *Bausch & Lomb*, as in all Sherman Act cases, turned on the application of established standards of concerted action to the full sweep of the particular facts in those cases, and not upon any new meaning given to the words "contract, combination . . . **[**517]** or conspiracy." The Court now says that the seller runs afoul of the Sherman Act when he goes beyond mere announcement of his policy and refusal to sell, not because the bare announcement and refusal fall outside the statutory phrase, but because any additional step removes a "countervailing consideration" **[***521]** in favor of permitting a seller to choose his customers. But we are left wholly in the dark as to what the purported new standard is for establishing a "contract, combination . . . or conspiracy."

*Second*. The Court is mistaken in attributing to the District Court the limited view that Parke Davis' activities should, under *Colgate*, be upheld unless they involved some express or implied "contractual arrangement" with **[*54]** wholesalers or retailers. The Government's complaint specifically charged a "combination and conspiracy" between Parke Davis and its wholesale and retail customers in the areas involved, comprising a "continuing agreement, understanding and concert of action" in the four aspects already noted. *Ante*, p. 50. In its 31 detailed findings of fact the District Court repeatedly emphasized that Parke Davis did not have an "agreement or understanding of any kind" with its distributors, and it concluded that the evidence as a whole did not support the Government's allegations. It determined with respect to each of the four facets of the alleged conspiracy that "there was no coercion" and that "Parke, Davis did not combine, conspire or enter into an agreement, understanding or concert of action" with the wholesalers, retailers, or anyone else. I cannot detect in the record any indication that the District Court in making these findings applied anything other than the standard which has always been understood to govern prosecutions based on *§§ 1* and *3* of the Sherman Act.

*Third*. Bearing down heavily on the statement in *Beech-Nut* that the conduct there involved showed more than "the simple refusal to sell," *257 U.S., at 454* (see also *Bausch & Lomb, supra, at 722*), the Court finds that Parke Davis' conduct exceeded the permissible limits of *Colgate* in two respects. The first is that Parke Davis announced that it would, and did, cut off wholesalers who continued to sell to price-cutting retailers. The second is that the Company in at least one instance reported its talks with one or more retailers to other retailers; that in "this manner Parke Davis sought assurances of compliance and got them"; and that it "was only by actively bringing about substantial unanimity among the competitors that Parke Davis was able to gain adherence to its policy."

**[*55]** There are two difficulties with the Court's analysis on these scores. The first is the findings of the District Court. As to refusals to sell to wholesalers, the lower court found that such conduct did not involve any concert of action, but was wholly unilateral on Parke Davis' part. And I cannot see how such unilateral action, permissible in itself, becomes any less unilateral because it is taken simultaneously with similar unilateral action at the retail level. As to the other respect in which the Court holds Parke Davis' conduct was illegal, the District Court found that the Company did not make "the enforcement of its policies as to any one wholesaler or retailer dependent upon the action of any other wholesaler or retailer." And it further stated that the "evidence is clear that both wholesalers and retailers valued defendant's business so highly that they acceded to its policy," and that such acquiescence was not brought about by "coercion" or "agreement." Even if this were not true, so that concerted action among the retailers at the "horizontal" level might be inferred, as the Court indicates, under the principles of *Interstate Circuit, Inc., v. United* **[**518]** *States, 306 U.S. 208*, **[***522]** I do not see how that itself would justify an inference that concerted action at the "vertical" level existed between Parke Davis and the retailers or wholesalers.

The second difficulty with the Court's analysis is that even reviewing the District Court's findings only as a matter of law, as the Court purports to do, the cases do not justify overturning the lower court's resulting conclusions. *Beech-Nut* did not say that refusals to sell to wholesalers who persisted in selling to cut-price retailers -- conduct which was present in that case (*257 U.S., at 448*) -- was a *per se* infraction of the *Colgate* rule, but only that it was offensive if it was the result of cooperative group action. While the Court in *Beech-Nut* and **[*56]** *Bausch & Lomb* inferred from the aggressive, widespread, highly organized, and successful merchandising programs involved there that such concerted action existed in those cases, the defensive, limited, unorganized, and unsuccessful effort of Parke Davis to maintain its resale price policy [4] does not justify our disregarding the District Court's finding to the contrary in this case. [5]

In light of the whole history of the *Colgate* doctrine, it is surely this Court, and not the District Court, that has proceeded on erroneous premises in deciding this case. Unless there is to be attributed to the Court a purpose to overturn the findings of fact of the District Court -- something which its opinion not only expressly disclaims doing, but which would also be in plain defiance of the *Federal Rules of Civil Procedure, Rule 52 (a)*, **[*57]** and principles announced in past cases (see, *e. g.*, *United States v. Yellow Cab Co., 338 U.S. 338, 341-342*; *International Boxing Club of New York, Inc., v. United States, 358 U.S. 242, 252)* -- I think that what the Court has really done here is to throw the *Colgate* doctrine into discard.

To be sure, the Government has explicitly stated that it does not ask us to overrule *Colgate*, and the Court professes not to do so. But contrary to the long understanding of bench and bar, the

---

[4] The District Court found, among other things, that the efforts of Parke Davis in the District of Columbia and Virginia came about only after some of its competitors had engaged in damaging local "deep price cutting" on Parke Davis products (Fdg. 12); that Parke Davis' sales in those areas constituted less than 5% of the total pharmaceutical sales therein (Fdg. 3); that these efforts followed the legal advice previously given by the Company's counsel (Fdg. 12); that Parke Davis did not have "any regularized or systematic machinery for maintaining its suggested minimum prices as to either retailers or wholesalers" (Fdg. 10); that the entire episode lasted only from July to the fall of 1956, when the Company "in good faith" abandoned all further such efforts (Fdgs. 12, 27); and that since that time retailers in these areas "have continuously sold and advertised Parke, Davis products at cut prices, and have been able to obtain those products from both the wholesalers and/or Parke, Davis itself." (Fdg. 27.)

[5] It may be observed that the facts found by the District Court militate more strongly against violation of the Sherman Act than those which formed the basis of the charge held erroneous by this Court in *Cudahy*, 256 U.S., at 210-211. Although the Court now repudiates what was said in *Cudahy* in this respect, I submit that there is nothing in *Beech-Nut, Bausch & Lomb*, or any other case in this Court which justifies this.

Court treats *Colgate* as turning not on the absence of the concerted action explicitly required by *§§ 1* and *3* of the Sherman Act, but upon the Court's notion of "countervailing" social policies. I can regard the Court's profession as no more than a bow to the fact that *Colgate*, decided more than 40 years ago, has become part of the economic regime of the country upon **[***523]** which the commercial community and the lawyers who advise it have justifiably relied.

**[**519]** If the principle for which *Colgate* stands is to be reversed, it is, as the Government's position plainly indicates, something that should be left to the Congress. It is surely the emptiest of formalisms to profess respect for *Colgate* and eviscerate it in application.

I would affirm.

**References**

Annotation References:

Right of manufacturer, producer, or wholesaler to control resale price, 7 ALR 449, 19 ALR 925, 32 ALR 1087, 103 ALR 1331, 125 ALR 1335.

EXHIBIT 296

LexisNexis®
Questioned
As of: August 12, 2014 9:20 AM EDT

**United States v. Philadelphia Nat'l Bank**
Supreme Court of the United States
February 20-21, 1963, Argued ; June 17, 1963, Decided
No. 83

**Reporter:** 374 U.S. 321; 83 S. Ct. 1715; 10 L. Ed. 2d 915; 1963 U.S. LEXIS 2413; 1963 Trade Cas. (CCH) P70,812
UNITED STATES v. PHILADELPHIA NATIONAL BANK ET AL.

**Prior History:** APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA.

**Disposition:** *201 F.Supp. 348*, reversed.

**Core Terms**

merger, acquisition, stock, concentrate, bank merger, consolidate, anti trust law, commerce, national bank, deposit, commercial bank, anticompetitive, largest, proposed merger, antitrust, loophole, currency, merge, lessen competition, banking industry, relevant market, legislative history, customer, corporate acquisition, stock-acquisition, geographical, metropolitan, manufacture, charter, amalgamate

**LexisNexis® Headnotes**

Antitrust & Trade Law > Sherman Act > General Overview

***HN1*** See *15 U.S.C.S. § 1*.

Mergers & Acquisitions Law > Antitrust > Antitrust Statutes > Clayton Act

***HN2*** See *15 U.S.C.S. § 18*.

Antitrust & Trade Law > Regulated Industries > Financial Institutions > General Overview
Antitrust & Trade Law > Regulated Industries > Financial Institutions > Bank Mergers
Banking Law > Commercial Banks > Bank Expansions > Banking Interests
Banking Law > Commercial Banks > Mergers & Consolidations

***HN3*** See *12 U.S.C.S. § 1828(c)*.

Antitrust & Trade Law > Clayton Act > Jurisdiction
Mergers & Acquisitions Law > Antitrust > Antitrust Statutes > Clayton Act
Banking Law > Federal Acts > General Overview
Banking Law > Federal Acts > Federal Trade Commission Act > General Overview
Banking Law > Federal Acts > Federal Trade Commission Act > Scope & Enforcement
Mergers & Acquisitions Law > General Overview

Mergers & Acquisitions Law > Antitrust > General Overview
Mergers & Acquisitions Law > Antitrust > Regulated Industry Mergers
Mergers & Acquisitions Law > Sales of Assets > General Overview

***HN4*** *Section 7* of the Clayton Act, *15 U.S.C.S. § 18*, reaches acquisitions of corporate stock or share capital by any corporation engaged in commerce, but it reaches acquisitions of corporate assets only by corporations subject to the jurisdiction of the Federal Trade Commission (FTC). The FTC, under *§ 5* of the Federal Trade Commission Act, has no jurisdiction over banks. *15 U.S.C.S. §45(a)(6)*.

Mergers & Acquisitions Law > Antitrust > Antitrust Statutes > Clayton Act
Mergers & Acquisitions Law > General Overview
Mergers & Acquisitions Law > Antitrust > General Overview
Mergers & Acquisitions Law > Antitrust > Regulated Industry Mergers

***HN5*** The stock-acquisition provision of *§ 7* of the Clayton Act, *15 U.S.C.S. § 18*, embraces every corporation engaged in commerce, including banks.

Antitrust & Trade Law > Exemptions & Immunities > General Overview

***HN6*** Immunity from the antitrust laws is not lightly implied.

Governments > Legislation > Interpretation

***HN7*** The views of a subsequent Congress form a hazardous basis for inferring the intent of an earlier one.

Antitrust & Trade Law > Exemptions & Immunities > General Overview
Governments > Legislation > Expiration, Repeal & Suspension
Mergers & Acquisitions Law > Antitrust > General Overview
Transportation Law > Air Transportation > Antitrust

***HN8*** Repeals of the antitrust laws by implication from a regulatory statute are strongly disfavored, and are found in cases of plain repugnancy between the antitrust and regulatory provisions.

Administrative Law > Separation of Powers > Primary Jurisdiction
Antitrust & Trade Law > Procedural Matters > Jurisdiction > General Overview
Antitrust & Trade Law > Procedural Matters > Jurisdiction > Primary Jurisdiction

***HN9*** The doctrine of primary jurisdiction requires judicial abstention in cases where protection of the integrity of a regulatory scheme dictates preliminary resort to the agency which administers the scheme.

Antitrust & Trade Law > Regulated Industries > Financial Institutions > General Overview
Mergers & Acquisitions Law > Antitrust > Antitrust Statutes > Clayton Act
Banking Law > Commercial Banks > Bank Expansions > General Overview
Banking Law > Commercial Banks > Mergers & Consolidations
Mergers & Acquisitions Law > Antitrust > General Overview
Mergers & Acquisitions Law > Antitrust > Regulated Industry Mergers

***HN10*** The tests of illegality under the Sherman Act, *15 U.S.C.S. §§ 1*, *2*, and the Clayton Act, *15 U.S.C.S. § 15*, are complementary. The public policy announced by *§ 7* of the Clayton Act, *15*

U.S.C.S. §18, is to be taken into consideration in determining whether acquisition of assets violates the prohibitions of the Sherman Act against unreasonable restraints.

Mergers & Acquisitions Law > Antitrust > Antitrust Statutes > General Overview
Mergers & Acquisitions Law > Antitrust > Antitrust Statutes > Clayton Act
Mergers & Acquisitions Law > Antitrust > General Overview
Mergers & Acquisitions Law > Antitrust > Market Definition

***HN11*** The statutory test of whether a proposed merger is lawful under § 7 of the Clayton Act, 15 U.S.C.S § 18, is whether the effect of the merger may be substantially to lessen competition in any line of commerce in any section of the country.

Mergers & Acquisitions Law > Antitrust > Antitrust Statutes > Clayton Act
Mergers & Acquisitions Law > General Overview
Mergers & Acquisitions Law > Antitrust > General Overview
Mergers & Acquisitions Law > Antitrust > Market Definition
Mergers & Acquisitions Law > Antitrust > Regulated Industry Mergers

***HN12*** The proper question to be asked in determination of the appropriate section of the country is not where the parties to the merger do business or even where they compete, but where, within the area of competitive overlap, the effect of the merger on competition will be direct and immediate. This depends upon the geographic structure of supplier-customer relations. The area of effective competition in the known line of commerce must be chartered by careful selection of the market area in which the seller operates, and to which the purchaser can practicably turn for supplies.

Mergers & Acquisitions Law > Antitrust > Antitrust Statutes > Clayton Act
Mergers & Acquisitions Law > General Overview
Mergers & Acquisitions Law > Antitrust > General Overview
Mergers & Acquisitions Law > Antitrust > Market Definition

***HN13*** The determination of whether the effect of a merger may be to substantially lessen competition in the relevant market requires not merely an appraisal of the immediate impact of the merger upon competition, but a prediction of its impact upon competitive conditions in the future. Such a prediction is sound only if it is based upon a firm understanding of the structure of the relevant market; yet the relevant economic data are both complex and elusive. Unless businessmen can assess the legal consequences of a merger with some confidence, sound business planning is retarded. The courts must be alert to the danger of subverting congressional intent by permitting a too-broad economic investigation. In any case in which it is possible, without doing violence to the congressional objective embodied in § 7 of the Clayton Act, 15 U.S.C.S. § 18, to simplify the test of illegality, the courts ought to do so in the interest of sound and practical judicial administration.

Mergers & Acquisitions Law > Antitrust > Antitrust Statutes > Clayton Act
Mergers & Acquisitions Law > General Overview
Mergers & Acquisitions Law > Antitrust > General Overview
Mergers & Acquisitions Law > Antitrust > Market Definition
Mergers & Acquisitions Law > Antitrust > Remedies

***HN14*** A merger which produces a firm controlling an undue percentage share of the relevant market, and results in a significant increase in the concentration of firms in that market, is so inherently likely to lessen competition substantially that it must be enjoined in the absence of evidence clearly showing that the merger is not likely to have such anticompetitive effects.

Mergers & Acquisitions Law > Antitrust > Antitrust Statutes > Clayton Act

***HN15*** The test of a competitive market is not only whether small competitors flourish but also whether consumers are well served.

**Lawyers' Edition Display**

**Summary**

Two Philadelphia banks, both engaged in interstate commerce, one organized under the laws of the United States and the other under Pennsylvania law, proposed a merger. In accordance with the Bank Merger Act of 1960 (*12 USC 1828(c)*), an application for approval of the merger was filed with, and approved by, the Comptroller of the Currency. The United States then brought the present civil action in the United States District Court for the Eastern District of Pennsylvania to enjoin the merger as violating 1 of the Sherman Act and 7 of the Clayton Act (*15 USC 18*), which in its pertinent part prohibits the acquisition by one corporation of the stock of another where in any line of commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly. After trial, the District Court dismissed the action with prejudice. (*201 F Supp 348*.)

On appeal, the United States Supreme Court reversed with direction to enter judgment enjoining the proposed merger. In an opinion by Brennan, J., expressing the views of five members of the Court, it was held that the merger violated 7 of the Clayton Act. This decision was rested on the grounds that 7 was applicable to bank mergers, that the Bank Merger Act of 1960 did not immunize mergers approved thereunder by the appropriate administrative agencies from challenge under the federal antitrust laws, and that 7 was violated because the merger, if realized, would result in a single bank's controlling at least 30 percent of the commercial bank business in the four-county Philadelphia metropolitan area.

Harlan, J., joined by Stewart, J., dissented on the ground that 7 of the Clayton Act did not apply to a bank merger.

Goldberg, J., in a memorandum, agreed with the view expressed in the dissenting opinion by Harlan, J., but made it clear that he did not necessarily dissent from the judgment of the Court invalidating the merger, because the result might be justified under the Sherman Act, expressing, however, no ultimate conclusion concerning the latter issue.

White, J., did not participate.

**Headnotes**

RESTRAINTS OF TRADE, MONOPOLIES, AND UNFAIR TRADE PRACTICES §34.5 > merger of banks -- injunctive relief. --

***LEdHN[1A]*** [1A]***LEdHN[1B]*** [1B]

The merger of two banks resulting in a single bank's controlling at least 30 percent of the commercial bank business in the four-county Philadelphia metropolitan area must be enjoined because forbidden by 7 of the Clayton Act (*15 USC 18*), prohibiting the acquisition by a corporation engaged in commerce of stock of another corporation so engaged, where in any line of commerce in any section of the country the effect of such acquisition may be substantially to lessen competition.

BANKS §3.5 > consolidation -- merger. --

***LEdHN[2]*** [2]

A consolidation of two banks exists where the resulting bank is a different entity from either of the constituent banks; in a merger one bank disappears in the other surviving bank.

RESTRAINTS OF TRADE, MONOPOLIES, AND UNFAIR TRADE PRACTICES §35 > acquisition by bank of assets of other bank. --

***LEdHN[3]*** [3]

In view of 5 of the Federal Trade Commission Act, (*15 USC 45 (a)(6)*), exempting banks from the jurisdiction of the Federal Trade Commission, the acquisition by one bank of the assets of another is not within 7 of the Clayton Act (*15 USC 18*), providing that no corporation subject to the jurisdiction of the Federal Trade Commission shall acquire the whole or any part of the assets of another corporation where in any line of commerce in any section of the country the effect of such acquisition may be substantially to lessen competition or to tend to create a monopoly.

RESTRAINTS OF TRADE, MONOPOLIES, AND UNFAIR TRADE PRACTICES §86 > banks -- jurisdiction of Federal Trade Commission. --

***LEdHN[4]*** [4]

No jurisdiction over banks is conferred upon the Federal Trade Commission by 11 of the amended Clayton Act (*15 USC 21*), providing that authority to enforce compliance with 2, 3, 7, and 8 of the act by persons respectively subject thereto is vested in the Federal Reserve Board where applicable to banks, and in the Federal Trade Commission where applicable to "all other character of commerce"; bank mergers do not fall into the residual category of "all other character of commerce."

RESTRAINTS OF TRADE, MONOPOLIES, AND UNFAIR TRADE PRACTICES §22 > banking as commerce. --

***LEdHN[5]*** [5]

Banking is, where the operations stretch across state lines, commerce within the meaning of 7 of the Clayton Act (*15 USC 18*), directed against the acquisition by one corporation engaged in commerce of the stock or assets of another corporation so engaged.

RESTRAINTS OF TRADE, MONOPOLIES, AND UNFAIR TRADE PRACTICES §86 > RESTRAINTS OF TRADE, MONOPOLIES, AND UNFAIR TRADE PRACTICES §103 > remedial powers of FTC. --

***LEdHN[6]*** [6]

The question of the Federal Trade Commission's remedial powers under 11 of the Clayton Act (*15 USC 21*) regarding violations of the act is to be distinguished from that of its remedial powers

under 5 of the Federal Trade Commission Act (*15 USC 45(b)*); the Commission has no power to order divestiture in 5 proceedings.

RESTRAINTS OF TRADE, MONOPOLIES, AND UNFAIR TRADE PRACTICES §34.5 > stock acquisition -- assets acquisition -- merger. --

***LEdHN[7]*** [7]

Read together, the stock-acquisition and assets-acquisition provisions of 7 of the Clayton Act (*15 USC 18*)--providing that no corporation engaged in commerce shall acquire the stock or other share capital and no corporation subject to the jurisdiction of the Federal Trade Commission shall acquire the assets of another corporation so engaged, where the effect of such acquisition may be substantially to lessen competition or to tend to create a monopoly--reach mergers, which fit neither category perfectly but lie somewhere between the two ends of the spectrum; so construed, the specific exception for acquiring corporations not subject to the Commission's jurisdiction excludes from the coverage of 7 only assets acquisitions by such corporations when not accomplished by merger.

RESTRAINTS OF TRADE, MONOPOLIES, AND UNFAIR TRADE PRACTICES §20 > RESTRAINTS OF TRADE, MONOPOLIES, AND UNFAIR TRADE PRACTICES §86 > bank mergers -- jurisdiction of administrative agencies to enforce 7 of Clayton Act. --

***LEdHN[8]*** [8]

The Bank Merger Act of 1960 (*12 USC 1828 (c)*), assigning roles in merger applications to the Federal Deposit Insurance Corporation and the Comptroller of the Currency as well as to the Federal Reserve Board, supplants whatever authority the Federal Reserve Board may have acquired under 11 of the Clayton Act (*15 USC 21*), by virtue of the 1950 amendment of 7 thereof (*15 USC 18*), to enforce the stock- acquisition provisions of 7 against bank mergers; since the Bank Merger Act applies only to mergers, consolidations, acquisitions of assets, and assumptions of liabilities, but not to outright stock acquisitions, the Federal Reserve Board's authority under 11, as it existed before the 1950 amendment (64 Stat 1125) of 7 of the Clayton Act, remains unaffected.

RESTRAINTS OF TRADE, MONOPOLIES, AND UNFAIR TRADE PRACTICES §34.5 > stock-acquisition provision -- assets-acquisition provision -- merger. --

***LEdHN[9]*** [9]

Though re-enacted in haec verba by the 1950 amendment (64 Stat 1125), the stock-acquisition provision of 7 of the Clayton Act (*15 USC 18*)--providing that no corporation engaged in commerce shall acquire the stock and no corporation subject to the jurisdiction of the Federal Trade Commission shall acquire the assets of another corporation so engaged, where the effect of such acquisition may be substantially to lessen competition or to tend to create a monopoly--must be deemed expanded in its new context to include, at the very least, acquisitions by merger or consolidation, transactions which entail a transfer of stock of the parties, while the assets-acquisition provision clearly reaches corporate acquisitions involving no such transfer.

RESTRAINTS OF TRADE, MONOPOLIES, AND UNFAIR TRADE PRACTICES §6 > purpose of amended 7 of Clayton Act. --

***LEdHN[10]*** [10]

The objective of including the phrase "corporation subject to the jurisdiction of the Federal Trade Commission" in 7 of the Clayton Act (*15 USC 18*), as amended in 1950 (64 Stat 1125)--providing that no corporation engaged in commerce shall acquire the stock and no corporation subject to the jurisdiction of the Federal Trade Commission shall acquire the assets of another corporation so engaged, where the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly--is not to limit the amalgamations to be covered by the amended statute but to make explicit the role of the Federal Trade Commission in administering the section.

RESTRAINTS OF TRADE, MONOPOLIES, AND UNFAIR TRADE PRACTICES §7 > immunity. --

***LEdHN[11]*** [11]

Immunity from the antitrust laws is not lightly implied.

STATUTES §151.5 > STATUTES §155 > administrative construction -- views of members of Congress. --

***LEdHN[12]*** [12]

The construction of the amended 7 of the Clayton Act (*15 USC 18*) as applicable to bank mergers is not foreclosed because, after the passage of the amendment, some members of Congress, and for a time the Justice Department, voiced a contrary view.

EVIDENCE §167 > inferences -- congressional intent. --

***LEdHN[13]*** [13]

The views of a subsequent Congress form a hazardous basis for inferring the intent of an earlier one.

EVIDENCE §167 > STATUTES §154 > inferences -- congressional intent -- Clayton Act -- Bank Merger Act. --

***LEdHN[14]*** [14]

The views of Congress in enacting the Bank Merger Act of 1960 (*12 USC 1828(c)*) form a hazardous basis for inferring the intent of Congress in enacting the 1950 amendment (64 Stat 1125) of 7 of the Clayton Act (*15 USC 18*), even though misunderstanding of the scope of 7 may have played some part in the passage of the 1960 act; the design fashioned in the Bank Merger Act being predicated upon uncertainty as to the scope of 7, the court may, in construing that scope, dispel the uncertainty.

BANKS §3.5 > RESTRAINTS OF TRADE, MONOPOLIES, AND UNFAIR TRADE PRACTICES §20 > mergers -- immunity from antitrust laws. --

***LEdHN[15A]*** [15A]***LEdHN[15B]*** [15B]

By directing the appropriate banking agencies to consider competitive factors before approving mergers, the Bank Merger Act of 1960 (*12 USC 1828(c)*) does not immunize approved mergers from challenge under the federal antitrust laws, the act not requiring such agencies either to give competitive factors any particular weight or to hold a hearing before approving an application for merger, and there being no specific provision for judicial review of the administrative decision.

APPEAL §1092 > waiver of error in appellate court. --

***LEdHN[16]*** [16]

Although appellees' contention below that the Bank Merger Act (*12 USC 1828(c)*), by directing the appropriate banking agencies to consider competitive factors before approving mergers, immunizes approved mergers from challenge under the federal antitrust laws, was abandoned on appeal, the United States Supreme Court will consider this contention because it touches the proper relations of the judicial and administrative spheres.

STATUTES §248.5 > implied repeal -- antitrust laws. --

***LEdHN[17]*** [17]

Repeals of the antitrust laws by implication from a regulatory statute are strongly disfavored, and will be found only in cases of plain repugnancy between the antitrust and regulatory provisions.

ADMINISTRATIVE LAW §322 > primary jurisdiction. --

***LEdHN[18]*** [18]

The doctrine of "primary jurisdiction" requires judicial abstention in cases where protection of the integrity of a regulatory scheme dictates preliminary resort to the agency which administers the scheme; court jurisdiction is not thereby ousted, but only postponed.

ADMINISTRATIVE LAW §324 > RESTRAINTS OF TRADE, MONOPOLIES, AND UNFAIR TRADE PRACTICES §68 > bank merger -- primary administrative jurisdiction. --

***LEdHN[19]*** [19]

Decision of the question whether a bank merger violates 7 of the Clayton Act (*15 USC 18*) and hence is enjoinable is not subject to postponement under the doctrine of primary administrative jurisdiction, where there may be no power of judicial review of the decision of the appropriate administrative agency approving the merger, and such approval does not in any event confer immunity from the antitrust laws, and moreover, even if the doctrine were applicable, the action would not be barred since the agency proceeding was completed before the action was commenced.

RESTRAINTS OF TRADE, MONOPOLIES, AND UNFAIR TRADE PRACTICES §20 > effect of Bank Merger Act. --

***LEdHN[20]*** [20]

The Bank Merger Act of 1960 (*12 USC 1828(c)*) is not intended to extinguish other sources of federal restraint of bank acquisitions having anticompetitive effects.

RESTRAINTS OF TRADE, MONOPOLIES, AND UNFAIR TRADE PRACTICES §34.5 > mergers. --

***LEdHN[21]*** [21]

The Sherman Act forbids mergers effecting an unreasonable restraint of trade.

RESTRAINTS OF TRADE, MONOPOLIES, AND UNFAIR TRADE PRACTICES §5 > Sherman Act -- Clayton Act. --

***LEdHN[22]*** [22]

The Clayton and Sherman Acts do not embody approaches to antitrust policy inconsistent with or unrelated to each other; the tests of illegality under both acts are complementary.

RESTRAINTS OF TRADE, MONOPOLIES AND UNFAIR TRADE PRACTICES §7 > construction of federal legislation -- acquisition of stock. --

***LEdHN[23]*** [23]

The public policy announced by 7 of the Clayton Act, which is directed against the acquisition by one corporation of the stock or assets of another corporation, is to be taken into consideration in determining whether acquisition of assets violates the prohibitions of the Sherman Act against unreasonable restraints, even though not every violation of 7 of the Clayton Act is necessarily a violation of the Sherman Act.

RESTRAINTS OF TRADE, MONOPOLIES, AND UNFAIR TRADE PRACTICES §34.5 > bank merger -- line of commerce. --

***LEdHN[24]*** [24]

The cluster of products (various kinds of credit) and services (such as checking accounts and trust administration) denoted by the term "commercial banking" composes a distinct line of commerce within the meaning of 7 of the Clayton Act (*15 USC 18*), prohibiting the acquisition by one corporation of the stock or assets of another corporation where "in any line of commerce" the effect of such acquisition may be substantially to lessen competition or to tend to create a monopoly.

RESTRAINTS OF TRADE, MONOPOLIES, AND UNFAIR TRADE PRACTICES §34.5 > bank merger -- lessening of competition -- appropriate "section of the country." --

***LEdHN[25]*** [25]

In determining the appropriate "section of the country" within the meaning of 7 of the Clayton Act (*15 USC 18*), which prohibits the acquisition by one corporation of the stock of another corporation where in any line of commerce "in any section of the country" the effect of such acquisition may be substantially to lessen competition, the proper question to be asked is not where the banks which are parties to a merger do business or even where they compete, but where, within the area of competitive overlap, the effect of the merger on competition will be direct and immediate; this depends upon the geographic structure of supplier-customer relations.

RESTRAINTS OF TRADE, MONOPOLIES, AND UNFAIR TRADE PRACTICES §34.5 > merger -- area of effective competition. --

***LEdHN[26]*** [26]

In determining whether a merger violates 7 of the Clayton Act (*15 USC 18*), prohibiting the acquisition by one corporation of the assets of another where "in any line of commerce in any section of the country" the effect of such acquisition may be substantially to lessen competition, the area of effective competition in a known line of commerce must be chartered by careful selection of the market area in which the seller operates, and to which the purchaser can practicably turn for supplies.

RESTRAINTS OF TRADE, MONOPOLIES, AND UNFAIR TRADE PRACTICES §34.5 > bank mergers -- lessening competition -- area. --

***LEdHN[27]*** [27]

The four-county Philadelphia metropolitan area, which state law recognizes as a meaningful banking community in allowing Philadelphia banks to branch within it, and which would seem roughly to delineate the area in which bank customers who are neither very large nor very small find it practical to do their banking business, is--for the purposes of 7 of the Clayton Act (*15 USC 18*), prohibiting the acquisition by one corporation of the stock of another where in any line of commerce in any section of the country the effect of such acquisition may be substantially to lessen competition--a more appropriate "section of the country" in which to appraise the merger of two Philadelphia banks than any larger or smaller or different area; this conclusion is fortified by the fact that three federal banking agencies regard the area in which banks have their offices as an "area of effective competition."

RESTRAINTS OF TRADE, MONOPOLIES, AND UNFAIR TRADE PRACTICES §34.5 > merger -- impact on competition. --

***LEdHN[28]*** [28]

Determination of the question whether the effect of a merger "may be substantially to lessen competition" in the relevant market, so as to bring the merger within the prohibition of 7 of the Clayton Act (*15 USC 18*), requires not merely an appraisal of the immediate impact of the merger upon competition, but a prediction of its impact upon competitive conditions in the future; such a prediction is sound only if it is based upon a firm understanding of the structure of the relevant market.

RESTRAINTS OF TRADE, MONOPOLIES, AND UNFAIR TRADE PRACTICES §34 > acquisition of stock and assets of corporation -- simplification of test of illegality. --

***LEdHN[29]*** [29]

In any case in which it is possible, without doing violence to the congressional objective embodied in 7 of the Clayton Act (*15 USC 18*)--prohibiting the acquisition by one corporation of the stock or assets of another corporation where in any line of commerce in any section of the country the effect of such acquisition may be substantially to lessen competition--to simplify the test of illegality, the courts ought to do so in the interest of sound and practical judicial administration.

EVIDENCE §343.5 > RESTRAINTS OF TRADE, MONOPOLIES, AND UNFAIR TRADE PRACTICES §34.5 > merger -- illegality -- burden of proof. --

***LEdHN[30]*** [30]

Under 7 of the Clayton Act (*15 USC 18*), prohibiting the acquisition by one corporation of the stock of another where the effect of such acquisition may be substantially to lessen competition, a merger which produces a firm control of an undue percentage share of the relevant market, and results in a significant increase in the concentration of firms in that market, is so inherently likely to lessen competition substantially that it must be enjoined in the absence of evidence clearly showing that the merger is not likely to have such anticompetitive effects; such a test lightens

the burden of proving illegality only with respect to mergers whose size makes them inherently suspect in the light of Congress' design in 7 to prevent undue concentration.

RESTRAINTS OF TRADE, MONOPOLIES, AND UNFAIR TRADE PRACTICES §34.5 > merger -- integration by contract. --

***LEdHN[31]*** [31]

Integration by a corporate merger is more suspect as violating the antitrust laws than integration by contract, because of the greater permanence of the former.

EVIDENCE §979 > weight -- in antitrust case involving bank merger. --

***LEdHN[32A]*** [32A]***LEdHN[32B]*** [32B]

In a suit to enjoin the merger of two Philadelphia commercial banks as violating 7 of the Clayton Act (*15 USC 18*) in which there is nothing in the record to rebut the inherently anticompetitive tendency manifested by the percentages of the business which would be controlled by the bank resulting from the merger, testimony by bank officers to the effect that competition among banks in Philadelphia was vigorous and would continue to be so after the merger is entitled to little weight, in view of the witnesses' failure to give concrete reasons for their conclusions, and of equally little value are the assurances offered by bank witnesses that customers dissatisfied with the services of the resulting bank may readily turn to the 40 other banks in the Philadelphia area; that some of the bank officers who testified represented small banks in competition with defendants does not substantially enhance the probative value of their testimony.

RESTRAINTS OF TRADE, MONOPOLIES, AND UNFAIR TRADE PRACTICES §14 > competitive market -- test. --

***LEdHN[33]*** [33]

For the purposes of the antitrust laws, the test of a competitive market is not only whether the competitors flourish but also whether the consumers are well served; congressional concern is with the protection of competition, not competitors.

RESTRAINTS OF TRADE, MONOPOLIES, AND UNFAIR TRADE PRACTICES §11 > coverage of antitrust laws -- commercial banking. --

***LEdHN[34]*** [34]

Commercial banking is not, because it is subject to a high degree of governmental regulation or because it deals in the intangibles of credit and services rather than in the manufacture or sale of tangible commodities, immune from the anticompetitive effects of undue concentration.

RESTRAINTS OF TRADE, MONOPOLIES, AND UNFAIR TRADE PRACTICES §34.5 > bank merger -- justifications. --

***LEdHN[35A]*** [35A]***LEdHN[35B]*** [35B]

A bank merger otherwise falling within the prohibitions of 7 of the Clayton Act (*15 USC 18*) cannot be justified on the grounds that only through mergers can banks follow their customers to suburbs and retain their business, or that the increased lending limit of the resulting bank will enable it to compete with large out-of-state banks for very large loans, or that the area in which

the banks operate needs a bank larger than it presently has in order to bring business to the area and stimulate its economic development.

