EXHIBIT 299

LexisNexis®

Warning
As of: August 12, 2014 9:20 AM EDT

**Zenith Radio Corp. v. Hazeltine Research**
Supreme Court of the United States
January 22, 1969, Argued ; May 19, 1969, Decided
No. 49

**Reporter:** 395 U.S. 100; 89 S. Ct. 1562; 23 L. Ed. 2d 129; 1969 U.S. LEXIS 3305; 161 U.S.P.Q. (BNA) 577; 1969 Trade Cas. (CCH) P72,800
ZENITH RADIO CORP. v. HAZELTINE RESEARCH, INC., ET AL.

**Prior History:** CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT.

**Disposition:** *388 F.2d 25*, affirmed in part, reversed in part, and remanded.

**Core Terms**

patent, pool, license, royalty, Radio, district court, licensee, patentee, injunction, products, imported, Automatic, damages, parties, manufacture, infringement, patent misuse, television, monopoly, counterclaim, injunctive relief, anti trust law, trial court, distributors, merchandise, export, conditions, conspiracy, invention, appearance

**LexisNexis® Headnotes**

Civil Procedure > Judgments > Entry of Judgments > Nonparties Affected by Judgment

***HN1*** One is not bound by a judgment in personam resulting from litigation in which he is not designated as a party or to which he has not been made a party by service of process. The consistent constitutional rule has been that a court has no power to adjudicate a personal claim or obligation unless it has jurisdiction over the person of the defendant.

Civil Procedure > Judgments > Entry of Judgments > Nonparties Affected by Judgment
Civil Procedure > Remedies > Injunctions > General Overview
Civil Procedure > Remedies > Injunctions > Contempt

***HN2*** Although injunctions issued by federal courts bind not only the parties defendant in a suit, but also those persons in active concert or participation with them who receive actual notice of the order by personal service or otherwise, *Fed. R. Civ. P. 65(d)*, a nonparty with notice cannot be held in contempt until shown to be in concert or participation.

Antitrust & Trade Law > Clayton Act > General Overview
Antitrust & Trade Law > Clayton Act > Remedies > General Overview
Antitrust & Trade Law > Clayton Act > Remedies > Damages
Evidence > Burdens of Proof > General Overview

Patent Law > ... > Defenses > Inequitable Conduct > Anticompetitive Conduct

***HN3*** It is enough that the illegality is shown to be a material cause of the injury; a plaintiff need not exhaust all possible alternative sources of injury in fulfilling his burden of proving compensable injury under § 4 of the Clayton Act, *15 U.S.C.S. § 15*.

Civil Procedure > Appeals > Standards of Review > Clearly Erroneous Review
Criminal Law & Procedure > Juries & Jurors > Province of Court & Jury > Factual Issues
Criminal Law & Procedure > ... > Standards of Review > De Novo Review > General Overview
Governments > Courts > Authority to Adjudicate

***HN4*** In applying the clearly erroneous standard to the findings of a district court sitting without a jury, appellate courts must constantly have in mind that their function is not to decide factual issues de novo. The authority of an appellate court, when reviewing the findings of a judge as well as those of a jury, is circumscribed by the deference it must give to decisions of the trier of the fact, who is usually in a superior position to appraise and weigh the evidence. The question for the appellate court under *Fed. R. Civ. P. 52 (a)* is not whether it would have made the findings the trial court did, but whether on the entire evidence it is left with the definite and firm conviction that a mistake has been committed.

Antitrust & Trade Law > ... > Private Actions > Remedies > General Overview
Patent Law > ... > Defenses > Inequitable Conduct > Burdens of Proof
Patent Law > Remedies > Damages > General Overview

***HN5*** Trial and appellate courts alike must also observe the practical limits of the burden of proof which may be demanded of a treble-damage plaintiff who seeks recovery for injuries from a partial or total exclusion from a market; damage issues in these cases are rarely susceptible of the kind of concrete, detailed proof of injury which is available in other contexts.

Antitrust & Trade Law > ... > Private Actions > Remedies > General Overview
Patent Law > ... > Defenses > Inequitable Conduct > Burdens of Proof

***HN6*** In the absence of more precise proof, the factfinder may conclude as a matter of just and reasonable inference from the proof of defendants' wrongful acts and their tendency to injure plaintiffs' business, and from the evidence of the decline in prices, profits and values, not shown to be attributable to other causes, that defendants' wrongful acts had caused damage to the plaintiffs.

Antitrust & Trade Law > ... > Private Actions > Remedies > General Overview
Patent Law > Remedies > Damages > General Overview

***HN7*** Although the factfinder is not entitled to base a judgment on speculation or guesswork, the jury may make a just and reasonable estimate of the damage based on relevant data and render its verdict accordingly. In such circumstances, juries are allowed to act upon probable and inferential, as well as direct and positive proof.

Patent Law > Remedies > Equitable Relief > Injunctions

***HN8*** See *15 U. S. C. S. § 26*.

Antitrust & Trade Law > Clayton Act > General Overview

Antitrust & Trade Law > Clayton Act > Scope

Antitrust & Trade Law > Clayton Act > Remedies > General Overview

Antitrust & Trade Law > ... > Private Actions > Remedies > General Overview

Antitrust & Trade Law > Regulated Practices > Private Actions > Prioritizing Resources & Organization for Intellectual Property Act

Patent Law > Remedies > Equitable Relief > Injunctions

***HN9*** The purpose of giving private parties treble-damage and injunctive remedies was not merely to provide private relief, but was to serve as well the high purpose of enforcing the antitrust laws. Section 16 of the Clayton Act, *15 U.S.C.S. § 26*, should be construed and applied with this purpose in mind, and with the knowledge that the remedy it affords, like other equitable remedies, is flexible and capable of nice adjustment and reconciliation between the public interest and private needs as well as between competing private claims. Its availability should be conditioned by the necessities of the public interest which Congress has sought to protect.

Labor & Employment Law > Wrongful Termination > Remedies > Reinstatement

Patent Law > Remedies > Equitable Relief > Injunctions

***HN10*** In exercising its equitable jurisdiction, a federal court has broad power to restrain acts which are of the same type or class as unlawful acts which the court has found to have been committed or whose commission in the future, unless enjoined, may fairly be anticipated from the defendant's conduct in the past.

Patent Law > Remedies > Equitable Relief > Injunctions

***HN11*** When one has been found to have committed acts in violation of a law he may be restrained from committing other related unlawful acts.

Antitrust & Trade Law > ... > Intellectual Property > Ownership & Transfer of Rights > Assignments

Antitrust & Trade Law > ... > Intellectual Property > Ownership & Transfer of Rights > Licenses

Patent Law > ... > Defenses > Inequitable Conduct > Anticompetitive Conduct

Patent Law > Infringement Actions > Exclusive Rights > Manufacture, Sale & Use

Patent Law > Ownership > Conveyances > Assignments

Patent Law > Ownership > Conveyances > Licenses

***HN12*** A patentee has the exclusive right to manufacture, use, and sell his invention. The heart of his legal monopoly is the right to invoke the state's power to prevent others from utilizing his discovery without his consent. The law also recognizes that he may assign to another his patent, in whole or in part, and may license others to practice his invention.

Antitrust & Trade Law > ... > Intellectual Property > Ownership & Transfer of Rights > Assignments

Antitrust & Trade Law > ... > Intellectual Property > Ownership & Transfer of Rights > Licenses

International Trade Law > General Overview

Patent Law > ... > Defenses > Inequitable Conduct > General Overview

Patent Law > ... > Defenses > Inequitable Conduct > Anticompetitive Conduct

Patent Law > Infringement Actions > Defenses > Misuse

Patent Law > Ownership > Conveyances > General Overview

Patent Law > Ownership > Conveyances > Licenses

Patent Law > Ownership > Conveyances > Royalties

Patent Law > Remedies > Equitable Relief > Injunctions

***HN13*** There are established limits which the patentee must not exceed in employing the leverage of his patent to control or limit the operations of the licensee. Among other restrictions upon him, he may not condition the right to use his patent on the licensee's agreement to purchase, use, or sell, or not to purchase, use, or sell, another article of commerce not within the scope of his patent monopoly. His right to set the price for a license does not extend so far, whatever privilege he has to exact royalties as high as he can negotiate. And just as the patent's leverage may not be used to extract from the licensee a commitment to purchase, use, or sell other products according to the desires of the patentee, neither can that leverage be used to garner as royalties a percentage share of the licensee's receipts from sales of other products; in either case, the patentee seeks to extend the monopoly of his patent to derive a benefit not attributable to use of the patent's teachings.

Antitrust & Trade Law > Regulated Practices > Intellectual Property > General Overview
Antitrust & Trade Law > ... > Intellectual Property > Misuse of Rights > General Overview
Antitrust & Trade Law > ... > Intellectual Property > Misuse of Rights > Patent Misuse Defense
Antitrust & Trade Law > ... > Intellectual Property > Ownership & Transfer of Rights > Licenses
Patent Law > ... > Defenses > Inequitable Conduct > Anticompetitive Conduct
Patent Law > Infringement Actions > Defenses > Misuse
Patent Law > Ownership > Conveyances > General Overview
Patent Law > Ownership > Conveyances > Licenses
Patent Law > Ownership > Conveyances > Royalties

***HN14*** It is not per se a misuse of patents to measure the consideration by a percentage of the licensee's sales.

Patent Law > Infringement Actions > Defenses > Misuse
Patent Law > Ownership > General Overview
Patent Law > Ownership > Conveyances > General Overview
Patent Law > Ownership > Conveyances > Royalties

***HN15*** If convenience of the parties rather than patent power dictates the total-sales royalty provision, there is no misuse of the patents and no forbidden conditions attached to the license.

Patent Law > ... > Defenses > Inequitable Conduct > General Overview
Patent Law > Infringement Actions > Defenses > Misuse
Patent Law > Ownership > General Overview
Patent Law > Ownership > Conveyances > Licenses
Patent Law > Ownership > Conveyances > Royalties

***HN16*** Patent misuse inheres in a patentee's insistence on a percentage-of-sales royalty, regardless of use, and his rejection of licensee proposals to pay only for actual use. Unquestionably, a licensee must pay if he uses the patent. Equally, however, he may insist upon paying only for use, and not on the basis of total sales, including products in which he may use a competing patent or in which no patented ideas are used at all. There is nothing in the right granted the patentee to keep others from using, selling, or manufacturing his invention which empowers him to insist on payment not only for use but also for producing products which do not employ his discoveries at all.

**Lawyers' Edition Display**

## Summary

In a patent infringement suit by a research company in the United States District Court for the Northern District of Illinois, the defendant, a radio and television set manufacturer, counterclaimed for treble damages and injunctive relief, alleging antitrust violations consisting of both misuse of the research company's patents and a conspiracy in restraint of trade by the research company, its parent corporation, and Canadian, English, and Australian patent pools. Holding that the research company had misused its patents, the District Court awarded the manufacturer treble damages and injunctive relief against the research company; and further holding that the research company and its parent corporation had conspired in restraint of trade, the District Court, relying upon a pretrial stipulation that the research company and its parent corporation were to be considered as an entity for purposes of the litigation, awarded the manufacturer treble damages and injunctive relief against both the research company and its parent corporation (*239 F Supp 51*). On appeal, the Court of Appeals for the Seventh Circuit, affirming the treble damage award for patent misuse, but otherwise reversing the judgment of the District Court, (1) held that the District Court lacked jurisdiction over the research company's parent corporation, and that the stipulation relied upon by the District Court was an insufficient basis for entering judgment against the parent corporation, (2) modified in certain respects the District Court's injunction against patent misuse, (3) held that the manufacturer had failed to prove that it had sustained damage as a result of the conspiracy in restraint of trade, and (4) struck the injunction against the research company's participation in conspiracies restricting the manufacturer's trade in foreign markets (*388 F2d 25*).

On certiorari, the United States Supreme Court affirmed in part, reversed in part, and remanded the case to the Court of Appeals. In an opinion by White, J., it was held, expressing the view of seven members of the court, that the question of injunctive relief against misuse of the research company's patents should be remanded for further proceedings, and it was held, expressing the unanimous view of the court, that (1) the District Court lacked jurisdiction over the research company's parent corporation, (2) the manufacturer had failed to prove that it sustained damage as a result of the conspiracy affecting the English and Australian markets, but had proved that it sustained damage as a result of the conspiracy affecting the Canadian market, and (3) the District Court had properly granted injunctive relief against the research company's participation in conspiracies restricting the manufacturer's trade in foreign markets.

Harlan, J., although concurring in the other parts of the court's opinion, dissented from the court's holding, with respect to the issue of injunctive relief against misuse of patents, that a patent license provision which measures royalties by a percentage of the licensee's total sales is lawful if included for the convenience of both parties but unlawful if insisted upon by the patentee.

**Headnotes**

JUDGMENT §244 > affiliated corporations -- > Headnote:

***LEdHN[1]*** [1]

Despite a pretrial stipulation by the parties that one of the parties and its parent corporation would be considered as an entity for purposes of the litigation, a judgment for damages and

injunctive relief cannot properly be entered against the parent corporation where it did not execute the stipulation, was not named as a party, was never served, and did not formally appear at the trial; and the fact that the subsidiary may have executed the stipulation to avoid litigating the alter ego issue cannot foreclose the parent corporation, which never had its day in court on the question whether it and its subsidiary should be considered the same entity for purposes of the litigation.

JUDGMENT §208 > nonparties -- > Headnote:

***LEdHN[2]*** [2]

A person is not bound by a judgment in personam in a litigation in which he is not designated as a party or to which he has not been made a party by service of process.

COURTS §26 > jurisdiction -- > Headnote:

***LEdHN[3]*** [3]

A court has no power to adjudicate a personal claim or obligation unless it has jurisdiction over the person of the defendant.

JUDGMENT §244 > affiliated corporations -- > Headnote:

***LEdHN[4]*** [4]

If it is shown that a parent corporation, through its officers, in fact controlled litigation on behalf of a subsidiary, and if the claim is made that a judgment against the subsidiary is res judicata against the parent because of this control, such claim can be finally adjudicated against the parent only in a court with jurisdiction over the parent.

ESTOPPEL AND WAIVER §55 > failure to repudiate stipulation -- > Headnote:

***LEdHN[5A]*** [5A]***LEdHN[5B]*** [5B]

Even if some attorneys of a parent corporation were present during part of the trial of antitrust claims against a subsidiary, and failed to repudiate a pretrial stipulation made by the subsidiary to the effect that the subsidiary and the parent would be treated as an entity for purposes of the litigation, the parent corporation is not estopped to deny that it is bound by such stipulation.

INJUNCTION §139 > persons bound -- > Headnote:

***LEdHN[6]*** [6]

Although injunctions issued by federal courts bind not only the parties- defendant in a suit, but also those persons in active concert or participation with them who receive actual notice of the order by personal service or otherwise, a nonparty with notice cannot be held in contempt until shown to be in concert or participation, and it is error to enter an injunction against the parent corporation of a company which is a party without making such determination in a proceeding to which the parent corporation itself is a party.

APPEARANCE §7 > effect of special appearance -- > Headnote:

***LEdHN[7A]*** [7A]***LEdHN[7B]*** [7B]

The fact that a parent corporation enters a special appearance to contest jurisdiction, in an antitrust case involving a patent pool conspiracy in restraint of trade, does not indicate that it was found to be in active concert and participation with its subsidiary, which was a party, nor does the entry of such a special appearance indicate that the parent corporation has consented to be bound by such a finding.

RESTRAINTS OF TRADE AND MONOPOLIES §61 > conspiracy -- patent pool -- > Headnote:

***LEdHN[8A]*** [8A]***LEdHN[8B]*** [8B]

The provision of the Sherman Antitrust Act proscribing conspiracies in restraint of trade (*15 USC 1*) is violated where a research company and its parent corporation conspire with a Canadian patent pool to deny patent licenses to companies seeking to export American-made goods to Canada.

RESTRAINTS OF TRADE AND MONOPOLIES §67 > treble damages -- > Headnote:

***LEdHN[9A]*** [9A]***LEdHN[9B]*** [9B]

Although patent rights are involved, once a manufacturer demonstrates that its exports from the United States have been restrained by the activities of a Canadian patent pool, an American research company participating in the patent pool conspiracy is subject to treble damage liability.

RESTRAINTS OF TRADE AND MONOPOLIES §67 > treble damages -- > Headnote:

***LEdHN[10A]*** [10A]***LEdHN[10B]*** [10B]

With respect to a claim for treble damages for conspiracy in restraint of trade, the claimant's burden of proving the fact of damage is satisfied by its proof of some damage flowing from the unlawful conspiracy; inquiry beyond this minimum point goes only to the amount, and not the fact of damage; it is enough that the illegality is shown to be a material cause of the injury; and a claimant need not exhaust all possible alternative sources of injury in fulfilling his burden of proving compensable injury.

EVIDENCE §958 > sufficiency -- damages -- > Headnote:

***LEdHN[11]*** [11]

With respect to a claim for treble damages for conspiracy in restraint of trade, the evidence is sufficient to sustain the inference that a manufacturer of radio and television sets has in fact been injured to some extent by a Canadian patent pool's restraints upon imports of radio and television sets, where there is evidence that (1) the pool's efforts to prevent importation of radio and television sets from the United States were highly organized and effective, agents, investigators, and manufacturer and distributor trade associations having systematically policed the market, warning notices and advertisements having advised distributors, dealers, and even consumers against selling or using unlicensed equipment, and infringement suits or threats thereof having been regularly and effectively employed to dissuade dealers from handling American-made sets; (2) the pool's past conduct interfered with and made more difficult the distribution of the manufacturer's products during subsequent years for which damages were sought, and the manufacturer suffered damage during the damage period from having a smaller share of the market than it would have had if the pool had never existed; (3) the pool continued after the beginning

of the damage period, and the manufacturer was deprived of a license on pool patents permitting it to sell American-made merchandise in Canada; (4) a formal request by the manufacturer for a pool license would have been futile; (5) the manufacturer continued to operate without a patent license unburdened by conspiratorial conduct and granted on terms which would satisfy the antitrust laws, and such deprivation in itself had an impact on the manufacturer and constituted an injury to its business; (6) although the manufacturer was able to obtain independent distributors in certain parts of Canada, it was unable to do so in other parts of Canada, and its poorer performance in Canada than in the United States was attributed to the discouraging and repressive effects of the Canadian patent pool; (7) without a pool license, the manufacturer encountered distribution difficulties which prevented its securing a share of the market comparable to that which it enjoyed in the United States and which its demonstrated business proficiency dictated that it should have obtained in Canada; and (8) the pool was an established organization with a long history of successfully excluding imported merchandise, and in view of its continued existence during the damage period, the injury alleged by the manufacturer was precisely the type of loss that the claimed violations of the antitrust laws would be likely to cause.

EVIDENCE §209 > presumption -- continuance of conspiracy -- > Headnote:

***LEdHN[12]*** [12]

A court is entitled to assume the continuance of a conspiracy in restraint of trade, in the absence of clear evidence of its termination.

APPEAL AND ERROR §1464 > review -- findings of fact -- > Headnote:

***LEdHN[13]*** [13]

In applying the standard of *Rule 52(a) of the Federal Rules of Civil Procedure*, which provides that the findings of fact of a Federal District Court sitting without a jury shall not be set aside unless clearly erroneous, appellate courts must constantly have in mind that their function is not to decide factual issues de novo; the authority of an appellate court, when reviewing the findings of a judge, as well as those of jury, is circumscribed by the deference it must give to decisions of the trier of the fact, who is usually in a superior position to appraise and weigh the evidence; and the question for the appellate court under *Rule 52(a)* is not whether it would have made the findings the trial court did, but whether, on the entire evidence, it is left with the definite and firm conviction that a mistake has been committed.

EVIDENCE §343.5 > burden of proof -- damages for antitrust violation -- > Headnote:

***LEdHN[14]*** [14]

Trial and appellate courts alike must observe the practical limits of the burden of proof which may be demanded of a plaintiff, in an antitrust action for treble damages, who seeks recovery for injuries from partial or total exclusion from a market, damage issues in such cases being rarely susceptible of the kind of concrete, detailed proof of injury which is available in other contexts.

EVIDENCE §958 > sufficiency -- damages -- > Headnote:

***LEdHN[15]*** [15]

In the absence of more precise proof in an antitrust action for treble damages, a finder of fact may conclude as a matter of just and reasonable inference from the proof of a defendant's wrongful

acts and their tendency to injure the plaintiff's business, and from the evidence of the decline in prices, profits, or values, not shown to be attributable to other causes, that the defendant's wrongful acts had caused damage to the plaintiff, and although not entitled to base a judgment on speculation or guesswork, the finder of fact may make a just and reasonable estimate of the damage based on relevant data, acting upon probable and inferential, as well as direct and positive, proof.

EVIDENCE §958 > sufficiency -- damages -- > Headnote:

***LEdHN[16]*** [16]

With respect to a claim for treble damages for conspiracy in restraint of trade, the evidence is not sufficient to sustain the inference that a manufacturer of radio and television sets has sustained any damage as a result of an English patent pool's restraints upon imports of radio and television sets, where there is evidence that (1) obstacles for which the patent pool was not responsible discouraged the manufacturer's entry into the English market, (2) the manufacturer was waiting for a change in the type of scanning signals used for English television and did not intend to promote the sale of its television sets in England until such a signal change occurred, and if such a change had occurred, neither the absence of a patent pool license nor patent pool threats against it or its customers would have deterred it from a major effort to penetrate the English market, and (3) the manufacturer's own business calculus, rather than restraints by the patent pool, led it to await more favorable conditions before attempting to enter the English market.

EVIDENCE §958 > sufficiency -- damages -- > Headnote:

***LEdHN[17]*** [17]

With respect to a claim for treble damages for conspiracy in restraint of trade, the evidence is not sufficient to sustain the inference that a manufacturer of radio and television sets has sustained any damage as a result of an Australian patent pool's restraints upon imports of radio and television sets, where there is evidence that (1) the manufacturer had exported no products to Australia and had not requested a patent pool license, (2) a government embargo had foreclosed importation into Australia of the manufacturer's American-made merchandise, and high tariffs and shipping costs, as well as the prospect of vigorous competition, were additional barriers, and (3) the manufacturer neither intended nor was prepared to enter the Australian market during the period for which damages were sought.

RESTRAINTS OF TRADE AND MONOPOLIES §61 > conspiracy -- patent pool -- > Headnote:

***LEdHN[18]*** [18]

If a conspiracy by a research company and its parent corporation with an Australian patent pool had effectively kept an American manufacturer of radio and television sets from the Australian market, a compensable violation of the antitrust laws would have occurred.

RESTRAINTS OF TRADE AND MONOPOLIES §68 > injunctive relief -- > Headnote:

***LEdHN[19]*** [19]

The remedy of injunctive relief, available under 16 of the Clayton Act (*15 USC 26*) upon demonstration of threatened loss or damage by a violation of the antitrust laws, is available even

though the plaintiff has not yet suffered actual injuries; he need only demonstrate a significant threat of injury from an impending violation of the antitrust laws or from a contemporary violation likely to continue or recur.

RESTRAINTS OF TRADE AND MONOPOLIES §67 > RESTRAINTS OF TRADE AND MONOPOLIES §68 > remedies for antitrust violation -- injunctive relief -- > Headnote:

***LEdHN[20]*** [20]

The purpose of giving private parties treble damage and injunctive remedies for violations of the antitrust laws is not merely to provide private relief, but is to serve as well the high purpose of enforcing the antitrust laws; 16 of the Clayton Act (*15 USC 26*), authorizing injunctive relief against threatened loss or damage by a violation of the antitrust laws, should be construed and applied with this purpose in mind, and with the knowledge that the remedy it affords, like other equitable remedies, is flexible and capable of nice adjustment and reconciliation between the public interest and private needs, as well as between competing private claims, and its availability should be conditioned by the necessities of the public interest which Congress has sought to protect.

RESTRAINTS OF TRADE AND MONOPOLIES §77 > injunctive relief -- patent pool -- > Headnote:

***LEdHN[21A]*** [21A]***LEdHN[21B]*** [21B]

Injunctive relief against a conspiracy in restraint of trade is proper where (1) the defendant research company and its parent corporation conspired with a Canadian patent pool to exclude the plaintiff, a manufacturer of radio and television sets, and others from the Canadian market, (2) there is nothing indicating that the conspiracy has terminated or that the threat to the plaintiff inherent in the conduct will cease in the foreseeable future, (3) neither the relative quiescence of the pool during the litigation nor claims that objectionable conduct will cease with the judgment negates the threat to the plaintiff's foreign trade, and (4) the parent corporation's abandonment of its participation in the Canadian patent pool has occurred after, and apparently in response to, the court's judgment and decree.

APPEAL AND ERROR §1672 > RESTRAINTS OF TRADE AND MONOPOLIES §81 > modification of injunction -- > Headnote:

***LEdHN[22A]*** [22A]***LEdHN[22B]*** [22B]

Although a defendant who has been enjoined from conspiring with a Canadian patent pool in violation of the antitrust laws is free to attempt to demonstrate in the future that the need for injunctive relief with respect to Canada has been eliminated, or that a change of circumstances elsewhere justifies additional modifications of the injunction, the United States Supreme Court will not, on direct review of the decree granting injunctive relief, undertake a reappraisal of the injunction in light of posttrial developments.

RESTRAINTS OF TRADE AND MONOPOLIES §77 > injunctive relief -- patent pools -- > Headnote:

***LEdHN[23A]*** [23A]***LEdHN[23B]*** [23B]

A radio and television set manufacturer which is interested in expanding its foreign commerce and which has suffered restraints of trade at the hands of a research company and its coconspirators in a Canadian patent pool is entitled to injunctive relief broadly barring the research company

from conspiring with others to restrict or prevent the manufacturer from entering any other foreign market, and findings that the research company and its parent corporation were conspiring with English and Australian patent pools which refused to license imports, and that the manufacturer intended to expand its export business, are sufficient foundation for the conclusion that continued participation by the research company and its parent corporation in the English and Australian pools poses a significant threat of loss or damage to the manufacturer's business, even if such business has not previously been damaged as a result of the activities of the English and Australian pools.

INJUNCTION §138 > extent of relief -- > Headnote:

***LEdHN[24]*** [24]

In exercising its equitable jurisdiction, a federal court has broad power to restrain acts which are of the same type or class as unlawful acts which the court has found to have been committed or whose commission in the future, unless enjoined, may fairly be anticipated from the defendant's conduct in the past.

RESTRAINTS OF TRADE AND MONOPOLIES §75 > injunction -- extent of relief -- > Headnote:

***LEdHN[25]*** [25]

The federal courts, in exercising the traditional equitable powers extended to them by 16 of the Clayton Act (*15 USC 26*), authorizing injunctive relief against threatened loss or damage by a violation of the antitrust laws, should respond to the salutary principle that when one has been found to have committed acts in violation of a law, he may be restrained from committing other related unlawful acts.

RESTRAINTS OF TRADE AND MONOPOLIES §75 > injunction -- extent of relief -- > Headnote:

***LEdHN[26]*** [26]

Although a Federal District Court may not enjoin all future illegal conduct of a defendant, or even all future violations of the antitrust laws, however unrelated to the antitrust violation found by the court, when the defendant's purpose to restrain trade appears from a clear violation of law, it is not necessary that all of the untraveled roads to that end be left open and that only the worn one be closed, and this is particularly true in treble-damage cases, which are brought for private ends, but which also serve the public interest in that they effectively pry open to competition a market which has been closed by the defendant's illegal restraints.

PATENTS §232 > misuse -- royalties -- > Headnote:

***LEdHN[27]*** [27]

Conditioning the grant of a patent license upon payment of royalties on products which do not use the teaching of the patent amounts to patent misuse.

PATENTS §5 > rights of patentee -- > Headnote:

***LEdHN[28]*** [28]

A patentee has the exclusive right to manufacture, use, and sell his invention; the heart of his legal monopoly is the right to invoke the state's power to prevent others from utilizing his discovery

without his consent; and the law recognizes that he may assign to another his patent, in whole or in part, and may license others to practice his invention.

PATENTS §225 > PATENTS §232 > licenses -- conditions -- royalties -- > Headnote:

***LEdHN[29]*** [29]

There are established limits which a patentee must not exceed in employing the leverage of his patent to control or limit the operations of a licensee; among other restrictions upon him, he may not condition the right to use his patent on the licensee's agreement to purchase, use, or sell, or not to purchase, use, or sell, another article of commerce not within the scope of the patent monopoly, and his right to set the price for a license does not extend so far, whatever privilege he has to exact royalties as high as he can negotiate; and just as the patent's leverage may not be used to extract from the licensee a commitment to purchase, use, or sell other products according to the desires of the patentee, neither can that leverage be used to garner as royalties a percentage share of the licensee's receipts from sales of other products, since, in either case, the patentee seeks to extend the monopoly of his patent to derive a benefit not attributable to use of the patent's teachings.

PATENTS §5 > rights of patentee -- > Headnote:

***LEdHN[30]*** [30]

A patentee may not use the power of his patent to levy a charge for making, using, or selling products not within the reach of the monopoly granted by the government.

PATENTS §232 > misuse -- royalties -- > Headnote:

***LEdHN[31]*** [31]

If the provision of a license agreement basing royalty payments on the licensee's total sales is dictated by the convenience of the parties rather than by the patent power of the patentee, such a royalty arrangement involves neither misuse of the patents nor forbidden conditions attached to the license.

PATENTS §232 > royalties -- > Headnote:

***LEdHN[32]*** [32]

If a licensee negotiates for the privilege to use any or all of the patents and developments as he desires to use them, he cannot complain that he must pay royalties if he chooses to use none of them, and he cannot then charge that the patentee has refused to license except on the basis of a total-sales royalty.

PATENTS §232 > royalties -- > Headnote:

***LEdHN[33]*** [33]

A patentee is not authorized to use the power of his patent to insist on a total-sales royalty from a licensee and to override protestations of the licensee that some of his products are unsuited to the patent or that for some lines of his merchandise he has no need or desire to purchase the privileges of the patent, since, in such event, not only would royalties be collected on unpatented

merchandise, but the obligation to pay for nonuse would have its source in the leverage of the patent.

PATENTS §232 > misuse -- royalties -- > Headnote:

***LEdHN[34]*** [34]

Patent misuse inheres in a patentee's insistence on a licensee's payment of a percentage-of-sales royalty, regardless of use, where the patentee rejects the licensee's proposals to pay only for actual use; a licensee must pay if he uses a patent, but he may insist upon paying only for use, and not on the basis of total sales, including products in which he may use a competing patent or in which no patented ideas are used at all; and there is nothing in the right granted the patentee to keep others from using, selling, or manufacturing his invention which empowers him to insist on payment not only for use, but also for producing products which do not employ his discoveries at all.

PATENTS §232 > royalties -- > Headnote:

***LEdHN[35]*** [35]

A licensee cannot expect to obtain a license, giving him the privilege of use and insurance against infringement suits, without at least footing the patentee's expenses in dealing with him; he cannot insist upon paying on use alone and perhaps, as things turn out, pay absolutely nothing because he finds he can produce without using the patent; if the risks of infringement are real and he would avoid them, he must anticipate some minimum charge for the license--enough to insure the patentee against loss in negotiating and administering his monopoly, even if in fact the patent is not used at all; but there is no basis in the statutory monopoly granted the patentee for his using that monopoly to coerce an agreement to pay a percentage royalty on merchandise not employing the discovery which the claims of the patent define.

RESTRAINTS OF TRADE AND MONOPOLIES §58 > RESTRAINTS OF TRADE AND MONOPOLIES §77 > misuse of patent -- license -- conditions -- > Headnote:

***LEdHN[36]*** [36]

If there is a patent misuse consisting of a patentee's conditioning the grant of patent licenses upon the payment of royalties on unpatented products, it does not necessarily follow that such misuse embodies the ingredients of an antitrust law violation under either 1 or 2 of the Sherman Act (*15 USC 1*, *2*), or that the licensee has been threatened by an antitrust law violation so as to entitle it to an injunction under 16 of the Clayton Act (*15 USC 26*).

APPEAL AND ERROR §1692.1 > remand -- > Headnote:

***LEdHN[37]*** [37]

The United States Supreme Court will remand an antitrust case to a Federal Court of Appeals for a determination in the first instance whether findings and evidence of a Federal District Court, sitting without a jury, are sufficient to make out an actual or threatened violation of the antitrust laws so as to justify an injunction issued by the District Court, where such matter has not been considered by the Court of Appeals.

**Syllabus**

Upon the expiration in 1959 of petitioner, Zenith's, license agreement with Hazeltine Research, Inc. (HRI), which permitted Zenith to use all of HRI's domestic radio and television patents under HRI's so-called standard package license, Zenith refused to renew, asserting that it no longer required a license. HRI brought a patent infringement suit in November 1959. Zenith's answer alleged invalidity of the patent, noninfringement, patent misuse by HRI, and HRI's unclean hands through conspiracy with foreign patent pools. In May 1963 Zenith counterclaimed against HRI for treble damages and injunctive relief, alleging Sherman Act violations by misuse of HRI patents, including the one in suit, as well as by conspiracy among HRI, its parent Hazeltine Corp. (Hazeltine), and patent pools in Canada, England, and Australia. Zenith contended that the patent pools refused to license the foreign patents, including Hazeltine's, placed within their exclusive licensing authority, to Zenith and others seeking to export American-made radios and television sets into those foreign markets. HRI and Zenith had stipulated before trial that HRI and Hazeltine were to be considered as one entity for purposes of the litigation. Hazeltine was not served with the counterclaim or named as a party, and made no appearance until Zenith proposed that judgment be entered against it, at which time Hazeltine filed a "special appearance." The District Court, sitting without a jury, ruled for Zenith on the infringement action, and on the counterclaim held that (1) HRI had misused its domestic patents by attempting to coerce Zenith's acceptance of a five-year package license and by insisting on extracting royalties from unpatented products, and (2) HRI and Hazeltine conspired with foreign patent pools to exclude Zenith from the Canadian, English, and Australian markets. With respect to patent misuse, judgment was entered for Zenith for treble the actual damages of approximately $ 50,000, and injunctive relief given against further misuse. Treble damages for almost $ 35,000,000 were awarded Zenith on the conspiracy claim, together with injunctive relief against further participation **[*101]** in any arrangement to prevent Zenith from exporting electronic equipment into any foreign market. Relying on the "one entity" stipulation, the court entered the judgments for treble damages and injunctive relief against Hazeltine as well as HRI. The Court of Appeals set aside the judgments against Hazeltine, ruling that the lower court lacked jurisdiction over that company and that the stipulation was an insufficient basis for entering judgment against Hazeltine. On the patent misuse claim, the treble-damage award against HRI was affirmed, but the injunction against further misuse was modified. The conspiracy treble-damage award was reversed, the Court of Appeals holding that Zenith had failed to prove it had in fact been injured during the relevant four-year period preceding the filing of its counter-claim. That court also struck down the injunction against HRI's participation in conspiracies restricting Zenith's foreign trade. *Held*:

1. One is not bound by a judgment *in personam* resulting from litigation in which he is not designated as a party or to which he has not been made a party by service of process. Pp. 108-112.

(a) The judgments against Hazeltine were properly vacated as Hazeltine was not named as a party or served, and did not formally appear at the trial; and the stipulation executed by HRI was not an adequate substitute for the normal means of obtaining jurisdiction over Hazeltine. P. 110.

(b) It was error to enter an injunction against Hazeltine without determining that it was "in active concert or participation" with HRI in a proceeding in which Hazeltine was a party. P. 112.

2. The Court of Appeals erred in setting aside the District Court's decision with respect to the fact of damage in Canada. Pp. 114-125.

(a) The evidence was sufficient to sustain a finding that the Canadian patent pool refused to license imported goods, thus excluding foreign manufacturers like Zenith from the Canadian market for radio and television products. P. 118.

(b) The evidence clearly warrants the inference that the Canadian patent pool's past conduct interfered with and made more difficult the distribution of Zenith products in the relevant 1959-1963 period; and it could rationally be found that Zenith suffered damage during the pertinent period from having a smaller share of the market than it would have had if the pool had never existed. Pp. 118-119.

**[*102]** (c) The evidence is sufficient to support a finding of damage resulting from events occurring after the damage period began. Pp. 119-123.

(d) In applying the clearly erroneous standard of *Fed. Rule Civ. Proc. 52 (a)* to the findings of a district court sitting without a jury, the appellate court must determine whether "on the entire evidence [it] is left with the definite and firm conviction that a mistake has been committed," and not whether it would have made the same findings the trial court did. P. 123.

(e) Where a treble-damage plaintiff seeks recovery for injuries from a total or partial market exclusion, a court may "conclude as a matter of just and reasonable inference from the proof of defendants' wrongful acts and their tendency to injure plaintiffs' business, and from the evidence of the decline in prices, profits and values, not shown to be attributable to other causes, that defendants' wrongful acts had caused damage to the plaintiffs." *Bigelow v. RKO Radio Pictures, Inc., 327 U.S. 251, 264*. Pp. 123-124.

(f) The trial court was entitled to infer from the circumstantial evidence that the necessary causal relation between the Canadian patent pool's conduct and the claimed damage existed. Pp. 124-125.

3. The Court of Appeals properly set aside the District Court's judgment with respect to injury to Zenith by the English patent pool, as the only permissible inference from the record is that Zenith did not enter the English television market because it was awaiting a change in the English line-scanning signal and not because of the activities of the patent pool. Pp. 125-128.

4. The Court of Appeals correctly reversed the lower court's damages award with respect to the Australian market as nothing in the record permits the inference that Zenith either intended or was prepared to enter the Australian market during the relevant period. Pp. 128-129.

5. Injunctive relief under § 16 of the Clayton Act is available even though the plaintiff has not suffered actual injury as long as he demonstrates a significant threat of injury from an impending antitrust violation or from a contemporary violation likely to continue or recur. Pp. 129-133.

(a) Injunctive relief against HRI with respect to the Canadian market was wholly proper, as the trial court found that HRI and the Canadian patent pool were conspiring to exclude Zenith **[*103]** and others from the Canadian market, and there was nothing to indicate that this clear violation of the antitrust laws had terminated or that the threat to Zenith would cease in the foreseeable future. Pp. 131-132.

(b) The injunction which barred HRI from conspiring with others to restrict or prevent Zenith from entering any other foreign markets is also reinstated, in light of HRI's antitrust violation by its conspiring with the Canadian pool, its participation in similar pools in England and Australia, and Zenith's interest in expanding its foreign markets. Pp. 132-133.

6. Conditioning the grant of a patent license upon payment of royalties on products which do not use the teaching of the patent amounts to patent misuse. Pp. 133-140.

(a) If convenience of the parties rather than patent power dictates a percentage-of-total-sales royalty provision there is no misuse of the patents. *Automatic Radio Mfg. Co. v. Hazeltine Research, Inc., 339 U.S. 827*. Pp. 137-138.

(b) A licensee, who obtains the privilege of using the patent and insurance against infringement suits, must anticipate some minimum charge for the license, enough to insure the patentee against loss in negotiating and administering his monopoly, even if in fact the patent is not used at all, but the patentee's statutory monopoly cannot be used to coerce an agreement to pay a percentage royalty on goods not using the patent. Pp. 139-140.

7. The matter is remanded to the Court of Appeals for it to consider whether the trial court correctly determined that HRI conditioned the grant of licenses upon the payment of royalties on unpatented products, and, if so, whether such misuse embodies the ingredients of a violation of either *§ 1* or *§ 2* of the Sherman Act, or whether Zenith was threatened by a violation so as to entitle it to an injunction under § 16 of the Clayton Act. Pp. 140-141.

**Counsel:** Thomas C. McConnell argued the cause for petitioner. With him on the briefs were Philip J. Curtis and Francis J. McConnell.

John T. Chadwell and Victor P. Kayser argued the cause for respondents. With them on the briefs for respondent Hazeltine Research, Inc., were C. Lee Cook, Jr., **[*104]** Joseph V. Giffin, M. Hudson Rathburn, and Laurence B. Dodds. With Messrs. Chadwell and Kayser on the brief for Hazeltine Corp. were Messrs. Cook and Giffin.

Solicitor General Griswold, Assistant Attorney General Zimmerman, and Harris Weinstein filed a brief for the United States as amicus curiae.

**Judges:** Warren, Black, Douglas, Harlan, Brennan, Stewart, White, Marshall

**Opinion by:** WHITE

**Opinion**

**[***137]** **[**1566]** MR. JUSTICE WHITE delivered the opinion of the Court.

Petitioner Zenith Radio Corporation (Zenith) is a Delaware Corporation which for many years has been successfully engaged in the business of manufacturing radio and television sets for sale in the United States and foreign countries. A necessary incident of Zenith's operations has been the acquisition of licenses to use patented devices in the radios and televisions it manufactures, and its transactions have included licensing agreements with respondent Hazeltine Research, Inc. (HRI), an Illinois corporation which owns and licenses domestic patents, principally in the radio and television fields. HRI is the wholly owned subsidiary of respondent Hazeltine Corporation (Hazeltine), a substantially larger and more diversified company that has among its assets numerous foreign patents -- including the foreign counterparts of HRI's domestic patents -- which it licenses for use in foreign countries.

Until 1959, Zenith had obtained the right to use all HRI domestic patents under HRI's so-called standard package license. In that year, however, with the expiration of Zenith's license imminent, Zenith declined to accept HRI's offer to renew, asserting that it no longer required a license from HRI. Negotiations proceeded to a stalemate, and in November 1959, HRI brought suit in the

Northern District of Illinois, claiming that **[**1567]** Zenith television sets infringed HRI's patents on a particular automatic control system. Zenith's answer alleged invalidity of the patent asserted and noninfringement, **[*105]** and further alleged that HRI's claim was unenforceable because of patent misuse as well as unclean hands through conspiracy with foreign patent pools. On May 22, 1963, more than three years after its answer had been filed, Zenith filed a counterclaim against HRI for treble damages and injunctive relief, alleging violations of the Sherman Act by misuse of HRI patents, including the one in suit, as well as by conspiracy among HRI, Hazeltine, and patent pools in Canada, England, and Australia. Zenith contended that these three patent pools had refused to license the patents placed within their exclusive licensing authority, including Hazeltine patents, to Zenith and others seeking to export American-made radios and televisions into those foreign markets.

**[***138]** The District Court, sitting without a jury, ruled for Zenith in the infringement action, *239 F.Supp. 51, 68-69*, and its judgment in that respect, which was affirmed by the *Court of Appeals, 388 F.2d 25, 30-33*, is not in issue here. On the counterclaim, the District Court ruled, first, that HRI had misused its domestic patents by attempting to coerce Zenith's acceptance of a five-year package license, and by insisting on extracting royalties from unpatented products. *239 F.Supp., at 69-72, 76-77*. Judgment was entered in Zenith's favor for treble the amount of its actual damages of approximately $ 50,000, and injunctive relief against further patent misuse was awarded. Second, HRI and Hazeltine were found to have conspired with the foreign patent pools to exclude Zenith from the Canadian, English, and Australian markets. Hazeltine had granted the pools the exclusive right to license Hazeltine patents in their respective countries and had shared in the pools' profits, knowing that each pool refused to license its patents for importation and that each enforced its ban on imports with threats of infringement suits. HRI, along with its coconspirator, Hazeltine, was therefore held to have conspired **[*106]** with the pools to restrain the trade or commerce of the United States, in violation of *§ 1* of the Sherman Act, 26 Stat. 209, as amended, *15 U. S. C. § 1*, and was liable for injury caused Zenith's foreign business by the operation of the pools. *239 F.Supp., at 77-78*. Total damages with respect to the three markets, when trebled, amounted to nearly $ 35,000,000. [1] **[**1568]** Judgment in this **[*107]**

---

[1] In its initial findings, handed down on January 25, 1965, 239 F.Supp., at 76, the District Court concluded that Zenith had suffered actual damages of $ 16,238,872 as a result of the restraints imposed by the three pools upon Zenith's export business during the four-year damage period:

| | |
|---|---|
| Canada: | |
| Television | $ 5,826,896 |
| Radio | 470,495 |
| England: | |
| Television | 8,079,859 |
| Radio | 1,169,067 |
| Australia: | |
| Television | 625,786 |
| Radio | 66,769 |
| Total | 16,238,872 |

On April 5, 1965, the District Court entered partial judgment, awarding Zenith treble damages for patent misuse and treble damages with respect to Canada, but reserving jurisdiction for further hearings on damages in the English and Australian markets. The further proceedings were held in October and November 1965, after which the District Court amended its findings on damages for England and Australia:

| | |
|---|---|
| England: | |
| Television | $ 4,312,924 |

amount was awarded Zenith, along with injunctive relief against further participation in any arrangement to prevent Zenith from exporting electronic equipment into any foreign market.

Relying **[***139]** upon its finding that HRI and Zenith had stipulated before trial that HRI and Hazeltine were to be considered as one entity for purposes of the litigation, see *239 F.Supp., at 69*, the court entered judgments for treble damages and injunctive relief, both with respect to patent misuse and conspiracy, against Hazeltine as well as against the named counter-defendant, HRI.

On appeal by HRI and Hazeltine, the Court of Appeals set aside entirely the judgments for damages and injunctive relief entered against Hazeltine, ruling that the District Court lacked jurisdiction over that company and that the stipulation relied upon by the District Court was an insufficient basis for entering judgment against Hazeltine. 388 F.2d, at 28-30. With respect to Zenith's patent misuse claim, the Court of Appeals affirmed the treble-damage award against HRI, but modified in certain respects the District Court's injunction against further misuse. *388 F.2d, at 33-35, 39*.

The Court of Appeals also reversed the treble-damage award for conspiracy to restrain Zenith's export trade. Without reaching any of the other issues presented by the appeal on this phase of the case, the court held that Zenith had failed to sustain its burden under § 4 of the **[*108]** Clayton Act, 38 Stat. 731, *15 U. S. C. § 15*, to prove the fact of damage -- injury to its business -- within the relevant four-year period preceding May 22, 1963, the date Zenith's counterclaim was filed. [2] Finally, the Court of Appeals struck the injunction against HRI's participation in conspiracies restricting Zenith's trade in foreign markets.

We granted certiorari, *391 U.S. 933*, to consider among other things the question whether the Court of Appeals properly discharged its appellate function under *Rule 52 (a) of the Federal Rules of Civil Procedure*, which specifies that the findings of fact made by a District Court sitting without a jury are not to be set aside unless "clearly erroneous."

I. THE JUDGMENTS AGAINST HAZELTINE.

The named plaintiff in the patent infringement complaint which began this litigation was HRI, not its parent, Hazeltine; Zenith's counterclaim named only HRI as the "counter-defendant,"

---

| | |
|---|---|
| Radio | 745,102 |
| Australia: | |
| Television | 223,508 |
| Radio | 24,952 |
| Total | 5,306,486 |

These revisions reflect the proof submitted at the further proceedings, showing that government embargoes in England and Australia, in effect until 1959 and 1960 respectively, precluded entry by Zenith into the English and Australian markets. The District Court found, with respect to England, that because of the embargoes, Zenith's damages were zero for the first year of the damage period, 50% of the figure initially accepted by the court for the second year, 75% for the third, and 100% for the fourth. With respect to Australia, the District Court adopted a similar 0-50-75-100% revision of the original figures used by the court in computing the damage findings of January 25, 1965.

[2] The record discloses that Zenith, HRI, and the courts below all considered the damage period to be the four years prior to the date on which Zenith filed its counterclaim. No argument was made that the counterclaim, in whole or in part, related back to an earlier pleading, thereby expanding the damage period to include years prior to 1959. Cf. *Bull* v. *United States*, 295 U.S. 247, 262 and n. 10 (1935); *Cold Metal Process Co*. v. *E. W. Bliss Co*., 285 F.2d 231 (C. A. 6th Cir. 1960), cert. denied, *366 U.S. 911 (1961)*. Cf. *Fed. Rule Civ. Proc. 15 (c)* (amended pleading relates back to date of original pleading if the "claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading").

identifying HRI and Hazeltine as "counter-defendant and its parent." After Zenith had filed its answer and had delivered a draft of its counter-claim to HRI's attorneys -- both the answer and the counterclaim alleging that HRI had unlawfully **[**1569]** conspired with Hazeltine and foreign patent pools -- HRI and Zenith **[*109]** stipulated that "for purposes of this litigation Plaintiff and its parent Hazeltine Corporation will be considered to be one and the same company."

**[***140]** On May 22, 1963, two weeks after the stipulation had been signed, Zenith filed its counterclaim, seeking money damages from HRI and an injunction against HRI and those "in privity" with it. Hazeltine was not served with the counterclaim and was not named as a party, although it was alleged to be a coconspirator with HRI and the foreign patent pools. Hazeltine made no appearance in the litigation until Zenith proposed that judgment be entered against it, at which time Hazeltine filed a "special appearance." Insofar as the record reveals, Hazeltine did not formally participate in the proceedings until after the District Court had entered its initial findings of fact and conclusions of law. On April 5, 1965, after Hazeltine's special appearance, the trial judge entered judgment against Hazeltine as well as HRI, thereby rejecting Hazeltine's objection that the court was without jurisdiction over it. Apparently, the trial court based its decision on the pretrial stipulation [3] and its earlier finding that:

"The parties stipulated that for the purposes of this litigation Hazeltine Research, Inc. and its parent, **[*110]** Hazeltine Corporation, would be considered as one entity operating as a patent holding and licensing company, engaged in the exploitation of patent rights in the electronics industry in the United States and in foreign countries." *239 F.Supp., at 69*.

***LEdHN[1]*** [1] ***LEdHN[2]*** [2] ***LEdHN[3]*** [3]The Court of Appeals was quite right in vacating the judgments against Hazeltine. It is elementary that ***HN1*** one is not bound by a judgment *in personam* resulting from litigation in which he is not designated as a party or to which he has not been made a party by service of process. *Hansberry v. Lee, 311 U.S. 32, 40-41 (1940)*. The consistent constitutional rule has been that a court has no power to adjudicate a personal claim or obligation unless it has jurisdiction over the person of the defendant. *E. g.*, *Pennoyer v. Neff, 95 U.S. 714 (1878)*; *Vanderbilt v. Vanderbilt, 354 U.S. 416, 418 (1957)*.

Here, Hazeltine was not named as a party, was never served and did not formally appear at the trial. Nor was the stipulation an adequate substitute for the normal methods of obtaining jurisdiction over a person or a corporation. The stipulation represented HRI's agreement to be bound by and to be liable for the acts of its parent, but it was signed only by HRI, through its attorney, Dodds. Hazeltine did not execute the stipulation, and Dodds, **[***141]** although an officer of Hazeltine, did not purport to be signing on its behalf. The trial court apparently viewed the stipulation as binding Hazeltine, as equivalent to an entry of appearance, or as consent to entry of judgment against it. The stipulation **[**1570]** on its face, however, hardly warrants this

---

[3] During the proceedings before the District Court on April 2, 1965, the trial judge noted: "Well, of course, Hazeltine Corporation wasn't a party to the lawsuit." The court's reliance upon the stipulation as a basis for its decision to enter judgment against Hazeltine as well as HRI is reflected by the interchanges between the court and counsel for Hazeltine during those proceedings. An example is the following:

"Mr. Kayser [counsel for Hazeltine]: . . . Could anyone really believe for a minute that if he had any thought of bringing the parent into this lawsuit that he would not have named them and that he would be relying on this stipulation which was intended to simplify and expedite the trial? Would any lawyer who has been practicing for two years expect to hold somebody liable on a judgment when he didn't even name them? He relied on some pretrial stipulation.

"The Court: You mean that pretrial stipulations are worthless?"

construction, and if there were other circumstances which justified the trial court's conclusion, the findings do not reveal them.

**[*111]** Perhaps Zenith could have proved and the trial court might have found that HRI and Hazeltine were *alter ego*s; but absent jurisdiction over Hazeltine, that determination would bind only HRI. If the *alter ego* issue had been litigated, and if the trial court had decided that HRI and Hazeltine were one and the same entity and that jurisdiction over HRI gave the court jurisdiction over Hazeltine, perhaps Hazeltine's appearance before judgment with full opportunity to contest jurisdiction would warrant entry of judgment against it. But that is not what occurred here. The trial court's judgment against Hazeltine was based wholly on HRI's stipulation. HRI may have executed the stipulation to avoid litigating the *alter ego* issue, [4] but this fact cannot foreclose Hazeltine, which has never had its day in court on the question of whether it and its subsidiary should be considered the same entity for purposes of this litigation.

***LEdHN[4]*** [4] ***LEdHN[5A]*** [5A] Likewise, were it shown that Hazeltine through its officer, Dodds, in fact controlled the litigation on behalf of HRI, and if the claim were made that the judgment against HRI would be *res judicata* against Hazeltine because of this control, that claim itself could be finally adjudicated against Hazeltine only in a court with jurisdiction over that company. [5] See *G. & C. Merriam Co.* **[*112]** v. *Saalfield, 241 U.S. 22 (1916)*; *Schnell v. Peter Eckrich & Sons, Inc., 365 U.S. 260 (1961)*.

***LEdHN[5B]*** [5B]

***LEdHN[6]*** [6] ***LEdHN[7A]*** [7A]Neither the judgment for damages nor the injunction against Hazeltine was proper. ***HN2*** Although injunctions issued by federal courts bind not only the parties defendant **[***142]** in a suit, but also those persons "in active concert or participation with them who receive actual notice of the order by personal service or otherwise," *Fed. Rule Civ. Proc. 65 (d)*, a nonparty with notice cannot be held in contempt until shown to be in concert or participation. It was error to enter the injunction against Hazeltine, without having made this determination in a proceeding to which Hazeltine was a party. [6]

---

[4] There is some indication that the genesis of the stipulation was a pretrial conference, when a question was raised as to whether or not a subpoena served upon HRI could reach certain records of Hazeltine relating to the latter's foreign patents. Hazeltine, of course, argues that the stipulation's only purpose and effect were to facilitate discovery and trial by obviating the necessity of litigating whether or not Zenith could "pierce the corporate veil" between HRI and its parent.

[5] In its brief in this Court, Zenith seems to argue that Hazeltine is estopped to deny that it is bound by the stipulation. Not only was HRI's counsel, Dodds, an officer of Hazeltine, but also Ruestow and Westermann, Hazeltine's general patent counsel and general counsel, were present during trial and failed to "repudiate" the construction allegedly given the stipulation by the parties at trial to the effect that it bound Hazeltine to any adjudication on the counterclaim. We find this theory untenable on the record of this case, for the references during trial to the stipulation are equally consistent with the interpretation advanced by Hazeltine that the stipulation merely eliminated the necessity for Zenith to perform the time-consuming task of piercing the corporate veil in proving its counterclaim against HRI. Also, Ruestow and Westermann were called as witnesses during trial, and assuming they were present throughout the trial -- a fact which is neither proved nor disproved by the record -- their failure to repudiate Zenith's proposed construction of the stipulation is entirely consistent with the proposition that they were present only as witnesses, and not as authorized representatives for a person who might be bound by the litigation.

[6] Just as the *alter ego* issue was not litigated after Hazeltine had made its special appearance and while it had an opportunity to be heard, see *supra*, at 111, so the District Court evidently did not rely upon anything more than the stipulation as a basis for entering the injunction against Hazeltine as well as HRI. The record does not support the contention, implicit in Zenith's brief, that when Hazeltine appeared to contest jurisdiction it was found by the District Court to be "in active concert or participation" with HRI and that, by entering its special appearance, Hazeltine consented to be bound by such a finding. See generally Dobbs, The Validation of Void Judgments: The Bootstrap Principle (pts. 1 and 2), 53 Va. L. Rev. 1003, 1241 (1967).

***LEdHN[7B]*** [7B]

**[*113]** II. **[**1571]** THE FOREIGN PATENT POOLS.

A. *The Treble-Damage Award*.

***LEdHN[8A]*** [8A] ***LEdHN[9A]*** [9A]HRI's major points in the Court of Appeals were that no injury to Zenith's business during the damage period had been proved; that if Zenith had suffered injury, it resulted wholly or partly from conduct prior to May 22, 1959, and to this extent was barred by the statute of limitations and by Zenith's 1957 settlement of certain antitrust litigation against RCA, General Electric, and Western Electric, which had the effect of releasing HRI from all liability for pre-settlement acts of the foreign patent pools; [7] that the Hazeltine companies had not illegally conspired with foreign pools; and that the damage award was excessive. Passing the other issues pressed by HRI, including the limitations defense, the Court of Appeals held that Zenith had failed to prove any injury to its export business during the damage period which resulted from pool activities either before or after the beginning of the damage period, and that the District Court's finding to the contrary was clearly erroneous. [8]

***LEdHN[8B]*** [8B] ***LEdHN[9B]*** [9B]

**[*114]** ***LEdHN[10A]*** [10A]We **[***143]** have concluded that the Court of Appeals erred in setting aside the District Court's decision with respect to the fact of damage in Canada. Zenith's evidence, although by no means conclusive, was sufficient to sustain the inference that Zenith had in fact been injured to some extent [9] by the Canadian pool's **[**1572]** restraints upon imports of radio and television sets. On the other hand, we agree with the Court of Appeals that the District Court erred as to the English and Australian markets.

***LEdHN[10B]*** [10B]

1. *The Canadian Pool*.

---

[7] Although HRI and Hazeltine were not parties to this prior litigation and did not enter the settlement agreement, HRI urged that all joint tortfeasors, including HRI and Hazeltine, were released from liability for injuries flowing from the pre-settlement acts of the pools. The 1957 release appears to be relevant only to Zenith's claim for injury to its Canadian trade; the embargoes in England and Australia were thought by the District Court to preclude any injury from acts of the English and Australian pools, and the embargoes were not lifted until well after the settlement was executed.

[8] The Court of Appeals did not disturb, nor do we, the findings of the District Court that HRI and Hazeltine conspired with the Canadian pool to deny patent licenses to companies seeking to export American-made goods to Canada. Accepting these findings, we have no doubt that the Sherman Act was violated. See, *e. g.*, *Timken Roller Bearing Co.* v. *United States*, 341 U.S. 593, 599 (1951); *Continental Ore Co.* v. *Union Carbide & Carbon Corp.*, 370 U.S. 690, 704 (1962). Once Zenith demonstrated that its exports from the United States had been restrained by pool activities, the treble-damage liability of the domestic company participating in the conspiracy was beyond question. *Continental Ore Co.* v. *Union Carbide & Carbon Corp.*, *supra*. Cf. *American Banana Co.* v. *United Fruit Co.*, 213 U.S. 347 (1909); *United States* v. *Aluminum Co. of America*, 148 F.2d 416, 443 (C. A. 2d Cir. 1945). Although patent rights are here involved, the same conclusions follow. See, for example, *United States* v. *Line Material Co.*, 333 U.S. 287, 305-315 (1948); *United States* v. *Singer Mfg. Co.*, 374 U.S. 174, 196-197 (1963).

[9] Zenith's burden of proving the fact of damage under § 4 of the Clayton Act is satisfied by its proof of *some* damage flowing from the unlawful conspiracy; inquiry beyond this minimum point goes only to the amount and not the fact of damage. ***HN3*** It is enough that the illegality is shown to be a material cause of the injury; a plaintiff need not exhaust all possible alternative sources of injury in fulfilling his burden of proving compensable injury under § 4. *Continental Ore Co.* v. *Union Carbide & Carbon Corp.*, *supra*, at 702 (1962); *Perma Life Mufflers, Inc.* v. *International Parts Corp.*, 392 U.S. 134, 143-144 (1968) (concurring opinion).

***LEdHN[11]*** [11]The findings of the District Court with respect to the operations of the Canadian pool may be briefly summarized. The Canadian patent pool, Canadian Radio Patents, Ltd. (CRPL), was formed in 1926 by the General Electric Company of the United States through its subsidiary, Canadian General Electric Company, and **[*115]** by Westinghouse through its Canadian subsidiary. The pool was made up largely of Canadian manufacturers, most of which were subsidiaries of American companies. The pool for many years had the exclusive right to sublicense the patents of its member companies and also those of Hazeltine and a number of other foreign concerns. About 5,000 patents were available to the pool for licensing, and only package licenses were granted, covering all patents in the pool and strictly limited to manufacture in Canada. No license to importers was available. The chief purpose of the pool was to protect the manufacturing members and licensees from competition by American and other foreign companies seeking to export their products into Canada.

CRPL's efforts to prevent importation of radio and television sets from the United States were highly organized and effective. Agents, investigators, and manufacturer and distributor trade associations systematically policed the market; warning notices and advertisements advised distributors, dealers, and even consumers against selling or using unlicensed equipment. Infringement suits or threats thereof were regularly and effectively employed to dissuade dealers from handling American-made sets.

For many years Zenith attempted to establish distribution in Canada, but distributors were warned off by the pool, and Zenith's efforts to secure a license for American-made goods were unsuccessful. Zenith then brought an antitrust suit against RCA, General Electric, and Western Electric. [10] This litigation was favorably settled, Zenith receiving, among other things, worldwide **[***144]** licenses on patents owned by the named defendants. **[*116]** Armed with these and other licenses, Zenith in 1958 began exporting radio and television products to Canada. It was promptly informed by CRPL that to continue business in Canada, Zenith would be required to sign CRPL's standard license, which did not permit importation, and that to sell in Canada it must manufacture there. Zenith was notified at the time that it was infringing at least one of Hazeltine's patents which had been placed with CRPL for licensing in Canada. Soon after this demand by CRPL, HRI began its infringement suit against Zenith.

Some of the trial court's findings describing the operations of the Canadian pool and its "drastic" impact upon Zenith's foreign commerce did not date the events or state whether they had occurred before or after May 22, 1959. The damage award was confined to injuries sustained during the statutory period, but the trial court apparently deemed it immaterial whether the damage-causing acts occurred before or after the start of the damage period. Damages **[**1573]** were awarded on the assumption that Zenith, absent the conspiracy, would have had 16% of the Canadian television market on May 22, 1959, and throughout the damage period rather than its actual 3% share. [11] Since the failure to have 16% of the market on the first day of the damage period was ascribed to pool operations, those operations must have occurred prior to May 22, 1959.

---

[10] Zenith's antitrust claim was asserted as a counterclaim in a patent infringement suit brought by RCA against Zenith and its subsidiary, the Rauland Corporation.

[11] The computation of damages, prepared by Zenith's experts and accepted by the District Court, see 239 F.Supp., at 76, reflects a comparison between Zenith's percentage share of the United States television market, ranging from 15.6% in 1959 to 21.7% in 1963, and Zenith's actual share of the Canadian market during the same period, ranging from 3.1% in 1959 to 5.2% in 1961 and down to 3.2% in 1963. Although we discuss only the measure of damages utilized for computing Zenith's injury in the Canadian television market, a comparable method was employed to determine Zenith's lost radio sales.

Some part of the damages **[*117]** awarded, therefore, necessarily resulted from pre-damage period conduct. [12]

The Court of Appeals reversed the District Court because it considered the evidence insufficient to prove the fact of any damage to Zenith after May 22, 1959. Having put aside HRI's statute of limitations defense, belatedly raised in the District Court and pressed in the Court of Appeals, [13] the import of the court's **[***145]** decision **[*118]** was that Zenith had not been damaged after May 22, 1959, by any act of the pool, whether occurring before or after that date. The Court of Appeals' overriding judgment -- as it had to be if its no-injury rationale were to meet claims of damage period injury from pre-damage period conduct -- was that Zenith would have done no more business in Canada after May 22, 1959, had the patent pool never operated in that country.

The Court of Appeals was clearly in error. The evidence was quite sufficient to sustain a finding that competing business concerns and patentees joined together to pool their Canadian patents, granting only package licenses and refusing to license imported goods. Their **[**1574]** clear purpose was to exclude concerns like Zenith from the Canadian market unless willing to manufacture there. Zenith, consequently, was never able to obtain a license. This fact and the pool's vigorous campaign to discourage importers, distributors, dealers, and consumers from selling, handling, or using unlicensed foreign merchandise effectively prevented Zenith from making any headway in the Canadian market until after the 1957 settlement with RCA and its codefendants. And even in 1958, when Zenith undertook in earnest to establish its distribution system in Canada and to market its merchandise, Zenith was met with further pool advertisements threatening action against imported goods and further notifications, continuing past May 22, 1959, that its products were infringing pool patents and that no license was available unless Zenith manufactured in Canada.

This evidence clearly warrants the inference that CRPL's past conduct interfered with and made more difficult the distribution of Zenith products in 1959 and later years. The District Court could reasonably conclude that the cumulative effects of the pool's campaign against imported goods had consequences lasting well into the damage period. It could also rationally **[*119]** be

---

12 On November 22, 1965, during the further proceedings held to consider damages for England and Australia, Zenith's executive vice-president and treasurer, Kaplan, testified:

"In Canada, our assumption was that we commenced the period starting June 1, 1959 as if we had a full blown organization, and had enjoyed the benefits of doing business there for years prior to that date."

13 HRI's answer to Zenith's counterclaim did not plead a statute of limitations defense. However, in the course of proceedings after entry of the District Court's initial findings of fact and conclusions of law, but before judgment, the trial court granted the oral motion of HRI's new counsel for "leave to file" defenses based on the statute of limitations and on the release given by Zenith pursuant to the 1957 settlement agreement. The thrust of the former was primarily that the findings as to Canada had erroneously included damages resulting from conduct occurring prior to May 22, 1959. The trial court, without further mention of these defenses, forthwith refused to set aside or amend the damage award as to Canada, thus either rejecting the statute of limitations defense or considering it to have been waived under *Fed. Rule Civ. Proc. 12 (h)*, as urged by Zenith in both the District Court and the Court of Appeals.

Zenith itself had requested damages only for the four-year period prior to the filing of its counterclaim, and the findings of the District Court expressly limited the damages awarded to those occurring "during the 4-year statutory damage period." 239 F.Supp., at 76. The Court of Appeals, although not purporting to pass on the statute of limitations defense, referred to the "four year damage period" and identified it as "four years prior to the May 22, 1963, filing date of Zenith's counterclaim. 15 U. S. C. Sec. 15b." 388 F.2d, at 35 and n. 4. The parties have not argued the matter here, and we make no further effort to penetrate the confusion surrounding this issue or to deal with the question of whether damage period injury from pre-damage period conduct is recoverable where an unwaived statute of limitations defense is properly asserted.

found from the evidence that Zenith, beginning in 1958, could not have reached its maximum potential by May 22, 1959, that the pool had effectively prevented an earlier beginning, and that Zenith therefore suffered damage during the damage period from having a smaller share of the market than it would have had if the pool had never existed.

***LEdHN[12]*** [12]We also conclude that the record evidence is sufficient to support a finding of damage resulting from events occurring after the beginning of the damage period. We need not merely assume that the Canadian pool continued throughout the period of this suit, as we are entitled to do in the absence of clear evidence of its termination. See, *e. g.*, *Local 167 v. United States, 291 U.S. 293, 297-298* **[***146]** (1934); *United States v. Oregon State Medical Society, 343 U.S. 326, 333 (1952)*. HRI frankly conceded the continuation of the pool before the District Court, [14] and it appears sufficiently clear that throughout this time Zenith was deprived of what had always been refused it -- a license on pool patents permitting it to sell American-made merchandise in Canada.

On May 12, 1959, the pool manager conferred with Zenith's vice president, informing him that Zenith was infringing pool patents and would require a license, **[*120]** but that licenses were granted only for local manufacture. This was followed on June 5, 1959, by a letter stating without reservation that Zenith receivers were infringing, and enclosing the pool's standard license form. This was nothing more nor less than a demand during the damage period that Zenith either manufacture in Canada and take the standard package license or cease its **[**1575]** activities in that country. [15] There is no evidence that the pool ever retreated from that position during the next four years.

Zenith thus continued to operate without a patent license unburdened by conspiratorial conduct and granted on terms which would satisfy the antitrust laws. This deprivation in itself necessarily had an impact on Zenith and constituted an injury to its business. We find singularly unpersuasive the argument that Zenith was as well off without a license as with one. This is little more than an assertion that pool licenses, from which CRPL and its participants enjoyed substantial income, were without value. Without the license, doing business in Canada obviously involved weighty risks for Zenith itself, besides requiring it to convince the trade that it could legally and effectively do business without clearance from CRPL. [16]

---

[14] On April 1, 1965, during the further proceedings held by the District Court before judgment, counsel for HRI stated:

"Now, what [counsel for Zenith] is really trying to sell this court is the idea that if he can show that these pools continued after 1957 and, as he defines the pools, yes, yes, they did. There is no question about it, that these arrangements in relation to patents -- that characterized necessarily as he characterizes them, but that these arrangements have continued and, so far as I know, are in existence today. There is no question about that."

HRI does contend, however, that the ties between the Canadian pool and the Hazeltine companies were broken in December 1965, when Hazeltine secured an early termination of its licensing agreement with CRPL. See n. 25, *infra*.

[15] That Zenith failed to make a formal request for a CRPL license during the damage period can properly be attributed to Zenith's recognition that such a request would have been futile. The pool had made its position entirely clear, and under these circumstances the absence of a formal request is not fatal to Zenith's case. See *Continental Ore Co*. v. *Union Carbide & Carbon Corp*., 370 U.S. 690, 699-702 (1962); *Hanover Shoe, Inc*. v. *United Shoe Machinery Corp*., 392 U.S. 481, 487, n. 5 (1968).

[16] In 1960, the Report of the Royal Commission on Patents, Copyright and Industrial Designs was published. This Report described the magnitude of the risk taken by Zenith and its distributors in selling imported products in Canada:

"The portfolio in respect of which CRPL had the right to grant licences consisted of 5,000 patents, and in the absence of a licence from CRPL it is doubtful if anyone could sell in Canada a radio or television receiver.

**[*121]** Of **[***147]** course, Zenith determined to take these risks, serious as they were. Although HRI brought the instant litigation claiming infringement of an HRI domestic patent, the foreign counterpart of which had been made available to the Canadian pool by Hazeltine, Zenith persevered in its Canadian efforts. The claim is now pressed, and the Court of Appeals held, that the pool bothered neither Zenith nor its distributors after mid-1959 and that Zenith ran the gantlet so successfully that not having a license made no difference whatsoever.

It is true that the record discloses no specific instance of subsequent infringement suits or threats against Zenith's existing or potential distributors or dealers. But there is evidence that the pool was not dormant after May 1959. The record contains a letter from the pool to a distributor of Motorola products containing clear warnings against handling unlicensed, imported merchandise. [17] More significant, the fair import of the testimony **[*122]** by Zenith officers was that the pool remained active during the damage period and prevented Zenith from establishing **[**1576]** an effective distribution system throughout Canada. Zenith was able to obtain independent distributors in the Western Provinces, but it was unable to do so in the Central and the Maritime Provinces, where it necessarily relied on its own subsidiaries for distribution. These officers, experienced businessmen, also testified to the similarities between the Canadian and American markets, attributing Zenith's much poorer Canadian performance to the discouraging and repressive effects of the pool. The Court of Appeals did not refuse to credit this testimony, as HRI insists we should do, [18] **[***148]** but accepting it as some evidence of damage, considered it of insufficient weight to prove injury to Zenith's business. In this respect the Court of Appeals both gave insufficient deference to the findings of the trial judge **[*123]** and failed to adhere to the teachings of *Bigelow v. RKO Radio Pictures, Inc., 327 U.S. 251 (1946)*, and other cases dealing with the standard of proof in treble-damage actions.

***LEdHN[13]*** [13]***HN4*** In applying the clearly erroneous standard to the findings of a district court sitting without a jury, appellate courts must constantly have in mind that their function is not to decide factual issues *de novo*. The authority of an appellate court, when reviewing the findings

---

"CRPL indicated that it does not grant a licence to any importer of radio or television receivers . . . . It is particularly in respect of the policy of CRPL in precluding importers from bringing into Canada radio and television receivers that the complaint was made to this Commission.

"It was stated to be the policy of CRPL to enforce its patent rights against any person who sells in Canada an imported radio or television receiver which infringes any one or more of the patents in its portfolio . . . ."

17 This letter, brought to Zenith's attention by an ex-Zenith dealer, warned the Motorola dealer that his importation of American-made television sets and FM radios probably infringed pool patents. The dealer not only was cautioned that CRPL remained willing to litigate infringements, describing two recent and successful suits, but also was reminded of CRPL's policy against licensing imports:

"In closing, I wish to inform you that we would be most happy to issue a license to you to make or have made in Canada any equipment coming within the ambit of our patents."

18 HRI urges that the trial testimony as to Canada of each of two Zenith officers, Wright and Kaplan, was inconsistent with his own testimony on recall, inconsistent with the testimony of the other, and inconsistent with documentary evidence, and that we should therefore disregard their testimony. It is true that the trial judge's views as to credibility are not completely impervious, but Rule 52 (a) admonishes due regard for the trial court's opportunity to assess the credibility of witnesses. The Court of Appeals clearly took into account this evidence, and we see no adequate basis in the record for refusing to accept the testimony of the two Zenith officers as probative evidence. See *United States* v. *United Shoe Machinery Co*., 247 U.S. 32, 37-38 (1918); *Walling* v. *General Industries Co*., 330 U.S. 545, 550 (1947); *Graver Tank & Mfg. Co*. v. *Linde Air Products Co*., 339 U.S. 605, 609-612 (1950); *United States* v. *Oregon State Medical Society*, 343 U.S. 326, 332 (1952); *Orvis* v. *Higgins*, 180 F.2d 537, 539-540 (C. A. 2d Cir.), cert. denied, *340 U.S. 810 (1950)*; *Ruth* v. *Utah Construction & Mining Co*., 344 F.2d 952 (C. A. 10th Cir. 1965). HRI relies heavily in this respect on Zenith's annual reports for the years 1957-1962, but aside from the fact that these reports, except for 1962, were never admitted into evidence, we find them quite insufficient to undermine the credibility of Wright and Kaplan.

of a judge as well as those of a jury, is circumscribed by the deference it must give to decisions of the trier of the fact, who is usually in a superior position to appraise and weigh the evidence. The question for the appellate court under *Rule 52 (a)* is not whether it would have made the findings the trial court did, but whether "on the entire evidence [it] is left with the definite and firm conviction that a mistake has been committed." *United States v. United States Gypsum Co., 333 U.S. 364, 395 (1948)*. See also *United States v. National Assn. of Real Estate Boards, 339 U.S. 485, 495-496 (1950)*; *Commissioner v. Duberstein, 363 U.S. 278, 289-291 (1960)*.

***LEdHN[14]*** [14] ***LEdHN[15]*** [15]***HN5*** Trial and appellate courts alike must also observe the practical limits of the burden of proof which may be demanded of a treble-damage plaintiff who seeks recovery for injuries from a partial or total exclusion from a market; damage issues in these cases are rarely susceptible of the kind of concrete, detailed proof of injury which is available in other contexts. The Court has repeatedly held that ***HN6*** in the absence of more precise proof, the factfinder may "conclude **[**1577]** as a matter of just and reasonable inference from the proof of defendants' wrongful acts and their tendency to injure plaintiffs' business, and from the evidence of the decline in prices, profits and values, not shown to be attributable to other causes, that defendants' wrongful acts had caused damage **[*124]** to the plaintiffs." *Bigelow v. RKO Pictures, Inc., supra, at 264.* See also *Eastman Kodak Co. v. Southern Photo Materials Co., 273 U.S. 359, 377-379 (1927)*; *Story Parchment Co. v. Paterson Parchment Paper Co., 282 U.S. 555, 561-566 (1931)*.

In *Bigelow*, a treble-damage plaintiff claimed injury from a conspiracy among film distributors to deny him first-run pictures. He offered evidence comparing his profits with those of a competing theater granted first-run showings and also measuring his current profits against those earned when first-run films had been available to him. This Court, reversing the Court of Appeals, found the evidence sufficient to sustain an award of damages. ***HN7*** Although the factfinder is not entitled to base a judgment on speculation or guesswork,

"the jury may make a just and reasonable estimate **[***149]** of the damage based on relevant data, and render its verdict accordingly. In such circumstances, 'juries are allowed to act upon probable and inferential, as well as direct and positive proof.' *Story Parchment Co. v. Paterson Co., supra, 561-4*; *Eastman Kodak Co. v. Southern Photo Co., supra, 377-9*. Any other rule would enable the wrongdoer to profit by his wrongdoing at the expense of his victim. It would be an inducement to make wrongdoing so effective and complete in every case as to preclude any recovery, by rendering the measure of damages uncertain. Failure to apply it would mean that the more grievous the wrong done, the less likelihood there would be of a recovery." *327 U.S., at 264-265*.

Here, Zenith was denied a valuable license and submitted testimony that without the license it had encountered distribution difficulties which prevented its securing a share of the market comparable to that which **[*125]** it enjoyed in the United States, and which its business proficiency, demonstrated in the United States, dictated it should have obtained in Canada. CRPL was an established organization with a long history of successfully excluding imported merchandise; and in view of its continued existence during the damage period, the injury alleged by Zenith was precisely the type of loss that the claimed violations of the antitrust laws would be likely to cause. The trial court was entitled to infer from this circumstantial evidence that the necessary causal relation between the pool's conduct and the claimed damage existed. See *Continental Ore Co. v. Union Carbide & Carbon Corp., 370 U.S. 690, 696-701 (1962)*.

2. *The English Pool*.

***LEdHN[16]*** [16]Hazeltine patents were made available to the English pool in 1930. The pool issued only package licenses, restricted to local manufacture. Although pool radio patents had expired prior to the beginning of the damage period, the trial court found, and we assume, that the pool held television patents which would not be licensed for television sets made in the United States. [19] Zenith was interested **[**1578]** in the English market and made exclusive arrangements with one distributor desiring to handle its merchandise. At no time during or before the damage period, however, did Zenith make available or offer for sale a substantial number of television sets suitable for the English market or make any other serious efforts to **[*126]** enter that market. It attained no appreciable position in the English television market.

Having initially found the patent pool responsible over the years for Zenith's failure to participate in the English market, the trial court, after further proceedings, held that a government embargo, not the patent pool, was the sole reason for Zenith's not entering the English market prior to the beginning of the damage period in 1959; until then, the **[***150]** District Court found, the pool "[was] not called upon to exercise the type of conduct that [it] exercised in Canada." It did not, however, retreat from its conclusion that restraints imposed by the pool had foreclosed Zenith during the damage period. [20] In this respect we agree with the Court of Appeals that the trial court clearly erred. Based on our own examination of the record, we are convinced that even with the ending of the embargo in mid-1959, Zenith faced other obstacles which effectively discouraged its entry into the English market and for which the pool was not responsible.

Positing that Zenith could not get a license from the English pool and that it did not enter the British market before or during the damage period, the issue is whether, once the embargo was lifted, Zenith wanted and intended to enter, had the capacity to do so, and was prevented from entering by its inability to secure a patent license and by other operations of the English patent pool. Section 4 of the Clayton Act required that Zenith show an injury to its "business or property by reason of anything forbidden in the antitrust laws." If Zenith's failure to enter the English market was attributable to its lack of desire, its limited production capabilities, or to other **[*127]** factors independent of HRI's unlawful conduct, Zenith would not have met its burden under § 4. [21]

Zenith was interested in the English market; this much is clear. But its standard domestic television set was manufactured to operate on 525- and 625-line-per-second scanning signals, whereas the 405-line signal was standard in England until after the damage period. Similarly, while FM transmission was utilized in the United States for the audio portion, AM signals were used in England. Zenith's regular product thus was not salable in the English market. To succeed at all, Zenith had either to produce a differently equipped set or to provide for the mass conversion of

---

[19] Wright testified that in mid-1955 a representative of the English pool had confirmed his understanding that "the policy of the Pool . . . required that [radio and television] sets be made in England, and that nothing would be licensed if it was imported from abroad." Wright further testified that the pool representative "saw no possibility" that this restrictive policy would be changed in the future. Subsequently, during its dealings with its English radio distributor, Zenith was "given to understand that television was just out of the question."

[20] Because the embargo precluded any recovery by Zenith for the first year of the damage period, the trial court modified its initial measure of damages to reflect the time it would have taken Zenith, starting with the removal of the embargo, to build up its market share. See n. 1, *supra*.

[21] See *American Banana Co.* v. *United Fruit Co.* 166 F. 261, 264 (C. A. 2d Cir. 1908), affirmed without specific reference to this issue, 213 U.S. 347 (1909); *Stearns* v. *Tinker & Rasor*, 252 F.2d 589, 606 (C. A. 9th Cir. 1958); *Volasco Products Co.* v. *Lloyd A. Fry Roofing Co.*, 308 F.2d 383, 395-396 (C. A. 6th Cir. 1962), cert. denied, *372 U.S. 907 (1963)*. Cf. *Pennsylvania Sugar Rfg. Co.* v. *American Sugar Rfg. Co.*, 166 F. 254, 260 (C. A. 2d Cir. 1908).

its standard receivers. Unquestionably, the company had the facilities and the ability to follow either course. But it is equally clear that it pursued neither. [22] A change in the standard **[***151]** British broadcast to include **[**1579]** a 625-line signal was under **[*128]** consideration, even imminent, during the damage period. Zenith's merchandise would in any event have sold at prices substantially higher than those prevailing in the English market; tariffs and freight costs tended to widen the differential. Producing a new set for the English market, or modifying existent models on a large-scale basis, would have involved substantial costs.

Based on the evidence before us, including the correspondence between Zenith and its British representative, we think the Court of Appeals correctly rejected the inference that "Zenith intended to and was prepared to enter the English television market during the damage period," and correctly concluded that Zenith was in fact "waiting for a change in English standards to a 625-line system." *388 F.2d, at 37*. It clearly emerges from the evidence that Zenith had every intention to promote the sale of its television sets if and when the signal change occurred. Given that event, neither the absence of a pool license nor pool threats against it or its customers would have deterred Zenith from a major effort to penetrate the British market. Why the existence of the pool, which as far as the record shows was quiescent during the damage period, should be credited with the power to discourage Zenith's entry before the signal change but not after is difficult to grasp. But the question at hand is not whether, if Zenith had decided to enter the market, the pool would have been a deterrent and inflicted damage. Rather, it is whether Zenith was in fact constrained by the pool to stay out of England during the damage period or whether Zenith's own business calculus led it to await more favorable conditions. As we have said, the latter is the only permissible inference from this record.

3. *The Australian Pool.*

***LEdHN[17]*** [17] ***LEdHN[18]*** [18]The Australian patent pool, which had exclusive rights to license Hazeltine patents, also granted licenses only **[*129]** for local manufacture. Had HRI and Hazeltine's conspiracy with the Australian pool effectively kept Zenith from that market, a compensable violation of the antitrust laws unquestionably would have occurred. But the findings of the District Court are wholly silent as to how the Australian pool had any impact on Zenith's business. An officer of Zenith revealed that Zenith had exported no products to Australia since the 1920's or early 1930's. Zenith had not requested a pool license during the 20-year period preceding the trial. A government embargo was found by the District Court to have foreclosed Zenith's American-made merchandise until well into the damage period. High tariffs and shipping costs were additional barriers, as well as the prospect of vigorous competition. Nothing in the record before us would permit the inference that Zenith either intended or was prepared to enter the Australian market during the damage period. The Court of Appeals was correct in reversing the District Court's award of damages with respect to the Australian market.

**[**1580]** B. *The Injunction.*

---

[22] During trial, Wright and Kaplan testified that adjustments could be made by Zenith's English distributor in his shop to adapt Zenith television sets to the English transmission system. However, the fair import of their testimony, both during trial and in November 1965 on recall, was that conversion of Zenith sets to the English system, whether done before shipment to England or in the distributor's shop, had in fact been carried out only occasionally in the past and was of questionable utility on a commercial basis. Wright and Kaplan stated that Zenith could have manufactured a television set suitable for English use without appreciably more difficulty than Zenith faced in producing a new model for the American market, but the record does not indicate that Zenith took any steps in this direction before the end of the damage period, except in anticipation of the British changeover to the 625-line-per-second transmission system.

In setting aside the District Court's grant of injunctive relief **[***152]** against continued participation by HRI and Hazeltine in any patent pool or similar association restricting Zenith's export trade, [23] the Court of Appeals stated, without more:

"It follows from our conclusion with respect to the foreign patent pools that injunctive relief against **[*130]** 'threatened loss or damage' directed at those pools, alleged by Zenith to be unlawful conspiracies, cannot be justified under *15 U. S. C. Sec. 26*. Paragraph C of the injunction granted must be stricken." *388 F.2d, at 39*.

***LEdHN[19]*** [19]The evident premise for striking Paragraph C was that Zenith's failure to prove the fact of injury barred injunctive relief as well as treble damages. This was unsound, for § 16 of the Clayton Act, *15 U. S. C. § 26*, which was enacted by the Congress to make available equitable remedies previously denied private parties, invokes traditional principles of equity and authorizes injunctive relief upon the demonstration of "threatened" injury. [24] That remedy is characteristically available even though the plaintiff has not yet suffered actual injury, see *Bedford Cut Stone Co. v. Journeymen Stone Cutters' Assn., 274 U.S. 37, 54-55 (1927)*; he need only demonstrate a significant threat of injury from an impending violation of the antitrust laws or from a contemporary violation likely to continue or recur. See *Swift & Co. v. United States, 196 U.S. 375, 396 (1905)*; *Bedford Cut Stone Co. v. Journeymen Stone Cutters' Assn., supra, at 54*; *United States v. Oregon State Medical Society, 343 U.S. 326, 333 (1952)*; *United States v. W. T. Grant Co., 345 U.S. 629, 633 (1953)*.

***LEdHN[20]*** [20]Moreover, ***HN9*** the purpose of giving private parties treble-damage and injunctive remedies was not merely to provide **[*131]** private relief, but was to serve as well the high purpose of enforcing the antitrust laws. *E. g.*, *United States v. Borden Co., 347 U.S. 514, 518 (1954)*. Section 16 should be construed and applied with this purpose in mind, and with the knowledge that the remedy it affords, like other equitable remedies, is flexible and capable of nice "adjustment and reconciliation between the public interest and private needs as well as between competing private claims." *Hecht Co. v. Bowles, 321 U.S. 321, 329-330 (1944)*. Its availability should be "conditioned by the necessities of the public interest which Congress has sought to protect." *Id., at 330*.

**[***153]** ***LEdHN[21A]*** [21A] ***LEdHN[22A]*** [22A]Judged by the proper standard, the record before us warranted the injunction with respect to Canada. The findings of the District Court were that HRI and CRPL were conspiring to exclude Zenith and others from the Canadian **[**1581]** market; there was nothing indicating that this clear violation of the antitrust laws had terminated or that the threat to Zenith inherent in the conduct would cease in the foreseeable future. Neither the relative quiescence of the pool during the litigation nor claims that objectionable conduct

---

[23] Paragraph C of the District Court's injunction prohibits HRI from

"Entering into, adhering to, enforcing or claiming any rights under any contract, agreement, understanding, plan or program, with any other person, company, patent pool, organization, association, corporation or entity which directly or indirectly restricts or prevents defendant-counterclaimant, Zenith Radio Corporation, or any of its subsidiaries, from exporting any electronic apparatus from the United States into any foreign market."

[24] Section 16 provides:

***HN8*** "Any person, firm, corporation, or association shall be entitled to sue for and have injunctive relief, in any court of the United States having jurisdiction over the parties, *against threatened loss or damage by a violation of the antitrust laws*, . . . when and under the same conditions and principles as injunctive relief against threatened conduct that will cause loss or damage is granted by courts of equity, under the rules governing such proceedings . . . ." (Emphasis added.) 15 U. S. C. § 26.

would cease with the judgment negated the threat to Zenith's foreign trade. [25] **[*132]** That threat was too clear for argument, and injunctive relief against HRI with respect to the Canadian market was wholly proper.

***LEdHN[21B]*** [21B] ***LEdHN[22B]*** [22B]

***LEdHN[23A]*** [23A] ***LEdHN[24]*** [24] ***LEdHN[25]*** [25] ***LEdHN[26]*** [26]We also reinstate the injunction entered by the District Court insofar as it more broadly barred HRI from conspiring with others to restrict or prevent Zenith from entering any other foreign market. ***HN10*** In exercising its equitable jurisdiction, "[a] federal court has broad power to restrain acts which are of the same type or class as unlawful acts which the court has found to have been committed or whose commission in the future, unless enjoined, may fairly be anticipated from the defendant's conduct in the past." *NLRB v. Express Publishing Co., 312 U.S. 426, 435 (1941)*. See also *United States v. National Lead Co., 332 U.S. 319, 328-335 and n. 4 (1947)*. Given the findings that HRI was conspiring with the Canadian pool, its purpose to exclude Zenith from Canada and its violation of the Sherman Act were clearly established. Its propensity for arrangements of this sort was also indicated by the findings revealing its participation in similar pools operating in England and Australia. [26] Zenith, a company interested in expanding its foreign commerce and having suffered at the hands of HRI and its coconspirators in the Canadian market, was entitled to injunctive relief against like conduct by HRI in other **[*133]** world markets. **[***154]** We see no reason that the federal courts, in exercising the traditional equitable powers extended to them by § 16, should not respond to the "salutary principle that ***HN11*** when one has been found to have committed acts in violation of a law he may be restrained from committing other related unlawful acts." *NLRB v. Express Publishing Co., supra, at 436*. Although a district court may not enjoin all future illegal conduct of the defendant, or even all future violations of the antitrust laws, **[**1582]** however unrelated to the violation found by the court, *e. g.*, *New York, N. H. & H. R. Co. v. ICC, 200 U.S. 361, 401 (1906)*, "when the purpose to restrain trade appears from a clear violation of law, it is not necessary that all of the untraveled roads to that end be left open and that only the worn one be closed." *International Salt Co. v. United States, 332 U.S. 392, 400 (1947)*. This is particularly true in treble-damage cases, which are brought for private ends, but which also serve the public interest in that "they effectively pry open to competition a market that has been closed by defendants' illegal restraints." *Id., at 401*.

***LEdHN[23B]*** [23B]

III. THE PATENT-MISUSE ISSUE.

---

[25] HRI informs us that Hazeltine, having obtained an early termination of its licensing agreement with CRPL, is now prepared to license any one or more of its Canadian patents "with no restrictions on imports." Since Hazeltine's abandonment of its participation in the Canadian pool occurred only after -- and, apparently, in response to -- the District Court's judgment and decree, we cannot agree with the suggestion that injunctive relief as to Canada has been rendered unnecessary and inappropriate. See *United States* v. *Oregon State Medical Society*, 343 U.S. 326, 333 (1952); *United States* v. *Concentrated Phosphate Export Assn.*, 393 U.S. 199, 202-203 (1968). Although HRI is free to attempt to demonstrate in the future that the need for injunctive relief with respect to Canada has been eliminated, or that a change of circumstances elsewhere justifies additional modifications of the injunction, see, *e. g.*, *United States* v. *W. T. Grant Co.*, 345 U.S. 629, 633-636 (1953), we are not willing at this time to undertake a reappraisal of the injunction in light of post-trial developments.

[26] Having not disturbed the District Court's findings that HRI and Hazeltine were conspiring with English and Australian patent pools which refused to license imports, the Court of Appeals in any event should have sustained the injunction with respect to the English and Australian markets. These findings, together with Zenith's demonstrated intent to expand its export business, were sufficient foundation for the conclusion that continued participation by HRI and Hazeltine in the English and Australian pools posed a significant threat of loss or damage to Zenith's business.

Since the District Court's treble damage award for patent misuse was affirmed by the Court of Appeals, and HRI has not challenged that award in this Court, the only misuse issue we need consider at length is whether the Court of Appeals was correct in striking the last clause from Paragraph A of the injunction, [27] which enjoined HRI from

"A. Conditioning directly or indirectly the grant of a license to defendant-counterclaimant, Zenith Radio Corporation, or any of its subsidiaries, under any **[*134]** domestic patent upon the taking of a license under any other patent *or upon the paying of royalties on the manufacture, use or sale of apparatus not covered by such patent*." (Emphasis added.)

This paragraph of the injunction was directed at HRI's policy of insisting upon acceptance of its standard five-year package license agreement, covering the 500-odd patents within its domestic licensing portfolio and reserving royalties on the licensee's total radio and television sales, irrespective of whether the licensed patents were actually used in the products manufactured. [28]

***LEdHN[27]*** [27]In **[***155]** striking the last clause of Paragraph A the Court of Appeals, in effect, made two determinations. First, under its view of *Automatic Radio Mfg. Co. v. Hazeltine Research, Inc., 339 U.S. 827 (1950)*, conditioning the grant of a patent license upon payment of royalties on unpatented products was not misuse of the patent. Second, since such conduct did not constitute **[*135]** patent misuse, neither could it be violative of the antitrust laws within the meaning of § 16 of the Clayton Act, under which Zenith had sought and the District Court had granted the injunction. With respect to the first determination, we reverse the Court of Appeals. We hold that conditioning the grant of a patent license upon **[**1583]** payment of royalties on products which do not use the teaching of the patent does amount to patent misuse.

The trial court's injunction does not purport to prevent the parties from serving their mutual convenience by basing royalties on the sale of all radios and television sets, irrespective of the use of HRI's inventions. The injunction reaches only situations where the patentee directly or indirectly "conditions" his license upon the payment of royalties on unpatented products -- that is, where the patentee refuses to license on any other basis and leaves the licensee with the choice between a license so providing and no license at all. Also, the injunction takes effect only if the license is conditioned upon the payment of royalties "on" merchandise not covered by the patent -- where the express provisions of the license or their necessary effect is to employ the patent monopoly to collect royalties, not for the use of the licensed invention, but for using, making, or selling an article not within the reach of the patent.

---

[27] The District Court's injunction also included a paragraph barring HRI from continuing to coerce acceptance of its package license through the mechanism of offering a much lower royalty rate for those licensees who take a license on the entire package of patents rather than a license on merely a few of them. Paragraph B enjoined HRI from

"Conditioning directly or indirectly the grant of any license to defendant-counterclaimant, Zenith Radio Corporation, or any of its subsidiaries, under any domestic patent upon the payment of the same or greater royalty rate than the rate at which licenses have been granted or offered to others under a group of domestic patents which includes said patent."

The Court of Appeals modified this paragraph in certain respects, 388 F.2d, at 39, but we do not disturb these modifications.

[28] The District Court concluded:

"Plaintiff's demands that royalties be paid on admittedly unpatented apparatus constitute misuse of its patent rights and plaintiff cannot justify such use of the monopolies of its patents, by arguing the necessities and convenience to it of such a policy. While parties in an arms-length transaction are free to select any royalty base that may suit their mutual convenience, a patentee has no right to demand or force the payment of royalties on unpatented products." 239 F.Supp., at 77.

***LEdHN[28]*** [28] ***LEdHN[29]*** [29]***HN12*** A patentee has the exclusive right to manufacture, use, and sell his invention. See, *e. g.*, *Bement v. National Harrow Co., 186 U.S. 70, 88-89 (1902)*. The heart of his legal monopoly is the right to invoke the State's power to prevent others from utilizing his discovery without his consent. See, *e. g.*, *Continental Paper Bag Co. v. Eastern Paper Bag Co., 210 U.S. 405 (1908)*; *Crown Die & Tool Co. v. Nye Tool & Machine Works, 261 U.S. 24 (1923)*. The law also recognizes that he may assign to another his patent, in whole or in part, and may license others to practice his invention. See, **[*136]** *e. g.*, *Waterman v. Mackenzie, 138 U.S. 252, 255 (1891)*. But ***HN13*** there are established limits which the patentee must not exceed in employing the leverage of his patent to control or limit the operations of the licensee. Among other restrictions upon him, he may not condition the right to use his patent on the licensee's agreement to purchase, use, or sell, or not to purchase, use, or sell, another article of commerce not within the scope of his patent monopoly. *E. g., Ethyl Gasoline Corp. v. United States, 309 U.S. 436, 455-459 (1940)*; *International Salt Co. v. United States, 332 U.S. 392, 395-396 (1947)*. His right to set the price for a license does not extend so far, whatever privilege he has "to exact royalties as high as he can negotiate." *Brulotte v. Thys Co., 379 U.S. 29, 33 (1964).* **[***156]** And just as the patent's leverage may not be used to extract from the licensee a commitment to purchase, use, or sell other products according to the desires of the patentee, neither can that leverage be used to garner as royalties a percentage share of the licensee's receipts from sales of other products; in either case, the patentee seeks to extend the monopoly of his patent to derive a benefit not attributable to use of the patent's teachings.

***LEdHN[30]*** [30]In *Brulotte v. Thys Co., supra*, the patentee licensed the use of a patented machine, the license providing for the payment of a royalty for using the invention after, as well as before, the expiration date of the patent. Recognizing that the patentee could lawfully charge a royalty for practicing a patented invention prior to its expiration date and that the payment of this royalty could be postponed beyond that time, we noted that the post-expiration royalties were not for prior use but for current use, and were nothing less than an effort by the patentee to extend the term of his monopoly beyond that granted by law. *Brulotte* thus articulated in a particularized context the principle that a patentee may **[*137]** not use the power of his patent to levy a charge for making, using, **[**1584]** or selling products not within the reach of the monopoly granted by the Government.

*Automatic Radio* is not to the contrary; it is not authority for the proposition that patentees have *carte blanche* authority to condition the grant of patent licenses upon the payment of royalties on unpatented articles. In that case, Automatic Radio acquired the privilege of using all present and future HRI patents by promising to pay a percentage royalty based on the selling price of its radio receivers, with a minimum royalty of $ 10,000 per year. HRI sued for the minimum royalty and other sums. Automatic Radio asserted patent misuse in that the agreement extracted royalties whether or not any of the patents were in any way used in Automatic Radio receivers. The District Court and the Court of Appeals approved the agreement as a convenient method designed by the parties to avoid determining whether each radio receiver embodied an HRI patent. The percentage royalty was deemed an acceptable alternative to a lump-sum payment for the privilege to use the patents. This Court affirmed.

Finding the tie-in cases such as *International Salt Co. v. United States, 332 U.S. 392 (1947)*, inapposite, and distinguishing *United States v. United States Gypsum Co., 333 U.S. 364 (1948)*, as involving a conspiracy between patentee and licensees to eliminate competition, the Court considered reasonable the "payment of royalties according to an agreed percentage of the

licensee's sales," since "sound business judgment could indicate that such payment represents the most convenient method of fixing the business value of the privileges granted by the licensing agreement." *339 U.S., at 834*. It found nothing "inherent" in such a royalty provision which would extend the patent monopoly. Finally, the holding by the Court was stated to be that in licensing the use **[*138]** of patents ***HN14*** "it is not *per se* a misuse of patents to measure the consideration by a percentage of the licensee's sales." *Ibid*.

***LEdHN[31]*** [31]Nothing in the foregoing is inconsistent with the District **[***157]** Court's injunction against conditioning a license upon the payment of royalties on unpatented products or with the principle that patent leverage may not be employed to collect royalties for producing merchandise not employing the patented invention. The Court's opinion in *Automatic Radio* did not deal with the license negotiations which spawned the royalty formula at issue and did not indicate that HRI used its patent leverage to coerce a promise to pay royalties on radios not practicing the learning of the patent. No such inference follows from a mere license provision measuring royalties by the licensee's total sales even if, as things work out, only some or none of the merchandise employs the patented idea or process, or even if it was foreseeable that some undetermined portion would not contain the invention. It could easily be, as the Court indicated in *Automatic Radio*, that the licensee as well as the patentee would find it more convenient and efficient from several standpoints to base royalties on total sales than to face the burden of figuring royalties based on actual use. [29]***HN15*** If convenience of the parties rather than patent power dictates the total-sales royalty provision, there are no misuse of the patents and no forbidden conditions attached to the license.

***LEdHN[32]*** [32]The Court also said in *Automatic Radio* that if the licensee bargains for the privilege of using the patent in all of his products and agrees **[**1585]** to a lump sum or a percentage-of-total-sales royalty, he cannot escape payment **[*139]** on this basis by demonstrating that he is no longer using the invention disclosed by the patent. We neither disagree nor think such transactions are barred by the trial court's injunction. If the licensee negotiates for "the privilege to use any or all of the patents and developments as [he] desire[s] to use them," *339 U.S., at 834*, he cannot complain that he must pay royalties if he chooses to use none of them. He could not then charge that the patentee had refused to license except on the basis of a total-sales royalty.

***LEdHN[33]*** [33]But we do not read *Automatic Radio* to authorize the patentee to use the power of his patent to insist on a total-sales royalty and to override protestations of the licensee that some of his products are unsuited to the patent or that for some lines of his merchandise he has no need or desire to purchase the privileges of the patent. In such event, not only would royalties be collected on unpatented merchandise, but the obligation to pay for nonuse would clearly have its source in the leverage of the patent.

***LEdHN[34]*** [34]We also think ***HN16*** patent misuse inheres in a patentee's insistence on a percentage-of-sales royalty, regardless of use, and his rejection of licensee proposals to pay only for actual use. Unquestionably, a licensee must pay if he uses the patent. Equally, however, he may insist upon paying only for use, and not on the basis of total sales, including products in which he may use a competing patent or in which no patented ideas are used at all. There is nothing in the right granted the patentee to keep others **[***158]** from using, selling, or manufacturing

---

[29] The record and oral argument in *Automatic Radio* disclose no basis for the conclusion that Automatic Radio was forced into accepting the total-sales royalty rate by HRI's use of its patent leverage.

his invention which empowers him to insist on payment not only for use but also for producing products which do not employ his discoveries at all.

***LEdHN[35]*** [35] Of course, a licensee cannot expect to obtain a license, giving him the privilege of use and insurance against infringement suits, without at least footing the patentee's **[*140]** expenses in dealing with him. He cannot insist upon paying on use alone and perhaps, as things turn out, pay absolutely nothing because he finds he can produce without using the patent. If the risks of infringement are real and he would avoid them, he must anticipate some minimum charge for the license -- enough to insure the patentee against loss in negotiating and administering his monopoly, even if in fact the patent is not used at all. But we discern no basis in the statutory monopoly granted the patentee for his using that monopoly to coerce an agreement to pay a percentage royalty on merchandise not employing the discovery which the claims of the patent define.

***LEdHN[36]*** [36] ***LEdHN[37]*** [37]Although we have concluded that *Automatic Radio* does not foreclose the injunction entered by the District Court, it does not follow that the injunction was otherwise proper. Whether the trial court correctly determined that HRI was conditioning the grant of patent licenses upon the payment of royalties on unpatented products has not yet been determined by the Court of Appeals. And if there was such patent misuse, it does not necessarily follow that the misuse embodies the ingredients of a violation of either *§ 1* or *§ 2* of the Sherman Act, or that Zenith was threatened by a violation so as to entitle it to an injunction under § 16 of the Clayton Act. See, *e. g., Morton Salt Co. v. G. S. Suppiger Co., 314 U.S. 488, 490 (1942)*; *Transparent-Wrap Machine Corp. v. Stokes & Smith Co., 329 U.S. 637, 641 (1947)*; *Laitram Corp. v. King Crab, Inc., 245 F.Supp. 1019 (D. C. Alaska 1965)*. See also Report of the Attorney General's National Committee to Study the Antitrust Laws 254 (1955); R. Nordhaus & E. Jurow, Patent-Antitrust Law 122-123 (1961); Frost, Patent Misuse As A Per Se Antitrust Violation, in Conference on the Antitrust Laws and the **[**1586]** Attorney General's Committee Report 113-123 (J. Rahl & E. Zaidins ed., 1955). **[*141]** Cf. Staff of Antitrust Subcommittee of House Committee on the Judiciary, 84th Cong., 2d Sess., Antitrust Problems in the Exploitation of Patents 23 (Comm. Print. 1956); Schueller, The New Antitrust Illegality Per Se: Forestalling and Patent Misuse, 50 Col. L. Rev. 170, 184-200 (1950). Whether the findings and the evidence are sufficient to make out an actual or threatened violation of the antitrust laws so as to justify the injunction issued by the District Court has not been considered by the Court of Appeals, and we leave the matter to be dealt with by that court in the first instance.

Accordingly, the judgment of the Court of Appeals is affirmed in part and reversed in part, and the case is remanded to that court for further proceedings consistent with this opinion.

*It is so ordered.*

**Concur by:** HARLAN (In Part)

**Dissent by:** HARLAN (In Part)

**Dissent**

**[***159]** MR. JUSTICE HARLAN, concurring in part and dissenting in part.

I concur in Parts I and II of the Court's opinion. However, I do not join Part III, in which the Court holds that a patent license provision which measures royalties by a percentage of the

licensee's total sales is lawful if included for the "convenience" of both parties but unlawful if "insisted upon" by the patentee.

My first difficulty with this part of the opinion is that its test for validity of such royalty provisions is likely to prove exceedingly difficult to apply and consequently is apt to engender uncertainty in this area of business dealing, where certainty in the law is particularly desirable. In practice, it often will be very hard to tell whether a license provision was included at the instance of both parties or only at the will of the licensor. District courts will have the unenviable task of deciding whether the course of negotiations establishes "insistence" upon the suspect provision. Because of the uncertainty inherent **[*142]** in such determinations, parties to existing and future licenses will have little assurance that their agreements will be enforced. And it may be predicted that after today's decision the licensor will be careful to embellish the negotiations with an alternative proposal, making the court's unravelling of the situation that much more difficult.

Such considerations lead me to the view that any rule which causes the validity of percentage-of-sales royalty provisions to depend upon subsequent judicial examination of the parties' negotiations will disserve rather than further the interests of all concerned. Hence, I think that the Court has fallen short in failing to address itself to the question whether employment of such royalty provisions should invariably amount to patent misuse. [1]

My second difficulty with this part of the Court's opinion is that in reality it overrules an aspect of a prior decision of this Court, *Automatic Radio Mfg. Co. v. Hazeltine Research, Inc., 339 U.S. 827 (1950)*, without offering more than a shadow of a reason in law or economics for departing from that earlier ruling. Despite the Court's efforts to distinguish *Automatic Radio*, it cannot be denied that the Court there sustained a Hazeltine patent license of precisely the same tenor as the one involved here, on the ground that "this royalty provision does not create another monopoly; it creates no restraint of competition beyond the legitimate grant of the patent." *339 U.S., at 833*.

In finding significance for present purposes in some of the qualifying language **[**1587]** in *Automatic Radio*, I believe that the Court today has misconstrued that opinion. A reading of the opinion as a whole satisfies me that the **[*143]** *Automatic Radio* Court did not consider it relevant whether Hazeltine Research had "insisted" upon inclusion of the disputed provision, and that in emphasizing that the royalty terms had no "inherent" tendency to extend the patent monopoly **[***160]** and were not a "*per se*" misuse of patents, the Court was simply endeavoring to distinguish prior decisions in which patent misuse was found when the patent monopoly had been employed to "create *another* monopoly or restraint of competition." *339 U.S., at 832*. [2] (Emphasis added.) Until now no subsequent decision has in any way impaired this aspect of *Automatic Radio*. [3]

Since the Court's decision finds little if any support in the prior case law, one would expect from the Court an exposition of economic reasons for doing away with the *Automatic Radio* doctrine. However, the nearest thing to an economic rationale is the Court's declaration that:

---

[1] I find it unnecessary to consider the further question whether inclusion of such a provision should be held to violate the antitrust laws.

[2] The *Automatic Radio* Court explicitly distinguished a number of cases of that kind, including *United States* v. *United States Gypsum Co.*, 333 U.S. 364 (1948), and *Mercoid Corp.* v. *Mid-Continent Investment Co.*, 320 U.S. 661 (1944). See 339 U.S., at 832-833.

[3] *Brulotte* v. *Thys Co.*, 379 U.S. 29 (1964), involved a different question: whether a royalty based solely upon use of the invention could be collected for use occurring after the patent's expiration.

"just as the patent's leverage may not be used to extract from the licensee a commitment to purchase, use, or sell other products according to the desires of the patentee, neither can that leverage be used to garner as royalties a percentage share of the licensee's receipts from sales of other products; in either case, the patentee seeks to extend the monopoly of his patent to derive a benefit not attributable to use of the patent's teachings." *Ante*, at 136.

The Court then finds in the patentee a heretofore nonexistent right to "insist upon paying only for use, and not on the basis of total sales . . . ." *Ante*, at 139.

**[*144]** What the Court does not undertake to explain is *how* insistence upon a percentage-of-sales royalty enables a patentee to obtain an economic "benefit not attributable to use of the patent's teachings," thereby involving himself in patent misuse. For it must be remembered that all the patentee has to license is the right to use his patent. It is solely for that right that a percentage-of-sales royalty is paid, and it is not apparent from the Court's opinion why this method of determining the *amount* of the royalty should be any less permissible than the other alternatives, whether or not it is "insisted" upon by the patentee.

One possible explanation for the Court's result, which seems especially likely in view of the Court's exception for cases where the provision was included for the "convenience" of both parties, is a desire to protect licensees against overreaching. But the Court does not cite, and the parties have not presented, any evidence that licensees as a class need such protection. [4] Moreover, the Court does not explain why a royalty based simply upon use could not be equally overreaching.

Another possible justification for the Court's result might be that a royalty based directly upon use of the patent will tend to spur the licensee to "invent around" the patent or otherwise acquire a substitute which costs less, while a percentage-of-sales royalty can have no **[***161]** such effect because of the licensee's knowledge that he must pay the royalty regardless of actual patent use. No hint of **[**1588]** such a rationale appears in the Court's opinion. Moreover, under this theory a percentage-of-sales royalty would be objectionable largely because of resulting damage to the rest of the economy, through less efficient allocation of resources, rather than because of possible harm to the licensee. Hence, the theory might not **[*145]** admit of the Court's exception for provisions included for the "convenience" of both parties.

Because of its failure to explain the reasons for the result reached in Part III, the Court's opinion is of little assistance in answering the question which I consider to be the crux of this part of the case: whether percentage-of-sales royalty provisions should be held without exception to constitute patent misuse. A recent economic analysis [5] argues that such provisions may have two undesirable consequences. First, as has already been noted, employment of such provisions may tend to reduce the licensee's incentive to substitute other, cheaper "inputs" for the patented item in producing an unpatented end-product. Failure of the licensee to substitute will, it is said, cause the price of the end-product to be higher and its output lower than would be the case if substitution had occurred. [6] Second, it is suggested that under certain conditions a percentage-of-sales royalty arrangement may enable the patentee to garner for himself elements of profit, above the norm for the industry or economy, which are properly attributable not to the

---

[4] Cf. *American Photocopy Equip. Co.* v. *Rovico*, 359 F.2d 745 (1966).

[5] Baxter, Legal Restrictions on Exploitation of the Patent Monopoly: An Economic Analysis, 76 Yale L. J. 267 (1966).

[6] See *id.*, at 299-301, 302-306.

licensee's use of the patent but to other factors which cause the licensee's situation to differ from one of "perfect competition," and that this cannot occur when royalties are based upon use. [7]

If accepted, this economic analysis would indicate that percentage-of-sales royalties should be entirely outlawed. However, so far as I have been able to find, there has as yet been little discussion of these matters either by lawyers or by economists. And I find scant illumination on this score in the briefs and arguments of the parties in this case. The Court has pointed out both today and in **[*146]** *Automatic Radio* that percentage-of-sales royalties may be administratively advantageous for both patentee and licensee. In these circumstances, confronted, as I believe we are, with the choice of holding such royalty provisions either valid or invalid across the board, I would, as an individual member of the Court, adhere for the present to the rule of *Automatic Radio*.

**References**

Am Jur, Monopolies, Combinations, and Restraints of Trade (1st ed 102, 174, 181); Patents (1st ed 145, 149)10 Am Jur Legal Forms, Patents, Forms 10:865, 10:867, 10:1054-10:1102US L Ed Digest, Evidence 958; Judgment 208, 244; Patents 225, 232; Restraints of Trade and Monopolies 55, 58, 61, 67, 68, 77ALR Digests, Patents 19; Restraints of Trade and Monopolies 15, 18L Ed Index to Anno, Patents; Restraints of Trade and MonopoliesALR Quick Index, Patents; Restraints of Trade and Monopolies Annotation References:Cross licensing or pooling of patents as violation of antitrust laws. *75 L Ed 926.Validity of agreement to pay royalties for use of patented articles beyond patent expiration date. 3 ALR 3d 770.Who may be regarded as injured in his business or property within provisions of antitrust acts as to person who may recover damages resulting from violation of the acts. 139 ALR 1017.*

[7] See *id.*, at 300-301, 302-306, 331-332.

# EXHIBIT 300

Warning
As of: August 13, 2014 1:25 PM EDT

# ZF Meritor LLC v. Eaton Corp.

United States District Court for the District of Delaware
March 10, 2011, Decided
Civ. No. 06-623-SLR

**Reporter:** 769 F. Supp. 2d 684; 2011 U.S. Dist. LEXIS 24505; 2012-1 Trade Cas. (CCH) P77,789
ZF MERITOR LLC and MERITOR TRANSMISSION CORPORATION, Plaintiffs, v. EATON CORPORATION, Defendant.

**Subsequent History:** Affirmed in part and reversed in part by, Remanded by *ZF Meritor, LLC v. Eaton Corp., 696 F.3d 254, 2012 U.S. App. LEXIS 20342 (3d Cir. Del., 2012)*

**Prior History:** *ZF Meritor LLC v. Eaton Corp., 2009 U.S. Dist. LEXIS 83409 (D. Del., Sept. 14, 2009)*

**Core Terms**

transmission, antitrust, new trial, penetrate, jury's verdict, competitor, anti trust law, monopoly power, anticompetitive, monopolize, anticompetitive conduct, relevant market, terminate, reliable, target, truck, opinion testimony, credibility, monopolist, customer, rebate, lay opinion, manufacturer, acquisition, gatekeeping, conspiracy, foreclose, discount, supplier, barrier

**Case Summary**

## Overview

Defendant manufactured and sold heavy duty transmissions. The district court denied defendant's renewed motion for a judgment as a matter of law or for a new trial in an antitrust suit against it wherein the jury found that defendant violated the Sherman Act, *15 U.S.C.S. §§ 1* and *2*, and the Clayton Act, *15 U.S.C.S. § 14*, because there was sufficient evidence for the jury to find that defendant had foreclosed the market to competition by tying discounts to market penetration goals in its Long Term Agreements with retailers and with Original Equipment Manufacturers.

## Outcome

Motion denied.

**LexisNexis® Headnotes**

Civil Procedure > Trials > Judgment as Matter of Law > Directed Verdicts

***HN1*** In ruling on a renewed motion for judgment as a matter of law following a jury trial under *Fed. R. Civ. P. 50(b)*, the court must inquire whether there is any legally sufficient evidentiary basis for a reasonable jury to find for the plaintiff. In making that determination, the court must draw all reasonable inferences in favor of the plaintiff, and the court may not make credibility determinations or weigh the evidence. However, the question is not whether there is literally no evidence supporting the party against whom the *Rule 50(b)* motion is directed but whether there is evidence upon which the jury could properly find a verdict for that party.

Civil Procedure > Judgments > Relief From Judgments > Motions for New Trials

***HN2*** See *Fed. R. Civ. P. 59(a)*.

Civil Procedure > Judgments > Relief From Judgments > Motions for New Trials

***HN3*** New trials are commonly granted in the following situations: (1) where the jury's verdict is against the clear weight of the evidence, and a new trial must be granted to prevent a miscarriage of justice; (2) where newly-discovered evidence surfaces that would likely alter the outcome of the trial; (3) where improper conduct by an attorney or the court unfairly influenced the verdict; or (4) where the jury's verdict was facially inconsistent.

Civil Procedure > Judicial Officers > Judges > Discretionary Powers
Civil Procedure > Trials > Judgment as Matter of Law > Directed Verdicts
Civil Procedure > Judgments > Relief From Judgments > Motions for New Trials

***HN4*** The decision to grant a new trial rests entirely within the sound discretion of the trial court. In considering whether a new trial is appropriate under *Fed. R. Civ. P. 59*, the court need not view the evidence in the light most favorable to the verdict winner, a distinction from similar motions under *Fed. R. Civ. P. 50*. A new trial should only be granted where a miscarriage of justice would result if the verdict were to stand, the verdict cries out to be overturned, or where the verdict shocks the conscience. A court should be cautious to not replace the jury's view of evidence with its own. Nevertheless, where a trial is long and complicated and deals with a subject matter not lying within the ordinary knowledge of jurors, a verdict should be scrutinized more closely by the trial judge than is necessary where the litigation deals with material which is familiar and simple, the evidence relating to ordinary commercial practices.

Civil Procedure > Judgments > Relief From Judgments > Motions for New Trials
Evidence > Burdens of Proof > Allocation

***HN5*** The movant has the burden of proving that a new trial is warranted.

Antitrust & Trade Law > ... > Price Fixing & Restraints of Trade > Exclusive & Reciprocal Dealing > Exclusive Dealing

***HN6*** Antitrust injury is an injury of the type the antitrust laws were intended to prevent and that flows from that which makes the defendants' acts unlawful. The injury should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation. The antitrust-injury requirement helps ensure that the harm claimed by the plaintiff corresponds to the rationale for finding a violation of the antitrust laws in the first place, and it prevents losses that stem from competition from supporting suits by private plaintiffs for damages. Courts have consistently held that competitors frozen out by exclusive dealing arrangements have suffered an antitrust injury.

Antitrust & Trade Law > ... > Monopolies & Monopolization > Actual Monopolization > Claims

***HN7*** It is true that antitrust laws protect competition, not competitors. However, obtaining the absolute lowest price is not always antitrust's goal. Foreclosure of a market is a form of antitrust injury, especially where the foreclosure is by a monopolist.

Antitrust & Trade Law > ... > Price Fixing & Restraints of Trade > Cartels & Horizontal Restraints > Price Fixing

Antitrust & Trade Law > ... > Per Se Rule & Rule of Reason > Per Se Rule Tests > Manifestly Anticompetitive Effects

***HN8*** The United States Supreme Court has recently held that minimum resale price maintenance was not per se illegal because it can create competition in the form of retailer services. Minimum resale price maintenance involves a manufacturer dictating the price retail sellers can charge. While this may lead to higher prices, it in theory also can lead to increased customer service.

Evidence > ... > Lay Witnesses > Opinion Testimony > Helpfulness

***HN9*** See *Fed. R. Evid. 701*.

Evidence > ... > Lay Witnesses > Opinion Testimony > Helpfulness

***HN10*** *Fed. R. Evid. 701* represents a movement away from the courts' historically skeptical view of lay opinion evidence, and is rooted in the modern trend away from fine distinctions between fact and opinion and toward greater admissibility.

Civil Procedure > ... > Standards of Review > Harmless & Invited Errors > Harmless Error Rule
Evidence > Admissibility > Procedural Matters > Rulings on Evidence
Evidence > ... > Lay Witnesses > Opinion Testimony > Helpfulness

***HN11*** Even if lay opinion testimony is erroneously admitted, a finding of reversible error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected. In reviewing evidentiary rulings, if the court finds nonconstitutional error in a civil suit, such error is harmless only if it is highly probable that the error did not affect the outcome of the case.

Evidence > Admissibility > Expert Witnesses
Evidence > Admissibility > Expert Witnesses > Daubert Standard

***HN12*** The United States Supreme Court in Daubert v. Merrell Dow Pharmaceuticals, Inc., has made clear that courts have to play a gatekeeping role with respect to experts. According to the Supreme Court, *Fed. R. Evid. 702* is the primary locus of the gatekeeping role. Pursuant to *Rule 702*, a party can offer testimony of an expert witness at trial so long as the expert is qualified, the methodology the expert uses is reliable, and the opinion fits the facts of the case. A trial judge, then, is tasked with being a gatekeeper to ensure that 'any and all expert testimony is not only relevant, but also reliable.

Evidence > Admissibility > Expert Witnesses > Daubert Standard

***HN13*** See *Fed. R. Evid. 702*.

Evidence > ... > Procedural Matters > Preliminary Questions > Witness Qualifications
Evidence > Admissibility > Expert Witnesses > Daubert Standard
Evidence > Admissibility > Expert Witnesses > Helpfulness

***HN14*** As recognized by the United States Court of Appeals for the Third Circuit, while an expert's methodology is required to pass muster under *Fed. R. Evid. 702*, the data underlying the expert's opinion must pass muster under *Fed. R. Evid. 104* and *703*. More specifically, the Third Circuit, has made clear that it is the judge who makes the determination of reasonable reliance, and that for the judge to make the factual determination under *Fed. R. Evid. 104(a)* that

an expert is basing his or her opinion on a type of data reasonably relied upon by experts, the judge must conduct an independent evaluation into reasonableness. Because the policy considerations underlying the rules of evidence are the same, the reliability requirement for admission under *Fed. R. Evid. 104*, *702* and *703* should be the same, there must be good grounds on which to find the data reliable.

Evidence > ... > Procedural Matters > Preliminary Questions > Witness Qualifications

***HN15*** See *Fed. R. Evid. 104*.

Evidence > Admissibility > Expert Witnesses

***HN16*** See *Fed. R. Evid. 703*.

Evidence > Admissibility > Expert Witnesses > Daubert Standard
Evidence > Admissibility > Expert Witnesses > Helpfulness
Evidence > ... > Testimony > Expert Witnesses > Qualifications

***HN17*** When facts are in dispute, experts sometimes reach different conclusions based on competing versions of the facts. The emphasis in the amendment on sufficient facts or data is not intended to authorize a trial court to exclude an expert's testimony on the ground that the court believes one version of the facts and not the other. *Fed. R. Evid. 702*.

Antitrust & Trade Law > ... > Monopolies & Monopolization > Actual Monopolization > Claims

***HN18*** The Sherman Act, *15 U.S.C.S. § 2*, makes it unlawful to monopolize, attempt to monopolize, or conspire to monopolize, interstate or international commerce. It is the provision of the antitrust laws designed to curb the excesses of monopolists and near-monopolists. Liability under *§ 2* requires (1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident. The second element of a monopolization claim under *§ 2* requires the willful acquisition or maintenance of monopoly power. As that element makes clear, the acquisition or possession of monopoly power must be accompanied by some anticompetitive conduct on the part of the possessor. Anticompetitive conduct may take a variety of forms, but it is generally defined as conduct to obtain or maintain monopoly power as a result of competition on some basis other than the merits. Conduct that impairs the opportunities of rivals and either does not further competition on the merits or does so in an unnecessarily restrictive way may be deemed anticompetitive. Conduct that merely harms competitors, however, while not harming the competitive process itself, is not anticompetitive.

Antitrust & Trade Law > ... > Monopolies & Monopolization > Conspiracy to Monopolize > Sherman Act
Antitrust & Trade Law > Sherman Act > Claims
Antitrust & Trade Law > Sherman Act > Scope > Monopolization Offenses

***HN19*** The Sherman Act, *15 U.S.C.S. § 1*, provides that every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal. The Third Circuit has explained that the statutory language imposes two essential requirements on an antitrust plaintiff. First, the plaintiff must show that the defendant was a party to a contract, combination or conspiracy. Second, the plaintiff must show that the contract to which the defendant was a party imposed an unreasonable restraint on trade.

Antitrust & Trade Law > ... > Monopolies & Monopolization > Conspiracy to Monopolize > Sherman Act
Antitrust & Trade Law > Sherman Act > Claims
Antitrust & Trade Law > Sherman Act > Scope > Monopolization Offenses

***HN20*** Acquescense in an illegal scheme is as much a violation of the Sherman Act, *15 U.S.C.S. § 1*, as the creation and promotion of one. A *§ 1* conspiracy arises when an unwilling dealer, to avoid termination by its supplier promises to deal exclusively. Though co-conspirators must share a commitment to a common scheme which has an anticompetitive objective, they need not share an identical motive for engaging in concerted action in violation of *§ 1*.

**Counsel: [**1]** Karen V. Sullivan, Esquire of Drinker Biddle & Reath LLP, Wilmington, Delaware. Counsel for Plaintiffs. Of Counsel: Jay N. Fastow, Esquire of Dickstein Sapiro LLP, New York, New York. R. Bruce Holcomb, Esquire of Adams Holcomb LLP, Washington, D.C.

Donald E. Reid, Esquire of Morris Nichols, Arsht & Tunnell LLP, Wilmington, Delaware. Robert F. Ruyak and Joseph A. Ostoyich, Esquire of Howrey LLP, Washington, DC. Counsel for Defendant.

**Judges:** ROBINSON, District Judge.

**Opinion by:** ROBINSON

**Opinion**

**[*687] MEMORANDUM OPINION**

/s/ Sue L. Robinson

**ROBINSON District Judge**

## I. INTRODUCTION

Plaintiffs ZF Meritor LLC ("ZFM") and Meritor Transmission Corporation ("Meritor") (collectively, "plaintiffs") filed this action against defendant Eaton Corporation ("defendant") on October 5, 2006, alleging violations of Sections 1 and 2 of the Sherman Antitrust Act, *15 U.S.C. §§ 1-2*, and Section 3 of the Clayton Act, *15 U.S.C. § 14*. (D.I. 1) At all times relevant prior to trial, plaintiffs and defendant were rival manufacturers of Class 8 commercial truck transmissions. Following a trial, on October 20, 2009, a jury found that defendant violated Sections 1 and 2 of the Sherman Antitrust Act and Section 3 of the Clayton Act. (D.I. 226) The issue of **[**2]** damages was not tried. *(Id.)* Currently before the court is defendant's renewed motion for judgment as a matter of law or for a new trial. (D.I. 245) For the reasons stated below, defendant's motion is denied.

## II. BACKGROUND

### A. Parties and Market Conditions

Defendant began making heavy duty transmissions during the 1950's, and was the only manufacturer of heavy duty ("HD") manual transmissions before Meritor entered the market in 1989 with 9- and 10-speed manual transmissions for on-highway trucks. (D.I. 238 at 2488:22-2490:14; D.I. 233 at 1259:22-1260:7; D.I. 233 at 1259:15-1261:19) In mid-1999,

Meritor transferred its transmission business **[*688]** into a new joint venture with ZF AG, a large German company that had never before sold HD transmissions in North America. (D.I 233 at 1263:7-14; D.I. 231 at 867:14-15) One purpose of this venture was to adapt ZF's "ASTronic" on-highway automated mechanical transmission for the NAFTA market. (D.I. 233 at 1287:12-1289:10) The ASTronic (renamed the "FreedomLine") was introduced in April 2001. (D.I. 233 at 1289:11-14; D.I. 230 at 478:23-479:3)

A series of mergers in the mid-1990's reduced to four the number of truck Original Equipment Manufacturers ("OEMs") **[**3]** who purchased HD transmissions. (D.I. 238 at 2487:12-16; D.I. 242 at 3618:1-3619:11) In late 1999-early 2000, a severe economic downturn resulted in HD truck orders falling by 40-50%. (D.I. 233 at 1205:1-6; D.I. 230 at 654:6-14; D.I. 232 at 1033:9-1034:18) Shortly thereafter, defendant entered into new multi-year contracts (Long Term Agreements or "LTAs") with each OEM.

**B. The LTAs**

Defendant's LTA with Freightliner, the largest of the OEMs, had a five-year duration and contained rebates that were contingent on a 92% share penetration target. [1] (D.I. 249, PTX-115 at 2-3) Defendant had the right to terminate the LTA if Freightliner did not meet its share penetration target. *(Id.)* Freightliner was also required under the LTA to preferentially price defendant's transmissions against all competing products, make defendant's products standard equipment, and exclusively publish defendant's transmissions in its data books. [2] (D.I. 249, PTX-115, ex. E) [3]

Defendant's LTA with Paccar had similar characteristics. In exchange for a 90-95% share penetration target, Paccar would receive optional rebates from 2-3%. (D.I. 249, PTX-599 at 26) These rebates were conditioned on share penetration across all product lines, and failure of any one line would lead to a loss of rebate across all lines. *(Id.)* Defendant's products were to receive preferential pricing and become standard equipment **[**5]** In Paccar's data books. *(Id.* at 7) The LTA contained an up-front payment of $1 million dollars in lieu of certain price reductions and had a seven-year term. *(Id.* at 2-3)

The LTA with International had a five-year term and included year-over-year price decreases on medium duty products. (D.I. 249, DX-467 at 4-6) It also included a $2.5 million dollar up-front payment in lieu of certain price reductions that was to be returned on a pro-rata basis in the event of termination of the agreement. *(Id.)* Additional rebates of 0.35%-2% were conditioned on International buying 87-97.5% of its HD transmission needs from defendant (*ld.*, Schedule 8.3)

**[*689]** Finally, Volvo's LTA had a five-year term and required that defendant's HD transmissions were listed as the standard offering for all Volvo North America trucks. (D.I. 249, DX-515 at 1)

---

[1] Share penetration targets are different from volume targets. A share penetration target is based solely on the percentage of the OEM's trucks that incorporate defendant's transmissions. (D.I. 231 at 862:18-863:2) So, for example, 92% of Freightliner's **[**4]** trucks needed to incorporate defendants' transmissions in order to meet its penetration goal. If Freightliner built only one truck in a given year and it incorporated defendant's transmission, Freightliner would still meet its 92% share penetration target.

[2] A data book is a term of art in the trucking industry. It represents the truck broken down into its core components, and provides the customer with a list of options when building the truck. (D.I. 229 at 320:1-16) For example, in the "seats" section of the data book, the customer may have a choice between Sears brand seats or Bostrom brand seats. *(Id.)* The same applies for other components such as engines and transmissions. *(Id.)*

[3] Many of the LTAs included additional benefits such as dedicated engineering support.

As with the Freightliner LTA, defendant had the ability to terminate if Volvo did not meet its share penetration target. *(Id.* at 8) If Volvo did reach its penetration targets of 70-78%, it would receive a discount of 0.5%-1.5%. *(Id.*, Attachment B)

Each of the LTAs contained a "competitive" clause that allowed the OEM to purchase transmissions from another supplier if **[**6]** said supplier offered the OEM a lower price, the OEM notified defendant of the price, and the price could not be met after good faith negotiations. (D.I. 249, DX-515 at 7; PTX-599 at 32; DX-467 at 15; PTX-115 at 3) Upon invoking the clause, the remaining provisions of the LTA remained in full force and effect, however, the OEM could remove defendant's product as standard equipment. *(Id.)*

For Freightliner, if not for all of the OEMs, these LTAs represented a substantial departure from their previous supply contracts. Prior to the LTAs, it was uncommon for a contract to include penetration targets. (D.I. 231 at 950:3-13) It was also uncommon to require preferential pricing of one supplier's products over another's and to require that an OEM exclusively publish one manufacturer's products in its data book. *(Id.* at 950:14-951:10)

### 3. ZFM's Exit From the Market

Despite the existence of the LTAs, ZFM's market share of on-highway HD transmissions increased at three of the four OEMs between 2000 and 2003. (D.I. 236 at 1987:19-1991:7) Irrespective of this growth, ZFM believed that it was limited by the LTAs to approximately 8% of the transmission market, and not the 30% that it had originally expected **[**7]** at the beginning of the joint venture. (D.I. 230 at 504:3-505:15) Because of this, ZFM concluded that it did not have enough potential market share to "industrialize" its transmissions and maintain viability as an ongoing business. (*Id.* at 505:22-506:9) The decision was made to dissolve the joint venture in 2003. (*id.* at 506:12-20)

## III. LEGAL STANDARDS

### A. Motion for Judgment as a Matter of Law

***HN1*** In ruling on a renewed motion for judgment as a matter of law following a jury trial under *Federal Rule of Civil Procedure 50(b)*, the court must "inquire whether there is any legally sufficient evidentiary basis for a reasonable jury to find for [plaintiff]." *Weisgram v. Marley Co., 528 U.S. 440, 453-54, 120 S. Ct. 1011, 145 L. Ed. 2d 958 (2000)* (internal quotations omitted). In making this determination, the court "must draw all reasonable inferences in favor of [plaintiff], and [the court] may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000)*. However, "[t]he question is not whether there is literally no evidence supporting the party against whom the [*Rule 50(b)*] motion is directed but whether there is evidence upon which the jury could properly find a **[**8]** verdict for that party." *Lightning Lube, Inc. v. Witco Corp., 4 F.3d 1153, 1166 (3d Cir. 1993)* (citing *Patzig v. O'Neil, 577 F.2d 841, 846 (3d Cir. 1978))*.

### B. **Motion for a New** Trial

*Federal Rule of Civil Procedure 59(a)* provides, in pertinent part:

> ***HN2*** A new trial may be granted to all or any of the parties and on all or part of the issues in an action in which there has been a trial by jury, for any of the reasons for which

> new trials have heretofore **[*690]** been granted in actions at law in the courts of the United States.***HN3*** New trials are commonly granted in the following situations: (1) where the jury's verdict is against the clear weight of the evidence, and a new trial must be granted to prevent a miscarriage of justice; (2) where newly-discovered evidence surfaces that would likely alter the outcome of the trial; (3) where improper conduct by an attorney or the court unfairly influenced the verdict; or (4) where the jury's verdict was facially inconsistent. *See* Zarow-Smith v. NJ. *Transit Rail Operations, 953 F. Supp. 581, 584 (D.N.J. 1997)* (citations omitted).

***HN4*** The decision to grant a new trial rests entirely within the sound discretion of the trial court. *Allied Chemical Corp. v. Daiflon, Inc., 449 U.S. 33, 36, 101 S. Ct. 188, 66 L. Ed. 2d 193 (1980)*; **[**9]** *Wagner v. Fair Acres Geriatric Ctr., 49 F. 3d 1002, 1017 (3d Cir. 1995)*. In considering whether a new trial is appropriate under *Rule 59*, the "court need not view the evidence in the light most favorable to the verdict winner, a distinction from similar motions under *Rule 50*." *McMillan v. Weeks Marine, Inc.*, 478 F. Supp.2d 651, 655 (D. Del. 2007). A new trial should only be granted where "a miscarriage of justice would result if the verdict were to stand, the verdict cries out to be overturned, or where the verdict shocks the conscience." *Williamson v. Consolidated Rail Corp., 926 F.2d 1344, 1352 (3d Cir. 1991)*; *Montgomery County v. MicroVote Corp., 152 F. Supp. 2d 784, 795 (E.D. Pa. 2001)*; *Barbee v. Southeastern Pennsylvania Transp. Authority, Civ. No. 04-4063, 2007 U.S. Dist. LEXIS 7183, 2007 WL 675851, at *2 (E.D. Pa. 2007)*. A court should be cautious to not replace the jury's view of evidence with its own. *Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc., 589 F. Supp. 2d 505, 508 (D. Del. 2008)*. Nevertheless,

> [w]here a trial is long and complicated and deals with a subject matter not lying within the ordinary knowledge of jurors, a verdict should be scrutinized more closely by the trial judge **[**10]** than is necessary where the litigation deals with material which is familiar and simple, the evidence relating to ordinary commercial practices.*Mattern & Associates, L.L.C. v. Seidel, 678 F. Supp. 2d 256, 264 (D. Del. 2010)* (quoting *Lind v. Schenley Indus. Inc., 278 F.2d 79, 90-91 (3d Cir. 1960)* (en banc)). ***HN5*** The movant has the burden of proving that a new trial is warranted. *Weeks Marine, Inc.*, 478 F. Supp. 2d at 655.

## IV. DISCUSSION

### A. Sufficiency of Evidence of Injury to Competition or Customers

1. Standard

***HN6*** Antitrust injury is "an injury of the type the antitrust laws were intended to prevent and that flows from that which makes the defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 489, 97 S. Ct. 690, 50 L. Ed. 2d 701 (1977)*. "The injury should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation." *Id.* "The antitrust-injury requirement helps ensure 'that the harm claimed by the plaintiff corresponds to the rationale for finding a violation of the antitrust laws in the first place, and it prevents losses that stem from competition from supporting suits by private plaintiffs

for. . . damages.'" *West Penn Allegheny Heath Sys. Inc. v. UPMC, 627 F.3d 85, 101 (3d Cir. 2010)* **[**11]** (citing *Atl. Richfield Co. v. USA Petroleum Co., 495 U.S. 328, 342, 110 S. Ct. 1884, 109 L. Ed. 2d 333 (1990))*. "Courts have consistently held that competitors frozen out by exclusive dealing arrangements have suffered an antitrust injury." *3M v.* **[*691]** *Appleton Papers, Inc., 35 F. Supp. 2d 1138, 1147 (D. Minn. 1999)*. *See also* Stop & Shop Supermarket Co. v. Blue Cross and Blue Shield of Rhode Island, 373 F. 3d 57, 66 (1st Cir. 2004)*; *Blackburn v. Sweeney, 53 F.3d 825, 830 (7th Cir. 1995)* ("harm inflicted on an excluded competitor... [is an] antitrust injury[]"); *Jefferson Parish Hosp. Dist No. 2 v. Hyde, 466 U.S. 2, 45, 104 S. Ct. 1551, 80 L. Ed. 2d 2 (1984)* (rev'd on other grounds).

**2. Discussion**

Plaintiffs' theory of the case was that defendant's use of the LTAs injured competition by excluding plaintiffs from the marketplace, and injured consumers by depriving them of their ability to choose HD transmissions on the trucks they ordered. (D.I. 248 at 3) In support of its motion, defendant argues that there is insufficient evidence of injury to competition or customers to support the jury's finding of liability because the LTAs that form the basis of the anticompetitive conduct in question led to lower prices. (D.I. 246 at 27)

Defendant's argument misinterprets **[**12]** the goals of the antitrust laws. ***HN7*** It is true that antitrust laws protect competition, not competitors. *Leegin Creative Leather Prods., Inc. v. PSKS, Inc., 551 U.S. 877, 906, 127 S. Ct. 2705, 168 L. Ed. 2d 623 (2007)*. However, obtaining the absolute lowest price is not always antitrust's goal. [4] Foreclosure of a market is a form of antitrust injury, especially where the foreclosure is by a monopolist. *LePage's Inc. v. 3M, 324 F.3d 141,157-58 (3d Cir. 2003)*; *see also* *Brown Shoe Co. v. U.S., 370 U.S. 294, 329, 82 S. Ct. 1502, 8 L. Ed. 2d 510 (1962)*. As discussed below, there was sufficient evidence for the jury to find that defendant had foreclosed the market to competition by tying discounts to market penetration goals in its LTAs with OEMs.

Defendant relies on *Concord Boat Corp. v. Brunswick Corp., 207 F.3d 1039, 1060 (8th Cir. 2000)*, **[**14]** to argue that market share discount programs are not anticompetitive when they do not require customers to purchase 100% from one source or to refrain from purchasing from competitors. (D.I. 254 at 9) While, in theory, OEMs were free to "walk away from [defendant's]

---

[4] For example, ***HN8*** the Supreme Court recently held that minimum resale price maintenance was not *per se* illegal because it can create competition in the form of retailer services. *Leegin Creative Leather Prods.*, 551 U.S. at 903-905. Minimum resale price maintenance involves a manufacturer dictating the price retail sellers can charge. While this may lead to higher prices, it (in theory) also can lead to increased customer service. As the Supreme Court reasoned:

> Absent vertical price restraints, the retail services that enhance **[**13]** interbrand competition might be underprovided. This is because discounting retailers can free ride on retailers who furnish services and then capture some of the increased demand those services generate. Consumers might learn, for example, about the benefits of a manufacturer's product from a retailer that invests in fine showrooms, offers product demonstrations, or hires and trains knowledgeable employees. Or consumers might decide to buy the product because they see it in a retail establishment that has a reputation for selling high-quality merchandise. If the consumer can then buy the product from a retailer that discounts because it has not spent capital providing services or developing a quality reputation, the high-service retailer will lose sales to the discounter, forcing it to cut back its services to a level lower than consumers would otherwise prefer. Minimum resale price maintenance alleviates the problem because it prevents the discounter from undercutting the service provider. With price competition decreased, the manufacturer's retailers compete among themselves over services. *Id.* at 890-91 (internal citations omitted).

discounts at any time," *id. at 1062-63*, this does not end the analysis. As the court in *Concord Boat* stated, "the principal criteria **[*692]** used to evaluate the reasonableness of a contractual arrangement include the extent to which competition has been foreclosed in a substantial share of the relevant market, the duration of any exclusive arrangement, and the height of entry barriers." *Id. at 1059*.

There is sufficient evidence for the jury to have found that the LTAs were unreasonable restraints of trade. First, there was evidence that the contracts foreclosed a substantial share of the relevant market. As discussed *supra*, in order to obtain the pricing incentives, each OEM was required to order 80% or more of its transmissions from defendant. (D.I. 249, PTX-115 at 3; D.I. 249, PTX-599 at 26) There is no evidence of record that shows that these market penetration goals were necessary for defendant to support its discount program. **[**15]** For Freightliner, the largest of the OEMs, failure to meet defendant's penetration goal of 92% gave defendant the right to unilaterally terminate the sales agreement. (D.I. 249, PTX-115 at 3) It had been demonstrated to Freightliner that defendant would refuse to pay rebates if Freightliner did not meet its penetration goals. (D.I. 249, PTX-159R at 5) Given the use of rebates as a "big hammer," the jury could conclude that it was reasonable for Freightliner to assume that defendant was willing to terminate its sales agreement had its penetration goals not been met. *(Id.)* In that regard, a reasonable jury also could have concluded that compliance with the market penetration targets was mandatory because no risk averse business would jeopardize its relationship with the largest manufacturer of transmissions in the market.

Additionally, the OEMs believed that the LTAs killed plaintiffs' business. A Freightliner executive wrote: "This is a dangerous situation. We have already killed [plaintiffs'] transmission business. It is just a matter of time now before they close the doors." (D.I. 24, PTX-531) He testified to the same at trial. (D.I. 233 at 1110:14-1111:6) The statements of the OEMs, **[**16]** combined with the LTAs' penetration targets and termination provisions, constitute sufficient evidence for a jury to find that defendant foreclosed a substantial share of the relevant market, and support the jury's verdict that the LTAs were an unreasonable restraint of trade.

The duration of the LTAs also supports the jury's verdict. Each of the LTAs lasted five to seven years. (D.I. 249, PTX-115 at 2; PTX-599 at 2; DX-467 at 4; DX-515 at 1) This is in stark contrast to the majority of the agreements in *Brunswick* that lasted two to three years. *Brunswick, 207 F.3d at 1044*. Indeed, the duration of these LTAs was substantially longer than defendant's previous contracts with the OEMs. (D.I. 231 at 950:3-13) This supports the jury's verdict that the contracts at issue were an unreasonable restraint of trade.

Finally, the record reflects barriers to entry that support the jury's verdict. There was not a single new entrant in the HD transmission market from 1989 to 2007, save ZF, who only entered after starting a joint venture with Meritor. (D.I. 239 at 2824:2-21) Even Volvo, who manufactures its own transmissions, entered into an LTA with defendant for a large majority of its needs. (D.I. **[**17]** 234 at 1576:25-1578:3) Defendant's power over the market was so strong that it was able to persuade Freightliner to remove plaintiffs from its data books. (D.I. 249, PTX-155, ex. E; PTX-633) This is credible evidence of high barriers to entry and supports the jury's verdict. As the Third Circuit said in *LePage's*, "the jury could have reasonably found that [defendant's] exclusionary conduct cut [plaintiffs] off **[*693]** from key retail pipelines necessary to permit it to compete profitably." *LePage's, 324 F.3d at 159*.

**B. Lay Opinion Testimony as to Causation**

In support of its argument that plaintiffs have failed to demonstrate that their injury flows from that which makes defendant's acts unlawful, defendant claims that all of plaintiffs' lay witnesses proffered "feelings" and "opinions" that they believed the contracts restricted the OEMs, [5] yet no OEM directly testified that it was restricted by its LTA with defendant, (D.I. 260 at 30-31) Defendant argues that this opinion testimony should not have been admitted and, without it, plaintiffs have made no showing of causation. *(Id.)*

**1. Standard**

***HN9*** If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences **[**18]** is limited to those opinions or inferences which are (a) rationally based on the perception of the witness, (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge within the scope of *Rule 702*.*Fed. R. Evid. 701*. "*Rule 701****HN10*** represents a movement away from . . . courts' historically skeptical view of lay opinion evidence, and is rooted in the modern trend away from fine distinctions between fact and opinion and toward greater admissibility." *U.S. v. Stadtmauer, 620 F.3d 238, 262 (3d Cir. 2010)* (quotations and citations omitted).

***HN11*** Even if lay opinion testimony is erroneously admitted, "a finding of reversible error 'may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected.'" *Becker v. ARCO Chemical Co., 207 F.3d 176, 205 (3d. Cir. 2000)* (citations omitted) "In reviewing evidentiary rulings, if the Court finds nonconstitutional error in a civil suit, such error is harmless only if it is highly probable that the error did not affect the outcome of the case." *Id.*

**2. Discussion**

Defendant mistakenly claims that the court erroneously admitted lay opinion testimony over objection. (D.I. 246 at 29-32) With respect to Mr. Lutz, the court not only told plaintiffs to rephrase the question that led to the testimony, but also instructed the jury to disregard Mr. Lutz's answer. (D.I. 232 at 1000:9-13) Other testimony, such as Mr. Martello's opinion that OEMs were "afraid" defendant "would give them a much higher price on the product that we could not protect," was admitted over a hearsay objection, **[**20]** not an improper lay opinion objection. [6] (D.I. 233 at 1180:9-1181:14) Consequently, "[defendant] may not seek a new trial on the basis of objections to evidence not brought to the court's attention at the original trial." *Laymon v. Lobby House, Inc. 613 F. Supp. 2d 504, 517 n.64 (D. Del. 2009)*; **[*694]** *Belmont Indus., Inc. v. Bethlehem Steel Corp., 512 F.2d 434, 438 (3d Cir. 1975)*.

Defendant relies on *Hirst v. Inverness Hotel Corp., 544 F.3d 221, 225, 50 V.I. 1122 (3d. Cir 2008)*, to argue that the court was placed on notice of its lay opinion objection because its "hearsay"

---

[5] For example, Mr. Lutz, a ZF employee, told the jury his "understanding" that Volvo/Mack was "scared to give business to us because they fear they will be penalized by [defendant] on the products which we cannot give them and they would still have to purchase from [defendant]." (D.I. 232 at 999:7-1000:14) Mr. Martello, president of ZFM, opined that the OEMs were "afraid" defendant would "give them a much higher price on the products that we could not protect[.]" (D.I. 233 at 1180:9-1181:14, 1189:14-19) Mr. Kline, Vice President of Meritor's **[**19]** truck division, told the jury that OEM customers purportedly "explained" to him that "there were very, very restrictive agreements in place." (D.I. 230 at 490:12-22)

[6] The testimony of Mr. Kline was also admitted over a hearsay objection, and not an improper opinion objection. (D.I. 230 at 490:12-22)

objection at trial is sufficient to cover an improper lay opinion. (D.I. 254 at 11 n.6) The court finds this argument unpersuasive. Expanding *Hirst* to such a degree would vitiate any utility that a specific objection affords both the parties and the court. The objections made in *Hirst were* improper foundation, speculation and, most importantly, "[n]ot an expert witness." *Hirst, 544 F.3d at 225*. These objections would have put the court and parties on notice of an "improper lay opinion" [7] objection, whereas **[**21]** a "hearsay" objection does not.

Assuming, *arguendo*, that the opinion testimony of plaintiffs' lay witnesses was improperly admitted, it was harmless, as it is "highly probable that it did not affect the outcome of the case." [8] The jury heard testimony from plaintiffs' expert witness that defendant's conduct caused the alleged injuries. (D.I. 235 at 1885-89) The jury knew of the LTAs, read them, and heard testimony about them. The jury was also privy to defendant's internal communications which contained similar statements, that the "[OEMs] have expressed their concern that we hold them 'hostage' by virtually forcing them to not offer [competitor's] products their customers demand. ... [We] have to work harder to keep the competition out." (D.I. 249, PTX-662 at 2) Members of the jury were free to judge the credibility of the witnesses and evidence, and eventually decided that plaintiffs' injuries flowed from anticompetitive conduct embodied within the LTAs.

**C. Dr. DeRamus' Opinions on Antitrust** Injury

Defendant argues that Deramus' conclusions on antitrust injury are unsupported by the facts in the case, and cannot support the jury's verdict. (D.I. 246 at 32-33) Defendant's arguments essentially mirror those made in its *Daubert* motion of May 5, 2009. (D.I. 106) Because defendant's motion was timely filed, and the court limited its analysis to DeRamus' damages opinion, it will now address causation. *ZF Meritor v. Eaton Corp.*, 646 F. Supp. 2d 663, 668 (D. Del. 2009).

**1. Standard**

***HN12*** The Supreme Court in *Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 597, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993)*, made clear that courts have to play a gatekeeping role with respect to experts. According to the Supreme Court, *Rule 702 of the Federal Rules of Evidence*[9] is the primary locus of the gatekeeping role. Pursuant to *Rule 702*, a party **[*695]** can offer testimony of an expert witness at trial so long as the expert is qualified, the methodology the expert uses is **[**23]** reliable, and the opinion fits the facts of the case. *See Elcock v. Kmart Corp., 233 F.3d 734, 741 (3d Cir. 2000)*. A trial judge, then, is tasked with being a "'gatekeeper'

---

[7] The court notes that "not an expert" is all but synonymous with "improper lay opinion."

[8] *Compare Hirst*, 544 F.3d at 228 (granting a new trial because improperly admitted lay opinion testimony was admitted on the issue of causation **[**22]** which was a "close case"); *Donlin v. Philips Lighting North Am. Corp.*, 581 F.3d 73, 83 (3d Cir. 2009) (vacating judgment where improper lay opinion testimony formed a significant share of the damages evidence presented at trial).

[9] *Rule 702* provides:

> ***HN13*** If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.*Fed. R. Evid. § 702*.

to ensure that 'any and all expert testimony is not only relevant, but also reliable.'" *Pineda v. Ford Motor Co., 520 F.3d 237, 243 (3d Cir. 2008)*.

***HN14*** As recognized by the United States Court of Appeals for the Third Circuit, while an expert's methodology is required to pass muster under *Rule 702*, the data underlying the expert's opinion must pass muster under *Rules 104*[10] and *703*. [11] More specifically, the Third Circuit, in *In re Paoli R.R. Yard PCB Litig., 35 F.3d 717 (3d Cir. 1994)*, **[**24]** made clear "that it is the judge who makes the determination of reasonable reliance, and that for the judge to make the factual determination under *Rule 104(a)* that an expert is basing his or her opinion on a type of data reasonably relied upon by experts, the judge must conduct an independent evaluation into reasonableness." *Id. at 748*. The Third Circuit concluded in *In re Paoli* that, because the policy considerations underlying the rules of evidence are the same, [12] the "reliability requirement" for admission under *Rules 104*, *702* and *703* should be the same - "there must be good grounds on which to find the data reliable." *Id.*

**2. Discussion**

Defendant argues that Deramus' conclusions on antitrust injury are unsupported by the facts in the case, and cannot support the jury's verdict. (D.I. 246 at 32-33) Once again relying on *Brook Group*, defendant bases its arguments on the fact that its prices were at all times lower than that of plaintiffs', and that the OEMs sought out the LTAs. *(Id.* at 33-34). Defendant essentially argues that, so long **[**26]** as its prices were above its costs, it is insulated from antitrust review. However, this is not the law. Exclusion of competition is sufficient injury to give rise to liability. *LePage's, 324 F.3d at 159*.

Unlike DeRamus' damages opinion that relied on a single page of estimates from a business plan prepared for a business formed within the year, [13] his opinion on liability is more substantive,

---

[10] Rule 104 provides:

> ***HN15*** (a) **Questions of admissibility generally.** Preliminary questions concerning the qualification of a person to be a witness, the existence of a privilege, or the admissibility of evidence shall be determined by the court, subject to the provisions of subdivision (b)....
>
> (b) **Relevance conditioned on fact.** When the relevance of evidence depends upon the fulfillment of a condition of fact, the court shall admit it upon, or subject to, the introduction of evidence sufficient to support a finding of the fulfillment of the condition.Fed. R. Evid. § 104.

[11] Rule 703 **[**25]** provides:

> ***HN16*** The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence in order for the opinion or inference to be admitted[.]Fed. R. Evid. § 703.

[12] Although the Third Circuit did not take the opportunity to expound on what these policy considerations are, it cannot be disputed that the touchstone of a trial judge's responsibilities is to provide to each jury the tools it needs to return a reasoned verdict, based upon appropriate legal instructions and evidence that is reliable and trustworthy.

[13] See this court's opinion on defendant's previous *Daubert* motion in *ZF Meritor*, 646 F. Supp 2d at 668.

and meets the standard for an expert opinion under *Rule 702*. In forming his opinion, DeRamus relied upon the exclusionary **[*696]** nature of the LTAs to opine as to plaintiffs' antitrust injury, and he stated the grounds for his opinion regarding the LTAs clearly during trial. (D.I. 235 at 1885-89) He discussed high barriers to entry, increases in price, and harm to customer choice. (D.I. 236 at 1889-1896) While some of his statements may have been contradicted by opposing evidence, DeRamus' testimony need not be automatically excluded.

> ***HN17*** When facts are in dispute, experts sometimes reach different conclusions based on competing versions of the facts. The emphasis in the amendment on "sufficient facts or data" is not intended to authorize a trial court to exclude an expert's testimony on the ground that the **[**27]** court believes one version of the facts and not the other.*S.E.C. v. Johnson, 525 F. Supp. 2d 70, 76 (D.D.C. 2007)* (quoting the advisory committee on *Fed. R. Evid. 702*). "Defendant's criticism of... [DeRamus'] alleged misconstruction of facts would appear to serve better as fodder for cross-examination than as grounds for a ruling *in limine." Id.* "[T]he credibility of [plaintiffs'] expert[] was for the jury to determine. [DeRamus] was extensively cross-examined and,... [i]n the end, the jury found [DeRamus] to be credible." *LePage's, 324 F.3d at 165*.

Defendant further argues that "DeRamus did not proffer any economic test of whether [defendant's] conduct was 'exclusionary' or foreclosed competition." (D.I. 246 at 33) To the contrary, by engaging in an analysis of defendant's monopoly power, barriers to entry, and exclusive dealing, then comparing the detrimental effects of these factors with their procompetitive justifications, he engaged in a rule of reason analysis similar to that found in *Dentsply* [14] *and LePage's.* [15] (D.I. 236 at 1899:10-1901:8) Plaintiffs second expert, Dr. Michael **[**28]** H. Riordan ("Riordan"), described this as a "consumer welfare analysis" and opined that DeRamus conducted the test correctly. (D.I. 123 at A-325-28)

**D. Sufficiency of Evidence of Monopoly Conduct**

Defendant's challenge to the sufficiency of evidence of monopoly conduct is largely repetitive of its arguments about the sufficiency of evidence of injury to competition or customers as discussed *supra.* First, defendant argues that the OEMs benefitted from lower prices and greater total value. (D.I. 246 at 36) Second, defendant argues that DeRamus' opinion that defendant exercised monopoly power is also insufficient to prop-up the jury's verdict because it depends on his incorrect definition of the relevant market. (*Id.* at 37)

**1. Standard**

*Section 2* of the Sherman Act ***HN18*** makes it unlawful to monopolize, attempt to monopolize, or conspire to monopolize, interstate or international commerce. *15 U.S.C. § 2*. It is "the provision of the antitrust laws designed to curb the excesses of monopolists and near-monopolists." *LePage's Inc. v. 3M, 324 F.3d 141, 169 (3d Cir. 2003)* (en banc). Liability under *§ 2* requires **[**29]** "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *United States v. Grinnell Corp., 384 U.S.*

---

[14] US. *v. Dentsply Int'l, Inc.*, 399 F.3d 181, 187-197 (3d Cir. 2005).

[15] *LePage's*, 324 F.3d at 154-164.

*563, 570-71, 86 S. Ct. 1698, 16 L. Ed. 2d 778 (1966)*; *Schuylkill Energy Resources v. Pennsylvania Power & Light Co., 113 F.3d 405, 412-13 (3d Cir. 1997)*.

The second element of a monopolization claim under *§ 2* requires the willful **[*697]** acquisition or maintenance of monopoly power. As this element makes clear, the acquisition or possession of monopoly power must be accompanied by some anticompetitive conduct on the part of the possessor. *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP, 540 U.S. 398, 407, 124 S. Ct. 872, 157 L. Ed. 2d 823 (2004)*. Anticompetitive conduct may take a variety of forms, but it is generally defined as conduct to obtain or maintain monopoly power as a result of competition on some basis other than the merits, *Lepage's, 324 F.3d at 147*, Conduct that impairs the opportunities of rivals and either does not further competition on the merits or does so in an unnecessarily restrictive way may be deemed anticompetitive. *Aspen Skiing Co. v. Aspen Highlands Skiing Corp., 472 U.S. 585, 604-05 n. 32, 105 S. Ct. 2847, 86 L. Ed. 2d 467 (1985)*. **[**30]** Conduct that merely harms competitors, however, while not harming the competitive process itself, is not anticompetitive. *See* *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp., 509 U.S. 209, 224, 113 S. Ct. 2578, 125 L. Ed. 2d 168 (1993)* ("It is axiomatic that the antitrust laws were passed for 'the protection of competition, not competitors.'" (quoting *Brown Shoe, 370 U.S. at 320*)); *Spectrum Sports, Inc. v. McQuillan, 506 U.S. 447, 458, 113 S. Ct. 884, 122 L. Ed. 2d 247 (1993)* ("The law directs itself not against conduct which is competitive, even severely so, but against conduct which unfairly tends to destroy competition itself.").

**2. Discussion**

As the court has already discussed, obtaining the absolute lowest price for customers is not always the goal of antitrust law. *Leegin, 551 U.S. at 903-905*. The jury found that defendant had willfully acquired or maintained its monopoly power through LTAs that amounted to de facto exclusive dealing contracts having the power to foreclose competition from the marketplace. (D.I. 217 at 4) "[Defendant] is a monopolist; a monopolist is not free to take certain actions that a company in a competitive (or even oligopolistic) market may take, because there is no market constraint on a monopolist's behavior." *LePage's, 324 F.3d at 151-52*. **[**31]** Furthermore, plaintiff's burden for proving anticompetitive conduct is lower than defendant suggests because "'[n]either proof of exertion of the power to exclude nor proof of actual exclusion of existing or potential competitors is essential to sustain a charge of monopolization under the Sherman Act.'" *Id. at 148* (quoting *Am. Tobacco Co. v. U.S., 328 U.S. 781, 810, 66 S. Ct. 1125, 90 L. Ed. 1575 (1946)*).

Defendant's argument that DeRamus inaccurately defined the market is similarly without merit. Defendant states that "[DeRamus'] untested say-so is not enough to support the jury finding of a Class 8 transmission relevant market or that Eaton possessed a monopoly share of that market." (D.I. 246 at 37) However, the parties had **agreed** that the relevant market is the Class 8 heavy duty transmission market, and this agreement is reflected in the court's final jury instructions. (D.I. 214 at 21) ("In this case the parties agree that the relevant product market is Class 8 heavy duty transmissions."). As for the geographic market, DeRamus looked at the freight costs, tariff fees, patent protection, and general development costs of foreign companies entering into the market, ultimately deciding that such an entry was unlikely. **[**32]** [16] (D.I. 236 at 1957:2-8) DeRamus **[*698]** considered factors that experts in his field would ordinarily rely on and came

---

[16] In terms of market definition, the court is cognizant of the *Cellophane* fallacy which cautions that "[the] existence of significant substitution in the event of further price increases or even at the current price does not tell us whether the defendant

to a conclusion. It was then up to the jury to determine his credibility. *LePage, 324 F.3d at 165*.

### E. Sufficiency of Evidence of Agreement

Defendant's final argument is that plaintiffs have failed to offer proof of an agreement that unreasonably restrained trade in violation of **[**33]** *Section 1 of the Sherman Antitrust Act*. (D.I. 246 at 37)

#### 1. Standard

*Section 1* of the Sherman Act ***HN19*** provides: "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal." *15 U.S.C. § 1*. The Third Circuit has explained that this statutory language imposes two essential requirements on an antitrust plaintiff. "First, the plaintiff must show that the defendant was a party to a 'contract, combination ... or conspiracy.'" *Toledo Mack Sales & Serv., Inc. v. Mack Trucks, Inc., 530 F.3d 204, 218 (3d Cir. 2008)*. Second, "the plaintiff must show that the [contract] to which the defendant was a party imposed an unreasonable restraint on trade." *Mack Trucks, 530 F.3d at 218*.

#### 2. Discussion

Defendant argues that proof of an agreement which unreasonably restrains trade requires plaintiff to show that "each OEM shared with Eaton a 'conscious commitment to a common scheme designed to achieve [the] unlawful objective'" of excluding competitors from the marketplace or raising prices. *(Id.* at 38) (citing *Link v. Mercedes-Benz of N. Am. Inc., 788 F.2d 918, 923 (3d Cir. 1986))*. Defendant contends **[**34]** that the evidence in this case shows, at most, that each OEM agreed to lawfully give defendant the majority of its business. (D.I. 246 at 38)

Defendant is incorrect in its assertion that plaintiffs were required to prove that both defendant and the OEMs desired to achieve an illegal objective, i.e., exclusion of plaintiffs from the Class 8 transmission marketplace. ***HN20*** "[A]cquescense in an illegal scheme is as much a violation of the Sherman Act as the creation and promotion of one." *U.S. v. Paramount Pictures, 334 U.S. 131, 161, 68 S. Ct. 915, 92 L. Ed. 1260 (1948)* As plaintiffs point out, "a *§ 1* conspiracy arises when an unwilling dealer, to avoid termination by [its] supplier promises ... to deal exclusively." *Fineman v. Armstrong World Indus.*, 980 F.2d 171, 214 (3d Cir. 1992). "Though ... co-conspirators must share a commitment to a common scheme which has an anticompetitive objective, they need not share an identical motive for engaging in concerted action in violation of *section 1 of the Sherman Act*." *Id.* Here, at the very least, the OEMs entered into the LTAs with the intention of obtaining the lowest price for defendant's transmissions, thus demonstrating a sufficient "commitment to a common scheme" to satisfy **[**35]** the requirements of *Section 1 of the Sherman Antitrust Act*. (D.I. 246 at 34)

### IV. CONCLUSION

For the reasons stated above, the court denies defendant's renewed motion for **[*699]** judgment as a matter of law or for a new trial. An appropriate order shall issue.

---

**already** exercises significant market power." *Eastman Kodak Co. v. Image Tech. Servs. Inc.*, 504 U.S. 451, 471, 112 S. Ct. 2072, 119 L. Ed. 2d 265 (1992) (quoting Phillip Areeda & Louis Kaplow, *Antitrust Analysis*, ¶ 340(b) (4th ed.1988) (emphasis in original)). Although foreign companies may have entered the market had defendant introduced a small but significant and non-transitory increase in price, this increase may have come on top of already existing monopoly prices. Therefore, it was not inappropriate for DeRamus to exclude foreign manufacturers from the Class 8 transmission market.

**ORDER**

At Wilmington this 10th day of March 2011, consistent with the memorandum opinion issued this same date;

IT IS ORDERED that Eaton Corporation's renewed motion for judgment as a matter of law or for a new trial (D.I. 245) is denied.

/s/ Sue L. Robinson

United States District Judge

# EXHIBIT 301

LexisNexis

Caution
As of: August 12, 2014 9:23 AM EDT

# ZF Meritor, LLC v. Eaton Corp.

United States Court of Appeals for the Third Circuit
June 26, 2012, Argued; September 28, 2012, Filed
Nos. 11-3301 and 11-3426

**Reporter:** 696 F.3d 254; 2012 U.S. App. LEXIS 20342; 2012-2 Trade Cas. (CCH) P78,078; 2012 WL 4483899
ZF MERITOR, LLC; MERITOR TRANSMISSION CORPORATION, Appellants, No. 11-3426 v. EATON CORPORATION, Appellant, No. 11-3301

**Subsequent History:** US Supreme Court certiorari denied by *Eaton Corp. v. ZF Meritor LLC, 133 S. Ct. 2025, 185 L. Ed. 2d 886, 2013 U.S. LEXIS 3349 (U.S., 2013)*
On remand at, Motion denied by *ZF Meritor LLC v. Eaton Corp., 2013 U.S. Dist. LEXIS 178890 (D. Del., Dec. 20, 2013)*

**Prior History:** **[**1]** On Appeal from the United States District Court for the District of Delaware. (D.C. No. 1-06-cv-00623). District Judge: Honorable Sue L. Robinson.
*ZF Meritor LLC v. Eaton Corp., 800 F. Supp. 2d 633, 2011 U.S. Dist. LEXIS 85709 (D. Del., 2011)*
*ZF Meritor LLC v. Eaton Corp., 769 F. Supp. 2d 684, 2011 U.S. Dist. LEXIS 24505 (D. Del., 2011)*
*ZF Meritor LLC v. Eaton Corp., 646 F. Supp. 2d 663, 2009 U.S. Dist. LEXIS 121826 (D. Del., 2009)*

**Core Terms**

prices, transmissions, discounts, truck, district court, competitors, products, appellees, rebates, customers, antitrust, practices, market-share, purchasers, damages, above-cost, targets, anticompetitive, Plaintiffs', price-cost, supplier, anti trust law, market share, predatory, requirements, contracts, manufacturer, foreclosed, foreclosure, buyers

**LexisNexis® Headnotes**

Civil Procedure > Trials > Judgment as Matter of Law > General Overview
Civil Procedure > Appeals > Standards of Review > De Novo Review

***HN1*** An appellate court exercises plenary review over an order denying a motion for judgment as a matter of law. A motion for judgment as a matter of law should be granted only if, viewing the evidence in the light most favorable to the nonmovant and giving it the advantage of every fair and reasonable inference, there is insufficient evidence from which a jury reasonably could find liability. An appellate court reviews questions of law underlying a jury verdict under a plenary standard of review. Underlying legal questions aside, a jury verdict will not be overturned unless

the record is critically deficient of that quantum of evidence from which a jury could have rationally reached its verdict.

Civil Procedure > Appeals > Standards of Review > Abuse of Discretion
Civil Procedure > Appeals > Standards of Review > De Novo Review
Evidence > Admissibility > Expert Witnesses

***HN2*** An appellate court reviews a district court's decision to exclude expert testimony for abuse of discretion. To the extent the district court's decision involved an interpretation of the Federal Rules of Evidence, the appellate court's review is plenary.

Civil Procedure > Discovery & Disclosure > General Overview
Civil Procedure > Appeals > Standards of Review > Abuse of Discretion

***HN3*** An appellate court reviews a district court's decisions regarding discovery and case management for abuse of discretion.

Civil Procedure > Appeals > Standards of Review > Clearly Erroneous Review
Civil Procedure > Appeals > Standards of Review > De Novo Review

***HN4*** An appellate court reviews legal conclusions regarding standing de novo and the underlying factual determinations for clear error.

Antitrust & Trade Law > ... > Per Se Rule & Rule of Reason > Per Se Rule Tests > Manifestly Anticompetitive Effects
Antitrust & Trade Law > ... > Price Fixing & Restraints of Trade > Per Se Rule & Rule of Reason > Sherman Act

***HN5*** Under the rule of reason, an exclusive dealing arrangement will be unlawful only if its probable effect is to substantially lessen competition in the relevant market. In contrast, under the price-cost test, to succeed on a challenge to the defendant's pricing practices, a plaintiff must prove that the defendant's prices are below an appropriate measure of the defendant's costs.

Antitrust & Trade Law > Clayton Act > Claims
Antitrust & Trade Law > Sherman Act > Claims
Evidence > Burdens of Proof > Allocation

***HN6*** In order to establish an actionable antitrust violation, a plaintiff must show both that the defendant engaged in anticompetitive conduct and that the plaintiff suffered antitrust injury as a result. Because a lack of anticompetitive conduct precludes a finding of antitrust injury, the key question for a court is whether the defendant engaged in anticompetitive conduct. Antitrust injury does not arise until a private party is adversely affected by an anticompetitive aspect of the defendant's conduct.

Antitrust & Trade Law > Clayton Act > Claims
Antitrust & Trade Law > Sherman Act > Claims
Antitrust & Trade Law > Sherman Act > Scope > Monopolization Offenses
Evidence > Burdens of Proof > Allocation

***HN7*** *Sections 1* and *2* of the Sherman Act, *15 U.S.C.S. §§ 1*, *2*, and *§ 3* of the Clayton Act, *15 U.S.C.S. § 14*, each include an anticompetitive conduct element, although each statute articulates

that element in a slightly different way. Under *§ 1* of the Sherman Act, a plaintiff must establish that the defendant was a party to a contract, combination, or conspiracy that imposed an unreasonable restraint on trade. *§ 1*. Under *§ 2* of the Sherman Act, a plaintiff must demonstrate that the defendant willfully acquired or maintained its monopoly power in the relevant market. *§ 2*. A monopolist willfully acquires or maintains monopoly power when it competes on some basis other than the merits. Finally, *§ 3* of the Clayton Act makes it unlawful for a person to enter into an exclusive dealing contract where the effect of such an agreement is to substantially lessen competition or create a monopoly. *§ 14*.

Antitrust & Trade Law > Clayton Act > Claims
Antitrust & Trade Law > ... > Price Fixing & Restraints of Trade > Exclusive & Reciprocal Dealing > Exclusive Dealing
Antitrust & Trade Law > Robinson-Patman Act > Claims
Antitrust & Trade Law > Sherman Act > Claims

***HN8*** Exclusive dealing claims may be brought under *§ 1* and *§ 2* of the Sherman Act, *15 U.S.C.S. §§ 1*, *2*, and *§ 3* of the Clayton Act, *15 U.S.C.S. § 14*. Additionally, the price-cost test is not confined to any one antitrust statute and applies to pricing practices claims under the Sherman Act, the Clayton Act, and the Robinson-Patman Act, *15 U.S.C.S. § 13*.

Antitrust & Trade Law > ... > Price Fixing & Restraints of Trade > Exclusive & Reciprocal Dealing > Exclusive Dealing

***HN9*** An exclusive dealing arrangement is an agreement in which a buyer agrees to purchase certain goods or services only from a particular seller for a certain period of time. The primary antitrust concern with exclusive dealing arrangements is that they may be used by a monopolist to strengthen its position, which may ultimately harm competition. Generally, a prerequisite to any exclusive dealing claim is an agreement to deal exclusively. An express exclusivity requirement, however, is not necessary because courts look past the terms of the contract to ascertain the relationship between the parties and the effect of the agreement in the real world. Thus, de facto exclusive dealing claims are cognizable under the antitrust laws.

Antitrust & Trade Law > Clayton Act > Claims
Antitrust & Trade Law > ... > Price Fixing & Restraints of Trade > Exclusive & Reciprocal Dealing > Exclusive Dealing
Antitrust & Trade Law > Sherman Act > Claims

***HN10*** Evidence of an agreement is expressly required under *§ 1* of the Sherman Act, *15 U.S.C.S. § 1*, and *§ 3* of the Clayton Act, *15 U.S.C.S. § 14*. However, an agreement is not necessarily required under *§ 2* of the Sherman Act, *15 U.S.C.S. § 2*, which can provide a vehicle for challenging a dominant firm's unilateral imposition of exclusive dealing on customers.

Antitrust & Trade Law > ... > Price Fixing & Restraints of Trade > Exclusive & Reciprocal Dealing > Exclusive Dealing

***HN11*** Exclusive dealing agreements are often entered into for entirely procompetitive reasons and generally pose little threat to competition. In many circumstances, exclusive dealing arrangements may be highly efficient to assure supply, price stability, outlets, investment, best efforts or the like, and pose no competitive threat at all. For example, in the case of the buyer, they may assure supply, afford protection against rises in price, enable long-term planning on the basis of known costs, and obviate the expense and risk of storage in the quantity necessary for

a commodity having a fluctuating demand. From the seller's perspective, an exclusive dealing arrangement with customers may reduce expenses, provide protection against price fluctuations, and offer the possibility of a predictable market. Exclusive dealing contracts can help prevent dealer free-riding on manufacturer-supplied investments to promote rival's products. As such, competition to be an exclusive supplier may constitute a vital form of rivalry, which the antitrust laws should encourage.

Antitrust & Trade Law > ... > Price Fixing & Restraints of Trade > Exclusive & Reciprocal Dealing > Exclusive Dealing

***HN12*** Exclusive dealing can have adverse economic consequences by allowing one supplier of goods or services unreasonably to deprive other suppliers of a market for their goods. Under certain circumstances, foreclosure might discourage sellers from entering, or seeking to sell in, a market at all, thereby reducing the amount of competition that would otherwise be available. Exclusive dealing arrangements are of special concern when imposed by a monopolist. Behavior that otherwise might comply with antitrust law may be impermissibly exclusionary when practiced by a monopolist. For example, suppose an established manufacturer has long held a dominant position but is starting to lose market share to an aggressive young rival. A set of strategically planned exclusive-dealing contracts may slow the rival's expansion by requiring it to develop alternative outlets for its product, or rely at least temporarily on inferior or more expensive outlets. Consumer injury results from the delay that the dominant firm imposes on the smaller rival's growth. In some cases, a dominant firm may be able to foreclose rival suppliers from a large enough portion of the market to deprive such rivals of the opportunity to achieve the minimum economies of scale necessary to compete.

Antitrust & Trade Law > ... > Price Fixing & Restraints of Trade > Exclusive & Reciprocal Dealing > Exclusive Dealing
Antitrust & Trade Law > ... > Per Se Rule & Rule of Reason > Per Se Rule Tests > Manifestly Anticompetitive Effects

***HN13*** Due to the potentially procompetitive benefits of exclusive dealing agreements, their legality is judged under the rule of reason. The legality of an exclusive dealing arrangement depends on whether it will foreclose competition in such a substantial share of the relevant market so as to adversely affect competition. In conducting this analysis, courts consider not only the percentage of the market foreclosed, but also take into account the restrictiveness and the economic usefulness of the challenged practice in relation to the business factors extant in the market. It is necessary to weigh the probable effect of the contract on the relevant area of effective competition, taking into account the relative strength of the parties, the proportionate volume of commerce involved in relation to the total volume of commerce in the relevant market area, and the probable immediate and future effects which pre-emption of that share of the market might have on effective competition therein. In other words, an exclusive dealing arrangement is unlawful only if the probable effect of the arrangement is to substantially lessen competition, rather than merely disadvantage rivals. The test for determining anticompetitive effect is not total foreclosure, but whether the challenged practices bar a substantial number of rivals or severely restrict the market's ambit.

Antitrust & Trade Law > ... > Price Fixing & Restraints of Trade > Exclusive & Reciprocal Dealing > Exclusive Dealing
Antitrust & Trade Law > ... > Per Se Rule & Rule of Reason > Per Se Rule Tests > Manifestly Anticompetitive Effects

***HN14*** There is no set formula for evaluating the legality of an exclusive dealing agreement, but modern antitrust law generally requires a showing of significant market power by the defendant, substantial foreclosure, contracts of sufficient duration to prevent meaningful competition by rivals, and an analysis of likely or actual anticompetitive effects considered in light of any procompetitive effects. Courts will also consider whether there is evidence that the dominant firm engaged in coercive behavior and the ability of customers to terminate the agreements. The use of exclusive dealing by competitors of the defendant is also sometimes considered.

Antitrust & Trade Law > ... > Actual Monopolization > Anticompetitive & Predatory Practices > Predatory Pricing

***HN15*** Predatory pricing may be defined as pricing below an appropriate measure of cost for the purpose of eliminating competitors in the short run and reducing competition in the long run. The United States Supreme Court has expressed deep skepticism of predatory pricing claims. In the typical predatory pricing scheme, a firm reduces the sale price of its product to below-cost, intending to drive competitors out of the business. Then, once competitors have been eliminated, the firm raises its prices to supra competitive levels. For such a scheme to make economic sense, the firm must recoup the losses suffered during the below-cost phase in the supra competitive phase. The Supreme Court fashioned a two-part test that reflected this economic reality. To succeed on a predatory pricing claim, the plaintiff must prove: (1) that the prices complained of are below an appropriate measure of the defendant's costs; and (2) that the defendant had a dangerous probability of recouping its investment in below-cost prices.

Antitrust & Trade Law > ... > Actual Monopolization > Anticompetitive & Predatory Practices > Predatory Pricing

***HN16*** In adopting the price-cost test, the United States Supreme Court rejected the notion that above-cost prices that are below general market levels or below the costs of a firm's competitors are actionable under the antitrust laws. Low prices benefit consumers regardless of how those prices are set, and so long as they are above predatory levels (i.e., above-cost), they do not threaten competition. Low, but above-cost, prices are generally procompetitive because the exclusionary effect of prices above a relevant measure of cost generally reflects the lower cost structure of the alleged predator, and so represents competition on the merits. The antitrust laws were enacted for the protection of competition, not competitors.

Antitrust & Trade Law > ... > Actual Monopolization > Anticompetitive & Predatory Practices > Predatory Pricing

Evidence > Inferences & Presumptions > Inferences

***HN17*** There may be situations in which above-cost prices are anticompetitive, but it is beyond the practical ability of a judicial tribunal to ascertain whether above-cost pricing is anticompetitive without courting intolerable risks of chilling legitimate price-cutting. To hold that the antitrust laws protect competitors from the loss of profits due to above-cost price competition would, in effect, render illegal any decision by a firm to cut prices in order to increase market share. The antitrust laws require no such perverse result. Significantly, because cutting prices in order to increase business often is the very essence of competition, in cases seeking to impose antitrust liability for prices that are too low, mistaken inferences are especially costly because they chill the very conduct that antitrust laws are designed to protect.

Antitrust & Trade Law > ... > Actual Monopolization > Anticompetitive & Predatory Practices > Predatory Pricing

Antitrust & Trade Law > ... > Price Fixing & Restraints of Trade > Exclusive & Reciprocal Dealing > Exclusive Dealing
Antitrust & Trade Law > ... > Per Se Rule & Rule of Reason > Per Se Rule Tests > Manifestly Anticompetitive Effects

***HN18*** Implicit in the United States Supreme Court's creation of the price-cost test was a balancing of the procompetitive justifications of above-cost pricing against its anticompetitive effects (as well as the anticompetitive effects of allowing judicial inquiry into above-cost pricing), and a conclusion that the balance always tips in favor of allowing above-cost pricing practices to stand. Thus, in the context of exclusive dealing, the price-cost test may be utilized as a specific application of the rule of reason when the plaintiff alleges that price is the vehicle of exclusion.

Antitrust & Trade Law > ... > Actual Monopolization > Anticompetitive & Predatory Practices > Predatory Pricing
Antitrust & Trade Law > ... > Price Fixing & Restraints of Trade > Tying Arrangements > General Overview

***HN20*** In light of the analogy drawn in LePage's v. 3M between bundled rebates and unlawful tying, which cannot exist unless two separate product markets have been linked, LePage's is inapplicable where only one product is at issue and the plaintiffs have not made any allegations of bundling or tying. The reasoning of LePage's is limited to cases in which a single-product producer is excluded through a bundled rebate program offered by a producer of multiple products, which conditions the rebates on purchases across multiple different product lines. Accordingly, the price-cost test applies to market-share or volume rebates offered by suppliers within a single-product market.

Antitrust & Trade Law > ... > Actual Monopolization > Anticompetitive & Predatory Practices > Predatory Pricing

***HN19*** The lesson of the predatory pricing case law is that, generally, above-cost prices are not anticompetitive, and although there may be rare cases where above-cost prices are anticompetitive in the long run, it is beyond the practical ability of courts to identify those rare cases without creating an impermissibly high risk of deterring legitimate procompetitive behavior (i.e., price-cutting). These principles extend to above-cost discounting or rebate programs, which condition the discounts or rebates on the customer's purchasing of a specified volume or a specified percentage of its requirements from the seller.

Antitrust & Trade Law > ... > Actual Monopolization > Anticompetitive & Predatory Practices > Predatory Pricing
Antitrust & Trade Law > ... > Price Fixing & Restraints of Trade > Exclusive & Reciprocal Dealing > Exclusive Dealing

***HN21*** A plaintiff's characterization of its claim as an exclusive dealing claim does not take the price-cost test off the table. Indeed, contracts in which discounts are linked to purchase (volume or market share) targets are frequently challenged as de facto exclusive dealing arrangements on the grounds that the discounts induce customers to deal exclusively with the firm offering the rebates. However, when price is the clearly predominant mechanism of exclusion, the price-cost test tells courts that, so long as the price is above-cost, the procompetitive justifications for, and the benefits of, lowering prices far outweigh any potential anticompetitive effects. There is always a legitimate business justification for lowering prices: attempting to attract additional business.

Antitrust & Trade Law > ... > Actual Monopolization > Anticompetitive & Predatory Practices > Predatory Pricing

Antitrust & Trade Law > ... > Price Fixing & Restraints of Trade > Exclusive & Reciprocal Dealing > Exclusive Dealing

***HN22*** Although the United States Supreme Court has created a safe harbor for above-cost discounting, it has not established a per se rule of non-liability under the antitrust laws for all contractual practices that involve above-cost pricing. The Supreme Court's predatory pricing decisions have not gone so far as to hold that in every case in which a plaintiff challenges low prices as exclusionary conduct, the plaintiff must prove that those prices were below cost. Nothing in the case law suggests, nor would it be sound policy to hold, that above-cost prices render an otherwise unlawful exclusive dealing agreement lawful.

Antitrust & Trade Law > ... > Price Fixing & Restraints of Trade > Exclusive & Reciprocal Dealing > Exclusive Dealing
Antitrust & Trade Law > ... > Per Se Rule & Rule of Reason > Per Se Rule Tests > Manifestly Anticompetitive Effects
Antitrust & Trade Law > ... > Price Fixing & Restraints of Trade > Tying Arrangements > General Overview

***HN23*** The means of illicit exclusion, like the means of legitimate competition, are myriad. Anticompetitive conduct can come in too many different forms and is too dependent on context for any court or commentator ever to have enumerated all the varieties. The law has long recognized forms of exclusionary conduct that do not involve below-cost pricing, including unlawful tying, enforcement of a legal monopoly provided by a patent procured through fraud, refusal to deal, exclusive dealing, and other unfair tortious conduct targeting competitors.

Antitrust & Trade Law > Clayton Act > General Overview
Antitrust & Trade Law > Sherman Act > General Overview

***HN24*** Monopsony power is market power on the buy (or input) side of the market. As such, a monopsony is to the buy side of the market what a monopoly is to the sell side.

Antitrust & Trade Law > ... > Actual Monopolization > Anticompetitive & Predatory Practices > Predatory Pricing
Antitrust & Trade Law > Sherman Act > Scope > Monopolization Offenses

***HN25*** Weyerhaeuser Co. v. Ross-Simmons Hardwood Lumber Co. established the straightforward principle that the exercise of market power on prices for the purpose of driving out competitors should be judged by the same standard, whether such power is exercised on the input or output side of the market. And Pacific Bell Telephone Co. v. linkLine Communications, Inc. did no more than hold that two antitrust theories cannot be combined to form a new theory of antitrust liability. The plaintiffs' retail-level claim in linkLine was a traditional pricing practices claim, and therefore indistinguishable from the pricing practices claims in Brooke Group Ltd . v. Brown & Williamson Tobacco Corp. , Atlantic Richfield Co. v. USA Petroleum Co., and Cargill, Inc. v. Monfort of Colorado, Inc.

Antitrust & Trade Law > ... > Price Fixing & Restraints of Trade > Exclusive & Reciprocal Dealing > Exclusive Dealing

***HN26*** Although prices are unlikely to exclude equally efficient rivals unless they are below-cost, exclusive dealing arrangements can exclude equally efficient (or potentially equally efficient) rivals, and thereby harm competition, irrespective of below-cost pricing. Where a dominant supplier enters into de facto exclusive dealing arrangements with every customer in the market, other

firms may be driven out not because they cannot compete on a price basis, but because they are never given an opportunity to compete, despite their ability to offer products with significant customer demand.

Antitrust & Trade Law > Clayton Act > Claims
Antitrust & Trade Law > ... > Price Fixing & Restraints of Trade > Exclusive & Reciprocal Dealing > Exclusive Dealing
Antitrust & Trade Law > ... > Per Se Rule & Rule of Reason > Per Se Rule Tests > Manifestly Anticompetitive Effects
Antitrust & Trade Law > Sherman Act > Claims
Evidence > Burdens of Proof > Allocation

***HN27*** The rule of reason governs exclusive dealing claims under *§ 1* and *§ 2* of the Sherman Act, *15 U.S.C.S. §§ 1*, *2*, and *§ 3* of the Clayton Act, *15 U.S.C.S. § 14*. Under the rule of reason, an exclusive dealing arrangement is anticompetitive only if its probable effect is to substantially lessen competition in the relevant market, rather than merely disadvantage rivals. In addition to establishing a statutory violation, a plaintiff must demonstrate that it suffered antitrust injury. To establish antitrust injury, the plaintiff must demonstrate: (1) harm of the type the antitrust laws were intended to prevent; and (2) an injury to the plaintiff which flows from that which makes the defendant's acts unlawful.

Antitrust & Trade Law > ... > Price Fixing & Restraints of Trade > Exclusive & Reciprocal Dealing > Exclusive Dealing

***HN28*** A threshold requirement for any exclusive dealing claim is necessarily the presence of exclusive dealing.

Antitrust & Trade Law > ... > Price Fixing & Restraints of Trade > Exclusive & Reciprocal Dealing > Exclusive Dealing

***HN29*** De facto partial exclusive dealing arrangements may, under certain circumstances, be actionable under the antitrust laws. The law is clear that an express exclusivity requirement is not necessary because de facto exclusive dealing may be unlawful.

Antitrust & Trade Law > Clayton Act > Claims
Antitrust & Trade Law > Clayton Act > Scope
Antitrust & Trade Law > ... > Price Fixing & Restraints of Trade > Exclusive & Reciprocal Dealing > Exclusive Dealing

***HN30*** Even though a contract does not contain specific agreements not to use the goods of a competitor, if the practical effect is to prevent such use, it comes within the condition of *§ 3* of the Clayton Act, *15 U.S.C.S. § 14*, as to exclusivity.

Antitrust & Trade Law > ... > Price Fixing & Restraints of Trade > Exclusive & Reciprocal Dealing > Exclusive Dealing

***HN31*** An agreement does not need to be 100% exclusive in order to meet the legal requirements of exclusive dealing. Partial exclusive dealing is rarely a valid antitrust theory. Partial exclusive dealing agreements such as partial requirements contracts and contracts stipulating a fixed dollar or quantity amount are generally lawful because market foreclosure is only partial, and competing sellers are not prevented from selling to the buyer. However, the United States Court of Appeals for

the Third Circuit declines to adopt the view that a requirement contract covering less than 100% of the buyer's needs can never be an unlawful exclusive dealing arrangement. Legal presumptions that rest on formalistic distinctions rather than actual market realities are generally disfavored in antitrust law. Antitrust analysis must always be attuned to the particular structure and circumstances of the industry at issue. Therefore, just as total foreclosure is not required for an exclusive dealing arrangement to be unlawful, nor is complete exclusivity required with each customer. The legality of such an arrangement ultimately depends on whether the agreement foreclosed a substantial share of the relevant market such that competition was harmed.

Antitrust & Trade Law > ... > Price Fixing & Restraints of Trade > Exclusive & Reciprocal Dealing > Exclusive Dealing

***HN32*** Exclusive dealing will generally only be unlawful where the market is highly concentrated, the defendant possesses significant market power, and there is some element of coercion present. For example, if the defendant occupies a dominant position in the market, its exclusive dealing arrangements invariably have the power to exclude rivals.

Antitrust & Trade Law > ... > Price Fixing & Restraints of Trade > Exclusive & Reciprocal Dealing > Exclusive Dealing

***HN33*** As to exclusive dealing claims, a hard look at the nature of the market in which the parties compete is important. An exclusive dealing arrangement is most likely to present a threat to competition in a situation in which the market is highly concentrated, such that long-term contracts operate to foreclose so large a percentage of the available supply or outlets that entry or continued operation in the concentrated market is unreasonably constricted.

Antitrust & Trade Law > ... > Price Fixing & Restraints of Trade > Exclusive & Reciprocal Dealing > Exclusive Dealing

***HN34*** If entry barriers to new firms are not significant, it may be difficult for even a monopoly company to control prices through some type of exclusive dealing arrangement because a new firm or firms easily can enter the market to challenge it, but if there are significant entry barriers, a potential competitor would have difficulty entering.

Antitrust & Trade Law > ... > Monopolies & Monopolization > Actual Monopolization > Monopoly Power

***HN35*** Although courts generally assume that a customer will make its decision only on the merits, a monopolist may use its power to break the competitive mechanism and deprive customers of the ability to make a meaningful choice. Coercion has played a key, if sometimes unexplored, role in antitrust law. A highly concentrated market, in which there is one (or a few) dominant suppliers, creates the possibility for such coercion.

Civil Procedure > Appeals > Standards of Review > General Overview

Evidence > Weight & Sufficiency

***HN36*** An appellate court's inquiry in a sufficiency of the evidence challenge is limited to determining whether, viewing the evidence in the light most favorable to the winner at trial and giving it the advantage of every fair and reasonable inference, there is insufficient evidence from which a jury reasonably could find liability.

Antitrust & Trade Law > ... > Price Fixing & Restraints of Trade > Exclusive & Reciprocal Dealing > Exclusive Dealing

Antitrust & Trade Law > ... > Per Se Rule & Rule of Reason > Per Se Rule Tests > Manifestly Anticompetitive Effects

***HN37*** The share of the market foreclosed is important because, for a contract to have an adverse effect upon competition, the opportunities for others to enter into or remain in that market must be significantly limited. Substantial foreclosure allows the dominant firm to prevent potential rivals from ever reaching the critical level necessary to pose a real threat to the defendant's business.

Antitrust & Trade Law > ... > Price Fixing & Restraints of Trade > Exclusive & Reciprocal Dealing > Exclusive Dealing
Antitrust & Trade Law > ... > Per Se Rule & Rule of Reason > Per Se Rule Tests > Manifestly Anticompetitive Effects

***HN38*** Although long exclusive dealing contracts are not per se unlawful, the significance of any particular contract duration is a function of both the number of such contracts and market share covered by the exclusive-dealing contracts.

Antitrust & Trade Law > Clayton Act > Claims
Antitrust & Trade Law > Sherman Act > Claims

***HN39*** A plaintiff suffers antitrust injury if its injury stems from a competition-reducing aspect or effect of the defendant's behavior.

Evidence > Admissibility > Expert Witnesses
Evidence > Admissibility > Expert Witnesses > Daubert Standard
Evidence > Admissibility > Expert Witnesses > Helpfulness
Evidence > ... > Testimony > Expert Witnesses > Qualifications

***HN40*** See *Fed. R. Evid. 702*.

Evidence > Admissibility > Expert Witnesses
Evidence > Admissibility > Expert Witnesses > Daubert Standard
Evidence > Admissibility > Expert Witnesses > Helpfulness
Evidence > ... > Testimony > Expert Witnesses > Qualifications

***HN41*** Under *Fed. R. Evid. 702*, the district court acts as a gatekeeper to ensure that the expert's opinion is based on the methods and procedures of science rather than on subjective belief or unsupported speculation.

Antitrust & Trade Law > Clayton Act > Claims
Antitrust & Trade Law > Sherman Act > Claims
Evidence > ... > Testimony > Expert Witnesses > General Overview

***HN42*** When an expert opinion is not supported by sufficient facts to validate it in the eyes of the law, or when indisputable record facts contradict or otherwise render the opinion unreasonable, it cannot support a jury's verdict. In an antitrust case, an expert opinion generally must incorporate all aspects of the economic reality of the relevant market.

Evidence > Admissibility > Expert Witnesses > Daubert Standard

***HN43*** *Fed. R. Evid. 702*, as amended in 2000 to incorporate the standards set forth in Daubert, imposes an obligation upon a district court to ensure that expert testimony is not only relevant, but

reliable. *Rule 702*. The reliability analysis required by Daubert applies to all aspects of an expert's testimony: the methodology, the facts underlying the expert's opinion, and the link between the facts and the conclusion. Not only must each stage of the expert's testimony be reliable, but each stage must be evaluated practically and flexibly without bright-line exclusionary (or inclusionary) rules.

Evidence > Admissibility > Expert Witnesses > Daubert Standard

***HN44*** In some circumstances, an expert might be able to rely on the estimates of others in constructing a hypothetical reality, but to do so, the expert must explain why he relied on such estimates and must demonstrate why he believed the estimates were reliable. *Fed. R. Evid. 702*. Arguably, third-party estimates that an expert relies on are not his underlying data, but rather the data that went into the third-party estimates in the first place are his underlying data.

Evidence > Admissibility > Expert Witnesses > Daubert Standard

***HN45*** Internal projections for future growth often serve as legitimate bases for expert opinions. Businesses are generally well-informed about the industries in which they operate and have incentives to develop accurate projections. As such, experts frequently use a plaintiff's business plan to estimate the plaintiff's expected profits in the absence of the defendant's misconduct. However, there is no per se rule of inclusion where an expert relies on a business plan; district courts must perform a case-by-case inquiry to determine whether the expert's reliance on the business plan in a given case is reasonable.

Evidence > Admissibility > Expert Witnesses > Daubert Standard

***HN46*** An expert's lack of familiarity with the methods and the reasons underlying someone else's projections virtually precludes any assessment of the validity of the projections through cross-examination.

Civil Procedure > Appeals > Standards of Review > Abuse of Discretion
Evidence > Admissibility > Procedural Matters > Rulings on Evidence

***HN47*** Under the deferential abuse of discretion standard, an appellate court will not disturb a district court's decision to exclude testimony unless its is left with a definite and firm conviction that the court below committed a clear error of judgment.

Civil Procedure > Appeals > Standards of Review > General Overview
Evidence > Admissibility > Procedural Matters > Rulings on Evidence

***HN48*** An appellate court may affirm evidentiary rulings on any ground supported by the record.

Evidence > Admissibility > Expert Witnesses > Daubert Standard

***HN49*** While the focus, of course, must be solely on principles and methodology, not on the conclusions that they generate, a district court must examine the expert's conclusions in order to determine whether they could reliably flow from the facts known to the expert and the methodology used. Where proffered expert testimony's factual basis, data, principles, methods, or their application are called sufficiently into question, the trial judge must determine whether the testimony has a reliable basis in the knowledge and experience of the relevant discipline. A district court's inquiry under *Fed. R. Evid. 702* is a flexible one and must be guided by the facts of the case.

Evidence > Admissibility > Expert Witnesses

***HN50*** An expert's testimony regarding damages must be based on a sufficient factual foundation. An expert's opinion should be excluded when it is based on assumptions which are speculative and not supported by the record.

Evidence > Admissibility > Procedural Matters > Rulings on Evidence

***HN51*** A district court must give the parties an adequate opportunity to be heard on evidentiary issues.

Civil Procedure > Judicial Officers > Judges > Discretionary Powers

Civil Procedure > ... > Discovery > Methods of Discovery > Expert Witness Discovery

Civil Procedure > Appeals > Standards of Review > General Overview

Evidence > Burdens of Proof > Allocation

***HN52*** A district court has considerable discretion in matters regarding expert discovery and case management, and a party challenging the district court's conduct of discovery procedures bears a heavy burden. An appellate court will not interfere with a trial court's control of its docket except upon the clearest showing that the procedures have resulted in actual and substantial prejudice to the complaining litigant.

Civil Procedure > Discovery & Disclosure > Disclosure > Mandatory Disclosures

***HN53*** Under *Fed. R. Civ. P. 26(a)(2)*, a party is required to disclose an expert report containing a complete statement of all opinions the witness will express and the basis and reasons for them. *Rule 26(a)(2)(B)(i)*. Any additions or changes to the information in the expert report must be disclosed by the time the party's pretrial disclosures are due. *Rule 26(e)(2)*.

Civil Procedure > Judicial Officers > Judges > Discretionary Powers

Civil Procedure > Discovery & Disclosure > Disclosure > Sanctions

Civil Procedure > Appeals > Standards of Review > Abuse of Discretion

***HN54*** A plaintiff omits evidence necessary to sustain a damages award at its own risk. However, exclusion of critical evidence is an extreme sanction, and, thus, a district court's discretion is not unlimited. A continuance, as opposed to exclusion, is the preferred means of dealing with a party's attempt to offer new evidence after the time for discovery has closed. There are indeed times, even when control of discovery is at issue, that a district court will exceed the permissible bounds of its broad discretion. In Meyers v. Pennypack Woods Home Ownership Ass'n, the United States Court of Appeals for the Third Circuit set forth five factors that should be considered in deciding whether a district court's exclusion of evidence as a discovery sanction constitutes an abuse of discretion.

Civil Procedure > Discovery & Disclosure > Disclosure > Sanctions

Civil Procedure > Appeals > Standards of Review > Abuse of Discretion

***HN55*** In considering whether a district court abused its discretion in denying a plaintiff's request to submit alternate damages calculations, the appellate court will consider: (1) the prejudice or surprise in fact of the party against whom the excluded witnesses would have testified or the excluded evidence would have been offered; (2) the ability of that party to cure the prejudice; (3) the extent to which allowing such witnesses or evidence would disrupt the orderly and efficient

trial of the case or of other cases in the court; (4) any bad faith or willfulness in failing to comply with the court's order; and (5) the importance of the excluded evidence. The importance of the evidence is often the most significant factor.

Antitrust & Trade Law > Clayton Act > Remedies > Damages
Antitrust & Trade Law > Sherman Act > Remedies > Damages
Evidence > ... > Testimony > Expert Witnesses > General Overview

***HN56*** Expert testimony is necessary to establish damages in an antitrust case.

Antitrust & Trade Law > Sherman Act > Claims
Antitrust & Trade Law > Sherman Act > Remedies > Damages

***HN57*** In the antitrust context, a damages award not only benefits the plaintiff, it also fosters competition and furthers the interests of the public by imposing a severe penalty (treble damages) for violation of the antitrust laws. Every violation of the antitrust laws is a blow to the free-enterprise system envisaged by the United States Congress. In enacting these laws, Congress had many means at its disposal to penalize violators. It could have, for example, required violators to compensate federal, state, and local governments for the estimated damage to their respective economies caused by the violations. But, this remedy was not selected. Instead, Congress chose to permit all persons to sue to recover three times their actual damages. By so doing, Congress encouraged these persons to serve as private attorneys general. A claim under the antitrust laws is not merely a private matter. The Sherman Act is designed to promote the national interest in a competitive economy.

Civil Procedure > Appeals > Standards of Review > Abuse of Discretion

***HN58*** The likelihood of finding an abuse of discretion is affected by the importance of the district court's decision to the outcome of the case and the effect it will have on important rights.

Civil Procedure > ... > Justiciability > Mootness > General Overview
Civil Procedure > ... > Justiciability > Standing > Personal Stake

***HN59*** The standing inquiry is focused on whether the party invoking jurisdiction had the requisite stake in the outcome when the suit was filed. The requisite personal interest that must exist at the commencement of the litigation (standing) must continue throughout its existence (mootness).

Civil Procedure > ... > Justiciability > Standing > Burdens of Proof
Civil Procedure > ... > Justiciability > Standing > Injury in Fact
Civil Procedure > ... > Justiciability > Standing > Personal Stake
Civil Procedure > ... > Injunctions > Grounds for Injunctions > Irreparable Harm
Constitutional Law > ... > Case or Controversy > Standing > Elements

***HN60*** A plaintiff bears the burden of establishing that he has U.S. Const. art. III standing for each type of relief sought. In order to have standing to seek injunctive relief, a plaintiff must show: (1) that he is under a threat of suffering injury in fact that is concrete and particularized; the threat must be actual and imminent, not conjectural or hypothetical; (2) a causal connection between the injury and the conduct complained of; and (3) a likelihood that a favorable judicial decision will prevent or redress the injury. Even if the plaintiff has suffered a previous injury due to the

defendant's conduct, the equitable remedy of an injunction is unavailable absent a showing of irreparable injury, a requirement that cannot be met where there is no showing of any real or immediate threat that the plaintiff will be wronged again. Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief if unaccompanied by any continuing, present adverse effects. Accordingly, a plaintiff may have standing to pursue damages, but lack standing to seek injunctive relief.

Civil Procedure > ... > Justiciability > Standing > Burdens of Proof
Civil Procedure > ... > Justiciability > Standing > Injury in Fact
Civil Procedure > ... > Injunctions > Grounds for Injunctions > Irreparable Harm
Constitutional Law > ... > Case or Controversy > Standing > Elements

***HN61*** Allegations of possible future injury are not sufficient to satisfy U.S. Const. art. III. Plaintiffs are required to set forth sufficient facts to show that they are entitled to prospective relief, including that they are likely to suffer future injury. A threatened injury must be certainly impending and proceed with a high degree of certainty.

Civil Procedure > ... > Justiciability > Standing > Injury in Fact
Civil Procedure > ... > Injunctions > Grounds for Injunctions > Irreparable Harm

***HN62*** In the context of injunctive relief, vague assertions of desire, without any descriptions of concrete plans, are insufficient to support a finding of actual or imminent injury.

Antitrust & Trade Law > ... > Private Actions > Standing > Requirements
Civil Procedure > ... > Justiciability > Standing > Burdens of Proof
Constitutional Law > ... > Case or Controversy > Standing > General Overview

***HN63*** Although the doctrines of constitutional standing and antitrust standing often overlap in practice, they are, in fact, distinct. Regardless of any additional requirements applicable to a particular type of action, a plaintiff must always demonstrate that a justiciable case or controversy exists sufficient to invoke the jurisdiction of the federal courts.

Constitutional Law > ... > Case or Controversy > Standing > General Overview

***HN64*** Standing is a constitutional mandate.

**Counsel:** Caeli A. Higney, Thomas G. Hungar, Theodore B. Olson (Argued), Cynthia E. Richman, Geoffrey C. Weien, Gibson, Dunn & Crutcher, Washington, DC; Erik T. Koons, William K. Lavery, Joseph A. Ostoyich, Baker Botts, Washington, DC; Donald E. Reid, Morris, Nichols, Arsht & Tunnell, Wilmington, DE, Counsel for Eaton Corporation.

Jay N. Fastow (Argued), Dickstein Shapiro, New York, NY; Robert B. Holcomb, Adams Holcomb, Washington, DC; Christopher H. Wood, Denver, CO, Counsel for ZF Meritor, LLC and Meritor Transmission Corp.

Michael S. Tarringer, Cafferty Faucher, Philadelphia, PA, Counsel for American Antitrust Institute.

**Judges:** Before: FISHER and GREENBERG, Circuit Judges, and OLIVER,* District Judge. Greenberg, Circuit Judge, dissenting.

**Opinion by:** FISHER

**Opinion**

**[*263]** OPINION OF THE COURT

*FISHER, Circuit Judge.*

This case arises from an antitrust action brought by ZF Meritor, LLC ("ZF Meritor") and Meritor Transmission Corporation ("Meritor") **[**2]** (collectively, "Plaintiffs") against Eaton Corporation ("Eaton") for allegedly anticompetitive practices in the heavy-duty truck transmissions market. The practices at issue are embodied in long-term agreements between Eaton, the leading supplier of heavy-duty truck transmissions in North America, and every direct purchaser of such transmissions. Following a four-week trial, a jury found that Eaton's conduct violated *Section 1* and *Section 2* of the Sherman Act, and *Section 3* of the Clayton Act. Eaton filed a renewed motion for judgment as a matter of law, arguing that its conduct was *per se* lawful because it priced its products above-cost. The District Court disagreed, reasoning that notwithstanding Eaton's above-cost prices, there was sufficient evidence in the record to establish that Eaton engaged in anticompetitive conduct—specifically that Eaton entered into long-term *de facto* exclusive dealing arrangements—which foreclosed a substantial share of the market and, as a result, harmed competition. We agree with the District Court and will affirm the District Court's denial of Eaton's renewed motion for judgment as a matter of law.

We are also called upon to address several other issues. **[**3]** Although the jury returned a verdict in favor of Plaintiffs on the issue of liability, prior to trial, the District Court granted Eaton's motion to exclude the damages testimony of Plaintiffs' expert. The District Court also denied Plaintiffs' request for permission to amend the expert report to include alternate damages calculations. Consequently, the issue of damages was never tried and no damages were awarded. Plaintiffs cross-appeal from the District Court's order granting Eaton's motion to exclude and the District Court's subsequent denial of Plaintiffs' motion for clarification. For the reasons set forth below, we will affirm the District Court's orders to the extent that they excluded Plaintiffs' expert's testimony based on the damages calculations in his initial expert report, but reverse to the extent that the District Court denied Plaintiffs' request to amend the report to submit alternate damages calculations. Finally, although the District Court awarded no damages, it did enter injunctive relief against Eaton. On appeal, Eaton argues that Plaintiffs lack standing to seek injunctive relief because they are no longer in the heavy-duty truck transmissions market, and have **[**4]** expressed no concrete desire to re-enter the market. We agree and will vacate the District Court's order issuing injunctive relief.

## I. BACKGROUND

### A. Factual Background

*1. Market Background*

---

* The Honorable Solomon Oliver, Jr., Chief Judge of the United States District Court for the Northern District of Ohio, sitting by designation.

The parties agree that the relevant market in this case is heavy-duty "Class 8" truck transmissions ("HD transmissions") in North America. Heavy-duty trucks include 18-wheeler "linehaul" trucks, which are used to travel long distances on highways, and "performance" vehicles, such as cement mixers, garbage trucks, and dump trucks. There are three types of HD transmissions: three-pedal manual, which uses a clutch to change gears; two-pedal automatic; and two-or-three-pedal automated mechanical, which engages the gears mechanically through electronic controls. Linehaul and performance transmissions, **[*264]** which comprise over 90% of the market, typically use manual or automated mechanical transmissions.[1]

There are only four direct purchasers of HD transmissions in North America: Freightliner, LLC ("Freightliner"), International Truck and Engine Corporation ("International"), PACCAR, Inc. ("PACCAR"), **[**5]** and Volvo Group ("Volvo"). These companies are referred to as the Original Equipment Manufacturers ("OEMs"). The ultimate consumers of HD transmissions, truck buyers, purchase trucks from the OEMs. Truck buyers have the ability to select many of the components used in their trucks, including the transmissions, from OEM catalogues called "data books." Data books list the alternative component choices, and include a price for each option relative to the "standard" or "preferred" offerings. The "standard" offering is the component that is provided to the customer unless the customer expressly designates another supplier's product, while the "preferred" or "preferentially-priced" offering is the lowest priced component in data book among comparable products. Data book positioning is a form of advertising, and standard or preferred positioning generally means that customers are more likely to purchase that supplier's components. Although customers may, and sometimes do, request components that are not published in a data book, doing so is often cumbersome and increases the cost of the component. Thus, data book positioning is essential in the industry.

Eaton has long been a monopolist in **[**6]** the market for HD transmissions in North America.[2] It began making HD transmissions in the 1950s, and was the only significant manufacturer until Meritor entered the market in 1989 and began offering manual transmissions primarily for linehaul trucks. By 1999, Meritor had obtained approximately 17% of the market for sales of HD transmissions, including 30% for linehaul transmissions. In mid-1999, Meritor and ZF Friedrichshafen ("ZF AG"), a leading supplier of HD transmissions in Europe, formed the joint venture ZF Meritor, and Meritor transferred its transmissions business into the joint venture.[3] Aside from Meritor, and then ZF Meritor, no significant external supplier of HD transmissions has entered the market in the past 20 years.[4]

One purpose of the ZF Meritor joint venture was to adapt ZF AG's two-pedal automated mechanical transmission, ASTronic, **[**7]** which was used exclusively in Europe, for the North American market. The redesign and testing took 18 months, and ZF Meritor introduced the adapted ASTronic model into the North American market in 2001 under the new name FreedomLine. FreedomLine was the first two-pedal automated mechanical transmission to be sold in North

---

[1] A third category of heavy-duty trucks, "specialty" vehicles, such as fire trucks, typically use automatic transmissions.

[2] At trial, Eaton disputed that it was a monopolist, but on appeal, does not challenge the jury's finding that it possessed monopoly power in the HD transmissions market in North America.

[3] ZF AG is not a party to this lawsuit.

[4] "External" transmission sales do not include transmissions manufactured by Volvo Group for use in its own trucks.

America.[5] When FreedomLine was released, Eaton projected that automated mechanical transmissions would account for 30-50% of the market for all HD transmission sales by 2004 or 2005.

**[*265]** *2. Eaton's Long-Term Agreements*

In late 1999 through early 2000, the trucking industry experienced a 40-50% decline in demand for new heavy-duty trucks. Shortly thereafter, Eaton entered into new long-term agreements ("LTAs") with each OEM. Although long-term supply contracts were not uncommon in the industry, and were also utilized by Meritor in the 1990s, Eaton's new LTAs were unprecedented in terms of their length and coverage of the market. Eaton signed LTAs with every OEM, and each LTA was for a term of at least five years.

Although the LTAs' terms varied somewhat, **[**8]** the key provisions were similar. Each LTA included a conditional rebate provision, under which an OEM would only receive rebates if it purchased a specified percentage of its requirements from Eaton.[6] Eaton's LTA with Freightliner, the largest OEM, provided for rebates if Freightliner purchased 92% or more of its requirements from Eaton.[7] Under Eaton's LTA with International, Eaton agreed to make an up-front payment of $2.5 million, and any additional rebates were conditioned on International purchasing 87% to 97.5% of its requirements from Eaton. The PACCAR LTA provided for an up-front payment of $1 million, and conditioned rebates on PACCAR meeting a 90% to 95% market-share penetration target. Finally, Eaton's LTA with Volvo provided for discounts if Volvo reached a market-share penetration level of 70% to 78%.[8] The LTAs were not true requirements contracts because they did not expressly require the OEMs to purchase a specified percentage of their needs from Eaton. However, the Freightliner and Volvo LTAs gave Eaton the right to terminate the agreements if the share penetration goals were not met. Additionally, if an OEM did not meet its market-share penetration target for one year, **[**9]** Eaton could require repayment of all contractual savings.

Each LTA also required the OEM to publish Eaton as the standard offering in its data book, and under two of the four LTAs, the OEM was required to remove competitors' products from its data book entirely. **[**10]** Freightliner agreed to exclusively publish Eaton transmissions in its data books through 2002, but reserved the right to publish ZF Meritor's FreedomLine through the life of the agreement. In 2002, Freightliner and Eaton revised the LTA to allow Freightliner to publish other competitors' transmissions, but the revised LTA provided that Eaton had the right to "renegotiate the rebate schedule" if Freightliner chose to publish a competitor's transmission. Subsequently, Freightliner agreed to a request by Eaton to remove FreedomLine from all of its data books. Eaton's LTA with International also required that International list exclusively Eaton transmissions in its electronic **[*266]** data book. International did, however, publish ZF

---

5 Eaton did not produce a two-pedal automated mechanical transmission at the time, and would not fully release one until 2004.

6 We will refer to these as "market-share" discounts or "market-penetration" discounts. It is important to distinguish such discounts from quantity or volume discounts. Quantity discounts provide the buyer with a lower price for purchasing a specified minimum quantity or volume from the seller. In contrast, market-share discounts grant the buyer a lower price for taking a specified minimum percentage of its purchases from the seller. Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 768, at 169 (3d ed. 2008).

7 In 2003, Freightliner and Eaton modified the agreement from a fixed 92% goal to a sliding scale, which entitled Freightliner to different rebates at different market-penetration levels.

8 The share penetration targets in the Volvo LTA were lower because Volvo also manufactured transmissions for use in its own trucks. The commitment to Eaton, plus Volvo's own manufactured products, accounted for more than 85% of Volvo's needs.

Meritor's manual transmissions in its printed data book. The Volvo and PACCAR LTAs did not require that Eaton products be the exclusive offering, but did require that Eaton products be listed as the preferred offering. Both Volvo and PACCAR continued to list ZF Meritor's products in their data books. In the 1990s, Meritor's products were listed in all OEM component data books, and in some cases, had preferred positioning.

The LTAs also required the OEMs to "preferential **[**11]** price" Eaton transmissions against competitors' equivalent transmissions. Eaton claims that it sought preferential pricing to ensure that its low prices were passed on to truck buyers. However, there were no express requirements in the LTAs that savings be passed on to truck buyers (i.e., that Eaton's prices be reduced) and there is evidence that the "preferential pricing" was achieved by both lowering the prices of Eaton's products and raising the prices of competitors' products. Eaton notes that it was "common" for price savings to be passed down to truck buyers, and a Volvo executive testified that some of the savings from Eaton products were passed down while others were kept to improve profit margins. Plaintiffs, however, emphasize that according to an email sent by Eaton to Freightliner, the Freightliner LTA required that ZF Meritor's products be priced at a $200 premium over equivalent Eaton products. Likewise, International agreed to an "artificial[] penal[ty]" of $150 on all of ZF Meritor's transmissions as of early 2003, and PACCAR imposed a penalty on customers who chose ZF Meritor's products.

Finally, each LTA contained a "competitiveness" clause, which permitted the OEM **[**12]** to purchase transmissions from another supplier if that supplier offered the OEM a lower price or a better product, the OEM notified Eaton of the competitor's offer, and Eaton could not match the price or quality of the product after good faith efforts. The parties dispute the significance of the "competitiveness" clauses. Eaton maintains that Plaintiffs were free to win the OEMs' business simply by offering a better product or a lower price, while Plaintiffs argue and presented testimony from OEM officials that, due to Eaton's status as a dominant supplier, the competitiveness clauses were effectively meaningless.

*3. Competition under the LTAs and Plaintiffs' Exit from the Market*

After Eaton entered into its LTAs with the OEMs, ZF Meritor shifted its marketing focus from the OEM level to a strategy targeted at truck buyers. Also during this time period, both ZF Meritor and Eaton experienced quality and performance issues with their transmissions. For example, Eaton's Lightning transmission, which was an initial attempt by Eaton to compete with FreedomLine, was "not perceived as a good [product]" and was ultimately taken off the market. ZF Meritor's FreedomLine and "G Platform" transmissions **[**13]** required frequent repairs, and in 2002 and 2003, ZF Meritor faced millions of dollars in warranty claims.

During the life of the LTAs, the OEMs worked with Eaton to develop a strategy to combat ZF Meritor's growth. On Eaton's urging, the OEMs imposed additional price penalties on customers that selected ZF Meritor products, "force fed" Eaton products to customers, and sought to persuade truck fleets using ZF Meritor transmissions to shift to Eaton transmissions. At all times relevant to this case, Eaton's average prices were lower than Plaintiffs' average prices, and on several occasions, Plaintiffs declined to grant price concessions **[*267]** requested by OEMs. Although Eaton's prices were generally lower than Plaintiffs' prices, Eaton never priced at a level below its costs.

By 2003, ZF Meritor determined that it was limited by the LTAs to no more than 8% of the market, far less than the 30% that it had projected at the beginning of the joint venture. ZF Meritor

officials concluded that the company could not remain viable with a market share below 10% and therefore decided to dissolve the joint venture. After ZF Meritor's departure, Meritor remained a supplier of HD transmissions and became **[**14]** a sales agent for ZF AG to ensure continued customer access to the FreedomLine. However, Meritor's market share dropped to 4% by the end of fiscal year 2005, and Meritor exited the business in January 2007.

**B. Procedural History**

On October 5, 2006, Plaintiffs filed suit against Eaton in the U.S. District Court for the District of Delaware, alleging that Eaton used unlawful agreements in restraint of trade, in violation of Section 1 of the Sherman Act, *15 U.S.C. § 1*; acted unlawfully to maintain a monopoly, in violation of *Section 2* of the Sherman Act, *15 U.S.C. § 2*; and entered into illegal restrictive dealing agreements, in violation of Section 3 of the Clayton Act, *15 U.S.C. § 14*. Specifically, Plaintiffs alleged that Eaton "used its dominant position to induce all heavy duty truck manufacturers to enter into *de facto* exclusive dealing contracts with Eaton," and that such agreements foreclosed Plaintiffs from over 90% of the market for HD transmission sales. Plaintiffs sought treble damages, pursuant to Section 4 of the Clayton Act, *15 U.S.C. § 15*, and injunctive relief, pursuant to Section 16 of the Clayton Act, *15 U.S.C. § 26*.

On February 17, 2009, Plaintiffs' expert, Dr. David DeRamus **[**15]** ("DeRamus"), submitted a report on both liability and damages. On May 11, 2009, Eaton filed a motion, pursuant to *Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993)*, to exclude DeRamus's testimony. The District Court ruled that DeRamus would be allowed to testify regarding liability, but excluded DeRamus's testimony on the issue of damages on the basis that his damages opinion failed the reliability requirements of *Daubert* and the Federal Rules of Evidence.*ZF Meritor LLC v. Eaton Corp.*, 646 F. Supp. 2d 663 (D. Del. 2009). Plaintiffs filed a motion for clarification, requesting that DeRamus be allowed to testify to alternate damages calculations based on other data in his expert report, or in the alternative, seeking permission for DeRamus to amend his expert report to present his alternate damages calculations. The District Court decided to defer resolution of the damages issue and bifurcate the case.

The parties proceeded to trial on liability. On October 8, 2009, after a four-week trial, the jury returned a complete verdict for Plaintiffs, finding that Eaton had violated *Sections 1* and *2* of the Sherman Act, and *Section 3* of the Clayton Act. Following the verdict, Plaintiffs **[**16]** asked the District Court to set a damages trial, but no damages trial was set at that time. On October 30, 2009, Plaintiffs supplemented their earlier motion for clarification, incorporating additional arguments based on developments at trial.

On November 3, 2009, Eaton filed a renewed motion for judgment as a matter of law, or in the alternative, for a new trial. Eaton's principal argument was that Plaintiffs failed to establish that Eaton engaged in anticompetitive conduct because Plaintiffs did not show, nor did they attempt to **[*268]** show, that Eaton priced its transmissions below its costs. Sixteen months later, on March 10, 2011, the District Court denied Eaton's motion, reasoning that Eaton's prices were not dispositive, and that there was sufficient evidence for a jury to conclude that Eaton's conduct unlawfully foreclosed competition in a substantial portion of the HD transmissions market. *ZF Meritor LLC v. Eaton Corp., 769 F. Supp. 2d 684 (D. Del. 2011)*.

On August 4, 2011, the District Court denied Plaintiffs' motion for clarification, and denied Plaintiffs' request to allow DeRamus to amend his expert report to include alternate damages

calculations. The same day, the District Court **[**17]** entered an order awarding Plaintiffs $0 in damages. On August 19, 2011, the District Court entered an injunction prohibiting Eaton from "linking discounts and other benefits to market penetration targets," but stayed the injunction pending appeal. Eaton filed a timely notice of appeal and Plaintiffs filed a timely cross-appeal.

**II. JURISDICTION AND STANDARD OF REVIEW**

The District Court had jurisdiction over this case pursuant to *28 U.S.C. §§ 1331* and *1337*. We have appellate jurisdiction under *28 U.S.C. § 1291*.

***HN1*** We exercise plenary review over an order denying a motion for judgment as a matter of law. *LePage's Inc. v. 3M, 324 F.3d 141, 145 (3d Cir. 2003)* (en banc). A motion for judgment as a matter of law should be granted "only if, viewing the evidence in the light most favorable to the nonmovant and giving it the advantage of every fair and reasonable inference, there is insufficient evidence from which a jury reasonably could find liability." *Id. at 145-46* (quoting *Lightning Lube, Inc. v. Witco Corp., 4 F.3d 1153, 1166 (3d Cir. 1993))*. We review questions of law underlying a jury verdict under a plenary standard of review. *Id. at 146* (citing *Bloom v. Consol. Rail Corp., 41 F.3d 911, 913 (3d Cir. 1994))*. **[**18]** Underlying legal questions aside, "[a] jury verdict will not be overturned unless the record is critically deficient of that quantum of evidence from which a jury could have rationally reached its verdict." *Swineford v. Snyder Cnty., 15 F.3d 1258, 1265 (3d Cir. 1994)*.

***HN2*** We review a district court's decision to exclude expert testimony for abuse of discretion. *Montgomery Cnty. v. Microvote Corp., 320 F.3d 440, 445 (3d Cir. 2003)*. To the extent the district court's decision involved an interpretation of the Federal Rules of Evidence, our review is plenary. *Elcock v. Kmart Corp., 233 F.3d 734, 745 (3d Cir. 2000)*. ***HN3*** We also review a district court's decisions regarding discovery and case management for abuse of discretion. *United States v. Schiff, 602 F.3d 152, 176 (3d Cir. 2010)*; *In re Fine Paper Antitrust Litig., 685 F.2d 810, 817-18 (3d Cir. 1982)*.

***HN4*** We review legal conclusions regarding standing de novo, and the underlying factual determinations for clear error. *Interfaith Cmty. Org. v. Honeywell Int'l, Inc., 399 F.3d 248, 253 (3d Cir. 2005)*.

**III. DISCUSSION**

**A. Effect of the Price-Cost Test**

The most significant issue in this case is whether Plaintiffs' allegations under *Sections 1* and *2* of the **[**19]** Sherman Act and *Section 3 of the Clayton Act* are subject to the price-cost test or the "rule of reason" applicable to exclusive dealing claims. ***HN5*** Under the rule of reason, an exclusive dealing arrangement will be unlawful only if its "probable effect" is to substantially lessen competition in the relevant market. *Tampa Elec. Coal Co. v. Nashville Coal Co.,* **[*269]** 365 U.S. 320, 327-29, 81 S. Ct. 623, 5 L. Ed. 2d 580 (1961); *United States v. Dentsply Int'l, 399 F.3d 181, 191 (3d Cir. 2005)*; *Barr Labs., Inc. v. Abbott Labs., 978 F.2d 98, 110 (3d Cir. 1992)*. In contrast, under the price-cost test, to succeed on a challenge to the defendant's pricing practices, a plaintiff must prove "that the [defendant's] prices are below an appropriate measure of [the

defendant's] costs." *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp., 509 U.S. 209, 222, 113 S. Ct. 2578, 125 L. Ed. 2d 168 (1993)*.[9]

Eaton urges us to apply the price-cost test, arguing that Plaintiffs failed to establish that Eaton engaged in anticompetitive conduct or that Plaintiffs suffered an antitrust injury because Plaintiffs did **[**22]** not prove—or even attempt to prove—that Eaton priced its transmissions below an appropriate measure of its costs. We decline to adopt Eaton's unduly narrow characterization of this case as a "pricing practices" case, i.e., a case in which price is the clearly predominant mechanism of exclusion. Plaintiffs consistently argued that the LTAs, in their entirety, constituted *de facto* exclusive dealing contracts, which improperly foreclosed a substantial share of the market, and thereby harmed competition. Accordingly, as we will discuss below, we must evaluate the legality of Eaton's conduct under the rule of reason to determine whether the "probable effect" of such conduct was to substantially lessen competition in the HD transmissions market in North America. *Tampa Elec., 365 U.S. at 327-29*. The price-cost test is not dispositive.

**[*270]** *1. Law of Exclusive Dealing*

***HN9*** An exclusive dealing arrangement is an agreement in which a buyer agrees to purchase certain goods or services only from a particular seller for a certain period of time. Herbert Hovenkamp, *Antitrust Law* ¶ 1800a, at 3 (3d ed. 2011). The primary antitrust concern with exclusive dealing arrangements is that they may be used by a monopolist **[**23]** to strengthen its position, which may ultimately harm competition. *Dentsply, 399 F.3d at 191*. Generally, a prerequisite to any exclusive dealing claim is an agreement to deal exclusively. *Tampa Elec., 365 U.S. at 326-27*; *see Dentsply, 399 F.3d at 193-94*; *Barr Labs., 978 F.2d at 110* & n.24.[10] An express exclusivity requirement, however, is not necessary, *LePage's, 324 F.3d at 157*, because we look past the terms of the contract to ascertain the relationship between the parties and the effect

---

[9] Although Plaintiffs brought claims under three statutes (*Sections 1* and *2* of the Sherman Act and Section 3 of the Clayton Act), our analysis regarding the applicability of the price-cost test is the same for all of Plaintiffs' claims. ***HN6*** In order to establish an actionable antitrust violation, a plaintiff must show both that the defendant engaged in anticompetitive conduct and that **[**20]** the plaintiff suffered antitrust injury as a result. *Atl. Richfield Co. v. USA Petroleum Co*., 495 U.S. 328, 339-40, 110 S. Ct. 1884, 109 L. Ed. 2d 333 (1990). Because a lack of anticompetitive conduct precludes a finding of antitrust injury, the key question for us is whether Eaton engaged in anticompetitive conduct. *See id*. at 339 ("Antitrust injury does not arise . . . until a private party is adversely affected by an *anticompetitive* aspect of the defendant's conduct.").

***HN7*** *Sections 1* and *2* of the Sherman Act and Section 3 of the Clayton Act each include an anticompetitive conduct element, although each statute articulates that element in a slightly different way. Under Section 1 of the Sherman Act, a plaintiff must establish that the defendant was a party to a contract, combination or conspiracy that "imposed an unreasonable restraint on trade." *15 U.S.C. § 1*; *In re Ins. Brokerage Antitrust Litig*., 618 F.3d 300, 314-15 (3d Cir. 2010). Under *Section 2*, a plaintiff must demonstrate that the defendant willfully acquired or maintained its monopoly power in the relevant market. *15 U.S.C. § 2*; *United States v. Grinnell Corp*., 384 U.S. 563, 570-71, 86 S. Ct. 1698, 16 L. Ed. 2d 778 (1966). "A monopolist willfully acquires or maintains monopoly power when it competes **[**21]** on some basis other than the merits." *LePage's Inc. v. 3M*, 324 F.3d 141, 147 (3d Cir. 2003) (en banc) (citing *Aspen Skiing Co. v. Aspen Highlands Skiing Corp*., 472 U.S. 585, 605 n.32, 105 S. Ct. 2847, 86 L. Ed. 2d 467 (1985)). Finally, Section 3 of the Clayton Act makes it unlawful for a person to enter into an exclusive dealing contract where the effect of such an agreement is to substantially lessen competition or create a monopoly. 15 U.S.C. § 14.

***HN8*** Exclusive dealing claims may be brought under Sections 1 and *2* of the Sherman Act and Section 3 of the Clayton Act. *LePage's*, 324 F.3d at 157. Additionally, the Supreme Court has held that the price-cost test is not confined to any one antitrust statute, and applies to pricing practices claims under the Sherman Act, the Clayton Act, and the Robinson-Patman Act. *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp*., 509 U.S. 209, 222-23, 113 S. Ct. 2578, 125 L. Ed. 2d 168 (1993); *Atl. Richfield*, 495 U.S. at 339-40. Thus, regardless of which test applies, that test is applicable to each of Plaintiffs' claims.

[10] ***HN10*** Evidence of an agreement is expressly required under Section 1 of the Sherman Act and Section 3 of the Clayton Act. *See15 U.S.C. §§ 1* and 14. However, an agreement is not necessarily required under *Section 2* of the Sherman Act, which can provide a vehicle for challenging a dominant firm's unilateral imposition of exclusive dealing on customers. *See15 U.S.C. § 2*; Herbert Hovenkamp, *Antitrust Law* ¶ 1821a, at 183 (3d ed. 2011).

of the agreement "in the real world." Dentsply, 399 F.3d at 191, 194. Thus, *de facto* exclusive dealing claims are cognizable under the antitrust laws. LePage's, 324 F.3d at 157.

***HN11*** Exclusive dealing agreements are often entered into for entirely procompetitive reasons, and generally **[**24]** pose little threat to competition. *Race Tires Am., Inc. v. Hoosier Racing Tire Corp., 614 F.3d 57, 76 (3d Cir. 2010)* ("[I]t is widely recognized that in many circumstances, [exclusive dealing arrangements] may be highly efficient—to assure supply, price stability, outlets, investment, best efforts or the like— and pose no competitive threat at all.") (quoting *E. Food Servs. v. Pontifical Catholic Univ. Servs. Ass'n, 357 F.3d 1, 8 (1st Cir. 2004)*). For example, "[i]n the case of the buyer, they may assure supply, afford protection against rises in price, enable long-term planning on the basis of known costs, and obviate the expense and risk of storage in the quantity necessary for a commodity having a fluctuating demand." *Standard Oil Co. v. United States, 337 U.S. 293, 306, 69 S. Ct. 1051, 93 L. Ed. 1371 (1949)*. From the seller's perspective, an exclusive dealing arrangement with customers may reduce expenses, provide protection against price fluctuations, and offer the possibility of a predictable market. *Id. at 306-07*; *see also* *Ryko Mfg. Co. v. Eden Servs., 823 F.2d 1215, 1234 n.17 (8th Cir. 1987)* (explaining that exclusive dealing contracts can help prevent dealer free-riding on manufacturer-supplied investments **[**25]** to promote rival's products). As such, competition to be an exclusive supplier may constitute "a vital form of rivalry," which the antitrust laws should encourage. *Race Tires, 614 F.3d at 83* (quoting *Menasha Corp. v. News Am. Mktg. In-Store, Inc., 354 F.3d 661, 663 (7th Cir. 2004)*).

However, ***HN12*** "[e]xclusive dealing can have adverse economic consequences by allowing one supplier of goods or services unreasonably to deprive other suppliers of a market for their goods[.]" *Jefferson Parish Hosp. Dist. No. 2 v. Hyde, 466 U.S. 2, 45, 104 S. Ct. 1551, 80 L. Ed. 2d 2 (1984)* (O'Connor, J., concurring), *abrogated on other grounds* by *Ill. Tool Works Inc. v. Indep. Ink, Inc., 547 U.S. 28, 126 S. Ct. 1281, 164 L. Ed. 2d 26 (2006)*; *Barry Wright, 724 F.2d at 236* (explaining that "under certain circumstances[,] foreclosure might discourage sellers from entering, or seeking to sell in, a market at all, thereby reducing the amount of competition that **[*271]** would otherwise be available"). Exclusive dealing arrangements are of special concern when imposed by a monopolist. *See* *Dentsply, 399 F.3d at 187* ("Behavior that otherwise might comply with antitrust law may be impermissibly exclusionary when practiced by a monopolist."). For example:

> [S]uppose an established manufacturer has **[**26]** long held a dominant position but is starting to lose market share to an aggressive young rival. A set of strategically planned exclusive-dealing contracts may slow the rival's expansion by requiring it to develop alternative outlets for its product, or rely at least temporarily on inferior or more expensive outlets. Consumer injury results from the delay that the dominant firm imposes on the smaller rival's growth.Phillip Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 1802c, at 64 (2d ed. 2002). In some cases, a dominant firm may be able to foreclose rival suppliers from a large enough portion of the market to deprive such rivals of the opportunity to achieve the minimum economies of scale necessary to compete. *Id.; see* *LePage's, 324 F.3d at 159*.

***HN13*** Due to the potentially procompetitive benefits of exclusive dealing agreements, their legality is judged under the rule of reason. *Tampa Elec., 365 U.S. at 327*. The legality of an exclusive dealing arrangement depends on whether it will foreclose competition in such a substantial

share of the relevant market so as to adversely affect competition. *Id. at 328*; *Barr Labs., 978 F.2d at 110*. In conducting this analysis, courts consider not only the **[**27]** percentage of the market foreclosed, but also take into account "the restrictiveness and the economic usefulness of the challenged practice in relation to the business factors extant in the market." *Barr Labs., 978 F.2d at 110-11* (quoting *Am. Motor Inns, Inc. v. Holiday Inns, Inc., 521 F.2d 1230, 1251-52 n.75 (3d Cir. 1975))*. As the Supreme Court has explained:

> [I]t is necessary to weigh the probable effect of the contract on the relevant area of effective competition, taking into account the relative strength of the parties, the proportionate volume of commerce involved in relation to the total volume of commerce in the relevant market area, and the probable immediate and future effects which pre-emption of that share of the market might have on effective competition therein.*Tampa Elec., 365 U.S. at 329*. In other words, an exclusive dealing arrangement is unlawful only if the "probable effect" of the arrangement is to substantially lessen competition, rather than merely disadvantage rivals. *Id.; Dentsply, 399 F.3d at 191* ("The test [for determining anticompetitive effect] is not total foreclosure, but whether the challenged practices bar a substantial number of rivals or severely restrict **[**28]** the market's ambit.").

***HN14*** There is no set formula for evaluating the legality of an exclusive dealing agreement, but modern antitrust law generally requires a showing of significant market power by the defendant, *Tampa Elec., 365 U.S. at 329*; *Race Tires, 614 F.3d at 74-75*; *LePage's, 324 F.3d at 158*, substantial foreclosure, *Tampa Elec., 365 U.S. at 327-28*; *United States v. Microsoft Corp., 253 F.3d 34, 69, 346 U.S. App. D.C. 330 (D.C. Cir. 2001)*, contracts of sufficient duration to prevent meaningful competition by rivals, *CDC Techs., Inc. v. IDEXX Lab., Inc., 186 F.3d 74, 81 (2d Cir. 1999)*; *Omega Envtl., Inc. v. Gilbarco, Inc., 127 F.3d 1157, 1163 (9th Cir. 1997)*, and an analysis of likely or actual anticompetitive effects considered in light of any procompetitive effects, *Race Tires, 614 F.3d at 75*; *Dentsply,* **[*272]** 399 F.3d at 194; *Barr Labs., 978 F.2d at 111*. Courts will also consider whether there is evidence that the dominant firm engaged in coercive behavior, *Race Tires, 614 F.3d at 77*; *SmithKline Corp. v. Eli Lilly & Co., 575 F.2d 1056, 1062 (3d Cir. 1978)*, and the ability of customers to terminate the agreements, *Dentsply, 399 F.3d at 193-94*. The use of exclusive dealing by competitors of the defendant is **[**29]** also sometimes considered. *Standard Oil, 337 U.S. at 309, 314*; *NicSand, Inc. v. 3M Co., 507 F.3d 442, 454 (6th Cir. 2007)*.

*2.* Brooke Group *and the Price-Cost test*

We turn now to some fundamental principles regarding predatory pricing claims and the price-cost test. ***HN15*** "Predatory pricing may be defined as pricing below an appropriate measure of cost for the purpose of eliminating competitors in the short run and reducing competition in the long run." *Cargill, Inc. v. Monfort of Colo., 479 U.S. 104, 117, 107 S. Ct. 484, 93 L. Ed. 2d 427 (1986)*;*see Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 584 n.8, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986)*; *Advo, Inc. v. Phila. Newspapers, Inc., 51 F.3d 1191, 1198 (3d Cir. 1995)*. The Supreme Court has expressed deep skepticism of predatory pricing claims. *See Cargill, 479 U.S. at 121 n.17* ("Although the commentators disagree as to whether it is ever rational for a firm to engage in such conduct, it is plain that the obstacles to the successful execution of a strategy of predation are manifold, and that the disincentives to engage in such a strategy are accordingly numerous.") (citations omitted); *Matsushita, 475 U.S. at 589* ("[P]redatory **[**30]** pricing schemes are rarely tried, and even more rarely successful.") (citations omitted). In

the typical predatory pricing scheme, a firm reduces the sale price of its product to below-cost, intending to drive competitors out of the business. *Weyerhaeuser Co. v. Ross-Simmons Hardwood Lumber Co., 549 U.S. 312, 318, 127 S. Ct. 1069, 166 L. Ed. 2d 911 (2007)*. Then, once competitors have been eliminated, the firm raises its prices to supra competitive levels. *Id*. For such a scheme to make economic sense, the firm must recoup the losses suffered during the below-cost phase in the supra competitive phase. *Id.; see Matsushita, 475 U.S. at 589* (explaining that success under such a scheme is "inherently uncertain" because the firm must sustain definite short-term losses, but the long-run gain depends on successfully eliminating competition).

In *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp., 509 U.S. at 222-24*, the Supreme Court fashioned a two-part test that reflected this "economic reality." *Weyerhaeuser, 549 U.S. at 318*. The Court held that, to succeed on a predatory pricing claim, the plaintiff must prove: (1) "that the prices complained of are below an appropriate measure of [the defendant's] costs"; and (2) that the **[**31]** defendant had "a dangerous probability . . . of recouping its investment in below-cost prices." *Brooke Grp., 509 U.S. at 222-24* (citations omitted). We are concerned only with the first requirement, which has become known as the price-cost test. ***HN16*** In adopting the price-cost test, the Court rejected the notion that above-cost prices that are below general market levels or below the costs of a firm's competitors are actionable under the antitrust laws. *Id. at 223*. "Low prices benefit consumers regardless of how those prices are set, and so long as they are above predatory levels [i.e., above-cost], they do not threaten competition." *Id*. (quoting *Atl. Richfield Co. v. USA Petroleum Co., 495 U.S. 328, 340, 110 S. Ct.* **[*273]** 1884, 109 L. Ed. 2d 333 (1990)). Low, but above-cost, prices are generally procompetitive because "the exclusionary effect of prices above a relevant measure of cost [generally] reflects the lower cost structure of the alleged predator, and so represents competition on the merits[.]" *Id.; see Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 488, 97 S. Ct. 690, 50 L. Ed. 2d 701 (1977)* ("The antitrust laws . . . were enacted for 'the protection of competition, not competitors.'") (quoting *Brown Shoe Co. v. United States, 370 U.S. 294, 320, 82 S. Ct. 1502, 8 L. Ed. 2d 510 (1962))*. **[**32]** The Court acknowledged that ***HN17*** there may be situations in which above-cost prices are anticompetitive, but stated that it "is beyond the practical ability of a judicial tribunal" to ascertain whether above-cost pricing is anticompetitive "without courting intolerable risks of chilling legitimate price-cutting." *Brooke Grp., 509 U.S. at 223* (citing Phillip Areeda & Herbert Hovenkamp, *Antitrust Law* ¶¶ 714.2, 714.3 (Supp. 2002)). "To hold that the antitrust laws protect competitors from the loss of profits due to [above-cost] price competition would, in effect, render illegal any decision by a firm to cut prices in order to increase market share. The antitrust laws require no such perverse result." *Id*. (quoting *Cargill, 479 U.S. at 116*). Significantly, because "[c]utting prices in order to increase business often is the very essence of competition . . ., [i]n cases seeking to impose antitrust liability for prices that are too low, mistaken inferences are 'especially costly, because they chill the very conduct that antitrust laws are designed to protect.'" *Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc., 555 U.S. 438, 451, 129 S. Ct. 1109, 172 L. Ed. 2d 836 (2009)* (quoting *Matsushita, 475 U.S. at 594*) **[**33]** (additional citations omitted).

*3. Effect of the Price-Cost Test on Plaintiffs' Exclusive Dealing Claims*

Eaton argues that principles from the predatory pricing case law apply in this case because Plaintiffs' claims are, at their core, no more than objections to Eaton offering prices, through its rebate program, which Plaintiffs were unable to match. Eaton contends that Plaintiffs have identified nothing, other than Eaton's pricing practices, that incentivized the OEMs to enter into the LTAs, and because price was the incentive, we must apply the price-cost test. We acknowledge

that even if a plaintiff frames its claim as one of exclusive dealing, the price-cost test may be dispositive. ***HN18*** Implicit in the Supreme Court's creation of the price-cost test was a balancing of the procompetitive justifications of above-cost pricing against its anticompetitive effects (as well as the anticompetitive effects of allowing judicial inquiry into above-cost pricing), and a conclusion that the balance always tips in favor of allowing above-cost pricing practices to stand. *See linkLine, 555 U.S. at 451*; *Brooke Grp., 509 U.S. at 223*. Thus, in the context of exclusive dealing, the price-cost test may be **[**34]** utilized as a specific application of the "rule of reason" when the plaintiff alleges that price is the vehicle of exclusion. *See, e.g., Concord Boat Corp. v. Brunswick Corp., 207 F.3d 1039, 1060-63 (8th Cir. 2000)*.

Here, Eaton argues that the price-cost test is dispositive, and therefore that Plaintiffs' claims must fail because Plaintiffs failed to show that the market-share rebates offered by Eaton pursuant to the LTAs resulted in below-cost prices. We do not disagree that predatory pricing principles, including the price-cost test, would control if this case presented solely **[*274]** a challenge to Eaton's pricing practices.[11] ***HN19*** The lesson of the predatory pricing case **[*275]** law is that,

---

[11] Despite the arguments of *amicus curiae*, the American Antitrust Institute, our decision in *LePage's v. 3M* does not indicate otherwise. In *LePage's*, we declined to apply the price-cost test to a challenge to a bundled rebate scheme, reasoning **[**36]** that such a scheme was better analogized to unlawful tying than to predatory pricing. *See*324 F.3d at 155. In that case, the plaintiff (LePage's) was the market leader in sales of "private label" (store brand) transparent tape. *Id*. at 144. As LePage's market share fell, it brought suit against 3M, alleging that 3M, which manufactured Scotch tape, some private label tape, and a number of other products, leveraged its monopoly power over Scotch brand tape and other products to monopolize the private label tape market. *Id*. at 145. Specifically, LePage's challenged 3M's multi-tiered bundled rebate program, which offered progressively higher rebates when customers increased purchases across 3M's different product lines. *Id*. The rebate programs also set customer-specific target growth rates. *Id*. at 154. The sizes of the rebates were linked to the number of product lines in which the targets were met: if a customer failed to meet the target for any one product, it would lose the rebates across all product lines. *Id*. LePage's could not offer these discounts because it did not sell the same diverse array of products as 3M. *Id*. at 155.

Relying on *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp*., 509 U.S. 209 (1993), 113 S. Ct. 2578, 125 L. Ed. 2d 168, 3M **[**37]** argued that its bundled rebate program was lawful because the rebates never resulted in below-cost pricing. We disagreed, reasoning that the principal anticompetitive effect of 3M's bundled rebates was analogous to an unlawful tying arrangement: when offered by a monopolist, the rebates "may foreclose portions of the market to a potential competitor who does not manufacture an equally diverse group of products and who therefore cannot make a comparable offer." *LePage's*, 324 F.3d at 155.

For several reasons, we interpret *LePage's* narrowly. Most important, ***HN20*** in light of the analogy drawn in *LePage's* between bundled rebates and unlawful tying, which "cannot exist unless two separate product markets have been linked," *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 21, 104 S. Ct. 1551, 80 L. Ed. 2d 2 (1984), *abrogated on other grounds* by *Ill. Tool Works Inc. v. Indep. Ink, Inc*., 547 U.S. 28, 126 S. Ct. 1281, 164 L. Ed. 2d 26 (2006), *LePage's* is inapplicable where, as here, only one product is at issue and the plaintiffs have not made any allegations of bundling or tying. The reasoning of *LePage's* is limited to cases in which a single-product producer is excluded through a bundled rebate program offered by a producer of multiple products, which conditions **[**38]** the rebates on purchases across multiple different product lines. Accordingly, we join our sister circuits in holding that the price-cost test applies to market-share or volume rebates offered by suppliers within a single-product market. *See NicSand, Inc. v. 3M Co*., 507 F.3d 442, 452 (6th Cir. 2007); *Concord Boat Corp. v. Brunswick Corp*., 207 F.3d 1039, 1061 (8th Cir. 2000); *Barry Wright Corp. v. ITT Grinnell Corp*., 724 F.2d 227, 236 (1st Cir. 1983).

Additionally, several of the bases on which we distinguished *Brooke Group* have been undermined by intervening Supreme Court precedent, which counsels caution in extending *LePage's*. For example, we indicated in *LePage's*, 324 F.3d at 151, that *Brooke Group* might be confined to the Robinson-Patman Act, but the Supreme Court has made clear that the standard adopted in *Brooke Group* also applies to predatory pricing claims under the Sherman Act. *Weyerhaeuser Co. v. Ross-Simmons Hardwood Lumber Co*., 549 U.S. 312, 318 n.1, 127 S. Ct. 1069, 166 L. Ed. 2d 911 (2007). Additionally, *LePage's*, 324 F.3d at 151-52, suggested that *Brooke Group* is not applicable in cases involving monopolists, but the Supreme Court has since applied *Brooke Group's* price-cost test to claims against a monopolist, **[**39]** *Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc*., 555 U.S. 438, 447-48, 129 S. Ct. 1109, 172 L. Ed. 2d 836 (2009), and a monopsonist, *Weyerhaeuser*, 549 U.S. at 320-25. Finally, we observed in *LePage's* that, in the years following *Brooke Group*, the Supreme Court had only cited the case four times (and for unrelated propositions), but since *LePage's*, the Court has reaffirmed and extended *Brooke Group*. *See linkLine*, 555 U.S. at 447-48; *Weyerhaeuser*, 549 U.S. at 325. In doing so, the Court emphasized the importance of *Brooke Group* in light of "developments in economic theory and

generally, above-cost prices are not anticompetitive, and although there may be rare cases where above-cost prices are anticompetitive in the long run, it is "beyond the practical ability" of courts to identify those rare cases without creating an impermissibly high risk of deterring legitimate procompetitive behavior (i.e., price-cutting). *linkLine, 555 U.S. at 452*; *Weyerhaeuser, 549 U.S. at 318-19*; *Brooke Grp., 509 U.S. at 223*. These principles extend to above-cost discounting or rebate programs, which condition **[**35]** the discounts or rebates on the customer's purchasing of a specified volume or a specified percentage of its requirements from the seller. *See* *NicSand, 507 F.3d at 451-52* (applying price-cost test to a challenge to up-front payments offered by a supplier to several large retailers on the basis that such payments were "nothing more than 'price reductions offered to the buyers for the exclusive right to supply a set of stores under multi-year contracts'"); *Concord Boat, 207 F.3d at 1060-63* (applying price-cost test to volume discounts and market-share discounts offered by a manufacturer); *Barry Wright, 724 F.2d at 232* (applying the price-cost test to uphold discounts linked to a requirements contract); *see also* *Race Tires, 614 F.3d at 79* ("[I]t is no more an act of coercion, collusion, or [other anticompetitive conduct] for [a supplier] . . . to offer more money to [a customer] than it is for such [a] supplier[] to offer the lowest . . . prices.").

Moreover, ***HN21*** a plaintiff's characterization of its claim as an exclusive dealing claim does not take the price-cost test off the table. Indeed, contracts in which discounts are linked to purchase (volume or market share) targets are frequently challenged as *de facto* exclusive dealing arrangements on the grounds that the discounts induce customers to deal exclusively with the firm offering the rebates. Hovenkamp ¶ 1807a, at 132. However, **[**40]** when price is the clearly predominant mechanism of exclusion, the price-cost test tells us that, so long as the price is above-cost, the procompetitive justifications for, and the benefits of, lowering prices far outweigh any potential anticompetitive effects. *See* *Brooke Grp., 509 U.S. at 223*; *Concord Boat, 207 F.3d at 1062* (noting that there is always a legitimate business justification for lowering prices: attempting to attract additional business).

In each of the cases relied upon by Eaton, the Supreme Court applied the price-cost test, regardless of the way in which the plaintiff cast its grievance, because pricing itself operated as the exclusionary tool. For example, in *Cargill, Inc. v. Monfort of Colorado, Inc.*, the plaintiff argued that a proposed merger between vertically integrated firms violated *Section 7* of the Clayton Act because the result of the merger would have been to substantially lessen competition or create a monopoly. *479 U.S. at 114*. The plaintiff offered, as a theory of antitrust injury, that it faced a threat of lost profits stemming from the possibility that the defendant, after the merger, would lower its prices to a level at or above-cost. *Id. at 114-15*. **[**41]** The plaintiff claimed that it would have to respond by lowering its prices, which would cause it to suffer a loss in profitability. *Id. at 115*. The Supreme Court held that such a theory did not present a cognizable antitrust injury, reasoning that "the antitrust laws do not require the courts to protect small businesses from the loss of profits due to continued [above-cost] competition." *Id. at 116*.

**[*276]** *Atlantic Richfield Co. v. USA Petroleum Co.* involved an allegation that a vertical price-fixing agreement was unlawful under Section 1 of the Sherman Act. *495 U.S. at 331*. In that case, the plaintiff was an independent retail marketer of gasoline, which bought gasoline from major petroleum companies for resale under its own name. *Id*. The defendant was an integrated oil company, which sold directly to consumers through its own stations, and sold indirectly through

---

antitrust jurisprudence," and downplayed the significance of seemingly inconsistent circuit court antitrust precedent from the 1950s and 1960s, some of which we referenced in *LePage's*. *See* linkLine, 555 U.S. at 452 n.3.

brand dealers. *Id*. Facing competition from independent marketers like the plaintiff, the defendant adopted a new marketing strategy, under which it encouraged its dealers to match the retail prices offered by independents by offering discounts and reducing the dealers' costs. *Id. at 331-32*. The plaintiff brought suit under the Sherman **[**42]** Act, alleging that the defendant conspired with its dealers to sell gasoline at below-market levels. *Id. at 332*. The district court granted summary judgment for the defendant on the basis that the plaintiff had not shown that the defendant engaged in predatory pricing, and thus had not shown any antitrust injury. *Id. at 333*. The U.S. Court of Appeals for the Ninth Circuit reversed, *USA Petroleum Co. v. Atl. Richfield Co., 859 F.2d 687, 693 (9th Cir. 1988)*, reasoning that a showing of predatory pricing was not necessary to establish antitrust injury; rather, the antitrust laws were designed to ensure that market forces alone determine what goods and services are offered, and at what price they are sold, and thus, an antitrust injury could result from a disruption in the market. The Supreme Court disagreed, explaining that where a firm (or a group of firms) lowers prices pursuant to a vertical agreement, but maintains those prices above predatory levels, any business lost by rivals cannot be viewed as an anticompetitive consequence of the agreement. *Atl. Richfield, 495 U.S. at 337*. "A firm complaining about the harm it suffers from nonpredatory price competition is really claiming that **[**43]** it is unable to raise prices." *Id. at 337-38*.

In *Brooke Group*, the plaintiff and the defendant were competitors in the cigarette market in the early 1980s. *509 U.S. at 212*. At that time, demand for cigarettes in the United States was declining and the plaintiff, once a major force in the industry, had seen its market share drop to 2%. *Id. at 214*. In response, the plaintiff developed a line of generic cigarettes, which were significantly cheaper than branded cigarettes. *Id*. The plaintiff promoted the generic cigarettes at the wholesale level by offering rebates that increased with the volume of cigarettes ordered. *Id*. Losing volume and profits on its branded products, the defendant entered the generic cigarette market. *Id. at 215*. At the retail level, the suggested price of the defendant's generic cigarettes was the same as that of the plaintiff's cigarettes, but the defendant's volume discounts to wholesalers were larger. *Id*. The plaintiff responded by increasing its wholesale rebates, and a price war ensued. *Id. at 216*. Subsequently, the plaintiff filed a complaint against the defendant under the Robinson-Patman Act, *15 U.S.C. § 13(a)*, alleging that the defendant's volume rebates amounted **[**44]** to unlawful price discrimination. *Id*. The plaintiff explained that it would have been unable to reduce its wholesale rebates without losing substantial market share. *Id*. Accordingly, because the "essence" of the plaintiff's claim was that its "rival ha[d] priced its products in an unfair manner with an object to eliminate or retard competition and thereby gain and exercise control over prices in the relevant market," **[*277]** the plaintiff had an obligation to show that the defendant's prices were below its costs. *Id. at 222*.

Here, in contrast to *Cargill*, *Atlantic Richfield*, and *Brooke Group*, Plaintiffs did not rely solely on the exclusionary effect of Eaton's prices, and instead highlighted a number of anticompetitive provisions in the LTAs. Plaintiffs alleged that Eaton used its position as a supplier of necessary products to persuade OEMs to enter into agreements imposing *de facto* purchase requirements of roughly 90% for at least five years, and that Eaton worked in concert with the OEMs to block customer access to Plaintiffs' products, thereby ensuring that Plaintiffs would be unable to build enough market share to pose any threat to Eaton's monopoly. Therefore, because price itself was **[**45]** not the clearly predominant mechanism of exclusion, the price-cost test cases are inapposite, and the rule of reason is the proper framework within which to evaluate Plaintiffs' claims.

We recognize that Eaton's rebates were part of Plaintiffs' case. DeRamus testified about the exclusionary effect of the rebates, OEM officials testified that Eaton offered lower prices, and Plaintiffs' counsel stated in oral argument that part of the reason ZF Meritor could not increase sales above a certain level was that "the OEMs were trying to hit those [share-penetration] targets to get their money from Eaton." Eaton's post-rebate prices were attractive to the OEMs, and Eaton's low prices may, in fact, have been an inducement for the OEMs to enter into the LTAs. That fact is not irrelevant, as it may help explain why the OEMs agreed to otherwise unfavorable terms and it may help to rebut an argument that the agreements were inefficient. Hovenkamp ¶ 1807b, at 134. However, contrary to Eaton's assertions, that fact is not dispositive.

Plaintiffs presented considerable evidence that Eaton was a monopolist in the industry and that it wielded its monopoly power to effectively force every direct purchaser **[**46]** of HD transmissions to enter into restrictive long-term agreements, despite the inclusion in such agreements of terms unfavorable to the OEMs and their customers. Significantly, there was considerable testimony that the OEMs did not want to remove ZF Meritor's transmissions from their data books, but that they were essentially forced to do so or risk financial penalties or supply shortages. Several OEM officials testified that exclusive data book listing was not a common practice in the industry and, in fact, it was probably detrimental to customers. An email between Freightliner employees stated: "From a customer perspective, publishing [ZF Meritor's] product is probably the right thing to do and [it] should never have been taken out of the book. It is a good product with considerable demand in the marketplace." The email went on to conclude, however, that including ZF Meritor's products would not be "prudent" because it would jeopardize Freightliner's relationship with Eaton. Eaton itself even acknowledged that the OEMs were dissatisfied. Internal Eaton correspondence reveals that PACCAR complained that the LTAs were preventing it from promoting a competitive product (FreedomLine), **[**47]** which was being demanded by truck buyers. In fact, PACCAR felt that Eaton was holding it "hostage."

Plaintiffs also introduced evidence that not only were the rebates conditioned on the OEMs meeting the market penetration targets, but so too was Eaton's continued compliance with the agreements. As one OEM executive testified, if the market penetration targets were not met, the OEMs "would have a big risk of cancellation of the contract, price increases, and shortages if the market [was] difficult." **[*278]** Eaton was a monopolist in the HD transmissions market, and even if an OEM decided to forgo the rebates and purchase a significant portion of its requirements from another supplier, there would still have been a significant demand from truck buyers for Eaton products. Therefore, losing Eaton as a supplier was not an option.

Accordingly, this is not a case in which the defendant's low price was the clear driving force behind the customer's compliance with purchase targets, and the customers were free to walk away if a competitor offered a better price. *Compare Concord Boat, 207 F.3d at 1063* (in deciding to apply price-cost test, noting that customers were free to walk away at any time and did **[**48]** so when the defendant's competitors offered better discounts), *with Dentsply, 399 F.3d at 189-96* (applying exclusive dealing analysis where the defendant threatened to refuse to continue dealing with customers if customers purchased rival's products, and no customer could stay in business without the defendant's products). Rather, Plaintiffs introduced evidence that compliance with the market penetration targets was mandatory because failing to meet such targets would jeopardize the OEMs' relationships with the dominant manufacturer of transmissions in the market. *See Dentsply, 399 F.3d at 194* (noting that "[t]he paltry penetration in the market by competitors over the years has been a refutation of" the theory that a competitor could steal the defendant's

customers by offering a better deal or a lower price "by tangible and measurable results in the real world"); *id. at 195* (explaining that an exclusivity policy imposed by a dominant firm is especially troubling where it presents customers with an "all-or-nothing" choice).

***HN22*** Although the Supreme Court has created a safe harbor for above-cost discounting, it has not established a *per se* rule of non-liability under the antitrust laws for **[**49]** *all* contractual practices that involve above-cost pricing. *See* *Cascade Health Solutions v. PeaceHealth*, 515 F.3d 883, 901 (9th Cir. 2007) (stating that the Supreme Court's predatory pricing decisions have not "go[ne] so far as to hold that in every case in which a plaintiff challenges low prices as exclusionary conduct[,] the plaintiff must prove that those prices were below cost"). Nothing in the case law suggests, nor would it be sound policy to hold, that above-cost prices render an otherwise unlawful exclusive dealing agreement lawful. We decline to impose such an unduly simplistic and mechanical rule because to do so would place a significant portion of anticompetitive conduct outside the reach of the antitrust laws without adequate justification.

***HN23*** "[T]he means of illicit exclusion, like the means of legitimate competition, are myriad." *Microsoft, 253 F.3d at 58*; *LePage's, 324 F.3d at 152* ("'Anticompetitive conduct' can come in too many different forms, and is too dependent on context, for any court or commentator ever to have enumerated all the varieties.") (quoting *Caribbean Broad Sys., Ltd. v. Cable & Wireless PLC, 148 F.3d 1080, 1087, 331 U.S. App. D.C. 226 (D.C. Cir. 1998))*. The law has long recognized **[**50]** forms of exclusionary conduct that do not involve below-cost pricing, including unlawful tying, *Jefferson Parish, 446 U.S. at 21*; *Standard Oil, 337 U.S. at 305-06*, enforcement of a legal monopoly provided by a patent procured through fraud, *LePage's, 324 F.3d at 152* (citing *Walker Process Equip., Inc. v. Food Mach. & Chem. Corp., 382 U.S. 172, 174, 86 S. Ct. 347, 15 L. Ed. 2d 247 (1965))*, refusal to deal, *Aspen Skiing Co. v. Aspen Highlands Skiing Corp., 472 U.S. 585, 601-02, 105 S. Ct. 2847, 86 L. Ed. 2d 467* **[*279]** (1985); *Otter Tail Power Co. v. United States, 410 U.S. 366, 93 S. Ct. 1022, 35 L. Ed. 2d 359 (1973)*, exclusive dealing, *Tampa Electric, 365 U.S. at 327*; *Dentsply, 399 F.3d at 184*, and other unfair tortious conduct targeting competitors, *Conwood Co., L.P. v. U.S. Tobacco Co., 290 F.3d 768 (6th Cir. 2002)*; *Int'l Travel Arrangers, Inc. v. Western Airlines, Inc., 623 F.2d 1255 (8th Cir. 1980)*.

Despite Eaton's arguments to the contrary, we find nothing in the Supreme Court's recent predatory pricing decisions to indicate that the Court intended to overturn decades of other precedent holding that conduct that does not result in below-cost pricing may nevertheless be anticompetitive. Rather, as we explained above, *Brooke Group* and the cases preceding it each involved an allegation that **[**51]** the defendant's pricing itself operated as the exclusionary tool. *See* *Brooke Grp., 509 U.S. at 212-22*; *Atl. Richfield, 495 U.S. at 331-38*; *Cargill, 479 U.S. at 114-16*. Eaton places particular emphasis on two recent cases, arguing that such cases demonstrate the Supreme Court's willingness to extend the price-cost test beyond the traditional predatory pricing context. However, neither of these cases suggests that the price-cost test applies to the exclusive dealing claims at issue in our case.

In *Weyerhaeuser Co. v. Ross-Simmons Hardwood Lumber Co., 549 U.S. at 315, 320*, the Supreme Court applied the price-cost test to a case involving an allegation of predatory bidding

by a monopsonist.[12] In a predatory bidding scheme, a purchaser of inputs bids up the market price of a critical input to such high levels that rival buyers cannot survive, and as a result acquires or maintains monopsony power. *Id*. Then, "if all goes as planned," once rivals have been driven out, the predatory bidder will reap monopsonistic profits to offset the losses that it suffered during the high-bidding stage. *Id. at 321*. Therefore, the Court explained, predatory pricing and predatory bidding claims are "analytically **[**52]** similar." *Id*. "Both claims involve the deliberate use of unilateral pricing measures for anticompetitive purposes." *Id. at 322*. Moreover, the Court noted, bidding up input prices, like lowering costs, is often "the very essence of competition." *Id. at 323* (citing *Brooke Grp., 509 U.S. at 226*). "Just as sellers use output prices to compete for purchasers, buyers use bid prices to compete for scarce inputs. There are myriad legitimate reasons—ranging from benign to affirmatively procompetitive—why a buyer might bid up input prices." *Id*. Furthermore, high bidding will often benefit consumers because it will likely lead to the firm's acquisition of more inputs, which will generally lead to the manufacture of more outputs, and an increase in outputs generally results in lower prices for consumers. *Id. at 324*. Accordingly, the Supreme Court adopted a variation of the price-cost test for allegations of predatory bidding: "[a] plaintiff must prove that the alleged predatory bidding led to below-cost pricing of the predator's outputs." *Id. at 325*. In other words, the firm's predatory bidding must have caused the cost of the relevant output to increase above the revenues generated by the sale **[**53]** of such output. *Id*.

**[*280]** In *Pacific Bell Telephone Co. v. linkLine Communications, Inc*., the Supreme Court relied, in part, on the price-cost test to hold that the plaintiffs' price-squeezing claim was not cognizable under the Sherman Act. *555 U.S. at 457*. In that case, the plaintiffs alleged that the defendant, an integrated firm that sold inputs at wholesale and sold finished goods at retail, drove its competitors out of the market by raising the wholesale price while simultaneously lowering the retail price. *Id. at 442*. The Court held that, pursuant to *Verizon Communications Inc. v. Trinko, LLP, 540 U.S. at 409-10*, the wholesale claim was not cognizable because the defendant had no antitrust duty to deal with its competitors at the wholesale level, and pursuant to *Brooke Group*, the retail claim was not cognizable because the defendant's retail prices were above cost. *linkLine, 555 U.S. at 457* **[**54]** . As to the retail claim, the Court explained that "recognizing a price-squeeze claim where the defendant's retail price remains above cost would invite the precise harm" the price-cost test was designed to avoid: a firm might refrain from aggressive price competition to avoid potential antitrust liability. *Id. at 451-52*. Recognizing that the plaintiffs were trying to combine two non-cognizable claims into a new form of antitrust liability, the Court explained that "[t]wo wrong claims do not make one that is right." *Id. at 457*.

Contrary to Eaton's argument, neither *Weyerhaeuser*nor *linkLine*stands for the proposition that the price-cost test applies here. ***HN25*** *Weyerhaeuser* established the straightforward principle that the exercise of market power on prices for the purpose of driving out competitors should be judged by the same standard, whether such power is exercised on the input or output side of the market. *See549 U.S. at 321, 325*. And *linkLine* did no more than hold that two antitrust theories cannot be combined to form a new theory of antitrust liability. *See555 U.S. at 457*. The plaintiffs' retail-level claim in *linkLine* was a traditional pricing practices claim, and **[**55]** therefore

---

[12] ***HN24*** Monopsony power is market power on the buy (or input) side of the market. *Weyerhaeuser*, 549 U.S. at 320. "As such, a monopsony is to the buy side of the market what a monopoly is to the sell side[.]" *Id*. (citing Roger Blair & Jeffrey Harrison, *Antitrust Policy and Monopsony*, 76 Cornell L. Rev. 297, 301, 320 (1991)).

indistinguishable from the pricing practices claims in *Brooke Group*, *Atlantic Richfield*, and *Cargill*. 555 U.S. at 451-52, 457.[13]

**[*281]** In contrast to the price-cost test line of cases, here, Plaintiffs do not allege that price itself functioned as the exclusionary tool. As such, we conclude that the price-cost test is not adequate to judge the legality of Eaton's conduct. ***HN26*** Although prices are unlikely to exclude equally efficient rivals unless they are below-cost, exclusive dealing arrangements can exclude equally efficient (or potentially equally efficient) rivals, and thereby harm competition, irrespective of below-cost pricing. *See Dentsply*, 399 F.3d at 191. Where, as here, a dominant supplier enters into *de facto* exclusive dealing arrangements with every customer in the market, other firms may be driven out not because they cannot compete on a price basis, but because they are never given an opportunity to compete, despite their ability to offer products with significant customer demand. *See id. at 191, 194*. Therefore, Eaton's attempt to characterize **[**58]** this case as a pricing practices case, subject to the price-cost test, is unavailing. We hold that, instead, the rule of reason from *Tampa Electric* and its progeny must be applied to evaluate Plaintiffs' claims.

### B. Proof of Anticompetitive Conduct and Antitrust Injury

We turn now to Eaton's contention that even leaving aside the price-cost test, Plaintiffs failed to prove that Eaton's LTAs were anticompetitive or that they caused antitrust injury to Plaintiffs. ***HN27*** The rule of reason governs Plaintiffs' claims under Section 1 and *Section 2* of the Sherman Act, and Section 3 of the Clayton Act. *See LePage's*, 324 F.3d at 157 & n.10 (explaining that exclusive dealing claims are cognizable under Sections 1 and *2* of the Sherman Act and Section 3 of the Clayton Act, and evaluated under the same rule of reason); *see also* Section III.A, *supra*, at n.9. Under the rule of reason, an exclusive dealing arrangement is anticompetitive only if its "probable effect" is to substantially lessen competition in the relevant market, rather than merely disadvantage rivals. *Tampa Elec.*, 365 U.S. at 328-29.

---

[13] Eaton also relies heavily on the Supreme Court's statement in *Atlantic Richfield v. USA Petroleum Co.* that price-cost principles apply "regardless of the type of antitrust claim involved." 495 U.S. at 340. When read in context, however, it is clear that this statement means that the price-cost test applies regardless of the statute under which a pricing practices claim is brought, not that the price-cost applies regardless of the type of anticompetitive conduct.

In *Atlantic Richfield*, the plaintiffs argued that no showing of below-cost pricing was required to establish antitrust injury for a claim of illegal price-fixing under Section 1 of the Sherman Act because the price agreement itself was illegal, and any losses that stem from such an agreement, by definition, flow from that which makes the defendant's conduct unlawful. *Id.* at 338. The Supreme Court rejected that argument, reasoning that although price-fixing is unlawful under Section 1, a plaintiff does not suffer antitrust injury unless it is adversely affected by an anticompetitive aspect **[**56]** of the defendant's conduct, and "in the context of pricing practices, only predatory pricing has the requisite anticompetitive effect." *Id.* at 339 (citing *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 487, 97 S. Ct. 690, 50 L. Ed. 2d 701 (1977)) (additional citations omitted). It was in this context, in rejecting an argument that Section 1 was somehow exempt from the price-cost test, that the Supreme Court made the broad statement that it has "adhered to . . . [price-cost] principle[s] regardless of the type of antitrust claim involved." *See id.* at 340.

The Court's discussion following this statement supports our interpretation. The Court went on to explain that, for purposes of determining whether a plaintiff has suffered antitrust injury in a pricing practices case, Section 1 is no different than, for example, the plaintiff's allegation in *Cargill, Inc. v. Monfort of Colorado, Inc.* that the defendants' unlawful merger under Section 7 of the Clayton Act caused antitrust injury. *Id.* at 340 (citing *Cargill*, 479 U.S. at 116) ("To be sure, the source of the price competition in the instant case was an agreement allegedly unlawful under § 1 of the Sherman Act rather than a merger in violation of § 7 of the **[**57]** Clayton Act. But that difference is not salient."). Moreover, *Atlantic Richfield* was decided before *LePage's* and we did not interpret the "regardless of the type of antitrust claim involved" language as mandating the application of the price-cost test to 3M's bundled rebates.

In addition to establishing a statutory violation, a plaintiff must demonstrate that it suffered antitrust injury. **[**59]** *Race Tires, 614 F.3d at 75*. To establish antitrust injury, the plaintiff must demonstrate: "(1) harm of the type the antitrustlaws were intended to prevent; and (2) an injury to the plaintiff which flows from that which makes defendant's acts unlawful." *Id. at 76* (quoting *Gulfstream III Assocs. Inc. v. Gulfstream Aerospace Corp., 995 F.2d 425, 429 (3d Cir. 1993))* (additional citation omitted).

Our inquiry on appeal has several components. First, we examine whether the LTAs could reasonably be viewed as exclusive dealing arrangements, despite the fact that the LTAs covered less than 100% of the OEMs' purchase requirements and contained no express exclusivity provisions. Second, because the unique characteristics of the HD transmissions market bear heavily on our inquiry, we review Eaton's monopoly power, the concentrated **[*282]** nature of the market, and the ability of a monopolist in Eaton's position to engage in coercive conduct. Third, we discuss the anticompetitive effects of the various provisions in the LTAs, and consider Eaton's procompetitive justifications for the agreements. Finally, we consider whether Plaintiffs established that they suffered antitrust injury as a result of Eaton's **[**60]** conduct.

*1*. De Facto *Partial Exclusive Dealing*

***HN28*** A threshold requirement for any exclusive dealing claim is necessarily the presence of exclusive dealing. Eaton argues that Plaintiffs' claims must fail because the LTAs were not "true" exclusive dealing arrangements in that they did not contain express exclusivity requirements, nor did they cover 100% of the OEMs' purchases. Neither contention is persuasive because ***HN29*** *de facto* partial exclusive dealing arrangements may, under certain circumstances, be actionable under the antitrust laws.[14]

First, the law is clear that an express exclusivity requirement is not necessary because *de facto* exclusive dealing may be unlawful. *Tampa Elec., 365 U.S. at 326*; *Dentsply, 399 F.3d at 193*; *LePage's, 324 F.3d at 157*. For example, in *United States v. Dentsply International, Inc.*, we held that transactions which were "technically only a series of independent sales" could form the basis for an exclusive dealing claim because the large share of the market held by the defendant and its conduct in excluding competitors, "realistically made the arrangements . . . as effective as those in written contracts." *399 F.3d at 193* (citing *Monsanto Co. v. Spray-Rite Serv. Corp., 465 U.S. 752, 764 n.9, 104 S. Ct. 1464, 79 L. Ed. 2d 775 (1984))*. Likewise, in *LePage's*, we held that bundled rebates and discounts offered to major suppliers were designed to and did operate as exclusive dealing arrangements, despite the lack of any express exclusivity requirements. *324 F.3d at 157-58*.

Here, there was sufficient evidence from which a jury could infer that, although the LTAs did not expressly require the OEMs to meet the market penetration targets, the **[**62]** targets were as effective as mandatory purchase requirements. *See* *Tampa Elec., 365 U.S. at 326* (noting that ***HN30*** "even though a contract does 'not contain specific agreements not to use the (goods) of a competitor,' if 'the practical effect is to prevent such use,' it comes within the condition of *[Section*

---

[14] Our dissenting colleague objects to the phrase "de facto partial exclusive dealing" as constituting a creative neologism that "distorts the English language" and infrequently appears in a search of an online legal database. Dissenting Op., Part II. "De facto partial exclusive dealing" is certainly a neologism, but it also accurately represents that an exclusive dealing claim does not require a contract that imposes an express exclusivity obligation. *Tampa Elec.*, 365 U.S. at 326; *Dentsply*, 399 F.3d at 193; *LePage's*, 324 F.3d at 157, nor a contract that covers 100% of the buyer's needs. *Tampa Elec.*, 365 U.S. at 328 ("[T]he competition foreclosed by the contract **[**61]** must be found to constitute a *substantial share* of the relevant market.") (emphasis added).

3] as to exclusivity") (citing *United Shoe Mach. Corp. v. United States, 258 U.S. 451, 457, 42 S. Ct. 363, 66 L. Ed. 708 (1922))*; *Dentsply, 399 F.3d at 193-94*. Evidence presented at trial indicated that not only were lower prices (rebates) conditioned on the OEMs meeting the market-share targets, but so too was Eaton's continued compliance with the LTAs. For example, Eaton's LTAs with Freightliner, the largest OEM, and Volvo explicitly gave Eaton the right to terminate the agreements if the market-share targets were not met. And despite the fact that Eaton did not actually terminate **[*283]** the agreements on the rare occasion when an OEM failed to meet its target, the OEMs believed that it might.[15] Critically, due to Eaton's position as the dominant supplier, no OEM could satisfy customer demand without at least some Eaton products, and therefore no OEM could afford to lose Eaton as a supplier. Accordingly, we agree with **[**63]** the District Court that a jury could have concluded that, under the circumstances, the market penetration targets were as effective as express purchase requirements "because no risk averse business would jeopardize its relationship with the largest manufacturer of transmissions in the market." *ZF Meritor, 769 F. Supp. 2d at 692*.

Second, ***HN31*** an agreement does not need to be 100% exclusive in order to meet the legal requirements of exclusive dealing. We acknowledge that "partial" exclusive dealing is rarely a valid antitrust theory. *See Barr Labs., 978 F.2d at 110 n.24* ("An agreement affecting less than all purchases does not amount to true exclusive dealing.") (citation omitted); *Concord Boat, 207 F.3d at 1044, 1062-63* (noting that the defendant's discount program, which conditioned incremental discounts on customers purchasing 60-80% of their needs from the defendant, did not constitute exclusive dealing because customers were not required to purchase all of their requirements from the defendant, and in fact, could purchase **[**64]** up to 40% of their requirements from other sellers without foregoing the discounts); *Magnus Petroleum Co. v. Skelly Oil Co., 599 F.2d 196, 200-01 (7th Cir. 1979)* (holding that contract requiring buyer to purchase a fixed quantity of goods that amounted to roughly 60-80% of its needs was not unlawful "[b]ecause the agreements contained no exclusive dealing clause and did not require [the buyer] to purchase any amounts of [the defendant's product] that even approached [its] requirements") (citations omitted). Partial exclusive dealing agreements such as partial requirements contracts and contracts stipulating a fixed dollar or quantity amount are generally lawful because market foreclosure is only partial, and competing sellers are not prevented from selling to the buyer. *See Concord Boat, 207 F.3d at 1062-63*; *Magnus Petroleum, 599 F.2d at 200-01*.

However, we decline to adopt Eaton's view that a requirements contract covering less than 100% of the buyer's needs can *never* be an unlawful exclusive dealing arrangement. *See Eastman Kodak, 504 U.S. at 466-67* ("Legal presumptions that rest on formalistic distinctions rather than actual market realities are generally disfavored in antitrust **[**65]** law."). "Antitrust analysis must always be attuned to the particular structure and circumstances of the industry at issue." *Verizon Commc'ns, 540 U.S. at 411*. Therefore, just as "total foreclosure" is not required for an exclusive dealing arrangement to be unlawful, nor is complete exclusivity required with each customer. *See Dentsply, 399 F.3d at 191*. The legality of such an arrangement ultimately depends on whether the agreement foreclosed a substantial share of the relevant market such that competition was harmed. *Tampa Elec., 365 U.S. at 326-28*.

In our case, although the market-share targets covered less than 100% of the OEMs' needs, a jury could nevertheless find that the LTAs unlawfully foreclosed competition in a substantial share

---

[15] In 2003, for example, PACCAR failed to meet its market penetration target, and although Eaton withdrew all contractual savings, it did not terminate the agreement.

of the HD transmissions market. *See id*. There are only four direct purchasers of **[*284]** HD transmissions in North America, and Eaton, long the dominant supplier in the industry, entered into long-term agreements with each of them. *Compare Concord Boat, 207 F.3d at 1044* (noting the defendant was the market leader, but there were at least ten other competing manufacturers). Each LTA imposed a market-penetration target of roughly 90% (with the exception of Volvo, **[**66]** which manufactured some of its own transmissions for use in its own trucks), which we explained above, could be viewed as a requirement that the OEM purchase that percentage of its requirements from Eaton. Although no agreement was completely exclusive, the foreclosure that resulted was no different than it would be in a market with many customers where a dominant supplier enters into complete exclusive dealing arrangements with 90% of the customer base. Under such circumstances, the lack of complete exclusivity in each contract does not preclude Plaintiffs' *de facto* exclusive dealing claim.[16]

*2. Market Conditions in HD Transmissions Market*

***HN32*** Exclusive dealing will generally only be unlawful where the market is highly concentrated, the defendant possesses **[**67]** significant market power, and there is some element of coercion present. *See Tampa Elec., 365 U.S. at 329*; *Race Tires, 614 F.3d at 77-78*; *LePage's, 324 F.3d at 159*. For example, if the defendant occupies a dominant position in the market, its exclusive dealing arrangements invariably have the power to exclude rivals. *Tampa Elec., 365 U.S. at 329*; *Dentsply, 399 F.3d at 187*. Here, the jury found that Eaton possessed monopoly power in the HD transmissions market, and Eaton does not contest that finding on appeal.

***HN33*** A hard look at the nature of the market in which the parties compete is equally important. *Tampa Elec., 365 U.S. at 329*. An exclusive dealing arrangement is most likely to present a threat to competition in a situation in which the market is highly concentrated, such that long-term contracts operate to "foreclose so large a percentage of the available supply or outlets that entry" or continued operation in "the concentrated market is unreasonably constricted." *Race Tires, 614 F.3d at 76* (quoting *E. Food Servs., 357 F.3d at 8*); *see Dentsply, 399 F.3d at 184* (noting that the relevant market was "marked by a low or no-growth potential" and the defendant had long dominated the industry **[**68]** with a 75-80% market share). Here, the HD transmissions market had long been dominated by Eaton. Except for Meritor's production of manual transmissions in the 1990s and the ZF Meritor joint venture, no significant external supplier has entered the market for the last twenty years. A jury could certainly infer that Eaton's dominance over the OEMs created a barrier to entry that any potential rival manufacturer would have to confront. *See Concord Boat, 207 F.3d at 1059* (***HN34*** "If entry barriers to new firms are not significant, it may be difficult for even a monopoly company to control prices through some type of exclusive dealing arrangement because a new firm or firms easily can enter the market to challenge it [but] [i]f there are significant entry barriers . . ., a potential competitor would have difficulty entering.") **[*285]** (citations omitted). The record shows that the barriers to entry in the North American HD transmission market are especially high: HD transmissions are expensive to produce; transmissions developed for other geographic markets must be substantially modified for the North American market; and all HD transmission sales must pass through the highly concentrated intermediate **[**69]** market in which the OEMs operate. Eaton's theory that ZF Meritor or any

[16] Additionally, the District Court instructed the jury that Plaintiffs did not allege "actual" exclusive dealing, but instead alleged that "the long-term supply contracts with defendant, in effect, committed the OEMs to purchase at least a substantial share of their transmissions from defendant." The District Court defined such an arrangement as a "'de facto' exclusive dealing contract." Eaton does not challenge this instruction on appeal.

new HD transmissions manufacturer would be able to "steal" an Eaton customer by offering a superior product at a lower price "simply has not proved to be realistic." Dentsply, 399 F.3d at 194 (citation omitted); *compare* NicSand, 507 F.3d at 454 (in finding exclusive dealing arrangements lawful, noting that the *plaintiff* was the market leader, and lost business due to a new entrant's competition). "The paltry penetration in the market by competitors over the years has been a refutation of [Eaton's] theory by tangible and measurable results in the real world." Dentsply, 399 F.3d at 194; *see* Microsoft, 253 F.3d at 55 (noting importance of significant barriers to entry in maintaining monopoly power, in spite of the plaintiffs' self-imposed problems).

***HN35*** Although we generally "assume that a customer will make [its] decision only on the merits," Santana Prods., Inc. v. Bobrick Washroom Equip., Inc., 401 F.3d 123, 133 (3d Cir. 2005) (quoting Stearns Airport Equip. Co. v. FMC Corp., 170 F.3d 518, 524-25 (5th Cir. 1999)), a monopolist may use its power to break the competitive mechanism and deprive customers of the ability **[**70]** to make a meaningful choice. *See* Race Tires, 614 F.3d at 77 (noting that coercion "has played a key, if sometimes unexplored, role" in antitrust law); Dentsply, 399 F.3d at 184 (observing that the defendant "imposed" an exclusivity policy on its customers); LePage's, 324 F.3d at 159 (explaining that because 3M occupied a dominant position in several different product markets, it was able to effectively force customers in the "private label" tape market to deal with 3M exclusively, despite the plaintiff's competitiveness in that market). A highly concentrated market, in which there is one (or a few) dominant supplier(s), creates the possibility for such coercion. And here, there was evidence that Eaton leveraged its position as a supplier of necessary products to coerce the OEMs into entering into the LTAs. Plaintiffs presented testimony from OEM officials that many of the terms of the LTAs were unfavorable to the OEMs and their customers, but that the OEMs agreed to such terms because without Eaton's transmissions, the OEMs would be unable to satisfy customer demand.[17]

Accordingly, this case involves precisely the combination of factors that we explained would be present in the rare case in which exclusive dealing would pose a threat to competition. *See* Race Tires, 614 F.3d at 76.

**[*286]** *3. Sufficiency of the Evidence: Anticompetitive Conduct*

We turn now to a discussion of whether there was sufficient evidence for a jury to conclude that Eaton engaged in anticompetitive conduct. **[**72]** ***HN36*** Our inquiry in a sufficiency of the evidence challenge is limited to determining whether, "viewing the evidence in the light most favorable to the [winner at trial] and giving it the advantage of every fair and reasonable inference, there is insufficient evidence from which a jury reasonably could find liability." Lightning Lube, Inc. v. Witco Corp., 4 F.3d 1153, 1166 (3d Cir. 1993) (citation omitted). Eaton argues that even under the extraordinarily deferential standard, there was insufficient evidence for a reasonable jury to conclude that Eaton engaged in conduct that harmed competition. Guided by the principles set forth in Section III.A.1, *supra*, we disagree.

---

[17] Eaton emphasizes that the OEMs are multi-billion dollar companies (or at least owned by multi-billion dollar parent **[**71]** companies), and therefore claims that the OEMs dictated terms to Eaton — not the other way around. Significantly, in *United States v. Dentsply International, Inc.*, we found coercion even though the relationship between the customers and the defendant was not totally one-sided. 399 F.3d 181, 185 (3d Cir. 2005) (noting that the defendant considered bypassing dealers and selling directly to customers but abandoned that strategy out of fear that dealers might retaliate by refusing to buy other products manufactured by the defendant). Moreover, even assuming that the evidence could support a conclusion that the OEMs had more power in the relationship, the fact that two reasonable conclusions could be drawn from the evidence does not make the jury's adoption of Plaintiffs' view unreasonable.

i. Extent of Foreclosure

First, the extent of the market foreclosure in this case was significant. ***HN37*** "The share of the market foreclosed is important because, for the contract to have an adverse effect upon competition, 'the opportunities for other[s] . . . to enter into or remain in that market must be significantly limited.'" *Microsoft, 253 F.3d at 69* (citing *Tampa Elec., 365 U.S. at 328*). Substantial foreclosure allows the dominant firm to prevent potential rivals from ever reaching "the critical level necessary" to pose a **[**73]** real threat to the defendant's business. *Dentsply, 339 F.3d at 191*. Here, Eaton entered into long-term agreements with every direct purchaser in the market, and under each agreement, imposed what could be viewed as mandatory purchase requirements of at least 80%, and up to 97.5%. The OEMs generally met these targets, which, as Plaintiffs' expert testified, resulted in approximately 15% of the market remaining open to Eaton's competitors by 2003.[18] *See LePage's, 324 F.3d at 159* (noting that foreclosure of 40% to 50% is usually required to establish an exclusive dealing violation under Section 1 of the Sherman Act (citing *Microsoft, 253 F.3d at 70*)). From 2000 through 2003, Plaintiffs' overall market share ranged from 8-14%, and by 2005, Plaintiffs' market share had dropped to 4%.

ii. Duration of LTAs

Second, the LTAs were not short-term agreements, which would present little threat to competition. *See, e.g., Christofferson Dairy, Inc. v. MMM Sales, Inc., 849 F.2d 1168, 1173 (9th Cir. 1988)* (upholding exclusive dealing arrangement of "short duration"); *Roland Mach. Co. v. Dresser Indus., Inc., 749 F.2d 380, 395 (7th Cir. 1984)* (noting that exclusive dealing contracts of less than one year are presumptively lawful); *Barry Wright, 724 F.2d at 237* (citing two-year term in upholding requirements contract). Rather, each LTA was for a term of at least five years, and the PACCAR LTA was for a **[*287]** seven-year term.[19] *See FTC v. Motion Picture Adver. Serv. Co., 344 U.S. 392, 393-96, 73 S. Ct. 361, 97 L. Ed. 426, 49 F.T.C. 1730 (1953)* (upholding contracts of one year or less, but condemning contract terms ranging from two to five years). ***HN38*** Although **[**75]** long exclusive dealing contracts are not *per se* unlawful, "[t]he significance of any particular contract duration is a function of both the number of such contracts and market share covered by the exclusive-dealing contracts." Hovenkamp ¶ 1802g, at 98. Here, Eaton entered into long-term contracts with *every* direct purchaser in the market, which locked up over 85% of the market for at least five years. Although long-term agreements had previously been used in the HD transmissions industry, it was unprecedented for a supplier to enter into contracts of such duration with the entire customer base.

Eaton acknowledges, as it must, the unprecedented length of the LTAs, but maintains that the LTAs were not anticompetitive because they were easily terminable. *See, e.g., PepsiCo, Inc. v. Coca-Cola Co., 315 F.3d 101, 111 (2d Cir. 2002)* (finding challenged contracts lawful, in part, because they were terminable at will); *Omega Envtl., 127 F.3d at 1164* (noting easy terminability of agreements). Each LTA included a "competitiveness" clause, which permitted the OEM to

---

[18] ZF Meritor's expert, Dr. David DeRamus, testified at trial that Eaton's market share was consistently above 80% from 2000 through 2007. Later in his testimony, DeRamus concluded that Eaton's increased market share from 2000 to 2007 was the result of the LTAs. Furthermore, DeRamus showed that ZF Meritor's market share percentages in the linehaul transmissions market (i.e., the only portion of the overall HD **[**74]** transmissions market in which ZF Meritor competed), dropped from 32% to 24% between 2000 and 2002, and dropped even further from 24% to 12% between 2002 and 2003, before ultimately falling to 0% in 2007. DeRamus concluded that the loss of ZF Meritor's linehaul transmissions market share and its eventual exit from the market were due to Eaton's conduct and, specifically, the LTAs.

[19] Eaton and Freightliner revised their original LTA to increase the duration to ten years.

purchase from another supplier or terminate **[**76]** the agreement if another supplier offered a better product or a lower price. However, Plaintiffs presented evidence that any language giving OEMs the right to terminate the agreements was essentially meaningless because Eaton had assured that there would be no other supplier that could fulfill the OEMs' needs or offer a lower price. Thus, a jury could very well conclude that "in spite of the legal ease with which the relationship c[ould] be terminated," the OEMs had a strong economic incentive to adhere to the terms of the LTAs, and therefore were not free to walk away from the agreements and purchase products from the supplier of their choice. *Dentsply, 399 F.3d at 194*.

iii. Additional Anticompetitive Provisions in LTAs

Third, the LTAs were replete with provisions that a reasonable jury could find anticompetitive. To begin, a jury could have found that the data book provisions were anticompetitive in that they limited the ability of ZF Meritor to effectively market its products, and limited the ability of truck buyers to choose from a full menu of available transmissions. *See id.* (discussing anticompetitive effect of limitations on customer choice). Eaton downplays the significance **[**77]** of the data book provisions, arguing that truck buyers always remained free to request unlisted transmissions, and ZF Meritor remained free to market directly to truck buyers. However, the mere existence of potential alternative avenues of distribution, without "an assessment of their overall significance to the market," is insufficient to demonstrate that Plaintiffs' opportunities to compete were not foreclosed. *Id. at 196*. An OEM's data book was the "most important tool" that any buyer selecting component parts for a truck would use. If a product was not listed in a data book, it was "a disaster for the supplier." Although truck buyers could request unpublished components, doing so involved additional transaction costs, and in practice, meant that truck buyers were far more likely to select a product listed in the data book. *See id. at 193* (explaining that the key question was not whether alternative distribution methods allowed a competitor to "survive" but whether the alternative methods would **[*288]** "pose[] a real threat" to the defendant's monopoly) (citing *Microsoft, 253 F.3d at 71*). Additionally, prior to the LTAs, it was not common practice for one supplier to be given exclusive **[**78]** data book listing. Historically, data books had included all product offerings, including Meritor transmissions, and the OEMs acknowledged that removing ZF Meritor products, especially FreedomLine, from the data books was "from a customer perspective," the wrong thing to do so because they were "good product[s] with considerable demand in the marketplace."

A jury could also have found that the "preferential pricing" provisions in the LTAs were anticompetitive. Although it was "common" for price savings to be passed down to truck buyers in the form of lower prices, and there are indications that at least some of the savings from Eaton transmissions were indeed passed down, there is also evidence that the preferential prices were achieved by artificially increasing the prices of Plaintiffs' products.

Additionally, the jury could have determined that the "competitiveness" clauses were of little practical import because Eaton's conduct ensured that no rival would be able to offer a comparable deal. There was also evidence that the competitiveness clauses were met with stiff resistance by Eaton.

iv. Anticompetitive Effects vs. Procompetitive Effects

Finally, the only procompetitive justification **[**79]** offered by Eaton on appeal is that the LTAs were crafted to meet customer demand to reduce prices, as well as engineering and support

costs. *See Barr Labs., 978 F.2d at 111* (explaining that courts must "evaluate the restrictiveness and the economic usefulness of the challenged practice in relation to the business factors extant in the market") (citations omitted). In response to the economic downturn in the heavy-duty trucking industry in the late 1990s and early 2000s, each OEM sought to negotiate lower prices, and some sought to reduce the number of suppliers. During this time, over supply was a problem, as were low truck prices, and an unavailability of drivers. It appears that Eaton responded well to the downturn; despite persistent quality control problems and a relatively late introduction of two-pedal automated mechanical transmissions, the company cut costs and increased market share.

However, no OEM ever asked Eaton to be a sole supplier, and there was considerable testimony from OEM officials that it was in an OEM's interest to have multiple suppliers. Although long-term agreements offering market-share or volume discounts had been used in the industry in the past (for transmissions **[**80]** and for other truck components), OEM executives consistently testified that Eaton's new LTAs represented a substantial departure from past practice. For example, the longest supply agreements Freightliner and Volvo had ever signed previously were for two-year terms. Likewise, OEM officials testified that the provisions in the LTAs requiring exclusive data book listing and "preferential pricing" were not common. Critically, there was considerable evidence from which a jury could infer that the primary purpose of the LTAs was not to meet customer demand, but to take preemptive steps to block potential competition from the new ZF Meritor joint venture. Eaton devised the unprecedented LTAs only after Meritor formed the joint venture with ZF AG, which Eaton viewed as a "serious competitor." Eaton feared that the ZF Meritor joint venture would put Eaton's "[North American] position at risk" by introducing a new product (FreedomLine) for which there was significant **[*289]** customer demand, but for which Eaton did not produce a comparable alternative.

In sum, the LTAs included numerous provisions raising anticompetitive concerns and there was evidence that Eaton sought to aggressively enforce the agreements, **[**81]** even when OEMs voiced objections.[20] Accordingly, we hold that there was more than sufficient evidence for a jury to conclude that the cumulative effect of Eaton's conduct was to adversely affect competition.[21]

*4. Sufficiency of the Evidence: Antitrust Injury*

Having concluded that there was sufficient evidence from which a jury could determine that the LTAs functioned as unlawful exclusive dealing agreements, we have no difficulty concluding that there was likewise sufficient evidence that Plaintiffs suffered antitrust injury. *See Atl. Richfield, 495 U.S. at 344* (explaining that ***HN39*** a plaintiff suffers antitrust injury if its injury "stems from

---

[20] Judge Greenberg, in dissent, objects that our rule of reason analysis fails to consider that Eaton's prices were above cost. Dissenting Op., Part II. However, contrary to this objection, and even though ZF Meritor does not contend that Eaton's prices operated as an exclusionary tool, we do not view Eaton's prices as irrelevant to the rule of reason analysis. Rather than analyzing the alleged exclusionary provisions in a vacuum, we analyze these provisions in the larger context of the LTAs as a whole, and we recognize that Eaton maintained above-cost prices. We conclude that ZF Meritor presented sufficient evidence for the jury to find that, even though not every provision was exclusionary, the LTAs as a whole functioned as exclusive dealing agreements that adversely affected competition.

[21] It is worth noting that despite Eaton's contention that Plaintiffs' higher prices and quality problems led to their decline in market share, the OEMs felt differently. In 2002, a Freightliner **[**82]** executive wrote: "[t]his is a dangerous situation. We have already killed Meritor's transmission business. It is just a matter of time before they close their doors." Likewise, a 2006 Volvo presentation states: "With all its OEM customers, Eaton has established long term supply contracts . . . [which] ha[ve] led to . . . Eaton's only North American competitor, Meritor, [being] gradually marginalized to its current market position with a 10% market share."

a *competition-reducing* aspect or effect of the defendant's behavior"). Eaton's conduct unlawfully foreclosed a substantial share of the HD transmissions market, which would otherwise have been available for rivals, including Plaintiffs. ZF Meritor exited the market in 2003, followed by Meritor in 2006, **[**83]** because they could not maintain high enough market shares to remain viable. A jury could certainly conclude that Plaintiffs' inability to grow was a direct result of Eaton's exclusionary conduct.

**C. Expert Testimony**

*1. Expert Testimony on Liability*

Eaton raises two challenges to the District Court's decision to admit DeRamus's testimony on liability. First, Eaton argues that DeRamus failed to employ any recognized or reliable economic test for determining whether Eaton's conduct harmed competition and caused antitrust injury. Second, Eaton contends that DeRamus's opinion was contradicted by the facts. We disagree with both contentions.[22]

*Federal Rule of Evidence 702* provides:

> ***HN40*** A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's **[*290]** scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based **[**84]** on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.***HN41*** Under *Rule 702*, the district court acts as a "gatekeeper" to ensure that "the expert's opinion [is] based on the methods and procedures of science rather than on subjective belief or unsupported speculation." *Calhoun v. Yamaha Motor Corp., U.S.A., 350 F.3d 316, 321 (3d Cir. 2003)* (quoting *In re Paoli R.R. Yard PCB Litig. (Paoli II), 35 F.3d 717, 741 (3d Cir. 1994))*. Here, as the District Court noted, DeRamus relied on the exclusionary nature of the LTAs to form his opinion. He defined the relevant market, determined whether Eaton has monopoly power, and engaged in an analysis of Eaton's conduct, taking into account market conditions and the extent of the exclusive dealing. He examined the effect of the LTAs on prices and consumer choice, and considered whether foreclosure of the market could be attributed to factors other than the LTAs, such as market conditions or quality issues with Plaintiffs' products. We find no error in the District Court's acceptance of DeRamus's methodologies as reliable **[**85]** under *Rule 702*. *See LePage's, 324 F.3d at 154-64* (analyzing exclusive dealing by looking to many of the same factors considered by DeRamus).

Eaton also argues that DeRamus's opinion was contradicted by the facts. ***HN42*** "When an expert opinion is not supported by sufficient facts to validate it in the eyes of the law, or when indisputable record facts contradict or otherwise render the opinion unreasonable, it cannot support a jury's verdict." *Brooke Grp., 509 U.S. at 242*; *Phila. Newspapers, 51 F.3d at 1198*. In an antitrust case, an expert opinion generally must "incorporate all aspects of the economic reality"

---

[22] Eaton also argues that DeRamus's testimony was contrary to law because he did not employ a price-cost test. However, as we explained above, no price-cost test was required in this case.

of the relevant market. *Concord Boat, 207 F.3d at 1057*. Here, the District Court properly rejected Eaton's argument that DeRamus's testimony should have been excluded on the basis that it was contradicted by other facts. Eaton's argument on this point really amounts to nothing more than a complaint that DeRamus did not adopt Eaton's view of the case. The District Court correctly noted that, although some of DeRamus's testimony may have been contradicted by other evidence, including the testimony of Eaton's expert, the existence of conflicting evidence was not a basis on which to exclude **[**86]** DeRamus's testimony. The respective credibility of Plaintiffs' and Eaton's experts was a question for the jury to decide. *LePage's, 324 F.3d at 165*. DeRamus was extensively cross-examined and Eaton presented testimony from its own expert, who opined that the LTAs had no anticompetitive effect. In the end, the jury apparently found DeRamus to be more credible. "[Eaton]'s disappointment as to the jury's finding of credibility does not constitute an abuse of discretion by the District Court in allowing [DeRamus's] testimony." *Id. at 166*.

*2. Expert Testimony on Damages*

In their cross-appeal, Plaintiffs argue that the District Court erred in excluding DeRamus's testimony on the issue of damages. The core of DeRamus's damages analysis was one page (titled "Five Year Product Line Profit and Loss") of ZF Meritor's Revised Strategic Business Plan ("SBP") for fiscal years 2002 through 2005, which was presented to ZF Meritor's **[*291]** Board of Directors in November 2000.[23] The District Court determined that, although DeRamus used methodologies regularly employed by economists, his opinion nevertheless failed the reliability requirements of *Daubert* and the Federal Rules of Evidence because the underlying **[**87]** data was not sufficiently reliable. The District Court acknowledged that experts often rely on business plans in forming damages estimates, but concluded that DeRamus's reliance on the SBP in this case was improper because he did not know either the qualifications of the individuals who prepared the SBP estimates or the assumptions upon which the estimates were based. Plaintiffs filed a motion for clarification, which asked the District Court to allow DeRamus to testify based on his existing expert report to damages estimates independent of the SBP, or, in the alternative, to allow him to amend his report to include the alternate damages estimates. The District Court did not resolve the damages issue at that time, and bifurcated the case. After the trial on liability, Plaintiffs supplemented their pre-trial motion for clarification, adding several new arguments based on developments at trial, and renewing their request that DeRamus be allowed to testify based on alternate calculations. The District Court denied Plaintiffs' motion and awarded $0 in damages.

Our inquiry on appeal is two-fold. Initially, we must determine whether the District Court erred in excluding the expert opinion of DeRamus on the basis that it was not sufficiently reliable. Then, we must consider whether the District Court abused its discretion in denying Plaintiffs' request to allow DeRamus to testify to alternative damages calculations. We will address these issues in turn.

i. DeRamus's original damages calculations

First, we will consider Plaintiffs' contention that the District Court erred in determining that DeRamus's damages opinion was not sufficiently reliable. ***HN43*** Federal Rule of Evidence 702, as amended in 2000 to incorporate the standards set forth in *Daubert*, imposes an obligation

---

[23] The SBP contained a five-year forecast of profit and loss estimates based on estimated unit sales, unit prices, manufacturing **[**88]** costs, operating expenses, and other considerations.

upon a district court to ensure that expert testimony is not only relevant, but reliable. *Fed. R. Evid. 702*; *Paoli II, 35 F.3d at 744*. As we have made clear, "the reliability analysis [required by *Daubert*] applies to all aspects of an expert's testimony: the methodology, the facts underlying the expert's opinion, [and] the link between the facts and the conclusion." *Heller v. Shaw Indus., Inc., 167 F.3d 146, 155 (3d Cir. 1999)*; *see* **[**89]** *also id*. ("Not only must each stage of the expert's testimony be reliable, but each stage must be evaluated practically and flexibly without bright-line exclusionary (or inclusionary) rules."). As we explain below, the District Court did not abuse its discretion by finding that DeRamus's damages estimate, which was based heavily on the SPB projections, bore insufficient indicia of reliability to be submitted to a jury.

To determine the damages suffered by Plaintiffs as a result of Eaton's anticompetitive conduct, DeRamus conducted a two-part analysis. He computed Plaintiffs' lost profits for the period between 2000 and 2009, as well as the lost enterprise value of Plaintiffs' HD transmissions business. To calculate Plaintiffs' lost profits, DeRamus first estimated the incremental revenues that Plaintiffs would have earned "but for" Eaton's anticompetitive conduct, and then subtracted from that figure the incremental cost that Plaintiffs would have **[*292]** had to incur to achieve such incremental sales.

Ordinarily, such an approach would be appropriate because "an expert may construct a reasonable offense-free world as a yardstick for measuring what, hypothetically, would have happened 'but for' **[**90]** the defendant's unlawful activities." *LePage's, 324 F.3d at 165* (citations omitted). However, the District Court's primary criticism of DeRamus's report was that *he* did not construct an offense-free world based on actual financial data, but instead relied on a one-page set of profit and volume projections without knowing the circumstances under which such projections were created or the assumptions on which they were based. ***HN44*** In some circumstances, an expert might be able to rely on the estimates of others in constructing a hypothetical reality, but to do so, the expert must explain why he relied on such estimates and must demonstrate why he believed the estimates were reliable. *See**Fed. R. Evid. 702*; *Daubert, 509 U.S. at 592-95*; *Paoli II, 35 F.3d at 748 n.18* ("Arguably, [third-party estimates] that an expert relies on are not his underlying data, but rather the data that went into the [third-party estimates] in the first place are his underlying data.").

Plaintiffs contend that DeRamus's reliance on the SBP estimates was appropriate because a company's internal financial projections, like those in the SBP, are regularly and reasonably relied upon by economists in formulating opinions **[**91]** regarding a company's performance in an offense-free world. Plaintiffs are certainly correct that ***HN45*** "internal projections for future growth" often serve as legitimate bases for expert opinions. *See* *LePage's, 324 F.3d at 165*; *Auto west, Inc. v. Peugeot, Inc., 434 F.2d 556, 566 (2d Cir. 1970)* (holding that damages testimony was admissible because the financial projections on which the testimony was based "were the product of deliberation by experienced businessmen charting their future course"). Businesses are generally well-informed about the industries in which they operate, and have incentives to develop accurate projections. As such, experts frequently use a plaintiff's business plan to estimate the plaintiff's expected profits in the absence of the defendant's misconduct. *See Litigation Services Handbook: The Role of the Financial Expert* 24:13 (4th ed. 2007). However, there is no *per se* rule of inclusion where an expert relies on a business plan; district courts must perform a case-by-case inquiry to determine whether the expert's reliance on the business plan in a given case is reasonable. *See* *Heller, 167 F.3d at 155*.

Here, the District Court concluded that the SBP could not serve **[**92]** as a reliable basis for DeRamus's opinion because he was unaware of the qualifications of the individuals who prepared

the document, or the assumptions on which the estimates were based. Plaintiffs argue that these factual findings are contradicted by the record. Admittedly, the record indicates that DeRamus did not, as the District Court suggested, blindly accept the SBP estimates without question. DeRamus was aware that the SBP had been presented to ZF Meritor's Board of Directors, and that it was revised several times to "address and resolve queries management had about the reasonableness of the assumptions, projections, [and] forecasts." He also knew that the Board had relied on the SBP in making business decisions. Moreover, ZF Meritor's former president testified that he "did not submit SBPs to management for review unless [he] believed the projections, forecasts, and assumptions therein to be reliable."

**[*293]** However, contrary to Plaintiffs' assertions, these excerpts from the record do not contradict the District Court's ultimate findings. The record amply supports the District Court's concern that, although DeRamus was generally aware of the circumstances under which the SBP was **[**93]** created and the purposes for which it was used, he lacked critical information that would be necessary for Eaton to effectively cross-examine him. ***HN46*** An expert's "lack of familiarity with the methods and the reasons underlying [someone else's] projections virtually preclude[s] any assessment of the validity of the projections through cross-examination." *TK-7 Corp. v. Estate of Barbouti, 993 F.2d 722, 732 (10th Cir. 1993)*; *compare Auto west*, *434 F.2d at 566* (holding that projections of company officials were admissible where such officials "set out at length the bases from which they derived their figures, and consequently, [the opposing party] was able to cross-examine them vigorously"). Here, DeRamus knew that the SBP was presented to the Board by experienced management professionals, but he did not know who initially calculated the SBP figures. He did not know whether the SBP projections were calculated by ZF Meritor management, lower level employees at ZF Meritor, or came from some outside source. Nor did DeRamus know the methodology used to create the SBP or the assumptions on which the SBP's price and volume estimates were based.[24]

***HN47*** Under the deferential abuse of discretion standard, we will not disturb a district court's decision to exclude testimony unless we are left with "a definite and firm conviction that the court below committed a clear error of judgment." *In re TMI Litig., 193 F.3d 613, 666 (3d Cir. 1999)* (citation omitted). Plaintiffs cannot clear that high hurdle. Accordingly, we conclude that the District Court acted within its discretion in determining that one page of financial projections for a nascent company, the assumptions underlying which were relatively unknown, did not provide "good grounds," *Paoli II, 35 F.3d at 742* (quoting *Daubert, 509 U.S. at 590*), for DeRamus to generate his damages estimate. *Compare* *LePage's, 324 F.3d at 165* (noting that plaintiff's expert considered the defendant's internal projections for growth, but also closely examined the market conditions, including **[**95]** the past performance of competitors).

Plaintiffs raise two additional challenges to the District Court's exclusion of DeRamus's testimony. First, Plaintiffs contend that because the SBP was admitted into evidence at trial, *Rule 703* does not provide a basis for exclusion. However, this argument is based on the flawed assumption that the District Court excluded DeRamus's testimony under *Rule 703*, rather than *Rule 702*. Plaintiffs assume that because the District Court stated that "DeRamus manipulated the SBP using methodologies employed by economists," *ZF Meritor*, 646 F. Supp. 2d at 667, the

---

[24] As the District Court noted, it is especially important **[**94]** for an expert to identify and justify the assumptions underlying financial projections when dealing with a new company. Here, although Meritor had been in the HD transmissions industry for over a decade, ZF Meritor was offering a brand new line of transmissions that had never before been sold in the North American market.

District Court necessarily concluded that *Rule 702*, which focuses on methodologies, was satisfied. However, the District Court explicitly stated that "the fundamental query" was "whether the [SBP] estimates pass[ed] the reliability requirements of *Rules 104*, *702*, and *703*." *Id*. Although it is not entirely clear from the District Court's opinion which rule the District Court relied upon in finding DeRamus's **[*294]** testimony inadmissible, ***HN48*** we may affirm evidentiary rulings on any ground supported by the record, *Hughes v. Long, 242 F.3d 121, 122 n.1 (3d Cir. 2001)*, and we conclude that DeRamus's opinion was properly **[**96]** excluded because it failed the reliability requirements of *Rule 702*.[25]

Plaintiffs' suggestion that the reasonableness of an expert's reliance on facts or data to form his opinion is somehow an inappropriate inquiry under *Rule 702* results from an unduly myopic interpretation of *Rule 702* and ignores the mandate of *Daubert* that the district court must act as a gatekeeper. *See Daubert, 509 U.S. at 589*; **[**97]** *Heller, 167 F.3d at 153* (***HN49*** "While 'the focus, of course, must be solely on principles and methodology, not on the conclusions that they generate,' a district court must examine the expert's conclusions in order to determine whether they could reliably flow from the facts *known* to the expert and the methodology used.") (emphasis added) (quoting *Daubert, 509 U.S. at 595*). Where proffered expert testimony's "factual basis, data, principles, methods, or their application are called sufficiently into question, . . . the trial judge must determine whether the testimony has 'a reliable basis in the knowledge and experience of the relevant discipline.'" *Kumho Tire Co. v. Carmichael, 526 U.S. 137, 149, 119 S. Ct. 1167, 143 L. Ed. 2d 238 (1999)* (quoting *Daubert, 509 U.S. at 592*). A district court's inquiry under *Rule 702* is "a flexible one" and must be guided by the facts of the case. *Daubert, 509 U.S. at 591, 594*. Here, the District Court's analysis fell squarely within its flexible gatekeeping function under *Daubert* and *Rule 702*. *See Kumho Tire Co. 526 U.S. at 149*; *Paoli II, 35 F.3d at 748 n.18*; *see also Elcock, 233 F.3d at 754* (explaining that ***HN50*** an expert's testimony regarding damages must be based on a sufficient factual foundation); **[**98]** *Tyger Constr. Co. v. Pensacola Constr. Co., 29 F.3d 137, 142 (4th Cir. 1994)* ("An expert's opinion should be excluded when it is based on assumptions which are speculative and not supported by the record.").

Second, Plaintiffs argue that the District Court did not provide fair notice that it intended to exclude DeRamus's testimony under *Federal Rule of Evidence 703*. Again, this argument rests on the flawed assumption that the District Court relied solely on *Rule 703*. However, even assuming the District Court mistakenly believed that its *Rule 702* reliability analysis actually fell under *Rule 703*, Plaintiffs' notice argument would still be meritless. ***HN51*** A district court must give the parties "an adequate opportunity to be heard on evidentiary issues." *In re Paoli R.R. Yard PCB Litig. (Paoli I), 916 F.2d 829, 854 (3d Cir. 1990)*. Here, there was extensive briefing regarding DeRamus's damages opinion, much of which focused on Eaton's argument that DeRamus's reliance on the SBP was improper. The District Court held not one, but two *in limine* hearings, in which DeRamus testified for several **[*295]** hours. *Compare id. at 854-55* (holding that the district court did not give the plaintiffs an adequate opportunity **[**99]** to be heard where it failed to conduct an *in limine* hearing and denied oral argument on the evidentiary issues). As such,

---

[25] We base our affirmance of the District Court's decision entirely on the fact that DeRamus's opinion failed *Rule 702*, and do not decide whether Rule 703 provides an additional basis for exclusion. We note, however, that Plaintiffs' argument that Rule 703 somehow constrains a district court's ability to conduct an assessment of reliability under *Rule 702* is misplaced. After all, a piece of evidence may be relevant for one purpose, and thus admissible at trial, but not be the type of information that can form the basis of a reliable expert opinion. As the District Court stated, "the fact that [a piece of evidence] [i]s part of [the] plaintiffs' 'story' does not mean, ipso facto," that an expert opinion relying on such evidence is admissible. *ZF Meritor LLC v. Eaton Corp.*, 800 F. Supp. 2d 633, 637 (D. Del. 2011).

Plaintiffs were well aware of, and had ample opportunity to be heard on, the question of whether DeRamus's reliance on the SBP rendered his testimony inadmissible.

ii. Alternate damages calculations

The District Court's opinion excluding DeRamus's damages testimony focused exclusively on DeRamus's damages estimates based on the SBP projections regarding ZF Meritor's market share and profit margin. However, his expert report also set forth market-share estimates based on an econometric model. The econometric model did not consider the SBP, but instead used economic variables, such as the number of heavy-duty trucks built and sold in the North American market, an index of consumer confidence in the United States, the average wholesale price of oil in the United States, and interest rates. The model also considered ZF Meritor's market share from the previous month "in order to capture market dynamics."

To reach his ultimate damages estimate, DeRamus averaged several damages calculations, each of which used a different combination of inputs for market share and profit **[**100]** margin. Following the District Court's order excluding DeRamus's testimony due to his reliance on the SBP, Plaintiffs filed a motion for clarification, asking the District Court to allow DeRamus to calculate damages using the same methodologies from his expert report, but using data independent of the SBP. Specifically, Plaintiffs proposed several revisions to DeRamus's damages estimate. First, Plaintiffs indicated that DeRamus could revise his "Eaton Operating Profit Method," which used as principal inputs the SBP estimates for market share and Eaton's actual operating profits for profit margin. Plaintiffs stated that DeRamus had recalculated lost profits using the same methodology, but replacing the market-share data from the SBP with market-share data from his econometric model. Second, Plaintiffs explained that DeRamus could similarly revise his "Econometric Method" of calculating lost profits, which used the econometric model for market share, and data from the SBP for profit margin. He could use the same methodology and replace the profit margin data from the SBP with profit margin data from Plaintiffs' actual sales data from 1996 through 2000.[26]

Noting that all of the data necessary for DeRamus's recalculations were already in the expert report, Plaintiffs requested that DeRamus be able to testify to the alternate calculations using the existing expert report. Allowing DeRamus to testify to alternate damages numbers without amending his expert report would have left Eaton without advance notice of the new calculations, and thus would have been improper. As such, the District Court did not err in ruling that DeRamus could not testify to new calculations *based on the existing expert report*. However, the District Court's refusal to allow DeRamus to amend his expert report presents a much more difficult question, one that we will explore in depth.

Before beginning our analysis, it is necessary to provide some context regarding the procedural history because the way in **[*296]** which the damages issue was handled by the District Court is significant to our determination that the District Court abused its discretion. After the District Court granted Eaton's motion **[**102]** to exclude DeRamus's damages testimony, it granted leave for Plaintiffs to file a motion for clarification to identify damages calculations in DeRamus's expert report that were not based on the SBP. On September 9, 2009, ten days before trial was set to begin, Plaintiffs filed the motion, acknowledging that new calculations would be required,

---

[26] Although the District Court **[**101]** did not address DeRamus's lost enterprise value calculations, Plaintiffs indicated in their motion for clarification that DeRamus could make similar revisions to those calculations.

but submitting that all of the necessary data was already in the report. The next day, the District Court held a pretrial conference, in which it considered Plaintiffs' motion, and determined that it had two options: to "basically punt" on the damages issue and bifurcate the case, or to allow Plaintiffs' new damages theory to go forward and allow Eaton to depose DeRamus to examine his new theories. The District Court concluded that the "cleanest" option was to defer the damages issue, bifurcate, and proceed to trial on liability. That way, the District Court stated, the damages issue would only need to be resolved if "the jury c[ame] back with a plaintiffs' verdict, which [was] [up]held on appeal." In opting to defer a decision on damages, the District Court noted that it "did not . . . at the moment, have the time to parse [DeRamus's report] **[**103]** as carefully" as would be necessary to satisfactorily address the parties' arguments regarding damages.

The jury delivered its verdict on liability on October 8, 2009, and the District Court entered judgment in favor of Plaintiffs on October 14. Two days later, Plaintiffs requested that the District Court set a trial on damages. Eaton opposed Plaintiffs' request, asserting that the judgment on liability was a final appealable decision. Although the District Court apparently agreed with Eaton initially, stating that it "d[id] not intend to address damages until liability has been finally resolved by the Third Circuit," the District Court subsequently issued an amended judgment, which stated that because damages had not been resolved, there was no final appealable order under *Federal Rule of Civil Procedure 54(b)*. On November 3, 2009, Eaton filed its renewed motion for judgment as a matter of law or a new trial. The District Court did not rule on the motion until March 2011.[27]

Following the District Court's denial of Eaton's motion, Plaintiffs renewed their request **[**104]** for a damages trial. On July 25, 2011, the District Court held a status conference, in which it heard arguments on whether the liability issue was appealable as a judgment on fewer than all claims under *Rule 54(b)*. Although the District Court initially indicated that it would proceed under *Rule 54(b)*, and once again defer resolution of the damages issue, after both parties agreed that the judgment on liability was not appealable under *Rule 54(b)* (and that it was unlikely that this Court would grant an interlocutory appeal), the District Court acknowledged that it would "need to go back to the papers and see how I extract myself from the procedural morass that I put myself in." The District Court then signaled the way in which it would extract itself, stating "so let's assume that I am going to resurrect a motion that is two years old [Plaintiffs' September 3, 2009 motion for clarification], and let's assume that I deny it, and we're left with the situation we have now. At that point, would it make sense to have **[*297]** a cross-appeal on liability, on the *Daubert* decision, and get it up to the Third Circuit?"

Several days later, on August 4, 2011, the District Court issued a memorandum opinion **[**105]** and order denying Plaintiffs' motion for clarification, and awarding $0 in damages. The District Court's entire analysis of Plaintiffs' request to modify DeRamus's report consisted of one paragraph. The District Court concluded that allowing Plaintiffs to amend DeRamus's expert report "would be tantamount to reopening expert discovery" because DeRamus would need to be deposed again and Eaton would have to prepare another rebuttal expert report. The District Court also noted that, when it granted leave for Plaintiffs to move for clarification, leave was granted only for Plaintiffs to show that DeRamus's report *already* contained an alternate damages calculation, and that Plaintiffs' motion requested permission to submit *additional* damages calculations. Therefore, the District Court concluded, "[a]t this stage of the litigation," it would not give Plaintiffs an opportunity to modify their damages estimate.

---

27 It is unclear from the record why sixteen months passed between Eaton's motion and the District Court's decision on the motion.

We provide this extensive review of the procedural history to make a basic point: while we appreciate the District Court's attempt to conserve judicial resources and refrain from addressing the damages issue unless absolutely necessary, it is apparent from the record that Plaintiffs' **[**106]** request for permission to submit alternative damages calculations was given little more than nominal consideration. We are mindful that ***HN52*** the District Court has considerable discretion in matters regarding expert discovery and case management, and a party challenging the district court's conduct of discovery procedures bears a "heavy burden." *In re Fine Paper, 685 F.2d at 817-18* ("We will not interfere with a trial court's control of its docket 'except upon the clearest showing that the procedures have resulted in actual and substantial prejudice to the complaining litigant.'") (citation omitted); *see Schiff, 602 F.3d at 176*. ***HN53*** Under *Federal Rule of Civil Procedure 26(a)(2)*, a party is required to disclose an expert report containing "a *complete* statement of all opinions the witness will express and the basis and reasons for them." *Fed. R. Civ. P. 26(a)(2)(B)(i)* (emphasis added). Any additions or changes to the information in the expert report must be disclosed by the time the party's pretrial disclosures are due. *Fed. R. Civ. P. 26(e)(2)*. Here, Plaintiffs were required to make all mandatory disclosures six months before trial, including all damages calculations. The damages estimates **[**107]** in DeRamus's report were found to be unreliable, and Plaintiffs sought, after the date by which discovery disclosures were due, to modify the estimates to reflect reliance on different data. Ordinarily, we will not disrupt a district court's decision to deny a party's motion to add information to an expert report under such circumstances. *Schiff, 602 F.3d at 176*; *In re Fine Paper, 685 F.2d at 817*. ***HN54*** A plaintiff omits evidence necessary to sustain a damages award at its own risk. *See Natural Res. Def. Council, Inc. v. Texaco Ref. & Mktg., Inc., 2 F.3d 493, 504 (3d Cir. 1993)*.

However, exclusion of critical evidence is an "extreme" sanction, and thus, a district court's discretion is not unlimited. *Konstantopoulos v. Westvaco Corp., 112 F.3d 710, 719 (3d Cir. 1997)*; *see also E.E.O.C. v. Gen. Dynamics Corp., 999 F.2d 113, 116 (5th Cir. 1993)* (explaining that a continuance, as opposed to exclusion, is the "preferred means" of dealing with a party's attempt to offer new evidence after the time for discovery has closed). There are indeed times, even when control of discovery is at issue, that a **[*298]** district court will "exceed[] the permissible bounds of its broad discretion." *Drippe v. Tobelinski, 604 F.3d 778, 783 (3d Cir. 2010)*. **[**108]** In *Meyers v. Pennypack Woods Home Ownership Ass'n, 559 F.2d 894, 905 (3d Cir. 1977)*, *overruled on other grounds* by *Goodman v. Lukens Steel Co.*, 777 F.2d 113 (3d Cir. 1985), we set forth five factors that should be considered in deciding whether a district court's exclusion of evidence as a discovery sanction constitutes an abuse of discretion. Here, although the District Court's decision was not a discovery sanction nor an exclusion of proffered evidence, but rather an exercise of discretion to control the discovery process and a refusal to allow submission of additional evidence, we find the *Pennypack* factors instructive, and thus they will guide our inquiry. *See Trilogy Commc'ns, Inc. v. Times Fiber Commc'ns, Inc., 109 F.3d 739, 744-45 (Fed. Cir. 1997)* (applying factors similar to those set forth in *Pennypack* to evaluate whether a district court erred in denying the plaintiff's motion to supplement its expert report with additional data); *see also Hunt v. Cnty. of Orange, 672 F.3d 606, 616 (9th Cir. 2012)* (applying similar factors to determine whether the district court abused its discretion in denying a motion to amend a pretrial order).

***HN55*** In considering whether the District Court **[**109]** abused its discretion in denying Plaintiffs' request to submit alternate damages calculations, we will consider: (1) "the prejudice or surprise in fact of the party against whom the excluded witnesses would have testified" or the excluded evidence would have been offered; (2) "the ability of that party to cure the prejudice"; (3) the extent to which allowing such witnesses or evidence would "disrupt the orderly and efficient

trial of the case or of other cases in the court"; (4) any "bad faith or willfulness in failing to comply with the court's order"; and (5) the importance of the excluded evidence. *Pennypack, 559 F.2d at 904-05*. The importance of the evidence is often the most significant factor. *See Sowell v. Butcher & Singer, Inc., 926 F.2d 289, 302 (3d Cir. 1991)*; *Pennypack, 559 F.2d at 904* (observing "how important [the excluded] testimony might have been and how critical [wa]s its absence").

Applying the *Pennypack* factors to this case, we conclude that the District Court abused its discretion in denying Plaintiffs' request to allow DeRamus to submit his alternate damages estimates. As to the first and second factors, Eaton would not have suffered substantial prejudice if DeRamus **[**110]** were allowed to amend his expert report. DeRamus's new calculations will be based on data from the initial report, which Eaton has been aware of for nearly three years, and DeRamus will employ methodologies that the District Court has already recognized as being regularly and reliably applied by economists. As Plaintiffs noted in their motion for clarification, it would be "a straightforward matter of arithmetic" to substitute data from the econometric model and actual sales data for the SBP projections. For this reason, the District Court's concern that granting Plaintiffs' request would be "tantamount to reopening discovery" seems unfounded. Although Eaton will have to respond to new calculations, it will not have to analyze any new data, or challenge any new methodologies. Moreover, Plaintiffs specifically set forth in their motion for clarification the changes that DeRamus would make, and because the changes only involved the substitution of inputs, Eaton would not be unfairly surprised by the new damages estimates.

As to the third *Pennypack* factor, allowing DeRamus to submit additional damages calculations will not disrupt the orderly and efficient flow of the case. In **[*299]** fact, our **[**111]** ruling on the liability issues and remand to the District Court to resolve damages is precisely what the District Court and the parties envisioned all along. Eaton, well aware of the District Court's desire to have this Court determine the liability issues before setting a damages trial, suggested that the best way to accomplish the District Court's objective was to amend the JMOL order to include "zero damages and no injunctive relief." As the District Court stated at the July 25, 2011 status conference, "[t]he way I handle complex litigation generally, when I bifurcate, is that I enter a final judgment pursuant to *Rule 54(b)*. . . and once the Circuit Court determines liability, if there is a reason to have a damages trial, we have a damages trial." Thus, it cannot seriously be a surprise to any of the parties that they will once again be required to address damages in this case. Additionally, Eaton repeatedly states in its brief that Plaintiffs seek to reopen discovery "on the eve of trial." Although that may have been true when Plaintiffs' original motion for clarification was filed, it is no longer true. Trial ended in October 2009 and thus, when the District Court finally ruled **[**112]** on Plaintiffs' motion, there was no longer any time-crunch problem. Any concern that granting Plaintiffs' motion would prevent Eaton from being able to effectively prepare to address DeRamus's new damages estimates at trial is no longer relevant, nor is there any risk that granting Plaintiffs' motion would excessively delay a trial on liability.

As to the fourth factor, there is no evidence of any bad faith on the part of Plaintiffs. However, under this fourth factor, we may also consider the Plaintiffs' justifications for failing to include alternative damages calculations in the event calculations based on the SBP were found to be insufficient. *See Pennypack, 559 F.2d at 905*; *Gen. Dynamics Corp., 999 F.2d at 115-16*. Given that DeRamus's report already included the data necessary to develop alternate damages estimates, he could very easily have provided such estimates. Plaintiffs have provided no persuasive explanation for his failure to do so, other than that he believed his existing estimates were

sufficiently reliable. It is not the district court's responsibility to help a party correct an error or a poor exercise of judgment, and thus, Plaintiffs' conscious choice to rely so heavily **[**113]** on data that was ultimately found to be unreliable weighs against a finding of abuse of discretion. This is especially true in a case such as this, where the party submitting the flawed expert report is a large corporation with significant resources represented by highly competent counsel.

However, perhaps the most important factor in this case is the critical nature of the evidence, and the consequences if permission to amend is denied. ***HN56*** Expert testimony is necessary to establish damages in an antitrust case. As such, without additional damages calculations, it is clear that Plaintiffs will be unable to pursue damages, despite the fact that they won at the liability stage. *Compare Gen. Dynamics Corp., 999 F.2d at 116-17* (finding an abuse of discretion in the district court's exclusion of expert testimony, in part, because the total exclusion of such testimony "was tantamount to a dismissal of the [plaintiff's] . . . claim"), *with Sowell, 926 F.2d at 302* (finding no abuse of discretion in district court's exclusion of proffered expert testimony, in large part, because "the record [was] totally devoid of any indication of . . . how th[e] testimony might have bolstered [the plaintiff's] **[**114]** case," and thus, there was "no basis whatever for believing that the admission of expert testimony would have influenced the outcome of th[e] case"). The District Court's decision therefore would clearly influence the **[*300]** outcome of the case. *See Sowell, 926 F.2d at 302*.

Significantly, ***HN57*** in the antitrust context, a damages award not only benefits the plaintiff, it also fosters competition and furthers the interests of the public by imposing a severe penalty (treble damages) for violation of the antitrust laws. *See Hawaii v. Standard Oil Co. of Cal., 405 U.S. 251, 262, 92 S. Ct. 885, 31 L. Ed. 2d 184 (1972)* ("Every violation of the antitrust laws is a blow to the free-enterprise system envisaged by Congress. . . . In enacting these laws, Congress had many means at its disposal to penalize violators. It could have, for example, required violators to compensate federal, state, and local governments for the estimated damage to their respective economies caused by the violations. But, this remedy was not selected. Instead, Congress chose to permit all persons to sue to recover three times their actual damages . . . . By [so doing], Congress encouraged these persons to serve as 'private attorneys general.'") (citations omitted); **[**115]** *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614, 655, 105 S. Ct. 3346, 87 L. Ed. 2d 444 (1985)* ("A claim under the antitrust laws is not merely a private matter. The Sherman Act is designed to promote the national interest in a competitive economy . . . .") (quotation omitted). Thus, if Plaintiffs are not able to pursue damages, not only will they be unable to recover for the antitrust injury Eaton caused, the policy of deterring antitrust violations through the treble damages remedy will also be frustrated. *See Paoli II, 35 F.3d at 750* (***HN58*** "[T]he likelihood of finding an abuse of discretion is affected by the importance of the district court's decision to the outcome of the case and the effect it will have on important rights.").

In sum, after weighing the *Pennypack* factors and taking into account the circumstances under which Plaintiffs' motion for clarification was ultimately denied, we conclude that the District Court abused its discretion in not permitting Plaintiffs to submit alternate damages calculations.[28]

### D. Article III Standing to Seek Injunctive Relief

---

[28] We express no opinion as to the reliability or admissibility of DeRamus's alternate damages calculations. That is a matter left to the District Court on remand. However, we note that Plaintiffs' **[**116]** motion for clarification only sought to include damages calculations based on data already in the expert report, and that fact is crucial to our holding that prejudice to Eaton can be easily cured. Nothing in our opinion should be read as requiring the District Court to allow Plaintiffs to bring in entirely new data for the revised damages estimates.

Finally, we turn to Eaton's contention that Plaintiffs lack standing to seek injunctive relief. Eaton argues that Plaintiffs' complete withdrawal from the HD transmissions market in 2006 and their failure to present evidence showing anything more than a mere possibility that they will reenter the market precludes a finding of Article III standing as to injunctive relief. Although the District Court did not directly address standing, it noted in a footnote that, "[w]hile [P]laintiffs are no longer in business and are unable to directly benefit from an injunction, here, an injunction is appropriate because of the public's interest in robust competition and the possibility that [P]laintiffs may one day reenter the market." *ZF Meritor LLC v. Eaton Corp., 800 F. Supp. 2d 633, 639 (D. Del. 2011)*. **[**117]** We agree with Eaton that this determination was improper, and we will therefore vacate the injunction issued by the District Court.[29]

**[*301]** ***HN60*** A plaintiff bears the burden of establishing that he has Article III standing for each type of relief sought. *Summers v. Earth Island Inst., 555 U.S. 488, 493, 129 S. Ct. 1142, 173 L. Ed. 2d 1 (2009)*. In order to have standing to seek injunctive relief, a plaintiff must show: (1) that he is under a threat of suffering "'injury in fact' that is concrete and particularized; the threat must be actual and imminent, not conjectural or hypothetical"; (2) a causal connection between the injury and the conduct complained of; and (3) a likelihood that a favorable judicial decision will prevent or redress the injury. *Id.* (citing *Friends of Earth, Inc. v. Laidlaw Envtl. Servs., Inc., 528 U.S. 167, 180-81, 120 S. Ct. 693, 145 L. Ed. 2d 610 (2000))*. Even if the plaintiff has suffered a previous injury due to the defendant's conduct, the equitable remedy of an injunction is "unavailable absent a showing of irreparable injury, a requirement that cannot be met where there is no showing of any real or immediate threat that the plaintiff will be wronged again[.]" *City of Los Angeles v. Lyons, 461 U.S. 95, 111, 103 S. Ct. 1660, 75 L. Ed. 2d 675 (1983)*; *see O'Shea v. Littleton, 414 U.S. 488, 495-96, 94 S. Ct. 669, 38 L. Ed. 2d 674 (1974)* ("Past exposure to illegal conduct does not in itself show a present case or **[**119]** controversy regarding injunctive relief . . . if unaccompanied by any continuing, present adverse effects."). Accordingly, a plaintiff may have standing to pursue damages, but lack standing to seek injunctive relief. *Lyons, 461 U.S. at 105*.

For example, in *City of Los Angeles v. Lyons*, the plaintiff sued the city, seeking damages, injunctive relief, and declaratory relief, for an incident in which he was allegedly choked by police officers. *Id. at 97*. The Supreme Court held that, although the plaintiff clearly had standing to seek damages, he lacked standing to seek injunctive relief because he failed to establish a "real and immediate threat" that he would again be stopped by the police and choked. *Id. at 105*. "Absent a sufficient likelihood that he [would] again be wronged in a similar way, [the plaintiff] [was] no more entitled to an injunction than any other citizen of Los Angeles." *Id. at 111*. Likewise, in *Summers v. Earth Island Institute*, the Court held that an organization lacked standing to enjoin the application of Forest Service regulations in national parks where its members expressed only a "vague desire" to return to the affected parks. *555 U.S. at 496*. "Such some-day

---

[29] Even though Meritor was still technically in the HD transmissions business at the time the complaint in this case was filed, it is still appropriate to frame this issue as one of standing, rather than one of mootness. Plaintiffs' complaint, which was filed on October 5, 2006, stated that Meritor intended to exit the HD transmissions business in January 2007, and did not indicate any intent to reenter. Thus, even at the time the complaint was filed, Plaintiffs could not demonstrate the requisite likelihood of future injury sufficient to confer standing. *See Davis v. F.E.C., 554 U.S. 724, 734, 128 S. Ct. 2759, 171 L. Ed. 2d 737 (2008)* (***HN59*** "[T]he standing inquiry [is] focused on whether the party invoking jurisdiction had the requisite stake in the outcome when the suit was filed.") (citations omitted); *U.S. Parole Comm'n v. Geraghty, 445 U.S. 388, 397, 100 S. Ct. 1202, 63 L. Ed. 2d 479 (1980)* ("The requisite personal interest that must exist at the commencement of the litigation (standing) must continue throughout its existence (mootness).") (citation omitted). Moreover, even if we treated this as a mootness question, our conclusion **[**118]** would remain the same.

**[**120]** intentions—without any description of concrete plans, or indeed any specification of *when* the some day will be—do not support a finding of . . . actual or imminent injury." *Id.* (quoting *Lujan v. Defenders of Wildlife, 504 U.S. 555, 564, 112 S. Ct. 2130, 119 L. Ed. 2d 351 (1992))* (internal marks omitted); *see also Wal-Mart Stores, Inc. v. Dukes, 131 S. Ct. 2541, 2559-60,* **[*302]** 180 L. Ed. 2d 374 (2011) (noting that employees who no longer worked for Wal-Mart lacked standing to seek injunctive or declaratory relief against Wal-Mart's employment practices).

Applying those principles to our case, we hold that Plaintiffs lack standing to seek an injunction. They clearly have standing to seek damages based on Eaton's violation of the antitrust laws while ZF Meritor and Meritor were competitors. However, the ZF Meritor joint venture operationally dissolved in 2003, Meritor stopped manufacturing HD transmissions in 2006, and Meritor has expressed no concrete desire to revive the joint venture or otherwise reenter the market. The sole evidence in the record of Meritor's future intentions is found in one page of trial testimony, in which a Meritor official stated that there had been internal discussions at the company about the possibility of reentry, but **[**121]** that no decision had been made. The official testified that Meritor "continue[d] to monitor the performance of the products that are in the marketplace[,] . . . ha[d] a very thorough understanding of how the products [we]re working[,] . . . and [was] actively considering what [its] alternatives might be." He explained, however, that upon any attempt to reenter, Meritor would be confronted with the "same obstacle that caused the dissolution of the joint venture."[30]

As the District Court acknowledged, this evidence establishes no more than a "possibility" that Meritor might one day reenter the market. Where the District Court went wrong, however, was in concluding that such a possibility is sufficient to confer Article III standing for injunctive relief. *See* **[**122]** *McCray v. Fidelity Nat'l Ins. Co., 682 F.3d 229, 242-43 (3d Cir. 2012)* (***HN61*** "Allegations of possible future injury are not sufficient to satisfy Article III.") (internal marks and citation omitted). Plaintiffs were required to set forth sufficient facts to show that they were entitled to prospective relief, including that they were "*likely* to suffer future injury." *McNair v. Synapse Grp. Inc., 672 F.3d 213, 223 (3d Cir. 2012)* (citation omitted) (emphasis added); *see McCray, 682 F.3d at 243* (explaining that "a threatened injury must be certainly impending and proceed with a high degree of certainty") (internal marks and citation omitted). Absent a showing that they are likely to reenter the market and again be confronted with Eaton's exclusionary practices, Plaintiffs were "no more entitled to an injunction" than any other entity that has considered the possibility of entering the HD transmissions market. *Lyons, 461 U.S. at 111*. ***HN62*** "Vague" assertions of desire, "without any descriptions of concrete plans," are insufficient to support a finding of actual or imminent injury. *See Summers, 555 U.S. at 496*. Although Plaintiffs claim that they might again enter the market, such a decision "w[ould] **[**123]** be their choice, and what that choice may be is a matter of pure speculation at this point." *McNair, 672 F.3d at 225*.

Plaintiffs seem to suggest that there is a lower threshold for standing in antitrust cases.[31] However, Plaintiffs confuse the **[*303]** doctrines of constitutional standing and antitrust standing.

---

[30] In a post-trial status conference, the District Court asked Plaintiffs' counsel why an injunction would be appropriate given that Plaintiffs were no longer in the business. Plaintiffs' counsel could give no more concrete information about Plaintiffs' plans than the witness, stating simply that, if Eaton's conduct was enjoined, "a different set of calculations" would apply to Plaintiffs' discussions regarding reentry into the market.

[31] Specifically, Plaintiffs argue that the appropriate standard is found in Section 16 of the Clayton Act, which provides that any person "shall be entitled to sue for and have injunctive relief . . . against threatened loss or damage by a violation of the antitrust laws . . . when and under the same conditions and principles **[**124]** as injunctive relief . . . is granted by courts of equity." 15 U.S.C. § 26.

***HN63*** Although the doctrines often overlap in practice, they are, in fact, distinct. *Sullivan v. D.B. Invs., Inc., 667 F.3d 273, 307 (3d Cir. 2011)*. Regardless of any additional requirements applicable to a particular type of action, a plaintiff must *always* demonstrate that a justiciable case or controversy exists sufficient to invoke the jurisdiction of the federal courts. *Id.* Plaintiffs' failure to do so here renders any inquiry into antitrust (statutory) standing unnecessary. *See Conte Bros. Auto., Inc. v. Quaker State-Slick 50, Inc., 165 F.3d 221, 225 (3d Cir. 1998)*.

We agree with the District Court that there are strong public policy reasons for issuing an injunction in this case. However, the fact that there may be strong public policy reasons for enjoining Eaton's behavior does not mean that Plaintiffs are the appropriate party to seek such an injunction. ***HN64*** Standing is a constitutional mandate, *Doe v. Nat'l Bd. of Med. Exam'rs, 199 F.3d 146, 152 (3d Cir. 1999)*, and the consequences that flow from a finding of lack of standing here, although concerning, cannot affect our analysis.[32]

## IV. CONCLUSION

First, we hold that Plaintiffs' claims are not subject to the price-cost test, and instead must be analyzed as *de facto* exclusive dealing claims under the rule of reason. Second, we conclude that Plaintiffs presented sufficient evidence to support the jury's finding that Eaton engaged in anticompetitive conduct and that Plaintiffs suffered antitrust injury as a result. **[**125]** Third, we find no error in the District Court's decision to admit DeRamus's testimony on the issue of liability. Fourth, we hold that the District Court properly exercised its discretion in excluding DeRamus's damages testimony based on his expert report, but we conclude that the District Court abused its discretion by preventing DeRamus from submitting alternate damages calculations based on data already included in his initial report. Finally, we hold that Plaintiffs lack standing to pursue injunctive relief, and therefore, we will vacate the injunction issued by the District Court. We will remand to the District Court for further proceedings consistent with this opinion.

**Dissent by:** Greenberg

**Dissent**

Greenberg, Circuit Judge, dissenting

Notwithstanding the majority's thoughtful and well-crafted opinion, I respectfully dissent as I would reverse the District Court's order that it entered following its opinion reported at *ZF Meritor LLC v. Eaton Corp., 769 F. Supp. 2d 684 (D. Del 2011)*, denying Eaton's motion for judgment as a matter of law. Although the majority opinion recites in detail the factual background of this case, I nevertheless also set forth its factual predicate as I believe the inclusion **[**126]** of certain additional facts demonstrates even more clearly than the facts the majority sets forth why Eaton was entitled to judgment as a matter of law.[1]

**[*304]** I. FACTS

A. The HD Transmission Market

---

32 Because we conclude that Plaintiffs lack standing to pursue injunctive relief, we need not address Plaintiffs' argument that the District Court erred by refusing to allow them to address the scope of injunctive relief.

1 Throughout this dissent I use the same standard of review that the majority sets forth. Thus while I am exercising plenary review of the order denying the motion for a judgment as a matter of law within that review I am being deferential to the jury verdict.

The parties stipulated before the District Court and do not now dispute that the relevant product market in this case is heavy-duty ("HD") truck transmissions and that the relevant geographic market is the United States, Canada, and Mexico, the so-called "NAFTA market." On appeal, Eaton does not dispute that it possessed monopoly power in that market during the events relevant to this case.

HD trucks include linehaul trucks, the familiar 18-wheelers used to travel long distances on highways, and performance trucks used on unfinished terrain or to carry heavy loads, such as cement mixers, garbage trucks, and dump trucks. There are three types of HD truck transmissions: manual, automatic, and automated mechanical.

As the majority indicates, the **[**127]** NAFTA HD truck transmission market functions in the following way. Original Equipment Manufacturers ("OEMs") construct HD trucks. There were four OEMs during the period relevant to this dispute: Freightliner Trucks ("Freightliner"); International Truck and Engine Corporation ("International"); PACCAR; and Volvo Group ("Volvo"). OEMs provide the purchasers of HD trucks with "data books" that list HD truck component part options, including transmissions, and thereby allow the customer to select from various options for certain parts of the HD trucks.

The data books list one option as the "standard" offering with which OEMs will fit the truck unless the customer selects otherwise. Additionally, the component part listed in the data book as the lowest-priced option is referred to as the so-called "preferred" or "preferentially-priced" option.[2] For obvious reasons, positioning as the standard or preferred component part option in a data book can be beneficial and a form of promotion of the parts that the component part manufacturers supply. Evidence adduced at trial, which I explore further below, shows that OEMs decide which component parts to list as standard or preferred based, at least **[**128]** in part, on their determination of which component part is the most advantageous option for them to supply in terms of such factors as cost of supply pricing as to the OEMs and the availability and performance of the product. Consequently, the OEMs and component part manufacturers negotiate with respect to data book positioning.

Data books, however, are not the exclusive means of advertising HD truck transmissions or other parts nor do they restrict the truck purchasers' choices. Component suppliers, such as appellees[3] and Eaton, market directly to purchasers, and purchasers of HD trucks can and do request unpublished options that are not listed in the data books.

B. The Parties and Market Conditions

During the 1950s, Eaton began manufacturing transmissions for HD trucks, and eventually it developed a full product line of transmissions in a range of speeds and styles. Prior to 1989, Eaton was the only **[*305]** domestic manufacturer of HD truck transmissions. In 1989, however, Meritor entered the market with 9-and 10-speed HD manual transmissions for linehaul trucks. But, unlike Eaton, Meritor did not offer nor did it develop at any point a full product line of HD

---

[2] "Standard" and "preferred" positioning are not the same thing. See J.A. at 2546 (PACCAR and Eaton's LTA) (stating that PACCAR will list Eaton's product "as Standard Equipment and the Preferred Option," whereas "'Standard Equipment' means the equipment that is provided to a customer unless the customer expressly designates another supplier's product" and "'Preferred Option' means the lowest priced option in the Data Book for comparable products").

[3] I refer to the plaintiffs as appellees even though they are also appellants in **[**129]** these consolidated appeals.

truck transmissions. Nevertheless, by 1999 Meritor had obtained approximately 18% of the market for sales of HD truck transmissions in North America.

In 1999, Meritor entered into a joint venture with ZF Freidrichshafen ("ZF AG"), a large German company that previously had not sold HD truck transmissions in North America. The joint venture, called ZF Meritor ("ZFM"), sought to adapt for the NAFTA market ZF AG's "ASTronic" transmission, a linehaul 12-speed, 2-pedal, automated mechanical transmission. Meritor transferred its transmission business to ZFM, and ZFM introduced the ASTronic (renamed the "FreedomLine" for the NAFTA market) to these new markets around February **[**130]** 2001. At that time, Eaton did not have a two-pedal automated mechanical transmission and did not intend to release one until 2004. Appellees believe that the FreedomLine was technically superior to other HD truck transmissions available.

In late 1999, during the same time period that appellees formed ZFM, there was a severe economic downturn in the NAFTA market area that caused a sharp decline of HD truck orders. By 2001, around the time ZFM introduced the FreedomLine, HD truck orders had fallen by approximately 50%, with demand plummeting from more than 300,000 new HD truck orders per year to roughly 150,000 orders.

C. The Long-Term Agreements

In the 1980s and 1990s, Eaton entered into supply agreements with each of the four OEMs. These agreements set the prices for Eaton's transmissions and offered volume discounts to the OEMs, i.e., discounted prices based on the OEMs' purchase of a certain quantity of transmissions. Appellees do not allege that these agreements violated the antitrust laws. Beginning in late 2000, however, Eaton entered into new supply agreements with all four of the OEMs. Those agreements, to which the parties refer as long-term agreements ("LTAs"), are at the core **[**131]** of the present dispute.

Eaton's LTAs offered the OEMs rebates based on market-share targets. The discounts thus provided the OEMs with lower prices on Eaton's transmissions conditioned on their purchase of a certain percentage of their transmission needs from Eaton. Although the LTAs' terms varied, all of the LTAs at issue were consistent in two respects.

First, the LTAs were not explicitly exclusive-dealing contracts: each OEM remained free to buy parts from any other HD transmission manufacturer, including ZFM, and none of the LTAs conditioned Eaton's payment of rebates on an OEM's purchase of 100% of its transmission needs from it. Second, each LTA contained a so-called "competitiveness clause" that permitted the OEM to exclude an Eaton product from the share target and to terminate its LTA altogether if another manufacturer offered transmissions of better quality or lower price. Because the LTAs are at the crux of ZFM's claims, I review those four contracts and the circumstances of their formation in some detail.

1. Freightliner

As of 1998, both Eaton and Meritor had respective three-year supply agreements with Freightliner, the largest of the OEMs. Meritor's agreement provided that **[**132]** it would reduce the price of its component **[*306]** parts if Freightliner listed Meritor's parts as standard in its data book, while, as I have mentioned, Eaton's agreement provided volume-discount rebates to Freightliner.

In October 2000, Freightliner notified Meritor, which by then had evolved into ZFM with respect to its transmission business, that Eaton had offered it 10-speed transmissions at a price significantly lower than Meritor's price, Eaton was offering certain transmissions that Meritor did not have available, and Eaton's transmissions were superior to Meritor's in price and technology. Pursuant to a provision in Meritor's supply agreement that required Meritor to remain competitive with respect to its products in terms of quality and technology, Freightliner notified Meritor that it had 90 days within which to match Eaton's inventory or Freightliner would delete Meritor's noncompetitive products from the agreement. Though Meritor disputed Freightliner's contention it did not make a counteroffer or offer to match Eaton's inventory.

Soon thereafter, in November 2000, Eaton entered into a five-year LTA with Freightliner, one of the four contracts that appellees challenge. The LTA provided **[**133]** rebates ranging from $200 to $700, contingent on a 92% share target for Eaton's transmissions and clutches, an additional truck component that Eaton manufactured. In 2003, Eaton and Freightliner amended the LTA by adopting a sliding scale that entitled Freightliner to varying lower rebates if it met lower market-share targets beginning at 86.5% and going up to 90.5%.

In exchange for the discounted prices, the LTA required Freightliner to list Eaton's transmissions as the "preferred" option in its data book. Significantly, however, Freightliner "reserve[d] the right to publish" the FreedomLine transmission "through the life of the agreement at normal retail price levels." J.A. at 1948. The LTA also provided that in 2002 Freightliner would publish Eaton's transmissions and clutches in its data book exclusively, but the parties amended that provision in 2001 to allow Freightliner to continue to publish Eaton's competitors' products. From 2002 onwards, Freightliner did not list ZFM's manual transmissions but it continued to list ZFM's other transmissions from 2000 to 2004. In 2004, however, Freightliner removed the FreedomLine from its data books because Meritor[4] had refused to pay a $1,250 **[**134]** rebate it had promised to Freightliner on that product and because Freightliner had experienced reliability issues with ZFM's products. See id. at 3725 (letter from Freightliner representative to Meritor representative (Feb. 10, 2004)) ("Freightliner is outraged at Arvin Meritor in the handling of the FreedomLine transmissions price changes. It is totally unacceptable that Arvin Meritor would commit to price protection, and then seek to renege on that commitment.").

Under the LTA, Eaton had the right to terminate the agreement if Freightliner did not meet its share targets. In 2002, however, even though Freightliner did not meet the 92% share target, Eaton did not terminate the agreement. In 2003, the parties amended the LTA so that it would last for a total of ten years, extending the agreement to 2010.

2. International

Eaton entered into a five-year LTA with International in July 2000. A representative from International stated that International entered into the LTA because it **[*307]** made "good business sense," id. at 1532, inasmuch as **[**135]** the LTA provided the lowest purchase price for International and there was "greater customer preference and brand recognition for the Eaton product," id. at 1528.

In return, Eaton provided a $2.5 million payment to International, $1 million of which was payable in cash or in cost-savings initiatives. The LTA provided sliding scale rebates of 0.35% to

---

[4] As explained below, ZFM dissolved in December of 2003, and thus Meritor was handling sales of the FreedomLine transmission in the NAFTA market as of 2004.

2% beginning at a market share of 80% and up to 97.5% and above. It also provided for sliding rebates based on a market share of Eaton's clutches. For current truck models, International agreed to list Eaton's transmission as the preferred option, and for future models, it agreed to publish Eaton's transmissions exclusively.[5] Notwithstanding the latter provision, International continued to list ZFM's manual transmissions in its printed data book.

3. PACCAR

In July 2000, Eaton entered into a seven-year LTA with PACCAR. A PACCAR representative stated that PACCAR agreed to the market-share rebates because it "ma[d]e long term economic sense and it **[**136]** ha[d] a total value as to PACCAR." Id. at 1555. The PACCAR representative indicated that the "total value" concept incorporated such considerations as the "lower cost" provided by the LTAs, "providing a full product line of . . . transmissions," "providing product during periods of peak demand and ensuring the product is available," "warranty provisions," and "aftermarket supply." Id. at 1555-56.

The representative indicated that PACCAR was in discussions with ZFM regarding a supply agreement but ultimately it declined to enter into an agreement with ZFM because, apart from Eaton's more appealing offer, ZFM suffered from negative considerations such as ZFM's restricted output of its products, "massive transmission failure in the marketplace that caused market unacceptance of their transmissions earlier," and ZFM's lack of a full product line. Id. at 1557, 1562. Additionally, PACCAR "always [paid] . . . a higher cost [for a ZFM product] than a comparable Eaton product, independent of the rebate," particularly for the FreedomLine, which, according to the PACCAR representative, was "by design, a more expensive product" because of its European origins. Id. at 1558-59. In this regard, the **[**137]** representative stated that Eaton's rebates were not "the only thing that made them competitive." Id. at 1562.

Under the LTA, Eaton provided price reductions, a $1 million payment, firm pricing for seven years, and engineering and marketing support. PACCAR also could obtain rebates ranging from 2% to 3% in exchange for meeting 90% to 95% market share targets in both transmissions and clutches. In exchange, PACCAR was required to list Eaton as the standard and preferred option in its data book. At all times PACCAR continued to list ZFM's transmissions in its data book.

4. Volvo

Eaton entered into a five-year LTA with Volvo in October 2002. A Volvo representative stated that Volvo entered into the LTA because it represented "the best overall value for Volvo" in terms of "price, delivery, quality manufacturing, and logistics." Id. at 1430. Indeed, another Volvo representative stated that "[p]ricing was significantly better with Eaton [even] excluding **[*308]** rebates." Id. at 1295; see id. at 1293, 1296 (the same representative estimating the savings to Volvo from the LTA with Eaton to be about 12% to 15% excluding the rebates and stating that Volvo's motivation in entering the LTA was "purely dollars, **[**138]** dollars and cents"). Volvo was in discussions with ZFM to sign a supply agreement, but ultimately it did not do so in large part because of ZFM's "inability to have a complete product offering of all transmissions." Id. at 1431.

The LTA provided sliding scale rebates of 0.5% to 1.5% originally set at 65% market share, and, as of 2004, a 70% to 78% market share. Eaton had the option of terminating the LTA if its

---

[5] International already had listed Eaton as the standard option as of 1996 because, according to an International representative, Eaton provided the greatest value to International. See J.A. at 1533.

market share at Volvo fell below 68%. In turn, Volvo agreed to position Eaton's transmissions and clutches as the standard and preferred offering. Volvo continued to list in its data books both ZFM's and Volvo's own transmissions that it manufactured only for installation in its own trucks.[6]

D. ZFM's Business and Exit from the Market

As of July 2000, before Eaton signed any of the challenged LTAs, ZFM had lost nearly 20% of its market share in transmissions, its share declining from 16.1% to 13%. Minutes from a ZFM Board of Directors meeting held in July 2000 reveal that **[**139]** ZFM's President, Richard Martello, identified a number of factors that caused ZFM's falling market position, including:

> (i) poor product quality image, (ii) a decrease in Ryder business, (iii) turnover in the [company's sales organization, (iv) an increase in sales of Eaton Auto shift, (v) the push towards 13-speed transmissions, especially by Freightliner, (vi) the multi-year fleet business lost due to competitive equalization cutbacks in early 1999 and (vii) controlled distribution.J.A. at 3235.

Some explanation will illuminate Mr. Martello's observations. "Competitive equalization" payments are incentives a component manufacturer provides directly to truck purchasers for them to select its products from a data book. ZFM's internal documents, included in the trial record, demonstrate that "[d]uring the peak periods of production between March 1999 and September 1999, Meritor reduced [competitive equalization] payment[s] on deals trying to reduce the incentive [to] 'war' with Eaton" but Eaton "continued . . . to buy business when Meritor declined deals." Id. at 3028. "Controlled distribution" refers to the practice of purposefully limiting the quantity of a product available to the **[**140]** market — a practice that ZFM identified as the cause of it losing "various deals" due to ZFM's "lack of product" availability. Id. at 3030. The reference to ZFM's decrease in "Ryder business" appears to refer to the fact that ZFM lost the business of the OEM previously known as Mack-Ryder due to ZFM's controlled distribution practices. See id.

In that same meeting, Mr. Martello also observed that there were "significant forces in favor of direct drive, fully automated transmissions," including:

> (i) major engine changes in October 2002 due to emissions standards changes, (ii) continued driver shortages, (iii) continued upward pressure on fuel prices, (iv) market pressure on 'guaranteed cost of operation' sales incentives and (v) continued technician shortages.

**[*309]** Id. at 3236. Significantly, as I already have noted, the FreedomLine was an automated mechanical transmission, not a fully automated transmission.

Mr. Martello also noted that the industry was turning away from the component part manufacturers' traditional focus on advertising directly to truck purchasers as an incentive for them to select their component part, so-called "pull" advertising, to focus instead on "the creation of closer

---

[6] Eaton also entered into an LTA with the OEM Mack Trucks that same month. Volvo had acquired Mack Trucks in 2001, and it appears that the LTAs are substantively the same. Accordingly, I refer only to the Volvo LTA.

**[**141]** relationships with the OEMs." Id. Along this line, Mr. Martello observed that the OEMs desired to have "single source, full product line suppliers" in an effort to reduce costs. See id. Additionally, Mr. Martello noted that OEMs were resistant to the prospect of engineering new products, such as the FreedomLine, into their trucks, and that, as sales of HD trucks declined, component part manufacturers provided rapidly increasing sales incentives to the OEMs. See id. To overcome these obstacles and increase ZFM's market share, Mr. Martello "recommended that a full line of automated products be released at every OEM and that [ZFM] develop a full [HD] product line." Id. at 3237.

Notwithstanding ZFM's awareness of the declining HD truck market, after the 2000 meeting ZFM refused to lower its prices despite certain OEMs' repeated requests that it do so. See, e.g., id. at 3596 (letter from Chris Benner, ZFM, to Paul D. Barkus, International (Sept. 19, 2002)) (stating ZFM's refusal to lower prices despite International's June 2002 request that it do so); id. at 1537-38 (deposition testimony of Paul D. Barkus, International) (indicating that ZFM refused International's request that ZFM lower **[**142]** its prices in December 2001); id. at 3953 (ZFM Board minutes) ("Board did not agree with providing any price decreases to Volvo/Mack."). To the contrary, at the end of 2003, ZFM raised the price of the FreedomLine by roughly 25%, an increase that caused significant consternation among the OEMs. Moreover, ZFM did not develop a full HD truck transmission product line as Mr. Martello had recommended. Furthermore, as the majority notes, at least two of ZFM's transmissions, including its flagship transmission, the FreedomLine, experienced significant performance problems resulting in frequent repairs, and, in 2002 and 2003, ZFM faced significant warranty claims on its products amounting to millions of dollars in potential liability.

Notwithstanding the trouble it experienced in 2000, ZFM experienced growth in some areas. From 2001 to 2003, the FreedomLine transmission went from comprising 0% of the linehaul market to 6% of the linehaul market, and between 2000 and 2003, ZFM's market share of linehaul HD truck transmissions increased at three of the four OEMs. From July 2000 to October 2003, ZFM's share of the total HD transmission market ranged between 8% and 14%.

In spite of its gains, ZFM **[**143]** believed that Eaton's LTAs limited ZFM's potential market share to approximately 8% of the transmission market, not the 30% that it had expected to gain as a result of the joint venture and which it needed to achieve for the venture to be a viable business. In December 2003, on the basis of that calculation, ZFM was dissolved. Following ZFM's dissolution, Meritor returned to the transmission business it had conducted before entering into the joint venture. In 2006, however, Meritor exited the HD truck transmission business entirely.

E. Eaton's Pricing

At trial, appellees did not allege or introduce any evidence that Eaton priced its transmissions below any measure of cost **[*310]** during the relevant time period, and, on appeal, appellees do not contend that Eaton's prices were below cost. Furthermore, at all times relevant to the present dispute, Eaton's average transmission prices to the OEMs were lower than ZFM's average prices to the OEMs. In other words, the OEMs paid more to purchase and supply ZFM's transmissions to the truck purchasers than they paid for Eaton's transmissions. In particular, ZFM priced its FreedomLine significantly above the price of Eaton's transmissions.

II. ANALYSIS

Although **[**144]** it frames the question differently, as the majority recognizes the central question that emerges in this appeal is what effect, if any, does appellees' failure to allege, much less prove, that Eaton engaged in below-cost pricing have on its claims? Eaton, of course, contends that the effect is dispositive, arguing that Supreme Court precedent requires that courts apply the price-cost test of *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp., 509 U.S. 209, 113 S.Ct. 2578, 125 L. Ed. 2d 168 (1993)*, in any case in which a plaintiff challenges a defendant's pricing practices.[7] Appellees challenged Eaton's pricing practices, namely, its market-share discounts, but because appellees did not introduce evidence that Eaton engaged in below-cost pricing, Eaton contends that appellees did not establish that they suffered antirust injury nor did they show that by adopting the LTAs Eaton violated the antitrust laws.[8]

**[*311]** Appellees, of course, contend that their failure to show that Eaton engaged in below-cost pricing is entirely irrelevant to the success or failure of their claims. Appellees claim that the obligation to show below-cost pricing applies only where a plaintiff brings a so-called "predatory pricing" claim.[9] In this regard, appellees contend that they were not required to show that Eaton engaged in below-cost pricing because they did not bring a "predatory pricing" claim. In fact, appellees explicitly disavow any allegation that Eaton engaged in below-cost pricing and instead contend that the LTAs, including the market-share rebates they contained, amounted to unlawful de facto exclusive dealing agreements.[10]

---

7 Under the Brooke Group price-cost test, a firm must first establish that the defendant's prices "are below an appropriate measure of its . . . costs," and second, it must show that the defendant "had a reasonable prospect [under *§ 1* of the Sherman Act], or, under *§ 2* of the Sherman Act, a dangerous **[**145]** probability, of recouping its investment in below-cost prices." 509 U.S. at 223-24, 113 S.Ct. at 2587-88.

8 Apart from meeting the requirements of Article III standing, an antitrust plaintiff seeking monetary or injunctive relief must show that it has suffered antitrust injury, i.e., an "injury of the type that the antitrust laws were intended to prevent and that flows from that which makes [the] defendant['s] acts unlawful." Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 489, 97 S.Ct. 690, 697, 50 L. Ed. 2d 701 (1977). Although courts often conflate the antitrust injury requirement with the determination of whether the defendant's conduct violated the antitrust laws, this approach is erroneous as the antitrust injury requirement assumes the defendant's conduct was unlawful (and thus anticompetitive) and asks whether the anticompetitive aspect of the unlawful conduct is the cause of plaintiff's injury. See Angelico v. Lehigh Valley Hosp., Inc., 184 F.3d 268, 275 n.2 (3d Cir. 1999) ("The District Court erred by incorporating the issue of anticompetitive market effect into its standing analysis, confusing antitrust injury with an element of a claim under *section 1* of the Sherman Act . . . ."); **[**146]** see also Daniel v. Am. Bd. of Emergency Med., 428 F.3d 408, 447-48 (2d Cir. 2005) (explaining that anticompetitive effects of defendant's behavior "are classic 'rule of reason' questions, distinct from the antitrust standing question") (citations omitted). Because I conclude that Eaton was entitled to judgment as a matter of law as there was insufficient evidence for the jury's conclusion that Eaton violated *Sections 1* and *2* of the Sherman Act and Section 3 of the Clayton Act, I do not address whether appellees satisfied the antitrust injury requirement. Accord L.A.P.D., Inc. v. Gen. Elec. Corp., 132 F.3d 402, 404 (7th Cir. 1997) ("Because LAPD adequately alleges injury in fact and thus has standing under Article III, however, we may bypass the antitrust-injury issue to go straight to the merits."); *Hairston v. Pac. 10 Conference, 101 F.3d 1315, 1318 (9th Cir. 1996)* ("[W]e need not decide whether appellants have met the requirements for antitrust standing, because they have failed to establish any violation of the antitrust laws."); Levine v. Cent. Fl. Med. Affiliates, Inc., 72 F.3d 1538, 1545 (11th Cir. 1996) ("We need not decide whether Dr. Levine has met the requirements for standing **[**147]** as to any of his antitrust claims, because as to each one he has failed to establish any violation of the antitrust laws.").

9 A firm engages in "predatory pricing" when it cuts its prices below an appropriate measure of cost to force competitors out of the market or to deter potential entrants from entering the market. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 584 n.8, 106 S.Ct. 1348, 1355 n.8, 89 L. Ed. 2d 538 (1986). "The success of any predatory scheme depends on maintaining **[**148]** monopoly power for long enough both to recoup the predator's losses and to harvest some additional gain." Id. at 589, 106 S.Ct. at 1357 (emphasis in original). Due to the inherently speculative nature of such an undertaking, "predatory pricing schemes are rarely tried, and even more rarely successful." Id.

10 As the leading antitrust treatise points out, "to be challenged as unlawful exclusive dealing, . . . [a] quantity discount program would necessarily involve prices above cost, else the program would not be sustainable." Phillip E. Areeda & Herbert Hovenkamp, Fundamentals of Antitrust Law § 18.03b, at 18-70 (4th ed. 2011).

The majority appears to split the difference between the parties' two positions. The majority concludes that the Brooke Group price-cost test may be dispositive in a case where a plaintiff brings a claim challenging a defendant's pricing practices[11] and alleges that price itself functioned as the exclusionary tool. I agree completely with the majority's conclusion in this regard. Thereafter, however, our paths diverge because the majority appears to conclude that where a plaintiff brings a claim of unlawful exclusive dealing against a defendant's pricing practices **[**149]** but does not contend that the defendant's prices operated as the exclusionary tool, the price-cost test is irrelevant and has neither dispositive nor persuasive effect.[12]

As I explain further below, while I do not believe that the Supreme Court has held that the inferior courts must impose and give dispositive effect to the Brooke Group price-cost test in every claim challenging a defendant's pricing practices, the Court's unwavering adherence to the general principle that above-cost **[**150]** pricing practices are not anticompetitive and its justifications for that position lead me to conclude that this principle is a cornerstone of antitrust jurisprudence that applies regardless of whether the plaintiff focuses its claim on the price or non-price aspects of the defendant's pricing program. Thus, although the price-cost test may not bar a claim of exclusive dealing challenging a defendant's above-cost pricing **[*312]** practices, regardless of how a plaintiff casts its claim or the non-price elements of the pricing practices that the plaintiff identifies as the exclusionary conduct, where a plaintiff attacks a defendant's pricing practices — and to be clear that is what the market-share rebate programs at issue here are — the fact that defendant's prices were above-cost must be a high barrier to the plaintiff's success. Accordingly, I believe that we must apply the Brooke Group price-cost test to the present case and give that test persuasive effect in the context of our broader analysis under the antitrust laws at issue.

Allowing appellees that opportunity, the majority concludes that the plaintiffs adduced sufficient evidence at trial from which a jury reasonably could infer that **[**151]** the LTAs represented unlawful "de facto partial exclusive dealing."[13] In doing so, the majority concludes that despite the fact that the LTAs by their terms were not exclusive nor mandatory and despite the fact that the prices offered under them were at all times above-cost such that an equally-efficient competitor could have matched them, they were de facto partial exclusive dealing contracts because Eaton was

---

[11] Throughout this opinion I use the term "pricing practices" to encompass the variety of ways in which a firm may set its prices, including but not limited to, straightforward price cuts and conditional rebates or discounts.

[12] I recognize that the majority states that Eaton's low prices are not irrelevant to the extent they may help explain why the OEMs entered the LTAs even though the LTAs allegedly included terms that were unfavorable to the OEMs and to rebut an argument that the agreements were inefficient but the majority does not factor the circumstance that Eaton's prices were above cost into its analysis of whether the LTAs were exclusionary and anticompetitive, and I believe its failure to do so is error.

[13] I cannot utilize this phrase without making the point that where a court permits a non-exclusive, non-mandatory supply agreement to morph into a mandatory exclusive-dealing contract to legitimize a plaintiff's claim of unlawful "de facto partial exclusive dealing" the court follows antitrust plaintiffs down the rabbit hole a bit too far. While "de facto partial exclusive dealing" is a creative neologism, the phrase not only distorts the English language (in what other realm would one refer to a contract as "partially exclusive"?), it takes us so far from the text of Section 3 of the Clayton Act and the actual concept of exclusive dealing that I shudder to think what will be labeled as exclusive dealing next.

The majority concedes that "partial exclusive dealing is rarely a valid antitrust theory." Typescript at 43 (internal quotation marks omitted). Indeed, the only thing rarer may be what appellees actually allege here: "de **[**153]** facto partial exclusive dealing." I am not aware of any Supreme Court or court of appeals precedent recognizing such a claim, and a Westlaw search of the phrase reveals only one other case recognizing the concept as a viable antitrust claim. In a sign that we truly have come full circle, that case is a class action pending in the United States District Court for the District of Delaware brought by truck purchasers against Eaton, the four OEMs, and a handful of other entities, alleging that the same LTAs at issue here violated *Sections 1* and *2 of the Sherman Act* and Section 3 of the Clayton Act. See Wallach v. Eaton Corp., 814 F. Supp. 2d 428, 442-43 (D. Del. 2011).

a dominant supplier, the OEMs could not have afforded to lose Eaton as a supplier, and thus, the majority reasons, the OEMs were compelled to enter the LTAs and meet their market-share targets. The majority reaches its conclusion despite the absence of evidence in the record suggesting that Eaton would have refused to supply transmissions to the OEMs had the OEMs failed to meet the LTAs' market-share targets or that Eaton at any point coerced the OEMs into entering the LTAs or meeting the targets. For reasons I set forth more fully below, I cannot join my colleagues in this judicial reworking of the LTAs and the unbridled speculation the majority's reasoning requires to convert the LTAs into exclusive dealing contracts. Even analyzing appellees' claims under the rule of reason **[**152]** and the principles used to ascertain whether an exclusive-dealing arrangement is lawful and employing the deferential standard of review to which we subject jury verdicts, it is plain that the agreements could not have been and in fact were not anticompetitive.

A. The Supreme Court's Treatment of Antitrust Challenges to Pricing Practices

Beginning with *Cargill, Inc. v. Monfort of Colorado, Inc., 479 U.S. 104, 107 S.Ct. 484, 93 L. Ed. 2d 427 (1986)*, the Supreme **[*313]** Court in a series of cases considering antitrust challenges to pricing practices has made clear that as a general matter above-cost pricing practices do not threaten competition. In Cargill, the Court considered whether Monfort, a beef-packing business, had shown antitrust injury to the end that it had standing to challenge the merger of two **[**154]** of its competitors that allegedly violated *Section 7 of the Clayton Act*. See *id. at 106-09, 107 S.Ct. at 487-88*. Monfort presented two theories of antitrust injury: "(1) a threat of a loss of profits stemming from the possibility that . . . [defendant], after the merger, would lower its prices to a level at or only slightly above its costs" and "(2) a threat of being driven out of business by the possibility that . . . [defendant], after the merger, would lower its prices to a level below its costs." *Id. at 114, 107 S.Ct. at 491*.

The Court rejected Monfort's first theory of injury, stating "the antitrust laws do not require the courts to protect small businesses from the loss of profits due to continued competition, but only against the loss of profits from practices forbidden by the antitrust laws." *Id. at 116, 107 S.Ct. at 492*. Because the defendant's above-cost "competition for increased market share" was not "activity forbidden by the antitrust laws" but rather constituted "vigorous competition," Monfort could not demonstrate antitrust injury under its first theory. Id. In this regard, the Court noted that "[t]o hold that the antitrust laws protect competitors from the loss of profits **[**155]** due to such price competition would, in effect, render illegal any decision by a firm to cut prices in order to increase market share." Id. The antitrust laws, the Court noted, "require no such perverse result" because "[i]t is in the interest of competition to permit dominant firms to engage in vigorous competition, including price competition." Id. (internal quotation marks and citation omitted). The Court rejected Monfort's second claim that the defendant would engage in below-cost, i.e. predatory pricing, following the merger because Monfort had failed to raise and failed to adduce adequate proof of that claim before the district court. See *id. at 118-19, 107 S.Ct. at 494*.

Four years later, in *Atlantic Richfield Co. v. USA Petroleum Co., 495 U.S. 328, 110 S.Ct. 1884, 109 L. Ed. 2d 333 (1990)*, the Court reiterated that above-cost pricing practices generally are not anticompetitive, this time in the context of *Section 1 of the Sherman Act*. In Atlantic Richfield, USA Petroleum Company ("USA"), an independent retail marketer of gasoline, alleged that its competitor, Atlantic Richfield Company ("ARCO"), which sold gasoline through its own stations and indirectly through dealers, violated *Sections 1* and **[**156]** *2* of the Sherman Act through a price-fixing scheme that set gasoline prices at below-market but above-cost levels through its offer of short-term discounts, such as volume discounts, and the elimination of credit-card

sales to its dealers. See *id. at 331-32, 110 S.Ct. at 1887-88*. Only USA's Section 1 claim was before the Court, see *id. at 333 n.3, 110 S.Ct. at 1888 n.3*, and the question presented was whether USA had suffered an antitrust injury by virtue of ARCO's Section 1 violation, see *id. at 335, 110 S.Ct. at 1889*. At the time, ARCO's conduct was regarded as a per se violation of *Section 1*. See id. (citing *Albrecht v. Herald Co., 390 U.S. 145, 88 S.Ct. 869, 19 L. Ed. 2d 998 (1968)*, overruled by *State Oil Co. v. Khan, 522 U.S. 3, 118 S.Ct. 275, 139 L. Ed. 2d 199 (1997))*.

First, the Court rejected USA's claim that it automatically satisfied the antitrust injury requirement because ARCO's conduct constituted a per se violation of *Section 1*. *495 U.S. at 336-37, 110 S.Ct. at 1890-91*. The Court then turned to USA's alternative claim that even if it was not **[*314]** entitled to a presumption of injury, it had suffered injury "because of the low prices produced by the vertical restraint." *Id. at 337, 110 S.Ct. at 1891*. Rejecting this **[**157]** contention, the Court reasoned that "[w]hen a firm, or even a group of firms adhering to a vertical agreement, lowers prices but maintains them above predatory levels, the business lost by rivals cannot be viewed as an 'anticompetitive' consequence of the claimed violation." Id. Such injury, the Court concluded, "is not antitrust injury; indeed, 'cutting prices in order to increase business often is the very essence of competition.'" *Id. at 338, 110 S.Ct. at 1891* (emphasis in original) (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 594, 106 S.Ct. 1348, 1359, 89 L. Ed. 2d 538 (1986))*.

USA argued alternatively that it was "inappropriate to require a showing of predatory pricing before antitrust injury can be established when the asserted antitrust violation is an agreement in restraint of trade illegal under *§ 1 of the Sherman Act*, rather than an attempt to monopolize prohibited by *§ 2*." *Id. at 338, 110 S.Ct. at 1891*. As the Court noted, "[p]rice fixing violates *§ 1*, for example, even if a single firm's decision to price at the same level would not create *§ 2* liability" because "the price agreement itself is illegal." *Id. at 338, 110 S.Ct. at 1891*. USA contended that therefore **[**158]** it had "suffered antitrust injury even if [ARCO's] pricing was not predatory under *§ 2 of the Sherman Act*." *Id. at 339, 110 S.Ct. at 1891*.

In a passage that is significant in the context of the present case, the Court also rejected that contention. It explained:

> Although a vertical, maximum-price-fixing agreement is unlawful under *§ 1 of the Sherman Act*, it does not cause a competitor antitrust injury unless it results in predatory pricing. Antitrust injury does not arise for purposes of *§ 4 of the Clayton Act*, until a private party is adversely affected by an anticompetitive aspect of the defendant's conduct; in the context of pricing practices only predatory pricing has the requisite anticompetitive effect. Low prices benefit consumers regardless of how those prices are set, and so long as they are above predatory levels, they do not threaten competition. Hence, they cannot give rise to antitrust injury.*Id. at 339-40, 110 S.Ct. at 1891-92* (citations omitted and some emphasis added).

The Court observed that it had "adhered to this principle regardless of the type of antitrust claim involved." *Id. at 340, 110 S.Ct. at 1892* (citing *Cargill, 479 U.S. at 116, 107 S.Ct. at 492*;

*Brunswick Corp., 429 U.S. at 487, 97 S.Ct. at 696*).[14] **[**159]** The **[*315]** Court noted that although "the source of the price competition in [Atlantic Richfield] was an agreement allegedly unlawful under *§ 1 of the Sherman Act* rather than a merger in violation of *§ 7* of the Clayton Act . . . that difference [wa]s not salient . . . [because] [w]hen prices are not predatory, any losses flowing from them cannot be said to stem from an anticompetitive aspect of the defendant's conduct." *495 U.S. at 340-41, 110 S.Ct. at 1892* (emphasis in original).

It is, of course, important to understand the significance of Cargill and Atlantic Richfield in the context of this case. Cargill and Atlantic Richfield involved the question of whether the plaintiffs had suffered antitrust injury, not whether above-cost pricing practices ever can violate *Sections 1* and *2* of the Sherman Act or *Section 3* of the Clayton Act. Indeed, at the time the Court decided Atlantic Richfield, vertical, maximum-price-fixing schemes were regarded as per se illegal under Section 1 of the Sherman Act, and the Court assumed in its analysis that even the above-cost scheme at issue in Atlantic Richfield was illegal under Section 1.

Nevertheless, though it was writing in the context of the antitrust injury requirement for the actions, the Court in Cargill and Atlantic Richfield forcefully rejected the notion that the above-cost pricing practices at issue threatened competition at all. See *Atl. Richfield, 495 U.S. at 340, 110 S.Ct. at 1892* **[**162]** ("[S]o long as [prices] are above predatory levels, they do not threaten competition."); *Cargill, 479 U.S. at 116, 107 S.Ct. at 492* (stating that Cargill's above-cost pricing practices aimed at increasing its market share was not "activity forbidden by the antitrust laws") (emphasis added). Because the antitrust laws at issue in this case require to fix liability on it that Eaton's behavior present a probable threat to or actually negatively impact competition in the relevant marketplace, these pronouncements are important here and should bear on our consideration of the question of whether the particular pricing practices involved in this case are anticompetitive and thus violate the antitrust laws.

Along this same line, other courts of appeals have looked to Atlantic Richfield's discussion of above-cost pricing practices not only in the context of considering whether the plaintiff has demonstrated antitrust injury but also in considering whether a defendant's conduct violates the antitrust laws. See *Cascade Health Solutions v. PeaceHealth, 515 F.3d 883, 902-03 (9th Cir. 2008)* (relying on Atlantic Richfield, among other cases, to hold that bundled discounts are not exclusionary conduct **[**163]** under *Section 2* of the Sherman Act unless the discounts result in

---

[14] As did Cargill, Brunswick Corp. involved a competitor's antitrust challenge to an allegedly illegal acquisition under Section 7 of the Clayton Act because it would have brought a "'deep pocket' parent into a market of 'pygmies.'" 429 U.S. at 487, 97 S.Ct. at 697. The Court concluded that the plaintiff could not show antitrust injury based on the losses it would suffer from that acquisition because the aspect of the merger that made it unlawful did not cause the plaintiffs losses. See id.

The majority interprets the Supreme Court's statement it had adhered to the principle that "in the context of pricing practices only predatory pricing has the requisite anticompetitive effect" "regardless of the type of antitrust **[**160]** claim involved" to mean "that the price-cost test applies regardless of the statute under which a pricing practice claim is brought, not that the price-cost [test] applies regardless of the type of anticompetitive conduct." Typescript at 38 n.13. While the Supreme Court's statement undoubtedly makes clear that the principle that above-cost pricing is not anticompetitive applies regardless of which provision of the antitrust laws is at issue, I believe that the Court's rather clear statement that it had adhered to this principle "regardless of the type of antitrust claim involved" means exactly what it says — that whether the plaintiff challenges a defendant's pricing practices in the context of a challenge to an allegedly unlawful merger or whether it does so in the context of a claim that a defendant has entered a price-fixing agreement a plaintiff cannot contend that the prices resulting from those arrangements are anticompetitive unless they are below cost. While I do not believe that the Court's statement in this regard requires that the price-cost test apply with dispositive force in every challenge to a defendant's pricing practices because there may be other elements of a defendant's **[**161]** conduct that are anticompetitive notwithstanding its above-cost prices, the Court's reasoning undoubtedly lends support to my conclusion that the price-cost test must factor into a court's decision when it is asked to judge the lawfulness of such a defendant's rebate program.

below-cost pricing); *Virgin Atl. Airways Ltd. v. British Airways PLC, 257 F.3d 256, 269 (2d Cir. 2001)* (stating in the context of a challenge to a volume-discount program that "[a]s long as low prices remain above predatory levels, they neither threaten competition nor give rise to antitrust injury") (citing *Atl. Richfield, 495 U.S. at 340, 110* **[*316]** S.Ct. at 1892) (emphasis added); *Concord Boat Corp. v. Brunswick Corp., 207 F.3d 1039, 1060-61 (8th Cir. 2000)* (relying on Atlantic Richfield in concluding that defendant had not violated *Section 2* through its above-cost market-share discounts). Similarly, the Supreme Court has invoked Atlantic Richfield's discussion of below-cost pricing practices in considering whether pricing practices violate the antitrust laws.

Indeed, three years after it decided Atlantic Richfield, the Court reemphasized this principle in concluding that below-cost pricing was necessary to establish liability under Section 2 of the Clayton Act in an attack on a defendant's pricing practices. In Brooke Group, Liggett, a generic cigarette manufacturer, alleged that Brown & Williamson Tobacco Corporation ("B&W") **[**164]** violated *Section 2* of the Clayton Act when it offered below-cost price-cuts and volume rebates on "orders of very substantial size" to its wholesalers on B&W's generic cigarettes in an effort to reverse decreasing sales of its branded cigarettes. *509 U.S. at 216-17, 113 S.Ct. at 2584*. The Court stated that "whether the claim alleges predatory pricing under *§ 2* of the Sherman Act or primary-line price discrimination under the Robinson-Patman Act, . . ., a plaintiff seeking to establish competitive injury resulting from a rival's low prices must prove that the prices complained of are below an appropriate measure of its rival's costs" and "that the competitor had a reasonable prospect, or under *§ 2* of the Sherman Act, a dangerous probability, of recouping its investment in below-cost prices." *Id. at 222-24, 113 S.Ct. at 2587-88* (emphasis added). Because Liggett had failed to provide sufficient evidence that B&W had a reasonable prospect of recouping its allegedly predatory losses, the Court concluded that B&W was entitled to judgment as a matter of law. See *id. at 243, 113 S.Ct. at 2598*.

Importantly, in explaining the dual requirements set forth above, the Court noted that it had "rejected **[**165]** elsewhere the notion that above-cost prices that are below general market levels or the costs of a firm's competitors inflict injury to competition cognizable under the antitrust laws." *Id. at 223, 113 S.Ct. at 2588* (citing *Atl. Richfield, 495 U.S. at 340, 110 S.Ct. at 1892*). In this connection, the Court reiterated Atlantic Richfield's principle that "'[l]ow prices benefit consumers regardless of how those prices are set, and so long as they are above predatory levels, they do not threaten competition . . . regardless of the type of antitrust claim involved.'" Id. (quoting *Atl. Richfield, 495 U.S. at 340, 110 S.Ct. at 1892*). The Court observed:

> As a general rule, the exclusionary effect of prices above a relevant measure of cost either reflects the lower cost structure of the alleged predator, and so represents competition on the merits, or is beyond the practical ability of a judicial tribunal to control without courting intolerable risks of chilling legitimate price-cutting.*509 U.S. at 223, 113 S.Ct. at 2588*.

The Court again rejected an attack on above-cost pricing practices with its decision in *Weyerhaeuser Co. v. Ross-Simmons Hardwood Lumber Co., 549 U.S. 312, 320-21, 127 S.Ct. 1069, 1075, 166 L. Ed. 2d 911 (2007)*. **[**166]** Weyerhaeuser involved the unusual situation in which there was an allegation of "predatory bidding," meaning that a firm with monopoly buying power on the supply side drives up the price of that input to levels at which a competitor cannot compete. *Id. at 320, 127 S.Ct. at 1075*. Once the monopolist has caused competing buyers to exit the market for

the input, "it will seek to restrict **[*317]** its input purchases below the competitive level, thus reduc[ing] the unit price for the remaining input[s] it purchases[,]" thereby allowing the monopolist to reap profits that will offset any losses it suffered in bidding up the input prices. *Id. at 320-21, 127 S.Ct. at 1075-76*. The issue was whether a plaintiff alleging that a defendant engaged in such conduct was required to demonstrate that the defendant engaged in below-cost pricing through the alleged predatory bidding on the supply side. Due to the theoretical and practical similarities between a claim of predatory pricing and a claim of predatory bidding, the Court concluded that its Brooke Group test applies to predatory bidding claims under *Section 2* just as the test applies to *Section 2* predatory pricing claims. See *id. at 325, 127 S.Ct. at 1078*.

In **[**167]** doing so, the Court noted that in Brooke Group it had been "particularly wary of allowing recovery for above-cost price cutting because allowing such claims could, perversely, 'chil[l] legitimate price cutting,' which directly benefits consumers." *Id. at 319, 127 S.Ct. at 1074* (quoting *Brooke Grp., 509 U.S. at 223-24, 113 S.Ct. at 2588*). Accordingly, the Court had "specifically declined to allow plaintiffs to recover for above-cost price cutting, concluding that 'discouraging a price cut and . . . depriving consumers of the benefits of lower prices . . . does not constitute sound antitrust policy.'" *Id., 127 S.Ct. at 1074-75* (quoting *Brooke Grp., 509 U.S. at 224, 113 S.Ct. at 2588*).

Most recently in *Pacific Bell Telephone Co. v. Linkline Communications, Inc., 555 U.S. 438, 129 S.Ct. 1109, 172 L. Ed. 2d 836 (2009)*, the Court extended this principle to "price squeeze" claims. Price squeeze claims allege that a "vertically integrated firm [that] sells inputs at wholesale and also sells finished goods or services at retail" has "simultaneously raise[d] the wholesale price of inputs and cut the retail price of the finished good" thereby "squeezing the profit margins of any competitors in the retail market," **[**168]** and forcing the competitors to "pay more for the inputs they need . . . [and] cut their retail prices to match the other firm's prices." *Id. at 442, 129 S.Ct. at 1114*. The Court noted that "[t]o avoid chilling aggressive price competition, [it] ha[d] carefully limited the circumstances under which plaintiffs can state a Sherman Act claim by alleging that prices are too low." *Id. at 451, 129 S.Ct. at 1120*. It reiterated the dual requirements of Brooke Group for predatory pricing claims, and noted, once more, Atlantic Richfield's principle that "so long as [prices] . . . are above predatory levels, they do not threaten competition." Id. (quoting *Atl. Richfield, 495 U.S. at 340, 110 S.Ct. at 1892*).[15]

The Supreme Court's decisions in the above cases require that inferior courts recognize that in general above-cost pricing practices are not anticompetitive **[**169]** and thus do not violate the antitrust laws. Time and time again, the Court has made clear that above-cost pricing practices generally do not threaten competition in the marketplace. Accord *Cascade Health Solutions, 515 F.3d at 901* (observing in the context of challenge to bundled discount program that Brooke Group and Weyerhaeuser "strongly suggest that, in the normal case, above-cost pricing will not be considered exclusionary conduct for antitrust purposes"); *Concord Boat, 207 F.3d at 1061* (stating in the context of a challenge **[*318]** to a market-share discount program that decisions of the Supreme Court "illustrate the general rule that above cost discounting is not anticompetitive"); see also *Khan, 522 U.S. at 15, 118 S.Ct. at 282* ("Our interpretation of the Sherman Act also incorporates the notion that condemnation of practices resulting in lower prices to consumers is 'especially costly' because 'cutting prices in order to increase business often is the very essence of competition.") (internal quotation marks and citation omitted).

---

15 An equally important facet of the Court's decision in Linkline, in a context quite apart from that here, was its holding that a plaintiff may not bring a *Section 2* Sherman Act price-squeeze claim "when the defendant is under no antitrust obligation to sell the inputs to the plaintiff in the first place." 555 U.S. at 442, 129 S.Ct. at 1115.

As the majority notes, it is also clear that the conditional nature of the price cuts or the fact that the prices and the conditions were memorialized in **[**170]** the LTAs does not render the precedent that I summarize above inapplicable.[16] As noted, both Atlantic Richfield and Brooke Group involved conditional discounts of another type, namely volume rebates, and surely inasmuch as ARCO and B&W both were sophisticated companies that dealt in large-scale transactions, they certainly explained these discounts and the conditions they placed on them to the purchasers of their products whether or not they did so in writing. In any event, the purchasers necessarily knew that they were receiving the discounts when they were afforded them. These cases thus make apparent that the Court's reluctance to condemn above-cost pricing practices extends not only to direct price cuts but also to conditional pricing practices whether or not they are stated in written agreements. The principle that above-cost pricing practices generally do not threaten competition in the marketplace remains true whether the plaintiff casts its claim in the verbiage of "predatory pricing" and alleges explicitly that defendant's prices are too low or whether it realizes it cannot do so because the prices were above cost so it instead couches its challenge in the language of exclusive **[**171]** dealing and attacks the agreements that offer the low prices.

In practice, however, a defendant's pricing practices may include both price and non-price elements. Further, I concur in the majority's conclusion that notwithstanding the Court's strong pronouncements favoring above-cost price cuts, the **[**172]** Supreme Court has not held that in every case in which a plaintiff challenges a defendant's pricing practices the Brooke Group test is dispositive and the plaintiff therefore must demonstrate that there has been below-cost pricing to succeed. See *Cascade Health Solutions, 515 F.3d at 901* (noting that "in neither Brooke Group nor Weyerhaeuser did the Court go so far as to hold that in every case in which a plaintiff challenges low prices as exclusionary conduct the plaintiff must prove that those prices were below cost").[17] But **[*319]** where a plaintiff contends that a defendant's prices alone were anticompetitive, the Brooke Group price-cost test provides the entire legal framework necessary to evaluate that claim because the Brooke Group price-cost test is designed to measure whether prices are anticompetitive or not. Thus, where a plaintiff challenges a defendant's pricing practices as exclusive dealing or under any other theory of antitrust liability but in fact alleges only that the defendant's prices themselves operate as the exclusionary or anticompetitive tool, the Brooke Group test must apply and have dispositive effect.[18] My **[**173]** conclusions **[*320]** in this regard largely mirror those of the majority.

---

[16] As noted, in the case of PACCAR's and International's respective LTAs, Eaton provided up-front cash payments in addition to market rebates. Although these payments were not in the form of rebates, they cannot be distinguished from the market-share rebates because both practices were an avenue for Eaton ultimately to provide discounted prices to the OEMs. Accord Race Tires Am., Inc. v. Hoosier Racing Tire Corp., 614 F.3d 57, 79 (3d Cir. 2010) (noting that tire manufacturer's offer of up-front payments to race sanctioning bodies to select manufacturer's tires presented no more a coercive threat than an offer of lower prices); NicSand, Inc. v. 3M Co., 507 F.3d 442, 452 (6th Cir. 2007) (en banc) (noting that defendant's cash payments to induce retailers to carry its product solely were "nothing more than price reductions offered to the buyers") (internal quotation marks and citation omitted).

[17] Likewise, I concur fully with the majority's point that a firm may engage in anticompetitive conduct without engaging in below-cost pricing. The antitrust laws proscribe an array of conduct that, of course, does not require as an essential element below-cost pricing. For example, tying arrangements, unlawful mergers, and price-fixing agreements, to name a few, are all practices that may violate the antitrust laws regardless of the prices resulting from such conduct. The Supreme Court has made clear, however, that where an antitrust plaintiff attacks a defendant's pricing practices, i.e. price cuts, rebates or the like, if those practices result in above-cost prices they generally do not threaten competition, regardless of the source or type of antitrust claim at issue.

[18] Appellees rely heavily on LePage's Inc. v. 3M, 324 F.3d 141 (3d Cir. 2003) (en banc), and contend that our decision in that case precludes the possibility that the price-cost test has any applicability outside of the predatory-pricing-claim framework. For

Where I part from my colleagues, however, is with their conclusion that if a plaintiff challenges a defendant's pricing practices but contends **[**177]** that the non-price aspects of defendant's conduct, rather than the prices themselves, constituted the anticompetitive conduct, the price-cost test is no longer relevant. While the Supreme Court has not held that the price-cost test is dispositive of all claims that attack a defendant's pricing practices, it is undeniable that its reasoning in the above cases establishes that courts ought to exercise a great deal of caution before condemning above-cost pricing practices. As the majority notes, in the precedent recited above the plaintiffs grounded their claims in the allegation that defendant's prices would cause or had caused them harm. Yet the purpose of my summary and my quotation of that precedent in such detail is to bear out the fact that the Court's holdings rejecting the respective plaintiffs' challenges in those cases were grounded in the fundamental and broader principle that above-cost pricing practices, even those embodied in discount and rebate programs memorialized in written agreements, generally are not anticompetitive and it is that point that is so critical here.

I believe that it is evident that the Supreme Court's reasoning with respect to above-costs pricing applies **[**178]** to a plaintiffs challenge to a defendant's pricing practices even if the plaintiff claims that the non-price aspects of the defendant's practices were the actual exclusionary tactics. Regardless of what components of Eaton's rebate program that appellees identify as the anticompetitive conduct, whether it is the prices or the conditions that Eaton attached to those prices, the question the jury considered at the trial and that we face on appeal is whether Eaton's rebate program and conduct as a whole was procompetitive or anticompetitive. See *LePage's Inc. v. 3M, 324 F.3d 141, 162 (3d Cir. 2003)* (en banc) ("[T]he courts must look to the monopolist's conduct taken as a whole rather than considering each aspect in isolation.") (citing *Cont'l Ore*

---

essentially the same reasons the majority sets forth. I, too, believe that LePage's must be confined **[**174]** to its facts and in any event does not bear on the present factually-distinguishable case.

LePage's dealt with bundled rebates, a practice which we analogized to tying arrangements in its exclusive potential and which we concluded may exclude an equally efficient but less diversified rival even if the bundled rebates resulted in above-cost prices. See324 F.3d at 155 ("The principal anticompetitive effect of bundled rebates as offered by 3M is that when offered by a monopolist they may foreclose portions of the market to a potential competitor who does not manufacture an equally diverse group of products and who therefore cannot make a comparable offer."). Above-cost single-product market-share discounts, however, do not present the same putative danger of excluding an equally efficient but less diversified rival by virtue of that rival's limited production alone. For this exact reason, as I explain in further detail below, the same leading antitrust treatise upon which LePage's relied to analogize bundled rebates to tying concludes that single-product market-share discounts are more appropriately likened to straightforward price cuts and the Brooke Group price-cost test should control **[**175]** challenges to such programs. Thus, I concur with the majority that our reasoning in that case necessarily is limited to a single-product producer's claim that it has been excluded through a more-diversified competitor's bundled rebate program that conditioned discounts on the purchase of products that the single-product producer did not offer.

Additionally, while I believe that LePage's' bases for distinguishing Brooke Group stood on questionable grounds when we set them forth nine years ago, as the majority notes the Supreme Court's subsequent decisions have eviscerated those bases and counsel that we do not extend LePage's beyond its original parameters. Furthermore, in concluding that LePage's must be confined to its facts, I think it appropriate to point out that there has been considerable academic criticism of our opinion in that case. See, e.g., J. Shahar Billbary, Predatory Bundling and the Exclusionary Standard, 67 Wash. & Lee L. Rev. 1231, 1246 (Fall 2010) ("[T]he main problem with the LePage's test is that it does not investigate whether a bundled discount is pro-competitive. . . . [It] may in fact protect a less efficient competitor (as LePage's admitted to be)."); Richard **[**176]** A. Epstein, Monopoly Dominance or Level Playing Field? The New Antitrust Paradox, 72 U. Chi. L. Rev. 49, 49, 61-72 (Winter 2005) (criticizing LePage's' reasoning and noting that the case "shows the deleterious consequences that flow from the aggressive condemnation of unilateral practices"). Moreover, another court of appeals specifically has declined to follow LePage's, see *Cascade Health Solutions, 515 F.3d at 903*. But perhaps most significantly, the Antitrust Modernization Commission, a statutorily-created bipartisan group tasked with evaluating the state of antitrust law and setting forth recommendations to Congress and the President for its modernization, criticized LePage's as potentially "harm[ing] consumer welfare," and proposed instead that courts adopt a three-part test modeled after Brooke Group's below-cost pricing test to evaluate the lawfulness of bundled discounts. See Antitrust Modernization Comm'n, Report and Recommendations 94-99 (2007) available at http://govinfo.library.unt.edu/amc/report_recommendation/amc_final_report.pdf

*Co. v. Union Carbide & Carbon Corp., 370 U.S. 690, 699, 82 S.Ct. 1404, 8 L. Ed. 2d 777 (1962))*. Our inquiry in that regard should be an objective one that focuses on the facts of the program and our answer to that question should not turn on the circumstance that appellees had enough foresight specifically not to protest Eaton's prices.[19]

Eaton's prices were, of course, the crux of the rebate program and are an inextricable element of the LTAs. Although appellees conveniently chose to ignore Eaton's prices in formulating their claims, in light of that economic reality and the Supreme Court's mandate that the inferior courts tread lightly when asked to condemn above-cost pricing practices, the nature of those prices must bear on the question of whether Eaton's rebate program as a whole was anticompetitive or not. Accordingly, I believe that if, as here, a plaintiff attacks both the price-based and non-priced-based elements of a defendant's pricing practices, a court should apply and give persuasive effect to the Brooke Group price-cost test such that a firm's above-cost pricing practices enjoy a presumption of lawfulness regardless of how a plaintiff **[*321]** crafts its claim challenging the practices. This approach honors the Supreme Court's repeated admonition that above-cost pricing practices are generally procompetitive **[**180]** and that inferior courts must exercise caution before condemning such practices. Furthermore, it has the added virtue of injecting a modicum of predictability into this muddled area of antitrust jurisprudence. This principle is critical in this case.

I recognize, however, that as is always true with respect to any nonconclusive presumption, there may be an exception to the presumption of lawfulness of above-cost pricing if a plaintiff challenging a defendant's above-cost pricing practices establishes that the defendant's conduct as a whole was anticompetitive notwithstanding the pricing aspect of its conduct. In this vein, I acknowledge that, as most contracts offering large-scale quantity discounts necessarily do, the LTAs had other provisions besides the reduced prices themselves, namely, the conditions Eaton attached to those reduced prices, i.e., the market-share targets and the data book placement provisions which appellees attack as anticompetitive. Applying and giving persuasive effect to the Brooke Group price-cost test would not preclude appellees from arguing that the non-price aspects of Eaton's conduct were anticompetitive even in the absence of below-cost pricing. In practice **[**181]** then, in a case such as this one, the Brooke Group price-cost test would operate only as one element, though a significant one, of a court's and jury's inquiry under the rule of reason.

In at least implicitly recognizing the dubious footing of an antitrust mode of analysis that hinges entirely on how a plaintiff crafts its claim, the majority states that a plaintiff may not escape the Brooke Group price-cost test simply by characterizing its claim as one of exclusive dealing but it does allow the plaintiff to avoid application of the test as long as the plaintiff brings an exclusive dealing claim and contends that the non-price aspects of the agreement offering the reduced prices operated as the exclusionary tool. The result of the majority's approach is that the strong procompetitive justifications driving the Supreme Court's repeated charge that inferior courts exercise caution before condemning above-cost pricing practices suddenly disappear so long as the plaintiff is clever enough to claim that the non-price aspects of the defendant's pricing practices, not the prices themselves, were anticompetitive. I do not believe that this is the result the precedent requires or prudence counsels.

---

[19] In this regard I note that Eaton's rebate program existed in the same form, above-cost prices and all, on the day before **[**179]** appellees filed their claim as on the day after they filed their claim. The program did not undergo an ontological transformation because appellees had enough prudence not to challenge the price aspects of the program.

I **[**182]** reject the notion that a plaintiff may engage in such legalistic maneuvering in an effort to circumvent the Supreme Court's charge that a court look with a skeptical eye at attacks on above-cost pricing practices. The non-price aspects of the LTAs which appellees challenge, namely the market-share targets and the data book placement provisions, and indeed the LTAs themselves would not exist without the reduced prices that Eaton offered as an incentive for the OEMs to enter the agreements. Conceptually severing the conditions Eaton attached to those prices ignores the economic realities of this case and allows a plaintiff essentially to commandeer a court's analysis through artificial distinctions.[20] In concluding **[*322]** that the Brooke Group price-cost test at least must have persuasive effect in a plaintiffs challenge to a defendant's pricing practices regardless of how a plaintiff casts its claim, I believe it appropriate to note that although I stand alone in this case, I nonetheless find myself in good company. The leading antitrust treatise, on which the majority also relies,[21] concludes that single-product market-share discounts that do not require exclusivity as a condition of the **[**183]** discount are pro-competitive and thus lawful so long as they remain above-cost. Because that treatise cogently explains why above-cost market-share discounts are generally not anticompetitive and do not constitute unlawful exclusive dealing, I quote it at length:

> [U]nilaterally imposed quantity discounts can foreclose the opportunities of rivals when a dealer can obtain its best discount only by dealing exclusively with the dominant firm. For example, discounts might be cumulated over lengthy periods of time, such as a calendar year, when no obvious economies result. The effect of continuously increasing discounts varies, but they can resemble exclusive dealing in extreme circumstances.
>
> Nevertheless, quantity and market share discounts differ from exclusive dealing in important respects. First, the buyer need not make any ex ante commitment of long duration to deal with only one firm; as soon as other advantages outweigh the discount, the buyer can switch simply by paying the nondiscounted price. The buyers can also switch if one or more other sellers can match the discount. As **[**184]** long as the discounted price is above cost and not predatory, it can be matched by any equally efficient rival.
>
> Second, the similarity to exclusive dealing is greatest when the product in question is fungible, with buyers indifferent to all characteristics except price.[22] If the product is differentiated, the buyer may wish to purchase a mixture from alternative sellers,

---

[20] Of course, the majority in effect if not intent encourages an antitrust plaintiff challenging a defendant's above-cost pricing practices simply to avoid any mention of defendant's prices. In light of the majority's approach, it would be the rare case indeed in which a sophisticated plaintiff would bring an exclusive dealing claim against a defendant's above-cost pricing practices and allege that price itself functioned as the exclusionary tool for such a claim necessarily would be ill-fated under the majority's approach.

[21] The majority quotes from Areeda and Hovenkamp to explain the treatise's perspective that a dominant firm may employ exclusive-dealing contracts to preclude a young rival's expansion. I do not doubt the truth of this statement but as I note above the treatise takes the position that market-share **[**187]** discount programs that do not condition the discount on exclusivity, which precisely describes Eaton's program, are, in fact, not exclusive dealing contracts and should not be treated as such. Areeda and Hovenkamp suggest that where a market-share discount program conditions the discount on exclusivity the standards applicable to exclusive dealing should apply. See Fundamentals of Antitrust Law, § 18.03b, at 18-65 ("A discount conditioned on exclusivity should generally be treated as no different than an orthodox exclusive-dealing arrangement.").

[22] Of course, HD truck transmissions are not fungible products. Indeed, this fact is an unstated premise of appellees' claims because they contend essentially that the FreedomLine was far superior to Eaton's transmissions and that its failure in the marketplace can be attributed only to Eaton's anticompetitive conduct.

> notwithstanding one seller's progressive discount. For example, an appliance seller who has customer demand for four brands of refrigerators is likely to stock all four, even though the seller of one offers progressive discounts for larger purchases.
>
> The effective period over which a firm is 'locked up' by a cumulating discount may bear on competitive effects, just as contract duration in excluding dealing cases Discounts that are aggregated over a longer period — say, over all purchases made in one year — may be more problematic. First, however, they cannot have an anticompetitive effect **[*323]** greater than exclusive dealing with one year contracts. Where there are multiple buyers, numerous selling opportunities will come up anew each year. Second, in the great majority of cases they exclude much less than the one-year **[**185]** exclusive dealing contract because an aggressive rival can steal sales by matching the cumulated discount, which will be the same as the dominant firm's cumulative discount obligation. Even in such a case, single-item discounts can be matched by an equally efficient rival.
>
> For single-item discounts, no matter how measured or aggregated, injury to an equally efficient rival seems implausible. It is perhaps most plausible where there are a very small number of buyers, entry barriers into the buying market are very high, and buying requires the making of long-term commitments. In that case, aggressive discounting by the monopolist could deprive a rival of most of its patronage. Even here, however, we would hesitate to condemn a firm for making an above-cost sale that could readily be matched by an equally efficient rival. Competitive injury is not plausible when there are a large number of buyers, particularly when entry barriers into the buying market are low. As the First Circuit did in Barry Wright [*Barry Wright Corp. v. ITT Grinnell Corp., 724 F.2d 227, 232 (1st Cir. 1983)* (Breyer, J.)], we would test illegality by the ordinary rules applying to predatory pricing and allow all above-cost **[**186]** single item discounts.
>
> Given that above-cost discounts can be matched by equally efficient rivals, anticompetitive effects are likely only when the large firm can offer a larger variety of products or services than the smaller firm does. The most common scenario resembles tying.IA Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law ¶ 768b, at 148-50 (2d ed. 2000) (emphasis added).

This discussion is set forth in the treatise's treatment of market-share discounts in the context of *Section 2* of the Sherman Act. However, for the same reasons recited above, Areeda and Hovenkamp take the identical position in the context of *Section 1* Sherman Act challenges to market-share discounts:

> One approach to [market-share **[**188]** discounts] . . . is to treat them as exclusive dealing contracts, with the contract period equal to the period over which purchases can be aggregated for purposes of measuring the size of the discount.
>
> . . .
>
> If exclusive dealing under equivalent structural conditions and subject to equivalent defenses were lawful, the discount arrangement should be lawful as well. But the

competitive impact must in fact be less because any equally efficient rival can take the customer by bidding a better price and even compensating the customer for the loss of the discount from the defendant — assuming, as we have, that the defendant's program results in above-cost prices at all discount levels. . . . For these reasons we suggest that discounts attached merely to the quantity of good purchased, and not to exclusivity itself, be treated as lawful, and not be subjected to the laws of exclusive dealing.

The decisions to the contrary involve situations where the defendant aggregates the discount across two or more related products, while the plaintiff produces only one or a subset of these products.XI Areeda & Hovenkamp, Antitrust Law ¶ 1807b2, at 132-33 (citing LePage's, 324 **[*324]** F.3d 141) (emphasis added).[23]

The treatise's reasoning as set forth above is clear and needs little further elaboration from me. While, as noted, the law allows a plaintiff to contend that non-price aspects of a defendant's pricing practices were anticompetitive under the rule of reason notwithstanding the defendant's above-cost prices, I believe that the treatise's extraordinarily detailed economic rationale for concluding that the price-cost test is appropriate in challenges to single-product market-share discounts show that my approach is on firm footing. See also *Barry Wright Corp. v. ITT Grinnell Corp., 724 F.2d 227, 232 (1st Cir. 1988)* (Breyer, J.) (Above-cost prices do not "have a tendency to exclude or eliminate equally efficient competitors. Moreover, a price cut that leaves prices above incremental costs was probably moving prices in the 'right' direction — towards the competitive norm."); Herbert Hovenkamp, Discounts and Exclusion, *3 Utah L. Rev. 841, 844 (2006)* ("One of the factors driving the predatory pricing rule is that, as long as prices are above the relevant **[**190]** measure of cost, the discounts cannot exclude an equally efficient rival. The same is true of single-product discounts.").

In sum, I reiterate that Supreme Court precedent requires that courts exercise considerable caution before condemning above-cost pricing practices and that in a challenge to a defendant's pricing practices the Brooke Group price-cost test should apply and be given persuasive effect regardless of whether a plaintiff identifies non-price elements of a defendant's conduct that it alleges were anticompetitive. Having discussed this critical point, I now turn to the question of whether under the rule of reason analysis and the standards applicable to claims of unlawful exclusive dealing appellees demonstrated that a jury could hold that Eaton violated the antitrust laws notwithstanding its above-cost prices.

B. Clayton Act Section 3 and Sherman Act Section 1 Claims[24]

Appellees contend that the LTAs were anticompetitive exclusive dealing arrangements in violation of *Section 1* of the Sherman Act and *Section 3* of the Clayton Act. They claim that

---

[23] As **[**189]** I explain below, Areeda and Hovenkamp take the position that Section 3 does not encompass non-exclusive market-share discount programs.

[24] The majority collapses appellees' three claims into one analysis, and while that approach is not necessarily incorrect and the three provisions at issue overlap substantially, I believe it most prudent to address the claims separately as the provisions at issue have some distinct elements that require separate **[**191]** discussion.

In this case, I make many more citations to the record than judges of this Court ordinarily would make in an opinion. I do so because while deference to the jury's verdict requires that we not reweigh the evidence and that we view the evidence in the light most favorable to appellees, where, as here, the evidence supporting that verdict falls so short of the standard required to sustain that verdict I believe it appropriate to point not only to the absence of evidence supporting the jury verdict but also to the considerable undisputed evidence contradicting that verdict.

through the LTAs "Eaton engaged in de facto exclusive dealing agreements and other conduct that denied any other supplier the ability to compete for even 10% of the market." Appellees' br. at 43.

In considering this argument, I start with the principle that even explicit exclusive-dealing arrangements, which preclude a buyer from purchasing the goods of another seller, are not per se unlawful. See *Race Tires Am., Inc. v. Hoosier Racing Tire Corp., 614 F.3d 57, 76 (3d Cir. 2010)*; **[**192]** *United States v. Dentsply Int'l, Inc., 399 F.3d 181, 187* **[*325]** (3d Cir. 2005). Indeed, "it is widely recognized that in many circumstances exclusive dealing arrangements may be highly efficient — to assure supply, price stability, outlets, investment, best efforts or the like — and pose no competitive threat at all." *Races Tires, 614 F.3d at 76* (quoting *E. Food Servs., Inc. v. Pontifical Catholic Univ. Servs. Ass'n, Inc., 357 F.3d 1, 8 (1st Cir. 2004))*(internal brackets omitted); see also *Standard Oil Co. of Calif. v. United States, 337 U.S. 293, 306-07, 69 S.Ct. 1051, 1058-59, 93 L. Ed. 1371 (1949)* (listing advantages of requirements contracts to both buyers and sellers); *Omega Envtl., Inc. v. Gilbarco, Inc., 127 F.3d 1157, 1162 (9th Cir. 1997)* ("There are . . . well-recognized economic benefits to exclusive dealing arrangements, including the enhancement of interbrand competition.") (citation omitted). As we stated in Race Tires, "[i]t is well established that competition among businesses to serve as an exclusive supplier should actually be encouraged." *614 F.3d at 83* (citation omitted). "[C]ompetition to be an exclusive supplier may constitute 'a vital form of rivalry, and often the most powerful one, **[**193]** which the antitrust laws encourage rather than suppress.'" *Id. at 76* (quoting *Menasha Corp. v. News Am. Marketing In-Store, Inc., 354 F.3d 661, 663 (7th Cir. 2004))*. Of course, "exclusive agreements are not exempt from antitrust scrutiny." *Race Tires, 614 F.3d at 76*. "All exclusive dealing agreements must comply with *section 1* of the Sherman Act." *Barr Labs., Inc. v. Abbott Labs., 978 F.2d 98, 110 (3d Cir. 1992)* (citing *Am. Motor Inns, Inc. v. Holiday Inns, Inc., 521 F.2d 1230, 1239 (3d Cir. 1975))*. "Contracts for the sale of goods . . . must also comply with the more rigorous standards of *section 3* of the Clayton Act." Id.

While *Section 3* requires that a plaintiff demonstrate that it is "probable that performance of the contract will foreclose competition in a substantial share of the line of commerce affected," *Tampa Electric Co. v. Nashville Coal Co., 365 U.S. 320, 327, 81 S.Ct. 623, 628, 5 L. Ed. 2d 580 (1961)* (emphasis added), under a Section 1 rule-of-reason case such as this case "the plaintiff bears the initial burden of showing that the [alleged] agreement produced an adverse, anticompetitive effect within the relevant geographic market," *Burtch v. Milberg Factors, Inc., 662 F.3d 212, 222 (3d Cir. 2011)* **[**194]** (quotations marks and citation omitted) (emphasis added). Accordingly, if an arrangement "do[es] not infringe upon the stiffer standards of anti-competitiveness under the Clayton Act, . . . [it] will also be lawful under the less restrictive provisions of the Sherman Act." *Barr Labs., 978 F.2d at 110* (citing *Am. Motor Inns, 521 F.2d at 1250*); see also *CDC Techs., Inc. v. IDEXX Labs., Inc., 186 F.3d 74, 79 (2d Cir. 1999)* ("The conclusion that a contract does not violate *§ 3* of the Clayton Act ordinarily implies the conclusion that the contract does not violate the Sherman Act . . . .") (citation omitted); Twin City Sport service, *Inc. v. Charles O. Finley & Co., 676 F.2d 1291, 1304 n.9 (9th Cir. 1982)* ("[A] greater showing of anticompetitive effect is required to establish a Sherman Act violation than a *section 3* Clayton Act violation in exclusive-dealing cases.") (citation omitted).[25]

---

[25] In Tampa Electric, the Court indicated that if an arrangement is lawful under Section 3 of the Clayton Act it will be lawful under both *Sections 1* and *2* of the Sherman Act. See365 U.S. at 335, 81 S.Ct. at 632 ("We need not discuss the respondents' further contention that the contract also violates *§ 1* **[**195]** and *§ 2* of the Sherman Act, for if it does not fall within the broader

**[*326]** To determine whether it is "probable that performance of the contract will foreclose competition in a substantial share of the line of commerce affected" in violation of *Section 3*, *Tampa Electric Co., 365 U.S. at 327, 81 S.Ct. at 628*, logically a plaintiff first **[**196]** must establish the share of the market, expressed in a percentage, in which the exclusive dealing arrangement forecloses competition. As the Court of Appeals for the District of Columbia Circuit stated in one of the more notable antitrust cases of the recent past, "[t]hough what is 'significant' may vary depending upon the antitrust provision under which an exclusive deal is challenged, it is clear that in all cases the plaintiff must both define the relevant market and prove the degree of foreclosure." *United States v. Microsoft Corp., 253 F.3d 34, 69, 346 U.S. App. D.C. 330 (D.C. Cir. 2001)*; see also *Stop & Shop Supermarket Co. v. Blue Cross & Blue Shield of R.I., 373 F.3d 57, 66 (1st Cir. 2004)* ("For the exclusive dealing contract, the first step would be [for plaintiff] to show the extent of foreclosure resulting from the . . . contract . . . ."); *R.J. Reynolds Tobacco Co. v. Philip Morris Inc., 199 F. Supp. 2d 362, 388 (M.D.N.C. 2002)*, aff'd, *67 F. App'x 810 (4th Cir. 2003)* ("A plaintiff makes out a prima facie case of substantial foreclosure by demonstrating first that a significant percentage of the relevant market is foreclosed by the provision challenged.").

"The share of the market foreclosed is **[**197]** important because, for the contract to have an adverse effect upon competition, 'the opportunities for other traders to enter into or remain in that market must be significantly limited.'" *Microsoft Corp., 253 F.3d at 69* (quoting *Tampa Elec. Co., 365 U.S. at 328, 81 S.Ct. at 628-29*); see also *Jefferson Parish Hosp. Dist. No. 2 v. Hyde, 466 U.S. 2, 45, 104 S.Ct. 1551, 1576, 80 L. Ed. 2d 2 (1984)* (O'Connor, J., concurring) ("Exclusive dealing is an unreasonable restraint on trade [under *Section 1* of the Sherman Act] only when a significant fraction of buyers or sellers are frozen out of a market by the exclusive deal.") (citation omitted); *Chuck's Feed & Seed Co. v. Ralston Purina Co., 810 F.2d 1289, 1294 (4th Cir. 1987)* ("[T]he courts' focus in evaluating exclusive dealing arrangements should be on their effect in shutting out competing manufacturers' brands from the relevant market."); *Perington Wholesale, Inc. v. Burger King Corp., 631 F.2d 1369, 1374 (10th Cir. 1979)* ("[A] complaining trader [challenging an exclusive-dealing arrangement] must allege and prove that a particular arrangement unreasonably restricts the opportunities of the seller's competitors to market their product.") (citation omitted). **[**198]** Thus, "[f]ollowing Tampa Electric, courts considering antitrust challenges to exclusive contracts have taken care to identify the share of the market foreclosed." *Microsoft Corp., 253 F.3d at 69* (citation omitted); see also *E.I. du Pont de Nemours and Co. v. Kolon Indus., Inc., 637 F.3d 435, 451 (4th Cir. 2011)* (noting that "the requirement of a significant degree of foreclosure serves a useful screening function") (internal quotation marks and citation omitted).

Nevertheless, the antitrust laws tolerate some degree of market foreclosure; *Section 3* only condemns an agreement where the foreclosure represents a substantial **[*327]** share of the market. See *Standard Fashion Co. v. Magrane Houston Co., 258 U.S. 346, 357, 42 S.Ct. 360, 362, 66 L. Ed. 653 (1922)* ("That . . . [*Section 3*] was not intended to reach every remote lessening of competition is shown in the requirement that such lessening must be substantial."). Thus, once the plaintiff demonstrates the portion of the market the exclusive-dealing arrangement forecloses,

---

proscription of § 3 of the Clayton Act it follows that it is not forbidden by those of the former.") (citing Times-Picayune Publ'g Co. v. United States, 345 U.S. 594, 608-09, 73 S.Ct. 872, 880, 97 L. Ed. 1277 (1953)). In Barr Laboratories, however, we disposed of the plaintiff's Section 1 Sherman Act claim with its Section 3 Clayton Act claim but we addressed the plaintiff's *Section 2* Sherman Act claim separately. See978 F.2d at 110-12; see also Dentsply, 399 F.3d at 197 (concluding that the district court erred in stating that defendant had not violated *Section 2* of the Sherman Act solely because it had concluded that defendant had not violated Section 3 of the Clayton Act) (citing LePage's, 324 F.3d at 157 n.10). For this reason, I subsume appellees' Section 1 Sherman Act claim within its Section 3 claim but I address separately appellees' *Section 2* Sherman Act claim.

the court must ask whether that level of preemption constitutes a "substantial" share of the market. See *Tampa Elec. Co., 365 U.S. at 328, 81 S.Ct. at 628* (In a Section 3 case, the Court **[**199]** must consider the degree of market foreclosure and "the competition foreclosed by the contract must be found to constitute a substantial share of the relevant market."). There is no fixed percentage at which foreclosure becomes "substantial" and courts have varied widely in the degree of foreclosure they consider unlawful. See *R.J. Reynolds Tobacco Co., 199 F. Supp. 2d at 388* (collecting cases and noting that "[c]ourts have condemned provisions involving foreclosure as low as 24% while provisions involving foreclosure as high as 50% have been upheld") (citations omitted).

Under Tampa Electric, however, "the degree of market foreclosure is only one of the factors involved in determining the legality of an exclusive dealing arrangement." *Barr Labs., 978 F.2d at 111* (citation omitted). Indeed, while a negligible degree of foreclosure "makes dismissal easy," a high degree of market foreclosure does not "automatically condemn" an exclusive-dealing arrangement. *Stop & Shop Supermarket, 373 F.3d at 68*. Rather, once a plaintiff identifies the degree of market foreclosure, to determine whether that preemption is "substantial," a court considers not only the quantitative aspect of the foreclosure **[**200]** but also the qualitative conditions of the particular market, such as "the relative strength of the parties, the proportionate volume of commerce involved in relation to the total volume of commerce in the relevant market area," and the effect "preemption of that share of the market might have on effective competition therein." *Tampa Elec. Co., 365 U.S. at 329, 81 S.Ct. at 629*; see also *Barr Labs., 978 F.2d at 111*. Courts employing Tampa Electric's market analysis also consider the duration of the agreement, the ease of its terminability, the height of any entry barriers, alternative outlets competitors may employ to sell their product, and the buyer's and seller's business justifications for the arrangement. See *Concord Boat, 207 F.3d at 1059*; *Omega Envtl., 127 F.3d at 1163-65*; *Barr Labs., 978 F.2d at 111*; *Barry Wright Corp, 724 F.2d at 236-37*; *R.J. Reynolds Tobacco Co., 199 F. Supp. 2d at 389*; see also XI Areeda & Hovenkamp, Antitrust Law ¶ 1821d, at 183-88.[26]

**[*328]** In considering whether Eaton's conduct violated *Section 3*, I note first that it is undisputed that the LTAs were not by their terms exclusive-dealing contracts. The LTAs did not require the OEMs to purchase any amount, much less all, of their transmission needs from Eaton, and they did not preclude the OEMs from purchasing transmissions from appellees or any other manufacturer. Additionally, the LTAs did not condition the rebates on the OEMs' purchase of 100% of their transmission needs from Eaton.

In the past, we have expressed doubt as to whether an agreement involving less than all of a customer's purchases even falls within the ambit of Section 3. See *Barr Labs., 978 F.2d at 110 n.24* ("An agreement affecting less than all purchases does not amount to true exclusive dealing.")

---

[26] In substance, the Tampa Electric standard for Clayton Act Section 3 claims differs very marginally, if at all, from the fact-intensive rule-of-reason analysis that applies to this case under *Section 1* of the Sherman Act. Cf. **[**201]** Deutscher Tennis Bund v. ATP Tour, Inc., 610 F.3d 820, 830 (3d Cir. 2010) ("The rule of reason requires the fact-finder to weigh [] all of the circumstances of a case in deciding whether a restrictive practice should be prohibited as imposing an unreasonable restraint on competition. The inquiry is whether the restraint at issue is one that promotes competition or one that suppresses competition.") (quotation marks and citations omitted). Indeed, it appears more often than not that in a Section 1 case courts explicitly employ the Tampa Electric standard as the guiding framework for the rule-of-reason analysis. See, e.g. Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp., 592 F.3d 991, 996 (9th Cir. 2010) ("Under the antitrust rule of reason, an exclusive dealing arrangement violates *Section 1* only if its effect is to 'foreclose competition in a substantial share of the line of commerce affected.'") (quoting Omega Envtl., 127 F.3d at 1162); see also Jefferson Parish, 466 U.S. at 45, 104 S.Ct. at 1575 (O'Connor, J., concurring) ("Exclusive dealing arrangements are independently subject to scrutiny under *§ 1* of the Sherman Act, and are also analyzed under the Rule of Reason.") **[**202]** (citing Tampa Elec. Co., 365 U.S. at 333-35, 81 S.Ct. at 631-32).

(citation omitted); see also W. Parcel Express v. United Parcel Serv. of Am., Inc., 190 F.3d 974, 976 (9th Cir. 1999) (concluding that because volume discount contracts did "not preclude consumers from using other delivery services, they [we]re not exclusive dealing contracts that preclude[d] competition"); Magnus Petroleum Co., v. Skelly Oil Co., 599 F.2d 196, 200 (7th Cir. 1979) **[**203]** ("Because the agreements contained no exclusive dealing clause and did not require plaintiffs to purchase any amounts of gasoline that even approached their requirements, they did not violate Section 3 of the Clayton Act.") (citations omitted).

Indeed, Section 3 explicitly applies only to those agreements entered into "on the condition, agreement, or understanding that the lessee or purchaser . . . shall not use or deal in the goods . . . of a competitor." 15 U.S.C. § 14; see also Standard Fashion Co., 258 U.S. at 356, 42 S.Ct. at 362 (Section 3 "deals with consequences to follow the making of the restrictive covenant limiting the right of the purchaser to deal in the goods of the seller only.").[27] I doubt whether a market-share discount program of the type here, which does not preclude the buyer from dealing in the goods of others and does not even condition the rebate on exclusivity, falls within the statutory reach of that provision. See IIIA Areeda & Hovenkamp, Antitrust Law ¶ 768, at 148 n.26 (noting that "only the Sherman Act applies" to a claim that a market-share discount amounts to exclusive dealing because "[w]hile § 3 of the Clayton Act, 15 U.S.C. § 14, expressly covers the **[**204]** seller who offers a 'discount from, or rebate upon' a sale in exchange for a promise not to deal with others, that is not the same thing as a quantity or market share discount, in which the buyer makes no promise not to deal with others").[28]

**[*329]** The majority bypasses this obstacle to appellees' success by stating that a plaintiff's allegation that a contract lacking an express exclusivity requirement nonetheless establishes an unlawful de facto exclusive dealing program sets forth a cognizable antitrust claim. In doing so, the majority also concludes that Section 3 encompasses contracts that require partial exclusivity.

The notion of de facto exclusive dealing has its roots in United Shoe Machinery Corp. v. United States, 258 U.S. 451, 457, 42 S.Ct. 363, 365, 66 L. Ed. 708 (1922), in which the Court held that a contract lacking an express agreement not to use the goods of a competitor falls within the ambit of Section 3 if "the practical effect is to prevent such use." As **[**206]** noted, the majority appears to interpret this statement as meaning that a contract that has the effect of causing the purchaser to buy most of its needs from one seller falls within Section 3 because it induces near-exclusivity. I disagree with this interpretation and believe instead that United Shoe and its "practical effect" standard stands for the proposition that a contract that is not facially exclusive may nonetheless fall within the ambit of Section 3 if, in the implementation of its terms, it induces actual exclusivity.

---

[27] Section 1 of the Sherman Act, which proscribes "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce," *15 U.S.C. § 1* and *Section 2* of the Sherman Act, which proscribes the monopolization or attempted monopolization of trade or commerce, *15 U.S.C. § 2*, do not contain Section 3's "on the condition" language. Accordingly, the LTAs fall within the theoretical reach of those provisions. Nevertheless, appellees' *Section 1* and *2* claims fail because appellees did not introduce sufficient evidence from which a jury could infer that the LTAs were exclusive dealing contracts that foreclosed competition in the marketplace.

[28] In fact, even if the LTAs had required the OEMs to purchase a certain share but not all of their transmissions needs from Eaton, as the majority interprets them to do, it is still unclear whether Section 3 would have reached that agreement. See Areeda & Hovenkamp, Fundamentals **[**205]** of Antitrust Law § 18.01c, at 18-17 ("Literally, a 'partial' exclusive dealing requirement appears not to be covered by § 3 of the Clayton Act at all. For example, if A requires B to purchase 'at least 60 percent' of its gasoline needs from A, B is still free to purchase the remaining 40 percent elsewhere. As a result, there is no condition that B not deal in the goods of a competitor, as the statute requires. Most of the courts take this position.") (citations omitted).

In United Shoe, the Court condemned as unlawful exclusive dealing a lease that included, among other things, a forfeiture provision to the effect that if the lessee failed to use exclusively machinery of certain kinds made by the lessor, the lessor had the right to cancel the lessee's right to use all such machinery, a provision that the lessee would not use the machinery on products that had not received particular operations upon certain of other lessor's machines, and a clause that required the lessee to purchase its supplies exclusively from the lessor. See *id. at 456-57, 42 S.Ct. at 365*. Lessees who used the lessor's competitors' machines in violation of **[**207]** the terms of the leases "had their attention called to the forfeiture provisions in the leases, which was understood, by many of the lessees, as warnings, in the nature of threats, that unless discontinued these covenants of the leases would be enforced." *United States v. United Shoe Mach. Co., 264 F. 138, 145 (D.C. Mo. 1920)*. These provisions, which the Court noted amounted in reality to "tying agreements," fell within the scope of Section 3 because they "effectually prevent[ed] the lessee from acquiring the machinery of a competitor of the lessor, except at the risk of forfeiting the right to use the machines furnished by the [lessor]." *258 U.S. at 457-58, 42 S.Ct. at 365*. Thus, in practice, the lease induced actual, total exclusivity. Subsequent cases relying on United Shoe's "practical effect" formulation bear the point out.

In *International Business Machines Corp. v. United States, 298 U.S. 131, 135, 56 S.Ct. 701, 703, 80 L. Ed. 1085 (1936)*, the Court, relying on United Shoe, concluded that a lease for tabulating machines that required the lessee to use only the tabulating cards of the lessor on its machines fell within Section 3 because in practice it required the exclusive use of the lessor's **[**208]** cards. The Court explained that while "the condition is not in so many words against the use of the cards of a competitor, but is affirmative in form, that the lessee shall use only appellant's cards in the leased machines," because "the lessee can make no use of the cards except with **[*330]** the leased machines, and the specified use of appellant's cards precludes the use of the cards of any competitor, the condition operates [to prohibit the use of the cards of a competitor] in the manner forbidden by" Section 3 of the Clayton Act. Id. (citing *United Shoe, 258 U.S. at 458, 42 S.Ct. at 365*); but see *FTC v. Sinclair Refining Co., 261 U.S. 463, 474, 43 S.Ct. 450, 453, 67 L. Ed. 746, 6 F.T.C. 587 (1923)* (distinguishing United Shoe and concluding that contract that required lessee of gasoline pumps not to use competitor's gasoline in lessor's pumps did not fall within Section 3 because the contract did not contain a provision "which obligate[d] the lessee not to sell the goods of another," and "[t]he lessee [wa]s free to buy [pumps] wherever he cho[se]"). Similarly, in Standard Oil, the Court assumed that Section 3 encompassed "[e]xclusive supply contracts" that the defendant had entered with its dealers, in which the dealer **[**209]** promised "to purchase from Standard all his requirements of one or more products."[29] *337 U.S. at 295-96, 69 S.Ct. at 1054*.

Accordingly, while Section 3 encompasses agreements that do not contain express exclusivity provisions but in reality induce actual exclusivity, it does not, as the majority seems to believe, encompass agreements that do not contain express exclusivity provisions and do not induce actual exclusivity.[30] Here, not only did the LTAs lack any provision imposing a ban on the OEMs' purchase of Eaton's competitors' products, they did not contain a provision amounting to or having

---

[29] In Tampa Electric, the case most often cited for the "practical effect" standard, the Court considered a challenge to a requirements contract and "assume[d], but d[id] not decide, that the contract [wa]s an exclusive-dealing arrangement within the compass of § 3." 365 U.S. at 330, 81 S.Ct. at 629.

[30] LePage's and Dentsply, cases on which the majority relies, are not to the contrary. Those cases dealt not with Section 3 of the Clayton Act but rather with *Section 2* of the Sherman Act. **[**211]** which does not contain the same restrictive "on the condition" language as Section 3. Furthermore, in LePage's, we concluded that 3M's bundled rebate agreements constituted unlawful de

the effect of imposing such a ban. Moreover, the evidence adduced at the trial demonstrates that the LTAs actually did not induce de facto total exclusivity on the part of the OEMs. As noted, from July 2000 to October 2003, ZFM's share of the HD transmission market ranged between 8% and 14%. Thus, the **[**210]** majority, in interpreting the scope of Section 3 to encompass an agreement which neither explicitly forbids nor has the effect of precluding the OEMs from purchasing Eaton's competitors' products, has expanded the scope of Section 3 greatly beyond its intent. Section 3 only encompasses agreements that explicitly forbid or have the practical effect of precluding one party from using the goods of another. Nevertheless, despite my serious misgivings on this threshold exclusive-dealing issue, which could justify terminating this discussion now and thus reversing the District Court's denial of judgment as a matter of law as to appellees' Section 3 Clayton Act claim, I will assume that the LTAs fall within the theoretical reach of Section **[*331]** 3 and proceed to analyze the LTAs under that provision. My analysis, however, does not get very far before it becomes readily apparent that this fundamental flaw in appellees' case — that the LTAs were not, in fact, exclusive-dealing contracts — is fatal to their claim.

As noted above, under Tampa Electric a plaintiff first must identify the degree of market foreclosure. Despite a lengthy trial in the District Court, which has resulted in the creation of a nine-volume joint appendix and extensive briefing on this appeal, appellees do not identify clearly **[**212]** for us the precise degree of market foreclosure attributable to the LTAs. The majority, however, attempts to make up for appellees' deficiency in this regard by stating that appellees' expert, Dr. David DeRamus, testified that the LTAs left only 15% of the market remaining to Eaton's competitors, or stated another way, that the LTAs foreclosed competition in 85% of the market. In reality, however, Dr. DeRamus did not testify that the LTAs foreclosed competition in 85% of the market. The testimony on which the majority apparently relies for that figure deals not with Dr. DeRamus' opinion as to the extent to which the LTAs foreclosed competition in the HD truck transmission market but rather with Dr. DeRamus' calculation of Eaton's market share during the relevant time period in the context of his determination as to whether Eaton had monopoly power. See J.A. at 722 (Dr. DeRamus' testimony) (explaining the steps he took to ascertain whether "Eaton has monopoly power in the[] . . . [NAFTA HD truck transmission market"); see also J.A. at 4758, 4760 (Dr. DeRamus' expert report) (setting forth the data reflecting Eaton's market share). I think it obvious that the inquiry into Eaton's market **[**213]** share is a question separate and apart from the LTAs' alleged foreclosure effect[31] and that we may not simply borrow Dr. DeRamus' testimony as to Eaton's market share to adduce evidence of the LTAs' foreclosure effect.

In point of fact, Dr. DeRamus aimed much higher with his estimation of the LTAs' alleged foreclosure effect by stating explicitly in his expert report that "Eaton's exclusionary agreements

---

facto exclusive dealing arrangements because LePage's "introduced powerful evidence" that its prior customers refused to meet with LePage's' sales representatives, refused to discuss purchasing LePage's products for "the next three years," and 3M offered bonus rebates to its customers upon achieving sole-supplier status. 324 F.3d at 158. And in Dentsply, we concluded that a provision that Dentsply imposed on its dealers that actually prohibited the dealers from adding its competitors' tooth lines as part of their product offering amounted to exclusive dealing. 399 F.3d at 193. Here, as explained below, appellees fell woefully short of introducing evidence that the LTAs induced anything approaching actual exclusivity.

[31] See, e.g., Barry Wright Corp., 724 F.2d at 229, 237 (observing that potential foreclosure effect of volume discount requirements contract between manufacturer, who had 83% to 94% market share, and purchaser of mechanical snubbers was 50% where purchaser's snubber purchases represented 50% of snubber market). The distinction between these two inquiries, the question of Eaton's market share and the question of the LTAs' alleged foreclosure effect, is particularly critical in a case such as this one since prior to 1989 Eaton was the only HD transmission manufacturer and thus possessed 100% market share at a time before appellees contend that it engaged in any alleged anticompetitive conduct.

with all four of the heavy-duty truck OEMs — the only significant manufacturers of heavy-duty **[**214]** trucks in the relevant geographic markets at issue in this case — foreclosed nearly 100 percent of the North American market or markets for HD [transmissions." J.A. at 4814 (Dr. DeRamus' expert report). Dr. DeRamus arrived at this foreclosure percentage on the basis of the market-share targets the LTAs required for the OEMs to receive the rebates.[32]

**[*332]** In denying Eaton judgment as a matter of law, the District Court took a similar view that reliance on the market-share **[**215]** targets was an appropriate method to ascertain the LTAs' foreclosure effect, concluding that there was sufficient evidence "that the contracts foreclosed a substantial share of the market" not because ZFM identified a specific foreclosure percentage but because "each OEM was required to order 80% or more of its transmissions from" Eaton to receive the rebates. *ZF Meritor, 769 F. Supp. 2d at 692*.[33] While the majority's reliance on Dr. DeRamus' testimony regarding Eaton's market share to ascertain the LTAs' foreclosure effect is mistaken, it is clear that the majority likewise ultimately concludes that the market-share targets may serve as a measure of the LTAs' foreclosure effect. For several reasons, however, the market-share targets do not reflect the LTAs' foreclosure effect, and, on this point, I find that the Court of Appeals for the Ninth Circuit's and the Court of Appeals for the Eighth Circuit's treatment of Sherman Act Section 1 challenges to non-exclusive market-share discount programs are instructive.

In *Allied Orthopedic Appliances Inc. v. Tyco Health Care Group, 592 F.3d 991, 994-96 (9th Cir. 2010)*, **[**216]** a group of hospitals and health care providers alleged, among other things, that Tyco, a monopolist in the U.S. pulse oximetry sensor market, unlawfully foreclosed competition in the market in contravention of *Section 1* of the Sherman Act through its offer of market-share discounts. As here, the market-share agreements provided discounts conditioned on the customers' purchase of a certain percentage of the product in issue, i.e., pulse oximetry sensors, from Tyco, the discount increasing with Tyco's increasing market share. "The agreements did not contractually obligate Tyco's customers to buy anything from Tyco . . . and [t]he only consequence of purchasing less than the agreed upon percentage of Tyco's products was loss of the negotiated discounts." *Id. at 995*.

The court of appeals concluded that the agreements did not foreclose competition in violation of *Section 1* because the agreements did not require Tyco's customers to purchase anything from Tyco and because "[a]ny customer subject to one of Tyco's market-share discount agreements could choose at anytime to forego the discount offered by Tyco and purchase from a generic competitor." *Id. at 997*.[34] Thus, Tyco's competitors "remained **[**217]** able to compete for Tyco's customers by offering their products at better prices." *Id. at 998*.

The Court of Appeals for the Eighth Circuit took a similar view of market-share discount agreements in Concord Boat. In that case, a group of boat builders that sold boats to dealers

---

32 Although Dr. DeRamus did not set forth explicitly in his expert report how he arrived at his foreclosure percentage or his arithmetic in that regard — a shocking oversight in a case that hinges on this very question — his testimony at trial illuminates that he relied on the market-share targets to arrive at his estimation of the LTAs' foreclosure effect, though notably he testified as to a different foreclosure percentage than that which he set forth in his report. See J.A. at 858 (Dr. DeRamus' testimony) (explaining that he arrived at his opinion of the LTAs' foreclosure effect by relying on the market-share targets and opining that one could take a "simple average" of the market-share targets to yield a 90% foreclosure rate).

33 The District Court's statement in this regard was inaccurate as Volvo's LTA granted it rebates beginning at a 65% market-share target.

34 The court also found significant the plaintiffs' expert failure to explain why "price-sensitive hospitals would adhere to Tyco's market-share agreements when they could purchase less expensive generic sensors instead." 592 F.3d at 997.

alleged that Brunswick, the market leader in the manufacture of stern drive engines, violated *Section 1* through its offer of market-share discount agreements with the builders and dealers. The agreements offered reduced prices conditioned on market-share targets of 60% to 80%. See *207 F.3d at 1044*.[35] **[*333]** As is true here with respect to the product in issue, none of Brunswick's programs "obligated boat builders and dealers to purchase engines from Brunswick, and none of the programs restricted the ability of builders and dealers to purchase engines from other engine manufacturers." *Id. at 1045*.

The court employed the standards of Tampa Electric to conclude that the plaintiffs had "failed to produce sufficient evidence to demonstrate that Brunswick had foreclosed a substantial share of the . . . market through anticompetitive conduct" and failed to show that "Brunswick's discount program was in any way exclusive" in violation of *Section 1*. *Id. at 1059*. The court reached that conclusion because the builders were "free to walk away from the discounts at any time," and "Brunswick's discounts, because they were significantly above cost, left ample room for new competitors . . . to enter the engine manufacturing market and to lure customers away by offering superior discounts." Id.; see also *Se. Mo. Hosp. v. C.R. Bard, Inc., 642 F.3d 608, 612-13 (8th Cir. 2011)* (rejecting Sherman *Sections 1* and *2* and Clayton *Section 3* challenge to market-share discount program on the basis of Concord Boat where customers "were not required to purchase 100 percent of their . . . needs from . . . [defendant] or to refrain from purchasing from competitors" or indeed to purchase "anything from **[**219]** . . . [defendant]"); *Stitt Spark Plug Co. v. Champion Spark Plug Co., 840 F.2d 1253, 1258 (5th Cir. 1988)* (affirming district court's directed verdict in favor of defendant on Section 1 and Section 3 claims where plaintiff "proved no instance in which a distributor honored an exclusive dealing arrangement by refusing to purchase . . . [plaintiff's] plugs, . . . there was no testimony that any distributor agreed to refrain from selling competing plugs for any specific period of time, . . . [and] [t]here was no evidence that a distributor who failed to abide by the agreement would be subject to any sanction").

As was true of the contracts at issue in Allied Orthopedic and Concord Boat with respect to what are suggested to be, wrongly in my view, mandatory purchase obligations, the LTAs did not obligate the OEMs to purchase anything from Eaton, much less 100% of their transmission needs, nor did they preclude the OEMs from purchasing transmissions from any other manufacturer. Rather, the agreements provided for increasing rebates and thus lower prices based on the percentage of an OEM's transmission needs that it purchased from Eaton. In such a circumstance, the LTAs did not foreclose **[**220]** competition in any share of the market because Eaton's competitors were able to compete for this business as the OEMs were at liberty to walk away from the LTAs at any time.

Indeed, this point is precisely where the Brooke Group price-cost test comes into play. In a situation such as this one, where the contract in terms is not exclusive and merely provides discounted but above-cost prices conditioned upon a market-share target, any equally efficient competitor, including ZFM, if it was an equally efficient competitor, had an ongoing opportunity to offer competitive discounts to capture the OEMs' business. If Eaton's discounts had resulted in prices that were below-cost, a charge that appellees do not make, then even an equally-efficient competitor might not have the opportunity to compete for the business the LTAs covered and thus it could be said that competition was foreclosed in that share of the market notwithstanding the non-obligatory **[*334]** and non-exclusive nature of the LTAs. But we do not need to

---

[35] The plaintiffs also alleged that Brunswick had violated Section 7 of the Clayton Act and **[**218]** *Section 2* of the Sherman Act, but the court likewise rejected these claims. See 207 F.3d at 1043, 1053, 1062.

address that unlikely circumstance because Eaton's discounts resulted in prices that were above-cost and thus the LTAs "left ample room" for ZFM or new competitors to enter the market and **[**221]** "to lure customers away by offering superior discounts." *Concord Boat, 207 F.3d at 1059*. As in Allied Orthopedic, "[t]he market-share discount agreements at issue here did not foreclose . . . [Eaton's] customers from competition because 'a competing manufacturer need[ed] only offer a better product or a better deal to acquire their [business].'" *592 F.3d at 997* (quoting *Omega, 127 F.3d at 1164*); see also Areeda & Hovenkamp, Antitrust Law ¶ 768b, at 148-50 (concluding that above-cost market-share discounts do not exclude equally efficient rivals because "[a]s long as the discounted price is above cost and not predatory, it can be matched by any equally efficient rival"). Absent evidence that notwithstanding the above-cost prices of the LTAs the non-price aspects of the LTAs rendered them anticompetitive, we should conclude that as a matter of law Eaton's LTAs were not anticompetitive.

The majority dismisses as inapplicable the reasoning of Allied Orthopedic and Concord Boat by stating that "this is not a case in which the defendant's low price was the clear driving force behind the customer's compliance with purchase targets, and the customers were free to walk away if a competitor offered **[**222]** a better price." Typescript at 33. But the reality is to the contrary as the testimony I have summarized establishes it is precisely the case that Eaton's low prices led the OEMs to enter the LTAs and to strive to meet the market-share targets. Likewise, it is clearly the case that the OEMs were free to walk away from the market-share rebates the LTAs offered at any time. In attempting to overcome this crucial defect in appellees' claim and concluding that notwithstanding the LTAs' terms the LTAs were in fact mandatory agreements to which the OEMs were beholden against their will the majority sets forth two justifications.

First, the majority downplays the possibility that ZFM could "steal" Eaton's customers by offering a superior product or lower price because that possibility did not "prove[] to be realistic." Typescript at 47. In other words, the majority appears to assume that because ZFM did not lure away Eaton's customers through offering superior products or lower prices, it could not have done so and the reason for its inability to do so was the LTAs. I find the majority's treatment of this point to be an unpersuasive answer to the logic of Allied Orthopedic and Concord Boat.

I **[**223]** hardly need make the logical point that one cannot assume that because an event did not happen it could not have happened. It appears that ZFM did not lure away Eaton's customers. That does not mean, however, that ZFM was incapable of doing so. It is beyond dispute and indeed a central point to this case that ZFM did not offer lower prices than Eaton's prices and ZFM did not develop a full product line as it knew it had to do in order to compete effectively with Eaton.[36] In other **[*335]** words, ZFM did not even engage in the type of competitive conduct

---

36 The majority states, without elaboration, that Eaton assured that there would be no other supplier that could fulfill the OEMs' needs or offer a lower price. I note first that it is an undisputed fact that when Meritor entered into the joint venture with ZF AG at a time prior to any allegation of anticompetitive conduct by Eaton, Meritor did not offer a full product line of HD truck transmissions. Thereafter, ZFM explicitly identified its lack of **[**224]** a full product line as a barrier to its market success and yet it did not develop a full product line. There is no evidence that Eaton somehow prevented either Meritor or later ZFM from developing a full product line. Furthermore, there is no evidence in the record indicating that Eaton prevented ZFM from offering more attractive discounts to capture Eaton's business and there is no evidence that other firms tried to enter the HD truck transmission market but were thwarted by Eaton.

that potentially could have lured away Eaton's customers. Thus, we cannot say that it is not realistic to think that if it had engaged in that competition conduct ZFM could have been successful.[37]

Second, the majority attempts to overcome this absolutely fundamental defect in appellees' case by concluding that notwithstanding the fact that the LTAs were not by their terms mandatory and the fact that Eaton's prices after consideration of the rebates were at all times above-cost such that appellees, were they equally efficient competitors, could have matched them, there nevertheless was sufficient evidence that the LTAs foreclosed competition in a substantial share of the HD truck transmission market because "the targets were as effective as mandatory purchase requirements." Typescript at 42. In this regard, the majority reasons that "[c]ritically, due to Eaton's position as the dominant supplier no OEM could satisfy customer demand without at least some Eaton products, and therefore no OEM could afford to lose Eaton as a supplier." Id. at 43. Therefore, the majority reasons, "a jury could have concluded that, under the circumstances, the market penetration targets were as effective as express purchase requirements because no risk averse business would jeopardize its relationship with the largest manufacturer of **[**227]** transmissions in the market." Id. (internal quotation marks and citation omitted).

Undoubtedly, there is evidence in the record that the OEMs required Eaton's products, to the end that an OEM could not have afforded to lose Eaton as a supplier. However, there is not a scintilla of evidence that if an OEM did not meet its LTA's market-share target Eaton would have refused to supply it with transmissions. First, as the majority notes, only the Freightliner LTA and the Volvo LTA granted Eaton the right to terminate the **[*336]** LTA altogether if the OEM did not meet its market-share targets. Yet the fact that Eaton had the right to terminate those LTAs if those OEMs did not meet their targets — notably, a right that it did not exercise when Freightliner failed to achieve the market-share target in 2002 — is no more significant than the fact that Eaton would not have to pay the rebate if Freightliner did not meet the target. Termination of the LTA simply made unavailable the rebates to those OEMs; it did not, as the majority implies, mean that Eaton no longer would provide transmissions to those OEMs. It simply meant that those OEMs would not receive Eaton's transmissions at the discounted prices **[**228]** the LTAs offered.

I understand that the LTAs are supply agreements that ensure that Eaton will meet the OEMs' transmission needs and do so at a certain price and under certain conditions, and an OEM lacking a supply agreement may be in an unfavorable position as it would prefer a supply agreement to

---

[37] I recognize that appellees contend that "[f]ar from offering low prices to seek competitive advantages . . . Eaton broke the price mechanism, so that ZFM could not compete even by offering discounts or other incentives notwithstanding that ZFM had a better product." Appellees' br. at 44. But appellees' assessment of their product does not establish that the truck purchasers — the entities that actually made the ultimate decision as to which transmission to select for their trucks — would make the same assessment. Indeed, some of the evidence suggests that both OEMs and truck purchasers held the opinion that overall Meritor's products were inferior to Eaton's, and Meritor does not point to evidence foreclosing **[**225]** the possibility that its relatively unfavorable reputation in that regard persisted despite the emergence of ZF Meritor and thereby tainted truck purchasers' view of the FreedomLine. Moreover, even if the truck purchasers had come to the same conclusion as appellees regarding the FreedomLine's technical superiority, appellees' complaint holds no force as the purchasers' were at all times free to act on that opinion by selecting the FreedomLine for their trucks. Nevertheless, it is clear from the record that other factors beyond possible technical superiority, including such considerations as price, service, and availability of the product, could motivate a purchaser in making its decision as to the most advantageous transmission for it to purchase. Lest this fact be doubted I merely need to point out that consumers regularly purchase inexpensive automobiles even though more highly-priced automobiles might be technically better. Overall, the point remains that if ZFM was an equally efficient competitor the LTAs simply did not preclude it from competing with Eaton and did not foreclose competition in any portion of the market, and thus a jury verdict based on a contrary conclusion simply **[**226]** could not survive Eaton's motion for judgment as a matter of law.

set the terms of its relationship with Eaton. Nevertheless, although an OEM with a cancelled LTA would have lacked a supply agreement with Eaton, at least temporarily, one cannot infer from that fact that Eaton would not have supplied the OEM with its transmissions. Furthermore, the majority glosses over the fact that PACCAR's and International's LTAs did not include a provision granting Eaton the right to terminate the LTAs if those OEMs did not meet their respective market-share targets.

Nevertheless, regardless of whether the LTAs granted Eaton a right of termination, the majority's suggestion that the OEMs faced losing Eaton as a supplier if they failed to meet the market-share targets is contradicted by the market reality that while Eaton was the largest manufacturer of transmissions in the market there were only four OEMs that bought Eaton's transmissions. Accordingly, the idea that **[**229]** Eaton could or would have refused to deal with one of the OEMs in addition to being unsupported by the record is irrational from an economic viewpoint for if Eaton had done so it would have turned its back on a significant purchaser of its products measured in sales volume. The notion is completely unjustified.

Perhaps if appellees had produced evidence at the trial that Eaton had threatened to refuse to supply transmissions to an OEM that did not meet its market-share targets the non-mandatory market-share targets would have taken on an air of the mandatory threats that the majority insists they actually were. Literally the only evidence that I can identify relating to this contention is deposition testimony by a Volvo representative relaying an email he had received from one of his colleagues in which the colleague stated that Volvo needed to meet its market share target because if it was not successful it faced "a big risk of cancellation of the contract, price increases and shortages if the market is difficult," J.A. at 688, and a sentence from an internal Volvo presentation in which it speculated that if Eaton terminated its LTA it would have "[n]o delivery performance commitment **[**230]** (possibly disastrous)," id. at 2101. While I understand that we view a jury's verdict through a deferential lens, even under that standard I cannot conclude that one sentence of second-hand speculation from a contracting party but not from Eaton as to whether Eaton might provide an OEM with an insufficient volume of transmissions in the event of a market shortage and an unidentified Volvo representative's statement that if it did not have a delivery performance commitment from Eaton it could be potentially disastrous is sufficient to sustain the inference that facially voluntary market-share targets were in reality **[*337]** the mandatory, almost extortionary, provisions the majority makes them out to be.[38]

I must address also an aspect of the majority's reasoning on this point that I find to suffer from a serious flaw with dangerous implications for antitrust jurisprudence. Perhaps the majority does not believe that any evidence was required to rebut the reality that even though the market-share targets were facially voluntary, the mere circumstances that Eaton was the dominant supplier in the market and that no OEM could afford to lose it as a supplier sufficed to render the LTAs mandatory. The majority's reasoning in this regard literally would mean that had Eaton not been the dominant supplier of HD truck transmissions in the NAFTA market, there would not have been sufficient evidence for the jury to conclude that the LTAs were de facto exclusive. While I realize that monopolists may face more constraints on their conduct under the antitrust laws

---

[38] The majority appears to hang its hat to some extent on the notion that even if the OEMs did not actually face the threat of losing Eaton as a supplier they believed they might and that belief drove their compliance with the LTAs. While, as noted, there is scant evidence, indeed, for the proposition that the OEMs' efforts to meet the market-share targets was driven by such a belief, that belief, if unfounded as it was here, does not support the majority's repeated statements to the effect **[**231]** that Eaton actually coerced the OEMs into entering the LTAs and meeting the targets.

than less dominant firms, see *LePage's, 324 F.3d at 151-52*, it is an unfair and unwarranted leap to create the specter of coercion out of reference to Eaton's market dominance, cf. *R.J. Reynolds, 199 F. Supp. 2d at 392* ("The strong position of Marlboro, however, **[**232]** does not, standing alone 'coerce' retailers into signing . . . [market-share] agreements."). In sum, I cannot ascribe to the view that a non-mandatory, non-exclusive contract is transformed magically into a mandatory, exclusive contract by virtue of reference to the firm's market position alone such that dominant firms must be wary when they enter voluntary contracts that offer rebates or discounts lest a court later permit a jury to interpret those contracts as mandatory simply due to that firm's dominant position.

Apart from insinuating that Eaton's dominant market position coerced the OEMs into meeting the market-share targets, the majority adds to the picture of coercion it attempts to paint by stating that "there was evidence that Eaton leveraged its position as a supplier of necessary products to coerce the OEMs into entering into the LTAs." Typescript at 48. Relatedly, the majority states that appellees "presented testimony from OEM officials that many of the terms of the LTAs were unfavorable to the OEMs and their customers, but that the OEMs agreed to such terms because without Eaton's transmissions, the OEMs would be unable to satisfy customer demand." Id.

In point of fact, **[**233]** there is not a trace of evidence beyond appellees' own baseless accusations and the majority does not bring our attention to any such evidence supporting its rather serious accusation that Eaton leveraged its position as a monopolist to force the OEMs to enter into agreements that the OEMs did not want to enter.[39] Eaton's offer of lower prices to **[*338]** the OEMs in the form of rebates and direct payments in an effort to gain their business is hardly coercion. Rather, it is nothing more than legitimate good business practice. See *Race Tires, 614 F.3d at 79* ("[I]t is no more an act of coercion, collusion, or improper interference for [suppliers] . . . to offer more money to [customers] . . . than it is for such suppliers to offer the lowest . . . prices.").

Likewise, there is no evidence that the LTAs represented unfavorable arrangements for the OEMs such that the OEMs only agreed to enter the contracts out of fear of losing Eaton as a supplier.[40] Indeed, to the extent one may be tempted to infer that the market-share targets were

---

[39] Appellees contend that the OEMs did not want to enter the LTAs and did so only in response to Eaton's coercion by citing to testimony that in fact weakens their case. In this regard, appellees rely on a Volvo representative's testimony that it entered into the LTA with Eaton because ZFM did not have a full product line and thus Volvo would require Eaton's products even if it entered into an LTA with ZFM but if Eaton was not its standard **[**234]** partner it would not provide favorable pricing to Volvo. See J.A. at 522; see also J.A. 2098 (noting that Eaton would not provide favorable pricing to Volvo if it selected ZFM as its partner). In part for this reason, it elected to enter the LTA with Eaton.

In business as in life we rarely are presented with a perfect option. The fact that long-term supply agreements with ZFM and Eaton each had their respective advantages and disadvantages is hardly surprising and that Eaton would not have granted an OEM the generous discounts its LTA provided if it selected ZFM as its primary supplier is likewise not exactly an astonishing revelation. That the OEMs had to weigh these factors in deciding whether to enter into an LTA with Eaton hardly amounts to coercion.

[40] In their brief, appellees point to the testimony of two OEM representatives who testified to the hardly surprising fact that they would have preferred upfront price cuts with no strings attached as opposed to conditional market-share targets but **[**236]** that the OEMs entered the agreements because they nonetheless offered the best prices. See J.A. at 415-16 (deposition testimony of International representative) (stating that International preferred to have upfront discounts "in price" but "if a supplier is willing to offer [it] rebates" it would take that option if it believed it could meet the conditions for those rebates); see id. at 525 (deposition testimony of Volvo representative) (stating that during LTA negotiations Volvo "wanted no" market-share targets but it agreed to the 68% target because it believed it could achieve that target and it "wanted the savings and the equalization, and the rebates"). That the OEMs would have preferred that Eaton simply cut its prices is hardly surprising. Customers faced with a buy one at full price and get one for 50% off deal likely would prefer to have the option of buying one item for 50% off. Yet, in the same

so high as to be unfavorable to the OEMs I note that the targets were actually very close to or in fact below Eaton's preexisting market share at three out of **[**235]** the four OEMs measured at a time before the adoption of the LTAs during which appellees do not claim that Eaton was violating any law. See J.A. at 4779 (Dr. DeRamus' expert report) (Eaton's LTA with International began providing rebates at 80% market share but Eaton's market share of International's transmission needs prior to the LTA already was 79%); id at 4785 (Eaton's LTA with PACCAR provided rebates beginning at 90% but Eaton's market share "consistently hover[ed] around 90% or higher for HD transmissions" with PACCAR prior to the LTA); id at 4793 (Eaton's LTA with Volvo provided a rebate starting at 65% market share but Eaton's market share of Volvo's transmissions was 85% when they entered the LTA in 2002.). The reality that the market share levels that Eaton reached prior to the adoption of the LTAs makes it, in a word I do not like using but fits perfectly here, ridiculous to conclude that the LTAs had a coercive effect on the OEMs.

After studying the majority's treatment of the LTAs I am left with the impression **[*339]** that it pictures Eaton representatives as using coercion when they handed the OEM representatives the LTAs. Yet the reality is that there is absolutely no evidence in the record suggesting that Eaton compelled the OEMs by the threat of punishment to agree to the LTAs or compelled them to meet the share targets.[41] Quite to the contrary, the record is replete with evidence, as I have summarized above, that shows that far from cowering under Eaton's "threats," the OEMs entered into the LTAs in furtherance of their own economic self-interests and because those agreements provided the best possible prices and assurance of a full product line supply. They worked to meet the market-share targets because by achieving those targets they received discounted prices.

Tellingly, the evidence also shows that the OEMs used those arrangements to their advantage. An illuminating example of this market reality is found in a letter an International representative wrote to ZFM in June 2002, in which the representative recounted the HD truck market's dramatic slump and stated to ZFM that:

> In the last 12 months, your competition has supported our need for cost control with price reductions consistent with the trend in new truck pricing. In addition, one of your competitors [i.e., Eaton] has offered International a compelling incentive to increase their sales at your expense. As a result, International is seriously considering shifting your portion of our buy to alternative suppliers.
>
> International values the relationship our companies have created over the years. However, the relationship is in jeopardy if your lack of cost competitiveness cannot be overcome. We therefore require a 5% across the board price reduction effective August 1, 2002.J.A. at 4596 (letter from Paul D. Barkus, International, to Robert S. Harrison, ZFM (June 18, 2002)). In fact, the record shows that **[**239]** six months prior to this correspondence, International had attempted to use its relationship with Eaton as leverage to gain further cost

---

way that the customer who purchases the two items to receive the discount on one cannot be said to have been "coerced" into that transaction, the OEMs' preference for unconditional price cuts hardly can be used as evidence that the terms of the LTAs were "unfavorable" to them, much **[**237]** less so "unfavorable" as to warrant the inference that the OEMs must have entered them as a product of coercion.

[41] Of course, the lack of coercion associated with the LTAs is significant. While coercion is not "an essential element of every antitrust claim," it is an important consideration where the relevant market players adopt their own business practices **[**238]** and the parties "freely entered into exclusive contracts." Race Tires, 614 F.3d at 78.

reductions from ZFM. See id. at 3727 (electronic mail from Paul D. Barkus, International, to Galynn Skelnik, International (Jan. 11, 2002)) ("I got a phone message from [ZFM] . . . stating that after much internal discussion they have decided not to offer any transmission reductions even though their list prices could be increased. . . . Our strategy was to give Meritor the impression that our Partnership with Eaton provided us with HD reductions that would increase Meritor's list price if they didn't offset the widened price gap. That started out as a bluff, but when we look at our option prices between the two supplier[s] there appears to be some cost/price inconsistency."). In sum, because appellees failed to produce evidence to show that the LTAs and their voluntary, above-cost market-share target rebates could have or did foreclose competition in any, much less a substantial, share of the market, notwithstanding the jury's verdict it is obvious that appellees' claims must fail under Tampa Electric.

Before moving on, I think it appropriate to make **[**240]** a final point on the importance of the Tampa Electric standard and to illuminate fully why I depart from the majority's application of that case. As I already have noted, exclusive-dealing contracts are not per se unlawful and, indeed, may lead to **[*340]** more competition in the marketplace as firms compete for such potentially lucrative arrangements. Accordingly, one must ask why antitrust law ever would forbid such contracts. The reason, as the Supreme Court's Tampa Electric standard makes clear, is that where there is such an agreement, the seller's competitors cannot compete for the percentage of the market that a purchaser needs because the purchaser has signed a contract to deal only in the goods of that particular seller (or has signed a contract that has that practical effect). Even if the seller's competitors can offer a better deal to the purchaser, the purchaser is precluded from accepting competing offers because they have entered the exclusive-dealing arrangement. Cf. *Standard Oil, 337 U.S. at 314, 69 S.Ct. at 1062* (requirements contract violated *Section 3* because "observance by a dealer of his requirements contract with Standard does effectively foreclose whatever opportunity **[**241]** there might be for competing suppliers to attract his patronage, and . . . the affected proportion of retail sales of petroleum products is substantial"). Therefore, competition is foreclosed in that percentage of the marketplace and under Tampa Electric the question is simply whether that foreclosure is substantial, considering the quantity of the foreclosure and the qualitative aspects of the marketplace and the agreement itself.

It is that foreclosure of competition, the elimination of the possibility that the seller's competitors can capture that portion of the market through vigorous competition, with which *Section 3* (and *Section 1* of the Sherman Act in exclusive-dealing cases) is concerned. See *Tampa Elec. Co., 365 U.S. at 328, 81 S.Ct. at 629* (emphasis added) (observing that "the ultimate question" is "whether the contract forecloses competition in a substantial share of the line of commerce involved"). The Tampa Electric market-foreclosure analysis thus assumes that a circumstance existed which appellees seek and fail to prove existed here: that there was an exclusive-dealing arrangement between a market seller and purchaser.

Now consider the case at hand. The parties do not **[**242]** dispute that the LTAs did not require the OEMs to purchase anything, much less 100% of their needs, from Eaton and appellees do not contend that Eaton's prices were below cost. Accordingly, appellees remained free at all times to compete for the OEMs' (and the truck purchasers') business. Appellees, if they were equally efficient competitors, were at liberty to offer lower prices, better products, more logistical and technical support, or any other myriad considerations to make their products more attractive to the OEMs, and the OEMs and the truck purchasers were at all times free to accept appellees'

products and services. Accordingly, the LTAs did not foreclose competition in any portion of the market. This basic point — that the LTAs were not in fact exclusive-dealing arrangements that foreclosed competition in any portion of the market —explains appellees' failure to identify before us any credible, precise percentage of market foreclosure. Appellees' failure to meet their burden under Tampa Electric to prove any quantitative degree of market foreclosure should spell the end of their Section 3 and Section 1 claims.

Although I believe that appellees' failure in this regard renders **[**243]** unnecessary discussion of the qualitative analysis under Tampa Electric, I note briefly that contrary to the majority's discussion, the qualitative inquiry elucidates further why the LTAs did not violate *Section 3*. Contrary to the majority's statement that the long duration of the contracts added to their alleged anticompetitiveness, the duration of the LTAs is of little to no significance because **[*341]** they did not actually preclude the OEMs from purchasing competitors' products at any time during the life of the LTA. Because the OEMs were free to walk away from the discounts at any time it does not matter how long Eaton promised to offer those discounts to the OEMs.

Moreover, a claim of lack of ease of terminability is likewise a non-starter given the LTAs were terminable at will; the agreements simply would have lost their force once the OEMs decided to seek Eaton's competitors' products and forego the market-share rebate.[42] The majority denies that the LTAs were easily terminable by reasoning that "the OEMs had a strong economic incentive to adhere to the terms of the LTAs, and therefore were not free to walk away from the agreements." Typescript at 52. I reject the majority's ipse dixit **[**244]** reasoning on this point. While Eaton offered through the LTAs financial incentives that undoubtedly served as the OEMs' motivation to meet the market-share targets, the LTAs' promise of financial reward does not mean that the OEMs were not at liberty to leave the LTAs behind to take up a more attractive offer. Economic incentives are by their nature fluid and the OEMs' incentives might have shifted in the face of a more financially appealing option.

Additionally, "[t]he existence of legitimate business justifications for the contracts also supports **[**245]** the legality of the . . . contracts." *Barr Labs., 978 F.2d at 111*. In this regard, evidence that the defendant's actions were motivated by an ordinary business motive is significant. See *Aspen Skiing Co. v. Aspen Highlands Skiing Corp., 472 U.S. 585, 608, 105 S.Ct. 2847, 2860, 86 L. Ed. 2d 467 (1985)* (noting that "[p]erhaps most significant . . . is the evidence related to [defendant] itself, for [defendant] did not persuade the jury that its conduct was justified by any normal business purpose"). Eaton contends that the LTAs were designed to meet the OEMs' demands to lower prices by consolidating their component part suppliers and that the OEMs entered the contracts because they afforded the best possible prices. As I noted above, the record supports this assertion as representatives from each of the OEMs testified that the OEMs entered into the LTAs because those agreements were financially attractive, and ZFM itself noted in 2001 that the OEMs sought a single-source supplier.[43] Additionally, an Eaton representative

---

[42] Although I conclude that the LTAs did not foreclose competition in any portion of the market, if as the majority concludes, the LTAs did foreclose competition in the market, that alleged foreclosure effect necessarily was diminished by the fact that the LTAs at most blocked only one avenue of reaching the end-users, i.e., the truck purchasers. Component part manufacturers, including ZFM, can and do advertise directly to truck purchasers and are able to offer discounts directly to those consumers as an incentive for them to select their parts from their data books, and truck purchasers were at all times free to select appellees' products.

[43] The majority states that the procompetitive justifications of the LTAs are diminished by the fact that no OEM asked Eaton to be a sole supplier. My response to that assertion is as simple as remarking once more that the LTAs did not by their terms or by their effect make Eaton a sole supplier for any of the OEMs.

testified that when the OEMs increase their purchases of Eaton's products, Eaton is able to "translate that volume into [a] lower cost base, [and] come up with the funds and the revenue **[**246]** to give them [the OEMs] more competitive pricing, which is what they were asking for." J.A. at 1398.

In a similar circumstance, we concluded that a defendant drug manufacturer offered valid business justifications to defeat its competitor's Section 1 and Section 3 **[*342]** claims, which attacked the defendant's offer of contracts that provided volume-based discounts to warehouse chain drug stores. See *Barr Labs., 978 F.3d at 104-05*. We found that there were "legitimate business justifications for the contracts" because "the evidence established that the warehouse chains [that carried defendant's products] entered the contracts because of the inherent advantages they saw in them in price, convenience, and service" and "[t]he contracts also proved advantageous from Abbott's perspective in terms of reaping business goodwill, and as providing high volume, low transaction cost outlets for **[**247]** Abbott's manufacturing capacity." *Id. at 111*; see also *Virgin Atl. Airways, 257 F.3d at 265* (finding that defendant proffered pro-competitive justification for market-share incentive agreement because such agreements "allow firms to reward their most loyal customers" and "[r]ewarding customer loyalty promotes competition on the merits"); *Barry Wright, 724 F.2d at 237* (finding legitimate business justification for requirements contracts because for the purchaser "the contracts guaranteed a stable source of supply, and, perhaps, more importantly, they assured [the purchaser] a stable, favorable price" and for the seller "they allowed use of considerable excess . . . [product] capacity and they allowed production planning that was likely to lower costs").

Undoubtedly, Eaton was motivated to tender the LTAs because of its desire to increase sales of its product. Although such a motivation could not excuse otherwise anticompetitive conduct, the desire to sell more product is an ordinary business purpose, and the antitrust laws do not prohibit such motivation. As the Supreme Court stated in Cargill, "competition for increased market share[] is not activity forbidden by the antitrust laws. **[**248]** It is simply . . . vigorous competition." *479 U.S. at 116, 107 S.Ct. at 492* (emphasis added); see also *Concord Boat, 207 F.3d at 1062* (noting that defendant's proffered reason that it was "trying to sell its product" through market-share discounts constituted valid, pro-competitive business justification for program); *Stearns Airport Equip. Co. v. FMC Corp., 170 F.3d 518, 524 (5th Cir. 1999)* (observing that defendant's explanation that "it was trying to sell its product" was valid business justification).

Tampa Electric makes clear that "it is the preservation of competition which is at stake" under Section 3. *365 U.S. at 328, 81 S.Ct. at 628* (emphasis added and internal quotations marks and citation omitted). Here, appellees remained free at all times to compete for the OEMs' business and directly for customers' business and yet the majority permits a jury to condemn the LTAs. I cannot join in that conclusion. Appellees failed to supply an evidentiary basis to establish that the LTAs had the probable effect of foreclosing competition in a substantial share of the market and thus they failed to produce evidence that could demonstrate that Eaton violated Section 3 of the Clayton Act. **[**249]** Because Section 3 of the Clayton Act sweeps more broadly than Section 1 of the Sherman Act, appellees likewise failed to show that Eaton violated Section 1.

C. Sherman Act *Section 2* Claim

Appellees presented the same evidence and same de facto exclusive dealing theory on which they based their *Section 2* claim as they did to support their Clayton Act Section 3 and Sherman Act Section 1 claims. In light of my lengthy analysis of appellees' other claims, I will abbreviate my discussion of their *Section 2* claim.

Section 2 targets defendants who "monopolize or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the **[*343]** trade or commerce among the several States, or with foreign nations." 15 U.S.C. § 2. To establish a Section 2 violation, a plaintiff must show that: (1) the defendant possessed monopoly power in the relevant market and (2) the defendant willfully acquired or maintained that power "as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." Eastman Kodak Co. v. Image Tech. Servs., Inc., 504 U.S. 451, 481, 112 S.Ct. 2072, 2089, 119 L. Ed. 2d 265 (1992) (quoting United States v. Grinnell Corp., 384 U.S. 563, 570-71, 86 S.Ct. 1698, 1704, 16 L. Ed. 2d 778 (1966)). **[**250]** Eaton acknowledges that it has monopoly power in the NAFTA HD truck transmission market, and thus I focus my discussion on whether it has maintained that monopoly through unlawful means.

A monopolist willfully acquires or maintains monopoly power in contravention of Section 2 if it "attempt[s] to exclude rivals on some basis other than efficiency." Aspen Skiing Co., 472 U.S. at 605, 105 S.Ct. at 2859. "Anticompetitive conduct may take a variety of forms, but it is generally defined as conduct to obtain or maintain monopoly power as a result of competition on some basis other than the merits." Broadcom Corp. v. Qualcomm Inc., 501 F.3d 297, 308 (3d Cir. 2007) (citation omitted). "[E]xclusive dealing arrangements can be an improper means of maintaining a monopoly." Dentsply, 399 F.3d at 187 (citing Grinnell Corp., 384 U.S. 563, 86 S.Ct. 1698, 16 L. Ed. 2d 778; LePage's, 324 F.3d at 157).

The District Court denied Eaton's motion seeking a judgment as a matter of law on appellees' Section 2 claim as it concluded that "[t]he jury found that [Eaton] had willfully acquired or maintained its monopoly power through LTAs that amounted to de facto exclusive dealing contracts having the power to foreclose competition **[**251]** from the marketplace." ZFM, 769 F. Supp. 2d at 697 (emphasis added). In this regard, the Court concluded that "'neither proof of exertion of the power to exclude nor proof of actual exclusion of existing or potential competitors is essential to sustain a charge of monopolization under the Sherman Act.'" Id (quoting LePage's, 324 F.3d at 148).

The District Court's finding on this point reflected its misunderstanding of the requirements of Section 2. As we recently stated in Dentsply:

> Unlawful maintenance of a monopoly is demonstrated by proof that a defendant has engaged in anti-competitive conduct that reasonably appears to be a significant contribution to maintaining monopoly power. Predatory or exclusionary practices in themselves are not sufficient. There must be proof that competition, not merely competitors, has been harmed.399 F.3d at 187 (citing LePage's, 324 F.3d at 162) (emphasis added) (citations omitted); see also Broadcom, 501 F.3d at 308 ("[T]he acquisition or possession of monopoly power must be accompanied by some anticompetitive conduct on the part of the possessor.") (citing Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP, 540 U.S. 398, 407, 124 S.Ct. 872, 878-79, 157 L. Ed. 2d 823 (2004)).

Indeed, **[**252]** in Dentsply we made clear that a plaintiffs demonstration that the defendant merely possessed the power to exclude is not a sufficient basis on which to build a claim that the defendant is culpable under Section 2; a plaintiff must show that the defendant used its power to foreclose competition. See399 F.3d at 191 ("Having demonstrated that Dentsply possessed market

power, the Government must also establish the second element of a *Section 2* claim, that the power was used 'to foreclose competition.'") (quoting *United States v.* **[*344]** Griffith, *334 U.S. 100, 107, 68 S.Ct. 941, 945, 92 L. Ed. 1236 (1948))* (emphasis added). As the Supreme Court explained in Trinko:

> The mere possession of monopoly power, and the concomitant charging of monopoly prices, is not only not unlawful; it is an important element of the free-market system. The opportunity to charge monopoly prices — at least for a short period — is what attracts 'business acumen' in the first place; it induces risk taking that produces innovation and economic growth. To safeguard the incentive to innovate, the possession of monopoly power will not be found unlawful unless it is accompanied by an element of anticompetitive conduct.*540 U.S. at 407, 124 S.Ct. at 879* **[**253]** (emphasis in original).

"Conduct that merely harms competitors . . . while not harming the competitive process itself, is not anticompetitive." *Broadcom, 501 F.3d at 308*; see also *Spectrum Sports, Inc. v. McQuillan, 506 U.S. 447, 458, 113 S.Ct. 884, 892, 122 L. Ed. 2d 247 (1993)* (The Sherman Act "directs itself not against conduct which is competitive, even severely so, but against conduct which unfairly tends to destroy competition itself."). To determine whether a practice is anticompetitive in violation of *Section 2*, we consider "whether the challenged practices bar a substantial number of rivals or severely restrict the market's ambit." *Dentsply, 399 F.3d at 191* (citations omitted). Thus, the standard for ascertaining whether certain conduct is anticompetitive under *Section 2* is quite similar to the market-foreclosure analysis under *Section 3* of the Clayton Act. "Conduct that impairs the opportunities of rivals and either does not further competition on the merits or does so in an unnecessarily restrictive way may be deemed anticompetitive." W. Penn Allegheny Health Sys., 627 F.3d at 108 (internal quotation marks and citation omitted).

Accordingly, for largely the same reasons that appellees' Section 3 **[**254]** and Section 1 claims fail, so, too, does their *Section 2* claim. Because the LTAs did not obligate the OEMs to purchase anything from Eaton and did not condition the rebates on Eaton having a 100% market share and because its prices were at all times above-cost, the LTAs allowed any equally efficient competitor, including appellees, if they were equally efficient competitors, to compete. Thus, the LTAs did not bar Eaton's competitors from the market nor did the LTAs impair their opportunities to compete with Eaton for the business the LTAs covered. Cf. *NicSand, Inc. v. 3M Co., 507 F.3d 442, 452 (6th Cir. 2007)* (en banc) (plaintiff failed to demonstrate antitrust injury under Sherman Act *Section 2* because defendant's rebates and up-front payments to retailers pursuant to exclusive dealing contract were above-cost).

In this regard, the LTAs stand in stark contrast to the contracts at issue in Dentsply, a case on which appellees and the majority rely heavily. In Dentsply we considered whether Dentsply, a monopolist in the field of the production of artificial teeth, violated *Section 2* of the Sherman Act through a provision called "Dealer Criterion 6" in its contracts with dealers, who, **[**255]** in turn, sold the products to dental laboratories. See*399 F.3d at 184-85*. The provision, which Dentsply "imposed . . . on its dealers" prohibited the dealers from adding non-Dentsply tooth lines to their product offering. See id. Dealers who carried competing lines prior to the implementation of Dealer Criterion 6 were permitted to continue carrying non-Dentsply products, but Dentsply enforced Dealer Criterion 6 against all other dealers. See id.

We concluded that Dealer Criterion 6 violated *Section 2* because "[b]y ensuring **[*345]** that the key dealers offer Dentsply teeth either as the only or dominant choice, Dealer Criterion 6 ha[d] a significant effect in preserving Dentsply's monopoly." *Id. at 191*. We noted that "Criterion 6 impose[d] an 'all-or-nothing' choice on the dealers" and "[t]he fact that dealers ha[d] chosen not to drop Dentsply teeth in favor of a rival's brand demonstrates that they ha[d] acceded to heavy economic pressure." *Id. at 196*. Accordingly, we concluded that Dealer Criterion 6 harmed competition by "keep[ing] sales of competing teeth below the critical level necessary for any rival to pose a real threat to Dentsply's market share." *Id. at 191*. Criterion 6 so limited **[**256]** competitors' sales because Dentsply's competitors realistically could not hope to compete solely through direct sales to laboratories and because "[a] dealer locked into the Dentsply line [wa]s unable to heed a request for a different manufacturers' product . . . ." *Id. at 194*.

Unlike Dealer Criterion 6, the LTAs did not impose an "all-or-nothing" choice on the OEMs because they did not prohibit the OEMs from purchasing or from offering to its HD truck purchasers non-Eaton transmissions. Accordingly, the LTAs did not suppress sales of appellees' products because the OEMs were able to and, in fact, did heed truck purchasers' requests for ZFM's products. Critically, at all times, truck purchasers retained the freedom to make the ultimate decision with respect to the transmissions they would select. Thus, the situation here differs from that in Dentsply because the LTAs did not have the effect of making Eaton the only choice for truck purchasers nor did it impair the purchasers' choice in the marketplace. See J.A. at 1530 (deposition testimony of Paul D. Barkus, International) (indicating that International's LTA included a clause explicitly stating that International was not precluded **[**257]** from dealing in Eaton's competitors' products because International "would never jeopardize a condition of sale based on a customer specifying a product that [it] would refuse to provide").

Adding to the specter of restricted customer choice, the majority states that the OEMs worked with Eaton to force feed Eaton's products to customers and to shift truck fleets from using ZFM transmissions to Eaton transmissions. It appears that there is some evidence in the record for the unsurprising contention that the OEMs sought to meet the market share targets and thus obtain the rebates in part by persuading their customers to select Eaton's products. Indeed, in all walks of life if a salesperson has more to gain by selling a customer product X as opposed to product Y it is to be expected that the salesperson will push the customer to select product X. Ultimately, however, the majority does not and cannot dispute the fact that the HD truck purchasers at all times were free to select any transmission, including ZFM's transmissions, for their truck orders.

Though appellees also assert that the LTA provisions that required the OEMs to list Eaton's products as the preferred and standard option in **[**258]** their data books constituted anticompetitive conduct, those provisions no more support appellees' case than the rebates that the LTAs provided. Appellees claim that the provisions were anticompetitive because they required the OEMs to charge artificially higher prices for ZFM's products than for Eaton's. This is not the case, however, because the terms of the LTAs only required that the OEMs ensure that Eaton was priced as the lowest-cost option, which, with respect to the OEMs, was at all times the case.

As a PACCAR representative explained, a component part manufacturer "is going **[*346]** to get a preferred position in the data book as long as . . . [it is] competitive in the marketplace, and being competitive in the marketplace means that . . . [it has] the lowest total cost to PACCAR, total

cost, not just price, total cost." Id. at 1553. A competitor manufacturer's product will be listed "at a premium . . . because that other transmission . . . is at a higher cost to PACCAR." Id. at 1552. Indeed, that representative confirmed that data book positioning was in fact "a leverage point for [PACCAR] to negotiate . . . [to] manage [its] supply base." Id. at 1553. Accordingly, Eaton's demand that **[**259]** the OEMs preferentially price its products reflected the fact that those transmissions came at the lowest cost to the OEMs and the fact that Eaton had made certain price concessions to the OEMs in exchange for that favorable listing, a practice that was apparently commonplace in the HD truck transmission market.

Furthermore, the demand had the added consequence of assuring Eaton that it receive the favorable promotion for which it had bargained through its price concessions. If the LTAs did not include requirements regarding data book placement, an OEM would have been able to purchase Eaton's transmissions at a low cost while listing Eaton's products at a higher cost to the truck purchasers than ZFM's products in its data book, thereby reaping a greater profit on Eaton's transmissions. It was entirely reasonable for Eaton to avoid this scenario by insisting that the OEMs' data books reflect that Eaton's transmissions were the lowest-cost, highest-value product.

As the majority notes, it is unclear from the record whether the OEMs arrived at the preferential price by lowering the price of the preferred option or by raising the price of the non-preferred options until the preferred component **[**260]** part was the lowest-cost option. The LTAs simply required that the OEMs list Eaton as the preferred option but they did not require that the OEMs take either path in doing so, and thus it appears that the OEMs had the discretion to decide in which way they would make Eaton the preferred option. Of course, from the OEMs' perspective, keeping the price of Eaton's products stable and raising the price of Eaton's competitors' products was the more financially attractive option than keeping the prices of Eaton's competitors' products stable and dropping the price of Eaton's products and, as the majority points out it appears there is some evidence in the record that the OEMs took the first path.[44]

Nevertheless, to the extent that the OEMs in some instances may have decided **[*347]** to ZFM's raise the cost of transmissions to arrive at the preferential price for Eaton's transmissions or to make Eaton's transmissions appear more favorable to their customers in an effort to achieve the market-share targets and receive the rebates, such conduct reasonably cannot be **[**262]** attributed to Eaton as neither the LTAs nor Eaton elsewhere required that the OEMs do so. Additionally, it is clearly telling with respect to data book placement provisions that prior to 2001 Meritor had a three-year LTA with Freightliner, under which Meritor reduced the prices of its component parts if Freightliner listed those parts as the standard option. Furthermore, there is evidence in the record that as of June 2002, ZFM itself was attempting to achieve exclusive listing in PACCAR's data book. See id. at 3394 (electronic correspondence from Tom Floyd, PACCAR, to Christian Benner, ZFM (June 4, 2002)) (noting that PACCAR was "extremely disappointed" with ZFM's

---

[44] Thus, as the majority notes, in an email exchange between Eaton and Freightliner representatives a Freightliner representative stated that its LTA with Eaton required it to price ZFM's products at a $200 premium. Yet, Freightliner's LTA did not require that Freightliner price ZFM's products at a premium; it simply required that Eaton's products be the lowest-priced option. In light of the silence of Freightliner's LTA as to this issue, I can interpret this exchange only to mean that Freightliner **[**261]** had elected to price Eaton's products preferentially by imposing the $200 premium on ZFM's products. Likewise, it appears that International and PACCAR may have imposed charges on customers who selected ZFM's products but neither their respective LTA nor Eaton itself required them to do so. In fact, as noted, at least in regard to International, there is evidence in the record that suggests that the data book price increases for ZFM's transmissions were a product of International's realization in 2002 that its current price for ZFM's products did not reflect accurately the cost of that product to International. See J.A. at 3727 (e-mail from Paul D. Barkus, International, to Galynn Skelnik, International (Jan. 11, 2002)) (proposing that International increase ZFM's list prices to bring them "in line with where they should be").

business proposal in part because PACCAR was "very clear that" ZFM's proposal "should not include requirements regarding exclusive position[ing]" and that "it would require some extraordinary benefits for PACCAR in order [for ZFM] to receive consideration" in that regard).

While Meritor's prior LTA and ZFM's own attempts to achieve exclusive data book positioning do not, in themselves, defeat appellees' claim that those tactics are anticompetitive, their actions are of some significance. Cf. *Race Tires, 614 F.3d at 82* (noting **[**263]** fact that plaintiff created and championed racing sanctioning bodies' rule that required the use of a single brand of tire during races and later alleged such rule violated the antitrust law); *NicSand, 507 F.3d at 454* (plaintiff's prior use of exclusive-dealing contract undermined its attack on defendant's use of such arrangements). At a minimum, ZFM's conduct belies its contention that the LTAs were far a field from the normal practice of the HD truck transmission market.

In our consideration of this case we should remember that "[a]ntitrust analysis must always be attuned to the particular structure and circumstances of the industry at issue." *Trinko, 540 U.S. at 411, 124 S.Ct. at 881*. Practices from industry to industry do not come on a one-size-fits-all basis. Here, it appears that bargaining between the OEMs and their suppliers regarding data book positioning is quite typical of the marketplace with which we are dealing. See *Race Tires, 614 F.3d at 79* (noting as relevant that it was "a common and generally accepted practice for a supplier to provide a sports sanctioning body . . . financial support in exchange for a supply contract"); *Concord Boat, 207 F.3d at 1062* (observing that **[**264]** "Brunswick's competitors also cut prices in order to attract additional business, confirming that such a practice was a normal competitive tool within the . . . industry"); see also *Trace X Chem., Inc. v. Canadian Indus., Ltd., 738 F.2d 261, 266 (8th Cir. 1984)* ("Acts which are ordinary business practices typical of those used in a competitive market do not constitute conduct violative of *Section 2*.").

But appellees' case fails for one more reason than its failure to show that Eaton engaged in anticompetitive conduct, in that their case also did not include evidence that the LTAs harmed competition. See *Dentsply, 399 F.3d at 187* ("There must be proof that competition, not merely competitors, has been harmed."). Appellees contend that the LTAs harmed competition by depriving truck buyers of access to the FreedomLine, which appellees believe was a technologically innovative product, and by causing truck buyers to pay higher prices.

**[*348]** With regard to the FreedomLine, it is enough to say once more that the OEMs and truck purchasers were at all times free to purchase that transmission as well as any other of ZFM's transmissions, whether or not those transmissions were listed in the data books. **[**265]** Additionally, with the exception of International, the LTAs permitted the OEMs to list all of ZFM's transmissions, including the FreedomLine, in their respective data books and the OEMs continued to do just that.[45]

Appellees do not point to any evidence in support of their contention that truck purchasers paid higher prices as a result of the LTAs. The only evidence that I can find in the record relevant to

---

[45] I have not overlooked the fact that International's LTA required it to list Eaton's transmissions exclusively. Yet, International continued to list ZFM's manual transmissions, and it is thus not apparent whether its decision not to list ZFM's automated and automated mechanical transmissions is attributable to the LTA. Regardless, International's failure to list the FreedomLine, standing alone, did not deprive truck purchasers of access to the FreedomLine because truck purchasers were at all times free to specify the use of the FreedomLine transmission. Furthermore, it is important to note that HD truck purchasers in many cases were sophisticated customers in the HD truck market that were aware that ZFM's transmissions were available. Though I recognize that some purchasers likely were small operators perhaps owning only one HD truck who may have had limited knowledge of the differences in available transmissions, certainly the large purchasers, i.e., big trucking companies, **[**266]** would have been more knowledgeable with respect to available transmissions. In any event, we are, after all, not dealing with consumers buying motor

appellees' allegation in this regard is Dr. DeRamus' statement in his expert report offered by appellees that after the LTAs went into effect Eaton reduced its "competitive equalization" or incentive payments that historically it had paid to truck buyers as an incentive to them to select Eaton's transmissions. See J.A. at 4830. While Dr. DeRamus put forth data demonstrating that Eaton decreased its competitive equalization payments on average by about $100 (dropping from roughly $500 on average to just below $400 on average) from 1999 to 2007, see id. at 4831, he did not present a scintilla of evidence that truck purchasers ultimately paid a higher price **[**267]** for Eaton's transmissions during the existence of the LTAs or following their expiration. Overall, it is clear that his testimony in this regard as an inadequate basis on which to predicate an antitrust case. In sum, appellees failed to put forth any — much less sufficient — evidence that Eaton engaged in anticompetitive conduct or that Eaton's conduct actually harmed competition, both of which are required elements of a claim under *Section 2*.[46]

III. CONCLUSION

I offer a few final thoughts on this important case, which, though seemingly **[*349]** complicated, should have an obvious result. It is axiomatic that "[t]he antitrust laws . . . were enacted for 'the protection of competition not competitors.'" *Brunswick, 429 U.S. at 488, 97 S.Ct. at 697* (quoting *Brown Shoe Co. v. United States, 370 U.S. 294, 320, 82 S.Ct. 1502, 1521, 8 L. Ed. 2d 510 (1962))* (emphasis in original). Yet as often as this refrain is repeated throughout antitrust jurisprudence, it appears increasingly that disappointed competitors, on the assumption that their deficient performances must be attributable to their competitors' anticompetitive conduct rather than their own errors in judgment or shortcomings or their competitors' more desirable products or business decisions, or on the assumption that they can convince a jury of that view, turn to the antitrust laws when they have been outperformed in the marketplace. Of course, competitors can be and sometimes are harmed by their peers' anticompetitive conduct and when they show that **[**269]** is what happened they may have viable antitrust claims. Yet often it is the case that a defeated competitor falls back on the antitrust laws in an attempt to achieve in the courts the goal that it could not reach in the properly-functioning competitive marketplace. This case is a classic demonstration of that process, which so far with respect to liability even if not damages has been successful. Indeed, I find it remarkable that appellees' case that is predicated on nothing more than smoke and mirrors has gotten so far.

But the basic facts are clear. Appellees do not bring a predatory pricing claim because they cannot do so as Eaton's prices were above cost. Instead, they seek refuge in the law of exclusive dealing to challenge the LTAs, which based on the record could not be found to be either facially or de facto exclusive or mandatory. After stripping this case of appellees' baseless insinuations that Eaton engaged in coercive or threatening conduct in regards to the LTAs, it becomes apparent that the core of appellees' claim really is their belief they had a superior product

---

vehicles for their personal use. The transmissions involved here were installed in vehicles intended for commercial use, and the owners did not acquire the vehicles to go to the grocery store.

[46] Even if a plaintiff establishes under *Section 2* that "monopoly power exists" and that "the exclusionary conduct . . . ha[s] an anti-competitive effect," "the monopolist still retains a defense of business justification." Dentsply, 399 F.3d at 187; Concord Boat, 207 F.3d at 1062 ("A *Section 2* defendant's proffered business justification is the most important factor in determining whether its challenged conduct is not competition on the merits."); Stearns Airport Equip. Co., 170 F.3d at 522 ("The key factor courts have analyzed in order to determine whether challenged conduct is or is not competition on the merits is the proffered business justification for the act."). As with appellees' Section 3 and Section 1 claim, Eaton's valid business **[**268]** justifications for the LTAs undermines the notion that the LTAs constituted competition on some basis other than the merits in violation of *Section 2*.

in the FreedomLine and the disappointing sales of that product relative to their expectations must have **[**270]** been attributable to Eaton's anticompetitive conduct. See appellees' br. at 32 ("Eaton's conduct harmed competition and ZFM. For the first time in this market, a better product, even combined with offers of discounts, could not elicit additional sales because Eaton's LTAs and other conduct had broken the competitive mechanism."). Appellees thus "appear[] to be assuming that if [Eaton's] product was not objectively superior, then its victories were not on the merits." *Stearns Airport Equip., 170 F.3d at 527*.

As the Court of Appeals for the Fifth Circuit stated in Stearns Airport Equipment in confronting a similar type of claim, courts are "ill-suited . . . to judge the relative merits of" the parties' respective products. Id. "That decision is left in the hands of the consumer, not the courts, and to the extent this judgment is 'objectively' wrong, the inference is not that there has been a[n] [antitrust] violation . . ., but rather that the winning party displayed superior business acumen in selling its product." Id. The truth is that neither judges nor juries have expertise in determining the best transmission to buy. Certainly, the purchasers of trucks and transmissions should make **[**271]** transmission decisions for themselves and so long as appellees manufactured their transmissions they had a chance to be their supplier.

I recognize that the record could support a finding that the FreedomLine was a technological innovation for which Eaton did not offer a technically comparable product, and I further recognize that Eaton engaged in vigorous competition through aggressive but above-cost methods **[*350]** to compensate for the possible deficiency of their transmission offerings in that regard. But in the absence of anticompetitive conduct, the antitrust laws do not forbid Eaton's response. See *Ball Mem'l Hosp., Inc. v. Mutual Hosp. Ins., Inc., 784 F.2d 1325, 1339 (7th Cir. 1986)* ("Even the largest firms may engage in hard competition, knowing that this will enlarge their market shares.") (citations omitted). In reality, however, the record compels that the conclusion that Eaton was able to maintain its dominant market position in the face of the availability of the FreedomLine for myriad reasons, including its capability of offering the OEMs a full product line, favorable pricing, its long-standing, positive reputation, and various market forces that favored an established market **[**272]** player such as Eaton. And it is also evident from the record, especially from ZFM's internal documents, that there were numerous intervening factors, such as ZFM's precipitously falling market share, which tellingly predated the adoption of the LTAs, the market's drive towards full-product line manufacturers, the OEMs' hesitancy to purchase new products, and the severe market downturn, that disfavored ZFM.[47] In the difficult market it faced, Meritor entered into a joint venture that needed to achieve an almost one-third market share within approximately four years of the venture's formation to maintain a viable business, an obviously ambitious goal indeed even when one overlooks the fact that the joint venture offered a limited product line and a flagship transmission that cost far more than other transmissions in the market.

I note finally that courts' erroneous judgments in cases such as this one do not come without a cost to the economy as a whole. Discounts of all varieties, whether tied to the purchase of multiple

---

[47] I recognize that as the majority points out, certain OEM representatives speculated that the LTAs damaged significantly ZFM's business and may have caused its ultimate demise. As I have stated above, it is beyond peradventure to say that "[t]he antitrust laws . . . were enacted for 'the protection of competition not competitors.'" Brunswick, 429 U.S. at 488, 97 S.Ct. at 697 **[**273]** (internal quotation marks and citation omitted); see also Virgin Atl. Airways, 257 F.3d at 259 ("[W]hat the antitrust laws are designed to protect is competitive conduct, not individual competitors."). Even if the LTAs negatively affected ZFM's business, that circumstance is not the salient inquiry in an antitrust case. The pivotal question is whether the LTAs negatively affected competition — not a particular competitor — in the marketplace, and for the reasons I have recited above, they could not be found to have done that.

products, exclusivity, volume, or market-share, are ubiquitous in our society. "Discounts are the age-old way that merchants induce customers to purchase from them and not from someone else or to purchase more than they otherwise would." Hovenkamp, Discounts and Exclusion, *3 Utah L. Rev. at 843*. Indeed, market-share discounts can be particularly pro-competitive because they can result in lower prices for a broader range of customers as they extend to smaller purchasers **[**274]** discounts typically reserved for the largest of purchasers under more common volume-discount programs. See IIIA Areeda & Hovenkamp, Antitrust Law ¶786b2, at 148. "[L]ower prices help consumers. The competitive marketplace that the antitrust laws encourage and protect is characterized by firms willing and able to cut prices in order to take customers from their rivals." *Barry Wright Corp., 724 F.2d at 231*. Accordingly, "mistaken inferences in cases such as this one are especially costly, because they chill the very conduct the antitrust laws are designed to protect." *Matsushita Elec. Indus. Co., 475 U.S. at 594, 106 S.Ct. at 1360*.

**[*351]** Thus, as the Supreme Court has stressed, courts do not issue these decisions in a vacuum: once we file our opinion in this case firms that engage in price competition but seek to stay within the confines of the antitrust laws must attempt to use the precedent that we establish as a guide for their conduct, at least if they are subject to the law of this Circuit. This is serious business indeed.[48] For this reason, the Supreme Court has "repeatedly emphasized the importance of clear rules in antitrust law." *Linkline, 555 U.S. at 452, 129 S.Ct. at 1120-21*; see **[**275]** also *Town of Concord v. Bos. Edison Co., 915 F.2d 17, 22 (1st Cir. 1990)* (Breyer, C.J.) (Antitrust rules "must be administratively workable and therefore cannot always take account of every complex economic circumstance or qualification."). I confess I can glean no such clear rule from the majority's opinion. I do not know how corporate counsel presented with a firm's business plan at least if it is a dominant supplier that seeks to expand sales through a discount program that might be challenged by competitors as providing for a de facto exclusive dealing program and asked if the plan is lawful under the Sherman and Clayton Acts will be able to advise the management. The sad truth is that the counsel only will be able to tell management that it will have to take a chance in the courtroom casino at some then uncertain future date to find out.

If Eaton's above-cost market-share rebate program memorialized in the LTAs, which were neither explicitly **[**276]** nor de facto exclusive or mandatory, can be condemned as unlawful de facto partial exclusive dealing on the basis of literally a handful of disjointed statements that amount at most to unsupported speculation as to the possibility that Eaton may have stopped supplying its transmissions if the OEMs did not meet the targets, firms face a difficult task indeed in structuring lawful discount programs. "Perhaps most troubling, firms that seek to avoid . . . liability [for market-share rebate programs] will have no safe harbor for their pricing practices." *linkLine, 555 U.S. at 452, 129 S.Ct. at 1121* (citing *Town of Concord, 915 F.2d at 22*) (Antitrust rules "must be clear enough for lawyers to explain them to clients."). What I find most troubling is that firms will play it safe by not formulating discount programs and that the result of this case will be an increase of prices to purchasers and the stifling of competition, surely a perverse outcome. It is ironical that the very circumstance that the majority's opinion is so thoughtful and well crafted that the risk that it poses is so great. On the other hand, the approach I believe the Supreme Court's precedent compels — applying and giving **[**277]** persuasive effect to the Brooke Group price-cost test and granting a presumption of lawfulness to pricing practices that result in above-cost prices — provides clear direction to firms engaging in price competition but still

---

[48] Of course, every decision we make is serious business and I do not imply otherwise. However, particularly in light of the current economic climax, the reasoning of a precedential opinion with such obvious economic repercussions is crucial.

allows for an antitrust plaintiff to allege that a defendant has engaged in attendant anticompetitive conduct that renders its practices unlawful.

In sum, I conclude that Eaton was entitled to judgment as a matter of law on liability in all respects. Accordingly, I would reverse the judgment of the District Court and remand this case for entry of a judgment in favor of Eaton. My view of this facet of the case renders it unnecessary for me to consider the numerous other issues raised on this appeal, including the District Court's decision that appellees **[*352]** suffered antitrust injury, and its decisions regarding damages and injunctive relief. Thus, I do not opine on the proper disposition of those matters.

# EXHIBIT 302

# Antitrust Law: An Analysis of Antitrust Principles and Their Application - Areeda and Hovenkamp, ¶394. Econometrics and Statistical Inference

Click to open document in a browser

**Last Updated: 4/2014**

For our purposes, *statistics* refers to two distinct, albeit related, concepts. *Descriptive statistics* refers to the collection, organization, and presentation of numerical information (i.e., data). For example, a firm's past profits may be collected from its business records, organized by year, and presented in the form of tables, line graphs, or bar charts. These are the facts that must be presented to the jury in ways that are easy to understand. *Statistical inference* deals with scientific generalizations based on somewhat incomplete information. In other words, statistical inference uses a sample to make predictions about a more general population. Most of us are familiar with inferences drawn from sample data. A sample is a subset of a population, where the sample is usually drawn randomly from the population or selected based on some criteria. Samples are used not because we are interested in the specific observations included in the particular sample, but rather because we are interested in drawing conclusions about the population as a whole. For example, the outcome of an election is predicted in advance of a final tally based on a sample of voters. In this way, an inference is drawn using available, although incomplete, information.

Antitrust damage calculations require the determination of the economic circumstances that would have existed "but for" the antitrust violation. [1] In an overcharge case, one must compare the actual price to the price that would have prevailed but for the price fixing. In a lost profits case, the plaintiff's actual profits are compared to what they would have been but for the antitrust violation. In either case, this "but for" world does not actually exist because of the antitrust violation. We do not know what the price and output would have been in a particular market if the alleged antitrust violation did not occur. As a result, one must infer what would have been from known conditions. In the case of lost profits, for example, one typically will collect and analyze data on the plaintiff's past experience and various market variables. Inferences would then be drawn regarding the plaintiff's "but for" profits using past profit figures. Given sufficient data, very sophisticated statistical analyses are possible. Less sophisticated, albeit still reliable, analyses may be done if fewer data are available. Accommodation to practical limitations is often necessary in actual cases.

In this paragraph, attention will be directed to a statistical technique known as *regression analysis*, which is a staple of empirical research in economics. [2] The goal is not to provide a course in regression analysis; instead, the goal is to provide an understanding of what regression analysis is and how it can be useful in damage estimation. The potential weaknesses of regression analysis will be discussed as well.

**394a. Basic steps in regression analysis..—**It is useful to organize the overview of regression analysis around a hypothetical. Suppose that the plaintiff has proven that it was foreclosed from a market and thereby suffered a loss in profit. The first step in estimating the lost profit is to estimate lost sales revenue. Regression analysis offers a mathematical method of identifying the factors that determine sales. In addition, it provides a way of estimating the size of the impact that each factor has on sales. Isolating and estimating the importance of the determinants of sales makes it possible to predict what the plaintiff's sales would have been "but for" the antitrust violation.

The first step in regression analysis is to build an economic model. An economic model specifies a relationship between an outcome measure (or the variable of interest) and other factors that affect the outcome measure. Start by identifying the most important economic and demographic factors that *theoretically* influence the variable of interest. The analyst relies on economic theory to decide which variables should be included. [3] Theory may predict, for example, that the population in the vicinity of a restaurant will influence the restaurant's level of sales. Theory may also predict whether this relationship is positive or negative. For example, the population in the vicinity is apt to be positively related to restaurant sales — that is, the larger the surrounding population, the higher the sales level. Other theoretically important variables may be per capita income and relative price.

***©2014 Wolters Kluwer. All rights reserved.***
***Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm***

It is important to note that the economic specification of the model proceeds on an entirely theoretical plane. While practical problems of implementation relating to the availability or reliability of data may require subsequent modification of the model, those adjustments should be postponed. Thus, at this stage the analyst should not worry about the availability of reliable population data. If such data do not exist, the research effort may be futile, but the variable's theoretical relevance cannot be ignored.

At this stage, the model is in a general, abstract form:

$$S = f(X_1, X_2, X_3). \qquad [1]$$

That is, $S$ is a function of $X_1$, $X_2$, and $X_3$. In this equation, $S$ represents sales revenue and is the *dependent* variable of interest; the *independent* (or *explanatory*) variables are $X_1$, $X_2$, and $X_3$, which may represent population, per capita income, and relative price, respectively; and $f(.)$ denotes the unspecified functional (or mathematical) relationship between the independent variables and the dependent variable. In other words, the value of $S$ is dependent on the values of $X_1$, $X_2$, and $X_3$ and, conversely, $X_1$, $X_2$, and $X_3$ determine or explain the value of $S$.

The second step in regression analysis is to create an econometric model based on the theoretical model. Start by selecting a specific functional form that appropriately relates the independent variables with the dependent variable. For most practical purposes, a linear relationship is assumed, at least initially. Selection of a linear relationship means that the independent variables are related to the dependent variable in a linear way. For example, if we relate the surrounding population to restaurant sales in a linear model, we assume that for every unit increase in the surrounding population, there is an associated increase in sales revenue. The change in sales revenue is the same for every one-unit change in population. In other words, the slope is constant. The economic model will be written as follows:

$$S = \beta_0 + \beta_1 X_1 + \beta_2 X_2 + \beta_3 X_3. \qquad [2]$$

This specification indicates that the total sales revenue equals some constant amount ( $\beta_0$) plus a variable amount that is determined by the value of each of the explanatory variables. The letters $\beta_0$, $\beta_1$, $\beta_2$, and $\beta_3$ in this model are known as the model's *parameters* or *coefficients.* These parameters describe the strength and direction of the relationship between the independent variables and the dependent variable. The true values of these parameters are unknown and therefore their values will be estimated based on sample data. The values of $X_1$, $X_2$, and $X_3$ are specific to each firm and therefore are known and do not have to be estimated. For example, $X_1$ represents population in each firm's immediate vicinity. This value will be unique to each firm depending on the firm's location. The coefficients, however, are constants for the entire universe of such firms. [4]

Once we have decided on an appropriate theoretical model, the third step in performing a regression analysis is to collect the relevant data. We have specified a clear algebraic relationship between sales revenue ( $S$), our dependent variable, and a set of independent variables ( $X_1$, $X_2$, $X_3$). Now we must turn our attention to gathering data. We require observations on $S$, $X_1$, $X_2$, and $X_3$. Data sources, of course, will vary from case to case. In many instances, company records can be utilized for important economic variables such as sales, prices, output, employment, production capacity, salaries and wages, and the like. Data on population, age distribution, ethnicity, wealth, and other economic and demographic factors can be obtained from public sources or from private data collection services. In some cases, the data must be constructed from market transactions. In any event, one should obviously record the data accurately and use common appropriate measurements. For example, any monetary values recorded at different points in time should be converted to real dollars by adjusting for inflation. Errors in recording and measuring data can undermine even the most carefully constructed models.

***©2014 Wolters Kluwer. All rights reserved.***
***Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm***

The fourth step is to apply the regression technique to the model and the data for this particular case. Just how one goes about this will be examined in the next subparagraph. In the fifth step, one must interpret the results of the analysis, determine their reliability or statistical significance, and apply them to the problem of damage estimation. This is the point of the entire empirical effort — to draw inferences from the sample data. We examine steps four and five in the next subsection through an example.

**394b. Developing the regression model..—**Suppose that the plaintiff has been foreclosed from selling the proverbial widget. Because it expects to win its antitrust case and, furthermore, expects to resume selling widgets following the judgment, the plaintiff wants to estimate the profits that it lost in the past as a result of the foreclosure. One procedure for doing this is to estimate the lost sales revenue and then deduct the avoided costs (i.e., the costs not incurred because the sales were not made) to yield the lost profit. As a first step, then, the plaintiff will be required to estimate its lost sales revenue. Because we do not know what the plaintiff's sales would have been, one way to do this is to examine the economic performance of other, similarly situated widget vendors and draw inferences about the sales lost by the plaintiff. [5] Regression analysis is a useful tool because it helps us in estimating sales for the plaintiff using the factors that determine sales for other vendors that need not satisfy the demanding standards of the yardstick model. In other words, we do not have to find a clone of the plaintiff. Instead, the plaintiff can use evidence from a sample of firms and statistically control for differences between the plaintiff and the firms in the sample. To this end, we shall estimate the relationship between sales and certain economic and demographic variables for other widget vendors. We can then employ the specific characteristics of the plaintiff along with the estimated relationship for vendors generally to infer the plaintiff's lost sales. The details of this procedure are explored below.

Suppose that experience has shown that widget buyers are drawn largely from those people who live within a three-mile radius of the store. As a result, we are interested in the economic and demographic characteristics of the population within a three-mile ring around each location. For purposes of illustration, we begin with a very simple model in which there is only one independent variable. Specifically, our model describes sales as a function of the total population within a three-mile ring surrounding each store location.

We select for analysis a random sample of 30 widget vendors who were not affected by the alleged violation. [6] The widget manufacturers' records provided data on sales, while population data were extracted from Census Bureau data files. These data are listed in Table 1 and are depicted graphically in Figure 1. Each point in Figure 1 represents a widget vendor and reflects the population within a three-mile ring and the sales at that vendor's location.

**TABLE 1 Population and Sales Data**

| Store | Population | Sales |
|---|---|---|
| 1 | 184,797 | 2,039 |
| 2 | 208,971 | 2,582 |
| 3 | 74,170 | 1,748 |
| 4 | 137,359 | 1,745 |
| 5 | 157,489 | 1,259 |
| 6 | 60,067 | 1,545 |
| 7 | 171,064 | 1,680 |
| 8 | 211,457 | 1,961 |
| 9 | 50,094 | 600 |
| 10 | 201,405 | 1,758 |
| 11 | 198,908 | 2,320 |
| 12 | 62,246 | 1,078 |
| 13 | 76,538 | 1,073 |
| 14 | 150,426 | 2,149 |
| 15 | 108,818 | 1,877 |
| 16 | 124,386 | 1,306 |
| 17 | 102,295 | 1,509 |
| 18 | 117,102 | 19,900 |

***©2014 Wolters Kluwer. All rights reserved.***
***Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm***

| | | |
|---|---|---|
| 19 | 99,955 | 1,312 |
| 20 | 85,880 | 893 |
| 21 | 103,311 | 1,438 |
| 22 | 135,663 | 1,448 |
| 23 | 215,710 | 2,631 |
| 24 | 68,948 | 1,168 |
| 25 | 85,287 | 1,560 |
| 26 | 217,375 | 2,357 |
| 27 | 124,896 | 1,818 |
| 28 | 85,110 | 1,324 |
| 29 | 55,710 | 1,268 |
| 30 | 94,236 | 1,375 |

For the 30 stores sampled, the average sales revenue was calculated as $1,624,000. Based solely on this information, the best estimate of sales revenue for the plaintiff in a "but for" world would be $1,624,000. But a visual inspection of Figure 1 suggests that sales tend to rise as population increases. Obviously, the relationship is not precise because the actual observations are scattered, but there is an unmistakable positive relationship between sales revenue and population. This suggests that we may be able to find a better estimate of the plaintiff's "but for" sales than the simple average of the sample. In other words, we may be able to do better if we control for the influence of differences in population.




Figure 1

Sales revenue depends on the number of widgets sold. People demand widgets and the more people there are, the more widgets a vendor will sell. Thus, the economic theory tells us that sales revenue is a function of population in the vendor's location. Each store's sales revenue is positively related to the surrounding population. We will employ a linear approximation of the relationship between sales and population:

$$S = \beta_0 + \beta_1 X_1 + \varepsilon$$

**©2014 Wolters Kluwer. All rights reserved.**
***Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm***

where *S* represents sales revenue, $X_1$ represents population within a three-mile ring around a vendor's location, and is a random (stochastic) disturbance (or error) term. In this specification, sales revenue has a nonstochastic component, $\beta_0 + \beta_1 X_1$, and a stochastic component, $\varepsilon$. Here, $\beta_0$ and $\beta_1$ are the parameters of the model. The coefficient, $\beta_0$ is the level of sales that would occur if the population within three miles was zero. For this reason, $\beta_0$ is known as the intercept. $\beta_1$ is the slope parameter, which explains the relationship between $X_1$ and *S*, holding all other factors constant. In this case, $\beta_1$ is the change in sales revenue given a one-unit increase in the surrounding population.

The nonstochastic portion is composed of the intercept and the independent variable that we expect will explain *S*. [7] The stochastic portion of the equation is the *unexplained* portion of *S* and is consequently referred to as the *error*. The inclusion of $\varepsilon$; is an explicit recognition that a precise relationship between sales and population is unlikely in real life. In other words, it is unlikely that we can completely explain sales using our independent variable. While our model says that population is the major determinant of sales, we recognize that there are other variables that have relatively minor effects on the dependent variable. The effect of these minor influences is captured by the error term — that is, the random error incorporates these minor factors in the regression model. In this particular example, all other factors are assumed to be unobserved and therefore are contained within the error term. Otherwise, if we could observe these factors, they would be included in the model as additional explanatory variables. It is assumed that the cumulative impact of these minor factors is small relative to the influence of the independent variable that is included. Moreover, it is assumed that these influences can be treated as though they occurred by chance. Problems can arise in regression analysis if important variables are not included. A discussion of omitted variables and omitted variables bias is provided in Subparagraph 394g2.

Incorporating the random error term in the regression equation makes the model probabilistic rather than deterministic. This means that *S* cannot be predicted exactly, but we can make certain probabilistic statements with measurable degrees of confidence. [8] Regression analysis requires certain statistical assumptions about the error term. [9] The validity of these assumptions may be affected by both the characteristics of the regression model and the data.

**394c. Estimating the regression parameters..—**The regression model has been specified as a linear equation,

$$S = \beta_0 + \beta_1 X_1 + \varepsilon\,.$$

We have collected data on sales and population for a sample of 30 stores. Now we want to use the regression technique to estimate the parameters $\beta_0$ and $\beta_1$, which we do not know, such that the resulting equation fits the data better than any other straight line. This requires a standard for what constitutes a best fit. The usual concept is that of *least squares*. This process is usually referred to as “ordinary least squares” regression, or OLS. In Figure 2, the least squares regression line is plotted along with the 30 observations. As one can readily see, few observations lie exactly on the estimated line. But the ordinary least squares line is the line of best fit, meaning that it fits the data better than any other straight line. If we were to measure the vertical distance between the observed value of *S* and the predicted value of *S* shown as the regression line, we would have a deviation. In other words, the deviation is *S*— *S´*, where *S´* is the predicted value for *S* based on the regression line. By construction, some of the observations lie above the line while others lie below the line. The sum of these deviations will be zero — that is, the pluses and minuses net out. To avoid this problem and provide a standard of best fit, we look at the squared deviations rather than the absolute deviations. If we were to compute the squared deviation for each observation and sum them, the resulting total would be smaller than for any other straight line. It is in this sense that the regression line provides a best fit to the data.

***©2014 Wolters Kluwer. All rights reserved.***
***Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm***




For the data in Table 1, the estimates of $\beta_0$ and $\beta_1$, which are denoted as $\beta'_0$ and $\beta'_1$, respectively, are as follows:

$$\hat{\beta}_0 = \$724{,}479 \text{ and } \hat{\beta}_1 = \$7.16.$$

In Figure 2, the regression line that best fits the data has been plotted along with the actual observations. The intercept on the sales revenue axis is $724,479, which is the estimated value of $\beta_0$ (or $\beta'_0$). The slope of the line is the estimated value of $\beta_1$ (or $\beta'_1$). In this case, $\beta_1$ is estimated to be 7.16. This means that each store earns sales revenue of $724,479 plus $7.16 for each person who lives within a three-mile radius of the store. If a particular location had 150,000 people within three miles, one would predict a base sales revenue of $724,479 plus $7.16 times 150,000, which amounts to $1,074,000, for a total of $1,798,479. There are statistical tests that provide information on the reliability of estimates such as these. We turn to these tests next.

**394d. Evaluating the estimates..—**When the regression model is specified as

$$S = \beta_0 + \beta_1 X_1 + \varepsilon$$

the implicit hypothesis is that the population within three miles of the widget vendor is what determines sales revenue. In other words, the hypothesis is that the coefficient $\beta_1$ is not zero. In the previous section, we estimated the coefficient on $X_1$ as a positive value. The estimated slope of the regression line was 7.16, which means that each additional person in the surrounding population will add $7.16 to sales revenue. Although the estimated coefficient is certainly not zero, the estimate could be imprecisely measured or spurious — that is, the true coefficient could be zero even though our calculation provides a positive coefficient. This possibility arises because the sample could have given us a misleading estimate of the true value of $\beta_1$. Rather than just guessing about whether our estimate is reliable, we can test this statistically. Using some basic principles of statistical inference, it is possible to test whether the estimated coefficient is statistically significantly different from zero. In other words, we can test the original hypothesis that $X_1$ is, in fact, a determinant of sales revenue.

***©2014 Wolters Kluwer. All rights reserved.***
***Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm***

***Hypothesis testing..—***Econometricians specify the hypothesis in two parts. When considering whether a coefficient is "statistically significant," economists usually compare the coefficient to zero. First, the so-called null hypothesis is that the influence of the independent variable is actually zero — that is, that $X_1$ has no influence on sales revenue. In other words, values of $X_1$ provide no information on the value of the dependent variable. As a statistical matter, the null hypothesis can be correct even though the ordinary least squares procedure calculates a value for $\beta_1$ that is numerically different from zero. Second, the alternative hypothesis is that the independent variable does explain the value of the dependent variable. In other words, the alternative hypothesis asserts that the coefficient is not equal to zero. Thus, the null hypothesis is

$$H_o: \beta_1 = 0$$

and the alternative hypothesis is

$$H_a: \beta_1 \neq 0$$

Interestingly, we actually test the null hypothesis rather than the alternative hypothesis. If the null hypothesis is rejected, then we infer that a statistically significant relationship exists between the independent and dependent variables. In other words, if we reject $H_o$, we accept $H_a$, the alternative hypothesis.

The null hypothesis is rejected when the sample data yield results that are sufficiently unlikely if the null hypothesis were true, meaning that we are able to precisely identify a nonnegative effect. In our previous example, the sample data provided an estimate of $\beta_1$, which we call $\beta'_1$, equal to $7.16. If the true value of $\beta_1$ were zero, it is still possible to observe a positive estimate. But is it likely? Since we can never *know* the true value of $\beta_1$, we must rely on statistical inference. If it is sufficiently unlikely that we would observe an estimate of $\beta_1$ equal to $7.16 when the true value of $\beta_1$ is zero, then we will infer that $\beta_1$ is not zero. The null hypothesis will be rejected and, by default, the alternative hypothesis will be accepted.

In order to test the hypothesis that $\beta_1 = 0$, we need a test statistic. To construct the test statistic, we have to introduce the concept of *standard error*. Using our data, we drew a sample and estimated values of the regression coefficients. If we draw other samples and repeat the process, the numerical values of the estimates are bound to be somewhat different. The standard error of, say, $\beta'_1$ is a measure of how much the estimates of $\beta'_1$ would vary across different samples. This is a measure of dispersion in the estimated coefficient. Now, under the assumptions of the ordinary least squares model, the difference between the estimate of $\beta_1$ (or $\beta'_1$) and the true value of $\beta_1$ divided by the standard error of $\beta'_1$,

$$\frac{\beta_1 - \hat{\beta}_1}{s(\hat{\beta}_1)},$$

is called the *test statistic*. This statistic has a so-called *t* distribution with $n - k$ degrees of freedom where $n$ is the number of observations (i.e., the sample size) and $k$ is the number of parameters being estimated.[10] In our simple model, $n$ equals 30 and $k$ equals 2. According to the null hypothesis, $\beta_1 = 0$; thus, we will be interested in the ratio of $\beta'_1$ to its standard error, $\beta'_1 / s(\beta'_1)$, which has a *t* distribution with $n - k$ degrees of freedom.

A brief review of the *t* distribution will aid our understanding of statistical inference. The *t* distribution is a symmetric distribution that resembles the normal (bell-shaped) distribution. In fact, as the sample size increases, the *t* distribution increasingly approaches the normal distribution. As a result, no meaningful precision is lost by using the normal distribution for sample sizes in excess of 30. In Figure 3, we have a graphical representation of the *t* distribution for the estimate of $\beta_1$ under the null hypothesis that $\beta_1 = 0$.

***©2014 Wolters Kluwer. All rights reserved.***
***Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm***




Figure 4

If the null hypothesis were true, then the bulk of the sample values of $\beta'_1$ will be close to zero. Now, if the sample generates a value of $\beta'_1$ that is sufficiently far from zero, then we will infer that the true value of $\beta_1$ is not zero after all. In Figure 3, we have cut off one-half of 1 percent of the distribution on each tail. Thus, the sum of the two striped areas is 1 percent; the remaining 99 percent is the unstriped area. For 28 degrees of freedom, the critical (or threshold) values are ± 2.763. [11] If, in fact, the null hypothesis $\beta_1 = 0$ is correct, repeated samples of 30 widget vendors will yield values of $\beta'_1$ and $s(\beta'_1)$ such that 99 percent of the time the ratio will lie between –2.763 and 2.763. That is, observing $\beta'_1/s(\beta'_1)$ greater than 2.763 or less than –2.763 will be very unlikely if $\beta_1$ is really zero.

A somewhat more general treatment is possible. If we let λ represent the level of statistical significance that we will use as a threshold, then we can find boundary values for the acceptance and rejection regions in a table of the *t* distribution. [12] In particular, the critical values are given by the table as $\pm t_{n-2, \lambda/2}$ where $n - 2$ reflects the degrees of freedom and λ/2 reflects the fraction of the *t* distribution that is in each tail of the distribution. The tails of the distribution, based on the significance level, represent the rejection region. With respect to the null hypothesis that $\beta_1$ equals zero, the acceptance region for $H_o$ is generally given by

$$-t_{n-2,\, a/2} \leq \frac{\hat{\beta}_1}{s(\hat{\beta}_1)} \leq t_{n-2,\, a/2}$$

Thus, in our example, the acceptance region is determined by

$$-t_{28,.005} \leq \frac{\hat{\beta}_1}{s(\hat{\beta}_1)} \leq t_{28,.005},$$

which results in the acceptance region noted above:

$$-2.763 \leq \frac{\hat{\beta}_1}{s(\hat{\beta}_1)} \leq 2.763.$$

In short, if the sample data provide an estimate of $\beta_1$ and a standard error of $s(\beta'_1)$ such that the value of $\beta'_1/s(\beta'_1)$ falls into the acceptance range, this means that we fail to reject the hypothesis that $\beta_1 = 0$. If we fail to

***©2014 Wolters Kluwer. All rights reserved.***
***Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm***

reject the null hypothesis, then the probability of calculating a test statistic outside of the acceptance region is small. In other words, we say that $\beta_1$ is *statistically insignificant*.

If the sample generates a value for $\beta'_1$ and $s(\beta'_1)$ such that the test statistic is, say, larger than the critical value, then the test statistic is in the rejection region. In other words, the value of the test statistic is incompatible with the null hypothesis. We therefore reject the null hypothesis at the $\lambda$ level of significance. When evaluating the regression results, the conventional thresholds for the critical probabilities are 5 percent and 1 percent. In our example, we employ a threshold of 1 percent ($\lambda = 0.01$).

In our example, $\beta'_1 = 7.16$ and $s(\beta'_1) = 1.03$. Thus, the *t* statistic is

$$t = \frac{\hat{\beta}_1}{s(\hat{\beta}_1)} = \frac{7.16}{1.03} = 6.95.$$

From the table of the *t* distribution, the critical *t* statistics are 2.048 for 5 percent and 2.763 for 1 percent when there are 28 degrees of freedom. Since the *t* statistic for our example is 6.95, the probability of observing the estimated value of $\beta'_1$ if, in fact, the true value of $\beta_1$ were zero is far less than 1 percent.

Based on the *t* distribution, the probability of drawing a sample of 30 stores that would generate an estimate as different from zero as the estimate observed when the true value is zero is far below 1 percent. The econometrician cannot say with certainty that the true value of $\beta_1$ is not zero, but it can be said that it is extremely unlikely. Thus, one can be quite confident that the population within three miles of the widget vendor is a determinant of sales revenue. We say then that this variable is *statistically significant.*

***Confidence intervals..*—**The regression model generates a point estimate of $\beta_1$, which in our example is 7.16. In addition to evaluating the significance of the point estimate, we can estimate an interval or range of values between which the true value of β is likely to be found. In other words, we can say with some degree of confidence that the true value of β will be between the two endpoints of the estimated interval. To determine how precise our point estimate may be, one may calculate the so-called confidence interval around the estimate. The confidence interval is a range of values such that we are *confident* — but not absolutely sure — that the true value of β lies within that range. First, we start with the degree of confidence we want, say, 95 percent; that is, = 0.05. Then the estimate of $\beta_1$ and its standard error are used to construct

$$\hat{\beta}_1 - (t_{n-2,\alpha/2})\, s(\hat{\beta}_1) \le \beta_1 \le \hat{\beta}_1 + (t_{n-2,\alpha/2})\ \ s(\hat{\beta}_1).$$

the confidence interval. The confidence interval is given by

Of course, $\beta'_1$ is our estimate of $\beta'_1$, $s(\beta'_1)$ is the standard error of that estimate, and $t_{n-2,\lambda/2}$ can be found in the table of the *t* distribution. For our example, the 95 percent confidence interval is

$$\$7.16 - (2.048)(\$1.03) \le \beta_1 \le \$7.16 + (2.048)(\$1.03),$$

or

$$\$5.05 \le \beta_1 \le \$9.27.$$

We cannot say with certainty that the true value of $\beta_1$ lies between \$5.05 and \$9.27, but we can make a probabilistic statement. In particular, one can say that the probability that the confidence interval includes the true value of $\beta_1$ is 95 percent.

***©2014 Wolters Kluwer. All rights reserved.***
***Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm***

Thus, while our point estimate is $7.16, the lower and upper bound on the 95 percent confidence interval are $5.05 and $9.27, respectively. As a result, one can be fairly confident that an additional person within a three-mile radius will raise sales revenue by a positive amount, somewhere between $5.05 and $9.27.

***Goodness of fit..*—**Finally, there is another way to evaluate how well the regression model explains the observed data. This is the coefficient of determination, which is usually denoted by $R^2$. This measure is calculated by breaking down the variation in the dependent variable ( *S*) into its component parts and isolating the proportion of the variation accounted for by the independent variable ( $X_1$). [13] The $R^2$ is a measure of the goodness of fit as it represents the proportion of the variation in sales revenue that the model explains. In this example,

$$R^2 = 0.633,$$

which means that the variation in population across the 30 vendor locations explains just over 63 percent of the variation in sales revenue across those locations. Whether this is good or bad depends on expectations. For a simple model like ours, one might consider this to be a rather good performance. On the other hand, the model leaves nearly 37 percent of the variation unexplained. An $R^2$ value can often be rather low, especially with cross-sectional data. But preoccupation with indiscriminately "improving" the $R^2$, as some literature may unintentionally encourage, can be inconsistent with objective analysis. [14]

***Correlation versus causation..*—**Even though regression analysis relates a dependent variable to one or more independent variables, it is important to keep in mind that this relationship does not imply *causation.* Regression results may suggest that one variable is related to or correlated with another, but this does not translate directly into a causal effect. In other words, we cannot necessarily infer that the independent variable causes some effect on the dependent variable. Causation must be based on some justification rooted in economic theory. Regression alone cannot satisfy the requirements for proving causality. Rather, regression analysis enables us to empirically test a hypothesis based on what economic theory would predict. This is important to keep in mind when interpreting regression results, inferring the effects of alleged anticompetitive conduct, and making statements about damage estimates.

**394e. Statistical properties of least squares estimators..—**Under the assumptions of the least squares regression model, the resulting estimates have some desirable statistical properties. [15] First, the estimates of $\beta_0$ and $\beta_1$ are *unbiased*. In statistical terms, bias has nothing to do with prejudice or favoritism, but bias is still undesirable. If an estimate is unbiased, it means that the expected value of the estimator is equal to the true value of the population parameter. This is comforting because the sample data are only a subset of the population. In our case:

$$E[\hat{\beta}_0] = 0 \text{ and } E[\hat{\beta}_1] = \beta_1.$$

Unbiasedness is a desirable property because it means that the least squares estimators are close, on average, to the true population parameter. If we had a biased estimator, then on average the estimate would not reflect the true population parameter.

Second, the least squares regression estimators have a smaller variance than any other linear, unbiased estimators. In this sense, these estimators are deemed "best." In combination, these two properties define *efficiency.* If the estimator is unbiased and the variance of the estimator is smaller than the variance of any other unbiased estimator, then the estimator is said to be efficient. Third, the least squares regression estimators are *consistent*, which means that as the sample size increases, the bias (if any) approaches zero and the variance approaches zero. In other words, as the sample size increases, our estimates will come closer and closer to the true value of the parameter. Taken together, these properties are reassuring. Given that we are forced to draw

***©2014 Wolters Kluwer. All rights reserved.***
***Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm***

inferences at all, these properties suggest that inferences based on our regression analysis are about as good as one could expect.

**394f. Multiple regression..—**In our illustrative example, one may object that the model is too simplistic because there is only one explanatory variable, population within three miles of the vendor location. One might feel that other variables, such as income, wealth, racial composition, educational attainment, advertising, presence of competitors, and the like could also be important in determining total sales revenue. This possibility cannot be ignored on a priori grounds unless economic theory suggests that these other variables should not be included. Accordingly, we return to the first step in the regression analysis, which involves the use of economic theory to identify the relevant economic and demographic variables to include in the model.

As we concluded earlier, sales are dependent on the local population and therefore we included the population within a three-mile ring around each vendor location. In addition to the sheer size of the population, other characteristics of the population may be relevant. For example, sales may also be influenced by the income and wealth of the surrounding population. Accordingly, one may want to include measures of household income, per capita income, or a wealth measure such as the value of housing in the area. Further, female workforce participation rates may influence sales as well. To the extent that educational attainment is important in the decision to buy a widget, we may want to include variables for median educational attainment in years or the percentage of the population that graduated from college. If racial composition seems important on a priori grounds, one can include a variable indicating the percentage of the total population that is a given race. One could also include a measure of advertising and other promotional expenditures. Finally, the presence and degree of competition can also be included in the regression model.

When we employ a more complete model by adding other independent variables, plotting the resulting relationship on a two-dimensional graph becomes impossible. The concept, however, remains the same: fitting a linear relationship to observations that are not precisely linear due to random errors. The expanded model may look like the following:

$$S = \beta_0 + \beta_1 X_1 + \beta_2 X_2 + \beta_3 X_3 + \beta_4 X_4 + \beta_5 X_5 + \beta_6 X_6 + \varepsilon$$

where $S$ represents annual sales revenue, $X_1$ is total population within a three-mile ring, $X_2$ is per capita income, $X_3$ is the median value of housing, $X_4$ represents the amount that each vendor spent on advertising, $X_5$ denotes the number of competitors faced by each vendor, $X_6$ tells us whether the vendor location is in a shopping mall, and ε is the random error term. In order to estimate the regression parameters — that is, the various β coefficients, one must gather data on each of these variables for every vendor location in the sample. In the case of whether the store is in a mall or not, a particular vendor is either in or not in a mall. We can therefore indicate whether a particular location is a mall location by assigning a value of 1 if a vendor is in a mall and a zero if it is not. Variables that take on a value of one or zero are called binary or dummy variables. The interpretation of the coefficients in multiple regression is slightly different. One infers that *after controlling for the other variables in the regression*, a one-unit change in the variable under consideration is associated with a change in sales equal to the coefficient. For the binary case, the coefficient yields the level of sales attributed to being in a mall rather than not being in a mall, holding all other factors constant.

**394g. Vulnerability of regression analysis..—**Regression analysis may be vulnerable to attack in damage cases on several grounds; this Subparagraph illustrates only two. First, the very essence of statistical inference may be attacked. Given the history of statistical inference in litigation, it will be difficult to challenge the concept, but the methods employed by the expert are apt to be fair game. Second, one may challenge regression results on the basis of model specification errors, including omitted variables as well as other misspecifications. For analysis of a specific example where regression analysis was used improperly, see the paragraph ¶399c for a discussion of the *Conwood* damage estimation.

**394g1. *Nature of statistical inference..*—**Statistical analysis generally and econometrics in particular have been used quite often in litigation. Nonetheless, the seemingly mysterious nature of statistical inference can be

***©2014 Wolters Kluwer. All rights reserved.***
***Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm***

a handicap in front of a jury. The expert cannot make unqualified statements. Every contention is probabilistic in nature and therefore can appear somewhat speculative. For example, suppose the coefficient on per capita income in the multiple regression equation is statistically significant at the $\lambda = 0.05$ level. As we discussed above, this means that the probability of observing an estimate of the observed magnitude if the true relationship were zero is quite small. More specifically, the probability of drawing a sample of 30 vendors that would produce an estimate of $\beta_1$ that is this different from zero when the true value is zero is less than 5 percent. As a consequence, the econometrician will be reasonably confident of this result, but he or she cannot say with certainty that there is no chance that the true impact of changes in per capita income is in fact zero. Under persistent cross-examination, the econometrician must concede that there is a positive probability that the observed results may be imprecise or spurious.

**394g2. *Specification error..*—**Specification error may occur when the econometrician fails to construct a sound *economic* model at the outset. This may arise (1) when a relevant explanatory variable has been omitted or (2) when an irrelevant explanatory variable has been included. Specification error also may occur due to *mathematical* misadventures — that is, (1) when an incorrect mathematical form of the regression equation has been selected or (2) when the disturbance term has entered the regression equation in an incorrect way. These problems are examined below.

***Omitted variables..*—**Suppose that an important explanatory variable has been left out of the model because, for example, the expert was unaware that the omitted variable was an important determinant of the dependent variable. [16] The omission of a relevant explanatory variable may make the estimates of the other variables biased. This, of course, sounds ominous, but bias in a statistical sense means only that the expected value of the estimate is not equal to the true population parameter. But for the purposes of damage estimation, this means that omitted variables could bias the damage estimates either up or down.

Due to the nature of econometric models, it will be difficult for an econometrician to maintain that there is no possibility of having omitted an economically significant explanatory variable. Consequently, he or she must concede that omitted variable bias may be present. But economic theory can be used to explain the choice of the variables that are included in the model. Although one can never fully rule out the possibility of omitted variable bias, the expert can take steps to ensure the most inclusive model possible according to economic theory.

Consider our regression model for estimating sales revenue at a widget vendor's location. Our estimate is based on a sample of 30 stores. These are located in 30 different places around the country. We have not included any variable to account for climatic variations across locations. Additionally, it is undeniable that the skills and abilities of a manager can make a difference in a vendor's success, but we do not have a variable that controls for such differences across the sample. The list of possibly relevant, albeit omitted, explanatory variables goes on and on.

***Including irrelevant variables..*—**Some experts may adopt a “kitchen sink” approach and include every conceivable variable in the regression equation with little (if any) theoretical justification. As it turns out, this specification error does not result in biased estimators. Consequently, this specification error just adds clutter, but it does not do any real harm. Variables included in the model, however, should be based on sound economic theory and have some hypothesized prediction. Use of economic theory when selecting variables to include in the model should help to avoid including irrelevant variables.

An expert could run into trouble if he or she uses the kitchen sink approach and employs variables that capture the same type of relationship. For example, assume the expert thought that household income in the surrounding area was an important determinant of some dependent variable. If the expert uses the median household income in conjunction with per capita income in the area, then each of these coefficients might be capturing the same effect in the model. In other words, there could be a high degree of correlation between these two proposed independent variables. In situations like this, the expert should select the most appropriate measure to estimate the variable that economic theory would predict to be important.

***Nonlinear versus linear models..*—**Most regression models have a linear mathematical specification. [17] It may be true that the correct specification is nonlinear and the linear model is just an approximation of the correct

***©2014 Wolters Kluwer. All rights reserved.***
***Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm***

model. In that case, it is easy to show that the linear model fails to include the relevant higher order variables. For example, it may be true that the age of a business — that is how long a company has been in business, may influence sales revenue. Age of a business and sales revenue are likely positively related. If it is true that age is linearly related to sales revenue, then for each additional year in business the company would realize some unit increase in sales revenue. It is possible, however, that the age of the business only matters linearly up to a point and then matters less and less. Hence, decreasing returns to age are introduced. If the expert thinks that this might be the case, then age of the business squared should be included. If the sign on the squared term is negative and the coefficient is statistically significant, then this would imply that age of the business is positively related to sales revenue, and at some point the increase in sales revenue increases at a decreasing rate. This is an example of a nonlinear relationship. Accordingly, omission of such a term if relevant could mean that the model is misspecified.

Nonlinearity could also enter a regression model when using logarithms. Use of a logarithm of the dependent variable transforms a continuous coefficient to a percentage change rather than a unit change. This is different from a linear slope coefficient because the relationship between an independent variable and the dependent variable is no longer constant. In this way, the line of best fit is no longer strictly linear in nature. In our example relating sales revenue to the surrounding population, we could use the natural logarithm of sales instead of sales itself. If this transformation is made, the coefficient on the surrounding population would be interpreted as a percentage change. If the coefficient on the surrounding population were estimated to be 0.10, then we would multiply the coefficient by 100 and say that a 1 percent increase in the surrounding population is associated with a 10 percent increase in sales revenue. Use of logarithms, therefore, is an example of a nonlinear transformation.

***Incorrect specification of the disturbance term..*—**It is possible that specifying an additive disturbance term ( $\varepsilon$) is incorrect and that it should enter the regression equation in, say, a multiplicative way. This error can also yield biased estimators.

**394g3. *Autocorrelation..*—**The statistical problems associated with autocorrelation may surface when the expert relies on time series data. For example, when using monthly sales data over, say, a five-year period, it would be desirable for the disturbance terms to be independent. Since economic variables tend to be nonrandom, however, the effect of the omitted variables that give rise to the error term in one period may carry over to the next period. When this is the case, the disturbance today will influence the size of the disturbance tomorrow.

It can be shown that the usual regression analysis yields unbiased estimators even when autocorrelation is present. This, of course, means that the expected value of the estimator will be equal to the population parameter even when autocorrelation is present. In other words, on average, the estimate will be correct. But it turns out that the estimated variances (and, therefore, the standard errors) are biased. If monthly sales data are positively correlated, then the bias will be negative. This in turn distorts the tests of statistical significance. One is more likely to infer mistakenly that a coefficient is statistically significant. Fortunately, there are statistical methods for dealing with this problem.

**394g4. *Data collection and measurement problems..*—**A regression model may be undermined considerably merely by human error in recording data. Data collectors may simply write down the wrong values or may not understand what the recorded values signify. Another common mistake is a failure to take collected data and transform them into common measurements. For example, if *annual* advertising expenditures are recorded from one location, then *annual* advertising expenditures must be recorded for all locations. It would distort the analysis if *quarterly* data were inadvertently included for several locations. Moreover, it is helpful if the data span the same time period. If some observations are on a calendar year basis while others are on fiscal year basis, exogenous economic factors (those the model assumes to be constant) could distort the analysis. [18]

**Footnotes**

***©2014 Wolters Kluwer. All rights reserved.***
***Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm***

1 For an excellent survey of statistical analysis in antitrust litigation, see Jonathan B. Baker & Daniel L. Rubinfeld, Empirical Methods in Antitrust Litigation: Review and Critique, 1 Am. L. & Econ. Rev. 386 (1999).

2 For a useful introduction to econometrics and regression analysis, see Jan Kmenta, Elements of Econometrics (2nd ed. 1986), or G.S. Maddala, Introduction to Econometrics (2nd ed. 1992). For a compact treatment of regression analysis, see Franklin M. Fisher, Multiple Regression in Legal Proceedings, 80 Colum. L. Rev. 702 (1980).

3 In particular, it is inappropriate to let the data dictate the specification of the model. If this is done, the results will be *ad hoc* and may have no use in predicting sales or profits in general.

4 Of course, we do not live in a linear world. But in many instances, a linear approximation for a nonlinear relationship is quite satisfactory. When it is not, nonlinear estimation methods can be used. Nonlinear models are mathematically more complex but have the same conceptual foundation, strengths, and weaknesses as the linear example explained here.

5 This approach to damage estimation is an econometric version of the yardstick model; ¶391f. For an expanded development, see Roger D. Blair & Amanda K. Esquibel, Yardstick Damages in Lost Profit Cases: An Econometric Approach, 72 Denv. U. L. Rev. 113 (1994).

6 A *random* sample is one that is drawn in such a way that every member of the population has an equal chance of being selected. When a sample is not random, the subsequent analysis is vulnerable to the criticism that the results are biased or even contrived.

7 In models with multiple explanatory variables, the nonstochastic portion includes all of the variables that economic theory indicates are relevant to the determination of the dependent variable.

8 The term “degrees of confidence” is a measure of just what it sounds like: one's confidence in a model or the reliability of that model.

9 This development follows Kmenta, note 2, and Fisher, note 2. There are three statistical assumptions implicit in regression analysis regarding the error term that are necessary for the model. If any of these assumptions are suspect, then the value of the regression model is undetermined. First, we assume that the expected value of the random error is zero:

$$E[\varepsilon] = 0$$

where *E* is the expectations operator, which denotes the expected value of the bracketed term that follows it. The expected value is a weighted average of the possible values of the variable where the weights are the probabilities. The equation means that if we took repeated samples, the random error term for any particular value of $X_1$ is on average zero — that is, it washes out on average. This is extremely important because if the expected value of the error term were not zero, then changes in $X_1$ would be related *systematically* to changes in $\varepsilon$, and the model would not really explain variations in *S.*

The second assumption about the random error term is that its probability distribution is *normal*. A normal probability distribution has the majority of the values distributed close to the mean value. Normality of the error term means that for every value of $X_1$, the random error is distributed normally around its mean value, which we just assume equals zero. The normal distribution is continuous, symmetric, and completely determined by two parameters, its mean and its variance. The variance of a probability distribution is a measure of its dispersion. The square root of the variance is the standard deviation. The normality assumption is less restrictive than one would initially think. Recall that the error term accounts for a large number of small influences that are not explicitly included in the model. Each of these minor influences produces a small deviation of *S* from the value that it would assume if the relationship between $X_1$ and *S* were completely deterministic. It turns out that an interesting statistical result is that such random *unsystematic* errors tend to be distributed normally. Normality of the error term is an extremely useful property because it makes precise probability statements about the regression results possible.

***©2014 Wolters Kluwer. All rights reserved.***
***Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm***

The third assumption is that the error terms are homoskedastic, which simply means that every random error has the same (albeit unknown) variance. In our example, this means that the variance of the error term is not larger for areas with higher populations than for areas with smaller populations. This assumption is very important because regression analysis is a form of averaging that deals with small random deviations in an efficient way provided that they are independent. If the random errors are not independent, then something should be done explicitly to deal with this. If the assumption of homoskedasticity is invalid, then the random error terms are said to be heteroskedastic. This causes some statistical problems that can be resolved by using other estimation methods. For an explanation and some nice examples, see Kmenta, note 2, at 269-298.

10 This standard statistical result is provided by Kmenta, note 2, at 244.

11 The critical *t* values for various combinations of degrees of freedom and acceptance regions are found in the table of the *t* distribution, which can be found in any statistics or econometrics text.

12 The researcher can select the value of λ based on how sure he or she wants it to be: 90 percent, 95 percent, 99 percent.

13 As a general matter, the confidence interval for the estimate of $\beta'_1$ is

$$\hat{\beta}_1 - t_{n-2,\alpha/2} s(\hat{\beta}_1) \leq \beta_1 \leq \hat{\beta}_1 + t_{n-2,\alpha/2} s(\hat{\beta}_1)$$

where $t_{n-2,\lambda/2}$ is the value of a t statistic with $n-2$ degrees of freedom and that cuts off $\lambda/2$ of the area under the t distribution at each tail. Notice that in this expression the end points are random variables because $\beta'_1$ appears. As a result, we can make the following sort of probabilistic statement: If one takes repeated samples and calculates confidence intervals in the same fashion, then $(1-\beta)$ percent of those confidence intervals will enclose the true parameter value of $\beta_1$. The smaller the confidence interval, the more precise the estimate. Since $R^2$ is a proportion, it must assume values between zero and one.

14 For example, Glen A. Stankee, Econometric Forecasting of Lost Profits: Using High Technology to Compute Commercial Damages, 61 Fla. B.J. 83, 85 (1987), writes “the higher the R-squared factor, the more reliable the predictions will be.” But the $R^2$ can be inflated by simply adding more explanatory variables (even unrelated ones) to the regression model, which encourages a “kitchen sink” approach to modeling. As we pointed out above, what should be included in the model is a matter of economic theory.

15 For the technical developments of these properties, see Kmenta, note 2.

16 Alternatively, he or she may have left it out because no data on that variable were available.

17 Log-linear model specifications are also popular because the coefficients represent elasticities.

18 It is possible to control for these exogenous factors, but one must be sure to do so if data are drawn from different time periods. In addition, this makes the analysis more complicated.

***©2014 Wolters Kluwer. All rights reserved.***
***Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm***

# EXHIBIT 303

# Antitrust Law: An Analysis of Antitrust Principles and Their Application - Areeda and Hovenkamp, ¶516. Inferring Power from Excess Returns or Accounting Data

Click to open document in a browser

**Last Updated: 4/2014**

**516a. Introduction..—**Although substantial market power usually brings higher returns than needed to attract capital to the business, excess returns do not necessarily show market power. Nevertheless, persistent excess returns can sometimes prove durable, individually held market power for a firm that is the only producer of a physically distinguishable product, or that has produced a very high and relatively stable proportion of the output of that product. We are talking of economic returns rather than accounting returns, and emphasize that capital must be valued at its replacement cost, assets must generally be valued at their opportunity cost, and so-called scarcity rents must be included as a cost. Moreover, the firm's returns must be greater than any reasonable estimate of normal returns, and excess returns must have continued longer than required for new capacity to enter the industry in competition with the established firm. The strictness of these requirements greatly limits the usefulness of such methodologies.

**516b. Persistent excess returns..—**Unless persistent, excess returns are consistent with competition and thus may not indicate the existence of any market power. Whatever the structure of the market, excess returns are a necessary ingredient of the dynamic adjustment of an industry's capacity to respond to changes in demand. Excess returns can be earned in a perfectly competitive market. [1] A sudden and substantial increase in demand will drive prices above average costs for most firms, and thus produce excess returns until capacity expands or the high demand subsides. Similarly, a steadily growing demand over time will produce continuous excess returns in a competitive industry until existing and new firms build new capacity in anticipation of the growth rate. These competitive situations are excluded by the requirement that the defendant be a sole or dominant producer, as well as by the requirement that excess returns last longer than necessary for the entry of new capacity to meet growing demand.

Even where excess returns do indicate monopoly power in the sense that one firm either controls supply or market price, antitrust concern is not great when that power is transitory. Consider the first firm to cut production costs substantially or consider the innovating firm that is the first on the market with a new, unpatented product that is well received. Here again, excess returns result from lags in rival responses. In the last instance, the excess returns are monopoly profits because the innovator without rival producers has power over supply and price. Nevertheless, if entry barriers are negligible, the excess returns will last no longer than necessary for other firms to marshal the necessary productive resources to match the innovator. In short, excess returns must be durable before they can indicate durable power.

Thus, to show any market power and to show that any such power is durable, excess returns must have lasted beyond the time that would have been required for other firms to match costs or to get into production in competition with the firm in question. That time will of course vary widely from market to market. In the case of simple manufactured commodities, such as hula hoops or yo-yos, it would probably not exceed a few months. In the case of extractive industries, such as natural gas, excess returns might persist more or less indefinitely if the discovery of new supplies never catches up with growing demands.

**516c. "Monopoly profits" versus "scarcity rents.".—**A firm may have a "monopoly" of a uniquely valuable resource — a rich source of raw material, a uniquely advantageous location, or a superior entrepreneur. That "monopoly" will bring it greater returns than earned by less well-endowed firms. But those excess returns are not necessarily monopoly profits attributable to inadequate competition; they may be what economists call "scarcity rents."

Suppose, for example, that mining Firm *A* owns uniquely high-grade veins of uranium ore, from which a given amount and quality of uranium can be extracted at a cost well below the costs of refining comparable quality

***©2014 Wolters Kluwer. All rights reserved.***
***Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm***

uranium from lower-grade ore. If the demand for uranium could be entirely satisfied by production from *A*'s high-grade mines, *A*'s control over those low-cost sources would give it market power — the power to raise price, up to the ceiling set by the costs of low-grade mines, by restricting output. [2] By contrast, if demand greatly exceeds what can be produced from *A*'s superior mines, price will be determined by the cost of low-grade production, which will be expanded if Firm *A* tries to raise price by restricting its own output. Indeed, when ownership of lower-grade ores is widely scattered, the prices of uranium ores will be completely market determined in a perfectly competitive manner. To be sure, Firm *A* will earn higher returns on its ore than will the owners of lower-grade sources, but not because it has a "monopoly" on all the high-grade ore: the aggregate returns on the high-grade ore would be the same if its ownership were divided among numerous independent firms. Hence, *A*'s higher returns are not monopoly profits but rents attributable to the relative scarcity of high-grade ore — comparable to the scarcity rents earned by well-located pieces of land in Manhattan. The market share controlled by such a firm could in fact be quite small.

Importantly, the firm earning scarcity rents rather than monopoly returns sets price at marginal cost, just as the competitor does. That is to say, this firm has no power to increase its price by reducing total market output. So its prices are above average total cost, thus giving it the high return, but not above marginal cost. The firm operates under the same constraint that generally faces the competitor: it can produce as little or as much as it pleases at the market price, but it has no power to raise the market price by reducing output. [3] This fact is important because the elimination of high profits per se is not the goal of the antitrust laws, and indeed, sometimes we say that marginal cost pricing *is* an important antitrust goal. By this measure, the firm earning scarcity rents is in full compliance.

We have described the extreme cases in which high returns are either entirely monopoly profits or entirely scarcity rents. The former is identified by the fact that the firm is the only producer; the latter, where it accounts for only a fraction of the supply. Characterization is much more difficult and complex where the firm accounts for a large part, but not all, of the output, and the high returns may be part monopoly profits and part scarcity rents. [4] However, at least some power over price — and hence some monopoly profit — is indicated where price exceeds *marginal* cost for the firm in question; and substantial power is clear when the firm could expand its capacity and satisfy the entire market demand at costs well below the current price.

The treatment of scarcity rents may differ for competitive and price-regulated firms, although the antitrust consequences are usually the same. Under competition, the firm with a unique cost advantage could be expected to charge the competitive price, but earn a higher profit rate than its higher-cost competitors. Under price regulation, however, the firm with lower costs may be forced to pass these on to its customers, thus charging less for its product than its rivals charge. For example, an electric utility would not have monopoly power for the generation of electricity simply because its generation costs in its relatively old plants were lower than those of others who had newer, more expensive plants. [5] There is no separate relevant market for "low-cost" electricity, as opposed to electricity in general, unless the lost-cost producer can actually reduce market output by reducing its own output. [6] To be sure, the older plants could have been built at lower costs, and these costs, computed into the rate base, could give the older utility lower rates than those that competitors could profitably charge, particularly if rates were based on historical cost rather than replacement cost. As the First Circuit noted, "[I]n a competitive market a firm that bought older, cheaper generating equipment would simply charge the higher prices that the cost of new, expensive equipment requires its competitors to charge and it would pocket the difference." [7] Of course, when this equipment wore out it would have to be replaced at costs equivalent to those faced by other firms.

**516d. Sole or dominant producer..—**Proof that a firm is the only or predominant producer of a product helps establish that excess returns are monopoly profits rather than scarcity rents and rather than the result of an excess of demand over supply. Such proof may also be necessary to see whether market power is possessed by a single firm or shared by several sellers in an oligopoly. This requires careful market definition. [8] Firm *F* may be the sole producer of a physically distinguishable product and yet face competition from "close"

***©2014 Wolters Kluwer. All rights reserved.***
***Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm***

substitutes. If the producers of those substitutes are earning comparably high returns, they would share power with Firm *F*. But if their returns have usually been substantially lower, Firm *F* would have a substantial degree of individual market power.

**516e. Caveat on proving excess returns..—**Returns are excessive when more than necessary to retain or attract the capital investment required for the business in question. Unfortunately, determining actual rates of return and capital costs faces serious difficulties, both theoretical and practical.

Some progress has been made in resolving the difficulties. Various formulas, most of a sophisticated mathematical nature, have been devised for making the necessary calculations. Even so, respectable estimates are likely to differ substantially. For the present, therefore, confident conclusions can be expected only when all or most of the plausible techniques of measurement show excess returns for a particular firm.

We do not purport to assess the large and growing technical literature in this field, or to provide confident answers. Rather, we discuss the major approach and its problems in comparing the cost of capital to the firm with its actual economic rate of return.

**516f. Using accounting data to prove power..—**To find a firm's excess of returns over its cost of capital, we might first turn to the data collected and analyzed by its accountants who periodically publish the firm's "profit." Historically, some economists were optimistic as to their ability to infer market power (or its absence) from accounting data. [9] Others believe "examination of absolute or relative accounting rates of return to draw conclusions about monopoly profits is a totally misleading enterprise." [10] At the very least, such data must be used with circumspection. It allows reliable conclusions about market power only rarely and, even then, is rarely useful, except to confirm conclusions derived from other methodologies.

**516f1. *Differences between accounting and economic costs.*.—**Accounting profits differ from economic profits in several important ways. *First*, accountants try to determine costs (and profits) for the firm (or perhaps a division of it) over some regularized period, such as a year or a quarter. By contrast, the economist wants to know the profitability of a project over its entire lifetime, including all planning and investment costs, and spillovers. [11] Any given project might show accounting losses in one year and profits in the next, but the final accounting is the only one important to the economist. [12] Unlike the accountant, moreover, the economist measuring monopoly profit is less interested in the total of a firm's profits made from all its various projects over the firm's life. Rather, the antitrust analyst wants to know whether the firm now has market power over some particular product (or group of products).

*Second*, accountants identify costs by looking at historical expenditures, while economists count so-called *opportunity* costs. The opportunity cost of capital, sometimes called the *normal rate of return, or profit*, is the smallest payment that must be made to the owners of a firm's capital to induce them to invest in the firm, rather than in their next-best investment alternative. This rate of return precisely compensates investors for the profit they could achieve elsewhere that they have foregone by investing in the firm. Economists regard capital's opportunity cost as a cost and define economic profit as the return to investors *above and beyond* what is necessary to induce them to invest. By excluding such costs, accounting profits exceed economic profits. Thus, the perfectly competitive firm in equilibrium earns zero economic profits though its normal returns are reflected in positive accounting profits. [13] Hence, substantial accounting profits — say, 20 percent — may be consistent with trivial or zero economic profit and thus do not necessarily indicate any market power. [14]

Accounting costs fail to reflect opportunity costs in other respects as well. For example, accountants depreciate durable resources on the basis of their historical cost. By contrast, the economic value of a resource is determined by its value to the owner in the best alternative use. With any inflation, historical costs understate economic costs — increasingly so as the asset is more durable — such that accounting profit exceeds economic profit. Consider the accounting treatment of a warehouse that the firm either rents for $1,000 monthly or owns. The accountant counts the rental as a cost. But if the warehouse is owned, it may count for much less. If the warehouse is fully depreciated and there is no mortgage interest, the accountant may count the "cost" of owning

***©2014 Wolters Kluwer. All rights reserved.***
***Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm***

the warehouse as zero, not including maintenance and taxes. But this warehouse still "costs" the firm the $1,000 it forgoes by using the warehouse itself rather than renting it to others at the $1,000 market price. Whether owned or rented, the warehouse is a necessary productive input whose value in its best alternative use (in this case, renting it to someone else) must be considered before finding economic profits.

In sum, the rate of return indicated by accounting data is greatly influenced by the firm's growth rate, accounting procedures, the useful life of its assets and the way that assets are depreciated, and which expenses are capitalized or treated as current costs. [15] Moreover, when a firm produces products in addition to the one under scrutiny, there may be serious dispute over the allocation of overhead and joint costs. These factors are largely irrelevant to economic profit. The overall picture suggests extreme caution in such data to infer market power.

**516f2. *Accounting profit higher than in comparable firms..*—**In some instances, excess returns may be indicated by comparison with returns of like firms in the same or similar industries. [16] For example, consider two firms that face precisely the same risks, use precisely the same accounting techniques, have the same array of new and old plants, and are similarly vertically integrated. If one firm's accounting profit persistently and substantially exceeds that of the other, which is itself substantially profitable, there is a significant likelihood that the former has some market power.

Of course, finding two such similarly situated firms may be impossible. Comparability may be disputable, and the results less than clear. [17] One must have not only industries with the same risk level, but also assets that have been evaluated and depreciated the same way, and markets that have faced the same growth rate. [18] Even with such comparability, accounting profit comparisons over relatively short periods of time — say, one to five years — have little probative value. But much greater profit than generally comparable firms over an extended period — say, ten years — can probably not be explained simply by minor differences in valuation or accounting techniques. Even then, there is no reliable way to infer from high accounting returns any particular degree of market power, although they may properly alert the enforcement authorities to watch for improper conduct and for better evidence of market power.

**516f3. *Accounting profit low..*—**A firm with market power can still have low accounting profits when it has dissipated its profits in some other way. Consider three examples. A firm may take its monopoly profit in the form of "the quiet life" of inefficiently high costs. It may spend up to its full monopoly profit in activities designed to achieve or maintain market power. [19] Or it may already have capitalized monopoly profits and paid them out to a previous owner. Suppose, for example, that a patent covers a process that reduces an industry's costs by $1 million annually for some years and allows its holder to price approximately that amount above its costs. A firm would be willing to pay the patentee up to the present discounted value of an incremental annual income stream of $1 million. If the patent price were $10 million and the investment were depreciated at the rate of 10 percent annually, the buyer's accounts would show only normal accounting profits. The monopoly profits are there, but they have gone to the patentee who is no longer in the market. The same is true when one firm acquires another that has market power. The future monopoly profits were likely capitalized into the price of the purchased stock and would have gone to the former owners. The post-merger firm would earn only competitive returns on its actual investment. [20]

One might try to adjust apparent profits upward by such amounts, but the obstacles are overwhelming. The tribunal will seldom be able to identify and quantify inefficiencies, to classify and measure nonproductive rent-seeking activities, [21] or to go behind the purchase price of patents and other assets.

**516f4. *Cost of capital..*—**To see whether a firm earns excess profit, the analyst must find its cost of capital. Although the calculation is subject to continuing dispute, general agreement on the main elements makes the task manageable.

***©2014 Wolters Kluwer. All rights reserved.***
***Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm***

In essence, the true economic cost of capital to a firm in any particular year is a weighted average of the "effective" rates paid to, or earned by, the firm's several debt and equity securities. [22]

The "effective" rate on notes or bonds and on preferred stock with a prescribed dividend is the ratio of the annual interest or dividend payment to the average market price of the security during the year. The "effective" rate on common stock is the ratio of the year's earnings per share to the average market price during the year, plus or minus an allowance for anticipated growth or decline in the price of the stock. [23] These rates are based on current market prices and not on the face value or actual receipts from the firm's original sale of the securities. The firm's current CC is measured by the rate it would now have to pay to acquire that capital, not by the rates promised or expected when bonds or stock were originally purchased. [24]

With respect to the growth factor adjustment, the earnings-price ratio on a firm's common stock is often well below the effective rates currently being paid on its less risky preferred stock or even on its bonds. This can occur only because current buyers of that stock on the open market expect the firm to earn more in the future than it now does. Such incremental earnings will accrue entirely to the benefit of common stockholders. Current buyers are therefore willing to accept a lower return now in anticipation of a higher return in the future. Because the current stock price reflects not only present earnings but also anticipated increased earnings in the future, the true cost of capital for common stock will be understated unless the earnings-price ratio is adjusted to reflect the growth factor assumed in the stock market. One can estimate the growth factor by adding to the earnings-price ratio the average rate of growth (or decline) in the price of stock during some preceding period. [25] Finally, stock prices may reflect a variety of complicating factors such as inflation and changes in interest rates. Such estimates would almost always involve the antitrust tribunal in excessive speculation.

**516f5. Alcoa *and* Cellophane..—**When Alcoa was challenged as an unlawful monopolist of aluminum before World War II, it claimed that its after-tax profit on its capital investment was only 10 percent, which was merely a competitive rate of return. [26] Even so, Judge Hand saw correctly that Alcoa's profit on aluminum ingot, the monopolized product, might exceed that on Alcoa's business as a whole. Moreover, even low profits might be attributable to inefficiency and thus do not negate power [27] ; nor, in any event, do low profits redeem an otherwise illegal monopolist. [28]

When the Supreme Court held that du Pont's cellophane occupied only a modest share of a broad market for flexible wrapping materials, it ignored evidence of du Pont's high rate of return because the data were incomplete and because other firms in the broad market might have earned as much. [29] The Court's position was unpersuasive. *First*, data both in and out of the record showed extraordinarily high profits for du Pont on cellophane sales from the 1920s on, and as late as 1950 du Pont earned profits of 20 percent after taxes. Profits of such magnitude and such durability strongly suggest market power. [30] It seems quite implausible that the cost of capital over this long period would have exceeded, say, 10 to 12 percent. During the same period, du Pont invested in rayon production at returns averaging 7 to 8 percent. [31] *Second*, as for the profits of others in the broad market, most products were made by a large number of unconcentrated producers. Such structures suggest competitive level profits for them. But even if they earned supracompetitive returns, they did not constrain du Pont. Effective competition was absent, as indicated by uncorrelated price movements and du Pont's relatively modest penetration of total flexible wrapping materials sales: du Pont was not "sharing" market power with them any more than it was sharing market power with producers of other dissimilar products who may have earned abnormally high profits during the same period.

**516g. Price-cost margins and excess returns..—**Market power is control over price — the ability to increase net revenues by restricting output and thus raising price above its competitive level. The degree of market power is measured by the excess of the profit-maximizing price over marginal cost. As ¶503 explained, this technical measure of market power is formulated in the Lerner Index, which is (P-MC)/P, where P is the profit-maximizing price and MC is short-run marginal cost. Some of the practical difficulties in determining market power by such technical measures were explained in ¶504. Here, we offer a few comments on the relationship between the

***©2014 Wolters Kluwer. All rights reserved.***
***Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm***

price-cost and excess-profit measures of market power. Of course, as with excess returns, reasonably careful market definition may be required to determine whether any market power indicated by price-cost margins is individually held or shared among oligopolists.

No matter how accurately measured, of course, a substantial excess of price over marginal cost does not necessarily bring excess returns on investment. A firm generates excess profit only if price exceeds its average total cost, including its cost of capital. Thus, a firm that does best at an output where price is $3 and marginal cost is $1 will earn excessive, normal, or below-normal returns, depending on whether its average total cost at that output is, say, $2, $3, or $4. The gap between average variable cost and average total cost is, of course, greater for more capital-intensive firms. Accordingly, any given excess of price over marginal cost implies a lower return on investment for the high-capital firm.

Prices above marginal cost are of little concern to antitrust law when the firm earns below-normal returns over the long run, for it will leave the market when its facilities wear out. There is also little concern with firms earning only a normal rate of return. [32] But it would be rare to find an excess of price over marginal cost with only normal returns over a long period of time. [33]

More generally, a persistent excess of price over marginal cost is associated with demand and cost conditions that would enable a profit-maximizing firm to earn excess returns. [34] Consequently, persistent and substantial differences between price and marginal cost strongly suggest either that excess returns have in fact been earned or that they could have been even though the books show otherwise. Accounting profits might understate the firm's true profits or reflect noncompetitive policy choices. The firm might have (1) operated inefficiently because lacking the cost-cutting stimulus of rivalry; (2) maintained capacity or supplies in excess of demand in order to forestall new entry; or (3) deliberately overinvested in research and development, advertising, or sources of supply. It is reasonable to believe that a firm with substantial power over price either has or could have earned excess returns and that its power deserves antitrust attention.

The many problems in classifying costs as "variable" and thus as bearing upon marginal cost are examined elsewhere. [35] However, asking judges or juries to classify costs on a case-by-case basis increases litigation costs enormously without necessarily bringing greater accuracy. Hence, if market power were to be measured by price-cost margins, we suggest a somewhat arbitrary allocation of costs. We err on the side of a more inclusive "variable" category, which has the effect of reducing the inference of market power (as compared with a less-inclusive variable category). We do so in order to offset the tendency of the short-run price-cost comparisons to overstate the market power of capital-intensive firms whose prices are close to their long-run marginal cost and, therefore, whose profits approach the normal level. Therefore, for purposes of inferring power from price-cost margins, we would exclude from variable cost only capital costs (including interest) attributable to investment in land, plant, and equipment; property taxes, other taxes, rents, royalties, and similar items not closely based on output; and depreciation (other than use-based depreciation) on plant and equipment depreciated for accounting purposes over a period of three years or more. Depending on the firm's accounting treatment, variable costs would include either full current research and development and promotional expenditures or the annual depreciation on such "investments."

**516h. Implications; single-firm power and relevance of *Cellophane* fallacy..—**The implications of this Paragraph are somewhat different in situations such as merger cases, where the emphasis is on market delineation and no one is assumed to have monopoly power, and §2 cases where monopoly is feared.

In the typical merger case the market contains multiple firms that usually employ similar technology and have roughly equivalent costs. In that case it is relatively unlikely that monopoly power is being exercised, although effective oligopoly may result in unacceptably high price-cost margins. If we can assume that the current price is reasonably close to acceptably competitive levels, then measuring demand and supply substitution at current market prices gives us a fair reading of the market. [36] In such cases measurement of price-cost margins from

***©2014 Wolters Kluwer. All rights reserved.***
***Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm***

accounting data is more likely to be inferior to the traditional methods of market definition developed later in this chapter. [37]

By contrast, in a monopolization case the defendant is suspected of having single-firm monopoly power. In such a case current prices already reflect the defendant's power and any method that is based on observed elasticities at current market prices is likely to err in the defendant's favor by stating the market too broadly. This is the so-called *Cellophane* fallacy, discussed at greater length in ¶539. In such cases the conventional measurement tools for delineating markets may fail us, and direct examination of price-cost margins may be necessary to draw reasonable inferences that substantial power does or does not exist. [38]

**Footnotes**

1 Such excess returns in a competitively structured market are not considered "monopoly" profits because they are not attributable to any firm's voluntary restriction or control of marketwide output.

2 If the high-grade sources were controlled by many competing firms, production would be higher and price lower than when Firm *A* controls it all.

3 More technically, the strategically advantaged firm in a competitive market faces a horizontal demand curve, and thus its residual demand curve and marginal revenue curve coincide. The firm differs from its rivals in that its marginal cost curve is lower. However, it continues to maximize profits by equating marginal revenue (measured along the horizontal curve) with marginal cost, thus yielding a price equal to marginal cost.

4 Accurate sorting-out requires knowing the cost functions of actual and potential suppliers, together with the industry demand curve.

5 See *Town of Concord v. Boston Edison Co.,* 915 F.2d 17 (1st Cir. 1990).

6 Id. at 30.

7 Ibid. The correctness of the court's position is readily apparent when applied outside the regulated context. For example, there is no market for "automobiles produced in older production plants," simply because the historical costs of those plants are lower than the costs of newer plants. Of course, when the plants wear out, they must be replaced at current costs. For this reason, in any inflationary period it is best to use replacement cost rather than original cost in assessing the ability of firms to charge prices above their cost.

8 See Ch. 5C.

9 See, e.g., Joe S. Bain, The Profit Rate as a Measure of Monopoly Power, 55 Q.J. Econ. 271 (1941).

10 Franklin M. Fisher & John J. McGowan, On the Misuse of Accounting Rates of Return to Infer Monopoly Profits, 73 Am. Econ. Rev. 82 (March 1983). See also William Long & David Ravenscraft, The Misuse of Accounting Rates of Return: Comment, 74 Am. Econ. Rev. 492 (June 1984).

11 A "spillover" in this context is an impact (negative or positive) on revenue or cost in another market in which the same firm also operates or makes sales. Since only that firm's profitability is in question, "spillover" does not include positive or negative effects that accrue to other firms.

12 See George A. Hay, Assessing Market Dominance Using Accounting Rates of Profit, in The Economics of Market Dominance (Donald Kay & John Vickers eds., 1987) at 129, 130.

13 By the same token, accounting profits can be less than normal returns such that the firm cannot pay its investors what they could earn elsewhere.

14 One can test for supranormal returns either (1) by including normal returns in costs such that any profit would, by definition, exceed normal returns or (2) by ignoring normal returns as a cost in order to see whether nominal returns exceed the cost of capital. In either event, we must somehow estimate the cost of capital.

***©2014 Wolters Kluwer. All rights reserved.***
***Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm***

15 See Fisher & McGowan, note 10; Yale Brozen, Bain's Concentration and Rates of Return Revisited, 14 J.L. & Econ. 351 (1971); George Benston, Accounting Numbers and Economic Values, 27 Antitrust Bull. 161 (1982).

16 See, e.g., George W. Stocking & Willard F. Mueller, The *Cellophane* Case and the New Competition, 45 Am. Econ. Rev. 29, 57-63 (1955) (comparing du Pont's returns on cellophane and rayon).

17 See, e.g., Donald H. Wallace, Market Control in the Aluminum Industry 231-233 (1937) (comparing Alcoa's returns on ingot with the returns of other metals industries).

18 The Federal Trade Commission therefore erred in *Borden (Realemon*), 92 F.T.C. 669, 791-792 (1978), enforced, 674 F.2d 498 (6th Cir. 1982), vacated for entry of consent decree, 461 U.S. 940 (1983), which inferred market power simply from the excess of Borden's accounting rate of return over that of a representative sample of firms operating in the same industry. This proposition was repudiated in *General Foods Corp*., 103 F.T.C. 204, 363 (1984). See also *Bailey v. Allgas*, 284 F.3d 1237 (11th Cir. 2002) (oligopoly performance in LP gas market could not be inferred from the fact that the defendant's rate of return was higher than for similar firms in other parts of the country; citing this paragraph in an earlier edition; further, a portion of the evidence of high rate of return came from the same period in which the defendant was allegedly engaged in predatory pricing).

19 For example, the owner of a statutory monopoly worth $1,000 per year will spend up to that amount in lobbying or other forms of petitions to the government to maintain its legal monopoly status. See ¶502, explaining such "rent-seeking" activities and the difficulty of deciding when cost-increasing activities such as product differentiation and other forms of non-price competition serve consumer interests. The firm investing in "anticompetitive" attempts to create or sustain a monopoly invests until the marginal outlay equals the anticipated marginal gain. In that case, accounting returns would appear to be at the competitive level.

20 See, e.g., David J. Ravenscraft & Frederic M. Scherer, Mergers, Sell-Offs, and Economic Efficiency 12-14, 78-80 (1987).

21 Activities of the rent-seeking sort do not themselves imply market power. For example, farmers seek government subsidies that do not give them market power. Others lobby for government correction of "market failures." And much such activity is defensive, countering the rent-seeking efforts of others — for example, a limousine firm's counter-lobbying to taxicab lobbying for an airport monopoly.

22 For a fuller explanation of calculating the cost of capital, see Stephen A. Ross, Randolph W. Westerfield & Jeffrey Jaffe, Corporate Finance 161-188 (5th ed. 1999); Richard A. Brealey & Stewart C. Myers, Principles of Corporate Finance (6th ed. 2000); Stewart C. Myers, The Application of Finance Theory to Public Utility Rate Cases, 3 Bell J. Econ. & Mgmt. Sci. 58 (1972); Franco Modigliani & Merton Miller, The Cost of Capital, Corporation Finance and the Theory of Investment, 48 Am. Econ. Rev. 261 (1958).

23 If we could compute the market value of a firm's common and preferred stock, plus its outstanding indebtedness, and divide this sum by the replacement value of the firm's productive assets, we would have a ratio not unlike the Lerner Index. A perfectly competitive firm should have a ratio of one — a value equal to the replacement cost of the assets, which are, after all, earning zero economic profits. Any ratio higher than one indicates a certain amount of capitalized value of anticipated monopoly profits. See Eric B. Lindenberg & Stephen A. Ross, Tobin's *q* Ratio and Industrial Organization, 54 J. Bus. 1 (1981); Frederic M. Scherer & David Ross, Industrial Market Structure and Economic Performance 416-417 (3d ed. 1990). The practical difficulties are apparent. The market value of shares not listed on a stock exchange may be obscure, and even listed shares are thought by some to overstate or understate a firm's true value by a wide margin. Moreover, the replacement cost of productive assets — including goodwill and human capital — will be much disputed. Finally, both monopoly power and the capacity to earn economic rents yield higher asset values, with no obvious way of distinguishing the two.

24 To the extent that changes in circumstances have caused a divergence between present and past costs of capital, the contractual arrangements simply divert a part of the "normal return" from the holders of fixed-

***©2014 Wolters Kluwer. All rights reserved.***
***Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm***

income securities to the common stockholders when the contractual rate is below the current rate indicated by interest/price or dividend/price ratios or, vice versa, when the contractual rates exceed the current rates.

25 For example, if earnings have been $4 per share of common stock that currently sells for $50, and the average annual rate of growth in the price per share has been 4 percent over the past three years, the cost of capital for the common stock component would be 12 percent, which is 4/50 + .04 = .12. But this is only an approximation. Past growth may not accurately reflect anticipated future growth: the current market price may in fact reflect anticipated growth of more (or less) than 4 percent, in which case the true cost is more (or less) than 12 percent.

26 *United States v. Aluminum Company of America (Alcoa)*, 148 F.2d 416, 426 (2d Cir. 1945).

27 See Donald H. Wallace, Market Control in the Aluminum Industry at 225-238, 233, 543-546 (1937): Alcoa's returns on its total assets exceeded 10 percent, and "returns upon operating investment used for ingot were considerably higher than the rates of return on total assets." Because these rates were hardly below normal, investment and output seemed "appreciably below the ideal amounts and price correspondingly above the ideal price."

28 Extreme price rigidity also suggested noncompetitive performance. The ingot price remained the same from December 21, 1927, through 1931, except for a one-cent drop in June 1930, when the tariff fell one cent. Ibid.

29 *United States v. du Pont (Cellophane)*, 351 U.S. 377, 420 (1956) (Warren, C.J., dissenting).

30 Only during 1942-1944, in the context of wartime controls, did du Pont's profits after taxes fall below 10 percent, and then only to a minimum of 8.4 percent.

31 George W. Stocking & Willard F. Mueller, The *Cellophane* Case and the New Competition, 45 Am. Econ. Rev. 29, 60-63 (1955). There is no reason to believe that cellophane investment was riskier than rayon investment.

32 If prices above marginal cost are somehow a prerequisite to a commodity's production, transferring the productive resources to other uses would increase consumer welfare if the incremental "consumer surplus" in the alternative use — the excess of aggregate value to consumers over the aggregate paid — exceeds that for the existing production. Nevertheless, no antitrust tribunal would concern itself with this situation.

33 Such an excess with only normal returns could occur when demand is so low and so unresponsive to lower prices that the firm produces much less than the capacity of a plant of minimum efficient size. Examples might be a very small local public utility or a local drugstore that can more than satisfy the demand.

34 In *Alcoa*, note 26, the record indicated that Alcoa's prices had exceeded average variable costs by substantial margins — as high as 2 to 1 — for many years.

35 See ¶¶740, 742.

36 As noted later, however, if oligopoly profits are substantial, such a methodology may define markets too broadly. See ¶¶536, 539.

37 See, in particular, ¶521 (direct measurement of residual demand at current prices); Ch. 5 (traditional market definition).

38 For thoughtful commentary on this problem, see Lawrence J. White, Market Definition in Monopolization Cases: A Paradigm Is Missing (March 31, 3005), in Issues in Competition Law and Policy (Wayne D. Collins ed., 2007, forthcoming), currently available at *http://www.stern.nyu.edu/eco/wkpapers/LW.pdf* ; and Philip B. Nelson & Lawrence J. White, Market Definition and the Identification of Market Power in Monopolization Cases: A Critique and a Proposal (Nov. 17, 2003), available at *http://www.stern.nyu.edu/eco/wkpapers/marketdefinition.pdf*.

***©2014 Wolters Kluwer. All rights reserved.***
***Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm***

EXHIBIT 304

# Antitrust Law: An Analysis of Antitrust Principles and Their Application - Areeda and Hovenkamp, ¶651. Monopolizing Conduct Defined

Click to open document in a browser

**Last Updated: 4/2014**

This Paragraph first gives a very general definition of unlawful exclusionary conduct under §2 of the Sherman Act, considers some alternatives, and then explains what is and is not involved in assessing conduct under the given definition.

**651a. General definition of anticompetitive exclusion..—**We define monopolistic conduct as acts that:

(1) are reasonably capable of creating, enlarging or prolonging monopoly power by impairing the opportunities of rivals; and

(2) that either (2a) do not benefit consumers at all, or (2b) are unnecessary for the particular consumer benefits claimed for them, or (2c) produce harms disproportionate to any resulting benefits.

In addition, the practice must be reasonably susceptible to judicial control, which means that the court must be able to identify the conduct as anticompetitive and either fashion an appropriate deterrent or an equitable remedy likely to improve competition. [1]

Clause (1) of the test ensures that the conduct is both exclusionary and "substantial" in the sense that it is reasonably capable of creating or prolonging monopoly. Clause (2a) deals with the easiest case for identifying anticompetitive exclusion—namely, where no consumer benefit whatsoever can be shown. Clause (2b) deals with situations where a less restrictive alternative might produce equivalent benefits, and clause number (2c) deals with the small number of situations thought to require some kind of balancing of harms and gains. For example, in a reasonably close predatory pricing case, one may have to determine whether monopoly pricing during a post-predation "recoupment" period is sufficient to offset any short-run benefits that accrue to consumers during a period of very low prices. [2]

**651b. Alternative definitions.—**The given definition of monopolistic conduct is very general, in the sense that it does not provide precise tests for specific practices, such as improper patent infringement suits [3] or predatory pricing. [4] We leave those essential details for later. Numerous definitions of exclusionary conduct have been proposed that are more focused or more technical than our stated definition. Many of these are more useful for analyzing specific exclusionary practices than our own general definition. However, these definitions are also "incomplete," in the sense that they do not account for every type of exclusionary conduct that the law of monopolization should condemn.

Further, alternative tests for monopolization are not merely technically different. Some of them reflect judgments quite different from ours about when conduct by a monopolist should be regarded as unlawfully exclusionary or different judgments about the ability of antitrust tribunals to detect and remedy exclusionary conduct.

We begin, however, by examining the broadest criteria for identifying anticompetitive conduct—namely, "total welfare" and "consumer welfare" tests.

**651b1. *"Welfare" tests for monopolization— "total welfare" and "consumer welfare."*.—**In economics a welfare test purports to measure how well off people are, perhaps as a result of a particular practice. Such welfare tests typically use "willingness to pay" as a welfare criterion. The "purest" welfare definition in neoclassical economics is the Pareto test, which declares that a state of affairs is efficient if no further movement exists that could benefit at least one person without also injuring someone else. Because virtually all legal policies produce both gainers and losers, pure Paretianism is much too strict a standard for evaluating legal policy. Rather, economists sometimes use a variation called "potential Pareto efficiency," or Kaldor-Hicks

***©2014 Wolters Kluwer. All rights reserved.***
***Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm***

efficiency, [5] which states that an economic change is efficient if those who gain from the change gain enough so that they can fully compensate any losers.

Under this test, which is the basis of modern cost-benefit analysis, a practice is efficient, or welfare-increasing, if the sum of all gains, measured in some constant unit of value, exceeds the sum of all losses. For example, a market movement from competition to monopoly harms welfare in this sense: although the monopolist gains, its gains are less than consumers lose. [6] It can be shown mathematically that perfect competition in a perfectly functioning market maximizes welfare in the Pareto sense. [7] Such a market is also Kaldor-Hicks-efficient.

Since competitive markets are the goal of antitrust, one is tempted to say that the proper definition of an unlawful exclusionary practice is one that reduces welfare, which should be the same as making the market less competitive. Robert Bork argued in 1978 that the proper test for antitrust practices is something that he called "consumer welfare" but by which he really meant "total welfare," or the sum of the welfare of all affected persons, including both consumers and producers. [8]

There are good reasons, grounded in both policy and administration, why total welfare in this sense is not a useful antitrust test. First, while any move from monopoly to competition may be thought to increase welfare, this begs the question when we are looking for a legal test. Surely an antitrust tribunal cannot measure and trade off all of the gains and losses that result from any specific practice except in the easiest and most unambiguous cases. Antitrust policy requires workable tests for making judgments about competitive effects. Further, these tests must be reasonably administrable by the courts.

That is not to say that the concept of welfare is useless to antitrust analysis. A practice that benefits consumers while doing no harm to producers or that harms consumers greatly while producing only small benefits to producers can readily be identified as competitive or anticompetitive with little analysis. But in most reasonably close cases, ambiguities and tradeoffs make serious netting of gains and losses impossible.

Another objection to total welfare tests is that they are indifferent as between consumer and producer gains. A practice that results in significantly higher prices to consumers would be lawful under a total welfare test if the gains that accrued to the monopolist (or cartel) were slightly greater than the losses suffered by consumers and no one else was affected. [9] But the broadest constituency in our economy is consumers, and the strong direction of antitrust policy has been to weigh consumer welfare higher than producer welfare, although perhaps this point should not be pushed too far. [10] While this political objection seems weighty when applied to joint ventures or mergers, observable transactions that we tolerate because they benefit certain constituencies, it does seem less weighty when applied to the unilateral conduct of a monopolist.

An alternative to total welfare tests is the so-called "consumer welfare" principle, which declares that antitrust practices should be evaluated by considering the impact on consumers, and largely ignoring effects on producers or others. [11] Under this test a practice that imposes consumer losses would be unlawful, even if it provided greater gains to the monopolist than the losses consumers encountered.

Such a test for monopolistic practices seems both overdeterrent and underdeterrent. First, it would condemn practices that are not capable of excluding anyone. Suppose that Microsoft, which has a monopoly in its Windows operating system, should develop a new version that was particularly buggy and prone to crashes. Clearly, consumers as a group would be harmed because they have few good alternatives to Windows. But developing a bad version of Windows is not a monopolistic practice because no one is excluded. Microsoft's mistake might permit other firms to come in and steal sales, or it might simply impose harm on consumers until Microsoft fixed the problems and restored the status quo, but the one thing that the practice would clearly not do is exclude rivals from the market. As a result, the practice is not "monopolistic," even though it causes consumer harm.

One might say that this is merely a technical objection. The real intent of a consumer welfare test is to identify practices that *both* exclude rivals from the market and harm consumers. But in that case the test is

***©2014 Wolters Kluwer. All rights reserved.***
***Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm***

underdeterrent because antitrust must be able to identify and condemn harmful practices long before actual consumer harm has occurred. Consider the monopolist who files a wrongful patent infringement suit in order to maintain its monopoly. [12] Such a lawsuit must be addressed by antitrust tribunals long before any consumer harm has resulted. Indeed, under existing rules such claims are treated as compulsory counterclaims, which means that they must be evaluated at the same time as the monopolist's infringement action itself is evaluated. [13]

Here again, one might say that the consumer welfare standard works because even though no actual consumer harm results, such harm is in prospect: it will occur if the monopolist succeeds in its infringement action. But in that case we are not measuring anything at all. Rather, we are observing that no principle of patent policy protects fraudulently obtained patents, so there is nothing to place on the monopolist's side of the ledger. Consumer harm may or may not occur, depending on the fortunes of the small firm who is saved from market exclusion by antitrust intervention. As a result, we are dealing with a case in which an action excludes a rival without any consumer benefit. [14] Measurement of consumer harm is not necessary to condemnation.

To be sure, there is an important sense in which consumer harm is essential to our analysis of antitrust practices. Antitrust should not be in the business of condemning conduct that does not harm consumers. But the measurement of consumer harm cannot serve as the basis for considering whether conduct violates §2 of the Sherman Act.

The remaining proposed tests discussed here are all designed to simplify §2 analysis by avoiding some of the measurement difficulties that "welfare" tests incur.

**651b2. *"Sacrifice."*.—**In *Aspen* the Supreme Court condemned conduct when the defendant

> was not motivated by efficiency concerns and…was willing to sacrifice short-run benefits and consumer goodwill in exchange for a perceived long-run impact on its smaller rival. [15]

So-called "sacrifice" tests for exclusionary conduct look at the defendant's willingness to sacrifice short-term revenues or profits in exchange for larger revenues anticipated to materialize later when a monopoly has been created or the dominant firm's position is strengthened. The strongest example of such a test is the recoupment test for predatory pricing given in the *Brooke Group* case, although it appeared in lower court opinions and the academic literature much earlier. [16]

The sacrifice test is also useful in unilateral refusal to deal cases to the extent that, if we wish to condemn refusals to deal at all, we must have a mechanism for identifying the very small subset of refusals that are anticompetitive. [17] In *Trinko* the government relied on a sacrifice theory in arguing that the alleged refusal to deal did not satisfy any Sherman Act standard of illegality. [18]

The sacrifice test does not require balancing of gains and harms. One looks at things exclusively from the defendant's perspective and asks whether the defendant has sacrificed short-term profits in exchange for the benefits of monopoly down the road. One does not need to net out gains to the monopolist against loss to consumers, competitors, or the general economy.

A particular problem with sacrifice tests is that most substantial investments involve a short-term "sacrifice" of dollars in anticipation of increased revenue at some future point. The automobile manufacturer who constructs a new plant is certainly in such a position. The manufacturer spends money on the plant during a lengthy period of planning and construction, hoping to realize higher profits several years later after the plant goes into production. To be sure, the profitability of the new plant need not "depend on" harmful effects on a rival, but in a concentrated market it is certainly likely to have such effects. Further, the new plant might not succeed unless rivals were forced to reduce their own output; nevertheless, building a new plant under such circumstances is almost always procompetitive.

***©2014 Wolters Kluwer. All rights reserved.***
***Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm***

Likewise, product innovations are always costly to the defendant, and their success may very well depend on their ability to exclude rivals from the market, but neither of these factors is or should be decisive in subsequent antitrust litigation. All innovation is costly, and many successful innovations succeed only because consumers substitute away from rivals' older versions and toward the innovator's version. The goal of innovation is increased sales, and one increases one's sales either by bringing new customers into the market or else by taking customers from rivals. As a result, willingness to "sacrifice" short-term profits in anticipation of later monopoly profits does not distinguish anticompetitive from procompetitive uses of innovation. The distinction lies in the character of the innovation itself. [19]

The sacrifice test seems to work poorly in areas of §2 law unrelated to predatory pricing or refusal to deal. Some exclusionary practices, such as exclusive dealing or tying, exclude immediately and are likely to be profitable to the dominant firm from the onset of the practice, so neither short-term sacrifice nor subsequent recoupment is necessary to make the practice profitable. [20] The same thing might be said of restrictive IP licensing practices, many of which are best analogized to either exclusive dealing or tying. [21]

Other practices, such as improper infringement suits, are often costly to the defendant in the short run, whether or not they are anticompetitive. Indeed, the improper patent infringement suit is likely to be most costly to the dominant firm when the infringement defendant has the resources to defend it; and may not be particularly costly when the infringement defendants are nascent firms who are easily excluded from the market.

**651b3. *No economic sense.*.—**The "no economic sense" test, which is similar to the sacrifice test in many respects, would refuse to condemn exclusionary single-firm conduct "unless it would make no economic sense for the defendant but for its tendency to eliminate or lessen competition." [22] The "no economic sense" test offers good insights into when aggressive actions by a single firm go too far, but it can lead to erroneous results unless complicating qualifications are added. Like the "sacrifice" test, it does not seek to measure general welfare or consumer welfare, nor does it seek to "balance" gains to the monopolist against losses to consumers, rivals, or others. Theoretically, an act might benefit the defendant very slightly while doing considerable harm to the rest of the economy, and it would be lawful. Or, conceivably, an act could be unlawful because its only benefit accrued from a lessening of competition, but the benefit was greater than any losses that lessened competition imposed.

Not all monopolizing conduct that we might wish to condemn is "irrational" in the sense that the only explanation that makes it seem profitable is destruction or discipline of rivals. Indeed, monopolizing conduct is not necessarily costly to the defendant. For example, supplying false information or failing to disclose important information to a government official or standard-setting organization need not cost any more than supplying truthful information, but it can create monopoly under appropriate circumstances. [23] Indeed, the provision of false information may be less costly than provision of truthful information, for false information is easier and cheaper to manufacture. Further, the provision of such information to a government official might be profitable (i.e., "make sense") whether it destroys a rival or merely if it results in increased output to the defendant. For example, the firm that acquires a patent by making false statements to the patent examiner and then brings infringement actions against rivals might be dominant and bent on protecting that position. [24] But it might also be one of many firms in a product-differentiated market that seeks to do no more than protect its sales from a close substitute. In either case the restraint on innovation and resulting harm to consumers is clear.

Other conduct, such as tying or exclusive dealing, can be profitable to the defendant from the onset but may also be anticompetitive if it excludes rivals and thereby injures consumers. [25] Such conduct makes "economic sense" if it merely enlarges the defendant's output but may be even more profitable if it raises rivals' costs or injures them so that they cannot compete effectively with the defendant.

**651b4. *Conduct capable of excluding equally efficient rival.*.—**Judge Posner's definition of exclusionary conduct requires the plaintiff to show

***©2014 Wolters Kluwer. All rights reserved.***
***Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm***

> that the defendant has monopoly power and…that the challenged practice is likely in the circumstances to exclude from the defendant's market an equally or more efficient competitor. The defendant can rebut by proving that although it is a monopolist and the challenged practice exclusionary, the practice is, on balance, efficient. [26]

This definition has enjoyed some recognition in the case law. For example, in condemning the targeted package discounts at issue in *LePage's*, the Third Circuit observed that "even an equally efficient rival may find it impossible to compensate for lost discounts on products that it does not produce." [27] As we show elsewhere, a specifically tailored discount aggregated over multiple products can exclude an equally efficient rival that makes only one or a subset of the products in question. [28]

The "equally efficient rival" test has also found acceptance in predatory pricing cases, particularly in discussions of how to identify a price as predatory. It is not so obviously related to the "recoupment" requirement in predation cases. [29]

The reasoning behind the "equally efficient rival" test is that a firm should not be penalized for having lower costs than its rivals and pricing accordingly. As a result, a price is predatory only if it is reasonably calculated to exclude a rival who is at least as efficient as the defendant. [30] Judge Posner's own examples in defense of his definition pertain to pricing. He writes that it

> would be absurd to require the firm to hold a price umbrella over less efficient entrants…. [P]ractices that will exclude only less efficient firms, such as the monopolist's dropping his price nearer to (but now below) his cost, are not actionable, because we want to encourage efficiency. [31]

Clearly we do not want low-cost firms to hold their prices above their costs merely to suffer a rival to become established in the market.

The "equally efficient rival" definition of exclusionary conduct can be underdeterrent in situations where the rival that is most likely to emerge is less efficient than the dominant firm. Consider the filing of fraudulent or otherwise improper IP infringement claims. [32] The value of infringement actions as entry deterrence devices is greatest when the parties have an unequal ability to bear litigation costs. This will typically be before or soon after the new entrant has begun production. The filing of a fraudulent patent infringement suit, unlike setting one's price at or a little above marginal cost, is a socially useless practice. But the strategy might not be effective against an equally efficient rival, who could presumably defend and win the infringement claim. In this case Judge Posner's definition of "exclusionary conduct" seems unreasonably lenient. It exonerates the defendant in precisely those circumstances when the conduct is most likely to be unreasonably exclusionary.

**651b5. *Raising rivals' costs (RRC)*..—**Several anticompetitive actions by dominant firms are best explained as efforts to limit rivals' market access by increasing their costs. Such strategies may succeed where more aggressive ones involving the complete destruction of rivals might not. Once rivals' costs have been increased, the dominant firm can raise its own price or increase its market share at the rivals' expense. [33]

RRC theories show that certain practices that have traditionally been subjected to antitrust scrutiny can be anticompetitive even though they do not literally involve the destruction of rivals. Situations in which rivals stay in the market but their costs increase may be more likely to occur and exist in a wider variety than those in which rivals are destroyed. Further, cost-raising strategies might be less detectable and less likely to invite prosecution. Indeed, a strategy of raising rivals' costs need not injure a rival severely at all if the dominant firm increases its own prices to permit smaller firms a price hike that compensates them for their cost increase. As a result, RRC augments older antitrust theories of "foreclosure," but without some of the conceptual problems that accompanied foreclosure theories. Many cases brought under both §§1 and 2 of the Sherman Act have acknowledged the theory. [34]

***©2014 Wolters Kluwer. All rights reserved.***
***Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm***

Of course, the law has never required complete market exclusion as a prerequisite to suit. Indeed, some successful §2 plaintiffs have both grown their market shares and earned high profits even through the period that the exclusionary practices were occurring. [35]

RRC is a sometimes useful but also incomplete definition of exclusionary practices. Further, many practices that raise rivals' cost, such as innovation that either deprives rivals or revenue or forces them to innovate in return, are also welfare-enhancing. As a result, raising rivals' costs can never operate as a *complete* test for exclusionary conduct. [36] One must always add "unreasonably," but that invariably requires some kind of balancing or trade-off.

**651b6. *Summary..*—**The development of a verbally simple monopolization test is more than an exercise in logic. It requires numerous experience-based judgments about the incentives that dominant firms face, the danger of false positives or occasionally negatives, and the measurement limitations of antitrust tribunals. Each of the previously discussed definitions of anticompetitive unilateral conduct has much to be said for it, and each is helpful in the analysis of some types of exclusionary behavior. However, none accounts for every type of behavior that we would wish to be addressed by §2. Others might think differently.

For that reason we prefer the test stated in ¶a1, which is less focused but broader. In Chapter 7 we develop specific tests for each of the various types of conduct that have been challenged under §2.

**651c. Formulations requiring "purpose" or "intent" generally unnecessary and sometimes harmful..—**

**1. *Generally..*—**In describing the conduct element of the monopolizing offense, numerous cases have employed terms such as "purpose," "intent," "willfulness," or "not inevitable." For example, in the early *Standard Oil* decision, [37] Chief Justice White noted the defendant's anticompetitive behavior but felt compelled to speak of intent:

> [Defendant's many acquisitions and mergers give rise] in the absence of countervailing circumstances, …to the *prima facie* presumption of intent and purpose to maintain the dominancy over the oil industry, not as a result of normal methods of industrial development, but by new means of combination…with the purpose of excluding others from the trade and thus centralizing in the combination a perpetual control of the movements of petroleum and its products in the channels of interstate commerce….
>
> [This] *prima facie* presumption of intent to restrain trade…to bring about monopolization…is made conclusive by considering [other elements of defendant's behavior in addition to the mergers and acquisitions]…. [38]

And in the first *Tobacco* case, Chief Justice White found it necessary to speak of both "wrongful purpose and illegal combination." [39]

One might have supposed that any requirement of wrongful purpose was later obviated by Judge Learned Hand's declaration in *Alcoa* that

> [w]e disregard any question of "intent."…[Because we are satisfied that illegality does not depend upon a showing of practices that are unlawful in and of themselves and apart from the existence of monopoly power,] the issue of intent ceases to have any importance; no intent is relevant except that which is relevant to any liability, criminal or civil: i.e., an intent to bring about the forbidden act…. In order to fall within §2, the monopolist must have both the power to monopolize, and the intent to monopolize. To read [this] as demanding any "specific" intent, makes nonsense of it, for no monopolist monopolizes unconscious of what he is doing…. [40]

The Supreme Court endorsed *Alcoa*'s general approach in the second *Tobacco* case. [41] And in *Griffith* the Court found specific intent necessary only in attempt cases:

**©2014 Wolters Kluwer. All rights reserved.**
***Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm***

> It is…not always necessary to find a specific intent to restrain trade or to build a monopoly in order to find that the anti-trust laws have been violated. It is sufficient that a restraint of trade or monopoly results as the consequence of a defendant's conduct or business arrangements…. Specific intent in the sense in which the common law used the term is necessary only where the acts fall short of the results condemned by the Act…. [42]

At the same time, however, the *Griffith* Court also said:

> [T]he existence of power "to exclude competition when it is desired to do so" is itself a violation of §2, provided it is coupled with the purpose or intent to exercise that power. [43]

And later in the *Grinnell* case the Court said that

> [t]he offense of monopoly…has two elements: (1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident. [44]

Finally, in *Professional Real Estate*, the Supreme Court concluded that alleged monopolizing conduct in the filing of an allegedly baseless copyright infringement suit could be evaluated only by considering the antitrust defendant's "subjective motivation" in bringing the suit. [45]

Not only are these formulations inconsistent, they are also not helpful and are sometimes misleading. To be sure, in some cases the defendant's "purpose or intent" may be enlightening. For example, in cases of ambiguity "knowledge of intent may help the court to interpret facts and to predict consequences." [46]

Thus, knowledge of intent may be more helpful in cases involving practices such as refusal to deal, which can have numerous explanations and are very difficult to characterize as competitive or anticompetitive. In its *Aspen* decision, which was such a situation, the Supreme Court elaborated. In the case of attempt to monopolize, the plaintiff must show the defendant's "'specific intent' to accomplish the forbidden objective." By contrast, in the case of monopolization "intent is merely relevant to the question whether the challenged conduct is fairly characterized as 'exclusionary' or 'anticompetitive.'" [47]

In *Brooke*, which involved predatory pricing, the Supreme Court spoke of intent as nothing more than Judge Hand's consciousness of what one is doing. [48] The Court referred repeatedly to the "intended victim" of predatory pricing without elaborating on the nature of any intent showing that might be required. [49] But the Court also made clear that, even if the defendant had intended anticompetitive consequences, the plaintiff's failure to show objective evidence of recoupment defeated its claim. [50]

Antitrust appraisal of conduct depends on an understanding of its likely anticompetitive consequences as well as its possible social benefits. In most cases an inquiry into subjective intent is unnecessary. But sometimes the benefits of the defendant's conduct will not be apparent or persuasive unless the defendant identifies its purpose in so acting, shows the legitimacy of that purpose in terms of antitrust objectives, and that the challenged action is an appropriate and perhaps the least restrictive way of achieving that legitimate purpose. The critical point is that the nature and consequences of a particular practice are the vital consideration, not the purpose or intent. Qualifying anticompetitive conduct must always be established first by objective facts about the relevant market and the defendant, quite apart from any manifestation of intent.

Further, any competitively energetic firm "intends" to prevail over its actual or potential rivals. The firm that drives out or excludes rivals by selling a superior product or producing it at substantially lower costs certainly intends to do so. But to find the requisite "purpose or intent" in such conduct would be to read the behavior requirement out of the monopolization offense altogether and make monopoly unlawful per se. This the courts clearly have not done. More important, it confuses the "intent" to behave competitively with the intent to monopolize. Indeed, in most circumstances the "intent" to do one thing cannot be distinguished from the intent to do another. For

***©2014 Wolters Kluwer. All rights reserved.***
***Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm***

example, the dominant firm that cuts price in order to increase its own sales undoubtedly knows—and thus "intends" [51] —that the result will be increased pressure on rivals, declining sales, or perhaps even their exit from the market. [52] In concentrated markets the "intent" to increase one's own sales substantially is equivalent to the "intent" to take sales from rivals; spending resources to distinguish the two is pointless and silly. Further, even socially beneficial behavior can yield monopoly.

In a perfectly competitive market each firm "intends" to maximize its own profits and is completely unconcerned about responses from rivals. [53] In that case it may be quite meaningful to speak of a firm as "intending" to increase its own profits, but not as "intending" to harm any particular rival. But in the more concentrated markets in which most plausible monopolization claims are made, firms cannot act rationally without considering effects on, and responses of, particular rivals. It becomes quite meaningless to speak, for example, of General Motors as "intending" to increase its own sales of pickup trucks, but not as "intending" to take those sales from Ford, Chrysler, or Toyota. [54] As a result, any formulation that permits GM to "intend" to increase its own sales or profits but that prohibits it from "intending" to injure rivals is nonsense.

In the great majority of antitrust cases talk of "purpose" or "intent" is largely diversionary or redundant. Thus, in *Standard Oil* and the first *Tobacco* cases, Chief Justice White conclusively inferred wrongful purpose from wrongful conduct. The result would have been the same and the analysis clearer had he spoken exclusively of conduct and avoided any incorporation of "intent."

The same may be said of the term "willful." The *Grinnell* Court stated the formula for the §2 offense as being monopoly plus "willful acquisition or maintenance." Although willfulness usually connotes something about intent, the Court contrasted "willful" with "justifiable." It indicated that a monopoly achieved or maintained because the defendant's products were superior is not "willful." This is a misuse of language: a firm that deliberately creates and markets an overpoweringly superior product has "willfully" acquired the resultant monopoly. Further, every firm "willfully" maintains its profits or market share or "wilfully" refuses to yield market share to new rivals. [55]

In sum, in defining the behavioral component of the monopolization offense, one must concentrate on conduct and define the characteristics of conduct that are undesirable. Despite loose language, this is in fact what the courts have attempted to do. They have focused on conduct while talking about intent.

**651c2. *Ambiguous conduct..*—**The ambiguity problem most often arises when conduct did not or may not have had its intended consequences. For example, a firm does not violate §2 by innovating a better product, even if the innovation has the effect of expanding or maintaining monopoly power. Some innovations both harm rivals and fail to benefit consumers. However, the consequences of innovation are difficult to predict, and even a dominant firm cannot be required to expand or innovate at its peril. This suggests two things: first, *ex ante* rather than *ex post* analysis is the most helpful. Second, considerations of subjective intent are sometimes essential, provided that exclusion has been objectively proven.

In the *C.R. Bard* case, defendant Bard was found to have a monopoly position in a patented "gun" for taking tissue samples from patients. [56] While the gun itself was durable hardware, it used disposable, one-use needles, and these were originally supplied by both Bard and others, including the plaintiff. Bard then modified the gun so that it would take only proprietary needles manufactured by Bard. This exclusion of rival needle makers was the basis of the §2 claim, in which a divided panel of the Federal Circuit affirmed liability.

A *non*dominant maker of biopsy guns would have no incentive to make a gun incompatible with others' needles unless the gun/needle combination were a significant improvement over prior technology. The nondominant firm maximizes its profits, *ceteris paribus*, by maximizing compatibility. [57] As a result, a finding of strong dominance of a properly defined relevant market is essential.

Further, both the patent laws and the general policy of the antitrust laws would permit Bard to innovate to make a better gun, even if the result were a re-designed needle that was incompatible with the needles of rivals. Further, innovation is risky and undertaken under great uncertainty. Many planned innovations do not meet

***©2014 Wolters Kluwer. All rights reserved.***
***Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm***

with market success. As a result, one cannot look *ex post*, proclaim that the innovated gun is no better than the earlier gun, and conclude that the innovation is anticompetitive. The real question is what the innovator had in mind. If Bard's intent was to develop a superior gun, but this required a unique needle, then Bard should not be penalized because its new gun/needle combination ended up working no better (or only a little better) than the old combination did.

Thus, *Aspen* emphasized that the defendant did not refuse to participate in the skiing joint venture because it could offer a better product on its own or because customers had rejected the joint venture's offerings. [58] To the contrary, customers preferred the joint venture. Ski Co. did what it did *only* in order to injure a rival. Thus, the Court approved a jury instruction to the effect that exclusionary conduct by a dominant firm is unlawful when it "unnecessarily excludes or handicaps competitors." [59] This includes "conduct which does not benefit consumers by making a better product or service available—or in other ways—and instead has the effect of impairing competition.") [60] The courts often say that such conduct lacks a "legitimate business purpose." [61] What this means is that if the dominant firm marketed or structured its product in a way that made it more difficult for rivals or potential rivals to sell their product and if this marketing or restructuring was not reasonably necessary to improve the defendant's own product, or if it produced more harm than reasonably necessary, then the dominant firm has violated §2. [62]

**651d. Not all conduct injuring rivals is anticompetitive..—**A sine qua non of anticompetitive conduct is that it enlarges (or preserves) the defendant's market share at the expense of rivals. Thus, the first requirement for exclusionary conduct is injury to rivals. Exclusionary behavior must be conduct that prevents actual or potential rivals from competing or that impairs their opportunities to do so effectively.

But this term and the root idea are much too broad, for they embrace competitive as well as anticompetitive behavior: *all* successful competitive moves tend to exclude, particularly in oligopoly markets. Nevertheless, while some novel term might be preferable, we shall use the term "exclusionary" as a short-hand description of "monopolizing" conduct, even though it is not precisely descriptive.

So the first step in defining "exclusionary" conduct is to state what it clearly is not. Our concern about monopoly and the opportunities of rivals must not be allowed to obscure the objective of antitrust law, which seeks to protect the process of competition on the merits and the economic results associated with workable competition. [63] Accordingly, aggressive but nonpredatory pricing, higher output, improved product quality, energetic market penetration, successful research and development, cost-reducing innovations, and the like are welcomed by the Sherman Act. They are therefore not to be considered "exclusionary" for §2 purposes even though they tend to exclude rivals and may even create a monopoly. [64]

We attempt no further catalogue of desirable behavior at this point, but rest for the moment on the desirability of behavior constituting competition on the merits—the superior skill, foresight, and industry of which Judge Hand spoke. Antitrust law should not impose sanctions for the very conduct it would encourage. Behavior that is no more restrictive of rivals' opportunities than is reasonably necessary to effect competition on the merits is and should be approved by Sherman Act §2. [65] Such behavior is, after all, indispensable if the antitrust laws are to achieve their objective. Thus, "exclusionary" comprehends at the most behavior that not only (1) tends to impair the opportunities of rivals, but also(2) either does not further competition on the merits or does so in an unnecessarily restrictive way.

**651d1. *Cost-reducing conduct..*—**Conduct that reduces the defendant's costs typically injures rivals, except in highly competitive markets, but it virtually always benefits consumers. Identifying the rare case where it does not taxes the tribunal's measurement capabilities so severely that it cannot be controlled without discouraging socially beneficial behavior.

One can imagine a scenario in which a firm builds a large plant that enables it to undersell rivals, does so for a period of time, and then raises price after rivals have been destroyed. At that point the firm might enjoy both reduced costs and monopoly prices, which may be higher than the preceding competitive price. But such

***©2014 Wolters Kluwer. All rights reserved.***
***Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm***

conduct has been analyzed under the rubric of above-cost predatory pricing and universally rejected by the courts. [66]

**651d2. *Output-increasing conduct*..—**Consumers are generally benefitted by higher output, which is nearly always accompanied by lower prices. As a result, considerable care must be exercised before conduct that clearly increases the defendant's output is condemned as monopolistic. When a firm is earning positive returns on each unit, an output increase is profitable, quite aside from impact on competitors. Since output increases are presumably in the best interest of consumers as well, a court must be wary of condemning above-cost output-increasing conduct. Thus, Judge Hand erred in *Alcoa* when he condemned the aluminum monopolist for embracing every competitive opportunity by building a larger plant with greater capacity to meet new demand. [67]

These observations are not categorical. For example, predatory pricing involves a significant increase in output, which must accompany price cuts to below-cost levels. But the increased output in a properly defined strategy of predatory pricing is only temporary, for the predation period will be followed by a "recoupment" period in which output will be reduced and prices increased. [68]

Further, an output increase by the dominant firm does not necessarily correspond with a marketwide output increase, and only the latter benefits consumers. For example, extreme cases of tying, exclusive dealing, package discounts, or similar practices can produce an output increase for the defendant at above-cost prices but also cause competitive harm. [69] Or an improperly brought patent infringement suit might oust a nascent rival and enable the dominant firm to keep its own output higher, but overall market output would decline for lack of competition. [70]

**651e. Exclusionary conduct requires actual or prospective consumer harm; balancing.—**As ¶c indicates, not all conduct that injures rivals is anticompetitive—indeed, most is not. The conduct that §2 brands as anticompetitive must additionally cause or threaten harm to consumers from lower market output, higher prices, reduced innovation, or some other indicator of diminished competitiveness. We consider whether this consumer harm must actually have occurred or whether it may merely be threatened, and if the latter, the degree of the threat. We also comment briefly on the nature of the proof and the relationship to remedies.

**651e1. *Relationship to identity of plaintiff and requested relief*..—**Monopoly harms consumers by producing higher prices, restricting innovation, or reducing the array of choices that consumers would face under more competitive conditions. Properly defined monopolizing conduct harms consumers by creating monopoly, increasing its amount, or extending its duration. Thus an expectation of consumer harm must always be at the logical end of any determination that a particular act "monopolizes" and thus satisfies §2 's conduct requirement.

But this is not the same thing as showing that consumer harm has in fact resulted from the challenged practice. This is clearest in the case of the government suit. The government generally sues to "enforce" the antitrust laws, not to obtain recompense for completed harms. The social cost of any harmful practice is minimized when the practice is apprehended before it occurs or in an early stage. Clearly the government must show that a certain instance of conduct is likely to cause consumer harm in the form of increased or prolonged monopoly, and that this conduct is not accompanied by an offsetting social benefit. But to delay suit until consumer harm has actually occurred would be to increase the social cost of monopoly unnecessarily. The proviso, of course, is that it may be more difficult to identify conduct as anticompetitive when the results have not yet materialized.

This principle is hardly unique to antitrust law. For example, while the private plaintiff may sue the drunken driver only to recompense a completed wrong, such as wrongful death or property damage, the government may arrest and condemn the drunken driver who has not yet caused harm to anyone. The point is that drunken driving is highly likely to cause social harm and it is less socially costly to arrest such a driver before rather than after that harm occurs.

The private plaintiff suing only in equity resembles the government's position more closely but is still distinct. The statute permits such a plaintiff to enjoin "threatened" harms. [71] The main difference with the government's

**©2014 Wolters Kluwer. All rights reserved.**
***Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm***

position is proximity. For example, a dominant firm's fraudulent procurement and enforcement of patents might cause consumer harm only in several years, after the market sees the result of reduced competitiveness. A particular consumer in this market might not be able to show sufficiently proximate injury to maintain even an equity suit. But the government could do so, presumably without any showing of immediate harm to consumers. By contrast, a competitor excluded by a fraudulent patent suit could sue immediately—and may be required to do so via a compulsory counterclaim [72] —even though consumer injury had not yet occurred. Indeed, we would not make the competitor's lawsuit depend on a showing that consumer harm would occur in the particular case. The targets of improper infringement suits are often nascent firms that may or may not succeed in the market. Antitrust goals are furthered by deterring such suits if they are improper, a fact that does not depend on proof that the competitor, if not victimized by the wrongful suit, would have succeeded in making the market more competitive.

Both consumers and competitors seeking damages must show actual harm. Consumers must generally show actual harm in the form of higher prices or reduced innovation. By contrast, competitors must show actual harm both to themselves and to the ordinary market processes that could otherwise be expected to produce or maintain competition. Once again, however, consumer harm may be threatened rather than realized. For example, the rival who successfully prosecutes a §2 counterclaim to an infringement suit based on an invalid patent will be able to obtain damages even though the consumer harm from this wrongful infringement suit is threatened rather than actual. [73]

But these differences in the nature of proof should not obscure the basic point: in all cases the plaintiff must show conduct that either has or is reasonably calculated to create, enlarge, or prolong monopoly, without substantial offsetting benefits. In such cases consumer harm is always in prospect, even though it has not already occurred.

**651e2. *Inferred from lack of justification..*—**Even though monopolistic conduct requires proof of actual or threatened consumer harm, the proof need not invariably be elaborate. The easiest case is conduct by a monopolist that clearly injures rivals and has no business justification. In that case consumer harm can sometimes be inferred from the injury to competitors itself. [74] For example, little purpose would be served by requiring proof of consumer harm in a case where the defendant brought an infringement action on a fraudulently obtained patent. [75] The only purpose in bringing such a suit is improper exclusion of rivals. About the best that can be said for such an action is it might fail and result in no harm at all, but it is not likely to produce a social benefit.

**651e3. *Balancing generally to be avoided; burden-shifting*..—**The law of exclusionary practices lies at the center of antitrust's rule of reason, where it is often said that the court must "balance" the threat of competitive harm against consumer gains. We question that assumption. [76] Many practices capable of creating or maintaining a monopoly by impairing the opportunities of rivals create no benefits at all. For many others the claimed benefits could readily be achieved by a less harmful alternative.

In *Microsoft* the D.C. Circuit appeared to state a balancing requirement for close cases. If the plaintiff had shown a qualifying exclusionary act with an anticompetitive effect and the defendant had presented an unrebutted justification, then "the plaintiff must demonstrate that the anticompetitive harm of the conduct outweighs the procompetitive benefit." [77] Interestingly, however, the court never attempted any real balancing. In most cases it either condemned the conduct when the defendant had not offered an adequate justification or refused to condemn it once the justification had been accepted.

Nevertheless, in at least a few cases conduct that causes some benefit and unavoidably threatens harm must be evaluated. On the one hand, the tribunal must have a way of deciding how to weigh them against each other. On the other, no court could quantify the economic harm that might result from the defendant's exercise of market power and balance this against any efficiency gains said to result from it, at least not in close cases. Of course,

***©2014 Wolters Kluwer. All rights reserved.***
***Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm***

balancing need not be difficult in every case: one does not need a fine set of scales to know what will happen when an elephant sits on one side of a see-saw and a mouse on the other.

A burden-shifting analysis should enable courts to avoid "close" balancing in most situations. The rule of reason applied in cases involving unilateral conduct need not differ significantly from that applied to multilateral conduct. [78] The principal difference between §1 and §2 is that the existence of an agreement among competitors shifts the scale against the defendants. As a result, in close cases it is proper to condemn the arrangement by resolving uncertainties against the defendant. By contrast, when the challenged conduct is unilateral, the court must be somewhat more cautious. We would be inclined to resolve close cases in favor of the defendant. But we re-emphasize, as *Microsoft* suggests, that cases involving (a) a truly exclusionary practice, (b) offset by a compelling efficiency explanation, and (c) with no less restrictive alternative will be uncommon.

The most important exception is predatory pricing. Some balancing of benefits and harms may be essential because aggressive pricing appears to confer short-term benefits but may harm consumers in the long run. In price predation cases the Supreme Court requires the dual showing of prices below cost and a reasonable prospect of "recoupment" during a subsequent period of monopoly prices. In such a case the requirement of harms disproportionate to the benefits is met if the monopoly profits earned during the recoupment period exceed the cost of charging below-cost prices, which constitutes the saving to consumers. [79]

**651f. Some exclusionary conduct rational only for market-dominating firm; creation vs. maintenance of monopoly.—**Most exclusionary conduct by dominant firms is strategic. Nondominant firms acting unilaterally typically lack the market position to make much strategic conduct work. Consider the *Microsoft* litigation. [80] A nondominant seller of computer operating systems would have every incentive to maximize compatibility with other types of software, such as Internet browsers or word processors, even if it sold these applications itself. After all, it would be competing in the market with sellers of other operating systems, and customer choice would be heavily driven by compatibility concerns. But a market-dominating seller of operating systems stands in a different position: by limiting compatibility with rivals' software applications it can force buyers to switch to its own applications. Thus it becomes important to restrain the innovations of others or keep them out of the market.

In other cases conduct challenged as exclusionary could be profitable for either a monopolist or a nonmonopolist. For example, even a relatively small oligopolist in a product-differentiated market might profit from fraudulent patent infringement suits calculated to protect its particular product variation from close copying. [81]

But both types of conduct are covered by the statute, which is concerned with the maintenance, or prolongation, or monopoly as well as with its creation. For example, *Grinnell* and later *Trinko* spoke of the offense as "the willful acquisition *or maintenance* of [monopoly] power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." [82]

**651g. Substantiality.—**To find that a monopolist's act may improperly impair rivals' opportunities and threaten consumer welfare does not say how substantial a contribution that act has made or may make to achieving or maintaining the monopoly. The effect may in fact be marginal or even inconsequential. The act may be incapable of making a significant contribution, abandoned before it could have had any such effect, or seem on balance not to have been significant when compared to scale economies or superior skill as sources of the particular defendant's power.

However, because monopoly will almost certainly be grounded in part in factors other than a particular exclusionary act, no government seriously concerned about the evil of monopoly would condition its intervention solely on a clear and genuine chain of causation from exclusionary act to the presence of monopoly. And so it is sometimes said that doubts should be resolved against the person whose behavior created the problem. [83] When we cannot truly find as a fact that an exclusionary act was significant to the defendant's monopoly, it is said, the defendant must bear the risk of the ignorance created by its own misconduct. The conclusion has merit, but the reasoning needs to be restated.

***©2014 Wolters Kluwer. All rights reserved.***
***Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm***

Any one exclusionary act may seem trivial. Indeed, we shall often be unable to find that several such acts, taken together, probably "caused" or contributed significantly to a defendant's power. Yet such acts can determine the often marginal choice of an actual or potential rival deciding whether to enter or expand. In that event, it may be fitting to presume the exclusionary act "significant" or "causally related" to the monopoly power being challenged. That is the sense in which the defendant is made to suffer the uncertain consequences of its own undesirable conduct.

But before such a formula can properly be used against the defendant, it must at least appear plausible to an informed observer that the exclusionary act could have had, or would probably have, a significant relationship to the defendant's monopoly. In sum, "exclusionary" behavior should be taken to mean conduct other than competition on the merits, or other than restraints reasonably "necessary" to competition on the merits, that reasonably appear capable of making a significant contribution to creating or maintaining monopoly power.

**651h. Business torts or unfair methods of competition distinguished.—**State laws on unfair competition or business torts provide remedies for a variety of competitive practices thought to be offensive to proper standards of business morality. Under these laws, false and misleading advertising, trade disparagement, and "misappropriation" of trade values created by another may entitle victimized buyers or competing sellers to damages and equitable relief. Section 5 of the Federal Trade Commission Act empowers the Commission to terminate (1) "unfair methods of competition," and (2) "unfair and deceptive acts or practices." [84] Particularly since 1938, when Clause (2) was added by amendment, the courts have given the Commission extremely wide latitude in expanding the scope of enjoinable conduct without any showing of injury to competition. [85]

Even if one defines "exclusionary" conduct with an eye only toward injunction, most conduct that is "unfair" under state tort law or FTC Act §5 fails to be "exclusionary" under Sherman Act §2. The FTC Act was clearly conceived as a supplement to the Sherman Act, a vehicle for evolving, through administrative expertness, prohibitions of conduct thought contrary to important consumer interests in honesty and fair dealing quite aside from monopoly. There is no private right of action for violations of the FTC Act, and the act is not part of the "antitrust laws" for violation of which private parties may sue and recover treble damages.

Thus automatically identifying practices "unfair" under the FTC Act or business tort law as "exclusionary" under §2 is not consistent with the statutory scheme. The Sherman Act was deemed a vehicle for incorporating common law notions of restraint of trade but certainly not the whole common law of business torts. The concern of §2 is with monopoly, not unfairness or deception. Accordingly, it is not enough under §2 to find that a firm has engaged in "unfair" conduct; the antitrust tribunal must also decide that the conduct has had, or is likely to have, the effect of significantly impairing the ability of rivals to compete.

The first and perhaps most important difference between the common law of business torts and the FTC Act's coverage of unfair and deceptive acts is the lack of any requirement of market power or competitive effects. Most of the law in this category focuses exclusively on conduct, and thus no inquiry is made whether the conduct is reasonably calculated to create or preserve a monopoly or, indeed, if monopoly is even plausible in the market under scrutiny.

Of course, in the presence of substantial market power, some kinds of tortious behavior could anticompetitively create or sustain a monopoly, and it would then warrant condemnation under §2. [86] As a result, it is wrong categorically to condemn such practices under §2 or categorically to excuse them. But the important point is that the law of business torts or unfair practices was developed without regard to its tendency to create a monopoly, and there is little more than an accidental overlap between the kinds of practices thought to be unfair or tortious and the kind that can support a §2 offense.

Thus many if not most misrepresentations or other practices held actionable in tort or under §5 do not qualify as anticompetitive or exclusionary for §2 purposes, even when done by a dominant firm. In many instances, few buyers are misled. The FTC is entitled to insist "upon a form of advertising clear enough so that…'wayfaring men, though fools, shall not err therein.'" [87] In other instances, the effects are transitory, either because the misrepresentation was episodic or because buyers quickly learn the truth. For example, much of the law of

**©2014 Wolters Kluwer. All rights reserved.**
**Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm**

business torts or misrepresentation is targeted at the firm that comes quickly into business, makes numerous sales on the basis of false claims, and then disappears or becomes judgment-proof before consumers can obtain redress. That government intervention in such cases is appropriate can be deemed beyond controversy, but the relief to be given would not be relief from any real or threatened monopoly.

In other cases, such as those requiring disclosure of facts wholly unrelated to product qualities, antitrust might well view the order rather than the conduct to be "anticompetitive." [88] And proof of compensable injury to particular buyers for misleading representations does not necessarily establish significant damage to competing sellers, whose conduct may, for example, have been no more exemplary.

Thus, while tort or FTC law provides some learning and experience that can be used by antitrust courts in identifying undesirable practices that *may* properly be deemed "exclusionary," the mere fact that the practices are undesirable in this sense is not enough. [89]

**651i. Relationship to other antitrust offenses.—**It is accepted law that a monopolist violates the Sherman Act if it "has acquired or maintained…monopoly…by means of those restraints of trade which are cognizable under §1 [of the Sherman Act ]." [90] But this does not mean that all violations of §1 necessarily establish the "monopolizing" offense under §2. The monopoly must be acquired or maintained "by means of" the conduct proscribed under §1, and not all violations of §1 have the requisite causal effect. Take, for example, a case in which a monopolist has imposed minimum resale price maintenance agreements on its distributors. Such agreements were traditionally per se unlawful under §1, but they do not create or enhance the monopolist's market power by curtailing the opportunities of its actual or potential competitors. [91] If anything, the higher retail prices on the monopolist's goods enhance their opportunities.

Similar caution must be taken with violations of the Clayton Act: price discrimination, [92] exclusive dealing [93] and tying arrangements, [94] and acquisitions, [95] in violation of §§2, 3, and 7 respectively. A monopolist from whom large buyers have coerced discriminatorily low prices has not by such price discrimination augmented its monopoly power; rather, the discrimination reflects a weakening of its power. A tying arrangement does not usually increase monopoly power in the tying-product market, and one that affects a small percentage of sales of the tied product does not significantly impair the opportunities of rivals in that market. [96]

In sum, whether or not violations of other antitrust provisions also constitute monopolizing conduct depends on the factual and analytical reasons behind those other proscriptions. They must be assessed in terms of §2 purposes. We shall do so in Chapter 7, but that chapter cannot assimilate the entire body of antitrust law. Rather, we explore an array of practices sufficiently to indicate the circumstances in which they may or may not reasonably be classified as "exclusionary" or "abusive," but without purporting to reach definitive conclusions as to their legality under other statutory provisions.

The other side of the coin is that practices that harm rivals unnecessarily may be violations of §2 when committed by a dominant firm, even though they would not be violations of other provisions when no dominant firm is involved. For example, forced bundling by the monopolist can violate §2 even when the "separate product" requirement that tying law imposes on nonmonopolists is not present. [97] The monopolist's refusal to deal may be unlawful even when lack of agreement precludes any finding of a "boycott." [98] Upon a few occasions courts have condemned price discrimination by a monopolist when the technical requirements of the Robinson-Patman Act could not have been met. [99]

The point is that §2 's highly general proscription of "monopolistic" practices is not cabined by any specific statutory formulation and thus can be both less than or more than the prohibitions of the other antitrust laws. As noted previously, this gives the courts more flexibility to fashion legal doctrine respecting dominant firms; but it also makes the statute more difficult to apply, particularly to novel conduct.

***©2014 Wolters Kluwer. All rights reserved.***
***Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm***

**651j. Power essential.—**As this Paragraph and the Chapter 7 coverage of specific practices indicates, the definition of anticompetitive conduct by the dominant firm must be flexible and not too categorical. Defining exclusionary conduct as conduct that harms rivals unnecessarily can dispense with technical requirements that are essential in the law of price fixing, tying or exclusive dealing, or other practices. Such an approach is appropriate, for anticompetitive strategic behavior by dominant firms comes in many kinds, many of which may not be known or even anticipated today.

But defining monopoly conduct in a flexible manner places a premium on unambiguous establishment of substantial and durable power. If courts find monopoly power too readily, they may be correspondingly unwilling to condemn exclusionary practices that are anticompetitive when practiced by a true monopolist, but ambiguous or harmless when the defendant is not a monopolist. These rules will then be applied to true monopolists as well. Worse yet, courts may condemn practices that are harmless or even beneficial when practiced by nonmonopolists.

As a court's confidence increases that the defendant before it is a true and durable monopolist, it can also more confidently condemn practices that harm rivals unnecessarily. As a result, "monopoly power" should be found only after rigorous application of the fundamental principles of market definition and market power measurement. When courts find substantial market power merely because a firm's customers are "locked in" to its aftermarket parts or service [100] or where the defendant's franchise contract prevents the buyer from substituting another's goods, [101] then they are no longer dealing with the kind of substantial market power that should be the concern of §2.

**651k. Conclusions.—**To summarize:

- Assuming that monopoly power has been established, the unlawful exclusionary conduct that §2 requires consists of acts that (1) are reasonably capable of creating, enlarging, or prolonging monopoly power by impairing the opportunities of rivals; and (2) that either (2a) do not benefit consumers at all or (2b) are unnecessary for the particular consumer benefits that the acts produce or (2c) produce harms disproportionate to the resulting benefits.
- The behavioral component is not defined by "purpose," "intent," or similar language. It can be rationally defined only in terms of conduct. However, knowledge of intent may sometimes aid in the interpretation of ambiguous conduct.
- Proof of actual consumer harm is generally unnecessary, but the challenged conduct must be of a type that the anticipated end result is actual consumer harm. Of course, the private plaintiff must prove the requisite actual or threatened harm to itself.
- The given definition of monopolizing conduct is flexible and frees the court of doctrinal rigidity, but it requires an extremely careful determination that the defendant has substantial market power.

**Footnotes**

1 See Herbert Hovenkamp, The Harvard and Chicago Schools and the Dominant Firm, in Conservative Economic Influences on U.S. Antitrust Policy (Robert Pitofsky ed., Oxford University Press 2008); Herbert Hovenkamp, Exclusion and the Sherman Act, 72 U. Chi. L. Rev. 147 (2005). In *Microsoft* the D.C. Circuit defined a test of equivalent generality, although in considerably more detail, and including allocation of proof burdens:

> *First*, to be condemned as exclusionary, a monopolist's act must have an "anticompetitive effect." That is, it must harm the competitive process and thereby harm consumers. In contrast, harm to one or more competitors will not suffice.
>
> *Second*, the plaintiff, on whom the burden of proof of course rests,…must demonstrate that the monopolist's conduct indeed has the requisite anticompetitive effect…. [I]n a case brought by the

©2014 Wolters Kluwer. All rights reserved.
Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm

> Government, it must demonstrate that the monopolist's conduct harmed competition, not just a competitor.
>
> *Third*, if a plaintiff successfully establishes a prima facie case under §2 by demonstrating anticompetitive effect, then the monopolist may proffer a "procompetitive justification" for its conduct…. If the monopolist asserts a procompetitive justification—a nonpretextual claim that its conduct is indeed a form of competition on the merits because it involves, for example, greater efficiency or enhanced consumer appeal—then the burden shifts back to the plaintiff to rebut that claim….
>
> *Fourth*, if the monopolist's procompetitive justification stands unrebutted, then the plaintiff must demonstrate that the anticompetitive harm of the conduct outweighs the procompetitive benefit….
>
> *Finally*, in considering whether the monopolist's conduct on balance harms competition and is therefore condemned as exclusionary for purposes of §2, our focus is upon the effect of that conduct, not upon the intent behind it. Evidence of the intent behind the conduct of a monopolist is relevant only to the extent it helps us understand the likely effect of the monopolist's conduct.

*United States v. Microsoft Corp*., 253 F.3d 34, 58-59 (D.C. Cir. 2001), cert. denied, 534 U.S. 952 (2001) (to the extent it is relevant, H.H. was consulted by the United States and some state AGs). See ¶617.

2 See *Brooke Group v. Brown & Williamson Tobacco Corp*., 509 U.S. 209 (1993) (assessing these requirements); *Weyerhaeuser Co. v. Ross-Simmons Hardwood Lumber Co., Inc*., 127 S. Ct. 1069 (2007) (reiterating them in a case involving allegedly predatory buying). See generally Ch. 7C.

3 See ¶706.

4 See Ch. 7C.

5 See Nicholas Kaldor, Welfare Propositions in Economics and Interpersonal Comparisons of Utility, 49 Econ.J. 545 (1939); John R. Hicks, The Foundations of Welfare Economics, 49 Econ. J. 696 (1939).

6 In the standard illustration of monopoly, the monopolist's gain in higher prices is precisely offset by the consumer's loss from the same higher prices. However, there is also a "deadweight" loss consisting of unmade sales that do not profit the monopolist and that harm consumers by forcing inferior choices. Because the deadweight loss triangle is a loss to consumers too, aggregate consumer losses exceed the monopolist's gains. See ¶403 ; and Herbert Hovenkamp, Federal Antitrust Policy: The Law of Competition and Its Practice §§1.2a, 2.3c (3d ed. 2005).

7 This is the First Welfare Theorem. See Kenneth J. Arrow & Gerard Debreu, The Existence of an Equilibrium for a Competitive Economy, 22 Econometrica 265 (1954).

8 See Robert H. Bork, The Antitrust Paradox 90, 107-115 (1978) (consumer welfare is "merely another term for the wealth of the nation").

9 See Herbert Hovenkamp, Distributive Justice and the Antitrust Laws, 51 Geo. Wash. L. Rev. 1 (1982). Hovenkamp, Federal Antitrust Policy, note 6, §2.3c.

10 Historically, while consumers represent the broadest interest group in the economy, producer groups have been much more effective lobbyists. Many statutory rules, including the antitrust laws, are best explained as favoring the special interests of politically powerful or clever producer groups. On this point, see Hovenkamp, Federal Antitrust Policy, note 6, §2.1; Herbert Hovenkamp, The Antitrust Enterprise: Principle and Execution, ch. 2 (2006).

11 See Steven C. Salop, Question: What Is the Real and Proper Antitrust Welfare Standard? Answer: The True Consumer Welfare Standard, presented to the Antitrust Modernization Commission (Nov. 4, 2005), available at *http://www.amc.gov/public_studies_fr28902/exclus_conduct_ pdf/051104_Salop_Mergers.pdf*.

See also Jonathan B. Baker, Competition Policy as a Political Bargain, 73 Antitrust L.J. 483, 518 (2006) (advocating a modified general welfare test that is solicitous of consumer welfare:

**©2014 Wolters Kluwer. All rights reserved.**
**Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm**

> …antitrust enforcers and courts should seek to maximize aggregate surplus, so long as consumers and producers sufficiently share the efficiency gains, at least on average….

And see Robert H. Lande, Wealth Transfers Should Guide Antitrust, 58 Antitrust L.J. 631 (1988).

12 See ¶706.

13 See ¶706e.

14 See part 2A of our test for monopolization, text at note 1.

15 *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 610-611 (1985).

16 *Brooke Group*, note 2; *A.A. Poultry Farms v. Rose Acre Farms*, 881 F.2d 1396, 1400-1401 (7th Cir. 1989), cert. denied, 494 U.S. 1019 (1990) (advocating recoupment test).

See also Phillip E. Areeda & Donald F. Turner, Predatory Pricing and Related Practices Under Section 2 of the Sherman Act, 88 Harv. L. Rev. 697, 698 (1975):

> …the classically-feared case of predation has been the deliberate sacrifice of present revenues for the purpose of driving rivals out of the market and then recouping the losses through higher profits earned in the absence of competition.

See also the first edition of this Treatise, ¶711b at 151 (1978) (similar); Richard A. Posner, Antitrust Law: An Economic Perspective 184 (1976) (similar). The current law is described in ¶¶725-730.

17 See Ch. 7D-3.

18 See Brief for the United States and the Federal Trade Commission as Amici Curiae Supporting Petitioner, 2003 WL 21269559, at *16-17, *Verizon Communications, Inc. v. Law Offices of Curtis V. Trinko*, 540 U.S. 398 (2004) ( "conduct is exclusionary where it involves a sacrifice of short-term profits or goodwill that makes sense only insofar as it helps the defendant maintain or obtain monopoly power"); and id. at *19-20 ( "If such a refusal involves a sacrifice of profits or business advantage that makes economic sense only because it eliminates or lessens competition, it is exclusionary and potentially unlawful.").

19 See ¶776.

20 See, e.g., ¶1802 (exclusive dealing foreclosing rivals); id., ¶1803 (same; output contract); id., ¶1804 (same; raising rivals' costs).

In *Rambus, Inc.*, 2006 WL 2330117 (F.T.C. Aug. 2, 2006), the FTC held that the "sacrifice" test for exclusionary conduct did not apply. Rambus reasoned that because its refusal to share information with JEDEC provided immediate benefit to Rambus, it would not qualify as conduct that involved the immediate sacrifice of profits in anticipation of exclusion of rivals or that made no economic sense except for the elimination of competition. The Commission opined that those tests might make sense in the context of refusal to deal or predatory pricing claims, but not here. As the Commission explained:

> As a matter of law, we recognize that the sacrifice test may be well-suited to certain types of Section 2 claims where the risk of interfering with vigorous competitive activity is heightened, but the test is not appropriate here. It misses conduct that reduces consumer welfare, but happens to be inexpensive to execute, and therefore does not involve a significant profit sacrifice. For example, defrauding the PTO in order to secure a patent that confers a monopoly demands little profit sacrifice, yet the Supreme Court has held that such fraud can violate Section 2. Likewise, in this case, without reducing prices, forgoing sales, or even spending substantial funds beyond what it otherwise would have spent, Rambus's conduct may have imposed substantial costs on rivals and contributed significantly to the creation of monopoly power. In cases such as this, the *Microsoft* analysis—with its focus on determining "whether the monopolist's conduct on balance harms competition"—is the proper lens for scrutinizing allegedly exclusionary conduct.

**©2014 Wolters Kluwer. All rights reserved.**
**Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm**

(Numerous citations omitted) (to the extent it is relevant, H.H. was consulted by the defendant after the FTC's remedial order was entered).

21 See Ch. 17G-2; Ch. 20E.

22 Brief for the United States and Federal Trade Commission as Amici Curiae Supporting Petitioner at 15, *Verizon Communications, Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398 (2004). See Gregory Werden, The "No Economic Sense" Test for Exclusionary Conduct, 31 J. Corp. L. 293 (2006); A. Douglas Melamed, Exclusive Dealing Agreements and Other Exclusionary Conduct—Are There Unifying Principles, 73 Antitrust L.J. 375 (2006).

23 E.g., *Walker Process Equipment, Inc. v. Food Mach. & Chem. Corp*., 382 U.S. 172 (1965) (maintaining infringement suit on patent obtained by fraud); *Rambus, Inc*., 2006 WL 2330117 (F.T.C., Aug. 2, 2006) (providing false information to private standard-setting organization with the result that organization unknowingly adopts standards protected by defendant's IP rights). See also *Netflix, Inc. v. Blockbuster, Inc*., 2006 WL 2458717 (slip copy) (N.D. Cal. Aug. 22, 2006) (NO. C06-02361 WHA) (refusing to dismiss *Walker Process*-style counterclaim against Netflix on business method patent based on Netflix's alleged failure to disclose prior art in patent application).

24 E.g,. *Walker Process*, note 23.

25 E.g., *United States v. Dentsply Intl., Inc.*, 399 F.3d 181, 191 (3d Cir. 2005), cert. denied, 546 U.S. 1089 (2006) (condemning exclusive dealing in action brought by government).

26 Richard A. Posner, Antitrust Law 194-195 (2d ed. 2001).

27 *LePage's, Inc. v. 3M*, 324 F.3d 141, 155 (3d Cir. 2003) (en banc), cert. denied, 542 U.S. 953 (2004) (quoting ¶794 in an earlier Supplement).

28 See ¶749.

29 See ¶¶725-727.

30 See, e.g., *Barry Wright Corp. v. ITT Grinnell Corp*., 724 F.2d 227, 232 (1st Cir. 1983) (noting that an "avoidable" or "incremental" cost test for predatory pricing is irrational because it would be less costly for the defendant to halt production; and moreover, "equally efficient competitors cannot permanently match this low price and stay in business."). See also *MCI Communic. Corp. v. AT&T*, 708 F.2d 1081, 1113 (7th Cir.), cert. denied, 464 U.S. 891 (1983) (similar, predatory pricing); *Borden, Inc. v. FTC*, 674 F.2d 498, 515 (6th Cir. 1982), vacated on other grounds, 461 U.S. 940 (1983) (same, predatory pricing); *Ortho Diagnostic Systems, Inc. v. Abbott Laboratories*, 920 F. Supp. 455, 466-467 (S.D.N.Y. 1996) ( "below-cost pricing, unlike pricing at or above that level, carries with it the threat that the party so engaged will drive equally efficient competitors out of business, thus setting the stage for recoupment at the expense of consumers").

31 Posner, *Antitrust Law*, note 26, at 196.

32 See ¶706.

33 See Thomas Krattenmaker & Steven Salop, Anticompetitive Exclusion: Raising Rivals' Costs to Achieve Power Over Price, 96 Yale L.J. 209 (1986); Steven C. Salop & David T. Scheffman, Raising Rivals' Costs, 73 Am. Econ. Rev. 267 (1983). See also Herbert Hovenkamp, Post-Chicago Antitrust: A Review and Critique, 2001 Colum. Bus. L. Rev. 257.

For a critique, see Posner, *Antitrust Law,* note 26, at 196. However, Judge Posner's first objection is that reducing one's own costs may raise a rivals' costs by denying the latter the ability to exploit relevant scale economies. While that is true, it does not suggest that every RRC strategy involves cost reductions to the dominant firm. Second, Judge Posner notes, a strategy such as predatory pricing does not really raise a rival's costs; rather, it denies it revenue.

Closely related to RRC except more aggressive is the standard proposed in Einer Elhauge, Defining Better Monopolization Standards, 56 Stan. L. Rev. 253 (2003), which queries "whether the alleged exclusionary

***©2014 Wolters Kluwer. All rights reserved.***
***Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm***

conduct succeeds in furthering monopoly power (1) only if the monopolist has improved its own efficiency or (2) by impairing rival efficiency whether or not it enhances monopolist efficiency." The second part of this test would condemn a firm for using practices that lowered its own costs if, in the process, they denied scale economies to a rival. See, e.g., Elhauge, id. at 324 (arguing that even if economies of scale are very substantial, above a 50 percent market share, the firm cannot use exclusive contracts to increase its output but must simply set its price). The Elhauge test would also condemn a firm that used a practice that increased its sales beyond the point that its scale economies topped out, if in so doing it denied scale economies to a rival. See id. at 324 (illustration of firm whose tie, exclusive deal, or other agreement requires customers to purchase 70 percent of the market from it, even though its economies of scale top out at 40 percent). Assuming such tests were desirable, they make severe demands on tribunals to measure relevant scale economies. See ¶408.

34 E.g., *Microsoft*, note 1, 253 F.3d at 70 (defendant's exclusionary contracts relegated rival Netscape to higher-cost distribution channels); *Dentsply*, note 25, 399 F.3d at 191 (similar; defendant's exclusive dealing arrangements relegated rivals to inferior distribution alternatives, citing ¶1802c); *JTC Petroleum Co. v. Piasa Motor Fuels, Inc.*, 190 F.3d 775, 778-779 (7th Cir.1999) (members of cartel may have paid off suppliers to charge cartel rivals significantly higher prices, thus creating a price umbrella under which the cartel could operate); *Brand Name Prescription Drugs Antitrust Litigation*, 123 F.3d 599, 614 (7th Cir. 1997), cert. denied, 522 U.S. 1123 (1998) (similar); *Forsyth v. Humana, Inc.*, 114 F.3d 1467, 1478 (9th Cir. 1997), aff'd on non-antitrust grounds, 525 U.S. 299 (1999) (health care provider's policy of shifting indigent patients to rivals could have effect of raising their costs); *Multistate Legal Studies, Inc. v. Harcourt Brace Jovanovich Legal and Professional Publications, Inc.*, 63 F.3d 1540, 1553 (10th Cir.1995) (dominant firm's practice of scheduling its own full slate of classes so as to conflict with rivals' specialized classes could have had effect of raising the rival's cost of distributing its own product); *Premier Elec. Constr. Co. v. National Elec. Contractors Assn., Inc.*, 814 F.2d 358 (7th 1987) (alleged agreement between union and contractors' association under which union would obtain fee from all employers without whom it had collective bargaining agreements, whether or not they were association members, to be paid to the association, probably intended to raise the costs of nonmember contractors). Cf. *Ball Memorial Hosp., Inc. v. Mutual Hosp. Ins., Inc.*, 784 F.2d 1325, 1340 (7th Cir. 1986) (rejecting RRC claim that Blue Cross forced hospitals to submit lower bids for taking care of BC patients, with result that it had to impose higher charges on non-BC patients).

35 E.g., *Conwood Co. v. United States Tobacco Co.*, 290 F.3d 768, 784 (6th Cir. 2002), cert. denied, 537 U.S. 1148 (2003). The plaintiff claimed that its market share would have grown even faster and that it would have earned even more profits but for the exclusionary conduct.

36 This is apparently the source of Judge Posner's objection. See Posner, *Antitrust Law,* note 26, at 196, referring to RRC as "not a happy formula" because one way of raising rivals' costs is to be more efficient than the rival, thus denying it scale economies.

37 *Standard Oil Co. v. United States,* 221 U.S. 1 (1911).

38 Id. at 75.

39 *United States v. American Tobacco Co.,* 221 U.S. 106, 182 (1911).

40 *United States v. Aluminum Co. (Alcoa),* 148 F.2d 416, 431-432 (2d Cir. 1945).

41 *American Tobacco Co. v. United States,* 328 U.S. 781, 814 (1946).

42 *United States v. Griffith,* 334 U.S. 100, 105 (1948).

43 Id. at 107.

44 *United States v. Grinnell Corp.,* 384 U.S. 563, 570-571 (1966).

45 *Professional Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 60 (1993):

***©2014 Wolters Kluwer. All rights reserved.***
***Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm***

> Only if challenged litigation is objectively meritless may a court examine the litigant's subjective motivation. Under this second part of our definition of sham, the court should focus on whether the baseless lawsuit conceals "an attempt to interfere directly with the business relationships of a competitor…. (citations omitted).

46 *Chicago Bd. of Trade v. United States,* 246 U.S. 231, 238 (1918). See also *Taylor Pub. Co. v. Jostens*, 216 F.3d 465 (5th Cir. 2000) (intent evidence useful for helping the court to characterize ambiguous conduct, quoting ¶806e in the previous edition). See use of intent evidence to interpret ambiguous conduct; and see ¶b2.

47 *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 602 (1985). The Court's subsequent *Trinko* decision, note 18, said little about subjective intent except to observe that in that particular situation involving an alleged refusal to deal:

> the defendant's prior conduct sheds no light upon the motivation of its refusal to deal—upon whether its regulatory lapses were prompted not by competitive zeal but by anticompetitive malice.

*Trinko*, 540 U.S. at 409.

48 See text at note 40 (quoting *Alcoa*, 148 F.2d at 431-432).

49 See, e.g., *Brooke Group*, 509 U.S. at 225 ( "intended effects on the firm's rivals"); ibid. ( "intended victim" and "intended target").

50 Id. at 231:

> Although Brown & Williamson's entry into the generic segment could be regarded as procompetitive in intent as well as effect, the record contains sufficient evidence from which a reasonable jury could conclude that Brown & Williamson envisioned or intended this anticompetitive course of events…. Liggett has failed to demonstrate competitive injury as a matter of law, however, because its proof is flawed in a critical respect: The evidence is inadequate to show that in pursuing this scheme, Brown & Williamson had a reasonable prospect of recovering its losses from below-cost pricing through slowing the growth of generics.

Accord *Weyerhaeuser Co. v. Ross-Simmons Hardwood Lumber Co., Inc.*, 127 S. Ct. 1069, 1071 (2007), which spoke of anticompetitive predatory buying as being for "anticompetitive purposes," but insisted on a test that measured market structure (recoupment) and required prices below cost.

51 The common law often infers intent from knowledge. See, e.g., Restatement (Second) Torts §825 (1977), defining an "intentional" invasion of property as occurring when the actor either (a) "acts for the purpose of causing it" or (b) "knows that it is resulting or is substantially certain to result from his conduct."

52 See generally Ch. 7C.

53 On perfect competition, see ¶402.

54 To be sure, one can imagine a situation where all increased sales come from new customers and none are taken from rivals, but such a situation does not exist when the strategizing firm and its rivals are in the same properly defined relevant market.

55 Both *Alcoa* and *United Shoe Machinery* also used the term "not inevitable." See *Alcoa*, note 40, at 431 ( "It was not inevitable that [Alcoa] should always anticipate increases in the demand for ingot and be prepared to supply them"); and *United States v. United Shoe Mach. Corp.,* 110 F. Supp. 295, 341 (D. Mass. 1953), aff'd per curiam, 347 U.S. 521 (1954) (speaking of Judge Hand's *Alcoa* decision as concluding that a firm had "'monopolized' if, regardless of its intent, it had achieved a monopoly by maneuvers that, though 'honestly industrial', were not economically inevitable, but were rather the result of the firm's free choice of business policies.") Later in the same opinion Judge Wyzanski spoke of the source of USM's market power as not "an adaptation to inevitable economic laws" (id. at 343)—something that would presumably characterize a natural monopoly market. But if these formulations are meant to be a definition

***©2014 Wolters Kluwer. All rights reserved.***
***Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm***

of monopolizing conduct, they suffer from the same basic defect of failing to distinguish between socially beneficial and socially harmful conduct. It is also not inevitable that a firm exclude rivals by building a better mousetrap or by building it more cheaply: to make "inevitability" the touchstone would thus be to condemn the very kind of conduct that it is the purpose of antitrust law to promote. Clearly Judge Wyzanski was not using the phrase in this perverse sense. And it would have been clear that Judge Hand was not either, except for his condemnation of Alcoa for expanding capacity to meet demand.

56 *C.R. Bard, Inc. v. M3 Sys., Inc.*, 157 F.3d 1340 (Fed. Cir. 1998), cert. denied, 526 U.S. 1131 (1999).

57 See ¶e.

58 *Aspen*, note 15.

59 Id., 472 U.S. at 597.

60 See, e.g., *Advanced Health-Care Servs. v. Radford Community Hosp.*, 910 F.2d 139, 148 (4th Cir. 1990); *Instructional Sys. Dev. Corp. v. Aetna Cas. & Sur. Co.*, 817 F.2d 639, 649 (10th Cir. 1987).

61 *Aspen*, note 15, 472 U.S. at 597; *Multistate Legal Studies*, note 34, 63 F.3d at 1550 (conduct not unlawful unless it lacks a "legitimate business justification); *General Indus. Corp. v. Hartz Mountain Corp.*, 810 F.2d 795, 804 (8th Cir. 1987) (equating conduct "without a legitimate business purpose" with conduct "that makes sense only because it eliminates competition"). Other courts sometimes distinguish conduct that merely injures competitors from conduct that harms the "competitive process." *Town of Concord v. Boston Edison Co.*, 915 F.2d 17, 21 (1st Cir. 1990), cert. denied, 499 U.S. 931 (1991).

62 See, e.g., *Multistate Legal Studies*, note 34, 63 F.3d at 1550, where the defendant offered both a general bar review course, in which it had a dominant position, and a complementary professional responsibility (PR) course, while the plaintiff offered only the latter. The court denied summary judgment on evidence that the defendant intentionally scheduled sessions of its general bar review course so as to conflict with the only times that the plaintiff's PR course could be offered, thus forcing students to take the defendant's PR course. See ¶658f.

63 Later discussions will show numerous instances where both courts and enforcement authorities appear to have sacrificed competitive objectives in order to protect particular competitors.

64 We find quite unhelpful and even counterproductive the formulation given in some decisions that a §2 violation occurs when the monopolist uses its market power to "obtain a competitive advantage" over a rival. Read literally, the "competitive advantage" formulation condemns any attempt by a dominant firm to take advantage of economies unavailable to smaller rivals. The relevant question is not *whether* the monopolist uses its position to obtain a "competitive advantage," but *how* it does so.

The "competitive advantage" formulation was given in *Griffith*, note 42, at 107, in reference to nonmonopolistic "leveraging." See ¶652. But the *Griffith* statement was then quoted in *Kodak* in reference to monopolization itself. See *Eastman Kodak Co. v. Image Technical Services*, 504 U.S. 451, 482-483 (1992) (to the extent it is relevant, H.H. was consulted by the defendant after remand). See also *Poster Exchange v. National Screen Service Corp.*, 431 F.2d 334, 339 n.13 (5th Cir.1970), cert. denied, 401 U.S. 912 (1971) (monopolist's decision to charge retail prices to competing wholesaler was unlawful if done "to gain a competitive advantage"); and *Great Western Directories v. Southwestern Bell Tel.*, 63 F.3d 1378, 1386 (5th Cir. 1995) (apparently approving *Poster Exchange* formulation).

65 This approximates Judge Wyzanski's formulation in *United Shoe*, note 55. See ¶614.

66 Cf. *DuPont (Titanium-Dioxide)*, 96 F.T.C. 653 (1980), discussed in ¶737d ; and see ¶741.

67 *United States v. Aluminum Co.,* 148 F.2d 416, 431 (2d Cir. 1945):

> It was not inevitable that it [Alcoa] should always anticipate increases in the demand for ingot and be prepared to supply them…. [W]e can think of no more effective exclusion than progressively to embrace each new opportunity as it opened, and to face every newcomer with new capacity already

**©2014 Wolters Kluwer. All rights reserved.**
**Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm**

geared into a great organization, having the advantage of experience, trade connections and the elite of personnel.

68 See ¶¶725-727.

69 On tying, see Ch. 17; exclusive dealing, Ch. 18; package discounts, ¶749.

70 See ¶706.

71 See 15 U.S.C. §26 ( "Any person…shall be entitled to sue for and have injunctive relief…against threatened loss or damage by a violation of the antitrust laws…."); see ¶326.

72 See ¶706e ; *Critical-Vac Filtration Corp. v. Minuteman Intl., Inc.*, 233 F.3d 697 (2d Cir. 2000), cert. denied, 532 U.S. 1019 (2001) (antitrust counterclaim to patent infringement suit was compulsory and thus could not be brought after infringement suit was completed).

73 See ¶706.

74 On this point, see Jonathan B. Baker, Promoting Innovation Competition Through the *Aspen*/*Kodak* Rule, 7 Geo. Mason L. Rev. 495 (1999).

75 See ¶706.

76 See generally Ch. 15.

77 *Microsoft*, note 1, 253 F.3d at 59.

78 See ¶1512.

79 These matters are taken up in Ch. 7C.

80 See note 1; ¶617.

81 On such suits, see ¶706.

82 *Grinnell*, note 44, 384 U.S. at 570-571 (emphasis added). The Supreme Court restated this formulation in *Verizon Communications v. Trinko*, 540 U.S. at 407. See also *Aspen*, note 15, 472 U.S. at 602 (speaking of the "purpose to create or maintain a monopoly," quoting *United States v. Colgate & Co*., 250 U.S. 300, 307 (1919). These formulations are widely quoted or paraphrased. See, e.g., *Kodak*, note 64, 504 U.S. at 483 (§2 violated by willful actions designed to maintain defendant's monopoly position when not supported by valid business justifications); *Christianson v. Colt Indus.*, 486 U.S. 800, 810 (1988) (§2 violated by willful maintenance of monopoly power as opposed to growth or development that results from a superior product, business acumen, or historic accident); *Hanover Shoe v. United Shoe Machinery Corp*., 391 U.S. 481, 486 (1968) (noting and approving lower court's conclusion that restrictive lease policies were designed to maintain defendant's monopoly); *C.R. Bard*, note 56, 157 F.3d at 1371 (similar).

83 Cf. *Bigelow v. RKO Radio Pictures,* 327 U.S. 251, 264 (1946) (damages).

84 Section 5 is also a jurisdictional vehicle for FTC action against violations of the Sherman and Clayton Acts. We discuss possible differences in FTC and court actions against monopoly in ¶302.

85 See, e.g., 83 Cong. Rec. 3287 (1938) ( "…under this section the Commission may stop false advertising with reference to all products. They have always used that power; but in the past they have had to show that the false advertisement was injurious to some competitor. We are doing away with that requirement in this bill and are providing that if an advertisement is false and deceptive it may be stopped if it is injurious to the public.") (Mr. Wheeler). See also *Pep Boys-Manny, Moe & Jack v. FTC*, 122 F.2d 158, 161 (3d Cir. 1941) ( "The failure to mention competition in the latter phrase [ "unfair or deceptive acts or practices"] shows a legislative intent to remove" the requirement of injury to competition, and "the Commission can now center its attention on the direct protection of the consumer where formerly it could protect him only indirectly through the protection of the competitor.").

86 See Ch. 7E.

87 *GM v. FTC,* 114 F.2d 33, 36 (2d Cir. 1940).

***©2014 Wolters Kluwer. All rights reserved.***
***Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm***

88 E.g., *Mohawk Refining Co. v. FTC,* 263 F.2d 818 (3d Cir. 1959) (not only prohibiting petitioner from failing to disclose that its oil was reclaimed from previously used oil, but also from selling such oil at all, notwithstanding a finding that the product was "identical with all other finished motor oils as to composition, quality, and utility.").

89 An additional problem with incorporating state business tort law is that it varies, sometimes widely, from state to state. It would be unseemly for an antitrust court to seek and then apply the law of the state most hostile to a particular practice. Even if the injury were confined to states accounting for a significant portion of the monopolist's business, diversity would in all likelihood remain; and even if not, it makes no sense to treat two monopolists differently under §2 because of fortuitous differences in state tort law. In short, antitrust courts would at the least have to formulate a "federal" law of business torts. But rather than engage in such an exercise, it seems far more sensible to deal directly with the question of what is "exclusionary" in light of the purposes of §2.

90 *Griffith,* note 42, at 106.

91 See generally Ch. 16B. The per se rule against resale price maintenance was overruled by the Supreme Court's decision in *Leegin Creative Leather Products, Inc. v. PSKS, Inc.*, 127 S. Ct. 2705 (2007). It is conceivable that the high retail margin protected by minimum resale price agreements would lead retailers to prefer handling the monopolist's product to that of any newcomer who would thereby fail to obtain adequate retail representation. But this would be a rare case. Our point is that a Sherman Act §1 violation is not automatically or necessarily an "exclusionary" act for §2 purposes.

92 See Ch. 23.

93 See Ch. 18.

94 See Ch. 17.

95 See Chs. 9-11.

96 See Ch. 17B-2.

97 See ¶777.

98 See Ch. 7D.

99 E.g., *United Shoe*, note 55 (condemning USM's price discrimination in lease terms; leases are not reachable by the Robinson-Patman Act, which covers only sales; see ¶2312).

100 E.g., *Kodak*, note 64, and ¶564.

101 See ¶519.

**©2014 Wolters Kluwer. All rights reserved.**
**Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm**

EXHIBIT 305

# Antitrust Law: An Analysis of Antitrust Principles and Their Application - Areeda and Hovenkamp, ¶1756. Proving Understood Conditions

Click to open document in a browser

**Last Updated: 4/2014**

**1756a. Introduction and summary..—**Typically, an announced condition is unambiguous and if followed by a bundled sale would then be a tying agreement. [1] Absent an announced condition, this Paragraph analyzes several recurring situations to determine whether and when an understood condition should be presumed.

*Caveats.* To minimize repetition, we say little here about the unimplemented or incomplete tie discussed earlier. [2] Nor do we say much about the "silent" tying condition practiced by the defendant but unknown to its would-be customers. [3] Were the silent condition sufficient to trigger the Clayton Act (and were its technical requirements satisfied [4] ) and were it found in any of the situations considered in this Paragraph, there would be a tying agreement without regard to the other factors analyzed here. Another issue that we will generally ignore until ¶¶f-g on terminated or rejected dealers is whether a non-tying agreement or nonsale to a particular person might nevertheless imply a tie with respect to the defendant's other customers. We also leave aside the technological tie and the package discount, which may have the effect of constraining customers to buy the defendant's bundle. [5]

*Summary.* A two-product transaction does not necessarily mean that buyers reasonably understand a tying condition that product *A* is unavailable separately. This Paragraph suggests circumstances in which the antitrust tribunal should or should not presume such a condition absent contrary evidence. A tying condition is presumptively absent when buyers request or choose a bundle of products that a defendant makes available separately (¶b1). This conclusion is not invariably undermined by a high percentage of bundled sales, onerous terms for the tied product, or a single contract covering both products, although these factors might help resolve more ambiguous cases (¶b2-4). Indeed, a single *negotiated* contract covering two products should itself be presumed a non-tie. At the other pole, a tying condition is readily inferred from a bundled sale after a rebuffed request for separate provision ( ¶c). The usual question is what constitutes a sufficient rebuff.

A form contract covering two products is presumptively a tie even though buyers have not requested separate provision and been rebuffed ( ¶d). Although merely offering a bundle that is purchased has some kinship with a form contract, we would not presume a tie unless buyers have requested separate provision or circumstances indicate that such requests would be futile or unduly burdensome ( ¶e). Nor should a tying condition be inferred from vigorous salesmanship urging *A* customers to buy *B*, although at some point salesmanship becomes a threat, which is sometimes implemented by cutting off supply of *A* to those who do not buy *B* ( ¶f). The additional practical questions are whether courts should infer that a defendant's conduct toward a non-unique customer also characterizes its dealings with other customers and whether terminating one customer implies prior tying arrangements with the terminated firm or current ties with others. Similar issues arise with additional ambiguities when a defendant silently refuses to deal with certain customers not buying or likely to buy its *B* ( ¶g).

Because we often deal here with ambiguous situations, we remind readers that the plaintiff bears the burden of persuading the tribunal that two products have been tied together. [6] The several tying presumptions that we suggest in the course of this Paragraph would satisfy that burden. But once appropriate rebuttal evidence is offered, the plaintiff must persuade that a tie is more likely than not.

**1756b. Non-tied bundles..—**

**1.** ***Buyer requests or chooses bundle though products available separately.*** **[7] .—**Products *A* and *B* are not tied together when buyers choose the bundle from a defendant who also offers the products separately. [8] This conclusion would be overcome when a particular plaintiff can persuade the tribunal that the offer to sell

***©2014 Wolters Kluwer. All rights reserved.***
***Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm***

separately was insincere—as when the defendant declined or ceased to deal with anyone who asked for *A* alone.

There is also no tie when buyers request and receive an *A*/ *B* bundle from the defendant who has no publicized policy one way or the other on bundling or separate availability. [9] The defendant has no obligation to offer or remind the buyer of an option to buy product *A* alone. Of course, this conclusion is overcome when the plaintiff persuades the tribunal that the defendant had generated among buyers the reasonable impression of a tying condition— for example, by threats of denying *A* separately or notorious terminations of others who had declined the bundle. [10]

The "uncoerced" request or choice of a bundle or other non-tying transaction is *not* rebutted by proof that a high percentage of defendant's transactions are bundled, that the terms for defendant's product *B* appear onerous, or that one contract covers two products—although some of these matters can sometimes be relevant. Indeed, the individually negotiated contract can rebut other evidence that two products have been tied together.

**1756b2. *High proportion of bundled sales..*—**A [11] high percentage, even 100 percent, of bundled sales does not itself indicate that two products have been tied together. [12] The buyers may have all bought the products bundled because they preferred them together. [13]

Of course, a high percentage of bundled sales can usefully supplement other evidence to indicate an understood tying condition. In one example, the defendant makes strong statements bordering on—but not quite sufficient to prove—threats that dealers had better take its *B*. [14] When all of them do so, we can properly infer that they reasonably supposed they had to buy *B* in order to get *A*. In a second example, defendant employs a "form contract" indicating an understood tying condition but offers rebuttal evidence. [15] A very high percentage of bundled sales would then be a surrebuttal.

What percentage is "high" depends on the rationale invoked to support liability. In the first example above, 80 percent bundling need not transform an otherwise ambiguous "threat" into an understood condition. In the form contract example, 2 percent unbundling might represent everyone who wanted and asked for it while even 80 percent bundling might indicate that the vast majority of customers reasonably assumed they had no choice. While any line is arbitrary, we would require 90 percent bundling to make persuasive otherwise insufficient evidence of a tying condition [16] or more than 10 percent unbundling to rebut an otherwise established or presumed inference of a tying condition. The plaintiff must introduce the evidence in the first instance; the defendant in the rebuttal instance.

**1756b3. *“Onerous” second product..*—**A tie is not conclusively established by evidence that taking product *B* is onerous because its price is higher or its quality lower than market alternatives. [17] *First*, price-quality claims are often difficult to resolve. Buyer testimony of lower quality is self-serving, and an objectively higher price might be offset by higher quality. *Second*, that a particular customer later shows an onerous *B* does not prove an understood tying condition, for it may simply have made a bad bargain or overreacted to the defendant's legitimate salesmanship. [18] Nevertheless, we can presume that a rational customer would not take an overpriced or inferior product *B* unless it must in order to get the defendant's product *A*—that is, unless there was a tying condition. [19] To be sure, the typical buyer burdened with an above-market quality-adjusted price for product *B* is compensated in the form of a lower price than it would otherwise have paid for product *A*. [20] It remains true that a customer might prefer to buy product *B* elsewhere notwithstanding recompense when buying it from the defendant. That the customer nevertheless purchased from the defendant tends to indicate that it had to in order to get defendant's product *A*. [21]

**1756b4. *Single contract; genuine negotiations..*—**The non-tying sale of products pursuant to the buyer's request or choice in ¶b1 remains a non-tie even though it is embodied in a single contract, [22] even one with an

***©2014 Wolters Kluwer. All rights reserved.***
***Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm***

apparent but illusory tying provision conditioning the sale of *A* on purchases of *B*. For example, the buyer might have declined the defendant's offer to sell *A* separately and then negotiated a contract covering both products.

Even apart from the ¶b1 circumstances, a single written *negotiated* [23] contract requiring buyers to buy *A* and *B* from the defendant does not establish a tie. [24] The parties might find it convenient to enter such a contract notwithstanding the defendant's willingness to sell *A* separately. Moreover, this contract does not imply that bundling is always or often the defendant's opening position. Even if it were, trying to sell all of one's products is quite legitimate, especially when nothing suggests that an unbundling request would have been futile or excessively burdensome or that redrafting would be impracticable. More generally, a negotiated *A*/*B* contract does not itself imply an announced or understood general policy against separate provision. The plaintiff must show more to establish that the two products were tied together. [25]

**1756c. Bundled sale after rebuffed unbundling request..—**The [26] tribunal should infer an understood tying condition when buyers requested product *A* separately, were flatly rebuffed by the defendant, and then bought both products *A* and *B*. [27] Even had the defendant unbundled for more insistent customers, the rebuffed customers reasonably believed that the defendant would not sell the products separately.

What constitutes a sufficient rebuff varies with the circumstances. A defendant's statement that "you really should take both products" is not enough. More ambiguous was the conduct in one Second Circuit case that found no tie where a television network did not refuse outright the plaintiff's request to buy advertising on selected stations. [28] Instead, the defendant's employees made a counteroffer for the full network, saying that the price for a selected lineup of stations would be higher and that its price and feasibility would have to be discussed with other network officials. [29] The plaintiff then completed negotiations for a full lineup without again requesting a selected lineup or inquiring as to its cost. [30] The court refused to hold that any delay at all in offering a separate price is a sufficiently vigorous rebuff to be coercive and to make an agreement to take the package a tie. [31] Nor did defendant's "initial amorphous negative response" suffice to give the plaintiff a reasonable belief that further negotiation would not have persuaded the defendant to unbundle some of the stations. [32]

Once the defendant's rebuff is sufficiently vigorous to create a reasonable belief that the products were tied together, antitrust policy does not require the buyer to ask several times or decline the package as a bargaining lever. [33] Nor is it required to go over the head of the rebuffing person up the chain of defendant's hierarchy until the very head of the firm rejects its request. [34] Thus, the Supreme Court affirmed district court findings that movies were tied together when the defendant had flatly refused buyer requests in the course of negotiations to license just some of the films. [35] The Court even implied that refusing to state "individual film prices" might sometimes be a sufficient rebuff to show that the films were tied together. [36]

In addition, rebuffs of unbundling requests from known customers generally imply that the defendant has also rebuffed other unknown requests to unbundle, unless the known buyers are unique in some respect. [37] Of course, the defendant can rebut by showing accepted requests and unbundled sales. [38] Although any particular number is arbitrary, we would find an adequate rebuttal with 10 percent accepted requests or unbundled sales and even more strongly with 15 percent.

**1756d. Form contracts to buy both products..—**

**1. *Analysis*..—**Consider the defendant who generally uses a form contract covering both products *A* and *B* with every customer. Such a contract does not necessarily mean that the two products were tied together, for the defendant might have revised the contract if asked, [39] and buyers may understand that they could buy product *A* separately if they wanted. Using the form contract might indicate only that buyers generally prefer to take their products *A* and *B* from the same source, so that it saves contracting costs to include both as a standard term.

***©2014 Wolters Kluwer. All rights reserved.***
***Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm***

This non-tying explanation is more likely when the form merely covers specified amounts of each product, *A* and *B*. When the contract's *B* term requires customers to take their *B* requirements exclusively from the defendant, the term's positive value to the buyer might seem more doubtful. Still, they might trade that restriction on their future action for an assured supply of product *B* or for a price reduction in product *B* made possible because of efficiencies flowing from exclusive dealing. [40] Finally, even a contract term expressly conditioning the defendant's obligation to supply *A* on the buyers' buying and paying for product *B* could be an illusory tying condition minimizing contract disputes and litigation over what constitutes a material breach. [41]

While form contracts do not conclusively prove that product *A* was unavailable separately, the tribunal may reasonably infer, absent contrary evidence, that products *A* and *B* were tied together. The contract form reveals that the defendant's opening offer to every buyer is for both products together. Moreover, sellers do not generally deviate from their form contracts, and their agents at the point of sale often lack authority to deviate from the form. Accordingly, buyers can reasonably interpret the defendant's form as announcing a general and hard-to-change policy against selling products *A* and *B* separately. Furthermore, the process for requesting and obtaining revisions in the form contract can often be excessively onerous relative to the stakes of the transaction. [42]

Because the recommended presumption over-includes some non-ties, consider three correctives. *First*, the defendant fearful of antitrust liability can itself eliminate the concern by disclosing on the form that product *A* is available separately (even though on different terms [43] ). The form might even allow buyers to check a preference for *A* alone or for both, thus reducing the parties' alternative contracting costs nearly to zero. [44]

*Second*, the recommended presumption might be triggered only if the plaintiff also presented evidence not only that the contract was a form contract but also that buyers requested separate provisions and were rebuffed or that many buyers actually understood that they had to buy *B* in order to get the defendant's *A*. Such requests are often required before finding a tie, as discussed in ¶e, but that requirement does burden the litigation. On balance, the tribunal should not require rebuffed requests or similar particularized evidence once it is persuaded by the plaintiff that the two-product contract is indeed a form contract.

*Third*, the proposed presumption should be rebuttable with evidence, for example, that buyers frequently requested and received *A* separately or generally understood that contract revisions were readily available. Ambiguities might be narrowed when the request procedure is burdensome, the defendant threatens or actually "punishes" dissidents, [45] or the percentage of bundled transactions is high.

**1756d2. *Precedent..*—**Precedent is generally consistent with our analysis in results but not always in language. The cases inferring a tie from a contract containing a tying provision almost all involve form contracts, [46] while the cases declining to infer a tie from such a contract generally involve negotiated contracts. [47] Thus, the cases are consistent with our conclusion that a tie can be inferred from a form contract covering two products but not from a negotiated contract. Many of the form contract cases went further in their dicta, suggesting that a contract itself implies a tie. [48]

In *IBM*, the Supreme Court found a tie in contracts leasing tabulating machines so long as users did not use non-IBM tabulating cards with those machines. [49] Although the opinion suggested that *any* such "tying clause" is a tie, [50] the lease used by IBM with all lessees except the government [51] appeared to be a form contract. [52] *United Shoe* also condemned as tying a clause routinely inserted by the defendant in machine leases that required lessees to use its tied products. [53] Although such a form contract justified the inference of a tie, the defendant claimed in rebuttal that the lessees were all offered an alternative lease without the requirement. [54] Noting that this alternative came with a premium price that, according to disputed testimony, was so onerous as to compel buyers to accept the tying condition, the Court declined to say whether these pricing relationships amounted to a tie. [55]

***©2014 Wolters Kluwer. All rights reserved.***
***Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm***

The *International Salt* and *Northern Pacific* decisions inferred a tie from form contracts selling or leasing an allegedly tying product and requiring the customers to buy the allegedly tied product from the defendant as long as its terms were as good as or better than those of rivals. [56] Moreover, the *International Salt* Court inferred the tie even though 50 of 913 total leases varied the form terms and four actually omitted the tying clause. [57] That "[t]he tying clause has not been insisted upon in all leases…do[es] not justify the general use of the restriction…." [58] *International Salt* thus shows that tying may be inferred from a form contract notwithstanding a realized possibility of altering the form as long as it is realized infrequently.

The lower courts have uniformly been willing to infer a tie when a standard form contract for sale of the defendant's allegedly tying product contains a provision requiring the buyer to take the defendant's allegedly tied product. [59]

**1756e. Bundle offered and bought..—**Suppose the only evidence of tying is that the defendant offered products *A* and *B* in a bundle that customers bought. Should we presume that customers understood that they had to take *B* in order to get *A*? Although the seller's opening offer is a bundle, it seems legitimate for sellers to try to sell all of their products. To be sure, there is some kinship with form contracts, for customers might believe that requesting separate provision would be futile or excessively burdensome. [60] Even so, the offer of a bundle seems less likely than a form contract to imply a likely refusal to sell *A* separately. Accordingly, a tie should not be inferred from such evidence [61] unless the plaintiff proves either that requests for separate provision were rebuffed [62] or circumstances indicate that customers reasonably believed that such requests would be futile [63] or excessively burdensome. The absence of such requests can mean that customers prefer the bundle or that no rival suppliers offer a tempting deal for the business "foreclosed" in the tied market.

Evidence that requests for separate provision are futile include the defendant's announced policy that it will not sell product *A* separately, rebuffed requests, refusals to sell or continue selling to those who do take its product *B*, putting two products in one box, or any similar conduct creating a reasonable impression of such a policy. For convenience in administering the antitrust laws, moreover, we would infer futility from the defendant's internal documents or admissions known to the tribunal—though not to customers—that the defendant would not sell *A* separately. [64]

The plaintiff may also prevail by showing that requests for separate provision are impractical. Suppose, for example, that a defendant sells cameras only in boxes containing some accessory that is deemed a separate product. Although customers might successfully request unbundling, consumers (or even dealers) likely face high transaction costs in making such requests to be considered by defendant's marketing department far from the point of sale. Indeed, no reasonable retail consumer believes it can cause the manufacturer to take seriously a request for altering the contents of the box. Such impractical requests should not be required. [65] The packaging of products in a box for consumer sale is thus generally and rightly understood as presenting a take-it-or-leave-it proposition that is a tie of the products. [66] By contrast, sophisticated repeat buyers of big-ticket items may feasibly request a defendant to sever the physical link it has made between the two products.

**1756f. Sales pressure, threats, terminations..—**

**1. *Sales pressure versus reasonable impression of tying condition..*—**Without showing that unbundling was ever requested, a bundle-buying plaintiff often offers evidence suggesting that the defendant chilled requests for separate provision. The tribunal must then decide whether that evidence suffices to prove a reasonable impression among customers that product *A* is not available separately. [67]

If the defendant says flatly during negotiations that it will refrain from or cease supplying *A* unless the customer buys *B*, it has announced a tying condition and leads reasonable buyers to believe that the products were tied together. One could take the opposing view—that buyers in such cases must test the defendant's statements by trying to buy the products separately. But here the defendant's own statements have indicated that such

***©2014 Wolters Kluwer. All rights reserved.***
***Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm***

requests would be futile. The cases are in accord. [68] To be sure, the defendant may be bluffing, so that it turns out that it has frequently (but not notoriously) granted buyer requests for separate provision or sold *A* to those who did not take its *B*. Unless the bluff is so notorious that reasonable buyers should know that the defendant's threats are empty, a tie is correctly found. [69] Though the defendant may have no intention of implementing the threat, a reasonable buyer will not know that subjective intention and will thus understand that a tying condition exists. [70] Of course, if the threat is withdrawn in timely fashion, no tie should be found. [71]

By contrast, no tie arises when the defendant merely points out the utility to buyers of taking the bundle [72] or urges or encourages them to do so but without suggesting that their access to *A* turns on purchasing *B*. [73] Any firm producing *B* would naturally and legitimately try to sell that product to those buying its *A*. [74] Such salesmanship does not mean that the defendant would refuse to sell *A* separately. While some buyers may perceive veiled threats from such salesmanship, even when *B* suggestions are separated in time from *A* salesmanship, their honest belief that their *A* supply is in jeopardy would be unreasonable. [75]

**1756f2. *"Notorious" terminations..*—**What is otherwise legitimate salesmanship becomes an implemented de facto announced tying condition when the defendant refuses to supply or ceases to supply *A* to those who do not take its *B*. There are three issues of proof. *First*, the plaintiff must show that the refusal or cessation was linked to the nonbuying of *B* rather than to other legitimate reasons, such as nonpayment of bills, insufficient sales volume, or the like. [76] *Second*, we must know or presume that the defendant made the suggestion to others that terminations transform into threats. [77]

*Third*, the implicit announcement creating a reasonable impression that buyers must take defendant's *B* in order to get the defendant's *A* extends only to those who are aware of the defendant's conduct. For customers buying the *A*/ *B* bundle with such awareness, the two products are tied together. [78] The question is whether the plaintiff or the defendant should bear the burden of producing evidence about awareness of the terminations and the reasons for them. We recommend that such awareness be presumed. [79] This presumption can be rebutted with evidence that buyers in fact were unaware of, or drew no inference from, the termination of others.

A final complication is the "punishment" for failing to buy the defendant's *B* that falls short of a refusal to sell *A* separately. Examples are late delivery, inadequate service, and onerous lease renewals. Although such sanctions may convert the suggestion into a threat, [80] that threat is not a tying condition as such because the defendant continues to supply recalcitrant customers with tying-product *A*. [81] However, regular use of such sanctions gives package buyers better nonprice terms and thus amounts to a package discount that sometimes becomes a tie. [82]

**1756f3. *Inferring threats or tying conditions to others..*—**When a defendant has threatened to or actually refused to supply or ceased supplying tying-product *A* to a nontrivial number of known customers, it has implicitly announced or created an understood condition with respect to those buyers. [83] If this behavior is presumed or proved notorious, the products are tied together for other customers purchasing the bundle. [84] Moreover, the tribunal is entitled to infer that the defendant's behavior toward the known customers was also practiced toward its other customers unless the known "victims" are unique in some relevant respect. [85] For reasons discussed earlier, we generally presume that the known victims are not unique unless the defendant introduces evidence to the contrary. [86]

The plaintiff wants to show ties with others for two reasons. *First*, the extent of damages [87] as well as rule of reason liability [88] may depend upon the share of the tied market that has been foreclosed. *Second*, no tying agreement, conditioned sale, or foreclosure results from refusals to supply or buy a tied bundle. [89] Thus, suit

**©2014 Wolters Kluwer. All rights reserved.**
***Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm***

by rival *B* suppliers or by nonbuying or nonsupplied customers depends upon proving other tying agreements or conditioned sales.

**1756f4. *Suits by terminated dealers..*—**The [90] plaintiff, typically a dealer or franchisee, who complains that its supply of *A* was terminated because it would not buy the defendant's product *B* may base its damage suit on a prior tying agreement with itself [91] or on the defendant's tying agreements with others. In either situation, it must prove that termination resulted from the plaintiff's refusal to take the defendant's *B* rather than from the many legitimate reasons that suppliers have to cease dealing with a customer. [92] The plaintiff must also show that it suffered actual injury as a result of the termination. [93] And, like all private plaintiffs, it must show that its injury resulted from the defendant's illegal conduct and constituted "antitrust injury." [94]

**(A) *Plaintiff's prior tie..*—**The terminated plaintiff can try to prove that it previously purchased the bundle under an illegal tying arrangement and was injured thereby. Whether its own previous purchases were under an illegal tying condition depends upon the factors already discussed in this Subchapter. In particular, the termination itself may imply that past sales of the tying and tied product to that plaintiff were tied together—by strengthening the inference of an understood tying policy from otherwise ambiguous conduct by the defendant.

Even when past illegal tying is established, the dealer will find it difficult to prove that past purchases of the bundle injured it. [95] Indeed, it is more likely to complain that it was injured not by past tying but by the cessation of supply that reduced its profits or even ruined its business. But compensable injury must result from the defendant's illegal conduct. On the one hand, the injury apparently results not from an illegal agreement or conditioned sale but from lawful nonagreeing or nonsale. [96] On the other hand, termination for noncompliance might seem an inherent term of the original tying agreement or conditioned sale. [97]

**(B) *Tying with other buyers..*—**Instead of proving a prior tie with itself, the terminated plaintiff may try to prove tying arrangements with others via any of the proofs or presumptions already discussed, including the ¶f2 presumption that the defendant has behaved similarly toward others. In particular, the evidence may indicate a tying arrangement with any identifiable replacement dealer. Moreover, terminating the plaintiff may be a signal reminding other customers to comply with their ties and thus be evidence of other ties. [98] Indeed, when the defendant is careful in its salesmanship, terminating dealers who do not buy *B* may be the only significant evidence of tying arrangements.

After proving illegal tying arrangements with others, the plaintiff must show that they caused its termination and thus its injury. The issue is whether terminating the noncomplying plaintiff is *necessary* to have tying arrangements with others or *economically feasible* for the defendant only because of those other ties. [99] Termination might be necessary to maintain those other ties by demonstrating to other customers the perils of noncompliance. [100] Termination might also be necessary if the bundle buyers would suffer a significant competitive disadvantage relative to buyers of defendant's *A* alone. This seems unlikely because the typical tied buyer received a lower price for the tying product as recompense for inferior quality or higher prices for the tied product. [101] Somewhat stronger is plaintiff's economic feasibility argument that the defendant could not afford, or at least would not bother, to terminate the plaintiff for not buying *B* unless the defendant had many other customers complying with illegal tying arrangements. [102]

The plaintiff has an additional feasibility argument when the defendant limits the number of its customers and replaces the plaintiff with an identifiable alternative customer subject to illegal tying arrangements. In that event, the new tie would not have been feasible without the termination of the plaintiff. Indeed, the termination was necessary for it. If the plaintiff's termination is thus contingent on or necessary to the existence of illegal ties with others, the required causal link exists.

**1756g. Silent refusals to deal or terminations..—**We conclude with the defendant's silent rejection or termination of dealers who are not likely to buy the defendant's *B* or have not done so. [103] By hypothesis, the

***©2014 Wolters Kluwer. All rights reserved.***
***Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm***

defendant has neither explained its choice of new or continued customers nor made any *B*-buying suggestions to actual or potential customers. Such cases are rare, for the typical seller eagerly encourages potential or actual customers for one of its products to take some or even all of their requirements of other products in its line. When it does occur, the truly silent rejection or termination is not a tie unless (1) the court finds that the defendant's silent practice is sufficiently consistent and notorious as to be a de facto announced or understood tying condition or, if not, (2) the court adopts the ¶1755c theory and learns from admissions or otherwise that the defendant had a secret policy unknown to customers of never selling product *A* separately.

**1756g1. *Initial selection of customers..*—**Such findings should not be made lightly, especially when the defendant merely chooses its dealers (or franchisees) in the first instance. [104] The supplier has the general right to select the dealers that it judges likely to be reliable and effective in representing its brand, and the supplier will bear the loss from mistaken selections. [105] In order not to interfere unduly with this process, the court should presume that the defendant has selected customers for such legitimate reasons until clear contrary evidence appears. [106]

Evidence of bundled purchases after the defendant initially selects dealers for product *A* based on their likely propensity to buy its product *B* should not indicate that the two products are tied together. [107] The silent selection and rejection of buyers based on their mere propensity to buy the tied product is unlikely to send a strong signal to future applicants or to the selected dealers.

Bundled purchases by dealers selected for a new product *A* based on their past and expected future purchases of product *B* could reflect a tie if it becomes sufficiently notorious to be an understood tying condition. If applicants for dealerships know that they must buy *B* in order to be accepted and are accepted and do buy the bundle, a tie exists because the defendant's conduct created among buyers the reasonable impression that they had to take *B* in order to get *A*. But the proof must be clear. That existing dealers take both products may mean only that a seller will naturally favor already selected buyers. Even proof that a rejected applicant had asked for separate provision would be insufficient, for its rejection could have been warranted on independent grounds. [108] The plaintiff must show that rejections under similar circumstances happened to sufficient applicants with enough consistency to establish a persuasive pattern that sends a clear signal to other buyers. Indeed, a defendant who currently has (or is negotiating with) dealers or exhibitors willing to take two products or films commits no tie by refusing to deal with a plaintiff who wants only one. [109]

In general, antitrust courts should hesitate to control a seller's initial selection of customers, for policing involves severe administrative difficulties. The seller is not obliged to sell to all applicants when it prefers more selective distribution, [110] and courts are hardly expert at weighing the suitability of various dealers in terms of a defendant's legitimate interests. [111]

**1756g2. *Terminations..*—**Silent termination of a customer— typically a dealer or franchisee—who did not purchase the defendant's product *B* is a nonagreement or nonsale. [112] To show liability, therefore, the plaintiff must show either that the silent termination implies a prior tie with the terminated customer or present ties with other customers. The issues are essentially those briefly explored in ¶f4.

A prior tie with the terminated dealer is hard to establish. A silent termination uncoupled with any suggestions could not have given the dealer an impression that it had to buy *B* in order to get *A*. Moreover, at the time the dealer bought the defendant's tying and tied products, it could not have known of its own future termination for not buying *B*. [113]

Numerous silent terminations, however, might prove that buyers generally and reasonably understand that products *A* and *B* are tied together. Silent terminations become equivalent to announcing conditions to other customers when the terminations were in fact based on not purchasing *B,* and other customers are aware of

***©2014 Wolters Kluwer. All rights reserved.***
***Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm***

such terminations and the reasons for them and know what they must do to avoid termination themselves. [114] But proof is not easy.

*First*, the true reason for any given termination may be obscure to the immediate observer with access to both parties and even more so for those viewing terminations from afar. As we have noted, defendants have many reasons for ending relationships, especially with dealers and franchisees. In addition to nonpayment of bills or inadequate service to consumers, a dealer's declining volume or zero purchases of *B* may reflect diminished attention to the brand that could itself justify termination in favor of a more vigorous replacement. Thus, no illegitimate termination should be inferred merely because replacement or nonterminated dealers handle more of the defendant's product. Otherwise the threat of finding a tie will deter the manufacturer's efforts to find dealers who distribute its product more actively. Such a termination does not evidence a tying policy or give rise to a reasonably understood tying condition on the part of those who learn about the termination. [115] Nor does termination resulting from the defendant's decision to sell directly to consumers, even if limited to the terminated dealer's area. [116] If there were such an inference, it would be rebuttable. [117]

*Second*, the plaintiff must show that other buyers were aware of such terminations for illegitimate tying reasons. An Alaska termination unknown to the rest of the country cannot generate an understood tying condition in other states. Nor can other dealers have such a reasonable impression of such a condition when they know of the termination but are unsure as to the reasons for it. One thus cannot infer the equivalent of announced conditions with remaining dealers based only on evidence of the silent termination of other dealers for noncompliance. [118]

Awareness might be inferred indirectly, subject to rebuttal, from the defendant's unambiguous intent to use termination as a signal to other customers—as revealed, for example, by an admission or clear internal memorandum. Such an intent by a sophisticated and rational seller who presumably knows its market implies that its other customers would receive the signal. However, the termination itself implies no such intent. [119]

While the ¶1755c tying theory is independent of buyer awareness, an internal defendant policy to refuse to sell *A* separately cannot be inferred from isolated or ambiguous terminations but only from strong proof that many, if not most, dealers not buying *B* were terminated. Still, we have suggested that terminated customers are presumptively not unique and that terminating a non-unique customer for noncompliance implies that the defendant also denies the tying product to other buyers who fail to buy the tied product. [120] But pyramiding a series of inferences from an occasional termination for not buying *B* into a conclusion that defendant has a silent policy of not selling *A* separately goes too far.

**Footnotes**

1 See ¶1754b - d.

2 See ¶1753d - e, and 1754f.

3 See ¶1755.

4 See ¶1752f2 -3.

5 See ¶¶1757 - 1758.

6 See ¶1752d. *CCBN.com, Inc. v. Thomson Fin., Inc.*, 270 F. Supp. 2d 146 (D. Mass. 2003) (dismissing complaint that did not allege that alleged tying and tied products were contractually tied together, or name any customers forced to purchase the two together).

7 See ¶a caveats.

8 *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 11-12 & n.17 (1984); *Northern Pacific Railway Co. v. United States*, 356 U.S. 1, 6 n.4 (1958) ( "[W]here the buyer is free to take either product by itself there is no tying problem even though the seller may also offer the two items as a unit at a single price."); *Marts v. Xerox*, 77 F.3d 1109, 1112-1113 (8th Cir. 1996) (no tie if defendant willing to offer items separately

**©2014 Wolters Kluwer. All rights reserved.**
***Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm***

at reasonable prices); *Stephen Jay Photography v. Olan Mills*, 903 F.2d 988, 991 (4th Cir. 1990) (no tie when buyers free to take yearbook with or without portraits); *Cia. Petrolera Caribe v. Avis Rental Car Corp.*, 735 F.2d 636, 637-638 (1st Cir. 1984) (no tie between rental cars and gasoline where customers had option of buying own gas); *CBS v. ASCAP*, 562 F.2d 130 (2d Cir. 1977) (blanket license of multiple copyrighted songs not a tie because buyers were free to instead get separate licenses from individual copyright holders), rev'd on other grounds sub nom. *BMI v. CBS*, 441 U.S. 1 (1979); *Capital Temporaries v. Olsten Corp.*, 506 F.2d 658, 665 (2d Cir. 1974) (no tie if contract gave buyer option of taking allegedly tied product); *Waldo v. North American Van Lines*, 669 F. Supp. 722, 727-729 (W.D. Pa. 1987) (no tie between tractor and insurance where buyers had option of obtaining insurance on own or from defendant); *Smith v. Mobil Oil Corp.*, 667 F. Supp. 1314, 1329-1330 (W.D. Mo. 1987) (no tie where contract left franchisees free to buy tires, batteries, and accessories from either defendant or other suppliers); *Innovation Data Processing v. International Business Machines Corp.*, 585 F. Supp. 1470, 1475 (D.N.J. 1984) (no tie if buyers free to take two software programs separately or together). Cf. *Georgia-Pacific Consumer Prods., LP v. Von Drehle Corp.,* 645 F. Supp. 2d 532 (E.D.N.C. 2009), vacated on other grounds, 618 F.3d 441 (4th Cir. 2010) (no tying of defendant's towel dispensers and towels where customers routinely purchased towels from rival and many appeared not even to be aware of the requirement); *Downs v. Insight Commcn. Co.*, 2010-1 Trade Cas. ¶77059, 2010 WL 2228295 (W.D. Ky. June 16, 2010) (no tying where cable company did not actually require customers to purchase set-top box; box was necessary only for those wishing interactive communication; others could use card pre-installed in TV).

9 See, e.g., *Tic-X-Press v. Omni Promotions Co.*, 815 F.2d 1407, 1416-1417 (11th Cir. 1987) ( "[N]o tying problem where buyer asks for package of items and is sold what it wishes to buy").

10 See ¶f.

11 See ¶a caveats.

12 See, e.g., *Cia. Petrolera Caribe v. Avis Rental Car Corp*., 735 F.2d 636, 638 (1st Cir. 1984) ( "high percentage" of allegedly tied purchases from defendant "insufficient, standing alone, to demonstrate coercion"); *Service & Training v. Data General Corp.*, 963 F.2d 680, 686-688 (4th Cir. 1992) (buying product *B* from defendant or not buying it from others insufficient because it is as consistent with independent business decisions as with a tying agreement); *Ungar v. Dunkin' Donuts*, 531 F.2d 1211, 1213 & 1225 n.14 (3d Cir.), cert. denied, 429 U.S. 823 (1976) (that many buyers accepted package "alone would not suffice to establish coercion prima facie").

13 See *Cia.*, 735 F.2d at 638; *Service & Training*, 963 F.2d at 686-688; *Ungar*, 531 F.2d at 1213 & 1225 n.14.

14 See ¶f.

15 See ¶d.

16 See *Innovation Data Processing v. IBM Corp.*, 585 F. Supp. 1470, 1474 (D.N.J. 1984) (no tie because, in part, 15 percent of purchases unbundled).

17 See, e.g., *Ungar*, 531 F.2d at 1225 (accepting "burdensome or uneconomic" tied product insufficient "alone" to "establish, prima facie, the coercion element of an illegal tie-in claim"). While *Moore v. Jas. H. Matthews*, 550 F.2d 1207, 1217 (9th Cir. 1977), stated that "coercion may be implied from a showing that an appreciable number of buyers have accepted burdensome terms, such as in a tie-in," it had already found announced or understood tying conditions (id. at 1212), had equated condition with coercion (id. at 1216), and made clear that "[c]oercion occurs when the buyer must accept the tied item and forego possibly desirable substitutes." Id. at 1217.

18 See ¶f.

19 See *Data General Corp. v. Grumman Systems Support Corp.*, 36 F.3d 1147, 1181 (1st Cir. 1994) (contract provided some but insufficient prima facie evidence of a tie; tying condition might be inferred if alleged tied product "inferior or overpriced"); *Detroit City Dairy v. Kowalski Sausage Co.*, 393 F. Supp. 453, 464-466

***©2014 Wolters Kluwer. All rights reserved.***
***Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm***

(E.D. Mich. 1975) (relying in part on high price for defendant's tied product coupled with evidence of direct threats from the defendant's employees).

20 See ¶1706b ( "single monopoly profit" means that a higher price for the tied product is typically offset by a lower price for the tying product); ¶¶1711 - 1712 (in some circumstances tying might enable defendant with market power to exploit it more effectively); ¶1735 (discussing meaning of "burdensome" tie); and ¶1769b (tied buyer seldom able to prove that it paid above-market price for tied *bundle*.

21 See *Tic-X-Press v. Omni Promotions Co.*, 815 F.2d 1407, 1416-1417 (11th Cir. 1987) (relying in part on evidence that one buyer would have bought tied product elsewhere absent an understood tying condition; form contract and course of dealing provided other evidence of such an understood condition that the court seemed to consider sufficient); *Hill v. A-T-O*, 535 F.2d 1349, 1355 (2d Cir. 1976) (relying in part on evidence customers bought allegedly tied vacuum cleaner, though they already had one, in order to obtain membership in alleged buying club that buyers could not otherwise obtain); *Ungar*, 531 F.2d at 1225 (although not sufficient, proof of the acceptance of a burdensome or uneconomic tied product is "some evidence of coercion").

22 See *Loew's* and other cases discussed at ¶1753b.

23 For the moment, this term means only that the contract does not fall in the ¶d form-contract category.

24 Such contracts typically require customers to purchase from defendant a given amount (or their requirements) of *A* and a given amount (or their requirements) of *B*. It might also contain an illusory tying condition. See ibid.

25 See especially ¶c (rebuffed requests), ¶d (form contract), ¶f (threats; terminations of noncompliant customers), and ¶b2 (high percentage of bundles might help resolve ambiguity).

26 See ¶a caveats.

27 See *305 East 24th Owners Corp. v. Parman Co.*, 714 F. Supp. 1296, 1305 (S.D.N.Y. 1989), aff'd, 994 F.2d 94 (2d Cir. 1993) (sufficient coercion where building purchase package included contracts for management, waste disposal and garage services (tied products) and plaintiffs had objected to the inclusion of these services during sale negotiations but were induced to believe that building was not available without them); and see *Healthamerica Pennsylvania v. Susquehanna Health Sys.*, 143 F. Supp. 2d 496 (M.D. Pa. 2001) (claim of hospital's refusal to negotiate with HMO for provision of hospital services unless HMO also agreed to take its high-priced physician's service sufficiently alleged tying).

28 *American Mfrs. Mut. Ins. Co. v. American Broadcasting-Paramount Theatres (American Manufacturers II*), 446 F.2d 1131 (2d Cir. 1971), cert. denied, 404 U.S. 1063 (1972).

29 Id. at 1135-1136.

30 Id. at 1136.

31 Id. at 1136-1137.

32 Id. at 1137.

33 See *305 East 24th Owners Corp. v. Parman Co.*, 714 F. Supp. 1296, 1305 (S.D.N.Y. 1989), aff'd, 994 F.2d 94 (2d Cir. 1993) ( "Although we will never know for certain whether plaintiffs could have separated the tying and tied products by refusing to release their 'No-Buy Agreements' until the leases were eliminated, the Court finds credible plaintiffs' testimony that defendants stated that they would not sell the Building without the leases.").

34 See *American Manufacturers I*, 388 F.2d at 284-285.

35 See *United States v. Loew's*, 371 U.S. 38, 40-43 (1962). See also *Associated Press v. Taft-Ingalls Corp.*, 340 F.2d 753, 757-758 (6th Cir.), cert. denied, 382 U.S. 820 (1965) (news services tied together where defendant refused request to unbundle them). Cf. *Perma Mufflers v. International Parts Corp.*, 392 U.S. 134, 137, 141 (1968) (tying claim by buyers not barred by in pari delicto doctrine where defendant had refused buyer requests for freedom to buy the tied product from others). On pari delicto, see ¶361a.

***©2014 Wolters Kluwer. All rights reserved.***
***Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm***

36 *Loew's*, 371 U.S. at 41, 53-54. See also *Associated Press*, 34 F.2d at 762-763.

37 See ¶f2 and ¶1729h. See also ¶1452, 1459e, 1460d.

38 See ¶b2.

39 See ¶1753b.

40 See Ch. 18C.

41 See ¶1753b.

42 For example, suppose a form contract with dealers provides for the sale of a DVD player with every stereo receiver. Even for large dealers, the process of making and drafting a contract revision and awaiting the response of defendant's upper management and lawyers could well be too high to bear. Dealers may thus simply sign the form contract even if they would in fact prefer the DVD player of another manufacturer.

43 When alternative terms themselves create a tie is the subject of ¶1758.

44 For the possibility that the separate-provision option is a charade, see ¶b1.

45 See ¶f.

46 See ¶¶1753b and 1754b; and *IBM v. United States*, 298 U.S. 131, 134 (1936); *International Salt Co. v. United States*, 332 U.S. 392, 394-395 (1947); *Northern Pacific Railway Co. v. United States*, 356 U.S. 1, 7-8 n.6 (1958).

47 See ¶b4 and ¶1753b.

48 See ¶1753b. These courts were not asked to decide whether any such implication was tentative or conclusive.

49 *IBM*, 298 U.S. 131.

50 Id. at 137, 140. See ¶1753b, which explains why such a clause might be an illusory tying condition.

51 *IBM*, 298 U.S. at 132.

52 In addition, IBM and its rivals consented to abandon an alleged agreement that each would use similar leases and refrain from soliciting card purchases from the other's lessees. Ibid.

53 *United Shoe Machinery Corp. v. United States*, 258 U.S. 451 (1922).

54 Id. at 464.

55 Ibid. See ¶1758. Instead, the Court rejected the rebuttal on the odd reasoning that buyers choosing the *A*/ *B* contract entered a tying contract even though they had been offered a bona fide unbundled choice. *United Shoe*, 258 U.S. at 464. Contemporary cases rule otherwise. See ¶b1 & 4 and ¶1753b.

56 See *International Salt Co. v. United States*, 332 U.S. 392, 394-395 (1947); *Northern Pacific Railway Co. v. United States*, 356 U.S. 1, 7-8 n.6 (1958) (same term used in more than 1,000 contracts).

57 *International Salt*, 332 U.S. at 394-395.

58 Id. at 398.

59 See *Photovest Corp v. Fotomat Corp.*, 606 F.2d 704, 725 (7th Cir. 1979), cert. denied, 445 U.S. 917 (1980) ( "express language in the [standard form] franchise agreement setting forth the condition constitutes a prima facie case" that the franchise was tied to the lease); *Siegel v. Chicken Delight*, 448 F.2d 43, 46 (9th Cir. 1971), cert. denied, 405 U.S. 955 (1972) (finding tie where standard form franchise agreement required that "franchises purchase [allegedly tied products] as a condition of obtaining a Chicken Delight trade-mark license [the allegedly tying product]"); *Aamco Automatic Transmissions v. Toyota*, 407 F. Supp. 430, 435 (E.D. Pa. 1975) (stressing that required purchase of *B* was not subject of bargaining but was standard provision in form contract). See also *Tic-X-Press v. Omni Promotions Co.*, 815 F.2d 1407, 1417 (11th Cir. 1987) (enough that buyers "understood from years of dealing with [defendant] and from repeated use of [his form contract] that they had to use [the tied product], although it was also found that no [buyer] had actually requested" to buy the tied product from another firm). And see id. at 1418-1419; *Smith v. Mobil*

***©2014 Wolters Kluwer. All rights reserved.***
***Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm***

*Oil Corp.*, 667 F. Supp. 1314, 1331-1332 & n.15 (W.D. Mo. 1987) (tying condition may be inferred from form contract requiring franchisees to buy *B*; no need to show that customers did not want defendant's *B*; but dismissing claim on single-product grounds); *Response of Carolina v. Leasco Response*, 537 F.2d 1307, 1328 (5th Cir. 1976) (stating in form contract case that "where one product is sold on the express contractual condition that the purchaser purchase supplies for that product only from the seller defendant… coercion is found in the agreement itself"); and *Esposito v. Mister Softee*, 1980-1 Trade Cas. ¶63,089, at 77,420 (E.D.N.Y. 1980) ( "Most of the courts which have addressed the question have concluded that coercion is an element of proof in a tying claim where a party seeks to establish the existence of a tie-in that is not reflected in a written agreement."); *Martino v. McDonald's*, 81 F.R.D. 81, 89 (N.D. Ill. 1979) (presumed coercion from contract); *American Can*, 87 F. Supp. 18, 25-26 (N.D. Cal. 1949) (similar). See also *Little Caesar Enters. v. Smith*, 172 F.R.D. 236, 250, 258 (E.D. Mich. 1997) (form contract calling for sale of both products creates a rebuttable presumption of a tie).

60 See ¶d1.

61 See, e.g., *Tic-X-Press*, 815 F.2d at 1415; *Ungar v. Dunkin' Donuts*, 531 F.2d 1211, 1225 (3d Cir.), cert. denied, 429 U.S. 823 (1976) ( "Establishing that buyers purchase products *A* and *B* from the seller does not establish that the seller ties the sale of product *A* to the purchase of product *B*. It merely establishes that buyers purchase products *A* and *B* from the seller.").

62 *Capital Temporaries v. Olsten Corp.*, 506 F.2d 658, 666 (2d Cir. 1974); *McCullough Tool Co. v. Well Surveys*, 343 F.2d 381, 408 (10th Cir. 1965), cert. denied, 383 U.S. 933 (1966). See also *Unijax v. Champion Intl.*, 683 F.2d 678, 686 (2d Cir. 1982) (no tie absent evidence that defendant ever required or threatened to require purchases of tied product and that plaintiff "ever sought to purchase only [the tied product] and that [defendant] would not permit it to do so"). See ¶c.

63 *American Mfrs. Mut. Ins. Co. v. American Broadcasting-Paramount Theatres (American Manufacturers II*), 446 F.2d 1137 (2d Cir. 1971), cert. denied, 404 U.S. 1063 (1972); *Tic-X-Press*, 815 F.2d at 1418-1419 (need not show requests where defendant's conduct created understood tying condition that explained lack of requests).

64 See ¶1755b.

65 Moreover, it would be difficult for a foreclosed accessory supplier to search defendant's files in order to identify and locate any consumers making an unsuccessful request for unbundling.

66 Cf. *Data General Corp. Antitrust Litigation*, 490 F. Supp. 1089, 1110-1011 (N.D. Cal. 1980), finding a tie of bundled products sold to retail customers even though two customers had bought tying product separately. The court relied partly on evidence that the defendant had neither informed customers about the option to buy the tying product separately nor published a separate price list for six years.

67 See, e.g., *McAlpine v. AAMCO Automatic Transmissions*, 461 F. Supp. 1232 (E.D. Mich. 1978) (no coercion where automatic transmission repair shop franchisor merely insisted that franchisees use parts equal to its own in quality, even if defendant's employees then used hard salesmanship to try to convince franchisees to take defendant's parts).

68 E.g., *Datagate v. Hewlett-Packard Co.*, 1994-2 Trade Cas. ¶70,827 (N.D. Cal. 1993) (inferring one instance of tying where defendant's employee told buyer that defendant would not provide tying product unless buyer bought tied product from defendant).

69 See *Photovest Corp. v. Fotomat Corp.*, 606 F.2d 704, 723-724 (7th Cir. 1979), cert. denied, 445 U.S. 917 (1980) (threats to terminate supply of tying product would suffice); *Advanced Business Systems & Supply Co. v. SCM Corp.*, 415 F.2d 55, 65-66 (4th Cir. 1969), cert. denied, 397 U.S. 920 (1970) (threat both oral and in written contract); *Yentsch v. Texaco*, 630 F.2d 46, 57 (2d Cir. 1980) (statement by defendant's representative that buyers who refused tied product "wouldn't be here when lease time came around again" sufficed to show tying coercion). Cf. *Borschow Hospital & Medical Supply v. Cesar Castillo*, 96 F.3d 10 (1st Cir. 1996) (threat to terminate distributor unless distributor sold only defendant's syringe products not unlawful tying when threat was never carried out); *T. Harris Young & Assoc. v. Marquette Electronics*, 931

***©2014 Wolters Kluwer. All rights reserved.***
***Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm***

F.2d 816 (11th Cir. 1991), cert. denied, 502 U.S. 1013 (1991) (no tie where never withheld or threatened to withhold tying product); *Airweld v. Airco*, 742 F.2d 1184, 1191 (9th Cir. 1984), cert. denied, 469 U.S. 1213 (1985) (mere threat to terminate distribution agreement unless dealer takes tied product insufficient if no showing that dealer was actually forced to take tied product); *Sargent-Welch Scientific Co. v. Ventron Corp.*, 567 F.2d 701, 709 (7th Cir. 1977), cert. denied, 439 U.S. 822 (1978) (no tie where plaintiff "failed to prove that the defendant attempted to coerce plaintiff into handling [its tied] products by, for example, threatening termination").

70 See *Advanced Business Systems*, 415 F.2d at 64 (unimportant that tying product never actually terminated where "overhanging threat of enforcement is ever present").

71 See *W.H. Brady Co. v. Lem Prods.,* 659 F. Supp. 1355, 1372-1373 (N.D. Ill. 1987) (one isolated threat by salesman to terminate supply of tying product unless tied product purchased; salesman, subsequently reprimanded by defendant, retracted his threat; no tie).

72 Though reprehensible, false statements misleading buyers about the utility of *B* are consistent with the separate availability of *A* and therefore do not show tying. See *Photovest*, 606 F.2d at 723-724.

73 See ¶¶1440a, 1460b3; and see *Paladin Assocs., Inc. v. Montana Power Co.*, 328 F.3d 1145, 1160 (9th Cir. 2003), aff'd, 328 F.3d 1145 (9th Cir. 2003) ( "mere sales pressure" is not coercion; in this case no evidence that gas customers were coerced into purchasing five-year uninterruptible supply guarantees); *Unijax v. Champion Intl.*, 683 F.2d 678, 685-686 & n.15 (2d Cir. 1982) ( "aggressive salesmanship" of tied product insufficient to show coercion); *Bob Maxfield v. American Motors Corp.*, 637 F.2d 1033, 1037 (5th Cir.) ( "strong persuasion, encouragement, or cajolery" insufficient to show tying coercion), cert. denied, 454 U.S. 860 (1981); *Response of Carolina v. Leasco Response*, 537 F.2d 1307, 1329 (5th Cir. 1976) ( "persuasive selling techniques" fall "far short of coercion"); *Ungar v. Dunkin' Donuts*, 531 F.2d 1211, 1224 (3d Cir.), cert. denied, 429 U.S. 823 (1976) ( "policy to persuade franchisees to buy [franchisor's] products" insufficient); *Ungar*, 531 F.2d at 1226 ( "influence, persuasion, and aggressive salesmanship" are not "coercion").

74 See *Ungar*, 531 F.2d at 1224 ( "[W]e cannot imagine any seller that would not have a firm and resolutely enforced policy to persuade buyers to buy what is offered for sale.").

75 *Bob Maxfield*, 673 F.2d at 1037 (refusing to infer tie where buyer testified that he believed a tying condition existed but pointed to no actual threat to supplies of *A*).

76 See ¶¶1441 - 1442 ; *Bob Maxfield*, 673 F.2d at 1037-1038 & n.6 (no tying inference where dealer successfully resisted pressure to take allegedly tied product and where no evidence linked his ultimate termination to his failure to take the tied product); *Unijax*, 683 F.2d at 685-686 (no tying inference where dealer wanted both products and was terminated for selling an insufficient volume of both). On causation in antitrust cases generally, see ¶338.

77 See ¶f3.

78 See ¶¶1440b, 1441f, 1452c, 1460d3.

79 See ¶¶1440b, 1441f, 1452c, e, 1460d3.

80 See ¶1440b.

81 See *General Motors Co. v. Gibson Chem. & Oil Co.*, 661 F. Supp. 567, 570 (E.D.N.Y. 1987) (defendant's warning that warranty would not apply if plaintiff used rivals' tied product not sufficient to infer tie where the warranty was not the alleged tying product).

82 See ¶1758.

83 Of course, the tribunal must be persuaded that the postulated threats actually occurred or that refusals to supply were actually based on not buying *B* rather than on legitimate reasons. See ¶1443d2 and 1460d3.

84 See ¶f2.

***©2014 Wolters Kluwer. All rights reserved.***
***Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm***

85 See ¶1440b (suggestions coupled with termination of noncompliers equivalent to announced conditions even without evidence of dealer awareness), ¶1452d (unless dealer unique, reasonable to assume manufacturer acting similarly toward others), ¶¶1460d3 (same). But see ¶¶1452c3 (noting circumstances in which inference cannot be made from treatment of terminated dealer).

86 See ¶1460d2.

87 See ¶1769b (buyer trying to show that illegal tying elevated *market* prices); ¶1767 (damage suits by foreclosed rivals in tied market).

88 See ¶1729.

89 See ¶¶1753f and 1754f.

90 See ¶1770 (standing for would-be buyers).

91 On this point, see *Systemcare v. Wang Laboratories Corp*., 117 F.3d 1137 (10th Cir. 1997) (overruling earlier Tenth Circuit decisions).

92 See ¶¶1440b, 1443d, 1452d, 1459c-d, 1460c.

93 See ¶1459d (noting possible circumstances in which terminated dealer would not suffer noticeable damage).

94 See ¶¶337 - 338 (antitrust injury and causation).

95 See ¶1769.

96 See ¶¶1459d3, which adopts this logic when, say, retailers are terminated for failing to comply with resale price maintenance or other agreements illegally restraining their retailing activities.

97 Ibid. In the resale price maintenance situation, termination threats by a seller without power may be less compelling than such threats by defendants with the power in the tying market that even the per se rule requires.

98 See *Black Gold v. Rockwool Indus.*, 729 F.2d 676, 686 (10th Cir.), maintained on reh'g, 732 F.2d 779, cert. denied, 469 U.S. 854 (1984). See generally ¶¶1460d, 1756c, e. Of course, tying agreements or conditioned sales with other dealers cannot always be inferred.

99 See ¶¶1459e1 -2.

100 See *Black Gold*, 729 F.2d at 686 (emphasizing possible demonstration effect indicating tying agreements with others).

101 See ¶1459e.

102 See ¶1460d4.

103 For simplicity, this Subparagraph focuses on a defendant's relationships with its independent dealers. Relations with franchisees are the same. Most, but not all, of the discussion also applies to end-user customers.

104 We focus mainly on the tribunal's ability to infer that customers reasonably understood a tying condition. The proof necessary to show a totally uncommunicated tying condition under ¶1755 would have to be exceedingly strong.

105 See ¶1441.

106 See also ¶¶1440b (requiring clear proof of reason for dealer termination), 1459d2 (same), 1460c2 (same).

107 See ¶¶1441c, 1441h2, 1460b3.

108 See generally ¶1708.

109 See *United States v. Loew's*, 371 U.S. 38, 55 (1962) ( "[T]emporary refusal to sell in broken lots to one customer while negotiating to sell the entire block to another is a proper business practice."). Cf. *Med Alert Ambulance, Inc. v. Atlantic Health Sys., Inc.*, 2007 WL 2297335, 2008-1 Trade Cas. ¶76,009 (D.N.J. Aug. 6, 2007) (unpublished) (defendant could have conditioned availability of its hospital beds on use of its

***©2014 Wolters Kluwer. All rights reserved.***
***Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm***

ambulance services, based on testimony of several nurses that defendant refused to supply beds to those transported by a different ambulance service). See ¶1708.

110 See Ch. 16E and ¶¶1441b and 1708.

111 See ¶1441c.

112 See ¶1754. Cf. ¶1452, 1459d3, 1460f.

113 However, the ¶1755 theory does not require any buyer awareness if the termination itself proves the existence of a silent tying condition.

114 See ¶1754b. Cf. ¶¶1441 & h2, 1452, and 1460d.

115 See *Famous Brands v. David Sherman Corp.*, 814 F.2d 517, 524 (8th Cir. 1987) ( "There is no illegal concert of action if [defendant] simply substituted [the replacement dealer] for [the terminated dealer] in an attempt to find a more active distributor."); *Unijax v. Champion Intl.*, 683 F.2d 678, 685-686 (2d Cir. 1982) (terminating dealer for insufficient sales of all lines of paper products did not show tie).

116 See *Dart Indus. v. Plinkett Co.*, 704 F.2d 496, 500 (10th Cir. 1985) (no tie where manufacturer stated that it might sell its adhesives directly to consumers after dealer refused to sell some of them to customers referred to it by manufacturer). Cf. ¶¶1400c, 1408 (should not classify as illegal condition or agreement when antitrust policy does not require or desire defendant to act other than it did).

117 See, e.g., *Bob Maxfield v. American Motors Corp.*, 637 F.2d 1033, 1038 & n.6. (5th Cir. 1981). The plaintiff presented evidence that after he refused to buy *B*, his *A* orders were canceled, unfilled, or delayed. The court, however, found no tie because the defendant introduced uncontradicted evidence that these difficulties resulted from a nationwide shortage of *A* and that the plaintiff obtained more of it than most dealers. See also *B.J.L.M. Liquor Store v. Block Distributing Co.*, 1987-2 Trade Cas. ¶67,710, at 58,961 (S.D. Tex. 1987) (shortages in tying product following failure to buy tied product explained by general nationwide shortage).

118 See ¶¶1441d, 1452c3.

119 See ¶¶1441e2, 1452c3, and 1460d3.

120 See ¶¶1460d, 1443d2, 1452d.

***©2014 Wolters Kluwer. All rights reserved.***
***Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm***

# EXHIBIT 306

# Antitrust Law: An Analysis of Antitrust Principles and Their Application - Areeda and Hovenkamp, ¶1800. Exclusive Dealing: Definitions; Statutory Coverage

Click to open document in a browser

**Last Updated: 4/2014**

**1800a. Introduction; basic definitions..—**In its simplest form, an exclusive-dealing arrangement is a contract between a manufacturer and a buyer that forbids the buyer from purchasing the contracted good from any other seller or that requires the buyer to take all of its needs in the contracted good from that manufacturer.

Exclusive-dealing agreements are thus "vertical" restraints in that the two parties to the arrangement stand in a buyer-seller relationship. Although the two firms might be competitors as well, that competition is usually not important to the antitrust analysis. For example, in *Brown Shoe* Brown owned its own shoe retail outlets and also sold shoes through independently owned outlets, some of which were subject to exclusive dealing arrangements that required them not to resell the shoes of any Brown rival. [1] Since the exclusive-dealing arrangement simply limited the independent stores' ability to sell non-Brown shoes, it did not affect competition in the sale of Brown shoes between the independent stores and Brown's wholly owned stores. [2] Of course, exclusivity might make it more difficult for customers to compare Brown and non-Brown shoes in the same store, but that difficulty is not affected by the fact that Brown also owns some of its stores.

Nevertheless, the antitrust concern with exclusive dealing is predominantly "horizontal" in that we worry mainly about the impact of exclusive dealing on rivals of the manufacturer. In *Brown* that impact would be felt by competing manufacturers of shoes trying to find adequate retail outlets. [3] Or, alternatively, exclusive dealing may facilitate collusion among upstream parties [4] or perhaps in a few instances among downstream parties. [5] Like tying, exclusive dealing is said to be an "interbrand" restraint in that it forbids the buyer of the defendant's [6] goods from purchasing similar goods from a rival as well. For example, Standard may sell gasoline to retail gasoline stations on the condition that they not purchase any gasoline for resale other than Standard's. The restraint is thought to insulate the Standard brand from the competition of a non-Standard brand sold by those stations.

**1800a1. *Requirements contracts and output contracts..*—**At common law the exclusive-dealing arrangement was commonly called a "requirements" contract, because it obligated the buyer to take all of its requirements of a given good from the seller. The common law generally approved such arrangements. [7]

The common law also recognized and distinguished the "output" contract, in which a seller promised to sell the buyer all of its production of the contracted good. While many of the economic effects of output contracts resemble those of requirements contracts, we shall see that they are not precisely the same, [8] and the statutory coverage differs. [9] Nevertheless, courts occasionally confuse the two.

Supply contracts between two parties can be requirements contracts and output contracts at the same time. For example, the challenged contract in the *Jefferson Parish* hospital case [10] was an exclusive contract requiring (1) that the hospital obtain all anesthesiological services required by its patients from a rival of the plaintiff; [11] but also (2) that all the physicians employed by the contracting anesthesiological firm confine their practice of anesthesiology to the defendant hospital. [12] The first provision is a requirements contract and the second is an output contract. Although only the first provision was challenged, both could have anticompetitive effects in appropriate circumstances. The feared evil of the first provision is that it might deny rival anesthesiologists access to the hospital as a place to practice their profession. The feared evil of the second provision is that it might deny rival hospitals access to the services of this particular anesthesiological firm.

***©2014 Wolters Kluwer. All rights reserved.***
***Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm***

Output contracts are also treated under the law of exclusive dealerships, which is different from exclusive dealing. For example, if Kawasaki Motorcycle Company agrees to create one and only one Kawasaki dealer in Kansas City, this amounts to Kawasaki's promise to sell its full output of motorcycles designated for that area to this one dealer. [13]

**1800a2. *Noncompetition clauses..*—**Often an exclusive-dealing requirement will be drafted simply as a covenant not to compete, particularly in franchise agreements. [14] For example, the fast-food franchisee may promise in its franchise agreement not to engage in any business in competition with the franchisor and perhaps even define with particularity the precise products and the geographic range over which such competition is forbidden. Thus the Dunkin' Donuts franchisee may promise not to sell doughnuts in competition with its franchise, either on the franchise location itself or within ten miles of that location. [15] Such a restriction operates as an exclusive-dealing requirement.

The classic noncompetition covenant contained in a deed to land often resembles exclusive dealing. For example, suppose a grocer sells Blackacre in order to move to a bigger location a block away. In order to protect its business the grocer places a covenant in the Blackacre deed preventing the buyer from operating a grocery store or leasing the land to anyone else for that purpose for, say, ten years. Quite literally, this agreement is a sale or lease on the condition or understanding that Blackacre's buyer not deal in the goods of the seller's competitor. This agreement is not covered by §3 of the Clayton Act, whose limitation to "goods, wares, merchandise, machinery, supplies, or other commodities" excludes real property. [16] However, the transaction would fall within §1 of the Sherman Act.

**1800a3. *"Quasi"-exclusive dealing..*—**Many agreements and some unilateral practices bear a rough family resemblance to exclusive dealing. Among them are (1) discounts or rebates conditioned on exclusivity; [17] (2) discounts or rebates in exchange for the buyer's purchase of a minimum amount or a specified percentage of its needs (but less than 100 percent); [18] (3) "slotting allowances" or similar up-front payments by a supplier in exchange for access to a retailer's shelf space; [19] and (4) various exclusivity provisions in intellectual property licenses. [20] A few other restraints that have been analogized to exclusive dealing are addressed in ¶c5, and a few additional restrictions involving intellectual property licenses are discussed in ¶d2.

**1800b. Exclusive dealing and tying distinguished..—**

**1. *Generally..*—**Many of the practices that have been characterized as exclusive dealing could also be described as tying, although perhaps not all of the technical legal requirements for a tying arrangement could be met. For example, in the *Standard Stations* case Standard's requirement that independent gasoline dealers sell its brand exclusively was described as exclusive dealing; [21] but it could also have been described as a tying arrangement in which the franchise itself, or the right to bear the Standard brand, or the right to use tanks and pumps that Standard provided its dealers was conditioned on their purchase of gasoline from Standard. [22] An exclusive arrangement under which a hospital agrees to use a single anesthesiological service for its operations could be characterized as either exclusive dealing or tying. It is tying if characterized, as the *Jefferson Parish* majority did, [23] as the hospital's insistence that all those using its operating facilities also use its anesthesiologists. But it is exclusive dealing if characterized, as four concurring Justices did, [24] as simply an agreement under which the hospital promised to purchase all of its anesthesiological needs from one particular firm. In this case we might regard the anesthesiological services as somehow inseparable from the hospital facility—thus, as a single "product." The legal distinction in this case between tying, which requires separate products, and exclusive dealing, which does not, seems quite substantial. [25] The economic distinction between the two is most often slight or nil. This further suggests the inappropriateness of tying's per se rule, [26] which induces plaintiffs to strain to make their agreements ties rather than exclusive deals. If ties were analyzed under the rule of reason, the difference between tying and exclusive dealing would rarely be important.

***©2014 Wolters Kluwer. All rights reserved.***
***Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm***

**1800b2. *Degree of competitive harm; consumer injury..*—**One important difference between exclusive dealing and tying is that the former generally applies to firms while the latter generally applies to products. For example, consider a local photocopy store that uses copying machines made by Xerox and Kodak. The store may lease the Kodak machines from their manufacturer under an arrangement requiring that all the leased machines be equipped with copying paper sold by Kodak as well. This arrangement would best be characterized as tying rather than exclusive dealing because it applies to the firm's Kodak machines but not to the firm's Xerox machines. Of course, even here, if we regarded Kodak's paper as distinctive we might speak of exclusive dealing in Kodak paper. But assuming that both brands of machines use the same paper, the exclusivity requirement should be characterized as tying. An exclusive-dealing requirement, by contrast, would require the copying firm to take all of its paper needs for both copier brands from a single supplier.

Although the courts have traditionally treated tying with greater hostility than exclusive dealing, in situations of this type the exclusive-dealing requirement actually excludes more than the tying requirement does. Under the tying arrangement the photocopy store must use Kodak paper in the Kodak copiers, but the store is free to continue using Xerox copiers as well and may use any paper it wishes in those copiers. Further, the store can increase its use of one and decrease its use of the other in response to competitive offers. But under an exclusive-dealing clause the copy store is bound to use one firm's copying paper exclusively. So, for example, if Xerox should try to use a tie of copying paper as a means for overcharging in either copy machines or paper, [27] the photocopying firm can respond by using Xerox machines less and Kodak machines more. By contrast, if the firm is obliged to take all of its paper from a single seller, it loses this ability to substitute.

Even more significantly, tying between a photocopy machine and paper does not deny rival copy makers access to that particular copying store, but only to a particular brand of machine. For example, suppose the store currently leased only Kodak photocopiers, subject to a tie requiring the use of Kodak paper in all Kodak machines, but no other restriction. Xerox would then be free to solicit that store's purchase or lease of some Xerox copiers, and the Kodak tie might even serve to make the Xerox offer more attractive. By contrast, if the Kodak lease required the store to purchase or lease Kodak machines exclusively—an exclusive-dealing requirement—Xerox sales personnel would be denied access to that store.

In other situations, however, tying appears more exclusionary than exclusive dealing. Tying often affects ultimate consumers more adversely, while exclusive-dealing arrangements leave consumers with broader power to shop for competitive alternatives. For example, in *Roy B. Taylor* the Fifth Circuit considered a restaurant supply store's claim that the defendant required the plaintiff to purchase its hamburger patty paper exclusively as a condition of being able to resell its hamburger patty-making machines. [28] While the arrangement required Taylor as reseller to stock only Hollymatic paper as long as Taylor wished to be a Hollymatic machine dealer, the store did not require customers coming into the store to take the machine and the paper together; they were free to buy the machine from the plaintiff's store and any paper they wished elsewhere. In refusing to condemn this arrangement the court concluded that "[i]t does not threaten competition to the same extent as tying arrangements that bind ultimate customers." [29]

Likewise, the exclusive arrangement in the *Jefferson Parish* case [30] was exclusive dealing if viewed from the hospital's perspective as forbidding the hospital from contracting with a rival anesthesiologist. But it resembled tying if viewed from the surgical patient's perspective, as requiring the patient to take the "tied" anesthesiologist as a condition of using the "tying" hospital facilities.

In form, the contracts in the *Roy B. Taylor* and *Jefferson Parish* cases were much the same: both required a downstream firm to deal in the supplier's product or service exclusively. The greater impact on consumers in *Jefferson Parish* results from the nature of the service that is the subject of the exclusive agreement. An agreement requiring a hospital to use *A*'s anesthesiological services exclusively is exclusive dealing on the hospital and tying on the patient because the patient cannot purchase surgical services at the hospital and anesthesiological services in a different place.

***©2014 Wolters Kluwer. All rights reserved.***
***Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm***

But a contract identical in form requiring a store to sell only Hollymatic's wax paper as a condition of selling Hollymatic's hamburger patty machine does not place the same burden on the end user, who in this case is free to purchase the machine at one store and the paper at a different store.

Thus, the question of impact on competition is addressed not by considering whether the arrangement is exclusive dealing or tying, but rather by considering the extent to which customer choice is restrained. Restrictions imposed on customers often produce greater competitive harm than restrictions imposed on intermediaries, for restrictions of the latter permit customers to continue to make substitutes. Thus, customers in *Roy B. Taylor* were perhaps inconvenienced by not being able to purchase a rival's hamburger patty paper at Taylor's store, but they were quite free to purchase it elsewhere, and the market for waxed paper was presumably competitive.

If the exclusive arrangement is anticompetitive at all, it is because the arrangement forecloses rivals from adequate sales outlets. Thus, the condition that makes tying or exclusive dealing anticompetitive in the first place is that customers lack sufficient options to purchase their patty paper elsewhere. The fact that they could readily do so indicates merely that the exclusive arrangement caused no anticompetitive injury.

The purpose of the law of exclusive dealing and tying is to protect competition. On the facts of *Roy B. Taylor,* competition would be injured when the tying or exclusive-dealing requirement denied rival manufacturers of patty paper adequate access to resellers, with the result that the paper market was less competitive than it might have been. Indeed, the plaintiff's claimed injury was that Hollymatic's paper was more expensive than the paper sold by rivals; as a result the plaintiff lost money because customers purchased their paper elsewhere. As the Fifth Circuit noted, this injury claim was inconsistent with the proposition that the exclusivity contract injured competition at all. [31]

To summarize, although the Supreme Court has treated tying as "inherently" more anticompetitive than exclusive dealing, [32] that proposition cannot be defended as a general matter. To the extent exclusive dealing limits the ability of an entire firm to sell the products of a rival, it often has more anticompetitive potential than tying, which often requires use of the tied product only with specific tying machines. [33] In all cases, competitive injury is best measured by examining the degree to which the restraint limits the effective choices of consumers. This question is not answered simply by determining that the restraint itself is tying rather than exclusive dealing, or vice versa.

**1800b3. *Two-product requirement not met..*—**Often the conclusion that a practice is exclusive dealing rather than tying results from failure to meet tying law's rather technical requirement of "separate" tying and tied products. [34] For example, in *Jefferson Parish* [35] the majority [36] and Justice O'Connor in concurrence disputed whether the hospital and anesthesiological services at issue constituted distinct products. [37] Justice O'Connor determined that they did not and thus believed that the hospital's practice of using a single anesthesiological firm should be treated as exclusive dealing. First, she noted that patients did not wish to purchase anesthesiological services without hospital services, and "[w]hen the tied product has no use other than in conjunction with the tying product" tying is inapt. [38] Second, she would have found a single product whenever "the economic advantages of joint packaging are substantial." [39] Then, having found no tie, Justice O'Connor concluded that the exclusive arrangement in question *did* constitute exclusive dealing.

However, not every conclusion that tying law's separate-products requirement is not met results in a finding of exclusive dealing. For example, a retailer might complain that in order to purchase the defendant's saucepans for resale the retailer must also take the bundled saucepan lid. If a court should find that the saucepan-plus-lid are a single product for tying purposes, then there would not be tying, but there would not be exclusive dealing either as long as the retailer was free to buy saucepans (with or without lids) from competing manufacturers.

Finally, there is no warrant for thinking that exclusivity contracts are more anticompetitive when they involve two products rather than one. The separate-products requirement of tying law has become a highly technical

***©2014 Wolters Kluwer. All rights reserved.***
***Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm***

query that has little relationship to the recognition of competitive harms. [40] It tells us only that the defendant has bundled two things that are also available on the market separately. But most such bundles—such as the discount store's combination of an inexpensive camera and two rolls of film in a single plastic package—have no competitive consequences whatsoever. Indeed, tying agreements often foreclose much less than exclusive-dealing agreements do. For example, the merchants required to purchase the manufacturer's saucepan and lid together is still free to stock both saucepans and lids manufactured by rivals. By contrast, the merchant subjected to an exclusive-dealing agreement would not be permitted to deal in a rival's saucepans.

**1800c. Brief history; statutory coverage..—**

**1. *Prior to the Clayton Act..*—**In late nineteenth century England exclusive dealing became infamous with the *Mogul Steamship* decision. The House of Lords upheld an agreement among members of an association of shippers trading with China offering a 5 percent rebate to any merchant who agreed to ship its tea exclusively on ships owned by the association. When challenged by rival shipowners, the House of Lords responded that the arrangement was "nothing more than the ordinary form of competition between traders by offering goods or services at a cheaper rate than their rivals." [41]

In the United States, between 1890 and 1914 exclusive-dealing arrangements were addressed by the lower courts under the Sherman Act. Most, but not all, were found lawful, just as they had always been at common law. [42] A few lower courts condemned exclusive dealing that actually created a monopoly. [43] But even in *Whitwell,* where market-dominating Continental Tobacco refused to sell tobacco to distributors who also sold the tobacco of others, the Eighth Circuit concluded that the arrangement left smaller rival firms free to capture the business by offering buyers "lower prices or…better terms than they secure from [Continental]." [44] In *Corning* [45] and *Terrell* [46] lower courts upheld programs under which distillers offered rebates to distributors agreeing to deal exclusively with that distiller. [47]

The more aggressive language of Clayton Act §3 was impelled mainly by a Supreme Court decision approving a tying arrangement, [48] not by lower court decisions approving exclusive dealing. Strangely, however, the language that Congress finally approved applies much more obviously to exclusive-dealing arrangements than to tying arrangements. That Act provides that

> [i]t shall be unlawful for any person engaged in commerce, in the course of such commerce, to lease or make a sale or contract for sale of goods, wares, merchandise, machinery, supplies, or other commodities, whether patented or unpatented…or fix a price charged therefor, or discount from, or rebate upon, such price, on the condition, agreement, or understanding that the lessee or purchaser thereof shall not use or deal in the goods, wares, merchandise, machinery, supplies, or other commodities of a competitor or competitors of the lessor or seller, where the effect of such lease, sale, or contract for sale or such condition, agreement, or understanding may be to substantially lessen competition or tend to create a monopoly in any line of commerce. [49]

Literally, a tying arrangement is not an arrangement that the purchaser of the tying product shall not deal in the complementary goods of a competitor, but only that the purchaser shall use the tying firm's goods for a particular tying product. To return to the previous example, [50] if a photocopying store purchased or leased equipment from Xerox and Kodak and the Xerox lease required the use of Xerox paper, this tying requirement would nevertheless permit the store to use other paper in its Kodak machines. By contrast, an exclusive-dealing contract in paper would cover the paper in all machines and would thus satisfy the statutory requirement of an agreement "that the lessee or purchaser thereof shall not use or deal in the goods, wares, merchandise, machinery, supplies, or other commodities of a competitor or competitors of the lessor or seller…."

**1800c2. *Clayton Act coverage excludes output contracts and "partial" exclusive dealing but includes some discount practices..*—**The Clayton Act language appears to cover requirements contracts but not output contracts. [51] In the former the seller sells its goods to the buyer on the "condition, agreement, or

***©2014 Wolters Kluwer. All rights reserved.***
***Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm***

understanding" that the buyer will not deal in the goods of a competitor of the seller— quite explicitly covered by the statute. By contrast, in an output contract a firm *buys* on the condition that the seller will not sells its good to anyone else, including a competitor of the buyer, a practice not covered by the statutory language of the Clayton Act. [52]

Literally, a "partial" exclusive-dealing requirement appears not to be covered by §3 of the Clayton Act at all. For example, if *A* requires *B* to purchase "at least 60 percent" of its gasoline needs from *A, B* is still free to purchase the remaining 40 percent elsewhere. As a result, there is no condition that *B* not deal in the goods of a competitor, as the statute requires. Most of the courts take this position. [53] The same thing applies to contracts stipulating a large fixed dollar amount or quantity—even if the quantity is based on the buyer's anticipated total needs for the contract period. As the First Circuit noted, "a fixed quantity contract leaves open the possibility that the buyer's needs will exceed his contractual commitment; he is free to purchase from others any excess amount that he may want." [54]

An agreement giving a discount in exchange for exclusivity is covered. The statute expressly reaches defendants who offer a "discount…or rebate…on the condition…that the purchaser... not…deal in the goods…of a competitor." [55] Nevertheless, the assessment of anticompetitive effects is complex. [56] Relatively minor incentives, such as advertising payments or provision of other promotional materials conditioned on exclusivity are typically found not to be covered. [57] Likewise, a manufacturer's suggestions that a dealer abandon a different line, even if forcefully made, are not considered exclusive dealing unless actually enforced. [58] Nor are arrangements requiring a dealer to separate the products of a competing supplier and treat them differently. For example, *Empire Volkswagen* refused to find exclusive dealing in an automobile distributor's insistence that its dealers sell other brands from a different showroom. [59]

**3. *Clayton Act coverage limited to "commodities that are 'in' interstate commerce".—***Section 3 of the Clayton Act applies only to "goods, wares, merchandise, machinery, supplies, or other commodities." It does not apply to exclusive dealing in services. For example, the exclusive contract under which a hospital procures all of its anesthesiological services from one firm [60] does not fall within §3 of the Clayton Act. Thus, one decision held that an event ticket has more "intangible" than tangible attributes and thus does not constitute a "commodity" for §3 purposes. [61]

Further, §3 applies only to persons "engaged in commerce" and to transactions occurring "in the course of such commerce." This "in the flow of commerce" language is narrower than the "affecting commerce" interpretation that determines jurisdiction under the Sherman Act. [62]

By contrast, §1 of the Sherman Act applies to any "contract," "combination," or "conspiracy" that is "in restraint of trade or commerce," without limitation to sellers as opposed to buyers, or to commodities as opposed to all transactions generally. Historically, of course, §3 of the Clayton Act was passed in order to strengthen perceived weaknesses in the Sherman Act. But the perceived weaknesses were mainly the result of the Supreme Court's *Henry* decision, which refused to condemn the tying of patented goods and unpatented staple commodities. [63]

*See Brown v. Student Loan Xpress, Inc.,* 2012 WL 1029467, 2012-1 Trade Cas. ¶77,846 (W.D. Ky. Mar. 26, 2012) (money, or more specifically student loans, not covered by Clayton Act provision); *and see Marion Healthcare, LLC v. Southern Illinois Healthcare*, 2013 WL 4510168, 2013-2 Trade Cas. ¶78,504 (S.D. Ill. Aug. 26, 2013) (§3 of Clayton Act does not apply to medical services, with respect to both tying and exclusive dealing).

**1800c4. *Different tests of illegality under Sherman and Clayton Acts?.—***The tests for illegality of exclusive-dealing arrangements are developed at length later. [64] Here, we consider briefly whether the test should depend on whether the arrangement is being challenged under the Clayton Act or the Sherman Act.

***©2014 Wolters Kluwer. All rights reserved.***
***Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm***

In tying-arrangement cases a few courts have followed the rule suggested in *Times-Picayune* of applying a more aggressive test under the Clayton Act than under the Sherman Act, but most apply the same test under both statutes. [65] Clearly this would be the most sensible approach to exclusive dealing as well. Nevertheless, the cases are divided, with a likely majority stating that the Clayton Act requires a smaller showing of anticompetitive effects. [66]

There is no apparent policy justification for applying a harsher exclusive-dealing test to goods than to services, or imposing a stricter "in commerce" requirement when the subject matter of exclusive dealing is services and thus not reachable under the Clayton Act. [67] Further, the origin of the bifurcation of legal tests in tying-arrangement cases was dictum in the *Times-Picayune* decision, [68] which stated that tie-ins could be condemned under a rule of reason under the Clayton Act but under a per se rule under the Sherman Act. [69] In tying cases the tests for legality have largely merged, notwithstanding the perpetuation of a so-called "per se" rule for tie-ins. [70] But exclusive dealing has always been considered a rule of reason offense, and thus there is even less reason for adopting one rule in a Sherman Act case and another in a Clayton Act case.

To be sure, in a predatory pricing case the Clayton Act's broader "may ... substantially ... lessen competition" language yields a more aggressive test for illegality than the Sherman Act does. [71] But in that case the alternative Sherman Act coverage comes under §2, which condemns activity only when it creates, maintains, or threatens to create a monopoly. [72] But the "restraint of trade" standard applied under §1 of the Sherman Act condemns actions falling short of monopoly and need not be regarded as materially different in substance than the Clayton Act's test of probable and substantial lessening of competition. For that reason the tests have largely converged in tie-in cases and also in merger cases where the alternatives are most generally §7 of the Clayton Act, which employs the same "lessen competition" language, and §1 of the Sherman Act.

As the merger discussion develops, there are strong policy reasons for avoiding the application of different substantive tests to economically similar practices, unless the statutes speak with absolute clarity on the point. Those reasons apply here as well. [73] As that discussion makes clear, the Clayton Act was passed in response to congressional perceptions that the Sherman Act was being interpreted far too narrowly. [74] But in subsequent years the Supreme Court began to interpret the Sherman Act far more aggressively—perhaps even more aggressively than Congress had in mind in 1914 when it passed the Sherman Act. [75] In that case, the perpetuation of different substantive tests under the two statutes should not be regarded as mandated by Congress either.

**1800c5. *"Agreement" requirement; Sherman §2 challenges;* Microsoft..—**Both §1 of the Sherman Act and §3 of the Clayton Act require an agreement—the former by its "contract," "combination," or "conspiracy" language; [76] the latter by its requirement of a sale or lease upon a "condition, agreement, or understanding" that the buyer or lessee will not deal in the goods of another. This agreement requirement is somewhat more strenuous than the requirement for tying arrangements, [77] and dictates that truly "unilateral" refusals to sell to those dealing in another's goods are not covered by either provision. For example, the firm that unilaterally announces its intention not to sell to any firm selling another's goods and who then refuses to fill the order of such a firm can qualify for the so-called *Colgate* exception for unilateral refusals. [78] Likewise, an unaccepted offer to enter an exclusive-dealing contract creates no antitrust liability. [79] However, an express contract requiring the buyer not to deal in the goods of another satisfies the agreement requirement, as does a clear implication. [80]

Section 2 of the Sherman Act reaches unilateral refusals to deal when the refusals constitute monopolization or attempt to monopolize. This means that the defendant must be either a monopolist or a dominant firm, or else that the conduct creates a dangerous probability of creating such a monopoly. [81]

***©2014 Wolters Kluwer. All rights reserved.***
***Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm***

As a matter of competition policy, the "agreement" requirement in exclusive-dealing cases should be regarded as questionable. Exclusive dealing is generally imposed on downstream firms by sellers who are either indifferent or feel worse off as a result of the exclusive dealing. Further, there are not many situations in which one dealer would agree with a manufacturer that exclusive dealing should be imposed on another dealer. [82] At its core, if exclusive dealing is anticompetitive at all, it is generally a strategy used by relatively dominant firms to restrain or hinder competition in the dominant firm's product. To that extent, it matters little whether one views exclusive dealing as "imposed" by the dominant firm or "agreed upon" by the dominant firm and its dealers.

The *Microsoft* decision very largely took this approach. The opinion addressed exclusive dealing under both §§1 and 2 of the Sherman Act and ultimately concluded that exclusive dealing could violate §2 of the Sherman Act even though it was found not to violate §1. [83] The court rejected Microsoft's contention that a finding of no liability under §1 "necessarily precludes holding it liable under §2." [84] The court explained:

> The basic prudential concerns relevant to §§1 and 2 are admittedly the same: exclusive contracts are commonplace—particularly in the field of distribution—in our competitive, market economy, and imposing upon a firm with market power the risk of an antitrust suit every time it enters into such a contract, no matter how small the effect, would create an unacceptable and unjustified burden upon any such firm. At the same time, however, we agree with plaintiffs that a monopolist's use of exclusive contracts, in certain circumstances, may give rise to a §2 violation even though the contracts foreclose less than the roughly 40% or 50% share usually required in order to establish a §1 violation. [85]
>
> In this case, plaintiffs allege that, by closing to rivals a substantial percentage of the available opportunities for browser distribution, Microsoft managed to preserve its monopoly in the market for operating systems….By ensuring that the "majority" of all IAP [86] subscribers are offered IE [87] either as the default browser or as the only browser, Microsoft's deals with the IAPs clearly have a significant effect in preserving its monopoly; they help keep usage of Navigator [88] below the critical level necessary for Navigator or any other rival to pose a real threat to Microsoft's monopoly. [89]

As a legal matter, Sherman Act §2 requires that the defendant either have monopoly power or a dangerous probability of achieving it, but when such power is established the Court may find illegality on lower percentages than the §1 law of exclusive dealing requires. By contrast, §1 is sometimes applied to nondominant defendants and where a "dangerous probability" of monopoly is not in prospect, but in such cases assesses somewhat higher foreclosure requirements. [90]

**1800c6. *FTCA §5..*—**Finally, exclusive-dealing arrangements can and have been challenged as unfair methods of competition under Federal Trade Commission Act §5. In *Brown Shoe* the Supreme Court both approved this use and indicated that FTCA §5 might be used to reach exclusive-dealing arrangements that would not be reachable under either the Sherman Act or the Clayton Act. [91] In more recent decisions, such as *Beltone,* however, the Federal Trade Commission has indicated that it will assess exclusive-dealing arrangements on the same principles as those applied in Clayton and Sherman Act cases. [92]

**1800d. Agency, resale, and licensing agreements..—**

**1. *Agency agreements generally..*—**As a matter of economics, agency is simply an alternative mechanism for distributing one's goods and occupies a middle position between complete vertical integration where the "retailer" is merely an employee, and a traditional sale-resale arrangement in which the retailer is an independent businessperson. Indeed, some agents operate virtually as employees except that their salaries are taken in the form of a "commission" on sales made. Others, such as insurance and travel agencies, often have their own quite distinct businesses in which they have made a significant investment.

What makes agency relationships legally distinct is that the downstream party never acquires legal title to the good or service in question before selling it to the customer. Rather, the agent acts as a facilitator of a

***©2014 Wolters Kluwer. All rights reserved.***
***Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm***

transaction that ultimately occurs directly between the manufacturer or supplier and the customer. So, for example, the insurance agent does not purchase insurance and resell it to the insured; rather, the agent contacts customers and describes to them the kind of insurance that the insurer is willing to sell and the price, and then brings the parties together, so to speak, to make a bargain. Likewise, the real estate broker typically does not purchase and resell the seller's house or commercial building, but instead agrees to represent the seller, to solicit buyers, and facilitate negotiations to a contract between the seller and eventual buyer. When the sale finally occurs, title proceeds directly from the seller to the buyer.

As ¶¶1621 - 1622 note, as long as resale price maintenance was governed by a per se rule, good policy reasons justified the refusal to extend the antitrust condemnation of resale price maintenance to bona fide agency agreements. Since the house was never sold to the real estate broker, the seller's only control over the proceeds is through the price eventually charged to the buyer. The owner and broker simply do not have the same incentives to set the correct price, for the broker has invested not in the purchase of the house but only in the sales efforts. Thus, if antitrust forbade the seller from instructing the broker to insist on a particular price, the broker might end up selling at a price completely unacceptable to the seller.[93] Now that resale price maintenance agreements have been brought under the rule of reason, however, these considerations can be addressed on the merits, and the difference between resales and agency arrangements should seldom matter.[94]

Because exclusive dealing is addressed under a rule of reason, the economic and competitive distinctions between agency and resale arrangements are small or nonexistent. The agent's willingness to push the manufacturer's or supplier's brand aggressively, or its incentive to "free-ride" on other brands, is roughly the same whether the underlying distribution agreement is one of sale-resale or one of agency. To be sure, there are important differences in certain contexts. The home owner with a single house to sell no longer has any interest in how the house is sold to an eventual buyer once it has been purchased by a broker, but the owner does retain a considerable interest as long as the house is listed under an agency agreement. However, the business firm that makes ongoing sales considers the two forms of distribution as largely similar insofar as exclusive-dealing policy is concerned. For example, the insurance firm may face problems of how to encourage insurance agents to push its products rather than those of rivals, or it may face problems of interbrand free riding,[95] but these are substantially although perhaps not completely independent of the fact that the underlying distribution arrangement is one of agency. As a result, the insurance company's insistence that its agents sell its policies exclusively would be treated the same as an agreement calling for the intermediary's purchase and resale.[96]

By the same token, to the extent that a particular instance of exclusive dealing is anticompetitive, it can be equally anticompetitive when the exclusivity provision is contained in an agency relationship. For example, an insurer's agreement with a local insurance agency forbidding the agency to sell the insurance of rivals can foreclose the latter just as much as a sale-resale agreement. Nevertheless, the language of §3 of the Clayton Act requires a lease, sale, or contract for sale on the condition that the buyer or lessee not deal in the goods of a competitor.[97] It thus excludes agency agreements. In *Standard Fashion* the Supreme Court suggested that result but did not decide the issue.[98] However, in *Curtis Publishing* the Court held that §3 of the Clayton Act did not reach exclusive dealing imposed on magazine distributors by publishers when the distributors were mere agents working on commission.[99] The Court also concluded that the "engagement of competent agents obligated to devote their time and attention to developing the principal's business, to the exclusion of all others …has long been recognized as a proper and unobjectionable practice."[100] The Court did not state why that same rationale would not apply if the distributors purchased and resold the magazines.

By contrast to §3 of the Clayton Act, §1 of the Sherman Act requires nothing more than an agreement, and even a commission contract meets that requirement. Most courts interpreting the Sherman Act conclude that whether the underlying distribution arrangement is one of sale-resale or of agency has nothing to do with the legality of exclusive dealing. The Supreme Court reached substantially this conclusion in the *Motion Picture Advertising*

***©2014 Wolters Kluwer. All rights reserved.***
***Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm***

case, holding that "bailment" contracts by which advertising films were licensed to theaters and the licensees were forbidden to show the films of rivals, were reachable under apparently the same standards as the Clayton Act applied. [101] Thus in its *Ryko* decision the Eighth Circuit conducted a lengthy analysis of the distribution arrangement for purposes of a resale price maintenance claim. [102] But having found an agency relationship and thus rejecting the resale price maintenance claim, the court went on to analyze an exclusive-dealing claim regarding the same equipment without referencing the agency decision at all. [103]

**1800d2. *Exclusive dealing in intellectual property licenses.* [104] .—**Exclusive-dealing claims in intellectual property licensing arise in a number of ways. First, the owner of a patent or other intellectual property right may simply give an exclusive license, thus promising not to license another. These licenses are really output contracts rather than requirements contracts, which are discussed later. [105] In any event, they are generally protected by the Patent Act's express permission for exclusive licenses. [106] Second, a trademark license or, less frequently, a license in a patent or copyright, may accompany or be implied in an exclusive-dealing agreement in a good. For example, Standard Oil's agreement under which independent dealers sell its gasoline exclusively [107] very likely also includes a provision authorizing these dealers to display Standard's logo or other markings on their buildings, gasoline pumps, advertising, and the like, and forbidding them from displaying the logos of competing brands. In such cases the exclusive-dealing analysis is driven by the exclusivity requirement in the product, and the trademark license ordinarily travels with the product. For example, once the court concludes that the stations are entitled to pump the gasoline of a rival, they will presumably also be able to display the rival's trademarks on the second set of pumps, notwithstanding any exclusivity provision in the trademark license.

Indeed, a special characteristic of trademarks that often justifies exclusive dealing or output contracts is that the trademark attests to the origin of a good as well as making statements about its quality. For example, once a gasoline station installs pumps bearing the "Texaco" brand, pumping non-Texaco gas through those pumps could mislead customers and even constitute trademark infringement. The true issue in the Supreme Court's *American Needle* decision was not whether the conduct at issue was the "unilateral" action of the NFL rather than the concerted action of its individual teams, as the Court held. [108] The case was a challenge to an exclusive contract between NFL and Reebok for the production of NFL-logoed headwear, the effect of which was to oust American Needle. So the challenge was appropriately one against concerted action under §1 in any event. The all-important difference, however, is that an exclusive trademark license agreement between a *single* licensor and a single licensee is nearly always lawful and may be essential to preserve the integrity of the mark. On the other hand, there may not be a justification for a decision by a group of teams to license their independently owned trademarkets collectively. [109]

Many exclusive IP licenses do not involve an underlying product at all. For example, many fast-food franchises provide franchisees essentially with a method of doing business and a set of trademarks, but not with a significant amount of product. For example, the McDonald's franchisor may require its franchisees to display only its own trademarks and copyrighted slogans and literature, and forbid the franchisees from holding themselves out as "dual" franchisees in, say, McDonald's and Pizza Hut or Taco Bell. [110]

Patent-licensing cases raise more complex issues. In one set of cases a patentee licenses its patent to a manufacturer on a royalty agreement that measures royalties by the total number of units of the manufactured product that the licensee produces, whether or not a specific unit incorporates the patent. Such practices are covered in Chapter 17G-2, which discussed patent practices that the Court has analogized to tying arrangements. But they can also be viewed as exclusive-dealing clauses. The impact of such arrangements is to make it more expensive for the licensee-manufacturer to use a rival licensor's alternative technology for any part of its production, because the first licensor must be paid even for units of the manufactured good that apply the second licensor's technology. [111]

***©2014 Wolters Kluwer. All rights reserved.***
***Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm***

The first round of *Microsoft* litigation involved a software license agreement that contained such a provision. [112] Computer manufacturers wishing to install Microsoft operating software such as Windows on their computers at the factory had to pay a licensing fee for each computer manufactured, whether or not that particular unit incorporated the Microsoft program. As a consequence, if a rival firm such as IBM wished to have its OS/2 operating system installed on some of the manufacturer's computers, the manufacturer would have to pay two licensing fees, one to Microsoft and one to IBM. The impact was to make the computer carrying the IBM software more expensive than the computer carrying the Microsoft software. The competitive effect of the practice was never fully litigated because Microsoft consented to abandon it.

The more traditional exclusive-dealing arrangement would be one in which the patentee licenses a right to make its patented product *X* or employ its patented process *Y* only on the condition that the licensee not make the *X* or employ the *Y* of a rival licensor. [113] These cases raise some of the same issues as those involved in patent ties generally, but they are distinguishable. For example, the *Motion Picture Patents* case involved a claim of tying a patented movie projector (the tying product) to the licensor's films. [114] By contrast, an exclusive-dealing claim would arise if the patentee licensed the projector to the theater only on the condition that the theater not employ projectors made by any rival of the licensor. Such a case should be treated as no different from the general run of exclusive-dealing cases. [115]

To that end, some of the license cases treated by the Supreme Court as involving tying arrangements might more appropriately be seen as involving a type of exclusive dealing. For example, the "block-booking" cases involved the insistence of licensors of films that the films be licensed in groups, or blocks, rather than individually. [116] The cases proceeded on the assumption that these blocks were tying arrangements in that they contained desirable films, which were the tying product, and undesirable films, which constituted the tied product. But the real economic objection to block booking was not the combining of desired and undesired films. Rather, it was the size of the packages, which had the effect of saturating the licensee's demand, with the result that alternative licensors could no longer obtain that licensee's business. [117] Of course, the blocks were not literally exclusive dealing either unless the licensee was forbidden to license its films from anyone other than that licensor.

Nevertheless, such injury resembles exclusive dealing, which forecloses rivals in the defendant's main product, rather than tying, which forecloses rivals in the tied product. [118] Given the tying analogy, in which desired films were the tying product and undesired films were the tied product, the tying claim would have to proceed on the odd assumption that television stations preferred to have the undesired films of other licensors rather than those of the defendant. But clearly that was not the objection, which rather was that block-booking effectively made it impossible for alternative licensors to sell any of their films to the stations.

**Footnotes**

1 *FTC v. Brown Shoe Co.,* 384 U.S. 316 (1966); see ¶1801j.

2 For the somewhat different concerns attending so-called dual distribution agreements and intrabrand restraints, see ¶1605.

3 See ¶1802c, d.

4 See ¶1805a.

5 See ¶1805b.

6 "Defendant" describes the person or firm whose behavior is in question, even though that person is hypothetical or has never been sued.

7 See the cases cited in ¶c ; and *Fort Wayne Corrugated Paper Co. v. Anchor Hocking Glass Corp.,* 130 F.2d 471 (3d Cir. 1942). Occasionally a court finds the contracts to be too indefinite or to lack sufficient consideration. See *Oscar Schlegel Mfg. Co. v. Peter Cooper's Glue Factory,* 231 N.Y. 459, 132 N.E. 148

**©2014 Wolters Kluwer. All rights reserved.**
***Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm***

(1921). See generally E. Allan Farnsworth Contracts §2.15 (3d ed. 2004 & Supp.); Note, The Legality of Contracts of Sale Which Prohibit the Purchaser-Retailer from Handling Goods of the Wholesaler's Competitors, 30 Harv. L. Rev. 72 (1916). See also George S. Geis, An Embedded Options Theory of Indefinite Contracts, 90 Minn. L. Rev. 1664 (2006); Mark P. Gergen, The Use of Open Terms in Contract, 92 Colum. L. Rev. 997 (1992).

8 See ¶1803.

9 See ¶c.

10 *Jefferson Parish Hosp. Dist. No. 2 v. Hyde,* 466 U.S. 2 (1984); see ¶¶1720b4, 1733e2, 1744, 1745.

11 *Jefferson Parish*, 466 U.S. at 6.

12 Id. at 6 n.3.

13 Such agreements are treated in Chapter 16E.

14 E.g., *Capital Temporaries, Inc. of Hartford v. Olsten Corp.,* 506 F.2d 658 (2d Cir. 1974) (refusing to disapprove noncompetition covenant preventing franchisee from opening competing business); *Postal Instant Press v. Jackson,* 658 F. Supp. 739 (D. Colo. 1987) (granting summary judgment against franchisee challenging restrictive covenants preventing Postal Instant Press (PIP) franchisee from accepting franchise from competing franchisor during franchise period); *Joyce Beverages of New York, Inc. v. Royal Crown Cola Co.,* 555 F. Supp. 271 (S.D.N.Y. 1983) (upholding covenant in franchise agreement that prevented bottler of one soft drink brand from bottling a second brand). Cf. *Interstate Automatic Transmission v. W.H. McAlpine Co.,* 1982-1 Trade Cas. ¶64,538 (N.D. Ohio 1981) (upholding restrictive covenants preventing franchisee from operating an auto transmission service shop within ten miles of any shop franchised by the defendant for one year after franchise termination). Cf. *Mayer Hoffman McCann, P.C. v. Barton*, 614 F.3d 893 (8th Cir. 2010) (employee noncompetition agreements did not violate federal antitrust law; in any event, it seemed clear that plaintiff was simply trying to avoid honoring the contract rather than protecting any interest in a more competitive market).

15 Cf. *Ungar v. Dunkin' Donuts of America, Inc.,* 531 F.2d 1211 (3d Cir.), cert. denied, 429 U.S. 823 (1976) (franchise agreement prevented franchisee from opening a competing doughnut store other than another Dunkin' Donuts store during and for 18 months after franchise arrangement expired); *Domed Stadium Hotel, Inc. v. Holiday Inns, Inc.,* 732 F.2d 480 (5th Cir. 1984) (monopolization claim; Holiday Inn franchisee forbidden from operating non-Holiday Inn hotel). See also *Queen City Pizza, Inc. v. Domino's Pizza, Inc.,* 922 F. Supp. 1055 (E.D. Pa. 1996), aff'd, 124 F.3d 430 (3d Cir. 1997) (franchisor's insistence that franchisees take all their pizza dough and other products from franchisor; power lacking).

16 See ¶1752f2 ; *Blackwell v. Power Test Corp.,* 540 F. Supp. 802 (D.N.J. 1981), aff'd mem., 688 F.2d 818 (3d Cir. 1982) (tie of service station lease to gasoline purchase; land not a "commodity" under Clayton Act §3); *Moore v. Jas. H. Matthews & Co.,* 550 F.2d 1207, 1214 (9th Cir. 1977) (Clayton Act does not apply to tie of grave sites and markers); *Consolidated Gas Co. of Florida, Inc. v. City Gas Co. of Florida,* 665 F. Supp. 1493, 1545-1546 (S.D. Fla. 1987) (same; tying homes and LP gas); *Valerio v. Boise Cascade Corp.,* 80 F.R.D 626, 652-653 (N.D. Cal. 1978) (Clayton Act does not apply to challenge that defendant tied residential lot sales to membership in homeowners' association, shares in a water company, and acquisition of a country club).

17 See ¶1807b.

18 See ¶1807c. See also ¶749, which deals with such discounts as exclusionary practices covered by §2 of the Sherman Act.

19 See ¶1807c.

20 See ¶1803e.

21 *Standard Oil of California v. United States (Standard Stations),* 337 U.S. 293 (1949); see also ¶1801g.

***©2014 Wolters Kluwer. All rights reserved.***
***Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm***

22 See, e.g., *FTC v. Sinclair Refining Co.,* 261 U.S. 463 (1923) (describing similar arrangement as tying); see ¶¶1720b, 1760b.

23 *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 43 (1984).

24 Id. at 44-46 (Justice O'Connor, concurring with then-Chief Justice Burger, Justice Powell, and then-Associate Justice Rehnquist).

25 See Ch. 17D-1.

26 See ¶1720.

27 See ¶¶1710 - 1711.

28 *Roy B. Taylor Sales v. Hollymatic Corp.,* 28 F.3d 1379 (5th Cir. 1994), cert. denied, 513 U.S. 1103 (1995).

29 Id. at 1385.

30 See *Jefferson Parish Hosp. Dist. No. 2 v. Hyde,* 466 U.S. 2 (1984).

31 The Fifth Circuit noted:

> Taylor's claim was, ironically, that it lost customers to competitors; that the consumer's response to the asserted high price of paper was to purchase paper elsewhere. Now, this may have cost Taylor money—injured it—but it belies its claim of injury to competition. Purchasers of machines from Taylor simply found a different seller. Taylor's incentive to accept Hollymatic's requirement that Taylor buy its paper rested on the profitability of its machine sales.

*Roy B. Taylor,* 28 F.3d at 1385.

32 Particularly in *Standard Oil of California v. United States (Standard Stations),* 337 U.S. 293, 304-306 (1949), an exclusive-dealing case where the Court compared exclusive dealing and tying and found tying inherently more anticompetitive, serving hardly "any purpose beyond the suppression of competition…." See ¶¶1720b, 1760b2.

33 For example, while canners were required to use International Salt's salt tablets with its salt-injecting machines, they were presumably free to use any salt they wished with the machines of others. *International Salt Co. v. United States,* 332 U.S. 392 (1947); see ¶1720b. Likewise, the tying requirement in gasoline at issue in *FTC v. Sinclair Refining Co.,* 261 U.S. 463 (1923), required the station owner to pump Sinclair's gasoline in pumps provided by Sinclair but did not prohibit the dealer from having a second set of pumps dispensing the gasoline of rivals. See ¶1801d.

34 See Ch. 17D-1.

35 See *Jefferson Parish Hosp. Dist. No. 2 v. Hyde,* 466 U.S. 2 (1984).

36 Per Justice Stevens.

37 *Jefferson Parish,* 466 U.S. at 43. For our conclusion that the majority was correct and that two products were involved, see ¶1751a.

38 As noted elsewhere, this conclusion is incorrect. True, patients would not wish to use an anesthesiologist except in conjunction with hospital operating services, but that does not mean that they could not purchase them separately. For example, most consumers would have no use for dishwasher soap except in conjunction with an automatic dishwasher, but they purchase the two from separate sources all the time, and tying law would almost certainly regard them as distinct products. See ¶1751a.

39 For our general rejection of this view, see ¶1741b.

40 See ¶¶1741b, 1744, 1745.

41 *Mogul Steamship Co. v. McGregor, Gow & Co.,* [1892] A.C. 25, 66 Law Times 1 (1892). For the history and context of this important decision, see Tony Freyer, Regulating Big Business: Antitrust in Great Britain and America, 1880-1990, at 78-79, 121-129 (1992). On rebates in exchange for exclusivity, see ¶1807b1.

***©2014 Wolters Kluwer. All rights reserved.***
***Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm***

42 See *Whitwell v. Continental Tobacco Co.,* 125 F. 454 (8th Cir. 1903) (approving tobacco company's granting of rebates to dealers who did not sell competing brands). See also 51 Cong. 9161-9162 (1914) (remarks of Rep. Floyd, complaining about the *Whitwell* case and stating that remedial legislation—the proposed Clayton Act—was needed).

43 See *United States Tel. Co. v. Central Union Tel. Co.,* 202 F. 66 (6th Cir.), cert. denied, 229 U.S. 620 (1913) (condemning 99-year exclusive long-distance telephone contract under Sherman Act; practice went "so far beyond any inherent [business] necessity…that it cannot be justified as properly incidental to a lawful purpose"); *United States v. Great Lakes Towing Co.,* 208 F. 733 (N.D. Ohio 1913), modified, 217 F. 656 (N.D. Ohio 1914), appeal dismissed, 245 U.S. 675 (1917) (condemning arrangement under which firm with dominant share of harbor towing on great lakes gave 20 percent discount to ships using its services exclusively at all ports where it operated and for the entire season):

> Even competitive practices, of a nature which as between business rivals standing practically on equal terms may be normal and lawful, yet when employed by a powerful monopolistic combination with the ability to crush, and for the purpose of crushing, a weak rival, may become abnormal and unlawful.

*Great Lakes Towing*, 208 F. at 744.

44 *Whitwell,* 125 F. at 461.

45 *Corning,* 51 F. 205 (D.N.D. Ohio 1892).

46 *Terrell,* 51 F. 213 (C.C.S.D.N.Y. 1892).

47 Contemporaneous state court decisions include *Joseph Schlitz Brewing Co. v. Travi & Corsorta,* 179 Ill. App. 269 (1913) (upholding arrangement under which Schlitz agreed with saloon keepers that they would sell only Schlitz brand beer; court noted that Schlitz supplied beer-serving equipment to the saloons, so arrangement might have been cast as a tie); *J.W. Ripy & Son v. Art Wall Paper Mills,* 136 P. 1080 (Okla. 1913) (upholding exclusive-dealing agreement between wallpaper manufacturer and distributor); *Peerless Pattern Co. v. Gauntlett Dry Goods Co.,* 136 N.W. 1113 (Mich. 1912) (upholding exclusive dealing between dress pattern manufacturer and dry goods store; facts similar to those of *Standard Fashion*, discussed in ¶1801b.

48 *Henry v. A.B. Dick Co.,* 224 U.S. 1 (1912). Once the Clayton Act was in force, the Federal Trade Commission applied it aggressively against exclusive dealing and apparently without close analysis of competitive impact. See, e.g., *Standard Elec. Mfg. Co.,* 5 F.T.C. 376 (1923) (condemning exclusive dealing by electrical switch manufacturer without showing of market share or foreclosure); *B.S. Pearsall Butter Co.,* 5 F.T.C. 127 (1922) (same; no discussion of market share or foreclosure except statement that Pearsall had 46 competitors); *Stanley Booking Corp.,* 1 F.T.C. 212 (1918) (exclusivity clause in motion picture licensing condemned under FTCA; no finding of market share or foreclosure).

49 15 U.S.C. §14.

50 See ¶b2.

51 See ¶1803.

52 See *Misco, Inc. v. United States Steel Corp.,* 784 F.2d 198 (6th Cir. 1986) (applying Clayton Act to exclusive dealership agreement under which manufacturer promised not to sell to other dealers within specified region). Cf. *Hughes Automotive, Inc. v. Mid-Atlantic Toyota Distributors, Inc.,* 543 F. Supp. 1056 (D. Md. 1982) (plaintiff alleged that it had been exclusive dealer in rust-coating, but lost its position when defendant supplier entered into agreement with Toyota distributor providing for alternative supplier; however, Clayton Act challenge appears to be to tying of alternative supplier's coating to the distributor's Toyotas, rather than to the termination of exclusive dealership).

53 *United Air Lines, Inc. v. Austin Travel Corp.,* 867 F.2d 737, 742 (2d Cir. 1989) (requirement that a minimum of 50 percent of travel bookings come from defendant's firm not exclusive dealing); *Sewell Plastics, Inc. v.*

***©2014 Wolters Kluwer. All rights reserved.***
***Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm***

*Coca-Cola Co.,* 720 F. Supp. 1186, 1220 (W.D.N.C. 1988), aff'd, 912 F.2d 463, 1990-2 Trade Cas. ¶69,165 (4th Cir. 1990) (unpublished), cert. denied, 498 U.S. 1110 (1991) (bottlers' agreement to purchase 80 percent of their bottle needs from their joint venture supplier not exclusive dealing); *Magnus Petroleum Co. v. Skelly Oil Co.,* 599 F.2d 196, 197 (7th Cir.), cert. denied, 444 U.S. 916 (1979) (contract requiring buyer to purchase 60 to 80 percent of its requirements from seller not exclusive dealing). Contra *United States v. Standard Oil Co.,* 362 F. Supp. 1331, 1337-1338, 1341 (N.D. Cal. 1972), aff'd, 412 U.S. 924 (1973) (condemning requirement that purchasers buy at least 60 percent of their gasoline from defendant).

54 *Barry Wright Corp. v. ITT Grinnell Corp.,* 724 F.2d 227, 237 (1st Cir. 1983) (contract for fixed dollar amount not exclusive dealing); *White & White, Inc. v. American Hosp. Supply Corp.,* 540 F. Supp. 951, 1028, 1032 (W.D. Mich. 1982), rev'd on other grounds, 723 F.2d 495 (6th Cir. 1983) (contracts that give low prices for purchases of very large volume not exclusive dealing where purchaser still bought significant percentage of products elsewhere); *Magnus Petroleum*, 599 F.2d at 201 & n.11 (contract to purchase stipulated amount of gasoline annually not exclusive dealing even though the amount was "intended to approximate" buyer's total requirements; in fact, buyer ended up using more and purchased as much as 30 to 50 percent of its needs elsewhere); *Seitz v. Rheem Mfr. Co*., 544 F. Supp. 2d 901 (D. Ariz. 2008) (defendant water heater's exclusive-dealing provisions with suppliers was a limitation on purchasing, not on selling, and §3 of the Clayton Act reached exclusive dealing only in sales); *Petroleum for Contractors, Inc. v. Mobil Oil Corp.,* 493 F. Supp. 320, 323-325 (S.D.N.Y. 1980) (contractual minimum purchase requirement; "a record of threats and enforcement of minimum purchase requirements alone, with no showing that [plaintiff] was ever forced to deal exclusively in Mobil lubricants, cannot support an exclusive dealing claim….").

55 15 U.S.C. §14.

56 On discounting practices challenged as exclusive dealing, see ¶1807.

57 *Stitt Spark Plug Co. v. Champion Spark Plug Co.,* 840 F.2d 1253, 1257-1258 (5th Cir.), cert. denied, 488 U.S. 890 (1988) (offering of minor incentives to sell defendants' product exclusively, but no sanctions for those who did not, insufficient); *Beverage Mgmt., Inc. v. Coca-Cola Bottling Corp.,* 653 F. Supp. 1144, 1146, 1154 (S.D. Ohio 1986) (minor advertising incentives in exchange for exclusive promotion insufficient). Cf. *Sulmeyer v. Coca-Cola Co.,* 515 F.2d 835, 847 (5th Cir. 1975) (cash bonuses for bottlers who agreed to promote other Coca-Cola products but with no prohibition on bottling non-Coca-Cola products not exclusive dealing).

58 See *Stearns v. Genrad, Inc.,* 564 F. Supp. 1309, 1313-1314 (M.D.N.C. 1983), aff'd, 752 F.2d 942 (4th Cir. 1984) (statements from distributor that it did not want plaintiff to deal in competing lines did not amount to exclusive dealing when plaintiff continued to do so without sanction; eventual termination occurred because plaintiff failed to pay for merchandise).

59 *Empire Volkswagen, Inc. v. World-Wide Volkswagen Corp.,* 814 F.2d 90, 97 (2d Cir. 1987).

60 Such in *Jefferson Parish Hospital District No. 2 v. Hyde,* 466 U.S. 2 (1984), which was brought under the Sherman Act. See also *E.T. Barwick Industries v. Walter E. Heller & Co.,* 692 F. Supp. 1331, 1343 (N.D. Ga. 1987) (financial services not covered by Clayton Act §3).

61 *Kennedy Theater Ticket Serv. v. Ticketron, Inc.,* 342 F. Supp. 922, 927 (E.D. Pa. 1972) ( "intangible aspects of the admission tickets are dominant over the tangible aspects"; thus not a "commodity"). See also *American Motor Inns, Inc. v. Holiday Inns, Inc.,* 521 F.2d 1230, 1250 (3d Cir. 1975) (hotel services not a commodity); *Wilson v. Mobil Oil Corp.,* 940 F. Supp. 944 (E.D. La. 1996) (dismissing Clayton §3 claim; franchise and trademark not commodities); *Greene County Memorial Park v. Behm Funeral Homes, Inc.,* 797 F. Supp. 1276 (W.D. Pa. 1992) (funeral home services not a commodity even though some products, such as embalming fluids, are used in their delivery); *Rankin County Cablevision v. Pearl River Valley Water Supply,* 692 F. Supp. 691 (S.D. Miss. 1988) (provision of cable television not a commodity); *Satellite Fin. Planning Corp. v. First Natl. Bank,* 633 F. Supp. 386, 399 (D. Del. 1986) (money and credit not a commodity for §3 purposes); *Waldo v. North Am. Van Lines,* 102 F.R.D. 807, 816-817 (W.D. Pa. 1984) (contract requiring exclusive service of independent truck drivers was for services, not commodities);

***©2014 Wolters Kluwer. All rights reserved.***
***Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm***

*Satellite T. Assoc. v. Continental Cablevision of Virginia,* 586 F. Supp. 973 (E.D. Va. 1982) (same; cable television services); *Walt Peabody Advertising Serv. v. Jay Gleason Advertising Serv.,* 1978-1 Trade Cas. ¶61,952 (D. Utah 1978) (sale of bowling score sheet was a commodity although score sheet contains advertising sold by third party); *G.O. Coin Serv. v. Ace Vending Co.,* 1978-1 Trade Cas. ¶61,882 (S.D. Ohio, 1978) (lease of space for vending machines not a "commodity").

62 See ¶267.

63 *Henry v. A.B. Dick Co.,* 224 U.S. 1 (1912).

64 See ¶1821.

65 See *Times-Picayune Publg. Co. v. United States,* 345 U.S. 594, 613-614 (1953); and ¶1719b, noting *Times-Picayune's* inconsistency with other Supreme Court decisions and that the courts generally apply the same test under both statutes.

66 See *Tampa Electric Co. v. Nashville Coal Co.,* 365 U.S. 320, 335 (1961) (indicating that the Clayton Act has a "broader proscription" than the Sherman Act, but not elaborating on the difference); *United States v. Microsoft Corp.,* 253 F.3d 34, 69 (D.C. Cir.), cert. denied, 534 U.S. 952 (2001) (Sherman Act test is less aggressive; quoting this Paragraph in previous edition); *Barr Laboratories, Inc. v. Abbott Laboratories,* 978 F.2d 98, 110 (3d Cir. 1992) (dicta: "if the global contracts do not infringe upon the stiffer standards of anticompetitiveness under the Clayton Act, they will also be lawful under the less restrictive provisions of the Sherman Act"); *American Motor Inns, Inc. v. Holiday Inns, Inc.,* 521 F.2d 1230, 1250 (3d Cir. 1975) (Sherman Act requires stricter standard; thus, something lawful under Clayton Act standard is a fortiori lawful under Sherman Act standard); *Lepage's v. 3-M,* 1997 WL 734005 (E.D. Pa. 1997) (unreported) (dicta: lesser degree of competitive harm required under Clayton Act than Sherman Act); *Yeager's Fuel, Inc. v. Pennsylvania Power & Light Co.,* 953 F. Supp. 617, 662 (E.D. Pa. 1997) ( "[L]esser degree of anticompetitive injury needs be demonstrated under Section 3 than under Section 1."); *T.A.M., Inc. v. Gulf Oil Corp.,* 553 F. Supp. 499, 504 (E.D. Pa. 1992) (quoting *American Motor Inns*, 521 F.2d 1230); *Waldo*, 102 F.R.D. 807, 816 (W.D. Pa. 1984) (Sherman Act requires "stiffer" standards); *Balaco, Inc. v. Upjohn Co.,* 1992 WL 131150 (E.D. Pa. 1992) (unreported) (Sherman Act requires "illegal purpose or objective" while Clayton Act requires only "substantial foreclosure" and some potentially anticompetitive effects). Contra *Roland Machinery Co. v. Dresser Industries,* 749 F.2d 380, 393 (7th Cir. 1984) (suggesting same rule of reason test under both statutes); *Bepco, Inc. v. Allied Signal, Inc.,* 106 F. Supp. 2d 814, 827 (M.D.N.C. 2000) (dicta suggesting same test under two statutes, but plaintiff failed to prove a violation even under a more aggressive Clayton Act test; quoting this Paragraph in previous edition); *Acton v. Merle Norman Cosmetics, Inc.,* 1995-1 Trade Cas. ¶71,025, at 74,817 (C.D. Cal. 1995) (same proof requirements).

67 See ¶c3.

68 See *Times-Picayune,* 345 U.S. at 613-614 (1953); and ¶1719b .

69 See ¶1719b ; the language was dicta because the Court failed to find separate tying and tied products.

70 See ¶1719.

71 See ¶745e. Predatory pricing is reachable under §2 of the Clayton Act, whose "lessen competition" standard is similar to that used in §3.

72 Ibid.

73 See ¶906.

74 See also ¶301b, c ; ¶1701 (early tying law).

75 E.g., *Northern Pacific Ry. Co. v. United States,* 356 U.S. 1 (1958) (applying aggressive tying test under Sherman Act §1); see ¶1720b3.

76 See generally Ch. 14.

***©2014 Wolters Kluwer. All rights reserved.***
***Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm***

77 See ¶1754b, c, noting that a sale on the announced condition that the buyer purchase the tied goods from the seller, followed by a subsequent refusal to deal with those not complying, ordinarily satisfies the tying-agreement requirement.

78 See, e.g., *Amplex of Md., Inc. v. Outboard Marine Corp.,* 380 F.2d 112, 115 (4th Cir. 1967), cert. denied, 389 U.S. 1036 (1968) (unilateral refusal not unlawful); *Timken Roller Bearing Co. v. FTC,* 299 F.2d 839, 842 (6th Cir.), cert. denied, 371 U.S. 861 (1962) (manufacturer may lawfully terminate dealers who sell competitor's goods); *McElhenney Co. v. Western Auto Supply Co.,* 269 F.2d 332, 337-339 (4th Cir. 1959) (same); *Howerton v. Grace Hosp.,* 1995-2 Trade Cas. ¶71,208 (W.D.N.C.), aff'd, 96 F.3d 1438 (4th Cir. 1996) (hospital's entry into contract with a single radiology group, and then its termination of that contract and entry into contract with a different group, not exclusive dealing; unilateral act); *Elliot & Frantz, Inc. v. Raygo, Inc.,* 379 F. Supp. 498, 501-502 (E.D. Pa. 1974) (unilateral refusal to deal with retailer selling others' goods not unlawful); *Carbon Steel Prods. Corp. v. Alan Wood Steel Co.,* 289 F. Supp. 584, 588 (S.D.N.Y. 1968) (same; distributor); *Alpha Distrib. Co. of Cal. v. Jack Daniel's Distillery,* 207 F. Supp. 136, 138 (N.D. Cal. 1961), aff'd per curiam, 304 F.2d 451 (9th Cir. 1962) (same). Cf. *Northeastern Educ. Television of Ohio, Inc. v. Educational Television Assoc.,* 758 F. Supp. 1560, 1561 (N.D. Ohio 1990) (no exclusive dealing in absence of conspiracy). On the *Colgate* doctrine protecting unilateral actions from resale price maintenance charges, see ¶1623.

79 *Ron Tonkin Gran Turismo v. Fiat Distribs.,* 637 F.2d 1376, 1388-1389 (9th Cir.), cert. denied, 454 U.S. 831 (1981) (mere offer not a violation); *Dillon Materials Handling v. Albion Indus.,* 567 F.2d 1299, 1306 (5th Cir.), cert. denied, 439 U.S. 832 (1978) (same).

80 See *Roland Mach. Co. v. Dresser Industries,* 749 F.2d 380, 392-393 (7th Cir. 1984) (dicta; tacit understanding sufficient); *Barr Lab., Inc. v. Abbott Lab.,* 1989-1 Trade Cas. ¶68,647, at 61,404 (D.N.J. 1989) (may be inferred from circumstances).

81 See ¶760b7 (exclusive dealing as unlawful monopolization) and ¶806e3 (same; attempt to monopolize). See also *U.S. Healthcare, Inc. v. Healthsource, Inc.,* 986 F.2d 589, 597 (1st Cir. 1993) ( "[e]xclusive contracts might in some situations constitute the wrongful act that is an ingredient in monopolization claims" under §2 of the Sherman Act). See also *SmithKline Corp. v. Eli Lilly & Co.,* 427 F. Supp. 1089, 1121 (E.D. Pa. 1976), aff'd, 575 F.2d 1056 (3d Cir.), cert. denied, 439 U.S. 838 (1978) (defendant violated §2 by using rebate scheme whose practical effect was to force purchasers to take all their requirements from the defendant).

82 One could imagine such situations, but they would be rare. For example, a powerful dealer in photocopier brands *A* and *B* might pressure its *A* supplier to impose exclusive dealing on a rival dealer, thus forbidding that dealer from selling *B* and reducing the amount of *B*'s competition that the powerful dealer faces. There are also a few instances of exclusive dealing requested by buyers in exchange for other amenities or services. See Richard M. Steuer, Customer-Instigated Exclusive Dealing, 68 Antitrust L.J. 239 (2000).

83 *United States v. Microsoft Corp.,* 253 F.3d 34, 68-69 (D.C. Cir. 2001). See also *United States v. Dentsply Intl., Inc.*, 399 F.3d 181, 191-192 (3d Cir. 2005) (condemning exclusive dealing under §2 of the Sherman Act).

84 253 F.3d at 70.

85 Citing Dennis W. Carlton, A General Analysis of Exclusionary Conduct and Refusal to Deal—Why *Aspen* and *Kodak* Are Misguided, 68 Antitrust L.J. 659 (2001).

86 "IAP" stands for Internet access providers, such as AOL, which provide consumer access to the Internet.

87 I.e., Internet Explorer, or Microsoft's own Internet browser.

88 I.e., Internet Explorer's principal competitor browser.

89 *Microsoft,* 253 F.3d at 70. Significantly, the district court had refused to find the exclusive dealing agreements unlawful under §1, and the government did not appeal that ruling. *Microsoft*, 253 F.3d at 70.

***©2014 Wolters Kluwer. All rights reserved.***
***Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm***

The D.C. Circuit at one point hinted that it would have ruled in favor of the government on the §1 claim as well had it been appealed:

> The District Court appears to have based its holding with respect to §1 upon a "total exclusion test" rather than the 40% standard drawn from the caselaw. Even assuming the holding is correct, however, we nonetheless reject Microsoft's contention [i.e., that nonliability under §1 precludes liability under §2].

*Microsoft*, 253 F.3d at 70.

90 These differences in requirements for defendant's upstream market share and downstream foreclosure are assessed in ¶1821b, c.

91 *FTC v. Brown Shoe Co.,* 384 U.S. 316 (1966); see ¶1801j.

92 *Beltone,* 100 F.T.C. 68 (1982).

93 For example, suppose a home owner had $200,000 invested in a house and wanted to recover her investment. The brokerage agreement requires a 6 percent commission to the broker, but suppose the law forbade the home owner from setting the price. If the broker then invested $1,000 in the sales effort, a chance to sell at a price of $30,000, generating a commission of $1,800 would be quite profitable to the broker but catastrophic for the home owner. Or an independent gasoline station owner selling a refiner's gasoline on commission of one cent per gallon might sell the gasoline for two cents per gallon, thus maximizing its volume of sales and commission but imposing significant losses on the gasoline's actual seller.

94 See ¶¶1473, 1621. See also Herbert Hovenkamp, The Rationalization of Antitrust, 116 Harv. L. Rev. 917, 937 (2003), commenting on Richard A. Posner, Antitrust Law 178-181 (2001).

95 See ¶¶1811 - 1812.

96 The agreement is one of agency because the insurance company does not sell insurance to the agent, who then resells it to the customer; rather, the agent functions as a broker who facilitates a transaction between the insurance company and the customer.

97 15 U.S.C. §14.

98 *Standard Fashion Co. v. Magrane-Houston Co.,* 258 U.S. 346, 354 (1922). See ¶1801b.

99 *FTC v. Curtis Publg. Co.,* 260 U.S. 568, 581 (1923); *CDC Tech., Inc. v. IDEXX Labs. Inc.,* 186 F.3d 74, 79 (2d Cir. 1999) (sales agent who does not purchase or lease the product is not covered by Clayton Act §3 exclusive-dealing proscription but is covered by §1 of the Sherman Act; citing this Paragraph in previous edition); *C.B.S. Business Equip. Corp. v. Underwood Corp.,* 240 F. Supp. 413 (S.D.N.Y. 1964).

100 *Curtis Publg.,* 260 U.S. at 581-582.

101 *FTC v. Motion Picture Advertising Service Co.,* 344 U.S. 392, 397 (1953). See also *Stop & Shop Supermarket Co. v. Blue Cross & Blue Shield of Rhode Island,* 2003-1 Trade Cas. ¶73,957 (Jan. 10, 2003), aff'd, 373 F.3d 57, 2004-1 Trade Cas. ¶74,459 (1st Cir. 2004) (insurance contract; concluding that agreement among insurers to deal exclusively with particular pharmacies would be treated as exclusive dealing rather than as a group boycott because the insurer entities were not competitors but were vertically related).

102 *Ryko Mfg. Co. v. Eden Services,* 823 F.2d 1215 (8th Cir. 1987).

103 Id. at 1233-1235. See also *Rothery Storage & Van Co. v. Atlas Van Lines Inc.,* 597 F. Supp. 217 (D.D.C. 1984), aff'd, 792 F.2d 210 (D.C. Cir. 1986), cert. denied, 479 U.S. 1033 (1987) (analyzing and ultimately approving exclusivity agreement between Atlas and independent carriers).

104 For further development, see Herbert Hovenkamp, Mark D. Janis, Mark A. Lemley, & Christopher R. Leslie, IP and Antitrust: An Analysis of Antitrust Principles Applied to Intellectual Property Law §21.7 (2d ed. 2010 & Supp.).

***©2014 Wolters Kluwer. All rights reserved.***
***Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm***

105 See ¶1803e.

106 35 U.S.C. §261 (permitting patentee to grant an exclusive license). Cf. 17 U.S.C. §201d (permitting copyright owner to make transfer of exclusive rights). See *Sheet Metal Duct, Inc. v. Lindab, Inc.,* 2000-2 Trade Cas. ¶72,973 (E.D. Pa. 2000) (distributorship agreement that involved exclusive license to manufacture the patentee's ductwork protected by Patent Act).

107 See, e.g., *Standard Oil of California v. United States (Standard Stations),* 337 U.S. 293 (1949); and ¶1801g. See also *Rothery Storage & Van Co. v. Atlas Van Lines Inc.,* 597 F. Supp. 217 (D.D.C. 1984) (exclusivity requirement prohibited Allied carriers from using Allied intellectual property with respect to their non-Allied business).

108 *American Needle, Inc. v. National Football League*, 130 S. Ct. 2201 (2010).

109 See ¶1478d.

110 In the context of tying, see ¶1749.

111 See ¶1782b, c.

112 See the proposed *Microsoft* consent decree, 59 Fed. Reg. 42,845 (Aug. 19, 1994), eventually approved by 56 F.3d 1448 (D.C. Cir. 1995).

113 Cf. *FTC v. Motion Picture Advertising Service Co.,* 344 U.S. 392 (1953), which involved the licensing of apparently copyrighted films under such a condition, although the Court treated it as simply a sale of services.

114 See, e.g., *Motion Picture Patents Co. v. Universal Film Mfg. Co.,* 243 U.S. 502 (1917); see ¶1701b.

115 E.g., *Chiplets, Inc. v. June Dairy Products Co.,* 89 F. Supp. 814 (D.N.J. 1950) (condemning under §3 arrangement under which licensee of patented machine for making print butter agreed not to use any patented or unpatented machine made by a rival of the licensor); see also *United States v. Linde Air Products Co.,* 83 F. Supp. 978 (N.D. Ill. 1949) (condemning arrangement under which licensor of welding process patent required licensees to take their entire requirements for welding rod used in the process).

116 E.g., *United States v. Loew's, Inc.,* 371 U.S. 38 (1962); *Fox Film Corp. v. Doyal,* 286 U.S. 123 (1932).

117 See *Loew*'s, 371 U.S. at 48-49:

> Moreover, there can be no question in this case of the adverse effects on free competition resulting from appellants' illegal block booking contracts. Television stations forced by appellants to take unwanted films were denied access to films marketed by other distributors who, in turn, were foreclosed from selling [to] the stations.

118 See ¶1704.

***©2014 Wolters Kluwer. All rights reserved.***
***Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm***

EXHIBIT 307

# Antitrust Law: An Analysis of Antitrust Principles and Their Application - Areeda and Hovenkamp, ¶1802. Requirements Contracts Foreclosing Markets and Deterring Entry

Click to open document in a browser

**Last Updated: 4/2014**

The most frequently given rationale for condemning exclusive-dealing arrangements is that they limit the access of upstream rivals to downstream firms, thus reducing upstream competition and creating or perpetuating lower output and higher prices. [1] Consider the shoe manufacturer that requires independently owned stores wishing to retail its shoes to agree not to deal in the shoes of any rival. As a result, a customer going to this shoe store to purchase shoes will find shoes of this particular manufacturer and brand, but not of any other manufacturer. Thus, one might say that there is less competition in the sale of shoes, at least looking at this particular store. [2]

Whether competition is injured depends on the availability of alternative shoe stores, of alternative stores that could add shoes to their inventory, or whether the rival or someone else can readily build new shoe stores. Injury to competition also depends on how competitive the market was to begin with. For example, if the market contains 20 manufacturers all of whom operate their own shoe stores, then competition will not be diminished if a few unintegrated rivals are unable to find sufficient independent stores.

**1802a. Foreclosure but no competitive harm in the short run..—**Exclusive dealing foreclosing upstream rivals from access to downstream markets may not produce any competitive harm at all. This would certainly be the case where economies of scale are insubstantial and entry barriers are low in the supposedly foreclosed market. Suppose, for example, that a shoe manufacturer makes shoes at a cost of $50 per pair and that the costs of selling them through an independent retailer are $20. Suppose further that (1) an exclusive-dealing contract generates no efficiencies whatsoever; that (2) any shoe store, even a small one, can sell shoes profitably at a $20 markup, and (3) that entry into the shoe-retailing business is quite easy. In this case not even foreclosure from 100 percent of a shoe-retailing market is likely to cause significant competitive injury. For example, suppose an isolated town has three shoe retailers and Brown Shoe negotiates exclusive-dealing agreements with all three. Any alternative manufacturer wishing to sell shoes in that town could readily and profitably establish its own shoe outlet or find someone willing to invest the capital to begin selling shoes in competition with Brown. [3]

A type of "foreclosure" could occur if the exclusive-dealing arrangement reduced the costs of retailing shoes to, say, $15. In that case a manufacturer selling through unrestricted independents would have costs $5 higher than a manufacturer selling through more specialized exclusive-dealing outlets. As a result, the manufacturer would lose market share if it were already established; or it might not be able to enter successfully, unless it could obtain its own exclusive outlets.

But it is not antitrust's purpose to interfere with arrangements that lower a firm's costs, even if the impact of reduced costs is to exclude those unable to match the cost reductions. Any foreclosure resulting from cost reduction itself is not an antitrust concern.

Even if entry barriers into shoe retailing are high, complete foreclosure need not result in higher consumer prices in the short run. For example, assume a shoe manufacturing monopolist whose costs are $50 but who maximizes its profits at a wholesale price of $70, allowing for a retail markup of $20 and output price of $90. Imposition of exclusive dealing does nothing to change these numbers: the firm's profit-maximizing price after exclusive dealing is imposed is still $90. Long-run considerations are different, as illustrated below. [4]

Now suppose that formerly a town contained three independent shoe sellers free to sell any brand, but the dominant shoe manufacturer then imposes exclusive dealing on all three, thus creating a second-level local "monopoly" in addition to its dominant position in manufacturing. The manufacturer's monopoly price is *still* $90.

***©2014 Wolters Kluwer. All rights reserved.***
***Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm***

As noted elsewhere [5] a monopolist of any single production or distribution level can obtain all the monopoly profits available in that market, because the monopoly price is determined entirely by the demand of end-use consumers. Adding a second monopoly in the distribution chain does nothing to increase the amount of monopoly.

Finally, as noted in the introduction, one consequence of exclusive dealing is that the customer walking into the restricted shoe store sees the shoes of only one manufacturer rather than two or several. One might think of this as a decrease in competition, and indeed some customers may simply purchase the shoe store's single brand without any further inquiry into alternative brands offered by other stores.

But antitrust cannot protect against every minor deviation from perfect competition in which a customer has instant, costless access to the offerings of every manufacturer. Indeed, the great majority of exclusive-dealing situations arise in product-differentiated markets where customers do distinguish among brands. Competition in such markets is never perfect. Rather, we examine competitive effects by looking at the extent of competition in a properly defined relevant market rather than in a single store.

**1802b. Minimum conditions for competitive harm..—**Exclusive dealing is analyzed under the rule of reason, [6] which in hard cases can stretch the court's measurement capacity to its limits. For example, if a particular exclusive-dealing arrangement is thought to present significant risks of competitive injury but also holds out significant promise of efficiency gains, any exercise in "balancing" these two will be highly speculative and prone to error. In such a case the court will quite naturally give the issue to the jury, if there is one, and this will limit the court's responsibility. But giving such issues to a jury is certainly not likely to reduce the rate of error. Thus, it is essential that the court confront no more "hard" cases than necessary, and this makes it critical that necessary preconditions be examined very carefully.

The concern of the antitrust laws is with injury to "competition," which generally means injury resulting in lower output and higher prices in a properly defined market. A "foreclosure" injury to a private firm occurs when that firm is denied access to a market that would presumably be open absent the challenged restraint. But as ¶a makes clear, this private injury might not result even from an exclusive-dealing agreement covering a significant share of a market. Further, even when this private injury does occur, it may not be injury to competition.

*First,* injury to competition can be expected only if the firm is denied access to a *market,* but not if it is denied access to only one particular buyer or seller within that market. Thus, for example, if the retail market for shoes is Kansas City, which contains 100 shoe retailers, denial of access to a particular shoe retailer hardly constitutes denial of access to the market. Denial of access would occur only if all or some substantial portion of the shoe stores were closed off by exclusive-dealing contracts or other arrangements, whether enforced by a single shoe manufacturer or perhaps by a number of manufacturers imposing similar arrangements. Thus, Justice O'Connor's *Jefferson Parish* concurrence concluded that an exclusive-dealing contract under which a hospital agreed to take all of its anesthesiological services from a single supplier could not be anticompetitive where the hospital accounted for only 30 percent of the admissions in its service area. [7]

*Second,* even complete denial of access by exclusive-dealing arrangements would have no impact on competition if the shoe market were already robustly competitive in any event. For example, suppose the 100 shoe stores already actively sold 50 brands of shoes but all were subjected to exclusive-dealing provisions covering all brands, with an average of two stores per brand. In that case absolute exclusion of brand number 51 would likely have no impact whatsoever on competition. One firm's additional exclusive-dealing contract ousting the plaintiff from its last store would also work no injury on competition, although it might of course be a breach of contract or other state law violation.

*Third,* denial of access to existing shoe stores need have no significant impact on competition if the competitor can readily open its own stores, find others willing to open new stores—perhaps under franchise arrangements —or find existing businesses such as clothing stores that are willing to add shoes to their retail line. For the shoe manufacturer wishing to find outlets for its shoes, procuring new outlets may be relatively easy. By contrast, for

***©2014 Wolters Kluwer. All rights reserved.***
***Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm***

the anesthesiologist denied access to a hospital by the hospital's exclusive arrangement with another, opening the anesthesiologist's own alternative hospital may not be a realistic option. [8]

In sum, the preconditions for competitive harm are (a) exclusive dealing or similar arrangements [9] covering a significant portion of the downstream market; (b) entry barriers or equivalent impediments making it difficult for rivals or potential rivals in the upstream market to obtain efficient access to the downstream market; and (c) resulting prolongation of the dominant firm's ability to earn monopoly profits in the downstream market.

**1802c. Short-run versus long-run foreclosure effects.** [10] **.—**As noted above, in the short run not even foreclosure absolutely cutting off a market need result in lower output or higher prices. A dominant firm's monopoly price does not become higher simply because it sells through exclusive-dealing arrangements. [11]

Competitive harm becomes more plausible when we consider not the instantaneous snapshot of the market, but rather possible changes in the market that exclusive dealing may be designed to undermine. For example, suppose an established manufacturer has long held a dominant position but is starting to lose market share to an aggressive young rival. A set of strategically planned exclusive-dealing contracts may slow the rival's expansion by requiring it to develop alternative outlets for its product, or rely at least temporarily on inferior or more expensive outlets. Consumer injury results from the delay that the dominant firm imposes on the smaller rival's growth.

But such a condition requires either a dominant firm imposing exclusive dealing or else an "oligopoly" of firms imposing it and sufficiently dominating downstream markets to make it difficult for the new upstream entrant to find adequate outlets.

We refer to an "oligopoly" of firms imposing exclusive dealing in order to distinguish two situations. In the first situation, if exclusive dealing results in significant distributional cost savings, then each firm will impose exclusive dealing in its own self-interest, whether or not other firms do it as well. For example, if exclusive dealing imposed by gasoline refiners on gasoline retailers reduces the costs of interbrand free riding by dual-brand retailers [12] then it would be in any firm's individual best interest to engage in exclusive dealing, whether or not rivals did the same. In that case the fact that five major refiners commanding, say, 80 percent of the market impose exclusive dealing provides no indication that it is competitively harmful. [13] But in the second situation exclusive dealing produces no or only insignificant cost savings but is employed by fellow oligopolists as an entry-deterrence device. [14]

**1802d. Measuring relevant foreclosure..—**

**1. *Significance of market power or share at each market level.*.—**When exclusive dealing is considered as a "foreclosure offense," it ordinarily becomes necessary to examine market power or share at *both* of the two market levels involved. [15] Significantly, the geographic boundaries of the two markets are not necessarily the same; indeed, many products are manufactured and wholesaled in large markets but retailed in relatively small ones.

We use this illustration to consider the various possibilities: an upstream gasoline refiner wholesales its gasoline to retailers in a "large" market, such as the United States, and imposes exclusive dealing on one or more of these retailers who resell in relatively small retail markets, such as in a single city. We assume that other requirements for anticompetitive exclusive dealing, such as high entry barriers at both market levels, [16] also exist.

One additional word of caution: when considering foreclosure offenses, market share acquires independent significance from its general antitrust use as a surrogate for power. [17] For example, we sometimes speak of measuring market *power* by alternative mechanisms that seek to determine the defendant's ability to set price above cost without reference to share. [18] But the foreclosure inquiry pertains to a firm's ability to deny market access to rivals, and this is a function of share itself, not of the power for which share is merely a surrogate.

***©2014 Wolters Kluwer. All rights reserved.***
***Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm***

**1802d2.** ***Small upstream market share; small downstream market share covered by restraint.*.—**The first case is the easy one. If the refiner has a small share in the gasoline refining (upstream) market—say, 10 percent—and it enters into exclusive-dealing contracts covering an equivalent percentage of gasoline retailers in some local market, injury to competition is not possible. The remaining 90 percent of refiners can readily realign themselves with the remaining 90 percent of retailers in the local market, and both will perform as competitively as they did before.

**1802d3.** ***Small upstream market share; large downstream market share covered by restraint.*.—**We consider separately the situations (1) of a nationwide distribution market and local retailing market, and (2) where both geographic markets are the same. Competitive injury is unlikely in both.

**(A)** ***National input market; local reselling market.*.—**Suppose our hypothetical refiner has the same relatively small percentage in a national refining market, say, 10 percent, but that the local retail market is dominated by a firm controlling 80 percent of the market with one or two small rivals. The refiner now enters into an exclusive-dealing contract with this dominant retailer. Alternatively, the local area has ten small retailers and the refiner enters into exclusive-dealing contracts with eight of them covering 80 percent of the retail market.

Or as an alternative example, suppose that anesthesiologists compete with each other in a regional or even national market for employment, with hospitals advertising nationally and many anesthesiologists willing to move to a different city to set up a practice or obtain employment; however, the hospital that employs the anesthesiologists delivers its surgical services in a local market limited to a single city and its suburbs. In that case a single anesthesiologist or anesthesiological group would represent a fraction of 1 percent of the market in which anesthesiological services are obtained at "wholesale" by the hospital. But if the hospital signed an exclusive-dealing contract, the anesthesiologist would acquire a market share in the hospital's market equal to the hospital's own share. In the extreme case of a monopoly hospital and no other facilities performing a full range of surgery requiring anesthesia, this could be 100 percent.

As a general matter, a firm controlling 10 percent of the upstream market could neither enter nor fulfill exclusive-dealing contracts covering 80 percent of a downstream market of the same size. For that to happen would require incredibly sleepy rivals at the upstream level, and a gross imbalance between upstream and downstream capacity. But this situation could arise when local retailing markets are significantly smaller than the wholesaling market. In the case of gasoline, for example, one refiner might be more successful in a particular distribution area than another. For example, an Oklahoma refiner with a 10 percent market share in its national or regional refining market might nevertheless enter exclusive-dealing arrangements with 80 percent of the retailers in a town like Norman, Oklahoma. Or, alternatively, anesthesiologists' services might be sold to hospitals in a highly competitive national market; however, once a community's only hospital enters an exclusive contract with a particular anesthesiologist, that anesthesiologist acquires a "monopoly" of the local sale of anesthesiological services to hospital patients, just as the hospital has a monopoly of hospital care in general.

In either situation, the antitrust concern is for monopoly in the downstream market. Assuming sufficient entry barriers, competing refiners will not be able to find sufficient retail outlets in the local market; however, this can hardly affect the overall volume of gasoline sold in the nationwide refining market. Likewise, if entry barriers into the creation of new hospitals are high, competing anesthesiologists—who we presume must have a hospital in which to sell their services—will not be able to find an outlet in the city with the single hospital and an exclusive contract. However, the exclusive contract with one hospital in one city will not noticeably affect the national market in which anesthesiologists are hired.

While exclusive-dealing arrangements dominating local retailing or anesthesia foreclose rival suppliers from access to that particular local market, it is hard to see how lower output or higher prices in the downstream market could result, at least for very long. The refiner could not impose unwanted exclusive dealing and high prices on the retailer so long as other refiners were competing for that retailer's business and willing to sell more cheaply. The exclusive dealing could not be a mechanism by which the refiner earns monopoly prices, for even the dominant retailer would prefer to purchase its gasoline at the competitive price, and the competitive

***©2014 Wolters Kluwer. All rights reserved.***
***Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm***

refining market makes that possible. Likewise, the monopoly hospital has no need to purchase anesthesiological services at monopoly prices in an upstream anesthesiological market that is competitive.

To be sure, the hospital may be a local "monopoly" capable of charging a monopoly price for all of its services, including anesthesiology. But it has this power without regard to any exclusive dealing imposed from above, and, further, it has no incentive to pay a monopoly price for anesthesiology services that it is purchasing in the nationwide competitive market. The hospital will attempt to pay as little as it can for anesthesiology services in the national market, and it will attempt to resell these services in the local market at its profit-maximizing price.

It is important to keep in mind that we are considering a requirements contract, not an output contract. Thus, in the gasoline case the contract in no way limits the ability of retailers not covered by exclusive dealing to obtain requisite gasoline. Both the remaining refiners and the contracting refiner are free to continue selling gasoline to the retailers. [19]

Another way of looking at the problem is by considering who the "victims" are of anticompetitive exclusive dealing that forecloses rivals' access to markets. Exclusive dealing foreclosing rivals is imposed by upstream firms on downstream firms in order to exclude upstream rivals from access to the downstream market. When it is anticompetitive at all, its effects are that the downstream firm must pay a monopoly price for the upstream firm's goods or services, because competitive alternatives driving the price down are not available. Thus, for example, if exclusive anesthesiological contracts are anticompetitive at all, it is because the removal of rival anesthesiologists from the market permits the anesthesiologist with the exclusive contract to charge higher prices.

But clearly the injury from such a scheme falls on both the hospital and its customers. Even if the hospital can fully pass on the cost of overpriced anesthesiological services, it suffers from the reduced volume of operations that attend higher prices. As a result, as long as the hospital is purchasing anesthesiological services in a competitive upstream market, it lacks any incentive to acquiesce in exclusive dealing yielding monopoly prices there. Even the monopoly hospital ordinarily profits by purchasing its input, including anesthesiology, at the lowest possible price, notwithstanding that it sells its services in the local market at a high price. [20] For these reasons Justice O'Connor concluded in her concurring opinion in *Jefferson Parish* that the effects of an exclusive-dealing contract between an anesthesiologist and a hospital had to be tested in the market in which the anesthesiologists sell their services. [21] This was presumably far smaller than the 30 percent share of admissions claimed by the hospital in its local service market. [22]

One can posit an exception where an upstream firm is essential to organizing a local downstream cartel. For example, perhaps the competitive refiner imposes exclusive dealing on a dominant share of local gasoline retailers and facilitates their cartel, possibly by acting as communicator or enforcer of resale prices. The refiner's reward for this activity is some portion of the cartel's profits in the form of either higher wholesale prices or perhaps a rebate. Ordinarily, even the local cartel would prefer to purchase the product at the competitive price, which would maximize its profits, and thus would not agree to such a deal unless the refiner were performing a valuable cartel-facilitating service. We know of no cases in this category. [23]

**(B) *Input market and resale market of same size..*—**For this case consider a city having five firms offering ambulance services but only one hospital where such services are delivered. For this illustration we assume that ambulance services, unlike anesthesiological services, are local in the sense that hardware in the form of ambulances and a dispatch network are needed. Thus, an ambulance firm from, say, Dallas would not ordinarily bid to supply a Nashville hospital with ambulance services. [24] We simply assume that the upstream market in which ambulances sell their services to hospitals has the same geographic range as that of the downstream market in which hospitals sell their services to patients.

After many years of offering various ambulances access to its patients, the hospital enters an exclusive contract requiring all ambulances dispatched at the request of the hospital to be provided by a particular firm. The result is that the other four ambulance companies are relegated to the distinctly inferior position of supplying services

***©2014 Wolters Kluwer. All rights reserved.***
***Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm***

requested directly by emergency patients or their attendants, law enforcement officers, and the like. Some of these companies may even be forced to exit from the market.

Nevertheless, competitive injury is not obvious. First, we may presume that the hospital has monopoly power in its provision market. But even the monopolist prefers to purchase its inputs at the lowest possible price and earns more when it minimizes its own costs. [25] As a result, it would not pay a monopoly price for ambulance services that are provided in a competitive market. [26] Although vertically related firms may sometimes profit by sharing monopoly returns when each firm has power at its own level, [27] the important point here is that nothing compels the hospital to share its monopoly returns with any ambulance firms, for the latter operate in a competitive market and the hospital need not pay more than a competitive price.

One might posit a longer-run entry-deterrence strategy: perhaps the hospital is concerned about entry by another hospital, and a shortage of available ambulance firms would make such entry more difficult. But this strategy would not become effective until after the exclusive dealing created a two-level monopoly by forcing the exit of other ambulance firms from the market. Further, the contract at issue is a requirements contract, not an output contract. The contracting ambulance firm is free to provide services to any second hospital as well. In sum, the exclusive ambulance contract must be explained by lower costs or improved service; it cannot be explained as a device for facilitating the monopoly pricing of ambulances.

Thus, this discussion generalizes that exclusive dealing cannot generally be anticompetitive when the downstream market share foreclosed by the challenged contract is large but the upstream party's market share in the supply market is small.

**1802d4. *Large upstream market share; small downstream market share covered by restraint..*—**Suppose by contrast to ¶d3 that the upstream market is dominated by a large firm. For example, assume a national gasoline refining market that is dominated by an 80 percent firm with a few small rivals. A particular downstream and local retailing market contains ten sellers, and the dominant refiner imposes exclusive dealing on just one or two of them. Given that the other retailers remain free to sell gasoline from any refiner, including both the dominant refiner and the smaller ones, it is apparent that this exclusive-dealing arrangement is also unlikely to have any significant anticompetitive consequences. [28]

The one exception might involve the downstream firm that has some significant cost advantage over rivals. For example, suppose that of ten local retailers, nine had distribution costs of $5.00 per unit, while one, because of favorable placement, has distribution costs of $4.00 per unit. A dominant refiner now imposes exclusive dealing on that low-cost firm. First, we would wonder why a low-cost firm such as this one continues to have a low market share; ordinarily such a firm would grow quickly at the expense of rivals. [29] Second, any firm that controls this low-cost retailer's output will be able to maximize its profits by selling the low-cost output at the market price. There is no reason for thinking that the retail market's output would be any lower or its price higher as a result of exclusive dealing imposed by the refiner.

**1802d5. *Large upstream market share; large downstream market share covered by restraint..*—**Finally, suppose that the national refining market is dominated by an 80 percent firm with a few small rivals. This firm imposes exclusive dealing on an equally dominant retailer with about 80 percent of the local retailing market; or, alternatively, the local retailing market may have ten small firms and the dominant refiner imposes exclusive dealing on eight of them making up 80 percent of the market.

Note the following: *First,* the dominant refiner's position in the refining market already gives it the ability to charge a monopoly price. In the short run it cannot exact a higher monopoly toll simply by "monopolizing" the local retailing market as well. [30]

*Second,* the dominant refiner's ability to impose an "undesired" exclusive-dealing arrangement on retailers must be regarded as significant. The dominant refiner is in a position to make "all or nothing" offers to retailers, who would presumably pay a premium for the assured output of the dominant refiner rather than the possibly riskier output of fringe refiners.

***©2014 Wolters Kluwer. All rights reserved.***
***Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm***

*Third,* in any period longer than the short run, significant competitive harms are possible, depending on the circumstances. For example, exclusive dealing closing off a sufficient number of local markets in this fashion could make it difficult for the fringe refiners to obtain access to retailers (where we have assumed entry barriers to be high). The result might be to impair their ability to expand, thus becoming more effective competitors with the dominant firm. Indeed, the smaller refiners may decline and even be forced to exit from the market. Alternatively, by forcing exclusive dealing on all the lowest-cost downstream firms, the dominant upstream firm could relegate the rivals to higher cost-distribution alternatives. [31]

**1802d6. *"Lock-in";* [32] *exclusive dealing imposed on franchisees..*—**Many franchise arrangements require franchisees to take various supplies, inventory, or equipment from the franchisor or another designated source. For example, Domino's Pizza might limit the sources from which franchisees purchase pizza dough. [33] Such practices are typically challenged both as unlawful tying and as unlawful exclusive dealing. [34] In many such cases, whether tying or exclusive dealing, the underlying basis of the power claim is that the franchise agreement locks the franchisee in to purchasing what its franchisor specifies, thus limiting substitution. The thinking then is that, because a relevant market is a grouping of sales for which no adequate substitutes exist, there must be a relevant market for "pizza dough for Domino's Pizza's" or some such grouping.

As we have shown, [35] the principle that a relevant market is a grouping of sales with inadequate substitutes refers to lack of substitutes in the marketplace, not to limitations on substitutes imposed by contract. To be sure, numerous contracts, including *all* requirements contracts, limit the ability of buyers to substitute; but the grouping of sales covered by the contract does not become a relevant market for that reason. Indeed, the very nature of a contract is to fetter the freedom of buyers and sellers to substitute away from what the contract stipulates.

Thus, a rule that a grouping of sales is a relevant market simply because a firm is contractually obligated to purchase it is inconsistent with the *Tampa Electric* holding [36] testing exclusive dealing by looking at the larger market for coal. Under the contract at issue Tampa Electric was obliged to take all its coal requirements from Nashville Coal, just as a franchisor might be obliged to take all its requirements for some ingredient from the franchisor. The parties were "locked in" by the long-term contract— indeed, getting out of it was the purpose of the litigation. But manifestly, *Tampa Electric* did not hold that this requirement foreclosed 100 percent of the "relevant market" of coal covered by the Tampa-Nashville contract. As the *Queen City* court noted,

> [w]ere we to adopt plaintiffs' position that contractual restraints render otherwise identical products non-interchangeable for purposes of relevant market definition, any exclusive dealing arrangement, output or requirement contract, or franchise tying agreement would support a claim for violation of antitrust laws. Perhaps for this reason, no court has defined a relevant product market with reference to the particular contractual restraints of the plaintiffs. [37]

As the court later explained, "[t]he franchise transaction between Domino's Pizza, Inc. and plaintiffs was subjected to competition at the pre-contract stage." [38] And presumably the balance of the market remains competitive thereafter. By measuring the relevant market as the range of firms capable of providing coal to Tampa Electric, rather than the single firm whose output was eventually tied up by the requirements contract, *Tampa Electric* compels the conclusion that the market be assessed at the pre-contract rather than post-contract stage. [39]

Even conceding for purposes of argument that the Domino franchisees' obligation to purchase only Domino's pizza dough determines a relevant market, this grouping of sales would not be the appropriate one for measuring the effect of exclusive dealing. Rival makers of pizza dough are not foreclosed unless this requirement significantly reduces opportunities in the market in which *they* sell. Further, relevant markets must be measured from the perspective of the end-use customer. In this case, while the buying opportunities of Domino's franchisees may be restricted, customers may freely substitute the pizzas and thus the dough of Pizza Hut,

***©2014 Wolters Kluwer. All rights reserved.***
***Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm***

Godfather's, or numerous other pizza restaurants, both franchised and independent, and perhaps even the offerings of Italian restaurants or restaurants generally. [40]

As a result, even though the franchisees are restricted from taking pizza dough from anyone other than Domino's, that requirement cannot be anticompetitive exclusive dealing unless Domino's (1) dominates the market for pizza dough and (2) forecloses access to alternative pizza dough resellers so successfully that consumers cannot readily obtain pizza dough from alternative sources. To the extent that pizza dough is a product made from commonly available flour, water, salt, and baking soda, such a claim seems quite implausible.

**1802d7. *Impact of product differentiation..*—**In an extreme case of product differentiation, the differentiated product may be a relevant market unto itself, [41] and then of course exclusive dealing can be tested in the market covered by that particular brand. Nevertheless, single-brand markets are rare although often alleged. [42] Further, product differentiation does not always track brands, and there may be a relevant market for such things as luxury cars, including Mercedes-Benz, BMW, Lexus, and a few other manufacturers' brands.

But what if the product differentiation in a market is significant, yet not so significant as to warrant a finding of separate markets? When the purpose of market definition is to measure possibly anticompetitive foreclosure, is there any reason for treating narrower groupings of sales than a properly defined relevant antitrust market?

The answer is no, for the simple reason that the boundaries of a relevant antitrust market are established in the first place by taking into account our ability to measure and other policy concerns respecting the resources we wish to allocate to the protection of competitive markets. For example, we might define "relevant market" as a grouping of sales such that a firm controlling that grouping could maximize its profits at a price at least 5 percent above its costs. In this case we have selected the 5 percent figure not because it is a law of nature, but because a lower number would involve too many close measurements exceeding the capacity of antitrust tribunals as well as the extra costs of correcting small amounts of market power where we cannot be sure that such corrections are worth the considerable costs of the corrective machinery.

Exclusive dealing is a complex offense. The practice is often fully justified even in concentrated markets, and courts are poorly equipped to quantify and "balance" competitive threats against efficiency benefits. As a result, analyzing a close exclusive-dealing case is an expensive and rather speculative enterprise, and this counsels against fine-tuning our market definition approach any more than in, say, merger cases.

**1802e. Entry barriers into foreclosed market..—**

**1. *Generally..*—**The entry-barrier question in exclusive-dealing cases revolves around two issues. *First* is the extent to which entry barriers in the *downstream,* or "foreclosed," market prevent or prolong the denial of access to rival upstream firms. For example, when Brown Shoe imposes exclusive dealing on a town's only two shoe stores, rival shoe manufacturers are deterred from entering that town to the extent that shoe retailing there is subject to entry barriers. By contrast, if barriers are totally lacking so that rival shoe retailers can be established almost immediately, then even high-foreclosure percentages will not entail competitive harm.

As a general matter, the exclusive-dealing contracts themselves do not act as entry barriers into the *downstream* market. To be sure, contracts preventing rival manufacturers from selling their brands through existing stores constitute a barrier to entry to such manufacturers in the local selling market. But here the relevant entry-barrier question concerns the ability of rival manufacturers to develop *alternative* retailers to the tied-up stores. For example, they might build their own stores, provide capital to independent businesspersons seeking to build new stores, or simply offer such businesspersons a product to sell. They might also seek out alternatives, such as selling shoes through general clothing stores, department stores, and the like. If customers prefer to select from a variety of brands, exclusive dealing imposed on an existing local store should actually make entry by rival shoe retailers more attractive and easier. For example, suppose that consumers would like to purchase a variety of shoe brands, but Brown has imposed exclusive dealing on the only local shoe store. The exclusive contract increases rather than decreases the anticipated value of a second store, which can now offer desired brands that the first store is forbidden to supply. Because exclusive dealing encourages rather than discourages local entry,

***©2014 Wolters Kluwer. All rights reserved.***
***Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm***

the relevant question is whether the downstream market is *independently* protected by entry barriers. To state this another way: if entry into the shoe-retailing market is easy, exclusive-dealing contracts imposed on existing shoe retailers will not make it more difficult.

The *second* entry-barrier query concerns the extent to which a system of exclusive-dealing arrangements itself operates as a barrier to entry into the *upstream* market or enhances other entry barriers already existing there. For example, if access to shoe stores is a prerequisite to success in shoe manufacturing, Brown's array of exclusive-dealing arrangements with shoe stores (perhaps paralleling other shoe manufacturers' imposition of similar requirements) may make it more difficult for a rival or potential shoe manufacturer to enter competition with Brown. To the extent existing shoe retailers are locked up by exclusive-dealing contracts, such a firm would have to enter the market at two levels rather than one, thus increasing the cost, risk, and attendant management problems connected with new entry. This second entry-barrier question is largely derivative of the first. If entry into the downstream market is easy, then the need for two-level entry by the upstream firm will not significantly augment the difficulty of entry. [43]

Entry barriers are discussed more comprehensively elsewhere. [44] As a general proposition, entry into downstream retailing or distribution markets is thought to be rather easy, and significant entry barriers are the exception rather than the rule. [45] Nevertheless, some markets can be protected by significant entry barriers. Among the most important is government licensing or other legal restrictions that limit the number of downstream firms in an area. For example, if local ordinances limit the number of firms serving liquor or beer, exclusive dealing imposed on a significant percentage of them can make it much more difficult for other liquor producers to enter that market. [46]

**1802e2. *Increased barriers resulting from two-level entry requirement; compounded risk..*—**A requirement of two-level entry can, but need not, increase entry barriers. First, if entry is easy in either market independently, then adding a requirement of entry into that market need not raise barriers significantly. For example, while entry into shoe manufacturing is supposed to be difficult and time-consuming, entry into shoe retailing might be easy and accomplished quickly with a general-purpose retail building. As a result, adding a requirement of entry into retailing would not significantly increase entry barriers into shoe manufacturing and distribution.

But a two-level entry requirement can affect entry substantially if information about the two market levels is imperfect and both face independent risks of failure. The cost of capital is in significant part a consequence of the investor's perception of risk level. Thus, the cost of raising capital to look for undiscovered oil in Antarctica is significantly higher than, say, the cost of capital for construction of an additional production plant by an established company with a good track record and high demand.

Suppose that we have estimated the likelihood of success for a new upstream entrant at 80 percent and of a new downstream entrant at 80 percent, but that success overall requires success at both levels. If success at each level is entirely independent of success at the other level, then the likelihood of two-level success is 64 percent, indicating a considerably higher risk and thus cost of capital than single-level entry. One might think that the success rate at the two levels is not entirely independent, but that it is not entirely dependent either—that is, success at one level does not guarantee success at the other level.

As a result, in most cases where the chance of success at each level is significantly less than 100 percent, the chance of two-level success will end up being measurably lower than the chance of single-level success. But it might also be true that the 64 percent figure understates the risk of failure. If an 80 percent likelihood of success represents the chance of success at each level on the assumption that the other level is already successful, those figures may have to be reduced where entry into the other level must be established as well. In that case a two-level entry requirement could raise capital costs considerably.

Suppose, for example, that the likelihood of success is 80 percent at each market level when the other level contains already successful firms with whom the new entrant must deal, but that likelihood of success at each

***©2014 Wolters Kluwer. All rights reserved.***
***Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm***

level drops to 70 percent if the other level is unestablished. In that case, entering and succeeding at both levels is only 49 percent likely to be successful, assuming the risks are independent. [47]

**1802e3. *Economies of scope in downstream market..*—**The potential for competitive harm increases when the downstream market is subject to economies of scope that make it more difficult for the upstream manufacturer to find adequate outlets. For example, suppose that men's bow ties cannot efficiently be sold in stores that deal exclusively in bow ties or even ties generally; rather, they must be sold in department stores where clerks can spread their efforts over numerous products and the ties can be sold in conjunction with shirts and suits. Suppose further that a dominant bow tie manufacturer should impose exclusive dealing on a town's only three department stores. In this case the rival bow tie maker cannot easily enter. Setting up another department store is an unneeded and very large investment in proportion to the bow tie maker's own production, which we assume is only bow ties, but any store that offers less will be an inefficient and costly seller of bow ties. As a result, such exclusive dealing could either exclude the nondominant bow tie maker or else raise its costs in comparison to the costs of the dominant firm. [48] While the department stores might prefer to sell the ties of multiple manufacturers, if faced with an "all or nothing" choice, they may accede to the dominant firm's wish for exclusive dealing. [49]

The anesthesiologist or other specialist seeking hospital access is a similar and perhaps more common example. The hospital is a facility within which many complementary specialties are practiced with great economy and satisfaction to consumers. Anesthesiology, many types of surgery, and even some forms of diagnosis cannot readily be practiced without access to a hospital's facilities. Once the hospital has entered into an exclusive-dealing contract covering a specialty that cannot readily be practiced elsewhere by other local practitioners, rivals have been cut out of the portion of the market represented by that hospital. If the hospital monopolizes its market, then the only way a new anesthesiological firm can enter the market is by constructing its own hospital.

Or one might suppose in a case such as *Standard Fashion* [50] that patterns for dresses could not sustain an efficient specialty retailer. They must be sold in a larger multiproduct store that sells fabrics, sewing supplies, and the other accoutrements of home clothing production and perhaps even a more general selection of household goods. In that case, exclusive dealing between the dominant pattern producer and a town's multiproduct sewing stores could significantly delay entry into the market by a rival maker of patterns relegated to selling its product through higher cost or inferior retailers.

Finally, the downstream seller might be a natural monopoly, with competitive entry either economically impossible or legally prohibited. A good example is an exclusive-dealing arrangement imposed by a maker of television programming on a cable television system. The rival programmer may be completely ousted from the market served by that cable television system. [51]

**1802f. Assessing anticompetitive effects in foreclosed market; end users and intermediaries distinguished..—**In the typical exclusive-dealing situation the upstream rival is foreclosed from access to a downstream reseller. For example, exclusive dealing imposed on retail stations by gasoline producers tends to deny competing refiners' access to retail stations in the area covered by the exclusive-dealing contracts.

Exclusive dealing imposed on end users can often have more harmful results than exclusive dealing imposed on intermediaries. In *Tampa Electric,* [52] for example, the electric utility consumed the coal that it purchased under the challenged exclusive-dealing product, and in the ordinary case the end user's ability to substitute is rather limited. In the long run, of course, the electric utility could convert its power plants or build new ones burning different fuels, but that could certainly not happen quickly.

The distribution market is quite different, however. The boundaries of substitution that define the product market for end users are often not the same as the boundaries that define the distribution market. For example, an end-use consumer would not regard a radio as an adequate substitute for an electronic wristwatch. For a store selling electronic goods, however, electronic wristwatches may represent nothing more than an alternative use

***©2014 Wolters Kluwer. All rights reserved.***
***Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm***

of "shelf space" and perhaps require some small amount of additional training of sales personnel. As a result, if exclusive dealing could be imposed directly on wristwatch consumers in an area, its effect on rival wristwatch manufacturers might be substantial. But exclusive dealing in wristwatches imposed on jewelry stores might have very little competitive impact if alternative wristwatch makers can readily sell their product through the electronics stores, department stores, clothing stores, or other locations. [53]

For example, in *Roy B. Taylor* the plaintiff dealer challenged a restaurant equipment manufacturer's policy of requiring dealers selling its hamburger patty-making machines to sell its patty paper exclusively. [54] While the plaintiff described this requirement as a tying arrangement, the court noted that the arrangement had the attributes of an exclusive-dealing arrangement as well. [55] Further, the court noted, the requirement was imposed on *dealers,* not on customers. As a result, a customer purchasing the defendant's machine was free to go to a different vendor to purchase the patty paper of its choosing.

Although rival suppliers must reach end users, they need not necessarily reach them through a particular intermediary or even a particular type of intermediary. The relevant question is to what degree the exclusive dealing denies access to the local market to competing suppliers of the good or service covered by the exclusive-dealing arrangements. As one court put it,

> [w]here the exclusive dealing restraint operates at the distributor level, rather than at the consumer level, we require a higher standard of proof of "substantial foreclosure," because it is less clear that a restraint involving a distributor will have a corresponding impact on the level of competition in the consumer market. [56]

If exclusive dealing is imposed on dealers rather than end users—as it is in the majority of circumstances—and the good or service can readily and conveniently be sold by numerous kinds of resellers, then all of these must be included in the market over which foreclosure is measured. [57] Several decisions have noted that the prevalence of alternative distribution channels reduces concern over exclusive dealing, although they have expressed this in different ways. Some have simply included the alternative distribution channels in the market over which foreclosure is to be measured. For example, if shoes can be readily sold by both specialized shoe stores and department stores, then the two groupings must be put together for purposes of measuring effective foreclosure. Other decisions have simply cited the existence of alternative distribution channels as undermining claims of unlawful exclusive dealing. [58]

The latter alternative may be necessary where the alternative channels are not yet actually distributing the product but could do so in response to a price increase. For example, suppose Standard Oil's exclusive dealing [59] in gasoline covers a high percentage of gasoline stations but does not apply to convenience stores. Suppose further that currently only a few convenience stores sell gasoline but many others would do so if the price increased. One could not include the "output" of these nonselling stores in measuring foreclosure, for they are not yet making sales. But their ready ability to enter the market makes their presence significant nonetheless. For example, *Omega* held that the plaintiff's claim that exclusive dealing between the defendant manufacturer of petroleum-dispensing equipment and a rival distributor had to be tested against a market not merely of existing distributors, but also

> the full range of selling opportunities reasonably open to rivals, namely, all the product and geographic sales they may readily compete for, using easily convertible plants and marketing organizations….
>
> If competitors can reach the ultimate consumers of the product by employing existing or potential alternative channels of distribution, it is unclear whether such restrictions foreclose from competition any part of the relevant market. [60]

In this case the record showed that many alternative manufacturers of the equipment distributed to gasoline stations directly. Further, a great many service companies in the business had also become distributors of the dispensing equipment at issue.

**©2014 Wolters Kluwer. All rights reserved.**
**Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm**

Indeed, exclusivity imposed on dealers or other intermediaries can encourage rather than discourage rival outlets for distribution. For example, what was fatal to the *Roy B. Taylor* [61] plaintiff's case was its claim that the exclusivity requirement in hamburger patty paper sales required the plaintiff to sell the defendant's rather high-priced paper exclusively, with the result that customers ended up purchasing their paper elsewhere. [62] But this claim, while factually plausible, was tantamount to an admission that the exclusivity requirement *increased* the volume of sales through rival distributors.

Of course, the market level upon which exclusive dealing is imposed does not always make a difference. In *Jefferson Parish,* [63] for example, the exclusive anesthesiological services contract between an anesthesiologist and a hospital was imposed on an intermediary (the hospital) rather than on an end user (the patient). As a practical matter, however, one could not obtain most operations requiring anesthesiological services except in a hospital, and the customer certainly does not have the option of purchasing the surgery at the hospital and the anesthesia elsewhere. As a result, the percentage of hospital foreclosures represented the percentage to which patients were denied access as well. The same might be true of a product such as feature films, which can be exhibited only in movie theaters; thus, an agreement between a movie producer and a town's only theater requiring that theater to show only that producer's films may effectively cut off all access to that town by competing producers. [64]

Finally, to say that a market subject to exclusive dealing is "local" is not necessarily to say that it is small. Even at the retail level, while customers will travel only a small distance for a gallon of milk or loaf of bread, they may be willing to travel 30 miles or more to purchase a new automobile, tractor, or other relatively expensive durable good. [65]

**1802g. Contract duration and switching costs; extent and nature of rebidding..—**

**1. *Optimal contract term depends on purpose.*.—**We begin with the premise that the great majority of vertical business contracts are competitive and that the parties arrived at the contract's terms by settling on some mutually advantageous period. Further, the optimal length of this period could vary considerably depending on circumstances. When an electric utility wants an assured fuel supply for a coal-burning plant, and running out of fuel can have disastrous consequences, a long-term contract can provide important assurance. [66] By contrast, distributorship agreements may be more or less long depending on the extent of each party's investment in the other. For example, a supplier who makes a large specialized investment in its distributor or dealer may insist on a long term in order to amortize these costs; by contrast, if investments are smaller and the costs of switching are considerably less, then shorter terms may provide more discipline. Many distribution contracts are terminable immediately, upon the giving of reasonable notice, or many have relatively short periods of six months to a year.

The upshot is that antitrust cannot condemn any contract period as automatically too long. Rather, contract duration is one of many factors that guide the inquiry. Short contract terms and low switching costs generally allay most fears of injury to competition. Long terms become a factor making anticompetitive outcomes more plausible, but even long exclusive-contract terms will have no anticompetitive consequences if the structural prerequisites for anticompetitive exclusive dealing are not met. At the same time, if these prerequisites *are* met, a shorter term may be a "less restrictive alternative," suggesting condemnation of a competitively threatening longer agreement. [67]

**1802g2. *General relevance of short term; relation to foreclosure percentage.*.—**Alternative forms of vertical integration can be more durable than even the lengthiest exclusive-dealing contracts. For example, when a manufacturer opens its own retail stores or when it acquires an existing chain of such stores, the ownership relationship between manufacturer and retailer becomes "permanent," or at least indefinite.

One might be tempted to say that if a vertical merger between the contracting parties would be lawful, then any exclusive-dealing relationship between them should be considered lawful as well. But duration is not the only point of difference between the vertical merger and the exclusive-dealing contract. The contract is a relationship

***©2014 Wolters Kluwer. All rights reserved.***
***Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm***

between different firms who continue to have different interests, and the reseller bound by an exclusive-dealing contract in one product, such as shoes, may be free to sell other products made by numerous manufacturers.

Even an exclusive-dealing contract covering a dominant share of a relevant market need have no adverse consequences if the contract is let out for frequent rebidding. For example, suppose that an exclusive-dealing contract requires retail stores to sell Brown's shoes exclusively but that any retailer wishing to sell a rival's shoes may cancel the arrangement on 30 days' notice. If Brown should try to use this scheme to exclude rivals and charge high wholesale prices, any store currently selling Brown shoes could in a 30-day period be selling the shoes of a Brown rival. [68]

The significance of any particular contract duration is a function of both the number of such contracts and market share covered by the exclusive-dealing contracts. On the first, suppose that exclusive-dealing contracts cover 100 percent of dealers and have ten-year terms. While these numbers sound ominous, no significant foreclosure is likely to result if there are in fact 1,000 dealers covered by such contracts, if the contract dates are staggered, and if dealers are completely free to switch without incurring significant costs at the time the contracts expire. In this case approximately 100 dealers would be freed up each year as their distribution contracts expire. By contrast, if there were only ten dealers, then only a single dealer on average would be freed up each year. [69]

The relevant question is always what percentage of the market is effectively "unrestricted" during a specific time period. The unrestricted set includes (a) those dealers who are not bound by exclusive-dealing arrangements at all; plus (b) those dealers whose contracts will expire during that time period in any event; and (c) those dealers whose contracts have termination clauses permitting them to sever existing arrangements during that time period and who realistically can do so.

In *Standard Stations* the Supreme Court condemned exclusive-dealing arrangements in the retail gasoline industry notwithstanding that the contracts were cancelable on very short notice—in many cases, 30 days. [70] But most of the more recent decisions have made contract duration a factor in assessing legality and have approved even foreclosures of significant market shares if the contracts at issue were of short duration and downstream firms could realistically switch away from the defendant's product to that of rivals. One decision found five-year contracts unlawful, while it approved one-year contracts. [71] Others have noted that where exclusive distribution contracts were either of short duration [72] or terminable on relatively short notice, [73] any alternative manufacturer could come along and offer a distributor a better deal. Others have noted the relatively long duration of the contract term as justifying condemnation where foreclosure requirements were met. [74]

**1802g3. *De facto duration..*—**Durational requirements need not be explicit in the contract. More significantly, a short notice period may suggest unrealistically that terminating a contract is less costly than it is in fact. [75] De facto durational requirements may arise from circumstances such as the nature and type of investment that the downstream party must make. For example, suppose a contract requires the reseller to purchase from the manufacturer an expensive diagnostic machine necessary to repair the manufacturer's complex product. The contract also requires exclusive dealing and is terminable at will, but additionally requires that upon termination the diagnostic machine must be returned to the manufacturer without compensation to the dealer. Or, alternatively, the machine may simply become useless to the dealer once it no longer deals in the seller's brand. In that case, while the exclusive-dealing arrangement as such is terminable on short notice, the large investment in the diagnostic machine may operate so as to tie up the dealer for a much longer period, perhaps as long as the life of the diagnostic machine itself. Or in yet other situations, a distribution arrangement may require a downstream firm to make a significant investment in training personnel to use the upstream firm's specialized equipment or method of doing business. If the arrangement is terminated, this investment will be lost. [76]

In still other cases, a distributorship or franchise agreement may require a downstream firm to make a significant co-investment in intellectual property rights that it may no longer lawfully use after the contract is terminated. For example, suppose a fast-food franchisee's building is built by the franchisee under specifications and licensing

**©2014 Wolters Kluwer. All rights reserved.**
***Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm***

agreements supplied by the franchisor, and that the building includes many trademarked, copyrighted, or patented design features, such as the McDonalds Golden Arches. When the franchise agreement is terminated, these intellectual property rights may terminate as well, and the franchisee's only options are to tear the building down or make significant design modifications.

In general, asset specificity leads to situations in which vertically related firms "commit" themselves to one another's technologies and methods of doing business. This has two important consequences. One is that the range of trading partners becomes smaller as the thing being traded is more specialized. The other is that the costs of extraction are much higher, because extraction often entails the loss of investment in assets that cannot readily be redeployed. [77] As a result, the contract penalty for early release can be significantly less important than the cost of other types of asset loss.

Finally, a supplier's exclusive-dealing agreement may permit termination on short notice but impose various penalties on termination. For example, in *Brown Shoe* the contracts were terminable on short notice, but dealers who agreed to deal exclusively in Brown's shoes received many discounts and other offers that were unavailable to dealers who sold other brands as well. [78] Likewise, in *U.S. Healthsource* the court noted that a short-notice policy permitting physicians to repudiate their exclusivity agreement with the defendant HMO could not be evaluated apart from the defendant's other policy of compensating physicians promising exclusivity at a higher rate than those who did not. Thus, even a contract terminable on 30 days' notice could have an anticompetitive effect if a significant penalty attached to terminating the agreement. [79] In *Beltone,* by contrast, the FTC found that a provision entitling a hearing aid dealer to terminate its exclusive arrangement with the manufacturer on 30 days' notice militated in favor of the arrangement, notwithstanding that termination would have been costly to the dealers in other ways. [80]

**Footnotes**

1 E.g., *Interface Group, Inc. v. Massachusetts Port Authority,* 816 F.2d 9, 11 (1st Cir. 1987) ( "Exclusive dealing arrangements may sometimes be found unreasonable under the antitrust laws because they may place enough outlets, or sources of supply, in the hands of a single firm (or small group of firms) to make it difficult for new, potentially competing firms to penetrate the market.").

2 Cf. *FTC v. Brown Shoe Co.*, 384 U.S. 316, 319 (1966). See ¶1801j.

3 As a consequence the orthodox Chicago School position on most vertical restraints, including exclusive dealing, is that they were almost never harmful to competition. See, e.g., Frank H. Easterbrook, Vertical Arrangements and the Rule of Reason, 53 Antitrust L.J. 135 (1984); Richard A. Posner, The Next Step in the Antitrust Treatment of Restricted Distribution: Per Se Legality, 48 U. Chi. L. Rev. 6 (1981); Robert H. Bork, The Antitrust Paradox: A Policy at War with Itself 299-309 (1978). See also Richard A. Posner, Antitrust Law 223-229 (2d ed. 2001).

4 See ¶c.

5 In the context of vertical integration by the monopolist, see ¶756b2 ; in the context of tying arrangements, see ¶1706.

6 See ¶1820b. On the rule of reason generally, see Ch. 15.

7 *Jefferson Parish Hosp. Dist. No. 2. v. Hyde,* 466 U.S. 2, 46-47 (1984). See William J. Lynk, "Tying and Exclusive Dealing: *Jefferson Parish Hospital v. Hyde,*" in The Antitrust Revolution (John E. Kwoka & Lawrence J. White eds., 2d ed. 1994).

8 As in *Jefferson Parish*, 466 U.S. 2.

9 "Similar arrangements" would include vertical ownership. That is to say, if 30 percent of the market was covered by exclusive-dealing arrangements and an additional 60 percent was covered by manufacturer

***©2014 Wolters Kluwer. All rights reserved.***
***Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm***

ownership of stores, then the total of tied-up stores would have to be reckoned at 90 percent, with only 10 percent available to rival manufacturers.

10 Cf. ¶¶1704 - 1705, which discuss the same effects for tying arrangements.

11 See ¶a.

12 On interbrand free riding, see ¶1812.

13 In *Standard Oil of California v. United States (Standard Stations),* 337 U.S. 293, 295 (1949), the Court emphasized the fact that other gasoline refiners and distributors also imposed exclusive dealing on their independently owned stations, without querying whether they were driven to do so by exclusive dealing's efficiency. See ¶1801g.

14 See ¶1805a.

15 While the Supreme Court's *Standard Stations* decision did not compel this result, its subsequent decision in *Tampa Electric Co. v. Nashville Coal Co.*, 365 U.S. 320 (1961), did. See ¶1801g, i.

16 On the significance and meaning of entry barriers at the two market levels, see ¶e.

17 See ¶¶531 - 532.

18 See Ch. 5B.

19 In the *Jefferson Parish* case, however, the contract at issue was both a requirements contract (exclusive dealing) and an output contract. It (1) required the hospital to obtain all its anesthesiological services from the Roux firm; but also (2) required members of the Roux firm to limit their practice to East Jefferson Hospital. See *Jefferson Parish Hosp. Dist. No. 2. v. Hyde,* 466 U.S. 2, 6 n.3 (1984). Only the first agreement was in dispute.

20 Figure 1 illustrates this proposition. A monopolist with lower costs will earn more, ceteris paribus, than a monopolist with higher costs. Figure 1 illustrates a monopolist facing demand curve D and thus marginal revenue curve MR. The monopolist maximizes its profits by equating its marginal cost with marginal revenue (see ¶403a). Here, the figure shows two different marginal cost curves. $MC_1$ represents the lower costs, when the hospital uses a less expensive anesthesiologist, and $MC_2$ the higher costs, when the hospital uses a more expensive one. The higher-cost monopolist pays more ( $MC_2$) and sells for more ( $P_2$) than the lower-cost monopolist, who pays $MC_1$ and sells for $P_1$, but the higher-cost monopolist also has lower output ( $Q_1$) than the lower-cost monopolist ( $Q_2$) since less is demanded at the higher price. It can be shown mathematically that the profits of the higher-cost monopolist are invariably smaller than those of the lower-cost monopolist.

***©2014 Wolters Kluwer. All rights reserved.***
***Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm***




**Figure 1**

21 *Jefferson Parish Hosp. Dist. No. 2 v. Hyde,* 466 U.S. 2, 46-47 (1984) ( "Plainly, however, the arrangement forecloses only a small fraction of the markets in which anesthesiologists may sell their services, and a still smaller fraction of the market in which hospitals may secure anesthesiological services."). See also *Howerton v. Grace Hosp., Inc.*, 1995-2 Trade Cas. ¶71,208 (W.D.N.C.), aff'd mem., 96 F.3d 1438 (4th Cir. 1996) (exclusive dealing to be tested in nationwide market in which radiologists are recruited); see ¶1821b. Cf. *Eastern Food Servs., Inc. v. Pontifical Catholic Univ. Servs. Assn.*, 357 F.3d 1 (1st Cir. 2004) (impact of exclusive dealing in soft drinks could not be tested by looking at foreclosure in the university alone when soft drink vendors competed across the entire municipality; citing ¶501 and this Paragraph in the previous edition).

22 See *Jefferson Parish,* 466 U.S. at 7-8.

23 See ¶1804, which discusses related issues.

24 We assume sufficient entry barriers, although in the real case the mobility and standardized nature of ambulances may make entry quite easy. See ¶e.

25 See Figure 1, supra.

26 Indeed, the hospital monopolist may be a monopsonist in the market for purchasing ambulance services if such services have little market demand other than that afforded by the hospital itself. In that case, the hospital would offer only an infracompetitive price for such services. On monopsony, see ¶2011.

27 See Herbert Hovenkamp, Mergers and Buyers, 77 Va. L. Rev. 1369 (1991).

***©2014 Wolters Kluwer. All rights reserved.***
***Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm***

28 But see *Yeager's Fuel, Inc. v. Pennsylvania Power & Light Co.*, 953 F. Supp. 617 (E.D. Pa. 1997), which concluded that agreements between the defendant electric utility (PPL) and builders giving the builders special concessions for building all-electric homes amounted to exclusive dealing. However, while PPL controlled a dominant share of the market for electricity, its "all electric" agreements with builders covered only some 2.7 percent of the houses in the relevant market. Nevertheless, the court found this latter statistic "misleading" because it is very expensive to convert an all-electric home to gas heating after electricity is installed. Thus, the effective competition was for installations in new homes. If one restricted the market to new homes, those covered by the "all electric" agreements amounted to nearly 25 percent—an amount the court thought sufficient to withstand a motion for summary judgment. See id. at 658-660.

29 To be sure, the low-cost input may be subject to some capacity constraint. For example, the farmer with the county's most fertile section of land may have lower costs than rivals, but he cannot increase the amount of unusually fertile land and thus his output, as the lower cost is limited to that which can be produced from the single section.

30 See ¶a.

31 See ¶1804.

32 On “lock-in” in other contexts and the implications of the Supreme Court's 1992 *Kodak* decision, see ¶1740. In the context of franchise agreements, see ¶519.

33 See *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 922 F. Supp. 1055, 1059 (E.D. Pa. 1996), aff'd, 124 F.3d 430 (3d Cir. 1997), cert. denied, 523 U.S. 1059 (1998) (plaintiff franchisees alleged that franchisor imposed exclusive dealing by requiring them to take pizza dough and other ingredients and supplies exclusively from franchisor or its agent). See also *Maris Distributing Co. v. Anheuser-Busch, Inc.*, 302 F.3d 1207 (11th Cir. 2002) (refusing to accept contract lock-in theory); *George Lussier Enters., Inc. v. Subaru of New England, Inc.*, 286 F. Supp. 2d 86 (D.N.H. 2003) (same).

34 This was the case in *Queen City*. In the typical case, the exclusive-dealing claim becomes necessary if the court should find that the franchise and the compulsory ingredients are not separate "products" for the purpose of tying arrangement law. See ¶1749a. For a discussion of recent cases considering the issue, see ¶¶519, 1709c5, 1725, and 1740.

35 See ¶519.

36 See *Tampa Electric Co. v. Nashville Coal Co.*, 365 U.S. 320 (1961); ¶1800i.

37 *Queens City*, 124 F.3d at 438.

38 Id. at 440.

39 On this point, see Benjamin Klein & Lester F. Saft, The Law and Economics of Franchise Tying Contracts, 28 J.L. & Econ. 345 (1985).

40 See ¶1802f ; *Roy B. Taylor Sales v. Hollymatic Corp.*, 28 F.3d 1379 (5th Cir. 1994), cert. denied, 513 U.S. 1103 (1995) (exclusive dealing imposed on intermediary cannot be anticompetitive when customers are free to purchase alternative products elsewhere).

41 See, e.g., *Coca-Cola Co.*, 5 Trade Reg. Rep. ¶23,625 (F.T.C. 1994) at 23,332 (finding relevant market of name-brand carbonated soft drinks).

42 See generally ¶563.

43 See *CDC Technologies, Inc. v. IDEXX Labs., Inc.*, 186 F.3d 74, 80 (2d Cir. 1999) (exclusive dealing not anticompetitive if entry barriers are low; see 7 F. Supp. 2d at 129; upstream market was blood analysis machines, but downstream market involved simple "sales agents," who sold the machines to veterinarians); *Western Parcel Express v. UPS of Am., Inc.*, 190 F.3d 974 (9th Cir. 1999) (exclusive dealing by delivery service not unlawful if entry barriers are low, as evidenced here by fact that other carriers had entered market during period covered by complaint); *Omega Environmental, Inc. v. Gilbarco, Inc.*, 127 F.3d 1157, 1164 (9th Cir. 1997) (apparently easy entry, including evidence of recent historical entry and rapid growth

***©2014 Wolters Kluwer. All rights reserved.***
***Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm***

into market for distribution of petroleum-dispensing products, undermined claims that manufacturers of such equipment would have a difficult time finding adequate distribution channels); *U.S. Healthcare, Inc. v. Healthsource, Inc.*, 986 F.2d 589, 596 (1st Cir. 1993) (noting that continual entrance by new doctors indicated that HMOs could operate notwithstanding the defendant's exclusive dealing); *Interface Group, Inc. v. Massachusetts Port Authority,* 816 F.2d 9 (1st Cir. 1987); *Beltone Electronics Corp.*, 100 F.T.C. 68, 211 (1982) ( "Also, entry is not especially difficult, a factor that reduces the potential rewards of inter-firm coordination."); *Sterling Merchandising, Inc. v. Nestle, S.A.,* 724 F. Supp. 2d 245 (D.P.R. 2010) (exclusive dealing on retail ice cream sales not unlawful when there were several recent instances of new entry by both smaller and very large grocers).

44 See Ch. 4C.

45 See, e.g., *Roland Machinery Co. v. Dressler Industries,* 749 F.2d 380, 395 (7th Cir. 1984), noting that Komatsu, an alternative equipment dealer, "undoubtedly has the resources to establish its own dealership in central Illinois, if it cannot lure away someone else's dealer despite the lack of long-term contracts binding dealers to their existing suppliers." By contrast, a dissenter noted evidence of repeated unsuccessful entry attempts by Komatsu in the Illinois region. Id. at 404.

46 Cf. *Adolph Coors Co. v. FTC,* 497 F.2d 1178 (10th Cir. 1974), cert. denied, 419 U.S. 1105 (1975) (condemning exclusive dealing imposed on beer retailers).

47 Further, the cost of capital goes up dramatically as the risk of complete failure rises. Assume that the cost of capital to a firm with a virtual 100 percent guarantee of success is 10 percent, yielding a return of 110 on an investment of 100. If the risk increases, with an 80 percent chance of success but a 20 percent chance of total failure, then an equivalent return to the investor requires a cost of capital of 37.5 percent. That is, an 80 percent chance of recovering 137.5 is equivalent to a 100 percent chance of recovering 110.

48 On use of exclusive dealing to raise a rival's costs, see ¶1804.

49 See *United States v. Dentsply Intl., Inc.*, 399 F.3d 181, 195 (3d Cir. 2005), cert. denied, 546 U.S. 1089 (2006) (following this reasoning).

50 *Standard Fashion Co. v. Magrane-Houston Co.*, 258 U.S. 346, 354 (1922); see ¶1801b.

51 E.g., *Storer Cable Communications, Inc. v. City of Montgomery,* 826 F. Supp. 1338 (M.D. Ala. 1993); *Futurevision Cable Systems of Wiggins, Inc. v. Multivision Cable TV Corp.*, 789 F. Supp. 760 (S.D. Miss. 1992). See also *Satellite T Associate v. Continental Cablevision of Virginia, Inc.*, 586 F. Supp. 973 (E.D. Va. 1982).

52 See *Tampa Electric Co. v. Nashville Coal Co.*, 365 U.S. 320 (1961), and ¶1801i.

53 Thus, the decision in *Brown Shoe Co.*, 62 F.T.C. 679 (1963), rev'd, 339 F.2d 45 (9th Cir. 1964), rev'd, 384 U.S. 316 (1966), was doubly overreaching because it condemned exclusive dealing imposed on shoe retailers when there may have been numerous alternative retailers capable of selling shoes.

54 *Roy B. Taylor Sales v. Hollymatic Corp.*, 28 F.3d 1379 (5th Cir. 1994).

55 Id. at 1384.

56 *Ryko Mfg. Co. v. Eden Servs.*, 823 F.2d 1215, 1235-1236 (8th Cir. 1987), cert. denied, 484 U.S. 1026 (1988).

57 See generally Richard Steuer, Exclusive Dealing in Distribution, 69 Cornell L. Rev. 101 (1983). Cf. *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 922 F. Supp. 1055 (E.D. Pa. 1996) (requiring a Domino's franchisee to use its franchisor's dough exclusively limits the franchisee's choice, but customers remain free to purchase their pizza and underlying dough from numerous sources).

58 *United States v. Microsoft Corp.*, 87 F. Supp. 2d 30, 53 (D.D.C. 2000), aff'd in part, rev'd in part, and remanded, 253 F.3d 34, 69 (D.C. Cir.), cert. denied, 534 U.S. 952 (2001) (to the extent it is relevant, H.H. was consulted by the federal government and some state agencies); *CDC Technologies, Inc. v. IDEXX Labs., Inc.*, 186 F.3d 74, 80-81 (2d Cir. 1999) (exclusive dealing unlikely to be anticompetitive if suppliers

***©2014 Wolters Kluwer. All rights reserved.***
***Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm***

can use channels of distribution other than the one tied up by exclusive contracts); *Seagood Trading Corp. v. Jerrico, Inc.*, 924 F.2d 1555, 1572-1573 (11th Cir. 1991) (plaintiff wished to wholesale to Long John Silver fast-food franchisees but is prevented by franchisor's exclusive agreements with other wholesalers; in dismissing complaint, court adopts broad market for distribution of restaurant supply services rather than plaintiff's narrow market of provision to LJS franchisees); *Super Premium Ice Cream Distribution Antitrust Litigation,* 691 F. Supp. 1262 (N.D. Cal. 1988), aff'd, 895 F.2d 1417 (9th Cir. 1990) (plaintiff franchisees terminated for refusing to deal exclusively in defendant's Haagan Dazs brand of ice cream; but ice cream was sold through many channels other than the specialty stores operated by the plaintiffs); *Thurman Industries v. Pay 'N Pak Stores, Inc.*, 875 F.2d 1369, 1374 (9th Cir. 1989) (for measuring foreclosure, market must include "all sellers or producers who have actual or potential ability to deprive each other of significant levels of business"); *Stitt Spark Plug Co v. Champion Spark Plug Co.*, 840 F.2d 1253, 1258 (5th Cir.), cert. denied, 488 U.S. 890 (1988) (spark plug manufacturer challenges exclusivity clauses imposed by rival spark plug maker on auto parts distributors; court notes many distribution alternatives to the auto parts distributors); *Stearns v. Genrad, Inc.*, 564 F. Supp. 1309, 1313 (M.D.N.C. 1983), aff'd mem., 752 F.2d 942 (4th Cir. 1984) (dismissing complaint of exclusive dealing applied to authorized dealers of sound-measuring equipment when the same equipment was also distributed by other types of sellers); *Bowen v. New York News, Inc.*, 366 F. Supp. 651, 679-680 (S.D.N.Y. 1973), aff'd in relevant part, 522 F.2d 1242 (2d Cir. 1975), cert. denied, 425 U.S. 936 (1976) (rejecting claim of unlawful exclusive dealing imposed by newspaper on home delivery dealers when newspapers could also be purchased at newsstands and other stores; as a result, alternative newspapers had more than adequate access to distribution channels); *McDaniel v. Greensboro News Co.*, 1984-1 Trade Cas. ¶65,792, at 67,287 (M.D.N.C. 1983) (similar); *Refrigeration Engg. Corp. v. Frick Co.*, 370 F. Supp. 702, 709 (W.D. Tex. 1974) (dismissing plaintiff's claim that its distributorship for refrigeration equipment was terminated by the defendant manufacturer after plaintiff refused exclusive-dealing ultimatum; noting that the equipment could be sold by a variety of businesses other than single-line distributors); *Beltone Electronics Corp.*, 100 F.T.C. 68, 210-211 (1982) (foreclosure percentage applied to specialized hearing aid dealers exaggerated actual foreclosure, for hearing aids were also sold by less specialized resellers).

59 Cf. *Standard Oil of California v. United States (Standard Stations),* 337 U.S. 293 (1949); and see ¶1801g.

60 *Omega Environmental, Inc. v. Gilbarco, Inc.*, 127 F.3d 1157, 1162 (9th Cir. 1997), citing ¶570b1 in the previous edition; and Herbert Hovenkamp, Federal Antitrust Policy: The Law of Competition and Its Practice §10.8 (1994).

61 See *Roy B. Taylor Sales v. Hollymatic Corp.*, 28 F.3d 1379 (5th Cir. 1994).

62 Id. at 1385.

63 See *Jefferson Parish Hosp. Dist. No. 2. v. Hyde,* 466 U.S. 2 (1984).

64 Cf. *United States v. Crescent Amusement Co.*, 323 U.S. 173 (1944) (cartel of exhibitors agree with each other to require distributors to give them exclusive rights in their towns).

65 *United States v. J.I. Case Co.*, 101 F. Supp. 856, 862-863 (D. Minn. 1951) (farm implement manufacturer encourages dealers to sell its brand exclusively; noting that the dealers operated in markets significantly larger than the towns in which they are located, mainly because they served rural areas).

66 For example, the terms of the contracts at issue in *Tampa Electric Co. v. Nashville Coal Co.*, 365 U.S. 320 (1961), were 20 years. See ¶1801i ; and see Victor P. Goldberg & John Erickson, Quantity and Price Adjustment in Long-Term Contracts: A Case Study of Petroleum Coke, 30 J.L. & Econ. 369 (1987); Paul L. Joskow, Vertical Integration and Long-Term Contracts: The Case of Coal-Burning Electrical Generating Plants, 1 J.L. Econ. & Org. 33 (1985).

67 On less restrictive alternatives, see ¶1822d.

68 Cf. *Paddock Publications, Inc. v. Chicago Tribune Co.*, 103 F.3d 42, 47 (7th Cir. 1996), cert. denied, 520 U.S. 1265 (1997) (output contract; as a consequence of termination clause in new service contract, competition for the contract could be renewed frequently). See also *CDC Technologies, Inc. v. IDEXX*

***©2014 Wolters Kluwer. All rights reserved.***
***Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm***

*Labs., Inc.*, 186 F.3d 74, 80-81 (2d Cir. 1999) (short notice provisions of exclusive-dealing arrangements made it unlikely that they were competitive, citing ¶1802g); *Western Parcel Express v. UPS of Am., Inc.*, 190 F.3d 974 (9th Cir. 1999) (similar).

69 See *Omega Environmental, Inc. v. Gilbarco, Inc.*, 127 F.3d 1157, 1163 (9th Cir. 1997), noting that there were some 500 distributors upon whom exclusive dealing was imposed and 60-day termination notice provisions after the initial year of a distribution contract. But see *United States v. Dairymen, Inc.*, 1983-2 Trade Cas. ¶65,651 (W.D. Ky. 1983), aff'd, 758 F.2d 654 (6th Cir.), cert. denied, 474 U.S. 822 (1985) (standing alone, one-year milk supply contracts reflected sound business judgment in light of cyclical supply and demand for milk, but a "proliferation" of such contracts covering more than 50 percent of market was excessive). Cf. *Ralph C. Wilson Industries v. Chronicle Broadcasting Co.*, 794 F.2d 1359, 1361 (9th Cir. 1986) (exclusive contracts among programmers and television broadcasters allegedly containing "unreasonably long" terms, overbroad geographic coverage, and rights of first refusal; but there were numerous stations; dismissed for lack of power).

70 *Standard Oil of California v. United States (Standard Stations),* 337 U.S. 293, 295 (1949). While the contracts had varying terms, many were from year to year and permitted a 30-day notice by either party for termination. Id. at 296.

71 *United States v. American Can Co.*, 87 F. Supp. 18 (N.D. Cal. 1949). The court noted that canners preferred to deal with a single can manufacturer, but this fact alone did not justify the defendant's form contract, which required exclusive dealing. The court struck down five-year provisions but upheld one-year provisions, noting testimony that one-year contracts permitted canners to "cast about in the open market" when the contracts expired. Id. at 31-32. The court concluded:

> Mindful that requirements contracts are not per se unlawful, and that one of the elements which should be considered is the length thereof, it is only fair to conclude after a careful review of the evidence, that a contract for a period of one year would permit competitive influences to operate at the expiration of said period of time, and the vice which is now present in the five year requirements contracts, would be removed. Under a contract limited to one year, the user-consumer would be guaranteed an assured supply and protected by a definite obligation on the part of American to meet the totality of needs of the canner, while he, in turn, would have a fixed obligation to purchase his seasonal needs from American, thus making for mutuality of contract and obligation.

Ibid. See also *FTC v. Motion Picture Advertising Co.*, 344 U.S. 392 (1953), affirming a decision condemning exclusive-dealing contracts for advertising films exceeding one year in length but permitting those of one year or less. See *In re Motion Picture Advertising Service Co.*, 47 F.T.C. 378 (1950); ¶1801h.

72 *Omega Environmental, Inc. v. Gilbarco, Inc.*, 127 F.3d 1157, 1163-1164 (9th Cir. 1997) (approving exclusive-dealing agreement where 90 percent of challenged contracts with distributors were subject to 60-day cancellation notice; as a result, "a competing manufacturer need only offer a better product or a better deal to acquire their services"; citing ¶¶420c, 421f); *Christofferson Dairy, Inc. v. MMM Sales, Inc.*, 849 F.2d 1168, 1173 (9th Cir. 1988) (approving exclusive milk surplus sales contracts that involved only small percentage of market and of "short duration"); *Roland Machinery Co. v. Dressler Industries,* 749 F.2d 380, 395 (7th Cir. 1984) (contract duration of less than one year presumptively lawful). See also *Barry Wright Corp. v. ITT Grinnell Corp.*, 724 F.2d 227, 237 (1st Cir. 1983) (citing two-year contract term in approving exclusive agreements); *Main Street Publishers, Inc. v. Landmark Communications, Inc.*, 701 F. Supp. 1289, 1295 (N.D. Miss. 1988) (approving one-year exclusive-dealing agreement for provision of advertising); *Fran Welch Real Estate Sales, Inc. v. Seabrook Island Co.*, 621 F. Supp. 128, 137 (D.S.C. 1985) (six-month exclusive real estate listing lawful where listings were coming in frequently); *Apollo Air Passenger Computer Reservation System (CRS),* 720 F. Supp. 1068, 1077 (S.D.N.Y. 1989) (approving five-year term for computerized reservation system license arrangement between carrier and travel agents where regulatory agency had approved five-year contracts).

***©2014 Wolters Kluwer. All rights reserved.***
***Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm***

73 See, e.g., *Paddock Publications, Inc. v. Chicago Tribune Co.*, 103 F.3d 42, 47 (7th Cir. 1996) (output contract; termination at will or on 30 days' notice); *Balaklaw v. Lovell,* 14 F.3d 793 (2d Cir. 1994) (approving exclusive hospital-anesthesiology contract with three-year term but permitting cancellation upon six months' notice); *U.S. Healthcare, Inc. v. Healthsource, Inc.*, 986 F.2d 589, 596 (1st Cir. 1993) (approving contract with 180-day cancellation provision, even though there were financial penalties for termination); *Drs. Steuer & Latham, P.A. v. National Med. Enters.*, 672 F. Supp. 1489, 1516 (D.S.C. 1987) (medical provision clause harmless where it could be canceled in 90 days); *Satellite Financial Planning Corp. v. First National Bank of Wilmington,* 633 F. Supp. 386, 397 (D. Del. 1986) (approving contracts with 180-day notice provision as having "de minimis" anticompetitive effect, noting that plaintiff could seek out competing offers at 180-day intervals); *Q-T Markets, Inc. v. Fleming Cos.,* 394 F. Supp. 1102 (D. Colo. 1975) (approving contract with ten-day cancellation provision); *Beltone Electronics Corp.*, 100 F.T.C. 68, 210 (1982) (same; 30-day notice provision).

74 E.g., *FTC v. Motion Picture Advertising Co.*, 344 U.S. 392 (1953) (condemning contract terms ranging from one to five years but approving those of one year or less); *Twin City Sportservice, Inc. v. Charles O. Finley & Co.*, 676 F.2d 1291 (9th Cir. 1982) (24 percent foreclosure sufficient when coupled with long duration of ten years and widespread use of such agreements); *L.G. Balfour Co. v. FTC,* 442 F.2d 1, 23 (7th Cir. 1971) (upholding FTC order condemning three-year contracts). See also *Mytinger & Casselberry, Inc. v. FTC,* 301 F.2d 534, 539 (D.C. Cir. 1962) (two-year exclusive distributorship contracts unlawful; manufacturer had significant market share); *Cass Student Advertising, Inc. v. National Educational Advertising Service, Inc.*, 407 F. Supp. 520, 521 (N.D. Ill. 1976) (condemning "indefinite" exclusive-dealing contracts for supplying national advertising to college newspapers; 95 percent market share). One court applying a state antitrust statute used its equity power to shorten the term of exclusive-dealing contracts from two years to one. *McCluney v. Zap Professional Photography, Inc.*, 663 So. 2d 922 (Ala. 1995).

75 See, e.g., *Yeager's Fuel, Inc. v. Pennsylvania Power & Light Co.*, 953 F. Supp. 617 (E.D. Pa. 1997) (once electric heat was installed in a home, switching to gas would be very expensive even though contractually permissible). See also *Minnesota Mining & Manufacturing (3M) v. Appleton Papers, Inc.*, 35 F. Supp. 2d 1138 (D. Minn. 1999) (Appleton, with two-thirds market share, imposed exclusive dealing on its dealers in its carbonless paper by arrangements that are formally terminable at will; but court finds fact issue as to whether termination at will is in fact a realistic possibility:

> Here, 3M has produced evidence that Appleton's sole-sourcing agreements often include incentives that have the practical effect of tying up the paper sheet inventory of a merchant over a period of several years. 3M also points to unique distribution factors, like the high costs a paper merchant must incur to switch completely from one brand to another, that make it very difficult for a supplier to dislodge a competitive brand from an exclusively dealing merchant. Further, 3M asserts that Appleton's high market share and the deeply rooted customer preference for the NCR brand of paper prevent merchants from surrendering Appleton as a supplier, which they must do under these agreements if they desire to distribute non-Appleton brands. Finally, 3M contends that, at the instance of Appleton, major distributors have agreed among themselves that they will remain loyal to Appleton carbonless sheets regardless of competitors' pricing or product innovations.

Id. at 1144.).

76 See Paul L. Joskow, Contract Duration and Relationship-Specific Investments: Empirical Evidence from Coal Markets, 77 Am. Econ. Rev. 168 (1987).

77 See Herbert Hovenkamp, Harvard, Chicago and Transaction Cost Economics in Antitrust Analysis, 55 Antitrust Bull. 613 (2010), available at *http://papers.ssrn.com/sol3/papers.cfm?abstract_id=1592476* .

78 See *Brown Shoe Co.*, 62 F.T.C. 679 (1963), rev'd, 339 F.2d 45 (9th Cir. 1964); ¶1801j.

79 *U.S. Healthcare, Inc. v. Healthsource, Inc.*, 986 F.2d 589, 596 & n.3 (1st Cir. 1993). Cf. *United States v. United Shoe Mach. Corp.*, 110 F. Supp. 295 (D. Mass. 1953), aff'd per curiam, 347 U.S. 521 (1954), where the defendant required long-term leases of its machines, restricted the use of rivals' machines, and

**©2014 Wolters Kluwer. All rights reserved.**
**Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm**

imposed penalty provisions for early cancellation of the leases. See ¶614 ; and Carl Kaysen, United States v. United Shoe Machinery Corporation: An Economic Analysis of an Antitrust Case 13-16, 75-76 (1956). See Joseph F. Brodley & Ching-to Albert Ma, Contract Penalties, Monopolizing Strategies, and Antitrust Policy, 45 Stan. L. Rev. 1161 (1993); Phillipe Aghion & Patrick Bolton, Contracts as a Barrier to Entry, 77 Am. Econ. Rev. 388 (1987).

80 *Beltone Electronics Corp.*, 100 F.T.C. 68, 210 (1982). In *Omega*, the product subject to exclusive dealing was a gasoline pump, or "dispenser," which would very likely have been expensive to switch if exclusive dealing had been imposed directly on gasoline retailers, who installed the pumps. But the challenged exclusive dealing was imposed on intermediaries who simply distributed the equipment from the defendant manufacturer to various retailers, and these could presumably change brands readily. As a result, short contract terms indicated that distributors were frequently available for competitive bids.

**©2014 Wolters Kluwer. All rights reserved.**
***Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm***

EXHIBIT 308

# Antitrust Law: An Analysis of Antitrust Principles and Their Application - Areeda and Hovenkamp, ¶1821. Prima Facie Exclusive-Dealing Case

Click to open document in a browser

**Last Updated: 4/2014**

In order to succeed in its claim of unlawful exclusive dealing, a plaintiff must show the requisite agreement to deal exclusively ( ¶a) and make a sufficient showing of power to warrant the inference that the challenged agreement threatens reduced output and higher prices in a properly defined market ( ¶b). Then it must also show a foreclosure coverage sufficient to warrant an inference of injury to competition ( ¶c), depending on the existence of other factors that give significance to a given foreclosure percentage, such as contract duration, presence or absence of high entry barriers, or the existence of alternative sources of distribution or resale ( ¶d).

After considering these elements of a prima facie case, ¶e examines the significance of exclusive dealing imposed by rivals of the defendant; and finally, ¶f examines briefly the rather different structural query when the claim is not foreclosure, but rather that the challenged exclusive dealing facilitates upstream or downstream collusion.

Our basic but tentative ¶c conclusion is that the plaintiff's case must fail unless it shows that an upstream firm in a concentrated market of at least 1,800 HHI and a 20 percent individual market share has imposed exclusive dealing foreclosing at least 20 percent of the downstream market. Both the upstream and downstream markets are to be defined by using the usual antitrust criteria developed in Chapter 5.

The elements described in this Paragraph develop a prima facie exclusive-dealing case, which is sufficient to prove illegality in the absence of defenses, which are considered in the next Paragraph. If sufficiently compelling defenses are offered, then less restrictive alternatives and perhaps even some form of "balancing" must be considered.

**1821a. Proof of agreement to deal exclusively..—**Unlawful exclusive dealing requires (1) an *agreement* (2) *not to deal* in the goods of another.

**1821a1. *Distinguishing unilateral from bilateral conduct..*—**When challenged under §1 of the Sherman Act, exclusive-dealing claims require a legal "contract," "combination," or "conspiracy." The same standard generally applies to challenges under §3 of the Clayton Act, which requires proof of a sale made on the "condition, agreement, or understanding" that the buyer not deal in the goods of another. In general, proof of agreement in an exclusive-dealing case resembles proof of agreement in a tying case. Thus, while an express exclusive-dealing condition in a contract triggers both the Sherman Act and the Clayton Act, [1] subtler constraints require closer analysis. Chapter 14A and B consider the general proof of agreement requirements, looking mainly at §1 of the Sherman Act, while Chapter 14D considers the differences between vertical agreements and unilateral activity. [2] Chapter 17D-2 considers the more specialized question of tying conditions or agreements.

Under these requirements a firm that "unilaterally" announces its refusal to deal with anyone selling a competitor's goods does not violate either §1 of the Sherman Act or §3 of the Clayton Act. [3] As the Seventh Circuit noted in *Roland Machinery,* if the defendant simply made clear

> that it wanted only exclusive dealers and would exercise its contract right to terminate, immediately and without cause, any dealer who took on a competing line,…the mere announcement of such a policy, and the carrying out of it by canceling…any…noncomplying dealer, would not establish an agreement. [4]

Further,

> [the defendant's] preference for exclusive dealers, its efforts to find out whether its dealers were exclusive dealers, and its terminating Roland [the plaintiff] when it found out that Roland no longer was its exclusive

***©2014 Wolters Kluwer. All rights reserved.***
***Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm***

dealer do not support an inference "both that the distributor communicated its acquiescence or agreement" to exclusive dealing "and that this was sought by the manufacturer." [5]

The *Virginia Vermiculite* decision is also instructive. [6] The defendant owned natural resource land and donated it to a charitable organization subject to noncompetition covenants prohibiting mineral production, thus removing that land from the market. While a restrictive covenant is contractual in nature, the court realized that the giving of a gift deed with such a covenant is essentially a unilateral act for antitrust purposes. [7]

The decision to deal exclusively may of course be made by the buyer rather than the seller. For example, a computer maker may decide to install only Intel brand processor chips, or an auto repair firm may decide to carry only Delco parts. Such decisions are to be counted as unilateral whenever there is no agreement not to deal in the goods of a competitor. [8]

Unilateral decisions to sell to a single customer [9] might be thought less common, but in fact they are not. Many large production firms have engendered the growth of small satellite firms created to satisfy the larger firm's specialized needs. The mere fact that a firm has been developed, for example, to supply automobile bodies to General Motors, or display devices to Motorola, creates no inference of an output contract unless the small firm has also agreed to supply that buyer exclusively.

Finally, under the Supreme Court's *Copperweld* decision, the "agreement" at issue cannot be one between agents or members of a single enterprise, such as a corporation and its manager, a parent and its subsidiary, or subsidiaries of a common parent. [10] Thus, for example, Ford's decision to sell only Ford vehicles through its wholly owned dealership in Pittsburgh is a unilateral act, addressable if at all only under §2 of the Sherman Act. [11]

To be sure, one might doubt on policy grounds the importance of an agreement requirement in exclusive-dealing cases. In the typical "foreclosure" case the dominant firm as seller imposes exclusive dealing on a distributor or dealer, thus making it more difficult for the dominant firm's upstream rivals to find adequate dealership below. If successful, this scheme injures not only the rival and final consumers, but also the distributor or dealer upon whom exclusive dealing is imposed. Ordinarily that firm would wish to purchase in a competitive market at the lowest possible price, and this would be facilitated by maintenance of upstream competition. As a result, unilaterally imposed exclusive dealing can be just as anticompetitive as any kind of exclusive-dealing agreement.

But the answers are, *first,* that insofar as exclusive dealing is a dominant-firm strategy calculated to create or maintain monopoly, it is addressable under §2 of the Sherman Act. [12] *Second,* the agreement has independent significance for measuring such things as the duration of the exclusive-dealing requirement being imposed. While a firm can unilaterally announce a policy of not supplying dealers who sell other brands, such a dealer can immediately forsake that supplier's brand in favor of the brand of a rival, and thus the rival cannot be as successfully foreclosed. This fact can be particularly important when the dominant firm attempts to "exercise" its power by charging dealers high wholesale prices. At that point the dealers have an incentive to switch to a lower-cost supplier, and exclusive dealing imposed unilaterally may not limit their ability to switch. [13] *Third,* and most important, both §1 of the Sherman Act and §3 of the Clayton Act require an exclusive-dealing "agreement" of some sort.

**1821a2. *Agreement not to deal; market-share discounts and market-share dealing requirements distinguished..*—**Paragraphs 1755-1756 considered alleged tying arrangements in which the purchaser was not really "required" to purchase the tied product but may have received somewhat subtler mandates from the seller. Suppose, for example, that the supplier does not explicitly require exclusive dealing, but gives the buyer a discount, a rebate, or more favorable terms in exchange for the buyer's commitment not to purchase a rival's goods. [14] In this case the Clayton Act readily provides an answer: it prevents not only the absolute refusal to

**©2014 Wolters Kluwer. All rights reserved.**
***Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm***

sell, but also a "discount from" or "rebate upon" a price if the buyer agrees not to deal in the goods of a rival. [15] The courts have interpreted the Sherman Act to like effect. [16]

Of course, not every discount has the requisite exclusionary effect. If a seller offers a 10 percent exclusivity discount to its 20 customers but only 2 accept the offer, that indicates that customers feel free to take it or leave it, and no exclusivity agreement should be inferred. The case law and our own conclusion suggested in the case of tying that an exclusivity agreement should not be inferred unless a high percentage of customers—say, 85 to 90 percent— accept the offer. [17] There is no reason to think the number should be any different for exclusive dealing.

Often the exclusive deal is not insisted upon, but is merely offered or recommended. An unaccepted offer does not create an agreement for purposes of either Sherman Act §1 or Clayton Act §3. [18] But suppose that a hospital in the business of supplying home care nurses to discharged patients has an exit interview with patients in which it "recommends" that they engage a home care nurse provided by the hospital. [19] On the one hand, a hospital offering a service ought to be able to recommend that service to its patients; further, it has no general duty to promote or even to supply information about the services of rivals. On the other hand, a patient being discharged from a hospital and requiring home care may be particularly vulnerable and uninformed, thus giving the hospital a distinct advantage over alternative home care providers, perhaps effectively making it impossible for them to acquire sufficient customers to stay in business.

In other situations a supplier may permit a dealer to sell the goods of a rival, but only under restricted conditions. For example, *Empire Volkswagen* approved an automobile manufacturer's policy of permitting its dealers to sell other brands, but only from physically separate showrooms. [20] Or a supplier may insist that its own product receive preferential treatment over the products of rivals—such as a larger or more prominent display, special promotion, and the like. [21] On the first type of requirement, insisting on separate showrooms may be a good compromise to prevent interbrand free riding [22] but yet avoid the harsher effect of an outright prohibition. Finally, many courts hold that "market share" agreements or discounts, which require or reward a firm for using a particular firm's goods for a specified percentage but less than all of its needs, do not amount to exclusive dealing. [23]

In this case one must differentiate between a market-share discount and a market-share contractual arrangement. In the first, the defendant offers a lower price to a firm that agrees to take, say, 80 percent of its needs from the defendant. In the second, the contract, which may be of long duration, requires the purchaser to take at least 80 percent of its needs for the duration of the contract. The most important difference is that with respect to the former a rival can steal the customer simply by matching the discount, unless other contractual complexities intervene. By contrast, the absolute market-share contract has the durational element of ordinary exclusive dealing; it simply excludes less than 100 percent. [24] A seller with a 100 percent market share that required all of its customers to buy 80 percent of their needs from itself will effectively have foreclosed 80 percent of that market. In such cases the best presumptive approach is to measure foreclosure by taking the market-share percentage into account. If a firm's sales would foreclose 40 percent of a market under absolute exclusive dealing, a contract requiring customers to purchase 80 percent of their needs from the defendant would foreclose 32 percent of the market.

**1821b. Power requirement for anticompetitive vertical foreclosure..—**

**1. *Dual requirements of significant upstream position and significant foreclosure of downstream market*..—**The relevant market for assessing exclusive-dealing claims depends on the underlying rationale for believing the arrangement in question to be anticompetitive. [25] In most cases this will involve injury to competitive opportunities in the upstream market. For example, in *Tampa Electric* the Supreme Court measured the competitive harm by examining the larger area in which competing coal companies sold their coal, rather than the smaller area served by the public utility that purchased the coal subject to the exclusive-dealing contract. [26]

***©2014 Wolters Kluwer. All rights reserved.***
***Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm***

To be sure, a consequence of failure of competition in the coal market would be higher prices paid by Tampa Electric and thus higher electric rates to its customers, who are "local" in that they are confined to the Tampa Electric service area. Nevertheless, the exclusive-dealing contract is anticompetitive only if it restricts the entry or expansion opportunities of coal producers, who sold and shipped their coal in a much larger area.

Or consider the situation in which a hospital enters an exclusive-dealing arrangement with an anesthesiological firm to supply all the hospital's anesthesiological services. [27] If the perceived threat to competition is reduced opportunities to supply anesthesiological services, one must consider the market in which hospitals contract for such services. It is presumably a large market, perhaps even a national market, if one is looking for employment opportunities. By contrast, if the perceived threat to competition is reduced competition in the delivery of anesthesiological services to patients, the relevant geographic market is the one served by the hospital, which will be quite local.

Of course, either consequence can provide a basis for illegality if a threat to competition is found, although the nature of the injury differs. But most claims of anticompetitive requirements or output contracts are plausible only if the defendant has a significant presence in the upstream market. [28] In nearly all cases the claim of anticompetitive effects is plausible only when there are *both* a significant market position in the upstream market and significant foreclosure of the downstream market. [29]

To illustrate, consider a case modeled after *Standard Fashion* (SF), involving a dominant manufacturer of clothing patterns that ships them at wholesale to a nationwide market. [30] SF then imposes exclusive dealing on a retailer located in a relatively small and geographically isolated community, such as Iowa City, Iowa. The feared consequence of exclusive dealing we suppose to be reduced output and thus higher wholesale and eventually higher retail prices for clothing patterns.

*First,* if SF were not a dominant manufacturer of patterns, but merely made them in a competitive market, the Iowa City retailer should not be expected to agree to exclusive dealing that requires the retailer to pay a monopoly wholesale price. The retailer would prefer to purchase from numerous rivals, either simultaneously or upon periodic rebidding at the competitive price. As a result, SF would need to have enough market position to make an "all or nothing" offer to the retailer. This would not have to be a monopoly position, but it would have to be a position sufficient enough that the retailer would value the right to deal in this manufacturer's patterns, be willing even to pay a premium for doing so, as well as promise not to deal in the patterns of rivals. As a result, if such a store enters an exclusive-dealing arrangement with a *competitive* supplier, the reason must be that it expects benefits at least equal to any price increase that the supplier might impose. Indeed, if the same benefits were available from numerous competitive sources, the downstream dealer would obtain both the benefits and a competitive price.

*Second,* the exclusive-dealing arrangement would not have its intended anticompetitive effect unless the result was to make it significantly more difficult and expensive for rival pattern manufacturers to sell their patterns in Iowa City. If Iowa City contained robust competition among numerous stores selling patterns, exclusive dealing with any one of them would not have this effect. Rather, the arrangements imposed by the defendant manufacturer would have to be sufficiently numerous to cover enough Iowa City stores so that the remaining stores would not be able adequately to handle the supply of rival manufacturers. [31]

It must be remembered that while exclusive-dealing agreements are both "vertical" and "bilateral," they are also fundamentally exclusionary practices akin to monopolization. Unlike resale price maintenance or territorial restraints, exclusive dealing is not typically solicited by rivals. Further, the principal harm is exclusion of rivals. For these reasons structural requirements more like those used under §2 of the Sherman Act seem appropriate. This is particular true, as noted previously, when the practice under challenge is not a long-run exclusive-dealing contract but rather the use of a price discount in order to exclude rivals. [32]

**1821b2. *Output contract.*.—**While the output contract operates differently from the requirements contract, the analysis is generally the same. Suppose, for example, that an Iowa City retailer enters into an output contract

***©2014 Wolters Kluwer. All rights reserved.***
***Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm***

with Standard Fashion under which SF promises to sell all its Iowa City output of patterns to that retailer. If the retailer is only one among many in Iowa City, SF is not likely to enter into such an agreement if it anticipates the effect will be that the retailer will assess a monopoly markup on SF's patterns; it would prefer to sell the patterns to numerous retailers who would compete among themselves to lower the markup and enlarge the manufacturer's volume. At the same time, SF's output contract with the Iowa City retailer would not deny access to patterns to other Iowa City retailers if SF were only one among numerous pattern makers, and the other retailers could readily enter their own exclusive or nonexclusive contracts with SF's rivals.

**1821c. Minimum standards for prima facie illegality..—**

**1. *General standards for requirements contracts..*—**Under the rule of reason applied in exclusive-dealing cases, structural evidence is decisive only when the numbers are small, thus indicating that the restraint is legal. When the numbers are large enough to be threatening, they establish an inference of prima facie illegality, thus shifting the burden to the defendant to show that exclusive dealing is justified under the circumstances. [33]

Picking the correct number is somewhat arbitrary, but single-firm foreclosure percentages of less than 30 or 40 percent in a properly defined market would seem to be harmless to competition, at least when there is no indication of upstream collusion or oligopoly using exclusive dealing as an entry-deterrence device. [34] When exclusive dealing is used to facilitate collusion, the percentage foreclosure by any single firm might be less, but then the relevant issue becomes the aggregate foreclosure imposed by the upstream firms in the collusive group.

At higher percentages, generalization is much more difficult, with a tendency on the part of courts to require stronger proof of offsetting efficiencies as the foreclosure percentage is higher. Percentages higher than 50 percent are routinely condemned when the practice is complete exclusion by a contract of fairly long duration, [35] and cases preceding *Jefferson Parish* [36] in 1984 often condemned significantly lower percentages. [37] However, even relatively high percentages are not necessarily illegal, for there is no "per se" rule condemning any specific percentage. [38] Finally, although the Federal Trade Commission once condemned exclusive dealing without any showing that a specific percentage of a downstream market had been foreclosed, [39] its *Beltone* decision [40] rejected those earlier cases and assessed competitive injury, and presumably foreclosure, requirements analogous to those applied by the courts.

But even high-foreclosure percentages are permissible when the upstream market is competitive. Justice O'Connor's concurring opinion in *Jefferson Parish* observed as much. At issue was exclusive dealing between an anesthesiological firm and a hospital whose patient admissions were about 30 percent of admissions in the area in which the hospital operated. [41] But 30 percent would be the correct number for analyzing the exclusive-dealing claim only if anesthesiological firms sold their services to hospitals in the same relatively small geographic market that the hospital served patients. If the market for anesthesiological services was significantly larger, however, then the foreclosure percentage could have been much smaller. As Justice O'Connor observed:

> A firm of four anesthesiologists represents only a very small fraction of the total number of anesthesiologists whose services are available for hire by other hospitals, and East Jefferson is one among numerous hospitals buying such services. Even without engaging in a detailed analysis of the size of the relevant markets we may readily conclude that there is no likelihood that the exclusive dealing arrangement challenged here will either unreasonably enhance the hospital's market position relative to other hospitals, or unreasonably permit [the anesthesiologist who has the exclusive agreement] to acquire power relative to other anesthesiologists. [42]

Other cases condemning foreclosure by hospitals, at apparently much higher percentages, have neglected this observation. In *Oltz,* [43] for example, the hospital entered into an exclusive-dealing contract with specific anesthesiologists after advertising in a national publication, thus excluding plaintiff Oltz, a nurse anesthetist. The court accepted as a premise that there was a national market for anesthesiologial services, but

***©2014 Wolters Kluwer. All rights reserved.***
***Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm***

> [t]he M.D. anesthesiologists, the hospital, and Oltz operated in both markets. Thus, the exclusive arrangement potentially affected both markets, and both were relevant to the search for competitive harm. Even if we accept St. Peter's [Hospital's] contention that the job market was national and competition in it suffered no injury, the analysis could not have ended there. An evaluation of the impact on competition in the patient market for anesthesia service was required. [44]

But the court then identified the competitive harm in this local market as (1) the denial of patient choice of anesthesiologist, and (2) denial of hospital access by rival anesthesiologists. [45]

However, antitrust is not concerned with denial of access in the abstract, but only with denial of access that foreseeably results in an output reduction and attendant increase in price. If St. Peter's Hospital could contract for anesthesiologists in a competitive market for such services, why would it select a particular anesthesiologist exclusively if the anticipated result was higher prices for anesthesiological services—an effect that would limit its own patient volume without giving it any monopoly profits that it did not already obtain by virtue of its position as the dominant hospital in its service area? [46]

By contrast, in *Collins* [47] the Seventh Circuit noted that pathologists competed for jobs in a national market. [48] The court concluded:

> As the district court noted, in the present case, St. John's [Hospital] is in the position of Tampa Electric and APL [the provider under the exclusive-dealing arrangement] is in the position of the supplying coal company. In determining whether this exclusive arrangement forecloses competition, the focus is upon competition between pathologists for the right to practice at St. John's. So the contract must be viewed in light of its effect on pathologists competing for work, not from the effect on patients at St. John's whose options are limited. [49]

Suppose, for example, that anesthesiological services are sold nationally in a competitive market. The feared consequence of exclusive dealing is that the upstream firm denies rivals' access to the downstream firm, thereby excluding the upstream firm from the market, raising its costs, or limiting its ability to expand. But if the upstream market is competitive, none of these consequences will result no matter how large the percentage of foreclosure in the downstream market.

To be sure, one might posit that the anesthesiological firm enters exclusive dealing with the hospital, thus denying alternative anesthesiologists access to hospital consumers in the local market and consumers access to alternative anesthesiologists. And this denial of opportunity could certainly occur, but *all* contracts, even those in highly competitive markets, deny opportunities to rivals in this fashion. For example, the market for both the production of tomatoes and the grocery stores retailing tomatoes may be highly competitive. But if Farmer Brown agrees to sell his tomatoes to Mom & Pop's Grocery for a season and the Grocery agrees to purchase only from Farmer Brown, then (a) other farmers are excluded from Mom & Pop's as a customer; and (b) Mom & Pop's own customers are denied access to alternative tomato growers.

If the market in which anesthesiologists sell their services to hospitals is large and competitive, not even a hospital that is a monopolist in its own service area will enter an anticompetitive exclusive-dealing contract. *First,* the hospital's ability to charge monopoly prices depends entirely on its own market position and has nothing to do with any exclusive contracts imposed on it from above. *Second,* even the monopoly hospital has every incentive to purchase from the best or lowest-cost supplier [50] and has no interest in having imposed on it an exclusive-dealing contract tending to exclude anesthesiologist rivals and resulting in high anesthesiologist prices to the hospital first, and then to its patients.

Thus, the upstream market must be sufficiently concentrated, and the defendant sufficiently powerful, to warrant an inference that the defendant is in a position to impose anticompetitive exclusive dealing that injures the downstream firm as well as consumers. Once again, picking an appropriate number is very difficult, but we suggest a minimum defendant's market share in the range of 30 or 40 percent for contracts that are "robust" in

***©2014 Wolters Kluwer. All rights reserved.***
***Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm***

the twin senses that they require absolute exclusion and cannot be evaded in a short period of time. When the contracts exclude only partially or are of short duration, these numbers are insufficient.

As shown earlier, [51] when the exclusion mechanism is a price discount rather than a true exclusive-dealing contract, stricter structural requirements are necessary. Predatory pricing, which involves below-cost prices, requires market shares on the order of 60 to 70 percent. Pricing practices claimed to be exclusionary but involving above-cost prices should require at least as much.

**1821c2. *Output contracts..*—**The output contract is generally the requirements contract turned upside down. For example, suppose that a dominant can maker such as American Can obtains contracts from the makers of can-making machinery requiring the latter to sell their full output of machinery to American Can. [52] The feared injury is that competing can makers will not be able to obtain sufficient machinery to compete effectively with American Can, thus facilitating higher can prices. However, American Can will not be able to impose such agreements on the makers of can machinery unless it has some power in the buying market for the machinery. The machinery makers generally profit when can output is maximized, and thus they lack any incentive to participate in a program designed to reduce can output for the profit of one can maker.

Once again, we suggest that the minimum condition for condemnation is a concentrated downstream market and that American Can have a market share of at least 30 or 40 percent, thus warranting an inference of at least minimal power vis-à-vis can makers. [53] Further, the strategy succeeds only if American Can is able to deny effective access to can machinery to its can-making rivals, which we suggest requires foreclosure of at least 30 or 40 percent, and even that number seems rather small. As in the case of requirements contracts, when these percentages have been shown, the plaintiff still has not made out its complete prima facie case: it must also show that the other factors, enumerated in ¶d, suggest that anticompetitive exclusive dealing is plausible.

**1821d. Factors determining anticompetitive potential of "significant" foreclosure percentage..—**

**1. *Generally..*—**While low foreclosure percentages are decisive for the defendant, higher percentages are seldom decisive in and of themselves. Rather, they provide the jumping-off point for further analysis. [54] We term a foreclosure percentage "significant" if, when combined with the other factors described here, the requisite anticompetitive threat appears.

Thus, in proving a prima facie case, the plaintiff's logical first step is to establish market structure, market share, and foreclosure percentages, as outlined in ¶c. Then, examination of the factors enumerated here provides additional evidence concerning the plausibility of anticompetitive exclusive dealing.

**1821d2. *Actual exclusion..*—**Even a high foreclosure percentage creates no injury to competition if no one is being excluded in fact by the challenged arrangement. For example, suppose that milk is wholesaled in a relatively small regional market because of perishability, and the grocery retail market encompasses the same region. One dominant dairy produces 30 percent of the region's milk and has entered exclusive-dealing contracts covering 30 percent of the region's grocery stores. However, smaller dairies and smaller grocery stores compete quite successfully against the larger dairy, and any dairy entering the market can easily find sufficient grocery stores to resell its milk.

In this case no inference is warranted that the exclusive-dealing arrangements have any anticompetitive effect, notwithstanding apparently high foreclosure percentages. In fact, no dairy is being foreclosed from entry or from the opportunity to expand. None is shown to incur higher costs as a result of the dominant dairy's exclusive dealing. [55]

In a case such as *Jefferson Parish,* [56] where the plaintiff is an excluded rival of the upstream firm, provable actual exclusion, inability to expand, or higher costs would seem to be a prerequisite for any showing of injury-in-fact. [57] But not all exclusive-dealing plaintiffs are excluded rivals; many are downstream firms upon whom exclusive dealing is imposed. For example, suppose a Baskin-Robbins franchisee should challenge a franchise contract forbidding it from selling the ice cream of a competing manufacturer in addition to Baskin-Robbins's

**©2014 Wolters Kluwer. All rights reserved.**
***Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm***

own ice cream. [58] Even at a high foreclosure percentage of, say, 60 percent, we would insist on a showing that as a result of the exclusive-dealing contract, alternative ice cream manufacturers were having a difficult time finding adequate outlets for their product. This would not be the case if (a) the remaining 40 percent of ice cream retailers were adequate and available; (b) the ice cream manufacturer could readily set up its own stores; or (c) the ice cream manufacturer could readily contract with other businesses, such as hamburger restaurants, to become franchisees of its product as well. Thus, in *Roland* the Seventh Circuit required a showing that exclusive dealing

> is likely to keep at least one significant competitor of the defendant from doing business in a relevant market. If there is no exclusion of a significant competitor, the agreement cannot possibly harm competition. [59]

**3. *Measuring contract duration for exclusion contracts, discounts, and rebates..*—**As noted in ¶1802g, even a high foreclosure percentage will not exclude competition if the period covered by the exclusive-dealing arrangement is short *and* there are no other impediments to switching. We suggest presumptively that periods of less than one year be approved, [60] particularly where switching appears to face no substantial impediments, and even more particularly where dealers in the same distribution system and operating under the same contract provisions can be observed to be switching. We say "presumptively," however, because while short contract duration suggests cycling availability of buyers for upstream rivals, it does not guarantee such availability.

Short contract term and dealer ability to switch become more relevant as the number of individual dealers covered by the arrangement increases. To illustrate, if a manufacturer has only a single large dealer covering 60 percent of the market, luring that dealer away would require a large rival and, further, there would be only one dealer who could be enticed to switch. By contrast, if the manufacturer's system had 300 dealers within the relevant market, a single dealer could be lured away by a relatively small rival, and at any given time numerous dealers may be available for such switches. Indeed, in a large dealer network, even contracts with long terms need not be anticompetitive. For example, in a 300-dealer network where contracts average three years long, approximately 100 dealers should be free to renegotiate each year.

When the "exclusive deal" is accomplished by a price discount scheme rather than an absolute non-dealing contract, close examination of contract terms and effects is necessary to determine the true length of any exclusion. Presumably, a rival can steal a customer at any time simply by matching the discount. Discounts that are aggregated across a period of time, such as one year, should never be counted as a contract of more than one year's duration; however, there may be cases where the aggregation effectively requires a rival to price at below cost in order to both meet the defendant's price on current sales and match the discount that will be lost on past sales. For example, suppose a discount scheme offers a 5 percent discount in exchange for a high share of the customer's purchases, that the customer purchases once a month, and that the customer will not receive the discount unless it meets the purchase-share obligations over the entire year. During the first month of this contract a rival could bid away the sale by simply matching the price. During the second month, however, it would have to match the price on the current order *and* compensate the buyer for the lost discount on the previous month's order, and so on. By the third or fourth month the buyer may be locked in to the extent that no equally efficient rival could steal the sales at an above-cost price. Of course, once the rebate accrues the cycle starts over and rivals will be able to bid again. Such contracts come in a wide variety of types and must be examined closely to ensure that they really cause the exclusion that is claimed for them. Further, rivals are typically able to bid sales away not only by compensating for past discounts that have been forgone but also by offering better discounts in the future. Finally, observations that rivals are actually taking sales notwithstanding the contract terms indicate that the terms are not exclusionary. [61]

In general, our suggested one-year presumption about contract duration should apply from the rival's or new entrant's perspective: the relevant question is whether during a one-year interval sufficient dealers are "freed up," looking at both contract terms and other impediments to switching, that the fact finder can conclude that there is a realistic opportunity for a new rival to enter the market or an existing rival to expand. In the case of aggregated

***©2014 Wolters Kluwer. All rights reserved.***
***Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm***

discounts, the relevant question would be whether the competing for the sales by an equally efficient rival can occur at least once a year. [62]

To illustrate, suppose that a dominant upstream firm imposes exclusive dealing on 30 downstream dealers in the local resale market, and these dealers' sales account for 30 percent of the market. However, these dealers have two-year contracts on different cycles and there are no significant impediments to dealer switching. As a result, on average half of these dealers' contracts become available for bidding by a rival each year, indicating that true foreclosure is more like 15 percent rather than 30 percent. [63]

As ¶1802g3 notes, the contract term is not the only impediment to dealer switching; dealers who have made a significant co-investment in their supplier's specialized inputs may not be able to switch easily even when contract duration is short or the contract is an at-will contract. For example, many franchisees have made significant investments in their franchise, imposing switching costs as high as or higher than the costs of a contract breach. In that case, a short notice-of-termination provision hardly indicates that such franchisees can easily be induced to switch. At the other extreme, a convenience store selling unbranded gasoline through its own pumps could probably be induced to switch quite easily whenever its contract term permits.

*ZF Meritor, LLC v. Eaton Corp*., 696 F.3d 254 (3d Cir. 2012) (contracts of at least five years duration tended to show exclusion; citing ¶1802g ; also, while the contracts were terminable on short notice, termination would be very costly because there was no alternative supplier that could fulfill the buyers' needs). *See also Pro Search Plus, LLC v. VFM Leonardo, Inc*., 2013 WL 3936394, 2013-2 Trade Cas. ¶78,464 (C.D. Cal. July 30, 2013) (numerous contracts with relatively short termination periods and overall durations in two- to five-year range indicated that exclusive dealing was not anticompetitive). A later decision sustained an amended complaint, which also alleged that there were independent switching costs that made escaping from the contracts costly notwithstanding their short duration. *Pro Search Plus, LLC v. VFM Leonardo, Inc*., 2013 WL 6229141 (C.D. Cal. Dec. 2, 2013).

**1821d4. *Existence of alternative distribution channels..*—**In part, the question of distribution channels reduces to one of proper market definition. For example, if Levi's blue jeans are sold in both franchised Levi's brand stores and department stores, then the denominator for the fraction computing foreclosure should include both. Suppose that all Levi's brand stores, selling 1,000 pairs of jeans annually, are covered by exclusive-dealing contracts, but in addition jeans are sold through department stores. Levi's has no exclusive-dealing relationship with them; these stores sell an additional 2,000 pair of jeans annually. In that case, the percentage of the market foreclosed by exclusive dealing must be reckoned at one-third, or 33 percent.

But suppose that the area contains a significant number of department stores or clothing stores not currently selling any jeans at all, but it seems clear that they could easily do so in response to an alternative jean maker's offer. Should these alternative stores be counted as "in the market" as well?

First, counting them as in the market poses one problem: because they are not currently selling jeans, they have no current market share. Of course, one could estimate their capacity for selling jeans, although such an estimate would necessarily be quite rough. Nevertheless, such firms have a presence in the market that clearly goes beyond simply saying there are low entry barriers. Indeed, we might assume that entry into the market for being a multiservice department store is quite difficult and time-consuming, but that an *existing* department store not selling blue jeans could readily switch part of its shelf space to jeans in response to a restraint-induced price increase above cost. [64]

In *Dentsply* the Third Circuit reversed the district court and concluded that the government had satisfactorily proven unlawful exclusive dealing. [65] The government had challenged Dentsply's policies under both §§1 and 2 of the Sherman Act, as well as §3 of the Clayton Act. [66] The defendant's market share in the upstream market for manufactured artificial teeth material and other dental restorative appliances ranged from 67 to 80 percent, depending on whether it was measured by units of production or by revenue. [67] The second

**©2014 Wolters Kluwer. All rights reserved.**
***Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm***

largest firm in the market was significantly smaller, having a share of approximately 5 percent. Another dozen manufacturers were even smaller.

Dentsply maintained a national network of 23 dealers who sold these materials mainly to dental laboratories, which prepared them for use by dentists and other dental care professionals. [68] These dealers sold a wide variety of dental materials and supplies produced by numerous manufacturers. [69] However, Dentsply required the dealers to sell its tooth materials exclusively, except for a few older dealers who were grandparented in. Dentsply also enjoyed very high margins and profits in this business. [70]

The district court had rejected Dentsply's business justification defenses as pretextual. [71] However, that court also held that (1) there was an ample number of other dealers to handle the tooth material of rivals; and (2) direct sales techniques were available that would enable rivals to bypass the dealer network entirely. [72] Finally, (3) existing dealers were free to leave the Dentsply network at any time and deal in rivals' brands. [73]

The Third Circuit analyzed the government's claim entirely under §2 of the Sherman Act. [74] The panel rejected the district court's conclusion that Dentsply's rivals' failure to grow their shares was evidence of lack of aggressiveness on their part; rather, it was an effect of the defendant's exclusionary policies. [75] The court concluded:

> The evidence demonstrated conclusively that Dentsply had supremacy over the dealer network and it was at that crucial point in the distribution chain that monopoly power over the market for artificial teeth was established. The reality in this case is that the firm that ties up the key dealers rules the market. [76]

The court likened the defendant's practices to those at issue in its own earlier decision in *LePage's*. [77]

On the merits of the §2 claim, the court concluded that the standard was "not total foreclosure, but whether the challenged practices bar a substantial number of rivals or severely restrict the market's ambit." [78] The court then quoted our conclusion that

> [a] set of strategically planned exclusive dealing contracts may slow the rival's expansion by requiring it to develop alternative outlets for its products or rely at least temporarily on inferior or more expensive outlets. Consumer injury results from the delay that the dominant firm imposes on the smaller rival's growth. [79]

The court concluded:

> By ensuring that the key dealers offer Dentsply teeth either as the only or dominant choice, [Dentsply's exclusive dealing] has a significant effect in preserving Dentsply's monopoly. It helps keep sales of competing teeth below the critical level necessary for any rival to pose a real threat to Dentsply's market share. As such, [the exclusive dealing] is a solid pillar of harm to competition. *See LePage's,* 324 F.3d 141, 159 (3d Cir. 2001) ( "When a monopolist's actions are designed to prevent one or more new or potential competitors from gaining a foothold in the market by exclusionary, i.e., predatory, conduct, its success in that goal is not only injurious to the potential competitor but also to competition in general."). [80]

The court also concluded that the market contained sufficient evidence that the dealer network offered significant benefits, thus making direct sales an inferior method of distribution. For example, dealers

> provide laboratories the benefit of "one stop-shopping" and extensive credit services. Because dealers typically carry the products of multiple manufacturers, a laboratory can order, with a single phone call to a dealer, products from multiple sources. Without dealers, in most instances laboratories would have to place individual calls to each manufacturer, expend the time, and pay multiple shipping charges to fill the same orders. [81]

***©2014 Wolters Kluwer. All rights reserved.***
***Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm***

Further,

> [d]ealers also provide benefits to manufacturers, perhaps the most obvious of which is efficiency of scale. Using select high-volume dealers, as opposed to directly selling to hundreds if not thousands of laboratories, greatly reduces the manufacturer's distribution costs and credit risks. Dentsply, for example, currently sells to twenty-three dealers. If it were instead to sell directly to individual laboratories, Dentsply would incur significantly higher transaction costs, extension of credit burdens, and credit risks. [82]

The Third Circuit thus concluded that direct sales as a distributional alternative was "'viable' only in the sense that it is 'possible,' not that it is practical or feasible in the market as it exists and functions." [83] The court noted that

> Dentsply's competitors can sell directly to the dental laboratories and an insignificant number do. The undeniable reality, however, is that dealers have a controlling degree of access to the laboratories. The long-entrenched Dentsply dealer network with its ties to the laboratories makes it impracticable for a manufacturer to rely on direct distribution to the laboratories in any significant amount. [84]

While the court did not state it in so many words, the implication was that direct sales methods were inferior and perhaps survived only because of the significant price "umbrella" that Dentsply's own high prices produced.

The court also rejected the district court's conclusion that entry into the market was easy because a rival could take one of Dentsply's dealers at any time by offering a better deal:

> Entrants into the marketplace must confront Dentsply's power over the dealers. The District Court's theory that any new or existing manufacturer may "steal" a Dentsply dealer by offering a superior product at a lower price [85] simply has not proved to be realistic. To the contrary, purloining efforts have been thwarted by Dentsply's longtime, vigorous and successful enforcement actions. The paltry penetration in the market by competitors over the years has been a refutation of theory by tangible and measurable results in the real world.
>
> The levels of sales that competitors could project in wooing dealers were minuscule compared to Dentsply's, whose long-standing relationships with these dealers included sales of other dental products. For example, Dentsply threatened Zahn with termination if it started selling Ivoclar teeth. At the time, Ivoclar's projected $1.2 million in sales were 85% lower than Zahn's $8 million in Dentsply's sales. [86]

As the court concluded, when substantial economies of scope effectively require dealers to sell multiple products, a firm can impose exclusive dealing even though entry into the dealership market seems easy by other criteria. [87] Dentsply's exclusive-dealing policies effectively imposed an "all or nothing" choice on dealers: they could accept the teeth material of rival manufacturers only at the cost of giving up Dentsply business that was significantly greater and more valuable. The court then concluded:

> This case does not involve a dynamic, volatile market like that in *Microsoft,* 253 F.3d at 70, or a proven alternative distribution channel. The mere existence of other avenues of distribution is insufficient without an assessment of their overall significance to the market. The economic impact of an exclusive dealing arrangement is amplified in the stagnant, no growth context of the artificial tooth field. [88]

Because it found the conduct unlawful under §2 of the Sherman Act, the court found no need to disturb the district court's conclusion that the conduct did not violate §1 of the Sherman Act or §3 of the Clayton Act. Further,

> the Government can obtain all the relief to which it is entitled under Section 2 and has chosen to follow that path without reference to Section 1 of the Sherman Act or Section 3 of the Clayton Act. We find no obstacle to that procedure. [89]

The court then remanded to the district court for entry of judgment against the defendant.

***©2014 Wolters Kluwer. All rights reserved.***
***Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm***

**1821d5. *Other barriers to entry..*—**Finally, we note that even a high foreclosure percentage does not indicate that exclusive dealing is anticompetitive unless rival suppliers would find difficulty in setting up new firms to compete with those in the downstream market. [90]

**1821e. Relevance of exclusive dealing by defendant's rivals..—**In *Standard Stations* the Court gave weight not only to the fact that exclusive dealing was employed by Standard, whose individual market share was relatively low, but also to the fact that the practice was widespread in the industry. [91] However, the issue is complex.

*First,* if exclusive dealing results in significant economies or risk reductions for the firm engaged in it, it will have to be copied by rivals who wish to survive or retain their market shares. [92] As a distribution strategy, exclusive-dealing systems are often not particularly costly to create, and risks are often minimal. So if one firm is observed to be using exclusive dealing and prospering, we can expect other firms to follow quickly. No anticompetitive inference can be drawn from such copying, any more than such an inference can be drawn from the fact that almost all farmers use fertilizer or that all automobile manufacturers have adopted assembly-line methods of production. [93] For example, in the franchise industry for fast foods, gasoline, and perhaps other products, exclusive dealing is the norm. Häagen-Dazs as franchisor will not permit its franchisees to sell Dairy Queen ice cream and vice versa. But no inference of collusion is to be drawn. Rather, franchisors use exclusive dealing to ensure franchisee loyalty and to "commit" their stores to their brand in the eyes of customers. [94]

*Second,* our concern with foreclosure injury arises mainly when the upstream market is already dominated by one or perhaps two or three firms, and exclusive dealing impedes new entry or expansion by smaller rivals. But these concerns are minimized to the extent that the upstream market is unconcentrated to begin with. [95] For example, suppose the upstream market has ten firms and all ten impose exclusive dealing. The result is that all or at least a substantial number of downstream firms are tied up and new firms are in fact foreclosed from the market. But that fact alone need not produce significant antitrust concern, given that the ten firms are sufficient to maintain competition.

*Third,* however, industrywide adoption of a common distribution method can be evidence of collusion. As noted previously, [96] exclusive dealing may be the product of a collusion strategy that includes limiting the ability of downstream firms to force the colluding parties to bid against each other. Such an explanation becomes more likely as the exclusive dealing in any industry becomes more pervasive, particularly if alternative distribution methods are unavailable. However, if only a relatively small percentage of the market is covered by exclusive-dealing contracts or if the upstream product is widely distributed through other, nonexclusive channels, an explanation of collusion is less likely. [97]

**1821f. Alternative structural inquiry: facilitation of collusion..—**While most lawsuits challenge exclusive dealing on foreclosure grounds, exclusive dealing may also facilitate price fixing or tacit coordination of price and output. [98] Condemning exclusive dealing on this ground poses a dilemma, however: while the structural prerequisites for collusion or oligopoly are readily identified as a general matter, determining whether a particular instance of exclusive dealing has anticompetitive consequences is difficult indeed. Of course, an explicit horizontal price-fixing agreement accompanied by an explicit agreement to use exclusive dealing as a facilitator would be illegal per se.

But in most situations the question is reduced to one of how much is to be inferred from structural evidence alone. For example, we might assume that a market with four firms and high entry barriers is conducive to collusion. Further, if aggressive solicitation of competing bids by intermediaries tends to frustrate collusion, exclusive dealing might make the collusion more successful by prohibiting dealers from trading sellers off against one another. Alternatively, cartel members might employ exclusive dealing as an entry-deterrence device, which requires two-level entry and thus protects the cartel from new competition in the upstream market.

***©2014 Wolters Kluwer. All rights reserved.***
***Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm***

But not every market that seems "conducive" to collusion actually exhibits collusion, and many concentrated markets perform competitively. Further, efficient practices will be copied, and this rule applies just as robustly in markets that are structurally conducive to collusion as those that are not. Should exclusive dealing be condemned in such cases on a mere showing that collusion is more likely under exclusive dealing than without it? Or must there also be "subjective" evidence indicating that an intended consequence of exclusive dealing is renewed attempts to collude? If that requirement is assessed, few instances of collusion-facilitating exclusive dealing will be proven.

In sum, a purely objective inquiry will condemn too much, while an inquiry requiring significant subjective evidence in addition will condemn too little. The most sensible compromise seems to be one in which (1) strong objective evidence of facilitation of collusion creates an inference of anticompetitive result when the challenged exclusive dealing has no obvious efficiency explanation; but (2) this evidence is rather easily rebutted by a showing that the exclusive dealing produces efficiencies; however, (3) the efficiency evidence will be disregarded if the evidence in addition shows that an actually intended consequence of the exclusive dealing was facilitation of express or tacit collusion.

Finally, we note that a sine qua non of exclusive dealing used to facilitate collusion or oligopoly is widespread use. Exclusive dealing could hardly be a successful collusion facilitator unless firms covering at least 60 or 70 percent of a relevant market employed it. [99] Thus, for example, exclusive dealing employed by three 10 percent firms but not the firms accounting for the remaining 70 percent of the market is not likely to be a collusion facilitator.

But while widespread coverage is a necessary condition for facilitation of collusion, it is not a sufficient condition. There is a perfectly good alternative explanation for widespread exclusive dealing in a concentrated or moderately concentrated market: the exclusive dealing reduces costs. For example, suppose that in a market of five manufacturers, exclusive dealing by one of them reduces distribution costs by 10 percent. Under competition the other four will either lose market share to the one or else they will have to duplicate the cost reduction for themselves. The consequence could be simultaneous exclusive dealing by all five, and as a result of intense competition rather than any attempt at collusion. For this reason a strong showing of efficiencies rebuts a claim that exclusive dealing facilitates collusion in the absence of evidence that collusion was actually intended or is actually occurring.

Finally, exclusive dealing is less likely to facilitate collusion if the exclusive contracts are of short duration and buyers are readily able to switch, thus enabling them more frequently to force colluders to bid against one another. [100]

**Footnotes**

1 Cf. ¶¶1753 - 1754 (discussing express tying contracts).

2 See particularly ¶¶1438, 1442.

3 See ¶1442 ; *United States v. Colgate & Co.,* 250 U.S. 300, 305-306 (1919); *Howerton, Inc. v. Grace Hosp.,* 1995-2 Trade Cas. ¶71,208 (W.D.N.C.), aff'd, 96 F.3d 1438 (4th Cir. 1996) (hospital's termination of contract with plaintiff in order to enter exclusive contract with a different group a unilateral act).

However, even in the absence of an express agreement, a firm may establish a course of dealing tantamount to an agreement. See *Dillon Materials Handling, Inc. v. Albion Industries,* 567 F.2d 1299, 1302 (5th Cir.), cert. denied, 439 U.S. 832 (1978) (exclusive dealing could be inferred from series of conversations in which defendant's representative asked plaintiff to stop selling competing lines); *McElhenney Co. v. Western Auto Supply Co.,* 269 F.2d 332, 337 (4th Cir. 1959) (same; continued threats and eventual termination). See also *Barr Laboratories, Inc. v. Abbott Laboratories,* 1989-1 Trade Cas. ¶68,647 (D.N.J. 1989) (agreement need not be express; it may be inferred from surrounding

**©2014 Wolters Kluwer. All rights reserved.**
**Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm**

circumstances; concluding that defendant's volume discount program could have been facilitator of exclusive-dealing agreement; denying summary judgment).

4 *Roland Machinery Co. v. Dresser Industries,* 749 F.2d 380, 393 (7th Cir. 1984). See also *Dillon Materials*, 567 F.2d at 1306 (evidence equally consistent with proposition that plaintiff's dealership was terminated for lack of attention to sales of defendant's product rather than its sales of the products of others; thus, no agreement to engage in exclusive dealing); *McElhenney*, 269 F.2d at 337 (unilateral termination of dealers who sell the competing products of other firms not an exclusive-dealing agreement); *Leo J. Meyberg Co. v. Eureka Williams Corp.,* 215 F.2d 100 (9th Cir.), cert. denied, 348 U.S. 875 (1954) (similar); *Nelson Radio & Supply Co. v. Motorola,* 200 F.2d 911 (5th Cir. 1952), cert. denied, 345 U.S. 925 (1953) (similar). Cf. *Satellite Financial Planning Corp. v. First Natl. Bank,* 643 F. Supp. 449, 452 (D. Del. 1986) (right of first refusal without more cannot be unlawful exclusive dealing where potential buyer is free either to purchase or to walk away; in any event, creation of the right is unilateral act); *Pacific Engineering & Prod. Co. v. Kerr-McGee Corp.,* 1974-1 Trade Cas. ¶75,054 (D. Utah. 1974) (no unlawful exclusive dealing in absence of contract).

5 *Roland*, 749 F.2d at 393, citing *Monsanto Co. v. Spray-Rite Service Corp.,* 465 U.S. 752, 764 n.9 (1984).

6 *Virginia Vermiculite, Ltd. v. Historic Green Springs, Inc.,* 307 F.3d 277 (4th Cir. 2002), cert. denied, 538 U.S. 998 (2003).

7 See ¶1474c in the main text and Supplement.

8 *United Air Lines, Inc. v. Austin Travel Corp.,* 681 F. Supp. 176 (S.D.N.Y. 1988), aff'd, 867 F.2d 737 (2d Cir. 1989) (unilateral decision to buy from a single supplier not exclusive dealing). See ¶1441. See also Richard M. Steuer, Customer-Instigated Exclusive Dealing, 68 Antitrust L.J. 239 (2000).

9 On output contracts, see ¶1803.

10 *Copperweld Corp. v. Independence Tube Corp.,* 467 U.S. 752 (1984); see Ch. 14E.

11 See *Advanced Health-Care Servs., Inc. v. Radford Community Hosp.,* 910 F.2d 139, 152 (4th Cir. 1990) (rejecting claim of exclusive dealing between hospital and subsidiary of sibling corporation); *M & M Medical Supplies & Serv., Inc. v. Pleasant Valley Hosp, Inc.,* 738 F. Supp. 1017, 1022-1023 (S.D. W. Va. 1990) (same). But see *Ralph Kearney & Sons, Inc. v. Emerson Electric Co.,* 1996 WL 502315 (E.D. Pa. 1996) (unreported), which concluded that the plaintiff stated a complaint of exclusive dealing in its allegations that Emerson, which had formerly purchased the plaintiff's electric motors for its ventilators, acquired certain productive assets and began making its own electric motors, thus terminating its relationship with the plaintiff; of course, the vertical merger might be illegal, but the post-merger self-dealing provision cannot be characterized as exclusive dealing).

12 See ¶1800c5 ; see also ¶¶767 - 769, which discuss various types of exclusive contracting under the general rubric of monopolization; and see *United States v. Microsoft Corp.,* 253 F.3d 34, 69 (D.C. Cir.), cert. denied, 534 U.S. 952 (2001) (condemning exclusivity requirements that amounted to exclusive dealing under §2 but not §1) (to the extent it is relevant, H.H. was consulted by the federal and some state plaintiffs); and see *LePage's v. 3M,* 324 F.3d 141 (3d Cir. 2003) (en banc), cert. denied, 542 U.S. 953 (2004) (condemning defendant's bundled discounts under §2 while refusing to hold them unlawful under Sherman Act §1 or Clayton Act §3). On *LePage's,* see ¶749 in the Supplement.

13 However, the market itself may impose de facto limits on switching. See ¶1802g3.

14 See ¶1807b ; the tying-arrangement equivalent is package discounts, discussed in ¶1758.

15 See 15 U.S.C. §14.

16 See ¶1807b.

17 See ¶1758b.

18 See *Ron Tonkin Gran Turismo v. Fiat Distributors, Inc.,* 637 F.2d 1376, 1389 (9th Cir. 1981) (unaccepted offer not an exclusive-dealing "agreement").

***©2014 Wolters Kluwer. All rights reserved.***
***Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm***

19 *Pacifica Kidney Ctr., Inc. v. National Medical Care, Inc.,* 995 F.2d 232, 1993 WL 190858 (9th Cir. 1993) (unpublished) (not unlawful exclusive dealing for hospital to recommend that outpatients use a particular kidney dialysis provider where patients were in fact free to use a different provider). See *Digene Corp. v. Third Wave Tech., Inc.,* 323 Fed. Appx. 902, 2009 WL 886301 (Fed. Cir. Apr. 1, 2009) (unpublished) (nonexclusive contract to sell defendant's FED testing kit did not violate antitrust laws, since customers were able to purchase from others as well); *Jensen Enters., Inc. v. Oldcastle Precast, Inc.,* 2009 WL 440492, 2009-1 Trade Cas. ¶76,508 (N.D. Cal. Feb. 23, 2009), aff'd, 375 Fed. Appx. 730 (9th Cir. 2010) (telephone company's reimbursement plan for concrete vaults for land-line telephone equipment installed in buildings did not unlawfully exclude plaintiff); see a later opinion, 2009 WL 1068887, 2009-1 Trade Cas. ¶76,606 (N.D. Cal. Apr. 17, 2009) (denying reconsideration); *Invacare Corp. v. Respironics, Inc*., 2008 WL 906112, 2008-1 Trade Cas. ¶76,143 (N.D. Ohio Mar. 31, 2008) (inducements that supplier gave to sleep lab customers, including free masks and other products, did not give rise to inference that they created a long-term agreement to deal exclusively in defendant's products; and in any event the agreements were not anticompetitive even if they did exist). See also *Imaging Center, Inc. v. Western Maryland Health Systems, Inc.,* 2004 WL 3168776, 2004-2 Trade Cas. ¶74,566 (D. Md. Aug. 10, 2004), aff'd, 158 Fed. Appx. 413 (4th Cir. 2005) (no exclusive dealing or unlawful boycott in health system's physicians' referrals to radiology clinics affiliated with the system when there was no evidence that the physicians were coerced into doing so or suffered any adverse consequences for referring to other clinics); *Rome Ambulatory Surgical Center, LLC v. Rome Memorial Hosp., Inc.*, 349 F. Supp. 2d 389 (N.D.N.Y. 2004) (refusing to dismiss complaint that hospital's exclusive contracts with insurers to provide ambulatory care was unlawful exclusive dealing, and that its refusal to refer patients to plaintiff ambulatory clinic was de facto exclusion); *Mountain Area Realty, Inc. v. Wintergreen Partners, Inc.*, 2007 WL 4561293, 2007-2 Trade Cas. ¶75,990 (W.D. Va. Dec. 21, 2007) (plaintiff realtor made sufficient allegations that agreement between resort and competing realtor giving latter exclusive right to operate real estate office on resort property constituted unlawful vertical restraint). Cf. *Stitt Spark Plug Co. v. Champion Spark Plug Co.,* 840 F.2d 1253, 1257-1258 (5th Cir.), cert. denied, 488 U.S. 890 (1988) (seller's incentives to engage in exclusive dealing, unaccompanied by any sanctions for not doing so, not unlawful); *Beverage Mgmt., Inc. v. Coca-Cola Bottling Corp.,* 653 F. Supp. 1144, 1146, 1154 (S.D. Ohio 1986) (incentives to produce advertising promoting one brand exclusively, but no pressure to deal exclusively in that brand, did not amount to exclusive dealing).

20 *Empire Volkswagen v. World-Wide Volkswagen Corp.,* 814 F.2d 90, 97 (2d Cir. 1987). Accord *Kellam Energy, Inc. v. Duncan,* 668 F. Supp. 861, 883-884 (D. Del. 1987) (arrangement that required plaintiff to resell defendant's gasoline exclusively at specified stores in its chain but not at other stores not exclusive dealing—but query: suppose the stores were in different geographic markets; should anticompetitive exclusive dealing in one market be defended by proof that the plaintiff also owned stores in a different market?).

21 See *R & G Affiliates, Inc. v. Knoll International,* 587 F. Supp. 1395 (S.D.N.Y. 1984) ( "preferential" contracts not exclusive dealing; nor was defendant's noncoercive suggestion that plaintiff reduce its purchases of rivals' products); *W.H. Brady Co. v. Lem Products,* 659 F. Supp. 1355 (N.D. Ill. 1987) (holding that nonbinding estimates of needs for inputs and price quotes do not constitute exclusive dealing; nor did contracts requiring that plaintiff purchase a specified amount of defendant's product). See also *R.J. Reynolds Tobacco Co. v. Philip Morris, Inc.,* 199 F. Supp. 2d 362 (M.D.N.C. 2002), aff'd per curiam, 67 Fed. Appx. 810, 2003 WL 21456688 (4th Cir. 2003) (defendant's granting of discounts to retailers in exchange for a display format that discriminated against rivals' brands was not exclusive dealing; judgment for defendant after finding inadequate power and foreclosure).

22 See ¶1812.

23 See ¶1807b2 ; and see *Concord Boat Corp. v. Brunswick Corp.,* 207 F.3d 1039 (8th Cir.), cert. denied, 531 U.S. 979 (2000) (market-share discounts did not amount to unlawful de facto exclusive dealing because the discount programs "did not require the boatbuilders to commit to Brunswick for any specified period of time." Id. at 1059. “They were free to walk away from the discounts at any time, and they in fact switched to

***©2014 Wolters Kluwer. All rights reserved.***
***Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm***

OMC engines at various points when that manufacturer offered superior discounts. Further, there was no showing of high entry barriers into the boat engine market.) (To the extent it is relevant, H.H. was consulted by the defendant after trial.) By contrast, in *Conwood Co. v. United States Tobacco Co.,* 290 F.3d 768 (6th Cir. 2002), cert. denied, 537 U.S. 1148 (2003), the Sixth Circuit appeared indifferent to duration. The court indiscriminately applied §2 to condemn tortious display rack removals along with agreements with retailers to use the defendant's racks, category management agreements, and agreements giving retailers small discounts in exchange for provision of sales information. All agreements were either terminable at will or of unspecified duration. But an agreement to use a firm's display rack to display all brands necessarily excludes much less than an agreement to sell only that firm's brands and does not exclude at all if the retailer is free to switch to a different rack at any time. (To the extent it is relevant, H.H. was consulted by the defendant after trial.)

See also *Minnesota Assn. of Nurse Anesthetists v. Unity Hospital,* 208 F.3d 655 (8th Cir. 2000) (not exclusive dealing when hospitals, acting unilaterally, agreed with anesthesiology firms that the latter would provide their own nurse anesthetists rather than previous regime in which anesthetists and anesthesiologists contracted with the hospital separately; anesthetists were still being used, but they were brought in by the anesthesiology firms themselves).

24 See *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435 (4th Cir. 2011) (following this approach).

25 See ¶570.

26 *Tampa Electric Co. v. Nashville Coal Co.,* 365 U.S. 320 (1961). See generally ¶1801i ; on why the larger coal market is the relevant one, see ¶570b. Justice O'Connor's concurring opinion in *Jefferson Parish* suggested the same. In assessing a contract under which one anesthesiological firm agreed to be exclusive provider of anesthesiological services to a hospital, thus excluding the plaintiff anesthesiologist from access to that hospital, she noted that even without a detailed analysis of the market at issue one could see that no harm to competition resulted. *Jefferson Parish Hospital District No. 2 v. Hyde,* 466 U.S. 2, 46 (1984).

27 Cf. *Jefferson Parish*, 466 U.S. 2.

28 See ¶1802d.

29 See *Balaklaw v. Lovell,* 14 F.3d 793 (2d Cir. 1994) (relevant market is area in which anesthesiologists competed for jobs; here, hospital solicited contracts from anesthesiologists in several states); *Collins v. Associated Pathologists, Ltd.,* 844 F.2d 473, 479 (7th Cir.), cert. denied, 488 U.S. 852 (1988):

> In determining whether this exclusive arrangement forecloses competition, the focus is upon competition between pathologists for the right to practice at St. John's [Hospital]. So the contract must be viewed in light of its effect on pathologists competing for work, not from the effect on patients at St. John's, whose options are limited. Thus the market that must be determined is that in which pathologists compete for jobs.

See also *Howerton, Inc. v. Grace Hosp.,* 1995-2 Trade Cas. ¶71,208 (W.D.N.C.) (exclusive radiology contract to be tested in national market for radiology services); *Ryko Mfg. Co. v. Eden Services,* 823 F.2d 1215, 1233-1235 (8th Cir. 1987), cert. denied, 484 U.S. 1026 (1988) (exclusive dealing imposed by national manufacturer of car-washing equipment on local dealer to be measured by foreclosure in national market for the equipment). But see *Parikh v. Franklin Medical Center,* 940 F. Supp. 395 (D. Mass. 1996) (incorrectly looking only at the market in which the hospital served customers; antitrust defendant had been state court plaintiff trying to enforce exclusivity provision in his anesthesiology contract). Cf. *Campfield v. State Farm Mut. Auto. Ins. Co.*, 532 F.3d 1111 (10th Cir. 2010) (exclusive-dealing claim failed because of inadequate market definition).

30 Cf. *Standard Fashion Co. v. Magrane-Houston Co.,* 258 U.S. 346, 354 (1922). See ¶1801b.

***©2014 Wolters Kluwer. All rights reserved.***
***Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm***

31 Recommended market shares and percentages are given in ¶c1. Cf. the Justice Department Vertical Restraints Guidelines, which were issued in 1985 but withdrawn in 1993, at §3.22:

> …[F]or exclusive dealing to facilitate anticompetitive exclusion, the following market conditions normally must be met:
>
> The "nonforeclosed market" is concentrated and leading firms in the market use the restraint;
>
> The firms subject to the restraint control a large share of the "foreclosed market"; and
>
> Entry into the "foreclosed market" is difficult.
>
> Anticompetitive exclusion is not likely to result from exclusive dealing arrangements if any of these conditions is absent.

50 Fed. Reg. 6,263, 6,267 (1985).

32 See ¶1807d.

33 See ¶1822.

34 *Stop & Shop Supermarket Co. v. Blue Cross & Blue Shield of Rhode Island*, 373 F.3d 57, 68 (1st Cir. 2004) ( "For exclusive dealing, foreclosure levels are unlikely to be of concern where they are less than 30 or 40 percent," citing Herbert Hovenkamp, Federal Antitrust Policy, 436-437 & nn.43-45 (2d ed. 1999)). See also *Stop & Shop*, id. at 68 (even a high foreclosure percentage would not establish unlawfulness in an exclusive-dealing case in the absence of other factors such as economies of scale or entry barriers, citing ¶1820b, d in an earlier edition); *Retina Associates, P.A. v. Southern Baptist Hospital of Florida, Inc.,* 105 F.3d 1376 (11th Cir. 1997) (15 percent foreclosure insufficient); *Barr Laboratories v. Abbott Laboratories,* 978 F.2d 98, 110-111 (3d Cir. 1992) (15 percent insufficient where manufacturer needed assurance of outlets); *Ryko*, 823 F.2d at 1234 (8-10 percent insufficient); *Satellite Television & Associated Resources, Inc. v. Contractual Cablevision of Virginia, Inc.,* 714 F.2d 351 (4th Cir. 1983), cert. denied, 465 U.S. 1027 (1984) (8 percent insufficient); *Magnus Petroleum Co. v. Skelly Oil Co.,* 599 F.2d 196, 204 (7th Cir. 1979) (1 percent insufficient); *American Motor Inns, Inc. v. Holiday Inns, Inc.,* 521 F.2d 1230, 1252 (3d Cir. 1975) (14.7 percent insufficient); *Cornwell Quality Tools Co. v. C.T.S. Co.,* 446 F.2d 825, 831 (9th Cir. 1971), cert. denied, 404 U.S. 1049 (1972) (10-15 percent insufficient); *Bepco, Inc. v. Allied-Signal, Inc.,* 106 F. Supp. 2d 814, 828 (M.D.N.C. 2000) (foreclosure percentages of 18.5 percent and 21.5 percent lie on the margin of any threshold; citing main text; these percentages insufficient in the absence of other evidence showing substantial foreclosure injury, especially where "the record also makes plain that during the time period in question the aftermarkets for compressors and valves were marked by vigorous competition among some forty (40) firms, expansion of production by rivals to Allied Signal, and entry by new competitors"); *Kidd v. Bass Hotels & Resorts, Inc.,* 136 F. Supp. 2d 965 (E.D. Ark. 2000) (hotel franchisor's requirement that franchisees upgrade with furniture from a single furniture manufacturer not unlawful exclusive dealing where hotel chain accounted for only 9 percent of national total); *Hendricks Music Co. v. Steinway, Inc.,* 689 F. Supp. 1501, 1506-1507 (N.D. Ill. 1988) (1.75 percent of acoustic pianos insufficient; rejecting claim of relevant submarket of "concert grand pianos," in which Steinway's share was 48 percent); *T.A.M. v. Gulf Oil Corp.,* 553 F. Supp. 499, 505-506 (E.D. Pa. 1982) (7 percent of sales; 5 percent of outlets insufficient); *JBL Enterprises, Inc. v. Jirmack Enterprises, Inc.,* 509 F. Supp. 357, 379 (N.D. Cal. 1981) (less than 5 percent insufficient); *Beltone Electronics Corp.,* 100 F.T.C. 68, 184 (1982) (7-8 percent foreclosure insufficient). Some decisions approve significantly higher percentages. E.g., *Sewell Plastics, Inc. v. Coca-Cola Co.,* 720 F. Supp. 1196, 1213-1214 (W.D.N.C. 1989), aff'd in part, 912 F.2d 463 (4th Cir. 1990), cert. denied, 498 U.S. 1110 (1991). *Cf. United States v. Microsoft Corp.,* 253 F.3d 34, 70 (D.C. Cir. 2001) (dicta suggesting a 40 percent requirement, although issue not faced because government had not appealed the district court's finding of legality).

Cf. *B & H Medical, LLC v. ABP Administration, Inc.*, 526 F.3d 257 (6th Cir.), subsequent determination, 534 F.3d 801 (6th Cir. 2008) (showing that physician network's exclusive contracts covered 46 percent

**©2014 Wolters Kluwer. All rights reserved.**
**Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm**

of retail outlets in Michigan failed as a matter of law when there was no evidence from which market-share figures could be drawn; defendant's expert provided evidence that these outlets in fact accounted for only 6 or 7 percent of the trade involved). See also *Linzer Prods. Corp. v. Chandra Sekar*, 499 F. Supp. 2d 540 (S.D.N.Y. 2007) (patent-licensing agreement forbidding paint roller licensee/manufacturer from making paint rollers not covered by the patent not unlawful absent sufficient allegations of relevant market); *Republic Tobacco Co. v. North Atlantic Trading Co., Inc.*, 381 F.3d 717 (7th Cir. 2004), rev'd in part, aff'd in part *,* 481 F.3d 442 (7th Cir. 2007) (dismissing exclusive dealing—in this case, an exclusive distributorship—counterclaim for lack of evidence of relevant geographic market). The subsequently withdrawn Department of Justice Vertical Restraints Guidelines, 50 Fed. Reg. 6,263, 6,269 (1985), would find a relatively absolute "safe harbor" for foreclosure percentages of 10 percent or less.

35 E.g., *Oltz v. St. Peter's Community Hosp.,* 656 F. Supp. 760, 763 (D. Mont. 1987), aff'd, 861 F.2d 1440 (9th Cir. 1988) (84 percent unlawful, but computed in a local supply market); *United States v. Dairymen, Inc.,* 1985-1 Trade Cas. ¶66,638, at 66,156, 758 F.2d 654 (6th Cir.), cert. denied, 474 U.S. 822 (1985) (50 percent unlawful); *Kohler Co. v. Briggs & Stratton Corp.,* 1986-1 Trade Cas. ¶67,047 (E.D. Wis.) (62 percent sufficient; preliminary injunction).

36 See *Jefferson Parish Hospital District No. 2 v. Hyde,* 466 U.S. 2 (1984).

37 E.g., *FTC v. Motion Picture Advertising Service Co.,* 344 U.S. 392 (1953) (40 percent unlawful); *Twin City Sportservice, Inc. v. Charles O. Finley & Co.,* 676 F.2d 1291, 1298 (9th Cir.), cert. denied, 459 U.S. 1009 (1982) (24 percent unlawful when contracts were for long term); *Luria Bros. & Co. v. Federal Trade Commission,* 389 F.2d 847 (3d Cir.), cert. denied, 393 U.S. 475 (1968) (condemning both 21 percent and 34 percent, depending on market definition). See also *Adolph Coors Co.,* 83 F.T.C. 32, aff'd, 497 F.2d 1178 (10th Cir. 1974), cert. denied, 419 U.S. 1105 (1975) (suggesting that if upstream market power is found, any amount of foreclosure is unlawful).

38 See, e.g., *Barry Wright Corp. v. ITT Grinnell Corp.,* 724 F.2d 227, 237 (1st Cir. 1983) (even 50 percent okay if there were only "limited anticompetitive effects"); *Sewell Plastics,* 720 F. Supp. at 1212-1214 (40 percent insufficient); *Servicetrends, Inc. v. Siemens Medical Systems, Inc.,* 870 F. Supp. 1042 (N.D. Ga.), amended, 1995-1 Trade Cas. ¶70,901 (N.D. Ga. 1994) (even 38 percent insufficient in the presence of business justifications); *Kuck v. Bensen,* 647 F. Supp. 743 (D. Me. 1986) (37 percent lawful); *Gonzalez v. Insignares,* 1985-2 Trade Cas. ¶66,701, at 63,335 (N.D. Ga. 1985) (40 percent coverage of exclusive contract for anesthesia services not necessarily unreasonable; court expresses doubt about geographic market definition, noting that plaintiff himself provided services outside the defined market).

And see *Eastern Food Services v. Pontifical Catholic Univ. Services Assn.,* 357 F.3d 1 (1st Cir. 2004). The plaintiff had previously had an exclusive contract to supply defendant university's soft drink machine vending, but then the university entered into exclusive contract with Coca-Cola and plaintiff was ousted. The court rejected the proposition that the new exclusive contract should be tested in a market that consisted of the university itself, in part because of the power that the university had over students:

> Here, perhaps University Services has power in an economic market: after all, it can set the prices charged students for food simply by making itself the sole distributor. In fact, whether it has power to raise price to a non-competitive level depends on how easy it is for students to find other nearby food suppliers. In any event, if the university has power to charge high prices to those on campus, it can be exploited without regard to whether it contracts with Coca Cola or Eastern or does the job itself.

The court also observed that

> [s]o far as Eastern's [the plaintiff's] competitive access to customers is concerned, the key question in market definition is what other customers Eastern and its competitors can supply and with what. Here, Eastern described in its complaint the product as vending machine sales and the geographic area of competition as the university campus.

***©2014 Wolters Kluwer. All rights reserved.***
***Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm***

Citing ¶¶782a, 1800a, 1802 - 1807, 1810 - 1814, 1821b, c, 501 in a previous edition. The question is not what market Eastern supplied in fact, but what market it and similarly situated firms reasonably could have supplied. The University was only a small portion of the community. In this case, which involved a motion to dismiss, the court approved judicial notice of the fact that a soft drink vendor would readily be able to service the entire community:

> [T]he district court was entitled to take notice that Ponce is a major city in Puerto Rico and, as a matter of common experience, to recognize that food and beverage machines are customarily accessible at a host of public and business points within cities. The idea that one university campus represents even a majority of the vending machine sales in a large city is so improbable that Eastern's own brief makes no such suggestion. Quite possibly (note Eastern's location in San Juan) distribution is an island-wide business, but it is enough that it is at least municipal.

The court also noticed a Web site giving the population of Ponce as 194,000, and that of the university student body as 7,150, or roughly 3.5 percent of the total.

39 *Brown Shoe Co.,* 62 F.T.C. 679, 714 (1963), rev'd, 339 F.2d 45 (8th Cir. 1964), rev'd, 384 U.S. 316, 319 (1966); see ¶1801j. See also *L.G. Balfour Co. v. FTC,* 442 F.2d 1 (7th Cir. 1971) (following *Brown Shoe*; no need to measure foreclosure under FTC Act §5, although it would be required under Clayton Act §3).

40 See *Beltone Electronics Corp.,* 100 F.T.C. 68, 184 (1982) (7-8 percent foreclosure insufficient).

41 See *Jefferson Parish Hospital District No. 2 v. Hyde,* 466 U.S. 2, 7 (1984).

42 Id. at 46. See also *Eastern Food Services v. Pontifical Catholic Univ. Services Assn.,* 357 F.3d 1 (1st Cir. 2004).

43 See *Oltz v. St. Peter's Community Hosp.,* 656 F. Supp. 760, 763 (D. Mont. 1987), aff'd, 861 F.2d 1440 (9th Cir. 1988).

44 *Oltz,* 861 F.2d at 1446.

45 Ibid.:

> The contract affected consumers who elected to have surgery at the defendant hospital by foreclosing the option of selecting, or having their surgeon select, the plaintiff or others to administer anesthesia. The contract affected providers of anesthesia services because it precluded the hospital from offering staff privileges to anyone but the exclusive group of anesthesiologists.

46 See ¶1802d3. The plaintiff also alleged, and the Ninth Circuit approved, a finding of a horizontal boycott among the hospital's staff anesthesiologists and the hospital itself directed against the plaintiff; that agreement is more plausible in a local market, although the willingness of the hospital to be a participant must be explained, given that the hospital is vertically related to anesthesiology and stands to benefit from low anesthesiologist prices. See *Oltz*, 861 F.2d at 1444-1445. The horizontal agreement—but not the exclusive-dealing agreement—would explain the district court's finding that anesthesiology prices rose as a result of the restraint. Presumably, high-priced anesthesiologists excluded lower-priced nurse anesthetists. See id. at 1448. On the hospital as participant in an anticompetitive conspiracy of its staff, see ¶¶1471 - 1472.

47 *See Collins v. Associated Pathologists, Ltd.,* 844 F.2d 473, 479 (7th Cir.), cert. denied, 488 U.S. 852 (1988).

48 The court noted as evidence of a national market that advertising for positions appeared in nationally published medical journals, including the New England Journal of Medicine; that the College of American Pathologists ran a national placement list; and that the plaintiff himself had previously practiced in Brooklyn, New York, Illinois, and San Leandro, California.

49 844 F.2d at 479-480, referring to 676 F. Supp. at 1395.

50 See ¶1802d3 and its accompanying Figure 1.

***©2014 Wolters Kluwer. All rights reserved.***
***Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm***

51 ¶1807d.

52 See *United States v. American Can Co.,* 230 F. 859 (D. Md. 1916), appeal dismissed, 256 U.S. 706 (1921); and ¶1801a.

53 See *Paddock Publications Inc. v. Chicago Tribune Co.,* 103 F.3d 42, 43-44 (7th Cir. 1996), cert. denied, 520 U.S. 1265 (1997) (output contract between news service and newspaper could not be anticompetitive when news service market had numerous alternative suppliers); *Holmes Products Corp. v. Dana Lighting, Inc.,* 958 F. Supp. 27 (D. Mass. 1997) (lamp buyer who insisted that supplier not deal with rival did not engage in unlawful "exclusive dealing" (in fact, it was an exclusive output contract) where there were hundreds of rival lamp manufacturers).

54 E.g., see *Beltone Electronics Corp.,* 100 F.T.C. 68, 204, 209 (1982):

> If, as the precedents seem to suggest, the degree of foreclosure caused by the exclusivity indicates without serious doubt that the party imposing exclusive contracts possesses substantial market power, then that foreclosure will be a more significant factor of the case against the restraint. Where the degree of foreclosure is less substantial, other measures of market performance are more likely to determine the overall effect of the restraint on competition.

55 On exclusive dealing raising rivals' costs, see ¶1804.

56 See *Jefferson Parish Hospital District No. 2 v. Hyde,* 466 U.S. 2 (1984).

57 On injury-in-fact, see ¶338.

58 For example, see *Roland Machinery Co. v. Dresser Industries,* 749 F.2d 380 (7th Cir. 1984) (antitrust claim by dealer upon whom exclusive dealing was imposed); *Queen City Pizza, Inc. v. Domino's Pizza, Inc.,* 922 F. Supp. 1055, 1059 (E.D. Pa. 1996), aff'd, 124 F.3d 430 (3d Cir. 1997), cert. denied, 523 U.S. 1059 (1998) (same; franchisee).

59 *Roland Machinery,* 749 F.2d at 394. The plaintiff was a dealer objecting to exclusive dealing imposed on itself by Dresser. But an alternative manufacturer, Komatsu, was significantly larger than Dresser and seemed quite able to set up its own dealerships. The court also noted:

> On the present record it appears that Komatsu cannot be kept out of the central Illinois market even if every manufacturer of construction equipment prefers exclusive dealers and will cancel any dealer who switches to the Komatsu line. Komatsu is the second largest manufacturer of construction equipment in the world. Its total sales of such equipment are four times as great as Dresser's. Already it is a major factor in the U.S. construction-equipment market; in some items it outsells Dresser. The nationwide practice of exclusive dealing has not kept Komatsu from becoming a major factor in the U.S. market, apparently in a short period of time. The reason is evident. Since dealership agreements in this industry are terminable by either party on short notice, Komatsu, to obtain its own exclusive dealer in some area, has only to offer a better deal to some other manufacturer's dealer in the area. It need not fear being sued for interference with contract; Roland would not be breaking its contract with Dresser if it gave Dresser the heave-ho, provided it gave 90 days' notice. Maybe if Roland had known that it would be cut off by Dresser as soon as it was, it would have demanded some guarantees from Komatsu to tide it over the period of transition when Komatsu was not yet as well established a name in central Illinois as Dresser (though Dresser itself was in a sense new to the market); and probably Komatsu would have given Roland these guarantees to get a foothold in the central Illinois market. The likeliest consequence of our dissolving the preliminary injunction would be to accelerate Komatsu's efforts to promote its brand through the Roland dealership.

Ibid. See also *Taggart v. Rutledge,* 657 F. Supp. 1420 (D. Mont. 1987), aff'd, 852 F.2d 1290 (9th Cir. 1988) (even high foreclosure percentage does not establish illegality where competition is flourishing and new suppliers are not in fact foreclosed from entering the upstream market). And see *U.S. Healthcare, Inc. v. Healthsource, Inc.,* 986 F.2d 589, 596 (1st Cir. 1993) (possible foreclosure of 25 or 87 percent

**©2014 Wolters Kluwer. All rights reserved.**
***Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm***

of physicians who opted to serve defendant's health care program exclusively, depending on market definition; but exclusivity provisions could be canceled on 30 days' notice; further, large number of uncommitted physicians were available notwithstanding high apparent foreclosure percentage); *Westman Commission Co. v. Hobart Intl.,* 796 F.2d 1216 (10th Cir. 1986), cert. denied, 486 U.S. 1005 (1988) (vigorous competition among resellers of restaurant supply equipment undermined plaintiff reseller's claim of unlawful exclusive dealing); *Ralph C. Wilson Industries v. Chronicle Broadcasting Co.,* 794 F.2d 1359 (9th Cir. 1986) (exclusive television programming contracts simply created variety among television stations; not shown to keep stations out of the market); *Joyce Beverages of New York v. Royal Crown Cola Co.,* 555 F. Supp. 271 (S.D.N.Y. 1983) (robust interbrand competition tends to make exclusive dealing competitively harmless); *Sterling Merchandising, Inc. v. Nestle, S.A.*, 724 F. Supp. 2d 245 (D.P.R. 2010) (dismissing complaint where most exclusive agreements were from one to two years in duration, although a few were for three years, but foreclosure shares were generally below 30 percent). Cf. *Natchitoches Parish Hosp. Serv. Dist. v. Tyco Intl. Ltd.,* 2009 WL 4061631 (D. Mass. Nov. 20, 2009) (dubious conclusion that contract enforcement activity should be counted as exacerbating factor in assessing anticompetitive potential of market-share discounts contracts; here, "sales representatives reviewed member-hospitals' purchasing activity to determine each member's compliance with market share commitments, and furthermore, required members to disclose their purchase records for review"; however, foreclosure on the basis of a market-share purchase contract is computed on the premise that the contract is being enforced according to its terms; on the other hand, lack of enforcement might indicate that a contract forecloses less than its terms suggest).

60 See, e.g., *Omega Environmental v. Gilbarco,* 127 F.3d 1157, 1162-1164 (9th Cir. 1997), cert. denied, 525 U.S. 812 (1998) (approving exclusive dealing where initial contract period was for one year and thereafter contract was terminable by either party on 60 days' notice); *Thompson Everett, Inc. v. National Cable Adver., L.P.,* 57 F.3d 1317, 1326 (4th Cir. 1995) (approving one-year contracts); *Balaklaw v. Lovell*, 14 F.3d 793, 799 (2d Cir. 1994) (approving three-year exclusive anesthesiological services contract with six months' notice provision as preserving ample "opportunities for competition"—"such a situation may actually encourage, rather than discourage, competition, because the incumbent and other, competing anesthesiology groups have a strong incentive continually to improve the care and prices they offer in order to secure the exclusive positions); *U.S. Healthcare*, 986 F.2d at 596 (approving 30-day provision); *Ferguson v. Greater Pocatello Chamber of Commerce, Inc.,* 848 F.2d 976, 982 (9th Cir. 1988) (approving six-year exclusivity provision in lease); *Konik v. Champlain Valley Physicians Hosp. Medical Center,* 733 F.2d 1007, 1014-1015 (2d Cir.), cert. denied, 469 U.S. 884 (1984) (same; six-month notice period in anesthesiology contract); *Roland*, 749 F.2d at 395 (less than one year presumptively lawful); *Barry Wright Corp. v. ITT Grinnell Corp.,* 724 F.2d 227, 236-238 (1st Cir. 1983) (two-year limitation okay); *Bepco, Inc. v. Allied Signal, Inc.,* 106 F. Supp. 2d 814, 828 (M.D.N.C. 2000) (short termination clause requiring 30-day notice undermined claim of unlawful exclusive dealing; citing main text); *Satellite Financial Planning Corp. v. First Natl. Bank of Wilmington,* 633 F. Supp. 386, 397 (D. Del. 1986) (180-day notice provision okay). Situations finding the duration excessive include *Twin City Sportservice, Inc. v. Charles O. Finley & Co.,* 676 F.2d 1291, 1307-1308 (9th Cir. 1982) (ten-year term invalid); *United States v. American Can Co.,* 87 F. Supp. 18, 29 (N.D. Cal. 1949) (five years too long); *Great Lakes Carbon Corp.,* 82 F.T.C. 1529, 1668-1669 (1973) (output contract; 7 to 20 years excessive).

61 See ¶748e, which suggests a way of analyzing such contracts. Cf. *Natchitoches Parish Hosp. Serv. Dist. v. Tyco Intl., Ltd.,* 2009 WL 4061631 (D. Mass. Nov. 20, 2009) (suggesting that a contract with no termination provision but offering above-cost market-share discounts could be counted as being long if loss of the discount applied retroactively to purchases already made; of course, in that case the duration of the contract could not be counted as longer than the duration of the "reach back" period, which was not specified; for example, a contract that provided for retroactive loss of rebate over the calendar year if the purchaser should switch too many purchases would have a duration of one month if the switch occurred on February 1, or 11 months if it occurred on December 1; the plaintiff's claimed damages were for monopoly

***©2014 Wolters Kluwer. All rights reserved.***
***Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm***

overcharges; in any event the court did not provide numbers from which one could compute whether the contract could exclude an equally efficient rival).

62 See *Ticketmaster Corp. v. Tickets.com, Inc.*, 127 Fed. Appx. 346, 2005 WL 824095, 2005-1 Trade Cas. ¶74,745 (9th Cir. Apr. 11, 2005) (unpublished) (Ticketmaster's exclusive contracts of six years' average duration were not excessive because individual venues came up for rebidding frequently and the plaintiff was an active bidder for these renewals. In this case, on average, 16 percent of Ticketmaster's overall venues, and 26 percent of its top 150 venues, came up for renewal each year. "[A]ll customers might contract to buy exclusively from incumbents and yet allow effective entry if 20 percent of the contracts expire monthly (or even annually)," quoting *Omega Envtl., Inc. v. Gilbarco, Inc.,* 127 F.3d 1157, 1164 (9th Cir. 1997), cert. denied, 525 U.S. 812 (1998), which was in turn quoting an earlier version of ¶421f. The court also held that this conduct did not constitute exclusionary behavior under §2 of the Sherman Act, apparently under the same test. See also *Sterling Merchandising, Inc. v. Nestle, S.A.,* 724 F. Supp. 2d 245 (D.P.R. 2010) (contracts between ice cream distributor and Puerto Rico retailers that gave the former exclusive rights in retailer freezer display space for ice cream never exceeded 30.8 percent and averaged just under 27 percent over complaint period, dropping to under 20 percent the final year).

63 For this reason the Eighth Circuit correctly concluded in *Concord Boat* that boat builders' immediate ability to switch undermined exclusion claims. By contrast, the Sixth Circuit concluded incorrectly in *Conwood Co. v. United States Tobacco Co.,* 290 F.3d 768 (6th Cir. 2002), cert. denied, 537 U.S. 1148 (2003), that the defendant's agreements with retailers to use its multibrand racks were exclusionary even though the agreements were apparently terminable at will. Although some of the rack replacements were done without any agreement with retailers, the court did not require the plaintiff to show how many were done by agreement and how many were not, and then permitted a damage award predicated on the assumption that all were unlawful.

64 See *Super Premium Ice Cream Distribution Antitrust Litigation,* 691 F. Supp. 1262, 1268 (N.D. Cal. 1988), aff'd sub nom. *Haagen-Dazs Co. v. Double Rainbow Gourmet Ice Creams, Inc.,* 895 F.2d 1417 (9th Cir. 1990) (unpublished), a §2 case where the offense was never denominated "exclusive dealing," but the plaintiff's distributorship was terminated because it distributed the brand of a second ice cream maker as well. The courts noted that in the years preceding the litigation so-called super premium ice cream had become widely distributed in supermarkets as well as in specialty stores, and in the supermarkets it competed with both other brands and lower grades of ice cream). See also *CDC Technologies, Inc. v. IDEXX Labs., Inc.,* 7 F. Supp. 2d 119 (D. Conn. 1998), aff'd, 186 F.3d 74 (2d Cir. 1999): exclusive dealing has anticompetitive effects only when alternative buyers or sellers are "frozen out" of the market; "[w]here market competitors may reach ultimate product consumers by using existing, or potential, alternate channels of distribution, an exclusive distributorship agreement may not foreclose competition in the market." Id. at 121; and "Where the undisputed evidence shows that CDC continued to reach end-users in the relevant market, absent any other demonstration of anticompetitive effect, IDEXX's 80% share of the clinical hematology instrument market and its foreclosure of 65% of the distributor outlet market, claimed by CDC, are inadequate to support the inference of anticompetitiveness that their magnitude would suggest at first blush." See also *United States v. Microsoft Corp.,* 253 F.3d 34, 70-71 (D.C. Cir. 2001) (finding §2 violation where Microsoft excluded Netscape from "most efficient" distribution channels, but noting that district court had refused to find §1 violation where the exclusion was not complete).

65 *United States v. Dentsply Intl., Inc.*, 399 F.3d 181 (3d Cir. 2005), cert. denied, 546 U.S. 1089 (2006).

66 Id. at 184.

67 Id.

68 Id.

69 These were described as "metals, porcelains, acrylics, waxes, and other materials required to fabricate fixed or removal restorations." Id. at 184.

70 Id. at 185.

***©2014 Wolters Kluwer. All rights reserved.***
***Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm***

71 The Third Circuit concluded that once the government had made out a prima facie case the burden shifted to the defendant to show a business justification. It then concluded that Dentsply had not proffered any effective business justification evidence. See id.

72 For example, at least one of Dentsply's rivals, Ivoclar, apparently operated only via direct sales to laboratories. Id. at 188.

73 Id. at 186, citing *United States v. Dentsply Intl., Inc.,* 277 F. Supp. 2d 387, 453 (D. Del. 2003), rev'd, 399 F.3d 181 (3d Cir. 2005), cert. denied, 546 U.S. 1089 (2006).

74 On market definition, the court rejected Dentsply's argument that there were two relevant markets, one for sales to dealers and another for direct sales to laboratories. *Dentsply*, 399 F.3d at 187. The court certainly seems correct in that conclusion. A unit of tooth material sold directly to a laboratory displaced a unit sold indirectly via a dealer, and vice versa. Further, the dealers simply performed functions that would be performed by others in the direct-sales channel. Cf. *United States v. Aluminum Co. of America*, 148 F.2d 416, 424 (2d Cir. 1945) (Alcoa's self-fabrication and its sales via independent fabricators were in the same market).

Within this market Dentsply had maintained a dominant share for more than a decade. *Dentsply*, 399 F.3d at 188.

Less persuasively, the court stated:

> In concluding that Dentsply lacked the power to exclude competitors from the laboratories, "the ultimate consumers," the District Court overlooked the point that the relevant market was the "sale" of artificial teeth to both dealers and laboratories. Although some sales were made by manufacturers to the laboratories, overwhelming numbers were made to dealers. Thus, the Court's scrutiny should have been applied not to the "ultimate consumers" who used the teeth, but to the "customers" who purchased the teeth, the relevant category which included dealers as well as laboratories. This mis-focus led the District Court into clear error.

Id. at 190.

Finally, people on both sides of the dispute testified that prices would fall if Dentsply abandoned its exclusive-dealing practices. Id. 190-191.

75 Id. at 191. The court found statements such as this one, from a former Dentsply manager, to be persuasive:

> You don't want your competition with your distributors, you don't want to give the distributors an opportunity to sell a competitive product. And you don't want to give your end user, the customer, meaning a laboratory and/or a dentist, a choice. He has to buy Dentsply teeth. That's the only thing that's available. The only place you can get it is through the distributor and the only one that the distributor is selling is Dentsply teeth. That's your objective.

76 Id. at 190.

77 *LePage's, Inc. v. 3M,* 324 F.3d 141 (3d Cir. 2003), cert. denied, 542 U.S. 953 (2004); see ¶¶749, 1758g, 1807b.

78 *United States v. Dentsply Intl., Inc.,* 399 F.3d 181, 191 (3d Cir. 2005), cert. denied, 546 U.S. 1089 (2006), citing *LePage's,* 24 F.3d at 159-160; and *United States v. Microsoft,* 253 F.3d 34, 50, 69 (D.C. Cir.), cert. denied, 534 U.S. 952 (2001).

79 *Dentsply*, 399 F.3d at 191, quoting ¶1802c at 64.

80 *Dentsply*, 399 F.3d at 191.

81 Id. at 192. The court also noted that:

> Another service dealers perform is taking back tooth returns. Artificial teeth and denture returns are quite common in dentistry. Approximately 30% of all laboratory tooth purchases are returned for

**©2014 Wolters Kluwer. All rights reserved.**
**Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm**

> exchange or credit. The District Court disregarded this benefit on the ground that all manufacturers except Vita accept tooth returns. However, in equating dealer and manufacturer returns, the District Court overlooked the fact that using dealers, rather than manufacturers, enables laboratories to consolidate their returns. In a single shipment to a dealer, a laboratory can return the products of a number of manufacturers, and so economize on shipping, time, and transaction costs.

Conversely, when returning products directly to manufacturers, a laboratory must ship each vendor's product separately and must track each exchange individually. Consolidating returns yields savings of time, effort, and costs.

82 Id. at 192-193.

83 Id. at 193.

84 Id., citing *United States v. Visa U.S.A.,* 344 F.3d 229, 240 (2d Cir. 2003), cert. denied, 543 U.S. 811 (2004).

85 Citing *Omega Environmental, Inc. v. Gilbarco,* 127 F.3d 1157 (9th Cir. 1997), cert. denied, 525 U.S. 812 (1998).

86 *United States v. Dentsply Intl., Inc.,* 399 F.3d 181, 194 (3d Cir. 2005), cert. denied, 546 U.S. 1089 (2006). The court also gave this example:

> When approached by Leach & Dillon and Heraeus Kulzer, Zahn's sales of Dentsply teeth had increased to $22-$23 million per year. In comparison, the president of Zahn expected that Leach & Dillon would add up to $200,000 (or less than 1% of its Dentsply's sales) and Heraeus Kulzer would contribute "maybe hundreds of thousands." Similarly, Vident's $1 million in projected sales amounted to 5.5% of its $18 million in annual Dentsply's sales.

As well as this:

> [C]urrent and potential customers requested Atlanta Dental to carry Vita teeth. Although these customers could have ordered the Vita teeth from Vident in California, Atlanta Dental's tooth department manager believed that they were interested in a local source. Atlanta Dental chose not to add the Vita line after being advised that doing so would cut off access to Dentsply teeth, which constituted over 90% of its tooth sales revenue.

Id. at 194.

87 Id. at 195, citing and quoting ¶1802e3 at 78-79.

88 *Dentsply*, 399 F.3d at 195.

89 Id. at 197.

90 See ¶1802e ; on entry barriers generally, see Ch. 4C.

91 *Standard Oil of California v. United States (Standard Stations),* 337 U.S. 293, 309, 314 (1949); see also *Tampa Electric Co. v. Nashville Coal Co.*, 365 U.S. 320, 334 (1961).

92 See, e.g., *Joyce Beverages of New York v. Royal Crown Cola Co.,* 555 F. Supp. 271, 275 (S.D.N.Y. 1983) (exclusivity and "best efforts" clauses gave soft drink bottlers increased incentives to compete for retailer shelf space; as a result, most bottler contracts contained such provisions).

93 See, e.g., *Barnosky Oils, Inc. v. Union Oil Co. of California,* 582 F. Supp. 1332, 1335-1337 (E.D. Mich. 1984) (evidence that other petroleum companies impose exclusive dealing should be regarded as creating an inference of anticompetitive behavior only if there was also evidence that they were behaving collusively).

94 See *Super Premium Ice Cream Distribution Antitrust Litigation,* 691 F. Supp. 1262 (N.D. Cal. 1988), aff'd sub nom. *Haagen-Dazs Co. v. Double Rainbow Gourmet Ice Creams, Inc.*, 895 F.2d 1417 (9th Cir. 1990) (exclusive dealing in ice cream franchises). See also *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430 (3d Cir. 1997) (same; pizza franchises).

**©2014 Wolters Kluwer. All rights reserved.**
**Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm**

95 See ¶1802a, b.

96 See ¶1805.

97 See ¶f.

98 See ¶1805.

99 Although one would have to count in this percentage wholly owned subsidiaries or outlets as well.

100 *Omega Environmental, Inc. v. Gilbarco, Inc.,* 127 F.3d 1157, 1164 (9th Cir. 1997); see ¶1805a1.

***©2014 Wolters Kluwer. All rights reserved.***
***Subject to Terms & Conditions: http://researchhelp.cch.com/License_Agreement.htm***

EXHIBIT 309

Case 1:10-cv-11622-WGY Document 421-1 Filed 08/18/14 Page 290 of 532



level are due to failures to enforce the cartel fully. In this story, market structure matters. For example, the more firms in an industry, the harder it is to detect cheating by any one firm, so more cheating occurs, and the average price is lower.

Game theorists model Stigler's insight as a supergame over repeated static games. In one version, random fluctuations in price due to fluctuations in demand or supply costs could make "cheating" by cartel members hard to detect because the price fluctuations could be due to either cheating or shifts in economic conditions. To prevent firms from cheating, all cartel members agree that if the market price drops below a certain level—a "trigger price"—each firm will expand its output to the precartel level for a certain period of time and prices will fall as a result. If firms expect other firms to stick to this agreement, a firm that cut its price might gain in the extremely short run, but would lose in the end because of the destruction of the cartel by this predetermined punishment mechanism (Chapter 5).

Porter (1983a), Lee and Porter (1984), and Ellison (1994) used this theory to estimate a model of 1880s railroad cartel behavior. Comparing high and low price periods, Porter finds that the cartel increased its rate by over 60 percent during periods of successful collusion. See Example 5.6.

**Dynamic Models with Adjustment Costs.** If firms have substantial adjustment costs from training new workers, from storage of inputs or outputs (inventories), or in accumulating capital, they must plan their actions over many periods if they are to maximize long-run profits. For example, if the firm must pay compensation to laid-off workers (an adjustment cost), the firm hires fewer workers in period $t$ if it believes demand will be lower in period $t + 1$. Similarly, firms' costs may fall over time if there is **learning by doing** (costs fall with production because workers become more skilled at their jobs due to experience or as better ways of producing are discovered); actions by a firm in this period affect its costs and profits in later periods.[34]

Pindyck (1985) showed that, in a dynamic setting, a mechanical application of the Lerner Index for each period can be misleading. In the intertemporal case, neither the short-run demand elasticity nor the Lerner Index provides a meaningful measure of monopoly power. One solution is to discuss the steady-state price-cost margin (the margin that eventually would be reached and that would persist if there were no further cost or demand shocks) or to compare the path of price or quantity with respect to the path under the price-taking assumption.

The game-theoretic literature abounds with dynamic models of oligopoly that are too general to be usable in estimation. To estimate these models practically, further restrictions have to be imposed. Roberts and Samuelson (1988) use a dynamic oligopoly model with reasonably general functional forms to reject the hypothesis that the ciga-

[34]Analogous to dynamic models with adjustment costs are those where demand today depends on quantities in previous periods. Some marketing studies attempt to estimate demand curves with this property, as do studies of durable goods such as aluminum (Suslow 1986b). Similarly, in pumping oil, the costs today depend on how much was pumped in the past and price is expected to rise at the rate of interest (according to the Hotelling formula), so empirical studies of oil reflect these dynamic issues as well (Matutes 1985).

EXHIBIT 310

LexisNexis
Questioned
As of: August 14, 2014 3:18 PM EDT

# Standard Oil Co. v. United States

Supreme Court of the United States
March 3-4, 1949, Argued ; June 13, 1949, Decided
No. 279

**Reporter:** 337 U.S. 293; 69 S. Ct. 1051; 93 L. Ed. 1371; 1949 U.S. LEXIS 2963
STANDARD OIL COMPANY OF CALIFORNIA ET AL. v. UNITED STATES

**Prior History:** APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF CALIFORNIA.

In a suit brought by the United States under the antitrust laws, the District Court enjoined an oil company and its wholly owned subsidiary from enforcing or entering into exclusive supply contracts with independent dealers in petroleum products and automobile accessories. *78 F.Supp. 850*. The companies appealed directly to this Court. Affirmed, p. 315.

**Disposition:** *78 F.Supp. 850*, affirmed.

**Core Terms**

contracts, requirements, monopoly, dealers, competitors, retail, commerce, oil company, sales, suppliers, patented, practices, gasoline, products, lease, salt, lessening, machines, big, service station, Anti-Trust, stations, supplied, outlets, substantially lessen, lessen competition, petroleum products, Oil, industrial, effective

**Case Summary**

### Procedural Posture

On direct appeal, appellant challenged a decree from the United States District Court for the Southern District of California that found for the United States in its action under the Sherman Act, *15 U.S.C.S. § 1*, and the Clayton Act, *15 U.S.C.S. § 14*, and that enjoined appellant and its subsidiary from enforcing or entering into exclusive supply contracts with any independent dealer in petroleum products and automobile accessories.

### Overview

In the United States' suit against appellant charging violations of the Sherman Act and the Clayton Act, appellant challenged a decree from the trial court that enjoined appellant from enforcing or entering into exclusive supply contracts for its products with any independent dealer in such products. The United States Supreme Court affirmed the injunctive relief granted. The Court rejected appellant's contention that the requirement of *§ 14*, that the effect of the contracts may have been to substantially lessen competition, had to be established by proof that competitive activity had actually diminished or probably would. Rather, the Court ruled that the qualifying clause of *§ 14* was satisfied by proof that competition had been foreclosed in a substantial share of the line of commerce affected by appellant's contracts. Furthermore, the Court rejected appellant's contention that sales of products manufactured within California and sold to California dealers did not affect interstate commerce. The Court ruled that the contracts with in-state

dealers impeded interstate as well as intrastate commerce by reducing competition from out-of-state and other in-state suppliers.

**Outcome**
The Supreme Court affirmed a decree that enjoined appellant from entering into and enforcing its supply contracts with independent petroleum dealers, because the trial court properly found the contracts to be violative of the antitrust laws. The qualifying clause of the applicable Clayton Act provision was satisfied by the proof that competition had been foreclosed in a substantial share of the line of commerce affected by appellant's contracts.

**LexisNexis® Headnotes**

Antitrust & Trade Law > Sherman Act > General Overview

***HN1*** See 15 U.S.C.S. § 1.

Antitrust & Trade Law > Clayton Act > General Overview

***HN2*** See 15 U.S.C.S. § 14.

Antitrust & Trade Law > ... > Price Fixing & Restraints of Trade > Exclusive & Reciprocal Dealing > Requirements Contracts

Antitrust & Trade Law > Sherman Act > General Overview

Antitrust & Trade Law > Regulated Practices > Trade Practices & Unfair Competition > General Overview

Contracts Law > Types of Contracts > Output & Requirements Contracts

***HN3*** In an antitrust case, the "line of commerce" affected need not be nationwide, at least where the purchasers cannot, as a practical matter, turn to suppliers outside their own area. Although the effect on competition will be quantitatively the same if a given volume of the industry's business is assumed to be covered, whether or not the affected sources of supply are those of the industry as a whole or only those of a particular region, a purely quantitative measure of this effect is inadequate because the narrower the area of competition, the greater the comparative effect on the area's competitors. Since it is the preservation of competition which is at stake, the significant proportion of coverage is that within the area of effective competition.

Antitrust & Trade Law > Clayton Act > General Overview

***HN4*** Section 3 of the Clayton Act, 15 U.S.C.S. § 14, condemns sales or agreements where the effect of such sale or contract of sale "may" be to substantially lessen competition or tend to create monopoly. The purpose in § 14 in using the word "may" was not to prohibit the mere possibility of the consequences described. It was intended to prevent such agreements as would under the circumstances disclosed probably lessen competition, or create an actual tendency to monopoly.

Antitrust & Trade Law > ... > Price Fixing & Restraints of Trade > Tying Arrangements > General Overview

Antitrust & Trade Law > ... > Price Fixing & Restraints of Trade > Tying Arrangements > Defenses

***HN5*** Tying agreements serve hardly any purpose beyond the suppression of competition. The justification most often advanced in their defense -- the protection of the good will of the manufacturer of the tying device -- fails in the usual situation because specification of the type and quality of the product to be used in connection with the tying device is protection enough. If the manufacturer's brand of the tied product is in fact superior to that of competitors, the buyer

will presumably choose it anyway. The only situation, indeed, in which the protection of good will may necessitate the use of tying clauses is where specifications for a substitute would be so detailed that they could not practicably be supplied. In the usual case only the prospect of reducing competition would persuade a seller to adopt such a contract and only his control of the supply of the tying device, whether conferred by patent monopoly or otherwise obtained, could induce a buyer to enter one. The existence of market control of the tying device, therefore, affords a strong foundation for the presumption that it has been or probably will be used to limit competition in the tied product also.

Antitrust & Trade Law > ... > Price Fixing & Restraints of Trade > Exclusive & Reciprocal Dealing > General Overview

Antitrust & Trade Law > ... > Price Fixing & Restraints of Trade > Exclusive & Reciprocal Dealing > Requirements Contracts

Antitrust & Trade Law > ... > Price Fixing & Restraints of Trade > Tying Arrangements > General Overview

Contracts Law > Types of Contracts > Output & Requirements Contracts

***HN6*** Requirements contracts may well be of economic advantage to buyers as well as to sellers, and thus indirectly of advantage to the consuming public. In the case of the buyer, they may assure supply, afford protection against rises in price, enable long-term planning on the basis of known costs, and obviate the expense and risk of storage in the quantity necessary for a commodity having a fluctuating demand. From the seller's point of view, requirements contracts may make possible the substantial reduction of selling expenses, give protection against price fluctuations, and offer the possibility of a predictable market. They may be useful, moreover, to a seller trying to establish a foothold against the counterattacks of entrenched competitors. Since the advantages of requirements contracts may often be sufficient to account for their use, the coverage by such contracts of a substantial amount of business affords a weaker basis for the inference that competition may be lessened than would similar coverage by tying clauses, especially where use of the latter is combined with market control of the tying device. A patent, moreover, although in fact there may be many competing substitutes for the patented article, is at least prima facie evidence of such control.

Antitrust & Trade Law > ... > Price Fixing & Restraints of Trade > Exclusive & Reciprocal Dealing > General Overview

Antitrust & Trade Law > ... > Price Fixing & Restraints of Trade > Exclusive & Reciprocal Dealing > Requirements Contracts

Antitrust & Trade Law > ... > Price Fixing & Restraints of Trade > Tying Arrangements > General Overview

Antitrust & Trade Law > ... > Price Fixing & Restraints of Trade > Tying Arrangements > Clayton Act

Antitrust & Trade Law > ... > Price Fixing & Restraints of Trade > Tying Arrangements > Sherman Act Violations

Contracts Law > Types of Commercial Transactions > Sales of Goods > Output, Exclusive & Requirements Agreements

Contracts Law > Types of Contracts > Output & Requirements Contracts

***HN7*** Even though the qualifying clause of § 3 of the Sherman Act, *15 U.S.C.S. § 14*, is appended without distinction of terms equally to the prohibition of tying clauses and of requirements contracts, pertinent considerations support, certainly as a matter of economic reasoning, varying standards as to each for the proof necessary to fulfill the conditions of that clause.

Antitrust & Trade Law > Clayton Act > General Overview

***HN8*** To interpret § 3 of the Clayton Act, *15 U.S.C.S. § 14*, as requiring proof that competition has actually diminished would make its very explicitness a means of conferring immunity upon the practices which it singles out.

Antitrust & Trade Law > Clayton Act > General Overview

Antitrust & Trade Law > ... > Price Fixing & Restraints of Trade > Exclusive & Reciprocal Dealing > Requirements Contracts

Contracts Law > Types of Commercial Transactions > Sales of Goods > Output, Exclusive & Requirements Agreements

Contracts Law > Types of Contracts > Output & Requirements Contracts

Energy & Utilities Law > Oil & Petroleum Products > Gasoline Fuels > Gasoline Dealers & Distributors

***HN9*** The qualifying clause of § 3 of the Clayton Act, *15 U.S.C.S. § 14*, is satisfied by proof that competition has been foreclosed in a substantial share of the line of commerce affected.

**Lawyers' Edition Display**

## Summary

The Standard Oil Company of California entered into exclusive supply contracts with independent dealers in petroleum products and automobile accessories, in which the dealers agreed to purchase from the company all their requirements of one or more of its products. This practice was assailed by the United States as violative of, among other provisions, 3 of the Clayton Act, which prohibits such contracts where their effect "may be to substantially lessen competition or tend to create a monopoly in any line of commerce."

In an opinion by Frankfurter, J., a majority of the Supreme Court agreed with the trial court that, for the purposes of 3 of the Clayton Act, the requirement of showing an actual or potential lessening of competition or a tendency to establish monopoly was adequately met by proof that the contracts covered a substantial number of outlets and a substantial amount of products, whether considered on a comparative basis or not. In addition, it was held that the contracts with California dealers should not be exempted from the prohibition merely because nearly all the products sold to them were produced in California, as such contracts prevented these dealers from dealing with suppliers from outside the state.

In a dissenting opinion, Jackson, J., with whom Vinson, Ch. J., and Burton, J., joined, took the view that the facts proven at the trial showed only that the contracts operated on enough commerce to violate the act, provided their effect was substantially to lessen competition or create a monopoly, but that this effect had not been established; that evidence in that respect should be admitted; and that without such evidence the contracts were not illegal per se under the antitrust laws.

Douglas, J., dissented on the ground that the elimination of the requirements contract would induce the defendant and other oil companies to build service station empires of their own and thus a relatively innocuous device would be replaced by one far worse from the point of view of small business units and of the nation.

**Headnotes**

RESTRAINTS OF TRADE AND MONOPOLIES, §51 > exclusive supply contracts -- alternative practices. -- > Headnote:

***LEdHN[1]*** [1]

In view of the authoritative determination by Congress in 3 of the Clayton Act (*15 USC 14*) that making a sale of goods on condition that the purchaser thereof shall not use or deal in the goods of a competitor is a detrimental practice where its effect may be substantially to lessen competition, the fact that an alternative practice would be even a greater detriment to the public interest than the perpetuation of the system condemned is immaterial, as Congress has not left at large for determination in each case the ultimate demand of the public interest.

RESTRAINTS OF TRADE AND MONOPOLIES, §19 > exclusive supply contracts -- extent of suppression of competition. -- > Headnote:

***LEdHN[2]*** [2]

The qualifying clause of 3 of the Clayton Act (*15 USC 14*) which condemns the practices specified therein where their effect may be substantially to lessen competition or tend to create a monopoly in any line of commerce, is satisfied by proof that competition has been foreclosed in a substantial share of the line of commerce affected; and it is not necessary to demonstrate that competitive activity has actually diminished or probably will diminish.

RESTRAINTS OF TRADE AND MONOPOLIES, §51 > exclusive supply contracts -- affecting substantial proportion of retail sales. -- > Headnote:

***LEdHN[3]*** [3]

The use by a producer of petroleum products of exclusive supply contracts entered into with independent retail dealers, in which the latter undertake to purchase from the producer all their requirements, violates 3 of the Clayton Act (*15 USC 14*), where the affected proportion of retail sales of petroleum products is substantial.

RESTRAINTS OF TRADE AND MONOPOLIES, §22 > exclusive supply contracts -- relation to interstate commerce. -- > Headnote:

***LEdHN[4]*** [4]

An exclusive supply contract in which a retail dealer undertakes to purchase all his requirements in certain products from a supplier is, even though these products are produced in the state in which the dealer is residing, in violation of 3 of the Clayton Act (*15 USC 14*), where the effect of such contract is to prevent the dealer from dealing with suppliers from outside the state as well as within the state and thus substantially to lessen competition in both interstate and intrastate commerce (distinguishing *Addyston Pipe & Steel Co. v. United States, 175 US 211, 44* L ed 136, *20 S Ct 96*).

**Syllabus**

1. Under contracts entered into by an oil company with independent dealers in petroleum products and automobile accessories, the dealer agreed to purchase exclusively from the company all of his requirements of one or more of the products marketed by the company. In 1947 the contracts affected a gross business of $ 58,000,000, comprising 6.7% of the total in a seven-state area in which the company sold its products. *Held*: The contracts were violative of § 3 of the Clayton Act and the company was properly enjoined from enforcing or entering into them. Pp. 294-314.

2. The requirement of § 3 of the Clayton Act of a showing that the effect of the contracts "may be to substantially lessen competition" is here satisfied by proof that competition has been foreclosed in a substantial share of the line of commerce affected. Pp. 299-314.

(a) In view of the widespread adoption of such contracts by the company's competitors and the availability of alternative ways of obtaining an assured market, evidence that competitive activity has not actually declined is inconclusive. P. 314.

(b) The company's use of the contracts creates just such a potential clog on competition as it was the purpose of § 3 to remove wherever, were it to become actual, it would impede a substantial amount of competitive activity. P. 314.

3. The fact that nearly all the products sold by the company to California dealers are produced in that State does not exempt the company's requirements contracts with California dealers as not substantially affecting interstate commerce, since the effect of those contracts is to prevent the California dealers from dealing with out-of-State as well as local suppliers and thus to lessen competition in both interstate and intrastate commerce. *Addyston Pipe & Steel Co . v. United States, 175 U.S. 211*, distinguished. Pp. 314-315.

**Counsel:** John M. Hall argued the cause for appellants. With him on the brief was Marshall P. Madison.

Assistant Attorney General Bergson argued the cause for the United States. With him on the brief were Solicitor General Perlman, Walker Smith, Robert G. Seaks and Stanley M. Silverberg.

**Judges:** Vinson, Black, Reed, Frankfurter, Doulgas, Murphy, Jackson, Rutledge, Burton

**Opinion by:** FRANKFURTER

**Opinion**

**[*294] [**1052] [***1376]** MR. JUSTICE FRANKFURTER delivered the opinion of the Court.

This is an appeal to review a decree enjoining the Standard Oil Company of California and its wholly-owned subsidiary, Standard Stations, Inc., [1] from enforcing or entering into exclusive supply contracts with **[**1053]** any independent dealer in petroleum products and automobile accessories. *78 F.Supp. 850*. The use of such contracts was successfully assailed by the United States as violative of *§ 1* of the Sherman Act [2] and § 3 of the Clayton Act. [3]

---

1 Standard Stations, Inc., has no independent status in these proceedings; since 1944 its activities have been confined to managing service stations owned by the Standard Oil Co. of California.

2 ***HN1*** "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is hereby declared to be illegal: . . . ." 26 Stat. 209, as amended, 50 Stat. 693, *15 U. S. C. § 1*.

3 ***HN2*** "It shall be unlawful for any person engaged in commerce, in the course of such commerce, to lease or make a sale or contract for sale of goods, wares, merchandise, machinery, supplies, or other commodities, whether patented or unpatented, for use, consumption, or resale within the United States or any Territory thereof or the District of Columbia or any insular possession or other place under the jurisdiction of the United States, or fix a price charged therefor, or discount from, or rebate upon, such price, on the condition, agreement, or understanding that the lessee or purchaser thereof shall not use or deal in the goods, wares, merchandise, machinery, supplies, or other commodities of a competitor or competitors of the lessor or seller, where the effect of

**[*295]** The Standard Oil Company of California, a Delaware corporation, owns petroleum-producing resources and refining plants in California and sells petroleum products in what has been termed in these proceedings the "Western area" -- Arizona, California, Idaho, Nevada, Oregon, Utah and Washington. It sells through its own service stations, to the operators of independent service stations, and to industrial users. It is the largest seller of gasoline in the area. In 1946 its combined sales amounted to 23% of the total taxable gallonage sold there in that year: sales by company-owned service stations constituted 6.8% of the total, sales under exclusive dealing contracts with independent service stations, 6.7% of the total; the remainder were sales to industrial users. Retail service-station sales by Standard's six leading competitors absorbed 42.5% of the total taxable gallonage; the remaining retail sales were divided between more than seventy small companies. It is undisputed that Standard's major competitors employ similar exclusive dealing arrangements. In 1948 only 1.6% of retail outlets were what is known as "split-pump" stations, that is, sold the gasoline of more than one supplier.

Exclusive supply contracts with Standard had been entered into, as of March 12, 1947, by the operators of 5,937 independent stations, or 16% of the retail gasoline outlets in the **[***1377]** Western area, which purchased from Standard in 1947, $ 57,646,233 worth of gasoline and **[*296]** $ 8,200,089.21 worth of other products. Some outlets are covered by more than one contract so that in all about 8,000 exclusive supply contracts are here in issue. These are of several types, but a feature common to each is the dealer's undertaking to purchase from Standard all his requirements of one or more products. Two types, covering 2,777 outlets, bind the dealer to purchase of Standard all his requirements of gasoline and other petroleum products as well as tires, tubes, and batteries. The remaining written agreements, 4,368 in number, bind the dealer to purchase of Standard all his requirements of petroleum products only. It was also found that independent dealers had entered 742 oral contracts by which they agreed to sell only Standard's gasoline. In some instances dealers who contracted to purchase from Standard all their requirements of tires, tubes, and batteries, had also orally agreed to purchase of Standard their requirements of other automobile accessories. Of the written agreements, 2,712 were for varying specified terms; the rest were effective from year to year but terminable "at the end of the first 6 months of any contract year, or at the end of any such year, by giving to the other at least 30 days prior thereto written notice . . . ." Before 1934 Standard's sales of petroleum products through independent service stations were made pursuant to **[**1054]** agency agreements, but in that year Standard adopted the first of its several requirements-purchase contract forms, and by 1938 requirements contracts had wholly superseded the agency method of distribution.

Between 1936 and 1946 Standard's sales of gasoline through independent dealers remained at a practically constant proportion of the area's total sales; its sales of lubricating oil declined slightly during that period from 6.2% to 5% of the total. Its proportionate sales of tires and batteries for 1946 were slightly higher than they were in 1936, though somewhat lower than for some **[*297]** intervening years; they have never, as to either of these products, exceeded 2% of the total sales in the Western area.

---

such lease, sale, or contract for sale or such condition, agreement, or understanding may be to substantially lessen competition or tend to create a monopoly in any line of commerce." 38 Stat. 731, 15 U. S. C. § 14.

Since § 3 of the Clayton Act was directed to prohibiting specific practices even though not covered by the broad terms of the Sherman Act, [4] it is appropriate to consider first whether the enjoined contracts fall within the prohibition of the narrower Act. The relevant provisions of § 3 are:

"It shall be unlawful for any person engaged in commerce, in the course of such commerce, to lease or make a sale or contract for sale of goods, wares, merchandise, machinery, supplies, or other commodities, whether patented or unpatented, for use, consumption, or resale within the United States . . . on the condition, agreement, or understanding that the lessee or purchaser thereof shall not use or deal in the goods . . . of a competitor or competitors of the . . . seller, where the effect of such lease, sale, or contract for sale or such condition, agreement, or understanding may be to substantially lessen competition or tend to create a monopoly in any line of commerce."

Obviously the contracts here at **[***1378]** issue would be proscribed if § 3 stopped short of the qualifying clause beginning, "where the effect of such lease, sale, or contract **[*298]** for sale . . . ." If effect is to be given that clause, however, it is by no means obvious, in view of Standard's minority share of the "line of commerce" involved, of the fact that that share has not recently increased, and of the claims of these contracts to economic utility, that the effect of the contracts may be to lessen competition or tend to create a monopoly. It is the qualifying clause, therefore, which must be construed.

The District Court held that the requirement of showing an actual or potential lessening of competition or a tendency to establish monopoly was adequately met by proof that the contracts covered "a substantial number of outlets and a substantial amount of products, whether considered comparatively or not." *78 F.Supp. at 875*. Given such quantitative substantiality, the substantial lessening of competition -- so the court reasoned -- is an automatic result, for the very existence of such contracts denies dealers opportunity to deal in the products of competing suppliers and excludes suppliers from access to the outlets controlled by those dealers. Having adopted this standard of proof, the court excluded as immaterial testimony bearing on "the economic merits or demerits of the present system as contrasted with a system which prevailed prior to its establishment and which would prevail if the court declared the present arrangement [invalid]." The court likewise deemed it unnecessary to make findings, on the basis of evidence that was admitted, whether the number of Standard's competitors had increased or decreased since the inauguration of the requirements-contract system, whether the **[**1055]** number of their dealers had increased or decreased, and as to other matters which would have shed light on the comparative status of Standard and its competitors before and after the adoption of that system. The court concluded:

"Grant that, on a comparative basis, and in relation to the entire trade in these products in the area, **[*299]** the restraint is not integral. Admit also that control of distribution results in lessening of costs and that its abandonment might increase costs. . . . Concede further, that the arrangement was entered into in good faith, with the honest belief that control of distribution and consequent concentration of representation were economically beneficial to the industry and to the public, that

---

[4] After the Clayton Bill, H. R. 15657, 63d Cong., 2d Sess., had passed the House, the Senate struck § 4, the section prohibiting tying clauses and requirements contracts, on the ground that such practices were subject to condemnation by the Federal Trade Commission under the then pending Trade Commission Bill. In support of a motion to reconsider this vote, Senator Reed of Missouri argued that the Trade Commission would be unlikely to outlaw agreements of a type held by this Court, in *Henry* v. *A. B. Dick* Co., 224 U.S. 1, not to be in violation of the Sherman Act. See 51 Cong. Rec. 14088, 14090-92. The motion was agreed to. *Id*. at 14223.

they have continued for over fifteen years openly, notoriously and unmolested by the Government, and have been practiced by other major oil companies competing with Standard, that the number of Standard outlets so controlled may have decreased, and the quantity of products supplied to them may have declined, on a comparative basis. Nevertheless, as I read the latest cases of the Supreme Court, I am compelled to find the practices here involved to be violative of both statutes. For they affect injuriously a sizeable part of interstate commerce, or, -- to use the current phrase, -- 'an appreciable segment' of interstate commerce."

The issue before us, therefore, is whether the requirement of showing that the effect of the agreements "may be to substantially lessen competition" may be met simply by proof that a substantial portion of commerce is affected or whether it must also be demonstrated that competitive activity has actually diminished or probably will diminish. [5]

**[*300] [***1379]** Since the Clayton Act became effective, this Court has passed on the applicability of § 3 in eight cases, in five of which it upheld determinations that the challenged agreement was violative of that Section. Three of these -- *United Shoe Machinery Corp*. v. *United States, 258 U.S. 451*; *International Business Machines Corp*. v. *United States, 298 U.S. 131*; *International Salt Co*. v. *United States, 332 U.S. 392* -- involved contracts tying to the use of a patented article all purchases of an unpatented product used in connection with the patented article. The other two cases -- *Standard Fashion Co*. v. *Magrane-Houston Co., 258 U.S. 346*; *Fashion Originators' Guild v. Federal Trade Comm'n, 312 U.S. 457* -- involved requirements contracts not unlike those here in issue.

The *Standard Fashion* case, the first of the five holding that the Act had been violated, settled one question of interpretation of § 3. The Court said:

***HN4*** "Section 3 condemns sales or agreements where the effect of such sale or contract of sale 'may' be to substantially lessen competition or tend to create monopoly. . . . But we do not think that the purpose in using the word 'may' was to prohibit the mere possibility of the consequences described. **[**1056]** It was intended to prevent such agreements as would under the circumstances disclosed probably lessen competition, or create an actual tendency to monopoly." *258 U.S. at 356-57*. See also *Federal Trade Comm'n v. Morton Salt Co., 334 U.S. 37, 46, n. 14*.

**[*301]** The Court went on to add that the fact that the Section "was not intended to reach every remote lessening of competition is shown in the requirement that such lessening must be substantial," but because it deemed the finding of two lower courts that the contracts in question did substantially lessen competition and tend to create monopoly amply supported by evidence that the defendant controlled two-fifths of the nation's pattern agencies, it did not pause to indicate where the line between a "remote" and a "substantial" lessening should be drawn.

---

[5] It is clear, of course, that ***HN3*** the "line of commerce" affected need not be nationwide, at least where the purchasers cannot, as a practical matter, turn to suppliers outside their own area. Although the effect on competition will be quantitatively the same if a given volume of the industry's business is assumed to be covered, whether or not the affected sources of supply are those of the industry as a whole or only those of a particular region, a purely quantitative measure of this effect is inadequate because the narrower the area of competition, the greater the comparative effect on the area's competitors. Since it is the preservation of competition which is at stake, the significant proportion of coverage is that within the area of effective competition. Cf. *Indiana Farmer's Guide Publishing Co*. v. *Prairie Farmer Publishing Co.*, 293 U.S. 268, 279; *United States* v. *Yellow Cab Co.*, 332 U.S. 218, 226. The criteria of substantiality deemed relevant in cases involving a nationwide market are thus also relevant in measuring the effect of Standard's requirements contracts in the seven-state Western area.

All but one of the later cases also regarded domination of the market as sufficient in itself to support the inference that competition had been or probably would be lessened. In the *United Shoe Machinery* case, referring, *inter alia*, to the clause incorporated in all United's leases of patented machinery requiring the use by the lessee of materials supplied by United, the Court observed:

"That such restrictive and tying agreements must necessarily lessen competition and tend to monopoly is, we believe, . . . apparent. When it is considered that the United Company occupies a dominating position in supplying shoe machinery of the classes involved, these covenants signed by the lessee and binding upon him effectually prevent him from acquiring the machinery of a competitor of the lessor except at the risk of forfeiting the right to use the machines furnished by the United Company which may **[***1380]** be absolutely essential to the prosecution and success of his business." *258 U.S. at 457-58*.

In the *International Business Machines* case, the defendants were the sole manufacturers of a patented tabulating machine requiring the use of unpatented cards. The lessees of the machines were bound by tying clauses to use in them only the cards supplied by the defendants, **[*302]** who, between them, divided the whole of the $ 3,000,000 annual gross of this business also. The Court concluded:

"These facts, and others, which we do not stop to enumerate, can leave no doubt that the effect of the condition in appellant's leases 'may be to substantially lessen competition,' and that it tends to create monopoly, and has in fact been an important and effective step in the creation of monopoly." *298 U.S. at 136*.

The *Fashion Originators' Guild* case involved an association of dress manufacturers which sold more than 60% of all but the cheapest women's garments. In rejecting the relevance of evidence that the Guild's use of requirements contracts was a "reasonable and necessary" measure of protection against "the devastating evils growing from the pirating of original designs," the Court again emphasized the presence and the consequences of economic power:

"The purpose and object of this combination, its potential power, its tendency to monopoly, the coercion it could and did practice upon a rival method of competition, all brought it within the policy of the prohibition declared by the Sherman and Clayton Acts." *312 U.S. at 467-68*.

It is thus apparent that none of these cases controls the disposition of the present appeal, for Standard's share of the retail market for gasoline, even including sales through company-owned stations, is hardly large enough to conclude as a matter of law that it occupies a dominant position, nor did the trial court so find. The cases do indicate, however, that some sort of showing as to the actual or probable economic consequences of the agreements, if only the inferences to be drawn from the fact of dominant power, is important, **[**1057]** and to that extent they tend to support appellant's position.

**[*303]** Two of the three cases decided by this Court which have held § 3 inapplicable also lend support to the view that such a showing is necessary. These are, *Federal Trade Comm'n v. Sinclair Co., 261 U.S. 463*, and *Pick Mfg. Co.* v. *General Motors Corp., 299 U.S. 3*. The third -- *Federal Trade Comm'n v. Curtis Pub. Co., 260 U.S. 568* -- went off on the ground that the contract involved was one of agency and so is of no present relevance. The *Sinclair* case involved the lease of gasoline pumps and storage tanks on condition that the dealer would use them only

for Sinclair's gasoline, but Sinclair did not own patents on the pumps or tanks and evidently did not otherwise control their supply. Although the Trade Commission had found that few dealers needed more than one pump, the Court concluded that "the record does not show that the probable effect of the practice will be unduly to lessen competition." *261 U.S. at 475*. The basis of this conclusion was thus summarized:

"Many competitors seek to sell excellent brands of gasoline and no one of them is essential to the retail business. The lessee is free to buy wherever he chooses; he may freely accept and use as many pumps as he wishes and may discontinue any or all of them. He may carry on business as his judgment dictates and his means permit, save only that he cannot use the lessor's equipment for dispensing another's brand. By investing a comparatively small sum, he can buy an outfit and use it without hindrance. He can have respondent's **[***1381]** gasoline, with the pump or without the pump, and many competitors seek to supply his needs. " *Id. at 474*.

The present case differs of course in the fact that a dealer who has entered into a requirements contract with Standard cannot consistently with that contract sell the petroleum products of a competitor of Standard's no **[*304]** matter how many pumps he has, [6] but the case is significant for the importance it attaches, in the absence of a showing that the supplier dominated the market, to the practical effect of the contracts. The same is true of the *Pick* case, in which this Court affirmed in a brief *per curiam* opinion the finding of the District Court, concurred in by the Court of Appeals, that the effect of contracts by which dealers agreed not to sell other automobile parts than those manufactured by General Motors "had not been in any way substantially to lessen competition or to create a monopoly in any line of commerce." *299 U.S. at 4*.

But then came *International Salt Co*. v. *United States, 332 U.S. 392*. That decision, at least as to contracts tying the sale of a nonpatented to a patented product, rejected the necessity of demonstrating economic consequences once it has been established that "the volume of business affected" is not "insignificant or insubstantial" and that the effect of the contracts is to "foreclose competitors from [a] substantial market." *Id. at 396*. Upon that basis we affirmed a summary judgment granting an injunction **[**1058]** against the leasing of machines for the utilization of salt products on the condition that the lessee use in **[*305]** them only salt supplied by defendant. It was established by pleadings or admissions that defendant was the country's largest producer of salt for industrial purposes, that it owned patents on the leased machines, that about 900 leases were outstanding, and that in 1944 defendant sold about $ 500,000 worth of salt for use in these machines. It was not established that equivalent machines were unobtainable, it was not indicated what proportion of the business of supplying such machines was controlled by defendant, and it was deemed irrelevant that there was no evidence as to the actual effect of the tying clauses upon competition. [7] It is clear, therefore, that unless a distinction is to be drawn for purposes of the applicability of § 3 between requirements contracts and contracts tying the sale of a

---

[6] Standard urges that the effect of its contracts is similarly confined in view of the fact that they apply not to all sales by a dealer but only to those made through a designated service station. Putting aside the fact that it does not appear that dealers commonly own more than one service station, there is marked difference between a contract which confines an entire retail outlet to the sale of a single brand and a contract which merely confines the use of a dispensing mechanism to a single brand: service-station sites, and therefore retail outlets, are limited in number; the number of pumps which a dealer may choose to set up is not, or so, at least, the Court assumed in the *Sinclair* case. It is reasonable to assume, therefore, that competition between suppliers is directed rather toward exclusive contracts with the maximum number of strategically located outlets than toward exclusive arrangements with dealers as such.

[7] The Court considered and found inadequate defendant's attempt to establish that the successful use of the machines depended upon a quality of salt which only it could supply, but the Court's willingness to consider such evidence does not weaken the

nonpatented to a patented product, the showing that Standard's requirements contracts affected a gross business of $ 58,000,000 comprising 6.7% of the total in the area goes far toward supporting the inference that **[***1382]** competition has been or probably will be substantially lessened. [8]

In favor of confining the standard laid down by the *International Salt* case to tying agreements, important economic differences may be noted. ***HN5*** Tying agreements serve hardly any purpose beyond the suppression of competition. **[*306]** The justification most often advanced in their defense -- the protection of the good will of the manufacturer of the tying device -- fails in the usual situation because specification of the type and quality of the product to be used in connection with the tying device is protection enough. If the manufacturer's brand of the tied product is in fact superior to that of competitors, the buyer will presumably choose it anyway. The only situation, indeed, in which the protection of good will may necessitate the use of tying clauses is where specifications for a substitute would be so detailed that they could not practicably be supplied. In the usual case only the prospect of reducing competition would persuade a seller to adopt such a contract and only his control of the supply of the tying device, whether conferred by patent monopoly or otherwise obtained, could induce a buyer to enter one. See Miller, Unfair Competition 199 *et seq*. (1941); Note, 49 Col. L. Rev. 241, 246 (1949). The existence of market control of the tying device, therefore, affords a strong foundation for the presumption that it has been or probably will be used to limit competition in the tied product also.

***HN6*** Requirements contracts, on the other hand, may well be of economic advantage to buyers as well as to sellers, and thus indirectly of advantage to the consuming public. In the case of the buyer, they may assure supply, afford protection against rises in price, enable long-term planning on the basis of known costs, [9] and obviate the expense and risk of storage in the quantity necessary for a commodity having a fluctuating demand. From the seller's point of view, requirements contracts may make possible the substantial reduction of selling expenses, give protection **[*307]** against price fluctuations, and -- of particular advantage to a newcomer to the field to whom it is important to know what capital **[**1059]** expenditures are justified -- offer the possibility of a predictable market. See Stockhausen, *The Commercial and Anti-Trust Aspects of Term Requirements Contracts*, 23 N. Y. U. L. Q. Rev. 412, 413-14 (1948). They may be useful, moreover, to a seller trying to establish a foothold against the counterattacks of entrenched competitors. See *id*. at 424 *et seq.; Excelsior Motor Mfg. & Supply Co*. v. *Sound Equipment, Inc., 73 F.2d 725, 728* (C. A. 7th Cir.); *General Talking Pictures Corp*. v. *American Tel. & Tel. Co., 18 F.Supp. 650, 666* (D. Del.). [10] Since these advantages of requirements contracts may often be sufficient to account for their use, the coverage by such contracts of a substantial amount of business affords a weaker basis for the inference **[***1383]** that competition may be lessened than

holding that coverage of a more than insignificant volume of business by such tying clauses is an adequate basis for finding a lessening of competition or a tendency to monopoly.

[8] It may be noted in passing that the exclusive supply provisions for tires, tubes, batteries, and other accessories which are a part of some of Standard's contracts with dealers who have also agreed to purchase their requirements of petroleum products should perhaps be considered, as a matter of classification, tying rather than requirements agreements.

[9] This advantage is not conferred by Standard's contracts, each of which provides that the price to be paid by the dealer is to be the "Company's posted price to its dealers generally at time and place of delivery."

[10] Some members of the House opposed § 4 of H. R. 15657, 63d Cong., 2d Sess. (the equivalent of what is now § 3) as denying this benefit to the newcomer, see 51 Cong. Rec. 9267, and Representative McCoy of New Jersey offered an amendment, *id*. at 9398, to make the agreements in question illegal only when entered "with the intent of obtaining or establishing a monopoly or of destroying the business of a competitor," which he and others supported on this ground. See *id*. at 9400-02, 9409. The amendment was rejected. *Id*. at 9410.

would similar coverage by tying clauses, especially where use of the latter is combined with market control of the tying device. A patent, moreover, although in fact there may be many competing substitutes for the patented article, is at least *prima facie* evidence of such control. And so we could not dispose of this case merely by citing *International Salt Co*. v. United States, 332 U.S. 392.

Thus, ***HN7*** even though the qualifying clause of § 3 is appended without distinction of terms equally to the prohibition of tying clauses and of requirements contracts, pertinent considerations support, certainly as a matter of economic reasoning, varying standards as to each for the **[*308]** proof necessary to fulfill the conditions of that clause. If this distinction were accepted, various tests of the economic usefulness or restrictive effect of requirements contracts would become relevant. Among them would be evidence that competition has flourished despite use of the contracts, and under this test much of the evidence tendered by appellant in this case would be important. See, as examples of the consideration of such evidence, *B. S. Pearsall Butter Co*. v. Federal Trade Comm'n, 292 Fed. 720 (C. A. 7th Cir.); *Pick Mfg. Co*. v. General Motors Corp., 80 F.2d 641, 644 (C. A. 7th Cir.), aff'd, 299 U.S. 3. Likewise bearing on whether or not the contracts were being used to suppress competition, would be the conformity of the length of their term to the reasonable requirements of the field of commerce in which they were used. See *Corn Products Refining Co*. v. Federal Trade Comm'n, 144 F.2d 211, 220 (C. A. 7th Cir.), aff'd, 324 U.S. 726; United States v. Pullman Co., 50 F.Supp. 123, 127-29 (E. D. Pa.). Still another test would be the status of the defendant as a struggling newcomer or an established competitor. Perhaps most important, however, would be the defendant's degree of market control, for the greater the dominance of his position, the stronger the inference that an important factor in attaining and maintaining that position has been the use of requirements contracts to stifle competition rather than to serve legitimate economic needs. See *Standard Fashion Co*. v. Magrane-Houston Co., supra, 258 U.S. 346; Fashion Originators' Guild v. Federal Trade Comm'n, supra, 312 U.S. 457. [11]

Yet serious difficulties would attend the attempt to apply these tests. We may assume, as did the court below, that no improvement of Standard's competitive **[*309]** position has coincided with the period during which the requirements-contract system of distribution has been in effect. We may assume further that the duration **[**1060]** of the contracts is not excessive and that Standard does not by itself dominate the market. But Standard was a major competitor when the present system was adopted, and it is possible that its position would have deteriorated but for the adoption of that system. When it is remembered that all the other major suppliers have also been using requirements contracts, and when it is noted that the relative share of the business which fell to each has remained about the same during the period of their use, [12] it would not be **[***1384]** farfetched to infer that their effect has been to enable the established suppliers individually to maintain their own standing and at the same time collectively, even though not collusively, to prevent a late arrival from wresting away more than an insignificant portion of the market. If, indeed, this were a result of the system, it would seem unimportant that a short-run by-product of stability may have been greater efficiency and lower costs, for it is the theory of the antitrust

---

[11] For an exposition of the considerations here summarized, see Stockhausen, *The Commercial and Anti-Trust Aspects of Term and Requirements Contracts*, 23 N. Y. U. L. Q. Rev. 412, 417-31 (1948).

[12] Upon the request of Standard, its six largest competitors filled out questionnaires showing the number of retail dealers who distributed their products during the years 1937 through 1946. Though their position relative to each other has fluctuated, the figures show that as a group they have maintained or improved their control of the market. Together with Standard, these six companies distributed, as of 1946, through 26,439 of approximately 35,000 independent service stations in the Western area.

laws that the long-run advantage of the community depends upon the removal of restraints upon competition. See *Fashion Originators' Guild v. Federal Trade Comm'n, 312 U.S. 457, 467-68*; *United States v. Aluminum Co. of America, 148 F.2d 416, 427-29* (C. A. 2d Cir.).

Moreover, to demand that bare inference be supported by evidence as to what would have happened but for **[*310]** the adoption of the practice that was in fact adopted or to require firm prediction of an increase of competition as a probable result of ordering the abandonment of the practice, would be a standard of proof, if not virtually impossible to meet, at least most ill-suited for ascertainment by courts. [13] Before the system of requirements contracts was instituted, Standard sold gasoline through independent service-station operators as its agents, and it might revert to this system if the judgment below were sustained. Or it might, as opportunity presented itself, add service stations now operated independently to the number managed by its subsidiary, Standard Stations, Inc. From the point of view of maintaining or extending competitive advantage, either of these alternatives would be just as effective as the use of requirements contracts, although of course insofar as they resulted in a tendency to monopoly they might encounter the anti-monopoly provisions of the Sherman Act. See *United States v. Aluminum Co. of America, 148 F.2d 416* (C. A. 2d Cir.). As appellant points out, dealers might order petroleum products in quantities sufficient to meet their estimated needs for the period during which requirements contracts are now effective, and even that would foreclose competition to some degree. So long as these diverse ways of restricting competition remain open, therefore, there can be no conclusive proof that the use of requirements contracts has actually reduced **[*311]** competition below the level which it would otherwise have reached or maintained.

***LEdHN[1]*** [1]We are dealing here with a particular form of agreement specified by § 3 and not with different arrangements, by way of integration or otherwise, that may tend to lessen competition. ***HN8*** To interpret that section as requiring proof that competition has actually diminished would make its **[**1061]** very explicitness a means of conferring immunity upon the practices which it singles out. Congress has authoritatively determined that those practices are detrimental where their effect may be to lessen competition. It has not left at large for determination in each case the ultimate demands of the "public interest," as the English lawmakers, considering and finding inapplicable to their own situation our experience with the specific prohibition of trade practices legislatively determined to be undesirable, have recently chosen **[***1385]** to do. [14] Though it may be that such an alternative to the present system as buying out independent dealers and making **[*312]** them dependent employees of Standard Stations, Inc., would be a greater detriment to the public interest than perpetuation of the system, this is an issue, like the choice between

---

[13] The dual system of enforcement provided for by the Clayton Act must have contemplated standards of proof capable of administration by the courts as well as by the Federal Trade Commission and other designated agencies. See 38 Stat. 734, 736, as amended, 15 U. S. C. §§ 21, 25. Our interpretation of the Act, therefore, should recognize that an appraisal of economic data which might be practicable if only the latter were faced with the task may be quite otherwise for judges unequipped for it either by experience or by the availability of skilled assistance.

[14] The Monopolies and Restrictive Practices (Inquiry and Control) Act, 1948, adopted July 30, 1948, provides, as one mode of procedure, for reference of restrictive trade practices by the Board of Trade to a permanent Commission for investigation in order to determine "whether any such things as are specified in the reference . . . operate or may be expected to operate against the public interest." 11 & 12 Geo. VI, c. 66, § 6 (2). The Act does not define what is meant by "the public interest," although in § 14 it sets up broad criteria to be taken into account. It is noteworthy, however, that, having established so broad a basis for investigation, the Act entrusts the task to an expert body without provision for judicial review. This approach was repeatedly contrasted in debate with that of the United States. See 449 H. C. Deb. 2046-47, 2058, 2063 (5th ser. 1948); 157 H. L. Deb. 350 (5th ser. 1948). Compare § 5 (2) of the Interstate Commerce Act, as amended, 41 Stat. 480, 49 U. S. C. § 5 (2), referring to the Interstate Commerce Commission determination of the more defined issues of "public interest" under review in *New York Central Securities Corp*. v. *United States*, 287 U.S. 12, 24; *United States* v. *Lowden*, 308 U.S. 225.

greater efficiency and freer competition, that has not been submitted to our decision. We are faced, not with a broadly phrased expression of general policy, but merely a broadly phrased qualification of an otherwise narrowly directed statutory provision.

In this connection it is significant that the qualifying language was not added until after the House and Senate bills reached Conference. The conferees responsible for adding that language were at pains, in answering protestations that the qualifying clause seriously weakened the section, to disclaim any intention seriously to augment the burden of proof to be sustained in establishing violation of it. [15] It seems hardly likely that, having with one hand set up an express prohibition against a practice thought to be beyond the reach of the Sherman Act, Congress meant, with the other hand, to reestablish the necessity of meeting the same tests of detriment to the public interest as that Act had been interpreted as requiring. [16] **[*313]** Yet the economic investigation which appellant **[**1062]** would have **[***1386]** us require is of the same broad scope as was adumbrated with reference to unreasonable restraints of trade in *Chicago Board of Trade v. United States, 246 U.S. 231*. [17] To insist upon such an investigation would be to stultify the force of Congress' declaration that requirements contracts are to be prohibited wherever their effect "may be" to substantially lessen competition. If in fact it is economically desirable for service stations to confine themselves to the sale of the petroleum products of a single supplier, they will continue **[*314]** to do so though not bound by contract, and if in fact it is important to retail dealers to assure the supply of their requirements by obtaining the commitment of a single supplier to fulfill them, competition for their patronage should enable them to insist upon such an arrangement without binding them to refrain from looking elsewhere.

***LEdHN[2]*** [2]***LEdHN[3]*** [3]We conclude, therefore, that ***HN9*** the qualifying clause of § 3 is satisfied by proof that competition has been foreclosed in a substantial share of the line of commerce affected. It cannot be gainsaid that observance by a dealer of his requirements contract with Standard does effectively foreclose whatever opportunity there might be for competing suppliers to attract his patronage, and it is clear that the affected proportion of retail sales of petroleum

---

[15] Representative Floyd of Arkansas, one of the managers on the part of the House, explained the use of the word "substantially" as deriving from the opinion of this Court in *Addyston Pipe & Steel Co*. v. United States, 175 U.S. 211, and quoted the passage from *id*. at 229 in which it is said that "the power of Congress to regulate interstate commerce comprises the right to enact a law prohibiting the citizen from entering into those private contracts which directly and substantially, and not merely indirectly, remotely, incidentally and collaterally, regulate to a greater or less degree commerce among the States." 51 Cong. Rec. 16317-18. Senator Chilton, one of the managers on the part of the Senate, denying that the clause weakened the bill, stated that the words "where the effect may be" mean "where it is possible for the effect to be." *Id*. at 16002. Senator Overman, also a Senate conferee, argued that even the elimination of competition in a single town would substantially lessen competition. *Id*. at 15935.

[16] See United States v. American Tobacco Co., 221 U.S. 106, 179:

"Applying the rule of reason to the construction of the statute, it was held in the *Standard Oil Case* that as the words 'restraint of trade' at common law and in the law of this country at the time of the adoption of the Anti-trust Act only embraced acts or contracts or agreements or combinations which operated to the prejudice of the public interests by unduly restricting competition or unduly obstructing the due course of trade or which, either because of their inherent nature or effect or because of the evident purpose of the acts, etc., injuriously restrained trade, that the words as used in the statute were designed to have and did have but a like significance." See also Handler, *A Study of the Construction and Enforcement of the Federal Antitrust Laws* 3-9 (T. N. E. C. Monograph No. 38, 1941). Compare § 4 of the Australian Industries Preservation Act, 1906, which forbids combinations entered into "with intent to restrain trade or commerce to the detriment of the public," construed in *Attorney General* v. *Adelaide S. S. Co*., [1913] A. C. 781, as requiring proof of actual economic detriment.

[17] "The true test of legality is whether the restraint imposed is such as merely regulates and perhaps thereby promotes competition or whether it is such as may suppress or even destroy competition. To determine that question the court must ordinarily consider the facts peculiar to the business to which the restraint is applied; its condition before and after the restraint was imposed; the nature of the restraint and its effect, actual or probable. The history of the restraint, the evil believed to exist, the reason for adopting the particular remedy, the purpose or end sought to be attained, are all relevant facts." 246 U.S. at 238.

products is substantial. In view of the widespread adoption of such contracts by Standard's competitors and the availability of alternative ways of obtaining an assured market, evidence that competitive activity has not actually declined is inconclusive. Standard's use of the contracts creates just such a potential clog on competition as it was the purpose of § 3 to remove wherever, were it to become actual, it would impede a substantial amount of competitive activity.

Since the decree below is sustained by our interpretation of § 3 of the Clayton Act, we need not go on to consider whether it might also be sustained by *§ 1* of the Sherman Act.

***LEdHN[4]*** [4]One last point remains to be disposed of. Appellant contends that its requirements contracts with California dealers, because nearly all the products sold to them are produced in California, do not substantially affect interstate commerce and therefore should have been exempted from the decree. It finds support for this contention in *Addyston Pipe & Steel Co*. v. *United States, 175 U.S. 211, 247*. But the effect of appellant's requirements contracts with California retail dealers is to prevent them **[*315]** from dealing with suppliers from outside the State as well as within the State and is thus to lessen competition in both interstate and intrastate commerce. Appellant has not suggested that if these dealers were not bound by their contracts with it that they would **[**1063]** continue to purchase **[***1387]** only products originating within the State. The *Addyston* case, on the other hand, dealt not with the diminution of competition between suppliers brought about by the action of one at the expense of the rest, whether within or without the State, but a combination among them to restrain competition. Modification of the decree was required only to make clear that it did not reach a combination among the defendants doing business in a single State which was confined to transactions taking place within that same State.

The judgment below is

*Affirmed* .

**[**1064contd]** [EDITOR'S NOTE: The page numbers of this document may appear to be out of sequence; however, this pagination accurately reflects the pagination of the original published document.]

MR. JUSTICE DOUGLAS.

The economic theories which the Court has read into the Anti-Trust Laws have favored rather than discouraged monopoly. As a result of the big business philosophy underlying *United States v. United Shoe Machinery Co., 247 U.S. 32*; *United States v. United States Steel Corp., 251 U.S. 417*; *United States v. International Harvester Co., 274 U.S. 693*, big business has become bigger and bigger. Monopoly has flourished. Cartels have increased their hold on the nation. The trusts wax strong. [1] **[***1388]** There is less and less place for the independent.

---

[1] See Final Report and Recommendations of the Temporary National Economic Committee, S. Doc. No. 35, 77th Cong., 1st Sess. (1941). For more detailed analyses, see Competition and Monopoly in American Industry (TNEC Monograph 21, 1940) pp. 299 *et seq*.; The Structure of Industry (TNEC Monograph 27, 1941) pp. 231 *et seq*.; The Distribution of Ownership in the 200 Largest Nonfinancial Corporations (TNEC Monograph 29, 1940); Relative Efficiency of Large, Medium-Sized, and Small Business (TNEC Monograph 13, 1941).

The merger and acquisition movement, which has been evident since the turn of the century and which contributed to the spiraling concentration of corporate wealth into the hands of the few, has not ended. We are presently in the midst of a similar movement. See the Federal Trade Commission report, The Present Trend of Corporate Mergers and Acquisitions, Sen. Doc. No. 17,

**[*316]** The full force of the Anti-Trust Laws has not been felt on our economy. It has been deflected. Niggardly interpretations **[**1065]** have robbed those laws of much of their efficacy. There are exceptions. Price fixing is illegal *per* **[*317]** *se*. [2] The use of patents to obtain monopolies on unpatented articles is condemned. [3] Monopoly that has been built as a result of unlawful tactics, *e. g.*, through practices that are restraints of trade, is broken up. [4] But when it comes to monopolies built in gentlemanly ways -- by mergers, purchases of assets or control **[**1066]** and the like -- the teeth have largely been drawn from the Act.

**[*318]** We announced that the existence of monopoly power, coupled with the purpose or intent to monopolize, was unlawful. [5] But to date that principle has not shown bright promise in application. [6] Under the guise of increased efficiency big business has received approval for easy growth. *United States v. Columbia Steel Co., 334 U.S. 495*, represents the current attitude of the Court on this problem. In that case United States Steel -- the giant of the industry -- was allowed to fasten its tentacles tighter on the economy by acquiring the assets of a steel company in the Far West where competition was beginning to develop.

---

80th Cong., 1st Sess. (1947), p. 6, where it is shown that "the increase in the merger movement following VJ-day parallels very closely the sharp upward movement which took place at the end of World War I." The causes which have recently contributed to the growing bigness of big corporations are varied. See Lynch, The Concentration of Economic Power (1946), pp. 3-4 where it is said:

"Even before the entrance of the United States into the war the placing of defense contracts served to augment the growth of bigness in industry and to intensify the struggle for survival by small concerns. By 1941 the pattern of defense contracts which, with modifications, was to remain for the duration of the war had been established. It is reported that in that year fifty-six firms, less than one-half of 1 percent of the manufacturing establishments of the country, were awarded 75 percent of all the contracts. Concentration was even more marked within this group, however, inasmuch as six corporations held 31 percent of the total. Between June, 1940, and March, 1943, more than 100 million dollars worth of prime warsupply contracts were awarded. Seventy percent of these were held by the leading 100 corporations; 10 corporations held 32 percent, and the leading 50 held 60 percent.

"Studies by the United States Department of Commerce during 1943-1944 throw additional light on this trend toward industrial concentration. After Pearl Harbor the total number of firms in business declined precipitously. Despite the wartime industrial boom, the number of firms which discontinued operations was greater than that replaced by new entries; it is estimated that the number in business in 1943 was nearly 17 percent less than in 1941. There are numerous indications that the relative importance of small business has declined during the war period and that the dominance of big business has become more marked. Between 1938 and 1942 it appears that the total number of workers employed by 95 percent of the nation's corporations (the smallest) declined 23 percent, whereas those employed by 5 percent of the corporations (the largest) increased 22 percent. A related study indicates that between January 1, 1941, and January 1, 1943, business firms employing fewer than 125 workers each experienced an increase in employment of 1 percent and an increase in the value of their product (attributable principally to price increases) of 16 percent; during the same period, however, the increase in employment by the large establishments employing more than 125 workers was 62 percent and the increase in the value of the product, 96 percent."

2 See for example *United States* v. *Socony-Vacuum Oil Co.*, 310 U.S. 150.

3 See for example *Mercoid Corp*. v. *Mid-Continent Co*., 320 U.S. 661.

4 See *United States* v. *Griffith*, 334 U.S. 100; *Schine Theatres* v. *United States*, 334 U.S. 110; *United States* v. *Paramount Pictures*, 334 U.S. 131, 172.

Those cases have largely expended the force of *Hartford-Empire Co*. v. *United States*, 323 U.S. 386 -- an indefensible decision whereby the Court allowed those who had built one of the tightest monopolies in American history largely to retain their ill-gotten gains and continue their hold on the economy. The philosophy of that decision can be summed up in the words Brandeis used to describe the decree effecting a so-called dissolution of the American Tobacco Co. He said that its defenders "appear to have discovered in the Constitution a new implied prohibition: *'What man has illegally joined together, let no court put asunder.'*" The Curse of Bigness (1935), p. 103.

5 See *Schine Theatres* v. *United States*, *supra*, pp. 129-130.

6 It should be noted in this connection that a majority of the Court could not be obtained for holding illegal *per se* the vertical integration in the motion picture industry. See *United States* v. *Paramount Pictures*, *supra*, pp. 173-174.

The increased concentration of industrial power in the hands of a few has changed habits of thought. A new age has been introduced. It is more and more an age of "monopoly competition." Monopoly competition is a regime of friendly alliances, of quick and easy accommodation of prices even without the benefit of trade associations, of what Brandeis said was euphemistically called "cooperation." [7] While this is not true in all fields, it has become alarmingly apparent in many.

The lessons Brandeis taught on the curse of bigness have largely been forgotten in high places. Size is allowed to become a menace to existing and putative competitors. Price control is allowed to escape the influences of the competitive market and to gravitate into the hands of the few. But beyond all that there is the effect on the community when independents are swallowed up by the trusts and entrepreneurs become employees of absentee **[*319]** owners. Then there is a serious loss in citizenship. **[***1389]** Local leadership is diluted. He who was a leader in the village becomes dependent on outsiders for his action and policy. Clerks responsible to a superior in a distant place take the place of resident proprietors beholden to no one. These are the prices which the nation pays for the almost ceaseless growth in bigness on the part of industry.

These problems may not appear on the surface to have relationship to the case before us. But they go to the very heart of the problem.

It is common knowledge that a host of filling stations in the country are locally owned and operated. Others are owned and operated by the big oil companies. This case involves directly only the former. It pertains to requirements contracts that the oil companies make with these independents. It is plain that a filling-station owner who is tied to an oil company for his supply of products is not an available customer for the products of other suppliers. The same is true of a filling-station owner who purchases his inventory a year in advance. His demand is withdrawn from the market for the duration of the contract in the one case and for a year in the other. The result in each case is to lessen competition if the standard is day-to-day purchases. Whether it is a substantial lessening of competition within the meaning of the Anti-Trust Laws is a question of degree and may vary from industry to industry.

The Court answers the question for the oil industry by a formula which under our decisions promises to wipe out large segments of independent filling-station operators. The method of doing business under requirements contracts at least keeps the independents alive. They survive as small business units. The situation is not ideal **[*320]** from either their point of view [8] or **[**1067]** that of the nation. But the alternative which the Court offers is far worse from the point of view of both.

The elimination of these requirements contracts sets the stage for Standard and the other oil companies to build service-station empires of their own. The opinion of the Court does more than set the stage for that development. It is an advisory opinion as well, stating to the oil companies how they can with impunity build their empires. The formula suggested by the Court is either the use of the "agency" device, which in practical effect means control of filling stations by the oil companies (cf. *Federal Trade Commission v. Curtis Co., 260 U.S. 568*), or the outright acquisition of them by subsidiary corporations or otherwise. See *United States v. Columbia*

---

[7] Other People's Money (1933), p. 110.

[8] For the plight of the independent service-station operator see Control of the Petroleum Industry by Major Oil Companies (TNEC Monograph No. 39, 1941) pp. 46, 47, 52. See also Review and Criticism on Behalf of Standard Oil Co. (New Jersey) and Sun Oil Co. of Monograph No. 39 with Rejoinder by Monograph Author (TNEC Monograph 39-A, 1941).

*Steel Co., supra.* Under the approved judicial doctrine either of those devices means increasing the monopoly of the oil companies over the retail field.

When the choice is thus given, I dissent from the outlawry of the requirements contract on the present facts. The effect which it has on competition in this field is minor as compared to the damage which will flow from the judicially approved formula for the growth of bigness tendered by the Court as an alternative. Our choice must be made on the basis not of abstractions but of the realities of modern industrial life.

Today there is vigorous competition between the oil companies for the market. That competition has left some room for the survival of the independents. But when this inducement for their survival is taken away, we **[*321]** can expect that the oil companies will move in to supplant **[***1390]** them with their own stations. There will still be competition between the oil companies. But there will be a tragic loss to the nation. The small, independent business man will be supplanted by clerks. Competition between suppliers of accessories (which is involved in this case) will diminish or cease altogether. The oil companies will command an increasingly larger share of both the wholesale and the retail markets.

That is the likely result of today's decision. The requirements contract which is displaced is relatively innocuous as compared with the virulent growth of monopoly power which the Court encourages. The Court does not act unwittingly. It consciously pushes the oil industry in that direction. The Court approves what the Anti-Trust Laws were designed to prevent. It helps remake America in the image of the cartels.

**Dissent by:** JACKSON

**Dissent**

**[**1063contd]** [EDITOR'S NOTE: The page numbers of this document may appear to be out of sequence; however, this pagination accurately reflects the pagination of the original published document.]

MR. JUSTICE JACKSON, with whom THE CHIEF JUSTICE and MR. JUSTICE BURTON join, dissenting.

I am unable to join the judgment or opinion of the Court for reasons I will state, but shortly.

Section 3 of the Clayton Act does not make any lease, sale, or contract unlawful unless "the effect of such lease, sale, or contract for sale or such condition, agreement or understanding may be to substantially lessen competition or tend to create a monopoly in any line of commerce." 38 Stat. 730, 731, *15 U. S. C. § 14*. It is indispensable to the Government's case to establish that either the actual or the probable effect of the accused arrangement is to substantially lessen competition or tend to create a monopoly.

I am unable to agree that this requirement was met. To be sure, the contracts cover "a substantial number of outlets and a substantial amount of products, whether considered comparatively or not." *78 F.Supp. 850, 875*. **[*322]** But that fact does not automatically bring the accused arrangement within the prohibitions of the statute. The number of dealers and the volume of sales covered by the arrangement of course was sufficient to be substantial. That is to say, this

arrangement operated on enough commerce to violate the Act, provided its effects were substantially to lessen competition or tend to create a monopoly. But proof of their quantity does not prove that they had this forbidden quality; and the assumption that they did, without proof, seems to me unwarranted.

Moreover, the trial court not only made the assumption but he did not allow the defendant affirmatively to show that such effects do not flow from this arrangement. Such evidence on the subject as was admitted was not considered in reaching the decision that these contracts are illegal.

I regard it as unfortunate that the Clayton Act submits such economic issues to judicial determination. It not only leaves the law vague as a warning or guide, and determined only after the event, but the judicial process is not well adapted to exploration of such industry-wide, and even nation-wide, questions.

But if they must decide, the only possible way for the courts to arrive at a fair determination is to hear all relevant evidence from both parties and weigh not only its inherent probabilities of verity but also compare the experience, disinterestedness and credibility of opposing witnesses. This is a tedious process and not too enlightening, but without it a judicial decree is but a guess in the dark. That is all we have here and I do not think it is an adequate basis on which to upset long-standing and widely practiced business arrangements.

I should therefore vacate this decree and direct the court below to complete the case by hearing and weighing the Government's evidence and that of defendant as to the effects of this device.

**[*323]** **[***1391]** However, if the Court refuses to do that, I cannot agree that the requirements contract is *per se* an illegal one under the antitrust law, and that is the substance of what the Court seems to hold. I am not convinced that the requirements contract as here used is a device for suppressing competition instead of a device for waging competition. If we look only **[**1064]** at its effect in relation to particular retailers who become parties to it, it does restrain their freedom to purchase their requirements elsewhere and prevents other companies from selling to them. Many contracts have the effect of taking a purchaser out of the market for goods he already has bought or contracted to take. But the retailer in this industry is only a conduit from the oil fields to the driver's tank, a means by which the oil companies compete to get the business of the ultimate consumer -- the man in whose automobile the gas is used. It means to me, if I must decide without evidence, that these contracts are an almost necessary means to maintain this all-important competition for consumer business, in which it is admitted competition is keen. The retail stations, whether independent or company-owned, are the instrumentalities through which competition for this ultimate market is waged.

It does not seem to me inherently to lessen this real competition when an oil company tries to establish superior service by providing the consumer with a responsible dealer from which the public can purchase adequate and timely supplies of oil, gasoline and car accessories of some known and reliable standard of quality. No retailer, whether agent or independent, can long remain in business if he does not always, and not just intermittently, have gas to sell. Retailers' storage capacity usually is limited and they are in no position to accumulate large stocks. They can take gas only when and as they can sell it. The Government can hardly force someone to contract to stand by, ever ready to fill **[*324]** fluctuating demands of dealers who will not in turn undertake to buy from that supplier all their requirements. And it is important to the driving public to be

able to rely on retailers to have gas to retail. It is equally important that the wholesaler have some incentive to carry the stocks and have the transport facilities to make the irregular deliveries caused by varied consumer demands.

It may be that the Government, if required to do so, could prove that this is a bad system and an illegal one. It may be that the defendant, if permitted to do so, can prove that it is, in its overall aspects, a good system and within the law. But on the present record the Government has not made a case. [1]

If the courts are to apply the lash of the antitrust laws to the backs of businessmen to make them compete, we cannot in fairness also apply the lash whenever they hit upon a successful method of competing. That, insofar as I am permitted by the record to learn the facts, appears to be the case before us. I would reverse.

---

[1] The Government can derive no comfort for this sort of thing from *International Salt Co*. v. *United States*, 332 U.S. 392. There the defendant started with a patent monopoly of the machine for utilization of its product. The customers, canners, were in effect the ultimate consumers of salt as such. But they could get the advantages of the invention only if they tied themselves to use no other salt therein.

EXHIBIT 311

# Horizontal Merger Guidelines

U.S. Department of Justice

and the

Federal Trade Commission

Issued: August 19, 2010

# Table of Contents


1. Overview ... 1

2. Evidence of Adverse Competitive Effects ... 2
2.1 Types of Evidence ... 3
2.1.1 Actual Effects Observed in Consummated Mergers ... 3
2.1.2 Direct Comparisons Based on Experience ... 3
2.1.3 Market Shares and Concentration in a Relevant Market ... 3
2.1.4 Substantial Head-to-Head Competition ... 3
2.1.5 Disruptive Role of a Merging Party ... 3
2.2 Sources of Evidence ... 4
2.2.1 Merging Parties ... 4
2.2.2 Customers ... 5
2.2.3 Other Industry Participants and Observers ... 5

3. Targeted Customers and Price Discrimination ... 6

4. Market Definition ... 7
4.1 Product Market Definition ... 8
4.1.1 The Hypothetical Monopolist Test ... 8
4.1.2 Benchmark Prices and SSNIP Size ... 10
4.1.3 Implementing the Hypothetical Monopolist Test ... 11
4.1.4 Product Market Definition with Targeted Customers ... 12
4.2 Geographic Market Definition ... 13
4.2.1 Geographic Markets Based on the Locations of Suppliers ... 13
4.2.2 Geographic Markets Based on the Locations of Customers ... 14

5. Market Participants, Market Shares, and Market Concentration ... 15
5.1 Market Participants ... 15
5.2 Market Shares ... 16
5.3 Market Concentration ... 18

6. Unilateral Effects ... 20
6.1 Pricing of Differentiated Products ... 20
6.2 Bargaining and Auctions ... 22
6.3 Capacity and Output for Homogeneous Products ... 22
6.4 Innovation and Product Variety ... 23

7. Coordinated Effects ... 24
7.1 Impact of Merger on Coordinated Interaction ... 25
7.2 Evidence a Market is Vulnerable to Coordinated Conduct ... 25

8. Powerful Buyers ... 27

9. Entry ..... 27
9.1 Timeliness ..... 29
9.2 Likelihood ..... 29
9.3 Sufficiency ..... 29

10. Efficiencies ..... 29

11. Failure and Exiting Assets ..... 32

12. Mergers of Competing Buyers ..... 32

13. Partial Acquisitions ..... 33

# 1. Overview

These Guidelines outline the principal analytical techniques, practices, and the enforcement policy of the Department of Justice and the Federal Trade Commission (the "Agencies") with respect to mergers and acquisitions involving actual or potential competitors ("horizontal mergers") under the federal antitrust laws.[1] The relevant statutory provisions include Section 7 of the Clayton Act, 15 U.S.C. § 18, Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2, and Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45. Most particularly, Section 7 of the Clayton Act prohibits mergers if "in any line of commerce or in any activity affecting commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly."

The Agencies seek to identify and challenge competitively harmful mergers while avoiding unnecessary interference with mergers that are either competitively beneficial or neutral. Most merger analysis is necessarily predictive, requiring an assessment of what will likely happen if a merger proceeds as compared to what will likely happen if it does not. Given this inherent need for prediction, these Guidelines reflect the congressional intent that merger enforcement should interdict competitive problems in their incipiency and that certainty about anticompetitive effect is seldom possible and not required for a merger to be illegal.

These Guidelines describe the principal analytical techniques and the main types of evidence on which the Agencies usually rely to predict whether a horizontal merger may substantially lessen competition. They are not intended to describe how the Agencies analyze cases other than horizontal mergers. These Guidelines are intended to assist the business community and antitrust practitioners by increasing the transparency of the analytical process underlying the Agencies' enforcement decisions. They may also assist the courts in developing an appropriate framework for interpreting and applying the antitrust laws in the horizontal merger context.

These Guidelines should be read with the awareness that merger analysis does not consist of uniform application of a single methodology. Rather, it is a fact-specific process through which the Agencies, guided by their extensive experience, apply a range of analytical tools to the reasonably available and reliable evidence to evaluate competitive concerns in a limited period of time. Where these Guidelines provide examples, they are illustrative and do not exhaust the applications of the relevant principle.[2]

---

[1] These Guidelines replace the Horizontal Merger Guidelines issued in 1992, revised in 1997. They reflect the ongoing accumulation of experience at the Agencies. The Commentary on the Horizontal Merger Guidelines issued by the Agencies in 2006 remains a valuable supplement to these Guidelines. These Guidelines may be revised from time to time as necessary to reflect significant changes in enforcement policy, to clarify existing policy, or to reflect new learning. These Guidelines do not cover vertical or other types of non-horizontal acquisitions.

[2] These Guidelines are not intended to describe how the Agencies will conduct the litigation of cases they decide to bring. Although relevant in that context, these Guidelines neither dictate nor exhaust the range of evidence the Agencies may introduce in litigation.

The unifying theme of these Guidelines is that mergers should not be permitted to create, enhance, or entrench market power or to facilitate its exercise. For simplicity of exposition, these Guidelines generally refer to all of these effects as enhancing market power. A merger enhances market power if it is likely to encourage one or more firms to raise price, reduce output, diminish innovation, or otherwise harm customers as a result of diminished competitive constraints or incentives. In evaluating how a merger will likely change a firm's behavior, the Agencies focus primarily on how the merger affects conduct that would be most profitable for the firm.

A merger can enhance market power simply by eliminating competition between the merging parties. This effect can arise even if the merger causes no changes in the way other firms behave. Adverse competitive effects arising in this manner are referred to as "unilateral effects." A merger also can enhance market power by increasing the risk of coordinated, accommodating, or interdependent behavior among rivals. Adverse competitive effects arising in this manner are referred to as "coordinated effects." In any given case, either or both types of effects may be present, and the distinction between them may be blurred.

These Guidelines principally describe how the Agencies analyze mergers between rival suppliers that may enhance their market power as sellers. Enhancement of market power by sellers often elevates the prices charged to customers. For simplicity of exposition, these Guidelines generally discuss the analysis in terms of such price effects. Enhanced market power can also be manifested in non-price terms and conditions that adversely affect customers, including reduced product quality, reduced product variety, reduced service, or diminished innovation. Such non-price effects may coexist with price effects, or can arise in their absence. When the Agencies investigate whether a merger may lead to a substantial lessening of non-price competition, they employ an approach analogous to that used to evaluate price competition. Enhanced market power may also make it more likely that the merged entity can profitably and effectively engage in exclusionary conduct. Regardless of how enhanced market power likely would be manifested, the Agencies normally evaluate mergers based on their impact on customers. The Agencies examine effects on either or both of the direct customers and the final consumers. The Agencies presume, absent convincing evidence to the contrary, that adverse effects on direct customers also cause adverse effects on final consumers.

Enhancement of market power by buyers, sometimes called "monopsony power," has adverse effects comparable to enhancement of market power by sellers. The Agencies employ an analogous framework to analyze mergers between rival purchasers that may enhance their market power as buyers. See Section 12.

## 2. Evidence of Adverse Competitive Effects

The Agencies consider any reasonably available and reliable evidence to address the central question of whether a merger may substantially lessen competition. This section discusses several categories and sources of evidence that the Agencies, in their experience, have found most informative in predicting the likely competitive effects of mergers. The list provided here is not exhaustive. In any given case, reliable evidence may be available in only some categories or from some sources. For each category of evidence, the Agencies consider evidence indicating that the merger may enhance competition as well as evidence indicating that it may lessen competition.

## 2.1 Types of Evidence

### *2.1.1 Actual Effects Observed in Consummated Mergers*

When evaluating a consummated merger, the ultimate issue is not only whether adverse competitive effects have already resulted from the merger, but also whether such effects are likely to arise in the future. Evidence of observed post-merger price increases or other changes adverse to customers is given substantial weight. The Agencies evaluate whether such changes are anticompetitive effects resulting from the merger, in which case they can be dispositive. However, a consummated merger may be anticompetitive even if such effects have not yet been observed, perhaps because the merged firm may be aware of the possibility of post-merger antitrust review and moderating its conduct. Consequently, the Agencies also consider the same types of evidence they consider when evaluating unconsummated mergers.

### *2.1.2 Direct Comparisons Based on Experience*

The Agencies look for historical events, or "natural experiments," that are informative regarding the competitive effects of the merger. For example, the Agencies may examine the impact of recent mergers, entry, expansion, or exit in the relevant market. Effects of analogous events in similar markets may also be informative.

The Agencies also look for reliable evidence based on variations among similar markets. For example, if the merging firms compete in some locales but not others, comparisons of prices charged in regions where they do and do not compete may be informative regarding post-merger prices. In some cases, however, prices are set on such a broad geographic basis that such comparisons are not informative. The Agencies also may examine how prices in similar markets vary with the number of significant competitors in those markets.

### *2.1.3 Market Shares and Concentration in a Relevant Market*

The Agencies give weight to the merging parties' market shares in a relevant market, the level of concentration, and the change in concentration caused by the merger. See Sections 4 and 5. Mergers that cause a significant increase in concentration and result in highly concentrated markets are presumed to be likely to enhance market power, but this presumption can be rebutted by persuasive evidence showing that the merger is unlikely to enhance market power.

### *2.1.4 Substantial Head-to-Head Competition*

The Agencies consider whether the merging firms have been, or likely will become absent the merger, substantial head-to-head competitors. Such evidence can be especially relevant for evaluating adverse unilateral effects, which result directly from the loss of that competition. See Section 6. This evidence can also inform market definition. See Section 4.

### *2.1.5 Disruptive Role of a Merging Party*

The Agencies consider whether a merger may lessen competition by eliminating a "maverick" firm, i.e., a firm that plays a disruptive role in the market to the benefit of customers. For example, if one of the merging firms has a strong incumbency position and the other merging firm threatens to

disrupt market conditions with a new technology or business model, their merger can involve the loss of actual or potential competition. Likewise, one of the merging firms may have the incentive to take the lead in price cutting or other competitive conduct or to resist increases in industry prices. A firm that may discipline prices based on its ability and incentive to expand production rapidly using available capacity also can be a maverick, as can a firm that has often resisted otherwise prevailing industry norms to cooperate on price setting or other terms of competition.

## 2.2 Sources of Evidence

The Agencies consider many sources of evidence in their merger analysis. The most common sources of reasonably available and reliable evidence are the merging parties, customers, other industry participants, and industry observers.

### *2.2.1 Merging Parties*

The Agencies typically obtain substantial information from the merging parties. This information can take the form of documents, testimony, or data, and can consist of descriptions of competitively relevant conditions or reflect actual business conduct and decisions. Documents created in the normal course are more probative than documents created as advocacy materials in merger review. Documents describing industry conditions can be informative regarding the operation of the market and how a firm identifies and assesses its rivals, particularly when business decisions are made in reliance on the accuracy of those descriptions. The business decisions taken by the merging firms also can be informative about industry conditions. For example, if a firm sets price well above incremental cost, that normally indicates either that the firm believes its customers are not highly sensitive to price (not in itself of antitrust concern, see Section 4.1.3[3]) or that the firm and its rivals are engaged in coordinated interaction (see Section 7). Incremental cost depends on the relevant increment in output as well as on the time period involved, and in the case of large increments and sustained changes in output it may include some costs that would be fixed for smaller increments of output or shorter time periods.

Explicit or implicit evidence that the merging parties intend to raise prices, reduce output or capacity, reduce product quality or variety, withdraw products or delay their introduction, or curtail research and development efforts after the merger, or explicit or implicit evidence that the ability to engage in such conduct motivated the merger, can be highly informative in evaluating the likely effects of a merger. Likewise, the Agencies look for reliable evidence that the merger is likely to result in efficiencies. The Agencies give careful consideration to the views of individuals whose responsibilities, expertise, and experience relating to the issues in question provide particular indicia of reliability. The financial terms of the transaction may also be informative regarding competitive effects. For example, a purchase price in excess of the acquired firm's stand-alone market value may indicate that the acquiring firm is paying a premium because it expects to be able to reduce competition or to achieve efficiencies.

---

3 High margins commonly arise for products that are significantly differentiated. Products involving substantial fixed costs typically will be developed only if suppliers expect there to be enough differentiation to support margins sufficient to cover those fixed costs. High margins can be consistent with incumbent firms earning competitive returns.

### *2.2.2 Customers*

Customers can provide a variety of information to the Agencies, ranging from information about their own purchasing behavior and choices to their views about the effects of the merger itself.

Information from customers about how they would likely respond to a price increase, and the relative attractiveness of different products or suppliers, may be highly relevant, especially when corroborated by other evidence such as historical purchasing patterns and practices. Customers also can provide valuable information about the impact of historical events such as entry by a new supplier.

The conclusions of well-informed and sophisticated customers on the likely impact of the merger itself can also help the Agencies investigate competitive effects, because customers typically feel the consequences of both competitively beneficial and competitively harmful mergers. In evaluating such evidence, the Agencies are mindful that customers may oppose, or favor, a merger for reasons unrelated to the antitrust issues raised by that merger.

When some customers express concerns about the competitive effects of a merger while others view the merger as beneficial or neutral, the Agencies take account of this divergence in using the information provided by customers and consider the likely reasons for such divergence of views. For example, if for regulatory reasons some customers cannot buy imported products, while others can, a merger between domestic suppliers may harm the former customers even if it leaves the more flexible customers unharmed. See Section 3.

When direct customers of the merging firms compete against one another in a downstream market, their interests may not be aligned with the interests of final consumers, especially if the direct customers expect to pass on any anticompetitive price increase. A customer that is protected from adverse competitive effects by a long-term contract, or otherwise relatively immune from the merger's harmful effects, may even welcome an anticompetitive merger that provides that customer with a competitive advantage over its downstream rivals.

> *Example 1:* As a result of the merger, Customer C will experience a price increase for an input used in producing its final product, raising its costs. Customer C's rivals use this input more intensively than Customer C, and the same price increase applied to them will raise their costs more than it raises Customer C's costs. On balance, Customer C may benefit from the merger even though the merger involves a substantial lessening of competition.

### *2.2.3 Other Industry Participants and Observers*

Suppliers, indirect customers, distributors, other industry participants, and industry analysts can also provide information helpful to a merger inquiry. The interests of firms selling products complementary to those offered by the merging firms often are well aligned with those of customers, making their informed views valuable.

Information from firms that are rivals to the merging parties can help illuminate how the market operates. The interests of rival firms often diverge from the interests of customers, since customers normally lose, but rival firms gain, if the merged entity raises its prices. For that reason, the Agencies do not routinely rely on the overall views of rival firms regarding the competitive effects of the

merger. However, rival firms may provide relevant facts, and even their overall views may be instructive, especially in cases where the Agencies are concerned that the merged entity may engage in exclusionary conduct.

> *Example 2:* Merging Firms A and B operate in a market in which network effects are significant, implying that any firm's product is significantly more valuable if it commands a large market share or if it is interconnected with others that in aggregate command such a share. Prior to the merger, they and their rivals voluntarily interconnect with one another. The merger would create an entity with a large enough share that a strategy of ending voluntary interconnection would have a dangerous probability of creating monopoly power in this market. The interests of rivals and of consumers would be broadly aligned in preventing such a merger.

## 3. Targeted Customers and Price Discrimination

When examining possible adverse competitive effects from a merger, the Agencies consider whether those effects vary significantly for different customers purchasing the same or similar products. Such differential impacts are possible when sellers can discriminate, e.g., by profitably raising price to certain targeted customers but not to others. The possibility of price discrimination influences market definition (see Section 4), the measurement of market shares (see Section 5), and the evaluation of competitive effects (see Sections 6 and 7).

When price discrimination is feasible, adverse competitive effects on targeted customers can arise, even if such effects will not arise for other customers. A price increase for targeted customers may be profitable even if a price increase for all customers would not be profitable because too many other customers would substitute away. When discrimination is reasonably likely, the Agencies may evaluate competitive effects separately by type of customer. The Agencies may have access to information unavailable to customers that is relevant to evaluating whether discrimination is reasonably likely.

For price discrimination to be feasible, two conditions typically must be met: differential pricing and limited arbitrage.

First, the suppliers engaging in price discrimination must be able to price differently to targeted customers than to other customers. This may involve identification of individual customers to which different prices are offered or offering different prices to different types of customers based on observable characteristics.

> *Example 3:* Suppliers can distinguish large buyers from small buyers. Large buyers are more likely than small buyers to self-supply in response to a significant price increase. The merger may lead to price discrimination against small buyers, harming them, even if large buyers are not harmed. Such discrimination can occur even if there is no discrete gap in size between the classes of large and small buyers.

In other cases, suppliers may be unable to distinguish among different types of customers but can offer multiple products that sort customers based on their purchase decisions.

Second, the targeted customers must not be able to defeat the price increase of concern by arbitrage, e.g., by purchasing indirectly from or through other customers. Arbitrage may be difficult if it would void warranties or make service more difficult or costly for customers. Arbitrage is inherently impossible for many services. Arbitrage between customers at different geographic locations may be

impractical due to transportation costs. Arbitrage on a modest scale may be possible but sufficiently costly or limited that it would not deter or defeat a discriminatory pricing strategy.

## 4. Market Definition

When the Agencies identify a potential competitive concern with a horizontal merger, market definition plays two roles. First, market definition helps specify the line of commerce and section of the country in which the competitive concern arises. In any merger enforcement action, the Agencies will normally identify one or more relevant markets in which the merger may substantially lessen competition. Second, market definition allows the Agencies to identify market participants and measure market shares and market concentration. See Section 5. The measurement of market shares and market concentration is not an end in itself, but is useful to the extent it illuminates the merger's likely competitive effects.

The Agencies' analysis need not start with market definition. Some of the analytical tools used by the Agencies to assess competitive effects do not rely on market definition, although evaluation of competitive alternatives available to customers is always necessary at some point in the analysis.

Evidence of competitive effects can inform market definition, just as market definition can be informative regarding competitive effects. For example, evidence that a reduction in the number of significant rivals offering a group of products causes prices for those products to rise significantly can itself establish that those products form a relevant market. Such evidence also may more directly predict the competitive effects of a merger, reducing the role of inferences from market definition and market shares.

Where analysis suggests alternative and reasonably plausible candidate markets, and where the resulting market shares lead to very different inferences regarding competitive effects, it is particularly valuable to examine more direct forms of evidence concerning those effects.

Market definition focuses solely on demand substitution factors, i.e., on customers' ability and willingness to substitute away from one product to another in response to a price increase or a corresponding non-price change such as a reduction in product quality or service. The responsive actions of suppliers are also important in competitive analysis. They are considered in these Guidelines in the sections addressing the identification of market participants, the measurement of market shares, the analysis of competitive effects, and entry.

Customers often confront a range of possible substitutes for the products of the merging firms. Some substitutes may be closer, and others more distant, either geographically or in terms of product attributes and perceptions. Additionally, customers may assess the proximity of different products differently. When products or suppliers in different geographic areas are substitutes for one another to varying degrees, defining a market to include some substitutes and exclude others is inevitably a simplification that cannot capture the full variation in the extent to which different products compete against each other. The principles of market definition outlined below seek to make this inevitable simplification as useful and informative as is practically possible. Relevant markets need not have precise metes and bounds.

Defining a market broadly to include relatively distant product or geographic substitutes can lead to misleading market shares. This is because the competitive significance of distant substitutes is unlikely to be commensurate with their shares in a broad market. Although excluding more distant substitutes from the market inevitably understates their competitive significance to some degree, doing so often provides a more accurate indicator of the competitive effects of the merger than would the alternative of including them and overstating their competitive significance as proportional to their shares in an expanded market.

> *Example 4:* Firms A and B, sellers of two leading brands of motorcycles, propose to merge. If Brand A motorcycle prices were to rise, some buyers would substitute to Brand B, and some others would substitute to cars. However, motorcycle buyers see Brand B motorcycles as much more similar to Brand A motorcycles than are cars. Far more cars are sold than motorcycles. Evaluating shares in a market that includes cars would greatly underestimate the competitive significance of Brand B motorcycles in constraining Brand A's prices and greatly overestimate the significance of cars.

Market shares of different products in narrowly defined markets are more likely to capture the relative competitive significance of these products, and often more accurately reflect competition between close substitutes. As a result, properly defined antitrust markets often exclude some substitutes to which some customers might turn in the face of a price increase even if such substitutes provide alternatives for those customers. However, a group of products is too narrow to constitute a relevant market if competition from products outside that group is so ample that even the complete elimination of competition within the group would not significantly harm either direct customers or downstream consumers. The hypothetical monopolist test (see Section 4.1.1) is designed to ensure that candidate markets are not overly narrow in this respect.

The Agencies implement these principles of market definition flexibly when evaluating different possible candidate markets. Relevant antitrust markets defined according to the hypothetical monopolist test are not always intuitive and may not align with how industry members use the term "market."

Section 4.1 describes the principles that apply to product market definition, and gives guidance on how the Agencies most often apply those principles. Section 4.2 describes how the same principles apply to geographic market definition. Although discussed separately for simplicity of exposition, the principles described in Sections 4.1 and 4.2 are combined to define a relevant market, which has both a product and a geographic dimension. In particular, the hypothetical monopolist test is applied to a group of products together with a geographic region to determine a relevant market.

## 4.1 Product Market Definition

When a product sold by one merging firm (Product A) competes against one or more products sold by the other merging firm, the Agencies define a relevant product market around Product A to evaluate the importance of that competition. Such a relevant product market consists of a group of substitute products including Product A. Multiple relevant product markets may thus be identified.

### *4.1.1 The Hypothetical Monopolist Test*

The Agencies employ the hypothetical monopolist test to evaluate whether groups of products in candidate markets are sufficiently broad to constitute relevant antitrust markets. The Agencies use the

hypothetical monopolist test to identify a set of products that are reasonably interchangeable with a product sold by one of the merging firms.

The hypothetical monopolist test requires that a product market contain enough substitute products so that it could be subject to post-merger exercise of market power significantly exceeding that existing absent the merger. Specifically, the test requires that a hypothetical profit-maximizing firm, not subject to price regulation, that was the only present and future seller of those products ("hypothetical monopolist") likely would impose at least a small but significant and non-transitory increase in price ("SSNIP") on at least one product in the market, including at least one product sold by one of the merging firms.[4] For the purpose of analyzing this issue, the terms of sale of products outside the candidate market are held constant. The SSNIP is employed solely as a methodological tool for performing the hypothetical monopolist test; it is not a tolerance level for price increases resulting from a merger.

Groups of products may satisfy the hypothetical monopolist test without including the full range of substitutes from which customers choose. The hypothetical monopolist test may identify a group of products as a relevant market even if customers would substitute significantly to products outside that group in response to a price increase.

> *Example 5:* Products A and B are being tested as a candidate market. Each sells for $100, has an incremental cost of $60, and sells 1200 units. For every dollar increase in the price of Product A, for any given price of Product B, Product A loses twenty units of sales to products outside the candidate market and ten units of sales to Product B, and likewise for Product B. Under these conditions, economic analysis shows that a hypothetical profit-maximizing monopolist controlling Products A and B would raise both of their prices by ten percent, to $110. Therefore, Products A and B satisfy the hypothetical monopolist test using a five percent SSNIP, and indeed for any SSNIP size up to ten percent. This is true even though two-thirds of the sales lost by one product when it raises its price are diverted to products outside the relevant market.

When applying the hypothetical monopolist test to define a market around a product offered by one of the merging firms, if the market includes a second product, the Agencies will normally also include a third product if that third product is a closer substitute for the first product than is the second product. The third product is a closer substitute if, in response to a SSNIP on the first product, greater revenues are diverted to the third product than to the second product.

> *Example 6:* In Example 5, suppose that half of the unit sales lost by Product A when it raises its price are diverted to Product C, which also has a price of $100, while one-third are diverted to Product B. Product C is a closer substitute for Product A than is Product B. Thus Product C will normally be included in the relevant market, even though Products A and B together satisfy the hypothetical monopolist test.

The hypothetical monopolist test ensures that markets are not defined too narrowly, but it does not lead to a single relevant market. The Agencies may evaluate a merger in any relevant market

---

4 If the pricing incentives of the firms supplying the products in the candidate market differ substantially from those of the hypothetical monopolist, for reasons other than the latter's control over a larger group of substitutes, the Agencies may instead employ the concept of a hypothetical profit-maximizing cartel comprised of the firms (with all their products) that sell the products in the candidate market. This approach is most likely to be appropriate if the merging firms sell products outside the candidate market that significantly affect their pricing incentives for products in the candidate market. This could occur, for example, if the candidate market is one for durable equipment and the firms selling that equipment derive substantial net revenues from selling spare parts and service for that equipment.

satisfying the test, guided by the overarching principle that the purpose of defining the market and measuring market shares is to illuminate the evaluation of competitive effects. Because the relative competitive significance of more distant substitutes is apt to be overstated by their share of sales, when the Agencies rely on market shares and concentration, they usually do so in the smallest relevant market satisfying the hypothetical monopolist test.

> *Example 7:* In Example 4, including cars in the market will lead to misleadingly small market shares for motorcycle producers. Unless motorcycles fail the hypothetical monopolist test, the Agencies would not include cars in the market in analyzing this motorcycle merger.

### *4.1.2 Benchmark Prices and SSNIP Size*

The Agencies apply the SSNIP starting from prices that would likely prevail absent the merger. If prices are not likely to change absent the merger, these benchmark prices can reasonably be taken to be the prices prevailing prior to the merger.[5] If prices are likely to change absent the merger, e.g., because of innovation or entry, the Agencies may use anticipated future prices as the benchmark for the test. If prices might fall absent the merger due to the breakdown of pre-merger coordination, the Agencies may use those lower prices as the benchmark for the test. In some cases, the techniques employed by the Agencies to implement the hypothetical monopolist test focus on the difference in incentives between pre-merger firms and the hypothetical monopolist and do not require specifying the benchmark prices.

The SSNIP is intended to represent a "small but significant" increase in the prices charged by firms in the candidate market for the value they contribute to the products or services used by customers. This properly directs attention to the effects of price changes commensurate with those that might result from a significant lessening of competition caused by the merger. This methodology is used because normally it is possible to quantify "small but significant" adverse price effects on customers and analyze their likely reactions, not because price effects are more important than non-price effects.

The Agencies most often use a SSNIP of five percent of the price paid by customers for the products or services to which the merging firms contribute value. However, what constitutes a "small but significant" increase in price, commensurate with a significant loss of competition caused by the merger, depends upon the nature of the industry and the merging firms' positions in it, and the Agencies may accordingly use a price increase that is larger or smaller than five percent. Where explicit or implicit prices for the firms' specific contribution to value can be identified with reasonable clarity, the Agencies may base the SSNIP on those prices.

> *Example 8:* In a merger between two oil pipelines, the SSNIP would be based on the price charged for transporting the oil, not on the price of the oil itself. If pipelines buy the oil at one end and sell it at the other, the price charged for transporting the oil is implicit, equal to the difference between the price paid for oil at the input end and the price charged for oil at the output end. The relevant product sold by the pipelines is better described as "pipeline transportation of oil from point A to point B" than as "oil at point B."

---

[5] Market definition for the evaluation of non-merger antitrust concerns such as monopolization or facilitating practices will differ in this respect if the effects resulting from the conduct of concern are already occurring at the time of evaluation.

*Example 9:* In a merger between two firms that install computers purchased from third parties, the SSNIP would be based on their fees, not on the price of installed computers. If these firms purchase the computers and charge their customers one package price, the implicit installation fee is equal to the package charge to customers less the price of the computers.

*Example 10:* In Example 9, suppose that the prices paid by the merging firms to purchase computers are opaque, but account for at least ninety-five percent of the prices they charge for installed computers, with profits or implicit fees making up five percent of those prices at most. A five percent SSNIP on the total price paid by customers would at least double those fees or profits. Even if that would be unprofitable for a hypothetical monopolist, a significant increase in fees might well be profitable. If the SSNIP is based on the total price paid by customers, a lower percentage will be used.

### *4.1.3 Implementing the Hypothetical Monopolist Test*

The hypothetical monopolist's incentive to raise prices depends both on the extent to which customers would likely substitute away from the products in the candidate market in response to such a price increase and on the profit margins earned on those products. The profit margin on incremental units is the difference between price and incremental cost on those units. The Agencies often estimate incremental costs, for example using merging parties' documents or data the merging parties use to make business decisions. Incremental cost is measured over the change in output that would be caused by the price increase under consideration.

In considering customers' likely responses to higher prices, the Agencies take into account any reasonably available and reliable evidence, including, but not limited to:

- how customers have shifted purchases in the past in response to relative changes in price or other terms and conditions;
- information from buyers, including surveys, concerning how they would respond to price changes;
- the conduct of industry participants, notably:
  - sellers' business decisions or business documents indicating sellers' informed beliefs concerning how customers would substitute among products in response to relative changes in price;
  - industry participants' behavior in tracking and responding to price changes by some or all rivals;
- objective information about product characteristics and the costs and delays of switching products, especially switching from products in the candidate market to products outside the candidate market;
- the percentage of sales lost by one product in the candidate market, when its price alone rises, that is recaptured by other products in the candidate market, with a higher recapture percentage making a price increase more profitable for the hypothetical monopolist;
- evidence from other industry participants, such as sellers of complementary products;

- legal or regulatory requirements; and
- the influence of downstream competition faced by customers in their output markets.

When the necessary data are available, the Agencies also may consider a "critical loss analysis" to assess the extent to which it corroborates inferences drawn from the evidence noted above. Critical loss analysis asks whether imposing at least a SSNIP on one or more products in a candidate market would raise or lower the hypothetical monopolist's profits. While this "breakeven" analysis differs from the profit-maximizing analysis called for by the hypothetical monopolist test in Section 4.1.1, merging parties sometimes present this type of analysis to the Agencies. A price increase raises profits on sales made at the higher price, but this will be offset to the extent customers substitute away from products in the candidate market. Critical loss analysis compares the magnitude of these two offsetting effects resulting from the price increase. The "critical loss" is defined as the number of lost unit sales that would leave profits unchanged. The "predicted loss" is defined as the number of unit sales that the hypothetical monopolist is predicted to lose due to the price increase. The price increase raises the hypothetical monopolist's profits if the predicted loss is less than the critical loss.

The Agencies consider all of the evidence of customer substitution noted above in assessing the predicted loss. The Agencies require that estimates of the predicted loss be consistent with that evidence, including the pre-merger margins of products in the candidate market used to calculate the critical loss. Unless the firms are engaging in coordinated interaction (see Section 7), high pre-merger margins normally indicate that each firm's product individually faces demand that is not highly sensitive to price.[6] Higher pre-merger margins thus indicate a smaller predicted loss as well as a smaller critical loss. The higher the pre-merger margin, the smaller the recapture percentage necessary for the candidate market to satisfy the hypothetical monopolist test.

Even when the evidence necessary to perform the hypothetical monopolist test quantitatively is not available, the conceptual framework of the test provides a useful methodological tool for gathering and analyzing evidence pertinent to customer substitution and to market definition. The Agencies follow the hypothetical monopolist test to the extent possible given the available evidence, bearing in mind that the ultimate goal of market definition is to help determine whether the merger may substantially lessen competition.

### *4.1.4 Product Market Definition with Targeted Customers*

If a hypothetical monopolist could profitably target a subset of customers for price increases, the Agencies may identify relevant markets defined around those targeted customers, to whom a hypothetical monopolist would profitably and separately impose at least a SSNIP. Markets to serve targeted customers are also known as price discrimination markets. In practice, the Agencies identify price discrimination markets only where they believe there is a realistic prospect of an adverse competitive effect on a group of targeted customers.

> *Example 11:* Glass containers have many uses. In response to a price increase for glass containers, some users would substitute substantially to plastic or metal containers, but baby food manufacturers would not. If a

---

[6] While margins are important for implementing the hypothetical monopolist test, high margins are not in themselves of antitrust concern.

hypothetical monopolist could price separately and limit arbitrage, baby food manufacturers would be vulnerable to a targeted increase in the price of glass containers. The Agencies could define a distinct market for glass containers used to package baby food.

The Agencies also often consider markets for targeted customers when prices are individually negotiated and suppliers have information about customers that would allow a hypothetical monopolist to identify customers that are likely to pay a higher price for the relevant product. If prices are negotiated individually with customers, the hypothetical monopolist test may suggest relevant markets that are as narrow as individual customers (see also Section 6.2 on bargaining and auctions). Nonetheless, the Agencies often define markets for groups of targeted customers, i.e., by type of customer, rather than by individual customer. By so doing, the Agencies are able to rely on aggregated market shares that can be more helpful in predicting the competitive effects of the merger.

## 4.2 Geographic Market Definition

The arena of competition affected by the merger may be geographically bounded if geography limits some customers' willingness or ability to substitute to some products, or some suppliers' willingness or ability to serve some customers. Both supplier and customer locations can affect this. The Agencies apply the principles of market definition described here and in Section 4.1 to define a relevant market with a geographic dimension as well as a product dimension.

The scope of geographic markets often depends on transportation costs. Other factors such as language, regulation, tariff and non-tariff trade barriers, custom and familiarity, reputation, and service availability may impede long-distance or international transactions. The competitive significance of foreign firms may be assessed at various exchange rates, especially if exchange rates have fluctuated in the recent past.

In the absence of price discrimination based on customer location, the Agencies normally define geographic markets based on the locations of suppliers, as explained in subsection 4.2.1. In other cases, notably if price discrimination based on customer location is feasible as is often the case when delivered pricing is commonly used in the industry, the Agencies may define geographic markets based on the locations of customers, as explained in subsection 4.2.2.

### *4.2.1 Geographic Markets Based on the Locations of Suppliers*

Geographic markets based on the locations of suppliers encompass the region from which sales are made. Geographic markets of this type often apply when customers receive goods or services at suppliers' locations. Competitors in the market are firms with relevant production, sales, or service facilities in that region. Some customers who buy from these firms may be located outside the boundaries of the geographic market.

The hypothetical monopolist test requires that a hypothetical profit-maximizing firm that was the only present or future producer of the relevant product(s) located in the region would impose at least a SSNIP from at least one location, including at least one location of one of the merging firms. In this exercise the terms of sale for all products produced elsewhere are held constant. A single firm may operate in a number of different geographic markets, even for a single product.

> *Example 12:* The merging parties both have manufacturing plants in City X. The relevant product is expensive to transport and suppliers price their products for pickup at their locations. Rival plants are some distance away in City Y. A hypothetical monopolist controlling all plants in City X could profitably impose a SSNIP at these plants. Competition from more distant plants would not defeat the price increase because supplies coming from more distant plants require expensive transportation. The relevant geographic market is defined around the plants in City X.

When the geographic market is defined based on supplier locations, sales made by suppliers located in the geographic market are counted, regardless of the location of the customer making the purchase.

In considering likely reactions of customers to price increases for the relevant product(s) imposed in a candidate geographic market, the Agencies consider any reasonably available and reliable evidence, including:

- how customers have shifted purchases in the past between different geographic locations in response to relative changes in price or other terms and conditions;
- the cost and difficulty of transporting the product (or the cost and difficulty of a customer traveling to a seller's location), in relation to its price;
- whether suppliers need a presence near customers to provide service or support;
- evidence on whether sellers base business decisions on the prospect of customers switching between geographic locations in response to relative changes in price or other competitive variables;
- the costs and delays of switching from suppliers in the candidate geographic market to suppliers outside the candidate geographic market; and
- the influence of downstream competition faced by customers in their output markets.

### *4.2.2 Geographic Markets Based on the Locations of Customers*

When the hypothetical monopolist could discriminate based on customer location, the Agencies may define geographic markets based on the locations of targeted customers.[7] Geographic markets of this type often apply when suppliers deliver their products or services to customers' locations. Geographic markets of this type encompass the region into which sales are made. Competitors in the market are firms that sell to customers in the specified region. Some suppliers that sell into the relevant market may be located outside the boundaries of the geographic market.

The hypothetical monopolist test requires that a hypothetical profit-maximizing firm that was the only present or future seller of the relevant product(s) to customers in the region would impose at least a SSNIP on some customers in that region. A region forms a relevant geographic market if this price increase would not be defeated by substitution away from the relevant product or by arbitrage,

[7] For customers operating in multiple locations, only those customer locations within the targeted zone are included in the market.

e.g., customers in the region travelling outside it to purchase the relevant product. In this exercise, the terms of sale for products sold to all customers outside the region are held constant.

> *Example 13:* Customers require local sales and support. Suppliers have sales and service operations in many geographic areas and can discriminate based on customer location. The geographic market can be defined around the locations of customers.

> *Example 14:* Each merging firm has a single manufacturing plant and delivers the relevant product to customers in City X and in City Y. The relevant product is expensive to transport. The merging firms' plants are by far the closest to City X, but no closer to City Y than are numerous rival plants. This fact pattern suggests that customers in City X may be harmed by the merger even if customers in City Y are not. For that reason, the Agencies consider a relevant geographic market defined around customers in City X. Such a market could be defined even if the region around the merging firms' plants would not be a relevant geographic market defined based on the location of sellers because a hypothetical monopolist controlling all plants in that region would find a SSNIP imposed on all of its customers unprofitable due to the loss of sales to customers in City Y.

When the geographic market is defined based on customer locations, sales made to those customers are counted, regardless of the location of the supplier making those sales.

> *Example 15:* Customers in the United States must use products approved by U.S. regulators. Foreign customers use products not approved by U.S. regulators. The relevant product market consists of products approved by U.S. regulators. The geographic market is defined around U.S. customers. Any sales made to U.S. customers by foreign suppliers are included in the market, and those foreign suppliers are participants in the U.S. market even though located outside it.

# 5. Market Participants, Market Shares, and Market Concentration

The Agencies normally consider measures of market shares and market concentration as part of their evaluation of competitive effects. The Agencies evaluate market shares and concentration in conjunction with other reasonably available and reliable evidence for the ultimate purpose of determining whether a merger may substantially lessen competition.

Market shares can directly influence firms' competitive incentives. For example, if a price reduction to gain new customers would also apply to a firm's existing customers, a firm with a large market share may be more reluctant to implement a price reduction than one with a small share. Likewise, a firm with a large market share may not feel pressure to reduce price even if a smaller rival does. Market shares also can reflect firms' capabilities. For example, a firm with a large market share may be able to expand output rapidly by a larger absolute amount than can a small firm. Similarly, a large market share tends to indicate low costs, an attractive product, or both.

## 5.1 Market Participants

All firms that currently earn revenues in the relevant market are considered market participants. Vertically integrated firms are also included to the extent that their inclusion accurately reflects their competitive significance. Firms not currently earning revenues in the relevant market, but that have committed to entering the market in the near future, are also considered market participants.

Firms that are not current producers in a relevant market, but that would very likely provide rapid supply responses with direct competitive impact in the event of a SSNIP, without incurring

significant sunk costs, are also considered market participants. These firms are termed "rapid entrants." Sunk costs are entry or exit costs that cannot be recovered outside the relevant market. Entry that would take place more slowly in response to adverse competitive effects, or that requires firms to incur significant sunk costs, is considered in Section 9.

Firms that produce the relevant product but do not sell it in the relevant geographic market may be rapid entrants. Other things equal, such firms are most likely to be rapid entrants if they are close to the geographic market.

> *Example 16:* Farm A grows tomatoes halfway between Cities X and Y. Currently, it ships its tomatoes to City X because prices there are two percent higher. Previously it has varied the destination of its shipments in response to small price variations. Farm A would likely be a rapid entrant participant in a market for tomatoes in City Y.

> *Example 17:* Firm B has bid multiple times to supply milk to School District S, and actually supplies milk to schools in some adjacent areas. It has never won a bid in School District S, but is well qualified to serve that district and has often nearly won. Firm B would be counted as a rapid entrant in a market for school milk in School District S.

More generally, if the relevant market is defined around targeted customers, firms that produce relevant products but do not sell them to those customers may be rapid entrants if they can easily and rapidly begin selling to the targeted customers.

Firms that clearly possess the necessary assets to supply into the relevant market rapidly may also be rapid entrants. In markets for relatively homogeneous goods where a supplier's ability to compete depends predominantly on its costs and its capacity, and not on other factors such as experience or reputation in the relevant market, a supplier with efficient idle capacity, or readily available "swing" capacity currently used in adjacent markets that can easily and profitably be shifted to serve the relevant market, may be a rapid entrant.[8] However, idle capacity may be inefficient, and capacity used in adjacent markets may not be available, so a firm's possession of idle or swing capacity alone does not make that firm a rapid entrant.

## 5.2 Market Shares

The Agencies normally calculate market shares for all firms that currently produce products in the relevant market, subject to the availability of data. The Agencies also calculate market shares for other market participants if this can be done to reliably reflect their competitive significance.

Market concentration and market share data are normally based on historical evidence. However, recent or ongoing changes in market conditions may indicate that the current market share of a particular firm either understates or overstates the firm's future competitive significance. The Agencies consider reasonably predictable effects of recent or ongoing changes in market conditions when calculating and interpreting market share data. For example, if a new technology that is important to long-term competitive viability is available to other firms in the market, but is not available to a particular firm, the Agencies may conclude that that firm's historical market share

---

[8] If this type of supply side substitution is nearly universal among the firms selling one or more of a group of products, the Agencies may use an aggregate description of markets for those products as a matter of convenience.

overstates its future competitive significance. The Agencies may project historical market shares into the foreseeable future when this can be done reliably.

The Agencies measure market shares based on the best available indicator of firms' future competitive significance in the relevant market. This may depend upon the type of competitive effect being considered, and on the availability of data. Typically, annual data are used, but where individual transactions are large and infrequent so annual data may be unrepresentative, the Agencies may measure market shares over a longer period of time.

In most contexts, the Agencies measure each firm's market share based on its actual or projected revenues in the relevant market. Revenues in the relevant market tend to be the best measure of attractiveness to customers, since they reflect the real-world ability of firms to surmount all of the obstacles necessary to offer products on terms and conditions that are attractive to customers. In cases where one unit of a low-priced product can substitute for one unit of a higher-priced product, unit sales may measure competitive significance better than revenues. For example, a new, much less expensive product may have great competitive significance if it substantially erodes the revenues earned by older, higher-priced products, even if it earns relatively few revenues. In cases where customers sign long-term contracts, face switching costs, or tend to re-evaluate their suppliers only occasionally, revenues earned from recently acquired customers may better reflect the competitive significance of suppliers than do total revenues.

In markets for homogeneous products, a firm's competitive significance may derive principally from its ability and incentive to rapidly expand production in the relevant market in response to a price increase or output reduction by others in that market. As a result, a firm's competitive significance may depend upon its level of readily available capacity to serve the relevant market if that capacity is efficient enough to make such expansion profitable. In such markets, capacities or reserves may better reflect the future competitive significance of suppliers than revenues, and the Agencies may calculate market shares using those measures. Market participants that are not current producers may then be assigned positive market shares, but only if a measure of their competitive significance properly comparable to that of current producers is available. When market shares are measured based on firms' readily available capacities, the Agencies do not include capacity that is committed or so profitably employed outside the relevant market, or so high-cost, that it would not likely be used to respond to a SSNIP in the relevant market.

> *Example 18:* The geographic market is defined around customers in the United States. Firm X produces the relevant product outside the United States, and most of its sales are made to customers outside the United States. In most contexts, Firm X's market share will be based on its sales to U.S. customers, not its total sales or total capacity. However, if the relevant product is homogeneous, and if Firm X would significantly expand sales to U.S. customers rapidly and without incurring significant sunk costs in response to a SSNIP, the Agencies may base Firm X's market share on its readily available capacity to serve U.S. customers.

When the Agencies define markets serving targeted customers, these same principles are used to measure market shares, as they apply to those customers. In most contexts, each firm's market share is based on its actual or projected revenues from the targeted customers. However, the Agencies may instead measure market shares based on revenues from a broader group of customers if doing so would more accurately reflect the competitive significance of different suppliers in the relevant market. Revenues earned from a broader group of customers may also be used when better data are thereby available.

## 5.3 Market Concentration

Market concentration is often one useful indicator of likely competitive effects of a merger. In evaluating market concentration, the Agencies consider both the post-merger level of market concentration and the change in concentration resulting from a merger. Market shares may not fully reflect the competitive significance of firms in the market or the impact of a merger. They are used in conjunction with other evidence of competitive effects. See Sections 6 and 7.

In analyzing mergers between an incumbent and a recent or potential entrant, to the extent the Agencies use the change in concentration to evaluate competitive effects, they will do so using projected market shares. A merger between an incumbent and a potential entrant can raise significant competitive concerns. The lessening of competition resulting from such a merger is more likely to be substantial, the larger is the market share of the incumbent, the greater is the competitive significance of the potential entrant, and the greater is the competitive threat posed by this potential entrant relative to others.

The Agencies give more weight to market concentration when market shares have been stable over time, especially in the face of historical changes in relative prices or costs. If a firm has retained its market share even after its price has increased relative to those of its rivals, that firm already faces limited competitive constraints, making it less likely that its remaining rivals will replace the competition lost if one of that firm's important rivals is eliminated due to a merger. By contrast, even a highly concentrated market can be very competitive if market shares fluctuate substantially over short periods of time in response to changes in competitive offerings. However, if competition by one of the merging firms has significantly contributed to these fluctuations, perhaps because it has acted as a maverick, the Agencies will consider whether the merger will enhance market power by combining that firm with one of its significant rivals.

The Agencies may measure market concentration using the number of significant competitors in the market. This measure is most useful when there is a gap in market share between significant competitors and smaller rivals or when it is difficult to measure revenues in the relevant market. The Agencies also may consider the combined market share of the merging firms as an indicator of the extent to which others in the market may not be able readily to replace competition between the merging firms that is lost through the merger.

The Agencies often calculate the Herfindahl-Hirschman Index ("HHI") of market concentration. The HHI is calculated by summing the squares of the individual firms' market shares,[9] and thus gives proportionately greater weight to the larger market shares. When using the HHI, the Agencies

[9] For example, a market consisting of four firms with market shares of thirty percent, thirty percent, twenty percent, and twenty percent has an HHI of 2600 ($30^2 + 30^2 + 20^2 + 20^2 = 2600$). The HHI ranges from 10,000 (in the case of a pure monopoly) to a number approaching zero (in the case of an atomistic market). Although it is desirable to include all firms in the calculation, lack of information about firms with small shares is not critical because such firms do not affect the HHI significantly.

consider both the post-merger level of the HHI and the increase in the HHI resulting from the merger. The increase in the HHI is equal to twice the product of the market shares of the merging firms.[10]

Based on their experience, the Agencies generally classify markets into three types:

- Unconcentrated Markets: HHI below 1500
- Moderately Concentrated Markets: HHI between 1500 and 2500
- Highly Concentrated Markets: HHI above 2500

The Agencies employ the following general standards for the relevant markets they have defined:

- *Small Change in Concentration:* Mergers involving an increase in the HHI of less than 100 points are unlikely to have adverse competitive effects and ordinarily require no further analysis.
- *Unconcentrated Markets:* Mergers resulting in unconcentrated markets are unlikely to have adverse competitive effects and ordinarily require no further analysis.
- *Moderately Concentrated Markets:* Mergers resulting in moderately concentrated markets that involve an increase in the HHI of more than 100 points potentially raise significant competitive concerns and often warrant scrutiny.
- *Highly Concentrated Markets:* Mergers resulting in highly concentrated markets that involve an increase in the HHI of between 100 points and 200 points potentially raise significant competitive concerns and often warrant scrutiny. Mergers resulting in highly concentrated markets that involve an increase in the HHI of more than 200 points will be presumed to be likely to enhance market power. The presumption may be rebutted by persuasive evidence showing that the merger is unlikely to enhance market power.

The purpose of these thresholds is not to provide a rigid screen to separate competitively benign mergers from anticompetitive ones, although high levels of concentration do raise concerns. Rather, they provide one way to identify some mergers unlikely to raise competitive concerns and some others for which it is particularly important to examine whether other competitive factors confirm, reinforce, or counteract the potentially harmful effects of increased concentration. The higher the post-merger HHI and the increase in the HHI, the greater are the Agencies' potential competitive concerns and the greater is the likelihood that the Agencies will request additional information to conduct their analysis.

[10] For example, the merger of firms with shares of five percent and ten percent of the market would increase the HHI by 100 ($5 \times 10 \times 2 = 100$).

# 6. Unilateral Effects

The elimination of competition between two firms that results from their merger may alone constitute a substantial lessening of competition. Such unilateral effects are most apparent in a merger to monopoly in a relevant market, but are by no means limited to that case. Whether cognizable efficiencies resulting from the merger are likely to reduce or reverse adverse unilateral effects is addressed in Section 10.

Several common types of unilateral effects are discussed in this section. Section 6.1 discusses unilateral price effects in markets with differentiated products. Section 6.2 discusses unilateral effects in markets where sellers negotiate with buyers or prices are determined through auctions. Section 6.3 discusses unilateral effects relating to reductions in output or capacity in markets for relatively homogeneous products. Section 6.4 discusses unilateral effects arising from diminished innovation or reduced product variety. These effects do not exhaust the types of possible unilateral effects; for example, exclusionary unilateral effects also can arise.

A merger may result in different unilateral effects along different dimensions of competition. For example, a merger may increase prices in the short term but not raise longer-term concerns about innovation, either because rivals will provide sufficient innovation competition or because the merger will generate cognizable research and development efficiencies. See Section 10.

## 6.1 Pricing of Differentiated Products

In differentiated product industries, some products can be very close substitutes and compete strongly with each other, while other products are more distant substitutes and compete less strongly. For example, one high-end product may compete much more directly with another high-end product than with any low-end product.

A merger between firms selling differentiated products may diminish competition by enabling the merged firm to profit by unilaterally raising the price of one or both products above the pre-merger level. Some of the sales lost due to the price rise will merely be diverted to the product of the merger partner and, depending on relative margins, capturing such sales loss through merger may make the price increase profitable even though it would not have been profitable prior to the merger.

The extent of direct competition between the products sold by the merging parties is central to the evaluation of unilateral price effects. Unilateral price effects are greater, the more the buyers of products sold by one merging firm consider products sold by the other merging firm to be their next choice. The Agencies consider any reasonably available and reliable information to evaluate the extent of direct competition between the products sold by the merging firms. This includes documentary and testimonial evidence, win/loss reports and evidence from discount approval processes, customer switching patterns, and customer surveys. The types of evidence relied on often overlap substantially with the types of evidence of customer substitution relevant to the hypothetical monopolist test. See Section 4.1.1.

Substantial unilateral price elevation post-merger for a product formerly sold by one of the merging firms normally requires that a significant fraction of the customers purchasing that product view

products formerly sold by the other merging firm as their next-best choice. However, unless pre-merger margins between price and incremental cost are low, that significant fraction need not approach a majority. For this purpose, incremental cost is measured over the change in output that would be caused by the price change considered. A merger may produce significant unilateral effects for a given product even though many more sales are diverted to products sold by non-merging firms than to products previously sold by the merger partner.

> *Example 19:* In Example 5, the merged entity controlling Products A and B would raise prices ten percent, given the product offerings and prices of other firms. In that example, one-third of the sales lost by Product A when its price alone is raised are diverted to Product B. Further analysis is required to account for repositioning, entry, and efficiencies.

In some cases, the Agencies may seek to quantify the extent of direct competition between a product sold by one merging firm and a second product sold by the other merging firm by estimating the diversion ratio from the first product to the second product. The diversion ratio is the fraction of unit sales lost by the first product due to an increase in its price that would be diverted to the second product. Diversion ratios between products sold by one merging firm and products sold by the other merging firm can be very informative for assessing unilateral price effects, with higher diversion ratios indicating a greater likelihood of such effects. Diversion ratios between products sold by merging firms and those sold by non-merging firms have at most secondary predictive value.

Adverse unilateral price effects can arise when the merger gives the merged entity an incentive to raise the price of a product previously sold by one merging firm and thereby divert sales to products previously sold by the other merging firm, boosting the profits on the latter products. Taking as given other prices and product offerings, that boost to profits is equal to the value to the merged firm of the sales diverted to those products. The value of sales diverted to a product is equal to the number of units diverted to that product multiplied by the margin between price and incremental cost on that product. In some cases, where sufficient information is available, the Agencies assess the value of diverted sales, which can serve as an indicator of the upward pricing pressure on the first product resulting from the merger. Diagnosing unilateral price effects based on the value of diverted sales need not rely on market definition or the calculation of market shares and concentration. The Agencies rely much more on the value of diverted sales than on the level of the HHI for diagnosing unilateral price effects in markets with differentiated products. If the value of diverted sales is proportionately small, significant unilateral price effects are unlikely.[11]

Where sufficient data are available, the Agencies may construct economic models designed to quantify the unilateral price effects resulting from the merger. These models often include independent price responses by non-merging firms. They also can incorporate merger-specific efficiencies. These merger simulation methods need not rely on market definition. The Agencies do not treat merger simulation evidence as conclusive in itself, and they place more weight on whether their merger simulations consistently predict substantial price increases than on the precise prediction of any single simulation.

---

[11] For this purpose, the value of diverted sales is measured in proportion to the lost revenues attributable to the reduction in unit sales resulting from the price increase. Those lost revenues equal the reduction in the number of units sold of that product multiplied by that product's price.

A merger is unlikely to generate substantial unilateral price increases if non-merging parties offer very close substitutes for the products offered by the merging firms. In some cases, non-merging firms may be able to reposition their products to offer close substitutes for the products offered by the merging firms. Repositioning is a supply-side response that is evaluated much like entry, with consideration given to timeliness, likelihood, and sufficiency. See Section 9. The Agencies consider whether repositioning would be sufficient to deter or counteract what otherwise would be significant anticompetitive unilateral effects from a differentiated products merger.

## 6.2 Bargaining and Auctions

In many industries, especially those involving intermediate goods and services, buyers and sellers negotiate to determine prices and other terms of trade. In that process, buyers commonly negotiate with more than one seller, and may play sellers off against one another. Some highly structured forms of such competition are known as auctions. Negotiations often combine aspects of an auction with aspects of one-on-one negotiation, although pure auctions are sometimes used in government procurement and elsewhere.

A merger between two competing sellers prevents buyers from playing those sellers off against each other in negotiations. This alone can significantly enhance the ability and incentive of the merged entity to obtain a result more favorable to it, and less favorable to the buyer, than the merging firms would have offered separately absent the merger. The Agencies analyze unilateral effects of this type using similar approaches to those described in Section 6.1.

Anticompetitive unilateral effects in these settings are likely in proportion to the frequency or probability with which, prior to the merger, one of the merging sellers had been the runner-up when the other won the business. These effects also are likely to be greater, the greater advantage the runner-up merging firm has over other suppliers in meeting customers' needs. These effects also tend to be greater, the more profitable were the pre-merger winning bids. All of these factors are likely to be small if there are many equally placed bidders.

The mechanisms of these anticompetitive unilateral effects, and the indicia of their likelihood, differ somewhat according to the bargaining practices used, the auction format, and the sellers' information about one another's costs and about buyers' preferences. For example, when the merging sellers are likely to know which buyers they are best and second best placed to serve, any anticompetitive unilateral effects are apt to be targeted at those buyers; when sellers are less well informed, such effects are more apt to be spread over a broader class of buyers.

## 6.3 Capacity and Output for Homogeneous Products

In markets involving relatively undifferentiated products, the Agencies may evaluate whether the merged firm will find it profitable unilaterally to suppress output and elevate the market price. A firm may leave capacity idle, refrain from building or obtaining capacity that would have been obtained absent the merger, or eliminate pre-existing production capabilities. A firm may also divert the use of capacity away from one relevant market and into another so as to raise the price in the former market. The competitive analyses of these alternative modes of output suppression may differ.

A unilateral output suppression strategy is more likely to be profitable when (1) the merged firm's market share is relatively high; (2) the share of the merged firm's output already committed for sale at prices unaffected by the output suppression is relatively low; (3) the margin on the suppressed output is relatively low; (4) the supply responses of rivals are relatively small; and (5) the market elasticity of demand is relatively low.

A merger may provide the merged firm a larger base of sales on which to benefit from the resulting price rise, or it may eliminate a competitor that otherwise could have expanded its output in response to the price rise.

> *Example 20:* Firms A and B both produce an industrial commodity and propose to merge. The demand for this commodity is insensitive to price. Firm A is the market leader. Firm B produces substantial output, but its operating margins are low because it operates high-cost plants. The other suppliers are operating very near capacity. The merged firm has an incentive to reduce output at the high-cost plants, perhaps shutting down some of that capacity, thus driving up the price it receives on the remainder of its output. The merger harms customers, notwithstanding that the merged firm shifts some output from high-cost plants to low-cost plants.

In some cases, a merger between a firm with a substantial share of the sales in the market and a firm with significant excess capacity to serve that market can make an output suppression strategy profitable.[12] This can occur even if the firm with the excess capacity has a relatively small share of sales, if that firm's ability to expand, and thus keep price from rising, has been making an output suppression strategy unprofitable for the firm with the larger market share.

## 6.4 Innovation and Product Variety

Competition often spurs firms to innovate. The Agencies may consider whether a merger is likely to diminish innovation competition by encouraging the merged firm to curtail its innovative efforts below the level that would prevail in the absence of the merger. That curtailment of innovation could take the form of reduced incentive to continue with an existing product-development effort or reduced incentive to initiate development of new products.

The first of these effects is most likely to occur if at least one of the merging firms is engaging in efforts to introduce new products that would capture substantial revenues from the other merging firm. The second, longer-run effect is most likely to occur if at least one of the merging firms has capabilities that are likely to lead it to develop new products in the future that would capture substantial revenues from the other merging firm. The Agencies therefore also consider whether a merger will diminish innovation competition by combining two of a very small number of firms with the strongest capabilities to successfully innovate in a specific direction.

The Agencies evaluate the extent to which successful innovation by one merging firm is likely to take sales from the other, and the extent to which post-merger incentives for future innovation will be lower than those that would prevail in the absence of the merger. The Agencies also consider whether the merger is likely to enable innovation that would not otherwise take place, by bringing together

---

[12] Such a merger also can cause adverse coordinated effects, especially if the acquired firm with excess capacity was disrupting effective coordination.

complementary capabilities that cannot be otherwise combined or for some other merger-specific reason. See Section 10.

The Agencies also consider whether a merger is likely to give the merged firm an incentive to cease offering one of the relevant products sold by the merging parties. Reductions in variety following a merger may or may not be anticompetitive. Mergers can lead to the efficient consolidation of products when variety offers little in value to customers. In other cases, a merger may increase variety by encouraging the merged firm to reposition its products to be more differentiated from one another.

If the merged firm would withdraw a product that a significant number of customers strongly prefer to those products that would remain available, this can constitute a harm to customers over and above any effects on the price or quality of any given product. If there is evidence of such an effect, the Agencies may inquire whether the reduction in variety is largely due to a loss of competitive incentives attributable to the merger. An anticompetitive incentive to eliminate a product as a result of the merger is greater and more likely, the larger is the share of profits from that product coming at the expense of profits from products sold by the merger partner. Where a merger substantially reduces competition by bringing two close substitute products under common ownership, and one of those products is eliminated, the merger will often also lead to a price increase on the remaining product, but that is not a necessary condition for anticompetitive effect.

> *Example 21:* Firm A sells a high-end product at a premium price. Firm B sells a mid-range product at a lower price, serving customers who are more price sensitive. Several other firms have low-end products. Firms A and B together have a large share of the relevant market. Firm A proposes to acquire Firm B and discontinue Firm B's product. Firm A expects to retain most of Firm B's customers. Firm A may not find it profitable to raise the price of its high-end product after the merger, because doing so would reduce its ability to retain Firm B's more price-sensitive customers. The Agencies may conclude that the withdrawal of Firm B's product results from a loss of competition and materially harms customers.

## 7. Coordinated Effects

A merger may diminish competition by enabling or encouraging post-merger coordinated interaction among firms in the relevant market that harms customers. Coordinated interaction involves conduct by multiple firms that is profitable for each of them only as a result of the accommodating reactions of the others. These reactions can blunt a firm's incentive to offer customers better deals by undercutting the extent to which such a move would win business away from rivals. They also can enhance a firm's incentive to raise prices, by assuaging the fear that such a move would lose customers to rivals.

Coordinated interaction includes a range of conduct. Coordinated interaction can involve the explicit negotiation of a common understanding of how firms will compete or refrain from competing. Such conduct typically would itself violate the antitrust laws. Coordinated interaction also can involve a similar common understanding that is not explicitly negotiated but would be enforced by the detection and punishment of deviations that would undermine the coordinated interaction. Coordinated interaction alternatively can involve parallel accommodating conduct not pursuant to a prior understanding. Parallel accommodating conduct includes situations in which each rival's response to competitive moves made by others is individually rational, and not motivated by

retaliation or deterrence nor intended to sustain an agreed-upon market outcome, but nevertheless emboldens price increases and weakens competitive incentives to reduce prices or offer customers better terms. Coordinated interaction includes conduct not otherwise condemned by the antitrust laws.

The ability of rival firms to engage in coordinated conduct depends on the strength and predictability of rivals' responses to a price change or other competitive initiative. Under some circumstances, a merger can result in market concentration sufficient to strengthen such responses or enable multiple firms in the market to predict them more confidently, thereby affecting the competitive incentives of multiple firms in the market, not just the merged firm.

## 7.1 Impact of Merger on Coordinated Interaction

The Agencies examine whether a merger is likely to change the manner in which market participants interact, inducing substantially more coordinated interaction. The Agencies seek to identify how a merger might significantly weaken competitive incentives through an increase in the strength, extent, or likelihood of coordinated conduct. There are, however, numerous forms of coordination, and the risk that a merger will induce adverse coordinated effects may not be susceptible to quantification or detailed proof. Therefore, the Agencies evaluate the risk of coordinated effects using measures of market concentration (see Section 5) in conjunction with an assessment of whether a market is vulnerable to coordinated conduct. See Section 7.2. The analysis in Section 7.2 applies to moderately and highly concentrated markets, as unconcentrated markets are unlikely to be vulnerable to coordinated conduct.

Pursuant to the Clayton Act's incipiency standard, the Agencies may challenge mergers that in their judgment pose a real danger of harm through coordinated effects, even without specific evidence showing precisely how the coordination likely would take place. The Agencies are likely to challenge a merger if the following three conditions are all met: (1) the merger would significantly increase concentration and lead to a moderately or highly concentrated market; (2) that market shows signs of vulnerability to coordinated conduct (see Section 7.2); and (3) the Agencies have a credible basis on which to conclude that the merger may enhance that vulnerability. An acquisition eliminating a maverick firm (see Section 2.1.5) in a market vulnerable to coordinated conduct is likely to cause adverse coordinated effects.

## 7.2 Evidence a Market is Vulnerable to Coordinated Conduct

The Agencies presume that market conditions are conducive to coordinated interaction if firms representing a substantial share in the relevant market appear to have previously engaged in express collusion affecting the relevant market, unless competitive conditions in the market have since changed significantly. Previous express collusion in another geographic market will have the same weight if the salient characteristics of that other market at the time of the collusion are comparable to those in the relevant market. Failed previous attempts at collusion in the relevant market suggest that successful collusion was difficult pre-merger but not so difficult as to deter attempts, and a merger may tend to make success more likely. Previous collusion or attempted collusion in another product market may also be given substantial weight if the salient characteristics of that other market at the time of the collusion are closely comparable to those in the relevant market.

A market typically is more vulnerable to coordinated conduct if each competitively important firm's significant competitive initiatives can be promptly and confidently observed by that firm's rivals. This is more likely to be the case if the terms offered to customers are relatively transparent. Price transparency can be greater for relatively homogeneous products. Even if terms of dealing are not transparent, transparency regarding the identities of the firms serving particular customers can give rise to coordination, e.g., through customer or territorial allocation. Regular monitoring by suppliers of one another's prices or customers can indicate that the terms offered to customers are relatively transparent.

A market typically is more vulnerable to coordinated conduct if a firm's prospective competitive reward from attracting customers away from its rivals will be significantly diminished by likely responses of those rivals. This is more likely to be the case, the stronger and faster are the responses the firm anticipates from its rivals. The firm is more likely to anticipate strong responses if there are few significant competitors, if products in the relevant market are relatively homogeneous, if customers find it relatively easy to switch between suppliers, or if suppliers use meeting-competition clauses.

A firm is more likely to be deterred from making competitive initiatives by whatever responses occur if sales are small and frequent rather than via occasional large and long-term contracts or if relatively few customers will switch to it before rivals are able to respond. A firm is less likely to be deterred by whatever responses occur if the firm has little stake in the status quo. For example, a firm with a small market share that can quickly and dramatically expand, constrained neither by limits on production nor by customer reluctance to switch providers or to entrust business to a historically small provider, is unlikely to be deterred. Firms are also less likely to be deterred by whatever responses occur if competition in the relevant market is marked by leapfrogging technological innovation, so that responses by competitors leave the gains from successful innovation largely intact.

A market is more apt to be vulnerable to coordinated conduct if the firm initiating a price increase will lose relatively few customers after rivals respond to the increase. Similarly, a market is more apt to be vulnerable to coordinated conduct if a firm that first offers a lower price or improved product to customers will retain relatively few customers thus attracted away from its rivals after those rivals respond.

The Agencies regard coordinated interaction as more likely, the more the participants stand to gain from successful coordination. Coordination generally is more profitable, the lower is the market elasticity of demand.

Coordinated conduct can harm customers even if not all firms in the relevant market engage in the coordination, but significant harm normally is likely only if a substantial part of the market is subject to such conduct. The prospect of harm depends on the collective market power, in the relevant market, of firms whose incentives to compete are substantially weakened by coordinated conduct. This collective market power is greater, the lower is the market elasticity of demand. This collective market power is diminished by the presence of other market participants with small market shares and little stake in the outcome resulting from the coordinated conduct, if these firms can rapidly expand their sales in the relevant market.

Buyer characteristics and the nature of the procurement process can affect coordination. For example, sellers may have the incentive to bid aggressively for a large contract even if they expect strong responses by rivals. This is especially the case for sellers with small market shares, if they can realistically win such large contracts. In some cases, a large buyer may be able to strategically undermine coordinated conduct, at least as it pertains to that buyer's needs, by choosing to put up for bid a few large contracts rather than many smaller ones, and by making its procurement decisions opaque to suppliers.

## 8. Powerful Buyers

Powerful buyers are often able to negotiate favorable terms with their suppliers. Such terms may reflect the lower costs of serving these buyers, but they also can reflect price discrimination in their favor.

The Agencies consider the possibility that powerful buyers may constrain the ability of the merging parties to raise prices. This can occur, for example, if powerful buyers have the ability and incentive to vertically integrate upstream or sponsor entry, or if the conduct or presence of large buyers undermines coordinated effects. However, the Agencies do not presume that the presence of powerful buyers alone forestalls adverse competitive effects flowing from the merger. Even buyers that can negotiate favorable terms may be harmed by an increase in market power. The Agencies examine the choices available to powerful buyers and how those choices likely would change due to the merger. Normally, a merger that eliminates a supplier whose presence contributed significantly to a buyer's negotiating leverage will harm that buyer.

> *Example 22:* Customer C has been able to negotiate lower pre-merger prices than other customers by threatening to shift its large volume of purchases from one merging firm to the other. No other suppliers are as well placed to meet Customer C's needs for volume and reliability. The merger is likely to harm Customer C. In this situation, the Agencies could identify a price discrimination market consisting of Customer C and similarly placed customers. The merger threatens to end previous price discrimination in their favor.

Furthermore, even if some powerful buyers could protect themselves, the Agencies also consider whether market power can be exercised against other buyers.

> *Example 23:* In Example 22, if Customer C instead obtained the lower pre-merger prices based on a credible threat to supply its own needs, or to sponsor new entry, Customer C might not be harmed. However, even in this case, other customers may still be harmed.

## 9. Entry

The analysis of competitive effects in Sections 6 and 7 focuses on current participants in the relevant market. That analysis may also include some forms of entry. Firms that would rapidly and easily enter the market in response to a SSNIP are market participants and may be assigned market shares. See Sections 5.1 and 5.2. Firms that have, prior to the merger, committed to entering the market also will normally be treated as market participants. See Section 5.1. This section concerns entry or adjustments to pre-existing entry plans that are induced by the merger.

As part of their full assessment of competitive effects, the Agencies consider entry into the relevant market. The prospect of entry into the relevant market will alleviate concerns about adverse competitive effects only if such entry will deter or counteract any competitive effects of concern so the merger will not substantially harm customers.

The Agencies consider the actual history of entry into the relevant market and give substantial weight to this evidence. Lack of successful and effective entry in the face of non-transitory increases in the margins earned on products in the relevant market tends to suggest that successful entry is slow or difficult. Market values of incumbent firms greatly exceeding the replacement costs of their tangible assets may indicate that these firms have valuable intangible assets, which may be difficult or time consuming for an entrant to replicate.

A merger is not likely to enhance market power if entry into the market is so easy that the merged firm and its remaining rivals in the market, either unilaterally or collectively, could not profitably raise price or otherwise reduce competition compared to the level that would prevail in the absence of the merger. Entry is that easy if entry would be timely, likely, and sufficient in its magnitude, character, and scope to deter or counteract the competitive effects of concern.

The Agencies examine the timeliness, likelihood, and sufficiency of the entry efforts an entrant might practically employ. An entry effort is defined by the actions the firm must undertake to produce and sell in the market. Various elements of the entry effort will be considered. These elements can include: planning, design, and management; permitting, licensing, or other approvals; construction, debugging, and operation of production facilities; and promotion (including necessary introductory discounts), marketing, distribution, and satisfaction of customer testing and qualification requirements. Recent examples of entry, whether successful or unsuccessful, generally provide the starting point for identifying the elements of practical entry efforts. They also can be informative regarding the scale necessary for an entrant to be successful, the presence or absence of entry barriers, the factors that influence the timing of entry, the costs and risk associated with entry, and the sales opportunities realistically available to entrants.

If the assets necessary for an effective and profitable entry effort are widely available, the Agencies will not necessarily attempt to identify which firms might enter. Where an identifiable set of firms appears to have necessary assets that others lack, or to have particularly strong incentives to enter, the Agencies focus their entry analysis on those firms. Firms operating in adjacent or complementary markets, or large customers themselves, may be best placed to enter. However, the Agencies will not presume that a powerful firm in an adjacent market or a large customer will enter the relevant market unless there is reliable evidence supporting that conclusion.

In assessing whether entry will be timely, likely, and sufficient, the Agencies recognize that precise and detailed information may be difficult or impossible to obtain. The Agencies consider reasonably available and reliable evidence bearing on whether entry will satisfy the conditions of timeliness, likelihood, and sufficiency.

### 9.1 Timeliness

In order to deter the competitive effects of concern, entry must be rapid enough to make unprofitable overall the actions causing those effects and thus leading to entry, even though those actions would be profitable until entry takes effect.

Even if the prospect of entry does not deter the competitive effects of concern, post-merger entry may counteract them. This requires that the impact of entrants in the relevant market be rapid enough that customers are not significantly harmed by the merger, despite any anticompetitive harm that occurs prior to the entry.

The Agencies will not presume that an entrant can have a significant impact on prices before that entrant is ready to provide the relevant product to customers unless there is reliable evidence that anticipated future entry would have such an effect on prices.

### 9.2 Likelihood

Entry is likely if it would be profitable, accounting for the assets, capabilities, and capital needed and the risks involved, including the need for the entrant to incur costs that would not be recovered if the entrant later exits. Profitability depends upon (a) the output level the entrant is likely to obtain, accounting for the obstacles facing new entrants; (b) the price the entrant would likely obtain in the post-merger market, accounting for the impact of that entry itself on prices; and (c) the cost per unit the entrant would likely incur, which may depend upon the scale at which the entrant would operate.

### 9.3 Sufficiency

Even where timely and likely, entry may not be sufficient to deter or counteract the competitive effects of concern. For example, in a differentiated product industry, entry may be insufficient because the products offered by entrants are not close enough substitutes to the products offered by the merged firm to render a price increase by the merged firm unprofitable. Entry may also be insufficient due to constraints that limit entrants' competitive effectiveness, such as limitations on the capabilities of the firms best placed to enter or reputational barriers to rapid expansion by new entrants. Entry by a single firm that will replicate at least the scale and strength of one of the merging firms is sufficient. Entry by one or more firms operating at a smaller scale may be sufficient if such firms are not at a significant competitive disadvantage.

## 10. Efficiencies

Competition usually spurs firms to achieve efficiencies internally. Nevertheless, a primary benefit of mergers to the economy is their potential to generate significant efficiencies and thus enhance the merged firm's ability and incentive to compete, which may result in lower prices, improved quality, enhanced service, or new products. For example, merger-generated efficiencies may enhance competition by permitting two ineffective competitors to form a more effective competitor, e.g., by combining complementary assets. In a unilateral effects context, incremental cost reductions may reduce or reverse any increases in the merged firm's incentive to elevate price. Efficiencies also may lead to new or improved products, even if they do not immediately and directly affect price. In a

coordinated effects context, incremental cost reductions may make coordination less likely or effective by enhancing the incentive of a maverick to lower price or by creating a new maverick firm. Even when efficiencies generated through a merger enhance a firm's ability to compete, however, a merger may have other effects that may lessen competition and make the merger anticompetitive.

The Agencies credit only those efficiencies likely to be accomplished with the proposed merger and unlikely to be accomplished in the absence of either the proposed merger or another means having comparable anticompetitive effects. These are termed merger-specific efficiencies.[13] Only alternatives that are practical in the business situation faced by the merging firms are considered in making this determination. The Agencies do not insist upon a less restrictive alternative that is merely theoretical.

Efficiencies are difficult to verify and quantify, in part because much of the information relating to efficiencies is uniquely in the possession of the merging firms. Moreover, efficiencies projected reasonably and in good faith by the merging firms may not be realized. Therefore, it is incumbent upon the merging firms to substantiate efficiency claims so that the Agencies can verify by reasonable means the likelihood and magnitude of each asserted efficiency, how and when each would be achieved (and any costs of doing so), how each would enhance the merged firm's ability and incentive to compete, and why each would be merger-specific.

Efficiency claims will not be considered if they are vague, speculative, or otherwise cannot be verified by reasonable means. Projections of efficiencies may be viewed with skepticism, particularly when generated outside of the usual business planning process. By contrast, efficiency claims substantiated by analogous past experience are those most likely to be credited.

Cognizable efficiencies are merger-specific efficiencies that have been verified and do not arise from anticompetitive reductions in output or service. Cognizable efficiencies are assessed net of costs produced by the merger or incurred in achieving those efficiencies.

The Agencies will not challenge a merger if cognizable efficiencies are of a character and magnitude such that the merger is not likely to be anticompetitive in any relevant market.[14] To make the requisite determination, the Agencies consider whether cognizable efficiencies likely would be sufficient to reverse the merger's potential to harm customers in the relevant market, e.g., by preventing price

---

[13] The Agencies will not deem efficiencies to be merger-specific if they could be attained by practical alternatives that mitigate competitive concerns, such as divestiture or licensing. If a merger affects not whether but only when an efficiency would be achieved, only the timing advantage is a merger-specific efficiency.

[14] The Agencies normally assess competition in each relevant market affected by a merger independently and normally will challenge the merger if it is likely to be anticompetitive in any relevant market. In some cases, however, the Agencies in their prosecutorial discretion will consider efficiencies not strictly in the relevant market, but so inextricably linked with it that a partial divestiture or other remedy could not feasibly eliminate the anticompetitive effect in the relevant market without sacrificing the efficiencies in the other market(s). Inextricably linked efficiencies are most likely to make a difference when they are great and the likely anticompetitive effect in the relevant market(s) is small so the merger is likely to benefit customers overall.

increases in that market.[15] In conducting this analysis, the Agencies will not simply compare the magnitude of the cognizable efficiencies with the magnitude of the likely harm to competition absent the efficiencies. The greater the potential adverse competitive effect of a merger, the greater must be the cognizable efficiencies, and the more they must be passed through to customers, for the Agencies to conclude that the merger will not have an anticompetitive effect in the relevant market. When the potential adverse competitive effect of a merger is likely to be particularly substantial, extraordinarily great cognizable efficiencies would be necessary to prevent the merger from being anticompetitive. In adhering to this approach, the Agencies are mindful that the antitrust laws give competition, not internal operational efficiency, primacy in protecting customers.

In the Agencies' experience, efficiencies are most likely to make a difference in merger analysis when the likely adverse competitive effects, absent the efficiencies, are not great. Efficiencies almost never justify a merger to monopoly or near-monopoly. Just as adverse competitive effects can arise along multiple dimensions of conduct, such as pricing and new product development, so too can efficiencies operate along multiple dimensions. Similarly, purported efficiency claims based on lower prices can be undermined if they rest on reductions in product quality or variety that customers value.

The Agencies have found that certain types of efficiencies are more likely to be cognizable and substantial than others. For example, efficiencies resulting from shifting production among facilities formerly owned separately, which enable the merging firms to reduce the incremental cost of production, are more likely to be susceptible to verification and are less likely to result from anticompetitive reductions in output. Other efficiencies, such as those relating to research and development, are potentially substantial but are generally less susceptible to verification and may be the result of anticompetitive output reductions. Yet others, such as those relating to procurement, management, or capital cost, are less likely to be merger-specific or substantial, or may not be cognizable for other reasons.

When evaluating the effects of a merger on innovation, the Agencies consider the ability of the merged firm to conduct research or development more effectively. Such efficiencies may spur innovation but not affect short-term pricing. The Agencies also consider the ability of the merged firm to appropriate a greater fraction of the benefits resulting from its innovations. Licensing and intellectual property conditions may be important to this enquiry, as they affect the ability of a firm to appropriate the benefits of its innovation. Research and development cost savings may be substantial and yet not be cognizable efficiencies because they are difficult to verify or result from anticompetitive reductions in innovative activities.

---

[15] The Agencies normally give the most weight to the results of this analysis over the short term. The Agencies also may consider the effects of cognizable efficiencies with no short-term, direct effect on prices in the relevant market. Delayed benefits from efficiencies (due to delay in the achievement of, or the realization of customer benefits from, the efficiencies) will be given less weight because they are less proximate and more difficult to predict. Efficiencies relating to costs that are fixed in the short term are unlikely to benefit customers in the short term, but can benefit customers in the longer run, e.g., if they make new product introduction less expensive.

## 11. Failure and Exiting Assets

Notwithstanding the analysis above, a merger is not likely to enhance market power if imminent failure, as defined below, of one of the merging firms would cause the assets of that firm to exit the relevant market. This is an extreme instance of the more general circumstance in which the competitive significance of one of the merging firms is declining: the projected market share and significance of the exiting firm is zero. If the relevant assets would otherwise exit the market, customers are not worse off after the merger than they would have been had the merger been enjoined.

The Agencies do not normally credit claims that the assets of the failing firm would exit the relevant market unless all of the following circumstances are met: (1) the allegedly failing firm would be unable to meet its financial obligations in the near future; (2) it would not be able to reorganize successfully under Chapter 11 of the Bankruptcy Act; and (3) it has made unsuccessful good-faith efforts to elicit reasonable alternative offers that would keep its tangible and intangible assets in the relevant market and pose a less severe danger to competition than does the proposed merger.[16]

Similarly, a merger is unlikely to cause competitive harm if the risks to competition arise from the acquisition of a failing division. The Agencies do not normally credit claims that the assets of a division would exit the relevant market in the near future unless both of the following conditions are met: (1) applying cost allocation rules that reflect true economic costs, the division has a persistently negative cash flow on an operating basis, and such negative cash flow is not economically justified for the firm by benefits such as added sales in complementary markets or enhanced customer goodwill;[17] and (2) the owner of the failing division has made unsuccessful good-faith efforts to elicit reasonable alternative offers that would keep its tangible and intangible assets in the relevant market and pose a less severe danger to competition than does the proposed acquisition.

## 12. Mergers of Competing Buyers

Mergers of competing buyers can enhance market power on the buying side of the market, just as mergers of competing sellers can enhance market power on the selling side of the market. Buyer market power is sometimes called "monopsony power."

To evaluate whether a merger is likely to enhance market power on the buying side of the market, the Agencies employ essentially the framework described above for evaluating whether a merger is likely to enhance market power on the selling side of the market. In defining relevant markets, the Agencies

---

16 Any offer to purchase the assets of the failing firm for a price above the liquidation value of those assets will be regarded as a reasonable alternative offer. Liquidation value is the highest value the assets could command for use outside the relevant market.

17 Because the parent firm can allocate costs, revenues, and intra-company transactions among itself and its subsidiaries and divisions, the Agencies require evidence on these two points that is not solely based on management plans that could have been prepared for the purpose of demonstrating negative cash flow or the prospect of exit from the relevant market.

focus on the alternatives available to sellers in the face of a decrease in the price paid by a hypothetical monopsonist.

Market power on the buying side of the market is not a significant concern if suppliers have numerous attractive outlets for their goods or services. However, when that is not the case, the Agencies may conclude that the merger of competing buyers is likely to lessen competition in a manner harmful to sellers.

The Agencies distinguish between effects on sellers arising from a lessening of competition and effects arising in other ways. A merger that does not enhance market power on the buying side of the market can nevertheless lead to a reduction in prices paid by the merged firm, for example, by reducing transactions costs or allowing the merged firm to take advantage of volume-based discounts. Reduction in prices paid by the merging firms not arising from the enhancement of market power can be significant in the evaluation of efficiencies from a merger, as discussed in Section 10.

The Agencies do not view a short-run reduction in the quantity purchased as the only, or best, indicator of whether a merger enhances buyer market power. Nor do the Agencies evaluate the competitive effects of mergers between competing buyers strictly, or even primarily, on the basis of effects in the downstream markets in which the merging firms sell.

> *Example 24:* Merging Firms A and B are the only two buyers in the relevant geographic market for an agricultural product. Their merger will enhance buyer power and depress the price paid to farmers for this product, causing a transfer of wealth from farmers to the merged firm and inefficiently reducing supply. These effects can arise even if the merger will not lead to any increase in the price charged by the merged firm for its output.

## 13. Partial Acquisitions

In most horizontal mergers, two competitors come under common ownership and control, completely and permanently eliminating competition between them. This elimination of competition is a basic element of merger analysis. However, the statutory provisions referenced in Section 1 also apply to one firm's partial acquisition of a competitor. The Agencies therefore also review acquisitions of minority positions involving competing firms, even if such minority positions do not necessarily or completely eliminate competition between the parties to the transaction.

When the Agencies determine that a partial acquisition results in effective control of the target firm, or involves substantially all of the relevant assets of the target firm, they analyze the transaction much as they do a merger. Partial acquisitions that do not result in effective control may nevertheless present significant competitive concerns and may require a somewhat distinct analysis from that applied to full mergers or to acquisitions involving effective control. The details of the post-acquisition relationship between the parties, and how those details are likely to affect competition, can be important. While the Agencies will consider any way in which a partial acquisition may affect competition, they generally focus on three principal effects.

First, a partial acquisition can lessen competition by giving the acquiring firm the ability to influence the competitive conduct of the target firm. A voting interest in the target firm or specific governance rights, such as the right to appoint members to the board of directors, can permit such influence. Such

influence can lessen competition because the acquiring firm can use its influence to induce the target firm to compete less aggressively or to coordinate its conduct with that of the acquiring firm.

Second, a partial acquisition can lessen competition by reducing the incentive of the acquiring firm to compete. Acquiring a minority position in a rival might significantly blunt the incentive of the acquiring firm to compete aggressively because it shares in the losses thereby inflicted on that rival. This reduction in the incentive of the acquiring firm to compete arises even if cannot influence the conduct of the target firm. As compared with the unilateral competitive effect of a full merger, this effect is likely attenuated by the fact that the ownership is only partial.

Third, a partial acquisition can lessen competition by giving the acquiring firm access to non-public, competitively sensitive information from the target firm. Even absent any ability to influence the conduct of the target firm, access to competitively sensitive information can lead to adverse unilateral or coordinated effects. For example, it can enhance the ability of the two firms to coordinate their behavior, and make other accommodating responses faster and more targeted. The risk of coordinated effects is greater if the transaction also facilitates the flow of competitively sensitive information from the acquiring firm to the target firm.

Partial acquisitions, like mergers, vary greatly in their potential for anticompetitive effects. Accordingly, the specific facts of each case must be examined to assess the likelihood of harm to competition. While partial acquisitions usually do not enable many of the types of efficiencies associated with mergers, the Agencies consider whether a partial acquisition is likely to create cognizable efficiencies.

EXHIBIT 312

LexisNexis

# NOTE: Rationalizing Antitrust Cluster Markets.

November, 1985

**Reporter:** 95 Yale L.J. 109
**Length:** 5726 words

**Author:** Ian Ayres +

+ I would like to thank Peter Ezersky, Al Klevorick and Richard Schmalensee for helpful comments. Special thanks go to Thomas Welch for piquing my interest in this subject and to Walter Vandaele for encouraging my research.

**LexisNexis Summary**

… The use of such cluster definitions has preceded the development of a theoretical framework. … Transactional complementarity effectively ties consumer purchases of multiple products to individual firms and thereby makes the cluster the relevant product. … Transactional complementarity is thus a demand-side analog to economies of scope, in which the economies accrue to the consumer instead of the producer. For the purpose of market definition, the crucial distinction between the two concepts is that while transactional complementarity necessitates joint purchase, economies of scope do not necessitate joint sale. … Transactional complementarity analysis provides a clearer justification for the Court's commercial banking cluster definition in *United States v. Philadelphia National Bank. … The partial cluster producers cannot compete for sales to those consumers with a transactional complement preference, because, by definition, individual products do not appeal to these consumers. … An adversarial position in which defendants seek individual market definitions requires transactional complementarity analysis because defendants' incentives to oppose a cluster definition may be proper. First, because a cluster market share is an average of individual market shares, clustering a market in which a defendant has a high market share with a market in which the defendant has a low market share can extend antitrust liability to markets in which it is not justified. …*

**Text**

**[*109]** Courts have traditionally defined antitrust markets on the basis of substitutability. [1] Several antitrust decisions involving multiproduct defendants, however, have departed from this

---

[1] The courts' objective in defining the relevant line of commerce for antitrust purposes has been "to recognize competition where, in fact, competition exists." Brown Shoe Co. v. United States, 370 U.S. 294, 326 (1962). Because substitutes compete, substitutability in demand or supply has been the prime criterion for setting the boundaries of a market. United States v. E.I. du Pont de Nemours & Co., 351 U.S. 377, 395 (1956) (goods that are "reasonably interchangeable by consumers" should be placed in the same market); Brown Shoe Co., 370 U.S. at 325 n.42 ("cross-elasticity of production facilities may also be an important factor in defining a product market"). By this substitutability criterion, if an antitrust defendant produced several goods (that is, was a multiproduct firm), a separate market would be defined for *each* of the defendant's products, consisting of each product's respective substitutes. *See* U.S. Dep't of Justice, Merger Guidelines, *49 Fed. Reg. 26,823, 26,828 (1984)* [hereinafter cited as "Guidelines"] ("The Department will first determine the relevant product market with respect to each of the products of each of the merging firms."). For a general discussion of antitrust market definition, see R. POSNER & F. EASTERBROOK, ANTITRUST 347-85 (2d ed. 1981).

standard and defined "clusters" of non-substituting and united [2] products to be the relevant line of commerce. [3] The use of such cluster definitions has preceded the development **[*110]** of a theoretical framework. Courts have not clearly articulated the circumstances in which nonsubstitutes should be included in the same market. [4] Instead of invoking substantive standards, courts have often justified cluster definitions merely by relying on such undefined phrases as trade, commercial or economic "reality." [5] To the extent that courts have proposed any substantive criteria, they have failed to explain how or why their chosen standards form a legitimate basis for market definition.

By analyzing the market conditions that cause firms to supply multiple products, this Note seeks to articulate a rational criterion for clustering. In particular, this Note suggests that courts should only cluster together "transactional complements." Goods are transactional complements

---

[2] Tied products" are those which sellers require to be purchased together. In cluster cases, defendant firms offer to sell a number of "united products," but do not require that they be purchased together. *See* R. POSNER & F. EASTERBROOK, *supra* note 1, at 802 (discussing tying arrangements).

[3] This point was explicitly made by the court in JBL Enter. v. Jhirmack Enter., 509 F. Supp. 357, 368-69 (N.D. Cal. 1981),*aff'd*,698 F.2d 1011 (9th Cir. 1983) (full-line cluster of beauty products held to be relevant market even though individual products were "not interchangeable for the end user" and there was no production flexibility). *See also*United States v. A.T.&T., 524 F. Supp. 1336, 1375 (D.D.C. 1981) ("[I]n United States v. Grinnell [384 U.S. 563 (1966)] the Supreme Court aggregated central fire alarm and burglar alarm systems without suggesting that these services are economic substitutes to any extent.").

Some courts, however, seem to have clustered products on the basis of supply substitutability. For example, in United States v. Hughes Tool Co., 415 F. Supp. 637 (C.D. Cal. 1976) (clustering specialized surface rotary drilling products), while the court did not explicitly define the market on the basis of supply substitutability, it found that "any large heavy machinery manufacturer would have plant facilities, personnel and at least basic equipment to go into production on any of these products . . . within a relatively short period of time." Id. at 642. This description fits the classic definition of supply substitutability. *See* R. POSNER & F. EASTERBROOK, *supra* note 1, at 352. *See also*FTC v. Lancaster Colony Corp., 434 F. Supp. 1088, 1093 (S.D.N.Y. 1977) (machine-pressed and machine-blown soda-lime glassware clustered in part because "many items can be made through either process"). While supply substitutability is a legitimate criterion for including goods in a market, this Note suggests a separate criterion for market definition.

[4] *See* P. AREEDA & D. TURNER, ANTITRUST LAW § 532c, at 403 (1978) ("There is no clear answer to the question whether it was appropriate [in United States v. Grinnell Corp., 384 U.S. 563 (1966)] to treat the various kinds of property protective services -- burglary alarm, fire alarm, etc. -- together [as a cluster market] rather than treating them separately."); Reasoner, Turner, Glassman, Collins & Kaplan, *Panel Discussion on Market Definition in Merger and Monopolization Cases: Concepts and Techniques*, 49 ANTITRUST L.J. 1167, 1179 (1982) (The "concept [of cluster markets] has expanded in the last few years, willy-nilly and without a great deal of analysis."); Rosenthal, *Continental Can Revisited: Limits Upon the Breadth of a Line of Commerce in a Section 7 Case*, 14 HOUS. L. REV. 973, 1010 (1977) ("Although this term [cluster market] has been used on a number of occasions, there is no clearly established standard designating what constitutes a cluster of products.").

[5] *See*United States v. Phillipsburg Nat'l Bank, 399 U.S. 350, 360 (1970) ("trade reality makes commercial banking a distinct line of commerce"); United States v. Grinnell Corp., 384 U.S. 563, 572 (1966) (cluster "reflects commercial realities"); United States v. Philadelphia Nat'l Bank, 374 U.S. 321, 357 (1963) (cluster "meaningful in terms of trade realities"); United States v. Tracinda Inv. Corp., 477 F. Supp. 1093, 1104 (C.D. Cal. 1979) ("commercial realities" do not support motion picture production/distribution cluster); Science Prods. Co. v. Chevron Chem. Co., 384 F. Supp. 793, 797 (N.D. Ill. 1974) ("[R]elevant product market can include clusters . . . where that combination reflects commercial realities."); In re Tenneco, Inc., 98 F.T.C. 464, 568 (1981) ("technical or commercial realities permit" clustering); In re British Oxygen Co., 86 F.T.C. 1241, 1311 (1975) ("trade reality" justifies cluster).

One must be similarly skeptical when courts base cluster definitions on industry and consumer recognition. Just as courts' undefined invocation of "economic reality" does not provide a substantive guideline for clustering, it is unclear which specific industry and consumer recognitions justify clustering. *See, e.g.*,United States v. A.T.&T., 524 F. Supp. 1336, 1376 (D.D.C. 1981) (industry recognition justifies cluster); FTC v. Lancaster Colony Corp., 434 F. Supp. 1088, 1093 (S.D.N.Y. 1977) (same); United States v. Hughes Tool Co., 415 F. Supp. 637, 640 (C.D. Cal. 1976) (cluster justified in part by "industry usage and recognition"); Science Prods. Co. v. Chevron Chem. Co., 384 F. Supp. 793, 796 (N.D. Ill. 1974) (analyzing industry and public recognition); United States v. Tidewater Marine Serv., 284 F. Supp. 324, 330 (E.D. La. 1968) (industry recognition justifies cluster); In re British Oxygen Co., 86 F.T.C. 1241, 1312 (1975) (same); *In re* American Medical Int'l, Inc., 3 TRADE REG. REP. (CCH) P22,170 at 23,040 (F.T.C. 1984) (government and industry recognition justifies health care cluster).

if buying them from a single firm significantly reduces consumers' transaction costs. Transactional complementarity effectively ties consumer **[*111]** purchases of multiple products to individual firms and thereby makes the cluster the relevant product. [6]

Part I of this Note describes the varying criteria that courts have used to define cluster markets and concludes that courts have failed to justify coherently the cluster market concept. Part II analyzes the causes of multiproduct supply and presents a theoretical justification for clustering transactional complements. Part III discusses how the suggested transactional complementarity approach should be applied.

I. LEGAL PRECEDENT

A cluster market definition was first adopted in 1963 by the Supreme Court in *United States v. Philadelphia National Bank:* "[T]he cluster of products (various kinds of credit) and services (such as checking accounts and trust administration) denoted by the term 'commercial bank' . . . composes a distinct line of commerce." [7] The Court defended its definition by arguing that none of the individual products or services of a commercial bank face competition. Rather, distinctiveness, cost advantages or "a settled consumer preference" insulated each commercial banking product from competition with the products of other financial institutions. [8]

The Court's analysis, however, is incomplete. While the Court may have been correct in its determination that the *individual* products of a commercial bank do not face competition, the Court did not explain why these individual product markets should be *grouped* together. [9]

Three years after *Philadelphia National Bank,* the Supreme Court in **[*112]** *United States v. Grinnell Corp.*[10] again clustered a group of products. This cluster was comprised of accredited central station services, which included various fire and burglar alarms. [11] Justice Douglas' opinion went beyond *Philadelphia National Bank* and suggested that a group of non-interchangeable

---

[6] The concept "transactional complementarity" is a new one. However, in showing that the results of neoclassical economic theory change when assumptions are loosened to allow for transaction costs, the approach of this Note parallels that of other recent work. *See, e.g.,* O. WILLIAMSON, MARKETS AND HIERARCHIES: ANALYSIS AND ANTITRUST IMPLICATIONS (1975) (analyzing the competitive effects of transaction costs); Gilson, *Value Creation By Business Lawyers: Legal Skills and Asset Pricing*,94 YALE L.J. 239, 253 (1984) (lawyers create value by reducing transaction costs); Harris & Jorde, *Antitrust Market Definition: An Integrated Approach*, 72 CALIF. L. REV. 1, 25 (1984) (criticizing assumptions of neoclassical price theory, suggesting transactional orientation toward market definition).

[7] 374 U.S. 321, 356 (1963). Earlier decisions, however, though not using the term "cluster," aggregated non-substitutes into a single market. *See, e.g.,*A.G. Spalding & Bros. v. FTC, 301 F.2d 585, 603 (3d Cir. 1962) ("athletic goods industry" is appropriate line of commerce); United States v. United Shoe Mach. Corp., 110 F. Supp. 295, 338-39 (D. Mass. 1953) (shoe machines performing 18 different processes aggregated into single market); In re The Papercraft Corp., 78 F.T.C. 1352, 1361-64 (1971) (giftwrap, tying materials and tags included in single market).

[8] Philadelphia Nat'l Bank, 374 U.S. at 356-57.

[9] Justice Brennan's only justification was that "commercial banking is a market 'sufficiently inclusive to be meaningful in terms of trade realities.'" Id. at 357 (quoting *Crown Zellerbach Corp. v. FTC, 296 F.2d 800, 811 (9th Cir. 1961)).*

Since this decision, banking deregulation has increased competition among commercial banks and other financial intermediaries. In United States v. Connecticut Nat'l Bank, 418 U.S. 656, 666 (1974), Justice Powell noted that "[a]t some stage in the development of savings banks it will be unrealistic to distinguish them from commercial banks."

[10] 384 U.S. 563 (1966).

[11] The Court again asserted that viewing a cluster of goods as a single product best captured reality: "We see no barrier to combining in a single market a number of different products or services where that combination reflects commercial realities. To repeat, there is here a single basic service." Id. at 572.

services should be "lumped" together if "companies recognize that to compete effectively, they must offer all or nearly all types of service." [12] *Grinnell*, then, stands for the proposition that courts should cluster a group of goods when competition causes that group to be supplied together. [13] The *Grinnell* Court, however, failed to explain why this standard was appropriate. [14]

The lack of a justifying theory apparent in *Philadelphia National Bank* and *Grinnell* has left lower courts virtually unconstrained to develop additional criteria for cluster definitions. Lower courts have based cluster definitions on the existence of trade associations; [15] census classifications; [16] functional complementarity; [17] common technology, distribution **[*113]** or marketing; [18] a unique product group; [19] and other market characteristics. [20] While courts have a plethora of standards from which to choose, they currently have no basis for distinguishing the good from the

---

[12] Id. at 572 (footnote omitted). The *Grinnell* decision implied that service clusters would somehow be judged by a different standard than product clusters: "[W]e deal with services, not with products." *Id.* The Court did not explain this distinction and, in fact, was forced to mischaracterize the *Philadelphia Nat'l Bank* definition as a service cluster -- even though that decision explicitly defined a loan to be a product. 374 U.S. at 356.

[13] In dissent, however, Justice Fortas argued that defendants did not in fact offer "a common or predominant 'cluster' of services." Grinnell, 384 U.S. at 595 (Fortas, J., dissenting).

[14] Joint supply may be necessary not only because of transactional complementarity, but also because of economies of scope, *see infra* Part II.A. Because economies of scope are not an appropriate basis for clustering, *see infra* text accompanying notes 42 & 43, the *Grinnell* standard is overbroad.

In explaining cluster definitions, several courts have applied standards which, like the overbroad *Grinnell* standard, may reflect only the presence of economies of scope. For example, courts have clustered products on the basis of trade associations, *see infra* note 15, and census classifications, *see infra* note 16. Such characteristics, however, may simply be the byproducts of economies of scope. *See* Phillips, *A Critique of Empirical Studies of the Relation Between Market Structure and Profitability*, 24 J. INDUS. ECON. 241, 242, 245 (1976) (census classifications often reflect supply-side linkages). If a group of firms all supply the same set of products, it is not surprising that a trade association or census classification would develop. Even the evolution of names to describe multiple goods (such as "dairy products") may be nothing more than a linguistic artifact of scope economies.

[15] *See* FTC v. Lancaster Colony Corp., 434 F. Supp. 1088, 1092 (S.D.N.Y. 1977); United States v. Times Mirror Co., 274 F. Supp. 606, 617 (C.D. Cal. 1967); In re Brunswick Corp., 94 F.T.C. 1174, 1258 (1979); In re British Oxygen Co., 86 F.T.C. 1241, 1312, 1346 (1975).

[16] *See* United States v. Hughes Tool Co., 415 F. Supp. 637, 641 (C.D. Cal. 1976); In re The Grand Union Co., 102 F.T.C. 812, 1046 n.31 (1983); In re British Oxygen Co., 86 F.T.C. 1241, 1312 (1975).

[17] *See* United States v. Hughes Tool Co., 415 F. Supp. 637, 640 (C.D. Cal. 1976); Science Prods. Co. v. Chevron Chem. Co., 384 F. Supp. 793, 797-98 (N.D. Ill. 1974); In re American Medical Int'l, Inc., TRADE REG. REP. (CCH) P22,170, at 23,040 (F.T.C. 1984). *But see infra* note 22, for discussion of In re British Oxygen Co., 86 F.T.C. 1241, 1359 (1975) (rejecting functional complementarity as cluster basis).

[18] *See* United States v. Hughes Tool Co., 415 F. Supp. 637, 641 (C.D. Cal. 1976); In re Tenneco, Inc. 98 F.T.C. 464, 567 (1981); In re Brunswick Corp., 94 F.T.C. 1174, 1258-59 (1979); In re British Oxygen Co., 86 F.T.C. 1241, 1345-47 (1975).

[19] *See* United States v. Household Fin. Corp., 602 F.2d 1255, 1258-60 (7th Cir. 1979); American Medicorp, Inc. v. Humana, Inc., 445 F. Supp. 589, 603-04 (E.D. Pa. 1977); United States v. Healthco, Inc., 387 F. Supp. 258, 265 (S.D.N.Y. 1975); Bowl Am., Inc. v. Fair Lanes, Inc. 299 F. Supp. 1080, 1089 (D. Md. 1969); United States v. Tidewater Marine Serv., Inc., 284 F. Supp. 324, 329-31 (E.D. La. 1968); United States v. Times Mirror Co., 274 F. Supp. 606, 617 (C.D. Cal. 1967); American Medical Int'l, Inc., TRADE REG. REP. (CCH) P22,170, at 23,040 (F.T.C. 1984).

[20] Several cases have defined cluster markets by relying on the "practical indicia" for defining submarkets. These indicia include "industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors." Brown Shoe Co. v. United States, 370 U.S. 294, 325 (1962) (footnote omitted). Decisions which have applied the *Brown Shoe* submarket criteria as a basis for clustering include: FTC v. Lancaster Colony Corp., 434 F. Supp. 1088, 1092 (S.D.N.Y. 1977); United States v. Healthco, Inc., 387 F. Supp. 258, 264 (S.D.N.Y. 1975); Science Prods. Co. v. Chevron Chem. Co., 384 F. Supp. 793, 795 (N.D. Ill. 1974); Credit Bureau Reports, Inc. v. Retail Credit Co., 358 F. Supp. 780, 789 (S.D. Tex. 1971).

bad (and the ugly). In sum, while some cluster markets have been defined correctly, [21] the lack of a sound justifying theory has led courts to adopt conflicting and ad hoc standards. [22] In a world in which antitrust defendants **[*114]** are usually multiproduct firms, [23] the problem of deciding when to cluster a group of products needs to be formally addressed.

## II. ANTITRUST ANALYSIS OF MULTIPRODUCT FIRMS

### A. *The Causes of Multiproduct Firms*

Because clustering only occurs in the multiproduct firm context, articulation of a rational criterion for clustering requires an understanding of the market conditions that cause firms to supply multiple products. In the past, multiproduct production has been explained *solely* by the concept of economies of scope. [24] A production technology has economies of scope if it is less expensive to produce certain goods together than separately. [25] The production of wheat and straw, milk and cream, and wool and mutton are classic examples of such scope economies. [26]

---

*See also* United States v. Household Fin. Corp., 602 F.2d 1255, 1260-61 (7th Cir. 1979) ("market segmentation" supports cluster definition); United States v. A.T.&T., 524 F. Supp. 1336, 1376 (D.D.C. 1981) (cluster market supported by "integrated nature of the telecommunications system"); United States v. Tracinda Inv. Corp., 477 F. Supp. 1093, 1104 (C.D. Cal. 1979) (cannot cluster goods at different levels in "vertical chain"); Science Products Co. v. Chevron Chem. Co., 384 F. Supp. 793, 797 (N.D. Ill. 1974) ("overlap of locus of use" supports cluster definition); Credit Bureau Reports, Inc. v. Retail Credit Co., 358 F. Supp. 780, 790 (S.D. Tex. 1971) ("the degree of differentiation" supports cluster definition); In re American Medical Int'l, Inc., TRADE REG. REP. (CCH) P22,170, at 23,040 (F.T.C. 1984) (fact that "almost every [product in cluster] would not exist but for the other[s]" supports cluster definition) (quoting Philadelphia Nat'l Bank, 201 F. Supp. 348, 363 (E.D. Pa. 1962)); In re The Grand Union Co., 102 F.T.C. 812, 1044 (1983) (stronger case for clustering where services are involved, especially "where the services are complex, interrelated, and interdependent"); In re British Oxygen Co., 86 F.T.C. 1241, 1346 (1975) ("synergetic marketing relationship" supports cluster definition).

21 *See, e.g., infra* text accompanying notes 56, 62 & 63 for a discussion supporting the market definitions in United States v. Philadelphia Nat'l Bank, 374 U.S. 321 (1963) (clustering commercial banking products); JBL Enter., Inc. v. Jhirmack Enter., Inc., 698 F.2d 1011, 1016-17 (9th Cir. 1983) (clustering beauty products); Manufacturing Research Corp. v. Greenlee Tool Co., 693 F.2d 1037, 1043 (11th Cir. 1982) (rejecting conduit and cable bender cluster); In re Brunswick Corp., 94 F.T.C. 1174, 1259 (1979) (clustering marine engines); In re British Oxygen Co., 86 F.T.C. 1241, 1346 (1975) (clustering industrial gases).

22 For example, United States v. Hughes Tool Co., 415 F. Supp. 637 (C.D. Cal. 1976), announced de novo that "complementarity of function" be used as a basis for clustering. Functional complements are those goods "which operate as a group in the performance of [a specific] function." Id. at 640. The Federal Trade Commission, however, had already correctly rejected such a standard in *British Oxygen Co.*: Functional complementarity "among the products . . . does not establish that the products belong in the same economic market. Automobiles need oil and gasoline to be operable, but no one would surely contend that automobiles, oil, and gasoline are all in the same product market." 86 F.T.C. at 1369 (1975). The crucial distinction between functional (or demand) complementarity and transactional complementarity is that consumers can buy the former but not the latter from different producers without incurring significant transaction costs.

23 Bailey & Friedlaender, *Market Structure and Multiproduct Industries,* 20 J. ECON. LITERATURE 1024, 1024 (1982).

24 *See* W. BAUMOL, J. PANZAR & R. WILLIG, CONTESTABLE MARKETS AND THE THEORY OF INDUSTRY STRUCTURE 71 (1982); Panzar & Willig, *Economies of Scope*, 71 AM. ECON. REV. 268, 268 (Papers and Proceedings 1981); Willig, *Multiproduct Technology and Market Structure,* 69 AM. ECON. REV. 346, 346 (Papers and Proceedings 1979).

25 *See* W. BAUMOL, J. PANZAR & R. WILLIG *supra* note 24, at 72. "Economies of scope" should be distinguished from the better-known concept of "economies of scale." The former results from supplying different products, the latter from supplying more of a single product. *See* Panzar & Willig, *supra* note 24, at 270.

26 These examples involve the use of "public inputs" (such as a cow) through which "the production of [beef] necessarily results in the production of [hides] in more or less fixed proportions." P. AREEDA & D. TURNER, *supra* note 4, § 521a, at 352. W. BAUMOL, J. PANZAR & R. WILLIG, *supra* note 24, at 76. While such public inputs are sufficient to cause economies of scope, they are not necessary. Rather, they represent a technological extreme -- once one good is produced the other is available at little or no cost. Economies of scope will also be present whenever producing one good simply reduces the cost of producing

By giving multiproduct firms a competitive cost advantage relative to single-product firms, economies of scope encourage firms to supply multiple products. [27]

Multiple product firms, however, may also be the result of transactional complementarity. Goods are transactional complements if buying them from a single firm significantly reduces consumers' transactions costs. In **[*115]** other words, given equal prices, consumers prefer to buy transactional complements from a single firm. [28] If consumers strongly prefer to purchase a group of goods from a single firm, firms selling only part of this group will not compete effectively with firms supplying the full line. [29]

Transactional complementarity may arise simply from consumers' desire to spread fixed transaction costs among a group of untied products. [30] If, for example, each trip to a grocery store costs a fixed amount (say, of gas), then, all else equal, consumers will prefer "one-stop shopping" -- buying the product group at a single store. [31]

These fixed transaction costs may represent a non-transferable investment that facilitates the purchase of a group of goods from a specific firm. Because such investments may be long-lived, joint purchase need not be simultaneous purchase. For example, a consumer's investment in learning to understand or trust a multiproduct seller could enhance the desirability of the entire product group over a lengthy period. Such firm-specific investments can shift competition among individual products to competition among product clusters. Because both consumers and suppliers realize that purchases of the entire group will effectively be tied to an individual firm

---

another. For example, once a manufacturer develops sterile facilities for producing one drug, it is likely to be cheaper to produce other drugs as well.

[27] Panzar & Willig, *supra* note 24, at 268; Willig, *supra* note 24, at 346. This theory is a natural extension of Coase's prediction that firms will carry out those transactions which they can perform less expensively than can an external market. Coase, *The Nature of the Firm*, 4 ECONOMICA (n.s.) 386, 393 (1937).

The tendency of firms to produce supply substitutes is not at odds with the economies of scope theory of multiproduct supply. For example, producing supply substitutes might generate scope economies by allowing firms to react more quickly to arbitrage opportunities. In United States v. A.T.&T., 524 F. Supp. 1336 (D.D.C. 1981), however, the court erred in inferring supply substitutability from joint supply. The court inferred from "the fact that most firms offering one of the services also offered the other," id. at 1375, "that the degree of cross-elasticity of supply in the industry" was high. Id. at 1375 n.163.*See also* P. AREEDA & D. TURNER, *supra* note 4, at § 521a (mistakenly inferring supply substitutability from joint supply). While supply substitutability may cause economies of scope (and therefore joint supply), the converse need not hold.

[28] Formally, joint supply affords the consumer a set of consumption opportunities that "Paretodominates" those opportunities offered by individual producers of the same products. *See* H. VARIAN, MICROECONOMIC ANALYSIS 216 (1978) (describing Pareto criterion).

[29] The ability of transactional complementarity to cause joint supply was explicitly recognized in In re Brunswick Corp., 94 F.T.C. 1174 (1979). There, the court held that outboard motor dealers, as buyers in the wholesale market, "have strong incentives to display a broad line from a single supplier and, as a result manufacturers have strong incentives to be able to supply that full line." Id. at 1260 (citation omitted).

In fact, demand-side transactional complementarity can even outweigh supply-side diseconomies of scope in determining firm structure. For example, a restaurant might find it cheaper to serve only cold beer or only hot foods (because of thermal externalities), but demand preferences to consume the two together may force joint supply.

[30] *See* Harris & Jorde, *supra* note 6, at 25 ("A buyer can spread transaction costs (including search and shopping costs) over a number of different products purchased in a single transaction.").

[31] *See id.* ("A major advantage of supermarkerts is that buyers can purchase a bundle of goods on a single trip."). For a discussion of difficulties in defining a grocery cluster, see *infra* note 62.

once such an investment is made, firms will compete for the investments and the tied sales that such investments imply. [32]

Consumers may also prefer to buy a product group from a single firm if different firms' products are functionally incompatible. [33] Such inter-firm incompatibility reveals the close association between effectively tied transactional complements and explicitly tied goods. To the extent that **[*116]** firms cause this inter-firm incompatibility, they can create transactional complementarity, thereby tying otherwise untied goods. [34]

Transactional complementarity need not be confined to consumer demand. That is, cluster markets may be appropriate not only when firms sell to individuals, but also when firms sell to firms. For example, in *In re Brunswick Corp.,*[35] the retail dealers of outboard motors preferred to buy a full line of engines from individual manufacturers. In defining an outboard motor cluster, the court held that while "no single consumer has an economic incentive to purchase a number of outboard motors under a single roof rather than shopping around . . . dealers have strong incentives to display a broad line from a single supplier." [36]

Transactional complementarity is thus a demand-side analog to economies of scope, in which the economies accrue to the consumer instead of the producer. For the purpose of market definition, [37] the crucial distinction between the two concepts is that while transactional complementarity

---

32 *See* M. PORTER, COMPETITIVE STRATEGY 25 (1980) ("switching costs" may tie demand to individual firms); O. WILLIAMSON, *supra* note 6, at 48 (firm-specific investments can *ex post* tie consumers to specific firms); P. Klemperer, Collusion via Switching Costs: How "Frequent-Flyer" Programs, Trading Stamps and Technology Choices Aid Collusion 1-3 (Dec. 1984) (Stanford University unpublished paper) (analyzing switching costs).

33 For example, to the extent that one computer firm's software and peripheral hardware cannot be used with that of other firms, consumers are forced to bring all of their patronage to one firm.

34 Klemperer has identified several ways that a firm can penalize consumers who switch companies:

Airlines enroll passengers in 'frequent-flyer' programs that reward them for repeated travel on the same carrier, and some retailers offer trading stamps (Greenshield stamps, S & H stamps, Pink stamps) which customers can exchange for prizes after sufficiently many have been accumulated from repeated purchases. Auto insurance companies offer 'dividends' that repeat purchasers of insurance can deduct from future premia, and shipping firms have offered 'deferred rebates' that return after a delay a fraction of past payments to customers who continue to patronize them exclusively (though the latter practice is now illegal in the U.S.). Film developing companies often return developed camera film with new film that can be developed only by the same company, and many grocery products are sold with a discount coupon valid for the next purchase of the same item.

P. Klemperer, *supra* note 32, at 1. The similarity of these practices to explicit tying arrangements might suggest their illegality. *See* R. POSNER & F. EASTERBROOK, *supra* note 1, at 802 (discussing tying arrangements).

35 94 F.T.C. 1174 (1979).

36 Id. at 1259-60.*See also* Harris & Jorde, *supra* note 6, at 25 ("[I]ndustrial buyers [may prefer to] purchase a full product line from one supplier, rather than shop for the terms on each single item.").

37 An understanding of the causes of multiproduct firms is necessary not only to define cluster markets correctly, but also to interpret the resulting market shares correctly. For example, both economies of scope and transactional complementarity can, by causing firms in an industry to supply multiple products, create barriers to entry. *See* J. BAIN, BARRIERS TO NEW COMPETITION 3 (1956) (defining entry barriers to include structural characteristics that may significantly *delay* entry); *but see* G. STIGLER, THE ORGANIZATION OF INDUSTRY 67 (1968) (defining entry barriers more narrowly to be a cost borne by an entrant but not borne by an incumbent). For example, transactional complementarity forced manufacturers of outboard motors to produce a full line of engines, *see supra* note 29, and thereby greatly increased barriers to entry because potential competitors would have to develop a technologically diverse group of engine sizes in order to enter effectively. For an explanation of how economies of scope can dramatically increase welfare loss associated with even single product collusion, *see infra* note 42.

necessitates joint purchase, economies of scope do not necessitate joint sale. [38] Only transactional complementarity ties consumers' purchases of product groups to individual firms.

**[*117]** B. *Market Definition in the Multiproduct Firm Context*

Courts should cluster transactional complements into the same market because competition takes place among the effectively tied groups, not the individual products. [39] Just as products that are explicitly tied together by producers are routinely aggregated into one market, [40] so should products that are effectively tied together by consumer purchasing behavior. Transactional complementarity makes the market for the cluster of products the relevant market. [41]

Economies of scope do not analogously connect goods from the suppliers' perspective. Because economies of scope do not necessitate that goods be sold together, firms can collude on *single* products profitably. [42] Thus, **[*118]** even though economies of scope cause joint supply, they do not justify clustering. [43]

C. *Harmonizing Cluster Markets with the D.O.J. Guidelines*

---

38 For example, while scope economies dictate that mutton and wool be produced together, there is no requirement that they be sold to the same purchasers.

39 *See* Harris & Jorde, *supra* note 6, at 33 ("If buyers typically purchase products in bundles (e.g., groceries), full-line stores may constitute a separate market from specially stores, especially if there are significant transaction cost savings involved.").

40 For example, the steering wheel and the rest of the car are unavoidably placed in the same market.

41 The cluster seen as a single product would then be subject to the traditional substitutability criterion. *See, e.g.*, United States v. Grinnell Corp., 384 U.S. 563, 573 (1966) (analyzing whether there are "substitutes for the accredited central station" cluster).

This transactional complement approach is not antithetical to the traditional substitutability approach. Transactional complements can be supply substitutes and, as such, can be included in a single market on both grounds independently.

42 Only in the case of joint products (such as beef and hides, discussed *supra* note 26) would a collusive restriction of one good's output necessitate a restriction of another good's output as well. Because such products are produced in fixed proportions, however, and because the individual and cluster market definitions will thus yield identical market share and concentration measures, the decision whether or not to cluster is unimportant. As mentioned *supra* note 26, joint products represent a technological extreme. More generally, economies of scope do not necessitate production in fixed proportions.

[See Illustration in Original]

Economies of scope, however, may dramatically increase the welfare loss associated with single product collusion. Consider, for example, an economies of scope technology in which producing more of a first good reduces a firm's cost of producing a second good. If firms agree to cartelize the first good and restrict its output, then the cost of the second good will rise. Even if the second market remains competitive -- in the sense that there are zero profits and marginal cost pricing -- there will be a welfare loss in the second market which may dwarf the traditional welfare loss created by the cartelization of the first market. Though producers are just breaking even in the second market, there is significant welfare loss because goods are being produced at an inefficiently high cost. Figure A illustrates that the losses in the second market induced by economies of scope (Area C) may be significantly larger than the traditional dead-weight triangle (Area T).

These additional welfare losses may increase significantly Harberger's calculation that the annual welfare loss in the United States in the 1920's due to monopoly was only two dollars per capita. Harberger, *Monopoly and Resource Allocation*, 44 AM. ECON. REV. 77 (1954).

43 This result is contrary to that of Areeda and Turner, who have proposed that:

[P]roducts produced in common facilities . . . are in the same market . . . . This is so whether (1) the products are 'joint products' where the production of X necessarily results in the production of Y in more or less fixed proportions, or (2) the facilities are freely convertible from one product to the other.

P. AREEDA & D. TURNER, *supra* note 4, at § 521a. This analysis is flawed because it assumes that joint supply is caused only by joint products of freely convertible facilities. The latter cause (often called supply substitutability), while being an independent ground for market definition, is neither a necessary nor a sufficient cause of joint supply. *See supra* note 27. The former, while being

The Department of Justice Merger Guidelines include in a market *those products whose price a cartel would have to control to obtain monopoly profits.*[44] Although the Guidelines currently define individual markets for each of defendant's products, [45] the Guidelines' underlying rationale **[*119]** lends independent support for the clustering of transactional complements.

When consumers' purchases are effectively tied to individual cluster producers, the consumers will choose on the basis of a set of prices. A cartel that does not reach agreement with regard to all prices within the cluster cannot profitably collude, because firms will have an incentive to lower the price of the non-collusive goods to attract more sales. [46] Controlling the price of all the cluster goods, even when the goods are untied, is therefore necessary for profitable collusion. [47]

The Guidelines' rationale also makes clear that economies of scope are not an appropriate basis for clustering, because manufacturers need not control the price of more than one product in order to collude profitably. [48]

## III. APPLYING THE TRANSACTIONAL COMPLEMENTARITY APPROACH

Defining clusters on the basis of transactional complementarity secures market definition in a coherent theory. Furthermore, it focuses judicial attention on well-specified factual questions that

---

a sufficient cause of economies of scope and therefor joint supply, represents a technological exception that will result in identical market shares for the cluster and individual product markets. *See supra* note 26.

44 This principle of market definition naturally incorporates the traditional process of including substitutes in the relevant market. A cartel which excludes a close substitute could not profitably increase price, because too much of the cartel's demand would shift to the lower-priced substitute.

This restatement differs in form from the Guidelines' wording: "[T]he product market [will include the smallest] group of products such that a hypothetical firm that was the only present and future seller of those products ('monopolists') could profitably impose a 'small but significant and nontransitory' increase in price." Guidelines, *supra* note 1, at § 2.11. Under either formulation the hypothetical cartel controls its price but does not control the price at which other firms sell.

This Note's restatement improves the Guidelines' formulation, because the Guidelines speak of increases beyond the *current* price. Firms that are already pricing supra-competitively will be placed incorrectly in larger markets. For example, because an *existing* monopolist cannot profitably increase price, under the Guidelines' formulation, it would be placed incorrectly in a larger market. *See* Note, *The* Cellophane *Fallacy and the Justice Department's Guidelines for Horizontal Mergers*,94 YALE L.J. 670, 676-77 (1985) (criticizing application of Guidelines' approach to supra-competitive prices). The Guidelines' method is also inadequate because it does not allow firms outside the market to react (usually by raising their own price) to the hypothesized price increase. This flaw will tend to define markets too broadly and thus dilute the merging firms' market shares.

45 Guidelines, *supra* note 1, at § 2.11. The Guidelines' procedure of defining markets is derived from Kenneth Boyer's innovative concept of an "ideal collusive group." Boyer, *Industry Boundaries,* in ECONOMIC ANALYSIS AND ANTITRUST LAW 88 (T. Calvani & J. Seigfried eds. 1979).

46 Any effective cartel must prohibit the *explicit tying* of below-cost goods. For example, a profitable theater carted could not allow one of its members to give away light bulbs *with every ticket purchase*, because tying the light bulb giveaway to the purchase of tickets would induce consumers to purchase more tickets from the giveaway theater. A transactional complements cartel, however, must in addition prohibit even *untied* below-cost sales in order to collude profitably, because *merely offering* below-cost transactional complements can induce consumers to purchase the entire cluster.

47 Transactional complementarity thus increases the dimensionality of necessary agreement, because a profitable cartel must reach, monitor and enforce an agreement concerning the entire cluster. This increased dimensionality may discourage collusive agreements because firms must negotiate many collusive prices instead of only one. The need for more involved negotiations, by itself, would tend to inhibit collusion. However, cartel members may be able to decrease this dimensionality by agreeing to a uniform mark-up (also called "administered pricing") or agreeing to fix a market-basket price.

48 The industrial organization literature has long recognized that firms may successfully agree to restrict price competition without necessarily agreeing to restrict areas of non-price competition such as advertising. The fact that competition over some products cannot eliminate the profits of collusion over others parallels Schmalensee's finding that advertising competition will not eliminate price collusion. Schmalensee, *A Model of Advertising and Product Quality*, 86 J. POL. ECON. 485, 498-99 (1978). In both instances the dimensionality of necessary agreement does not increase. In contrast, the dimensionality of necessary agreement *does* increase when there are significant transactional complementarities. *See supra* note 47.

courts are competent to address and have, in fact, answered in the past. This Part suggests guidelines for determining when transactional complementarity is present and for handling firms that supply only part of the cluster product group. It then analyzes the various incentives that encourage antitrust litigants to propose cluster definitions.

**[*120]** A. *Establishing Transactional Complementarity*

To establish the existence of transactional complementarity, courts should investigate consumer behavior to see whether consumers' purchases of a product group are tied to individual firms. [49] Specifically, courts should ask whether consumers buy the group of goods from individual firms. Moreover, because transactional complementarity leads consumers to compare prices of the entire cluster instead of individual goods, evidence that manufacturers promote their goods on the basis of joint price indices would be evidence of transactional complementarity. [50]

Transactional complementarity analysis provides a clearer justification for the Court's commercial banking cluster definition in *United States v. Philadelphia National Bank.*[51] By limiting itself to a product-by-product analysis, the Supreme Court could not explain the "settled consumer preference" for commercial banks' savings accounts which, but for paying a *lower* return, were identical to those offered at savings and loans. [52] The opinion quoted a bank official: "[T]here isn't anybody in Philadelphia who will take the trouble to walk across Broad Street to get 1/2 of 1 per cent more interest. If you ask me why, I will say I do not know." [53] Transactional complementarity analysis explains that this settled consumer preference was not for savings accounts alone, but for the group of services as a whole offered by commercial banks.

Indeed, the Supreme Court has already relied upon this factual finding. For example, in *United States v. Phillipsburg National Bank,*[54] the Supreme Court relied explicitly on a finding that consumers preferred purchasing multiple products from individual commercial banks to support a cluster definition: "A customer who uses one service usually looks to his bank for others as well . . . . [C]ustomers are likely to maintain checking and savings accounts in the same local bank even when higher **[*121]** savings interest is available elsewhere." [55] In essence, this is a finding of transactional complementarity. [56]

---

49 By focusing on consumer behavior, courts would be examining the *effects* of transactional complementarity. Courts could also weigh evidence of the *causes* of transactional complementarity -- for example, whether consumers significantly save time or money by buying the group of products from an individual store. Ascertaining information about consumers' preferences, however, is likely to be more difficult than analyzing actual consumer behavior. *See* Harris & Jorde, *supra* note 6, at 29-31 (transactional approach to market definition should be based on observable consumer behavior).

50 For example, grocery stores sometimes advertise that they offer the lowest weekly food bill.

51 374 U.S. 321 (1963).

52 The fact that savings accounts at savings and loans are identical but still excluded from the market demonstrates that the market was not defined on the basis of supply-side substitutability.

53 Philadelphia Nat'l Bank, 374 U.S. at 357, n.34.

54 399 U.S. 350 (1970).

55 Id. at 361.*Phillipsburg Nat'l Bank* also goes beyond *Philadelphia Nat'l Bank* in describing the source of this consumer preference. By offering various services together, commercial banks reduce consumers' transaction costs not only by facilitating "convenient access" but also by inexpensively establishing consumers' credit ratings. By establishing checking or savings accounts, a consumer can convey information about her credit worthiness and thus facilitate obtaining a loan. *Phillipsburg Nat'l Bank* explicitly echoed this theory by finding that the consumer "who has patronized a particular bank for a variety of financial products and services is more likely to be able to obtain a loan from that bank than from a specialty financial institution to which he

B. *Analyzing Partial Cluster Producers*

The existence of partial cluster producers -- firms that produce only a subset of the products in the cluster group [57] -- demonstrates that at least some consumers (at least one demand segment) [58] do not consider the products **[*122]** to be transactional complements. [59] Nevertheless, as long as a court finds that a significant group of consumers [60] considers a product group to be transactional complements, a cluster definition is appropriate. [61] Such cluster definitions should exclude

---

turns simply to borrow money." Id. at 360-61.*Philadelphia Nat'l Bank* was similarly construed by JBL Enter. v. Jhirmack Enter., 698 F.2d 1011 (9th Cir. 1983): "[C]onsumers do not generally shop for individual banking services, especially because it is usually easier to obtain some services, *e.g.,* loans, at the same bank where other services, *e.g.,* savings accounts, are held." Id. at 1017.

If establishing a savings account makes it easier to obtain loans, consumers may be willing to forego a higher yield. As long as there is a chance that consumers will need loans in the future, there will be a real option value associated with establishing a savings account at a commercial bank. The value of this option to borrow at a commercial bank will be higher 1) the more likely it is that a consumer will need to borrow and 2) the more that an established savings account facilitates obtaining a loan (the greater the transaction cost savings). This option value theory not only solves the *Philadelphia Nat'l Bank* conundrum of a consumer preference for inferior-yielding savings accounts but also suggests an additional source of transactional complementarity. *See* Henry, *Option Values in the Economics of Irreplaceable Assets,* 89 REV. ECON. STUD. 104 (1974) (using similar model to evaluate option value).

56 Analysis close to the transactional complements approach has been used in four cases. In Manufacturing Research Corp. v. Greenlee Tool Co., 693 F.2d 1037, 1043 (11th Cir. 1982), the court, in rejecting a cluster of conduit and cable benders, distinguished both *Grinnell* and *Philadelphia Nat'l Bank*, because in those cases "[d]ifferent services were lumped together . . . *only* because demand forced competitors to offer the entire cluster of services as effectively one product" (emphasis added). The *Greenlee* statement correctly goes beyond the *Phillipsburg* finding by making demandforced joint supply the *only* reason for clustering.

Like *Phillipsburg*, three F.T.C. decisions have cited a consumer preference for joint purchase as a contributing factor in clustering. In re Brunswick Corp., 94 F.T.C. 1174, 1259 (1979) (marine engine cluster justified in part because "dealers prefer a full line, usually sourced by a single brand"); In re British Oxygen Co., 86 F.T.C. 1241, 1346 (1975) (industrial gases cluster justified in part "because many buyers prefer to order [a full line of gases] from one gases supplier"); In re The Grand Union Co., 102 F.T.C. 812, 1045 (1983) (supermarket cluster justified in part because "'one-stop shopping' . . . is preferred by many consumers"). *See also*JBL Enter. v. Jhirmack Enter., 698 F.2d 1011, 1016-17 (9th Cir. 1983) ("cluster approach is appropriate where the product package is significantly different from, and appeals to buyers on a different basis from, the individual products considered separately").

57 A basic requirement of a cluster theory is to explain the existence of partial cluster producers. It is insufficient to say, as in United States v. Grinnell Corp., 384 U.S. 563, 574 (1966), that watchman service does not compete with electronic burglar alarms because it "is far more costly and less reliable." If this were universally the case, no one would hire watchmen. Similarly, in *Philadelphia Nat'l Bank*, small finance companies were found not to compete with commercial banks because they were more costly. This theory, however, does not explain why small finance companies have continued to exist. Finance companies could still compete with higher prices if consumers had to make reputational investments to obtain loans from commercial banks. *See supra* note 55.

58 In attempting to establish whether transactional complementarity is present, courts may find that some consumers view the members of the product group as transactional complements, while others treat them independently. To distinguish such preferences courts must define demand segments. While complicating the analysis, demand segment definition is not unworkable and, in fact, has already been attempted by courts. *See, e.g.,*United States v. Household Fin. Corp., 602 F.2d 1255, 1260-61 (7th Cir. 1979) ("market segmentation" supports cluster definition). Procedures for defining market segments have also been set forth in the marketing literature. *See, e.g.,* Blattberg & Sen, *Market Segmentation Using Models of Multidimensional Purchasing Behavior,* 38 J. MARKETING 17, 19 (1974).

59 If all consumers preferred to purchase a product group from individual firms, partial cluster producers would be at a severe competitive disadvantage and would not survive in the long run.

60 While the term "significant" is somewhat vague, courts have confidently applied it in antitrust analysis to avoid *de minimis* problems. *See, e.g.,*United States v. Household Fin. Corp., 602 F.2d 1255, 1258 (7th Cir. 1979) (cluster must be offered to "significant number of consumers" to be appropriate); International Salt Co. v. United States, 332 U.S. 392, 396 (1947) ("unreasonable, *per se,* to foreclose competitors from any substantial market").

61 Similarly, other commentators have suggested that markets be defined with respect to particular demand segments. *See* Harris & Jorde, *supra* note 6, at 18 ("market definition should begin from the perspective of the injured . . . buyer or seller group"); Note, *The Line of Commerce for Commercial Bank Mergers: A Product-Oriented Redefinition,*96 HARV. L. REV. 907, 919 (1983) (market definitions should begin by identifying "customer segments").

partial cluster producers. The partial cluster producers cannot compete for sales to those consumers with a transactional complement preference, because, by definition, individual products do not appeal to these consumers.

This analysis provides a theoretical justification for excluding savings accounts at savings and loans from the commercial banking cluster in *United States v. Philadelphia National Bank.*[62] Savings and loans can be viewed as partial cluster producers, because they provide only one of the services -- savings accounts -- that make up the commercial banking cluster. **[*123]** Although the existence of savings accounts at savings and loans indicates that some consumers purchased this service independently, the fact that a substantial number of other consumers preferred to hold savings accounts at commercial banks, even though these accounts yielded less, demonstrates that cluster producers had the power to raise price profitably. [63] Such savings accounts were thus properly excluded from the cluster definition.

C. *Analyzing Adversarial Incentives*

In deciding whether or not to cluster a group of products, a court will face one of two adversarial positions -- either plaintiff or defendant will favor clustering while the opposing party will favor individual product definitions. [64] Regardless of competitive realities, adversaries will propose the market definitions that most favor their position. An analysis of the adversarial incentives should inform a court's clustering decision.

An adversarial position in which defendants seek individual market definitions requires transactional complementarity analysis because defendants' incentives to oppose a cluster

---

Clustering despite the existence of partial cluster producers is also supported by the Guidelines' rationale for market definition. *See supra* note 44 and accompanying text. By the Guidelines' rationale, the presence of partial cluster producers does not invalidate a cluster definition if a cluster cartel could profitably collude. The existence of these partial partial cluster producers need not eliminate the possibility of a profitable cluster cartel, because that cartel could simply cede the non-cluster demand segments to the partial cluster firms. Moreover, the cluster cartel might compete with partial cluster producers by charging a competitive price on overlapping goods, and still extract collusive profits by only raising the price of the non-overlapping products.

62 374 U.S. 321 (1963). This analysis is at odds, however, with the FTC's inclusion of "limited assortment" warehouse stores (which only sell non-perishable groceries) into a full-line grocery store cluster in In re The Grand Union Co., 102 F.T.C. 812, 1045 (1983). In that case, Chairman Miller reasoned that a "substantial segment of consumers . . .. even if disinclined to make multiple shopping trips, may nevertheless purchase the more durable food products, from, say, box or warehouse stores in one week, and follow the next week patronizing a supermarket with the full 'cluster' of services." *Id.* Such consumer behavior, however, does not justify including the non-perishable sales of the warehouse store in the relevant market, because full-line grocery stores could continue to collude profitably even if the warehouse stores priced the non-perishables competitively. The full-line grocery stores could cede the non-perishable food sales to the warehouses stores every few weeks and still profitably collude during the times when consumers prefer "one-stop shopping." Moreover, a full-line cartel might not even need to cede the non-perishable sales, because it could price non-perishables competitively with the warehouses and extract the monopoly rents through the nondurable prices.

63 The amount of collusion will be limited by the degree to which goods are transactional complements. If consumers have only a weak preference for joint purchase, supra-competitive prices by cluster producers will cause consumers to buy the products independently.

64 More generally, the litigants might disagree about the appropriate size of the cluster. *See, e.g.,*United States v. Hughes Tool Co., 415 F. Supp. 637, 641 (C.D. Cal. 1976) (rejecting plaintiff's 16-product cluster in favor of defendant's 36-product cluster). For the purposes of this section, the side seeking the smaller cluster is analytically similar to a party seeking individual product definitions.

definition may be proper. [65] First, because a cluster market share is an average of individual market shares, [66] **[*124]** clustering a market in which a defendant has a high market share with a market in which the defendant has a low market share can extend antitrust liability to markets in which it is not justified. [67]

Second, plaintiffs may seek a cluster definition to gerrymander not only market shares but also evidence of anticompetitive conduct. For example, in *United States v. A.T.&T.*,[68] defendants claimed that the government's proposed cluster definition improperly joined markets "in which their market share [was] high but for which the government did not prove significant anticompetitive conduct, together with those for which improper conduct may have been proven but in which their market share [was] relatively low." [69] Such aggregation may unfairly create antitrust liability by locating the necessary elements of an offense in independently lawful markets.

Finally, plaintiffs may unjustly propose a cluster market to exclude from the market definition partial cluster producers that are, in fact, competing with the defendant's individual products. Such inappropriate exclusion of partial cluster producers can overstate dramatically a defendant's market share.

In the contrasting adversarial position, however, defendants do not have legitimate reasons to *seek* cluster market definitions. In fact, defendants will have incentives to seek cluster definitions

---

65 In the majority of cases, plaintiffs have been the parties seeking a cluster definition. *See, e.g.*,United States v. Grinnell Corp., 384 U.S. 563, 571-72 (1966); United States v. Philadelphia Nat'l Bank, 374 U.S. 32, 356 (1963).

66 As with market shares, clustering will generally dampen the Herfindahl-Hirschman index of concentration (HHI). The HHI is defined as the sum of the squares of the market shares of all firms in the industry. The effect of clustering on the HHI is important because the Guidelines, *supra* note 1, at § 3.1, rely on the HHI and the difference between pre- and post-merger HHIs (delta HHI) to determine whether a merger is likely to have anticompetitive effects.

The HHI under a cluster definition must be below that of at least one of the individual products. In fact, the HHI may fall below that of the least concentrated product market. For example, in Table 1 the HHI for products A and B is each 4200, while the HHI for the cluster of A and B is only 3750.

TABLE 1

MARKET SHARES

| | PRODUCT A | PRODUCT B | PRODUCT CLUSTER |
|---|---|---|---|
| FIRM 1 | 50 | 50 | 50 |
| FIRM 2 | 10 | 40 | 25 |
| FIRM 3 | 40 | 10 | 25 |

The dampening effect of clustering on concentration measures, however, is not absolute. In merger cases the delta HHI need only be greater than the smallest increase of the individual product markets and may be greater than even the largest delta HHI of any individual market. For example, in Table 1, if the second and third firms merged, the delta HHI for products A or B would be 800, while the delta HHI for the cluster would be 1250. This "overstatement" of the cluster delta HHI is, however, somewhat pathological as it will only occur if the pre-merger cluster HHI is less than each of the individual products.

67 For example, if a defendant has a 90 percent share in one product market and 10 percent share in another, a plaintiff may wish to cluster so that the resulting 50 percent cluster market share will extend antitrust liability to the second market.

Inappropriate clustering can increase the size of either divestiture remedies or monetary damages. In forming divestiture remedies, courts should adopt a conservative posture. Even if a court errs and only divests single products when cluster divestiture is appropriate, the defendant will be forced to divest both products. Because transactional complementarity encourages joint supply, the single product entity would be less marketable.

68 524 F. Supp. 1336 (D.D.C. 1981).

69 Id. at 1375. Although the court upheld the cluster definition on the facts, it recognized that such gerrymandering could occur: "If aggregating markets leads to the appearance of a causal link between defendants' anticompetitive conduct and their monopoly power which disappears the moment the markets are treated separately, then clearly the aggregation would be improper." Id. at 1376.

only when individual market definitions are appropriate. A defendant will only seek to cluster when the cluster market share, as an average of the individual market shares, is so reduced as to enable the defendant to avoid or lessen liability. For example, a defendant might prefer a cluster definition to individual market definitions if its market shares for products A and B were fifty and ten percent, respectively. The cluster share of thirty percent might avoid liability while the fifty percent share for product A could be violative.

Such a difference in the market shares of the individual products is itself strong evidence that a significant group of consumers does not consider **[*125]** the products to be transactional complements. [70] The existence of significant demand segments that do not consider product groups to be transactional complements makes individual market definitions at least a plausible alternative to a cluster definition. [71] Under these circumstances, however, if a plaintiff can point to an anticompetitive situation in one relevant market, it should not be a defense to claim that there is competition in another. Therefore, courts should not allow defendants to interpose a cluster definition as a defense. [72]

Such a prohibition of defensive clustering found acceptance in *Hittman Nuclear & Development Corp. v. Chem-Nuclear Systems, Inc.*[73] The court, in rejecting the defendant's cluster definiton, held that *Grinnell* and *Philadelphia National Bank* "certainly provide no authority for combining two or more distinct markets into one larger market so that a defendant may avoid antitrust liability." [74]

CONCLUSION

To correctly define cluster markets courts must understand why firms supply multiple products. This Note has introduced the term "transactional complementarity" to further this understanding. Transactional complementarity, like economies of scope, can cause multiproduct firms. But unlike economies of scope, only transactional complementarity can tie consumers' purchases of different goods to individual firms. [75] Transactional complements should be clustered because competition takes place among the effectively tied groups and not the individual products. In our economy dominated by multiproduct firms, antitrust law needs to develop a coherent theory of cluster markets. The current failure to recognize the relevance of transactional complementarity is a serious judicial flaw.

---

70 If a defendant has 50% of one market and only 10% of another, there are likely to be some purchasers of the first product who are purchasers of the second, and who do not consider the second to be a transactional complement.

71 An individual product cartel could collude and extract monopoly profits from those consumers who purchase goods independently. There can thus arise instances in which individual as well as cluster markets can be relevant lines of commerce. For example, in In re The Grand Union Co., 102 F.T.C. 812, 1046 (1983), the defendant full-line grocery might have the opportunity to participate in either a non-perishables cartel or a full-line cartel. For a more complete discussion of this case, see *supra* note 62.

72 Defendants, however, should still be able to contest the plaintiff's exclusion of rivals' individual products as non-substitutes.

73 1980-1 TRADE CAS. (CCH) P63,140, at 77,682 (D. Md. 1979).

74 *Id.* at 77,682. *But see* JBL Enter. v. Jhirmack Enter., 698 F.2d 1011, 1016 (9th Cir. 1983) (rejecting plaintiff's shampoo market in favor of defendant's beauty-products cluster); United States v. Hughes Tool Co., 415 F. Supp. 637, 641 (C.D. Cal. 1976) (rejecting plaintiff's 16-product cluster in favor of defendant's 36-product cluster).

75 While this Note has examined the theory of transactional complimentarity, future empirical work should document the prevalence of transactional complimentarity and the degree to which it is responsible for altering consumer behavior and determining industry structure.

Copyright © 1985 Yale Law Journal Company.Yale Law Journal

EXHIBIT 313

# **Considerations in Defining the Relevant Product Market for Antitrust Analysis**

Dr. Lauren J. Stiroh*

Presented at the 61st Spring Meeting

of the Section of Antitrust Law, American Bar Association

Fundamentals – Antitrust Economics

April 10, 2013

* Senior Vice President, NERA Economic Consulting.

## 1. Introduction

Antitrust analysis is typically concerned with whether a proposed merger, joint venture, collaboration, or particular business practice is likely to harm consumers by leading to higher prices, reduced output, reduced choice, or lower quality compared to the prices, choices and quality that would be available to consumers absent the merger, collaboration, or complained-of business practice. The ultimate question to be answered is whether the activity under investigation will give the firms at issue market power (or the ability to impose price increases) that they would not otherwise have.[1]

While the ultimate goal is to determine whether the activity under investigation is likely to give the firms in question the ability to raise price higher than would be profitable absent the challenged activity, an analysis of the competitive effects of a merger or business practice often approaches the question from the opposite angle and asks whether there are sufficient constraints on the firm or firms' market power such that a post-merger, or post-business-activity price increase would not be profitable. The constraints on the market power of a firm or group of firms are, in general terms, demand substitutability, supply substitutability and entry.

The set of products to which a customer would likely turn if faced with a price increase for the products manufactured by a firm or group of collaborating firms is known as the relevant (product) market. Defining the relevant market is often, but not always, a first step in an antitrust analysis. As a general matter, the purpose of market definition in the context of antitrust analysis is to evaluate the range of competitive alternatives that are available to the firm's customers.[2] The greater the availability of close substitutes or alternatives to consumers, the lower the potential for any single manufacturer or set of manufacturers to profit from attempting to raise price. If there are sufficient alternative products produced by different suppliers that consumers view as relatively close substitutes, then consumers could avoid an attempted price increase by switching their purchases to a firm that is not attempting to raise price.

The degree of substitutability between the product produced by the firm or firms under investigation and alternative products is therefore often central to a competitive effects analysis. Potential substitutes may come from existing products and firms already in the market, the ability of new firms to enter the market, and the ability of existing firms to expand output to offset any attempted constriction of output by an accused monopolist or merging entity.

---

[1] While, as noted at the outset, an exercise of market power may be manifest as a reduction in choice or quality, for ease of exposition, I focus the discussion below on market power as an ability to raise price. It is equivalent to discuss a firm's market power as the ability to raise price or the ability to restrict output. The two actions are opposite sides of the same coin and occur together.

[2] US Department of Justice and Federal Trade Commission *Horizontal Merger Guidelines* issued August 19, 2010 ("Horizontal Merger Guidelines"), p. 7. The guidelines note that the Agencies' evaluation of competitive effects need not always start with, or rely on, market definition.

This paper will discuss some of the concepts and methods economists use to define the relevant market for antitrust analysis. It is important to note though that in some situations, it may be sufficient to determine only whether reasonable substitutes for a product at issue exist and not necessary to determine all of the potential substitutes for a product. That is, for the purposes of a given antitrust analysis, we may only be interested in whether sufficient constraints on market power exist, and not on establishing the outer boundaries of the relevant market.

The relevant market for antitrust purposes is the set of (actual and potential) products that serve to constrain the market power of the firm(s) that is the target of the antitrust inquiry. In practice this involves determining the set of products among which consumers can and would substitute in deciding on their ultimate purchases. Substitutability is therefore one of the key factors in the investigation. Market definition consists of determining which products are effective substitutes, from the standpoint of consumer demand, and then determining which firms could readily supply these substitutes in sufficient quantities to offset an attempted price increase.

The Supreme Court has held that products "reasonably interchangeable by consumers for the same purposes" make up the relevant product market.[3] The Department of Justice (DOJ) and Federal Trade Commission (FTC) have added some precision to what it means to be "reasonably interchangeable" by defining the relevant product market as the group of products over which a hypothetical monopolist would be able to impose a "small but significant and non-transitory increase in price" (SSNIP).[4] The so-called SSNIP test (or hypothetical monopolist test) proceeds by starting with a reasonably narrow potential market definition and considering whether a monopolist over those products could profit from a price increase over a sustained period of time. If consumers could evade the hypothetical price increase by turning to other products, then those other products are properly considered interchangeable with or substitutes for the initial product and should be included in the relevant market. The test or thought experiment is then repeated imagining a hypothetical monopolist controlling output of the now expanded set of products and considering whether a price increase for the expanded set of products would be profitable. This iterative thought experiment stops when we have defined the smallest set of products over which a hypothetical monopolist could sustain a price increase.[5]

While evolving case law and the *Horizontal Merger Guidelines* give practitioners some guidance as to the proper questions to ask in defining a relevant market, there is not one single analytical method or approach to use to identify products in the relevant market in practice. Instead, the approach to market definition used by economists or analysts is often guided by the quality and availability of sales and price data, publicly available information, business documents of the

---

[3] See *U.S. v. E.I. du Pont de Nemours and Co*., 351 U.S. 377, 76 S.Ct. 994 (1956) ("*U.S. v. E.I. du Pont de Nemours and Co.*").

[4] See Horizontal Merger Guidelines, p. 9.

[5] In practice, the experiment may stop when it becomes clear that products manufactured by other, non-collaborating or non-merging, parties belong in a properly defined relevant market and constrain the pricing power of the merging firms or accused monopolist.

merging firms or parties to an antitrust lawsuit, and the nature of the case or the business activity generating the competitive effects inquiry.

Economists may rely on statistical and econometric techniques for determining substitutability as well as more qualitative information that yields reasonable inferences about the set of products that compete in a relevant market. While an econometric analysis may be the cornerstone of a relevant market inquiry, it is generally important to complement a quantitative analysis with a qualitative analysis to test the robustness of findings based on quantitative data.

## 2. Fundamental Economic Concepts Used in the Analysis of Relevant Markets

As described above, the fundamental concept underlying market definition is the identification of products that are "interchangeable" for the products manufactured by the firm or firms that are the subject of the antitrust investigation. Economists refer to "interchangeable" products as "substitutes." The degree to which two products are substitutable for one another is measured by the "cross-price elasticity of demand." These terms are defined below.

### a. Substitutes and Complements

In economic terms, Product B is a demand substitute for product A if an increase in the price of Product A causes some consumers to switch some of their purchases to Product B, all else equal. In this case, demand of one product responds to changes in the price of the other product.[6] Examples of substitute goods may include margarine and butter, Gala apples and Braeburn apples, or pens with blue ink and pens with black ink.

Two products are "complements" if an increase in the price of one product causes a decrease in the quantity demanded of the other product. Complements are products that consumers like to buy together (skis and ski boots for example, or perhaps printer paper and toner, or peanut butter and jelly). When the price of one of the complementary products increases, the cost to the consumer of buying the bundle of products increases and so consumers respond by purchasing less of both.

A third possibility is that there is simply no relationship between the two products. A change in the price of one product does not affect consumer demand for the second product (except for income effects).[7]

---

[6] For a more detailed discussion of these topics see Dennis W. Carlton and Jeffrey M. Perloff, *Modern Industrial Organization, Fourth Edition,* (New York: Addison Wesley, 2005) ("Carlton and Perloff"), p. 646.

[7] The effects of price changes can be decomposed into a substitution effect and an income effect. The substitution effect captures the changes in demand in response to a price increase holding utility constant, while the income effect looks at how demand has changed as a result of the income the consumer has after accounting for the price change. This decomposition of price changes into income and substitution effects is known as the Slutsky equation. See, for example, Hal R. Varian,

Generally, one cannot identify substitutes, complements, or unrelated products simply by analyzing changes in average prices and quantities over time. This is because the economic definition has in it the assumption of "all else equal," which means that the relationship between prices and quantities would be true if nothing else were changing. This, of course, is not the case with actual market data. Market data reflect the interaction of supply and demand, and so econometric methods are typically required to isolate the true underlying relationships in the quantity demanded of one product and the price of another.

### b. Demand Curves and Own Price Elasticity

An individual consumer's demand function describes the amounts the consumer would purchase of a good as a function of the price charged for the good and other factors that can affect demand, such as income, prices of other goods, and individual tastes.[8] Typically demand curves slope downwards, so that higher prices lead to lower quantities demanded.

The market demand for a good, also called aggregate demand, is the sum of these individual demands over all consumers. We can look at the individual or aggregate demand curve as giving us quantity as a function of price or as giving price as a function of quantity. The term "demand function" typically refers to quantity as a function of price (among other variables), whereas we use "inverse demand" when we invert the expression to show price as a function of quantity (among other variables).

Elasticity of demand measures how responsive demand is to some change in price, income, or another variable. The own-price elasticity of demand, $\varepsilon$, is measured as the percentage change in quantity caused by a one percent change in price. Denoting quantity by Q, price by P, and using the symbol $\Delta$ to denote "change in", the own-price elasticity of demand can be calculated as:

$$\varepsilon = \frac{(\Delta Q/Q)}{(\Delta P/P)}$$

Or, rearranging the expression,

$$\varepsilon = \frac{P}{Q}\frac{\Delta Q}{\Delta P}$$

---

*Intermediate Microeconomics, A Modern Approach, Fifth Edition*, (New York: W. W. Norton & Company, 1999) ("Varian"), Chapter 8.

[8] Varian, p. 95.

Noting that $\Delta Q/\Delta P$ approximates the slope of the demand function, elasticity can therefore be expressed as the ratio of price to quantity multiplied by the slope of the demand function.[9] The sign of the elasticity of demand is expected to be negative because the demand function has a negative slope.

If the absolute value of the elasticity of demand is less than one, demand is defined as inelastic at that point. If the absolute value of demand is greater than one, demand is defined as elastic.

Elastic demand means that quantity demanded responds relatively more than the price change that caused it. If a small percentage change in price leads to a bigger percentage change in quantity demanded, then demand is elastic and a hypothetical monopolist cannot profit from an attempted price increase.[10] The monopolist will lose more in terms of lost sales than he will gain from higher prices on the remaining sales.

Inelastic demand means that quantity demanded responds by a proportionally smaller amount than the price change that caused it. If demand is inelastic, a hypothetical monopolist could profit from a price increase because he would gain more in terms of higher revenue per sale than he would lose from customers turning to other products. If demand is inelastic then an increase in price will result in an increase in revenue.[11]

### c. Cross-Price Elasticity

Cross-price elasticity of demand measures the percentage change in sales of one good in response to a one percent change in the price of another good. A positive cross-price elasticity of demand between two products indicates that the two products are substitutes in the eyes of consumers. An increase in the price of one product leads to an increase in sales of the other product, suggesting that consumers substitute away from one of the products when it becomes relatively more expensive and toward the other product that has become relatively less expensive.

A negative cross-price elasticity indicates that the two products are complements in the eyes of consumers. When the price of one product increases, the combined price of the two products that consumers like to purchase together is now higher, and consumers respond by buying less of the bundle.

The cross-price elasticity also measures the degree to which the price of one good is constrained by the price of another good within a relevant market. If the cross-price elasticity is small, then a change in the price of one product has little impact on demand for the other product.

---

[9] The slope of a demand function is measured by the derivative of the function with respect to price. In the case of linear demand, the slope can be measured by the equation described above.

[10] This simplified example assumes that average costs are constant.

[11] Again, assuming that average costs are constant.

### 3. Quantitative Approaches to Identifying Substitutes and Defining Relevant Product Markets

There are a variety of quantitative methods for determining whether two products are in the same relevant market, or whether the price of one product is constrained by competition from another product, and therefore are likely to be in the same relevant market. The appropriate method for any particular circumstance depends on the availability and quality of market data (including prices, quantities and attributes of the potentially competing products).

#### a. Price Correlation

A first step to assessing whether two products are likely to be in the same relevant market is to measure the extent to which their prices movements are correlated. Correlation is a statistical measure of the degree to which two series move together. The amount of correlation between two data series is, by definition, bound between negative one and one, with a correlation near one indicating that the two series move together in the same direction, a correlation near negative one indicating that the two series move together but in opposite directions, and a correlation near zero indicating that the two series are likely unrelated.[12] A positive and statistically significant correlation in the prices of two goods provides, at a threshold level, evidence that the two products are in the same relevant market.

The logic behind the correlation test is that, if two products compete in the same relevant market, then their prices will be similarly affected by common market forces, such that prices of these two products will appear to move together over time. In contrast, if two products were in different markets, then one would expect them to be affected by individual market forces, perhaps in addition to some common market forces, causing more independent price movements over time.

A high degree of positive price correlation suggests that the two products are responding in similar ways to similar market forces. However there are a number of caveats to this conclusion. First, inflation generally causes the price of all products to rise over time. Therefore even if the two products are unrelated and in different relevant markets, they may still show some degree of positive price correlation. Second, if the products incorporate similar inputs, changes in the underlying cost of the those inputs may also lead to similar changes in the prices of the products, even though there may be no competitive relationship between the two products. Thus, additional tests may be needed to determine whether the high correlation of the two price series is an artifact of market-wide inflation, underlying cost changes affecting both markets, or reflects the prices of the two products responding in similar ways to common demand shocks. There are a variety of robustness checks that can be performed to test the validity of the conclusion that a

[12] For a discussion on the use of correlation between price movements to show whether two products are close substitutes see, for example, Richard Posner, *Antitrust Law, Second Edition* (New York: University of Chicago Press, 2001), pp. 149 – 51. See also, Carlton and Perloff, p. 647.

high positive correlation coefficient suggests that the two products compete in the same relevant market, such as detrending the data or testing for cointegration.[13]

**b. Analysis of Cross-Price Elasticities**

An advantage of a price correlation test is that it is simple to implement and has fewer data requirements than other statistical approaches to market definition. Where the economist has access to richer data on prices and quantities sold of potentially competing products, it may be possible to estimate the cross-price elasticity of demand. This empirical test directly examines the effect of a change in the price of the hypothesized competing product on consumer demand for the product whose market scope is in question.

Own- and cross-price elasticities can be estimated by means of a multiple regression analysis, which allows the analyst to isolate specific relationships in the data holding constant other factors that may also affect those variables. Regression analysis is a statistical decomposition of the data such that changes in one variable (the dependent variable) are explained by changes in other variables (the independent, or explanatory, variables).

The cross-price elasticity of demand measures the percent change in the quantity of one product in response to a one-percent change in the price of the other product. Estimating the cross-price elasticity of demand provides a direct measure of consumer willingness to substitute from one product to another in response to a price change.[14] Calculating the cross-elasticity of demand, however has more stringent data requirements and is not always possible, particularly when some of the potentially competing products are sold by parties outside the scope of the antitrust investigation.

Two products are in the same relevant market if they are considered to be substitutes to each other, which can be represented by a positive and statistically significant coefficient on the cross-price elasticity, and the degree of substitution is sufficient to render an attempted price increase unprofitable. To estimate cross elasticities economists generally estimate some version of a demand function for the two products in question. In general an estimation technique known as "two-stage least squares" ("2SLS") needs to be employed because the quantity of a good sold (Q) and its price (P) are simultaneously determined through the interaction of supply and demand, what economists refer to as Q and P being endogenous. Using the quantity of a good sold as the dependent variable that is being explained by right-hand-side or independent variables such as

---

[13] For further details see Robert S. Pindyck and Daniel L. Rubinfeld, *Econometric Models and Economic Forecasts, Fourth Edition* (McGraw-Hill, 1998), Chapter 16. In addition, see Jeffrey M. Wooldridge, Introductory Econometrics: A Modern Approach, Fourth Edition, (South-Western Cengage Learning, 2009), Chapter 18 and Søren Johansen, "Estimation and Hypothesis Testing of Cointegration Vectors in Gaussian Vector Autoregressive Models," *Econometrica*, Vol. 59, no. 6 (November, 1991), pp. 1551 – 80.

[14] See Order in the connection of *In Re Live Concert Antitrust Litigation*, United States District Court for the Central District of California, March 23, 2012, Case No: 06-ML-1745-SVW ("*In Re Live Concert Antitrust Litigation*"), pp. 29 – 30.

the prices of the goods in question and other relevant variables that help explain quantity demand, an economist may estimate the equation in the following general form:

$$\ln(Q_t^1) = b_0 + b_1 \ln(P_t^1) + b_2 \ln(P_t^2) + \sum_{i=1}^{n} b_{i+2}(X_{i,t}) + u_t$$

Where $Q_t^1$ represents the quantity of product 1 purchased during a specific time period t, $P_t^1$ represents the average price of product 1 during the same time period t, $P_t^2$ represents the average price of product 2 during time period t, and $X_{i,t}$ are other relevant control variables. The term $u_t$ is an error term. The error term or disturbance in the relationship represents factors other than the independent variables that affect the dependent variable.

The natural logarithm of prices and quantities are used because by doing so the coefficients of the price variables in the above equation can be directly interpreted as elasticities. The relevant cross-price elasticity is provided by the coefficient estimate for the natural log of the price of product 2, $\ln(P_t^2)$ while the own-price elasticity is provided by the coefficient estimate for the natural log of the price of product 1, $\ln(P_t^1)$. The coefficient on the natural log of the price of product 2 can be interpreted as: a 1 percent increase in the price of product 2 leads to an increase in demand for product 1 of $b_2$ percent. Conversely, as the price of product 1 increases, consumers will shift their consumption away from product 1 by $b_1$ percent.

A negative and statistically significant coefficient for the natural log of the price of product 1 $\ln(P_t^1)$ is the expected sign for a product with a downward sloping demand curve. If the absolute value of $b_1$ is greater than one in magnitude, we refer to demand for product 1 as being elastic, and infer that an increase in the price of product 1 will result in a decrease in total revenues obtained from the sale of this product.[15] If the absolute value of $b_1$ is less than one in magnitude, we refer to demand for product 1 as being inelastic, and infer that an increase in the price of product 1 will result in an increase in total revenues obtained from the sale of this product.

A positive and statistically significant coefficient for the natural log of the price of product 2 $\ln(P_t^2)$ implies that product 1 and 2 are substitutes, i.e., an increase in the price of product 2 will lead to an increase in the demand for product 1 as consumers substitute away from product 2 to product 1. A negative and statistically significant coefficient for the natural log of the price of product 2 $\ln(P_t^2)$ implies that product 1 and 2 are complements, i.e., an increase in the price of product 2 will lead to a decrease in the demand for product 1. If two products are determined to be substitutes for one another, then the next question to be considered is whether they are sufficiently close substitutes such that an attempted price increase for one product would be rendered unprofitable by customers switching to the second product. If so, the two products are properly considered to be in the same relevant market.

[15] Varian, p. 271: "If demand is very responsive to price – that is, it is very elastic [greater than 1 in magnitude] – then an increase in price will reduce demand so much that revenue will fall."

In interpreting the outcome of a regression analysis, it is important to bear in mind the limitations of the data and the potential impact such data limitations can have on the results. Sometimes the lack of data or the poor quality of data available may make a regression analysis unreliable. When important control variables are missing from the data, such as quality of products being sold, or specific attributes of products being sold, it is important to supplement a quantitative analysis with a more qualitative analysis that considers other available information regarding the set of products that consumers view as substitutes.

One further consideration in interpreting the outcome of a multiple regression equation such as the one above that arises in monopolization cases is the so-called Cellophane fallacy.[16] Regression analysis is conducted using prevailing prices. In monopolization cases, where the actions of the accused monopolist are alleged to have kept prevailing prices above competitive levels, the outcome of the regression analysis will reveal competitive interactions at existing prices which may be different from competitive prices. The implication being that substitution effects may be stronger at elevated prices than they would be at competitive prices, causing the regression analysis to support an inference of an overly broad relevant market.

In monopolization cases, Cellophane arguments tend to lead to circular reasoning. Proponents of a Cellophane theory may opine that the cross-price elasticity test is only valid if run on competitive prices. But if one had compelling information on competitive prices and reliable evidence that they were lower than prevailing prices, then there would be no real need to define the market and identify substitutes. One can only be certain that a Cellophane problem exists if one presupposes that prevailing prices are higher than competitive prices, which is typically the very question that we are trying to resolve in monopolization cases.

The solution to the cellophane circularity is to interpret the outcome of the regression analysis in the context of other data, information and analyses that may be available.[17] One example is to evaluate changes in shares of the alleged monopoly product and the hypothetical substitute. Is the product with the allegedly too high price gaining sales from its hypothetical competitors or losing sales to them? Evidence of the monopolized product losing sales to what should be a distant substitute supports a cellophane inference, in contrast, evidence of the monopolized product gaining sales from the potential alternatives, in spite of its allegedly supra-competitive price, supports the opposite inference. Other potential indicia that may inform an analysis of market power include the responsiveness of prices to natural experiments (such as entry, exit, or changes in business practices), the rate of innovation, and output expansion or contraction. All of this information should be taken into account and evaluated before drawing conclusions from any one particular test or statistical outcome.

---

[16] The term arises from a critique of the conclusions reached in *U.S. v. E.I. du Pont de Nemours and Co*.. See Phillip Areeda, and Herbert Hovenkamp,*Antitrust Law: An Analysis of Antitrust Principles and Their Application* (Aspen Law & Business, 2012), ¶ 539.

[17] See for example, Gregory J. Werden, "Market Delineation under the Merger Guidelines: Monopoly Cases and Alternative Approaches." *Review of Industrial Organization* 16, no.2 (2000), pp. 211 – 8.

### 4. Qualitative Methods to Define the Relevant Product Market

An economic assessment of the relevant market should consider in the first instance the products that consumers consider and switch between when making their purchases. Consumer switching behavior may be revealed through a quantitative analysis of market data, or may be revealed through other sources of information such as consumer surveys, company won/loss reports, or a firm's responses to competitive threats from other products or companies. Often a company's internal competitive assessments and marketing efforts will reveal the set of products that manufacturers take into account when setting prices, offering incentives, and marketing its products. The products or companies that a firm focuses on when trying to drive more sales of its own products indicate the types of products or companies that the firm views as its competitors.

Sometimes it is possible to canvas the opinions of customers directly. In matters involving consumer products, it may be possible to survey consumers in various ways to determine what they view as close substitutes to the product at issue. Another potential source of information on the set of products or technologies in the relevant market is the sales staff of the companies that are the focus of the dispute or antitrust inquiry. Sales staff employed by the relevant parties may know a great deal about what their customers view as the competitive alternatives to the product at issue, since they often spend much of their working day defending the virtues of their products over the alternatives.

In *Brown Shoe* the Court laid out a set of "practical indicia" that may be considered in identifying a relevant market using a more qualitative set of considerations.[18] However, it is important to note that "[w]hile the ninth circuit has acknowledged that the practical indicia identified in *Brown Shoe* are 'relevant' to the definition of the primary product market…it has never expressly held that a plaintiff…can define the relevant product market *exclusively* by reference to these 'practical indicia.'"[19] The seven practical indicia are:[20]

(a) industry or public recognition of the submarket as a separate economic entity;

(b) the product's peculiar characteristics and uses;

(c) unique production facilities;

(d) distinct consumers;

---

[18] *Brown Shoe Co. v. United States*, 370 U.S. 294, 82 S. Ct. 1502, 8 L. Ed. 2d 510 (1962) ("*Brown Shoe*").

[19] *In Re Live Concert Antitrust Litigation*, p. 32.

[20] *Brown Shoe*.

(e) distinct prices;

(f) sensitivity to price changes; and

(g) specialized vendors.

An indispensable component of any market analysis based on a *Brown Shoe* analysis is an evaluation of the economic significance of these indicia. For example, the "peculiar characteristics" of a product may be of no economic relevance in determining whether that product competes with other products not sharing that characteristic. The fundamental question to be asked is whether consumers consider products not sharing the "peculiar" distinction to be substitutes for the product with peculiar characteristics, and whether the degree of substitutability is sufficient to constrain pricing. The fact that one product has a characteristic feature not shared by another product does not mean *a priori* that consumers do not substitute between those two products, or that those products do not constrain the pricing of one another. Moreover, in differentiated product markets, companies may choose to compete, and compete vigorously, by developing and calling out "peculiar characteristics and uses" for their products.[21]

Similarly, while having "unique production facilities" may impede supply substitution, it is not an indication that two products manufactured using unique methods or facilities do not compete in the eyes of consumers. Thus, a slavish adherence to the *Brown Shoe* indicia may be misleading as a means of determining market definition.

Often, a thorough review and analysis of qualitative information can lead to robust conclusions about the scope of the relevant market, even when more quantitative data methods are not appropriate. However, there are no formulaic methods that one can follow in using these sources in this way. Rather, one has to be guided by the circumstances of each industry and case.

---

[21] See, for example, Christopher Pleatsikas and David Teece, "The analysis of market definition and market power in the context of rapid innovation," *International Journal of Industrial Organization*, Vol. 19 (2001) ("Pleatsikas and Teece"), p. 666: "Technology and features are as important to consumers as price, requiring consideration of price/performance competition rather than price competition alone." See also Pleatsikas and Teece, p. 674: "A 'product's peculiar characteristics and uses' are even less useful [for defining a relevant market], since products (and services) in many high technology industries are highly differentiated. Subdividing the relevant market based on the very product differentiation that is one of the fundamental bases for competition risks defining markets much too narrowly and overstating market power, so that monopoly power is found where none, in fact, exists."

**Suggested Bibliography**

Areeda, Phillip and Herbert Hovenkamp. *Antitrust Law: An Analysis of Antitrust Principles and Their Application*. Aspen Law & Business, 2012.

Baker, Jonathan B. "Market Definition: An Analytical Overview." *Antitrust Law Journal* 74 (2007): –129 – 73.

Baker, Jonathan B., and Daniel L. Rubinfeld. "Empirical Methods in Antitrust Litigation: Review and Critique." *American Law and Economics Review* 1, no. 1 (1999): 386 - 435.

Baker, Jonathan B. and Timothy F. Bresnahan. "Economic Evidence in Antitrust: Defining Markets and Measuring Market Power." *Stanford Law and Economics Olin Working Paper* no. 328 (2006): 1 - 45.

Carlton, Dennis W., and Jeffrey M. Perloff. *Modern Industrial Organization, Fourth Edition*. New York: Addison Wesley, 2005.

Eblen, Charles Carson. "Defining the Geographic Market in Modern Commerce: The Effect of Globalization and E-Commerce on *Tampa Electric* and Its Progeny." *Baylor Law Review* 56, no. 1 (2004): 49 - 88.

Elzinga, Kenneth G. "Defining geographic market boundaries." *The Antitrust Bulletin* 26 (1981): 739 – 52.

Elzinga, Kenneth G., and Thomas F. Hogarty. "The Problem of Geographic Market Delineation in Antimerger Suits." *The Antitrust Bulletin* 18 (1973): 45 - 81.

Johansen, Søren, "Estimation and Hypothesis Testing of Cointegration Vectors in Gaussian Vector Autoregressive Models." *Econometrica*, 59, no. 6 (November, 1991): 1551 – 80.

Katz, Michael L., and Carl Shapiro. "Critical Loss: Let's Tell the Whole Story." *Antitrust*, Spring 2003.

Langenfeld, James, and Wenqing Li. "Critical loss analysis in evaluating mergers." *The Antitrust Bulletin* 46 (2001): 299 - 337.

O'Brien, Daniel P., and Abraham L. Wickelgren. "A Critical Analysis of Critical Loss Analysis." *Antitrust Law Journal* 71 (2003 - 4): 161 – 84.

Pleatsikas, Christopher, and David Teece. "The analysis of market definition and market power in the context of rapid innovation." *International Journal of Industrial Organization* 19 (2001): 665 – 93.

Posner, Richard A. *Antitrust Law, Second Edition.* Chicago: University of Chicago Press, 2001.

Pindyck, Robert S. and Daniel L. Rubinfeld. *Econometric Models and Economic Forecasts, Fourth Edition.* (McGraw-Hill, 1998).

Shapiro, Carl. “Mergers with Differentiated Products.” *Antitrust*, Spring 1996.

Stigler, George J., and Robert A. Sherwin. “The Extent of the Market.” *The Journal of Law and Economics* 28 (1985): 555 – 85.

Varian, Hal R. *Intermediate Microeconomics: A Modern Approach, Fifth Edition*. New York: W. W. Norton & Company, 1999.

Werden, Gregory J. “Market Delineation under the Merger Guidelines: Monopoly Cases and Alternative Approaches.” *Review of Industrial Organization* 16, no.2 (2000): 211 – 8.

Werden, Gregory J. “The History of Antitrust Market Delineation.” *Marquette Law Review* 76 (1992): 123 – 215.

Werden Gregory J., and Luke M. Froeb. “Correlation, Causality, and All that Jazz: The Inherent Shortcomings of Price Tests for Antitrust Market Delineation.” *Review of Industrial Organization* 8 (1993): 329 – 53.

Wooldridge, Jeffrey M. *Introductory Econometrics: A Modern Approach, Fourth Edition*. Mason, OH: South-Western Cengage Learning, 2009.

EXHIBIT 314

**UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF MASSACHUSSETTS**

| | |
|---|---|
| **SAVANT SYSTEMS, LLC,** | **Civil Action** |
| **Plaintiff,** | |
| **v.** | **No. 10-CV-11622 MLW**<br>**Hon. Mark L. Wolf** |
| **CRESTRON ELECTRONICS, INC.,** | |
| **Defendant** | |
| **CRESTRON ELECTRONICS, INC.,** | |
| **Counterclaim-Plaintiff** | |
| **SAVANT SYSTEMS, LLC,** | |
| **Counterclaim-Defendant** | |

# CORRECTED EXPERT REPORT

**PROFESSOR EINER ELHAUGE**

May 20, 2014

**RESTRICTED CONFIDENTIAL: OUTSIDE COUNSEL ONLY**
**SUBJECT TO PROTECTIVE ORDER**

## Table of Contents

EXECUTIVE SUMMARY .......... 3
QUALIFICATIONS .......... 8
I. HIGH-END RESIDENTIAL SYSTEM MARKET .......... 10
A. Market Definition .......... 10
1. Identifying the Set of Plausible Close Substitutes .......... 13
2. Ranking Plausible Close Substitutes from Closest to Most Distant .......... 18
3. Hypothetical Monopolist Test Confirms that High-End Market Limited to Crestron, AMX, and Savant is Sufficiently Broad .......... 27
4. Relevant Geographic Market is the United States and Canada .......... 30
5. Dealer Demand for High-end Systems Is Fragmented .......... 32
B. Market Shares .......... 33
C. Monopoly Power .......... 41
1. High Market Shares Coupled with High Barriers to Entry and Expansion 41
2. Crestron's Demonstrated Power to Exclude Rivals .......... 44
3. Crestron's Demonstrated Power over Price .......... 44
II. DESCRIPTION OF CRESTRON'S EXCLUSIVE DEALING .......... 45
A. Crestron's Executives Instituted a Corporate Policy of Telling Dealers That They Had to Make a Choice Between Crestron and Savant .......... 45
B. Crestron Implemented Its Exclusive Dealing Policy in Numerous Ways .......... 47
1. Distributing Comparison Guides .......... 47
2. Lawsuit Against Cyber Sound .......... 48
3. Direct Communications with Individual Dealers .......... 49
III. LACK OF PROCOMPETITIVE EFFICIENCIES .......... 51
IV. THEORIES OF ANTICOMPETITIVE HARM .......... 55
V. PROOF THAT CRESTRON'S CONDUCT HAS RESTRICTED THE HIGH-END RESIDENTIAL SYSTEM MARKET .......... 58
A. Relevant Baseline is the But-for World, not the Past .......... 59
B. Theory of How Exclusive Dealing Can Reduce Savant Sales Below But-For Levels .......... 60
C. Concrete Examples of Dealers Being Deterred from Purchasing Savant Because of Crestron Conduct .......... 63
D. Restricted Shares .......... 67
VI. PROOF OF ANTICOMPETITIVE EFFECTS FROM RESTRICTING THE MARKET .......... 69
A. Extraction of Consumer Welfare .......... 69

B. Maintaining Market Power over Local Dealers by Excluding Savant .......... 71
C. Exacerbating Buyer Switching Costs ........ 71
D. Deterring Investment and Innovation ........ 73
E. Impairing Rival Efficiency ........ 73
1. Economies of Scale in Purchasing and Production ........ 74
2. Economies of Scale in Regional Sales Force ........ 75
F. Impairing Rival Expandability ........ 76
VII. DAMAGES DUE TO EXCLUSIVE DEALING ........ 77
A. Additional But-For Revenue ........ 78
B. Additional But-for Costs ........ 82
C. Savant's Lost Profits from Creston's Exclusive Dealing ........ 85
VIII. THE ANTICOMPETITIVE EFFECTS OF DECEPTION ........ 86
IX. CRESTRON PROFITS DURING PERIOD OF ALLEGED DECEPTION ........ 89
CONCLUSION ........ 92
EXHIBIT A ........ 93
EXHIBIT B ........ 107

## EXECUTIVE SUMMARY

1. Crestron Electronics, Inc. ("Crestron"), the defendant, has competed in the North American high-end residential control system market for over two decades. Residential control systems are technological products comprised of many components that allow a homeowner to control multiple aspects of the home – such as the temperature, audio volume, TV display, and security system – from a single interface. As described below, the high-end residential system market is a properly defined relevant market, and excludes relatively inferior low-end systems. Savant Systems LLC ("Savant"), the plaintiff, was founded in 2005 and first started selling residential control systems (which were all high-end) in August 2007.[1] Since then the only three competitors in the high-end residential control system market have been Crestron, AMX, and Savant. As of 2007, Crestron's share was 80%.

2. Because installing and programming high-end residential control systems is complex and requires significant technical expertise, these products are always sold to intermediary specialized dealers with training in control system installation. These dealers then sell the systems to the ultimate customers and install them into their homes.

3. Around June 2008, Crestron started telling dealers that they were not allowed to sell both Crestron and Savant systems. In the economic literature, this conduct is generally referred to as "exclusive dealing" because an upstream supplier (here Crestron) tells downstream firms that they must sell that upstream supplier's products exclusively.

4. Plaintiff counsel has asked me to perform economic analysis of the evidence in this case to answer the following questions:

A. Did Crestron's exclusive dealing injure Savant?
B. Did Crestron's exclusive dealing anticompetitively harm consumers?
C. If Crestron's exclusive dealing reduced Savant's profits below but-for levels, approximately how much profit did Savant lose because of Crestron's exclusive dealing?
D. Can deception be anticompetitive?

[1] Savant's sales data shows that it first started selling systems to dealers in August 2007. *See* "11 First 100 Savant Sales.csv".

E. What were Crestron's profits from the sale of high-end residential control systems in the United States during the period that Savant alleges that Crestron made literally false statements to dealers, from May 11, 2009 to January 25, 2012? Additionally, what were Crestron's profits from the sale of high-end residential control systems in the United States to dealers that Crestron admits were sent at least one of the comparison or sales guides that Savant alleges contain literally false statements, starting from the day each received a guide, until January 25, 2012?

5. Economic analysis of the evidence in this case shows that Crestron's exclusive dealing both: (A) injured Savant, and (B) anticompetitively harmed consumers. I estimate that (C) Crestron's exclusive dealing has caused Savant to lose approximately $20 million in profits. I also explain (D) that deception can be anticompetitive, not only by distorting consumer decisions but also by depriving rivals of economies of scale. Finally, I calculate Crestron's profits from the sale of high-end systems in the United States as specified in question (E).

6. **A. Injury to Savant**. Crestron's exclusive dealing injured Savant by restricting a large portion of the high-end market and reducing Savant's sales below but-for levels (the level of sales Savant would have achieved on a free market but for Crestron's exclusive dealing). This reduction in Savant's sales in turn weakened Savant's ability to compete because decreasing Savant's sales increased its per-unit costs, reduced its expandability, and deterred Savant from investing in as much innovation.

7. **B. Anticompetitive Harm to Consumers**. Restricting a large portion of the high-end system market and weakening Savant's ability to compete also anticompetitively harmed consumers. Deterring dealers from carrying Savant not only extracts welfare from dealers (by reducing their profits) but also prevents the homeowners in the area who would prefer Savant from purchasing their preferred high-end residential control system. Further, weakening Savant by increasing its costs, reducing its expandability, and deterring its investments in research harms all consumers because weakening Savant both: (1) makes Savant a less attractive option to consumers (higher prices, lower quality), and (2) increases Crestron's market power, thus allowing Crestron to raise its prices more than if it were competing against a full-strength Savant. Although exclusive dealing can sometimes create procompetitive efficiencies that benefit consumers, there is no evidence that Crestron's exclusive dealing does in this case. In other words, Crestron's exclusive dealing increased Crestron's profits not by making Crestron

more efficient, reducing its prices, or increasing its quality, but instead by weakening Savant.

8. **<u>C. Lost Profit Damages to Savant</u>**. In Part VII below, I calculate the profits Savant lost due to Crestron's exclusive dealing. I find that, even if one conservatively ignores the fact that Savant would have been more efficient in the but-for world, Savant would have earned approximately $20million more in profits on high-end residential sales in the United States in the but-for world from June 7, 2008 to March 31, 2014.

9. **<u>D. Anticompetitive Effects of Deception</u>**. Savant also alleges that Crestron deceived dealers by claiming in various ways that Savant was inferior to Crestron. I do not opine on whether Crestron in fact deceived dealers because that is not an issue of economics. However, in Part VIII I explain why, as a matter of economics, deception by a firm with market power harms competition, both because it distorts buyer choice in a way that directly reduces market efficiency and because it shrinks rival market share and raises rival costs in a way that impairs rival efficiency and enhances incumbent market power. Part VIII also explains that deception has no offsetting efficiency justification.

10. **<u>E. Crestron's Sales Profits.</u>** Crestron's sales data shows that it earned approximately $107 million in profits on high-end residential sales in the United States from May 11, 2009 to January 25, 2012. Crestron data also shows that it earned approximately $3.7 million in profits on high-end residential sales to dealers that Crestron's discovery responses indicate received Crestron sales and comparison guides with allegedly false statements, starting from the date each dealer received a guide to January 25, 2012. I present these results below in Part IX.

11. I summarize the analysis I used to reach these conclusions in each Section below.

12. **<u>I. Upstream High-end Residential Control System Market</u>.** The relevant market in this case is the North American (U.S. & Canada) high-end residential control system market. Savant entered the high-end market in August 2007.[2] The defendant Crestron has had monopoly power in this market the entire

[2] Savant's sales data shows that it first started selling systems to dealers in August 2007. *See* "11 First 100 Savant Sales.csv".

time Savant has competed in it. From July 2007 to September 2013,[3] Crestron's market share has ranged from 66-83% in the high-end market. Crestron has had market power and monopoly power in this market throughout that time, evinced by: (a) high market shares coupled with high barriers to entry and expansion, (b) demonstrated power to exclude rivals, such as Savant, and (c) demonstrated power to control prices.

13. **II. Summary of Crestron's Exclusive Dealing**. The evidence indicates that, around June 2008, Crestron instituted a corporate policy of requiring its dealers to "choose" between Crestron and Savant, and threatening to terminate dealers if they continued to sell Savant. The evidence also shows that Crestron implemented this policy in three main ways: (1) distributing "comparison guides" with the statement "Remember you can't be a Crestron dealer and also sell Savant products!" to dealers, (2) filing a public legal complaint against the dealer Cyber Sound & Security, which communicated to dealers that Crestron believed that expending efforts to sell Savant products violated the "best efforts" clause in Crestron's dealer agreements, and (3) personally informing individual dealers about Crestron's policy.

14. **III. No Procompetitive Efficiencies that Benefit Customers**. Standard economics assumes that firms, such as Crestron, are always trying to maximize their profits. Thus, any economist would assume that Crestron engaged in exclusive dealing in order to increase its profits, and the evidence suggests that it did. But economists have also long recognized that many types of conduct that benefit a *firm* actually harm *consumers*. For example, burning down a rival's manufacturing plant would likely increase the arsonist's profits, but that would harm consumers by eliminating the rival product and allowing the arsonist to raise prices. In contrast, other types of conduct increase the firm's profits in a way that also benefits consumers. The most common example is conduct that allows the firm to reduce the quality-adjusted price of its product, for example by reducing the cost of making the product or improving the product's quality. An economist can use standard tools to determine whether a given type of conduct is anticompetitive - i.e., harms consumer welfare – or is procompetitive – i.e., benefits consumer welfare.

15. Here, the evidence affirmatively indicates that Crestron's exclusive dealing has no procompetitive efficiencies, for three reasons. First, I have found no evidence in Crestron's internal documents describing any procompetitive

[3] This is the only period for which Crestron produced complete data.

rationales for its exclusive dealing. Second, the procompetitive efficiency claim that Crestron's Chief Executive made at his deposition – that exclusive dealing is necessary to ensure that dealers do enough Crestron jobs to be sufficiently skilled – is not sound because exclusive dealing is not an effective way of achieving this goal. For example, suppose dealer A installed only one Crestron system ever, but that it had never installed a rival system, while in contrast dealer B had installed 20 Crestron systems, but also 10 Savant systems. Clearly dealer B's greater experience with Crestron systems would make it more skilled than dealer A, all else equal. But Crestron's exclusive dealing policy would perversely *terminate* Dealer B (the skilled dealer), and keep on dealer A (the unskilled dealer). In contrast, requiring that dealers install a minimum *number* of Crestron projects, or providing incentives for installing larger amounts of Crestron systems, would efficiently ensure that only skilled Crestron dealers could remain Crestron dealers. Third, the firms without market power in this market (Savant and AMX) do *not* engage in exclusive dealing. This affirmatively indicates that exclusive dealing is not procompetitive in this market because procompetitive conduct increases firm profits regardless of whether the firm has market power or not. Thus, if this conduct were actually procompetitive, firms without market power should be doing it too. To the contrary, the evidence shows that Savant and AMX only use volume discounts, not exclusive dealing.

16. The fact that Crestron's exclusive dealing has *no* procompetitive effects whatsoever means that this conduct will be on net anticompetitive if it has *any* anticompetitive effects.

17. **IV. Theory of Anticompetitive Harm to Savant and Consumers**. The economic literature shows that exclusive dealing can anticompetitively harm both rivals and consumers in several ways. For example, when exclusive dealing restricts a large share of the market and reduces rival sales below but-for levels, it can raise rivals' per-unit costs by depriving them of economies of scale. This in turn will cause both the rivals' and the monopolist's profit-maximizing prices to increase. Part IV below describes this theory of anticompetitive harm, in addition to several others.

18. **V. Proof that Crestron's Exclusive Dealing Restricted a Large Portion of the Market and Reduced Savant's Sales Below But-for Levels**. Crestron's exclusive dealing can restrict dealers from purchasing Savant, and reduce Savant sales below but-for levels, because it will often cause dealers to purchase 100% from Crestron even if the dealer would ideally prefer to buy a mix of Crestron and Savant in the but-for world. In Part V, I present concrete examples

confirming the economic theory that Crestron's exclusive dealing can restrict dealers from purchasing Savant products, and show that Crestron's exclusive dealing has restricted 51-77% of the market (depending on the year).

19. **VI. Proof that Restricting a Large Portion of the Market and Reducing Savant's Sales Below But-for Levels Anticompetitively Harmed Consumers**. By restricting a large share of the market and reducing Savant's sales below but-for levels, Crestron's exclusive dealing caused anticompetitive harm in six ways: (1) extracting consumer welfare, (2) maintaining market power over local dealers by excluding Savant, (3) impairing Savant's efficiency, (4) reducing Savant's expandability, (5) exacerbating dealer switching costs, and (6) deterring Savant from investing as much in research and innovation as it would in the but-for world.

20. **VII. Lost Profits Damages**. I estimate how much additional revenue Savant would have earned in the but-for world, and then subtract the additional costs Savant would have to incur to earn that additional revenue. I find that Crestron's exclusive dealing has caused Savant approximately $20 million in lost profits on high-end residential sales in the United States from June 7, 2008 to September 30, 2013.

21. **VIII. Deception is Anticompetitive**. Savant alleges Crestron engaged in deception. Although I do not opine on whether Crestron did in fact engage in deception, I explain in Part VIII the economics of why deception has anticompetitive effects.

22. **IX. Crestron's Profits Earned on the Sale of High-end Residential System Components in the United States.** I calculate Crestron's profits on residential high-end components as specified in question (E) based on Crestron sales data, which indicates both the net price Crestron charged each dealer and Crestron's cost of goods sold. I present the exact figures below in Part IX.

## QUALIFICATIONS

23. I am the Petrie Professor of Law at Harvard University, where I teach and write about the economic analysis of antitrust law, health policy, and various other subjects. I am the author of various books, including *U.S. Antitrust Law & Economics*; co-author of *Global Antitrust Law & Economics*, *Global Competition*

*Law & Economics*, and *Areeda, Elhauge & Hovenkamp, Vol X, Antitrust Law*; and editor of *The Research Handbook On The Economics Of Antitrust Law* and *The Fragmentation Of U.S. Health Care*. I am also the author of numerous articles on various topics involving the economic analysis of antitrust and other legal issues, including articles on monopolization and exclusionary conduct. My CV (attached as Exhibit A) lists all my publications, including all those in the past ten years. Exhibit B to this report describes my compensation and the cases in which I have testified at trial or in a deposition in the past four years.

24. I am also President of Legal Economics, LLC, which provides expert witnesses and support work on legal cases. I myself have testified as an expert witness on antitrust economics in dozens of federal cases, and I have been qualified as an expert in antitrust economics by all seven courts to rule on that question. I have also served as an expert witness on antitrust economics before Congress, arbitration panels, and competition agencies in the US, EC, Korea and Brazil. My testimony as an economics expert has spanned a wide range of topics, including mergers, horizontal agreements, vertical agreements, monopolization and exclusionary conduct, price discrimination, health economics, patent economics, and contract economics. My clients have included leading corporations, law firms, and the United States. I have been named one of the world's leading competition economists in the *International Who's Who of Competition Lawyers and Economists*.

25. I am a Member of Advisory Boards for the Journal of Competition Law & Economics, the Social Sciences Research Network on Antitrust Law & Policy, and the Social Sciences Research Network on Telecommunications & Regulated Industries. I have taken courses in economics, statistics, antitrust, and economic analysis of law, and I regularly read and use economic literature on antitrust economics, including books on industrial organization. I also regularly attend workshops on those and other topics regarding the economic analysis of law. I routinely use and teach economic analysis in my classes, including those that I regularly offer on antitrust law and economics and health law policy.

26. I am being compensated at a rate of $1045 per hour for my work on this case, and my consulting firm, Legal Economics LLC, is being compensated $235-475 per hour for the work of my staff on this report. None of my compensation in this case is contingent upon the outcome of the case or any aspect of the case.

## I. HIGH-END RESIDENTIAL SYSTEM MARKET

27. A relevant product market in this case is the high-end residential control system market ("High-End System Market"). This is the primary market in which Savant and Crestron compete. All suppliers in the High-End System Market sell their systems downstream to dealers, who then install and program them in the ultimate consumers' homes.[4] Part A describes the evidence showing that the High-End System Market is a properly defined relevant market. Part B summarizes the competitors, shares, and prices in this market. Part C shows that Crestron has market power and monopoly power in this market.

### *A. Market Definition*

28. When analyzing whether conduct has anticompetitively harmed consumers, economists regularly define a "relevant market." The technical definition of a "relevant market" in economic analysis of antitrust issues is precise and differs from the lay definition of "market."[5] The lay definition of "market" is broad and ambiguous – for example, both the phrases "residential control system market" and "high-end residential control market" are acceptable uses of the lay definition of the word "market." Thus, the lay definition of the word "market" is not useful for economic analysis in part because it is vague and subjective and not necessarily logically connected to any of the economic issues that are relevant to determining whether a given type of conduct helped or harmed consumers.

29. Antitrust economists generally define the relevant market in the following two-step process.[6] First, one ranks the products that are most similar to

---

[4] Klein 30(b)(6) Deposition at 111 ("Q: The dealers are critical in getting Crestron's products to the end users, correct? A: Yes. . . We don't sell to end users.").

[5] DOJ/FTC Horizontal Merger Guidelines §4 (2010) ("Relevant antitrust markets defined according to the hypothetical monopolist test are not always intuitive and may not align with how industry members use the term 'market.'").

[6] The DOJ/FTC Horizontal Merger guidelines describe this methodology, among other commonly used market definition methodologies in economic analysis of antitrust issues. Although the government enforcement agencies most often apply this methodology to merger analysis, it is also applicable to exclusionary conduct cases. *See* Horizontal Merger Guidelines n. 5 (noting that market definition is similar for non-merger conduct, such as monopolization, except that one cannot assume that the prices that exist in in the market are at competitive levels because the alleged anticompetitive conduct may have in fact elevated them above competitive levels).

the defendants' products at issue, from the closest substitutes to the most distant.[7] For example, in car markets, the closest substitute to one luxury sedan is another luxury sedan, the next closest substitute is probably a non-luxury sedan, and even more distant partial substitutes include motorcycles and bicycles.

30. Second, one starts with the smallest possible market that is potentially useful for analysis (in an exclusive dealing case, just the defendant's relevant product and its closest substitute), and tests whether that posited market would likely pass the "Hypothetical Monopolist Test." The Hypothetical Monopolist Test asks whether a hypothetical 100% monopolist in a posited market could profitably charge prices that were at least 5% higher than the prices that would prevail if the market were competitive.[8] If a hypothetical monopolist could, then the test is passed, meaning that the posited market is sufficiently broad (i.e., includes a sufficient number of substitutes) to be useful in economic analysis. If the test is failed, that tells the economist that the posited market is too narrow (i.e., includes an insufficient number of substitutes) to be useful in economic analysis. The economist should then expand the posited market to include the next closest substitute, and repeat the hypothetical monopolist test to see whether the slightly broader market is sufficiently broad.

31. For example, suppose the defendant sold "hand-churned" chocolate ice cream. Suppose the closest substitute to the defendant's product is another type of hand-churned chocolate ice cream, the next closest substitute is machine-churned chocolate ice cream, and the next closest is vanilla ice cream. An economist would start with the smallest possible market: just "hand-churned" chocolate ice cream, and ask whether it passed the Hypothetical Monopolist Test. A posited market for just "hand-churned" chocolate ice cream would probably fail the hypothetical monopolist test because so few people care about whether their ice cream is "hand-churned" that, if even a 100% monopolist in hand-churned chocolate ice cream tried to raise prices by 5%, so many customers would switch to machine-churned chocolate ice cream that the price increase would not be profitable. That tells the economist directly that impairing competition in just the hand-churned chocolate ice cream market could not significantly harm consumers,

---

[7] DOJ/FTC Horizontal Merger Guidelines §4.1.1 (2010) ("When applying the hypothetical monopolist test to define a market around a product offered by one of the merging firms, if the market includes a second product, the Agencies will normally also include a third product if that third product is a closer substitute to the first product than is the second product.").

[8] *See* DOJ/FTC Horizontal Merger Guidelines §4 (2010) (describing the hypothetical monopolist test).

and thus that using a hand-churned ice cream market would not be useful for competition analysis. The economist's next step would then be to add the next closest substitute to the market (machine-churned chocolate ice cream), and test whether this slightly broader market satisfied the hypothetical monopolist test. A posited market for "all chocolate ice cream" (both hand-churned and machine-churned) would probably pass the hypothetical monopolist test because many people have strong preferences for chocolate or vanilla ice cream, and consequently if a hypothetical 100% monopolist in chocolate ice cream raised prices by 5% above competitive levels, not enough customers would switch to vanilla ice cream to make the price increase unprofitable. This would directly indicate that impairing competition solely between chocolate ice cream suppliers could cause significant harm to consumers, and thus that a chocolate ice cream market is useful for competition analysis.

32. Markets defined using the hypothetical monopolist test usually "exclude some substitutes to which some customers might turn" in response to a price increase for the products in the relevant market.[9] Economists generally define markets narrowly to focus only on close substitutes because "defining a market broadly to include relatively distant product or geographic substitutes can lead to misleading market shares" that overstate the importance of distant substitutes.[10] This means that the mere fact that some customers substitute between Products A and B does not necessarily mean that Products A and B are in the same

[9] DOJ/FTC Horizontal Merger Guidelines §4 (2010) ("Market shares of different products in narrowly defined markets are more likely to capture the relative competitive significance of these products, and often more accurately reflect competition between close substitutes. As a result, properly defined antitrust markets often exclude some substitutes to which some customers might turn in the face of the price increase even if such substitutes provide alternatives for those customers."); *id.* §4.1.1 ("Groups of products may satisfy the hypothetical monopolist test without including the full range of substitutes from which customers choose."). Relatedly, official commentary to the Merger Guidelines explains that "Even when no readily apparent gap exists in the chain of substitutes, drawing a market boundary within the chain may be entirely appropriate when a hypothetical monopolist over just a segment of the chain of substitutes would raise prices significantly." DOJ/FTC, Commentary on the Horizontal Merger Guidelines 15 (2006). The Merger Guidelines likewise explain that "relevant markets need not have precise metes and bounds." DOJ/FTC Horizontal Merger Guidelines §4 (2010).

[10] DOJ/FTC Horizontal Merger Guidelines §4 (2010) ("Defining a market broadly to include relatively distant product or geographic substitutes can lead to misleading market shares. This is because the competitive significance of distant substitutes is unlikely to be commensurate with their shares in a broad market. Although excluding more distant substitutes from the market inevitably understates their competitive significance to some degree, doing so often provides a more accurate indicator of the competitive effects of the merger than would the alternative of including them and overstating their competitive significance").

market. Indeed, "The hypothetical monopolist test may identify a group of products as a relevant market even if customers would substitute significantly to products outside that group."[11]

33. Here, this hypothetical monopolist test methodology indicates that a high-end residential control system market limited to Crestron, AMX and Savant is a properly defined relevant market for competition analysis. Specifically, the evidence shows that: (1) Savant's and AMX's high-end systems are the closest substitutes to Crestron's high-end systems, and (2) a posited market that includes only Crestron, Savant, and AMX's high-end systems satisfies the hypothetical monopolist test. I also find that it is appropriate (and in fact conservative) to use a relevant geographic market limited to the United States and Canada.

### *1. Identifying the Set of Plausible Close Substitutes*

34. The first step in product market definition is ranking the potential substitutes for high-end Crestron residential control systems from closest to most distant. For clarity, when I discuss "Crestron high-end systems", I am referring to all Crestron residential control systems besides its "Prodigy" and "Adagio" line of systems, which are lower-cost, lower-function alternatives to Crestron's high-end systems.[12] To be clear, I am also excluding from my definition of "high-end systems" Crestron's products that are designed specifically to control only lighting and shading, rather than multiple different aspects of the house.[13]

---

[11] DOJ/FTC Horizontal Merger Guidelines §4.1.1 (2010).

[12] Klein 30(b)(6) Deposition 236 ("A: . . . we had a product line called Prodigy that was maybe a little less, not maybe, it was less in features and capabilities . . . . It was a much very, very small and short-lived portion of our product line. . . . that could have been deemed a lower end or not a high end."); Crestron0028569 at Crestron0028570 ("Our residential market has become very polarized – high end versus entry level, i.e. Adagio").

[13] Several facts make clear that specialized lighting control is a separate product from general home control. First, consumers cannot reasonably substitute specialized lighting control for general home control because the latter provides many functions the former omits. Second, the same customers will often obtain general home control from one firm and specialized lighting control from another, even though some firms, such as Crestron, offer both. *See* http://www.crestron.com/resources/product_and_programming_resources/catalogs_and_brochures/online_catalog/default.asp?jump=1&model=ST-LT&tab=specifications (describing a Crestron product that allows one to integrate a Crestron home control system with a Lutron lighting control system); http://www.crestron.com/products/green_light_residential_lighting_control/ (Crestron website describing its own residential lighting and shade control products). Third, some firms, such as Lutron, specialize solely in lighting control. *See* www.lutron.com. Even what Lutron calls its

35. A high-end residential control system is not a single item, but instead a set of components that a dealer can connect (often wirelessly) and program in a way that allows a homeowner to control multiple aspects of a home from a single user interface.[14] For example, in a Savant or Crestron system, a resident can use a single touchscreen interface to control any TV in the house, the music, the lighting, the thermostat, and the security system, among other things. A whole system usually consists of dozens of components, but the most important components are: (1) user interfaces that the residents use, (2) a "controller", "host", or "server" that receives the signal from the user interface and then sends a signal to the technology the user is trying to control (such as the TV),[15] and (3) the software dealers use to program the system.[16]

36. The products that are the closest substitutes to a Crestron high-end system are the products that provide the most similar functionality at similar price levels. To narrow the universe of potential substitutes down to those that are at least plausibly the closest substitutes to Crestron high-end systems, I analyzed Crestron's internal documents to see which products Crestron believed competed against its own products.

---

"Whole Home" solution only controls all *lighting* in the home. *See* http://www.lutron.com/en-US/Residential-Commercial-Solutions/Pages/Residential-Solutions/WholeHomeSolutions.aspx.

[14] Parks Associates, *Home Systems: Home Controls, 2007 Update* at 2 ("Advanced home control systems are typified by sophisticated and extensive control capabilities provided through significant processing power. Generally, they require additional wiring in the home, include computers with capable software, cost thousands and even tens of thousands of dollars, and require trained personnel for installation.").

[15] A "controller", "host", or "server" usually includes a CPU, several "switchers" that can change the input and output of different technologies, and wireless receivers and senders. *See* http://www.savantsystems.com/category/savant_host_and_controllers.aspx ("Savant Host & Controllers. The key components that deliver control and automation to every SmartSystem are a Savant Host and any one Savant Controller. The Savant Host, . . . a device containing Savant's powerful control software, provides numerous functions including: automation and control, user interface interpretations, system administration, monitoring, and can act as the digital media server housing and controlling the playback of any iTunes content (music, movies, etc.). All Savant Controllers includes a Linux processor that provides two-way communication to all connected components or subsystem within an installation. Supporting the most common control protocols (IR, Serial, IP IR, Relay, GPIO), and standards, several Savant Controllers also deliver audio/video switching, processing, video scaling and overlay and more.").

[16] Klein 30(b)(6) Deposition at 121 ("Q: Crestron has proprietary software that dealers use when they are setting up residential systems, correct? A: Yes."). Savant's programming software is called Racepoint Blueprint. *See* http://www.savantsystems.com/product-details/racepoint_blueprint.aspx.

37. Crestron's internal strategic documents often discussed its "competition," and only a small handful of suppliers were regularly listed as its key competitors. The set of firms Crestron lists among its "competitors" is likely to include some products that do not actually compete against Crestron's high-end residential systems because Crestron also has distinct commercial, lighting, and low-end residential products.[17] Looking at Crestron's internal strategic discussions of its "competition" will thus produce an over-inclusive list of plausible close substitutes for Crestron's high-end residential systems.

38. I instructed my staff to search Crestron's documents for internal strategic documents that listed which firms Crestron and Crestron dealers viewed as Crestron's competitors. My staff found thirteen unique documents.[18] These

[17] *See* www.crestron.com/markets/ (listing as one of Crestron's markets "Corporate Enterprise"); http://www.crestron.com/products/lighting_and_shade_control/ (showing Crestron's lighting control products); Klein 30(b)(6) Deposition 236 ("A: . . . we had a product line called Prodigy that was maybe a little less, not maybe, it was less in features and capabilities . . . . It was a much very, very small and short-lived portion of our product line. . . . that could have been deemed a lower end or not a high end.").

[18] Crestron0115828 (June 2, 2008 email from John Gutekunst, then a Regional Director at Crestron, now an Executive Director at Crestron, stating "I see Savant as posing a bigger threat to our high end business than any Control4 or Niles."); Crestron0078645 at Crestron0078670 (Crestron Southwest division "FY 2008 Sales Review", dated July 22, 2009. It lists "Crestron competitors" as "Control4, Savant, Extron, AMX"); Crestron0172730 at Crestron0172732 (January 28, 2011 Randy Klein meeting notes. One topic was "Competition (Savant)". The notes do not list any other competitors); Crestron0116465 (June 23, 2011 email from Michael Mongiardo, then a Crestron "Manager of Residential Design – Sales Support Services", stating "We are currently looking for any competitive price lists we can get our hands on so we can keep pumping out all those great competitive quotes and analysis! The ones we are looking for in particular are… Savant Control4 Extron AMX Lutron, Magenta Research, RGB Spectrum); Crestron0170247 (July 15, 2008 notes for a Crestron "Regional Directors Meeting". One note is "Competition – our position C4, AMX, Extron, Lutron, Savant"); Crestron0078637 (July 21, 2009 notes for a Crestron-Florida sales meeting. Under "Competition" it lists "Control4" and "Savant". It lists AMX and Extron separately under subheadings that appear to be about commercial, rather than residential, clients); Crestron0002697 (July 2011 outline for a Crestron "Regional Directors Meeting". Under "Competition", it lists "C4" "DM – Extron", "Savant", and "Other"); Crestron0214140 (July 22, 2009 "FY 2009 Annual Sales Review" for Crestron Southwest. Under "Competition", it lists "Control4", "Savant", and "Extron"); Crestron0170267 at Crestron0170268 (October 1, 2008 internal Crestron notes from a meeting including Randy Klein and other Crestron employees. One of the notes is titled "Competitors – what is our message to dealers? And lists "AMX", "Control4", "Savant", and "Extron"); Crestron0211119 (April 15, 2011 Crestron "Residential Sales Meeting Agenda". One note is "Competition", under which it lists "Control 4 / Savant / Lutron"); Crestron0346422 at

documents list multiple firms as competitors, but Savant is the only firm that is listed in every document. Indeed, one document even states that "I see Savant posing a bigger threat to our high end business than any Control4 or Niles."[19] Out of these thirteen documents, Control4 is listed as a competitor in twelve, and Extron and AMX are listed in seven. Lutron is listed in only three, Niles is listed in two, while Magenta Research, RGB Spectrum, URC, Elan, RTI, and HAI are each listed in only one of these documents.

39. Of these twelve firms, five do not provide any solutions designed for controlling entire homes (as opposed to offices, classrooms, or other settings): Extron, Lutron, Niles, Magenta, and RGB Spectrum. Extron only sells systems that are designed for commercial application, such as "boardrooms, presentation centers" and "university lecture halls."[20] Lutron only provides lights and lighting control.[21] Niles systems on their own can provide audio and video control, but not whole house control.[22] Magenta provides commercial video and audio switching, but not any residential interfaces or systems.[23] RGB Spectrum is likewise purely

---

Crestron0346474 (July 2011 Crestron slideshow. One slide is titled "Residential competition", and lists "Control4", "Savant", and "AMX"); Crestron0334416 at Crestron0334417 (Crestron meeting notes for July 13, 2011 meeting titled "Residential Market Development Discussion." One section is titled "Competition", and lists "Control 4" and "Savant"); Crestron0025959 at Crestron0025973 (this survey ranked, in order, Control4, Savant, AMX, URC, Elan, RTI, HAI, and Niles).

[19] Crestron0115828.

[20] *See* http://www.extron.com/product/index.aspx ("Extron manufactures computer-video interfaces, switchers, configurable control systems, distribution amplifiers, computer-video scan converters, scalers, signal processing equipment, and high resolution cables. These products are used to integrate computer, video, and audio into presentation displays for today's boardrooms, presentation/training centers, university lecture halls, and other applications."). Crestron's internal documents are consistent with Extron selling only commercial system components; the Crestron comparison guides I have found comparing Crestron components to Extron components always compare commercial components. *See, e.g.*, Crestron0058389 (May 1, 2009 Crestron document comparing "Crestron iMedia vs. Extron PoleVault" "Crestron iMedia is the only media control solution that transmits all audio, video, control and power over a single CAT5 wire. Amazingly simple, flexible, and scalable, iMedia is the perfect solution for all your basic classroom and meeting rooms.").

[21] *See* www.lutron.com. Even what Lutron calls its "Whole Home" solution only controls all *lights* in the home. *See* http://www.lutron.com/en-US/Residential-Commercial-Solutions/Pages/Residential-Solutions/WholeHomeSolutions.aspx.

[22] *See* Julie Jacobson, *Elan Gives Home Automation, iOS Control to Niles ICS*, CePro (August 30, 2011), available at http://www.cepro.com/article/elan_gives_home_automation_ios_control_to_niles_ics/.

[23] *See* http://www.magenta-research.com/.

non-residential.[24] Thus, the only remaining possible substitutes for Crestron's high-end residential systems are Savant, AMX, Control4, Elan, RTI, Universal Remote, and HAI.

40. Even among this set of potential substitutes, a survey Crestron conducted of its dealers indicates that Control4, Savant, and AMX are the largest "threats" to Crestron's product lines (the survey does not specify whether the dealers are comparing these competitors to all of Crestron's residential control systems, or only its high-end ones).[25] I therefore begin my analysis by ranking Savant, AMX, and Control4 from closest substitutes to most distant substitutes for Crestron's high-end residential control systems. As I show below in Part I.A.3, I ultimately find that a posited market limited to just Crestron's high-end systems, AMX, and Savant, is a properly defined relevant antitrust market, so in this case there is no need to rank the other more distant substitutes.[26]

---

[24] *See* www.rgb.com (listing under "Our Markets", "Commercial", "Control Rooms", "Education", "Medical", "Military", "Security", "Simulation & Training", "Command & Control", and "Oil and Gas.").

[25] Crestron0025959 at Crestron0025973 (this survey ranked, in order, Control4, Savant, AMX, URC, Elan, RTI, HAI, and Niles). Internal Savant documents similarly indicate that Savant views Crestron, AMX, and Control4 as its closest competitors. *See* Keynote Presentation Attached to SAVANT1661634 (internal Savant email dated January 29, 2011) at slide 3 (Slide titled "Market Share vs. Top 3 Competitors". It has two pie charts, one titled "Commercial" and another "Residential". The residential pie chart lists four firms, with the following "Market Shares", Crestron: 68.5; AMX: 4.1%; Control4: 21.92%; Savant: 5.48%).

[26] Crestron deposition testimony indicates that Niles, RTI, Universal Remote, Russound and Elan are all lower-end systems that are most comparable to Crestron's Prodigy system and Control4. Dave Sell Deposition at 126 ("Q: Was [Crestron's Prodigy line] designed with a particular purpose in mind? A: Yes. Q: Which was? A: Offer a lower-priced control solution. Q: Was it designed to compete with any particular brand? A: Yes. Q: Which? A: Control4, RTI, Universal Remote, Russound, Niles, Elan."). This is consistent with other sources, which for example indicate that Elan user interfaces are not fully customizable. Century Stereo, "Home Automation and Control" ("Elan G! is a home automation system that has a consistent user interface across a wide range of devices. It's out-of-the box pre-programmed user interfaces of Elan G! means it can be set up in a matter of hours versus the labor intensive programming of other automation systems and avoids some of the errors that can arise from a completely custom program."), available at http://www.centurystereo.com/audio-video-brands/controls-and-touch-panels/. Third party reports similarly indicate that HAI is relatively low-end. *See* 2007 Parks Report, appendix p. 64 ("In comparison to high-end systems such as Crestron and AMX, HAI is affordable with end user sales ranging between $4K and $7K."). According to the Crestron dealer survey, Control4 is the closest substitute to Crestron's products (primarily Crestron's Prodigy systems) of all these low-end systems, but I show below that even Control4 is a more distant substitute to Crestron's high-end systems than Savant or AMX are, and that a market

*2. Ranking Plausible Close Substitutes from Closest to Most Distant*

41. The products that are the closest substitutes to Crestron's high-end residential systems are the products that are most similar in function and price, and thus impose the greatest constraints on Crestron's ability to raise prices. One of Crestron's own documents suggests that Savant's products impose a larger competitive constraint on Crestron's "high-end" products than Control4 (the document does not mention AMX at all).[27] Analyzing the prices and functionalities of Savant's, AMX's and Control4's products confirms that Savant's high-end residential systems are the closest substitutes to Crestron's high-end residential systems.

42. Because several of these firms have multiple distinct product lines, one must really identify which *product lines* are the closest substitutes to Crestron's high-end control systems. For example, a firm's low-end product line might be a close substitute for Crestron's low-end systems, but fail to provide any reasonable substitute for Crestron's high-end systems.

43. As Table 1 below shows, AMX's only residential product line is high-end.[28] Savant's product line is likewise aimed at high-end customers.[29] Crestron

---

limited to Crestron, Savant, and AMX is sufficiently broad. This thus indicates that these other low-end systems are even more distant substitutes outside of the high-end systems market.

[27] Crestron0115828 (June 2, 2008 email from John Gutekunst, then a Regional Director at Crestron, now an Executive Director at Crestron, stating "I see Savant as posing a bigger threat to our high end business than any Control4 or Niles.").

[28] SAVANT0520194 at SAVANT0520232 (2010 report by Parks Associates describing AMX: "the Company's products are aimed at the high end market with each system costing between $25k to over $100k; with an average price tag of $50k"); 2007 Parks Associates Report at 35 (AMX is "One of the two established leaders in the section of the industry that targets only the high end market."); *id*. at 36 ("AMX does not choose to adapt their product for sale to high middle income customers. They consider themselves the Rolls Royce of remote controls and wish to remain in that niche.").

[29] *See* Parks Associates 2007 Report, Appendix p. 97 (listing the "Target Markets" for Savant as "High-end, whole home control systems in residential markets."). In contrast, this same report explains that Control4's strategy is "making automated home control available to the average home". *Id*. at 49. Crestron0116256 at Crestron0116257 (July 2010 email from Warren Lanza, then a regional employee at Crestron, to John Gutekunst, an Executive Director at Crestron, stating that "We have a high end Control System Competitor for 1st time in years. Savant will take some biz [sic]."). SAVANT3330221 at SAVANT3330222 (report on Control4 by Needham Co., an investment banking firm, describing "Savant" as an "ultra-premium solution"). Crestron0349081 at Row 6435 (September 9, 2011, entry by Jake Baley in the compilation of Crestron's SalesForce.com database regarding his visit to Listen Up Audio/Video

has both a high-end residential line and a low-end residential line. Crestron started selling its lower-end residential line under the brand name "Prodigy" in August 2009.[30] Crestron designed the Prodigy line specifically to be cheaper and lower in functionality so that it could compete more directly with Control4,[31] and has instructed its salespeople to try to sell Prodigy systems specifically to dealers who use Control4.[32] The analysis below confirms that, although Control4's systems

---

stating "Dave and the other executives at ListenUp have always looked at Crestron as only being the higher end solution where they use C4 and URC for entry level and SAVANT and Crestron for higher end.").

[30] *See* "12 First 100 Prodigy Sales.csv".

[31] Klein 30(b)(6) Deposition 236 ("A: . . . we had a product line called Prodigy that was maybe a little less, not maybe, it was less in features and capabilities . . . . It was a much very, very small and short-lived portion of our product line. . . . that could have been deemed a lower end or not a high end."). Julie Jacobson, *Crestron's Low-Cost Prodigy to Compete with Control4* (July 21, 2009) ("Crestron is working on a 'Control4 buster' called Prodigy". . . .It's no secret that Control4's rise in the home automation control business has rankled Crestron management. Crestron's first attempt at a more downscale system, Adagio, is still not cheap enough to compete. A Control4 automation system starts at about $300 for what amounts to a feature-rich universal remote control solution. Add a couple hundred dollars and you can get a system with two-way ZigBee remote including metadata. The Prodigy price points will be very similar. A 'media controller' with remote will list for about $700. An in-wall touchscreen costs less than $700. Wireless dimmers will sell for about $99. The system supports up to 16 zones of audio (not wireless. . . . Several high-end Crestron dealers such as Electronics Design Group . . . and Audio Advisors . . . have started new divisions for more down-scale installations. They are using Control4.") available at http://www.cepro.com/article/crestrons_low_cost_prodigy_to_compete_with_control4/. Internally, Crestron referred to their Prodigy system as "Control5", alluding to the fact that it was aimed specifically at Control4. *See* Crestron0091409 (August 2009 email from a Crestron regional sales manager to a dealer stating "We did refer to Prodigy as Control 5 for about the past 18 months. I was in a meeting with Randy Klein the first time I heard him say it."); Dave Sell Deposition at 126 ("Q: Was [Crestron's Prodigy line] designed with a particular purpose in mind? A: Yes. Q: Which was? A: Offer a lower-priced control solution. Q: Was it designed to compete with any particular brand? A: Yes. Q: Which? A: Control4, RTI, Universal Remote, Russound, Niles, Elan."); Crestron0171063 at Crestron0171063 (May 23, 2009 e-mail from Dave Sell, Director of Crestron West, to commercial and residential Regional Sales Managers, stating "Prodigy line (C4 killer)").

[32] Internal Crestron documents show that Crestron aimed its Prodigy sales specifically at dealers who were selling Control4. Crestron2506624 at Crestron2506639 (July 2009 Crestron slide showing that Crestron told its salespeople to focus its Prodigy sales on dealers that installed Control4 systems); Crestron0078637 (July 21, 2009 notes for a Crestron-Florida sales meeting. It notes under "Prodigy Distribution" "Residential Crestron dealers that sell or are affected by C4"); *id*. at Crestron0078637 (Under "Crestron dealers that take on C4", it states "Show them Prodigy – hardware and software." In contrast, it does not state anything about Prodigy in the Savant section.); Crestron0030809 (March 2011 internal Crestron email explaining that

were close substitutes for Crestron's low-end Prodigy systems, they were much more distant substitutes for Crestron's high-end residential systems.

| **Table 1: Distinct Residential Product Lines** | | |
|---|---|---|
| **Firm** | **Product Line** | **Name of Product Line** |
| Crestron | High-end | Non-Prodigy, Non-Adagio |
| Savant | High-end | Only product line |
| AMX | High-end | Only product line |
| Control4 | Low-end | Only product line |
| Crestron | Low-end | "Prodigy" and "Adagio" systems |

44. Several key characteristics differentiate these product lines: (a) price range, (b) customizability, (c) compatibility with third-party devices, and (d) speed/responsiveness. Additionally, the evidence indicates that there is a general perception that Crestron's, Savant's and AMX's high-end systems are higher in overall quality than Control4's systems and Crestron's low-end systems.

45. **a. Price Range**. Although the exact total price of any system depends on which components are included, there is a general consensus among competitors and third-party reports that AMX has the most expensive products, followed by Crestron's high-end products, then Savant's product line, with

"Control4 continues to be a pain but I am working to push the new Prodigy products to overtake that business." In contrast, the email did not propose pushing Prodigy products to overtake Savant); Crestron0144610 at Crestron0144613 (August 10, 2009 plan from a Crestron's Regional Sales Manager for Crestron West, John Yohanna. It states that "Prodigy will be a great way to increase sales by taking away business from Control 4, Universal, and RTI as well as generating plus business for the dealer. It will also help us protect ourselves from Control 4 by not leaving an open door to a dealer in the form of a whole in the product line."); Crestron0119571 at Crestron0119572 (August 2, 2009 email from Crestron's Chief Executive, Randy Klein, to the Regional Director of Crestron West, Dave Sell. Klein explains "We can try our best with C4 vs Prodigy. But if he is going to have to make a choice between Savant and us. If he wants to continue to sell Savant, we say goodbye on Wed[nesday] … plain and simple.").

Control4 and Crestron's Prodigy being the cheapest. Third-party reports refer to AMX as the "Rolls Royce" of control systems,[33] and internal Crestron documents note that AMX systems are more expensive than Crestron systems approximately 70% of the time.[34] Third party reports indicate that, after AMX and Crestron's high-end systems, the next most expensive is Savant.[35] Third-party reports and Crestron documents indicate that Control4's systems and Crestron's Prodigy systems are the cheapest.[36]

46. **<u>b. Customizability</u>**. The evidence indicates that Crestron's, Savant's and AMX's high-end systems are all more customizable than Control4 systems and

---

[33] Parks Associates, Home Systems: Home Controls 2007 Update at 21 (noting that AMX "Intends to remain the Rolls Royce of control systems."); Raymond James, August 27, 2013 Evaluation of Control 4 IPO at 20 (noting that AMX's main controller is $9,500, as compared to Crestron's PRO2 controller, priced at $3,600).

[34] Crestron1426865 at Crestron1426865 (internal Crestron document noting that "Of the 100 competitive quotes generated by Tech Sales, pitting AMX against Crestron in 2011, 71 out of 100 quotes Crestron was the cheaper quote.").

[35] *See* Raymond James, August 27, 2013 Evaluation of Control 4 IPO at 18 (classifying AMX, Crestron, and Savant in the "Luxury $10k-$100k+" segment of the "Home Automation Industry," which $10k-$100k+. In contrast, Control4 is classified in the "Mainstream $1-3k to start up to $20k+" segment); *id*. at 20-21 (noting that Savant's main host controller costs $2,800, while Control4's "retails for $600-1000," and that "Pricing for complete [Control4] projects is generally lower than Luxury/Mainstream providers like Savant.").

[36] *See* Raymond James, August 27, 2013 Evaluation of Control 4 IPO at 20-21 (noting that Savant's main host controller costs $2,800, while Control4's "retails for $600-1000, and that "Pricing for complete [Control4] projects is generally lower than Luxury/Mainstream providers like Savant."); Crestron0189488 at Crestron0189492 (Crestron "Fact Sheet" comparing Crestron and Control4. It states that "a customer might be initially attracted to Control4 based on price, however that customer will quickly find him/herself in a maze of system design and visual design dead ends."); Julie Jacobson, *Crestron's Low-Cost Prodigy to Compete with Control4* (July 21, 2009) ("Crestron is working on a 'Control4 buster' called Prodigy". . . . It's no secret that Control4's rise in the home automation control business has rankled Crestron management. Crestron's first attempt at a more downscale system, Adagio, is still not cheap enough to compete."). SAVANT3330221 (August 17, 2013 report on Control4 by Needham Co, an investment banking firm. The introduction states "Home automation has historically been dominated by ultra-premium solutions such as Crestron that can easily cost $40,000+ and require custom programming. Control4 is priced in the $3-4k range.") *id*. at SAVANT3330222 ("The pricing of [Control4] is starkly different from Crestron or Savant or AMX, which are all ultra-premium solutions"). Dave Sell Deposition at 126 ("Q: Was [the Crestron Prodigy line] designed with a particular purpose in mind? A: Yes. Q: Which was? A: Offer a lower-priced control solution. Q: Was it designed to compete with any brand? A: Yes. Q: Which? A: Control4, RTI, Universal Remote, Russound, Niles, Elan."); Crestron0095712 at Crestron0095712 (February 18, 2011, e-mail from Rob Christensen, Regional Sales Manager, to Jerrie Anderson, stating "we now offer a very cost effective 'value'oriented Prodigy solution").

Crestron's Prodigy system. Internal Crestron documents emphasize repeatedly that Control4's systems are less customizable than high-end Crestron systems.[37] Similarly, Crestron's public statements acknowledge that its Prodigy systems are less customizable than its high-end line.[38] In contrast, I have not found Crestron documents claiming that Savant or AMX systems were significantly less customizable than Crestron systems. Third-party statements confirm that Savant and AMX systems and user interfaces are completely customizable.[39] Dealer

---

[37] Crestron0064375 at Crestron0064383 (2009 Crestron document noting that "according to a Control4 dealer, the system must be a simple one to be easy for anyone to program, and Control4 instructs dealers not to 'go outside the box.'"); Crestron0544915 at Crestron0544918 ("Control4 allows portions of the UI [User Interface] screens to be configured – for instance to add additional buttons that may be required for specific devices, but major functionality cannot be added. This is an advantage for Crestron, because Control4 has much more strict limits on what can be added for individual customers." This document predates the entry of the Prodigy panel, so it is clearly comparing Control4 to Crestron's high-end systems); Crestron1404774 (internal Crestron spreadsheet titled "Crestron vs. Control4 Touchpanels. It indicates that Crestron touchpanels have "completely customizable GUI colors, buttons, etc.", while Control4 does not); Crestron0000527 (March 13, 2009 Crestron comparison guide with Control4, stating "Compare with Control4, only Crestron offers customization, larger format displays, video and streaming media capabilities, RF for long-range, reliable wireless communication, Web browsing and intercom. See the latest comparison guide to see how our extensive, award-winning family of touchpanels far exceeds what Control4 offers."); Crestron2467711 (Crestron "Comparison Guide" for Touchpanels "Crestron vs. Control4". It states that Crestron touchpanels have the following capabilities that Control4 touchpanels lack: "Completely customizable GUI colors, buttons, etc."). Dealer statements also indicate that Control4 is less customizable than high-end Crestron systems. *See, e.g.*, "Crestron vs Control4 - What's really the difference", http://callcharles.com/crestron-vs-control-4/ (Last accessed January 28, 2014)("Control4's software uses an auto-generated interface . . . and makes installation . . . extremely efficient. Crestron provides the ability for completely customized interfaces.").

[38] *See* Crestron, *Prodigy Products Now Exclusively Available Through Distribution* (November 1, 2011 Press Release) ("Prodigy is very simple and ideal for distribution, Crestron [i.e., non-prodigy Crestron] is full featured, expandable, and customizable, and is best served through the expertise of our value-added dealers."), available at http://www.crestron.com/about/press_room/press_releases/show_release.asp?press_release_id=1687. Crestron also recognized that its Prodigy less was less customizable internally. *See, e.g.*, Crestron0119464, "Fiscal Q4 '09" tab (July 23, 1009, Weekly Report of Landon Lovett, Director of Crestron South & Mid-Atlantic, stating "The strategy moving forward is to sell Prodigy for the simple solution (PMLX2, PMC2, some light switches, use a third party receiver for surround and an extra zone of audio, E-Control and I-Pod control); above that is Crestron core with all the value that line provides--expandibility, customization, seamless integration of lights, hvac, audio, video, switching, etc.).

[39] 2007 Parks Report at 36 ("Crestron and AMX are the two companies with the most flexible and customizable software. Software of both companies is difficult to program, at least from the perspectives of either a consumer or an unsophisticated dealer." This report was

testimony also confirms that Savant systems are more customizable than Control4 systems.[40]

47. **c. Compatibility with Third-Party Devices**. One of the main purposes of a home control system is to control multiple different types of technologies that are made by many different brands, such as televisions, audio systems, and security systems. If a control system is not compatible with a third-party device, then the homeowner will not be able to control that third-party device, which severely reduces the utility of the control system. The evidence indicates that Crestron's high-end systems and Savant's systems are compatible with more third-party devices than Control4 systems.[41] At this time I have not found any evidence comparing the compatibility of AMX and Crestron's low-end Prodigy system to any of the other product lines.

48. **d. Speed/Responsiveness**. The evidence indicates that some control systems are "faster" than others, in the sense that they will perform the action the user specifies faster. For example, a slower system may have a few-second delay between pressing a button that tells the control system to switch the TV input from Satellite to BluRay, while a faster system may do so almost instantaneously. The

---

published during the second quarter of 2007, which is right when Savant first started selling systems); "Home Automation — Savant Home Automation Denver and Control4 Denver Home Theater", http://www.theavspecialists.com/services/home-automation, (Last accessed January 28, 2014)(Savant has "Completely customizable graphics.").

[40] Clancy Deposition at 61 (dealer testifying that "with C4, you're living in a finite world. The customization level is – is restricted. Q: What about comparing C4 to Savant? A: With Savant, you get more customization, essentially, than you do with C4.").

[41] *Crestron vs Control4*, http://www.c9ny.com/control4_vs_crestron (Last accessed January 28, 2014)("Crestron can control more brands. . . . Control4 works with the most common brands. If you want to control something unusual (i.e. a wine cellar), it's likely that Crestron will be the only option [when choosing between Crestron and Control4]"); Crestron0544915 at Crestron0544918 ("Unlike Crestron – Control4 strictly limits who can write drivers for third-party devices. This is because their driver language is much more complex than Crestron's SIMPL and SIMPL + - and their dealers have less technical ability. Normal dealers cannot add their own custom drivers for other devices. This is a significant limitation because they only support about 40 2-way devices as of August 2008 (most of which are security systems or I/O extenders."); *Control4 vs. Savant for Today's Smart Home*, http://residentialsystemsinc.com/control4-vs-savant-for-todays-smart-home/ (Last accessed January 28, 2014)(One of the strengths of Savant in comparison to Control4 is its "[e]asy ability to integrate with other world-class smart-home products including Lutron, Vantage, HAI and others").

evidence indicates that Crestron's high-end systems are faster than AMX's,[42] and that Savant's systems are faster than Control4's.[43] I have not been able to find any speed comparisons between Crestron and Savant.

49. **Summary: Crestron, Savant, and AMX High-end Systems are the Closest Substitutes for Each Other, While Control4 is a Closer Substitute to Crestron's Low-end Prodigy System**. In sum, AMX's systems, Savant's systems, and Crestron's high-end systems are more expensive and higher quality than Control4's systems and Crestron's low-end Prodigy system. This is consistent with competitor and industry statements indicating that these three high-end product lines are generally superior to Control4 and Crestron Prodigy systems.[44] It is also consistent with numerous internal Crestron strategic

---

[42] Crestron1426865 (internal Crestron document titled "What makes Crestron better than … AMX?" It lasts as one reason, "AMX has a slower and older lineup (control processors are slower, touchpanels are older by the day). Our processors are still 3x faster eve AFTER their recent upgrades. The MVP-8400 panel is a dinosaur, and it's the heart of their lineup.").

[43] Cloud9 Smart Home, *Control4 vs. Savant* (February 8, 2013) ("a Savant system will usually be faster than a Control4 system. A couple of years ago this difference was more significant, but Control4 has upped the horsepower in their latest home controllers, catching up on speed. Savant is still faster, but we're talking a second or two difference in response times (if both systems are smartly designed and adequately powered") available at http://www.c9ny.com/control4_vs_savant; *Control4 vs. Savant for Today's Smart Home*, http://residentialsystemsinc.com/control4-vs-savant-for-todays-smart-home/ (Last accessed January 28, 2014)("Savant's HDMI switching products are some of the best in the world, so if a client is particular about that, we recommend Savant [over Control4]").

[44] *See, e.g.*, Residential Systems Inc. Blog, *Control4 vs. Savant For Today's Smart Home* (November 22, 2013), available at http://residentialsystemsinc.com/control4-vs-savant-for-todays-smart-home/ (authorized dealer of both Savant and Control4 explaining that "we tend to recommend Savant [over Control4] in applications where quality is the utmost importance to our clients . . . For example – Savant's HDMI switching products are some of the best in the world so if a client is particular about that, we will recommend Savant. Our clients recognize the premium price for that, but they also recognize that they get incredibly quality, as well." In contrast, the dealer states that "we tend to use Control4 in applications where price/budget is more of a consideration."); Crestron0189488 ("Crestron Fact Sheet: Crestron vs. Control4". It notes that Control4's pitch is that "current solutions [i.e., solutions other than Control4] only address customers who are building high-end customer homes or doing major reconstruction on an existing home. Homeowners need a more affordable way to automate their existing homes without the headaches and expense of major remodeling." Crestron notes that Control4's "aim is existing homes, and low cost. In other words, they know that they do not have competitive products in installations where there is the opportunity to pull cable."); Parks Associates 2007 Report, Appendix p. 36, 63, 49, 97 (listing the "Target Markets" for Savant as "High-end, whole home control systems in residential markets.", for Crestron "Very upscale households . . . via high-end custom installers", for AMX "high level income groups – those living in homes worth

statements indicating that it designed its low-end Prodigy systems specifically to compete with Control4's low-end systems,[45] and instructed its salespeople to target Prodigy sales at dealers who used Control4.[46]

50. To be sure, some Crestron documents express concern that it lost sales when Control4's systems became available, but that does not necessarily indicate that Control4's systems are closer substitutes to Crestron's high-end systems, for two reasons.

51. First, Crestron also has a low-end line, the "Prodigy," which the evidence indicates competes more directly with Control4's line.[47] The evidence indicates both that: (1) Crestron decided to make a lower-end system like the Prodigy specifically in response to competition from Control4,[48] and (2) Crestron targeted its Prodigy sales specifically at dealers who were selling Control4, but did

---

$2M+". In contrast, it lists Control4's strategy as "making automated home control available to the average home." Crestron had not yet introduced its lower-end Prodigy line when this report was published); Crestron0116256 at Crestron0116257 (July 2010 email from Warren Lanza, then a regional employee at Crestron to John Gutekunst, an Executive Director at Crestron, stating that "We have a high end Control System Competitor for 1st time in years. Savant will take some biz [sic]. Not much, hopefully, but some. C-4 is still here too.").

[45] Crestron0544915 (internal Crestron document stating "Control4 – a new competitor in the lower-end residential control system market has gained traction in the hotel and low-end home theater markets. . . . Crestron should create a new series of products based on cheap control system/remote control combination to regain the competitive edge in this area.") id. at Crestron0544917 ("Control4 is targeted towards the lower-end home automation market, which is mostly retrofit installations instead of new construction and tends to be serviced by lower-cost dealers with less technically skilled staff."); Crestron1539445 (March 27, 2009 email from Randy Klein regarding the dealer Crescendo. It states "I approved an order yesterday with a large discount in order to compete effectively with C4. That's OK, because it's short term. Once we come out with our new Prodigy line (60 days or so), we won't have to do that. . . . Until we ship Prodigy, if they have a C4 customer or competitive situation, we will match the C4 price. We need the C4 BOM in order to make an accurate comparison and Crestron BOM. Once Prodigy is released, that product line will replace the competitive discount program."); Sean Riordan Deposition at 26-27 (dealer testifying that, if a customer asked for an alternative to Crestron, he would tell them that that there were "three companies that [he] felt were building quality control systems . . . Crestron, AMX, and Savant.").

[46] *See supra* note 32 (collecting sources).

[47] Third-party reports also state that Control4 competes most directly with Crestron's Prodigy line. *See, e.g.*, ABIResearch Report, Home Automation and Control (2010) at 8 ("in August 2009, Crestron introduced the Prodigy system at the CEDIA trade show. The Prodigy system competes on price more directly with the system on offer from Control4 and the other 'mainstream' vendors.").

[48] *See supra* note 45.

not target its Prodigy sales at dealers who sold just AMX or Savant.[49] Thus, at least part of Crestron's concern about Control4 is that it is losing sales in its *lower-end* Prodigy product line, rather than because Crestron believes that Control4 is a closer substitute to its high-end product line than Savant or AMX.[50]

52. Second, economic theory would predict that the new entry of the *first* major "low-end" competitor, Control4, would cause a large decline in incumbent high-end sales because until then high-end systems did not have to compete with low-end systems for customers who did not get much value from the high-end features. Before Control4 came along in late 2004,[51] high-end suppliers like AMX and Crestron (Savant had not entered the market yet) were essentially the only options for whole-house control.[52] Thus, if a customer wanted a residential control system, its only options were the high-end Crestron and AMX options, even if the customer did not place significant value on the aspects of high-end systems that make them superior to low-end systems (such as greater customizability, compatibility, and speed). Consequently, before Control4 entered, a portion of Crestron's sales were to customers who valued home control enough to be willing to pay the high price for high-end systems (the only option), even though they did not place much value on the *high-end* characteristics, and thus would prefer a lower-end system at a lower price. When Control4 entered, this type of customer who did not value the high-end characteristics now had a significantly cheaper and lower quality option, which is what they would have preferred all along had it been

---

[49] *See supra* note 32.

[50] Dealers have also stated that Control4 was primarily a threat to Crestron's low-end line, and that Savant was a much greater threat to Crestron's high-end market power. *See, e.g.*, Crestron0119657 at Crestron0119659 (August 4, 2009 email from a Crestron dealer, Stereo One, to Crestron. The dealer states "I think the threat of Savant is in the order of magnitude of ten times the threat created by Control4 and should be treated as such. Losing the high end of the business will have a dramatic impact on Crestron's mid-tiered components and those components will need to be discounted . . .Losing this position will sting a lot harder and a lot longer than Control4 taking the low(er) end of the market").

[51] *See* Julie Jacobson, *Introducing Control4: Automation Vets Plan 'Unrivaled' Product Launch* (June 1, 2004 article, stating that "When it rolls out product in the fourth quarter of this year, Control4 will offer its own subsystems such as lighting, multiroom audio, and HVAC control, but it will also support subsystems from other manufacturers."). Available at: http://www.cepro.com/article/introducing_control4_automation_vets_plan_unrivaled_product_launch/.

[52] *See* Raymond James, August 27, 2013 Evaluation of Control4 IPO at 1 ("Control4 has disrupted the sleepy luxury world of home automation, which has been dominated by very expensive solutions for the last 30 years"); Control4 S1 filing at 2 ("Historically, the home automation market was primarily comprised of luxury systems that were so expensive that only wealthy consumers could afford the programming and installation costs.").

available. Economic theory would predict that incumbent high-end suppliers would then lose this group of customers to the newly available low-end product (here Control4). Indeed, when the first low-end supplier enters, the size of the decrease in high-end system sales can actually be greater the *more* distant the low-end substitute is because great distance can mean the low-end substitute much better satisfies a wide range of consumer preferences that previously were not met. Industry reports are consistent with this economic theory: one explained in 2009 that Crestron's introduction of the Prodigy system made "perfect sense" because, now that the lower-end Control4 was an option, it was "more difficult to sell a $100k Crestron system to someone who wants a basic feature set."[53]

53. **Final Ranking**. The above evidence indicates that AMX and Savant's product lines are clearly the closest substitutes in terms of functionality and price range for Crestron's high-end systems. However, the evidence does not clearly indicate whether Savant or AMX is the closest substitute to Crestron's high-end systems. Nonetheless, in this case there is almost no practical difference between ranking Savant before AMX or the opposite – even if one conservatively assumes that Crestron, Savant, and AMX are all in the same market, Crestron has maintained dominant share in the market and restricted a large share of the market.

*3. Hypothetical Monopolist Test Confirms that High-End Market Limited to Crestron, AMX, and Savant is Sufficiently Broad*

54. Given that the above analysis showed that Savant's and AMX's high-end systems are the closest substitutes to Crestron's high-end systems, I start by determining whether a posited market that included only high-end systems from Crestron, Savant, and AMX would satisfy the Hypothetical Monopolist Test.

55. A posited market definition satisfies the Hypothetical Monopolist Test if the evidence indicates that a hypothetical, 100% monopolist in the posited market could profitably raise prices at least 5% above competitive levels.[54] Although sometimes there is data available that allows one to statistically estimate exactly how much a hypothetical 100% monopolist could raise prices if all

[53] Julie Jacobson, *Crestron's Low-Cost Prodigy to Compete with Control4* (July 21, 2009) (noting that a Crestron dealer said that Crestron's introduction of the Prodigy system "makes perfect sense. It will continue to become more difficult to sell a $100k Crestron system to someone who wants a basic feature set."), available at http://www.cepro.com/article/crestrons_low_cost_prodigy_to_compete_with_control4/.

[54] DOJ/FTC Horizontal Merger Guidelines §4.1-4.2 (2010).

competition were eliminated, the hypothetical monopolist test is still useful when the necessary data is not available.[55] In those cases, economists look to other types of evidence that can indicate whether a hypothetical 100% monopolist could likely raise prices significantly above competitive levels.

56. Here, two types of evidence indicate that a posited market that includes only Crestron's high-end systems, Savant's high-end systems, and AMX's high-end systems would likely satisfy the hypothetical monopolist test.

57. **a. Significant Functional Differences**. First, the significant functional differences between high-end systems, such as Crestron's high-end systems, Savant, and AMX, and low-end systems like Control4, makes it unlikely that a large enough percentage of customers would switch to Control4 in response to a hypothetical 100% high-end monopolist raising prices by 5% above the competitive level to make the price increase unprofitable. As I explained above in Part I.A.2, the next closest substitute for Crestron's high-end systems (after Savant and AMX) is Control4, but Control4 systems have several major functional disadvantages, including less customizability, compatibility, and speed.[56] These functional differences would deter many high-end system customers from switching to Control4 in response to a price increase by a 100% high-end monopolist. To be sure, when Control4 entered the market and provided a low-end option for the first time, many customers did switch, but those were customers with low-end preferences who otherwise would have been stuck buying a high-end product. The issue here is whether, now that Control4 already has captured the customers with low-end preferences, a 5% price premium over competitive levels in high-end system prices would cause a large number of *additional* high-end customers to switch to Control4 even though, by definition, their preferences were sufficiently high-end not to switch because of the mere existence of the low-end option.

[55] DOJ/FTC Horizontal Merger Guidelines § 4.1.3 (2010) ("Even when the evidence necessary to perform the hypothetical monopolist test quantitatively is not available, the conceptual framework of the test provides a useful methodological tool for gathering and analyzing evidence pertinent to customer substitution and to market definition.").

[56] Functional differences are one of the factors economists analyze when determining whether a market likely satisfies the hypothetical monopolist test. *See* DOJ/FTC Horizontal Merger Guidelines § 4.1.3 ("In considering consumers' likely responses to higher prices, the Agencies take into account any reasonably available and reliable evidence, including but not limited to: . . . objective information about product characteristics and the costs and delays of switching products, especially from switching from products in the candidate market to products outside the candidate market.").

58. **b. Significant Crestron Price Cuts in Response to Competition from Savant**. A second source of evidence that indicates eliminating all competition between Crestron, Savant, and AMX (or even just Crestron and Savant) would significantly raise prices is that Crestron has often significantly reduced the prices of its high-end systems specifically in response to competition from Savant.

59. For example, Savant gained a major foothold in the Phoenix area when Phoenix's biggest dealer, Cyber Sound & Security, started buying Savant products in December 2009.[57] Cyber Sound had previously purchased significant amounts of high-end products from Crestron, but by April 2011 had switched almost entirely to Savant.[58] Crestron responded in May 2011 by providing 50% discounts to dealers whenever they were bidding for a client against Savant in Phoenix.[59] As one example, in July 2011 Crestron reduced its price by 50% (equal to a $1,162.50 reduction in value) to the dealer "Acoustic Designs" in Phoenix in response to competition from Savant.[60] Similarly, in August 2011 Crestron reduced its price by 50% (equal to $14,700 in value) to the dealer Theater X in Scottsdale (right outside Phoenix) in response to competition from Savant.[61] These 50% discounts in response to competition from Savant indicate that Creston's normal pricing is double (i.e., 100% higher than) the competitive level, which far exceeds the 5% level at which economists usually consider a market sufficiently broad under the Hypothetical Monopolist test.

60. A similar story occurred in Park City, Utah. On April 30, 2010, Crestron learned that one of its dealers in Park City, S3, could not obtain a particular client's business at Crestron's normal prices because the client was very interested in Savant.[62] In response, Crestron's Regional Sales Manager for the area

[57] Cyber Sound & Security has customer number 10284 in the Savant sales data and 1000584 in the Crestron sales data. *See* "15 Concrete Examples.xlsx", "Cyber Sound" tab.

[58] *See* "15 Concrete Examples.xlsx", "Cyber Sound" tab

[59] Crestron0133959 (May 2011 internal Crestron e-mail stating that "6 dealers have been chosen and notified of our special deal of 50% off Creston to steal business from Cybersound. They are: Dennis Sage Home Entertainment, Avalon Audio, Creative Sound & Integration, Theater X, Acme AV, Elite Home Technologies. All have been told that this discount is exclusively to be used for winning projects against Cybersound when selling Savant and C4.").

[60] Crestron0031251.

[61] Crestron0145231.

[62] Crestron0081616.

requested that Crestron reduce its price to this dealer by 10%.[63] This 10% discount specifically in response to competition from Savant indicates that Creston's normal pricing is at least 11% above the competitive level, which far exceeds the 5% level at which economists usually consider a market sufficiently broad under the Hypothetical Monopolist test.

61. The same thing happened in New York as well. On June 2, 2010, Crestron provided a 20% "competitive discount" to the dealer "Bri-Tech" specifically in order to "sell against Savant."[64] This 20% discount specifically in response to competition from Savant indicates that Crestron's normal pricing is at least 25% above the competitive level, which again far exceeds the 5% level at which economists usually consider a market sufficiently broad under the Hypothetical Monopolist test.

### *4. Relevant Geographic Market is the United States and Canada*

62. Three sources of evidence in this case indicate that it is conservative but appropriate to use a relevant geographic market limited to the United States and Canada.

63. **a. Crestron's Region-Specific Responses to Savant Competition**. First, evidence that Crestron provides significant discounts in regions of the United States where Savant is able to gain a significant foothold indicates that even smaller regional markets are sufficiently broad to properly constitute distinct relevant markets under the hypothetical monopolist test. The Merger Guidelines explain that it is proper to define markets based on the locations of customers when the products are shipped to customers and hypothetical monopolists are able to price discriminate between customers based on their location.[65] Specifically, the Merger Guidelines state that a regional market defined by customer location is sufficiently broad if a hypothetical monopolist to customers in the region "would impose at least a [5% increase above competitive levels] on some customers in that

[63] Crestron0081616 ("I am requesting a 20% non-DRP eligible sale. That means we are giving up 10% above what we would normally give S3 as they are at a 10% DRP level.").

[64] Crestron0138644 at Crestron0138645.

[65] DOJ/FTC Horizontal Merger Guidelines §4.2.2 (2010) ("When the hypothetical monopolist could discriminate based on customer location, the Agencies may define geographic markets based on the locations of targeted customers. Geographic markets of this type often apply when suppliers deliver their products to customers' locations.").

region."[66] Here, the evidence shows that: (1) high-end control system suppliers such as Crestron and Savant ship their systems to dealers,[67] and (2) Crestron has actually provided discounts in excess of 5% to dealers in particular regions specifically in response to competition from Savant, meaning that eliminating competition between Crestron and Savant would cause those dealers to suffer at least a 5% increase in prices.[68] This evidence thus indicates that regional markets that were even smaller than the United States would be sufficiently broad to satisfy the hypothetical monopolist test.

64. Because regional markets smaller than the United States would satisfy the hypothetical monopolist test, by definition a larger market that includes multiple regional submarkets would also satisfy the hypothetical monopolist test. Using a market definition that is broader that the narrowest market that satisfies the hypothetical monopolist test tends to produce market shares that conservatively *under*estimate market power,[69] meaning that using a broader geographic market that consists of the United States and Canada biases this analysis towards finding that Crestron does not have market power. In this case, I use the geographic market definition of the United States and Canada because: (a) it simplifies the analysis, (b) it is congruent with the geographic economies of scope in this industry, and (c) conservatively using this broader market definition does not alter my conclusion that Crestron has monopoly power and market power.

65. **b. Evidence Indicates There are Economies of Scope Within the U.S. and Canada That Do Not Extend Elsewhere**. A geographic market limited to the United States and Canada is appropriate also because the evidence indicates that there are economies of scope within the United States and Canada that do not extend elsewhere. Crestron deposition testimony indicates that there are economies of scope in the United States and Canada that do not extend elsewhere. For example, Crestron's Chief Financial Officer explained that, from an

---

[66] DOJ/FTC Horizontal Merger Guidelines §4.2.2 (2010) ("The hypothetical monopolist test requires that a hypothetical profit-maximizing firm that was the only present or future seller of the relevant product(s) to customers in the region would impose at least a SSNIP on some customers in that region.")

[67] Savant and Crestron's detailed sales databases both show that they ship their products to the dealers' addresses.

[68] *See infra* Part I.A.3.c.

[69] DOJ/FTC Horizontal Merger Guidelines § 4.1.1 ("Because the relative competitive significance of more distant substitutes is apt to be overstated by their share of sales, when the Agencies rely on market shares and concentration, they usually do so in the smallest relevant market satisfying the hypothetical monopolist test.").

operational standpoint, Crestron considers the U.S. and Canada to be part of the same region, but does not consider any other countries to be part of the same region.[70] Similarly, one of Savant's regional residential sales territories covers both the U.S. and Canada, but none of Savant's regional sales territories in the U.S. also cover any other foreign countries.[71] This indicates that there are regional economies of scope in the United States and Canada that do not extend elsewhere.

66. **c. Crestron Statements Indicate Demand for Home Control is Different Elsewhere**. A third reason why it is proper to use a geographic market limited to the United Stata and Canada is that the evidence indicates that demand for control systems is significantly different elsewhere. For example, a third-party report from 2007 attributes to Crestron the position that "Crestron continues to see the highest growth rates in the U.S., but perceives that Europe has future potential (3-7 years) for high growth rates."[72] These differential rates of growth indicate that the demand for control systems is significantly different between the United States and Europe.

### *5. Dealer Demand for High-end Systems Is Fragmented*

67. The fact that a relevant market exists does not mean it is an undifferentiated market, where homogeneous products each have the same appeal to all buyers for all their purchases. Although all high-end systems are reasonably interchangeable substitutes for each other in most situations, dealer demand for high-end systems is differentiated because some end-users prefer Crestron's brand or a particular Crestron system so much that they are not willing to switch to rival products at all, or would be willing to switch only if the rival high-end systems were priced substantially lower than the Crestron systems. As I explain further in Part V.B, this fragmented demand within each relevant market means that many

---

[70] Deposition of Dave Hakula at 34-35 ("Q: Does Crestron include Canada in its domestic sales data? A: For operational reporting, yes, we do. Q: Why? A: Because we just consider it an extension of the U.S. . . . From an operational standpoint, to us Canada is no different that the western region [of the United States], okay. . . Q: Operationally, are other foreign countries also included with the domestic sales? A: No.").

[71] SAVANT1543753 at slide 3 (October 1, 2012 internal Savant slideshow titled "Sales Organization & Channel Alignment: Draft Execution Plan". A slide titled "Residential Regional Sales Managers Territories notes that a single Regional Sales manager is responsible for the "New York Metro and Canada" region): id. at 2 (distinguishing "North American Residential Regional Sales Team" form "International Team.").

[72] Parks Associates, Home Systems: Home Controls 2007 Update, Appendix page 63.

dealers cannot avoid Crestron's disloyalty penalties by immediately switching 100% of their system purchases to rival products.

68. Crestron deposition testimony confirms that some homeowners prefer Crestron, others prefer Savant, and still others are essentially indifferent between the two.[73] Crestron's internal documents also confirm that it recognizes that its systems have problems and are arguably inferior to Savant's systems in several ways. For example, one Crestron salesperson wrote in July 2011 that many of his dealers are "becoming disinterested in Crestron" and "have expressed utter disgust with our [Crestron's] product failures this year and subsequent complications (time) used up for completing any Crestron system now."[74] He explained that "some dealers are . . . having to go back on EVERY job to replace multiple failed input/output cards and room boxes."[75] He continued, explaining that Savant's "super simple programming" would allow dealers to "dump their $100k+ per year 'Crestron guy' and replace him or her with 1 or 2, $33k per year, untrained bodies."[76]

### *B. Market Shares*

69. Crestron has had a dominant share in the high-end systems market from January 2007 to the present.

---

[73] Klein 30(b)(6) Deposition at 128-129 ("Q: Sometimes homeowners ask for a specific automation and control brand such as Crestron, is that right? A: Sometimes they ask for specific brands? Q: Yes. A. Yes. Q: Is it your experience that sometimes end user will ask specifically for Crestron? A: Yes. Q: And in your experience sometimes end user will ask for Savant; is that correct? A: Yes. Q: And then at other times the end users simply seek input from the dealer as to which brands the dealers think would be appropriate; is that correct? A: I believe so. . . . "Q: And sometimes those end users would prefer to have a Crestron over a Savant system, correct? A: Sometimes, yes. Q: And sometimes the other way around, sometimes an end users might want Savant instead? A. Yes.").

[74] Crestron0177497 at Crestron0177498 (internal Crestron document written by regional sales employee, dated July 24, 2011. It states "The key reasons for dealers becoming disinterested in Crestron is purely dollars. Even my most trained dealers (AVD, Kiwi, Newport A/V, SaiTech, Henry's TV, etc…) have all expressed utter disgust with our product failures this year and subsequent complications (time) used up for completing any Crestron system now. Some dealers are spec'ing double hours on DM bids now just due to having to go back on EVERY job to replace multiple failed input/output cards and room boxes. This is unacceptable, especially when our tech support response is to just swap product.").

[75] Crestron0177497 at Crestron0177498.

[76] Crestron0177497 at Crestron0177498.

70. Crestron's own past statements indicate that it has a dominant share of high-end residential sales. Crestron's own litigation position is that, at least as of May 4, 2011, it had "approximately a 50% share of the 'high end' residential market", though it is unclear which products it included in its definition.[77] In August 2010, a Crestron employee emailed a potential business partner and stated that "Crestron control systems are at the heart of the integrated home (80% market share in the high end category)."[78] On July 10, 2009, notes for a Crestron Regional Director meeting instructed salespeople to tell dealers that "We can handle Savant, we have a 98% market share."[79] Similarly, Crestron's Director of Business Development sent a letter to Pandora Internet Radio in December 2010 stating that "in additional to our mainstream products, Crestron's high performance solutions enjoy 85% market share in the ultra high-end residences."[80] A Crestron slideshow meant to be presented to dealers likewise states that "Crestron has a 95% market share in the CEDIA marketplace."[81] (CEDIA is the "Custom Electronic Design & Installation Association," and includes many dealers).[82] This is also consistent with a third-party industry report from June 2007 stating that "Crestron holds 80% of the unit high end customer whole house controller sales."[83]

71. Savant and Crestron sales data confirm that Crestron has had a dominant share relative to Savant since Savant's inception. To focus solely on high-end residential system sales, I removed from Crestron's database any lighting products (which are in a distinct lighting market) and low-end products (Prodigy

[77] May 4, 2011 Declaration of Randy Klein In Opposition to Plaintiff's Motion for an Order Setting a Scheduling Conference ¶3 ("At the present time, Creston holds approximately a 50% share of the 'high end' residential market.").

[78] Crestron0172688.

[79] Crestron0085203 at Crestron0085204 (notes of July 10, 2009 Crestron Regional Director meeting. In response to a hypothetical dealer stating "Crestron must be worried about Savant given the position you are taking?" the notes respond "No, I am worried about you and your long term success. We can handle Savant, we have a 98% market share.").

[80] Crestron0170553.

[81] Crestron0170565 at Crestron0170571 (this document does not specify what time period it is referring to).

[82] CEDIA stands for "Custom Electronic Design & Installation Association"

http://www.cedia.net/about ("CEDIA, the Custom Electronic Design & Installation Association, is the leading global authority in the $14 billion home technology industry. CEDIA represents 3,500 member companies worldwide and serves more than 22,000 industry professionals that manufacture, design, and integrate goods and services for the connected home.").

[83] Parks Associates, *Home Systems: Home Controls 2007 Update* (June 2007) at 58 ("Today, Crestron holds 80% of the unit high end custom whole house controller sales with AMX at about 20%").

and Adagio). I similarly removed Savant's lighting products from its database. I limit my analysis to July 1, 2007 through September 30, 2013, which is the period of time for which I have complete sales data from both Savant and Crestron.[84]

72. Because Crestron did not produce detailed Canadian data, and AMX has not produced any data, I estimated the firms' shares by combining the US data from Creston and the Canadian and US data from Savant with other sources. I explain the steps below.

73. First, I calculated Crestron's and Savant's shares of high-end sales relative to each other (excluding AMX) and solely within the United States. Because both Crestron and Savant produced detailed sales data for the United States, I can calculate these figures solely using their data. Figure 1 below shows that Crestron's share of Crestron and Savant high-end residential sales in the United States has ranged from 68-100%.

**Figure 1: Crestron and Savant Shares of High-End Residential Sales in U.S. Relative to Each Other[85]**




[84] I also excluded maintenance and programming services, which are likewise in a separate market.

[85] *See* "27 Crestron Savant U.S. High-end Shares Calendar Year.csv".

74. Second, I calculated Crestron's and Savant's high-end residential shares relative to each other (excluding AMX) in both the U.S. *and* Canada based on: (1) detailed Savant sales data in the United States and Canada, (2) detailed Crestron sales data in the United States, and (3) estimates of Crestron's high-end residential sales in Canada. Crestron has produced aggregate data indicating that its sales of residential control system products (this aggregate data does not break it down between high-end and low-end) in the United States constituted approximately 92-95% of Crestron's total residential control system sales in the United States and Canada.[86] Using this information, I can estimate Crestron's high-end residential sales in Canada.[87] Figure 2 below shows that Crestron's share of Crestron and Savant high-end residential sales in the United States *and Canada* has ranged from 70-100%.

[86] Crestron2558639, row 13.

[87] To be exact, I calculate Crestron's high-end sales in the U.S. and Canada in any given year as its actual high-end residential sales in the U.S. (calculated using detailed Crestron sales data) divided by the percentage of Crestron's total residential revenue in the U.S and Canada that was to the United States (based on Crestron's aggregate data - Crestron2558639). Because Crestron's aggregate data is in fiscal years that run from July1 to June 30 (splitting the calendar years in half), I calculate an average aggregate percentage for each calendar year based on the two fiscal years that are in that calendar year. The exceptions are: (1) calendar year 2007, for which I rely only on aggregate data for the fiscal year spanning July 2007 to June 2008 because Crestron's detailed sales data starts in July 2007, (2) calendar year 2012, for which I rely only upon aggregate data for the fiscal year ending in June 2012 because Crestron did not produce aggregate data covering the fiscal year ending in June 2013, and (3) calendar year 2013, for which I rely on the aggregate data for the fiscal year ending in June 2012, for the same reason just noted.

**Figure 2: Crestron and Savant Shares of High-End Residential Sales in U.S. *and Canada* Relative to Each Other**[88]




75. Lastly, I calculated Crestron's, Savant's, *and* AMX's shares of high-end residential sales in both the U.S. and Canada based on estimates of AMX's share relative to Crestron and Savant. Although I do not have AMX's transactional sales data, information about its residential sales from other sources allows me to estimate Crestron's share of all high-end residential sales in the United States and Canada by Crestron, Savant, and AMX. As of 2007, independent industry reports indicate that AMX had approximately $25-27 million in U.S. residential control system sales.[89] By comparison, Crestron had $50.6 million in high-end sales in the U.S. *solely for the first half of 2007*,[90] meaning that its pro-rated annual sales for 2007 would be $100.2 million. Savant's sales were negligible, meaning that Crestron had approximately a 79-80% share of a market that included Crestron, AMX, and Savant in 2007. This calculation is consistent with third-party industry reports, which indicate that, in 2007, Crestron held "80%

---

[88] *See* "27 Crestron Savant U.S. & Canada High-end Shares Calendar Year.csv".

[89] 2007 Parks Report at appendix p. 35 ("Parks Associates estimates that [AMX's] RESIDENTIAL controls revenue are between $40-45M USD. 60% of sales in U.S.").

[90] *See* "27 Crestron Savant U.S. High-end Shares Calendar Year.csv". Crestron has produced complete data only from July 2007 to September 2013.

of the unit high end customer whole house controller sales with AMX at about 20%."[91] Later documents indicate that AMX's share of Crestron, Savant, and AMX high-end residential sales has decreased significantly since 2007. For example, one of Crestron's Regional Sales Managers stated in July 2010 that "AMX is a dead duck now and moving forward. They are struggling and are sinking pretty fast in the residential market."[92] Consistent with AMX's share dropping significantly, a January 2011 Savant presentation indicates that, between Crestron, Savant, and AMX, AMX had only a 5.3% share, as compared to 87.7% for Crestron and 7.0% for Savant.[93]

76. Based on this data, I estimate AMX's share of high-end residential sales between Crestron, Savant, and AMX as shown below in Table 2. In short, I assume that AMX's share decreased linearly from 2007, when I know it to be 20%, to 2011, when I know it to be 5.3%. I also assume that AMX's share did not decrease further in 2012 and 2013, which is likely a conservative assumption given Crestron's assessment that AMX was "sinking pretty fast in the residential market."[94]

---

[91] Parks Associates Report 2007, Appendix Page 58.

[92] Crestron0003284 (July 2010 internal Crestron email from Rob Christensen, a regional sales manager at Crestron, explaining that a residential dealer "can't go to AMX" because "AMX is a dead duck now and moving forward. They are really struggling and are sinking pretty fast in the residential market. If [the dealer] said SAVANT, that would be a more effective threat.").

[93] Keynote Presentation Attached to SAVANT1661634 (internal Savant email dated January 29, 2011) at slide 3 (Slide titled "Market Share vs. Top 3 Competitors". It has two pie charts, one titled "Commercial" and another "Residential". The residential pie chart lists four firms, with the following "Market Shares", Crestron: 68.5; AMX: 4.1%; Control4: 21.92%; Savant: 5.48%). AMX's estimated share between Crestron, Savant, and AMX is thus 4.1/ (4.1 + 68.5 + 5.48), which equal 5.3%.

[94] *See supra* note 92.

| Table 2: Estimates of AMX shares out of Crestron, Savant, and AMX High-end Residential Sales | | |
|---|---|---|
| **Year** | **Estimate of Share** | **Source** |
| 2007 | 20.0% | 2007 Parks Report |
| 2008 | 16.3% | Linear approximation of share between 2007 and 2011 data points |
| 2009 | 12.6% | |
| 2010 | 8.9% | |
| 2011 | 5.3% | 2011 Savant Document |
| 2012 | 5.3% | Assumed same as 2011 |
| 2013 | 5.3% | |

77. Figure 3 below shows that Crestron share of Crestron, Savant, *and AMX* high-end residential sales in the United States and Canada has ranged from 66-83%.

**Figure 3: Shares of High-End Residential Control System Sales in U.S. and Canada[95]**




95 *See* "27 Crestron Savant AMX U.S. & Canada High-end Shares Calendar Year.csv".

### *C. Monopoly Power*

78. Throughout the relevant period, Crestron has had monopoly power in the high-end system market. Three independently sufficient bases confirm this conclusion: (1) high market shares coupled with high barriers to entry and expansion; (2) direct evidence that Crestron has the power to exclude rivals; and (3) Crestron's demonstrated power to control prices.

#### *1. High Market Shares Coupled with High Barriers to Entry and Expansion*

79. Crestron's high market share combined with high barriers to entry and expansion supports an economic inference of monopoly power. From July 2007 to September 2013, Crestron's share has ranged from 66-83% of the high-end residential system market. These high market shares (coupled with entry barriers) indicates monopoly power because it makes it more likely that Crestron has power over price. Crestron's high market share also allows Crestron to act as a unitary actor and impose collective action problems on dealers without being hampered by a collective action problem itself.[96] Crestron's high market shares also indicate that (1) Crestron controls enough of the market to restrict a substantial share and (2) Crestron will profit from a successful exclusionary scheme more than firms with smaller market shares would.[97]

80. The high-end system market has at least six barriers to entry and expansion that make it hard for new rivals to enter and for existing rivals to expand in a way that could restrain Crestron's market power.

81. **a. Research and Development**. Because the high-end system market evolves quickly, firms must continue to invest in research and development to stay competitive. For example, Savant invested over $6 million in research and development in 2007,[98] $5.9 million 2008,[99] over $3.3 million in 2009,[100] over $7.8

[96] Einer R. Elhauge, *Defining Better Monopolization Standards*, 56 STAN. L. REV. 253, 336 (2003).
[97] *Id.* at 335.
[98] SAVANT0200133.
[99] SAVANT0200133.
[100] SAVANT0131365 at SAVANT0131369 (Savant 2008 and 2009 financial statements, indicating that Savant spent a total of $3,356,801 on "Research and Development" in 2009 and $5,973,208 in 2008).

million in 2010, and over $9.1 million in 2011.[101] Crestron's deposition testimony confirms that one must invest significantly in research and development to compete in the high-end system market.[102]

82. **b. Intellectual Property Protection**. Second, many of the necessary technologies for making high-end systems are covered by intellectual property protection. For example, both Savant's and Crestron's programming software is copyrighted, so a new firm trying to enter the high-end system market would have to develop brand new programming software.[103] Similarly, both Savant and Crestron hold patents for various designs and functionalities, such as Savant's TrueImage and On-Screen Display patents, which new entrants would have to design around.[104]

83. **c. Economies of Scale**. Economies of scale in production significantly limit the ability of new firms to enter and constrain larger firms' prices. There are economies of scale in the production of high-end systems, meaning that the per-unit cost of producing high-end systems is lower in time periods where the manufacturer produces more units of high-end systems. I show in Part VI.E below that Savant's per-unit costs are significantly lower at high volumes.

84. **d. Dealer Switching Costs**. Dealer switching costs also pose a significant barrier to entry and expansion in both relevant markets. Because programming and installing a high- or low-end system is complex, dealers must expend time and money to learn how to install a particular type of system.[105]

---

[101] *See* Statement of Operations, Savant Systems LLC Financial Statements for the Years Ended December 31, 2011 and 2010, prepared by DiCicco, Gulman & Company LLP.

[102] Klein 30(b)(6) Deposition at 23 ("A: . . . we [Crestron] invest a great deal in R& D and on developing new products. We're noted for that. We're noted as a new technology product. We win lots of awards for new products. And so as a company that invests a lot in new products, and we don't buy products from other people, typically we have a lot of research and development resources, we introduce these new products every year.").

[103] Klein 30(b)(6) Deposition at 121-122 ("A: . . . our software is copyrighted, and you have to be authorized to use it. And we authorize by signing the dealer agreement.").

[104] *See, e.g.* U.S. Patent No. 8,659,705 (Savant On Screen Display patent); U.S. Patent No 7,930,644 (Savant Racepoint Blueprint Graphical Programming Environment Patent); U.S. Patent No. 8,619,950 (Crestron patent video and digital audio transport patent.).

[105] Klein 30(b)(6) Deposition at 75-76 ("A: Many of these dealers are not – they are not large companies. They have – they are smaller companies, they have limited resources, and it takes a lot of day-to-day practice, and it takes a lot of dedication and commitment to be skilled at a product line, and if they take on multiple product lines, then that skill and that expertise

Further, installation methods vary by brand (e.g., Crestron vs. Savant). Consequently a dealer must expend time and money in order to learn how to program and install a new brand. These switching costs limit the ability of new firms to enter and expand in the market.

85. **e. Long Lead Times Prevent Immediate Expansion**. Another barrier to expansion is the long time it takes to manufacture high-end system components. For example, if Savant placed a new order for its top-selling product, item number VIM-30D4-06 (a video input module used with digital media switchers), that order would not be ready until about 140 calendar days later.[106] Consequently, if Crestron restricted its own output and raised prices, it would take at least 140 days for Savant to increase its output.

86. **f. Crestron's Exclusive Dealing**. I present the evidence showing that Crestron has engaged in exclusive dealing below in Part II. Crestron's exclusive dealing has restricted approximately 51-77% of the market from 2008 to 2013. This has significantly limited the ability of competitors such as Savant to expand their sales.

87. **g. Lack of Entry Confirms High Entry Barriers**. The existence of high entry barriers is confirmed by the fact that there were no new entrants in the high-end system market since Savant entered the market over six years ago in 2007.[107] This lack of successful entry indicates high barriers to entry, given the high profit margins earned by Crestron and other competitors. Savant currently earns a 43% profit margin,[108] and Crestron's profit-margin has always exceeded 53%.[109] If barriers to entry were low, then rivals would quickly enter to obtain those high profit margins. The absence of new entrants would not be a serious problem if the market were unconcentrated. But to the contrary, the high-end

becomes fragmented and the burden of customer support, and ultimately the ability to deliver a quality product to the end user is compromised."); Bargetzi Deposition at 49 ("A: in order to do Crestron well, and I think in order to do really any of the sophisticated products well, you have to be focused on it. You have to do it on a regular basis. It is not something that you can just pick up after a year or two or six months and get back into it and do the same job that you would do if you were doing it on a regular basis.").

[106] *See* "J03 Savant Product Leadtimes.csv". Savant's Salesforce database tracks the lead times of its products.

[107] In other words, no firm that was an equally close (or closer) substitute to Crestron's high-end systems than Savant or AMX has entered since Savant entered the market over six years ago.

[108] *See* "48 total incremental costs.csv".

[109] *See* "16 Crestron Gross Profit Margins.xlsx".

system market has had a Herfindahl-Hirschman Index ("HHI") of at least 5,222 (out of a maximum of 10,000), which indicates extreme concentration.[110]

### *2. Crestron's Demonstrated Power to Exclude Rivals*

88. Crestron's monopoly power is confirmed by direct evidence that it actually exercised that power to exclude rivals. Standard antitrust economics shows that firms that are able to exclude rivals from competing to win business have monopoly power. The reason is that, absent monopoly power, a firm's attempts to exclude rivals would be unavailing because the buyers would simply switch to purchasing from a rival firm. In contrast, buyers may not be able to switch from a firm that has monopoly power, giving the firm the ability to impose exclusionary conditions on its buyers that can adversely affect rivals. The evidence shows here that Crestron was able to restrict 51-77% of the market while maintaining a market share in excess of 66%. This ability to profitably restrict customer decisions confirms that Crestron has monopoly power.

### *3. Crestron's Demonstrated Power over Price*

89. Direct evidence of Crestron's power over pricing also confirms Crestron's monopoly power. The ability to increase prices above competitive levels is a hallmark of monopoly power. This means that evidence that Crestron's can raise its prices above competitive levels shows Crestron's has monopoly power. Sales data shows that Crestron earns higher profit margins on its high-end systems than Savant. Crestron's profit margins have always exceeded 53%,[111] whereas Savant's have never exceeded 48%.[112]

---

[110] The Herfindahl-Hirschman Index (HHI) is simply the summed squares of market shares. *See supra* Part I.B (calculating market shares); *See also* DOJ/FTC Horizontal Merger Guidelines §5.3 (2010) (merger guidelines presuming anticompetitive effects are likely with an HHI above 2,500). The minimum HHI in this market was in 2013, when Crestron's share was 66%, Savant's was 29%, and AMX's was 5%. The HHI for 2013 is thus 66^2 + 29^2 + 5^2, which equals 5,222.

[111] *See* "16 Crestron Gross Profit Margins.xlsx". This is consistent with Crestron's internal calculations indicating that it earned on average a 61.94% margin on its residential sales in the United States in 2012. *See* Crestron2558639.xlsx.

[112] *See* "48 total incremental costs.csv".

## II. Description of Crestron's Exclusive Dealing

90. The evidence indicates that Crestron has communicated to all of its dealers in the United States that they had to make a choice between selling Crestron or Savant – not both. The economic literature generally refers to this type of conduct as "exclusive dealing", and shows that exclusive dealing has both potential anticompetitive effects and potential procompetitive effects.[113] In this section, I present the evidence showing that Crestron has engaged in exclusive dealing. I then analyze whether this conduct has any procompetitive effects in Part III, and analyze whether it has anticompetitive effects in Parts IV-VI. I ultimately find that Crestron's exclusive dealing does not have any procompetitive effects, but has significant anticompetitive effects.

91. Part A of this section explains that, around June 2008, Crestron instituted a policy of telling its dealers that they had to make a choice between Crestron and Savant, and that Crestron would terminate their dealerships if they sold Savant. Part B then explains the numerous ways in which Crestron implemented this policy.

### *A. Crestron's Executives Instituted a Corporate Policy of Telling Dealers That They Had to Make a Choice Between Crestron and Savant*

92. Crestron's deposition testimony and documents show that its executives ordered its salespeople to check which dealers were selling Savant and tell dealers that they had to make a choice between Crestron and Savant.

93. **<u>a. Deposition Testimony of Crestron's Chief Executive</u>**. Crestron's Chief Executive, Randy Klein, testified at deposition that in general there was a "practice" of communicating the "message" that "we [Crestron] don't want our dealers . . . to represent competitive or Savant brands."[114] He similarly testified that Crestron made sure to "find out if they [dealers] are selling Control4 and Savant and ask them [the dealers] to choose" between Crestron and Savant.[115]

---

[113] *See, e.g.*, Bernheim & Whinston, *Exclusive Dealing*, 106 Journal of Political Economy 64, 65 (1998) ("A manufacturer engages in exclusive dealing when it prohibits a retailer or distributor that carries its product from selling certain other products (typically those of its direct competitors).").

[114] Klein 30(b)(6) Deposition at 168-169.

[115] Klein 30(b)(6) Deposition at 216.

94. **b. Internal Crestron Statements by Executives Confirm Policy**. On June 7, 2008, Crestron's Chief Executive, Randy Klein, ordered Crestron employees to "poll every residential dealer to see if any of them are representing Savant."[116] Later that month, a regional director at Crestron emailed his sales team, explaining that "it is required that you visit your dealers and ask these questions, press them, look them in the eye and tell them we have a 'zero tolerance policy' on Savant."[117] Similarly, July 2009 internal notes from a Crestron "Regional Director meeting" includes the statement "Dealer: You cannot represent both Crestron and Savant. Zero Tolerance," indicating that Crestron was ordering its salespeople to tell this to dealers.[118] This continued into August 2010, when Randy Klein instructed another Crestron employee to make a dealer "make a decision now . . . they represent us or Savant, but not both."[119] And in January 2011, Randy Klein held another meeting with Crestron employees, and ordered that "we [Crestron] need to ask them [dealers] to commit to us", and to tell dealers "if you don't make that commitment, . . . we will review your dealership and you may be subject to termination."[120] Moreover, the evidence indicates that Randy Klein would not allow dealers to become Crestron dealers unless they agreed to "drop" Crestron's competitors.[121]

95. **c. Internal Crestron Statements by Lower-level Crestron Employees Confirm Crestron's Exclusive Dealing Policy**. Statements by Crestron salespeople confirm that Crestron had a general policy of making dealers choose between Crestron and Savant. For example, in May 2009, a Crestron salesperson reported to his supervisor that "I had to tell [a dealer] that it is our policy that you cannot be a Savant dealer and a Crestron dealer and if [the dealer] went forward with a demo order and dealer agreement with Savant that my boss would terminate their Crestron dealership."[122] The salesperson's supervisor

[116] Crestron0137437.

[117] Crestron0137437 (June 7, 2008 email sent from Dave Sell, the Regional Director of Crestron West, to his team).

[118] Crestron0085203 at Crestron0085205.

[119] Crestron0124727 (August 5, 2010 email from Crestron's Chief Executive, Randy Klein, to another Crestron employee stating "they [the dealer Interhome] need to make a decision now … they represent us or Savant, but not both. Their choice. But make them make it.").

[120] Klein 30(b)(6) Deposition 164.

[121] Crestron0192220 (October 22, 2007 email from Randy Klein to the Director of Crestron West, stating that "I cannot support [this dealer's] application [to become a Crestron dealer] without a firm knowledge of how much business they're doing with our competitors, and a firm commitment to drop them.").

[122] Crestron2558269 (May 15, 2009 internal Crestron email from the Director of Crestron Midwest stating "As Randy has told us many times our dealers cannot have Savant. Yes we will

affirmed this policy, stating that Crestron's Chief Executive, Randy Klein, has "told [Crestron employees] many times our dealers cannot have Savant," and affirmed to a salesperson that Crestron "will terminate [dealer] agreement if [the dealer] becomes a Savant dealer."[123] Similarly, in July 2009 Crestron salespeople reported to their managers that "any dealer signing up Savant, will be warned to choose: Crestron or Savant, not both. If they can't commit to us, they will be dropped."[124] Crestron salesperson likewise explained to a dealer in August 2009 that "Any dealer that carries Savant will not be able to continue with Crestron."[125] These examples show that Crestron's salespeople understood that there was a general policy of telling dealers that they had to choose between Crestron and Savant, and that they communicated this policy to dealers.

### *B. Crestron Implemented Its Exclusive Dealing Policy in Numerous Ways*

96. Crestron implemented its policy of telling dealers that they had to make a choice between Crestron and Savant in at least three ways: (1) distributing "comparison guides" to dealers that included the statement "you can't be a Crestron dealer and also sell Savant products!", (2) publicly filing a legal complaint against the dealer Cyber Sound, alleging that Cyber Sound's efforts to sell Savant violated the "best efforts" clause in Crestron's dealer agreements, and (3) direct communications with individual dealers.

#### *1. Distributing Comparison Guides*

97. One way Crestron communicated its exclusive dealing policy to dealers was by distributing "Comparison Guides" that included the statement "Remember, you can't be a Crestron dealer and also sell Savant products!"[126] Crestron's discovery responses state that it distributed these agreements to at least

---

terminate the Stereo One Crestron agreement if they become a Savant dealer." In this same email chain, a Crestron sales representative explains that "I had to tell [the dealer Stereo One] that it is our policy that you can not be a Savant dealer and a Crestron dealer and if he went forward with a demo order and dealer agreement with Savant that my boss would terminate their Crestron dealership.").

[123] Crestron2558269.

[124] Crestron0119464.

[125] Crestron0097982 at Crestron0097983 (August 21, 2009 e-mail from a Crestron employee to Entertainment Engineering, a dealer in Houston, stating "Any dealer that carries Savant will not be able to continue with Crestron.").

[126] *See* Exhibits E-H to Savant's Amended Complaint.

11 dealers, from at least May 11, 2009 to March 30, 2011.[127] However, the evidence indicates that more dealers received comparison guides with this exclusivity language than Crestron indicated in its discovery responses. For example, the evidence indicates that the dealer "Big Picture Solutions", in Palm Beach Florida, showed Savant comparison guides it had received that stated "Remember, you can't be a Crestron Dealer and also sell Savant products!",[128] but Crestron's discovery responses do not list that dealer as having received any comparison guides.

### *2. Lawsuit Against Cyber Sound*

98. Crestron also communicated its exclusive dealing policy to dealers by publicly filing a legal complaint against Cyber Sound & Security, a dealer in Phoenix, Arizona. Crestron requires all of its dealers to sign its Crestron dealer agreements,[129] and all of its dealer agreements include a standard clause that requires the dealer to "exercise its best efforts to promote the use and sales of Crestron Products."[130] On June 16, 2011, Crestron publicly filed a legal complaint against Cyber Sound alleging (among other things) that Cyber Sound & Security had violated its Crestron dealer agreement.[131] Specifically, Crestron alleged that "Cyber Sound agreed to exercise its best efforts to promote the use and sales of Crestron products,"[132] and that "Cyber Sound did not consistently exercise its best efforts to promote the use and sales of Crestron products" in part because it "actively worked" to "divert sales to a Crestron competitor."[133] This complaint

[127] *See* Crestron's April 18, 2012 Response to Savant's Second Set of Interrogatories, Response #12; Crestron's Further Supplemental Responses to Savant's Interrogatories, #12; "28 Comparison Guide Exclusive Range.csv".

[128] *See* SAVANT2882677.

[129] *See* Klein 30(b)(6) Deposition at 116-117 ("Q: So Crestron, in order to become a Crestron dealer, Crestron signs an agreement with those dealers, correct? A: After they go through the process, an agreement is signed, yes. Q: Why are they required to sign the agreement? A: The agreement – what the agreement does it is document and memorialize the terms and conditions of business . . . It is the contract or the agreement is general good business terms, represent us with best efforts, don't steal of trade, don't distribute or steal trade secrets, things like that.")

[130] *See, e.g.*, NU Systems 0000002 (also marked as Exhibit 2 to the Arceo Deposition) ("Dealer Obligations: Dealer shall, at its own expense: Maintain an adequate trained sales force and exercise its best efforts to promote the use and sales of Crestron Products;").

[131] *See* Crestron Complaint against Cyber Sound & Security, LLC. Case 2:11-cv-03492-FSH-PS, filed June 16, 2011.

[132] Crestron v. Cyber Sound & Security Complaint ¶16.

[133] Crestron v. Cyber Sound & Security Complaint ¶76.

was publicly available, and was in fact publicized in an online article by CEPro.com ten days later, on June 21, 2011.[134] This complaint thus indicates that Creston interpreted the best efforts clause to prevent its dealers from making active efforts to sell Savant until at least Feb 9, 2012, when a court ruled that this contract did not require exclusivity.[135] (In Cyber Sound's particular case, Crestron at first orally demanded an exclusivity condition, and then retracted it shortly thereafter).[136] This is consistent with Crestron's discovery response stating that Savant "induced . . . dealers to violate their agreements with Crestron. . . . to the extent Savant successfully converted Crestron dealers to become Savant dealers and shift their business to Savant."[137]

*3. Direct Communications with Individual Dealers*

99. The evidence also confirms that Crestron told individual dealers that they could not sell both Crestron and Savant systems. Crestron does not appear to have a policy of memorializing every communication with dealers,[138] so Crestron's internal documents do not comprehensively memorialize every time a Crestron employee told a dealer in person that they could not sell both Savant and Crestron. Nonetheless, these examples confirm that Crestron salespeople did follow their executives' orders to make dealers choose between Savant and Crestron. There are hundreds of these documents – these are only a few representative ones.

100. For example, in November 2008, Crestron's Chief Executive, Randy Klein, issued an "edict" to Intelect that it had to "make a decision. [Intelect] can support us [Crestron] and continue, or [Intelect is] going to be a Savant dealer and

[134] *See, e.g.*, Julie Jacobson, *Crestron Sues Big Savant Dealer*, CePro.com. Available at http://www.cepro.com/article/crestron_sues_big_savant_dealer/.

[135] Although Crestron also alleged in its complaint against Cyber Sound that "at no point has Crestron ever required a dealer – let alone CyberSound – to be an 'exclusive' Crestron dealer", Complaint ¶54, what matters for economic analysis is whether the agreement restrained dealer decisions, not whether the firm uses a particular word (such as "exclusive"). Here, the impact of Crestron's contract terms and complaint on dealers is that it indicated to dealers that Crestron viewed actively selling Savant as a breach of the "best efforts' clause and would terminate dealers who actively tried to sell Savant.

[136] Summer Declaration ¶¶8-10.

[137] Crestron's Response to Savant's Sixth Interrogatories at 11-12.

[138] For example, evidence from parties besides Crestron indicates the dealer Intelect was informed of Crestron's exclusivity policy by Randy Klein, *see infra* Part V.C., but I have found no evidence in Crestron's produced documents memorializing that.

support Savant."[139] Similarly, in February 2009 Crestron employees told the dealer SoCal Smart Home that it could not become a Crestron dealer unless it resigned its Savant dealership.[140] I explain below in Part V.D that that these two statements to dealers that they had to be exclusive to Crestron caused the dealers to stop or delay buying Savant products. More generally, Crestron salespeople relayed to their superior that Crestron salespeople had "told them [the salespeople's dealers] all that there is a zero tolerance to Savant."[141]

101. Crestron salespeople also used examples of dealers who had been terminated to convince dealers that Crestron would follow through on its threats. For example, in April 2009 a Crestron Regional Sales manager explained to his colleagues that Crestron can "spread the news on [the dealer] Safe and Sound" that "they were fired because they brought on Savant."[142] Similarly, in September 2010 a Crestron salesperson asked his supervisor if they could "start telling dealers that Cyber is no longer a dealer because they were flipping [business]? Make an example of them?"[143] The supervisor responded "Yes. Tell your dealers that Cybersound is NO LONGER AUTHORIZED to sell Crestron."[144]

102. Crestron internal documents also confirm that, the more Crestron told individual dealers about its exclusive dealing policy, the more dealers started to warn each other about the policy. For example, in August 2008 a Crestron employee reported that "someone on a blog was telling Crestron dealers to

---

[139] Sean Riordan Dep. at 57; *id*. at 64 ("A: The edict was asked, 'Are you going to be a supporting dealer of Savant, or are you going to be a supporting dealer of Crestron?' And I took some time to consider it, and the decision was made that we would stay with Crestron."); Crestron0118963 (Nov. 6, 2008 email from Randy Klein to John Gutekunst, both of Crestron, stating that "I just spoke with Sean [Riordan]; in short, he knows who his partner is – Crestron – and what his business is built around. He has no obligation to Savant, is not a dealer for their products and has no plan to sell it.").

[140] *See* Crestron0000632 at Crestron0000633 (Feb. 12, 2009 email from Brian Nachum to Dave Sell, both of Crestron, stating that "Yesterday . . . I told Jonathan, SoCal Smart Home owner, that to become a Crestron dealer, resigning the Savant line was necessary. Here is Jonathan's resignation letter to Savant."). *See also* Crestron0138196 (spreadsheet with the "Q4 Call Reports" tab including reports for the week of 11/3/08 – 11/7/08, noting at line 704 that SoCal Smart Home that "Dealer is doing C4 and Savant. Willing to drop both for Crestron.").

[141] Crestron0110398 at Crestron0110399 (July 31, 2009 email from a Crestron regional sales manager to the Director of Crestron west, referring to the Phoenix area market).

[142] Crestron0090368 at Crestron0090370 (April 2009 internal Crestron e-mail stating that "Now we can spread the news about Safe and Sound on 2 fronts. 1. They were fired because they brought on Savant. 2. They were fired because of C-4.").

[143] Crestron0030621.

[144] Crestron0030621.

consider their switch to Savant with caution as Crestron was telling dealers that if they picked up Savant they would lose their Crestron dealerships."[145]

103. In sum, Crestron's executives established a policy of requiring dealers to make a choice between Crestron and Savant, and Crestron's employees (including sometimes even its chief executive, Randy Klein) carried out that policy.

## III. Lack of Procompetitive Efficiencies

104. Conduct benefits consumer welfare when it causes prices to be lower, or quality to be higher, than they would be without the conduct. Many methods of competition, such as simple price cuts and increasing product quality, not only increase a firm's profits but also benefit consumers. However, economists have long recognized that other methods can increase the firm's profits but anticompetitively reduce consumer welfare. For example, burning down a rival's manufacturing plant would increase a monopolist's profits (if it got away with the arson), but clearly leaves consumers worse off. Thus, one cannot determine whether a particular type of conduct is procompetitive simply by looking at whether it increases the firm's profits. Instead, one has to ask whether this conduct has actually caused customers to pay lower prices or gain access to higher quality products. Although economic literature shows that exclusive dealing can sometimes procompetitively benefit consumers, I have not found any evidence in this case that Crestron's exclusive dealing has any procompetitive efficiencies.

105. At deposition, Crestron employees testified that the reason Crestron told dealers that they could not carry both Crestron and Savant (besides the simple fact that it would increase Crestron sales) is because: (a) Crestron is not willing to sell its products to dealers who are not sufficiently skilled to install Crestron systems competently, and (b) Crestron does not believe a dealer can become sufficiently skilled at installing Crestron systems unless it installs Crestron systems exclusively.[146] This asserted justification for Crestron's exclusive dealing conflicts

[145] Crestron0147517.

[146] Klein 30(b)(6) Deposition at 75-76 ("A: Many of these dealers are not – they are not large companies. They have – they are smaller companies, they have limited resources, and it takes a lot of day-to-day practice, and it takes a lot of dedication and commitment to be skilled at a product line, and if they take on multiple product lines, then that skill and that expertise becomes fragmented and the burden of customer support, and ultimately the ability to deliver a quality product to the end user is compromised."); Bargetzi Deposition at 49 ("A: in order to do

with the facts for three reasons: (1) there is no evidence in Crestron's internal documents indicating that this was the reason Crestron told dealers that they had to choose between Savant and Crestron, (2) there are clear less restrictive alternatives to exclusive dealing that would ensure that dealers are sufficiently skilled without foreclosing rivals, and (3) the fact that firms in this market that lack market power, such as Savant and AMX, do not engage in this same conduct indicates that it is not procompetitive.

106. **<u>a. No Crestron Business Documents Indicate That Concerns About Dealer Skill Motivated Crestron to Engage in Exclusive Dealing</u>**. If concerns that non-exclusive dealers would be insufficiently skilled were actually motivating Crestron's decision, then one would expect to see internal Crestron business documents stating that. To the contrary, I have not found a single Crestron business document stating such a thing.

107. **<u>b. If Crestron Actually Wants to Ensure Minimum Dealer Competency, There are Clear Less Restrictive (and Superior) Alternatives to Exclusive Dealing</u>**. Crestron's deponents asserted that, to be minimally competent at installing Crestron systems, dealers had to install Crestron systems on a regular basis.[147] Even if that is true, exclusive dealing is not even necessary, much less the best way, to ensure that dealers are minimally competent. If Crestron believes that dealers need to install systems at a certain minimum frequency to remain competent, then the obvious less restrictive alternative is to require dealers to install a minimum *number* of systems in a given time period (or perhaps simply require them to undergo additional training if they do not meet that minimum number).

108. For example, suppose hypothetically that any given dealer will be incompetent at installing Crestron systems unless it installs at least three Crestron systems per year. Requiring all dealers to install a minimum of three Crestron systems per year would ensure that all Crestron dealers were competent much better than exclusive dealing would. For example, suppose Dealer A installs only

---

Crestron well, and I think in order to do really any of the sophisticated products well, you have to be focused on it. You have to do it on a regular basis. It is not something that you can just pick up after a year or two or six months and get back into it and do the same job that you would do if you were doing it on a regular basis.").

[147] Bargetzi Deposition at 49 ("A: in order to do Crestron well, and I think in order to do really any of the sophisticated products well, you have to be focused on it. You have to do it on a regular basis. It is not something that you can just pick up after a year or two or six months and get back into it and do the same job that you would do if you were doing it on a regular basis.")

one Crestron system per year, but is exclusive to Crestron, while in contrast Dealer B installs five Crestron systems per year, but also installs five Savant systems per year. Thus, in this hypothetical Dealer A would be incompetent at installing Crestron systems (because it installs only 1 per year), while Dealer B would be competent (because it installs at least 1 Crestron systems per year). But exclusive dealing would perversely mean that Crestron *would* allow the incompetent Dealer A to install Crestron products, but would *not* allow the competent Dealer B to install Crestron products. In contrast, if Crestron had instead required all dealers to install a minimum of three Crestron systems per year, Crestron would efficiently prohibit the incompetent dealer A from selling Crestron systems, but allow the competent dealer A to sell Crestron systems. In short, when a dealer must install a certain minimum number of Crestron systems to be competent, exclusive dealing is not an efficient way of ensuring that only competent dealers can install Crestron products.

109. Similarly, another less restrictive alternative to exclusive dealing would be to provide dealers with financial incentives, such as discounts or rebates, for installing Crestron systems more frequently (and thus in theory better maintain their ability to install Crestron systems). Indeed, AMX and Savant both provide volume discounts that are not contingent on exclusivity.[148]

---

[148] Julie Jacobson, *AMX Sheds 700 Dealers, Rewards Most Committed* Group (March 10, 2010) ("AMX shed about 700 dealers recently as part of its new Bullseye program. The program, says CEO Rashid Skaf, 'is set up so those dealers that do the most amount of business with us and get the most training, get the most rewards.' Some integrators buying less than $25,000 per year from AMX were terminated in January. Others were relegated to 'bronze' level of the Bullseye program, in which margins are slimmer and tech support costs $1,200 per year for most dealers. For 'silver' dealers buying $25,000 to $50,000 per year with AMX, nothing changes this year, but in 2011 they'll lose margin if they don't make it to the magic $50,000 gold level. At that point, dealers are eligible for rebates and other goodies from AMX such as dedicated support personnel. . . . AMX maintains it's too expensive to support so many dealers, especially one=s that are doing a low volume of business and have minimal training.") available at http://www.cepro.com/article/amx_sheds_700_dealers_to_focus_on_most_committed_group/; "Elite Dealer" letter attached to SAVANT3519820 (describing Savant's "Dealer Loyalty Program" for 2009 and 2010. "The premise of the program is very simple. The more you sell, the higher the rewards." The letter explains that there four levels, each with a minimum "Annual Business Level": (1) "Standard" - $25,000, (2) "Premier" - $75,000, (3) "Elite" - $200,000, and (4) "Reference" - $350,000. All four levels provide a 2% pre-pay discount. The "Premier", "Elite", and "Reference" levels provide 1%, 4%, and 8% volume discounts, respectively.).

110. **c. The Fact that Only the Firm with Market Power (Crestron) Engages in Exclusive Dealing Indicates it is Anticompetitive, Not Procompetitive**. One way economists can test whether a certain type of conduct can have procompetitive effects in a particular market is to see whether firms *without* market power in that market engage in the same conduct. Smaller firms (such as Savant and AMX) without sufficient market power to exclude their rivals cannot increase their profits through anticompetitive means because they lack the market power to do so. Thus, if one observes a smaller firm engaging in a particular type of conduct, that indicates at least that this conduct could have some potential procompetitive effects in this market, because otherwise it would be unprofitable for a small firm to engage in that conduct.[149] Here, the evidence indicates that neither Savant nor AMX engages in exclusive dealing, which directly indicates that exclusive dealing is not procompetitive in this market.[150] Indeed, it suggests that exclusive dealing is affirmatively inefficient, and would cause the firm using the exclusive dealing to *lose* profits, unless the firm had sufficient market power to anticompetitively exclude rivals.

---

[149] Note importantly, however, that the mere fact that a small firm engages in a given type of conduct does not necessarily mean that this type of conduct is *always* procompetitive, that it actually has procompetitive efficiencies for other firms, or that the conduct is on net procompetitive when balanced against any anticompetitive effects when the conduct is engaged in by firms with market power.

[150] AMX and Savant both use volume discounts, not exclusive dealing. *See supra* note 148. I understand that Crestron has claimed that Savant has made certain dealers the sole distributor of the Savant brand in some regions (i.e., promising a dealer that Savant will not authorize other dealers in the area), Defendant's Mem. in Supp. of Def.'s Mot to Compel Answers to Interrogatory Nos. 4, 8 11 and 49-58 at 8-10 (Dkt. No. 336), but such sole outlet agreements do not have any of the anticompetitive effects of exclusive dealing. Promising a dealer that the upstream firm will not supply other dealers in the area restricts only *intra*brand competition among distributors; unlike exclusive dealing, it does not in any way restrict *inter*brand competition among suppliers by restricting rival upstream firms from selling to any dealers. *See* ELHAUGE, U.S. ANTITRUST LAW & ECONOMICS 443 & n.4 (2d. Ed. Foundation Press 2011) ("vertical territorial restraints, limiting dealers to a particular geographic area ... should be distinguished from exclusive dealing ... agreements, which limit the manufacturers the dealer can carry, and thus have possible foreclosing effects that may impede interbrand competition between manufacturers... This can lead to somewhat confusing terminology because an agreement that makes a dealer the ''exclusive dealer'' in a territory for a particular manufacturer is generally considered a vertical nonprice restraint on distribution rather than ''exclusive dealing'' ... The reason is that such an agreement does not bar that dealer from carrying other manufacturers and thus has intrabrand effects but not interbrand effects, where the manufacturers are the relevant competing ''brands.'' To minimize confusion, we will call such dealers ''sole outlets'' rather than ''exclusive dealers.''). When a firm simply makes certain dealers its sole dealer in certain areas, that does not in any way restrict those dealers from purchasing rival products.

111. In sum, I have not found any evidence indicating procompetitive efficiencies for Crestron's exclusive dealing, let alone the type of concrete evidence that quantifies those efficiencies and shows they are passed on to buyers. Instead, the evidence affirmatively conflicts with the claimed procompetitive efficiencies. If Crestron later offers additional procompetitive efficiency justifications for its conduct, I will examine them and consider whether they are persuasive and sufficient to change my conclusions.

## IV. THEORIES OF ANTICOMPETITIVE HARM

112. The fact that Crestron's exclusive dealing had no procompetitive effects raises the question: "how then did it increase Crestron's profits?" The economic literature shows that exclusive dealing can increase a firm's profits above but-for levels by anticompetitively reducing the rival's sales and weakening the rival's ability to compete.[151] Specifically, the economic literature shows that a dominant firm can increase its profits by restricting a large enough portion of the market to prevent rivals from becoming as efficient as they otherwise would have been, thus preventing rivals from constraining dominant firm prices as much as they would have.

113. For example, when rivals experience economies of scale, meaning that their per-unit costs are lower when their output is higher, restricting the rival to a small portion of the market can reduce the rival's output and thus increase its per-unit costs. This tends to both increase the rival's price and reduce the rival's ability to constrain the monopolist's prices. This method is analogous to a sports competitor winning a competition not by improving himself, but instead by injuring the competition, which we might call the Tonya Harding method of competition. It may help the dominant firm win, but it harms consumers.

114. In short, the two necessary conditions for this type of anticompetitive harm are that: (1) the exclusive dealing reduced Savant's sales below but-for levels, and (2) this reduction in Savant's sales reduced Savant's ability to compete in some way. I therefore test whether Crestron's exclusive dealing has actually reduced Savant's sales below but-for levels in Part V below, and, having found that it did, test whether this reduced Savant's ability to compete in Part VI. Below, I

[151] *See, e.g.* Carlton & Perloff, MODERN INDUSTRIAL ORGANIZATION 371 (4th ed. 2005) ("A firm may benefit from strategic behavior that raises its rivals' costs.").

quickly summarize several ways in which reducing a rival's sales below but-for levels can impair the rival's ability to compete and harm consumer welfare.

115. **a. Depriving Rivals of Economies of Scale**. As just described, reducing a rival's sales below but-for levels can raise its per-unit costs by depriving the rival of economies of scale.[152] Standard economics shows that, under almost any model of competition, increasing a rival's per-unit costs will increase the rival's price and in turn increase other competitors' prices. This anticompetitive effect can exist even if Crestron's rivals are equally (or more) efficient in the sense that they have the same (or better) cost curve, because the restriction can prevent rivals from growing to the point at which they would have achieved their natural efficiencies.[153] If the rival's costs increase so much that it is no longer profitable to remain in the market, then the rival will exit the market, which will cause prices to increase even further above but-for levels. Below, in Part VI.E, I show that Savant does in fact experience significant economies of scale, and would have had significantly lower per-unit costs had its sales not been restrained.

116. **b. Reduced Rival Expandability**. Exclusionary contracts that shrink rival market share can also have the anticompetitive effect of impairing rival ability to expand sales, even if shrinking rival share does not reduce rival efficiency. A monopolist's power over price stems from its ability to restrict output and raise prices without rivals rapidly expanding enough to replace the monopolist's lost output or undercut its prices. The more easily rivals can rapidly expand sales, the less the monopolist can restrict output to raise prices above the competitive level. Because in reality a smaller rival cannot expand as fast as a

---

[152] *See, e.g.*, MICHAEL D. WHINSTON, LECTURES ON ANTITRUST ECONOMICS 147 (MIT Press, Cambridge 2006) ("[S]cale economies need not be in the form of entry costs to get exclusionary effects"); Louis Kaplow & Carl Shapiro, *Antitrust*, HANDBOOK OF LAW AND ECONOMICS 1206 (A. Mitchell Polinsky & Steven Shavell, eds., Elsevier, 2007) (finding that even if restricted rivals are already on the market that anticompetitive effects can arise because an existing rival "may indeed conclude that making the necessary investments to expand its product line, manufacturing capacity, sales and distribution network, or advertising would not yield a sufficient return. [The dominant firm]'s exclusivity may render unprofitable a strategy under which [the existing rival] gradually increases its share at the retail locations where [the dominant firm] has been dominant.").

[153] *Accord* Louis Kaplow & Carl Shapiro, *Antitrust*, HANDBOOK OF LAW AND ECONOMICS 1204 (A. Mitchell Polinsky & Steven Shavell, eds., Elsevier, 2007) (finding that a multiple-buyer situation "supports an equilibrium in which all buyers agree to exclusivity, in exchange for an arbitrarily small transfer, and [the entrant] is excluded from the market … even if [the entrant] is more efficient than [the dominant firm]").

larger rival, standard economic models assume that rivals' ability to expand depends in part on how large they already are. Standard economic models therefore also assume that market power increases when rival market shares are lower or rivals have less ability to expand.[154] The result is that, unless the rival elasticity of supply is infinite, restraining rival market share in ways unrelated to product merits (such as by using exclusionary restrictions, reducing access to distributors, or deceiving buyers) leads to anticompetitive effects even if it does not lower rival efficiency. Below, in Part VI.F, I show that Savant does in fact have a limited ability to expand.

117. **c. Deterred Rival Investments**. In markets where competition by innovation is important, restricting rival sales can deny rivals economies of scale in recouping investments in research.[155] If a substantial share of customer purchases are restricted from purchasing rival products, then successful innovations will have a smaller payoff than they otherwise would have, which will discourage efficient investments and innovation.[156] Restricting a substantial share of a market can bar rivals from the potential market sales they need in order to raise the capital necessary to make efficient levels of investment in the research and development of new products. Investment in research and development is costly and risky, and capital markets will not provide the funding unless the expected net returns are positive. If firms are blocked from any significant share of the market, then successful innovations will have a smaller payoff than they otherwise would have, which will discourage capital markets from making efficient investments in research and innovation.

118. For example, suppose it would cost $1 million to invest in research with a firm that has a 50% chance of successfully innovating to create a product that would be sufficiently better than current market options that, if created, it would take all customers in a market with 2.1 million customers and earn the firm an additional $1 per customer.[157] Without any artificial restriction, capital markets would provide the firm with funding because the expected returns are $1.05 million, which exceeds the $1 million cost, and this is socially efficient since the

---

[154] *See* William M. Landes & Richard A. Posner, *Market Power in Antitrust Cases*, 94 HARV. L. REV. 937, 944–45, 985–86 (1981).

[155] ELHAUGE & GERADIN, GLOBAL ANTITRUST LAW & ECONOMICS 499 (2d ed. 2011).

[156] *Id.*

[157] For simplicity, costs here include normal returns on capital and earnings reflect the present value of future earnings. Capital markets are also assumed to be risk-neutral. Accounting for risk aversion would only exacerbate the anticompetitive effects of restriction by increasing the deterrent effect of risks faced by new innovative companies.

net benefits exceed the costs. But if even as little as 10% of the market were restricted, then capital markets would not provide the firm with funding for its research because the expected payoff would only be $945,000, which is less than the cost. Thus, in this example, restricting 10% of the market could preclude rivals from obtaining the capital funding they need to make efficient, socially desirable investments in research and development.

119. Because incentives for research investments are optimal if the entire market is open to a firm that succeeds with new innovation, agreements that restrict a significant share of the market will discourage some funding necessary to make efficient investments in innovation. This anticompetitive effect follows even if the unrestricted market is large enough that rivals can achieve economies of scale or scope in operations and have sufficient access to efficient means of distribution.

## V. Proof That Crestron's Conduct Has Restricted the High-End Residential System Market

120. As I just explained, a necessary condition for Crestron's exclusive dealing causing anticompetitive effects is that it reduces Savant's sales below but-for levels. I therefore investigate whether Crestron's exclusive dealing has in fact reduced Savant's sales below but-for levels, and calculate the share of the market that Crestron's exclusive dealing has restricted.

121. Basic common sense and economic theory both suggest that telling dealers that they cannot buy any Crestron products if they also buy Savant products should make dealers less willing to buy Savant products, all else equal. Economic theory also indicates that Crestron must have expected its exclusive dealing to affect customer decisions given that it had no procompetitive efficiencies. Crestron spent significant resources monitoring whether dealers were selling Savant products and telling dealers (usually in-person) that they could not buy Savant products.[158] Therefore, given that the exclusive dealing didn't have any procompetitive efficiencies that reduced Crestron's costs or increased its product value, the only way in which it could have increased Crestron's profits is by restraining rival competition in a way that increased Crestron's sales and/or prices. Indeed, any argument that Crestron's exclusive dealing did not affect dealers' purchasing decisions contradicts the incredibly weak assumption that, even if

[158] *See supra* Part II.B.3.

Crestron is not a perfect profit-maximizer, it at least prefers not to spend money for no reason.

122. The following sections rigorously confirm that Crestron's exclusive dealing restricted Savant's sales below but-for levels.

### *A. Relevant Baseline is the But-for World, not the Past*

123. As a matter of basic logic, if one wants to measure the effect of Crestron's exclusive dealing on Savant's sales, one would have to estimate the difference between: (1) Savant's actual sales, and (2) the sales Savant would have achieved in a hypothetical world where Crestron could not engage in exclusive dealing.

124. That is *not* the same as comparing Savant's sales in the present to Savant's sales at some point in the past. Savant started with a 0% share when it first entered in 2007, so by definition its share could only increase – even if Crestron's exclusive dealing were restricting it from growing as fast as it would have otherwise. In fact, one of the most common uses of restrictive contracts is to slow down what would otherwise be the faster growth of a new rival. Thus, merely observing that a rival's share has increased somewhat does not show that the rival was not restricted. One instead has to ask whether the rival would have grown faster but-for the restriction. Figure 4 below illustrates this graphically with hypothetical shares.

**Figure 4: Hypothetical Shares Showing the Effect of Restrictive Contracts on a Growing Rival**




***B. Theory of How Exclusive Dealing Can Reduce Savant Sales Below But-For Levels***

125. The theory of how exclusive dealing can reduce rival sales is straightforward. In short, without Crestron's exclusive dealing, many dealers would buy some Savant and some Crestron high-end systems. In contrast, Crestron's exclusive dealing forces dealers to buy either 100% Crestron or 100% Savant, and because Crestron was the incumbent with significant incontestable demand, most dealers will choose 100% Crestron when faced with this choice, even if they would really prefer some Crestron and some Savant.

126. For example, take a hypothetical dealer who charged a $10,000 markup for any high-end system. Suppose that, in its region, this hypothetical dealer has 5 customers who are willing to pay a $10,000 markup only for a Crestron high-end system, 10 who are willing to pay a $10,000 markup for either a

Savant or a Crestron high-end system, and 2 who are willing to pay a $10,000 markup only for a Savant high-end system. In a world without exclusive dealing, this dealer would obviously maximize its profits by buying at least 5 Crestron systems, at least 2 Savant systems, and some mix of Savant and Crestron for the other 10 customers, netting the dealer 17 total customers and $170,000 in markup profits.

127. In contrast, if Crestron used exclusive dealing, this dealer would have to choose between using 100% Crestron or 100% Savant. If it chose 100% Crestron, it would sell to 15 customers (the 5 who would only choose Crestron and the 10 who are willing to buy either) netting it $150,000 in profits. If it chose 100% Savant, it would sell to 12 customers (2 who would only choose Savant and 10 who are willing to buy either), netting it $120,000 in profits. Thus, this dealer would be worse off if Crestron used exclusive dealing (a maximum $150,000 in profits versus $170,000 without the exclusive dealing), but if forced to choose between two inferior options, would choose 100% Crestron and 0% Savant.

128. In this hypothetical, the exclusive dealing not only reduces the dealer's profits, but also harms the two homeowners who would have bought Savant systems in the but-for world but do not have that option if their local dealer cannot carry Savant. The exclusive dealing also reduced Savant's sales in this region from 2-12 customers to zero customers. If Crestron's widespread exclusive dealing in total reduced Savant's sales enough, it could further harm consumers and Savant by weakening Savant's ability to compete, for example by depriving it of economies of scale.

129. This hypothetical also illustrates why some dealers will choose 100% Crestron while others will switch to 100% Savant: dealers with more incontestable demand for Crestron than for Savant will choose 100% Crestron, while customers with more incontestable demand for Savant will choose 100% Savant. Thus, differences in dealer responses to Crestron's exclusive dealing indicate that dealers have differing levels of incontestable demand. Crestron's exclusive dealing on net reduced Savant's sales below but-for levels because most dealers have more incontestable demand for Crestron than for Savant.

130. In this case there are two main reasons why high-end dealers will have some incontestable demand: (1) varying homeowner preferences, and (2) upkeep of legacy Crestron systems. It is undisputed that some homeowners prefer Crestron systems, others prefer Savant systems, and still others are indifferent

between the two.[159] The homeowners who prefer Crestron create incontestable demand for Crestron; the dealer will not be able to best satisfy those homeowners without using a Crestron system, and indeed the homeowner may switch to a different dealer in order to get a Crestron system. The upkeep of legacy Crestron systems also creates additional incontestable demand for Crestron.[160] Because Crestron has been the dominant firm in the high-end market for over a decade, most dealers have already installed Crestron systems into customers' houses.[161] All high-end systems require the dealer to provide follow-up support on a regular basis, for example to fix a malfunctioning aspect of the system, to update the system to incorporate a new device (such as a new television), or to upgrade the system.[162] Because Savant products are not compatible with Crestron products, a dealer cannot use Savant products to fix or upgrade part of an already-installed Crestron system. Further, when Crestron terminates a dealer's agreements, the

---

[159] Klein 30(b)(6) Deposition at 128-129 ("Q: Sometimes homeowners ask for a specific automation and control brand such as Crestron, is that right? A: Sometimes they ask for specific brands? Q: Yes. A. Yes. Q: Is it your experience that sometimes end user will ask specifically for Crestron? A: Yes. Q: And in your experience sometimes end user will ask for Savant; is that correct? A: Yes. Q: And then at other times the end users simply seek input from the dealer as to which brands the dealers think would be appropriate; is that correct? A: I believe so."); ("Q: And sometimes those end users would prefer to have a Crestron over a Savant system, correct? A: Sometimes, yes. Q: And sometimes the other way around, sometimes an end users might want Savant instead? A. Yes.").

[160] Crestron sales reports show its sales representatives warning dealers about the risk of being unable to maintain legacy Crestron systems if they start selling rival high-end systems. *See, e.g.*, Crestron0170271, Tab "CMW QTR. 1 FY-09", Row 272 (entry titled "Week of September 15th, 2008, Residential." A Crestron sales representative reports that the dealer "Barretts" of Naperville, Illinois "advised me that HTSA has urged their members to look at Control 4 and Savant as viable replacements for Crestron. . . I asked how they would service their existing legacy Crestron customers if they did not have access to the line."); Bernard Deposition at 61-62 (dealer who had sold significant amounts of Crestron systems in the past stating that "with the high number of clients that we've installed systems in, the support required after sales was still required. Clients were still going to make changes to system, they're going to buy new televisions, they're going to want that new iPad as a remote now and get their system reprogrammed accordingly."); Richard Smith Deposition at 33 (a dealer was asked, "What were the consequences of your being terminated [by Crestron]?" The dealer responded "Well, I mean we were unable to support our existing clients. Shortly after that, we lost a – a support contract we had that was about 2 grand a month to us for a huge Crestron system we had installed on an estate. And then all of our other customers, we couldn't – couldn't get equipment for to fix stuff").

[161] The parties' sales data indicates that 92.5% of residential high-end system dealers (weighted by dollars sold) have purchased a Crestron system at some point from July 2007 to September 2013. *See* "45 Ever Bought Crestron.csv".

[162] Richard Smith Deposition at 33.

dealer's license to use Crestron's programming software is also terminated,[163] meaning that the dealer is not even legally allowed to reprogram legacy Crestron systems.

### *C. Concrete Examples of Dealers Being Deterred from Purchasing Savant Because of Crestron Conduct*

131. Although anecdotes are no substitute for statistical evidence, concrete examples do confirm that Crestron's exclusive dealing can deter dealers from buying Savant products.

132. **a. SoCal Smart Home**. For example, the dealer SoCal Smart Home ("SoCal") started buying Savant high-end control system components in January 2008.[164] It had never previously purchased Crestron high-end systems,[165] but in February 2009 wanted to start selling Crestron systems in response to several clients specifically requesting Crestron systems.[166] But when SoCal applied to be a Crestron dealer, Crestron employees told it on February 11, 2009 that, in order to become a Crestron dealer, "resigning the Savant line was necessary."[167] The next day, SoCal resigned its dealership with Savant, in an email it forwarded to Crestron as proof.[168] At his deposition, SoCal's owner stated that if Crestron had not

[163] Klein 30(b)(6) Deposition 122 ("Q: Once a dealer's contract with Crestron comes to an end, they are no longer allowed to use [Crestron's] software; is that correct? A: After the effective date of termination, yes.").

[164] "15 Concrete Examples.xlsx", "SoCal SmartHome" tab. SoCal Smart Home has customer number 10032 in the Savant sales data and 1007746 in the Crestron sales data.

[165] "15 Concrete Examples.xlsx", "SoCal SmartHome" tab.

[166] April 18, 2012 Deposition of Jonathan Lane at 157 ("A: in '08 when I reached out to Brian [Nachum, of Crestron], the only reason I reached out to Brian was . . . we had clients saying we're thinking about building a house, we want Crestron. And it was like okay, I guess we have to become a Crestron dealer.").

[167] *See* Crestron0000632 at Crestron0000633 (Feb. 12, 2009 email from Brian Nachum to Dave Sell, both of Crestron, stating that "Yesterday . . . I told Jonathan, SoCal Smart Home owner, that to become a Crestron dealer, resigning the Savant line was necessary. Here is Jonathan's resignation letter to Savant."). *See also* Crestron0138196 (spreadsheet with the "Q4 Call Reports" tab including reports for the week of 11/3/08 – 11/7/08, noting at line 704 that SoCal Smart Home that "Dealer is doing C4 and Savant. Willing to drop both for Crestron.").

[168] *See* Crestron0000632 at Crestron0000633 (Feb. 12, 2009 email from Jonathan Lane to MK Marketing and Daisy Lane, stating that "I wanted to give you formal notification that effective today, 02/12/2009 I am resigning my Savant dealership."). *See also* Crestron0000669 (Aug. 5, 2009 email from Brian Nachum to Dave Sell, both of Crestron, stating that "I did my first Prodigy demo today for Jonathan Lane of So Cal Smart Home. He is an active C4 dealer,

required him to drop Savant in order to become a Crestron dealer, he would have retained his Savant dealership and continued to make significant efforts to sell Savant products.[169] Savant and Crestron sales data confirm that SoCal started buying Savant high-end systems in 2008, and stopped completely when Crestron told SoCal it had to resign its Savant dealership in order to become a Crestron dealer, at which point SoCal started purchasing Crestron systems (see Figure 5 below).

**Figure 5: Crestron and Savant High-End Sales to SoCal Smart Home[170]**




133. As Figure 5 indicates, SoCal became a Savant dealer again in October 2011, about two years after Crestron required SoCal to stop selling Savant.[171] At

---

but I made him renounce his Savant dealership, he bcc'd us on the email, to become a Crestron dealer.").

[169] *See* April 18, 2012 Deposition of Jonathan Lane at 157-58 ("Q: Now, if Crestron had not told you that you could not be a Crestron dealer if you had handled the Savant products, you would have stayed a Savant dealer; is that correct? A: Correct, yeah. Q: And you would have, in fact, attempted to make significant efforts to sell Savant products? A: Of course, absolutely.").

[170] *See* "15 Concrete Examples.xlsx", "SoCal SmartHome" tab.

his deposition, the SoCal's owner explained that he switched back to Savant because he was hardly selling any Crestron systems.[172] This is consistent with Figure 5, which shows that SoCal hardly purchased any Crestron components in 2010 or 2011. It is also consistent with the economic theory of exclusion in this case. As I explained above in Part V.B, exclusive dealing can reduce Savant's sales below but-for levels when dealers have substantial incontestable demand for Crestron, and consequently would be better off selling only Crestron instead of only selling Savant, even if the dealer would ideally prefer to sell both. In February 2009, SoCal had significant incontestable demand for Crestron because several clients were asking specifically for Crestron systems, and consequently Crestron's exclusive dealing deterred SoCal from buying Savant components. In contrast, by 2011, SoCal had little-to-no incontestable demand for Crestron (as evinced by its inability to sell Crestron systems) and thus had significantly less Crestron sales to lose from switching to Savant and losing its right to sell Crestron.

134. **b. Intelect Integrated Electronics**. The evidence also indicates that Crestron's exclusive dealing caused the dealer Intelect Integrated Electronics ("Intelect") to purchase less Savant system components than it would have in the but-for world.[173] Since at least July 2007 (the beginning of Crestron's data), Intelect has purchased significant amounts of Crestron high-end system components.[174] In May 2008, Intelect started buying Savant high-end system components too, and created a demonstration system for potential customers.[175] But in November 2008, Crestron's Chief Executive (Randy Klein) issued an "edict" to Intelect that it had to "make a decision. [Intelect] can support us [Crestron] and continue, or [Intelect is] going to be a Savant dealer and support Savant."[176] Faced with this choice, Intelect decided to "stay with Crestron", which

---

[171] April 18, 2012 Deposition of Jonathan Lane at 158 ("Q: When did you again become a Savant dealer? A: October, November of last year.").

[172] April 18, 2012 Deposition of Jonathan Lane at 158-59 ("Q: What motivated your renewal efforts to become a Savant dealer? A: You know, after losing a couple of jobs because of other Crestron – of the price cutting of Crestron dealers").

[173] Intelect Integrated Electronics has customer number 1001044 in the Crestron sales database and 10035 in the Savant database.

[174] *See* "15 Concrete Examples.xlsx", "Intelect" tab.

[175] Sean Riordan Deposition at 64-65 ("The only [Savant] thing we had was a demo system that we had put together for the boat show.").

[176] Sean Riordan Deposition at 57; id. at 64 ("A: The edict was asked, 'Are you going to be a supporting dealer of Savant, or are you going to be a supporting dealer of Crestron?' And I took some time to consider it, and the decision was made that we would stay with Crestron."); Crestron0118963 (Nov. 6, 2008 email from Randy Klein to John Gutekunst, both of Crestron, stating that "I just spoke with Sean [Riordan]; in short, he knows who his partner is – Crestron –

meant no longer offering Savant.[177] Intelect has never bought Savant high-end system components since. Intelect's President explained at his deposition that, but for Crestron requiring Intelect to choose between Crestron and Savant, his business would not have been harmed in any way by carrying both Crestron and Savant,[178] and that he prefers to test out multiple products to determine which are the best for his clients.[179] The parties' sales data shows that Intelect started purchasing some Savant components in mid-2008, but has not purchased Savant components since Crestron issued its "edict."[180]

135. This example is also consistent with the economic theory of exclusion in this case. As I explained above in Part V.B, exclusive dealing can reduce Savant's sales below but-for levels when dealers have substantial incontestable demand for Crestron, such that they are better off selling only Crestron instead of selling only Savant, even if the dealer would ideally prefer to sell both. At his deposition, Intelect's President explained that he decided to "stay with Crestron," and therefore not offer Savant, because he had projects in various stages of development on which Crestron products were already being used, or would be used in the future.[181] This was a clear source of substantial incontestable demand for Crestron in November 2008, when Crestron's Chief Executive issued the "edict" to Intelect's President regarding Savant. If Intelect lost its right to sell Crestron products at this point in time, it could lose sales on projects that were in-progress or planned. Crestron was able to exploit this incontestable demand for Crestron's products to exclude Savant from this dealership, as economic theory would predict.

---

and what his business is built around. He has no obligation to Savant, is not a dealer for their products and has no plan to sell it.").

[177] Sean Riordan Deposition at 58.

[178] Sean Riordan Deposition at 64 ("Q: But for that [Crestron's] edict, would there have been any harm to your company to have continued carrying both Crestron and Savant? A: No.")

[179] Sean Riordan Deposition at 60:9-19 ("Q: If you had the choice, would you have continued to carry Savant products? A: Counsel, in the real world I'm always looking to find better products for my clients. And I'm going to continue to test and look and -- Otherwise, what's great today is no longer great three years from now. Had I would have liked to see Savant become successful and have a product that was viable in our market back then? Sure.").

[180] *See* "15 Concrete Examples.xlsx", "Intelect" tab.

[181] *See* Sean Riordan Deposition at 58:11-25 (Q: Why did you decide to stick with Crestron? A: … and I had in due process at that juncture vessels of different stages of construction that were to receive or already had Crestron being implemented or in the future being implemented.").

### *D. Restricted Shares*

136. In economic analysis of restrictive contract terms, such as exclusive dealing, it is useful to measure how much of the market has been restricted from purchasing rival products. The more of the market that is restricted, the more likely the conduct is to impair rival competitiveness and cause anticompetitive harm.

137. I began by determining which dealers were restricted and which were not. The evidence here indicates that, although Crestron had a general practice of telling dealers to make a "choice" between Crestron and Savant,[182] Crestron failed to track many of these statements. For example, the dealer Intelect testified in deposition that Crestron's Chief Executive, Randy Klein, issued an "edict" to Intelect that it had to "make a decision. [Intelect] can support us [Crestron] and continue, or [Intelect is] going to be a Savant dealer and support Savant",[183] but I have not been able to find any evidence in Crestron's internal documents memorializing this statement. Accordingly, I treat a dealer as restricted unless some evidence indicates that a particular dealer was an exception to this general rule. I therefore instructed my staff to review the documents, depositions, and declarations in this case for evidence affirmatively indicating that particular dealers were not told they had to be exclusive. This search indicated that approximately nine dealers (out of 2,444 who bought Crestron systems since June 7, 2008[184]) claimed that either: (1) Creston never told them they had to be exclusive, or (2) Crestron told them to be exclusive at one point, but later retracted that exclusivity requirement.[185] Although I have tried to find as many of these dealers as possible, a few may have slipped through the cracks simply because the record in this case is enormous.[186] In any event, if I or a defense expert finds additional affirmative evidence indicating that other dealers did not learn of Crestron's exclusivity policy, it is easy to update these restricted share calculations by simply marking those additional dealers as "unrestricted" in the computer programming code used to calculate these restricted shares. Note that even the few dealers who claim they were never told directly by Crestron to be exclusive may have nonetheless been

---

[182] *See supra* Part II.

[183] *See supra* Part V.C.

[184] *See* "46 Num Dealers Buying Crestron.csv".

[185] *See* "Dealers Not Threatened.xlsx" (summarizing evidence).

[186] I understand from counsel that Crestron has produced approximately 508,125 documents, totaling 2,494,830 pages, and that the document database I have been provided access to contains all of these documents.

restricted by learning from sources other than Crestron (such as other dealers) that Crestron had an exclusivity policy.

138. I also identified when dealers were restricted, to the extent some were restricted at some times but not at others. The evidence indicates that Crestron first instituted a practice of telling dealers to make a "choice" between Crestron and Savant on June 7, 2008.[187] I therefore consider all dealers unrestricted before June 7, 2008. Because of Crestron's exclusive dealing policy, I consider all dealers to have been informed about Crestron's exclusive dealing requirement from June 7, 2008 onward unless the evidence affirmatively indicates otherwise. To be conservative, I consider a dealer restricted in a given year for the purposes of calculating restricted shares only if the dealer was *completely* compliant to Crestron's exclusive dealing policy towards Savant, meaning that it did not purchase *any* Savant products that year. This is a conservative estimate of restricted share because many dealers who bought small amounts of Savant in a given year were still restricted by Crestron's exclusive dealing, either because: (1) they bought only a small amount early in the year, and Crestron reminded them of its exclusive dealing policy shortly after, or (2) they bought small amounts of Savant, but less than they would have in the but-for world because they were concerned that the probability of being detected and terminated would be higher if they purchased more Savant.

139. Having identified which dealers were restricted by Crestron's exclusive dealing, I then calculated the restricted share of the market. The denominator is the sum of all Crestron, Savant, and AMX high-end residential sales in the United States and Canada during the period of the restriction (June 7, 2008 to the most recent date with Crestron data, September 30, 2013). The numerator is the sum of Crestron's sales to restricted dealers in Crestron's data (while they were restricted). Crestron produced detailed dealer-level data only for the United States, but none of its statements about its exclusive dealing policy are limited to the United States,[188] and its employees have testified that Crestron operationally considers the United States and Canada part of the same region.[189] I therefore adjust for the fact that Crestron's detailed sales data excludes Canada by assuming that Crestron restricted dealers at an equal rate in Canada as it did in the United States.

---

[187] *See supra* Part II.
[188] *See supra* Part II.A.
[189] *See supra* Part I.A.4.

**Figure 6: Restricted Share of the High-End Residential Control Market**[190]




## VI. PROOF OF ANTICOMPETITIVE EFFECTS FROM RESTRICTING THE MARKET

140. By restricting a large share of the market and reducing Savant's sales below but-for levels, Crestron's exclusive dealing caused anticompetitive harm in six ways: (1) extracting consumer welfare, (2) maintaining market power over local dealers by excluding Savant, (3) impairing rival efficiency, (4) reducing rival expandability, (5) exacerbating switching costs, and (6) deterring rival investment in research and innovation.

### *A. Extraction of Consumer Welfare*

141. Crestron's exclusive dealing extracts consumer welfare to increase Crestron's profits by bundling dealer's incontestable and contestable demand for

---

[190] *See* "29 Restricted Shares.xlsx". Even if one conservatively assumes that Crestron's Canadian sales are completely unrestricted, the restricted shares range from 47-73%. *Id*.

high-end systems. For example, Crestron's exclusive dealing extracted dealer profits and reduced homeowner welfare in the example presented above in Part V.B. Indeed, the economic literature confirms that bundling contestable and incontestable demand can extract consumer surplus in cases like this, where customers' contestable and incontestable demand each include multiple units of high-end systems and the amount of contestable demand is not necessarily equal to the amount of incontestable demand.[191]

> If buyers use varying amounts of the tying product, then tying can extract individual consumer surplus. The basic reason is that, even at a monopoly price for the tying product, each multi-unit buyer enjoys some consumer surplus because it values the last unit it purchases at the monopoly price and values the prior (or inframarginal) units at something more, given that any buyer rationally uses its initial units to meet its greatest needs first. The difference between each buyer's valuation of those inframarginal units and the monopoly price will be the consumer surplus enjoyed by each buyer at the monopoly price. A tying firm can expropriate that consumer surplus by allowing buyers to purchase the tying product at the monopoly price only if buyers agree to purchase their needs of some tied product at supracompetitive prices. Each buyer will accept the tie as long as the burden of paying supracompetitive prices on the tied product is less than the consumer surplus they would lose by being unable to buy the tying product at the monopoly price. This form of tying can increase profits without a substantial tied foreclosure share, but does require tying market power. Tying that extracts individual consumer welfare always reduces consumer welfare if the tying firm chooses profit-maximizing prices.[192]

142. This means Crestron's bundling of contestable and incontestable demand could extract consumer welfare even if, contrary to fact, Crestron's exclusive dealing had not restricted a substantial share of the high-end system market. After all, the fact that Crestron has extracted some welfare from a particular customer does not change whether Crestron does the same thing to every

---

[191] *See* Einer Elhauge, *Tying, Bundled Discounts, and the Death of the Single Monopoly Profit Theory*, 123 HARV. L. REV. 397, 407–413 (2009); EINER ELHAUGE, U.S. ANTITRUST LAW & ECONOMICS 361–362 (2d ed. 2011); M.L. Burstein, *The Economics of Tie-In Sales*, 42 REV. ECON. & STAT. 68, 68–69 (1960); M.L. Burstein, *A Theory of Full-Line Forcing*, 55 NW. U.L. REV. 62, 73–91 (1960); Nicholas Economides, *Tying, Bundling, and Loyalty/Requirement Rebates*, in RESEARCH HANDBOOK ON THE ECONOMICS OF ANTITRUST LAW 121, 127 (Einer Elhauge ed., 2012).

[192] EINER ELHAUGE, U.S. ANTITRUST LAW & ECONOMICS 361–362 (2d ed. 2011).

other customer or no other customers. However, restricting a substantial share of the market can exacerbate this consumer welfare extraction by enhancing the bundler's market power and impairing rival efficiency, as described in further detail below.

### *B. Maintaining Market Power over Local Dealers by Excluding Savant*

143. Crestron's exclusive dealing has also harmed consumer welfare by excluding Savant from many localities, which allowed Crestron to charge supracompetitive prices to dealers. I explained in Part I.A.3.b that, where Crestron has been able to gain significant footholds, Crestron has responded by providing large discounts (10-50%) specifically in response to competition from Savant. This indicates that excluding Savant from a region by restricting the dealers in that region from purchasing Savant, and thus precluding competition from Savant, would allow Crestron to continue to charge supracompetitive (i.e. not discounted in response to competition) prices.

### *C. Exacerbating Buyer Switching Costs*

144. Buyer switching costs also mean that substantial marketwide restrictions will have anticompetitive effects even if they do not raise rivals' costs. Natural buyer switching costs can impede the ability of rivals to expand sales, and thus mean that restricting rival shares lessens the rival's ability to constrain Crestron's market power even if the exclusive dealing does not increase those buyer switching costs.[193] As I explained above in Part I.C.1, there are substantial natural switching costs in the high-end residential system market, the main cost being that dealers must learn how to install a new brand of system to switch to selling that brand.

145. Because of these switching costs, a rival such as Savant cannot gain sales from a monopolist such as Crestron simply by offering an equivalent mix of price and quality. For example, suppose $V_M$ and $V_R$ are the values of the

[193] *See* Joseph Farrell & Paul Klemperer, *Coordination and Lock-In: Competition with Switching Costs and Network Effects*, in 3 HANDBOOK OF INDUSTRIAL ORGANIZATION 1977 (2007, Armstrong, Porter, eds.) ("A consumer faces a switching cost between sellers when an investment specific to his current seller must duplicate for a new seller. The investment might be in equipment, in setting up a relationship, in learning how to use a product, or in buying a high-priced first unit that then allows one to buy subsequent units more cheaply (when firms' prices are non-linear). Switching costs may be psychological.").

monopolist's and rival's products to consumers, respectively, $P_M$ and $P_R$ are their respective prices, and $S_N$ is the natural switching cost a consumer must incur to switch suppliers. Because of the switching cost, an incumbent customer will switch only if $V_R - P_R - S_N > V_M - P_M$, meaning that the rival must offer a price/quality mix that is better than the monopolist's by at least the amount of the switching cost in order to convince the customer to switch, and thus the greater the switching cost the more the rival's price/quality mix must exceed the monopolist's.[194] This also means that, even if the rival and monopolist products are of identical price and quality, the monopolist can raise its price by $S_N$ without losing any customers. Consequently, by restraining Savant's growth and inflating Crestron's market shares, Crestron's restrictions have increased the share of the market that has switching costs relative to the but-for world. This allows Crestron to elevate its prices and exclude equally (or more) efficient rivals.

146. Worse, Crestron's exclusive dealing inflates the size of dealer switching costs.[195] Specifically, exclusive dealing raises dealer switching costs by requiring a 100% switch. For almost all dealers, it is not optimal to switch all of the dealer's sales to a rival product because of the fragmented demand I described above in Part I.A.5. In those cases, exclusive dealing exacerbates buyer switching costs by requiring the dealer to choose a non-optimal mix of product purchases.

147. These extra artificial switching costs exacerbate the tendency of Crestron's exclusionary contracts to reduce pricing constraints on Crestron's market power. Because of the additional *artificial* switching cost $S_A$, a customer of a monopolist would switch only if $V_R - P_R - (S_N + S_A) > V_M - P_M$, meaning that

---

[194] That is, the rival must be able to satisfy the equation $(V_R - P_R) - (V_M - P_M) > S_N$, taking $V_M$, $P_M$, and $S_N$ as given, in order to induce the customer to switch.

[195] There is a wealth of literature explaining how exclusionary contracts can artificially raising switching costs. *See, e.g.*, Farrell & Klemperer, *supra* note 193, at 2001 n. 70 ("A larger issue is whether the switching costs are inevitable real social costs. They may instead by contractual (this includes those created by 'loyalty contracts', 'exclusive contracts' and 'bundling' or 'tying' etc."); *id.* at 2004 ("More generally, we have seen (section 2.7) that an incumbent firm may protect a monopoly position against entry by writing exclusionary contracts, or by artificially creating real switching costs through technological incompatibility with potential entrants"); *see also* Patrick Greenlee, David Reitman, & David S. Sibley, *An Antitrust Analysis of Bundled Loyalty Discounts*, 26 INT'L J. IND. ORGAN. 1132, 1134 (2007) ("Employing a bundled loyalty discount imposes switching costs because a customer that shifts some purchases to a rival seller pays a higher unit price for the quantity still purchased from the incumbent.").

even if the rival and monopolist products were of identical price and quality, the monopolist could raise its prices by $S_N + S_A$ without losing any customers.[196]

### *D. Deterring Investment and Innovation*

148. In markets where competition by innovation is important, restricting rival sales can deny rivals economies of scale in recouping investments in research.[197] If a substantial share of customer purchases is restricted from purchasing rival products, then successful innovations will have a smaller payoff than they otherwise would have, which will discourage efficient investments and innovation.[198] As I explained above in Part I.C.1, firms must continually innovate to stay competitive in the high-end residential system market, and consequently spend millions of dollars per year on research and development. However, because Crestron's exclusive dealing has restricted Savant's sales, it has significantly reduced Savant's return on investment on research and development below but-for levels. Economic theory therefore predicts that Savant's profit-maximizing amount of research and development would be significantly higher in the but-for world than it has been in the actual world. If Savant's profit-maximizing amount of research and development had been higher, then economic theory predicts that Savant would have engaged in more research and development, which would have resulted in better and/or cheaper products. This would have benefited consumers not only by making Savant a better option (better price-adjusted quality), but also by imposing a greater constraint on Crestron's ability to raise prices.

### *E. Impairing Rival Efficiency*

149. Crestron's exclusive dealing has impaired Savant's efficiency by depriving it of economies of share and scale. Markets often exhibit various economies of share, such as economies of scale and of scope, as well as research, learning, or network effects.[199] Here, restricting a large share of the market and

[196] That is, the rival must be able to satisfy the equation $(V_R - P_R) - (V_M - P_M) > (S_N + S_A)$, taking $V_M$, $P_M$, $S_N$, and $S_A$ as given, in order to induce the customer to switch.

[197] ELHAUGE & GERADIN, GLOBAL ANTITRUST LAW & ECONOMICS 499 (2d ed. 2011).

[198] *Id.*

[199] *See* Einer R. Elhauge *Defining Better Monopolization Standards*, 56 STAN. L. REV. 253, 320–23 (2003); Einer R. Elhauge, Antitrust Analysis of GPO Exclusionary Agreements, Comments Regarding Hearings on Health Care and Competition Law and Policy: Statement for DOJ-FTC Hearing on GPOs at 3–9 (Sept. 26, 2003), available at

reducing Savant's sales below but-for levels has impaired Savant's efficiency in at least two ways: (1) depriving it of economies of scale in production, and (2) depriving it of economies of scale in its regional sales force.

*1. Economies of Scale in Purchasing and Production*

150. Savant experiences significant economies of scale in production, meaning that its per-unit costs are lower when its current output is higher. Savant outsources production of most of its products to a firm called CTS that specializes in manufacturing electronics equipment.[200] CTS is often able to produce Savant's products at lower per-unit costs at higher volumes, and consequently CTS charges Savant lower prices when Savant orders larger volumes.

151. For example, one of Savant's top-selling products, a stereo preamplifier output module that allows a Savant system to distribute audio from multiple inputs to multiple outputs,[201] is significantly cheaper for Savant to purchase at higher quantities than at lower quantities. An April 2011 quote from CTS to Savant states that CTS would charge Savant $198.23 per unit if it ordered

---

http://www.law.harvard.edu/faculty/elhauge/pdf/statement_ftcdoj.pdf [hereinafter Elhauge Statement to the DOJ/FTC]; *See also* DENNIS W. CARLTON & JEFFREY M. PERLOFF, MODERN INDUSTRIAL ORGANIZATION 36–40, 44–47 (3d ed. 2000) (discussing economies of scale and scope); XI HERBERT HOVENKAMP, ANTITRUST LAW 94–95 (1998); Louis Kaplow & Carl Shapiro, *Antitrust*, HANDBOOK OF LAW AND ECONOMICS 1206 (A. Mitchell Polinsky & Steven Shavell, eds., Elsevier, 2007) (stating that because of restriction, rivals to a dominant firm "may indeed conclude that making the necessary investments to expand its product line, manufacturing capacity, sales and distribution network, or advertising would not yield a sufficient return."); Thomas G. Krattenmaker & Stephen C. Salop, *Anticompetitive Exclusion: Raising Rivals' Costs to Achieve Power Over Price*, 96 YALE L.J. 209, 234–45 (1986); Stephen C. Salop & David T. Scheffman, *Raising Rivals' Costs*, 73 AM. ECON. REV. 267 (1983) (Special Issue); James E. Hodder & Yael A. Ilan, *Declining Prices and Optimality When Costs Follow an Experience Curve*, 7 MANAGERIAL & DECISION ECON. 229 (1986); A. Michael Spence, *The Learning Curve and Competition*, 12 BELL J. ECON. 49 (1981); David S. Evans & Richard Schmalensee, *A Guide to the Antitrust Economics of Networks*, ANTITRUST, Spring 1996, at 36; Michael L. Katz & Carl Shapiro, *Systems Competition and Network Effects*, 8 J. ECON. PERSP. 93 (1994); S.J. Liebowitz & Steve Margolis, *Network Effects and Externalities*, in THE NEW PALGRAVE DICTIONARY OF ECONOMICS AND THE LAW 671 (1998).

[200] *See* "32 Top Savant High-end Component Suppliers.csv".

[201] In the Savant product catalog and database, the product code for this item is "AOM-016U". This paragraph focuses on the sixth version of this product, "AOM-016U-05" (the first versions are marked "-00"). This particular version is Savant's 3rd best selling product of all time (in terms of total dollar sales). *See* "J03 Savant Product Leadtimes.xslx".

1,000 units per year, but only $176.88 if it ordered at least 2,000 units per year, and only $176.12 if it ordered 4,000 units or more per year.[202] Savant's purchase database indicates that this purchase contract was effective from March 10, 2011 to October 3, 2012.[203] During this period, with Crestron's exclusive dealing restraining Savant's sales, Savant purchased only 1,618 units on an annualized basis.[204] Thus, if Savant's sales would have been at least 1.23 times higher (2,000/1,618) in the but-for world, its per-unit costs for this product would have decreased by 12%.[205]

152. Depriving Savant of such economies of scale by restraining its sales impairs its efficiency and harms consumers in two ways. First, it worsens market options because increasing Savant's per-unit costs also increases its profit-maximizing prices. Second, it enhances Crestron's market power, and thus allows Crestron to raise prices above but-for levels, by impairing Savant's ability to constrain Crestron prices.

*2. Economies of Scale in Regional Sales Force*

153. Savant also experiences economies of scale in its regional sales force. Regional salespeople can increase Savant's sales, but will increase profits only if demand in the region is sufficiently large to justify the cost of employing a regional sales person. As an extreme example, employing a regional salesperson in the middle of a desert with only one small customer would cost Savant more than it gained in sales. Here, the difference between Savant's residential and commercial sales territories indicates that Savant experiences economies of scale in its regional sales force. Savant's residential sales are significantly higher than its commercial sales,[206] and consequently Savant has seven different regional sales

---

[202] *See* "AOM-016U-05 (remake of 2010-0273-NH) 4-26-11.pdf"

[203] *See* "37 AOM-016U-05 purchases.csv". The "direct purchase cost" is equal to $198.23 – the price if Savant ordered 1,000 units per year in this quote – from March 10, 2011 to October 3, 2012. Neither the direct purchase cost before or after this period match any amounts in this quote ($191.04 for before, and $188.32 after).

[204] *See* "37 AOM-016U-05 Annualized Units Purchased.csv". As expected, Savant's annualized sales of this product are slightly lower (1,316), reflecting the fact that high-end system suppliers (such as Savant and Crestron) want to maintain some inventory due to the relatively long times it takes to obtain additional quantity. "37 AOM-016U-05 Annualized Units sold.csv".

[205] ($198.23 / $176.88 – 1).

[206] *See* "Savant – COGS Details.xls", 2010 tab. It indicates "Sales Product-Residential" as $12,887,992, as compared to only $969,737 for "Sales Product – Commercial".

managers for the residential market who each focus on a particular area of North America (the United States and Canada).[207] In contrast, Savant has only two regional sales managers for commercial (also called "Enterprise") sales, one taking each side of the country.[208] This is consistent with it being profit-maximizing for Savant to invest in more regional salesforce only when there is sufficient demand for the product in the region. Thus, restricting Savant from gaining access to dealers in a given locality can make it unprofitable for Savant to employ regional sales people (or additional regional salespeople), even if it would be profitable to do so if the regional dealer demand for Savant products was not restrained by Crestron's exclusive dealing. When Crestron's exclusive dealing deters Savant from employing additional regional salesforce, that weakens Savant's ability to compete in the region, which in turn allows Crestron to raise prices higher than it otherwise would.

### *F. Impairing Rival Expandability*

154. Exclusionary contracts that shrink rival market share can also have the anticompetitive effect of impairing rival ability to expand sales, even if shrinking rival share does not reduce rival efficiency. A monopolist's power over price stems from its ability to restrict output and raise prices without rivals expanding to replace the monopolist's lost output or undercut its prices. The more rivals can expand sales, the less the monopolist can restrict output to raise prices above the competitive level. Because in reality a smaller rival cannot expand as fast as a larger rival, standard economic models assume that rivals' ability to expand depends in part on how large they already are. Standard economic models therefore also assume that market power increases when rival market shares are lower or rivals have less ability to expand.[209] The result is that, unless the rival elasticity of supply is infinite, restraining rival market share in ways unrelated to product merits (such as by using exclusionary restrictions, reducing access to

[207] SAVANT1543753 at slide 3 (October 1, 2012 internal Savant slideshow titled "Sales Organization & Channel Alignment: Draft Execution Plan". A slide titled "Residential Regional Sales Managers Territories" shows seven different regional sales manager in the Residential sales channel splitting up the United States and Canada into smaller regions).

[208] SAVANT1543753 at slide 4 (October 1, 2012 internal Savant slideshow titled "Sales Organization & Channel Alignment: Draft Execution Plan". A slide titled "US Enterprise Regional Sales Managers Territories." There are only two regional sales managers listed, one taking the Western U.S. and the other taking the East).

[209] *See* William M. Landes & Richard A. Posner, *Market Power in Antitrust Cases*, 94 HARV. L. REV. 937, 944–45, 985–86 (1981).

distributors, or deceiving buyers) leads to anticompetitive effects even if it does not lower rival efficiency.

155. Here, Savant experiences constraints on its expandability because it takes significant amounts of time to manufacture its products. For example, if Savant placed a new order for its top-selling product, item number VIM-30D4-06 (a video input module used with digital media switchers), that order would not be ready until about 140 calendar days later.[210] Consequently, if Crestron restricted its own output and raised prices, it would take at least 140 days for Savant to increase its output in response.

## VII. Damages Due to Exclusive Dealing

156. Plaintiff counsel has asked me to estimate the profits Savant lost on high-end residential sales in the United States because of Crestron's exclusive dealing. Savant's lost profits equal the total profits (or losses) it would have earned in a but-for world without Crestron's exclusive dealing, minus the actual profits (or losses) it earned in the actual world with Crestron's exclusive dealing. Savant's profits would have been higher (or losses lower) without Crestron's exclusive dealing primarily because it would have sold significantly more units if the market had been unrestricted. Although Savant's profits would have been higher in the but-for world also because its per-unit costs would have been lower, in this damages analysis I conservatively assume that Savant's per-unit costs would remain the same.

157. Part A below estimates the additional revenues Savant would have earned in the but-for world. Part B then estimates the additional costs Savant would have to incur to earn that additional revenue. Lastly, Part C subtracts the additional costs Savant would incur in the but-for world from the additional revenues it would earn in the but-for world, which produces Savant's lost profits. I calculate damages from June 2008, when Crestron first started telling dealers to make a "choice" between Crestron and Savant, until March 31, 2013. I calculate damages separately for each calendar year.[211]

[210] *See* "J03 Savant Product Leadtimes.csv". Savant's Salesforce database tracks the lead times of its products.

[211] None of these damages figures include interest on lost profits from the time they were lost. However, I can estimate how much that interest would be at the Court's request.

### *A. Additional But-For Revenue*

158. Because Crestron's exclusive dealing restricted dealers from freely purchasing Savant products, Savant would have sold significantly more high-end system components had Crestron not engaged in exclusive dealing.

159. Ideally, one would calculate Savant's but-for sales by analyzing some control group of customers that were not exposed to Crestron's exclusive dealing. If Savant's share among these unrestricted customers were, for example, 40%, that would suggest that Savant would normally obtain a 40% share in an unrestricted marketplace (assuming there were no significant confounding factors). Here, because Crestron had a general policy of informing dealers of its exclusivity policy, the best available benchmark is the group of dealers for which there is affirmative evidence indicating that Crestron either: (1) never informed them of its exclusivity policy, or (2) initially informed them of its exclusivity policy, but later told them that they could buy Savant without being terminated. Here, comparing Savant's share at all dealers to the share at the nine dealers who claimed they were unrestricted (while they were unrestricted) shows that Savant has been able to grow significantly faster at the latter group. Figure 7 below shows that Savant's share among these dealers claiming to be unrestricted (only after they became unrestricted, if they were previously restricted),[212] grew significantly faster than its overall share from June 7, 2008 to September 30, 2013. These shares are all relative to Crestron because I do not have dealer-level data from AMX.[213]

---

[212] For example, Pro Design did not become unrestricted until September 30, 2010. Brian Moffett Declaration at ¶¶5-7. Similarly, Stereo One did not become unrestricted until September 2009. John Selby Deposition at 14. And Cyber Sound & Security did not become unrestricted until September 21, 2009. Jon Summer Declaration ¶10. For the dealers who claim they were always unrestricted, this statistic starts at June 7, 2008, which is the start of Crestron's exclusive dealing policy. *See supra* Part II.

[213] Because AMX's shares have recently been very low in the high-end systems market, *see supra* Part I.B, these relative shares are unlikely to be much different if one had access to dealer-level AMX data and included them.

**Figure 7: Savant's Share (Relative to Crestron) at Dealers Claiming to be Unrestricted, Compared to Savant's Share at All U.S. Dealers[214]**




| | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 |
|---|---|---|---|---|---|---|
| Unrestricted | 1% | 3% | 15% | 37% | 45% | 54% |
| All | 2% | 6% | 13% | 23% | 29% | 32% |

160. Figure 8 shows the individual shares of the five largest unrestricted dealers, which constitute 89% of total Crestron and Savant sales to these nine unrestricted dealers.[215] The thickness of the line is in proportion to the size of the dealer (meaning that that relatively thinner teal line for EDG indicates that it is smaller than the rest).

---

[214] *See* "47 Unrestricted Dealer Shares.csv".

[215] The sixth largest, Tempus, has a 0% Savant share except for a spike to 62% in 2012. Newport AV/Attack Communications, the seventh largest, has a 0 % Savant share the entire time. Although Newport AV/Attack Communications is so small that it does not significantly affect the overall shares, it should be noted that contemporaneous emails indicate that Steve Vickers of Attack Communications emailed Savant in 2008 stating that "Brian [Nachum, a sales representative at Crestron] was in to threaten me again today. He told me that Dave sell told him to cut off anyone that is selling Savant."). Savant0484583. The eight largest, Pro Design, had 100% Savant shares the entire time it was unrestricted. The smallest, Stereo One, had 0-1% shares the entire time it was unrestricted.

**Figure 8: Shares of Five Largest Individual Unrestricted Dealers**[216]




161. There is no evidence that this group of unrestricted dealers inherently preferred Savant more than dealers did in general. If anything, the evidence indicates the opposite: before Crestron started using exclusive dealing, none of these unrestricted dealers purchased Savant components.[217]

162. Using this subset of dealers as a benchmark for Savant's but-for market share will conservatively underestimate Savant's lost profits for three reasons. First, even if *Crestron* did not directly inform some of these dealers of its exclusivity policy, the evidence indicates that dealers heard about Crestron's policy through other channels as well (such as the Internet). This may have caused even this subset of dealers to be less willing to purchase Savant than if Crestron had never initiated an exclusivity policy. Second, Crestron's conduct reduced Savant's ability to compete for *every dealer* in the market by deterring Savant from

---

[216] *See* "47 Individual Unrestricted Dealer Shares.csv".

[217] *See* "47 Sav Shares Pre XD." Savant's share among all dealers from January 1, 2008 to June 6, 2008 (the last day before Crestron's exclusive dealing policy was instituted) was 0.5%.

investing as much in innovation and by raising Savant's per-unit costs. This equally impaired Savant's ability to sell to all dealers in the actual world, and thus comparing Savant's performance at one set of dealers to its performance at another will completely ignore this anticompetitive effect. Third, this group of dealers bought absolutely no Savant products before Crestron started using its exclusive dealing policy, suggesting that this group may on average inherently value Savant less than the market as a whole.

163. For each year and Savant product, I calculate the but-for revenues as actual revenues on high-end residential product sales in the United States times Savant's but-for market share in that year divided by Savant's actual market share in that year.[218] This methodology conservatively underestimates damages because it assumes that: (1) the market would not expand at all if Crestron's anticompetitive conduct were eliminated, and (2) Savant would not alter its prices in the but-for world if its costs were lower, even though doing so would increase Savant's profits.

**Table 3: Savant Total But-For Revenues[219]**

| Year | Actual Revenue [a] | But-for Share [b] | Actual Share [c] | [b]/[c] | But-for Revenue [d] |
|---|---|---|---|---|---|
| 2008[220] | $1,077,279 | 0.9% | 2.0% | 0.45 | $484,776 |
| 2009 | $4,487,803 | 3.1% | 6.2% | 0.5 | $2,243,901 |
| 2010 | $10,424,591 | 14.7% | 13.4% | 1.1 | $11,435,931 |
| 2011 | $18,646,884 | 36.6% | 22.9% | 1.6 | $29,802,444 |
| 2012 | $26,379,946 | 45.1% | 28.7% | 1.57 | $41,454,200 |
| 2013[221] | $24,798,166 | 53.5% | 32.4% | 1.65 | $40,947,588 |

[218] As noted above, these shares calculated based on subsets of dealers are all relative to Crestron because AMX has not provided dealer-level data.

[219] *See* "48 But-For Revenues.xlsx".

[220] I excluded from Savant's 2008 actual revenues any sales made before June 7, 2008, when Crestron first started engaging in exclusive dealing against Savant.

[221] 2013 only includes January 1 through September 30 because Crestron's sales data end son September 30, 2013.

164. Table 4 below shows the additional revenues Savant would have earned in the but-for world in each year. Because Savant's benchmark shares were slightly lower than its actual shares in 2008 and 2009, Savant's "additional revenues" are negative for those two years.

**Table 4: Additional Revenues Savant Would Have Earned in the But-for World**

| Year | Actual Revenues [a] | But-for Revenues [d] | Additional But-For Revenues [e] = [d] – [a] |
|---|---|---|---|
| 2008 | $1,077,279 | $484,776 | $(592,504) |
| 2009 | $4,487,803 | $2,243,901 | $(2,243,902) |
| 2010 | $10,424,591 | $11,435,931 | $1,011,340 |
| 2011 | $18,646,884 | $29,802,444 | $11,155,560 |
| 2012 | $26,379,946 | $41,454,200 | $15,074,254 |
| 2013 | $24,798,166 | $40,947,588 | $16,149,422 |

### *B. Additional But-for Costs*

165. In order to earn this additional revenue, Savant would also have to incur additional costs. The costs that would have changed in the but-for world, where Savant would have sold a significantly larger quantity of products, are the costs that Savant would have to incur to sell these additional products.[222] In other

[222] In contrast, the other costs that Savant incurred in the actual world would not have been any different in the but-for world. For example, if demand for Savant products suddenly increased because dealers were no longer restricted from purchasing Savant products, Savant would not have to incur any additional research and development costs to sell those additional products. However, note that, although Savant could satisfy this additional demand without incurring additional research and development costs, removing the restriction on the market would likely increase Savant's profit-maximizing amount of research and development because Savant would earn a greater return on any investments it made. By assuming that Savant would not increase its research and development costs in the but-for, I am conservatively assuming that

words, they are the costs Savant would have to incur if dealers suddenly started ordering more Savant products (economists usually call these "incremental" costs). For Savant, its main incremental costs are:[223]

A. Cost of purchasing or producing an additional unit
B. Costs of defective units that could not be sold, or repairing a defective unit[224]
C. The cost of shipping the product from the manufacturer to Savant
D. The cost of shipping the product from Savant to the dealer
E. The "Warranty cost" and "RMA" costs, which are the costs Savant must incur to repair and replace products
F. Commissions paid to salespeople.

166. Because Savant sells many different high-end system components, I calculated these average incremental costs across all of Savant's units as a percentage of sales revenue. These costs varied slightly over time, so I calculated these percentages separately for each year. I calculated Savant's average incremental cost of producing or purchasing additional units using Savant's sales and purchasing databases.[225] I obtained data on the other incremental costs from Savant's financial statements, and calculated the percentage of revenue each comprised by dividing each respective cost in each year by Savant's total revenue from products sold in that year.[226] Using Savant's actual profit margins conservatively underestimates damages because the evidence shows that Savant's

---

Savant would forego the additional profits it could earn by increasing its research and development expenditures from their actual levels (which are artificially restricted) to the levels that would be profit-maximizing in the but-for world. In other words, this assumption causes me to understate damages.

[223] Savant also pays small amounts of royalties, which I include in my damages calculations because they increase with the number of units sold (in contrast to the license fees it pays, which do not depend on the number of units it sells). In measuring Savant's additional incremental costs, I also account for discounts on Savant's purchases that are not accounted for in Savant's sales and purchase data. These are called "vendor discounts" in Savant's COGS spreadsheets. They are included in the "other incremental costs" group.

[224] For example, if 2% of purchased units are defective, purchasing 100 units will only yield 98 sellable units, and thus the purchase cost per sellable unit is actually 1/98% times the purchase cost per unit.

[225] For many products, Savant's sales database lists the cost of purchasing and producing the product. For the remaining products with positive incremental costs, I relied on Savant's purchasing data for its per-unit purchasing costs. For any given product and date, I used the most recent price at which Savant purchased that product.

[226] *See* "CORRECTED Savant Incremental Cost Spreadsheet.xlsx". To be conservative, I use Dr. Stiroh's estimates of Savant's commissions, and include accounting variances. *See* Stiroh Exhibits 7A-C.

per-unit costs would have been lower in the but-for world due to economies of scale.[227] Table 5 below summarizes Savant's incremental costs as a percentage of its total revenue, by year.

| Table 5: Savant's Incremental Costs as a Percentage of Net Revenue[228] | | | |
|---|---|---|---|
| **Year** | **Purchase/ Production** | **Other Incremental Costs** | **Total Incremental Costs [f]** |
| 2008 | 73% | 47 | 120 |
| 2009 | 62% | 34% | 96% |
| 2010 | 61% | 17% | 78% |
| 2011 | 50% | 16% | 66% |
| 2012 | 46% | 13% | 59% |
| 2013 | 51% | 12% | 63% |

167. Multiplying Savant's additional but-for revenues times its incremental costs as a percentage of revenue produces the additional costs Savant would have to incur in the but-for world to earn this additional revenue. Table 6 shows the additional costs Savant would have incurred in the but-for world from June 2008 to September 2013. Because Savant's benchmark shares were lower than its actual shares for 2008 and 2009, these "additional costs" are negative for those years.

[227] *See supra* Part VI.E.
[228] *See* "CORR48 Total Incremental Costs.csv".

| Table 6: Additional But-For Costs[229] | | | |
|---|---|---|---|
| Year | Additional But-for Revenues [e] | Incremental Costs as % of Revenue [f] | Additional But-for Costs [g] = [e] * [f] |
| 2008 | $(592,504) | 120 | $(700,408) |
| 2009 | $(2,243,902) | 96% | $(2,161,025) |
| 2010 | $1,011,340 | 78% | $791,579 |
| 2011 | $11,200,000 | 66% | $7,386,353 |
| 2012 | $15,100,000 | 59% | $8,941,414 |
| 2013 | $16,100,000 | 63% | $10,199,174 |

### *C. Savant's Lost Profits from Creston's Exclusive Dealing*

168. Savant's lost profits equal the additional revenues it would have earned in the but-for world minus the additional costs it would have incurred in the but-for world. Table 7 below presents Savant's lost profits due to Crestron's exclusive dealing. I exclude 2008 from this damages calculation because Savant simultaneously had a negative profit margin and a benchmark share below its actual share in 2008, resulting in a tiny amount of lost profits ($108,000) due to selling fewer units in the but-for world. Likely because this methodology is so conservative, it also results in slightly negative damages for 2009 due to Savant's profit-margin being positive in that year but its actual share slightly exceeding its but-for share in that year. To be conservative, I include these reduced damages in my total estimate. The figures up to September 30, 2013 rely on Crestron and Savant detailed sales data, but Crestron has yet to produce data after that time. I therefore apply the monthly rate of lost profits in 2013 to the six months span from October 1, 2013 to March 31, 2014. If Crestron provides updated sales data, I will update my damages estimates accordingly.[230]

---

[229] *See* "CORR48 Addl costs.csv".

[230] The monthly rate of damages for January 1 to September 30, 2013 was $5,950,248 divided by 9, or $661,139. Multiplying this rate of damages times the six month span from October 1, 2013 to March 31, 2014 produces prorated damages for this period of $3,966,832.

| **Table 7: Savant's Lost Profits due to Crestron's Exclusive Dealing**[231] | | | |
|---|---|---|---|
| **Year** | **Additional But-for Revenues [e]** | **Additional But-for Costs [g]** | **Lost Profits [e] – [g]** |
| 2009 | $(2,243,902) | $(2,161,025) | $(82,877) |
| 2010 | $1,011,340 | $791,579 | $219,762 |
| 2011 | $11,200,000 | $7,386,353 | $3,769,207 |
| 2012 | $15,100,000 | $8,941,414 | $6,132,840 |
| Jan – Sep 2013 | $16,100,000 | $10,199,174 | $5,950,248 |
| **Total until Sep 2013** | $41,167,438 | $25,178,258 | $15,989,180 |
| Oct 2013 – March 2014, Prorated | $10,733,333 | $6,766,501 | $3,966,832 |
| **Total to until March 2014** | **$51,900,771** | $31,944,759 | $19,956,012 |

## VIII. THE ANTICOMPETITIVE EFFECTS OF DECEPTION

169. Savant alleges that Crestron deceived customers by claiming that Savant was inferior to Crestron in various ways. Because the truth of these allegations is not an economic question, I do not opine on whether Crestron's statements were deceptive. Instead, I explain how the alleged deception, if proven, would harm competition. Deception is wholly undesirable economic conduct that can cause serious competitive harm without any corresponding benefit or added efficiency.

170. There are no efficiency benefits to deception.[232] Deception neither lowers the deceiver's production costs nor improves the quality of the deceiver's product. In contrast, deception has strong anticompetitive effects because it

[231] *See* "CORR48 Lost profits.csv".

[232] *See* Maurice E. Stucke, *When a Monopolist Deceives*, 76 ANTITRUST L.J. 823, 825 (2010) ("Deception lacks any redeeming economic qualities or cognizable efficiency justifications."); *see also* Einer Elhauge, *Defining Better Monopolization Standards*, 56 STAN. L. REV. 253, 281 (2003) ("[D]eceptive conduct by a monopolist to enhance or maintain its monopoly power is patently undesirable…").

distorts buyer choices, thus reducing market efficiency and excluding rivals.[233] Market efficiency is directly impaired (even if rival efficiency is not) because the distortion of buyer choice means that some buyers will buy a product that they did not actually prefer given its true features or will pay more for that product than they would have without the deception. Rival efficiency can suffer because the deception either takes sales away from rivals, depriving rivals of economies of size,[234] or requires rivals to incur costly efforts to combat the deception.[235] This increase in rival costs will tend to increase rival prices and lessen the rival's ability to constrain the deceiver's pricing power, further raising the deceiver's prices as well and resulting in a marketwide increase in prices. Thus, deception can foster monopoly power and harm competition as readily as exclusionary contracts, if not more so.

171. The potential for deception to anticompetitively exclude rivals is especially great in industries that are driven by non-price considerations that are opaque and difficult to verify. In such industries, even a knowledgeable consumer can be deceived. For example, claims about certain products require extensive technical expertise and expensive testing to verify. Even a knowledgeable customer may rationally decide to rely on a seller's assertions rather than conducting burdensome verification.[236]

172. A simple example will illustrate the ability of deception to foster monopoly power. Suppose Firm A is the sole incumbent in a market and suddenly faces new competition from Firm B. Firm B is equally efficient as Firm A, in the sense that its per-unit costs are the same as Firm A's if they are both selling equal

---

[233] *See* Elhauge, *Defining Better Monopolization Standards*, *supra* note 232, at 281 ("Lying is cheap in the short run, and can immediately shift buyers away from rivals. The costs of lying are, if anything, likely to come in the long run, when the consumers figure out the lies, which should diminish the reputation of the lying firm in a way that may make consumers more reluctant to buy from it. But by then the anticompetitive exclusion of the rival may have already been achieved."); Stucke, *supra* note 232, at 824 (noting that when deceived, "[m]arket participants do not act with full and perfect knowledge … and enter suboptimal transactions").

[234] *See* Elhauge, *Defining Better Monopolization Standards*, *supra* note 232, at 321.

[235] *See* Stucke, *supra* note 232, at 825 (noting that deception's harms to rivals include "increasing the transaction costs for honest sellers to differentiate their products and to reap the financial, reputation-related rewards associated with their desirable products; … raising rival's costs (in having to respond to a competitor's deceptive statements); … increasing entry barriers for new products (whose qualities and risks cannot be quickly assessed); … and creating 'lemon' markets where lower-quality goods or services drive out higher-quality goods or services").

[236] *See id.* at 835 ("[E]ven sophisticated purchasers are at times overconfident and can be duped.").

quantities. However, there are significant economies of scale in the market, meaning that Firm B's per-unit costs will be higher if it is selling fewer units. If the deception reduced Firm B's sales below what would have occurred without the deception, then the deception will not only have distorted consumer choices, but also impaired Firm B's efficiency by depriving it of economies of scale. This will increase Firm B's per-unit costs above but-for levels, which under standard economic models will increase both Firm B's price and Firm A's price above but-for levels.

173. Moreover, in this case, deception could also enhance the anticompetitive effects of Crestron's exclusive dealing. This is because deceptive claims as to the superiority of Crestron products could cause customers to form a preference for Crestron over Savant when they would otherwise be indifferent between the two (or even prefer Savant). This, in turn, would increase the incontestable portion of demand for high-end controllers, and reduce the contestable portion. As a result, any dealer that considered switching the contestable portion of its demand from Crestron to Savant would have to face the prospect of losing the ability to sell Crestron products to a larger portion of its total high-end system needs than it would absent the deception. This would lead Crestron's bundling of incontestable and contestable demand to restrict an even greater portion of the market than in the deception-free world.

## IX. CRESTRON PROFITS DURING PERIOD OF ALLEGED DECEPTION

174. I understand that Savant alleges that Crestron disseminated literally false advertising statements about Savant. Because the truth of these allegations is not an economic question, I do not opine on whether Crestron actually made these statements, or whether they were false. I also understand that Savant seeks damages for these alleged statements in the form of a percentage of Crestron's profits earned on the sale of high-end control systems during the period Savant claims that Crestron disseminated these alleged statements. Savant has therefore asked me to use Crestron's sales data to calculate the profits Crestron earned from the sale of high-end residential control systems in the United States from May 11, 2009 to January 25, 2012. Table 8 below thus presents the profits Crestron earned on the sale of high-end residential control systems in the United States during this period according to Crestron's sales database.[237]

[237] The source for this table is "36 Crestron Monthly High-end Sales Profits.xlsx".

| **Table 8: Crestron Profits on High-End Residential U.S. Sales** | | | | |
|---|---|---|---|---|
| **Year** | **Month** | **Net Revenue** | **Cost of Goods** | **Sales Profits** |
| 2009 | 5 | $4,669,613 | $1,815,567 | $2,854,046 |
| 2009 | 6 | $9,654,922 | $3,817,479 | $5,837,443 |
| 2009 | 7 | $6,042,988 | $2,556,675 | $3,486,313 |
| 2009 | 8 | $4,997,945 | $2,114,132 | $2,883,813 |
| 2009 | 9 | $5,969,333 | $2,573,433 | $3,395,900 |
| 2009 | 10 | $5,764,811 | $2,397,739 | $3,367,072 |
| 2009 | 11 | $5,532,347 | $2,269,811 | $3,262,536 |
| 2009 | 12 | $5,691,778 | $2,355,451 | $3,336,327 |
| 2010 | 1 | $6,027,105 | $2,021,350 | $4,005,755 |
| 2010 | 2 | $4,614,695 | $1,969,468 | $2,645,227 |
| 2010 | 3 | $5,707,842 | $2,421,717 | $3,286,126 |
| 2010 | 4 | $7,114,591 | $2,398,897 | $4,715,694 |
| 2010 | 5 | $6,341,102 | $2,651,187 | $3,689,915 |
| 2010 | 6 | $9,315,903 | $4,052,924 | $5,262,979 |
| 2010 | 7 | $4,402,954 | $1,753,794 | $2,649,161 |
| 2010 | 8 | $5,071,418 | $1,996,828 | $3,074,591 |
| 2010 | 9 | $5,099,525 | $2,233,887 | $2,865,638 |
| 2010 | 10 | $5,368,241 | $2,366,087 | $3,002,154 |
| 2010 | 11 | $4,449,508 | $1,862,106 | $2,587,402 |
| 2010 | 12 | $4,860,941 | $2,063,046 | $2,797,896 |
| 2011 | 1 | $4,077,113 | $1,791,718 | $2,285,395 |
| 2011 | 2 | $4,343,316 | $1,877,380 | $2,465,936 |
| 2011 | 3 | $5,314,093 | $2,342,702 | $2,971,391 |
| 2011 | 4 | $4,840,229 | $2,239,170 | $2,601,059 |
| 2011 | 5 | $5,329,613 | $2,412,927 | $2,916,686 |
| 2011 | 6 | $8,972,682 | $3,963,251 | $5,009,432 |
| 2011 | 7 | $5,146,803 | $2,076,587 | $3,070,216 |
| 2011 | 8 | $5,388,319 | $2,180,305 | $3,208,014 |
| 2011 | 9 | $4,798,178 | $1,923,917 | $2,874,261 |
| 2011 | 10 | $5,539,623 | $2,375,750 | $3,163,873 |
| 2011 | 11 | $5,192,780 | $2,283,946 | $2,908,834 |
| 2011 | 12 | $4,861,025 | $2,155,046 | $2,705,980 |
| 2012 | 1 | $3,619,723 | $1,621,145 | $1,998,578 |
| **Total** | | **$184,121,060** | **$76,935,422** | **$107,185,638** |

175. Savant has also asked me to calculate the profits Crestron earned from the sale of high-end systems specifically to the dealers that Crestron states in its discovery responses received "comparison guides" from Crestron that Savant alleges to include literally false statements. Savant alleges that Exhibits E, F, G, H, I, and K to its Amended Complaint contain literally false statements about Savant. Crestron's discovery responses listed 89 dealers that it states received these comparison guides, and lists the date it sent each comparison guide to each dealer. I identified each of these dealers in Crestron's sales database and summed Crestron's profits on sales to each of these dealers from the day on which dealer received the comparison guide to January 25, 2012.

**Table 9: Crestron Profits to Dealers Listed as Receiving Exhibits E, F, G, H, I, or K in Crestron's Interrogatories From the Date Received First Comparison Guide to January 25, 2012**[238]

| Year | Net Revenue | Cost of Goods | Profits |
|---|---|---|---|
| 2009 | $60,597 | $29,049 | $31,548 |
| 2010 | $2,189,232 | $922,972 | $1,266,260 |
| 2011 | $4,202,057 | $1,877,391 | $2,324,666 |
| 2012 | $191,943 | $84,765 | $107,178 |
| **Total** | **$6,643,829** | **$2,914,177** | **$3,729,652** |

[238] *See* "36 Crestron Profits to Rog Dealers.csv".

## CONCLUSION

176. In sum, the evidence shows all of the following:

a. ***Relevant Market***. The relevant product market is the market for high-end residential control systems, in which the relevant firms are Crestron, AMX, and Savant. The relevant geographic market is the United States and Canada.
b. ***Monopoly Power***. In this market, Crestron has had monopoly power since Savant's entry to the present, as evinced by Crestron's 66-83% market share, its power to exclude Savant from the market, and its ability to elevate its prices well above cost.
c. ***Exclusive Dealing***. In June 2008, Crestron's executives instituted an exclusive dealing policy that required dealers to choose between Savant and Crestron, and communicated this policy to dealers in multiple ways.
d. ***No Procompetitive Efficiencies***. Crestron's exclusive dealing policy has no procompetitive efficiencies that benefit dealers or homeowners. There is no evidence in Crestron's internal documents indicating any procompetitive efficiencies. Crestron's claims at deposition that exclusive dealing is necessary to ensure dealers are sufficiently skilled is unsound because requiring dealers to install a minimum number of Crestron systems would better achieve this goal. And the fact that Crestron's smaller competitors (AMX and Savant) do not engage in exclusive dealing affirmatively indicates that exclusive dealing is not efficient in this market.
e. ***Large Restriction on Rivals Sales.*** Crestron's exclusive dealing has restricted 50-77% of the market, and concrete examples confirm it can reduce Savant sales below but-for levels.
f. ***Significant Anticompetitive Effects.*** By restricting a large share of the market, Crestron's exclusive dealing has (1) extracted consumer welfare, (2) maintained Crestron's market power over local dealers by excluding Savant, (3) impaired Savant's efficiency, (4) reduced Savant's expandability, (5) exacerbated dealer switching costs, and (6) deterred Savant investment in research and innovation. All of these effects harm consumer welfare.
g. ***Lost Profits from Exclusive Dealing.*** Crestron's exclusive dealing caused Savant damages of approximately $20 million in lost profits.
h. ***Deception.*** Deception, if proven, would be anticompetitive and has no redeeming efficiencies.
**i.** ***Crestron Profits.*** Creston earned profits of more than $107 million while it distributed sales guides that Savant alleges contain literally false statements.

**EXHIBIT A**

**Einer Richard Elhauge**
**Harvard Law School**
**1575 Massachusetts Ave.**
**Cambridge, Ma 02138**

**Tel: (617) 496-0860** **Hauser Hall 502**
**Fax: (617) 496-0861** **elhauge@law.harvard.edu**

**EMPLOYMENT**

**Petrie Professor of Law, Harvard University**

Subjects: Antitrust, Contracts, Health Law Policy, Statutory Interpretation.

Founding Director, Petrie-Flom Center for Health Law Policy, Biotechnology and Bioethics.

Member, ABA Antitrust Section Transition Task Force 2012.

Chair, Obama Campaign's Antitrust Advisory Committee

Co-Chair, Obama Campaign's Blogs and Op-eds Committee

Member, Obama Campaign's Health Policy Advisory Committees.

Member, Editorial Board for Competition Policy International

Member, Advisory Board for the Journal of Competition Law & Economics.

Member, Advisory Board for the Social Sciences Research Network on Antitrust Law & Policy.

Member, Advisory Board for the Social Sciences Research Network on Telecommunications & Regulated Industries.

FTC Special Employee on Antitrust Issues.

Recipient, Jerry S. Cohen Memorial Fund Writing Award (for "Tying, Bundled

Discounts, and the Death of the Single Monopoly Profit Theory"), 2010.

## Books

ELHAUGE, ED., RESEARCH HANDBOOK ON THE ECONOMICS OF ANTITRUST LAW (EDWARD ELGAR PUBLISHING LTD. 2013).

ELHAUGE, OBAMACARE ON TRIAL (2012), available at www.amazon.com

ELHAUGE, U.S. ANTITRUST LAW & ECONOMICS (2d. Ed. Foundation Press 2011; 1st ed. 2008).

ELHAUGE & GERADIN, GLOBAL ANTITRUST LAW & ECONOMICS (2d. Ed. Foundation Press 2011; 1st ed. 2007).

ELHAUGE & GERADIN, GLOBAL COMPETITION LAW & ECONOMICS (2d. Ed. Hart Publishing 2011; 1st ed. 2007).

ELHAUGE, ED., THE FRAGMENTATION OF U.S. HEALTH CARE: CAUSES AND SOLUTIONS (Oxford University Press 2010).

ELHAUGE, STATUTORY DEFAULT RULES (Harvard University Press 2008).

AREEDA, ELHAUGE & HOVENKAMP, VOL X, ANTITRUST LAW (Little, Brown 1996).

## Academic Articles

Elhauge, *Treating RAND Commitments Neutrally* (Feb 2014), available at http://ssrn.com/abstract=2398579

Einer Elhauge, *Obamacare and the Theory of the Firm,* in THE FUTURE OF HEALTH CARE REFORM (Malani and Schill, eds., forthcoming U. Chicago Press

2014).

Elhauge, *Introduction and Overview to Current Issues in Antitrust Economics*, in Research Handbook on the Economics of Antitrust Law (Edward Elgar Publishing Ltd. 2013).

Elhauge & Krueger, *Solving the Patent Settlement Puzzle*, 91 TEXAS LAW REVIEW 283 (2012)

Elhauge & Wickelgren, *Robust Exclusion through Loyalty Discounts with Buyer Commitment*, Harvard Discussion Paper No. 722 (August 2012), available at http://ssrn.com/abstract=2125398

Elhauge & Wickelgren, *Anticompetitive Market Division through Loyalty Discounts without Buyer Commitment*, Harvard Discussion Paper No. 723 (August 2012), available at http://ssrn.com/abstract=2125428

Elhauge, *The Irrelevance of the Broccoli Argument Against the Insurance Mandate*, NEW ENGLAND JOURNAL OF MEDICINE (Dec 21, 2011)

Elhauge, *Why the Google Books Settlement Is Procompetitive*, 2(1) JOURNAL OF LEGAL ANALYSIS 1 (2010).

Elhauge, *The Failed Resurrection of the Single Monopoly Profit Theory*, 6(1) COMPETITION POLICY INTERNATIONAL 155 (Spring 2010).

Elhauge, *Why We Should Care about Health Care Fragmentation and How to Fix It*, in THE FRAGMENTATION OF U.S. HEALTH CARE: CAUSES AND SOLUTIONS 1 (Oxford University Press 2010).

Elhauge, *Tying, Bundled Discounts, and the Death of the Single Monopoly Profit*

*Theory*, 123 HARVARD LAW REVIEW 397 (2009).

Elhauge, *Framing the Antitrust Issues in the Google Books Settlement*, GLOBAL COMPETITION POL'Y, (October 2009 Release 2).

Elhauge, *How Loyalty Discounts Can Perversely Discourage Discounting*, 5 JOURNAL OF COMPETITION LAW & ECONOMICS 189 (2009)

Elhauge, *Disgorgement as an Antitrust Remedy*, 76 ANTITRUST LAW JOURNAL 79 (2009).

Elhauge, *Do Patent Holdup and Royalty Stacking Lead to Systematically Excessive Royalties?*, 4 JOURNAL OF COMPETITION LAW & ECONOMICS 535 (2008)

Elhauge, *How Should Competition Law Be Taught?*, 4(1) COMPETITION POLICY INTERNATIONAL 267 (Spring 2008)

Elhauge, *Harvard, Not Chicago: Which Antitrust School Drives Recent Supreme Court Decisions*?, 3(2) COMPETITION POLICY INTERNATIONAL 59 (Autumn 2007)

Elhauge, *Can Health Law Become a Coherent Field of Law?*, 41 WAKE FOREST L. REV. 365 (2006).

Elhauge, *Sacrificing Corporate Profits in the Public Interest*, 80 N.Y.U. LAW REVIEW 733 (2005)

Elhauge, *Corporate Manager's Operational Discretion to Sacrifice Corporate Profits in the Public Interest*, in ENVIRONMENTAL PROTECTION AND THE SOCIAL RESPONSIBILITY OF FIRMS 13-76 (Bruce Hay, Robert Stavins, & Richard Vietor eds., 2005)

Elhauge, *Defining Better Monopolization Standards*, 56 STANFORD LAW REVIEW 253 (2003)

Elhauge, *Why Above-Cost Price Cuts to Drive out Entrants Do Not Signal Predation or Even Market Power – and the Implications for Defining Costs*, 112 YALE LAW JOURNAL 681 (2003)

Elhauge, *Preference-Estimating Statutory Default Rules*, 102 COLUMBIA LAW REVIEW 2027 (2002)

Elhauge, *Preference-Eliciting Statutory Default Rules*, 102 COLUMBIA LAW REVIEW 2162 (2002)

Elhauge, *The Lessons of Florida 2000*, 110 POLICY REVIEW 15 (Dec 2001 -Jan 2002).

Elhauge, *What Term Limits Do That Ordinary Voting Cannot*, CATO POLICY ANALYSIS, No. 328 (Dec. 16, 1998).

Elhauge, *Are Term Limits Undemocratic?*, 64 U. CHIC. L. REV. 83 (1997).

Elhauge, Lott & Manning, *How Term Limits Enhance the Expression Of Democratic Preferences*, 5 SUPREME COURT ECON. REV. 59 (1997)

Elhauge, *The Limited Regulatory Potential of Medical Technology Assessment*, 82 VA. L. REV. 1525

(1996).

Elhauge, *Allocating Health Care Morally*, 82 CALIF. L. REV. 1449 (1994)

Elhauge, *Toward a European Sale of Control Doctrine*, 41 AM. J. COMP. LAW 627 (1993)

Bundy & Elhauge, *Knowledge About Legal Sanctions*, 92 MICH. L. REV. 261 (1993)

Elhauge, *The Triggering Function of Sale of Control Doctrine*, 59 U. CHIC. L. REV. 1465 (1992)

Elhauge, *Making Sense of Antitrust Petitioning Immunity*, 80 CALIF. L. REV. 1177 (1992)

Bundy & Elhauge, *Do Lawyers Improve the Adversary System? A General Theory of Litigation Advice and Its Regulation*, 79 CALIF. L. REV. 313 (1991)

Elhauge, *Does Interest Group Theory Justify More Intrusive Judicial Review?*, 101 YALE L.J. 31 (1991)

Elhauge, *The Scope of Antitrust Process*, 104 HARV. L. REV. 667 (1991)

<u>Media Publications</u>

"Roberts' Real Long Game?," The Atlantic (July 20, 2012)

"The Fatal Flaw In John Roberts' Analysis Of The Commerce Clause," The New Republic (July 1, 2012)

"The Killer Precedent For Today's Decision," The New Republic (June 28, 2012)

"Even The Most Conservative Supreme Court Justices Have Already Declared Mandates Constitutional," The New Republic (June 21, 2012) (with Emily Bass)

"What a Nobel Prize-Winning Economist Can Teach Us About Obamacare," The Atlantic (May 23, 2012) (with Kevin Caves)

“A Further Response to Critics on the Founding Fathers and Insurance Mandates”, The New Republic (April 21, 2012)

“A Response to Critics on the Founding Fathers and Insurance Mandates”, The New Republic (April 19, 2012)

“It's Not About Broccoli!: The False Case Against Health Care,” The Atlantic (April 16, 2012)

“If Health Insurance Mandates Are Unconstitutional, Why Did the Founding Fathers Back Them?” The New Republic (April 13, 2012)

“Commentary: The Roberts-Kagan Compromise on Obamacare?:, The National Law Journal (March 28, 2012)

“Don’t Blame Verrilli for Supreme Court Health-Care Stumble,” The Daily Beast (March 28, 2012)

“Economists Argue Over the Cost of Caring for the Uninsured,” The Daily Beast (March 26, 2012)

“The Broccoli Test,” New York Times (Nov. 16, 2011)

"Coverage vs Coercion," The Huffington Post (March 3, 2008)

"Rewire This Circuit," The Wall Street Journal, A26 (Sept. 17, 2003)

"Soft on Microsoft," The Weekly Standard (March 25, 2002)

"Despite What the Critics Say, it Wasn't a Bag Job," Boston Globe (March 3, 2002)

"Florida 2000: Bush Wins Again!," Weekly Standard (November 26, 2001 )

"State Made The Right Call On Microsoft," The Hartford Courant (Nov. 9, 2001)

"States Should Seek More From Microsoft," San Francisco Chronicle (Nov. 6, 2001)

"A Smart Move on Microsoft," Boston Globe (Sept. 11, 2001)

"Competition Wins in Court," New York Times, (June 30, 2001)

"Bush v. Florida," New York Times, A31 (Nov. 20, 2000)

"Florida's Vote Wasn't 'Irregular,'" Wall Street Journal (Nov. 13, 2000)

"The New 'New Property'," San Francisco Chronicle (Nov. 6, 2000)

"The Real Problem with Independent Counsels," The Washington Times, A19 (Jun 30, 1999)

"Foul Smoke," The Washington Post, A15 (August 4, 1998)

"The Court Failed My Test," The Washington Times, A-19 (July 10, 1998)

"Microsoft Gets an Undeserved Break," The New York Times,A21 (June 29, 1998)

"Medi-Choice," The New Republic, 24 (November 13,1995)

"Term Limits: Voters Aren't Schizophrenic," Wall Street Journal, A-16 (March 14, 1995)

## Harvard Committees

Chair, Harvard Law School Lateral Appointments Committee (1998-99), Member (2003-05, 2011-present).

Member, Harvard Law School Entry Level Appointments Committee (2009-2011).

Member, Harvard University Standing Committee on the Degree of Doctor of Philosophy in Health Policy (1996-99, 2006-07).

Member, Harvard University Internal Advisory Board for the Interfaculty Initiative in Health Policy (1996-99).

Member, Harvard Law School Lecturers and Visitors Committee (1996-98).

**Past Academic Positions**

| | |
|---|---|
| 1988-95 | Professor of Law, Boalt Hall, University of California at Berkeley |
| 1995 | Visiting Professor of Law, Univ. of Chicago Law School |
| 1994 | Visiting Professor of Law, Harvard Law School |
| 1993 | Visiting Olin Faculty Fellow, Yale Law School |
| 1991-92 | Visiting Scholar in Europe at the Karolinska Institute, the Centre for Health Economics, the Rockefeller Foundation Study Center, Cambridge University, the European University Institute and the University of Florence |

**Clerkships**

| | |
|---|---|
| 1987-88 | Clerk for Justice William J. Brennan, Jr., United States Supreme Court |
| 1986-87 | Clerk for Judge William A. Norris, U.S. Court of Appeals for the Ninth Circuit |
| 1986 | Clerk for U.S. Solicitor General's Office, Washington, D.C. |

**Bar Admissions**: Massachusetts (2000); Pennsylvania (1986); United States Courts of Appeals for the Fourth (1997), Sixth (2008), and Ninth Circuits (1987); Supreme Court of the United States (1997).

**ECONOMICS EXPERT WORK**

President, Legal Economics LLC, 2007 to present.

Senior Expert at Criterion Economics LLC, 2004-2007

Named One of World's Leading Competition Economists in the *International Who's Who of Competition Lawyers and Economists*.

Testifying Expert in *Castro et. al. vs Sanofi Pasteur*, a case alleging anticompetitive bundled loyalty contracts in the vaccines industry.

Testifying Expert in *In re Mushroom Direct Purchaser Antitrust Litigation*, a case alleging price-fixing in the fresh mushroom market.

Testifying Expert in *It's My Party, Inc. v. Live Nation, Inc.*, a case alleging anticompetitive conduct in markets for promotion and amphitheaters.

Testifying Expert in *Retractable Technologies v. Becton Dickinson*, a case alleging exclusionary contracts in syringe and IV catheter markets.

Testifying Expert in *Caldon v. Westinghouse Electric*, a case alleging attempted monopolization.

Testifying Expert in *King Drug v. Cephalon*, a case alleging that a reverse payment settlement of a patent dispute delayed entry and restrained competition.

Testifying Expert for the United States in *United States v. Wyeth*, a case involving claims of bundled sales and bundled discounts.

Testifying Expert in *BAE Holdings AH v. ArmorWorks Enterprises*, a case alleging price discrimination by a ceramic tile manufacturer resulting in harm to downstream competition.

Testifying Expert in *In re Marsh & Mclennan Companies, Inc. Securities Litigation*, a case alleging securities violations from failure to disclose bid steering.

Testifying Expert in *Tessera Technologies v. Hynix Semiconductor*, a case alleging conspiracy to exclude outside technologies from semiconductor markets.

Testifying Expert in *American Steel Erectors v. Local Union No. 7*, a case alleging boycott claims related to steel erection and labor markets.

Testifying Expert in *BP America v. Repsol*, an arbitration.

. Testifying Expert in *Food Lion v. Dean Foods Company*, a class action alleging conspiracies to restrict and foreclose competition in milk markets.

Testifying Expert in *Eisai Inc. v. Sanofi-Aventis U.S. LLC*, a case by a rival alleging foreclosure in anticoagulant pharmaceutical markets.

Testifying Expert in *Daniels v. Tyco*, a case by a rival alleging foreclosure from sharps containers and GPO markets.

Testifying Expert in *Natchitoches Parish Hospital v. Tyco*, a class action concerning sharps containers and GPO markets.

Testifying Expert in *Amgen v. F. Hoffman La Roche*, concerning erythropoietin-simulating agents (ESAs) and white blood cell simulators (WBCs) pharmaceutical markets.

Testifying Expert in *White v. NCAA*, concerning markets for athletic and educational services.

Testifying Expert in *Applied Medical Resources v. Ethicon, Inc*, concerning sutures, trocars, and GPO markets.

Testifying Expert in *Masimo Corp. v. Tyco Health Care Group*, concerning oximetry products and GPO markets.

Testifying Expert in *Rochester Medical v. Bard*, concerning catheter and GPO markets.

Testifying Expert in *Retractable Technologies, Inc. v. Becton Dickinson*, concerning syringes and GPO markets.

Testifying Expert in *Spartanburg v. Hill-Rom*, a class action concerning hospital beds and GPO markets.

Testifying Expert in *Mountain Area Realty v. Wintergreen Partners*, concerning conduct in the real estate brokerage services market.

Testifying Expert in *Louisiana Municipal Police Employees' Retirement System v. Crawford*, concerning merger in the pharmacy benefit manager market.

Testifying Expert in *Capital Credit Alliance v. National Automated Clearing House Association*, concerning electronic checks market.

Testifying Expert for Intel before EC and Korean antitrust authorities on microprocessor markets.

Testifying Expert for AmBev before the EC and Brazilian antitrust authorities on beer market.

Testifying Expert for 1-800-Contacts before the FTC on OSI-CooperVision merger and agreements restraining distribution by nonprescribing retailers.

Testifying Expert in *In Re Cardizem CD Antitrust Litigation*, concerning patents and pharmaceuticals.

Testifying Expert regarding the *B.F. Goodrich-Coltec* Merger, concerning the aerospace industry.

Testifying Expert regarding the *Alcoa-Reynolds* Merger, concerning the aluminum industry

Expert Consultant to National Cable Television Association on Internet Access Bills before Congress and Interactive Television Inquiry before FCC.

Expert for Royal Caribbean for proposed mergers of Princess with Royal Caribbean and Carnival, concerning the cruise industry.

Expert for the Medical Device Manufacturers Association, producing Report to U.S. Senate and Statement to FTC/DOJ regarding exclusionary agreements between medical device suppliers and Group Purchasing Organizations and their hospitals.

## EDUCATION

**Harvard Law School** J.D., June 1986

*Awards*

Fay Diploma -- for graduating first in class

Sears Prize -- Second Year -- to top two students in class

Sears Prize -- First Year -- to top two students in class

*Activities*

Harvard Law Review, Articles Office Co-Chair

Class Marshal

Author: *Modes of Analysis: The Theories and Justifications of Privileged Communications*, 98 HARV. L. REV. 1471-1500 (1985).

**Harvard College** B.A., June 1982

Graduated in three years, majoring in Biochemical Sciences. GPA 3.9

## PERSONAL

Born of Argentinian immigrants in New York City. First language was Spanish. Live with wife and 3 children in Newton, Massachusetts.

## EXHIBIT B

## STATEMENT OF PUBLICATIONS, PRIOR TRIAL AND DEPOSITION TESTIMONY, & COMPENSATION

### I. Publications

My publications from the last 10 years are listed on my CV, which is attached as Exhibit A.

### II. Trial and Deposition Testimony

Within the past four years, I have provided deposition testimony in *Southeastern Milk Antitrust Litigation* on April 22, 2010; *BAE Systems AH v. ArmorWorks Enterprises* on July 16, 2010; *King Drug Co. of Florence, Inc. v. Cephalon* on August 2, 2011; *United States v. Wyeth* on October 12, 2011; *Retractable Technologies v. Becton Dickinson*, on January 20, 2012, February 10, 2012, and February 20, 2013; *DOCA v. Westinghouse Electric Company*, on February 3, 2012; *Eisai v. Sanofi*, on March 1, 2013; *In re Mushroom Direct Purchaser Antitrust Litigation* on October 15, 2013 and *It's My Party vs. Live Nation* on November 18, 2013.

Within the past four years, I have also testified at trial in *Retractable Technologies vs. Becton Dickinson*, on September 10-18, 2013. Other cases in which I have filed expert reports in the last four years are listed in my CV, which is attached as Exhibit A.

### III. Compensation

I am being compensated at a rate of $1045 per hour for my work on this case, and my consulting firm, Legal Economics LLC, is being compensated $235-475 per hour for the work of my staff on this report.

# EXHIBIT 315

| billing_date | soldto_nan | material_n | soldto_nun | monthyear | fiscalyear | fiscalyearva | salesregion | salesregion |
|---|---|---|---|---|---|---|---|---|
| 25-Aug-09 | SAKAB DES | 6503612 | 1006871 | 8/1/2009 | 2009 | V6 | Z001 | East Coast |
| 25-Aug-09 | SAKAB DES | 6503607 | 1006871 | 8/1/2009 | 2009 | V6 | Z001 | East Coast |
| 27-Aug-09 | CINETEC | 6503623 | 1004270 | 8/1/2009 | 2009 | V6 | Z002 | Midwest U. |
| 27-Aug-09 | AUDIO VISI | 6503623 | 1000260 | 8/1/2009 | 2009 | V6 | Z005 | South US-F |
| 27-Aug-09 | GEORGIA H | 6503623 | 1000842 | 8/1/2009 | 2009 | V6 | Z006 | GAMA |
| 27-Aug-09 | AUDIO VID | 6503623 | 1000219 | 8/1/2009 | 2009 | V6 | Z001 | East Coast |
| 27-Aug-09 | PAIR ELECT | 6503623 | 1004780 | 8/1/2009 | 2009 | V6 | Z006 | GAMA |
| 27-Aug-09 | AVID CONC | 6503623 | 1007837 | 8/1/2009 | 2009 | V6 | Z005 | South US-F |
| 28-Aug-09 | HOMELOGI | 6503608 | 1004304 | 8/1/2009 | 2009 | V6 | Z004 | West Coast |
| 31-Aug-09 | AVID CONC | 6503625 | 1007837 | 8/1/2009 | 2009 | V6 | Z005 | South US-F |
| 31-Aug-09 | AUDIO VID | 6503607 | 1000219 | 8/1/2009 | 2009 | V6 | Z001 | East Coast |
| 31-Aug-09 | NATURAL A | 6503607 | 1004595 | 8/1/2009 | 2009 | V6 | Z001 | East Coast |
| 31-Aug-09 | PAIR ELECT | 6503607 | 1004780 | 8/1/2009 | 2009 | V6 | Z006 | GAMA |
| 31-Aug-09 | MAVERICK | 6503607 | 1002872 | 8/1/2009 | 2009 | V6 | Z001 | East Coast |
| 31-Aug-09 | GEORGIA H | 6503607 | 1000842 | 8/1/2009 | 2009 | V6 | Z006 | GAMA |
| 31-Aug-09 | AUDIO VID | 6503607 | 1000231 | 8/1/2009 | 2009 | V6 | Z006 | GAMA |
| 31-Aug-09 | AUDIO INN | 6503607 | 1005476 | 8/1/2009 | 2009 | V6 | Z002 | Midwest U. |
| 31-Aug-09 | AUDIO VID | 6503607 | 1000231 | 8/1/2009 | 2009 | V6 | Z006 | GAMA |
| 1-Sep-09 | E-HOME IN | 6503607 | 1000699 | 9/1/2009 | 2009 | V6 | Z001 | East Coast |
| 1-Sep-09 | APPOLLO S | 6503607 | 1003899 | 9/1/2009 | 2009 | V6 | Z002 | Midwest U. |
| 1-Sep-09 | AVID SOLU | 6503613 | 1004638 | 9/1/2009 | 2009 | V6 | Z003 | Southwest |
| 1-Sep-09 | NATURAL A | 6503613 | 1004595 | 9/1/2009 | 2009 | V6 | Z001 | East Coast |
| 1-Sep-09 | ACCENT EL | 6503613 | 1000027 | 9/1/2009 | 2009 | V6 | Z005 | South US-F |
| 1-Sep-09 | COMMAND | 6503625 | 1000482 | 9/1/2009 | 2009 | V6 | Z005 | South US-F |
| 1-Sep-09 | AVID SOLU | 6503613 | 1004638 | 9/1/2009 | 2009 | V6 | Z006 | GAMA |
| 1-Sep-09 | MAVERICK | 6503613 | 1002872 | 9/1/2009 | 2009 | V6 | Z001 | East Coast |
| 1-Sep-09 | E-HOME IN | 6503613 | 1000699 | 9/1/2009 | 2009 | V6 | Z001 | East Coast |
| 1-Sep-09 | SIGNALS AU | 6503607 | 1001631 | 9/1/2009 | 2009 | V6 | Z004 | West Coast |
| 1-Sep-09 | E-HOME IN | 6503623 | 1000699 | 9/1/2009 | 2009 | V6 | Z001 | East Coast |
| 1-Sep-09 | CUSTOM A | 6503624 | 1004021 | 9/1/2009 | 2009 | V6 | Z003 | Southwest |
| 1-Sep-09 | HITECH STE | 6503613 | 1000913 | 9/1/2009 | 2009 | V6 | Z001 | East Coast |
| 1-Sep-09 | GEORGIA H | 6503625 | 1000842 | 9/1/2009 | 2009 | V6 | Z006 | GAMA |
| 1-Sep-09 | AVID CONC | 6503613 | 1007837 | 9/1/2009 | 2009 | V6 | Z005 | South US-F |
| 1-Sep-09 | GEORGIA H | 6503613 | 1000842 | 9/1/2009 | 2009 | V6 | Z006 | GAMA |
| 1-Sep-09 | CHT SYSTEI | 6503612 | 1003614 | 9/1/2009 | 2009 | V6 | Z003 | Southwest |
| 2-Sep-09 | AUDIO VID | 6503622 | 1000219 | 9/1/2009 | 2009 | V6 | Z001 | East Coast |
| 2-Sep-09 | CHT SYSTEI | 6503622 | 1003614 | 9/1/2009 | 2009 | V6 | Z003 | Southwest |
| 2-Sep-09 | AUTOMATI | 6503623 | 1007371 | 9/1/2009 | 2009 | V6 | Z002 | Midwest U. |
| 2-Sep-09 | HITECH STE | 6503622 | 1000913 | 9/1/2009 | 2009 | V6 | Z001 | East Coast |
| 2-Sep-09 | DIGITAL TH | 6503623 | 1004355 | 9/1/2009 | 2009 | V6 | Z002 | Midwest U. |
| 2-Sep-09 | CINETEC | 6503625 | 1004270 | 9/1/2009 | 2009 | V6 | Z002 | Midwest U. |
| 2-Sep-09 | DIGITAL TH | 6503613 | 1004355 | 9/1/2009 | 2009 | V6 | Z002 | Midwest U. |
| 2-Sep-09 | C-N-C HOM | 6503613 | 1006672 | 9/1/2009 | 2009 | V6 | Z003 | Southwest |
| 2-Sep-09 | CINETEC | 6503623 | 1004270 | 9/1/2009 | 2009 | V6 | Z002 | Midwest U. |
| 2-Sep-09 | AVID SOLU | 6503622 | 1004638 | 9/1/2009 | 2009 | V6 | Z006 | GAMA |
| 2-Sep-09 | NATURAL A | 6503622 | 1004595 | 9/1/2009 | 2009 | V6 | Z001 | East Coast |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 2-Sep-09 | COMPLETE | 6503613 | 1003153 | 9/1/2009 | 2009 | V6 | Z004 | West Coast |
| 2-Sep-09 | AUDIO VID | 6503625 | 1000219 | 9/1/2009 | 2009 | V6 | Z001 | East Coast |
| 2-Sep-09 | AUTOMATI | 6503607 | 1007371 | 9/1/2009 | 2009 | V6 | Z002 | Midwest U. |
| 2-Sep-09 | AVID SOLU | 6503622 | 1004638 | 9/1/2009 | 2009 | V6 | Z003 | Southwest |
| 2-Sep-09 | DFA | 6503622 | 1000667 | 9/1/2009 | 2009 | V6 | Z006 | GAMA |
| 3-Sep-09 | ABBOTT'S A | 6503612 | 1000024 | 9/1/2009 | 2009 | V6 | Z004 | West Coast |
| 3-Sep-09 | HITECH STE | 6503612 | 1000913 | 9/1/2009 | 2009 | V6 | Z001 | East Coast |
| 3-Sep-09 | HOUSTON . | 6503607 | 1004345 | 9/1/2009 | 2009 | V6 | Z003 | Southwest |
| 3-Sep-09 | AUDIO INSI | 6503612 | 1005435 | 9/1/2009 | 2009 | V6 | Z006 | GAMA |
| 3-Sep-09 | COME ALIV | 6503612 | 1006879 | 9/1/2009 | 2009 | V6 | Z002 | Midwest U. |
| 3-Sep-09 | WAVE | 6503612 | 1001996 | 9/1/2009 | 2009 | V6 | Z004 | West Coast |
| 3-Sep-09 | MOBIUS DE | 6503612 | 1005350 | 9/1/2009 | 2009 | V6 | Z005 | South US-F |
| 3-Sep-09 | HOUSTON . | 6503612 | 1004345 | 9/1/2009 | 2009 | V6 | Z003 | Southwest |
| 3-Sep-09 | THE TECH S | 6503612 | 1007794 | 9/1/2009 | 2009 | V6 | Z004 | West Coast |
| 3-Sep-09 | NATURAL A | 6503623 | 1004595 | 9/1/2009 | 2009 | V6 | Z001 | East Coast |
| 3-Sep-09 | AUDIO VID | 6503612 | 1002592 | 9/1/2009 | 2009 | V6 | Z002 | Midwest U. |
| 3-Sep-09 | MAVERICK | 6503612 | 1002872 | 9/1/2009 | 2009 | V6 | Z001 | East Coast |
| 8-Sep-09 | HESI SECUF | 6503607 | 1000888 | 9/1/2009 | 2009 | V6 | Z003 | Southwest |
| 8-Sep-09 | IMAGINE A | 6503613 | 1006913 | 9/1/2009 | 2009 | V6 | Z004 | West Coast |
| 8-Sep-09 | HESI SECUF | 6503623 | 1000888 | 9/1/2009 | 2009 | V6 | Z003 | Southwest |
| 8-Sep-09 | HESI SECUF | 6503613 | 1000888 | 9/1/2009 | 2009 | V6 | Z003 | Southwest |
| 8-Sep-09 | HESI SECUF | 6503622 | 1000888 | 9/1/2009 | 2009 | V6 | Z003 | Southwest |
| 8-Sep-09 | RED DOT A | 6503607 | 1007229 | 9/1/2009 | 2009 | V6 | Z004 | West Coast |
| 8-Sep-09 | IMAGINE A | 6503612 | 1006913 | 9/1/2009 | 2009 | V6 | Z004 | West Coast |
| 8-Sep-09 | HESI SECUF | 6503612 | 1000888 | 9/1/2009 | 2009 | V6 | Z003 | Southwest |
| 8-Sep-09 | RED DOT A | 6503612 | 1007229 | 9/1/2009 | 2009 | V6 | Z004 | West Coast |
| 9-Sep-09 | MYRIAD HC | 6503608 | 1004086 | 9/1/2009 | 2009 | V6 | Z004 | West Coast |
| 10-Sep-09 | APPOLLO S | 6503612 | 1003899 | 9/1/2009 | 2009 | V6 | Z002 | Midwest U. |
| 10-Sep-09 | CUTTING E | 6503612 | 1007384 | 9/1/2009 | 2009 | V6 | Z004 | West Coast |
| 10-Sep-09 | STEREO AN | 6503612 | 1001746 | 9/1/2009 | 2009 | V6 | Z001 | East Coast |
| 11-Sep-09 | AT HOME I | 6503607 | 1000156 | 9/1/2009 | 2009 | V6 | Z002 | Midwest U. |
| 11-Sep-09 | MEDIA DES | 6503613 | 1002672 | 9/1/2009 | 2009 | V6 | Z003 | Southwest |
| 11-Sep-09 | UNLIMITED | 6503607 | 1005064 | 9/1/2009 | 2009 | V6 | Z005 | South US-F |
| 11-Sep-09 | SOUNDVISI | 6503607 | 1001716 | 9/1/2009 | 2009 | V6 | Z004 | West Coast |
| 11-Sep-09 | AV TECHNC | 6503612 | 1000316 | 9/1/2009 | 2009 | V6 | Z003 | Southwest |
| 11-Sep-09 | DIGITAL INT | 6503612 | 1000641 | 9/1/2009 | 2009 | V6 | Z006 | GAMA |
| 11-Sep-09 | C-N-C HOM | 6503612 | 1006672 | 9/1/2009 | 2009 | V6 | Z003 | Southwest |
| 11-Sep-09 | C-N-C HOM | 6503612 | 1006672 | 9/1/2009 | 2009 | V6 | Z003 | Southwest |
| 11-Sep-09 | PROGRESSI | 6503607 | 1001472 | 9/1/2009 | 2009 | V6 | Z001 | East Coast |
| 11-Sep-09 | CINEVISION | 6503612 | 1003906 | 9/1/2009 | 2009 | V6 | Z004 | West Coast |
| 14-Sep-09 | RED DOT A | 6503608 | 1007229 | 9/1/2009 | 2009 | V6 | Z004 | West Coast |
| 15-Sep-09 | COMPLETE | 6503612 | 1003153 | 9/1/2009 | 2009 | V6 | Z004 | West Coast |
| 15-Sep-09 | EPIC AUDIC | 6503608 | 1007805 | 9/1/2009 | 2009 | V6 | Z003 | Southwest |
| 15-Sep-09 | EPIC AUDIC | 6503613 | 1007805 | 9/1/2009 | 2009 | V6 | Z003 | Southwest |
| 15-Sep-09 | DIGITAL LIV | 6503612 | 1005247 | 9/1/2009 | 2009 | V6 | Z005 | South US-F |
| 15-Sep-09 | CUSTOM A | 6503608 | 1004021 | 9/1/2009 | 2009 | V6 | Z003 | Southwest |
| 16-Sep-09 | MAVERICK | 6503608 | 1002872 | 9/1/2009 | 2009 | V6 | Z001 | East Coast |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 16-Sep-09 | THEATER X | 6503736 | 1004641 | 9/1/2009 | 2009 | V6 | Z004 | West Coast |
| 16-Sep-09 | QWEBL | 6503608 | 1007422 | 9/1/2009 | 2009 | V6 | Z003 | Southwest |
| 16-Sep-09 | QWEBL | 6503607 | 1007422 | 9/1/2009 | 2009 | V6 | Z003 | Southwest |
| 16-Sep-09 | AUDIO VID | 6503608 | 1000219 | 9/1/2009 | 2009 | V6 | Z001 | East Coast |
| 16-Sep-09 | UNLIMITED | 6503608 | 1002487 | 9/1/2009 | 2009 | V6 | Z002 | Midwest U |
| 16-Sep-09 | HIGH SEAS | 6503608 | 1005394 | 9/1/2009 | 2009 | V6 | Z005 | South US-F |

| historicalre | salesrep | salerep_de | salesreptyp | plant_num | plant_nam | material_d | itemcatego | itemcatego |
|---|---|---|---|---|---|---|---|---|
| East Coast | R1-6 | Patrick Luc | Residential | 10 | Volvo Plant | PLX2- | TAN | Standard It |
| East Coast | R1-6 | Patrick Luc | Residential | 10 | Volvo Plant | PTL4- | TAN | Standard It |
| Midwest U | R3-2 | Craig Gulle | Residential | 10 | Volvo Plant | P-DIMRF-6 | TAPQ | Price Hdr-S |
| South US-F | R2-5 | John Gutek | Residential | 10 | Volvo Plant | P-DIMRF-6 | TAPQ | Price Hdr-S |
| GAMA | R2-2 | Scott Smith | Residential | 10 | Volvo Plant | P-DIMRF-6 | TAPQ | Price Hdr-S |
| East Coast | R1-3 | Ben DeFilip | Residential | 10 | Volvo Plant | P-DIMRF-6 | TAPQ | Price Hdr-S |
| GAMA | R2-4 | Unassignec | Residential | 10 | Volvo Plant | P-DIMRF-6 | TAPQ | Price Hdr-S |
| South US-F | R2-6 | Will Knapp | Residential | 10 | Volvo Plant | P-DIMRF-6 | TAPQ | Price Hdr-S |
| West Coast | R5-5 | Will Sexton | Residential | 10 | Volvo Plant | P-IDOCV- | TAN | Standard It |
| South US-F | R2-6 | Will Knapp | Residential | 10 | Volvo Plant | P-CBD-6 KI | TAPQ | Price Hdr-S |
| East Coast | R1-3 | Ben DeFilip | Residential | 10 | Volvo Plant | PTL4- | TAN | Standard It |
| East Coast | R1-3 | Ben DeFilip | Residential | 10 | Volvo Plant | PTL4- | TAN | Standard It |
| GAMA | R2-4 | Unassignec | Residential | 10 | Volvo Plant | PTL4- | TAN | Standard It |
| East Coast | R1-3 | Ben DeFilip | Residential | 10 | Volvo Plant | PTL4- | TAN | Standard It |
| GAMA | R2-2 | Scott Smith | Residential | 10 | Volvo Plant | PTL4- | TAN | Standard It |
| GAMA | R2-2 | Scott Smith | Residential | 10 | Volvo Plant | PTL4- | TAN | Standard It |
| Midwest U | R3-3 | Tom Little | Residential | 10 | Volvo Plant | PTL4- | TAN | Standard It |
| GAMA | R2-2 | Scott Smith | Residential | 10 | Volvo Plant | PTL4- | TAN | Standard It |
| East Coast | R1-7 | Ken Vanem | Residential | 10 | Volvo Plant | PTL4- | TAN | Standard It |
| Midwest U | R3-1 | Mark Swide | Residential | 10 | Volvo Plant | PTL4- | TAN | Standard It |
| GAMA | R4-2 | Jerrie Ande | Residential | 10 | Volvo Plant | P-MNETGV | TAN | Standard It |
| East Coast | R1-3 | Ben DeFilip | Residential | 10 | Volvo Plant | P-MNETGV | TAN | Standard It |
| South US-F | R2-3 | William Ha | Residential | 10 | Volvo Plant | P-MNETGV | TAN | Standard It |
| South US-F | R2-6 | Will Knapp | Residential | 10 | Volvo Plant | P-CBD-6 KI | TAPQ | Price Hdr-S |
| GAMA | R2-2 | Scott Smith | Residential | 10 | Volvo Plant | P-MNETGV | TAN | Standard It |
| East Coast | R1-3 | Ben DeFilip | Residential | 10 | Volvo Plant | P-MNETGV | TAN | Standard It |
| East Coast | R1-7 | Ken Vanem | Residential | 10 | Volvo Plant | P-MNETGV | TAN | Standard It |
| West Coast | R5-6 | Andy Benn | Residential | 10 | Volvo Plant | PTL4- | TAN | Standard It |
| East Coast | R1-7 | Ken Vanem | Residential | 10 | Volvo Plant | P-DIMRF-6 | TAPQ | Price Hdr-S |
| Southwest | R4-2 | Jerrie Ande | Residential | 10 | Volvo Plant | P-SWRF6 K | TAPQ | Price Hdr-S |
| East Coast | R1-6 | Patrick Luc | Residential | 10 | Volvo Plant | P-MNETGV | TAN | Standard It |
| GAMA | R2-2 | Scott Smith | Residential | 10 | Volvo Plant | P-CBD-6 KI | TAPQ | Price Hdr-S |
| South US-F | R2-6 | Will Knapp | Residential | 10 | Volvo Plant | P-MNETGV | TAN | Standard It |
| GAMA | R2-2 | Scott Smith | Residential | 10 | Volvo Plant | P-MNETGV | TAN | Standard It |
| Southwest | R4-1 | Darrell (DJ) | Residential | 10 | Volvo Plant | PLX2- | TAN | Standard It |
| East Coast | R1-3 | Ben DeFilip | Residential | 10 | Volvo Plant | P-TSTATRF- | TAN | Standard It |
| Southwest | R4-1 | Darrell (DJ) | Residential | 10 | Volvo Plant | P-TSTATRF- | TAN | Standard It |
| Midwest U | R3-2 | Craig Gulle | Residential | 10 | Volvo Plant | P-DIMRF-6 | TAPQ | Price Hdr-S |
| East Coast | R1-6 | Patrick Luc | Residential | 10 | Volvo Plant | P-TSTATRF- | TAN | Standard It |
| Midwest U | R3-1 | Mark Swide | Residential | 10 | Volvo Plant | P-DIMRF-6 | TAPQ | Price Hdr-S |
| Midwest U | R3-2 | Craig Gulle | Residential | 10 | Volvo Plant | P-CBD-6 KI | TAPQ | Price Hdr-S |
| Midwest U | R3-1 | Mark Swide | Residential | 10 | Volvo Plant | P-MNETGV | TAN | Standard It |
| Southwest | R4-2 | Jerrie Ande | Residential | 10 | Volvo Plant | P-MNETGV | TAN | Standard It |
| Midwest U | R3-2 | Craig Gulle | Residential | 10 | Volvo Plant | P-DIMRF-6 | TAPQ | Price Hdr-S |
| GAMA | R2-2 | Scott Smith | Residential | 10 | Volvo Plant | P-TSTATRF- | TAN | Standard It |
| East Coast | R1-3 | Ben DeFilip | Residential | 10 | Volvo Plant | P-TSTATRF- | TAN | Standard It |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| West Coast | R5-5 | Will Sexton | Residential | 10 | Volvo Plant | P-MNETGV | TAN | Standard It |
| East Coast | R1-3 | Ben DeFilip | Residential | 10 | Volvo Plant | P-CBD-6 KI | TAPQ | Price Hdr-S |
| Midwest U | R3-2 | Craig Gulle | Residential | 10 | Volvo Plant | PTL4- | TAN | Standard It |
| GAMA | R4-2 | Jerrie Ande | Residential | 10 | Volvo Plant | P-TSTATRF- | TAN | Standard It |
| GAMA | R2-4 | Unassignec | Residential | 10 | Volvo Plant | P-TSTATRF- | TAN | Standard It |
| West Coast | R5-5 | Will Sexton | Residential | 10 | Volvo Plant | PLX2- | TAN | Standard It |
| East Coast | R1-6 | Patrick Luc | Residential | 10 | Volvo Plant | PLX2- | TAN | Standard It |
| Southwest | R4-1 | Darrell (DJ) | Residential | 10 | Volvo Plant | PTL4- | TAN | Standard It |
| GAMA | R2-2 | Scott Smith | Residential | 10 | Volvo Plant | PLX2- | TAN | Standard It |
| Midwest U | R3-1 | Mark Swide | Residential | 10 | Volvo Plant | PLX2- | TAN | Standard It |
| West Coast | R5-7 | Craig Childs | Residential | 10 | Volvo Plant | PLX2- | TAN | Standard It |
| South US-F | R2-6 | Will Knapp | Residential | 10 | Volvo Plant | PLX2- | TAN | Standard It |
| Southwest | R4-1 | Darrell (DJ) | Residential | 10 | Volvo Plant | PLX2- | TAN | Standard It |
| West Coast | R5-13 | John Yohar | Residential | 10 | Volvo Plant | PLX2- | TAN | Standard It |
| East Coast | R1-3 | Ben DeFilip | Residential | 10 | Volvo Plant | P-DIMRF-6 | TAPQ | Price Hdr-S |
| Midwest U | R3-1 | Mark Swide | Residential | 10 | Volvo Plant | PLX2- | TAN | Standard It |
| East Coast | R1-3 | Ben DeFilip | Residential | 10 | Volvo Plant | PLX2- | TAN | Standard It |
| Southwest | R4-2 | Jerrie Ande | Residential | 10 | Volvo Plant | PTL4- | TAN | Standard It |
| West Coast | R5-5 | Will Sexton | Residential | 10 | Volvo Plant | P-MNETGV | TAN | Standard It |
| Southwest | R4-2 | Jerrie Ande | Residential | 10 | Volvo Plant | P-DIMRF-6 | TAPQ | Price Hdr-S |
| Southwest | R4-2 | Jerrie Ande | Residential | 10 | Volvo Plant | P-MNETGV | TAN | Standard It |
| Southwest | R4-2 | Jerrie Ande | Residential | 10 | Volvo Plant | P-TSTATRF- | TAN | Standard It |
| West Coast | R5-7 | Craig Childs | Residential | 10 | Volvo Plant | PTL4- | TAN | Standard It |
| West Coast | R5-5 | Will Sexton | Residential | 10 | Volvo Plant | PLX2- | TAN | Standard It |
| Southwest | R4-2 | Jerrie Ande | Residential | 10 | Volvo Plant | PLX2- | TAN | Standard It |
| West Coast | R5-7 | Craig Childs | Residential | 10 | Volvo Plant | PLX2- | TAN | Standard It |
| West Coast | R5-9 | Bruce Mos | Residential | 10 | Volvo Plant | P-IDOCV- | TAN | Standard It |
| Midwest U | R3-1 | Mark Swide | Residential | 10 | Volvo Plant | PLX2- | TAN | Standard It |
| Southwest | R5-4 | Unassignec | Residential | 10 | Volvo Plant | PLX2- | TAN | Standard It |
| East Coast | R1-6 | Patrick Luc | Residential | 10 | Volvo Plant | PLX2- | TAN | Standard It |
| Midwest U | R3-3 | Tom Little | Residential | 10 | Volvo Plant | PTL4- | TAN | Standard It |
| Southwest | R4-1 | Darrell (DJ) | Residential | 10 | Volvo Plant | P-MNETGV | TAN | Standard It |
| South US-F | R2-6 | Will Knapp | Residential | 10 | Volvo Plant | PTL4- | TAN | Standard It |
| West Coast | R5-1 | Mats Bergc | Residential | 10 | Volvo Plant | PTL4- | TAN | Standard It |
| Southwest | R4-2 | Jerrie Ande | Residential | 10 | Volvo Plant | PLX2- | TAN | Standard It |
| GAMA | R2-2 | Scott Smith | Residential | 10 | Volvo Plant | PLX2- | TAN | Standard It |
| Southwest | R4-2 | Jerrie Ande | Residential | 10 | Volvo Plant | PLX2- | TAN | Standard It |
| Southwest | R4-2 | Jerrie Ande | Residential | 10 | Volvo Plant | PLX2- | TAN | Standard It |
| East Coast | R1-7 | Ken Vanem | Residential | 10 | Volvo Plant | PTL4- | TAN | Standard It |
| West Coast | R5-10 | Joe Russo | Residential | 10 | Volvo Plant | PLX2- | TAN | Standard It |
| West Coast | R5-7 | Craig Childs | Residential | 10 | Volvo Plant | P-IDOCV- | TAN | Standard It |
| West Coast | R5-5 | Will Sexton | Residential | 10 | Volvo Plant | PLX2- | TAN | Standard It |
| Southwest | R4-1 | Darrell (DJ) | Residential | 10 | Volvo Plant | P-IDOCV- | TAN | Standard It |
| Southwest | R4-1 | Darrell (DJ) | Residential | 10 | Volvo Plant | P-MNETGV | TAN | Standard It |
| South US-F | R2-5 | John Gutek | Residential | 10 | Volvo Plant | PLX2- | TAN | Standard It |
| Southwest | R4-2 | Jerrie Ande | Residential | 10 | Volvo Plant | P-IDOCV- | TAN | Standard It |
| East Coast | R1-3 | Ben DeFilip | Residential | 10 | Volvo Plant | P-IDOCV- | TAN | Standard It |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| West Coast | R5-12 | Unassignec | Residential | | 10 | Volvo Plant | PDDK-DIMI | TAPQ | Price Hdr-S |
| Southwest | R4-1 | Darrell (DJ) | Residential | | 10 | Volvo Plant | P-IDOCV- | TAN | Standard It |
| Southwest | R4-1 | Darrell (DJ) | Residential | | 10 | Volvo Plant | PTL4- | TAN | Standard It |
| East Coast | R1-3 | Ben DeFilip | Residential | | 10 | Volvo Plant | P-IDOCV- | TAN | Standard It |
| Midwest U | R3-1 | Mark Swide | Residential | | 10 | Volvo Plant | P-IDOCV- | TAN | Standard It |
| South US-F | R2-6 | Will Knapp | Residential | | 10 | Volvo Plant | P-IDOCV- | TAN | Standard It |

| materialtyp | materialtyp | salesdocun | orderreaso | orderreaso | billingdocu | billingtype | billingdocdate | qty |
|---|---|---|---|---|---|---|---|---|
| FER1 | Finished Gc | 693861 | # | Not assigne | 91612637 | Invoice | 8/25/2009 | 1 |
| FER1 | Finished Gc | 693861 | # | Not assigne | 91612637 | Invoice | 8/25/2009 | 1 |
| FER1 | Finished Gc | 689282 | # | Not assigne | 91613433 | Invoice | 8/27/2009 | 1 |
| FER1 | Finished Gc | 690374 | # | Not assigne | 91613068 | Invoice | 8/27/2009 | 1 |
| FER1 | Finished Gc | 693136 | # | Not assigne | 91613152 | Invoice | 8/27/2009 | 1 |
| FER1 | Finished Gc | 694398 | # | Not assigne | 91613063 | Invoice | 8/27/2009 | 1 |
| FER1 | Finished Gc | 691253 | # | Not assigne | 91613468 | Invoice | 8/27/2009 | 1 |
| FER1 | Finished Gc | 693430 | # | Not assigne | 91613579 | Invoice | 8/27/2009 | 1 |
| FER1 | Finished Gc | 693913 | # | Not assigne | 91613918 | Invoice | 8/28/2009 | 1 |
| FER1 | Finished Gc | 693430 | # | Not assigne | 91614537 | Invoice | 8/31/2009 | 1 |
| FER1 | Finished Gc | 694398 | # | Not assigne | 91614067 | Invoice | 8/31/2009 | 1 |
| FER1 | Finished Gc | 694492 | 95 | Special not | 91614451 | Invoice | 8/31/2009 | 1 |
| FER1 | Finished Gc | 691253 | # | Not assigne | 91614463 | Invoice | 8/31/2009 | 2 |
| FER1 | Finished Gc | 689633 | # | Not assigne | 91614362 | Invoice | 8/31/2009 | 1 |
| FER1 | Finished Gc | 693136 | # | Not assigne | 91614174 | Invoice | 8/31/2009 | 1 |
| FER1 | Finished Gc | 693241 | # | Not assigne | 91614074 | Invoice | 8/31/2009 | 1 |
| FER1 | Finished Gc | 691711 | # | Not assigne | 91614490 | Invoice | 8/31/2009 | 1 |
| FER1 | Finished Gc | 695590 | 95 | Special not | 91614071 | Invoice | 8/31/2009 | 1 |
| FER1 | Finished Gc | 695472 | # | Not assigne | 91614651 | Invoice | 9/1/2009 | 1 |
| FER1 | Finished Gc | 694857 | # | Not assigne | 91614880 | Invoice | 9/1/2009 | 1 |
| FER1 | Finished Gc | 692670 | 95 | Special not | 91614904 | Invoice | 9/1/2009 | 1 |
| FER1 | Finished Gc | 694492 | 95 | Special not | 91614901 | Invoice | 9/1/2009 | 1 |
| FER1 | Finished Gc | 695552 | # | Not assigne | 91614560 | Invoice | 9/1/2009 | 1 |
| FER1 | Finished Gc | 695636 | # | Not assigne | 91614622 | Invoice | 9/1/2009 | 3 |
| FER1 | Finished Gc | 695677 | 95 | Special not | 91614905 | Invoice | 9/1/2009 | 1 |
| FER1 | Finished Gc | 689633 | # | Not assigne | 91614842 | Invoice | 9/1/2009 | 1 |
| FER1 | Finished Gc | 695472 | # | Not assigne | 91614650 | Invoice | 9/1/2009 | 1 |
| FER1 | Finished Gc | 695414 | C03 | 22 DRP: Eq | 91614732 | Invoice | 9/1/2009 | 1 |
| FER1 | Finished Gc | 695472 | # | Not assigne | 91614651 | Invoice | 9/1/2009 | 3 |
| FER1 | Finished Gc | 695463 | C03 | 22 DRP: Eq | 91614881 | Invoice | 9/1/2009 | 2 |
| FER1 | Finished Gc | 692806 | 95 | Special not | 91614665 | Invoice | 9/1/2009 | 1 |
| FER1 | Finished Gc | 693136 | # | Not assigne | 91614660 | Invoice | 9/1/2009 | 1 |
| FER1 | Finished Gc | 693430 | # | Not assigne | 91614971 | Invoice | 9/1/2009 | 1 |
| FER1 | Finished Gc | 693136 | # | Not assigne | 91614659 | Invoice | 9/1/2009 | 1 |
| FER1 | Finished Gc | 692651 | # | Not assigne | 91614875 | Invoice | 9/1/2009 | 1 |
| FER1 | Finished Gc | 694398 | # | Not assigne | 91615019 | Invoice | 9/2/2009 | 1 |
| FER1 | Finished Gc | 692651 | # | Not assigne | 91615358 | Invoice | 9/2/2009 | 1 |
| FER1 | Finished Gc | 695905 | # | Not assigne | 91615476 | Invoice | 9/2/2009 | 1 |
| FER1 | Finished Gc | 692806 | 95 | Special not | 91615115 | Invoice | 9/2/2009 | 1 |
| FER1 | Finished Gc | 695060 | # | Not assigne | 91615396 | Invoice | 9/2/2009 | 1 |
| FER1 | Finished Gc | 694899 | # | Not assigne | 91615392 | Invoice | 9/2/2009 | 1 |
| FER1 | Finished Gc | 695060 | # | Not assigne | 91615396 | Invoice | 9/2/2009 | 1 |
| FER1 | Finished Gc | 694455 | # | Not assigne | 91615455 | Invoice | 9/2/2009 | 1 |
| FER1 | Finished Gc | 694899 | # | Not assigne | 91615392 | Invoice | 9/2/2009 | 2 |
| FER1 | Finished Gc | 695677 | 95 | Special not | 91615414 | Invoice | 9/2/2009 | 1 |
| FER1 | Finished Gc | 694492 | 95 | Special not | 91615405 | Invoice | 9/2/2009 | 1 |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| FER1 | Finished Gc | 696194 | C03 | 22 DRP: Eq | 91615334 | Invoice | 9/2/2009 | 1 |
| FER1 | Finished Gc | 694398 | # | Not assigne | 91615018 | Invoice | 9/2/2009 | 1 |
| FER1 | Finished Gc | 695905 | # | Not assigne | 91615476 | Invoice | 9/2/2009 | 2 |
| FER1 | Finished Gc | 692670 | | 95 Special not | 91615413 | Invoice | 9/2/2009 | 1 |
| FER1 | Finished Gc | 690179 | # | Not assigne | 91615083 | Invoice | 9/2/2009 | 1 |
| FER1 | Finished Gc | 696605 | # | Not assigne | 91615510 | Invoice | 9/3/2009 | 1 |
| FER1 | Finished Gc | 692806 | | 95 Special not | 91615653 | Invoice | 9/3/2009 | 1 |
| FER1 | Finished Gc | 693997 | # | Not assigne | 91616007 | Invoice | 9/3/2009 | 2 |
| FER1 | Finished Gc | 689065 | C03 | 22 DRP: Eq | 91616056 | Invoice | 9/3/2009 | 1 |
| FER1 | Finished Gc | 692414 | # | Not assigne | 91616086 | Invoice | 9/3/2009 | 1 |
| FER1 | Finished Gc | 696502 | # | Not assigne | 91615802 | Invoice | 9/3/2009 | 1 |
| FER1 | Finished Gc | 691950 | PR1 | Pricing: De | 91616051 | Invoice | 9/3/2009 | 3 |
| FER1 | Finished Gc | 693997 | # | Not assigne | 91616007 | Invoice | 9/3/2009 | 1 |
| FER1 | Finished Gc | 694104 | # | Not assigne | 91616121 | Invoice | 9/3/2009 | 1 |
| FER1 | Finished Gc | 694492 | | 95 Special not | 91616014 | Invoice | 9/3/2009 | 1 |
| FER1 | Finished Gc | 690934 | | 95 Special not | 91615904 | Invoice | 9/3/2009 | 1 |
| FER1 | Finished Gc | 689633 | # | Not assigne | 91615923 | Invoice | 9/3/2009 | 1 |
| FER1 | Finished Gc | 697222 | C03 | 22 DRP: Eq | 91616781 | Invoice | 9/8/2009 | 2 |
| FER1 | Finished Gc | 697307 | # | Not assigne | 91617072 | Invoice | 9/8/2009 | 3 |
| FER1 | Finished Gc | 697222 | C03 | 22 DRP: Eq | 91616781 | Invoice | 9/8/2009 | 2 |
| FER1 | Finished Gc | 697222 | C03 | 22 DRP: Eq | 91616781 | Invoice | 9/8/2009 | 2 |
| FER1 | Finished Gc | 697222 | C03 | 22 DRP: Eq | 91616781 | Invoice | 9/8/2009 | 4 |
| FER1 | Finished Gc | 695674 | | 95 Special not | 91617078 | Invoice | 9/8/2009 | 3 |
| FER1 | Finished Gc | 697307 | # | Not assigne | 91617072 | Invoice | 9/8/2009 | 3 |
| FER1 | Finished Gc | 697222 | C03 | 22 DRP: Eq | 91616781 | Invoice | 9/8/2009 | 4 |
| FER1 | Finished Gc | 695674 | | 95 Special not | 91617078 | Invoice | 9/8/2009 | 1 |
| FER1 | Finished Gc | 693707 | # | Not assigne | 91617441 | Invoice | 9/9/2009 | 1 |
| FER1 | Finished Gc | 694857 | # | Not assigne | 91617834 | Invoice | 9/10/2009 | 1 |
| FER1 | Finished Gc | 698836 | # | Not assigne | 91618890 | Invoice | 9/10/2009 | 2 |
| FER1 | Finished Gc | 698054 | # | Not assigne | 91617713 | Invoice | 9/10/2009 | 2 |
| FER1 | Finished Gc | 697034 | # | Not assigne | 91617980 | Invoice | 9/11/2009 | 1 |
| FER1 | Finished Gc | 696415 | C03 | 22 DRP: Eq | 91618290 | Invoice | 9/11/2009 | 2 |
| FER1 | Finished Gc | 696823 | | 95 Special not | 91618367 | Invoice | 9/11/2009 | 1 |
| FER1 | Finished Gc | 696782 | # | Not assigne | 91618188 | Invoice | 9/11/2009 | 1 |
| FER1 | Finished Gc | 694666 | | 95 Special not | 91618025 | Invoice | 9/11/2009 | 1 |
| FER1 | Finished Gc | 694991 | C03 | 22 DRP: Eq | 91618076 | Invoice | 9/11/2009 | 1 |
| FER1 | Finished Gc | 695028 | # | Not assigne | 91618399 | Invoice | 9/11/2009 | 1 |
| FER1 | Finished Gc | 698112 | # | Not assigne | 91618398 | Invoice | 9/11/2009 | 2 |
| FER1 | Finished Gc | 696866 | # | Not assigne | 91618168 | Invoice | 9/11/2009 | 1 |
| FER1 | Finished Gc | 695055 | # | Not assigne | 91618332 | Invoice | 9/11/2009 | 1 |
| FER1 | Finished Gc | 695674 | | 95 Special not | 91618885 | Invoice | 9/14/2009 | 1 |
| FER1 | Finished Gc | 698175 | # | Not assigne | 91619275 | Invoice | 9/15/2009 | 1 |
| FER1 | Finished Gc | 698471 | # | Not assigne | 91619389 | Invoice | 9/15/2009 | 1 |
| FER1 | Finished Gc | 698471 | # | Not assigne | 91619389 | Invoice | 9/15/2009 | 2 |
| FER1 | Finished Gc | 696777 | # | Not assigne | 91619355 | Invoice | 9/15/2009 | 2 |
| FER1 | Finished Gc | 695463 | C03 | 22 DRP: Eq | 91619312 | Invoice | 9/15/2009 | 2 |
| FER1 | Finished Gc | 689633 | # | Not assigne | 91619654 | Invoice | 9/16/2009 | 1 |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| FER1 | Finished Gc | 697709 | # | Not assigne | 91619727 | Invoice | 9/16/2009 | 1 |
| FER1 | Finished Gc | 696293 | C03 | 22 DRP: Eq | 91619789 | Invoice | 9/16/2009 | 1 |
| FER1 | Finished Gc | 696293 | C03 | 22 DRP: Eq | 91619789 | Invoice | 9/16/2009 | 1 |
| FER1 | Finished Gc | 694398 | # | Not assigne | 91619425 | Invoice | 9/16/2009 | 1 |
| FER1 | Finished Gc | 698127 | # | Not assigne | 91619643 | Invoice | 9/16/2009 | 3 |
| FER1 | Finished Gc | 695456 | # | Not assigne | 91619747 | Invoice | 9/16/2009 | 1 |

| cogs | netnetsales | per_inch | material_ty | material_gr | material_b | material_h | mat_hier1_ | mat_hier2_ |
|---|---|---|---|---|---|---|---|---|
| 70.01 | 90 | 0 | FER1 | 170 | PRODIGY,T | PD411PD2( | Prodigy | Button Pan |
| 0 | 360 | 0 | FER1 | 170 | PRODIGY,T | LECTERN | WHT" | PD411PD2. |
| 612.28 | 423 | 0 | FER1 | 170 | KIT,PRODIG | PD411PD2: | Prodigy | Dimmers / |
| 612.28 | 423 | 0 | FER1 | 170 | KIT,PRODIG | PD411PD2: | Prodigy | Dimmers / |
| 612.28 | 423 | 0 | FER1 | 170 | KIT,PRODIG | PD411PD2: | Prodigy | Dimmers / |
| 612.28 | 423 | 0 | FER1 | 170 | KIT,PRODIG | PD411PD2: | Prodigy | Dimmers / |
| 612.28 | 423 | 0 | FER1 | 170 | KIT,PRODIG | PD411PD2: | Prodigy | Dimmers / |
| 612.28 | 423 | 0 | FER1 | 170 | KIT,PRODIG | PD411PD2: | Prodigy | Dimmers / |
| 220.21 | 225 | 0 | FER1 | 170 | PRODIGY,D | PD411PD2: | Prodigy | iDoc / iPad |
| 844.77 | 486 | 0 | FER1 | 170 | KIT,PRODIG | PD411PD2( | Prodigy | Button Pan |
| 0 | 360 | 0 | FER1 | 170 | PRODIGY,T | LECTERN | WHT" | PD411PD2. |
| 0 | 288 | 0 | FER1 | 170 | PRODIGY,T | LECTERN | WHT" | PD411PD2. |
| 0 | 720 | 0 | FER1 | 170 | PRODIGY,T | LECTERN | WHT" | PD411PD2. |
| 0 | 360 | 0 | FER1 | 170 | PRODIGY,T | LECTERN | WHT" | PD411PD2. |
| 0 | 360 | 0 | FER1 | 170 | PRODIGY,T | LECTERN | WHT" | PD411PD2. |
| 0 | 360 | 0 | FER1 | 170 | PRODIGY,T | LECTERN | WHT" | PD411PD2. |
| 0 | 360 | 0 | FER1 | 170 | PRODIGY,T | LECTERN | WHT" | PD411PD2. |
| 0 | 288 | 0 | FER1 | 170 | PRODIGY,T | LECTERN | WHT" | PD411PD2. |
| 212.75 | 360 | 0 | FER1 | 170 | PRODIGY,T | LECTERN | WHT" | PD411PD2. |
| 212.75 | 360 | 0 | FER1 | 170 | PRODIGY,T | LECTERN | WHT" | PD411PD2. |
| 102.71 | 60.75 | 0 | FER1 | 170 | PRODIGY,N | PD411PD2: | Prodigy | Peripherals |
| 102.71 | 54 | 0 | FER1 | 170 | PRODIGY,N | PD411PD2: | Prodigy | Peripherals |
| 102.71 | 67.5 | 0 | FER1 | 170 | PRODIGY,N | PD411PD2: | Prodigy | Peripherals |
| 2534.31 | 1620 | 0 | FER1 | 170 | KIT,PRODIG | PD411PD2( | Prodigy | Button Pan |
| 102.71 | 60.75 | 0 | FER1 | 170 | PRODIGY,N | PD411PD2: | Prodigy | Peripherals |
| 102.71 | 67.5 | 0 | FER1 | 170 | PRODIGY,N | PD411PD2: | Prodigy | Peripherals |
| 102.71 | 67.5 | 0 | FER1 | 170 | PRODIGY,N | PD411PD2: | Prodigy | Peripherals |
| 212.75 | 360 | 0 | FER1 | 170 | PRODIGY,T | LECTERN | WHT" | PD411PD2. |
| 1836.85 | 1269 | 0 | FER1 | 170 | KIT,PRODIG | PD411PD2: | Prodigy | Dimmers / |
| 1224.85 | 846 | 0 | FER1 | 170 | KIT,PRODIG | PD411PD2: | Prodigy | Dimmers / |
| 102.71 | 54 | 0 | FER1 | 170 | PRODIGY,N | PD411PD2: | Prodigy | Peripherals |
| 844.77 | 486 | 0 | FER1 | 170 | KIT,PRODIG | PD411PD2( | Prodigy | Button Pan |
| 102.71 | 67.5 | 0 | FER1 | 170 | PRODIGY,N | PD411PD2: | Prodigy | Peripherals |
| 102.71 | 67.5 | 0 | FER1 | 170 | PRODIGY,N | PD411PD2: | Prodigy | Peripherals |
| 70.01 | 90 | 0 | FER1 | 170 | PRODIGY,T | PD411PD2( | Prodigy | Button Pan |
| 106 | 135 | 0 | FER1 | 170 | PRODIGY,T | PD411PD2: | Prodigy | Environmei |
| 106 | 135 | 0 | FER1 | 170 | PRODIGY,T | PD411PD2: | Prodigy | Environmei |
| 612.28 | 423 | 0 | FER1 | 170 | KIT,PRODIG | PD411PD2: | Prodigy | Dimmers / |
| 106 | 108 | 0 | FER1 | 170 | PRODIGY,T | PD411PD2: | Prodigy | Environmei |
| 612.28 | 423 | 0 | FER1 | 170 | KIT,PRODIG | PD411PD2: | Prodigy | Dimmers / |
| 844.77 | 486 | 0 | FER1 | 170 | KIT,PRODIG | PD411PD2( | Prodigy | Button Pan |
| 102.71 | 67.5 | 0 | FER1 | 170 | PRODIGY,N | PD411PD2: | Prodigy | Peripherals |
| 102.71 | 67.5 | 0 | FER1 | 170 | PRODIGY,N | PD411PD2: | Prodigy | Peripherals |
| 1224.56 | 846 | 0 | FER1 | 170 | KIT,PRODIG | PD411PD2: | Prodigy | Dimmers / |
| 106 | 121.5 | 0 | FER1 | 170 | PRODIGY,T | PD411PD2: | Prodigy | Environmei |
| 106 | 108 | 0 | FER1 | 170 | PRODIGY,T | PD411PD2: | Prodigy | Environmei |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 102.71 | 67.5 | 0 | FER1 | 170 | PRODIGY,M | PD411PD2: | Prodigy | Peripherals |
| 844.77 | 486 | 0 | FER1 | 170 | KIT,PRODIG | PD411PD20 | Prodigy | Button Pan |
| 425.5 | 720 | 0 | FER1 | 170 | PRODIGY,T | LECTERN | WHT" | PD411PD2: |
| 106 | 121.5 | 0 | FER1 | 170 | PRODIGY,T | PD411PD2: | Prodigy | Environmer |
| 106 | 135 | 0 | FER1 | 170 | PRODIGY,T | PD411PD2: | Prodigy | Environmer |
| 70.01 | 90 | 0 | FER1 | 170 | PRODIGY,T | PD411PD20 | Prodigy | Button Pan |
| 70.01 | 72 | 0 | FER1 | 170 | PRODIGY,T | PD411PD20 | Prodigy | Button Pan |
| 425.5 | 720 | 0 | FER1 | 170 | PRODIGY,T | LECTERN | WHT" | PD411PD2: |
| 70.01 | 90 | 0 | FER1 | 170 | PRODIGY,T | PD411PD20 | Prodigy | Button Pan |
| 70.01 | 90 | 0 | FER1 | 170 | PRODIGY,T | PD411PD20 | Prodigy | Button Pan |
| 70.01 | 90 | 0 | FER1 | 170 | PRODIGY,T | PD411PD20 | Prodigy | Button Pan |
| 210.03 | 216 | 0 | FER1 | 170 | PRODIGY,T | PD411PD20 | Prodigy | Button Pan |
| 70.01 | 90 | 0 | FER1 | 170 | PRODIGY,T | PD411PD20 | Prodigy | Button Pan |
| 70.01 | 90 | 0 | FER1 | 170 | PRODIGY,T | PD411PD20 | Prodigy | Button Pan |
| 612.28 | 338.4 | 0 | FER1 | 170 | KIT,PRODIG | PD411PD2: | Prodigy | Dimmers / |
| 70.01 | 90 | 0 | FER1 | 170 | PRODIGY,T | PD411PD20 | Prodigy | Button Pan |
| 70.01 | 90 | 0 | FER1 | 170 | PRODIGY,T | PD411PD20 | Prodigy | Button Pan |
| 425.5 | 720 | 0 | FER1 | 170 | PRODIGY,T | LECTERN | WHT" | PD411PD2: |
| 308.12 | 202.5 | 0 | FER1 | 170 | PRODIGY,M | PD411PD2: | Prodigy | Peripherals |
| 1224.56 | 846 | 0 | FER1 | 170 | KIT,PRODIG | PD411PD2: | Prodigy | Dimmers / |
| 205.42 | 135 | 0 | FER1 | 170 | PRODIGY,M | PD411PD2: | Prodigy | Peripherals |
| 424 | 540 | 0 | FER1 | 170 | PRODIGY,T | PD411PD2: | Prodigy | Environmer |
| 638.25 | 864 | 0 | FER1 | 170 | PRODIGY,T | LECTERN | WHT" | PD411PD2: |
| 210.03 | 270 | 0 | FER1 | 170 | PRODIGY,T | PD411PD20 | Prodigy | Button Pan |
| 280.04 | 360 | 0 | FER1 | 170 | PRODIGY,T | PD411PD20 | Prodigy | Button Pan |
| 70.01 | 72 | 0 | FER1 | 170 | PRODIGY,T | PD411PD20 | Prodigy | Button Pan |
| 220.21 | 225 | 0 | FER1 | 170 | PRODIGY,D | PD411PD2: | Prodigy | iDoc / iPad |
| 70.01 | 90 | 0 | FER1 | 170 | PRODIGY,T | PD411PD20 | Prodigy | Button Pan |
| 140.02 | 180 | 0 | FER1 | 170 | PRODIGY,T | PD411PD20 | Prodigy | Button Pan |
| 140.02 | 180 | 0 | FER1 | 170 | PRODIGY,T | PD411PD20 | Prodigy | Button Pan |
| 212.75 | 360 | 0 | FER1 | 170 | PRODIGY,T | LECTERN | WHT" | PD411PD2: |
| 205.42 | 135 | 0 | FER1 | 170 | PRODIGY,M | PD411PD2: | Prodigy | Peripherals |
| 212.75 | 288 | 0 | FER1 | 170 | PRODIGY,T | LECTERN | WHT" | PD411PD2: |
| 212.75 | 360 | 0 | FER1 | 170 | PRODIGY,T | LECTERN | WHT" | PD411PD2: |
| 70.01 | 72 | 0 | FER1 | 170 | PRODIGY,T | PD411PD20 | Prodigy | Button Pan |
| 70.01 | 90 | 0 | FER1 | 170 | PRODIGY,T | PD411PD20 | Prodigy | Button Pan |
| 70.01 | 90 | 0 | FER1 | 170 | PRODIGY,T | PD411PD20 | Prodigy | Button Pan |
| 140.02 | 180 | 0 | FER1 | 170 | PRODIGY,T | PD411PD20 | Prodigy | Button Pan |
| 212.75 | 360 | 0 | FER1 | 170 | PRODIGY,T | LECTERN | WHT" | PD411PD2: |
| 70.01 | 90 | 0 | FER1 | 170 | PRODIGY,T | PD411PD20 | Prodigy | Button Pan |
| 220.21 | 180 | 0 | FER1 | 170 | PRODIGY,D | PD411PD2: | Prodigy | iDoc / iPad |
| 70.01 | 90 | 0 | FER1 | 170 | PRODIGY,T | PD411PD20 | Prodigy | Button Pan |
| 220.21 | 225 | 0 | FER1 | 170 | PRODIGY,D | PD411PD2: | Prodigy | iDoc / iPad |
| 205.42 | 135 | 0 | FER1 | 170 | PRODIGY,M | PD411PD2: | Prodigy | Peripherals |
| 140.02 | 180 | 0 | FER1 | 170 | PRODIGY,T | PD411PD20 | Prodigy | Button Pan |
| 440.41 | 450 | 0 | FER1 | 170 | PRODIGY,D | PD411PD2: | Prodigy | iDoc / iPad |
| 220.21 | 225 | 0 | FER1 | 170 | PRODIGY,D | PD411PD2: | Prodigy | iDoc / iPad |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 2118.03 | 1588.5 | 0 | FER1 | 170 | KIT,PRODIG | PD411PD2( | Prodigy | Demo Kits |
| 220.21 | 225 | 0 | FER1 | 170 | PRODIGY,D | PD411PD2: | Prodigy | iDoc / iPad |
| 212.75 | 360 | 0 | FER1 | 170 | PRODIGY,T | LECTERN | WHT" | PD411PD2: |
| 220.21 | 225 | 0 | FER1 | 170 | PRODIGY,D | PD411PD2: | Prodigy | iDoc / iPad |
| 660.62 | 675 | 0 | FER1 | 170 | PRODIGY,D | PD411PD2: | Prodigy | iDoc / iPad |
| 220.21 | 225 | 0 | FER1 | 170 | PRODIGY,D | PD411PD2: | Prodigy | iDoc / iPad |

_desc

els / Keypads / Remotes

Prodigy Touch Screen - Small

Fans / Switches / Slaves

Fans / Switches / Slaves

Fans / Switches / Slaves

Fans / Switches / Slaves

Fans / Switches / Slaves

Fans / Switches / Slaves

/ iPanel

els / Keypads / Remotes

Prodigy Touch Screen - Small

Prodigy Touch Screen - Small

Prodigy Touch Screen - Small

Prodigy Touch Screen - Small

Prodigy Touch Screen - Small

Prodigy Touch Screen - Small

Prodigy Touch Screen - Small

Prodigy Touch Screen - Small

Prodigy Touch Screen - Small

Prodigy Touch Screen - Small

els / Keypads / Remotes

Prodigy Touch Screen - Small

Fans / Switches / Slaves

Fans / Switches / Slaves

els / Keypads / Remotes

els / Keypads / Remotes

ntal Controls

ntal Controls

Fans / Switches / Slaves

ntal Controls

Fans / Switches / Slaves

els / Keypads / Remotes

Fans / Switches / Slaves

ntal Controls

ntal Controls

els / Keypads / Remotes
Prodigy Touch Screen - Small
ntal Controls
ntal Controls
els / Keypads / Remotes
els / Keypads / Remotes
Prodigy Touch Screen - Small
els / Keypads / Remotes
els / Keypads / Remotes
els / Keypads / Remotes
els / Keypads / Remotes
els / Keypads / Remotes
els / Keypads / Remotes
Fans / Switches / Slaves
els / Keypads / Remotes
els / Keypads / Remotes
Prodigy Touch Screen - Small

Fans / Switches / Slaves

ntal Controls
Prodigy Touch Screen - Small
els / Keypads / Remotes
els / Keypads / Remotes
els / Keypads / Remotes
/ iPanel
els / Keypads / Remotes
els / Keypads / Remotes
els / Keypads / Remotes
Prodigy Touch Screen - Small

Prodigy Touch Screen - Small
Prodigy Touch Screen - Small
els / Keypads / Remotes
els / Keypads / Remotes
els / Keypads / Remotes
els / Keypads / Remotes
Prodigy Touch Screen - Small
els / Keypads / Remotes
/ iPanel
els / Keypads / Remotes
/ iPanel

els / Keypads / Remotes
/ iPanel
/ iPanel

| | |
|---|---|
| / iPanel | |
| Prodigy | Touch Screen - Small |
| / iPanel | |
| / iPanel | |
| / iPanel | |

EXHIBIT 316

| uniq_id | soldto_nun | nav_cust_r | savant_name | nyear | nmonth | savant | crestron |
|---|---|---|---|---|---|---|---|
| 102 | 1000584 | 10284 | CYBER SOUND & SECURITY | 2007 | 7 | 0 | 8800 |
| 102 | 1000584 | 10284 | CYBER SOUND & SECURITY | | 8 | 0 | 49405.05 |
| 102 | 1000584 | 10284 | CYBER SOUND & SECURITY | | 9 | 0 | 37700 |
| 102 | 1000584 | 10284 | CYBER SOUND & SECURITY | | 10 | 0 | 31410 |
| 102 | 1000584 | 10284 | CYBER SOUND & SECURITY | | 11 | 0 | 121414 |
| 102 | 1000584 | 10284 | CYBER SOUND & SECURITY | | 12 | 0 | 50120 |
| 102 | 1000584 | 10284 | CYBER SOUND & SECURITY | 2008 | 1 | 0 | 33672 |
| 102 | 1000584 | 10284 | CYBER SOUND & SECURITY | | 2 | 0 | 39565 |
| 102 | 1000584 | 10284 | CYBER SOUND & SECURITY | | 3 | 0 | 30455 |
| 102 | 1000584 | 10284 | CYBER SOUND & SECURITY | | 4 | 0 | 49595 |
| 102 | 1000584 | 10284 | CYBER SOUND & SECURITY | | 5 | 0 | 115824.5 |
| 102 | 1000584 | 10284 | CYBER SOUND & SECURITY | | 6 | 0 | 243933.5 |
| 102 | 1000584 | 10284 | CYBER SOUND & SECURITY | | 7 | 0 | 14275 |
| 102 | 1000584 | 10284 | CYBER SOUND & SECURITY | | 8 | 0 | 6067.5 |
| 102 | 1000584 | 10284 | CYBER SOUND & SECURITY | | 9 | 0 | 6471 |
| 102 | 1000584 | 10284 | CYBER SOUND & SECURITY | | 10 | 0 | 14605 |
| 102 | 1000584 | 10284 | CYBER SOUND & SECURITY | | 11 | 0 | 3038.75 |
| 102 | 1000584 | 10284 | CYBER SOUND & SECURITY | | 12 | 0 | 26239.5 |
| 102 | 1000584 | 10284 | CYBER SOUND & SECURITY | 2009 | 1 | 0 | 5002.25 |
| 102 | 1000584 | 10284 | CYBER SOUND & SECURITY | | 2 | 0 | 66368.25 |
| 102 | 1000584 | 10284 | CYBER SOUND & SECURITY | | 3 | 0 | 42424.5 |
| 102 | 1000584 | 10284 | CYBER SOUND & SECURITY | | 4 | 0 | 40950 |
| 102 | 1000584 | 10284 | CYBER SOUND & SECURITY | | 5 | 0 | 25263.75 |
| 102 | 1000584 | 10284 | CYBER SOUND & SECURITY | | 6 | 0 | 136475.3 |
| 102 | 1000584 | 10284 | CYBER SOUND & SECURITY | | 7 | 0 | 30061.5 |
| 102 | 1000584 | 10284 | CYBER SOUND & SECURITY | | 8 | 0 | 2270 |
| 102 | 1000584 | 10284 | CYBER SOUND & SECURITY | | 9 | 0 | 6775 |
| 102 | 1000584 | 10284 | CYBER SOUND & SECURITY | | 10 | 0 | 10511.02 |
| 102 | 1000584 | 10284 | CYBER SOUND & SECURITY | | 11 | 0 | 47659.05 |
| 102 | 1000584 | 10284 | CYBER SOUND & SECURITY | | 12 | 290.53 | 3003.9 |
| 102 | 1000584 | 10284 | CYBER SOUND & SECURITY | 2010 | 1 | 14948.68 | 86883.5 |
| 102 | 1000584 | 10284 | CYBER SOUND & SECURITY | | 2 | 1553.67 | 30243.6 |
| 102 | 1000584 | 10284 | CYBER SOUND & SECURITY | | 3 | 3486.32 | 30793.15 |
| 102 | 1000584 | 10284 | CYBER SOUND & SECURITY | | 4 | 4410.1 | 21641.07 |
| 102 | 1000584 | 10284 | CYBER SOUND & SECURITY | | 5 | 3083.05 | 44133.56 |
| 102 | 1000584 | 10284 | CYBER SOUND & SECURITY | | 6 | 920 | 12284.99 |
| 102 | 1000584 | 10284 | CYBER SOUND & SECURITY | | 7 | 9294.91 | 7697 |
| 102 | 1000584 | 10284 | CYBER SOUND & SECURITY | | 8 | 4157.92 | 25826.82 |
| 102 | 1000584 | 10284 | CYBER SOUND & SECURITY | | 9 | 69417.19 | -4387.97 |
| 102 | 1000584 | 10284 | CYBER SOUND & SECURITY | | 10 | 43011.06 | 9579.92 |
| 102 | 1000584 | 10284 | CYBER SOUND & SECURITY | | 11 | 79739.88 | 11130.67 |
| 102 | 1000584 | 10284 | CYBER SOUND & SECURITY | | 12 | 73249.5 | 13998.25 |
| 102 | 1000584 | 10284 | CYBER SOUND & SECURITY | 2011 | 1 | 35692.16 | 3425.13 |
| 102 | 1000584 | 10284 | CYBER SOUND & SECURITY | | 2 | 31122.31 | 7571.5 |
| 102 | 1000584 | 10284 | CYBER SOUND & SECURITY | | 3 | 65877.95 | 9939.85 |
| 102 | 1000584 | 10284 | CYBER SOUND & SECURITY | | 4 | 24454.43 | 760 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 102 | 1000584 | 10284 | CYBER SOUND & SECURITY | | 5 | 59557.15 | 3800 |
| 102 | 1000584 | 10284 | CYBER SOUND & SECURITY | | 6 | 35382.76 | 0 |
| 102 | 1000584 | 10284 | CYBER SOUND & SECURITY | | 7 | 92015.92 | 0 |
| 102 | 1000584 | 10284 | CYBER SOUND & SECURITY | | 8 | 81386.98 | 0 |
| 102 | 1000584 | 10284 | CYBER SOUND & SECURITY | | 9 | 186795.9 | 0 |
| 102 | 1000584 | 10284 | CYBER SOUND & SECURITY | | 10 | 80308.42 | 0 |
| 102 | 1000584 | 10284 | CYBER SOUND & SECURITY | | 11 | 19397.48 | 0 |
| 102 | 1000584 | 10284 | CYBER SOUND & SECURITY | | 12 | 46137.95 | 0 |
| 102 | 1000584 | 10284 | CYBER SOUND & SECURITY | 2012 | 1 | 36980.06 | 0 |
| 102 | 1000584 | 10284 | CYBER SOUND & SECURITY | | 2 | 183102.9 | 0 |
| 102 | 1000584 | 10284 | CYBER SOUND & SECURITY | | 3 | 110789.6 | 0 |
| 102 | 1000584 | 10284 | CYBER SOUND & SECURITY | | 4 | 87676.97 | 0 |
| 102 | 1000584 | 10284 | CYBER SOUND & SECURITY | | 5 | 58285.14 | 0 |
| 102 | 1000584 | 10284 | CYBER SOUND & SECURITY | | 6 | 94621.12 | 0 |
| 102 | 1000584 | 10284 | CYBER SOUND & SECURITY | | 7 | 48961.2 | 0 |
| 102 | 1000584 | 10284 | CYBER SOUND & SECURITY | | 8 | 109186 | 0 |
| 102 | 1000584 | 10284 | CYBER SOUND & SECURITY | | 9 | 146465.6 | 0 |
| 102 | 1000584 | 10284 | CYBER SOUND & SECURITY | | 10 | 128411.7 | 0 |
| 102 | 1000584 | 10284 | CYBER SOUND & SECURITY | | 11 | 123810.2 | 0 |
| 102 | 1000584 | 10284 | CYBER SOUND & SECURITY | | 12 | 104587 | 0 |
| 102 | 1000584 | 10284 | CYBER SOUND & SECURITY | 2013 | 1 | 91339.68 | 0 |
| 102 | 1000584 | 10284 | CYBER SOUND & SECURITY | | 2 | 60980.96 | 0 |
| 102 | 1000584 | 10284 | CYBER SOUND & SECURITY | | 3 | 63412.23 | 0 |
| 102 | 1000584 | 10284 | CYBER SOUND & SECURITY | | 4 | 108613.7 | 0 |
| 102 | 1000584 | 10284 | CYBER SOUND & SECURITY | | 5 | 93556.7 | 0 |
| 102 | 1000584 | 10284 | CYBER SOUND & SECURITY | | 6 | 68566.96 | 0 |
| 102 | 1000584 | 10284 | CYBER SOUND & SECURITY | | 7 | 34064.6 | 0 |
| 102 | 1000584 | 10284 | CYBER SOUND & SECURITY | | 8 | 51397.67 | 0 |
| 102 | 1000584 | 10284 | CYBER SOUND & SECURITY | | 9 | 70520.34 | 0 |

| cumul_sav | cumul_crestron |
|---|---|
| 0 | 8800 |
| 0 | 58205.05 |
| 0 | 95905.05 |
| 0 | 127315 |
| 0 | 248729 |
| 0 | 298849.1 |
| 0 | 332521.1 |
| 0 | 372086.1 |
| 0 | 402541.1 |
| 0 | 452136.1 |
| 0 | 567960.6 |
| 0 | 811894.1 |
| 0 | 826169.1 |
| 0 | 832236.6 |
| 0 | 838707.6 |
| 0 | 853312.6 |
| 0 | 856351.3 |
| 0 | 882590.8 |
| 0 | 887593.1 |
| 0 | 953961.3 |
| 0 | 996385.8 |
| 0 | 1037336 |
| 0 | 1062600 |
| 0 | 1199075 |
| 0 | 1229136 |
| 0 | 1231406 |
| 0 | 1238181 |
| 0 | 1248692 |
| 0 | 1296351 |
| 290.53 | 1299355 |
| 15239.21 | 1386239 |
| 16792.88 | 1416482 |
| 20279.2 | 1447275 |
| 24689.3 | 1468917 |
| 27772.35 | 1513050 |
| 28692.35 | 1525335 |
| 37987.26 | 1533032 |
| 42145.18 | 1558859 |
| 111562.4 | 1554471 |
| 154573.4 | 1564051 |
| 234313.3 | 1575181 |
| 307562.8 | 1589180 |
| 343255 | 1592605 |
| 374377.3 | 1600176 |
| 440255.2 | 1610116 |
| 464709.7 | 1610876 |

| | |
|---|---|
| 524266.8 | 1614676 |
| 559649.6 | 1614676 |
| 651665.5 | 1614676 |
| 733052.5 | 1614676 |
| 919848.4 | 1614676 |
| 1000157 | 1614676 |
| 1019554 | 1614676 |
| 1065692 | 1614676 |
| 1102672 | 1614676 |
| 1285775 | 1614676 |
| 1396565 | 1614676 |
| 1484242 | 1614676 |
| 1542527 | 1614676 |
| 1637148 | 1614676 |
| 1686109 | 1614676 |
| 1795295 | 1614676 |
| 1941761 | 1614676 |
| 2070173 | 1614676 |
| 2193983 | 1614676 |
| 2298570 | 1614676 |
| 2389910 | 1614676 |
| 2450891 | 1614676 |
| 2514303 | 1614676 |
| 2622917 | 1614676 |
| 2716473 | 1614676 |
| 2785040 | 1614676 |
| 2819105 | 1614676 |
| 2870503 | 1614676 |
| 2941023 | 1614676 |

EXHIBIT 317

| uniq_id | soldto_nun | nav_cust_r | savant_name | nyear | nmonth | savant | crestron | cumul_sava |
|---|---|---|---|---|---|---|---|---|
| 13 | 1001044 | 10035 | INTELECT INTEGRATE | 2007 | 7 | 0 | 5065 | 0 |
| 13 | 1001044 | 10035 | INTELECT INTEGRATED ELECTROI | | 8 | 0 | 6150 | 0 |
| 13 | 1001044 | 10035 | INTELECT INTEGRATED ELECTROI | | 9 | 0 | 1000 | 0 |
| 13 | 1001044 | 10035 | INTELECT INTEGRATED ELECTROI | | 10 | 0 | 20805 | 0 |
| 13 | 1001044 | 10035 | INTELECT INTEGRATED ELECTROI | | 11 | 0 | 1750 | 0 |
| 13 | 1001044 | 10035 | INTELECT INTEGRATED ELECTROI | | 12 | 0 | 0 | 0 |
| 13 | 1001044 | 10035 | INTELECT INTEGRATE | 2008 | 1 | 0 | 9540 | 0 |
| 13 | 1001044 | 10035 | INTELECT INTEGRATED ELECTROI | | 2 | 0 | 100460 | 0 |
| 13 | 1001044 | 10035 | INTELECT INTEGRATED ELECTROI | | 3 | 0 | 14905 | 0 |
| 13 | 1001044 | 10035 | INTELECT INTEGRATED ELECTROI | | 4 | 0 | 10265 | 0 |
| 13 | 1001044 | 10035 | INTELECT INTEGRATED ELECTROI | | 5 | 4692.62 | -29480 | 4692.62 |
| 13 | 1001044 | 10035 | INTELECT INTEGRATED ELECTROI | | 6 | 0 | 52850 | 4692.62 |
| 13 | 1001044 | 10035 | INTELECT INTEGRATED ELECTROI | | 7 | 3104.13 | 1840 | 7796.75 |
| 13 | 1001044 | 10035 | INTELECT INTEGRATED ELECTROI | | 8 | 0 | 3350 | 7796.75 |
| 13 | 1001044 | 10035 | INTELECT INTEGRATED ELECTROI | | 9 | 0 | 73040 | 7796.75 |
| 13 | 1001044 | 10035 | INTELECT INTEGRATED ELECTROI | | 10 | 0 | 12325 | 7796.75 |
| 13 | 1001044 | 10035 | INTELECT INTEGRATED ELECTROI | | 11 | 0 | 2127 | 7796.75 |
| 13 | 1001044 | 10035 | INTELECT INTEGRATED ELECTROI | | 12 | 0 | 94792 | 7796.75 |
| 13 | 1001044 | 10035 | INTELECT INTEGRATE | 2009 | 1 | 0 | 13290 | 7796.75 |
| 13 | 1001044 | 10035 | INTELECT INTEGRATED ELECTROI | | 2 | 0 | -5380 | 7796.75 |
| 13 | 1001044 | 10035 | INTELECT INTEGRATED ELECTROI | | 3 | 0 | 3080 | 7796.75 |
| 13 | 1001044 | 10035 | INTELECT INTEGRATED ELECTROI | | 4 | 0 | 1560 | 7796.75 |
| 13 | 1001044 | 10035 | INTELECT INTEGRATED ELECTROI | | 5 | 0 | 600 | 7796.75 |
| 13 | 1001044 | 10035 | INTELECT INTEGRATED ELECTROI | | 6 | 0 | 750 | 7796.75 |
| 13 | 1001044 | 10035 | INTELECT INTEGRATED ELECTROI | | 7 | 0 | 0 | 7796.75 |
| 13 | 1001044 | 10035 | INTELECT INTEGRATED ELECTROI | | 8 | 0 | 0 | 7796.75 |
| 13 | 1001044 | 10035 | INTELECT INTEGRATED ELECTROI | | 9 | 0 | 535.5 | 7796.75 |
| 13 | 1001044 | 10035 | INTELECT INTEGRATED ELECTROI | | 10 | 0 | 6388.5 | 7796.75 |
| 13 | 1001044 | 10035 | INTELECT INTEGRATED ELECTROI | | 11 | 0 | 2067.6 | 7796.75 |
| 13 | 1001044 | 10035 | INTELECT INTEGRATED ELECTROI | | 12 | 0 | 697.5 | 7796.75 |
| 13 | 1001044 | 10035 | INTELECT INTEGRATE | 2010 | 1 | 0 | 558 | 7796.75 |
| 13 | 1001044 | 10035 | INTELECT INTEGRATED ELECTROI | | 2 | 0 | 697.5 | 7796.75 |
| 13 | 1001044 | 10035 | INTELECT INTEGRATED ELECTROI | | 3 | 0 | 1962.3 | 7796.75 |
| 13 | 1001044 | 10035 | INTELECT INTEGRATED ELECTROI | | 4 | 0 | 1712.35 | 7796.75 |
| 13 | 1001044 | 10035 | INTELECT INTEGRATED ELECTROI | | 5 | 0 | 0 | 7796.75 |
| 13 | 1001044 | 10035 | INTELECT INTEGRATED ELECTROI | | 6 | 0 | 1842.73 | 7796.75 |
| 13 | 1001044 | 10035 | INTELECT INTEGRATED ELECTROI | | 7 | 0 | 0 | 7796.75 |
| 13 | 1001044 | 10035 | INTELECT INTEGRATED ELECTROI | | 8 | 0 | 0 | 7796.75 |
| 13 | 1001044 | 10035 | INTELECT INTEGRATED ELECTROI | | 9 | 0 | 344.65 | 7796.75 |
| 13 | 1001044 | 10035 | INTELECT INTEGRATED ELECTROI | | 10 | 0 | 0 | 7796.75 |
| 13 | 1001044 | 10035 | INTELECT INTEGRATED ELECTROI | | 11 | 0 | 0 | 7796.75 |
| 13 | 1001044 | 10035 | INTELECT INTEGRATED ELECTROI | | 12 | 0 | 0 | 7796.75 |
| 13 | 1001044 | 10035 | INTELECT INTEGRATE | 2011 | 1 | 0 | 2042.5 | 7796.75 |
| 13 | 1001044 | 10035 | INTELECT INTEGRATED ELECTROI | | 2 | 0 | 0 | 7796.75 |
| 13 | 1001044 | 10035 | INTELECT INTEGRATED ELECTROI | | 3 | 0 | 0 | 7796.75 |
| 13 | 1001044 | 10035 | INTELECT INTEGRATED ELECTROI | | 4 | 0 | 0 | 7796.75 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 13 | 1001044 | 10035 | INTELECT INTEGRATED ELECTROI | 5 | 0 | 0 | 7796.75 |
| 13 | 1001044 | 10035 | INTELECT INTEGRATED ELECTROI | 6 | 0 | 498.75 | 7796.75 |
| 13 | 1001044 | 10035 | INTELECT INTEGRATED ELECTROI | 7 | 0 | 0 | 7796.75 |
| 13 | 1001044 | 10035 | INTELECT INTEGRATED ELECTROI | 8 | 0 | 1064.7 | 7796.75 |
| 13 | 1001044 | 10035 | INTELECT INTEGRATED ELECTROI | 9 | 0 | 0 | 7796.75 |
| 13 | 1001044 | 10035 | INTELECT INTEGRATED ELECTROI | 10 | 0 | 50270.65 | 7796.75 |
| 13 | 1001044 | 10035 | INTELECT INTEGRATED ELECTROI | 11 | 0 | 1719.9 | 7796.75 |
| 13 | 1001044 | 10035 | INTELECT INTEGRATED ELECTROI | 12 | 0 | 870 | 7796.75 |
| 13 | 1001044 | 10035 | INTELECT INTEGRATE 2012 | 1 | 0 | 3774.48 | 7796.75 |
| 13 | 1001044 | 10035 | INTELECT INTEGRATED ELECTROI | 2 | 0 | 8551 | 7796.75 |
| 13 | 1001044 | 10035 | INTELECT INTEGRATED ELECTROI | 3 | 0 | 0 | 7796.75 |
| 13 | 1001044 | 10035 | INTELECT INTEGRATED ELECTROI | 4 | 0 | -680 | 7796.75 |
| 13 | 1001044 | 10035 | INTELECT INTEGRATED ELECTROI | 5 | 0 | 0 | 7796.75 |
| 13 | 1001044 | 10035 | INTELECT INTEGRATED ELECTROI | 6 | 0 | 680 | 7796.75 |
| 13 | 1001044 | 10035 | INTELECT INTEGRATED ELECTROI | 7 | 0 | 0 | 7796.75 |
| 13 | 1001044 | 10035 | INTELECT INTEGRATED ELECTROI | 8 | 0 | 2525.25 | 7796.75 |
| 13 | 1001044 | 10035 | INTELECT INTEGRATED ELECTROI | 9 | 0 | 0 | 7796.75 |
| 13 | 1001044 | 10035 | INTELECT INTEGRATED ELECTROI | 10 | 0 | 0 | 7796.75 |
| 13 | 1001044 | 10035 | INTELECT INTEGRATED ELECTROI | 11 | 0 | 0 | 7796.75 |
| 13 | 1001044 | 10035 | INTELECT INTEGRATED ELECTROI | 12 | 0 | 45.5 | 7796.75 |
| 13 | 1001044 | 10035 | INTELECT INTEGRATE 2013 | 1 | 0 | 0 | 7796.75 |
| 13 | 1001044 | 10035 | INTELECT INTEGRATED ELECTROI | 2 | 0 | 0 | 7796.75 |
| 13 | 1001044 | 10035 | INTELECT INTEGRATED ELECTROI | 3 | 0 | 0 | 7796.75 |
| 13 | 1001044 | 10035 | INTELECT INTEGRATED ELECTROI | 4 | 0 | 0 | 7796.75 |
| 13 | 1001044 | 10035 | INTELECT INTEGRATED ELECTROI | 5 | 0 | 0 | 7796.75 |
| 13 | 1001044 | 10035 | INTELECT INTEGRATED ELECTROI | 6 | 0 | 800 | 7796.75 |
| 13 | 1001044 | 10035 | INTELECT INTEGRATED ELECTROI | 7 | 0 | 900 | 7796.75 |

| cumul_crestron |
|---|
| 5065 |
| 11215 |
| 12215 |
| 33020 |
| 34770 |
| 34770 |
| 44310 |
| 144770 |
| 159675 |
| 169940 |
| 140460 |
| 193310 |
| 195150 |
| 198500 |
| 271540 |
| 283865 |
| 285992 |
| 380784 |
| 394074 |
| 388694 |
| 391774 |
| 393334 |
| 393934 |
| 394684 |
| 394684 |
| 394684 |
| 395219.5 |
| 401608 |
| 403675.6 |
| 404373.1 |
| 404931.1 |
| 405628.6 |
| 407590.9 |
| 409303.3 |
| 409303.3 |
| 411146 |
| 411146 |
| 411146 |
| 411490.6 |
| 411490.6 |
| 411490.6 |
| 411490.6 |
| 413533.1 |
| 413533.1 |
| 413533.1 |
| 413533.1 |

413533.1
414031.9
414031.9
415096.6
415096.6
465367.2
467087.1
467957.1
471731.6
480282.6
480282.6
479602.6
479602.6
480282.6
480282.6
482807.8
482807.8
482807.8
482807.8
482853.3
482853.3
482853.3
482853.3
482853.3
482853.3
483653.3
484553.3

EXHIBIT 318

| uniq_id | soldto_nun | nav_cust_r | savant_name | nyear | nmonth | savant | crestron | cumul_sava |
|---|---|---|---|---|---|---|---|---|
| 11 | 1007746 | 10032 | SOCAL SMART HC | 2008 | 1 | 12218.42 | 0 | 12218.42 |
| 11 | 1007746 | 10032 | SOCAL SMART HC | 2008 | 2 | 0 | 0 | 12218.42 |
| 11 | 1007746 | 10032 | SOCAL SMART HC | 2008 | 3 | 0 | 0 | 12218.42 |
| 11 | 1007746 | 10032 | SOCAL SMART HC | 2008 | 4 | 0 | 0 | 12218.42 |
| 11 | 1007746 | 10032 | SOCAL SMART HC | 2008 | 5 | 0 | 0 | 12218.42 |
| 11 | 1007746 | 10032 | SOCAL SMART HC | 2008 | 6 | 4702.1 | 0 | 16920.52 |
| 11 | 1007746 | 10032 | SOCAL SMART HC | 2008 | 7 | 0 | 0 | 16920.52 |
| 11 | 1007746 | 10032 | SOCAL SMART HC | 2008 | 8 | 0 | 0 | 16920.52 |
| 11 | 1007746 | 10032 | SOCAL SMART HC | 2008 | 9 | 0 | 0 | 16920.52 |
| 11 | 1007746 | 10032 | SOCAL SMART HC | 2008 | 10 | 0 | 0 | 16920.52 |
| 11 | 1007746 | 10032 | SOCAL SMART HC | 2008 | 11 | 0 | 0 | 16920.52 |
| 11 | 1007746 | 10032 | SOCAL SMART HC | 2008 | 12 | 0 | 0 | 16920.52 |
| 11 | 1007746 | 10032 | SOCAL SMART HC | 2009 | 1 | 0 | 0 | 16920.52 |
| 11 | 1007746 | 10032 | SOCAL SMART HC | 2009 | 2 | 0 | 0 | 16920.52 |
| 11 | 1007746 | 10032 | SOCAL SMART HC | 2009 | 3 | 0 | 5730 | 16920.52 |
| 11 | 1007746 | 10032 | SOCAL SMART HC | 2009 | 4 | 0 | 1572 | 16920.52 |
| 11 | 1007746 | 10032 | SOCAL SMART HC | 2009 | 5 | 0 | 6635 | 16920.52 |
| 11 | 1007746 | 10032 | SOCAL SMART HC | 2009 | 6 | 0 | 1820 | 16920.52 |
| 11 | 1007746 | 10032 | SOCAL SMART HC | 2009 | 7 | 0 | 0 | 16920.52 |
| 11 | 1007746 | 10032 | SOCAL SMART HC | 2009 | 8 | 0 | 7461 | 16920.52 |
| 11 | 1007746 | 10032 | SOCAL SMART HC | 2009 | 9 | 0 | 1125 | 16920.52 |
| 11 | 1007746 | 10032 | SOCAL SMART HC | 2009 | 10 | 0 | 0 | 16920.52 |
| 11 | 1007746 | 10032 | SOCAL SMART HC | 2009 | 11 | 0 | -1060 | 16920.52 |
| 11 | 1007746 | 10032 | SOCAL SMART HC | 2009 | 12 | 0 | 4429.05 | 16920.52 |
| 11 | 1007746 | 10032 | SOCAL SMART HC | 2010 | 1 | 0 | -18.6 | 16920.52 |
| 11 | 1007746 | 10032 | SOCAL SMART HC | 2010 | 2 | 0 | 0 | 16920.52 |
| 11 | 1007746 | 10032 | SOCAL SMART HC | 2010 | 3 | 0 | 0 | 16920.52 |
| 11 | 1007746 | 10032 | SOCAL SMART HC | 2010 | 4 | 0 | 1233.65 | 16920.52 |
| 11 | 1007746 | 10032 | SOCAL SMART HC | 2010 | 5 | 0 | 0 | 16920.52 |
| 11 | 1007746 | 10032 | SOCAL SMART HC | 2010 | 6 | 0 | 0 | 16920.52 |
| 11 | 1007746 | 10032 | SOCAL SMART HC | 2010 | 7 | 0 | -200 | 16920.52 |
| 11 | 1007746 | 10032 | SOCAL SMART HC | 2010 | 8 | 0 | 70.87 | 16920.52 |
| 11 | 1007746 | 10032 | SOCAL SMART HC | 2010 | 9 | 0 | 0 | 16920.52 |
| 11 | 1007746 | 10032 | SOCAL SMART HC | 2010 | 10 | 0 | 0 | 16920.52 |
| 11 | 1007746 | 10032 | SOCAL SMART HC | 2010 | 11 | 0 | 0 | 16920.52 |
| 11 | 1007746 | 10032 | SOCAL SMART HC | 2010 | 12 | 0 | 0 | 16920.52 |
| 11 | 1007746 | 10032 | SOCAL SMART HC | 2011 | 1 | 0 | 0 | 16920.52 |
| 11 | 1007746 | 10032 | SOCAL SMART HC | 2011 | 2 | 0 | 0 | 16920.52 |
| 11 | 1007746 | 10032 | SOCAL SMART HC | 2011 | 3 | 0 | 0 | 16920.52 |
| 11 | 1007746 | 10032 | SOCAL SMART HC | 2011 | 4 | 0 | 950 | 16920.52 |
| 11 | 1007746 | 10032 | SOCAL SMART HC | 2011 | 5 | 0 | 142.5 | 16920.52 |
| 11 | 1007746 | 10032 | SOCAL SMART HC | 2011 | 6 | 0 | 0 | 16920.52 |
| 11 | 1007746 | 10032 | SOCAL SMART HC | 2011 | 7 | 0 | 0 | 16920.52 |
| 11 | 1007746 | 10032 | SOCAL SMART HC | 2011 | 8 | 0 | 0 | 16920.52 |
| 11 | 1007746 | 10032 | SOCAL SMART HC | 2011 | 9 | 0 | 0 | 16920.52 |
| 11 | 1007746 | 10032 | SOCAL SMART HC | 2011 | 10 | 0 | 0 | 16920.52 |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 11 | 1007746 | 10032 | SOCAL SMART HC | 2011 | 11 | 0 | 136.5 | 16920.52 |
| 11 | 1007746 | 10032 | SOCAL SMART HC | 2011 | 12 | 671.06 | 0 | 17591.58 |
| 11 | 1007746 | 10032 | SOCAL SMART HC | 2012 | 1 | 0 | 0 | 17591.58 |
| 11 | 1007746 | 10032 | SOCAL SMART HC | 2012 | 2 | 0 | 0 | 17591.58 |
| 11 | 1007746 | 10032 | SOCAL SMART HC | 2012 | 3 | 0 | 0 | 17591.58 |
| 11 | 1007746 | 10032 | SOCAL SMART HC | 2012 | 4 | 426.53 | 0 | 18018.11 |
| 11 | 1007746 | 10032 | SOCAL SMART HC | 2012 | 5 | 261.33 | 0 | 18279.44 |
| 11 | 1007746 | 10032 | SOCAL SMART HC | 2012 | 6 | 0 | 45 | 18279.44 |
| 11 | 1007746 | 10032 | SOCAL SMART HC | 2012 | 7 | 7471.32 | 0 | 25750.76 |
| 11 | 1007746 | 10032 | SOCAL SMART HC | 2012 | 8 | 26.32 | 0 | 25777.08 |
| 11 | 1007746 | 10032 | SOCAL SMART HC | 2012 | 9 | 12200.59 | 0 | 37977.67 |
| 11 | 1007746 | 10032 | SOCAL SMART HC | 2012 | 10 | 1000 | 0 | 38977.67 |
| 11 | 1007746 | 10032 | SOCAL SMART HC | 2012 | 11 | 0 | 0 | 38977.67 |
| 11 | 1007746 | 10032 | SOCAL SMART HC | 2012 | 12 | 683.95 | 0 | 39661.62 |
| 11 | 1007746 | 10032 | SOCAL SMART HC | 2013 | 1 | 19384.48 | 0 | 59046.1 |
| 11 | 1007746 | 10032 | SOCAL SMART HC | 2013 | 2 | 4954.73 | 0 | 64000.83 |
| 11 | 1007746 | 10032 | SOCAL SMART HC | 2013 | 3 | 3230.88 | 0 | 67231.71 |
| 11 | 1007746 | 10032 | SOCAL SMART HC | 2013 | 4 | 0 | 0 | 67231.71 |
| 11 | 1007746 | 10032 | SOCAL SMART HC | 2013 | 5 | 0 | 0 | 67231.71 |
| 11 | 1007746 | 10032 | SOCAL SMART HC | 2013 | 6 | 0 | 0 | 67231.71 |
| 11 | 1007746 | 10032 | SOCAL SMART HC | 2013 | 7 | 1399.5 | 0 | 68631.21 |
| 11 | 1007746 | 10032 | SOCAL SMART HC | 2013 | 8 | 160 | 0 | 68791.21 |
| 11 | 1007746 | 10032 | SOCAL SMART HC | 2013 | 9 | 21451.5 | 0 | 90242.71 |

| cumul_crestron |
|---|
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 0 |
| 5730 |
| 7302 |
| 13937 |
| 15757 |
| 15757 |
| 23218 |
| 24343 |
| 24343 |
| 23283 |
| 27712.05 |
| 27693.45 |
| 27693.45 |
| 27693.45 |
| 28927.1 |
| 28927.1 |
| 28927.1 |
| 28727.1 |
| 28797.97 |
| 28797.97 |
| 28797.97 |
| 28797.97 |
| 28797.97 |
| 28797.97 |
| 28797.97 |
| 28797.97 |
| 29747.97 |
| 29890.47 |
| 29890.47 |
| 29890.47 |
| 29890.47 |
| 29890.47 |
| 29890.47 |

30026.97
30026.97
30026.97
30026.97
30026.97
30026.97
30026.97
30071.97
30071.97
30071.97
30071.97
30071.97
30071.97
30071.97
30071.97
30071.97
30071.97
30071.97
30071.97
30071.97
30071.97
30071.97
30071.97

EXHIBIT 319

| year | net_dollars | cogs | gross_margin |
|---|---|---|---|
| 2007 | 50675731 | 19947483 | 0.606 |
| 2008 | 97880878 | 38771094 | 0.604 |
| 2009 | 72598531 | 29460545 | 0.594 |
| 2010 | 68373826 | 27791291 | 0.594 |
| 2011 | 63803774 | 27622699 | 0.567 |
| 2012 | 66114519 | 30617640 | 0.537 |
| 2013 | 52302241 | 17262061 | 0.67 |

EXHIBIT 320

| year | pSavant | pCrestron | pAMX | savant | crestron | calendar_y | us_plus_can_ov | AMX_share | _merge | AMX |
|---|---|---|---|---|---|---|---|---|---|---|
| 2007 | 0 | 0.8 | 0.2 | 19197.36 | 53,600,000 | 2007 | 1.058567 | 0.2 | matched (3 | 13,400,000 |
| 2008 | 0.011 | 0.826 | 0.163 | 1326241 | 103,000,000 | 2008 | 1.057373 | 0.16325 | matched (3 | 20,500,000 |
| 2009 | 0.051 | 0.823 | 0.127 | 4785761 | 77,600,000 | 2009 | 1.068822 | 0.1265 | matched (3 | 11,900,000 |
| 2010 | 0.114 | 0.796 | 0.09 | 1.06E+07 | 73,700,000 | 2010 | 1.078552 | 0.08975 | matched (3 | 8,314,591 |
| 2011 | 0.204 | 0.743 | 0.053 | 1.89E+07 | 68,900,000 | 2011 | 1.080458 | 0.053 | matched (3 | 4,917,423 |
| 2012 | 0.257 | 0.69 | 0.053 | 2.67E+07 | 71,800,000 | 2012 | 1.085611 | 0.053 | matched (3 | 5,509,559 |
| 2013 | 0.29 | 0.657 | 0.053 | 2.51E+07 | 56,800,000 | 2013 | 1.085611 | 0.053 | matched (3 | 4,581,622 |

EXHIBIT 321

| year | savant | crestron | calendar_y | us_plus_can_over_us | pSavant | pCrestron |
|---|---|---|---|---|---|---|
| 2007 | 19197.36 | 53,600,000 | 2007 | 1.058567 | 0 | 1 |
| 2008 | 1326241 | 103,000,000 | 2008 | 1.057373 | 0.013 | 0.987 |
| 2009 | 4785761 | 77,600,000 | 2009 | 1.068822 | 0.058 | 0.942 |
| 2010 | 1.06E+07 | 73,700,000 | 2010 | 1.078552 | 0.125 | 0.875 |
| 2011 | 1.89E+07 | 68,900,000 | 2011 | 1.080458 | 0.215 | 0.785 |
| 2012 | 2.67E+07 | 71,800,000 | 2012 | 1.085611 | 0.271 | 0.729 |
| 2013 | 2.51E+07 | 56,800,000 | 2013 | 1.085611 | 0.306 | 0.694 |

EXHIBIT 322

| year | net_dollarsCrestron | net_dollarsSavant | total_dollars | pSavant |
|---|---|---|---|---|
| 2007 | 50675731 | 19197.36 | 50,700,000 | 0 |
| 2008 | 97880878 | 1309120.9 | 99,200,000 | 0.01 |
| 2009 | 72598531 | 4785760.9 | 77,400,000 | 0.06 |
| 2010 | 68373826 | 10582378 | 79,000,000 | 0.13 |
| 2011 | 63803774 | 18926836 | 82,700,000 | 0.23 |
| 2012 | 66114519 | 26642950 | 92,800,000 | 0.29 |
| 2013 | 52302241 | 25049148 | 77,400,000 | 0.32 |

EXHIBIT 323

| calendar_y | pRestrictedNoCanada | pRestrictedWithCanada | restricted_crestron | savant_total | crestron_total | AMX_total |
|---|---|---|---|---|---|---|
| 2008 | 0.73 | 0.772000015 | 51881537.39 | 1119609.464 | 58335829.98 | 11599762 |
| 2009 | 0.677 | 0.72299999 | 63802842.16 | 4785760.893 | 77594926.82 | 11930346 |
| 2010 | 0.598 | 0.644999981 | 55441022.44 | 10582377.65 | 73744710.77 | 8314590.5 |
| 2011 | 0.55 | 0.593999982 | 51012684.93 | 18926835.72 | 68937309.03 | 4917423 |
| 2012 | 0.497 | 0.540000021 | 51697207.84 | 26669701.03 | 71774671.79 | 5509558.5 |
| 2013 | 0.468 | 0.508000016 | 40422528.73 | 25084161.56 | 56779905.61 | 4581621.5 |

| denominator | us_plus_can_over_us | restricted_crestron_w_canada |
|---|---|---|
| 71055200 | 1.057372928 | 54858132 |
| 94311032 | 1.068822265 | 68193896 |
| 92641680 | 1.078551769 | 59796012 |
| 92781568 | 1.080458164 | 55117072 |
| 103953936 | 1.085611343 | 56123076 |
| 86445688 | 1.085611343 | 43883156 |