"***Nonqualified Stock Option***" means an Option other than an Incentive Stock Option.

"***Option***" means a right to purchase Common Stock granted under Section 7.

"***Option Expiration Date***" has the meaning set forth in Section 7.6.

"***Option Term***" means the maximum term of an Option as set forth in Section 7.3.

"***Participant***" means any Eligible Person to whom an Award is granted.

"***Plan***" means the Control4 Corporation 2003 Equity Incentive Plan.

"***Plan Administrator***" has the meaning set forth in Section 3.1.

"***Related Company***" means any entity that, directly or indirectly, is in control of, is controlled by or is under common control with the Company.

"***Related Party Transaction***" means (a) a merger or consolidation of the Company in which the holders of the outstanding voting securities of the Company immediately prior to the merger or consolidation hold at least a majority of the outstanding voting securities of the Successor Company immediately after the merger or consolidation; (b) a sale, lease, exchange or other transfer of all or substantially all of the Company's assets to a majority-owned subsidiary company; (c) a transaction undertaken for the principal purpose of restructuring the capital of the Company, including, but not limited to, reincorporating the Company in a different jurisdiction, converting the Company to a limited liability company or creating a holding company; or (d) a corporate dissolution or liquidation.

"***Restricted Stock***" means an Award of shares of Common Stock granted under Section 10, the rights of ownership of which may be subject to restrictions prescribed by the Plan Administrator.

"***Retirement***," unless otherwise defined in the instrument evidencing the Award or in a written employment, services or other agreement between the Participant and the Company or a Related Company, means "***Retirement***" as defined for purposes of the Plan by the Plan Administrator or the Company's chief human resources officer or other person performing that function or, if not so defined, means Termination of Service on or after the date the Participant reaches age 55 and has completed ten years of employment or service with the Company or a Related Company.

"***Securities Act***" means the Securities Act of 1933, as amended from time to time.

"***Stock Appreciation Right***" has the meaning set forth in Section 9.1.

"***Stock Award***" means an Award of shares of Common Stock granted under Section 10, the rights of ownership of which are not subject to restrictions prescribed by the Plan Administrator.



---

"***Stock Unit***" means an Award denominated in units of Common Stock granted under Section 10.

"***Substitute Awards***" means Awards granted or shares of Common Stock issued by the Company in assumption of, or in substitution or exchange for, awards previously granted by an Acquired Entity.

"***Successor Company***" means the surviving company, the successor company, the acquiring company or its parent, as applicable, in connection with a Company Transaction.

"***Termination of Service***" means a termination of employment or service relationship with the Company or a Related Company for any reason, whether voluntary or involuntary, including by reason of death, Disability or Retirement. Any question as to whether and when there has been a Termination of Service for the purposes of an Award and the cause of such Termination of Service shall be determined by the Company's chief human resources officer or other person performing that function or, in the case of directors and executive officers, the Board, each of whose determination shall be conclusive and binding. Transfer of a Participant's employment or service relationship between the Company and any Related Company shall not be considered a Termination of Service for purposes of an Award. Unless the Board determines otherwise, a Termination of Service shall be deemed to occur if the Participant's employment or service relationship is with an entity that has ceased to be a Related Company.

"***Vesting Commencement Date***" means the Grant Date or such other date set forth in the instrument evidencing the Award as the date from which the Option begins to vest for purposes of Section 7.4.

**SECTION 3. ADMINISTRATION**

**3.1 Administration of the Plan**

The Plan shall be administered by the Board. If and so long as the Common Stock is registered under Section 12(b) or 12(g) of the Exchange Act, the Board shall consider in selecting the members of any committee acting as Plan Administrator, with respect to any persons subject or likely to become subject to Section 16 of the Exchange Act, the provisions regarding (a) "outside directors" as contemplated by Section 162(m) of the Code and (b) "non-employee directors" as contemplated by Rule 16b-3(b)(3) under the Exchange Act, or any successor provision thereto. Members of any committee shall serve for such term as the Board may determine, subject to removal by the Board at any time. All references in the Plan to the "***Plan Administrator***" shall be, as applicable, to the Board or any committee to whom the Board has delegated authority to administer the Plan.

**3.2 Administration and Interpretation by Plan Administrator**

Except for the terms and conditions explicitly set forth in the Plan, the Plan Administrator shall have full power and exclusive authority, subject to such orders or resolutions not inconsistent with the provisions of the Plan as may from time to time be adopted by the Board to the extent the Plan Administrator is a committee of the Board, to (a) select the Eligible Persons to whom Awards may from time to time be granted under the Plan; (b) determine the type or



---

types of Award to be granted to each Participant under the Plan; (c) determine the number of shares of Common Stock to be covered by each Award granted under the Plan; (d) determine the terms and conditions of any Award granted under the Plan; (e) approve the forms of agreements for use under the Plan; (f) determine whether, to what extent and under what circumstances Awards may be settled in cash, shares of Common Stock or other property or canceled or suspended; (g) determine whether, to what extent and under what circumstances cash, shares of Common Stock, other property and other amounts payable with respect to an Award shall be deferred either automatically or at the election of the Participant; (h) interpret and administer the Plan and any instrument evidencing an Award; (i) establish such rules and regulations as it shall deem appropriate for the proper administration of the Plan; (j) delegate ministerial duties to such of the Company's officers as it so determines; and (k) make any other determination and take any other action that the Plan Administrator deems necessary or desirable for administration of the Plan. Decisions of the Plan Administrator shall be final, conclusive and binding on all persons, including the Company, any Participant, any stockholder and any Eligible Person. A majority of the members of the Plan Administrator may determine its actions and fix the time and place of its meetings.

**SECTION 4. SHARES SUBJECT TO THE PLAN**

**4.1 Authorized Number of Shares**

Subject to adjustment from time to time as provided in Section 13.1, a maximum of 12,523,595 shares of Common Stock shall be available for issuance under the Plan. Shares issued under the Plan shall be drawn from authorized and unissued shares or shares now held or subsequently acquired by the Company as treasury shares.

**4.2 Share Usage**

(a) Shares of Common Stock covered by an Award shall not be counted as used unless and until they are actually issued and delivered to a Participant. If any Award lapses, expires, terminates or is canceled prior to the issuance of shares thereunder or if shares of Common Stock are issued under the Plan to a Participant and thereafter are forfeited to or otherwise reacquired by the Company, the shares subject to such Awards and the forfeited or reacquired shares shall again be available for issuance under the Plan. Any shares of Common Stock (i) tendered by a Participant or retained by the Company as full or partial payment to the Company for the purchase price of an Award or to satisfy tax withholding obligations in connection with an Award or (ii) covered by an Award that is settled in cash shall be available for Awards under the Plan.

(b) The Plan Administrator shall have the authority to grant Awards as an alternative to or as the form of payment for grants or rights earned or due under other compensation plans or arrangements of the Company.

(c) Notwithstanding anything in the Plan to the contrary, the Plan Administrator may grant Substitute Awards under the Plan. In the event that a written agreement pursuant to which a Company Transaction or a Related Party Transaction is completed is approved by the Board and said agreement sets forth the terms and conditions of the Substitute



---

Awards, said terms and conditions shall be deemed to be the action of the Plan Administrator without any further action by the Plan Administrator, except as may be required for compliance with Rule 16b-3 under the Exchange Act, and the persons holding such Substitute Awards shall be deemed to be Participants.

(d) Notwithstanding the foregoing and, subject to adjustment provided in Section 13.1, the maximum number of shares that may be issued upon the exercise of Incentive Stock Options shall equal the aggregate share number stated in Section 4.1.

**SECTION 5. ELIGIBILITY**

An Award may be granted to any employee, officer or director of the Company or a Related Company whom the Plan Administrator from time to time selects. An Award may also be granted to any consultant, agent, advisor or independent contractor for bona fide services rendered to the Company or any Related Company that (a) are not in connection with the offer and sale of the Company's securities in a capital-raising transaction and (b) do not directly or indirectly promote or maintain a market for the Company's securities.

**SECTION 6. AWARDS**

**6.1 Form, Grant and Settlement of Awards**

The Plan Administrator shall have the authority, in its sole discretion, to determine the type or types of Awards to be granted under the Plan. Such Awards may be granted either alone, in addition to or in tandem with any other type of Award. Any Award settlement may be subject to such conditions, restrictions and contingencies as the Plan Administrator shall determine.

**6.2 Evidence of Awards**

Awards granted under the Plan shall be evidenced by a written (including electronic) instrument that shall contain such terms, conditions, limitations and restrictions as the Plan Administrator shall deem advisable and that are not inconsistent with the Plan.

**6.3 Vesting of Awards**

The effect on the vesting of an Award of a Company-approved leave of absence or a Participant's working less than full-time shall be determined by the Company's chief human resources officer or other person performing that function or, in the case of directors and executive officers, the Board, each of whose determination shall be conclusive and binding.

**6.4 Deferrals**

The Plan Administrator may permit or require a Participant to defer receipt of the payment of any Award. If any such deferral election is permitted or required, the Plan Administrator, in its sole discretion, shall establish rules and procedures for such payment deferrals, which may include the grant of additional Awards or provisions for the payment or crediting of interest or dividend equivalents, including converting such credits to deferred stock unit equivalents.



---

**SECTION 7. OPTIONS**

**7.1 Grant of Options**

The Plan Administrator may grant Options designated as Incentive Stock Options or Nonqualified Stock Options.

**7.2 Option Exercise Price**

The exercise price for shares purchased under an Option shall be as established by the Plan Administrator, but shall not be less than the minimum exercise price required by Section 8.3 with respect to Incentive Stock Options, except in the case of Substitute Awards.

**7.3 Term of Options**

Subject to earlier termination in accordance with the terms of the Plan and the instrument evidencing the Option, the maximum term of an Option (the "***Option Term***") shall be as established for that Option by the Plan Administrator or, if not so established, shall be ten years from the Grant Date. For Incentive Stock Options, the Option Term shall be as specified in Section 8.4.

**7.4 Exercise of Options**

The Plan Administrator shall establish and set forth in each instrument that evidences an Option the time at which, or the installments in which, the Option shall vest and become exercisable, any of which provisions may be waived or modified by the Plan Administrator at any time. If not so established in the instrument evidencing the Option, the Option shall vest and become exercisable according to the following schedule, which may be waived or modified by the Plan Administrator at any time:

| Period of Participant's Continuous Employment or Service With the Company or Its Related Companies From the Vesting Commencement Date | Portion of Total Option That Is Vested and Exercisable |
|---|---|

| | |
|---|---|
| After 1 year | 1/4 |
| Each additional one-month period of continuous service completed thereafter | An additional 1/48 |
| After 4 years | 100% |

To the extent an Option has vested and become exercisable, the Option may be exercised in whole or from time to time in part by delivery to the Company of a properly executed stock option exercise agreement or notice, in a form and in accordance with procedures established by the Plan Administrator, setting forth the number of shares with respect to which the Option is being exercised, the restrictions imposed on the shares purchased under such exercise agreement



or notice, if any, and such representations and agreements as may be required by the Plan Administrator, accompanied by payment in full as described in Section 7.5. An Option may be exercised only for whole shares and may not be exercised for less than a reasonable number of shares at any one time, as determined by the Plan Administrator.

**7.5 Payment of Exercise Price**

The exercise price for shares purchased under an Option shall be paid in full to the Company by delivery of consideration equal to the product of the Option exercise price and the number of shares purchased. Such consideration must be paid before the Company will issue the shares being purchased and must be in a form or a combination of forms acceptable to the Plan Administrator for that purchase, which forms may include:

(a) cash;

(b) check or wire transfer;

(c) tendering (either actually or, if the Common Stock is registered under Section 12(b) or 12(g) of the Exchange Act, by attestation) shares of Common Stock already owned by the Participant, which on the day prior to the exercise date have a Fair Market Value equal to the aggregate exercise price of the shares being purchased under the Option;

(d) if the Common Stock is registered under Section 12(b) or 12(g) of the Exchange Act, and to the extent permitted by law, delivery of a properly executed exercise agreement or notice, together with irrevocable instructions to a brokerage firm designated or approved by the Company to deliver promptly to the Company the aggregate amount of sale or loan proceeds to pay the Option exercise price and any withholding tax obligations that may arise in connection with the exercise, all in accordance with the regulations of the Federal Reserve Board; or

(e) such other consideration as the Plan Administrator may permit.

In addition, to assist a Participant (including directors and executive officers) in acquiring shares of Common Stock pursuant to an Award granted under the Plan, the Plan Administrator, in its sole discretion, may authorize, either at the Grant Date or at any time before the acquisition of Common Stock pursuant to the Award, (i) the payment by a Participant of the purchase price of the Common Stock by a promissory note or (ii) the guarantee by the Company of a loan obtained by the Participant from a third party. Such notes or loans must be full recourse to the extent necessary to avoid charges to the Company's earnings for financial reporting purposes. Subject to the foregoing, the Plan Administrator shall in its sole discretion specify the terms of any loans or loan guarantees, including the interest rate and terms of and security for repayment.

**7.6 Effect of Termination of Service**

The Plan Administrator shall establish and set forth in each instrument that evidences an Option whether the Option shall continue to be exercisable, and the terms and conditions of such exercise, after a Termination of Service, any of which provisions may be waived or modified by the Plan Administrator at any time. If not so established in the instrument evidencing the Option,



the Option shall be exercisable according to the following terms and conditions, which may be waived or modified by the Plan Administrator at any time:

(a) Any portion of an Option that is not vested and exercisable on the date of a Participant's Termination of Service shall expire on such date.

(b) Any portion of an Option that is vested and exercisable on the date of a Participant's Termination of Service shall expire on the earliest to occur of

(i) if the Participant's Termination of Service occurs for reasons other than Cause, Retirement, Disability or death, the date that is three months after such Termination of Service;

(ii) if the Participant's Termination of Service occurs by reason of Retirement, Disability or death, the one-year anniversary of such Termination of Service; and

(iii) the last day of the Option Term (the "***Option Expiration Date***").

Notwithstanding the foregoing, if a Participant dies after the Participant's Termination of Service but while an Option is otherwise exercisable, the portion of the Option that is vested and exercisable on the date of such Termination of Service shall expire upon the earlier to occur of (y) the Option Expiration Date and (z) the one-year anniversary of the date of death, unless the Plan Administrator determines otherwise.

Also notwithstanding the foregoing, in case a Participant's Termination of Service occurs for Cause, all Options granted to the Participant shall automatically expire upon first notification to the Participant of such termination, unless the Plan Administrator determines otherwise. If a Participant's employment or service relationship with the Company is suspended pending an investigation of whether the Participant shall be terminated for Cause, all the Participant's rights under any Option shall likewise be suspended during the period of investigation. If any facts that would constitute termination for Cause are discovered after a Participant's Termination of Service, any Option then held by the Participant may be immediately terminated by the Plan Administrator, in its sole discretion.

(c) A Participant's change in status from an employee to a consultant, advisor or independent contractor or a change in status from a consultant, advisor or independent contractor to an employee shall not be considered a Termination of Service for purposes of this Section 7.6.

**SECTION 8. INCENTIVE STOCK OPTION LIMITATIONS**

Notwithstanding any other provisions of the Plan, the terms and conditions of any Incentive Stock Options shall in addition comply in all respects with Section 422 of the Code or any successor provision and any applicable regulations thereunder, including the following:



---

**8.1 Dollar Limitation**

To the extent the aggregate Fair Market Value (determined as of the Grant Date) of Common Stock with respect to which a Participant's Incentive Stock Options become exercisable for the first time during any calendar year (under the Plan and all other stock option plans of the Company and its parent and subsidiary corporations) exceeds $100,000, such portion in excess of $100,000 shall be treated as a Nonqualified Stock Option. In the event the Participant holds two or more such Options that become exercisable for the first time in the same calendar year, such limitation shall be applied on the basis of the order in which such Options are granted.

**8.2 Eligible Employees**

Individuals who are not employees of the Company or one of its parent or subsidiary corporations may not be granted Incentive Stock Options.

**8.3 Exercise Price**

The exercise price of an Incentive Stock Option shall be at least 100% of the Fair Market Value of the Common Stock on the Grant Date and, in the case of an Incentive Stock Option granted to a Participant who owns more than 10% of the total combined voting power of all classes of the stock of the Company or of its parent or subsidiary corporations (a "***10% Stockholder***"), shall not be less than 110% of the Fair Market Value of the Common Stock on the Grant Date. The determination of more than 10% ownership shall be made in accordance with Section 422 of the Code.

**8.4 Option Term**

Subject to earlier termination in accordance with the terms of the Plan and the instrument evidencing the Option, the Option Term of an Incentive Stock Option shall not exceed ten years, and in the case of an Incentive Stock Option granted to a 10% Stockholder, shall not exceed five years.

**8.5 Exercisability**

An Option designated as an Incentive Stock Option shall cease to qualify for favorable tax treatment as an Incentive Stock Option to the extent it is exercised (if permitted by the terms of the Option) (a) more than three months after the date of a Participant's Termination of Service if termination was for reasons other than death or Disability, (b) more than one year after the date of a Participant's Termination of Service if termination was by reason of Disability, or (c) after the Participant has been on leave of absence for more than 90 days, unless the Participant's reemployment rights are guaranteed by statute or contract.

**8.6 Taxation of Incentive Stock Options**

In order to obtain certain tax benefits afforded to Incentive Stock Options under Section 422 of the Code, the Participant must hold the shares acquired upon the exercise of an Incentive Stock Option for two years after the Grant Date and one year after the date of exercise.



---

A Participant may be subject to the alternative minimum tax at the time of exercise of an Incentive Stock Option. The Participant shall give the Company prompt notice of any disposition of shares acquired on the exercise of an Incentive Stock Option prior to the expiration of such holding periods.

**8.7 Promissory Notes**

The amount of any promissory note delivered pursuant to Section 7.5 in connection with an Incentive Stock Option shall bear interest at a rate specified by the Plan Administrator, but in no case less than the rate required to avoid imputation of interest (taking into account any exceptions to the imputed interest rules) for federal income tax purposes.

**8.8 Code Definitions**

For the purposes of this Section 8, "disability," "parent corporation" and "subsidiary corporation" shall have the meanings attributed to those terms for purposes of Section 422 of the Code.

**SECTION 9. STOCK APPRECIATION RIGHTS**

**9.1 Grant of Stock Appreciation Rights**

The Plan Administrator may grant stock appreciation rights ("***Stock Appreciation Rights***" or "***SARs***") to Participants at any time. An SAR may be granted in tandem with an Option or alone ("***freestanding***"). The grant price of a tandem SAR shall be equal to the exercise price of the related Option, and the grant price of a freestanding SAR shall be as established by the Plan Administrator. An SAR may be exercised upon such terms and conditions and for the term as the Plan Administrator determines in its sole discretion; provided, however, that, subject to earlier termination in accordance with the terms of the Plan and the instrument evidencing the SAR, the term of a freestanding SAR shall be as established for that SAR by the Plan Administrator or, if not so established, shall be ten years, and in the case of a tandem SAR, (a) the term shall not exceed the term of the related Option and (b) the tandem SAR may be exercised for all or part of the shares subject to the related Option upon the surrender of the right to exercise the equivalent portion of the related Option, except that the tandem SAR may be exercised only with respect to the shares for which its related Option is then exercisable.

**9.2 Payment of SAR Amount**

Upon the exercise of an SAR, a Participant shall be entitled to receive payment from the Company in an amount determined by multiplying: (a) the difference between the Fair Market Value of the Common Stock for the date of exercise over the grant price by (b) the number of shares with respect to which the SAR is exercised. At the discretion of the Plan Administrator as set forth in the instrument evidencing the Award, the payment upon exercise of an SAR may be in cash, in shares of equivalent value, in some combination thereof or in any other manner approved by the Plan Administrator in its sole discretion.



---

**SECTION 10. STOCK AWARDS, RESTRICTED STOCK AND STOCK UNITS**

**10.1 Grant of Stock Awards, Restricted Stock and Stock Units**

The Plan Administrator may grant Stock Awards, Restricted Stock or Stock Units on such terms and conditions and subject to such repurchase or forfeiture restrictions, if any (which may be based on continuous service with the Company or a Related Company or the achievement of any performance criteria), as the Plan Administrator shall determine in its sole discretion, which terms, conditions and restrictions shall be set forth in the instrument evidencing the Award.

**10.2 Issuance of Shares; Settlement of Awards**

Upon the satisfaction of any terms, conditions and restrictions prescribed with respect to Restricted Stock or Stock Units, or upon a Participant's release from any terms, conditions and restrictions of Restricted Stock or Stock Units, as determined by the Plan Administrator, and subject to the provisions of Section 11, (a) the shares of Restricted Stock covered by each Award of Restricted Stock shall become freely transferable by the Participant, and (b) Stock Units shall be paid in shares of Common Stock or, if set forth in the instrument evidencing the Award, in cash, shares of Common Stock or a combination of cash and shares of Common Stock as the Plan

Administrator shall determine in its sole discretion. Any fractional shares subject to such Awards shall be paid to the Participant in cash.

**10.3 Dividends and Distributions**

Participants holding shares of Restricted Stock or Stock Units may, if the Plan Administrator so determines, be credited with dividends paid with respect to the underlying shares or dividend equivalents while they are so held in a manner determined by the Plan Administrator in its sole discretion. The Plan Administrator may apply any restrictions to the dividends or dividend equivalents that the Plan Administrator deems appropriate. The Plan Administrator, in its sole discretion, may determine the form of payment of dividends or dividend equivalents, including cash, shares of Common Stock, Restricted Stock or Stock Units.

**10.4 Waiver of Restrictions**

Notwithstanding any other provisions of the Plan, the Plan Administrator, in its sole discretion, may waive the repurchase or forfeiture period and any other terms, conditions or restrictions on any Restricted Stock or Stock Unit under such circumstances and subject to such terms and conditions as the Plan Administrator shall deem appropriate.

**SECTION 11. WITHHOLDING**

The Company may require the Participant to pay to the Company the amount of (a) any taxes that the Company is required by applicable federal, state, local or foreign law to withhold with respect to the grant, vesting or exercise of an Award ("***tax withholding obligations***") and (b) any amounts due from the Participant to the Company or to any Related Company ("***other obligations***"). The Company shall not be required to issue any shares of Common Stock or



otherwise settle an Award under the Plan until such tax withholding obligations and other obligations are satisfied.

The Plan Administrator may permit or require a Participant to satisfy all or part of the Participant's tax withholding obligations and other obligations by (a) paying cash to the Company, (b) having the Company withhold an amount from any cash amounts otherwise due or to become due from the Company to the Participant, (c) having the Company withhold a number of shares of Common Stock that would otherwise be issued to the Participant (or become vested in the case of Restricted Stock) having a Fair Market Value equal to the tax withholding obligations and other obligations, or (d) surrendering a number of shares of Common Stock the Participant already owns having a value equal to the tax withholding obligations and other obligations. The value of the shares so withheld may not exceed the employer's minimum required tax withholding rate, and the value of the shares so surrendered may not exceed such rate to the extent the Participant has owned the surrendered shares for less than six months if such limitation is necessary to avoid a charge to the Company for financial reporting purposes.

**SECTION 12. ASSIGNABILITY**

No Award or interest in an Award may be sold, assigned, pledged (as collateral for a loan or as security for the performance of an obligation or for any other purpose) or transferred by the Participant or made subject to attachment or similar proceedings otherwise than by will or by the applicable laws of descent and distribution, except to the extent a Participant designates one or more beneficiaries on a Company-approved form who may exercise the Award or receive payment under the Award after the Participant's death. During a Participant's lifetime, an Award may be exercised only by the Participant. Notwithstanding the foregoing and to the extent permitted by Section 422 of the Code, the Plan Administrator, in its sole discretion, may permit a Participant to assign or transfer an Award; provided, however, that any Award so assigned or transferred shall be subject to all the terms and conditions of the Plan and the instrument evidencing the Award.

**SECTION 13. ADJUSTMENTS**

**13.1 Adjustment of Shares**

In the event, at any time or from time to time, a stock dividend, stock split, spin-off, combination or exchange of shares, recapitalization, merger, consolidation, distribution to stockholders other than a normal cash dividend, or other change in the Company's corporate or capital structure results in (a) the outstanding shares of Common Stock, or any securities exchanged therefor or received in their place, being exchanged for a different number or kind of securities of the Company or any other company or (b) new, different or additional securities of the Company or any other company being received by the holders of shares of Common Stock, then the Plan Administrator shall make proportional adjustments in (i) the maximum number and kind of securities available for issuance under the Plan; (ii) the maximum number and kind of securities issuable as Incentive Stock Options as set forth in Section 4.2(d); and (iii) the number and kind of securities that are subject to any outstanding Award and the per share price of such securities, without any change in the aggregate price to be paid therefor.



The determination by the Plan Administrator as to the terms of any of the foregoing adjustments shall be conclusive and binding.

Notwithstanding the foregoing, the issuance by the Company of shares of stock of any class, or securities convertible into shares of stock of any class, for cash or property, or for labor or services rendered, or for other valid consideration, either upon direct sale or upon the exercise of rights or warrants to subscribe therefor, or upon conversion of shares or obligations of the Company convertible into such shares or other securities, shall not affect, and no adjustment by reason thereof shall be made with respect to, outstanding Awards. Also notwithstanding the foregoing, a dissolution or liquidation of the Company or a Company Transaction shall not be governed by this Section 13.1 but shall be governed by the remaining provisions of this Section 13.

**13.2 Dissolution or Liquidation**

To the extent not previously exercised or settled, and unless otherwise determined by the Plan Administrator in its sole discretion, Options, Stock Appreciation Rights and Stock Units shall terminate immediately prior to the dissolution or liquidation of the Company. To the extent a forfeiture provision or repurchase right applicable to an Award has not been waived by the Plan Administrator, the Award shall be forfeited immediately prior to the consummation of the dissolution or liquidation.

**13.3 Company Transaction**

**13.3.1 Options, Stock Appreciation Rights and Stock Units**

(a) In the event of a Company Transaction, except as otherwise provided in the instrument evidencing the Award or in a written employment, services or other agreement between a Participant and the Company or a Related Company,

(i) all Options and Stock Appreciation Rights outstanding and held by a Participant whose employment or service relationship has not terminated (other than Terminations of Service immediately prior to or in connection with the Company Transaction) as of the date of the Company Transaction shall, immediately prior to the Company Transaction, become fully vested and exercisable with respect to 100% of the unvested portion of the Award; and

(ii) all Stock Units outstanding as of the date of the Company Transaction shall, immediately prior to the Company Transaction, become fully vested and shall be settled with respect to 100% of the unvested portion of the Award; provided, however, that

(iii) notwithstanding the foregoing, such accelerated vesting and exercisability or settlement of such Options, Stock Appreciation Rights and Stock Units shall not occur



(A) if and to the extent any Successor Company assumes or continues such Options, Stock Appreciation Rights or Stock Units, or substitutes equivalent options, rights or units or

(B) if the Plan Administrator determines, in its sole discretion, that to the extent any Successor Company does not assume or continue such Options, Stock Appreciation Rights or Stock Units, or substitute equivalent options, rights or units, any portion of such Awards that is not assumed, continued or substituted for by the Successor Company shall terminate immediately prior to the Company Transaction in exchange for a cash payment at least equal to the amount, if any, by which the Acquisition Price multiplied by the number of shares of Common Stock subject to such Award, either to the extent the Award is vested and exercisable in accordance with its original terms or as such vesting and exercisability may be accelerated by the Plan Administrator, in its sole discretion, in connection with the Company Transaction, exceeds the aggregate exercise or grant price, if any, for such Award.

(iv) provided that the conditions set forth in Section 13.3.1(a)(iii)(A) are satisfied, if at any time during the six (6) month period following a Company Transaction, a Participant's employment or service relationship with the Company is terminated by the Company or its Related Companies without Cause, or for Good Reason (as defined below), then fifty percent (50%) of the then unvested portion such Participant's Options, Stock Appreciation Rights or Stock Units shall immediately become vested and exercisable. For the purposes of this Section 13.3.1, "Good Reason" shall mean that the Participant's employment or service relationship with the Company or its Related Companies was "constructively terminated" if within 90 days after the occurrence of one of the following Company actions (unless such action(s) applies generally to all of the Company's management of the Company or unless Participant consents in writing to such action(s)), Participant resigns in writing from his employment with the Company: (x) a significant reduction in the Participant's duties, position or responsibilities compared to the Participant's duties, position or responsibilities immediately prior to such reduction; provided however that a reduction in position that occurs solely by virtue of the Company being acquired and made part of a larger entity shall not constitute "Good Reason" so long as Participant maintains a comparable level of duties and responsibilities with the acquiring entity as Participant held immediately prior to the acquisition; (y) a material reduction in Participant's base salary as in effect immediately before such reduction; and (z) the relocation by the Company of Participant's then current work site that has the effect of increasing the Participant's then-current commute by more than 75 miles (not including any regular business travel consistent with the business travel requirements of the Participant's position with the Company).

(b) Immediately following a Company Transaction, all outstanding Options, Stock Appreciation Rights and Stock Units shall terminate and cease to be outstanding, except to the extent assumed, continued or substituted for by the Successor Company.

---

**13.3.2 Restricted Stock**

In the event of a Company Transaction, except as otherwise provided in the instrument evidencing the Award or in a written employment, services or other agreement between a Participant and the Company or a Related Company, the restrictions applicable to all Restricted Stock outstanding as of the date of the Company Transaction shall, immediately prior to the Company Transaction, lapse, and such Restricted Stock shall become free of all restrictions and become fully vested and transferable to the full extent of the original Award. Notwithstanding the foregoing, if and to the extent any Successor Company generally assumes or continues all or any portion of Options, Stock Appreciation Rights or Stock Units outstanding as of the date of the Company Transaction, or substitutes equivalent options, rights or units, the restrictions applicable to such Restricted Stock shall not lapse, any Company repurchase rights shall automatically be assigned to the Successor Company, and all such restrictions shall continue with respect to any shares of the Successor Company or other consideration that may be issued in exchange or in substitution for such Restricted Stock.

**13.3.3 Assumption, Continuation or Substitution**

For the purposes of this Section 13.3, an Award shall be considered assumed, continued or substituted for if, following the Company Transaction, the Substitute Award confers the right to purchase or receive, for each share of Common Stock subject to the Award immediately prior to the Company Transaction, the consideration (whether stock, cash, or other securities or property) received in the Company Transaction by holders of Common Stock for each share subject to the Award immediately prior to the Company Transaction (and if holders were offered a choice of consideration, the type of consideration chosen by the holders of a majority of the outstanding shares) without any change in the aggregate exercise or grant price, if any, of such Award; provided, however, that if such consideration received in the Company Transaction is not solely common stock of the Successor Company, the Plan Administrator may, with the consent of the Successor Company, provide for the consideration to be received upon the exercise or settlement of the Award, for each share of Common Stock subject to the Award, to be solely common stock of the Successor Company substantially equal in fair market value to the per share consideration received by holders of Common Stock in the Company Transaction. The determination of such substantial equality of value of consideration shall be made by the Plan Administrator, whose determination shall be conclusive and binding.

**13.4 Further Adjustment of Awards**

Subject to Sections 13.2 and 13.3, the Plan Administrator shall have the discretion, exercisable at any time before a sale, merger, consolidation, reorganization, liquidation, dissolution or change in control of the Company, as defined by the Plan Administrator, to take such further action as it determines to be necessary or advisable with respect to Awards. Such authorized action may include (but shall not be limited to) establishing, amending or waiving the type, terms, conditions or duration of, or restrictions on, Awards so as to provide for earlier, later, extended or additional time for exercise, lifting restrictions and other modifications, and the Plan Administrator may take such actions with respect to all Participants, to certain categories of Participants or only to individual Participants. The Plan Administrator may take such action before or after granting Awards to which the action relates and before or after any public



---

announcement with respect to such sale, merger, consolidation, reorganization, liquidation, dissolution or change in control that is the reason for such action.

**13.5 Limitations**

The grant of Awards shall in no way affect the Company's right to adjust, reclassify, reorganize or otherwise change its capital or business structure or to merge, consolidate, dissolve, liquidate or sell or transfer all or any part of its business or assets.

**13.6 Fractional Shares**

In the event of any adjustment in the number of shares covered by any Award, each such Award shall cover only the number of full shares resulting from such adjustment.

**SECTION 14. FIRST REFUSAL AND REPURCHASE RIGHTS**

**14.1 First Refusal Rights**

Until the date on which the initial registration of the Common Stock under Section 12(b) or 12(g) of the Exchange Act first becomes effective, the Company shall have the right of first refusal with respect to any proposed sale or other disposition by a Participant of any shares of Common Stock issued pursuant to an Award. Such right of first refusal shall be exercisable in accordance with the terms and conditions established by the Plan Administrator and set forth in the stock purchase agreement evidencing the purchase of the shares.

**14.2 Repurchase Rights for Vested Shares**

Until the date on which the initial registration of the Common Stock under Section 12(b) or 12(g) of the Exchange Act first becomes effective, upon a Participant's Termination of Service, all vested shares of Common Stock issued pursuant to an Award (whether issued before or after such Termination of Service) shall be subject to repurchase by the Company, at the Company's sole discretion, at the Fair Market Value of such shares on the date of such repurchase. The terms and conditions upon which such repurchase right shall be exercisable (including the period and procedure for exercise) shall be established by the Plan Administrator and set forth in the stock purchase agreement evidencing the purchase of the shares.

**14.3 General**

The Company may not exercise its first refusal or repurchase rights under Section 14.1 or 14.2, respectively, earlier than six months and one day following the date the shares were purchased by a Participant (or any shorter period determined by the Company to be sufficient to avoid a charge to the Company's earnings for financial reporting purposes or required by applicable law).

The Company's first refusal and repurchase rights under this Section 14 are assignable by the Company at any time.



---

**SECTION 15. MARKET STANDOFF**

In the event of an underwritten public offering by the Company of its equity securities pursuant to an effective registration statement filed under the Securities Act, including the Company's initial public offering, no person may sell, make any short sale of, loan, hypothecate, pledge, grant any option for the purchase of, or otherwise dispose of or transfer for value or otherwise agree to engage in any of the foregoing transactions with respect to any shares issued pursuant to an Award granted under the Plan without the prior written consent of the Company or its underwriters. Such limitations shall be in effect for such period of time as may be requested by the Company or such underwriters; provided, however, that in no event shall such period exceed 180 days. The limitations of this Section 15 shall in all events terminate two years after the effective date of the Company's initial public offering.

In the event of any stock split, stock dividend, recapitalization, combination of shares, exchange of shares or other change affecting the Company's outstanding Common Stock effected as a class without the Company's receipt of consideration, any new, substituted or additional securities distributed with respect to the purchased shares shall be immediately subject to the provisions of this Section 15, to the same extent the purchased shares are at such time covered by such provisions.

In order to enforce the limitations of this Section 15, the Company may impose stop-transfer instructions with respect to the purchased shares until the end of the applicable standoff period.

**SECTION 16. AMENDMENT AND TERMINATION**

**16.1 Amendment, Suspension or Termination**

The Board may amend, suspend or terminate the Plan or any portion of the Plan at any time and in such respects as it shall deem advisable; provided, however, that, to the extent required by applicable law, regulation or stock exchange rule, stockholder approval shall be required for any amendment to the Plan. Subject to Section 16.3, the Board may amend the terms of any outstanding Award, prospectively or retroactively.

**16.2 Term of the Plan**

The Plan shall have no fixed expiration date. After the Plan is terminated, no future Awards may be granted, but Awards previously granted shall remain outstanding in accordance with their applicable terms and conditions and the Plan's terms and conditions. Notwithstanding the foregoing, no Incentive Stock Options may be granted more than ten years after the earlier of (a) the adoption of the Plan by the Board and (b) the adoption by the Board of any amendment to the Plan that constitutes the adoption of a new plan for purposes of Section 422 of the Code.

**16.3 Consent of Participant**

The amendment, suspension or termination of the Plan or a portion thereof or the amendment of an outstanding Award shall not, without the Participant's consent, materially adversely affect any rights under any Award theretofore granted to the Participant under the



---

Plan. Any change or adjustment to an outstanding Incentive Stock Option shall not, without the consent of the Participant, be made in a manner so as to constitute a "modification" that would cause such Incentive Stock Option to fail to continue to qualify as an Incentive Stock Option. Notwithstanding the foregoing, any adjustments made pursuant to Sections 13.2 and 13.3 shall not be subject to these restrictions.

**SECTION 17. GENERAL**

**17.1 No Individual Rights**

No individual or Participant shall have any claim to be granted any Award under the Plan, and the Company has no obligation for uniformity of treatment of Participants under the Plan.

Furthermore, nothing in the Plan or any Award granted under the Plan shall be deemed to constitute an employment contract or confer or be deemed to confer on any Participant any right to continue in the employ of, or to continue any other relationship with, the Company or any Related Company or limit in any way the right of the Company or any Related Company to terminate a Participant's employment or other relationship at any time, with or without cause.

**17.2 Issuance of Shares**

Notwithstanding any other provision of the Plan, the Company shall have no obligation to issue or deliver any shares of Common Stock under the Plan or make any other distribution of benefits under the Plan unless, in the opinion of the Company's counsel, such issuance, delivery or distribution would comply with all applicable laws (including, without limitation, the requirements of the Securities Act or the laws of any state or foreign jurisdiction) and the applicable requirements of any securities exchange or similar entity.

The Company shall be under no obligation to any Participant to register for offering or resale or to qualify for exemption under the Securities Act, or to register or qualify under the laws of any state or foreign jurisdiction, any shares of Common Stock, security or interest in a security paid or issued under, or created by, the Plan, or to continue in effect any such registrations or qualifications if made.

As a condition to the exercise of an Option or any other receipt of Common Stock pursuant to an Award under the Plan, the Company may require (a) the Participant to represent and warrant at the time of any such exercise or receipt that such shares are being purchased or received only for the Participant's own account and without any present intention to sell or distribute such shares and (b) such other action or agreement by the Participant as may from time to time be necessary to comply with the federal, state and foreign securities laws. At the option of the Company, a stop-transfer order against any such shares may be placed on the official stock books and records of the Company, and a legend indicating that such shares may not be pledged, sold or otherwise transferred, unless an opinion of counsel is provided (concurred in by counsel for the Company) stating that such transfer is not in violation of any applicable law or regulation, may be stamped on stock certificates to ensure exemption from registration. The Plan Administrator may also require the Participant to execute and deliver to the Company a purchase



---

agreement or such other agreement as may be in use by the Company at such time that describes certain terms and conditions applicable to the shares.

To the extent the Plan or any instrument evidencing an Award provides for issuance of stock certificates to reflect the issuance of shares of Common Stock, the issuance may be effected on a noncertificated basis, to the extent not prohibited by applicable law or the applicable rules of any stock exchange.

**17.3 Indemnification**

Each person who is or shall have been a member of the Board, or a committee appointed by the Board to whom authority was delegated in accordance with Section 3.1 shall be indemnified and held harmless by the Company against and from any loss, cost, liability or expense that may be imposed upon or reasonably incurred by such person in connection with or resulting from any claim, action, suit or proceeding to which such person may be a party or in which such person may be involved by reason of any action taken or failure to act under the Plan and against and from any and all amounts paid by such person in settlement thereof, with the Company's approval, or paid by such person in satisfaction of any judgment in any such claim, action, suit or proceeding against such person; provided, however, that such person shall give the Company an opportunity, at its own expense, to handle and defend the same before such person undertakes to handle and defend it on such person's own behalf, unless such loss, cost, liability or expense is a result of such person's own willful misconduct or except as expressly provided by statute.

The foregoing right of indemnification shall not be exclusive of any other rights of indemnification to which such person may be entitled under the Company's certificate of incorporation or bylaws, as a matter of law, or otherwise, or of any power that the Company may have to indemnify such person or hold such person harmless.

**17.4 No Rights as a Stockholder**

Unless otherwise provided by the Plan Administrator or in the instrument evidencing the Award or in a written employment, services or other agreement, no Option, Stock Appreciation Right or Stock Unit shall entitle the Participant to any cash dividend, voting or other right of a stockholder unless and until the date of issuance under the Plan of the shares that are the subject of such Award.

**17.5 Compliance With Laws and Regulations**

In interpreting and applying the provisions of the Plan, any Option granted as an Incentive Stock Option pursuant to the Plan shall, to the extent permitted by law, be construed as an "incentive stock option" within the meaning of Section 422 of the Code.

**17.6 Participants in Other Countries**

The Plan Administrator shall have the authority to adopt such modifications, procedures and subplans as may be necessary or desirable to comply with provisions of the laws of other countries in which the Company or any Related Company may operate to ensure the viability of



---

the benefits from Awards granted to Participants employed in such countries, to comply with applicable foreign laws and to meet the objectives of the Plan.

**17.7 No Trust or Fund**

The Plan is intended to constitute an "unfunded" plan. Nothing contained herein shall require the Company to segregate any monies or other property, or shares of Common Stock, or to create any trusts, or to make any special deposits for any immediate or deferred amounts payable to any Participant, and no Participant shall have any rights that are greater than those of a general unsecured creditor of the Company.

**17.8 Successors**

All obligations of the Company under the Plan with respect to Awards shall be binding on any successor to the Company, whether the existence of such successor is the result of a direct or indirect purchase, merger, consolidation, or otherwise, of all or substantially all the business and/or assets of the Company.

**17.9 Severability**

If any provision of the Plan or any Award is determined to be invalid, illegal or unenforceable in any jurisdiction, or as to any person, or would disqualify the Plan or any Award under any law deemed applicable by the Plan Administrator, such provision shall be construed or deemed amended to conform to applicable laws, or, if it cannot be so construed or deemed amended without, in the Plan Administrator's determination, materially altering the intent of the Plan or the Award, such provision shall be stricken as to such jurisdiction, person or Award, and the remainder of the Plan and any such Award shall remain in full force and effect.

**17.10 Choice of Law**

The Plan, all Awards granted thereunder and all determinations made and actions taken pursuant hereto, to the extent not otherwise governed by the laws of the United States, shall be governed by the laws of the State of Delaware without giving effect to principles of conflicts of law.

**17.11 Appendix Provisions**

Participants who are residents of the State of California shall be subject to the additional terms and conditions set forth in Appendix A to the Plan until such time as the Common Stock becomes a "listed" security under the Securities Act.

**SECTION 18. EFFECTIVE DATE**

The effective date (the "***Effective Date***") is the date on which the Plan is adopted by the Board. If the stockholders of the Company do not approve the Plan within 12 months after the Board's adoption of the Plan, any Incentive Stock Options granted under the Plan will be treated as Nonqualified Stock Options.



---

**APPENDIX A**

**TO THE CONTROL4 CORPORATION**
**2003 EQUITY INCENTIVE PLAN**

(For California Residents Only)

This Appendix to the Control4 Corporation 2003 Equity Incentive Plan (the "***Plan***") shall have application only to Participants who are residents of the State of California. Capitalized terms contained herein shall have the same meanings given to them in the Plan, unless otherwise provided in this Appendix. **Notwithstanding any provision contained in the Plan to the contrary and to the extent required by applicable law, the following terms and conditions shall apply to all Awards granted to residents of the State of California, until such time as the Common Stock becomes a "listed security" under the Securities Act**:

1. Nonqualified Stock Options shall have an exercise price that is not less than 85% of the Fair Market Value of the Common Stock at the Grant Date, except that the exercise price shall be at least 110% of the Fair Market Value in the case of any person who owns stock possessing more than 10% of the total combined

voting power of all classes of stock of the Company or its parent or subsidiary companies.

2. The purchase price for any shares of Common Stock that may be purchased under the Plan (“***Stock Purchase Rights***”) shall be at least 85% of the Fair Market Value of the Common Stock at the time the Participant is granted the Stock Purchase Right or at the time the purchase is consummated. Notwithstanding the foregoing, the purchase price shall be at least 100% of the Fair Market Value of the Common Stock at the time the Participant is granted the Stock Purchase Right or at the time the purchase is consummated in the case of any person who owns stock possessing more than 10% of the total combined voting power of all classes of stock of the Company or its parent or subsidiary companies.

3. Options shall have a term of not more than ten years from the Grant Date.

4. Awards shall be nontransferable other than by will or the laws of descent and distribution. Notwithstanding the foregoing, and to the extent permitted by Section 422 of the Code, the Plan Administrator, in its discretion, may permit distribution of an Option to an inter vivos or testamentary trust in which the Option is to be passed to beneficiaries upon the death of the trustor (settlor), or by gift to “immediate family” as that term is defined in Rule 16a-1(e) under the Exchange Act.

5. Options shall become exercisable at the rate of at least 20% per year over five years from the date the Option is granted, subject to reasonable conditions such as continued employment. However, in the case of an Option granted to officers, directors or consultants of the Company or a Related Company, the Option may become fully exercisable, subject to reasonable conditions such as continued employment, at any time or during any period established by the Company or a Related Company.



---

6. Unless employment or services are terminated for Cause, the right to exercise an Option in the event of Termination of Service, to the extent that the Participant is otherwise entitled to exercise an Option on the date of Termination of Service, shall be

a. at least six months from the date of a Participant’s Termination of Service if termination was caused by death or Disability; and

b. at least 30 days from the date of a Participant’s Termination of Service if termination of employment was caused by other than death or Disability;

c. but in no event later than the Option Expiration Date.

7. No Award may be granted to a resident of California more than ten years after the earlier of the date of adoption of the Plan and the date the Plan is approved by the stockholders.

8. Any Award exercised before stockholder approval is obtained shall be rescinded if stockholder approval is not obtained within 12 months before or after the Plan is adopted. Such shares shall not be counted in determining whether such approval is obtained.

9. The Company shall provide annual financial statements of the Company to each California resident holding an outstanding Award under the Plan. Such financial statements need not be audited and need not be issued to key employees whose duties at the Company assure them access to equivalent information.

10. Any right of repurchase on behalf of the Company in the event of a Participant’s Termination of Service shall be (a) at a purchase price that is not less than the Fair Market Value of the securities upon Termination of Service, and the right to repurchase shall be exercised for cash or cancellation of purchase money indebtedness for the shares within 90 days of Termination of Service (or in the case of securities issued upon exercise of Options after the date of Termination of Service, within 90 days after the date of the exercise), and the right shall terminate when the Company’s securities become publicly traded; or (b) at the original purchase price, provided that the right to repurchase at the original purchase price lapses at the rate of at least 20% of the shares per year over five years from the date the Option or Stock Purchase Right is granted (without respect to the date the Option or Stock Purchase Right was exercised or became exercisable) and the right to repurchase shall be exercised for cash or cancellation of purchase money indebtedness for the shares within 90 days of Termination of Service (or in the case of securities issued upon exercise of Options after the date of Termination of Service, within 90 days after the date of the exercise). In addition to the restrictions set forth in clauses (a) and (b), the securities held by an officer, director or consultant of the Company or a Related Company may be subject to additional or greater restrictions.



---

**CONTROL4 CORPORATION**
**2003 EQUITY INCENTIVE PLAN**

**STOCK OPTION GRANT NOTICE**

Control4 Corporation (the "Company") hereby grants to Participant an Option (the "Option") to purchase shares of the Company's Common Stock. The Option is subject to all the terms and conditions set forth in this Stock Option Grant Notice (this "Grant Notice") and in the Stock Option Agreement and the Company's 2003 Equity Incentive Plan (the "Plan" which are attached to and incorporated into this Grant Notice in their entirety.

| | |
|---|---|
| **Participant:** | |
| **Grant Date:** | |
| **Vesting Commencement Date:** | |
| **Number of Shares Subject to Option:** | |
| **Exercise Price (per Share):** | |
| **Option Expiration Date:** | |
| | (subject to earlier termination in accordance with the terms of the Plan and the Stock Option Agreement) |
| **Type of Option:** | [Incentive / Non-Qualified] Stock Option |
| **Vesting and Exercisability Schedule:** | 1/4th of the shares subject to the Option will vest and become exercisable on the one (1) year anniversary of the Vesting Commencement Date.<br>1/48th of the shares subject to the Option will vest and become exercisable each month thereafter over the remaining three (3) years following the one (1) year anniversary of the Vesting Commencement Date. |

**Additional Terms/Acknowledgement:** The undersigned Participant acknowledges receipt of, and understands and agrees to, this Grant Notice, the Stock Option Agreement and the Plan. Participant further acknowledges that as of the Grant Date, this Grant Notice, the Stock Option Agreement and the Plan set forth the entire understanding between Participant and the Company regarding the Option and supersede all prior oral and written agreements on the subject.

| | |
|---|---|
| CONTROL4 CORPORATION | PARTICIPANT |
| By: ________________ | By: ________________ |
| | Signature |
| | Date: ________________ |
| **Attachments:** | Address: |
| 1. Stock Option Agreement | |
| 2. 2003 Equity Incentive Plan | Taxpayer ID: |

---

**CONTROL4 CORPORATION**
**2003 EQUITY INCENTIVE PLAN**

**STOCK OPTION AGREEMENT**

Pursuant to your Stock Option Grant Notice (the "Grant Notice") and this Stock Option Agreement, Control4 Corporation has granted you an Option under its 2003 Equity Incentive Plan (the "Plan") to purchase the number of shares of the Company's Common Stock indicated in your Grant Notice (the "Shares") at the exercise price indicated in your Grant Notice. Capitalized terms not explicitly defined in this Stock Option Agreement but defined in the Plan shall have the same definitions as in the Plan.

The details of the Option are as follows:

1. **Vesting and Exercisability**. Subject to the provisions contained herein, the Option will vest and become exercisable as provided in your Grant Notice, provided that vesting will cease upon the termination of your employment or service relationship with the Company or a Related Company and the unvested portion of the Option will terminate.

2. **Securities Law Compliance**. Notwithstanding any other provision of this Agreement, you may not exercise the Option unless the Shares issuable upon exercise are registered under the Securities Act or, if such Shares are not then so registered, the Company has determined that such exercise and issuance would be exempt from the registration requirements of the Securities Act. The exercise of the Option must also comply with other applicable laws and regulations governing the Option, and you may not exercise the Option if the Company determines that such exercise would not be in material compliance with such laws and regulations.

3. **Incentive Stock Option Qualification**. If so designated in your Grant Notice, all or a portion of the Option is intended to qualify as an Incentive Stock Option under federal income tax law, but the Company does not represent or guarantee that the Option qualifies as such.

If the Option has been designated as an Incentive Stock Option and the aggregate Fair Market Value (determined as of the grant date) of the shares of Common Stock subject to the portions of the Option and all other Incentive Stock Options you hold that first become exercisable during any calendar year exceeds $100,000, any excess portion will be treated as a Nonqualified Stock Option, unless the Internal Revenue Service changes the rules and regulations governing the $100,000 limit for Incentive Stock Options. A portion of the Option may be treated as a Nonqualified Stock Option if certain events cause exercisability of the Option to accelerate.

4. **Notice of Disqualifying Disposition**. To the extent the Option has been designated as an Incentive Stock Option, to obtain certain tax benefits afforded to Incentive Stock Options, you must hold the Shares issued upon the exercise of the Option for two years after the Grant Date and one year after the date of exercise. You may be subject to the alternative minimum tax at the time of exercise. You should obtain tax advice when exercising the Option and prior to the disposition of the Shares. You will be responsible for any taxes or

---

duties arising from the exercise of this Option, and agree to indemnify and hold the Company harmless from any such taxes or duties. By accepting the Option, you agree to promptly notify the Company if you dispose of any of the Shares within one year from the date you exercise all or part of the Option or within two years from the Grant Date.

5. **Method of Exercise**. You may exercise the Option by giving written notice to the Company in the form of the Notice of Exercise of Stock Option attached hereto as Exhibit A, or such other form as may be reasonably required by the Company from time to time (the "Exercise Notice"). The Exercise Notice must be accompanied by full payment of the exercise price for the number of Shares you are purchasing. You may make this payment in any combination of the following: (a) by cash; (b) by check acceptable to the Company; (c) if permitted by the Plan Administrator, by using shares of Common Stock you have owned for at least six months; (d) if the Common Stock is registered under the Exchange Act, by instructing a broker to deliver to the Company the total payment required; or (e) by any other method permitted by the Plan Administrator.

6. **Repurchase and First Refusal Rights**. So long as the Common Stock is not registered under the Exchange Act, the Company may, in its sole discretion at the time of exercise, require you to sign a stock purchase agreement, in the form to be provided, pursuant to which you will grant to the Company certain repurchase and/or first refusal rights to purchase the Shares acquired by you upon exercise of the Option. Upon request to the Company, you may review a current form of this agreement prior to exercise of the Option.

7. **Market Standoff**. By exercising the Option you agree that the Shares will be subject to the market standoff restrictions on transfer set forth in the Plan.

8. **Treatment Upon Termination of Employment or Service Relationship**. The unvested portion of the Option will terminate automatically and without further notice immediately upon termination of your employment or service relationship with the Company or a Related Company for any reason ("Termination of Service"). You may exercise the vested portion of the Option as follows:

(a) *General Rule*. You must exercise the vested portion of the Option on or before the earlier of (i) three months after your Termination of Service and (ii) the Option Expiration Date;

(b) *Retirement or Disability*. If your employment or service relationship terminates due to Retirement or Disability, you must exercise the vested portion of the Option on or before the earlier of (i) one year after your Termination of Service and (ii) the Option Expiration Date.

(c) *Death*. If your employment or service relationship terminates due to your death, the vested portion of the Option must be exercised on or before the earlier of (i) one year after your Termination of Service and (ii) the Option Expiration Date. If you die after your Termination of Service but while the Option is still exercisable, the vested portion of the Option may be exercised until the earlier of (x) one year after the date of death and (y) the Option Expiration Date; and



---

(d) *Cause*. The vested portion of the Option will automatically expire at the time the Company first notifies you of your Termination of Service for Cause, unless the Plan Administrator determines otherwise. If your employment or service relationship is suspended pending an investigation of whether you will be terminated for Cause, all your rights under the Option likewise will be suspended during the period of investigation. If any facts that would constitute termination for Cause are discovered after your Termination of Service, any Option you then hold may be immediately terminated by the Plan Administrator.

The Option must be exercised within three months after Termination of Service for reasons other than death or Disability and one year after Termination of Service due to Disability to qualify for the beneficial tax treatment afforded Incentive Stock Options.

**It is your responsibility to be aware of the date the Option terminates.**

9. **Change of Control**. Upon the consummation of any Company Transaction (as such term is defined in the Plan), any unvested portion of the Option shall be treated in the manner defined in the Plan.

10. **Limited Transferability**. During your lifetime only you can exercise the Option. The Option is not transferable except by will or by the applicable laws of descent and distribution, except that Nonqualified Stock Options may be transferred to the extent permitted by the Plan Administrator. The Plan provides for exercise of the Option by a beneficiary designated on a Company-approved form or the personal representative of your estate.

11. **Withholding Taxes**. As a condition to the exercise of any portion of an Option, you must make such arrangements as the Company may require for the satisfaction of any federal, state, local or foreign withholding tax obligations that may arise in connection with such exercise.

12. **Option Not an Employment or Service Contract**. Nothing in the Plan or any Award granted under the Plan will be deemed to constitute an employment contract or confer or be deemed to confer any tight for you to continue in the employ of, or to continue any other relationship with, the Company or any Related Company or limit in any way the right of the Company or any Related Company to terminate your employment or other relationship at any time, with or without Cause.

13. **No Right to Damages**. You will have no right to bring a claim or to receive damages if you are required to exercise the vested portion of the Option within three months (one year in the case of Retirement, Disability or death) of the Termination of Service or if any portion of the Option is cancelled or expires unexercised. The loss of existing or potential profit in Awards will not constitute an element of damages in the event of your Termination of Service for any reason even if the termination is in violation of an obligation of the Company or a Related Company to you.

14. **Binding Effect**. This Agreement will inure to the benefit of the successors and assigns of the Company and be binding upon you and your heirs, executors, administrators, successors and assigns.



---

**EXHIBIT A**

**NOTICE OF EXERCISE OF STOCK OPTION**

To: Control4 Corporation

I, a resident of , hereby exercise my [Incentive / Non-Qualified] Stock Option granted by Control4 Corporation (the "Company") on , subject to all the terms and provisions thereof and of the 2003 Equity Incentive Plan referred to therein, and notify the Company of my desire to purchase shares of Common Stock of the Company (the "Securities") at the exercise price of $ per share. I hereby represent and warrant that I have been furnished with a copy of the Plan.

I hereby represent and warrant that (1) I have been furnished with all information which I deem necessary to evaluate the merits and risks of the purchase of the Securities; (2) I have had the opportunity to ask questions and receive answers concerning the information received about the Securities and the Company; and (3) I have been given the opportunity to obtain any additional information I deem necessary to verify the accuracy of any information obtained concerning the Securities and the Company.

I am aware that the Securities have not been registered under the Federal Securities Act of 1933 (the "1933 Act") or any state securities laws, pursuant to exemption(s) from registration. I understand that the reliance by the Company on such exemption(s) is predicated in part upon the truth and accuracy of the statements by me in this Notice of Exercise.

I hereby represent and warrant that I am purchasing the Securities for my own personal account for investment and not with a view to the sale or distribution of all or any part of the Securities.

I understand that because the Securities have not been registered under the 1933 Act, I must continue to bear the economic risk of the investment for an indefinite time and the Securities cannot be sold unless the Securities are subsequently registered or an exemption from registration is available.

I agree that I will in no event sell or distribute all or any part of the Securities unless (1) there is an effective registration statement under the 1933 Act and applicable state securities laws covering any such transaction involving the Securities or (2) the Company receives an opinion of my legal counsel (concurred in by legal counsel for the Company) stating that such transaction is exempt from registration or the Company otherwise satisfies itself that such transaction is exempt from registration.

I consent to the placing of a legend on my certificate (s) for the Securities stating that the Securities have not been registered and setting forth the restriction on transfer contemplated hereby and to the placing of a stop transfer order on the books of the Company and with any transfer agents against the Securities until the Securities may be legally resold or distributed.

I understand that at the present time I may not rely on Rule 144 of the Securities and Exchange Commission (the "SEC") for the resale or distribution of the Securities. I understand

---

that the Company has no obligation to me to register the Securities with the SEC and has not represented to me that it will register the Securities.

I am advised, prior to my purchase of the Securities, that neither the offering of the Securities nor any offering materials have been reviewed by any administrator under the Securities Act of 1933, the Utah State Securities Act or any other applicable securities act, law or regulation (the "Acts"), and that the Securities have not been registered under any of the Acts and therefore cannot be resold unless they are registered under the Acts or unless an exemption from such registration is available.

Dated: ______________________

______________________
(signature)

______________________
(print name)

Address:

Taxpayer I.D. Number

2

---

**Exhibit 10.3**

**CONTROL4 CORPORATION**

**2013 STOCK OPTION AND INCENTIVE PLAN**

SECTION 1. GENERAL PURPOSE OF THE PLAN; DEFINITIONS

The name of the plan is the Control4 Corporation 2013 Stock Option and Incentive Plan (the "*Plan*"). The purpose of the Plan is to encourage and enable the officers, employees, Non-Employee Directors and other key persons (including Consultants) of Control4 Corporation (the "*Company*") and its Subsidiaries upon whose judgment, initiative and efforts the Company largely depends for the successful conduct of its business to acquire a proprietary interest in the Company. It is anticipated that providing such persons with a direct stake in the Company's welfare will assure a closer identification of their interests with those of the Company and its stockholders, thereby stimulating their efforts on the Company's behalf and strengthening their desire to remain with the Company.

The following terms shall be defined as set forth below:

*"Act"* means the Securities Act of 1933, as amended, and the rules and regulations thereunder.

*"Administrator"* means either the Board or the compensation committee of the Board or a similar committee performing the functions of the compensation committee and which is comprised of not less than two Non-Employee Directors who are independent.

*"Award"* or *"Awards,"* except where referring to a particular category of grant under the Plan, shall include Incentive Stock Options, Non-Qualified Stock Options, Stock Appreciation Rights, Restricted Stock Units, Restricted Stock Awards, Unrestricted Stock Awards, Cash-Based Awards, Performance Share Awards and Dividend Equivalent Rights.

*"Award Certificate"* means a written or electronic document setting forth the terms and provisions applicable to an Award granted under the Plan. Each Award Certificate is subject to the terms and conditions of the Plan.

*"Board"* means the Board of Directors of the Company.

*"Cash-Based Award"* means an Award entitling the recipient to receive a cash-denominated payment.

*"Code"* means the Internal Revenue Code of 1986, as amended, and any successor Code, and related rules, regulations and interpretations.

*"Consultant"* means any natural person that provides bona fide services to the Company, and such services are not in connection with the offer or sale of securities in a capital-raising transaction and do not directly or indirectly promote or maintain a market for the Company's securities.

*"Covered Employee"* means an employee who is a "Covered Employee" within the meaning of Section 162(m) of the Code.

*"Dividend Equivalent Right"* means an Award entitling the grantee to receive credits based on cash dividends that would have been paid on the shares of Stock specified in the Dividend Equivalent Right (or other award to which it relates) if such shares had been issued to and held by the grantee.

*"Effective Date"* means the date on which the Plan is approved by stockholders as set forth in Section 21.

*"Exchange Act"* means the Securities Exchange Act of 1934, as amended, and the rules and regulations thereunder.

*"Fair Market Value"* of the Stock on any given date means the fair market value of the Stock determined in good faith by the Administrator; provided, however, that if the Stock is admitted to quotation on the National Association of Securities Dealers Automated Quotation System ("*NASDAQ*"), NASDAQ Global Market or another national securities exchange, the determination shall be made by reference to market quotations. If there are no market quotations for such date, the determination shall be made by reference to the last date preceding such date for which there are market quotations; provided further, however, that if the date for which Fair Market Value is determined is the first day when trading prices for the Stock are reported on a national securities exchange, the Fair Market Value shall be the "Price to the Public" (or equivalent) set forth on the cover page for the final prospectus relating to the Company's Initial Public Offering.

*"Incentive Stock Option"* means any Stock Option designated and qualified as an "incentive stock option" as defined in Section 422 of the Code.

*"Initial Public Offering"* means the consummation of the first fully underwritten, firm commitment public offering pursuant to an effective registration statement under the Act covering the offer and sale by the Company of its equity securities, or such other event as a result of or following which the Stock shall be publicly held.

*"Non-Employee Director"* means a member of the Board who is not also an employee of the Company or any Subsidiary.

*"Non-Qualified Stock Option"* means any Stock Option that is not an Incentive Stock Option.

*"Option"* or *"Stock Option"* means any option to purchase shares of Stock granted pursuant to Section 5.

*"Performance-Based Award"* means any Restricted Stock Award, Restricted Stock Units, Performance Share Award or Cash-Based Award granted to a Covered Employee that is intended to qualify as "performance-based compensation" under Section 162(m) of the Code and the regulations promulgated thereunder.



---

*"Performance Criteria"* means the criteria that the Administrator selects for purposes of establishing the Performance Goal or Performance Goals for an individual for a Performance Cycle. The Performance Criteria (which shall be applicable to the organizational level specified by the Administrator, including, but not limited to, the Company or a unit, division, group, or Subsidiary of the Company) that will be used to establish Performance Goals are limited to the following: earnings before interest, taxes, depreciation and amortization, net income (loss) (either before or after interest, taxes, depreciation and/or amortization), changes in the market price of the Stock, economic value-added, funds from operations or similar measure, sales or revenue, acquisitions or strategic transactions, operating income (loss), cash flow (including, but not limited to, operating cash flow and free cash flow), return on capital, assets, equity, or investment, stockholder returns, return on sales, gross or net profit levels, productivity, expense, margins, operating efficiency, customer satisfaction, working capital, earnings (loss) per share of Stock, sales or market shares and number of customers, any of which may be measured either in absolute terms or as compared to any incremental increase or as compared to results of a peer group.

*"Performance Cycle"* means one or more periods of time, which may be of varying and overlapping durations, as the Administrator may select, over which the attainment of one or more Performance Criteria will be measured for the purpose of determining a grantee's right to and the payment of a Restricted Stock Award, Restricted Stock Units, Performance Share Award or Cash-Based Award. Each such period shall not be less than 12 months.

*"Performance Goals"* means, for a Performance Cycle, the specific goals established in writing by the Administrator for a Performance Cycle based upon the Performance Criteria.

*"Performance Share Award"* means an Award entitling the recipient to acquire shares of Stock upon the attainment of specified Performance Goals.

*"Restricted Stock Award"* means an Award entitling the recipient to acquire, at such purchase price (which may be zero) as determined by the Administrator, shares of Stock subject to such restrictions and conditions as the Administrator may determine at the time of grant.

*"Restricted Stock Units"* means an Award of phantom stock units to a grantee.

*"Sale Event"* shall mean (i) the sale of all or substantially all of the assets of the Company on a consolidated basis to an unrelated person or entity, (ii) a merger, reorganization or consolidation pursuant to which the holders of the Company's outstanding voting power immediately prior to such transaction do not own a majority of the outstanding voting power of the resulting or successor entity (or its ultimate parent, if applicable) immediately upon completion of such transaction, (iii) the sale of all of the Stock of the Company to an unrelated person or entity, or (iv) any other transaction in which the owners of the Company's outstanding voting power prior to such transaction do not own at least a majority of the outstanding voting power of the Company or any successor entity immediately upon completion of the transaction other than as a result of the acquisition of securities directly from the Company.

*"Sale Price"* means the value as determined by the Administrator of the consideration payable, or otherwise to be received by stockholders, per share of Stock pursuant to a Sale Event.



---

*"Section 409A"* means Section 409A of the Code and the regulations and other guidance promulgated thereunder.

*"Stock"* means the Common Stock, par value $0.0001 per share, of the Company, subject to adjustments pursuant to Section 3.

*"Stock Appreciation Right"* means an Award entitling the recipient to receive shares of Stock having a value equal to the excess of the Fair Market Value of the Stock on the date of exercise over the exercise price of the Stock Appreciation Right multiplied by the number of shares of Stock with respect to which the Stock Appreciation Right shall have been exercised.

*"Subsidiary"* means any corporation or other entity (other than the Company) in which the Company has at least a 50 percent interest, either directly or indirectly.

*"Ten Percent Owner"* means an employee who owns or is deemed to own (by reason of the attribution rules of Section 424(d) of the Code) more than 10 percent of the combined voting power of all classes of stock of the Company or any parent or subsidiary corporation.

*"Unrestricted Stock Award"* means an Award of shares of Stock free of any restrictions.

SECTION 2. ADMINISTRATION OF PLAN; ADMINISTRATOR AUTHORITY TO SELECT GRANTEES AND DETERMINE AWARDS

(a) Administration of Plan. The Plan shall be administered by the Administrator.

(b) Powers of Administrator. The Administrator shall have the power and authority to grant Awards consistent with the terms of the Plan, including the power and authority:

(i) to select the individuals to whom Awards may from time to time be granted;

(ii) to determine the time or times of grant, and the extent, if any, of Incentive Stock Options, Non-Qualified Stock Options, Stock Appreciation Rights, Restricted Stock Awards, Restricted Stock Units, Unrestricted Stock Awards, Cash-Based Awards, Performance Share Awards and Dividend Equivalent Rights, or any combination of the foregoing, granted to any one or more grantees;

(iii) to determine the number of shares of Stock to be covered by any Award;

(iv) to determine and modify from time to time the terms and conditions, including restrictions, not inconsistent with the terms of the Plan, of any Award, which terms and conditions may differ among individual Awards and grantees, and to approve the forms of Award Certificates;

(v) to accelerate at any time the exercisability or vesting of all or any portion of any Award;



---

(vi) subject to the provisions of Section 5(b), to extend at any time the period in which Stock Options may be exercised; and

(vii) at any time to adopt, alter and repeal such rules, guidelines and practices for administration of the Plan and for its own acts and proceedings as it shall deem advisable; to interpret the terms and provisions of the Plan and any Award (including related written instruments); to make all determinations it deems advisable for the administration of the Plan; to decide all disputes arising in connection with the Plan; and to otherwise supervise the administration of the Plan.

All decisions and interpretations of the Administrator shall be binding on all persons, including the Company and Plan grantees.

(c) Delegation of Authority to Grant Options. Subject to applicable law, the Administrator, in its discretion, may delegate to the Chief Executive Officer of the Company all or part of the Administrator's authority and duties with respect to the granting of Options to individuals who are (i) not subject to the reporting and other provisions of Section 16 of the Exchange Act and (ii) not Covered Employees. Any such delegation by the Administrator shall include a limitation as to the amount of Options that may be granted during the period of the delegation and shall contain guidelines as to the determination of the exercise price and the vesting criteria. The Administrator may revoke or amend the terms of a delegation at any time but such action shall not invalidate any prior actions of the Administrator's delegate or delegates that were consistent with the terms of the Plan.

(d) Award Certificate. Awards under the Plan shall be evidenced by Award Certificates that set forth the terms, conditions and limitations for each Award which may include, without limitation, the term of an Award and the provisions applicable in the event employment or service terminates.

(e) Indemnification. Neither the Board nor the Administrator, nor any member of either or any delegate thereof, shall be liable for any act, omission, interpretation, construction or determination made in good faith in connection with the Plan, and the members of the Board and the Administrator (and any delegate thereof) shall be entitled in all cases to indemnification and reimbursement by the Company in respect of any claim, loss, damage or expense (including, without limitation, reasonable attorneys' fees) arising or resulting therefrom to the fullest extent permitted by law and/or under the Company's articles or bylaws or any directors' and officers' liability insurance coverage which may be in effect from time to time and/or any indemnification agreement between such individual and the Company.

(f) Foreign Award Recipients. Notwithstanding any provision of the Plan to the contrary, in order to comply with the laws in other countries in which the Company and its Subsidiaries operate or have employees or other individuals eligible for Awards, the Administrator, in its sole discretion, shall have the power and authority to: (i) determine which Subsidiaries shall be covered by the Plan; (ii) determine which individuals outside the United States are eligible to participate in the Plan; (iii) modify the terms and conditions of any Award granted to individuals outside the United States to comply with applicable foreign laws; (iv) establish subplans and modify exercise procedures and other terms and procedures, to the extent



the Administrator determines such actions to be necessary or advisable (and such subplans and/or modifications shall be attached to this Plan as appendices); provided, however, that no such subplans and/or modifications shall increase the share limitations contained in Section 3(a) hereof; and (v) take any action, before or after an Award is made, that the Administrator determines to be necessary or advisable to obtain approval or comply with any local governmental regulatory exemptions or approvals. Notwithstanding the foregoing, the Administrator may not take any actions hereunder, and no Awards shall be granted, that would violate the Exchange Act or any other applicable United States securities law, the Code, or any other applicable United States governing statute or law.

SECTION 3. STOCK ISSUABLE UNDER THE PLAN; MERGERS; SUBSTITUTION

(a) Stock Issuable. The maximum number of shares of Stock reserved and available for issuance under the Plan shall be [*insert number equal to 10% of the outstanding shares post-IPO*] shares (the "*Initial Limit*"), subject to adjustment as provided in Section 3(c), plus on January 1, 2014 and each January 1 thereafter, the number of shares of Stock reserved and available for issuance under the Plan shall be cumulatively increased by 5 percent of the number of shares of Stock issued and outstanding on the immediately preceding December 31 (the "*Annual Increase*"). Subject to such overall limitation, the maximum aggregate number of shares of Stock that may be issued in the form of Incentive Stock Options shall not exceed the Initial Limit cumulatively increased on January 1, 2014 and on each January 1 thereafter by the lesser of the Annual Increase for such year or [*insert number equal to 5% of the outstanding shares post-IPO*] shares of Stock, subject in all cases to adjustment as provided in Section 3(c). For purposes of this limitation, the shares of Stock underlying any Awards that are forfeited, canceled, held back upon exercise of an Option or settlement of an Award to cover the exercise price or tax withholding, reacquired by the Company prior to vesting, satisfied without the issuance of Stock or otherwise terminated (other than by exercise) shall be added back to the shares of Stock available for issuance under the Plan. In the event the Company repurchases shares of Stock on the open market, such shares shall not be added to the shares of Stock available for issuance under the Plan. Subject to such overall limitations, shares of Stock may be issued up to such maximum number pursuant to any type or types of Award; provided, however, that Stock Options or Stock Appreciation Rights with respect to no more than [ ] shares of Stock may be granted to any one individual grantee during any one calendar year period, and no more than [ ] shares of the Stock, plus the number of shares added pursuant to the Annual Increase, may be issued in the form of Incentive Stock Options. The shares available for issuance under the Plan may be authorized but unissued shares of Stock or shares of Stock reacquired by the Company.

(b) Effect of Awards. The grant of any Award shall be deemed, for purposes of determining the number of shares of Stock available for issuance under Section 3(a), as an Award of one share of Stock for each such share of Stock actually subject to the Award. Any forfeitures, cancellations or other terminations (other than by exercise) of such Awards shall be returned to the reserved pool of shares of Stock under the Plan in the same manner.

(c) Changes in Stock. Subject to Section 3(d) hereof, if, as a result of any reorganization, recapitalization, reclassification, stock dividend, stock split, reverse stock split or other similar change in the Company's capital stock, the outstanding shares of Stock are



increased or decreased or are exchanged for a different number or kind of shares or other securities of the Company, or additional shares or new or different shares or other securities of the Company or other non-cash assets are distributed with respect to such shares of Stock or other securities, or, if, as a result of any merger or consolidation, sale of all or substantially all of the assets of the Company, the outstanding shares of Stock are converted into or exchanged for securities of the Company or any successor entity (or a parent or subsidiary thereof), the Administrator shall make an appropriate or proportionate adjustment in (i) the maximum number of shares reserved for issuance under the Plan, including the maximum number of shares that may be issued in the form of Incentive Stock Options, (ii) the number of Stock Options or Stock Appreciation Rights that can be granted to any one individual grantee and the maximum number of shares that may be granted under a Performance-Based Award, (iii) the number and kind of shares or other securities subject to any then outstanding Awards under the Plan, (iv) the repurchase price, if any, per share subject to each outstanding Restricted Stock Award, and (v) the exercise price for each share subject to any then outstanding Stock Options and Stock Appreciation Rights under the Plan, without

changing the aggregate exercise price (i.e., the exercise price multiplied by the number of Stock Options and Stock Appreciation Rights) as to which such Stock Options and Stock Appreciation Rights remain exercisable. The Administrator shall also make equitable or proportionate adjustments in the number of shares subject to outstanding Awards and the exercise price and the terms of outstanding Awards to take into consideration cash dividends paid other than in the ordinary course or any other extraordinary corporate event. The adjustment by the Administrator shall be final, binding and conclusive. No fractional shares of Stock shall be issued under the Plan resulting from any such adjustment, but the Administrator in its discretion may make a cash payment in lieu of fractional shares.

(d) Mergers and Other Transactions. Except as the Administrator may otherwise specify with respect to particular Awards in the relevant Award Certificate, in the case of and subject to the consummation of a Sale Event, the parties thereto may cause the assumption or continuation of Awards theretofore granted by the successor entity, or the substitution of such Awards with new Awards of the successor entity or parent thereof, with appropriate adjustment as to the number and kind of shares and, if appropriate, the per share exercise prices, as such parties shall agree. To the extent the parties to such Sale Event do not provide for the assumption, continuation or substitution of Awards, all Options and Stock Appreciation Rights that are not exercisable immediately prior to the effective time of the Sale Event shall become fully exercisable as of the effective time of the Sale Event, all other Awards with time-based vesting, conditions or restrictions shall become fully vested and nonforfeitable as of the effective time of the Sale Event and all Awards with conditions and restrictions relating to the attainment of performance goals may become vested and nonforfeitable in connection with a Sale Event in the Administrator's discretion and upon the effective time of the Sale Event, the Plan and all outstanding Awards granted hereunder shall terminate. In the event of such termination, (i) the Company shall have the option (in its sole discretion) to make or provide for a cash payment to the grantees holding Options and Stock Appreciation Rights, in exchange for the cancellation thereof, in an amount equal to the difference between (A) the Sale Price multiplied by the number of shares of Stock subject to outstanding Options and Stock Appreciation Rights (to the extent then exercisable at prices not in excess of the Sale Price) and (B) the aggregate exercise price of all such outstanding Options and Stock Appreciation Rights; or (ii) each grantee shall be permitted, within a specified period of time prior to the consummation of the Sale Event as



---

determined by the Administrator, to exercise all outstanding Options and Stock Appreciation Rights (to the extent then exercisable) held by such grantee.

(e) Substitute Awards. The Administrator may grant Awards under the Plan in substitution for stock and stock based awards held by employees, directors or other key persons of another corporation in connection with the merger or consolidation of the employing corporation with the Company or a Subsidiary or the acquisition by the Company or a Subsidiary of property or stock of the employing corporation. The Administrator may direct that the substitute awards be granted on such terms and conditions as the Administrator considers appropriate in the circumstances. Any substitute Awards granted under the Plan shall not count against the share limitation set forth in Section 3(a).

SECTION 4. ELIGIBILITY

Grantees under the Plan will be such full or part-time officers and other employees, Non-Employee Directors and key persons (including Consultants) of the Company and its Subsidiaries as are selected from time to time by the Administrator in its sole discretion.

SECTION 5. STOCK OPTIONS

Any Stock Option granted under the Plan shall be in such form as the Administrator may from time to time approve.

Stock Options granted under the Plan may be either Incentive Stock Options or Non-Qualified Stock Options. Incentive Stock Options may be granted only to employees of the Company or any Subsidiary that is a "subsidiary corporation" within the meaning of Section 424(f) of the Code. To the extent that any Option does not qualify as an Incentive Stock Option, it shall be deemed a Non-Qualified Stock Option.

Stock Options granted pursuant to this Section 5 shall be subject to the following terms and conditions and shall contain such additional terms and conditions, not inconsistent with the terms of the Plan, as the Administrator shall deem desirable. If the Administrator so determines, Stock Options may be granted in lieu of cash compensation at the optionee's election, subject to such terms and conditions as the Administrator may establish.

(a) Exercise Price. The exercise price per share for the Stock covered by a Stock Option granted pursuant to this Section 5 shall be determined by the Administrator at the time of grant but shall not be less than 100 percent of the Fair Market Value on the date of grant. In the case of an Incentive Stock Option that is granted to a Ten Percent Owner, the option price of such Incentive Stock Option shall be not less than 110 percent of the Fair Market Value on the grant date.

(b) Option Term. The term of each Stock Option shall be fixed by the Administrator, but no Stock Option shall be exercisable more than ten years after the date the Stock Option is granted. In the case of an Incentive Stock Option that is granted to a Ten Percent Owner, the term of such Stock Option shall be no more than five years from the date of grant.



---

(c) Exercisability; Rights of a Stockholder. Stock Options shall become exercisable at such time or times, whether or not in installments, as shall be

determined by the Administrator at or after the grant date. The Administrator may at any time accelerate the exercisability of all or any portion of any Stock Option. An optionee shall have the rights of a stockholder only as to shares acquired upon the exercise of a Stock Option and not as to unexercised Stock Options.

(d) Method of Exercise. Stock Options may be exercised in whole or in part, by giving written or electronic notice of exercise to the Company, specifying the number of shares to be purchased. Payment of the purchase price may be made by one or more of the following methods to the extent provided in the Option Award Certificate:

(i) In cash, by certified or bank check or other instrument acceptable to the Administrator;

(ii) Through the delivery (or attestation to the ownership) of shares of Stock that have been purchased by the optionee on the open market or that have been beneficially owned by the optionee for at least six months and that are not then subject to restrictions under any Company plan. Such surrendered shares shall be valued at Fair Market Value on the exercise date;

(iii) By the optionee delivering to the Company a properly executed exercise notice together with irrevocable instructions to a broker to promptly deliver to the Company cash or a check payable and acceptable to the Company for the purchase price; provided that in the event the optionee chooses to pay the purchase price as so provided, the optionee and the broker shall comply with such procedures and enter into such agreements of indemnity and other agreements as the Administrator shall prescribe as a condition of such payment procedure; or

(iv) With respect to Stock Options that are not Incentive Stock Options, by a "net exercise" arrangement pursuant to which the Company will reduce the number of shares of Stock issuable upon exercise by the largest whole number of shares with a Fair Market Value that does not exceed the aggregate exercise price.

Payment instruments will be received subject to collection. The transfer to the optionee on the records of the Company or of the transfer agent of the shares of Stock to be purchased pursuant to the exercise of a Stock Option will be contingent upon receipt from the optionee (or a purchaser acting in his stead in accordance with the provisions of the Stock Option) by the Company of the full purchase price for such shares and the fulfillment of any other requirements contained in the Option Award Certificate or applicable provisions of laws (including the satisfaction of any withholding taxes that the Company is obligated to withhold with respect to the optionee). In the event an optionee chooses to pay the purchase price by previously-owned shares of Stock through the attestation method, the number of shares of Stock transferred to the optionee upon the exercise of the Stock Option shall be net of the number of attested shares. In the event that the Company establishes, for itself or using the services of a third party, an automated system for the exercise of Stock Options, such as a system using an internet website or interactive voice response, then the paperless exercise of Stock Options may be permitted through the use of such an automated system.



---

(e) Annual Limit on Incentive Stock Options. To the extent required for "incentive stock option" treatment under Section 422 of the Code, the aggregate Fair Market Value (determined as of the time of grant) of the shares of Stock with respect to which Incentive Stock Options granted under this Plan and any other plan of the Company or its parent and subsidiary corporations become exercisable for the first time by an optionee during any calendar year shall not exceed $100,000. To the extent that any Stock Option exceeds this limit, it shall constitute a Non-Qualified Stock Option.

SECTION 6. STOCK APPRECIATION RIGHTS

(a) Exercise Price of Stock Appreciation Rights. The exercise price of a Stock Appreciation Right shall not be less than 100 percent of the Fair Market Value of the Stock on the date of grant.

(b) Grant and Exercise of Stock Appreciation Rights. Stock Appreciation Rights may be granted by the Administrator independently of any Stock Option granted pursuant to Section 5 of the Plan.

(c) Terms and Conditions of Stock Appreciation Rights. Stock Appreciation Rights shall be subject to such terms and conditions as shall be determined from time to time by the Administrator. The term of a Stock Appreciation Right may not exceed ten years.

SECTION 7. RESTRICTED STOCK AWARDS

(a) Nature of Restricted Stock Awards. The Administrator shall determine the restrictions and conditions applicable to each Restricted Stock Award at the time of grant. Conditions may be based on continuing employment (or other service relationship) and/or achievement of pre-established performance goals and objectives. The terms and conditions of each such Award Certificate shall be determined by the Administrator, and such terms and conditions may differ among individual Awards and grantees.

(b) Rights as a Stockholder. Upon the grant of the Restricted Stock Award and payment of any applicable purchase price, a grantee shall have the rights of a stockholder with respect to the voting of the Restricted Stock and receipt of dividends; provided that if the lapse of restrictions with respect to the Restricted Stock Award is tied to the attainment of performance goals, any dividends paid by the Company during the performance period shall accrue and shall not be paid to the grantee until and to the extent the performance goals are met with respect to the Restricted Stock Award. Unless the Administrator shall otherwise determine, (i) uncertificated Restricted Stock shall be accompanied by a notation on the records of the Company or the transfer agent to the effect that they are subject to forfeiture until such Restricted Stock are

vested as provided in Section 7(d) below, and (ii) certificated Restricted Stock shall remain in the possession of the Company until such Restricted Stock is vested as provided in Section 7(d) below, and the grantee shall be required, as a condition of the grant, to deliver to the Company such instruments of transfer as the Administrator may prescribe.

(c) Restrictions. Restricted Stock may not be sold, assigned, transferred, pledged or otherwise encumbered or disposed of except as specifically provided herein or in the Restricted Stock Award Certificate. Except as may otherwise be provided by the Administrator either in



the Award Certificate or, subject to Section 18 below, in writing after the Award is issued, if a grantee's employment (or other service relationship) with the Company and its Subsidiaries terminates for any reason, any Restricted Stock that has not vested at the time of termination shall automatically and without any requirement of notice to such grantee from or other action by or on behalf of, the Company be deemed to have been reacquired by the Company at its original purchase price (if any) from such grantee or such grantee's legal representative simultaneously with such termination of employment (or other service relationship), and thereafter shall cease to represent any ownership of the Company by the grantee or rights of the grantee as a stockholder. Following such deemed reacquisition of unvested Restricted Stock that are represented by physical certificates, a grantee shall surrender such certificates to the Company upon request without consideration.

(d) Vesting of Restricted Stock. The Administrator at the time of grant shall specify the date or dates and/or the attainment of pre-established performance goals, objectives and other conditions on which the non-transferability of the Restricted Stock and the Company's right of repurchase or forfeiture shall lapse. Subsequent to such date or dates and/or the attainment of such pre-established performance goals, objectives and other conditions, the shares on which all restrictions have lapsed shall no longer be Restricted Stock and shall be deemed "vested." Except as may otherwise be provided by the Administrator either in the Award Certificate or, subject to Section 18 below, in writing after the Award is issued, a grantee's rights in any shares of Restricted Stock that have not vested shall automatically terminate upon the grantee's termination of employment (or other service relationship) with the Company and its Subsidiaries and such shares shall be subject to the provisions of Section 7(c) above.

SECTION 8. RESTRICTED STOCK UNITS

(a) Nature of Restricted Stock Units. The Administrator shall determine the restrictions and conditions applicable to each Restricted Stock Unit at the time of grant. Conditions may be based on continuing employment (or other service relationship) and/or achievement of pre-established performance goals and objectives. The terms and conditions of each such Award Certificate shall be determined by the Administrator, and such terms and conditions may differ among individual Awards and grantees. At the end of the deferral period, the Restricted Stock Units, to the extent vested, shall be settled in the form of shares of Stock. To the extent that an award of Restricted Stock Units is subject to Section 409A, it may contain such additional terms and conditions as the Administrator shall determine in its sole discretion in order for such Award to comply with the requirements of Section 409A.

(b) Election to Receive Restricted Stock Units in Lieu of Compensation. The Administrator may, in its sole discretion, permit a grantee to elect to receive a portion of future cash compensation otherwise due to such grantee in the form of an award of Restricted Stock Units. Any such election shall be made in writing and shall be delivered to the Company no later than the date specified by the Administrator and in accordance with Section 409A and such other rules and procedures established by the Administrator. Any such future cash compensation that the grantee elects to defer shall be converted to a fixed number of Restricted Stock Units based on the Fair Market Value of Stock on the date the compensation would otherwise have been paid to the grantee if such payment had not been deferred as provided herein. The Administrator shall have the sole right to determine whether and under what circumstances to permit such elections



and to impose such limitations and other terms and conditions thereon as the Administrator deems appropriate. Any Restricted Stock Units that are elected to be received in lieu of cash compensation shall be fully vested, unless otherwise provided in the Award Certificate.

(c) Rights as a Stockholder. A grantee shall have the rights as a stockholder only as to shares of Stock acquired by the grantee upon settlement of Restricted Stock Units; provided, however, that the grantee may be credited with Dividend Equivalent Rights with respect to the phantom stock units underlying his Restricted Stock Units, subject to such terms and conditions as the Administrator may determine.

(d) Termination. Except as may otherwise be provided by the Administrator either in the Award Certificate or, subject to Section 18 below, in writing after the Award is issued, a grantee's right in all Restricted Stock Units that have not vested shall automatically terminate upon the grantee's termination of employment (or cessation of service relationship) with the Company and its Subsidiaries for any reason.

SECTION 9. UNRESTRICTED STOCK AWARDS

Grant or Sale of Unrestricted Stock. The Administrator may, in its sole discretion, grant (or sell at par value or such higher purchase price determined by the Administrator) an Unrestricted Stock Award under the Plan. Unrestricted Stock Awards may be granted in respect of past services or other valid consideration, or in lieu of cash compensation due to such grantee.

Restricted Confidential - Outside Counsel Only




SECTION 10. CASH-BASED AWARDS

Grant of Cash-Based Awards. The Administrator may, in its sole discretion, grant Cash-Based Awards to any grantee in such number or amount and upon such terms, and subject to such conditions, as the Administrator shall determine at the time of grant. The Administrator shall determine the maximum duration of the Cash-Based Award, the amount of cash to which the Cash-Based Award pertains, the conditions upon which the Cash-Based Award shall become vested or payable, and such other provisions as the Administrator shall determine. Each Cash-Based Award shall specify a cash-denominated payment amount, formula or payment ranges as determined by the Administrator. Payment, if any, with respect to a Cash-Based Award shall be made in accordance with the terms of the Award and may be made in cash or in shares of Stock, as the Administrator determines.

SECTION 11. PERFORMANCE SHARE AWARDS

(a) Nature of Performance Share Awards. The Administrator may, in its sole discretion, grant Performance Share Awards independent of, or in connection with, the granting of any other Award under the Plan. The Administrator shall determine whether and to whom Performance Share Awards shall be granted, the Performance Goals, the periods during which performance is to be measured, and such other limitations and conditions as the Administrator shall determine.

(b) Rights as a Stockholder. A grantee receiving a Performance Share Award shall have the rights of a stockholder only as to shares actually received by the grantee under the Plan and not with respect to shares subject to the Award but not actually received by the grantee. A



grantee shall be entitled to receive shares of Stock under a Performance Share Award only upon satisfaction of all conditions specified in the Performance Share Award Certificate (or in a performance plan adopted by the Administrator).

(c) Termination. Except as may otherwise be provided by the Administrator either in the Award agreement or, subject to Section 18 below, in writing after the Award is issued, a grantee's rights in all Performance Share Awards shall automatically terminate upon the grantee's termination of employment (or cessation of service relationship) with the Company and its Subsidiaries for any reason.

SECTION 12. PERFORMANCE-BASED AWARDS TO COVERED EMPLOYEES

(a) Performance-Based Awards. Any employee or other key person providing services to the Company and who is selected by the Administrator may be granted one or more Performance-Based Awards in the form of a Restricted Stock Award, Restricted Stock Units, Performance Share Awards or Cash-Based Award payable upon the attainment of Performance Goals that are established by the Administrator and relate to one or more of the Performance Criteria, in each case on a specified date or dates or over any period or periods determined by the Administrator. The Administrator shall define in an objective fashion the manner of calculating the Performance Criteria it selects to use for any Performance Cycle. Depending on the Performance Criteria used to establish such Performance Goals, the Performance Goals may be expressed in terms of overall Company performance or the performance of a division, business unit, or an individual. The Administrator, in its discretion, may adjust or modify the calculation of Performance Goals for such Performance Cycle in order to prevent the dilution or enlargement of the rights of an individual (i) in the event of, or in anticipation of, any unusual or extraordinary corporate item, transaction, event or development, (ii) in recognition of, or in anticipation of, any other unusual or nonrecurring events affecting the Company, or the financial statements of the Company, or (iii) in response to, or in anticipation of, changes in applicable laws, regulations, accounting principles, or business conditions provided however, that the Administrator may not exercise such discretion in a manner that would increase the Performance-Based Award granted to a Covered Employee. Each Performance-Based Award shall comply with the provisions set forth below.

(b) Grant of Performance-Based Awards. With respect to each Performance-Based Award granted to a Covered Employee, the Administrator shall select, within the first 90 days of a Performance Cycle (or, if shorter, within the maximum period allowed under Section 162(m) of the Code) the Performance Criteria for such grant, and the Performance Goals with respect to each Performance Criterion (including a threshold level of performance below which no amount will become payable with respect to such Award). Each Performance-Based Award will specify the amount payable, or the formula for determining the amount payable, upon achievement of the various applicable performance targets. The Performance Criteria established by the Administrator may be (but need not be) different for each Performance Cycle and different Performance Goals may be applicable to Performance-Based Awards to different Covered Employees.

(c) Payment of Performance-Based Awards. Following the completion of a Performance Cycle, the Administrator shall meet to review and certify in writing whether, and to



what extent, the Performance Goals for the Performance Cycle have been achieved and, if so, to also calculate and certify in writing the amount of the Performance-Based Awards earned for the Performance Cycle. The Administrator shall then determine the actual size of each Covered Employee's Performance-Based Award, and, in doing so, may reduce or eliminate the amount of the Performance-Based Award for a Covered Employee if, in its sole judgment, such reduction or elimination is appropriate.

(d) Maximum Award Payable. The maximum Performance-Based Award payable to any one Covered Employee under the Plan for a Performance Cycle is

[ ] shares of Stock (subject to adjustment as provided in Section 3(c) hereof) or $5,000,000 in the case of a Performance-Based Award that is a Cash-Based Award.

SECTION 13. DIVIDEND EQUIVALENT RIGHTS

(a) Dividend Equivalent Rights. A Dividend Equivalent Right may be granted hereunder to any grantee as a component of an award of Restricted Stock Units, Restricted Stock Award or Performance Share Award or as a freestanding award. The terms and conditions of Dividend Equivalent Rights shall be specified in the Award Certificate. Dividend equivalents credited to the holder of a Dividend Equivalent Right may be paid currently or may be deemed to be reinvested in additional shares of Stock, which may thereafter accrue additional equivalents. Any such reinvestment shall be at Fair Market Value on the date of reinvestment or such other price as may then apply under a dividend reinvestment plan sponsored by the Company, if any. Dividend Equivalent Rights may be settled in cash or shares of Stock or a combination thereof, in a single installment or installments. A Dividend Equivalent Right granted as a component of an award of Restricted Stock Units or Restricted Stock Award with performance vesting or Performance Share Award shall provide that such Dividend Equivalent Right shall be settled only upon settlement or payment of, or lapse of restrictions on, such other Award, and that such Dividend Equivalent Right shall expire or be forfeited or annulled under the same conditions as such other Award.

(b) Interest Equivalents. Any Award under this Plan that is settled in whole or in part in cash on a deferred basis may provide in the grant for interest equivalents to be credited with respect to such cash payment. Interest equivalents may be compounded and shall be paid upon such terms and conditions as may be specified by the grant.

(c) Termination. Except as may otherwise be provided by the Administrator either in the Award Certificate or, subject to Section 18 below, in writing after the Award is issued, a grantee's rights in all Dividend Equivalent Rights or interest equivalents granted as a component of an award of Restricted Stock Units, Restricted Stock Award or Performance Share Award that has not vested shall automatically terminate upon the grantee's termination of employment (or cessation of service relationship) with the Company and its Subsidiaries for any reason.

SECTION 14. TRANSFERABILITY OF AWARDS

(a) Transferability. Except as provided in Section 14(b) below, during a grantee's lifetime, his or her Awards shall be exercisable only by the grantee, or by the grantee's legal representative or guardian in the event of the grantee's incapacity. No Awards shall be sold,



assigned, transferred or otherwise encumbered or disposed of by a grantee other than by will or by the laws of descent and distribution or pursuant to a domestic relations order. No Awards shall be subject, in whole or in part, to attachment, execution, or levy of any kind, and any purported transfer in violation hereof shall be null and void.

(b) Administrator Action. Notwithstanding Section 14(a), the Administrator, in its discretion, may provide either in the Award Certificate regarding a given Award or by subsequent written approval that the grantee (who is an employee or director) may transfer his or her Non-Qualified Options to his or her immediate family members, to trusts for the benefit of such family members, or to partnerships in which such family members are the only partners, provided that the transferee agrees in writing with the Company to be bound by all of the terms and conditions of this Plan and the applicable Award. In no event may an Award be transferred by a grantee for value.

(c) Family Member. For purposes of Section 14(b), "family member" shall mean a grantee's child, stepchild, grandchild, parent, stepparent, grandparent, spouse, former spouse, sibling, niece, nephew, mother-in-law, father-in-law, son-in-law, daughter-in-law, brother-in-law, or sister-in-law, including adoptive relationships, any person sharing the grantee's household (other than a tenant of the grantee), a trust in which these persons (or the grantee) have more than 50 percent of the beneficial interest, a foundation in which these persons (or the grantee) control the management of assets, and any other entity in which these persons (or the grantee) own more than 50 percent of the voting interests.

(d) Designation of Beneficiary. Each grantee to whom an Award has been made under the Plan may designate a beneficiary or beneficiaries to exercise any Award or receive any payment under any Award payable on or after the grantee's death. Any such designation shall be on a form provided for that purpose by the Administrator and shall not be effective until received by the Administrator. If no beneficiary has been designated by a deceased grantee, or if the designated beneficiaries have predeceased the grantee, the beneficiary shall be the grantee's estate.

SECTION 15. TAX WITHHOLDING

(a) Payment by Grantee. Each grantee shall, no later than the date as of which the value of an Award or of any Stock or other amounts received thereunder first becomes includable in the gross income of the grantee for Federal income tax purposes, pay to the Company, or make arrangements satisfactory to the Administrator regarding payment of, any Federal, state, or local taxes of any kind required by law to be withheld by the Company with respect to such income. The Company and its Subsidiaries shall, to the extent permitted by law, have the right to deduct any such taxes from any payment of any kind otherwise due to the grantee. The Company's obligation to deliver evidence of book entry (or stock certificates) to any grantee is subject to and conditioned on tax withholding obligations being satisfied by the grantee.

(b) Payment in Stock. Subject to approval by the Administrator, a grantee may elect to have the Company's minimum required tax withholding obligation satisfied, in whole or in part, by authorizing the Company to withhold from shares of Stock to be issued pursuant to any

Award a number of shares with an aggregate Fair Market Value (as of the date the withholding is effected) that would satisfy the withholding amount due.

SECTION 16. SECTION 409A AWARDS

To the extent that any Award is determined to constitute "nonqualified deferred compensation" within the meaning of Section 409A (a "*409A Award*"), the Award shall be subject to such additional rules and requirements as specified by the Administrator from time to time in order to comply with Section 409A. In this regard, if any amount under a 409A Award is payable upon a "separation from service" (within the meaning of Section 409A) to a grantee who is then considered a "specified employee" (within the meaning of Section 409A), then no such payment shall be made prior to the date that is the earlier of (i) six months and one day after the grantee's separation from service, or (ii) the grantee's death, but only to the extent such delay is necessary to prevent such payment from being subject to interest, penalties and/or additional tax imposed pursuant to Section 409A. Further, the settlement of any such Award may not be accelerated except to the extent permitted by Section 409A.

SECTION 17. TRANSFER, LEAVE OF ABSENCE, ETC.

For purposes of the Plan, the following events shall not be deemed a termination of employment:

(a) a transfer to the employment of the Company from a Subsidiary or from the Company to a Subsidiary, or from one Subsidiary to another; or

(b) an approved leave of absence for military service or sickness, or for any other purpose approved by the Company, if the employee's right to re-employment is guaranteed either by a statute or by contract or under the policy pursuant to which the leave of absence was granted or if the Administrator otherwise so provides in writing.

SECTION 18. AMENDMENTS AND TERMINATION

The Board may, at any time, amend or discontinue the Plan and the Administrator may, at any time, amend or cancel any outstanding Award for the purpose of satisfying changes in law or for any other lawful purpose, but no such action shall adversely affect rights under any outstanding Award without the holder's consent. The Administrator is specifically authorized to exercise its discretion to reduce the exercise price of outstanding Stock Options or Stock Appreciation Rights or effect the repricing of such Awards through cancellation and re-grants. To the extent required under the rules of any securities exchange or market system on which the Stock is listed, to the extent determined by the Administrator to be required by the Code to ensure that Incentive Stock Options granted under the Plan are qualified under Section 422 of the Code, or to ensure that compensation earned under Awards qualifies as performance-based compensation under Section 162(m) of the Code, Plan amendments shall be subject to approval by the Company stockholders entitled to vote at a meeting of stockholders. Nothing in this Section 18 shall limit the Administrator's authority to take any action permitted pursuant to Section 3(c) or 3(d).



SECTION 19. STATUS OF PLAN

With respect to the portion of any Award that has not been exercised and any payments in cash, Stock or other consideration not received by a grantee, a grantee shall have no rights greater than those of a general creditor of the Company unless the Administrator shall otherwise expressly determine in connection with any Award or Awards. In its sole discretion, the Administrator may authorize the creation of trusts or other arrangements to meet the Company's obligations to deliver Stock or make payments with respect to Awards hereunder, provided that the existence of such trusts or other arrangements is consistent with the foregoing sentence.

SECTION 20. GENERAL PROVISIONS

(a) No Distribution. The Administrator may require each person acquiring Stock pursuant to an Award to represent to and agree with the Company in writing that such person is acquiring the shares without a view to distribution thereof.

(b) Delivery of Stock Certificates. Stock certificates to grantees under this Plan shall be deemed delivered for all purposes when the Company or a stock transfer agent of the Company shall have mailed such certificates in the United States mail, addressed to the grantee, at the grantee's last known address on file with the Company. Uncertificated Stock shall be deemed delivered for all purposes when the Company or a Stock transfer agent of the Company shall have given to the grantee by electronic mail (with proof of receipt) or by United States mail, addressed to the grantee, at the grantee's last known address on file with the Company, notice of issuance and recorded the issuance in its records (which may include electronic "book entry" records). Notwithstanding anything herein to the contrary, the Company shall not be required to issue or deliver any certificates evidencing shares of Stock pursuant to the exercise of any Award, unless and until the Administrator has determined, with advice of counsel (to the extent the Administrator deems such advice necessary or advisable), that the issuance and delivery of such certificates is in compliance with all applicable laws, regulations of governmental authorities and, if applicable, the requirements of any exchange on which the shares of Stock are listed, quoted or traded. All Stock certificates delivered pursuant to the Plan shall be subject to any stop-transfer orders and other restrictions as the Administrator deems necessary or advisable to

comply with federal, state or foreign jurisdiction, securities or other laws, rules and quotation system on which the Stock is listed, quoted or traded. The Administrator may place legends on any Stock certificate to reference restrictions applicable to the Stock. In addition to the terms and conditions provided herein, the Administrator may require that an individual make such reasonable covenants, agreements, and representations as the Administrator, in its discretion, deems necessary or advisable in order to comply with any such laws, regulations, or requirements. The Administrator shall have the right to require any individual to comply with any timing or other restrictions with respect to the settlement or exercise of any Award, including a window-period limitation, as may be imposed in the discretion of the Administrator.

(c) Stockholder Rights. Until Stock is deemed delivered in accordance with Section 20(b), no right to vote or receive dividends or any other rights of a stockholder will exist with respect to shares of Stock to be issued in connection with an Award, notwithstanding the exercise of a Stock Option or any other action by the grantee with respect to an Award.

17

---

(d) Other Compensation Arrangements; No Employment Rights. Nothing contained in this Plan shall prevent the Board from adopting other or additional compensation arrangements, including trusts, and such arrangements may be either generally applicable or applicable only in specific cases. The adoption of this Plan and the grant of Awards do not confer upon any employee any right to continued employment with the Company or any Subsidiary.

(e) Trading Policy Restrictions. Option exercises and other Awards under the Plan shall be subject to the Company's insider trading policies and procedures, as in effect from time to time.

(f) Forfeiture of Awards under Sarbanes-Oxley Act. If the Company is required to prepare an accounting restatement due to the material noncompliance of the Company, as a result of misconduct, with any financial reporting requirement under the securities laws, then any grantee who is one of the individuals subject to automatic forfeiture under Section 304 of the Sarbanes-Oxley Act of 2002 shall reimburse the Company for the amount of any Award received by such individual under the Plan during the 12-month period following the first public issuance or filing with the United States Securities and Exchange Commission, as the case may be, of the financial document embodying such financial reporting requirement.

SECTION 21. EFFECTIVE DATE OF PLAN

This Plan shall become effective upon stockholder approval in accordance with applicable state law, the Company's bylaws and articles of incorporation, and applicable stock exchange rules or pursuant to written consent. No grants of Stock Options and other Awards may be made hereunder after the tenth anniversary of the Effective Date and no grants of Incentive Stock Options may be made hereunder after the tenth anniversary of the date the Plan is approved by the Board.

SECTION 22. GOVERNING LAW

This Plan and all Awards and actions taken thereunder shall be governed by, and construed in accordance with, the laws of the State of Delaware, applied without regard to conflict of law principles.

DATE APPROVED BY BOARD OF DIRECTORS:

DATE APPROVED BY STOCKHOLDERS:

18

---

**INCENTIVE STOCK OPTION AGREEMENT**
**UNDER THE CONTROL4 CORPORATION**
**2013 STOCK OPTION AND INCENTIVE PLAN**

Name of Optionee:

No. of Option Shares:

Option Exercise Price per Share: $

Grant Date:

Expiration Date:

Pursuant to the Control4 Corporation 2013 Stock Option and Incentive Plan as amended through the date hereof (the "Plan"), Control4 Corporation (the "Company") hereby grants to the Optionee named above an option (the "Stock Option") to purchase on or prior to the Expiration Date specified above all or part of the

number of shares of Common Stock, par value $0.0001 per share (the "Stock"), of the Company specified above at the Option Exercise Price per Share specified above subject to the terms and conditions set forth herein and in the Plan.

1. Exercisability Schedule. No portion of this Stock Option may be exercised until such portion shall have become exercisable. Except as set forth below, and subject to the discretion of the Administrator (as defined in Section 2 of the Plan) to accelerate the exercisability schedule hereunder, this Stock Option shall be exercisable with respect to the following number of Option Shares on the dates indicated so long as the Optionee remains an employee of the Company or a Subsidiary on such dates:

| Incremental Number of Option Shares Exercisable* | Exercisability Date |
|---|---|
| ( %) | |
| ( %) | |
| ( %) | |
| ( %) | |
| ( %) | |

* Max. of $100,000 per yr.

Once exercisable, this Stock Option shall continue to be exercisable at any time or times prior to the close of business on the Expiration Date, subject to the provisions hereof and of the Plan.

2. Manner of Exercise.

(a) The Optionee may exercise this Stock Option only in the following manner: from time to time on or prior to the Expiration Date of this Stock Option, the Optionee may give written notice to the Administrator of his or her election to purchase some or all of the Option Shares purchasable at the time of such notice. This notice shall specify the number of Option Shares to be purchased.

Payment of the purchase price for the Option Shares may be made by one or more of the following methods: (i) in cash, by certified or bank check or other instrument acceptable to the Administrator; (ii) through the delivery (or attestation to the ownership) of shares of Stock that have been purchased by the Optionee on the open market or that are beneficially owned by the Optionee and are not then subject to any restrictions under any Company plan and that otherwise satisfy any holding periods as may be required by the Administrator; or (iii) by the Optionee delivering to the Company a properly executed exercise notice together with irrevocable instructions to a broker to promptly deliver to the Company cash or a check payable and acceptable to the Company to pay the option purchase price, provided that in the event the Optionee chooses to pay the option purchase price as so provided, the Optionee and the broker shall comply with such procedures and enter into such agreements of indemnity and other agreements as the Administrator shall prescribe as a condition of such payment procedure; or (iv) a combination of (i), (ii) and (iii) above. Payment instruments will be received subject to collection.

The transfer to the Optionee on the records of the Company or of the transfer agent of the Option Shares will be contingent upon (i) the Company's receipt from the Optionee of the full purchase price for the Option Shares, as set forth above, (ii) the fulfillment of any other requirements contained herein or in the Plan or in any other agreement or provision of laws, and (iii) the receipt by the Company of any agreement, statement or other evidence that the Company may require to satisfy itself that the issuance of Stock to be purchased pursuant to the exercise of Stock Options under the Plan and any subsequent resale of the shares of Stock will be in compliance with applicable laws and regulations. In the event the Optionee chooses to pay the purchase price by previously-owned shares of Stock through the attestation method, the number of shares of Stock transferred to the Optionee upon the exercise of the Stock Option shall be net of the Shares attested to.

(b) The shares of Stock purchased upon exercise of this Stock Option shall be transferred to the Optionee on the records of the Company or of the transfer agent upon compliance to the satisfaction of the Administrator with all requirements under applicable laws or regulations in connection with such transfer and with the requirements hereof and of the Plan. The determination of the Administrator as to such compliance shall be final and binding on the Optionee. The Optionee shall not be deemed to be the holder of, or to have any of the rights of a holder with respect to, any shares of Stock subject to this Stock Option unless and until this Stock Option shall have been exercised pursuant to the terms hereof, the Company or the transfer agent shall have transferred the shares to the Optionee, and the Optionee's name shall have been entered as the stockholder of record on the books of the Company. Thereupon, the Optionee shall have full voting, dividend and other ownership rights with respect to such shares of Stock.

(c) The minimum number of shares with respect to which this Stock Option may be exercised at any one time shall be 100 shares, unless the number of shares with respect to which this Stock Option is being exercised is the total number of shares subject to exercise under this Stock Option at the time.

(d) Notwithstanding any other provision hereof or of the Plan, no portion of this Stock Option shall be exercisable after the Expiration Date hereof.

3. Termination of Employment. If the Optionee's employment by the Company or a Subsidiary (as defined in the Plan) is terminated, the period within which to exercise the Stock Option may be subject to earlier termination as set forth below.

(a) Termination Due to Death. If the Optionee's employment terminates by reason of the Optionee's death, any portion of this Stock Option outstanding on such date, to the extent exercisable on the date of death, may thereafter be exercised by the Optionee's legal representative or legatee for a period of 12 months from the date of death or until the Expiration Date, if earlier. Any portion of this Stock Option that is not exercisable on the date of death shall terminate immediately and be of no further force or effect.

(b) Termination Due to Disability. If the Optionee's employment terminates by reason of the Optionee's disability (as determined by the Administrator), any portion of this Stock Option outstanding on such date, to the extent exercisable on the date of such disability, may thereafter be exercised by the Optionee for a period of 12 months from the date of disability or until the Expiration Date, if earlier. Any portion of this Stock Option that is not exercisable on the date of disability shall terminate immediately and be of no further force or effect.

(c) Termination for Cause. If the Optionee's employment terminates for Cause, any portion of this Stock Option outstanding on such date shall terminate immediately and be of no further force and effect. For purposes hereof, "Cause" shall mean, unless otherwise provided in an employment agreement between the Company and the Optionee, a determination by the Administrator that the Optionee shall be dismissed as a result of (i) any material breach by the Optionee of any agreement between the Optionee and the Company; (ii) the conviction of, indictment for or plea of nolo contendere by the Optionee to a felony or a crime involving moral turpitude; or (iii) any material misconduct or willful and deliberate non-performance (other than by reason of disability) by the Optionee of the Optionee's duties to the Company.

(d) Other Termination. If the Optionee's employment terminates for any reason other than the Optionee's death, the Optionee's disability, or Cause, and unless otherwise determined by the Administrator, any portion of this Stock Option outstanding on such date may be exercised, to the extent exercisable on the date of termination, for a period of three months from the date of termination or until the Expiration Date, if earlier. Any portion of this Stock Option that is not exercisable on the date of termination shall terminate immediately and be of no further force or effect.

The Administrator's determination of the reason for termination of the Optionee's employment shall be conclusive and binding on the Optionee and his or her representatives or legatees.



---

4. Incorporation of Plan. Notwithstanding anything herein to the contrary, this Stock Option shall be subject to and governed by all the terms and conditions of the Plan, including the powers of the Administrator set forth in Section 2(b) of the Plan. Capitalized terms in this Agreement shall have the meaning specified in the Plan, unless a different meaning is specified herein.

5. Transferability. This Agreement is personal to the Optionee, is non-assignable and is not transferable in any manner, by operation of law or otherwise, other than by will or the laws of descent and distribution. This Stock Option is exercisable, during the Optionee's lifetime, only by the Optionee, and thereafter, only by the Optionee's legal representative or legatee.

6. Status of the Stock Option. This Stock Option is intended to qualify as an "incentive stock option" under Section 422 of the Internal Revenue Code of 1986, as amended (the "Code"), but the Company does not represent or warrant that this Stock Option qualifies as such. The Optionee should consult with his or her own tax advisors regarding the tax effects of this Stock Option and the requirements necessary to obtain favorable income tax treatment under Section 422 of the Code, including, but not limited to, holding period requirements. To the extent any portion of this Stock Option does not so qualify as an "incentive stock option," such portion shall be deemed to be a non-qualified stock option. If the Optionee intends to dispose or does dispose (whether by sale, gift, transfer or otherwise) of any Option Shares within the one-year period beginning on the date after the transfer of such shares to him or her, or within the two-year period beginning on the day after the grant of this Stock Option, he or she will so notify the Company within 30 days after such disposition.

7. Tax Withholding. The Optionee shall, not later than the date as of which the exercise of this Stock Option becomes a taxable event for Federal income tax purposes, pay to the Company or make arrangements satisfactory to the Administrator for payment of any Federal, state, and local taxes required by law to be withheld on account of such taxable event. The Company shall have the authority to cause the minimum required tax withholding obligation to be satisfied, in whole or in part, by withholding from shares of Stock to be issued to the Optionee a number of shares of Stock with an aggregate Fair Market Value that would satisfy the minimum withholding amount due.

8. No Obligation to Continue Employment. Neither the Company nor any Subsidiary is obligated by or as a result of the Plan or this Agreement to continue the Optionee in employment and neither the Plan nor this Agreement shall interfere in any way with the right of the Company or any Subsidiary to terminate the employment of the Optionee at any time.

9. Integration. This Agreement constitutes the entire agreement between the parties with respect to this Stock Option and supersedes all prior agreements and discussions between the parties concerning such subject matter.

10. Data Privacy Consent. In order to administer the Plan and this Agreement and to implement or structure future equity grants, the Company, its subsidiaries and affiliates and certain agents thereof (together, the "Relevant Companies") may process any and all personal or professional data, including but not limited to Social Security or other identification number,



---

home address and telephone number, date of birth and other information that is necessary or desirable for the administration of the Plan and/or this Agreement (the "Relevant Information"). By entering into this Agreement, the Grantee (i) authorizes the Company to collect, process, register and transfer to the Relevant Companies all Relevant Information; (ii) waives any privacy rights the Grantee may have with respect to the Relevant Information; (iii) authorizes the Relevant Companies to store and transmit such information in electronic form; and (iv) authorizes the transfer of the Relevant Information to any jurisdiction in which the Relevant Companies consider appropriate. The Grantee shall have access to, and the right to change, the Relevant Information. Relevant Information will only be used in accordance with applicable law.

11. Notices. Notices hereunder shall be mailed or delivered to the Company at its principal place of business and shall be mailed or delivered to the Optionee at the address on file with the Company or, in either case, at such other address as one party may subsequently furnish to the other party in writing.

**CONTROL4 CORPORATION**

By: ______________________________
Title:

The foregoing Agreement is hereby accepted and the terms and conditions thereof hereby agreed to by the undersigned. Electronic acceptance of this Agreement pursuant to the Company's instructions to the Grantee (including through an online acceptance process) is acceptable.

Dated: ______________________________

______________________________
Optionee's Signature

Optionee's name and address:

______________________________

______________________________

______________________________



---

**NON-QUALIFIED STOCK OPTION AGREEMENT**
**FOR COMPANY EMPLOYEES**
**UNDER THE CONTROL4 CORPORATION**
**2013 STOCK OPTION AND INCENTIVE PLAN**

Name of Optionee:

No. of Option Shares:

Option Exercise Price per Share: $

Grant Date:

Expiration Date:

Pursuant to the Control4 Corporation 2013 Stock Option and Incentive Plan as amended through the date hereof (the "Plan"), Control4 Corporation (the "Company") hereby grants to the Optionee named above an option (the "Stock Option") to purchase on or prior to the Expiration Date specified above all or part of the number of shares of Common Stock, par value $0.0001 per share (the "Stock") of the Company specified above at the Option Exercise Price per Share specified above subject to the terms and conditions set forth herein and in the Plan. This Stock Option is not intended to be an "incentive stock option" under Section 422 of the Internal Revenue Code of 1986, as amended.

1. Exercisability Schedule. No portion of this Stock Option may be exercised until such portion shall have become exercisable. Except as set forth below, and subject to the discretion of the Administrator (as defined in Section 2 of the Plan) to accelerate the exercisability schedule hereunder, this Stock Option shall be exercisable with respect to the following number of Option Shares on the dates indicated so long as Optionee remains an employee of the Company or a Subsidiary on such dates:

| Incremental Number of Option Shares Exercisable | Exercisability Date |
|---|---|
| ( %) | |
| ( %) | |
| ( %) | |
| ( %) | |
| ( %) | |

Once exercisable, this Stock Option shall continue to be exercisable at any time or times prior to the close of business on the Expiration Date, subject to the provisions hereof and of the Plan.

---

2. Manner of Exercise.

(a) The Optionee may exercise this Stock Option only in the following manner: from time to time on or prior to the Expiration Date of this Stock Option, the Optionee may give written notice to the Administrator of his or her election to purchase some or all of the Option Shares purchasable at the time of such notice. This notice shall specify the number of Option Shares to be purchased.

Payment of the purchase price for the Option Shares may be made by one or more of the following methods: (i) in cash, by certified or bank check or other instrument acceptable to the Administrator; (ii) through the delivery (or attestation to the ownership) of shares of Stock that have been purchased by the Optionee on the open market or that are beneficially owned by the Optionee and are not then subject to any restrictions under any Company plan and that otherwise satisfy any holding periods as may be required by the Administrator; (iii) by the Optionee delivering to the Company a properly executed exercise notice together with irrevocable instructions to a broker to promptly deliver to the Company cash or a check payable and acceptable to the Company to pay the option purchase price, provided that in the event the Optionee chooses to pay the option purchase price as so provided, the Optionee and the broker shall comply with such procedures and enter into such agreements of indemnity and other agreements as the Administrator shall prescribe as a condition of such payment procedure; (iv) by a "net exercise" arrangement pursuant to which the Company will reduce the number of shares of Stock issuable upon exercise by the largest whole number of shares with a Fair Market Value that does not exceed the aggregate exercise price; or (v) a combination of (i), (ii), (iii) and (iv) above. Payment instruments will be received subject to collection.

The transfer to the Optionee on the records of the Company or of the transfer agent of the Option Shares will be contingent upon (i) the Company's receipt from the Optionee of the full purchase price for the Option Shares, as set forth above, (ii) the fulfillment of any other requirements contained herein or in the Plan or in any other agreement or provision of laws, and (iii) the receipt by the Company of any agreement, statement or other evidence that the Company may require to satisfy itself that the issuance of Stock to be purchased pursuant to the exercise of Stock Options under the Plan and any subsequent resale of the shares of Stock will be in compliance with applicable laws and regulations. In the event the Optionee chooses to pay the purchase price by previously-owned shares of Stock through the attestation method, the number of shares of Stock transferred to the Optionee upon the exercise of the Stock Option shall be net of the Shares attested to.

(b) The shares of Stock purchased upon exercise of this Stock Option shall be transferred to the Optionee on the records of the Company or of the transfer agent upon compliance to the satisfaction of the Administrator with all requirements under applicable laws or regulations in connection with such transfer and with the requirements hereof and of the Plan. The determination of the Administrator as to such compliance shall be final and binding on the Optionee. The Optionee shall not be deemed to be the holder of, or to have any of the rights of a holder with respect to, any shares of Stock subject to this Stock Option unless and until this Stock Option shall have been exercised pursuant to the terms hereof, the Company or the transfer agent shall have transferred the shares to the Optionee, and the Optionee's name shall have been

entered as the stockholder of record on the books of the Company. Thereupon, the Optionee shall have full voting, dividend and other ownership rights with respect to such shares of Stock.

(c) The minimum number of shares with respect to which this Stock Option may be exercised at any one time shall be 100 shares, unless the number of shares with respect to which this Stock Option is being exercised is the total number of shares subject to exercise under this Stock Option at the time.

(d) Notwithstanding any other provision hereof or of the Plan, no portion of this Stock Option shall be exercisable after the Expiration Date hereof.

3. Termination of Employment. If the Optionee's employment by the Company or a Subsidiary (as defined in the Plan) is terminated, the period within which to exercise the Stock Option may be subject to earlier termination as set forth below.

(a) Termination Due to Death. If the Optionee's employment terminates by reason of the Optionee's death, any portion of this Stock Option outstanding on such date, to the extent exercisable on the date of death, may thereafter be exercised by the Optionee's legal representative or legatee for a period of 12 months from the date of death or until the Expiration Date, if earlier. Any portion of this Stock Option that is not exercisable on the date of death shall terminate immediately and be of no further force or effect.

(b) Termination Due to Disability. If the Optionee's employment terminates by reason of the Optionee's disability (as determined by the Administrator), any portion of this Stock Option outstanding on such date, to the extent exercisable on the date of such disability, may thereafter be exercised by the Optionee for a period of 12 months from the date of disability or until the Expiration Date, if earlier. Any portion of this Stock Option that is not exercisable on the date of disability shall terminate immediately and be of no further force or effect.

(c) Termination for Cause. If the Optionee's employment terminates for Cause, any portion of this Stock Option outstanding on such date shall terminate immediately and be of no further force and effect. For purposes hereof, "Cause" shall mean, unless otherwise provided in an employment agreement between the Company and the Optionee, a determination by the Administrator that the Optionee shall be dismissed as a result of (i) any material breach by the Optionee of any agreement between the Optionee and the Company; (ii) the conviction of, indictment for or plea of nolo contendere by the Optionee to a felony or a crime involving moral turpitude; or (iii) any material misconduct or willful and deliberate non-performance (other than by reason of disability) by the Optionee of the Optionee's duties to the Company.

(d) Other Termination. If the Optionee's employment terminates for any reason other than the Optionee's death, the Optionee's disability or Cause, and unless otherwise determined by the Administrator, any portion of this Stock Option outstanding on such date may be exercised, to the extent exercisable on the date of termination, for a period of three months from the date of termination or until the Expiration Date, if earlier. Any portion of this Stock Option that is not exercisable on the date of termination shall terminate immediately and be of no further force or effect.



---

The Administrator's determination of the reason for termination of the Optionee's employment shall be conclusive and binding on the Optionee and his or her representatives or legatees.

4. Incorporation of Plan. Notwithstanding anything herein to the contrary, this Stock Option shall be subject to and governed by all the terms and conditions of the Plan, including the powers of the Administrator set forth in Section 2(b) of the Plan. Capitalized terms in this Agreement shall have the meaning specified in the Plan, unless a different meaning is specified herein.

5. Transferability. This Agreement is personal to the Optionee, is non-assignable and is not transferable in any manner, by operation of law or otherwise, other than by will or the laws of descent and distribution. This Stock Option is exercisable, during the Optionee's lifetime, only by the Optionee, and thereafter, only by the Optionee's legal representative or legatee.

6. Tax Withholding. The Optionee shall, not later than the date as of which the exercise of this Stock Option becomes a taxable event for Federal income tax purposes, pay to the Company or make arrangements satisfactory to the Administrator for payment of any Federal, state, and local taxes required by law to be withheld on account of such taxable event. The Company shall have the authority to cause the minimum required tax withholding obligation to be satisfied, in whole or in part, by withholding from shares of Stock to be issued to the Optionee a number of shares of Stock with an aggregate Fair Market Value that would satisfy the minimum withholding amount due.

7. No Obligation to Continue Employment. Neither the Company nor any Subsidiary is obligated by or as a result of the Plan or this Agreement to continue the Optionee in employment and neither the Plan nor this Agreement shall interfere in any way with the right of the Company or any Subsidiary to terminate the employment of the Optionee at any time.

8. Integration. This Agreement constitutes the entire agreement between the parties with respect to this Stock Option and supersedes all prior agreements and discussions between the parties concerning such subject matter.

9. Data Privacy Consent. In order to administer the Plan and this Agreement and to implement or structure future equity grants, the Company, its subsidiaries and affiliates and certain agents thereof (together, the "Relevant Companies") may process any and all personal or professional data, including but not limited to Social Security or other identification number, home address and telephone number, date of birth and other information that is necessary or desirable for the administration of the Plan and/or this Agreement (the "Relevant Information"). By entering into this Agreement, the Grantee (i) authorizes the Company to collect, process, register and transfer to the Relevant Companies all Relevant Information; (ii) waives any privacy rights the Grantee may have with respect to the Relevant Information; (iii) authorizes the Relevant Companies to store and transmit such information in electronic form; and (iv) authorizes the transfer of the Relevant Information to any jurisdiction in which the Relevant Companies consider appropriate. The Grantee shall have access to, and the right to change, the



---

Relevant Information. Relevant Information will only be used in accordance with applicable law.

10. Notices. Notices hereunder shall be mailed or delivered to the Company at its principal place of business and shall be mailed or delivered to the Optionee at the address on file with the Company or, in either case, at such other address as one party may subsequently furnish to the other party in writing.

**CONTROL4 CORPORATION**

By: ________________________
Title:

The foregoing Agreement is hereby accepted and the terms and conditions thereof hereby agreed to by the undersigned. Electronic acceptance of this Agreement pursuant to the Company's instructions to the Grantee (including through an online acceptance process) is acceptable.

Dated: ________________________

________________________
Optionee's Signature

Optionee's name and address:

________________________

________________________

________________________



---

**NON-QUALIFIED STOCK OPTION AGREEMENT**
**FOR NON-EMPLOYEE DIRECTORS**
**UNDER THE CONTROL4 CORPORATION**
**2013 STOCK OPTION AND INCENTIVE PLAN**

Name of Optionee:

No. of Option Shares:

Option Exercise Price per Share: $

Grant Date:

Expiration Date:

Pursuant to the Control4 Corporation 2013 Stock Option and Incentive Plan as amended through the date hereof (the "Plan"), Control4 Corporation (the

"Company") hereby grants to the Optionee named above, who is a Director of the Company but is not an employee of the Company, an option (the "Stock Option") to purchase on or prior to the Expiration Date specified above all or part of the number of shares of Common Stock, par value $0.0001 per share (the "Stock"), of the Company specified above at the Option Exercise Price per Share specified above subject to the terms and conditions set forth herein and in the Plan. This Stock Option is not intended to be an "incentive stock option" under Section 422 of the Internal Revenue Code of 1986, as amended.

1. Exercisability Schedule. No portion of this Stock Option may be exercised until such portion shall have become exercisable. Except as set forth below, and subject to the discretion of the Administrator (as defined in Section 2 of the Plan) to accelerate the exercisability schedule hereunder, this Stock Option shall be exercisable with respect to the following number of Option Shares on the dates indicated so long as the Optionee remains in service as a member of the Board on such dates:

| Incremental Number of Option Shares Exercisable | Exercisability Date |
|---|---|
| ( %) | |
| ( %) | |
| ( %) | |
| ( %) | |
| ( %) | |

Once exercisable, this Stock Option shall continue to be exercisable at any time or times prior to the close of business on the Expiration Date, subject to the provisions hereof and of the Plan.

---

2. Manner of Exercise.

(a) The Optionee may exercise this Stock Option only in the following manner: from time to time on or prior to the Expiration Date of this Stock Option, the Optionee may give written notice to the Administrator of his or her election to purchase some or all of the Option Shares purchasable at the time of such notice. This notice shall specify the number of Option Shares to be purchased.

Payment of the purchase price for the Option Shares may be made by one or more of the following methods: (i) in cash, by certified or bank check or other instrument acceptable to the Administrator; (ii) through the delivery (or attestation to the ownership) of shares of Stock that have been purchased by the Optionee on the open market or that are beneficially owned by the Optionee and are not then subject to any restrictions under any Company plan and that otherwise satisfy any holding periods as may be required by the Administrator; (iii) by the Optionee delivering to the Company a properly executed exercise notice together with irrevocable instructions to a broker to promptly deliver to the Company cash or a check payable and acceptable to the Company to pay the option purchase price, provided that in the event the Optionee chooses to pay the option purchase price as so provided, the Optionee and the broker shall comply with such procedures and enter into such agreements of indemnity and other agreements as the Administrator shall prescribe as a condition of such payment procedure; (iv) by a "net exercise" arrangement pursuant to which the Company will reduce the number of shares of Stock issuable upon exercise by the largest whole number of shares with a Fair Market Value that does not exceed the aggregate exercise price; or (v) a combination of (i), (ii), (iii) and (iv) above. Payment instruments will be received subject to collection.

The transfer to the Optionee on the records of the Company or of the transfer agent of the Option Shares will be contingent upon (i) the Company's receipt from the Optionee of the full purchase price for the Option Shares, as set forth above, (ii) the fulfillment of any other requirements contained herein or in the Plan or in any other agreement or provision of laws, and (iii) the receipt by the Company of any agreement, statement or other evidence that the Company may require to satisfy itself that the issuance of Stock to be purchased pursuant to the exercise of Stock Options under the Plan and any subsequent resale of the shares of Stock will be in compliance with applicable laws and regulations. In the event the Optionee chooses to pay the purchase price by previously-owned shares of Stock through the attestation method, the number of shares of Stock transferred to the Optionee upon the exercise of the Stock Option shall be net of the Shares attested to.

(b) The shares of Stock purchased upon exercise of this Stock Option shall be transferred to the Optionee on the records of the Company or of the transfer agent upon compliance to the satisfaction of the Administrator with all requirements under applicable laws or regulations in connection with such transfer and with the requirements hereof and of the Plan. The determination of the Administrator as to such compliance shall be final and binding on the Optionee. The Optionee shall not be deemed to be the holder of, or to have any of the rights of a holder with respect to, any shares of Stock subject to this Stock Option unless and until this Stock Option shall have been exercised pursuant to the terms hereof, the Company or the transfer agent shall have transferred the shares to the Optionee, and the Optionee's name shall have been



---

entered as the stockholder of record on the books of the Company. Thereupon, the Optionee shall have full voting, dividend and other ownership rights with respect to such shares of Stock.

(c) The minimum number of shares with respect to which this Stock Option may be exercised at any one time shall be 100 shares, unless the number of shares with respect to which this Stock Option is being exercised is the total number of shares subject to exercise under this Stock Option at the time.

(d) Notwithstanding any other provision hereof or of the Plan, no portion of this Stock Option shall be exercisable after the Expiration Date hereof.

3. Termination as Director. If the Optionee ceases to be a Director of the Company, the period within which to exercise the Stock Option may be subject to earlier termination as set forth below.

(a) Termination Due to Death. If the Optionee's service as a Director terminates by reason of the Optionee's death, any portion of this Stock Option outstanding on such date, to the extent exercisable on the date of death, may thereafter be exercised by the Optionee's legal representative or legatee for a period of 12 months from the date of death or until the Expiration Date, if earlier. Any portion of this Stock Option that is not exercisable on the date of death shall terminate immediately and be of no further force or effect.

(b) Other Termination. If the Optionee ceases to be a Director for any reason other than the Optionee's death, any portion of this Stock Option outstanding on such date may be exercised, to the extent exercisable on the date the Optionee ceased to be a Director, for a period of 6 months from the date the Optionee ceased to be a Director or until the Expiration Date, if earlier. Any portion of this Stock Option that is not exercisable on the date the Optionee ceases to be a Director shall terminate immediately and be of no further force or effect.

4. Incorporation of Plan. Notwithstanding anything herein to the contrary, this Stock Option shall be subject to and governed by all the terms and conditions of the Plan, including the powers of the Administrator set forth in Section 2(b) of the Plan. Capitalized terms in this Agreement shall have the meaning specified in the Plan, unless a different meaning is specified herein.

5. Transferability. This Agreement is personal to the Optionee, is non-assignable and is not transferable in any manner, by operation of law or otherwise, other than by will or the laws of descent and distribution. This Stock Option is exercisable, during the Optionee's lifetime, only by the Optionee, and thereafter, only by the Optionee's legal representative or legatee.

6. No Obligation to Continue as a Director. Neither the Plan nor this Stock Option confers upon the Optionee any rights with respect to continuance as a Director.

7. Integration. This Agreement constitutes the entire agreement between the parties with respect to this Stock Option and supersedes all prior agreements and discussions between the parties concerning such subject matter.



---

8. Data Privacy Consent. In order to administer the Plan and this Agreement and to implement or structure future equity grants, the Company, its subsidiaries and affiliates and certain agents thereof (together, the "Relevant Companies") may process any and all personal or professional data, including but not limited to Social Security or other identification number, home address and telephone number, date of birth and other information that is necessary or desirable for the administration of the Plan and/or this Agreement (the "Relevant Information"). By entering into this Agreement, the Grantee (i) authorizes the Company to collect, process, register and transfer to the Relevant Companies all Relevant Information; (ii) waives any privacy rights the Grantee may have with respect to the Relevant Information; (iii) authorizes the Relevant Companies to store and transmit such information in electronic form; and (iv) authorizes the transfer of the Relevant Information to any jurisdiction in which the Relevant Companies consider appropriate. The Grantee shall have access to, and the right to change, the Relevant Information. Relevant Information will only be used in accordance with applicable law.

9. Notices. Notices hereunder shall be mailed or delivered to the Company at its principal place of business and shall be mailed or delivered to the Optionee at the address on file with the Company or, in either case, at such other address as one party may subsequently furnish to the other party in writing.

**CONTROL4 CORPORATION**

By: ______________________________
Title:

The foregoing Agreement is hereby accepted and the terms and conditions thereof hereby agreed to by the undersigned. Electronic acceptance of this Agreement pursuant to the Company's instructions to the Grantee (including through an online acceptance process) is acceptable.

Dated: ______________________________ ______________________________
Optionee's Signature

Optionee's name and address:

________________________________________

________________________________________

________________________________________



---

**RESTRICTED STOCK AWARD AGREEMENT**
**UNDER THE CONTROL4 CORPORATION**
**2013 STOCK OPTION AND INCENTIVE PLAN**

Name of Grantee:

No. of Shares:

Grant Date:

Pursuant to the Control4 Corporation 2013 Stock Option and Incentive Plan (the "Plan") as amended through the date hereof, Control4 Corporation (the "Company") hereby grants a Restricted Stock Award (an "Award") to the Grantee named above. Upon acceptance of this Award, the Grantee shall receive the number of shares of Common Stock, par value $0.0001 per share (the "Stock") of the Company specified above, subject to the restrictions and conditions set forth herein and in the Plan. The Company acknowledges the receipt from the Grantee of consideration with respect to the par value of the Stock in the form of cash, past or future services rendered to the Company by the Grantee or such other form of consideration as is acceptable to the Administrator.

1. Award. The shares of Restricted Stock awarded hereunder shall be issued and held by the Company's transfer agent in book entry form, and the Grantee's name shall be entered as the stockholder of record on the books of the Company. Thereupon, the Grantee shall have all the rights of a stockholder with respect to such shares, including voting and dividend rights, subject, however, to the restrictions and conditions specified in Paragraph 2 below. The Grantee shall (i) sign and deliver to the Company a copy of this Award Agreement and (ii) deliver to the Company a stock power endorsed in blank.

2. Restrictions and Conditions.

(a) Any book entries for the shares of Restricted Stock granted herein shall bear an appropriate legend, as determined by the Administrator in its sole discretion, to the effect that such shares are subject to restrictions as set forth herein and in the Plan.

(b) Shares of Restricted Stock granted herein may not be sold, assigned, transferred, pledged or otherwise encumbered or disposed of by the Grantee prior to vesting.

(c) If the Grantee's employment with the Company and its Subsidiaries is voluntarily or involuntarily terminated for any reason (including death) prior to vesting of shares of Restricted Stock granted herein, all shares of Restricted Stock shall immediately and automatically be forfeited and returned to the Company.

3. Vesting of Restricted Stock. The restrictions and conditions in Paragraph 2 of this Agreement shall lapse on the Vesting Date or Dates specified in the following schedule so long as the Grantee remains an employee of the Company or a Subsidiary on such Dates. If a series

---

of Vesting Dates is specified, then the restrictions and conditions in Paragraph 2 shall lapse only with respect to the number of shares of Restricted Stock specified as vested on such date.

| Incremental Number of Shares Vested | Vesting Date |
|---|---|
| ( %) | |
| ( %) | |
| ( %) | |
| ( %) | |

( %)

Subsequent to such Vesting Date or Dates, the shares of Stock on which all restrictions and conditions have lapsed shall no longer be deemed Restricted Stock. The Administrator may at any time accelerate the vesting schedule specified in this Paragraph 3.

4. Dividends. Dividends on shares of Restricted Stock shall be paid currently to the Grantee.

5. Incorporation of Plan. Notwithstanding anything herein to the contrary, this Award shall be subject to and governed by all the terms and conditions of the Plan, including the powers of the Administrator set forth in Section 2(b) of the Plan. Capitalized terms in this Agreement shall have the meaning specified in the Plan, unless a different meaning is specified herein.

6. Transferability. This Agreement is personal to the Grantee, is non-assignable and is not transferable in any manner, by operation of law or otherwise, other than by will or the laws of descent and distribution.

7. Tax Withholding. The Grantee shall, not later than the date as of which the receipt of this Award becomes a taxable event for Federal income tax purposes, pay to the Company or make arrangements satisfactory to the Administrator for payment of any Federal, state, and local taxes required by law to be withheld on account of such taxable event. Except in the case where an election is made pursuant to Paragraph 8 below, the Company shall have the authority to cause the required minimum tax withholding obligation to be satisfied, in whole or in part, by withholding from shares of Stock to be issued or released by the transfer agent a number of shares of Stock with an aggregate Fair Market Value that would satisfy the minimum withholding amount due.

8. Election Under Section 83(b). The Grantee and the Company hereby agree that the Grantee may, within 30 days following the Grant Date of this Award, file with the Internal Revenue Service and the Company an election under Section 83(b) of the Internal Revenue Code. In the event the Grantee makes such an election, he or she agrees to provide a copy of the election to the Company. The Grantee acknowledges that he or she is responsible for obtaining the advice of his or her tax advisors with regard to the Section 83(b) election and that he or she is relying solely on such advisors and not on any statements or representations of the Company or any of its agents with regard to such election.

2

---

9. No Obligation to Continue Employment. Neither the Company nor any Subsidiary is obligated by or as a result of the Plan or this Agreement to continue the Grantee in employment and neither the Plan nor this Agreement shall interfere in any way with the right of the Company or any Subsidiary to terminate the employment of the Grantee at any time.

10. Integration. This Agreement constitutes the entire agreement between the parties with respect to this Award and supersedes all prior agreements and discussions between the parties concerning such subject matter.

11. Data Privacy Consent. In order to administer the Plan and this Agreement and to implement or structure future equity grants, the Company, its subsidiaries and affiliates and certain agents thereof (together, the "Relevant Companies") may process any and all personal or professional data, including but not limited to Social Security or other identification number, home address and telephone number, date of birth and other information that is necessary or desirable for the administration of the Plan and/or this Agreement (the "Relevant Information"). By entering into this Agreement, the Grantee (i) authorizes the Company to collect, process, register and transfer to the Relevant Companies all Relevant Information; (ii) waives any privacy rights the Grantee may have with respect to the Relevant Information; (iii) authorizes the Relevant Companies to store and transmit such information in electronic form; and (iv) authorizes the transfer of the Relevant Information to any jurisdiction in which the Relevant Companies consider appropriate. The Grantee shall have access to, and the right to change, the Relevant Information. Relevant Information will only be used in accordance with applicable law.

3

---

12. Notices. Notices hereunder shall be mailed or delivered to the Company at its principal place of business and shall be mailed or delivered to the Grantee at the address on file with the Company or, in either case, at such other address as one party may subsequently furnish to the other party in writing.

**CONTROL4 CORPORATION**

By: ______________________________
Title:

The foregoing Agreement is hereby accepted and the terms and conditions thereof hereby agreed to by the undersigned. Electronic acceptance of this Agreement pursuant

to the Company's instructions to the Grantee (including through an online acceptance process) is acceptable.

Dated: ______________________

______________________
Grantee's Signature

Grantee's name and address:

______________________

______________________

______________________



**RESTRICTED STOCK UNIT AWARD AGREEMENT**
**FOR COMPANY EMPLOYEES**
**UNDER THE CONTROL4 CORPORATION**
**2013 STOCK OPTION AND INCENTIVE PLAN**

Name of Grantee:

No. of Restricted Stock Units:

Grant Date:

Pursuant to the Control4 Corporation 2013 Stock Option and Incentive Plan as amended through the date hereof (the "Plan"), Control4 Corporation (the "Company") hereby grants an award of the number of Restricted Stock Units listed above (an "Award") to the Grantee named above. Each Restricted Stock Unit shall relate to one share of Common Stock, par value $0.0001 per share (the "Stock") of the Company.

1. Restrictions on Transfer of Award. This Award may not be sold, transferred, pledged, assigned or otherwise encumbered or disposed of by the Grantee, and any shares of Stock issuable with respect to the Award may not be sold, transferred, pledged, assigned or otherwise encumbered or disposed of until (i) the Restricted Stock Units have vested as provided in Paragraph 2 of this Agreement and (ii) shares of Stock have been issued to the Grantee in accordance with the terms of the Plan and this Agreement.

2. Vesting of Restricted Stock Units. The restrictions and conditions of Paragraph 1 of this Agreement shall lapse on the Vesting Date or Dates specified in the following schedule so long as the Grantee remains an employee of the Company or a Subsidiary on such Dates. If a series of Vesting Dates is specified, then the restrictions and conditions in Paragraph 1 shall lapse only with respect to the number of Restricted Stock Units specified as vested on such date.

| Incremental Number of Restricted Stock Units Vested | Vesting Date |
| --- | --- |
| ( %) | |
| ( %) | |
| ( %) | |
| ( %) | |

The Administrator may at any time accelerate the vesting schedule specified in this Paragraph 2.

3. Termination of Employment. If the Grantee's employment with the Company and its Subsidiaries terminates for any reason (including death or disability) prior to the satisfaction of the vesting conditions set forth in Paragraph 2 above, any Restricted Stock Units that have not vested as of such date shall automatically and without notice terminate and be forfeited, and neither the Grantee nor any of his or her successors, heirs, assigns, or personal representatives will thereafter have any further rights or interests in such unvested Restricted Stock Units.

4. Issuance of Shares of Stock. As soon as practicable following each Vesting Date (but in no event later than two and one-half months after the end of the year in which the Vesting Date occurs), the Company shall issue to the Grantee the number of shares of Stock equal to the aggregate number of Restricted Stock Units that have vested pursuant to Paragraph 2 of this Agreement on such date and the Grantee shall thereafter have all the rights of a stockholder of the Company with respect to such shares.

5. Incorporation of Plan. Notwithstanding anything herein to the contrary, this Agreement shall be subject to and governed by all the terms and conditions of the Plan, including the powers of the Administrator set forth in Section 2(b) of the Plan. Capitalized terms in this Agreement shall have the meaning specified in the Plan, unless a different meaning is specified herein.

6. Tax Withholding. The Grantee shall, not later than the date as of which the receipt of this Award becomes a taxable event for Federal income tax purposes, pay to the Company or make arrangements satisfactory to the Administrator for payment of any Federal, state, and local taxes required by law to be withheld on account of such taxable event. The Company shall have the authority to cause the required minimum tax withholding obligation to be satisfied, in whole or in part, by withholding from shares of Stock to be issued to the Grantee a number of shares of Stock with an aggregate Fair Market Value that would satisfy the withholding amount due.

7. Section 409A of the Code. This Agreement shall be interpreted in such a manner that all provisions relating to the settlement of the Award are exempt from the requirements of Section 409A of the Code as "short-term deferrals" as described in Section 409A of the Code.

8. No Obligation to Continue Employment. Neither the Company nor any Subsidiary is obligated by or as a result of the Plan or this Agreement to continue the Grantee in employment and neither the Plan nor this Agreement shall interfere in any way with the right of the Company or any Subsidiary to terminate the employment of the Grantee at any time.

9. Integration. This Agreement constitutes the entire agreement between the parties with respect to this Award and supersedes all prior agreements and discussions between the parties concerning such subject matter.

10. Data Privacy Consent. In order to administer the Plan and this Agreement and to implement or structure future equity grants, the Company, its subsidiaries and affiliates and certain agents thereof (together, the "Relevant Companies") may process any and all personal or professional data, including but not limited to Social Security or other identification number, home address and telephone number, date of birth and other information that is necessary or desirable for the administration of the Plan and/or this Agreement (the "Relevant Information"). By entering into this Agreement, the Grantee (i) authorizes the Company to collect, process, register and transfer to the Relevant Companies all Relevant Information; (ii) waives any privacy rights the Grantee may have with respect to the Relevant Information; (iii) authorizes the Relevant Companies to store and transmit such information in electronic form; and (iv)



---

authorizes the transfer of the Relevant Information to any jurisdiction in which the Relevant Companies consider appropriate. The Grantee shall have access to, and the right to change, the Relevant Information. Relevant Information will only be used in accordance with applicable law.

11. Notices. Notices hereunder shall be mailed or delivered to the Company at its principal place of business and shall be mailed or delivered to the Grantee at the address on file with the Company or, in either case, at such other address as one party may subsequently furnish to the other party in writing.

**CONTROL4 CORPORATION**

By: ______________________________

Title:

The foregoing Agreement is hereby accepted and the terms and conditions thereof hereby agreed to by the undersigned. Electronic acceptance of this Agreement pursuant to the Company's instructions to the Grantee (including through an online acceptance process) is acceptable.

Dated: ______________________________

______________________________
Grantee's Signature

Grantee's name and address:

______________________________

**RESTRICTED STOCK UNIT AWARD AGREEMENT**
**FOR NON-EMPLOYEE DIRECTORS**
**UNDER THE CONTROL4 CORPORATION**
**2013 STOCK OPTION AND INCENTIVE PLAN**

Name of Grantee:

No. of Restricted Stock Units:

Grant Date:

Pursuant to the Control4 Corporation 2013 Stock Option and Incentive Plan as amended through the date hereof (the "Plan"), Control4 Corporation (the "Company") hereby grants an award of the number of Restricted Stock Units listed above (an "Award") to the Grantee named above. Each Restricted Stock Unit shall relate to one share of Common Stock, par value $0.0001 per share (the "Stock") of the Company.

1. Restrictions on Transfer of Award. This Award may not be sold, transferred, pledged, assigned or otherwise encumbered or disposed of by the Grantee, and any shares of Stock issuable with respect to the Award may not be sold, transferred, pledged, assigned or otherwise encumbered or disposed of until (i) the Restricted Stock Units have vested as provided in Paragraph 2 of this Agreement and (ii) shares of Stock have been issued to the Grantee in accordance with the terms of the Plan and this Agreement.

2. Vesting of Restricted Stock Units. The restrictions and conditions of Paragraph 1 of this Agreement shall lapse on the Vesting Date or Dates specified in the following schedule so long as the Grantee remains in service as a member of the Board on such Dates. If a series of Vesting Dates is specified, then the restrictions and conditions in Paragraph 1 shall lapse only with respect to the number of Restricted Stock Units specified as vested on such date.

| Incremental Number of Restricted Stock Units Vested | Vesting Date |
|---|---|
| ( %) | |
| ( %) | |
| ( %) | |
| ( %) | |

The Administrator may at any time accelerate the vesting schedule specified in this Paragraph 2.

3. Termination of Service. If the Grantee's service with the Company and its Subsidiaries terminates for any reason (including death or disability) prior to the satisfaction of the vesting conditions set forth in Paragraph 2 above, any Restricted Stock Units that have not vested as of such date shall automatically and without notice terminate and be forfeited, and neither the Grantee nor any of his or her successors, heirs, assigns, or personal representatives will thereafter have any further rights or interests in such unvested Restricted Stock Units.

4. Issuance of Shares of Stock. As soon as practicable following each Vesting Date (but in no event later than two and one-half months after the end of the year in which the Vesting Date occurs), the Company shall issue to the Grantee the number of shares of Stock equal to the aggregate number of Restricted Stock Units that have vested pursuant to Paragraph 2 of this Agreement on such date and the Grantee shall thereafter have all the rights of a stockholder of the Company with respect to such shares.

5. Incorporation of Plan. Notwithstanding anything herein to the contrary, this Agreement shall be subject to and governed by all the terms and conditions of the Plan, including the powers of the Administrator set forth in Section 2(b) of the Plan. Capitalized terms in this Agreement shall have the meaning specified in the Plan, unless a different meaning is specified herein.

6. Section 409A of the Code. This Agreement shall be interpreted in such a manner that all provisions relating to the settlement of the Award are exempt from the requirements of Section 409A of the Code as "short-term deferrals" as described in Section 409A of the Code.

7. No Obligation to Continue as a Director. Neither the Plan nor this Award confers upon the Grantee any rights with respect to continuance as a Director.

8. Integration. This Agreement constitutes the entire agreement between the parties with respect to this Award and supersedes all prior agreements and discussions between the parties concerning such subject matter.

9. Data Privacy Consent. In order to administer the Plan and this Agreement and to implement or structure future equity grants, the Company, its subsidiaries and affiliates and certain agents thereof (together, the "Relevant Companies") may process any and all personal or professional data, including but not limited to Social Security or other identification number, home address and telephone number, date of birth and other information that is necessary or desirable for the administration of the Plan and/or this Agreement (the "Relevant Information"). By entering into this Agreement, the Grantee (i) authorizes the Company to collect, process, register and transfer to the Relevant Companies all Relevant Information; (ii) waives any privacy rights the Grantee may have with respect to the Relevant Information; (iii) authorizes the Relevant Companies to store and transmit such information in electronic form; and (iv) authorizes the transfer of the Relevant Information to any jurisdiction in which the Relevant Companies consider appropriate. The Grantee shall have access to, and the right to change, the Relevant Information. Relevant Information will only be used in accordance with applicable law.



---

10. Notices. Notices hereunder shall be mailed or delivered to the Company at its principal place of business and shall be mailed or delivered to the Grantee at the address on file with the Company or, in either case, at such other address as one party may subsequently furnish to the other party in writing.

**CONTROL4 CORPORATION**

By: ______________________________

Title:

The foregoing Agreement is hereby accepted and the terms and conditions thereof hereby agreed to by the undersigned. Electronic acceptance of this Agreement pursuant to the Company's instructions to the Grantee (including through an online acceptance process) is acceptable.

Dated: ______________________________

______________________________
Grantee's Signature

Grantee's name and address:

______________________________

______________________________

______________________________



---

**Exhibit 10.4**

August 20, 2011

Martin Plaehn

Dear Martin:

On behalf of Control4 Corporation (the "***Company***"), I am pleased to present you this offer of employment. The terms of this offer, should you accept this opportunity, are as follows:

1. **Employment**. Effective as of October 17, 2011, or such earlier date as we may mutually agree (the "***Start Date***"), you will be appointed to serve in a full-time capacity as the Company's President and Chief Executive Officer. In such capacity, you will report directly to the Board of Directors of the Company (the "***Board***"). Your employment with the Company will be for an unspecified duration and will constitute "*at-will*" employment, meaning either you or the Company may terminate your employment relationship at any time, and for any or no reason, with or without Cause subject to the terms and conditions of this Agreement. The "*at-will*" nature of your employment may only he changed in a document signed by you and a duly authorized member of the Board. Your position will be classified as "exempt" and you will not be eligible for overtime pay.

2. **Compensation**.

(a) *Base Salary*. You will be paid a base salary at the annual rate of $360,000 (the "***Base Salary***"), less applicable deductions and withholdings, paid in accordance with the Company's standard payroll procedures. The Board will review your Base Salary annually, and, in its sole discretion, consider any increases it deems warranted at that time.

(b) *Equity Incentives*. The Company will request that the Board approve the grant to you of an option (the "***Option***") to purchase shares of Company Common Stock equal to 2.7% of the Company's fully diluted shares, calculated as of the Start Date. The Option shall vest as follows: 25% of the shares purchasable upon exercise of the Option shall vest on the one-year anniversary of the Start Date, with the rest of the shares purchasable upon exercise of the Option to vest in equal monthly installments over the ensuing 36 months thereafter. In addition to the Option, the Company will request that the Board approve a second grant to you of an option (the "***Milestone Option***") to purchase additional shares of Company Common Stock equal to 0.6% of the Company's fully diluted shares, calculated as of the Start Date. The Milestone Option shall vest on the same time-based vesting schedule as the Option if, and only if, certain annual objectives (the "***Milestones***"), as mutually agreed by you and the Board, are achieved. For the avoidance of doubt, upon the failure to achieve any given Milestone, the options related to such Milestone shall be immediately terminated and returned to the Company's equity incentive plan and shall not be eligible for any vesting acceleration as set forth below in Section 5(d).

(c) *Bonus*. Beginning in 2012, you will be eligible to receive an annual performance bonus of up to 30% of your Base Salary, based upon criterion to be established by the Board in its sole discretion.

---

(d) *Business Expenses*. The Company will reimburse you for reasonable business expenses incurred by you from time to time in accordance with applicable Company travel and expense policies, including, if necessary, travel to the Company's headquarters prior to the Start Date.

(e) *Relocation Expenses*. In connection your employment, you will move to the Salt Lake City, Utah area, and the Company will pay for in advance (or, for smaller expenses, reimburse you for upon presentation of reasonable documentation) reasonable and customary moving expenses associated with locating and purchasing or leasing housing (not including payment for such housing), transportation for your household goods and immediate family, and directly related expenses associated with this move (including taxes on any relocation payment or reimbursement that are taxable to you).

3. **Taxes and 409A Compliance**.

(a) The intent of the parties is that payments and benefits under this Agreement comply with Code Section 409A and the regulations and guidance promulgated thereunder (collectively "***Code Section 409A***") and, accordingly, to the maximum extent permitted, this Agreement shall be interpreted to be in compliance therewith. In no event whatsoever shall the Company be liable for any additional tax, interest or penalty that may be imposed on you by Code Section 409A or damages for failing to comply with Code Section 409A.

(b) A termination of employment shall not be deemed to have occurred for purposes of any provision of this Agreement providing for the payment of any amounts or benefits upon or following a termination of employment unless such termination is also a "separation from service" within the meaning of Code Section 409A and, for purposes of any such provision of this Agreement, references to a "termination," "termination of employment" or like terms shall mean "separation from service." Notwithstanding anything to the contrary in this Agreement, if you are deemed on the date of termination to be a "specified employee" within the meaning of that term under Code Section 409A(a)(2)(B), then with regard to any payment or the provision of any benefit that is considered deferred compensation under Code Section 409A payable on account of a "separation from service," such payment or benefit shall not be made or provided until the date which is the earlier of (i) the expiration of the six (6)-month period measured from the date of your "separation from service," and (ii) the date of your death, to the extent required under Code Section 409A. Upon the expiration of the foregoing delay period, all payments and benefits delayed pursuant to this Section 3(b) (whether they would have otherwise been payable in a single sum or in installments in the absence of such delay) shall be paid or reimbursed to you in a lump sum, and any remaining payments and benefits due under this Agreement shall be paid or provided in accordance with the normal payment dates specified for them herein.

(c) To the extent that reimbursements or other in-kind benefits under this Agreement constitute "nonqualified deferred compensation" for purposes of Code Section 409A, (i) all expenses or other reimbursements hereunder shall be made on or prior to the last day of the taxable year following the taxable year in which such expenses were incurred by you, (ii) any right to reimbursement or in-kind benefits shall not be subject to liquidation or exchange for another benefit, and (iii) no such reimbursement, expenses eligible for reimbursement, or in-kind

benefits provided in any taxable year shall in any way affect the expenses eligible for reimbursement, or in-kind benefits to be provided, in any other taxable year.

(d) For purposes of Code Section 409A, your right to receive any installment payments pursuant to this Agreement shall be treated as a right to receive a series of separate and distinct payments. Whenever a payment under this Agreement specifics a payment period with reference to a number of days, the actual date of payment within the specified period shall be within the sole discretion of the Company.

(e) Notwithstanding any other provision of this Agreement to the contrary, in no event shall any payment under this Agreement that constitutes "nonqualified deferred compensation" for purposes of Code Section 409A be subject to offset by any other amount unless otherwise permitted by Code Section 409A.

(f) All payments and benefits provided herein shall be subject to withholding of taxes and other amounts as are required by law to be withheld.

(g) Notwithstanding any provision of this Agreement to the contrary, the Company may unilaterally amend this Agreement to the extent it deems necessary to avoid the imposition of excise taxes, penalties or similar charges on the Company as a result of this Agreement being considered to be "discriminatory," including, without limitation, any penalties under Section 4980D of the Code.

4. **Termination of Employment**. Upon the termination of your employment for any reason, you shall be entitled to the compensation, benefits and reimbursements then due and owing for the period ending as of the end of the effective date of the termination (the "***Termination Date***") and the Company shall make the following payments to you (or your beneficiaries or estate if applicable) on your Termination Date: (i) all accrued but unpaid salary and any unpaid vacation that has accrued pursuant to the Company's vacation accrual policy through the Termination Date, (ii) any earned but unpaid bonuses, (iii) any unreimbursed business expenses, and in addition (iv) you will continue to be able to exercise any vested and exercisable stock options then held by you pursuant to their terms and conditions (collectively, (i) through (iv) are the "***Accrued Benefits***"). In addition, you may also be eligible for other post-employment payments and benefits as provided in this Agreement or pursuant to other agreements or plans with the Company that you enter into from time to time.

(a) *By Death*. Your employment shall terminate automatically upon your death. The Company shall pay to your beneficiaries or estate, as appropriate, any compensation then due and owing, including the Accrued Benefits, and any other benefits provided hereunder, including without limitation the ability to exercise any vested and exercisable options held by you. Thereafter, all obligations of the Company under this Agreement shall cease.

(b) *By Disability*. For purposes of this Agreement, "disability" means a mental or physical Impairment that is expected to result in death or that has lasted or is expected to last for a continuous period of three (3) months or more and that causes you to be unable to perform your duties under this Agreement and to be engaged in any substantial gainful activity. If you experience such a disability, then, to the extent permitted by law, the Company may terminate

---

your employment upon sixty (60) days' advance written notice. Termination by disability shall be determined by a physician selected by the Board, if such physician is unable to schedule an appointment with you within ten business days of physician's written request, the Board is authorized to determine whether your disability has occurred at its sole discretion. The Company shall pay you all compensation to which you are entitled up through the last business day of the notice period, including all Accrued Benefits, and any other benefits provided hereunder, including without limitation the exercisability of any vested and exercisable option held by you; thereafter, all obligations of Company under this Agreement shall cease. Nothing in this subsection shall affect your rights under any applicable Company disability plan. Termination by disability shall not constitute termination without Cause or for resignation for Good Reason.

(c) *By Company Not For Cause or By You for Good Reason*. At any time, Company may terminate your employment without Cause by providing you written notice of such termination or you may terminate your employment. In either event, the Company will pay to you the Accrued Benefits and all post-termination payments and benefits when due as provided in this Agreement. As a condition to your receipt of such benefits, you will be required to comply with your continuing obligations (including without limitation the return of any Company properly and the non-competition and non-solicitation obligations set forth herein), resign from all positions you hold with the Company, and execute the Company's standard form of release agreement attached as an exhibit to this Agreement (Exhibit A) in which you agree to fully release the Company and its representatives from any and all claims you may have, and such release must become effective no later than sixty (60) days following your termination. Thereafter, all obligations of the Company under this Agreement will cease except as set forth herein.

(d) *By Company For Cause*. At any time, unless such actions are cured as described below, and without prior notice for actions that are not curable, the Company may terminate your employment for Cause. In such event, the Company will pay to you the Accrued Benefits. Thereafter, all obligations of the Company under this Agreement will cease except as set forth herein.

(e) *By You Without Good Reason*. At any time you may terminate your employment voluntarily and without Good Reason. In such event, the Company will pay to you the Accrued Benefits. Thereafter, all obligations of the Company under this Agreement will cease except as set forth herein.

5. **Severance Benefits**. Subject to the conditions set forth in Section 4(c) above, in the event your employment with the Company is terminated by the Company without Cause or by you for Good Reason, then you will be entitled to receive:

(a) the continued payment of your Base Salary for six months (6) months, provided, however, (i) after the Company's initial public offering, or (ii) if your termination without Cause or due to Good Reason occurs within ninety (90) days prior to or within 12 months after a Change of Control, the continued payment of your

Base Salary shall be for twelve (12) months (the "***Cash Severance***"). Notwithstanding the foregoing, if the Cash Severance constitutes deferred compensation for purposes of Code Section 409A as determined by the Company, such

---

payments shall commence upon the 60th date following your date of termination (and the first payment shall include payment of all amounts that otherwise would have been due prior thereto under the terms of this Agreement had such payments commenced immediately upon your termination, and any payments thereafter shall continue as provided herein);

(b) Company paid group medical, dental and vision coverage for you and your dependents (at the same coverage levels that you had on the date of your termination) commencing as of the first day of the month immediately following your termination and continuing for the duration of twelve (12) months;

(c) the Accrued Benefits;

(d) if such termination without Cause or due to Good Reason occurs (i) during the first year of your employment and within ninety (90) days prior to or within twelve (12) months after a Change of Control, accelerated vesting of (A) 50% of the then unvested shares purchasable upon exercise of the Option and (B) 25% of the Milestone Option; and (ii) after the first year of your employment and within ninety (90) days prior to or within 12 months after a Change of Control, accelerated vesting of (A) 100% of the then unvested shares purchasable upon exercise of the Option, and (B) the greater of either, (x) 50% of the then unvested portion of the Milestone Option, or (y) 25% of the total Milestone Option.; and

(e) a twelve (12) month period to purchase any or all vested shares through the exercise of your Option and Milestone Option.

For purposes of clarity, you will not be entitled to receive the foregoing benefits of subsection 5(a) through (c) should your employment terminate for Cause (as provided in Section 4(d) above) or should you terminate your employment other than for Good Reason (as provided in Section 4(e) above).

6. **Benefits**. You will be entitled to continue to participate in the Company's basic employment benefits available to all Company employees, as currently in effect or as the Company may revise such benefits in the future, in its sole discretion. As you know, participation in Company benefit programs may require payroll deductions and/or direct contributions by you.

7. **Vacation**. You will be entitled to accrue up to three (3) weeks of vacation leave consisting of fifteen (15) business days earned on an annual, pro-rata basis throughout each calendar year of employment, all in accordance with the Company's standard vacation policy in effect from time to time and approved by the Board of Directors. Employee's vacation accrual will be pro-rated for the remainder of this calendar year. Once the maximum vacation accrual is reached, no further vacation will accrue. When some vacation is used, vacation will begin to accrue again and there will be no retroactive grant of vacation for the period of time the accrued vacation was at the maximum accrual balance. Any accrued and unused vacation will be paid to you in cash upon your termination of employment.

8. **Confidentiality Agreement**. As a condition of employment, you agree to enter into the Company's standard Confidential Information and Intellectual Property Assignment Agreement (the "***PIIA***"), a copy of which is attached hereto as Exhibit B.

---

9. **Noncompetition and Nondisparagement**.

(a) During the term of your employment with the Company and for eighteen (18) months after termination, for any reason, of your employment with the Company, you shall not directly or indirectly, own, manage, operate, join or control, be employed by or participate in the ownership, management, operation or control of, or be a consultant to or connected in any other manner with, any business, firm or corporation which is similar to or competes with a principal business of the Company or its subsidiaries; provided, however, that your ownership of securities of any company not in excess of one percent of any class of such securities shall not be a violation of this provision. You acknowledge that the foregoing is in addition to your obligations under the PIIA.

(b) From the date hereof and forever hereafter, you expressly agree not to disparage the Company, its past and present investors, officers, directors or employees or its affiliates and to keep all confidential and proprietary information about the past or present business affairs of the Company and its affiliates confidential unless a prior written release from the Company is obtained or unless disclosure is required by law.

10. **Defined Terms**: For purposes of this Agreement, the following terms will mean:

(a) "***Cause***" shall be defined as (1) your repeated failure, in the reasonable judgment of the Board to perform one or more of your essential and material duties and responsibilities to the Company after formal written notice thereof from the Board to you describing your failure to perform such essential and material duties or responsibilities and, if such failure is remediable, your failure to remedy same within 10 business days of receiving written notice; (2) your refusal or failure to comply with the legal directives of the Board after formal written notice thereof to you describing your failure to comply and, if such failure is remediable, your failure to remedy same within 10 business days of receiving written notice; (3) your material violation of any material Company policy; (4) your commission or conviction of, or entry of a plea of

nolo contendere to, any felony or any act of fraud, embezzlement, dishonesty, moral turpitude, misappropriation or any other misconduct that has caused or is reasonably expected to result in material injury to the Company or its affiliates; (5) your unauthorized use or disclosure of any proprietary information or trade secrets of the Company or any other party to whom the Company owes an obligation of nondisclosure as a result of a relationship with the Company; (6) your material breach of any obligations under any written agreement or covenant with the Company; or (7) your violation of a federal or state law or regulation applicable to the Company which violation was or is reasonably likely to be injurious to the Company; provided, however, that a finding of any of the above shall be predicated on a good faith determination by the Board.

(b) "***Change of Control***" means a transaction or series of related transactions that constitutes a "***Deemed Liquidation***" in accordance with the Company's then-current Certificate of incorporation, as amended from time to time (proved that such amendment shall not be formulated with the intention of denying the benefits of this paragraph to you).

(c) "***Code***" means the Internal Revenue Code of 1986, as amended.

---

(d) "***Disability***" means you have a mental or physical impairment that is expected to result in death or that has lasted or is expected to last for a continuous period of three months or more and that causes you to be unable to perform your duties under this Agreement and to be engaged in any substantial gainful activity.

(e) "***Good Reason***" for your resignation shall mean that your continuous status as an employee was "constructively terminated" by the Company if within 90 days after the occurrence of one of the following Company actions (unless you consent in writing to such action(s)), and after providing the Company with a reasonable opportunity to cure such action(s), you resign in writing from your employment with the Company: (1) a material reduction in your base salary as in effect immediately before such reduction; or (2) the relocation by the Company of your then-current work site that has the effect of increasing your then-current commute by more than 50 miles (not including any regular business travel consistent with the business travel requirements of the your position with the Company).

11. **Governing Law**. This Agreement will be construed in accordance with, and governed by, the laws of the State of Utah without regard to its conflicts of law principles. Please note that this Agreement (together with the PIIA, and the documentation memorializing the Option and the Milestone Option) represent the entire agreement and understanding between you and the Company regarding your employment with the Company and supersede any and all prior representations, promises or agreements, whether written or oral. To the extent that the practices, policies or procedures of Company or any other document referenced in this Agreement, now or in the future, apply to you, are inconsistent with the terms of this Agreement, the provisions of this Agreement will control.

***********************

If you are in agreement with the above, please execute a copy of this Agreement where indicated below, and return an executed copy to the Company via fax or email PDF.

***********************

Sincerely,

*CONTROL4 CORPORATION*

By: ______________________

Name: ______________________

Title: ______________________

ACCEPTED AND AGREED:

/s/ Martin Plaehn
______________________
Martin Plaehn
Aug 20, 2011

---

**EXHIBIT A**

**Standard Release upon Employment Termination**

## SEPARATION AGREEMENT AND RELEASE

This Separation Agreement and Release ("Agreement") is made and entered into as of the day of 20 , by and between ("Employee") and Control4 Corporation ("Employer"), who shall be referred to collectively as the "Parties" and each individually as a "Party."

## DEFINITIONS

1. "Employee" shall include Employee and Employee's heirs, assigns, and legal representatives.

2. The phrase "employer Released Parties" shall mean Control4 Corporation and any and all of its business units, committees and groups, as well as its present, former or future parents, affiliates, subsidiaries, directors, officers, attorneys, successors, predecessors, and assigns.

3. The "Released Claims" shall mean any type or manner of suits, claims, demands, allegations, charges, damages, or causes of action whatsoever in law or in equity under federal, state, municipal or local statute law, ordinance, regulation, constitution, or common law, whether known or unknown, which Employee has ever had or now has against the Employer Released Parties. This includes but is not limited to any action for costs, interest or attorney's fees, which arise in whole or in part (i) from Employee's employment relationship with Employer, (ii) from the ending of that relationship, and (iii) from any other conduct by or dealings of any kind between Employee and the Employer Released Parties, which occurred prior to the execution of this Agreement. This also includes but is not limited to any and all claims, rights, demands, allegations and causes of action for alleged wrongful discharge, breach of alleged employment contract, breach of the covenant of good faith and fair dealing, termination in violation of public policy, intentional or negligent infliction of emotional distress, fraud, misrepresentation, defamation, interference with prospective economic advantage, failure to pay wages due or other monies owed, failure to pay pension benefits, conversion, breach of duty, interference with existing economic relations, punitive damages, retaliation, discrimination on the basis of age in violation of the Age Discrimination and Employment Act of 1967, as amended ("ADEA"), harassment or discrimination on the basis of sex, race, color, citizenship, religion, age, national origin, or disability, or other protected classification under the federal, state, municipal or local laws of employment, including those arising under the common law, and any alleged violation of the Employee Retirement Income Security Act of 1974 ("ERISA"), the Family and Medical Leave Act, the Fair Labor Standards Act ("FLSA"), the Occupational Safety and Health Act ("OSHA"), Title VII of the Civil Rights Act of 1964, as amended, the Americans with Disabilities Act, the Washington State Law Against Discrimination, the Utah Antidiscrimination Act, the California Fair Employment and Housing Act and any other state law to similar effect, the California Family Rights Act, as well as any other federal, state or local laws or regulations concerning discrimination or harassment, wages or compensation or wrongful termination. The "Released Claims" shall not mean (i) any rights of indemnity against Employer that Employee may have as a former employee of Employer, or (ii) any claims that may not be released by law.

---

## RECITALS

A. The Parties desire to settle and compromise the Released Claims and to enter into this Agreement.

B. This Agreement releases any claims Employee may have against the Employer Released Parties under the Age Discrimination in Employment Act. Employer is providing Employee with 21 days to review this Agreement and seek advice and counsel. If Employee chooses to sign this Agreement, Employee will have seven days to revoke this Agreement, if Employee chooses, and this Agreement will not become effective and enforceable until the seven day revocation period has passed without Employee revoking this Agreement. Employer advises Employee to consult an attorney of his own choosing before signing this Agreement.

## COVENANTS

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and in consideration of the mutual covenants set forth in this Agreement the Parties agree as follows:

1. Employee's employment with Employer is terminated effective (the "Termination Date"). All employment compensation due to Employee has been paid to Employee by Employer.

2. Employer, shall grant Employee the severance benefits set forth in Section 5 of that certain employment agreement between Employer and Employee, dated as of August , 2011, as may be amended from time to time. Employer will pay such severance benefits to Employee within fifteen business days after this Agreement becomes effective as provided in Paragraph 15 hereof, and only if this Agreement becomes effective as provided therein. The foregoing amount is consideration for Employee's release of all of the Released Claims, including attorney's fees, costs, interest and all other expenses which may have been incurred. Employee assumes full and sole responsibility for any tax consequences related to this Agreement. Employee acknowledges that this consideration listed in this paragraph constitutes consideration for this Agreement and is separate from and in addition to anything Employee is entitled to receive from Employer. Employee acknowledges that Employee has been fully compensated by the terms of this Agreement for releasing the Released Claims.

3. Employee shall not pursue, or authorize anyone on Employee's behalf to pursue, the Released Claims in any way in any court. Employee represents that Employee has not filed and there is not pending with any governmental agency or any state or federal court, any other claims, complaints, charges, or lawsuits of any kind

against the Employer Released Parties. Employee agrees that Employee will not make any filings with any court at any time hereafter for any matter, claim or incident, known or unknown, which occurred or arose out of occurrences on or prior to the date of this Agreement; provided, however, this shall not limit either of the Parties from filing a lawsuit for the sole purpose of enforcing its rights under this Agreement. Each of the Parties shall bear its own costs and attorneys' fees in this dispute.

4. Employee hereby waives, releases, remises and discharges each and every one of the Employer Released Parties from liability with respect to the Released Claims. Employee

---

acknowledges that Employee understands that Employee is prohibited from receiving any further relief on the Released Claims. Employee hereby promises and covenants never to institute any suit or action at law or in equity against the Employer Released Parties regarding or relating to the Released Claims. Specifically and without limitation, Employee understands and agrees that that Employee is waiving and forever discharging the Employer Released Parties from any and all claims, causes of action or complaints that Employee may have or have ever had, which have or may have arisen prior to the execution of this Agreement.

5. Employee represents and warrants that Employee is the sole owner of the Released Claims, that the Released Claims have not been assigned, transferred, or disposed of in fact, by operation of law or in any manner whatsoever, and that Employee has the full right and power to grant, execute and deliver the full and complete releases, undertakings, and agreements herein contained.

6. It is the intention of Employee and Employer that this Agreement is a general release that will be effective as a bar to each and every claim, demand, or cause of action it releases. Employee recognizes that Employee may have some claim, demand, or cause of action against Employer or one or more of the Employer Released Parties of which Employee is totally unaware and unsuspecting which Employee is giving up by execution of this Agreement. It is the intention of Employee in executing this Agreement that it will deprive Employee of each such claim, demand or cause of action and prevent Employee from asserting it against the Employer Released Parties. In furtherance of this intention. Employee expressly waives any rights or benefits conferred by the provisions of Section 1542 of the Civil Code of the State of California (or any other law of any other jurisdiction of similar import), which provides as follows:

**"A general release does not extend to claims which the creditor does not know or suspect to exist in his or her favor at the time of executing the release, which if known by him or her must have materially affected his or her settlement with the debtor."**

Employee understands the statutory language of Section 1542 of the California Civil Code but nevertheless elects to and hereby does release the Employer Released Parties from all claims Employee may have against the Employer Released Parties, or any of them, whether known or unknown, as herein provided, and specifically waives any rights which Employee may have under said Civil Code Section (or any other law of any other jurisdiction of similar import). Employee fully understands that if the facts with respect to this Agreement are found hereafter to be other than or different from the facts now believed by Employee to be true, Employee expressly accepts and assumes the risk of such possible difference in fact and agrees that this Agreement will be and remain effective, notwithstanding any such difference.

7. Each of Employee and the Company agrees that the existence and terms of this Agreement shall be and remain confidential. The Parties acknowledges that this confidentiality provision is an essential element of the consideration provided for entering into this Agreement. Therefore, each of Employee and the Company agrees not to discuss or describe any information concerning of the terms of this Agreement to anyone, except as required by subpoena or permitted herein, except that Employee may discuss the same with Employee's immediate

---

family, attorneys and tax and financial advisors provided Employee first informs them of their obligation of confidentiality regarding the same and the Company may disclose the existence of this Agreement and the terms hereof to its agents, employees, and advisors and as deemed in good faith to be required by law. Each of Employee and the Company agrees to reveal only that the matter has been resolved. This paragraph shall not apply to any action by the Parties to enforce this Agreement. If any provision of this paragraph is breached, the Parties shall be untitled to such legal or equitable relief as may be available by law.

8. This Agreement is entered into by the Parties solely to avoid the expenses associated with litigation and does not constitute and shall not be construed as an admission by the Employer Released Parties of any breach of any alleged agreements or duties, or of any wrongdoing toward any person, including any alleged breach of contract or violation of any federal, state, or local law, regulation, or ordinance. The Employer Released Parties specifically disclaim any liability to Employee for wrongdoing of any kind.

9. The Parties agree that this Agreement may be used in evidence in a subsequent proceeding in which any of the Parties alleges a breach of this Agreement.

10. The Parties affirm they are not relying on any representations or statements made by each other which are not specifically included in this Agreement. The Parties acknowledge they have been informed in writing by this Agreement that they have the right to consult with legal counsel regarding this release and confirm that they have consulted with counsel to the extent desired concerning the meaning and consequences of this Agreement.

11. This Agreement constitutes the entire agreement between the Parties with relation to the subject matter hereof. Any prior negotiations or correspondence relating to the subject mailer hereof shall be deemed to have been merged into this Agreement and to the extent inconsistent herewith shall be deemed to be of no force or

effect. This Agreement may not be modified, nor any provision waived unless such modification or waiver is made in writing referring to this Agreement and signed by each Party. This Agreement shall be binding upon and inure to the benefit of each of the Party's respective successors, heirs, executors, administrators and assigns, as the case may be.

12. This Agreement may be executed in any number of counterparts, each of which when executed and delivered shall be an original, but all of such counterparts shall constitute one and the same instrument.

13. This Agreement shall be interpreted and enforced in accordance with the laws of the State of, and/or when applicable, of the United States.

14. The provisions of this Agreement are severable, and if any part of it is found to be unenforceable, the other parts and/or paragraphs shall remain fully valid and enforceable. Should any provisions of this Agreement be determined by any court or administrative body to be invalid, the validity of the remaining provisions is not affected thereby and the invalidated part shall be deemed not a part of this Agreement. Any court or administrative body shall construe and interpret this Agreement as enforceable to the full extent available under applicable law. This Agreement shall survive the termination of any arrangements contained in it.

---

15. Employee and Employer acknowledge and understand this is a legal contract and that they each sign this Agreement knowingly, freely and voluntarily and have not been threatened, coerced or intimidated into making the same. Employee and Employer acknowledge that they have had ample and reasonable time to consider this Agreement and the effects and import of it and that they have fully dwelt on it in their minds and have had such counsel and advice, legal or otherwise, as they desire in order to make this Agreement. EMPLOYER AND EMPLOYER, BY SIGNING TIHS AGREEMENT, ACKNOWLEDGE IT CONTAINS A RELEASE OF KNOWN AND UNKNOWN CLAIMS. Employee and Employer have read and fully considered this Agreement and understand and desire to enter into it. The terms of this Agreement were derived through mutual compromise and are fully understood. Employee acknowledges that Employee has been offered at least 21 days to consider the impact of this Agreement and its release of Employee's rights to bring suit against the Employer Released Parties and after due consideration has decided to enter into this Agreement at this time. Employee further understands that Employee may revoke this Agreement for a period of up to seven (7) days following signature and execution of the same. This Agreement will not become effective and enforceable until such seven-day period has passed without revocation of this Agreement by the Employee. Any revocation within this period must be signed and submitted in writing to the undersigned representative of Employer and must state, "I hereby revoke my acceptance of the Agreement." Employee understands that if Employee revokes this Agreement, Employee is not entitled to receive the consideration provided by this Agreement.

16. As of the effectiveness of this Agreement (as provided in the preceding paragraph) the Company represents and warrants to Employee that is not aware of claims that it could reasonably levy against Employee prior to the date hereof other than as expressly disclosed to Employee in writing.

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first set forth above.

EMPLOYEE

______________________________

CONTROL4 CORPORATION

______________________________

By:

Its:

---

**Exhibit 10.5**

**EMPLOYMENT AGREEMENT**

This EMPLOYMENT AGREEMENT (this "Agreement") is made and entered into as of July 28, 2003, by and between Control4 Corporation, a Delaware corporation (the "Company"), and William B. West ("Employee").

**RECITALS**

A. Employee is a founder of the Company and had been serving as the Company's Chief Executive Officer and President since its inception.

B. As conditions to the Company's proposed Series A Preferred Stock financing (the "Series A Financing"), the investors in such Series A financing have

requested that:

1. the Company and Employee enter into a Stock Restriction Agreement in the form attached hereto as Exhibit A (the "Stock Restriction Agreement"); and

2. the Company secure Employee's continued service on the terms and conditions set forth herein.

**AGREEMENT**

NOW THEREFORE, for and in consideration of the mutual promises and covenants set forth herein and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties agree as follows:

1. Effective Date. This Agreement, and the terms and conditions set forth herein, shall become effective simultaneously with the first closing of the Series A Financing (the "Effective Date").

2. Employment. Employee shall continue to serve as a full-time employee of the Company as Chief Executive Officer and President. Employee's office shall continue to be located at 5983 South Redwood Road, Salt Lake City, Utah 84123, or such other location as may be established from time to time, subject to the limitations set forth in Section 5(f)(ii) of this Agreement. Employee's employment with the Company shall be for no certain duration but will be "at-will" employment. Although the Company's personnel policies and procedures may change from time to time, the "at-will" nature of Employee's employment may only be changed in a document signed by Employee and a duly authorized member of the Company's Board of Directors.

3. Compensation.

(a) *Base Salary*. Employee's salary shall initially be set at $13,333.33 per month, which is equivalent to $160,000 on an annual basis, less applicable deductions and withholdings, paid in accordance with the Company's standard payroll procedures. Employee's position will be classified as "exempt" and Employee will not be eligible for overtime pay.

---

(b) *Stock Options*. Employee may receive stock options, and/or similar stock-related incentives or performance bonuses, as may be granted by the Board of Directors from time to time in accordance with applicable corporate approval procedures.

(c) *Performance Bonus*. At such time, if any, as the Board of Directors determines in its sole discretion that the Company has achieved requisite development, revenue and/or profitability milestones, the Board of Directors will determine Employee's eligibility to receive an incentive bonus, less applicable deductions and withholdings, subject to the attainment of Company and individual performance objectives as determined by the Board of Directors and subject to any other terms and conditions determined by the Board of Directors.

(d) *Other Benefits*. The Company shall provide Employee with the opportunity to participate in the Company's standard benefits plans available to other similarly situated employees and approved by the Board of Directors, subject to any eligibility requirements imposed by such plans or programs.

(e) *Business Expenses*. The Company shall reimburse business expenses incurred by Employee from time to time, which shall include, without limitation, mobile telephone, home office telephone and home office high-speed Internet access expenses, in accordance with the Company's standard policies and procedures relating thereto as approved from time to time by the Board of Directors.

(f) *Vacation*. Employee will be entitled to accrue up to four (4) weeks of vacation leave consisting of twenty (20) business days earned on an annual, pro-rata basis throughout each calendar year of employment, all in accordance with the Company's standard vacation policy in effect from time to time and approved by the Board of Directors. Employee's vacation accrual will be pro-rated for the remainder of this calendar year. Once the maximum vacation accrual is reached, no further vacation will accrue. When some vacation is used, vacation will begin to accrue again. There will be no retroactive grant of vacation for the period of time the accrued vacation was at the maximum accrual balance.



---

4. Noncompetition. During the term of Employee's employment with the Company and for twelve (12) months after termination, for any reason, of Employee's employment with the Company, Employee shall not directly or indirectly, own, manage, operate, join or control, be employed by or participate in the ownership, management, operation or control of, or be a consultant to or connected in any other manner with, any business, firm or corporation which is similar to or competes with a principal business of the Company or its subsidiaries (a "Competitive Activity"); provided, however, that Employee's ownership of securities of any company not in excess of one percent of any class of such securities shall not be considered to be competition with the Company or its subsidiaries. Employee acknowledges that the foregoing is in addition to Employee's obligations under that certain Confidential Information and Intellectual Property Assignment Agreement

between the Company and Employee, including without limitation Section 4 thereof, attached hereto as Exhibit B (the "Confidentiality Agreement").

5. Termination.

(a) *By Death*. Employee's employment shall terminate automatically upon his death. The Company shall pay to Employee's beneficiaries or estate, as appropriate, any compensation then due and owing, including payment for accrued bonus, unused vacation, expense reimbursement, if any, and any other benefits provided under this Agreement, including without limitation the ability to exercise any vested and exercisable options held by Employee. Thereafter, all obligations of the Company under this Agreement shall cease. Nothing in this Section 5(a) shall affect any entitlement of Employee's heirs to the benefits of any life insurance plan or other applicable benefits.

(b) *By Disability*. For purposes of this Agreement, disability" means a mental or physical impairment that is expected to result in death or that has lasted or is expected to last for a continuous period of three (3) months or more and that causes Employee to be unable to perform his duties under this Agreement and to be engaged in any substantial gainful activity. If Employee experiences such a disability, then, to the extent permitted by law, the Company may terminate Employee's employment upon sixty (60) days' advance written notice. Termination by disability shall be determined by a physician selected by the Board of Directors. If such physician is unable to schedule an appointment with Employee within ten business days of physician's written request, the Board of Directors are authorized to determine whether Employee's disability has occurred at its sole discretion. The Company shall pay Employee all compensation to which he is entitled up through the last business day of the notice period, including payment for accrued unused vacation, expense reimbursement, if any, and any other benefits provided under this Agreement, including without limitation the exercisability of any vested and exercisable option held by Employee; thereafter, all obligations of Company under this Agreement shall cease. Nothing in this Section 5(b) shall affect Employee's rights under any applicable Company disability plan. Termination by disability shall not constitute termination without Cause or for Good Reason.

(c) *For Cause or Without Good Reason*. If Employee's employment is terminated by the Company for Cause (as defined below) or by Employee for other than Good Reason (as defined below), the Company shall pay Employee all wages earned through the date of termination at the rate in effect at the time notice of termination is given and the Company shall have no further obligations to Employee under this Agreement.



---

(d) *Without Cause or For Good Reason*. In no way limiting the Company's policy of employment at-will, if Employee's employment is terminated by the Company without Cause or by Employee for Good Reason, and other than as a result of Employee's death or disability, the Company will offer certain severance benefits to Employee as specified below. As a condition to Employee's receipt of such benefits, Employee is required to comply with Employee's continuing obligations (including without limitation the return of any Company property and the non-competition and non-solicitation obligations), resign from all positions Employee holds with the Company, and execute the Company's standard form of release agreement releasing any and all claims Employee may have against the Company.

(i) In addition to paying Employee all wages earned through the date of termination, the Company shall pay Employee severance equal to six (6) months of his then-current regular base salary in effect at the time notice of termination is given, paid out over the Company's regular payroll schedule following the effective date of the release, as well as all other unpaid amounts, if any, that Employee has earned as of the date of termination under any compensation plan or program of the Company, at the time such payments are or become due;

(ii) For the first six (6) months after Employee's date of termination, the Company shall continue, to the extent permitted under the terms of the applicable plans, to maintain in full force and effect, and cover the premium costs of, the insurance benefits set forth in Section 3(d) of this Agreement; provided, that if (i) the Employee becomes reemployed after the date of termination and (ii) his new employer offers medical and dental insurance plans or programs under which he will be eligible to participate, any such continuing medical and dental coverage shall be secondary to such new employer's coverage.

(iii) In addition to all of Employee's stock and stock options that were vested on the date of termination, that number of shares subject to any option (collectively, the "Options") and that number of shares subject to a right of repurchase in favor of the Company (collectively, the "Restricted Stock") determined as follows:

(x) if such termination without Cause or For Good Reason occurs before a Change of Control (as defined below), then that number of shares determined with respect to each Option or grant of Restricted Stock equal to the greater of:

(A) the product of the total shares originally subject to the Option or the original grant of the Restricted Stock times 50%; or

(B) the number of shares subject to the Options and the Restricted Stock that would otherwise have vested and been exercisable or released from the right of repurchase as of the date that is six months from the date of termination shall immediately vest, and any repurchase right of the Company with respect to such Options and Restricted Stock shall immediately lapse, and the Options shall remain exercisable for ninety (90) days after the date of termination (but not beyond their original expiration dates); provided, however, that the foregoing provision is in addition to, and is not intended to limit or amend, any provisions set forth in the Company's stock option plan pursuant to which such options were granted; and

(y) if such termination without Cause or For Good Reason occurs either (A) within 60 days prior to a Change of Control and in direct contemplation of such Change of Control or (B) within 12 months after a Change of Control, then all of Employee's remaining Options and Restricted Stock shall fully vest. "Change of Control" shall mean a transaction or series of related transactions that constitutes a "Deemed Liquidation" in accordance with the Company's then current Certificate of Incorporation, as amended from time to time.

(e) *Priority*. The compensation and benefits, if any, payable under this Section 5 shall be in addition to any vested accrued compensation or benefits to which the Employee may be entitled under the Company's (or any of its subsidiaries') employee benefit plans and arrangements; provided, however, that the severance benefits provided by this Agreement shall supercede, and Employee shall not also be entitled to, any compensation or benefits under any other severance plan or arrangement of the Company or any of its subsidiaries to which Employee would otherwise be entitled under the terms thereof, whether now existing or hereafter adopted.

(f) *Certain Definitions*.

(i) "Cause" shall be defined as (1) Employee's repeated failure, in the reasonable judgment of the Board of Directors, to perform one or more of his essential duties and responsibilities to the Company after written notice thereof from the Board of Directors to Employee describing Employee's failure to perform such duties or responsibilities and, if such failure is remediable, his failure to remedy same within 10 days of receiving written notice; (2) Employee's refusal or failure to comply with the legal directives of the Board of Directors after written notice thereof from the Board of Directors to Employee describing Employee's failure to comply and, if such failure is remediable, his failure to remedy same within 10 days of receiving written notice; (3) Employee's material violation of any Company policy; (4) Employee's commission or conviction of, or entry of a plea of nolo contendere to, any felony or any act of fraud, embezzlement, dishonesty, moral turpitude, misappropriation or any other misconduct that has caused or is reasonably expected to result in material injury to the Company or its affiliates; (5) Employee's unauthorized use or disclosure of any proprietary information or trade secrets of the Company or any other party to whom he owes an obligation of nondisclosure as a result of his relationship with the Company; (6) Employee's material breach of any of his obligations under any written agreement or covenant with the Company; or (7) Employee's violation of a federal or state law or regulation applicable to the Company which violation was or is reasonably likely to be injurious to the Company; provided, however, that a finding of any of the above shall be predicated on a good faith determination by the Board of Directors.

(ii) "Good Reason" for Employee's resignation shall mean that Employee's continuous status as an employee was "constructively terminated" by the Company if within 90 days after the occurrence of one of the following Company actions (unless such action(s) applies generally to all of the Company's management of the Company or unless Employee consents in writing to such action(s)), Employee resigns in writing from his employment with the Company: (x) a significant reduction in the Employee's duties, position or responsibilities compared to the Employee's duties, position or responsibilities immediately prior to such reduction; provided however that a reduction in position that occurs solely by virtue of



the Company being acquired and made part of a larger entity (as", for example, when a chief financial officer of an acquired company remains as such following a Change of Control but is not made the chief financial officer of the acquiring corporation) shall not constitute "Good Reason" so long as Employee maintains a comparable level of duties and responsibilities with the acquiring entity as Employee held immediately prior to the acquisition; (y) a material reduction in Employee's base salary as in effect immediately before such reduction; and (z) the relocation by the Company of Employee's then current work site that has the effect of increasing the Employee's then-current commute by more than 50 miles (not including any regular business travel consistent with the business travel requirements of the Employee's position with the Company).

6. Confidentiality Agreement. Employee represents that he has signed and returned to the Company, or that prior to the Effective Date he shall sign and return to the Company, the Confidentiality Agreement.

7. Stock Restriction Agreement. On or prior to the Effective Date, Employee shall sign and return to the Company the Stock Restriction Agreement in the form attached hereto as Exhibit A.

8. Attorneys Fees. If any legal action or other proceeding, including an arbitration, is brought for the enforcement of this Agreement, or because of an alleged dispute, breach or default thereof, the successful or prevailing party shall be entitled to recover attorneys' fees and other costs incurred in such proceeding, in addition to any other relief to which it may be entitled.

9. Indemnification. The Company and Employee will enter into the Company's standard form of indemnification agreement for its directors and officers.

10. Governing Law. This Agreement shall be construed in accordance with, and governed by, the laws of the State of Utah without regard to its conflicts of law principles.

11. Arbitration. Any claims arising under this Agreement shall be resolved in binding arbitration with a duly authorized representative of the American Arbitration Association ("AAA") in accordance with the provisions hereof and thereof. Either the Company or Employee may submit the matter to binding arbitration before the AAA in Salt Lake County, Utah, which arbitration shall be final and binding on the parties and the exclusive method, absent agreement between the Company

and Employee, for purposes of determining the ability of the Company to satisfy such claim. All claims shall be settled by a single arbitrator appointed in accordance with the Commercial Arbitration Rules then in effect of the AAA (the "AAA Rules"). The arbitrator shall render a final decision pursuant to the AAA Rules within thirty (30) days after filing of the claim. The final decision of the arbitrator shall be furnished to Employee and the Company in writing and shall constitute the conclusive determination of the issue in question binding upon Employee and the Company, and shall not be contested by any of them. Such decision may be used in a court of law only for the purpose of seeking enforcement of the arbitrator's decision. The prevailing part; shall be entitled to reasonable attorney's fees, costs and necessary disbursements in addition to any other relief that such party may be entitled. For purposes of this Agreement, the prevailing party shall be that party in whose favor final



---

judgment is rendered or who substantially prevails, if both parties are awarded judgment. Notwithstanding the foregoing, any party may pursue any equitable remedies that it may have under this Agreement for any breach or threatened breach by another party of this Agreement (including without limitation specific performance) in a court of law.

12. Counterparts. This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one agreement.

13. Entire Agreement. This is the full and complete agreement between the parties with regard to the subject matter hereof and supersedes any and all prior understandings or agreements.

*[Remainder of page intentionally left blank; signature page to follow.]*



---

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed as of the date first set forth above.

| **"EMPLOYEE"** | **CONTROL4 CORPORATION** |
|---|---|
| /s/ William B. West | By: /s/ W. Eric Smith |
| William B. West | Title: W. Eric Smith, Secretary |

---

**EXHIBIT A**

**CONTROL4 CORPORATION**
**STOCK RESTRICTION AGREEMENT**

This Stock Restriction Agreement (this "**Agreement**") is entered into as of July 28, 2003, by and between Control4 Corporation, a Delaware corporation (the "**Company**"), and William B. West (the "**Founder**").

**RECITALS**

WHEREAS, the Company and the Founder previously entered into a Restricted Stock Purchase Agreement, dated March 27, 2003 (a copy of which is attached hereto as Appendix A, the "**Existing Agreement**") pursuant to which Founder purchased 2,150,000 shares of the Company's Common Stock (reflecting the 21,500-for-1 forward stock split effected on or before the date hereof, as appropriately adjusted further for stock splits, stock dividends, combinations and other recapitalizations after the date hereof, the "**Purchased Shares**");

WHEREAS, certain potential investors in the Company's proposed Series A Preferred Stock financing request that the Founder agree to certain restrictions on the Purchased Shares, including the imposition of vesting provisions on a portion of the Purchased Shares upon the terms herein provided; and

WHEREAS, the Company and the Founder are concurrently entering into an Employment Agreement of even date herewith (the "**Employment Agreement**") to which this Agreement is attached as Exhibit A.

NOW, THEREFORE, in consideration of the mutual promises and covenants set forth herein, the Company and the Founder hereby agree as follows. Capitalized terms not defined above are defined in Article 5 of this Agreement.

**AGREEMENT**

**ARTICLE 1**
**RIGHT OF REPURCHASE**

1.1 Scope of Repurchase Right. All Purchased Shares shall initially be Restricted Shares and shall be subject to an irrevocable, exclusive right (but not an obligation) of repurchase by the Company. The Founder shall not transfer, assign, encumber or otherwise dispose of any Restricted Shares, except as provided in the following sentence and in compliance with any other agreements by which the Founder or the Purchased Shares are bound. The Founder may transfer Restricted Shares to a trust established by the Founder for the benefit of the Founder, and may transfer Restricted Shares for which the Company's Right of Repurchase has lapsed (i) by beneficiary designation, will or intestate succession or (ii) to the Founder's spouse, children or grandchildren or to a trust established by the Founder for the benefit of the Founder or the Founder's spouse, children or grandchildren, provided in either case that the Transferee agrees in writing on a form prescribed by the Company to be bound by all provisions of this Agreement and any other agreements by which the Founder or the Purchased Shares are bound. If the Founder transfers any Restricted Shares, then this Section 1 shall apply to the Transferee to the same extent as to the Founder.

1.2 Condition Precedent to Exercise. The Right of Repurchase shall be exercisable only during the 60-day period next following the date when the Founder's Service terminates for any reason, with or without Cause, including (without limitation) death or disability.

1.3 Lapse of Repurchase Right. The Right of Repurchase shall lapse with respect to the first 25% of the Restricted Shares when the Founder completes 12 months of continuous Service following January 1, 2003, and thereafter the Right of Repurchase shall lapse with respect to an additional l/48th of the Restricted Shares when the Founder completes each month of continuous Service.

1.4 Repurchase Cost. If the Company exercises the Right of Repurchase, it shall pay the Founder an amount in cash or cash equivalents equal to the Purchase Price for each of the Restricted Shares being repurchased.

1.5 Exercise of Repurchase Right. The Right of Repurchase shall be exercisable only by written notice delivered to the Founder prior to the expiration of the 60-day period specified in Section 1.2 above. The notice shall set forth the date on which the repurchase is to be effected. Such date shall not be more than 30 days after the date of the expiration of such 60-day period. The Company shall pay to the Founder the purchase price determined according to Section 1.4 above. Payment shall be made in cash or cash equivalents or by cancelling indebtedness to the Company incurred by the Founder in the purchase of Restricted Shares. Upon delivery of such notice and payment of the purchase price in any of the ways described above, the Company shall become the legal and beneficial owner of the Restricted Shares being repurchased and all rights and interest therein or related thereto, and the Company shall have the right to transfer to its own name the number of Restricted Shares being repurchased by the Company, without further action by the Founder. The Right of Repurchase shall terminate with respect to any Restricted Shares for which it has not been timely exercised pursuant to this Section 1.5.

1.6 Additional Shares or Substituted Securities. In the event of the declaration of a stock dividend, the declaration of an extraordinary dividend payable in a form other than stock, a spin-off, a stock split, an adjustment in conversion ratio, a recapitalization or a similar transaction affecting the Company's outstanding securities without receipt of consideration, any new, substituted or additional securities or other property (including money paid other than as an ordinary cash dividend), that by reason of such transaction are distributed with respect to any Restricted Shares or into which such Restricted Shares thereby become convertible, shall immediately be subject to the Right of Repurchase. Appropriate adjustments to reflect the distribution of such securities or property shall be made to the number and/or class of the Restricted Shares. After each such transaction, appropriate adjustments shall also be made to the price per share to be paid upon the exercise of the Right of Repurchase in order to reflect any change in the Company's outstanding securities effected without receipt of consideration therefor; provided, however, that the aggregate purchase price payable for the Restricted Shares shall remain the same.



1.7 Termination of Rights as Stockholder. If the Company makes available, at the time and place and in the amount and form provided in this Agreement, the consideration for the Restricted Shares to be repurchased in accordance with this Article 1, then after such time the person from whom such Restricted Shares are to be repurchased shall no longer have any rights as a holder of such Restricted Shares (other than the right to receive payment of such consideration in accordance with this Agreement). Such Restricted Shares shall be deemed to have been repurchased in accordance with the applicable provisions hereof, whether or not the certificate(s) therefor has or have been delivered as required by this Agreement.

1.8 Escrow. Upon issuance, the certificates for Purchased Shares shall be deposited in escrow with the Company to be held in accordance with the provisions of this Agreement. Any new, substituted or additional securities or other property described in Section 1.6 above shall immediately be delivered to the Company to be held in escrow, but only to the extent the Purchased Shares are at the time Restricted Shares. All regular cash dividends on Purchased Shares (or other securities at the time held in escrow) shall be paid directly to the Founder and shall not be held in escrow. Purchased Shares, together with any other assets or securities held in escrow hereunder, shall be (i) surrendered to the Company for repurchase and cancellation upon the Company's exercise of its Right of Repurchase or Right of First Refusal or (ii)

released to the Founder upon the Founder's request to the extent the Purchased Shares are no longer Restricted Shares (but not more frequently than once every six months). In any event, all Purchased Shares that have vested (and any other vested assets and securities attributable thereto) shall be released within 60 days after the Founder's cessation of Service.

1.9 Market Stand-Off Agreement. Founder hereby agrees that he will not, without the prior written consent of the managing underwriters), during the period commencing on the date of the final prospectus relating to the Company's initial public offering and ending on the date specified by the Company and the managing underwriter (such period not to exceed one hundred eighty days) (i) lend, offer, pledge, sell, contract to sell, sell any option or contract to purchase,, purchase any option or contract to sell, grant any option, right or warrant to purchase, or otherwise transfer or dispose of, directly or indirectly, any Purchased Shares, or (ii) enter into any swap or other arrangement that transfers to another, in whole or in part, any of the economic consequences of ownership of the Purchased Shares, whether any such transaction described in clause (i) or (ii) above is to be settled by delivery of Common Stock or such other securities, in cash or otherwise. Founder further agrees to execute and enter into an agreement (such agreement to be in the form as may be requested by the managing underwriters)) with the managing underwriter(s) of such initial public offering to reflect the foregoing. The foregoing provisions of this Section 1.9 shall apply only to the Company's initial public offering of equity securities, shall not apply to the sale of any shares to an underwriter pursuant to an underwriting agreement, and shall only be applicable to Founder if all officers, directors and greater than one percent stockholders of the Company enter into similar agreements; provided, however, that if any provision of such agreement is waived or terminated with respect to any of the securities of any such officer, director or greater than one percent stockholder (in any such case of waiver or termination, such securities being the "**Released Securities**"), the foregoing provisions shall be waived or terminated, as applicable, to the same extent with respect to the same percentage of securities of Founder as the percentage the Released Securities represent with respect to the securities held by the applicable officer, director or greater than one percent stockholder. The underwriters in connection with the Company's initial public offering are intended third party



beneficiaries of this Section 1.9 and shall have the right, power and authority to enforce the provisions hereof as though they were a party hereto. In order to enforce the foregoing covenant, the Company may impose stop-transfer instructions with respect to the Purchased Shares until the end of such period.

**ARTICLE 2**
**NO RETENTION RIGHTS**

Nothing in this Agreement shall confer upon the Founder any right to continue in Service for any period of specific duration or interfere with or otherwise restrict in any way the rights of the Company (or any Parent or Subsidiary employing or retaining the Founder) or of the Founder, which rights are hereby expressly reserved by each, to terminate the Founder's Service at any time and for any reason, with or without cause.

**ARTICLE 3**
**TAX ELECTION**

The subjection of the Purchased Shares to the Right of Repurchase may result in adverse tax consequences that may be avoided or mitigated by filing an election under Code Section 83(b). Such election may be filed only within 30 days after the date the Purchased Shares are subjected to the Right of Repurchase. The form for making the Code Section 83(b) election is attached hereto as Appendix B. The Founder should consult with the Founder's tax advisor to determine the tax consequences of subjecting the Purchased Shares to the Right of Repurchase and the advantages and disadvantages of filing the Code Section 83(b) election. THE FOUNDER ACKNOWLEDGES THAT IT IS THE FOUNDER'S SOLE RESPONSIBILITY, AND NOT THE COMPANY'S, TO FILE A TIMELY ELECTION UNDER CODE SECTION 83(B), EVEN IF THE FOUNDER REQUESTS THE COMPANY OR ITS REPRESENTATIVES TO MAKE THIS FILING ON THE FOUNDER'S BEHALF.

**ARTICLE 4**
**CHOICE OF LAW**

This Agreement shall be governed by, and construed in accordance with, the laws of the State of Delaware, as such laws are applied to contracts entered into and to be performed entirely within such State.

**ARTICLE 5**
**DEFINITIONS**

5.1 "**Board of Directors**" shall mean the board of Directors of the Company, as constituted from time to time.

5.2 "**Cause**" shall have the same meaning as provided in 5(f)(i) of the Employment Agreement.

5.3 "**Code**" shall mean the Internal Revenue Code of 1986, as amended.



5.4 "**Consultant**" shall mean an individual who performs bona fide services for the Company, a Parent or a Subsidiary as a consultant or advisor, excluding

Employees and Outside Directors.

5.5 "**Employee**" shall mean any individual who is a common-law employee of the Company, a Parent or a Subsidiary.

5.6 "**Outside Director**" shall mean a member of the Board of Directors who is not an Employee.

5.7 "**Parent**" shall mean any corporation (other than the Company) in an unbroken chain of corporations ending with the Company, if each of the corporations other than the Company owns stock possessing 50% or more of the total combined voting power of all classes of stock in one of the other corporations in such chain.

5.8 "**Purchase Price**" shall mean $0.0001 per share (reflecting the 21,500-for-1 forward stock split, effected on or before the date hereof, as appropriately adjusted further for stock splits, stock dividends, combinations and other recapitalizations after the date hereof).

5.9 "**Restricted Share**" shall mean a Purchased Share that is subject to the Right of Repurchase.

5.10 "**Right of First Refusal**" shall mean the Company's right of first refusal described in that certain Right of First Refusal and Co-Sale Agreement by and between the Company and certain stockholders of the Company, of even date herewith and as amended from time to time.

5.11 "**Right of Repurchase**" shall mean the Company's right of repurchase described in Article 1.

5.12 "**Service**" shall mean service as an Employee, Outside Director or Consultant.

5.13 "**Subsidiary**" shall mean any corporation (other than the Company) in an unbroken chain of corporations beginning with the Company, if each of the corporations other than the last corporation in the unbroken chain owns stock possessing 50% or more of the total combined voting power of all classes of stock in one of the other corporations in such chain.

5.14 "**Transferee**" shall mean any person to whom the Founder has directly or indirectly transferred any Purchased Share no longer subject to the Company's Right of Repurchase.



---

IN WITNESS WHEREOF, the parties year first above written.

| **FOUNDER:** | **CONTROL4 CORPORATION** |
|---|---|
| By: /s/ William B. West | By: /s/ W. Eric Smith |
| Print Name: William B. West | Print Name: W. Eric Smith |
| Address: | Title: |
| | Address: |

**SIGNATURE PAGE TO**
**STOCK RESTRICTION AGREEMENT**

---

**Appendix A**

**RESTRICTED STOCK PURCHASE AGREEMENT**

THIS RESTRICTED STOCK PURCHASE AGREEMENT is entered into as of March 27, 2003, by Control4 Corporation, a Delaware corporation (the "***Company***"), and William B. West (the "***Purchaser***").

ARTICLE 1
**ACQUISITION OF SHARES**

1.1 **Sale and Purchase.** On the terms and conditions set forth in this Agreement, the Company agrees to sell to the Purchaser, and the Purchaser agrees to purchase, the Purchased Shares (as defined herein). The sale and purchase shall occur at the offices of the Company on the date set forth above or at such other place and time as the parties may agree.

1.2 **Consideration.** The Purchaser agrees to pay $2.15 for each Purchased Share. The Purchase Price is agreed to be the fair market value of the Purchased Shares. Payment shall be made on the transfer date in cash or cash equivalents payable to the order of the Company in an amount equal to the Purchase Price for all of the Purchased Shares.

1.3 **Defined Terms.** Capitalized terms not defined above are defined in Article 8 of this Agreement.

ARTICLE 2
**OTHER RESTRICTIONS ON TRANSFER**

2.1 **Purchaser Representations.** In connection with the issuance and acquisition of Shares under this Agreement, the Purchaser hereby represents and warrants to the Company as follows:

(a) The Purchaser is acquiring and will hold the Purchased Shares for investment for the Purchaser's account only and not with a view to, or for resale in connection with, any "distribution" thereof within the meaning of the Securities Act.

(b) The Purchaser understands that the Purchased Shares have not been registered under the Securities Act by reason of a specific exemption therefrom and that the Purchased Shares must be held indefinitely, unless they are subsequently registered under the Securities Act or the Purchaser obtains an opinion of counsel, in form and substance reasonably satisfactory to the Company and its counsel, that such registration is not required. The Purchaser further acknowledges and understands that the Company is under no obligation to register the Purchased Shares.

(c) The Purchaser is aware of the adoption of Rule 144 by the Securities and Exchange Commission under the Securities Act, which permits limited public resales of securities acquired in a non-public offering, subject only to the satisfaction of certain conditions. The Purchaser acknowledges and understands that the conditions for resale set

---

forth in Rule 144 have not been satisfied and that the Company has no plans to satisfy these conditions in the foreseeable future

(d) The Purchaser will not sell, transfer or otherwise dispose of the Purchased Shares in violation of the Securities Act, the Securities Exchange Act of 1934, or the rules promulgated thereunder, including Rule 144 under the Securities Act. The Purchaser agrees that the Purchaser will not dispose of the Purchased Shares unless and until the Purchaser has complied with all requirements of this Agreement applicable to the disposition of Purchased Shares and the Purchaser has provided the Company with written assurances, in substance and form satisfactory to the Company, that (A) the proposed disposition does not require registration of the Purchased Shares under the Securities Act or all appropriate action necessary for compliance with the registration requirements of the Securities Act or with any exemption from registration available under the Securities Act (including Rule 144) has been taken and (B) the proposed disposition will not result in the contravention of any transfer restrictions applicable to the Purchased Shares under the Rules of the California Corporations Commissioner.

(e) The Purchaser has been furnished with, and has had access to, such information as the Purchaser considers necessary or appropriate for deciding whether to invest in the Purchased Shares, and the Purchaser has had an opportunity to ask questions and receive answers from the Company regarding the terms and conditions of the issuance of the Purchased Shares.

(f) The Purchaser is aware that the Purchaser's investment in the Company is a speculative investment that has limited liquidity and is subject to the risk of complete loss. The Purchaser is able, without impairing the Purchaser's financial condition, to hold the Purchased Shares for an indefinite period and to suffer a complete loss of the Purchaser's investment in the Purchased Shares.

2.2 **Securities Law Restrictions**. Regardless of whether the offering and sale of Shares under this Agreement have been registered under the Securities Act or have been registered or qualified under the securities laws of any state, the Company at its discretion may impose restrictions upon the sale, pledge or other transfer of the Purchased Shares (including the placement of appropriate legends on stock certificates or the imposition of stop-transfer instructions) if, in the judgment of the Company, such restrictions are necessary or desirable in order to achieve compliance with the Securities Act, the securities laws of any state or any other law.

2.3 **Rights of the Company**. The Company shall not be required to (i) transfer on its books any Purchased Shares that have been sold or transferred in contravention of this Agreement or (ii) treat as the owner of Purchased Shares, or otherwise to accord voting, dividend or liquidation rights to, any transferee to whom Purchased Shares have been transferred in contravention of this Agreement.

ARTICLE 3
**SUCCESSORS AND ASSIGNS**

Except as otherwise expressly provided to the contrary, the provisions of this Agreement shall inure to the benefit of, and be binding upon, the Company and its successors and assigns and be binding upon the Purchaser and the Purchaser's heirs, assigns and transferees by operation of law, whether or not any such person has become a party to this Agreement or has agreed in writing to join herein and to be bound by the terms, conditions and restrictions hereof.

ARTICLE 4
**LEGENDS**

**Legends.** All certificates evidencing Purchased Shares shall bear the following (or substantially similar) legends:

"THE SHARES REPRESENTED HEREBY MAY NOT BE SOLD, ASSIGNED, TRANSFERRED, ENCUMBERED OR IN ANY MANNER DISPOSED OF, EXCEPT IN COMPLIANCE WITH THE TERMS OF A WRITTEN AGREEMENT BETWEEN THE COMPANY AND THE REGISTERED HOLDER OF THE SHARES (OR THE PREDECESSOR IN INTEREST TO THE SHARES). THE SECRETARY OF THE COMPANY WILL UPON WRITTEN REQUEST FURNISH A COPY OF SUCH AGREEMENT TO THE HOLDER HEREOF WITHOUT CHARGE."

"THE SHARES REPRESENTED HEREBY HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, AND MAY NOT BE SOLD, PLEDGED, OR OTHERWISE TRANSFERRED WITHOUT AN EFFECTIVE REGISTRATION THEREOF UNDER SUCH ACT OR AN OPINION OF COUNSEL, REASONABLY SATISFACTORY TO THE COMPANY AND ITS COUNSEL, THAT SUCH REGISTRATION IS NOT REQUIRED."

If required by the authorities of any state in connection with the issuance of the Purchased Shares, the legend or legends required by such state authorities shall also be endorsed on all such certificates.

ARTICLE 5
**NOTICE**

Any notice required by the terms of this Agreement shall be given in writing and shall be deemed effective upon personal delivery or upon deposit with the United States Postal Service, by registered or certified mail, with postage and fees prepaid. Notice shall be addressed to the Company at its principal executive office and to the Purchaser at the address that he or she most recently provided to the Company.



---

ARTICLE 6
**ENTIRE AGREEMENT**

This Agreement constitutes the entire contract between the parties hereto with regard to the subject matter hereof. It supersedes any other agreements, representations or understandings (whether oral or written and whether express or implied) relating to the subject matter hereof.

ARTICLE 7
**CHOICE OF LAW**

This Agreement shall be governed by, and construed in accordance with, the laws of the State of Delaware, as such laws are applied to contracts entered into and to be performed entirely within such State.

ARTICLE 8
**DEFINITIONS**

8.1 "***Agreement***" shall mean this Restricted Stock Purchase Agreement.

8.2 "***Board of Directors***" shall mean the board of directors of the Company, as constituted from time to time.

8.3 "***Parent***" shall mean any corporation (other than the Company) in an unbroken chain of corporations ending with the Company, if each of the corporations other than the Company owns stock possessing 50% or more of the total combined voting power of all classes of stock in one of the other corporations in such chain.

8.4 "***Purchased Shares***" shall mean 100 Shares.

8.5 "***Purchase Price***" shall mean the amount for which one Share may be purchased pursuant to this Agreement, as specified in Subsection 1.2.

8.6 "***Securities Act***" shall mean the Securities Act of 1933, as amended.

8.7 "***Share***" shall mean one share of Stock.

8.8 "***Stock***" shall mean the Common Stock of the Company.

8.9 "***Subsidiary***" shall mean any corporation (other than the Company) in an unbroken chain of corporations beginning with the Company, if each of the corporations other than the last corporation in the unbroken chain owns stock possessing 50% or more of the total combined voting power of all classes of stock in one of the other corporations in such chain.



---

| **PURCHASER:** | | **CONTROL4 CORPORATION** | |
|---|---|---|---|
| By: | /s/ William B. West | By: | /s/ W. Eric Smith |
| Print Name: | William B. West | Print Name: | W. Eric Smith |
| Address: | | Title: | CTO & Secretary |
| | | Address: | |

**SIGNATURE PAGE TO**
**RESTRICTED STOCK PURCHASE AGREEMENT**

---

**EXHIBIT B**

**CONTROL4 CORPORATION**
**CONFIDENTIAL INFORMATION AND**
**INTELLECTUAL PROPERTY ASSIGNMENT AGREEMENT**

As a condition of my relationship with Control4 Corporation, its subsidiaries, affiliates, successors or assigns (together the "Company"), and for other valuable consideration, the receipt and sufficiency of which is hereby acknowledged, I agree to the following terms under this Confidential Information and Intellectual Property Assignment Agreement (the "Intellectual Property Agreement"):

1. Confidential Information.

(a) *Company Information*. I agree at all times during the term of my relationship with the Company whether commenced prior to or upon the date of this Agreement (my "Relationship with the Company") and thereafter to hold in strictest confidence, and not to use except for the benefit of the Company or to disclose to any person, firm or corporation without written authorization of the Board of Directors of the Company, any Confidential Information of the Company. I understand that "Confidential Information" means any Company proprietary information, technical data, trade secrets or know-how, including, but not limited to, research, product plans, products, services, suppliers, prices and costs, customer lists and customers (including, but not limited to, customers of the Company on whom I called or with whom I became acquainted during the term of my Relationship with the Company), markets, works of original authorship, photographs, negatives, digital images, software, developments, inventions, processes, formulas, technology, designs, drawings, engineering, hardware configuration information, marketing, finances or other business information disclosed to me by the Company either directly or indirectly in writing, orally or by drawings or observation of parts or equipment. I understand that Confidential Information includes, but is not limited to, information pertaining to any aspect of the Company's business which is either information not known by actual or potential competitors of the Company or other third parties not under confidentiality obligations to the Company, or is otherwise proprietary information of the Company or its customers or suppliers, whether of a technical nature or otherwise. I further understand that Confidential Information does not include any of the foregoing items which has become publicly known and made generally available through no wrongful act of mine or of others who were under confidentiality obligations as to the item or items involved.

(b) *Other Employer Information*. I agree that I will not, during my Relationship with the Company, improperly use or disclose any proprietary information or trade secrets of any former or concurrent employer or other person or entity and that I will not bring onto the premises of the Company any unpublished document or proprietary information belonging to any such employer, person or entity unless consented to in writing by such employer, person or entity.

(c) *Third Party Information*. I recognize that the Company has received and in the future will receive from third parties their confidential or

proprietary information subject to a duty on the Company's part to maintain the confidentiality of such information and to use it

only for certain limited purposes. I agree to hold all such confidential or proprietary information in the strictest confidence and not to disclose it to any person, firm or corporation or to use it except as necessary in carrying out my work for the Company consistent with the Company's agreement with such third party.

2. Intellectual Property.

(a) *Assignment of Intellectual Property*. I agree that I will promptly make full written disclosure to the Company, will hold in trust for the sole right and benefit of the Company, and hereby assign to the Company, or its designee, all my right, title, and interest in and to any original works of authorship, inventions, concepts, improvements or trade secrets, whether or not patentable or registrable under copyright or similar laws, which I may solely or jointly conceive or develop or reduce to practice, or cause to be conceived or developed or reduced to practice, during the period of my Relationship with the Company (collectively referred to as "Intellectual Property") and which (i) are developed using the equipment, supplies, facilities or Confidential Information of the Company, (ii) result from or are suggested by work performed by me for the Company, or (iii) relate to the business, or to the actual or demonstrably anticipated research or development of the Company. The Intellectual Property will be the sole and exclusive property of the Company. I further acknowledge that all original works of authorship which are made by me (solely or jointly with others) within the scope of and during the period of my Relationship with the Company and which are protectable by copyright are "works made for hire," as that term is defined in the United States Copyright Act. To the extent any Intellectual Property is not deemed to be work for hire, then I will and hereby do assign all my right, title and interest in such Intellectual Property to the Company, except as provided in Section 2(e).

(b) *Patent and Copyright Registrations*. I agree to assist the Company, or its designee, at the Company's (or its designee's) expense, in every proper way to secure the Company's (or its designee's) rights in the Intellectual Property and any copyrights, patents or other intellectual property rights relating thereto in any and all countries, including the disclosure to the Company or its designee of all pertinent information and data with respect thereto, the execution of all applications, specifications, oaths, assignments and all other instruments which the Company or its designee shall deem necessary in order to apply for and obtain such rights and in order to assign and convey to the Company (or its designee), its successors, assigns, and nominees the sole and exclusive rights, title and interest in and to such Intellectual Property, and any copyrights, patents or other intellectual property rights relating thereto. I further agree that my obligation to execute or cause to be executed, when it is in my power to do so, any such instrument or papers shall continue after the termination of my Relationship with the Company. If the Company or its designee is unable because of my mental or physical incapacity or for any other reason to secure my assistance in perfecting the rights transferred in this Intellectual Property Agreement, then I hereby irrevocably designate and appoint the Company or its designee and its duly authorized officers and agents as my agent and attorney in fact, to act for and in my behalf and stead to execute and file any such applications and to do all other lawfully permitted acts to further the prosecution and issuance of letters patent or copyright registrations thereon with the same legal force and effect as if executed by me. The designation and appointment of the Company or its designee and its duly authorized officers and agents as my agent and attorney in fact shall be deemed to be coupled with an interest and therefore



irrevocable. I hereby waive and irrevocably quitclaim to the Company or its designee any and all claims, of any nature whatsoever, which I now or hereafter have for infringement of any and all proprietary rights assigned to the Company or such designee.

(c) *Maintenance of Records*. I agree to keep and maintain adequate and current written records of all Intellectual Property made by me (solely or jointly with others) during the term of my Relationship with the Company. The records will be in the form of notes, sketches, drawings, and works of original authorship, photographs, negatives, digital images or any other format that may be specified by the Company. I agree not to remove such records from the Company's place of business except as expressly permitted by Company policy which may, from time to time, be revised at the sole election of the Company for the purpose of furthering the Company's business. The records will be available to and remain the sole property of the Company at all times.

(d) *Intellectual Property Retained and Licensed*. I provide below a list of all original works of authorship, inventions, developments, improvements, and trade secrets which were made by me prior to my Relationship with the Company (collectively referred to as "Prior Intellectual Property"), which belong to me (solely or jointly), which relate in any way to the Company's proposed business, products or research and development, and which are not assigned to the Company hereunder; or, if no such list is attached, I represent that there is no such Prior Intellectual Property. If in the course of my Relationship with the Company, I incorporate into Company property any Prior Intellectual Property owned by me or in which I have an interest, the Company is hereby granted and shall have a nonexclusive, royalty-free, irrevocable, perpetual, worldwide license (with the right of sublicense) to make, have made, modify, use and sell such Prior Intellectual Property as part of or in connection with such Company property.

*Prior Intellectual Property:*

| **Title** | **Date** | **Identifying Number or Brief Description** |
|---|---|---|
| | | |
| | | |

(e) *Exception to Assignments*. I understand that the provisions of this Intellectual Property Agreement requiring assignment of Intellectual Property to the Company are limited by the Employment Inventions Act, Utah Code Annotated Section 34-39-3, which is attached hereto as Appendix A, and do not apply to any intellectual property that (i) I develop entirely on my own time; and (ii) is not an "employment invention" as such term is defined in the Employment Inventions Act, which I understand to be any invention or part thereof that I conceive, develop, reduce to practice, or create: (x) within the scope of my employment, on the Company's time, or with the aid, assistance, or use of any of the Company's property, equipment, facilities, supplies, resources, or intellectual property; or (y) as the result of any work, services, or duties that I perform for the Company that are related to the Company's industry or trade, or that are related to the Company's current or demonstrably anticipated business, research, or development. Any such intellectual property will be owned entirely by



me, even if developed by me during the time period in which I am employed by the Company. I will advise the Company promptly in writing of any intellectual property that I believe meet the criteria for exclusion set forth herein and are not otherwise disclosed pursuant to Section 2(d) above.

(f) *Company Property; Return of Company Documents*. I acknowledge and agree that I have no expectation of privacy with respect to the Company's telecommunications, networking or information processing systems (including, without limitation, stored company files, e-mail messages and voice messages) and that my activity and any files or messages on or using any of those systems may be monitored at any time without notice. I further agree that any property situated on the Company's premises and owned by the Company, including disks and other storage media, filing cabinets or other work areas, is subject to inspection by Company personnel at any time with or without notice. I agree that, at the time of leaving the employ of the Company, I will deliver to the Company (and will not keep in my possession, recreate or deliver to anyone else) any and all works of original authorship, photographs, negatives, digital images, devices, records, data, notes, reports, proposals, lists, correspondence, specifications, drawings blueprints, sketches, materials, equipment, other documents or property, or reproductions of any aforementioned items developed by me pursuant to my Relationship with the Company or otherwise belonging to the Company, its successors or assigns. In the event of the termination of my Relationship with the Company, I agree to sign and deliver the "Termination Certificate" attached hereto as Appendix B.

3. Notification of New Employer. I hereby grant consent to notification by the Company to my concurrent employer, or in the event that I leave the employ of the Company, my new employer or consulting client about my rights and obligations under this Intellectual Property Agreement.

4. No Solicitation of Employees, Consultants and Other Parties. I agree that during the period of my Relationship with the Company and for a period of twelve (12) months thereafter I shall not directly or indirectly solicit, induce, recruit or encourage or take away any person who shall then be employed by the Company (as an employee or consultant) or who shall have been employed by the Company (as an employee or consultant) within the prior nine (9) month period, on behalf of myself or any other person, firm, corporation, association or other entity, directly or indirectly. Further, during my Relationship with the Company and at any time following termination of my Relationship with the Company for any reason, with or without cause, I shall not use any Confidential Information of the Company to attempt to negatively influence any of the Company's clients, suppliers or customers from purchasing Company products or services or providing goods or services to the Company or to solicit or influence or attempt to influence any client, customer or other person either directly or indirectly, to direct his or its purchase of products and/or services or his or its provision of products and/or services to any person, firm, corporation, institution or other entity in competition with the business of the Company.

5. Representations. I represent that my performance of all the terms of this Intellectual Property Agreement will not breach any agreement to keep in confidence proprietary information acquired by me in confidence or in trust prior to my Relationship with the Company. I have not entered into, and I agree I will not enter into, any oral or written agreement in conflict



herewith. I agree to execute any proper oath or verify any proper document required to carry out the terms of this Intellectual Property Agreement. I represent that my performance of all terms of this Agreement as an employee of the Company has not breached and will not breach any agreement to keep in confidence proprietary information, knowledge or data acquired by me prior or subsequent to the commencement of my Relationship with the Company. I acknowledge and agree that I have attached as Exhibit A hereto all agreements (e.g., non-competition agreements, non-solicitation of customers agreements, non-solicitation of employees agreements, confidentiality agreements, inventions agreements, etc.) with a current or former employer, or any other person or entity, that may restrict my ability to accept employment with the Company or my ability as an employee or consultant to recruit or engage customers or service providers on behalf of the Company, or otherwise relate to or restrict my ability to perform my duties as an employee of the Company or any obligation I may have to the Company.

6. Arbitration and Equitable Relief.

(a) *Arbitration*. Except as provided in Section 6(b) below, I agree that any dispute or controversy arising out of or relating to any interpretation, construction, performance or breach of this Intellectual Property Agreement, shall be settled by arbitration to be held in Salt Lake City, Utah, in accordance with the rules then in effect of the American Arbitration Association. The arbitrator may grant injunctions or other relief in such dispute or controversy. The decision of the arbitrator shall be final, conclusive and binding on the parties to the arbitration. Judgment may be entered on the arbitrator's decision in any court having jurisdiction. The Company and I shall each pay one-half of the costs and expenses of such arbitration, and each of us shall separately pay our counsel fees and expenses.

(b) *Equitable Remedies*. Each of the Company and I agree that disputes relating to or arising out of a breach of the covenants contained in this

Intellectual Property Agreement would likely require injunctive relief to maintain the status quo of the parties pending the appointment of an arbitrator pursuant to this Intellectual Property Agreement. The parties hereto also agree that it would be impossible or inadequate to measure and calculate the damages from any breach of the covenants contained in this Intellectual Property Agreement prior to resolution of any dispute pursuant to arbitration. Accordingly, if either party claims that the other party has breached any covenant of this Intellectual Property Agreement, that party will have available, in addition to any other right or remedy, the right to obtain an injunction from a court of competent jurisdiction restraining such breach or threatened breach and/or to specific performance of any such provision of this Intellectual Property Agreement pending resolution of the dispute through arbitration. The parties further agree that no bond or other security shall be required in obtaining such equitable relief and hereby consents to the issuance of such injunction and to the ordering of specific performance. However, upon appointment of an arbitrator, the arbitrator shall review any interim, injunctive relief granted by a court of competent jurisdiction and shall have the discretion, jurisdiction, and authority to continue, expand, or dissolve such relief pending completion of the arbitration of such dispute or controversy. The parties agree that any orders issued by the arbitrator may be enforced by any court of competent jurisdiction if necessary to ensure compliance by the parties.



---

7. General Provisions.

(a) *Governing Law; Consent to Personal Jurisdiction*. This Intellectual Property Agreement will be governed by the laws of the State of Utah as they apply to contracts entered into and wholly to be performed within such State. I hereby expressly consent to the nonexclusive personal jurisdiction and venue of the state and federal courts located in the federal District of Utah for any lawsuit filed there by either party arising from or relating to this Intellectual Property Agreement.

(b) *Entire Agreement*. This Intellectual Property Agreement sets forth the entire agreement and understanding between the Company and me relating to the subject matter herein and merges all prior discussions between us. No modification of or amendment to this Intellectual Property Agreement, nor any waiver of any rights under this Intellectual Property Agreement, will be effective unless in writing signed by the party to be charged. Any subsequent change or changes in my duties, salary or compensation will not affect the validity or scope of this Intellectual Property Agreement.

(c) *Severability*. If one or more of the provisions in this Intellectual Property Agreement is deemed void by law, then the remaining provisions will continue in full force and effect.

(d) *Successors and Assigns*. This Intellectual Property Agreement will be binding upon my heirs, executors, administrators and other legal representatives and will be for the benefit of the Company, its successors, and its assigns.

(e) *At Will Relationship*. I understand and acknowledge that my Relationship with the Company is and shall continue to be at-will, as defined under applicable law, meaning that either I or the Company may terminate the Relationship at any time for any reason or no reason, without further obligation or liability.

(f) *ADVICE OF COUNSEL*. I ACKNOWLEDGE THAT, IN EXECUTING THIS AGREEMENT, I HAVE HAD THE OPPORTUNITY. TO SEEK THE ADVICE OF INDEPENDENT LEGAL COUNSEL, AND I HAVE READ AND UNDERSTOOD ALL OF THE TERMS AND PROVISIONS OF THIS AGREEMENT. THIS AGREEMENT SHALL NOT BE CONSTRUED AGAINST ANY PARTY BY REASON OF THE DRAFTING OR PREPARATION HEREOF.

(g) *Not an IRS "Confidential Transaction"*. Notwithstanding anything in this Agreement or in any other written or oral understanding or agreement to which the parties hereto are parties or by which they are bound, either the Company or I (or either of our representatives, agents or employees) may consult any tax advisor regarding the tax treatment and tax structure of the transaction contemplated by this Agreement and may at any time disclose to any person, without limitation of any kind, the tax treatment and tax structure of such transaction and all materials (including opinions or other tax analyses) that are provided relating to such treatment or structure. The preceding sentence is intended to satisfy the requirements for the transaction contemplated herein to avoid classification as a "confidential transaction" in accordance with Treasury Regulations Section 1.6011-4(b)(3) and shall be interpreted consistent with such intent.



---

This authorization is not intended to permit disclosure of any other information relating to any transaction contemplated by the Relationship, including (without limitation) (i) any portion of any materials to the extent not related to the tax treatment or tax structure of any such transaction, (ii) the identities of participants or potential participants in any such transaction, (iii) the existence or status of any negotiations, (iv) any pricing or financial information (except to the extent such pricing or financial information is related to the tax treatment or tax structure of any such transaction), or (v) any other term or detail not relevant to the tax treatment or the tax structure of any such transaction.

(h) *Survival*. The provisions of this Agreement shall survive the termination of the Relationship and the assignment of this Agreement by the Company to any successor in interest or other assignee.



---

IN WITNESS WHEREOF, the undersigned has executed this Confidential Information and Intellectual Property Assignment Agreement as of March 27, 2003.

By: /s/ William B. West

Name: William B. West

Address:

Witness

By: /s/ W. Eric Smith

Name: W. Eric Smith

Address:

---

**APPENDIX A**

**Utah Code Annotated Section 34-39-3. Scope of act — When agreements between an employee and employer are enforceable or unenforceable with respect to employment inventions — Exceptions.**

(1) An employment agreement between an employee and his employer is not enforceable against the employee to the extent that the agreement requires the employee to assign or license, or to offer to assign or license, to the employer any right or intellectual property in or to an invention that is:

(a) created by the employee entirely on his own time; and

(b) not an employment invention.

(2) An agreement between an employee and his employer may require the employee to assign or license, or to offer to assign or license, to his employer any or all of his rights and intellectual property in or to an employment invention.

(3) Subsection (1) does not apply to:

(a) any right, intellectual property or invention that is required by law or by contract between the employer and the United States government or a state or local government to be assigned or licensed to the United States; or

(b) an agreement between an employee and his employer which is not an employment agreement.

(4) Notwithstanding Subsection (1), an agreement is enforceable under Subsection (1) if the employee's employment or continuation of employment is not conditioned on the employee's acceptance of such agreement and the employee receives a consideration under such agreement which is not compensation for employment.

(5) Employment of the employee or the continuation of his employment is sufficient consideration to support the enforceability of an agreement under Subsection (2) whether or not the agreement recites such consideration.

(6) An employer may require his employees to agree to an agreement within the scope of Subsection (2) as a condition of employment or the continuation of employment.

(7) An employer may not require his employees to agree to anything unenforceable under Subsection (1) as a condition of employment or the continuation of employment.

(8) Nothing in this chapter invalidates or renders unenforceable any employment agreement or provisions of an employment agreement unrelated to

employment inventions.

Enacted by Chapter 217, 1989 General Session

---

**APPENDIX B**

**CONTROL4 CORPORATION**

**Termination Certificate**

This is to certify that I do not have in my possession, nor have I failed to return, any devices, records, data, notes, reports, proposals, lists, correspondence, specifications, drawings, blueprints, sketches, materials, equipment, other documents or property, or reproductions of any aforementioned items belonging to Control4 Corporation, its subsidiaries, affiliates, successors or assigns (together, the "Company).

I further certify that I have complied with all the terms of the Company's Confidential Information and Intellectual Property Assignment Agreement signed by me (the "Intellectual Property Agreement"), including the reporting of any Intellectual Property (as defined therein), conceived or made by me (solely or jointly with others) covered by the Intellectual Property Agreement.

I further agree that, in compliance with the Intellectual Property Agreement, I will preserve as confidential all trade secrets, confidential knowledge, data or other proprietary information relating to products, processes, know-how, designs, formulas, developmental or experimental work, computer programs, data bases, other original works of authorship, customer lists, business plans, financial information or other subject matter pertaining to any business of the Company or any of its employees, clients, consultants or licensees.

I further agree that for nine (9) months from this date, I shall not solicit the employment of any person who shall then be employed by the Company (as an employee or consultant) or who shall have been employed by the Company (as an employee or consultant) within the prior nine (9) month period, on behalf of myself or any other person, firm, corporation, association or other entity, directly or indirectly, all as provided more fully with the Intellectual Property Agreement.

Date: ______________________________________________,

______________________________________________
(Signature)

---

**CONTROL4 CORPORATION**

**EMPLOYMENT AMENDMENT AGREEMENT**

This Employment Amendment Agreement (this "***Amendment***") is made as of June 17, 2004, by and among Control4 Corporation, a Delaware corporation (the "***Company***"), and William B. West (the "***Employee***"). Capitalized terms not defined herein shall have the meaning assigned to them in the Employment Agreement and/or the Employee PIIA, as applicable (such terms as defined below).

**RECITALS**

WHEREAS, the Company and the Employee are parties to that certain Employment Agreement dated as of July 29, 2003 (the "***Employment Agreement***") and the Confidential Information and Intellectual Property Assignment Agreement attached as Exhibit B thereto (the "***Employee PIIA***"), and

WHEREAS, the Company and Employee desire to amend the Employment Agreement and the Employee PIIA as set forth herein;

NOW, THEREFORE, in consideration of the premises and the mutual covenants herein contained, and other good and valuable consideration the receipt and sufficiency of which is hereby acknowledged, the undersigned hereby agree as follows:

**SECTION 1**

1.1 Section 4 of the Employment Agreement is hereby amended and restated in its entirety to read as follows:

"4. Noncompetition. During the term of Employee's employment with the Company and for twenty-four (24) months after termination, for any reason, of Employee's employment with the Company, Employee shall not directly or indirectly, own, manage, operate, join or control, be employed by or participate in the ownership, management, operation or control of, or be a consultant to or connected in any other manner with, any business, firm or corporation which is similar to or

competes with a principal business of the Company or its subsidiaries (a "Competitive Activity"); provided, however, that Employee's ownership of securities of any company not in excess of one percent of any class of such securities shall not be considered to be competition with the Company or its subsidiaries. Employee acknowledges that the foregoing is in addition to Employee's obligations under mat certain Confidential information and Intellectual Property Assignment Agreement between the Company and Employee, including without limitation Section 4 thereof, attached hereto as Exhibit B (the "Confidentiality Agreement").

1.2 Section 5(d)(i) of the Employment Agreement is hereby amended and restated in its entirety to read as follows:

"(i) In addition to paying Employee all wages earned through the date of termination, the Company shall pay Employee severance equal to twelve (12) months of his then-current regular base salary in effect at the time notice of termination is given, paid out over the

---

Company's regular payroll schedule following the effective date of the release, as well as all other unpaid amounts, if any, that Employee has earned as of the date of termination under any compensation plan or program of the Company, at the time such payments are or become due;"

1.3 The Employment Agreement is hereby amended to include Section 14 to read as follows:

"14. Separate Covenants. The parties expressly agree that the character, duration and geographical scope of this Agreement are reasonable in light of the circumstances as they exist on the date upon which this Agreement has been executed. However, should a determination nonetheless be made by a court of competent jurisdiction at a later date that the character, duration or geographical scope of this Agreement is unreasonable in light of the circumstances as they then exist, then it is the intention and the agreement of Employee that this Agreement shall be construed by the court in such a manner as to impose only those restrictions on the conduct of Employee that are reasonable in light of the circumstances as they then exist and as are necessary to assure the Company of the intended benefit of this Agreement. If, in any judicial proceeding, a court shall refuse to enforce all of the separate covenants deemed included herein because, taken together, they are more extensive than necessary to assure the Company of the intended benefit of this Agreement, it is expressly understood and agreed among the parties hereto that those of such covenants that, if eliminated, would permit the remaining separate covenants to be enforced in such proceeding shall, for the purpose of such proceeding, be deemed eliminated from the provisions hereof."

1.4 The Employment Agreement is hereby amended to include Section 15 to read as follows:

"15. Severability. If any of the provisions of this Agreement shall otherwise contravene or be invalid under the laws of any state, country or other jurisdiction where this Agreement is applicable but for such contravention or invalidity, such contravention or invalidity shall not invalidate all of the provisions of this Agreement but rather it shall be construed, insofar as the laws of that state, country or jurisdiction are concerned, as not containing the provision or provisions contravening or invalid under the laws of that state or jurisdiction, and the rights and obligations created hereby shall be construed and enforced accordingly."

1.5 Section 4 of the Employee PIIA is hereby amended and restated in its entirety to read as follows:

"4. **No Solicitation of Employees, Consultants and Other Parties**. I agree that during the period of my Relationship with the Company and for a period of twenty-four (24) months thereafter I shall not directly or indirectly solicit, induce, recruit or encourage or take away any person who shall then be employed by the Company (as an employee or consultant) or who shall have been employed by the Company (as an employee or consultant) within the prior nine (9) month period, on behalf of myself or any other person, firm, corporation, association or other entity, directly or indirectly. Further, during my Relationship with the Company and at any time following termination of my Relationship with the Company for any reason, with or without cause, I shall not use any Confidential Information of the Company to attempt to negatively influence any of the Company's clients, suppliers or customers from purchasing Company



---

products or services or providing goods or services to the Company or to solicit or influence or attempt to influence any client, customer or other person either directly or indirectly, to direct his or its purchase of products and/or services or his or its provision of products and/or services to any person, firm, corporation, institution or other entity in competition with the business of the Company."

**SECTION 2**

2.1 Except as set forth in Section 1 of this Amendment, the Employment Agreement and all exhibits attached thereto, including, without limitation, the Employee PIIA shall continue in full force and effect.

2.2 This Amendment shall be interpreted, construed, and enforced in all respects in accordance with the laws of the State of Utah, without reference to its choice of law rules.

2.3 This Amendment may be executed by the parties hereto in separate counterparts, each of which when so executed and delivered shall be an original, but

all such counterparts together shall constitute one and the same instrument.

**[Remainder of Page Intentionally Left Blank]**



---

IN WITNESS WHEREOF, the parties have executed this Employment Amendment Agreement as of the date first above written.

**COMPANY:**

**CONTROL4 CORPORARTION**

By: /s/ William B. West

William B. West, Chief Executive Officer

**EMPLOYEE:**

/s/ William B. West

*(signature)*

William B. West

*(printed name)*

Address:

**SIGNATURE PAGE TO EMPLOYMENT AMENDMENT AGREEMENT**

---

August 3, 2011

William B. West

Dear Will:

As of August 3, 2011 this letter (the "***Agreement***") memorializes your employment relationship with Control4 Corporation (the "***Company***") as follows:

1. **Employment.** You will continue to be employed in a full-time capacity as the Company's Chief Executive Officer until such time as your successor (the "***New CEO***") is appointed by the Board of Directors (the "***Board***"). As you know, the Board has engaged in a process to identify and recruit a New CEO. Upon his or her appointment in such role, your title will initially become the Company's Chief Strategy Officer (with your specific role and responsibilities to be decided upon by the New CEO and Board in consultation with you). You will also be appointed the Chairman of the Board provided, however, that the latter appointment as Chairman may terminate at the discretion of the then current Board (collectively, your "***New Rote***"). Your employment with the Company prospectively from the date hereof will be for an unspecified duration and is intended to constitute "at-will" employment.

2. **Compensation.**

(a) *Base Salary.* Effective as of the date of this Agreement, your annual base salary will be increased from $280,000 (the "***Prior Base Salary***") to $300,000 per year, less applicable deductions and withholdings, paid in accordance with the Company's standard payroll procedures. Your position as of today and when you assume the New Role will be classified as "exempt" and you will not be eligible for overtime pay.

(b) *Equity Incentives.* You are currently the record holder of 1,650,000 shares of Company Common Stock and William and Lisa West Holdings, LTD is currently the record holder of 500,000 shares of Company Common Stock (collectively "***Your Shares***"). You are also the holder of record of an option to purchase 1,749,795 shares of Company Common Stock ("***Current Option***"). In addition, the Company will request that its Board approve the grant to you of an additional option (a "***New Option***") to purchase an additional 500,000 shares of Company Common Stock. Such New Option shall vest during so long as you remain employed by the Company as follows: 25% of the New Option shares will vest on the one-year anniversary of the date of its grant; and the remaining New Option shares will vest in equal monthly installments over the subsequent 36 months. In addition but not contradicting the foregoing or the other terms and conditions set forth herein, the terms and

conditions of such New Option will be governed by the Company's Equity Incentive Plan, as currently in effect (the "***Plan***").

(c) *Bonus.* You will continue to be eligible to receive a 2011 performance bonus based upon previously determined criteria as defined by the Board. You will also be eligible to participate in future executive bonus programs as determined by the Board in its sole discretion and based upon milestones related to your operating role.

---

(d) *Stay Bonus.* If you remain continuously employed with the Company from the date hereof through the 180 day period following the hire date of the New CEO, you shall receive a $50,000 bonus, less applicable deductions and withholdings, to be paid in accordance with the Company's standard payroll procedures.

(e) *Business Expenses:* The Company will continue to reimburse you for reasonable business expenses incurred by you from time to time in accordance with applicable Company travel and expense policies.

3. **Taxes and 409A Compliance.**

(a) The intent of the parties is that payments and benefits under this Agreement comply with Internal Revenue Code Section 409A and the regulations and guidance promulgated thereunder (collectively "***Code Section 409A***") and, accordingly, to the maximum extent permitted, this Agreement shall be interpreted to be in compliance therewith. In no event whatsoever shall the Company be liable for any additional tax, interest or penalty that may be imposed on you by Code Section 409A.

(b) A termination of employment shall not be deemed to have occurred for purposes of any provision of this Agreement providing for the payment of any amounts or benefits upon or following a termination of employment unless such termination is also a "separation from service" within the meaning of Treas. Reg. Section 1.409A-3(a)(l) and, for purposes of any such provision of this Agreement, references to a "termination," "termination of employment" or like terms shall mean "separation from service." Notwithstanding anything to the contrary in this Agreement, if you are deemed on the date of termination to be a "specified employee" within the meaning of that term under Treas. Reg. Section 1.409A-l(i), then with regard to any payment or the provision of any benefit that is considered deferred compensation under Code Section 409A payable on account of a "separation from service," such payment or benefit shall not be made or provided until the date which is the earlier of (i) the expiration of the six (6)-month period measured from the date of your "separation from service," and (ii) the date of your death, to the extent required under Code Section 409A. Upon the expiration of the foregoing delay period, all payments and benefits delayed pursuant to this Section 3(b) (whether they would have otherwise been payable in a single sum or in installments in the absence of such delay) shall be paid or reimbursed to you in a lump sum, and any remaining payments and benefits due under this Agreement shall be paid or provided in accordance with the normal payment dates specified for them herein.

(c) To the extent that business expense reimbursements or other in-kind benefits under this Agreement constitute "nonqualified deferred compensation" for purposes of Code Section 409A, (i) all such expenses or other reimbursements hereunder shall be made on or prior to the last day of the taxable year following the taxable year in which such expenses were incurred by you, (ii) any right to reimbursement or in-kind benefits shall not be subject to liquidation or exchange for another benefit, and (iii) no such reimbursement, expenses eligible for reimbursement, or in-kind benefits provided in any taxable year shall in any way affect the expenses eligible for reimbursement, or in-kind benefits to be provided, in any other taxable year.



---

(d) For purposes of Code Section 409A, your right to receive any installment payments pursuant to this Agreement shall be treated as a right to receive a series of separate and distinct payments. Whenever a payment under this Agreement specifies a payment period with reference to a number of days, the actual date of payment within the specified period shall be within the sole discretion of the Company.

(e) Notwithstanding any other provision of this Agreement to the contrary, in no event shall any payment under this Agreement that constitutes "nonqualified deferred compensation" for purposes of Code Section 409A be subject to offset by any other amount unless otherwise permitted by Code Section 409A.

4. **Termination of Employment.** Upon the termination of your employment for any reason, you shall be entitled to the compensation, benefits and reimbursements then due and owing for the period ending as of the end of the effective date of the termination (the "***Termination Date***") and the Company shall make the following payments to you (or your beneficiaries or estate if applicable) on your Termination Date ("***Accrued Benefits***"): (i) ail accrued but unpaid salary and any unpaid vacation that has accrued pursuant to the Company's vacation accrual policy through the Termination Date, (ii) any earned but unpaid bonuses, (iii) any unreimbursed business expenses, and in addition (iv) you will continue to be able to exercise any vested and exercisable stock options then held by you pursuant to their terms and conditions. In addition, you may also be eligible for other post-employment payments and benefits as provided in this Agreement or pursuant to other agreements or plans with the Company that you enter into from time to time.

(a) *By Death.* Your employment shall terminate automatically upon your death. The Company shall pay to your beneficiaries or estate, as appropriate, the Accrued Benefits. Thereafter, all obligations of the Company under this Agreement shall cease.

(b) *By Disability.* For purposes of this Agreement, "disability" means a mental or physical impairment that is expected to result in death or that has lasted or is expected to last for a continuous period of three (3) months or more and that causes you to be unable to perform your duties under this Agreement and to be engaged in any substantial gainful activity. If you experience such a disability, then, to the extent permitted by law, the Company may terminate your employment upon sixty (60) days' advance written notice. Termination by disability shall be determined by a physician selected by the Board. If such physician is unable to schedule an appointment with you within ten business days of physician's written request, the Board is authorized to determine whether your disability has occurred at its sole discretion. The Company shall pay you all compensation to which you are entitled up through the last business day of the notice period, and the Accrued Benefits. Thereafter, all obligations of Company under this Agreement shall cease. Nothing in this subsection shall affect your rights under any applicable Company disability plan. Termination by disability shall not constitute termination without Cause or for resignation for Good Reason.

(c) *By Company Not For Cause or By You for Good Reason.* At any time, Company may terminate your employment without Cause by providing you written notice of such termination or you may terminate your employment for Good Reason. In either event, the Company will pay to you the Accrued Benefits and all post-termination payments and benefits



---

when due as provided in this Agreement. As a condition to your receipt of such benefits, you will be required to comply with your continuing obligations (including without limitation the return of any Company property and the non-competition and non-solicitation obligations set forth herein), resign from all positions you hold with the Company, and execute the Company's standard form of release agreement (which the Company will provide to you within one (1) week of your termination) in which you agree to fully release the Company and its representatives from any and all claims you may have and such release must become effective no later than sixty (60) days after your termination. Thereafter, all obligations of the Company under this Agreement will cease except as set forth herein.

(d) *By Company For Cause.* At any time, unless such actions are cured as described below, and without prior notice for actions that are not curable, the Company may terminate your employment for Cause. In such event, the Company will pay to you the Accrued Benefits. Thereafter, all obligations of the Company under this Agreement will cease.

(e) *By You Without Good Reason.* At any time you may terminate your employment voluntarily and without Good Reason. In such event, the Company will pay to you the Accrued Benefits. Thereafter, all obligations of the Company under this Agreement will cease.

5. **Severance Benefits.** Subject to the conditions set forth in Section 4(c) above, in the event your employment with the Company is terminated by the Company without Cause or by you for Good Reason, then you will be entitled to receive:

(a) the continued payment of your Prior Base Salary for twelve months (12) months (the "***Initial Cash Severance***") plus, thereafter, additional payments equal to the lesser of $25,000 per month or your then current monthly base salary for up to twelve (12) additional months to be calculated as follows: one (1) additional month for each full month your employment with the Company continues after the date hereof (the "***Additional Cash Severance***"); provided, however, that should the Company consummate an initial public offering, otherwise become a public reporting company under the Securities Exchange Act of 1934, as amended, or undergo a "change of control" as defined in the Plan, there shall be no Additional Cash Severance and the Initial Cash Severance shall be paid at a monthly rate equal to the greater of $25,000 or your monthly base salary in effect immediately prior to such termination. Notwithstanding the foregoing, if the foregoing Initial Cash Severance and, if applicable Additional Cash Severance constitute deferred compensation for purposes of Code Section 409A (as defined below) as determined by the Company, such payments shall commence upon the 60th date following your date of termination (and the first payment shall include payment of all amounts that otherwise would have been due prior thereto under the terms of this Agreement had such payments commenced immediately upon your termination, and any payments thereafter shall continue as provided herein);

(b) In the event that you choose to exercise the your right under COBRA to continue your participation in the Company's group medical, dental and vision insurance plan and make all timely and proper elections with respect to same under COBRA, the Company shall pay the full amount of the costs for such coverage during the severance period, to the same extent that such insurance is provided to persons then currently employed by the Company.



---

Should the Severance Period extend beyond the period in which you are eligible to make a COBRA election, the Company will use commercially reasonable efforts to provide comparable continued group medical, dental and vision coverage for you and your dependents (i.e., comparable coverage levels that you had on the date of your termination) which coverage will continue until the earlier of the duration of the Severance Period or until you become eligible to receive such benefits by another employer. Notwithstanding any provision of this Agreement to the contrary, the Company may unilaterally amend this Agreement to the extent it deems it necessary in order to avoid the imposition of excise taxes, penalties or similar charges on the Company as a result of this Agreement being considered to be "discriminatory," including, without limitation, any penalties under Section 4980D of the Code, and in such event the Company will use its commercially reasonable efforts to provide comparable coverage.

(c) The Accrued Benefits;

(d) Accelerated vesting of a portion of the unvested shares purchasable upon exercise of the New Option as equals the number of shares that would otherwise vest over one (1) month for each full month that your employment with the Company continues from the date of this Agreement; provided, however, that in no event shall such accelerated vesting exceed the acceleration of that number of shares as would otherwise vest over a twelve (12) month period; and provided further that should your employment terminate prior to the six (6) month anniversary of this Agreement, you shall be deemed vested in 12.5% of the shares purchasable upon exercise of the New Option;

(e) In the event of your termination within 180 days of the New CEO commencing employment with the Company, you will receive the Stay Bonus of $50,000 as provided in Section 2(d) above; and

(f) Extension of the post-termination exercise period for your Current Option and New Option to twelve (12) months.

For purposes of clarity, you will not be entitled to receive the foregoing benefits of subsection 5(a) through (f) should your employment terminate for Cause (as provided in Section 4(d) above) or should you terminate your employment other than for Good Reason (as provided in Section 4(e) above).

6. **Benefits.** You will be entitled to continue to participate in the Company's full employment benefits available to Company executives, as currently in effect or as the Company may revise such benefits in the future, in its sole discretion. As you know, participation in Company benefit programs may require payroll deductions and/or direct contributions by you. In addition, each year you will continue to accrue paid time off in the same manner as you have prior to the date of this Agreement. Any unused vacation will be paid to you in cash upon your termination of employment.

7. **Confidentiality Agreement.** The Confidential Information and Intellectual Property Assignment Agreement, as amended pursuant to the terms of that certain Employment Amendment Agreement, dated as of June 17, 2004, a copy of which is attached hereto as Exhibit A (the "***PIIA***"), remains in full force and effect.



---

8. **Noncompetition and Nondisparagement.**

(a) During the term of your employment with the Company and for twenty-four (24) months after termination, for any reason, of your employment with the Company, you shall not directly or indirectly, own, manage, operate, join or control, be employed by or participate in the ownership, management, operation or control of, or be a consultant to or connected in any other manner with, any business, firm or corporation which is similar to or competes with a principal business of the Company or its subsidiaries; provided, however, that your ownership of securities of any company not in excess of one percent of any class of such securities shall not be a violation of this provision. You acknowledge that the foregoing is in addition to your obligations under the PIIA.

(b) From the date hereof and forever hereafter, you expressly agree not to disparage the Company, its past and present investors, officers, directors or employees or its affiliates and to keep all confidential and proprietary information about the past or present business affairs of the Company and its affiliates confidential unless a prior written release from the Company is obtained or unless disclosure is required by law.

9. **Indemnification.** The Company and you hereby acknowledge and ratify that certain Indemnification Agreement dated as of March 24, 2011, between you and the Company (the "***Indemnification Agreement***") and such Indemnification Agreement remains in full force and effect.

10. **Defined Terms:** For purposes of this Agreement, the following terms will mean:

(a) "***Cause***" shall be defined as (1) your repeated failure, in the reasonable judgment of the New CEO or Board, to perform one or more of your essential duties and responsibilities to the Company after written notice thereof from the New CEO or Board to you describing your failure to perform such duties or responsibilities and, if such failure is remediable, your failure to remedy same within 10 days of receiving written notice; (2) your refusal or failure to comply with the legal directives of the New CEO or Board after written notice thereof to you describing your failure to comply and, if such failure is remediable, your failure to remedy same within 10 days of receiving written notice; (3) your material violation of any Company policy; (4) your commission or conviction of, or entry of a plea of nolo contendere to, any felony or any act of fraud, embezzlement, dishonesty, moral turpitude, misappropriation or any other misconduct that has caused or is reasonably expected to result in material injury to the Company or its affiliates; (5) your unauthorized use or disclosure of any proprietary information or trade secrets of the Company or any other party to whom he owes an obligation of nondisclosure as a result of his relationship with the Company; (6) your material breach of any of his obligations under any written agreement or covenant with the Company; or (7) your violation of a federal or state law or regulation applicable to the Company which violation was or is reasonably likely to be injurious to the Company; provided, however, that a finding of any of the above shall be predicated on a good faith determination by the New CEO or Board.

(b) "***Code***" means the Internal Revenue Code of 1986, as amended.

(c) "***Company***" means Control4 Corporation, a Delaware corporation.



---

(d) "***Disability***" means you have a mental or physical impairment that is expected to result in death or that has lasted or is expected to last for a continuous period of three months or more and that causes you to be unable to perform your duties under this Agreement and to be engaged in any substantial gainful activity.

(e) "***Good Reason***" for your resignation shall mean that, within 90 days after the occurrence of one or more of the following condition(s) or Company actions (unless such conditions) or Company action(s) applies generally to all of the Company's management of the Company or unless you consent in writing to such action(s)), you resign in writing from your employment with the Company: (1) a material reduction in your base salary as in effect immediately before such reduction; (2) the relocation by the Company of your then-current work site that has the effect of increasing your then-current commute by more than 50 miles (not including any regular business travel consistent with the business travel requirements of the your position with the Company), or (3) your employment continues but you no longer serve in an executive operating role (which for clarification purposes shall mean you no longer report directly to the Company's Chief Executive Officer). In order to qualify for Good Reason, your resignation must be preceded by your delivery to the Company of written notice of the existence of the foregoing condition(s) or Company action(s), which notice shall require the Company to remedy such condition(s) or Company action(s) within 30 days of such notice.

(f) "***Prior Agreement***" means that certain employment agreement between you and the Company, dated as of July 28, 2003, as amended by that certain Employment Amendment Agreement, dated as of June 17, 2004 (a copy of which is attached hereto as Exhibit B).

11. **Governing Law.** This Agreement will be construed in accordance with, and governed by, the laws of the State of Utah without regard to its conflicts of law principles. Please note that this Agreement (together with the surviving provisions of the Prior Agreement, the PIIA, and the documentation memorializing the purchase of Your Shares, your Current Option and your New Option (as amended from time to time), and the Indemnification Agreement) represent the entire agreement and understanding between you and the Company regarding your employment with the Company and supersede any and all prior representations, promises or agreements, whether written or oral. To the extent that the practices, policies or procedures of Company or any other document referenced in this Agreement, now or in the future, apply to you, are inconsistent with the terms of this Agreement, the provisions of this Agreement will control.

***********************

If you are in agreement with the above, please execute a copy of this Agreement where indicated below, and return an executed copy to the Company via fax or email PDF.

***********************



---

On behalf of the Board, we look forward to your continuing leadership.

Sincerely,

*CONTROL4 CORPORATION*

By: /s/ Len Jordan
Name: Len Jordan
Title: Chairman of the Board

ACCEPTED AND AGREED:

/s/ William B. West
William B. West



---

**Exhibit 10.6**

**EMPLOYMENT AGREEMENT**

This EMPLOYMENT AGREEMENT (this "**Agreement**") is made and entered into as of , 2007, by and between Control4 Corporation, a Delaware corporation (the "**Company**"), and Dan Strong ("**Employee**").

**RECITALS**

**WHEREAS**, the Company desires to obtain Employee's continued service and Employee agrees to employment with the Company in accordance with the following terms and conditions.

**AGREEMENT**

**NOW THEREFORE**, for and in consideration of the mutual promises and covenants set forth herein and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties agree as follows:

1. Employment. Employee shall serve as a full-time employee of the Company as its Chief Financial Officer. Employee's employment with the Company shall be for no certain duration but will be "at-will" employment. Although the Company's personnel policies and procedures may change from time to time, the "at-will" nature of Employee's employment may only be changed in a document signed by Employee and a duly authorized member of the Company's Board of Directors.

2. Compensation.

(a) *Base Salary*. Employee's salary shall initially be set at $17,333.34 per month, which is equivalent to $208,000.00 on an annual basis, less applicable deductions and withholdings, paid in accordance with the Company's standard payroll procedures. Employee's position will be classified as "exempt" and Employee will not be eligible for overtime pay.

(b) *Signing Bonus*. Employee shall receive a bonus of $40,000.00 upon the execution of this Agreement and the related Company agreements. Employee agrees to refund this bonus to the Company in the event that he terminates his employment with the Company within 12 months of the date of this Agreement (other than a termination for Good Reason, as defined below).

(c) *Stock Options*. The Company will request that its Board of Directors approve a grant of 722,564 Company stock options to Employee, which number represents one percent (1%) of the fully diluted capital stock of the Company (which includes all outstanding shares of Common Stock and Preferred Stock, as well as the shares purchasable upon exercise of all outstanding options and warrants, as well as those additional shares of Common Stock reserved for issuance under the Company's 2003 Stock Incentive Plan). The terms and conditions of the option grant will be as set forth in the Company's 2003 Equity Incentive Plan and the vesting of the option grant shall be as approved by the Company's Board of Directors.

---

(d) *Performance Bonus*. At such time, if any. as the Board of Directors determines in its sole discretion that the Company has achieved requisite development, revenue and/or profitability milestones, the Board of Directors will determine Employee's eligibility to receive an incentive bonus up to 50% of Employee's Base Salary, less applicable deductions and withholdings, subject to the attainment of Company and individual performance objectives as determined by the Board of Directors and subject to any other terms and conditions determined by the Board of Directors.

(e) *Other Benefits*. The Company shall provide Employee with the opportunity to participate in the Company's standard benefits plans available to other similarly situated employees and approved by the Board of Directors, subject to any eligibility requirements imposed by such plans or programs.

(f) *Business Expenses*. The Company shall reimburse business expenses incurred by Employee from time to time, which shall include, without limitation, mobile telephone, home office telephone and home office high-speed Internet access expenses, in accordance with the Company's standard policies and procedures relating thereto as approved from time to time by the Board of Directors.

(g) *Vacation*. Employee will be entitled to accrue up to three (3) weeks of vacation leave consisting of fifteen (15) business days earned on an annual, pro-rata basis throughout each calendar year of employment, all in accordance with the Company's standard vacation policy in effect from time to time and approved by the Board of Directors. Employee's vacation accrual will be pro-rated for the remainder of this calendar year. Once the maximum vacation accrual is reached, no further vacation will accrue. When some vacation is used, vacation will begin to accrue again. There will be no retroactive grant of vacation for the period of time the accrued vacation was at the maximum accrual balance.

3. Noncompetition. During the term of Employee's employment with the Company and for twelve (12) months after termination, for any reason, of Employee's employment with the Company, Employee shall not directly or indirectly, own, manage, operate, join or control, be employed by or participate in the ownership, management, operation or control of, or be a consultant to or connected in any other manner with, any business, firm or corporation which is similar to or competes with a principal business of the Company or its subsidiaries (a "**Competitive Activity**"); *provided, however*, that Employee's ownership of securities of any company not in excess of one percent of any class of such securities shall not be considered to be competition with the Company or its subsidiaries. Employee acknowledges that the foregoing is in addition to Employee's obligations under that certain Confidential Information and Intellectual Property Assignment Agreement between the Company and Employee, including without limitation Section 4 thereof, attached hereto as Exhibit A (the "**Confidentiality Agreement**").

4. Termination.

(a) *By Death*. Employee's employment shall terminate automatically upon his death. The Company shall pay to Employee's beneficiaries or estate, as appropriate, any compensation then due and owing, including payment for accrued bonus, unused vacation,



expense reimbursement, if any, and any other benefits provided under this Agreement, including without limitation the ability to exercise any vested and exercisable options held by Employee. Thereafter, all obligations of the Company under this Agreement shall cease. Nothing in this Section 4(a) shall affect any entitlement of Employee's heirs to the benefits of any life insurance plan or other applicable benefits.

(b) *By Disability*. For purposes of this Agreement, "disability" means a mental or physical impairment that is expected to result in death or that has lasted or is expected to last for a continuous period of three (3) months or more and that causes Employee to be unable to perform his duties under this Agreement and to be engaged in any substantial gainful activity. If Employee experiences such a disability, then, to the extent permitted by law, the Company may terminate Employee's employment upon sixty (60) days' advance written notice. Termination by disability shall be determined by a physician selected by the Board of Directors. If such physician is unable to schedule an appointment with Employee within ten business days of physician's written request, the Board of Directors are authorized to determine whether Employee's disability has occurred at its sole discretion. The Company shall pay Employee all compensation to which he is entitled up through the last business day of the notice period, including payment for accrued unused vacation, expense reimbursement, if any, and any other benefits provided under this Agreement, including without limitation the exercisability of any vested and exercisable option held by Employee; thereafter, all obligations of Company under this Agreement shall cease. Nothing in this Section 4(b) shall affect Employee's rights under any applicable Company disability plan. Termination by disability shall not constitute termination without Cause or for Good Reason.

(c) *For Cause or Without Good Reason*. If Employee's employment is terminated by the Company for Cause (as defined below) or by Employee for other than. Good Reason (as defined below), the Company shall pay Employee all wages earned through the date of termination at the rate in effect at the time notice of termination is given and the Company shall have no further obligations to Employee under this Agreement.

(d) *Without Cause or For Good Reason*. In no way limiting the Company's policy of employment at-will, if Employee's employment is terminated by the Company without Cause or by Employee for Good Reason, and other than as a result of Employee's death or disability, the Company will offer certain severance benefits to Employee as specified below. As a condition to Employee's receipt of such benefits, Employee is required to comply with Employee's continuing obligations (including without limitation the return of any Company property and the non-competition and non-solicitation obligations), resign from all positions Employee holds with the Company, and execute the Company's standard form of release agreement releasing any and all claims Employee may have against the Company.

(i) In addition to paying Employee all wages earned through the date of termination, the Company shall pay Employee severance equal to six (6) months of his then-current regular base salary in effect at the time notice of termination is given, paid out over the Company's regular payroll schedule following the effective date of the release, as well as all other unpaid amounts, if any, that Employee has earned as of the date of termination under any compensation plan or program of the Company, at the time such payments are or become due;



(ii) For the first six (6) months after Employee's date of termination, the Company shall continue, to the extent permitted under the terms of the applicable plans, to maintain in full force and effect, and cover the premium costs of, the insurance benefits set forth in Section 2(d) of this Agreement; *provided*, that if (A) the Employee becomes reemployed after the date of termination and (B) his new employer offers medical and dental insurance plans or programs under which he will be eligible to participate, any such continuing medical and dental coverage shall, be secondary to such new employer's coverage.

(iii) In addition to all of Employee's stock and stock options that were vested on the date of termination, if such termination without Cause or for Good Reason occurs either (A) within 60 days prior to a Change of Control and in direct contemplation of such Change of Control or (B) within 12 months after a Change of Control, then 75% of Employee's remaining unvested Options shall fully vest.

"**Change of Control**" shall mean a transaction or series of related transactions that constitutes a "Deemed Liquidation" in accordance with the Company's then current Certificate of Incorporation, as amended from, time to time.

(e) *Priority*. The compensation and benefits, if any, payable under this Section 4 shall be in addition to any vested accrued compensation or benefits to which the Employee may be entitled under the Company's (or any of its subsidiaries') employee benefit plans and arrangements; *provided, however*, that the severance benefits provided by this Agreement shall supercede, and Employee shall not also be entitled to, any compensation or benefits under any other severance plan or arrangement of the Company or any of its subsidiaries to which Employee would otherwise be entitled under the terms thereof, whether now existing or hereafter adopted.

(f) *Certain Definitions*.

(i) "**Cause**" shall be defined as (1) Employee's repeated failure, in the reasonable judgment of the Board of Directors, to perform one or more of his essential duties and responsibilities to the Company after written notice thereof from the Board of Directors to Employee describing Employee's failure to perform such duties or responsibilities and, if such failure is remediable, his failure to remedy same within 10 days of receiving written notice; (2) Employee's refusal or failure to comply with the legal directives of the Board of Directors after written notice thereof from the Board of Directors to Employee describing Employee's failure to comply and, if such failure is remediable, his failure to remedy same within 10 days of receiving written notice; (3) Employee's material violation of any Company policy; (4) Employee's commission or conviction of, or entry of a plea of nolo contendere to, any felony or any act of fraud, embezzlement, dishonesty, moral turpitude, misappropriation or any other misconduct that has caused or is reasonably expected to result in material injury to the Company or its affiliates; (5) Employee's unauthorized use or disclosure of any proprietary information or trade secrets of the Company or any other patty to whom, he owes an obligation of nondisclosure as a result of his relationship with the Company; (6) Employee's material breach of any of his obligations under any written agreement or covenant with the Company; or (7) Employee's violation of a federal or state law or regulation applicable to the Company which violation was or



---

is reasonably likely to be injurious to the Company; *provided, however*, that a finding of any of the above shall be predicated on a good faith determination by the Board of Directors.

(ii) "**Good Reason**" for Employee's resignation shall mean that Employee's continuous status as an employee was "constructively terminated" by the Company if within 90 days after the occurrence of one of the following Company actions (unless such action(s) applies generally to all of the Company's management of the Company or unless Employee consents in writing to such action(s)), Employee resigns in writing from his employment with the Company: (x) a significant reduction in the Employee's duties, position or responsibilities compared to the Employee's duties, position or responsibilities immediately prior to such reduction; *provided, however*, that a reduction in position that occurs solely by virtue of the Company being acquired and made part of a larger entity (as, for example, when a chief financial officer of an acquired company remains as such following a Change of Control but is not made the chief financial officer of the acquiring corporation) shall not constitute "Good Reason" so long as Employee maintains a comparable level of duties and responsibilities with the acquiring entity as Employee held immediately prior to the acquisition; (y) a material reduction in Employee's base salary as in effect immediately before such reduction; and (z) the relocation by the Company of Employee's then current work site that has the effect of increasing the Employee's then-current commute by more than 50 miles (not including any regular business travel consistent with the business travel requirements of the Employee's position with the Company).

5. Confidentiality Agreement. Employee represents that he has signed and returned to the Company the Confidentiality Agreement.

6. Attorneys' Fees. If any legal action or other proceeding, including an arbitration, is brought for the enforcement of this Agreement, or because of an alleged dispute, breach or default thereof, the successful or prevailing party shall be entitled to recover attorneys' fees and other costs incurred in such proceeding, in addition, to any other relief to which it may be entitled.

7. Indemnification. The Company and Employee will enter into the Company's standard form of indemnification agreement for its directors and officers.

8. Governing Law. This Agreement shall be construed in accordance with, and governed by, the laws of the State of Utah without regard to its conflicts of law principles,

9. Arbitration. Any claims arising under this Agreement shall be resolved in binding arbitration with a duly authorized representative of the American Arbitration Association ("**AAA**") in accordance with the provisions hereof and thereof. Either the Company or Employee may submit the matter to binding arbitration before the AAA in Salt Lake County, Utah, which arbitration shall be final and binding on the parties and the exclusive method, absent agreement between the Company and Employee, for purposes of determining the ability of the Company to satisfy such claim. All claims shall be settled by a single arbitrator appointed in accordance with the Commercial Arbitration Rules then in effect of the AAA (the "**AAA Rules**"). The arbitrator shall render a final decision pursuant to the AAA Rules within thirty (30) days after filing of the claim. The final decision of the arbitrator shall, be furnished to



---

Employee and the Company in writing and shall constitute the conclusive determination of the issue in question binding upon Employee and the Company, and shall not be contested by any of them. Such decision may be used in a court of law only for the purpose of seeking enforcement of the arbitrator's decision. The prevailing party shall be entitled to reasonable attorney's fees, costs and necessary disbursements in addition to any other relief that such party may be entitled. For purposes of this Agreement, the prevailing party shall be that party in whose favor final judgment is rendered or who substantially prevails, if both parties are awarded judgment. Notwithstanding the foregoing, any party may pursue any equitable remedies that it may have under this Agreement for any breach, or threatened breach by another party of this Agreement (including without limitation specific performance) in a court of law.

10. Separate Covenants. The parties expressly agree that the character, duration and geographical scope of this Agreement are reasonable in light of the circumstances as they exist on the date upon which this Agreement has been executed. However, should a determination nonetheless be made by a court of competent jurisdiction at a later date that the character, duration or geographical scope of this Agreement is unreasonable in light of the circumstances as they then exist, then it is the intention and the agreement of Employee that this Agreement shall be construed by the court in such a manner as to impose only those restrictions on the conduct of

Employee that are reasonable in light of the circumstances as they then exist and as are necessary to assure the Company of the intended benefit of this Agreement. If, in any judicial proceeding, a court shall refuse to enforce all of the separate covenants deemed included herein, because, taken together, they are more extensive than necessary to assure the Company of the intended benefit of this Agreement, it is expressly understood and agreed among the parties hereto that those of such covenants that, if eliminated, would permit the remaining separate covenants to be enforced in such proceeding shall, for the purpose of such proceeding, be deemed eliminated from the provisions hereof.

11. Severability. If any of the provisions of this Agreement shall otherwise contravene or be invalid under the laws of any state, country or other jurisdiction where this Agreement is applicable but for such, contravention or invalidity, such contravention or invalidity shall not invalidate all of the provisions of this Agreement but rather it shall be construed, insofar as the laws of that state, country or jurisdiction are concerned, as not containing the provision or provisions contravening or invalid under the laws of that state or jurisdiction, and the rights and obligations created hereby shall be construed and enforced accordingly.

12. Counterparts. This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one agreement.

13. Entire Agreement. This is the full and complete agreement between the parties with regard to the subject matter hereof and supersedes any and all prior understandings or agreements.

*[Remainder of page intentionally left blank; signature page to follow.]*



---

**IN WITNESS WHEREOF**, the parties have caused this Agreement to be executed as of the date first set forth above.

| **"EMPLOYEE"** | **CONTROL4 CORPORATION** |
|---|---|
| /s/ Dan Strong | By: /s/ William B. West |
| Dan Strong | William B. West |
| | CEO |

**Signature Page to Dan Strong Employment Agreement**

---

**EXHIBIT A**

**CONFIDENTIAL INFORMATION AND**
**INTELLECTUAL PROPERTY ASSIGNMENT AGREEMENT**

Confidential Information and Proprietary Inventions Agreement

As a condition of my relationship with Control4 Corporation, its subsidiaries, affiliates, successors or assigns (together the "**Company**"), and for ether valuable consideration, the receipt and sufficiency of which is hereby acknowledged, I agree to the renewing terms under this Confidential Information and Proprietary Inventions Agreement (this "**Agreement**"):

1. Confidential Information. I agree at all times during the term of my relationship (my "**Relationship with the Company**") and thereafter to hold in strictest confidence, and not to use except for the benefit of the Company, or to disclose to any person or entity without written authorization of the President of the Company, any Confidential Information of the Company. I understand that "**Confidential Information**" means any Company proprietary information, technical data or research, trade secrets, customer information or know-how. I further understand that Confidential Information does not include any information that has become publicly known and made generally available through no wrongful act of mine or of others who were under confidentiality obligations concerning the item or items involved. I agree that I will not, during my Relationship with the Company, improperly use or disclose any proprietary information or trade secrets of any other person or entity.

2. Intellectual Property. Any original works of authorship, inventions, concepts, improvements or trade secrets, whether or not patentable or registrable under copyright or similar laws, that I solely or jointly conceive or develop or reduce to practice, or cause to be conceived or developed or reduced to practice, during the period of time I am in the service of the Company (collectively referred to as "**Intellectual Property**") and which (i) are developed using the equipment, supplies, facilities or Confidential Information of the Company, (ii) result from or are suggested by work performed by me for the Company, or (iii) relate to the business, or to the anticipated research or development of the Company, shall be the sole and exclusive property of the Company. I hereby assign to the Company, or its designee, all of my right, title and interest in and to such Intellectual Property. I further acknowledge that all original works of authorship which are made by me (solely or jointly with others) within the scope of and during the period of my Relationship with the Company and which are protectable by copyright are "works made for hire," as that term is defined in the Unites

States Copyright Act. I further agree to assist the Company, or its designee, at the Company's expense and in every proper way requested by the Company, to secure the Company's rights in the Intellectual Property, including any copyrights, patents or ether rights in any and all countries. If the Company is unable because of my mental or physical incapacity or for any other reason to secure my assistance in perfecting the rights transferred in this Agreement, then I hereby irrevocably designate and appoint the Company and its duly authorized officers and agents as my agent and attorney in fact, to act for and in my behalf and stead to perfect such rights with the same legal force and effect as if done by me. The designation and appointment of the Company and its duly authorized officers and agents as my agent and attorney in fact shall be deemed to be coupled with an interest and therefore



---

Irrevocable. If in the course of my Relationship with the Company, I incorporate into Company property any intellectual property owned by me or in which I have an interest, the Company is hereby granted and shall have a nonexclusive, royalty-free, revocable, perpetual, worldwide license to make, have made, modify, use and sell such intellectual property as part of or in connection with such Company property.

3. Return of Company Documents. I agree that, at the time of leaving the employ of the Company, I will deliver to the Company (and will not keep in my possession, recreate or deliver to anyone else) any and all of the Company's Intellectual Property or Confidential Information.

4. Remedies. I agree that any harm arising from a breach by me of the covenants of this Agreement would be immediate and irreparable, and that it would be impossible or inadequate to measure and calculate the damages from any breach of the covenants contained in this Agreement prior to resolution of any dispute. Accordingly, in any claim for breach of a covenant the Company may, in addition to any other right or remedy, obtain an injunction or other equitable relief from a court of competent jurisdiction.

5. No Solicitation of Employees. I agree that during the period or my employment at the Company and for a period of twelve (12) months thereafter I shall not solicit the employment of any person who is then employed by the Company or who was employed by the Company, as an employee or consultant within the prior twelve (12) month period, on behalf of myself or any other person or entity, directly or indirectly.

6. General Provisions.

(a) *Governing Law; Consent to Personal Jurisdiction*. This Agreement will be governed by the laws of the State of Utah as they apply to contracts entered into and wholly to be performed within such State, and I expressly consent to the jurisdiction and venue of the courts located in the federal District of Utah.

(b) *Miscellaneous*. This Agreement sets forth the entire agreement and understanding between the Company and me relating to the subject matter herein and merges all prior discussions between us. No modification of or amendment to this Agreement, nor any waiver of any rights under this Agreement, will be effective unless in writing signed by the party to be charged. Any subsequent change or changes in my duties, salary or compensation will not affect the validity or scope of this Agreement. If one or more of the provisions in this Agreement is deemed void by law, then the remaining provisions will continue in full force and effect. This Agreement will be binding upon my heirs, executors, administrators and ether legal representatives and will be for the benefit of the Company, its successors, and its assigns.



---

IN WITNESS WHEREOF, the undersigned has executed this Confidential information and Proprietary Inventions Agreement as of the date set forth below.

By: /s/ Dan E. Strong

Name: Dan E. Strong

Address:

Witness:

By: /s/ Alison Nelson

Name: Alison Nelson



---

**Exhibit 10.7**

**[Control4 logo]**

Control4 Technologies
11734 Election Drive Suite 200
Salt Lake City, UT 84020
801-523-3100

August 1, 2006

Jefferson Dungan
1273 Star Ridge Court
Wellington, CO 80549

Subject: Offer of Employment

Dear Jefferson,

Control4 is pleased to extend an offer of employment to you as Vice President of Manufacturing and Supply Chain Operations reporting to Rhonda Bassett-Spiers, Chief Operating Officer. Your annual compensation will be $150,000 per year (paid semi-monthly). You will be eligible to participate in the company bonus program with a potential payout at 40% of your base pay. In addition, you will receive 250,000 shares of employee stock options. There will also be a $20,000 allowance permitted towards relocation costs.

This offer is supplemented by our competitive benefits package which is summarized on the enclosed benefits overview.

We would like to make your acceptance of this offer by Wednesday, August 2, 2006. Should you have any questions, please feel free to contact me. We look forward to having you join our team.

Sincerely,

Alison Nielson, PHR
Director of Human Resources

Enclosure

Agreed and Accepted

| | |
|---|---|
| /s/ Jefferson Dungan | August 2, 2006 |
| Jefferson Dungan | Date |

---

CONTROL4 CORPORATION

Confidential Information and Proprietary inventions Agreement

As a condition of my relationship with Control4 Corporation, its subsidiaries, affiliates, successors or assigns (together the "*Company*"), and for other valuable consideration, the receipt and sufficiency of which is hereby acknowledged, I agree to the following terms under this Confidential Information and Proprietary Inventions Agreement (this "*Agreement*"):

1. Confidential Information. I agree at all times during the term of my relationship (my "*Relationship with the Company*") and thereafter to hold in strictest confidence, and not to use except for the benefit of the Company, or to disclose to any person or entity without written authorization of the President of the Company, any Confidential Information of the Company. I understand that "*Confidential Information*" means any Company proprietary information, technical data or research, trade secrets, customer information or know-how. I further understand that Confidential Information does not include any information that has become publicly known and made generally available through no wrongful act of mine or of others who were under confidentiality obligations concerning the item or items involved. I agree that I will not, during my Relationship with the Company, improperly use or disclose any proprietary information or trade secrets of any other person or entity.

2. Intellectual Property. Any original works of authorship, inventions, concepts, improvements or trade secrets, whether or not patentable or registrable under copyright or similar laws, that I solely or jointly conceive or develop or reduce to practice, or cause to be conceived or developed or reduced to practice, during the period of time I am in the service of the Company (collectively referred to as "*Intellectual Property*") and which (i) are developed using the equipment, supplies, facilities or Confidential Information of the Company, (ii) result from or are suggested by work performed by me for the Company, or (iii) relate to the business, or to the anticipated research or development of the Company, shall be the sole and exclusive property of the Company. I hereby assign to the Company, or its designee, all of my right, title and interest in and to such intellectual Property. I further acknowledge that all original works of authorship which are made by me (solely or jointly with others) within the scope of and during the period of my Relationship with the Company and which are protectable by copyright are "works made for hire," as that term is defined in the United States Copyright Act. I further agree to assist the Company, or its designee, at the Company's expense and in every proper way requested by the Company, to secure the Company's rights in the Intellectual Property, including any copyrights, patents or other rights in any and ail countries. If the Company is unable because of my mental or physical incapacity or for any other reason to secure my assistance in perfecting the rights transferred in this Agreement, then I hereby irrevocably designate and appoint the Company and its duly authorized officers and agents as my agent and attorney in fact, to act for and in my behalf and stead to perfect such rights with the same legal force and effect as if done by me. The designation and appointment of the Company and its duly authorized officers and agents as my agent and attorney in fact shall be teemed to be coupled with an interest and therefore irrevocable. If in the course of my Relationship with the Company, I incorporate into Company property any intellectual property owned by me or in which I have an interest, the Company is hereby granted and shall have a nonexclusive, royalty-free, irrevocable, perpetual, worldwide license to make, have made, modify, use and sell such intellectual property as part of or in connection with such Company property.

3. Return of Company Documents. I agree that, at the time of leaving the employ of the Company, I will deliver to the Company (and will not keep in my possession, recreate or deliver to anyone else) any and all of the Company's Intellectual Property or Confidential Information.

4. Remedies. I agree that any harm arising from a breach by me of the covenants of this Agreement would be immediate and irreparable, and that it would be impossible or inadequate to measure and calculate the damages from any breach of the covenants contained in this Agreement prior to resolution of any dispute. Accordingly, in any claim form breach of a covenant the Company may, in addition to any other right or remedy, obtain an injunction or other equitable relief from a court of competent jurisdiction.



---

5. No Solicitation of employees. I agree that during the period of my employment at the Company and for a period of twelve (12) months thereafter I shall not solicit the employment of any person who is then employed by the Company or who was employed by the Company, as an employee or consultant within the prior three (3) month period, on behalf of myself or any other person or entity, directly or indirectly.

6. General Provisions.

(a) Governing Law: Consent to Personal Jurisdiction. This Agreement will be governed by the laws of the State of Utah as they apply to contracts entered into and wholly to be performed within such State, and I expressly consent to the jurisdiction and venue of the courts located in the federal District of Utah.

(b) Miscellaneous. This Agreement sets forth the entire agreement and understanding between the Company and me relating to the subject matter herein and merges all prior discussions between us. No modification of or amendment to this Agreement, nor any waiver of any rights under this Agreement, will be effective unless in writing signed by the party to be charged. Any subsequent change or changes in my duties, salary or compensation will not affect the validity or scope of this Agreement. If one or more of the provisions in this Agreement is deemed void by law, then the remaining provisions will continue in full force and effect. This Agreement will be binding upon my heirs, executors, administrators and other legal representatives and will be for the benefit of the Company, its successors, and its assigns.

IN WITNESS WHEREOF, the undersigned has executed this Confidential Information and Proprietary Inventions Agreement as of the date set forth below.

By: /s/ Jeff Dungan

Name: Jeff Dungan

Witness:

By: /s/ Alison Nielson

Name: Alison Nielson



---

**Exhibit 10.8**

June 19, 2012

Eric B. Anderson

Subject: Offer of Employment

Dear Eric,

Control4 is pleased to extend an offer of employment to you as Sr. Vice President of Products and Services, reporting to Martin Plaehn, President and CEO.

Compensation.

(a) *Base Salary*. Your salary shall initially be set at $20,000 per month, which is equivalent to $240,000.00 on an annual basis, less applicable deductions and withholdings, paid in accordance with the Company's standard payroll procedures. Your position will be classified as "exempt" and you will not be eligible for overtime pay.

(b) *Stock Options*. The Company will request that the Board approve the grant to you of an option to purchase 900,000 shares of Company Common Stock. The terms and conditions of the option grant will be as set forth in the Company's 2003 Equity Incentive Plan and the vesting of the option grant shall be as approved by the Company's Board of Directors.

(c) *Performance Bonus*. At such time, if any, as the Board of Directors determines in its sole discretion that the Company has achieved requisite development, revenue and/or profitability milestones, the Board of Directors will determine your eligibility to receive an incentive bonus up to 30% of your Base Salary, less applicable deductions and withholdings, subject to the attainment of Company performance objectives as determined by the Board of Directors and subject to any other terms and conditions determined by the Board of Directors. Your 2012 bonus, if attained, will be pro-rated based on your hire date.

(d) *Other Benefits*. The Company shall provide you with the opportunity to participate in the Company's standard benefits plans (summary enclosed) available to other similarly situated employees and approved by the Board of Directors, subject to any eligibility requirements imposed by such plans or programs.

(e) *Vacation*. You will be entitled to accrue up to three (3) weeks of vacation leave consisting of fifteen (15) business days earned on an annual, pro-rata basis throughout each calendar year of employment, all in accordance with the Company's standard vacation policy in effect from time to time and approved by the Board of Directors. Your vacation accrual will be pro-rated for the remainder of this calendar year. Once the maximum vacation accrual is reached, no further vacation will accrue. When some vacation is used, vacation will begin to accrue again. There will be no retroactive grant of vacation for the period of time the accrued vacation was at the maximum accrual balance.

---

This offer is contingent upon the provision that you successfully pass a pre-employment drug screen and background check.

We would like you to make your signed acceptance, below, of this offer by Friday, 6/22/12 with an anticipated start date on or before June 29, 2012. In addition to the offer letter, please complete and sign the enclosed waiver, 1-9 (only the top portion), W-4 and emergency contact form and fax back to my attention at 801-206-0062. I have included electronic copies of these forms on the enclosed USB drive for your convenience.

Should you have any questions, please feel free to contact me. We look forward to having you join our team.

Sincerely,

/s/ Martin Plaehn

Martin Plaehn
President and CEO

Enclosures

Agreed and Accepted

Eric B. Anderson Date

Date

**Exhibit 10.10**

# Control4 OEM Supply Agreement: OEM Design

**Supplier:** Lite-On Electronic Company Ltd.
Address:

Primary Contact:
Phone:
Email:
Fax:
Web Site:

**Effective Date:** December 3, 2010

This OEM Supply Agreement: OEM Design ("Agreement") is made as of the Effective Date identified above, by and between Control4 Corporation, a Delaware corporation with offices located at 11734 S. Election Road, Salt Lake City, Utah 84020 ("Control4") and the supplier identified above ("Supplier"). This Agreement incorporates by reference the Terms and Conditions set forth below (including all Schedules thereto).

| **Supplier** | **Control4 Corporation** |
|---|---|
| Signature: /s/ Andrew Hou | Signature: /s/ Jeff Dungan |
| Name: Andrew Hou | Name: Jeff Dungan |
| Title: Vice President & G.M. SSBU | Title: VP Manufacturing |

Terms and Conditions

1. **Definitions**. Terms with initial capital letters shall have the meanings ascribed to them in this Section 1 or elsewhere in this Agreement.

1.1 Agreement. "Agreement" means this OEM Supply Agreement: OEM Design.

1.2 Change Order. "Change Order" means a written order from Control4 to Supplier requesting one or more changes to the Product that Control4 desires to have made, including but not limited to changes in the drawings, designs, Specifications, method of shipment, and/or packaging of the Products.

1.3 Confidential Information. "Confidential Information" shall include all technical information, financial information, proprietary information that each Party hereunder may deliver to the other Party during the course of performing this Agreement, or acquired by the one Party about the other during the course of performing this Agreement, including without limitation all Proprietary Information, non-public information about each Party's business affairs, financing, finances, methods of operation, technical or scientific information, data systems, procedures, computer programs, circuitry schematics, software or algorithms.

1.4 Deliverable. "Deliverable" means any item, project, material, documentation, software code (both Object Code and Source Code), or object, or the physical embodiment of the same, required to be delivered by Supplier to Control4 pursuant to this Agreement.

1.5 Derivative Work. "Derivative Work" means a work based on Products, Intellectual Property, or Confidential Information (collectively, "Prior Work"), including, but not limited to: (i) for material subject to copyright protection, any work that is based upon one or more Prior Works, such as a revision, modification, translation, abridgment, condensation, expansion, collection, compilation or any other form in which such pre-existing works may be recast, transformed or adapted; (ii) for patentable or patented inventions, any adaptation, subset, addition, improvement or combination of any Prior Work; and (iii) for material subject to trade secret protection, any new material, information or data relating to and derived from Confidential Information.

1.6 Documentation. "Documentation" means the written instructions, user guides, and user manuals for the Products, whether in electronic or paper form, provided by Supplier upon delivery of Products and any such materials provided by Supplier in connection with any updates,

---

modifications and improvements to any software provided hereunder.

1.7 End Customer. "End Customer" means the ultimate purchaser and end user of the Products.

1.8 Epidemic Failure. "Epidemic Failure" shall mean the occurrence of one or more material failures in Hardware (including in any embedded Firmware) supplied by Supplier during its Hardware Warranty Period (as defined below), due to a single root cause, discovered either in testing or in the field at a failure rate over any roiling 90 day period exceeding five percent (5%) of such Hardware delivered during such period.

1.9 Error. "Error" means a reproducible failure of the Licensed Software or Firmware to perform in substantial conformity with the Specifications and applicable Documentation accompanying such Licensed Software or Firmware (if any) when delivered to Control4. The priority level of an Error shall be determined in accordance with Schedule D.

1.10 Firmware. Firmware means Licensed Software that is embedded in a Product.

1.11 Hardware. "Hardware" means tangible devices or tangible system components, including any embedded Firmware that Supplier makes available to Control4 or an End Customer under this Agreement.

1.12 Intellectual Property. "Intellectual Property" shall mean the applicable Party's proprietary intellectual property, including without limitation the Patent Rights and the Marks, and proprietary information that is not generally known, including, and whether or not patentable, all trade secrets, know-how, data, software code, designs, specifications, material lists, drawings, algorithms, formulas, patterns, compilations, programs, samples, devices, protocols, methods, techniques, processes, procedures and results of experimentation and testing.

1.13 Inventions. "Inventions" means any and all ideas, designs, concepts, techniques, technology, know-how, processes, methods, configurations, inventions, discoveries, and improvements, regardless of whether they are patentable or subject to protection under applicable copyright, trademark, trade secret or other laws governing the protection of Intellectual Property.

1.14 Licensed Software. "Licensed Software" means the machine-readable, Object-Code version of Supplier's software (whether or not embedded in a Product as Firmware), including all related Documentation, and including any modified, updated or enhanced versions of the software or Documentation, that Supplier makes available to Control4 or an End Customer under this Agreement.

1.15 Major Release. "Major Release" means a new release of Software supported by Supplier that adds features and functionality improving overall Product performance, efficiency and/or usability, and designated by Supplier as a replacement for a Product.

1.16 Marks. "Marks" shall mean the applicable Party's current and future logos, trade names, and trademarks.

1.17 Manufacturing Know-How. "Manufacturing Know-How" means the Specifications and information, including without limitation engineering designs, bill of materials, drawings, and the like, necessary to manufacture the Products, as well as the names and contact information for all of Supplier's then-current suppliers and manufacturers with respect to the Products.

1.18 Minor Release. "Minor Release" means a Supplier-designated correction, extension, or fix to an existing release of a Product, generally designed to address one or more errors or reduce the effects thereof. A Minor Release may also include enhanced, improved or modified functionality (as determined in Supplier's sole discretion). All Minor Releases are provided on an "AS IS" basis only and in object code only.

1.19 Object Code. "Object Code" means the machine-readable, executable instructions for computer programs or applications.

1.20 Party. "Party" mean Control4 or Supplier as the context requires. "Parties" means both Control4 and Supplier.

1.21 Patent Rights. "Patent Rights" shall mean the patents and patent applications owned, licensed or filed by the applicable Party anywhere in the world, and all continuations, continuations-in-part, divisions, reissues, reexaminations, substitutions, additions and extensions thereof, and all supplementary protection certificates.

1.22 Price. "Price" means the "Ex Works" price for the applicable Product as set forth in Schedule B (or as otherwise agreed to in writing by the Parties).

1.23 Product. "Product" means those Hardware, Firmware, and Licensed Software created, designed and/or manufactured, and those Services performed by Supplier as specified in Schedule A.

1.24 Product Support Materials. "Product Support Materials" mean those materials which Supplier is



---

required to provide supplemental to the Hardware, and which are identified on Schedule A. Such materials may include, by way of example and not limitation, Product installation guides, user manuals for End Customers, Q&A knowledgebase documentation, and documentation with information for tracking and identifying installed Products such as MAC, serial number, and installation code information.

1.25 Proprietary Information. "Proprietary Information" means Inventions, Works, Intellectual Property, and any and all confidential, proprietary or secret information, including, without limitation, information relating to products, best-practices, templates, methodologies, research, technology, developments, services, clients, End Customers, suppliers, employees, business, operations or activities, and also similar information of any third party also divulged by the disclosing Party in connection with this Agreement.

1.26 Purchase Order. "Purchase Order" means a written order issued by Control4 to Supplier containing information with respect to each purchase made

pursuant to this Agreement, including a description of the Product to be purchased, the purchase quantity, the purchase delivery schedule, the nominated carrier, the routing instructions, the destination, and confirmation of the Price.

1.27 Schedules. The following Schedules are appended hereto and incorporated herein as a part of this Agreement (which Schedules may be amended by the parties from time to time in a signed writing):

- Schedule A Product Specifications and Support Materials
- Schedule B Pricing and Terms of Delivery
- Schedule C Project and Delivery Schedule and Deliverables
- Schedule D Product Support
- Schedule E Quality Assurance
- Schedule F Out-of-Warranty Repair Process and Fees
- Schedule G Customization & Works beyond Schedule A
- Schedule H Control Intellectual Property; Supplier Intellectual Property

1.28 Services. "Services" shall mean the specialized services to be provided by Supplier to Control4 pursuant to this Agreement.

1.29 Source Code. "Source Code" means the instructions for computer programs and applications that are designed to be readable by the human eye, which when compiled or otherwise altered become usable by a computer. Source Code includes all related diagrams, flow charts, and programmers notes.

1.30 Specifications. "Specifications" means the physical, technical, functional and/or performance requirements for the Products as set forth more specifically in Schedule A.

1.31 Trade Secret(s). "Trade Secret(s)" means any scientific or technical data, information, design, process, procedure, formula, or improvement that is commercially valuable to the owner and not generally known in the industry. The obligations set forth in this Agreement as they pertain to Trade Secret(s) shall survive termination of this Agreement and continue for so long as the relevant information remains a Trade Secret(s).

1.32 Work Product. "Work Product" means all Intellectual Property associated with any Services, Inventions, Deliverables, Works or works of authorship developed or created by Supplier during the course of performing Services pursuant to this Agreement.

1.33 Works. "Works" means products, devices, equipment, information, data and works of authorship, including, without limitation, processes, methodologies, templates, best-practices, lists, computer source and object code, devices, formulas, drawings, artwork, notes, memoranda, specifications, and documents of any nature, and all copies thereof, whether stored electronic or otherwise.

2. **Grant of Rights.**

2.1 Control4 Appointment. Subject to the terms of this Agreement, Supplier hereby appoints Control4, and Control4 hereby accepts appointment, as an exclusive reseller to sell and license the Products worldwide to Control4 customers and End Customers. The foregoing appointment is subject to the license and the other terms and conditions set forth herein.

2.2 License Grants. Subject to the terms of this Agreement:

2.2.1 Supplier grants to Control4, and Control4 accepts a perpetual, exclusive royalty-free license in and to that portion of the Supplier Intellectual Property identified on Schedule H, for Control's use in making, having made, marketing and selling the Products worldwide.

2.2.2 During the Term, Control4 grants to Supplier, and Supplier accepts a personal, non-transferable, indivisible, revocable and non-exclusive license in and to that portion of the Control4 Intellectual Property identified on Schedule H, or that Control4 delivers or discloses to Supplier from time to time and indicates, at the time of such disclosure, that such Control4 Intellectual Property, and the disclosure thereof by Control4 to Supplier, is subject to the terms of this Agreement, solely for Licensee's use in developing and



manufacturing each Product, and selling the same to Control4 only.

2.2.3 Restrictions on Use.

2.2.3.1 Supplier acknowledges that the Control4 Intellectual Property constitutes valuable trade secrets of Control4. Accordingly, Supplier will not do any of the following without Control4's prior written consent: (a) modify, adapt, alter, translate, or create Derivative Works from the Control4 Intellectual Property; (b) sublicense or sell the Control4 Intellectual Property to any third party; (c) reverse engineer, decompile, disassemble, or otherwise attempt to derive the source code for the Control4 Intellectual Property.

2.2.3.2 Control4 acknowledges that the Supplier Intellectual Property constitutes valuable trade secrets of Supplier. Accordingly, Control4 will not do any of the following without Supplier's prior written consent: (a) modify, adapt, alter, translate, or create Derivative Works from the Supplier Intellectual Property; (b) sublicense or sell the Supplier Intellectual Property to any third party except as specifically permitted in this Agreement; (c) reverse engineer, decompile, disassemble, or otherwise attempt to derive the source code for the Control4 Intellectual Property

2.3 Products. Supplier will design, manufacture and ship to Control4 the Products in accordance with the Specifications set forth in Schedule A, including any applicable Hardware, Firmware and Licensed Software.

2.4 Testing, Certifications and Standards. The parties may identify on Schedule A any testing, technical certifications and standards which Products must receive or meet, respectively; and the parties may identify on Schedule B any additional compensation (if any) for Supplier related to such certifications and standards. Unless specifically provided on Schedule A, Supplier shall not be responsible for causing applicable Products to achieve specified certifications and standards prior to delivery.

2.5 Initial Delivery Time Frame. Subject to the availability of all requisite parts and/or components on the open market through normal commercial channels within the time frame that was specified for parts purchasing in the Schedule A, Supplier will adhere to the initial delivery time frame specified in Schedule C. Subsequent delivery time frames will be set forth in the applicable Purchase Orders.

2.6 Change of Product Specifications; Design Changes. Supplier may not exclude or discontinue Products set forth on Schedule A, nor make changes or modifications in Specifications, construction, or design of said Products to be delivered to Control4, during the Term, without first receiving Control4's written consent, which shall not be unreasonably withheld.

2.7 Effect of Product or Design Chances. Any mutually agreed to and executed Product changes, whether suggested by Control4 or Supplier, shall be governed by and shall not change any other terms of this Agreement, including Supplier's warranty of Product, unless mutually agreed to in writing and attached as an amendment hereto.

2.8 Additional Products. Additional Products may be added to Schedule A upon the mutual agreement and written Change Order agreed upon by both Control4 and Supplier. In such event, the development, manufacturing, and sale of such additional Products shall be made in accordance with the terms of this Agreement.

2.9 Product Support. Supplier will provide to Control4 support for each Product as set forth more specifically in the Service Level Agreement appended as Schedule D ("Product Support").

2.10 Control4's Obligation. Subject to Supplier's compliance with its obligations hereunder, Control4 agrees to purchase via Purchase Order the Products specified in Schedule A at the price specified in Schedule B.

2.11 Supplier's Obligation. In consideration of Control4's purchase commitments in this Agreement, Supplier agrees to commit to the design and development, production, and manufacturing of the Product, including without limitation completing all necessary design implementations, hiring necessary staff and other resources, and committing to the development of proper tooling for manufacturing and/or applicable testing of the Products set forth in Schedule A.

2.12 Pre-Existing Intellectual Property. Nothing herein shall be deemed to constitute a transfer, sale or conveyance by one Party to the other Party of any ownership interest in such Party's Intellectual Property that was owned or developed by it prior to the Effective Date.

2.13 Works Made for Hire. Any and all Services, Inventions, Works, Work Product and Deliverables, prepared by Supplier pursuant to this Agreement (whether or not they are made, conceived or reduced to practice using Control4's data or facilities) which are made, conceived, developed, reduced to practice, or created by Supplier (whether alone or jointly with Control4 and/or one or more independent contractors), shall be considered "WORKS-MADE-FOR-HIRE" and shall be the sole property of Control4. Supplier agrees to and hereby does assign to Control4, without further compensation, all right, title and interest in any such Services, Inventions, Work Product, Deliverables and Works, and in all Intellectual Property contained therein. Supplier hereby grants Control4 a perpetual, royalty-free license to use any pre-



---

existing materials, concepts, processes or information contained or expressed in Supplier's work, Services, Work Product or Deliverables hereunder.

2.14 Assignment of Intellectual Property. Supplier will promptly disclose to Control4 any and all Inventions and Intellectual Property and will assist Control4 in obtaining and enforcing, for Control4's benefit, patents and any other Intellectual Property rights relating thereto in any country. Upon request, Supplier will execute all applications, assignments, instruments and papers and perform all acts necessary or desired by Control4 to assign all such Inventions, and Intellectual Property relating thereto, fully and completely to Control4 and to enable Control4, (including its successors, assigns and nominees) to secure and enjoy the full benefits and advantages thereof. In the event Supplier fails or refuses to sign any document or documents reasonably requested by Control4 to allow it to apply for or prosecute any patent, copyright or mask work registration, or other right or protection relating to an Invention, Deliverable, Work or Work Product, whether because of Supplier's physical or mental incapacity or for any other reason, Supplier hereby irrevocably appoints Control4 and its authorized officers and agents as its agent and attorney-in-fact, to act in Supplier's behalf to execute and file any such application or applications and to do all other lawfully permitted acts to further the prosecution and issuance of patent, copyright or mask work registrations, or similar protections with the same legal force and effect as if executed by Supplier.

2.15 Residual Rights. Notwithstanding anything to the contrary herein, Supplier shall be free to use and employ its general skills, know-how and expertise

gained or learned during the course of any Work Order, so long as it acquires such information without disclosure or use of any Control4 Proprietary Information or any Work Product, Works, Deliverables, Inventions or Intellectual Property of Control4.

3. **Ordering and Delivery of Products.**

3.1 General. The purchase and sale of the Products shall be made against specific written Purchase Orders submitted by Control4 to Supplier during the term of this Agreement. All Purchase Orders for Product submitted by Control4 (by either facsimile or email) shall state the following: (a) Control4's name and address; (b) the description of the Products ordered; (c) the quantities of Products ordered as per Schedule A; (d) the desired delivery dates; (e) the destination of the Products ordered; and (f) the price(s) for the Products ordered. Control4 shall mail, email and/or fax each Purchase Order to Supplier. Supplier shall acknowledge by facsimile or email the details of the Purchase Order within two (2) business days of receipt of the Purchase Order.

3.2 Acceptance. All Purchase Orders (and any amendments thereto) are subject to acceptance by Supplier, which acceptance may not be withheld for any Purchase Order falling within the scope of the agreed quantities and delivery dates set forth in Schedule B (if any) and issued within the agreed upon Product lead time. Acceptance shall be indicated by return of an email or facsimile appropriately signed by Supplier, so as to indicate acceptance, conditional or otherwise, of any such order of Products. Any Purchase Order that is not rejected by Supplier within five (5) business days of the day sent by Control4 shall be deemed automatically accepted by Supplier.

3.3 Conflicting Provisions. If any conflict arises between the terms stated in any Purchase Order and the terms and conditions of this Agreement, the terms and conditions of this Agreement shall prevail. Any term of a Purchase Order that is in conflict with, omitted or contradictory to this Agreement will be null and void. The remaining terms and commitment of the Purchase Order will still remain valid and binding.

3.4 Affiliates. This Agreement is entered into by Control4 for the benefit of itself and its affiliated companies (if any), each of which shall be deemed to be a third-party beneficiary of this Agreement. Control4's affiliated companies will be entitled to place Purchase Orders with Supplier subject to the terms and conditions herein contained.

3.5 Deviation from Purchase Orders. Following acceptance of a Purchase Order, Supplier may not reject or deviate from the Purchase Order without Control4's written approval in Control4's sole discretion. Control4 may from time to time need to pull in a delivery date or push out a delivery date to accommodate changes in schedules and End Customer demand. Such changes can be made in accordance with the terms outlined in the Pricing and Terms of Delivery Schedule of this Agreement.

3.6 Time of the Essence. Time is of the essence with respect to delivery of ordered Products by specified delivery dates. [LIQUIDATED DAMAGES?]

4. **Term**. Unless terminated as provided herein, this Agreement will be effective for a period of four (4) years from the Effective Date ("Initial Term"). Upon the expiration of the Initial Term, this Agreement will automatically renew for successive periods of one (1) year (each a "Renewal Term") unless terminated at the end of the Initial Term or any Renewal Term by either Party by delivering written notice of the intent to terminate not less than (or a minimum of) one hundred and eighty (180) days prior to the end of the Initial Term or Renewal Term, as applicable.



---

5. **Pricing**.

5.1 Prices. The applicable Price for each Product ordered hereunder is set forth in Schedule B,

5.2 Taxes. The Prices specified in Schedule B for each Product are exclusive of any other federal, state or local sales, use, excise, or other similar taxes or duties, which Supplier may be required to collect or pay as a consequence of the sale or delivery of any Products to Control4. Supplier shall include all required taxes as a separate line item on each invoice. Control4 shall not be responsible for the payment or reimbursement of any tax not properly invoiced by Supplier, or for any taxes based on Supplier's income.

5.3 Price Changes. Any change in the Price payable for any Product shall be made only upon written agreement of the Parties.

5.4 Cost Reductions. Supplier shall provide to Control4 regular cost reductions to occur semi-annually from the date of execution of this Agreement or as mutually agreed between the Parties in writing. Such reductions may be either through manufacturing efficiency gains, through component pricing improvements or through cost reductions, so long as any component changes are approved by Control4 in advance and in writing.

6. **Delivery**.

6.1 General. All Products shall be delivered to Control4 (or its designated location) Ex Works Supplier's facility as specified in the applicable Purchase Order, using Control4's specified standard shipping. The Product shall be packed and marked for shipment in accordance with Schedules A and B. Supplier shall have no liability for any events occurring during shipment except in cases where Product is not packaged in accordance with Schedule A. In the event that Supplier is unable to meet the delivery date at the specified location as set forth in the Purchase Order, Supplier is responsible for any incremental fees associated with expedited shipping to ensure fastest freight and delivery to Control4, as well as incremental expediting fees associated with ongoing shipments, until Supplier is caught up on deliveries to Control4.

6.2 Title; Risk of Loss. Title to and risk of loss or damage on any Product shall pass to Control4 upon Supplier's delivery of such Product to the carrier specified by Control4.

6.3 Time of the Essence. Each Party acknowledges that timely completion of applicable development schedule milestones, as outlined in Schedule C, are of the essence and vital to the success of this business arrangement set forth herein.

7. **Inspection and Acceptance.**

7.1 Testing and Inspection. Control4 may inspect and perform tests of the Products at any reasonable time and place. If such inspection or testing is made on Supplier's premises, Control4 shall provide Supplier with ten (10) business days advance notice and Supplier shall provide reasonable facilities for such inspection and testing.

7.2 Acceptance. Final inspection and acceptance by Control4 shall be conducted within ten (10) business days of the receipt of the applicable Products at Control4's specified receiving destination (except as otherwise agreed in writing, signed by both Parties). Any Products not rejected within such ten (10) business day period shall be deemed to be accepted by Control4.

7.3 Rejection. Control4 may, within ten (10) business days of receipt of any Products at Control4's receiving destination, reject Products that fail to conform to the applicable specifications and test procedures specified in Schedule A. In the event of a rejection, the provisions of Section 8 shall apply to any such rejected Products.

8. **Warranty**.

8.1 Product Warranty. Supplier warrants to Control4 and its End Customers that for a period of twenty-four (24) months from the date of sale by Control4 to the End Customer (excluding prototype or qualification units not intended for delivery to End Customers), that the Products will conform to the Specifications as per Schedule A, and will be free from manufacturing defects in materials and workmanship under normal use and service. In the event that there is an issue with one of Supplier's component suppliers that results in an issue for Control4 that has not been previously specified, Supplier will provide support to work with such component supplier to correct the issue. As set forth below in Section 9, Control4 may return directly to Supplier any defective Product that does not conform to the Specifications. For products out-of-warranty or damaged due to misuse, Control4 may request that Supplier perform repairs, in which event Control4 agrees to pay the specified repair fees as per Schedule F. Supplier warrants such repairs for three (3) months (workmanship only).

8.2 Software or Firmware Warranty; Enhancement. Where applicable and as part of the Product Warranty set forth above, Supplier shall fix, without charge, any reproducible software or firmware defect that is documented by Control4. In the event that a reproducible software or firmware defect occurs following release of an update or upgrade to a Control4 controller, and in the event the firmware is demonstrated to work properly with the prior version of the Control4 controller, then revising the software or firmware to attain compatibility with the new release shall



be categorized as an enhancement project which is performed as Additional Work as described in Schedule G.

8.3 Refund. Supplier's liability for warranty claims hereunder is limited to a refund of the purchase price then paid to Supplier for any defective Products, whether Supplier's liability arises from any breach of Supplier's express warranty, breach of any obligation arising from breach of warranty, or otherwise with respect to the manufacture and sale of any Products hereunder.

8.4 CLASS QUALITY ISSUE. IN THE EVENT THAT THERE IS A CLASS QUALITY ISSUE WITH ANY PRODUCT PROVIDED BY SUPPLIER TO CONTROL4 THAT REQUIRES A FIELD RECALL FOR PRODUCTS UNDER WARRANTY AND IT IS DETERMINED THAT QUALITY ISSUE IS RELATED TO MANUFACTURING OR COMPONENT ISSUES OR ERRORS IN THE PRODUCT SPECIFICATION BY SUPPLIER, SUPPLIER WILL BE RESPONSIBLE FOR SPECIFIC COSTS RELATED TO THE RECALL, REPAIR, AND REPLACEMENT OF PRODUCT IN THE FIELD.

8.5 Additional Warranties. Supplier hereby represents and warrants to Control4 that:

8.5.1 Supplier has and will convey to Control4, upon payment in full, good title to the Products, free and clear of all liens and other security interests;

8.5.2 The Products and any accompanying user manuals and product documentation (if any; "Materials")), and the use, distribution, and resale thereof by Control4 do not and shall not infringe upon, misappropriate, or violate any patent, copyright, trade secret, trade name, trademark, or any other proprietary right of any third party; and

8.5.3 The Products and Materials shall be compliant with all applicable government or administrative electrical, environmental and emissions standards in countries for which they are designed for use (as specified in Schedule A); any additional compliance and/or markings are Control4's responsibility.

8.6 No Other Warranties. EXCEPT AS SPECIFIED HEREIN, CONTROL4 AND SUPPLIER EACH HEREBY DISCLAIM ALL EXPRESSED OR IMPLIED REPRESENTATIONS AND WARRANTIES, INCLUDING, WITHOUT LIMITATION, ANY IMPLIED WARRANTY OF MERCHANTABILITY ,

EXCEPT TO THE EXTENT THAT SUCH DISCLAIMERS ARE HELD TO BE LEGALLY INVALID.

9. **Return-to-Vendor Process.**

9.1 General. All Products returned to Supplier under a warranty claim require a Return To Vendor (RTV) number, which will be issued by Supplier upon request. All Products returned to Supplier must have the RTV number clearly marked on the outside of each box returned. Returned Product must be packaged in a way that prevents any damage during shipment. Any Product that is damaged in shipment will be the responsibility of the Party making the shipment. Control4 is responsible for one-way freight to Supplier for returned product and the Supplier is responsible for one-way freight to Control4.

9.2 Non-Warranty Repair. Clear signs of Control4 caused damage or Products that appear to have been used in a manner contrary to the Product specifications are subject to be processed under "Non-Warranty Repair." In such case, Control4 will be notified of the change in return status. At Control4's option, the Product can then be repaired at cost or returned "as is" to Control4. In the case of any non-warranty repair, Control4 shall assume all shipping charges.

9.3 All authorized RTV's will be either be replaced with conforming product shipped to Control4 at Supplier's expense at the time of receipt of non-conforming product, or Supplier will issue a credit to Control4 for the full purchase price of the Product. In the

10. **Limitation of Liability**. EXCEPT AS OTHERWISE PROVIDED FOR IN THIS AGREEMENT, NEITHER PARTY WILL BE LIABLE FOR ANY PUNITIVE, INCIDENTAL OR CONSEQUENTIAL DAMAGES IN ANY ACTION ARISING FROM OR RELATED TO THIS AGREEMENT, WHETHER BASED IN CONTRACT, TORT (INCLUDING NEGLIGENCE), INTENTIONAL CONDUCT OR OTHERWISE, INCLUDING WITHOUT LIMITATION, DAMAGES RELATING TO THE LOSS OF PROFITS, INCOME OR GOODWILL, REGARDLESS OF WHETHER SUCH PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES, TO THE EXTENT NOT PROHIBITED BY APPLICABLE LAW; PROVIDED, HOWEVER, THAT THIS SECTION IS NOT INTENDED TO LIMIT AND SHALL NOT BE CONSTRUED TO LIMIT THE OBLIGATIONS OF EITHER PARTY TO DEFEND AND FULLY INDEMNIFY THE OTHER PARTY AGAINST CLAIMS ASSERTED BY THIRD PARTIES TO THE EXTENT REQUIRED BY SECTION 16.

11. **Change Orders**

11.1 Change Orders Submitted by Control4. Control4 may, by written Change Order, request changes in the drawings, designs, specifications, software, packaging or packing requirements concerning the Product, and/or request



additional services from Supplier. Upon Supplier's receipt of a proposed Change Order, Supplier shall determine within twenty (20) business days any corresponding change in Price, and shall provide Control4 with a statement setting forth any such Price changes. Change Orders shall not be effective until signed by both Parties.

11.2 Change Orders Submitted by Supplier. At any time, Supplier may recommend to Control4 proposed changes in the drawings, designs, specifications, process changes, or packaging or packing requirements that are expected to result in improved Product reliability or cost reduction. Implementation of Supplier's recommendations shall only be made upon receipt of authorization by Control4 in the form of a written Change Order. Change Order costs shall be negotiated between Supplier and Control4 and shall be outlined in the applicable signed Change Order.

11.3 Effect of Change Orders. Upon written agreement by the Parties as to any proposed Change Order, any resulting Price change shall apply to any subsequent Purchase Order with respect to which the change is effective, and Schedule B shall be amended accordingly. Modifications or changes to Products that are not provisioned in Schedule A, which by their nature require additional effort or deliverables on the part of the Supplier, are considered as extra work and shall be invoiced separately. The costs of such modifications are calculated on an hourly basis and charged as per Schedule G.

12. **Discontinuation and Modification of Product**

12.1 Availability of Products. Except as provided below in Section 12.2, during the term of this Agreement, Supplier shall continue to manufacture and offer each of the Products for sale to Control4.

12.2 Discontinuation of a Product. Supplier may discontinue providing any particular Product to Control4 upon nine (9) months prior written notice. After the discontinuation of any particular Product, Supplier shall continue to honor all warranty and the RTV processes outlined in Sections 8 and 9 for twenty four (24) months.

12.3 Modification of Products. Any Product modification developed specifically for Control4 by Supplier shall be work made for hire and shall be the property of Control4 (including but not limited to all IP, documentation, and tooling). All such modifications will be maintained with latest, up to date information/items, and shall be deemed to be Control4 Confidential.

13. **Payment and Invoice.**

13.1 Payment Terms. Unless otherwise agreed in Schedule B or a writing by Control4, payment for any Purchase Orders shall be due sixty (60) days from delivery of the Products to Control4. All transactions must be valued and paid in United States currency.

13.2 Partial Shipments. When partial shipments are made, Supplier shall invoice Control4 in accordance with this Agreement for the quantity of conforming

Products shipped at the agreed upon Price for such Products,

14. **Termination.**

14.1 Termination for Breach. Either Party may terminate this Agreement if the other Party violates any material provision of this Agreement and fails to correct or cure any such violation within thirty (30) days after receipt of written notice of such violation. In addition, should either Party be adjudicated to be bankrupt or insolvent, or should a receiver or liquidator be appointed for its business or assets, or should an assignment be made for the benefit of such Party's creditors, or should such Party file or have filed against it a petition for winding up its affairs, or should such Party file or have filed against it a petition under any applicable bankruptcy statutes or regulations or should such Party attempt to assign this Agreement without the written consent of the other Party being first obtained, then the other Party shall be entitled to terminate this Agreement effective immediately upon delivery of notice of such election to the other Party.

14.2 Effect of Termination. Any undisputed and properly invoiced payment obligations of Control4 owed to Supplier shall survive expiration or termination of this Agreement for any reason.

14.3 Right to Market and Distribute. In the any event resulting in Termination, Control4 shall retain the right to market and distribute any remaining inventory purchased from Supplier.

15. **Source Code Escrow**

15.1 Escrow Deposit. Within thirty (30) days of the Effective Date, Supplier shall enter into a third party escrow agreement ("Software Escrow Agreement") approved by Control4, with an escrow agent ("Software Escrow Agent") for the benefit of Control4, and within five (5) days thereafter shall deposit a copy of the current version of the source code for the Supplier Intellectual Property identified in Schedule H with the Software Escrow Agent under the Software Escrow Agreement. Supplier will update the escrow with the source code as soon as reasonably possible after they are made generally available to Supplier's customers or made available to Control4 (whichever comes sooner).

15.2 Release Conditions. Control4 shall have the right to obtain from the Software Escrow Agent one copy of



all source code in escrow, under any of the following conditions (each a "Release Condition"):

15.2.1 A receiver, trustee, or similar officer is appointed for the business or property of Supplier;

15.2.2 Supplier files a petition in bankruptcy, files a petition seeking any reorganization, makes an arrangement, composition, or similar relief under any law regarding insolvency or relief for debtors, or makes an assignment for the benefit of creditors;

15.2.3 Any involuntary petition or proceeding under bankruptcy or insolvency laws is instituted against Supplier and not stayed, enjoined, or discharged within thirty (30) days;

15.2.4 Supplier takes any corporate action authorizing any of the foregoing;

15.2.5 Any similar or analogous proceedings or event to those in sub paragraphs (a) through (d) above occurs in respect of Supplier within any jurisdiction outside the USA; or

15.2.6 Control4 determines in good faith that Supplier has failed to or is unable to support, maintain, manufacture and/or deliver the Licensed Software, or the Products, as applicable, as required under this Agreement for a period of at least twenty (20) days, Control4 gives written notice of such determination to Supplier, and Control4 in good faith determines that Supplier has failed to support and maintain the Licensed Software or Products as required under this Agreement within ten (10) days following receipt of such notice; or

15.2.7 A force majeure event (as described below) prevents Supplier from supporting, maintaining, manufacturing and/or delivering the Licensed Software or Product as required under this Agreement for a period of at least thirty (30) days/

16. **Escrow of Manufacturing Know-How**

16.1 Escrow Deposit. Within thirty (30) days of the Effective Date, Supplier shall enter into a third-party escrow agreement ("Manufacturing Escrow Agreement") approved by Control4 with an escrow agent ( "Manufacturing Escrow Agent"), and within five (5) days thereafter shall deposit a copy of its current Manufacturing Know-How with the Manufacturing Escrow Agent under the Manufacturing Escrow Agreement. Supplier will update the escrow with the up-to-date Manufacturing Know-How as soon as reasonably possible after material changes are known to Supplier.

16.2 Release Conditions. Control4 shall have the right to obtain from the Manufacturing Escrow Agent one (1) copy of the Manufacturing Know-How, upon the occurrence of a Release Condition.

16.3 License Grant. Upon release of the Manufacturing Know-How from escrow pursuant to this Section ("Escrow of Manufacturing Know-How"), Control4

may, directly or through its contractors and suppliers:

16.3.1 Use the Manufacturing Know-How (including without limitation all Supplier Intellectual Property Rights related thereto) to manufacture or have manufactured Products solely for resale and uses of Products otherwise permitted under this Agreement, and to improve, enhance and create Derivative Works of the Products and various components thereof. Control4 shall own all such Derivative Works created by or for Control4. Supplier shall execute such documents and take such steps as Control4 reasonably requests to perfect Control4's ownership of the intellectual Property Rights in such Derivative Works.

16.3.2 Enter into agreements with Supplier and/or Supplier's suppliers for the continuing supply of Products to Control4. In addition, Control4 shall be permitted to share access to the Manufacturing Know-How with other customers and contractors of Supplier who otherwise have access to Supplier's Manufacturing Know-How.

16.4 Assistance. If Control4 elects to have the Manufacturing Know-How released from escrow pursuant to this Section, Supplier shall provide reasonable and prompt cooperation to assist Control4 in establishing a source of Products supply using the Manufacturing Know-How.

17. **Force Majeure**: Neither Party to this Agreement shall be liable to the other for non-performance due to causes not reasonably within its control; including but not limited to fire, flood, war, embargo, riot, or intervention of any governmental authority, provided, however, that the Party suffering such delay immediately notifies the other Party in writing, of the reasons for the delay and, if possible, the duration of such delay.

18. **Confidentiality; Non-Compete; Non-Solicitation**

18.1 Proprietary Materials. From time to time during the performance of this Agreement, each Party may deliver certain Proprietary Information to the other Party hereunder. All such Proprietary Information shall be deemed "Confidential information" as described in this Section 16, and, as between the Parties hereto, the Party providing such materials shall be deemed the owner, except as otherwise provided in this Agreement.



---

18.2 Confidentiality Obligations. During the term of this Agreement and for a period of five (5) years thereafter, each Party hereto shall hold the Confidential Information in strict confidence and shall not permit the use or disclosure of any such Confidential Information by or to any person or entity (excluding party employees, attorneys, and subcontractors who may have access to Confidential Information on a need-to-know basis) unless such use or disclosure is specifically authorized in writing by the Party providing the Confidential Information.

18.3 Treatment of Confidential Information. Each Party shall take appropriate action and utilize the same effort to safeguard Confidential Information as it utilizes to protect its own trade secrets or proprietary information, but at a minimum, each Party shall undertake reasonable precautions to protect the Confidential Information. Without limitation on the foregoing, each Party shall: (i) advise its own employees who have access to the Confidential Information and others for whom the other Party has given written consent to disclose the Confidential Information, of the confidential nature of the Confidential Information; (ii) ensure by agreement or otherwise that the confidential Information is prohibited from being disclosed to any additional third parties except to the extent required to carry out obligations under this Agreement; and (iii) require that such Confidential Information be kept in a reasonably secure location.

18.4 Compliance with Law. In the event that a Party hereto is required by law or by any legal process, including interrogatories, requests for information or documents, subpoena, civil investigative demand, depositions, or similar legal process, to disclose any Confidential Information, such Party shall provide the other Party with reasonably prompt, written notice of such request or requirement so that the other Party may seek, at its own cost, an appropriate protective order if it deems it appropriate to do so. If, in the absence of a protective order or the receipt of a waiver hereunder, the compelled Party is nonetheless, based on the advise of the Party's legal counsel, required by law to disclose Confidential Information, such Party may disclose only that portion of the Confidential Information which such Party's counsel reasonably believes the Party is legally required to disclose, and will undertake reasonable efforts to obtain assurance that the Confidential Information will receive confidential treatment.

18.5 Use of Confidential Information. The Confidential Information shall be used by each Party solely in the course of performing its obligations hereunder. The Parties shall not make Confidential Information available for use by or for the benefit of any other third party, whether or not for consideration.

18.6 Return of Confidential Information. Each Party will return to the other Party or destroy (and certify to the other Party that such destruction has taken place) all Confidential Information in written form provided by the other Party, including any copies, upon termination of this Agreement Notwithstanding the foregoing, neither Party shall be required to destroy any of the other Party's Confidential Information that is stored electronically as part of such Party's disaster recovery program (provided that such Party shall maintain the confidentiality of any such electronically retained Confidential Information).

18.7 Limitations. The obligations set forth in this Section 16 do not apply if and to the extent the Party receiving Confidential Information establishes that: (i) the information disclosed to it was already known to it without obligation to keep it confidential; (ii) it received the information in good faith from a third party lawfully in possession thereof without obligation to keep such information confidential; (iii) the information was publicly known at the time of its receipt by it or has become publicly known other than by a breach of this Agreement; (iv) the information is independently developed by it without use of the other Party's Confidential information; or (v) it was disclosed under operation of Law, provided that the receiving Party has promptly notified the disclosing Party of any legal process requiring production of Confidential Information prior to compliance and has taken all reasonable precautions, including a protective order if so requested by disclosing party to insure confidential treatment of any information.

19. **Indemnification**.

19.1 By Supplier. Supplier will indemnify, hold harmless and defend Control4, at Supplier's expense, against any loss, injury, expense or damage arising from any claim brought against Control4 alleging that its sale of the Products in accordance with the terms of this Agreement infringes a third party's copyright, patent or trade secret or other intellectual property rights, and will indemnify and hold Control4 harmless against all losses in connection with any such claims.

19.2 By Control4. Control4 will indemnify, hold harmless and defend Supplier, at Control4's expense, any claim brought against Supplier alleging that Supplier's use, in accordance with the terms of this Agreement and where applicable, of materials provided to Supplier by Control4 infringes a third person's copyright, trade secret or patent, and will indemnify and hold Supplier harmless against alt losses in connection with any such claims.

19.3 General. The Party entitled to indemnity under this Section ("Indemnified Party") shall give the other Party ("Indemnifying Party") written notice of any claims resulting in an obligation of indemnification under this Section. The Indemnified Party shall provide reasonable assistance in the defense and the settlement of a claim at the



Indemnifying Party's expense. The Indemnifying Party shall not settle a claim without the written consent of the Indemnified Party; such consent shall not be unreasonably withheld. The Indemnifying Party will obtain the prior written approval, which approval will not be unreasonably delayed or withheld, of the Indemnified Party in respect of any non-cash aspects of a proposed settlement of such claim from the Indemnified Party before entering into any settlement of such claim or ceasing to defend against such claim.

20. **Notices**.

20.1 General. All notices permitted or required pursuant to this Agreement shall be written in the English language and shall be either (1) hand-delivered, (2) deposited with a nationally recognized overnight delivery service, (3) deposited with the United States Post Office, certified mail, return receipt requested, postage prepaid. All notices other than those sent by facsimile transmission shall be deemed to have been served when actually received, or upon refusal of delivery. All notices shall be addressed to the parties to whom such notices are intended as set forth below:

20.1.1 If to Control4:

Control4 Corporation
Attn:
11734 S. Election Road, Suite 200
Salt Lake City, Utah 84020-6432

Copy to Control4 General Counsel

20.1.2 If to Supplier:

20.2 Change of Address. Either Party may change its address by giving notice to the other in accordance with this Section.

20.3 Exceptions. Regular business communications such as Purchase Orders, engineering Change Orders, corrective action requests, and the like may be sent via electronic mail or facsimile to appropriate individuals within either Supplier, Any regular business communication that will be relied upon as a material legal document must be delivered via one of the means noted above.

21. **General**.

21.1 Independent Contractors. In performing their respective obligations hereunder, each of the Parties shall operate as and have the status of an independent contractor and shall not act as or be joint venturers, or an agent or employee of the other Party. Neither Party shall have any right or authority to assume or create any obligations of any kind or to make any representations or warranties on behalf of the other party, whether express or implied, or to bind the other party in any respect whatsoever.

21.2 Amendments. Any mutually agreed terms which may be specified during the continuance of this Agreement, or any extension hereof, shall be incorporated into this Agreement in the form of an addendum signed by both Parties and attached hereto.

21.3 No Waiver. No failure or delay by either Party in exercising any right, power, or remedy under this Agreement shall operate as a waiver of any such right, power, or remedy. No waiver of any term or condition of this Agreement shall be effective, unless it is in writing and signed by the Party against whom such waiver or modification is sought to be enforced. The express waiver of any right or default hereunder shall be effective only in the instance given and shall not operate as or imply a waiver of any similar right or default on any subsequent occasion.

21.4 Invalidity. Should any provision of this Agreement be determined to be void, invalid or otherwise unenforceable by any court or tribunal of competent jurisdiction, such determination shall not affect the remaining provisions hereof which shall remain in full force and effect.

21.5 Choice of Law; Jurisdiction

21.5.1 This Agreement shall be governed by and interpreted in accordance with the laws of the State of Utah, USA, without regard to provisions relating to conflicts of laws.

21.5.2 The Parties agree that if any legal proceeding is commenced to interpret or enforce the provisions of this Agreement, the Utah District Court in and for the County of Salt Lake shall have exclusive jurisdiction over the matter. Control4 and Supplier each consents to the personal jurisdiction of such Court. All legal fees including but not limited to attorney fees will be paid by the non-prevailing Party in any Segal dispute.

21.6 Entire Terms and Conditions. The headings, font and bold and underlined type to the portions of this Agreement are for the convenience of the Parties only and have no legal effects. This Agreement along with its Schedules constitutes the entire agreement between the Parties and may only be amended by an express, written document signed by the authorized representatives of both Parties.

11

---

21.7 Copies. All copies duly signed and executed by both Parties shall be deemed to be originals of this Agreement.

21.8 Authority. The persons executing this Agreement on behalf of Control4 and Supplier represent and warrant that they each have the requisite corporate authority to do so and that their execution of this Agreement is not subject to any further ratification or approval whatsoever.

12

---

Schedule A - Product Specifications; Product Support Materials

Below are the technical specifications for the Products) to be designed and/or manufactured by Supplier for Control4. Consistent with the Agreement, upon completion of the design and effective when volume production commences, and unless an alternate timeframe is mutually agreed upon by both Parties in advance and in writing, Control4 must be notified prior to any changes to the bill of materials, approved vendor list or any other ECO changes at least four (4) weeks in advance of the implementation of any such change. Depending on the type of change, Control4 may elect to have Supplier re-qualify such changes for the affected Product(s) to confirm there are no negative changes to form, fit, or function of the below specified Product(s). Any Product changes not approved in advance by Control4 may be deemed non-conforming material and in such event shall be rejected and returned to Supplier for repair or replacement at Supplier's expense.

1. Product Specifications for all Hardware, Firmware and Licensed Software will be agreed upon in a writing signed by both parties after the Effective Date.

2. The Acceptance Test Criteria for each of the Products set forth in Section 1 of this Schedule A will be agreed upon in a writing signed by both parties after the Effective Date.

3. Supplier shall provide the Product Support Materials for each of the Products set forth in Section 1 of this Schedule A as identified and agreed upon in a writing signed by both parties after the Effective Date.

13

---

Schedule B - Pricing and Terms of Delivery

1. Supplier will provide the following Product(s) in accordance with Schedule A:

   a. The Products will be agreed upon in a writing signed by both Parties after the Effective Date.

2. Product Pricing (for each Product outlined in Schedule A)

   a. Pricing for each Product identified above in Section 1.a of this Schedule B will be agreed upon in a writing signed by both Parties after the Effective Date.

3. Sample pricing

a. Sample Pricing for each Product identified above in Section 1.a of this Schedule B will be agreed upon in a writing signed by both Parties after the Effective Date.

4. Terms of Delivery

a. Delivery is Ex Works Supplier's facility.

b. All units shall be bundled and packaged in accordance with the Schedule A.

c. Shipments shall include accompanying documentation for build date and test data in accordance with the Schedule A.

d. Unless otherwise expressly stated, Control4 agrees to pay all properly executed and undisputed Invoices within forty-five (45) days of receipt of a valid invoice or the date on which the entire delivery associated with the total Purchase Order amount is delivered to and accepted by Control4, whichever is later. This payment term as defined is in effect for any term noted in this Agreement as "payment upon/from invoice date" or "payment upon/from date of receipt of valid invoice."

e. Upon request, Control4 may review Supplier financial under appropriate NDA with to satisfy any query required for Supplier to establish appropriate credit limit for Control4.

f. Supplier agrees to pay for all expedited shipping for late deliveries and as may be required to meet delivery schedule as defined by Control4 in the Agreement.

g. Other than the customized and/or Control4 specific related materials, Control4 is not responsible for raw materials ordered by Supplier that exceed those requirements to support Control4 valid and existing Purchase Orders at component lead time.

h. Control4 may alter a valid Purchase Order by any amount up to the date of longest component lead time plus the manufacturing and testing time required. Control4 may alter a valid Purchase Order by any amount and upon receipt of such change request from Control4 by Supplier, and subject to various lead times of the Products, Supplier will make commercially reasonable efforts to increase or decrease the quantity of Products requested in a valid Purchase Order.

i. Any two (2) contiguous production shipments in which Supplier provides less than 98.5% on time delivery as measured by the delivery date stated on a Purchase Order and accepted by Supplier, may be considered a material breach of the Agreement by Supplier.

14

---

5. Packaging Requirements:

a. Exterior Packaging: Exterior packaging requirements for each Product identified above in Section 1a of this Schedule B will be agreed upon in a writing signed by both Parties after the Effective Date.

b. End Customer Packaging: End customer packaging requirements for each Product identified above in Section 1.a of this Schedule B will be agreed upon in a writing signed by both Parties after the Effective Date.

15

---

Schedule C - Project and Delivery Schedule; Deliverables

1. The Project and Delivery Schedule for each Product identified in Section 1.a of Schedule B will be agreed upon in a writing signed by both Parties after the Effective Date.

2. The Deliverables will be agreed upon in a writing signed by both Parties after the Effective Date.

16

Schedule D - Product Support

Product Support

1.1 If requested, Supplier shall provide operating documentation for the Product hardware and any applicable software. Control4 shall be entitled to use the information to generate corresponding documents for Control4's Products but Supplier shall not be held liable for any inadvertent errors associated with said documentation.

1.2 Supplier shall also provide reasonable support to Control4. However, Supplier shall not be held responsible for any misrepresentations or any error in Control4's marketing of the Product to the public.

1.3 There may be occasions where Control4 may desire Supplier, and Supplier is willing, to implement proprietary customization to hardware components of the Product. Control4 and Supplier agree that such customization will be a separate activity and fees for such shall be quoted as NRE. Any agreement relating to such customization shall be in writing, endorsed by Supplier and Control4, and attached to this document. See Schedule G for more detail.

1.4 Should Control4 require developmental support, such support shall be provided to Control4 on a case by case basis.



---

Schedule E - Quality Assurance Requirements

The following Quality Assurance Requirements are the basis for technical and organizational conditions and processes and shall be applied by both Supplier and Control4 in order to meet quality goals of each Party. The minimum requirements for the Quality Management System of both Parties are specified below. Rights and duties in view of supplied Product quality are regulated. Supplier shall provide technical and organizational conditions in order to produce and supply high quality Products. If at any point after the failure rates at Control4's IQA exceed 0.5%, Control4 may consider Supplier to be in material breach of this Agreement. During the 24-month warranty period after the date of sale by Control4, if any Products have been returned for repair and shipped back to Control4 with multiple instances of test failure or failure to meet the Specifications as defined in this Agreement, then Supplier shall replace the unit with a new unit at no extra charge or cost to Control4.

**1. Quality Management System at the Supplier**

Supplier agrees to introduce and maintain a Quality Management System based on ISO 9001:2000 with the obligation to set a zero-defect goal and to continuously improve performance. Production, inspection and/or packaging equipment provided by Control4 shall be part of the Quality Management System. Control4 is interested in the protection and maintenance of our environment. Therefore it is desirable that Supplier introduce an Environmental Management System based on ISO 14001 or similar.

**2. Quality Management System at sub-suppliers**

If production or inspection equipment, software, services, material or any other components are provided by sub-suppliers, they will be part of the Supplier's Quality Management System. Otherwise Supplier will secure quality by adequate actions. Supplier shall require its sub-suppliers to introduce and maintain a Quality Management System based on ISO 9000 with the obligation for sub-suppliers to also set a zero-defect goal and to continuously improve their performance. Control4 may demand documented evidence from Supplier showing the effectiveness of the Quality Management System utilized by his sub-suppliers.

**3. Information**

If it becomes evident that quality assurance requirements (such as quality characteristics, schedules or delivered quantities) cannot be met, Supplier shall inform Control4 immediately. Supplier shall also notify Control4 immediately of any deviations detected after delivery. To support a rapid solution, Supplier shall disclose all necessary data and facts. Supplier shall obtain the approval of Control4 prior to any of the following:

- Changing the production methods, sequence and materials (also at sub-suppliers)
- Changing sub-suppliers
- Changing test methods/equipment
- Relocating production sites
- Relocating production equipment at the same site
- Outsourcing
- Substitution

In order to be able to check the impact of any of the changes listed above, Supplier shall timely inform Control4. However, Supplier's duty to inform Control4 will not be applied in case of non-Control4 specific standard parts.

**4. Audit**

Supplier authorizes Control4 to determine through audits whether its quality assurance activities meet the requirements set forth herein. The audit can be conducted as a system, process or product audit. Supplier shall support even short-term audit date requests. Reasonable restrictions imposed by Supplier to safeguard business will be accepted and confidentiality will be warranted. In the event of quality problems, Supplier shall enable Control4 to conduct an audit at its sub-suppliers. Control4 shall communicate audit results to Supplier. If Control4 considers corrective actions to be needed, Supplier agrees to immediately prepare an action plan and implement it on schedule through Control4's Supplier Corrective Action (SCAR) system. Supplier shall notify Control4 of all progress made.

**5. Product and process agreements**

The Products shall comply with agreed or warranted conditions (e.g. Specification, data sheets, drawings, sample parts). Supplier shall promptly examine all documentation provided by Control4 (e.g. specifications, data sheets, drawings). If the Control4 documentation is obviously incorrect, unclear, incomplete or obviously different than a sample part, Supplier shall inform Control4 in writing prior to start of mass production or performance of services.



---

**a. Mass production and First Article Acceptance Report**

Prior to starting mass production, Supplier shall, if not agreed otherwise, submit a mass production process validation plan, similar to PPAP per QS9000. Verification of applicability and capability shall be provided. Prior to starting mass production, Supplier shall submit initial samples of the product built under mass production conditions in agreed quantities and on schedule. Mass production may not be started until it is released by Control4 through the FAAR (First Article Acceptance Report) program.

**b. Process capability**

For all process characteristics, Supplier shall perform process planning (work plans, test plans, operating supplies, tooling, machinery, etc.). For functional and process critical characteristics Supplier shall review the suitability of the manufacturing facilities and shall document the results. Documented test results and process data must be made available to Control4 electronically. Product quality is monitored with periodic audits. "Special characteristics," identified and agreed on between Control4 and Supplier shall, if applicable, be monitored electronically by statistic process control. Special characteristics and process capabilities shall be determined and documented. If not agreed otherwise, the following values shall be maintained.

Type Term Capability
Machine capability MFU $Cm_k \geq 1{,}33$
Short-term process capability PFU $Pp_k \geq 1$,
Long-term process capability PFU $Cp_k \geq 1{,}33$
If the value above cannot be met, Supplier shall perform and document a 100% inspection prior to shipping, until the root cause has been determined and fixed. In the case of process disruptions and quality deviations, Supplier shall analyze the causes, shall initiate improvement measures and review their effectiveness.

| $C_{pk}$ | Sigma level (s) | Area under the probability density function F(s) | Process yield | Process fallout (in terms of DPMO/PPM) |
|---|---|---|---|---|
| 0.33 | 1 | 0.6826894921 | 68.27% | 317311 |
| 0.67 | 2 | 0.9544997361 | 95.45% | 45500 |
| 1.00 | 3 | 0.9973002039 | 99.73% | 2700 |
| 1.33 | 4 | 0.9999366575 | 99.99% | 63 |
| 1.67 | 5 | 0.9999994267 | 99.9999% | 1 |
| 2.00 | 6 | 0.9999999980 | 99.9999998% | 0.002 |

**6. Production records**

Supplier shall maintain the following documents:
- Work plan for every part
- Test plan for every part
- Inspection results for every batch
- Process settings for every batch
- Material used for every batch
- Material RoHS certificate for every part

In general, Supplier shall maintain evidence of the documents above. Control4 may demand documented evidence.

**7. Serial production, documentation, product identification**

Supplier shall record and document quality assurance measures, especially test and inspection results, and orderly retain these records electronically. Control4 shall have the ability to query the Supplier database by unit MAC ID or unique Unit serial number to access electronically stored data. Documents and records shall be retained for at least 7 years. All changes made on the product and in the process chain shall be documented by Supplier in a product history, and shall be submitted to Control4 upon request if its PLM system is separate from Control4's Arena PLM system. Upon request Supplier shall enable Control4 to access the records electronically. Supplier shall use process descriptions to regulate the control of all data and documents (including external documents like standards and customer drawings) and implement them effectively. Based on the agreements herein, Supplier may be required to provide serialization documentation with every shipment.

**8. Packaging, identification, traceability**

Supplier shall deliver products in approved shipping containers in order to prevent damage and quality impairments (e.g. scratches, contamination, corrosion, chemical reaction). Supplier agrees to identify the products, parts and the packaging in accordance with agreements reached with Control4. Supplier must ensure that packed products will also remain legible during shipping and storage.



---

Supplier agrees to ensure the traceability of the products produced. Measures must be instituted to ensure that if a defect is detected, the defective parts/products/batches etc., are traceable and contained. If Control4 makes production and test equipment available to Supplier, especially equipment and fixtures related to deliveries, and then they must be labeled as Control4 property. Supplier is responsible for protecting this property from damage and ensuring proper function, maintenance and repair.

**9. Control4's quality expectation**

Supplier is committed in the same way as Control4 towards its customers to the zero-defect goal in business with Control4. If the zero-defect goal is not attainable short-term, Control4 together with Supplier shall set temporary upper limits for defect rates as an interim goal. Supplier shall propose and agree with Control4 on improvement actions. If the defect rate is below the upper limit, this does not release Supplier from its responsibility to process all complaints and to proceed with continuous improvement activities. Based on a periodic Supplier rating, the quality performance of Supplier will be monitored and reported by Control4. It is expected that Supplier will monitor its quality performance as well. Within the warranty period of 24 months from the date of sale by Control4, Supplier guarantees that all products, which are only assembled or sold without modification, are free of defects, which might be caused by material defects or poor processing. Control4 shall limit incoming inspections to externally apparent shipping damage and conformation of the quantity and part number of the ordered product, according to supplied shipping documentation. Discrepancies are reported without delay. If the defect is not detected directly after delivery, Supplier will waive the claim of late notification of defects within the warranty period. Supplier must adapt its Quality Management System and quality assurance activities to this limited incoming inspection. If, in exceptional cases, Supplier is unable to supply products conforming to the specification, Supplier must obtain a concession from Control4 prior to delivery. Supplier agrees to implement comments and ideas from Control4 to improve product quality by modifying production and quality assurance activities to the extent possible. If the supply of components is not conforming to Specifications, should threaten to cause a production interruption at Control4 or its customers, Supplier, in consultation with Control4, must seek a remedy through suitable immediate actions for which Supplier is financially responsible (substitute delivery, sorting, rework, special shifts, rush shipment etc.). Supplier then analyses defects without delay, with support from Control4 to the extent necessary and possible. Defective parts shall be returned to Supplier. Supplier agrees to analyze each deviation and to notify Control4 promptly of the cause of the deviation, initiated corrective and preventive measures as well as their effectiveness.

**10. Safety and Environmental Regulations (RoHS, REACH)**

Supplier commits to complying with all legal regulations regarding the environment, health, and striving to avoid all negative effects on humans and environment through an adequate organization and realization of environmental protection in the company. For this, the implementation and further development of an Environmental and Occupational Safety Management Systems is beneficial. Supplier is obligated to fulfill the requirements of the RoHS EC-guideline 2002/957EG and the REACH regulation (EC) no. 1907/2006. If there is an exception for these requirements it must be clearly communicated to Control4 in writing for every single case.

**11. Affected parts**

These quality assurance requirements are valid for all parts and sub-assemblies which are supplied by Supplier.



---

Schedule F - Out-of-Warranty Repair Process and Fees

Out-of-Warranty Repair Process Supplier to Control4

1.1 The out-of-warranty Repair Process shall be the same as the RTV Process except that repair time, component cost and shipping and handling charges shall be invoiced to Control4.

1.2 Out-of-Warranty Repair Fees to Control4 shall be charged per incident based on the work and the components involved, plus labor cost



---

Schedule G - Customizations and Additional Work

Pricing for Extra Work that has been requested by Control4 and agreed to by Supplier with an executed Change Order or Request for Proposal is to be quoted on a case by case basis. Control4 is not responsible for any work performed by Supplier without a valid Control4 Purchase Order.

Restricted Confidential - Outside Counsel Only






---

Schedule H - Control4 Intellectual Property; Supplier Intellectual Property

1. The Control4 Intellectual Property will be identified in a writing signed by Control4 after the Effective Date.

2. Supplier's Intellectual Property consists of the following:

   a. Multimedia Communication System, and Television Device and Core Module as identified in Taiwanese Application No. 099100089, filed January 5, 2010.

   b. Digital Home / Space Management System and Method, as identified in the attached application.



---

Restricted Confidential - Outside Counsel Only




US 20110164674A1

(19) United States
(12) Patent Application Publication
HOU et al.
(10) Pub. No.: US 2011/0164674 A1
(43) Pub. Date: Jul. 7, 2011

(54) MULTIMEDIA COMMUNICATION SYSTEM, AND TELEVISION DEVICE AND CORE MODULE THEREOF

(75) Inventors: CHIH-YUAN HOU, TAIPEI HSIEN (TW); TSAO-TENG TSENG, TAIPEI HSIEN (TW); CHI-WEN CHEN, TAIPEI HSIEN (TW)

(73) Assignee: LITE-ON TECHNOLOGY CORP., TAIPEI (TW)

(21) Appl. No.: 12/983,456

(22) Filed: Jan. 3, 2011

(30) Foreign Application Priority Data

Jan. 5, 2010 (TW) .............................. 099100089

Publication Classification

(51) Int. Cl.
*G10L 19/00* (2006.01)
*H04N 7/26* (2006.01)
*H04W 88/02* (2009.01)

(52) U.S. Cl. ........ 375/240.01; 704/500; 704/E19.001; 375/E07.026

(57) ABSTRACT

A multimedia communication system includes: an intercom device operable for picking up audio information, and for performing encoding and modulation processes upon the audio information so as to generate a modulated signal; and a multimedia device coupled to the intercom device for receiving the modulated signal therefrom, and operable for performing demodulation and decoding processes upon the modulated signal so as to generate a decoded audio signal, for generating an output audio signal from external audio information contained in an external input signal when the decoded audio signal is not received thereby, for generating the output audio signal from at least the decoded audio signal when the decoded audio signal and the external input signal are received thereby, and for audible reproduction of the output audio signal.






FIG. 1


100
7
8a
FIRST WIRED COMMUNICATION UNIT
142
FIRST COMMUNICATION UNIT
141
FIRST WIRELESS COMMUNICATION UNIT
14
143
FIRST ENCODING UNIT
FIRST DECODING UNIT
13
17
FIRST AUDIO PROCESSING UNIT
11
12
FIRST VIDEO PROCESSING UNIT
FIRST DISPLAY DRIVER
FIRST DISPLAY MODULE
FIRST SOUND-PICKUP MODULE
51
52
FIRST AUDIO REPRODUCTION MODULE
FIRST VIDEO-CAPTURE MODULE
53
10
16
54

F I G. 2

Restricted Confidential - Outside Counsel Only









FIG. 3

Restricted Confidential - Outside Counsel Only









F I G. 4


SECOND AUDIO REPRODUCTION MODULE
62
SECOND DISPLAY MODULE
64
20
SECOND SIGNAL PROCESSING MODULE
34
AUDIO PROCESSOR
35
VIDEO PROCESSOR
SECOND DISPLAY DRIVER
36
DEMODULATOR
30
33
3
31
FREQUENCY TUNER
32
S-VIDEO RECEIVER

F I G. 5


SECOND AUDIO REPRODUCTION MODULE
62
SECOND DISPLAY MODULE
64
20
37
34
35
SECOND SIGNAL PROCESSING MODULE
MULTIPLEXING UNIT
AUDIO PROCESSOR
VIDEO PROCESSOR
SECOND DISPLAY DRIVER
36
DEMODULATOR
30
33
3
31
32
FREQUENCY TUNER
S-VIDEO RECEIVER

FIG. 6

## MULTIMEDIA COMMUNICATION SYSTEM, AND TELEVISION DEVICE AND CORE MODULE THEREOF

### CROSS-REFERENCE TO RELATED APPLICATION

[0001] This application claims priority of Taiwanese Application No. 099100080, filed on Jan. 5, 2010.

### BACKGROUND OF THE INVENTION

[0002] 1. Field of the Invention

[0003] The present invention relates to a communication system, more particularly to a multimedia communication system, and a television device and a core module thereof.

[0004] 2. Description of the Related Art

[0005] A door intercom device is generally installed at an entrance to a residence so as to enable remote communication between visitors near the door intercom device and people inside the residence.

[0006] However, upon activation of a correspondent intercom device by the visitors via the door intercom device, a person inside the residence may have to stop on-going activities or even move toward the correspondent intercom device so as to initiate communication with the visitors via the correspondent intercom device and the door intercom device, which may be disturbing especially when watching a television program.

### SUMMARY OF THE INVENTION

[0007] Therefore, an object of the present invention is to provide a multimedia communication system capable of alleviating the aforesaid drawbacks of the prior art.

[0008] Accordingly, a multimedia communication system of the present invention is adapted to receive an external input signal that contains external audio information, and includes an intercom device and a multimedia device.

[0009] The intercom device includes: a first sound-pickup module operable for picking up first audio information so as to generate a first to-be-encoded audio signal; a first signal processing module operable for performing an encoding process upon the first to-be-encoded audio signal so as to generate a first to-be-transmitted signal; and a first communication module operable for performing a modulation process upon the first to-be-transmitted signal so as to generate a first modulated signal.

[0010] The multimedia device includes: a second communication module coupled to the first communication module for receiving the first modulated signal therefrom, and operable for performing a demodulation process upon the first modulated signal so as to generate a first to-be-decoded signal; a second signal processing module operable for performing a decoding process upon the first to-be-decoded signal so as to generate a first decoded audio signal; a core module adapted to receive the external input signal, and operable to generate a first output audio signal from at least one of the first decoded audio signal and the external audio information contained in the external input signal; and a second audio reproduction module operable for audible reproduction of the first output audio signal.

[0011] The core module is operable for generating the first output audio signal from the external audio information contained in the external input signal when the first decoded audio signal is not received thereby. The core module is operable for generating the first output audio signal from at least the first decoded audio signal when the first decoded audio signal and the external input signal are received thereby.

[0012] Preferably, the external input signal further contains external video information. The intercom device further includes a video-capture module operable for capturing video information so as to generate a to-be-encoded video signal. The first signal processing module is operable for performing the encoding process upon the first to-be-encoded audio signal and the to-be-encoded video signal so as to generate the first to-be-transmitted signal. The second signal processing module is operable for performing the decoding process upon the first to-be-decoded signal so as to generate the first decoded audio signal and a decoded video signal. The core module is further operable to generate an output video signal from at least one of the decoded video signal and the external video information contained in the external input signal. The multimedia device further includes a display module operable for display of the output video signal. The core module is operable for generating the output video signal from the external video information contained in the external input signal when the decoded video signal is not received thereby. The core module is operable for generating the output video signal from at least the decoded video signal when the decoded video signal and the external input signal are received thereby.

[0013] Another object of the present invention is to provide a television device capable of alleviating the aforesaid drawbacks of the prior art.

[0014] Accordingly, a television device is adapted to receive a first modulated signal that contains first audio information picked up by an intercom device, and an external input signal that contains external audio information. The television device includes: a communication module adapted for receiving the first modulated signal, and operable for performing a demodulation process upon the first modulated signal so as to generate a to-be-decoded signal; a signal processing module operable for performing a decoding process upon the to-be-decoded signal so as to generate a decoded audio signal, a core module adapted to receive the external input signal, and operable to generate an output audio signal from at least one of the decoded audio signal and the external audio information contained in the external input signal; and an audio reproduction module operable for audible reproduction of the output audio signal.

[0015] The core module is operable for generating the output audio signal from the external audio information contained in the external input signal when the decoded audio signal is not received thereby. The core module is operable for generating the output audio signal from at least the decoded audio signal when the decoded audio signal and the external input signal are received thereby.

[0016] Preferably, the first modulated signal further contains first video information captured by the intercom device, the external input signal further containing external video information. The signal processing module is operable for performing the decoding process upon the to-be-decoded signal so as to generate the decoded audio signal and a decoded video signal. The core module is further operable to generate an output video signal from at least one of the decoded video signal and the external video information contained in the external input signal. The television device further includes a display module operable or display of the

Restricted Confidential - Outside Counsel Only






output video signal. The core module is operable for generating the output video signal from the external video information contained in the external input signal when the decoded video signal is not received thereby. The core module is operable for generating the output video signal from at least the decoded video signal when the decoded video signal and the external input signal are received thereby.

[0017] Yet another object of the present invention is to provide a core module for a television device.

[0018] Accordingly, a core module of the present invention is adapted to receive a decoded audio signal and an external input signal containing external audio information, and is operable for generating an output audio signal from at least one of the decoded audio signal and the audio information contained in the external input signal for sound reproduction.

[0019] The core module includes: a tuning unit adapted to receive the external input signal, and operable for performing a frequency tuning process upon the external input signal so as to generate an input audio signal; and an audio processing unit operable for generating the output audio signal from the input audio signal when the decoded audio signal is not received by the core module, and from at least the decoded audio signal when the decoded audio signal and the external input signal are received by the core module.

[0020] Preferably, the external input signal further contains external video information. The core module further includes a video processing unit, is further adapted to receive a decoded video signal, and is further least one of the decoded video signal and the video information contained in the external input signal for visual rendering. The tuning unit is operable for performing the frequency tuning process upon the external input signal so as to generate the input audio signal and an input video signal. The video processing unit is operable for generating the output video signal from the input video signal when the decoded video signal is not received by the core module, and from at least the decoded video signal when the decoded video signal and the external input signal are received by the core module.

## BRIEF DESCRIPTION OF THE DRAWINGS

[0021] Other features and advantages of the present invention will become apparent in the following detailed description of the preferred embodiment with reference to the accompanying drawings, of which:

[0022] FIG. 1 is a block diagram of the preferred embodiment of a multimedia communication system according to the present invention;

[0023] FIG. 2 is a block diagram of an intercom device of the multimedia communication system of the preferred embodiment;

[0024] FIG. 3 is a block diagram of a multimedia device of the multimedia communication system of the preferred embodiment;

[0025] FIG. 4 is a block diagram of a modification of the multimedia device according to the present invention;

[0026] FIG. 5 is a block diagram of a core module of the multimedia device; and

[0027] FIG. 6 is a block diagram of a modification of the core module according to the present invention.

## DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENT

[0028] Referring to FIG. 1, the preferred embodiment of a multimedia communication system of the present invention includes an intercom device 100 and a multimedia device 200, which, in the present embodiment, is exemplified as a television device. The intercom device 100 and the multimedia device 200 are connected to each other via a network to enable audio and video communication between visitors and people inside a residence.

[0029] With further reference to FIG. 2, the intercom device 100 of the preferred embodiment includes: a first sound-pickup module 51 (e.g., a microphone module) operable for picking up first audio information (e.g., voices of the visitors) so as to generate a first to-be-encoded audio signal; a first video-capture module 53 operable for capturing first video information (e.g., images of the visitors) so as to generate a first to-be-encoded video signal; a first signal processing module 10 operable for performing an encoding process upon the first to-be-encoded audio signal and the first to-be-encoded video signal so as to generate a first to-be-transmitted signal; and a first communication module 14 operable for performing such as a modulation process upon the first to-be-transmitted signal so as to generate a first modulated signal.

[0030] In the present embodiment, the first signal processing module 10 includes a first audio processing unit 11 operable for processing the first to-be-encoded audio signal so as to generate a first intermediate encoded audio signal; a first video processing unit 12 operable for processing the first to-be-encoded video signal so as to generate a first intermediate encoded video signal; and a first encoding unit 13 operable for performing preferably a Moving Picture Experts Group (MPEG) encoding process upon the first intermediate encoded audio signal and the first intermediate encoded video signal so as to generate the first to-be-transmitted signal.

[0031] In the present embodiment, the first communication module 14 includes a first communication unit 141, first wired communication unit 142, and a first wireless communication unit 143. The first communication unit 141 is operable for performing such as the modulation process upon the first to-be-transmitted signal so as to generate the first modulated signal, and for initiating a communication session with the multimedia device 200 through a selected one of the first wired communication unit 142 and the first wireless communication unit 143 based on a combination of Session Initiating Protocol (SIP) techniques and transmission control protocol/internet protocol (TCP/IP) suite so as to enable transmission of the first modulated signal therethrough. The first wired communication unit 142 is preferably an ethernet communication unit connected to the multimedia device 200 via an ethernet cable 7, and the first wireless communication unit 143 is preferably a worldwide interoperability for microwave access (WiMAX) communication unit coupled to the multimedia device 200 via a first antenna 8a.

[0032] With further reference to FIG. 3, the multimedia device 200 includes: a second communication module 24 coupled to the first communication module 14 for receiving the first modulated signal, and operable for performing such as a demodulation process upon the first modulated signal so as to generate a first to-be-decoded signal; a second signal processing module 20 operable for performing a decoding process upon the first to-be-decoded signal so as to generate a first decoded audio signal and a first decoded video signal; a core module 3 adapted to receive an external input signal containing external audio and video information, operable to generate a first output audio signal from at least one of the first decoded audio signal and the external audio information, and operable to generate a first output video signal from at least

one of the first decoded video signal and the external video information; a second audio reproduction module **62** operable for audible reproduction of the first output audio signal; and a second display module **64** operable display of the first output video signal.

[0033] In the present embodiment, the second communication module **24** includes a second communication unit **241**, a second wired communication unit **242**, and a second wireless communication unit **243**. The second communication unit **241** is operable for establishing the communication session with the intercom device **100** through one of the second wired communication unit **242** and the second wireless communication **243** using the combination of SIP techniques and TCP/IP suite so as to enable receipt of the first modulated signal therethrough, and for performing such as the demodulation process upon the first modulated signal so as to generate the first to-be-decoded signal. The second wired communication unit **242** is preferably an ethernet communication unit connected to the first wired communication unit **142** via the ethernet cable **7**, and the second wireless communication unit **243** is preferably a WIMAX communication unit coupled to the first wireless communication unit **143** via a second antenna **87**.

[0034] In the present embodiment, the second signal processing module **20** includes: a second decoding unit **23** operable for performing preferably an MPEG decoding process upon the first to-be-decoded signal so as to generate a first intermediate decoded audio signal and a first intermediate decoded video signal; a second audio processing unit **21** operable for processing the first intermediate decoded audio signal so as to generate the first decoded audio signal; and a display processing unit **26** operable for processing the first intermediate decoded video signal so as to generate the first decoded video signal.

[0035] Although the display processing unit **26** of the preferred embodiment is implemented in the second signal processing module **20**, it may be implemented in the core module **3** in a modification of the preferred embodiment (see FIG. **4**). With further reference to FIG. **5**, the external input signal received by the core module **3** may include, but is not limited to, a television signal, an audio/video signal, an HDMI signal, and an S-video signal. The core module **3** of the preferred embodiment includes a demodulating unit **30**, an audio processor **34**, a video processor **35**, and a second display driver **36**.

[0036] The demodulating unit **30** is preferably a tuning unit including: a frequency tuner **31** operable for performing a frequency tuning process upon the television signal so as to generate an intermediate television signal; an S-video receiver **32** operable for generating an intermediate S-video signal from the S-video signal; and a demodulator **33** operable for performing a demodulation process upon a selected one of the television signal and the S-video signal so as to generate an input audio signal and an input video signal.

[0037] In the preferred embodiment, the audio processor **34** is operable for generating the first output audio signal from the input audio signal when the first decoded audio signal is not received thereby, and from the first decoded audio signal and the input audio signal when the first decoded audio signal and the input audio signal are received thereby. When the first decoded audio signal and the input audio signal are received by the audio processor **34**, the audio processor **34** is preferably configured to generate the first output audio signal such that audible reproduction corresponding to the first decoded audio signal by the second audible reproduction module **62** is louder than that corresponding to the input audio signal by the same. In other embodiments, when the first decoded audio signal and the input audio signal are received by the audio processor **34**, the audio processor **34** may be configured to generate the first output audio signal solely from the first decoded audio signal, i.e., the input audio signal is not audibly reproduced by the second audio reproduction module 62.

[0038] The video processor **35** is configured to cooperate with the second display driver **36** for generating the first output video signal from the input video signal when the first decoded video signal is not received thereby, and from at least the first decoded video signal when the first decoded video signal and the input video signal are received thereby. If the video processor **35** and the second display driver **36** are configured to generate the first output video signal from the first decoded video signal and the input video signal, the first decoded video signal and the input video signal are preferably displayed in different regions of a display area of the second display module **64**, respectively, such as in a picture-in-picture manner or in a side-by-side manner. In other embodiments, when the first decoded video signal and the input video signal are received by the video processor **35**, the video processor **35** and the second display driver **36** may be configured to generate the first output video signal solely from the first decoded video signal, i.e., the input video signal is not visually rendered through the second display module **64**.

[0039] Referring to FIG. **6**, in a modification, the core module **3** further includes a multiplexing unit **37** operable for generating the first output audio signal from the input audio signal when the first decoded audio signal is not received thereby, and from at least the first decoded audio signal when the first decoded audio signal and the input audio signal are received thereby.

[0040] Referring again to FIG. **3**, the multimedia device **200** of the preferred embodiment further includes: a second sound-pickup module **61** (e.g., a microphone module) operable for picking up second audio information (e.g., voices of the people inside the residence) so as to generate a second to-be-encoded audio signal; and a second video-capture module **63** operable for capturing second video information (e.g., images of the people inside the residence) so as to generate a second to-be-encoded video signal.

[0041] The second signal processing module **20** further includes a second video processing unit **22** and a second encoding unit **27**. The second audio processing unit **21** is further operable for processing the second to-be-encoded audio signal so as to generate a second intermediate encoded audio signal. The second video processing unit **22** is operable for processing the second to-be-encoded video signal so as to generate a second intermediate encoded video signal. The second encoding unit **27** is operable for performing preferably an MPEG encoding process upon the second intermediate encoded audio signal and the second intermediate encoded video signal so as to generate a second to-be-transmitted signal.

[0042] The second communication unit **241** is further operable for performing such as a modulation process upon the second to-be-transmitted signal so as to generate a second modulated signal, and/or transmitting the second modulated signal to the intercom device **100** via said one of the second wired communication unit **242** and the second wireless communication unit **243**.

[0043] Referring again to FIG. 2, upon receipt of the second modulated signal via said one of the first wired communication unit 142 and the first wireless communication unit 143, the first communication unit 141 is further operable for performing such as a demodulation process upon the second modulated signal so as to generate a second to-be-decoded signal.

[0044] The first signal processing module 10 further includes a first decoding unit 17 operable for performing preferably an MPEG decoding process upon the second to-be-decoded signal so as to generate a second intermediate decoded audio signal and a second intermediate decoded video signal. The first audio processing unit 11 and the first video processing unit 12 are further operable for processing the second intermediate decoded audio signal and the second intermediate decoded video signal so as to generate a second decoded audio signal and a second decoded video signal, respectively.

[0045] The intercom device 100 further includes: a first audio reproduction module 52 operable for audible reproduction of the second decoded audio signal; a first display module 54; and a first display driver 16 configured to cooperate with the first video processing unit 12 so as to enable display of the second decoded video signal on the first display module 54.

[0046] Of course, the multimedia communication system of the preferred embodiment may be modified or configured such that the visitors may not see images of the people inside the residence to protect their privacy.

[0047] Moreover, each of the first and second sound-pickup modules 51, 61 preferably includes an array of sound-pickup units, and a weighting unit for weighting sound information picked up by each of the sound-pickup units and for generating a corresponding one of the first and second to-be-encoded audio signals, accordingly, thereby achieving a better Signal-to-Noise performance.

[0048] In other embodiments, the multimedia device 200 may be implemented as a portable device (e.g., a mobile internet device or a smart phone device) or a non-portable device (e.g., a video phone device).

[0049] In summary, the multimedia communication system of the preferred embodiment enables the residents to communicate with the visitors while enjoying multimedia contents.

[0050] While the present invention has been described in connection with what is considered the most practical and preferred embodiment, it is understood that this invention is not limited to the disclosed embodiment but is intended to cover various arrangements included within the spirit and scope of the broadest interpretation so as to encompass all such modifications and equivalent arrangements.

What is claimed is:

1. A multimedia communication system adapted to receive an external input signal that contains external audio information, comprising:

an intercom device including

a first sound-pickup module operable for picking up first audio information so as to generate a first to-be-encoded audio signal,

a first signal processing module operable for performing an encoding process upon the first to-be-encoded audio signal so as to generate a first to-be-transmitted signal, and

a first communication module operable for performing a modulation process upon the first to-be-transmitted signal so as to generate a first modulated signal; and

a multimedia device including

a second communication module coupled to said first communication module for receiving the first modulated signal therefrom, and operable for performing a demodulation process upon the first modulated signal so as to generate a first to-be-decoded signal,

a second signal processing module operable for performing a decoding process upon the first to-be-decoded signal so as to generate a first decoded audio signal,

a core module adapted to receive the external input signal, and operable generate a first output audio signal from at least one of the first decoded audio signal and the external audio information contained in the external input signal, and

a second audio reproduction module operable for audible reproduction of the first output audio signal;

wherein:

said core module is operable for generating the first output audio signal from the external audio information contained in the external input signal when the first decoded audio signal is not received thereby; and

said core module is operable for generating the first output audio signal from at least the first decoded audio signal when the first decoded audio signal and the external input signal are received thereby.

2. The multimedia communication system as claimed in claim 1, wherein:

said multimedia device further includes a second sound-pickup module operable for picking up second audio information so as to generate a second to-be-encoded audio signal, said second signal processing module being further operable for performing an encoding process upon the second to-be-encoded audio signal so as to generate a second to-be-transmitted signal, said second communication module being further operable for performing a modulation process upon the second to-be-transmitted signal so as to generate a second modulated signal;

said first communication module is further operable for receiving the second modulated signal from said second communication module and for performing a demodulation process upon the second modulated signal so as to generate a second to-be-decoded signal, said first signal processing module being further operable performing a decoding process upon the second to-be-decoded signal so as to generate a second decoded audio signal; and

said intercom device further includes a first audio reproduction module for audible reproduction of the second decoded audio signal.

3. The multimedia communication system as claimed in claim 1, the external input signal further containing external video information, wherein:

said intercom device further includes a video-capture module operable for capturing video information so as to generate a to-be-encoded video signal, said first signal processing module being operable for performing the encoding process upon the first to-be-encoded audio signal and the to-be-encoded video signal so as to generate the first to-be-transmitted signal;

said second signal processing module is operable for performing the decoding process upon the first to-be-decoded signal so as to generate the first decoded audio signal and a decoded video signal, said core module

being further operable to generate an output video signal from at least one of the decoded video signal and the external video information contained in the extern input signal;

said multimedia device further includes a display module operable for display of the output video signal;

said core module is operable for generating the output video signal from the external video information contained in the external input signal when the decoded video signal is not received thereby; and

said core module is operable for generating the output video signal from at least the decoded video signal when the decoded video signal and the external input signal are received thereby.

**4**. The multimedia communication system as claimed in claim **1**, wherein communications between said intercom device and said multimedia device is based upon one of Session Initiating Protocol (SIP), transmission control protocol internet protocol (TCP/IP) suite, and worldwide interoperability for microwave access (WIMAX).

**5**. The multimedia communication system as claimed in claim **1**, wherein said multimedia device is one of a television device, a mobile internet device, a smart phone device, and a video phone device.

**6**. A television device adapted to receive a first modulated signal that contains first audio information picked up by an intercom device, and an external input signal that contains external audio information, said television device comprising:

a communication module adapted for receiving the first modulated signal, and operable for performing a demodulation process upon the first modulated signal so as to generate a to-be-decoded signal;

a signal processing module operable for performing a decoding process upon the to-be-decoded signal so as to generate a decoded audio signal;

a core module adapted to receive the external input signal, and operable to generate an output audio signal from at least one of the decoded audio signal and the external audio information contained in the external input signal; and

an audio reproduction module operable for audible reproduction of the output audio signal;

wherein:

said core module is operable for generating the output audio signal from the external audio information contained in the external input signal when the decoded audio signal is not received thereby; and

said core module is operable for generating the output audio signal from at least the decoded audio signal when the decoded audio signal and the external input signal are received thereby.

**7**. The television device as claimed in claim **6**, further comprising a sound-pickup module operable for picking up second audio information so as to generate a to-be-encoded audio signal, wherein said signal processing module is further operable for performing an encoding process upon the to-be-encoded audio signal so as to generate a to-be-transmitted signal, said communication module being further operable for performing a modulation process upon the to-be-transmitted signal so as to generate a second modulated signal for receipt by the intercom device.

**8**. The television device as claimed in claim **6**, the first modulated signal further containing first video information captured by the intercom device, the external input signal further containing external video information, wherein:

said signal processing module is operable for performing the decoding process upon the to-be-decoded signal so as to generate the decoded audio signal and a decoded video signal, said core module being further operable to generate an output video signal from at least one of the decoded video signal and the external video information contained in the external input signal;

said television device further comprising a display module operable for display of the output video signal;

said core module being operable for generating the output video signal from the external video information contained in the external input signal when the decoded video signal is not received thereby; and

said core module being operable for generating the output video signal from at least the decoded video signal when the decoded video signal and the external input signal are received thereby.

**9**. The television device as claimed in claim **6**, further comprising a video-capture module operable for capturing second video information so as to generate a to-be-encoded video signal, wherein said signal processing module is further operable to perform an encoding process upon the to-be-encoded video signal so as to generate a to-be-transmitted signal, said communication module being further operable to perform a modulation process upon the to-be-transmitted signal so as to generate a second modulated signal for receipt by the intercom device.

**10**. A core module for a television device, adapted to receive a decoded audio signal and an external input signal containing external audio information, and operable for generating an output audio signal from at least one of the decoded audio signal and the audio information contained in the external input signal for sound reproduction, said core module comprising:

a tuning unit adapted to receive the external input signal, and operable for performing a frequency tuning process upon the external input signal so as to generate an input audio signal; and

an audio processing unit operable for generating the output audio signal from the input audio signal when the decoded audio signal is not received by said core module, and from at least the decoded audio signal when the decoded audio signal and the external input signal are received by said core module.

**11**. The core module as claimed in claim **10**, wherein said audio processing unit is operable for generating the output audio signal from both the decoded audio signal and the input signal when the decoded audio signal and the external input signal are received by said core module.

**12**. The core module as claimed in claim **10**, the external input signal further containing external video information, said core module further comprising a video processing unit, being further adapted to receive a decoded video signal, and being further operable for generating an output video signal from at least one of the decoded video signal and the video information contained in the external input signal for visual rendering, wherein:

said tuning unit is operable for performing the frequency tuning process upon the external input signal so as to generate the input audio signal and an input video signal; and

said video processing unit is operable for generating the output video signal from the input video signal when the decoded video signal is not received by said core module, and from at least the decoded video signal when the decoded video signal and the external input signal are received by said core module.

13. The core module as claimed in claim 12, wherein said video processing unit is operable for generating the output video signal from both the decoded video signal and the input video signal when the decoded video signal and the external input signal are received by said core module.

* * * * *

US 20120023215A1

(19) **United States**
(12) **Patent Application Publication** (10) **Pub. No.: US 2012/0023215 A1**
**TSENG et al.** (43) **Pub. Date: Jan. 26, 2012**

(54) **DIGITAL SPACE MANAGEMENT SYSTEM**

(75) Inventors: **TSAO-TENG TSENG**, TAIPEI (TW); **CHI-WEN CHEN**, TAIPEI (TW); **YUNG-YANG CHIU**, TAIPEI (TW)

(73) Assignee: **LITE-ON TECHNOLOGY CORP**, TAIPEI (TW)

(21) Appl. No.: **13/187,595**

(22) Filed: **Jul. 21, 2011**

**Related U.S. Application Data**

(60) Provisional application No. 61/367,045, filed on Jul. 23, 2010.

**Publication Classification**

(51) **Int. Cl.**
*G06F 15/173* (2006.01)

(52) **U.S. Cl.** ........................................ **709/223**

(57) **ABSTRACT**

A digital space management system is provided for managing a plurality of peripheral devices in a space. The digital space management system includes a communication unit for communicating with the peripheral devices, and a processing unit electrically coupled to the communication unit. The processing unit is operable to generate a space management graphic interface with a floor-planning function and a room-planning function allowing a user of the digital space management system to perform a space planning operation for the space.






SAVANT3330002

Control4 Corp files Form S-1 (IPO Registration) SEC Filing SEC Filing - MarketBrief






http://marketbrief.com/control4-corp/s1/ipo-registration/2013/7/1/10240590/filing[8/5/2013 2:31:13 PM]

Restricted Confidential - Outside Counsel Only









F I G. 2


33
COMMUNICATION
DEVICE
33
33
POWER SOURCE
AUTOMATION
33
32
HOME OVERVIEW
MULTIMEDIA
33
31
SMART YOUR HOME
SETTING
33
3

FIG. 3


431
43
453
HOME OVERVIEW
441
44
422
425
423
42
424
421
LIVING ROOM
ADD DEVICE
452
MAIN MENU
451
4
412
1ST FLOOR
414
413
415
41
411
45

FIG. 4


51
HOME
FIRST FLOOR
SECOND FLOOR
THIRD FLOOR
ENTRANCE
KITCHEN
LIVING ROOM
REST AREA
GUEST ROOM
STUDY ROOM
MASTER BEDROOM
BATHROOM
5
52
53

F I G. 5


61
7
LIGHTING
DETECTOR
AUTOMATION
TEMPERATURE CONTROL
COMMUNICATION
MULTIMEDIA
HOME OVERVIEW
663
70
ADD ROOM
662
621
65
LIVING ROOM
67
62
64
MAIN MENU
661
1 ST FLOOR
66
63
6

F I G. 6


LIVING ROOM LAMP
TEST
WALL LAMP
TEST
ENTRANCE LAMP
TEST
LIVING ROOM
1ST FLOOR
MAIN MENU
ADD ROOM
HOME OVERVIEW
7
71
712
72
722
73
732
61
711
721
731
65
621
62
67
64
731
63
6
66
661
662
663

FIG. 7


LIVING ROOM LAMP
WALL LAMP
ENTRANCE LAMP
LIGHTING
GAS DETECTOR
HEAT DETECTOR
DETECTOR
PERIPHERAL DEVICES
AUTOMATION
AUTOMATIC CURTAIN
ELECTRIC ROLLING DOOR
811
TEMPERATURE CONTROL
AIR CONDITIONER
ELECTRIC FAN
COMMUNICATION
INTERNET TELEPHONE
AUDIO/VIDEO PLAYER
MULTIMEDIA
812
WEBCAM
81
813

F I G. 8


823
822
INFRARED
LIVING ROOM LAMP
WALL LAMP
ENTRANCE LAMP
AIR CONDITIONER
GAS DETECTOR
HEAT DETECTOR
AUTOMATIC CURTAIN
ELECTRIC ROLLING DOOR
PERIPHERAL DEVICES
ZIGBEE
821
AUDIO/VIDEO PLAYER
WI-FI
WEBCAM
82
SESSION INITIATION PROTOCOL
INTERNET TELEPHONE

F I G. 9




F I G. 10


WALL LAMP
AUTOMATIC CURTAIN
WEBCAM
HOME OVERVIEW
MAIN MENU
MASTER BEDROOM
95
96
97
98
92
94
911
951
961
971
91
932
933
93
931
9

FIG. 11

# DIGITAL SPACE MANAGEMENT SYSTEM

## CROSS-REFERENCE TO RELATED APPLICATION

[0001] This application claims priority of U.S. Provisional Patent Application No. 61/367045, filed on Jul. 23, 2010.

## BACKGROUND OF THE INVENTION

[0002] 1. Field of the Invention

[0003] The present invention relates to a digital space management system for a plurality of peripheral devices, more particularly to a digital space management system for performing a space planning operation for a space and for managing a plurality of peripheral devices in the space.

[0004] 2. Description of the Related Art

[0005] As communication technologies and digital household electrical appliances are developed increasingly, technologies for managing and controlling the digital household electrical appliances have been developed. For example, U.S. Pat. No. 7,627,098 discloses "an intelligent management apparatus and method of digital home network system" for minimizing user intervention and providing a relatively convenient living environment. However, the conventional technologies for managing and controlling the digital household electrical appliances do not provide a graphic interface allowing a user to perform a space planning operation for a space.

## SUMMARY OF THE INVENTION

[0006] Therefore, an object of the present invention is to provide a digital space management system for managing a plurality of peripheral devices in a space with the use of a graphic interface

[0007] Accordingly, a digital space management system of the present invention is used for managing a plurality of peripheral devices in a space. The digital space management system comprises a communication unit for communicating with the peripheral devices, and a processing unit electrically coupled to the communication unit. The processing unit is operable to generate a space management graphic interface with a floor-planning function and a room-planning function for allowing a user of the digital space management system to perform a space planning operation for the space.

## BRIEF DESCRIPTION OF THE DRAWINGS

[0008] Other features and advantages of the present invention will become apparent in the following detailed description of the preferred embodiment with reference to the accompanying drawings, of which:

[0009] FIG. 1 is a schematic diagram illustrating a space that has a plurality of peripheral devices and that is applied with a preferred embodiment of a digital space management system according to this invention;

[0010] FIG. 2 is a block diagram of the digital space management system of the preferred embodiment;

[0011] FIG. 3 is a schematic diagram illustrating a main menu graphic interface generated by the digital space management system of the preferred embodiment;

[0012] FIG. 4 is a schematic diagram illustrating a space management graphic interface generated by the digital space management system of the preferred embodiment;

[0013] FIG. 5 illustrates a space (home) catalog resulting from classification of space planning information according to floor information thereof;

[0014] FIG. 6 is a schematic diagram illustrating a device management graphic interface generated by the digital space management system of the preferred embodiment;

[0015] FIG. 7 is a schematic diagram illustrating the device management graphic interface associated with a device category of lighting equipment;

[0016] FIG. 8 illustrates a device function catalog resulting from functional classification of visual elements according to device function information of peripheral devices that respectively correspond to the visual elements;

[0017] FIG. 9 illustrates a device communication type catalog resulting from communication type classification of the visual elements according to communication type information of the peripheral devices;

[0018] FIG. 10 is a schematic diagram illustrating a home overview graphic interface generated by the digital space management system of the preferred embodiment; and

[0019] FIG. 11 is a schematic diagram illustrating a room view graphic interface generated by the digital space management system of the preferred embodiment.

## DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENT

[0020] Referring FIG. 1, the preferred embodiment of a digital space management system 1 of this invention is applied to a space having a plurality of peripheral devices. In practice, the space may be a house, a hotel, a condominium, or a plan area and sub-spaces of an exhibition center or a large public space. For instance, the digital space management system 1 can be applied to management and control of peripheral devices in a house, to management and control of power source, lighting and air conditioning in an exhibition center, and to management and control of public facilities in a hotel or in a condominium. The digital space management system 1 is configured to manage and control the peripheral devices communicating with the digital space management system 1 via various communication types. As shown in FIG. 1, in this embodiment, the digital space management system 1 is applied to a house, and the peripheral devices in the house are classified, according to the communication types thereof, into an infrared communication-based device group 21, a Zigbee communication-based device group 22, a Wi-Fi communication-based device group 23, and a Session Initiation Protocol (SIP) communication-based device group 24. The infrared communication-based device group 21 includes a living room lamp 211, a wall lamp 212, an entrance lamp 213, and an air conditioner 214.

[0021] The Zigbee communication-based device group 22 includes a gas detector 221, a heat detector 222, an automatic curtain 223, and an electric rolling door 224. The Wi-Fi communication-based device group 23 includes an online video player 231 and a webcam 232. The SIP communication-based device group 24 includes an internet telephone 241.

[0022] Currently, since intelligent household electrical appliances and network communication are developed increasingly, many home network protocol standards for regulating and controlling the peripheral devices have been developed. The digital space management system 1 is operable to control the peripheral devices through the existing home network protocol standards including, for example, LonTalk standard, ECHONET standard, KNX standard, etc. Since the above-mentioned home network protocol standards

Restricted Confidential - Outside Counsel Only






are well known to those skilled in the art, details thereof will be omitted herein for the sake of brevity.

[0023] Referring to FIG. 2, in this embodiment, the digital space management system 1 is implemented with an electronic device, such as a portable electronic device examples of which include a smart phone, a personal digital assistant, a tablet computer, etc. The digital space management system 1 includes an input/output unit 11, a communication unit 12, an image capture unit 13, a processing unit 14, and a data base 15.

[0024] The input/output unit 11 is configured to allow a user to interactively operate the digital space management system 1. In practice, the input/output unit 11 is a combination of a keyboard, a mouse, a display and a joystick, a touch screen, or other devices with similar functions. The communication unit 12 is configured for communicating with the peripheral devices. The image capture unit 13 is configured for capturing a physical space image of the sub-space of the space. It should be noted that, in other embodiments, the image capture unit 13 may be omitted, and the physical space image may be captured by the webcam 232 and received by the communication unit 12 of the digital space management system 1 through wireless communication. In other embodiments, the image capture unit 13 and the webcam 232 may be configured to capture a physical space image of the space.

[0025] The processing unit 14 is electrically coupled to the input/output unit 11, the communication unit 12, the image capture unit 13 and the data base 15. During initialization of the digital space management system 1, the processing unit 14 is operable to detect and scan the peripheral devices through the communication unit 12 to obtain a plurality of device information sets corresponding to the peripheral devices, respectively. Further, the processing unit 14 is operable to store in the data base 15 the physical space image captured by the image capture unit 13 (or received by the communication unit 12 in other embodiments) and the device information sets.

[0026] In particular, each of the device information sets includes manufacturer information, device function information, communication type information, and device identification information. The manufacturer information has the information related to a manufacturer of a corresponding one of the peripheral devices, such as a name of the manufacturer. The device function information indicates a property of a function of a corresponding one of the peripheral devices, such as the functions of lighting, detection, temperature control, and communication. The communication type information indicates a communication type of a corresponding one of the peripheral devices, for example, Wi-Fi, infrared, and Zigbee. The device identification information is unique, and the digital space management system 1 is configured to identify a corresponding one of the peripheral devices through the device identification information.

[0027] Referring to FIGS. 2 to 4, when the digital space management system 1 is activated, the processing unit 14 is operable to generate a main menu graphic interface 3 as shown in FIG. 3, and to control the input/output unit 11 to display the main menu graphic interface 3. The main menu graphic interface 3 includes a "Smart Your House" icon 31, a "Home Overview" icon 32, and a plurality of function icons 33. When a user of the digital space management system 1 selects the "Smart Your House" icon 31, the processing unit 14 is operable to generate a space management graphic interface 4 as shown in FIG. 4, to control the input/output unit 11 to show the space management graphic interface 4 to the user, and to allow the user to perform a space planning operation for the space, to set the physical space image of the sub-space, and to perform other interactive operations. In this embodiment, the space has at least one sub-space. In particular, the space is a house and the sub-space of the space is a room located in a floor of the house, and the physical space image is an image of the room. In the case of a space having only one sub-space, the sub-space may be a portion of the space or the space itself.

[0028] As shown in FIG. 4, an exemplary embodiment of the space management graphic interface 4 generated by the processing unit 14 includes a floor management toolbar 41, a room management toolbar 42, a first display area 43, a second display area 44, and a functional shortcut toolbar 45. The functional shortcut toolbar 45 includes a "Main Menu" button 451, an "Add Device" button 452, and a "Home Overview" button 953. When the user selects one of the buttons 451 to 453, the processing unit 14 is operable to control the input/output unit 11 to display a corresponding graphic interface allowing the user to perform a corresponding operation. For example, when the user selects the "Main Menu" button 451, the processing unit 14 is operable to control the input/output unit 11 to display the main menu graphic interface 3 allowing the user to perform the interactive operation.

[0029] The floor management toolbar 41 in the space management graphic interface 4 generated by the processing unit 14 allows the user to perform a floor-planning function through the input/output unit 11. The floor management toolbar 41 includes a floor-adding button 411 for adding a floor to a space plan, a floor-deleting button 412 for deleting an existing floor from the space plan, a floor information display area 413 for displaying an index of a current floor that is to be planned in the space plan, an upward button 414 for changing the floor from the current floor to an upper floor in the space plan, and a downward button 415 for changing the floor from the current floor to a lower floor in the space plan. The room management toolbar 42 allows the user to perform a room-planning function through the input/output unit 11. The room management toolbar 42 includes a room-adding button 421 for adding a room to a floor plan, a room-deleting button 422 for deleting an existing room from the floor plan, a room information display area 423 for displaying a name of a current room that is to be planned in the floor plan, a previous button 424 for changing the room from the current room to a previous room in the floor plan, and a next button 425 for changing the room from the current room to a next room in the floor plan. The second display area 44 is configured to display the physical space image 441 associated with the current room with the name displayed in the room information display area 423.

[0030] When the user selects the room-adding button 421 to add a room to the floor plan during the space planning operation, the processing unit 14 is operable to display, on the first display area 43 in the space management graphic interface 4, the physical space images 431 (stored in the data base 15) of respective rooms that are located in a floor associated with the floor plan. Further, the processing unit 14 is configured to allow the user to use the input/output unit 11 for selecting one of the physical space images 431 on the first display area 43 that corresponds to a to-be-added room (i.e., the sub-space), and for dragging and moving the corresponding one of the physical space images 431 from the first display area 43 to the second display area 44 so as to set the physical

Restricted Confidential - Outside Counsel Only






space image 441 of the to-be-added room (the sub-space). The processing unit 14 is further operable, according to the space planning operation, to generate space planning information including floor information and room information, and to classify the space planning information according to the floor information and the room information.

[0031] For example, it is assumed that, in the space planning operation, the user has planned the home with a first floor having a entranceway, a kitchen and a living room; a second floor having a rest area, a guest room and a study room; and a third floor having a master bedroom and a bathroom. The processing unit 14 is operable to classify the space planning information according to the floor information and the room information. The classification result is shown in FIG. 5 as a home catalog 5. In the home catalog 5, a root catalog 51 indicates the home, a first-layer sub-catalog 52 includes the described floors (i.e., the first to third floors) classified according to the floor information, and a second-layer sub-catalog 53 includes the described rooms corresponding to the respective floors in the first-layer sub-catalog 52.

[0032] Referring to FIGS. 2, 6 and 7, when the user selects the "Add Device" button 452 of the functional shortcut toolbar 45 shown in FIG. 4, the processing unit 14 is operable to generate a device management graphic interface 6, and to control the input/output unit 11 to display the device management graphic interface 6. The device management graphic interface 6 is configured to allow the user to perform a device disposing operation to dispose a plurality of visual elements in the physical space image 621. Each of the visual elements corresponds to a respective one of the peripheral devices, and may be an icon, an image or text in practice for indicating the respective one of the peripheral devices. The device management graphic interface 6 is further configured to display the described visual elements and to allow the user to perform interactive operation upon the peripheral devices.

[0033] As shown in FIG. 6, an exemplary embodiment of the device management graphic interface 6 includes a third display area 61, a fourth display area 62, a floor management toolbar 63, a previous room button 64, a next room button 65, a functional shortcut toolbar 66, and a room information display area 67.

[0034] The third display area 61 is configured to display the visual elements corresponding to the respective peripheral devices. The fourth display area 62 is configured to display a physical space image 621 associated with the current room (i.e., the sub-space) that is to be planned and managed. Functions of the floor management toolbar 63 are similar to those of the floor management toolbar 41 in the space management graphic interface 4 of FIG. 4 for adding a floor to the space plan, for deleting an existing floor from the space plan, and for changing the current floor among various floors in the space plan. The previous room button 64 and the next room button 65 are configured to change the current room among various rooms in the floor plan associated with the same floor. The room information display area 67 is configured to display the name of the current room, i.e., the name of the room associated with the physical space image 621 displayed in the fourth display area 62. The functional shortcut toolbar 66 includes a "Main Menu" button 661, an "Add Room" button 662, and a "Home Overview" button 663. When the user selects the "Add Room" button 662, the processing unit 14 is operable to control the input/output unit 11 to display the space management graphic interface 4 shown in FIG. 4, and to allow the user to perform the space planning operation for the home (i.e., the space).

[0035] It should be noted that the device information sets of the respective peripheral devices are obtained by the processing unit 14 using the communication unit 12 to scan the peripheral devices during initialization of the digital space management system 1, and are pre-stored in the data base 15. The data base 15 is configured to further store a plurality of pre-established icons, and each of the device information sets further includes icon information indicating one of the pre-established icons stored in the data base 15. The processing unit 14 is operable to obtain one of the pre-established icons corresponding to one of the peripheral devices from the data base 15 according to the icon information in the device information set of the corresponding one of the peripheral devices, and to display said one of the pre-established icons of the corresponding one of the peripheral devices. Thus, the user can directly appreciate and know the peripheral devices actually corresponding to the visual elements, respectively.

[0036] Further, the processing unit 14 is operable to classify the visual elements into various categories 70 according to the device information sets of the peripheral devices that respectively correspond to the visual elements, and to display the various categories 70 of the visual elements on the third display area 61. For example, the processing unit 14 is operable to classify the peripheral devices with the communication type of Zigbee according to standards in Zigbee Cluster Library (abbreviated as ZCL) of Zigbee pro 2007. In this embodiment, the processing unit 14 is operable to classify the peripheral devices into a category of lighting equipment, a category of detectors, a category of automation devices, a category of temperature control devices, a category of communication devices, and a category of multimedia devices. The result of the functional classification is shown in FIG. 8 as a device function catalog 81. In the device function catalog 81, a root catalog 811 indicates the peripheral devices, a first-layer sub-catalog 812 includes the described categories classified according to the device function information, and a second-layer sub-catalog 813 includes the peripheral devices classified into various groups each corresponding to a respective one of the categories in the first-layer sub-catalog 812.

[0037] In other embodiments, the processing unit 14 may be operable, according to the communication type information, to classify the peripheral devices into a category of infrared devices, a category of Zigbee devices, a category of Wi-Fi devices, and a category of SIP devices. The result of the communication type classification is shown in FIG. 9 as a device communication type catalog 82. In the device communication type catalog 82, a root catalog 821 indicates the peripheral devices, a first-layer sub-catalog 822 includes the described categories classified according to the communication type information, and a second-layer sub-catalog 823 includes the peripheral devices classified into various groups each corresponding to a respective one of the categories in the first-layer sub-catalog 822.

[0038] When the user selects one of the categories 70 of the visual elements using the input/output unit 11, the processing unit 14 is operable to display the visual elements in the selected one of the categories 70 on the third display area 61. The visual elements are configured to allow the user to perform interactive operation upon the peripheral devices in the selected one of the categories 70. The processing unit 14 is further operable to generate at least one control signal in

Restricted Confidential - Outside Counsel Only






response to the interactive operation, and to send the control signal to a corresponding one of the peripheral devices through the communication unit 12.

[0039] Referring to FIGS. 6 and 7 as an example, when the user touches the catalog of lighting equipment 7 (see FIG. 6), the processing unit 14 is operable to display a visual element of the living room lamp 71, a visual element of the wall lamp 72, and a visual element of the entrance lamp 73 on the third display area 61 in the device management graphic interface 6 as shown in FIG. 7. The visual element of the living room lamp 71 has an icon of the living room lamp 711 and a test button 712, the visual element of the wall lamp 72 has an icon of the wall lamp 721 and a test button 722, and the visual element of the entrance lamp 73 has an icon of the entrance lamp 731 and a test button 732. In this embodiment, when the user touches one of the test buttons 712, 722 and 732, the processing unit 14 is operable to check whether a corresponding one of the living room lamp 211, the wall lamp 212 and the entrance lamp 213 operates accordingly. The visual elements 71-73 in the third display area 61 are configured to present a relatively bright color indicating that living room lamp 211, the wall lamp 212 and the entrance lamp 213 have not been allocated yet and can be disposed to a desired room.

[0040] As shown in FIG. 7, for disposing a visual element corresponding to a desired one of the peripheral devices (e.g., the entrance lamp 213), the device management graphic interface 6 generated by the processing unit 14 is further configured to allow the user to drag and move the icon 731 of the visual element 73 corresponding to the desired one of the peripheral devices (the entrance lamp 213) to the physical space image 621 displayed on the fourth display area 62. Then, the processing unit 14 is operable to generate, according to the device disposing operation, disposition information including a disposition relationship of at least one of the visual elements 71, 72, 73 in the physical space image 621. The disposition relationship indicates a position of one of the peripheral devices corresponding to said at least one of the visual elements 71, 72, 73 in the sub-space (i.e., the living room associated with the physical space image 621). In this embodiment, the disposition information further includes physical space information and device identification information of the peripheral devices corresponding to the respective visual elements that have been disposed in the physical space image 621. The physical space information is used for indicating the positions of the peripheral devices that have been disposed in the sub-space.

[0041] Seeing FIG. 7 as an example, after the user drags and moves the icon 731 corresponding to the entrance lamp 213 to the physical space image 621 on the fourth display area 62 associated with the living room using the input/output unit 11, the processing unit 14 is operable accordingly to generate the disposition information with the physical space information indicating that the entrance lamp 213 is in the living room on the first floor of the house. When the user touches the test button 732 of the visual element 73 corresponding to the entrance lamp 213 on the device management graphic interface 6, the processing unit 14 is operable to generate and send the control signal to the entrance lamp 213 according to the device identification information for checking whether the entrance lamp 213 operates accordingly. In this embodiment, the device management graphic interface 6 is further configured to allow the user to drag and move the icon 731 of the entrance lamp 213 from the physical space image 621 on the fourth display area 62 back to the third display area 61. At this time, the visual element 73 of the entrance lamp 213 in the third display area 61 is configured to re-present the relatively bright color indicating that the icon 731 of the entrance lamp 213 has not been allocated yet and can be disposed to a desired room. Similarly, after the user disposes the icon 731 of the entrance lamp 213 to the physical space image 621 on the fourth display area 62, the visual element 73 of the entrance lamp 213 in the third display area 61 is configured to present a relatively dim color indicating that the icon 731 of the entrance lamp 213 has been disposed.

[0042] Referring to FIG. 10, when the user selects the "Home Overview" button 453 shown in FIG. 4 or the "Home Overview" button 663 shown in FIG. 6, the processing unit 14 is operable to generate a home overview graphic interface 60 for presenting the physical space images 601-605 that have been disposed with the visual elements after the space planning operation and the device disposing operation. When the user touches one of the physical space images 601-605, the processing unit 14 is further operable to generate a room view graphic interface 9 as shown in FIG. 11, and to control the input/output unit 11 to display the room view graphic interface 9 with a physical space image 911 corresponding to one of the physical space images 601-605 that has been touched in the home overview graphic interface 60. Further, the room graphic interface 9 is configured to allow the user to find the peripheral devices desired to be controlled from the physical space image 911 in the room view graphic interface 9 that has been allocated with the visual elements corresponding to the peripheral devices. Therefore, the u ser may control the peripheral devices by operating visual elements 95-97 in the room view graphic interface 9. The home overview graphic interface 60 includes a "Main Menu" button 606 for returning to the main menu graphic interface 3 as shown in FIG. 3

[0043] As shown in FIG. 11, an exemplary embodiment of the room view graphic interface 9 includes a fifth display area 91, a sixth display area 92, a room toolbar 93, a "Main Menu" button 94, and a "Home Overview" button 98. When the user selects the "Home Overview" button 98, the input/output unit 11 is configured to display the home overview graphic interface 60 of FIG. 10 again. The fifth display area 91 is configured to display the physical space image 911 associated with a current room selected from the home overview graphic interface 60, and an icon 951 of the wall lamp 212, an icon 961 the automatic curtain 223, and an icon 971 of the webcam 232 that have been disposed to the physical space image 911. The sixth display area 92 is configured to display a visual element 95 of the wall lamp 212, a visual element 96 of the automatic curtain 223, and a visual element 97 of the webcam 232 that correspond to the peripheral devices disposed in the current room, respectively. The room, toolbar 93 includes a previous room button 931, a next room button 932, and a room information display area 933. The previous room button 931 and the next room button 932 are configured for changing the current room. The room information display area 933 is configured to display the name of the current room, i.e., the name of the room associated with the physical space image 911 displayed in the fifth display area 91.

[0044] In summary, the space management graphic interface 4 generated by the processing unit 14 is configured to allow the user to perform the space planning operation. The processing unit 14 is operable to generate the space planning information and to classify the space planning information according to the floor information such that the user may manage the space (i.e., the house) according to the house

catalog 5. Further, the device management graphic interface 6 generated by the processing unit 14 is configured to allow the user to perform the device disposing operation to dispose the icons of the peripheral devices to the physical space images. The processing unit 14 is further operable to generate the disposition information according to the device disposing operation so as to provide the physical space information of the peripheral devices to the user.

[0045] While the present invention has been described in connection with what is considered the most practical and preferred embodiment, it is understood that this invention is not limited to the disclosed embodiment but is intended to cover various arrangements included within the spirit and scope of the broadest interpretation so as to encompass all such modifications and equivalent arrangements.

What is claimed is:

1. A digital space management system for managing a plurality of peripheral devices in a space, said digital space management system comprising:
   a communication unit for communicating with the peripheral devices, and
   a processing unit electrically coupled to said communication unit, said processing unit being operable to generate a space management graphic interface allowing a user of said digital space management system to perform a space planning operation for the space.

2. The digital space management system as claimed in claim 1, the space having at least one sub-space,
   wherein said processing unit is configured to generate the space management graphic interface to further allow the user to set a physical space image associated with the sub-space.

3. The digital space management system as claimed in claim 1, the space having at least one sub-space, wherein said processing unit is further operable to generate a device management graphic interface including a physical space image associated with the sub-space and a plurality of visual elements each of which corresponds to a respective one of the peripheral devices, and allowing the user to dispose at least one of the visual elements in the physical space image.

4. The digital space management system as claimed in claim 3, wherein each of the visual elements allows the user to interactively operate the respective one of the peripheral devices, and said processing unit is further operable to generate at least One control signal in response to the interactive operation, and to send the control signal to a corresponding one of the peripheral devices through said communication unit.

5. The digital space management system as claimed in claim 3, wherein said processing unit is further operable to generate, according to the disposition of said at least one of the visual elements, disposition information including a disposition relationship of said at least one of the visual elements in the physical space image, the disposition relationship indicating a position of one of the peripheral devices corresponding to said at least one of the visual elements in the sub-space.

6. The digital space management system as claimed in claim 5, wherein the disposition information further includes physical space information and device identification information of the peripheral devices corresponding to the respective visual elements that have been disposed in the physical space image.

7. The digital space management system as claimed in claim 6, the space further having at least one floor, the sub-space being a room located in the floor of the space and the physical space image being an image of the room,
   wherein the physical space information includes the floor and a position where the room is located in the floor.

8. The digital space management system as claimed in claim 7, wherein said processing unit is operable to generate the space management graphic interface further with a floor-planning function allowing the user to plan the floor in the space.

9. The digital space management system as claimed in claim 8, wherein said processing unit is further operable to generate space planning information including floor information according to the space planning operation, and to classify the space planning information according to the floor information.

10. The digital space management system as claimed in claim 3, the sub-space being a room located in the space,
   wherein said processing unit is operable to generate the space management graphic interface with a room-planning function allowing the user of said digital space management system to plan the sub-space.

11. The digital space management system as claimed in claim 3, further comprising an input/output unit electrically coupled to said processing unit, wherein
   the device management graphic interface generated by said processing unit is configured to allow the user to drag and move the visual elements through said input/output unit for disposing at least one of the visual elements in the physical space image; and
   the device management graphic interface and the space management graphic interface generated by said processing unit are displayed on said input/output unit.

12. The digital space management system as claimed in claim 3, wherein said processing unit is further operable to detect and scan the peripheral devices through said communication unit to obtain a plurality of device information sets corresponding to the peripheral devices, respectively.

13. The digital space management system as claimed in claim 12, wherein said processing unit is further operable to classify the visual elements into various categories according to the device information sets of the peripheral devices that respectively correspond to the visual elements, and to display the visual elements according to the categories.

14. The digital space management system as claimed in claim 13, wherein the device information set of each of the peripheral devices includes device function information and communication type information.

* * * * *

Control4 Corp files Form S-1 (IPO Registration) SEC Filing SEC Filing - MarketBrief

(19)中華民國智慧財產局
(12)發明說明書公開本 (11)公開編號：TW 201125376 A1
(43)公開日： 中華民國 100 (2011) 年 07 月 16 日

(21)申請案號：099100089 (22)申請日： 中華民國 99 (2010) 年 01 月 05 日
(51)Int. Cl.： *H04R3/12 (2006.01)*

(71)申請人：光寶科技股份有限公司 (中華民國) LITE-ON TECHNOLOGY CORPORATION (TW)
臺北市內湖區瑞光路 392 號 22 樓
(72)發明人：侯知遠 HOU, CHIH YUAN (TW)；曾兆登 TSENG, TSAO TENG (TW)；陳祈文 CHEN, CHI WEN (TW)
(74)代理人：[illegible]；陳文郎

申請實體審查：有 申請專利範圍項數：18 項 圖式數：7 共 28 頁

(54)名稱

通信模組、多媒體播放器以及包含該多媒體播放器的收發系統

COMMUNICATING MODULE, MULTIMEDIA PLAYER AND TRANSCEIVING SYSTEM COMPRISING THE MULTIMEDIA PLAYER

(57)摘要

一種多媒體播放器，適用於接收一個多媒體信號，並接收一個來自一對講機且載有一輸入信號的溝通信號，該多媒體播放器包含：一輸出裝置；一通信模組，包括：一傳輸單元，用以接收該溝通信號；一解碼單元，根據該溝通信號進行解碼；及一處理單元，根據該解碼單元的解碼結果，產生一對應該輸入信號的輸出信號；及一核心裝置，用以接收該多媒體信號與該輸出信號，並令該輸出裝置同時播放該輸出信號與該多媒體信號，而達到在與訪客互動同時仍不中斷多媒體服務的目的。




1：主轉換裝置
2：從轉換裝置
3：核心裝置
40：輸入裝置
50：輸出裝置
51：收音裝置
52：揚聲裝置
53：攝像裝置
54：顯示裝置
100：對講機
200：多媒體播放器
300：通信模組

Control4 Corp files Form S-1 (IPO Registration) SEC Filing SEC Filing - MarketBrief

201125376

# 發明專利說明書

（本說明書格式、順序，請勿任意更動，※記號部分請勿填寫）

※申請案號：099100059

※申請日：99. 1. 05　　※IPC 分類：H04R 3/12 (2006.01)

一、發明名稱：（中文/英文）

通信模組、多媒體播放器以及包含該多媒體播放器的收發系統/

communicating module, multimedia player and transceiving system comprising the multimedia player

二、中文發明摘要：

一種多媒體播放器，適用於接收一個多媒體信號，並接收一個來自一對講機且載有一輸入信號的溝通信號，該多媒體播放器包含：一輸出裝置；一通信模組，包括：一傳輸單元，用以接收該溝通信號；一解碼單元，根據該溝通信號進行解碼；及一處理單元，根據該解碼單元的解碼結果，產生一對應該輸入信號的輸出信號；及一核心裝置，用以接收該多媒體信號與該輸出信號，並令該輸出裝置同時播放該輸出信號與該多媒體信號，而達到在與訪客互動同時仍不中斷多媒體服務的目的。

三、英文發明摘要：

A multimedia player is adapted for receiving a multimedia signal and receiving a communicating signal from an interphone and carrying with an input signal. The multimedia player comprises an output device, a communicating module and a core

device. The communicating module includes a transporting unit used to receive the communicating signal, a decoding unit used to decode according to the communicating signal, and a processing unit generating an output signal corresponding to the input signal based on the decoding result of the decoding unit. The core device is used to receive the multimedia signal and the output signal and to let the output device play the multimedia signal and the output signal simultaneously in order to achieve the object of not breaking off a multimedia service when interaction with a visitor is ongoing.

201125376

四、指定代表圖：

(一)本案指定代表圖為：圖（ 1 ）。

(二)本代表圖之元件符號簡單說明：

100……對講機

200……多媒體播放器

300……通信模組

1…………主轉換裝置

2…………僕轉換裝置

3…………核心裝置

40………輸入裝置

50………輸出裝置

51………收音裝置

52………揚聲裝置

53………攝像裝置

54………顯示裝置

五、本案若有化學式時，請揭示最能顯示發明特徵的化學式：



5

六、發明說明：

【發明所屬之技術領域】

本發明是有關於一種收發系統，特別是指一種包含一多媒體播放器的收發系統。

【先前技術】

一般來說，居家門口總會設置一個室外對講機(interphone)，方便門外訪客取得與屋內住戶的聯繫。而且，通常住戶會藉由一單獨設置在門內入口處的室內對講機來進行互動。

只是，當室內對講機發出一來訪請求時，如果住戶不在對講機旁，就得放下手邊工作，匆忙地從目前所在地移動接近。更糟的是，如果當時正觀賞著一精采影片，更會造成住戶的不悅。

【發明內容】

因此，本發明之目的，即在提供一種通信模組、多媒體播放器以及包含該多媒體播放器的收發系統，可以讓住戶在享受多媒體服務的同時，也能與門外的訪客進行對談。

於是，本發明多媒體播放器，適用於接收一個多媒體信號，並接收一個來自一對講機且載有一輸入信號的溝通信號，該多媒體播放器包含：一輸出裝置；一通信模組，包括：一傳輸單元，用以接收該溝通信號；一解碼單元，根據該溝通信號進行解碼；及一處理單元，根據該解碼單

元的解碼結果，產生一對應該輸入信號的輸出信號；及一核心裝置，用以接收該多媒體信號與該輸出信號，並令該輸出裝置同時播放該輸出信號與該多媒體信號。

且本發明通信模組，適用於接收一載有一輸入信號的溝通信號，並電連接一耦接有一輸出裝置的核心裝置，該通信模組包括：一傳輸單元，用以接收該溝通信號；一解碼單元，根據該溝通信號進行解碼；及一處理單元，根據該解碼單元的解碼結果，產生一對應該輸入信號的輸出信號；在該輸出裝置播放一多媒體信號的情況下，當該核心裝置收到該輸出信號，該核心裝置更驅使該輸出裝置同時播放該輸出信號與該多媒體信號。

又本發明收發系統，包含：一對講機，包括：一輸入裝置，用以捕捉一信號；一處理單元，根據該輸入裝置捕捉的信號，處理成一編碼信號；及一傳輸單元，將該編碼信號載於一溝通信號，並發送出去；一多媒體播放器，包括：一輸出裝置；一通信模組，具有：一傳輸單元，用以接收該溝通信號；一解碼單元，根據該溝通信號進行解碼；及一處理單元，根據該解碼單元的解碼結果產生一輸出信號；及一核心裝置，用以接收一多媒體信號與該輸出信號，並令該輸出裝置同時播放該輸出信號與該多媒體信號。

【實施方式】

有關本發明之前述及其他技術內容、特點與功效，在

以下配合參考圖式之一個較佳實施例的詳細說明中，將可清楚的呈現。

參閱圖 1，本發明收發系統之較佳實施例包含一對講機 100 及一多媒體播放器 200。較佳地，對講機 100 會設置於居家門口，且多媒體播放器 200 是一台室內電視機。

並且，多媒體播放器 200 包含一通信模組 300，會透過網路連接到該對講機 100。因此，當訪客觸發該對講機 100，對講機 100 能夠將一第一溝通信號傳送到該通信模組 300，以提醒住戶。另一方面，住戶也可以透過通信模組 300 發出一第二溝通信號，而與對講機 100 旁的訪客進行互動。

訪客請求

本例的對講機 100 包括一主轉換裝置 1，以及當做輸入裝置 40 的一收音裝置 51 和一攝像裝置 53。而本例的多媒體播放器 200 包含該通信模組 300、一核心裝置 3，以及做為輸出裝置 50 的一揚聲裝置 52 和一顯示裝置 54。並且，通信模組 300 是藉由所包括的一僕轉換裝置 2 來網路連接到對講機 100 的主轉換裝置 1。

當多媒體播放器 200 收到一多媒體信號，核心裝置 3 會根據該多媒體信號，處理成一音訊信號使揚聲裝置 52 播放，並處理成一視訊信號而供顯示裝置 54 呈現。因此，位於多媒體播放器 200 旁的住戶能享受到相關多媒體服務。

如果，對講機 100 在此多媒體服務期間受到訪客觸發

，會令收音裝置 51 進行收錄得到一第一收音信號，也會令攝像裝置 53 進行拍攝以捕捉一第一攝像信號。然後，主轉換裝置 1 將第一收音信號與第一攝像信號當做輸入信號，並轉換成該第一溝通信號。

而第一溝通信號經過網路傳送到多媒體播放器 200 後，僕轉換裝置 2 會基於第一溝通信號的聲音部分轉換成一對應第一收音信號的第一揚聲信號，並送出第一溝通信號的影像部分，以供核心裝置 3 轉換成一對應第一攝像信號的第一顯示信號。因而，得到當做輸出信號的第一揚聲信號和第一顯示信號。

最後，核心裝置 3 再將第一揚聲信號和多媒體服務的音訊信號合成，以藉由揚聲裝置 52 同步播放。並且，核心裝置 3 更採用子母畫面方式，使顯示裝置 54 呈現出第一顯示信號疊放在多媒體服務之視訊信號上的效果。因此，住戶不但不用匆忙移動去回應門外訪客，還能享有不中斷的多媒體服務。

以下更進一步說明用以產生第一溝通信號的主轉換裝置 1，且進一步說明用以處理第一溝通信號的僕轉換裝置 2。

如圖 2 所示，主轉換裝置 1 具有一音訊處理單元 11、一視訊處理單元 12、一編碼單元 13 以及一傳輸單元 14。音訊處理單元 11 基於收音裝置 51 收錄所得，產生一第一收音信號，視訊處理單元 12 基於攝像裝置 53 拍攝所得，產



5

生一第一攝像信號。且編碼單元 13 以 MPEG(Moving Picture Experts Group，動態影像專家群)編碼方式，根據第一收音信號和第一攝像信號來編碼出一第一編碼信號。然後，再由傳輸單元 14 基於第一編碼信號傳送出該第一溝通信號。

而傳輸單元 14 可以選擇有線或無線方式來傳送，本例的實施態樣是：傳輸單元 14 具有一協定單元 141、一有線傳收單元 142 及一無線傳收單元 143。協定單元 141 將第一編碼信號載於符合對話啟始協定(SIP，Session Initiation Protocol)的第一溝通信號上，然後選擇性地傳送第一溝通信號給有線傳收單元 142 或無線傳收單元 143。有線傳收單元 142 在 TCP/IP(Transmission Control Protocol/Internet Protocol，傳輸控制協定/網際網路協定)格式的基礎上，透過一乙太網路(ethernet)線 7 轉發信號給僕轉換裝置 2。而無線傳收單元 143 則是在 WiMax(Worldwide Interoperability for Microwave Access，全球互通微波存取)或 Wi-Fi(Wireless Fidelity，無線相容性認證)的基礎上，透過一天線 8 來轉發信號。

請注意，主轉換裝置 1 還具有一控制單元 15，會根據第一收音信號與第一攝像信號，訓練出一同步信號，以供各單元運作依據。

另一方面，如圖 3 所示，僕轉換裝置 2 具有呼應主轉換裝置 1 的功能，能從第一溝通信號中解析出訪客的聲音

及影像。僕轉換裝置 2 具有一傳輸單元 24、一解碼單元 23、一音訊處理單元 21，且核心裝置 3 包括一顯示處理單元 26。

當第一溝通信號傳入僕轉換裝置 2，傳輸單元 24 會以對應傳輸單元 14 的轉發方式來有線或無線接收，並藉由一過濾單元 241 從第一溝通信號中分離出一第一待解碼信號。解碼單元 23 對第一待解碼信號進行 MPEG 解碼。音訊處理單元 21 進而根據解碼結果產生該第一揚聲信號，核心裝置 3 的顯示處理單元 26 則根據解碼結果產生該第一顯示信號，然後再透過與核心裝置 3 耦接的揚聲裝置 52 和顯示裝置 54 展現出來。如此，使得訪客聲音與影像能傳達給正在享受多媒體服務的住戶。

值得注意的是，圖 2 中，主轉換裝置 1 所具有的音訊處理單元 11 和視訊處理單元 12 可以整合成一個處理單元 10。且圖 3 中，僕轉換裝置 2 所具有的音訊處理單元 21 也可構成一處理單元 20。

且值得注意的是，本例假設多媒體播放器 200 是一具備子母畫面功能的室內電視機，所以使顯示處理單元 26 內建於核心裝置 3 中。但是，其他應用中，如果不具備此功能(如圖 4)，那麼較佳地可以將顯示處理單元 26 移建到僕轉換裝置 2 的處理單元 20' 中。

住戶回應



S

如圖 3 所示，為了遞送住戶的回應，本例多媒體放器的通信模組 300 更包括一收音裝置 51、一攝像裝置 53，且僕轉換裝置 2 的處理單元 20 更具有一視訊處理單元 22。通信模組 300 藉由收音裝置 51 與攝像裝置 53 分別取得住戶的發音及影像，以令僕轉換裝置 2 產生該第二溝通信號，來回應位於對講機 100 旁的訪客。

僕轉換裝置 2 藉由音訊處理單元 21 基於住戶發音，產生一第二收音信號，並藉由視訊處理單元 22 基於住戶影像，產生一第二攝像信號。且編碼單元 27 會根據第二收音信號和第二攝像信號進行 MPEG 編碼而得到一第二編碼信號。然後，再由傳輸單元 14 基於第二編碼信號傳送出該第二溝通信號。

而當圖 2 的主轉換裝置 1 收到該第二溝通信號，會藉由傳輸單元 14 根據 SIP 協定從該第二溝通信號中分離出一第二待解碼信號。第二待解碼信號經過解碼單元 17 的解碼程序後，音訊處理單元 11 會根據解碼結果產生該第二揚聲信號，且視訊處理單元 12 會根據解碼結果產生該第二顯示信號，然後再分別透過耦接的揚聲裝置 52 和顯示裝置 54 展現出來，以回應門外訪客。

當然，在保護住戶隱私的考量下，是可以免除對講機 100 的顯示裝置 54、通信模組 300 的攝像裝置 53，以及僕轉換裝置 2 的視訊處理單元 22，使得通信模組 300 僅將載有住戶發音的第二溝通信號傳送出。

值得注意的是，為了讓訪客清晰地收到住戶聲音而不受多媒體音效干擾，通訊模組 300 的收音裝置 51 較佳地是以一加權單元 511 與複數個麥克風 MIC 來組配，如圖 5。這樣的收音裝置 51 會產生類似波束合成器(beamformer)的功效，而令加權單元 511 以不同加權比例整合所有麥克風 MIC 的收音，來得到具有較佳訊雜比(SNR，Signal to Noise ratio)的收錄品質。同理，對講機 100 的收音裝置 51 如果也是以上述方式實現，那麼住戶就比較不會聽到馬路上的雜音，例如：汽車喇叭鳴聲。

再者，如圖 6 所示，核心裝置 3 收到的多媒體信號可以是需藉由調頻器 31 處理的一電視信號，也可以是需藉由接收器 32 處理的 AV(audio/video)、SV(S-video)或其他格式視訊流。當解調器 33 進一步從多媒體信號中分離出所載內容，音訊處理器 34 會令揚聲裝置 52 發出對應音效，視訊處理器 35 也會令驅動器 55 致使顯示裝置 54 呈現相關影像。

其中，本例的音訊處理器 34 主要是根據該多媒體信號處理成該音訊信號，再將第一揚聲信號和多媒體服務的音訊信號合成，以令揚聲裝置 52 同步播放。而圖 7 的另一實施態樣中，在音訊處理器 34 處理得到該音訊信號後，核心裝置 3 還可藉由一多工單元 37 根據一放音指示，選擇播放第一揚聲信號，或播放多媒體服務的音訊信號，或是同時播放第一揚聲信號與音訊信號。



S

而核心裝置 3 所包括的一控制單元 36，除了根據多媒體信號訓練出一個供各元件 26、31~35、55 運作依據的同步信號，還會令顯示處理單元 26 產生哪種圖框尺寸的第一顯示信號，並令視訊處理器 35 將第一顯示信號放在顯示裝置 54 的哪一相對位置。基本上，第一顯示信號的圖框尺寸不大於顯示裝置 54 所能顯影的最大範圍。

這裡需強調的是，前述曾說明：視訊處理器 35 可以採用子母畫面方式將第一顯示信號疊放於多媒體服務的視訊信號上。但實際疊放順序不限於此，甚至可以採用左右分割畫面或是上下分割畫面來呈現。

此外，本例中，多媒體播放器 200 是以一個處在固定位置的電視機來實現，但也可以是例如視訊電話(video-phone)的他種定點裝置。甚者，在其他應用中，多媒體播放器 200 更可以是一個可攜式裝置，使得不論在屋內任何角落，住戶都能收到來訪訊息。該可攜式裝置譬如是：行動上網裝置(Mobile Internet Device，MID)或智慧手機。

值得注意的是，編碼單元 13、27 與解碼單元 17、23 的編解碼方式不限於 MPEG，也可以是其他方式。

最後，更值得注意的是，對講機 100 和多媒體播放器 200 都可分別獨立出於收發系統，且通信模組 300 更可獨立於多媒體播放器 200。而收發系統的設置背景不限於居家，也可以是公司行號，或是任何一種機關。

綜上所述，本例核心裝置 3 會將第一顯示信號疊加在

Restricted Confidential - Outside Counsel Only






多媒體服務的視訊信號上，以同時在顯示裝置 54 上呈現，並讓揚聲裝置 52 同步播放第一揚聲信號與多媒體服務的音訊信號，使得住戶可以不用移動位置，就能即時與訪客交談，也能繼續享受多媒體服務，故確實能達成本發明之目的。

惟以上所述者，僅為本發明之較佳實施例而已，當不能以此限定本發明實施之範圍，即大凡依本發明申請專利範圍及發明說明內容所作之簡單的等效變化與修飾，皆仍屬本發明專利涵蓋之範圍內。

【圖式簡單說明】

圖 1 是一方塊圖，說明本發明收發系統之較佳實施例；

圖 2 是一方塊圖，說明本實施例的對講機；

圖 3 是一方塊圖，說明本實施例的多媒體播放器；

圖 4 是一方塊圖，說明多媒體播放器的另一態樣；

圖 5 是一方塊圖，說明通信模組的收音裝置；

圖 6 是一方塊圖，說明本實施例的核心裝置；及

圖 7 是一方塊圖，說明該核心裝置的另一實施態樣。



S

【主要元件符號說明】

100……對講機
200……多媒體播放器
300……通信模組
1……主轉換裝置
10……處理單元
11、21‥音訊處理單元
12、22‥視訊處理單元
13、27‥編碼單元
14、24‥傳輸單元
141……協定單元
142……有線傳收單元
143……無線傳收單元
15、25‥控制單元
17、23‥解碼單元
2……僕轉換裝置
20、20'‧處理單元
241……協定單元
242……有線傳收單元
243……無線傳收單元
26……顯示處理單元
3……核心裝置
31……調頻器
32……接收器
33……解調器
34……音訊處理器
35……視訊處理器
36……控制單元
37……多工單元
40……輸入裝置
50……輸出裝置
51……收音裝置
511……加權單元
52……揚聲裝置
53……攝像裝置
54……顯示裝置
55……驅動器
7……乙太網路線
8……天線
MIC……麥克風

七、申請專利範圍：

1. 一種多媒體播放器，適用於接收一個多媒體信號，並接收一個來自一對講機且載有一輸入信號的溝通信號，該多媒體播放器包含：

一輸出裝置；

一通信模組，包括：

一傳輸單元，用以接收該溝通信號；

一解碼單元，根據該溝通信號進行解碼；及

一處理單元，根據該解碼單元的解碼結果，產生一對應該輸入信號的輸出信號；及

一核心裝置，用以接收該多媒體信號與該輸出信號，並令該輸出裝置同時播放該輸出信號與該多媒體信號。

2. 根據申請專利範圍第 1 項所述之多媒體播放器，其中，該通信模組更包括一用以收錄聲音的收音裝置，以及一編碼單元；

該通信模組的處理單元具有一音訊處理單元，會基於該收音裝置收錄的聲音來產生另一收音信號，以供該編碼單元進行編碼；且

該傳輸單元會將該編碼單元的編碼結果發送出去。

3. 根據申請專利範圍第 1 項所述之多媒體播放器，其中，該溝通信號所載的輸入信號是一攝像信號，且該輸出裝置是一顯示裝置；

該處理單元是以一不大於該顯示裝置最大顯影範圍



S

的圖框尺寸來產生該輸出信號，且是使該顯示裝置將該輸出信號疊放在該多媒體信號上。

4. 根據申請專利範圍第 1 項所述之多媒體播放器，該溝通信號所載的輸入信號是一收音信號，其中，

該通信模組的處理單元具有一音訊處理單元，根據該解碼單元的解碼結果，產生一對應該收音信號的揚聲信號；且

該多媒體播放器更包含一耦接該核心裝置的揚聲裝置，受該核心裝置控制而根據該揚聲信號放音。

5. 根據申請專利範圍第 1 項所述之多媒體播放器，其中，該通信模組更包括一用以拍攝影像的攝像裝置，以及一編碼單元；

該通信模組的處理單元具有一視訊處理單元，基於該攝像裝置拍攝的影像來產生另一攝像信號，以供該編碼單元進行編碼；且

該傳輸單元會將該編碼單元的編碼結果發送出去。

6. 根據申請專利範圍第 1 項所述之多媒體播放器，其中，該傳輸單元具有：

一傳收單元，在傳輸控制協定/網際網路協定(TCP/IP)的基礎上透過一網路線有線地接收該溝通信號，或在全球互通微波存取(WiMax)或無線相容性認證(Wi-Fi)的基礎上透過一天線無線地接收該溝通信號；及

一協定單元，循對話啟始協定(SIP)，從該溝通信號中分離出一個對應該輸入信號的信號，以供該解碼單元

進行動態影像專家群(MPEG)解碼。

7. 根據申請專利範圍第 1 項所述之多媒體播放器，其中，該核心裝置具有一多工單元，根據一放音指示令該輸出裝置播放該輸出信號、或播放該多媒體信號，或是同時播放該輸出信號與該多媒體信號。

8. 根據申請專利範圍第 1 項所述之多媒體播放器，該多媒體播放器是一台電視機。

9. 一種通信模組，適用於接收一載有一輸入信號的溝通信號，並電連接一耦接有一輸出裝置的核心裝置，該通信模組包括：

一傳輸單元，用以接收該溝通信號；

一解碼單元，根據該溝通信號進行解碼；及

一處理單元，根據該解碼單元的解碼結果，產生一對應該輸入信號的輸出信號；

在該輸出裝置播放一多媒體信號的情況下，當該核心裝置收到該輸出信號，該核心裝置更驅使該輸出裝置同時播放該輸出信號與該多媒體信號。

10. 根據申請專利範圍第 9 項所述之通信模組，更包括一用以收錄聲音的收音裝置，以及一編碼單元；

該通信模組的處理單元具有一音訊處理單元，基於該收音裝置收錄的聲音來產生另一收音信號，以供該編碼單元進行編碼；且

該傳輸單元會將該編碼單元的編碼結果發送出去。

11. 根據申請專利範圍第 9 項所述之通信模組，該溝通信號

所載的輸入信號具有一攝像信號和一收音信號，且該輸出裝置具有一顯示裝置和一揚聲裝置，其中，

該處理單元是以一不大於該顯示裝置最大顯影範圍的圖框尺寸來產生該輸出信號，且是使該顯示裝置將該輸出信號疊放在該多媒體信號上；

並且，該處理單元會根據該解碼單元的解碼結果來產生一對應該收音信號的揚聲信號，以供該核心裝置令該揚聲裝置據以放音。

12. 根據申請專利範圍第 9 項所述之通信模組，更包括一用以拍攝影像的攝像裝置，以及一編碼單元；

該通信模組的處理單元具有一視訊處理單元，基於該攝像裝置拍攝的影像來產生另一攝像信號，以供該編碼單元進行編碼；且

該傳輸單元會將該編碼單元的編碼結果發送出去。

13. 根據申請專利範圍第 9 項所述之通信模組，其中，

該傳輸單元是基於對話啟始協定(SIP)來接收該溝通信號。

14. 一種包含一多媒體播放器的收發系統，包含：

一對講機，包括：

一輸入裝置，用以捕捉一信號；

一處理單元，根據該輸入裝置捕捉的信號，處理成一編碼信號；及

一傳輸單元，將該編碼信號載於一溝通信號，並發送出去；及

該多媒體播放器，包括：

一輸出裝置；

一通信模組，具有：

一傳輸單元，用以接收該溝通信號；

一解碼單元，根據該溝通信號進行解碼；及

一處理單元，根據該解碼單元的解碼結果產生一輸出信號；及

一核心裝置，用以接收一多媒體信號與該輸出信號，並令該輸出裝置同時播放該輸出信號與該多媒體信號。

15. 根據申請專利範圍第 14 項所述之收發系統，其中，該通信模組更包括一用以收錄聲音的收音裝置，以及一編碼單元；

該通信模組的處理單元具有一音訊處理單元，基於該收音裝置收錄的聲音來產生另一收音信號，以供該編碼單元進行編碼；且

該傳輸單元會將該編碼單元的編碼結果發送出去。

16. 根據申請專利範圍第 14 項所述之收發系統，其中，該輸入裝置捕捉到的信號是一攝像信號，且該輸出裝置是一顯示裝置；

該處理單元是以一不大於該顯示裝置最大顯影範圍的圖框尺寸來產生該輸出信號，且是使該顯示裝置將該輸出信號疊放在該多媒體信號上。

17.根據申請專利範圍第14項所述之收發系統，其中，

該對講機的傳輸單元是基於對話啟始協定(SIP)來將將該編碼信號載於該溝通信號；且

該多媒體播放器的傳輸單元是基於對話啟始協定(SIP)來接收該溝通信號。

18.根據申請專利範圍第14項所述之收發系統，其中，該核心裝置具有一多工單元，根據一放音指示令該輸出裝置播放該輸出信號、或播放該多媒體信號，或是同時播放該輸出信號與該多媒體信號。

Restricted Confidential - Outside Counsel Only




201125376

八、圖式：




圖1

Restricted Confidential - Outside Counsel Only




201125376




圖2

Control4 Corp files Form S-1 (IPO Registration) SEC Filing SEC Filing - MarketBrief

201125376




圖 3

http://marketbrief.com/control4-corp/s1/ipo-registration/2013/7/1/10240590/filing[8/5/2013 2:31:13 PM]

Restricted Confidential - Outside Counsel Only




201125376




圖4

201125376




圖5

Control4 Corp files Form S-1 (IPO Registration) SEC Filing SEC Filing - MarketBrief

201125376




圖6

http://marketbrief.com/control4-corp/s1/ipo-registration/2013/7/1/10240590/filing[8/5/2013 2:31:13 PM]

201125376




圖7

(19) 中华人民共和国国家知识产权局

# (12) 发明专利申请

(10) 申请公布号 CN 102346879 A
(43) 申请公布日 2012.02.08

(21) 申请号 201110212296.2
(22) 申请日 2011.07.22
(30) 优先权数据
61/367045 2010.07.23 US
(71) 申请人 光宝科技股份有限公司
地址 中国台湾台北市内湖区瑞光路 392 号 22 楼
(72) 发明人 [illegible] [illegible] [illegible]
(74) 专利代理机构 北京中原华和知识产权代理有限责任公司 11019
代理人 寿宁 张华辉
(51) Int. Cl.
*G06Q 10/00*(2012.01)
*G06Q 50/00*(2012.01)

权利要求书 2 页 说明书 7 页 附图 11 页

(54) 发明名称

数字环境的管理系统

(57) 摘要

本发明是有关于一种数字环境的管理系统，适用于包括多个周边设备的数字环境中，该管理系统包含一通讯单元及一电连接于该通讯单元的处理单元。该通讯单元用以与所述周边设备进行通讯，该处理单元用以产生一空间管理图形介面，用以供使用者进行实体空间的切换操作。



CN 102346879 A

Control4 Corp files Form S-1 (IPO Registration) SEC Filing SEC Filing - MarketBrief



1. 一种数字环境的管理系统，适用于包括多个周边设备的数字环境中，所述周边设备可被设置于一实体空间中并可与该管理系统进行通讯，该管理系统包含一通讯单元，以及一处理单元；该通讯单元用以与所述周边设备进行通讯，该处理单元电连接于该通讯单元；其特征在于：

该处理单元用以产生一空间管理图形介面，该空间管理图形介面用以供使用者进行实体空间规划操作。

2. 如权利要求1所述的数字环境的管理系统，其特征在于：该空间管理图形介面还用以设定对应该实体空间的一实体空间影像。

3. 如权利要求1所述的数字环境的管理系统，其特征在于：该处理单元还用以产生一周边设备管理图形介面，该周边设备管理图形介面用以呈现对应于该实体空间的一实体空间影像，及分别对应于所述周边设备的多个视觉元件，该周边设备管理图形介面还用以供使用者进行配置操作以将所述视觉元件其中至少一者配置于该实体空间影像中。

4. 如权利要求3所述的数字环境的管理系统，其特征在于：所述视觉元件用以供使用者对所述周边设备进行互动式操作，该处理单元还用以根据所述互动式操作产生至少一控制信号并通过该通讯单元传送给对应的该周边设备。

5. 如权利要求3所述的数字环境的管理系统，其特征在于：该处理单元还用以根据所述配置操作产生一配置信息，该配置信息包括所述视觉元件其中至少一者于该实体空间影像中的配置关系，其用以指示所述周边设备中对应所述其中至少一者的视觉元件的周边设备与该实体空间的对应关系。

6. 如权利要求5所述的数字环境的管理系统，其特征在于：该配置信息还包括经过所述配置操作后的每一视觉元件所对应的该周边设备的一实体空间信息，及一设备识别信息。

7. 如权利要求6所述的数字环境的管理系统，其特征在于：该实体空间更具有一楼层和一位于该楼层的房间，该实体空间影像为该房间的影像，该实体空间信息包括该楼层及该房间于该楼层的位置。

8. 如权利要求7所述的数字环境的管理系统，其特征在于：该处理单元所产生的该空间管理图形介面提供一楼层规划功能，以供使用者进行所述实体空间中的楼层规划操作。

9. 如权利要求8所述的数字环境的管理系统，其特征在于：该处理单元还用以根据所述实体空间规划操作产生一实体空间规划信息，该实体空间规划信息具有一楼层信息，且该实体空间规划信息依该楼层信息进行分类。

10. 如权利要求3所述的数字环境的管理系统，其特征在于：该实体空间更具有一房间，该处理单元所产生的该空间管理图形介面还提供一房间规划功能，以供使用者进行所述实体空间中的房间规划操作。

11. 如权利要求3所述的数字环境的管理系统，还包含电连接于该处理单元的一输入/输出单元，其特征在于：该处理单元所产生的该周边设备管理图形介面用以供使用者利用该输入/输出单元以拖曳方式进行配置操作，以将所述视觉元件其中至少一者配置于该实体空间影像中，该处理单元所产生的该周边设备管理图形介面及该空间管理图形介面利用该输入/输出单元进行显示。

12. 如权利要求3所述的数字环境的管理系统，其特征在于：该处理单元还用以通过该

通讯单元进行扫描，以得到所述周边设备的多个设备信息。

13. 如权利要求 12 所述的数字环境的管理系统，其特征在于：该处理单元将所述视觉元件依其等分别对应的所述周边设备的所述设备信息进行分类，并根据分类结果呈现所述视觉元件。

14. 如权利要求 13 所述的数字环境的管理系统，其特征在于：每一周边设备的该设备信息包括一设备功能信息及一通讯方式信息。

Control4 Corp files Form S-1 (IPO Registration) SEC Filing SEC Filing - MarketBrief



# 数字环境的管理系统

## 技术领域

[0001] 本发明涉及一种数字周边设备的管理／控制技术，特别是涉及一种用于规划数字环境空间的管理系统。

## 背景技术

[0002] 随着通讯技术的日渐成熟及数字家电的蓬勃发展，近年来已发展出许多相关于数字家电的管理／控制技术，例如美国专利第 7627098 号所揭露的「INTELLIGENT MANAGEMENT APPARATUS AND METHOD OF DIGITAL HOME NETWORK SYSTEM」，旨在提供使用者更为便利的数字生活环境。

[0003] 然而，上述现有的数字家电的管理／控制技术，并未提供利用图形介面供使用者进行数字环境空间的规划。

[0004] 由此可见，上述现有的数字环境的管理系统在结构与使用上，显然仍存在有不便与缺陷，而亟待加以进一步改进。为了解决上述存在的问题，相关厂商莫不费尽心思来谋求解决的方法，但长久以来一直未见适用的设计被发展完成，而一般产品又没有适切结构能够解决上述问题，此显然是相关业者急欲解决的问题。因此如何能创设一种新颖的数字环境的管理系统，实属当前重要研发课题，亦成为当前业界极需改进的目标。

## 发明内容

[0005] 本发明的目的在于，本发明的目的在于提供一种数字环境的管理系统，借由该空间管理图形介面，供使用者可以直觉的规划数字环境的实体空间；更进一步来说，本发明还可配合周边设备的管理控制功能，对该实体空间中的所述周边设备进行配置及管理。

[0006] 本发明的目的及解决其技术问题是采用以下技术方案来实现的。依据本发明提出的一种数字环境的管理系统，适用于包括多个周边设备的数字环境中，所述周边设备可被设置于一实体空间中并可与该管理系统进行通讯，该管理系统包含一通讯单元，以及一处理单元：该通讯单元用以与所述周边设备进行通讯，该处理单元电连接于该通讯单元；该处理单元用以产生一空间管理图形介面，该空间管理图形介面用以供使用者进行实体空间规划操作。

[0007] 本发明的目的及解决其技术问题还可采用以下技术措施进一步实现。

[0008] 较佳地，前述的数字环境的管理系统，其中该空间管理图形介面还用以设定对应该实体空间的一实体空间影像。

[0009] 较佳地，前述的数字环境的管理系统，其中该处理单元还用以产生一周边设备管理图形介面，该周边设备管理图形介面用以呈现对应于该实体空间的一实体空间影像，及分别对应于所述周边设备的多个视觉元件，该周边设备管理图形介面还用以供使用者进行配置操作以将所述视觉元件其中至少一者配置于该实体空间影像中。

[0010] 较佳地，前述的数字环境的管理系统，其中所述视觉元件用以供使用者对所述周边设备进行互动式操作，该处理单元还用以根据所述互动式操作产生至少一控制信号并通



http://marketbrief.com/control4-corp/s1/ipo-registration/2013/7/1/10240590/filing[8/5/2013 2:31:13 PM]

过该通讯单元传送给对应的该周边设备。

[0011] 较佳地，前述的数字环境的管理系统，其中该处理单元还用以根据所述配置操作产生一配置信息，该配置信息包括所述视觉元件其中至少一者于该实体空间影像中的配置关系，其用以指示所述周边设备中对应所述其中至少一者的视觉元件的周边设备与该实体空间的对应关系。

[0012] 较佳地，前述的数字环境的管理系统，其中该配置信息还包括经过所述配置操作后的每一视觉元件所对应的该周边设备的一实体空间信息，及一设备识别信息。

[0013] 较佳地，前述的数字环境的管理系统，其中该实体空间更具有一楼层和一位于该楼层的房间，该实体空间影像为该房间的影像，该实体空间信息包括该楼层及该房间于该楼层的位置。

[0014] 较佳地，前述的数字环境的管理系统，其中该处理单元所产生的该空间管理图形介面提供一楼层规划功能，以供使用者进行所述实体空间中的楼层规划操作。

[0015] 较佳地，前述的数字环境的管理系统，其中该处理单元还用以根据所述实体空间规划操作产生一实体空间规划信息，该实体空间规划信息具有一楼层信息，且该实体空间规划信息依该楼层信息进行分类。

[0016] 较佳地，前述的数字环境的管理系统，其中该实体空间更具有一房间，该处理单元所产生的该空间管理图形介面还提供一房间规划功能，以供使用者进行所述实体空间中的房间规划操作。

[0017] 较佳地，前述的数字环境的管理系统，其中还包含电连接于该处理单元的一输入／输出单元，该处理单元所产生的该周边设备管理图形介面用以供使用者利用该输入／输出单元以拖曳方式进行配置操作，以将所述视觉元件其中至少一者配置于该实体空间影像中，该处理单元所产生的该周边设备管理图形介面及该空间管理图形介面利用该输入／输出单元进行显示。

[0018] 较佳地，前述的数字环境的管理系统，其中该处理单元还用以通过该通讯单元进行扫描，以得到所述周边设备的多个设备信息。

[0019] 较佳地，前述的数字环境的管理系统，其中该处理单元将所述视觉元件依其等分别对应的所述周边设备的所述设备信息进行分类，并根据分类结果呈现所述视觉元件。

[0020] 较佳地，前述的数字环境的管理系统，其中每一周边设备的该设备信息包括一设备功能信息及一通讯方式信息。

[0021] 本发明与现有技术相比具有明显的优点和有益效果。借由上述技术方案，本发明数字环境的管理系统至少具有下列优点及有益效果：本发明借由该空间管理图形介面所提供的该楼层规划功能及该房间规划功能，供使用者可以直觉的规划数字环境的实体空间；更进一步来说，本发明还可配合周边设备的管理控制功能，对该实体空间中的所述周边设备进行配置及管理。

[0022] 上述说明仅是本发明技术方案的概述，为了能够更清楚了解本发明的技术手段，而可依照说明书的内容予以实施，并且为了让本发明的上述和其他目的、特征和优点能够更明显易懂，以下特举较佳实施例，并配合附图，详细说明如下。

附图说明

Restricted Confidential - Outside Counsel Only






[0023] 图 1 是一示意图，说明应用本发明数字环境的管理系统的一包括多个周边设备的数字环境；

[0024] 图 2 是本发明数字环境的管理系统的一较佳实施例的一方块图；

[0025] 图 3 是一示意图，说明在本较佳实施例中所产生的一主选单图形介面；

[0026] 图 4 是一示意图，说明在本较佳实施例中所产生的一空间管理图形介面；

[0027] 图 5 是一示意图，说明在本较佳实施例中将一实体空间规划信息依一楼层信息进行分类，其分类结果所对应的一住家目录结构；

[0028] 图 6 是一示意图，说明在本较佳实施例中所产生的一周边设备管理图形介面；

[0029] 图 7 是一示意图，说明在本较佳实施例中灯光类别的该周边设备管理图形介面；

[0030] 图 8 是一示意图，说明在本较佳实施例中将多个视觉元件依其等分别对应的多个设备功能信息进行分类，其分类结果所对应的一设备目录结构；

[0031] 图 9 是一示意图，说明在本较佳实施例中将所述视觉元件依其等分别对应的多个通讯方式信息进行分类，其分类结果所对应的该设备目录结构；

[0032] 图 10 是一示意图，说明在本较佳实施例中所产生的一住家整体空间图形介面；

[0033] 图 11 是一示意图，说明在本较佳实施例中所产生的一空间概观图形介面。

## 具体实施方式

[0034] 为更进一步阐述本发明为达成预定发明目的所采取的技术手段及功效，以下结合附图及较佳实施例，对依据本发明提出的数字环境的管理系统其具体实施方式、结构、特征及其功效，详细说明如后。

[0035] 参阅图 1，本发明数字环境的管理系统 1 的一较佳实施例适用于包括多个周边设备的数字环境中，其适用的空间可为家庭、旅馆、集合式住宅群以及展览或大型公共空间的平面区块及各子空间等。例如，本发明数字环境的管理系统 1 除了可作为数字家庭的周边设备管理控制外，亦可延伸应用在展览空间的电源、灯光及空调管理控制或是旅馆以及集合式住宅公共设施的管理应用。该管理系统 1 可管理并控制利用不同通讯方式与该管理系统 1 通讯的所述周边设备。如图 1 所示，在本较佳实施例中，数字环境中的所述周边设备依照通讯方式区分为一基于红外线通讯的装置群 21、一基于 Zigbee（紫蜂）通讯的装置群 22、一基于无线保真通讯（wi-fi）的装置群 23，以及一基于会话发起协议（Session Initiation Protocol，简称 SIP）通讯的装置群 24。该基于红外线通讯的装置群 21 具有一客厅灯 211、一壁灯 212、一玄关灯 213，及一空调装置 214。该基于 Zigbee 通讯的装置群 22 具有一瓦斯侦测器 221、一热源侦测器 222、一自动窗帘 223，及一电卷门 224。该基于无线保真通讯的装置群 23 具有一影音播放器 231，及一网络摄影机 232。该基于 SIP 通讯的装置群 24 具有一网络电话 241。

[0036] 近年来，因为智慧型家电及网络通讯的蓬勃发展，已发展许多关于用以规范控制所述周边设备的家庭网络通讯协定标准，该管理系统 1 可利用现有的家庭网络通讯协定标准控制所述周边设备。所述家庭网络通讯协定标准包括 LonTalk 通讯标准、ECONET 通讯标准，及 KNX 通讯标准等，所述技艺是为熟习此领域技术者所习知，且非本发明的重点，所以不在此赘述。

[0037] 参阅图 2，在本较佳实施例中，该管理系统 1 是以一电子装置（例如，一智慧型手

机、一个人数字助理或平板电脑等可携式电子装置,图未示)来实现。该管理系统 1 包含一输入/输出单元 11、一通讯单元 12、一影像撷取单元 13、一处理单元 14,及一信息库 15。

[0038] 该输入/输出单元 11 用以供使用者对该管理系统 1 进行互动式操作。该输入/输出单元 11 可为键盘、鼠标、显示器、摇杆的的组合,或触控式荧幕等具有类似功能的输入/输出操作单元。该通讯单元 12 用以与所述周边设备进行通讯。该影像撷取单元 13 用以撷取对应于一实体空间的一实体空间影像,值得一提的是,该管理系统 1 也可不包含该影像撷取单元 13,该实体空间影像可由该数字环境中该网络摄影机 232 所拍摄,通过无线通讯而由该管理系统 1 的该通讯单元 12 所接收,但并不限于本较佳实施例所揭露。于其它实施例中,该影像撷取单元 13 及该网络摄影机 232 亦可用以撷取对应于例如家庭、旅馆、集合式住宅群、展览或大型公共空间的该空间的实体空间影像。

[0039] 该处理单元 14 与该输入/输出单元 11、该通讯单元 12、该影像撷取单元 13、及该信息库 15 电连接。在该管理系统 1 的初始化阶段,该处理单元 14 通过该通讯单元 12 进行扫描,以得到所述周边设备的多个设备信息。该处理单元 14 还将该影像撷取单元 13 所撷取的该实体空间影像、以及通过该通讯单元 12 接收到的该实体空间影像及所述设备信息储存于该信息库 15 中。

[0040] 其中,每一设备信息具有一制造厂商信息、一设备功能信息、一通讯方式信息,及一设备识别信息。该制造厂商信息为例如制造厂商名称等的相关信息。该设备功能信息用以指示该周边设备的设备功能属性,例如照明、侦测、温度控制,或通讯等功能。该通讯方式信息用以指示该周边设备的通讯方式,例如:无线、红外线,或 Zigbee 等通讯方式。该设备识别信息是一唯一识别信息,用以供该处理单元 14 辨别该周边设备。

[0041] 参阅图 2、图 3、图 4 及图 5,当该管理系统 1 被启动时,该处理单元 14 产生一主选单图形介面 (Main menu graphic interface)3 并利用该输入/输出单元 11 呈现给使用者。该主选单图形介面 3 具有一智慧家庭图像 (Smart Your home icon)31、一住家概观图像 (Home overview icon)32,及多个功能图像 (functional icons)33,当使用者选择该智慧家庭图像 31 时,该处理单元 14 产生一空间管理图形介面 4 并利用该输入/输出单元 11 呈现给使用者,供使用者进行实体空间规划操作、设定对应该实体空间的该实体空间影像及进行其他互动式操作。在本较佳实施例中,该实体空间具有一楼层内的其中一房间,该实体空间影像为该房间的影像。

[0042] 以下配合一范例具体说明该空间管理图形介面 4 的操作方式。

[0043] 如图 4 所示,该处理单元 14 所产生的该空间管理图形介面 4 的一实施态样具有一楼层管理工具列 41、一房间管理工具列 42、一第一显示区 43、一第二显示区 44,及一功能捷径工具列 45。该功能捷径工具列 45 具有一主选单 (Main menu) 按钮 451、一新增装置 (Add device) 按钮 452,及一住家概观 (Home overview) 按钮 453。当使用者选择所述按钮的其中一者,会利用该输入/输出单元 11 呈现对应的图形介面供使用者进行操作。举例来说,当使用者选择该主选单按钮 451 时,会呈现该主选单图形介面 3 供使用者进行互动式操作。

[0044] 该处理单元 14 产生的该空间管理图形介面 4 中的该楼层管理工具列 41 用以供使用者进行一楼层规划功能,该楼层管理工具列 41 具有用以新增一楼层的一楼层新增按钮 411、用以移除一楼层的一楼层移除按钮 412、用以显示目前楼层名称的一楼层信息显示区 413、用以由目前楼层移至上一楼层的一楼层前移按钮 414、以及用以由目前楼层移至下

一楼层的一楼层后移按钮 415。该房间管理工具列 42 用以供使用者利用该输入/输出单元 11 进行一房间规划功能。该房间管理工具列 42 具有用以新增一房间的一房间新增按钮 421、用以移除一房间的一房间移除按钮 422、用以显示目前房间名称(即指该第二显示区 44 所显的画面)的一房间信息显示区 423、用以由目前房间移至上一房间的一房间前移按钮 424，以及用以由目前房间移至下一房间的一房间后移按钮 425。

[0045] 当使用者利用该房间新增按钮 421 新增一房间至一楼层时，该处理单元 14 将该信息库 15 中对应于该楼层的所述实体空间影像呈现于该空间管理图形介面 4 的该第一显示区 43，供使用者利用该输入/输出单元 11 选取对应于该新增的该房间(该实体空间)的该实体空间影像，并供使用者利用该输入/输出单元 11 将该实体空间影像由该第一显示区 43 以拖曳方式移到该第二显示区 44 中，以进行设定该新增的该房间(该实体空间)所对应的该实体空间影像。该处理单元 14 还根据所述实体空间规划操作产生一具有一楼层信息及一房间信息的实体空间规划信息，并且根据该楼层信息及该房间信息将该实体空间规划信息进行分类。举例来说，假设使用者将住家进行规划成三个楼层，一楼具有一玄关、一厨房，以及一客厅；二楼具有一休息室、一客房，以及一书房；三楼具有一主卧室，以及一浴室。该处理单元 14 根据该楼层信息及该房间信息对该实体空间规划信息进行分类，该分类结果对应如图 5 所示的一住家目录结构 5，在该住家目录结构 5 中，根目录 51 为住家，第一层子目录 52 为根据该楼层信息进行分类后的所述楼层，第二层子目录 53 为对应所述楼层的所述房间。

[0046] 参阅图 2、图 6 及图 7，当使用者选择如图 4 所示该功能捷径工具列 45 的该新增装置按钮 452 时，该处理单元 14 产生一周边设备管理图形介面 6 并利用该输入/输出单元 11 呈现给使用者。该周边设备管理图形介面 6 用以供使用者配置所述周边设备对应的多个视觉元件于该实体空间影像中，所述视觉元件例如图像(icons)、图片(images)或文字(text)，用以表示所述周边设备。该周边设备管理图形介面 6 还用以呈现所述视觉元件以供使用者对所述周边设备进行互动式操作。

[0047] 以下配合一范例详细说明该周边设备管理图形介面 6 的操作方式。

[0048] 该周边设备管理图形介面 6 的一实施态样具有一第三显示区 61、一第四显示区 62、一楼层工具列 63、一房间前移按钮 64、一房间后移按钮 65、一功能捷径工具列 66，以及一房间名称显示区 67。

[0049] 该第三显示区 61 用以显示对应所述周边设备的所述视觉元件，该第四显示区 62 用以呈现对应目前实体空间的该实体空间影像，该楼层工具列 63 类似该空间管理图形介面 4 的该楼层管理工具列 41 所述的功能，用以新增楼层、移除楼层，及进行不同楼层之间的切换，该房间前移按钮 64 以及该房间后移按钮 65 用以供使用者切换同一楼层中的不同房间，该房间名称显示区 67 用以显示目前房间名称(即指该第四显示区 62 所显的房间名称)。该功能捷径工具列 66 具有该主选单(Main menu)按钮 661、一新增房间(Addroom)按钮 662，及一住家概观(Home overview)按钮 663，当使用者选择该新增房间按钮 662 时，会呈现该空间管理图形介面 4 供使用者进行操作。

[0050] 补充说明的是，如上所述，所述周边设备的所述设备信息已于该管理系统 1 的初始化阶段，由该处理单元 14 通过该通讯单元 12 进行扫描而得，并预先储存于该信息库 5 中；更进一步来说，该信息库 5 还包括多个预先建立的图像(icon)，该设备信息还包括一图

Restricted Confidential - Outside Counsel Only






像指示信息，该处理单元 14 根据该图像指示信息得到该周边设备所对应的图像 (icon) 来呈现给使用者，以便使用者可直观地得知该视觉元件实际上所对应的该周边设备。

[0051] 该处理单元 14 还将所述视觉元件依其等分别对应的所述周边设备的所述设备信息进行分类，并将分类后的所述视觉元件显示于该周边设备管理图形介面 6 的该第三显示区 61 中。举例来说，对于以 Zigbee 方式通讯的周边装置，该处理单元 14 是根据 Zigbee pro 2007 中的 Zigbee Cluster Library（简称 ZCL）所制定的标准来分类。在本较佳实施例中，该处理单元 14 将所述周边设备依其等对应的所述设备功能信息将所述周边设备分类成一灯光类别、一侦测器类别、一自动化类别、一温度控制类别、一通讯类别，以及一多媒体类别，其中，分类结果对应如图 8 所示的一设备目录结构 81，在该设备目录结构 81 中，根目录 811 为所述周边设备，第一层子目录 812 为依照所述设备功能信息进行分类后的所述功能类别，第二层子目录 813 为对应相同功能类别中的所述周边设备。值得一提的是，在另一应用范例中，该处理单元 14 也可以依照所述设备信息中的所述通讯方式信息将所述周边设备进行分类成一红外线装置类别、一 Zigbee 装置类别、一无线装置类别，以及一会话发起协议装置类别。其中，该分类结果对应如图 9 所示的该设备目录结构 82，在该设备目录结构中 82，根目录 821 为所述周边设备，第一层子目录 822 为依照所述通讯方式信息进行分类后的所述类别，第二层子目录 823 为相同通讯方式类别中的所述周边设备。

[0052] 配合图 6 及图 7，当使用者利用该输入／输出单元 11 选择其中一类别时，该处理单元 14 将该类别中的所述周边装置及其等所对应的所述视觉元件呈现于该第三显示区 61 中，所述视觉元件用以供使用者对所述周边设备进行互动式操作，该处理单元 14 还用以根据所述互动式操作产生至少一控制信号并通过该通讯单元 12 传送给对应的该周边设备。举例来说，当使用者选择并点击该灯光类别 7（如图 6 所示）时，该处理单元 14 将该灯光类别 7 中的一客厅灯视觉元件 71（该客厅灯视觉元件 71 具有一客厅灯图像 711 及一测试按钮 712）、一壁灯视觉元件 72（该壁灯视觉元件 72 具有一壁灯图像 721 及一测试按钮 722），及一玄关灯视觉元件 73（该玄关灯视觉元件 73 具有一玄关灯图像 731 及一测试按钮 732）呈现于该周边设备管理图形介面 6 的该第三显示区 61（如图 7 所示）中，供使用者进行管理控制该周边设备。在本较佳实施例中，当使用者点击该客厅灯视觉元件 71、该壁灯视觉元件 72、该玄关灯视觉元件 73 中的其中一测试按钮时，可测试该周边设备是否进行对应动作。

[0053] 如图 7 所示，该处理单元 14 所产生的该周边设备管理图形介面 6 还供使用者将欲进行配置的周边设备所对应的视觉元件的该图像 (icon) 例如该玄关灯图像 731，可用拖曳方式配置于该第四显示区 62 所呈现的该实体空间影像中，该处理单元 14 并根据其拖曳操作方式产生该配置信息，该配置信息包括所述视觉元件其中至少一者于该实体空间影像中的配置关系，其用以指示所述周边设备其中至少一者与该实体空间的对应关系。在本较佳实施例中，该配置信息包括一实体空间信息，以及该设备识别信息。该实体空间信息用以指示所述周边设备配置于该实体空间的位置信息。

[0054] 延续上述范例，当使用者利用该输入／输出单元 11 将对应于该玄关灯的该玄关灯图像 731 以拖曳方式配置于该第四显示区 62 所呈现的对应于客厅的该实体空间影像后，该处理单元 14 所对应产生该配置信息的该实体空间信息用以指示玄关灯的实体空间位置为住家的一楼的客厅里。当该周边设备管理图形介面 6 的该测试按钮 732 被按压时，该处理单

Restricted Confidential - Outside Counsel Only






元 14 根据该设备识别信息传送该控制指令给玄关灯，以测试玄关灯是否对应动作。在本较佳实施例中，使用者也可利用该输入／输出单元 11 将该玄关灯图像 731 以拖曳方式从该第四显示区 62 移回该第三显示区 61 中该玄关灯图像 731 原本的位置，此时该玄关灯视觉元件 73 会呈现亮的颜色，表示该玄关灯图像 731 未被配置而可被配置至其他欲使用的房间；相同地，当使用者将该玄关灯图像 731 以拖曳方式配置于该第四显示区 62 中的该实体空间影像后，该玄关灯视觉元件 73 会变暗，表示该玄关灯图像 731 已经被配置。

[0055] 参阅图 10 及图 11，当使用者选择图 4 中的该住家概观按钮 453 或图 6 中的该住家概观按钮 663 时，该处理单元 14 产生一住家整体空间图形介面 (home overview graphic interface) 60，该住家整体空间图形介面 60 用以呈现使用者进行实体空间规划操作及周边设备配置后的所述实体空间影像（如图 10 所示的 601 ～ 605），当使用者点击其中一实体空间影像（举例来说，点击图 10 所示的 605）时，该处理单元 14 产生一空间概观图形介面 (room view graphic interface) 9 并利用该输入／输出单元 11 呈现给使用者，供使用者从完成配置所述视觉元件后的所述实体空间影像中找到欲进行控制的该周边设备，并借由操作所述视觉元件控制该周边设备。该住家整体空间图形介面 60 还包括一主选单按钮 606，当使用者点击该主选单按钮 606 时，会回到图 3 中的该主选单图形介面 3。

[0056] 该空间概观图形介面 9 具有一第五显示区 91、一第六显示区 92、一房间工具列 93、一主选单按钮 94，及一住家整体空间按钮 98，当使用者选择该住家整体空间按钮 98 时，会回到该住家整体空间图形介面 60 供使用者进行互动式操作。该第五显示区 91 用以呈现对应该目前实体空间的该实体空间影像（如图 11 所示的 911），及配置于该实体空间影像中的所述图像：一壁灯图像 951、一自动窗帘图像 961 及一网络摄影机图像 971；该第六显示区 92 用以显示配置于该目前实体空间中对应所述周边设备的所述视觉元件：一壁灯视觉元件 95、一自动窗帘视觉元件 96，及一网络摄影机视觉元件 97；该房间工具列 93 具有一房间前移按钮 931、一房间后移按钮 932，及一房间名称显示区 933，该房间前移按钮 931 及该房间后移按钮 932 用以供使用者进行所述实体空间影像间的切换，该房间名称显示区 933 用以显示目前房间名称（即指该第五显示区 91 所见的房间名称）。

[0057] 由以上说明可知，本发明的功效在于：一、利用该处理单元 14 所产生的该空间管理图形介面 4 可供使用者进行实体空间规划操作，该处理单元 14 还根据实体空间规划操作产生该实体空间规划信息，并且根据该楼层信息将该实体空间规划信息进行分类，供使用者以目录方式管理数字环境中的所述实体空间；二、利用该处理单元 14 所产生的该周边设备管理图形介面 6 供使用者进行配置操作，以将所述周边设备的所述图像配置于该实体空间影像，该处理单元 14 还根据所述配置操作产生该配置信息，以提供所述周边设备的实体空间位置信息给使用者；所以确实能达成本发明的目的。

[0058] 以上所述，仅是本发明的较佳实施例而已，并非对本发明作任何形式上的限制，虽然本发明已以较佳实施例揭露如上，然而并非用以限定本发明，任何熟悉本专业的技术人员，在不脱离本发明技术方案范围内，当可利用上述揭示的技术内容作出些许更动或修饰为等同变化的等效实施例，但凡是未脱离本发明技术方案的内容，依据本发明的技术实质对以上实施例所作的任何简单修改、等同变化与修饰，均仍属于本发明技术方案的范围内。


23
24
231
影音播放器
网络摄影机
232
241
网络电话
1
数字环境的管理系统
21
22
212
壁灯
空调装置
214
223
自动窗帘
电卷门
224
211
客厅灯
玄关灯
213
221
瓦斯侦测器
热源侦测器
222

图1




图 2




图 3

Restricted Confidential - Outside Counsel Only









图 4





SAVANT3330060




图 5


61
7
灯光
侦测器
自动化
温度控制
通讯
多媒体
住家概观
663
浏览房间
662
主选单
661
66
65
客厅
67
64
62
一楼
63
6

图 6


71
712
72
722
73
732
61
7
测试
客厅灯
壁灯
玄关灯
711
721
731
65
62
客厅
67
64
731
1楼
63
6
住家概观
663
新增房间
662
主选单
661
66

图 7


客厅灯
壁灯
玄关灯
灯光
瓦斯侦测器
热源侦测器
侦测器
所有周边设备
自动化
自动窗帘
电卷门
811
温度控制
空调装置
电风扇
通讯
网络电话
多媒体
影音播放器
网络摄影机
812
81
813

图 8

Control4 Corp files Form S-1 (IPO Registration) SEC Filing SEC Filing - MarketBrief






图 9




图 10




图 11



Exhibit 10.11

AMENDED AND RESTATED LOAN AND SECURITY AGREEMENT

**THIS AMENDED AND RESTATED LOAN AND SECURITY AGREEMENT** (this "**Agreement**") dated as of June 17, 2013 (the "**Effective Date**") between **SILICON VALLEY BANK**, a California corporation with a loan production office located at 2755 East Cottonwood Parkway, Suite 540, Salt Lake City, Utah 84121 ("**Bank**"), and **CONTROL4 CORPORATION**, a Delaware corporation ("**Borrower**"), provides the terms on which Bank shall lend to Borrower and Borrower shall repay Bank. This Agreement amends and restates in its entirety that certain Loan and Security Agreement dated as of December 29, 2005, between Borrower and Bank, as amended by that certain Amendment to Loan and Security Agreement dated as of May 31, 2007, between Borrower and Bank, as amended by that certain Amendment to Loan and Security Agreement dated as of February 15, 2008, between Borrower and Bank, as amended by that certain Amendment to Loan and Security Agreement dated as of April 30, 2008, between Borrower and Bank, as amended by that certain Amendment to Loan and Security Agreement dated as of June 30, 2008, between Borrower and Bank, as amended by that certain Amendment to Loan and Security Agreement dated as of April 17, 2009, between Borrower and Bank, as amended by that certain Amendment to Loan and Security Agreement dated as of December 15, 2009, between Borrower and Bank, as amended by that certain Amendment to Loan and Security Agreement dated as of December 30, 2010, between Borrower and Bank, as amended by that certain Amendment to Loan and Security Agreement dated as of June 13, 2011, between Borrower and Bank, and as further amended by that certain Amendment to Loan and Security Agreement dated as of September 21, 2012, between Borrower and Bank (the "**Prior Agreement**"). The parties agree that the Prior Agreement is hereby superseded and replaced in its entirety by this Agreement, and the parties hereto further agree as follows:

**1. ACCOUNTING AND OTHER TERMS**

Accounting terms not defined in this Agreement shall be construed following GAAP. Capitalized terms not otherwise defined in this Agreement shall have the meanings set forth in Section 13. All other terms contained in this Agreement, unless otherwise indicated, shall have the meaning provided by the Code to the extent such terms are defined therein.

**2. LOAN AND TERMS OF PAYMENT**

**2.1 Promise to Pay**. Borrower hereby unconditionally promises to pay Bank the outstanding principal amount of all Credit Extensions and accrued and unpaid interest thereon as and when due in accordance with this Agreement.

**2.1.1 Revolving Advances.**

(a) Availability. Subject to the terms and conditions of this Agreement, Bank shall make Advances not exceeding the Availability Amount. Amounts borrowed under the Revolving Line may be repaid and, prior to the Revolving Line Maturity Date, reborrowed, subject to the applicable terms and conditions precedent herein.

(b) Termination; Repayment. The Revolving Line terminates on the Revolving Line Maturity Date, when the principal amount of all Advances, the unpaid interest thereon, and all other Obligations relating to the Revolving Line shall be immediately due and payable.

**2.1.2 Equipment Advances.**

(a) Availability. Subject to the terms and conditions of this Agreement, during the Draw Period, Bank shall make advances (each, an "**Equipment Advance**" and, collectively, "**Equipment Advances**") not exceeding the Equipment Line. Equipment Advances may only be used to finance Eligible Equipment purchased within ninety (90) days (determined based upon the applicable invoice date of such Eligible Equipment) before the date of each Equipment Advance. All Eligible Equipment must have been new when purchased by Borrower, except for such Eligible Equipment that is disclosed in writing to Bank by Borrower, and that Bank in its sole discretion has agreed to finance, prior to being financed by Bank. No Equipment Advance may exceed one hundred

---

percent (100.0%) of the total invoice for Eligible Equipment (excluding taxes, shipping, warranty charges, freight discounts and installation expenses relating to such Eligible Equipment except to the extent such are allowed to be financed pursuant hereto as Other Equipment). Notwithstanding the foregoing, (i) the initial Equipment Advance hereunder may be used to reimburse Borrower for Eligible Equipment purchased on or after January 1, 2013, and (ii) up to an aggregate of One Million Dollars ($1,000,000.00) of the Equipment Advances may be used for (x) tooling Equipment, provided such tooling Equipment is otherwise Eligible Equipment, and (y) Eligible Equipment maintained by Borrower outside of the State of Utah. Unless otherwise agreed to by Bank, not more than thirty percent (30.0%) of the proceeds of the Equipment Line shall be used to finance Other Equipment. Each Equipment Advance must be in an amount of at least Two Hundred Fifty Thousand Dollars ($250,000.00). After repayment, no Equipment Advance may be reborrowed.

(b) Interest Period. Commencing on the first Payment Date of the month following the month in which the Funding Date of an Equipment Advance occurs (or commencing on the Funding Date if the Funding Date is the first calendar day of the month), and continuing on each Payment Date thereafter, Borrower shall make monthly payments of interest, in arrears, on the principal amount of each Equipment Advance at the rate set forth in Section 2.3(a)(ii).

(c) Repayment. Commencing on June 1, 2014, and continuing on the Payment Date of each month thereafter, Borrower shall repay each Equipment Advance in (i) forty-two (42) equal monthly installments of principal, plus (ii) monthly payments of accrued interest at the rate set forth in Section 2.3(a)(ii). The final payment due on the Equipment Maturity Date shall include all outstanding principal and all accrued unpaid interest and all other Obligations with respect to the Equipment Advances. Borrower may prepay any of the Equipment Advances, in whole or in part, at any time without a prepayment fee or penalty.

**2.1.3 First Equipment Advance Loan**.

(a) Availability. Subject to the satisfaction of the terms and conditions of this Agreement, on the Effective Date, Bank shall make one (1) term loan (the "**First Equipment Advance Loan**") to Borrower in an amount equal to Four Hundred Forty-Four Thousand Four Hundred Forty-Four Dollars and Thirty-Two Cents ($444,444.32) to refinance in full the outstanding principal amount of the "Equipment Advances" pursuant to Section 2.1.6 of the Prior Agreement.

(b) Repayment. Commencing on the first Payment Date following the Effective Date, and continuing on each Payment Date thereafter, Borrower shall repay the First Equipment Advance Loan in (i) seven (7) consecutive equal installments of principal, plus (ii) monthly payments of accrued interest at the effective rate of interest as set forth in Section 2.3(a)(iii) (each a "**First Equipment Advance Loan Payment**"). Borrower's final First Equipment Advance Loan Payment, due on the First Equipment Maturity Date, shall include all outstanding principal and accrued unpaid interest and all other Obligations with respect to the First Equipment Advance Loan. Once repaid, the First Equipment Advance Loan may not be reborrowed.

**2.1.4 Second Equipment Advance Loan**.

(a) Availability. Subject to the satisfaction of the terms and conditions of this Agreement, on the Effective Date, Bank shall make one (1) term loan (the "**Second Equipment Advance Loan**") to Borrower in an amount equal to Seven Hundred Seventy-Nine Thousand Eight Hundred Eighty Dollars and Eighty-Eight Cents ($779,880.88) to refinance in full the outstanding principal amount of the "Equipment Advances II" pursuant to Section 2.1.7 of the Prior Agreement.

(b) Repayment. Commencing on the first Payment Date following the Effective Date, and continuing on each Payment Date thereafter, Borrower shall repay the Second Equipment Advance Loan in (i) twenty-eight (28) consecutive equal installments of principal, plus (ii) monthly payments of accrued interest at the effective rate of interest as set forth in Section 2.3(a)(iv) (each a "**Second Equipment Advance Loan Payment**"). Borrower's final Second Equipment Advance Loan Payment, due on the Second Equipment Maturity Date, shall include all outstanding principal and accrued unpaid interest and all other Obligations with respect to the Second Equipment Advance Loan. Once repaid, the Second Equipment Advance Loan may not be reborrowed.



---

**2.1.5 Third Equipment Advance Loan**.

(a) Availability. Subject to the satisfaction of the terms and conditions of this Agreement, on the Effective Date, Bank shall make one (1) term loan (the "**Third Equipment Advance Loan**") to Borrower in an amount equal to Two Million Dollars ($2,000,000.00) to refinance in full the outstanding principal amount of the "Equipment Advances III" pursuant to Section 2.1.8 of the Prior Agreement.

(b) Repayment. Commencing on the first Payment Date following the Effective Date, and continuing on each Payment Date thereafter, Borrower shall repay the Third Equipment Advance Loan in (i) forty-two (42) consecutive equal installments of principal, plus (ii) monthly payments of accrued interest at the effective rate of interest as set forth in Section 2.3(a)(v) (each a "**Third Equipment Advance Loan Payment**"). Borrower's final Third Equipment Advance Loan Payment, due on the Third Equipment Maturity Date, shall include all outstanding principal and accrued unpaid interest and all other Obligations with respect to the Third Equipment Advance Loan. Once repaid, the Third Equipment Advance Loan may not be reborrowed.

**2.2 Overadvances**. If, at any time, the outstanding principal amount of any Advances exceeds the lesser of either (a) the Revolving Line or (b) the aggregate of (i) the Borrowing Base, plus (ii) the Non-Formula Amount, Borrower shall immediately pay to Bank in cash the amount of such excess (such excess, the "**Overadvance**"). Without limiting Borrower's obligation to repay Bank any Overadvance, Borrower agrees to pay Bank interest on the outstanding amount of any Overadvance, on demand, at the Default Rate.

**2.3 Payment of Interest on the Credit Extensions.**

(a) Interest Rate.

(i) Advances. Each Advance shall bear interest on the outstanding principal amount thereof from the date when made, continued or converted until paid in full at a rate per annum equal to (i) for Prime Rate Advances, the Prime Rate, and (ii) for LIBOR Advances, the LIBOR Rate plus the LIBOR Rate Margin. On and after the expiration of any Interest Period applicable to any LIBOR Advance outstanding on the date of occurrence of an Event of Default or acceleration of the Obligations, the amount of such LIBOR Advance shall, during the continuance of such Event of Default or after acceleration, bear interest at a rate per annum equal to the Prime Rate plus four percent (4.0%). Pursuant to the terms hereof, interest on each Advance shall be paid in arrears on each Interest Payment Date. Interest shall also be paid on the date of any prepayment of any Advance pursuant to this Agreement for the portion of any Advance so prepaid and upon payment (including prepayment) in full thereof. All accrued but unpaid interest on the Advances shall be due and payable on the Revolving Line Maturity Date.

(ii) Equipment Advances. Subject to Section 2.4(e), the principal amount outstanding for each Equipment Advance shall accrue interest at a floating per annum rate equal to one half of one percent (0.50%) above the Prime Rate, which interest shall be payable on the Payment Date.

(iii) First Equipment Advance Loan. Subject to Section 2.4(e), the principal amount outstanding under the First Equipment Advance Loan shall accrue interest at a floating per annum rate equal to one half of one percent (0.50%) above the Prime Rate, which interest shall be payable on the Payment Date.

(iv) Second Equipment Advance Loan. Subject to Section 2.4(e), the principal amount outstanding under the Second Equipment Advance Loan shall accrue interest at a floating per annum rate equal to one half of one percent (0.50%) above the Prime Rate, which interest shall be payable on the Payment Date.

(v) Third Equipment Advance Loan. Subject to Section 2.4(e), the principal amount outstanding under the Third Equipment Advance Loan shall accrue interest at a floating per annum



---

rate equal to one half of one percent (0.50%) above the Prime Rate, which interest shall be payable on the Payment Date.

(b) Prime Rate Advances. Each change in the interest rate of the Prime Rate Advances based on changes in the Prime Rate shall be effective on the effective date of such change and to the extent of such change.

(c) LIBOR Advances. The interest rate applicable to each LIBOR Advance shall be determined in accordance with Section 3.5(a) hereunder. Subject to Sections 3.6 and 3.7, such rate shall apply during the entire Interest Period applicable to such LIBOR Advance, and interest calculated thereon shall be payable on the Interest Payment Date applicable to such LIBOR Advance.

(d) Computation of Interest. Any interest hereunder will accrue from day to day and is calculated on the basis of the actual number of days elapsed and a year of 360 days in the case of any Credit Extension outstanding. In computing interest on any Credit Extension, the date of the making of such Credit Extension shall be included and the date of payment shall be excluded; provided, however, that if any Credit Extension is repaid on the same day on which it is made, such day shall be included in computing interest on such Credit Extension.

(e) Default Rate. Except as otherwise provided in Section 2.3(a)(i), upon the occurrence and during the continuance of an Event of Default, Obligations shall bear interest at a rate per annum which is four percent (4.0%) above the rate that would otherwise be applicable thereto (the "**Default Rate**"). Payment or acceptance of the increased interest provided in this Section 2.3(e) is not a permitted alternative to timely payment and shall not constitute a waiver of any Event of Default or otherwise prejudice or limit any rights or remedies of Bank.

**2.4 Fees**. Borrower shall pay to Bank:

(a) Revolving Line Commitment Fee. A fully earned, non-refundable Revolving Line commitment fee of Twenty Thousand Dollars ($20,000.00), on May 29, 2013;

(b) Revolving Line Anniversary Fee. A fully earned, non-refundable Revolving Line anniversary fee (the "**Anniversary Fee**") of Twenty Thousand Dollars ($20,000.00) shall be earned as of the Effective Date, and shall be due and payable on the earlier of (i) May 29, 2014, (ii) the early termination of this Agreement, or (iii) an Event of Default;

(c) Equipment Line Commitment Fee. A fully earned, non-refundable Equipment Line commitment fee of Six Thousand Eight Hundred Seventy-Five Dollars ($6,875.00), on the Effective Date;

(d) Unused Revolving Line Facility Fee. Payable quarterly in arrears on the first day of each calendar quarter occurring prior to the Revolving Line Maturity Date, and on the Revolving Line Maturity Date, a fee (the "**Unused Revolving Line Facility Fee**") in an amount equal to 0.375% per annum of the average unused portion of the Revolving Line, as determined by Bank. The unused portion of the Revolving Line, for purposes of this calculation, shall be calculated on a calendar year basis and shall equal the difference between (i) the Revolving Line, and (ii) the average for the period of the daily closing balance of the Revolving Line outstanding; and

(e) Bank Expenses. All Bank Expenses (including reasonable attorneys' fees and expenses for documentation and negotiation of this Agreement) incurred through and after the Effective Date, when due(or, if no stated due date, upon demand by Bank).

(f) Fees Fully Earned. Unless otherwise provided in this Agreement or in a separate writing by Bank, Borrower shall not be entitled to any credit, rebate, or repayment of any fees earned by Bank pursuant to this Agreement notwithstanding any termination of this Agreement or the suspension or termination of Bank's obligation to make loans and advances hereunder. Bank may deduct amounts owing by Borrower under the clauses of this Section 2.4 pursuant to the terms of Section 2.5(c). Bank shall provide Borrower written notice of deductions made from the Designated Deposit Account pursuant to the terms of the clauses of this Section 2.4.

**2.5 Payments; Application of Payments; Debit of Accounts.**

(a) All payments to be made by Borrower under any Loan Document shall be made in immediately available funds in Dollars, without setoff or counterclaim, before 12:00 p.m. Pacific time on the date when due. Payments of principal and/or interest received after 12:00 p.m. Pacific time are considered received at the opening of business on the next Business Day. When a payment is due on a day that is not a Business Day, the payment shall be due the next Business Day, and additional fees or interest, as applicable, shall continue to accrue until paid.

(b) Bank has the exclusive right to determine the order and manner in which all payments with respect to the Obligations may be applied. Borrower shall have no right to specify the order or the accounts to which Bank shall allocate or apply any payments required to be made by Borrower to Bank or otherwise received by Bank under this Agreement when any such allocation or application is not specified elsewhere in this Agreement.

(c) Bank may debit any of Borrower's deposit accounts, including the Designated Deposit Account, for principal and interest payments or any other amounts Borrower owes Bank when due. These debits shall not constitute a set-off.

3. CONDITIONS OF LOANS

**3.1 Conditions Precedent to Initial Credit Extension**. Bank's obligation to make the initial Credit Extension is subject to the condition precedent that Bank shall have received, in form and substance satisfactory to Bank, such documents, and completion of such other matters, as Bank may reasonably deem necessary or appropriate, including, without limitation:

(a) duly executed original signatures to the Loan Documents;

(b) duly executed original signatures to the Control Agreement(s);

(c) the Operating Documents and long-form good standing certificates of Borrower certified by the Secretary of State (or equivalent agency) of Borrower's jurisdiction of organization or formation and each jurisdiction in which Borrower is qualified to conduct business, each as of a date no earlier than thirty (30) days prior to the Effective Date;

(d) duly executed original signatures to the completed Borrowing Resolutions for Borrower;

(e) certified copies, dated as of a recent date, of financing statement searches, as Bank may request, accompanied by written evidence (including any UCC termination statements) that the Liens indicated in any such financing statements either constitute Permitted Liens or have been or, in connection with the initial Credit Extension, will be terminated or released;

(f) the Perfection Certificate of Borrower, together with the duly executed original signature thereto;

(g) a bailee's waiver in favor of Bank for each location where Borrower maintains property with a third party, by each such third party, together with the duly executed original signatures thereto;

(h) evidence satisfactory to Bank that the insurance policies and endorsements required by Section 6.5 hereof are in full force and effect, together with appropriate evidence showing lender loss payable and/or additional insured clauses or endorsements in favor of Bank; and

(i) payment of the fees and Bank Expenses then due as specified in Section 2.4 hereof.

**3.2 Conditions Precedent to all Credit Extensions**. Bank's obligations to make each Credit Extension, including the initial Credit Extension, is subject to the following conditions precedent:



(a) except as otherwise provided in Section 3.4, timely receipt of an executed Payment/Advance Form and/or Notice of Borrowing, as applicable;

(b) the representations and warranties in this Agreement shall be true, accurate, and complete in all material respects on the date of the Payment/Advance Form and/or Notice of Borrowing, as applicable, and on the Funding Date of each Credit Extension; provided, however, that such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality in the text thereof; and provided, further that those representations and warranties expressly referring to a specific date shall be true, accurate and complete in all material respects as of such date, and no Event of Default shall have occurred and be continuing or result from the Credit Extension. Each Credit Extension is Borrower's representation and warranty on that date that the

representations and warranties in this Agreement remain true, accurate, and complete in all material respects; provided, however, that such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality in the text thereof; and provided, further that those representations and warranties expressly referring to a specific date shall be true, accurate and complete in all material respects as of such date; and

(c) Bank determines to its satisfaction that there has not been any material impairment in the general affairs, management, results of operation, financial condition or the prospect of repayment of the Obligations, or any material adverse deviation by Borrower from the most recent business plan of Borrower presented to and accepted by Bank.

**3.3 Covenant to Deliver**. Borrower agrees to deliver to Bank each item required to be delivered to Bank under this Agreement as a condition precedent to any Credit Extension. Borrower expressly agrees that a Credit Extension made prior to the receipt by Bank of any such item shall not constitute a waiver by Bank of Borrower's obligation to deliver such item, and the making of any Credit Extension in the absence of a required item shall be in Bank's sole discretion.

**3.4 Procedures for Borrowing.**

(a) Advances.

(i) Subject to the prior satisfaction of all other applicable conditions to the making of an Advance set forth in this Agreement, an Advance shall be made upon Borrower's irrevocable written notice delivered to Bank by electronic mail in the form of a Notice of Borrowing executed by an Authorized Signer or without instructions if any Advances is necessary to meet Obligations which have become due. Such Notice of Borrowing must be received by Bank prior to 12:00 p.m. Pacific time, (i) at least three (3) Business Days prior to the requested Funding Date, in the case of any LIBOR Advance, and (ii) on the requested Funding Date, in the case of a Prime Rate Advance, specifying: (1) the amount of the Advance; (2) the Currency in which such Advance shall be denominated; (3) the requested Funding Date; (4) whether the Advance is to be comprised of LIBOR Advances or Prime Rate Advances; and (5) the duration of the Interest Period applicable to any such LIBOR Advances included in such notice; provided that if the Notice of Borrowing shall fail to specify the duration of the Interest Period for any Advance comprised of LIBOR Advances, such Interest Period shall be one (1) month.

(ii) On the Funding Date, Bank shall credit proceeds of an Advance to the Designated Deposit Account denominated in the same Currency as the Currency requested with respect to the Advance and, subsequently, shall transfer such proceeds by wire transfer to such other account as Borrower may instruct in the Notice of Borrowing. No Advances shall be deemed made to Borrower, and no interest shall accrue on any such Advance, until the related funds have been deposited in the applicable Designated Deposit Account.

(b) Equipment Advances. Subject to the prior satisfaction of all other applicable conditions to the making of an Equipment Advance set forth in this Agreement, to obtain an Equipment Advance, Borrower must notify Bank (which notice shall be irrevocable) by electronic mail or facsimile no later than 12:00 p.m. Pacific time two (2) Business Days before the proposed Funding Date. The notice shall be a Payment/Advance Form, must



be signed by a Responsible Officer or designee, and shall include a copy of the invoice for the Equipment being financed. If Borrower satisfies the conditions of each Equipment Advance, Bank shall disburse such Equipment Advance by transfer to the Designated Deposit Account.

**3.5 Conversion and Continuation Elections.**

(a) So long as (i) no Event of Default exists; (ii) Borrower shall not have sent any notice of termination of this Agreement; and (iii) Borrower shall have complied with such customary procedures as Bank has established from time to time for Borrower's requests for LIBOR Advances, Borrower may, upon irrevocable written notice to Bank:

(1) elect to convert on any Business Day, Prime Rate Advances into LIBOR Advances;

(2) elect to continue on any Interest Payment Date any LIBOR Advances maturing on such Interest Payment Date; or

(3) elect to convert on any Interest Payment Date any LIBOR Advances maturing on such Interest Payment Date into Prime Rate Advances.

(b) Borrower shall deliver a Notice of Conversion/Continuation by electronic mail to be received by Bank prior to 12:00 p.m. Pacific time (i) at least three (3) Business Days in advance of the Conversion Date or Continuation Date, if any Advances are to be converted into or continued as LIBOR Advances; and (ii) on the Conversion Date, if any Advances are to be converted into Prime Rate Advances, in each case specifying the:

(1) proposed Conversion Date or Continuation Date;

(2) aggregate amount of the Advances to be converted or continued;

(3) nature of the proposed conversion or continuation; and

(4) if the resulting Advance is to be a LIBOR Advance, the duration of the requested Interest Period.

(c) If upon the expiration of any Interest Period applicable to any LIBOR Advances, Borrower shall have timely failed to select a new Interest Period to be applicable to such LIBOR Advances or request to convert a LIBOR Advance into a Prime Rate Advance, Borrower shall be deemed to have elected to convert such LIBOR Advances into Prime Rate Advances.

(d) Any LIBOR Advances shall, at Bank's option, convert into Prime Rate Advances in the event that (i) an Event of Default exists, or (ii) the aggregate principal amount of the Prime Rate Advances which have been previously converted to LIBOR Advances, or the aggregate principal amount of existing LIBOR Advances continued, as the case may be, at the beginning of an Interest Period shall at any time during such Interest Period exceeds the lesser of the Revolving Line or the Borrowing Base. Borrower agrees to pay Bank, upon demand by Bank (or Bank may, at its option, debit the Designated Deposit Account or any other account Borrower maintains with Bank) any amounts required to compensate Bank for any loss (including loss of anticipated profits), cost, or expense incurred by Bank, as a result of the conversion of LIBOR Advances to Prime Rate Advances pursuant to this Section 3.5(d).

(e) Notwithstanding anything to the contrary contained herein, Bank shall not be required to purchase Dollar deposits in the London interbank market or other applicable LIBOR market to fund any LIBOR Advances, but the provisions hereof shall be deemed to apply as if Bank had purchased such deposits to fund the LIBOR Advances.



**3.6 Special Provisions Governing LIBOR Advances**. Notwithstanding any other provision of this Agreement to the contrary, the following provisions shall govern with respect to LIBOR Advances as to the matters covered:

(a) Determination of Applicable Interest Rate. As soon as practicable on each Interest Rate Determination Date, Bank shall determine (which determination shall, absent manifest error in calculation, be final, conclusive and binding upon all parties) the interest rate that shall apply to the LIBOR Advances for which an interest rate is then being determined for the applicable Interest Period and shall promptly give notice thereof (in writing or by telephone confirmed in writing) to Borrower.

(b) Inability to Determine Applicable Interest Rate. In the event that Bank shall have determined (which determination shall be final and conclusive and binding upon all parties hereto), on any Interest Rate Determination Date with respect to any LIBOR Advance, that by reason of circumstances affecting the London interbank market adequate and fair means do not exist for ascertaining the interest rate applicable to such LIBOR Advance on the basis provided for in the definition of LIBOR, Bank shall on such date give notice (by facsimile or by telephone confirmed in writing) to Borrower of such determination, whereupon (i) no Advances may be made as, or converted to, LIBOR Advances until such time as Bank notifies Borrower that the circumstances giving rise to such notice no longer exist, and (ii) any Notice of Borrowing or Notice of Conversion/Continuation given by Borrower with respect to LIBOR Advances in respect of which such determination was made shall be deemed to be rescinded by Borrower.

(c) Compensation for Breakage or Non-Commencement of Interest Periods. If (i) for any reason, other than a default by Bank or any failure of Bank to fund LIBOR Advances due to impracticability or illegality under Sections 3.7(c) and 3.7(d) of this Agreement, a borrowing or a conversion to or continuation of any LIBOR Advance does not occur on a date specified in a Notice of Borrowing or a Notice of Conversion/Continuation, as the case may be, or (ii) any complete or partial principal payment or reduction of a LIBOR Advance, or any conversion of any LIBOR Advance, occurs on a date prior to the last day of an Interest Period applicable to that LIBOR Advance, including due to voluntary or mandatory prepayment or acceleration, then, in each case, Borrower shall compensate Bank, upon written request by Bank, for all losses and expenses incurred by Bank in an amount equal to the excess, if any, of:

(A) the amount of interest that would have accrued on the amount (1) not borrowed, converted or continued as provided in clause (i) above, or (2) paid, reduced or converted as provided in clause (ii) above, for the period from (y) the date of such failure to borrow, convert or continue as provided in clause (i) above, or the date of such payment, reduction or conversion as provided in clause (ii) above, as the case may be, to (z) in the case of a failure to borrow, convert or continue as provided in clause (i) above, the last day of the Interest Period that would have commenced on the date of such borrowing, conversion or continuing but for such failure, and in the case of a payment, reduction or conversion prior to the last day of an Interest Period applicable to a LIBOR Advance as provided in clause (ii) above, the last day of such Interest Period, in each case at the applicable rate of interest or other return for such LIBOR Advance(s) provided for herein (excluding, however, the LIBOR Rate Margin included therein, if any), over

(B) the interest which would have accrued to Bank on the applicable amount provided in clause (A) above through the purchase of a Eurodollar deposit bearing interest at the rate obtained pursuant to the definition of LIBOR Rate on the date of such failure to borrow, convert or continue as provided in clause (i) above, or the date of such payment, reduction or conversion as provided in clause (ii) above, as the case may be, for a period equal to the remaining period of such applicable Interest Period provided in clause (A) above.

Bank's request shall set forth the manner and method of computing such compensation and such determination as to such compensation shall be conclusive absent manifest

error.



(d) Assumptions Concerning Funding of LIBOR Advances. Calculation of all amounts payable to Bank under this Section 3.6 and under Section 3.7 shall be made as though Bank had actually funded each relevant LIBOR Advance through the purchase of a Eurodollar deposit bearing interest at the rate obtained pursuant to the definition of LIBOR Rate in an amount equal to the amount of such LIBOR Advance and having a maturity comparable to the relevant Interest Period; provided, however, that Bank may fund each of its LIBOR Advances in any manner it sees fit and the foregoing assumptions shall be utilized only for the purposes of calculating amounts payable under this Section 3.6 and under Section 3.7.

(e) LIBOR Advances After Default. After the occurrence and during the continuance of an Event of Default, (i) Borrower may not elect to have an Advance be made or continued as, or converted to, a LIBOR Advance after the expiration of any Interest Period then in effect for such Advance and (ii) subject to the provisions of Section 3.6(c), any Notice of Conversion/Continuation given by Borrower with respect to a requested conversion/continuation that has not yet occurred shall, at Bank's option, be deemed to be rescinded by Borrower and be deemed a request to convert or continue Advances referred to therein as Prime Rate Advances.

**3.7 Additional Requirements/Provisions Regarding LIBOR Advances.**

(a) Borrower shall pay Bank, upon demand by Bank, from time to time such amounts as Bank may determine to be necessary to compensate it for any costs incurred by Bank that Bank determines are attributable to its making or maintaining of any amount receivable by Bank hereunder in respect of any LIBOR Advances relating thereto (such increases in costs and reductions in amounts receivable being herein called "**Additional Costs**"), in each case resulting from any Regulatory Change which:

(i) changes the basis of taxation of any amounts payable to Bank under this Agreement in respect of any LIBOR Advances (other than changes which affect taxes measured by or imposed on the overall net income of Bank by the jurisdiction in which Bank has its principal office);

(ii) imposes or modifies any reserve, special deposit or similar requirements relating to any extensions of credit or other assets of, or any deposits with, or other liabilities of Bank (including any LIBOR Advances or any deposits referred to in the definition of LIBOR); or

(iii) imposes any other condition affecting this Agreement (or any of such extensions of credit or liabilities).

Bank will notify Borrower of any event occurring after the Effective Date which will entitle Bank to compensation pursuant to this Section 3.7(a) as promptly as practicable after it obtains knowledge thereof and determines to request such compensation. Bank will furnish Borrower with a statement setting forth the basis and amount of each request by Bank for compensation under this Section 3.7(a). Determinations and allocations by Bank for purposes of this Section 3.7(a) of the effect of any Regulatory Change on its costs of maintaining its obligations to make LIBOR Advances, of making or maintaining LIBOR Advances, or on amounts receivable by it in respect of LIBOR Advances, and of the additional amounts required to compensate Bank in respect of any Additional Costs, shall be conclusive absent manifest error.

(b) If Bank shall determine that the adoption or implementation of any applicable law, rule, regulation, or treaty regarding capital adequacy, or any change therein, or any change in the interpretation or administration thereof by any governmental authority, central bank, or comparable agency charged with the interpretation or administration thereof, or compliance by Bank (or its applicable lending office) with any request or directive regarding capital adequacy (whether or not having the force of law) of any such authority, central bank, or comparable agency, has or would have the effect of reducing the rate of return on capital of Bank or any person or entity controlling Bank (a "**Parent**") as a consequence of its obligations hereunder to a level below that which Bank (or its Parent) could have achieved but for such adoption, change, or compliance (taking into consideration policies with respect to capital adequacy) by an amount deemed by Bank to be material, then from time to time, within five (5) days after demand by Bank, Borrower shall pay to Bank such additional amount or amounts as will compensate Bank for such reduction. A statement of Bank claiming compensation under this Section 3.7(b) and setting forth the additional amount or amounts to be paid to it hereunder shall be conclusive absent manifest error.



Notwithstanding anything to the contrary in this Section 3.7, Borrower shall not be required to compensate Bank pursuant to this Section 3.7(b) for any amounts incurred more than nine (9) months prior to the date that Bank notifies Borrower of Bank's intention to claim compensation therefor; provided that if the circumstances giving rise to such claim have a retroactive effect, then such nine-month period shall be extended to include the period of such retroactive effect. The obligations of the Borrower arising pursuant to this Section 3.7(b) shall survive the Revolving Line Maturity Date, the termination of this Agreement and the repayment of all Obligations.

(c) If, at any time, Bank, in its sole and absolute discretion, determines that (i) the amount of LIBOR Advances for periods equal to the corresponding Interest Periods are not available to Bank in the offshore currency interbank markets, or (ii) LIBOR does not accurately reflect the cost to Bank of lending the LIBOR Advances, then Bank shall promptly give notice thereof to Borrower. Upon the giving of such notice, Bank's obligation to make the LIBOR Advances shall terminate; provided, however, LIBOR Advances shall not terminate if Bank and Borrower agree in writing to a different interest rate applicable to LIBOR Advances.

(d) If it shall become unlawful for Bank to continue to fund or maintain any LIBOR Advances, or to perform its obligations hereunder, upon demand by Bank, Borrower shall prepay the LIBOR Advances in full with accrued interest thereon and all other amounts payable by Borrower hereunder (including, without limitation, any amount payable in connection with such prepayment pursuant to Section 3.6(c)). Notwithstanding the foregoing, to the extent a determination by Bank as described above relates to a LIBOR Advance then being requested by Borrower pursuant to a Notice of Borrowing or a Notice of Conversion/Continuation, Borrower shall have the option, subject to the provisions of Section 3.6(c), to (i) rescind such Notice of Borrowing or Notice of Conversion/Continuation by giving notice (by facsimile or by telephone confirmed in writing) to Bank of such rescission on the date on which Bank gives notice of its determination as described above, or (ii) modify such Notice of Borrowing or Notice of Conversion/Continuation to obtain a Prime Rate Advance or to have outstanding Advances converted into or continued as Prime Rate Advances by giving notice (by facsimile or by telephone confirmed in writing) to Bank of such modification on the date on which Bank gives notice of its determination as described above.

4. <u>CREATION OF SECURITY INTEREST</u>

4.1 **Grant of Security Interest.** Borrower hereby grants Bank, to secure the payment and performance in full of all of the Obligations, a continuing security interest in, and pledges to Bank, the Collateral, wherever located, whether now owned or hereafter acquired or arising, and all proceeds and products thereof.

Borrower acknowledges that it previously has entered, and/or may in the future enter, into Bank Services Agreements with Bank. Regardless of the terms of any Bank Services Agreement, Borrower agrees that any amounts Borrower owes Bank thereunder shall be deemed to be Obligations hereunder and that it is the intent of Borrower and Bank to have all such Obligations secured by the first priority perfected security interest in the Collateral granted herein (subject only to Permitted Liens that are permitted pursuant to the terms of this Agreement to have superior priority to Bank's Lien in this Agreement).

If this Agreement is terminated, Bank's Lien in the Collateral shall continue until the Obligations (other than inchoate indemnity obligations) are repaid in full in cash. Upon payment in full in cash of the Obligations (other than inchoate indemnity obligations) and at such time as Bank's obligation to make Credit Extensions has terminated, Bank shall, at the sole cost and expense of Borrower, release its Liens in the Collateral and all rights therein shall revert to Borrower. In the event (x) all Obligations (other than inchoate indemnity obligations), except for Bank Services, are satisfied in full, and (y) this Agreement is terminated, Bank shall terminate the security interest granted herein upon Borrower providing cash collateral acceptable to Bank in its good faith business judgment for Bank Services, if any. In the event such Bank Services consist of outstanding Letters of Credit, Borrower shall provide to Bank cash collateral in an amount equal to (x) if such Letters of Credit are denominated in Dollars, then at least one hundred five percent (105.0%); and (y) if such Letters of Credit are denominated in a Foreign Currency, then at least one hundred ten percent (110.0%), of the Dollar Equivalent of the face amount of all such Letters of Credit plus all interest, fees, and costs due or to become due in connection therewith (as estimated by Bank in its business judgment), to secure all of the Obligations relating to such Letters of Credit.



---

4.2 **Priority of Security Interest**. Borrower represents, warrants, and covenants that the security interest granted herein is and shall at all times continue to be a first priority perfected security interest in the Collateral (subject only to Permitted Liens that are permitted pursuant to the terms of this Agreement to have superior priority to Bank's Lien under this Agreement). If Borrower shall acquire a commercial tort claim, Borrower shall promptly notify Bank in a writing signed by Borrower of the general details thereof and grant to Bank in such writing a security interest therein and in the proceeds thereof, all upon the terms of this Agreement, with such writing to be in form and substance reasonably satisfactory to Bank.

4.3 **Authorization to File Financing Statements**. Borrower hereby authorizes Bank to file financing statements, without notice to Borrower, with all appropriate jurisdictions to perfect or protect Bank's interest or rights hereunder, including a notice that any disposition of the Collateral, by either Borrower or any other Person, shall be deemed to violate the rights of Bank under the Code.

5. <u>REPRESENTATIONS AND WARRANTIES</u>

Borrower represents and warrants as follows:

5.1 **Due Organization, Authorization; Power and Authority**. Borrower is duly existing and in good standing as a Registered Organization in its jurisdiction of formation and is qualified and licensed to do business and is in good standing in any jurisdiction in which the conduct of its business or its ownership of property requires that it be qualified except where the failure to do so could not reasonably be expected to have a material adverse effect on Borrower's business. In connection with this Agreement, Borrower has delivered to Bank a completed certificate signed by Borrower, entitled "Perfection Certificate". Borrower represents and warrants to Bank that (a) Borrower's exact legal name is that indicated on the Perfection Certificate and on the signature page hereof; (b) Borrower is an organization of the type and is organized in the jurisdiction set forth in the Perfection Certificate; (c) the Perfection Certificate accurately sets forth Borrower's organizational identification number or accurately states that Borrower has none; (d) the Perfection Certificate accurately sets forth Borrower's place of business, or, if more than one, its chief executive office as well as Borrower's mailing address (if different than its chief executive office); (e) Borrower (and each of its predecessors) has not, in the past five (5) years, changed its jurisdiction of formation, organizational structure or type, or any organizational number assigned by its jurisdiction; and (f) all other information set forth on the Perfection Certificate pertaining to Borrower and each of its Subsidiaries is accurate and complete (it being understood and agreed that Borrower may from time to time update certain information in the Perfection Certificate after the Effective Date to the extent permitted by one or more specific provisions in this Agreement). If Borrower is not now a Registered Organization but later becomes one, Borrower shall promptly notify Bank of such occurrence and provide Bank with Borrower's organizational identification number.

The execution, delivery and performance by Borrower of the Loan Documents to which it is a party have been duly authorized, and do not (i) conflict with any of Borrower's organizational documents, (ii) contravene, conflict with, constitute a default under or violate any material Requirement of Law, (iii) contravene, conflict or

violate any applicable order, writ, judgment, injunction, decree, determination or award of any Governmental Authority by which Borrower or any of its Subsidiaries or any of their property or assets may be bound or affected, (iv) require any action by, filing, registration, or qualification with, or Governmental Approval from, any Governmental Authority (except such Governmental Approvals which have already been obtained and are in full force and effect), or (v) conflict with, contravene, constitute a default or breach under, or result in or permit the termination or acceleration of, any material agreement by which Borrower is bound. Borrower is not in default under any agreement to which it is a party or by which it is bound in which the default could reasonably be expected to have a material adverse effect on Borrower's business.

**5.2 Collateral**. Borrower has good title to, rights in, and the power to transfer each item of the Collateral upon which it purports to grant a Lien hereunder, free and clear of any and all Liens except Permitted Liens. Borrower has no Collateral Accounts at or with any bank or financial institution other than Bank or Bank's Affiliates except for the Collateral Accounts described in the Perfection Certificate delivered to Bank in connection herewith and which Borrower has taken such actions as are necessary to give Bank a perfected security interest therein, pursuant to the term of Section 6.6(b). The Accounts are bona fide, existing obligations of the Account Debtors.



The Collateral is not in the possession of any third party bailee (such as a warehouse) except as otherwise provided in the Perfection Certificate. None of the components of the Collateral shall be maintained at locations other than as provided in the Perfection Certificate or as permitted pursuant to Section 6.12.

All Inventory is in all material respects of good and marketable quality, free from material defects.

Borrower is the sole owner of the Intellectual Property which it owns or purports to own except for (a) non-exclusive licenses granted to its customers in the ordinary course of business, (b) over-the-counter software that is commercially available to the public, and (c) material Intellectual Property licensed to Borrower and noted on the Perfection Certificate. Each Patent which it owns or purports to own and which is material to Borrower's business is valid and enforceable, and no part of the Intellectual Property which Borrower owns or purports to own and which is material to Borrower's business has been judged invalid or unenforceable, in whole or in part. To the best of Borrower's knowledge, no claim has been made that any part of the Intellectual Property violates the rights of any third party except to the extent such claim would not reasonably be expected to have a material adverse effect on Borrower's business.

Except as noted on the Perfection Certificate, Borrower is not a party to, nor is it bound by, any Restricted License.

**5.3 Accounts Receivable.**

(a) For any Eligible Account in any Borrowing Base Certificate, all statements made and all unpaid balances appearing in all invoices, instruments and other documents evidencing such Eligible Accounts are and shall be true and correct and all such invoices, instruments and other documents, and all of Borrower's Books are genuine and in all respects what they purport to be. Whether or not an Event of Default has occurred and is continuing, Bank may notify any Account Debtor owing Borrower money of Bank's security interest in such funds and verify the amount of such Eligible Account.

(b) All sales and other transactions underlying or giving rise to each Eligible Account shall comply in all material respects with all applicable laws and governmental rules and regulations. Borrower has no knowledge of any actual or imminent Insolvency Proceeding of any Account Debtor whose accounts are Eligible Accounts in any Borrowing Base Certificate. To the best of Borrower's knowledge, all signatures and endorsements on all documents, instruments, and agreements relating to all Eligible Accounts are genuine, and all such documents, instruments and agreements are legally enforceable in accordance with their terms.

**5.4 Litigation**. There are no actions or proceedings pending or, to the knowledge of any Responsible Officer, threatened in writing by or against Borrower or any of its Subsidiaries involving more than, individually or in the aggregate, Five Hundred Thousand Dollars ($500,000.00).

**5.5 Financial Statements; Financial Condition**. All consolidated financial statements for Borrower and any of its Subsidiaries delivered to Bank fairly present in all material respects Borrower's consolidated financial condition and Borrower's consolidated results of operations. There has not been any material deterioration in Borrower's consolidated financial condition since the date of the most recent financial statements submitted to Bank.

**5.6 Solvency**. The fair salable value of Borrower's consolidated assets (including goodwill minus disposition costs) exceeds the fair value of Borrower's liabilities; Borrower is not left with unreasonably small capital after the transactions in this Agreement; and Borrower is able to pay its debts (including trade debts) as they mature.

**5.7 Regulatory Compliance**. Borrower is not an "investment company" or a company "controlled" by an "investment company" under the Investment Company Act of 1940, as amended. Borrower is not engaged as one of its important activities in extending credit for margin stock (under Regulations X, T and U of the Federal Reserve Board of Governors). Borrower (a) has complied in all material respects with all Requirements of Law, and (b) has not violated any Requirements of Law the violation of which could reasonably be expected to have a

material adverse effect on its business. None of Borrower's or any of its Subsidiaries' properties or assets has been used by Borrower or any Subsidiary or, to the best of Borrower's knowledge, by previous Persons, in disposing, producing, storing, treating, or transporting any hazardous substance other than legally. Borrower and each of its Subsidiaries have obtained all consents, approvals and authorizations of, made all declarations or filings with, and given all notices to, all Government Authorities that are necessary to continue their respective businesses as currently conducted.

**5.8 Subsidiaries; Investments**. Borrower does not own any stock, partnership, or other ownership interest or other equity securities except for Permitted Investments.

**5.9 Tax Returns and Payments; Pension Contributions**. Borrower has timely filed all required tax returns and reports, and Borrower has timely paid all foreign, federal, state and local taxes, assessments, deposits and contributions owed by Borrower except (a) to the extent such taxes are being contested in good faith by appropriate proceedings promptly instituted and diligently conducted, so long as such reserve or other appropriate provision, if any, as shall be required in conformity with GAAP shall have been made therefor, or (b) if such taxes, assessments, deposits and contributions do not, individually or in the aggregate, exceed Fifty Thousand Dollars ($50,000.00).

To the extent Borrower defers payment of any contested taxes, Borrower shall (i) notify Bank in writing of the commencement of, and any material development in, the proceedings, and (ii) post bonds or take any other steps required to prevent the governmental authority levying such contested taxes from obtaining a Lien upon any of the Collateral that is other than a "Permitted Lien." Borrower is unaware of any claims or adjustments proposed for any of Borrower's prior tax years which could result in additional taxes becoming due and payable by Borrower. Borrower has paid all amounts necessary to fund all present pension, profit sharing and deferred compensation plans in accordance with their terms, and Borrower has not withdrawn from participation in, and has not permitted partial or complete termination of, or permitted the occurrence of any other event with respect to, any such plan which could reasonably be expected to result in any liability of Borrower, including any liability to the Pension Benefit Guaranty Corporation or its successors or any other governmental agency.

**5.10 Use of Proceeds**. Borrower shall use the proceeds of the Credit Extensions as working capital and to fund its general business requirements and not for personal, family, household or agricultural purposes.

**5.11 Full Disclosure**. No written representation, warranty or other statement of Borrower in any certificate or written statement given to Bank, as of the date such representation, warranty, or other statement was made, taken together with all such written certificates and written statements given to Bank, contains any untrue statement of a material fact or omits to state a material fact necessary to make the statements contained in the certificates or statements not misleading (it being recognized by Bank that the projections and forecasts provided by Borrower in good faith and based upon reasonable assumptions are not viewed as facts and that actual results during the period or periods covered by such projections and forecasts may differ from the projected or forecasted results).

**5.12 Definition of "Knowledge."** For purposes of the Loan Documents, whenever a representation or warranty is made to Borrower's knowledge or awareness, to the "best of" Borrower's knowledge, or with a similar qualification, knowledge or awareness means the actual knowledge, after reasonable investigation, of any Responsible Officer.

## 6. AFFIRMATIVE COVENANTS

Borrower shall do all of the following:

**6.1 Government Compliance.** Borrower shall, and shall cause each of its Subsidiaries to, maintain its legal existence and good standing in its jurisdiction of formation and each jurisdiction in which the nature of its business requires them to be so qualified, except where the failure to take such action would not reasonably be expected to have a material adverse effect on Borrower's and its Subsidiaries' business or operations, taken as a whole; provided, that (a) the legal existence of any Subsidiary that is not a co-Borrower or guarantor may be terminated or permitted to lapse, and any qualification of such Subsidiary to do business may be terminated or



permitted to lapse, if, in the good faith judgment of Borrower, such termination or lapse is in the best interests of Borrower and its Subsidiaries, taken as a whole, and (b) Borrower may not permit its qualification to do business in the jurisdiction of its chief executive office to terminate or lapse; and provided, further, that this Section 6.1 shall not be construed to prohibit any other transaction that is otherwise expressly permitted in Section 7 of this Agreement. Borrower shall comply, and shall have each Subsidiary comply, with all laws, ordinances and regulations to which it is subject, noncompliance with which could have a material adverse effect on Borrower's business.

**6.2 Financial Statements, Reports, Certificates.** Provide Bank with the following:

(a) Borrowing Base Reports. Within thirty (30) days after the last day of each month, aged listings of accounts receivable and accounts payable (by invoice date) (the "**Borrowing Base Reports**");

(b) Borrowing Base Certificate. Within thirty (30) days after the last day of each month and together with the Borrowing Base Reports, a duly completed Borrowing Base Certificate signed by a Responsible Officer;

(c) Monthly Financial Statements. As soon as available, but no later than thirty (30) days after the last day of each month, a company prepared consolidated balance sheet and income statement covering Borrower's consolidated operations for such month certified by a Responsible Officer and in a form acceptable to Bank (the "**Monthly Financial Statements**");

(d) Monthly Compliance Certificate. Within thirty (30) days after the last day of each month and together with the Monthly Financial Statements, a duly completed Compliance Certificate signed by a Responsible Officer, certifying that as of the end of such month, Borrower was in full compliance with all of the terms and conditions of this Agreement, and setting forth calculations showing compliance with the financial covenants set forth in this Agreement and such other information as Bank may reasonably request;

(e) Board-Approved Projections. As soon as available, but no later than thirty (30) days after to the last day of Borrower's fiscal year, and contemporaneously with any updates or changes thereto, Board-approved projections as to the following fiscal year in a form acceptable to Bank;

(f) Annual Audited Financial Statements. As soon as available, but no later than one hundred eighty (180) days after the last day of Borrower's fiscal year, audited consolidated financial statements prepared under GAAP, consistently applied, together with an unqualified opinion on the financial statements from an independent certified public accounting firm reasonably acceptable to Bank;

(g) Other Statements. Within five (5) days of delivery, copies of all statements, reports and notices made available to Borrower's security holders or to any holders of Subordinated Debt;

(h) SEC Filings. As soon as available, but no later than five (5) days after filing with the Securities Exchange Commission, Borrower's 10K, 10Q, and 8K reports; Borrower's 10K, 10Q, and 8K reports required to be delivered pursuant to this subsection (h) shall be deemed to have been delivered on the date on which Borrower posts such report or provides a link thereto on Borrower's or another website on the Internet, provided, that Borrower shall provide paper copies to Bank of the Compliance Certificates required by subsection (d) hereof;

(i) Legal Action Notice. A prompt report of any legal actions pending or threatened in writing against Borrower or any of its Subsidiaries that could result in damages or costs to Borrower or any of its Subsidiaries of, individually or in the aggregate, Five Hundred Thousand Dollars ($500,000.00) or more; and

(j) Other Financial Information. Other financial information reasonably requested by Bank.

**6.3 Inventory; Returns**. Keep all Inventory in good and marketable condition, free from material defects. Returns and allowances between Borrower and its Account Debtors shall follow Borrower's customary practices as they exist at the Effective Date. Borrower must promptly notify Bank of all returns, recoveries, disputes and claims that involve more than Five Hundred Thousand Dollars ($500,000.00).



**6.4 Taxes; Pensions**. Timely file, and require each of its Subsidiaries to timely file, all required tax returns and reports and timely pay, and require each of its Subsidiaries to timely pay, all foreign, federal, state and local taxes, assessments, deposits and contributions owed by Borrower and each of its Subsidiaries, except for deferred payment of any taxes contested pursuant to the terms of Section 5.9 hereof, and shall deliver to Bank, on demand, appropriate certificates attesting to such payments, and pay all amounts necessary to fund all present pension, profit sharing and deferred compensation plans in accordance with their terms.

**6.5 Insurance.**

(a) Keep its business and the Collateral insured for risks and in amounts standard for companies in Borrower's industry and location and as Bank may reasonably request. Insurance policies shall be in a form, with financially sound and reputable insurance companies that are not Affiliates of Borrower, and in amounts that are satisfactory to Bank. All property policies shall have a lender's loss payable endorsement showing Bank as lender loss payee. All liability policies shall show, or have endorsements showing, Bank as an additional insured. Bank shall be named as lender loss payee and/or additional insured with respect to any such insurance providing coverage in respect of any Collateral.

(b) Ensure that proceeds payable under any property policy are, at Bank's option, payable to Bank on account of the Obligations.

(c) At Bank's request, Borrower shall deliver certified copies of insurance policies and evidence of all premium payments. Each provider of any such insurance required under this Section 6.5 shall agree, by endorsement upon the policy or policies issued by it or by independent instruments furnished to Bank, that it will give Bank thirty (30) days prior written notice before any such policy or policies shall be materially altered or canceled. If Borrower fails to obtain insurance as required under this Section 6.5 or to pay any amount or furnish any required proof of payment to third persons and Bank, Bank may make all or part of such payment or obtain such insurance policies required in this Section 6.5, and take any action under the policies Bank deems prudent.

**6.6 Operating Accounts.**

(a) (i) Borrower shall maintain (A) its primary operating and depository accounts with Bank and Bank's Affiliates, and (B) a portion of its excess cash in a securities account or accounts with Bank and/or Bank's Affiliates, and (ii) each Subsidiary of Borrower shall maintain its primary U.S. operating and depository

accounts with Bank and Bank's Affiliates.

(b) Provide Bank five (5) days prior written notice before establishing any Collateral Account at or with any bank or financial institution other than Bank or Bank's Affiliates. For each Collateral Account that Borrower at any time maintains, Borrower shall cause the applicable bank or financial institution (other than Bank) at or with which any Collateral Account is maintained to execute and deliver a Control Agreement or other appropriate instrument with respect to such Collateral Account to perfect Bank's Lien in such Collateral Account in accordance with the terms hereunder which Control Agreement may not be terminated without the prior written consent of Bank. The provisions of the previous sentence shall not apply to (i) any Collateral Account maintained by Borrower or its Subsidiaries outside the United States, and (ii) deposit accounts exclusively used for payroll, payroll taxes and other employee wage and benefit payments to or for the benefit of Borrower's employees and identified to Bank by Borrower as such.

**6.7 Financial Covenants**. Maintain at all times, subject to periodic reporting as of the last day of each month, commencing with the month ending April 30, 2013, and as of the last day of each month thereafter, on a consolidated basis with respect to Borrower and its Subsidiaries:

(a) Liquidity Coverage. A ratio of (i) Borrower's unrestricted and unencumbered cash at Bank plus Eligible Accounts to (ii) the aggregate amount of outstanding Obligations of Borrower to Bank, of at least 1.50:1.00.



(b) Tangible Net Worth. A Tangible Net Worth of at least the sum of (i) Thirteen Million Five Hundred Thirty-Eight Thousand Dollars ($13,538,000.00), plus (ii) fifty percent (50.0%) of Borrower's Net Income for the quarter ending June 30, 2013, and as of the last day of each Testing Quarter thereafter, plus (ii) twenty-five percent (25.0%) of all net cash consideration received by Borrower on or after the Effective Date from the issuance and sale by Borrower of its equity securities and/or Subordinated Debt, in each case with investors acceptable to Bank.

**6.8 Protection of Intellectual Property Rights.**

(a) (i) Protect, defend and maintain the validity and enforceability of its Intellectual Property; (ii) promptly advise Bank in writing of material infringements or any other event that could reasonably be expected to materially and adversely affect the value of its Intellectual Property; and (iii) not allow any Intellectual Property material to Borrower's business to be abandoned, forfeited or dedicated to the public without Bank's written consent.

(b) Provide written notice to Bank within ten (10) days of entering or becoming bound by any Restricted License (other than over-the-counter software that is commercially available to the public). Borrower shall take such steps as Bank requests to obtain the consent of, or waiver by, any person whose consent or waiver is necessary for (i) any Restricted License to be deemed "Collateral" and for Bank to have a security interest in it that might otherwise be restricted or prohibited by law or by the terms of any such Restricted License, whether now existing or entered into in the future, and (ii) Bank to have the ability in the event of a liquidation of any Collateral to dispose of such Collateral in accordance with Bank's rights and remedies under this Agreement and the other Loan Documents.

**6.9 Litigation Cooperation**. From the date hereof and continuing through the termination of this Agreement, make available to Bank, without expense to Bank, Borrower and its officers, employees and agents and Borrower's books and records, to the extent that Bank may deem them reasonably necessary to prosecute or defend any third-party suit or proceeding instituted by or against Bank with respect to any Collateral or relating to Borrower.

**6.10 Access to Collateral; Books and Records**. Upon the occurrence of the Audit Trigger Event, allow Bank, or its agents, at reasonable times, on one (1) Business Day's notice (provided no notice is required if an Event of Default has occurred and is continuing), to inspect the Collateral and audit and copy Borrower's Books, provided however that such inspections or audits shall be conducted no more often than once every twelve (12) months unless an Event of Default has occurred and is continuing in which case such inspections and audits shall occur as often as Bank shall determine is necessary. The foregoing inspections and audits shall be at Borrower's expense. Borrower confirms, acknowledges and agrees that the Audit shall be completed upon the earlier to occur of (i) ninety (90) days after the Audit Trigger Event, or (ii) after the occurrence of the Audit Trigger Event, the aggregate amount of outstanding Advances exceeds Five Million Dollars ($5,000,000.00).

**6.11 Further Assurances**. Execute any further instruments and take further action as Bank reasonably requests to perfect or continue Bank's Lien in the Collateral or to effect the purposes of this Agreement.

**6.12 Change in Business Location**. Provide at least thirty (30) days prior written notice to Bank: (1) add any new offices or business locations, including warehouses (unless such new offices or business locations contain less than One Hundred Thousand Dollars ($100,000.00) in Borrower's assets or property) or deliver any portion of the Collateral valued, individually or in the aggregate, in excess of One Hundred Thousand Dollars ($100,000.00) to a bailee at a location other than to a bailee and at a location already disclosed in the Perfection Certificate, (2) change its jurisdiction of organization, (3) change its organizational structure or type, (4) change its legal name, or (5) change any organizational number (if any) assigned by its jurisdiction of organization. If Borrower intends to deliver any portion of the Collateral valued, individually or in the aggregate, in excess of Five Hundred Thousand Dollars ($500,000.00) to a bailee, and Bank and such bailee are not already parties to a bailee agreement governing both the Collateral and the location to which Borrower intends to deliver the Collateral, then Borrower will first receive the written consent of Bank, and such bailee shall execute and deliver a bailee agreement in form and substance satisfactory to Bank.

7. <u>NEGATIVE COVENANTS</u>

Borrower shall not do any of the following without Bank's prior written consent:

7.1 **Dispositions**. Convey, sell, lease, transfer or otherwise dispose of (collectively "**Transfer**"), or permit any of its Subsidiaries to Transfer, all or any part of its business or property, except for:

(a) Transfers in the ordinary course of business for reasonably equivalent consideration;

(b) Transfers to Borrower or any of its Subsidiaries from Borrower or any of its Subsidiaries;

(c) Transfers of property to the extent such property is exchanged for credit against, or proceeds are promptly applied to, the purchase price of other property used or useful in the business of Borrower or its Subsidiaries;

(d) Transfers constituting non-exclusive licenses and similar arrangements for the use of the property of Borrower or its Subsidiaries in the ordinary course of business and other non-perpetual licenses that may be exclusive in some respects other than territory (and/or that may be exclusive as to territory only in discrete geographical areas outside of the United States), but that could not result in a legal transfer of Borrower's title in the licensed property;

(e) Transfers otherwise permitted by the Loan Documents;

(f) Transfers associated with the making or disposition of a Permitted Investment;

(g) Transfers in connection with the Permitted Acquisition of a portion of the assets or rights acquired; and

(h) Transfers of assets (other than Accounts, Inventory, and Intellectual Property), provided, that the aggregate book value of all such Transfers by Borrower and its Subsidiaries, together, shall not exceed in any fiscal year, One Hundred Fifty Thousand Dollars ($150,000.00).

7.2 **Changes in Business; Change in Control; Jurisdiction of Formation**. (a) Engage in or permit any of its Subsidiaries to engage in any business other than the businesses currently engaged in by Borrower and such Subsidiary, as applicable, or reasonably related thereto; (b) liquidate or dissolve; or (c) (i) fail to provide notice to Bank of any Key Person departing from or ceasing to be employed by Borrower within five (5) days after such Key Person's departure from Borrower; or (ii) permit or suffer any Change in Control.

7.3 **Mergers or Acquisitions.** Merge or consolidate, or permit any of its Subsidiaries to merge or consolidate, with any other Person, or acquire, or permit any of its Subsidiaries to acquire, all or substantially all of the capital stock or property of another Person (including, without limitation, by the formation of any Subsidiary), except for the Permitted Acquisitions. A Subsidiary may merge or consolidate into another Subsidiary or into Borrower.

7.4 **Indebtedness.** Create, incur, assume, or be liable for any Indebtedness, or permit any Subsidiary to do so, other than Permitted Indebtedness.

7.5 **Encumbrance.** Create, incur, allow, or suffer any Lien on any of its property, or assign or convey any right to receive income, including the sale of any Accounts, or permit any of its Subsidiaries to do so, except for Permitted Liens, permit any Collateral not to be subject to the first priority security interest granted herein, or enter into any agreement, document, instrument or other arrangement (except with or in favor of Bank) with any Person which directly or indirectly prohibits or has the effect of prohibiting Borrower or any Subsidiary from assigning, mortgaging, pledging, granting a security interest in or upon, or encumbering any of Borrower's or any Subsidiary's



---

Intellectual Property, except as is otherwise permitted in Section 7.1 hereof and the definition of "Permitted Liens" herein.

7.6 **Maintenance of Collateral Accounts.** Maintain any Collateral Account except pursuant to the terms of Section 6.6(b) hereof.

7.7 **Distributions; Investments.** (a) Pay any dividends or make any distribution or payment or redeem, retire or purchase any capital stock, other than Permitted Distributions; or (b) directly or indirectly make any Investment (including, without limitation, by the formation of any Subsidiary) other than Permitted Investments, or permit any of its Subsidiaries to do so.

7.8 **Transactions with Affiliates.** Directly or indirectly enter into or permit to exist any material transaction with any Affiliate of Borrower except for (a) transactions that are in the ordinary course of Borrower's business, upon fair and reasonable terms (when viewed in the context of any series of transactions of which it may be a part, if applicable) that are no less favorable to Borrower than would be obtained in an arm's length transaction with a non-affiliated Person; or (b) transactions

among Borrower and its Subsidiaries and among Borrower's Subsidiaries so long as no Event of Default exists or could result therefrom.

**7.9 Subordinated Debt.** Make or permit any payment on or amendments of any Subordinated Debt, except (a) payments pursuant to the terms of the Subordinated Debt; (b) payments made with Borrower's capital stock or other Subordinated Debt; or (c) other purchases or payments of Subordinated Debt, provided that the aggregate amount of such purchases or payments made pursuant to this clause (c) during the period commencing on the Effective Date and ending on the date of determination, when combined with distributions, dividends or purchases of Borrower's capital stock in cash during such period, shall not exceed One Hundred Fifty Thousand Dollars ($150,000.00) in the aggregate.

**7.10 Compliance.** Become an "investment company" or a company controlled by an "investment company", under the Investment Company Act of 1940, as amended, or undertake as one of its important activities extending credit to purchase or carry margin stock (as defined in Regulation U of the Board of Governors of the Federal Reserve System), or use the proceeds of any Credit Extension for that purpose; fail to (a) meet the minimum funding requirements of ERISA, (b) prevent a Reportable Event or Prohibited Transaction, as defined in ERISA, from occurring, or (c) comply with the Federal Fair Labor Standards Act, the failure of any of the conditions described in clauses (a) through (c) which could reasonably be expected to have a material adverse effect on Borrower's business; or violate any other law or regulation, if the violation could reasonably be expected to have a material adverse effect on Borrower's business, or permit any of its Subsidiaries to do so; withdraw or permit any Subsidiary to withdraw from participation in, permit partial or complete termination of, or permit the occurrence of any other event with respect to, any present pension, profit sharing and deferred compensation plan which could reasonably be expected to result in any liability of Borrower, including any liability to the Pension Benefit Guaranty Corporation or its successors or any other governmental agency.

## 8. EVENTS OF DEFAULT

Any one of the following shall constitute an event of default (an "**Event of Default**") under this Agreement:

**8.1 Payment Default.** Borrower fails to (a) make any payment of principal or interest on any Credit Extension when due, or (b) pay any other Obligations within three (3) Business Days after such Obligations are due and payable (which three (3) Business Day cure period shall not apply to payments due on the Maturity Date). During the cure period, the failure to make or pay any payment specified under clause (b) hereunder is not an Event of Default (but no Credit Extension will be made during the cure period);

**8.2 Covenant Default.**

(a) Borrower fails or neglects to perform any obligation in Sections 6.2, 6.4, 6.5, 6.6, 6.7, 6.8(b), 6.10 or 6.12, or violates any covenant in Section 7; or



(b) Borrower fails or neglects to perform, keep, or observe any other term, provision, condition, covenant or agreement contained in this Agreement or any Loan Documents, and as to any default (other than those specified in this Section 8) under such other term, provision, condition, covenant or agreement that can be cured, has failed to cure the default within ten (10) days after the occurrence thereof; provided, however, that if the default cannot by its nature be cured within the ten (10) day period or cannot after diligent attempts by Borrower be cured within such ten (10) day period, and such default is likely to be cured within a reasonable time, then Borrower shall have an additional period (which shall not in any case exceed thirty (30) days) to attempt to cure such default, and within such reasonable time period the failure to cure the default shall not be deemed an Event of Default (but no Credit Extensions shall be made during such cure period). Cure periods provided under this section shall not apply, among other things, to financial covenants or any other covenants set forth in clause (a) above;

**8.3 Material Adverse Change.** A Material Adverse Change occurs;

**8.4 Attachment; Levy; Restraint on Business.**

(a) (i) The service of process seeking to attach, by trustee or similar process, any funds of Borrower or of any entity under the control of Borrower (including a Subsidiary), or (ii) a notice of lien or levy is filed against any of Borrower's assets by any Governmental Authority, and the same under subclauses (i) and (ii) hereof are not, within ten (10) days after the occurrence thereof, discharged or stayed (whether through the posting of a bond or otherwise); provided, however, no Credit Extensions shall be made during any ten (10) day cure period; or

(b) (i) any material portion of Borrower's assets is attached, seized, levied on, or comes into possession of a trustee or receiver, or (ii) any court order enjoins, restrains, or prevents Borrower from conducting all or any material part of its business;

**8.5 Insolvency.** (a) Borrower is unable to pay its debts (including trade debts) as they become due or otherwise becomes insolvent; (b) Borrower begins an Insolvency Proceeding; or (c) an Insolvency Proceeding is begun against Borrower and is not dismissed or stayed within thirty (30) days (but no Credit Extensions shall be made while any of the conditions described in clause (a) exist and/or until any Insolvency Proceeding is dismissed);

**8.6 Other Agreements.** There is, under any agreement to which Borrower is a party with a third party or parties, (a) any default resulting in a right by such third party or parties, whether or not exercised, to accelerate the maturity of any Indebtedness in an amount individually or in the aggregate in excess of Five Hundred

Thousand Dollars ($500,000.00); or (b) any breach or default by Borrower, the result of which could have a material adverse effect on Borrower's business;

**8.7 Judgments; Penalties**. One or more fines, penalties or final judgments, orders or decrees for the payment of money in an amount, individually or in the aggregate, of at least Five Hundred Thousand Dollars ($500,000.00) (not covered by independent third-party insurance as to which liability has been accepted by such insurance carrier) shall be rendered against Borrower by any Governmental Authority, and the same are not, within ten (10) days after the entry, assessment or issuance thereof, discharged, satisfied, or paid, or after execution thereof, stayed or bonded pending appeal, or such judgments are not discharged prior to the expiration of any such stay (provided that no Credit Extensions will be made prior to the satisfaction, payment, discharge, stay, or bonding of such fine, penalty, judgment, order or decree);

**8.8 Misrepresentations**. Borrower or any Person acting for Borrower makes any representation, warranty, or other statement now or later in this Agreement, any Loan Document or in any writing delivered to Bank or to induce Bank to enter this Agreement or any Loan Document, and such representation, warranty, or other statement is incorrect in any material respect when made; or

**8.9 Subordinated Debt**. Any document, instrument, or agreement evidencing any Subordinated Debt shall for any reason be revoked or invalidated or otherwise cease to be in full force and effect, any Person shall be in breach thereof or contest in any manner the validity or enforceability thereof or deny that it has any further liability



or obligation thereunder, or the Obligations shall for any reason be subordinated or shall not have the priority contemplated by this Agreement.

## 9. BANK'S RIGHTS AND REMEDIES

**9.1 Rights and Remedies**. Upon the occurrence and during the continuance of an Event of Default, Bank may, without notice or demand, do any or all of the following:

(a) declare all Obligations immediately due and payable (but if an Event of Default described in Section 8.5 occurs all Obligations are immediately due and payable without any action by Bank);

(b) stop advancing money or extending credit for Borrower's benefit under this Agreement or under any other agreement between Borrower and Bank;

(c) demand that Borrower (i) deposit cash with Bank in an amount equal to at least (A) one hundred five percent (105.0%) of the Dollar Equivalent of the aggregate face amount of all Letters of Credit denominated in Dollars remaining undrawn, and (B) one hundred ten percent (110.0%) of the Dollar Equivalent of the aggregate face amount of all Letters of Credit denominated in a Foreign Currency remaining undrawn, (plus, in each case, all interest, fees, and costs due or to become due in connection therewith (as estimated by Bank in its good faith business judgment)), to secure all of the Obligations relating to such Letters of Credit, as collateral security for the repayment of any future drawings under such Letters of Credit, and Borrower shall forthwith deposit and pay such amounts, and (ii) pay in advance all letter of credit fees scheduled to be paid or payable over the remaining term of any Letters of Credit;

(d) terminate any FX Contracts;

(e) verify the amount of, demand payment of and performance under, and collect any Accounts and General Intangibles, settle or adjust disputes and claims directly with Account Debtors for amounts on terms and in any order that Bank considers advisable, and notify any Person owing Borrower money of Bank's security interest in such funds;

(f) make any payments and do any acts it considers necessary or reasonable to protect the Collateral and/or its security interest in the Collateral. Borrower shall assemble the Collateral if Bank requests and make it available as Bank designates. Bank may enter premises where the Collateral is located, take and maintain possession of any part of the Collateral, and pay, purchase, contest, or compromise any Lien which appears to be prior or superior to its security interest and pay all expenses incurred. Borrower grants Bank a license to enter and occupy any of its premises, without charge, to exercise any of Bank's rights or remedies;

(g) apply to the Obligations any (i) balances and deposits of Borrower it holds, or (ii) any amount held by Bank owing to or for the credit or the account of Borrower;

(h) ship, reclaim, recover, store, finish, maintain, repair, prepare for sale, advertise for sale, and sell the Collateral. Bank is hereby granted a non-exclusive, royalty-free license or other right to use, without charge, Borrower's labels, Patents, Copyrights, mask works, rights of use of any name, trade secrets, trade names, Trademarks, and advertising matter, or any similar property as it pertains to the Collateral, in completing production of, advertising for sale, and selling any Collateral and, in connection with Bank's exercise of its rights under this Section, Borrower's rights under all licenses and all franchise agreements inure to Bank's benefit;

(i) place a "hold" on any account maintained with Bank and/or deliver a notice of exclusive control, any entitlement order, or other directions or instructions pursuant to any Control Agreement or similar agreements providing control of any Collateral;

(j) demand and receive possession of Borrower's Books; and



---

(k) exercise all rights and remedies available to Bank under the Loan Documents or at law or equity, including all remedies provided under the Code (including disposal of the Collateral pursuant to the terms thereof).

**9.2 Power of Attorney**. Borrower hereby irrevocably appoints Bank as its lawful attorney-in-fact, exercisable upon the occurrence and during the continuance of an Event of Default, to: (a) endorse Borrower's name on any checks or other forms of payment or security; (b) sign Borrower's name on any invoice or bill of lading for any Account or drafts against Account Debtors; (c) settle and adjust disputes and claims about the Accounts directly with Account Debtors, for amounts and on terms Bank determines reasonable; (d) make, settle, and adjust all claims under Borrower's insurance policies; (e) pay, contest or settle any Lien, charge, encumbrance, security interest, and adverse claim in or to the Collateral, or any judgment based thereon, or otherwise take any action to terminate or discharge the same; and (f) transfer the Collateral into the name of Bank or a third party as the Code permits. Borrower hereby appoints Bank as its lawful attorney-in-fact to sign Borrower's name on any documents necessary to perfect or continue the perfection of Bank's security interest in the Collateral regardless of whether an Event of Default has occurred until all Obligations have been satisfied in full and Bank is under no further obligation to make Credit Extensions hereunder. Bank's foregoing appointment as Borrower's attorney in fact, and all of Bank's rights and powers, coupled with an interest, are irrevocable until all Obligations have been fully repaid and performed and Bank's obligation to provide Credit Extensions terminates.

**9.3 Protective Payments**. If Borrower fails to obtain the insurance called for by Section 6.5 or fails to pay any premium thereon or fails to pay any other amount which Borrower is obligated to pay under this Agreement or any other Loan Document or which may be required to preserve the Collateral, Bank may obtain such insurance or make such payment, and all amounts so paid by Bank are Bank Expenses and immediately due and payable, bearing interest at the then highest rate applicable to the Obligations, and secured by the Collateral. Bank will make reasonable efforts to provide Borrower with notice of Bank obtaining such insurance at the time it is obtained or within a reasonable time thereafter. No payments by Bank are deemed an agreement to make similar payments in the future or Bank's waiver of any Event of Default.

**9.4 Application of Payments and Proceeds Upon Default**. If an Event of Default has occurred and is continuing, Bank shall have the right to apply in any order any funds in its possession, whether from Borrower account balances, payments, proceeds realized as the result of any collection of Accounts or other disposition of the Collateral, or otherwise, to the Obligations. Bank shall pay any surplus to Borrower by credit to the Designated Deposit Account or to other Persons legally entitled thereto; Borrower shall remain liable to Bank for any deficiency. If Bank, directly or indirectly, enters into a deferred payment or other credit transaction with any purchaser at any sale of Collateral, Bank shall have the option, exercisable at any time, of either reducing the Obligations by the principal amount of the purchase price or deferring the reduction of the Obligations until the actual receipt by Bank of cash therefor.

**9.5 Bank's Liability for Collateral**. So long as Bank complies with reasonable banking practices regarding the safekeeping of the Collateral in the possession or under the control of Bank, Bank shall not be liable or responsible for: (a) the safekeeping of the Collateral; (b) any loss or damage to the Collateral; (c) any diminution in the value of the Collateral; or (d) any act or default of any carrier, warehouseman, bailee, or other Person. Borrower bears all risk of loss, damage or destruction of the Collateral.

**9.6 No Waiver; Remedies Cumulative**. Bank's failure, at any time or times, to require strict performance by Borrower of any provision of this Agreement or any other Loan Document shall not waive, affect, or diminish any right of Bank thereafter to demand strict performance and compliance herewith or therewith. No waiver hereunder shall be effective unless signed by the party granting the waiver and then is only effective for the specific instance and purpose for which it is given. Bank's rights and remedies under this Agreement and the other Loan Documents are cumulative. Bank has all rights and remedies provided under the Code, by law, or in equity. Bank's exercise of one right or remedy is not an election and shall not preclude Bank from exercising any other remedy under this Agreement or other remedy available at law or in equity, and Bank's waiver of any Event of Default is not a continuing waiver. Bank's delay in exercising any remedy is not a waiver, election, or acquiescence.



---

**9.7 Demand Waiver**. Borrower waives demand, notice of default or dishonor, notice of payment and nonpayment, notice of any default, nonpayment at maturity, release, compromise, settlement, extension, or renewal of accounts, documents, instruments, chattel paper, and guarantees held by Bank on which Borrower is liable.

**10. <u>NOTICES</u>**

All notices, consents, requests, approvals, demands, or other communication by any party to this Agreement or any other Loan Document must be in writing and shall be deemed to have been validly served, given, or delivered: (a) upon the earlier of actual receipt and three (3) Business Days after deposit in the U.S. mail, first class, registered or certified mail return receipt requested, with proper postage prepaid; (b) upon transmission, when sent by electronic mail or facsimile transmission; (c) one (1) Business Day after deposit with a reputable overnight courier with all charges prepaid; or (d) when delivered, if hand-delivered by messenger, all of which shall be addressed to the party to be notified and sent to the address, facsimile number, or email address indicated below. Bank or Borrower may change its mailing or electronic mail address or facsimile number by giving the other party written notice thereof in accordance with the terms of this Section 10.

| | |
|---|---|
| If to Borrower: | Control4 Corporation<br>11734 South Election Road, Suite 200<br>Draper, Utah 84020<br>Attn:<br>Fax:<br>Email: |
| If to Bank: | Silicon Valley Bank<br>2755 East Cottonwood Parkway, Suite 540<br>Salt Lake City, Utah 84121<br>Attn: Gary Jackson<br>Fax:<br>Email: gjackson@svb.com |
| with a copy to: | Riemer & Braunstein LLP<br>Three Center Plaza<br>Boston, Massachusetts 02108<br>Attn: David A. Ephraim, Esquire<br>Fax: (617) 692-3455<br>Email: DEphraim@riemerlaw.com |

**11. CHOICE OF LAW, VENUE, JURY TRIAL WAIVER, AND JUDICIAL REFERENCE**

California law governs the Loan Documents without regard to principles of conflicts of law. Borrower and Bank each submit to the exclusive jurisdiction of the State and Federal courts in Santa Clara County, California; provided, however, that nothing in this Agreement shall be deemed to operate to preclude Bank from bringing suit or taking other legal action in any other jurisdiction to realize on the Collateral or any other security for the Obligations, or to enforce a judgment or other court order in favor of Bank. Borrower expressly submits and consents in advance to such jurisdiction in any action or suit commenced in any such court, and Borrower hereby waives any objection that it may have based upon lack of personal jurisdiction, improper venue, or forum non conveniens and hereby consents to the granting of such legal or equitable relief as is deemed appropriate by such court. Borrower hereby waives personal service of the summons, complaints, and other process issued in such action or suit and agrees that service of such summons, complaints, and other process may be made by registered or certified mail addressed to Borrower at the address set forth in, or subsequently provided by Borrower in accordance with, Section 10 of this Agreement and that service so made shall be deemed completed upon the earlier to occur of Borrower's actual receipt thereof or three (3) days after deposit in the U.S. mails, proper postage prepaid.



---

**TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, BORROWER AND BANK EACH WAIVE THEIR RIGHT TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION ARISING OUT OF OR BASED UPON THIS AGREEMENT, THE LOAN DOCUMENTS OR ANY CONTEMPLATED TRANSACTION, INCLUDING CONTRACT, TORT, BREACH OF DUTY AND ALL OTHER CLAIMS. THIS WAIVER IS A MATERIAL INDUCEMENT FOR BOTH PARTIES TO ENTER INTO THIS AGREEMENT. EACH PARTY HAS REVIEWED THIS WAIVER WITH ITS COUNSEL.**

WITHOUT INTENDING IN ANY WAY TO LIMIT THE PARTIES' AGREEMENT TO WAIVE THEIR RESPECTIVE RIGHT TO A TRIAL BY JURY, if the above waiver of the right to a trial by jury is not enforceable, the parties hereto agree that any and all disputes or controversies of any nature between them arising at any time shall be decided by a reference to a private judge, mutually selected by the parties (or, if they cannot agree, by the Presiding Judge of the Santa Clara County, California Superior Court) appointed in accordance with California Code of Civil Procedure Section 638 (or pursuant to comparable provisions of federal law if the dispute falls within the exclusive jurisdiction of the federal courts), sitting without a jury, in Santa Clara County, California; and the parties hereby submit to the jurisdiction of such court. The reference proceedings shall be conducted pursuant to and in accordance with the provisions of California Code of Civil Procedure §§ 638 through 645.1, inclusive. The private judge shall have the power, among others, to grant provisional relief, including without limitation, entering temporary restraining orders, issuing preliminary and permanent injunctions and appointing receivers. All such proceedings shall be closed to the public and confidential and all records relating thereto shall be permanently sealed. If during the course of any dispute, a party desires to seek provisional relief, but a judge has not been appointed at that point pursuant to the judicial reference procedures, then such party may apply to the Santa Clara County, California Superior Court for such relief. The proceeding before the private judge shall be conducted in the same manner as it would be before a court under the rules of evidence applicable to judicial proceedings. The parties shall be entitled to discovery which shall be conducted in the same manner as it would be before a court under the rules of discovery applicable to judicial proceedings. The private judge shall oversee discovery and may enforce all discovery rules and orders applicable to judicial proceedings in the same manner as a trial court judge. The parties agree that the selected or appointed private judge shall have the power to decide all issues in the action or proceeding, whether of fact or of law, and shall report a statement of decision thereon pursuant to California Code of Civil Procedure § 644(a). Nothing in this paragraph shall limit the right of any party at any time to exercise self-help remedies, foreclose against collateral, or obtain provisional remedies. The private judge shall also determine all issues relating to the applicability, interpretation, and enforceability of this paragraph.

This Section 11 shall survive the termination of this Agreement.

**12. GENERAL PROVISIONS**

**12.1 Termination Prior to Maturity Date; Survival**. All covenants, representations and warranties made in this Agreement continue in full force until this Agreement has terminated pursuant to its terms and all Obligations have been satisfied. So long as Borrower has satisfied the Obligations (other than inchoate indemnity obligations, and any other obligations which, by their terms, are to survive the termination of this Agreement, and any Obligations under Bank Services Agreements that are cash collateralized in accordance with Section 4.1 of this Agreement), this Agreement may be terminated prior to the Maturity Date by Borrower, effective three (3) Business Days after written notice of termination is given to Bank. Those obligations that are expressly specified in this Agreement as surviving this Agreement's termination shall continue to survive notwithstanding this Agreement's termination.

**12.2 Successors and Assigns**. This Agreement binds and is for the benefit of the successors and permitted assigns of each party. Borrower may not assign this Agreement or any rights or obligations under it without Bank's prior written consent (which may be granted or withheld in Bank's discretion). Bank has the right, without the consent of or notice to Borrower, to sell, transfer, assign, negotiate, or grant participation in all or any part of, or any interest in, Bank's obligations, rights, and benefits under this Agreement and the other Loan Documents.

**12.3 Indemnification**. Borrower agrees to indemnify, defend and hold Bank and its directors, officers, employees, agents, attorneys, or any other Person affiliated with or representing Bank (each, an "**Indemnified Person**") harmless against: (i) all obligations, demands, claims, and liabilities (collectively, "**Claims**") claimed or



---

asserted by any other party in connection with the transactions contemplated by the Loan Documents; and (ii) all losses or expenses (including Bank Expenses) in any way suffered, incurred, or paid by such Indemnified Person as a result of, following from, consequential to, or arising from transactions between Bank and Borrower (including reasonable attorneys' fees and expenses), except for Claims and/or losses directly caused by such Indemnified Person's gross negligence or willful misconduct.

This Section 12.3 shall survive until all statutes of limitation with respect to the Claims, losses, and expenses for which indemnity is given shall have run.

**12.4 Time of Essence**. Time is of the essence for the performance of all Obligations in this Agreement.

**12.5 Severability of Provisions**. Each provision of this Agreement is severable from every other provision in determining the enforceability of any provision.

**12.6 Correction of Loan Documents**. Bank may correct patent errors and fill in any blanks in the Loan Documents consistent with the agreement of the parties.

**12.7 Amendments in Writing; Waiver; Integration**. No purported amendment or modification of any Loan Document, or waiver, discharge or termination of any obligation under any Loan Document, shall be enforceable or admissible unless, and only to the extent, expressly set forth in a writing signed by the party against which enforcement or admission is sought. Without limiting the generality of the foregoing, no oral promise or statement, nor any action, inaction, delay, failure to require performance or course of conduct shall operate as, or evidence, an amendment, supplement or waiver or have any other effect on any Loan Document. Any waiver granted shall be limited to the specific circumstance expressly described in it, and shall not apply to any subsequent or other circumstance, whether similar or dissimilar, or give rise to, or evidence, any obligation or commitment to grant any further waiver. The Loan Documents represent the entire agreement about this subject matter and supersede prior negotiations or agreements. All prior agreements, understandings, representations, warranties, and negotiations between the parties about the subject matter of the Loan Documents merge into the Loan Documents.

**12.8 Counterparts**. This Agreement may be executed in any number of counterparts and by different parties on separate counterparts, each of which, when executed and delivered, is an original, and all taken together, constitute one Agreement.

**12.9 Confidentiality**. In handling any confidential information, Bank shall exercise the same degree of care that it exercises for its own proprietary information, but disclosure of information may be made: (a) to Bank's Subsidiaries or Affiliates (such Subsidiaries and Affiliates, together with Bank, collectively, "**Bank Entities**"); (b) to prospective transferees or purchasers of any interest in the Credit Extensions (provided, however, Bank shall use its best efforts to obtain any prospective transferee's or purchaser's agreement to the terms of this provision); (c) as required by law, regulation, subpoena, or other order; (d) to Bank's regulators or as otherwise required in connection with Bank's examination or audit; (e) as Bank considers appropriate in exercising remedies under the Loan Documents; and (f) to third-party service providers of Bank so long as such service providers have executed a confidentiality agreement with Bank with terms no less restrictive than those contained herein. Confidential information does not include information that is either: (i) in the public domain or in Bank's possession when disclosed to Bank, or becomes part of the public domain (other than as a result of its disclosure by Bank in violation of this Agreement) after disclosure to Bank; or (ii) disclosed to Bank by a third party, if Bank does not know that the third party is prohibited from disclosing the information.

Bank Entities may use anonymous forms of confidential information for aggregate datasets, for analyses or reporting, and for any other uses not expressly prohibited in writing by Borrower. The provisions of the immediately preceding sentence shall survive termination of this Agreement.

**12.10 Right of Set Off.** Borrower hereby grants to Bank, a lien, security interest and right of set off as security for all Obligations to Bank, whether now existing or hereafter arising upon and against all deposits, credits, collateral and property, now or hereafter in the possession, custody, safekeeping or control of Bank or any entity



---

under the control of Bank (including a Bank subsidiary) or in transit to any of them. At any time after the occurrence and during the continuance of an Event of Default, without demand or notice, Bank may set off the same or any part thereof and apply the same to any liability or obligation of Borrower even though unmatured and regardless of the adequacy of any other collateral securing the Obligations. ANY AND ALL RIGHTS TO REQUIRE BANK TO EXERCISE ITS RIGHTS OR REMEDIES WITH RESPECT TO ANY OTHER COLLATERAL WHICH SECURES THE OBLIGATIONS, PRIOR TO EXERCISING ITS RIGHT OF SETOFF WITH RESPECT TO SUCH DEPOSITS, CREDITS OR OTHER PROPERTY OF BORROWER ARE HEREBY KNOWINGLY, VOLUNTARILY AND IRREVOCABLY WAIVED.

**12.11 Attorneys' Fees, Costs and Expenses**. In any action or proceeding between Borrower and Bank arising out of or relating to the Loan Documents, the prevailing party shall be entitled to recover its reasonable attorneys' fees and other costs and expenses incurred, in addition to any other relief to which it may be entitled.

**12.12 Electronic Execution of Documents**. The words "execution," "signed," "signature" and words of like import in any Loan Document shall be deemed to include electronic signatures or the keeping of records in electronic form, each of which shall be of the same legal effect, validity and enforceability as a manually executed signature or the use of a paper-based recordkeeping systems, as the case may be, to the extent and as provided for in any applicable law, including, without limitation, any state law based on the Uniform Electronic Transactions Act.

**12.13 Captions**. The headings used in this Agreement are for convenience only and shall not affect the interpretation of this Agreement.

**12.14 Construction of Agreement**. The parties mutually acknowledge that they and their attorneys have participated in the preparation and negotiation of this Agreement. In cases of uncertainty this Agreement shall be construed without regard to which of the parties caused the uncertainty to exist.

**12.15 Relationship**. The relationship of the parties to this Agreement is determined solely by the provisions of this Agreement. The parties do not intend to create any agency, partnership, joint venture, trust, fiduciary or other relationship with duties or incidents different from those of parties to an arm's-length contract.

**12.16 Third Parties**. Nothing in this Agreement, whether express or implied, is intended to: (a) confer any benefits, rights or remedies under or by reason of this Agreement on any persons other than the express parties to it and their respective permitted successors and assigns; (b) relieve or discharge the obligation or liability of any person not an express party to this Agreement; or (c) give any person not an express party to this Agreement any right of subrogation or action against any party to this Agreement.

**13. DEFINITIONS**

**13.1 Definitions**. As used in the Loan Documents, the word "shall" is mandatory, the word "may" is permissive, the word "or" is not exclusive, the words "includes" and "including" are not limiting, the singular includes the plural, and numbers denoting amounts that are set off in brackets are negative. As used in this Agreement, the following capitalized terms have the following meanings:

"**Account**" is any "account" as defined in the Code with such additions to such term as may hereafter be made, and includes, without limitation, all accounts receivable and other sums owing to Borrower.

"**Account Debtor**" is any "account debtor" as defined in the Code with such additions to such term as may hereafter be made.

"**Additional Costs**" is defined in Section 3.7(a).

"**Advance**" or "**Advances**" means a revolving credit loan (or revolving credit loans) under the Revolving Line.



---

"**Affiliate**" is, with respect to any Person, each other Person that owns or controls directly or indirectly the Person, any Person that controls or is controlled by or is under common control with the Person, and each of that Person's senior executive officers, directors, partners and, for any Person that is a limited liability company, that Person's managers and members.

"**Agreement**" is defined in the preamble hereof.

"**Anniversary Fee**" is defined in Section 2.4(b).

"**Audit**" is Bank's inspection of Borrower's Accounts, the Collateral, and Borrower's Books, in each case with results satisfactory to Bank in its sole and absolute discretion.

"**Audit Trigger Event**" means the date on which an Advance request has been made or Advances are outstanding, provided however that the Audit Trigger Event shall not include any Advance requests that are made or Advances that are outstanding within five (5) days prior to and within five (5) days after any fiscal quarter end of Borrower.

"**Authorized Signer**" is any individual listed in Borrower's Borrowing Resolution who is authorized to execute the Loan Documents, including any Notice of Borrowing or other Credit Extension request, on behalf of Borrower.

"**Availability Amount**" (a) the lesser of (i) the Revolving Line or (ii) the aggregate amount of (x) the amount available under the Borrowing Base, plus (y) the Non-Formula Amount minus (b) the outstanding principal balance of any Advances.

"**Bank**" is defined in the preamble hereof.

"**Bank Entities**" is defined in Section 12.9.

"**Bank Expenses**" are all audit fees and expenses, costs, and expenses (including reasonable attorneys' fees and expenses) for preparing, amending, negotiating, administering, defending and enforcing the Loan Documents (including, without limitation, those incurred in connection with appeals or Insolvency Proceedings) or otherwise incurred with respect to Borrower.

"**Bank Services**" are any products, credit services, and/or financial accommodations previously, now, or hereafter provided to Borrower or any of its Subsidiaries by Bank or any Bank Affiliate, including, without limitation, any letters of credit, cash management services (including, without limitation, merchant services, direct deposit of payroll, business credit cards, and check cashing services), interest rate swap arrangements, and foreign exchange services as any such products or services may be identified in Bank's various agreements related thereto (each, a "**Bank Services Agreement**").

"**Bank Services Agreement**" is defined in the definition of Bank Services.

"**Board**" is Borrower's board of directors.

"**Borrower**" is defined in the preamble hereof.

"**Borrower's Books**" are all Borrower's books and records including ledgers, federal and state tax returns, records regarding Borrower's assets or liabilities, the Collateral, business operations or financial condition, and all computer programs or storage or any equipment containing such information.

"**Borrowing Base**" is eighty percent (80.0%) of Eligible Accounts, as determined by Bank from Borrower's most recent Borrowing Base Certificate; provided, however, that Bank has the right to decrease the foregoing percentage in its good faith business judgment to mitigate the impact of events, conditions, contingencies, or risks which may adversely affect the Collateral or its value.



---

"**Borrowing Base Certificate**" is that certain certificate in the form attached hereto as Exhibit D.

"**Borrowing Base Report**" is defined in Section 6.2(a).

"**Borrowing Resolutions**" are, with respect to any Person, those resolutions adopted by such Person's board of directors (and, if required under the terms of such Person's Operating Documents, stockholders) and delivered by such Person to Bank approving the Loan Documents to which such Person is a party and the transactions contemplated thereby, together with a certificate executed by its secretary on behalf of such Person certifying (a) such Person has the authority to execute, deliver, and perform its obligations under each of the Loan Documents to which it is a party, (b) that set forth as a part of or attached as an exhibit to such certificate is a true, correct, and complete copy of the resolutions then in full force and effect authorizing and ratifying the execution, delivery, and performance by such Person of the Loan Documents to which it is a party, (c) the name(s) of the Person(s) authorized to execute the Loan Documents, including any Notice of Borrowing or other Credit Extension request, on behalf of such Person, together with a sample of the true signature(s) of such Person(s), and (d) that Bank may conclusively rely on such certificate unless and until such Person shall have delivered to Bank a further certificate canceling or amending such prior certificate.

"**Business Day**" is any day that is not a Saturday, Sunday or a day on which Bank is closed, and if any determination of a "Business Day" shall relate to an FX Contract, the term "Business Day" shall mean a day on which dealings are carried on in the country of settlement of the Foreign Currency.

"**Cash Equivalents**" means (a) marketable direct obligations issued or unconditionally guaranteed by the United States or any agency or any State thereof having maturities of not more than one (1) year from the date of acquisition; (b) commercial paper maturing no more than one (1) year after its creation and having the highest rating from either Standard & Poor's Ratings Group or Moody's Investors Service, Inc.; and (c) Bank's certificates of deposit issued maturing no more than one (1) year after issue.

"**Change in Control**" is a transaction in which any "person" or "group" (within the meaning of Section 13(d) and 14(d)(2) of the Securities Exchange Act of 1934, as amended) becomes the "beneficial owner" (as defined in Rule 13d-3 under the Securities Exchange Act of 1934, as amended), directly or indirectly, of greater than thirty-five percent (35%) of the shares of all classes of stock then outstanding of Borrower ordinarily entitled to vote in the election of directors.

"**Claims**" is defined in Section 12.3.

"**Code**" is the Uniform Commercial Code, as the same may, from time to time, be enacted and in effect in the State of California; provided, that, to the extent that the Code is used to define any term herein or in any Loan Document and such term is defined differently in different Articles or Divisions of the Code, the definition of such term contained in Article or Division 9 shall govern; provided further, that in the event that, by reason of mandatory provisions of law, any or all of the attachment, perfection, or priority of, or remedies with respect to, Bank's Lien on any Collateral is governed by the Uniform Commercial Code in effect in a jurisdiction other than the State of California, the term "**Code**" shall mean the Uniform Commercial Code as enacted and in effect in such other jurisdiction solely for purposes of the provisions thereof relating to such attachment, perfection, priority, or remedies and for purposes of definitions relating to such provisions.

"**Collateral**" is any and all properties, rights and assets of Borrower described on Exhibit A.

"**Collateral Account**" is any Deposit Account, Securities Account, or Commodity Account.

"**Compliance Certificate**" is that certain certificate in the form attached hereto as Exhibit E.

"**Contingent Obligation**" is, for any Person, any direct or indirect liability, contingent or not, of that Person for (a) any indebtedness, lease, dividend, letter of credit or other obligation of another such as an obligation, in each case, directly or indirectly guaranteed, endorsed, co-made, discounted or sold with recourse by that Person, or for which that Person is directly or indirectly liable; (b) any obligations for undrawn letters of credit for the



---

account of that Person; and (c) all obligations from any interest rate, currency or commodity swap agreement, interest rate cap or collar agreement, or other agreement or arrangement designated to protect a Person against fluctuation in interest rates, currency exchange rates or commodity prices; but "Contingent Obligation" does not include endorsements in the ordinary course of business. The amount of a Contingent Obligation is the stated or determined amount of the primary obligation for which the Contingent Obligation is made or, if not determinable, the maximum reasonably anticipated liability for it determined by the Person in good faith; but the amount may not exceed the maximum of the obligations under any guarantee or other support arrangement.

"**Continuation Date**" means any date on which Borrower continues a LIBOR Advance into another Interest Period.

"**Control Agreement**" is any control agreement entered into among the depository institution at which Borrower maintains a Deposit Account or the securities intermediary or commodity intermediary at which Borrower maintains a Securities Account or a Commodity Account, Borrower, and Bank pursuant to which Bank obtains control (within the meaning of the Code) over such Deposit Account, Securities Account, or Commodity Account.

"**Conversion Date**" means any date on which Borrower converts a Prime Rate Advance to a LIBOR Advance or a LIBOR Advance to a Prime Rate Advance.

"**Copyrights**" are any and all copyright rights, copyright applications, copyright registrations and like protections in each work of authorship and derivative work thereof, whether published or unpublished and whether or not the same also constitutes a trade secret.

"**Credit Extension**" is any Advance, Overadvance, Equipment Advance, the First Equipment Advance Loan, the Second Equipment Advance Loan, the Third Equipment Advance Loan, or any other extension of credit by Bank for Borrower's benefit.

"**Currency**" is coined money and such other banknotes or other paper money as are authorized by law and circulate as a medium of exchange.

"**Default Rate**" is defined in Section 2.3(e).

"**Deferred Revenue**" is all amounts received or invoiced in advance of performance under contracts and not yet recognized as revenue.

"**Deposit Account**" is any "deposit account" as defined in the Code with such additions to such term as may hereafter be made.

"**Designated Deposit Account**" is the multicurrency account denominated in Dollars, account number xxxxxx7276, maintained by Borrower with Bank.

"**Dollars**," "**dollars**" or use of the sign "$" means only lawful money of the United States and not any other currency, regardless of whether that currency uses the "$" sign to denote its currency or may be readily converted into lawful money of the United States.

"**Dollar Equivalent**" is, at any time, (a) with respect to any amount denominated in Dollars, such amount, and (b) with respect to any amount denominated in a Foreign Currency, the equivalent amount therefor in Dollars as determined by Bank at such time on the basis of the then-prevailing rate of exchange in San Francisco, California, for sales of the Foreign Currency for transfer to the country issuing such Foreign Currency.

"**Draw Period**" is the period of time from the Effective Date through the earlier to occur of (a) May 31, 2014, or (b) an Event of Default.

"**Effective Date**" is defined in the preamble hereof.



---

"**Eligible Accounts**" means Accounts which arise in the ordinary course of Borrower's business that meet all Borrower's representations and warranties in Section 5.3. Bank reserves the right at any time after the Effective Date to adjust any of the criteria set forth below and to establish new criteria in its good faith business judgment. Unless Bank otherwise agrees in writing, Eligible Accounts shall not include:

(a) Accounts for which the Account Debtor is Borrower's Affiliate, officer, employee, or agent;

(b) Accounts that the Account Debtor has not paid within ninety (90) days of invoice date (one hundred twenty (120) days for retail accounts with net sixty (60) day terms) regardless of invoice payment period terms;

(c) Accounts with credit balances over ninety (90) days (one hundred twenty (120) days for retail accounts with net sixty (60) day terms) from invoice date;

(d) Accounts owing from an Account Debtor if fifty percent (50%) or more of the Accounts owing from such Account Debtor have not been paid within ninety (90) days (one hundred twenty (120) days for retail accounts with net sixty (60) day terms) of invoice date;

(e) Accounts owing from an Account Debtor which does not have its principal place of business in the United States or Canada;

(f) Accounts billed from and/or payable to Borrower outside of the United States;

(g) Accounts owing from an Account Debtor to the extent that Borrower is indebted or obligated in any manner to the Account Debtor (as creditor, lessor, supplier or otherwise - sometimes called "contra" accounts, accounts payable, customer deposits or credit accounts);

(h) Accounts owing from an Account Debtor which is a United States government entity or any department, agency, or instrumentality thereof unless Borrower has assigned its payment rights to Bank and the assignment has been acknowledged under the Federal Assignment of Claims Act of 1940, as amended;

(i) Accounts for demonstration or promotional equipment, or in which goods are consigned, or sold on a "sale guaranteed", "sale or return", "sale on approval", or other terms if Account Debtor's payment may be conditional;

(j) Accounts owing from an Account Debtor where goods or services have not yet been rendered to the Account Debtor (sometimes called memo billings or pre-billings);

(k) Accounts subject to contractual arrangements between Borrower and an Account Debtor where payments shall be scheduled or due according to completion or fulfillment requirements where the Account Debtor has a right of offset for damages suffered as a result of Borrower's failure to perform in accordance with the contract (sometimes called contracts accounts receivable, progress billings, milestone billings, or fulfillment contracts);

(l) Accounts owing from an Account Debtor the amount of which may be subject to withholding based on the Account Debtor's satisfaction of Borrower's complete performance (but only to the extent of the amount withheld; sometimes called retainage billings);

(m) Accounts subject to trust provisions, subrogation rights of a bonding company, or a statutory trust;

(n) Accounts owing from an Account Debtor that has been invoiced for goods that have not been shipped to the Account Debtor unless Bank, Borrower, and the Account Debtor have entered into an agreement acceptable to Bank wherein the Account Debtor acknowledges that (i) it has title to and has ownership of the goods



---

wherever located, (ii) a bona fide sale of the goods has occurred, and (iii) it owes payment for such goods in accordance with invoices from Borrower (sometimes called "bill and hold" accounts);

(o) Accounts for which the Account Debtor has not been invoiced;

(p) Accounts that represent non-trade receivables or that are derived by means other than in the ordinary course of Borrower's business;

(q) Accounts for which Borrower has permitted Account Debtor's payment to extend beyond ninety (90) days (one hundred twenty (120) days for retail accounts with net sixty (60) day terms);

(r) Accounts arising from chargebacks, debit memos or other payment deductions taken by an Account Debtor;

(s) Accounts arising from product returns and/or exchanges (sometimes called "warranty" or "RMA" accounts);

(t) Accounts in which the Account Debtor disputes liability or makes any claim (but only up to the disputed or claimed amount), or if the Account Debtor is subject to an Insolvency Proceeding, or becomes insolvent, or goes out of business;

(u) Accounts owing from an Account Debtor with respect to which Borrower has received Deferred Revenue (but only to the extent of such Deferred Revenue);

(v) Accounts owing from an Account Debtor, whose total obligations to Borrower exceed twenty-five percent (25%) of all Accounts, for the amounts that exceed that percentage, unless Bank approves in writing; and

(w) Accounts for which Bank in its good faith business judgment determines collection to be doubtful, including, without limitation, accounts represented by "refreshed" or "recycled" invoices.

"**Eligible Equipment**" is the following to the extent it complies with all of Borrower's representations and warranties to Bank, is acceptable to Bank in all respects, is located at 11734 South Election Road, Suite 200, Draper, Utah 84040 or a location of Borrower in the United States as disclosed in the Perfection Certificate in effect as of the Effective Date or such other location of which Bank has approved in writing, and in each case is subject to a first priority Lien in favor of Bank: (a) general purpose equipment, and (b) Other Equipment.

"**Equipment**" is all "equipment" as defined in the Code with such additions to such term as may hereafter be made, and includes without limitation all machinery, fixtures, goods, vehicles (including motor vehicles and trailers), and any interest in any of the foregoing.

"**Equipment Advance**" and "**Equipment Advances**" are each defined in Section 2.1.2(a).

"**Equipment Line**" is an Equipment Advance or Equipment Advances in an aggregate amount of up to Two Million Seven Hundred Fifty Thousand Dollars ($2,750,000.00).

"**Equipment Maturity Date**" is November 1, 2017.

"**ERISA**" is the Employee Retirement Income Security Act of 1974, and its regulations.

"**Event of Default**" is defined in Section 8.

"**Exchange Act**" is the Securities Exchange Act of 1934, as amended.



---

"**Financed Equipment**" is all present and future Eligible Equipment in which Borrower has any interest which is financed by an Equipment Advance, the First Equipment Advance Loan, the Second Equipment Advance Loan, and/or the Third Equipment Advance Loan.

"**First Equipment Advance Loan**" is defined in Section 2.1.3(a).

"**First Equipment Advance Loan Payment**" is defined in Section 2.1.3(b).

"**First Equipment Maturity Date**" is December 1, 2013.

"**Foreign Currency**" means lawful money of a country other than the United States.

"**Funding Date**" is any date on which a Credit Extension is made to or for the account of Borrower which shall be a Business Day.

"**FX Contract**" is any foreign exchange contract by and between Borrower and Bank under which Borrower commits to purchase from or sell to Bank a specific amount of Foreign Currency on a specified date.

"**GAAP**" is generally accepted accounting principles set forth in the opinions and pronouncements of the Accounting Principles Board of the American Institute of

Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board or in such other statements by such other Person as may be approved by a significant segment of the accounting profession, which are applicable to the circumstances as of the date of determination.

"**General Intangibles**" is all "general intangibles" as defined in the Code in effect on the date hereof with such additions to such term as may hereafter be made, and includes without limitation, all Intellectual Property, claims, income and other tax refunds, security and other deposits, payment intangibles, contract rights, options to purchase or sell real or personal property, rights in all litigation presently or hereafter pending (whether in contract, tort or otherwise), insurance policies (including without limitation key man, property damage, and business interruption insurance), payments of insurance and rights to payment of any kind.

"**Governmental Approval**" is any consent, authorization, approval, order, license, franchise, permit, certificate, accreditation, registration, filing or notice, of, issued by, from or to, or other act by or in respect of, any Governmental Authority.

**"Governmental Authority"** is any nation or government, any state or other political subdivision thereof, any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative functions of or pertaining to government, any securities exchange and any self-regulatory organization.

"**Indebtedness**" is (a) indebtedness for borrowed money or the deferred price of property or services, such as reimbursement and other obligations for surety bonds and letters of credit, (b) obligations evidenced by notes, bonds, debentures or similar instruments, (c) capital lease obligations, and (d) Contingent Obligations.

"**Indemnified Person**" is defined in Section 12.3.

"**Insolvency Proceeding**" is any proceeding by or against any Person under the United States Bankruptcy Code, or any other bankruptcy or insolvency law, including assignments for the benefit of creditors, compositions, extensions generally with its creditors, or proceedings seeking reorganization, arrangement, or other relief.

"**Intellectual Property**" means, with respect to any Person, all of such Person's right, title, and interest in and to the following:

(a) its Copyrights, Trademarks and Patents;



---

(b) any and all trade secrets and trade secret rights, including, without limitation, any rights to unpatented inventions, know-how, operating manuals;

(c) any and all source code;

(d) any and all design rights which may be available to such Person;

(e) any and all claims for damages by way of past, present and future infringement of any of the foregoing, with the right, but not the obligation, to sue for and collect such damages for said use or infringement of the Intellectual Property rights identified above; and

(f) all amendments, renewals and extensions of any of the Copyrights, Trademarks or Patents.

"**Interest Payment Date**" means, with respect to any LIBOR Advance, the last day of each Interest Period applicable to such LIBOR Advance and, with respect to Prime Rate Advances, the first day of each month (or, if that day of the month does not fall on a Business Day, then on the first Business Day following such date), and each date a Prime Rate Advance is converted into a LIBOR Advance to the extent of the amount converted to a LIBOR Advance.

"**Interest Period**" means, as to any LIBOR Advance, the period commencing on the date of such LIBOR Advance, or on the conversion/continuation date on which the LIBOR Advance is converted into or continued as a LIBOR Advance, and ending on the date that is one, two, or three months thereafter, in each case as Borrower may elect in the applicable Notice of Borrowing or Notice of Conversion/Continuation; provided, however, that (a) no Interest Period with respect to any LIBOR Advance shall end later than the Revolving Line Maturity Date, (b) the last day of an Interest Period shall be determined in accordance with the practices of the LIBOR interbank market as from time to time in effect, (c) if any Interest Period would otherwise end on a day that is not a Business Day, that Interest Period shall be extended to the following Business Day unless, in the case of a LIBOR Advance, the result of such extension would be to carry such Interest Period into another calendar month, in which event such Interest Period shall end on the preceding Business Day, (d) any Interest Period pertaining to a LIBOR Advance that begins on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the calendar month at the end of such Interest Period) shall end on the last Business Day of the calendar month at the end of such Interest Period, and (e) interest shall accrue from and include the first Business Day of an Interest Period but exclude the last Business Day of such Interest Period.

"**Interest Rate Determination Date**" means each date for calculating the LIBOR for purposes of determining the interest rate in respect of an Interest Period. The Interest Rate Determination Date shall be the second Business Day prior to the first day of the related Interest Period for a LIBOR Advance.

"**Inventory**" is all "inventory" as defined in the Code in effect on the date hereof with such additions to such term as may hereafter be made, and includes without limitation all merchandise, raw materials, parts, supplies, packing and shipping materials, work in process and finished products, including without limitation such

inventory as is temporarily out of Borrower's custody or possession or in transit and including any returned goods and any documents of title representing any of the above.

"**Investment**" is any beneficial ownership interest in any Person (including stock, partnership interest or other securities), and any loan, advance or capital contribution to any Person.

"**Key Person**" is each of Borrower's (a) Chief Executive Officer, who is Martin Plaehn as of the Effective Date, and (b) Chief Financial Officer, who is Dan Strong as of the Effective Date.

"**Letter of Credit**" is a standby or commercial letter of credit issued by Bank upon request of Borrower based upon an application, guarantee, indemnity, or similar agreement.



---

"**LIBOR**" means, for any Interest Rate Determination Date with respect to an Interest Period for any Advance to be made, continued as or converted into a LIBOR Advance, the rate of interest per annum determined by Bank to be the per annum rate of interest at which deposits in Dollars are offered to Bank in the London interbank market (rounded upward, if necessary, to the nearest 0.0001%) in which Bank customarily participates at 11:00 a.m. (local time in such interbank market) two (2) Business Days prior to the first day of such Interest Period for a period approximately equal to such Interest Period and in an amount approximately equal to the amount of such Advance.

"**LIBOR Advance**" means an Advance that bears interest based at the LIBOR Rate.

"**LIBOR Rate**" means, for each Interest Period in respect of LIBOR Advances comprising part of the same Advances, an interest rate *per annum* (rounded upward, if necessary, to the nearest 0.0001%) equal to LIBOR for such Interest Period *divided by* one (1) *minus* the Reserve Requirement for such Interest Period.

"**LIBOR Rate Margin**" is two and one half of one percent (2.50%).

"**Lien**" is a claim, mortgage, deed of trust, levy, charge, pledge, security interest or other encumbrance of any kind, whether voluntarily incurred or arising by operation of law or otherwise against any property.

"**Loan Documents**" are, collectively, this Agreement and any schedules, exhibits, certificates, notices, and any other documents related to this Agreement, the Perfection Certificate, any Bank Services Agreement, any subordination agreement, any note, or notes or guaranties executed by Borrower, and any other present or future agreement by Borrower with or for the benefit of Bank in connection with this Agreement or Bank Services, all as amended, restated, or otherwise modified.

"**Material Adverse Change**" is (a) a material impairment in the perfection or priority of Bank's Lien in the Collateral or in the value of such Collateral; (b) a material adverse change in the business, operations, or condition (financial or otherwise) of Borrower; (c) a material impairment of the prospect of repayment of any portion of the Obligations; or (d) Bank determines, based upon information available to it and in its reasonable judgment, that there is a reasonable likelihood that Borrower shall fail to comply with one or more of the financial covenants in Section 6 during the next succeeding financial reporting period.

"**Maturity Date**" is the Revolving Line Maturity Date, Equipment Maturity Date, First Equipment Maturity Date, Second Equipment Maturity Date, and Third Equipment Maturity Date, as applicable.

"**Monthly Financial Statements**" is defined in Section 6.2(c).

"**Net Income**" means, as calculated on a consolidated basis for Borrower and its Subsidiaries for any period as at any date of determination, the net profit (or loss), after provision for taxes, of Borrower and its Subsidiaries for such period taken as a single accounting period.

"**Non-Formula Amount**" is an Advance or Advances under the Revolving Line in an amount of up to Five Million Dollars ($5,000,000.00).

"**Notice of Borrowing**" means a notice given by Borrower to Bank in accordance with Section 3.4, substantially in the form of Exhibit B, with appropriate insertions.

"**Notice of Conversion/Continuation**" means a notice given by Borrower to Bank in accordance with Section 3.2, substantially in the form of Exhibit C, with appropriate insertions.

"**Obligations**" are Borrower's obligations to pay when due any debts, principal, interest, fees, Bank Expenses, the Anniversary Fee, the Unused Revolving Line Facility Fee, and other amounts Borrower owes Bank now or later, whether under this Agreement, the other Loan Documents, or otherwise, including, without limitation, any interest accruing after Insolvency Proceedings begin and debts, liabilities, or obligations of Borrower assigned to Bank, and to perform Borrower's duties under the Loan Documents.



---

"**Operating Documents**" are, for any Person, such Person's formation documents, as certified by the Secretary of State (or equivalent agency) of such Person's jurisdiction of organization on a date that is no earlier than thirty (30) days prior to the Effective Date, and, (a) if such Person is a corporation, its bylaws in current form, (b) if such Person is a limited liability company, its limited liability company agreement (or similar agreement), and (c) if such Person is a partnership, its partnership agreement (or similar agreement), each of the foregoing with all current amendments or modifications thereto.

"**Other Equipment**" is tooling, computer software, and other similar property and soft costs approved by Bank, including taxes, shipping, warranty charges, freight discounts and installation expenses.

"**Overadvance**" is defined in Section 2.2.

"**Parent**" is defined in Section 3.7(b).

"**Patents**" means all patents, patent applications and like protections including without limitation improvements, divisions, continuations, renewals, reissues, extensions and continuations-in-part of the same.

"**Payment/Advance Form**" is that certain form attached hereto as Exhibit F.

"**Payment Date**" is the first (1st) calendar day of each month.

"**Perfection Certificate**" is defined in Section 5.1.

"**Permitted Acquisitions**" means the acquisition by Borrower of all or substantially all of the assets of another company or companies (collectively, the "**Target**"), provided that (a) Target is engaged in a similar line of business as Borrower both prior to and after giving effect to such acquisition, (b) such acquisition is non-hostile in nature, (c) no Event of Default has occurred and is continuing or would exist after giving effect to such acquisition, (d) Borrower provides evidence to Bank acceptable to Bank in its sole and absolute discretion that Borrower is and shall be in compliance with the terms of this Agreement both prior to and after giving effect to such acquisition, (e) such acquisition is consummated within a reasonable amount of time, as determined by Bank in its sole and absolute discretion, (f) Borrower provides evidence to Bank, acceptable to Bank in its sole and absolute discretion, that immediately before giving effect to such acquisition, that Borrower shall have unrestricted and unencumbered cash in accounts with Bank or Bank's Affiliates in an amount of at least Eight Million Dollars ($8,000,000.00) and Borrower shall provide evidence to Bank, acceptable to Bank in its sole and absolute discretion, that immediately after giving effect to such acquisition, that Borrower shall have unrestricted and unencumbered cash in accounts with Bank or Bank's Affiliates in an amount of at least Eight Million Dollars ($8,000,000.00), (g) within thirty (30) days after giving effect to such acquisition, upon request of Bank, Borrower shall (i) cause Target to become a co-borrower hereunder and provide to Bank such appropriate financing statements and/or Control Agreements, all in form and substance satisfactory to Bank (including being sufficient to grant Bank a first priority Lien (subject to Permitted Liens) in and to the assets of Target), (ii) provide to Bank appropriate certificates and powers and financing statements, pledging all of the direct or beneficial ownership interest in Target, in form and substance satisfactory to Bank, and (iii) provide to Bank all other documentation in form and substance satisfactory to Bank, including one or more opinions of counsel satisfactory to Bank, which in its opinion is appropriate with respect to the execution and delivery of the applicable documentation referred to above, (h) Borrower remains a separate legal entity following the transactions in connection with and contemplated by such acquisition, (i) prior to the consummation of such acquisition, Borrower delivers to Bank evidence that the assets of Target are free and clear of all Liens, and (j) no Indebtedness, other than Permitted Indebtedness, shall be assumed or incurred by Borrower in connection with such acquisition.

"**Permitted Distributions**" means:

(a) purchases of capital stock from former employees, consultants and directors pursuant to repurchase agreements or other similar agreements in an aggregate amount not to exceed One Hundred Fifty Thousand Dollars ($150,000.00) in any fiscal year provided that at the time of such purchase no Event of Default has occurred and is continuing;



---

(b) distributions or dividends consisting solely of Borrower's capital stock;

(c) purchases for value of any rights distributed in connection with any stockholder rights plan;

(d) purchases of capital stock or options to acquire such capital stock with the proceeds received from a substantially concurrent issuance of capital stock or convertible securities;

(e) purchases of capital stock pledged as collateral for loans to employees;

(f) purchases of capital stock in connection with the exercise of stock options or stock appreciation rights by way of cashless exercise or in connection with the satisfaction of withholding tax obligations; and

(g) purchases of fractional shares of capital stock arising out of stock dividends, splits or combinations or business combinations.

"**Permitted Indebtedness**" is:

(a) Borrower's Indebtedness to Bank under this Agreement or any other Loan Document;

(b) (i) any Indebtedness that does not exceed Five Hundred Thousand Dollars ($500,000.00) in principal amount existing on the Effective Date, and (ii) any Indebtedness in excess of Five Hundred Thousand Dollars ($500,000.00) in principal amount existing on the Effective Date and shown on the Perfection Certificate;

(c) Subordinated Debt;

(d) unsecured Indebtedness to trade creditors and with respect to surety bonds and similar obligations incurred in the ordinary course of business;

(e) Indebtedness incurred as a result of endorsing negotiable instruments received in the ordinary course of business;

(f) Indebtedness between Borrower and any of its Subsidiaries or among any of Borrower's Subsidiaries;

(g) capitalized leases and purchase money Indebtedness not to exceed Two Hundred Fifty Thousand Dollars ($250,000.00) in the aggregate in any fiscal year secured by Permitted Liens; and

(h) refinanced Permitted Indebtedness, provided that the amount of such Indebtedness is not increased except by an amount equal to a reasonable premium or other reasonable amount paid in connection with such refinancing and by an amount equal to any existing, but unutilized, commitment thereunder.

"**Permitted Investments**" are:

(a) Investments existing on the Effective Date;

(b) (i) marketable direct obligations issued or unconditionally guaranteed by the United States or its agencies or any State maturing within 1 year from its acquisition, (ii) commercial paper maturing no more than 2 years after its creation and having the highest rating from either Standard & Poor's Corporation or Moody's Investors Service, Inc., and (iii) Bank's certificates of deposit maturing no more than 2 years after issue;

(c) Investments approved by the Borrower's Board of Directors or otherwise pursuant to a Board-approved investment policy;

(d) Investments in or to Borrower or any of its Subsidiaries in each case for current ordinary necessary operating expenses;



---

(e) Investments consisting of Collateral Accounts in the name of Borrower so long as Bank has a first priority, perfected security interest in such Collateral Accounts;

(f) Investments consisting of extensions of credit to Borrower's or its Subsidiaries' customers in the nature of accounts receivable, prepaid royalties or notes receivable arising from the sale or lease of goods, provision of services or licensing activities of Borrower;

(g) Investments received in satisfaction or partial satisfaction of obligations owed by financially troubled obligors;

(h) Investments acquired in exchange for any other Investments in connection with or as a result of a bankruptcy, workout, reorganization or recapitalization;

(i) Investments acquired as a result of a foreclosure with respect to any secured Investment;

(j) Investments consisting of loans and advances to employees in an aggregate amount not to exceed One Hundred Fifty Thousand Dollars ($150,000.00); and

(k) other Investments, if, on the date of incurring any Investments pursuant to this clause (l), the outstanding aggregate amount of all Investments incurred pursuant to this clause (l) does not exceed One Hundred Fifty Thousand Dollars ($150,000.00).

"**Permitted Liens**" are:

(a) (i) Liens securing Permitted Indebtedness described under clause (b) of the definition of "Permitted Indebtedness" or (ii) Liens arising under this

Agreement or other Loan Documents;

(b) Liens for taxes, fees, assessments or other government charges or levies, either not delinquent or being contested in good faith and for which Borrower maintains adequate reserves on its Books, provided that no notice of any such Lien has been filed or recorded under the Internal Revenue Code of 1986, as amended, and the Treasury Regulations adopted thereunder;

(c) Liens (including with respect to capital leases) (i) on property (including accessions, additions, parts, replacements, fixtures, improvements and attachments thereto, and the proceeds thereof) acquired or held by Borrower or its Subsidiaries incurred for financing such property (including accessions, additions, parts, replacements, fixtures, improvements and attachments thereto, and the proceeds thereof) other than Accounts, Inventory, and Financed Equipment, or (ii) existing on property (and accessions, additions, parts, replacements, fixtures, improvements and attachments thereto, and the proceeds thereof) when acquired other than Accounts, Inventory, and Financed Equipment, if the Lien is confined to such property (including accessions, additions, parts, replacements, fixtures, improvements and attachments thereto, and the proceeds thereof);

(d) Liens incurred in the extension, renewal or refinancing of the indebtedness secured by Liens described in (a) through (c), but any extension, renewal or replacement Lien must be limited to the property encumbered by the existing Lien and the principal amount of the indebtedness it secures may not increase;

(e) leases or subleases of real property granted in the ordinary course of business, and leases, subleases, non-exclusive licenses or sublicenses of property (other than real property or intellectual property) granted in the ordinary course of Borrower's business, if the leases, subleases, licenses and sublicenses do not prohibit granting Bank a security interest;

(f) non-exclusive license of intellectual property granted to third parties in the ordinary course of business, and licenses of intellectual property that could not result in a legal transfer of title of the licensed property that may be exclusive in respects other than territory and that may be exclusive as to territory only as to discrete geographical areas outside of the United States;



---

(g) leases or subleases granted in the ordinary course of Borrower's business, including in connection with Borrower's leased premises or leased property;

(h) Liens in favor of custom and revenue authorities arising as a matter of law to secure the payment of custom duties in connection with the importation of goods;

(i) Liens on insurance proceeds securing the payment of financed insurance premiums;

(j) Liens on assets acquired in mergers and acquisitions not prohibited by Section 7 of this Agreement;

(k) Liens arising from attachments or judgments, orders, or decrees in circumstances not constituting an Event of Default under Sections 8.4 and 8.7;

(l) Liens in favor of other financial institutions arising in connection with Borrower's deposit or securities accounts held at such institutions so long as Bank has a first priority, perfected security interest in such deposit or securities accounts;

(m) Liens of carriers, warehousemen, suppliers, or other Persons that are possessory in nature arising in the ordinary course of business so long as such Liens attach only to Inventory, securing liabilities in the aggregate amount not to exceed One Hundred Fifty Thousand Dollars ($150,000.00) and which are not delinquent or remain payable without penalty or which are being contested in good faith and by appropriate proceedings which proceedings have the effect of preventing the forfeiture or sale of the property subject thereto;

(n) Liens to secure payment of workers' compensation, employment insurance, old-age pensions, social security and other like obligations incurred in the ordinary course of business (other than Liens imposed by ERISA);

(o) deposits to secure the performance of bids, trade contracts (other than for borrowed money), contracts for the purchase of property, leases, statutory obligations, surety and appeal bonds, performance bonds and other obligations of a like nature, in each case, incurred in the ordinary course of business and not representing an obligation for borrowed money; and

(p) Liens not otherwise permitted, provided that (i) the amount of all such Liens is not in excess of One Hundred Fifty Thousand Dollars ($150,000.00) (with any such Lien valued as the amount of the obligation secured by such Lien) and (ii) such Liens are subordinate in priority to Bank's Lien hereunder.

"**Person**" is any individual, sole proprietorship, partnership, limited liability company, joint venture, company, trust, unincorporated organization, association, corporation, institution, public benefit corporation, firm, joint stock company, estate, entity or government agency.

"**Prime Rate**" is the rate of interest per annum from time to time published in the money rates section of The Wall Street Journal or any successor publication thereto as the "prime rate" then in effect; provided that if such rate of interest, as set forth from time to time in the money rates section of The Wall Street Journal,

becomes unavailable for any reason as determined by Bank, the "Prime Rate" shall mean the rate of interest per annum announced by Bank as its prime rate in effect at its principal office in the State of California (such Bank announced Prime Rate not being intended to be the lowest rate of interest charged by Bank in connection with extensions of credit to debtors).

"**Prime Rate Advance**" means an Advance that bears interest based at the Prime Rate.

"**Prior Agreement**" is defined in the preamble hereof.

"**Registered Organization**" is any "registered organization" as defined in the Code with such additions to such term as may hereafter be made.



---

"**Regulatory Change**" means, with respect to Bank, any change on or after the date of this Agreement in United States federal, state, or foreign laws or regulations, including Regulation D, or the adoption or making on or after such date of any interpretations, directives, or requests applying to a class of lenders including Bank, of or under any United States federal or state, or any foreign laws or regulations (whether or not having the force of law) by any court or governmental or monetary authority charged with the interpretation or administration thereof.

"**Requirement of Law**" is as to any Person, the organizational or governing documents of such Person, and any law (statutory or common), treaty, rule or regulation or determination of an arbitrator or a court or other Governmental Authority, in each case applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject.

"**Reserve Requirement**" means, for any Interest Period, the average maximum rate at which reserves (including any marginal, supplemental, or emergency reserves) are required to be maintained during such Interest Period under Regulation D against "Eurocurrency liabilities" (as such term is used in Regulation D) by member banks of the Federal Reserve System. Without limiting the effect of the foregoing, the Reserve Requirement shall reflect any other reserves required to be maintained by Bank by reason of any Regulatory Change against (a) any category of liabilities which includes deposits by reference to which the LIBOR Rate is to be determined as provided in the definition of LIBOR or (b) any category of extensions of credit or other assets which include Advances.

"**Responsible Officer**" is any of the Chief Executive Officer, Vice President of Finance, and Chief Financial Officer of Borrower.

"**Restricted License**" is any material license or other agreement with respect to which Borrower is the licensee (a) that prohibits or otherwise restricts Borrower from granting a security interest in Borrower's interest in such license or agreement or any other property, or (b) for which a default under or termination of could interfere with the Bank's right to sell any Collateral.

"**Revolving Line**" is an aggregate principal amount equal to Thirteen Million Dollars ($13,000,000.00).

"**Revolving Line Maturity Date**" is May 29, 2015.

"**SEC**" shall mean the Securities and Exchange Commission, any successor thereto, and any analogous Governmental Authority.

"**Second Equipment Advance Loan**" is defined in Section 2.1.4(a).

"**Second Equipment Advance Loan Payment**" is defined in Section 2.1.4(b).

"**Second Equipment Maturity Date**" is September 1, 2015.

"**Securities Account**" is any "securities account" as defined in the Code with such additions to such term as may hereafter be made.

"**Subordinated Debt**" is indebtedness incurred by Borrower subordinated to all of Borrower's now or hereafter indebtedness to Bank (pursuant to a subordination, intercreditor, or other similar agreement in form and substance satisfactory to Bank entered into between Bank and the other creditor), on terms acceptable to Bank.

"**Subsidiary**" is, as to any Person, a corporation, partnership, limited liability company or other entity of which shares of stock or other ownership interests having ordinary voting power (other than stock or such other ownership interests having such power only by reason of the happening of a contingency) to elect a majority of the board of directors or other managers of such corporation, partnership or other entity are at the time owned, or the management of which is otherwise controlled, directly or indirectly through one or more intermediaries, or both, by such Person. Unless the context otherwise requires, each reference to a Subsidiary herein shall be a reference to a Subsidiary of Borrower.



---

"**Tangible Net Worth**" is, on any date, the consolidated total assets of Borrower and its Subsidiaries minus (a) any amounts attributable to (i) goodwill, (ii) intangible items including unamortized debt discount and expense, Patents, Trademarks, Copyrights, and research and development expenses except prepaid expenses, (iii) notes, accounts receivable and other obligations owing to Borrower from its officers or other Affiliates, and (iv) reserves not already deducted from assets, minus (b) Total Liabilities, plus (c) Subordinated Debt.

"**Target**" is defined in the definition of "Permitted Acquisition."

"**Testing Quarter**" is any quarter with respect to which Bank has tested Borrower's Net Income to determine whether Borrower is in compliance with the Tangible Net Worth financial covenant set forth in Section 6.7(b).

"**Third Equipment Advance Loan**" is defined in Section 2.1.5(a).

"**Third Equipment Advance Loan Payment**" is defined in Section 2.1.5(b).

"**Third Equipment Maturity Date**" is November 1, 2016.

"**Total Liabilities**" is on any day, obligations that should, under GAAP, be classified as liabilities on Borrower's consolidated balance sheet, including all Indebtedness, but excluding Subordinated Debt.

"**Trademarks**" means any trademark and servicemark rights, whether registered or not, applications to register and registrations of the same and like protections, and the entire goodwill of the business of Borrower connected with and symbolized by such trademarks.

"**Transfer**" is defined in Section 7.1.

"**Unused Revolving Line Facility Fee**" is defined in Section 2.4(d).

[Signature page follows.]



---

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be executed as of the Effective Date.

BORROWER:

CONTROL4 CORPORATION

By /s/ Dan Strong
Name: Dan Strong
Title: CFO

BANK:

SILICON VALLEY BANK

By /s/ Jayson Davis
Name: Jayson Davis
Title: Vice President

Signature Page to Loan and Security Agreement

---

## EXHIBIT A — COLLATERAL DESCRIPTION

The Collateral consists of all of Borrower's right, title and interest in and to the following personal property:

All goods, Accounts (including health-care receivables), Equipment, Inventory, contract rights or rights to payment of money, leases, license agreements, franchise agreements, General Intangibles (except as provided below), commercial tort claims, documents, instruments (including any promissory notes), chattel paper (whether tangible or electronic), cash, deposit accounts, certificates of deposit, fixtures, letters of credit rights (whether or not the letter of credit is evidenced by a writing),

securities, and all other investment property, supporting obligations, and financial assets, whether now owned or hereafter acquired, wherever located; and

all Borrower's Books relating to the foregoing, and any and all claims, rights and interests in any of the above and all substitutions for, additions, attachments, accessories, accessions and improvements to and replacements, products, proceeds and insurance proceeds of any or all of the foregoing.

Notwithstanding the foregoing, the Collateral does not include any Intellectual Property; provided, however, the Collateral shall include all Accounts and all proceeds of Intellectual Property. If a judicial authority (including a U.S. Bankruptcy Court) would hold that a security interest in the underlying Intellectual Property is necessary to have a security interest in such Accounts and such property that are proceeds of Intellectual Property, then the Collateral shall automatically, and effective as of the Effective Date, include the Intellectual Property to the extent necessary to permit perfection of Bank's security interest in such Accounts and such other property of Borrower that are proceeds of the Intellectual Property.

Pursuant to the terms of a certain negative pledge arrangement with Bank, Borrower has agreed not to encumber any of its Intellectual Property without Bank's prior written consent.



---

**EXHIBIT B**

**FORM OF NOTICE OF BORROWING**

**CONTROL 4 CORPORATION**

Date: ______________________

To: Silicon Valley Bank
3003 Tasman Drive
Santa Clara, CA 95054
Attention: Corporate Services Department

RE: Amended and Restated Loan and Security Agreement dated as of , 2013 (as amended, modified, supplemented or restated from time to time, the "*Loan Agreement*"), by and between **SILICON VALLEY BANK**, a California corporation with a loan production office located at 2755 East Cottonwood Parkway, Suite 540, Salt Lake City, Utah 84121 ("*Bank*"), and **CONTROL 4 CORPORATION**, a Delaware corporation ("*Borrower*")

Ladies and Gentlemen:

The undersigned refers to the Loan Agreement, the terms defined therein and used herein as so defined, and hereby gives you notice irrevocably, pursuant to Section 3.4 of the Loan Agreement, of the borrowing of an Advance.

1. The Funding Date(1), which shall be a Business Day, of the requested borrowing is .

2. The aggregate amount of the requested Advance is $ .

3. The requested Advance shall consist of $ of Prime Rate Advances and $ of LIBOR Advances.

4. The duration of the Interest Period for the LIBOR Advances included in the requested Advance shall be months.

The undersigned hereby certifies that the following statements are true on the date hereof, and will be true on the date of the proposed Advance before and after giving effect thereto, and to the application of the proceeds therefrom, as applicable:

(a) all representations and warranties of Borrower contained in the Loan Agreement are true, accurate and complete in all material respects as of the date hereof; provided, however, that such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality in the text thereof; and provided, further that those representations and warranties expressly referring to a specific date shall be true, accurate and complete in all material respects as of such date;

(b) no Event of Default has occurred and is continuing, or would result from such proposed Advance; and

(c) the requested Advance will not cause the aggregate principal amount of the outstanding Advances to exceed, as of the designated Funding Date, the Availability Amount.

(1) Advance requests for LIBOR Advances must be submitted by 12:00 pm Pacific time at least three (3) Business Days prior to Funding Date. Advance requests for Prime Rate Advances must be submitted by 12:00 pm Pacific time on the Funding Date.



---

**BORROWER:**

**CONTROL 4 CORPORATION**

By: ______________________________

Name: ______________________________

Title: ______________________________

*For internal Bank use only*

| LIBOR Pricing Date | LIBOR | LIBOR Variance | Maturity Date |
|---|---|---|---|
| | | % | |



---

**EXHIBIT C**

**FORM OF NOTICE OF CONVERSION/CONTINUATION**

**CONTROL 4 CORPORATION**

Date: ______________________________

To: Silicon Valley Bank
3003 Tasman Drive
Santa Clara, CA 95054
Attention: Corporate Services Department

RE: Amended and Restated Loan and Security Agreement dated as of ________, 2013 (as amended, modified, supplemented or restated from time to time, the "*Loan Agreement*"), by and between **SILICON VALLEY BANK**, a California corporation with a loan production office located at 2755 East Cottonwood Parkway, Suite 540, Salt Lake City, Utah 84121 ("*Bank*"), and **CONTROL 4 CORPORATION**, a Delaware corporation ("*Borrower*")

Ladies and Gentlemen:

The undersigned refers to the Loan Agreement, the terms defined therein being used herein as therein defined, and hereby gives you notice irrevocably, pursuant to Section 3.4 of the Loan Agreement, of the [conversion] [continuation] of the Advances specified herein, that:

1. The date of the [conversion] [continuation] is ________________, 20___.

2. The aggregate amount of the proposed Advances to be [converted] is $____________ or [continued] is $____________.

3. The Advances are to be [converted into] [continued as] [LIBOR] [Prime Rate] Advances.

4. The duration of the Interest Period for the LIBOR Advances included in the [conversion] [continuation] shall be _____ months.

The undersigned, on behalf of Borrower, hereby certifies that the following statements are true on the date hereof, and will be true on the date of the proposed [conversion] [continuation], before and after giving effect thereto and to the application of the proceeds therefrom:

(a) all representations and warranties of Borrower stated in the Loan Agreement are true, accurate and complete in all material respects as of the date hereof; provided, however, that such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified

by materiality in the text thereof; and provided, further that those representations and warranties expressly referring to a specific date shall be true, accurate and complete in all material respects as of such date;

(b) no Event of Default has occurred and is continuing, or would result from such proposed [conversion] [continuation]; and

(c) the requested [conversion] [continuation] will not cause the aggregate principal amount of the outstanding Advances to exceed, as of the designated Funding Date, the Availability Amount.

1

---

**BORROWER:**

**CONTROL 4 CORPORATION**

By: ____________________________

Name: ____________________________

Title: ____________________________

*For internal Bank use only*

| LIBOR Pricing Date | LIBOR | LIBOR Variance | Maturity Date |
|---|---|---|---|
| | | % | |

2

---

## EXHIBIT D - BORROWING BASE CERTIFICATE

Borrower: Control4 Corporation
Lender: Silicon Valley Bank
Commitment Amount: $13,000,000.00

| | | |
|---|---|---|
| ACCOUNTS RECEIVABLE | | |
| 1 | Accounts Receivable (invoiced) Book Value as of | $ |
| 2 | Additions (Please explain on next page) | $ |
| 3 | Less: Intercompany / Employee / Non-Trade Accounts | $ |
| 4 | NET TRADE ACCOUNTS RECEIVABLE | $ |
| ACCOUNTS RECEIVABLE DEDUCTIONS (without duplication) | | |
| 5 | 90 Days Past Invoice Date (120 days for retail accounts with net 60 day terms) | $ |
| 6 | Credit Balances over 90 Days (120 days for retail accounts with net 60 day terms) | $ |
| 7 | Balance of 50% over 90 Day (120 days for retail accounts with net 60 day terms) Accounts (Cross-Age or Current Affected) | $ |
| 8 | Foreign Account Debtor Accounts | $ |
| 9 | Foreign Invoiced and/or Collected Accounts | $ |
| 10 | Contra / Customer Deposit Accounts | $ |
| 11 | U.S. Government Accounts | $ |
| 12 | Promotion or Demo Accounts; Guaranteed Sale or Consignment Sale Accounts | $ |
| 13 | Accounts with Memo or Pre-Billings | $ |
| 14 | Contract Accounts; Accounts with Progress / Milestone Billings | $ |
| 15 | Accounts for Retainage Billings | $ |
| 16 | Trust / Bonded Accounts | $ |
| 17 | Bill and Hold Accounts | $ |
| 18 | Unbilled Accounts | $ |
| 19 | Non-Trade Accounts (If not already deducted above) | $ |

| | | | |
|---|---|---|---|
| 20 | Accounts with Extended Term Invoices (Net 90+ (120+ for retail accounts with net 60 day terms)) | $ | |
| 21 | Chargebacks Accounts / Debit Memos | $ | |
| 22 | Product Returns / Exchanges | $ | |
| 23 | Disputed Accounts; Insolvent Account Debtor Accounts | $ | |
| 24 | Deferred Revenue, if applicable / Other (Please explain on next page) | $ | |
| 25 | Concentration Limits | $ | |
| 26 | TOTAL ACCOUNTS RECEIVABLE DEDUCTIONS | $ | |
| | | | |
| 27 | Eligible Accounts (#4 minus #26) | $ | |
| 28 | ELIGIBLE AMOUNT OF ACCOUNTS (80 of #27) | $ | |
| | | | |
| 29 | NON-FORMULA AMOUNT | $ | 5,000,000.00 |
| | | | |
| BALANCES | | | |
| 30 | Maximum Loan Amount | $ | 13,000,000.00 |
| 31 | Total Funds Available (Lesser of #30 or (#28 plus #29)) | $ | |
| 32 | Present balance owing on Line of Credit | $ | |
| 33 | RESERVE POSITION (#31 minus #32) | $ | |

[Continued on following page.]



---

Explanatory comments from previous page:

*The undersigned represents and warrants that this is true, complete and correct, and that the information in this Borrowing Base Certificate complies with the representations and warranties in the Loan and Security Agreement between the undersigned and Silicon Valley Bank.*

| | |
|---|---|
| | **BANK USE ONLY** |
| COMMENTS: | Received by: ______________________ |
| | AUTHORIZED SIGNER |
| CONTROL4 CORPORATION | Date: ______________________ |
| | Verified: ______________________ |
| By: ______________________ | AUTHORIZED SIGNER |
| Authorized Signer | Date: ______________________ |
| Date: ______________________ | Compliance Status: Yes No |



---

**<u>EXHIBIT E</u>**

**<u>COMPLIANCE CERTIFICATE</u>**

TO: SILICON VALLEY BANK Date: ______________________

FROM: CONTROL4 CORPORATION

The undersigned authorized officer of CONTROL4 CORPORATION ("Borrower") certifies that under the terms and conditions of the Loan and Security Agreement between Borrower and Bank (the "Agreement"):

(1) Borrower is in complete compliance for the period ending with all required covenants except as noted below; (2) there are no Events of Default; (3) all representations and warranties in the Agreement are true and correct in all material respects on this date except as noted below; provided, however, that such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality in the text thereof; and provided, further that those representations and warranties expressly referring to a specific date shall be true, accurate and complete in all material respects as of such date;

(4) Borrower, and each of its Subsidiaries, has timely filed all required tax returns and reports, and Borrower has timely paid all foreign, federal, state and local taxes, assessments, deposits and contributions owed by Borrower except as otherwise permitted pursuant to the terms of Section 5.9 of the Agreement; and (5) no Liens have been levied or claims made against Borrower or any of its Subsidiaries relating to unpaid employee payroll or benefits of which Borrower has not previously provided written notification to Bank.

Attached are the required documents supporting the certification. The undersigned certifies that these are prepared in accordance with GAAP consistently applied from one period to the next except as explained in an accompanying letter or footnotes. The undersigned acknowledges that no borrowings may be requested at any time or date of determination that Borrower is not in compliance with any of the terms of the Agreement, and that compliance is determined not just at the date this certificate is delivered. Capitalized terms used but not otherwise defined herein shall have the meanings given them in the Agreement.

**Please indicate compliance status by circling Yes/No under "Complies" column.**

| Reporting Covenants | Required | Complies |
|---|---|---|
| Monthly financial statements with Compliance Certificate | Monthly within 30 days | Yes No |
| Annual financial statement (CPA Audited) | FYE within 180 days | Yes No |
| 10-Q, 10-K and 8-K | Within 5 days after filing with SEC | Yes No |
| Borrowing Base Certificate, A/R & A/P Agings | Monthly within 30 days | Yes No |
| Board-approved projections | Within 30 days prior to FYE | Yes No |

| Financial Covenants | Required | Actual | Complies |
|---|---|---|---|
| Maintain at all times (reported monthly) | | | |
| Liquidity | 1.50:1.0 | :1.0 | Yes No |
| Tangible Net Worth | * | :1.0 | Yes No |

**As set forth in Section 6.7(b)*

The following financial covenant analyses and information set forth in Schedule 1 attached hereto are true and accurate as of the date of this Certificate.

**Other Matters**

| | | |
|---|---|---|
| Have there been any amendments of or other changes to the capitalization table of Borrower and to the Operating Documents of Borrower or any of its Subsidiaries? If yes, provide copies of any such amendments or changes with this Compliance Certificate. | Yes | No |



The following are the exceptions with respect to the certification above: (If no exceptions exist, state "No exceptions to note.")

| CONTROL4 CORPORATION | **BANK USE ONLY** |
|---|---|
| By: ______________________ | Received by: ______________________ AUTHORIZED SIGNER |
| Name: ______________________ | Date: ______________________ |
| Title: ______________________ | Verified: ______________________ AUTHORIZED SIGNER |
| | Date: ______________________ |

Compliance Status: Yes No



**Schedule 1 to Compliance Certificate**

**Financial Covenants of Borrower**

In the event of a conflict between this Schedule and the Loan Agreement, the terms of the Loan Agreement shall govern.

Dated: ______________________________

I. **Liquidity Coverage** (Section 6.7(a))

Required: 1.50:1.0

Actual: :1.0

| | | |
|---|---|---|
| A. | Aggregate value of Borrower's unrestricted and unencumbered cash at Bank | $ |
| B. | Aggregate value of Borrower's Eligible Accounts | $ |
| C. | Sum of Line A plus Line B | $ |
| D. | Aggregate amount of outstanding Obligations of Borrower to Bank | $ |
| E. | Liquidity Coverage (line C divided by line D) | |

Is line E equal to or greater than 1.50:1:00?

☐ No, not in compliance ☐ Yes, in compliance

I. **Tangible Net Worth** (Section 6.7(b))

Required: A Tangible Net Worth of at least the sum of (i) Thirteen Million Five Hundred Thirty-Eight Thousand Dollars ($13,538,000.00), plus (ii) fifty percent (50.0%) of Borrower's Net Income as of the last day of each Testing Quarter, plus (ii) twenty-five percent (25.0%) of all net cash consideration received by Borrower on or after the Effective Date from the issuance and sale by Borrower of its equity securities and/or Subordinated Debt, in each case with investors acceptable to Bank.

Actual: $

☐ No, not in compliance ☐ Yes, in compliance



**EXHIBIT F — LOAN PAYMENT/ADVANCE REQUEST FORM**

**DEADLINE FOR SAME DAY PROCESSING IS NOON PACIFIC TIME***

Fax To: Date: ______________

**LOAN PAYMENT:** CONTROL4 CORPORATION

From Account # ______________________________ (Deposit Account #) To Account # ______________ (Loan Account #)

Principal $ and/or Interest $

Authorized Signature: ______________________ Phone Number: ________

Print Name/Title: ______________________

**LOAN ADVANCE:**

Complete *Outgoing Wire Request* section below if all or a portion of the funds from this loan advance are for an outgoing wire.

From Account # ______________________ (Loan Account #) To Account # ______________________ (Deposit Account #)

Amount of Advance $ ____________

All Borrower's representations and warranties in the Loan and Security Agreement are true, correct and complete in all material respects on the date of the request for an advance; provided, however, that such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality in the text thereof; and provided, further that those representations and warranties expressly referring to a specific date shall be true, accurate and complete in all material respects as of such date:

Authorized Signature: ______________________ Phone Number: ________

Print Name/Title: ______________________

**OUTGOING WIRE REQUEST:**

**Complete only if all or a portion of funds from the loan advance above is to be wired.**

Deadline for same day processing is noon, Pacific Time

Beneficiary Name: ______________________ Amount of Wire: $ ________

Beneficiary Bank: ______________________ Account Number: ________

City and State: ______________________

Beneficiary Bank Transit (ABA) #: ________ Beneficiary Bank Code (Swift, Sort, Chip, etc.): ________

**(For International Wire Only)**

Intermediary Bank: ______________________ Transit (ABA) #: ________

For Further Credit to: ______________________

Special Instruction: ______________________

*By signing below, I (we) acknowledge and agree that my (our) funds transfer request shall be processed in accordance with and subject to the terms and conditions set forth in the agreements(s) covering funds transfer service(s), which agreements(s) were previously received and executed by me (us).*

Authorized Signature: ______________________ 2nd Signature (if required): ________

Print Name/Title: ______________________ Print Name/Title: ________

Telephone #: ______________________ Telephone #: ________

* Unless otherwise provided for an Advance bearing interest at LIBOR.



---

**Exhibit 10.12**

**LEASE**

**BETWEEN**

**WDCI, INC.**

**A HAWAII CORPORATION**

**AND**

**CONTROL 4 CORPORATION,**

**A DELAWARE CORPORATION**

**FOR THE PREMISES LOCATED AT**

**BROADBENT CENTENNIAL PLAZA**

**SALT LAKE CITY, UTAH**

**DATED: JUNE , 2004**

---

## INDUSTRIAL LEASE

THIS LEASE is made this 29th day of June, 2004, by and between **WDCI, INC.**, a Hawaii corporation ("Landlord") and Control4 Corporation, a Delaware corporation ("Tenant"):

1. BASIC TERMS.

1.01 Basic Terms.

(A) Landlord: **WDCI, INC.**, a Hawaii corporation.

(B) Tenant: Control4 Corporation, a Delaware corporation.

(C) Address of Tenant: 3612 West 1820 South, Salt Lake City, Utah 84104

(D) Premises: 15,000 square feet of space in the industrial building located at 3612 West 1820 South, Salt Lake City, Utah, which Premises are outlined on Exhibit A attached hereto for the purposes of identification.

(E) Parking Stalls: 9 common stalls in front of the Premises, and additional non-exclusive overflow parking located on the north side of buildings #1 and #2

(F) Building: The Building in which the Premises are located.

(G) Project: A warehouse complex including all improvements and appurtenances thereto known as "Centennial Plaza" and located in Salt Lake City, Utah, such complex depicted and described on Exhibit A attached hereto.

(H) Lease Commencement: September 1, 2004

(I) Lease Term: Three (3) Years

(J) Rent: All sums, moneys, or payments are required to be paid by Tenant to Landlord pursuant to the terms of this Lease, including Sections 5, 21.01, 21.02, and 21.03.

(K) Base Rent: Base Rent shall be in accordance with the following schedule:

| Months | Monthly Base Rent |
|---|---|
| 1 | $ 0.00 |
| 2-12 | $ 3,900.00 |
| 13-24 | $ 4,050.00 |
| 25-36 | $ 4,200.00 |

(L) Security Deposit: $8,400.00

(M) Tenant's Proportionate Share: 6.15%.

(N) Estimated Initial Monthly Common Expenses: $650.00

(O) Estimated Initial Monthly Real Estate Tax Charge: $562.50

(P) Permitted Use: General office and warehouse use.

1.02 Effect of Reference to Basic Terms. Effect of Reference to Basic Terms. Each reference in this Lease to any of the Basic Terms contained in Section 1.01 shall be construed to incorporate into such reference the respective definition for such Basic Term set forth in Section 1.01 above.

2. PREMISES.

2.01 Lease. In consideration of the rents, covenants, agreements, and conditions hereinafter provided to be paid, kept, performed, and observed, Landlord leases to Tenant and Tenant hereby hires from Landlord the Premises described in Section 1.01D.

2.02 Reservations by Landlord. Landlord excepts and reserves the roof and exterior walls of the Building, and further reserves the right to place, install, maintain, carry through, repair, and replace such utility lines, pipes, wires, appliances, tunneling, and the like in, over, through, and upon the Premises as may be reasonably necessary or advisable for the servicing of the Premises or any other portions of the Project.

Notwithstanding any provision in this Lease to the contrary, it is agreed that Landlord reserves the right, without invalidating this Lease or modifying any provision thereof, at any time, and from time to time, (i) to make alterations changes, and additions to the Building and other improvements in the Project (including, without limitation, the Building in which the Premises are located), (ii) to add additional areas and buildings to the Project and/or to exclude areas therefrom, (iii) to construct additional buildings and other improvements in the Project, (iv) to remove or relocate the whole or any part of any building or other improvement in the Project, and (v) to relocate any other tenant in the Project. It is further understood that the existing layout of the buildings, walks, roadways, parking areas, entrances, exits, and other improvements shall not be deemed to be a warranty, representation, or agreement on the part of Landlord that the Project shall remain exactly as presently built, it being understood and agreed that Landlord may change the number, dimensions, and locations of the walks, buildings, and parking spaces as Landlord shall deem proper.

3. USE.

The Premises hereby leased shall be used by Tenant for the purpose specified in Section 1.01N and for no other purposes. Landlord makes no representation to Tenant that the use limited in this Section 3 constitutes a lawful use under applicable zoning regulations, or that the lawful uses for the Premises as of the date of this Lease shall not change during the Lease Term. Tenant shall, at its own expense, comply promptly with all applicable statutes, ordinances, rules, regulations, orders, and requirements in effect during the Term or any part of the Term hereof regulating the use by Tenant or condition of the Premises. Tenant shall not use or permit the use of the Premises in any manner that will tend to create waste or a nuisance, or which will tend to unreasonably disturb other tenants in the Project. Tenant shall not place a load upon the floor of the Building which exceeds that load per square foot which such floor was designed to carry or which is allowed by law. Tenant, its employees, and all persons visiting or doing business with



Tenant in the Premises shall be bound by and shall observe the Rules and Regulations attached to this Lease as Exhibit B, and such further and other reasonable Rules and Regulations made hereafter by Landlord relating to the Project or the Premises, of which notice in writing shall be given to Tenant, and all such Rules and Regulations shall be deemed to be incorporated into and form a part of this Lease. Tenant shall be solely responsible for providing security for the Premises, and for Tenant, its agents, employees, contractors, customers, invitees, and others within the Premises. Landlord shall have no responsibility therefor.

4. TERM.

4.01 Term of Lease. To have and to hold the leased Premises for and during the" Lease Term described in Section 1.01G, commencing on the Commencement Date (defined in Section 4.02 below), subject to the payment of the Rent and the full and timely performance by Tenant of the covenants and conditions hereinafter set forth.

4.02 Commencement Date. As used in this Lease, the term "Commencement Date" shall mean the date the Premises are Ready for Occupancy (as defined in Section 4.04 below). If the Commencement Date occurs on other than the first day of a month, Tenant shall pay Base Rent at the same monthly rate for such partial month (also in advance), any periods for rent adjustments shall be measured from the first day of the calendar month in which the Commencement Date falls and all other terms and conditions of this Lease shall be in force and effect during such partial month. As soon as the Commencement Date is established Landlord and Tenant shall execute a Commencement Date Memorandum in the form of attached Exhibit C, which may be requested by either party, setting forth the exact Commencement Date and the Expiration Date to provide for the full term referenced in Section 1.01G from the Commencement Date. Notwithstanding anything contained in this Section 4.02 to the contrary, it is understood and agreed that at such time as Tenant occupies all or any portion of the Premises for the purposes permitted or allowed in this Lease, its Rental obligation shall commence.

4.03 Landlords Work. Landlord agrees to perform the work described in Exhibit D hereto ("Landlords Work"). Other than Landlord's Work, Landlord shall have no obligation for the completion or repair of the Premises and Tenant shall accept the Premises in its "as is" condition on the date Landlord delivers possession of the Premises to Tenant in accordance with the provisions of this Lease.

4.04 Ready for Occupancy; Delay in Delivery. Landlord shall deliver and Tenant shall accept possession of the Premises at such time as the Premises is Ready for Occupancy. If the Premises, or any portion, is not "Ready for Occupancy" on the Commencement Date, Rent and other sums owing under this Lease attributable to the Premises shall not commence until the Premises is Ready for Occupancy. The postponement of Rent and other sums herein provided to be paid by Tenant attributable to such space for any period prior to the delivery to Tenant of such space Ready for Occupancy shall be in full settlement of all claims which Tenant might otherwise have by reason of such space not being Ready for Occupancy on the Commencement Date. "Ready for Occupancy" as used herein shall mean the date that Landlord shall have substantially completed Landlord's Work, subject only to the completion of "punch list" items of a minor nature. The issuance of a temporary certificate of occupancy for such space (or its



equivalent), or certification by Landlord's contractor, architect or space planner verifying substantial completion of Landlord's Work shall conclusively control the date upon which the space is Ready for Occupancy and the commencement of Tenant's obligation to pay Rent. In the event Tenant's acts or omission delay the completion of Landlord's Work, Landlord's Work shall be deemed Ready for Occupancy on the date Landlord's Work would have been substantially completed in the absence of Tenants acts or omission that caused the delay. Notwithstanding anything in the foregoing to the contrary, should Landlord fail to have the Premises Ready for Occupancy within one hundred eighty (180) days after the date of this Lease (such date extended if failure to have the Premises Ready for Occupancy is due to Force Majeure, as referenced in Section 14), then Tenant shall have the option to terminate this Lease upon written notice (which shall be delivered if at all within thirty (30) days after the date Tenant is entitled to terminate the Lease pursuant to this Section and if not timely delivered, then Tenant's termination right shall lapse), the effective date of termination to be at least thirty (30) days after the date of delivery of Tenant's notice; provided, however, should Landlord have the Premises Ready for Occupancy prior to the date set forth in Tenant's notice then such termination notice shall be of no force and effect and this Lease shall continue in full force and effect between the parties. In the event this Lease is terminated as provided immediately above, then neither Landlord nor Tenant shall have any claim or obligation to the other by reason of this Lease or the termination thereof.

4.05 Early Possession. Tenant shall be permitted to enter the Premises after the later of (i) full execution and delivery of this Lease or (ii) the vacation of the Premises by the existing tenant, and prior to the Commencement Date without the obligation for payment of rent for the purpose of installing fixtures and equipment; provided that (a) Tenant will not interfere with Landlord's construction of the Landlord's Work, (b) Tenant first provides Landlord with all insurance required by the terms of this Lease, and (c) all construction by Tenant shall be performed in accordance with the terms of this Lease. Without limiting any other provision of this Lease, Landlord shall not be responsible for damages or loss to any work performed by Tenant or to Tenant's personal property or the personal property of Tenant's contractor's, employees or agents which occurs during such period of early access.

5. BASE RENT.

Tenant agrees to pay Landlord the Base Rent set out in Section 1.01I for the full Term. The first full monthly installment of Base Rent shall be payable upon the execution of this Lease by Tenant. Thereafter, each succeeding monthly installment shall be due and payable on or before the first day of each and every successive calendar month during the Term. In the event the Term of this Lease ends on a date other than the last day of a month, the last monthly payment of Base Rent shall be in a pro rata portion of the then applicable Base Rent for such partial month based on the number of days in such partial month prior to and including the last day of the Term of this Lease.

The Base Rent and all other Rent or other charges provided for herein shall be paid to Landlord without deduction or offset, and in lawful money of the United States of America to such persons and at such place as Landlord may from time to time designate in writing. For purposes of rent adjustment under the Lease, the number of months is measured from the first day of the calendar month in which the Commencement Date falls. Landlord and Tenant agree



for tax reporting purposes that none of the Base Rent due in periods in which the Base Rent is not being abated shall be allocated to any other period.

6. UTILITIES AND SERVICES.

Tenant shall contract in its own name and pay for all charges for water, sewer, electricity, gas, fuel, telephone, trash hauling, and any other services or utilities used in, servicing, or assessed against the Premises, unless otherwise herein expressly provided.

7. QUIET ENJOYMENT.

Landlord covenants that Tenant, on paying the Rent herein provided, and on keeping, performing, and observing the covenants, agreements, and conditions herein required of Tenant, shall peaceably and quietly hold and enjoy the Premises for the Term aforesaid, subject, however, to the terms of this Lease.

8. ASSIGNMENT AND SUBLETTING.

8.01 No Assignments. Except as expressly permitted in this paragraph, Tenant shall not, without the prior written consent of Landlord, assign or hypothecate this Lease or any interest herein or sublet the Premises or any part thereof, or permit the use of the Premises by any party other than Tenant. Any of the foregoing acts without such consent shall be void and shall, at the option of Landlord, terminate this Lease. This Lease shall not, nor shall any interest herein, be assignable as to the interest of Tenant by operation of law without the written consent of Landlord, which consent shall not be unreasonably withheld. A transfer of a majority interest or control of the stock or capital or member interest of Tenant shall be deemed an assignment under this Lease requiring Landlord's consent.

8.02 Limits on Subletting. No sublease shall be made without the prior written consent of Landlord, which consent Landlord agrees will not unreasonably be withheld. If at any time or from time to time during the term of this Lease, Tenant desires to sublet all or any part of the Premises, Tenant shall give notice to Landlord setting forth the terms of the proposed subletting and the space so proposed to be sublet and such additional information concerning the subtenant as Landlord may request, including, without limitation, the name of the proposed subtenant; the nature of the proposed subtenant's business to be carried on in the Premises; the terms and provisions of the proposed sublease and a copy of the proposed sublease form; and such financial information, including financial statements, as Landlord reasonably may request concerning the proposed subtenant. Landlord shall have the option, exercisable by notice given to Tenant within ninety (90) days after Tenant's notice is given, either to sublet from Tenant such space at the rental and other terms set forth in Tenant's notice, or, if the proposed subletting is for the entire Premises and for the substantial balance of the Term of this Lease, to terminate this Lease. If Landlord does not elect to terminate and has consented to such sublease, Tenant shall be free to sublet such space to any third party subject to the following conditions:

1. The sublease shall be on the same terms set forth in the notice given to Landlord;



---

2. No sublease shall be valid and no sublessee shall take possession of the Premises subleased until an executed counterpart of such sublease has been delivered to Landlord;

3. No sublessee shall have a right further to sublet; and

4. One hundred percent (100%) of any sums or other economic consideration received by Tenant as a result of such subletting (excluding brokerage commissions amortized over the term of the sublease and rental or other payments received by Tenant which are attributable to the amortization of the costs of leasehold improvements, other than building standard tenant improvements, made by Tenant to the sublet portion of the Premises) whether denominated as rentals under the sublease or otherwise and which exceed, in the aggregate, the total sums which Tenant is obligated to pay Landlord under this Lease (prorated to reflect Tenant's obligation to pay rent under this Lease allocable to that portion of the Premises subject to such sublease) shall be payable to Landlord.

8.03 Permitted Assignment/Subletting. Notwithstanding the provisions of Sections 8.01 and 8.02 above, Tenant may assign this Lease or sublet the Premises or any portion thereof, without Landlord's consent and without extending any option to Landlord, to any corporation which controls, is controlled by or is under common control with Tenant, or to any corporation resulting from the merger or consolidation with Tenant, or to any person or entity which acquires all the assets of Tenant provided that said assignee (i) assumes each and every obligation of Tenant under this Lease and (ii) such assignee has a tangible net worth that equals or exceeds Tenant's tangible net worth on the date of this Lease or on the date of the transfer, whichever is greater.

8.04 Tenant Not Released. Regardless of Landlord's consent, no subletting or assignment shall release Tenant or Tenant's obligations hereunder or alter the primary liability of Tenant to pay the Rent and to perform all other obligations to be performed by Tenant hereunder. The acceptance of Rent by Landlord from any other person shall not be deemed to be a waiver by Landlord of any provision hereof. Consent to one assignment or subletting shall not be deemed consent to any subsequent or different assignment or subletting. In the event of default by any assignee of Tenant or any successor of Tenant in the performance of any of the terms hereof, Landlord may proceed directly against Tenant without the necessity of exhausting remedies against such assignee or successor.

8.05 Attorney Fees. In the event Tenant shall assign or sublet the Premises or request the consent of Landlord to any assignment or subletting or if Tenant shall request the consent of Landlord for any act that Tenant proposes to do, then Tenant shall pay Landlord's reasonable attorney fees incurred in connection therewith.



---

9. DAMAGE OR DESTRUCTION.

9.01 Definitions.

"Premises Partial Damage" shall herein mean damage or destruction to the Premises to the extent that the cost of repair is less than fifty percent (50%) of

the then replacement cost of the Premises.

"Premises Building Partial Damage" shall herein mean damage or destruction to the Building of which the Premises are a part to the extent that the cost of repair is less than fifty percent (50%) of the then replacement cost of such Building as a whole.

"Premises Total Destruction" shall herein mean damage or destruction to the Premises to the extent that the cost of repair is fifty percent (50%) or more of the then replacement cost of the Premises.

"Premises Building Total Destruction" shall herein mean damage or destruction to the Building of which the Premises are a part to the extent that the cost of repair is fifty percent (50%) or more of the then replacement cost of such Building as a whole.

"Insured Loss" shall herein mean damage or destruction which was caused by an event covered by insurance carried by Landlord and the proceeds payable under such insurance policy are sufficient to pay in full the cost to repair and restore such damage and destruction.

9.02 Partial Damage - Insured Loss. Subject to the provisions of Section 9.04, 9.05, and 9.06 hereof, if at any time during the term of this Lease there is damage which is an Insured Loss and which falls into the classification of Premises Partial Damage or Premises Building Partial Damage, then Landlord shall, at Landlord's expense, repair such damage, but not Tenant's fixtures, equipment or tenant improvements unless the same have become a part of the Premises pursuant to the terms of the Lease as soon as reasonably practicable and this Lease shall continue in full force and effect.

9.03 Partial Damage - Uninsured Loss. Subject to the provisions of Section 9.04, 9.05 and 9.06 below, if at any time during the term of this Lease there is damage which is not an Insured Loss and which falls within the classification of Premises Partial Damage or Premises Building Partial Damage, unless caused by a negligent or willful act of Tenant (in which event Tenant shall make the repairs at Tenant's expense), Landlord may at Landlord's option either (i) repair such damage as soon as reasonably possible at Landlord's expense, in which event this Lease shall continue in full force and effect, or (ii) give written notice to Tenant within thirty (30) days after the date of the occurrence of such damage of Landlord's intention to cancel and terminate this Lease, as of the date of the occurrence of such damage. In the event Landlord elects to give such notice of Landlord's intention to cancel and terminate this Lease, Tenant shall have the right within ten (10) days after the receipt of such notice to give written notice to Landlord of Tenant's intention to repair such damage at Tenant's expense, without reimbursement from Landlord, in which event this Lease shall continue in full force and effect, and Tenant shall proceed to make such repairs as soon as reasonably possible. If Tenant does not give such notice within such ten (10) day period this Lease shall be canceled and terminated as of the date of the occurrence of such damage.



---

9.04 Total Destruction. If at any time during the term of this Lease there is damage, whether or not an Insured Loss (including destruction required by any authorized public authority), which falls into the classification of Premises Total Destruction or Premises Building Total Destruction, this Lease shall automatically terminate as of the date of such total destruction.

9.05 Damage Near End of Term. If at any time during the last six (6) months of the term of this Lease there is damage, whether or not an Insured Loss, which falls within the classification of Premises Partial Damage, Landlord may at Landlord's option cancel and terminate this Lease as of the date of occurrence of such damage by giving written notice to Tenant of Landlord's election to do so within thirty (30) days after the date of occurrence of such damage.

9.06 Abatement of Rent; Tenant's Remedies. In the event of damage described in Sections 9.02, or 9.03 hereof, and Landlord or Tenant repairs or restores the Premises pursuant to the provisions of this Section 9, the Rent payable hereunder for the period during which such damage, repair or restoration continues shall be abated in proportion to the degree to which Tenant's use of the Premises is impaired. Except for abatement of Rent, if any, Tenant shall have no claim against Landlord for any damage suffered by reason of any such damage, destruction, repair or restoration, unless such damage was caused by the gross negligence or willful misconduct of Landlord or its agents. If Landlord shall be obligated to repair or restore the Premises under the provisions of this Section 9 and shall not commence such repair or restoration within ninety (90) days after such obligations shall accrue, Tenant may, at Tenant's option, cancel and terminate this Lease by giving Landlord written notice of Tenant's election to do so at any time prior to the commencement of such repair or restoration. In such event this Lease shall terminate as of the date of such notice.

9.07 Termination - Advance Payments. Upon termination of this Lease pursuant to this Section 9, an equitable adjustment shall be made concerning advance rent and any advance payments made by Tenant to Landlord. Landlord shall, in addition, return to Tenant so much of Tenant's Security Deposit as has not theretofore been applied by Landlord.

9.08 Waiver. Landlord and Tenant waive the provisions of any statutes which relate to termination of leases when leased property is destroyed and agree that such event shall be governed by the terms of this Lease.

10. LANDLORD'S RIGHTS.

Landlord reserves the following rights:

1. To change the name of the Building or the Project without notice or liability of Landlord to Tenant;

2. At any time during the last ninety (90) days of the Term of this Lease or any renewal hereof or any part hereof, if during or prior to that time, Tenant has

vacated the Premises, to decorate, remodel, repair, alter, or otherwise prepare the Premises for occupancy;

3. To exhibit the Premises to others and to display "For Rent" signs on the Premises during the last ninety (90) days of the Term of this Lease or any renewal hereof;



---

4. To remove from the parking lot abandoned or unlicensed vehicles and vehicles that are unreasonably interfering with the use of said parking lot by others and to charge the responsible tenant for the expense of removing said vehicles; and

5. To take any and all measures, including making inspections, repairs, alterations, additions, and improvements to the Premises or Project as may be necessary or desirable for the safety, protection, or preservation of the Premises or the Project or Landlord's interests, or as may be necessary or desirable in the operation of the Premises or the Project.

Landlord may enter upon the Premises for the purpose of exercising any or all of the foregoing rights hereby reserved without being deemed guilty of an eviction or disturbance of Tenant's use or possession of the Premises and without being liable in any manner to the Tenant.

11. HOLDING OVER.

In the event of a holding over by Tenant after the expiration or termination of this Lease without the written consent of Landlord, Tenant shall be deemed a month to month tenant upon all of the provisions of the Lease pertaining to the obligations of Tenant excepting, however, any option to renew extend or expand contained in this Lease, at 150% of the Base Rent for the entire holdover period, and all attorney fees and other expenses incurred by Landlord in enforcing its rights hereunder. Any holding over with the consent of Landlord shall constitute Tenant a month-to-month Tenant at the same Base Rent and all other Rent paid or payable by Tenant for the last full month of this Lease or any renewal or extension hereof.

12. SIGNS AND ADVERTISEMENTS.

Tenant shall not put upon nor permit to be put upon or affixed to any part of the Premises or Project any signs, billboards, or advertisements of whatsoever kind or nature, except as Landlord has specifically approved in writing.

13. EMINENT DOMAIN.

If the Premises or any portion thereof (including parking spaces allotted thereto) are taken under the power of eminent domain, or sold under the threat of the exercise of said power (all of which are herein called "condemnation"), this Lease shall terminate as to the part so taken as of the date the condemning authority takes title or possession, whichever first occurs. If more than ten percent (10%) of the floor area of the Premises, or more than twenty five percent (25%) of the land area of the Project which is not occupied by any building, is taken by condemnation and such taking materially interferes with the conduct of or access to Tenant's business, Tenant may, at Tenant's option, by written notice to Landlord within ten (10) days after Landlord shall have given Tenant written notice of such taking (or in the absence of such notice, within ten (10) days after the condemning authority shall have taken possession) terminate this Lease as of the date the condemning authority takes possession. If Tenant does not terminate this Lease in accordance with the foregoing, this Lease shall remain in full force and effect as to the portion of the Premises remaining, except that the Base Rent shall be reduced in the proportion that the floor area of the Premises taken bears to the total floor area of the Premises prior to such taking. No reduction of Base Rent shall occur if the only area in the Project which is taken is that which



---

does not have a Building located thereon. Any award of the taking of all or any part of the Premises under the power of eminent domain or any payment made under threat of the exercise of such power shall be the property of Landlord, whether such award shall be made as compensation for diminution in value of the leasehold or for the taking of the fee, or as severance damages; provided, however, that Tenant shall be entitled to any award for loss of or damage to Tenant's trade fixtures and removable personal property, moving expense and interruption of business so long as any such award does not diminish Landlord's award. In the event that this Lease is not terminated by reason of such condemnation, Landlord shall to the extent of severance damages received by Landlord in connection with such condemnation, repair any damage to the Premises caused by such condemnation except to the extent that Tenant has been reimbursed therefor by the condemning authority. Tenant shall pay any amount in excess of such severance damages required to complete such repair.

14. LANDLORD'S INABILITY TO PERFORM.

If, by reason of Landlord's reasonable inability to obtain and utilize labor, materials, or supplies; circumstances directly or indirectly the result of a state of war, act of terrorism or national or local emergency; laws, rules, orders, regulations, or requirements of any governmental authority now or hereafter in force; strikes or riots; accident in, damage to, or the making of repairs, replacements, or improvements to the Premises or any of the equipment thereof (except as provided in Section 9); or by reason of any other cause beyond the reasonable control of Landlord (collectively "Force Majeure"), Landlord shall be unable to perform or shall be delayed in the performance of any covenant to supply any service, such nonperformance or delay in performance shall not render Landlord liable in any respect for damages to either

person or property, constitute a total or partial eviction (constructive or otherwise), work an abatement of Rent, or relieve Tenant from the fulfillment of any covenant or agreement contained in this Lease.

15. ASSIGNMENT TO TRUSTEE.

Neither this Lease nor any interest herein nor any estate hereby created shall pass to any trustee or receiver in bankruptcy or to any other receiver or assignee for the benefit of creditors, or otherwise by operation of law during the term of this Lease or any renewal or extension of the term hereof.

16. COMMON AREAS.

The term "Common Areas" means all the areas of the Project not intended for renting and, instead, designed for the common use and benefit of Landlord and all of the tenants, their employees, agents, customers, and invitees. The Common Areas include, but not by way of limitation, parking lots, truck courts, landscaped and vacant areas, driveways, walks, and curbs, with facilities appurtenant to each, as such areas may exist from time to time. Landlord expressly reserves the right to add additional Common Area to the Project from time to time. Landlord shall operate and maintain in reasonably good condition the Common Areas of the Project, and the cost of same shall be reimbursed by Tenant to Landlord as provided for in Section 21. Landlord may delegate its rights with regard to the Common Area to an independent contractor or management company, which may be an affiliate of Landlord. Landlord hereby



---

grants the non-exclusive, revocable right to use the Common Areas to Tenant, Tenant's employees, agents, customers, and business invitees, which use shall be subject at all times to such reasonable, uniform, and nondiscriminatory rules and regulations as may from time to time be established by Landlord.

17. ACCEPTANCE OF PREMISES.

Except as otherwise provided in this Lease, Tenant hereby accepts the Premises in their condition existing as of the Commencement Date or the actual date that Tenant takes possession of the Premises, whichever is earlier. Tenant acknowledges that neither Landlord nor any agent of Landlord has made any representation or warranty as to the present or future suitability of the Premise for the conduct of Tenant's business.

18. MAINTENANCE, REPAIRS AND ALTERATIONS.

18.01 Maintenance and Care by Tenant. Tenant shall be responsible for all maintenance and repair to the Premises of whatsoever kind or nature that is not hereinafter set forth specifically as the obligation of Landlord. Tenant shall take good care of the Premises and fixtures, and keep them in good repair (ordinary wear and tear excepted), free from filth, overloading, danger of fire, or any pest or nuisance, and shall repair any damage or breakage done by Tenant or its agents, employees, or invitees, including damage done to the Premises by Tenant's equipment and/or installations. Tenant shall be responsible for the repair and replacement of all glass and plate glass on the Premises. Tenant shall maintain and pay for a service contract with a licensed contractor for the upkeep, maintenance, repair, and periodic servicing of the heating, ventilating, and air conditioning systems servicing the Premises. Tenant shall supply Landlord, from time to time, such information as Landlord reasonably requests to verify the services being performed under the service contract. The Landlord, at Landlord's option, may elect to enter into a service contract for the maintenance and periodic inspection of the heating, ventilating, and air conditioning equipment in which event Tenant shall within ten (10) days of billing therefore, reimburse Landlord for the costs of such service contract allocated to the Premises. In the event that Tenant fails to maintain the Premises as required herein, Landlord shall have the right, but not the obligation, to perform such maintenance and/or repairs, and Tenant shall, within ten (10) days of the billing by Landlord, reimburse Landlord for Landlord's costs in providing such maintenance and/or repairs, together with a fifteen percent (15%) charge for Landlord's overhead. Upon termination of the Lease Tenant shall deliver the Premises to Landlord in a broom-clean condition.

18.02 Maintenance and Repair by Landlord. During the Term of this Lease, Landlord shall keep and maintain the roof, exterior walls (excluding glass or plate glass), gutters, and downspouts of the Building in good condition and repair. Landlord shall be under no obligation and shall not be liable for any failure to make repairs that are Landlord's responsibility as designated herein until and unless Tenant notifies Landlord in writing of the necessity therefor, and Landlord shall have a reasonable time after such notice to make such repairs. Landlord reserves the right to the exclusive use of the roof and exterior walls of the Building. If any portion of the Premises which Landlord is obligated to maintain or repair is damaged through the fault or negligence of Tenant, its agents, employees, or invitees, then repairs necessitated by such damage shall be paid for by Tenant on Landlord's demand. Except for the obligations of



---

Landlord under Section 18.02 (relating to the condition of the Premises), Section 9 (relating to destruction of the Premises) and under Section 13 (eminent domain), it is intended by the parties hereto that Landlord have no obligation, in any manner whatsoever, to repair and maintain the Premises nor the Building located thereon nor the equipment therein, whether structural or nonstructural, all of which obligations are intended to be that of Tenant under Section 18.01 hereof. Tenant expressly waives the benefit of any statute now or hereinafter in effect which would otherwise afford Tenant the right to make repairs at Landlord's expense or to terminate this Lease because of Landlord's failure to keep the Premises in good order, condition and repairs.

18.03 Alterations and Additions. Tenant shall not make any alterations, improvements, or additions to the Premises without Landlord's prior written consent and approval of the plans and specifications. Alterations, improvements, or additions so made by either of the parties upon the Premises, except movable furniture and equipment placed in the Premises at the expense of Tenant, shall become the property of Landlord and shall remain upon and be surrendered with the Premises as a part thereof at the termination of this Lease, without disturbance, molestation, injury, or damage unless Landlord, by written notice to Tenant, elects to require Tenant to remove such alterations, improvements, or additions from the Premises at the expiration of this Lease. In the event damage to the Building shall be caused by moving said furniture and/or equipment in or out of the Premises, such damage shall be repaired at the expense of Tenant. Any such alterations shall be made in compliance with all applicable laws, rules and regulations (including without limitation the Americans with Disabilities Act and other disabled person access requirements) to the extent applicable to such alterations or as may be required by any governmental authority in connection with such alterations. Tenant shall not make any installations or penetrations on the roof of the Building, except with Landlord's prior written consent and in strict compliance with the reasonable requirements of Landlord's roofing contractor. Landlord's consent to or approval of any alterations, additions or improvements (or the plans therefor) shall not constitute a representation or warranty by Landlord, nor Landlord's acceptance, that the same comply with sound architectural and/or engineering practices or with all applicable laws, and Tenant shall be solely responsible for ensuring all such compliance.

18.04 Mechanic's Liens. Tenant shall not permit any mechanic's liens or other liens to be placed upon the Premises, the Building, or the Project during the Term of this Lease, and in the case of the filing of any such lien, Tenant shall promptly pay same; however, Tenant shall have the right to contest the validity or amount of any such lien upon Tenant's prior posting of security with Landlord, which security, in Landlord's sole judgment, must be adequate to pay and discharge any such lien in full, plus Landlord's reasonable estimate of its legal fees. Tenant agrees to pay all legal fees that might be incurred by Landlord because of any mechanic's liens or other liens placed upon the Premises.

19. INSURANCE.

19.01 Coverages Required. Tenant hereby agrees to maintain in full force and effect at all times during the term of this Lease, at its own expense, for the protection of Tenant and Landlord, as their interest may appear, policies of insurance issued by a responsible carrier or carriers licensed to do business in the State of Utah and which are rated A and have a financial size category of at least VIII in the most recent Best's Key Rating Guide, or any successor



thereto (or if there is none, an organization having a national reputation), which afford the following coverages:

(A) commercial general liability insurance, including contractual liability (specifically covering this Lease), fire legal liability, and premises operations, with the following minimum limits: General Aggregate $2,000,000.00; Products/Completed Operations Aggregate $2,000,000.00; Each Occurrence $1,000,000.00; Personal and Advertising Injury $1,000,000.00; Medical Payments $5,000.00 per person;

(B) Umbrella/Excess Liability on a following form basis with the following minimum limits: General Aggregate $3,000,000.00; Each Occurrence $3,000,000.00;

(C) Workers' Compensation with statutory limits;

(D) Employer's Liability insurance with the following limits: Bodily injury by disease per person $1,000,000.00; Bodily injury by accident policy limit $1,000,000.00; Bodily injury by disease policy limit $1,000,000.00;

(E) A "causes of loss, special form of insurance" policy, commonly referred to in the industry as an "all risk, fire and extended coverage" policy, with vandalism and malicious mischief endorsements, covering Tenant's furniture, equipment, and personal property, to the extent of not less than their full replacement value.

(F) Loss of income/business interruption insurance in such amounts as will reimburse Tenant for direct or indirect loss of earnings attributable to all perils commonly insured against under an extended coverage property insurance policy or attributable to prevention of access to or use of the Premises or the Building as a result of such perils but in no event in an amount less than the Base Rent and all additional rent payable hereunder for six (6) months.

19.02 Deductibles. Tenant may, with the written consent of Landlord, elect to have reasonable deductibles in connection with coverages required in Section 19.01 above.

19.03 Certificates. Tenant shall deliver to Landlord at least thirty (30) days prior to the time such insurance is first required to be carried by Tenant, and thereafter at least thirty (30) days prior to expiration of such policy, Certificates of Insurance evidencing the above coverage with limits not less than those specified above. Such Certificates, with the exception of Workers Compensation, shall name Landlord, Landlord's property manager and such other persons as Landlord may reasonably designate as additional insureds as their interests may appear and shall expressly provide that the interest of each shall not be affected by a breach by Tenant of any policy provision for which such Certificates evidence coverage. All Certificates of Insurance shall provide not less than thirty (30) days' prior written notice to Landlord in the event of material alteration to or cancellation of the coverage evidenced by such Certificates of Insurance.

19.04 Mutual Waiver of Subrogation. Landlord and Tenant do each hereby release the other from any and all liability or responsibility (to the other or to anyone

claiming through or under the other by way of subrogation or otherwise) for any loss or damage to the property caused by



---

fire, any of the extended coverage perils, or any other insured peril, even if such fire or other casualty shall have been caused by the negligence of the other party or anyone who shall be covered under such policy, to the extent of coverage under the relevant policy. Such waiver of subrogation shall be effective with respect to loss or damage occurring only during such time as Landlord's and Tenant's policies shall be in force and effect with respect to such loss or damage and shall contain a clause or endorsement to the effect that any such release shall not adversely affect or impair said policies or prejudice the right of the releasing party to recover thereunder. Landlord and Tenant each agree that their policies shall include such a clause or endorsement.

19.05 Indemnification of Landlord. Tenant shall indemnify, protect and defend Landlord, Landlord's property manager and their respective agents, contractors and employees (collectively, the Indemnified Parties ) and save them harmless from and against any and all loss (including loss of Rents payable by Tenant or by other tenants), and against all claims, actions, damages, liability, costs, fees and expenses (including, without limitation, attorneys and consultants fees) in connection with loss of life, bodily and personal injury, or damage to property (real or personal) arising from any occurrence in, upon, or at the Premises or any part thereof, or occasioned wholly or in part by any act or omission of Tenant, its agents, contractors, employees, servants, licensees, concessionaires, or invitees or by anyone permitted to be on the Premises by Tenant. Tenant assumes all risks of and Landlord shall not be liable for injury to person or damage to Tenant's property (real or personal) or the property of Tenant's agents, servants, or employees resulting from the condition of the Premises, or from the bursting or leaking of any and all pipes, utility lines, connections, or air conditioning, ventilating, or heating equipment in, on, or about the Premises, or from water, rain, or snow which may leak into, issue from, or flow from any part of the roof or the Building. Tenant agrees, at all times, to indemnify and hold the Indemnified Parties harmless against all actions, claims, demands, costs, damages, or expenses or any kind which may be brought against or made against the Indemnified Parties or which the Indemnified Parties may pay or incur by reason of Tenant's occupancy of the Premises or Tenant's negligent performance or failure to perform any of its obligations under this Lease. In the event that Landlord shall, without fault on its part, be made a party to any litigation commenced by or against Tenant, Tenant shall protect and hold the Indemnified Parties harmless and shall pay all costs, expenses, and reasonable attorney fees incurred or paid by the Indemnified Parties in connection with such litigation. The obligations of this Section 19.05 shall survive the expiration or earlier termination of the Lease.

19.06 Increased Insurance Risk. Tenant shall not permit the Premises to be used for any purpose which would render the insurance thereon void or the insurance risk more hazardous or cause the State Board of Insurance, any other insurance authority or Landlord's insurance carrier to disallow any of Landlord's sprinkler credits. If any penalty, surcharge or increase in Landlord's insurance premiums is imposed because of Tenant's original or subsequent placements or use of storage racks or bins, Tenant's method of storage, the nature of Tenant's inventory, Tenant's abandonment of the Premise or any other act of Tenant, Tenant shall pay as additional Rent, the increase in Landlord's insurance premiums, and, upon demand by Landlord, Tenant agrees to correct at Tenant's expense the cause of such penalty, surcharge or increase to the satisfaction of the particular insurance authority or carrier.



---

20. HAZARDOUS MATERIALS.

20.01 Lessor's Prior Consent. Notwithstanding anything contained in this Lease to the contrary, Tenant shall not cause or permit any Hazardous Materials (as defined in Section 20.02 below) to be brought upon, kept, stored, discharged, released or used in, under or about the Premises by Tenant, its agents, employees, contractors, subcontractors, licensees or invitees, without the prior written consent of Landlord, which Landlord may grant or withhold in Landlord's sole discretion.

20.02 Compliance with Hazardous Materials Laws. Tenant shall at all times and in all respects comply with all federal, state and local laws, ordinances and regulations relating to or involving the use, generation, manufacture, storage, discharge, release, disposal or transportation of any materials, substances or wastes which are considered to be or may be hazardous to human health or safety or to the environment due to their radioactivity, ignitability, corrositivity, reactivity, carcinogenicity, infectiousness or other harmful or potential harmful properties and which are defined as or included within the definition of "hazardous materials," "toxic substances" or "chemicals known to cause cancer or reproductive toxicity" under any Hazardous Materials Laws (collectively, "Hazardous Materials"). All laws, ordinances and regulations relating to industrial hygiene, environmental protection or the use, analysis, generation, manufacture, storage, discharge, release, disposal or transportation of Hazardous Materials are collectively referred to herein as "Hazardous Materials Laws".

Tenant shall handle, treat, deal with and manage any and all Hazardous Materials in, on, under or about the Premises in total conformity with all applicable Hazardous Materials Laws and prudent industry practices regarding management of such Hazardous Materials. Upon expiration or earlier termination of this Lease, Tenant shall, at Tenant's sole cost and expense, cause all Hazardous Materials brought or allowed on the Premises during the Lease Term to be removed from the Premises and transported for use, storage or disposal in accordance and in compliance with all applicable Hazardous Materials Laws. Tenant shall not take any remedial action in response to the presence of any Hazardous Materials in or about the Premises or enter into any settlement agreement, consent decree or other compromise in respect to any claims relating to any Hazardous Materials in any way connected with the Premises, without first notifying Landlord of Tenant's intention to do so and affording Lessor ample opportunity to appear, intervene or otherwise appropriately assert and protect Landlord's interests with respect thereto.

20.03 Notices. Tenant shall immediately notify Landlord in writing of: (i) any enforcement, cleanup, removal or other governmental or regulatory action threatened, instituted, or completed pursuant to any Hazardous Materials Laws; (ii) any claim made or threatened by any person against Tenant or the Premises relating to damage,

contribution, cost recovery compensation, loss or injury resulting from or claimed to result from any Hazardous Materials; and (iii) any reports made to any environmental agency arising out of or in connection with any Hazardous Materials on or removed from the Premises, including any complaints, notices, warnings or asserted violations in connection therewith. Tenant shall also supply to Landlord as promptly as possible, and in no event later than five (5) business days after Tenant first receives or sends the same, copies of all claims, reports, complaints, notices, warnings or asserted violations relating in any way to the Premises or Tenant's use thereof. Tenant shall maintain copies of hazardous



waste manifests reflecting the legal and proper disposal of all Hazardous Materials removed from the Premises and supply Landlord with copies of same on request.

20.04 Indemnification of Landlord. Tenant shall indemnify, protect, defend and hold the Indemnified Parties harmless from any and all damages, losses, expenses, liabilities, obligations, costs, fees and expenses (including without limitation attorneys and consultants fees), in any way arising out of or related to the use, generation, storage, handling, transportation, release, discharge or disposal of Hazardous Materials on or about the Premises during the term of this Lease. The obligations of this Section 20.04 shall survive the expiration or earlier termination of the Lease.

20.05 Landlord's Right to Order Environmental Studies. From time to time during the term of this Lease, if Landlord shall have reasonable cause to believe that a release of Hazardous Materials has occurred at the Premises, or from the Premises into the Common Areas or the environment, Landlord may retain a qualified environmental consultant (a "Consultant") to conduct an environmental investigation of the Premises, Common Areas, or other areas that may be affected by the suspected release of Hazardous Materials (1) for Hazardous Materials contamination in, about or beneath such areas and (2) to assess the compliance of Tenant with the provisions of this Section 20 of the Lease. Additionally, Landlord shall have the right within the last one hundred twenty (120) days of the term of this Lease to order an environmental assessment to determine whether the Premises, Common Areas or the environment surrounding the Premises contain any Hazardous Materials that may be attributable to Tenant's use of the premises. In the event Landlord's Consultant determines that a release of Hazardous Materials has occurred at the Premises, or from the Premises into the Common Areas or the environment, Tenant shall pay the cost of any such environmental assessment and comply with all reasonable recommendations of the Consultant as to any precautions to be taken with respect to the storage, use, disposal, handling or emission of Hazardous Materials. Landlord will provide Tenant with written notice five (5) days prior to any proposed investigation to be undertaken hereunder. Tenant shall cooperate with the Consultant to allow entry and reasonable access of the Consultant to all portions of the Premises for the purposes of the investigation.

21. ADDITIONAL RENT.

21.01 Real Estate Taxes.

1. Tenant shall pay to Landlord, as additional Rent, Tenant's Proportionate Share of Landlord's Real Estate Taxes for the Project for each Tax Year during the Term of this Lease or any renewal, extension, or holding over hereof. Such additional Rent payments by Tenant shall be due and payable on the first day of each month during each Tax Year, each such payment in an amount equal to one-twelfth (1/12) of Tenant's Proportionate Share of Landlord's obligation for Real Estate Taxes for the applicable Tax Year. The sum set out in Section 1.01M shall be the monthly charge for the first Tax Year. For each subsequent Tax Year the amount payable under Section 1.01M shall be adjusted to reflect Landlord's estimate of Tenant's obligation for Real Estate taxes for that Tax Year. In the event the sum of such monthly payments by Tenant for a particular Tax Year exceeds Tenant's Proportionate Share of Landlord's Real Estate Taxes for the applicable Tax Year,



provided Tenant is not in default, Landlord shall refund or credit such excess payment to Tenant. In the event the sum of Tenant's monthly payments for a particular Tax Year is less than Tenant's Proportionate Share of Landlord's Real Estate Taxes for the applicable Tax Year, Tenant shall pay such deficiency upon demand. "Tax Year", as used herein, shall mean each calendar year during the Term of the Lease or any renewal, extension, or holding over hereof in which Real Estate Taxes are billed against the Project regardless of the Year in which the assessment for Real Estate Taxes occurs. For the purposes of this Section, the first Tax Year shall be the calendar year in which the Lease Term commences.

2. "Real Estate Taxes" shall mean: (a) all ad valorem Real Estate Taxes on the Project (adjusted after protest or litigation, if any) for any part of the Term of this Lease, exclusive of penalties; (b) any taxes which shall be levied in lieu of any such ad valorem Real Estate Taxes; (c) any special assessments for benefits on or to the Project paid or payable in annual installments by Landlord; (d) occupational taxes or excise taxes levied on rentals derived from the operation of the Project for the privilege of leasing property; and (e) the expense of protesting, negotiating, or contesting the amount or validity of any such taxes, charges, or assessments, such expense to be applicable to the Tax Year of the item contested, protested, or negotiated.

3. If the Term of this Lease shall end during a Tax Year of which only part is included in the Term hereof, the amount of such additional Rent shall be prorated on a per diem basis and shall be paid on or before the last day of the Term. If the Term of this Lease ends during any Tax Year before the amount of the Real Estate Taxes is established and the amount payable by Tenant has not been finally determined under the provisions of this Section, an amount payable for that portion of the Lease Term during the Tax Year shall be reasonably estimated by Landlord, and the estimated amount shall be promptly paid by Tenant should such estimated amount paid by Tenant exceed its actual obligation under this Section then Landlord shall refund such

excess amount.

21.02 Common Expenses.

1. During the Term of this Lease or any renewal, extension, or holding over hereof, Tenant shall pay to Landlord, as additional Rent, Tenant's Proportionate Share of the Common Expenses.

2. For the purpose of this Section, the "Common Expense" means Landlord's total costs and expenses incurred during each Lease year in connection with owning, operating, maintaining, and repairing the Project, herein defined, including, but without limitation by enumeration: costs for all management fees, electrical current, gas, water, sewer, or fuels used in connection with the operation, maintenance, and repair of the Common Areas or the Building; the amount paid for all electricity furnished to the Common Area to light the parking lots or for any other common purpose; the amount paid for all labor and/or wages and other payments, including costs to Landlord of worker's compensation and disability



insurance, payroll taxes, and welfare and fringe benefits, made to janitors, employees, contractors, and subcontractors of Landlord who are involved in the operation and maintenance of the Common Areas and the Project; charges of any independent contractors employed in the care, operation, maintenance, cleaning, and landscaping of the Common Areas; the amount paid for all supplies, tools, replacements parts or components, equipment, and necessities which are occasioned by everyday wear and tear; the premiums for all insurance maintained by Landlord for the Project; and the pro rata costs of machinery and equipment purchased and/or leased by Landlord in order to perform Common Area maintenance. To the extent that Landlord provides services which are not separately metered or directly billed to Tenant the costs of such services shall be included in the Common Expenses. Common Expenses shall not include interest on debt, capital retirement of debt and depreciation; however Common Expenses shall include Landlord's capital expenditures incurred for the purpose of reducing Common Area or Building operating costs and capital expenditures incurred by Landlord that are required by changes or amendments in laws or regulations governing the Premises or the Project, plus interest on the unamortized costs of each such capital expenditure at the rate of 10% per annum or such higher rate as Landlord may have incurred on funds borrowed to construct such improvements, amortized over the useful life of the respective improvements of a capital nature. If Landlord elects to self-insure or includes the Project under blanket insurance policies covering multiple properties, then the term "Common Expenses" shall also include the portion of the cost of such self-insurance or blanket insurance allocated by Landlord to this Project.

3. For the purposes of this Section, the term "Lease Year" shall mean in the case of the first Lease Year, that period from the Commencement Date of the Term to the first succeeding December 31; thereafter, "Lease Year" shall mean each successive twelve (12) calendar month period following the expiration of the first Lease Year except that should the Expiration Date be any day other than on December 31, then the last Lease Year shall be the period from the end of the preceding Lease Year to the Expiration Date.

21.03 Payment of Common Expense. Tenant's obligation for the Common Expenses for each Lease Year during the Lease Term shall be paid in monthly installments on the first day of each calendar month in advance. The first Lease Year's monthly installment amount is set out in Section 1.01L above. Within a reasonable period after the end of the first Lease Year and within a reasonable period after the end of each Lease Year thereafter, Landlord shall notify Tenant of Tenant's monthly obligation for Common Expenses which Landlord estimates it will incur for the then current Lease Year and the Common Expenses provided for in Section 1.01L shall be adjusted accordingly on the first day of the first month following such notice. Within a reasonable period after the end of each Lease Year, Landlord shall furnish Tenant with a statement of the actual amount of Tenant's obligation for Common Expenses for such period. In the event the total of Tenant's monthly installments paid for any Lease Year does not equal Tenant's Proportionate Share as shown on such statement, then Tenant shall, within ten (10) days of the mailing of the statement, pay Landlord any deficiency, or Landlord upon receipt of such annual statement shall issue to Tenant a credit invoice for such excess, as the case may be. Upon



request delivered by Tenant within thirty (30) days after the date that Landlord delivers Landlord s statement, Landlord shall provide additional detail to Tenant regarding the calculation of Common Expenses for the year in question. The statement of Common Expenses shall be presumed correct and shall be deemed final and binding upon Tenant unless Tenant in good faith objects in writing thereto within thirty (30) days after delivery of the statement to Tenant (which writing shall state, in reasonable detail, all of the reasons for the objection); and Tenant pays in full, within ten (10) days after delivery of the statement to Tenant, the amount shown on the statement as being owed by Tenant, regardless of whether such amount is in dispute. Tenant's dispute of any amount shown on Landlord's statement shall not excuse Tenant from promptly paying such amount as required above, provided however if it is determined that the amount specified in Landlord's statement as being payable by Tenant was over stated and Tenant has otherwise complied with the requirements of this Section, then Landlord shall pay or credit to Tenant the amount of such overcharge. Tenant's failure to pay the amount shown on Landlord's statement within ten (10) days after delivery thereof or Tenant's failure to pay in a timely manner the revised estimate of Landlord's determination of Common Expenses shall be deemed an irrevocable waiver of Tenant s right to contest and/or receive any credit or reimbursement for an overcharge of Common Expenses shown on the Landlord's statement under which payment is required at that time.

22. DEFAULT AND REMEDIES.

22.01 Events of Default. The occurrence of any of the following events shall constitute an Event of Default on the part of Tenant.

(A) Tenant shall at any time fail to pay Rent when due; or

(B) Tenant shall fail to keep, perform, or observe any other covenant, agreement, condition, or undertaking described hereunder and shall fail to remedy such default within ten (10) days after written notice thereof has been mailed by Landlord to Tenant; or if such default is one that will take longer than ten (10) days to remedy, Tenant fails to commence the cure of such default within said ten (10) day period and/or fails to diligently pursue such cure to completion; or

(C) This Lease or the Premises or any part thereof shall be taken upon execution or by other process of law directed against Tenant or shall be taken upon or subject to any attachment at the instance of any creditor of or claimant against Tenant and said attachment shall not be discharged or disposed of within fifteen (15) days after the levy thereof; or

(D) There is a filing of any petition or commencement of any case or proceeding by Tenant under any provision or chapter of the Federal Bankruptcy Act or any other federal or state law relating to Tenant's insolvency, bankruptcy, or reorganization; or

(E) There is a filing of any petition or commencement of any case or proceeding described in subparagraph (D) above against Tenant, unless such petition and all



---

proceedings initiated thereby are dismissed within sixty (60) days from the date of such filing; or

(F) The Premises shall be vacated or abandoned by Tenant, regardless of whether or not Tenant continues to pay Rent.

22.02 Remedy. Upon the occurrence of an Event of Default Landlord shall have the right, without further notice to or demand upon Tenant, to re-enter and take exclusive possession of the Premises, with or without force or legal process; to refuse to allow Tenant to enter the same or have possession thereof; to change the locks on the doors to the Premises; to take possession of any furniture or other property in or upon the Premises (Tenant hereby waiving the benefit of all exemptions by law) and to sell the same at public or private sale without notice and apply the proceeds thereof to the costs of sale, payment of damages, and payment of the Rent due under this Lease; all without Landlord being liable to Tenant for any damages or any prosecution therefor; and Landlord shall have the right;

(i) As an agent of Tenant, to relet the Premises for the balance of the Term of this Lease or for a shorter or longer Term, with or without the granting of free rent or other market concessions, and to receive the rents therefor; applying them first to the payment of all of Landlord's expenses of such reletting, such as, reasonable and customary repairs, improvements, broker's commissions and, second, to the payment of remedying all damages suffered to the Premises and, third, to all Rent due and thereafter becoming due under this Lease, with Tenant remaining liable for and hereby agreeing to pay Landlord any such deficiency on a monthly basis during the Lease Term on the days Rent would be due hereunder; or

(ii) To cancel and terminate the remaining Term of this Lease, regardless of whether Landlord has previously elected to relet or has relet the Premises as permitted in (i) above, to re-enter and take possession of the Premises free of this Lease, and thereafter this Lease shall be null and void, and the Rent in such case shall be apportioned and paid on and up to the date of such entry and possession by Landlord. Thereafter Tenant shall be liable for and pay all Rents accrued, due or owing as of the date or termination, as well as the costs to repair damage to the Premises incurred by Landlord by reason of Tenants breach or default of this Lease; or

(iii) To treat such default as a breach of this Lease and terminate this Lease by written notice to Tenant and recover from Tenant as damages for such breach:

(a) the worth at the time of award of any unpaid Rent which had been earned at the time of such termination; plus

(b) the worth at the time of award of the amount by which the unpaid Rent which would have been earned after termination



---

until the time of award exceeds the amount of such rental loss Tenant proves could have been reasonably avoided; plus

(c) the worth at the time of award of the amount by which the unpaid Rent for the balance of the term after the time of award exceeds the amount of such rental loss that Tenant proves could be reasonably avoided; plus

(d) any other amount necessary to compensate Landlord for all the detriment proximately caused by Tenant failure to perform its obligations under this Lease or which in the ordinary course of things would be likely to result therefrom; plus

(e) such reasonable attorneys' fees incurred by Landlord as a result of such default, and costs in the event suit is filed by Landlord to enforce such remedy; and

(f) at Landlord's election, such other amounts in addition to or in lieu of the foregoing as may be permitted from time to time by applicable law.

As used in subparagraphs (a) and (b) above, the "worth at the time of award" is computed by allowing interest at the rate of ten percent (10%) per annum. As used in subparagraph (c) above, the "worth at the time of award" is computed by discounting such amount at the discount rate of the Federal Reserve Bank of San Francisco at the time of award, plus one percent (1%).

All rights and remedies expressly provided in the Lease for Landlord's protection shall be cumulative and shall be in addition to any other rights and remedies provided by law. Landlord shall be entitled to recover from Tenant reasonable attorneys' fees and costs incurred by Landlord in enforcing its rights hereunder. In the event Landlord elects to re-enter or take possession of the Premises, Tenant agrees to quit and peaceable surrender the Premises and possess and repossess itself thereof, and may have, hold, and enjoy the Premises and the right to receive all rental income of and from the same. No such re-entry and taking of possession by Landlord shall be construed as an election on Landlord's part to terminate or surrender this Lease unless Landlord gives notice to Tenant specifically terminating the Lease. Unless a written notice of such intention is served on Tenant, any service of demand for the payment of rent or possession required under applicable law to recover the Premises does not constitute an election on the part of Landlord to terminate this Lease, nor shall such notice or re-entry by Landlord or forfeiture by Tenant relieve Tenant of its continuing liability for unaccrued rent.

A waiver by Landlord of any breach or default by Tenant under the terms and conditions of this Lease shall not be construed to be a waiver of any subsequent breach or default or of any other term or condition of this Lease, and a failure of Landlord to assert any breach or to declare a default by Tenant shall not be construed to constitute a waiver thereof, so long as such breach or default continues unremedied.

22.03 Landlord's Default. Landlord shall not be deemed to be in default in the performance of any obligation required to be performed by Landlord hereunder unless and until Landlord has



failed to perform the obligation within fifteen (15) days after receipt of written notice by Tenant to Landlord specifying wherein Landlord has failed to perform the obligation; provided, however, that if the nature of Landlord's obligation is such that more than fifteen (15) days are required for its performance, then Landlord shall not be deemed to be in default if Landlord shall commence the performance within the fifteen (15) day period and thereafter shall diligently prosecute the same to completion. Upon Landlord's default, Tenant shall be entitled to exercise all rights, powers and remedies provided hereunder, at law, or in equity. In addition, during such default, rent shall be abated as appropriate.

22.04 Landlord's Right to Perform Tenant's Covenants. If Tenant shall at any time fail to make any payment or perform any other act on its part to be made or performed under this Lease, Landlord may, but shall not be obligated to, make the payment or perform any other act to the extent Landlord may deem desirable and, in connection therewith, pay expenses and employ counsel. Any payment or performance by Landlord shall not waive or release Tenant from any obligations of Tenant under this Lease. All sums so paid by Landlord, and all penalties, interest and costs in connection therewith, shall be due and payable by Tenant on the next day after any payment by Landlord, together with interest thereon at the Interest Rate (as defined in Section 32), from that date to the date of payment thereof by Tenant to Landlord, plus collection costs and attorneys' fees. Landlord shall have the same rights and remedies for the nonpayment thereof as in the case of default in the payment of Rent.

23. NOTICES.

Except as other wise herein provided, whenever by the terms of this Lease notice shall or may be given either to Landlord or to Tenant, such notice shall be in writing and shall be deemed to have been properly served if delivered personally, sent by Federal Express or other national overnight courier or through the U.S. Postal Service, certified mail, postage prepaid, to Landlord at the addresses set forth below or such other person or place as Landlord may designate in writing and to Tenant at the Premises. The date of personal delivery or receipt of the notice, one (1) business day after deposit with such overnight courier or three (3) business days after mailing, whichever is earlier shall be deemed the date of service of notice. Notice may also be served by Landlord or Tenant in the same manner as provided for personal service under the Rules of Civil Procedure in the State of Utah. Landlord's addresses for notice are as follows:

| | |
|---|---|
| Landlord: | WDCI, Inc.<br>ATTN: Vice President - Property Management<br>822 Bishop Street<br>Honolulu, HI 96813 |
| With a copy to: | WDCI, Inc.<br>ATTN: General Counsel |

822 Bishop Street
Honolulu, HI 96813

Tenant: Control4 Corporation
Attn: President



11734 South Election Drive, Suite 200
Draper, Utah 84020

24. PERSONS BOUND.

The agreements, covenants, and conditions of this Lease shall be binding upon and shall insure to the benefit of the heirs, legal representatives, successors, and assigns of each of the parties hereto, except that no assignment, encumbrance, or subletting by Tenant, unless permitted by the provisions of this Lease, without the prior written consent of Landlord, shall vest any right of an assignee, encumbrance, or sublessee of Tenant. The singular herein, in referring to either Landlord or Tenant, shall be deemed to include the plural where the context so requires. If there be more than one Tenant herein named, the provisions of this Lease shall be applicable to and binding upon such Tenant jointly and severally.

25. SECURITY DEPOSIT.

Tenant herewith deposits with Landlord the sum referenced in the Basic Terms as a Security Deposit for the performance by Tenant of every covenant and condition of this Lease. Said deposit may be commingled with other funds of Landlord and shall bear no interest. If Tenant shall default with respect to any covenant or condition of this Lease, Landlord may apply the whole or any part of such Security Deposit to the payment of any sum in default or any sum which Landlord may be required to spend by reason of Tenant's default, including, but not limited to, applying the Security Deposit first to the costs of any restoration and/or cleanup made necessary by reason of above normal wear and tear of the Premises. It is agreed that the Security Deposit is not to be considered as the last month's Rent under this Lease. Should Tenant comply with all of the covenants and conditions of this Lease, the Security Deposit or any balance thereof shall be returned to Tenant within a reasonable time after the expiration of the Term hereof. If Landlord uses or applies all or any portion of the deposit, Tenant shall within ten (10) days after written demand therefore deposit cash with Landlord in an amount sufficient to restore the deposit to the full amount hereinabove stated and Tenant's failure to do so shall be a material breach of this Lease. If the Base Rent shall, from time to time, increase during the term of this Lease, Tenant shall thereupon deposit with Landlord additional sums so that the amount of Security Deposit held by Landlord shall at all times bear the same proportion to current Base Rent as the original Security Deposit bears to the original Base Rent set forth in Section 1.01I hereof.

26. [INTENTIONALLY OMITTED]

27. SUBORDINATION/FINANCIAL DISCLOSURE.

Landlord shall have the right to transfer, mortgage, pledge or otherwise encumber, assign or convey in whole or in part the Premises, building, Project, this Lease and all rents and amounts payable by Landlord under the provisions hereof, and Tenant shall continue its performance hereunder notwithstanding any such transfer. At Landlord's option, or at the option of any mortgagee or ground lessee of Landlord, this Lease shall be made subordinate to any ground lease, mortgage, deed of trust or any other hypothecation or security now or hereafter placed upon or affecting real property of which the premises are a part and to any and all



advances made on the security thereof and to all renewals, modifications, consolidations, replacements and extensions thereof pursuant to a written subordination agreement between Tenant and any such ground lessee or mortgagee. Notwithstanding the foregoing, the subordination of Tenant's interest pursuant to the terms hereof shall be conditional on such mortgagee or ground lessee entering into a commercially reasonable non-disturbance agreement with Tenant, which shall provide for the continuation of the Lease for the remaining term hereof on the terms and conditions hereof, notwithstanding the termination of any relevant ground lease or a foreclosure, deed in lieu of foreclosure or other transfer under any mortgage or deed of trust affecting the Project or the Premises, so long as Tenant shall have paid rent and all other sums required to be paid under this lease and shall otherwise be in compliance with the terms hereof. Tenant agrees to execute any documents required to effectuate an attornment or subordination pursuant to the terms hereof and Tenant hereby irrevocably appoints Landlord as its agent and attorney to execute and deliver any such instrument for and in the name of Tenant if Tenant fails to do so within ten (10) days after written notice by Landlord or any ground lessee or mortgagee. Any mortgagee, trustee or ground lessor may elect to have the Lease prior to the lien of its mortgage, deed of trust or ground lease and upon written notice to Tenant this lease shall be deemed prior to such mortgage, deed of trust or ground lease whether this Lease is dated prior subsequent to the date of said mortgage, deed of trust or ground lease or the date of recording thereof.

If Landlord desires to finance, refinance, or sell the Premises or any part thereof, Tenant hereby agrees to deliver to any lender or purchaser designated by

Landlord such financial statements of Tenant as may be reasonably requested by such lender or purchaser. Such statements shall include the past three (3) years' financial statements of Tenant. All such financial statements shall be received by Landlord and such lender or purchaser in confidence and shall only be used for the purposes herein set forth.

28. ATTORNEY'S FEES.

If either party brings an action to enforce the terms hereof or declare rights hereunder, the prevailing party in any such action, on trial or appeal, shall be entitled to its reasonable attorney's fees to be paid by the losing party as fixed by the court.

29. PARKING.

Tenant's employees, customers, invitees and visitors shall park only in areas designated for parking of vehicles.

30. EXAMINATION OF LEASE.

Submission of this document for examination or signature by Tenant does not constitute a reservation of or option for space and it is not effective as a lease or otherwise until execution by both Tenant and Landlord.



---

31. BROKER'S COMMISSIONS.Tenant and Landlord each represent and warrant to the other that neither has had any dealings with any person, firm, broker or finder (other than those persons, if any, whose names are set forth in this Paragraph 31) in connection with the negotiation of this Lease and/or the consummation of the transaction contemplated hereby, and no other broker or other person, firm or entity is entitled to any commission or finder's fee in connection with said transaction and Tenant and Landlord do each hereby indemnify and hold the other harmless from and against any costs, expenses, attorneys' fees or liability for compensation, commission or charges which may be claimed by any such unnamed broker, finder or other similar party by reason of any dealings or actions of the indemnifying party. Named brokers:

| | |
|---|---|
| Landlord's Broker: | CB Richard Ellis |
| Tenant's Broker: | Cottonwood Realty Group |

The commission payable to Landlord's Broker with respect to this Lease shall be pursuant to the terms of the separate commission agreement in effect between Landlord and Landlord's Broker. Landlord's Broker shall pay a portion of its commission to Tenant's Broker, if so provided in any agreement between Landlord's Broker and Tenant's Broker. Nothing in this Lease shall impose any obligation on Landlord to pay a commission or fee (a) to any party other than Landlord's Broker or (b) to any party with respect to (i) the exercise by Tenant of any option or right of first refusal pursuant to this Lease, or (ii) any extension or renewal of this Lease.

32. LATE PAYMENT/INTEREST.

Tenant's failure to pay Rent or any other payment required of Tenant hereunder within five (5) days of the due date therefor shall result in the imposition of a service charge for such late payment in the amount of five percent (5%) of such required payment to cover Landlord's administrative costs to handle late payments. Imposition of and/or payment of a service charge for late payment shall not constitute a cure or waiver for such default in payment. In addition, any amount which is not paid when due shall bear interest from the date due until the date paid at the rate ("Interest Rate") which is the lesser of fifteen percent (15%) per annum or the maximum rate permitted by law.

33. ESTOPPEL CERTIFICATE.

Tenant shall upon not less than ten (10) day's prior written notice from Landlord execute, acknowledge and deliver to Landlord a statement in writing (i) certifying that this Lease is unmodified and is full force and effect (or, if modified, stating the nature of such modification and certifying that this Lease, as so modified, is in full force and effect) and the date to which the Rent and other charges are paid in advance, if any; (ii) acknowledging that there are not, to Tenant's knowledge, any uncured defaults on the part of Landlord hereunder, or specifying such defaults if any are claimed; and (iii) stating the correctness or incorrectness of any other fact related to Tenant's use and occupancy of the Premises or either or both Landlord's and Tenant's rights and obligations under this Lease as may be reasonably requested. Any such statement may be conclusively relied upon by any prospective purchaser or encumbrancer of the Premises.



---

At Landlord's option, Tenant's failure to deliver such statement within such time shall be a material default under this Lease or shall be conclusively entitle Landlord or any third party to rely on the facts (i) that this Lease is in full force and effect, without modification except as may be represented by Landlord, (ii) that there are no uncured defaults in Landlord's performance, and (iii) that not more than one month's rent has been paid in advance.

34. PARTIAL INVALIDITY.

If any term, covenant, condition or provision of this Lease or the application thereof to any person or circumstance shall, to any extent, be invalid or unenforceable, or violate a party's legal rights, then such term, covenant, condition or provision shall be deemed to be null, void, and unenforceable; however, all provisions of this Lease, or the application of such term or provision to persons or circumstances other than those to which are held invalid, unenforceable, or violative of legal rights, shall not be affected thereby, and each and every other term, covenant, condition or provision of this Lease shall be valid and shall be enforced to the fullest extent permitted by law.

35. CAPTIONS.

The captions used throughout this Lease are for convenience and reference only and shall in no way be held to explain, modify, amplify, or aid in the interpretation, construction, or meaning of any provisions in this Lease.

36. ENTIRE AGREEMENT.

This Lease, together with the referenced Rider and Exhibits (which are incorporated herein by this reference), contains the entire agreement between the parties, and no modification of this Lease shall be binding upon the parties unless evidenced by an agreement, in writing, signed by Landlord and Tenant after the date hereof. No prior agreements or understandings pertaining to this Lease prior to the date hereof shall be effective.

37. LANDLORD'S LIABILITY.

37.01 Transfer of the Project. Upon transfer of the Project and assignment of this Lease, Landlord shall be entirely freed and relieved of all liability under any and all of its covenants and obligations contained in or derived from this Lease occurring after the consummation of the transfer and assignment, and from all liability for the Security Deposit. Tenant shall attorn to any entity purchasing or otherwise acquiring the Premises at any sale or other proceeding.

37.02 Landlord's Exculpation. In the event of default, breach or violation by Landlord of any of Landlord's obligations under this Lease, Landlord's liability to Tenant shall be limited to its ownership interest in the Building and Project or the proceeds of a public sale of the ownership interest pursuant to the foreclosure of a judgment against Landlord. Landlord shall not be personally liable, or liable in any event, for any deficiency beyond its ownership interest in the Building and Project.



---

38. SURRENDER OF PREMISES.

On the expiration or early termination of this Lease, Tenant shall surrender the Premises to Landlord "broom-clean", in its condition as of the Commencement Date, normal wear and tear excepted. Tenant shall remove from the Premises all of Tenant's personal property, trade fixtures and any alterations required to be removed by Landlord. Tenant shall repair damage or perform any restoration work required by the removal. If Tenant fails to remove any personal property, trade fixtures or alterations after the end of the Term as required by Landlord, Landlord may remove the property and store it at Tenant's expense, including interest at the Interest Rate. If the Premises are not so surrendered at the termination of this Lease, Tenant shall indemnify Landlord against all loss or liability resulting from delay by Tenant in so surrendering the Premises, including, without limitation, any claims made by any succeeding tenant, losses to Landlord due to lost opportunities to lease to succeeding tenants, and attorneys' fees and costs.

39. MORTGAGEE PROTECTION.

In the event of any default on the part of Landlord, Tenant will give notice by registered or certified mail to any beneficiary of a deed of trust or mortgagee of a mortgage covering the Building and shall offer the beneficiary or mortgagee a reasonable opportunity to cure the default, including time to obtain possession of the Building or the Premises by power of sale or a judicial foreclosure, if such should prove necessary to effect a cure.

40. NO OPTION TO EXTEND LEASE.

Tenant does not have the option to extend this Lease.

41. WAIVER OF TRIAL BY JURY.

LANDLORD AND TENANT HEREBY WAIVE TRIAL BY JURY AND CONSENT TO TRIAL WITHOUT A JURY IN THE EVENT OF ANY ACTION, PROCEEDING OR COUNTERCLAIM BROUGHT BY EITHER LANDLORD OR TENANT AGAINST THE OTHER IN CONNECTION WITH THIS LEASE.

IN WITNESS WHEREOF the parties have signed triplicate copies hereof.

TENANT: LANDLORD:

Control4 Corporation, a Delaware corporation

By: /s/ William B. West
William B. West, CEO
[Printed Name and Title]

**WDCI, INC.**, a Hawaii corporation

By: /s/ Norbert Buelsing
Name: NORBERT BUELSING
Its: PRESIDENT

By: /s/ Charles W. Loomis
Name: CHARLES W. LOOMIS
Its: ASST. SECRETARY



---

**EXHIBIT A**

**PREMISES**





---

**EXHIBIT B**

**RULES AND REGULATIONS**

The following rules and regulations constitute a part of the Lease and are hereby incorporated herein:

1. During periods of freezing weather conditions, Tenant shall maintain sufficient heat within the demised premises to insure that water and fire sprinkler pipes do not freeze. Tenant hereby acknowledges that the fire protection system in the building is a "wet" (water filled) system.

2. All shipping pallets shall be stored within the demised premises and not outside of the building unless they are to be disposed of during the business day.

3. Tenants shall deposit all trash and rubbish in their own container in such a manner that styrofoam packing and other materials are not scattered throughout the complex by natural forces i.e., the wind.

4. Tenant shall cooperate with the other tenants within the complex as to truck parking and/or "spotting" to insure all tenants have easy access to their respective loading areas. All automobiles shall be parked in the designated areas.

**SIGNS**

All signs must be approved in writing and must conform to the following standards in addition to any sign regulations adopted by Salt Lake City Corporation. All existing

signs not conforming to these standards, which conformed to the Salt Lake City regulations when erected, are considered to be a legal nonconforming sign, the continued use of which shall be governed by the Salt Lake City Corporation sign regulations relating to nonconforming signs.

Only the following signs are allowed:

a. public necessity signs identifying danger or hazard on or near the premises.

b. property signs offering the property for sale or lease, or announcing contemplated improvements.

c. on-premises business signs directing attention to a use, product, or service conducted on the premises on which it is located.

d. identification signs indicating nature of buildings or uses other than commercial or industrial.

e. service signs giving information to public such as directions to parking facilities.



---

In addition to signs prohibited in Salt Lake City sign regulations, the following signs are specifically prohibited:

a. off-premises business signs advertising products or services not provided on the premises.

b. roof signs erected partly or wholly on or over the roof of a building.

c. wall signs painted or giving the appearance of being painted on the wall of a building.

Business signs shall be limited to one or more signs not exceeding one (1) squared foot for each two (2) linear feet of frontage occupied by owner or occupant, but in no case shall the total area of all business signs associated with one building exceed one hundred seventy (170) square feet.

Where buildings are owned or occupied by more than one business entity in the same building, business signs must be standardized flat signs. Standards must include shape, back ground color, and size which will be limited to twelve (12) square feet per occupant.



---

## EXHIBIT C

## COMMENCEMENT DATE MEMORANDUM

LANDLORD: **WDCI, INC.**, a Hawaii corporation

TENANT: Control4 Corporation, a Delaware corporation

LEASE DATE: September 1, 2004

PREMISES:

Pursuant to Section 4.02 of the above-referenced Lease, the Commencement Date hereby is established as September 1, 2004, and the Expiration Date is hereby established as August 31, 2007.

TENANT:

**Control4 Corporation**, a Delaware corporation

By: /s/ William B. West
William B. West, CEO
[Printed Name and Title]

LANDLORD:

**WDCI, INC.**, a Hawaii corporation

By: /s/ Norbert Buelsing
NORBERT BUELSING PRESIDENT
[Printed Name and Title]

By: /s/ Charles W. Loomis

CHARLES W. LOOMIS ASST. SECRETARY

[Printed Name and Title]



---

**EXHIBIT D**

**LANDLORD'S WORK**

Landlord shall complete the following prior to the commencement date:

- Repair damaged overhead door
- Repair damaged soffit and truck loading area



---

MEMO

CBRE
CB Richard Ellis
Salt Lake City Main Office
[illegible] East Cottonwood Parkway
Suite 100
Salt Lake City, UT [illegible]
[illegible]
[illegible]
[illegible]

Date: June 23, 2004

To: Greg Gunn

From: Michael Jeppesen

Subject: Control4 at Centennial Plaza

This memo shall outline the additional agreements for the lease between Control4 Corporation ("Tenant") and WDCI, Inc. ("Landlord") for the property located at 3612 West 1820 South, Salt Lake City, Utah.

1. Landlord will provide a rent credit to Tenant in the amount of $1,000 towards the first month's net rental in lieu of the trip giveaway promotion.
2. Month one of the lease shall be free of base rent charges to Tenant. Operating expenses shall still be due and payable by Tenant.
3. Landlord has performed the repair requirements under Exhibit "D" of the lease.
4. Tenant shall be granted Early Possession to the premises as per section 4.05 of the Lease., so long as Tenant has paid the first month's rent and security deposit as provided for in the Lease, and provided a Certificate of Insurance naming the Landlord, and CBRE as additional insureds.

If you have any questions regarding the lease please feel free to contact me.

Respectfully,

**CB RICHARD ELLIS**

Michael Jeppesen

---

**FIRST AMENDMENT TO LEASE**

This First Amendment to Lease Agreement (the "First Amendment") is made and entered into this 24th day of May 2006, by and between **WDCI, Inc.** (the "Landlord") and **Control4 Corporation**, (the "Tenant").

**WITNESSETH:**

**WHEREAS**, Landlord and Tenant have entered into that certain Lease Agreement dated June 29, 2004 for premises consisting of approximately 15,000 leaseable square feet located at 3612 West 1820 South, Salt Lake City, Utah (Existing Premises), and,

**WHEREAS**, the Lease Agreement and this First Amendment shall be hereinafter collectively be referred to as the "Lease", and,

NOW THEREFORE, the parties hereto hereby agree as follows:

1. Effective June 1, 2006 the Premises shall include 3614 West 1820 South, Salt Lake City, Utah ("Expansion Space"), comprising an additional approximately 20,000 square feet of leaseable area as shown on the attached site plan (Exhibit A). The Existing Premises and the Expansion Area, together have an area of 35,000 square feet, more or less, and from and after June 1, 2006, shall be referred to as the "Premises".

2. The Expiration Date of the Lease is hereby amended to be May 31, 2011.

3. Base Rent shall be as follows:

| | |
|---|---|
| June 1, 2006- December 31, 2006 | $5,400.00 per month |
| January 1, 2007 - May 31, 2007 | $9,450.00 per month |
| June 1, 2007 - May 31, 2008 | $9,800.00 per month |
| June 1, 2008- May 31, 2009 | $10,150.00 per month |
| June 1, 2009- May 31, 2010 | $10,500.00 per month |
| June 1, 2010- May 31, 2011 | $10,850.00 per month |

4. Upon execution of this Amendment by Landlord and Tenant, Landlord shall promptly commence the following permanent improvements ("Tenant Improvements") to the Premises, and shall promptly complete them in a timely manner using Landlord's good faith efforts (subject to force majeure or any delays caused by Tenant). Furthermore, Tenant may elect to have Landlord competitively bid any materials, contractors, or subcontractors to no less than three sources (unless three sources do not exist) and pick the vendor or service provider as determined by Tenant. Tenant shall notify Landlord in writing in advance of Tenant's intent to do so, and any delays resulting from this process (except delays caused solely by Landlord) shall be attributed to Tenant

 - Add two restrooms in the Expansion Premises. (One men's having one toilet, one urinal, and one sink and one women's having one toilet and one sink.)

---

 - One 10' wide by 12' tall penetration in the demising wall between the Existing Premises and Expansion Space, the exact location of which shall be mutually agreed upon by Landlord and Tenant.

 - Change the lighting in the Expansion Space to Halogen lamps, the exact layout of which shall be mutually agreed upon by both Landlord and Tenant once Tenant has established its space plan.

 - Install adequate swamp coolers in both the Existing Premises and Expansion Space to maintain the Premises at a commercially reasonable temperature throughout the Summer months.

 - Install fiber optic cable to the Existing Premises. Landlord and Tenant agree that Tenant has already paid $16,064 to Qwest for the installation of the fiber optic cable. Upon execution of this Amendment and receipt by Landlord of evidence of payment (paid invoice, cancelled check), Landlord shall reimburse Tenant for this expense (which shall be deducted from the available allowance described below).

 - Build a basic break room with cabinets/counters, sink, and electrical outlets for a refrigerator, microwave, and vending machines (but Landlord is not obligated to provide such refrigerator, microwave, or vending machine, all of which are Tenant's responsibility). The location, layout, and design of the break room shall be mutually agreed upon by both Landlord and Tenant.

 - Install two dock levelers at Tenant's discretion, should the Tenant Improvement budget allow.

Landlord shall be responsible for payment of all Tenant Improvement costs up to $35,000.00. Should Tenant Improvement costs exceed this amount, Landlord shall provide an Additional Tenant Improvement Allowance in a maximum amount of $15,000, to be repaid by Tenant to Landlord over the remaining Lease Term. The Additional Tenant Improvement Allowance shall be fully amortized as additional rent over the balance of the Lease Term commencing January 1, 2007, using an 8.5% per annum amortization rate. In such event, Landlord will calculate the amount of additional rent payable by Tenant and deliver to Tenant in writing a payment schedule for such amount. Costs for any Tenant Improvements in excess of $50,000 shall be the responsibility of the Tenant. In the event Landlord pays such costs, Tenant shall reimburse Landlord within ten (10) days of receipt of an invoice therefor, and such amount shall be considered additional rent under the Lease.

The Lease is amended to conform to the terms and conditions of this First Amendment and in the event of any conflict between the provisions of this First Amendment and the Lease, the provisions of this First Amendment shall control; but in all other respects, the provisions of the Lease shall continue in full force and effect, and are hereby ratified and affirmed.

---

IN WITNESS HEREOF, the parties hereto have executed this First Amendment on the day and year written above.

**TENANT**
CONTROL4 CORPORATION

By: /s/ Rhonda Basset Spears

Its:

**LANDLORD**
WDCI, INC.

By: /s/ Norbert Buelsing
NORBERT BUELSING
PRESIDENT

By: /s/ Charles W. Loomis
CHARLES W. LOOMIS
ASST. SECRETARY

---

## SECOND AMENDMENT TO LEASE

THIS SECOND AMENDMENT TO LEASE (this "**Amendment'**) is entered into as of the 25th day of February, 2011, by and between **WDCI, INC.**, a Hawaii corporation ("**Landlord**") and **CONTROL4 CORPORATION**, a Delaware corporation ("**Tenant**").

### WITNESSETH

WHEREAS, Landlord is the landlord and Tenant is the tenant under that certain Industrial Lease dated June 29, 2004, as amended by First Amendment to Lease dated May 24, 2006 (as amended, the "**Lease**") demising Suites 3612 and 3614 in the Centennial Plaza complex, comprising approximately 35,000 square feet of space, all as more particularly described in the Lease.

WHEREAS, Landlord and Tenant desire to extend the term of the Lease, set the rent for such extended term, and update various provisions of the Lease, all on the terms and conditions set forth below;

NOW THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are acknowledged, Landlord and Tenant make this Amendment. All terms capitalized and not otherwise defined in this Amendment shall have the respective meanings ascribed to them by the Lease.

### AMENDMENT TO LEASE

1. Premises. Inadvertently, Exhibit A of the Lease, outlining the Premises, was not attached to the Lease. Accordingly, Exhibit A attached to this Amendment is hereby added as Exhibit A to the Lease.

2. Lease Term. The Lease Term is extended for six (6) months, such that the new Expiration Date shall be November 30, 2011.

3. Base Rent. Base Rent for the extended portion of the Lease Term shall be as follows:

June 1, 2011 - November 30, 2011 $10,850.00 per month

4. Option to Extend. Provided that Tenant is not then in default under the Lease, Tenant shall have the right to extend the Lease Term for one additional

six (6) month period, such that the Expiration Date would be May 31, 2012, at the same Base Rent of $10,850.00 per month, plus all other amounts that comprise "Rent" under the Lease. To exercise its right, Tenant must give Landlord notice in writing of its intent to extend the Lease Term no later than August 3 1, 201 1. Should Tenant exercise its right, except only the Expiration Date, the extension shall be on the same terms and conditions set forth in this paragraph for the first extension period.

5. Right of First Offer. Landlord grants to Tenant a one time right of first offer ("**ROFO**") to lease Suite 3610, totaling 10,000 square feet (the "**ROFO Space**"), should it come

1

---

available during the Lease Term. The ROFO shall be subordinate and secondary to all rights of expansion, rights of first refusal, rights of first offer, or similar rights granted to tenants under any existing tenant space leases within the Building and existing as of the date of the ROFO Notice (as defined below). The rights described in this paragraph shall be known collectively as "**Superior Rights**." Landlord shall give Tenant written notice when Landlord determines that the ROFO Space is available for lease (the "**ROFO Notice**"), as long as no Superior Right has been exercised or asserted.

The ROFO Notice shall (a) state the Base Rent proposed by Landlord for the ROFO Space (the "**ROFO Rent**"); and (b) slate the estimated date that Landlord then-anticipates the ROFO Space will be available for delivery to Tenant. All other terms and conditions for leasing the ROFO Space shall be as set forth in the Lease, except for any improvement allowances, tenant improvements by Landlord, and other tenant inducements therein, if Tenant wishes to exercise the ROFO, Tenant shall deliver to Landlord written notice ("**Exercise Notice**"), which shall be irrevocable, within ten (10) business days after receipt of the ROFO Notice. The ROFO Rent shall be as set forth in the ROFO Notice, except that if Tenant disagrees with the ROFO Rent proposed by Landlord, Tenant shall include in the Exercise Notice Tenant's counter-proposal for ROFO Rent. Tenant must elect to exercise the ROFO, if at all, only with respect to all of the ROFO Space, and Tenant may not elect to lease only a portion of such space. If Tenant fails to timely deliver the Exercise Notice, Tenant shall be deemed to have waived its ROFO and Landlord shall thereafter be free to lease the ROFO Space to any third party.

If Landlord and Tenant are unable to agree on ROFO Rent by the date thirty (30) days after the Exercise Notice, the ROFO Rent shall be determined by arbitration as set forth herein, in such event, ROFO Rent shall be at the "Market Rate", which is described as follows:

The Base Rent that would be agreed to by a landlord and a new tenant, each of whom is willing, but neither of whom is compelled, to enter into the lease transaction, The Market Rate shall not take into account any existing tenant improvements or any special uses or rights afforded to Tenant under the Lease in connection with the Premises, but shall take into account the following factors:

i. Rent for comparable premises in comparable existing buildings (taking into consideration, but not limited to, use, location within the applicable building, definition of net rentable area, quality, age, and location of the applicable buildings):

ii. The length of the remaining Lease 'term; and

iii. The extent to which inducements such as tenant improvement allowances, rent credits, moving allowances, space planning allowances, or similar inducements given to tenants affect the determination of Market Rent for the Base Rate.

The determination of the appraiser(s) shall be limited to the sole issue of whether Landlord's or Tenant's proposed ROFO Rent is the closest to the Market Rate as determined by the appraiser(s). if the parties agree upon a single appraiser, such appraiser's decision shall be

2

---

final and binding upon both parties, if the parties fail to agree upon a single appraiser within forty (40) days after the Exercise Notice, there shall be an arbitration by three (3) appraisers, in which case either party shall name one appraiser by written notice to the other party, whereupon the other party shall, within ten (10) days after receipt of such notice, name the second appraiser, and in case of failure to do so, the party who has already named an appraiser may have the second appraiser selected or appointed by a judge of the trial court of the county in which the Premises is located. The two appraisers so appointed shall appoint a third appraiser, and if the two appraisers shall fail to appoint such third appraiser within ten (10) days after the naming of the second appraiser, cither party may have the third appraiser appointed by such judge, and the three appraisers so appointed shall thereupon proceed to make the determination required by this section. The decision and award of any two appraisers shall be final, conclusive and binding upon both parties, unless such decision and award shall be vacated, modified or corrected, all as provided by in the arbitration statute (if any) of the state in which the Premises is located. The appraisers shall notify the parties of their decision within thirty (30) days after initiation of the arbitration proceeding.

The appraisers shall have the MAI designation and a minimum of ten (10) years experience in the Salt Lake City market, and shall have all of the powers and duties prescribed by the laws of the state in which the Premises is located, and judgment may be entered upon any such decision and award as therein provided. If, and whenever the fixing of ROFO Rent is under arbitration, Tenant, pending the determination thereof, shall continue to pay the same Base Rent per square foot for the ROFO Space that it is then paying for the Premises, and shall promptly pay the deficiency, if any upon the conclusion of the arbitration proceedings, if Base Rent paid by Tenant is more than the ROFO Rent. Landlord shall reimburse or credit Tenant for such difference. The cost of such arbitration shall be borne by the losing party, except attorneys' fees and witness fees that shall be borne by the party engaging such attorney or witness.

6. Patriot Act. Tenant covenants that the use of the Premises will not violate (a) the Trading with the Enemy Act, as amended, or (b) any of the foreign assets control regulations of the United States Treasury Department or any enabling legislation or order relating thereto. Without limiting the foregoing, neither Tenant nor any guarantor (i) is, or will become a person described in the Specially Designated Nationals and Blocked Persons List of the Office of Foreign Assets Control or as described by Section 1 of Executive Order 13224 of September 24, 2001, Blocking Property and Prohibiting Transactions With Persons Who Commit, or Support Terrorism (3 1 CFR Part 595 et seq.) or (ii) to its knowledge, engages in any dealings or transactions, or is otherwise associated, with any such person. Tenant covenants that Tenant is in compliance, in all material respects, with the USA Patriot Act, to the extent applicable. Tenant will indemnify, defend, and hold harmless Landlord from any claims, costs, expenses, demands, fees (including reasonable attorneys' fees), penalties, and amounts related to Tenant's violation of the provisions of this Section, or the failure of any of the provisions in this Section to be true or accurate at any time during the Term. The indemnification provisions of this Section shall survive termination of the Lease for any reason.

7. Certification. As an essential inducement to Landlord to execute this Amendment. Tenant hereby certifies and warrants to and agrees with Landlord that to Tenant's knowledge (a) no event of default by Landlord under the Lease exists as of the dale of this Amendment, nor has any event occurred which, with the passage of time or the giving of notice,



---

or both, would constitute an event of default, (b) Landlord is not in any manner in default in the performance or observance of any obligation or duty owned to Tenant, under the Lease or otherwise, and (c) Tenant has no defenses, offsets, claims or counterclaims to the observance and performance by Tenant of any provision of the Lease.

8. Full Force and Effect. The provisions of the Lease are hereby amended to conform herewith, and in the event of any conflict between the provisions of the Lease or this Amendment, the provisions of this Amendment shall control; but in all other respects, the provision of the Lease shall continue in full force and effect.

9. Severability. If for any reason any of the provisions of this Amendment shall be unenforceable or ineffective, all of the other provisions shall remain in full force and effect.

10. Entire Agreement. The provisions of this Amendment constitute, and are intended to constitute, the entire agreement of Landlord and Tenant regarding this Amendment. No terms, conditions, warranties, promises or undertakings of any nature whatever, express or implied, exist between Landlord and Tenant except as expressly set forth in the Lease as amended by this Amendment. Any amendment or modification of the Lease must be in writing and signed by both Landlord and Tenant.

11. Miscellaneous. The section headings herein are for convenience of reference, and shall in no way define, limit or describe the scope or intent of any provisions of this Amendment. This Amendment may be signed in counterparts and by facsimile signature.

IN WITNESS WHEREOF, Landlord and Tenant have executed this Amendment as of the date above set forth.

| | |
|---|---|
| **LANDLORD:** | **TENANT:** |
| **WDCI, INC.** | **CONTROL4 CORPORATION** |
| By: [Illegible] | By: /s/ Mark Novakovich |
| Its: EXECUTIVE VICE PRESIDENT | Its: VP Finance |
| By: [Illegible] | By: |
| Its: ASST. SECRETARY | Its: |



---

EXHIBIT A

Premises Outline

[insert drawing showing outline of Premises]

**EXHIBIT A**




---

EXHIBIT E

**Schedule 1**

**INSURANCE QUESTIONNAIRE**

1. Do you use store or contemplate using at any time fluids or other materials having a closed cup flash point 80 degrees or less including, but not limited to, gasoline, benzene, carbon disulfide, naphtha, kerosene, LPG, or other materials? Yes ☐ No ☐

If yes, please answer the following:

A. Will you use Underwriter's Laboratories approved self-closing cans?
Yes ☐ No ☐

B. What is the gallon capacity you anticipate storing or using?

C. Will the above be "shelf stock" stored in original sealed containers?
Yes ☐ No ☐

D. Do you plan to store or use the above outside of the building?
Yes ☐ No ☐

If yes, will it be within 30 feet of the building? Yes ☐ No ☐

2. Do you have or plan to have a gasoline engine or other gasoline powered equipment to be used in the building (other than forklifts)? Yes ☐ No ☐

3. Do you contemplate the use of any spray painting equipment? Yes ☐ No ☐

If yes, please answer the following:

A. Will an Underwriter's Laboratory approved booth be installed?
Yes ☐ No ☐

B. If yes, submit the specifications for the booth or furnish the name of the booth company and person to contact including telephone number and address.

4. Do you contemplate or plan to operate a restaurant or similar cooking facility?
Yes ☐ No ☐

If yes, will you install an Underwriter's Laboratory approved hood and dust fire extinguisher system? Yes ☐ No ☐

---

5. If building is sprinklered, please answer the following:

A. Do you contemplate storing stock over 1 5 feet without racks, or over 12 feet with racks?
Yes ☐ No ☐

B. How many feet in height will you store goods?

C. Will you store goods closer than within 3 feet of the sprinkler heads?
Yes ☐ No ☐

D. Will you use racks or shelves for storage? Yes ☐ No ☐

E. If answer to "D" above is "Yes", please answer the following:

1. Are racks slatted, solid, or open?

2. What is the width of racks?

3. Will racks be single or multi-row?

4. What is the aisle width between racks?

F. Describe the goods to be stored:

G. What materials are the products made of?

H. Will your inventory consist of any of the following? Please check the appropriate item(s).

☐ Linoleum products
☐ Lacquers in cans or in cartons
☐ All high-hazard plastics
☐ Upholstered furniture
☐ Wooden furniture
☐ Eighty-six proof or higher liquors
☐ Pharmaceuticals in bottles
☐ Rugs or carpets
☐ Rolled pulp and paper light tissue crepe grade (horizontal storage or racked)
☐ Balled waste paper
☐ Alcohol in cans or bottles or in cartons
☐ Baled cork
☐ Wooden patterns, pallets, and flats
☐ Rolled pulp and paper (vertical storage)
☐ Unhanded or light tissue crepe paper
☐ Rolled asphalt paper (vertical)



---

☐ Rubber Tires
☐ Foam or sponge rubber
☐ Crude or synthetic rubber
☐ Roamed plastic products (with or without cartons)
☐ Goods encapsulated by plastic

If any of the above is "checked", do you plan to install approved in-rack or in-bin sprinklers?
Yes ☐ No ☐

Do you plan to install other fire protection devices? Yes ☐ No ☐

If yes, describe:

6. Do you contemplate any of the following operations? If yes, please check the appropriate occupancy.

☐ Storage of dynamite, dynamite caps, or gunpowder
☐ Woodworking (any kind)
☐ Paper Box Manufacturing
☐ Excelsior Works
☐ Paper Shredding Plants
☐ Upholstery Works
☐ Cotton Storage
☐ Broom Manufacturing
☐ Calcium Carbide (Slocks)
☐ Celluloid Goods
☐ Fireworks
☐ Furniture Repairing
☐ Furniture Factories
☐ Moving Picture Film (Slock)
☐ Paint Manufacturing
☐ Printer's Ink Manufacturing
☐ Rubber Tire Recap or Retread

7. What is your contemplated usage if not previously covered?

COMPANY NAME:

LOCATION OF PREMISES:

SIGNED BY: ______________________ DATE: ______________

TITLE: ______________________________



**Schedule 2**

**ENVIRONMENTAL QUESTIONNAIRE**

The protection of the environment and compliance with all applicable environmental laws are of extreme importance to Landlord. As part of Landlord's leasing procedures, please complete this Environmental Questionnaire ("**Questionnaire**") for every business that will be conducted from the leased premises. Use additional sheets if there is insufficient space for your response. Thank you for your cooperation.

1. Tenant's name:

2. Location of leased premises:

3. Each business to be conducted by Tenant at the leased premises (*please be specific*):

4. Will all or any portion of the premises be subleased to others? Yes ☐ No ☐
If yes, identify each subtenant and each business to be conducted by the subtenant at the premises (*please be specific*):

| | **Subtenant Name** | **Business** |
|---|---|---|
| a) | | |
| b) | | |

5. Please indicate which of the following items will be placed, used, stored, treated or generated at the leased premises by Tenant or any subtenant (*check all applicable categories*):

☐ Underground storage tank.

☐ Above-ground storage tank.

☐ Any hazardous materials or wastes that are regulated by state or federal law. (If this category is checked, please complete Part A on page 3 of this questionnaire.)

☐ Any other materials which, if not properly stored, treated or handled, could pose a risk of harm to the environment. (If this category is checked, please complete Part B on page 3 of this questionnaire.)

☐ None of the above.

6. Will any by-product of any business conducted at the leased premises by Tenant or any subtenant be released or discharged into the atmosphere, the ground or any waterway,



drainage ditch, or private cesspool or septic tank?
Yes ☐ No ☐ (*If yes, please complete Part C on page 3 of this questionnaire.*)

7. Has Tenant or any proposed subtenant been subject to any warning from or citation, penalty, lawsuit or administrative action by any government agency under any hazardous materials law?
Yes ☐ No ☐ (*If yes, please complete Part D on page 3 of this questionnaire.*)

Tenant hereby certifies that each of the above questions has been answered accurately and completely. Tenant acknowledges that neither the above answers nor Landlord's receipt and review of this Questionnaire will release Tenant from any liability or responsibility for environmental matters or from any liability or obligation under Tenant's lease with Landlord, or result in any transfer or assumption of any liability or responsibility to or by Landlord.

Signature: ______________________ Date: ______________

Title: ______________________

5

---

**ENVIRONMENTAL QUESTIONNAIRE**

**Additional Information**

Please use additional sheets if there is insufficient space for your response.

A. The following regulated hazardous materials or wastes will be used, stored, treated or generated at the leased premises:

B. The following other materials, if not properly stored, treated or handled, could pose a risk of harm to the environment:

C. The following by-products will be released or discharged into the atmosphere, the ground, a waterway, a drainage ditch or a private cesspool or septic tank:

D. The following warning from, or citation, penalty, lawsuit or administration by a government agency under a hazardous materials law was brought against me or my proposed subtenant
(*please describe*):

Tenant hereby certifies that each of the above questions has been answered accurately and completely. Tenant acknowledges that neither the above answers nor Landlord's receipt and review of this Questionnaire will release Tenant from any liability or responsibility for environmental matters or from any liability or obligation under Tenant's lease with Landlord, or result in any transfer or assumption of any liability or responsibility to or by Landlord.

Signature: ______________________ Date: ______________

Title: ______________________

6

---

**THIRD AMENDMENT TO LEASE**

THIS THIRD AMENDMENT TO LEASE (this "**Amendment**") is entered into as of the 7th day of November, 2011, by and between **WDCI, INC.**, a Hawaii corporation ("**Landlord**") and **CONTROL4 CORPORATION**, a Delaware corporation ("**Tenant**").

**WITNESSETH**

WHEREAS, Landlord is the landlord and Tenant is the tenant under that certain Industrial Lease dated June 29, 2004, as amended by First Amendment to Lease dated May 24, 2006, and Second Amendment to Lease dated February 25, 2011 (as amended, the "**Lease**") demising Suites 3612 and 3614 in the Centennial Plaza complex, comprising approximately 35,000 square feet of space;

WHEREAS, Landlord and Tenant desire to extend the term of the Lease, set the rent for such extended term, and update various provisions of the Lease, all on the terms and conditions set forth below;

NOW THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are acknowledged, Landlord and Tenant make this Amendment. All terms capitalized and not otherwise defined in this Amendment shall have the respective meanings ascribed to them by the Lease.

**AMENDMENT TO LEASE**

1. Lease Term. The Lease Term is extended for sixty four (64) months, such that the new Expiration Date shall be March 31, 2017.

2. Base Rent. Base Rent for the extended portion of the Lease Term shall be as follows

| **Term** | | **Base Rent Per Month** |
|---|---|---|
| 12/1/11 -3/31/12 | $ | 0.00 |
| 4/1/12-3/31/13 | $ | 11,550.00 |
| 4/1/13-3/31/14 | $ | 11,896.50 |
| 4/1/14-3/31/15 | $ | 12,253.40 |
| 4/1/15-3/31/16 | $ | 12,621.00 |
| 4/1/16-3/31/17 | $ | 12,999.63 |

3. Option to Extend. Provided that Tenant is not then in default under the Lease, Tenant shall have the right to extend the Lease Term for one additional period of either thirty-six (36) or sixty (60) months, as determined by Tenant pursuant to this Paragraph 3 (the "**Extension Option**").

a. The Extension Option is subject to the following conditions:

i. Other than a Permitted Assignment as defined in Section 8.03 of the Lease, the rights contained in this Paragraph shall be personal to the originally named and



may be exercised only by the originally named Tenant (and not any other non permitted assignee, subtenant, or other non permitted transferee of Tenant's interest in the Lease).

ii. Tenant shall not be in default when it exercises its option or at the commencement of the Option Term (defined below), nor shall Tenant have been in material default under the Lease (regardless of whether such default was ultimately cured) more than three (3) times during the Lease Term. Whether a default is material is in Landlord's reasonable discretion, but shall include without limitation, failure to pay Rent when due.

iii. If Tenant properly exercises the Extension Option and all conditions set forth in this Paragraph are satisfied, the term shall be extended for the Option Term. Tenant's exercise of the Extension Option is irrevocable.

iv. Tenant must exercise the Extension Option, if at all, only at the lime and in the manner provided in this Paragraph.

b. Exercise of Extension Option:

i. If Tenant wishes to exercise the Extension Option, Tenant shall deliver written notice ("**Interest Notice**") to Landlord no less than six (6) months before the expiration of the initial Lease Term. The Interest Notice shall state whether Tenant elects to exercise the Extension Option for a thirty-six (36) month term, or a sixty (60) month term, and whichever Tenant elects in the Interest Notice shall be the "**Option Term**." Within sixty (60) days after Landlord's receipt of Tenant's Interest Notice, Landlord shall deliver notice ("**Option Rent Notice**") to Tenant stating the Base Rent for the Option Term (the "**Option Rent**"), based upon Landlord's determination of fair market rental value of the Premises as of the commencement date of the Option Term.

ii. If Tenant wishes to exercise the Extension Option, Tenant must, on or before the earlier of (1) the date occurring three (3) months prior to the commencement of the Option Term, or (2) the date occurring thirty (30) days after Tenant's receipt of the Option Rent Notice, exercise the Extension Option by delivering written notice ("**Exercise Notice**") to Landlord. If Tenant wishes to contest the Option Rent stated in the Option Rent Notice, Tenant must provide, with the Exercise Notice, written notice to Landlord that Tenant objects to the stated Option Rent and include Tenant's determination of the fair market rental value of the Premises. If Tenant provides such written objection and includes Tenant's determination of fair market rental value, the Option Rent shall be determined in accordance with the procedure set forth below for determining fair market rental value. Otherwise, the Option Rent shall be as set forth in the Option Rent Notice. If Tenant fails to deliver a timely Interest Notice or Exercise Notice, Tenant shall be considered to have elected not to exercise the Extension Option.

iii. If Tenant timely exercises its Extension Option, Landlord and Tenant shall, within thirty (30) days after the Option Rent is determined, execute an amendment to the Lease extending the Term on the terms and conditions set forth in this Paragraph. If Landlord and Tenant are unable to agree on the Option Rent for the Option Term, the Option Rent shall be the fair market rental value of the Premises (at least commensurate with rents typical of other similar space in other comparable projects), including amenities offered, but in

no event shall the monthly Option Rent be less than the Base Rent for the immediately preceding month. Determination of such fair market rental shall include consideration of any commercially-reasonable, industry-standard commissions payable, incentives, free rent, tenant improvement allowances, or any other incentives offered by a landlord to a new tenant, each of whom is willing, but neither of whom is compelled, to enter into a lease transaction. If each party makes a timely determination of the fair market rental value, those determinations shall be submitted to an appraiser as provided herein. Such appraisal shall commence as soon as practicable following the Exercise Notice. If there is an appraisal, the determination of the appraiser(s) shall be limited to the sole issue of whether Landlord's or Tenant's submitted fair market rental value is the closest to the actual fair market rental value as determined by the appraisers in accordance with the limitations set forth in this Paragraph. Such Option Rent shall be payable in advance on the first day of each month. If the parties agree upon a single appraiser, such appraiser's decision shall be final, conclusive and binding upon both parties, subject to the minimum limitations stated above. If the parties fail to agree upon a single appraiser within ten (10) days of the Exercise Notice, there shall be an arbitration by three (3) appraisers, in which case either party shall name one of the appraisers by written notice to the other party, whereupon the other party shall, within ten (10) days after receipt of such notice, name a second appraiser, and in case of failure to do so, the party who has already named an appraiser may have the second appraiser selected or appointed by a judge of the trial court of the county in which the Premises is located; and the two appraisers so appointed, in either manner, shall select and appoint a third appraiser, and if the two appraisers so appointed shall fail to appoint the third appraiser within ten (10) days after the naming of the second appraiser, either party may have the third appraiser selected or appointed by such judge; and the three appraisers so appointed shall thereupon proceed to make the determination required by this Paragraph, and the decision and award of any two of them shall be final, conclusive and binding upon both parties, subject to the minimum limitations stated in this Paragraph, unless such decision and award shall be vacated, modified or corrected, all as provided by in the arbitration statute (if any) of the state in which the Premises is located. The appraisers shall be recognized real estate appraisers who are members of the American Institute of Real Estate Appraisers (MAI) or Society of Real Estate Appraisers or any similar appraisal organization, shall have a minimum of 5 years experience in the Salt Lake City market, and shall have all of the powers and duties prescribed by the laws of the state in which the Premises is located, and judgment may be entered upon any such decision and award as therein provided,

iv. In ascertaining the fair market rental value of the Premises, the appraisers shall assume for purposes of their appraisal that the Premises are available for immediate utilization to the greater of the use then being made of the Premises by Tenant or the then-highest and best use therefor. Subject to the foregoing provisions, the process or method of appraisal shall be that receiving general acceptance among competent, experienced and recognized appraisers in the field of real estate valuation in the state in which the Premises is located. If, and whenever the fixing of such fair market rental value is under arbitration, Tenant, pending the determination thereof, shall continue to pay the same Rent that it had been paying during the last preceding rental period and shall promptly pay the deficiency, if any, upon the conclusion of the arbitration proceedings. If Tenant does not pay the deficiency within 10 days following the determination of fair market rental through arbitration, Tenant shall owe Landlord the deficiency plus interest at the rate of twelve percent (12%) per annum on the amount of such deficiency computed from the date or dates when the amount of such deficiency would have



---

been payable but for the pendency of the arbitration. The cost of such arbitration shall be borne by the losing party, except attorneys' fees and witness fees that shall be borne by the party engaging such attorney or witness.

4. Tenant Improvements: Landlord will provide Tenant with an improvement allowance in the maximum amount of $105,000.00 (the "**Allowance**"). The Allowance shall be used by Tenant solely for improvements to the Premises as previously approved by Landlord in writing on the attached Exhibit A, including office space, a customer waiting area, and new lighting; but in no event may the Allowance be used for personal property, including but not limited to data cabling and wiring. After completion of Tenant's work and the expiration of the statutory period in which mechanics and materialmen can file liens or the furnishing of lien releases acceptable to Landlord from all contractors and suppliers, Tenant shall deliver to Landlord a copy of the construction contract, all bills and invoices and such other documentation as Landlord may reasonably require to evidence payment of the expenses incurred by Tenant for which Tenant seeks reimbursement of the Allowance. Upon Landlord's receipt of such items and verification of Tenant's costs. Landlord shall pay to Tenant the Allowance, reduced by any Landlord project management fee, within fifteen (15) days of receipt of all of such documentation and verification. Landlord's project management fee shall not exceed $750, provided Landlord has approved, in writing, all mechanical, electrical and plumbing contractors selected by Tenant for the Tenant Improvements. Landlord reserves the right, but not the obligation, to charge a three percent (3%) project management fee on the total cost of the Tenant Improvements should Tenant use a contractors) that has not been approved by the Landlord. Tenant must request reimbursement of the Allowance pursuant to this Paragraph 4 no later than December 31, 2012. If Tenant does not timely make such request, then all of Tenant's rights to such Allowance or any portion thereof shall automatically terminate and be null and void as of such date, and Tenant shall no longer be entitled to any portion or all of the Allowance. In the event the costs of the approved improvements for which Tenant seeks reimbursement are less than the full amount of the Allowance, Landlord shall be obligated to reimburse Tenant only the actual amount of such costs, and Tenant shall not be entitled to payment or credit of any remaining balance. In the event the costs of Tenant's improvements to the Premises exceed the Allowance, Tenant and not Landlord shall be solely responsible for such excess amounts. The provisions of this Paragraph 4 shall supersede any other improvement allowances, Landlord build-out obligations, and reimbursements previously set forth in the Lease, Landlord's performance obligations having been satisfied with respect thereto.

5. Landlord's Work. Landlord has agreed to make the following improvements to the Building: (a) upgrade the Building's fire alarm panel, including horns and strobes; (b) construct an ADA-accessible ramp at the Building entrance, if required by law; and (c) upgrade any Building amenities that do not currently comply with the building or fire code ("**Landlord's Work**"). In no event shall Landlord's Work include any code compliance associated with Tenant's specific use of the Premises or necessitated by Tenant's improvements to the Premises, provided that if Tenant is unable to secure a permit or proceed with its improvements to the Premises because of any noncompliance with the building or fire code as of the date of this Amendment and not caused by Tenant, then Landlord acknowledges and agrees that Landlord shall be responsible, at its own cost and expense, for promptly curing such noncompliance Landlord shall use "building standard" materials applicable to the Project. Any

upgrades requested by Tenant of Landlord's Work beyond "building standard" shall be at Tenant's sole cost and expense, chargeable to Tenant as additional rent.

In no event may Tenant interfere with the pace or performance of Landlord's Work, or cause any delay to the construction schedule. Additional costs to Landlord resulting from such interference and delay shall be payable by Tenant as additional rent. The provisions of this Paragraph 5 shall supersede any other improvement allowances (except the Allowance described in Paragraph 4 of this Amendment), Landlord build-out obligations, and reimbursements previously set forth in the Lease, Landlord's performance obligations having been satisfied with respect thereto.

Landlord shall be responsible for ensuring that the Common Areas comply with the requirements of Title III of the Americans with Disabilities Act of 1990 (42 U.S.C. 12181, et seq., The Provisions Governing Public Accommodations and Services Operated by Private Entities), and all regulations promulgated thereunder, and all amendments, revisions or modifications thereto now or hereafter adopted or in effect in connection therewith, or any other similar Laws (hereinafter collectively referred to as the "ADA"), and to take such actions and make such alterations and improvements as are necessary for such compliance. The cost of such compliance shall be included in the Operating Expenses of the Project.

6. Right of First Offer. Landlord grants to Tenant a right of first offer ("**ROFO**") to lease Suite 3610, totaling approximately 10,000 square feet (the "**ROFO Space**"), should it come available during the Lease Term. The ROFO shall be subordinate and secondary to all rights of expansion, rights of first refusal, rights of first offer, or similar rights granted to tenants under any existing tenant space leases within the Building and existing as of the effective date of this Amendment. The rights described in this Paragraph shall be known collectively as "**Superior Rights**." Landlord shall give Tenant written notice when Landlord determines that the ROFO Space is available for lease (the "**ROFO Notice**"), as long as no Superior Right has been exercised or asserted.

The ROFO Notice shall state the estimated date that Landlord then-anticipates the ROFO Space will be available for delivery to Tenant. All other terms and conditions for leasing the ROFO Space shall be as set forth in the Lease, including the Base Rent rate per square foot, Common Expenses, and remaining Lease Term, and a tenant improvement allowance of $3.00 per square foot prorated by the number of months left in the Term upon rent commencement of the ROFO Space divided by 64, but excluding any tenant improvements by Landlord and other tenant inducements similar thereto. If Tenant wishes to exercise the ROFO, Tenant shall deliver to Landlord written notice ("**Exercise Notice**"), which shall be irrevocable, fifteen (15) business days after receipt of the ROFO Notice, Tenant must elect to exercise the ROFO, if at all, only with respect to all of the ROFO Space, and Tenant may not elect to lease only a portion of such space. If Tenant fails to timely deliver the Exercise Notice, Tenant shall be deemed to have waived its ROFO and Landlord shall thereafter be free to lease the ROFO Space to any third party.

If Tenant timely delivers the Exercise Notice, (a) Landlord and Tenant shall execute an amendment to the Lease to incorporate the ROFO Space, and to set Base Rent and Tenant's new proportionate share of Common Expenses, as well as any other matters that depend



for their calculation on the area of the Premises; and (b) Landlord, at its sole expense, will either remove the demising wall between the Premises and the ROFO Space, or provide openings in the demising wall between the Premises and the ROFO Space to facilitate Tenant's use of the combined premises. The ROFO described in this Paragraph 6 supersedes and replaces any rights of first offer, rights of first refusal, and similar rights set forth in the Lease prior to this Amendment.

7. Hazardous Materials. Section 20 of the Lease entitled "Hazardous Materials" is hereby deleted and replaced by the following:

20. HAZARDOUS MATERIALS.

a. Use, Storage, Handling and Disposal of Hazardous Materials. Except as explicitly provided in this Lease, Tenant shall not cause any Hazardous Materials (as such term is defined below) to be used, generated, stored, transported, handled or disposed of in, on, under, or about the Premises or the Project at any time (such activities are hereinafter referred to as "**Environmental Activities**"). Tenant further agrees that (i) Tenant will not engage in any activity on the Premises that will produce any Hazardous Materials; (ii) Tenant will not install any underground tanks of any type; (iii) Tenant will not use any portion of the Premises as a landfill or a dump; and (iv) Tenant will not cause any surface or subsurface conditions to exist or come into existence that constitute, or with the passage of time may constitute, a public or private nuisance. Tenant shall be responsible for assuring compliance by such persons with the foregoing prohibition, which shall survive the expiration or early termination of this Lease and extend to Tenant, and its officers, directors, employees, agents, contractors, and invitees, and any assignees claiming by, through, or under Tenant, any subtenants claiming by, through, or under Tenant ("**Tenant Party**"), and Tenant's failure to abide by the terms of this Section shall be restrainable by injunction. Notwithstanding the foregoing, and subject to Tenant's covenant to strictly comply with all Hazardous Materials Laws (as such term is defined below) and all other terms and conditions of this Lease, Tenant may bring upon, keep and use general office and cleaning supplies typically used in the ordinary course of business of an office, such as copier toner, liquid paper, glue, ink, and cleaning solvents, for use in the manner for which they were designed. From time to time during the Term, Tenant may request Landlord's approval of Tenant's use of other Hazardous Materials, which approval may be withheld in Landlord's sole discretion.

b. Compliance with Laws. Tenant, at its sole cost and expense, shall comply and shall cause all Tenant Parties to comply, with all federal, state

and local laws, ordinances and regulations and all rules, licenses, permits, orders, decrees and judgments relating to the environment and/or Environmental Activities (collectively referred to as "**Hazardous Materials Laws**") conducted on the Premises. Tenant's willful breach of any of its covenants or obligations under this Section shall constitute a material event of default under the Lease. The obligations of Tenant under this Section shall survive the expiration or earlier termination of the Lease without any limitation, and shall constitute obligations that are independent and severable from Tenant's covenants and obligations to pay rent under this Lease.



c. Exculpation of Landlord. Other tenants of the Project may be using, handling, or storing certain Hazardous Materials in connection with such tenants' use of their premises. The failure of another tenant to comply with applicable laws and procedures could result in a release of Hazardous Materials and contamination to improvements within the Project or the soil and groundwater thereunder. In the event of such release, the tenant responsible for the release, and not Landlord, shall be solely responsible for any claim, damage, or expense incurred by Tenant by reason of such contamination. Tenant waives any rights it may have to later assert that the foregoing release does not cover unknown claims.

d. Disclosure and Notification. Tenant shall promptly complete and return to Landlord all environmental questionnaires and hazardous materials disclosures submitted by Landlord to Tenant from time to time. In addition, on January 1 of each calendar year during the Term (each such date being hereafter referred to as a "**Disclosure Date**"), Tenant shall complete and deliver to Landlord the form attached hereto as Exhibit E and shall disclose to Landlord the names and amounts of all Hazardous Materials other than general office and cleaning items and other supplies referred to in Subsection (a) above that were used, generated, treated, handled, stored or disposed of at the Premises or that Tenant intends to use, generate, treat, handle, store or dispose of at the Premises, for the year prior to and after such Disclosure Date. The foregoing in no way shall limit the necessity of Tenant obtaining Landlord's consent pursuant to Subsection (a) above.

At any time Tenant becomes aware of any violation of any Hazardous Materials Laws or of any claim made pursuant to any Hazardous Materials Laws that has occurred or that Tenant reasonably believes may have occurred with respect to the Premises or the Project, Tenant shall immediately (but in no event later than five (5) business days) advise Landlord in writing and provide Landlord with a copy of any notices, correspondence, and other materials relating to (i) any violation or potential or alleged violation of any Hazardous Materials Laws that are received by Tenant from any governmental agency concerned with Tenant's or any other Tenant Party's Environmental Activities; (ii) any and all inquiry, investigation, enforcement, clean-up, removal or other governmental or regulatory actions instituted or threatened relating to Tenant, the Premises, or the Project; (iii) all claims made or threatened by any third party against Tenant, the Premises, or the Project relating to any Hazardous Materials; and (iv) any release of Hazardous Materials on or about the Premises or the Project that Tenant knows of or reasonably believes may have occurred.

e. Inspection of Premises. Tenant shall permit Landlord and Landlord's agents, servants, and employees, including but not limited to legal counsel and environmental consultants and engineers, access to the Premises for the purposes of environmental inspections and sampling during normal business hours, or during other hours either by agreement of the parties or in the event of any environmental emergency. Tenant shall not restrict access to any part of the Premises, and Tenant shall not impose any conditions to access. From time to time, Landlord may retain a registered environmental consultant (the "**Consultant**") to conduct an investigation of the Premises ("**Environmental Assessment**") (i) for Hazardous Materials contamination in, about, or beneath the Premises and (ii)to assess all Environmental Activities at the Premises for



compliance with all applicable laws, ordinances and regulations and for the use of procedures intended to reasonably reduce the risk of a release of Hazardous Materials. Tenant covenants to reasonably cooperate with the Consultant and to allow entry and reasonable access to all portions of the Premises for the purpose of Consultant's investigation.

f. Indemnification of Landlord. Tenant shall indemnify, defend (with counsel satisfactory to Landlord) and hold harmless Landlord, its affiliates, partners, directors, shareholders, officers, employees, agents, assigns and any successors to Landlord's interest in the Project, from and against any and all foreseeable and unforeseeable consequential damages or loss (including without limitation, any loss in fair market value, damages for the loss or restriction on use and damages arising from any adverse impact on marketing of the Premises or the Project, and sums paid in settlement of all claims), cost, damage, expense (including reasonable attorneys5 fees and litigation costs, consultant fees and expert fees), claim, cause of action, demand, obligation, judgment, penalty, fine or liability directly attributable to and arising from (i) any Environmental Activity undertaken by Tenant or any other Tenant Party at the Premises, (ii) any remedial or clean-up work undertaken by or for Tenant in connection with Tenant's or any other Tenant Party's Environmental Activities or its compliance with Hazardous Materials Laws, or (iii) the breach by Tenant of any of its obligations and covenants set forth in this Section. Landlord shall have the right but not the obligation to join and participate in, and control, if it so elects, any legal proceedings or actions initiated in connection with Tenant's or any other Tenant Party's Environmental Activities. Landlord may also negotiate, defend, approve and appeal any action taken or issued by any applicable governmental authority with regard to contamination of the Premises or the Project by a Hazardous Material. Tenant shall reimburse any costs or expenses incurred by Landlord for which Tenant is responsible under this Section or for which Tenant has indemnified Landlord on demand as additional rent. At the request of Landlord, Tenant shall promptly provide to Landlord evidence of insurance or financial resources available to satisfy the obligations of Tenant under this Lease, including the obligations under this Section.

g. Remediation. If any Environmental Activities undertaken by Tenant or any other Tenant Party result in contamination of the Premises or any other portion of the Project or the soil or ground water thereunder, subject to Landlord's prior written approval and any conditions imposed by Landlord, Tenant shall promptly take all actions, at its sole expense and without abatement of rent, as are necessary to return the affected portion to the condition existing prior to the introduction of the contaminating Hazardous Material. Landlord shall also have the right to approve any and all contractors hired by Tenant to perform such remedial work. All such remedial work shall be performed in compliance with all applicable Hazardous Materials Laws and in such a manner as to minimize any interference with the use and enjoyment of the Project. Appearance of a Hazardous Material caused by Tenant in or about the Premises or the Project shall not be deemed an occurrence of damage or destruction that is subject to the terms of the Lease respecting damage or destruction.



---

h. Surrender of Premises. Prior to or after the expiration or termination of the Term and prior to surrendering possession of the Premises, Tenant shall cause all Hazardous Materials previously owned, stored or used by Tenant to be removed from the Premises and disposed of in accordance with applicable provisions of Hazardous Materials Laws. Landlord may have an Environmental Assessment of the Premises performed in accordance with Subsection (e) above. Tenant shall perform, at its sole cost and expense, any clean-up or remedial work recommended by the Consultant that is necessary to remove, mitigate, or remediate any Hazardous Materials contamination of the Premises or the Project in connection with Tenant's or any other Tenant Party's or their agent's Environmental Activities.

i. Definition of Hazardous Materials. As used in this Lease, the term "**Hazardous Materials**" shall mean all of the following introduced to the Premises by Tenant or a Tenant Party: asbestos, any petroleum fuel or petroleum product, chemicals known to cause cancer or reproductive toxicity, pollutant, contaminant, organic matter (including but not limited to mold), and any hazardous, toxic, or other substance, material or waste which is or becomes regulated by any local governmental authority, the state in which the Premises is located, or the United States government, including, but not limited to, any material or substance defined as a "hazardous waste," "extremely hazardous waste," "restricted hazardous waste," "hazardous substance," "hazardous material," "toxic substance" or "toxic pollutant" under Hazardous Materials Laws. If any such Hazardous Materials is introduced to the Premises by Tenant or a Tenant Party, the same shall be immediately removed by Tenant, with proper disposal, and all required cleanup procedures shall be diligently undertaken pursuant to all Hazardous Materials Laws, by Tenant, at Tenant's sole expense.

8. Certification. As an essential inducement to Landlord to execute this Amendment, Tenant hereby certifies and warrants to and agrees with Landlord that to Tenant's knowledge: (a) no event of default by Landlord under the Lease exists as of the date of this Amendment, nor has any event occurred which, with the passage of time or the giving of notice, or both, would constitute an event of default, (b) Landlord is not in any manner in default in the performance or observance of any obligation or duty owed to Tenant, under the Lease or otherwise, and (c) Tenant has no defenses, offsets, claims or counterclaims to the observance and performance by Tenant of any provision of the Lease.

9. Full Force and Effect. The provisions of the Lease are hereby amended to conform herewith, and in the event of any conflict between the provisions of the Lease or this Amendment, the provisions of this Amendment shall control; but in all other respects, the provision of the Lease shall continue in full force and effect.

10. Severability. If for any reason any of the provisions of this Amendment shall be unenforceable or ineffective, all of the other provisions shall remain in full force and effect.

11. Entire Agreement. The provisions of this Amendment constitute, and are intended to constitute, the entire agreement of Landlord and Tenant regarding this Amendment. No terms, conditions, warranties, promises or undertakings of any nature whatever, express or implied, exist between Landlord and Tenant except as expressly set forth in the Lease as



---

amended by this Amendment. Any amendment or modification of the Lease must be in writing and signed by both Landlord and Tenant.

12. Miscellaneous. The section headings herein are for convenience of reference, and shall in no way define, limit or describe the scope or intent of any provisions of this Amendment. This Amendment may be signed in counterparts and by facsimile signature.

IN WITNESS WHEREOF, Landlord and Tenant have executed this Amendment as of the date above set forth.

| | |
|---|---|
| **LANDLORD:** | **TENANT:** |
| **WDCI, INC.** | **CONTROL4 CORPORATION** |
| By: [Illegible] | By: /s/ Mark Novakovich |
| Its: PRESIDENT | Its: VP Finance |

Restricted Confidential - Outside Counsel Only




| | | | |
|---|---|---|---|
| By: | [Illegible] | By: | |
| Its: | SECRETARY | Its: | |



EXHIBIT A

Tenant Improvement Plans approved by the Landlord









SAVANT3330138



12

EXHIBIT E

**Schedule 1**

**INSURANCE QUESTIONNAIRE**

1. Do you use, store or contemplate using at any time fluids or other materials having a closed cup flash point 80 degrees or less including, but not limited to, gasoline, benzene, carbon disulfide, naphtha, kerosene, LPG, or other materials? Yes ☐ No ☒

   If yes, please answer the following:

   A. Will you use Underwriter's Laboratories approved self-closing cans?
   Yes ☐ No ☐

   B. What is the gallon capacity you anticipate storing or using?

   C. Will the above be "shelf stock" stored in original sealed containers?
   Yes ☐ No ☐

   D. Do you plan to store or use the above outside of the building?
   Yes ☐ No ☐

   If yes, will it be within 30 feet of the building? Yes ☐ No ☐

2. Do you have or plan to have a gasoline engine or other gasoline powered equipment to be used in the building (other than forklifts)? Yes ☐ No ☒

3. Do you contemplate the use of any spray painting equipment? Yes ☐ No ☒

   If yes, please answer the following:

4. Do you contemplate or plan to operate a restaurant or similar cooking facility?
   Yes ☐ No ☒

   If yes, will you install an Underwriter's Laboratory approved hood and dust fire extinguisher system? Yes ☐ No ☐

5. If building is sprinklered, please answer the following:

A. Do you contemplate storing stock over 15 feet without racks, or over 12 feet with racks?
Yes ☒ No ☐

B. How many feet in height will you store goods? 20 feet

C. Will you store goods closer than within 3 feet of the sprinkler heads?
Yes ☐ No ☒

---

D. Will you use racks or shelves for storage? Yes ☒ No ☐

E. If answer to "D" above is "Yes", please answer the following:

1. Are racks slatted, solid, or open? Open

2. What is the width of racks? 48"

3. Will racks be single or multi-row? Multi-Row

4. What is the aisle width between racks? Minimum 10 ft.

F. Describe the goods to be stored: Consumer Electronics

G. What materials are the products made of? Plastic, Metal, Silicon

H. Will your inventory consist of any of the following? Please check the appropriate item(s).

☐ Linoleum products
☐ Lacquers in cans or in cartons
☐ All high-hazard plastics
☐ Upholstered furniture
☐ Wooden furniture
☐ Eighty-six proof or higher liquors
☐ Pharmaceuticals in bottles
☒ Rugs or carpets
☐ Rolled pulp and paper light tissue crepe grade (horizontal storage or racked)
☐ Balled waste paper
☐ Alcohol in cans or bottles or in cartons
☐ Baled cork
☒ Wooden patterns, pallets, and flats
☐ Rolled pulp and paper (vertical storage)
☐ Unbanded or light tissue crepe paper
☐ Rolled asphalt paper (vertical)
☐ Rubber Tires
☐ Foam or sponge rubber
☐ Crude or synthetic rubber
☐ Roamed plastic products (with or without cartons)
☒ Goods encapsulated by plastic

If any of the above-is "checked", do you plan to install approved in-rack or in-bin sprinklers?
Yes ☐ No ☒

Do you plan to install other fire protection devices? Yes ☒ No ☐



---

If yes, describe: Smoke alarms, File alarms, Fire hoses & sprinklers

6. Do you contemplate any of the following operations? If yes, please check the appropriate occupancy.

- ☐ Storage of dynamite, dynamite caps, or gunpowder
- ☐ Woodworking (any kind)
- ☐ Paper Box Manufacturing
- ☐ Excelsior Works
- ☐ Paper Shredding Plants
- ☐ Upholstery Works
- ☐ Cotton Storage
- ☐ Broom Manufacturing
- ☐ Calcium Carbide (Stocks)
- ☐ Celluloid Goods
- ☐ Fireworks
- ☐ Furniture Repairing
- ☐ Furniture Factories
- ☐ Moving Picture Film (Stock)
- ☐ Paint Manufacturing
- ☐ Printer's Ink Manufacturing
- ☐ Rubber Tire Recap or Retread

7. What is your contemplated usage if not previously covered?

COMPANY NAME: Control4 Corporation

LOCATION OF PREMISS: Centennial Plaza

SIGNED BY: /s/ Mark Novakovich DATE: 11/7/2011

TITLE: VP Finance



---

**Schedule 2**

**ENVIRONMENTAL QUESTIONNAIRE**

The protection of the environment and compliance with all applicable environmental laws are of extreme importance to Landlord. As part of Landlord's leasing procedures, please complete this Environmental Questionnaire ("**Questionnaire**") for every business that will be conducted from the leased premises. Use additional sheets if there is insufficient space for your response. Thank you for your cooperation.

1. Tenant's name: Control4 Corporation

2. Location of leased premises: Centennial Plaza

3. Each business to be conducted by Tenant at the leased premises (please be specific):
Product Warehousing

4. Will all or any portion of the premises be subleased to others? Yes ☐ No ☒
If yes, identify each subtenant and each business to be conducted by the subtenant at the premises (*please be specific*):

| | Subtenant Name | Business |
|---|---|---|
| a) | | |
| b) | | |

5. Please indicate which of the following items will be placed, used, stored, treated or generated at the leased premises by Tenant or any subtenant (*check all applicable categories*):

- ☐ Underground storage tank.
- ☐ Above-ground storage tank.
- ☐ Any hazardous materials or wastes that are regulated by state or federal law.
(*If this category is checked, please complete Part A on page 3 of this questionnaire.*)
- ☐ Any other materials which, if not properly stored, treated or handled, could pose a risk of harm to the environment. (*If this category is checked, please complete Part B on page 3 of this questionnaire.*)
- ☒ None of the above.

6. Will any by-product of any business conducted at the leased premises by Tenant or any subtenant be released or discharged into the atmosphere, the ground or any waterway, drainage ditch, or private cesspool or septic tank?
Yes ☐ No ☒ (*If yes, please complete Part C on page 3 of this questionnaire.*)



---

7. Has Tenant or any proposed subtenant been subject to any warning from or citation, penalty, lawsuit or administrative action by any government agency under any hazardous materials law?
Yes ☐ No ☒ (*If yes, please complete Part D on page 3 of this questionnaire.*)

Tenant hereby certifies that each of the above questions has been answered accurately and completely. Tenant acknowledges that neither the above answers nor Landlord's receipt and review of this Questionnaire will release Tenant from any liability or responsibility for environmental matters or from any liability or obligation under Tenant's lease with Landlord, or result in any transfer or assumption of any liability or responsibility to or by Landlord.

Signature: /s/ Mark Novakovich Date: 11/7/2011

Title: VP Finance



---

## ENVIRONMENTAL QUESTIONNAIRE

### Additional Information

Please use additional sheets if there is insufficient space for your response.

A. The following regulated hazardous materials or wastes will be used, stored, treated or generated at the leased premises:

Liquid Nitrogen, Propane for Forklifts

B. The following other materials, if not properly stored, treated or handled, could pose a risk of harm to the environment:

C. The following by-products will be released or discharged into the atmosphere, the ground, a waterway, a drainage ditch or a private cesspool or septic tank:

D. The following warning from, or citation, penalty, lawsuit or administration by a government agency under a hazardous materials law was brought against me or my proposed subtenant (*please describe*):

Tenant hereby certifies that each of the above questions has been answered accurately and completely. Tenant acknowledges that neither the above answers nor Landlord's receipt and review of this Questionnaire will release Tenant from any liability or responsibility for environmental matters or from any liability or obligation under Tenant's lease with Landlord, or result in any transfer or assumption of any liability or responsibility to or by Landlord.

Signature: /s/ Mark Novakovich Date: 11/7/2011

Title: VP Finance

6

---

**Exhibit 10.13**

**ADVISOR AGREEMENT**

**WHEREAS** Tom Kuhn ("Advisor") has served as a member of the Board of Directors of Control4 Corporation ("Company") since April 2010;

**WHEREAS** Advisor desires to resign from the Board of the Directors of the Company effective as of February 28, 2013 ("Effective Date");

**WHEREAS** the Company desires that Advisor continue to provide the Company with certain consulting services during the period of time from the Effective Date until April 26, 2014 ("Expiration Date"), or such earlier date that this Advisor Agreement ("Agreement") is terminated (collectively the "Termination Date"); and

**WHEREAS** Advisor is willing to provide such services during the period of time from the Effective Date until the Termination Date (the "Term").

**NOW THEREFORE**, in consideration of the rights and obligations of Advisor and the Company (each a "party" and collectively the "parties") as set forth in this Agreement, the sufficiency of which is hereby acknowledged, the "parties hereby agree as follows:

1. **Services**. During the Term of this Agreement, Advisor shall consult with and advise the Company from time-to-time upon activities relating to the Company's strategic direction and customer relationships ("Services"). Advisor shall provide the Services as needed and when requested by the Company. During the Term of this Agreement, Advisor will not provide consulting services to any company that directly competes with the business of Company.

2. **Consideration**. In consideration of the Services provided by Advisor during the Term, Advisor shall, until the Termination Date, continue to vest in the outstanding unvested options previously granted to Advisor by the Company.

3. **Ownership**. Company shall own all right, title and interest (including patent rights, copyrights, trade secret rights, mask work rights, trademark rights, *sui generis* database rights and all other intellectual and industrial property rights of any sort throughout the world) relating to any and all inventions (whether or not patentable), works of authorship, mask works, designations, designs, know-how, ideas and information made or conceived or reduced to practice, in whole or in part, by Advisor that arise out of or in connection with the Services or any Proprietary Information (as defined below) (collectively, "Inventions") and Advisor will promptly disclose and provide all Inventions to Company. Advisor agrees to make and hereby makes all assignments necessary to accomplish the foregoing. Advisor shall further assist Company, at Company's expense, to further evidence, record and perfect such assignments, and to perfect, obtain, maintain, enforce and defend any rights assigned. Advisor agrees and warrants that all Inventions will be original to and owned by Advisor and Advisor will use and disclose only Inventions in the course of providing Services.

4. **Proprietary Information**. Advisor agrees that all Inventions and other business, technical and financial information (including, without limitation, the identity of and information relating to Company's customers or employees) that Advisor obtains from or assigns to Company, or learns in connection with the Services or his prior services to the Company, constitute "Proprietary Information." Advisor will hold in confidence and not disclose or, except in performing the Services, use any Proprietary Information. However, Advisor shall not be so obligated with respect to

---

information that Advisor can document (i) is or becomes readily publicly available without restriction through no fault of Advisor, or (ii) that Advisor knew without restriction prior to its disclosure by Company. Upon termination or as otherwise requested by Company, Advisor will promptly return to Company all items and copies containing or embodying Proprietary Information.

5. **Solicitation**. Advisor agrees that during the Term of this Agreement and for one year thereafter, Advisor will not encourage or solicit any employee or consultant of the Company to leave Company for any reason.

6. **Termination**. Prior to the Expiration Date, either party may terminate this Agreement at any time, for any reason, by giving the other party ten (10) days' written or electronic notice. Sections 2 through 9 of this Agreement and any remedies for breach of this Agreement shall survive any termination or expiration.

7. **Relationship of the Parties; No Conflicts Promotional Rights**. Notwithstanding any provision hereof, for all purposes of this Agreement, each party shall be and act as an independent contractor and not as a partner, joint venturer, agent or employee of the other and shall not bind nor attempt to bind the other to any contract. Advisor represents and warrants that neither this Agreement nor the performance thereof will conflict with or violate any obligation of Advisor or right of any third party. Advisor shall not be eligible to participate in any of Company's employee benefit plans, fringe benefit programs, group insurance arrangements or similar programs. Company may use and authorize the use of Advisor's name, likeness and biographical information in promotional materials, websites and the like.

8. **Resignation from Board**. The Advisor hereby resigns from the Company's Board of Directors and from any committee of such Board of Directors as of the Effective Date.

9. **Miscellaneous**. This Agreement and the Services performed hereunder are personal to Advisor and Advisor shall not have the right or ability to assign, transfer or subcontract any obligations under this Agreement without the written consent of Company. Any attempt to do so shall be void. Company shall be free to transfer any of its rights under this Agreement to a third party. Any breach of Section 2, 3, or 4 will cause irreparable harm to Company for which damages would not be an adequate remedy, and therefore, Company shall be entitled to injunctive relief with respect thereto in addition to any other remedies. This is the entire agreement between the parties with respect to the subject matter hereof and no changes or modifications or waivers to this Agreement shall be effective unless in writing and signed by both parties. In the event that any provision of this Agreement is determined to be illegal or unenforceable, that provision shall be limited or eliminated to the minimum extent necessary so that this Agreement shall otherwise remain in full force and effect and enforceable. This Agreement shall be governed by and construed in accordance with the laws of the State of Utah without regard to the conflicts of law provisions thereof. In any action or proceeding to enforce rights under this Agreement, the prevailing party shall be entitled to recover costs and attorneys fees. Any notice shall be given in writing by first class mail and addressed to the party to be notified at the address below, or at such other address as the party may designate by ten (10) days' advance written notice to the other party.

[Signature page follows.]



---

| THOMAS R. KUHN | CONTROL4 CORPORATION | |
|---|---|---|
| /s/ Thomas R. Kuhn | By: | /s/ Martin Plaehn |
| (Signature) | Name: | Martin Plaehn |
| | Title: | President and Chief Executive Officer |



---

**Exhibit 21.1**

Subsidiaries of Control4 Corporation

Control4 EMEA Ltd (United Kingdom)

Control4 HK Limited (Hong Kong)

Control4 India Private Limited (India)

Control4 Smart Control Technology Shanghai Co., Ltd. (PR China)

---

QuickLinks -- Click here to rapidly navigate through this document

**Exhibit 23.1**

**CONSENT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

We consent to the reference to our firm under the caption "Experts" and to the use of our report dated March 15, 2013, in the Registration Statement (Form S-1) and related Prospectus of Control4 Corporation for the registration of shares of its common stock.

/s/ ERNST & YOUNG LLP

Salt Lake City, Utah
July 1, 2013

QuickLinks

Exhibit 23.1

CONSENT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

MARKETBRIEF

CORPORATE FILINGS
Search SEC Filings
SEC Filing Types
Insider Transactions
Private Investment
IPO Center
Company List

OTHER DOCUMENTS
Press Releases
Patents
Trademarks

ABOUT
About MarketBrief
Contact Us
Custom News Feeds
Press
Advertising
Search