EXHIBIT 361

You are here:Home /Blog /Products /Control4 vs. Savant for Today's Smart Home

# Control4 vs. Savant for Today's Smart Home

November 22, 2013/in Products, Tips and Trends /by Travis Leo

At Residential Systems, Inc. one of the most common questions our clients ask us is "What are the major differences between Control4 and Savant and which should I use in my house?" As authorized dealers for both of these world-class products, this can be a very difficult question to answer. I joke with our clients that, when it comes to Savant vs. Control4, it is sort of like picking which of my kids do I like the best! Fortunately, I love both of my kids and at Residential Systems, Inc. we feel the same way about Savant and Control4!

Both Savant and Control4 have revolutionized the home automation and smart home landscapes for our clients. Control4 is the more seasoned of the two companies, having been around for many years and recently becoming a public company. Control4 recognized a major shift in smart-home technology and capitalized on this by making their products available to a broader marketplace through more reasonable pricing. Savant, the newer of the two companies, has strongly leveraged their partnership with Apple to gain momentum in the last few years. Since the invention of the iPad,

Savant has grown tremendously and has made smart home technology more appealing to the mass market.

Let's take a closer look at the strengths of each company:

**Savant**

Strengths of Savant

- Apple-based system is familiar to most consumers
- Easy integration with client iTunes libraries for whole-house audio distribution and movie downloads
- Carrier-grade switching equipment for audio switching, HDMI switching, etc…
- Easy ability to integrate with other world-class smart-home products including Lutron, Vantage, HAI and others
- The whole house is easily accessible from your iPhone, iPad or iPod Touch

At Residential Systems, Inc. we tend to recommend Savant in applications where quality is of utmost importance to our clients or where the clients are self-described "Mac People." For example—Savant's HDMI switching products are some of the best in the world so if a client is particular about that, we will recommend Savant. Our clients recognize that they pay a premium price for that, but they also recognize that they get incredible quality, as well. Additionally, if our clients are very comfortable with the Apple operating system (and already have their content housed in iTunes, etc…) Savant is the more seamless approach for usability and functionality. We also tend to recommend Savant for clients in the Colorado mountain communities (Aspen, Breckenridge, Telluride, Vail, etc…) as the remote management capabilities give us the ability to troubleshoot issues remotely, potentially saving our clients a service call.

**Control4**

Strengths of Control4

- Control4's products are available at lower price points, enabling clients to do more with their budget
- Control4 offers a full line of automation products including thermostats and lighting control under one umbrella. This makes integration incredibly simple and quick!
- Control4's handheld remote control is one of the best we have ever used. It is intuitive and rarely fails.
- Control4 offers an Android application for those users who prefer Android over the Apple Operating System

- A large majority of the Control4 product line-up can be installed wirelessly, making it very easy to use in retrofit environments

At Residential Systems, Inc. we tend to use Control4 in applications where price/budget is more of a consideration. While Control4 can do many of the same things that Savant can do, the interface is very different. It is extremely intuitive and the on-screen display make it very easy for clients to control their entire home from their TV, iPad or Android device.

At the end of the day, this decision boils down to customer preference and perceived value. For clients who value an integrated home-automation system with high functionality, Savant presents a more "luxurious" option. For clients who want the ability to control their entire home and not break the bank, Control4 presents a wonderful option.

If you are thinking about adding Control4 or Savant to your Denver smart home, here are some questions you should ask yourself as you prepare to make that decision:

- What is the budget I have for this project? This is probably the most important question to ask yourself so that you can be prepared for the trade-offs that will be necessary if the scope exceeds your budget.
- What do I want to control? Is this a relatively simple Audio/Video control or do I want to integrate other technologies like climate control, lighting control, security, cameras, motorized shades, etc…
- What type of technology am I comfortable with today? If you are an "Apple Zealot," Savant may present a better solution for you and your family.

At Residential Systems, Inc., we are proud to be dealers for both of these companies, as well as many more. By offering our clients a full line-up of smart home solutions, we can meet any need and operate under any budget.

To learn more about Savant, Control4 or other smart home technologies, stop by our showroom or contact us today!

*Share & Recommend*

## Latest News

- **CE Pro 100 RecognitionJune 10, 2014 - 8:32 pm**
- **Try It, Then Buy ItMay 20, 2014 - 8:13 pm**
- **Savant Smart SystemsApril 4, 2014 - 3:19 pm**
-  **Is 2014 The Year For Mainstream Home Automation?January 19, 2014 - 3:45 am**

EXHIBIT 362

Control4 Better. Together.

# Investor Overview
# February 2014

Martin Plaehn, Chairman and Chief Executive Officer
Dan Strong, Chief Financial Officer

# Driving Mainstream Opportunity




Control4

***Currently installed in 150K homes, providing significant runway***

Source: U.S. Census Bureau, 2012.

# Control4 Delivers and Leads on Value



EXHIBIT 363

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

------------------------------------------

SAVANT SYSTEMS, LLC,
Plaintiff,
vs. Civil Action No. 1:10-CV-11622(EFH)
CRESTRON ELECTRONICS, INC.,
Defendant.

------------------------------------------

CRESTRON ELECTRONICS, INC.,
Counterclaim-Plaintiff
vs.
SAVANT SYSTEMS, LLC,
Counterclaim-Defendant.

------------------------------------------

VIDEOTAPED 30(b)(6) DEPOSITION OF
FRED H. BARGETZI
THURSDAY, JANUARY 17, 2014
9:30 a.m.

Reported by: Adrienne M. Mignano, RPR
Job Number: 67625

Bargetzi

Q What have you heard?

A I just heard that -- you know, again, like I mentioned, I have heard that a dealer might have complained that somebody was out on site doing a bad job representing the product and even the industry improperly, and then we may get involved.

Q Well, you said representing the company or the industry improperly.

Do you mean basically by using Crestron software when they are not authorized to do so?

A It is a bigger issue than that. The issue is that in order to do Crestron well, and I think in order to do really any of the sophisticated products well, you have to be focused on it. You have to do it on a regular basis. It is not something that you can just pick up after a year or two or six months and get back into it and do the same job that you would do if you were doing it on a regular basis.

Bargetzi

A I believe that the way that they were created was the sales support department, which is Todd and Ray, created most of the content, and the editing would have been done by Vin Bruno, and it might not have been specifically Vin, but Vin representing the marketing team.

Q Was anybody else involved in editing or supervising this?

A I don't know that.

Q Do you know how they obtained the information with respect to the Savant features and options?

A I have been informed that the information was gathered from the Internet and possibly from speaking with dealers.

Q On each of the comparison guides we see an image of a Savant product or set of products.

Do you know where those images came from?

A I have been informed that the marketing department got them from the Internet.

Bargetzi

Q Where on the Internet?

A They mentioned Google Images as one of the sources.

Q So the marketing department went to Google Images and got these Savant icons?

MR. PINEAULT: Objection.

A They said that was one of the sources that they may have gotten them from.

Q Were there any other sources for these images?

A I don't know that.

Q Are you aware of whether any of these images were taken from Savant's website?

A I'm not aware of that. Vin Bruno, who represented the marketing department and was in charge of the editing, said that these came from the Internet and Google Images, so wherever that information comes from, I don't know.

Q Do you know who requested the creation of these comparison guides?

Bargetzi

MR. PINEAULT: I have no questions.

MR. JACOBS: We're done.

THE VIDEOGRAPHER: The time is now 2:05 p.m. This concludes media unit number four and the January 17, 2014 videotaped 30(b)(6) deposition of Crestron Electronics, Incorporated by Fred Bargetzi.

_________________________

FRED H. BARGETZI

Subscribed and sworn to
before me this day
of , 2014.

______________________

EXHIBIT 364

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
CIVIL ACTION NO. 1:10-CV-11622 (MLW)

----------------------------------------X

SAVANT SYSTEMS, LLC,
Plaintiff,
-against-
CRESTRON ELECTRONICS, INC.,
Defendant.

----------------------------------------X

CRESTRON ELECTRONICS, INC.,
Counterclaim Plaintiff,
-against-
SAVANT SYSTEMS, LLC,
Counterclaim Defendant.

----------------------------------------X

VIDEOTAPTED 30(b)6 DEPOSITION OF
DAVID H. HAKULA
FEBRUARY 20, 2014
TENAFLY, NEW JERSEY

REPORTER:
Angela Castoro, CSR, RPR

D. H. HAKULA

MR. KAVANAGH: Objection to form. Vague.

A. Systematically, no.

Q. Does Crestron include Canada in its domestic sales data?

A. For operational reporting, yes, we do.

Q. Why?

A. Because we just consider it an extension of the U.S.

Q. Now, you qualified it by saying "for operational." Is there some way that you -- some other way in which you separate them?

A. Well, it is a separate region, so it is easy enough to separate out. So if I get a report -- if I have to do some sort of reporting to the U.S. Government, which we have to do from time to time about our domestic sales, I exclude it.

We file a separate tax return in Canada, so those results are included in that tax returns not on our domestic return.

From an operational standpoint, to

D. H. HAKULA

us Canada is no different than the western region, okay. But from a -- when you get into legal reporting and different things that come up, you know, sometimes it has to be segregated out.

Q. Operationally, are other foreign countries also considered with the domestic sales?

A. No.

Q. Is Canada the only region that is considered integral on an operational basis?

MR. KAVANAGH: Objection to form.

A. Yes.

Q. Does Crestron separately track high-end sales versus other sales?

MR. KAVANAGH: Objection to form.

A. I don't know how you would define "high end."

Q. I am going to run into a lot of terms which I will go over with you as we go through some of the documents, but how does Crestron record its total fiscal year sales; is it net/gross, net/net?

A. Well, we record it both ways.

D. H. HAKULA

going down so much. They are not growing as fast as the other categories. I think my sales for touch panels are actually up slightly -- I can't --

Q. You means in dollar value or numbers sold?

A. Both.

Q. Okay. If you could take a look at the net/net tab.

A. Ahem.

Q. The same information or same --

A. All year net/net or just net/net?

Q. Just net/net.

A. Okay.

Q. Net/net shows that the fiscal year 2008 you had a touch panels sale of 52 million. 2009 fiscal year ending June, 2009 you had touch panel sales of 39 million, dropped by 13 million. By the last completed fiscal year which ended in June of 2013, you had 17 million in touch panel sales.

A. Yes.

Q. Do you want to take back what you

D. H. HAKULA

just said?

A. No.

Q. Why not? It looks like your sales have plunged by two-thirds.

A. Because you are only looking at my residential sales.

Q. Okay.

A. Overall, I believe my touch panel sales are I believe -- I am not going to quote you. I believe they are holding steady.

Q. Oh.

A. Now residential is off so much because of the iPad.

Q. Okay.

A. Now everybody, anybody who is buying a Crestron system has got an iPad and an iPhone and probably an iTouch and several other devices. And so, you know, the need to put touch panels everywhere has diminished. Now commercially businesses are less than enthused about hanging iPads all over their walls because they tend to walk away. And, frankly, the iPad is not a commercial device. While the iPad is a great tool and for

D. H. HAKULA

personal use it is very viable and works great for residential touch panel, it doesn't work as well for a commercial touch panel.

So a lot of the -- frankly, we are selling a lot more lower-priced touch panels and that's on the residential side. But if you go back to '08, we were selling people, you know, the large installations. They wanted, you know, half a dozen or more 24-inch touch panels on their walls. Bigger the touch panel, the better because they also wanted to be able to use it as a TV and everything else.

Okay, nobody is doing that anymore. Now everybody wants it all small. Frankly, they really want to control it with their personal device. They are still going to have a couple of touch panels around, but on the big guy's houses we used to put touch panels in every room, hang it on every wall.

Now maybe they are going to put it in half as many. In the residential it is down, but overall if I could pull out my black book of what my sales were for last month, I believe my touch panel sales were holding.

D. H. HAKULA

Q. So going back again to Exhibit 4, which was interrogatory response, Crestron's sales for residential peaked in year ending 2008 at 135 million?

A. Yes.

Q. And then the fiscal year ending June, 2013 was down to a hair under 90 million?

A. Yes.

Q. It is going to drop about 45 million?

A. Yes.

Q. When I look at the touch panel sales for those same years, they have gone from 52 million to 17 million. So that's about 35 million, right?

A. Yeah.

Q. So $35 million worth of the difference between 2008 and 2013 can be accounted for in touch panels, correct?

MR. KAVANAGH: Objection to form.

Q. People aren't buying touch panels anymore. So you have lost about $35 million worth of sales there, right?

D. H. HAKULA

MR. KAVANAGH: Objection to form.

A. I don't know that it is -- it can be stated that succinctly. I understand your conclusion, but I don't -- I'd have to look at more data to say yeah, because it is of touch panels.

Q. What else would you need to look at?

A. I would have to look at overall -- how the jobs are being quoted. Again, we're probably selling more touch panel units, okay, because we used to sell -- the TPMC8X we sold as an $8,500 touch panel. Who is going to buy an $8,500 touch panel when you could buy one for 400 bucks?

Okay, now we sell -- new replacement touch panels are a fraction of that price. I don't know. I know that overall my touch panel units are up. I can't speak for residential by itself, okay. So to state, well, the reason why you are off is because nobody is buying touch panels anymore, is, to be honest with you, a gross generalization.

D. H. HAKULA

Q. Let's remove the gross generalization. It isn't because people aren't buying touch panels, it is because of the delta in touch panel sale value.

A. I am not prepared to agree with that. I don't think you can look at our business over a five or seven year period and say well, it is because of that. I mean, there is a lot of different dynamics going on. Obviously we are selling less in touch panel dollars.

Q. 35 million?

A. Yes.

Q. Okay. So if you got back that 35 million, you'd only be 10 million short of 2008 peak, correct?

A. According to the math.

Q. What's wrong with that assumption?

MR. KAVANAGH: Objection to form.

Q. What is wrong with the idea of thinking that is something on the order of 75 percent of the drop from Crestron's peak was its decrease in dollar value of touch screen sales?

D. H. HAKULA

some electronic credit notes as well. So there may be a -- there may be or there may not be, I can't say for certain. But a lot of these are filed and stuff like that, so there might be information about them in there.

Q. The SAP database to which we have been given access, to the best of your knowledge, is it accurate?

A. Yes.

Q. Is it up to date?

A. Well, it was up to date as of when we gave it to you. I mean, it was a cutoff. We have sold some things since then, so...

Q. Is there any reason that you are aware of that we should not be able to rely upon the data in that database?

A. Not that I am aware of.

MR. JACOBS: No further questions.

MR. KAVANAGH: Okay. Thank you.

THE VIDEOGRAPHER: This marks the end of Tape Number 6 and concludes today's videotaped deposition and we're going off the record at 17:27 P.M.

EXHIBIT 365

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

------------------------------------------

SAVANT SYSTEMS, LLC,

Plaintiff,

vs. Civil Action No. 1:10-CV-11622(EFH)

CRESTRON ELECTRONICS, INC.,

Defendant.

------------------------------------------

CRESTRON ELECTRONICS, INC.,

Counterclaim-Plaintiff

vs.

SAVANT SYSTEMS, LLC,

Counterclaim-Defendant.

------------------------------------------

VIDEOTAPED 30(b)(6) DEPOSITION OF

RANDY KLEIN

WEDNESDAY, JANUARY 16, 2014

10:00 a.m.

Reported by: Adrienne M. Mignano, RPR
Job Number: 67617

Klein

speakers, offer speakers, and other people, it is very, very -- it's hard to pin down.

Q Has Crestron's product offering changed over the past eight years?

A Yes.

Q How so?

A We have -- we -- well, let me answer it that way -- this way: Is that we spend a great -- we invest a great deal in R&D and on developing new products. We're noted for that. We're noted as a new technology product. We win lots of awards for new products. And so as a company that invests a lot in new products, and we don't buy products from other people, typically we have a lot of research and development resources, we introduce these new products every year. So since 2007, there's a lot of new products in a lot of new areas.

Q Well, let's focus on the new areas.

What new areas has Crestron

Klein

referring to?

A I believe, we are in the category of competition and at this point -- just trying to recall. I believe, because I am looking at item number one, that it may have some integration with item number two.

