# EXHIBIT 509

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| SAVANT SYSTEMS, LLC<br>Plaintiff,<br><br>v.<br><br>CRESTRON ELECTRONICS, INC.<br>Defendant<br><br><br>CRESTRON ELECTRONICS, INC.<br>Counterclaim-Plaintiff,<br>v.<br><br>SAVANT SYSTEMS, LLC<br>Counterclaim-Defendant | Civil Action No. 10-cv-11622-EFH |

**DECLARATION OF JON SUMMER IN SUPPORT OF PLAINTIFF, SAVANT SYSTEMS, LLC'S MOTION FOR A PRELIMINARY INJUNCTION**

I, Jon Summer, declare as follows:

1. I am President of Cyber Sound & Security, LLC of Scottsdale, Arizona ("Cyber Sound").

2. Since 1995, Cyber Sound has been a dealer, integrator and installer of high-end automation and control products for the residential market.

3. Cyber Sound started purchasing high-end residential automation and control systems from Crestron Electronics, Inc. ("Crestron") in 2000.

4. In May 2000, Cyber Sound entered into a Dealer Agreement with Crestron. A copy of Cyber Sound's Dealer Agreement with Crestron is attached as Exhibit A.

5. Over the course of its nearly 11 year relationship with Crestron, Cyber Sound has purchased and installed over one hundred Crestron systems. Cyber Sound's sales of Crestron equipment have typically exceeded several hundred thousand dollars per year and, in one year, they exceeded one million dollars.

6. In early 2009, Cyber Sound signed on as a dealer of residential automation and control systems manufactured by Savant Systems, LLC ("Savant"), a new entrant in the market. Because our early experiences with Savant's products were positive, we began offering them to our customers as an alternative to Crestron's products.

7. On August 5, 2009, after we had started selling and installing Savant products in customers' homes, Randy Klein, whom I believe was at that time an Executive Vice President and part owner of Crestron and Dave Sell, Director of Crestron West, visited Jason Beatty, Vice President of Cyber Sound, and me at Cyber Sound. They demanded that Cyber Sound either drop Savant and Control4, another manufacturer of automation and control products, or be terminated as a Crestron dealer on the spot. When I asked Mr. Klein if Crestron was willing to throw away a million dollar per year revenue account, he replied that Crestron had $400 million per year total revenue, and $399 million wouldn't hurt.

8. Later during the visit, Mr. Sell stated that Crestron did not have that much of a problem with Cyber Sound offering Control4, since its products were primarily directed to the low-end automation and control market, but that it had a major problem with Cyber Sound offering Savant, since its products competed directly with Crestron products in the high-end market.

9. We decided to accede to Crestron's demands and to stop offering Savant products.

10. On September 21, 2009, I visited Crestron's Phoenix, Arizona office for an open house. Dave Sell pulled me aside and stated that Crestron had received negative press regarding its demands to dealers and no longer had a problem with Cyber Sound selling Savant products. We then again started offering Savant products to our customers.

11. On August 26, 2010, Randy Klein, Dave Sell and Gordon Isaac, a Crestron sales representative, again visited Cyber Sound and met with Jason Beatty and me. Mr. Sell asked what was going on between Cyber Sound and Crestron. I responded that we were experiencing major reliability problems with Crestron's remote controls which required that Cyber Sound spend excess time and resources addressing customer complaints. Mr. Klein agreed that the reliability problems existed and noted that Crestron was working to fix them.

12. On September 5, 2010, I had lunch with Mr. Isaac. Mr. Isaac stated that, if Cyber Sound decided to continue offering Savant products, Crestron would work together with a band of local Crestron dealers to beat Cyber Sound on any jobs that Cyber Sound might pursue that did not involve Crestron equipment. I said this might put the rest of Mr. Isaac's account with Cyber Sound at risk. He responded that that wasn't fair because he was only doing his job.

13. On September 8, 2010, I learned from five different homebuilder customers of Cyber Sound that Crestron was contacting them directly and telling them

that Crestron would do anything to keep them as Crestron customers, including introducing them to local Crestron dealers other than Cyber Sound.

14. After hearing this, I called Dave Sell and asked him if Crestron was going directly to Cyber Sound's customers. He affirmed that it was, saying those were his "marching orders." He stated that, if they had not made it clear previously, he would make it clear now - "we want all or none." I asked if he meant literally "all or none," he said "absolutely." I responded that "you get none then."

15. Within minutes of my call with Dave Sell, Crestron started calling local dealers to inform them that Crestron had dropped Cyber Sound as a dealer. Crestron representatives also called various Cyber Sound customers, telling them that, because Cyber Sound had been dropped as a Crestron dealer, it will not be able to service their installed Crestron systems.

16. On September 9, 2010, I again spoke to Dave Sell, and asked him if Cyber Sound could remain a Crestron dealer at least for the sake of servicing our customers with installed Crestron systems. He said that he would have to get back to me. In a call two days later, Dave Sell stated that Cyber Sound could remain a Crestron dealer , but that Crestron would do everything possible to compete with Cyber Sound on any job that did not involve Crestron products.

17. After these events of August/September 2010, and given the reliability issues Cyber Sound was experiencing with Crestron's products and Cyber Sound's positive experiences with Savant products, Cyber Sound began promoting Savant products more actively for its high-end residential applications. Cyber Sound, however,

continued to offer its customers the choice of either Savant or Crestron for those applications.

18. On April 6, 2011, CE Pro magazine published an article about Cyber Sound and the success it had experienced with Savant products. I was interviewed for the article and made several positive comments regarding Savant products which are reproduced in the article. A copy of the article is attached as Exhibit B.

19. In early May 2011, Cyber Sound received a written notice of termination from Crestron, dated April 29, 2011, effective May 29, 2010, stating that "[a]ny outstanding commitments to your customers should be completed prior to the effective date of termination." A copy of the notice of termination is attached as Exhibit C.

20. On June 16, 2011, Crestron sued Cyber Sound in the United States District Court for the District of New Jersey. A copy of the Complaint in that lawsuit is attached as Exhibit D. Among the claims made by Crestron is a breach of contract claim charging Cyber Sound with violating a provision in the Crestron Dealer Agreement that purports to require it to use "its best efforts to promote and sell Crestron products."

21. On July 21, 2011, Crestron's counsel in the New Jersey lawsuit sent a letter to Cyber Sound's counsel, a copy of which is attached as Exhibit E. In the letter, Crestron demanded that Cyber Sound cease providing technical assistance to any of its existing customers for whom Cyber Sound has installed Crestron products during its nearly 11 years as a Crestron dealer. Crestron also demanded that Cyber Sound provide a list of any such customers who required service of their existing Crestron systems so that such service could be referred by Crestron to a competitive dealer who is currently authorized by Crestron.

22. Because of the signficant cost and complexity of high-end residential automation and control systems, a dealer builds a relationship with its customers that typically lasts long after the initial sale and installation of a system. The maintenance and upgrade of the systems Cyber Sound has installed over the years for its customers are important factors in its ability to survive in competition with other dealers.

23. Cyber Sound has lost customers due to its inability to service their existing Crestron systems, and believes that it will continue to lose customers on a regular basis as long as it is unable to provide such service.

I declare under penalty of perjury that the foregoing is true and correct.

Dated this 29 day of JULY, 2011.

Jon Summer

EXHIBIT 510

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACUSETTS

| | |
|---|---|
| SAVANT SYSTEMS, LLC,<br>Plaintiff,<br>v.<br>CRESTRON ELECTRONICS, INC.,<br>Defendant.<br><br>CRESTRON ELECTRONICS, INC.<br>Counterclaim-Plaintiff,<br>v.<br>SAVANT SYSTEMS, LLC,<br>Defendant. | Civil Action No.: 1:10-cv-11622 (EFH) |

**DECLARATION OF RANDY KLEIN IN SUPPORT OF OPPOSITION OF DEFENDANT CRESTRON ELECTRONICS, INC. TO PLAINTIFF SAVANT SYSTEMS LLC'S MOTION FOR A PRELIMINARY INJUNCTION**

I, Randy Klein, declare as follows:

1. I submit this declaration in support of the Opposition of Defendant Crestron Electronics Inc. to Plaintiff Savant Systems, LLC's Motion for a Preliminary Injunction. I have personal knowledge of the facts set forth in the declaration, and if called to testify as a witness, could and would do so competently.

2. I am Executive Vice President of Crestron Electronics, Inc. ("Crestron"). I have been a Crestron employee for 21 years and have spent 38 years in the automation and control industry.

3. I have reviewed Plaintiff Savant Systems, LLC's ("Savant") Motion for a Preliminary Injunction and the accompanying declarations and exhibits. There are numerous inaccuracies in the documents and I attempt to respond to the main ones in this declaration.

4. First and foremost, Crestron ***did not*** file a lawsuit against a former dealer, Cyber Sound & Security, Inc. ("Cyber Sound") in order to intimidate dealers or other companies in the automation and control industry. Nor did Crestron file the Cyber Sound lawsuit simply because Cyber Sound decided to represent and sell Savant products. The Cyber Sound lawsuit is not intended to block dealers from selling Savant's products or to harm competition in the market place.

5. Crestron filed its lawsuit against Cyber Sound because Crestron believes Cyber Sound engaged in egregious efforts to harm Crestron's business and reputation, engaged in false advertising, misused Crestron's trademarks, and refused to return Crestron confidential and proprietary information, specifically including Crestron's proprietary software. By many accounts, Cyber Sound openly made disparaging statements about Crestron and its products – even when it was still an authorized Crestron dealer. By its lawsuit, Crestron seeks to put a stop to, and seeks damages for, Cyber Sound's wrongful conduct.

6. Cyber Sound still refuses to return Crestron confidential information. Cyber Sound's counsel admitted this in a July 14, 2011 email where he objected to "Crestron's prohibiting CyberSound's [sic] use of proprietary information" to continue to service Crestron systems. A copy of this email is attached hereto as Exhibit A.

7. Indeed, Cyber Sound's misleading conduct continues to this day, as it is still holding itself out to the public as an authorized Crestron dealer. For example, in its LinkedIn home page, Cyber Sound represents that: "We have the distinction of being Arizona's Largest Crestron Dealer." A screen shot of this page, captured on August 15, 2011, is attached hereto as Exhibit B.

8. Cyber Sound's continuing efforts to advertise itself as an authorized Crestron dealer are demonstrated by its apparent payment for advertising on Google. Typing in search terms for "Crestron dealer Phoenix" or "Crestron dealer Scottsdale" results in the appearance of an advertised link for a "Crestron Dealer Dealer [sic] – Theaters/Hi-Fi/Automation" or "Audio Video Dealer – Theaters/HiFi/Automation" that directs one to the Cyber Sound website, www.cybersound.tv. Screen shots of pages reflecting these Google searches, captured on August 15, 2011, are attached hereto as Exhibit C.

9. While Cyber Sound was a Crestron authorized dealer, it no longer is. At one point, Cyber Sound was one of Crestron's largest dealers, with sales reaching a high of $1.1 million. For close to ten years, Cyber Sound worked well with Crestron as an authorized Crestron dealer pursuant to a non-exclusive Dealer Agreement (attached hereto as Exhibit D). During this time, Crestron provided Cyber Sound considerable support and training and helped grow Cyber Sound's business.

10. But despite Crestron's efforts to facilitate Cyber Sound's success as a dealer, Cyber Sound decided at some point to neglect its relationship with Crestron. This was reflected in a dramatic decline in sales of Crestron products by Cyber Sound. From May 2010 to May 2011, Cyber Sound's sales of Crestron products decreased approximately 89%, to $125,000. From February to April, 2011, Cyber Sound's sales of Crestron products totaled a mere $21,000. We met with Cyber Sound on several occasions in an effort to determine why its Crestron sales were declining. In these meetings, Jon Summer and Cyber Sound lied to me and others at Crestron in order to conceal that they had formed an allegiance to Savant and were actively promoting Savant products.

11. Contrary to Savant's claims, however, Crestron did not terminate Cyber Sound because it was selling Savant products, but because of Cyber Sound's active efforts to undermine Crestron's reputation and business through, among other things, disparagement of the company and its products. Crestron believes that Cyber Sound used its status as an authorized Crestron dealer to do so. In 2010, Crestron began hearing from industry sources that Cyber Sound was disparaging Crestron and its products, as well as taking action to interfere with business deals relating to Crestron systems and equipment. During this time, however, Cyber Sound continued to represent to me and others at Crestron that it was a committed Crestron dealer.

12. Crestron did not terminate Cyber Sound's Dealer Agreement to prevent Savant's access to dealers. Terminating Cyber Sound as an authorized dealer now means that Cyber Sound can devote all of its efforts to promoting and selling Savant products.

13. While Crestron's Dealer Agreement with Cyber Sound permitted either party to terminate the agreement for any reason, there were good reasons for terminating Cyber Sound. For example, Crestron did not want to continue to permit Cyber Sound to hold itself out as an authorized dealer and use this status as a means to harm Crestron. Nor did Crestron want Cyber Sound to misuse Crestron confidential materials and information.

14. Crestron terminated its dealer relationship with Cyber Sound on April 29, 2011, effective May 29, 2011. In the notice of termination, Crestron specifically informed Cyber Sound that it should resolve existing commitments prior to the effective date of the termination.

15. On May 27, 2011, Crestron sent Jon Summer at Cyber Sound a letter reminding him of his company's obligations under the Dealer Agreement and requesting the return of all proprietary information and information relating to trade secrets as required under the Dealer Agreement.

16. As noted, Cyber Sound has yet to return any materials to Crestron, specifically including Crestron's proprietary software.

17. Cyber Sound's wrongful actions and its continuing disregard of its obligations left Crestron with no choice but to file suit. On June 16, 2011, Crestron filed its lawsuit against Cyber Sound in the United States District Court for the District of New Jersey.

18. Savant's motion and supporting papers also fail to portray accurately either the marketplace or the automation and control industry. Crestron has been in the automation and control business for over four decades. Over that time, Crestron has developed a strong reputation as a manufacturer and distributor of reliable and innovative automation control systems for homes, offices, schools, hospitals, hotels and other commercial settings.

19. Crestron has invested substantial resources in growing the industry and has made numerous and significant technological innovations. I believe that through the years Crestron has shown a strong passion and commitment to develop and grow the automation and control industry generally.

20. Numerous industry players, including many dealers and other industry participants, began and built their businesses through an association with Crestron and its products. Crestron has succeeded over the years through the hard work of its employees and its commitment to research, innovation, testing, training, reliability, and service. Crestron also has succeeded by working with its industry partners in mutually beneficial relationships.

21. Crestron products are developed, designed and manufactured in Creston's facilities in the United States. Crestron invests millions of dollars every year in research and development and has a large R&D facility in Rockleigh, New Jersey. Crestron's products are distributed through networks of independent dealers and other distribution channels.

22. There are literally thousands of potential dealers of automation and control systems in the United States. If a manufacturer wants to have dealers sell and distribute its products, it has the ability to sign up thousands of dealers. Crestron has standard, non-exclusive Dealer Agreements with thousands of dealers across the country. In addition, some manufacturers distribute their products through sales to retail centers or directly to end-users.

23. While Crestron helped create the automation and control industry, the industry has grown and developed such that the marketplace is, and has been, intensely competitive.

24. Crestron has faced, and continues to face, vigorous competition from numerous competitors including, but not limited to, Control4, Savant, AMX, Cooper Wiring Devices, HAI, iControl, Leviton, Lutron, SmartLabs, uControl, Elan, Speakercraft, and others. Industry publications such as CE Pro and Parks Associates Reports have recognized that these are among the competitors for automation and control systems. Attached hereto as Exhibit E is an article from CE Pro magazine that lists the Top 100 dealers and whose products they represent. Even from this limited sample, it is clear that there are numerous companies that compete in the automation and control market.

25. Savant, for example, touts itself as an industry leader. In a recent advertisement in this month's CE Pro magazine, attached hereto as Exhibit F, Savant advertised a "Whole-House Audio Equation" from "the Leading Control, Automation & Media Company…."

26. Further, given the global economic downturn, the past several years have seen significant and increasing competition in the industry. During this time, for example, Crestron's net sales of residential home automation products have declined significantly. In addition, Crestron has lost numerous dealers who have chosen to terminate their dealer relationships with Crestron.

27. Crestron cannot, in any way, control pricing in the automation and control industry. It cannot, and has not attempted to, maintain high prices for its automation and control products. Nor has it attempted any practice of aggressive price increases. In fact, fierce price competition exists in the automation and control industry. In order to compete, Crestron frequently and aggressively discounts its product prices. These discounts are generally prompted by requests from dealers who are seeking to compete for projects.

28. The competition in the marketplace also requires Crestron to distinguish itself from its competitors in other ways. In addition to discounting product prices, Crestron provides additional and substantial support to its dealers and other industry partners. Crestron offers free training classes, support from regional sales and marketing representatives, and confidential and proprietary information and materials, specifically including proprietary software. Crestron also provides a technical support network that is unmatched in the industry to ensure prompt on-site response to resolve problems or issues with Crestron products and systems.

29. Given its passion and commitment to its products, Crestron encourages its dealers and industry partners to demonstrate a similar level of passion and commitment. But Crestron's Dealer Agreements do not contain any clause or provision that prohibits dealers from carrying or representing other competing products or one requiring the dealer to be "exclusive" to Crestron and only sell Crestron products.

30. Circumstances do arise, from time to time, where either Crestron or the dealer will terminate the Dealer Agreement. The terms of Crestron's Dealer Agreements allow any party to terminate the agreement for any reason upon 30 days' notice. Terminating a dealer only ensures that the dealer devotes none of its efforts to selling Crestron products.

31. Crestron prefers to have as many qualified and committed dealers in the marketplace as possible in order to maximize the opportunities for the sale of Crestron products. Crestron simply expects its dealers to make sound business decisions that facilitate their ability to promote and sell Crestron's products. Crestron makes efforts, however, to support its committed dealers. There have been instances in the past where dealers have gone bankrupt and

Crestron has, following reorganization, forgiven the dealers' debts and allowed the dealers to become authorized Crestron dealers once again.

32. Savant's claim that Crestron has a policy of threatening to terminate, or terminating dealers, that offer the products of competitors, such as Savant, is wrong.

33. Crestron does not have a policy of threatening to terminate, or terminating dealers, that offer the products of competitors, such as Savant. Most, if not all, Crestron dealers also currently offer the products of competitors, including Savant, Control4, Lutron, AMX, and others. In fact, in the fall of 2009, at the September 2009 CEDIA conference in Atlanta, Georgia, I instructed our sales directors and sales managers that Crestron employees should not threaten to terminate, or terminate, dealers based on a dealer's decision to sell or represent the products of competitors.

