EXHIBIT 525

# Exhibit K

CRESTRON®

# Sales Guide

**Total Home Control**
Crestron vs. Savant

Today, there are many start-up control system companies like Savant who promise a better solution than Crestron. When looked at critically, it is evident that Crestron is the only total end-to-end solution, offering products in all categories of home automation: AV distribution, lighting control, climate control and security.

While Savant touts operating on a Mac® based platform, Crestron actually offers more integration with Apple products. In addition, Crestron pioneered the industry's only multi-format HD video distribution system, allowing seamless viewing of HDMI (w/ HDCP) content throughout the home. Its important to consider the various pieces of total-home automation when deciding on a control system manufacturer for a high-end home. Take a look at how Crestron excels in all areas of home automation, truly delivering a complete, scalable solution.



| Apple® Features | Crestron | Savant |
|---|---|---|
| **iPhone® / iPod touch® / iPad™ Control**<br>Control entire home, including media, lights, climate & security, from any iPhone or iPod touch within home or worldwide | ● | ● |
| **iPod® Integration**<br>Play music or watch videos stored on docked iPods around the home | ● | ● |
| **Sync iTunes library remotely**<br>Leave the iPod in the dock while it automatically gets media updates without connecting to a Mac or PC | ● | |
| **System Control from any Mac® Worldwide**<br>Control entire home from any Mac within home or worldwide | ● | |
| **iTunes® Control on any Touchpanel**<br>Access entire iTunes collection on any touchpanel or TV throughout the home, view cover art and album info (metadata) | ● | ● |
| **Apple TV® Control on Touchpanel**<br>Access entire Apple TV collection on any touchpanel or TV throughout the home, view album and movie cover art and info | ● | |
| **Media Server Product with sync-to-iTunes capabilities**<br>Leverage all types of digital media content, including iTunes libraries, online streamed content, HD movies, HD video rentals | ● | Audio & Ripped CDs Only |



| User Interface Features | Crestron | Savant |
|---|---|---|
| **System Control via Flash® Interface**<br>Control entire home from any computer within home or worldwide that can run Adobe® Flash® | ● | |
| **On-screen Control**<br>Control entire system from any display around the home, overlay graphics on HD video, PIP | ● | No PIP or multi-window |
| **Gesture Control**<br>Swipe the touchpanel for different system functions, similar to iPhone | ● | ● |
| **HD Touchpanels**<br>View HDMI content on touchpanel & transform into an HDTV display | ● | |
| **Touchpanel with Integrated Graphics Engine**<br>Touchpanel and engine packaged in one condensed unit, uses less space and energy | ● | Requires extra box for each touchpanel |


All brand names, product names and trademarks are the property of their respective owners. ©2010 Crestron Electronics, Inc.
04.10

CRESTRON®

# Sales Guide

## Total Home Control
Crestron vs. Savant



| AV Distribution Features | Crestron | Savant |
|---|---|---|
| **Surround Sound Processor**<br>Audiophile grade surround sound processing equipment, native system integration | ● | ● |
| **Surround Sound Amplification**<br>Audiophile grade surround sound amplification, native system integration | ● | |
| **Audio Distribution Products**<br>Full matrix audio distribution products for various sized systems | ● | ● |
| **Video Distribution Products**<br>Full matrix video distribution products, ranging in size, transmit any video signal type to any display over CAT5 or Fiber | ● | HDMI over CAT5 extenders only |
| **HDMI w/HDCP Video Distribution**<br>Distribute protected content from Blu-ray discs and Macs with Mini DisplayPort | ● | |







| Home Automation Features | Crestron | Savant |
|---|---|---|
| **Lighting Control Products**<br>Natively integrate centralized or distributed whole-home lighting control | ● | |
| **Climate Control Products**<br>Natively integrate thermostats, humidistats, and a range of sensors for perfect climate throughout the home | ● | |
| **Security System Native Integration**<br>Ethernet based native security system integration | ● | Complex RS-232 systems only |
| **Menu-driven Configuration Software for System Setup**<br>Configure complete system using drag-and-drop, menu driven software, without programming | ● | ● |
| **Completely Customizable Touchpanel User Interfaces**<br>Ability to design from the ground-up a fully customized touchpanel or OSD | ● | |

Crestron Electronics, Inc. 15 Volvo Drive | Rockleigh, NJ 07647
All Crestron products are proudly manufactured in the United States.

800.237.2041 | crestron.com
All brand names, product names and trademarks are the property of their respective owners. ©2010 Crestron Electronics, Inc.
04.10

EXHIBIT 526

# Exhibit L

# Certificate of Registration

SEAL OF THE UNITED STATES COPYRIGHT OFFICE 1870

This Certificate issued under the seal of the Copyright Office in accordance with title 17, *United States Code*, attests that registration has been made for the work identified below. The information on this certificate has been made a part of the Copyright Office records.

Marybeth Peters

Register of Copyrights, United States of America

**Registration Number**
VA 1-742-893

**Effective date of registration:**
October 28, 2010

## Title

**Title of Work:** Touch Pad Cradle

## Completion/Publication

**Year of Completion:** 2007

**Date of 1st Publication:** August 30, 2007 **Nation of 1st Publication:** United States

## Author

- **Author:** Savant Systems, LLC

**Author Created:** photograph(s)

**Work made for hire:** Yes

**Citizen of:** United States **Domiciled in:** United States

## Copyright claimant

**Copyright Claimant:** Savant Systems, LLC

32 Wianno Avenue, Osterville, MA, 02655, United States

## Rights and Permissions

**Organization Name:** Savant Systems, LLC

**Address:** 32 Wianno Avenue

Osterville, MA 02655 United States

## Certification

**Name:** Michael T. Abramson

**Date:** October 28, 2010

**Applicant's Tracking Number:** 104215-0058

Case 1:10-cv-11622-WGY Document 394-2 Filed 07/02/14 Page 8 of 20

**Registration #:** VA0001742893

**Service Request #:** 1-510543528

Cesari and McKenna, LLP
Thomas C. O'Konski
88 Black Falcon Avenue
Suite 271
Boston, MA 02210 United States


Living Room
Kitchen
Den
Master Bedroom
Bedroom 1
Bedroom 2


Zone
Date & Time
Living Room
Kitchen
Den
Master Bedroom
Bedroom 1
Bedroom 2
ROSIE

# EXHIBIT 527

# Exhibit M

# Certificate of Registration

SEAL OF THE UNITED STATES COPYRIGHT OFFICE · 1870

This Certificate issued under the seal of the Copyright Office in accordance with title 17, *United States Code*, attests that registration has been made for the work identified below. The information on this certificate has been made a part of the Copyright Office records.

Marybeth Peters

Register of Copyrights, United States of America

**Registration Number**
VA 1-742-896

**Effective date of registration:**
October 28, 2010

## Title

**Title of Work:** ROSIE System 2

## Completion/Publication

**Year of Completion:** 2007

**Date of 1st Publication:** September 30, 2007 **Nation of 1st Publication:** United States

## Author

- **Author:** Savant Systems, LLC

  **Author Created:** photograph(s)

  **Work made for hire:** Yes

  **Citizen of:** United States **Domiciled in:** United States

## Copyright claimant

**Copyright Claimant:** Savant Systems, LLC

32 Wianno Avenue, Osterville, MA, 02655, United States

## Rights and Permissions

**Organization Name:** Savant Systems, LLC

**Address:** 32 Wianno Avenue

Osterville, MA 02655 United States

## Certification

**Name:** Michael T. Abramson

**Date:** October 28, 2010

**Applicant's Tracking Number:** 104215-0058

Case 1:10-cv-11622-WGY Document 394-2 Filed 07/02/14 Page 12 of 20

**Registration #:** VA0001742896

**Service Request #:** 1-510543483

Cesari and McKenna, LLP
Thomas C. O'Konski
88 Black Falcon Avenue
Suite 271
Boston, MA 02210 United States


ROSIE


ROSIE

EXHIBIT 528

Case 1:10-cv-11622-WGY Document 394-2 Filed 07/02/14 Page 14 of 20

# Exhibit N

# Certificate of Registration

This Certificate issued under the seal of the Copyright Office in accordance with title 17, *United States Code*, attests that registration has been made for the work identified below. The information on this certificate has been made a part of the Copyright Office records.

Register of Copyrights, United States of America

**Registration Number**
VA 1-742-898

**Effective date of registration:**
October 28, 2010

## Title

**Title of Work:** ROSIE Traditional Remote

## Completion/Publication

**Year of Completion:** 2007

**Date of 1st Publication:** September 30, 2007 **Nation of 1st Publication:** United States

## Author

- **Author:** Savant Systems, LLC

**Author Created:** photograph(s)

**Work made for hire:** Yes

**Citizen of:** United States **Domiciled in:** United States

## Copyright claimant

**Copyright Claimant:** Savant Systems, LLC

32 Wianno Avenue, Osterville, MA, 02655, United States

## Rights and Permissions

**Organization Name:** Savant Systems, LLC

**Address:** 32 Wianno Avenue

Osterville, MA 02655 United States

## Certification

**Name:** Michael T. Abramson

**Date:** October 28, 2010

**Applicant's Tracking Number:** 104215-0058

Case 1:10-cv-11622-WGY Document 394-2 Filed 07/02/14 Page 16 of 20

**Registration #:** VA0001742898

**Service Request #:** 1-510543504

Cesari and McKenna, LLP
Thomas C. O'Konski
88 Black Falcon Avenue
Suite 271
Boston, MA 02210 United States


ROSIE
CHA
VOL
MUTE
menu
info
guide
1
2
3
4
5
6
7
8
9
*
0
#
last
dvr
exit
ROSIE


ROSIE
CHA
VOL
MUTE
menu
info
guide
1
2
3
4
5
6
7
8
9
0
*
#
exit
dvr
last
ROSIE

EXHIBIT 529

Volume: I
Pages: 1-189
Exhibits: 1-4

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

C.A. No. 10-CV-11622-EFH

SAVANT SYSTEMS, LLC,

Plaintiff

vs.

CRESTRON ELECTRONICS, INC.,

Defendant

CRESTRON ELECTRONICS, INC.,

Counterclaim-Plaintiff

vs.

SAVANT SYSTEMS, LLC,

Counterclaim-Defendant

**VIDEOTAPED DEPOSITION OF EINER ELHAUGE,** a witness called on behalf of CRESTRON ELECTRONICS, INC., taken pursuant to the applicable provisions of the Federal Rules of Civil Procedure, before Virginia Dodge, Registered Diplomate Reporter, Certified Realtime Reporter and Notary Public in and for the Commonwealth of Massachusetts, at the law offices of CLEMENTS & PINEAULT, LLP, 24 Federal Street, 3rd Floor, Boston, Massachusetts, on Thursday, May 22, 2014, commencing at 10:02 a.m.

CURRAN COURT REPORTING
21 Rowe Hill Road
Stoneham, MA 02180
(781) 279-8400

cases, correct?
A. Yes.
Q. And in pharmaceutical cases, data relating to pharmaceutical companies are available, correct?
A. Transactional databases are normally not available without them producing it. They're proprietary, and so it depends upon whether the lawyers can get discovery of it.
Q. Pricing data are available, correct? You've used IMS data?
A. I have used IMS data. IMS aggregates, though. It does not provide transactional database customer by customer.
Q. Fair point.
Sir, in terms of your analysis of the relevant product market in this case, you -- you define the market as what?
A. I define it as high-end residential control systems.
Q. And what does that mean?
A. It means -- well, to be a residential control system, you have to be a system that can control multiple features within a house such as temperature, security, audiovisual, from a single interface. And

among the residential control systems, it means that they are high-end in terms of price, customizability, compatibility, speed and quality.

And more specifically, having looked at those features and at the parties' documents, I conclude that this includes Crestron, home -- residential home control system products other than Prodigy, Adagio, lighting and services, and includes Savant and AMX residential home control systems, leaving aside services and lighting.

Q. Sir, do you know sitting here today whether or not in either Savant's transactional database or Crestron's transactional database that either company tracks sales of systems?