RESTRAINTS OF TRADE, MONOPOLIES, AND UNFAIR TRADE PRACTICES §14 > effects of competition. --

***LEdHN[36]*** [36]

Anticompetitive effects in one market cannot be justified by procompetitive consequences in another.

RESTRAINTS OF TRADE, MONOPOLIES, AND UNFAIR TRADE PRACTICES §17 > RESTRAINTS OF TRADE, MONOPOLIES, AND UNFAIR TRADE PRACTICES §34.5 > merger. --

***LEdHN[37]*** [37]

A corporate merger the effect of which "may be substantially to lessen competition" is not saved because, on some ultimate reckoning of social or economic debits and credits, it may be deemed beneficial; 7 of the Clayton Act (*15 USC 18*) proscribes anticompetitive mergers, the benign and the malignant alike.

RESTRAINTS OF TRADE, MONOPOLIES, AND UNFAIR TRADE PRACTICES §34.5 > bank mergers -- justification. --

***LEdHN[38]*** [38]

*Section 7* of the Clayton Act (*15 USC 18*), as applied to prohibit bank mergers, does not mandate cutthroat competition in the banking industry, and does not exclude defenses based on dangers to liquidity or solvency, if to avert them a merger is necessary; it does require, however, that the forces of competition be allowed to operate within the broad framework of governmental regulation of the industry, and the fact that banking is a highly regulated industry critical to the nation's welfare makes the play of competition not less important but more so.

**Syllabus**

Appellees, a national bank and a state bank, are the second and third largest of the 42 commercial banks in the metropolitan area consisting of Philadelphia and its three contiguous counties, and they have branches throughout that area. Appellees' boards of directors approved an agreement for their consolidation, under which the national bank's stockholders would retain their stock certificates, which would represent shares in the consolidated bank, while the state bank's stockholders would surrender their shares in exchange for shares in the consolidated bank. After obtaining reports, as required by the Bank Merger Act of 1960, from the Board of Governors of the Federal Reserve System, the Federal Deposit Insurance Corporation and the Attorney General, all of whom advised that the proposed merger would substantially lessen competition in the area, the Comptroller of the Currency approved it. The United States sued to enjoin consummation of the proposed consolidation, on the ground, *inter alia*, that it would violate *§ 7* of the Clayton Act. *Held* : The proposed consolidation of appellee banks is forbidden by *§ 7* of the Clayton Act, and it must be enjoined. Pp. 323-372.

1. By the amendments to *§ 7* of the Clayton Act enacted in 1950, Congress intended to close a loophole in the original section by broadening its scope so as to cover the entire range of corporate

amalgamations, from pure stock acquisitions to pure acquisitions of assets, and it did not intend to exclude bank mergers. Pp. 335-349.

2. The Bank Merger Act of 1960, by directing the banking agencies to consider competitive factors before approving mergers, did not immunize mergers approved by them from operation of the federal antitrust laws; and the doctrine of primary jurisdiction is not applicable here. *California v. Federal Power Commission, 369 U.S. 482*. Pp. 350-355.

3. The proposed consolidation of appellee banks would violate *§ 7* of the Clayton Act, and it must be enjoined. Pp. 355-372.

(a) The "line of commerce" here involved is commercial banking. Pp. 355-357.

(b) The "section of the country" which is relevant here is the metropolitan area consisting of Philadelphia and its three contiguous counties. Pp. 357-362.

(c) The consolidated bank would control such an undue percentage share of the relevant market (at least 30%) and the consolidation would result in such a significant increase in the concentration of commercial banking facilities in the area (33%) that the result would be inherently likely to lessen competition substantially, and there is no evidence in the record to show that it would not do so. Pp. 362-367.

(d) The facts that commercial banking is subject to a high degree of governmental regulation and that it deals with the intangibles of credit and services, rather than in the manufacture or sale of tangible commodities, do not immunize it from the anticompetitive effects of undue concentration. Pp. 368-370.

(e) This proposed consolidation cannot be justified on the theory that only through mergers can banks follow their customers to the suburbs and retain their business, since this can be accomplished by establishing new branches in the suburbs. P. 370.

(f) This proposed consolidation cannot be justified on the ground that the increased lending limit would enable the consolidated bank to compete with the large out-of-state banks, particularly the New York banks, for very large loans. Pp. 370-371.

(g) This proposed consolidation cannot be justified on the ground that Philadelphia needs a bank larger than it now has in order to bring business to the area and stimulate its economic development. P. 371.

(h) This Court rejects appellees' pervasive suggestion that application of the procompetitive policy of *§ 7* to the banking industry will have dire, although unspecified, consequences for the national economy. Pp. 371-372.

**Counsel:** Assistant Attorney General Loevinger argued the cause for the United States. With him on the briefs were Solicitor General Cox, Charles H. Weston, George D. Reycraft, Lionel Kestenbaum and Melvin Spaeth.

Philip Price and Arthur Littleton argued the cause for appellees. With them on the brief were Ernest R. von Starck, Donald A. Scott, Carroll R. Wetzel, John J. Brennan and Minturn T. Wright III.

**Judges:** Warren, Black, Clark, Harlan, Brennan, Stewart, Goldberg; White took no part in the consideration or decision of this case.

**Opinion by:** BRENNAN

**Opinion**

**[*323]** **[***921]** **[**1720]** MR. JUSTICE BRENNAN delivered the opinion of the Court.

***LEdHN[1A]*** [1A]

The United States, appellant here, brought this civil action in the United States District Court for the Eastern District of Pennsylvania under *§ 4* of the Sherman Act, *15 U. S. C. § 4*, and *§ 15* of the Clayton Act, *15 U. S. C. § 25*, to enjoin a proposed merger of The Philadelphia National Bank (PNB) and Girard Trust Corn Exchange Bank (Girard), appellees here. The complaint charged violations of *§ 1* of the Sherman Act, *15 U. S. C. § 1*, and **[***922]** *§ 7* of the Clayton Act, *15 U. S. C. § 18*. [1] From a judgment for appellees after trial, see *201 F.Supp. 348*, the United States appealed to this Court under § 2 of the Expediting Act, *15 U. S. C. § 29*. Probable jurisdiction was noted. *369 U.S. 883*. We reverse the judgment of the District Court. We hold that the merger of appellees is forbidden by *§ 7* of the **[*324]** Clayton Act and so must be enjoined; we need not, and therefore do not, reach the further question of alleged violation of *§ 1* of the Sherman Act.

I. THE FACTS AND PROCEEDINGS BELOW.

A. *The Background: Commercial Banking in the United States*.

Because this is the first case which has required this Court to consider the application of the antitrust laws to the commercial banking industry, and because aspects of the industry and of the degree of governmental regulation of it will recur throughout our discussion, we deem it appropriate to begin with a brief background description. [2]

---

[1] *Section 1* of the Sherman Act provides in pertinent part: ***HN1*** "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal." Section 7 of the Clayton Act, as amended in 1950 by the Celler-Kefauver Antimerger Act, provides in pertinent part: ***HN2*** "No corporation engaged in commerce shall acquire, directly or indirectly, the whole or any part of the stock or other share capital and no corporation subject to the jurisdiction of the Federal Trade Commission shall acquire the whole or any part of the assets of another corporation engaged also in commerce, where in any line of commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly."

[2] The discussion in this portion of the opinion draws upon undisputed evidence of record in the case, supplemented by pertinent reference materials. See Board of Govs. of the Fed. Res. System, Financing Small Business (Comm. print 1958); The Federal Reserve System (3d ed. 1954); Concentration of Banking in the United States (Comm. print 1952); Bogen, The Competitive Position of Commercial Banks (1959); Commission on Money and Credit, Money and Credit (1961); Freeman, The Problems of Adequate Bank Capital (1952); Hart, Money, Debt, and Economic Activity (2d ed. 1953); Lent, The Changing Structure of Commercial Banking (1960); Savers, Modern Banking (5th ed. 1960); Staff of House Select Comm. on Small Business, 86th Cong., 2d Sess., Banking Concentration and Small Business (1960); U.S. Attorney General's Comm. on Administrative Procedure, Federal Control of Banking (S. Doc. No. 186, 76th Cong., 3d Sess., 1940); Fox, Supervision of Banking by the Comptroller of the Currency, in Public Administration and Policy Formation (Redford ed. 1956), 117; Stokes, Public Convenience and Advantage in Applications for New Banks and Branches, 74 Banking L. J. 921 (1957). For materials which focus specifically on the question of competition in the banking industry, see also Alhadeff, Monopoly and Competition in Banking (1954); Chapman, Concentration of Banking (1934); Horvitz, Concentration and Competition in New England Banking (1958); Lawrence, Banking Concentration in the United States (1930); Berle, Banking Under the Anti-Trust Laws, 49 Col. L. Rev. 589 (1949); Chandler, Monopolistic Elements in Commercial Banking, 46 J. Pol. Econ. 1 (1938); Gruis, Antitrust Laws and Their Application to Banking, 24 Geo. Wash. L. Rev. 89 (1955); Funk, Antitrust Legislation Affecting Bank Mergers, 12 Bus. Law. 496 (1957); Klebaner,

**[*325]** Commercial **[**1721]** banking in this country is primarily unit banking. That is, control of commercial banking is **[***923]** diffused throughout a very large number of independent, local banks -- 13,460 of them in 1960 -- rather than concentrated in a handful of nationwide banks, as, for example, in England and Germany. There are, to be sure, in addition to the independent banks, some 10,000 branch banks; but branching, which is controlled largely by state law -- and prohibited altogether by some States -- enables a bank to extend itself only to state lines and often not that far. [3] It is also the case, of course, that many banks place loans and solicit deposits outside their home area. But with these qualifications, it remains true that ours is essentially a decentralized system of community banks. Recent years, however, have witnessed a definite trend toward concentration. Thus, during the decade ending in 1960 the number of commercial banks in the United **[*326]** States declined by 714, despite the chartering of 887 new banks and a very substantial increase in the Nation's credit needs during the period. Of the 1,601 independent banks which thus disappeared, 1,503, with combined total resources of well over $ 25,000,000,000, disappeared as the result of mergers.

Commercial banks are unique among financial institutions in that they alone are permitted by law to accept demand deposits. This distinctive power gives commercial banking a key role in the national economy. For banks do not merely deal in, but are actually a source of, money and credit; when a bank makes a loan by crediting the borrower's demand deposit account, it augments the Nation's credit supply. [4] Furthermore, the power to accept demand deposits makes banks the intermediaries in most financial transactions (since transfers of substantial moneys are almost always by check rather than by cash) and, concomitantly, the repositories of very substantial individual and corporate funds. The banks' use of these funds is conditioned by the fact that their working capital consists very largely of demand deposits, which makes liquidity the guiding principle of bank lending and investing policies; thus it is that banks are the chief source of the country's short-term business credit.

Banking operations are varied and complex; "commercial banking" describes a congeries of services and credit devices. [5] But among **[***924]** them the creation of additional **[*327]** money and credit, the management **[**1722]** of the checking-account system, and the furnishing of

---

Federal Control of Commercial Bank Mergers, 37 Ind. L. J. 287 (1962); Wemple and Cutler, The Federal Bank Merger Law and the Antitrust Laws, 16 Bus. Law. 994 (1961); Comment, Bank Charter, Branching, Holding Company and Merger Laws: Competition Frustrated, 71 Yale L. J. 502 (1962); Note, Federal Regulation of Bank Mergers: The Opposing Views of the Federal Banking Agencies and the Department of Justice, 75 Harv. L. Rev. 756 (1962).

[3] In addition, there is a certain amount of bank holding company activity. The Bank Holding Company Act of 1956, 12 U. S. C. §§ 1841-1848, brought bank holding companies under stringent federal regulation. As of 1958, the 43 registered bank holding companies controlled 5.7% of all banking offices and 7.4% of all deposits. Lent, The Changing Structure of Commercial Banking (1960), 19. See also Comment, *supra*, note 2, 71 Yale L. J., at 516-522.

[4] Such creation is not, to be sure, pure sleight of hand. A bank may not make a loan without adequate reserves. Nevertheless, the element of bank money creation is real. *E. g.*, Samuelson, Economics (5th ed. 1961), 331-343.

[5] The principal banking "products" are of course various types of credit, for example: unsecured personal and business loans, mortgage loans, loans secured by securities or accounts receivable, automobile installment and consumer goods installment loans, tuition financing, bank credit cards, revolving credit funds. Banking services include: acceptance of demand deposits from individuals, corporations, governmental agencies, and other banks; acceptance of time and savings deposits; estate and trust planning and trusteeship services; lock boxes and safety-deposit boxes; account reconciliation services; foreign department services (acceptances and letters of credit); correspondent services; investment advice. It should be noted that many other institutions are in the business of supplying credit, and so more or less in competition with commercial banks (see further, pp. 356-357, *infra*), for example: mutual savings banks, savings and loan associations, credit unions, personal-finance companies, sales-finance companies, private businessmen (through the furnishing of trade credit), factors, direct-lending government agencies, the Post Office, Small Business Investment Corporations, life insurance companies.

short-term business loans would appear to be the most important. For the proper discharge of these functions is indispensable to a healthy national economy, as the role of bank failures in depression periods attests. It is therefore not surprising that commercial banking in the United States is subject to a variety of governmental controls, state and federal. Federal regulation is the more extensive, and our focus will be upon it. It extends not only to the national banks, *i. e.*, banks chartered under federal law and supervised by the Comptroller of the Currency, see *12 U. S. C. § 21 et seq.* For many state banks, see *12 U. S. C. § 321*, as well as virtually all the national banks, *12 U. S. C. § 222*, are members of the Federal Reserve System (FRS), and more than 95% of all banks, see *12 U. S. C. § 1815*, are insured by the Federal Deposit Insurance Corporation (FDIC). State member and nonmember insured banks are subject to a federal regulatory scheme almost as elaborate as that which governs the national banks.

The governmental controls of American banking are manifold. First, the Federal Reserve System, through its open-market operations, see *12 U. S. C. §§ 263 (c)*, 353-359, control of the rediscount rate, see *12 U. S. C. § 357*, and modifications of reserve requirements, see *12 U. S. C. §§ 462*, *462b*, **[*328]** regulates the supply of money and credit in the economy and thereby indirectly regulates the interest rates of bank loans. This is not, however, rate regulation. The Reserve System's activities are only designed to influence the prime, *i. e.*, minimum, bank interest rate. There is no federal control of the maximum, although all banks, state and national, are subject to state usury laws where applicable. See *12 U. S. C. § 85*. In the range between the maximum fixed by state usury laws and the practical minimum set by federal fiscal policies (there is no law against undercutting the prime rate but bankers seldom do), bankers are free to price their loans as they choose. Moreover, charges for other banking services, such as service charges for checking privileges, are free of governmental regulation, state or federal.

Entry, branching, and acquisitions are covered by a network of state and federal statutes. A charter for a new bank, state or national, will not be granted unless the invested capital and management of the applicant, and its prospects for doing sufficient business to operate at a reasonable profit, give adequate protection against undue competition and possible failure. See, *e. g.*, *12 U. S. C. §§ 26*, *27*, *51*; *12 CFR § 4.1 (b)*; Pa. Stat. Ann., Tit. 7, § 819-306. Failure to meet these standards may cause the FDIC to refuse an application for insurance, *12 U. S. C. §§ 1815*, *1816*, and may cause the FDIC, Federal Reserve Board (FRB), and Comptroller to refuse permission to branch to insured, member, and national banks, respectively. *12 U. S. C. §§ 36*, *321*, *1828 (d)*. Permission to merge, consolidate, acquire assets, or assume liabilities may be refused by the agencies on the same grounds. *12 U. S. C. (1958* **[***925]** ed., Supp. IV) § 1828 (c), note 8, *infra*. Furthermore, national banks appear to be subject to state geographical limitations on branching. See *12 U. S. C. § 36 (c)*.

**[*329]** Banks are also subject to a number of specific provisions aimed at ensuring sound banking practices. For example, member banks of the Federal Reserve **[**1723]** System may not pay interest on demand deposits, *12 U. S. C. § 371a*, may not invest in common stocks or hold for their own account investment securities of any one obligor in excess of 10% of the bank's unimpaired capital and surplus, see *12 U. S. C. §§ 24* Seventh, 335, and may not pay interest on time or savings deposits above the rate fixed by the FRB, *12 U. S. C. § 371b*. The payment of interest on deposits by nonmember insured banks is also federally regulated. *12 U. S. C. (1958 ed., Supp. IV) § 1828 (g)*; 12 CFR, 1962 Supp., Part 329. In the case of national banks, the 10% limit on the obligations of a single obligor includes loans as well as investment securities. See *12 U. S. C. § 84*. Pennsylvania imposes the same limitation upon banks chartered under its laws, such as Girard. Pa. Stat. Ann. (1961 Supp.), Tit. 7, § 819-1006.

But perhaps the most effective weapon of federal regulation of banking is the broad visitatorial power of federal bank examiners. Whenever the agencies deem it necessary, they may order "a thorough examination of all the affairs of the bank," whether it be a member of the FRS or a nonmember insured bank. *12 U. S. C. §§ 325*, *481*, *483*, *1820 (b)*; *12 CFR § 4.2*. Such examinations are frequent and intensive. In addition, the banks are required to furnish detailed periodic reports of their operations to the supervisory agencies. *12 U. S. C. §§ 161*, *324*, *1820 (e)*. In this way the agencies maintain virtually a day-to-day surveillance of the American banking system. And should they discover unsound banking practices, they are equipped with a formidable array of sanctions. If in the judgment of the FRB a member bank is making "undue use of bank credit," the Board may suspend the bank from the use of the credit facilities of the FRS. *12 U. S. C. § 301*. The FDIC has an even more formidable **[*330]** power. If it finds "unsafe or unsound practices" in the conduct of the business of any insured bank, it may terminate the bank's insured status. *12 U. S. C. § 1818 (a)*. Such involuntary termination severs the bank's membership in the FRS, if it is a state bank, and throws it into receivership if it is a national bank. *12 U. S. C. § 1818 (b)*. Lesser, but nevertheless drastic, sanctions include publication of the results of bank examinations. *12 U. S. C. §§ 481*, *1828 (f)*. As a result of the existence of this panoply of sanctions, recommendations by the agencies concerning banking practices tend to be followed by bankers without the necessity of formal compliance proceedings. 1 Davis, Administrative Law (1958), § 4.04.

Federal supervision of banking has been called "probably the outstanding example in the federal government of regulation of an entire industry through methods of supervision . . . . The system may be one of the most successful [systems of economic regulation], if not the most successful." *Id.*, § 4.04, at 247. To the efficacy of this system we may owe, in part, the virtual disappearance of bank failures from the American economic scene. [6]

B. **[***926]** *The Proposed Merger of PNB and Girard.*

The Philadelphia National Bank and Girard Trust Corn Exchange Bank are, respectively, the second and third largest of the 42 commercial banks with head offices in the Philadelphia metropolitan area, which consists of the City of Philadelphia and its three contiguous counties in Pennsylvania. The home county of both banks is the **[*331]** city itself; Pennsylvania law, however, permits branching **[**1724]** into the counties contiguous to the home county, Pa. Stat. Ann. (1961 Supp.), Tit. 7, § 819-204.1, and both banks have offices throughout the four-county area. PNB, a national bank, has assets of over $ 1,000,000,000, making it (as of 1959) the twenty-first largest bank in the Nation. Girard, a state bank, is a member of the FRS and is insured by the FDIC; it has assets of about $ 750,000,000. Were the proposed merger to be consummated, the resulting bank would be the largest in the four-county area, with (approximately) 36% of the area banks' total assets, 36% of deposits, and 34% of net loans. It and the second largest (First Pennsylvania Bank and Trust Company, now the largest) would have between them 59% of the total assets, 58% of deposits, and 58% of the net loans, while after the merger the four largest banks in the area would have 78% of total assets, 77% of deposits, and 78% of net loans.

The present size of both PNB and Girard is in part the result of mergers. Indeed, the trend toward concentration is noticeable in the Philadelphia area generally, in which the number of

---

[6] In 1957, for example, there were three bank suspensions in the entire country by reason of financial difficulties; in 1960, two; and in 1961, nine. Of these nine, four involved state banks which were neither members of the FRS nor insured by the FDIC. 1961 Annual Report of the Comptroller of the Currency 286. In a typical year in the 1920's, roughly 600 banks failed throughout the country, about 100 of them national banks. See S. Rep. No. 196, Regulation of Bank Mergers, 86th Cong., 1st Sess. 17-18.

commercial banks has declined from 108 in 1947 to the present 42. Since 1950, PNB has acquired nine formerly independent banks and Girard six; and these acquisitions have accounted for 59% and 85% of the respective banks' asset growth during the period, 63% and 91% of their deposit growth, and 12% and 37% of their loan growth. During this period, the seven largest banks in the area increased their combined share of the area's total commercial bank resources from about 61% to about 90%.

In November 1960 the boards of directors of the two banks approved a proposed agreement for their consolidation under the PNB charter. By the terms of the agreement, PNB's stockholders were to retain their share certificates, which would be deemed to represent an equal **[*332]** number of shares in the consolidated bank, while Girard's stockholders would surrender their shares in exchange for shares in the consolidated bank, receiving 1.2875 such shares for each Girard share. Such a consolidation is authorized, subject to the approval of the Comptroller of the Currency, by *12 U. S. C. (1958 ed., Supp. IV) § 215*. [7] But under the Bank Merger Act of 1960, *12 U. S. C. (1963 ed., Supp. IV) § 1828* **[***927]** *(c)*, the Comptroller may not give his approval until he has received reports from the other two banking agencies and the Attorney General respecting the probable effects of the proposed transaction on competition. [8] All three reports **[**1725]** advised that the proposed **[*333]** merger would have substantial anticompetitive effects in the Philadelphia metropolitan area. However, on February 24, 1961, the Comptroller approved the merger. No opinion was rendered at that time. But as required by *§ 1828 (c)*, the Comptroller explained the basis for his decision to approve the merger in a statement to be included in his annual report to Congress. As to effect upon competition, he reasoned that "since there will remain an adequate number of alternative sources of banking service in Philadelphia, and in view of the beneficial effects of this consolidation upon international and national competition it was concluded that the over-all effect upon competition would not be unfavorable." He also stated that the

---

[7] The proposed "merger" of appellees is technically a consolidation, since the resulting bank will be a different entity from either of the constituent banks, whereas if the transaction were a merger, Girard would disappear into PNB and PNB would survive. However, the proposed transaction resembles a merger very closely, in that PNB's shareholders are not to surrender their present share certificates and the resulting bank is to operate under PNB's charter. In any event, the statute treats mergers and consolidations essentially alike, compare 12 U. S. C. (1958 ed., Supp. IV) § 215 with § 215a, and it is not suggested that the legal question of the instant case would be affected by whether the transaction is technically a merger or a consolidation. Therefore, throughout this opinion we use the term "merger."

[8] Section 1828 (c) provides in pertinent part:

***HN3*** "No insured [by FDIC] bank shall merge or consolidate with any other insured bank or, either directly or indirectly, acquire the assets of, or assume liability to pay any deposits made in, any other insured bank without the prior written consent (i) of the Comptroller of the Currency if the acquiring, assuming, or resulting bank is to be a national bank or a District [of Columbia] bank, or (ii) of the Board of Governors of the Federal Reserve System if the acquiring, assuming, or resulting bank is to be a State member bank (except a District bank), or (iii) of the [Federal Deposit Insurance] Corporation if the acquiring, assuming, or resulting bank is to be a nonmember insured bank (except a District bank). . . . In granting or withholding consent under this subsection, the Comptroller, the Board, or the Corporation, as the case may be, shall consider the financial history and condition of each of the banks involved, the adequacy of its capital structure, its future earnings prospects, the general character of its management, the convenience and needs of the community to be served, and whether or not its corporate powers are consistent with the purposes of this chapter. In the case of a merger, consolidation, acquisition of assets, or assumption of liabilities, the appropriate agency shall also take into consideration the effect of the transaction on competition (including any tendency toward monopoly), and shall not approve the transaction unless, after considering all of such factors, it finds the transaction to be in the public interest. In the interests of uniform standards, before acting on a merger, consolidation, acquisition of assets, or assumption of liabilities under this subsection, the agency (unless it finds that it must act immediately in order to prevent the probable failure of one of the banks involved) shall request a report on the competitive factors involved from the Attorney General and the other two banking agencies referred to in this subsection . . . . The Comptroller, the Board, and the Corporation shall each include in its annual report to the Congress a description of each merger, consolidation, acquisition of assets, or assumption of liabilities approved by it during the period covered by the report, along with the following information: . . . a statement by the Comptroller, the Board, or the Corporation, as the case may be, of the basis for its approval."

consolidated bank "would be far better able to serve the convenience and needs of its community by being of material assistance to its city and state in their efforts to attract new industry and to retain existing industry." The day after the Comptroller approved the **[*334]** merger, the United States commenced the present action. No steps have been taken to consummate the merger pending the outcome of this litigation.

***LEdHN[2]*** [2]

C. **[***928]** *The Trial and the District Court's Decision.*

The Government's case in the District Court relied chiefly on statistical evidence bearing upon market structure and on testimony by economists and bankers to the effect that, notwithstanding the intensive governmental regulation of banking, there was a substantial area for the free play of competitive forces; that concentration of commercial banking, which the proposed merger would increase, was inimical to that free play; that the principal anticompetitive effect of the merger would be felt in the area in which the banks had their offices, thus making the four-county metropolitan area the relevant geographical market; and that commercial banking was the relevant product market. The defendants, in addition to offering contrary evidence on these points, attempted to show business justifications for the merger. They conceded that both banks were economically strong and had sound management, but offered the testimony of bankers to show that the resulting bank, with its greater prestige and increased lending limit, [9] would be better able to compete with large out-of-state **[**1726]** (particularly New York) banks, would attract new business to Philadelphia, and in general would promote the economic development of the metropolitan area. [10]

**[*335]** Upon this record, the District Court held that: (1) the passage of the Bank Merger Act of 1960 did not repeal by implication the antitrust laws insofar as they may apply to bank mergers; (2) *§ 7* of the Clayton Act is inapplicable to bank mergers because banks are not corporations "subject to the jurisdiction of the Federal Trade Commission"; (3) but assuming that *§ 7* is applicable, the four-county Philadelphia metropolitan area is not the relevant geographical market because PNB and Girard actively compete with other banks for bank business throughout the greater part of the northeastern United States; (4) but even assuming that *§ 7* is applicable and that the four-county area is the relevant market, there is no reasonable probability that competition among commercial banks in the area will be substantially lessened as the result of the merger; (5) since the merger does not violate *§ 7* of the Clayton Act, *a fortiori* it does not violate *§ 1* of the Sherman Act; (6) the merger will benefit the Philadelphia metropolitan area economically. The District Court also ruled that for the purposes of *§ 7*, commercial banking is a line of commerce; the appellees do not contest this ruling.

---

[9] See 12 U. S. C. § 84, p. 329, *supra*. The resulting bank would have a lending limit of $ 15,000,000, of which $ 1,000,000 would not be attributable to the merger but to unrelated accounting factors.

[10] There was evidence that Philadelphia, although it ranks fourth or fifth among the Nation's urban areas in terms of general commercial activity, ranks only ninth in terms of the size of its largest bank, and that some large business firms which have their head offices in Philadelphia must seek elsewhere to satisfy their banking needs because of the inadequate lending limits of Philadelphia's banks: First Pennsylvania and PNB, currently the two largest banks in Philadelphia, each have a lending limit of $ 8,000,000. Girard's is $ 6,000,000.

Appellees offered testimony that the merger would enable certain economies of scale, specifically, that it would enable the formation of a more elaborate foreign department than either bank is presently able to maintain. But this attempted justification, which was not mentioned by the District Court in its opinion and has not been developed with any fullness before this Court, we consider abandoned.

**[***929]** II. THE APPLICABILITY OF *SECTION 7* OF THE CLAYTON ACT TO BANK MERGERS.

A. *The Original Section and the 1950 Amendment*.

***LEdHN[3]*** [3]By its terms, the present *§ 7**HN4*** reaches acquisitions of corporate stock or share capital by any corporation engaged **[*336]** in commerce, but it reaches acquisitions of corporate assets only by corporations "subject to the jurisdiction of the Federal Trade Commission." The FTC, under *§ 5* of the Federal Trade Commission Act, has no jurisdiction over banks. *15 U. S. C. § 45 (a)(6)*. [11] Therefore, **[**1727]** if the proposed merger be deemed an assets acquisition, it is not within *§ 7*. [12] Appellant argues vigorously that a merger is crucially different from a pure assets acquisition, [13] and **[*337]** appellees argue with equal vigor that it is crucially different from a pure stock acquisition. [14] **[***930]** Both positions, we think, have merit; a merger fits neither category neatly. Since the literal terms of *§ 7* thus do not dispose of our question, we must determine whether a congressional design to embrace bank mergers is revealed in the history of the statute. The question appears to be one of first impression; we have been directed to no previous case in which a merger or consolidation was challenged under *§ 7* of the Clayton Act, as amended, where the acquiring corporation was not subject to the FTC's jurisdiction.

***LEdHN[4]*** [4]

---

[11] We reject the argument that § 11 of the Clayton Act, as amended, 15 U. S. C. § 21, confers jurisdiction over banks upon the FTC. That section provides in pertinent part: "Authority to enforce compliance with sections 13, 14, 18, and 19 of this title [§§ 2, 3, 7, and 8 of the Clayton Act, as amended] by the persons respectively subject thereto is vested . . . in the Federal Reserve Board where applicable to banks, banking associations, and trust companies; and in the Federal Trade Commission where applicable to all other character of commerce . . . ." The argument is that since the FRB has no authority to enforce the Clayton Act against bank mergers, see note 22, *infra*, bank mergers must fall into the residual category of "all other character of commerce" and so be subject to the FTC. However, there is no intimation in the legislative history of the 1950 amendment to §§ 7 and 11 that the FTC's traditional lack of jurisdiction over banks was to be disturbed. Moreover, it is clear from the language of § 11 that "banks, banking associations, and trust companies" are meant to comprise a distinct "character of commerce," and so cannot be part of the "other character of commerce" reserved to the FTC.

The exclusion of banks from the FTC's jurisdiction appears to have been motivated by the fact that banks were already subject to extensive federal administrative controls. See *T. C. Hurst & Son* v. *Federal Trade Comm'n*, 268 F. 874, 877 (D. C. E. D. Va. 1920).

[12] No argument is made in this case that banking is not commerce, and therefore that § 7 is inapplicable; plainly, such an argument would have no merit. See *Transamerica Corp.* v. *Board of Govs. of Fed. Res. Sys.*, 206 F.2d 163, 166 (C. A. 3d Cir. 1953); cf. *United States* v. *South-Eastern Underwriters Assn.*, 322 U.S. 533.

[13] "A merger necessarily involves the complete disappearance of one of the merging corporations. A sale of assets, on the other hand, may involve no more than a substitution of cash for some part of the selling company's properties, with no change in corporate structure and no change in stockholder interests. Shareholders of merging corporations surrender their interests in those corporations in exchange for their very different rights in the resulting corporation. In an asset acquisition, however, the shareholders of the selling corporation obtain no interest in the purchasing corporation and retain no interest in the assets transferred. In a merger, unlike an asset acquisition, the resulting firm automatically acquires all the rights, powers, franchises, liabilities, and fiduciary rights and obligations of the merging firms. In a merger, but not in an asset acquisition, there is the likelihood of a continuity of management and other personnel. Finally, a merger, like a stock acquisition, necessarily involves the acquisition by one corporation of an immediate voice in the management of the business of another corporation; no voice in the decisions of another corporation is acquired by purchase of some part of its assets." Brief for the United States, 75-76.

[14] "[A] merger such as appellees' may be effected upon the affirmative vote of the holders of only two-thirds of the outstanding stock of each bank . . . but if PNB were acquiring all of the Girard stock each Girard shareholder could decide for himself whether to transfer his shares. A merger requires public notice whereas stock can be acquired privately. A shareholder dissenting from a merger has the right to receive the appraised value of his shares . . . whereas no shareholder has a comparable right in an acquisition of stock. Furthermore the corporate existence of a merged company is terminated by a merger, but remains unaffected by an acquisition of stock." Brief for Appellees, 30-31.

***LEdHN[5]*** [5]

When it was first enacted in 1914, *§ 7* referred only to corporate acquisitions of stock and share capital; it was silent as to assets acquisitions and as to mergers and consolidations. **[*338]** Act of October 15, 1914, c. 323, *§ 7*, 38 Stat. 731-732, note 18, *infra*. It is true that the omission may not have been an oversight. Congress' principal concern was with the activities of holding companies, and specifically with the practice whereby corporations secretly acquired control of their competitors by purchasing the stock of those companies. Although assets acquisitions and mergers were known forms of corporate amalgamation at the time, their no less dangerously anticompetitive effects may not have been fully apparent to the Congress. [15] Still, the statutory language, read in the light of the overriding congressional purpose to **[**1728]** control corporate concentrations tending to monopoly, lent itself to a construction whereby *§ 7* would have reached at least mergers and consolidations. It would hardly have done violence to the language so to have interpreted the vague term "share capital," see 30 Geo. Wash. L. Rev. 1024, 1027-1028 (1962), or to have adopted the view that: "where the assets are exchanged for the stock of the purchasing company, assuming that the two companies were previously in competition, it is apparent that the seller has acquired stock in a competing company . . . [and] therefore, that in effecting the merger *section 7* was violated and hence the distribution of the stock received by the selling company to its shareholders and its subsequent dissolution are no bar to proceedings by the government to set aside the purchase." Handler, Industrial Mergers and the Anti-Trust Laws, 32 Col. L. Rev. 179, 266 (1932). [16]

But the courts found mergers to be beyond the reach of *§ 7*, even when the merger technique had supplanted **[*339]** stock acquisitions as the prevalent mode of corporate amalgamation. *United States v. Celanese Corp. of America, 91 F.Supp. 14 (D. C. S. D. N. Y. 1950)*; see *Thatcher Mfg. Co*. v. *Federal Trade Comm'n* and *Swift & Co*. v. *Federal Trade Comm'n* , decided together with *Federal Trade Comm'n v. Western Meat Co., 272 U.S. 554*; *Arrow-Hart & Hegeman Elec. Co*. v. *Federal Trade Comm'n,* **[***931]** 291 U.S. 587. [17] As a result, *§ 7* **[**1729]** became largely **[*340]** a dead letter. Comment, 68 Yale L. J. 1627, 1629-1630 (1959); see Federal Trade

---

[15] The legislative history of the 1914 Act is reviewed in *Brown Shoe Co*. v. *United States*, 370 U.S. 294, 313-314, and notes 22-24.