We introduced a new line called Prodigy, which was more -- which was aimed to try to compete with some of Control4's products. And maybe, it may be line item number two says we would like them to decide if they would carry Control4 -- decide between Control4 and Crestron, which may be Prodigy. I'm not quite sure. That seems to be based upon the way this is written.

Q So it is your not interpretation that you were saying that Crestron dealers that take on C4 have to decide between C4 and Crestron?

A Well, again, it says Crestron dealers that take on C4, and we're asking them to show them Prodigy because we have

Klein

a product line that competes with Control4, and then we're asking them if they could or can decide, this is what this says, between Control4 and Crestron.

Q So Crestron was asking its dealers to decide between Control4 and Crestron?

A Yes.

Q And to carry one or the other?

A Yes.

Q Why?

A As I stated in previous testimony, it takes a lot to support a dealer. We've invested a lot in our software; we invest a lot in training; we invest a lot in customer support; and we commit a great deal of resources and money to that dealer, and in turn we ask for that commitment to be reciprocal, for them to commit back to us.

Many of these dealers are not -- they are not large companies. They have -- they are smaller companies, they have limited resources, and it takes a lot

Klein

of day-to-day practice, and it takes a lot of dedication and commitment to be skilled at a product line, and if they take on multiple product lines, then that skill and that expertise becomes fragmented and the burden of customer support, and ultimately the burden -- and ultimately the ability to deliver a quality product to the end user is compromised.

So, you know, it takes money to support these dealers and in turn we need their sales, and if they carry multiple product lines, then our sales will lose some sales to that competitor.

Q So are Crestron's agreements with these dealers -- do their agreements require exclusivity?

A The agreement they sign with us is a nonexclusive agreement.

Q Why not make it exclusive?

A I didn't write the agreement. So I don't know the different laws and different kinds of regulations around exclusive or nonexclusive agreements, but

Klein

we would still like to offer them a choice.

Q And the choice is either you carry Crestron exclusively or you don't get to carry Crestron?

Is that what you're saying?

A I'm saying that we offer dealers a choice, that they could carry our product line or they could carry others.

Q But they can't carry both?

MR. PINEAULT: Objection.

A I'm saying we offer them a choice.

Q What happened if they say I want to continue --

A I'm saying we offer them a choice. But to follow on your statement, they can't carry both. A large number of our dealers today carry multiple product lines or competitors, so --

Q Returning to Exhibit 6, the next item under competition is Savant, and then the first numbered item under Savant is "We are in the same place with them as we

Klein

by the regional sales managers ultimately get approved?

A No, I don't.

Q What role do the residential dealers play in getting Crestron's products to the end users?

A I'm sorry, say that again.

Q The dealers are critical in getting Crestron's products to the end users, correct?

MR. PINEAULT: Objection.

A Yes.

Q Let's just clear it up.

The dealers are critical to getting Crestron's products to the end users; is that correct?

MR. PINEAULT: Objection.

A Well, I wouldn't use the word critical, that's your word, but that's the only way that the products get to the end users. We don't sell to end users. So it is the only way they get there.

Q Why don't you sell to end users?

A Because we don't. Again, our --

Klein

well, the best answer I can give you is there is a much larger show called the Consumer Electronics Show, CES show, and we don't exhibit at that show. And we don't exhibit at the Consumer Electronics Show because it says "consumer electronics", and what that implies, this is my characterization of it, is you can take a product and plug it in and it works. You can take your printer and plug it in and it works. You can't take our product -- sometimes -- bad choice -- sometimes. You can't take our product and plug it in and it works. It takes engineering, and it takes all the things that I mentioned before, the drawings and the design and things like that. End users don't have those capabilities.

Q Are there any other sales paths to residential end users other than through the dealer network from Crestron?

A Well, I'm going to qualify your -- expand your word sales path. There is plenty of sales paths. Sales,

Klein

like Ami Wright is a market developer, she is a sales development person. There is only one path of supply and that's through the dealer. But we do call actively on architects and designers, as Ami Wright did, actively on architects and designers and lighting engineers and interior designers to sell them our product or to develop the sale in the market, but there is only one route to supply it, through the dealer.

Q So even though you're approaching the architects --

A I'm sorry, let me correct that.

There was at one point, we went through a distributor for certain products, but that didn't work out very well.

Q Which products?

A Our products.

Q All of them?

A Yes, some -- we had some -- we still have some residue. We had some distributors that would sell simpler

Klein

products and less expensive products to education or something like that, but that doesn't work out. We're an added -- the term is we sell through a value added reseller. They have to add some value to our product rather than just plug it in.

Q What are the hallmarks of a good dealing?

A The hallmarks?

MR. PINEAULT: Objection.

Q What would you say makes a good residential systems dealer?

A I think there are a number of -- there are a number of bullet points that I could list to call this person a good dealer. I think --

Q Imagine your ideal residential dealer. What would he be or she be like?

A We first and foremost have to -- we have to have a mutual, reciprocal good working relationship. We have to work together with each other. We have to trust each other.

The ideal dealer, besides having

Klein

stuff.

Q So you mean somebody who is repeatedly selling things for Crestron?

A I good dealer is not somebody that sells zero, as you referred to. We can't live very long on having dealers that sell zero.

You asked me what the ideal one was. So those are the main things that come to my mind. I like dealers like that.

Q So Crestron, in order to become a Crestron dealer, Crestron signs an agreement with those dealers, correct?

A After they go through the process, an agreement is signed, yes.

Q Why are they required to sign the agreement?

A The agreement -- what the agreement does is document and memorialize the terms and conditions of business. I shouldn't say -- the terms and conditions of doing business together, but specifies what each other's obligations and

Klein

responsibilities are as well. Some of those, not all of them.

There is no -- when I say some of those, because you ask me what makes up an ideal dealer, and I said one that sells. There is no sales volume on that thing. There is no annual commitment. It is the contract or the agreement is general good business terms, represent us with best efforts, don't steal off trade, don't distribute or steal trade secrets, things like that.

Q What do you mean by best efforts?

A Represent us with best efforts, professionally, ethically.

Q Does best efforts require only selling the Crestron brand?

A Best efforts requires best efforts. It doesn't stipulate that.

Q So could somebody exercise their best efforts to sell Crestron and still sell Savant products?

A Well, as I testified earlier,

Klein

office. We have to build a training room. We have to supply equipment and update it. We have to hire instructors. When they come, we have to -- we feed them and take them out at night, and sometimes pay for their transportation and their lodging.

So it is a lot of money. It is thousands of dollars. And even more so indirect, and even more so indirect costs.

Q Crestron has proprietary software that dealers use when they are setting up residential systems, correct?

A Yes.

Q And Crestron has to provide that software to its dealers?

A We have to provide it?

Q That's what you provide?

A We do provide it, yes.

Q And is there a license agreement? Does the license agreement prohibit the dealers from sharing that software?

A You have to be -- our software is copyrighted, and you have to be

Klein

authorized to use it. And we authorize by signing the dealer agreement, which is another reason for the dealer agreement, we authorize the dealer to use our software.

When they download it off of our website, there is a -- I'm not familiar with the exact or click wrap or some other term that people use, there is an agreement online that says that they agree that they are authorized to use our software.

So if that is called -- I'm not sure if that is a license agreement, I'm not a lawyer, but they do -- we only allow people that are authorized to use it.

Q Once a dealer's contract with Crestron comes to end, they are no longer allowed to use that software; is that correct?

A After the effective date of termination, yes.

Q Does that mean that they are no longer able to reprogram Crestron systems

Klein

dealer's customers?

MR. PINEAULT: Objection.

Q Is that correct?

A I'm saying that once a dealer is terminated, that dealer and its employees are not authorized to use our software.

Q And if, just to take an example, if you've got a house with a Crestron system and they want to add a new Blu-Ray player, in order to do that, you would have to reprogram the existing system, correct?

A Sometimes, not all the time. If you replaced it with a Blu-Ray player that was, and this is pretty common nowadays, of the same manufacturer and the same type, it may not require a different interface, the thing I spoke about earlier, the different module or interface, but it might.

Q If I had a system that didn't previously had a Blu-Ray player and I wanted to add one.

A If you wanted to add one, you

Klein

would have to -- it would have to be --
you would have to change the program, yes.

Q And that is not something
someone can do themselves if they don't
have the software?

A That is not something somebody
can do -- if they are a terminated dealer,
they can't do that because they are not
authorized to use the software.

MR. JACOBS: We've been going a
little longer than an hour, why don't
we take a break.

THE VIDEOGRAPHER: The time is
12:26 p.m. We're going off the
record. This is the end of tape
number two.

(Thereupon, a recess was taken,
and then the proceedings continued as
follows:)

A F T E R N O O N S E S S I O N

THE VIDEOGRAPHER: The time is
now 1:17 p.m. This is media unit
number three in the January 16, 2014
30(b)(6) deposition of Crestron

Klein
A If it is working, there is no reason to change it.
Q What if you want --
A Again, the only reason that you would upgrade it, in your words, or change it, is if you added a lot of additional functionality that maybe the size and scope of that brain wouldn't handle it. That usually happens only, I believe, if you added on to the house. You don't just suddenly add more TVs and stuff to your house.
Q Sometimes homeowners ask for a specific automation and control brand such as Crestron; is that right?
A Sometimes they ask for specific brands?
Q Yes.
A Yes.
Q It is your experience that sometimes end users will ask specifically for Crestron?
A Yes.
Q And in your experience sometimes

Klein

end users will ask for Savant; is that correct?

A Yes.

Q And then at other times the end users simply seek input from the dealer as to which brands the dealers think would be appropriate; is that correct?

A I believe so.

Q And sometimes those end users would prefer to have a Crestron over a Savant system, correct?

A Sometimes, yes.

Q And sometimes the other way around, sometimes an end users might want Savant instead?

A Yes.

Q I'd like to go back to something that we briefly touched on earlier.

So if a dealer is terminated, they are no longer allowed to sell Crestron products; is that right?

A Correct.

Q Has that always been the case?

A To the best of my recollection,

Klein

yes.

Q And if dealer is terminated, they are no longer allowed to have access to the software with which they would modify an existing Crestron installation, correct?

A After the effective date of termination, they can't use our software.

Q Has this loss of software ever been used as leverage to prevent dealers from taking on other brands?

MR. PINEAULT: Objection.

A So repeat that. The loss of software --

Q Right.

So, for example, if a dealer is no longer able to use the software, they then can't modify an existing installation, correct?

A Correct.

Q And so if a dealer -- has a dealer ever been threatened with the loss of the ability to modify its existing customer base of Crestron installations?

Klein

MR. PINEAULT: Objection.

A That's your interpretation of it. I just interpret that he is asking a question, how would he service his customers if he did not have access to the line.

Q Because if he picked up Control4 or Savant, he would be terminated as a Crestron dealer?

A That's what you say. I just read it as.

Q Has Crestron ever terminated a dealer for selling products that compete with Crestron?

A There are a lot of reasons why Crestron terminates dealers. That could be part of one, but there are a lot of reasons why we've terminated dealers.

Q I'm sure there are a lot of reasons, but is that a reason that any dealer has ever been terminated?

A I can't recall any specific case that that was the specific reason.

Q Has Crestron ever threatened to

Klein

I'm making them aware of the competition (Savant), and I'm saying right now that I can only imagine. The date of this is?

Q The date we have is January 28, 2011.

A 2011.

So at this point, Savant had made a huge impact on our sales and our dealers by 2011. The sales were continuing to go down. Many of our dealers, a good portion of our larger dealers, were selling Savant in addition to Crestron, and our sales were going down.

So I'm saying remind those dealers that we have a commitment, we have products, we have offices, support offices around the country. We give you rebates. If we commit to you, we need to ask them to commit to us. And if you don't make that commitment, if not, we will review your dealership and you may be subject to termination.

Klein

apostrophes.

So "Savant, zero tolerance", what did that mean?

A Probably it meant back to the zero tolerance is my message or my style of us losing business to Savant as we had done to Control4, as we had lost prior to Control4.

Q It says, "No Crestron dealer existing or new can represent Savant"?

A Right.

Q You keep on taking issue with my use of the word policy.

What would you call that?

A I'm calling it a practice. I'm calling it a message. Because it was my practice, it was our message. We don't want our dealers, new dealers, to represent competitive or Savant brands. That doesn't mean that it was always enforced or that doesn't mean that it was -- not always, it doesn't mean that that is what happened. I'm just saying it is our message. We don't want our dealers

Klein

to represent competitive products.

Q So you don't think it was a -- it wasn't a policy?

A As I indicated before, my definition or idea of policy is something that is very specifically written and documented in the company directives, and we don't have such a policy.

MR. JACOBS: I'm going to mark as Exhibit 20 a document produced at Crestron 137437.

(Whereupon, E-mail dated June 7, 2008, Bates Stamped Crestron 137437, was marked as Klein Exhibit 20 for identification, as of this date.)

(Witness reviewing document)

BY MR. JACOBS:

Q This is an e-mail from Dave Sell to a group of individuals, dated June 7, 2008.

Who are these individuals to whom the e-mail is addressed?

A From Dave?

Q Yes.

Klein

to this time for us or AMX.

Even they, which means AMX, admitted, and they told their customers that our products were better than theirs. So I'm saying we can't win on a product basis because even AMX back then when they were the leader and we were competing, they told every customer that Crestron's products were better.

There is a typographical. I mean there is a wrong word here. They were the leader and it was easy to do business -- it should AMX, because that was their presentation. Crestron's products are better, but it is easier to do business with Crestron.

Q With AMX?

A With AMX, yeah. See, I said it again. Crestron's products are better, but it is easier to do business with AMX. They won on that.

So I'm trying to tell these people as a preface to this that we will not within a battle against competition on

Klein

A Uh-huh.

Q So this was the message that was being given to the regional sales managers, correct?

MR. PINEAULT: Objection.

A This is the message that he -- these are the words and the message that he gave to them if he stated those words.

Q Is this a message that you wanted disseminated?

A Once again, my message is we don't want Control4 or Savant. We don't want our dealers selling Control4 and Savant. And we do not want new dealers to sell Control4, and we're going to ask them to choose. And existing dealers, we have to find out if they are selling Control4 and Savant and ask them to choose.

Part of the other words here, I might note, that underneath here, I assume this goes to the same slide, that there is two dealers here that he says are 25 percent of Gordon's quota, 2.4 million dollars in sales. These are some of the

Klein

paragraph where you are talking about Crestron sales revenues, it says, "Crestron sales revenues for residential programmable controllers including 'high end' residential programmable controllers decreased."

You seem to be distinguishing high end residential programmable controllers from all residential programmable controllers.

How are you distinguishing them?

A I'm not quite sure. I don't know that -- I could have, it was some time ago, I could have been including, we had a product line called Prodigy that was maybe a little less, not maybe, it was less in features and capabilities, and I could have been including them. It was a much very, very small and short-lived portion of our product line. So maybe I was including that, because that could have been deemed a lower end or not a high end. That's the only explanation I could make.

Klein

I'm sorry, who is Chris Perkins?
Q Yes.
A He is a regional director of the northeast.
Q So he is one of your direct reports?
A Yes.
Q And he is e-mailing with Marla Suttenberg, correct?
A Correct.
Q Who is Marla Suttenberg?
A She is a regional sales rep for Crestron, but she is -- she owns an independent manufacturers representative company. It is a different kind of model we have in the northeast.
Q Ms. Suttenberg also happens to be your wife, correct?
A Happens to be.
Q And on this first page, halfway down, she asks Mr. Perkins, who again reports to you, "Will we get yelled out for the CE Pro top 100 listing Savant and C4 at all our dealers?"

Klein

has Crestron employees that report to him that don't work for Marla Suttenberg. He doesn't treat them any different than he does Marla because she is married to me.

Q So he would yell at anybody if they had dealers in the top 100 CE Pro?

A You're reading the same thing I'm reading. I haven't seen this before, but --

Q Let's shift topics a little bit.

THE WITNESS: Can I take a quick break again? It will be very quick.

THE VIDEOGRAPHER: The time is now 5:03 p.m. We are off the record.

(Thereupon, a recess was taken, and then the proceedings continued as follows:)

THE VIDEOGRAPHER: The time is now 5:08 p.m. We are on the record.