34. I have reviewed the declaration of John Summer that was filed with Plaintiff's motion for a preliminary injunction. It contains inaccuracies relating to conversations that Mr. Summer recalls having with me.

35. Mr. Summer refers to an August 5, 2009 conversation that involved me, him, Dave Sell, Director of Crestron West, and Jason Beatty, Vice President of Cyber Sound. In that conversation, neither I nor Dave Sell threatened to terminate Cyber Sound on the spot if they refused to drop Savant and Control4 products. The purpose of the conversation was to inquire as to why Cyber Sound had decided to become a Savant dealer. During the conversation, both Dave Sell and I emphasized how much support we had contributed to Cyber Sound, and that we had enjoyed a mutually-beneficial relationship. We did express disappointment that Cyber Sound had decided to place some of its focus on selling the products of a competitor, Savant. I

do not recall Dave Sell making any statements discounting Control4's status as a competitor in the marketplace.

36. Mr. Summer further refers to an August 26, 2010, conversation relating to reliability issues with Crestron products. I recall that, during this visit, we discussed some technical difficulties that Cyber Sound had experienced with remote controls. As I recall, there were a few Crestron products that had some issues, and I recall agreeing to assist in resolving any difficulties. I do not recall that any "major reliability problems" existed. Rather, the technical problem that Summer complained about related to a specific battery issue present in two particular Crestron touch panel models, all of which Crestron promptly replaced. It is my understanding that many of the other technical issues that were perceived as Crestron product failures were in fact due to Cyber Sound's improper wiring, installation and programming.

37. I have also reviewed the declarations of Mike Thul (Thul Electronics), Jason Jobe (Jobe Systems), Brian Moffett (Pro Design), Jay Bakaler (Metro Eighteen), and Richard Smith (Theatron), filed in support of Savant's motion. While I was not personally involved in many of the interactions set forth in these declarations, I have been informed that there are inaccuracies in these declarations. I have spoken with individuals involved in dealing with these individuals and respective companies.

38. It is my understanding that Thul Electronics, Jobe Systems, Pro Design, Metro Eighteen, and Theatron are all Savant dealers.

39. Thul Electronics, Jobe Systems, and Pro Design currently are authorized Crestron dealers. It is also my understanding that Jason Jobe is president of Savant's advisory board. Crestron sales representatives continue to call on these companies and continue to provide support to these companies.

40. Thul Electronics was never terminated as a Crestron dealer. I recall having a meeting with Mike Thul at the 2009 CEDIA conference in Atlanta where I informed Thul that Crestron valued the relationship with him and his company. At the time, I made clear to Thul that Crestron would not terminate our dealer relationship based on his company's sale of products that competed with Crestron products.

41. Consistent with this position, which I had communicated to Crestron's salespeople at the 2009 CEDIA conference, Jobe Systems was reinstated as a Crestron dealer in the middle of September 2009. It is my understanding that Jobe Systems was sent a notice of termination on September 2, 2009; and so the termination of Jobe Systems was extremely short-lived.

42. It is my understanding that Pro Design was never terminated as a Crestron dealer and continues to be an authorized Crestron dealer. I further understand that Rob Christensen of Crestron did not threaten to terminate Pro Design as a Crestron dealer. Nonetheless, Rob Christensen told Brian Moffett at the September 2010 CEDIA conference that he was sorry if he had given Moffett any impression that the Crestron – Pro Design relationship was at risk. Crestron's dealer relationship with Moffett has continued, and in January or February of 2011, Moffett and one of his engineers attended some Crestron dealer training sessions.

43. Metro Eighteen is no longer an authorized Crestron dealer. Metro Eighteen was terminated for non-payment of bills and the Metro Eighteen account was referred to collections.

44. I am informed that Jay Bakaler's characterizations of alleged failings of Crestron equipment are inaccurate. Jay Bakaler and his staff apparently never attended any training sessions. As a result, problems that Metro Eighteen experienced with Crestron systems appear to be attributed to Metro Eighteen's inability properly to design, program, install and service Crestron systems.

45. Metro Eighteen's deficiencies in in this regard are exemplified by the problems that it experienced with Crestron equipment in several customers' homes. When Metro Eighteen realized that it was unable to successfully program, service and support the Crestron systems that it had installed, it demanded that Crestron refund the cost of the Crestron products to the customers. Metro Eighteen told its customers to contact us directly as it apparently wished to avoid its responsibilities. Crestron insisted on the opportunity to evaluate and solve the problems. When Crestron accessed the homes and evaluated the problems, Crestron staff discovered that Metro Eighteen had incorrectly programmed and installed the Crestron systems.

46. Because of Metro Eighteen's mistakes, the systems needed complete reprogramming and rewiring. Crestron, at its own cost, provided new products, reprogramming and rewiring. Although reprogramming and rewiring were all that was required to make the systems work, Crestron also provided new products in order to appease the customers, who had been told by Bakaler that replacements were necessary. After that, the systems worked.

47. It is my understanding that Theatron was terminated for, among other reasons, its inactivity in selling Crestron products. In the fiscal year 2008, the year prior to termination, Theatron did only roughly $500 in net sales for Crestron. In fiscal year 2009, the year of its termination, Theatron had zero sales of Crestron products. In addition to Theatron's failure to sell products, Theatron's employees did not keep up with Crestron's free training classes and so its employees did not have up-to-date knowledge regarding Crestron's products.

48. Richard Smith's account of what happened with the client he describes is baffling. Crestron was in contact with the client because Leading Edge – the dealer that found and cultivated the client – had asked Crestron to speak to the client on Leading Edge's behalf about the benefits of Crestron's products. Crestron honored Leading Edge's request because Leading Edge had been hired by the client and was already pre-wiring the home for Crestron equipment.

49. It is industry practice for Crestron to advocate for a dealer directly to a client. Crestron provides considerable support to our dealers and participates in a large number of joint end-user meetings with our dealers. Collaboration with a dealer is mutually-beneficial and often results in the expansion of the scope of the project. In this case, it was appropriate for Crestron to support Leading Edge since it was the incumbent dealer and was actively promoting Crestron products.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 16 day of August 2011.

Randy Klein

EXHIBIT 511

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

SAVANT SYSTEMS, LLC
Plaintiff,

v.

CRESTRON ELECTRONICS, INC.
Defendant

CRESTRON ELECTRONICS, INC.
Counterclaim-Plaintiff,

v.

SAVANT SYSTEMS, LLC
Counterclaim-Defendant

Civil Action No. 10-cv-11622-EFH

**DECLARATION OF OTTO BENSON**

I, Otto Benson, declare as follows:

1. I am President of La Jolla Home Theatre and Automation, Inc. of La Jolla, California ("La Jolla").

2. Since 2004, La Jolla has been a dealer, integrator and installer of high-end automation and control products for the residential market.

3. La Jolla started purchasing high-end residential automation and control systems from Crestron Electronics, Inc. ("Crestron") in 2006.

4. In October 2006, La Jolla entered into a written Dealer Agreement with Crestron. A copy of that Dealer Agreement is attached as Exhibit A.

5. I believe that La Jolla signed an earlier second Dealer Agreement with Crestron which I believe is substantially identical to the Dealer Agreement of Exhibit A.

6. About 3 years ago, La Jolla received a demonstration of residential automation and control system products manufactured by Savant Systems, LLC ("Savant"). Shortly thereafter, La Jolla started offering Savant automation and control products to our customers as an alternative to Crestron's products.

7. In June 2009, Brian Nachum, a regional sales manager for Crestron, visited La Jolla, and noticed that there were Savant products on the display rack in our store. Mr. Nachum told me that I had to remove the Savant products before his boss visited the store, or Crestron might consider terminating La Jolla as a Crestron dealer.

8. Mr. Nachum's boss from Crestron, whose name I cannot presently recall, visited the store about a couple of months later. We removed the Savant products from the display rack during his visit to avoid any controversy, but later continued to offer Savant's products.

9. La Jolla no longer sells Crestron products but does service those that it has previously sold. In the event that any Crestron parts are required to service existing installed Crestron systems, we would obtain those parts from another Crestron dealer.

I declare under penalty of perjury that the foregoing is true and correct.

Dated this 06 day of August, 2011.

[signature]
Otto Benson

# Exhibit A

# Crestron Dealer Agreement and Application

1005283

CRESTRON®

# Crestron Dealer Agreement and Application

THIS AGREEMENT made and entered into as of the , day of , in the year by and between (hereinafter referred to as "Dealer") and CRESTRON Electronics, Inc. 15 Volvo Drive, Rockleigh, New Jersey, 07647 U.S.A. and its subsidiaries (hereinafter referred to as "CRESTRON"), a corporation organized under the laws of the State of New Jersey.

**RECITALS**

CRESTRON produces and sells products for the Audio/Visual Media Control Market. The specific products authorized for sale by Dealer under the terms and conditions of this Agreement are detailed in APPENDIX A attached hereto (hereinafter collectively referred to as the 'Products'). CRESTRON and the Dealer agree that the Dealer shall act as CRESTRON'S authorized non-exclusive dealer subject to the terms and conditions hereinafter set forth.

**NOW, THEREFORE,** the parties agree as follows:

**1. APPOINTMENT AND AUTHORIZED LOCATIONS:**
CRESTRON hereby appoints the Dealer as its authorized dealer for the Products set forth in APPENDIX A from the location or locations set forth in Appendix B.

**2. DEALER REPRESENTATIONS AND WARRANTIES:** Dealer represents and warrants that all of the statements made in the Dealership Application and made a part hereof were and are true and accurate statements upon which CRESTRON may rely. Dealer represents and warrants to CRESTRON that it employs a sufficient number of trained sales and administrative personnel and has adequate facilities and capital to effectively and efficiently develop demand for and make sales and deliveries of products from the location or locations set forth in Appendix B and to otherwise perform its obligations under this Agreement. Dealer further represents and warrants that it is duly authorized to enter into this Agreement and perform its obligations hereunder, and that nothing in this Agreement constitutes a breach of or is otherwise inconsistent with any other agreement or obligation to which the Dealer is a party or which affects Dealer.

**3. DEALER OBLIGATIONS: Dealer shall, at its own expense:**

Maintain an adequate trained sales force and exercise its best efforts to promote the use and sale of CRESTRON Products;

Maintain an adequate technical and training staff to ensure proper installation and utilization of CRESTRON products and training of customers.

Maintain up-to-date technical knowledge and assist users with both warranty and non-warranty repairs in a reliable and professional manner.

Provide and maintain sufficient financial capability to purchase an adequate supply of Products in accordance with the credit and payment requirements of CRESTRON and;

Maintain in stock current product line for demonstration and customer support purposes.

**4. OBLIGATIONS OF CRESTRON:**

Subject to the provisions of paragraph 5 herein, CRESTRON shall sell products to the Dealer for re-sale to Audio/Visual Control Markets, at the net prices established from time to time by CRESTRON. All prices are subject to change without notice. All prices are net of shipping, tax and insurance. CRESTRON reserves the right to change pricing, discount or product specifications, or to discontinue the sale of any or all of the Products without notice.

CRESTRON shall cooperate with the Dealer in the promotion of Products by furnishing, upon request, reasonable quantities of brochures and circulars describing the Products and shall furnish, upon request, available technical information concerning the same. The foregoing obligation is limited to furnishing brochures and circulars which CRESTRON, at its sole discretion, has elected to prepare.

**5. ORDER ACCEPTANCE AND TERMS OF SALE:**

All orders for Products are subject to acceptance and acknowledgment by CRESTRON. No order shall be binding upon CRESTRON until so accepted. The terms of sale are net 30 days from date of invoice upon approved credit, however, CRESTRON reserves the right to ship C.O.D. if the Dealer's financial condition or credit history warrants the same.

CRESTRON shall not be affected by or responsible for any credit extended by the Dealer to its customers.

CRESTRON shall have the right to cancel any order placed by Dealer, or to delay shipment thereof, if Dealer fails, or has failed, to meet any of its payment obligations hereunder. Nonacceptance, cancellation or delay of such orders shall not be construed as a termination or breach of this agreement by CRESTRON.

Dealer shall be responsible to CRESTRON for payment for each shipment even if such shipment represents only a portion of products purchased under Dealer's purchase order.

CRESTRON reserves the right in its sole and absolute discretion to charge a 15% restocking fee, plus shipping costs, on orders placed and then canceled by the Dealer before or after shipment.

Products may only be returned for credit, exchange or service with a CRESTRON Return Merchandise Authorization (RMA) number. Authorized returns must be shipped freight prepaid to CRESTRON, Rockleigh, N.J., or its authorized subsidiaries, with RMA number clearly marked on the outside of all cartons. Shipments arriving freight collect or without an RMA number shall be subject to refusal. CRESTRON reserves the right in its sole and absolute discretion to charge a 15% restocking fee, plus shipping costs, on any products returned with an RMA.

**6. DELIVERY, INSTALLATION AND ACCEPTANCE:** Unless otherwise agreed to in writing by CRESTRON, delivery of the Productshereunder shall be made FO.B. CRESTRON's plant in New Jersey. CRESTRON shall not be liable for delays in delivery or performance. This includes, but is not limited to, acts of God, acts of the Dealer or the End User, acts of civil or military authorities, fires, strikes, floods, epidemics, quarantine restrictions, war or riots. In the event of any such delay, the date of delivery or performance shall be deferred for a good period equal to the time lost be reason of the delay. Shipping of products from CRESTRON's plant shall be at Dealer's expense. CRESTRON shall arrange for shipping, using carrier specified by Dealer. In the absence of specific instructions from Dealer, CRESTRON shall select carrier for such delivery. CRESTRON shall not be deemed thereby to assume any liability in connection with the shipment nor shall the carrier be construed to be the agent of CRESTRON. Risk or loss shall remain with CRESTRON until the Products are delivered by CRESTRON to the carrier at CRESTRON's plant. The Dealer shall assume all risk or loss upon delivery of the Products to the carrier. CRESTRON shall insure the Products through the carrier or an independent insurer, as determined by CRESTRON, for their full invoice price, with the insurance cost paid by the Dealer. CRESTRON shall be entitled to designate CRESTRON as a beneficiary of such insurance to the extent of the unpaid balance due to CRESTRON pursuant to Section 4.

**7. TITLE AND SECURITY INTEREST:** CRESTRON shall retain title to Products sold hereunder and any such Products shall remain personal property of CRESTRON, until payment in full by the Dealer of the purchase price and all other amounts due hereunder in respect to such Products, notwithstanding delivery of such Products to a carrier, to the Dealer or to an End User. Until the payment in full of the purchase price, CRESTRON shall have a purchase money security interest in the Products, including all additions and replacements thereto and the proceeds thereof, to secure payment thereof. The Dealer agrees promptly to execute, upon request of CRESTRON, any financing statements, continuation statements and like documents and to take any other action deemed necessary or desirable by CRESTRON in order to perfect CRESTRON's security interest hereunder. The Dealer hereby appoints CRESTRON its attorney-in-fact to prepare, sign and file, any such documents. The Dealer agrees to do all acts necessary to perfect and maintain such rights and title in CRESTRON, including, without limitation, to advise End Users as to CRESTRON's lien if requested in writing by CRESTRON. The Dealer shall keep the Products in good order and repair until the purchase price has been paid in full and shall promptly pay all taxes and assessments upon the Products or the use of the Products.

**8. TERM OF THE AGREEMENT:** This Agreement shall become effective on the date first written above and shall remain in effect unless and until it is terminated in accordance with the provisions of Paragraph 9.

**9. TERMINATION:** If the Dealer fails to make any payment to CRESTRON when due, CRESTRON may immediately terminate the Agreement by notice to the Dealer. This Agreement shall also terminate immediately upon the insolvency, bankruptcy or receivership of Dealer. Termination of the Dealer shall be in addition to any other rights which CRESTRON may have for breach. Further this agreement may be terminated by CRESTRON, or DEALER, for any reason with or without cause, upon thirty (30) days advance written notice. Termination shall not affect Dealer's continuing payment, indemnification and other obligations to Crestron hereunder which shall remain in effect notwithstanding such termination.

**10. TRADEMARKS AND TRADE NAMES:**
Dealer shall in no way alter any CRESTRON trademark or trade name appearing on the Product sold to Dealer. Dealer shall have no authority to use such trademarks or trade names on stationery, advertising or displays, or in its company name or in any other fashion whatsoever, unless the written approval of CRESTRON is obtained in advance of such use, provided that any such use, if approved, shall in no way bestow any rights to such trademarks or trade names upon Dealer other than revocable license to use same until revoked by CRESTRON. In no event shall the Dealer use said trademarks or trade names after the termination of this Agreement. Dealer shall not affix any trademark or trade name to the Products or other merchandise supplied to Dealer and shall not modify or alter the Products without the prior written approval and consent of CRESTRON.

**11. MARKETING MATERIALS: CRESTRON** shall have an unlimited license to use, for promotional purposes, any photographs or other materials provided to it by Dealer which relate to the Products. All such materials may be utilized by CRESTRON for publication or reprinted, and, upon request of Dealer, CRESTRON shall provide the appropriate acknowledgment.

**12. CONFIDENTIAL INFORMATION:** Confidential Information will be held by the Dealer in the strictest confidence at all times and will not be disclosed or used by the Dealer or its agents for any purpose other than in connection with its anticipated performance under this Agreement. Upon termination of this Agreement, all

Confidential Information and documents relating to same shall be returned to CRESTRON. For purposes of this paragraph, "Confidential Information" shall include all of CRESTRON's specifications, operations or systems manuals, diagrams, graphs, models, sketches, technical data, production processes, research, business or financial information, plans, strategies, forecasts, forecast assumptions, business practices, marketing information and material, customer names, proprietary ideas, concepts, know-how, methodologies and all other information related to the CRESTRON's business which is secret, confidential or proprietary to CRESTRON, regardless of the media (including, without limitation, notes, analyses, compilations, studies, interpretations, or other materials prepared by the Dealer) and regardless of whether such information was disclosed before, on, or after the effective date of this Agreement.

**13. WARRANTY:** CRESTRON's warranty with respect to Products sold under this Agreement shall be as set forth in the standard published Warranty statement issued by CRESTRON with respect to such Products. No other warranty is made or implied in this Agreement, and CRESTRON shall not be responsible for any other warranty which may be provided by Dealer to its customers.