A. Yes. They track sales of systems and components that go into those systems.

Q. Well, let me ask you this. Do they track sales of components or they track sales of packaged systems?

A. It varies somewhat by the company. Savant is -- prices much more in packages, whereas Crestron prices much more in components.

Q. And when you refer to Savant packages, what are you referring to?

A. Well, I mean, for example, when they sell a

Crestron and Savant?
A. Yes.
Q. Have you done any comparison of prices of components sold by Savant and Control4?
A. Yes.
Q. Have you done any cross-price elasticity analysis?
A. No. We do not have the data to do that.
Q. So in connection with the preparation of your report, you or your staff have not conducted any cross-price elasticity analyses, correct?
A. We don't have Control4 data, so we couldn't do any cross-price elasticity analysis between them and -- and Control4.
Q. Or AMX, correct?
A. We don't have data for AMX either.
Q. So then by definition, you could not do cross-price elasticity analyses for AMX, Control4, Savant or Crestron, true?
A. True.
Q. Now, in your report, at the outset, you talk about a high-end residential control system as we discussed. Correct?
A. Actually clarify my last answer, you threw in Crestron there, so for Crestron, we do have

transactional data. But they and Savant are in the same market so from -- to figure out whether other products are in the same market, there's no need to do a cross elasticity analysis.

And for them, also I think that the difficulty with doing such an analysis is that jobs vary so much, that there is no uniform price so you could do a traditional cross-price elasticity analysis, which is why I rely upon the evidence of particular price responses by Crestron when they respond to competition from Savant.

Q. And sir, following on that, you discuss the fact that Crestron has from time to time discounted its prices to meet competition from Savant, correct?

A. Yes.

Q. And that, in your experience and expert opinion, is -- reflects price competition in the very market that you've defined?

A. Well, I would say what it reflects is that they were charging above the competitive level before they faced competition with Savant. So if you are able to price 50 percent higher when you weren't faced with competition with Savant, then you must have been able to price at double -- at least double what the

Do you see that at the first clause of that paragraph?
A. Yes.
Q. And you would agree with that, correct?
A. Yes.
Q. And you wrote that, correct?
A. Yes.
Q. And so a high-end control system is actually not a single product, is it?
A. I don't think it follows that it's not a product. It is a product that is customizable for different homes.
Q. How do you do an apples-to-apples comparison of the prices for uniquely configurable residential control systems?
A. Well, if you look at the section where I discuss pricing, I rely both on the fact that reports talk -- compare prices among projects, there's third-party reports, there are internal Crestron documents that indicate that on the same kind of jobs, AMX systems are more expensive than Crestron and talk about how AMX, Crestron relates to Savant and to Control4 systems and Crestron's Prodigy systems.
And in the footnotes, I track the price of the

main controller, which I think is the best apples-to-apples comparison, pointing out that the AMX controller is 9500, the Crestron one is 3600, the Savant one is 2800, whereas when you get to Control4 and Prodigy, they are in the hundreds; Control4, 600 to a thousand. And I'm not sure where the Prodigy figure is, but it's also below a thousand dollars, in the hundreds of dollars.

Q. As you pointed out in the paragraphs that you referred me to, paragraphs 1 and 35 and others, a high-end residential control system in your definition is comprised of many components and not just the main controller, true?

A. Yes. But the main controller is one thing that's constant to all these jobs, and the different pricing indicates which product line is generally more expensive than the other.

Q. But did you do any independent investigation with respect to the actual pricing of particular systems for the various manufacturers you've mentioned?

A. The analysis is based upon, like I said, the components. I did rely on Crestron's documents for the AMX versus Crestron comparison where they're talking about bids for similar systems.

with your expert opinion here.

A. Right, but I did -- you asked me whether I did any independent analysis. I independently analyzed that in order to look at the component pricing issue and concluded that you have to look apples to apples and that if you just average components the way he did, you're really comparing apples to oranges because you're comparing Savant packages to broken-down components by Crestron in a way that distorts the analysis.

Q. And can you elaborate in terms of deficiencies that you believed are apparent in Mr. Jos -- Dr. Joskow's report?

A. Sure. So for example, he breaks it down into three product lines. One is controllers, so he's comparing largely Savant packages about controllers, where -- but in Crestron, he's doing each component. So he's averaging in, for example, a -- a wall bracket, which is a few hundred dollars, into his price to bring down the average for Crestron hugely, even though that's generally included in the Savant package.

So that's why -- if you look apples to apples at the similar kinds of controllers, you find that Crestron is more expensive than Savant, the opposite of

what he finds.

For audiovisual, when you look at it in order to get the audiovisual components cheaper for Crestron, he again is comparing Savant packages to component pricing. The most popular component of Crestron's for audiovisual turns out to be those little modules for iPods which are just a few hundred bucks.

The fourth most popular is a bracket for speakers. It only costs $20. He's averaging those in to bring down Crestron's supposed average price for audiovisual components, even though those are generally packaged in with Savant.

And then his last category is touchscreens. And Savant sells the touchscreens all together. It turns out the most commonly sold component that he is considering as a touchscreen is actually the battery pack, which cost a few hundred dollars. So he's averaging that in to get an artificially low price for Crestron.

So in all those cases, he's doing apples-to-oranges comparisons or maybe I should say apples-to-a-thousand-apples comparisons.

He also only looks at half the products, and he has product classifications that don't match the

product classifications of the parties. He just -- he used Crestron's, but he just created his own for Savant without any real explanation.

Q. Now, all the products that you mentioned with respect to the battery pack for the touchscreens, the bracket for the speakers, the AV components, all of those would be considered part of your definition of a high-end residential system to the extent that they are sold residentially, are not lighting, are not Adagio, Prodigy and are sold in the U.S. or Canada, correct?

A. Yes. But if you're trying to figure out the average price, the fact that one firm breaks it down into separate prices and another firm doesn't does not mean that the Crestron price is cheaper than the Savant price.

Q. Now, you included in paragraph 34 that lighting control products do not provide general home control. Do you see that, sir?

A. Yes.

Q. Do audio/video control products provide general home control to your understanding?

A. No.

Q. Do thermostat HVAC control products provide general home control to your understanding?

products, exclamation point," end quote. This was a glossy sort of circular, and we have evidence it went to at least 11 dealers, who received it and purchased under that.

And then in paragraphs 99 to 102, I cite various other examples of direct communications with individual dealers.

Q. Now, in connection with your work on this case, sir, did counsel for Savant ever share with you any sort of lists that they prepared in connection with discovery, setting forth an identification of dealers that Savant believed were subject to either threats or pressure from Crestron?

A. Well, I had full access to all the interrogatory responses of Savant, if that's what you mean.

Q. And I'm asking you whether or not you or your staff ever made an effort to try to calculate foreclosure shares based upon specific revenues derived from individual dealers that were identified in a discovery response, other legal paper.

A. No. I think that would clearly be under inclusive foreclosure shares since there was a far wider demand for exclusivity by Crestron.

Q. But you're assuming that everyone that potentially

my reports were invalid. There was lots of other ones, but I guess the one that comes to mind is that she -- and maybe all the defense experts, but her perhaps the most extended -- has a long line of argument to the effect that there was some shortcomings that she says Savant had and that that should change the analysis.

And that's incorrect because my analysis looked at how Savant actually performed. In the actual world, that dealer is not exposed to exclusive dealings with whatever advantages and disadvantages that they had and that she failed to consider whether or not foreclosure itself creates any shortcomings that a rival may have, which is the second point.

And that in fact a lot of her points were in fact about dealerships that in fact were deemed unrestricted in my analysis.

Q. And in terms of the unrestricted dealers, you classify Cyber Sound as an unrestricted dealer, correct?

A. Yeah. Not only I guess unrestricted, but at the subset of unrestricted dealers, it was not exposed to exclusive dealing. And only for part of the period after the exclusive dealing condition was retracted against them.

Q. As you sit here today, what do you recall with respect to any conclusions you've reached following your review of Dr. Sorenson's report?
A. Most of it seemed irrelevant. Dr. Sorenson's report seemed to be based on the assumption that I was basing my analysis on whether or not Savant meant -- met certain projections by Savant, and that's not the basis of my analysis. My analysis is based upon how Savant actually did in the actual world at dealers who were not exposed to exclusive dealing.

That general form of critique was also replicated in some other defense expert reports and is equally misguided in -- in their reports for the -- for the same reason.

And he also, like the other defense experts, tried to claim that various shortcomings that he alleged that Savant had would change my analysis, which again is untrue because any shortcomings or advantages that Savant had are already reflected in my analysis, and he just is really ignoring that fact.
Q. Anything else, sir, with respect to conclusions that you reached following your review of Dr. Sorenson's report?
A. None that I can recall at this time.

document that indicated that its regional sales territories, one of them covered both the U.S. and Canada, but none of its regional sales territories covered the U.S. and any other foreign country.
Q. And do you know as you sit here today how Savant distributes its products in Canada?
A. I know it's got a regional director whose region, if I recall correctly, went up from Michigan. He's got the sort of -- I think the Midwest area and goes up there to Canada.
Q. And I'm asking, do you know whether or not Savant sells to dealers in Canada?
A. I believe so. I believe other foreign countries, it sells through distributors, but Canada, I think is through dealers.
Q. And that's to the best of your knowledge as you sit here today?
A. Yes.
Q. And what distribution channels does Savant avail itself of in the United States?
A. The United States, all the players in the high-end residential home control systems market sell through dealers, including Crestron and AMX and Savant.
Q. Now, you are aware that Savant sells its products

same document.

And I don't see the particular price here, but I have seen Prodigy pricing that was in the same range as the Control4 pricing, and we also have deposition testimony from I believe Mr. Sell of Crestron that Prodigy competes with a bunch of low-price competitors like Control4, HAI, Elan and a bunch of other ones that he mentions.

Q. But prior to 2013, did you have any price comparisons available to you or did you come up with any price comparisons for controlled manufacturer products?

A. Well, as I said, for Crestron versus Savant, I have access to their full database, and for a comparable controller, Crestron is more expensive.

And for AMX, I have the 2007 report of Parks Associates, which notes that it intends to remain the Rolls-Royce of control systems.

For 2011, I have a Crestron document that indicates that for competitive quotes for the same job, AMX was more expensive in 71 out of a hundred jobs.

There's a Crestron document whose date I don't know in footnote 36, as I sit here, although probably it says it on the document. There's a 2009 article by

Julie Jacobson which notes that Prodigy is a Control4 buster. It's supposed to be in the same price range.

There is another report on August 17 of 2013 by Needham Company, investment bank, that talks about the different price range of Control4 versus Crestron.

Oh, here we have the Sell deposition that notes that the Prodigy line is low-priced, comparable to Control4, RTI, Universal Remote, Russound, Niles and Elan.

That's all I can recall at this time, although when I reviewed the documents that I cited, it seemed to me there were some other documents that mentioned pricing, and they were consistent with the conclusion that Control4 and Prodigy were priced much lower than Savant, Crestron and AMX.

Q. Now, in your dep -- cites, you cite to a deposition of Dave Sell, correct?

A. Yes.

Q. And I take it that in preparing your report and your expert opinion, you have relied on deposition transcripts as evidence that you consider, true?

A. Yes.

Q. And in connection with that exercise, have you considered the deposition transcripts of dealers?

in the second sentence, "Additionally, the evidence indicates that there is a general perception that Crestron, Savant and AMX's high-end systems are higher in overall quality than Control4 systems and Crestron's low-end systems."

Do you see that, sir?

A. Yes.

Q. And with respect to your statement that there is a general perception, you're relying on evidence other than any sort of independent assessment, correct?

A. I'm relying on the documents quoted in paragraphs 49 through -- I guess just paragraph 49.

Q. Okay. But as we talked about earlier, you or your staff have not made any sort of independent technical assessment as to the overall quality of any of the products at issue in this case, true?

A. No. It's not an independent engineering assessment. It's an assessment about what the documents indicate that firms and third parties have concluded about differences in quality and characteristics and how those track form conclusions about the way the market has polarized between high end and low end.

Q. And in terms of your statement right now in terms

of the way the market has polarized between high end and low end, is that based again upon your review of documents?