[16] In the case of an acquisition like the instant one, in which shares in the acquired corporation are to be exchanged for shares in the resulting corporation, *a fortiori* we discern no difficulty in conceptualizing the transaction as a "stock acquisition." Compare note 13, *supra*.

[17] Statements to the same effect may be found in, *e. g.*, *Brown Shoe Co*., *supra*, at 313-314, 316; *United States* v. *E. I. du Pont de Nemours & Co*., 353 U.S. 586, 592; *United States* v. *Columbia Steel Co*., 334 U.S. 495, 507, n. 7; *United States* v. *Columbia Pictures Corp*., 189 F.Supp. 153, 182 (D. C. S. D. N. Y. 1960). See also 33 Op. Atty. Gen. 225, 241 (1922); Hernacki, Mergerism and Section 7 of the Clayton Act, 20 Geo. Wash. L. Rev. 659, 676-677 (1952); Wemple and Cutler, The Federal Bank Merger Law and the Antitrust Laws, 16 Bus. Law. 994, 999-1000 (1961); Note, Section 7 of the Clayton Act: A Legislative History, 52 Col. L. Rev. 766, 768-769 (1952).

Actually, the holdings in the three cases that reached this Court, *Thatcher*, *Swift*, and *Arrow-Hart*, were quite narrow. See generally Note, 26 Col. L. Rev. 594-596 (1926). They were based not on a lack of substantive power under § 7, but on the enforcement section, § 11, which limited the FTC's remedial powers to "an order requiring such person to cease and desist from such violations [of §§ 2, 3, 7, and 8 of the Clayton Act], and divest itself of the stock held or rid itself of the directors chosen contrary to the provisions of sections seven and eight of this Act." 38 Stat. 735. Faced with Congress' evident refusal to confer upon the FTC the ordinary powers of a court of equity, this Court held that unless the assets were acquired after the FTC's order of stock divestiture had been issued (which was the case in *Federal Trade Comm'n* v. *Western Meat Co*., *supra*, where the Commission was sustained), the Commission could not order a divestiture of assets. Compare *Board of Govs. of Fed. Res. Sys*. v. *Transamerica Corp*., 184 F.2d 311 (C. A. 9th Cir. 1950), with *Federal Trade Comm'n* v. *International Paper Co*., 241 F.2d 372 (C. A. 2d Cir. 1956). Since under this Court's decisions the FTC was powerless even where the transfer of assets was an evasive maneuver aimed at defeating the FTC's remedial jurisdiction over stock acquisitions violative of § 7, *a fortiori* the Commission was

Commission, The Merger Movement: A Summary Report (1948), 1, 3-6; Henderson, The Federal Trade Commission (1924), 40. Meanwhile, this Court's decision in *United States v. Columbia Steel Co., 334 U.S. 495*, stirred concern whether the Sherman Act alone was a check against corporate acquisitions. Note, 52 Col. L. Rev. 766, 768 (1952).

***LEdHN[6]*** [6]

***LEdHN[7]*** [7]It was against this background that Congress in 1950 amended *§ 7* to include an assets-acquisition provision. Act of December 29, 1950 (Celler-Kefauver Antimerger Act), c. 1184, 64 Stat. 1125-1126, *15 U. S. C. § 18*. [18] **[*341]** The legislative history is **[***932]** silent on the specific questions why the amendment made no explicit reference to mergers, why assets acquisitions by corporations not subject to FTC jurisdiction were not included, and what these omissions signify. Nevertheless, the basic congressional design clearly emerges and from that design the answers to these questions may be inferred. Congress primarily sought to bring mergers within *§ 7* and thereby close what it regarded as a loophole in the section. [19] But, in addition, it sought **[**1730]** to reach transactions such as that involved in *Columbia Steel*, which was a simple purchase **[*342]** of assets and not a merger. [20] In other words, Congress contemplated that

---

powerless against the typical merger. See *Arrow-Hart & Hegeman Elec. Co.* v. *Federal Trade Comm'n, supra*, at 595, 598-599. As part of the 1950 amendments to the Clayton Act, § 11 was amended to read: "an order requiring such person to . . . divest itself of the stock, or other share capital, or assets, held . . . ." 15 U. S. C. § 21. Whether as an original matter *Thatcher*, *Swift* and *Arrow-Hart* were correctly decided is no longer an open question, since they were the explicit premise of the 1950 amendment to § 7. See *State Bd. of Ins.* v. *Todd Shipyards Corp.*, 370 U.S. 451, 458, p. 349, *infra*.

The question of the FTC's remedial powers under § 11 of the Clayton Act is to be distinguished from that of its remedial powers under § 5 of the Federal Trade Commission Act. 15 U. S. C. § 45 (b). In *Federal Trade Comm'n* v. *Eastman Kodak Co.*, 274 U.S. 619, the Court, relying on *Thatcher* and *Swift*, held that the Commission had no power to order divestiture in § 5 proceedings. But cf. *Gilbertville Trucking Co.* v. *United States*, 371 U.S. 115, 129-131; *Pan American World Airways* v. *United States*, 371 U.S. 296, 312, and n. 17.

[18] See note 1, *supra*, for text of amended § 7. The original § 7 read in pertinent part: "no corporation engaged in commerce shall acquire, directly or indirectly, the whole or any part of the stock or other share capital of another corporation engaged also in commerce, where the effect of such acquisition may be to substantially lessen competition between the corporation whose stock is so acquired and the corporation making the acquisition, or to restrain such commerce in any section or community, or tend to create a monopoly of any line of commerce."

The passage of the 1950 amendment followed many years of unsuccessful attempts to enact legislation plugging the assets-acquisition loophole. See Note, 52 Col. L. Rev. 766-767, notes 3 and 4 (1952). To be sure, the 1950 amendment was intended not only to enlarge the number of transactions covered by § 7 but also to change the test of illegality. The legislative history pertinent to the latter point is reviewed in *Brown Shoe Co., supra*, at 315-323, and is not directly relevant to the present discussion.

[19] "The purpose of the proposed legislation [the 1950 amendments to § 7] is to prevent corporations from acquiring another corporation by means of the acquisition of its assets, whereunder [*sic*] the present law it is prohibited from acquiring the stock of said corporation. Since the acquisition of stock is significant chiefly because it is likely to result in control of the underlying assets, failure to prohibit direct purchase of the same assets has been inconsistent and paradoxical as to the over-all effect of existing law." S. Rep. No. 1775, 81st Cong., 2d Sess. 2. This theme pervaded congressional consideration of the proposed amendments. See, *e. g.*, H. R. Rep. No. 1191, 81st Cong., 1st Sess., *passim*; Hearing before Subcommittee No. 3 of the House Committee on the Judiciary on Amending Sections 7 and 11 of the Clayton Act, 81st Cong., 1st Sess., ser. 10, pp. 11-13, 28-29, 39, 117; Hearings before a Subcommittee of the Senate Committee on the Judiciary on Corporate Mergers and Acquisitions, 81st Cong., 1st and 2d Sess. 4-5, 15, 20, 62-63, 126-129, 139, 321; 95 Cong. Rec. 11485 (Congressman Celler, sponsor of the bill to amend § 7 in the House: "this bill seeks to plug a loophole in the present antitrust laws. . . . It is time to stop, look, and listen and to call a halt to the merger movement that is going on in this country"), 11493-11494, 11497, 11502; 96 Cong. Rec. 16433, 16443.

[20] *Columbia Steel* involved the cash purchase by United States Steel Corporation of the physical assets of Consolidated Steel Corporation; there was no exchange of shares and no alteration of Consolidated's corporate identity. See Transcript of Record, *United States* v. *Columbia Steel Co.*, 334 U.S. 495 (No. 461, October Term, 1947), pp. 453-475. As a result of the purchase, in its horizontal aspect, U.S. Steel controlled about 24% of the structural steel fabricating market in an 11-state western area. This Court held that the acquisition could not be reached under § 7 of the Clayton Act, see 334 U.S., at 507, n. 7, and did not violate

the 1950 amendment would give *§ 7* a reach which would bring the entire range of corporate amalgamations, from pure stock acquisitions to pure **[***933]** assets acquisitions, within the scope of *§ 7*. Thus, the stock-acquisition and assets-acquisition provisions, *read together*, reach mergers, which fit neither category perfectly but lie somewhere between the two ends of the spectrum. See pp. 336-337, and notes 13, 14, *supra*. So construed, the specific exception for acquiring corporations not subject to the FTC's jurisdiction excludes from the coverage of *§ 7* only assets acquisitions by such corporations when not accomplished by merger.

**[*343]** This construction is supported by a number of specific considerations.

*First*. Any other construction would be illogical and disrespectful of the plain congressional purpose in amending *§ 7*, because it would create a large loophole in a statute designed to close a loophole. It is unquestioned that ***HN5*** the stock-acquisition provision of *§ 7* embraces every corporation engaged in commerce, including banks. And it is plain that Congress, in amending *§ 7*, considered a distinction for antitrust purposes between acquisition of corporate control by purchase of stock and acquisition by merger unsupportable in reason, and sought to overrule the decisions of this Court which had recognized such a distinction. [21] If, therefore, mergers in industries outside **[*344]** the FTC's **[**1731]** jurisdiction were deemed beyond the reach of *§ 7*, the result would be precisely that difference in treatment which Congress rejected. On the other hand, excluding from the section assets acquisitions not by merger in those industries does not appear to create a lacuna of practical importance. [22]

---

the Sherman Act. It should be noted, however, that the Court regarded the 24% market-share figure proposed by the Government as a "doubtful assumption" and also pointed to "unusual conditions" tending to mitigate the anticompetitive effect of the acquisition. 334 U.S., at 529. *Columbia Steel* was repeatedly cited by Congressmen considering the amendment of § 7 as an example of what they conceived to be the inability of the Sherman Act, as then construed, to deal with the problems of corporate concentration. See, *e. g.*, H. R. Rep. No. 1191, 81st Cong., 1st Sess. 10-11, and n. 16; Hearing before Subcommittee No. 3 of the House Committee on the Judiciary on Amending Sections 7 and 11 of the Clayton Act, 81st Cong., 1st Sess., ser. 10, pp. 28, 73; Hearings before a Subcommittee of the Senate Committee on the Judiciary on Corporate Mergers and Acquisitions, 81st Cong., 1st and 2d Sess. 24; 96 Cong. Rec. 16453 (Senator Kefauver, Senate sponsor of the bill to amend § 7: "the Columbia Steel Co. case is a vivid illustration of the necessity for the proposed amendment of the Clayton Act"), 16503; and cf. 96 Cong. Rec. 16498-16499.

[21] See note 19, *supra*. The congressional attitude toward this Court's *Thatcher*, *Swift*, and *Arrow-Hart* decisions is typified in this remark of Senator O'Conor's: "The Court, in effect, said that the [Federal Trade] Commission was quite free to use the power which Congress had conferred upon it, so long as it confined the use of that power to ordering the divestiture of pieces of paper which happened to be worthless." 96 Cong. Rec. 16433. Senator O'Mahoney remarked, for example, that there was "no doubt of the fundamental fact that an innocent defect in the drafting of section 7 of the Clayton Act back in 1914 had resulted in creating a great opportunity for escape by flagrant violators of the law." 96 Cong. Rec. 16443. After sharply criticizing this Court's decisions, the Senator continued: "I take it the record is perfectly clear that what this bill purports to do is to correct an omission in the original Clayton Act. When the authors of the Clayton Act and the Congress which passed it enacted the bill into law they thought they were giving the Federal Trade Commission administrative authority to prevent monopolistic mergers . . . ." *Ibid*. So also, Senator Kefauver observed: "it would have been much better for the economy of the country to have repealed sections 7 and 11 of the Clayton Act rather than let this wide-open loophole to remain. Most of the large and monopolistic mergers which have become detrimental to the free-enterprise system of our Nation have occurred by way of this plain evasion of the intent of the original Clayton Act." 96 Cong. Rec. 16451.

[22] A cash purchase of another bank's assets would not seem to be a fully effective method of corporate acquisition. In other industries, a cash purchase of plant, inventory, patents, trade secrets, and the like will often directly enhance the competitive position of the acquiring corporation, as in *Columbia Steel Co.* But a bank desiring to increase its share of banking business through corporate acquisition would ordinarily need to acquire the other bank's deposits and capital, not merely its assets. For more deposits mean more working capital, and additions to capital and surplus increase the lending limit. A cash purchase, in effect, only substitutes cash for cash, since bank assets consist principally of cash and very liquid securities and loans receivable, and adds nothing to the acquiring bank's capital and surplus or to its working capital. True, an exchange of its stock for assets would achieve the acquiring bank's objectives. We are clear, however, that in light of Congress' overriding purpose, in amending § 7, to close

***LEdHN[8]*** [8]

**[*345]** *Second*. **[***934]** The Congress which debated the bill to amend *§ 7* was fully aware of the important differences between a **[**1732]** merger and a pure purchase of assets. For example, Senator Kilgore remarked:

"When you talk about mergers, you are talking about a stock transaction. . . .

. . . .

". . . Actually what you do is merge the stockholdings of both corporations, and instead of that -- I am thinking in practical terms -- you merge the corporate entities of the two corporations and you get one corporation out of it, and you issue stock in the one corporation in lieu of the stock in the other corporation, whereupon the stock of the corporation which had been merged is canceled by the new corporation, and you have one corporation handling the operation of two. So it really is a stock transaction in the final wind-up, regardless of what you call it. But what I call a purchase of assets is where you purchase physical assets, things upon which you could lay your hand, either in the records or on the ground . . . ." Hearings before a Subcommittee of **[*346]** the Senate Committee on the Judiciary on Corporate Mergers and Acquisitions, 81st Cong. , 1st and 2d Sess. 176; to the same effect, see, *e. g., id., at 100, 139, 320-325*.

***LEdHN[9]*** [9]Plainly, acquisition of "assets" as used in amended *§ 7* was not meant to be a simple equivalent of acquisition by merger, but was intended rather to ensure against the blunting of the antimerger thrust of the section by evasive transactions such as had rendered the original section ineffectual. Thus, the stock-acquisition provision of *§ 7*, though reenacted *in haec verba* by the 1950 amendment, must be deemed expanded in its new context to include, at the very least, acquisitions by **[***935]** merger or consolidation, transactions which entail a transfer of stock of the parties, while the assets-acquisition provision clearly reaches corporate acquisitions involving no such transfer. And see note 22, *supra*. This seems to be the point of Congressman Patman's remark, typical of many, that: "What this bill does is to put all corporate mergers on the same footing, whether the result of the acquisitions of stock or the acquisition of physical assets."

---

the loophole in the original section, if such an exchange (or other clearly evasive transaction) were tantamount in its effects to a merger, the exchange would not be an "assets" acquisition within the meaning of § 7 but would be treated as a transaction subject to that section.

We have not overlooked the fact that there are corporations in other industries not subject to the FTC's jurisdiction. Chief among these are air carriers subject to the Civil Aeronautics Board and other carriers subject to the Interstate Commerce Commission. Both agencies have been given, expressly, broad powers to exempt mergers and acquisitions in whatever form from the antitrust laws. See 49 U. S. C. §§ 1378, 1384; 49 U. S. C. § 5 (11) and (13). Therefore, the exclusion of assets acquisitions in such industries from § 7 would seem to have little significance.

Section 11 of the Clayton Act, 15 U. S. C. § 21, vests the FRB with authority to enforce § 7 "where applicable to banks." This provision has been in the Act since it was first passed in 1914 and was not changed by the 1950 amendments. The Bank Merger Act of 1960, assigning roles in merger applications to the FDIC and the Comptroller of the Currency as well as to the FRB, plainly supplanted, we think, whatever authority the FRB may have acquired under § 11, by virtue of the amendment of § 7, to enforce § 7 against bank mergers. Since the Bank Merger Act applies only to mergers, consolidations, acquisitions of assets, and assumptions of liabilities but not to outright stock acquisitions, the FRB's authority under § 11 as it existed before the 1950 amendment of § 7 remains unaffected. See, *e. g., Transamerica Corp*. v. *Board of Govs. of Fed. Res. Sys*., 206 F.2d 163 (C. A. 3d Cir. 1953).

Nothing in this opinion, of course, limits the power of the FTC, under §§ 7 and 11, as amended, to reach any transaction, including mergers and consolidations, in the broad range between and including pure stock and pure assets acquisitions, where the acquiring corporation is subject to the FTC's jurisdiction, see 15 U. S. C. § 45 (a)(6), and to order divestiture of the stock, share capital, or assets acquired in the transaction, see 15 U. S. C. § 21.

Hearings, *supra*, at 126. To the same effect is the House Report on the bill to amend *§ 7*: "The bill retains language of the present statute which is broad enough to prevent evasion of the central purpose. It covers not only purchase of assets or stock but also any other method of acquisition . . . . It forbids not only direct acquisitions but also indirect acquisitions . . . ." H. R. Rep. No. 1191, 81st Cong., 1st Sess. 8-9.

***LEdHN[10]*** [10] Third. The legislative history shows that the objective of including the phrase "corporation subject to the jurisdiction of the Federal Trade Commission" in *§ 7* was not to limit the amalgamations to be covered by the amended statute but to make explicit the role of the FTC in administering the section. The predominant focus of the hearings, **[*347]** debates, and committee reports was upon the powers of the FTC. The decisions of this Court which had uncovered the loophole in the original *§ 7* -- *Thatcher*, *Swift*, and *Arrow-Hart* -- had not rested directly upon the substantive coverage of *§ 7*, but rather upon the limited scope of the FTC's divestiture powers under *§ 11*. See note 17, *supra*. There were intimations that the *courts*' power to enforce *§ 7* might be far greater. See *Thatcher Mfg. Co.* v. *Federal Trade Comm'n, supra, at 561*; *Swift & Co.* v. *Federal Trade Comm'n, supra, at 563*; *Federal Trade Comm'n v. Eastman Kodak Co., 274 U.S. 619, 624*; *Arrow-Hart & Hegeman Elec. Co.* v. *Federal Trade Comm'n, supra, at 598-599*; Irvine, The Uncertainties of *Section 7* of the Clayton Act, 14 Cornell L. Q. 28 (1928). Thus, **[**1733]** the loophole was sometimes viewed as primarily a gap in the FTC's jurisdiction. [23] Furthermore, although the Clayton Act has always provided for dual enforcement by court and agency, see *15 U. S. C. § 25*; *United States v. W. T. Grant Co., 345 U.S. 629*; *United States Alkali Export Assn*. v. *United States, 325 U.S. 196, 208*, prior to the 1950 amendment enforcement of *§ 7* was left largely to the FTC. Martin, Mergers and the Clayton Act (1959), 205, 219; Montague, The Celler Anti-Merger Act: An Administrative Problem in an Economic Crisis, 37 A. B. A. J. 253 **[*348]** (1951). And the impetus to amend *§ 7* came in large part from the FTC. See, *e. g*., Martin, *supra*, 187-194; Federal **[***936]** Trade Commission, Annual Reports, 1928, pp. 18-19; 1940, pp. 12-13; 1948, pp. 11-22; The Merger Movement: A Summary Report (1948). Congress in 1950 clearly intended to remove all question concerning the FTC's remedial power over corporate acquisitions, and therefore explicitly enlarged the FTC's jurisdiction. Congress' choice of this means of underscoring the FTC's role in enforcing *§ 7* provides no basis for a construction which would undercut the dominant congressional purpose of eliminating the difference in treatment accorded stock acquisitions and mergers by the original *§ 7* as construed.

***LEdHN[11]*** [11] Fourth. It is settled law that ***HN6*** "immunity from the antitrust laws is not lightly implied." *California v. Federal Power Comm'n, 369 U.S. 482, 485*.Cf. *United States v. Borden Co., 308 U.S. 188, 198-199*; *United States v. Southern Pac. Co., 259 U.S. 214, 239-240*. This canon of construction, which reflects the felt indispensable role of antitrust policy in the maintenance of a free economy, is controlling here. For there is no indication in the legislative history to the 1950 amendment of *§ 7* that Congress wished to confer a special dispensation upon the banking industry; if Congress had so wished, moreover, surely it would have exempted the industry from the stock-acquisition as well as the assets-acquisition provision.

---

[23] See, *e. g*., statement of Assistant Attorney General Bergson: "If it [§ 7] is to have any significant effect for the future, it is essential that it be amended so that the Federal Trade Commission will be in a position to deal with the merger problem as it exists today." Hearing before Subcommittee No. 3 of the House Committee on the Judiciary on Amending Sections 7 and 11 of the Clayton Act, 81st Cong., 1st Sess., ser. 10, p. 28. See also 96 Cong. Rec. 16437, 16452-16453; 95 Cong. Rec. 11490-11491, 11499, 11504 (Representative Byrne: "the suggested amendment to sections 7 and 11 of the Clayton Act would merely give the [Federal Trade] Commission the same power in regard to asset acquisitions that it already possesses over acquisitions of stock. This would close the loophole and restore meaning to the statute.").

***LEdHN[12]*** [12]***LEdHN[13]*** [13]***LEdHN[14]*** [14] Of course, our construction of the amended *§ 7* is not foreclosed because, after the passage of the amendment, some members of Congress, and for a time the Justice Department, voiced the view that bank mergers were still beyond the reach of the section. [24] "***HN7*** The views of a subsequent **[*349]** Congress form a hazardous basis for inferring the intent of an earlier one." *United States v. Price, 361 U.S. 304, 313*; see *Rainwater v. United* **[**1734]** *States, 356 U.S. 590, 593*; *United States v. United Mine Workers, 330 U.S. 258, 282*; cf. *United States v. E. I. du Pont de Nemours & Co., 353 U.S. 586, 590*.This holds true even though misunderstanding of the scope of *§ 7* may have played some part in the passage of the Bank Merger Act of 1960. [25] There is a question, to which we shall shortly turn, whether there exists such inconsistency between the Bank Merger Act and *§ 7*, as we now construe it, as to require a holding that *§ 7* must be deemed repealed *pro tanto*; but that is a different question from whether misunderstanding of the scope of *§ 7* is relevant to our task of defining what scope Congress gave the section in 1950. When Congress enacted the Bank Merger Act, **[***937]** the applicability of *§ 7* to bank mergers was still to be authoritatively determined; it was a subject of speculation. Thus, this is not a case in which our "earlier decisions are part of the arch on which the new structure rests, [and] we [must] refrain from disturbing them lest we change the design that Congress fashioned." *State Board of Ins* . v. Todd Shipyards Corp., 370 U.S. 451, 458. Cf. note 17, *supra*. The design fashioned in the Bank Merger Act was predicated upon uncertainty as to the scope of *§ 7*, and we do no violence to that design by dispelling the uncertainty.

**[*350]** B. *The Effect of the Bank Merger Act of 1960*.

***LEdHN[15A]*** [15A]***LEdHN[17]*** [17]Appellees contended below that the Bank Merger Act, by directing the banking agencies to consider competitive factors before approving mergers, *12 U. S. C. (1958 ed., Supp. IV) § 1828 (c)*, note 8, *supra*, immunizes approved mergers from challenge under the federal antitrust laws. [26] We think the District Court was correct in rejecting this contention. No express immunity is conferred by the Act. [27]***HN8*** Repeals of the antitrust laws by implication from a regulatory statute are strongly disfavored, [28] and **[*351]** have only been

---

24 See, *e. g.*, Staff of Subcommittee No. 5 of House Committee on the Judiciary, 82d Cong., 2d Sess., Bank Mergers and Concentration of Banking Facilities (1952) vii; H. R. 5948, printed in 102 Cong. Rec. 2108-2109 (1956); Hearings before a Subcommittee of the Senate Committee on Banking and Currency on the Financial Institutions Act of 1957, 85th Cong., 1st Sess., pt. 2, p. 1030 (testimony of Attorney General Brownell); H. R. Rep. No. 1416, Regulation of Bank Mergers, 86th Cong., 2d Sess. 9; S. Rep. No. 196, Regulation of Bank Mergers, 86th Cong., 1st Sess. 1-2, 5.

25 See, *e. g.*, remarks of Representative Spence: "The Clayton Act is ineffective as to bank mergers because in the case of banks it covers only stock acquisitions and bank mergers are not accomplished that way." 106 Cong. Rec. 7257 (1960). See also note 24, *supra*.

26 This contention was abandoned on appeal. We consider it, nevertheless, because it touches the proper relations of the judicial and administrative spheres. *United States* v. *Western Pac. R. Co.*, 352 U.S. 59, 63.

27 Contrast this with the express exemption provisions of, *e. g.*, the Federal Aviation Act, 49 U. S. C. § 1384; Federal Communications Act, 47 U. S. C. §§ 221 (a), 222 (c)(1); Interstate Commerce Act, 49 U. S. C. §§ 5 (11), 5b (9), 22; Shipping Act, 46 U. S. C. (1958 ed. Supp. III) § 814; Webb-Pomerene Act, 15 U. S. C. § 62; and the Clayton Act itself, § 7, 15 U. S. C. § 18.

28 See *United States* v. *Trans-Missouri Freight Assn.*, 166 U.S. 290, 314-315; *United States* v. *Joint Traffic Assn.*, 171 U.S. 505; *Northern Securities Co.* v. *United States*, 193 U.S. 197, 343 (plurality opinion), 374-376 (dissenting opinion); *United States* v. *Pacific & Arctic Ry. & Nav. Co.*, 228 U.S. 87, 105, 107; *Keogh* v. *Chicago & N. W. R. Co.*, 260 U.S. 156, 161-162; *Central Transfer Co.* v. *Terminal Railroad Assn.*, 288 U.S. 469, 474-475; *Terminal Warehouse Co.* v. *Pennsylvania R. Co.*, 297 U.S. 500, 513-515; *United States* v. *Borden Co.*, 308 U.S. 188, 197-206; *United States* v. *Socony-Vacuum Oil Co.*, 310 U.S. 150, 226-228; *Georgia* v. *Pennsylvania R. Co.*, 324 U.S. 439, 456-457; *United States Alkali Export Assn.* v. *United States*, 325 U.S. 196, 205-206;

found **[**1735]** in cases of plain repugnancy between the antitrust and regulatory provisions. [29] Two recent cases, *Pan American World Airways v. United States, 371 U.S. 296*, and *California v. Federal Power Comm'n, 369 U.S. 482*, **[***938]** illustrate this principle. In *Pan American*, the Court held that because the Civil Aeronautics Board had been given broad powers to enforce the competitive standard clearly delineated by the Civil Aeronautics Act, and to immunize a variety of transactions from the operation of the antitrust laws, the Sherman Act could not be applied to facts composing the precise ingredients of a case subject to the Board's broad regulatory and remedial powers; in contrast, the banking agencies have authority neither to enforce the antitrust laws against mergers, cf. note 22, *supra*, nor to grant immunity from those laws.

***LEdHN[16]*** [16]

***LEdHN[15B]*** [15B]

In the *California* case, on the other hand, the Court held that the FPC's approval of a merger did not confer immunity from *§ 7* of the Clayton Act, even though, as in the instant case, the agency had taken the competitive factor into account in passing upon the merger application. See *369 U.S., at 484-485, 487-488*. We think *California* is controlling here. Although the Comptroller was required to consider effect upon competition in passing upon appellees' merger application, he was not required to give this factor any particular weight; he was not even required to (and did not) hold a hearing before approving the application; and there is no specific provision for judicial review of his decision. [30] Plainly, the **[*352]** range and scope of administrative powers under the Bank Merger Act bear little resemblance to those involved in *Pan American*.

Nor did Congress, in passing the Bank Merger Act, embrace the view that federal regulation of banking is so comprehensive that enforcement of the antitrust laws would be either unnecessary, in light of the completeness of the regulatory structure, or disruptive of that structure. On the contrary, the legislative history of the Act seems clearly to refute any suggestion that applicability of the antitrust laws was to be affected. Both the House and Senate Committee Reports stated that the Act would not affect in any way the applicability of the antitrust laws to bank acquisitions. H. R. Rep. No. 1416, 86th Cong., 2d Sess. 9; S. Rep. No. 196, 86th Cong., 1st Sess. 3. See also, *e. g.*, 105 Cong. Rec. 8131 (remarks of Senator Robertson, the Act's sponsor). Moreover, bank regulation is in most respects less complete than public utility regulation, to which interstate rail and air carriers, among others, are subject. Rate regulation in the banking industry is limited and largely indirect, see p. 328, *supra*; banks are under no duty not to discriminate in their services; and though the location of bank offices is regulated, banks may do business -- place loans and solicit deposits -- **[**1736]** where they please. The fact that the banking agencies maintain a close surveillance of the industry with a view toward preventing unsound practices that might impair liquidity or lead to insolvency does not make federal banking regulation all-pervasive, although it does minimize the hazards of intense competition. Indeed, that there

---

*Allen Bradley Co.* v. *Local Union No. 3*, 325 U.S. 797, 809-810; *Northern Pac. R. Co.* v. *United States*, 356 U.S. 1; *United States* v. *Radio Corp. of America*, 358 U.S. 334; *Maryland & Va. Milk Producers Assn.* v. *United States*, 362 U.S. 458, 464-467; *California* v. *Federal Power Comm'n*, 369 U.S. 482; *Pan American World Airways* v. *United States*, 371 U.S. 296, 304, 305; *Silver* v. *New York Stock Exchange*, 373 U.S. 341.

[29] See, *e. g.*, *Keogh* v. *Chicago & N. W. R. Co.*, *supra*, at 163; *Pan American World Airways* v. *United States*, *supra*, at 309-310. Cf. *Texas & Pac. R. Co.* v. *Abilene Cotton Oil Co.*, 204 U.S. 426.

[30] With respect to the question (upon which we intimate no view) whether judicial review of the Comptroller's decision is possible notwithstanding the absence of a specific provision, see Note, 75 Harv. L. Rev. 756, 762-763 (1962); Note, 37 N. Y. U. L. Rev. 735, 750, n. 95 (1962); cf. 1 Davis, Administrative Law (1958), § 4.04.

are so many direct public controls over unsound competitive practices in the industry refutes the argument that private controls of competition are necessary in the **[***939]** public interest and ought therefore to be immune from scrutiny under the antitrust laws. Cf. Kaysen and Turner, Antitrust Policy (1959), 206.

**[*353]** ***LEdHN[18]*** [18]***LEdHN[19]*** [19]We note, finally, that the doctrine of "primary jurisdiction" is not applicable here. ***HN9*** That doctrine requires judicial abstention in cases where protection of the integrity of a regulatory scheme dictates preliminary resort to the agency which administers the scheme. See *Far East Conference v. United States, 342 U.S. 570*; *Great Northern R. Co*. v. *Merchants Elevator Co., 259 U.S. 285*; Schwartz, Legal Restriction of Competition in the Regulated Industries: An Abdication of Judicial Responsibility, 67 Harv. L. Rev. 436, 464 (1954). [31] Court jurisdiction is not thereby ousted, but only postponed. See *General Am. Tank Car Corp*. v. *El Dorado Terminal Co., 308 U.S. 422, 433*; *Federal Maritime Bd*. v. *Isbrandtsen Co., 356 U.S. 481, 498-499*; 3 Davis, Administrative Law (1958), 1-55. Thus, even if we were to assume the applicability of the doctrine to merger-application proceedings before the banking agencies, [32] the present action would not be barred, for the agency proceeding was completed before the antitrust action was commenced. Cf. *United States v. Western Pac. R. Co., 352 U.S. 59, 69*; *Retail Clerks Int'l Assn*. v. *Schermerhorn, 373 U.S. 746, 756*. We recognize that the practical effect of applying the doctrine of primary **[*354]** jurisdiction has sometimes been to channel judicial enforcement of antitrust policy into appellate review of the agency's decision, see *Federal Maritime Bd*. v. *Isbrandtsen Co., supra*; cf. *D. L. Piazza Co*. v. *West Coast Line, Inc., 210 F.2d 947 (C. A. 2d Cir. 1954)*, or even to preclude such enforcement entirely if the agency has the power to approve the challenged activities, see *United States Nav. Co*. v. *Cunard S. S. Co., 284 U.S. 474*; cf. *United States v. Railway Express Agency, 101 F.Supp. 1008 (D. C. D. Del. 1951)*; but see *Federal Maritime Bd*. v. *Isbrandtsen Co., supra.* But here there may be no power of judicial review of the administrative decision approving the merger, and such approval does not in any event confer immunity from the antitrust laws, see pp. 350-352, *supra*. Furthermore, the considerations that militate against finding a repeal of the antitrust laws by implication from the existence of a regulatory scheme also argue persuasively against attenuating, by postponing, the courts' jurisdiction to enforce those laws.

***LEdHN[20]*** [20] ***LEdHN[21]*** [21] ***LEdHN[22]*** [22] ***LEdHN[23]*** [23]It **[***940]** **[**1737]** should be unnecessary to add that in holding as we do that the Bank Merger Act of 1960 does not preclude application of *§ 7* of the Clayton Act to bank mergers, we deprive the later statute of none of its intended force. Congress plainly did not intend the 1960 Act to extinguish other sources of federal restraint of bank acquisitions having anticompetitive effects. For example, Congress certainly knew that bank mergers would continue subject to the Sherman Act, see p. 352, *supra*, as well as that pure stock acquisitions by banks would continue subject to *§ 7* of the Clayton Act. If, in addition, bank mergers are subject to *§ 7*, we do not see how the objectives of the 1960 Act are thereby thwarted. It is not as if the Clayton and Sherman Acts embodied approaches to

---

[31] See generally Jaffe, Primary Jurisdiction Reconsidered, The Anti-Trust Laws, 102 U. of Pa. L. Rev. 577 (1954); Latta, Primary Jurisdiction in the Regulated Industries and the Antitrust Laws, 30 U. of Cin. L. Rev. 261 (1961); Note, Regulated Industries and the Antitrust Laws: Substantive and Procedural Coordination, 58 Col. L. Rev. 673 (1958).

[32] In *California* v. *Federal Power Comm'n, supra*, the Court held that the FPC must stay its proceeding on a merger application until the completion of a pending antitrust suit by the Justice Department; *a fortiori*, the court entertaining the suit would not be required to abstain pending consideration of the merger application by the FPC. We need not and do not consider the question whether the *California* decision would control here had the Comptroller been denied an opportunity to approve the merger before the antitrust suit was commenced.

antitrust policy inconsistent with or unrelated to each other. The Sherman Act, of course, forbids mergers effecting an unreasonable restraint of trade. See, *e. g.*, *Northern* **[*355]** *Securities Co.* v. *United States, 193 U.S. 197*; *United States v. Union Pac. R. Co., 226 U.S. 61*; indeed, there is presently pending before this Court a challenge to a bank merger predicated solely on the Sherman Act. *United States* v. *First Nat. Bank & Trust Co. of Lexington*, prob. juris. noted, *post*, p. 824. And ***HN10*** the tests of illegality under the Sherman and Clayton Acts are complementary. "The public policy announced by *§ 7* of the Clayton Act is to be taken into consideration in determining whether acquisition of assets . . . violates the prohibitions of the Sherman Act against unreasonable restraints." *United States v. Columbia Steel Co., 334 U.S. 495, 507, n. 7*; see Note, 52 Col. L. Rev. 766, 768, n. 10 (1952). To be sure, not every violation of *§ 7*, as amended, would necessarily be a violation of the Sherman Act; our point is simply that since Congress passed the 1960 Act with no intention of displacing the enforcement of the Sherman Act against bank mergers -- or even of *§ 7* against pure stock acquisitions by banks -- continued application of *§ 7* to bank mergers cannot be repugnant to the design of the 1960 Act. It would be anomalous to conclude that Congress, while intending the Sherman Act to remain fully applicable to bank mergers, and *§ 7* of the Clayton Act to remain fully applicable to pure stock acquisitions by banks, nevertheless intended *§ 7* to be completely inapplicable to bank mergers.