BY MR. JACOBS:

Q Mr. Klein, what is the Crestron Partnership Awards Program?

A It is a -- it is an incentive program for our dealers that gives them

Klein

rebates and other things, free freight and things like that, for our dealers for purchasing products.

Q Is it a current program?

A We do have one currently. Over the years, it changes names and acronyms every year. I think it is called DRP today, but it is a -- we do have one currently, yes.

Q Has the basis of the program always been the same?

A No. No. It has always had rebates, but the rebates have been structured differently. Sometimes it is purely for volume. Sometimes it's purely -- it could be a mixture of volume and performance in certain product categories. It is a number of things.

Q Has it ever required exclusivity?

A Has it ever what?

Q Required exclusivity.

A As a general rule, no. We did have a -- I think we called it a PI

Klein

Partner, I can't remember what we called it, when we terminated our agreement with HTSA, Home Theater Specialist Association, and some members of that association came up to us or approached us and asked us to continue the benefits of the HTSA program, and in exchange, yes, we asked for their exclusive support of our product line. I don't know if that was called -- was it PRP? I don't know what it was called.

Q Crestron Partner.

A We had numbers of names, but we did ask for -- I believe we asked for exclusive participation on that one.

MR. JACOBS: Let me mark as Exhibit 46 a document produced at Crestron 0137459.

(Whereupon, Document entitled "Crestron Partnership Awards Program", Bates Stamped Crestron 0137459, was marked as Klein Exhibit 46 for identification, as of this date.)

BY MR. JACOBS:

Q This is a document headed

Klein

THE VIDEOGRAPHER: The time is now 7:11 p.m. This concludes media unit number seven in the January 16, 2014 videotaped 30(b)(6) deposition of Crestron Electronics, Incorporated by Randy Klein.

_________________________

RANDY KLEIN

Subscribed and sworn to
before me this day
of , 2014.
______________________

# EXHIBIT 366

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| CRESTRON ELECTRONICS, INC.,<br>Plaintiff,<br>-against-<br>CYBER SOUND & SECURITY LLC,<br>Defendant. | **Civil Action No.**<br><br>**<u>COMPLAINT FOR DAMAGES</u>** |

Plaintiff Crestron Electronics Inc. ("Crestron"), through its undersigned counsel, for its complaint against Defendant Cyber Sound & Security LLC ("Cyber Sound") alleges upon knowledge to itself and its own acts, and otherwise upon information and belief, as follows:

## I. NATURE OF THE ACTION

1. Through this action, Crestron seeks damages arising from the unlawful and continuing efforts of its former dealer, Cyber Sound, to destroy Creston's business and reputation.

2. For close to ten years, Cyber Sound worked with Crestron, pursuant to a non-exclusive dealer agreement, to provide and install Crestron's state-of-the-art control and automation systems in residential homes. During this time, in order to facilitate Cyber Sound's performance under its dealer agreement, Crestron provided Cyber Sound considerable support and training. In addition, Crestron provided Cyber Sound confidential and proprietary information relating to, among other things, pricing lists and policies, software, and sales and marketing information.

3. Despite Crestron's efforts to facilitate Cyber Sound's success as a dealer, Cyber Sound decided more than two years ago to turn its back on Crestron and covertly invest its energies in selling the products of Savant Systems, LLC ("Savant"), a Crestron competitor. Indeed, Cyber Sound has admitted to a trade publication that it began working with Savant products "under the radar." While Cyber Sound was free under its dealer agreement to represent the automation and control products of other manufacturers, Cyber Sound initially concealed its arrangement with Savant from Crestron and then began clandestine efforts to switch its customer base from using Crestron products to Savant products.

4. On information and belief, Cyber Sound did not simply cease its efforts actively to promote Crestron products. In coordination with Savant, Cyber Sound embarked on a campaign to spread false and misleading information about Crestron and its products to industry players, including, but not limited to, other dealers, builders, developers, architects, and end-users. Cyber Sound also has shared information concerning Crestron with Savant in order to force competition against Crestron. The goal in all of these efforts has been to injure Crestron for the benefit of Cyber Sound and Savant.

5. As detailed below, Cyber Sound's unfair and harmful activities have violated federal and state laws. Crestron brings this action to recover damages suffered to its business and reputation resulting from Cyber Sound's unlawful conduct.

## II. THE PARTIES

6. Plaintiff Crestron is a privately-held corporation duly organized and existing under the laws of the State of New Jersey, with its principal place of business located at 15 Volvo Drive, Rockleigh, New Jersey, 07647.

7. Crestron is informed and believes, and on that basis alleges, that Defendant Cyber Sound is a private limited liability company incorporated in Arizona, with its principal place of business located at 16559 N. 92nd Street, Scottsdale, Arizona, 85260.

## III. JURISDICTION AND VENUE

8. Jurisdiction over the parties and subject matter of this action is proper in this Court pursuant to 15 U.S.C. § 1121 (actions arising under the Lanham Act); and 28 U.S.C. § 1322(a)(1) (diversity of citizenship between the parties), because the parties are diverse and the amount in controversy exceeds $75,000, exclusive of interest and costs.

9. This Court has personal jurisdiction over the Defendant because Defendant has consented to this Court's jurisdiction, as evidenced by the choice of law and forum provision set forth in the parties' duly executed Dealer Agreement. This provision states, in relevant part, that

> [a]ny controversy or claim arising out of or relating to this Agreement shall be settled in New Jersey in accordance with the appropriate State or Federal laws. The Dealer hereby submits to the jurisdiction of the Courts of the State of New Jersey and of the Federal Courts of the District of New Jersey with respect to any litigation arising out of this agreement. The parties further agree that the exclusive venue for suit with respect to this Agreement shall be the Courts of the State of New Jersey or the Federal Courts of the district of New Jersey.

A true and correct copy of the Dealer Agreement is attached hereto as Exhibit 1 and is incorporated herein by reference.

10. Venue is properly found in this judicial district pursuant to the parties' agreement and pursuant to 28 U.S.C. § 1391(a)(2).

## IV. FACTUAL ALLEGATIONS

### A. History of the Crestron-Cyber Sound Business Relationship

11. Over more than four decades, Crestron has developed a well-regarded and successful business as a manufacturer and distributor of control and automation systems for homes, offices, schools, hospitals, hotels and other locations and entities. Crestron is one of the largest manufacturing employers in northern New Jersey and manufactures all of its products in Bergen County, New Jersey.

12. Crestron products are distributed through networks of independent dealers and other distribution channels, including online sales and sales directly to end-users. Because Crestron does not integrate or design whole systems, a dealer can choose whether to match Crestron systems with features and accessories, such as lighting, from other companies. Dealers therefore typically sell products of various manufacturers, so that a dealer selling Crestron products also will offer products from other manufacturers and distributers of control and automation systems.

13. Cyber Sound has been an independent dealer based in Scottsdale, Arizona since 1995. Cyber Sound designs and installs home automation systems. Cyber Sound is currently an authorized dealer of automation and control products for Savant Systems, LLC ("Savant"), Control4 Corp., Lutron Electronics Co. Inc., Universal Remote Control, Inc., and Power House Dynamics, Inc.

14. On May 23, 2000, Crestron (doing business at that time as "Crestron Remote Control Systems") and Cyber Sound entered into a binding and enforceable contract entitled Dealer Agreement ("Agreement"). The Agreement had an effective date of May 9, 2000.

15. The Agreement provided that Cyber Sound would act as an "authorized non-exclusive Dealer" for Crestron, "with responsibility for the sale, installation and customer support of Products subject to the terms and conditions" set forth in the Agreement.

16. By executing the Agreement, Cyber Sound agreed to "exercise its best efforts to promote the use and sale of CRESTRON products."

17. Cyber Sound also agreed that it

> shall have no authority to use [CRESTRON] trademarks or trade names on stationery, advertising or displays . . . or in any other fashion whatsoever, unless the written approval of CRESTRON is obtained in advance of such use. . . . In no event shall the Dealer use said trademarks or trade names after the termination of this Agreement.

18. The Agreement provided protection for Crestron's proprietary and confidential information. Cyber Sound specifically agreed that it "shall maintain in confidence and safeguard all trade secrets and proprietary business and technical information which become available to it under, or in connection with this Agreement."

19. Further, Cyber Sound agreed that "[u]pon termination of this Agreement, all proprietary information and information relating to trade secrets shall be returned to CRESTRON."

20. The Agreement specified that "trade secrets" includes

> all information relating to the business and operations of CRESTRON, including, without limitation, customer lists, pricing policies, operational methods, marketing plans or strategies, product development techniques or plans, business acquisition plans, new personnel acquisition plans, methods of manufacturer technical processes, designs and design products, invention and research projects and other business affairs relating to the business and operations of CRESTRON.

21. Significantly, by executing the Agreement, Cyber Sound specifically agreed that "proprietary information and information relating to trade secrets shall not be used at any time to force competition against Crestron."

22. Throughout the time that Cyber Sound acted as an authorized dealer for Crestron, Cyber Sound had access to proprietary information on Crestron's password-protected website. Different password-protected levels allow Crestron to tailor the confidential information that it makes available to those visiting its website. Even among Crestron's employees, there are different levels of access to the information on the website.

23. Cyber Sound's access to the password-protected Crestron website allowed it to view and download confidential and proprietary information including, but not limited to, Crestron's pricing information, product information, and promotional materials. Crestron also provided Cyber Sound samples of Crestron products as well as proprietary programming software. Crestron provided these materials to Cyber Sound with the intention that they remain confidential. Crestron expected that Cyber Sound would use these confidential and proprietary materials to assist it in promoting and selling Crestron products.

24. Cyber Sound necessarily used pricing information, product information, proprietary software, and promotional materials in order to perform its obligations under the Dealer Agreement.

25. For some time, Cyber Sound and Crestron enjoyed a successful business relationship. Indeed, at one point, Cyber Sound was one of Crestron's largest dealers, with sales of Crestron products reaching a high of 1.1 million dollars. However, beginning in the spring of 2010, Cyber Sound's Crestron sales began to drop precipitously. From May 2010 to May 2011,

Cyber Sound's sales of Crestron products decreased approximately 89%, to $125,000. From February to May 2011, Cyber Sound's sales of Crestron products totaled a mere $21,000.

26. Cyber Sound's dramatic decrease in Crestron product sales coincided with its engagement as a dealer for Savant, a Massachusetts developer of programmable controllers for residential and commercial automation.

27. Despite Cyber Sound's binding obligation to "exercise its best efforts to promote the use and sale of CRESTRON products," Cyber Sound instead initiated efforts to promote Savant and undermine Crestron. In fact, as the industry trade publication CE Pro reported, Cyber Sound admitted that it "first started playing with Savant [in October, 2008] '*under the radar*.'" *See* Jason Knott, *How Cyber Sound Leverages Apple to Thrive in Down Market* (CEPro, Apr. 6, 2011), *available at:* http://www.cepro.com/article/how_cyber_sound_leverages_apple_to_thrive_in_down_market (*emphasis added*).

28. Beginning in or about March 2010, Cyber Sound began openly and heavily to market Savant products to the detriment of Crestron. Approximately a year later, in or about February 2011, Cyber Sound opened its "Savant Experience Center" in Scottsdale, Arizona which was devoted to showcasing Savant products. Throughout this period, Cyber Sound continued to represent to Crestron that it was performing its obligations under the parties' Dealer Agreement to use its best efforts to promote and sell Crestron products.

29. On or about May 2010, however, Crestron began hearing from dealers, builders, and developers that Cyber Sound and Savant were making false and disparaging comments about Crestron. In addition to Cyber Sound's dramatic drop in sales of Crestron products, increase in sales of Savant products, and dedication of its marketing capital to Savant, Cyber Sound had

taken concerted efforts with Savant to sway industry and end-user sentiment away from Crestron.

30. Cyber Sound has, in fact, sought to undermine Crestron in the marketplace and interfere with its business deals. For example, on or about July 2010, Crestron learned that several homes that were committed, designed or "pre-wired" to be equipped with Crestron home automation products had been switched to Savant systems by Cyber Sound. On information and belief, these and subsequent "flips" resulted from Cyber Sound's efforts—by tortious means and in breach of the Agreement—to take business from Crestron and divert it to Savant.

31. Cyber Sound's strategy included, but was not limited to, using the popularity and brand recognition of Crestron to secure meetings with potential customers, at which point Cyber Sound would introduce Savant products and attempt to convince the customer, through misrepresentations and falsehoods, to switch to Savant.

32. Crestron has lost the business of existing and potential end-users due to Cyber Sound's activities, in coordination with Savant. The loss of several projects was the result of the false and misleading representations made about Crestron by Cyber Sound.

33. Moreover, Crestron has lost prospective clients, including builders and developers, as the result of the campaign that Cyber Sound has waged against Crestron, and because of the illegal tactics that Cyber Sound has used in order to help Savant further its competitive efforts against Crestron.

34. Existing end-users and clients that Crestron has lost due to Cyber Sound's illegal activities include, but are not limited to: (i) the Elliott Residence at Desert Mountain in Scottsdale, Arizona, which had been prewired for Crestron but was "flipped" by Cyber Sound to Savant; and (ii) a home prewired for Crestron by Tim Henderson of One Way Media Designs,

Case 2:11-cv-03492-SH-MAH Document 1 Filed 06/16/11 Page 9 of 24 PageID: 9

which Cyber Sound "flipped" to Savant on or about April 2010. In addition, Rod Cullum of Cullum Homes, a custom new home builder serving Scottsdale, Paradise Valley, and the Phoenix area, had been a loyal Crestron client for years. However, after hearing Cyber Sound's false and misleading statements regarding Crestron, Cullum decided to equip his newest development in Paradise Valley, consisting of thirty-two sites with homes at a starting price of over $1.5 million, with Savant systems.

35. Crestron also has lost prospective end-users and clients due to Cyber Sound's illegal activities. These losses are evidenced by the decline of Crestron's residential sales in the past year, with an accelerated descent since September 2011.

**B. <u>Cyber Sound's Misinformation Campaign Against Crestron</u>**

36. In furtherance of its goal to harm Crestron in the marketplace and to promote Savant, Cyber Sound has made and repeated false and misleading statements and representations about Crestron in order to harm Crestron's sales and reputation.

37. On information and belief, at various times, beginning on or about the spring of 2010, Cyber Sound employees and officers made false statements to individuals in the custom electronics industry, as well as clients and end-users, that have included, but were not limited to, the following:

a. Crestron products use old, outdated technology. One or more agents of Cyber Sound made this statement to employees and officers of Cullum Homes in or about May or June 2010. Additionally, Jon Summer of Cyber Sound repeated this false statement to Rod Cullum of Cullum Homes in or about October 2010.

b. A Crestron system is five-times more expensive to program than a Savant system. Brad Zoerb and another Cyber Sound employee made this statement to a homeowner, Mr. Kukunoor, in or about the March to May 2011 time period.

c. Crestron products are unreliable and repeatedly experience failures. One or more agents of Cyber Sound made this statement to employees and officers of Cullum Homes in or about May or June 2010. Additionally, Jon Summer of Cyber Sound repeated this false statement to Rod Cullum of Cullum Homes in or about October 2010.

d. Crestron's products do not work with Apple technology. Specifically, in this regard, Cyber Sound has stated that Crestron's products cannot integrate with the iPhone and iPad. In addition, Cyber Sound has stated that Crestron control processors cannot "keep up" with the speed of the iPad processor. A Cyber Sound agent made one or both of these statements to the electronics purchaser for Craig Jackson's home, in or about September 2010. Additionally, Brad Zoerb and another Cyber Sound employee made one or both of these statements to a homeowner, Mr. Kukunoor, in or about the March to May 2011 time period. A Cyber Sound agent made one or both of these statements to Gregg Drumm in or about May 2011; and a Cyber Sound agent made one or both of these statements to the owner of a home in the Silverleaf development in Scottsdale, Arizona, in or about the March to May 2011 time period.

e. The number of iPads that can be used with a Crestron system is less than with a Savant system. Cyber Sound representatives conveyed this message to Mr. Pappas, a homeowner in the Phoenix area, on or about June 2010.

f. A Crestron system requires a $1000 "room box" for every iPad. One or more Cyber Sound agents made this statement to employees and officers of Century Builders at a Cyber Sound party that numerous builders attended, in or about the March to May 2011 time period.

g. Crestron is planning on exiting the residential control business. Brad Zoerb and another Cyber Sound employee made this statement to a homeowner, Mr. Kukunoor, in or about the March to May 2011 time period.

h. Cyber Sound can service a Crestron system without being a Crestron dealer. Cyber Sound employee Chris Easter made this statement to a customer who had purchased a home with an existing Crestron system, on or about June 2011.