**14. DISCLAIMER OF WARRANTY TO DEALER; LIMITATION OF LIABILITY**
**The Dealer represents and agrees that the products are sold to the Dealer strictly for resale. CRESTRON makes no warranty of any kind whatsoever to the Dealer, including, without limitation, any implied warranty of title, merchantability or fitness for a particular purpose. CRESTRON shall not be liable to the Dealer for any loss of profit, loss of revenue, incidental, consequential or special damages arising from this Agreement, including, without limitation, the return of any product by an end user for any reason, the failure of any product to conform to specifications, or from error or defect of an product, or otherwise arising out of the use of any product for any purpose, regardless of the type of claim or form of action, whether by contract, warranty, negligence or otherwise.**

**15. SALES AND SIMILAR TAXES:** Unless otherwise stated, the purchase price does not include sales, use, excise or similar taxes or charges. As noted above Crestron sells exclusively to resellers of our products. Consequently, in addition to the prices specified herein, the amount of any present or future sales, use, excise or other similar tax or charge applicable to the sale of the Products hereunder or the use thereof hereafter is the responsibility of and shall be reported and paid by the Dealer. As a reseller of products, the Dealer shall provide CRESTRON with applicable tax exemption certificates acceptable to the relevant taxing authorities.

**16. ASSIGNMENT:** The Dealer shall not, by operation of law or otherwise, assign its rights or delegate its performance here under without the prior written consent of CRESTRON, and any attempted assignment or delegation without such consent shall be void.

**17. RELATION BETWEEN THE PARTIES:** The relation between CRESTRON and Dealer created hereby is that of vendor and vendee and, with respect to sales by Dealer to third parties, that of an independent contractor and not that of principal and agent. The Dealer is not a legal representative or agent of CRESTRON and shall not, and is not, authorized to enter into any commitment on behalf of CRESTRON. The Dealer is not a franchisee of CRESTRON.

**18. INDEMNIFICATION:** Dealer agrees to defend, indemnify and hold harmless CRESTRON from any loss, damage or claim (including attorney's fees and costs) from third parties, including end users, arising from Dealer's sale or installation of Products or performance of services relating to the Products or for any breach of this Agreement.

**19. INSURANCE:** Dealer agrees to maintain commercial general liability insurance coverage covering bodily injury or death and property damage, including all legal liability to the extent insurable and all court costs, legal fees and expenses, arising out of the Dealer's business for a combined single limit of not less than $2,000,000 aggregate and $1,000,000 per occurrence. The required coverage must provide for claims to be made on an occurrence basis. The policy must name CRESTRON as an additional insured. On request, Dealer shall deliver to CRESTRON within ten days the insurance binder (Acord Form 25S) provided by the insurance carrier as well as proof of payment of the premium for the first year).

**20. WAIVER OF RIGHTS:** A failure by CRESTRON to assert its rights for or upon any breach of this Agreement shall not be deemed a waiver of such rights, nor shall any such waiver be implied from the acceptance of any payment from Dealer. No waiver in writing by CRESTRON with respect to any right shall extend or affect any subsequent breach of a like or different kind or impair any right consequent thereof.

**21. CLAIMS; JURY TRIAL WAIVER:** The Dealer hereby submits to the jurisdiction of the Courts of the State of New Jersey and of the Federal Courts of the District of New Jersey with respect to any litigation arising out of this Agreement. The parties further agree that the exclusive venue for suit with respect to this Agreement shall be the Courts of the State of New Jersey or the Federal Courts of the District of New Jersey. **THE DEALER AND CRESTRON HEREBY WAIVE ANY AND ALL RIGHTS TO A TRIAL BY JURY IN ANY ACTION BASED UPON, OR ARISING OUT OF, OR IN CONJUNCTION WITH THIS AGREEMENT.** The Dealer shall be obligated to pay CRESTRON'S expenses, including reasonable attorneys' fees, in any action or legal proceedings between the parties relating to this Agreement.

**21. CREDIT LINE:** If Crestron determines that Dealer requires a credit line with Crestron to support its inventory of the Products, then Dealer agrees to provide current financial statements, tax returns and trade references to Crestron for that purpose, which information will be kept confidential by Crestron.

**22. APPLICABLE LAW:** The laws of the State of New Jersey shall apply to the construction and interpretation of this Agreement.

**23. MISCELLANEOUS:** This Agreement (including any Exhibits hereto) constitutes the entire understanding between the Dealer and CRESTRON concerning the subject matter hereof, and any representation, promise, course of dealing or trade usage not contained herein shall not be binding upon the parties. No termination, modification, amendment, rescission, waiver or other change of this Agreement or any part thereof shall be binding unless assented to in writing by the authorized representatives of both parties Any terms of any purchase order or other form of documents submitted by the Dealer in connection with any order hereunder shall not vary the terms of this Agreement.

**IN WITNESS WHEREOF,** the parties by their duly authorized representatives, have caused this Agreement to be executed as of the date first above stated.

**APPENDIX A**
**CRESTRON AUTHORIZED PRODUCTS FOR SALE:**

☒ All Control and related products per the US Dealer Price List

☒ All Control and related products per the Prodigy Dealer Price List

**APPENDIX B**
CRESTRON AUTHORIZED DEALER LOCATION(S):
(list addresses of Dealer location or locations):

**Dealer**

Company: BINACORP, DBA LA JOLLA HOME THEATER & AUTOMAT
Name: OTTO BENSON, JR.
Title: PRESIDENT
Signature: [signature]
Date: 10.14.10

**Crestron Electronics, Inc.**

Name: __________
Title: __________
Signature: __________
Date: __________

# EXHIBIT 512

Case 1:10-cv-11622-EFH Document 56 Filed 08/30/11 Page 1 of 6

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| SAVANT SYSTEMS, LLC<br>Plaintiff,<br><br>v.<br><br>CRESTRON ELECTRONICS, INC.<br>Defendant<br><br>CRESTRON ELECTRONICS, INC.<br>Counterclaim-Plaintiff,<br>v.<br><br>SAVANT SYSTEMS, LLC<br>Counterclaim-Defendant | )<br>)<br>)<br>)<br>)<br>)<br>) Civil Action No. 10-cv-11622-EFH<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**DECLARATION OF JAMES W. CARROLL**

I, James W. Carroll, declare as follows:

1. I am currently General Manager - Residential Business of Savant Systems, LLC ("Savant"), the plaintiff in the above action.

2. I have been with Savant since the company was formed in 2005.

3. Savant did not actually start shipping residential automation and control products in the market until early 2008.

4. Because specialized services are required in connection with the sale and installation of high-end residential automation and control products, these products are sold through independent local dealers throughout the United States who specialize in such products. Access to these dealers by manufacturers such as Savant and Crestron Electronics, Inc. ("Crestron") is essential to the distribution of their products.

5. Since 2006, Savant has been actively attempting to sign on dealers across the United States to carry its products for resale to end user customers in their local areas.

6. I know of my own knowledge, or am informed and believe, that many of the dealers approached by Savant delayed signing on as Savant dealers because they were dealers for the automation and control products of Crestron and because Crestron objected, or threatened to terminate them, if they carried Savant products.

7. Crestron's threats to terminate dealers can have a major impact on the dealer because termination can carry with it severe penalties for the dealer. Dealers commonly not only sell and install residential automation and control systems, but also service them after installation. The servicing frequently requires access to parts, components and tools from the manufacturer of the original system. In the case of high-end systems which may cost a customer from fifty thousand dollars to several hundreds of thousands of dollars, the customer looks to the dealer who sold and installed the system and who is most knowledgeable about that customer's specific installation to attend to its maintenance and upgrade as necessary. While a dealer can replace future lost sales of Crestron products by sales of Savant products instead, denial of access to the materials needed to service a dealer's existing installed base of Crestron systems not only affects the dealer's service revenues but also affects the good will that the dealer has built up with its customers often over many years of business. Thus, Crestron's threats to terminate a dealer, especially a dealer with a large installed base of Crestron systems, simply because it adds Savant systems to its offerings, can act as a strong deterrent to dealing with Savant in the face of objection by Crestron.

Case 1:10-cv-11622-EFH Document 36 Filed 08/30/11 Page 3 of 6

8. On information and belief, dealers who delayed signing on as Savant dealers because of Crestron's objections, or threats of termination, but who later signed on as Savant dealers, include at least:

Acadian Custom Installations
Baton Rouge, LA

NuSystems, Inc.
Gardnerville, NV

Genesis Home Technologies, Inc.
Portland, OR

Thul Electronics, Inc.
Avon, CO

Sound Design
Toronto, Canada

Newport Audio Video
Sandy, UT

Homeworks Holding Corp. d/b/a Digital Ear
Tristin, CA

Electronics By Design
Broomfield, CO

Studio A/V
Bozeman, MT

Harrison Home Systems
Evergreen, CO

AVE Solutions d/b/a S3
Park City, UT

Audition Systems by Audio Design Group
West Valley, UT

Vatland Electronics
Appleton, WI

Case 1:10-cv-11622-EFH Document 38 Filed 08/30/11 Page 4 of 6

Connecterios
Chicago, IL

Sound Components
Miami, FL

Eagle Security
Las Vegas, NV

Big Picture Solutions
Palm Beach, FL

Cyber Sound & Security, Inc.
Scottsdale, AZ

American Automation & Communication
Bowie, MD

Concierge Direct
New Rochelle, NY

Stereo and Video Integrators
Fair Haven, NJ

Premier Home Technologies
Dublin, OH

9. Savant lost sales in an amount yet to be determined because of the delays of dealers in signing on as Savant dealers.

10. I know of my own knowledge, or I am informed and believe, that other dealers who initially signed on as Savant dealers later dropped Savant as a supplier because Crestron objected, or threatened to terminate them, if they carried Savant products.

11. On information and belief, dealers who initially signed on as Savant dealers and who later dropped Savant for at least some period of time because of Crestron's objections, or threats of termination, include at least:

Stereo One Inc.
Cape Girardea, MO

Intellect Integrates Electronics
Fort Lauderdale, FL

Attack Communications
Newport Beach, CA

Custom Home Theater Systems
Solona Beach, CA

SoCal Smart Home
San Clemente, CA

Media Design Associates, Inc.
Fort Lauderdale, FL

12. Savant lost sales in an amount yet to be determined during the time periods that dealers dropped Savant as a supplier.

13. I know of my own knowledge, or I am informed and believe, that other dealers approached by Savant initially refused, and continue to refuse, to sign on as Savant dealers because they are Crestron dealers and because Crestron objected, or threatened to terminate them if they carry Savant products.

14. On information and belief, dealers who initially refused, and who continue to refuse, to carry Savant's products because of Crestron's objections, or threats of termination, include at least:

American Home Technologies
Harbor Springs, MI

Electronic Environments
Chicago, IL

Sound & Vision
Chicago, IL

Case 1:10-cv-11622-EFH Document 58 Filed 08/30/11 Page 6 of 6

Carefree AV
Scottsdale, AZ

AV Innovation
Scottsdale, AZ

Vision Systems
Cypress, CA

15. Savant has lost, and continues to lose, sales in amounts yet to be determined as a result of the refusal of dealers to carry Savant products.

16. Many dealers that we have approached regarding Crestron's threats to terminate them if they carry Savant products have been reluctant to confirm those threats for fear of retaliation by Crestron. I believe that the listings of dealers in paragraphs 8, 11 and 14 are partial only and that depositions and other discovery will reveal numerous others in each category.

17. Savant estimates that it will need to sign on an additional 500 to 600 dealers in order to make its products readily available to customers throughout the United States.

I declare under penalty of perjury that the foregoing is true and correct.

Dated this 30 day of August, 2011.

James W. Carroll

# EXHIBIT 513

Case 1:10-cv-11622-EFH Document 82 Filed 08/02/12 Page 1 of 12

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| SAVANT SYSTEMS, LLC<br>Plaintiff,<br><br>v.<br><br>CRESTRON ELECTRONICS, INC.<br>Defendant<br><br>CRESTRON ELECTRONICS, INC.<br>Counterclaim-Plaintiff,<br>v.<br><br>SAVANT SYSTEMS, LLC<br>Counterclaim-Defendant | Civil Action No. 10-cv-11622-EFH |

**MEMORANDUM IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO COMPEL PRODUCTION OF DOCUMENTS AND ANSWERS TO INTERROGATORIES**

## I. INTRODUCTION

The present suit arises from exclusionary tactics adopted by Defendant, Crestron Electronics, Inc. ("Crestron"), the "leading provider of control and automation systems for homes, offices, schools, hospitals, hotels and more," (Exhibit A to Am. Compl., Docket 14), to prevent the entrance of Plaintiff, Savant Systems, LLC ("Savant"), into the home automation portion of that market.

Savant was founded in 2005 by a core group of technology pioneers and business executives for the purpose of developing high-end programmable controller systems for home automation, particularly for controlling home audio, video, lighting, climate/environmental control, communication, and security subsystems ("the market"). (Am. Compl. ¶3; Decl. of

James Carroll ("Carroll Decl.") ¶ 2, filed herewith as Ex. A). Such systems typically cost a dealer on the order of $25,000 and up in a manufacturer's control equipment. (Am. Compl. ¶ 10; Carroll Decl. ¶2). Savant brought its first products to market at the end of 2007 and early 2008. (Carroll Decl., ¶ 3). At that time Crestron controlled approximately 80% of the high-end home controller market. (Am. Compl. ¶ 13). Central to Savant's systems are Apple, Inc.'s software and hardware, which have enabled Savant to provide a user interface which is immediately familiar to, and thus readily accepted by, the hundreds of millions of Apple users worldwide. (Am. Compl. ¶ 6).

Savant's entrance posed a grave threat to Crestron's dominance of the market. In an attempt to stifle Savant before it could gain a foothold, Crestron implemented a series of tactics which it expected would severely hobble Savant in its attempt to compete with Crestron, if not keep Savant out the market altogether. Central to Crestron's scheme was (and is) the structure of the market and Crestron's control over the distribution channels in the market.

In particular, the controller systems at issue require trained technicians to plan the layout of the system components throughout a customer's residence, as well as to perform the actual physical installation of those components. This may include not only programming the controllers for the specific components that the customer wants to control (such as TVs, audio amplifiers, lighting, air conditioners and etc.), but may also include such tasks as running cabling to those components, as well as attending to other necessities of the particular installation, and servicing them subsequently. Because no manufacturer can maintain a staff of sufficient size to send out to each of the tens of thousands of households in which these systems are being installed throughout the United States and elsewhere, the sale, installation, and servicing of such systems is done by independent, local audio/video dealers. These dealers typically offer a

variety of products from a variety of manufacturers, assist their customers in selecting components suitable to their desires and budgets, and thereafter attend to the installation and subsequent servicing. (Am. Compl. ¶ 15). Effectively, the manufacturers *must* go through these independent dealers to sell their products to end users.

In 2009, the industry trade association Custom Electronic Design & Installation Association ("CEDIA") listed over 330 dealers of high-end systems in the major (*i.e.*, highest revenue) markets, of whom over 250 (76%) were Crestron dealers. (Am. Compl. ¶ 16). Because Crestron was the giant in the industry, with little competition prior to Savant, the overwhelming share of revenues of the dealers in the high end home automation control systems area came largely from the sale of Crestron products. Additional dealer revenues came from the dealers' servicing and upgrading of Crestron systems that they had earlier installed. Crestron thus had a stranglehold on the dealers in this segment of the market; it used its de facto (and, as Savant asserts, de jure) monopoly power to try keep Savant out of the market.

Specifically, Crestron threatened to refuse to sell its products to any dealer who also handled Savant products. Both through its sales representatives and through published sales literature, it expressly informed its dealers that they would be terminated as Crestron dealers if they dared to handle Savant products. (Am. Compl. ¶ 22, Exs. E-H: "**Remember, you can't be a Crestron dealer and also sell Savant products!**" (emphasis in original)). Such terminations would not only destroy a major portion of the dealers business in the original sale and installation of home control systems, but would also destroy their ability to service or upgrade previously-installed systems, thus further cutting the dealers' revenues and destroying the good will that they had built up with their customers over the years. These threats to dealers, and other anti-

Case 1:10-cv-11622-EFH Document 82 Filed 08/02/12 Page 4 of 12

competitive acts on the part of Crestron, (Am. Compl. ¶¶ 31, 33), all created substantial impediments to Savant's ability to establish itself in the market, as they were intended to do.

## II. ARGUMENT

Crestron moved to compel Savant's response to Crestron's Request For Production No. 66 and its Interrogatory No. 13, both of which address Savant's recent acquisition of LiteTouch, Inc., a manufacturer of lighting control products, as well as to compel Savant's response to Crestron's Request For Production No. 67 and its Interrogatory No. 14, both of which relate to Savant's newly introduced Blueprint Express™ software. These events occurred only this year, *i.e.*, 2012, well after this suit was filed, and have no relevance to any claim or defense in this case.

### A. Savant's Acquisition of LiteTouch, Inc.

Savant acquired LiteTouch, a manufacturer of lighting control systems, in February of this year, well after this litigation began. (Carroll Decl. ¶ 4). Crestron's request for production and its interrogatory concerning the acquisition seek to plumb the details of the acquisition, despite their lack of relevance to the present suit:

> Crestron Request for Production No. 66:
> All documents relating to Savant's acquisition of LiteTouch, Inc.
>
> Crestron Interrogatory No. 13:
> State the total consideration paid by Savant, including, but not limited to, cash or stock for the purchase of LiteTouch, Inc. from Nortek, Inc.

In addition to its objections to Crestron's Request No. 66 for "all documents" as overly broad and unduly burdensome, Savant objected to it, and to Crestron's Interrogatory No. 13, on the ground of relevance: the requested information is not even remotely relevant to any claim or defense of the parties.

Rule 26(b)(1) of the Federal Rules of Civil procedure provides that:

Case 1:10-cv-11622-EFH Document 82 Filed 08/02/12 Page 5 of 12

> Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense . . . .

The prior scope of Rule 26(b)(1) was expressly narrowed in 2000 from the thitherto prevailing, far broader scope of "matter relevant to the subject matter" of the litigation: discovery of the latter is now available only on express order of the court, which is to be sparingly granted. *See* "Notes of Advisory Committee on Rules - 2000 Amendment" ("Reviser's Notes") to Rule 26(b)(1). The reason given was to control the ever-broadening cost of discovery:

> [I]n some instances, particularly cases involving large quantities of discovery, parties seek to justify discovery requests that sweep far beyond the claims and defenses of the parties on the ground that they nevertheless have a bearing on the "subject matter" involved in the action.