A. Yes. I believe it's footnote 12, where Crestron's own internal documents says, "Our residential market has become very polarized, high end versus entry-level."

Q. And what date was that document, sir?

A. I do not know the date.

But the same footnote, it cites the Klein deposition, your 30(b)(6) witness, who stresses that Prodigy was a lower end product. And there's a bunch of other documents that I cite for the proposition that Prodigy was designed to compete in the low end with Control4 and other similar products.

Q. Now, we discussed your comparison of the pricing of various manufacturers' controllers at a particular point in time, correct?

A. Yes.

Q. Now, in connection with preparing your expert report and formulating your expert opinion, you or your staff did not compare the prices of Savant's other products with the prices of, say, Control4's other products, correct?

MR. JACOBS: Objection. Vague.
A. I don't believe we have a full set of Control4's other prices. We don't have a transactional database from Control4.
Q. So you didn't do any comparisons then by definition of Control4's products with Savant's products?
A. Well, I didn't, other than to the extent that documents indicated it was cheaper. Whether my staff also looked at other documents on other components that indicated Control4 was cheaper, I am not sure of. I just know we didn't have a transactional database to do a check of a broader range of component pricing.
Q. Earlier in the day, you discussed sort of doing an apples-to-apples pricing comparison when it related to your discussion concerning the controller prices. Do you recall that?
A. Yes.
Q. And so what I'm asking you is, you know, regardless of the reason, did you or your staff ever do an apples-to-apples comparison of any Savant product other than a controller to any other product of any other manufacturer other than a controller?
A. I have not. Whether my staff looked at that, I

economist, there are different tools, quantitative tools, that one can employ to come to conclusions relating to various questions of antitrust economics. You would agree, correct?
A. Yes.
Q. Now, I take it in this case, that you -- neither you nor staff did any econometrics?
A. I guess it's statistical, but I wouldn't call it econometrics. But natural experiments of this sort are usually the best approach in a case where you've already got a monopolist because most of the econometric techniques one would use would be subject to the cellophane fallacy.
Q. And that's a legal case, correct, that you're mentioning?
A. Well, the legal case was the cellophane fall -- was the cellophane case. The cellophane fallacy is an economic --
Q. Okay.
A. -- concept, widespread among the antitrust economics literature, that you cannot determine market definition by whether or not there's a high cross elasticity at the monopoly price because any monopolist raises its price to the point where it induces cross

elasticity.

So no monopolist ever prices on the inelastic portion of its demand curve. So it would be improper to ask about elasticity at current monopoly prices to define a market.

So that's reflected in the merger guidelines by the U.S. agencies, which stress that a lot of these tests can only be used when you don't think the market has already had its prices elevated by monopoly pricing or oligopoly pricing.

Q. But here, you didn't do any quantitative assessment to determine whether or not there was monopoly pricing, supracompetitive pricing, that was already imposed by Crestron, true?

A. No. I think that's untrue. I looked at these specific instances that showed that the price was elevated by 11 to a hundred percent over the competitive level at least, so that's a direct indication of monopoly pricing.

Q. So you're basically relying on a few examples of what you call a natural experiment?

A. I'm relying -- for which issue are you talking about now?

Q. Well, I think you're -- you're mixing issues,

not conduct any econometrics in this case, correct?
A. Yes. I mean, we did statistical analysis, and I say we thought about econometrical issues in creating the but-for sample that I looked at, but there's no regression sort of analysis being done in this case.
Q. Now, at one point in your -- oh, I think it's in paragraph 84. You talk about dealer switching costs as a barrier to entry. Do you see that, sir? It's paragraph 84 on page 42.
A. Excuse me.
Yes.
Q. Did you or your staff ever quantify dealer switching costs in this case?
A. No.
Q. And did you consider the fact that dealers did switch from Crestron to Savant during the relevant time period?
A. Yes.
Q. And in fact, one of the largest dealers in Phoenix, Cyber Sound, as you know, switched basically all of their purchases from Crestron to Savant during this relevant time period, correct?
A. Yes.
Q. And are you aware of other dealers that switched

most of all their purchases from Crestron to Savant during this time period?
A. Yes.
Q. Now, in paragraph 86 -- are you there, sir?
A. Yes.
Q. I'm sorry. I apologize. Paragraph 88. You have a section on Crestron's demonstrated power to exclude rivals. Do you see that?
A. Yes.
Q. And that is your -- the sum and substance of your conclusion and analysis with respect to this power to exclude rivals?
A. Well, this paragraph incorporates a whole lot of other analysis in the report by reference.
Q. Okay. And then so similarly, you have one paragraph following that relating to Crestron's demonstrated power over price, correct?
A. Well, again, this paragraph incorporates other paragraphs by reference.
Q. And in connection with the demonstrated power over price, you cite essentially that Crestron has higher profit margins than Savant, correct?
A. Well, before I do that, I talk about the examples where it can raise prices above competitive levels.

A. It could. Or if its costs were artificially elevated by exclusionary conduct.
Q. But in this case, have you considered the evidence that Savant took no efforts to put into place cost controls during the relevant time period?
A. I'm unaware of any evidence that Savant made no efforts to control its costs.
Q. Okay. But evidence and information, especially from an outside accounting firm, that documents that would be relevant to your analysis, true?
A. I don't think so. Any -- any Savant shortcomings that may have existed in terms of its costs would be reflected in the unexposed portion of the market that I use for the but-for baseline. And as I note in the report, the costs were artificially elevated by the foreclosure in this case.
Q. By how much?
A. Well, at least for one component, we know they were increased by 12 percent.
Q. Which is that?
A. So one of Savant's top-selling products, a stereo preamplifier output module, which allows a Savant system to distribute audio from multiple inputs to multiple outputs.

relevant foreclosure. So I reject the defense expert claim that as long as you can find one dealer in a 250-mile radius that somebody could find Savant from, that there's no relevant foreclosure.

If you're foreclosed from a lot of the other dealers, that's still relevant foreclosure. It still raises rivals' costs, prevents customers from getting Savant from their preferred dealers. It still prevents those dealers from promoting the product. And it still leaves the systemic effects that make Savant's prices worse throughout the marketplace.

Q. So my question, sir, sitting here today, can you identify any locality within the United States or Canada where Savant was unable to sell or distribute its products during the relevant time period?

MR. JACOBS: Objection. Asked and answered.

A. No. It all depends on how you define locality. We haven't defined local markets in this case. So you know, again, I know the defense experts have analysis, but it seems to me, based on the unrealistic premise that consumers are equal -- have equal likelihood of buying from any dealer within a 250-mile radius in certain areas. But I have not -- I have not based my analysis on a locality by locality access analysis.

Q. So you haven't done that analysis?
A. Not what I would say -- I guess no -- no locality has been defined. I guess the relevant locality seems to me is in fact the dealer. And that's the foreclosure that I focused on.
Q. Now, in paragraph 169 to 173, you talk about deception, correct?
A. Those were some of the paragraphs I talk about deception. Yes.
Q. Right, right. And just to be clear and actually I think short-circuit some of the questioning, it's true that you're not going to opine on whether or not any of Crestron's statements were in fact deceptive, correct?
A. Correct.
Q. Your entire role here was to really be a calculator with respect to potential figures, correct?
MR. JACOBS: Objection.
A. No.
Q. Tell me why that's not correct.
A. Well, my entire role here included opining about a lot of issues besides deception, for one thing. And then even within deception, I have several paragraphs that explain why deception has anticompetitive effects, in addition to calculating the profits that Crestron

A. I didn't even see it when I wrote my report. So I didn't make a decision not to rely on it. I wasn't aware of it.
Q. Have you since reviewed his report?
A. I just briefly scanned it.
Q. And I take it you haven't had any communications with Mr. Kippycash, correct?
A. I have not.
Q. Now, did you conduct any analysis to determine the actual amount or quantify the amount of incontestable demand for Crestron's products?
A. No.
Q. What about for Savant?
A. No.
Q. What about for AMX?
A. No.
Q. What about for Control4?
A. No. Although Control4 is not in the relevant market, so I guess I could say there's zero incontestable demand in an irrelevant market for Control4.
Q. And so what is your basis for concluding that most dealers have more incontestable demand for Crestron than for Savant?

Savant's share is higher at restricted customers than at other -- than at unrestricted customers.

Q. Now, are there other critiques that we haven't yet discussed that you have concerning Dr. Joskow's report?

A. I'm sure there are, but I don't think I can recall every one of them.

Q. Have you ever worked with Dr. Joskow before?

A. I have not.

Q. Now, we've discussed Dr. Stiroh's report earlier today, correct?

A. Yes.

Q. And what are your principal critiques of her report?

MR. JACOBS: Objection. Asked and answered extensively.

A. Yeah. I don't know if I have anything to add to what I said earlier about that. There's -- if I'm recalling her report correctly, there's all this talk about specific drawbacks she sees in Savant, and my analysis already takes care of that by using a but-for world that's the actual world of unexposed dealers.

And she also misdefines Savant's share of restricted versus unrestricted dealers and mischaracterizes my analysis, which is really of the

THE VIDEOGRAPHER: The time is 4:31 p.m., and we are on the record.

MR. PARK: I have no further questions, sir. Thank you.

THE WITNESS: Thank you.

MR. JACOBS: No questions.

THE VIDEOGRAPHER: The time is 4:31 p.m., and we are off the record.

(Deposition concluded at 4:31 p.m.)

EXHIBIT 530

Mr. Kippycash has the following corrections:

| Page | Line(s) | Original | Corrected | Comment |
|---|---|---|---|---|
| 11 | 17 | passing mark of all | passing mark for all | Typo or misstatement |
| 33 | 10 | Was one | One was | Typo or misstatement |
| 37 | 18 | Morton Comput- | Wharton School of Business | Typo or misstatement |
| 37 | 10 | No feasible | Or being available as an option by Crestron at that time | Typo or misstatement |
| 40 | 14 | Poddulsky | Podolsky | Typo or misstatement |
| 42 | 17 | Beagley | Bailey | Typo or misstatement |
| 44 | 10 | May of 2006 | May of 2010 | Typo or misstatement |
| 44 | 13 | 2011 | 2012 | Typo or misstatement |
| 116 | 21 | between two and two hundred | between one and two hundred | Typo or misstatement |
| 134 | 7 | an if-when statement | an if-then statement | Typo or misstatement |
| 134 | 23 | an if-when statement | an if-then statement | Typo or misstatement |
| 136 | 6 | be programmed with if-when statements | be programmed with if-then statements | Typo or misstatement |
| 136 | 20 | do an if-when | do an if-then | Typo or misstatement |
| 146 | 9 | 2009 or 2010 | Through 2012 | Typo or misstatement |
| 173 | 24 | Yes, I would | Yes, I could | Typo or misstatement |
| 178 | 5 | whole home, compatible | whole home, comparable | Typo or misstatement |
| 192 | 11 | Pangea | Panja | Typo or misstatement |
| 192 | 16 | Pangea | Panja | Typo or misstatement |
| 192 | 17 | Pangea | Panja | Typo or misstatement |
| 192 | 18 | Pangea | Panja | Typo or misstatement |
| 192 | 22 | Pangea | Panja | Typo or misstatement |

| | | | | |
|---|---|---|---|---|
| 193 | 10 | Pangea | Panja | Typo or misstatement |
| 193 | 12 | Fast | Phast | Typo or misstatement |
| 195 | 5 | Correct. | No, I'm sorry. I meant dealer price including software programming. | Misstatement |
| 205 | 22 | Gordon Alexander | Gordon Isaac | Typo or misstatement |
| 220 | 12 | Not privy to the | I'm not privy to | Typo or misstatement |

The following portions (identified in the format of [Page]:[Line]) should be designated as Confidential:

100:21 – 101:12

104:5 – 104:10

105:16 – 105:29

106:2

106:20 – 107:16

107:22-111:19

209:17-210:17

The following portions (identified in the format of [Page]:[Line]) should be designated as Restricted Confidential:

111:21-112:20

205:15-208:20

209:5-209:7

Mr. Kippycash will provide his signature for the above next week.