III. THE LAWFULNESS OF THE PROPOSED MERGER UNDER *SECTION 7*.

***HN11*** The statutory test is whether the effect of the merger "may be substantially to lessen competition" "in any line of commerce in any section of the country." We analyzed the test in detail in *Brown Shoe Co.* v. *United States, 370 U.S. 294*, and that analysis need not be repeated or extended here, for the instant case presents only a straightforward problem of application to particular facts.

**[*356]** ***LEdHN[24]*** [24] We have no difficulty in determining the "line of commerce" (relevant product or services market) and "section of the country" (relevant geographical market) in which to appraise the probable competitive effects of appellees' proposed merger. We agree with the District Court that the cluster of products (various kinds of credit) and services **[***941]** (such as checking accounts and trust administration) denoted by the term "commercial banking," see note 5, *supra*, composes a distinct line of commerce. Some commercial banking products or services are so distinctive that they are entirely free of effective competition from products or services of other financial institutions; the checking account is in this category. Others enjoy such cost advantages as to be insulated within a broad range from substitutes furnished by other institutions. For example, commercial banks compete with small-loan companies in the personal-loan market; but the small-loan companies' rates are **[**1738]** invariably much higher than the banks', in part, it seems, because the companies' working capital consists in substantial part of bank loans. [33] Finally, there are banking facilities which, **[*357]** although in terms of cost and price they are freely competitive with the facilities provided by other financial institutions,

---

[33] Cf. *United States* v. *Aluminum Co. of America*, 148 F.2d 416, 425 (C. A. 2d Cir. 1945). In the instant case, unlike *Aluminum Co.*, there is virtually no time lag between the banks' furnishing competing financial institutions (small-loan companies, for example) with the raw material, *i. e.*, money, and the institutions' selling the finished product, *i. e.*, loans; hence the instant case, compared with *Aluminum Co.* in this respect, is *a fortiori*. As one banker testified quite frankly in the instant case in response to the question: "Do you feel that you are in substantial competition with these institutions [personal-finance and sales-finance companies] that you lend . . . such money to for loans that you want to make?" -- "Oh, no, we definitely do not. If we did, we would stop making the loans to them." (R. 298.) The reason for the competitive disadvantage of most lending institutions *vis-a-vis* banks is that only banks obtain the bulk of their working capital without having to pay interest or comparable charges thereon, by virtue of their unique power to accept demand deposits. The critical area of short-term commercial credit, see pp. 326-327, *supra*,

nevertheless enjoy a settled consumer preference, insulating them, to a marked degree, from competition; this seems to be the case with savings deposits. [34] In sum, it is clear that commercial banking is a market "sufficiently inclusive to be meaningful in terms of trade realities." *Crown Zellerbach Corp*. v. Federal Trade Comm'n, 296 F.2d 800, 811 (C. A. 9th Cir. 1961).

***LEdHN[25]*** [25] ***LEdHN[26]*** [26]We part company with the District Court on the determination of the appropriate "section of the country." ***HN12*** The proper question to be asked in this case is not where the parties to the merger do business or even where they compete, but where, within the area of competitive overlap, the effect of the merger on competition will be direct and immediate. **[***942]** See Bock, Mergers and Markets (1960), 42. This depends upon "the geographic structure of supplier-customer relations." Kaysen and Turner, Antitrust **[*358]** Policy (1959), 102. In banking, as in most service industries, convenience of location is essential to effective competition. Individuals and corporations typically confer the bulk of their patronage on banks in their local community; they find it impractical to conduct their banking business at a distance. [35] See *Transamerica Corp*. v. *Board* **[**1739]** *of Govs. of Fed. Res. Sys., 206 F.2d 163, 169 (C. A. 3d Cir. 1953)*. The factor of inconvenience localizes banking competition as effectively as high transportation costs in other industries. See, *e. g.*, *American* **[*359]** *Crystal Sugar Co*. v. *Cuban-American Sugar Co., 152 F.Supp. 387, 398 (D. C. S. D. N. Y. 1957)*, aff'd, *259 F.2d 524 (C. A. 2d Cir. 1958)*. Therefore, since, as we recently said in a related context, the

---

appears to be one in which banks have little effective competition, save in the case of very large companies which can meet their financing needs from retained earnings or from issuing securities or paper.

[34] As one witness for the defendants testified:

"We have had in Philadelphia for 50 years or more the mutual savings banks offering 1/2 per cent and in some instances more than 1/2 per cent higher interest than the commercial banks. Nevertheless, the rate of increase in savings accounts in commercial banks has kept pace with and in many of the banks exceeded the rate of increase of the mutual banks paying 3 1/2 per cent. . . .

"I have made some inquiries. There are four banks on the corner of Broad and Chestnut. Three of them are commercial banks all offering 3 per cent, and one is a mutual savings bank offering 3 1/2. As far as I have been able to discover, there isn't anybody in Philadelphia who will take the trouble to walk across Broad Street to get 1/2 of 1 per cent more interest. If you ask me why, I will say I do not know. Habit, custom, personal relationships, convenience, doing all your banking under one roof appear to be factors superior to changes in the interest rate level." (R. 1388-1389.)

[35] Consider the following colloquy between governmental counsel and a witness for the defendants:

"Q. What do you consider to be the area of a branch office?

"A. Well, there is no set rule on that. We hope to have an area from 1 1/2 to 2 miles.

"However, we have opened branches directly in the communities where other banks are established, in fact, across the street from them because it is not only a question of getting new business, it's a question of servicing and retaining the accounts that we now have.

. . . . .

"Q. And your business is not necessarily dependent upon it [the customer] being within a mile or two of a branch, is it?

"A. To a large degree, it is, because we found that we were losing deposit accounts regularly from our in-town offices because other banks were opening or had offices in other sections of the city; and in order to retain those accounts and to get additional business we felt it was necessary to establish branches." (R. 1815.)

As far as the customer for a bank loan is concerned, "the size of his market is somewhat dependent upon his own size, how well he is known, and so on. For example, for small business concerns known primarily locally, they may consider that their market is a strictly local one, and they may be forced by circumstances to do business with banks in a nearby geographic relationship to them. On the other hand, as businesses increase in size, the scope of their business activities, their national reputation, the alternatives they have available to them will be spread again over a very large area, possibly as large as the entire United States." (R. 1372.) (Defendants' testimony on direct examination.)

"area of effective competition in the known line of commerce must be charted by careful selection of the market area in which the seller operates, *and to which the purchaser can practicably turn for supplies," Tampa Elec. Co*. v. *Nashville Coal Co., 365 U.S. 320, 327* (emphasis supplied); see *Standard Oil Co*. v. *United States, 337 U.S. 293, 299* and 300, n. 5, the four-county area in which appellees' offices are located would seem to be the relevant geographical market. Cf. *Brown Shoe Co., supra*, at 338-339. In fact, the vast bulk of appellees' business originates in the four-county area. [36] Theoretically, we should be concerned with the **[***943]** possibility that bank offices on the perimeter of the area may be in **[*360]** effective competition with bank offices within; actually, this seems to be a factor of little significance. [37]

***LEdHN[27]*** [27]We recognize that the area in which appellees have their offices does not **[**1740]** delineate with perfect accuracy an appropriate "section of the country" in which to appraise the effect of the merger upon competition. Large borrowers and large depositors, the record shows, may find it practical to do a large part of their banking business outside their home community; very small borrowers and depositors may, as a practical matter, be confined to bank offices in their immediate neighborhood; and customers **[*361]** of intermediate size, it would appear, deal with banks within an area intermediate between these extremes. See notes 35-37, *supra*. So also, some banking services are evidently more local in nature than others. But that in banking the relevant geographical market is a function of each separate customer's economic scale means simply that a workable compromise must be found: some fair intermediate delineation which avoids the indefensible extremes of drawing the market either so expansively as to make the effect of the merger upon competition seem insignificant, because only the very largest bank customers are taken into account in defining the market, or so narrowly as to place appellees in different markets, because only the smallest customers are considered. We think that the four-county Philadelphia metropolitan area, which state law apparently recognizes as a meaningful

---

[36] The figures for PNB and Girard respectively are: 54% and 63% of the dollar volume of their commercial and industrial loans originate in the four-county area; 75% and 70%, personal loans; 74% and 84%, real estate loans; 41% and 62%, lines of credit; 94% and 72%, personal trusts; 81% and 94%, time and savings deposits; 56% and 77%, demand deposits; 93% and 87%, demand deposits of individuals. Actually, these figures may be too low. The evidence discloses that most of the business done outside the area is with large borrowers and large depositors; appellees do not, by and large, deal with small businessmen and average individuals not located in the four-county area. For example, of appellees' combined total business demand deposits under $ 10,000, 94% originate in the four-county area. This reinforces the thesis that the smaller the customer, the smaller is his banking market geographically. See note 35, *supra*.

The appellees concede that the four-county area has sufficient commercial importance to qualify, under *Brown Shoe Co., supra*, at 336-337, as a "section of the country" within the meaning of § 7. See *Maryland & Va. Milk Producers Assn*. v. *United States*, 362 U.S. 458, 469; cf. *United States* v. *Yellow Cab Co.*, 332 U.S. 218, 226; *Indiana Farmer's Guide Publishing Co*. v. *Prairie Farmer Publishing Co.*, 293 U.S. 268, 279.

[37] Appellees suggest not that bank offices skirting the four-county area provide meaningful alternatives to bank customers within the area, but that such alternatives are provided by large banks, from New York and elsewhere, which solicit business in the Philadelphia area. There is no evidence of the amount of business done in the area by banks with offices outside the area; it may be that such figures are unobtainable. In any event, it would seem from the local orientation of banking insofar as smaller customers are concerned, see notes 35 and 36, *supra*, that competition from outside the area would only be important to the larger borrowers and depositors. If so, the four-county area remains a valid geographical market in which to assess the anticompetitive effect of the proposed merger upon the banking facilities available to the smaller customer -- a perfectly good "line of commerce," in light of Congress' evident concern, in enacting the 1950 amendments to § 7, with preserving small business. See *Brown Shoe Co., supra*, at 315-316. As a practical matter the small businessman can only satisfy his credit needs at local banks. To be sure, there is still some artificiality in deeming the four-county area the relevant "section of the country" so far as businessmen located near the perimeter are concerned. But such fuzziness would seem inherent in any attempt to delineate the relevant geographical market. Note, 52 Col. L. Rev. 766, 778-779, n. 77 (1952). And it is notable that outside the four-county area, appellees' business rapidly thins out. Thus, the other six counties of the Delaware Valley account for only 2% of appellees' combined individual demand deposits; 4% demand deposits of partnerships and corporations; 7%, loans; 2%, savings deposits; 4%, business time deposits.

banking community in allowing **[***944]** Philadelphia banks to branch within it, and which would seem roughly to delineate the area in which bank customers that are neither very large nor very small find it practical to do their banking business, is a more appropriate "section of the country" in which to appraise the instant merger than any larger or smaller or different area. Cf. Hale and Hale, Market Power: Size and Shape Under the Sherman Act (1958), 119. We are helped to this conclusion by the fact that the three federal banking agencies regard the area in which banks have their offices as an "area of effective competition." Not only did the FDIC and FRB, in the reports they submitted to the Comptroller of the Currency in connection with appellees' application for permission to merge, so hold, but the Comptroller, in his statement approving the merger, agreed: "With respect to the effect upon competition, there are three separate levels and effective areas of competition involved. These are the national level for national **[*362]** accounts, the regional or sectional area, and the local area of the City of Philadelphia and the immediately surrounding area."

**[**1741]** ***LEdHN[28]*** [28] ***LEdHN[29]*** [29]Having determined the relevant market, we come to the ultimate question under *§ 7*: whether the effect of the merger "may be substantially to lessen competition" in the relevant market. Clearly, this is not the kind of question which is susceptible of a ready and precise answer in most cases. ***HN13*** It requires not merely an appraisal of the immediate impact of the merger upon competition, but a prediction of its impact upon competitive conditions in the future; this is what is meant when it is said that the amended *§ 7* was intended to arrest anticompetitive tendencies in their "incipiency." See *Brown Shoe Co*., *supra*, at 317, 322. Such a prediction is sound only if it is based upon a firm understanding of the structure of the relevant market; yet the relevant economic data are both complex and elusive. See generally Bok, *Section 7* of the Clayton Act and the Merging of Law and Economics, 74 Harv. L. Rev. 226 (1960). And unless businessmen can assess the legal consequences of a merger with some confidence, sound business planning is retarded. See *Crown Zellerbach Corp*. v. *Federal Trade Comm'n*, 296 F.2d 800, 826-827 (C. A. 9th Cir. 1961). So also, we must be alert to the danger of subverting congressional intent by permitting a too-broad economic investigation. *Standard Oil Co*. v. *United States, 337 U.S. 293, 313*. And so in any case in which it is possible, without doing violence to the congressional objective embodied in *§ 7*, to simplify the test of illegality, the courts ought to do so in the interest of sound and practical judicial administration. See *Union Carbide Corp*., Trade Reg. Rep., FTC Complaints and Orders, 1961-1963, para. 15503, at 20375-20376 (concurring opinion). This is such a case.

***LEdHN[30]*** [30] We noted in *Brown Shoe Co., supra*, at 315, that "the dominant theme pervading congressional consideration of **[*363]** the 1950 amendments [to *§ 7*] was a fear of what was considered to be a rising tide of economic concentration in the American economy." This intense congressional concern with the trend toward concentration warrants dispensing, in certain cases, with elaborate proof of market structure, market behavior, or probable **[***945]** anticompetitive effects. Specifically, we think that ***HN14*** a merger which produces a firm controlling an undue percentage share of the relevant market, and results in a significant increase in the concentration of firms in that market, is so inherently likely to lessen competition substantially that it must be enjoined in the absence of evidence clearly showing that the merger is not likely to have such anticompetitive effects. See *United States v. Koppers Co., 202 F.Supp. 437 (D. C. W. D. Pa. 1962)*.

Such a test lightens the burden of proving illegality only with respect to mergers whose size makes them inherently suspect in light of Congress' design in *§ 7* to prevent undue concentration.

Furthermore, the test is fully consonant with economic theory. [38] That "competition is likely to be greatest when there are many sellers, none of which has any significant market share," [39] is common ground among most economists, and was undoubtedly a premise **[**1742]** of congressional reasoning about the antimerger statute.

**[*364]** ***LEdHN[1B]*** [1B]The merger of appellees will result in a single bank's controlling at least 30% of the commercial banking business in the four-county Philadelphia metropolitan area. [40] Without attempting to specify the smallest market share which would still be considered to threaten undue concentration, we are clear that 30% presents that threat. [41] **[*365]** Further, **[***946]** whereas presently the two largest banks in the area (First Pennsylvania and PNB) control between them approximately 44% of the area's commercial banking business, the two largest after the merger (PNB-Girard and First Pennsylvania) will control 59%. Plainly, we think, this increase of more than 33% in concentration must be regarded as significant. [42]

***LEdHN[31]*** [31]Our conclusion that these percentages raise an inference that the effect of the contemplated merger of appellees may be substantially to lessen competition is not an arbitrary one, although neither the terms of *§ 7* nor the legislative history suggests that any particular percentage share was deemed critical. The House Report states that the tests of illegality under amended *§ 7* "are intended to be similar to those which the courts have applied in interpreting the same

---

38 See Kaysen and Turner, Antitrust Policy (1959), 133; Stigler, Mergers and Preventive Antitrust Policy, 104 U. of Pa. L. Rev. 176, 182 (1955); Bok, *supra*, at 308-316, 328. Cf. Markham, Merger Policy Under the New Section 7: A Six-Year Appraisal, 43 Va. L. Rev. 489, 521-522 (1957).

39 Comment, "Substantially to Lessen Competition . . .": Current Problems of Horizontal Mergers, 68 Yale L. J. 1627, 1638-1639 (1959); see, *e. g.*, Machlup, The Economics of Sellers' Competition (1952), 84-93, 333-336; Bain, Barriers to New Competition (1956), 27. Cf. Mason, Market Power and Business Conduct: Some Comments, 46-2 Am. Econ. Rev. (1956), 471.

40 See p. 331, *supra*. We note three factors that cause us to shade the percentages given earlier in this opinion, in seeking to calculate market share. (1) The percentages took no account of banks which do business in the four-county area but have no offices there; however, this seems to be a factor of little importance, at least insofar as smaller customers are concerned, see note 37, *supra*. (2) The percentages took no account of banks which have offices in the four-county area but not their home offices there; however, there seem to be only two such offices and appellees in this Court make no reference to this omission. (3) There are no percentages for the amount of business of banks located in the area, other than appellees, which originates in the area. Appellees contend that since most of the 40 other banks are smaller, they do a more concentratedly local business than appellees, and hence account for a relatively larger proportion of such business. If so, we doubt much correction is needed. The five largest banks in the four-county area at present control some 78% of the area banks' assets. Thus, even if the small banks have a somewhat different pattern of business, it is difficult to see how that would substantially diminish the appellees' share of the local banking business.

No evidence was introduced as to the quantitative significance of these three factors, and appellees do not contend that as a practical matter such evidence could have been obtained. Under the circumstances, we think a downward correction of the percentages to 30% produces a conservative estimate of appellees' market share.

41 Kaysen and Turner, *supra*, note 38, suggest that 20% should be the line of prima facie unlawfulness; Stigler suggests that any acquisition by a firm controlling 20% of the market after the merger is presumptively unlawful; Markham mentions 25%. Bok's principal test is increase in market concentration, and he suggests a figure of 7% or 8%. And consult note 20, *supra*. We intimate no view on the validity of such tests for we have no need to consider percentages smaller than those in the case at bar, but we note that such tests are more rigorous than is required to dispose of the instant case. Needless to say, the fact that a merger results in a less-than-30% market share, or in a less substantial increase in concentration than in the instant case, does not raise an inference that the merger is *not* violative of § 7. See, *e. g., Brown Shoe Co., supra*.

42 See note 41, *supra*. It is no answer that, among the three presently largest firms (First Pennsylvania, PNB, and Girard), there will be no increase in concentration. If this argument were valid, then once a market had become unduly concentrated, further concentration would be legally privileged. On the contrary, if concentration is already great, the importance of preventing even slight increases in concentration and so preserving the possibility of eventual deconcentration is correspondingly great. Comment, note 39, *supra*, at 1644.

language as used in other sections of the Clayton Act." H. R. Rep. No. 1191, 81st Cong., 1st Sess. 8. Accordingly, we **[**1743]** have relied upon decisions under these other sections in applying *§ 7*. See *Brown Shoe Co., supra, passim*; cf. *United States v. E. I. du Pont de Nemours & Co., 353 U.S. 586, 595*, and n. 15. In *Standard Oil Co*. v. *United States, 337 U.S. 293*, cited in S. Rep. No. 1775, 81st Cong., 2d Sess. 6, this Court held violative of § 3 of the Clayton Act exclusive contracts **[*366]** whereby the defendant company, which accounted for 23% of the sales in the relevant market and, together with six other firms, accounted for 65% of such sales, maintained control over outlets through which approximately 7% of the sales were made. In *Federal Trade Comm'n v. Motion Picture Adv. Serv. Co., 344 U.S. 392*, we held unlawful, under *§ 1* of the Sherman Act and *§ 5* of the Federal Trade Commission Act, rather than under § 3 of the Clayton Act, exclusive arrangements whereby the four major firms in the industry had foreclosed 75% of the relevant market; the respondent's market share, evidently, was 20%. Kessler and Stern, Competition, Contract, and Vertical Integration, 69 Yale L. J. 1, 53 n. 231 (1959). In the instant case, by way of comparison, the four largest banks after the merger will foreclose 78% of the relevant market. P. 331, *supra*. And in *Standard Fashion Co*. v. *Magrane-Houston Co., 258 U.S. 346*, the Court held violative of § 3 a series of exclusive contracts whereby a single manufacturer controlled 40% of the industry's retail outlets. **[***947]** Doubtless these cases turned to some extent upon whether "by the nature of the market there is room for newcomers." *Federal Trade Comm'n* v. *Motion Picture Adv. Serv. Co., supra*, at 395. But they remain highly suggestive in the present context, for as we noted in *Brown Shoe Co., supra*, at 332, n. 55, integration by merger is more suspect than integration by contract, because of the greater permanence of the former. The market share and market concentration figures in the contract-integration cases, taken together with scholarly opinion, see notes 41 and 42, *supra*, support, we believe, the inference we draw in the instant case from the figures disclosed by the record.

***LEdHN[32A]*** [32A]There is nothing in the record of this case to rebut the inherently anticompetitive tendency manifested by these percentages. There was, to be sure, testimony by bank officers to the effect that competition among banks in **[*367]** Philadelphia was vigorous and would continue to be vigorous after the merger. We think, however, that the District Court's reliance on such evidence was misplaced. This lay evidence on so complex an economic-legal problem as the substantiality of the effect of this merger upon competition was entitled to little weight, in view of the witnesses' failure to give concrete reasons for their conclusions. [43]

***LEdHN[32B]*** [32B] ***LEdHN[33]*** [33]

Of equally little value, we think, are the assurances offered by appellees' witnesses that customers dissatisfied with the services of the resulting **[**1744]** bank may readily turn to the 40 other banks in the Philadelphia area. In every case short of outright monopoly, the disgruntled customer has alternatives; even in tightly oligopolistic markets, there may be small firms operating. A fundamental purpose of amending *§ 7* was to arrest the trend toward concentration, the *tendency* to monopoly, before the consumer's alternatives disappeared through merger, and that purpose would be ill-served if the law stayed its hand until 10, or 20, or 30 more Philadelphia banks were absorbed. This is not a fanciful eventuality, in view of the strong trend toward mergers evident

---

[43] The fact that some of the bank officers who testified represented small banks in competition with appellees does not substantially enhance the probative value of their testimony. ***HN15*** The test of a competitive market is not only whether small competitors flourish but also whether consumers are well served. See *United States* v. *Bethlehem Steel Corp*., 168 F.Supp. 576, 588, 592 (D. C. S. D. N. Y. 1958). "Congressional concern [was] with the protection of *competition*, not *competitors*." *Brown Shoe Co., supra*, at 320. In an oligopolistic market, small companies may be perfectly content to follow the high prices set by the dominant firms, yet the market may be profoundly anticompetitive.

in the area, see p. 331, *supra*; and we might note also that entry of new competitors into the banking field is far from easy. [44]

**[*368]** ***LEdHN[34]*** [34]So also, we reject the position that commercial banking, because it is subject to a high degree of governmental regulation, or because it deals in the intangibles of credit and services rather than in the manufacture or sale of tangible commodities, is **[***948]** somehow immune from the anticompetitive effects of undue concentration. Competition among banks exists at every level -- price, variety of credit arrangements, convenience of location, attractiveness of physical surroundings, credit information, investment advice, service charges, personal accommodations, advertising, miscellaneous special and extra services -- and it is keen; on this appellees' own witnesses were emphatic. [45] **[*369]** There is no reason to **[**1745]** think that concentration is less inimical to the free play of competition in banking than in other service industries. On the contrary, it is in all probability more inimical. For example, banks compete

---

[44] Entry is, of course, wholly a matter of governmental grace. See p. 328, *supra*. In the 10-year period ending in 1961, only one new bank opened in the Philadelphia four-county area. That was in 1951. At the end of 10 years, the new bank controlled only one-third of 1% of the area's deposits.

[45] The following colloquy is representative:

"Q. Mr. Jennings, what is the nature of competition among commercial banks?

"A. Keen, highly competitive. I think, from my own observation, that I have never known competition among banks to be keener than it is today. . . .

"Q. In what area does competition exist? . . .

"A. I think the stiffest, sternest competition of all is in the field to obtain demand deposits and loans. . . .

"Q. What form does the competition take?

"A. It takes many forms. If we are dealing with the deposits of large corporations, wealthy individuals, I would say that most, if not all, of the major banks of the country are competing for such deposits. The same would hold true as regards loans to those corporations or wealthy individuals.

"If we go into the field of smaller loans, smaller deposits, the competition is more regional -- wide but nevertheless regional -- and there the large banks as well as the small banks are after that business with everything they have.

. . . .

"Q. What form does the competition take? Is it competition in price?

"A. No, I wouldn't say that it is competition as to price. After all, interest rates are regulated at the top level by the laws of the 50 states. Interest rates at the bottom level have no legal limitation, but for practical purposes the prime rate . . . furnishes a very effective floor. I would say that the area of competition for interest rates would range between, let us say, the prime rate of 4 1/2 and 6 per cent for normal loans exclusive of consumer loans, where higher rates are permitted.

. . . .

"In the area of service charges, I would say that banks are competitive in that field. They base their service charges primarily on their costs, but they have to maintain a weather eye to windward as to what the competitors are charging in the service charge field. The minute they get out of line in connection with service charges they find their customers will start to protest, and if something isn't done some of the customers will leave them for a differential in service charges of any significance.

"I do not believe that competition is really affected by the price area. I think it is affected largely by the quality and the caliber of service that banks give and whether or not they feel they are being received in the right way, whether they are welcome in the bank. Personalities enter into it very heavily, but I do not think price as such is a major factor in banking competition. It is there, it is a factor, but not major." (R. 1940-1942.)

It should be noted that besides competition in interest rates, there is a great deal of indirect price competition in the banking industry. For example, the amount of compensating balance a bank requires of a borrower (*i. e.*, the amount the borrower must always retain in his demand deposit account with the bank) affects the real cost of the loan, and varies considerably in the bank's discretion.

to fill the credit needs of businessmen. Small businessmen especially are, as a practical matter, confined to their locality for the satisfaction of their credit needs. See note 35, *supra*. If the number of banks in the locality is reduced, the vigor of competition for filling the marginal small business borrower's needs is likely to diminish. **[*370]** At the same time, his concomitantly greater difficulty in obtaining credit is likely to put him at a disadvantage *vis-a-vis* larger businesses with **[***949]** which he competes. In this fashion, concentration in banking accelerates concentration generally.

***LEdHN[35A]*** [35A]

We turn now to three affirmative justifications which appellees offer for the proposed merger. The first is that only through mergers can banks follow their customers to the suburbs and retain their business. This justification does not seem particularly related to the instant merger, but in any event it has no merit. There is an alternative to the merger route: the opening of new branches in the areas to which the customers have moved -- so-called *de novo* branching. Appellees do not contend that they are unable to expand thus, by opening new offices rather than acquiring existing ones, and surely one premise of an antimerger statute such as *§ 7* is that corporate growth by internal expansion is socially preferable to growth by acquisition.

***LEdHN[36]*** [36]Second, it is suggested that the increased lending limit of the resulting bank will enable it to compete with the large out-of-state banks, particularly the New York banks, for very large loans. We reject this application of the concept of "countervailing power." Cf. *Kiefer-Stewart Co*. v. *Joseph E. Seagram & Sons, 340 U.S. 211*.If anticompetitive effects in one market could be justified by procompetitive consequences in another, the logical upshot would be that every firm in an industry could, without violating *§ 7*, embark on a series of mergers that would make it in the end as large as the industry leader. For if all the commercial banks in the Philadelphia area merged into one, it would be smaller than the largest bank in New York City. This is not a case, plainly, where two small firms in a market propose to merge in order to be able to compete more successfully with the leading firms in that **[*371]** market. Nor is it a case in which lack of adequate banking facilities is causing hardships to individuals or businesses in the community. The present two largest banks in Philadelphia have lending limits of $ 8,000,000 each. The only businesses located in the Philadelphia area which find such limits inadequate are large enough readily to obtain bank credit in other cities.

***LEdHN[35B]*** [35B] ***LEdHN[37]*** [37] This brings us to appellees' final contention, that Philadelphia needs a bank larger than it now has in order to bring business to the area and stimulate its economic development. See p. 334 and note 10, *supra*. We are clear, however, that a merger the effect of which "may be substantially to lessen competition" is not saved because, on some ultimate reckoning of social or economic debits and credits, it may be deemed beneficial. A value choice of such magnitude is beyond the ordinary limits of judicial competence, and in any event has been made for us already, by Congress when it enacted the amended *§ 7*. Congress determined to preserve our traditionally competitive economy. **[**1746]** It therefore proscribed anticompetitive mergers, the benign and the malignant alike, fully aware, we must assume, that some price might have to be paid.

***LEdHN[38]*** [38]In holding as we do that the merger of appellees would violate *§ 7* and must therefore be enjoined, we reject appellees' pervasive suggestion that application of the procompetitive policy of *§ 7* to the banking industry will have dire, although unspecified, consequences for the national economy. Concededly, **[***950]** PNB and Girard are healthy

and strong; they are not undercapitalized or overloaned; they have no management problems; the Philadelphia area is not overbanked; ruinous competition is not in the offing. *Section 7* does not mandate cutthroat competition in the banking industry, and does not exclude defenses based on dangers to liquidity or **[*372]** solvency, if to avert them a merger is necessary. [46] It does require, however, that the forces of competition be allowed to operate within the broad framework of governmental regulation of the industry. The fact that banking is a highly regulated industry critical to the Nation's welfare makes the play of competition not less important but more so. At the price of some repetition, we note that if the businessman is denied credit because his banking alternatives have been eliminated by mergers, the whole edifice of an entrepreneurial system is threatened; if the costs of banking services and credit are allowed to become excessive by the absence of competitive pressures, virtually all costs, in our credit economy, will be affected; and unless competition is allowed to fulfill its role as an economic regulator in the banking industry, the result may well be even more governmental regulation. Subject to narrow qualifications, it is surely the case that competition is our fundamental national economic policy, offering as it does the only alternative to the cartelization or governmental regimentation of large portions of the economy. Cf. *Northern Pac. R. Co*. v. *United States, 356 U.S. 1, 4*. There is no warrant for declining to enforce it in the instant case.

The judgment of the District Court is reversed and the case remanded with direction to enter judgment enjoining the proposed merger.

*It is so ordered*.

MR. JUSTICE WHITE took no part in the consideration or decision of this case.

**Dissent by:** HARLAN

**Dissent**

**[*373]** MR. JUSTICE HARLAN, whom MR. JUSTICE STEWART joins, dissenting.

I suspect that no one will be more surprised than the Government to find that the Clayton Act has carried the day for its case in this Court.

In response to an apparently accelerating trend toward concentration in the commercial banking system in this country, a trend which existing laws were evidently illsuited to control, numerous bills were introduced in Congress from 1955 to 1960. [1] During this period, the Department of Justice and the federal banking agencies [2] advocated **[***951]** divergent methods of dealing with the competitive aspects of bank mergers, the former urging **[**1747]** the extension of *§ 7* of the Clayton Act to cover such mergers and the latter supporting a regulatory scheme under which the effect of a bank merger on competition would be only one of the factors to be considered

---

46 Thus, arguably, the so-called failing-company defense, see *International Shoe Co*. v. *Federal Trade Comm'n*, 280 U.S. 291, 299-303, might have somewhat larger contours as applied to bank mergers because of the greater public impact of a bank failure compared with ordinary business failures. But the question what defenses in § 7 actions must be allowed in order to avert unsound banking conditions is not before us, and we intimate no view upon it.

1 See Wemple and Cutler, The Federal Bank Merger Law and the Antitrust Laws, 16 Bus. Law. 994, 995 (1961). Many of the bills are summarized in Funk, Antitrust Legislation Affecting Bank Mergers, 75 Banking L. J. 369 (1958).

2 These agencies and the areas of their primary supervisory responsibility are: (1) the Comptroller of the Currency -- national banks; (2) the Federal Reserve System -- state Reserve-member banks; (3) the FDIC -- insured nonmember banks.

in determining whether the merger would be in the public interest. The Justice Department's proposals were repeatedly rejected by Congress, and the regulatory approach of the banking agencies was adopted in the Bank Merger Act of 1960. See *infra*, pp. 379-383.

Sweeping aside the "design fashioned in the Bank Merger Act" as "predicated upon uncertainty as to the scope of *§ 7*" of the Clayton Act (*ante*, p. 349), the Court today holds *§ 7* to be applicable to bank mergers and concludes that it has been violated in this case. I respectfully submit that this holding, which sanctions a remedy **[*374]** regarded by Congress as inimical to the best interests of the banking industry and the public, and which will in large measure serve to frustrate the objectives of the Bank Merger Act, finds no justification in either the terms of the 1950 amendment of the Clayton Act or the history of the statute.

I.

The key to this case is found in the special position occupied by commercial banking in the economy of this country. With respect to both the nature of the operations performed and the degree of governmental supervision involved, it is fundamentally different from ordinary manufacturing and mercantile businesses.

The unique powers of commercial banks to accept demand deposits, provide checking account services, and lend against fractional reserves permit the banking system as a whole to create a supply of "money," a function which is indispensable to the maintenance of the structure of our national economy. And the amount of the funds held by commercial banks is very large indeed; demand deposits alone represent approximately three-fourths of the money supply in the United States. [3] Since a bank's assets must be sufficiently liquid to accommodate demand withdrawals, short-term commercial and industrial loans are the major element in bank portfolios, thus making commercial banks the principal source of short-term business credit. Many other services are also provided by banks, but in these more or less collateral areas they receive more active competition from other financial institutions. [4]

**[*375]** Deposit banking operations affect not only the volume of money and credit, but also the value of the dollar and the stability of the currency system. In this field, considerations other than simply the preservation of competition are relevant. Moreover, commercial banks are entrusted with the safekeeping of large amounts of funds belonging to individuals and corporations. Unlike the ordinary investor, these depositors do not regard their funds as **[***952]** subject to a risk of loss and, at least in the case of demand depositors, they do not receive a return for taking such a risk. A bank failure is a community disaster; its impact first strikes the bank's depositors most heavily, and then spreads throughout the economic life of the community. [5] Safety and soundness of banking practices are thus critical factors in any banking system.

The **[**1748]** extensive blanket of state and federal regulation of commercial banking, much of which is aimed at limiting competition, reflects these factors. Since the Court's opinion describes, at some length, aspects of the supervision exercised by the federal banking agencies (*ante*, pp.

---

[3] Samuelson, Economics (5th ed. 1961), p. 311.