38. These statements alleged above are false, and verifiably so.

39. On information and belief, Cyber Sound's false statements were made and repeated on numerous occasions including, but not limited to, the instances alleged above.

40. Cyber Sound employees and officers making some or all of the defamatory statements listed above included, but were not limited to, Jon Summer, Jason Beatty, Chris Easter, Brad Zoerb, and Deric Andre.

41. Cyber Sound, in coordination with Savant, has disseminated the above and other false information with the common aim of harming Crestron.

42. To this end, Cyber Sound made numerous disparaging statements about Crestron at Savant's annual dealers' conference that took place in San Francisco, California on or about May 15-17, 2011. Cyber Sound president Jon Summer took center stage and joined Savant president Robert Madonna in a presentation to the industry representatives, including current

Crestron dealers, in attendance. During what has been described to Crestron as a "rant," the comments about Crestron included, but were not limited to, the following false assertions:

a. The long-term effects of being a Crestron dealer will put the dealer out of business.

b. Crestron does not care about its dealers or the quality of their work, but just how much Crestron product the dealers can sell.

c. Crestron does not listen to dealer concerns, and this keeps their business at half the size that it could be.

d. Crestron's paranoia keeps them from succeeding.

43. In addition, Jon Summer told the gathering at the Savant annual conference that "I spent the last ten years installing Crestron, and I'll spend the next ten years ripping them out."

44. Cyber Sound employee Jason Beatty also made disparaging comments concerning Crestron at the 2011 Savant dealers' conference. According to several reports, Jason Beatty went on to single out dealers in the audience, in front of their peers, and pressured them to answer why they were selling Crestron and not Savant.

45. Cyber Sound's actions at the Savant conference were intended to interfere with Crestron's existing and prospective business relationships. Many of the attendees were Crestron customers or potential Crestron customers, including dealers who are currently authorized representatives of both Savant and Crestron products. Attendees at the conference understood that Cyber Sound (and Savant) sought to convey the message that they should think twice before dealing with Crestron or steer clear of Crestron altogether.

46. Cyber Sound's efforts to deceive the industry and public extend to its Savant showroom floor. Cyber Sound misleadingly displays an outdated model of a Crestron touch

Case 2:11-cv-03492-FSH-MAH Document 1 Filed 06/16/11 Page 13 of 24 PageID: 13

panel in its showroom that bears the Crestron trademark. Cyber Sound uses this outdated model as a contrast to the product specifications and utility of the newest Apple iPad, which the Savant system uses.

47. On information and belief, Cyber Sound's intent in using an outdated Crestron touch panel is to give the impression to those who visit the showroom that the panel on display is a recent and representative Crestron model, that Crestron's technology is outdated, and that Crestron systems are not compatible with Apple technology.

48. On information and belief, Cyber Sound's ultimate objective in using an outdated Crestron touch panel is to turn customers away from Crestron and toward Savant.

49. In addition, Cyber Sound has used Crestron's trademarks on advertisements and flyers including, but not limited to, advertisements touting Cyber Sound's partnership with Savant. Cyber Sound's use of Crestron's trademarks in this regard has not been approved or authorized by Crestron.

### C. Cyber Sound's Continued Coordination with Savant

50. Cyber Sound's coordination with Savant in their campaign against Crestron is further reflected and confirmed in an email that Cyber Sound sent on or about May 10, 2011, to a wide distribution of its customers and competitors that bears the subject line: "Our Valued Customers."

51. The email, from Jon Summer, falsely claimed that Cyber Sound had decided to end its dealer relationship with Crestron as a result of Crestron's desire to have an exclusive dealer relationship with Cyber Sound.

52. After extolling the virtues of Savant, Cyber Sound's email stated that "Crestron, who has also been a partner for the past many years, has decided that they want our business

exclusively. We can no longer do this as we feel there are better solutions for our clients. Effective immediately, we will no longer represent the Crestron line."

53. Here, again, Cyber Sound has misrepresented the facts—and this time in writing. In reality, it was Crestron who had sent Cyber Sound a termination notice almost two weeks prior to the May 10 email. Crestron terminated the relationship because of Cyber Sound's failure to perform under its dealer agreement and its concerted efforts to thwart the sale of Crestron products and harm Crestron's reputation.

54. In addition, at no point has Crestron ever required a dealer—let alone Cyber Sound—to be an "exclusive" Crestron dealer. Ironically, Cyber Sound's own experience and ability to switch its focus to Savant bears testament to this. Moreover, Cyber Sound's own dealer agreement with Crestron further proves this point.

55. Cyber Sound released this email, which contains statements that it knew were false and misleading, in a deliberate effort to tarnish Crestron's image, and thereby drive away Crestron's current and potential customers.

56. On information and belief, Cyber Sound created this email in an effort to bolster Savant's pending lawsuit filed against Crestron in the District of Massachusetts.

57. The substance and dissemination of this email—issued on May 10, 2011—reflects calculated and coordinated skullduggery. The email represents nothing more than an after-the-fact attempt to create evidence to support Savant's baseless claims that Crestron requires exclusivity in its dealer relationships.

58. Both Cyber Sound and Savant knew at or before the time the email was sent out that Crestron had sent Cyber Sound a termination notice on April 29, 2011. This is apparent

because on May 11, 2011, the very next day after Cyber Sound's email was sent out, Savant attached a copy of the notice of termination as an exhibit to a court filing made by Savant.

59. Apart from the issuance of the false and misleading email, Cyber Sound's further actions in response to Crestron's notice of termination reflect additional wrongful conduct.

60. The parties' Agreement allowed for termination "by CRESTRON, or DEALER, for any reason with or without cause, upon thirty (30) days advance written notice." Crestron terminated its dealer relationship with Cyber Sound on April 29, 2011, effective May 29, 2011.

61. Subsequently, on May 27, 2011, Crestron sent Jon Summer at Cyber Sound a letter reminding him of his company's obligations under the Dealer Agreement and requesting the return of all proprietary information and information relating to trade secrets.

62. To date, Cyber Sound has breached its agreement and failed to return to Crestron any proprietary information or information relating to trade secrets.

63. As set forth above, Savant and Cyber Sound have exchanged information and documents relating to Crestron to further their efforts to harm Crestron's business and reputation. As such, it appears that Cyber Sound has also misappropriated Crestron's confidential information and trade secrets.

**COUNT I**
**(Violation of Lanham Act, 15 U.S.C. § 1125(a))**

64. Crestron incorporates the allegations from paragraphs 1 through 63 above as if expressly realleged herein.

65. Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a) creates a cause of action for any false or misleading description or representation of a product.

66. Cyber Sound has made false and misleading statements about Crestron's products in commerce.

67. Cyber Sound's lies and misrepresentations were material, in that they were likely to influence customers' purchasing decisions.

68. Cyber Sound's misrepresentations had a tendency to deceive a substantial portion of the intended audience.

69. There was actual deception of a substantial portion of the intended audience.

70. The advertised goods travelled in interstate commerce.

71. As a direct and proximate result of Cyber Sound's violation of the Lanham Act, Crestron has been damaged in an amount to be proved at trial.

**COUNT II**
**(Breach of Contract)**

72. Crestron incorporates the allegations from paragraphs 1 through 71 above as if expressly realleged herein.

73. Crestron and Cyber Sound were parties to a binding and enforceable contract, entitled Dealer Agreement.

74. Crestron fully performed its obligations under the contract.

75. Cyber Sound breached the contract by failing to perform the obligations it accepted under the Agreement.

76. Cyber Sound did not consistently exercise its best efforts to promote the use and sale of Crestron products. Instead, upon information and belief, Cyber Sound actively worked to undermine the use and sale of Crestron products and divert sales to a Crestron competitor.

77. On information and belief, Cyber Sound further used Crestron trademarks as part of its marketing campaign to promote Savant, a use of which Crestron did not approve.

78. On information and belief, Cyber Sound shared Crestron trade secrets with potential clients of Crestron, and with Crestron's competitor, Savant.

Case 2:11-cv-03492-FSH-MAH Document 1 Filed 06/16/11 Page 17 of 24 PageID: 17

79. On information and belief, Cyber Sound used proprietary information and information relating to trade secrets to force competition against Crestron, including but not limited to, by sharing Crestron documents with the intent, and effect, of undermining Crestron's existing and prospective business relationships.

80. On information and belief, Cyber Sound told Crestron customers and end-users that it could service a Crestron system even if it is not a Crestron dealer, which is contrary to the Agreement.

81. Cyber Sound has failed to return all proprietary information and information relating to trade secrets as required under the Agreement.

82. As a direct and proximate result of Cyber Sound's contractual breaches, Crestron has been damaged by an amount to be determined at trial.

**COUNT III**
**(Breach of the Implied Covenant of Good Faith and Fair Dealing)**

83. Crestron incorporates the allegations from paragraphs 1 through 82 above as if expressly realleged herein.

84. Crestron and Cyber Sound were parties to a valid, enforceable agreement with respect to the Dealer Agreement, as alleged above.

85. Cyber Sound breached the implied covenant of good faith and fair dealing by acting arbitrarily and in bad faith so as to deprive Crestron of the benefits of the Agreement. Among other things, starting in or around March 2010, Cyber Sound decided that it no longer wished to promote Crestron products. Instead, Cyber Sound, without telling Crestron, ceased to promote Crestron, and began diverting sales to Crestron's competitor, Savant.

86. In addition, Cyber Sound worked with Savant actively to harm Crestron's business and reputation, for the purpose of bolstering Savant's sales and revenue, and to further Cyber Sound's relationship with Savant in order to receive benefits from Savant.

87. As a direct and proximate result of Cyber Sound's actions, Crestron has been damaged in an amount to be proved at trial.

**COUNT IV**
**(Defamation)**

88. Crestron incorporates the allegations from paragraphs 1 through 87 above as if expressly realleged herein.

89. Cyber Sound has made defamatory statements of fact about Crestron to third parties.

90. These statements, as alleged above, were false and injurious to Crestron's reputation as a manufacturer of cutting-edge, technologically advanced, and reliable electronic control and automation products, and as an upstanding and responsible business partner. Cyber Sound's statements tended to harm the reputation of Crestron such that Crestron lowered in the estimation of the community and third persons avoided associating or dealing with Crestron.

91. As a Crestron dealer familiar with Crestron's products and business practices, Cyber Sound knew that these statements were false, but nevertheless intentionally made them in order to injure Crestron.

92. These statements damaged Crestron by turning a number of its current customers away from the company, and by dissuading potential customers from using Crestron's products.

93. As a direct and proximate result of Cyber Sound's defamatory statements, Crestron has been damaged in an amount to be proved at trial.

**COUNT V**
**(Trade Libel)**

94. Crestron incorporates the allegations from paragraphs 1 through 93 above as if expressly realleged herein.

95. Cyber Sound published matters derogatory to Crestron's products and business to third persons, as alleged above.

96. These statements were false and Cyber Sound knew that they were false.

97. These statements were of objective, verifiable facts.

98. Cyber Sound made these statements in order to prevent customers and other dealers from dealing with Crestron.

99. These statements played a material and substantial part in inducing others not to deal with Crestron, and Crestron lost existing customers and failed to attract a number of prospective customers. But for these statements, Crestron would have retained existing customers, and added new customers.

100. As a direct and proximate result of Cyber Sound's defamatory statements, Crestron has lost present and prospective advantages in the form of sales and contracts, and thus has been damaged in an amount to be proved at trial.

**COUNT VI**
**(Tortious Interference with a Contract)**

101. Crestron incorporates the allegations from paragraphs 1 through 100 above as if expressly realleged herein.

102. Crestron had valid and enforceable contracts relating to the purchase and installation of Crestron products.

103. Cyber Sound intentionally and improperly interfered with the performance of the contracts between Crestron and the customers by inducing the customers, through lies and misrepresentations concerning Crestron and its products, not to perform the contract.

104. Crestron also had valid and enforceable contracts with other dealers.

105. Cyber Sound intentionally and improperly interfered with the performance of the contracts between Crestron and the dealers by inducing the dealers, through intimidation, lies, and misrepresentations regarding the quality of Crestron's product, not to perform on their contracts with Crestron. Specifically, Cyber Sound induced the dealers not to make their best efforts to promote the sale and use of Crestron products, as is required under Creston's standard Dealer Agreement.

106. Cyber Sound communicated these false statements and misrepresentations in order to promote Savant's products in favor of Crestron's products. Cyber Sound's goal was to further its relationship with Savant in order to receive benefits from Savant.

107. As a direct and proximate result of Cyber Sound's interference, Crestron has been damaged in an amount to be proved at trial.

**COUNT VII**
**(Tortious Interference with Prospective Economic Advantage)**

108. Crestron incorporates the allegations from paragraphs 1 through 107 above as if expressly realleged herein.

109. Crestron is a well-known and well-established manufacturer of residential and commercial automation and control systems. Its products are favored by customers around the world. Because of its track record, innovation, and skilled marketing and business sense, Crestron had a reasonable expectation of economic advantage from prospective contractual or

economic relationships with current or potential customers in the area in which Cyber Sound operates.

110. Cyber Sound, as a Crestron dealer and industry insider, knew of Crestron's expectancy of economic advantage.

111. Cyber Sound intentionally interfered with Crestron's prospective economic advantage by making intentionally false and misleading statements to potential customers that Crestron's product was flawed or inferior, and that Crestron was not a good business partner with whom to work.

112. Cyber Sound made these statements without justification or excuse; its sole purpose was to harm Crestron in favor of Savant, in order to more fully benefit from its own relationship with Savant.

113. The interference by Cyber Sound caused Crestron's loss of its expected advantage, as customers who would have used Creston's products instead used the products of Savant or other competitors.

114. Without the interference, there was a reasonable probability that Crestron would have received the anticipated economic benefits of selling its products to the customers.

115. Cyber Sound also made intentionally false and misleading statements to potential or current Crestron dealers.

116. Cyber Sound made these statements without justification or excuse; its sole purpose was to harm Crestron in favor of Savant, in order to more fully benefit from its own relationship with Savant.

117. The interference by Cyber Sound caused Crestron's loss of its expected advantage, as dealers who would have sold or carried Creston's products instead will not do so.

118. Without Cyber Sound's interference, there was a reasonable probability that Crestron would have received the anticipated economic benefits of entering into beneficial relationships with the dealers.

119. As a direct and proximate result of Cyber Sound's interference, Crestron has been damaged in an amount to be proved at trial.

**COUNT VIII**
**(Misappropriation of Trade Secrets)**

120. Crestron incorporates the allegations from paragraphs 1 through 119 above as if expressly realleged herein.

121. Crestron has trade secrets and has communicated portions of such information to Cyber Sound in confidence.

122. On information and belief, Cyber Sound has disclosed and shared Crestron information and clients with Savant and others, including, but not limited to, trade secret information.

123. On information and belief, Savant and others acquired such information with knowledge of Cyber Sound's breach of confidence.

124. Cyber Sound, Savant and others have used confidential and trade secret information to the detriment of Crestron, including but not limited to by sharing the information with customers in order to deter them from using Crestron.

125. Crestron had taken precautions to maintain the secrecy of its trade secrets and confidential and property information.

126. As a direct and proximate result of Cyber Sound's misappropriation of trade secrets, Crestron has been damaged in an amount to be proved at trial.

## REQUEST FOR RELIEF

**WHEREFORE**, Crestron respectfully prays for the following relief:

A. Awarding Crestron compensatory damages against Cyber Sound for false representation under the Lanham Act 15 U.S.C. § 1125(a) (1998); breach of contract; breach of the implied covenant of good faith and fair dealing; defamation; trade libel; tortious interference with contract; tortious interference with prospective economic advantage; and misappropriation of trade secrets in amounts to be determined at trial, together with pre-judgment interest at the maximum rate allowable by law.