The Reviser's Notes further explain:

> The Committee intends that the parties and the court focus on the actual claims and defenses involved in the action…..
>
> *The rule change signals to the court that it has the authority to* confine *discovery to the claims and defenses asserted in the pleadings, and signals to the parties that they have no entitlement to discovery to develop new claims or defenses that are not already identified in the pleadings….*

(emphasis added).

In the present case, the information requested is not relevant to any party's claim or defense. Savant's claims are set forth in ¶¶ 48-83 of its Amended Complaint and are based on intentional exclusionary acts of *Crestron* that are alleged to violate the Sherman Antitrust Act (Am. Compl. ¶¶ 44-54), §3 of the Clayton Act (*id.* at ¶¶ 55-59), §43(a) of the Lanham Act (*id.* at ¶¶ 60-65), the Massachusetts Antitrust Act (*id.* at ¶¶ 69-78), and the Copyright Act (*id.* at ¶¶ 79-83). These claims neither mention, nor relate to, LiteTouch or its acquisition in any manner.

Case 1:10-cv-11622-EFH Document 82 Filed 08/02/12 Page 6 of 12

Crestron's counterclaims are based on alleged interference with Crestron's contractual relations with its dealers (Answer, Affirmative Defenses & Counterclaim Complaint of Defendant Crestron Electronics, Inc., Document 38, ("Answer") ¶¶ 39-45), tortious interference with advantageous business relations (*id.* at ¶¶ 46-53), and reckless filing of this lawsuit (*id.* at ¶¶ 54-59). None of these claims relate in any way to LiteTouch. In short, there is no claim, counterclaim, or defense of either party even remotely dealing with LiteTouch, an entity which was not acquired by Savant until well after this suit was brought. *Cf. Amorim Holding Financiera S.G.P.S. v. C.P. Baker & Co*. 2011, WL 5879433 at *2 (D. Mass. 2011) (concluding that interrogatories and requests for production concerning an investment entity created by plaintiff *after* initiation of instant suit against defendant claiming securities fraud held not relevant to the events leading to the complaint: motion to compel discovery denied). As Magistrate Judge Sorokin explained in *Amorim Holding*:

> Defendants have requested all documents concerning Amorim Global Investors ("AGI"). AGI was launched in February 2008, after the relevant events leading to this case occurred. Thus, these documents have little relevance. Therefore, the Court denies this request on the merits as the burden of the proposed discovery will outweigh its likely benefit. See Fed. R. Civ. P. 26(b)(2)(C)(iii).

Crestron weaves with a weak thread when it argues, (Crestron Mem. at 5), that it needs the requested information to support its expected defense that Savant's ability to make the LiteTouch acquisition demonstrates that *Crestron* does not have the ability to lessen or destroy competition and thus cannot possibly be guilty of an attempt to monopolize, citing *Sterling Merch. Inc. v. Nestlé,* 656 F.3d 112, 125 (1st Cir. 2011). The very quote itself ("whether a *defendant* has monopoly power depends on the *defendant's* 'ability to lessen or destroy competition' in the relevant market." (emphases added)) refers to the *defendant's* conduct, and Crestron's requests for information directed to plaintiff *Savant's* activities provide no information concerning Crestron's conduct. And as succinctly stated by the Supreme Court in

*California Dental Association v. Federal Trade Commission*, 526 U.S. 756, 789 (1999), the market power needed to support a finding of unlawful restraint under §1 is "enough market power to harm competition." At the time of the acts complained of, Crestron had an 80% share of the relevant market. (Am. Compl. ¶ 14). The fact that Crestron has subsequently not *succeeded* in keeping Savant out of the market entirely does not excuse the fact that it did its utmost to try to do so, nor relieve it from liability for the harm that it did cause.

With respect to Crestron's argument that it wishes to know the price paid by Savant for its recent purchase of LiteTouch in order to show Savant's "ability to compete against Crestron" (Crestron Mem. at 5-6), again the link is unsustainably tenuous and too remote from any pleaded claim or defense. The issue in this case is whether Crestron's predatory acts are illegal, not whether Savant has the necessary resources to survive them. Further, Savant's "ability to compete with Crestron" has already been the subject of direct and detailed inquiry by Crestron, *see, e.g.*, Crestron's Request For Production Nos. 5 (Savant's competitive analyses), 6 (Savant's strategic or business plans), 39 (Savant's organizational structure), 8, 10 (Savant's monthly sales), 9 (Savant's price lists), 12 (Savant's research and development expenses), 15, 35 (Savant's market share), Savant's distribution strategy), 20, 25, 50-53 (Savant's competitive response to Crestron), 41, 48 (damage to Savant caused by Crestron) among others. A copy of Crestron's Second Requests For Production of Documents is attached hereto as Exhibit B. The documents being produced in response to these requests are more directly probative of Savant's ability to compete than any information concerning Savant's acquisition of LiteTouch, which took place only this year.

Finally, Crestron argues, (Crestron Mem. at 6), that the requested information is necessary to show that its acts harmed neither competition nor competitors. However, in *Barry*

Case 1:10-cv-11622-EFH Document 82 Filed 08/02/12 Page 8 of 12

*Wright Corp. v. ITT Grinnell Corp.*, 724 F.2d 227, 230 (1st Cir. 1983), the First Circuit noted that: "[A] practice, a method, a means, is 'improper' if it is 'exclusionary,'" (citing *United States v. United Shoe Machinery Corp.*, 110 F.Supp. 295, 342 (D.Mass.1953), aff'd per curiam, 347 U.S. 521, 74 S.Ct. 699, 98 L.Ed. 910 (1954)). It continued:

> To decide whether Pacific's conduct was exclusionary, we should ask whether its dealings with Grinnell went beyond the needs of ordinary business dealings, beyond the ambit of ordinary business skill, and "unnecessarily excluded competition" from the snubber market.

and concluded:

> "Exclusionary" conduct is conduct, other than competition on the merits or restraints reasonably "necessary" to competition on the merits, that reasonably appears *capable* of making a significant contribution to creating or maintaining monopoly power.

(emphasis added) (citing 3 P. Areeda and D. Turner, Antitrust Law p. 626 at 83 (1978)).

Although the First Circuit ultimately found that Grinnell's conduct did not in fact go beyond the needs of ordinary business dealings in that case, the standards that it set forth for assessing exclusionary conduct remain intact. There can be no doubt that Crestron's acts were indeed *capable* of "making a significant contribution to creating or maintaining monopoly power," and the fact that Savant had greater staying power than ever anticipated by Crestron does not excuse Crestron's actions. It is Crestron's attempts to exclude Savant from the market that are to be judged here, not Savant's staying power in the face of them, and nothing concerning the details of Savant's acquisition of LiteTouch can affect the determination of whether *Crestron's* conduct "reasonably appears capable of making a significant contribution to creating or maintaining monopoly power." The requested information is not relevant to any claim or defense, and Crestron's motion to compel should be denied as to them.

Case 1:10-cv-11622-EFH Document 82 Filed 08/02/12 Page 9 of 12

### B. Savant's Introduction of Blueprint Express™ Software.

Savant's Blueprint™ software is an application developed by it to enable installers of home automation systems to quickly and easily create a specific program for controlling the various components of a particular installation without writing extensive lines of code. Savant's Blueprint Express™ software is a streamlined version of its Blueprint™ software, and was introduced this Spring, well after the instant suit was filed. (Carroll Decl. ¶¶ 5-6). Again, Crestron's document request concerning this product was unbounded:

> Crestron Request for Production No. 67:
> All documents relating to Savant's Blueprint Express™.
>
> Crestron Interrogatory No. 12:
> Identify all authorized Blueprint Express™ dealers.

Savant objected to these on the same grounds as those made with respect to Request No. 66 and Interrogatory No. 13 above. Crestron has made no claim, in the pleadings or elsewhere, that Blueprint Express™ infringes (or does not infringe) any patent, trademark, copyright or other protected interest of Crestron; neither is there any other plausible basis on which Crestron can rest its requests.

Crestron argues that the requested information is relevant to Savant's "ability to gain entry and compete in the market." (Crestron Mem. at 7). On that line of reasoning, *anything* that Savant does is "relevant," no matter how tenuous the connection. For example, suppose that Savant decided to offer new employees three weeks of vacation instead of two: one could argue (tenuously) that such act shows that Savant is generating sufficient funds to be more generous to its employees and thus its hiring and employment practices from its inception are "relevant" to its "ability to gain entry and compete in the market," thereby turning the focus of this suit onto Savant's employment practices instead of Crestron's exclusionary practices. It is precisely this

misuse of discovery that the Rules Committee's revisions to Rule 26(b)(1) were meant to curb. Further, as discussed above, information directly related to Savant's ability to compete has already been produced or is being produced in response to Crestron's Second Set of Requests For Production of Documents.

Creston also argues, (Crestron Mem. at 7-8), that Savant's confining distribution of Blueprint Express™ to a limited number of dealers shows that Savant was not foreclosed from dealer access by Crestron. The argument is both specious and based on an incorrect premise.

As to the former, Crestron's foreclosure of Savant from qualified dealers is not shown by examining which dealers in the high-end home automation and control market handle which Savant products but, rather, which dealers were pressured by Crestron to refuse to handle on the threat of losing the livelihood they had built up over many years in selling and installing Crestron products. As noted above, that information has already been the subject of earlier requests for production.

As to the latter, Crestron's assertion "on information and belief" that the availability of Blueprint Express™ is being restricted by Savant to a limited set of dealers who will sell only Blueprint Express™ is contrary to fact. It is being made available to *all* dealers who are qualified to handle the installation of Savant products, as well as those that may qualify in the future. (Carroll Decl. ¶ 6). Savant "qualifies" a dealer in this context by, *inter alia,* satisfying itself that the dealer has sufficient staff with technical competence to properly install the products for which they are being qualified. *Id.*

Finally, Crestron argues that the requested information is relevant to the "definition of the product market." The product market is defined in the Amended Complaint at Paragraph 10 as:

> the distribution and sale of high-end programmable controller systems for residential automation, particularly for controlling home audio-video, lighting,

Case 1:10-cv-11622-EFH Document 82 Filed 08/02/12 Page 11 of 12

> climate/environmental communication and security subsystems. . . . A "high-end" programmable controller system is typically sold to a dealer by the manufacturer for, on average, approximately twenty-five thousand dollars and may well extend into in excess of one-hundred thousand dollars."

This definition provides a clear test for determining whether a particular system sold to a customer is or is not a "high end" system, and conforms to the general usage of dealers in such systems. (*See* excerpt from the April 5, 2012 deposition of John L. Selby, Exhibit C hereto, at 21:7-16). Crestron's motion to compel discovery of Savant's latest Blueprint Express™ software is simply an attempt to obtain inside but non-relevant information on Savant's latest business strategy and should be denied.

Respectfully submitted,

SAVANT SYSTEMS, INC.
By Its Attorneys,

/s/ Martin J. O'Donnell
Thomas C. O'Konski
Martin J. O'Donnell
William J. Mostyn IV
Aaron S. Jacobs
CESARI and MCKENNA, LLP
88 Black Falcon Avenue
Boston, MA 02210
(617) 951-2500

**CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on August 1, 2012.

/s/ Martin J. O'Donnell

Case 1:10-cv-11622-EFH Document 82-1 Filed 08/02/12 Page 1 of 3

**EXHIBIT A**

Case 1:10-cv-11622-EFH Document 82-1 Filed 08/02/12 Page 2 of 3

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

SAVANT SYSTEMS, LLC.
Plaintiff,

v.

CRESTRON ELECTRONICS, INC.
Defendant.

Civil Action No. 10-cv-11622 EFH

**DECLARATION OF JAMES CARROLL IN SUPPORT OF MEMORANDUM IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO COMPEL PRODUCTION OF DOCUMENTS AND ANSWERS TO INTERROGATORIES**

I, James Carroll, declare as follows:

1. I am Vice President of plaintiff Savant Systems, LLC. and make this declaration of my own knowledge.

2. Savant was founded in 2005 to design, develop and market, through a nationwide network of dealers and integrators, automation and control products specifically for the high end residential market. A high end residential automation and control system typically costs the dealer approximately $25,000 or more in a manufacturer's control equipment.

3. Savant introduced its first home automation and control products into the market at the end of 2007, early 2008.

4. Savant acquired LiteTouch, Inc., a manufacturer of lighting control products, early this year, 2012.

5. Savant introduced its Blueprint Express™ software in the Spring of this year. Blueprint Express™ is an application developed by Savant that enables installers of home automation systems to quickly and easily create a specific program for controlling the various components of a particular installation without writing extensive lines of code. It is a streamlined version of its Blueprint™ software which Savant has marketed since 2008.

6. The Blueprint Express™ software is being made available to all dealers that have qualified to handle the installation of Savant products, as well as those that may qualify in the future. Savant "qualifies" a dealer in this context by, *inter alia,* satisfying itself that the dealer has sufficient staff with technical competence to properly install the products for which they are being qualified.

I declare under penalty of perjury that the foregoing is true and correct.

Dated this 2 day of August, 2012.

James Carroll

Case 1:10-cv-11622-EFH Document 82-2 Filed 08/02/12 Page 1 of 11

# EXHIBIT B

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| SAVANT SYSTEMS, LLC,<br><br>Plaintiff,<br><br>v.<br><br>CRESTRON ELECTRONICS, INC.,<br><br>Defendant.<br><br>CRESTRON ELECTRONICS, INC.<br><br>Counterclaim-Plaintiff,<br><br>v.<br><br>SAVANT SYSTEMS, LLC,<br><br>Counterclaim-Defendant. | Civil Action No.: 1:10-cv-11622 (EFH) |

**CRESTRON ELETRONICS, INC.'S SECOND SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS AND THINGS TO SAVANT SYSTEMS, LLC**

Defendant and Counterclaim Plaintiff Crestron Electronics, Inc., ("Crestron") by its undersigned counsel, in accordance with Federal Rule of Civil Procedure 34, hereby requests that Plaintiff and Counterclaim-Defendant Savant Systems, LLC ("Savant") respond to this Second Set of Requests for Production of Documents and Things and produce the documents described below for inspection and copying at the offices of Steptoe & Johnson LLP, 1330 Connecticut Ave. NW, Washington, DC 20036, or by other mutually agreeable means, within the time prescribed by the Federal Rules of Civil Procedure.

Case 1:10-cv-11622-EFH Document 82-2 Filed 08/02/12 Page 3 of 11

**DEFINITIONS**

1. "Communication" means the transmittal of information (in the form of facts, ideas, inquiries, or otherwise).

2. "Concerning" means referring to, describing, evidencing or constituting.

3. "Crestron" means Crestron Electronics, Inc.

4. "Dealer" means a business and its affiliates, agents, assignors, directors, officers, parents, partners, representatives and subsidiaries, both individually and collectively, which design, buy the component parts, configure, and/or install automation and control products and systems for homes, businesses and/or other institutions.

5. "Describe," "state" and "set forth" mean to indicate fully and unambiguously each relevant fact of which you have knowledge.

6. "Document" is defined to be synonymous in meaning and equal in scope to the usage of this term in Fed. R. Civ. P. 34(a). A draft or non-identical copy is a separate document within the meaning of this term.

7. "Plaintiff" and "defendant" as well as a party's full or abbreviated name or a pronoun referring to a party mean the party and, where applicable, its officers, directors, employees, partners, corporate parent, subsidiaries, or affiliates. This definition is not intended to impose a discovery obligation on any person who is not a party to the litigation.

Case 1:10-cv-11622-EFH Document 82-2 Filed 08/02/12 Page 4 of 11

8. The term "person" is defined as any natural person or any business, legal, or governmental entity or association.

9. "Relating to" and "regarding " are used in the broadest possible sense and mean, in whole or in part, addressing, analyzing, commenting, concerning, constituting, containing, in connection with, contradicting, controverting, corroborating, dealing, demonstrating, describing, disputing, discussing, embodying, evidencing, identifying, mentioning, pertaining, proving, rebutting, referring, reflecting, refuting, reporting, showing, stating or summarizing.

10. "You," "your," "Savant," and "Plaintiff," mean Savant Systems, LLC, its current and former affiliates, agents, attorneys, assignors, directors, officers, parents, partners, representatives, and subsidiaries, both individually and collectively.

## INSTRUCTIONS

1. In answering these Requests, furnish all documents, however obtained, including hearsay, that are available to Plaintiff, including documents in the actual or constructive possession of Plaintiff, their attorneys, investigators, experts, and anyone else acting on Plaintiff's behalf. In answering these requests, furnish all documents available to you or subject to your reasonable inquiry, access, or control, including, but not limited to, all documents available to your counsel in this case.

2. The documents produced in response to these document requests shall be produced in accordance with FED. R. CIV. P. 34(b)(2)(E).

3. If Plaintiff maintains that any document that is responsive to any request herein has been destroyed or is no longer subject to the control of the Plaintiff, then set forth the

Case 1:10-cv-11622-EFH Document 82-2 Filed 08/02/12 Page 5 of 11

contents of said document, the location of any copies of said document, state how and when the document was lost or destroyed, and, if destroyed, the reason for such destruction and the name of the person who ordered or authorized such destruction.

4. If you refuse to respond to a request on the grounds that it is unduly burdensome, overbroad, or oppressive, state:

a. The approximate number and nature of all documents and things needed to be served or reviewed in order to respond to the request;
b. The location of such documents and things that need to be searched; and
c. The cost and number of man hours required to conduct such a search or review.

5. If any privilege is claimed as a ground for not responding to a request, describe the basis for the claim of privilege and all information necessary for Defendants and the Court to assess the claim of privilege in accordance with FED. R. CIV. P. 26(b)(5).

6. Whenever necessary to bring within the scope of a request a response that might otherwise be construed to be outside its scope, the following constructions should be applied: (i) construing the terms "and" and "or" in the disjunctive or conjunctive, as necessary, to make the Interrogatory more inclusive; (ii) construing the singular form of any word to include the plural and the plural form to include the singular; (iii) construing the past tense of the verb to include the present tense and the present tense to include the past tense; and (iv) construing "include" to mean include or including "without limitation."

7. These requests are continuing in nature, up to and during the course of trial. Documents or data sought by these Requests that you obtain after you serve your answers must be produced to counsel for Defendant by supplemental answers or productions pursuant to FED. R. CIV. P. 26(E).

Case 1:10-cv-11622-EFH Document 82-2 Filed 08/02/12 Page 6 of 11

8. The relevant time period for these requests is from January 1, 2007, through the date of these requests, unless otherwise stated.