EXHIBIT 531

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| SAVANT SYSTEMS, LLC<br>Plaintiff,<br><br>v.<br><br>CRESTRON ELECTRONICS, INC.<br>Defendant<br><br>CRESTRON ELECTRONICS, INC.<br>Counterclaim-Plaintiff,<br>v.<br><br>SAVANT SYSTEMS, LLC<br>Counterclaim-Defendant | Civil Action No. 10-cv-11622- MLW |

**EXPERT REPORT OF DANIEL S. KIPPYCASH**

**TABLE OF CONTENTS**


**I. QUALIFICATION AND SCOPE OF WORK ........ 3**

- **A. Retention ........ 3**
- **B. Compensation ........ 3**
- **C. Experience ........ 3**

**II. SCOPE OF THIS REPORT ........ 6**

**III. INTRODUCTION TO AUTOMATION AND CONTROL ........ 8**

**IV. QUESTIONS ADDRESSED ........ 12**

- **A. The Importance of Dealers to Manufacturers ........ 12**
- **B. The Reaction of a Crestron Dealer to an Ultimatum Regarding Savant ........ 16**
- **C. The Impact on a Dealer of Being Terminated by Crestron ........ 19**
- **D. The Likelihood of Deception Generated by the Crestron Sales and Comparison Guides ........ 23**

**V. REFERENCES ........ 25**

# I. QUALIFICATION AND SCOPE OF WORK

## A. Retention

1. I have been retained by Cesari and McKenna, LLP, counsel for Savant Systems, LLC, the plaintiff in the legal action captioned *Savant Systems, LLC v. Crestron Electronics, Inc.*, pending in the U.S. District Court for the District of Massachusetts, Civil Action No. 10-cv-11622 (MLW). I have been retained to address certain questions regarding the high-end residential segment of the automation and control product market generally known as the Custom Electronics Design and Installation Association ("CEDIA") market.

## B. Compensation

2. I am being compensated for my services at an hourly rate of $165 per hour for office work which takes place in the Riverside, California area, or a daily rate of $1485 for work that takes place outside of my office, including travel days. My compensation does not depend on the outcome of the lawsuit, the opinions that I express or my testimony.

## C. Experience

3. I have worked with companies in the CEDIA market for more than twenty-four years. My experience includes almost all facets of sales, design, engineering and management within this channel. I have owned a custom integration firm, worked as a Sales Manager, Director of Business Development, Vice President of Sales, CTO and CEO of multiple firms within the CEDIA industry. My previous employment includes Crestron, Gentner Communications, SpeakerCraft and The DaVinci Group. I have also consulted on various products, sales distribution, sales and management training and event production for Hyatt Corporation, Maytag, Sunshine Kids, IBM and the American Cancer Society.

4. I was employed twice by Crestron and held the positions of Regional Sales Manager, National Residential Sales Manager and Director of Business Development. I was Crestron's first National Residential Sales Manager. In this role, I helped introduce a Crestron product line that was largely designed for commercial applications.

5. In 2003, I founded of Xplore Solutions, which offered the first open-source automated control system and touch screen control product featuring Java, Dreamweaver and HTML for GUI development and automation programming. The Xplore Solution platform and automation system was the backbone of the NFL Team-Cam system for the NFL Network and was nominated for a technical EMMY Award in 2003.

6. In 2010, I was hired to take over the engineering department of SpeakerCraft, Inc. While there, I led the development and completion of a product known as Nirv, the industry's first fully digital audio/video distribution system with a full automation suite designed for display and use on a digital display device. This technology and system was the first in the world to use digital audio technology called CobraNet, which designed by Cirrus Logic.

7. In 2013, I co-founded and became CEO of a new firm within the custom electronics channel named The DaVinci Group. This firm specializes in high-end speaker systems for in-wall, in-ceiling, outdoor, home theater and commercial applications. The DaVinci Group is the first manufacturer to offer shares of ownership to its dealers. In its first full year, it won numerous awards including CEPro New Comers to Watch, rAVe Publications CEDIA 2013 Best in Show, 2013 EXCITE Award, 2014 EXCITE Award, Residential Systems Magazine Stellar Service Award and the 2014 CEPro Quest for Quality Award – Dealer Protection Policies.

8. My education, employment history and list of awards is as follows:

**Education**

- Attended County College of Morris, New Jersey
- McIntosh McMasters Certification
- Crown IQ Certification
- AT&T Project Management Certification
- AT&T Environmental Design Study Certification
- Dale Carnegie Sales and Networking
- Certified Meeting Planner

**Employment**

- Infinite Audio Video - Residential Custom Integration Firm (Owner)
- Audio Visual Associates - Sales Representative
- Crestron Electronics – Technical Support, Residential Sales Manager, Regional Sales Manager
- Gentner Communications – East Coast Sales Manager
- Crestron Electronics – Regional Sales Manager, Director of Business Development
- Xplore Technologies – CEO
- Xplore Solutions – CEO
- AVD – CTO
- The Momentum Group – President
- VAE – Director of AV
- Entrepreneur Assistant – Director of Technology & Business Development
- SpeakerCraft – Director of Engineering – Nirv Digital Media
- The DaVinci Group – CEO & Co-Founder

**Awards**

- Sunshine Kids Southeast Volunteer of the Year 2008
- Dealerscope Builder Marketing Program of the Year 2006
- Excite Award 2013 – Blue Aura WS-80i
- Excite Award 2014 – The DaVinci Group NFC63
- 2014 Technology Integrator Young Turk Award

9. I am an industry practitioner and executive. As such, I have not previously provided expert testimony in connection with any other litigation. I have not in the past four years been deposed as an expert, nor have I testified at trial as an expert.

10. In my roles at SpeakerCraft and The DaVinci Group, I have written various newsletters and technical articles for dealers and sales teams. For SpeakerCraft, I contributed to "The SpeakerCraft News," a publication which did not include particular bylines. For The DaVinci Group, I contributed and continue to contribute to "The DaVinci Group Dealer News," an e-mail that is distributed to dealers also without particular bylines.

## II. SCOPE OF THIS REPORT

11. I have been asked by Savant's counsel to opine regarding the following questions:

a. How important is it to a manufacturer of high-end residential automation products to be able to recruit dealers, particularly the more technically qualified dealers in the higher-revenue markets, for the resale of its products?

b. What is the likely reaction of a long-time Crestron dealer to a requirement imposed on it, by or on behalf of Crestron, that the dealer resell Crestron products or Savant products, but not both?

c. What is the impact on the business of a long-time Crestron dealer of having its Crestron dealership terminated?

d. Assuming that the Crestron Guides attached to the [Proposed] Third Amended Complaint are found to contain false and/or misleading statements regarding Savant and/or its products, how likely is it that a dealer unfamiliar with Savant and/or its products would be deceived by the statements and choose not to carry Savant products?

12. Based on my knowledge and years of experience in the CEDIA market, and my review of various materials supplied to me in connection with this lawsuit, my opinions are as follows:

a. It is critically important to a manufacturer of high-end residential automation products—particularly a relatively new entrant into the market for the sale and distribution of such products such as Savant—to be able to promptly and readily recruit and establish sales relationships with dealers, particularly the more technically qualified dealers in the higher-revenue markets, for the resale of its products.

b. A dealer who has been selling Crestron products for a period of time, having made several installations involving Crestron products and invested money and personnel in Crestron, if required to choose between carrying Savant products or continuing to carry Crestron products, but *not both*, would likely feel forced to continue to carry Crestron products because of the investments it has made to become a Crestron dealer and because of the consequences of being terminated as a Crestron dealer, as discussed in more detail below.

c. The consequences to a Crestron dealer of having its dealership terminated can be catastrophic to the dealer's business because, once terminated, according to

Crestron, the dealer can no longer service, support or upgrade the dealer's previous Crestron installations, jeopardizing the dealer's relationships with many of its existing, long-time clients.

d. Assuming that the Guides attached to the [Proposed] Third Amended Complaint are found to contain materially false and/or misleading statements regarding Savant and/or its products, it is very likely that a dealer who is exposed to one or more of the Guides and who is unfamiliar with Savant and/or its products would be deceived by the statements to the point where it would opt to not to carry, or to defer carrying, Savant products.

## III. INTRODUCTION TO AUTOMATION AND CONTROL

13. Automation has been around for many years, although many people did not realize what they were seeing was actually automation. In the early days, most automation was done from electrical triggers. For example, when a door switch was triggered, it would send a current to another device, typically a relay, which would then open/close to send another current to a light switch to turn a light on or off.

14. Early home automation was an engineered solution with the primitive use of the electronics available at that time. In the early 1980s, there was a great deal of automation being done. However, it was not seen by most of the public and was generally used only in corporate boardrooms, factories and for other, specialized applications.

15. One of the largest growth areas to drive the development of automation was its use in the corporate channel. Also, the security industry had been using this technology for many years. In fact, they still do today. However, the specialty use of automation for audio/visual equipment did not really begin to hit the mainstream until the mid-1980s.

16. Even as electronics technology began to expand its capabilities with the advancement of microchip technology for processing, home automation was still very specialized. One of the early uses of automation began with the simple control of a slide projector. In the audio/visual segment, the potential for other, broader applications of home automation technology was realized (primarily) by three primary companies: York Controls, AMX and Crestron. York Controls eventually merged with AMX. This left two primary competitors, AMX and Crestron, driving each other to create new home automation technology, applications and products.

17. In these early days, the most common uses for control were push-button controls on wall-mounted keypads, custom-wired panels with buttons and (eventually) the use of RF wireless remote controls.

18. Today, the technology has come so far that home automation has grown into three primary segments: entry-level, mid-level and high-end residential automation products. High-end residential automation systems are typically multi-functional, highly reliable, fully customizable, integrated systems designed around the client's particular desires and residence. Most such systems feature touch-screen control applications such as via Apple iOS and Droid, and (less often today) proprietary touch screens to control any and all facets of the client's residence.

19. As it stands today, a residential automation system includes a programmable controller for controlling a variety of home subsystems. These systems typically include individual products such as a control platform for switching and processing audio-video content and control signals, and one or more user-interface products, such as touch panels or pads, together with docking stations.

20. Among the subsystems of the client's residence that can be controlled by a high-end residential automation products are audio/visual, home theater, HVAC, lighting, pool/spa, security, CCTV and other lifestyle elements. For example, a given high-end residential automation product can be designed and programmed to automatically "wake up" a residence with the push of a single button by:

a. turning on a pathway lighting preset so the lights in the main hallway come on at a desired level of intensity;

b. turning on the stairway lighting at a desired level of illumination;

c. turning on a select subset of the lights in the kitchen to a desired level of illumination;

d. turning on the master bedroom lights at a desired level of illumination;

e. turning on the radiant floor heating in the master bedroom;

f. raising the master bedroom black out shades;

g. turning on the master bedroom television and sound system;

h. tuning DirecTV receiver to a particular channel such as CNN; and

i. turning the HVAC to a desired temperature, among other options.

21. High-end residential automation products are typically sold by the manufacturers to dealers, who are also sometimes known as integrators. The dealers combine the products, including not only the residential automation products, but also the subsystems such as described above, into custom-designed system which are resold to end-user customers for higher prices due to dealer markups, installation costs and programming costs.

22. The market position, caliber and features of systems that compete at the high-end residential automation segment are critical factors. Usually, a project as sophisticated as a high-

end residential automation system will involve several bidding dealers. Many of these projects are controlled, or directed, by a builder, architect and often a client management team. One of the first elements of the bid process is to review the dealers' financial stability, experience on projects of similar size and scope, references and technical expertise. A dealer who is not able to address these issues to the end-user customer's satisfaction is likely not going to be permitted to provide a bid.

23. It is my opinion that from 2006-2008, Crestron dominated the high-end residential automation market. AMX had at this time begun to focus most of its resources and attention on the commercial market. While it was still selling products into the high-end residential automation market, AMX's market share diminished significantly. Indeed, it was known in the industry and among dealers that AMX had shifted its focus almost entirely away from the residential market in favor of the commercial market. As such, AMX was not a significant competitor to Crestron in the high-end residential marketplace by 2008.