[4] For example, savings and loan associations, credit unions, and other institutions compete with banks in installment lending to individuals, and banks are in competition with individuals in the personal trust field.

[5] Since bank insolvencies destroy sources of credit, not only borrowers but also others who rely on the borrowers' ability to secure loans may be adversely affected. See Berle, Banking Under the Anti-Trust Laws, 49 Col. L. Rev. 589, 592 (1949).

327-330), I do no more here than point out that, in my opinion, such regulation evidences a plain design grounded on solid economic considerations to deal with banking as a specialized field.

This view is confirmed by the Bank Merger Act of 1960 and its history.

Federal legislation dealing with bank mergers [6] dates from 1918, when Congress provided that, subject to the **[*376]** approval of the Comptroller of the Currency, two or more national banks could consolidate to form a new national bank; [7] similar provision was made in 1927 for the consolidation of a state and a national bank resulting in a national bank. [8] In 1952 mergers of national and state banks into national banks were authorized, also conditioned on approval by the Comptroller of the Currency. [9] In 1950 Congress authorized the theretofore prohibited [10] merger or consolidation of a national bank with a state bank when the assuming or resulting bank would be a state bank. [11] In addition, the Federal Deposit Insurance Act was amended to require the approval of the FDIC for all mergers and consolidations between insured and noninsured banks, and of specified federal banking agencies for conversions of insured banks into insured state banks if the conversion would result in the capital stock or surplus of the newly formed bank being less than that of the converting bank. [12] The Act further required insured banks merging with insured state banks to secure the approval of the Comptroller of the Currency if the assuming bank would be a national bank, and the **[*377]** approval of the Board of Governors of the Federal Reserve System and the FDIC, respectively, if the assuming or resulting bank would be a state member bank or nonmember insured bank. [13]

None **[***953]** of this legislation prescribed standards by which the appropriate federal banking agencies were to be guided in determining the significance to be attributed to the anticompetitive effects of a proposed merger. As previously noted (*supra, p. 373*), Congress became increasingly concerned with this problem in the 1950's. The antitrust laws apparently provided no solution; in only one case prior to 1960, *United States* v. *Firstamerica Corp*., Civil No. 38139, N. D. Cal., March 30, 1959, settled by consent decree, had either the Sherman or Clayton Act been invoked to attack a commercial bank merger.

**[**1749]** Indeed the inapplicability to bank mergers of *§ 7* of the Clayton Act, even after it was amended in 1950, was, for a time, an explicit premise on which the Department of Justice performed its antitrust duties. In passing upon an application for informal clearance of a bank merger in 1955, the Department stated:

---

[6] The term "merger" is generally used throughout this opinion to designate any form of corporate amalgamation. See note 7 in the Court's opinion, *ante*, p. 332. Occasionally, however, as in the above paragraph, the terms "merger" and "consolidation" are used in their technical sense.

[7] 40 Stat. 1043, as amended, 12 U. S. C. (Supp. IV, 1963) § 215.

[8] 44 Stat. 1225, as amended, 12 U. S. C. (Supp. IV, 1963) § 215.

[9] 66 Stat. 599, as amended, 12 U. S. C. (Supp. IV, 1963) § 215a.

[10] See Paton, Conversion, Merger and Consolidation Legislation -- "Two-Way Street" For National and State Banks, 71 Banking L. J. 15 (1954).

[11] 64 Stat. 455, as amended, 12 U. S. C. § 214a.

[12] 64 Stat. 457; see 64 Stat. 892 (now 74 Stat. 129, 12 U. S. C. (Supp. IV, 1963) § 1828 (c)).

[13] *Ibid*. However, under the Act, insured banks merging with insured state banks did not have to obtain approval unless the capital stock or surplus of the resulting or assuming bank would be less than the aggregate capital stock or surplus of all the merging banks.

"After a complete consideration of this matter, we have concluded that this Department would not have jurisdiction to proceed under *section 7* of the Clayton Act. For this reason this Department does not presently plan to take any action on this matter." Hearings before the Antitrust Subcommittee of the House Committee on the Judiciary, 84th Cong., 1st Sess., Ser. 3, pt. 3, p. 2141 (1955).

**[*378]** And in testifying before the Senate Committee on Banking and Currency in 1957 Attorney General Brownell, speaking of bank mergers, noted:

"On the basis of these provisions the Department of Justice has concluded, and all apparently agree, that asset acquisitions by banks are not covered by *section 7* [of the Clayton Act] as amended in 1950." Hearings on the Financial Institutions Act of 1957 before a Subcommittee of the Senate Committee on Banking and Currency, 85th Cong. , 1st Sess., pt. 2, p. 1030 (1957).

Similar statements were repeatedly made to Congress by Justice Department representatives in the years prior to the enactment of the Bank Merger Act. [14]

The inapplicability of *§ 7* to bank mergers was also an explicit basis on which Congress acted in passing the Bank Merger Act of 1960. The Senate Report on S. 1062, the bill that was finally enacted, stated:

"Since bank mergers are customarily, if not invariably, carried out by asset acquisitions, they are exempt from *section 7* of the Clayton Act. (Stock acquisitions by bank holding companies, as distinguished from mergers and consolidations, are subject to both the Bank Holding Company Act of 1956 and *sec. 7* of the Clayton Act.)" S. Rep. No. 196, 86th Cong., 1st Sess. 1-2 (1959).

"In 1950 (64 Stat. 1125) *section 7* of the Clayton Act was amended to correct these deficiencies. Acquisitions of assets were included within the section, **[*379]** in addition to stock acquisitions, but only in the **[***954]** case of corporations subject to the jurisdiction of the Federal Trade Commission (banks, being subject to the jurisdiction of the Federal Reserve Board for purposes of the Clayton Act by virtue of *section 11* of that act, were not affected)." *Id., at 5*. [15]

During the floor debates Representative Spence, the Chairman of the House Committee on Banking and Currency, recognized the same difficulty: "The Clayton Act is ineffective as to bank mergers because **[**1750]** in the case of banks it covers only stock acquisitions and bank mergers are not accomplished that way." 106 Cong. Rec. 7257 (1960). [16]

---

[14] See Hearings before the Antitrust Subcommittee of the House Committee on the Judiciary, 84th Cong., 1st Sess., Ser. 3, pt. 1, pp. 243-244 (1955); Hearings on S. 3911 before a Subcommittee of the Senate Committee on Banking and Currency, 84th Cong., 2d Sess. 60-61, 84 (1956); Hearings on S. 1062 before the Senate Committee on Banking and Currency, 86th Cong., 1st Sess. 9 (1959).

[15] See also H. R. Rep. No. 1416, 86th Cong., 2d Sess. 5 (1960) ("The Federal antitrust laws are also inadequate to the task of regulating bank mergers; while the Attorney General may move against bank mergers to a limited extent under the Sherman Act, the Clayton Act offers little help."); *id.*, at 9 ("Because section 7 [of the Clayton Act] is limited, insofar as banks are concerned, to cases where a merger is accomplished through acquisition of stock, and because bank mergers are accomplished by asset acquisitions rather than stock acquisitions, the act offers 'little help,' in the words of Hon. Robert A. Bicks, acting head of the Antitrust Division, in controlling bank mergers.").

[16] In the Senate, a sponsor of S. 1062, Senator Fulbright, reported that the "1950 amendment to section 7 of the Clayton Act, which for the first time imposed controls over mergers by means other than stock acquisitions, did not apply to bank mergers which are practically invariably accomplished by means other than stock acquisition. Accordingly for all practical purposes bank mergers have been and still are exempt from section 7 of the Clayton Act." 106 Cong. Rec. 9711 (1960).

But instead of extending the scope of *§ 7* to cover bank mergers, as numerous proposed amendments to that section were designed to accomplish, [17] Congress made the **[*380]** deliberate policy judgment that "it is impossible to subject bank mergers to the simple rule of *section 7* of the Clayton Act. Under that act, a merger would be barred if it might tend substantially to lessen competition, regardless of the effects on the public interest." 105 Cong. Rec. 8076 (1959) (remarks of Senator Robertson, a sponsor of S. 1062). Because of the peculiar nature of the commercial banking industry, its crucial role in the economy, and its intimate connection with the fiscal and monetary operations of the Government, Congress rejected the notion that the general economic and business premises of the Clayton Act should be the only considerations applicable to this field. Unrestricted bank competition was thought to have been a major cause of the panic of 1907 and of the bank failures of the 1930's, [18] and was regarded as a highly undesirable condition to impose on banks in the future:

**[***955]** "Banking is too important to depositors, to borrowers, to the Government, and the public generally, to permit unregulated and unrestricted competition in that field.

**[*381]** "The antitrust laws have reflected an awareness of the difference between banking and other regulated industries on the one hand, and ordinary unregulated industries and commercial enterprises on the other hand." 106 Cong. Rec. 9711 (1960) (remarks of Senator Fulbright, a sponsor of S. 1062).

"It is this distinction between banking and other businesses which justifies different treatment for bank mergers and other mergers. It was this distinction that led the Senate to reject the flat prohibition of the Clayton Act test which applies to other mergers." *Id.*, at 9712. [19]

Thus the Committee on Banking and Currency recommended "continuance of the existing exemption from *section 7* **[**1751]** of the Clayton Act." 105 Cong. Rec. 8076 (1959). Congress accepted this recommendation; it decided to handle the problem of concentration in commercial banking "through banking laws, specially framed to fit the particular needs of the field . . . ." S. Rep. No. 196, 86th Cong., 1st Sess. 18 (1959). As finally enacted in 1960, the Bank Merger Act embodies the regulatory approach advocated by the banking agencies, vesting in them responsibility for its administration and placing the scheme within the framework of existing banking laws as an amendment to *§ 18 (c)* of the Federal Deposit Insurance Act, *12 U. S. C. (Supp. IV, 1963), § 1828 (c)*. [20] It maintains the latter Act's requirement of advance approval by the appropriate federal agency for mergers between insured banks and between insured and noninsured **[*382]** banks

---

[17] *E. g.*, H. R. 5948, 84th Cong. 1st Sess. (1955); S. 198, 85th Cong., 1st Sess. (1957); S. 722, 85th Cong., 1st Sess. (1957); see note 1, *supra*.

[18] S. Rep. No. 196, 86th Cong., 1st Sess. 17 (1959): "Time and again the Nation has suffered from the results of unregulated and uncontrolled competition in the field of banking, and from insufficiently regulated competition. . . . The rapid increase in the number of small weak banks, to such a large number that the Comptroller could not effectively supervise them or control any but the worst abuses, was one of the factors which led to the panic of 1907.

"The banking collapse in the early 1930's again was in large part the result of insufficient regulation and control of banks, in effect the result of too much competition." See also 105 Cong. Rec. 8076 (1959): "But unlimited and unrestricted competition in banking is just not possible. We have had too many panics and banking crises and bank failures, largely as the result of excessive competition in banking, to consider for a moment going back to the days of free banking or unregulated banking."

[19] See also S. Rep. No. 196, 86th Cong., 1st Sess. 16 (1959): "But it is impossible to require unrestricted competition in the field of banking, and it would be impossible to subject banks to the rules applicable to ordinary industrial and commercial concerns, not subject to regulation and not vested with a public interest."

[20] For the pertinent text of the statute, see note 8 in the Court's opinion, *ante*, pp. 332-333.

(*supra, pp. 375-377*), but establishes that such approval is necessary in every merger of this type. To aid the respective agencies in determining whether to approve a merger, and in "the interests of uniform standards" (*12 U. S. C. (Supp. IV, 1963) § 1828 (c)*), the Act requires the two agencies not making the particular decision and the Attorney General to submit to the immediately responsible agency reports on the competitive factors involved. It further provides that in addition to considering the banking factors examined by the FDIC in connection with applications to become an insured bank, which focus primarily on matters of safety and soundness, [21] the approving agency "shall also take into consideration the effect of the transaction on competition (including any tendency toward monopoly), and shall not approve the transaction unless, after considering all of such factors, it finds the transaction to **[***956]** be in the public interest." *12 U. S. C. (Supp. IV, 1963) § 1828 (c)*.

The congressional purpose clearly emerges from the terms of the statute and from the committee reports, hearings, and floor debates on the bills. Time and again it was repeated that effect on competition was *not to be the controlling factor* in determining whether to approve a bank merger, that a merger could be approved as being in the public interest even though it would cause a substantial lessening of competition. The following statement is typical:

"The committee wants to make crystal clear its intention that the various banking factors in any particular **[*383]** case may be held to outweigh the competitive factors, and that the competitive factors, however favorable or unfavorable, are not, in and of themselves, controlling on the decision. And, of course, the banking agencies are not bound in their consideration of the competitive factors by the report of the Attorney General." S. Rep. No. 196, 86th Cong., 1st Sess. 24 (1959); *id., at 19, 21*. [22]

**[**1752]** The foregoing statement also shows that it was the congressional intention to place the responsibility for approval squarely on the banking agencies; the report of the Attorney General on the competitive aspects of a merger was to be advisory only. [23] And there was deliberately omitted any attempt to specify or restrict the kinds of circumstances in which the agencies might properly determine that a proposed merger would be in the public interest notwithstanding its adverse effect on competition. [24]

---

[21] These factors are: "the financial history and condition of each of the banks involved, the adequacy of its capital structure, its future earnings prospects, the general character of its management, the convenience and needs of the community to be served, and whether or not its corporate powers are consistent with the purposes of this chapter." 12 U. S. C. (Supp. IV, 1963) § 1828 (c). Compare § 6 of the Federal Deposit Insurance Act, 12 U. S. C. § 1816.

[22] See also 106 Cong. Rec. 7259 (1960): "The language of S. 1062 as amended by the House Banking and Currency Committee and as it appears in the bill we are now about to pass in the House makes it clear that the competitive and monopolistic factors are to be considered along with the banking factors and that after considering all of the factors involved, if the resulting institution will be in the public interest, then the application should be approved and otherwise disapproved."

[23] 106 Cong. Rec. 7257 (1960): "This puts the responsibility for acting on a proposed merger where it belongs -- in the agency charged with supervising and examining the bank which will result from the merger. Out of their years of experience in supervising banks, our Federal banking agencies have developed specialized knowledge of banking and the people who engage in it. They are experts at judging the condition of the banks involved, their prospects, their management, and the needs of the community for banking services. They should have *primary responsibility* in deciding whether a proposed merger would be in the public interest." (Emphasis added.)

[24] H. R. Rep. No. 1416, 86th Cong., 2d Sess. 11-12 (1960): "We are convinced, also, that approval of a merger should depend on a positive showing of some benefit to be derived from it. As previously indicated, your committee is not prepared to say that the cases enumerated in the hearings are the only instances in which a merger is in the public interest, nor are we prepared to devise a specific and exclusive list of situations in which a merger should be approved."

**[*384]** What Congress has chosen to do about mergers and their effect on competition in the highly specialized field of commercial banking could not be more "crystal clear." (*Supra, p. 382*.) But in the face of overwhelming evidence to the contrary, the Court, with perfect equanimity, finds "uncertainty" in the foundations of the Bank Merger Act (*ante*, p. 349) and on this premise puts it aside as irrelevant to the task of construing the scope of *§ 7* of the Clayton Act.

I am unable to conceive of a more inappropriate case in which to overturn the considered opinion of all concerned as to the reach of prior **[***957]** legislation. [25] For 10 years everyone -- the department responsible for antitrust law enforcement, the banking industry, the Congress, and the bar -- proceeded on the assumption that the 1950 amendment of the Clayton Act did not affect bank mergers. This assumption provided a major impetus to the enactment of remedial legislation, and Congress, when it finally settled on what it thought was the solution to the problem at hand, emphatically rejected the remedy now brought to life by the Court.

The result is, of course, that the Bank Merger Act is almost completely nullified; its enactment turns out to have been an exorbitant waste of congressional time and energy. As the present case illustrates, the Attorney General's report to the designated banking agency is no longer truly advisory, for if the agency's decision is not **[*385]** satisfactory a *§ 7* suit may be commenced immediately. [26] The bank merger's legality will then be judged solely from its competitive aspects, unencumbered by any considerations peculiar **[**1753]** to banking. [27] And if such a suit were deemed to lie after a bank merger has been consummated, there would then be introduced into this field, for the first time to any significant extent, the threat of divestiture of assets and all the complexities and disruption attendant upon the use of that sanction. [28] The only vestige of the Bank Merger Act which remains is that the banking agencies will have an initial veto. [29]

---

[25] Compare *State Board of Ins.* v. *Todd Shipyards Corp.*, 370 U.S. 451, 457, in which this Court refused to reconsider certain prior decisions because Congress had "posited a regime of state regulation" of the insurance business on their continuing validity. Cf. *Toolson* v. *New York Yankees, Inc.*, 346 U.S. 356.

[26] If a bank merger such as this falls within the category of a "stock" acquisition, a § 7 suit to enjoin it may be brought not only by the Attorney General, but by the Federal Reserve Board as well. See § 11 of the Clayton Act, 15 U. S. C. § 21 (vesting authority in the Board to enforce § 7 "where applicable to banks"). In an attempt to retain some semblance of the structure erected by Congress in the Bank Merger Act, the Court states that it "supplanted . . . whatever authority the FRB may have acquired under § 11, by virtue of the amendment of § 7, to enforce § 7 against bank mergers." *Ante*, p. 344, note 22. Since both the Attorney General and the Federal Reserve Board have purely advisory roles where a bank merger will result in a national bank, the Court's reasoning with respect to the effect of the Bank Merger Act upon enforcement authority should apply with equal force to both.

[27] Indeed the Court has erected a simple yardstick in order to alleviate the agony of analyzing economic data -- control of 30% of a commercial banking market is prohibited. *Ante*, pp. 363-364.

[28] Although § 7 of the Clayton Act is applicable to an outright purchase of bank stock, this form of amalgamation is infrequently used in the banking field and does not involve divestiture problems of the same magnitude as does an asset acquisition.

[29] It is true, as the Court points out (*ante*, p. 354), that Congress, in enacting the Bank Merger Act, agreed that the applicability of the Sherman Act to banking should not be disturbed. See, *e. g.*, 105 Cong. Rec. 8076 (1959). But surely this alone provides no conceivable justification for applying the Clayton Act as well. Apart from the fact that the Sherman Act covers many kinds of restraints besides mergers, one of the sponsors of the Bank Merger Act (Senator Fulbright) expressed his expectation that in a Sherman Act case a bank merger would not be subjected to strict antitrust standards to the exclusion of all other considerations: "And even if the Sherman Act is held to apply to banking and to bank mergers, it seems clear that under the rule of reason spelled out in the Standard Oil case, different considerations will be found applicable, in a regulated field like banking, in determining whether activities would 'unduly diminish competition,' in the words of the Supreme Court in that case." 106 Cong. Rec. 9711 (1960). Moreover, this Court has recognized in other areas that it may be necessary to accommodate the Sherman Act to regulatory policy. *McLean Trucking Co.* v. *United States*, 321 U.S. 67, 83; *Federal Communications Comm'n* v. *RCA Communications, Inc.*, 346 U.S. 86, 91-92. See also *United States* v. *Columbia Steel Co.*, 334 U.S. 495, 527. And of course the Sherman Act is

**[*386] [***958]** This frustration of a manifest congressional design is, in my view, a most unwarranted intrusion upon the legislative domain. I submit that *whatever* may have been the congressional purpose in 1950, Congress has now so plainly pronounced its current judgment that bank mergers are not within the reach of *§ 7* that this Court is duty bound to effectuate its choice.

But I need not rest on this proposition, for, as will now be shown, there is nothing in the 1950 amendment to *§ 7* or its legislative history to support the conclusion that Congress even then intended to subject bank mergers to this provision of the Clayton Act.

II.

Prior to 1950, *§ 7* of the Clayton Act read, in pertinent part, as follows:

"That no corporation engaged in commerce shall acquire, directly or indirectly, the whole or any part of the stock or other share capital of another corporation engaged also in commerce, where the effect of **[*387]** such acquisition may be to substantially lessen competition between the corporation whose stock is so acquired and the corporation making the acquisition, **[**1754]** or to restrain such commerce in any section or community, or tend to create a monopoly of any line of commerce."

In 1950 this section was amended to read (the major amendments being indicated in italics):

"That no corporation engaged in commerce shall acquire, directly or indirectly, the whole or any part of the stock or other share capital *and no corporation subject to the jurisdiction of the Federal Trade Commission shall acquire the whole or any part of the assets* of another corporation engaged also in commerce, where *in any line of commerce in any section of the country*, the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly."

If Congress did intend the 1950 amendment to reach bank mergers, it certainly went at the matter in a very peculiar way. While prohibiting asset acquisitions having the anticompetive effects described in *§ 7*, it limited the applicability of that provision to corporations subject to the jurisdiction of the Federal Trade Commission, which does not include banks. And it reenacted the stock-acquisition provision in the very same language which -- as it was fully aware -- had been interpreted not to reach the type of merger customarily used in the banking industry. See *infra* , pp. 389-393. In the past this Court has drawn the normal inference that such a reenactment indicates congressional adoption of the prior judicial statutory construction. *E. g.*, *United States v. Dixon, 347 U.S. 381*; *Overstreet v. North Shore Corp., 318 U.S. 125, 131-132*. **[***959]**

**[*388]** In this instance, however, the Court holds that the stock-acquisition provision underwent an expansive metamorphosis, so that it now embraces all mergers or consolidations involving an exchange of stock. Since bank mergers usually, if not always, do involve exchanges of stock, the effect of this construction is to rob the Federal Trade Commission provision relating to asset acquisitions of all force as a substantive limitation upon the scope of *§ 7*; according to the Court the purpose of that provision was merely to ensure the Commission's role in the enforcement of *§ 7*. *Ante*, pp. 346-348. In short, under this reasoning bank mergers to all intents and purposes are fully within the reach of *§ 7*.

---

concerned more with existing anticompetitive effects than with future probabilities, and thus would not reach incipient restraints to the same extent as would § 7 of the Clayton Act. See *Brown Shoe Co*. v. United States, 370 U.S. 294, 317-318 and notes 32, 33.

A more circumspect look at the 1950 amendment of *§ 7* and its background will show that this construction is not tenable.

The language of the stock-acquisition provision itself is hardly congenial to the Court's interpretation. The PNB-Girard merger is technically a consolidation, governed by § 20 of the national banking laws, *12 U. S. C. (Supp. IV, 1963) § 215*. Under that section, the corporate existence of both PNB and Girard, all of their rights, franchises, assets, and liabilities, would be automatically vested in the resulting bank, which would operate under the PNB charter. PNB itself would acquire nothing. Rather, the two banks would be creating a new entity by the amalgamation of their properties, and the subsequent conversion of Girard stock (which would then represent ownership in a nonfunctioning entity) into stock of the resulting bank would simply be part of the mechanics by which ownership in the new entity would be reflected. Clearly this is not a case of a corporation acquiring the stock of another functioning corporation, which is the only situation where "the *effect* of . . . [a stock] acquisition may be substantially to lessen competition." (Emphasis added.)

**[*389]** There are further crucial differences between a merger and a stock acquisition. A merger normally requires public **[**1755]** notice and the approval of the holders of two-thirds of the outstanding shares of each corporation, and dissenting shareholders have the right to receive in cash the appraised value of their shares. [30] A purchase of stock may be done privately, and the only approval involved is that of the individual parties to the transaction. Unlike a merged company, a corporation whose stock is acquired usually remains in business as a subsidiary of the acquiring corporation. [31]

The Government, however, contends that a merger more closely resembles a stock acquisition than an asset acquisition because of one **[***960]** similarity of central importance: the acquisition by one corporation of an immediate voice in the management of the business of another corporation. But this is obviously true *a fortiori* of asset acquisitions of sufficient magnitude to fall within the prohibition of *§ 7*; if a corporation buys the plants, equipment, inventory, etc., of another corporation, it acquires absolute control over, not merely a voice in the management of, another business.

The legislative history of the 1950 amendment also unquestionably negates any inference that Congress intended **[*390]** to reach bank mergers. It is true that the purpose was "to plug a loophole" in *§ 7* (95 Cong. Rec. 11485 (1949) (remarks of Representative Celler)). But simply to state this broad proposition does not answer the precise questions presented here: what was the nature of the loophole sought to be closed; what were the means chosen to close it?

The answer to the latter question is unmistakably indicated by the relationship between the 1950 amendment and previous judicial decisions. In *Arrow-Hart & Hegeman Elec. Co.* v. *Federal Trade Comm'n, 291 U.S. 587*, this Court, by a divided vote, ruled on the scope of the Federal

---

[30] In these respects a merger is precisely the contrary of what § 7 was originally designed to proscribe -- the secret acquisition of corporate control. See the Court's opinion, *ante*, p. 338.

[31] That the stock-acquisition provision was not intended to cover mergers is strongly suggested by the second paragraph of § 7: "No corporation shall acquire . . . any part of the stock . . . of one or more corporations . . . where . . . the effect . . . of *the use* of such stock by the voting or granting of proxies . . . may be substantially to lessen competition, or to tend to create a monopoly." 15 U. S. C. § 18. (Emphasis added.) After a merger has been consummated, the resulting corporation holds no stock in any party to the merger; thus there can be in this situation no such thing as a restraint of trade by "the use" of the voting power of acquired stock.

Trade Commission's remedial powers under the original Clayton Act. After the Commission had issued a *§ 7* complaint against a holding company which had been formed by the stockholders of two manufacturing corporations, steps were taken to avoid the Commission's jurisdiction. Two new holding companies were formed, each acquired all the common stock of one of the manufacturing companies, and each issued its stock directly to the stockholders of the original holding company. This company then dissolved and the two new holding companies and their respective manufacturing subsidiaries merged into one corporation. This Court held that the Commission had no authority, after the merger, to order the resulting corporation to divest itself of assets. An essential part of this holding was that the merger in question, which was technically a consolidation similar to that here planned by PNB and Girard, was not a stock acquisition within the prohibitions of *§ 7*: "If the merger of the two manufacturing corporations and the combination of their assets was in any respect a violation of any antitrust law, as to which we express no opinion, it was necessarily a **[**1756]** violation of statutory prohibitions other **[*391]** than those found in the Clayton Act." *291 U.S., at 599*; see *id., at 595*. [32]

This decision, along with two others earlier handed down by this Court (*Thatcher Mfg. Co*. v. *Federal Trade Comm'n* and *Swift & Co*. v. *Federal Trade Comm'n*, decided together with *Federal Trade Comm'n v. Western Meat Co., 272 U.S. 554*), perhaps provided more of a spur to enactment of the "assets" amendment to *§ 7* than any other single factor. These decisions were universally regarded as opening the unfortunate loophole whereby *§ 7* could be evaded through the use of an asset acquisition. Representative Celler expressed the view of Congress in this fashion:

"The result of these decisions has so weakened *sections 7* and *11* . . . as to give to the Federal Trade Commission **[***961]** and the Department of Justice merely a paper sword to prevent improper mergers." 95 Cong. Rec. 11485 (1949). [33]

**[*392]** Since this Court's decisions were cast in terms of the scope of the Federal Trade Commission's jurisdiction, Congress, in amending *§ 7* so as to close that gap, emphasized its expectation -- made plain in the committee reports, hearings, and debates -- that the Commission would assume the principal role in enforcing the section. [34] Implicit here is that no change in the enforcement powers of the other agencies named in *§ 11* was contemplated. [35] Of more importance, the legislative history demonstrates that it was the asset-acquisition provision that was designed to plug the loophole created by *Thatcher*, *Swift*, and *Arrow*. Although *Arrow*, unlike *Thatcher* and *Swift*, involved a consolidation of the same type as the PNB-Girard merger, the

---

[32] On this point, the dissenters agreed: "It is true that the Clayton Act does not forbid corporate mergers . . . ." 291 U.S., at 600. See also *United States* v. *Celanese Corp. of America*, 91 F.Supp. 14.

[33] See also Hearings on H. R. 988, H. R. 1240, H. R. 2006, H. R. 2734 before Subcommittee No. 3 of the House Committee on the Judiciary, 81st Cong., 1st Sess. 38-39 (1949); Hearings on H. R. 2734 before a Subcommittee of the Senate Committee on the Judiciary, 81st Cong., 1st & 2d Sess. 109-110 (1950): "The loophole sought to be filled resulted from a series of Supreme Court decisions. (*Swift & Co*. v. *FTC* and *Thatcher Mfg. Co*. v. *FTC* (272 U.S. 554); *Arrow-Hart & Hegeman Co*. v. *FTC* (291 U.S. 587).) In these decisions the Supreme Court held that section 7 of the Clayton Act, while prohibiting the acquisition of stock of a competitor, gave the Federal Trade Commission no authority under section 11 to order divestiture of assets which had been acquired before a cease-and-desist order was issued, even though the acquisition resulted from the voting of illegally held stock."

[34] The Federal Trade Commission had assumed primary enforcement responsibility before the 1950 amendment. See Martin, Mergers and the Clayton Act (1959), p. 197.

[35] Compare note 26, *supra*.

members of Congress drew no distinction among these cases, invariably discussing all three of them in the same breath as examples of asset acquisitions. [36] Indeed, the House report stated that

"the Supreme Court . . . held [in *Arrow*] that if an acquiring corporation secured *title to the physical* **[**1757]** *assets* of a corporation whose stock it had acquired before the Federal Trade Commission issues its final order, the Commission lacks power to direct divestiture of the physical assets . . . ." H. R. Rep. No. 1191, 81st Cong., 1st Sess. 5 (1949). (Emphasis added.)

And on the Senate floor it was pointed out that "the *method* by which . . . [the merger in *Arrow*] had been **[*393]** accomplished was an innocent one . . . ." 96 Cong. Rec. 16505 (1950). (Emphasis added.) Clearly the understanding of Congress was that a consolidation of two corporations was an acquisition of assets. [37]

Nor **[***962]** did Congress act inadvertently or without purpose in limiting the asset-acquisition provision to corporations subject to the jurisdiction of the Federal Trade Commission, thereby excluding bank mergers. The reports, hearings, and debates on the 1950 amendment reveal that Congress was then concerned with the rising tide of *industrial* concentration -- *i. e.*, "the external expansion . . . through mergers, acquisitions, and consolidations" [38] of corporations engaged in manufacturing, mining, merchandising, and of other kindred commercial endeavors. Specialized areas of the economy such as banking were not even considered. Thus the Federal Trade Commission's 1948 report on mergers recounted the statistics on concentration in a multitude of industries -- *e. g.*, steel, cement, electrical equipment, food and dairy products, tobacco, textiles, paper, chemicals, rubber -- but included not one figure on banking concentration. [39] This report was repeatedly cited and heavily relied on by members of Congress and others to demonstrate the magnitude **[*394]** of the merger movement and the economic dangers it presented. [40] In the committee hearings the focus was exclusively upon amalgamation in the ordinary commercial fields, [41] and similarly the Senate and House reports spoke solely of industrial concentration as the evil to be remedied. [42] On the floor of the House, Representative Celler indicated the extent of concentration of industrial power:

"Four companies now have 64 percent of the steel business, four have 82 percent of the copper business, two have 90 percent of the aluminum **[**1758]** business, three have 85 percent of the

---

36 See note 33 *supra*; Hearings on H. R. 2734 before a Subcommittee of the Senate Committee on the Judiciary, 81st Cong., 1st & 2d Sess. 97 (1950). And this Court has, after the 1950 amendment, described *Arrow* as a case involving an asset acquisition. *Brown Shoe Co.* v. *United States*, 370 U.S. 294, 313 and note 20.

37 The single excerpt quoted by the Court (*ante*, p. 345) casts no doubt on this proposition, for Senator Kilgore's remark occurred in the course of a discussion in which he was trying to make the point that there is no difference in *practical* effect, as opposed to the legal distinction, between a merger and a stock acquisition. Thus at the end of the paragraph quoted by the Court the Senator stated: ". . . I cannot see how on earth you can get the idea that the purchase of the stock of the corporation, all of it, does not carry with it the transfer of all of the physical assets in that corporation." Hearings on H. R. 2734 before a Subcommittee of the Senate Committee on the Judiciary, 81st Cong., 1st & 2d Sess. 176 (1950).

38 H. R. Rep. No. 1191, 81st Cong., 1st Sess. 2 (1949).

39 Federal Trade Commission, The Merger Movement: A Summary Report (1948), *passim*.

40 *E. g.*, Hearings on H. R. 988, H. R. 1240, H. R. 2006, H. R. 2734 before Subcommittee No. 3 of the House Committee on the Judiciary, 81st Cong., 1st Sess. 39-40 (1949); 95 Cong. Rec. 11503 (1949); 96 Cong. Rec. 16505 (1950).

41 Hearings on H. R. 2734 before a Subcommittee of the Senate Committee on the Judiciary, 81st Cong., 1st & 2d Sess. 5-6, 17, 57-59 (1950); Hearings on H. R. 988, H. R. 1240, H. R. 2006, H. R. 2734 before Subcommittee No. 3 of the House Committee on the Judiciary, 81st Cong., 1st Sess. 40, 113 (1949).

42 S. Rep. No. 1775, 81st Cong., 2d Sess. 3 (1950); H. R. Rep. No. 1191, 81st Cong., 1st Sess. 2-3 (1949).

automobile business, two have 80 percent of the electric lamp business, four have 75 percent of the electric refrigerator business, two have 80 percent of the glass business, four have 90 percent of the cigarette business, and so forth.

"The antitrust laws are a complete bust unless we pass this bill." 95 Cong. Rec. 11485 (1949).

The legislatory history is thus singularly devoid of any evidence that Congress sought to deal with the special problem of banking concentration.

I do not mean to suggest, of course, that *§ 7* of the Clayton Act is thereby rendered applicable only to ordinary commercial and industrial corporations and not to firms in any "regulated" sector of the economy. The **[*395]** point is that when Congress included in *§ 7* asset acquisitions by corporations subject to the Federal Trade Commission's jurisdiction, and at the same time **[***963]** continued in *§ 11* the Federal Reserve Board's jurisdiction over banks, it was not acting irrationally. Rather, the absence of any mention of banks in the legislative history of the 1950 amendment, viewed in light of the prior congressional treatment of banking as a distinctive area with special characteristics and needs, compels the conclusion that bank mergers were simply not then regarded as part of the loophole to be plugged. [43]

This conclusion is confirmed by a number of additional considerations. It was not until *after* the passage of the 1950 amendment of *§ 7* that Representative Celler, its cosponsor requested the staff of the Antitrust Subcommittee of the House Committee on the Judiciary "to prepare a report indicating the concentration existing in our banking system." Staff of Subcommittee No. 5, House Committee on the Judiciary, 82d Cong., 2d Sess., Report on Bank Mergers and Concentration of Banking Facilities III (1952). The introduction to the report reveals that:

"On March 21, 1945, the Board of Governors of the Federal Reserve System wrote to the chairman of the Committee on the Judiciary requesting that the provisions of H. R. 2357, Seventy-ninth Congress, first session, one of the early predecessors of the Celler Antimerger Act, be extended so as to include corporations subject to the jurisdiction of the Federal Reserve Board under *section 11* of the Clayton Act. Because of the revisions made in subsequent versions of antimerger bills, however, it became impracticable **[*396]** to include within the scope of the act corporations other than those subject to regulation by the Federal Trade Commission. Banks, which are placed squarely within the authority of the Federal Reserve Board by *section 11* of the Clayton Act, are therefore circumscribed insofar as mergers are concerned only by the old provisions of *section 7*, and certain additional statutes which do not presently concern themselves substantively with the question of competition in the field of banking." *Id.*, at VII.