B. Awarding Crestron punitive damages in an amount to be determined at trial for Cyber Sound's egregious and malicious conduct;

C. Directing Cyber Sound to return immediately to Crestron all proprietary information and information relating to trade secrets;

D. Awarding Crestron its attorneys' fees and other out-of-pocket expenses incurred by reason of the enforcement and protection of its rights in this action; and

E. Awarding Crestron such other and further relief, in law and equity, as this Court deems just and proper.

**CERTIFICATION PURSUANT TO L. Civ. R. 11.2**

This matter in controversy is not the subject of any other action pending in any court, or of any pending arbitration or administrative proceeding.

Nicoll Davis & Spinella LLP
Attorneys for Plaintiff Crestron Electronics, Inc.

Dated: June 16, 2011

/s/ *Christopher M. Santomassimo*
Christopher M. Santomassimo
95 Route 17 South
Paramus, New Jersey 07652
Phone: (201) 712-1616
Fax: (201) 712-9444

and

Chong S. Park, Esq.
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue, N.W.
Washington, D.C. 20036
Phone: (202) 429-6275
*(pending pro hac vice admission)*

JS 44 (Rev. 12/07, NJ 5/08)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS

Crestron Electronics, Inc.

**(b)** County of Residence of First Listed Plaintiff: Bergen

**(c) Attorney's (Firm Name, Address, Telephone Number and Email Address)**

Christopher M. Santomassimo, Esq., Nicoll Davis & Spinella LLP, 95 Route 17 South, Suite 203, Paramus, NJ 07652; (201) 712-1616; csantomassimo@ndslaw.com

## DEFENDANTS

Cyber Sound & Security LLC

County of Residence of First Listed Defendant: Maricopa

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

Attorneys (If Known)

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

- ☐ 1 U.S. Government Plaintiff
- ☐ 3 Federal Question (U.S. Government Not a Party)
- ☐ 2 U.S. Government Defendant
- ☒ 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)

(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☒ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

**CONTRACT**
- ☐ 110 Insurance
- ☐ 120 Marine
- ☐ 130 Miller Act
- ☐ 140 Negotiable Instrument
- ☐ 150 Recovery of Overpayment & Enforcement of Judgment
- ☐ 151 Medicare Act
- ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans)
- ☐ 153 Recovery of Overpayment of Veteran's Benefits
- ☐ 160 Stockholders' Suits
- ☒ 190 Other Contract
- ☐ 195 Contract Product Liability
- ☐ 196 Franchise

**REAL PROPERTY**
- ☐ 210 Land Condemnation
- ☐ 220 Foreclosure
- ☐ 230 Rent Lease & Ejectment
- ☐ 240 Torts to Land
- ☐ 245 Tort Product Liability
- ☐ 290 All Other Real Property

**TORTS**

PERSONAL INJURY
- ☐ 310 Airplane
- ☐ 315 Airplane Product Liability
- ☐ 320 Assault, Libel & Slander
- ☐ 330 Federal Employers' Liability
- ☐ 340 Marine
- ☐ 345 Marine Product Liability
- ☐ 350 Motor Vehicle
- ☐ 355 Motor Vehicle Product Liability
- ☐ 360 Other Personal Injury

PERSONAL INJURY
- ☐ 362 Personal Injury - Med. Malpractice
- ☐ 365 Personal Injury - Product Liability
- ☐ 368 Asbestos Personal Injury Product Liability

PERSONAL PROPERTY
- ☐ 370 Other Fraud
- ☐ 371 Truth in Lending
- ☐ 380 Other Personal Property Damage
- ☐ 385 Property Damage Product Liability

**CIVIL RIGHTS**
- ☐ 441 Voting
- ☐ 442 Employment
- ☐ 443 Housing/ Accommodations
- ☐ 444 Welfare
- ☐ 445 Amer. w/Disabilities - Employment
- ☐ 446 Amer. w/Disabilities - Other
- ☐ 440 Other Civil Rights

**PRISONER PETITIONS**
- ☐ 510 Motions to Vacate Sentence

Habeas Corpus:
- ☐ 530 General
- ☐ 535 Death Penalty
- ☐ 540 Mandamus & Other
- ☐ 550 Civil Rights
- ☐ 555 Prison Condition

**FORFEITURE/PENALTY**
- ☐ 610 Agriculture
- ☐ 620 Other Food & Drug
- ☐ 625 Drug Related Seizure of Property 21 USC 881
- ☐ 630 Liquor Laws
- ☐ 640 R.R. & Truck
- ☐ 650 Airline Regs.
- ☐ 660 Occupational Safety/Health
- ☐ 690 Other

**LABOR**
- ☐ 710 Fair Labor Standards Act
- ☐ 720 Labor/Mgmt. Relations
- ☐ 730 Labor/Mgmt.Reporting & Disclosure Act
- ☐ 740 Railway Labor Act
- ☐ 790 Other Labor Litigation
- ☐ 791 Empl. Ret. Inc. Security Act

**IMMIGRATION**
- ☐ 462 Naturalization Application
- ☐ 463 Habeas Corpus - Alien Detainee
- ☐ 465 Other Immigration Actions

**BANKRUPTCY**
- ☐ 422 Appeal 28 USC 158
- ☐ 423 Withdrawal 28 USC 157

**PROPERTY RIGHTS**
- ☐ 820 Copyrights
- ☐ 830 Patent
- ☐ 840 Trademark

**SOCIAL SECURITY**
- ☐ 861 HIA (1395ff)
- ☐ 862 Black Lung (923)
- ☐ 863 DIWC/DIWW (405(g))
- ☐ 864 SSID Title XVI
- ☐ 865 RSI (405(g))

**FEDERAL TAX SUITS**
- ☐ 870 Taxes (U.S. Plaintiff or Defendant)
- ☐ 871 IRS—Third Party 26 USC 7609

**OTHER STATUTES**
- ☐ 400 State Reapportionment
- ☐ 410 Antitrust
- ☐ 430 Banks and Banking
- ☐ 450 Commerce
- ☐ 460 Deportation
- ☐ 470 Racketeer Influenced and Corrupt Organizations
- ☐ 480 Consumer Credit
- ☐ 490 Cable/Sat TV
- ☐ 810 Selective Service
- ☐ 850 Securities/Commodities/ Exchange
- ☐ 875 Customer Challenge 12 USC 3410
- ☐ 890 Other Statutory Actions
- ☐ 891 Agricultural Acts
- ☐ 892 Economic Stabilization Act
- ☐ 893 Environmental Matters
- ☐ 894 Energy Allocation Act
- ☐ 895 Freedom of Information Act
- ☐ 900Appeal of Fee Determination Under Equal Access to Justice
- ☐ 950 Constitutionality of State Statutes

## V. ORIGIN (Place an "X" in One Box Only)

- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from another district (specify)
- ☐ 6 Multidistrict Litigation
- ☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing (**Do not cite jurisdictional statutes unless diversity**): 15 U.S.C. § 1121 and 28 U.S.C. §1322(a)(1)

Brief description of cause: Breach of Contract and Tort

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

**DEMAND $**

CHECK YES only if demanded in complaint:

**JURY DEMAND:** ☐ Yes ☑ No

## VIII. RELATED CASE(S)

(See instructions): JUDGE ______ DOCKET NUMBER ______

Explanation:

JUNE 16, 2011

DATE

SIGNATURE OF ATTORNEY OF RECORD

06/16/2011

Christopher M. Santomassimo

JS 44 Reverse (Rev. 12/07, NJ 1/08)

# INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

**I.** **(a) Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

(b) County of Residence. For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

(c) Attorneys. Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II.** **Jurisdiction**. The basis of jurisdiction is set forth under Rule 8(a), F.R.C.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.

United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.

United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.

Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.

Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. (See Section III below; federal question actions take precedence over diversity cases.)

**III.** **Residence (citizenship) of Principal Parties.** This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

**IV.** **Nature of Suit**. Place an "X" in the appropriate box. If the nature of suit cannot be determined, be sure the cause of action, in Section VI below, is sufficient to enable the deputy clerk or the statistical clerks in the Administrative Office to determine the nature of suit. If the cause fits more than one nature of suit, select the most definitive.

**V.** **Origin**. Place an "X" in one of the seven boxes.

Original Proceedings. (1) Cases which originate in the United States district courts.

Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441. When the petition for removal is granted, check this box.

Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.

Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.

Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.

Multidistrict Litigation. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407. When this box is checked, do not check (5) above.

Appeal to District Judge from Magistrate Judgment. (7) Check this box for an appeal from a magistrate judge's decision.

**VI.** **Cause of Action**. Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity.** Example: U.S. Civil Statute: 47 USC 553
Brief Description: Unauthorized reception of cable service

**VII.** **Requested in Complaint**. Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.

Demand. In this space enter the dollar amount (in thousands of dollars) being demanded or indicate other demand such as a preliminary injunction.

Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII.** **Related Cases**. This section of the JS 44 is used to reference related pending cases if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases. Provide a brief explanation of why the cases are related.

**Date and Attorney Signature**. Date and sign the civil cover sheet.

# DEALER AGREEMENT

THIS AGREEMENT made and entered into as of the 9 day of MAY, by and between CYBER SOUND & SECURITY

## RECITALS

NOW, THEREFORE, the parties agree as follows:

APPOINTMENT AND AUTHORIZED LOCATION:

DEALER REPRESENTATIONS AND WARRANTIES:

DEALER OBLIGATIONS:

OBLIGATIONS OF CRESTRON:

RELATION BETWEEN THE PARTIES:

WAIVER OF RIGHTS:

CLAIMS:

APPLICABLE LAW:

MISCELLANEOUS:

DEALER

Name: CYBER SOUND & SECURITY

Signature:

By: JON SUMMER

Title: PRES.

Date: 5-10-00

CRESTRON ELECTRONICS INC.

Name:

Signature:

By:

Title:

Date: 5/30/00

APPENDIX A

CRESTRON AUTHORIZED DEALER LOCATION:

15525 N. 83rd Way #B-7
Scottsdale, AZ
85260

APPENDIX B

CRESTRON AUTHORIZED PRODUCTS FOR SALE:

DEALER

Name: CYBER SOUND & SECURITY

By: JON SUMMER

Title: PRES.

Date: 5-10-00

APPENDIX A

15525 N. 83rd Way #B-7
Scottsdale, AZ
85260

APPENDIX B

DEALER

Name: CYBER SOUND & SECURITY

By: JON SUMMER

Title: PRES.

Date: 5-10-00

APPENDIX A

15525 N. 83rd Way #B-7
Scottsdale, AZ
85260

APPENDIX B

AO 440 (Rev. 12/09) Summons in a Civil Action

# UNITED STATES DISTRICT COURT

for the

District of New Jersey

| | | |
|---|---|---|
| Crestron Electronics, Inc. | ) | |
| *Plaintiff* | ) | |
| v. | ) | Civil Action No. |
| Cyber Sound & Security LLC | ) | |
| *Defendant* | ) | |

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)* Cyber Sound & Security LLC
16559 N. 92nd Street
Scottsdale, Arizona 85260

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*CLERK OF COURT*

Date: ____________________

____________________
*Signature of Clerk or Deputy Clerk*

Civil Action No.

## PROOF OF SERVICE

***(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))***

This summons for *(name of individual and title, if any)* ______________________
was received by me on *(date)* ______________ .

❒ I personally served the summons on the individual at *(place)* ______________________
______________________ on *(date)* ______________ ; or

❒ I left the summons at the individual's residence or usual place of abode with *(name)* ______________
______________________ , a person of suitable age and discretion who resides there,
on *(date)* ______________ , and mailed a copy to the individual's last known address; or

❒ I served the summons on *(name of individual)* ______________________ , who is
designated by law to accept service of process on behalf of *(name of organization)* ______________
______________________ on *(date)* ______________ ; or

❒ I returned the summons unexecuted because ______________________ ; or

❒ Other *(specify)*:

.

My fees are $ ________ for travel and $ ________ for services, for a total of $ 0.00 .

I declare under penalty of perjury that this information is true.

Date: ______________

______________________
*Server's signature*

______________________
*Printed name and title*

______________________
*Server's address*

Additional information regarding attempted service, etc:

EXHIBIT 367

Navigation

# Call Charles

Simple, Reliable, Technology Solutions.

**631-333-1467**

Monday-Friday | 9AM-6PM EST

## Crestron vs Control4: What's the difference?

January 30, 2013

### Centralized control of your music, television, HVAC, lights, and security. This vision is well executed by both Control4 and Crestron.

### The biggest difference is the user-interface.

**Control4**'s software uses an auto-generated interface on Touch Screens and Displays. This template provides an intuitive platform for controlling the home, and makes installation to programming turnaround extremely efficient. Crestron provides the ability for completely customized interfaces. **Crestron** separates the system from the interface by giving installers two different pieces of software. This allows designers to focus on the graphics, and programmers on function.

Both Crestron and Control4 allow control from iOS devices, Android devices, and from the Desktop. For control outside the Home or Office, both Crestron and Control4 maintain a connection to their servers, and facilitate a remote connection.

## Programming and serviceability differences.

**Control4** provides one software suite for an installer to configure and manage an entire Project. This software provides a drag and drop interface for configuring a system and identifying all devices. This system configuration is accessible at any time to view, modify, and update in real-time. **Crestron** follows a Program and Compile work-flow. Any system change requires an update of the entire configuration; meaning no real-time updating. Crestron's advantages in customization increase overall programming labor.

Building, updating, and fixing systems is **must faster with Control4**. Customizing programming for **highly-specialized applications is Crestron's** department.

## Different companies, different philosophies.

**Control4** *Salt Lake City, Utah*

Approaching **$100m** Annual Revenue

Estimated **300** Employees

Founded in **2004**

**Crestron** *Rockleigh, NJ*

Estimated **$500m** Annual Revenue

Estimated **+2,500** Employees

Founded in **1968**

**Control4**'s devices are based on open-source hardware and IP Standards. This saves an incredible amount of engineering time, and provides a working platform for Automation specific programming.

**Crestron** developed their own hardware and communication standards for automation prior to modern IP. The reason many argue Crestron is 'harder' to program, is because it's built on a philosophy of 'purpose-building' – only services and applications needed are installed from the ground up.

## Infrastructure and hardware.

**Control4** manufactures controllers, audio switches, audio amplifiers, lighting control, thermostats, remotes, keypads, and touch screen hardware. For complete environment control, an outside manufacturer will need to be integrated at some point of the project. Control4 promotes these relationships and outside development is a large part of their model.

**Crestron** manufacturers their own proprietary cabling, controllers, video switches, audio switches, network equipment, audio amplifiers, keypads, lighting control, shades, thermostats, smoke detectors, remotes, a wealth of touch screens and a sea of accessory items – all built and tested in-house. A complete system build is feasible using all Crestron designed and manufactured hardware.

**Control4** manufacturers it's products in China, whereas **Crestron** produces mainly in New Jersey.

---

## So which system is right for me?

For most residences and light commercial applications, the well structured design of Control4 will provide an easier to install, and overall more cost-effective automation solution. For specialized residential and commercial applications of all sizes, the customization of Crestron can provide a more integrated solution in non-traditional environments.

Like 7 people like this. Sign Up to see what your friends like.

**audio**, **audio-video**, **automation**, **control4**, **crestron**, **ip**, **video**, **zigbee**

Add a comment...

Comment usir

Facebook social plugin

### Search for Information

Search...

---

© 2013 Call Charles. All Rights Reserved.




loading

# EXHIBIT 368

cloud9 smarthome Intelligent Luxury

# Control4 vs Crestron




If you're considering turning your new or existing home into a "Smarthome", two brand names you have no doubt come across are Crestron and Control4. This article explains the main differences between the two brands, breaking down what you need to consider when shopping between the two Home Automation brands. (Full discloser: We install Control4, but we do not install Crestron. Both are great brands.)

On average, a Crestron solution will cost more than double a Control4 solution. Crestron is more expensive for 2 reasons:

1. Crestron is a richer solution. Crestron can control more brands, more simultaneous devices without issue, and its user interface can be customized for unusual and very specific needs.