9. Plaintiff shall produce and make the documents and things available for inspection and/or copying within thirty (30) days of the date of service hereof, at the office of Steptoe & Johnson LLP, 1330 Connecticut Avenue, NW, Washington, DC 20036-1795, or such other place as may be mutually agreed upon by the parties.

## REQUESTS FOR PRODUCTION

66. All documents relating to Savant's acquisition of LiteTouch, Inc.

67. All documents relating to Savant's Blueprint Express.

68. All documents used to prepare the spreadsheet attached as Exhibit B to Savant's Response to Crestron's First Set of Interrogatories.

69. All documents relating to any agreements between Savant and any contract manufacturer.

70. All documents relating to efforts by Savant to engage the services of any contract manufacturer.

71. All documents relating to communications and documents exchanged between Savant, specifically including, but not limited to its attorneys, and any of the following individuals listed in Savant's Response to Interrogatory No. 5 of Crestron's First Set of Interrogatories:

a. Jay Bakaler

b. Jason Beatty

c. Otto Benson

d. Paul Bernard

e. Greg Bilotta

f. Jared Blackford

g. Steven Carroll

h. John Clancy

i. Eric Davidson

j. Mark Goldman

Case 1:10-cv-11622-EFH Document 82-2 Filed 08/02/12 Page 8 of 11

k. Jason Gotz

l. Robert Gullo

m. Jason Jobe

n. Ron Jobe

o. Steve Koss

p. Tim Koziarski

q. Jonathan Lane

r. Joel Maxwell

s. Arthur Mayo

t. Brian Mires

u. Brian Moffett

v. Robert Owens

w. Corey Reistad

x. Sean Riordan

y. Eric Schmidt

z. John Selby

aa. Rick Smith

bb. Craig Stulce

cc. Jon Summer

dd. Michael Thul

ee. Steve Vickers

ff. Chad Weuve

gg. Michael Wohl

72. All audio or video recordings taken during or relating to any Savant Dealer Conference.

73. All agreements with Home Theater Specialists of America.

74. All documents that relate to, reflect, or set forth the "requirements" that must be completed by a dealer "before being classified as an authorized Savant dealer," as referenced in Savant's Response to Crestron's Interrogatory No. 7.

75. All documents that relate to, reflect, or set forth how, as referenced in Savant's Response to Crestron's Interrogatory No. 6, Exhibits E-K of the Amended Complaint were "provided to" Savant by "Jonathan Lane, SoCal Smart Home; Arthur Mayo, AVE Solutions d/b/a S3; and Henry Lua, Audiogene.com.br."

76. All documents relating to the acquisition of Exhibits E-K of the Amended Complaint by Savant from any other source aside from the individuals referenced in Savant's Response to Crestron's Interrogatory No. 6.

77. All documents relating to the limiting by Savant of the number of Savant dealers in geographical areas within the United States.

78. All video or audio recordings of Crestron employees.

79. All video or audio recordings of Savant employees that mention Crestron.

80. All documents referring to Crestron as a "legacy control system" or Crestron products as "legacy control products."

81. All documents relating to any challenges, obstacles, or problems faced by Savant relating to the marketing and sales of Savant products.

82. All documents provided to or received from Strategy Analytics Inc.

Respectfully submitted,

CRESTRON ELECTRONICS, INC.

By its attorneys,

Michael J. Pineault (BBO #555314)
CLEMENTS & PINEAULT, LLP
24 Federal Street
Boston, MA 02110
Tel.: 857.445.0135
Fax: 857.366.5404
mpineault@clementspineault.com

Chong S. Park (admitted *pro hac vice*)
John J. Kavanagh (admitted *pro hac vice*)
Steptoe & Johnson LLP
1330 Connecticut Avenue, NW
Washington, DC 20036-1795
Tel.: 202.429.3000
Fax: 202.429.3902
cpark@steptoe.com
jkavanagh@steptoe.com

Dated: May 1, 2012

**CERTIFICATE OF SERVICE**

I hereby certify that Creston Electronics, Inc.'s Second Set of Requests for Production of Documents and Things to Savant Systems, LLC was served on this 1st day of May 2012 by hand on:

Thomas C. O'Konski
Martin J. O'Donnell
William J. Mostyn IV
CESARI and MCKENNA, LLP
88 Black Falcon Avenue
Boston, MA 02210
Counsel for Savant Systems, LLC

Case 1:10-cv-11622-EFH Document 82-3 Filed 08/02/12 Page 1 of 7

# EXHIBIT C

1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

CA No. 10-cv-11622-EFH

SAVANT SYSTEMS, LLC,
Plaintiff,
vs.
CRESTRON ELECTRONICS, INC.,
Defendant.

CRESTRON ELECTRONICS, INC.
Counterclaim-Plaintiff,

vs.

SAVANT SYSTEMS, LLC,
Counterclaim-Defendant.

VIDEOTAPE DEPOSITION OF
JOHN L. SELBY

April 5, 2012
9:20 a.m.

Cesari and McKenna, LLP
88 Black Falcon Avenue
Boston, Massachusetts

Cindy Falcon, CSR

2

APPEARANCES:
On Behalf of Savant Systems, LLC:
MARTIN J. O'DONNELL, ESQUIRE
Cesari and McKenna, LLP
88 Black Falcon Avenue
Boston, Massachusetts 02210
617.951.2500
mod@c-m.com
On Behalf of Crestron Electronics, Inc.:
JOHN J. KAVANAGH, III, ESQUIRE
Steptoe & Johnson, LLP
1330 Connecticut Avenue, NW
Washington, DC 20036
202.429.6256
jkavanagh@steptoe.com
ALSO PRESENT:
Jason Lachapelle, Videographer

3

INDEX


| WITNESS | EXAMINATION |
|---|---|
| JOHN L. SELBY | |
| (By Mr. O'Donnell) | 5 |
| (By Mr. Kavanagh) | 47 |
| (By Mr. O'Donnell) | 112 |
| (By Mr. Kavanagh) | 114 |


EXHIBITS


| No. | | Page |
|---|---|---|
| 1 | Bates Nos. 0000001-0000144 | 22 |
| 2 | Google Map | 102 |


STIPULATIONS

It is stipulated and agreed by and between counsel for the respective parties that the witness will read and sign the depostion, but the sealing, filing, and certification thereof are waived.

It is further stipulated that all objections, except as to form of the question, and motions to strike will be reserved until the time of trial

THE VIDEOGRAPHER: Here begins Videotape No. 1 in the deposition of John L. Selby in the matter of Savant Systems, LLC, versus Crestron Electronics, Inc. being heard before the United States District Court for the District of Massachusetts, Case No. 10-cv-11622-EFH. This deposition is being held at 88 Black Falcon Avenue, Suite 271, Boston, Massachusetts, on April 5, 2012 at 9:21 AM.

My name is Jason Lachapelle. I'm the legal videographer. The court reporter today is Cindy Falcon. Counsel, will you please voice identify yourselves and state whom you represent.

MR. O'DONNELL: Martin O'Donnell for Savant Systems, LLC.

MR. KAVANAGH: John Kavanagh, Steptoe & Johnson, Washington, DC, for Crestron Electronics.

JOHN L. SELBY, having been satisfactorily identified by the production of his driver's license, and duly sworn by the notary public, testified as follows:

EXAMINATION BY MR. O'DONNELL:

Q. Would you please state your name for the record?
A. John Selby.
Q. And where do you reside? Not your home address, but just city and state.
A. Cape Girardeau, Missouri.
Q. Are you presently employed?
A. Yes.
Q. What is your occupation?
A. I'm the owner of Stereo One, Incorporated.
Q. What is the business of Stereo One, Incorporated?
A. We are in consumer electronics, mobile, audio, home entertainment and custom home integration.
Q. How long have you, has Stereo One been in that business?



A. This will be our 32nd year.
Q. And what is your position at Stereo One?
A. I'm the owner and general manager.
Q. When was -- were you involved in the founding of Stereo One?
A. Yes.
Q. Are you appearing here in response to a subpoena for deposition?
A. Yes.
Q. Can you briefly describe your educational background?
A. I went to high school ** at Ruskin High School in Kansas City, bachelor of science degree from Central Missouri State University, and that was it.
Q. In what field was your BS degree?
A. Industrial arts.
Q. And could you briefly describe your work experience subsequent to that?
A. I got out of college, worked for an architect, I was an architect in training for a year. The economy went sour, I got laid off. I needed a paycheck. I went to work for an appliance TV store in Kansas City. I was offered a job a year later in Cape Girardeau, Missouri. I moved my family there and



worked for another gentleman for six years until 1980, and then I formed my own company and I've worked there ever since.
Q. Have you ever previously had your deposition taken?
A. I don't recall if I have. It seems like I might have at one point in the past, but I can't remember the situation.
Q. Your business includes home automation custom integration?
A. Yes.
Q. What is home automation custom integration? What are they?
A. Okay. Well, within the home, we are talking basically residential systems, we have what's called subsystems. Examples of that would be security, lighting, whole house music, video, and other systems.
And what integration does is basically ties those things together so that one system which is easy for the consumer to use can operate those systems. Automation is where we have prompts or vents. Some are automated where those systems will perform certain tasks without the customer having to interface with them. It's done automatically.

Q. What companies have you represented in connection with your work in home automation and custom integration?
A. We were AMX, PHAST, P-H-A-S-T, which is kind of entry level AMX systems, Olan, Control4, and Crestron.
Q. How long have you been handling Crestron products?
A. About ten years.
Q. What products do you handle for Crestron?
A. We're pretty much a full line dealer for them, so control systems, interfaces, which is touch panels, lighting control, amplifiers, thermostats, music servers. I think that's about it.
Q. And you're still a Crestron dealer today?
A. Yes.
Q. Have you had any dealings with Savant Systems?
A. Yes.
Q. And what was the nature of your dealings?
A. We became highly interested in a product in September of 2007 after seeing it at CEDIA, which is our industry trade show, started communication at that point with Savant. They were not ready to put on

Case 1:10-cv-11622-EFH Document 82-3 Filed 08/02/12 Page 4 of 7





dealers in our area at that time, and the communication continued until a year later when we actually met with them at CEDIA and became a dealer shortly thereafter.
Q. When does CEDIA take place, the trade show?
A. It's generally the first or second week in September.
Q. So somewhere in September of 2008?
A. Yes.
Q. You became more directly involved with Savant?
A. Mm-hmm.
Q. What were your dealings with Savant at that point?
A. Well, we went to training. I since followed up and sent some other people to training. We brought our demo system in, I think it was January.
Q. January of what year?
A. That would have been 2009.
Q. Okay.
A. I put it in my secret room upstairs, spent about three or four months, what I call banging around on it, see if it would actually work and what made it break. And after several months of experimenting, we



felt that the product was ready for the market.
Q. Now, why do you call it a secret room?
A. We felt like Savant offered a very strong competitive advantage in the market for us and thought we could have a pretty good run with it among the Apple loyal, of which there are a few of those people out there.
I networked with clients. It was fresh, different, and we felt it would offer a lot of prestige, a lot of competitive advantage to our store. So that was our, basically our interest in Savant at that time.
Another thing that was important was I go back to 1978 with my experience with Apple. I sold Apple computers, in fact, the first ones on the market, I actually ended up taking home the demo, original demo we have, I still have it. It's in my basement. I have everything that Apple ever made. I'm very passionate about it. I know customers are very passionate about it.
I went through the training and I felt I could personally drive this to issue myself and everything from the marketing to sales to exit actual programming of the product. So it was a very



important initiative for us and one that I felt that I personally I was going to drive to successful outcome.
Q. And what happened?
MR. KAVANAGH: Objection to form.
Q. You may answer.
A. Okay. What happened?
Q. Yes.
MR. KAVANAGH: Objection to form.
Q. Did you in fact proceed with Savant?
MR. KAVANAGH: Objection to form.
A. No, I did not.
Q. Any reason why?

REDACTED



REDACTED

I asked for a little help from HTSA. That stands for Home Technology Specialists of America. We're part of a group of about 60 dealers, and Savant had just, Crestron had just pulled out of that group, Savant had just got involved with the group, and asked for some group support and basically got nothing. There was no one there that either wanted to take on that initiative or knew what to do.
So my Savant rep was asking me about some projects that were leads that he had and whether or

Case 1:10-cv-11622-EFH Document 82-3 Filed 08/02/12 Page 5 of 7





not we could deal with them, and I said: No, we can't. He asked several times over I would say a five- or six-week period, and I finally had to tell him that I don't have a solution, so you're probably going to put on another dealer, which they did, and those leads were given to the other dealer in the market.
Q. Who was that other dealer?
A. It was HD Media Systems, and was kind enough to keep us on as a dealer. Our interest was a lot less at that point. We felt like we had lost a competitive advantage in the market. We continued to support Crestron with new projects and supporting the existing customers, and that's the way the status is today with us. So Savant is basically off the radar, and Crestron is the line that we're supporting today.
Q. What were the consequences to you of Crestron's actions?
MR. KAVANAGH: Objection to form.
MR. O'DONNELL: What's the problem with the form?
MR. KAVANAGH: It's vague and ambiguous.
Q. What are the consequences, what were the consequences to you of Crestron's decision with



respect to Savant?
MR. KAVANAGH: Objection to form.
A. Well, we're fairly certain with a pretty high degree of certainty that we lost at least one very important project. We lost a competitive advantage. It was pretty demotivating for me. We had an investment in training, we had an investment in a demo system, so we felt like there was a reasonable amount of revenue that we would have done with Savant above and beyond what we normally would have done had we had a head start and we would have had a green light to sell it.

REDACTED



REDACTED
Q. Did you ever learn of the reason for Crestron's change in position?
MR. KAVANAGH: Objection to form.
A. Only from the word on the street.
Q. And what did you learn from the word on the street?
A. A Canadian company had sued them for antitrust.

REDACTED

Q. Now, during this three-month period, you say you lost at least one very important project?
A. Mm-hmm.
Q. What project was that?
A. The customer was Shannon Davis. He owned the chain of O'Donnell stores, he was an avid Apple user, ran his business on his iPod, remote locations. But apparently this customer actually had a project



committed to the Crestron dealer and learned about Savant and immediately pursued the Savant dealer and gave that dealer the business.
Q. The customer?
A. Yes.
Q. Initiated the switch over to Savant?
A. Yes.
Q. Did you learn of any reason why the customer initiated the switch over?
A. Because he's a very passionate Apple user.
Q. What was your interest in the Savant?
MR. KAVANAGH: Objection to form.
A. My interest was that I really felt like it was a group of customers who were, would not necessarily be typical home automation customers, who would be interested in what Savant products could do for them, so I felt it was a loss of business.
I felt that product had some prestige and some uniqueness to it that we didn't currently have. It had some exclusivity that we didn't currently have. And it was a product that I could personally control pretty much any aspect of it from start to finish. So I felt like the quality of that initiative could be maintained at a pretty high level, so that

17

was my interest in Savant.
Q. Now, you say also that you felt that there might be a conflict --
A. Mm-hmm.
Q. -- with handling the Crestron product that you had with the Savant product?
A. Mm-hmm.
Q. Why would that be? What did you view as the conflict?
A. Well, I didn't see it as a conflict myself as much as I felt that Crestron would probably view it as a conflict. But I felt like out of respect for our rep that we should have that discussion, and it's not typical that when dealers make a line addition of another vendor they really put other vendors on notice that they're doing it. I just felt that it was the right thing do. So I certainly didn't want to have my rep find out from another person that we had another control line in there. So that's why I talked to him about it.
Q. Now, you mentioned testing the Savant system in your secret room.
A. Mm-hmm.
Q. Why a secret room for that?

18

A. I felt like part of my strategy was to catch our competitors completely off guard and have this thing out there very aggressively marketed before they would have a chance to respond to what's going on in the market. So that's why it was secret.
Q. Were you trying to conceal it from Crestron?
A. I was trying to conceal it from everybody because I didn't want my competitors to find out, so I kept it pretty close. There was myself, my wife, I think two other employees who knew what was going on with this system, so that's how important the initiative was for me at that time.
Q. At this point in time, did you have more than one place of business for your company, Stereo One?
A. No, we just have one at present.
Q. Did you at some point in time add any other places of business?
A. Yes.
Q. And what was the reason for that?
A. Well, I had a growth initiative that was part of a long-term strategy for us that we would open some locations and then turn them in a certain amount of time and create an annuity with those to where my last ten years or so in the market would be based on

19

quality and not quantity. I would have sufficient revenue coming where I wouldn't have to be concerned about payroll and have to compromise any part of the business in terms of what we could deliver to our customers.
So we sold our Springfield store in January of 2010. That store was closed a year after I had planned to close it because we had a major Crestron project that was running a little bit past the completion date. It wasn't us, it was the general contractor that was slowing things down.
Q. When you say major contract or major project, could you quantify that in terms of dollars?

REDACTED

Q. Had you been able to handle Savant, could that project have been satisfied with Savant equipment?
MR. KAVANAGH: Objection to form.
A. No.
Q. Why not?
A. The time line where that project started was about three years before completion date, so this

20

would have been seven, I'm guessing is when we actually got the commitment to do that project. So this would have been -- there would have been no chance to put Savant in there, nor would there really have been any motivation for us to do that.
Q. Savant wasn't in the market?
A. It wasn't on the market at the time, and if there was, there wouldn't have been any motivation to do that.
Q. Subsequently were there any projects that you handled using Crestron projects that could have been handled using Savant products?
A. None that I'm aware of. I mean, when I say could have probably, we would have been motivated to change those to Savant, no.
Q. So there were projects that you could have changed to Savant and sold Savant equipment had you not been prohibited?
MR. KAVANAGH: Objection to form.
A. Yes.
Q. Who are Savant's competitors that you're aware of?
A. There's only two that I know of right now. It would be Crestron and AMX that really fill the,

quote, unquote, high-end niche in the market, and Crestron is very strong in residential, but also very strong in commercial too, but very strong in residential. I think they dominate the high end of that market. AMX is also another high-end company that leans more toward commercial than residential.
Q. You mentioned the word high end. How do you define the high end say in dollar terms?
A. I'd say $50,000 for the control system, including the programming.
Q. Is that the price the installer pays, the retailer pays, or the price the consumer pays?
A. That would be the price the consumer pays.
Q. So the price to the installer would be what roughly, in the --
A. Roughly half that.
MR. O'DONNELL: Okay. I'll ask the reporter to mark as Deposition Exhibit 1 a series of documents bearing production numbers Stereo One 0000001 through 0000144.
MR. KAVANAGH: Are you going to discuss every single one of these pages? Because these are discrete documents in here.
MR. O'DONNELL: Yes.