24. The control system that was seeing significant growth during this time was Control4. But, Control4's market focus was on mid-level, affordable-home automation. During this time frame Control4 was experiencing significant growth and taking market share, from the mid-level market, from Crestron. But Crestron was left almost alone in the high-end residential automation market.

25. As Control4 experienced significant growth in the mid-level market, it also experienced some product liability issue and delays in delivering new product.

26. These problems for Control4 left an opening for Crestron to focus its efforts on new product development that provided a higher level of functionality and in categories for which Control4 did not have solutions. Some of these areas were the system processing power,

video and HDMI matrix switching. At this stage in system development and product performance, there were questions in the market about the reliability of Control4 systems in larger installations.

27. Crestron also began developing automation and control systems targeted at the mid-level market that were specifically intended to compete with Control4's product offerings. This included the Prodigy and Adagio lines of products, both of which were aimed at the mid-level market. Indeed, Crestron told its sales force that these product lines were specifically designed to compete with Control4, and Crestron further instructed its sales force that dealers were not allowed to combined Crestron-branded products with Prodigy products.

28. During this time, there was a separation in the perception between what kinds of projects Control4, Crestron and AMX were able to handle.

29. During this time, Savant introduced its product line to the CEDIA custom integration channel, specifically into the high-end residential automation market.

30. During this growth time for Control4, Control4 was not systematically exposed to the dealer threats, demands or actions such as those experienced by Savant. While Crestron did attempt to encourage bad press and word-of-mouth regarding Control4 and its products, Crestron did not systematically threaten its dealers with termination if they took on Control4.

## IV. QUESTIONS ADDRESSED

31. I will now address in greater detail the questions identified above.

### A. The Importance of Dealers to Manufacturers

32. Manufacturers of high-end residential automation products cannot, as a practical matter, sell their products to a wide audience of end-user customers without doing so through dealers.

33. Today, home automation is often thought to include everything from technology sold "off-the-shelf" at Radio Shack (such as, for example, a light switch featuring X-10) to a completely engineered solution that can control every facet within a residence. The cost of these products and systems vary from $39.00 for the X-10 switch—or even less for smaller products—to more than $500,000 for the implementation of a fully functional, customized high-end residential automation solution.

34. Because of the complexity of automation products generally, all but the most basic, off-the-shelf or do-it-yourself versions of automation and control products are sold through independent dealers who purchase the products from the manufacturers. These dealers then integrate and install them in systems in their clients' residences after designing the individual installations from scratch. End-user customers simply do not have the knowledge of how to design such systems, nor the skill to install them.

35. I understand that the lawsuit between Savant and Crestron is focused on what is commonly known as the high-end residential automation market segment of the CEDIA market. It is my opinion that there is a separate and distinct high-end residential automation product market segment of the CEDIA market whose product offerings are not generally interchangeable with those offered in the entry-level or mid-level segments of that market. I believe that most other individuals with considerable experience in CEDIA agree that this is the case.

36. It is my opinion that the control portion of high-end residential automation systems in the 2010 time frame were sold by manufacturers, such as Crestron and Savant, to dealers for a total on average of approximately twenty-five thousand dollars ($25,000). High end residential automation systems could and often did sell for well in excess of this amount, depending upon the nature, number and complexity of the subsystems controlled.

37. Automation and control system product manufacturers generally can be classified based on factors such as breadth of product offerings, technology implementation, product feature sets, software customization capability and price point. Based on these factors, I rank AMX, Crestron and Savant above the remainder of the competitors in the CEDIA market and as the sole competitors in the high-end residential automation product segment of that market.

38. This is not to say the other manufacturers, such as Control4, cannot achieve a given—albeit lower—level of automation and features somewhat comparable to that of an AMX, Crestron or Savant system in a given installation. Control4 can, and at times, does. However, for all of their product offerings, the other competitors, including Control4, do not offer end-to-end, integrated, fully customizable, whole home solutions comparable to those offered by AMX, Crestron and Savant. As Control4 recognized in its IPO paperwork, Control4 was not aimed at the high-end residential automation marketplace and, historically, it has not had the product-line features to properly and consistently be used in such installations.

39. Most of the entry-level and mid-level solutions do not provide programming tools to create 100% customized graphical user interfaces ("GUIs") for the control of the automation system. This is an important aspect to the dealer for the project sale and integration cycle. Each of the high-end residential automation brands (AMX, Crestron and Savant) promotes the fact that it is a complete engineered solution. So, the authorized dealer can create system functionality, graphical appearance and performance features right down to each button. This level of technical ability is one of the elements each manufacturer and dealer will promote to new and existing clients. The level of software sophistication is an important element for dealers to obtain new clients, which may include not only homeowners, but also builders, architects, interior designers and the like.

40. Dealers who are not qualified or authorized to sell and install the high-end residential automation brands such as AMX, Crestron and Savant typically need to integrate, often in a haphazard way, a multitude of other manufacturer's products into a system in an attempt to design a similarly featured solution. Such integration efforts are rarely seamless. Indeed, such attempts often end up costing more than the high-end products they were designed to mimic; are likely to fail frequently and/or be bug ridden; and result in an unhappy end-user customer. Additionally, this means the dealer's installation, software and technician team might have to deal with several manufacturers' support groups, rather than a single manufacturer's support group.

41. Because the high-end residential automation market segment is predominantly made up of very high net-worth clients and properties, the level of system sophistication, equipment costs, feature sets and the technical expertise that is required to design, install, program and support an installation is simply too high for many run-of-the-mill audio/visual dealers.

42. First, the level of financial resources and flexibility required for high-end residential automation dealers is relatively high. These dealers must have the financial stability and resources to not only train and maintain their staff; maintain show rooms; and put out bids; but also pay in advance for some or all of the equipment to be installed in residences; and deal with end-user customer based delays in payments.

43. The level of technical expertise is also high when it comes to designing and installing these systems, as discussed below.

44. These factors tend to limit the number of dealers who can provide these services and engineering expertise for high-end residential automation products.

45. As a result of the above, it is of critical importance to manufacturers of high-end residential automation products (specifically AMX, Crestron and Savant) that they have ready access to such dealers, particularly the more technically qualified dealers in the higher-revenue locations, in order to succeed in selling their products. It is, simply, impractical to directly sell high-end residential automation products to end-user customers.

**B. The Reaction of a Crestron Dealer to an Ultimatum Regarding Savant**

46. It is my understanding, based upon my experience in the industry, what I have heard from others in the industry, and from what I have seen in this case, that Crestron threatened its dealers with termination if they decided to represent Savant. I also understand that Crestron disputes that it ever "threatened" its dealers, but instead that it made its dealers make a choice between remaining a Crestron dealer or becoming a Savant dealer. Based upon my experience in the industry, Crestron's attempted distinction is without a difference—it was a threat.

47. In order to fully appreciate the impact that an ultimatum regarding Savant would have on a Crestron dealer, it is useful to review the typical investment that a dealer must make to become an authorized Crestron dealer.

48. Most successful dealers in the high-end residential automation market, including Crestron dealers, invest in demonstration and/or engineering equipment and software programming to allow them to effectively demonstrate the manufacturer's automation concept to their clients and prospective clients. This investment in the case of Crestron can be anywhere from $5000-50,000, or even more.

49. The equipment commitment can vary depending on the dealer's staff size, capability, showroom and desire. Some dealers will only purchase demonstration equipment for

a showroom, show house or meeting room within their facility. Other dealers will not only invest in the demonstration equipment, but also purchase additional equipment for engineering and service departments.

50. The next significant investment in connection with becoming an authorized Crestron dealer is in regard to product training and certification. Crestron has several levels of training that are offered to its dealers and that are required before any given dealer will be "certified" as a Crestron dealer. I have been told that some of these training courses have included fees to attend, at least at times. Additional expenses are incurred with regard to travel and lodging for those who are required to be away from their offices to be at the site where the training is provided. There is also the expense associated with the fact that the individuals being trained are away from their jobs and not generating revenue for their employers.

51. Finally, another significant investment is software engineering. Most dealers who cater to the high-end residential automation market, including in particular Crestron dealers, will have a software development engineering department. Dealers will frequently have at least one and, for many of the larger dealers, several full-time software engineers. These engineers typically specialize in software development at salaries that can range up to low six figures per year. Software engineers who program Crestron systems are required to be specially trained in the intricacies of the Crestron software protocols, which training involves considerable time and expense on top of training relating generally to Crestron's products.

52. A software engineer at a given dealer can and often will be trained to program multiple systems and manufacturers' products. While it does take time and effort to learn how to program a given system, and while it does take time to maintain such skills, most software engineers are able to learn and maintain their skills in many different systems without difficulty.

Indeed it would be inefficient if a given software engineer could only program one system or manufacturers' products, because there are often times when a given dealer does not need Crestron programming.

53. Crestron also trains Crestron Authorized Independent Programmers ("CAIPs"). CAIPs go through the same training as software engineers employed by dealers, but CAIPs are independent contractors who are not affiliated with dealers. CAIPs can be hired to help program systems on behalf of dealers. Individuals who are CAIPs also frequently know how to program other manufacturers' systems.

54. Common sense dictates that, because of these significant investments, a Crestron dealer, especially a larger Crestron dealer with a larger dollar and personnel investment in Crestron equipment and training, would be reluctant to jeopardize its Crestron dealership if forced to choose between continuing to carry Crestron, or start carrying a competitor's line, such as Savant's line, but not both.

55. As discussed below, Crestron takes the position with its terminated dealers that they can no longer service, support or upgrade their existing clients' installed Crestron systems. For larger dealers with a long history as an authorized Crestron dealer, this could be hundreds of clients. This places the dealer at risk of losing its existing clients with Crestron installations and represents a strong, if not determinative, factor affecting the dealer's decision when the dealer is forced by Crestron to choose between continuing to carry the Crestron line, or to start carrying the Savant line, but not both.

56. Although I was not a dealer during the relevant time period, Crestron's threats (or, as Crestron called them "choices") were common knowledge in the industry and widely discussed. And, to the extent anyone had not heard about them, it became even more notorious

after Crestron sued Cyber Sound and Security. As such, most—if not all—Crestron dealers knew about Crestron's actions, even if a given dealer was not directly threatened (or told to make a choice) by Crestron.

57. In light of the above, a dealer who has been selling Crestron products for a period of time, having made several installations involving Crestron products and having devoted significant resources to becoming a Crestron dealer, if required to choose between carrying Savant products or continuing to carry Crestron products, but *not both*, would likely feel forced to continue to carry Crestron products. Indeed, insofar as the word got out among dealers that Crestron was forcing its dealers to make this choice—and, as the dealers saw it, was threatening them with termination if they did not agree to forgo Savant—many dealers would likely feel obligated to avoid Savant so as to avoid a confrontation with Crestron.

**C. The Impact on a Dealer of Being Terminated by Crestron**

58. In my opinion, the impact on a dealer of being terminated is quite large on several levels.

59. The first impact would be on the dealer's sales.

60. For example, dealers often have multiple bids for projects out at any given time. If a given dealer had three bids out that incorporated Crestron and that dealer were suddenly terminated by Crestron, then the dealer would not be able to honor any of its outstanding bids. Further, it would be unlikely that the dealer could rework those bids in time—and with sufficient trust by the end-user customer—to incorporate a new control system. This would force the dealer to cut off any pending bids involving Crestron.

61. Further, some high-end residential automation projects can take years to progress from design to completion. On many of these larger projects, the contracts stipulate that the client reserves the right to terminate the contract if new products are required.

62. The following example illustrates a job cycle that would expose the dealer to significant risk. Assume that a job has been contracted and the dealer begins to prewire the residence to match the system design. The dealer has taken funds from the first project payout and procured a great deal of the primary system hardware, including Crestron products. At a particular point in the construction phase, the dealer begins the custom programming of the project. If at this point—or practically any other point from the start of work all the way through to the final payment—the dealer were terminated by Crestron, the dealer would not be authorized to continue the installation, programming and integration on the project. This would immediately place the dealer at risk for all equipment cost and programing costs to this stage. It would also expose them to potential termination of the contract with the homeowner. This is all due to a policy or decision made by Crestron and not the dealer.