It is also worth noting that in 1956 Representative Celler himself introduced another amendment to *§ 7*, explaining that "all the bill [H. R. 5948] does is plug a loophole in the present law dealing with bank mergers . . . . This loophole exists because *section 7* of the Clayton Act prohibits bank mergers . . . only if such mergers are accomplished by **[**1759]** stock acquisition." 102 Cong. Rec. 2109 (1956). The bill read in pertinent part: "No bank . . . shall acquire . . . the whole or any part of the assets of another corporation engaged also in commerce . . . ." *Ibid*. The amendment passed the House but was defeated in the Senate.

---

43 It is interesting to note that in the same year in which § 7 was amended Congress passed an act *facilitating* certain kinds of bank mergers which had theretofore been prohibited. See note 11, *supra*, and accompanying text.

For all these reasons, I think the conclusion is inescapable that *§ 7* of the Clayton Act does not apply to the PNB-Girard merger. The Court's contrary conclusion seems to me little better than a *tour de force*. [44]

Memorandum of MR. JUSTICE GOLDBERG.

I agree fully with my Brother HARLAN that *§ 7* of the Clayton Act has no application to bank mergers **[***964]** of the type involved here, and I therefore join in the conclusions expressed in his opinion on that point. However, while I **[*397]** thus dissent from the Court's holding with respect to the applicability of the Clayton Act to this merger, I wish to make clear that I do not necessarily dissent from its judgment invalidating the merger. To do so would require me to conclude in addition that on the record as it stands the Government has failed to prove a violation of the Sherman Act, which is fully applicable to the commercial banking business. In my opinion there is a substantial Sherman Act issue in this case, but since the Court does not reach it and since my views relative thereto would be superfluous in light of today's disposition of the case, I express no ultimate conclusion concerning it. Compare *Rescue Army v. Municipal Court of Los Angeles, 331 U.S. 549, 585* (Murphy, J., dissenting); *Poe v. Ullman, 367 U.S. 497, 555* (STEWART, J., dissenting).

**References**

Annotation References:

1. Application to banks and banking institutions of antimonopoly or antitrust laws. *83 ALR2d 374*.

*2. Validity and construction of statute creating Federal Trade Commission. 6 ALR 366, 11 ALR 797, 18 ALR 549, 30 ALR 1129, 32 ALR 792, 51 ALR 331, 68 ALR 847, 79 ALR 1200.*

*3. The doctrine of primary administrative jurisdiction. 94 L ed 806, 1 L ed 2d 1596.*

---

[44] Since the Court does not reach the Sherman Act aspect of this case, it would serve no useful purpose for me to do so.

# EXHIBIT 297

LexisNexis

Positive
As of: August 12, 2014 9:20 AM EDT

# Winter Hill Frozen Foods & Services, Inc. v. Haagen-Dazs Co.

United States District Court for the District of Massachusetts
July 19, 1988, Decided
Civil Action No. 88-0009-XX

**Reporter:** 691 F. Supp. 539; 1988 U.S. Dist. LEXIS 8019; 1988-2 Trade Cas. (CCH) P68,182

WINTER HILL FROZEN FOODS AND SERVICES, INC., Plaintiff, v. THE HAAGEN-DAZS COMPANY, INC., THE PILLSBURY CO., INC., PAUL'S DISTRIBUTORS, INC., DAIRI FARMS, INC., INTERNATIONAL ICE CREAM CORP., and B & K DISTRIBUTORS, INC., Defendants

**Core Terms**

ice cream, distributors, manufacturer, products, premium, market power, prices, sales, frozen food, conspiracy, summary judgment, antitrust, retailers, vertical, asserts, anti trust law, market share, genuine, space, summary judgment motion, rule of reason, restrictions, defendants', termination, effects, unreasonable restraint, anticompetitive, competitive, competitor, customers

**LexisNexis® Headnotes**

Civil Procedure > ... > Discovery > Methods of Discovery > General Overview
Civil Procedure > ... > Summary Judgment > Burdens of Proof > General Overview
Civil Procedure > ... > Summary Judgment > Supporting Materials > General Overview

***HN1*** Pursuant to *Fed. R. Civ. P. 56*, the party seeking summary judgment must inform the court of the basis of its motion and identify those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which demonstrate the absence of a genuine issue of material fact.

Civil Procedure > ... > Discovery > Methods of Discovery > General Overview
Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > General Overview
Civil Procedure > ... > Summary Judgment > Supporting Materials > General Overview

***HN3*** See *Fed. R. Civ. P. 56(c)*.

Civil Procedure > ... > Summary Judgment > Burdens of Proof > General Overview
Civil Procedure > ... > Summary Judgment > Supporting Materials > General Overview
Civil Procedure > ... > Summary Judgment > Supporting Materials > Affidavits

***HN4*** See *Fed. R. Civ. P. 56(e)*.

Civil Procedure > ... > Discovery > Methods of Discovery > General Overview
Civil Procedure > ... > Methods of Discovery > Interrogatories > General Overview

Civil Procedure > ... > Summary Judgment > Burdens of Proof > General Overview
Civil Procedure > ... > Summary Judgment > Supporting Materials > General Overview

***HN2*** Where the nonmoving party will bear the burden of proof on an issue at trial, *Fed. R. Civ. P. 56(e)* requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial.

Antitrust & Trade Law > Sherman Act > General Overview

***HN5*** See *15 U.S.C.S. § 1*.

Antitrust & Trade Law > Regulated Practices > Price Fixing & Restraints of Trade > General Overview

***HN6*** See *Mass. Gen. Laws ch. 93, § 4* (1984).

Antitrust & Trade Law > ... > Price Fixing & Restraints of Trade > Horizontal Refusals to Deal > General Overview

***HN7*** A manufacturer generally has a right to deal, or refuse to deal, with whomever it likes, as long as it does so independently.

Antitrust & Trade Law > ... > Price Fixing & Restraints of Trade > Horizontal Refusals to Deal > General Overview
Antitrust & Trade Law > Sherman Act > General Overview

***HN8*** A mere unilateral refusal to deal, without more, is not cognizable under *§ 1* of the Sherman Act, *15 U.S.C.S. § 1*.

Antitrust & Trade Law > ... > Price Fixing & Restraints of Trade > Horizontal Refusals to Deal > General Overview
Antitrust & Trade Law > Sherman Act > General Overview

***HN9*** When the manufacturer's actions go beyond mere announcement of his policy and the simple refusal to deal, and he employs other means which effect adherence to his resale prices, the countervailing consideration, the right of the manufacturer to decide with whom to deal, is not present and therefore he has put together a combination in violation of the Sherman Act.

Antitrust & Trade Law > Regulated Practices > Price Fixing & Restraints of Trade > General Overview
Antitrust & Trade Law > ... > Price Fixing & Restraints of Trade > Horizontal Refusals to Deal > General Overview

***HN10*** The boundary separating the Colgate doctrine - the simple unilateral refusal to deal - from the non-simple unilateral refusal to deal is the presence of a contract, combination, or conspiracy, that is, either an express, implied or tacit agreement among two or more parties, or an involuntary acquiescence to one party's trade restraining policy.

Antitrust & Trade Law > ... > Monopolies & Monopolization > Conspiracy to Monopolize > Sherman Act
Antitrust & Trade Law > ... > Price Fixing & Restraints of Trade > Horizontal Refusals to Deal > General Overview
Antitrust & Trade Law > Sherman Act > General Overview
Antitrust & Trade Law > Sherman Act > Claims

***HN12*** Even where such a combination contract or conspiracy exists, there is not necessarily a violation of *§ 1* of the Sherman Act, *15 U.S.C.S. § 1*. The complainant must still prove that the manufacturer's policy constitutes an unlawful restraint of trade.

Antitrust & Trade Law > ... > Price Fixing & Restraints of Trade > Horizontal Refusals to Deal > General Overview
Antitrust & Trade Law > ... > Price Fixing & Restraints of Trade > Horizontal Refusals to Deal > Sherman Act
Antitrust & Trade Law > ... > Price Fixing & Restraints of Trade > Per Se Rule & Rule of Reason > General Overview
Antitrust & Trade Law > Sherman Act > General Overview
Antitrust & Trade Law > ... > Price Fixing & Restraints of Trade > Per Se Rule & Rule of Reason > Per Se Violations
Antitrust & Trade Law > Public Enforcement > US Federal Trade Commission Actions > General Overview

***HN11*** Where a manufacturer's refusal to deal either promotes or enforces a trade policy which is unreasonable per se, the manufacturer's refusal is a per se violation of *§ 1* of the Sherman Act, *15 U.S.C.S. § 1*.

Antitrust & Trade Law > ... > Price Fixing & Restraints of Trade > Horizontal Refusals to Deal > General Overview

***HN13*** There is a distinction between a non-simple unilateral refusal to deal and a concerted refusal to deal, which is also known as a "group boycott." A concerted refusal to deal is defined as an agreement by two or more persons not to do business with other individuals, or to do business with them only on specified terms. Direct evidence of an explicit agreement that restricts dealing with a third party is not necessary for finding "concerted action."

Antitrust & Trade Law > ... > Monopolies & Monopolization > Conspiracy to Monopolize > Sherman Act
Antitrust & Trade Law > ... > Price Fixing & Restraints of Trade > Horizontal Refusals to Deal > General Overview
Antitrust & Trade Law > Sherman Act > General Overview

***HN14*** Evidence of a contract, combination or conspiracy does not, without more, violate *§ 1* of the Sherman Act, *15 U.S.C.S. § 1*. Rather, there must be compelling proof that the refusal to deal was motivated by anticompetitive purposes, or will produce an anticompetitive effect.

Antitrust & Trade Law > ... > Price Fixing & Restraints of Trade > Horizontal Refusals to Deal > General Overview
Antitrust & Trade Law > ... > Price Fixing & Restraints of Trade > Vertical Restraints > Nonprice Restraints
Antitrust & Trade Law > Sherman Act > General Overview
Business & Corporate Law > Distributorships & Franchises > Causes of Action > Restraints of Trade
Business & Corporate Law > Distributorships & Franchises > Termination > Antitrust Issues

***HN15*** Regardless whether a combination or conspiracy between a manufacturer and its dealer exists, the court must analyze whether a particular trade policy or practice imposes an unreasonable restraint on competition.

Antitrust & Trade Law > ... > Price Fixing & Restraints of Trade > Per Se Rule & Rule of Reason > General Overview
Civil Procedure > ... > Summary Judgment > Opposing Materials > General Overview
Civil Procedure > ... > Summary Judgment > Opposing Materials > Memoranda in Opposition

***HN16*** Where the plaintiff does not allege any agreements or practices which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use, the per se rules do not apply.

Antitrust & Trade Law > ... > Price Fixing & Restraints of Trade > Per Se Rule & Rule of Reason > General Overview

***HN17*** Under the rule of reason, the true test of legality is whether the restraint imposed is such as merely regulates and perhaps thereby promotes competition or whether it is such as may suppress or even destroy competition. To determine that question the court must ordinarily consider the facts peculiar to the business to which the restraint is applied; its condition before and after the restraint was imposed; and the nature of the restraint and its effect, actual or probable. The history of the restraint, the evil believed to exist, the reason for adopting the particular remedy, the purpose or end sought to be attained, are all relevant facts.

Antitrust & Trade Law > ... > Price Fixing & Restraints of Trade > Per Se Rule & Rule of Reason > General Overview

***HN18*** The fact-finder weighs all of the circumstances of a case in deciding whether a restrictive practice should be prohibited as imposing an unreasonable restraint on competition.

Antitrust & Trade Law > ... > Price Fixing & Restraints of Trade > Per Se Rule & Rule of Reason > General Overview

Antitrust & Trade Law > ... > Price Fixing & Restraints of Trade > Vertical Restraints > Nonprice Restraints

Business & Corporate Law > Distributorships & Franchises > General Overview

Business & Corporate Law > Distributorships & Franchises > Termination > General Overview

Business & Corporate Law > Distributorships & Franchises > Termination > Antitrust Issues

***HN19*** In the context of distributorship/dealership terminations, manufacturers are generally permitted a wide latitude to discontinue relationships with distributors, to determine the profile of its distributorship, and to otherwise establish vertical nonprice restraints.

Antitrust & Trade Law > ... > Price Fixing & Restraints of Trade > Per Se Rule & Rule of Reason > General Overview

Antitrust & Trade Law > Sherman Act > General Overview

Antitrust & Trade Law > Sherman Act > Claims

Business & Corporate Law > Distributorships & Franchises > Termination > General Overview

Business & Corporate Law > Distributorships & Franchises > Termination > Antitrust Issues

***HN20*** A plaintiff asserting that a distributorship termination violates *§ 1* of the Sherman Act, *15 U.S.C.S. § 1*, must present facts proving that competition has been injured rather than merely a competitor.

Antitrust & Trade Law > ... > Price Fixing & Restraints of Trade > Per Se Rule & Rule of Reason > General Overview

Antitrust & Trade Law > ... > Price Fixing & Restraints of Trade > Vertical Restraints > General Overview

Antitrust & Trade Law > ... > Price Fixing & Restraints of Trade > Vertical Restraints > Nonprice Restraints

***HN21*** Where there are vertical nonprice restraints, a threshold inquiry in rule of reason analysis is whether the defendant has market power.

Antitrust & Trade Law > ... > Price Fixing & Restraints of Trade > Per Se Rule & Rule of Reason > General Overview

***HN22*** Market power is often defined as the power to raise prices significantly above the competitive level without losing all of one's business, and market power is often inferred from the control of a substantial percentage of the sales in a market carefully defined in terms of both product and geography.

Antitrust & Trade Law > ... > Price Fixing & Restraints of Trade > Per Se Rule & Rule of Reason > General Overview

***HN23*** In the context of evaluating whether a particular competitor has market power, the competitor's declining market share is evidence that such competitor lacks such power, although it is not dispositive.

Antitrust & Trade Law > ... > Price Fixing & Restraints of Trade > Per Se Rule & Rule of Reason > General Overview

***HN24*** Under the rule of reason inquiry, the court must compare the negative effects of the restraint on intrabrand and interbrand competition, if any, with any alleged positive effects on interbrand competition stemming from the restraints.

Torts > Business Torts > Commercial Interference > General Overview
Torts > ... > Commercial Interference > Prospective Advantage > General Overview

***HN25*** To establish a claim for interference with advantageous business relations, the plaintiff must show: (1) a business relationship or contemplated contract of economic benefit; (2) the defendant's knowledge of such relationship; (3) the defendant's intentional and malicious interference with it; (4) the plaintiff's loss of advantage directly resulting from the defendant's conduct. Such conduct must have been done without justification. Justification is established when (a) the actor has an economic interest in the matter with reference to which he wishes to influence the policy of the other, (b) the desired policy does not unlawfully restrain trade, and (c) the means employed are not wrongful.

Torts > Business Torts > Unfair Business Practices > General Overview

***HN26*** In considering whether a plaintiff has established a claim for unfair practice under Mass. Gen. Laws ch. 93A, the court must consider: (1) whether the practice is within at least the penumbra of some common-law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers, competitors, or other businessmen.

**Counsel: [**1]** James C. Donnelly, Jr., Robert L. Hamer, Joan O. Vorster, Mirick, O'Connell, DeMallie & Lougee, Worcester, Massachusetts

Lawrence G. Green, Neill E. Silverman, Perkins, Smith, Arata & Howard, Boston, Massachusetts

Local Counsel: Philip J. MacCarthy, Worcester, Massachusetts

Richard Wegener, The Pillsbury Company, Minneapolis, Minnesota

William Miller, Pillsbury, Madison & Sutro, San Fransisco, California

Stanley Gorrinson, Washington, District of Columbia

Stanley Rudman, Dana Rodin, Rubin & Rudman, Boston, Massachusetts

**Judges:** William G. Young, United States District Judge.

**Opinion by:** YOUNG

**Opinion**

**[*541]** MEMORANDUM AND ORDER

WILLIAM G. YOUNG, UNITED STATES DISTRICT JUDGE.

Winter Hill Frozen Foods and Services, Inc. ("Winter Hill"), a frozen food distributor, brought this action against The Haagen-Dazs Company, Inc. ("Haagen-Dazs"), an ice cream manufacturer, The Pillsbury Co., Inc. ("Pillsbury"), the corporate parent of Haagen-Dazs, and the New England distributors of Haagen-Dazs products, [1] alleging that the defendants' refusal to sell Haagen-Dazs products to Winter Hill is an unlawful restraint of competition in violation of *Section 1* of the Sherman Act, *15 U.S.C. sec. 1*, and various state laws. This matter is presently before the Court on the motions by defendants Haagen-Dazs, Pillsbury, and International for summary judgment **[**2]** pursuant to *Fed. R. Civ. P. 56*.

I. BACKGROUND

The plaintiff Winter Hill, a Massachusetts corporation with a usual place of business in Westborough, Massachusetts, is engaged in the distribution of a full line of frozen food products to retailers in New England, New York and New Jersey ("the New England area"). Winter Hill carries approximately 1,900 frozen food items, 400 of which are ice cream products and frozen desserts. In the New England area, there are at least 189 other distributors of frozen foods.

The defendant Haagen-Dazs, a New Jersey corporation with a usual place of business in Woodbright, New Jersey, manufactures ice cream and frozen desserts products including Haagen-Dazs brand ice cream, which are distributed nationally via company-owned and selected independent distributors. Haagen-Dazs is a wholly owned subsidiary of the defendant Pillsbury, a Delaware corporation with a principal place of business in Minneapolis, **[**3]** Minnesota.

The defendants Paul's, Dairi Farms, International and B & K are independent authorized distributors of Haagen-Dazs products in the New England area. Although Dairi Farms and International also carry some non-dessert frozen foods, these four defendants are primarily ice cream distributors. In addition to these four distributors, Haagen-Dazs also sells its ice cream to approximately 50 independent distributors in the New England area.

Beginning in 1983, Winter Hill purchased Haagen-Dazs ice cream products from the distributor B & K and then resold the ice cream to its customers; at that time, Winter Hill was not an authorized Haagen-Dazs distributor. In 1985, Haagen-Dazs undertook to identify and correct various weaknesses in its distribution system, including those instances where its product was being sold

---

[1] These distributors and co-defendants are Paul's Distributors, Inc. ("Paul's"), Dairi Farms, Inc. ("Dairi Farms"), International Ice Cream, Inc. ("International"), and B & K Distributors, Inc. ("B & K")(collectively, the "New England distributors.").

to frozen food or warehouse distributors. [2] At this time, Haagen-Dazs learned that B & K was selling the Haagen-Dazs product to Winter Hill, but it believed that Winter Hill's sales of ice cream were minor and only to military purchasers. Affidavit of Michael L. Baily at 10.

**[**4]** **[*542]** After learning the extent of Winter Hill's sales to the military, Haagen-Dazs decided that B & K should not continue to supply ice cream to Winter Hill, and on August 1, 1987, Haagen-Dazs wrote B & K requesting that it discontinue sales to Winter Hill effective October 1, 1987. B & K's sales of Haagen-Dazs to Winter Hill ended on November 30, 1987.

Paul's, Dairi Farms and International have never sold -- and have refused to sell -- Haagen-Dazs ice cream to Winter Hill.

On January 20, 1988, Winter Hill brought this action against the named defendants to preliminarily enjoin these defendants' refusal to deal with, and to sell Haagen-Dazs products to, Winter Hill. In the complaint, Winter Hill alleges:

1) the agreement between Haagen-Dazs and its distributors to refuse sales of Haagen-Dazs products to Winter Hill is an unreasonable restraint of trade in violation of *Section 1* of the Sherman Act, *15 U.S.C. sec. 1* ("Count I");

2) the agreement between Haagen-Dazs and its New England distributors to refuse sales of Haagen-Dazs products to Winter Hill is an unreasonable restraint of trade in violation of *Mass. Gen. Laws ch. 93, sec. 4* ("Count II");

3) Haagen-Dazs' conduct constitutes a tortious **[**5]** interference with Winter Hill's contractual relations and advantageous business relationships with its existing customers ("Count III"); and

4) Haagen-Dazs' conduct constitutes unfair acts or business practices in violation of *Mass. Gen. Laws ch. 93A, secs. 2* and *11* ("Count IV").

On February 16, 1988, the Court denied Winter Hill's motion for preliminary injunction without prejudice, and denied Haagen-Dazs' and Pillsbury's motion to dismiss the complaint on February 22, 1988. Defendants Haagen-Dazs, Pillsbury, and International now move the Court, pursuant to *Fed. R. Civ. P. 56(c)*, for summary judgment on the grounds that there is no genuine issue as to any material fact and that they are entitled to judgment as matter of law.

---

[2] Haagen-Dazs states that it does not want its product distributed by frozen food or warehouse distributors whose primary stake is in products other than ice cream. Affidavit of James E. Richards at 2. It thereby seeks to maintain the focus of the independent distributor on the Haagen-Dazs product and thus to secure the greatest amount of freezer space for the product. *Id.*

Apparently, this battle for the limited amount of freezer space is an important element of distributing ice cream in the highly competitive frozen food and frozen desserts business. *See* Affidavit of Michael L. Baily at 4. Mr. Baily, vice president, sales, of Haagen-Dazs, explained:

> All products that occupy freezer space compete for that space. Ice creams compete against frozen pizza and vegetables. Only the winners -- in terms of consumer takeaway -- are awarded adequate shelf space. . .
>
> . . . Haagen-Dazs believes the frozen foods distributor has a substantially greater conflict of interest -- if he fights for additional space for ice cream, he has to give up space that is occupied by the other frozen foods he sells.*Id.* at 5-6.

Moreover, Haagen-Dazs asserts that it prefers to have its distributors sell only to retail accounts, not to subdistributors, because Haagen-Dazs has no contractual or other control over subdistributors. *Id.* at 9.

II. DISCUSSION

***HN1*** Pursuant to *Rule 56 of the Federal Rules of Civil Procedure*, [3] the party seeking summary judgment must inform the court of the basis of its motion and identify those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)*. ***HN2*** Where, **[**6]** however, the nonmoving party will bear the burden of proof on an issue at trial, "*Rule 56(e)* . . . requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id. at 324*; *see Moody v. Maine Central R.R. Co., 823 F.2d 693, 694 (1st Cir. 1987)*; *Jako v. Pilling Co., 670 F. Supp. 1074, 1076 (D. Mass.1987)*, *vacated and rev'd in part*, *848 F.2d 318* (1st Cir. June 8, 1988). **[*543]** *Cf. Hahn v. Sargent, 523 F.2d 461, 464 (1st Cir. 1975)*, *cert. denied*, *425 U.S. 904, 47 L. Ed. 2d 754, 96 S. Ct. 1495 (1976)*(nonmovant must establish by substantial evidence the existence of an issue of fact that is both genuine and material).

**[**7]** A. Counts I and II -- The Alleged Antitrust Violations.

Winter Hill asserts that the agreement between Haagen-Dazs and its distributors to refuse to sell Haagen-Dazs products to Winter Hill is an unreasonable restraint of trade in violation of both *Section 1* of the Sherman Act, [4]*15 U.S.C. sec. 1*, and *Mass. Gen. Laws ch. 93, sec. 4*. [5] In order to survive this motion for summary judgment, Winter Hill must establish that there is a genuine issue of material fact as to whether the defendants entered into an illegal conspiracy that caused

---

[3] *Fed. R. Civ. P. 56* provides, in relevant part:

> . . .
>
> ***HN3*** (c) Motion and Proceedings Thereon. . . . The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.
>
> . . .
>
> ***HN4*** (e) Form of Affidavits; Further Testimony; Defense Required. Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall affirmatively that the affiant is competent to testify to the matters stated therein. . . . The court may permit affidavits to be supplemented or opposed by depositions, answers to interrogatories, or further affidavits. When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

[4] *Section 1* provides, in relevant part:

> ***HN5*** Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal.*15 U.S.C. sec. 1 (1982)*.

[5] Section 4 of the Massachusetts Antitrust Act provides:

Winter Hill to suffer a cognizable injury. *See* Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 585-86, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986). Winter Hill asserts that the material issues of disputed fact are the following: 1) whether Haagen-Dazs has gone beyond the "mere announcement of a policy" and "simple refusal to deal;" 2) whether Haagen-Dazs has achieved "market power," i.e., the ability to set prices which are higher than the competition without losing the ability to sell its products; 3) whether the vertical restriction against sales to Winter Hill is harmful to competition either at the interbrand or intrabrand level, and 4) whether **[**8]** such harm to competition outweighs any benefit resulting from the restriction. Winter Hill's Memorandum in Opposition to Defendants' Motions for Summary Judgment at 2-3 (hereinafter "Winter Hill's Memorandum in Opposition to Summary Judgment"). On Counts I and I, Winter Hill does not succeed.

*1. The Refusal to Deal.*

It is a well established **[**9]** principle of antitrust law that ***HN7*** "[a] manufacturer . . . generally has a right to deal, or refuse to deal, with whomever it likes, as long as it does so independently." *Monsanto Co. v. Spray-Rite Serv. Corp., 465 U.S. 752, 761, 104 S. Ct. 1464, 79 L. Ed. 2d 775 (1984)*(citing *United States v. Colgate & Co., 250 U.S. 300, 307, 39 S. Ct. 465, 63 L. Ed. 992* [1919]) and *United States v. Parke, Davis & Co., 362 U.S. 29, 80 S. Ct. 503, 4 L. Ed. 2d 505* [1960]). The *Colgate* Court explained:

> The purpose of the Sherman Act is to prohibit monopolies, contracts and combinations which probably would unduly interfere with the free exercise of their rights by those engaged, or who wish to engage, in trade and commerce -- in a word to preserve the right of freedom to trade. In the absence of any purpose to create or maintain a monopoly, the act does not restrict the long recognized right of trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal. And, of course, he may announce in advance the circumstances under which he will refuse to sell.*250 U.S. at 307*. Therefore, ***HN8*** a mere unilateral refusal to deal, without more, is not **[**10]** cognizable under *Section 1* of the Sherman Act. *See, e.g., Parke, Davis, 362 U.S. at 37*; *Fuchs Sugars & Syrups, Inc. v. Amstar Corp., 602 F.2d 1025, 1033* (2d Cir.), *cert. denied*, *444 U.S. 917, 62 L. Ed. 2d 172, 100 S. Ct. 232* **[*544]** *(1979)*; *Butera v. Sun Oil Co., 496 F.2d 434, 437 n.7 (1st Cir. 1974)*.

All refusals to deal, however, are not beyond the reach of the antitrust laws. The Supreme Court has explicitly ruled that

> ***HN9*** When the manufacturer's actions, as here, go beyond mere announcement of his policy and the simple refusal to deal, and he employs other means which effect adherence

---

***HN6*** Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce in the commonwealth shall be unlawful.Mass. Gen. Laws Ann. ch. 93, sec. 4 (West 1984). This statute is construed in harmony with *Section 1* of the Sherman Act, and the same principles and analysis under the federal claim apply to this particular state law claim. *See*Mass. Gen. Laws Ann. ch. 93, sec. 1 (West 1984). Therefore, Winter Hill's state antitrust claims are subsumed by this discussion of federal antitrust law.

to his resale prices, this countervailing consideration [the right of the manufacturer to decide with whom to deal] is not present and therefore he has put together a combination in violation of the Sherman Act.*Parke, Davis, 362 U.S. at 44*. ***HN10*** The boundry separating the *Colgate* doctrine -- the simple unilateral refusal to deal -- from the non-simple unilateral refusal to deal is the presence of a "contract, combination, or conspiracy:" that is, either an express, implied or tacit agreement among two or more parties, or an involuntary acquiescence to one party's trade restraining policy. *See generally* **[**11]** 2 Kinter *Federal Antitrust Law* sec. 10.22 at 137 (1980). [6] **[**12]** In this context, the Supreme Court has ruled repeatedly that ***HN11*** where a manufacturer's refusal to deal either promotes or enforces a trade policy which is unreasonable *per se*, the manufacturer's refusal is a *per se* violation of *Section 1*. *E.g.*, *Federal Trade Comm'n v. Beech-Nut Packing Co., 257 U.S. 441, 42 S. Ct. 150, 66 L. Ed. 307 (1922)*(holding that a company's refusal to deal with those dealers who did not observe resale prices violated Section 5 of the Federal Trade Commission Act); *United States v. Bausch & Lomb Optical Co., 321 U.S. 707, 723, 64 S. Ct. 805, 88 L. Ed. 1024 (1944)*(holding that "more . . . than mere acquiescence of wholesalers" to a resale price maintenance scheme constituted a violation of *Section 1*); *Parke, Davis, 362 U.S. 29, 4 L. Ed. 2d 505, 80 S. Ct. 503* (ruling that when a manufacturer goes beyond the mere announcement of a pricing policy [i.e., having the wholesalers terminate the sales to those retailers who do not abide by the policy], an unlawful combination in violation of *Section 1* exists). [7]

***HN14*** Evidence of "a contract, combination or conspiracy," however, does not, without more, violate *Section 1* of the Sherman Act. *See, e.g.*, *A. H. Cox & Co. v. Star Machinery Co., 653 F.2d 1302, 1305-06 (9th Cir. 1981)* (Kennedy, J.); *Muenster Butane, Inc. v. Stewart Co., 651 F.2d 292, 298* (5th Cir. Unit A, July, 1981); *Fuchs Sugar, 602 F.2d at 1030*. Rather, there must be compelling proof **[**13]** that the refusal to deal was motivated by anticompetitive purposes, or will produce an anticompetitive effect. *See, e.g.*, *Oreck Corp. v. Whirlpool Corp., 579 F.2d 126, 133* (2d Cir.)(en banc), *cert. denied*, *439 U.S. 946, 99 S. Ct. 340, 58 L. Ed. 2d 338 (1978)* ("Something more than an agreement between [a manufacturer and a distributor] must be shown. The agreement becomes violative of *Section 1* of the Sherman Act only if it is *anticompetitive in purpose and effect* -- in sum, it must be tested by the rule of reason.") (emphasis in original); *Westman Comm'n Co. v. Hobart Int'l, Inc., 796 F.2d 1216, 1223 (10th Cir. 1986)*, *cert. denied*, *486 U.S. 1005, 108 S. Ct. 1728, 100 L. Ed. 2d 192 (1988)*; *cf.* *Local Beauty Supply, Inc. v. Lamaur, Inc., 787 F.2d 1197, 1200 (7th Cir. 1986)*(holding that otherwise lawful non-price mechanism agreements between a manufacturer and a distributor may be rendered *per se* unlawful **[*545]** if imposed as part of an illegal scheme to fix prices). Therefore, ***HN15*** regardless whether a combination or conspiracy between a manufacturer and its dealer exists, this Court's analysis is based upon the fundamental premise of antitrust law: whether a particular trade policy or practice

---

[6] Yet, ***HN12*** even where such a "combination contract or conspiracy" exists, there is not necessarily a violation of Section 1 of the Sherman Act: the complainant must still prove that the manufacturer's policy constitutes an unlawful restraint of trade. *See* 2 Kinter *Federal Antitrust Law* sec. 10.20 at 133.

[7] The Court notes that ***HN13*** there is a distinction between a non-simple unilateral refusal to deal and a concerted refusal to deal, which is also known as a "group boycott." *See* Horsley, *Per Se Illegality and Concerted Refusals to Deal*, 13 B.C. Indus. & Com. L. Rev. 484 (1972). A concerted refusal to deal is defined as "an agreement by two or more persons not to do business with other individuals, or to do business with them only on specified terms." Note, *Concerted Refusals to Deal Under the Federal Antitrust Laws*, 71 Harv. L. Rev. 1531 (1958). Although direct evidence of an explicit agreement that restricts dealing with a third party is not necessary for finding "concerted action," this Court cannot find sufficient evidence of a "boycott" in this particular case.

**[**14]** imposes an unreasonable restraint on competition. [8] **[**15]** More precisely, the central issue in this case is whether a manufacturer's termination of an unauthorized distributor constitutes an unreasonable restraint on competition. [9] The Court rules that it does not.

*2. Distributorship/Dealership Terminations*.

***HN17*** Under the Rule of Reason, the standard for lawful trade practices has been described as follows:

> The true test of legality is whether the restraint imposed is such as merely regulates and perhaps thereby promotes competition or whether it is such as may suppress or even destroy competition. To determine **[**16]** that question the court must ordinarily consider the facts peculiar to the business to which the restraint is applied; its condition before and after the restraint was imposed; the nature of the restraint and its effect, actual or probable. The history of the restraint, the evil believed to exist, the reason for adopting the particular remedy, the purpose or end sought to be attained, are all relevant facts.*Continental T.V., Inc. v. GTE Sylvania Inc., 433 U.S. 36, 49 n.15, 53 L. Ed. 2d 568, 97 S. Ct. 2549 (1977)*(quoting *Chicago Bd. of Trade v. United States, 246 U.S. 231, 238, 38 S. Ct. 242, 62 L. Ed. 683* [1918] [Brandeis, J.]). Simply, ***HN18*** "the fact-finder weighs all of the circumstances of a case in deciding whether a restrictive practice should be prohibited as imposing an unreasonable restraint on competition." *Continental T.V., 433 U.S. at 49* (footnote omitted).

***HN19*** In the context of distributorship/dealership terminations, manufacturers are generally permitted a wide latitude to discontinue relationships with distributors, to determine the profile of its distributorship, and to otherwise establish vertical nonprice restraints. *See, e.g., Chandler Supply Co. v. GAF Corp., 650 F.2d 983, 989 (9th* **[**17]** Cir. 1980) (manufacturer **[*546]** was dissatisfied with the franchisee's service); *Edward J. Sweeny & Sons, 637 F.2d at 110* (franchisee's

---

[8] This Court, therefore, need not address the issue of whether there exists a "contract, combination or conspiracy" between Haagen-Dazs and the New England distributors in the present case.