2. Because of the programming capabilities, Crestron is substantially more difficult to program. This requires very advanced labor, and more of it.

Let's address #1 – For most home automation demands, Control4 is more than capable. Control4 works with the most common brands. If you want to control something unusual (i.e. a wine cellar), it's likely that Crestron will be the only option. But for audio visual gear, lighting, security and HVAC, Control4 works well. Similarly, Crestron is the better solution for a mansion because it can control a huge number of devices simultaneously (and with proper programming, will control it all glitch-free.) Control4 is not meant to control mansions, and would be more prone to glitches in a massive setting with hundreds of devices. Finally, regarding the user interface, the same concept applies. Both brands have wonderful iPhone and iPad apps, as well as a variety of touch screens in-wall and table-top. Both brands can program multiple events to happen at the touch of a single button on a user-friendly interface. The typical demands of smarthome can be met by either brand, but more visual customization is possible with Crestron.

Now # 2 – Control4's initial goal was to bring home automation to the masses. They accomplished this by building on a platform that was much easier in terms of programming than Crestron's. Control4's programming is more user friendly, so labor ends up being cheaper.



Posted on 03. Oct, 2011 by KrebStar

## 4 Responses to "Control4 vs Crestron"

1. *Greg Zajaczkowski* says:
May 30, 2012 at 3:42 pm

I will agree with the majority of your assessment between these two brands. I disagree with you when you say that Control4 is not good for mansions, or it can not control a wine cellar. Control4 is more than capable of controlling hundreds of devices efficiently and effectively so long as the installer/programmer have the right Control4 and networking equipment installed and know what they are doing with the programming.

Oddities are also easy to program and control with Control4. Control4's Card Access products make it

The Art of Smart

Subscribe to weekly articles. Email:

Submit

- How to upgrade your song quality for free with iTunes Match : If you've obtained the songs in your iTunes library from places other than their intended source (CD...
- McIntosh offering up to 75% trade in value : McIntosh Labs has been producing some of the highest-quality audiophile gear out there for decades. ...
- iPhone 6: What you need to know if you're going to upgrade : The iPhone 5c and 5s were released a year ago this September. You know what that means. No one is be...
- TimeAway lets you manage parental controls on Android : TimeAway is an Android app that helps you control how your kids use their smartphones or tablets. Th...
- AV Cables & Connections Guide : You've purchased the TV, got the receiver, the speakers, BluRay Player, Xbox 360, Apple TV and even ...
- Google announces Android TV for our living rooms : At last week's Google I/O Developer's Conference, Google announced the soon to be released Android T...

Questions? Ask away!

easy to control almost anything with a switch or a relay with a little programming skill.

Control4 is capable of almost everything that a person will see in a Crestron system. The only hard differences are in price and programmer/installer skill.

2. *Nick Dunning* says:
July 30, 2012 at 8:52 am

I have been installing Control4 for the past 10 years and so far there has not been any device that I have not been able to control, either IP, IR or RS232 (Serial) and I have Control4 systems working in very large properties, from Portugal to Spain and UK.

The main difference between the two is the Graphical User Interface (GUI) and the extent you can program the user interface. Control4 is limited in this department and will have to change to keep ahead, but if you know how to create custom buttons and custom the Control4 home screen then you can have most items at a finger press away.

3. *Matt Gleeson* says:
June 19, 2013 at 9:17 pm

I have to agree with Nick and Greg. I have yet to find an instance where control4 doesn't have a solution for something as simple as a wine cellar.
Recently Control4 has also released hard wired keypads (that you don't need a proprietary Crestron cable for). As well they have panellized lighting to cater to large scale and commercial structures.
In the past 7 years I have worked on 10,000 sq/ft homes in Toronto, Halifax, Calgary, and Jamaica. No problems fulfilling our customers needs.

4. *Corey D* says:
July 27, 2013 at 6:09 pm

I have to say this was a rather mislead and unimformed read, as a Control4 AND Crestron dealer, I have some very pointed thoughts on the grand, seemingly "eternal Crestron vs C4″ debate.

First off, I must address the comments about large scale projects, as this one keeps getting skewed in a HUGE way. the question of Crestron's scalability is moot. Crestron runs full scale university campuses, highrise corporate deployments, large scale government installations, the list goes on. Control4, however, is "theoretically" capable of all the same. the reason for this is because C4 runs commands that correspond to controlling and communicating with devices, that is automation, pure and simple. The problem here, is that many would naturaly point out that "a full scale university IT deployment is way too much for Control4″ and they would be right. However, those same individuals don't really KNOW that's a true statement based on a quantifiable "How much is too much for control4 processing", it's just the popular answer that "everyone knows".
I'ts been my experience as a dealer of Control4, that I have to roll a truck to do FREE service visit's because a C4 project is "acting up" and "not working". Every time it is to do with the software side of things. the Zigbee network had a "hiccup", or the router needed to be rebooted, or there was simply a "ghost in the machine". the lost revenues in free service visit's over control4 is staggering to my company. That being said, when I deploy Crestron projects, I have far fewer service visit needs, but they do happen. the difference is they are NEVER to do with software or the network, it works once, and it always works from there. the problems are controllable issues like an IR emmitter "fell off a TV" or the likes of that. This point alone has caused me to lean always to Crestron whenever customer's will allow me to use that brand in their home.

MAJOR Point #2: on pure hardware alone, as of the date of this post, Crestron hardware is, on the whole, the SAME PRICE as Control4. I can show anyone from the MSRP lists that asks, and it's true. in fact, a great example of the reverse pricing comparison, is that Crestron cameo Express light dimmers/keypad combination pieces are MSRP $180, compared to the Control4 Keypad/Light combo piece price of $299.99. These instances don't happen often, but it underscores my point of the pricing being roughly the SAME on the overal whole. The only real exception to this is in audio sources for distributed sound, forcing me to use non proprietary audio sources. When people say Crestron is "more expensive" than Control4, they fail to elaborate the reason why when it is. I can program a Crestron system in a similar time as a Control4 project with no major GUI customization or elaborate programming modifications. With this, I can therefore offer to a customer a Crestron solution for the almost SAME price as a similar equipped Control4 system. Nowadays, Control4 is my option for only small house sound, and small 1-4 room systems that need low cost hand held remotes(the two last bastiens of cheap price in C4 line) Larger projects help the pricing for Crestron even more, because it only takes ONE controller to run a large project, not 2-5.

On the topic of large scale and "issues", I once had a thermostat that kept resetting itself, with C4 tech support on the phone not being able to pinpoint the problem. it was an issue in the controller firmware, but the problem was that Thermostat was in a fully loaded $100k wine cellar, and the t-stat kept forcing the temp above 72 degrees F, not good for expensive wine. we had to watch it over the next 24hours while firmware updating was taking place. that was not cool.

Lastly, while the above individuals show a bias toward Control4, I have a bias towards Crestron, and it rests solely on the fact, that Control4 is just not stable enough for me to trust my customers' patience with their $25,000-$200,000 investment in lifestyle conveniences.

## Leave a Reply

Name (required)

Mail (will not be published) (required)

Questions? Ask away!

Website

Submit Comment

Copyright © 2014 Cloud9 Smarthome - Sitemap - Contact Us - Employment

B&W Bowers & Wilkins
CEDIA Custom Electronic Design & Installation Association Member
McIntosh Legendary Performance
Control4 Authorized Platinum Dealer
SONOS The Wireless HiFi System
savant Now You Can
Authorized Dealer
LUTRON

Questions? Ask away!

EXHIBIT 369




Contact: Joyce Essig | 800.237.2041, ext. 10439 | jessig@crestron.com

**November 1, 2011**

## Prodigy® Products Now Exclusively Available Through Distribution

*Crestron Dealers Can Source Affordable, Easy-to-Install Home Control Solutions Direct from Crestron; New Prodigy Website Launched for Distribution Channel*

prodigy® Simple, affordable home control

Crestron today announced that Prodigy®, its popular line of affordable home automation solutions, will be exclusively available through distribution channels. The change goes into effect immediately. Crestron dealers continue to purchase direct from Crestron and have access to the same affordable products, just with a new model number and name.

"Crestron dealers continue to purchase direct from Crestron and leverage the industry's best support, training and customer service," said Crestron VP of Marketing, Sean Goldstein. "From simple and affordable one-room systems to infinitely scalable, fully integrated whole house solutions, Crestron provides our dealers with a proven home automation solution for every home and every budget."

For dealers buying through distribution, all Prodigy product information and technical resources are now available on ProdigyHomeControl.com.

Crestron will continue to fully service and support existing Prodigy system installations.

"Our decision to clearly define two separate sales channels for each brand will give both Prodigy and Crestron the best roadmap for continued growth and success," said Randy Klein, Crestron Executive Vice President. "Prodigy is very simple and ideal for distribution, Crestron is full featured, expandable and customizable, and is best served through the expertise of our value-added dealers."

**About Crestron**

*For more than 40 years Crestron has been the world's leading manufacturer of advanced control and automation systems, innovating technology and reinventing the way people live and work. Providing integrated solutions to control audio, video, lighting, computer, IP and environmental systems, Crestron streamlines technology, improving the quality of life for people in corporate conference rooms, hotels, classrooms, auditoriums, and in their homes. Crestron's leadership stems from its dedicated people who are committed to providing the best products, programs and services in the industry. In addition to its World Headquarters in Rockleigh, New Jersey, Crestron has sales and support offices throughout the U.S., Canada, Europe, Asia, Latin America and Australia. Discover the world of Crestron by visiting www.crestron.com. Crestron and the Crestron logo are trademarks or registered trademarks of Crestron Electronics, Inc. in the United States and other countries. ENERGY STAR is either a trademark or registered trademark of the U.S. government in the United States and/or other countries. Other trademarks, registered trademarks, and trade names may be used in this document to refer to either the entities claiming the marks and names or their products. Crestron disclaims any proprietary interest in the marks and names of others.*

*Crestron, the Crestron logo, Prodigy and the Prodigy logo are either trademarks or registered trademarks of Crestron Electronics, Inc. in the United States and/or other countries. Other trademarks, registered trademarks, and trade names may be used in this document to refer to either the entities claiming the marks and names or their products. Crestron disclaims any proprietary interest in the marks and names of others.*

*©2011 Crestron Electronics, Inc.*

# # #

### High Res Photos & Logos

The high-res photos & logos below are permitted to be reproduced without consent for the following parties only:

- Crestron Authorized Dealers and Partners
- Members of the Media/Press

EXHIBIT 370

RESTRICTED CONFIDENTIAL

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| SAVANT SYSTEMS, LLC,<br><br>Plaintiff,<br><br>v.<br><br>CRESTRON ELECTRONICS, INC.,<br><br>Defendant.<br><br>CRESTRON ELECTRONICS, INC.<br><br>Counterclaim-Plaintiff,<br><br>v.<br><br>SAVANT SYSTEMS, LLC,<br><br>Counterclaim-Defendant. | Civil Action No.: 1:10-cv-11622 (EFH) |

**DEFENDANT AND COUNTERCLAIM PLAINTIFF CRESTRON ELECTRONICS, INC.'S RESPONSE TO PLAINTIFF AND COUNTERCLAIM DEFENDANT'S SECOND SET OF INTERROGATORIES**

Defendant and Counterclaim Plaintiff Crestron Electronics, Inc. ("Crestron"), in accordance with Rule 26 and 33 of the Federal Rules of Civil Procedure, hereby serves this Response to Plaintiff and Counterclaim Defendant Savant Systems, LLC's ("Savant") Second Set of Interrogatories.

## GENERAL OBJECTIONS

Crestron's responses to Savant's interrogatories are subject to the General Objections set forth below. The specific responses to each interrogatory are made subject to and without

waiving these Objections, which are incorporated by reference into each of these responses. The failure to list a specific General Objection within a response should not be construed as a waiver of that objection.

1. Definitions. Crestron objects to Plaintiff's definitions as follows:

*"Document"* – Crestron objects to the purported definition of "document" in that it is overbroad, oppressive and unduly burdensome.

*"Defendant," "defendant," "Crestron"* – Crestron objects to the definition of "Defendant," "defendant" and "Crestron" to the extent that it includes those "acting on its behalf" because the entities falling within the scope of that phrase are uncertain and/or in dispute. Additionally, to the extent an employee is acting outside the scope of his or her duties, Crestron objects to that employee falling within the definition of Defendant, defendant or Crestron.

*"Products"* – Crestron objects to the definition of "Products" to the extent that it is overbroad, vague and ambiguous.

*"high-end automation and control system"* – Crestron objects to the definition of "high-end automation and control system" to the extent it limits without explanation or reason the definition to "a system . . . approximately twenty-five thousand dollars or more."

*"identify"* – Crestron objects to the definition of "identify" to the extent that the obligations regarding the identification of any information, document or thing that is protected by a claim of privilege or attorney-work product are oppressive, unduly burdensome and subject to privilege or attorney-work product.

2. Privileges. Crestron objects to each interrogatory to the extent that it seeks information that is protected by the attorney-client privilege, the work product doctrine, the joint defense privilege, settlement immunity or by another applicable privilege or discovery immunity.

3. Confidential Information. Crestron objects to each interrogatory to the extent that it seeks confidential, business, commercial or proprietary information or other similar information of either Crestron or third parties to the extent it seeks information that Crestron is barred from producing by law. Crestron will seek permission from third parties to release any information that might be subject to confidentiality agreements with third parties.

4. Privacy. Crestron objects to the interrogatories to the extent that they seek information the disclosure of which would violate its privacy rights or the privacy rights of third parties.

5. Beyond Scope of the Discovery Rules. Crestron objects to the interrogatories, Definitions and Instructions to the extent that they seek information or attempt to impose duties or obligations beyond that required by the Federal Rules of Civil Procedure or the Local Rules of the District of Massachusetts.

6. Relevance. Crestron objects to each interrogatory to the extent that it seeks information that is not relevant to the subject matter of this action or reasonably calculated to lead to the discovery of admissible evidence.

7. Vague, Ambiguous and Overbroad. Crestron objects to each interrogatory to the extent that it is vague, ambiguous, overbroad or fails to identify with sufficient particularity the information requested and, thus, is not susceptible to response. Crestron further objects to each interrogatory containing words or phrases with no apparent meaning, with uncertain meaning and/or that call for speculation.

8. Unduly Burdensome. Crestron objects to each interrogatory to the extent that it requires an unduly burdensome search for information that has little or no relevance to this lawsuit and on the grounds that Plaintiff can obtain the requested information from another

source. The value of providing such information, if it could be obtained, would be far outweighed by the time, expense and effort involved in searching for the information.

9. Repetitive. Crestron objects to each interrogatory to the extent that it is repetitive of other requests.

10. Not Within Defendant's Possession, Custody, or Control. Crestron objects to each interrogatory to the extent that it calls for information not within Creston's possession, custody and control and/or seeks to circumvent Rule 45 of the Federal Rules of Civil Procedure by requesting information of persons and entities who are not parties to this lawsuit.

11. Equal Access. Crestron objects to each interrogatory to the extent that it calls for information already in the possession, custody or control of Plaintiff.

12. Crestron objects to the extent that Plaintiff's interrogatories violate Fed. R. Civ. P. 33 by containing an excess of the maximum allowable interrogatories, including all subparts.

13. Where Crestron agrees to produce any responsive documents, if any exist, in response to any interrogatory, its agreement shall not be deemed to be a representation that the requested documents do exist, or are relevant to, or admissible in, this action.

14. Crestron does not concede that any of its Objections or Answers to these interrogatories is or will be admissible at the trial of this action or in any other proceeding in this action, and Crestron does not waive any objection on any ground to the use of any such Response at trial or in any other proceeding in this action.

15. Crestron does not concede that any of the information which Crestron may ultimately provide in response to these interrogatories is relevant or will be admissible at the trial of this action or in any other proceeding in the action, and Crestron does not waive any objection on any ground to the use of any such information at trial or in any other proceeding in this action.

Crestron objects to the interrogatories to the extent they are predicated upon erroneous assumption or to the extent that they state incorrect facts. When Crestron responds to these interrogatories, Crestron does not agree to these assumptions or factual predicates and specifically reserves the right to challenge any of the assumptions or factual predicates contained in the interrogatories.