MR. KAVANAGH: So you're introducing every single -- it's basically the entire document production.
MR. O'DONNELL: It's a single exhibit. The single exhibit consists of 143 pages, 144 pages.
MR. KAVANAGH: But you would agree --
MR. O'DONNELL: Do you have some problem with that?
MR. KAVANAGH: I don't know that that's proper.
MR. O'DONNELL: Why?
MR. KAVANAGH: I guess you could introduce a box of documents and call that one exhibit.
MR. O'DONNELL: Mm-hmm.
(Exhibit No. 1 marked for identification.)
Q. Mr. Selby, could you take a look at Exhibit 1 and see if you can identify the documents that comprise that exhibit?
A. Sure. These are documents that were requested that I produce by Savant Systems.
Q. And is that the complete document set that you produced to the best of your knowledge and belief?
A. Yes, to the best of my knowledge, mm-hmm.
Q. I direct your attention to Page 3, 0000003.



A. Okay.
Q. Could you please explain what is set forth there?
A. This is an outline that I had delivered that basically is a directory of what documents answered the specific questions that were requested by Savant.

REDACTED



REDACTED

# EXHIBIT 514

Case 1:10-cv-11622-EFH Document 107 Filed 09/20/12 Page 1 of 4

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| SAVANT SYSTEMS, LLC<br>Plaintiff, | ) |
| v. | ) |
| CRESTRON ELECTRONICS, INC.<br>Defendant | ) Civil Action No. 10-cv-11622-EFH |
| CRESTRON ELECTRONICS, INC.<br>Counterclaim-Plaintiff, | ) |
| v. | ) |
| SAVANT SYSTEMS, LLC<br>Counterclaim-Defendant | ) |

**DECLARATION OF MICHAEL SILVA IN SUPPORT OF PLAINTIFF'S MOTION TO COMPEL PRODUCTION OF DOCUMENTS IN RESPONSE TO REQUEST FOR PRODUCTON AND ANSWERS TO INTERROGATORIES**

I, Michael Silva, declare as follows:

1. I am the Chief Technology Officer of Savant Systems, LLC ("Savant") and have worked for Savant since June 2005.

2. I am informed and believe that, sometime in the Spring of 2010, Crestron Electronics, Inc. ("Crestron") published a number of Comparison Guides and Sales Guides purporting to compare features of Crestron's products to features of Savant products, and that copies of these Comparison Guide and Sales Guides are attached as Exhibits E, F, G, H, I and K to Savant's Amended Complaint against Crestron in the above-captioned action.

3. I have reviewed these Comparison Guides and Sales Guides and can state that each of them contains representations regarding Savant or its products that are false or misleading.

4. Take, by way of example, the Crestron Sales Guide titled "Total Home Control – Crestron vs. Savant", which is Ex. I to Savant's Amended Complaint and a copy of which is attached hereto as Ex. 1. I identify below some, but not all, of the false or misleading representations regarding Savant and/or its products contained in the Sales Guide of Ex. 1.

5. The second paragraph of the Sales Guide of Ex. 1 states that "[w]hen you buy Savant, you buy Savant – a one room storefront in Cape Cod – not Apple." This was false when made back in the Spring of 2010 and is false today. Back in the Spring of 2010, Savant had facilities at 770 Main Street and 32 Wianno Avenue in Osterville, MA and 45 Perseverance Way in Hyannis MA. These locations together represented more than 35,000 square feet of space. Savant also had a 3,000 square foot Experience Center in New York City which was expanded to 8,000 square feet in June 2010. Currently, Savant has the 8,000 square foot Experience Center in New York City and has consolidated to a 40,000 sq. ft. facility at 45 Perseverance Way in Hyannis MA. Savant's products are manufactured at a separate contract manufacturing facility in Londonderry, NH.

6. Under the heading "Apple® Features" in Ex. 1, there is a bullet in the column labeled "Crestron" but no bullet in the column labeled "Savant" for the row entry labeled "System Control from any Mac®, iPhone or iPod Touch Worldwide", representing that Savant products do not have that capability. This is false. Savant products back in the Spring of 2010

Case 1:10-cv-11622-EFH Document 107 Filed 09/20/12 Page 3 of 4

supported, and currently support, remote system access and control from any Mac®, iPhone or iPod Touch worldwide via Apple's "Back to my Mac" feature and other methods.

7. Under the heading "Apple® Features" in Ex. 1, the row entry labeled "Apple TV® Control on Touchpanel" represents that Savant products lack that feature. This is false. Savant products back in the Spring of 2010 supported, and currently support, the Digital Audio Access Protocol ("DAAP"), a protocol developed by Apple, Inc. to allow devices such as the iPad to query media content and control media playback in many Apple products like AppleTV and iTunes.

8. Under the heading "User Interface Features" in Ex. 1, the row entry labeled "HD Touchpanels" suggests that Savant does not offer HD touchpanels or equivalent products. This is false. Since the Spring of 2010, Savant has offered TouchTVs which are HD touchpanels and much more in terms of their functionality. With a Savant TouchTV, one can overlay controls like buttons, sliders, and the like on top of live video . This is more than just putting video content in a small window with control graphics surrounding it, as with a conventional HD touchpanel.

9. Under the heading "User Interface Features", the row entry labeled "Touchpanel with Integrated Graphics Engine" represents that the Savant equivalent product "requires Mac Mini for each touchpanel." This is false. Savant's iPad docks do not, and never did, require a Mac Mini.

10. Under the heading "AV Distribution Features", the row entry labeled "HDMI w/ HDCP Video Distribution" represents that Savant products do not support this feature. This is false. Savant's products have supported HDMI with HDCP video distribution since at least the Spring of 2010.

Case 1:10-cv-11622-EFH Document 107 Filed 09/20/12 Page 4 of 4

11. Under the heading "Home Automation Features", the row entry labeled "Security System Native Integration" suggests that Savant's products do not support such a security feature. This is false. Savant's products since at least the Spring of 2010 have supported IP-based security.

12. Under the heading "Home Automation Features", the row entry labeled "Completely Customizable Touchpanel User Interfaces" suggests that Savant's user interfaces are not completely customizable. This is false. Complete ground-up customization is possible with Savant's user interface products using applications such as photoshop, themes and Quartz Elements.

I declare under penalty of perjury that the foregoing is true and correct.

Dated this 12th day of September, 2012, in Hyannis, Massachusetts.

Michael Silva

EXHIBIT 515

Case 1:10-cv-11622-EFH Document 149 Filed 11/02/12 Page 1 of 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

SAVANT SYSTEMS, LLC
Plaintiff,
v.

CRESTRON ELECTRONICS, INC.
Defendant

CRESTRON ELECTRONICS, INC.
Counterclaim-Plaintiff,
v.

SAVANT SYSTEMS, LLC
Counterclaim-Defendant

Civil Action No. 10-cv-11622-EFH

**FILED UNDER SEAL**
Electronic Order
Leave to File granted
November 1, 2012
Judge Edward F. Harrington

**FILED UNDER SEAL**

**SAVANT'S REPLY TO CRESTRON'S OPPOSITION TO SAVANT'S MOTION FOR AN ORDER FURTHER EXPANDING THE DISCOVERY EVENT LIMITATIONS FOR THE CASE**

**NOVEMBER 2, 2012**

Respectfully submitted,

SAVANT SYSTEMS, INC.
By Its Attorneys,

/s/ Thomas C. O'Konski
Thomas C. O'Konski BBO# 378265
Martin J. O'Donnell BBO# 377475
Michael E. Attaya BBO#548297
Aaron S. Jacobs BBO# 677545
William J. Mostyn IV BBO# 678869
CESARI and MCKENNA, LLP
88 Black Falcon Avenue
Boston, MA 02210
(617) 951-2500
TOK@c-m.com

## TABLE OF CONTENTS


I. INTRODUCTION ..... 1

II. THERE IS NO BASIS TO LIMIT THE DISCOVERY REQUESTED BY SAVANT UNDER RULE 26(B)(2)(C) ..... 2

A. The Discovery Sought Is Not Unreasonably Cumulative or Duplicative ..... 2

B. Savant Has Not Had a Reasonable Opportunity to Obtain the Requested Discovery in this Action ..... 3

C. The Burden or Expense of the Proposed Discovery Does Not Outweigh its Likely Benefit ..... 4

D. Crestron's Arguments Regarding Savant's Contacting and/or Representation of Third Parties are Specious ..... 15

III. CONCLUSION ..... 17


## TABLE OF AUTHORITIES

**Rules**


Fed. R. Civ. P. 12(b)(6) ..... 1
Fed. R. Civ. P. 26(b)(2)(C) ..... 2
Fed. R. Civ. P. 26(f) ..... 1
Local Rule 26.1(c) ..... 1

## I. INTRODUCTION

It comes as no surprise that Defendant, Crestron Electronics, Inc. ("Crestron"), opposes Plaintiff, Savant Systems, LLC's ("Savant"), Motion for on Order Further Expanding the Discovery Event Limitations for the Case ("Savant's Motion").

Since this action commenced, Crestron has done everything in its power to prevent Savant from developing evidence to support its claims. First, Crestron sought to dismiss Savant's original Complaint pursuant to Rule 12(b) (6).[1] *See* Dkt. No. 10. Then, Crestron sought to dismiss Savant's Amended Complaint pursuant to Rule 12(b) (6). *See* Dkt. No. 18. Both efforts were unsuccessful, at least in substance. *See* Order (May 19, 2011) (Dkt. No. 33) ("Defendant's Motion to Dismiss Plaintiff's Amended Complaint is denied. Defendant submits several arguments contesting the sufficiency of the allegations. These arguments are without merit.") But in practical terms, they effectively delayed discovery for nearly one year. Thereafter, in the Amended Joint Conference Report Pursuant to Rule 26(f), filed on September 9, 2011, Crestron argued that the discovery event limitations of Local Rule 26.1(c) should apply to this case. *See* Joint Conference Report (Dkt. No. 59). The Court recognized the absurdity of Crestron's argument, given the complex and fact-sensitive nature of the claims and counterclaims pled in the case, not to mention just how dispersed among third-parties the relevant facts are. In particular, the Court, on November 17, 2011, entered a Scheduling Order allowing Savant, in a *first* phase of discovery, half of the discovery events that Savant requested in the Joint Conference Report. *See* Scheduling Order (Dkt. No. 68). The Court also expressly noted in its Scheduling Order that it would "decide whether it is necessary for a *second* phase of discovery at the close of the first phase of discovery." *Id.* (emphasis added). Savant's Motion simply asks that it now be afforded the discovery that it requested in the Joint Conference Report, plus an additional ten depositions,

[1] Unless otherwise noted, all references herein to "Rule" are to the Federal Rules of Civil Procedure.

for a total of sixty, and an additional three sets of requests to produce, for a total of eight. The Declaration of Thomas C. O'Konski, filed in support of Savant's Motion, sets forth Savant's best estimate as to the number of additional depositions that Savant will need to notice and take, and specifies the particular categories of deponents involved in the total. *See* O'Konski Decl. (Dkt. No. 117) ¶¶ 4-5. Crestron does not challenge Savant's need for the additional discovery, only whether the discovery is likely to benefit Savant's case, given past depositions. As shown below, there is good cause for Savant's request and no good basis upon which to deny it.

## II. THERE IS NO BASIS TO LIMIT THE DISCOVERY REQUESTED BY SAVANT UNDER RULE 26(B)(2)(C)

Rule 26(b) (2) (C) provides, in pertinent part, that

> the Court must limit . . . discovery . . . if it determines that:
>
> (i) the discovery sought is unreasonably cumulative or duplicative . . . ;
>
> (ii) the party seeking the discovery has had ample opportunity to obtain the information by discovery in the action; or
>
> (iii) the burden or expense of the proposed discovery outweighs its likely benefit, considering the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the action, and the importance of the discovery in resolving the issues.

Rule 26(b) (2) (C). None of these factors applies in this instance.

### A. The Discovery Sought Is Not Unreasonably Cumulative or Duplicative

Of the thirty-five additional depositions requested by Savant for this case, Savant anticipates that fifteen will be of dealers who have not been previously deposed and another fifteen will be of current or former Crestron employees also not yet deposed. *See* Memorandum in Support of Plaintiff's Motion at 9 (Dkt. No. 116). Regarding the additional dealer depositions, Crestron has identified in an interrogatory response more than *three-thousand* residential dealers across the country authorized to resell automation and control products manufactured by Crestron. *See* O'Konski Reply Decl. Ex. B at 6 (referencing a 251-page document produced by Crestron

listing more than three-thousand residential dealers). Even with fifteen additional dealer depositions, on top of the thirteen taken at the time that Savant's Motion was filed, Savant will have deposed less than one percent (1%) of the total number of residential dealers authorized to resell Crestron products. This is an eminently reasonable and modest request given the total number of Crestron dealers involved and just how dispersed the facts to be uncovered are.

Regarding the fifteen current or former Crestron employees, at the start of fact discovery, Crestron identified nearly twice as many Crestron custodians—twenty-nine in all—whose computer hard drives and central computer server profiles were to be imaged and searched for search terms. Deposing fifteen, or about half of them, is again an eminently reasonable and modest request.

**B. Savant Has Not Had a Reasonable Opportunity to Obtain the Requested Discovery in this Action**

There is no basis to conclude that Savant could have taken any of the thirty-five additional depositions that it requested prior to the time it filed its Motion. In its November 17, 2011, Scheduling Order, the Court allowed only twenty-five depositions, subject to thereafter granting a subsequent *second* phase of discovery. When Savant filed its Motion, it had taken a total of fifteen depositions, leaving only ten additional depositions available. The time was thus ripe for Savant to request permission to take a total of forty-five additional depositions (*i.e.*, the ten remaining, plus the thirty-five requested) to avoid exhausting its total allotment before addressing all issues in the case.

The depositions to be taken of the fifteen current or former Crestron employees also could not have been taken sooner. To say the least, Crestron has been slow in producing documents responsive to Savant's requests for production in this case, and is in fact still withholding responsive documents from Savant at this late stage. *See generally* Plaintiff Savant Systems,

LLC's Memorandum in Support of its Motion to Compel Production of Documents in Response to Savant's First and Second Set of Requests for Production of Documents to Defendant Crestron Electronics, Inc. (Dkt. No. 133). It makes no sense to schedule and take the depositions of Crestron's personnel until such time as Crestron has produced all or substantially all documents in response to the requests.

**C. The Burden or Expense of the Proposed Discovery Does Not Outweigh its Likely Benefit**

Crestron argues that the depositions that Savant has taken to date have provided little benefit to Savant in support of its argument that it has lost sales, or has otherwise been harmed, as a result of Crestron's threats to terminate any of its dealers who choose to carry Savant. That is simply not true. Consider, for example, the following testimony regarding lost sales that was elicited from the dealers in recent depositions:

Q. How long have you been handling Crestron products?

A. About ten years.

* * *

Q. And you're still a Crestron dealer today?

A. Yes.

Q. Have you had any dealings with Savant Systems?

A. Yes.

Q. And what was the nature of your dealings?

A. We became highly interested in a product in September of 2007 after seeing it at CEDIA, which is our industry trade show, started communication at that point with Savant. They were not ready to put on dealers in our area at that time, and the communication continued until a year later when we actually met with them at CEDIA and became a dealer shortly thereafter.

* * *

Q. What were your dealings with Savant at that point?

A. Well, we went to training. I since followed up and sent some other people to training. We brought our demo system in, I think it was January.

Q. January of what year?

A. That would have been 2009.

Q. Okay.

A. I put it in my secret room upstairs, spent about three or four months, what I call banging around on it, see if it would actually work and what made it break. And after several months of experimenting, we felt that the product was ready for the market.

* * *

Q. *Did you in fact proceed with Savant?*

A. *No, I did not.*

Q. *Any reason why?*

A. *I had a meeting with my Crestron rep, Craig Gulley, in June.*

Q. June?

A. June 2009.

Q. June 2009.

A. Because I felt it was correct to inform another vendor partner that we had an agenda that could potentially be a conflict to them. *I was told at that time that if the product went to display within 24 hours I would not be a Crestron dealer.* This was at a time that was extremely vulnerable for us. We had a million dollar project that was incomplete that was a Crestron control system. We had a couple of other high value projects that were not complete. So we basically couldn't take on Savant for that purpose. *The rep followed up the next day, made a phone call. He said: I've talked to Randy Klein. I just want to make sure you're aware that I checked or double-checked, and that is in fact our position. So when your first product goes on display, 24 hours later you won't be a Crestron dealer.* I asked questions like support, warranty, completing projects, and the answer to that was no, could not get product. So we put the initiative on hold.

* * *

Q. What are the consequences, what were the consequences to you of Crestron's decision with respect to Savant?

A. Well, *we're fairly certain with a pretty high degree of certainty that we lost at least one very important project*. We lost a competitive advantage. It was pretty demotivating for me. We had an investment in training, we had an investment in a demo system, so we felt like *there was a reasonable amount of revenue that we would have done with Savant above and beyond what we normally would have done had we had a head start and we would have had a green light to sell it.*

O'Konski Reply Decl. Ex. C (Tr. of Deposition of John L. Selby) at 8:7-14:12 (emphasis added).

Q. Okay. Now, when you started your company, SoCal Smart Homes, you started with Control4 systems?

A. Uh-huh.

Q. At some point in time did you take on other systems?

A. Yeah, we -- as they -- I think as the economy began to change, we realized that we had to kind of step up to the next level and start to look at more of the upper tier of products, but, again -- and when I heard about Savant being -- kind of blazing the trail in that they had the reliability of Crestron, but the ease of programming, and that it was Macintosh-based, it looked like an exciting proposition.

* * *

So I started investigating Savant and worked with the Crestron rep -- a gentleman by the name of Sean Manzanares, at the time was a regional manager -- to become a Savant dealer. And so we were accepted into -- and this was in year 2 of Savant's existence to become -- and we became a Savant dealer.

* * *

About that time I had acquired a client who had a very large property -- actually, we had done their beach house with a Control4 system and then they were just finishing construction on a 15,000-square-foot house up in Montecito, California, which is by Santa Barbara, and they wanted – they specifically said they wanted Crestron and we were not a Crestron dealer at the time.