63. Another impact on a dealer being terminated by Crestron is that it would, effectively, cut that dealer off from many of its existing clients. For, one of the most important aspects of high-end residential automation projects is not only the ability of a dealer to complete the project to the client's satisfaction (and to be paid for it), but also to support the system *after* the installation to address any product defects or operational changes that need to made, and to provide service and updates as required.

64. For example, many of high-end residential automation systems have automated control of cable or satellite viewing. These are icon-driven menus that include the station-logos as the presets. Thus, there might be an icon that looks like the ESPN logo and another icon that

looks like the CNN logo. Pressing the ESPN logo icon would change the channel to ESPN and pressing the CNN logo icon would change the channel to CNN. However, cable and satellite providers frequently change their channel numbers. And end-user customers frequently change the programming packages they purchase, thereby adding or taking away channels. When this happens, the dealer must provide software modifications and upload those changes to the client's system. Crestron's position is that a former dealer cannot use Crestron's programming tools, and thus such a dealer cannot make the changes necessary from this example, or most other changes for that matter.

65. For another example, if an end-user customer wants to switch a DVD player out for a new Blu-Ray player, such modification would require reprogramming the Crestron system. Yet if a dealer is terminated, that dealer would not be able to service its existing client's system and reprogram the system to make the switch.

66. I understand that Crestron has taken the position that a terminated dealer can hire a CAIP to reprogram a system, such as in the situations detailed above. However this might not be viable for some dealers and on some client properties.

67. Many end-user customers do not allow sub-contractor employees within their residences. Similarly, many do not allow sub-contractor employees any connectivity access to the home networks and systems.

68. Further, when an installing dealer uses a new CAIP, the dealer must turn over all software source code and place all support of a project in the hands of a firm or person the client never agreed to contract with.

69. In some instances, the end-user customer views its relationship with the dealer as the key relationship. And, when the end-user customer discovers that the dealer has been

terminated by Crestron, the end-user customer's view of the dealer is denigrated, to the point where the end-user customer might no longer wish to work with that dealer, even if the dealer hires a CAIP to do the reprogramming.

70. In other instances, the end-user customer views its relationship with Crestron as the key relationship. In this instance, the dealer is a way to get Crestron products and the dealer is interchangeable with any other dealer. However, since the end-user customer knows the dealer who installed the system, the end-user customer in most instances will simply contact that dealer again to modify the system. In this situation, when the end-user customer discovers that the dealer has been terminated by Crestron, the end-user customer will find a new dealer.

71. Further, changes and upgrades often need to be made on very short notice. For example, some of the homes which have high-end residential automation installed are second, third or fourth homes that might not see more than two weeks of use per year. When the (very high net-worth) home owner shows up at the house, the automation *must* work. If it does not, then it *must* be fixed immediately. Thus, the dealer who installed the system *must* be able to immediately access and fix any issues, which is not necessarily doable if the dealer must find, contract and educate a CAIP on the given installation.

72. Finally, even assuming the original dealer can hire a CAIP, the dealer might not see any profit—or, indeed, might need to operate at a loss—with respect to such modifications.

73. Thus, Crestron's threat to terminate a given dealer is a real and significant threat, and one that would dissuade many dealers from taking on Savant if forced to choose between Crestron and Savant.

### D. The Likelihood of Deception Generated by the Crestron Sales and Comparison Guides

74. The potential of the Crestron Sales and Comparison Guides to deceive dealers, and thereby harm Savant's sales, is quite high.

75. I have reviewed but not analyzed in detail the Crestron Guides attached to the [Proposed] Third Amended Complaint. I am technically and experientially qualified to critique and comment upon the technical issues raised by those Guides. However, for the purposes of this Report, I have reviewed Savant's responses to Crestron's interrogatories regarding the Crestron Guides. I base my understanding on Crestron's misstatements upon Savant's position, as opposed to any personal analysis.

76. For some products in the audio/visual industry, such as speakers or televisions, performance can be heard, seen or in some manner easily analyzed and compared. When it comes to a software based applications, and particularly the controllers, analysis and comparison of the products are much more subjective or "behind the scenes," or requires incredibly detailed understanding of technical features. For example, a speaker company can make certain specifications available or statements about a competitor's product. And, conversely, a dealer can easily assess these claims through a simple demonstration to hear for themselves which sounds better. Similarly, it is easy to compare apples to apples when it comes to the number of pixels, refresh rates, switching speeds and controllable features of televisions. But such is not the case for high-end residential automation systems.

77. The claims made by Crestron are especially damaging due to the nature of the comparisons. The comparisons are misleading because they are not truly comparing features to features, or at least not apples to apples. Other areas are gray or simply misleading. To make an analogy, one car might have an eight cylinder engine while another might have a six cylinder

engine. It would be misleading to suggest that the latter car lacks an engine, even if it is not an eight cylinder version; indeed, the six cylinder engine might even be more powerful than the eight cylinder engine.[1]

78. The matter gets even worse when the specifications, results and claims are—such as here—either not accurate or purposely the type that a dealer cannot easily verify and test on its own. In my opinion, then, Crestron's attempt to lessen the value, performance and/or capability of Savant's products in the Guides is misleading at best and intentionally designed to do so at worst.

79. In the audio/video industry, it is common practice for manufacturers to make statements to dealers, consultants, builders and even end-user customers about a products performance. When faced with such statements, dealers will often question the validity because these comments clearly come from biased parties. However, when a company is willing to go to the lengths, as Crestron has done, to make statements in print that are handed out or shown to dealers, and in the same document inform its dealers that they cannot carry the other brand, it raises the statements to another, unacceptable level.

80. In sum, based upon Savant's position with respect to the inaccuracies of the Crestron Guides, those Guides are highly likely to actually deceive dealers and result in dealers (and end users) not purchase Savant's products. Further, these Guides address features and

---

[1] I understand that Crestron has used the analogy that a dealer of Ford cars might be prohibited by Ford from selling GM cars on the same lot. However, the analogy fails. Car dealers sell *one* product on their lots, along with the accessories to that *one* product. Automation and control dealers, however, typically sell the *entire range* of automation and control products, including audio/visual, home theater, HVAC, lighting, pool/spa, security, CCTV and/or other lifestyle elements. For example, the same dealer might carry The DaVinci Group speakers, Bose speakers and SpeakerCraft speakers; and also carry Panasonic televisions, Sony televisions and Samsung televisions. Thus, while it would be extremely uncommon—and unexpected—for a car dealer to sell competing lines of products, automation and control dealers almost always carry competing brands.

specifications that are not easily compared by the dealers themselves. And, finally, given the threats Crestron put out with respect to even attending a Savant dealer conference, dealers would be left without the practical ability to conduct their own comparisons and thus in all likelihood actually be deceived by the Guides.

## V. REFERENCES

- Personal knowledge
- Control4 CEPro Article regarding Aria-PDF Control4 IPO –PDF Crestron Annual Sales High End Automation
- Crestron's Sales Guides and Comparison Guides
- Plaintiff Savant Systems, LLC's Answers to Crestron Electronics, Inc.'s Fourth Set of Interrogatories
- Plaintiff Savant Systems, LLC's Third Supplemental Objections and Responses to Crestron Electronics, Inc.'s Interrogatory Nos. 3, 7, 22, 25, 27 and 28
- Complaint from *Crestron Electronics, Inc. v. Cyber Sound and Security*.

Dated: March 28, 2014

*<u>/s/ Daniel Kippycash</u>*
Daniel Kippycash

EXHIBIT 532

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

SAVANT SYSTEMS, LLC
Plaintiff,

v.

CRESTRON ELECTRONICS, INC.
Defendant.

CRESTRON ELECTRONICS, INC.
Counterclaim-Plaintiff,
v.

SAVANT SYSTEMS, LLC
Counterclaim-Defendant.

Civil Action No. 1:10-cv-11622-MLW

**EXPERT REPORT OF**

**SIMON D. PLATT, CPA/CFF, FCA**

Respectfully submitted this 28th day of March, 2014

Simon D. Platt, CPA/CFF, FCA

**RESTRICTED CONFIDENTIAL**

**OUTSIDE COUNSEL ONLY**

contractual and business relations, and therefore absent these acts by Savant, Crestron would have completed these product sales and benefitted from the associated profits.[23]

## VII. ANALYSIS OF LOST PROFITS DAMAGES

23. I understand that Savant allegedly persuaded dealers of automation and control products to utilize Savant rather than Crestron products for existing jobs with end customers (i.e., a "flip"). The "flip" of Crestron jobs to use Savant products, which I understand Crestron alleges constitute tortious interference with contractual and business relations, has caused Crestron to lose revenue and profits.[24] Therefore, but-for Savant's alleged tortious interference with contractual and business relations, these "flipped" jobs would have been fulfilled by Crestron resulting in additional revenue, and after the deduction of incremental costs, ultimately profits to Crestron.

### A. Determination of Crestron Lost Revenue

24. To determine the revenue lost by Crestron as a result of Savant's alleged tortious interference, I first quantified the revenue earned by Savant on those jobs it "flipped" from Crestron.

25. Specifically, I understand that a "flip" refers to the following:

> "[A] job that was pre-wired or contracted to consist of the products of a manufacturer, or for which materials were purchased and/or installed consisting of the products of a manufacturer, but was then switched to consist of the products of a different manufacturer."[25]

26. As a starting point for my analysis of lost revenue, I utilized the jobs that I understand Savant has listed as "flipped" to Savant from Crestron, as set forth by Savant in Exhibit I to *Plaintiff Savant Systems, LLC's Supplemental Answer to Interrogatory Nos. 4, 11 and 49 through 58 of Crestron Electronics, Inc.'s First, Third and Sixth Sets of Interrogatories*, dated January 8, 2014 ("Savant Supplemental Interrogatory Answer of January 8, 2014 Exhibit I"), which relates to Interrogatory No. 4. Specifically, Interrogatory No. 4 requests that Savant:

---

[23] Crestron Counterclaim Complaint, pp. 20-21.
[24] Crestron Counterclaim Complaint, pp. 12-13 and 20-24.
[25] *Crestron Electronic, Inc.'s First Set of Interrogatories to Savant Systems, LLC*, September 30, 2011 ("Crestron First Set of Interrogatories"), p. 3.

> "Identify all jobs or projects that were flipped to Savant from Crestron including, but not limited to, those flipped under the Savant Competitive Flip Program including:
>
> (a) the value of the other manufacturer or manufacturers' contract or contracts for the job;
>
> (b) the value of the Savant contract for the job;
>
> (c) the dealer or dealers connected to the job;
>
> (d) any discounted Savant merchandise provided to dealer or dealers who flipped the job and the value of the discounts."[26]

27. Savant Supplemental Interrogatory Answer of January 8, 2014 Exhibit I is a listing of 167 jobs[27] identified by Savant either as a "Potential Flip" or "Flip Completed."[28] Savant describes these two categories of jobs as follows:

> "Insofar as there is no formal method of tracking flips, including whether a proposed flip ever took place, Exhibit I identifies both sales that are confirmed as flips and instances where flips were or are proposed but for which Savant cannot confirm a flip took place."[29]

28. Of the total 167 jobs listed in Savant Supplemental Interrogatory Answer of January 8, 2014 Exhibit I, 47 were identified as "Flip Completed" while the remaining 120 were identified as a "Potential Flip." The 47 "Flip Completed" jobs are listed in **Exhibit 3** to this report. My analysis, which is discussed in detail below, was limited to these 47 completed jobs that were "flipped" to Savant from Crestron, and included a detailed review of the related documents cited in Savant Supplemental Interrogatory Answer of January 8, 2014 Exhibit I.

29. As part of my review of these 47 jobs, and using the best evidence available to me in this matter, I estimated the amount that Savant most likely realized as revenue for each job. With

---

[26] *Plaintiff Savant Systems, LLC's Supplemental Answer to Interrogatory Nos. 4, 11 and 49 through 58 of Crestron Electronics, Inc.'s First, Third and Sixth Sets of Interrogatories*, dated January 8, 2014 ("Savant Supplemental Interrogatory Answer of January 8, 2014"), pp. 2-4.