If, however, this Court were to decide this issue, there must be "something more than evidence of complaints [from the nonterminated distributors] . . . there must be evidence that tends to exclude the possibility that the manufacturers and nonterminated distributors were acting independently." *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 764, 104 S. Ct. 1464, 79 L. Ed. 2d 775 (1984); *see Bruce Drug, Inc. v. Hollister, Inc.*, 688 F.2d 853, 856-57 (1st Cir. 1982). "The antitrust plaintiff should present direct or circumstantial evidence that reasonably tends to prove that the manufacturer and others 'had a conscious commitment to a common scheme designed to achieve an unlawful objective.'" 465 U.S. at 764 (quoting *Edward J. Sweeney & Sons, Inc. v. Texaco, Inc.*, 637 F.2d 105, 111 [3d Cir. 1980], *cert. denied*, *451 U.S. 911*, *68 L. Ed. 2d 300*, *101 S. Ct. 1981* [1981]). Moreover, the plaintiff must present evidence "both that the distributor communicated its acquiescence or agreement, and that this was sought by the manufacturer." *Id.* at 764 n.9. Furthermore, the finding that an unlawful conspiracy exists cannot be supported by the mere fact that the court determines that the business reasons for certain trade practices are pretextual. *See Bruce Drug*, 688 F.2d at 857. Applying these evidentiary standards to the case at bar, it does not appear that Winter Hill has presented sufficient evidence to support the finding of a conspiracy; the Court, however, does not rule on this particular issue.

[9] Winter Hill concedes that this case is governed by the "Rule of Reason," not the *per se* rules of antitrust illegality. *See* Winter Hill's Memorandum in Opposition to Defendants' Motions for Summary Judgment at 14 (hereinafter, "Winter Hill's Memorandum in Opposition to Summary Judgment"). ***HN16*** Since Winter Hill does not allege any "agreements or practices which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use." *Northern Pacific Ry. Co. v. United States*, 356 U.S. 1, 5, 78 S. Ct. 514, 2 L. Ed. 2d 545 (1958), the *per se* rules do not apply. *See* Continental T.V., Inc. v. GTE Sylvania, Inc., 433 U.S. 36, 49-50, 97 S. Ct. 2549, 53 L. Ed. 2d 568 (1977).

service stations had produced a number of customer complaints); *White v. Hearst Corp., 669 F.2d 14, 18-19 (1st Cir. 1982)*(manufacturer had decided to establish an in-house method of distribution). The policy for allowing manufacturers to establish certain vertical nonprice restraints is basic: such restrictions may have pro-competitive effects. Addressing the manufacturer's decision to impose vertical nonprice restraints, the Supreme Court stated:

> New manufacturers and manufacturers entering new markets can use the restrictions in order to induce competent and aggressive retailers to make the kind of investment of capital and labor that is often required in the distribution of products unknown to the consumer. Established manufacturers can use them to induce retailers to engage in promotional activities or to provide service and repair facilities necessary to the efficient marketing of their products. Service and repair are vital for many products. . . . The availability and quality of such services affect a manufacturer's goodwill and the competitiveness **[**18]** of his product. Because of market imperfections such as the so-called 'free-rider' effect, these services might not be provided by retailers in a purely competitive situation, despite the fact that each retailer's benefit would be greater if all provided the services than if none did.*Business Electronics Corp. v. Sharp Electronics Corp., 485 U.S. 717, 108 S. Ct. 1515, 1519-20, 99 L. Ed. 2d 808 (1988)*(quoting *Continental T.V., 433 U.S. at 55*). The Supreme Court, in *Continental T.V.*, explained that, although vertical restrictions reduce intrabrand competition by limiting the number of sellers of a particular product, "vertical restrictions promote interbrand competition by allowing the manufacturer to achieve certain efficiencies in the distribution of his products." [10]*433 U.S. at 54*. Therefore, ***HN20*** a plaintiff asserting that a distributorship termination violates *Section 1* of the Sherman Act must present facts *proving that competition has been injured rather than merely a competitor*. *Rutman Wine Co. v. E. & J. Gallo Winery, 829 F.2d 729, 734 (9th Cir. 1987)*. In this regard, it must be stressed that the antitrust laws were not established for the protection of a **[**19]** particular competitor, rather the protection of competition. *See Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 488, 97 S. Ct. 690, 50 L. Ed. 2d 701 (1977)*. Under the rule of reason analysis, Winter Hill's antitrust claims cannot survive the defendants' motions for summary judgment on the ground that, as matter of law, there is not sufficient evidence establishing the existence of antitrust injury.

**[**20]** First, Winter Hill asserts that Haagen-Dazs has market power in the super premium ice cream market, [11] and that such market **[*547]** power allows Haagen-Dazs to raise its prices above

---

[10] The *Continental T.V.* Court further noted that market efficiency is not the only permissible reason for a manufacturer to exercise control over the sales and servicing of a product. 433 U.S. at 55 n.23. "As a result of statutory and common-law developments, society increasingly demands that manufacturers assume direct responsibility for the safety and quality of their products. . . . The legitimacy of these concerns has been recognized in cases involving vertical restrictions." *Id.* In the present case, Haagen-Dazs asserts that "ice cream requires more careful handling than other frozen foods. Because ice cream is perishable and sensitive to changes in temperatures, distribution involves a risk that the product may be mistreated." Affidavit of Michael L. Baily at 7. The Court thus acknowledges that the quality and safety of the product constitute a basis for vertical non-price restrictions.

[11] For the purposes of this opinion, super premium ice cream is defined as that ice cream containing all natural ingredients, with a higher butterfat and a lower air content than other ice creams. *See* Declaration of Jerry A. Hausman at 4; Affidavit of Harold R. Rudnick in Opposition to the Motion by the Pillsbury Company and the Haagen-Dazs Company, Inc. for Summary Judgment at 3 (hereinafter, "Rudnick Aff. II"). Furthermore, the super premium ice cream is sold only in pints and for prices which are higher

those of the competition. [12] Affidavit of Harold R. Rudnick at 2 (hereinafter, "Rudnick Aff. I"); Rudnick Aff. II at 5-9. ***HN21*** Where there are vertical nonprice restraints, some circuits have ruled that a threshold inquiry in rule of reason analysis is whether the defendant has market power. *See, e.g.*, *Assam Drug Co. v. Miller Brewing Co., 798 F.2d 311, 315-16 (8th Cir. 1986)*; *Hennessy Indus. Inc. v. FMC Corp., 779 F.2d 402, 404-05 (7th Cir. 1985)*. ***HN22*** Market power is often defined as the "'power to raise prices significantly above the competitive level without losing all of one's business,'" *Valley Liquors, Inc. v. Renfield Importers, Ltd., 822 F.2d 656, 666 (7th Cir. 1987)*(quoting *Valley Liquors, Inc. v. Renfield Importers, Ltd., 678 F.2d 742, 745* [7th Cir. 1982] [*Valley I*], *cert, denied*, *484 U.S. 977, 108 S. Ct. 488, 98 L. Ed. 2d 486* [1987]), and market power is often inferred from the control of a "'substantial percentage of the sales in a market carefully defined in terms of both product and geography.'" **[**21]** *Id*. (quoting *Valley I, 678 F.2d at 745*). Based upon those facts that Winter Hill presented to this Court, there is insufficient evidence to raise a genuine issue of material fact regarding Haagen-Dazs' market power.

**[**22]** Winter Hill asserts that Haagen-Dazs has a 43% market share of the super premium ice cream market in New England. [13] A 43% market share, however, does not alone establish that Haagen-Dazs has market power. *See* *Nifty Foods Corp. v. Great Atlantic & Pacific Tea Co., 614 F.2d 832, 841 (2d Cir. 1980)*(market share declining from 54.5% to 33% over five years insufficient to establish market power); *Broadway Delivery Corp. v. United Parcel Service of America, Inc., 651 F.2d 122, 129* (2d Cir.), *cert. denied*, *454 U.S. 968, 102 S. Ct. 512, 70 L. Ed. 2d 384 (1981)*(market share below 50% is rarely evidence of monopoly power). *Cf.* *Graphic Prod. Distrib., Inc. v. Itek Corp., 717 F.2d 1560, 1570 (11th Cir. 1983)*(70-75 per-cent market share constitutes sufficient evidence of market power). Moreover, ***HN23*** in the context of evaluating whether a particular competitor has market power, the competitor's declining market share is evidence that such competitor lacks such power, although it is not dispositive. *See* *Berkey Photo, Inc. v. Eastman Kodak Co., 603 F.2d 263, 273 n. 11 (2d Cir. 1979)*, *cert. denied*, *444 U.S. 1093, 100 S. Ct. 1061, 62 L. Ed. 2d 783 (1980)*. From the A. C. Nielson data regarding the **[**23]** sales of ice cream in New England, the Court notes that Haagen-Dazs' market share in **[*548]** the super premium ice cream market declined from 61% in 1985 to 50% in 1986 to 43%

---

than other ice creams. *See* Rudnick Aff. II at 3. In the New England area, the super premium ice cream market includes the following brands of ice cream: Haagen-Dazs, Frusen Gladje, Ben & Jerry's, and Steve's.

[12] As a preliminary matter, the Court does not decide the issue whether there in fact exists a separate market for super premium ice cream; rather, it assumes *arguendo* that such a market does exist.

If the Court were to decide this issue, the evidentiary burden falls on the plaintiff Winter Hill to establish a well-defined relevant market upon which anticompetitive actions had a substantial impact. *See Kartell v. Blue Shield of Massachusetts, Inc.*, 582 F. Supp. 734, 742 (D. Mass. 1984), *reversed and vacated in part on other grounds*, 749 F.2d 922 (1st Cir. 1984), *cert. denied*, *471 U.S. 1029, 85 L. Ed. 2d 322, 105 S. Ct. 2040 (1985)*. To demonstrate the separate existence of a super premium ice cream submarket, Winter Hill must prove those submarket elements such as "industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors." *Brown Shoe Co. v. United States*, 370 U.S. 294, 325, 82 S. Ct. 1502, 8 L. Ed. 2d 510 (1962) (footnote omitted). Given these requisite factors for determining the existence of a submarket, this Court concludes that the two affidavits of Harold Rudnick would be insufficient to establish a distinct market for super premium ice cream. Moreover, in similar litigation filed in the United States District Court for the Northern District of California, Judge Legge ruled that "all grades of ice cream compete for both retail shelf space and for consumers' attention," and there is not, therefore, a separate market for super premium ice cream. *In re Super Premium Ice Cream Distribution Antitrust Litigation*, 691 F. Supp. 1262, 1268 (N.D. Cal. June 23, 1988). The Court, however, does not decide this issue.

[13] Harold Rudnick, president of Winter Hill, asserts that the market shares of the super premium ice creams in New England from December, 1986 through November, 1987 are the following: Haagen-Dazs - 43%, Ben & Jerry's - 41%, Frusen Gladje - 8%, and Steve's - 8%. Rudnick Aff. II at 10. Haagen-Dazs, however, notes that in the October - November, 1987 reporting period, Haagen-Dazs' market share was only 39%, while Ben & Jerry's was 45%. Declaration of Jerry A. Hausman at 10.

in 1987. *See* Exhibit E, Declaration of Jerry A. Hausman. Therefore, the data concerning both Haagen-Dazs' historical and current market shares demonstrates that Haagen-Dazs indeed lacks market power in the super premium ice cream market, [14] and thus would preclude the need to further balance the competitive effects of Haagen-Dazs' restraint under rule of reason analysis. *See Assam Drug, 798 F.2d at 316*.

**[**24]** Regardless, however, of this Court's conclusion that Haagen-Dazs lacks market power, the Court further rules that Winter Hill has failed to prove that there are anti-competitive effects resulting from terminating sales of Haagen-Dazs products to Winter Hill. ***HN24*** Under the rule of reason inquiry, the Court must compare the negative effects of the restraint on intrabrand and interbrand competition, if any, with any alleged positive effects on interbrand competition stemming from the restraints. *See Graphic Prods. Distrib., 717 F.2d at 1571*. Winter Hill asserts that the price of a pint of Haagen-Dazs ice cream at Pease Air Force Base near Portsmouth, New Hampshire, has increased from $ 1.49 to $ 1.60, and at Griffiss Air Force Base near Syracuse, New York, the price has risen from $ 1.49 to $ 1.70. Winter Hill's Memorandum in Opposition to Defendants' Motions for Summary Judgment at 26. Winter Hill also alleges that B & K approached Trucchi's Supermarket, a Winter Hill customer in Raynham, Massachusetts, and proposed to charge $ 12.50 per case of Haagen-Dazs ice cream, a 21% increase over Winter Hill's price of $ 10.29 per case. *Id*. In short, these isolated examples of price increases **[**25]** in Haagen-Dazs ice cream products are insufficient to establish that there are anti-competitive effects resulting from Winter Hill's termination. Accordingly, this Court grants the motions for summary judgment of Haagen-Dazs, Pillsbury and International on the antitrust claims, Counts I and II.

B. Count III -- Interference with Advantageous Business Relations.

***HN25*** As for this claim, Winter Hill must show "'(1) a business relationship or contemplated contract of economic benefit; (2) the defendant's knowledge of such relationship; (3) the defendant's intentional and malicious interference with it; (4) the plaintiff's loss of advantage directly resulting from the defendant's conduct.'" *Comey v. Hill, 387 Mass. 11, 19, 438 N.E.2d 811 (1982)*(quoting J. Nolan, *Tort Law* sec. 72, at 87 [1979]). Such conduct, however, must have been done without justification. Justification is established when "'(a) the actor has an economic interest in the matter with reference to which he wishes to influence the policy of the other and (b) the desired policy does not unlawfuly restrain trade . . . and (c) the means employed are not wrongful.'" *Moffat v. Lane Co., 595 F. Supp. 43, 49 (D. Mass. 1984)*(quoting **[**26]** *Restatement (Second) of Torts sec. 771* [1977]). Haagen-Dazs, Pillsbury and International have proved that 1) they have an economic interest in the matter, *see* Affidavit of Michael L. Baily (Haagen-Dazs **[*549]** and Pillsbury), Affidavit of Bruce C. Ginsberg (International), 2) the conduct does not unlawfully restrain trade, *see* Section II (A), *supra*, and 3) the conduct was

---

[14] Winter Hill further contends that Haagen-Dazs' market power stems from its ability to raise prices above competitive levels without losing customers, and states, "Haagen-Dazs is the price leader and is usually sold in supermarkets at prices which are more than 10 cents per pint above the price of any other super premium ice cream. Special flavors are priced 10 to 15 cents higher than that." Rudnick Aff. II at 9. First, the Court questions Mr. Rudnick's conclusion that Haagen-Dazs is the price leader where Winter Hill's October 14, 1987 order guide contains the following suggested retail prices for 16-ounce packages of frozen desserts: Howard Johnson -- $ 1.79, Dole -- $ 1.98, Tofutti -- $ 2.79, Haagen-Dazs - $ 1.89, Frusen Gladie - $ 2.08, Mousse d'Jour - $ 1.99, and Steve's - $ 2.19. Affidavit of Michael L. Baily, Exhibit B. Second, and more importantly, this conclusory statement of the pricing differentials in the super premium ice cream market, which is not supported by specific factual data, is insufficient evidence that Haagen-Dazs is in fact the price leader in the market. *Cf. United States v.* Hall, 424 F. Supp. 508, 533-34 (W. D. Okla. 1975)(holding that a motion requesting a trial judge to disqualify himself and the affidavit in support thereof were insufficient in part due to their conclusory nature), *aff'd*, 536 F.2d 313 (10th Cir.) cert. denied, *429 U.S. 919 97 S. Ct. 313*, 50 L. 2d 285 (1976).

not wrongful pursuant to *Moffat, 595 F. Supp. at 49*. Accordingly, the actions of the defendants Haagen-Dazs, Pillsbury and International were justifiable and, therefore, the Court grants their motions for summary judgment on Count III.

C. Count IV -- Unfair Competition.

***HN26*** In considering whether Winter Hill has established an unfair practice under Mass. Gen. Laws ch. 93A, the Court must consider "'1) whether the practice . . . is within at least the penumbra of some common-law, statutory, or other established concept of unfairness; 2) whether it is immoral, unethical, oppressive, or unscrupulous; 3) whether it causes substantial injury to consumers (or competitors or other businessmen).'" *PMP Associates, Inc. v. Globe Newspaper Co., 366 Mass. 593, 596, 321 N.E.2d 915 (1975)*(quoting 29 Fed. Reg. 8325, 8355 [1964]); **[**27]** *see also* *Moffat, 595 F. Supp. at 49*. The case law is clear that the defendants' conduct does not fall within the scope of unfairness prohibited by Section 93A.

Accordingly, the Court grants the motions for summary judgment of Haagen-Dazs, Pillsbury and International on all counts of the complaint.

EXHIBIT 298

LexisNexis®

Caution
As of: August 12, 2014 9:20 AM EDT

# Yentsch v. Texaco, Inc.

United States Court of Appeals for the Second Circuit
February 11, 1980, Argued ; May 12, 1980, Decided
Nos. 698, 772, Dockets 79-7735, 79-7746

**Reporter:** 630 F.2d 46; 1980 U.S. App. LEXIS 17619; 1980-2 Trade Cas. (CCH) P63,349
DAVID A. YENTSCH, Plaintiff-Appellee-Cross-Appellant, v. TEXACO, INC., Defendant-Appellant-Cross-Appellee

**Prior History: [**1]** Appeal from a judgment after a jury trial in the United States District Court for the District of Connecticut, Thomas F. Murphy, Judge, finding that appellant coerced its Connecticut service station dealers, including appellee, to participate in an illegal maximum resale price maintenance scheme, in violation of *Section 1* of the Sherman Antitrust Act, *15 U.S.C. § 1*, that appellant was in breach of its contract with appellee, or that appellant illegally tied promotional products to its lease and dealer agreements. Cross-appeal from the district court's vacation of its order trebling the jury award of $73,500.

**Disposition:** Judgment reversed because of insufficiency of evidence to support a finding in favor of appellee on the breach of contract and illegal tying claims; remanded for a new trial on the pricefixing claim.

**Core Terms**

dealers, prices, termination, lease, Oil, station, tied product, Antitrust, gasoline, threats, resale price, Stamps, sales, promotions, products, retail, service station, price-fixing, competitors, glassware, economic power, manufacturer, coercion, dropping, volume, trading stamp, tying product, complied, promises, coerced

**LexisNexis® Headnotes**

Antitrust & Trade Law > ... > Price Fixing & Restraints of Trade > Per Se Rule & Rule of Reason > General Overview
Antitrust & Trade Law > ... > Price Fixing & Restraints of Trade > Vertical Restraints > General Overview
Antitrust & Trade Law > ... > Price Fixing & Restraints of Trade > Vertical Restraints > Resale Price Maintenance
Antitrust & Trade Law > Sherman Act > General Overview

***HN1*** Vertical resale price maintenance is per se illegal under the Sherman Act, *15 U.S.C.S. § 1*.

Antitrust & Trade Law > Sherman Act > General Overview

***HN3*** See *15 U.S.C.S. § 1*.

Antitrust & Trade Law > ... > Monopolies & Monopolization > Attempts to Monopolize > General Overview

Antitrust & Trade Law > Sherman Act > General Overview
Antitrust & Trade Law > Sherman Act > Scope > General Overview

***HN2*** In the absence of any purpose to create or maintain a monopoly, the Sherman Act, *15 U.S.C.S. § 1*, does not restrict the long recognized right of trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal. And, of course, he may announce in advance the circumstances under which he will refuse to sell.

Antitrust & Trade Law > ... > Price Fixing & Restraints of Trade > Exclusive & Reciprocal Dealing > General Overview

***HN4*** An unlawful combination is not just such as arises from a price maintenance agreement, express or implied; such a combination is also organized if the producer secures adherence to his suggested prices by means which go beyond his mere declination to sell to a customer who will not observe his announced policy. The required combination must be demonstrated, then, by proof of (1) an express or implied agreement, or (2) the securing of actual adherence to prices by means beyond mere refusal to deal. A supplier may not use coercion on its retail outlets to achieve resale price maintenance.

Antitrust & Trade Law > ... > Price Fixing & Restraints of Trade > Exclusive & Reciprocal Dealing > General Overview
Energy & Utilities Law > Oil & Petroleum Products > Gasoline Fuels > Gasoline Dealers & Distributors

***HN5*** Use of coercion that achieves actual price-fixing is illegal.

Civil Procedure > ... > Standards of Review > Substantial Evidence > General Overview
Energy & Utilities Law > Oil & Petroleum Products > Gasoline Fuels > Gasoline Dealers & Distributors

***HN6*** The reviewing court must sustain the jury's verdict if there is substantial evidence, taking the view most favorable to appellee, to support it.

Antitrust & Trade Law > ... > Price Fixing & Restraints of Trade > Exclusive & Reciprocal Dealing > General Overview

***HN7*** While evidence of exposition, persuasion, argument, or pressure is alone insufficient to establish coercion, threats of termination, as long as they secure adherence to the fixed price, have been deemed to trigger a finding of an illegal combination.

Antitrust & Trade Law > ... > Price Fixing & Restraints of Trade > Tying Arrangements > General Overview
Antitrust & Trade Law > ... > Price Fixing & Restraints of Trade > Tying Arrangements > Clayton Act
Antitrust & Trade Law > ... > Price Fixing & Restraints of Trade > Tying Arrangements > Sherman Act Violations

***HN8*** A tying arrangement is an agreement by a party to sell one product but only on the condition that the buyer also purchases a different (or tied) product. The law of tying requires proof of five specific elements: first, a tying and a tied product; second, evidence of actual coercion by the seller that in fact forced the buyer to accept the tied product; third, sufficient economic power in the tying product market to coerce purchaser acceptance of the tied product; fourth, anticompetitive effects in the tied market; and fifth, involvement of a "not insubstantial" amount of interstate commerce in the tied product market.

Antitrust & Trade Law > ... > Price Fixing & Restraints of Trade > Tying Arrangements > General Overview

***HN9*** For purposes of determining whether the amount of commerce foreclosed is too insubstantial to warrant prohibition of the practice, the relevant figure is the total volume of sales tied by the sales policy under challenge, not the portion of this total accounted for by the particular plaintiff who brings suit.

Antitrust & Trade Law > ... > Price Fixing & Restraints of Trade > Tying Arrangements > General Overview

***HN10*** To prove the element of sufficient economic power in the tying product market, the relevant standard is as follows: The question is whether the seller has some advantage not shared by his competitors in the market for the tying product.

**Counsel:** Alan Neigher, Bridgeport, Conn., for plaintiff-appellee-cross-appellant.

G. Kenneth Handley, White Plains, N.Y. (Milton J. Schubin, Randolph S. Sherman, Ira S. Sacks, New York City, Kaye, Scholer, Fierman, Hays & Handler, New York City, of counsel), for defendant-appellant-cross-appellee.

**Judges:** Before OAKES and VAN GRAAFEILAND, Circuit Judges, and NICKERSON, District **[**2]**

**Opinion by:** OAKES

**Opinion**

**[*48]** This action, an anachronism in today's OPEC-pricing world, was brought against Texaco, Inc. by a former Connecticut service station dealer David Yentsch. Following a six-day trial in the United States District Court for the District of Connecticut, Judge Thomas F. Murphy submitted three issues to the jury: (1) whether Texaco **[*49]** coerced its Connecticut dealers, including Yentsch, to participate in an illegal maximum resale price maintenance scheme, in violation of *Section 1* of the Sherman Antitrust Act, *15 U.S.C. § 1*; (2) whether Texaco broke its contract with Yentsch by terminating his lease and dealer agreement; and (3) whether Texaco illegally tied S & H Green Stamps, Coca-Cola, and glassware products to the lease and dealer agreement, also in violation of *15 U.S.C. § 1*.

The jury returned a single general verdict for $ 73,500 in favor of Yentsch, and the district court subsequently granted appellee's oral request for treble damages, pursuant to *15 U.S.C. § 15*. In response to a Texaco motion, however, the court later vacated its trebling order since it had no **[**3]** way of knowing whether the jury found for Yentsch on antitrust or non-antitrust grounds, a situation which could have been avoided with the use of a special verdict, *Fed.R.Civ.P. 49*.

Texaco now appeals from denials by the district court of its motions for judgment notwithstanding the jury verdict and for a new trial. Yentsch cross-appeals from the district court's decision to vacate its original treble damages order. We reverse the judgment and remand for a new trial on the price-fixing claim.

FACTS

David Yentsch leased and operated a Texaco service station in North Haven, Connecticut, from January 1, 1970 through December 31, 1971, when he was terminated by Texaco. [1] He signed a one-year lease and dealer agreement with Texaco in September, 1969, for the year 1970, and both parties renewed for 1971. The agreement could be terminated at the end of the annual lease term by either party upon thirty days' written notice.

**[**4]** During negotiations prior to the agreement, Texaco told Yentsch that it was dissatisfied with the prior dealer's sales volume and thought the station could increase sales if appellee remained open twenty-four hours a day, gave S & H Green Stamps to customers, participated in other Texaco promotions, and kept the station clean. Yentsch agreed, apparently on a trial basis, to offer Green Stamps and to maintain round-the-clock service.

Appellee stayed open twenty-four hours a day throughout 1970, except for Thanksgiving and Christmas, even though he thought it unprofitable to do so. Richard Ross, a Texaco sales supervisor from 1961 to 1968, testified that during 1967 and 1968, his district manager, Arthur Davis, told him "daily" to warn dealers that, unless they stayed open twenty-four hours each day, they would be terminated. Ross recounted that fifteen to twenty dealers were terminated by him on Davis's orders, because of their failure to maintain round-the-clock service. According to Ross, Davis himself threatened a dealer, in Ross's presence, with termination if he refused to stay open twenty-four hours.

Although Yentsch believed that increased gasoline sales resulting from **[**5]** offering Green Stamps did not cover their cost, he nevertheless distributed them during most of his two-year tenure. Texaco representatives threatened lease termination several times when he suggested dropping them. Donald Breitenstein, Texaco's sales representative for the North Haven area and Yentsch's representative from early 1970 through the spring of 1971, testified that he told his sales supervisor, Richard Hammer, about recalcitrant dealers who were unhappy with trading stamps, and Hammer "said that if they didn't do it, that, you know, Texaco could get someone who would do it and they wouldn't be there when lease time came around again." Ross noted that Texaco generally told dealers during the late 1960s that a condition of keeping their stations would be their giving away trading stamps. **[*50]** Texaco also urged appellee to participate in glassware and Coca-Cola promotional programs, which he grudgingly did after threats that his lease would otherwise not be renewed. Breitenstein testified that Texaco kept forms indicating whether a dealer did or did not participate in the two promotions. Hammer told him that he wanted all retailers to join the promotions.

Another **[**6]** major area of contention between Yentsch and Texaco was pricing policy. Texaco offered a "temporary voluntary allowance" (TVA) to its dealers during times of price instability-popularly known as "price wars"-reducing its wholesale dealer tankwagon prices by, for example, 2.1 cents per gallon. The dealer was expected to make a further .9 cent or 30 percent reduction, resulting in an overall pump price decrease of three cents. Yentsch, mistakenly under the impression that Texaco would cover the full three cent reduction, followed this program for a short time in early 1970, until he learned that he, too, was contributing to the lower price. He testified that even then, "I left (the price at that level) for a while, and I realized I didn't have enough

---

[1] Texaco claims that Yentsch was not terminated, since he voluntarily signed a "mutual cancellation" agreement. By signing the agreement, Yentsch received a promise from Texaco that it would buy back his inventory and settle all accounts within 60 days. Since the record makes it clear that Texaco intended to end its relationship with Yentsch whether he consented or not, he had nothing to lose and a little to gain by making the "termination" mutual.

of a margin on the gasoline to be dropping a cent, so I went back up one cent to meet the two cents that they were giving me." He later decided generally to reduce his retail price only by the amount of the Texaco allowance, although he noted that "(at) times I did" lower the "price an additional 30 percent" over the allowance late in 1970.

Texaco, however, wanted Yentsch to contribute his own price reductions as part of its TVA program. **[**7]** It thought that Yentsch priced his gasoline too high for the market, at least one or two cents higher than his competitors. Yentsch testified that sales supervisor Hammer told appellee at least ten times during 1971: "(E)ither drop the price or we are going to get a replacement for you." When asked during direct examination whether he complied with Hammer's threats, appellee answered "(not) every time" and "(very) seldom." He testified that he recalled dropping his price the extra 30 percent only once in 1971, during the summer. Yentsch stated in a deposition that Hammer "convinced me to participate in the pricing and it would increase my volume so much that I would be making more money. I tried it for a couple of weeks and it didn't work out."

Breitenstein testified that "Mr. Hammer would want me to tell the dealers to lower their prices so they would pump more gallonage," and that Hammer told him to tell dealers "(t)hat if their gallonage wasn't up to what Texaco wanted it to, they could find somebody else to run the station that could get it up there." Breitenstein had monthly discussions on this topic with Hammer and had previously talked on the same topic every six weeks **[**8]** or so with Hammer's predecessor, Henry Milton, Texaco's sales supervisor from 1969 to 1970.

After reviewing projections estimating a 10,000 gallon decrease in sales for Breitenstein's area during the month of May, Hammer handwrote him a memorandum on April 3, 1971, stating:

> I expect you to do everything possible to have this in the Black by 5-31-71. Prices, Coca-Rama, and hours of operation must be utilized. I told H. C. Milton today Yentsch is off 24 hours and he and I agree. Get a replacement retailer. We are both upset that you didn't come to us for help before he went off. I want an S-202 (termination form) drawn up on Yentsch, bring it to me this week, and then discuss with me.Ross testified that district manager Davis would "ride the area" and survey dealer prices, in order to determine whether dealers were reducing prices according to the TVA. He also commented that "the dealers were really informed (during training) that in order to be very competitive they had to follow the tank wagon pricing."

Although Texaco renewed Yentsch's lease and dealer agreement for 1971, it grew increasingly dissatisfied with him. [2] Finally, **[*51]** in late November, 1971, **[**9]** it informed him that the lease would be terminated as of December 31, 1971. Yentsch signed a "mutual cancellation" agreement with Texaco, see note 1 supra, and later rejected its offer of a month-to-month extension of his lease and dealer agreement.

DISCUSSION

---

[2] In addition to the dispute over prices, hours of operation, promotional programs, and volume of gasoline sold, the appearance of the station became an issue. Texaco claims that Yentsch failed, for example, to keep the men's room clean and the toilet in running order. Yentsch responds that he had continuous problems with the plumbing and repeatedly asked Texaco to make the repairs, as it was required as landlord to do.

A. Price-Fixing Claim

***HN1*** Vertical resale price maintenance is, so far as still appears, per se illegal under *§ 1* of the *Sherman Act. California Retail Liquor Dealers Association v. Midcal Aluminum, Inc., 445 U.S. 97, 105, 100 S. Ct. 937, 942, 63 L. Ed. 2d 233 (1980)*; *Albrecht v. Herald Co., 390 U.S. 145, 151, 88 S. Ct. 869, 872,* **[**10]** 19 L. Ed. 2d 998 (1968). [3] The Supreme Court originally made this position clear in *Dr. Miles Medical Co. v. John D. Park & Sons Co., 220 U.S. 373, 31 S. Ct. 376, 55 L. Ed. 502 (1911)*, when it proscribed written contracts between the manufacturer and dealers fixing retail prices. *Id. at 407-08, 31 S. Ct. at 384-85*. Eight years later, the Court, in *United States v. Colgate & Co., 250 U.S. 300, 39 S. Ct. 465, 63 L. Ed. 992 (1919)*, backtracked to some extent:

> ***HN2*** In the absence of any purpose to create or maintain a monopoly, the (Sherman) (Act) does not restrict the long recognized right of trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal. And, of course, he may announce in advance the circumstances under which he will refuse to sell.

**[**11]** *Id. at 307, 39 S. Ct. at 468*. The Court noted that the indictment did not charge Colgate "with selling its products to dealers under agreements which obligated the latter not to resell except at prices fixed by the company," id., whereas in Dr. Miles, "the unlawful combination was effected through contracts which undertook to prevent dealers from freely exercising the right to sell (their own goods)," *United States v. Colgate & Co., supra, 250 U.S. at 307-08, 39 S. Ct. at 468*.

Since the advent of Colgate, both the Court and commentators have been grappling to recast or limit its reach. See Turner, The Definition of Agreement Under the Sherman Act: Conscious Parallelism and Refusals to Deal, 75 Harv.L.Rev. 655, 684-85, 687-88 (1962) (discussing cases); Pitofsky, in Pitofsky & Dam, Is the Colgate Doctrine Dead, 37 ABA Antitrust L.J. 772 (1968) (yes it is); Maslow, Colgate Updated: Resale Price Maintenance and Antitrust Liability, 48 N.Y.St.B.J. 626 (1978) (Colgate not dead). The Dr. Miles "contract" element was enlarged to include agreements "implied from a course of dealing." *United* **[*52]** States v. A. Schrader's Son, Inc., 252 U.S. 85, 99, 40 S. Ct. 251, 64 L. Ed. 471 **[**12]** (1920). The Colgate refusal-to-deal notion was narrowly construed in *FTC v. Beech-Nut Packing Co., 257 U.S. 441, 42 S. Ct. 150, 66*

---

[3] *Section 1* of the Sherman Act states:

***HN3*** Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal . . ..

*15 U.S.C. § 1*.

We need not enter the debate over whether maximum resale price maintenance should be treated differently from minimum resale price maintenance, since both are presently considered illegal per se. Albrecht v. Herald Co., supra, 390 U.S. at 152-53, 88 S. Ct. at 873-74. But cf. Albrecht, supra, at 156-59, 88 S. Ct. at 875-77 (Harlan, J., dissenting) (arguing for distinction); Quinn v. Mobil Oil Co., 375 F.2d 273, 276-77 (1st Cir.), cert. dismissed, *389 U.S. 801, 88 S. Ct. 8, 19 L. Ed. 2d 56 (1967)* (Coffin, J., concurring) (arguing for distinction); P. Areeda & D. Turner, 3 Antitrust Law: An Analysis of Antitrust Principles and their Application, § 734e, at 263-64 (arguing for distinction). Compare Pitofsky, The Sylvania Case: Antitrust Analysis of Non-Price Vertical Restrictions, 78 Colum.L.Rev. 1, 16 n. 59 (1978) (suggesting that Continental T.V., Inc. v. GTE Sylvania, Inc., 433 U.S. 36, 97 S. Ct. 2549, 53 L. Ed. 2d 568 (1977), applying rule of reason to geographical restrictions may augur demise of per se analysis of maximum price-fixing under Albrecht ) with Continental T.V., Inc. v. GTE Sylvania, Inc., supra, 433 U.S. at 51 n. 18, 97 S. Ct. at 2558 ("The per se illegality of price restrictions has been established firmly for many years and involves significantly different questions of analysis and policy." (emphasis added)).

L. Ed. 307 (1922), where the Court found that Beech-Nut's announced pricing policy, accompanied by threats of termination, active surveillance of prices, and reinstatement conditioned on assurances of price maintenance, fell outside the protection of Colgate. See also *United States v. Bausch & Lomb Optical Co., 321 U.S. 707, 64 S. Ct. 805, 88 L. Ed. 1024 (1944)*.