16. These responses reflect Crestron's current understanding, belief and knowledge regarding the matters about which inquiry is made. Crestron's discovery, investigation and preparation for trial have not yet been completed as of the date of these responses. Crestron expressly reserves the right to conduct further discovery and investigation which may develop information that, if presently within its knowledge would have been included in these responses. Discovery is on-going and Crestron reserves the right to offer in to evidence in this action other documents and things at trial or any pretrial proceeding which may have been discovered subsequent to the date of these responses. Crestron therefore reserves the right, at any time, to revise, amend, correct, supplement, modify or clarify its responses set forth below to the extent required by Fed.R.Civ.P. 26(e).

17. Each of the following specific responses is subject to the foregoing general and specific objections which shall be incorporated into each such specific response.

RESTRICTED CONFIDENTIAL

**CRESTRON'S RESPONSES AND OBJECTIONS**

**INTERROGATORY NO. 11**: Identify the last known residence and business addresses, and last known telephone contact numbers, for each of the following former Crestron employees:

a. Gordon Isaac

b. Brent Corn

c. Brian Nachum

d. Hank Alexander

**RESPONSE TO INTERROGATORY NO. 11**:

a. Gordon Isaac

c/o SpeakerCraft
Tel: (480) 686-4729

b. Brent Corn

c/o Pioneer Electronics
Tel: (469) 422-9009

c. Brian Nachum

c/o John Kavanagh
Steptoe & Johnson LLP
1330 Connecticut Ave. NW
Washington, DC 20036
Tel: (202) 429-6256

d. Hank Alexander

c/o Niles Audio Corporation
Tel: (303) 912-3237

**INTERROGATORY NO. 12**: Identify each person not employed by Crestron to whom Crestron distributed a copy of any of Exhibits E, F, G, H, I and K to the Amended Complaint, and for each copy so distributed, state whether the copy was of Exhibit E, F, G, H, I or K to the Amended Complaint, who at Crestron distributed the copy to the person, and when it was distributed.

**RESPONSE TO INTERROGATORY NO. 12**:

Rob Christensen distributed a copy of Exhibits E, F, G and H on April 13, 2010 to:

Kelsey Bailey
Home Theatre Design
567 W. 19th St.
Idaho Falls, ID 83402

Rob Christensen distributed a copy of Exhibits E, F, G, H and K on April 30, 2010 to:

Carter Rains, Dan Ray
S3 US Inc.
6415 N Business Park Loop Rd., Ste. K
Park City, UT 84098

Arthur Mayo
S3 US Inc.
60 N Cutler Dr. Bldg. 202
North Salt Lake City, UT 84054

Mark Blundell
New York
mblundell@S3us.com

Rob Christensen distributed a copy of Exhibits E, F, G, H and K on December 2, 2010 to:

Taylor Syphus, Kevin Barnes, Dave Lukan
Lifestyle Electronics
2078 Prospector Ave.
Park City, UT 84060

Brian Lewis distributed a copy of Exhibits E, F, G, and H on March 30, 2011 to:

Dan Milligan
Acme Integration Co.
7689 East Paradise Lane, Suite 4
Scottsdale, AZ 85260

Brian Nachum distributed a copy of Exhibits E, F, G, and H on May 11, 2009 to:

Xeven Zorza
ArchiTechKnowlogy Design Group
P O Box 4766
Laguna Beach, CA 92652

RESTRICTED CONFIDENTIAL

Brian Nachum distributed a copy of Exhibits E, F, G and H on May 13, 2009 to:

Ken Hoffman
Digital Home Design
2 Eastbourne Bay
Laguna Niguel, CA 92677

Craig Gulley distributed a copy of Exhibits E, F, G and H on June 16, 2009 to:

John Selby
Stereo One
345 S Kingshighway St
Cape Girardeau, MO 63703

Craig Gulley distributed a copy of Exhibits E, F, G and H on July 27, 2009 to:

Bill Green
Q Audio Video
1733 N Kingshighway St
Cape Girardeau, Missouri 63701

Craig Gulley distributed a copy of Exhibits E, F, G and H on April 23, 2010 to:

Jerry Cook
Audio Video Integrations
623 S Lyons Ave Suite 300
Sioux Falls, SD 57106

Craig Gulley distributed a copy of Exhibit K on April 23, 2010 to:

Amos Anson
Famos Construction, Inc.
1212 Sagewood Ave.
Grand Island, NE 68803

Andy Wiatrak
Sensation Design Group
5892 Sunnybrook Lane
Minnetrista, MN 55364

Barry Shaw
Acorn Audio Inc.
1709 W Main St.
Rapid City, SD 57702

RESTRICTED CONFIDENTIAL

Bill Green
Q Audio Video
1733 N Kingshighway St
Cape Girardeau, Missouri 63701

Blake Ertel, Felix Williams, Owain Price, Robert Puthoff
The Screening Room LLC
10301 Clayton Rd
St Louis, MO 63131

Bob Christensen
AVI-SPL
1427 Energy Park Dr.
St. Paul, MN 55108

Brian Ginkens, Tim Osborne, Juli Palmer
Technology By Design
3956 Northwest Urbandale Drive
Urbandale, IA 50322

Brian Shaw
Maximum Sight & Sound
4017 University Ave
Waterloo, IA 50701

Bridgid Miller
August Systems
1715 Paris Road
Columbia, MO 65201

Charlie Santmire, Gale Cooper, Joel Chandler, Noel Huff
The Sound Environment
11021 Elm St
Rockbrook Village Shopping Center
Omaha, NE 68144

Clint Miller, Michael Gray
DataUnite llc
790 SW US Hwy 40 #114
Blue Springs, MO 64015

Dan Ward, Joel Ward, Tom Ward, Tony Tamberine, Russ Neil
American Electronics
4760 S. 135th St.
Omaha, NE. 68137

<u>RESTRICTED CONFIDENTIAL</u>

Dan Woody, Alec Schwadt, Mike Klinger, Kevin Ruddy, Joe Boler, Jerimy Stremikis, Daniel Malat, Brian Martineau, Chad Moore, Chris Farkas, Austin Figgins, Bob Woods, Matt Thompson, Jesse Korsbon, Kevin Olstad, Thom Ott, Tim Doyle
Appollo Systems
181 Cheshire Lane N Suite 300
Minneapolis, MN 55441

Dave Ault, Justin Bresnahan
Audio Video Planners
434 Hale Ave, Suite 160
Oakdale, MN 55128

Dave Bunce
Audio Room
88 Blairs Ferry Rd
Marion, IA 52302

David Young, Dennis Hickman, Ross Cook, Tony Vieira, Nick Tipton, Jerry Boer, Mike Dolan
The Sound Room
1661 Clarkson Rd.
Chesterfield, MO 63017

Deanna Ginkens
Technology By Design
3956 NW Urbandale Drive
Urbandale, Iowa 50322

Eric Lee, Jeff Bartels, Jennifer Oplt, Scott Markovich
MBD Electronics
220 West Highway 40
Troy, IL. 62294

Eric Wing, Jason Swenson, Brad Odegard, Mark Kurilla
CS Media
6101 Baker Road #202
Minnetonka, MN 55345

Sales Team
Home Technology Systems
2400 Kerper Blvd.
Dubuque, IA 52001

RESTRICTED CONFIDENTIAL

Jason Brewer
Automated Lifestyles, Inc
1737 State St
Bettendorf, IA 52722

Jason Shaw, John Shaw, Matt Bolton
Digital Theater Experts
5601 O Street
Lincoln, NE 68510

Jay Rice, Larry Badson, Mike Elsberry
SCS Home Entertainment
2868 S. Glenstone
Springfield MO 65804

Jeff Erickson, Mark Clark, Janice Wilson
Elite Home Systems
1250 Jungermann Road
St. Peters, MO 63376

Jerry Cook
Audio Video Integrations LLC (AVI)
623 S Lyons Ave Suite 300
Sioux Falls, SD 57106

Jim White
Sound Pro
1709 West Main Street
Rapid City, SD 57702

John Deering
John Deering Theater Design, Inc.
International Market Square
275 Market Street, Suite 556
Minneapolis, MN 55405

John Selby, John Tiffany, Jason, Joe Belcher, Jim Adams, David Collins, Scott Siebert
Stereo One
345 S Kingshighway St
Cape Girardeau, MO 63703

Jonathan Kessler
Kreissler Electric Inc
1204 South Main Street, Lockwood, MO 65682

RESTRICTED CONFIDENTIAL

Keith Axe, Zac Besse, Derrick Potts
Integrated Electronics
660 N. Lindenwood Drive
Olathe, KS 66062

Mark Balkowitsch
Audio Perfection
7401 Lyndale Ave South
Minneapolis, MN 55423

Patrick Cain
Front Row Audio Video
PO. BOX 3151
Lawrence, Kansas 66046

Paul Larson
Alchemy Sound and Vision
404 3rd Ave. North Suite 205
Minneapolis, MN 55401

Perry Workman
Audio Input
7462 E 7th St.
Duenweg, Missouri 64841

Philip Stegman
Stegman Audio and Video
2605 Northridge Pkwy
Ames, IA 50010

Randy Sparks
21st Century Automation
73 Evergreen Condo Dr., Unit 1B
Sunrise Beach, MO 65079

Rob Roessler
Audio Video Concepts
204 South Main Street
Columbia, IL 62236

Rob Zurn, Russell Iverson
Audio Video Dimensions
1695 Hwy 169
North Plymouth, MN 55441

RESTRICTED CONFIDENTIAL

Ron Weiskopf, Todd McNurlin
Audio Video Planners
434 Hale Ave
Oakdale, MN 55128

Ryan Hofer, Darin Guthmiller
Unlimited Audio
3511 W 57th St
Sioux Falls, SD 57108

Scott VandeVegte, Sarah Aukes
Amani
387 7th Street NW
Sioux Center, IA 51250

Steven D. Anderson, Jamie Anderson, Daniel De Longe
TKFast, Inc.
437 S. Hydraulic St.
Wichita, KS 67211

Terry Baer
PC Parts and Supplies
1335 2nd Avenue North, Suite N
Fargo, ND 58102

Terry Dahl, Tom Barna, Joe DuBord
VSI
1227 Caledonia Street
Mankato, MN 56001

Tom Brandabur, Elizabeth Hegi
Clarity AV
15831 Highway 55 # C
Minneapolis, MN 55447

Tony Dollar, Mat Heldenbrand, Paul Doneff
Hi Fi Fo Fum
1155 S Big Bend Blvd
Saint Louis, MO 63117

Craig Tiefenbrun, Daniel Gauvain, John Schmitz, Brad Amling
Audio Video Innovations, Inc.
145 Centre Pointe Drive, Suite B
Saint Peters, MO 63376

RESTRICTED CONFIDENTIAL

Eric Degonia, John Gabler
Come Alive Integration
6402 Redruth Street
Duluth, MN 55807

Jay Johnson, Thomas Shafer
Audio Dimensions
2222 West Hefner Road,
Suite E, Oklahoma City, OK 73120

Jimmy Coiner, Chris Isom
Media One
11263 Strang Line Rd
Lenexa, KS 66215

Levi Angst
Integration Excellence
430 South Jefferson Avenue
Lebanon, MO 65536

Nathan R., Jesse Splichal, Don Plew, Jamie DeJean, Adam Hoffman, Tom Glick, Tony Berg, Kevin Fleck, Brent Sanden, Jared Steiner, Ryan Stuart, Travis Rixen
Pacific Sound and Video
2306 15th Street Northwest
Bismarck, ND 58503

Ryan Zimmerman
AVP, Inc.
10133 Josephine Ave.
La Vista, NE 68128

Sam Guarino, Todd Pierson
Custom Electronics
7511 Pacific Street
Omaha, NE 68124

Steve Spurgeon
CI Select
1716 Hidden Creek Court
St. Louis, MO 63131

Thomas Ondov
Domus Vita Consortium, LLC.
6250 Sycamore Lane
Suite 500B
Maple Grove, MN 55369

RESTRICTED CONFIDENTIAL

Andy Jones
Automated Living
30 Street of Dreams
Loch Lloyd, MO 64012

Chris
(Unknown recipient)

Derek Benz
Mystic Smarthomes LLC
1853 Victoria Road S.
Saint Paul, MN 55118

Gary Fish
FishNet Security
6130 Sprint Parkway
Suite 400
Overland Park, KS 66211

Jeff Steen
The Audio Room
855 Blairs Ferry Road
Marion, IA 52302

Tom Sampson
Tom's TV
25 NE Washington St.
Brainerd, MN 56401

Craig Gulley distributed a copy of Exhibit K on June 29, 2010 to:

Marathon Office Interiors (August Systems)
1715 Paris Road
Columbia, MO 65201

Craig Gulley distributed a copy of Exhibit K on March 30, 2011 to:

Jordan Erdman
The J. Edison Group LLC
355 Deer Valley Dr.
Hudson, WI 54016

RESTRICTED CONFIDENTIAL

Craig Gulley distributed a copy of Exhibit K on April 11, 2011 to:

Cinetic (Audio Video Design Center)
11324 Southwest Hwy
Palos Hills, IL 60465

Craig Gulley distributed a copy of Exhibit K on July 30, 2011 to:

The Audio Room
855 Blairs Ferry Road
Marion, IA 52302

Craig Gulley distributed a copy of Exhibit K on January 25, 2012 to:

Tunnelvision
1640 W. Hubbard, Ste. 200
Chicago, IL 60622

Dated: April 18, 2012

Respectfully Submitted,

CRESTRON ELECTRONICS, INC.

/s/ *Chong S. Park*

Chong S. Park (admitted *pro hac vice*)
John J. Kavanagh (admitted *pro hac vice*)
Steptoe & Johnson LLP
1330 Connecticut Avenue, NW
Washington, DC 20036-1795
Tel.: 202.429.3000
Fax: 202.429.3902
cpark@steptoe.com

Michael J. Pineault (BBO #555314)
CLEMENTS & PINEAULT, LLP
24 Federal Street
Boston, MA 02110
Tel.: 857.445.0135
Fax: 857.366.5404
mpineault@clementspineault.com

## CERTIFICATE OF SERVICE

I hereby certify that Creston Electronics, Inc.'s Response to Savant Systems, LLC's Second Set of Interrogatories was served on this 18th day of April 2012 by email and U.S. mail on:

Thomas O'Konski
Martin J. O'Donnell
William J. Mostyn IV
CESARI and MCKENNA, LLP
88 Black Falcon Avenue
Boston, MA 02210
Counsel for Savant Systems, LLC

/s/ *John J. Kavanagh*
John J. Kavanagh

CONFIDENTIAL

CERTIFICATION OF RANDY KLEIN

I am Executive Vice President of Crestron Electronics, Inc. I believe, based on reasonable inquiry, that the foregoing Response to Savant Systems, LLC's Second Set of Interrogatories is true and correct to the best of my knowledge, information, and belief.

I verify under the penalty of perjury that the foregoing is true and correct.

Dated: April 18, 2012

Randy Klein

# EXHIBIT 371

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| SAVANT SYSTEMS, LLC,<br>Plaintiff,<br>v.<br>CRESTRON ELECTRONICS, INC.,<br>Defendant.<br><br>CRESTRON ELECTRONICS, INC.<br>Counterclaim-Plaintiff,<br>v.<br>SAVANT SYSTEMS, LLC,<br>Counterclaim-Defendant. | Civil Action No.: 1:10-cv-11622 (EFH) |

**CRESTRON ELETRONICS, INC.'S FIRST SET OF INTERROGATORIES TO SAVANT SYSTEMS, LLC**

Defendant and Counterclaim Plaintiff Crestron Electronics, Inc. ("Crestron"), by its undersigned counsel, in accordance with the Federal Rule of Civil Procedure 33 and Local Rule 26, hereby requests that Plaintiff and Counterclaim-Defendant Savant Systems, LLC ("Savant") respond in writing, under oath, and within the time prescribed by the Federal Rules of Civil Procedure, to this First Set of Interrogatories.

## DEFINITIONS

1. "Action" and "litigation," unless otherwise specified, refer to the action that is the subject of this lawsuit captioned Savant Systems, LLC v. Crestron Electronics, Inc., Case No. 1:10-cv-11622, pending in the District Court of Massachusetts.