* * *

I called Crestron up and said, you know – I went through a series of messages. Eventually the rep gets back to you. And I said, well, I have got a client that wants to be -- wants the Crestron system, and it was a substantial sale. It wasn't just a $50,000 sale. It ended up being about a $350,000 sale, so it was a considerable thing. And whereas I wasn't looking to take on the Crestron line, I wasn't going to lose this opportunity for a good sale and to build a good client.

* * *

> And we were all set to become a dealer and then I believe it was actually a meeting at a Starbucks, the local rep for Crestron, his name was Brian Nachum, who is no longer with Crestron, he has moved on, said that he is all set to approve me – he would be all set to approve me as a dealer, but, you know, *Crestron was not happy with the competition of Savant and in order for me to become a Crestron dealer I had to resign my Savant dealership, that there would be no way that he would approve me as a Crestron dealer also being a Savant dealer*.
>
> * * *
>
> Q. And the reason for your resignation was you wanted to do that job for the client?
>
> A. For the client who wanted Crestron. *I did not want to resign my Savant dealership. I wanted to keep both control systems, but it was -- I couldn't* -- again, as a new business, you know, you are struggling to always acquire new clients and when a client says, "I want Crestron," and it's several hundred thousand dollars, you go get Crestron, but I did not want to resign Savant at the time.
>
> * * *
>
> *It was Crestron's insistence that – it actually wasn't insistence. It was an ultimatum. If you want to become a Crestron dealer resign Savant, period.* There was no way that they were going to accept me being a Savant dealer and a Crestron dealer.

O'Konski Reply Decl. Ex. D (Tr. of Deposition of Jonathan Lane) at 12:23-19:3 (emphasis added).

> Q. (BY MR. JACOBS) Has anyone from Crestron ever discussed Savant with you?
>
> A. Oh, sure.
>
> Q. Did anyone from Crestron ever tell you that you shouldn't carry Savant products?
>
> A. Yes.
>
> Q. Who told you that?
>
> A. Will Knapp.
>
> * * *
>
> Q. What did Mr. Knapp tell you?

A. Mr. Knapp post the boat show visited my office and said, *"You kind of got to make a decision. You can support us and continue, or you're going to be a Savant dealer and support Savant."*

* * *

Q. (BY MR. JACOBS) What was your reaction to Mr. Knapp's ultimatum?

MR. KAVANAGH: Objection to form.

A. I told him I'd consider it.

Q. (BY MR. JACOBS) Did you consider it?

A. Yes.

Q. What was your decision?

A. To stay with Crestron.

O'Konski Reply Decl. Ex. E (Tr. of Deposition of Sean Riordan) at 17:8-18, 56:25-58:8 (emphasis added).

Testimony was also elicited regarding harm to other competitors, such as Control4, and competition in general caused by Crestron's conduct:

Q. Did you continue installing and selling Crestron systems up through February of 2010?

A. Okay. Sometime in 2007 we – Crestron called a meeting with us. The Crestron – our Crestron reps, rep, and Dave Sell, who was the western regional sales manager or something like that for Crestron -- he was the main guy out here.

* * *

Q. What happened? Who called the meeting?

A. Crestron called the meeting.

* * *

Q. Do you know why they called the meeting?

A. So the meeting was they were concerned that they were hearing from dealers that we had become a Control4 dealer and were selling Control4 in the marketplace, and that they didn't like it and were urging me to be able to move away from Control4.

> * * *
>
> Q. Okay. So if you could pick up from the point where the meeting ended.
>
> A. Thanks. So a year later right before Christmas -- it would have been maybe two days before the Christmas holiday. It was just really close to the Christmas holiday, so it would have been 2008, probably Christmas of 2008, there was another meeting that Crestron requested. *This time the meeting -- this one had Randy Klein in it, who was -- I think he's a vice president at Crestron.* I think he's a pretty high guy at Crestron. Dave Sell, a guy named Bill Schafer, who was our director of sales at that time, Dan Fry from PMP Marketing, Rob Christensen from PMP Marketing, and also there was an engineer from Crestron who I didn't know -- I don't know his name -- who was accompanying their group as well. And he met with my partner and I, Tom Morris and myself. *The meeting basically was we met with you a year ago. We urged you to move away from Control4. A year later now you haven't done that, and so we're now -- so the crux of the meeting was if you -- you can't continue to represent Crestron and Control4 both. Therefore, you need to make a decision. So you have until after the Christmas holiday, until the first of the year, to be able to decide whether or not you're going to be a Control4 dealer or a Crestron dealer, and you can't do both.*

O'Konski Reply Decl. Ex. F (Tr. of Deposition of Craig Stulce) at 22:15-26:16 (emphasis added).

> Q. Okay. What products have you used or dealt with for controlling the various audiovisual products that you install?
>
> A. Crestron, AMX, and Savant.
>
> Q. When did you start dealing with each of those respectively?
>
> A. Crestron, we started pretty much right when we started our business, so probably '99, 2000 time frame. Savant, around 2008. And AMX, 2006.
>
> * * *
>
> Q. Did you terminate your dealings with Crestron?
>
> A. No.
>
> Q. Okay. And when I say "you," I mean Theatron.
>
> A. No.
>
> Q. They terminated you?
>
> A. Yes.
>
> Q. Did they give you any reason why?

A. No. We just got a -- a letter, and it had some reference to our dealer agreement, which I -- I never -- I didn't have, so I didn't know what it was.

* * *

Q. Now, on September 5, you're at -- paragraph 11 states, "On September 15, Theatron received a written notice of termination of its dealer agreement with Crestron."

A. Right.

Q. A copy of the notice is attached as -- as Exhibit C. I'd like to direct your attention to Exhibit C. Is that the notice of termination --

A. Yes.

Q. -- that you received? What were the consequences of your being terminated?

A. Well, I mean, we were unable to support our existing clients. Shortly after that, we lost a -- a support contract we had that was about 2 grand a month to us for a huge Crestron system we had installed on an estate. And then all of our other customers, we couldn't -- couldn't get equipment for to fix stuff, so --

Q. Did that cause any problems with your customers?

A. Oh, absolutely, yeah. You know, we'd have to talk about, you know, doing something different for their system, changing out systems. You know, parts that we told them that were not Crestron anymore, that were third party, we would just program them to – you know, so they'd still work with the system. We kind of just had to eat those costs because we can't say, oh, we can't get you Crestron stuff anymore.

Q. You had to get some replacement?

A. Yeah, yeah.

Q. And in paragraph 14, you indicate some of the consequences that you've had to refer your former customers to other Crestron dealers.

A. Uh-huh.

Q. So you lost that business?

A. Right.

O'Konski Reply Decl. Ex. G (Tr. of Deposition of Richard Smith) at 7:25-10:14, 33:3-34:21.

Testimony was also elicited regarding damage to Savant as a result of Crestron's conduct:

Q. Sir, do you blame all of the problems that Savant Systems has experienced with respect to turning a profit on Crestron?

A. Yes. Based on what we know today, you know, we would have already turned a profit.

Q. When?

A. In two thousand – end of 2009, beginning of 2010.

* * *

Q. What plan?

A. The plans that we had back in 2008, 2009 and 2010 and 11 and on. We fell short by over a hundred million dollars over the past eight years, and that was – the majority of that – I would say all of that was because of the activity of Crestron.

It doesn't mean we didn't have other issues, but any other issue, we could overcome. We cannot overcome blocking the strategy Crestron has had in the market, blocking access to the dealer channel.

* * *

Q. Let's say from 2010 to 2011, currently.

A. The current year? I'm going by my memory now so it's not exact. We're about 100 percent off or more.

Q. What accounts for that, in your mind?

A. The threats from Crestron.

Q. Anything else?

A. No. It's more than the threats. It's a cumulative – all of the things 'cause it's – it's not just the threats. It's all the things they did out in the field. That's just one.

Q. So in your mind, all of the activities that Crestron has done in the field has been basically the sole reason why Savant can't meet its projections, is that correct?

A. That is on the residential side what I believe. Yes.

* * *

Q. Okay. Well, how much damage has Crestron's alleged activities done in terms of a financial impact to Savant?

A. The financial impact would have been roughly somewhere around north of 40, $50 million in profit that was lost.

O'Konski Reply Decl. Ex. H (Tr. of Deposition of Robert P. Madonna) at 41:1-9, 50:12-23, 126:21-127:6, 369:19-24.

Q. Do you believe that Savant can continue to be a successful company going forward based upon your experience and your review of the market conditions?

A. I think that is at risk.

Q. And in terms of the risk factors, what are they?

A. Unfortunately, I believe that things have a beginning and a middle and an end, and I think the Apple phenomenon created an opportunity for them that may, at some stage, pass us by, and I believe that we lost two to three precious years in our ability to sell Savant to our targeted high-end CEDIA type integrator customers, and I believe that it was a direct result of the, you know, the apparent lack of support or lack of the dealers buying Savant products and, therefore, I think, you know, if the Apple phenomenon comes to an end sooner rather than later, they've lost a lot of opportunity.

Q. And when you say that your belief was that there was a lack of support or lack of dealers buying Savant products, that could be attributed to numerous factors, correct?

A. I believe there was one main factor.

Q. And what do you base that belief on?

A. Regular reporting from the sales teams at Savant.

* * *

Q. But you did not -- you were not actually present with respect to any activity taking place concerning the actual actions, correct?

A. Which actual actions are you talking about?

Q. Any lack of support from the dealers.

A. Yes. I was personally present for some discussions.

Q. With dealers?

A. Yes.

Q. Which ones?

A. Bob Gullo, and he told me in the first person that this was a real issue and that he had been threatened by Crestron.

Q. Oh, so describe for me those communications. Mr. Gullo told you that he had been threatened by Crestron?

A. I asked Mr. Gullo, who was a Crestron dealer and was a long-term member of CEDIA -- in fact, he was on the board of CEDIA for some of his membership -- what the issues with Savant and why he personally had not decided to take on Savant, and he told me in the first person, "I made years of investment in Crestron, if they pull the franchise from me, they take my customers with them." And I said, "What do you mean by that?" And he said, "If they pull the franchise, I no longer have access to program my customers' remotes. I can't get parts from Crestron and, therefore, I lose my customers."

Q. And let me ask you this directly, sir --

A. Yes.

Q. -- did Mr. Gullo ever tell you that he had been threatened by Crestron?

A. He said -- he said that he had been threatened by Crestron and he feared retribution up to and including termination.

O'Konski Reply Decl. Ex. I (Tr. of Deposition of Philip Schoonover) at 135:8-139:6.

Moreover, even if it were true (and, as demonstrated above, it is not) that the depositions taken to date offered little benefit to Savant in support of its substantial damage claims in this case, that argument, in and of itself, does not justify cutting off further discovery at this stage for at least three reasons.

First, any difficulties in obtaining proof from *Crestron*'s dealers should come as no surprise, given the sheer number of them—in excess of three-thousand—and the fact that the industry in general is (and the dealers in particular are) legitimately concerned about retribution by Crestron. Indeed, we saw as much in the meritless suit Crestron brought against Cyber Sound, the Arizona dealer that was threatened with termination by Crestron because it carried Savant's products and whose president provided Savant with a declaration for use in this case attesting to Crestron's threats. *See* Declaration of Jon Summer in Support of Plaintiff, Savant Systems, LLC's

Motion for a Preliminary Injuction (Dkt. No. 43). Tellingly, Crestron later dropped its suit against Cyber Sound in return for payment from Cyber Sound's insurance carrier which was modest (just $95,000) compared to the costs and attorneys' fees being expended in this litigation.

Second, there is still sufficient time remaining for discovery that is focused specifically on damages even if the fact discovery deadline currently set for March 31, 2013, is not extended.[2] Savant's initial round of dealer depositions, and discovery directed to Crestron, focused primarily on establishing that Crestron did, in fact, have a "zero tolerance" policy with regard to its dealers carrying Savant. *See, e.g.*, Jacobs Decl. Ex. 21 at 2 (Dkt. No. 106-21) (filed under seal) (E-mail from Randy Klein, Executive Vice President of Crestron: "No Crestron dealer is a Savant dealer....ZERO tolerance") (ellipsis and emphasis in original). Savant's next round of dealer depositions, and discovery directed to Crestron, will focus more on the harm to Savant, and competition generally, caused by Crestron's indisputable "zero tolerance" policies. Clearly, this additional discovery should be allowed to proceed.

Third, even assuming Crestron is correct (although it is not) that Savant has adduced *no* evidence in support of its case, then the proper procedural vehicle for Crestron to address that issue is a motion for summary judgment after the close of fact discovery—as opposed to its current effort to prevent Savant from completing discovery. Crestron threatened some (significant) number of its three-thousand residential dealers, and Crestron should not be allowed to shield its conduct behind procedural rules that are designed to adapt to the given facts of the case.

[2] An extension of that deadline may in fact be necessary in the interests of justice given the sad state of Crestron's document productions to date in response to Savant's requests to produce. *See* Savant's Memorandum in Support of Plaintiff's Motion to Compel Production of Documents in Response to Savant's First and Second Set of Requests for Production of Documents to Defendant (Dkt. No. 133).

Although the discovery requested by Savant is extensive, and regrettably expensive, it is necessary for Savant to prove its case. Savant is committed to investing whatever resources are necessary to achieve that goal, but as expeditiously as possible. Indeed, Savant's good faith in its efforts to keep those costs down are well illustrated by the brevity of the depositions it has taken thus far. And Crestron would be hard-pressed to argue that it has insufficient resources to commit to the case, given its frequent public boasts regarding its half a billion dollars of annual revenue. *See* O'Konski Reply Decl. Ex. J.

### D. Crestron's Arguments Regarding Savant's Contacting and/or Representation of Third Parties are Specious

Crestron's arguments regarding the "questionable" practice of contacting, and in a few instances, offering representation of, third parties in advance of depositions, are specious. *See* Crestron's Memorandum at 9-13. There is nothing wrong in law or in fact in doing so.[3] Indeed, it would be a colossal waste of everyone's time and effort if Savant were to *not* attempt to contact the dealers in advance. As noted above, Crestron has approximately three-thousand dealers, many of whom were threatened or told by Crestron to avoid Savant. *See, e.g.*, Am. Compl. (Dkt. No. 14) Ex. E ("**Remember, you can't be a Crestron dealer and also sell Savant products!**") (emphasis in original); Jacobs Decl. Ex. 23 at 6-16 (filed under seal) (listing dozens of dealers sent the Comparison Guides with the aforementioned threat). However, given the limited number of depositions it has, Savant cannot simply select dealers at random in the hopes that they (1) were explicitly threatened by Crestron and (2) have someone who still works there who remembers the threats. Instead, Savant's counsel conducted a reasonable investigation by contacting dealers. In certain of those situations, a dealer would agree to testify but would also request representation

[3] If there were anything wrong with it, Crestron's counsel is guilty of the same wrongdoing. Crestron's counsel has stated that it represents Sapphire Marketing, an independent third-party entity doing sales and marketing work for Crestron and other manufacturers, in connection with a document subpoena served on Sapphire by Savant. O'Konski Reply Decl. K.

due to its (understandable) fears regarding retribution by Crestron, not to mention the foreign and otherwise costly process of being deposed. Furthermore, notwithstanding Crestron's intimations, there is absolutely no evidence that anyone requested or procured false testimony.

Indeed, it is worth noting that the most dubious testimony has come from dealers who appear to be concerned about retribution by Crestron, as opposed to attempting to help Savant. For example, Steve Vickers, a Crestron installer who is apparently capable of designing systems to automate and control mega-mansions, was unable to recognize *any* of the e-mails—even those sent as recently as *last year*—from *any* of his e-mail accounts. *See, e.g.*, O'Konski Reply Decl. Ex. L (Rough Tr. of Deposition of Steven Vickers) at 33:10-34:24 (testifying that he did not recognize a 2007 e-mail he sent to a Savant representative stating that he wanted to keep his two companies separate so that he could carry Savant and Crestron separately), 47:6-48:6 (testifying that he did not recognize a 2008 e-mail he sent entitled "I just got threatened again today" in reference to his Crestron representative threatening to terminate Newport AV's Crestron dealer license), 55:12-23 (testifying that he did not recognize a 2009 e-mail he sent to Crestron regarding his Savant representative), 56:4-57:8 (testifying that he did not recognize a 2010 e-mail he sent to Crestron forwarding Savant information, and did not recognize the sales representative company that was his contact for Savant), 59:10-60:7 (testifying that he did not recognize a 2011 e-mail he sent to Crestron forwarding Savant information), 62:9-24 (testifying that he did not recognize a 2011 e-mail he sent to Crestron forwarding Savant information and could not recall ever receiving a Savant price list). For example, when shown an e-mail from *his* address with the subject "I just got threatened again today by [my Crestron representative]," Mr. Vickers agreed that it was his e-mail address, but insisted that he (1) did not recognize the document, (2) had not seen the document before, and (3) could not recall being threatened by anyone at Crestron, even though

this e-mail explicitly mentioned a threat and that it had just happened "again." *Id.* at 47:6-49:14.[4] He further testified that he could not say, one way or another, whether his e-mail account had ever been hacked and flatly refused to authenticate the document which he clearly authored and sent.

In fact, Mr. Vickers was so forgetful that he "forgot" that he even had a Newport AV e-mail address, a company for which he has done a lot of business, and through which he forwarded confidential Savant materials to Crestron. *Compare id.* at 15:12-14 ("Q. Did you have an e-mail address from Newport AV? A. No.") *with* 57:9-25 (after being shown an e-mail with the address "steve@newportav.com" "Q. Okay. So you were mistaken when you testified earlier that you didn't have one? A. I think you misspoke the question and I misunderstood you.") *and* 74:17-75:13 (testifying that he couldn't recall how often he checked that e-mail address, nor when the last time he did so).

Savant has no evidence that Crestron or its counsel did anything untoward with respect to this witness, or any of the others. However, this does exemplify some of the difficulties involved in obtaining discovery with respect to a *de facto* and *de jure* monopolist that has threatened—and sued—dealers in the market.

## III. CONCLUSION

For the foregoing reasons, and those set forth in Savant's opening Memorandum, Savant respectfully requests that its Motion for an Order Further Expanding the Discovery Event Limitations in the Case be granted.

---

[4] It is difficult to accept the idea that a Crestron dealer, twice threatened with termination and the terrible impact this would have on his ability to service his existing clients, would actually forget such threats, particularly given that he repeatedly complained about these threats to a Savant representative.