[27] I understand that a "job" refers to "the design or configuration, pre-wiring, purchase, and installation of the products of a manufacturer that constitutes a home, business, or other institution's control and automation system." (Crestron First Set of Interrogatories, p. 3.)

[28] In one instance a job for the dealer Theatron Home Theater, Inc. is listed simply as "Complete" rather than "Flip Completed." However, for purposes of my analysis, I have assumed that "Complete" in this instance is synonymous with "Flip Completed."

[29] Savant Supplemental Interrogatory Answer of January 8, 2014, p. 4.

respect to the Savant job revenue, the common source documents included Savant Sales Quotes, Purchase Orders from Dealers, Savant Order Confirmations, Savant internal tracking worksheets, Dealer Proposals, and Savant email correspondence.[30]

30. Once the review of documentation specifically identified by Savant as relating to the 47 " Flip Completed" jobs was complete, I then performed an independent search for additional documents produced in this matter to supplement my understanding as to the relevant Savant values.

31. Of the 47 jobs "flipped" to Savant from Crestron, based on my detailed review, there was one job that clearly appeared to be duplicative of another job listed on Savant Supplemental Interrogatory Answer of January 8, 2014 Exhibit I. I have consolidated these jobs within my analysis, and only included the Savant value associated with one of the two jobs to avoid potentially double-counting any Crestron lost revenue, as detailed in **Exhibit 3**.[31]

32. For the remaining 46 jobs "flipped" to Savant from Crestron, I evaluated the documentation associated with each job individually to determine the appropriate revenue value on which to calculate the associated lost profit. In five instances, I did not have documentation available to support a value for the "flipped" job, and so my analysis and conclusion does not include any Crestron lost profits associated with these five jobs "flipped" to Savant from Crestron. See **Exhibit 4** for additional detail.[32]

33. With respect to the appropriate revenue on which to calculate lost profit, I have relied on the best alternative source available to me, which is the revenue that was earned by Savant. Such an assumption is consistent with my understanding, as discussed in the Background section above, that Savant products were generally priced competitively with Crestron products.

---

[30] To the extent that source documents differed as to the likely revenue earned by Savant for a particular job, I exercised my professional judgment as to the most reliable source, as noted throughout the Exhibits to this report.
[31] Specifically, I have consolidated StoneTurn ID 95 and StoneTurn ID 98 into a single job (i.e., StoneTurn ID 98). The dealer for both jobs was "Home Theater of Long Island," and while the job referenced in StoneTurn ID 95 was "Yales" and the job referenced in StoneTurn ID 98 was "Yates," the sales order number noted in both was exactly the same - #55334. (SAVANT1614857; and SAVANT0311796-797.)
[32] These five jobs for which I did not have documentation available to support a value for the "flipped" job include StoneTurn ID 13, 96, 114, 124 and 147. See **Exhibit 4**.

34. Further, the deposition of John Clancy, Executive Vice President and Chief Technology Officer of Audio Command Systems, states:

> "Q. Is there a difference in terms of cost between the [Crestron and Savant] systems?
>
> A. Hardware-wise, no.
>
> Q. If you were to --
>
> A. They're pretty similar.
>
> Q. If you were to take the same basic installation of everything other than the control system, using Savant versus Crestron for just the control products, you're saying they'd be about the same cost?
>
> ...
>
> A. In our experience, they're very similar price-wise."[33]

35. Additionally, Jonathan Lane, owner of SoCal Smart Home, Inc., stated in deposition that:

> "Control4 was probably just as young, but the price point outweighed anything else, because at that time Crestron and Savant were about the same price hardware[]wise. They were pretty much neck and neck. I would say Savant is probably less now than Crestron, maybe 10, 20 percent less. Programming[]wise they have always been less, but hardware[]wise they were pretty much neck and neck. Control4 obviously being considerably less."[34]

36. In certain instances, the only value that was available for these jobs was the price that was ultimately charged by the dealer to the end customer, which would presumably include the markup from the amount the dealer was originally charged by Savant. Therefore, in these instances (and where possible), I attempted to match the model number and suggested retail price of an item in the Savant proposal and/or equipment list against Savant's dealer price lists for the same time period.[35] To the extent I was able to find a match, I then identified the appropriate dealer cost (i.e., revenue to Savant) for the given item that was associated therewith. To the

[33] Clancy Deposition, pp. 7 and 59. Also, see Clancy Deposition pp. 159-161.
[34] Deposition of Jonathan Lane, April 18, 2012 ("Lane Deposition"), pp. 73-74.
[35] Savant's dealer price lists included on a product-by-product basis both the suggested retail price to be charged by dealers to end customers, as well as the amount Savant charged its dealers. (See e.g., SAVANT0083235-370; SAVANT0143224-360; and SAVANT0059318-324).

EXHIBIT 533

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

SAVANT SYSTEMS, LLC, )
)
Plaintiff, )
)
-v- ) CAUSE NO.
) 1:10-CV-11622(EFH)
CRESTRON ELECTRONICS, INC., )
)
Defendant. )

The deposition upon oral examination of RONALD A. FLEMING, a witness produced and sworn before me, Elizabeth T. Lindner, RPR, Notary Public in and for the County of Hendricks, State of Indiana, taken on behalf of the Defendant at the offices of Stewart Richardson & Associates, One Indiana Square, Suite 2425, Indianapolis, Indiana, on March 19, 2013, at 9:28 a.m., pursuant to all applicable rules.

STEWART RICHARDSON & ASSOCIATES
Registered Professional Reporters
One Indiana Square, Suite 2425
Indianapolis, IN 46204
(317)237-3773

A No.
Q Did you speak to anybody from Savant?
A No.
Q Did you speak to anybody from Crestron?
A No.
Q What did you and Mr. Gilpin talk about?
MR. CONLEY: Well, to the extent that it was a meeting with counsel, I would say that that's privileged. Outside of that meeting, I don't have a problem about it. But we had a meeting with himself and me and Mr. Gilpin.
MR. KAVANAGH: Okay.
MR. CONLEY: So if he could avoid talking about that conversation.
Q I won't go into that at this point, but, okay, besides your meeting with Mr. Conley or where Mr. Gilpin was present, what did you talk about with Mr. Gilpin about the deposition?
A Nothing.
Q Okay. You did not meet with Mr. Gilpin or speak with Mr. Gilpin outside of your meeting with Mr. Conley?
A When I first was aware of the subpoena, I let Mr. Gilpin know. He said we have to involve Mr. Conley, and we did. And every conversation

since then has been the three of us alone, nobody else.
Q Do you know if CEDIA responded to a document subpoena in this case issued by Crestron asking that CEDIA produce documents?
A Yes.
Q And did you have any role in responding to that subpoena?
A Yes.
Q And what did you do?
A I searched my e-mail files for anything with the word Crestron or Savant in it, printed it out, and gave it to my attorney.
Q And then your understanding is your attorney reviewed them and turned them over to us?
A I assume, yes.
Q Do you know if your attorney turned over everything you gave to him?
A I have no idea.
Q Mr. Fleming, what is your title at CEDIA?
A Senior director of sales and new business development.
Q What is CEDIA?
A CEDIA is a trade association of the custom electronics design installation group. We

represent the industry of the custom home installation market.
Q What is the custom home installation market?
A It's everything from home theatre design and installation, power management, home automation. It's in security systems. It's primarily the low voltage industry that gets installed in the consumer's home.
Q What is home automation, in your mind?
A It's the -- the automatic functioning of something you could do manually for purposes of convenience.
Q You also mentioned power management.
A Uh-huh.
Q What is that?
A Energy savings primarily; setback thermostats, perhaps; maybe integration of solar cells; wind turbines. Things that would make the home more power efficient.
Q And you also mentioned home security. What did you mean by home security?
A Protection of burglary, fire, break-in, gas, carbon dioxide, things of that nature.
Q And the last thing you mentioned was home theatre --
A Uh-huh.

Q -- was home theatre.
A Entertainment. So it's the integration of audio throughout the home, perhaps a room for viewing theatre with an impactful sound system, things of that style.
Q Can home security be part of home automation?
A Yeah, I think so.
Q Can power management be part of home automation?
A I think so.
Q Can your home theatre be part of home automation?
A Perhaps.
Q Why do you say perhaps?
A Well, I can envision where you would push a button and the lights would dim to create an atmosphere for watching a movie. That's automated, because you're not manually pushing every switch. Perhaps maybe the screen opens up, a curtain opens up and the screen comes down. So there's servo functions that to me would signify automation.
Q So home theatre could be part of home automation?
A Yes.
Q Can you have a home automation system that controls your home theatre, your power management, and your home security?
A Yes.

Q Can you have a home automation system that only controls the home theatre and power management?
A Yes.
Q I will only take this one step further, but can you have a home automation system that controls your power management and your home security but not your home theatre?
A It would be a partial, but I don't see why you wouldn't -- yes, I -- simply, yes.
Q So home automation can control many things, few things, or different things from situation to situation; right?
A Correct.
MR. JACOBS: Objection, compound and vague.
Q Does CEDIA have members?
A Yes.
Q Who are the members of CEDIA, generally speaking?
A The installers are the primary membership class; we have manufacturers; we have manufacturers' representatives; we have professional services; and students.
Q Why might it be attractive for a manufacturer to become a member of CEDIA?
A We have an expo, and the cost to exhibit at the show is lower for a member. So there's a financial

our show, were a little unlucky.
Q When you say CEDIA is a leading indicator of the recession, what do you mean?
MR. JACOBS: Objection, mischaracterizes his testimony.
Q You can answer.
A Oh. It's just my own personal theory that the belt tightening that consumers began in September -- officially began in September 2008, began earlier in the segment that -- of the population that we address. It's my own personal opinion only.
Q And that's fine that it's your own personal opinion. If you are speaking for anyone else besides yourself, you can preface that. But in your testimony today, we'll assume that you are speaking for yourself.
A Okay.
Q So I'm interested in what your thoughts are.
A Okay.
Q So I think you referred to -- actually, can you read it back? I think he referred to something about people that we deal with.
In your response just now, you referred to the segment of the population that we address.
A Uh-huh.

Q What did you mean by that?
A The economic class.
Q What economic class does CEDIA address?
A Primarily the upper middle class and wealthy.
Q In your opinion, were the upper middle class and wealthy affected by the recession?
A Yes.
Q And what do you base that on?
A Personal experience.
Q And by personal experience, what do you mean?
A It affected me. It affected my family. It affected friends that I know. It affected everyone I read about in the newspaper. It affected the unemployment rate, on and on.
Q Does your opinion in any way stem from your experiences at CEDIA?
A No, I started with CEDIA in 2011, which the recession was -- became normal by then.
Q How do you believe the recession affected CEDIA as an organization?
MR. JACOBS: Objection, lacks foundation.
By the way, if I object, I don't have the authority to tell you not to --
THE WITNESS: Okay.
MR. JACOBS: -- respond. I'm simply

# EXHIBIT 534

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------
SAVANT SYSTEMS, LLC,
Plaintiff, Case No.
-against- 10-CV-11622(EFH)
CRESTRON ELECTRONICS, INC.,
Defendant.
-------------------------------

DEPOSITION OF ROBERT GULLO, the witness herein, taken at the offices of Steptoe & Johnson, LLP, 1114 Avenue of the Americas, New York, New York, on March 5, 2013, at 9:59 a.m., before Robert Bloom, a Shorthand Reporter and notary public, within and for the State of New York.

R. Gullo

Q. What manufacturers control products do you sell?

A. Crestron, Control 4, Savant, Lutron.

Those would be the primary. AMX.

Q. Crestron, Control 4, Savant, AMX and Lutron?

A. Correct.

Q. Do you sell URC?

A. A little bit, yes.

Q. Do you consider URC to be a control product?

A. No. Not really.

URC for me is more like a universal remote control. It's a little different.

Q. Do you also sell Sonos?

A. Yes.

Q. Do you consider Sonos to be a control product?

A. No.

Q. Among the control products that you sell, Crestron, Control 4, Lutron, Savant and AMX, do you consider them to be competitors of each other?

A. Sure, yes.

R. Gullo

Mr. Siakas?