More recently, the Court, in *United States v. Parke, Davis & Co., 362 U.S. 29, 80 S. Ct. 503, 4 L. Ed. 2d 505 (1960)*, fleshing out what might be termed a "Colgate plus" doctrine, held that

> ***HN4*** an unlawful combination is not just such as arises from a price maintenance agreement, express or implied; such a combination is also organized if the producer secures adherence to his suggested prices by means which go beyond his mere declination to sell to a customer who will not observe his announced policy.*Id. at 43, 80 S. Ct. at 511* (emphasis in original). [4] The required combination must be demonstrated, then, by proof of (1) an express or implied agreement, or (2) the securing of actual adherence **[**13]** to prices by means beyond mere refusal to deal. See also *Simpson v. Union Oil Co., 377 U.S. 13, 17, 84 S. Ct. 1051, 1054, 12 L. Ed. 2d 98 (1964)* ("(A) supplier may not use coercion on its retail outlets to achieve resale price maintenance."). In addition, the Court, in *Albrecht v. Herald Co., supra*, suggested several different formulations of combinations:
>
> Under Parke, Davis petitioner could have claimed a combination between respondent and himself, at least as of the day he unwillingly complied with respondent's advertised price. Likewise, he might successfully have claimed that respondent had combined with other carriers because the firmly enforced price policy applied **[**14]** to all carriers, most of whom acquiesced in it.*390 U.S. at 150 n.6, 88 S. Ct. at 872* (citation omitted). See Pitofsky and Dam, supra, at 787 (describing the Albrecht footnote as "pleading hints to prospective plaintiffs"). Thus, Yentsch might satisfy the hypotheticals in Albrecht by proving either that he complied with Texaco's price policy, or that the price policy (1) was firmly enforced, (2) applied to all service station dealers, and (3) was acquiesced in by most of them. Taken together, then, Parke, Davis and Albrecht stand for the basic proposition that ***HN5*** use of coercion that achieves actual price-fixing is illegal.

In determining whether the above standards were met in the instant case, ***HN6*** we must, of course, sustain the jury's verdict if there was substantial evidence, taking the view most favorable to appellee, to support it. *Glasser v. United States, 315 U.S. 60, 80, 62 S. Ct. 457, 469, 86 L. Ed. 680 (1942)*. We think there was sufficient evidence here, although just barely, to find an illegal combination to maintain resale prices [5] **[**16]** between Texaco and other Connecticut service

---

[4] Justice Harlan, in dissent, thought that the majority opinion had in effect overruled Colgate without so stating. 362 U.S. at 49, 80 S. Ct. at 514 (Harlan, J., dissenting), although he later largely retracted this critical view, Albrecht v. Herald Co., supra 390 U.S. at 163 n. 7, 88 S. Ct. at 879 n. 7, (Harlan, J., dissenting).

[5] Justice Harlan posited that "there is no "combination' when a manufacturer simply states a resale price and announces that he will not deal with those who depart from it; there is a combination when the manufacturer goes one inch further." Albrecht v. Herald Co. supra, 390 U.S. at 163, 88 S. Ct. at 879 (Harlan, J., dissenting). One commentator has suggested that the very facts in the original Colgate opinion would no longer be protected under the modern version of the Colgate doctrine. Maslow, Colgate Updated : Resale Price Maintenance and Antitrust Liability, 48 N.Y.St.B.J. 626, 638 (1978). Others have counseled companies

station dealers, and between Texaco and **[*53]** Yentsch. [6] Texaco went beyond Colgate's **[**15]** safe harbor of announcement plus mere refusal to deal by creating a coercive business climate in which its dealers knew of the low price policy, understood the consequences of failure to comply and thus generally complied.

Appellant warns that if the *§ 1* requirement of proof of concerted action, i. e., "contract, combination . . . or conspiracy," is to remain viable, "plaintiff's "inference' theory must be rejected." Reply Brief of Appellant **[**17]** at 9. While Yentsch's case is surely not a strong one, by carefully considering the totality of evidence at trial relating to discussions among Texaco's employees, Hammer's memorandum, and Texaco's dealings with Yentsch, a jury could reasonably infer the existence of an illegal price-fixing combination. [7]

Texaco's threats of termination to enforce its price policy were sufficient to satisfy the Parke, Davis - Albrecht standards of "means beyond mere refusal to deal" and "firm enforcement." Sales representative Breitenstein recounted that his supervisor Hammer wanted him to tell Texaco dealers to lower their gas prices, in order to produce greater volume sales. Hammer also advised him that if volume did not increase, dealers were **[**18]** to be threatened with termination. His memorandum to Breitenstein exhorted: "I expect you to do everything to have this in the Black by 5-31-71 (emphasis in original). Prices, Coca-Rama, and hours of operation must be utilized (emphasis added)."

Although it would have been far preferable for Yentsch to have presented direct evidence, such as testimony from other dealers, proving that Texaco actually threatened or terminated dealers besides Yentsch over prices, a jury would nevertheless be able to infer from the in-house Texaco discussions and the memorandum that such threats to dealers were made. [8] Yentsch himself testified that Hammer told him at least ten times to "drop the price" or risk replacement. ***HN7*** While evidence of exposition, persuasion, argument, or pressure is alone insufficient to establish coercion, see *Chisholm Bros. Farm Equipment Co. v. International Harvester Co., 498 F.2d 1137, 1140-43* (9th Cir.), cert. denied *419 U.S. 1023, 95 S. Ct. 500, 42 L. Ed. 2d 298 (1974)* (retailer's independent pricing discretion maintained); *Gray v. Shell Oil Co., 469 F.2d 742, 748 (9th Cir. 1972)*, cert. denied, *412 U.S. 943, 93 S. Ct. 2773, 37 L. Ed. 2d 403 (1973)* (coercion versus exposition, **[**19]** persuasion, argument), threats of termination, as long as they secure adherence to the fixed price, have been deemed to trespass beyond the boundaries of Colgate, thereby triggering a finding of an illegal combination. *Albrecht v. Herald Co., supra, 390 U.S. at 149, 88 S. Ct. at 871* ("The combination with retailers (in Parke, Davis) arose because their

---

about the risks inherent in relying on a Colgate pricing program. L. Sullivan, Handbook of the Law of Antitrust § 139, at 395 (1977) (likening Colgate defense to a "small sheet to windward" but useless as a planning device); Hally, Antitrust Restraints on Pricing Communications to Dealers, ALI-ABA Course Materials, J., Aug. 1978, at 35-51 (outline of circuit court case law).

[6] A review of cases from other circuits leads one to conclude that the character of the instant interaction between Yentsch, Texaco, and its other Connecticut dealers is, or in the petroleum products business was, by no means unique. See, e.g., Arnott v. American Oil Co., 609 F.2d 873 (8th Cir. 1979), petition for cert. filed, *446 U.S. 873, 100 S. Ct. 1852, 64 L. Ed. 2d 272, 48 U.S.L.W. 3664 (1980)*; Umphres v. Shell Oil Co., 512 F.2d 420 (5th Cir.), cert. denied, *423 U.S. 929, 96 S. Ct. 278, 46 L. Ed. 2d 257 (1975)*; Lehrman v. Gulf Oil Corp., 464 F.2d 26 (5th Cir.), cert. denied, *409 U.S. 1077, 93 S. Ct. 687, 34 L. Ed. 2d 665 (1972)*; Quinn v. Mobil Oil Co., 375 F.2d 273 (1st Cir.), cert. dismissed, *389 U.S. 801, 88 S. Ct. 8, 19 L. Ed. 2d 56 (1967)*; Broussard v. Socony Mobil Oil Co., 350 F.2d 346 (5th Cir. 1965); Lessig v. Tidewater Oil Co., 327 F.2d 459 (9th Cir. 1964).

[7] One might argue that forcing dealers to pass out trading stamps is a form of illegal price-fixing, since the stamps operate as a de facto price discount for customers. Since the evidence on the chief price-fixing claim is sufficient, however, we need not consider this issue.

[8] We do note in passing that, in the original posture of this case, eight other former Texaco dealers along with Yentsch filed suit. The district court granted Texaco's motion for severance of each of the named plaintiffs.

acquiescence in the suggested prices was secured by threats of termination . . . ."). See *Bowen v. New York News, Inc., 522 F.2d 1242, 1254 (2d Cir. 1975)* ("(A) manufacturer . . . may not enforce his announced resale prices by active coercion of those who purchase for resale, such as **[*54]** through threats of termination for noncompliance, whether made in combination with others . . . or alone . . . .") (citations omitted); *Lehrman v. Gulf Oil Corp., 464 F.2d 26, 32-33* (5th Cir.), cert. denied, *409 U.S. 1077, 93 S. Ct. 687, 34 L. Ed. 2d 665 (1972)*; *Phillips v. Crown Central Petroleum Corp., 395 F. Supp. 735, 760-61 (D. Md. 1975)*, vacated and remanded on other grounds, *556 F.2d 702 (4th Cir. 1977)*. Thus, such threats were also adequate proof of firm enforcement. See *United States v. Arnold, Schwinn & Co., 388 U.S. 365, 372, 87* **[**20]** S. Ct. 1856, 1862, 18 L. Ed. 2d 1249 (1967) ("firmness" grounded upon communicated danger of termination), overruled on other grounds, *Continental T.V., Inc. v. GTE Sylvania, Inc., 433 U.S. 36, 59, 97 S. Ct. 2549, 2562, 53 L. Ed. 2d 568 (1977)*; *Simpson v. Union Oil Co., supra, 377 U.S. at 17, 84 S. Ct. at 1054*; *Janel Sales Corp. v. Lanvin Parfums, Inc., 396 F.2d 398, 406-07* (2d Cir.), cert. denied, *393 U.S. 938, 89 S. Ct. 303, 21 L. Ed. 2d 275 (1968)*. The coercive atmosphere may have been enhanced by a policy of price surveillance. Ross, the sales supervisor in the 1960s, testified that district manager Davis would survey dealer's stations to determine their prices, a tactic condemned as part of an illegal resale price maintenance scheme in *FTC v. Beech-Nut Packing Co., supra, 257 U.S. at 446, 449-50, 42 S. Ct. at 151, 153*.

**[**21]** The evidence also supported a finding of actual adherence to prices, as required under the Parke, Davis -Albrecht formula. There was every reason to believe that Texaco's pricing policy applied to all Connecticut dealers; indeed, the TVA program itself was designed to include each service station. The jury could properly draw the inference that most Texaco dealers actually adopted lower prices. Other Texaco stations in Yentsch's area had lower prices than his. Widespread use of the TVA would alone result in lower prices. [9] **[**23]** Appellee himself lowered his pump prices on at least three occasions. Although his reason for doing so one of the times was his own confusion over operation of the TVA program, another of his decreases was apparently in response to Hammer's threats of termination and general efforts to enforce Texaco's pricing policy. [10] **[**24]** This coerced "agreement" with Texaco alone was sufficient to violate *§ 1* of the Sherman Act. [11] **[**25]** See *Albrecht v. Herald Co., supra, 390 U.S. at 150 n.6, 88 S. Ct. at 872 n.6*; **[*55]** *United States v. Parke, Davis & Co., supra, 362 U.S. at 45 n.6, 80 S. Ct. at 512 n.6*. That

---

9 There was some evidence that dealers were told that they were expected to follow tank wagon pricing (wholesaler dealer pricing) as part of the TVA program. But is was insufficient to show that availability of the TVA was expressly conditioned upon a dealer's corresponding price reduction, or that the allowance would be withdrawn without such compliance. Compare Hanson v. Shell Oil Co., 541 F.2d 1352, 1356 (9th Cir. 1976), cert. denied, *429 U.S. 1074, 97 S. Ct. 813, 50 L. Ed. 2d 792 (1977)* (because TVA was initiated by dealers, i. e., "not initiated by Shell to force dealers to fix prices," it was not illegal price-fixing), with Lehrman v. Gulf Oil Corp., 464 F.2d 26, 32-33, 41 (5th Cir.), cert. denied, *409 U.S. 1077, 93 S. Ct. 687, 34 L. Ed. 2d 665 (1972)* (withdrawal of TVA because dealer refused to lower price is improper).

10 Texaco asserts that "plaintiff acknowledges that he did not comply with Texaco's alleged pricing demands" and "(t)hat admission establishes that there was no conspiracy between plaintiff and Texaco." Reply Brief of Appellant at 3. We find no such admission by Yentsch in his brief or in the record. There is some conflict in Yentsch's testimony about how often and when he lowered his prices. At one point, he seemed to indicate that the only time he dropped prices other than the first few months of 1970 was in May 1970. However, he also twice testified at trial and once in a deposition that he decreased prices in 1971 at Hammer's request. Although appellee commented that Hammer "convinced me to participate in the pricing" (emphasis added), it seems clear that such convincing included threats of finding a replacement dealer if compliance was not forthcoming. Thus, his testimony indicated that he did at least three times lower his price in compliance with Texaco's pricing policy, once unwittingly (when he thought his allowance would be three cents and he would not have to contribute), once voluntarily (when he knew he would have to contribute), and once in response to Hammer.

11 Texaco argues that Quinn v. Mobil Oil Co., 375 F.2d 273 (1st Cir.), cert. dismissed, *389 U.S. 801, 88 S. Ct. 8, 19 L. Ed. 2d 56 (1967)*, supports its conduct as permissible. In Quinn, Mobil threatened to increase its rent in an upcoming renewal of a

Yentsch, after finding that his lowered price provided an insufficient **[**22]** profit margin, subsequently raised his price and generally thereafter maintained it at the higher level, does not insulate Texaco's behavior. See *Broussard v. Socony Mobil Oil Co., 350 F.2d 346, 348-50 (5th Cir. 1965)*. Furthermore, Yentsch was terminated by Texaco, arguably in part because of his refusal most of the time to comply with pricing demands. [12] See *Lessig v. Tidewater Oil Co. 327 F.2d 459, 464* (9th Cir.), cert. denied, *377 U.S. 993, 84 S. Ct. 1920, 12 L. Ed. 2d 1046 (1964)* (actual termination enough to constitute illegal behavior).

B. Breach of Contract Claim

Count IV of appellee's amended complaint alleged a "breach of contract and . . . breach of fiduciary relationship with the plaintiffs" [13] by Texaco. The complaint cited implied representations made by Texaco that the lease and dealer agreements would be automatically renewed as long as plaintiffs paid their bills, operated their stations primarily for the sale of gasoline and automotive products, maintained a clean station, purchased a designated amount of Texaco products, and otherwise complied with the terms of the express written agreements. P 30 of Plaintiffs' Amended Complaint. Paragraphs 31(a), (c), and (d) alleged other **[**26]** Texaco promises which Yentsch relied upon and which were presumable not fulfilled.

Appellee argues nevertheless that "(t)he breach of contract-fiduciary obligation claims were effectively removed from the jury's consideration." Brief of Appellee at **[*56]** 24. We disagree

---

station operator's lease, unless he reduced prices, but the dealer refused. Several months later, Mobil threatened lease termination, delayed payments needed by the dealer as well as gasoline shipments, attempted to unload a consignment of tires, batteries, and accessories in lieu of payments owed, and otherwise harassed the dealer. The supplier eventually terminated the dealer for failure to reduce his prices.

Judge McEntee's opinion said:

The allegation that defendant pressured plaintiff to reduce his retail price at best amounts to a unilateral attempt to coerce plaintiff into making such an agreement. Therefore the immediate question is whether this is actionable under *section 1* of the Sherman Act. I think not. If Congress intended to make attempts actionable under this section undoubtedly it would have done so expressly as it did in the very next section of the Act (*15 U.S.C. § 2*) dealing with monopolies.

Id. at 275. The court viewed the dealer's failure to agree to reduce his prices as dispositive, presaging the Supreme Court's statement in Albrecht v. Herald Co., supra, 390 U.S. at 150 n. 6, 88 S. Ct. at 872 (suggesting a combination was formed between the newspaper company and the independent carrier "at least as of the day he unwillingly complied with (the newspaper company's) advertised price"). Here, Yentsch did lower his price, not counting the unintentional reduction, thereby signalling agreement. Furthermore, in Quinn, there was no evidence of any Mobil policy or action toward other dealers, whereas the evidence in the instant case portrayed-although vaguely-a general Texaco policy directed at its Connecticut dealers.

The Quinn case promotes an interesting dichotomy between attempted and successful coercion. Judge Coffin, specially concurring, discussed the apparent anomaly of rewarding the plaintiff who agrees to fix prices while denying reward to one who "steadfastly resist(s) pressure to enter such an agreement." 375 F.2d at 278. Justice Harlan echoed this sentiment: "Obviously it makes no sense to deny recovery to a pressured retailer who resists temptation to the last and grant it to one who momentarily yields but is restored to virtue by the vision of treble damages." Albrecht v. Herald Co., supra, 390 U.S. at 162, 88 S. Ct. at 878 (Harlan J., dissenting). Judge Aldrich, dissenting in Quinn, would not draw any distinction between successful and unsuccessful coercion. 375 F.2d at 281 (Aldrich, J., dissenting). Justice Harlan's dissent in Albrecht puts a damper on reading the majority's "at least as of the day" (emphasis added) language as suggesting the possibility that an attempt might be sufficient. Therefore, while we see arguments pro and con for differentiating attempts from actual compliance, we believe existing law demands such a distinction.

[12] There was evidence in the record that, over a three-year period, 75% of Texaco's service stations changed hands. The direct proof did not indicate whether the turnover rate was fueled by threats of termination or actual terminations. However, we presume that hard news or rumors of terminations, resulting from noncompliance with Texaco's pricing policy, would in and of itself have a coercive effect on dealers' pricing independence.

[13] The amended complaint was filed on February 10, 1976 by the original nine Texaco service stations dealers, including Yentsch.

and find that submission of the claim to the jury constituted reversible error. [14] The district court charged the jury as follows:

**[**27]**

> As I told you earlier, Plaintiff has another theory of liability other than the alleged violation of antitrust laws. It is his claim, as I said, that Texaco breached the contract and fiduciary relationship with him by not renewing his lease and contract claims, that such written agreements would be automatically renewed as long as Plaintiff paid his bills, et cetera.
>
> In order for Plaintiff to succeed on this claim, he must prove by a preponderance of the evidence that his agreement with Texaco made these promises, and that the promises were broken by Texaco. In order for you to ascertain that these promises, if they were made, you must find them in the written agreement. You are not allowed to imply the promises. The written agreements control exclusively.Thus, while the judge narrowed the issue by eliminating jury consideration of implied promises, he nevertheless submitted a contract claim based on the written agreements.

Moreover, the jury itself indicated its interest in the breach of contract claim by sending two notes to the district judge during its deliberations. In the first, after mentioning some of the minimum and maximum gasoline volume figures **[**28]** in the lease and dealer agreement, the jury asked, "Question, is this a breach of the agreement, and by whom?" In response to the judge's request for clarification of what it meant by this note, the jury recast its question:

> Is Texaco restricting the number of gallons of gasoline that they, Texaco, will sell to Mr. Yentsch per year by stating maximum numbers of gasoline in the sales agreement? . . . In 1970 and "71 Mr. Yentsch purchased amounts of gasoline in excess of the maximums contained in the sales agreement. Does the purchase of Texaco gasoline by Mr. Yentsch in amounts in excess of those amounts stated in the sales agreement constitute a breach of contract by either party?

The breach of contract claim never should have gone to the jury in the first instance, since there was no evidence to support it. See *Gehrhardt v. General Motors Corp., 581 F.2d 7, 14 (2d Cir. 1978)*. There were no allegations that Texaco had failed to live up to the written terms of the lease and dealer agreement. The contract clearly provided that

> (e)ither party may terminate this agreement on the last mentioned date or any succeeding anniversary thereof by giving written notice to the other **[**29]** at least thirty days prior to the date upon which termination shall become effective.Texaco fully complied with this unconditional mutual cancellation provision, by notifying Yentsch in November, 1971 of its desires. Since the district court had already removed implied

---

[14] Judge Murphy also thought he had submitted a breach of contract claim to the jury upon which it may have based its decision. Although he initially granted Yentsch's motion for treble damages, he subsequently vacated the trebling order, apparently on the rationale that one could not be sure whether the jury had decided the case on antitrust or non-antitrust grounds.

breach of oral promises and fiduciary relationship claims from consideration, the jury was left to ponder issues clearly disposed of on the face of the contract.

C. Illegal Tying Claim

Yentsch's third claim was that Texaco illegally tied S & H Green Stamps, Coca-Cola, and glassware promotions to its lease and dealer agreements, in violation of *Section 1* of the Sherman Act, *15 U.S.C. § 1*. ***HN8*** A tying arrangement is "an agreement by a party to sell one product but only on the condition that the buyer also purchases a different (or tied) product." *Northern Pacific Railway Co. v. United States, 356 U.S. 1, 5, 78 S. Ct. 514, 518, 2 L. Ed. 2d 545 (1958)*. The law of tying requires proof of five specific elements: first, a tying and a tied product, *Coniglio v. Highwood Services,* **[*57]** Inc., 495 F.2d 1286, 1289 (2d Cir.), cert. denied, *419 U.S. 1022, 95 S. Ct. 498, 42 L. Ed. 2d 296 (1974)*; second, evidence of actual **[**30]** coercion by the seller that in fact forced the buyer to accept the tied product, *Capital Temporaries, Inc. v. Olsten Corp., 506 F.2d 658, 661-62 (2d Cir. 1974)*; *American Manufacturers Mutual Insurance Co. v. American Broadcasting-Paramount Theatres, Inc., 446 F.2d 1131, 1137 (2d Cir. 1971)*, cert. denied, *404 U.S. 1063, 92 S. Ct. 737, 30 L. Ed. 2d 752 (1972)*; third, sufficient economic power in the tying product market to coerce purchaser acceptance of the tied product, *United States Steel Corp. v. Fortner Enterprises, Inc., 429 U.S. 610, 620, 97 S. Ct. 861, 867, 51 L. Ed. 2d 80 (1977)* (Fortner II ); fourth, anticompetitive effects in the tied market, *Northern Pacific Railway Co. v. United States, supra, 356 U.S. at 6, 78 S. Ct. at 518*; *Coniglio v. Highwood Services, Inc., supra, 495 F.2d at 1289*; and fifth, involvement of a "not insubstantial" amount of interstate commerce in the tied product market, *Fortner Enterprises, Inc. v. United States Steel Corp., 394 U.S. 495, 501, 89 S. Ct. 1252, 1257, 22 L. Ed. 2d 495 (1969)* (Fortner I ); *United States v. Loew's, Inc., 371 U.S. 38, 49, 83 S. Ct. 97, 104, 9 L. Ed. 2d 11 (1962)*; *International Salt Co. v. United States, 332 U.S. 392, 396, 68* **[**31]** S. Ct. 12, 15, 92 L. Ed. 20 (1947). [15]

The first two elements of an illegal tying arrangement were present **[**32]** here. The tying product was the lease and dealer agreement; the tied products were S & H Green Stamps, Coca-Cola, and glassware. Furthermore, the evidence supported a finding that Yentsch and probably other dealers were successfully coerced by Texaco into buying the tied products, at least as to the stamps. Sales representative Breitenstein testified that his supervisor Hammer stated that dealers who refused trading stamps "wouldn't be there when lease time came around again." Supervisor Ross testified that distribution of trading stamps was a condition of keeping a station in the late 1960s. Yentsch himself was threatened with lease termination when he suggested dropping the stamps. Proof is weaker on whether the Coca-Cola and glassware promotions were successfully tied. Hammer did tell Breitenstein that he wanted all retailers to join in the promotions, and Texaco kept forms on dealers indicating their participation or nonparticipation. But the only direct proof of coercive tactics related to Yentsch, who stated he accepted the items only after threats of termination.

---

15 Appellant urges us to adopt a sixth test for determining an illegal tying, namely whether the seller of the tying product has a direct economic interest in the market for the tied product. We see considerable logic for using such a criterion, and other circuits have already applied it, see Keener v. Sizzler Family Steak Houses, 597 F.2d 453, 456 (5th Cir. 1979); Ohio-Sealy Mattress Manufacturing Co. v. Sealy, Inc., 585 F.2d 821, 835 (7th Cir. 1978), cert. denied, *440 U.S. 930, 99 S. Ct. 1267, 59 L. Ed. 2d 486 (1979)*; Venzie Corp. v. United States Mineral Products Co., 521 F.2d 1309, 1317-18 (3d Cir. 1975); Crawford Transport Co. v. Chrysler Corp., 338 F.2d 934, 938-39 (6th Cir. 1964), cert. denied, *380 U.S. 954, 85 S. Ct. 1088, 13 L. Ed. 2d 971 (1965)*. Nevertheless, we do not decide today whether to incorporate this element into our tying analysis, since appellee's claim fails on another ground.

Evidence going to the last two elements of illegal tying forces us into a posture of conjecturing possibilities. **[**33]** As to anticompetitive effects in the tied product markets, the question is whether trading stamp, soft drink, or glassware competitors were foreclosed from selling to Yentsch and other Connecticut dealers because of Texaco's policies. Appellee suggests that the jury could infer such impact from the persuasiveness of the coercive tying policy and the very fact of Texaco's 400 Connecticut and 40,000 overall service stations. Appellant counters that Yentsch never claimed that, absent the alleged tying, he would have purchased products from other trading stamp, soft drink, or glassware suppliers, such as, for example, Blue Chip Stamps or Seven-Up. In fact, Yentsch testified that he would not have bought any promotional products at all. Furthermore, he adduced no direct evidence that other service station dealers wanted to purchase other products in the tied markets. If the jury were to infer general behavior from that of Yentsch, as he asked it to do for the price-fixing claim, **[*58]** it could only assume that other dealers would similarly decline to substitute different items.

Even to the extent that appellee need not establish an exact percentage of foreclosure in the tied **[**34]** product and that "it is unreasonable, per se, to foreclose competitors from any substantial market," *International Salt Co. v. United States, supra, 332 U.S. at 396, 68 S. Ct. at 15*; see *Ohio-Sealy Mattress Manufacturing Co. v. Sealy, Inc., 585 F.2d 821, 835 (7th Cir. 1978)*, cert. denied, *440 U.S. 930, 99 S. Ct. 1267, 59 L. Ed. 2d 486 (1979)*, appellee has skirted perilously close to failing to demonstrate any foreclose at all. We require at least some showing that the illegal tying arrangement results in actual foreclosure of competition in the tied product market. See *Coniglio v. Highwood Services, Inc., supra, 495 F.2d at 1291-92* (where defendant's monopoly in the tied product prevented actual foreclosure of competition).

Proof relating to the fifth element is also speculative. Yentsch spent $ 7,487.50 for stamps in 1970, and $ 7,037.50 in 1971, $ 294 for Coca-Cola and $ 558 for bottle deposits, and $ 150 for glassware. Although Yentsch urges that his own $ 15,000 total is sufficient to meet the test of quantitative substantiality, we are not convinced that this amount alone is "substantial enough . . . so as not to be merely de minimis." *Fortner I, supra, 394 U.S. at 501, 89* **[**35]** S. Ct. at 1258. In Fortner I, the Court found $ 200,000 sufficiently substantial. *Id. at 502, 89 S. Ct. at 1258*. See also *United States v. Loew's Inc., supra, 371 U.S. at 49, 83 S. Ct. at 104* (payments ranging from $ 60,800 to over $ 2,500,000 were substantial); *Detroit City Dairy, Inc. v. Kowalski Sausage Co., 393 F. Supp. 453, 472 (E.D. Mich. 1975)* ($ 86,376.72 not insubstantial).

This conclusion does not halt the inquiry, however. The Court has counseled that,

> ***HN9*** (f)or purposes of determining whether the amount of commerce foreclosed is too insubstantial to warrant prohibition of the practice . . . the relevant figure is the total volume of sales tied by the sales policy under challenge, not the portion of this total accounted for by the particular plaintiff who brings suit.*Fortner I, supra 394 U.S. at 502, 89 S. Ct. at 1258*. Here, Yentsch presented no specific evidence on dollar amounts of purchases by other dealers, but instead asked the jury to extrapolate such numbers by multiplying his own figures by some or all of the 400 Connecticut and 40,000 nationwide Texaco dealers. The evidence at least suggested that some Connecticut dealers also participated in the promotions, **[**36]** so that undoubtedly more than Yentsch's $ 15,000 was involved. Even if only 10% of the dealers purchased an amount of tied products equal to that purchased by Yentsch, about $ 600,000 of commerce would be involved, clearly meeting any test of substantiality.

Whether or not the evidence was sufficient to satisfy these last two elements, however, appellee failed ***HN10*** to prove the third element: sufficient economic power in the tying product market. *Fortner II, supra*, provides the relevant standard: "(T)he question is whether the seller has some advantage not shared by his competitors in the market for the tying product." *429 U.S. at 620, 97 S. Ct. at 867*. Without such advantage, the Court reasoned, "the seller's product does not have the kind of uniqueness considered relevant in prior tying-clause cases." *Id. at 620-21, 97 S. Ct. at 868*. The Court suggested that evidence of some cost advantage over competitors in the tying market, or the offering of a tying product significantly differentiated from that which competitors could offer, would suffice in demonstrating adequate economic power. [16] The simple fact of a company's largeness or enormous financial resources is inadequate.

**[**37]** Yentsch has not met his burden here. He failed to show that Texaco's competitors in the tying market, i. e., other **[*59]** gasoline suppliers, operated under some disadvantage in the Connecticut service station market. There was no evidence that Texaco dominated the regional market, owned the best sites, had a special deal on crude oil, petroleum products, or related supplies unavailable to other companies, or otherwise enjoyed a special position creating sufficient economic power in the tying market to impose illegal tying. See *Bogosian v. Gulf Oil Corp., 561 F.2d 434, 453-54 (3d Cir. 1977)*, cert. denied, *434 U.S. 1086, 98 S. Ct. 1280, 55 L. Ed. 2d 791 (1978)* (plaintiffs might prove economic power if defendants controlled majority of stations, or zoning and high capital costs restricted potential new service station entrants). [17]

**[**38]** DISPOSITION

The breach of contract and illegal tying claims should not have been submitted to the jury, in that both were insufficiently supported by the evidence. Since the jury returned a single general verdict in favor of appellee, and "there is no way to know that (either of) the invalid claim(s) . . . was not the sole basis for the verdict," a new trial is required. *United New York and New Jersey Sandy Hook Pilots Association v. Halecki, 358 U.S. 613, 619, 79 S. Ct. 517, 520, 3 L. Ed. 2d 541 (1959)*. See *Morrissey v. National Maritime Union, 544 F.2d 19, 26-27 (2d Cir. 1976)*. [18] Yentsch urges that we can nevertheless affirm the judgment below if we are "fairly convinced that the jury proceeded only on the sound ground." *Id. at 27*; see *Collum v. Butler, 421 F.2d*

---

[16] One commentator has criticized Fortner II, on the ground that a company's own efficiency and enterprise resulting in a cost advantage over other competitors should not be adequate to prove sufficient economic power. See Jones, The Two Faces of Fortner: Comment on a Recent Antitrust Opinion, 78 Colum.L.Rev. 39, 45 (1978).

[17] The district court's charge to the jury on what constitutes an illegal tying arrangement was inadequate. The judge charged as follows:

So, turning to the other three tie-ins involving glassware, Coca-Cola and Green Stamps, to prevail on any one of these claims, Plaintiff must prove each of the following elements by a preponderance of the evidence. One, that there are two separate and distinct products involved, a tying product and a tied product. Two, Texaco has sufficient economic power in the tie-in market to coerce purchase of the tied product. Three, Texaco, in fact, coerced Plaintiff to purchase the tied product. Four, that here were anticompetitive effects on the tied market. And five, a not insubstantial amount of interstate commerce in the tied market was involved.

No further explanation of these five elements was proffered. While the bare bones of the charge was correct, it did little else to direct the jury toward proper consideration of the facts. How, for example, would a jury understand that "sufficient economic power" does not equal mere bigness, or that it requires some advantage not shared by other competitors? Our own analysis of the tying problem in this very opinion indicates the level of care necessary for understanding. A charge to the jury, especially in as complex an area as antitrust law, should avoid sacrificing clarity for brevity.

[18] Both United New York and Morrissey deal with claims improperly submitted to the jury. Although Texaco bases this appeal on the district court's failure to grant a judgment notwithstanding the verdict and a new trial, it could just as well have appealed the court's denial of its two motions for directed verdict, apparently made both after plaintiff's and defendant's case. For purposes of this appeal, the directed verdict and JNOV considerations are functionally equivalent. See Epoch Producing Corp. v. Killiam

*1257, 1260 (7th Cir. 1970)*; *Roginsky v. Richardson-Merrell, Inc., 378 F.2d 832, 837-38 (2d Cir. 1967)*. We have no confidence, however, that the jury based its decision exclusively on the price-fixing claim, the only one sufficiently supported by the evidence to warrant submission.

**[**39]** We therefore reverse and remand for a new trial solely on Yentsch's illegal resale price maintenance claim against Texaco. [19]

**[**40]**

---

Shows, Inc., 522 F.2d 737, 742-43 (2d Cir. 1975). The contract and tying claims never should have reached the jury. Once they did, however, and a general verdict was returned, the judge erred further by failing to grant a JNOV.

19 Should appellee prevail on retrial, we must caution the judge to exercise greater supervision on the determination of damages. Although damages may be ascertained from a jury's just and reasonable inference from proof of the wrongful act, its tendency to injure plaintiff's business, and evidence of decline in profits, Bigelow v. RKO Radio Pictures, Inc., 327 U.S. 251, 264, 66 S. Ct. 574, 579, 90 L. Ed. 652 (1946), there must nevertheless be a reasonable foundation from which a jury can calculate the amount of damages. See Coleman Motor Co. v. Chrysler Corp., 525 F.2d 1338, 1352-53 (3d Cir. 1975). When the evidence presented precludes such rational consideration, it must be excluded. Herman Schwabe, Inc. v. United Shoe Machinery Corp., 297 F.2d 906, 912-13 (2d Cir.), cert. denied, *369 U.S. 865, 82 S. Ct. 1031, 8 L. Ed. 2d 85 (1962)*.

Appellee's expert Victor Cino, a New Jersey Shell station dealer, calculated future lost profits by using the actual gasoline sales volume figures from Yentsch's station, operated by a new dealer, for 1972 through 1975, and then by using the 1975 figure, 1,134,000 gallons, as a surrogate for years 1976 though 1981. Yet, Cino knew before he testified the actual station figures from 1976 through part of 1979, figures which showed a substantial drop from 1975, (801,300 gallons in 1976; 724,800 in 1977; 639,500 in 1978; 562,320 in 1979, as projected from the first five months). We can see no reason to use 1975 as a model year instead of actual figures other than to inflate future profits and increase the damage award. Cino admitted as much-when asked whether using the actual figures would have been "a more honest way to calculate Mr. Yentsch's alleged losses," he responded, "I don't know if-it would be more intelligent. That might have been more honest . . . ." Certainly that portion of the testimony dealing with the later years should have been excluded from jury consideration.