2. "Automation and control systems" means a combination of hardware, software, programming, wiring and appliances whereby a number of functions, including lighting, home appliances, heating and cooling, security and monitoring systems, audio and video, and communication can be remotely or automatically controlled from one or more specified locations.

3. "Communication" means the transmittal of information (in the form of facts, ideas, inquiries, or otherwise).

4. "Concerning" means referring to, describing, evidencing or constituting.

5. "Crestron" means Crestron Electronics, Inc.

6. "Customer" means an architect, builder, developer, end user or engineer who purchases or might purchase and have installed the products for a home, business or other institution.

7. "Dealer" means a business and its affiliates, agents, assignors, directors, officers, parents, partners, representatives and subsidiaries, both individually and collectively, which design, buy the component parts, configure, and/or install the products for homes, businesses and/or other institutions.

8. "Describe," "state" and "set forth" mean to indicate fully and unambiguously each relevant fact of which you have knowledge.

9. "Document" is defined to be synonymous in meaning and equal in scope to the usage of this term in Fed. R. Civ. P. 34(a). A draft or non-identical copy is a separate document within the meaning of this term.

10. "End user" means the homeowner, business or other establishment for whose home, business or establishment a control and automation system is designed, prewired, configured, programmed, installed and/or serviced.

11. "Flip" refers to a job that was pre-wired or contracted to consist of the products of a manufacturer, or for which materials were purchased and/or installed consisting of the products of a manufacturer, but was then switched to consist of the products of a different manufacturer.

12. "Job" refers to the design or configuration, pre-wiring, purchase, and installation of the products of a manufacturer that constitutes a home, business, or other institution's control and automation system.

13. "Lutron" means Lutron Electronics Co., Inc.

14. "Lutron Litigation" refers to any action relating to the patent infringement suit brought by Lutron against Crestron filed in the United States District Court for the District of Utah (Case No. 2:09-cv-00707).

15. "Market" refers to the market that Savant alleges in paragraph 10 of its Amended Complaint, i.e. "the distribution and sale of high-end programmable controller systems for residential automation, particularly for controlling home audio-video, lighting, climate/environmental control, communication and security subsystems."

16. "Manufacturer" means a business that creates and produces the products.

17. "Plaintiff" and "defendant" as well as a party's full or abbreviated name or a pronoun referring to a party mean the party and, where applicable, its officers, directors, employees, partners, corporate parent, subsidiaries, or affiliates. This definition is not intended to impose a discovery obligation on any person who is not a party to the litigation.

18. The term "person" is defined as any natural person or any business, legal, or governmental entity or association.

19. "Products" refers to the definition of products that Savant alleges in paragraph 10 of its Amended Complaint; i.e. "a control platform component for switching and processing audio-video content and control signals, and a plurality of user interface components, such as touch panels or pads, together with docking stations for the interface components."

20. "Relating to" and "regarding " are used in the broadest possible sense and mean, in whole or in part, addressing, analyzing, commenting, concerning, constituting, containing, in connection with, contradicting, controverting, corroborating, dealing, demonstrating, describing, disputing, discussing, embodying, evidencing, identifying, mentioning,

pertaining, proving, rebutting, referring, reflecting, refuting, reporting, showing, stating or summarizing.

21. "Savant" means Savant Systems, LLC.

22. "Third party" or "third parties" means any person or entity other than Savant or Crestron, including but not limited to, those persons identified by Plaintiff in all initial disclosures, dealers, customers, and consultants.

23. "You," "your," "Savant," and "Plaintiff," mean Savant Systems, LLC, its current and former affiliates, agents, assignors, directors, officers, parents, partners, representatives, and subsidiaries, both individually and collectively.

## INSTRUCTIONS

1. Deem any reference to a non-natural person to include the legal predecessors of such non-natural person.

2. When an interrogatory asks you to "state the basis" of or for a particular claim, assertion, allegation, or contention, the you shall

   (a) identify each and every document (and, where pertinent, the section, article, or subparagraph thereof), which forms any part of the source of the party's information regarding the alleged facts or legal conclusions referred to by the interrogatory;

   (b) identify each and every communication which forms any part of the source of the party's information regarding the alleged facts or legal conclusions referred to by the interrogatory;

   (c) state separately the acts or omissions to act on the part of any person (identifying the acts or omissions to act by stating their nature, time, and place and identifying the persons involved) which form any part of the party's information regarding the alleged facts or legal conclusions referred to in the interrogatory; and

   (d) state separately any other fact which forms the basis of the party's information regarding the alleged facts or conclusions referred to in the interrogatory.

3. When an interrogatory asks you to "describe" or "identify" a document, provide, to the extent known, the following information with respect to each such document:

(a) the type of document;

(b) the general subject matter;

(c) the date of the document if it has no date, so state and give the date or approximate date such document was prepared, produced, created, or came into being; and

(d) the name of the author(s), producer(s), creator(s), and/or producer(s) of the document;

(e) the name of the addressee(s), and recipient(s) of the document or a copy or reproduction thereof.

(f) Any identifying or descriptive code number, file number, title or label of such document;

(g) The name of the person or entity having present possession, custody and/or control of such document;

(h) The present location of such document;

(i) If such document was, but is no longer in your possession or control, state what disposition was made of such document, the reason for such disposition, and the date thereof.

(j) Whether or not any draft, copy, or reproduction of such document contains any script, notation, change, addendum, or the like, not appearing on such document itself, and if so, the answer shall give the description and identification of each

such draft, copy or reproduction in accordance with the above subparts (a) through (i).

4. The above information shall be given in sufficient detail to enable any person or party to whom a subpoena or request for production is directed to identify the documents sought to be produced and to enable counsel to determine whether such document, when produced, is in fact the document so described and identified.

5. Notwithstanding any other instruction in this First Set of Interrogatories that is or may be to the contrary, if a document has already been produced by you to Crestron, such document may be identified by specifying the Bates numbers for all pages of such document.

6. A request that you identify a document is not limited to documents within your possession, and such requests shall extend to documents under your control.

7. When an interrogatory asks you to "identify" a person, the answer shall give, to the extent known, the person's full name, present or last known address, business and residence phone numbers of such person, and, when referring to a natural person, the name and address of the agency, employer or entity of the present or last known place of employment and name and the title(s) and related periods of service for such person with each such agency, employer or entity. Once a person has been identified in accordance with this subparagraph, only the name of that person need be listed in response to subsequent discovery requesting the identification of that person.

8. When an interrogatory calls for the "description" or "identity" of any "document" you contend to be subject to a privilege against disclosure in response to these interrogatories, provide with respect to each such document or communication the following:

(a) The nature of the document you contend is privileged (*e.g.*, letter, memorandum, chart, picture, report, etc.);

(b) The number of pages comprising the document and a description of any identifying marks or designations (*e.g.* Bates numbers) if any, on the document;

(c) The date of the document which you contend is privileged;

(d) The name(s) of the author(s) and of any recipient(s) of the document;

(e) The name and address of any person who is not included in your response to subpart (d) with respect to such document and who has access to or has seen, read, or heard any portion of the material in the document that you contend to be privileged; and

(f) The nature of the privilege asserted.

9. In answering each of these interrogatories, furnish all information available to you that is relevant or that might lead to the discovery of relevant evidence, including information in the possession of your attorneys, or their investigators, and all persons acting on your behalf, including but not limited to your employees, agents, officers, or representatives. If you are unable to answer these interrogatories in full after exercising due diligence to supply a complete answer, so state and answer to the extent possible. Specify the reasons

for your inability to answer and state whatever information or knowledge you have concerning the unanswered portions.

10. For each interrogatory or part of an interrogatory that you refuse to answer on grounds of burdensomeness, explain in as much detail as possible the basis for your contention.

11. These interrogatories are deemed to be continuing; as such, you are requested to file and serve by way of supplemental answers thereto such additional information as may be required to complete your answers to these interrogatories.

## INTERROGATORIES

1. Identify all former and current dealers of Savant automation and control products, and for each state the dates when they were dealers of Savant.

2. Identify all competitors of Savant in the sale of automation and control products.

3. Identify all sales and business that Savant has allegedly lost as a result of Crestron's alleged conduct and state the dollar amount of any such losses, as well as the basis for calculating this amount.

4. Identify all jobs or projects that were flipped to Savant from Crestron including, but not limited to, those flipped under the Savant Competitive Flip Program including:

(a) the value of the other manufacturer or manufacturers' contract or contracts for the job;

(b) the value of the Savant contract for the job;

(c) the dealer or dealers connected to the job;

---

(d) any discounted Savant merchandise provided to dealer or dealers who flipped the job and the value of the discounts.

5. Identify each of the "dozens of dealers" contacted by Savant, as referenced in in footnote 3 of Savant's Memorandum in Support of Its Motion for Preliminary Injunction and identify the individual who contacted each dealer on behalf of Savant.

6. Describe how Savant came into possession of each of the documents attached as Exhibits E-K to the Amended Complaint.

7. Describe any plan, intent, strategy or policy of Savant to limit the number of dealers it allows to distribute or sell its automation and control products.

8. Describe any plan, intent, strategy or policy of Savant to give dealers exclusive rights to distribute or sell Savant products in a particular geographical area or region.

Respectfully submitted,

CRESTRON ELECTRONICS, INC.

By its attorneys,

Michael J. Pineault (BBO #555314)
CLEMENTS & PINEAULT, LLP
24 Federal Street
Boston, MA 02110
Tel.: 857.445.0135
Fax: 857.366.5404
mpineault@clementspineault.com

Chong S. Park (admitted *pro hac vice*)
John J. Kavanagh (admitted *pro hac vice*)
Steptoe & Johnson LLP
1330 Connecticut Avenue, NW
Washington, DC 20036-1795
Tel.: 202.429.3000
Fax: 202.429.3902
cpark@steptoe.com

Dated: September 30, 2011

**CERTIFICATE OF SERVICE**

I hereby certify that Creston Electronics, Inc.'s First Set of Interrogatories to Savant Systems, LLC were served on this 30th day of September 2011 by hand on:

Thomas O'Konski
Martin J. O'Donnell
Michael E. Attaya
CESARI and MCKENNA, LLP
88 Black Falcon Avenue
Boston, MA 02210
Counsel for Savant Systems, LLC

# EXHIBIT 372

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| SAVANT SYSTEMS, LLC<br>Plaintiff | ) | Civil Action |
| v. | ) | No. 10-CV-11622 MLW<br>Hon. Mark L. Wolf |
| CRESTRON ELECTRONIC, INC,<br>Defendant. | ) | |
| CRESTRON ELECTRONICS, INC.,<br>Counterclaim- Plaintiff, | ) | **EXPERT REPORT OF** |
| v. | ) | DR. RALPH Z. SORENSON |
| SAVANT SYSTEMS, LLC,<br>Counterclaim- Defendant | ) | |

Respectfully submitted this 2nd day of May, 2014

Ralph Z. Sorenson

Dr. Ralph Z. Sorenson

**RESTRICTED CONFIDENTIAL**

**OUTSIDE COUNSEL ONLY**

101. Moreover, even in those areas of the firm's operations that one would expect to benefit most greatly from the management team's experience at Excel, there were problems. Shortly before his expression of confidence in his team's capabilities as a reason for Madonna's certainty that Savant would perform according to its original projections, Mr. Madonna also acknowledged that "We didn't ship product until 2008.... We were a year late before we started selling, just 'cause we were off on the estimates and how long it would take to develop the software. . . . it's a lot of software in one of these products, and we underestimated the amount and time it took initially." Mr. Madonna then explained that as a result of this delay, 2009 was Savant's first full year of production. Deposition of Robert Madonna (October 26, 2011) 373:22-375:3. And as discussed above, the company had well-documented technical issues with its products, including the previously discussed overheating issues that required redesigns of the product in the year 2008, which CFO Myers stated had caused Savant to fall short of its revenue forecast that year. Savant Systems Expectations Memo, December 31, 2008, DGC0072126.

102. In addition, it should be noted that the story of Excel Switching did not have a fairy-tale ending. Savant Executive J.C. Murphy, who was also a member of the Excel team, testified that Excel Switching was sold to Lucent Technology in 1999 for a purchase price exceeding $1 billion worth of stock. However, just three years later, Lucent sold Excel Switching, including all of the assets that it had originally acquired from its acquisition of Excel Switching, in a management-led buyout for a price of seven to eight *million* dollars, plus the assumption of a five-million-dollar lease. Deposition of J.C. Murphy (January 24, 2014) 9:16-18, 12:18-13:12, 17:13-16. Although Mr. Murphy testified that part of the reason for the $7-8 million purchase price for Excel Switching's assets may have been attributable to market pressures facing Lucent, the precipitous decline in the market value of Excel Switching's assets just three years after it was sold for $1 billion worth of stock suggests that the real value of that firm may have been illusory.

103. In his Report, Professor Elhauge offers a theory of a anticompetitive harm that "If firms are blocked from any significant share of the market, then successful innovations will have a smaller payoff than they otherwise would have, which will discourage capital markets from making efficient investments in research and innovation." I offer no opinion in this report as to the validity of Professor Elhauge's statement as a matter of antitrust or economic theory. But in this case, Savant, unlike the vast majority of start-up firms, has had what appears to be almost unlimited access to capital that has been provided by 886 Holdings, an entity owned and controlled by Mr. Robert Madonna, CEO of Savant. A final statement in the December 31, 2009 Expectations Memo prepared by DiCicco Gulman contains the following "going concern" alert:

- *The ability of Savant to continue as a going concern is dependent on the willingness of the preferred member of 866 Holdings to continue to fund its*

*operations. DGC will inquire of management as to the preferred member's intentions and will consider the necessary disclosure requirements.*

104. This statement is identical to one that occurs in every year-end Expectation Memo prepared by Savant's outside accounting firm from 2008-2012, and a similar cautionary note is contained in Savant's financial statements spanning the same period.[70] These statements reveal that, from the beginning, Savant has been unable to stand on its own feet financially and has generated significant annual losses. From 2008 to 2012, these losses have ranged from $17.4 million to $21.9 million per year. Yet the record shows that 886 Holdings has continued to invest whatever sums the company needed to continue operations each year. In terms of its access to capital, this makes Savant more like the wholly-owned subsidiary of a deep-pocketed private equity firm or a large established corporation than a traditional start-up firm that has to stand on its own two financial feet and where much of senior management's time is spent seeking new equity investors or additional bank financing for the firm.

105. And although it may be the case that Savant was unable to convince suitors such as Leviton and Harman to acquire it, the real question is, why weren't they persuaded of the value of the business? As an experienced investor, I conclude that the answer is the approach with which management operated the company. The statements in the Expectations Memos that "a potential buyer would be more interested in the inherent value of Savant's product line" is a lens through which numerous aspects of Savant's strategy can be understood, as explained above in ¶112. The irony is that the decision to run Savant according to a particular strategy aimed at making it an attractive acquisition target appears to have had the opposite effect. By focusing on "inherent" business value rather than taking the steps needed to achieve actual results, Savant was perhaps successful in developing some innovative technology, but had failed to develop the foundation necessary to sustainably grow its revenues and operate profitably.

106. In sum, I conclude that as a result of numerous factors, including management's competence and pursuit of an acquisition strategy, Savant did not have the capability of achieving the lofty earnings projections set forth in Professor Elhauge's model. Rather than pursuing steps to maximize the company's ability to deliver actual results, Savant's management appears to have focused on an approach that was designed to maximize potential value in the eyes of acquisition partners, at the expense of developing Savant's capacity to grow its own revenues organically. Many actions by management, such as Savant's failure to invest adequately in developing its sales force, a demonstrated lack of interest in managing expenses and controlling costs, and deciding to go to market with a product that was not yet fully reliable and failing to respond adequately to

[70] Savant Systems Expectations Memos for 2008 (DGC0072126); 2009 (DGC0073418); 2010 (DGC0077946); 2011 (DGC0066224); and 2012 (DGC0067407); Savant Systems LLC Financial Statements for years 2007-2008 (SAVANT0131349); 2009-2010 (SAVANT0200168); and 2011-2012 (DGC0028584).