Dated: November 2, 2012

Respectfully submitted,

SAVANT SYSTEMS, INC.
By Its Attorneys,

/s/ Thomas C. O'Konski______

Thomas C. O'Konski BBO# 378265
Martin J. O'Donnell BBO# 377475
Michael E. Attaya BBO#548297
Aaron S. Jacobs BBO# 677545
William J. Mostyn IV BBO# 678869
CESARI and MCKENNA, LLP
88 Black Falcon Avenue
Boston, MA 02210
(617) 951-2500
TOK@c-m.com

**CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on November 2 2012.

/s/ Thomas C. O'Konski

EXHIBIT 517

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| SAVANT SYSTEMS, LLC<br>Plaintiff,<br><br>v.<br><br>CRESTRON ELECTRONICS, INC.<br>Defendant<br><br>CRESTRON ELECTRONICS, INC.<br>Counterclaim-Plaintiff,<br>v.<br><br>SAVANT SYSTEMS, LLC<br>Counterclaim-Defendant | Civil Action No. 10-cv-11622-EFH |

**DECLARATION OF JAMES W. CARROLL IN OPPOSITION TO DEFENDANT CRESTRON ELECTRONICS, INC.'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

I, James W. Carroll, declare as follows:

1. I am currently Executive Vice President, Strategy and Business Development, for Savant Systems, LLC ("Savant"), the plaintiff in the above action.

2. I co-founded Savant with its current Chief Executive Officer and President, Mr. Robert P. Madonna, back in 2005.

**Savant's Revenue Plans**

3. Prior to the formation of Savant, for a period of approximately three and on half years, I owned and operated AViX, LLC ("AViX"), a dealer specializing in the design and installation of high-end residential automation and control systems, based in Osterville, Massachusetts.

4. The products at issue are sophisticated electronic control systems that require expert preparation and installation in the customer's home. This is accomplished through a network of thousands of independent dealers who purchase the system components from the manufacturer and then resell them to the end user together with their installation services. Fair access to these dealers is essential for a competitor to enter and succeed in the market. Through its overwhelming dominance in the market, defendant Crestron Electronics, Inc. ("Crestron") has exercised strong control over these dealers and the products that they can handle, and has used this power over the years to block access not only to Savant but to other competitors (e.g., AMX and Control4 ("C4")) as well. 5. Since 2006, Savant has been actively attempting to sign on dealers across the United States to carry its products for resale to end user customers in their local areas.

6. AViX was an active member of the Custom Electronics Design and Installation Association ("CEDIA"), a trade association of dealers specializing in residential automation and control systems.

7. As a result of my involvement with AViX, and as a result of detailed studies of the CEDIA market that I conducted after Savant was formed, I considered myself particularly knowledgeable of that market, certainly by 2008.

8. It was my understanding that, in 2008, there were approximately five thousand dealers in the United States who were potentially qualified to serve as Savant dealers. I understand and believe that the majority of these dealers were at that time also authorized Crestron dealers.

9. In 2008, I and other experienced members of Savant's management team prepared a forecast for Savant based on our expectation of the number of residential dealers in the United States that Savant could, and should, reasonably have been able to sign each year from 2008 through 2012. Attached as Exhibit A is a chart that sets forth our 2008 dealer acquisition forecast in its first row.

10. We used the dealer acquisition forecast to prepare a revenue projection for Savant through 2012. We estimated conservatively that each dealer signed by Savant would generate $50,000 per year on average in revenue for Savant. Multiplying the estimated number of dealers to be acquired each year by the $50,000 per year per dealer yielded the projected revenue figures shown in the second row of the chart of Exhibit A.

11. In 2009, we revised our dealer acquisition forecast downwardly, due primarily to factors such as the economy and the interference from Crestron that we were experiencing in our efforts to sign dealers. The revised dealer acquisition numbers are set forth in the third row of the chart of Exhibit A. At $50,000 per year per dealer per year, the revenue projections set forth in the fourth row of the chart of Exhibit A were reduced commensurately.

12. The fifth row of the chart of Exhibit A sets forth the number of dealers that actually signed on each year as authorized Savant dealers.

13. The sixth row of the chart of Exhibit A sets forth the number of dealers that signed as Savant dealers and that actually purchased Savant products. As is evident from a comparison of the fifth row to the sixth row of the chart of Exhibit A, it is not uncommon for a dealer to sign on as a Savant dealer but not thereafter purchase any

product. On information and belief, many dealers who sign on as Savant dealers do not thereafter sell any Savant products due to threats from Crestron.

14. The seventh row of the chart of Exhibit A sets forth Savant's actual revenue numbers for the domestic residential automation and control market each year through 2012.

15. Based upon my experience in the CEDIA market and information that I have received from numerous dealers since Savant has embarked on its plan to sign dealers, it is my considered belief that Savant's failure to meet its 2009 revised dealer acquisition forecast, and the revenue projections of the 2009 revised plan, were due primarily to Crestron's interference with Savant's efforts to sign dealers across the country. I estimate that at least 80% of Savant's revenue shortfall each year compared to its 2009 revised plan was as a result of Crestron's interference.

**Crestron's Unlawful Activities**

16. I provide below a few examples of specific instances in which I was involved where Savant lost sales revenue with dealers because of Crestron's actions.

**CyberSound, Inc.**

17. CyberSound, Inc. ("CyberSound") is a CEDIA dealer in the Phoenix/Scottsdale, Arizona. In early 2008, it was an authorized Crestron dealer and, on information and belief, Crestron's highest revenue dealer in that area.

18. Savant's sales team first tried to sign CyberSound as a Savant dealer in March 2008.

19. CyberSound resisted Savant's overtures to become a Savant dealer for about one year.

20. I was finally able to arrange a face-to-face meeting with Jon Summer, CyberSound's president, and members of his staff, at CyberSound for 1:30 p.m. on March 2, 2009.

21. Jon Summer called me and requested that I show up at his offices before 7:00 a.m. instead of 1:30 p.m. for the meeting. He told me that he did not want Crestron to know that he was talking to someone from Savant, for fear that Crestron would retaliate against CyberSound if it associated with Savant, and requested an early meeting because he was concerned that one of his employees might inform Crestron about our meeting.

22. CyberSound ultimately signed on as a Savant dealer on May 20, 2009.

23. On information and belief, CyberSound was given an ultimatum by Randy Klein and Dave Sell of Crestron in a face-to-face meeting at CyberSound on August 5, 2009, to the effect that CyberSound had to choose between Crestron and Savant, and if CyberSound did not agree to drop Savant, Crestron would terminate it as a Crestron dealer.

24. Although I understand that a couple of months later, Crestron temporarily reversed its position with regard to Savant, I am informed and believe that, in early 2010, Crestron reversed its position again and insisted that CyberSound drop Savant or be terminated as a Crestron dealer.

25. CyberSound did not start selling Savant products until May 2010.

26. Cyber Sound purchased $364,333 worth of Savant equipment in 2010, $659,220 in 2011 and $1,184,270 in 2012. I am confident that comparable revenue numbers would have been generated by CyberSound for Savant in 2008, 2009 and 2010,

respectively, had CyberSound started selling Savant in 2008 and had Crestron not interfered with and delayed CyberSound's sale of Savant products.

27. I am confident that, had we been able to sign Cyber Sound as a Savant dealer in 2008, many other large dealers who, like Cyber Sound, were members of the buying group, Home Technology Specialists of America ("HTSA"), would have followed suit in that time frame and signed on as Savant dealers.

**Stereo One, Inc.**

28. John Selby of Stereo One, Inc. ("Stereo One") first expressed interest in Savant products at the 2007 CEDIA show which Savant attended. I understand that Stereo One was at that time an authorized Crestron dealer.

29. In early 2009, Stereo One signed on as a Savant dealer, attended Savant training and purchased a Savant demo system. Mr. Selby was very enthusiastic about the Savant product line.

30. Mr. Selby told me that he installed the Savant demo system in a secret room above his showroom because he did not want Crestron to know that he was considering selling Savant products.

31. Mr. Selby also told me that, in June 2009, his Crestron rep informed him that if the Savant system went on display in the Stereo One showroom, Stereo One would be terminated as a Crestron dealer.

32. Stereo One has not purchased any Savant products since June 2009.

33. Given Mr. Selby's enthusiasm regarding the Savant products, I am confident that he would have made substantial purchases of Savant products in 2009 through 2012 had he not been threatened with termination by Crestron.

**SoCal Smart Home, Inc.**

34. SoCal Smart Home, Inc. of Southern California ("SoCal") signed on as a Savant dealer in early 2008.

35. Jonathan Lane of SoCal told Savant's Craig Spinner that an opportunity presented itself in which the end user wanted Crestron equipment used for its installation.

36. Mr. Lane also told Mr. Spinner that, when he applied to be a Crestron dealer, he was told by his Crestron contact that his application would not be approved by Crestron unless he resigned his Savant dealership.

37. SoCal resigned its Savant dealership in February, 2009. SoCal was reinstated as a Savant dealer in or about October, 2011.

38. SoCal purchased no Savant equipment in the period from February, 2009 to October, 2011.

**Intelect Integrated**

39. Sean Riordan of Intelect Integrated of Ft. Launderdale, FL expressed an interest in a Savant system in the Fall of 2007. I understood at that time that he was then, and had been for more than 20 years, an authorized Crestron dealer.

40. Mr. Riordan purchased, and we installed, a Savant demo system at his facility in November 2007.

41. Mr. Riordan told me that when his Crestron rep saw the Savant demo system, the rep gave Mr. Riordan an ultimatum - either support Crestron and continue as a Crestron dealer or support Savant and be terminated as a Crestron dealer. The ultimatum was given to him in mid-2008 after a boat show.

42. Mr. Riordan also told me that he couldn't afford to be terminated by Crestron and to lose his ability to service his existing customers with Crestron equipment in place, so he ultimately decided to stay with Crestron and did not purchase any Savant products after the latter half of 2008.

**HiFi House**

43. I visited John Robbins and other employees of HiFi House in Broomall, PA on May 8, 2008 in an attempt to sign it on as a Savant dealer. I understood that HiFi House was at that time an authorized Crestron dealer.

44. On May 8, 2008, Mr. Robbins told me that he and others at HiFi House was very excited about the prospect of becoming a Savant dealer, and asked me to schedule a demo of Savant equipment for him and several of his employees.

45. On May 20, 2008, the Savant sales representative responsible for HiFi House called me and indicated that Mr. Robbins asked that the upcoming demo meeting be kept "top secret" because he did not want Crestron to know that he was visiting Savant.

46. On June 6, 2008, Harry Blanchard, HiFi House's leading salesperson, visited Savant and indicated that HiFi House was still very interested in becoming a Savant dealer. Mr. Blanchard's initial feedback regarding the Savant products after the visit was very positive. During the visit he did express concerns about other dealers being threatened by Crestron if they carried Savant products.

47. In September 2008, at CEDIA 2008, Mr. Blanchard and other employees of HiFi House visited the Savant booth and continued to indicate their enthusiasm regarding the Savant product line. However, shortly after CEDIA 2008, Mr. Blanchard

told me that HiFi House could not sign on as a Savant dealer because they were threatened by their Crestron rep with termination as a Crestron dealer if they proceeded to become a Savant dealer and to sell Savant.

**Thul Electronics, Inc.**

48. Thul Electronics, Inc. ("Thul") of Avon, Colorado purchased and installed in their showroom a residential automation and control system manufactured by Savant. By early 2009, Thul started offering Savant products to its customers in addition to Crestron products.

49. Michael Thul, the owner of Thul Electronics, Inc., told me that, in April 2009, Crestron threatened to cut him off as a Crestron dealer if he continued to offer the Savant product line. Because he was in the middle of a major condominium project in Vail, Colorado involving Crestron equipment, he told me that he had no choice but to drop the Savant line.

50. Mr. Thul also told me at the time that he dropped the Savant line that he had at least five other major projects planned for Savant equipment.

51. Crestron's threats to terminate dealers can have a major impact on the dealer because termination can carry with it severe penalties for the dealer. Dealers commonly not only sell and install residential automation and control systems, but also service them after installation. The servicing frequently requires access to parts, components and tools from the manufacturer of the original system. In the case of high-end systems which may cost a customer from fifty thousand dollars to several hundreds of thousands of dollars, the customer looks to the dealer who sold and installed the system and who is most knowledgeable about that customer's specific installation to

attend to its maintenance and upgrade as necessary. While a dealer can replace future lost sales of Crestron products by sales of Savant products instead, denial of access to the materials needed to service a dealer's existing installed base of Crestron systems not only affects the dealer's service revenues but also affects the good will that the dealer has built up with its customers often over many years of business. Thus, Crestron's threats to terminate a dealer, especially a dealer with a large installed base of Crestron systems, simply because it adds Savant systems to its offerings, can act as a strong deterrent to dealing with Savant in the face of objection by Crestron.

52. On information and belief, other dealers who delayed signing on as Savant dealers because of Crestron's objections, or threats of termination, but who later signed on as Savant dealers, include at least:

Acadian Custom Installations
Baton Rouge, LA

NuSystems, Inc.
Gardnerville, NV

Genesis Home Technologies, Inc.
Portland, OR

Sound Design
Toronto, Canada

Newport Audio Video
Sandy, UT

Homeworks Holding Corp. d/b/a Digital Ear
Tristin, CA

Electronics By Design
Broomfield, CO

Studio A/V
Bozeman, MT

Harrison Home Systems
Evergreen, CO

AVE Solutions d/b/a S3
Park City, UT

Audition Systems by Audio Design Group
West Valley, UT

Vatland Electronics
Appleton, WI

Connecterios
Chicago, IL

Sound Components
Miami, FL

Eagle Security
Las Vegas, NV

Big Picture Solutions
Palm Beach, FL

American Automation & Communication
Bowie, MD

Concierge Direct
New Rochelle, NY

Stereo and Video Integrators
Fair Haven, NJ

Premier Home Technologies
Dublin, OH

53. Savant lost sales in an amount yet to be determined because of the delays of dealers in signing on as Savant dealers.

54. I know of my own knowledge, or I am informed and believe, that other dealers who initially signed on as Savant dealers later dropped Savant as a supplier

because Crestron objected, or threatened to terminate them, if they carried Savant products.

55. On information and belief, dealers who initially signed on as Savant dealers and who later dropped Savant for at least some period of time because of Crestron's objections, or threats of termination, include at least:

Attack Communications
Newport Beach, CA

Custom Home Theater Systems
Solona Beach, CA

Media Design Associates, Inc.
Fort Lauderdale, FL

Modern Home
Lincoln, MA

56. Savant lost sales in an amount yet to be determined during the time periods that dealers dropped Savant as a supplier.

57. I know of my own knowledge, or I am informed and believe, that other dealers approached by Savant initially refused, and continue to refuse, to sign on as Savant dealers because they are Crestron dealers and because Crestron objected, or threatened to terminate them if they carry Savant products.

58. On information and belief, dealers who initially refused, and who continue to refuse, to carry Savant's products because of Crestron's objections, or threats of termination, include at least:

American Home Technologies
Harbor Springs, MI

Electronic Environments

Chicago, IL

Sound & Vision
Chicago, IL

Carefree AV
Scottsdale, AZ

AV Innovation
Scottsdale, AZ

Vision Systems
Cypress, CA

59. Savant has lost, and continues to lose, sales in amounts yet to be determined as a result of the refusal of dealers to carry Savant products.

60. Many dealers that we have approached regarding Crestron's threats to terminate them if they carry Savant products have been reluctant to confirm those threats in a declaration or deposition for fear of retaliation by Crestron. I believe that the listings of dealers in paragraphs 52, 55 and 58 are partial only and that depositions and other discovery will reveal others in each category.

**Savant Generally**

61. Like many other manufacturing companies, Savant experiences economies of scale in that its per unit cost decrease as the total quantity of products produced increases.

62. Like many other manufacturing companies, Savant experiences learning curve economies in that its product manufacturing processes become more efficient as its manufacturing personnel become more familiar with the processes.

63. Because Savant uses a large contract manufacturer with several facilities around the world to manufacture its products, there is no maximum limit on the output of Savant's manufacturing facilities.

64. It is time-consuming and expensive to research and develop high-end residential automation and control products. Since 2007, Savant has invested more than $54 million in research and development of such products.

65. Savant would have invested more heavily in research and development had it made a profit through 2012.

66. Many technologies that are specific to high-end residential automation and control products are covered by U.S. and foreign patents. Savant currently holds seven issued U.S. patents and 19 pending patent applications on its technologies. It holds 21 U.S. issued design patents. In addition, Savant holds more than 70 issued foreign patents and more than 100 pending foreign patent applications.

67. To the best of my knowledge and belief, Signals Audio/Video and Eagle Century have never been Savant dealers.

68. As indicated in the attached Exhibit A, according to Savant's 2009 revised plan, its target for dealers was 440 in 2009. Savant's target for dealers in 2012 was more than 2800.

69. The market for the distribution and sale of high-end programmable controller systems for residential automation has remained relatively stable since 2008 notwithstanding the economy.

70. For all intents and purposes, the only competitors in the high-end residential automation and control market are Crestron, AMX, and Savant.

71. I am aware of no automation and control products being offered for sale currently by Clare Controls.

72. To the best of my knowledge and belief, the prices charged by manufacturers for high-end residential automation and control system components have remained relatively stable since 2007. The prices charged by manufacturer for low-end residential automation and control system components have declined since that time.

73. To the best of my knowledge and belief, the volumes of high-end residential automation and control system components produced by manufacturers since 2007 have remained relatively stable, while the volumes of low-end system components have increased.

I declare under penalty of perjury that the foregoing is true and correct.

Dated this 9th day of April, 2013.

James W. Carroll

# EXHIBIT A

| | **2007** | **2008** | **2009** | **2010** | **2011** | **2012** |
|---|---|---|---|---|---|---|
| 2008 Plan - Dealers To Be Signed | | 80 | 700 | 1,128 | 2,880 | 3,500 |
| Projected Revenue per 2008 Plan (at $50K per dealer per year (millions) | | $4.00 | $35.00 | $56.40 | $144.00 | $175.00 |
| 2009 Revised Plan Dealers to be Signed | | 80 | 440 | 700 | 1,128 | 2,880 |
| Projected Revenue per 2009 Revised Plan (millions) | | $4.00 | $22.00 | $35.00 | $56.40 | $144.00 |
| Dealers Actually Signed | | 65 | 358 | 547 | 700 | 985 |
| Dealers That Signed and Purchased | | 65 | 239 | 380 | 469 | 631 |
| Actual Revenue (millions) | | $1.38 | $5.34 | $12.84 | $25.60 | $28.08 |