A. Well, yes, that, and I had -- our company had lost that deal previously, so it was a little bit of a kick in the balls because the guy was trying to steal my clients -- I mean my employees, and also was awarded a project and then the guy burns his business down. So it was kind of a whole ironic, bizarre twist of circumstances.

Q. So Mr. Siakas was a Savant dealer and he burned his business down?

A. I don't think that has anything to do with being a Savant dealer. A guy is a scumbag, a scumbag is a scumbag is a scumbag.

Q. He was a Savant dealer, he had the O'Shea job and then he burned his business down?

A. That's right.

MR. JACOBS: Objection to the extent counsel is suggesting there is any relation between any of those.

Q. At the time Mr. Katsiris called you about the O'Shea job, were you a Savant dealer?

A. No.

R. Gullo

Q. Why not?

A. Still was investigating, as I always do, going through my own due diligence.

Q. Well, why would you do due diligence on a manufacturer of control products?

A. Because if you look up my long list of control companies, I've always been control agnostic. I offer my clients choice. And I always have since 1987. So I'm always interested in offering my clients different options.

Q. So by saying that you like to offer your clients different options, you sold Crestron -- you offered Crestron at the same time that you offered AMX, Lutron or Control 4, right?

A. We discussed the best fit with every client and we discussed -- it all depends on the project, the job, the circumstances, the fit. There's a whole slew of reasons.

Q. Right, but since you took on Savant, your company, EDG, has offered to potential clients products from Lutron, AMX, Savant, Crestron and Control 4 in the control area?

R. Gullo

A. That's correct.

Q. Now, you said you were doing your due diligence and were not a dealer yet at the time that Mr. Katsiris presented you with the O'Shea project?

A. Yes.

Q. What type of due diligence do you do on a control manufacturer?

A. Just try to understand more about their -- understand the products, understand the people behind the products, try to find out, you know, how they're funded. That kind of due diligence.

Ask other people -- is for references, people I can talk to. Standard due diligence.

Q. Was Savant -- you testified earlier the first time you saw Savant was at a CEDIA conference approximately five years ago, right?

A. Correct, yes.

Q. Is it difficult to find references for companies that are new to the market?

A. Sure.

Q. Why is that?

R. Gullo

A. Because they don't have enough of a reference base, obviously.

Q. Now, you said as part of your due diligence you like to understand the products the potential manufacturer offers.

What did you mean by that?

A. Well, understand their product line, meaning what products are they selling, what are they controlling, the -- what's the mechanism for the user interface, the touch screens and remotes and things of that sort.

You know, the back end of it, the software that operates it. Those kind of things.

Q. And why is that important to you?

A. I got to see if there's a fit.

Q. A fit between who and whom?

A. A fit, if the product -- if the vendor's product line fits my company's, you know, interests, and our clients in types of projects we do.

Q. So sometimes there is not a fit between your company, EDG and a manufacturer?

A. Sure.

R. Gullo

2009 time frame.

I understand you're not great with dates, but try to go back a couple of years, shortly after Savant came into the market.

Do you have an idea how much a high end automation and control system would have cost then in terms of the floor?

MR. KAVANAGH: Objection to form, vague and ambiguous regarding a control system.

A. Prior to iPad it would have been about 30 percent, 40 percent more, because touch panels are always a big -- were always a big cost of control systems.

Q. If you could go through the pile of exhibits you have there and pull out Exhibit 2, the second exhibit you had been handed.

A. Yes.

Q. It's an E-mail from you to Mr. Katsiris dated March 18, 2009.

Do you have that, sir?

A. I do.

Q. Flip to the second page towards the bottom, there is a paragraph which is under the

R. Gullo

A. That's correct.

Q. What would happen to you if the Crestron dealer were terminated by Crestron?

MR. HAMMER: Objection.

MR. KAVANAGH: Objection to form. Calls for speculation, vague, ambiguous.

MR. HAMMER: I'm not sure I understand, what would happen to him.

Q. Would you be concerned if Crestron terminated your Dealer Agreement?

MR. KAVANAGH: Objection to form, vague, ambiguous.

A. Yes.

Q. Why would you be concerned?

A. Because I have a large customer base that I need to maintain and service.

Q. Is it your understanding that you would not be able to maintain and service your existing Crestron customer base if your Dealer Agreement with Crestron were terminated.

MR. KAVANAGH: Objection. Vague, ambiguous, calls for a legal conclusion.

MR. JACOBS: Could you please read back the question?

R. Gullo

(Whereupon, the requested portion was read back by the court reporter.)

MR. HAMMER: You're talking pursuant to the agreement or pursuant to a conversation? What are you talking about?

MR. JACOBS: I'm just asking for his understanding, any understanding that he has.

MR. KAVANAGH: Same objections.

A. If my Dealer Agreement with Crestron was terminated, I would not be able to purchase parts or get support and, therefore I would not be able to support my client base which the large majority of my client base are Crestron systems.

Q. Do you have -- do you at EDG have a lot of repeat business?

A. Yes.

Q. So if a customer installs a system they might come back to you to modify the system, correct?

A. Correct.

Q. Or to put in a whole new system, yes?

A. Correct.

R. Gullo
MR. HAMMER: How it would affect him.
Q. How it would affect on other dealers in general. I'm not focusing on the HTSA.
You have been in this industry for 25 years. Based upon that experience, when you say a sentence like:
"Remember, you can't be a Crestron dealer and also sell Savant products" --
A. It creates fear. It's fear and intimidation.
Q. How would that fear and intimidation affect dealers?
MR. KAVANAGH: Objection. Vague, ambiguous.
A. Because they don't want Crestron to fire them and take away their dealership. Then they won't be able to service their clients.
Q. Have you heard that sort of sentiment from the industry, excepting the HTSA?
MR. KAVANAGH: Objection to form. Vague, ambiguous.
A. Only within HTSA.
MR. JACOBS: I would like to mark as Exhibit 17, a Crestron document entitled,

R. Gullo

THE VIDEOGRAPHER: Now going off the record at 3:22 p.m. This is the end of the deposition for today.

(Time noted: 3:22 p.m.)

______________________

Subscribed and sworn to
before me this _____day
of _______________2013.
_______________________
Notary Public

EXHIBIT 535




## Home Automation

# Savant and Control4



## The user experience is key…

Choosing your user interface is paramount to the satisfaction that you will have with your control system.

Your user interface will come in a variety of types from handheld remotes and touchscreens to in-wall touchscreens and keypads. Understanding how you will interact with these devices will make the user experience much more powerful. Once you are comfortable with the basics on how your system will work, now you have to decide what you want to make work.



It is extremely important not to make decisions too hastily at this stage. We find that within 12 months of ownership homeowners change their thoughts on what they would like to do, and their favorite parts of the system are often different than what they thought they would be.

Savant automation provides both local and remote access to control everything from intelligent lighting, home theater or media

offline Click here to leave a message



room,whole-house audio and media, security, and climate—any home appliance connected to a Savant Smart System. All this is done with lightning speed, as it runs on a specially loaded, dedicated Mac computer. Imagine being able to help a family member turn on the television or pick out a favorite movie when you aren't even home. Maybe you have just come home from a long trip and can't wait to get into your hot tub to relax. When you left, you put your home in away mode, so the hot tub lowered its temperature to save energy. Now you can get it ready, so by the time you get home, it will be the perfect temperature again, saving you both time and money.

### Control4, easy to operate, lighter on your budget

Savant is not your only option. Control4 automation provides an incredibly powerful system with a lighter budget in mind. Just like Savant you can take control of your entire home from a variety of interfaces to control your lighting, security and keyless door entry,whole-house audio and media, climate and energy management, just about any device connected to a Control4 automation system.

### Savant Automation Key features & benefits

- Mac-based, dedicated processor for the fastest response of any control system on the market.
- Native iTunes support to playback all of your media purchased in or out of the iTunes store.
- Native iPad, iPhone, and iPod Touch interface for top tier performance
- Remote access right from your internet connected iPad or iPhone and inside the app.
- Completely customizable graphics.
- New handheld remote will be able to function dually has a telephone handset.
- Savant's trademarked on-screen display (OSD) overlays over your current video source, so you can manage your house without switching sources.
- Savant True Image Control offers a revolutionary option to control anything in the room by literally touching the picture of it on your iPad.
- Superior remote access for support engineers means less service calls and faster upgrades.

### Control4 Automation Key features & benefits

- The most affordable home automation system available.
- Control4 manufactures many of the sub-system devices such as lighting and HVAC controls for maximum compatibility.
- A wide variety of native interfaces from standard remotes, keypads, in-wall touch panels and the iDevices.
- The web-based 4Sight account allows you to access your automation functions remotely.
- A powerful media search and database service allows for the widest variety of content from mp3 and apple audio formats to Apple TV video, DVD, and Blu-Ray digital formats. This allows you the most flexibility and best quality available.
- Control4 uses a proprietary zigbee mesh network, so the more Control4 you install in your home, the more reliable your system becomes.
- Easy to program back end means you can spend more on the fun toys and less on a specialized programmer to make it work.
- Savant True Image Control offers a revolutionary option to control anything in the room by literally touching the picture of it on your iPad.

Copyright © 2011 The Audio Video Specialists. All rights reserved.
Designed by The Audio/Video Specialists 2011

offline Click here to leave a message

EXHIBIT 537

# MAKING THE ULTIMATE EXPERIENCE IN HOME ENTERTAINMENT A REALITY

Experience a showroom environment that feels more like a home than a store. Discover the finest products from world-renowned brands. Plus, our dedicated staff of System Designers, Engineers and Installers are dedicated to turning your home entertainment dreams into reality. When you're ready for the ultimate home theater experience, look no further than the new Magnolia Design Center located inside your redesigned Best Buy store.

## **PREMIUM GEAR** FROM THE FINEST BRANDS



Every Magnolia Design Center showcases the latest gear from the most sought after brands, including 4K Ultra HD and OLED TVs, the finest floor and bookshelf speakers, as well as the newest sound bars and headphones. We also offer a complete line of outdoor audio products, plus home automation gear designed to bring it all together. And with brands like McIntosh, MartinLogan, Bowers & Wilkins, Sonus faber, Bang & Olufsen and so many more, we have the names that even the most discerning home entertainment enthusiasts are sure to love.

## **OUR KNOWLEDGE** IS OUR BEST PRODUCT

Inside every Design Center, you'll find employees that are some of the most knowledgeable and experienced in the industry. They not only have a passion for the latest home entertainment gear, but they also have a passion for finding you exactly what you need and installing it to perfection. From System Designers and Project Managers to Engineers and Installers, everyone at Magnolia is dedicated to your complete satisfaction, and we do everything we can to exceed that goal.



## **SHOWROOMS** LIKE YOU'VE NEVER EXPERIENCED BEFORE

Enjoy a shopping environment that feels more like a home than a store. Test-drive the finest products in private demo rooms that let you experience the gear before you get it home. Then enter our inspirational showrooms that allow you to see, hear and feel the latest technology in real-life settings, as well as multiple audio rooms that let you test products side-by-side.

### Magnolia Design Center Locations

**Find a Design Center Near You**

Use this locator to find all Magnolia Design Center locations. Check back often to see the new showrooms we've added across the country.

Select a State ...

**Stand-Alone Design Centers**

**BELLEVUE**
14404 NE 20th Street, Bellevue, WA 98007
425-747-0850

**ROOSEVELT**
6308 Roosevelt Way NE, Seattle, WA 98115
206-525-1961

**SAN RAMON**
110 Sunset Drive, San Ramon, CA 94583
925-242-3600



## **ANY PROJECT** ANY SIZE

Whether we're installing a flat-panel TV on your wall or turning a spare bedroom into a full-blown 7.2-channel home cinema, no job is ever too big or too small for Magnolia. And because we've completed projects that have reached the multi-million dollar mark, we're confident we have the products and resources to bring any home entertainment dream to life.



TRUSTe Certified Privacy

Online prices and selection generally match our retail stores, but may vary. Prices and offers are subject to change. © 2014 Best Buy. All rights reserved. BEST BUY, the BEST BUY logo, the Tag Design, MY BEST BUY, and BESTBUY.COM are trademarks of Best Buy and its affiliated companies.