# EXHIBIT 593

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| SAVANT SYSTEMS, LLC<br>Plaintiff,<br><br>v.<br><br>CRESTRON ELECTRONICS, INC.<br>Defendant<br><br><br>CRESTRON ELECTRONICS, INC.<br>Counterclaim-Plaintiff,<br>v.<br><br>SAVANT SYSTEMS, LLC<br>Counterclaim-Defendant | Civil Action No. 10-cv-11622-EFH |

**PLAINTIFF SAVANT SYSTEMS, LLC'S SUPPLEMENTAL ANSWERS TO INTERROGATORY NOS. 4, 11 AND 49 THROUGH 58 OF CRESTRON ELECTRONICS, INC.'S FIRST, THIRD AND SIXTH SETS OF INTERROGATORIES**

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure and the Local Rules of the United States District Court for the District of Massachusetts, Plaintiff, Savant Systems, LLC ("Savant"), provides the following Supplemental Answers to Interrogatory No. 4 of Crestron Electronics, Inc.'s ("Crestron") First Set of Interrogatories, Interrogatory No. 11 of Crestron's Third Set of Interrogatories, and Interrogatory Nos. 49 through 58 of Crestron's Sixth Set of Interrogatories, as follows:

## GENERAL OBJECTIONS

1. Savant hereby incorporates by reference the General Objections stated in its earlier Responses.

## ANSWERS TO INTERROGATORIES

**Interrogatory No. 4:**

Identify all jobs or projects that were flipped to Savant from Crestron including, but not limited to, those flipped under the Savant Competitive Flip Program including:

(a) the value of the other manufacturer or manufacturers' contract or contracts for the job;

(b) the value of the Savant contract for the job;

(c) the dealer or dealers connected to the job;

(d) any discounted Savant merchandise provided to dealer or dealers who flipped the job and the value of the discounts.

**Response to Interrogatory No. 4:**

Without waiving and expressly reserving the foregoing objections, Savant states that the information requested in subparts (a) and (b) of this interrogatory is not available to Savant because it does not have contracts per job with dealers and purchase orders from dealers are not generally specific to a given job or dealer/end user agreement. Savant states that it is in the process of preparing a report based on its business records from which the information requested in subparts (c) and (d) of this interrogatory may be derived or ascertained. Savant will produce the report upon its completion.

**First Supplemental Response to Interrogatory No. 4:**

Without waiving and expressly reserving the foregoing objections, Savant states that it has conducted a search of its business records for the information requested in each of the subparts of this Interrogatory, and that the information requested is not available from those records.

**Second Supplemental Response to Interrogatory No. 4:**

Without waiving and expressly reserving the foregoing objections, Savant states that it has conducted a search of its business records for the information requested in each of the subparts of this Interrogatory, and that the information requested is not available from those records.

Savant states that inquiries have been made of James Carroll and other Savant personnel likely to have the information requested by this interrogatory and such individuals have no specific recollection of the matters requested.

Savant is also in the process of electronically searching the hard drives of several Savant custodians and, specific shares/folders of its central servers, using keywords likely to uncover any documents relating to the matters requested (e.g., "flipped jobs," "Competitive Flip Program" and "flip"). In the event that any relevant information is obtained from documents uncovered in this searching, Savant will further supplement this response when the searching is completed.

**Third Supplemental Response to Interrogatory No. 4:**

Without waiving and expressly reserving the foregoing objections, pursuant to Federal Rule of Civil Procedure 33(d), Savant refers Crestron to the documents listed in Exhibit H attached hereto. Savant further refers Crestron to the sales data produced by Savant at SAVANT3330289-SAVANT3330593.

**Fourth Supplemental Response to Interrogatory No. 4:**

Savant did not and does not track flips from any competitor to Savant, including under the Competitive Flip Program.

The only way Savant has to know whether a given project is a "flip" is when so advised by the dealer. And, even in such instances, it is difficult to tell whether a contract for a competitor's products had been signed; whether there were actually competing bids; whether the end-user was simply considering a competitor's products; or even if there were competing products at all. As such, Savant conducted a thorough search of the documents produced in this litigation for projects that were flipped. However, it is also difficult to correlate correspondence and communications with often vaguely identified projects by dealers with actual, finalized sales. As such, any effort to determine whether a specific sale was actually a flip is difficult at best.

Without waiving and expressly reserving the foregoing objections, Savant refers Crestron to Exhibit I attached hereto, and pursuant to Federal Rule of Civil Procedure 33(d), to the documents cited therein. Insofar as there is no formal method of tracking flips, including whether a proposed flip ever took place, Exhibit I identifies both sales that are confirmed as flips and instances where flips were or are proposed but for which Savant cannot confirm a flip took place. Further, all monetary values might not represent the final contract value, insofar as proposals are not final, and even finalized projects are often altered or amended in process. Savant further refers Crestron to the sales data produced by Savant and provided via online access.

**Interrogatory No. 11:**

Identify all dealers who have requested or applied to be a Savant dealer that have been denied a Savant dealership by Savant.

**Response to Interrogatory No. 11:**

Subject to and without waiving the General Objections, Savant states the following:

**DSI Entertainment Systems**, 6955 Hayvenhurst Ave, Van Nuys, CA 91406;

**Paragon Technology Group**, 3766 Highway 82, Glenwood Springs, CO 81601; and

**Strategic Sync**, 2105 Avenida Espada, San Clemente CA 92673.

**First Supplemental Response to Interrogatory No. 11:**

Subject to and without waiving the General Objections, Savant further states the following:

Savant engaged a number of manufacturers' representatives in different regions of the United States to identify dealers who were qualified for and capable of becoming Savant dealers within the representatives' respective regions. The representatives were given general instructions on the qualifications and requirements for dealers to become Savant dealers, but the representatives acted semi-autonomously in their efforts to find and sign new Savant dealers.

Insofar as Savant was a new company, Savant actively sought to increase—rather than limit—the number of dealers signed to distribute and sell its products. However, since the bulk of Savant's sales were of its high-end, residential automation and control products, Savant's general sales strategy at least during the first few years of its existence was to selectively target so-called "Tier 1" and "Tier 2" dealers. As such, Savant instructed the representatives to look for dealers who were of sufficient size and capability to competently serve as Savant dealers. The representatives were further instructed to sign up as many such dealers as the representatives thought were capable of meeting the requirements.

Although Savant's instruction to the representatives was to engage as many capable, qualified dealers as possible in order to expand the brand and market penetration, some representatives—of their own accord and without expressly informing Savant—also, in a limited

number of instances, declined to sign or deferred signing certain dealers in a given area of their regions to avoid there being what the representatives believed in their professional judgment at that time to be "too many" Savant dealers in a given geographic area. However, at no time was any dealer ever given the exclusive right to sell into a geographic region, and at no time was any dealer refused a Savant dealership in a given geographic region because another dealer in that region was exclusive.

The process for becoming a Savant dealer usually began in an informal way. At times, an employee of a given representative would speak with a dealer within that representative's region about the possibility of becoming a Savant dealer. At other times, a dealer would of its own volition approach an employee of the representative about becoming a Savant dealer. These communications usually occurred in person or over the telephone. In each instance, the representative would explain the requirements for becoming a Savant dealer to the prospective dealer. In most instances, if the dealer could not meet the requirements, the dealer itself would recognize as much and withdraw from consideration. It was, therefore, rare for a dealer to press for a Savant dealership agreement if it were not qualified; and, therefore, it was rare for the representative to explicitly deny a Savant dealership to a given dealer due to the dealer's size and capabilities. At other times, even if a dealer could meet the requirements to become a Savant dealer, the dealer might be turned down by the representative for reasons relating to the dealer's business practices, reputation, credit or for other reasons. For example, some dealers admitted that they would never actively sell Savant products. Rather, they wanted to carry Savant as a basis to increase the number of jobs on which they could compete, regardless of any preference preliminarily expressed by an end user.

Once the representative and the dealer agreed that the dealer could and should become a Savant dealer, the dealer would begin the formal application process. Only at that time would the dealer fill out an application, which application would be passed on to Savant. Insofar as only dealers who were, effectively, prequalified would ever fill out an application, no dealer who ever filled out an application has ever been denied a dealership.

In light of the above, and following its reasonable investigation of information within its and its current representatives possession, custody or control, Savant hereby identifies the following dealers whose requests for Savant dealerships may have, at one time or another, been denied or deferred for a period of time:

**Artisan**, Scottsdale, AZ

**Automated Environments**, Mesa, AZ

**Avitel**, Carefree, AZ

**Carefree Audio Video**, Carefree, AZ

**Cavalti**, Scottsdale, AZ

**Clean Media**, Scottsdale, AZ

**DSI Entertainment Systems**, Van Nuys, CA

**G.I. Maintenance LLC**, Brooklyn, NY

**Gizmo**, Los Angeles, CA

**Hughes Electric**, Costa Mesa, CA

**iWired**, Scottsdale, AZ

**Layers**, Scottsdale, AZ

**Metron**, Akron OH

**Paragon Technology Group**, Glenwood Springs, CO

**Prime ECS**, Irvine, CA

**Room Service**, Beaverton, OR

**Spectrum Services**, Lake Forest, CA

**Strategic Sync**, San Clemente, CA

**Tech Automation**, Troy, MI

**WCI**, El Segundo, CA

**Wiplaince**, Bellevue, WA

**Second Supplemental Response to Interrogatory No. 11:**

Savant conducted another thorough review of its files and contacted each of its manufacturers' representatives to determine whether, after yet another investigation, it or they were able to identify any additional dealers who were denied Savant dealerships. Subject to and without waiving the General Objections, Savant further states that there are no additional dealers it or its manufacturers' representatives were able to identify who were denied Savant dealerships.

**Interrogatory No. 49**:

To the extent that any of your responses to Creston Electronics, Inc.'s Fourth Set of Requests for Admission are anything but an admission, please state the basis for your denials.

**Response to Interrogatory No. 49:**

In addition to its General Objections, Savant specifically objects to this interrogatory because, counting all subparts of the interrogatories in this and Crestron's prior five sets, it exceeds the total number of interrogatories currently allowed by the Court.

**Supplemental Response to Interrogatory No. 49:**

Without waiving and expressly reserving the General Objections, and specific objection to this Interrogatory, set forth in Savant's previous Answers thereto, Savant states that the following supplemental responses regarding features, functionality and capabilities of its products as of March 27, 2009 and as of August 2010 are based, at least in part, on SAVANT0143224, SAVANT0147191, SAVANT0240613, SAVANT0243215, SAVANT0463966, SAVANT0537227, SAVANT0964931, SAVANT1587359, SAVANT3559619 and SAVANT3559620-49, each of which is incorporated herein by reference, as well as on knowledge and information regarding those products provided by Savant's James W. Carroll and Michael Silva. Savant further identifies the following as the basis for each of its responses to the following requests in Crestron's Fourth Set of Requests for Admission:

**Request for Admission No. 41:**

Admit that, as of March 27, 2009, Savant did not offer software or an application which enabled an end user to control a Savant system from a user interface from a Mac or PC.

**Supplemental Response to Interrogatory No. 49(1):**

Request for Admission No. 41 was denied because, as of March 27, 2009, Savant was an authorized reseller of Apple® products including the Apple® OS operating system, which included a "Back to My Mac" feature that enabled an end user to control a Savant system from a user interface on a Mac or PC.

**Request for Admission No. 45:**

Admit that, as of March 27, 2009, Savant did not offer a dedicated shade controller.

**Supplemental Response to Interrogatory No. 49(2):**

Request for Admission No. 45 was "otherwise denied" because, as of March 27, 2009, Savant promoted compatible shade controllers of its third party Partners in Excellence for use with Savant systems and which when installed were "dedicated" to such systems.

**Request for Admission No. 46:**

Admit that, as of March 27, 2009, Savant did not offer stand-alone scheduling and management software.

**Supplemental Response to Interrogatory No. 49(3):**

Request for Admission No. 46 was denied because, as of March 27, 2009, Savant "offered" System Monitor," which was a stand-alone management software application used to manage, deploy and upgrade Savant systems, and because, as of that same date, Savant also "offered" its Racepoint Blueprint software product which provided the ability to create scheduled events.

**Request for Admission No. 47:**

Admit that, as of March 27, 2009, Savant did not offer a Savant-brand lighting solution.

**Supplemental Response to Interrogatory No. 49(4):**

Request for Admission No. 47 was "otherwise denied" because, as of March 27, 2009, Savant promoted compatible lighting solutions of its third party Partners in Excellence for use with Savant systems.

**Request for Admission No. 48:**

Admit that, as of March 27, 2009, Savant did not offer a Savant-brand HVAC control.

**Supplemental Response to Interrogatory No. 49(5):**

Request for Admission No. 48 was "otherwise denied" because, as of March 27, 2009, Savant promoted compatible HVAC control solutions of its third party Partners in Excellence for use with Savant systems.

**Request for Admission No. 50:**

Admit that, as of March 27, 2009, Savant did not offer a digital media HDMI switching and distribution solution with HDCP support.

**Supplemental Response to Interrogatory No. 49(6):**

Request for Admission No. 50 was denied because, as of March 27, 2009, Savant "offered" its Rosie System 2 which was a digital media HDMI switching and distribution solution with HDCP support.

**Request for Admission No. 51:**

Admit that, as of March 27, 2009, Savant did not offer amplifiers and/or expansion amplifiers.

**Supplemental Response to Interrogatory No. 49(7):**

Request for Admission No. 51 was "otherwise denied" because, as of March 27, 2009, Savant promoted compatible amplifiers and/or expansion amplifiers of its third party Partners in Excellence for use with Savant systems.

**Request for Admission No. 52:**

Admit that, as of March 27, 2009, Savant did not have a SDK available for cross platform compatiblity.

**Supplemental Response to Interrogatory No. 49(8):**

Request for Admission No. 52 was denied because, as of March 27, 2009, Savant's RacePoint Blueprint software product was capable of providing a SDK for cross platform compatibility.

**Request for Admission No. 53:**

Admit that, as of March 27, 2009, neither the Savant Rosie System 2 nor the Rosie Touch 13 had analog audio inputs.

**Supplemental Response to Interrogatory No. 49(9):**

Request for Admission No. 53 was denied because, as of March 27, 2009, at least the upgraded version of Savant's Rosie System 2 had analog audio inputs.

**Request for Admission No. 55:**

Admit that, as of March 27, 2009, neither the Savant Rosie System 2 nor the Rosie Touch 13 had amplified audio distribution.

**Supplemental Response to Interrogatory No. 49(10):**

Request for Admission No. 55 was denied because, as of March 27, 2009, at least the upgraded version of Savant's Rosie System 2 had amplified audio distribution albeit separate from and nonintegral with the System.

**Request for Admission No. 56:**

Admit that, as of March 27, 2009, neither the Savant Rosie System 2 nor the Rosie Touch 13 had an AM/PM tuner included.

**Supplemental Response to Interrogatory No. 49(11):**

On the assumption that "AM/PM" was intended to be "AM/FM," Request for Admission No. 56 was nonetheless denied because, as of March 27, 2009, at least the upgraded version of Savant's Rosie System 2 had an AM/FM tuner albeit separate from and nonintegral with the System.

**Request for Admission No. 57:**

Admit that, as of March 27, 2009, neither the Savant Rosie System 2 nor the Rosie Touch 13 had optional XM and/or Sirius Tuners

**Supplemental Response to Interrogatory No. 49(12):**

Request for Admission No. 57 was denied because, as of March 27, 2009, at least the upgraded version of Savant's Rosie System 2 had optional XM and/or Sirius Tuners albeit separate from and nonintegral with the System.

**Request for Admission No. 60:**

Admit that, as of March 27, 2009, Savant did not offer all of the following: outboard PC applications for Web browsing, streaming media, conferencing, VoIP, & remote computer access.

**Supplemental Response to Interrogatory No. 49(13):**

Request for Admission No. 60 was denied because, as of March 27, 2009, Savant "offered" and supported web screen and web browsing on touch panels and OSD interfaces.

**Request for Admission No. 63:**

Admit that, as of March 27, 2009, neither the Savant Rosie System 2 nor the Rosie Touch 13 had optional desktop and wall mount docking stations.

**Supplemental Response to Interrogatory No. 49(14):**

Request for Admission No. 63 was denied because, as of March 27, 2009, Savant "offered" wireless touch panel charging dock/base products (model #WDB-100B-00 and WDB-100W-00). *See* Savant Systems dealer price list dated 11-19-2008, (SAVANT0147191).

**Request for Admission No. 69:**

Admit that, as of March 27, 2009, each Savant Touchpanel and/or keypad required a separate server/extender "box" to be installed/wired between it and the main Savant Control Processor.

**Supplemental Response to Interrogatory No. 49(15):**

Request for Admission No. 69 was denied because, as of March 27, 2009, although the ITS server required an additional power or network connection, each Savant Touchpanel and/or keypad did not require a separate server/extender "box" to be installed/wired between it and the main Savant Control Processor.

**Request for Admission No. 70:**

Admit that, as of March 27, 2009, the separate server/extender "box" required to be installed/wired between each Savant Touchpanel and keypad and the main Savant Control Processor added additional costs to the installation, due to the cost of the units themselves as well as extra writing, connectors and labor.

**Supplemental Response to Interrogatory No. 49(16):**

Request for Admission No. 70 was denied for the reason set forth in Supplemental Response No. 49(15).

**Request for Admission No. 71:**

Admit that, as of March 27, 2009, the separate server/extender box required to be installed/wired between each Savant Touchpanel and keypad and the main Savant Control Processor increase the possibility of miswiring and failed connections in the Savant system.

**Supplemental Response to Interrogatory No. 49(17):**

Request for Admission No. 71 was denied for the reason set forth in Supplemental Response No. 49(15).

**Request for Admission No. 74:**

Admit that, as of August 2010, it was not possible to control an entire home from any Mac or with just a mobile data connection using Savant system end products.

**Supplemental Response to Interrogatory No. 49(18):**

Request for Admission No. 74 was denied because, as of August 2010, Savant systems and products provided full home control via the "Back to My Mac" feature of the Apple® OS. Savant also provided iPhone and iPad applications that enabled full home remote control from a mobile data connection at that time. *See* Savant's 4.1.2 ER1 Product Release Notification dated June 30, 2010 (SAVANT3559619) which announced the availability of "Rosie on the Road for iPad."

**Request for Admission No. 76:**

Admit that, as of August 2010, Savant products did not enable the user to access entire Apple TV collection on any touchpanel throughout the home and view album and movie cover art and info on any touchpanel throughout the home.

**Supplemental Response to Interrogatory No. 49(19):**

Request for Admission No. 74 was denied because, as of August 2010, Savant systems and products supported viewing the entire Apple TV collection, including cover art. *See* Savant 4.0 Product Overview – R2, dated November 2009 (SAVANT0240613).

**Request for Admission No. 77:**

Admit that, as of August 2010, Savant did not manufacture and sell a product that enabled the user to leverage all types of digital media content, including iTunes libraries, on-line streamed content, HD movies and HD video rentals.

**Supplemental Response to Interrogatory No. 49(20):**

Request for Admission No. 77 was denied because, as of August 2010, although Savant itself did not manufacture such a product, it did resell the Apple TV which had iTunes library access, on-line stream content, HD movies, and HD video rentals. *See* Savant US Price List MSRP (March 2010) at 109 (SAVANT0964931).

**Request for Admission No. 78:**

Admit that, as of August 2010, Savant did not enable the end user to control an entire home from any computer within the home or worldwide with Adobe® Flash®.

**Supplemental Response to Interrogatory No. 49(21):**

Request for Admission No. 78 was denied because, even though Savant did not provide this control specifically using Abobe® Flash®, it provided the control using alternative mechanisms. *See* Supplemental Response No. 49(18).

**Request for Admission No. 81:**

Admit that, as of August 2010, Savant had discontinued its own line of touchpanels.

**Supplemental Response to Interrogatory No. 49(22):**

Request for Admission No. 81 was denied because, as of August 2010, Savant was still selling touchscreen devices including its "Touch TV" product and a Rosie Surface Kit. *See* Savant US Price List MSRP (March 2010) at 52 (SAVANT0964931). Around this time, Savant started to leverage the Apple technology (iPad, iPhone etc.) as touch interfaces for its products.

**Request for Admission No. 82:**

Admit that, as of August 2010, Savant required a Mac Mini for each operational touchpanel.

**Supplemental Response to Interrogatory No. 49(23):**

Request for Admission No. 82 was denied because, as of August 2010, while this was true for Savant's touchpanel line of products, it was not the case for Apple devices, such as iPads, iPods and iPhones, which could be served by a single Mac Mini.

**Request for Admission No. 83:**

Admit that, as of August 2010, Savant did not offer professional or high fidelity surround sound processing equipment.

**Supplemental Response to Interrogatory No. 49(24):**

Request for Admission No. 83 was denied because, as of August 2010, Savant did offer "professional" and "high fidelity" surround sound processing equipment. *See* Savant Cut Sheet MSC – 12SE – Rev. 1 (SAVANT0537227).

**Request for Admission No. 85:**

Admit that, as of August 2010, Savant offered HDMI over CATS extenders only.

**Supplemental Response to Interrogatory No. 49(25):**

Request for Admission No. 85 was denied because, as of August 2010, Savant offered both HDMI COAX and CAT 5 extenders. *See* Savant U.S. Dealer Price List for November 2009 (SAVANT0143224).

**Request for Admission No. 86:**

Admit that, as of August 2010, Savant did not offer HDMI with HDCP video distribution.

**Supplemental Response to Interrogatory No. 49(26):**

Request for Admission No. 86 was denied because, as of August 2010, Savant's video products had HDCP support. *See* Savant 4.1.2 ER1 Product Release Notification of June 30, 2010 (SAVANT3559619); and Firmware Build Notes da Vinci 4.x at 22, Build # 5.25:116, 6/4/10 (SAVANT3559620-49).

**Request for Admission No. 87:**

Admit that, as of August 2010, Savant did not offer a native internet radio source.

**Supplemental Response to Interrogatory No. 49(27):**

Request for Admission No. 87 was denied because, as of August 2010, Savant promoted compatible native internet radio sources of its third party Partners in Excellence for use with its products.

**Request for Admission No. 88:**

Admit that, as of August 2010, Savant did not offer lighting control products.

**Supplemental Response to Interrogatory No. 49(28):**

Request for Admission No. 88 was denied because, as of August 2010, Savant promoted compatible lighting control products of its third party Partners in Excellence for use with its products.

**Request for Admission No. 89:**

Admit that, as of August 2010, Savant did not offer climate control products.

**Supplemental Response to Interrogatory No. 49(29):**

Request for Admission No. 89 was denied because, as of August 2010, Savant promoted compatible climate control products of its third party Partners in Excellence for use with its products.

**Request for Admission No. 90:**

Admit that, as of August 2010, Savant offered security system native integration for RS-232 systems only.

**Supplemental Response to Interrogatory No. 49(30):**

Request for Admission No. 90 was denied because, as of August 2010, Savant "offered" IP controlled security system integration as well. *See* Savant 4.1.2 ER1 Product Release Notification (SAVANT3559619).

**Request for Admission No. 91:**

Admit that, as of August 2010, Savant did not offer security system native integration.

**Supplemental Response to Interrogatory No. 49(31):**

Request for Admission No. 91 was denied for the reason set forth in Supplemental Response No. 49(30).

**Request for Admission No. 92:**

Admit that, as of August 2010, Savant did not offer completely customizable touch panel user interfaces.

**Supplemental Response to Interrogatory No. 49(32):**

Request for Admission No. 92 was denied because, as of August 2010, the ability to customize by changing the screens, graphics and control on touch panels had been a core feature of Savant systems since their introduction.

**Request for Admission No. 93:**

Admit that Savant cannot identify a specific lost sale of Savant lost products or services as a result of any Crestron action that you allege to be unlawful.

**Supplemental Response to Interrogatory No. 49(33):**

Request for Admission No. 93 was denied because Savant has identified several such lost sales. *See*, *e.g.*, the Declaration of James W. Carroll dated August 30, 2011 (Dkt. No. 56) and the Declaration of James W. Carroll in Opposition to Defendant Crestron Electronics, Inc.'s Motion for Partial Summary Judgment dated April 9, 2013 (Dkt. No. 217), ¶¶ 16-60. *See also* Savant's Responses to Interrogatory No. 3 in Plaintiff Savant Systems, LLC's Fourth Supplemental Objections and Responses to Crestron Electronics, Inc.'s First Set of Interrogatories served herein on October 21, 2013 including without limitation, Ex. B through G thereto.

**Request for Admission No. 94:**

Admit that Savant obtained Crestron's Trane ComfortLink module.

**Supplemental Response to Interrogatory No. 49(34):**

Request for Admission No. 94 was denied because, although Savant believes that Crestron Trane ComfortLink modules were sent to it from sources other than Crestron, Savant did not make an affirmative effort to "obtain" the modules and made no use of the modules.

**Request for Admission No. 95:**

Admit that Savant has operated Crestron's Trane ComfortLink module.

**Supplemental Response to Interrogatory No. 49(35):**

Request for Admission No. 95 was denied because Savant has not operated Crestron's Trane ComfortLink Module.

**Request for Admission No. 96:**

Admit that Savant has obtained Crestron price lists from sources other than Crestron.

**Supplemental Response to Interrogatory No. 49(36):**

Request for Admission No. 96 was "otherwise denied" because, on occasion, Crestron price lists have come into possession of Savant from non-public domain sources other than Crestron but that Savant did not make an affirmative effort to "obtain" such lists.

**Request for Admission No. 97:**

Admit that Savant has used Crestron price lists to compete against Crestron.

**Supplemental Response to Interrogatory No. 49(37):**

Request for Admission No. 97 was denied because, to the best of Savant's knowledge, information and belief, Savant has not used any Crestron price lists received from other than public domain sources to compete against Crestron.

**Request for Admission No. 99:**

Admit that Savant has obtained Crestron software.

**Supplemental Response to Interrogatory No. 49(38):**

Request for Admission No. 99 was denied because, to the best of Savant's knowledge, information and belief, although Crestron Trane ComfortLink modules were sent to Savant from sources other than Crestron, Savant did not make an affirmative effort to "obtain" the modules.

**Request for Admission No. 100:**

Admit that Savant has used Crestron software to compete against Crestron.

**Supplemental Response to Interrogatory No. 49(39):**

Request for Admission No. 100 was denied because, to the best of Savant's knowledge, information and belief, Savant has not used Crestron software to compete against Crestron.

**Interrogatory No. 50**:

Identify all data, methodologies, models and assumptions, if any, on which Savant relied in generating any and all sales projections and forecasts for Savant products and services from 2005 to the present, including modifications to those sales projections and forecasts.

**Response to Interrogatory No. 50:**

In addition to its General Objections, Savant specifically objects to this interrogatory because, counting all subparts of the interrogatories in this and Crestron's prior five sets, it exceeds the total number of interrogatories currently allowed by the Court.

**Supplemental Response to Interrogatory No. 50:**

Without waiving and expressly reserving its General Objections, and specific objection to this Interrogatory, previously made, Savant identifies, and expressly incorporates herein by reference, the Declaration of James W. Carroll In Opposition to Defendant Crestron Electronics, Inc.'s Motion for Partial Summary Judgment dated April 9, 2013 (Dkt. No. 217), ¶¶ 1-15 and Ex. A. Savant also identifies, and expressly incorporates by reference herein, the deposition excerpts attached hereto as Exhibit J.

Savant further states that, like many other businesses the forecasting done by Savant over the years has been a balanced mix of qualitative and quantitative approaches. Qualitative approaches used have been based on industry experts via published market reports such as the Parks Associates reports. Very early on, Bruce Myers and Jim Carroll used these reports and coupled them with Mr. Carroll's first-hand experiences as a dealer as well as industry interviews to rationalize business plan feasibility.

The quantitative approaches are more data driven and discount opinions with much more weight put on actual trends based on revenues and SKU shipments along with first hand customer inputs.

Bruce Myers and Jim Carroll relied heavily on qualitative inputs to formulate Savant's go-to market forecast assumptions. These qualitative inputs were coupled with Savant's 2006 CEDIA exhibit experience and the 2007 Amelia Island Savant Event, where there was real

excitement and enthusiasm regarding the power of Racepoint BluePrint as a significant game changer for the integrator as well as end user benefits.

As Savant entered the market in early 2008 with its beta product, it became even more optimistic with the feedback from dealers in general. In planning for 2009, Savant relied more heavily on direct communication with the dealer community, its own SKU uptake rates, and industry reports such CEPro Top 100 and "State of the Industry" reports for 2010. Savant believed that, based on the data sets it reviewed, its earlier assumptions around what the average expected purchasing level or automation by dealer and dealer attainment rates were validated.

Beyond 2010, forecasting has been more focused on a number of metrics. The diagram below shows graphically how the forecasting was conducted by Savant with the mix of qualitative and quantitative factors for 2010 forward.




As more time goes by, the shift continues away from qualitative assessments towards more reliance on quantitative measurement and forecasting. The balance will never completely

shift towards strictly quantitative analysis methods, as external environmental elements always have some factoring, *e.g.*, Crestron's threats to dealers and its publication of misinformation regarding Savant and its products.

**Interrogatory No. 51**:

Identify any and all Crestron software that Savant has obtained, and state with particularity how such software was obtained.

**Response to Interrogatory No. 51:**

In addition to its General Objections, Savant specifically objects to this interrogatory because, counting all subparts of the interrogatories in this and Crestron's prior five sets, it exceeds the total number of interrogatories currently allowed by the Court.

**Supplemental Response to Interrogatory No. 51:**

Without waiving and expressly reserving its General Objections, and specific objection to this Interrogatory, previously made, Savant states that it believes that Crestron Trane ComfortLink modules, which Savant assumes to have included Crestron software, were sent to it independently by Cyber Sound and Security, Inc. and Trane, but that Savant did not make an affirmative effort to "obtain" the modules and that the modules were not used, and could not effectively be used, by Savant to design a competing product because the software contained therein was compiled and encrypted and because of dramatic differences between Crestron software architecture and Savant software architecture.

**Interrogatory No. 52**:

Identify any and all Crestron price information, including price lists that Savant has obtained, and state with particularity how such price information was obtained.

**Response to Interrogatory No. 52:**

In addition to its General Objections, Savant specifically objects to this interrogatory because, counting all subparts of the interrogatories in this and Crestron's prior five sets, it exceeds the total number of interrogatories currently allowed by the Court.

**Supplemental Response to Interrogatory No. 52:**

Without waiving and expressly reserving its General Objections, and specific objection to this Interrogatory, previously made, Savant identifies the following Crestron price-related documents, where the left column sets forth the original name of the Crestron price-related document, the center column sets forth the Savant production number of the document, and the right column sets forth information regarding how the document was obtained:

| OriginalName | ProdBegBates | Parent Email |
|---|---|---|
| Crestron PRP 2011.pdf | SAVANT0034455;<br>SAVANT0046042 | (Same Parents = : SAVANT0034454;<br>SAVANT0046041)<br>From: Hoffenberg, Mark<br>Sent: Thursday, May 05, 2011 01:31 PM<br>To: Chuck Parrelli; mikek@mkrep.com;<br>Michael Verkinder<br>Subject: FW: Crestron Dealer Program<br>Attachments: Crestron PRP 2011.pdf<br>Mark Hoffenberg<br>President<br>AUDIOVISIONS<br>25741 Atlantic Ocean Dr<br>Lake Forest, CA 92630 |

| | | |
|---|---|---|
| | SAVANT0640992 | (parent = SAVANT0640991)<br>From: 'Hoffenberg, Mark' <mark@avisions.com><br>To: Chuck Parrelli <Chuck.Parrelli@savantav.com>;mikek@mkrep.com" <mikek@mkrep.com>;Michael Verkinder <michael.verkinder@savantav.com><br>Sent: 5/5/2011 1:30:40 PM<br>Attachments: Crestron PRP 2011.pdf<br>Subject: FW: Crestron Dealer Program |
| Crestron.pdf<br><br>(Crestron US Dealer Price List, January 26, 2010) | SAVANT0072990 | No parent. |
| | SAVANT0665335 | (parent = SAVANT0665333)<br>From: David Humphries<br>Sent: Monday, July 12, 2010 07:19 AM<br>To: Chuck Parrelli<br>Subject: Crestron Catalogue<br>Attachments: Crestron.pdf |
| | SAVANT0315524 | No parent. |
| | SAVANT0677270 | (parent = SAVANT0677268)<br>From: Michael Pawlowski (mike@theaintegrated.com)<br>Sent: Wednesday, June 30, 2010 02:06 PM<br>To: George Katsiris<br>CC: dave@theaintegrated.com<br>Subject: Fwd: Crestron Catalogue<br>Attachments: ATT184690.htm; Crestron.pdf |
| crestron_price_list_prodigy_20090814.pdf | SAVANT0170308 | No parent. |
| | SAVANT0288718 | (parent = SAVANT0288717)<br>From: Sean Manzanares<br>Sent: Saturday, September 05, 2009 10:18 AM<br>To: Tim Locascio; Mike Silva; Jim Carroll; Ben Jamison; Bruce Myers<br>Subject: Re:<br>Attachments: crestron_price_list_prodigy_20090814.pdf |
| | SAVANT0715940 | (parent = SAVANT0715939)<br>From: 'Sean Manzanares<br>To: Tim Locascio;Mike Silva;Jim Carroll; Ben Jamison;Bruce Myers Sent: 9/5/2009 10:17:51 AM |

| | | |
|---|---|---|
| | | Attachments: crestron_price_list_prodigy_20090814.pdf<br>Subject: Re: |
| | SAVANT0394458 | No parent. |
| | SAVANT0727633 | (parent = SAVANT0727632)<br>From: ‘Sean Manzanares<br>To: Tim Locascio; Mike Silva; Jim Carroll; Ben Jamison; Bruce Myers Sent: 9/5/2009 10:17:51 AM<br>Attachments: crestron_price_list_prodigy_20090814.pdf<br>Subject: Re: |
| | SAVANT0207510 | (parent = SAVANT0207509)<br>From: Sean Manzanares<br>Sent: Saturday, September 05, 2009 10:18 AM<br>To: Tim Locascio; Mike Silva; Jim Carroll; Ben Jamison; Bruce Myers<br>Subject: Re:<br>Attachments: crestron_price_list_prodigy_20090814.pdf |
| | SAVANT0580905 | (parent = SAVANT0580904)<br>From: Sean Manzanares<br>Sent: Saturday, September 05, 2009 10:18 AM<br>To: Tim Locascio; Mike Silva; Jim Carroll; Ben Jamison; Bruce Myers<br>Subject: Re:<br>Attachments: crestron_price_list_prodigy_20090814.pdf |
| crestron_price_list_prodigy _20090801.pdf | SAVANT0288522 | (parent = SAVANT0288521)<br>From: Micah Sheveloff (wirc1@wircmedia.com)<br>Sent: Thursday, September 24, 2009 08:45 AM<br>To: Jim Carroll<br>Subject: Is this useful?<br>Attachments: crestron_price_list_prodigy_20090801.pdf |
| | SAVANT0375570 | (parent = SAVANT0375569)<br>From: ‘Micah Sheveloff’ <wirc1@wircmedia.com><br>To: Jim Carroll <Jim.Carroll@savantav.com><br>Sent: 9/24/2009 8:44:35 AM<br>Attachments: |

| | | |
|---|---|---|
| | | crestron_price_list_prodigy_20090801.pdf<br>Subject: Is this useful? |
| | SAVANT0394292 | No parent. |
| | SAVANT0411318 | (parent = SAVANT0411317)<br>From: 'Micah Sheveloff' <wirc1@wircmedia.com><br>To: Jim Carroll <Jim.Carroll@savantav.com><br>Sent: 9/24/2009 8:44:35 AM<br>Attachments: crestron_price_list_prodigy_20090801.pdf<br>Subject: Is this useful? |
| | SAVANT3072548 | (parent = SAVANT3072536)<br>From: tsmanz@mac.com<br>Sent: Tuesday, August 04, 2009 03:05 PM<br>To: Jim Carroll; Ben Jamison; Tim Locascio; Mike Silva; Craig Spinner; Victor Saverino; Peter Corsini<br>Subject: updated competitive information<br>Attachments: ATT23092053.htm; Archive.zip |
| | SAVANT3254559 | (parent = SAVANT3254547)<br>From: tsmanz@mac.com<br>Sent: Tuesday, August 04, 2009 03:05 PM<br>To: Jim Carroll; Ben Jamison; Tim Locascio; Mike Silva; Craig Spinner; Victor Saverino; Peter Corsini<br>Subject: updated competitive information<br>Attachments: ATT23092053.htm; Archive.zip |
| | SAVANT3254577 | (parent = SAVANT3254547)<br>From: tsmanz@mac.com<br>Sent: Tuesday, August 04, 2009 03:05 PM<br>To: Jim Carroll; Ben Jamison; Tim Locascio; Mike Silva; Craig Spinner; Victor Saverino; Peter Corsini<br>Subject: updated competitive information<br>Attachments: ATT23092053.htm; Archive.zip |
| | SAVANT3072566 | (parent = SAVANT3072536)<br>From: tsmanz@mac.com<br>Sent: Tuesday, August 04, 2009 03:05 PM<br>To: Jim Carroll; Ben Jamison; Tim Locascio; Mike Silva; Craig Spinner; Victor Saverino; Peter Corsini<br>Subject: updated competitive information |

| | | |
|---|---|---|
| | | Attachments: ATT23092053.htm; Archive.zip |
| price_list-070921.pdf<br><br>(Crestron US Dealer Price List, September 2007) | SAVANT0423157 | No parent. |
| | SAVANT0734094 | (parent = SAVANT0734091)<br>From: 'Jim Carroll' <Jim.Carroll@savantav.com><br>To: Victor Saverino <Victor.Saverino@savantav.com><br>Sent: 12/18/2007 6:25:27 AM<br>Attachments: ATT987272.txt; Savant_blue.jpg; ATT987270.txt; MC Email Signature Graphic.JPG; ATT987271.txt; price_list-070921.pdf<br>Subject: Fwd: from September 2007 |
| | SAVANT0479555 | No parent. |
| residential_dealer_rewards_program.pdf<br><br>DRP+ (Crestron Dealer Rewards program for 2010) | SAVANT0948478 | No parent. |
| | SAVANT1002744 | No parent. |
| | SAVANT3072509 | (parent = SAVANT3072501)<br>From: tsmanz@mac.com<br>Sent: Tuesday, September 15, 2009 02:18 AM<br>To: Tim Locascio; Jim Carroll; Ben Jamison; Mike Silva; Bruce Myers<br>Subject: new pricing update from 9.9.09<br>Attachments: ATT6912464.txt; new.zip |
| | SAVANT3072519 | (parent = SAVANT3072501)<br>From: tsmanz@mac.com<br>Sent: Tuesday, September 15, 2009 02:18 AM<br>To: Tim Locascio; Jim Carroll; Ben Jamison; Mike Silva; Bruce Myers<br>Subject: new pricing update from 9.9.09<br>Attachments: ATT6912464.txt; new.zip |
| | SAVANT3085230 | (parent = SAVANT3085222)<br>From: tsmanz@mac.com<br>Sent: Tuesday, September 15, 2009 02:18 AM<br>To: Tim Locascio; Jim Carroll; Ben Jamison; Mike Silva; Bruce Myers<br>Subject: new pricing update from 9.9.09<br>Attachments: ATT31024582.txt; new.zip |
| | SAVANT3085240 | (parent = SAVANT3085222)<br>From: tsmanz@mac.com<br>Sent: Tuesday, September 15, 2009 02:18 AM |

| | | |
|---|---|---|
| | | To: Tim Locascio; Jim Carroll; Ben Jamison; Mike Silva; Bruce Myers<br>Subject: new pricing update from 9.9.09<br>Attachments: ATT31024582.txt; new.zip |
| | SAVANT3253645 | (parent = SAVANT3253637)<br>From: tsmanz@mac.com<br>Sent: Tuesday, September 15, 2009 02:18 AM<br>To: Tim Locascio; Jim Carroll; Ben Jamison; Mike Silva; Bruce Myers<br>Subject: new pricing update from 9.9.09<br>Attachments: ATT6912464.txt; new.zip |
| | SAVANT3253655 | (parent = SAVANT3253637)<br>From: tsmanz@mac.com<br>Sent: Tuesday, September 15, 2009 02:18 AM<br>To: Tim Locascio; Jim Carroll; Ben Jamison; Mike Silva; Bruce Myers<br>Subject: new pricing update from 9.9.09<br>Attachments: ATT6912464.txt; new.zip |

Regarding the Crestron price list for Prodigy (*e.g.*, SAVANT 0288718), an inquiry was made of Sean Manzanares as to how he obtained that document and he has stated that he does not recall specifically, but that Crestron routinely sent him price lists and pricing information for about one year after he left Crestron's employ and started working for Savant.

**Interrogatory No. 53**:

Identify any and all Crestron documents that Savant has obtained, and state with particularity how such documents were obtained.

**Response to Interrogatory No. 53:**

In addition to its General Objections, Savant specifically objects to this interrogatory because, counting all subparts of the interrogatories in this and Crestron's prior five sets, it exceeds the total number of interrogatories currently allowed by the Court.

**Supplemental Response to Interrogatory No. 53:**

Savant objects to this Interrogatory to the extent it conflicts with the Court's August 12, 2013, Order denying Savant's Motion to Compel with respect to Savant's Requests for Production Nos. 168 and 169.

Without waiving and expressly reserving its forgoing Specific and General Objections, and Specific Objection to this interrogatory, previously made, Savant states that it and/or its counsel are in possession of literally tens of thousands of Crestron documents received from various sources, including from Crestron in response to discovery requests served by Savant in this action, from third parties in response to document subpoenas served by Savant in this action, and in the normal course of Savant's business over the years from Crestron and various other public domain sources. Pursuant to a Stipulation Establishing Protocol For Discovery of Electronic Information executed on behalf of the parties on November 15, 2011, Savant has produced electronic copies of all such documents to Crestron as well as all of the same data regarding each document that is available to Savant in terms of either party's ability to search for such documents and obtain information as to their source. Accordingly, pursuant to Fed.R.Civ.P. 33(d), Savant submits that the answer to this interrogatory may be determined by searching Savant's productions and that the burden of deriving or ascertaining the answer will be substantially the same for either party. Savant will further supplement this answer in the event that, after Crestron conducts such a search, questions remain as to the source of a reasonable number of documents.

**Interrogatory No. 54**:

Identify any and all specific lost sales of Savant products and/or services caused by Crestron.

**Response to Interrogatory No. 54:**

In addition to its General Objections, Savant specifically objects to this interrogatory because, counting all subparts of the interrogatories in this and Crestron's prior five sets, it exceeds the total number of interrogatories currently allowed by the Court.

**Supplemental Response to Interrogatory No. 54:**

Savant further specifically objects to this Interrogatory to the extent that it seeks production of information that is irrelevant to the issues raised in the pleadings or that is not reasonably calculated to lead to the discovery of admissible evidence because the law applicable to at least Savant's antitrust claims against Crestron does not require that Savant identify specific lost sales caused by Crestron's alleged conduct.

Without waiving and expressly reserving its General Objections, and specific objections to this Interrogatory, previously made, Savant identifies, and expressly incorporates herein by reference, the Declaration of James W. Carroll dated August 30, 2011 (Dkt. No. 56) and the Declaration of James W. Carroll In Opposition to Defendant Crestron Electronics, Inc.'s Motion for Partial Summary Judgment dated April 9, 2013 (Dkt. No. 217), ¶¶ 16 through 60. Savant also identifies, and expressly incorporates by reference, its Responses to Interrogatory No. 3 in Plaintiff Savant Systems, LLC's Fourth Supplemental Objections and Responses to Crestron Electronics, Inc.'s First Set of Interrogatories served herein on October 21, 2013 including without limitation, Ex. B through G thereto.

**Interrogatory No. 55:**

Identify any and all specific lost sales of Savant products or services as a result of any Crestron action that you allege to be unlawful.

**Response to Interrogatory No. 55:**

In addition to its General Objections, Savant specifically objects to this interrogatory because, counting all subparts of the interrogatories in this and Crestron's prior five sets, it exceeds the total number of interrogatories currently allowed by the Court.

**Supplemental Response to Interrogatory No. 55:**

Savant further specifically objects to this Interrogatory to the extent that it seeks production of information that is irrelevant to the issues raised in the pleadings or that is not reasonably calculated to lead to the discovery of admissible evidence because the law applicable to at least Savant's antitrust claims against Crestron does not require that Savant identify specific lost sales caused by Crestron's alleged conduct.

Without waiving and expressly reserving its General Objections, and specific objections to this Interrogatory, previously made, Savant identifies, and expressly incorporates herein by reference, the Declaration of James W. Carroll dated August 30, 2011 (Dkt. No. 56) and the Declaration of James W. Carroll In Opposition to Defendant Crestron Electronics, Inc.'s Motion for Partial Summary Judgment dated April 9, 2013 (Dkt. No. 217), ¶¶ 16 through 60. Savant also identifies, and expressly incorporates by reference herein, its Responses to Interrogatory No. 3 in Plaintiff Savant Systems, LLC's Fourth Supplemental Objections and Responses to Crestron Electronics, Inc.'s First Set of Interrogatories served herein on October 21, 2013 including without limitation, Ex. B through G thereto.

**Interrogatory No. 56:**

Identify all data, methodologies, models and assumptions, if any, on which Savant relied in determining that its forecasted rates of growth in market share were attainable by Savant.

**Response to Interrogatory No. 56:**

In addition to its General Objections, Savant specifically objects to this interrogatory because, counting all subparts of the interrogatories in this and Crestron's prior five sets, it exceeds the total number of interrogatories currently allowed by the Court.

**Supplemental Response to Interrogatory No. 56:**

Without waiving and expressly reserving its General Objections, and specific objection to this Interrogatory, previously made, Savant identifies, and expressly incorporates herein by reference, the Declaration of James W. Carroll In Opposition to Defendant Crestron Electronics, Inc.'s Motion for Partial Summary Judgment dated April 9, 2013 (Dkt. No. 217), ¶¶ 1 through 15 and Ex. A. Savant also identifies, and expressly incorporates herein by reference, the deposition excerpts attached hereto as Exhibit J.

Savant further states that, like many other businesses the forecasting done by Savant over the years has been a balanced mix of qualitative and quantitative approaches. Qualitative approaches used have been based on industry experts via published market reports such as the Parks Associates reports. Very early on, Bruce Myers and Jim Carroll used these reports and coupled them with Mr. Carroll's first-hand experiences as a dealer as well as industry interviews to rationalize business plan feasibility.

The quantitative approaches are more data driven and discount opinions with much more weight put on actual trends based on revenues and SKU shipments along with first hand customer inputs.

Bruce Myers and Jim Carroll relied heavily on qualitative inputs to formulate Savant's go-to market forecast assumptions. These qualitative inputs were coupled with Savant's 2006 CEDIA exhibit experience and the 2007 Amelia Island Savant Event, where there was real

excitement and enthusiasm regarding the power of Racepoint BluePrint as a significant game changer for the integrator as well as end user benefits.

As Savant entered the market in early 2008 with its beta product, it became even more optimistic with the feedback from dealers in general. In planning for 2009, Savant relied more heavily on direct communication with the dealer community, its own SKU uptake rates, and industry reports such CEPro Top 100 and "State of the Industry" reports for 2010. Savant believed that, based on the data sets it reviewed, its earlier assumptions around what the average expected purchasing level or automation by dealer and dealer attainment rates were validated.

Beyond 2010, forecasting has been more focused on a number of metrics. The diagram below shows graphically how the forecasting was conducted by Savant with the mix of qualitative and quantitative factors for 2010 forward.




As more time goes by, the shift continues away from qualitative assessments towards more reliance on quantitative measurement and forecasting. The balance will never completely

shift towards strictly quantitative analysis methods, as external environmental elements always have some factoring, *e.g.*, Crestron's threats to dealers and its publication of misinformation regarding Savant and its products.

**Interrogatory No. 57:**

State the difference between the status of a "disqualified" and a "suspended" Dealer, as these terms appear in Exhibit A to Savant's First Supplemental Responses to Crestron's First Set of Interrogatories.

**Response to Interrogatory No. 57:**

In addition to its General Objections, Savant specifically objects to this interrogatory because, counting all subparts of the interrogatories in this and Crestron's prior five sets, it exceeds the total number of interrogatories currently allowed by the Court.

**Supplemental Response to Interrogatory No. 57:**

Without waiving and expressly reserving its General Objections, and specific objection to this interrogatory, previously made, Savant states that, as a general rule, a "disqualified" dealer is one who was at one time, but no longer is, an authorized Savant dealer for reasons such as going out of business, merger with or acquisition by another dealer, or dropping the Savant product line. A "suspended" dealer is a Savant dealer who is not allowed to purchase Savant product temporarily for reasons such as failure to pay for Savant Care or failure to complete Savant dealer agreement paperwork to update its account.

**Interrogatory No. 58:**

Identify all reasons why, as of June 2011, Savant forecast that its costs for the year 2011 would be $15.29 million, as indicated in the document produced at SAVANT0201505, which is

higher than the $12.469 million indicated in Savant's 2011 Second Quarter Report to the Board of Advisors, produced at SAVANT0201502.

**Response to Interrogatory No. 58:**

In addition to its General Objections, Savant specifically objects to this interrogatory because, counting all subparts of the interrogatories in this and Crestron's prior five sets, it exceeds the total number of interrogatories currently allowed by the Court.

**Supplemental Response to Interrogatory No. 58:**

In addition to its General Objections, Savant further specifically objects to this interrogatory because the cost figures in the two referenced Savant documents appear to be the same.

DATED this 8th day of January, 2014.

Respectfully submitted,

SAVANT SYSTEMS, INC.
By Its Attorneys,

/s/ *Aaron S. Jacobs*
Thomas C. O'Konski BBO#378265
Michael E. Attaya BBO#548297
Aaron S. Jacobs BBO#677545
William J. Mostyn IV BBO#678869
CESARI and MCKENNA, LLP
88 Black Falcon Avenue
Boston, MA 02210
(617) 951-2500
ajacobs@c-m.com

**Certificate of Service**

I hereby certify that this document(s) was served by-mail with confirmation regular mail on:

Chong S. Park
John J. Kavanagh
Steptoe & Johnson LLP
1330 Connecticut Ave., N.W.
Washington, D.C. 20036-1795

Michael J. Pineault, Esq.
Clements & Pineault, LLP
24 Federal Street
Boston, MA 02110

On this 8th day of January, 2014.

/s/ *Aaron S. Jacobs*
Aaron S. Jacobs

**VERIFICATION OF SUPPLEMENTAL INTERROGATORY ANSWERS**

I, James W Carroll, am EVP of Savant Systems, LLC, and the Plaintiff in this action. I believe, based on reasonable inquiry, that the foregoing Plaintiff Savant Systems, LLC's Supplemental Answers to Interrogatory Nos. 49 Through 58 of Crestron Electronics, Inc.'s Sixth Set of Interrogatories are true and correct to the best of my knowledge, information and belief.

I verify under penalty of perjury that the foregoing is true and correct.

Executed on this 8 day of January, 2014.

RESTRICTED CONFIDENTIAL – OUTSIDE COUNSEL ONLY

# EXHIBIT H

SAVANT0008432
SAVANT0008437
SAVANT0008438
SAVANT0009937
SAVANT0009939
SAVANT0010941
SAVANT0010943
SAVANT0013962
SAVANT0013964
SAVANT0029811
SAVANT0029813
SAVANT0036600
SAVANT0039171
SAVANT0043171
SAVANT0046713
SAVANT0046715
SAVANT0046926
SAVANT0050402
SAVANT0053502
SAVANT0055109
SAVANT0055112
SAVANT0071692
SAVANT0073834
SAVANT0074292
SAVANT0074555
SAVANT0074973
SAVANT0075591
SAVANT0075641
SAVANT0075928
SAVANT0075939
SAVANT0076189
SAVANT0076360
SAVANT0076645
SAVANT0076720
SAVANT0076725
SAVANT0077601
SAVANT0078319
SAVANT0078324
SAVANT0078623
SAVANT0078638
SAVANT0078647
SAVANT0078657
SAVANT0082034
SAVANT0086957
SAVANT0086962
SAVANT0090851
SAVANT0098288
SAVANT0104126
SAVANT0109667
SAVANT0109669
SAVANT0110658
SAVANT0110659
SAVANT0110748
SAVANT0110984
SAVANT0118342
SAVANT0118346
SAVANT0118904
SAVANT0118967
SAVANT0119463
SAVANT0119760
SAVANT0119794
SAVANT0120249
SAVANT0120258
SAVANT0120655
SAVANT0120658
SAVANT0120659
SAVANT0121852
SAVANT0123083
SAVANT0124439
SAVANT0124840
SAVANT0124843
SAVANT0125522
SAVANT0125523
SAVANT0125524
SAVANT0125526
SAVANT0125528
SAVANT0125531
SAVANT0125534
SAVANT0125804
SAVANT0125805
SAVANT0126231
SAVANT0126281
SAVANT0126288
SAVANT0126399
SAVANT0126403
SAVANT0127333
SAVANT0134131
SAVANT0139745
SAVANT0141639
SAVANT0141641
SAVANT0146425
SAVANT0146432
SAVANT0146478
SAVANT0146485
SAVANT0147722
SAVANT0147916
SAVANT0148003
SAVANT0148641
SAVANT0148643
SAVANT0148644
SAVANT0148645
SAVANT0148648
SAVANT0148653
SAVANT0148657
SAVANT0148663
SAVANT0148706
SAVANT0148721
SAVANT0148754
SAVANT0148757
SAVANT0148762
SAVANT0148771
SAVANT0153830
SAVANT0153832
SAVANT0153913
SAVANT0153922
SAVANT0155168
SAVANT0155208
SAVANT0156616
SAVANT0156627
SAVANT0159935
SAVANT0186971
SAVANT0186973
SAVANT0186976
SAVANT0186983
SAVANT0187005
SAVANT0187008
SAVANT0187010
SAVANT0192230
SAVANT0216535
SAVANT0216539
SAVANT0216543
SAVANT0219567
SAVANT0219569
SAVANT0219588
SAVANT0219591
SAVANT0219593
SAVANT0226297
SAVANT0226302
SAVANT0226306
SAVANT0226309
SAVANT0227148
SAVANT0227471
SAVANT0231621
SAVANT0240145
SAVANT0242194
SAVANT0242299
SAVANT0244646
SAVANT0250775
SAVANT0250803
SAVANT0250807
SAVANT0250810
SAVANT0250820
SAVANT0250824
SAVANT0251486
SAVANT0252913
SAVANT0252974
SAVANT0252984
SAVANT0252993
SAVANT0253006
SAVANT0253013
SAVANT0254145
SAVANT0255044
SAVANT0255055
SAVANT0255756
SAVANT0261320
SAVANT0261822
SAVANT0262319
SAVANT0262322
SAVANT0262368
SAVANT0262378
SAVANT0262951
SAVANT0262953
SAVANT0262955
SAVANT0263004
SAVANT0263324
SAVANT0263336
SAVANT0263507
SAVANT0263509
SAVANT0263511
SAVANT0263527

RESTRICTED CONFIDENTIAL – OUTSIDE COUNSEL ONLY

| | | | |
|---|---|---|---|
| SAVANT0263545 | SAVANT0283893 | SAVANT0313778 | SAVANT0331420 |
| SAVANT0263552 | SAVANT0284841 | SAVANT0314872 | SAVANT0331422 |
| SAVANT0263557 | SAVANT0285953 | SAVANT0314875 | SAVANT0331499 |
| SAVANT0263711 | SAVANT0287391 | SAVANT0314886 | SAVANT0331500 |
| SAVANT0263717 | SAVANT0289009 | SAVANT0316729 | SAVANT0332829 |
| SAVANT0263729 | SAVANT0289011 | SAVANT0319051 | SAVANT0333946 |
| SAVANT0263731 | SAVANT0289537 | SAVANT0319100 | SAVANT0335677 |
| SAVANT0264701 | SAVANT0289540 | SAVANT0319115 | SAVANT0335964 |
| SAVANT0264899 | SAVANT0294443 | SAVANT0319806 | SAVANT0337891 |
| SAVANT0265236 | SAVANT0295570 | SAVANT0319860 | SAVANT0341897 |
| SAVANT0265239 | SAVANT0295586 | SAVANT0319871 | SAVANT0344080 |
| SAVANT0265247 | SAVANT0295703 | SAVANT0321175 | SAVANT0344645 |
| SAVANT0265249 | SAVANT0297677 | SAVANT0321360 | SAVANT0344646 |
| SAVANT0266180 | SAVANT0297687 | SAVANT0321882 | SAVANT0344654 |
| SAVANT0267005 | SAVANT0297690 | SAVANT0322379 | SAVANT0344658 |
| SAVANT0267055 | SAVANT0297823 | SAVANT0322715 | SAVANT0344950 |
| SAVANT0268993 | SAVANT0297828 | SAVANT0323551 | SAVANT0347694 |
| SAVANT0268995 | SAVANT0297831 | SAVANT0323553 | SAVANT0347992 |
| SAVANT0273801 | SAVANT0297834 | SAVANT0323675 | SAVANT0348020 |
| SAVANT0275277 | SAVANT0297836 | SAVANT0324420 | SAVANT0348023 |
| SAVANT0276327 | SAVANT0297841 | SAVANT0325314 | SAVANT0348137 |
| SAVANT0276449 | SAVANT0304048 | SAVANT0325608 | SAVANT0349013 |
| SAVANT0276457 | SAVANT0304091 | SAVANT0325918 | SAVANT0350615 |
| SAVANT0277385 | SAVANT0306024 | SAVANT0329894 | SAVANT0350618 |
| SAVANT0277928 | SAVANT0306298 | SAVANT0329901 | SAVANT0350620 |
| SAVANT0278937 | SAVANT0307631 | SAVANT0329903 | SAVANT0350658 |
| SAVANT0280459 | SAVANT0308105 | SAVANT0329924 | SAVANT0351585 |
| SAVANT0280464 | SAVANT0308353 | SAVANT0329929 | SAVANT0351586 |
| SAVANT0280471 | SAVANT0308455 | SAVANT0330153 | SAVANT0351588 |
| SAVANT0280476 | SAVANT0308457 | SAVANT0330154 | SAVANT0351590 |
| SAVANT0280652 | SAVANT0308462 | SAVANT0330161 | SAVANT0353829 |
| SAVANT0280738 | SAVANT0308464 | SAVANT0330171 | SAVANT0354021 |
| SAVANT0280801 | SAVANT0308522 | SAVANT0330173 | SAVANT0354022 |
| SAVANT0281004 | SAVANT0308524 | SAVANT0330223 | SAVANT0354266 |
| SAVANT0281007 | SAVANT0308726 | SAVANT0330266 | SAVANT0355569 |
| SAVANT0281014 | SAVANT0308728 | SAVANT0330570 | SAVANT0357151 |
| SAVANT0281026 | SAVANT0308823 | SAVANT0330574 | SAVANT0358342 |
| SAVANT0281458 | SAVANT0308829 | SAVANT0330580 | SAVANT0360431 |
| SAVANT0283218 | SAVANT0308830 | SAVANT0330585 | SAVANT0360432 |
| SAVANT0283221 | SAVANT0308835 | SAVANT0330603 | SAVANT0360435 |
| SAVANT0283223 | SAVANT0308863 | SAVANT0330611 | SAVANT0361442 |
| SAVANT0283225 | SAVANT0308870 | SAVANT0330612 | SAVANT0361443 |
| SAVANT0283882 | SAVANT0312112 | SAVANT0330617 | SAVANT0361446 |
| SAVANT0283886 | SAVANT0312840 | SAVANT0331323 | SAVANT0363346 |
| SAVANT0283889 | SAVANT0313759 | SAVANT0331419 | SAVANT0363348 |

RESTRICTED CONFIDENTIAL – OUTSIDE COUNSEL ONLY

| | | | |
|---|---|---|---|
| SAVANT0363360 | SAVANT0403091 | SAVANT0460454 | SAVANT0528209 |
| SAVANT0364250 | SAVANT0403100 | SAVANT0473109 | SAVANT0528457 |
| SAVANT0365392 | SAVANT0406384 | SAVANT0473122 | SAVANT0528458 |
| SAVANT0365397 | SAVANT0410013 | SAVANT0485574 | SAVANT0528460 |
| SAVANT0365450 | SAVANT0414431 | SAVANT0485575 | SAVANT0528463 |
| SAVANT0366796 | SAVANT0414495 | SAVANT0485580 | SAVANT0528466 |
| SAVANT0372601 | SAVANT0419233 | SAVANT0485582 | SAVANT0529210 |
| SAVANT0372602 | SAVANT0419235 | SAVANT0486308 | SAVANT0529216 |
| SAVANT0372604 | SAVANT0419237 | SAVANT0488310 | SAVANT0529224 |
| SAVANT0372606 | SAVANT0419240 | SAVANT0490573 | SAVANT0530359 |
| SAVANT0372609 | SAVANT0420441 | SAVANT0492787 | SAVANT0530361 |
| SAVANT0372612 | SAVANT0424643 | SAVANT0492788 | SAVANT0530370 |
| SAVANT0372613 | SAVANT0424911 | SAVANT0492789 | SAVANT0531023 |
| SAVANT0372615 | SAVANT0426009 | SAVANT0517785 | SAVANT0531053 |
| SAVANT0372720 | SAVANT0426391 | SAVANT0517870 | SAVANT0532659 |
| SAVANT0372722 | SAVANT0427601 | SAVANT0518120 | SAVANT0532715 |
| SAVANT0372971 | SAVANT0427609 | SAVANT0518141 | SAVANT0549386 |
| SAVANT0372973 | SAVANT0427612 | SAVANT0518145 | SAVANT0553080 |
| SAVANT0373134 | SAVANT0427664 | SAVANT0518626 | SAVANT0556559 |
| SAVANT0373136 | SAVANT0427698 | SAVANT0518628 | SAVANT0559036 |
| SAVANT0373138 | SAVANT0427701 | SAVANT0518630 | SAVANT0562116 |
| SAVANT0373319 | SAVANT0427867 | SAVANT0518962 | SAVANT0562180 |
| SAVANT0373674 | SAVANT0427912 | SAVANT0519418 | SAVANT0563029 |
| SAVANT0374388 | SAVANT0427928 | SAVANT0519419 | SAVANT0573607 |
| SAVANT0374390 | SAVANT0427935 | SAVANT0523141 | SAVANT0573610 |
| SAVANT0374645 | SAVANT0428905 | SAVANT0523147 | SAVANT0578462 |
| SAVANT0376832 | SAVANT0429582 | SAVANT0523151 | SAVANT0578466 |
| SAVANT0377077 | SAVANT0430893 | SAVANT0523815 | SAVANT0578491 |
| SAVANT0377214 | SAVANT0434333 | SAVANT0523819 | SAVANT0578493 |
| SAVANT0378034 | SAVANT0437072 | SAVANT0524599 | SAVANT0581173 |
| SAVANT0380582 | SAVANT0437073 | SAVANT0524606 | SAVANT0581176 |
| SAVANT0381703 | SAVANT0437120 | SAVANT0524642 | SAVANT0581179 |
| SAVANT0381706 | SAVANT0437122 | SAVANT0525262 | SAVANT0581184 |
| SAVANT0388584 | SAVANT0437250 | SAVANT0525636 | SAVANT0583068 |
| SAVANT0395870 | SAVANT0437252 | SAVANT0525661 | SAVANT0587088 |
| SAVANT0395872 | SAVANT0444820 | SAVANT0525663 | SAVANT0590547 |
| SAVANT0399379 | SAVANT0451348 | SAVANT0525673 | SAVANT0590549 |
| SAVANT0400684 | SAVANT0452161 | SAVANT0525701 | SAVANT0590759 |
| SAVANT0403041 | SAVANT0452162 | SAVANT0525972 | SAVANT0591404 |
| SAVANT0403045 | SAVANT0456049 | SAVANT0526482 | SAVANT0591406 |
| SAVANT0403047 | SAVANT0458528 | SAVANT0526986 | SAVANT0591409 |
| SAVANT0403049 | SAVANT0458531 | SAVANT0526992 | SAVANT0594138 |
| SAVANT0403052 | SAVANT0458586 | SAVANT0527141 | SAVANT0598738 |
| SAVANT0403057 | SAVANT0460373 | SAVANT0528079 | SAVANT0598739 |
| SAVANT0403088 | SAVANT0460375 | SAVANT0528207 | SAVANT0598740 |

SAVANT0608347
SAVANT0608349
SAVANT0637218
SAVANT0637313
SAVANT0637460
SAVANT0641133
SAVANT0641135
SAVANT0642856
SAVANT0648909
SAVANT0662494
SAVANT0667114
SAVANT0672873
SAVANT0672874
SAVANT0672877
SAVANT0678450
SAVANT0683850
SAVANT0699200
SAVANT0699681
SAVANT0701377
SAVANT0702696
SAVANT0702697
SAVANT0703747
SAVANT0703748
SAVANT0706345
SAVANT0707540
SAVANT0709641
SAVANT0710788
SAVANT0710789
SAVANT0710798
SAVANT0716317
SAVANT0716318
SAVANT0716320
SAVANT0716359
SAVANT0716360
SAVANT0716361
SAVANT0716385
SAVANT0716386
SAVANT0716387
SAVANT0716388
SAVANT0716603
SAVANT0726875
SAVANT0731388
SAVANT0731400
SAVANT0731401
SAVANT0748996
SAVANT0759965
SAVANT0768699
SAVANT0768949
SAVANT0769195
SAVANT0777134
SAVANT0777135
SAVANT0777887
SAVANT0777894
SAVANT0777904
SAVANT0777905
SAVANT0777910
SAVANT0777912
SAVANT0777913
SAVANT0777919
SAVANT0778153
SAVANT0779192
SAVANT0779195
SAVANT0779205
SAVANT0780837
SAVANT0780844
SAVANT0780846
SAVANT0788313
SAVANT0790638
SAVANT0790654
SAVANT0808986
SAVANT0835078
SAVANT0841631
SAVANT0856237
SAVANT0867240
SAVANT0876764
SAVANT0876775
SAVANT0877540
SAVANT0878256
SAVANT0902268
SAVANT0902825
SAVANT0902853
SAVANT0904921
SAVANT0905055
SAVANT0918726
SAVANT0922905
SAVANT0928448
SAVANT0930499
SAVANT0932727
SAVANT0935870
SAVANT0938590
SAVANT0940390
SAVANT0940548
SAVANT0940549
SAVANT0944117
SAVANT0946569
SAVANT0948548
SAVANT0958333
SAVANT0958367
SAVANT0958370
SAVANT0960387
SAVANT0960391
SAVANT0960398
SAVANT0960405
SAVANT0968463
SAVANT0970808
SAVANT0973387
SAVANT0975622
SAVANT0984684
SAVANT0986776
SAVANT0987508
SAVANT0989252
SAVANT0989369
SAVANT0989414
SAVANT0989521
SAVANT0992180
SAVANT0992831
SAVANT0993490
SAVANT0994173
SAVANT1011004
SAVANT1011007
SAVANT1011011
SAVANT1025420
SAVANT1025423
SAVANT1128136
SAVANT1128138
SAVANT1153596
SAVANT1153895
SAVANT1160872
SAVANT1161059
SAVANT1189536
SAVANT1205418
SAVANT1232612
SAVANT1234913
SAVANT1234916
SAVANT1234922
SAVANT1234925
SAVANT1235899
SAVANT1250801
SAVANT1251073
SAVANT1253218
SAVANT1253389
SAVANT1254264
SAVANT1256636
SAVANT1320607
SAVANT1320609
SAVANT1320629
SAVANT1324205
SAVANT1324212
SAVANT1325328
SAVANT1325331
SAVANT1325336
SAVANT1325339
SAVANT1326120
SAVANT1326121
SAVANT1326123
SAVANT1334544
SAVANT1348588
SAVANT1348834
SAVANT1348872
SAVANT1349024
SAVANT1507484
SAVANT1507595
SAVANT1510022
SAVANT1537936
SAVANT1544469
SAVANT1550631
SAVANT1551885
SAVANT1552039
SAVANT1552040
SAVANT1577145
SAVANT1577882
SAVANT1580339
SAVANT1585533
SAVANT1585535
SAVANT1585537
SAVANT1585538
SAVANT1602880
SAVANT1602933
SAVANT1619959
SAVANT1619961

RESTRICTED CONFIDENTIAL – OUTSIDE COUNSEL ONLY

SAVANT1619963
SAVANT1620068
SAVANT1620069
SAVANT1622366
SAVANT1623961
SAVANT1624009
SAVANT1627247
SAVANT1627250
SAVANT1630102
SAVANT1639309
SAVANT1643679
SAVANT1648667
SAVANT1648843
SAVANT1649250
SAVANT1653635
SAVANT1653685
SAVANT1653687
SAVANT1653689
SAVANT1653690
SAVANT1653691
SAVANT1657722
SAVANT1661060
SAVANT1676713
SAVANT1725507
SAVANT2005439
SAVANT2399394
SAVANT2476685
SAVANT2509583
SAVANT2603134
SAVANT2603807
SAVANT2603809
SAVANT2697838
SAVANT2700358
SAVANT2705474
SAVANT2706579
SAVANT2706581
SAVANT2706584
SAVANT2708350
SAVANT2708352
SAVANT2709936
SAVANT2718939
SAVANT2720094
SAVANT2720112
SAVANT2737433
SAVANT2737435
SAVANT2737437
SAVANT2739233
SAVANT2758738
SAVANT2758747
SAVANT2761217
SAVANT2761220
SAVANT2761223
SAVANT2761227
SAVANT2765075
SAVANT2765077
SAVANT2765080
SAVANT2765092
SAVANT2765097
SAVANT2768011
SAVANT2883951
SAVANT2887033
SAVANT3051119
SAVANT3051120
SAVANT3052754
SAVANT3052756
SAVANT3052758
SAVANT3053484
SAVANT3074646
SAVANT3074650
SAVANT3074654
SAVANT3074656

# EXHIBIT I

RESTRICTED CONFIDENTIAL – OUTSIDE COUNSEL ONLY

| Job/Project Name | Flip Reference Document ID | Approximate Flip Date | Dealer(s) Connected (DBA) | Identified Original Contract Value ($) | Identified Savant Contract Value ($) | Identified Discounted Savant Merchandise | Identified Discount Value ($) | Flip Project Status |
|---|---|---|---|---|---|---|---|---|
| **Unknown** | SAVANT0086957, SAVANT0086962, SAVANT1585533, SAVANT1585535, SAVANT1585537, SAVANT1585538, SAVANT0244646, SAVANT1639309, SAVANT1648843, SAVANT2005439, SAVANT1653635, SAVANT1653685, SAVANT1653687, SAVANT1653689, SAVANT1653690, SAVANT1653691, SAVANT1657722 | 8/3/2007 | Atlantic Stereo | • 20000 (SAVANT0086957) (SAVANT0086962) (SAVANT1585533) (SAVANT1585535) (SAVANT1585537) (SAVANT1585538) (SAVANT0244646) (SAVANT1639309) (SAVANT1648843) (SAVANT2005439) (SAVANT1653635) (SAVANT1653685) (SAVANT1653687) (SAVANT1653689) (SAVANT1653690) (SAVANT1653691) (SAVANT1657722) | | | | Potential Flip |
| **Unknown** | SAVANT0086957, SAVANT0086962, SAVANT1585533, SAVANT1585535, SAVANT1585537, SAVANT1585538, SAVANT0244646, SAVANT1639309, SAVANT2005439, SAVANT1653635, SAVANT1653685, SAVANT1653687, SAVANT1653689, SAVANT1653690, SAVANT1653691, SAVANT1657722 | 8/17/2007 | UV Ultimate Visions, Inc. | | | | | Potential Flip |
| **Unknown** | SAVANT0485186 | 6/3/2008 | American Automation & Communications, Inc. | | | | | Potential Flip |
| **Unknown** | SAVANT0429511, SAVANT0429514 | 6/13/2008 | American Automation & Communications, Inc. | | | | | Potential Flip |
| **Unknown** | SAVANT0429582, SAVANT0186971, SAVANT0186973, SAVANT0186976, SAVANT0219588, SAVANT0219591, SAVANT0219593, SAVANT0485574, SAVANT0485575, SAVANT0485580, SAVANT0485582, SAVANT0490573, SAVANT0132056, SAVANT0768699 | 6/27/2008 | Ambient Technologies | | • 51940 (SAVANT0132058)<br>• 50000 (SAVANT0768699) | | • 10% Fast Start Discount (SAVANT0429582) (SAVANT0186971) (SAVANT0186973) (SAVANT0186976) (SAVANT0219588) (SAVANT0219591) (SAVANT0219593) (SAVANT0485574) (SAVANT0485575) (SAVANT0485580) (SAVANT0485582) (SAVANT0490573) | Flip Completed |
| **Unknown** | SAVANT0429582, SAVANT0186971, SAVANT0186973, SAVANT0186976, SAVANT0219588, SAVANT0219591, SAVANT0219593, SAVANT0485574, SAVANT0485575, SAVANT0485580, SAVANT0485582, SAVANT0490573, SAVANT0132056, SAVANT0768699 | 6/27/2008 | Ambient Technologies | | • 67570 (SAVANT0132058)<br>• 75000 (SAVANT0768699) | | • 10% Fast Start Discount (SAVANT0429582) (SAVANT0186971) (SAVANT0186973) (SAVANT0186976) (SAVANT0219588) (SAVANT0219591) (SAVANT0219593) (SAVANT0485574) (SAVANT0485575) (SAVANT0485580) (SAVANT0485582) (SAVANT0490573) | Flip Completed |
| **Unknown** | SAVANT0768699 | 6/27/2008 | Components Electronics | | • 28000 (SAVANT0768699) | | | Potential Flip |
| **Unknown** | SAVANT0768699 | 6/27/2008 | Control AV Corporation | | • 70000 (SAVANT0768699) | | | Potential Flip |
| **Unknown** | SAVANT0768699 | 6/27/2008 | Homeworks Holding Corp. (Digital Ear) | | • 25000 (SAVANT0768699) | | | Potential Flip |
| **Unknown** | SAVANT0768699 | 6/27/2008 | Genesis Home Technologies Inc. | | • 25000 (SAVANT0768699) | | | Potential Flip |
| **Unknown** | SAVANT0768699 | 6/27/2008 | Access Point Designs | | • 13440 (SAVANT0768699) | | | Potential Flip |
| **Unknown** | SAVANT0768699 | 6/27/2008 | Smart Systems Integrated Inc. | | • 96500 (SAVANT0768699) | | | Potential Flip |
| **Unknown** | SAVANT1550631 | 6/30/2008 | Home Media, Inc. | | | | | Flip Completed |
| **Unknown** | SAVANT0186983, SAVANT0187005, SAVANT0187008, SAVANT0187010, SAVANT0219567, SAVANT0219569 | 7/1/2008 | Radio Active | | | | | Potential Flip |
| **Bill Rudin job** | SAVANT0102792, SAVANT0323145 | 7/22/2008 | Audio Interiors, Inc. | | • 75000 (SAVANT0362231)<br>• 76445.25 (SAVANT0124852)(SAVANT0805292) | Non third party materials (SAVANT0429810) | • 10% (SAVANT0323158) | Potential Flip |
| **Bazant Job** | SAVANT2697838, SAVANT0525972, SAVANT0486308 | 7/28/2008 | Tim Smith Electric Company | | • 149517 (SAVANT0984958) | | | Flip Completed |
| **Clareo/Apthorp Project** | SAVANT0323551, SAVANT0323553, SAVANT0124840, SAVANT0124843, SAVANT0268993, SAVANT0268995 | 10/7/2008 | Clareo Networks LLC, Rave Audio Visual (CAN) | | | | • Competitive Flip Discount (SAVANT0323551) (SAVANT0323553) (SAVANT0124840) (SAVANT0268993) (SAVANT0268995)<br>• 10%, NO Discount (SAVANT0124840) | Potential Flip |
| **Lightly** | SAVANT0323675, SAVANT0361442, SAVANT0361446, SAVANT0284841 | 10/24/2008 | Clareo Networks LLC | | • 36621.04 (SAVANT0361443) | | • 10% Competitive Flip Discount (SAVANT0323675)(SAVANT0361442)(SAVANT0284841) | Potential Flip |
| **Unknown** | SAVANT0324420, SAVANT0124439 | 2/9/2009 | ProLink LLC | • 300000+ (SAVANT0324420) (SAVANT0124439) | | | | Potential Flip |
| **Simmons** | SAVANT0344950, SAVANT0123083, SAVANT0680197, SAVANT0680196, SAVANT0680257, SAVANT3330467 | 3/30/2009 | JPC Pops, Inc. (Tune Street) | • 181668 (SAVANT0680259) | • 41349.50 (SAVANT0316617)(SAVANT0680199)(SAVANT0703140)<br>• 41444.25 (SAVANT0316620)<br>• 61724.28 (SAVANT0322040)<br>• 47665.29 (SAVANT0322087)<br>• 15000 (SAVANT3330467) | | | Flip Completed |
| **Unknown** | SAVANT0430893 | 5/7/2009 | Jobe Systems, Inc. | | | | | Potential Flip |
| **Unknown** | SAVANT3330467 | 5/8/2009 | Unknown | | • 21000 (SAVANT3330467) | | | Flip Completed |
| **Fowler** | SAVANT0427601, SAVANT0731388, SAVANT0427609, SAVANT0427612 | 5/21/2009 | Genesis Home Technologies Inc. | • 21000 (SAVANT0427601)(SAVANT073138) | • 43289 (SAVANT0427601) (SAVANT0731388) (SAVANT0427609) (SAVANT0427612) | | | Potential Flip |
| **Unknown** | SAVANT0679753, SAVANT0332829 | 6/2/2009 | American Automation & Communications, Inc. | | | | | Potential Flip |
| **Knight Residence** | SAVANT0148706, SAVANT0525701 | 6/4/2009 | Digital Home Systems Incorporated | • 100987.18 (SAVANT0776955)<br>• 217767.50 (SAVANT0525736) | • 154265.24 (SAVANT0525262) | | | Potential Flip |
| **Hevrdejs Residence** | SAVANT0414431, SAVANT0427701, SAVANT1649250, SAVANT0701377, SAVANT3330388 | 6/7/2009 | Jobe Systems, Inc. | • 30750 (SAVANT0395870)<br>• 357321.62 (SAVANT0395872)<br>• 389630 (SAVANT0948548) | | | | Potential Flip |
| **Unknown** | SAVANT0525661, SAVANT0525663, SAVANT0148721 | 6/8/2009 | Big Picture Solutions, Inc. | | • 20294.74 (SAVANT0776535) | Sys 12 and 24 and cards (SAVANT0148721)<br><br>RMF and Modules (SAVANT0525663) | • 15% (SAVANT0525663)(SAVANT0148721) | Flip Completed |
| **Project 1** | SAVANT1627247, SAVANT0372601, SAVANT0372602, SAVANT0372606, SAVANT1627250, SAVANT0372612, SAVANT0372613, SAVANT0731400, SAVANT0731401, SAVANT0427664, SAVANT0308823, SAVANT0308829, SAVANT0308835, SAVANT0308863, SAVANT0308870, SAVANT1725507, SAVANT0808986, SAVANT0835078, SAVANT0227148, SAVANT0430893, SAVANT0734354, SAVANT0430946, SAVANT0372720, SAVANT0372722, SAVANT0372971, SAVANT0372973, SAVANT0414495, SAVANT0427698, SAVANT0427867, SAVANT0437120, SAVANT0437122, SAVANT0437250, SAVANT0437252, SAVANT0289537, SAVANT0289540, SAVANT0308726, SAVANT0308728, SAVANT1235899, SAVANT1326120, SAVANT1326121, SAVANT1326123 | 6/9/2009 | Jobe Systems, Inc. | | • 24012.10 (SAVANT0372604) (SAVANT0372615) (SAVANT0308830)<br>• 22089.47 (SAVANT0372609)<br>• 64720 (SAVANT0734357) | RMF- 1200- 00 ROSIE MULTIFUNCTIONAL PLATFORM 12 SLOT<br>AIM- 0A16- 00 16- CH ANALOG AUDIO INPUT M ODULE<br>AOM- 016U- 00 16- CHANNEL STEREO PREAMP OUTPU T MODULE ( UNBALANCED)<br>RFD- 1000- 00 RADIO FREQUENCY USB 2.0 DONGLE<br>RTR- 1000- 02 ROSIE TRADITIONAL REMOTE<br>OSD- 1010- 00 ROSIE OSD CONTROL SYSTEM<br>RSC- 0025- 00 ROSIE SYSTEM CONTROLLER - 1U P LATFORM WITH 25 CONTROL<br>ITP- 107W- 00 7- INCH IN- WALL COLOR WIDESCREE N TOUCH PANEL WITH WHIT<br>ITS- 1001- 00 IN- WALL TOUCH PANEL SERVER AND SINGLE- PORT TP EXTENDE<br>KPB- M11W- 00 MEDIA KEYPAD BUTTON KIT WHITE WITH EXTENDER<br>WTP- 113B- 01 13.3- INCH WIRELESS WIDESCREEN TOUCH PANEL<br>WDB- 100B- 01 WIRELESS TOUCH PANEL CHARGING DOCKING BASE ( BLACK) (SAVANT0372604) (SAVANT0372615) | • 7581.59 (SAVANT0372604) (SAVANT0372615)<br>• 25% off everything (SAVANT0372606) (SAVANT0427664) (SAVANT0308835) (SAVANT0227148)<br>• 7021.06 (SAVANT0372609) | Flip Completed |
| **4-5 Unknown Projects** | SAVANT0372720, SAVANT0372722, SAVANT0372971, SAVANT0372973, SAVANT0414495, SAVANT0427698, SAVANT0427867, SAVANT0437120, SAVANT0437122, SAVANT0437250, SAVANT0437252, SAVANT0289537, SAVANT0289540, SAVANT0308726, SAVANT0308728, SAVANT1235899, SAVANT1326120, SAVANT1326121, SAVANT1326123 | 6/9/2009 | Jobe Systems, Inc. | | | | | Potential Flip |
| **Beck (or Bech) Project** | SAVANT0148754, SAVANT0148757, SAVANT0148762, SAVANT0778153, SAVANT0148771 | 6/12/2009 | Innovative Home Systems, Inc. | | • 70000 (SAVANT0148024)<br>• 22000 (SAVANT0740481) | | | Potential Flip |
| **Unknown** | SAVANT3330467 | 6/14/2009 | Unknown | | • 30000 (SAVANT3330467) | | | Flip Completed |
| **Unknown** | SAVANT0940390, SAVANT0322715, SAVANT0360431, SAVANT0360432, SAVANT0360435, SAVANT0267005, SAVANT0267055 | 6/17/2009 | Audio Command Systems, Inc. | | | | • Competitive Flip Discount (SAVANT0322715) | Potential Flip |
| **Rizzone** | SAVANT0373134, SAVANT0373138, SAVANT0427912, SAVANT0427928, SAVANT0308522, SAVANT0308524 | 6/23/2009 | J.R. Goold Enterprises, Inc. (Pacific Digital Home) | | • 56021.75 (SAVANT0373136)<br>• 55000 (SAVANT1602986)(SAVANT1635742) | RMF- 2400- 00 ROSIE SYSTEM 24 ( BASE CONFIGUR ATION WITH INTEGRATED H<br>AIM- 0A16- 00 ANALOG AUDIO INPUT MODULE<br>AOM- 016U- 00 16- CHANNEL STEREO PREAMP OUTPU T MODULE ( UNBALANCED)<br>VIM- A3C3S- 00 ANALOG VIDEO INPUT MODULE<br>VOM- A3C3S- 00 ANALOG VIDEO OUTPUT MODULE (SAVANT0373136) | • 3718.43 (SAVANT0373136)<br>• 10%, 5602 (SAVANT0373138) (SAVANT0427928) (SAVANT0308522) | Flip Completed |
| **Unknown** | SAVANT0523815, SAVANT0523819 | 6/24/2009 | Jobe Systems, Inc. | | | | | Potential Flip |

RESTRICTED CONFIDENTIAL – OUTSIDE COUNSEL ONLY

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| **Unknown** | SAVANT0373319, SAVANT0308353 | 6/28/2009 | Home Entertainemtn Design South, Inc. (HED South) | | | | | Potential Flip |
| **Unknown** | SAVANT3330467 | 7/4/2009 | End User | | • 11000 (SAVANT3330467) | | | Flip Completed |
| **Unknown** | SAVANT0148024 | 7/9/2009 | Greenville Electric | | • 50000 (SAVANT0148024) | | | Potential Flip |
| **Unknown** | SAVANT0940548, SAVANT0940549, SAVANT1325328, SAVANT1325331, SAVANT1325336, SAVANT1325339 | 7/15/2009 | Unknown | | • 35000 (SAVANT0940548) (SAVANT0940549) (SAVANT1325328) (SAVANT1325331) (SAVANT1325336) (SAVANT1325339) | | | Potential Flip |
| **Unknown** | SAVANT0350615, SAVANT0350618, SAVANT0350620, SAVANT0944117, SAVANT0350658, SAVANT0125522, SAVANT0125523, SAVANT0125524, SAVANT0125526, SAVANT0125528, SAVANT0125531, SAVANT0125534, SAVANT0283882, SAVANT0283886, SAVANT0283889, SAVANT0283893, SAVANT1234913, SAVANT1234916, SAVANT1234922, SAVANT1234925 | 7/15/2009 | JPC Pops, Inc. (Tune Street) | | • 35000 (SAVANT0350615) (SAVANT0350618) (SAVANT0350620) (SAVANT0944117) (SAVANT0350658) (SAVANT0125522) (SAVANT0125523) (SAVANT0125524) (SAVANT0125526) (SAVANT0125528) (SAVANT0125531) (SAVANT0125534) (SAVANT1234913) (SAVANT1234916) (SAVANT1234922) (SAVANT1234925) | | | Potential Flip |
| **Unknown** | SAVANT0098288, SAVANT0373674, SAVANT0424643, SAVANT0308105 | 7/18/2009 | Theatron Home Theater, Inc. | • 17000 (SAVANT0098288) (SAVANT0308105) | • ~7000 (SAVANT0098288) (SAVANT0308105) | | | Flip Completed |
| **Unknown** | SAVANT0703747, SAVANT0672873, SAVANT0672874, SAVANT0710373, SAVANT0359967 | 7/29/2009 | Theatron Home Theater, Inc. | | • 505.32 (SAVANT0703748) (SAVANT0672877) | | • System 12 or 24 and modules (SAVANT0672873) | Complete |
| **Sound Room Crestron Flip** | SAVANT3330467, SAVANT0740481, SAVANT0739850, SAVANT0715993 | 7/31/2009 | Simptronics, LLC (Fusion Media Systems), The Sound Room | | • 78000 (SAVANT3330467)<br>• 72973.61 (SAVANT0799893) | RMF-2400-20 ROSIE SYSTEM 24 (BASE CONFIGUR<br>AIM-0A16-00 ANALOG AUDIO INPUT MODULE<br>AOM-016U-00 16-CHANNEL STEREO PREAMP OUTPU<br>OSD-1010-20 ROSIE OSD CONTROL SYSTEM<br>MSC-1200-01 ROSIE SYSTEM 12 (BASE CONFIGUR<br>AIM-D4A8-00 MIXED DIGITAL AND ANALOG AUDIO<br>AOM-04DC-00 DIGITAL AUDIO OUTPUT MODULE<br>VIM-A3C3S-00 ANALOG VIDEO INPUT MODULE<br>VIM-A3C3S-00 ANALOG VIDEO INPUT MODULE<br>VOM-A3C3S-00 ANALOG VIDEO OUTPUT MODULE (SAVANT0799893) | • 6994.73 (SAVANT0799893) | Flip Completed |
| **N Square** | SAVANT0777887 | 8/5/2009 | Advanced Audio Design | | • 21301 (SAVANT0777894) | | • 15% Flip Discount (SAVANT0777887)<br>• 3759 (SAVANT0777894) | Potential Flip |
| **Unknown** | SAVANT3330467 | 8/7/2009 | Unknown | | • 44000 (SAVANT3330467) | | | Potential Flip |
| **La Playa Trust** | SAVANT0147916, SAVANT0777905, SAVANT0788313 | 8/17/2009 | Advanced Audio Design | • 522699.81 (SAVANT0524606)<br>• 444 803.81 (AMX)(SAVANT0524642) | • 61506 after discount (SAVANT0147916) (SAVANT0788313) (SAVANT0777905)<br>• 72360 before discount (SAVANT0148003)(SAVANT0147916) (SAVANT0788313) (SAVANT0777905)<br>• 72038.94 (SAVANT0777910), 62696.87 (SAVANT0777919) | RMF- 3600- 00 ROSIE SYSTEM 36 BASE CONFIGURA TION 6U MULTIFUNCTIONAL<br>VIM- A3C3S- 00 ANALOG VIDEO INPUT MODULE<br>VOM- D1080P- 00 DIGITAL VIDEO OUTPUT MODULE ( 1 080P)<br>VIM- D1080P- 00 DIGITAL VIDEO INPUT MODULE 108 0P<br>AIM- D4A8- 00 MIXED DIGITAL AND ANALOG AUDIO INPUT MODULE<br>AOM- 016U- 00 16- CHANNEL STEREO PREAMP OUTPU T MODULE ( UNBALANCED)<br>VOM- A3C3S- 00 ANALOG VIDEO OUTPUT MODULE (SAVANT0777910)<br><br>RMF- 3600- 00 ROSIE SYSTEM 36 BASE CONFIGURA TION 6U MULTIFUNCTIONAL<br>VOM- D1080P- 00 DIGITAL VIDEO OUTPUT MODULE ( 1 080P)<br>VIM- D1080P- 00 DIGITAL VIDEO INPUT MODULE 108 0P<br>AIM- D4A8- 00 MIXED DIGITAL AND ANALOG AUDIO INPUT MODULE<br>AOM- 016U- 00 16- CHANNEL STEREO PREAMP OUTPU T MODULE ( UNBALANCED) (SAVANT0777919) | • 15% Flip Discount, 10854 (SAVANT0147916) (SAVANT0788313) (SAVANT0777905)<br>• 15% on Sys 36 and cards (SAVANT0777904)(SAVANT0777913)<br>• 6284.21 (SAVANT0777910)<br>• 5100 (SAVANT0777919) | Potential Flip |
| **Unknown** | SAVANT0374388, SAVANT0374390, SAVANT0424911, SAVANT0289009, SAVANT0289011, SAVANT0581173, SAVANT0581176, SAVANT0581179, SAVANT0581184, SAVANT1254264, SAVANT1324205, SAVANT1324212, SAVANT1348588, SAVANT0563029 | 8/19/2009 | Jobe Systems, Inc. | | | | | Potential Flip |
| **Armstrong** | SAVANT3330467, SAVANT0311259, SAVANT0330066 | 8/19/2009 | Phoenix Audio Video, LLC | | • 35000 (SAVANT3330467)<br>• 33176.88 (SAVANT0710635) | System 12 and cards (SAVANT0710632)<br><br>MSC- 12SE- 00 ROSIE SYSTEM 12 ( SINGLE EDITIO N MSC- 1200 BASE CONFIGURAT<br>VIM- D1080P- 00 DIGITAL VIDEO INPUT MODULE 108 0P<br>VOM- D1080P- 00 DIGITAL VIDEO OUTPUT MODULE ( 1 080P)<br>AOM- 016U- 00 16- CHANNEL STEREO PREAMP OUTPU T MODULE ( UNBALANCED)<br>AIM- 0A16- 00 ANALOG AUDIO INPUT MODULE<br>AOM- SS8U- 00 7.1 SURROUND SOUND & AUDIO PRO CESSING MODULE ( UNBALA (SAVANT0710635) | • 15% (SAVANT0710632)<br>• 2226.32 (SAVANT0710635) | Flip Completed |
| **Unknown** | SAVANT0351585, SAVANT0351586, SAVANT0351588, SAVANT0351590, SAVANT0283218, SAVANT0283223, SAVANT0283225, SAVANT0374645, SAVANT0307631, SAVANT1232612, SAVANT0519418, SAVANT0444820 | 8/26/2009 | Theatron Home Theater, Inc. | | • 90000 (for System 36) (SAVANT0519418) (SAVANT0444820)<br>• 102024.23 (SAVANT0315247)(SAVANT0345596)<br>• 95575.64 (SAVANT0282776) | | | Flip Completed |
| **Unknown** | SAVANT0351585, SAVANT0351586, SAVANT0351588, SAVANT0351590, SAVANT0283218, SAVANT0283223, SAVANT0283225, SAVANT0374645, SAVANT0307631, SAVANT1232612, SAVANT0282381 | 8/26/2009 | Theatron Home Theater, Inc. | | • 36077.94 (SAVANT0329848) | | | Flip Completed |
| **Unknown** | SAVANT0351585, SAVANT0351586, SAVANT0351588, SAVANT0351590, SAVANT0283218, SAVANT0283223, SAVANT0283225, SAVANT0374645, SAVANT0307631, SAVANT1232612, SAVANT0345986 | 8/26/2009 | Theatron Home Theater, Inc. | | • 21072.62 (SAVANT0345987) | | | Flip Completed |
| **Unknown** | SAVANT0492787 | 9/4/2009 | Ghost Fighters Home Technology Solutions | | • Option 1: 42831.63<br>• Option 2: 44896.13<br>• Option 3: 40014.54 (SAVANT0492787) | Option 1: RMF 2400-00 Rosie System 24<br>AIM-D48A 4 digital 8 analog audio input card<br>AOM 016u "8 zones Sterio Audio out, PreAmp,"<br>AOM-SS8U 7.1 SURROUND SOUND CARD<br>vim-A3C3S Component Video Input card (3 inputs per card)<br>VOM-A3C3S Component Video Output card (3 inputs per card)<br><br>Option 2: RMF 1200-00 Rosie System 12<br>AIM0A16 16-ch analog Input<br>AIM-D48A 4 digital 8 analog audio input card<br>AOM 016u "8 zones Sterio Audio out, PreAmp,"<br>vim-D1080P Digital Video Input 3 1080P<br>VOM-D1080P Digital Video Output 4 1080P<br><br>Option 3: RMF 1200-00 Rosie System 12<br>AIM-D48A 4 digital 8 analog audio input card<br>AOM 016u "8 zones Sterio Audio out, PreAmp,"<br>vim-D1080P Digital Video Input 3 1080P<br>VOM-D1080P Digital Video Output 4 1080P<br>VOM-A3C3S Component Video Output card (3 inputs per card) (SAVANT0492787) | • Option 1 = 3331.58<br>• Option 2 = 3082.90<br>• Option 3 = 2332.90 (SAVANT0492787) | Potential Flip |
| **Unknown** | SAVANT0053524 | 9/4/2009 | Electronic Home, Inc. | | | | | Potential Flip |
| **Unknown** | SAVANT1627731, SAVANT0148024 | 9/4/2009 | RG Convergence Technologies LLC | | • 120000 (SAVANT1627731)(SAVANT0148024) | | | Potential Flip |
| **Unknown** | SAVANT0492788 | 9/9/2009 | Unknown | | • 59289.597 (SAVANT0492788) | RMF 2400-00 Rosie System 24<br>AIM-D48A 4 digital 8 analog audio input card<br>AOM 016u "8 zones Sterio Audio out, PreAmp,"<br>vim-A3C3S Component Video Input card (3 inputs per card)<br>VOM-D1080P Digital Video Output 3 1080P<br>VOM-A3C3S Component Video Output card (3 inputs per card) (SAVANT0492788) | • 2905.263 (SAVANT0492788) | Potential Flip |
| **Unknown** | SAVANT0519418, SAVANT0444820 | 9/15/2009 | Kaiden Home Technologies, LLC | | | | | Potential Flip |
| **Hoffman** | SAVANT0519418, SAVANT0444820, SAVANT3330467 | 9/15/2009 | JVN Systems, Inc. | | • 10000 (SAVANT3330467) | | | Potential Flip |
| **Unknown** | SAVANT0519418, SAVANT0444820 | 9/15/2009 | Converge | | | | | Potential Flip |
| **Unknown** | SAVANT0492789 | 9/30/2009 | Unknown | | • 398790225 (SAVANT0492789) | MSC 1200 Rosie System 24<br>AIM-D48A 4 digital 8 analog audio input card<br>AOM 016u "8 zones Sterio Audio out, PreAmp,"<br>vim-A3C3S Component Video Input card (3 inputs per card)<br>VOM-D1080P Digital Video Output 3 1080P<br>VOM-A3C3S Component Video Output card (3 inputs per card) (SAVANT0492789) | • 1563.1575 (SAVANT0492789) | Potential Flip |

RESTRICTED CONFIDENTIAL – OUTSIDE COUNSEL ONLY

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| **Sojo 1500** | SAVANT3330467 | 9/30/2009 | Unknown | | • 15000 (SAVANT3330467)(SAVANT0524836) | | | Potential Flip |
| **Judson Ain (Ain Residence)** | SAVANT3330467 | 10/3/2009 | Audio Command Systems, Inc. | | • 30000 (SAVANT3330467)<br>• 614.94 (SAVANT0311763)<br>• 552 (SAVANT0311790)<br>• 210.53 (SAVANT0938232)<br>• 421.05 (SAVANT0938232)<br>• 290.53 (SAVANT0938232)<br>• 32347.36 (SAVANT0938232)<br>• No figures (SAVANT0263444) | | | Flip Completed |
| **Unknown** | SAVANT0441221, SAVANT0148024, SAVANT0377077, SAVANT0410013 | 10/4/2009 | Sky Audio Video Entertainment LLC | | • 30000 (SAVANT0441221)(SAVANT1627731)(SAVANT0148024) | | | Flip Completed |
| **Unknown** | SAVANT0441221, SAVANT0148024, SAVANT0377077, SAVANT0410013 | 10/4/2009 | Sky Audio Video Entertainment LLC | | • 50000 (SAVANT0441221)(SAVANT1627731)(SAVANT0148024) | | | Flip Completed |
| **Fox Residence** | SAVANT3330388, SAVANT0358262 | 10/5/2009 | Simptronics, LLC (Fusion Media Systems) | | | | | Potential Flip |
| **Jim Wolford** | SAVANT0716317, SAVANT0716359, SAVANT0716360, SAVANT0716385, SAVANT0716386, SAVANT0716387, SAVANT0683850, SAVANT0699681 | 10/6/2009 | Audio Video Dimensions | | • 26951.57 (SAVANT0716320) | | | Potential Flip |
| **Kopczynski - Schlosser Residence** | SAVANT0344645, SAVANT0344646, SAVANT0344654, SAVANT0344658, SAVANT0355569, SAVANT0125804, SAVANT0125805, SAVANT0265236, SAVANT0265239, SAVANT0265247, SAVANT0265249, SAVANT0277928, SAVANT0328811, SAVANT0344726 | 10/15/2009 | Electronics Design Group Inc. | | • 105579.50 (SAVANT0344465)(SAVANT0328812)<br>• 40000 (SAVANT0711244) | | | Flip Completed |
| **Pedersen** | SAVANT3330467, SAVANT0344824, SAVANT0708917, SAVANT0322539 | 10/21/2009 | Lights! Camera! Action! (LCA Systems) | | • 9000 (SAVANT3330467)<br>• 17499.08 (SAVANT0708920) | MSC- 12SE- 00 ROSIE SYSTEM 12 ( SINGLE EDITIO N MSC- 1200 BASE CONFIGURAT<br>VIM- A3C3S- 00 ANALOG VIDEO INPUT MODULE<br>AOM- 016U- 00 16- CHANNEL STEREO PREAMP OUTPU T MODULE ( UNBALANCED)<br>AOM- SS8U- 01 7.1 SURROUND SOUND & AUDIO PRO CESSING MODULE ( UNBALA<br>OSD- 1010- 10 ROSIE OSD CONTROL SYSTEM<br>RSC- 0007- 00 ROSIE SYSTEM CONTROLLER ( RSC- 0 007)<br>RTR- 1000- 02 TRADITIONAL REMOTE CONTROL ( OS D NAVIGATION)<br>RTR- 2000- 00 ROSIE REMOTE ( NON- OSD NAVIGATI ON)<br>RFD- 1000- 00 RADIO FREQUENCY ( RF) WIRELESS RECEIVER<br>IDS- 110W- 00 ROSIE IN- WALL MEDIA DOCK ( WHIT E)<br>ITP- 109W- 00 9- INCH IN- WALL ( WHITE BEZEL)<br>ITS- 1001- 10 INTEGRATED TOUCH PANEL SERVER AND SINGLE- PORT EXTEND<br>UCX- 1000- 00 USB OVER CAT5E DIGITAL EXTENDE R SET (SAVANT0708920) | • 172.53 (SAVANT0708920) | Potential Flip |
| **McWilliams Job** | SAVANT2720112, SAVANT0281458, SAVANT3498004 | 10/23/2009 | E-Live Networks | | | | | Potential Flip |
| **Tyra Banks** | SAVANT3330467, SAVANT0311505 | 10/23/2009 | Audio Command Systems, Inc. | | • 10000 (SAVANT3330467)(SAVANT0024642)(SAVANT0026145)( SAVANT0030952) | | | Potential Flip |
| **Unknown** | SAVANT0321882, SAVANT1602933, SAVANT0376832, SAVANT0377214, SAVANT0426391, SAVANT0306024, SAVANT0306298, SAVANT2476685, SAVANT0377065 | 10/27/2009 | HD Media Systems LLC, Q Audio & Video | | | | | Potential Flip |
| **Unknown** | SAVANT3330388 | 11/2/2009 | Audio Advisors, Inc. | | | | | Potential Flip |
| **Unknown** | SAVANT0716603, SAVANT0699200 | 11/3/2009 | Audio Advisors, Inc. | | • 19331 (SAVANT0726875) | Cards and Chassis (SAVANT0716603) (SAVANT0699200)<br><br>MSC- 12SE- 01 ROSIE SYSTEM 12 ( SINGLE EDITIO N MSC- 1200 BASE CONFIGURA<br>OSD- 1010- 20 ROSIE OSD CONTROL SYSTEM<br>AIM- D4A8- 00 MIXED DIGITAL AND ANALOG AUDIO INPUT MODULE<br>AOM- 016U- 00 16- CHANNEL STEREO PREAMP OUTPU T MODULE ( UNBALANCED) (SAVANT0726875) | • 15% (SAVANT0716603) (SAVANT0699200)<br>• 852.63 (SAVANT0726875) | Potential Flip |
| **Lucky 7 Project** | SAVANT3534431, SAVANT3534433, SAVANT2718939, SAVANT0263507, SAVANT0263509, SAVANT0263511, SAVANT0378034, SAVANT0426009, SAVANT0287391, SAVANT1011004, SAVANT1011007, SAVANT1011011, SAVANT2761217, SAVANT2761220, SAVANT2761223, SAVANT2761227, SAVANT1025420, SAVANT1025423, SAVANT0216535, SAVANT0216539, SAVANT0216543, SAVANT0226297, SAVANT0226302, SAVANT0226306, SAVANT0226309, SAVANT0578462, SAVANT0578466, SAVANT0578491, SAVANT0578493, SAVANT1320607, SAVANT1320609, SAVANT1320629, SAVANT3330388 | 11/23/2009 | Home Media Inc., Jobe Systems, Inc. | | • 30000 (SAVANT0432230) | | | Flip Completed |
| **Unknown** | SAVANT3330467 | 12/2/2009 | Unknown | | • 25000 (SAVANT3330467) | | • 15% (SAVANT3330467) | Flip Completed |
| **Unknown** | SAVANT3330388 | 12/10/2009 | End User | | | | | Potential Flip |
| **Frank Hook Project** | SAVANT1619959, SAVANT1623961, SAVANT0263729, SAVANT0330002, SAVANT0335418 | 12/21/2009 | Scene-Scape LLC | | • ~51000 (SAVANT0332117)(SAVANT0332199) | "Rosie System 12 or 24 and associated modules" (SAVANT0263731) | • 15% (SAVANT0263731) | Flip Completed |
| **Unknown** | SAVANT0281026 | 12/21/2009 | At Home Theater LLC | | | | | Potential Flip |
| **Upper Hook Road Project** | SAVANT1619961, SAVANT0329894, SAVANT0329901, SAVANT0329903, SAVANT0126231, SAVANT0281004, SAVANT0281007, SAVANT0281014, SAVANT1602880 | 12/22/2009 | Elite Performance Integration, Inc. (EPI Systems Integration), AVS | | • 30791.93 (SAVANT0315117) (SAVANT0281899) | | | Flip Completed |
| **Vann Residence** | SAVANT0329924, SAVANT0329929, SAVANT0263711, SAVANT0263717 | 12/23/2009 | Resolution Audio Video | | | System 12 and cards (SAVANT0329967) | • 15% (SAVANT0329924) (SAVANT0329929) (SAVANT0263711) (SAVANT0263717) (SAVANT0329967) | Flip Completed |
| **Unknown** | SAVANT0329957 | 12/23/2009 | Innerspace Electronics, Inc. | | • 31221.11 (SAVANT0329976) | AOM-016U-00 16-CHANNEL STEREO PREAMP OUTPUT MODULE (UNBALAN<br>AIM-0A16-00 ANALOG AUDIO INPUT MODULE<br>AIM-D4A8-00 MIXED DIGITAL AND ANALOG AUDIO INPUT MODULE<br>VIM-D1080P-01 DIGITAL VIDEO INPUT MODULE 1080P<br>VOM-41080P-00 DIGITAL VIDEO OUTPUT MODULE (1080P)<br>VOM-A3C3S-00 ANALOG VIDEO OUTPUT MODULE<br>MSC-1200-01 ROSIE SYSTEM 12 (BASE CONFIGURATION)<br>(SAVANT0329976) | • 15% (SAVANT0329957)<br>• 2,194.74 (SAVANT0329976) | Potential Flip |
| **Unknown** | SAVANT1620068, SAVANT0354021, SAVANT0354022, SAVANT0280652 | 1/8/2010 | Hampton Technology Group Inc. | | | | | Potential Flip |
| **Unknown** | SAVANT3330388 | 1/24/2010 | Best Buy Co. Inc. (AudioVisions) | | | | | Potential Flip |
| **Cheng Job (Cheng Bank Street Job)** | SAVANT0702697, SAVANT0330153, SAVANT0330154, SAVANT0330161, SAVANT0330171, SAVANT0330223, SAVANT0330266, SAVANT0330570, SAVANT0330574, SAVANT0330580, SAVANT0330585, SAVANT0330603, SAVANT0330611, SAVANT0330612, SAVANT0331323, SAVANT0331419, SAVANT0331420, SAVANT0331422, SAVANT1624009, SAVANT0126281, SAVANT0126288, SAVANT0126399, SAVANT0126403, SAVANT0262951, SAVANT0262953, SAVANT0262955, SAVANT0263004, SAVANT0263324, SAVANT0263336, SAVANT0263527, SAVANT0263545, SAVANT0263552, SAVANT0263557, SAVANT0678450, SAVANT0280459, SAVANT0280464, SAVANT0280471, SAVANT0280476, SAVANT0280738, SAVANT0280801 | 2/1/2010 | Cocooning Electronics Ltd. (Electronic Environments Inc.) | | • 47484.67 (SAVANT0330617)<br>• 50305.30 (SAVANT0706345) | MSC- 1200- 01 ROSIE SYSTEM 12 ( BASE CONFIGURATION)<br>AIM- 0A16- 00 ANALOG AUDIO INPUT MODULE<br>AOM- 016U- 00 16- CHANNEL STEREO PREAMP OUTPUT MODULE ( UNBALAN<br>SVS- 1004- 00 STREAMING VIDEO SERVER ( FOUR VIDEO FEEDS)<br>ITS- 1002- 20 INTEGRATED DUAL TOUCH PANEL SERVER AND DUAL- PORT<br>ITS- 1001- 20 INTEGRATED TOUCH PANEL SERVER AND SINGLE- PORT EX<br>ITP- C07B- 00 7- INCH IN- WALL ( CAPACITIVE GLASS BLACK BEZEL)<br>OSD- 1010- 20 ROSIE OSD CONTROL SYSTEM<br>RFD- 1000- 00 RADIO FREQUENCY ( RF) WIRELESS RECEIVER<br>RTR- 1000- 02 TRADITIONAL REMOTE CONTROL ( OSD NAVIGATION)<br>HCX- 1000- 01 HDMI OVER CAT5E/ CAT6 ( STP) SOLUTION SET<br>DDL- 100B- 00 DESKTOP IPOD DOCKING CRADLE ( BLACK)<br>ITP- C12B- 00 12- INCH IN- WALL ( CAPACITIVE GLASS BLACK BEZEL)<br>WTP- 113B- 20 13.3- INCH WIRELESS TOUCH PANEL ( BLACK)<br>WDB- 100B- 01 WIRELESS TOUCH PANEL CHARGING DOCKING BASE ( BLAC<br>RSC- 0007- 00 ROSIE SYSTEM CONTROLLER ( RSC- 0007)<br>ITP- C09B- 00 9- INCH IN- WALL ( CAPACITIVE GLASS BLACK BEZEL) (SAVANT0330617) | • 1978.53 (SAVANT0330617)<br>• 15% (SAVANT0706345)<br>• 15% on System 12's and cards or 6% Elite Loyalty Discount (SAVANT0331419) (SAVANT0331420) (SAVANT0331422) (SAVANT0262951) (SAVANT0262953) (SAVANT0262955) | Potential Flip |
| **Unknown** | SAVANT3330388 | 2/5/2010 | Best Buy Co. Inc. (AudioVisions), Jetson Systems | | | | | Potential Flip |
| **Unknown** | SAVANT3330467 | 2/25/2010 | Audio Command Systems Inc. | | • 30000 (SAVANT3330467) | | | Potential Flip |
| **Peck** | SAVANT0110659, SAVANT0110748 | 3/1/2010 | Theatron Home Theater, Inc. | | 170000 (SAVANT0110659) (SAVANT0110748) | | | Flip Completed |
| **Unknown** | SAVANT0709641, SAVANT0347992, SAVANT0348020, SAVANT0348023, SAVANT0262319, SAVANT0262322, SAVANT0262368, SAVANT0262378 | 3/16/2010 | Picture Perfect Custom Media Systems | | | | | Potential Flip |
| **O'Brein/ Omert Residence** | SAVANT0321360, SAVANT0348137, SAVANT0278937 | 3/18/2010 | Electronics Design Group, Inc. | | • No figures (SAVANT0313778) | | | Potential Flip |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| **Peter** | SAVANT3330467 | 3/22/2010 | Unknown | | • 11000 (SAVANT3330467) | | | Flip Completed |
| **4370 Project** | SAVANT3330388, SAVANT0147040, SAVANT0147041, SAVANT0776370, SAVANT0147047 | 3/26/2010 | Guenther-Vorucken, Inc. (Advanced Audio Design) | | • 230,640.00 (SAVANT0147041) | MSC-3600 ROSIE System 36 Multifunctional Platform, Integrated iTunes<br>HST-1001 ROSIE Host Controller with Redundant Backup<br>VOM-41080P Video Output Module, 4 x HDMI<br>VIM-D1080P Video Input Module, 3 x HDMI<br>AIM-D4A8 Audio Input Module, 2 x Tos, 2 x SPDF, 8-Analog<br>AOM-016U Audio Output Module, 16-Analog (8 Stereo Zones)<br>VIM-A3C3S Video Input Module, 3 x Component<br>OSD-1010 ROSIE OSD Control System<br>UCX-1000 USB over CAT5 Extender<br>RTR-1000 ROSIE Tradtional RF Remote<br>RFD-1000 RF USB Dongle<br>SVS-1004 Streaming Video Server, 4-Channel<br>IDC-200W iPad In-Wall Charging Dock, White<br>DCD-100W Desktop Charging Dock for iPad, White<br>DDS-100W ROSIE Desktop Media Dock Solution, includes MDR-1000, White<br>IDS-110W ROSIE In-Wall Media Dock, White<br>WIA-STAND iPod Touch Table Top Stand (SAVANT0776370)(SAVANT0776375) | • 8% , $6,640 (SAVANT0776370) | Potential Flip |
| **Tom Freitas** | SAVANT0517870 | 4/1/2010 | Audiogene | | | | | Potential Flip |
| **Unknown** | SAVANT0076720, SAVANT0304091 | 4/5/2010 | Creative Stereo & Security Systems Inc. (Creative Systems), Elite Media Solutions, LLC | | | | | Potential Flip |
| **Unknown** | SAVANT0904921, SAVANT0380582, SAVANT0388584, SAVANT0406384, SAVANT0304048 | 4/7/2010 | ListenUp Inc. | • 70000 (SAVANT0904921) (SAVANT0380582) (SAVANT0388584) (SAVANT0406384) (SAVANT0304048) | | | | Potential Flip |
| **Unknown** | SAVANT1630102, SAVANT1648667 | 4/13/2010 | Elite Media Solutions | | | | | Potential Flip |
| **Unknown** | SAVANT3330388 | 4/16/2010 | Accent ESI, Inc. | | | | | Potential Flip |
| **Yales Job** | SAVANT3330467 | 4/21/2010 | Home Theater of Long Island | | • 125912.88 (SAVANT3330467)(SAVANT1614857) | | | Flip Completed |
| **Unknown** | SAVANT0332829, SAVANT0127333, SAVANT0261320 | 5/3/2010 | American Automation & Communications, Inc. | | | | | Flip Completed |
| **Unknown** | SAVANT0332829, SAVANT0127333, SAVANT0261320 | 5/3/2010 | American Automation & Communications, Inc. | | | | | Flip Completed |
| **Yates Project** | SAVANT0341897, SAVANT0254145, SAVANT0337179, SAVANT0258078, SAVANT0349013, SAVANT0261822 | 5/5/2010 | Home Theater of Long Island | • 92000 (SAVANT0349013) (SAVANT0261822) | • 128,458.02 (SAVANT0072798)(SAVANT0643196)(SAVANT0643802)<br>• 127476.04 (SAVANT0311796)<br>• 101.05 (SAVANT0312356)<br>• 5052.63 (SAVANT0312375)<br>• 50.52 (SAVANT0312393)<br>• 8686.99 (SAVANT0315962) | OSD- 1010- 20 ROSIE OSD CONTROL SYSTEM, UCX- 1100- 00 USB OVER CAT5E DIGITAL EXTENDER SET<br>RTR- 1000- 02 TRADITIONAL REMOTE CONTROL ( OSD NAVIGATION), ITP- C07A- 00 7- INCH IN- WALL ( CAPACITIVE GLASS ALMOND BEZEL), RSC- 0025- 00 ROSIE SYSTEM CONTROLLER ( RSC- 0025)<br>DDS- 100W- 00 ROSIE DESKTOP MEDIA DOCK SOLUTION ( WHITE), ITP- C12A- 00 12- INCH IN- WALL ( CAPACITIVE GLASS ALMOND BEZEL), RSC- 0007- 00 ROSIE SYSTEM CONTROLLER ( RSC- 0007), ITS- 1002- 20 INTEGRATED DUAL TOUCH PANEL SERVER AND DUAL- PORT<br>MSC- 2400- 01 ROSIE SYSTEM 24 ( BASE CONFIGURATION), VOM- 41080P- 00 DIGITAL VIDEO OUTPUT MODULE ( 1080P), VOM- 21080P- 00 DIGITAL VIDEO OUTPUT MODULE ( 1080P), RFD- 1000- 00 RADIO FREQUENCY ( RF) WIRELESS RECEIVER, VIM- D1080P- 01 DIGITAL VIDEO INPUT MODULE 1080P<br>AIM- 0A16- 00 ANALOG AUDIO INPUT MODULE, AOM- 016U- 00 16- CHANNEL STEREO PREAMP OUTPUT MODULE ( UNBALAN, SVS- 1004- 00 STREAMING VIDEO SERVER ( FOUR VIDEO FEEDS), VIM- A3C3S- 01 ANALOG VIDEO INPUT MODULE, SCS- 1000- 20 SAVANT CALL SERVER (SAVANT0311796), BZX- 1007- 00 7- INCH IN- WALL TOUCH PANEL BEZEL BLACK, BZX- 1007- 00 7- INCH IN- WALL TOUCH PANEL BEZEL WHITE (SAVANT0312356)<br><br>OSD- 1010- 22 SAVANT OSD CONTROL SYSTEM<br>AOM- 8XLR- 00 8- CHANNEL STEREO PREAMP OUTPUT MODULE ( BALANCED) (SAVANT0312375)<br><br>BZX- 1007- 00 7- INCH IN- WALL TOUCH PANEL BEZEL IVORY (SAVANT0312393)(SAVANT0315962)<br><br>MSC- 1200- 02 ROSIE SYSTEM 12 ( BASE CONFIGURATION)<br>064- 0070- 00 IPASS CABLE 3 FEET<br>064- 0084- 00 CABLE 1 METER CHAMP<br>AOM- 04DC- 00 DIGITAL AUDIO OUTPUT MODULE<br>AOM- 016U- 00 16- CHANNEL STEREO PREAMP OUTPUT MODULE ( UNBALAN (SAVANT0315962) | • 1234.58 (SAVANT0311796)<br>• 4.21 (SAVANT0312356)<br>• 210.53 (SAVANT0312375)<br>• 2.11 (SAVANT0312393)<br>• 361.96 (SAVANT0315962) | Flip Completed |
| **Unknown** | SAVANT0075928, SAVANT0120258, SAVANT0355346, SAVANT0127720 | 5/17/2010 | All Around Technology | | • 30000 (SAVANT0075928) (SAVANT0120258) | | | Potential Flip |
| **Unknown** | SAVANT0075928, SAVANT0120258, SAVANT0355346 | 5/17/2010 | All Around Technology | | • 30000 (SAVANT0075928) (SAVANT0120258) | | | Potential Flip |
| **Unknown** | SAVANT0075939, SAVANT0120249 | 5/17/2010 | AVE Solutions S3 Entertainment, LLC (S3) | | | | | Potential Flip |
| **Unknown** | SAVANT0075939, SAVANT0120249 | 5/17/2010 | AVE Solutions S3 Entertainment, LLC (S3) | | | | | Potential Flip |
| **Unknown** | SAVANT0075939, SAVANT0120249 | 5/17/2010 | AVE Solutions S3 Entertainment, LLC (S3) | | | | | Potential Flip |
| **Unknown** | SAVANT0075939, SAVANT0120249 | 5/17/2010 | AVE Solutions S3 Entertainment, LLC (S3) | | | | | Potential Flip |
| **Wally job** | SAVANT0526482 | 5/27/2010 | Hi-Tech Integrated Systems, Inc. | | | | | Potential Flip |
| **Fong** | SAVANT3330467 | 6/1/2010 | Brian Marshman, Inc. | | • 20000 (SAVANT3330467) | | | Potential Flip |
| **Ivin** | SAVANT0110659, SAVANT0110748 | 6/4/2010 | Guenther-Vorucken, Inc. (Advanced Audio Design) | | 14798 (SAVANT0110659) (SAVANT0110748) | | | Flip Completed |
| **Unknown** | SAVANT1630102, SAVANT1648667 | 6/22/2010 | Custom Home Technology Inc. | | | | | Potential Flip |
| **Unknown** | SAVANT0076725, SAVANT0119794, SAVANT0357151 | 7/8/2010 | Enhanced Environments Inc. | | | | | Potential Flip |
| **Gladstone Residence** | SAVANT0076392, SAVANT0076367, SAVANT0076392, SAVANT0076367, SAVANT0076368 | 7/12/2010 | Architectural Electronics, Inc. (Audio Video Design) | • 38000 (SAVANT0076367)(SAVANT0076392) | • 52000 (SAVANT portion 12000) (SAVANT0076367)(SAVANT0076392) | | | Flip Completed |
| **Unknown** | SAVANT0153830, SAVANT0153832 | 7/17/2010 | Sound Image, Inc. | • 8500 less than SAVANT (SAVANT0153830) (SAVANT0153832) | • ~56666 (SAVANT0153830)(SAVANT0153832) | | • 15% (SAVANT0153830)(SAVANT0153832) | Potential Flip |
| **Unknown** | SAVANT0333946, SAVANT0277385 | 7/26/2010 | Gilmore's Sound Advice Inc. | | | | | Potential Flip |
| **Unknown** | SAVANT0984684 | 7/29/2010 | Unknown | | | | | Potential Flip |
| **Unknown** | SAVANT0528079, SAVANT0528207, SAVANT0528209, SAVANT0075591, SAVANT0118967; | 8/31/2010 | Premier Home Technologies LP, (Premier Technology Group) | | | | | Flip Completed |
| **Berg** | SAVANT0335677, SAVANT0707540, SAVANT0276449, SAVANT0276457, SAVANT0335777, SAVANT0335778, SAVANT0335799, SAVANT0128149, SAVANT0128151, SAVANT0258678, SAVANT0276422 | 9/7/2010 | Audio Command Systems, Inc. | | | | | Potential Flip |
| **Unknown** | SAVANT0642856, SAVANT1580339 | 9/10/2010 | Safe and Sound Systems, Inc. | | | | | Potential Flip |
| **Unknown** | SAVANT1630102, SAVANT1348834 | 9/13/2010 | American Automation & Communications, Inc. | | | | | Potential Flip |
| **Unknown** | SAVANT1205418, SAVANT1348872, SAVANT3330388 | 9/23/2010 | Futurehome Systems & Design Inc. | | | | | Potential Flip |
| **Cavelli** | SAVANT3330467 | 10/11/2010 | Digital Home Custom, Inc. | | • 16250 (SAVANT3330467)(SAVANT2697023)(SAVANT0776044) | | | Potential Flip |
| **Unknown** | SAVANT0528079, SAVANT0528207, SAVANT0528209, SAVANT0075591, SAVANT0118967 | 10/14/2010 | Premier Home Technologies LP, (Premier Technology Group) | | | | | Flip Completed |
| **Unknown** | SAVANT0987508 | 10/21/2010 | Audio Video Designs | | | | | Potential Flip |
| **Bleyzer Job** | SAVANT0769195, SAVANT0523815, SAVANT0523819, SAVANT0074292, SAVANT0077601, SAVANT0118342 SAVANT0118346, SAVANT0528356 | 11/10/2010 | Jobe Systems, Inc. | | • 2370 (SAVANT0744740)(SAVANT0454660)<br>• 252.66 (SAVANT0454304)<br>• 2964.61 (SAVANT0454549)<br>• ~50000 (SAVANT0458784)<br>• 600000 (SAVANT0769195) | | | Flip Completed |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| **Boger Project** | SAVANT0134131, SAVANT0531053, SAVANT0075641, SAVANT0118904, SAVANT0400684, SAVANT0135419, SAVANT0628739, SAVANT0628768 | 11/10/2010 | Creation Networks, Ultimate Control, Metro Eighteen | | • 52351.08 (SAVANT3502192)<br>• 43919.26 (SAVANT0454996)<br>• 40732.55 (SAVANT0748009) | MSC- 2400- 03 SAVANT SYSTEM 24 ( BASE CONFIGURATION)<br>AIM- 0A16- 00 ANALOG AUDIO INPUT MODULE<br>AIM- D4A8- 00 MIXED DIGITAL AND ANALOG AUDIO INPUT MODULE<br>AOM- 016U- 00 16- CHANNEL STEREO PREAMP OUTPUT MODULE ( UNBALAN<br>VIM- 30D4- 00 DIGITAL VIDEO INPUT MODULE ( 4- PORT HDMI)<br>VOM- 30D4- 01 DIGITAL VIDEO OUTPUT MODULE ( 4- PORT HDMI)<br>VOM- VP02- 00 VIDEO PROCESSING OUTPUT MODULE<br>DDS- 100W- 00 SAVANT DESKTOP MEDIA DOCK SOLUTION ( WHITE)<br>OCC- 5100- 00 SAVANT SYSTEM OSD<br>RFD- 1000- 00 RADIO FREQUENCY ( RF) WIRELESS RECEIVER<br>RTR- 1000- 02 TRADITIONAL REMOTE CONTROL ( OSD NAVIGATION)<br>RSC- 0025- 00 SAVANT SYSTEM CONTROLLER ( RSC- 0025)<br>RSC- 0007- 00 SAVANT SYSTEM CONTROLLER ( RSC- 0007)<br>HCX- 1010- 00 HDMI OVER CAT5/ 6 SOLUTION SET<br>UCX- 1100- 00 USB OVER CAT5E DIGITAL EXTENDER SET<br>ICC- 200X- 00 IN- WALL WIRED CHARGING AND CONTROL DOCK FOR IPAD WHITE (SAVANT0748009)(SAVANT0748006) | • 10% "Apple friends and family discount" (SAVANT0135419)(SAVANT0074022)(SAVANT0454994)<br>• 3975.93 (SAVANT0748009) | Flip Completed |
| **Unknown** | SAVANT0777135 | 11/11/2010 | LWS Enterprises, LLC | | | | | Flip Completed |
| **San Marco Job** | SAVANT0528457, SAVANT0528458, SAVANT0528463, SAVANT0528466, SAVANT0153339 | 11/12/2010 | Definitive Electronic Solutions, Inc. | | • 4648.55 (SAVANT1630300) (SAVANT0442902) (SAVANT1614857) | | | Flip Completed |
| **Unknown** | SAVANT0338396 | 11/13/2010 | Electronics Design Group, Inc. | | • No figures (SAVANT0338396) | | | Potential Flip |
| **Unknown** | SAVANT1630102, SAVANT1648667 | 11/15/2010 | Modern Media Innovations | | | | | Potential Flip |
| **Unknown** | SAVANT1630102, SAVANT1648667 | 12/1/2010 | Innovative Audio Video Products, Inc. | | | | | Flip Completed |
| **Unknown** | SAVANT1630102 | 12/17/2010 | LWS Enterprises, LLC | | | | | Potential Flip |
| **Unknown** | SAVANT1630102, SAVANT1648667 | 1/13/2011 | Spextronic, Inc. | | | | | Potential Flip |
| **Don Burns Residence (Nantucket Project)** | SAVANT0008432, SAVANT2883951, SAVANT2662831, SAVANT0518141, SAVANT0518626, SAVANT0518628, SAVANT2887033, SAVANT0518962, SAVANT0141639, SAVANT0141641, SAVANT0146425, SAVANT0146432, SAVANT0146478, SAVANT0146485, SAVANT0530359, SAVANT0530361, SAVANT0530370, SAVANT0780844, SAVANT0780846, SAVANT0159935, SAVANT0523815, SAVANT0989414, SAVANT0074292, SAVANT0077601, SAVANT0118342, SAVANT0118346, SAVANT0295703, SAVANT0856237, SAVANT1160872, SAVANT1161059, SAVANT0573607, SAVANT0573610, SAVANT0867240, SAVANT1250801, SAVANT0876764, SAVANT3492748, SAVANT0583068, SAVANT0876775, SAVANT1251073, SAVANT0877540, SAVANT0590547, SAVANT1253218, SAVANT0590549, SAVANT0878256, SAVANT0591404, SAVANT0591406, SAVANT0591409, SAVANT0841631 | 1/14/2011 | Jobe Systems, Inc. | • 93015 (SAVANT0008437)<br>• 26445.20 (Symetrix)(SAVANT0008438) | • 160000 (SAVANT0743305) | | | Flip Completed |
| **Ted Cheng** | SAVANT0074544, SAVANT0930285, SAVANT0454997, SAVANT0957779, SAVANT0467778; | 1/18/2011 | KGO Electric (KGO Inc.) | | • 15000 (SAVANT0665184) | | • 20% off all non-apple products (SAVANT0074544) | Flip Completed |
| **Unknown** | SAVANT0590759, SAVANT1253389, SAVANT0556559 | 1/20/2011 | Audio Video Designs, Inc. | | | | | Potential Flip |
| **Unknown** | SAVANT1551885, SAVANT1552039, SAVANT1552040 | 1/28/2011 | Definitive Concepts Inc. | | | | | Potential Flip |
| **Unknown** | SAVANT1630102, SAVANT1648667, SAVANT0524891, SAVANT0778035 | 1/31/2011 | Atlantic Smart Technologies, Inc. | | | | | Potential Flip |
| **Rudin Residence** | SAVANT0347694, SAVANT0255756, SAVANT0345712 | 2/6/2011 | Cocooning Electronics Ltd. (Electronic Environments Inc.) | | • 28000 (SAVANT1628051) | | | Potential Flip |
| **Estate Job in FTL** | SAVANT0989521 | 2/22/2011 | Unknown | | | | | Potential Flip |
| **Unknown** | SAVANT0319806, SAVANT0325608, SAVANT0325918, SAVANT0273801, SAVANT0932727 | 3/4/2011 | Performance Imaging LLC | | | | | Potential Flip |
| **Unknown** | SAVANT0319860, SAVANT0319871, SAVANT0363346, SAVANT0363348, SAVANT0363360, SAVANT0255044, SAVANT0255055 | 3/8/2011 | Innerspace Electronics, Inc. | | | | | Potential Flip |
| **Unknown** | SAVANT0529210, SAVANT0529216, SAVANT0529224 | 3/9/2011 | Progressive Integrations Inc. | | | | | Potential Flip |
| **Unknown** | SAVANT0641133, SAVANT0667114, SAVANT0637313, SAVANT0532715, SAVANT0759965 | 3/15/2011 | Futurehome Systems & Design Inc. | | | | | Potential Flip |
| **Durban Residence** | SAVANT0399379, SAVANT0420441, SAVANT0294443, SAVANT0399611 | 3/23/2011 | Engineered Environments, Jetson Systems | | • 2754.08 (SAVANT0755938) | | | Flip Completed |
| **Unknown** | SAVANT1507595, SAVANT0994173 | 4/7/2011 | Engineered Environments | | | | | Potential Flip |
| **Unknown** | SAVANT1153596, SAVANT1153895 | 4/9/2011 | Best Buy Co. Inc. (AudioVisions) | | | | | Potential Flip |
| **Gartland** | SAVANT0073834, SAVANT1507484, SAVANT0992180, SAVANT0993294, SAVANT1153596 | 5/3/2011 | Best Buy Co. Inc. (AudioVisions) | | • 490000 (SAVANT0993294) | | | Potential Flip |
| **Klein Residence** | SAVANT0902268, SAVANT0637218, SAVANT0902825, SAVANT0902853, SAVANT0532659, SAVANT0790638, SAVANT0451348, SAVANT0748996 | 5/16/2011 | Sound & Secure Inc. (Eagle Sentry) | • 707508.71 (SAVANT0227471) | | | | Potential Flip |
| **Unknown** | SAVANT0587088, SAVANT0549386 | 5/23/2011 | Unknown | | | | | Flip Completed |
| **Koepell** | SAVANT2706579, SAVANT2706581, SAVANT2706584, SAVANT3052520 | 5/24/2011 | Cyber Sound & Security | • 2640 (SAVANT3052520) | • 5200 (SAVANT3052520) | MSC-24SE, corresponding cards and peripherals, SSA-3000, SSM-3100, SSV-3100 (SAVANT2706504) | | Flip Completed |
| **Unknown** | SAVANT0608347, SAVANT0608349, SAVANT1128136, SAVANT1128138, SAVANT0973387, SAVANT0975622, SAVANT1661060, SAVANT0968463, SAVANT0970808 | 5/24/2011 | Kozi Media Design Inc. | | | | | Potential Flip |
| **Unknown** | SAVANT0078623, SAVANT0078638, SAVANT0078647, SAVANT0078657, SAVANT0319100, SAVANT0319115, SAVANT0344080, SAVANT0365392, SAVANT0365397, SAVANT0252974, SAVANT0252984, SAVANT0252993, SAVANT0253006, SAVANT0055109, SAVANT0055112, SAVANT0253013 | 6/14/2011 | Limelight Systems | | • 90,000 (SAVANT0078623) (SAVANT0078638) (SAVANT0078647) (SAVANT0078657) (SAVANT0319100) (SAVANT0319115) (SAVANT0344080) (SAVANT0365392) (SAVANT0365397) (SAVANT0252974) (SAVANT0252984) (SAVANT0252993) (SAVANT0253006) (SAVANT0055109) (SAVANT0055112) (SAVANT0253013) | | | Potential Flip |
| **Unknown** | SAVANT0319051, SAVANT0365450, SAVANT0366796, SAVANT0252913 | 6/27/2011 | Unknown | | | | | Potential Flip |
| **8 - 10 Unknown Projects** | SAVANT0456049, SAVANT0460454 | 7/20/2011 | Sound Entertainment Solutions LLC | | • 100000 - 150000 (SAVANT0456049) | | | Potential Flip |
| **Unknown** | SAVANT0637460, SAVANT0993490, SAVANT0960387, SAVANT0960391, SAVANT0960398, SAVANT0960405, SAVANT0473109, SAVANT0473122 | 7/26/2011 | The Appropriate Connections, Inc. | | | | | Potential Flip |
| **Unknown** | SAVANT0637460, SAVANT0993490, SAVANT0960387, SAVANT0960391, SAVANT0960398, SAVANT0960405, SAVANT0473109, SAVANT0473122 | 7/26/2011 | The Appropriate Connections, Inc. | | | | | Potential Flip |
| **Promontory Clubhouse** | SAVANT3053484, SAVANT3051119, SAVANT3051120 | 8/5/2011 | AVE Solutions, S3 Entertainment, LLC (S3), Face Group, Inc. (Lifestyle Electronics) | | • 15000 - 20000 (SAVANT3053484) (SAVANT3051120) | "Savant Discountable Gear" (SAVANT3053484) (SAVANT3051119) | • 10% (SAVANT3053484) (SAVANT3051119) | Potential Flip |
| **Unknown** | SAVANT0452161, SAVANT0452162, SAVANT0460373, SAVANT0460375 | 8/12/2011 | Audio Advice | | | | | Potential Flip |
| **Unknown** | SAVANT0452161, SAVANT0452162, SAVANT0460373, SAVANT0460375 | 8/12/2011 | Audio Advice | | | | | Potential Flip |
| **Chateau Des Fleuers** | SAVANT1577549, SAVANT1577554, SAVANT2602970, SAVANT1716520, SAVANT0790390, SAVANT0645883, SAVANT0645886, SAVANT1716519 | 8/12/2011 | Robert's Home Audio Video Inc. | | • ~55000 (SAVANT1577549)(SAVANT1577554)(SAVANT2602970)(SAVANT1716520)(SAVANT0790390)(SAVANT1577553) | | • 10% on discountable items (SAVANT1577549)(SAVANT1577554) | Potential Flip |
| **Unknown** | SAVANT0082034, SAVANT0364250, SAVANT0251486 | 9/26/2011 | Audiocom, Inc. | | | | | Potential Flip |
| **Unknown** | SAVANT0314872, SAVANT0314875, SAVANT0314886 | 10/4/2011 | Commercial Audio Associates, Inc. (Integrated Media Systems) | | | | | Potential Flip |
| **Unknown** | SAVANT1676713, SAVANT0231621, SAVANT0662494, SAVANT1510022, SAVANT2603134, SAVANT2603807, SAVANT2603809, SAVANT0992831, SAVANT2399394 | 10/11/2011 | N&S Marketing and Sales, IHI | | • 12432 (SAVANT1676713)<br>• 38,571 (SAVANT0992835)<br>• 31,191 (SAVANT0992836) | | | Potential Flip |

RESTRICTED CONFIDENTIAL – OUTSIDE COUNSEL ONLY

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| **Unknown** | SAVANT0156616, SAVANT0156627 | 10/14/2011 | Unknown | | | | | Potential Flip |
| **Mike Upwall job** | SAVANT0071692 | 10/26/2011 | AVE Solutions S3 Entertainment, LLC (S3) | | | | | Potential Flip |
| **55 Unit Luxury Condominium Development** | SAVANT0120655, SAVANT0120658, SAVANT0120659, SAVANT0250775, SAVANT0250803, SAVANT0250807, SAVANT0250810, SAVANT0250820, SAVANT0250824, SAVANT0285953, SAVANT0598738, SAVANT0598739, SAVANT0598740 | 10/31/2011 | Clareo Networks LLC | | | | | Potential Flip |
| **Unknown** | SAVANT0992575 | 11/4/2011 | Best Buy Co. Inc. (AudioVisions) | | • 950000 (SAVANT0992575) | | | Potential Flip |
| **Unknown** | SAVANT0458528, SAVANT0458531, SAVANT0458586, SAVANT0958333, SAVANT0958367, SAVANT0958370 | 11/9/2011 | Symbio Lighting & Control | • 68000 (SAVANT0458528) (SAVANT0458531) (SAVANT0458586) (SAVANT0958333) (SAVANT0958367) (SAVANT0958370) | • ~83000 (SAVANT0458528)(SAVANT0458531) (SAVANT0458586) (SAVANT0958333) (SAVANT0958367) (SAVANT0958370) | "Across the board" (SAVANT0458531)(SAVANT0958367) | • 10% (SAVANT0458531) (SAVANT0458586) (SAVANT0958333) (SAVANT0958367) | Potential Flip |
| **Vista Diamante** | SAVANT3330467 | 8/27/2013 | Unknown | | • 5000 (SAVANT3330467) | | | Potential Flip |

RESTRICTED CONFIDENTIAL – OUTSIDE COUNSEL ONLY

# EXHIBIT J

**DEPOSITION EXCERPTS REGARDING REVENUE FORECASTS, PROJECTIONS, PLANS & DAMAGES ANALYSES**

**Robert Madonna**

**38:13-41:9**

Q. That's a fair point, sir. I'll accept that, sir.
Let me ask you this: You have business plans, correct?
A. **What's your definition of a "business plan"?**
Q. You have -- well, let me ask you this -- let me withdraw the question, okay. Do you come up with plans to make profits?
A. **What's your definition of a "plan"?**
Q. Well, you used the word, sir, in your prior answer. Do you have a definition?

A. **We do not have an official business plan 'cause we're a small company. It's -- you know, as far as can I -- do I have a business plan with a financial plan written down on it in, you know, language?**

Q. Yes.

A. **No.**

Q. What do you provide your Board of Directors or advisors, if anything, concerning what you plan to do for the next quarter, for the next year, et cetera?

A. **We do have projections on possibilities for next year.**

Q. Do you have prepared already projections within your custody or control for Savant Systems projections for 2012?

A. **We have multiple projections.**

Q. What sort of multiple projections do you have?

A. **We have ranges on possibilities of what we may or may not do, depending on what happens in the market with CEDIA and what -- Crestron's behavior in the market, and if we continue to get blocked access to the dealer**

channel, we will not -- it's impossible to hit a profit, if that's what you're getting at.

So you're asking me for what the plan is next year. I guess it depends. If we actually -- we have a plan that if, you know, we had fair competition out there where we didn't have blocked access to the dealer channel, we didn't have blocked access to manufacturers, we didn't have blocked access to even marketing what we were doing, we could possibly turn a profit midyear, if all these things were happening. But I've learned over the years, with the plans we put on the table, I am shocked at what happened in this marketplace -- shocked because of the behavior of Crestron and what they did in the marketplace across the board, not just with Savant either.

So for you to ask me whether next year do I have plans on turning a profit, if we had a fair marketplace, we could turn a profit next year, but I'm not quite sure if that will be accomplished because of what's happened in the marketplace to date.

Q. Sir, do you blame all of the problems that Savant Systems has experienced with respect to turning a profit on Crestron?

**A. Yes. Based on what we know today, you know, we would have already turned a profit.**

Q. When?

**A. In two thousand -- end of 2009, beginning of 2010.**

**50:12-23**

Q. What plan?

A. The plans that we had back in 2008, 2009 and 2010 and 11 and on. We fell short by over a hundred million dollars over the past eight years, and that was -- the majority of that -- I would say all of that was because of the activity of Crestron.

It doesn't mean we didn't have other issues, but any other issue, we could overcome. We cannot overcome blocking the strategy Crestron has had in the market, blocking access to the dealer channel.

**58:15-59:8**

Q. Are these projections you talked
about --
A. **Give or take -- give or take, you
know, a quarter or so.**
Q. And these projections that you just
talked about with respect to a range of
possible outcomes for next year, are those
committed to an Excel spreadsheet or some sort
of document at this point in time?
A. **Yes, they are.**

Page 59

Q. Who has possession of those
documents?
A. **Bruce Myers.**
Q. Have you reviewed those recently?
A. **Yes, I did.**
Q. When?
A. **A board meeting two weeks ago?
Recently. Within weeks.**

**67:10-69:17**

A. **Tier 1 and Tier 2 are somewhere, I would guess, between 500 and 1,000. And our target was, you know, again, more than enough to hit our plans targeting Tier 1 and Tier 2.**
Q. What would be more than enough to hit your plans?
A. **Our plans that we had for revenue.**
Q. Are those documented?
A. **Yes, they are.**
Q. How so?
A. **In spreadsheets from the financial folks.**
Q. Bruce Myers has those?
A. **Yes.**
Q. How many Tier 1 or tier dealers does



Savant need to be, in your words, profitable?
A. **Well, let me give you a sense, right. Tier 1 and Tier 2 dealers, the average sale is around $25,000 roughly. That's true for (inaudible).**

THE STENOGRAPHER: "That's true for"?

A. I'm sorry. I'll talk slowly. Tier 1 and Tier 2 dealers will sell a system for around $25,000. That's the average. That's for one home, so if we have two Tier 2 -- I'm sorry -- a Tier 2 dealer selling two homes, that's roughly what -- on average two to three homes, makes sense, so that's 50 to $75,000 in a year.

We have about 40 of those dealers right now. The plan was to have hundreds of those dealers, so when you start talking about thousands, you're talking about Tier 3 and there's thousands of those. Our plan was to go after Tier 1 and Tier 2.

Now, again, in the -- if you look at the -- what's been going on in the marketplace, the threats, the delays,

everything that's documented in these
declarations, I mean, the declarations we have
is just a small sampling. It's throughout the
whole industry. There is not a single dealer
in our industry that doesn't know about the
threats that Crestron has done across the
space. And these are small companies.
Average dealer is five people or small. I
don't know how many exact people. It's --
they're not big companies is my point.
Average revenue per dealer is probably --
their revenue -- million to $2 million.
They're small companies. They can't afford
for a big company like Crestron to come and
threaten them and try to destroy their
business if they're using a Savant product.
They can't afford it so.

**81:2-22**

Q. So that provided you access with -- to Brian Moffett, correct?
A. It didn't provide me access to the hundreds of dealers that we had in our plan that would have gone to Savant. You can't -- you can't use -- again, we have 30 -- 30 -- three zero dealers in that Category. 30 out of thousands because of this blocking strategy. This is not --
Q. Out of thousands?
A. Yeah. We have -- yeah -- out of thousands in the marketplace. If you say the whole market -- you mentioned thousands earlier -- if the marketplace is 5,000 -- I'm sorry -- if the high-end space is, say, 700 to 1,000, we have 30 of them that are doing multiple installs. They're doing, on average, more than two installs a year because the rest of them -- they'll buy our product and just hold it. I have dealers that are hiding our product. I have --

**126:16-128:11**

Q. How far off have you been generally year to year on your projections?
A. I'm -- I have to figure out the percentage. What year would you like to me to --
Q. Let's say from 2010 to 2011, currently.
A. The current year? I'm going by my memory now, so it's not exact. We're about

**100 percent off or more.**
Q. What accounts for that, in your mind?
**A. The threats from Crestron.**
Q. Anything else?
**A. No. It's more than the threats. It's a cumulative -- all of the things 'cause it's -- it's not just the threats. It's all the things they did out in the field. That's just one.**
Q. So in your mind, all of the activities that Crestron has done in the field has been basically the sole reason why Savant can't meet its projections; is that correct?
**A. That is on the residential side what I believe. Yes.**
Q. Now, on the residential side, have you met any other obstacles, aside from Crestron's activities, throughout the years?
**A. That affected the plan? No. Well, in the plan we just talked about.**
Q. And when you talk about "the plan," are you talking about a specific document or set of documents? What are you referring to

when you talk about "the plan"?

A. Our projected what we talked about earlier. We put together numbers of what we expect to do, and it's not just one year, too. This is a cumulative, these issues. Because, realize, it takes runway to get altitude, and the effectiveness that Crestron had with this blocking strategy has, unfortunately, worked because we couldn't get enough altitude with the dealers 'cause the main dealers wouldn't try us or they'd keep us hidden.

**205:4-206:17**

RESTRICTED CONFIDENTIAL – OUTSIDE COUNSEL ONLY

Q. And Jim Carroll sets the sales quotas for the independent sales reps, correct?
A. In the residential space. That's correct.
Q. And in terms of the quotas, are those tied to projections that are made in the residential sales space?
A. Yes. Of course.
Q. And are those projections tied to historical performance?
A. I don't know.
Q. There's got to be some basis for the projections, right?
A. Yeah. But a lot of -- like, as I said, if you look at the market, we haven't gotten altitude in a lot of these dealers because of us being blocked in the majority of the market, so it's hard to go on history, and that's exactly what I was talking about earlier when I said we needed some runway

because, frankly, our history is -- yeah -- excuse me -- Crestron's been using these tactics since we started, and it hasn't let up.

So every year, it's hard to use -- yeah. I can use historical data on, you know, last year when all the dealers were threatened, this is what their performance was, so it doesn't give me a lot until we can stop them from blocking our access into the dealer channel. So we try to think positive. We actually, you know, going forward, that's why historical data -- I don't rely on that that much because of the tactics at Crestron. If that wasn't there, it would be hockey-sticked up because you'd have this huge increase.

**207:23-208:12**

Q. How many dealers did you sign up to agreements during that 12 month period?



**A. I'd have to check.**

Q. Can you give me an estimate? Was it over above 200?

**A. It was probably under, but I'd have to check. I don't want to guess.**

Q. And you would check with Jim Carroll to get that information?

**A. Yes. I know the projections. I mean, we felt we were -- the projections -- dealers were dropping off and pushing us back when they got threatened, and quite a number of them were doing that.**

**361: 16-20**

Q. Savant blames Crestron for its inability to meet its business plans, correct?

**A. Which were based on very conservative -- very conservative numbers in the market so it's --**

**368:22-377:2**

Q. Do you have any estimate of amount of damages that you think Savant suffered as a result of Crestron's alleged activities?

**A. I believe our plan is off collectively over the years in north of a hundred million dollars in revenue.**
Q. And you believe all of that is attributable to Crestron?
**A. Due to the blocking, I believe that's what we would have hit without the blocking that was happening.**
Q. So you believe that you can prove that Savant suffered a hundred million dollars in damage solely --
**A. I --**
THE STENOGRAPHER: I'm sorry. I'm sorry. I'm sorry.
Q. -- solely because of Crestron's activities?
**A. I didn't say damages. I said revenue.**
Q. Okay. Well, how much damage has Crestron's alleged activities done in terms of a financial impact to Savant?
**A. The financial impact would have been roughly somewhere around north of 40, $50 million in profit that was lost.**

Q. And where do you get that number from?

A. **Due to the fact that I'm did some analysis on a hundred million dollars and, again, in the first blush, that's what we believe.**

Q. And so you've actually done a damages analysis?

A. **We did just an analysis of, again, our plan, would we have been able to hit the plan that we had had it been not for Crestron, and we believe the answer to that is yes.**

Q. And --

A. **And collectively, the plan, if you add up the years, added up to north -- well north of a hundred million.**

Q. And who did that analysis?

A. **Jim Carroll and myself.**

Q. And you have that analysis still in your possession?

A. **Well, I wouldn't call it an analysis. It was something we did with the attorneys.**

Q. And you have that still in your

possession?
A. In my possession today?
Q. Custody, control, and possession.
A. It really was just a discussion with a spreadsheet we did with the attorneys.
Q. Where is that spreadsheet?
A. It's with the attorneys.
Q. Did that spreadsheet have a range of numbers?
A. It had a -- did it have a range of numbers? It had numbers every year, and there was a different analysis that we did based on our plan, and the delay into the marketplace also hurt us, and it's -- you know, again, companies, when they grow, your growth year over year is a function of your previous success. So being even -- even if we were to completely settle this case tomorrow morning, we're still suffering from those damages going forward because we lost the lift that we would have had, but so there was some thought process around that if we weren't delayed into the marketplace because of this, if we weren't blocked into the marketplace, if -- so we did

do some.
Q. And the numbers were just based upon revenues and profitability?
A. That's all we did first. That's correct.
Q. For which years?
A. We pretty much focused on '09 right through even 012 and then brought 012 -- a little bit of 012 in this year.
Q. So you looked into a crystal ball into 012; is that right?
A. Yeah. Based on what our projections were, and if we weren't delayed into the marketplace, some of that revenue would have been pulled in, so there was some thought process on if we weren't blocked in the market, what would the revenue numbers have been.
Q. And you're attributing all of your lost profits to Crestron's activities?
A. No. We actually had some formula. I'd have to look at it again to see where we came up with it. It was actually well north of a hundred million. It was somewhere in the

order of 168 to $238 million based on the projections that we believe we would have had, so I'm kind of rounding it down, and it is subjective when you do one of these analysis based on --
Q. I'm sorry. Go ahead.
A. Go ahead.
Q. Now, I was just wondering. What was well north of 168 to 238 million?
A. I don't have it in front of me so what we did is an analysis that if we weren't blocked from the market and we -- and if we weren't delayed in the market, we came up with a dollar amount between 168 and 230 odd millions dollars in revenue. I basically applied a -- I scaled that down to over a hundred million dollars roughly.
Q. In terms of obstacles that Savant faced, aside from Crestron's alleged activities throughout the years from 2005 to the present, have there been any?
A. We didn't ship product until 2008, so that's one thing incorrect in these -- some of your filings. We didn't start selling

until 2008; not 2005, so in the early days, it was all development. Yes. We had obstacles. We were a year late before we started selling, so just 'cause we were off on the estimates and how long it would take to develop the software, so yeah. That cost us more money.

Q. And that wasn't Crestron's fault, right?

A. (Inaudible.)

THE STENOGRAPHER: I'm sorry. I'm sorry.

A. I didn't -- I didn't add that into any of the numbers 'cause that was in the early days, so that was an obstacle. You asked me what -- that was one of them. It's -- we -- it's a lot of software in one of these products, and we underestimated the amount and time it took initially.

Q. Since 2008 to the present, has Savant faced obstacles not caused by Crestron?

A. Not that affected our numbers after 2008. 2008 the initial product introduction I -- you know, as far as it was only a quarter, so put that one aside. I only really counted

that first full year of 2009 'cause that's really the first full year we were in production, but from 2009 on, if it weren't for Crestron's activity, I believe we would have made the plan. It doesn't mean we wouldn't have had obstacles to overcome, but there wouldn't have been an obstacle we couldn't overcome with the team I put in place. So I feel very strong about that because this team was a proven team. We knew what we were doing, but we underestimated the types of thing that went on in the space.

It's unheard of in other markets. It's unethical. It's unbelievable, and I think I thought initially -- the very first year we started selling -- even in '09 -- I was getting reports every month from Jim that what Crestron was doing in the field. I was the one who was saying, well, just keep on plugging, the better product's going to win no matter what they do, no matter how unethical they are. I was wrong. I was wrong about that. Jim hardly ever hears me say those words.

Page 376

We didn't overcome it, and they tried to get me to look at this two, three years ago. Some of my board members wanted me to pull the trigger on this lawsuit a year earlier and I said no. There's no way I want to get into a lawsuit. We'll beat them in the market anyways. That didn't happen. It was the -- we felt that the Cyber Sound threat two weeks before CEDIA was the last straw. We couldn't take this anymore, and we could not be successful unless this stopped, so that's what happened over the years, and I really believe that we would not have hit an obstacle we couldn't have overcome.

Q. So --

A. And our numbers were very conservative, in my opinion, based on the product we had and what we knew about the market, that -- you know, we weren't shooting for ownership of the market. We were shooting for 10 percent of the market to 20 percent based on new innovative technology and all the excitement the dealers had around what we were offering. That was very conservative. We're

Page 377

not anywhere near that because of this blocking strategy that Crestron has.

**Jim Carroll**

143:10-144:6
**Q.** What other issues do you attribute
11:54:43 **10** for lack of sufficient revenue for Savant --
11:54:48 **11** sitting here now for its lack of sufficient
11:54:51 **12** revenue back in January 2010?
11:54:55 **13** [Witness' phone rings]
11:54:56 **14** THE WITNESS: I'm sorry.
11:54:56 **15** **A.** Crestron, obviously, their antics
11:54:59 **16** and tactics were the number one thing
11:55:01 **17** affecting us. Could have been 80 percent of
11:55:11 **18** the problem at this point, if higher -- if not
11:55:13 **19** higher.
11:55:13 **20** **Q.** As you sit here today, you believe
11:55:16 **21** that back in 2010, beginning of 2010, the lack
11:55:22 **22** of sufficient revenue for Savant was
11:55:26 **23** 20 percent based on the negative economic
11:55:29 **24** conditions, and 80 percent based on Crestron?
CURRAN COURT REPORTING
144
11:55:32 **1** **A.** 20 percent or less. Yeah.
11:55:34 **2** **Q.** So that may be more than 80 percent
11:55:37 **3** that you attribute to Crestron for the lack of
11:55:39 **4** sufficient revenue at Savant in early 2010?
11:55:42 **5** **A.** Yes. Could be. And these are tough
11:55:46 **6** numbers to -- you know.

**183:7-185:11**
12:38:20 **7** **Q.** The top of the page is "Potential
12:38:23 **8** Revenue Scenarios," right?
12:38:25 **9** **A.** Uh-huh.
12:38:26 **10** THE STENOGRAPHER: Is that a
12:38:26 **11** yes?
12:38:27 **12** **A.** Yes, please. Yes.
12:38:28 **13** **Q.** It says $10 million case is very
12:38:32 **14** realistic, right?
12:38:32 **15** **A.** Correct.
12:38:33 **16** **Q.** It assumes that Savant would replace
12:38:38 **17** west and central regional sales manager
12:38:40 **18** positions?
12:38:40 **19** **A.** Correct.

12:38:41 **Q.** But no one beyond that, right?
12:38:44 **A.** Correct.
12:38:44 **Q.** So that means that several of those
12:38:48 regions would be left open then, right?
12:38:49 **A.** No. This is making reference to
CURRAN COURT REPORTING
184
12:38:52 let's skip Phase 1, Phase 2, let's keep the
12:38:55 current plan of record in place is what that
12:38:58 means.
12:38:58 **Q.** What was the current plan of record?
12:39:02 **A.** A west coast guy, a central guy, a
12:39:05 northeast and a southeast person -- I'm sorry.
12:39:08 **Q.** So it would be four regional sales
12:39:11 managers for the country?
12:39:12 **A.** Correct.
12:39:12 **Q.** And it says 13 million case is also
12:39:21 doable if we add two additional head count for
12:39:25 the western region and Rocky Mountains.
12:39:27 **A.** That's that phased approach then.
12:39:29 **Q.** So it would be breaking part of the
12:39:30 country up to add a Rocky Mountain region?
12:39:32 **A.** Correct.
12:39:33 **Q.** Then it says 17 million is very
12:39:43 aggressive and would depend on more southeast
12:39:46 support?
12:39:46 **A.** Sales engineering support.
12:39:48 **Q.** And what does that mean?
12:39:49 **A.** Those are the resources we discussed
12:39:52 earlier where they would be available to
12:39:54 dealers to help them design systems, help them
CURRAN COURT REPORTING
:41 PM
185
12:39:59 with technical questions as opposed to
12:40:01 counting on the reps. They could call an
12:40:05 engineer that could answer a very specific
12:40:12 question and keeps them from going into tech
12:40:09 support for questions.
12:40:14 **Q.** It says -- going on from this 17
12:40:16 million very aggressive position for revenue
12:40:19 in 2010 would depend on more products that are
12:40:26 volume oriented. What does that refer to?
12:40:29 **A.** There was broader channels that we
12:40:31 talked about. The Protégé type of products.

**187:5-19**

12:42:06 **Q.** Again, sticking on this 17 million
12:42:14 aggressive assumption for potential revenue
12:42:17 scenarios in 2010, it says, “We would need to
12:42:23 open additional distribution in order to
12:42:25 achieve this number.” What does that mean?
12:42:27 **A.** That’s what I was talking about with
12:42:29 the -- like Apple resellers, the big box
12:42:34 retailers. Distribution in that sense.
12:42:38 **Q.** Then the next sentence says “This
12:42:41 would also assume several more direct sales
12:42:45 personnel instead of reps.” What do you mean
12:42:47 by “direct sales personnel instead of reps”?
12:42:49 **A.** As we’ve done with George and Craig
12:42:52 when they manage that retail business
12:42:54 directly, that’s the implementation of that.

**188:20-189:20**

12:44:02 **Q.** The last sentence of this paragraph
12:44:04 regarding $17 million potential revenue
12:44:08 scenario says “I am uncomfortable with this
12:44:11 scenario at this stage of our planning.” Why
12:44:13 is that?
CURRAN COURT REPORTING
189
12:44:13 **A.** I felt we needed to stay keenly
12:44:16 focused on the rep model and the high-end
12:44:19 residential space.
12:44:23 **Q.** Going down to the last bullet point,
12:44:27 it says -- and this is the final bullet point
12:44:31 under Potential Revenue Scenarios, it says,
12:44:34 “It is difficult to envision significantly
12:44:37 affect (steepen) the revenue ramp in Q1/10 due

12:44:45 the time it will take to training personnel
12:44:47 but obviously we will try." What are you
12:44:50 talking about there?
12:44:51 **A.** Well, if you -- you recall that
12:44:53 earlier some of the issues we felt we were
12:44:55 having is the rep organization wasn't
12:44:58 technically prepared well enough to answer
12:45:00 some basic questions, so we brought them all
12:45:04 back in and gave them more training, and one
12:45:07 of the questions Phil must have asked me in
12:45:09 preparation of this is what can we do to ramp
12:45:12 the revenue in Q1. We're already in Q1.

301:23-303:1
04:09:49 **Q.** Let's turn to the document or the
04:10:02 page that's marked 289. SAVANT --
CURRAN COURT REPORTING
302
04:10:07 **A.** Okay.
04:10:07 **Q.** -- 0833289. It's the third page in
04:10:13 this exhibit.
04:10:14 **A.** Yes.
04:10:14 **Q.** It says at the top "Savant Systems
04:10:20 Forecast," right?
04:10:20 **A.** Yes, it does.
04:10:21 **Q.** Do you know what that is?
04:10:22 **A.** This appears to be something
04:10:26 produced by Bruce that's talking about, I
04:10:29 would assume -- I have to assume it's sometime
04:10:33 in 2010 that he's forecasting out revenues
04:10:39 'cause he's giving us the actual of 2009 and
04:10:42 forecasting out -- yeah -- that was
04:10:44 March 23rd, of course, that's...
04:10:48 **Q.** What did you say?
04:10:48 **A.** I confirmed that it was probably
04:10:52 March because the e-mail is titled March, so I
04:10:54 was just looking saying oh, you got actuals in
04:10:57 one column and forecast in 2010, so it would
04:10:59 be 2009 actuals, which would imply that he's
04:11:02 closed the books on 2009 at that point 'cause
04:11:04 knowing Bruce, he wouldn't use the word
04:11:06 "actual." He would say something like
04:11:09 "preaudited" or something like that.

**310: 1-11**
04:19:25 **Q.** Do you know why Mr. Myers would do a

04:19:32 five year forecast in 2011?
04:19:34 **A.** I don't know specifically what drove
04:19:40 him to do it at this time, but in the normal
04:19:42 course of being a CFO, you're constantly
04:19:45 looking at projections and cash needs and cash
04:19:47 flow and things like that.
04:19:48 **Q.** It's something that the CFO of
04:19:50 Savant would create in the ordinary course of
04:19:52 his job as CFO of Savant?
04:19:54 **A.** That's right.

**335:5-365:8**
04:47:39 MR. KAVANAGH: Jackie, can
04:47:40 you mark this as the next exhibit.
(Deposition Exhibit No. 11, Plaintiff
Savant Systems, LLC's Second
Supplemental Responses to Crestron
Electronics, Inc.'s First Set of
Interrogatories, marked for
04:48:10 identification)
04:48:10 **Q.** Mr. Carroll, the court reporter has
04:48:13 handed you what's been marked as Exhibit 11.
04:48:14 **A.** Okay.
04:48:16 **Q.** Can you go to the last page. Oh,
04:48:31 actually, it's not the last page. Actually,
04:48:42 can you go to the page after page 12.
04:48:53 **A.** Is it numbered or --
04:48:54 **Q.** Yes. The pages should be numbered
04:48:57 at the bottom.
04:48:58 **A.** Okay. Yup. Sorry. The first ones
04:49:00 I was flipping through weren't. Okay.
04:49:01 **Q.** Is that the page after page 12?
CURRAN COURT REPORTING
336
04:49:06 **A.** Oh, the page after. I'm sorry.
04:49:10 **Q.** Is that signature -- your signature
04:49:16 that appears there?
04:49:17 **A.** Yes, it is.
04:49:17 **Q.** And you were verifying the
04:49:19 interrogatory answers?
04:49:20 **A.** Yes.
04:49:21 **Q.** Under penalties of perjury that the
04:49:25 foregoing were true and correct?
04:49:26 **A.** Yes.
04:49:26 **Q.** You signed it on January 24, 2012?
04:49:30 **A.** Yes.

04:49:30 **Q.** And the interrogatories that you
04:49:33 were signing -- if you go back to the first
04:49:35 page -- are Savant's Second Supplemental
04:49:39 Responses to Crestron Electronics First Set of
04:49:43 Interrogatories?
04:49:43 **A.** Yes.
04:49:43 **Q.** Would you turn to the page marked
04:49:55 Exhibit B. It is actually the last --
04:49:58 actually, it's the last page of the document.
04:50:00 **A.** This one here that has little
04:50:02 markings on it?
04:50:03 **Q.** Yes. What is Exhibit B?
CURRAN COURT REPORTING
**Deposition of James Carroll**
**March 22, 2013**
85 of 95 sheets Page 337 to 340 of 378 07:38:41 PM
337
04:50:14 **A.** Exhibit B was generated as part of
04:50:22 our response to this to put in one place the
04:50:26 actual plan, and then the modified plan based
04:50:31 on what we were projecting out to do for
04:50:34 revenues.
04:50:34 **Q.** What is the plan that's discussed
04:50:37 here?
04:50:37 **A.** Revenue plan.
04:50:39 **Q.** What revenue plan?
04:50:41 **A.** The revenue plan for Savant Systems.
04:50:43 **Q.** When was the revenue plan for Savant
04:50:47 Systems created?
04:50:48 **A.** There was many versions of it from
04:50:51 2007 right up to current day.
04:50:52 **Q.** So when it says "plan" here, what
04:50:56 plan is it referring to?
04:50:57 **A.** The -- this is reflective of what we
04:51:02 -- so this document was created uniquely for
04:51:04 the lawsuit to answer the questions. The
04:51:07 information contained in it was derived from a
04:51:11 lot of these Keynote presentations and
04:51:13 discussions that Bruce, Bob, and I would have
04:51:15 about how do we grow the business. Primarily,
04:51:18 all of this is driven off dealer acquisition
CURRAN COURT REPORTING
338
04:51:20 and the understanding that what the average
04:51:21 revenue per dealer would be. That's where you
04:51:21 see some of those other numbers (inaudible).

04:51:21 THE STENOGRAPHER: “Some of
04:51:21 those other numbers.”
04:51:25 **A.** Of how many dealers we needed to
04:51:31 obtain to hit those revenue goals based on --
04:51:33 I believe it was $50,000 per dealer we were
04:51:36 looking to obtain.
04:51:38 **Q.** So the planned -- is it revenue?
04:51:46 **A.** Yes. And these are in millions of
04:51:50 dollars.
04:51:51 **Q.** And below “Actual” is actual
04:51:53 revenue?
04:51:53 **A.** That’s correct.
04:51:54 **Q.** And “Difference” is the difference
04:51:57 between them?
04:51:58 **A.** That’s correct.
04:51:58 **Q.** What’s the difference between “Plan”
04:52:03 in the first line and “Original Plan” at the
04:52:06 bottom line?
04:52:07 **A.** At some point in 2008, we were
04:52:12 starting to realize that we weren’t having the
04:52:15 success with dealer acquisition, as

04:52:19 bewildering as it was, because of the
04:52:20 excitement that dealers were demonstrating at
04:52:22 CEDIA events and their attendance to our
04:52:24 dealer conferences and all -- everything we’ve
04:52:27 discussed. Again, we sit here today knowing
04:52:29 that the primary cause was Crestron’s actions.
04:52:33 **Q.** So the plan in the first row is a
04:52:39 modified plan?
04:52:39 **A.** It’s a modified plan to the original
04:52:41 plan below.
04:52:42 **Q.** When was the original plan created?
04:52:44 **A.** Those numbers were derived from our
04:52:49 planning process in ‘07 and ‘08.
04:52:53 **Q.** So are the numbers listed in the row
04:52:57 marked “Original Plan” from one particular
04:53:01 plan in ‘07 and ‘08?
04:53:03 **A.** Really, a number of plans that
04:53:06 evolved, we became a lot more optimistic after
04:53:09 our first CEDIA and into our second dealer
04:53:12 conference to really (inaudible).
THE STENOGRAPHER: “To
really”?
**A.** Optimistic.

THE STENOGRAPHER: Yeah. I
CURRAN COURT REPORTING
340
got that. "Into our second dealer
conference to really" -- I didn't
hear what you said.
04:53:22 **A.** To really adjust our thinking in how
04:53:24 quickly this business would grow based on the
04:53:27 feedback from the dealers.
04:53:28 **Q.** So where it says "Original Plan," it
04:53:32 actually came from a number of different
04:53:35 plans?
04:53:35 **A.** That's a number of different
04:53:37 discussions and keep in mind, we were a very
04:53:40 small company at this point, right, seven or
04:53:43 eight employees. There wasn't big long
04:53:44 drawn-out plans. It was Bob, Bruce, and I
04:53:47 having discussions and meetings talking about
04:53:50 type of dealers, the number of dealers, the
04:53:52 type of revenue we could expect off of those
04:53:54 type of things, all those activities.
04:53:56 **Q.** When you say it was -- was it six or
04:53:59 seven of you?
04:54:00 **A.** In the total company, I think in the
04:54:02 beginning -- 11, actually, when we first
04:54:04 started the business, day one.
04:54:05 **Q.** And when was that?
CURRAN COURT REPORTING
**Deposition of James Carroll**
**March 22, 2013**
Page 341 to 344 of 378 86 of 95 sheets
341
04:54:09 **A.** 2007 time frame.
04:54:11 **Q.** So in 2007, you came up with the
04:54:16 original plan?
04:54:16 **A.** That's right.
04:54:19 **Q.** And for what years were there
04:54:23 projections in this original plan?
04:54:25 **A.** In 2007, we probably looked out two
04:54:29 to three years, and then in 2008, after we had
04:54:32 such a positive acceptance of the company and
04:54:35 the product, the direction, the business
04:54:37 problems we were solving, we started
04:54:39 forecasting out longer than that to build --
04:54:43 to give us the opportunity to build business
04:54:46 plans, hiring plans, real estate acquisition,

04:54:48 all those things that you need to do to grow a
04:54:50 successful business.
04:54:50 **Q.** So in 2007, for what years did you
04:54:58 project the numbers on this document?
04:55:01 **A.** 2008 forward, so if you look,
04:55:04 original plan doesn't have a 2007 number in
04:55:07 there, so in original plan, we weren't looking
04:55:10 at revenue in 2007. We actually got revenue,
04:55:13 as we added the actual number. That's why the
04:55:16 plan in the 2007 has zeros in it.


04:55:20 **Q.** So going down to the row marked
04:55:24 "Original Plan."
04:55:24 **A.** Yes.
04:55:25 **Q.** For 2008, the plan was for
04:55:28 $4 million in revenue?
04:55:29 **A.** That's correct.
04:55:30 **Q.** And when was that number projected?
04:55:33 **A.** I would imagine it would have been
04:55:37 in the beginning of the year of 2008 and then
04:55:39 modified to the 4 million through the dealer
04:55:43 conference process.
04:55:45 **Q.** So if I want to find the source of
04:55:52 this $4 million original plan projection for
04:55:57 2008, what document do I go to?
04:55:59 **A.** It's probably not a single source
04:56:01 document. It's discussions with Bruce Myers
04:56:03 and Bob and myself talking about what we
04:56:05 needed to do, how we needed to do it.
04:56:08 **Q.** Going on to "Original Plan" for
04:56:18 2009, the projection is $35 million, right?
04:56:22 **A.** Correct.
04:56:22 **Q.** When was that number derived?
04:56:24 **A.** During that 2008 planning process, I
04:56:28 got to assume. I think all those numbers


04:56:30 probably come out of that process.
04:56:31 **Q.** All the numbers come out of the
04:56:36 planning process for the particular year in
04:56:38 which the original plan --
04:56:40 **A.** No. No.
04:56:40 [Simultaneous talking]
04:56:40 THE STENOGRAPHER: I'm sorry.
04:56:55 **Q.** The number for 2008 for the original

RESTRICTED CONFIDENTIAL – OUTSIDE COUNSEL ONLY

04:57:00 plan is listed as $35 million. You testified
04:57:06 that you believed that that number came from
04:57:09 the 2008 planning process, right?
04:57:11 **A.** That's right.
04:57:12 **Q.** When would that have been?
04:57:14 **A.** During 2008, we were modifying our
04:57:20 plans, so Bob, Bruce, and I had these numbers
04:57:24 in our head for 4 million 35, 56, 144 as what
04:57:29 we were driving towards. Bruce, being in
04:57:32 charge of operations and finance, was off
04:57:33 looking to source factory space and things to
04:57:36 accommodate those, primary purpose for these
04:57:40 type of things, what type of head count we
04:57:44 would need (inaudible).
04:57:44 THE STENOGRAPHER: "We would
04:57:44 need."



04:57:44 **A.** We would need.
04:57:44 THE STENOGRAPHER: You're
04:57:44 killing me.
04:57:47 **Q.** Would I find a single document where
04:57:53 this $35 million revenue projection for 2008
04:57:59 exists?
04:57:59 **A.** I don't know if it's in any of these
04:58:04 other documents. I wasn't looking for it when
04:58:05 we were flipping through them. Bruce may have
04:58:07 it in his Einstein Project and things like
04:58:10 that. I'm not sure.
04:58:10 **Q.** Can you point me to the document
04:58:13 that this $35 million projection for 2008 --
04:58:18 **A.** Sitting here right at this --
04:58:18 THE STENOGRAPHER: I --
04:58:19 **A.** -- moment, no.
04:58:23 THE WITNESS: You're going to
04:58:24 whack me in a minute.
04:58:26 MR. O'KONSKI: Wait 'til he
04:58:27 finishes.
04:58:28 THE WITNESS: I'm sorry.
04:58:28 **Q.** Actually, the 35 million is for
04:58:30 2009?
04:58:31 **A.** Yes.

345
04:58:31 **Q.** Okay. So for the original plan in
04:58:39 2009, there's a projection of $35 million.
04:58:42 Can you point me to a document from
04:58:47 2009 where the $35 million was originally
04:58:51 projected?
04:58:51 **A.** No. Not sitting here right now, I
04:58:55 cannot.
04:58:55 **Q.** For 2009, what is the source of the
04:59:00 $35 million projection of revenue under the
04:59:03 original plan?
04:59:04 **A.** The primary calculation for all of
04:59:06 these revenue numbers with the amount of
04:59:09 dealers we believed we could acquire, and on
04:59:11 average, we would get $50,000 of revenue out
04:59:14 of each of them.
04:59:15 **Q.** Why did you pick $50,000?
04:59:18 **A.** It is generally understood to me
04:59:23 from being in the industry that that's the
04:59:24 average of a midsize dealer would purchase of
04:59:27 a year for control, and we believed we could
04:59:31 take smaller dealers that sold other products
04:59:33 and turn them into that type of purchasing,
04:59:35 and at the other end of the spectrum, we would
04:59:37 acquire larger dealers that spend a million
CURRAN COURT REPORTING
346
04:59:40 dollars, and when you average it together, it
04:59:41 comes out to 50,000.
04:59:42 **Q.** And you base this on your experience
04:59:45 in the industry?
04:59:46 **A.** My experience and probably
04:59:47 discussions with folks at AMX and things like
04:59:49 that and reps and...
04:59:51 **Q.** When did you talk to people at AMX
04:59:53 about this?
04:59:54 **A.** I wasn't -- not this particular,
04:59:55 but, you know, I was an AMX dealer and they
04:59:58 offered a tiered pricing program, and you're
05:00:01 always inquiring how do I get to that next
05:00:03 level. The magical average dealer does
05:00:06 $50,000 of control. Seemed to be common in a
05:00:08 lot of different discussions.
05:00:10 **Q.** What year was that?
05:00:12 **A.** In the period of time that I was
05:00:15 involved with AViX, which would have been

05:00:17 prior to 2007.
05:00:22 **Q.** And for original plan for the year
05:00:25 2010, it's listed as $56.4 million, right?
05:00:31 **A.** Yes.
05:00:31 **Q.** When was that number derived?
CURRAN COURT REPORTING
347
05:00:38 **A.** I believe all those numbers were
05:00:42 derived at the same time during the 2008 time
05:00:44 period.
05:00:44 **Q.** So going on to 2011, where the
05:00:53 projections under the original plan for
05:00:54 revenue in 2011 is 144 million?
05:00:57 **A.** Correct.
05:00:57 **Q.** That number was also derived in
05:00:59 2008?
05:01:00 **A.** I believe so.
05:01:00 **Q.** Going on to 2012 where under the
05:01:06 original plan, the number for projected
05:01:09 revenue is 175 million?
05:01:11 **A.** That's correct.
05:01:11 **Q.** That number was originally derived
05:01:15 in 2008?
05:01:15 **A.** I believe so.
05:01:16 **Q.** And again, you cannot point me to a
05:01:20 single document from 2008 that lists all these
05:01:46 numbers on the original plan?
05:01:25 **A.** No. I don't believe so.
05:01:27 **Q.** Going up to the top row, it says
05:01:40 "Plan," right?
05:01:40 **A.** Yes.
CURRAN COURT REPORTING
348
05:01:41 **Q.** And "Plan" is the modified plan due
05:01:45 to slower traction in channel based on
05:01:50 Crestron threats, according to the notes
05:01:52 below, right?
05:01:52 **A.** Correct.
05:01:53 **Q.** In 2007, the modified plan lists
05:02:05 zero revenue, right?
05:02:07 **A.** Correct.
05:02:07 **Q.** In 2008 under the modified plan, the
05:02:16 revenue projection is $4 million, right?
05:02:18 **A.** Correct.
05:02:19 **Q.** When was that number derived?
05:02:22 **A.** I believe it's part of the original

05:02:24 planning in 2008. The modified plan, as you
05:02:29 see it there, I believe, happened end of 2008
05:02:32 going into 2009. Maybe early 2009. So 2008
05:02:37 being behind us, you know, could change your
05:02:40 plan for something that's already happened.
05:02:41 **Q.** So the modified plan only begins to
05:02:44 deviate from the original plan in 2009 --
05:02:46 **A.** That's correct.
05:02:48 **Q.** -- right? So in 2009, under the
05:02:51 modified plan, the revenue is projected as
05:02:55 $22 million?





05:02:55 **A.** Correct.
05:02:56 **Q.** When was that number derived?
05:02:58 **A.** I believe it was in early 2009.
05:03:03 Again, the derivative is we were less
05:03:06 optimistic about dealer performance, sign on,
05:03:09 and follow through.
05:03:09 **Q.** And how is that $22 million revenue
05:03:13 projection for 2009 derived?
05:03:14 **A.** We took the number of dealers that
05:03:16 we thought were going to be productive dealers
05:03:19 based on the current dealer base and our
05:03:21 potential to sign on new dealers and
05:03:23 multiplied it by $50,000 and ended up with
05:03:26 that number.
05:03:29 **Q.** Going on to 2010, under the modified
05:03:34 plan, the projection is $35 million, right?
05:03:40 **A.** Yes.
05:03:40 **Q.** At what point was that $35 million
05:03:47 in revenue projected originally?
05:03:50 **A.** I believe this all took place in
05:03:53 2009 time frame for '10, '11 and '12.
05:03:57 **Q.** So the modified plan for 2010 was
05:04:05 derived in early 2009?
05:04:08 **A.** Correct.





05:04:09 **Q.** The modified plan projected revenue
05:04:14 of 56.4 million for 2011 was derived in early
05:04:20 2009?
05:04:20 **A.** Yes. I believe that to be accurate.

05:04:23 **Q.** What was that?
05:04:23 **A.** I believe that to be accurate. Yes.
05:04:25 **Q.** And the modified plan for 2012,
05:04:30 which is listed as $144 million, was derived
05:04:35 in early 2009?
05:04:37 **A.** That's correct.
05:04:44 MR. KAVANAGH: Let's take
05:04:47 another break. Let's take another
05:04:47 break. What do you need, five
05:04:47 minutes?
05:04:47 THE STENOGRAPHER: Yes.
05:04:50 MR. KAVANAGH: Jackie needs
05:04:50 five minutes.
05:04:51 THE VIDEOGRAPHER: The time
05:04:53 is 5:04, and we're going off the
05:04:56 record.
05:05:00 (Recess was taken from 5:05 p.m. to
05:09:19 5:13 p.m.)
05:09:19 (Deposition Exhibit No. 12, Two-Page
05:09:19 Document, Bates labeled SAVANT



05:09:19 3318114 and 3318115, marked for
05:13:18 identification)
05:13:55 THE VIDEOGRAPHER: The time
05:13:56 is 5:13, and we're back on the
05:14:00 record.
05:14:00 **Q.** Mr. Carroll, going back to
05:14:04 Exhibit 11, that chart. Who prepared it?
05:14:10 **A.** The original chart was done by Bruce
05:14:13 Myers, Bob, and myself.
05:14:14 **Q.** For the purpose of answering the
05:14:18 interrogatories?
05:14:18 **A.** Yes.
05:14:18 **Q.** Let's move on to Exhibit 12. This
05:14:24 exhibit was just handed to us today by
05:14:28 Mr. O'Konski. Do you know why?
05:14:30 **A.** Why he handed it to you today or --
05:14:33 **Q.** Yes.
05:14:34 **A.** It further explains in more -- Tom
05:14:38 asked me to -- Steve asked me to produce this
05:14:42 to provide the level of detail that you and I
05:14:43 just verbally went through in a concise manner
05:14:47 here.
05:14:47 **Q.** Do you know why it was handed to me
05:14:49 today?

05:14:49 **A.** I do not know why Tom decided to
05:14:52 make it available to you today.
05:14:53 **Q.** Did you help prepare it?
05:14:54 **A.** I prepared it.
05:14:55 **Q.** When did you prepare it?
05:14:56 **A.** Weeks ago now.
05:14:57 **Q.** Did you say weeks ago?
05:15:00 **A.** Weeks, yes.
05:15:02 **Q.** How many weeks?
05:15:03 **A.** Five maybe, six.
05:15:04 **Q.** Five or six weeks ago?
05:15:06 **A.** Yup. It's the same -- I believe
05:15:08 it's the same spreadsheet we looked at before.
05:15:11 I just added information to it.
05:15:12 **Q.** Why did you prepare it?
05:15:13 **A.** As discussions with Tom and some of
05:15:16 his team members, I would go through the
05:15:18 explanations that you and I just went through
05:15:20 on how many dealers, what's the price, so I
05:15:22 built it out and added these categories of --
05:15:25 at 50,000 it says how many dealers, it says
05:15:28 how many we had.
05:15:29 **Q.** What team members are you talking
05:15:30 about?





05:15:30 **A.** Martin and Aaron that work for Tom
05:15:34 O'Konski.
05:15:34 **Q.** And anybody else?
05:15:36 **A.** That was the intended audience for
05:15:40 this.
05:15:41 **Q.** When was the last time you spoke to
05:15:49 Martin?
05:15:50 **A.** I guess it had to be in the fall.
05:15:54 **Q.** Did you talk to him about this
05:15:55 spreadsheet?
05:15:58 **A.** Not this iteration of it, I don't
05:16:01 believe. I think it was the earlier one that
05:16:05 was more generic.
05:16:05 **Q.** Who did you talk to about this
05:16:07 spreadsheet five or six weeks ago?

05:16:09 **A.** Not five or six weeks ago. A couple
05:16:12 of weeks ago with Tom.
05:16:13 **Q.** But you prepared it five or six --
05:16:15 **A.** I prepared it, yes.
05:16:16 **Q.** You prepared it five or six weeks
05:16:17 ago?
05:16:17 **A.** Yes, I did.
05:16:18 **Q.** And you talked to Tom about it
05:16:21 several weeks ago?





05:16:22 **A.** Yup. Two maybe.
05:16:25 **Q.** Now, comparing Exhibit 12 to
05:16:29 Exhibit 11, the line in Exhibit 12, the new
05:16:49 document, up at the top it says “Revised
05:16:54 Revenue.”
05:16:54 Is that the equivalent of the line
05:16:58 -- well, it says “Revised Revenue Plan.” Is
05:17:00 that the equivalent of the line labeled “Plan”
05:17:03 in Exhibit 11?
05:17:03 **A.** Yes, it is.
05:17:04 **Q.** The line labeled “Actual Revenue” in
05:17:12 the new document, Exhibit 12, is that the
05:17:14 equivalent of the line labeled “Actual” in
05:17:18 Exhibit 11?
05:17:18 **A.** That’s correct.
05:17:22 **Q.** So the title “Actual Revenue” and
05:17:27 “Revenue” are supposed to indicate what the
05:17:30 revenue actually was in the particular year,
05:17:33 right?
05:17:33 **A.** That’s correct.
05:17:33 **Q.** So in both documents, the numbers
05:17:37 are the same for 2007, 2008, 2009, 2010, and
05:17:45 2011, right?
05:17:46 **A.** Yes.





05:17:48 **Q.** But the actual revenue for 2012 in
05:17:55 Exhibit 11 is 56 million, right?
05:17:59 **A.** 2011, the actual revenue. The
05:18:06 actual is twenty-five six.
05:18:09 MR. O’KONSKI: 2012 he said.
05:18:10 **A.** Oh, 2012. 56, correct.
05:18:14 **Q.** Now, please turn to the damages
05:18:20 analysis that we were provided with today --
05:18:22 **A.** Right.

05:18:23 **Q.** -- in Exhibit 12. The actual
05:18:24 revenue for 2012 is now listed as 28.079
05:18:30 million, right?
05:18:30 **A.** That's correct.
05:18:31 **Q.** Why did that change?
05:18:33 **A.** I inappropriately put the 56, which
05:18:37 was the company's total revenue, versus this
05:18:39 sheet is trying to show North American revenue
05:18:42 or US revenue.
05:18:45 **Q.** Okay. So in --
05:18:50 **A.** That's my fault.
05:18:50 **Q.** So in Exhibit 11, does every other
05:18:54 number on Exhibit 11, besides the erroneous 56
05:19:00 million in actual revenue for 2012, does every
05:19:04 other number on here reflect North American



05:19:08 revenue?
05:19:08 **A.** It should, yes.
05:19:09 **Q.** And North America means what?
05:19:13 **A.** I actually believe this means just
05:19:15 the United States in this example.
05:19:17 **Q.** So in Exhibit 11, all the numbers,
05:19:21 except the 56 million listed for actual
05:19:24 revenue for 2012, are for the United States
05:19:28 only?
05:19:28 **A.** That's correct.
05:19:29 **Q.** And are they for residential?
05:19:30 **A.** Residential.
05:19:32 **Q.** So residential only in the United
05:19:36 States?
05:19:36 **A.** Right.
05:19:37 **Q.** Except for the 56 million for actual
05:19:41 revenue in 2012?
05:19:43 **A.** Correct.
05:19:43 **Q.** Because that should be changed to
05:19:48 28.079?
05:19:49 **A.** Correct.
05:19:49 **Q.** So looking at Exhibit 12, all of
05:19:59 these numbers reflect residential sales for
05:20:03 the United States --

05:20:05 **A.** That's correct.
05:20:05 **Q.** -- only? Besides that number that I
05:20:20 pointed out for actual revenue in 2012, are
05:20:24 there any changes to the numbers setting aside
05:20:29 the new information that's on here?
05:20:30 **A.** I don't believe so. I'm really
05:20:34 trying to double check it now. No.
05:20:37 **Q.** Now, under "Revised Revenue" in
05:20:47 Exhibit 12, you list number of dealers
05:20:50 required at 50K. Why did you put that in?
05:20:55 **A.** It's part of that explanation,
05:20:57 again, that I brought you through, as I've
05:20:59 brought Tom and his team through it. There
05:21:01 was a request to clarify not only these titles
05:21:04 but how many of these dealers doing -- you
05:21:06 know, how does that math work, so I built this
05:21:09 out so they could see that.
05:21:10 **Q.** So doing the math in my head at the
05:21:12 end of the day here, I can multiply 50K times
05:21:16 80, and I get -- 80 being the number of
05:21:21 dealers -- and I get 4 million, which is the
05:21:25 revised revenue plan for 2008, right?
05:21:28 **A.** Correct.
05:21:28 **Q.** And if for the same column, 2008, if





05:21:36 I multiply number of dealers at $65,000 per
05:21:40 dealer times number of dealers being 62, I get
05:21:51 4 million?
05:21:51 **A.** That's correct.
05:21:52 **Q.** What is the actual purchasing dealer
05:22:13 count?
05:22:14 **A.** That represents the smaller number
05:22:18 of the total dealers versus dealers that have
05:22:20 actually purchased.
05:22:22 **Q.** So actual purchasing dealer count,
05:22:25 if a dealer purchases $150 or $150,000 worth
05:22:31 of product, they're counted among these
05:22:32 numbers?
05:22:33 **A.** That's correct.
05:22:33 **Q.** For a given year?
05:22:34 **A.** That's correct.
05:22:35 **Q.** Revenue triple zero slash dealer,
05:22:44 what does that mean?
05:22:45 **A.** Revenue in thousands per dealer.
05:22:48 **Q.** So in 2008, the revenue in thousands

05:22:51 per dealer was 21,000?
05:22:54 **A.** That's correct.
05:22:54 **Q.** And in 2011, the revenue per dealer
05:22:59 was 54,000?
CURRAN COURT REPORTING
359
05:23:00 **A.** '11, yes.
05:23:02 **Q.** Total number of dealers -- total
05:23:09 dealers is the next line down?
05:23:13 **A.** Yes.
05:23:13 **Q.** And is that total residential
05:23:15 dealers in the United States?
05:23:15 **A.** That's correct.
05:23:16 **Q.** So in 2008, it was 65?
05:23:18 **A.** Correct.
05:23:20 **Q.** And in 2009, it was 358?
05:23:23 **A.** Correct.
05:23:23 **Q.** In 2010, it was 547?
05:23:26 **A.** Correct.
05:23:27 **Q.** In 2011, there were 700 Savant
05:23:31 residential dealers in the United States?
05:23:32 **A.** That's correct.
05:23:33 **Q.** And in 2012, there were 985 Savant
05:23:38 residential dealers in the United States?
05:23:39 **A.** Correct.
05:23:39 **Q.** Below that, it says "Percentage of
05:23:44 dealers buying." What does that mean?
05:23:46 **A.** That's if you take the 358 and
05:23:51 divide it by the -- or the 239 on the actual
05:23:54 purchasing divided by the 358, it says 239 is
CURRAN COURT REPORTING
360
05:24:00 67% of the (inaudible).
05:24:00 THE STENOGRAPHER: I'm sorry.
05:24:00 I missed it.
05:24:02 **A.** If you look at 2009 and you look at
05:24:04 the actual purchasing dealer count of 239, and
05:24:07 then you take the total dealer count and
05:24:10 divide the 239 by the 358, that should equal
05:24:14 67 percent, meaning 239 is 67 percent of 358.
05:24:19 **Q.** Next row is "Dealer conference
05:24:23 attending companies." What dealer conference
05:24:26 is that referring to?
05:24:27 **A.** The Savant dealer conferences.
05:24:29 **Q.** So in 2007, 42 dealers attended the
05:24:33 Savant conference?

05:24:33 **A.** That’s correct.
05:24:34 **Q.** In 2010, there were 112 that
05:24:38 attended?
05:24:39 **A.** That’s correct -- companies -- yes.
05:24:41 **Q.** And in -- I’m sorry -- in 2010,
05:24:45 there were 112 dealers attending the Savant
05:24:48 dealer conference?
05:24:49 **A.** Yeah. Dealer companies; not
05:24:51 individuals. There was more individuals than
05:24:53 112.
CURRAN COURT REPORTING
**Deposition of James Carroll**
**March 22, 2013**
91 of 95 sheets Page 361 to 364 of 378 07:38:41 PM
361
05:24:54 **Q.** So 112 separate companies?
05:24:56 **A.** Companies.
05:24:56 **Q.** But some companies brought several
05:24:59 people?
05:25:00 **A.** Correct.
05:25:02 **Q.** And in 2011, the number of dealer
05:25:06 companies attending the Savant conference
05:25:08 increased to 170?
05:25:09 **A.** Correct.
05:25:09 **Q.** And in 2012, that number increased
05:25:12 to 204?
05:25:14 **A.** Correct.
05:25:14 **Q.** Now, you have “Industry stats 2011
05:25:20 367 dealers,” what does that mean?
05:25:22 **A.** That’s from the CE Pro Top 100 and
05:25:26 Jason Knotts right above it. He says 367
05:25:30 dealers applied for the CE Pro Top 100 spots.
05:25:34 From that population, he derived those other
05:25:36 two stats that are below that.
05:25:39 **Q.** What are those other two stats?
05:25:41 **A.** Average spends on automation 43,000,
05:25:45 and then the number of US dealers being
05:25:47 15,000.
05:25:49 **Q.** What does it mean “USA dealers”?
CURRAN COURT REPORTING
362
05:25:52 **A.** Dealers in the United States that
05:25:53 are CEDIA dealers, I assume is what that’s
05:25:57 from.
05:25:57 **Q.** So are the 367 dealers from the
05:26:00 United States only?

05:26:01 **A.** Yes. That's CE Pro -- let me stop.
05:26:07 I'm not positive. I believe it's just the
05:26:08 United States.
05:26:10 **Q.** Then why is this -- if the
05:26:15 statistics below the 367 dealers were based on
05:26:20 those 367, why is there a number for USA
05:26:23 dealers, and why is there a number for dealers
05:26:26 generally?
05:26:26 **A.** In this edition of CE Pro, he
05:26:30 reports out -- on page 40 would have been his
05:26:33 CE Pro Top 100. That was a separate article
05:26:36 that made reference on page 68 that they
05:26:39 believed it was 15,000 active dealers in the
05:26:42 United States, CEDIA-grade dealers.
05:26:46 **Q.** Okay. So the USA dealers is the
05:26:51 number of dealers in the USA?
05:26:53 **A.** Total addressable market of dealer
05:26:56 count, yes.
05:26:56 **Q.** 15,000 dealers?


05:26:57 **A.** Correct.
05:26:58 **Q.** So average spends on automation is a
05:27:01 dollar figure, and that's 43,000?
05:27:04 **A.** That's correct.
05:27:04 **Q.** And that's for 367 dealers that
05:27:08 applied for the top 100 -- CE Pro Top 100?
05:27:12 **A.** That's correct.
05:27:13 **Q.** And these figures are published in
05:27:18 the January 2013 edition of CE Pro Magazine?
05:27:22 **A.** That's correct. Those are the
05:27:24 corresponding page numbers.
05:27:25 **Q.** Going to the second page of
05:27:33 Exhibit 12, it's titled "Revenue by Dealer
05:27:36 sign-on Date, Domestic." By "Domestic," do
05:27:41 you mean United States only?
05:27:41 **A.** Yes.
05:27:42 **Q.** And by "Dealer sign-on date," I
05:27:48 think we discussed this earlier in the
05:27:50 deposition, you say that Savant sometimes
05:27:53 considers their dealers by class, right?
05:27:55 **A.** Yeah. Like a graduating class
05:27:57 almost, a sign-on class group.
05:27:59 **Q.** So a dealer that signed on in 2008
05:28:02 would be listed as dealer class 2008?

364
05:28:04 **A.** Correct.
05:28:04 **Q.** And why did you do this chart?
05:28:11 **A.** The question was kicked around is
05:28:15 are $50,000 per dealer on average a reasonable
05:28:19 number and how do you quantify that?
05:28:23 **Q.** So for your inquiry into whether
05:28:35 $50,000 per dealer was reasonable, you looked
05:28:37 at Savant dealers?
05:28:38 **A.** Correct.
05:28:39 **Q.** And if this was done in January --
05:28:48 this spreadsheet was drafted in January or so
05:28:55 -- well, it was early 2013 that you drafted
05:28:57 it, right?
05:28:58 **A.** Yes.
05:28:58 **Q.** You would be basing this research on
05:29:03 a dealer count of 985 Savant dealers?
05:29:08 **A.** These are only purchasing dealers,
05:29:12 not the total dealers, so it would be 631.
05:29:22 The numbers in the parenthesis is the number
05:29:25 of dealers in that population in the pie
05:29:26 charts, so if you added those up, it would...
05:29:42 **Q.** Are you going to say something?
05:29:53 **A.** No. I was just adding them up in my
05:29:56 head. They're roughly right.
CURRAN COURT REPORTING
**Deposition of James Carroll**
**March 22, 2013**
Page 365 to 368 of 378 92 of 95 sheets
365
05:29:57 **Q.** So these numbers are based on
05:29:59 approximately 631 dealers who purchased Savant
05:30:03 equipment in 2012?
05:30:04 **A.** In 2012, correct. 631.
05:30:07 **Q.** And the -- each class of dealers are
05:30:15 the dealers that signed on in previous years
05:30:19 and still remain as Savant dealers?
05:30:20 **A.** That's correct.
05:30:40 MR. KAVANAGH: Okay. Let's
05:30:45 turn to the next exhibit.
05:31:23 (Deposition Exhibit No. 13,

**<u>BRUCE MYERS</u>**

**24:21-28:11**

09:50:10 **Q.** And similarly, while you've been CFO
09:50:18 at Savant, have you had any responsibility for
09:50:22 generating projections for Savant?
09:50:25 **A.** Yes.
CURRAN COURT REPORTING
09:50:25 **Q.** And could you describe the process
09:50:29 that you have used since you've been CFO to
09:50:32 generate projections for Savant?
09:50:34 **A.** I think you would look at the
09:50:44 industry, try to understand the industry a
09:50:47 little bit. You would try to talk to the
09:50:54 sales guys, what they thought was going to
09:50:56 happen. We would look at our product
09:51:02 development cycles and determine what staffing
09:51:07 requirements were needed to do product
09:51:09 development. Stuff like that.
09:51:16 **Q.** Anything else that you can recall?
09:51:17 **A.** Just based on history what we used
09:51:26 to do, I guess.
09:51:27 **Q.** And in terms of the process that
09:51:33 you've just talked about at Savant relating to
09:51:37 generating projections, have you been
09:51:39 personally involved in that process?
09:51:41 **A.** Yes.
09:51:43 **Q.** And what has been your involvement
09:51:46 personally at Savant with respect to
09:51:49 generating projections?
09:51:50 **A.** Just putting different scenarios
09:51:54 together.
CURRAN COURT REPORTING
26
09:51:55 **Q.** Who, if anyone, have you worked with
09:52:01 at Savant in connection with generating
09:52:05 projections for Savant?
09:52:07 **A.** Mostly Peter.
09:52:09 **Q.** And when you refer to "Peter,"
09:52:12 you're referring to Peter Wisniowski?
09:52:15 **A.** Correct.
09:52:16 **Q.** Anyone else at Savant with whom you
09:52:19 have worked in generating projections for
09:52:22 Savant?
09:52:22 **A.** Maybe you can rephrase it.
09:52:35 **Q.** Sure. In generating projections for
09:52:38 Savant, do you talk with or work with anyone
09:52:42 else at Savant, aside from Peter Wisniowski?
09:52:48 **A.** Sure.

09:52:49 **Q.** Who?
09:52:49 **A.** Can work with Jim Carroll, can work
09:52:55 with J.C. Murphy. Those were probably the
09:53:09 main ones.
09:53:10 **Q.** Anyone else?
09:53:11 **A.** On spending would be just the rest
09:53:15 of the management team for what they thought
09:53:18 they were going to spend.
09:53:19 **Q.** Anyone else?
CURRAN COURT REPORTING
09:53:22 **A.** Not that -- no.
09:53:27 **Q.** And in terms of spending, through
09:53:32 the years that you've been CFO at Savant, you
09:53:36 and Peter have expressed concerns about
09:53:39 overspending, correct?
09:53:39 **A.** Correct.
09:53:42 **Q.** And in terms of the categories of
09:53:49 expenses that you and Peter have been most
09:53:52 concerned about, what sort of categories are
09:53:54 they?
09:53:54 **A.** I think you look at everything, you
09:54:01 know, and seeing where you can always improve
09:54:03 and cut back or do you really need to do that.
09:54:07 **Q.** Well, there have been particular
09:54:09 categories of spending that you and Peter have
09:54:11 been concerned about, haven't there?
09:54:12 **A.** We look at what could be over
09:54:15 budget, and then we'll address those to why
09:54:22 we're overspending, but sometimes, there's
09:54:25 reasons behind it.
09:54:26 **Q.** But that's a dialogue you have to
09:54:28 have with the management team, correct?
09:54:29 **A.** Correct.
09:54:30 **Q.** Because you and Peter are in charge
CURRAN COURT REPORTING
28
09:54:32 of the financial documents, projections,
09:54:35 budgets, and the other financial information,
09:54:37 correct?
09:54:37 **A.** Correct.
09:54:38 **Q.** And with respect to the financial
09:54:41 information, let's say, forecast budgets,
09:54:45 P&L's, et cetera, are you the final person
09:54:52 that those financials go to before they're
09:54:55 disseminated to either Mr. Madonna or the
09:54:57 board?

09:54:57 **A.** Correct.

**31:9-31:22**

09:57:49 **Q.** Is the process that you've used --
09:57:54 that you used at Excel Switching to collect
09:57:58 data and to generate projections different
09:58:01 from that used now at Savant?
09:58:03 **A.** Yes.
09:58:04 **Q.** How so, sir?
09:58:06 **A.** Different templates, different
09:58:09 formats.
09:58:10 **Q.** I take it though that, again, you,
09:58:20 as the CFO of Savant, try to ensure that the
09:58:24 projections provided to Mr. Madonna or anyone
09:58:28 else at Savant are accurate, to the best of
09:58:31 your ability?
09:58:31 **A.** Correct.

**32:24- 36:2**

09:59:30 **Q.** And for budgets and projections, at
CURRAN COURT REPORTING
what point in time, whether in terms of
09:59:37 drafting or time period, on a typical basis do
09:59:42 you believe those are ready then to be
09:59:44 disseminated either to Mr. Madonna or others
09:59:47 at Savant?
09:59:47 **A.** When we -- when we have the meeting.
09:59:54 **Q.** And when you're talking about "the
09:59:57 meeting," are you talking about the meeting
09:59:59 that you've described where you report out the
10:00:01 financials to the board?
10:00:02 **A.** No.
10:00:03 **Q.** What meeting are you speaking about,
10:00:06 sir?
10:00:06 **A.** To review the budget meeting.
10:00:10 **Q.** And how often does that meeting take
10:00:13 place?
10:00:13 **A.** Most likely, once or twice a year.
10:00:21 **Q.** And are budgets reviewed at the same
10:00:24 time as projections?
10:00:24 **A.** Not always.
10:00:36 **Q.** Could you explain that, sir?
10:00:38 **A.** Sometimes, we'll just focus on the
10:00:41 budget for the current year, and projections
10:00:46 going out can be done at other times.
CURRAN COURT REPORTING

34
10:00:50 **Q.** How often are projections reviewed
10:00:56 between you, Mr. Madonna, or others at Savant?
10:00:58 **A.** Not often.
10:01:04 **Q.** Can you give me an estimate, sir?
10:01:07 **A.** If once a year, maybe twice,
10:01:17 depending -- you know, depending on who asked
10:01:22 for it.
10:01:22 **Q.** And who typically asked for the
10:01:26 projections?
10:01:27 **A.** Just the management team sometimes.
10:01:42 **Q.** Are you familiar with the term
10:01:49 top-down forecast?
10:01:50 **A.** Kind of.
10:01:55 **Q.** Do you have any understanding of
10:01:58 that?
10:01:58 **A.** Yes.
10:01:59 **Q.** What is it?
10:02:00 **A.** What I believe it is to be is that
10:02:07 you take your top level revenue numbers and
10:02:13 then derive a budget off of that.
10:02:15 **Q.** Is that different from a bottom-up
10:02:19 forecast?
10:02:19 **A.** Yes.
10:02:19 **Q.** And what is a bottom-up forecast and
CURRAN COURT REPORTING
35
10:02:22 how does that differ, in your understanding,
10:02:23 to a top-down forecast?
10:02:25 **A.** Bottom-up is that you take your
10:02:28 detail spends and detail customers and derive
10:02:37 a budget that way.
10:02:38 **Q.** And in terms of what you have done
10:02:41 for Savant as the CFO, have you utilized
10:02:46 either of those particular approaches?
10:02:48 **A.** Yes.
10:02:49 **Q.** Which ones, if any?
10:02:51 **A.** Both.
10:02:51 **Q.** Did you do the same when you were
10:02:57 employed at Excel?
10:02:58 **A.** Yes. I would say yes.
10:03:04 **Q.** And do you have a particular
10:03:06 preference for one approach or the other?
10:03:08 **A.** I think you look at it both ways.
10:03:13 **Q.** Why?
10:03:16 **A.** Just to make sure it seems

10:03:23 reasonable.
10:03:23 **Q.** And in connection with the financial
10:03:28 information prepared for Savant, who at Savant
10:03:34 makes the final determination as to whether or
10:03:37 not a particular budget or forecast is
CURRAN COURT REPORTING
36
10:03:40 reasonable?
10:03:40 **A.** I believe it has to be me.

**48:19-51:21**
10:18:21 **Q.** Has he ever overruled you on issues
10:18:24 relating to the preparation of forecast or
10:18:29 budgets?
10:18:29 **A.** I think we have discussions on
10:18:42 those.
10:18:42 **Q.** And what sort of discussions?
CURRAN COURT REPORTING
**A.** I don't know. Overruling is to see
10:18:47 if it's -- you know, is it -- you know, what
10:18:53 we think we can do for a company or what not,
10:18:57 you know.
10:18:57 **Q.** Has he ever pressured you to adjust
10:19:00 the numbers one way or the other on forecasts
10:19:04 or budgets?
10:19:04 **A.** No. We come up with different
10:19:06 scenarios usually, so we will have a high,
10:19:09 medium, low.
10:19:10 **Q.** You have an aggressive model, a
10:19:12 moderate model, a conservative model, or a
10:19:14 very conservative model?
10:19:15 **A.** Correct.
10:19:16 **Q.** And typically, do you have an
10:19:20 understanding as to which particular model Mr.
10:19:24 Madonna prefers?
10:19:25 **A.** No.
10:19:26 **Q.** What about you? Where do you --
10:19:29 **A.** I'm always conservative.
10:19:30 **Q.** Why is that?
10:19:33 **A.** It's just my nature.
10:19:35 **Q.** And I take it from time to time that
10:19:41 you have adjusted the forecast of Savant based
CURRAN COURT REPORTING
50
10:19:46 upon the historical performance -- the actual
10:19:49 and historical performance of Savant, correct?

10:19:51 **A.** Sure.
10:19:52 **Q.** Because in your world, you have a
10:19:55 lookback that can either confirm or make --
10:19:58 you know, cause you to adjust the projections
10:20:01 going forward, correct?
10:20:02 **A.** Yes.
10:20:03 **Q.** So that, for example, in 2008, if
10:20:07 you had a projection of, for example,
10:20:10 particular revenues, you might adjust that as
10:20:13 the year goes on based upon what the actual
10:20:15 revenues are, correct?
10:20:16 **A.** Yes. With a forecast, right.
10:20:19 **Q.** And that’s something that you would
10:20:21 typically do in connection with your role as a
10:20:24 CFO, correct?
10:20:24 **A.** Yes.
10:20:26 **Q.** Did you do that at Excel Switching
10:20:28 also?
10:20:29 **A.** Yes.
10:20:29 **Q.** And is Peter Wisniowski typically
10:20:32 charged with tracking that process and
10:20:37 adjusting the forecasts based upon the actual





10:20:41 revenues as the year goes on?
10:20:43 **A.** Yes.
10:20:45 **Q.** How often do you at Savant adjust
10:20:51 the projections based upon the revenues --
10:20:54 actual revenues? Is that on a quarterly
10:20:56 basis, an annual basis?
10:20:57 **A.** We try to look at the forecast
10:20:59 midway through the year.
10:21:00 **Q.** So midway through the fiscal year?
10:21:03 **A.** Yeah.
10:21:03 **Q.** And does Savant run on a calendar
10:21:07 year or a different fiscal year?
10:21:08 **A.** Calendar year.
10:21:09 **Q.** So in June or July, you take a look
10:21:13 at the first two quarters of the year and then
10:21:16 adjust your projections accordingly?
10:21:19 **A.** We adjust our forecasts. We don’t
10:21:21 adjust the budget.
10:21:22 **Q.** Why not?
10:21:23 **A.** Because -- ‘cause people have to
10:21:29 understand what they’re supposed to be doing.

**53:13-53:18**
10:23:23 **Q.** I'm sorry. Why do you shoot for
10:23:24 50 percent for a standard margin at Savant?
10:23:25 **A.** We feel that if we can keep our
10:23:31 total operational spends to be around 40, 45
10:23:37 percent of revenue, then we'll be able to
10:23:40 break even.

**60:9-67:4**
10:37:56 **Q.** Sir, at Savant, do you recall when
10:38:03 you or others working for you first prepared
10:38:07 any projections?
10:38:08 **A.** I don't.
10:38:14 **Q.** Was it in 2005?
10:38:16 **A.** I'm not sure.
10:38:20 **Q.** 2006?
10:38:22 **A.** Not sure.
10:38:22 **Q.** 2007?
10:38:24 **A.** I don't know.
10:38:26 **Q.** Well, you did prepare projections in
10:38:30 2008, correct?
10:38:30 **A.** Yeah. Most likely.
10:38:34 **Q.** When did Savant first begin shipping
10:38:37 products and recognizing revenue?
10:38:41 **A.** When was that. I couldn't tell you
CURRAN COURT REPORTING
61
10:38:52 the year exactly. I think it was three years,
10:38:55 but I'm not quite sure. 2008, I think.
10:39:00 **Q.** Is that your best recollection?
10:39:01 **A.** That's my best.
10:39:02 **Q.** And at least by 2008, you or others
10:39:10 were preparing projections, correct?
10:39:12 **A.** Most likely. Yeah.
10:39:12 (Mr. Park sneezes)
10:39:16 THE WITNESS: Bless you.
10:39:17 MR. PARK: Thank you.
10:39:17 **Q.** Now, in preparing projections, prior
10:39:25 to the actual shipment of a Savant product,
10:39:28 what data, if any, did you rely on in
10:39:32 preparing those projections?
10:39:37 **A.** I think you would try to understand
10:39:41 the market, I think we'd try to understand the
10:39:45 number of dealers we were trying to get at the
10:39:47 time, and probably try to understand, you
10:39:51 know, the average revenue that they could do

10:39:56 with that.
10:39:56 **Q.** Right. Because, obviously, prior to
10:39:58 the shipment of product, you don't have a
10:40:00 historical basis in terms of what the actual
10:40:03 sales were, correct?
CURRAN COURT REPORTING
62
10:40:03 **A.** Correct.
10:40:04 **Q.** So in terms of understanding the
10:40:07 market and the industry, do you recall how you
10:40:10 gained that information and data?
10:40:12 **A.** Just talking to sales, you know,
10:40:17 trying to understand the market a little bit,
10:40:21 how many potential dealers were out there, and
10:40:26 trying to shoot for -- you know, I think the
10:40:30 way I was looking at it is a certain
10:40:33 percentage of that dealer base, say if we
10:40:39 could get, you know, a certain percentage,
10:40:42 depending on the year, and then they could do
10:40:45 on average, you know, this amount of money,
10:40:48 then does that smell right for a -- for a
10:40:53 budget.
10:40:53 **Q.** And so do you recall that was the
10:40:56 sort of process that you and others at Savant
10:40:59 engaged in to prepare the projections for --
10:41:04 **A.** Early on.
10:41:05 **Q.** Early on?
10:41:05 **A.** I think so.
10:41:06 **Q.** And again, just to be clear -- I
10:41:09 just want to make sure we're clear on the
10:41:13 record -- what you're talking about is
CURRAN COURT REPORTING
63
10:41:14 estimating the number of dealers that you
10:41:16 might have and attributing a certain -- either
10:41:19 a dollar amount on average to that dealer in
10:41:25 terms of potential revenue and then using that
10:41:27 to calculate the projected revenue for that
10:41:30 particular year?
10:41:30 **A.** Correct.
10:41:32 **Q.** And was there a particular dollar
10:41:36 amount on average that in preparing your
10:41:38 projections you anticipated a dealer doing in
10:41:43 terms of Savant sales?
10:41:44 **A.** I believe -- I think this is 'cause
10:41:49 we always -- we always look at this number --

10:41:51 but, you know, we always look around -- I
10:41:53 think around 50K a year from a dealer.
10:41:57 **Q.** And then you multiply that by the
10:42:01 number of dealers that you project to have
10:42:03 that year to come up with your projections for
10:42:06 your revenues?
10:42:07 **A.** Correct.
10:42:07 **Q.** Now, how, if any, did that process
10:42:12 change once you actually began to make sales
10:42:18 and recognize revenue?
10:42:25 **A.** Well, once we had the rep channel in





10:42:31 place, right, we would ask the reps what they
10:42:36 thought they could do for the year, so that
10:42:39 was probably the change -- the biggest change.
10:42:42 **Q.** And do you know who would actually
10:42:45 talk with the independent reps to ask them to
10:42:50 estimate the revenue they expected?
10:42:54 **A.** Sure. The sales -- head of sales
10:42:57 would.
10:42:57 **Q.** And would that head of salesperson
10:43:00 then speak with you or Mr. Wisniowski to
10:43:02 provide that information?
10:43:04 **A.** Yes. They would have -- we would
10:43:06 have targets for the reps later on of what
10:43:09 they were supposed to do, and then we would
10:43:13 take that -- take that number.
10:43:14 **Q.** Who would prepare the targets?
10:43:17 **A.** It would be whoever was in charge of
10:43:21 sales at the time.
10:43:22 **Q.** And I take it that person changed
10:43:28 from time to time, correct?
10:43:28 **A.** Yes.
10:43:29 **Q.** Who did you deal with most directly?
10:43:32 **A.** I guess you have to rephrase that
10:43:40 question.





10:43:40 **Q.** Sure. Well, let me ask you this:
10:43:42 Over the years, who did you deal with as head
10:43:44 of sales?
10:43:45 **A.** It depends on who was there at the
10:43:49 time.
10:43:49 **Q.** And that's what I'm asking. Who was
10:43:52 there at the time?

10:43:54 **A.** Sometimes, it was Ben Jamison, other
10:43:59 times it was Chuck Parrelli, and other times
10:44:05 it's been J.C. Murphy.
10:44:07 **Q.** And in making projections at Savant,
10:44:13 for how many years --
10:44:14 **A.** I think Jim was in there sometime
10:44:16 too, you know, Jim Carroll sometimes so.
10:44:18 **Q.** So at some point in time, you spoke
10:44:20 with all of those individuals concerning the
10:44:24 potential sales that they expected from the
10:44:29 rep channels or from their dealers, correct?
10:44:32 **A.** At some time, yeah.
10:44:34 **Q.** And I take it you relied on their
10:44:38 estimates in terms of putting that in your
10:44:42 model for projections, correct?
10:44:43 **A.** Yes.
10:44:44 **Q.** Did you rely on data or information





10:44:48 from any other sources in putting together
10:44:51 projections for Savant?
10:44:52 **A.** Well, sometimes I would still do the
10:44:57 if we had this many dealers at this amount of
10:45:01 money, does it make sense.
10:45:03 **Q.** And has that exercise continued to
10:45:10 this day with respect to calculating the
10:45:12 average revenue from a particular dealer and
10:45:14 multiplying that out by the number of dealers
10:45:19 that Savant has?
10:45:19 **A.** I still think that plumbing gets
10:45:22 used a little bit. Yeah, I do.
10:45:25 **Q.** Do you use it?
10:45:26 **A.** I think sometimes in my head, I do.
10:45:28 **Q.** And is that documented and
10:45:32 transferred to the financial statements?
10:45:34 **A.** No.
10:45:35 **Q.** Is it documented in projections?
10:45:40 **A.** Recently?
10:45:42 **Q.** Yes.
10:45:42 **A.** I don't think so.
10:45:45 **Q.** When did you discontinue, if at all,
10:45:47 using that particular methodology in
10:45:49 connection with projections for Savant?





10:45:51 **A.** I think when we had -- maybe a

10:46:04 couple years ago.
10:46:05 **Q.** So 2011?
10:46:07 **A.** Potentially.

72:23-74:4
10:52:36 **Q.** What sort of financial information
10:52:39 have you provided to Mr. Madonna in the past?
CURRAN COURT REPORTING
73
10:52:41 **A.** I try to go over the numbers with
10:52:48 him sometimes, and sometimes we look at
10:52:51 forecasts.
10:52:52 **Q.** When do you look at forecasts?
10:52:55 **A.** Not that often.
10:52:58 **Q.** Can you give me an estimate as to
10:52:59 the frequency?
10:53:00 **A.** Whenever he wants to look at it, I
10:53:06 guess. It's not that easy. It's not that --
10:53:08 it's not that way.
10:53:10 **Q.** What do you mean "it's not that
10:53:12 way"?
10:53:12 **A.** Whenever he wants to look at it,
10:53:14 which could be a year from now, it could be a
10:53:17 month from now. It's not -- there's no
10:53:21 schedule on it.
10:53:22 **Q.** There's no rhyme or reason, to your
10:53:24 understanding, as to when Mr. Madonna wants to
10:53:26 see the financials?
10:53:27 **A.** Correct.
10:53:28 **Q.** There's no regularly scheduled
10:53:30 time --
10:53:30 **A.** No.
10:53:30 **Q.** -- annually?
CURRAN COURT REPORTING
74
10:53:31 **A.** No.
10:53:31 **Q.** So it's just whenever he wants to
10:53:35 look at the financials?
10:53:36 **A.** Correct.

**80:19-84:16**
11:06:01 **Q.** Why do you have on this document a
11:06:06 column for "Revised Budget"?
11:06:08 **A.** It should state forecast, most
11:06:13 likely.
11:06:14 **Q.** So on Exhibit 1 under the column

11:06:22 “Full Year Budget,” you believe that the
“Revised
11:06:26 Forecast”?
11:06:26 **A.** Correct.
11:06:27 **Q.** And in terms of Savant’s financial
11:06:35 statements, are budgets and forecasts used
11:06:39 interchangeably, or is it -- I mean, why is
11:06:42 there that confusion, sir?
11:06:43 **A.** I don’t know. Based on what I’m
11:06:47 looking at here from the original budget, we
11:06:51 always keep the original budget, and we have a
11:06:55 different file for that, you know, but then we
11:06:58 can say oh, we revised it or we changed the
11:07:02 forecast, and to me, that’s a forecast, not a
11:07:06 budget from the original.
11:07:08 **Q.** And so what adjustments, if any,
11:07:15 then are made? If the budget remains the
11:07:17 same, it’s just the forecast changes through
11:07:19 the year?
11:07:19 **A.** Yeah. I mean, this looks like it
11:07:22 was done in July and say, okay, this is what
11:07:25 we think we’re going to do, right, so when you
11:07:28 think you’re going to do it, it’s really a
11:07:30 forecast, you know.
11:07:30 **Q.** And so what you’re doing in July of

11:07:33 2008 is, based upon the year to date and the
11:07:37 month of July and you’re revising your
11:07:41 forecast in terms of what you’re going to --
11:07:43 think you’re going to do for the rest of the
11:07:44 year, correct?
11:07:45 **A.** Correct.
11:07:45 **Q.** Then on the next column, what you’re
11:07:48 putting in is what the original budget numbers
11:07:51 were, correct?
11:07:52 **A.** Correct.
11:07:52 **Q.** And were those original budget
11:07:54 numbers -- is that synonymous with the
11:07:57 original forecast?
11:07:58 **A.** It had to be the original budget
11:08:01 numbers of what we decided this is what we’re
11:08:04 going on for 2008 in the beginning.
11:08:07 **Q.** And would that be based upon the
11:08:09 forecasts for 2008?
11:08:10 **A.** Forecasts. It would be based on

11:08:14 developing that budget for 2008.
11:08:16 **Q.** And I guess what I’m asking is, is
11:08:18 it the same process -- let’s say in the
11:08:20 beginning of 2008, Savant sets up its budget
11:08:25 goals for that year, correct?


11:08:25 **A.** Correct.
11:08:26 **Q.** Is that simply based upon what
11:08:28 Savant believes the forecast will be for that
11:08:31 year?
11:08:31 **A.** No. Because we probably decided how
11:08:38 many people we were going to hire, and then
11:08:40 we’re going to say, okay, you know, we’re
11:08:43 going to spend this amount of money on this,
11:08:48 we probably put our budgeted goals to do
11:08:51 certain marketing events, we knew we were
11:08:56 going to have to do some travel, so you would
11:09:00 just base it on that.
11:09:01 **Q.** The reason I’m confused is if you
11:09:04 look down, there’s not only just revenue
11:09:06 figures that are, you know, sort of adjusted
11:09:09 and vary from the original budget but other,
11:09:11 you know, operating expenses and costs and
11:09:15 professional fees and the like. Do you see
11:09:17 that, sir?
11:09:17 **A.** Sure.
11:09:18 **Q.** So there’s a variance between the
11:09:20 revised budget or forecast and the original
11:09:23 budget, correct?
11:09:23 **A.** Correct.


11:09:24 **Q.** That happens for a variety of these
11:09:27 line items, correct?
11:09:27 **A.** Yes.
11:09:28 **Q.** And I guess my question is, what
11:09:35 does Savant do with that information?
11:09:38 **A.** I know what I do with it.
11:09:44 **Q.** Sure. Tell me what you do with it.
11:09:46 **A.** It gives me an idea of how much
11:09:49 money we needed.
11:09:53 **Q.** And that informs also your
11:10:00 assessment as to how much additional capital
11:10:03 Savant may need from time to time, correct?
11:10:05 **A.** Correct.

11:10:05 **Q.** And as we know, Mr. Madonna is the
11:10:14 source of Savant's capital, correct?
11:10:16 **A.** Correct.

**100:19-101:01**
11:39:12 **Q.** Okay. Well, did you provide input
11:39:14 in terms of the preparation of this document,
11:39:16 sir?
11:39:16 **A.** I probably could have given the
11:39:19 actuals, and then the plan -- I probably could
11:39:28 have gotten some of the plan numbers. I'm not
CURRAN COURT REPORTING
101
11:39:30 -- I'm not quite sure, to be honest with you.

**105:10-113:7**
11:43:53 **Q.** What does it mean by "plan"?
11:43:55 **A.** Looks like the plan that we were
11:44:01 shooting for during that time frame.
11:44:03 **Q.** Is that another word for forecast,
11:44:06 to your understanding?
11:44:06 **A.** Well, I think they're used kind of
11:44:12 in the same way.
11:44:13 **Q.** Is that your understanding as CFO of
11:44:16 Savant that during the time that you've been
11:44:19 at Savant, that "plan" was used in the same
11:44:22 way as the term "forecast"?
11:44:24 **A.** In this instance, I would say it
11:44:28 would be.
11:44:28 **Q.** So what is the difference here on
11:44:32 this document between the "plan" and, quote,
CURRAN COURT REPORTING
106
11:44:35 the "original plan"?
11:44:37 **A.** Looks like -- looks like it was a
11:44:51 year -- year off is what it looks like to me.
11:44:57 Starting in 2009, it's exactly a year off.
11:45:03 **Q.** Well, in 2008 you have the same --
11:45:10 **A.** The same. But then 2009 for
11:45:15 original plan equals the plan for 2010. The
11:45:20 original plan in 2010 equals the plan for
11:45:23 2011. And the original plan for 2011 equals
11:45:28 the plan for 2012.
11:45:30 **Q.** And I'm asking you, as the CFO of

11:45:33 Savant, are you familiar during your tenure
11:45:38 with two plans, a plan and an original plan?
11:45:43 **A.** I think you always adjust your plans
11:45:50 based on how well you're doing, and that's
11:45:53 what you do.
11:45:54 **Q.** Well, let me ask you this though:
11:45:57 Did you provide numbers for the plan and
11:46:01 original plan as set forth in this document,
11:46:04 Exhibit B on -- of Exhibit 3 to your
11:46:08 deposition?
11:46:08 **A.** Did I participate in those numbers?
11:46:16 **Q.** Well, I'm asking you did you
11:46:19 actually provide these numbers for the plan
CURRAN COURT REPORTING
107
11:46:21 and the original plan?
11:46:22 **A.** I'm not sure, to be honest with you.
11:46:27 **Q.** Do you have any clue as to whether
11:46:29 you did that?
11:46:30 **A.** I'm not sure if they came from me or
11:46:35 somebody else. I'm not sure.
11:46:36 **Q.** Well, you're the CFO of Savant,
11:46:38 correct?
11:46:38 **A.** Correct.
11:46:39 **Q.** As you've testified under oath,
11:46:42 you're responsible for the accuracy of the
11:46:44 financial information and documents to Savant,
11:46:46 correct?
11:46:46 **A.** Yes.
11:46:47 **Q.** Who else would have provided this
11:46:49 information?
11:46:50 **A.** You would have to let me know who
11:46:59 this came from.
11:47:00 **Q.** Well, as I represented, this came
11:47:03 from counsel and a verified interrogatory
11:47:06 response said the people that were responsible
11:47:08 for preparing this include you, Mr. Madonna,
11:47:11 and Mr. Carroll.
11:47:12 **A.** All right. Then it has to be me --
CURRAN COURT REPORTING
108
11:47:14 **Q.** Okay.
11:47:14 **A.** -- if that's what they said.
11:47:16 **Q.** And do you have any concerns about
11:47:19 the accuracy of any of the figures set forth
11:47:22 and the numbers set forth on this exhibit?

11:47:24 **A.** My concerns were already stated.
11:47:30 **Q.** And any other concerns with respect
11:47:31 to the accuracy of any other numbers?
11:47:33 **A.** Not that I know of.
11:47:40 **Q.** And then I'm asking you what is your
11:47:46 understanding of the original plan?
11:47:50 **A.** The original plan is probably what
11:47:54 we thought we were going to do back what it
11:47:59 looks like had to be -- if you come out with a
11:48:02 plan before 2008 or sometime within 2008, come
11:48:08 up with a plan saying we're going to do 4
11:48:12 million for 2008, we expected to do 35 million
11:48:17 in 2009, then to 56.4 million in 2010, then
11:48:25 144 million in 2011, and then 175 million in
11:48:30 2012, that's what we expected to do.
11:48:32 **Q.** So that was your expectations in the
11:48:35 plan as of 2008; is that right?
11:48:37 **A.** Most likely, yes.
11:48:39 **Q.** And so what you're testifying to is





11:48:42 that the figures to the right of the phrase
11:48:46 "original plan" reflects your expectations or
11:48:51 forecasts as of 2008? Is that what your
11:48:54 testimony is?
11:48:55 **A.** Most likely, yes.
11:48:57 **Q.** And why do you say "most likely"?
11:49:00 **A.** Well, you never can be sure. It's
11:49:02 been how many years? It's been five years --
11:49:04 **Q.** Again --
11:49:06 **A.** -- so.
11:49:06 **Q.** Again, you are the person whose
11:49:10 primary responsibility is the financial
11:49:13 information and data at Savant, correct?
11:49:15 **A.** Understood.
11:49:17 MR. O'KONSKI: Objection.
11:49:17 **Q.** And so do you have a recollection
11:49:25 that in or about 2008 that you or others at
11:49:31 Savant forecasted these numbers for 2008,
11:49:36 2009, 2010, 2011, and 2012?
11:49:41 **A.** I don't have a recollection because
11:49:46 it was a long time ago.
11:49:50 **Q.** But would that make sense? Is that
11:49:52 your testimony?
11:49:52 **A.** It makes sense to me, these numbers.

110

11:49:55 **Q.** And as in 2008, as we discussed
11:50:01 earlier, you or others at Savant did not
11:50:05 really have the benefit of a long history of
11:50:08 the historical sales or revenue information,
11:50:10 correct?
11:50:10 **A.** Correct.
11:50:11 **Q.** So with respect to the forecasted
11:50:16 figures set forth on the original plan, what
11:50:20 was your basis, for example, for forecasting
11:50:24 $175 million in revenue for 2012?
11:50:29 **A.** It was probably based on if we had
11:50:36 this many dealers in the CEDIA market that
11:50:38 could do this amount of revenue, by that time,
11:50:42 we should be able to do that amount of
11:50:43 revenue.
11:50:44 **Q.** So it was, in some sense, an
11:50:47 estimate based upon wishful thinking?
11:50:51 MR. O'KONSKI: Objection.
11:50:51 **A.** I don't think it was wishful
11:50:53 thinking. I think it was based upon the
11:50:57 market size, what market share we were trying
11:50:59 to get, and based on what we thought each
11:51:05 dealer could do for revenue and how many
11:51:07 dealers we'd need to bring on during that time

CURRAN COURT REPORTING

111

11:51:10 to get it is how I would look at it.
11:51:13 **Q.** So that was based upon your
11:51:14 understanding back in 2008, correct?
11:51:15 **A.** If this is when it was done, yes.
11:51:18 **Q.** Well, I'm asking you.
11:51:22 **A.** It looks like it was done in 2008.
11:51:25 Okay. But, you know, I have no idea.
11:51:27 **Q.** You have no clue?
11:51:29 **A.** When it was originally done?
11:51:31 **Q.** Right.
11:51:31 **A.** Yeah, I don't.
11:51:33 **Q.** Do you have any clue as to --
11:51:35 sitting here today, I'm just asking you for
11:51:37 your recollection because the reason I'm
11:51:38 asking is 'cause you were identified as
11:51:40 someone with input into this document, sir,
11:51:43 okay. So I'm --
11:51:44 **A.** And I'm sure I did. All right.
11:51:46 **Q.** So sitting here today under oath,

11:51:49 can you tell me whether or not you have any
11:51:53 clue as to where any of these numbers came
11:51:55 from?
11:51:56 MR. O'KONSKI: Objection.
11:51:57 Asked and answered.
CURRAN COURT REPORTING
112
11:51:57 **A.** I thought we just went through it.
11:52:01 **Q.** Okay. And so your testimony is some
11:52:04 projections in 2008?
11:52:06 **A.** That's what I would believe this
11:52:08 would say. I wouldn't want to be held to it,
11:52:11 but I believe that in 2008, this must have
11:52:16 been done based on, you know, document number
11:52:21 one when you had that revised budget there,
11:52:25 saying that, okay, if we have the revised
11:52:28 budget here, we'll put the revised budget in
11:52:31 here and take it from there. So I'm assuming
11:52:35 it was done somewhere in the second half of
11:52:37 2008 based on the data I have in front of me.
11:52:40 **Q.** * And so would it be your testimony
11:52:43 that based upon the document you have and your
11:52:46 testimony that the figures for -- to the right
11:52:49 of what's termed "plan" and "original plan"
11:52:55 are figures that were created and estimated in
11:53:00 or about the time period in 2008 that you just
11:53:02 testified to?
11:53:05 MR. O'KONSKI: Can I have
11:53:06 that read back, please.
11:53:23 * (Question read)
11:53:24 MR. O'KONSKI: Objection.
CURRAN COURT REPORTING
113
11:53:25 **A.** I would find it highly unlikely that
11:53:30 the plan and the original plan were done at
11:53:35 the same time.
11:53:35 **Q.** Okay. So then when do you think the
11:53:39 plan was done?
11:53:40 **A.** To me, it had to be sometime in 2009
11:53:49 looking at the numbers.

**121:8-124:5**
121
12:07:00 correct.
12:07:01 **Q.** And did you receive any response

12:07:04 from Mr. Carroll?
12:07:05 **A.** I couldn't remember, to tell you the
12:07:08 truth, on this.
12:07:08 **Q.** Is it possible you received --
12:07:10 **A.** Possible.
12:07:11 **Q.** And that -- but you were trying to
12:07:15 communicate what you believed was the accurate
12:07:20 state of play at the time, correct?
12:07:22 MR. O'KONSKI: Objection.
12:07:22 **A.** When I -- when I used this template
12:07:28 to try to get to my valuation, I was trying to
12:07:32 see if the numbers made sense in my head for
12:07:40 the future forecast.
12:07:41 **Q.** But what you put down to Mr. Carroll
12:07:44 was, in your mind at the time, the best
12:07:47 information you had, correct?
12:07:48 **A.** I was missing a lot of information.
12:07:51 **Q.** But what you did provide him was the
12:07:53 best information you had at the time, correct?
12:07:55 **A.** It was just my guess.
12:07:58 **Q.** Well, what did you base your guess
12:08:01 on?
CURRAN COURT REPORTING
122
12:08:01 **A.** Just if we had this many dealers and
12:08:04 if we were trying to get if the market was
12:08:06 this big growing at this amount, if, if, if, I
12:08:11 mean, I don't know if the CEDIA market was 250
12:08:14 and my assumption was 250. There's a lot of
12:08:18 things in here that I was asking questions
12:08:22 about that I needed more information to see if
12:08:24 it was correct.
12:08:25 **Q.** But you were doing the best possible
12:08:27 job you could at the time in terms of
12:08:29 preparing this document, correct?
12:08:30 **A.** Yeah.
12:08:33 **Q.** You were trying to make the best
12:08:38 efforts based upon your experience and your
12:08:45 knowledge in the industry as to what you
12:08:43 believed were the accurate figures?
12:08:46 **A.** Putting a template together 'cause
12:08:50 this is early on based on this e-mail, this is
12:08:52 like, you know, Jim, take a look at this, is
12:08:57 this correct or not, you know, this is just my
12:09:01 -- I would say my first pass attempt or, you
12:09:04 know, second pass attempt, at this trying to

12:09:07 put this template together.
12:09:09 **Q.** But again, at the time, based upon
CURRAN COURT REPORTING
123
12:09:13 the information you had and your industry
12:09:16 experience, you were doing what you thought
12:09:20 was the best job in putting the information
12:09:22 together, correct?
12:09:23 MR. O'KONSKI: Objection.
12:09:23 **A.** I always try to do my best in
12:09:27 everything I do. That's what I try.
12:09:29 **Q.** And then I take it that typically,
12:09:34 when you provide information to others at
12:09:38 Savant seeking feedback, that there may be
12:09:42 some discussions afterwards, correct?
12:09:43 **A.** There could be, yes.
12:09:46 **Q.** Whether it's forecasts or budgets
12:09:48 or --
12:09:48 **A.** If they read it, you know, 'cause a
12:09:51 lot of times, people don't read your stuff.
12:09:53 **Q.** But when there's a forecast or a
12:09:56 budget and you provide -- there's input, et
12:09:59 cetera, sometimes the numbers get adjusted,
12:10:01 correct, whether upwards or downwards?
12:10:03 **A.** Yes.
12:10:03 **Q.** And that's the normal give and take
12:10:08 of any company and management of the company,
12:10:11 correct?
CURRAN COURT REPORTING
124
12:10:11 **A.** Yes.
12:10:12 **Q.** And so this is, in your mind, sort
12:10:16 of a typical give and take with respect to
12:10:19 your role as CFO, correct?
12:10:21 **A.** Yes.

130:20-132:14
130
12:15:43 the confidentiality that we talked about, that
12:15:45 the target and the potential acquirer are
12:15:49 given code names, correct?
12:15:50 **A.** Correct.
12:16:08 MR. PARK: We'll just review
12:16:09 one more document before the lunch
12:16:11 break, sir. I'm going to have
12:16:14 marked as Exhibit 6 a document Bates

12:16:18 labeled SAVANT 0009894 with an
12:16:26 attachment that goes to SAVANT
12:16:31 0009895 to 000056. And I'll
12:16:37 represent that this is an e-mail
12:16:39 with an attachment that came from
12:16:42 your files, sir.
12:17:15 (Deposition Exhibit No. 6, E-Mail to
12:17:15 Robert Madonna from Bruce Meyers dated
12:17:15 8/24/10 with attachment, Bates stamped
12:17:15 SAVANT 0009894 and 0009895-000001 to
12:17:15 000056, marked for identification)
12:17:15 **Q.** Sir, take a look at this document.
12:17:18 That's an e-mail from you to Mr. Madonna dated
12:17:22 August 24, 2010. Subject: "5 Year Business
12:17:26 Model." And then let me know when you're
12:17:28 prepared to discuss it, sir.
CURRAN COURT REPORTING
131
12:17:51 (Pausing)
12:21:10 **A.** Okay.
12:21:10 **Q.** Do you recall this document, sir?
12:21:13 **A.** It's a document I use. Yes.
12:21:16 **Q.** Well, the e-mail -- the cover e-mail
12:21:20 is an e-mail from you to Robert Madonna,
12:21:24 correct?
12:21:24 **A.** Sorry. Yes.
12:21:29 **Q.** And that's dated on August 24, 2010,
12:21:34 correct?
12:21:34 **A.** Yes.
12:21:34 **Q.** At 10:54 a.m., correct?
12:21:38 **A.** Correct.
12:21:38 **Q.** And then the subject is "5 Year
12:21:41 Business Model," correct?
12:21:42 **A.** Right.
12:21:42 **Q.** And the attachment is entitled "5
12:21:46 Year Business Model for Bob 082410.xls,"
12:21:53 correct?
12:21:53 **A.** Correct.
12:21:53 **Q.** And that is reflected by the
12:21:55 attachment that follows this cover e-mail,
12:21:59 correct?
12:21:59 **A.** Yes.
CURRAN COURT REPORTING
132
12:22:01 **Q.** And as we talked about, you work in
12:22:03 Excel spreadsheets at Savant, correct?

12:22:05 **A.** Yes. For forecasting.
12:22:09 **Q.** Right. Now, do you have an
12:22:12 understanding as to why you were providing
12:22:14 this information on this Excel spreadsheet to
12:22:19 Mr. Madonna in August of 2010?
12:22:21 **A.** I think I do.
12:22:22 **Q.** Can you explain?
12:22:24 **A.** Gadi didn't think anybody had a 5
12:22:30 year business plan, and he wanted me to send
12:22:31 it to Bob, so I said I had one, and I think I
12:22:36 sent it to Bob. I think that was -- that was
12:22:38 the case.

**Regarding revised Revenue Forecasts in 2009,** 157:1-159:10:
02:07:18 **Q.** Now, if you return or refer to the
02:07:25 page that's labeled 0009. It's entitled
02:07:32 "Savant Systems 2009 Budget & Forecast."
02:07:35 **A.** Okay.
02:07:37 **Q.** Do you see there there's some
02:07:40 columns "Original Budget 2009," "Revised
02:07:45 Budget 2009" onwards? Do you see that, sir?
02:07:46 **A.** Uh-huh. Oh, I'm sorry. Yes.
02:07:49 **Q.** In the middle of this chart, there
02:07:51 are three columns for "Most Likely Forecast
02:07:54 2009," "Worse Case Forecast 2009," and
02:08:01 "Catastrophic Forecast 2009." Do you see
02:08:02 that, sir?
02:08:02 **A.** Yes.
02:08:02 **Q.** Could you explain to me what the
02:08:05 differences were for the various cases?
02:08:10 **A.** To me, it looks like just a revenue
02:08:20 change for that period looking at it right at
02:08:26 the moment.
02:08:26 **Q.** So we're talking about basically
02:08:31 changes in terms of what the most likely
02:08:34 revenue forecast would be versus a worst case
02:08:37 versus a catastrophic forecast for revenue?
02:08:41 **A.** Correct.

02:09:09 **Q.** And do you recall back in 2009 which
02:09:13 particular case that you thought was the most
02:09:17 reasonable one at the time?
02:09:18 **A.** At this particular time, the most
02:09:21 likely forecast was probably the one that was
02:09:25 going to come in at that particular time.

02:09:28 **Q.** And why do you say that, sir?
02:09:31 **A.** 'Cause it says "Most Likely."
02:09:33 **Q.** Now, has this been something that
02:09:40 you and Savant have typically done through the
02:09:43 time that you were a CFO in terms of setting
02:09:45 forth most likely, worst case, and

02:09:49 catastrophic forecasts?
02:09:50 **A.** We do different scenarios. I like
02:09:54 to look at the catastrophic side to see what
02:09:59 potential money that may be needed, but it's
02:10:03 not what we run to.
02:10:04 **Q.** And how do you come up with the
02:10:07 figures or what assumptions do you use to come
02:10:09 up with these cases?
02:10:10 **A.** Just pull it out of my rear end.
02:10:13 **Q.** Okay. Fair enough.

**Regarding a November 2009 document, and revenue forecasts,** 160:17-164:1:

02:14:08 **Q.** I want to refer your attention to
02:14:10 the last page of this exhibit, sir. It's
02:14:14 Bates labeled 1787449-8 [SAVANT0178749]. Do you see that,
02:14:18 sir?
02:14:18 **A.** Yes.
02:14:18 **Q.** What does this chart represent or
02:14:22 reflect?
02:14:23 **A.** This is to represent money outlaid

02:14:35 potentially by the end of 2010, right, and --
02:14:47 and ways to improve not potentially spending
02:14:49 all that money.
02:14:52 **Q.** And so the top heading reads
02:14:58 "Capital Uses and Sources 2009-2010," correct?
02:15:00 **A.** Yes.
02:15:01 **Q.** And so here though, would it be fair
02:15:07 to say that the source of capital would be Mr.
02:15:09 Madonna?
02:15:09 **A.** Yes.
02:15:10 **Q.** Now, underneath the second row
02:15:14 states "Capital Infusion as of 6/30/2009." Do
02:15:19 you see that, sir?
02:15:19 **A.** I do.
02:15:20 **Q.** And then to the right of it for all
02:15:22 four columns is the amount $57,181,964. Do
02:15:29 you see that, sir?

02:15:29 **A.** I do.
02:15:30 **Q.** Was that the amount of capital that
02:15:32 as of that time Mr. Madonna had contributed to
02:15:36 Savant Systems, LLC?
02:15:37 **A.** I'm not sure if that's just the
02:15:44 preferred amount or if that's everybody.
02:15:46 **Q.** Okay. But Mr. Madonna is the

02:15:49 preferred amount, correct?
02:15:50 **A.** He would be the majority of it, but
02:15:53 not -- he's potentially not all of it.
02:15:57 **Q.** And do you see there's four columns
02:15:59 here that talk about 5 million '09; 20 million
02:16:04 '10, and then the next column is 5 million
02:16:08 '09; 15 million '10, and then 5 million '09;
02:16:13 10 million '10 for the third column, and 5
02:16:15 million '09; 8 million '10 for the fourth
02:16:18 column. Do you see that?
02:16:19 **A.** I do.
02:16:19 **Q.** Could you explain to me why you have
02:16:22 four different columns set up in that fashion,
02:16:25 sir?
02:16:25 **A.** So it looks like four different
02:16:30 scenarios, okay, so if we do 5 million in '09,
02:16:34 right, we would end at a certain amount, and
02:16:38 then if we did 20 million in revenue in '10 or
02:16:43 15 million in '10 or $10 million in revenue in
02:16:47 '10 or 8 million in '10, this is what it
02:16:48 potentially would look like.
02:16:51 **Q.** And the bottom line would be at the
02:16:53 very last rows in terms of, you know, what
02:16:57 total cash would be needed for 2010 or total

02:17:00 cash needed for 2010 with improvements,
02:17:03 correct?
02:17:03 **A.** Correct.
02:17:04 **Q.** And that changes with each scenario?
02:17:07 **A.** Correct.
02:17:07 **Q.** Was this particular spreadsheet ever
02:17:15 used in any way?
02:17:16 **A.** This might have been. I'm not sure.
02:17:23 **Q.** And how might it have been used?
02:17:26 **A.** I might have used it on one of the
02:17:28 board meetings one time.
02:17:29 **Q.** For what purpose, sir?
02:17:32 **A.** Just to show.

02:17:35 **Q.** So at the board meeting, you would
02:17:37 have shared it with Mr. Madonna and the board
02:17:39 members, correct?
02:17:40 **A.** Correct.
02:17:40 **Q.** Along with perhaps Jim Carroll and
02:17:43 other senior management?
02:17:44 **A.** Yeah. Whoever was there at that
02:17:45 time.
02:17:45 **Q.** Has Mr. Madonna ever asked
02:17:52 specifically for just this page of the
02:17:56 exhibit?

02:17:57 **A.** Not that I'm aware of. No.

**Regarding Savant Sales Breakdown 2009,** 167:21-171:23:

02:29:43 **Q.** Now, referring to the page Bates
02:29:48 labeled 131529, it's headed "Savant Sales
02:29:53 Breakdown 2009." Do you see that, sir?
02:29:56 **A.** Oh, okay. Okay.

02:30:05 **Q.** And the data that's displayed on
02:30:10 this spreadsheet, where did you pull this data
02:30:15 from?
02:30:15 **A.** Most likely, our ERP system.
02:30:20 **Q.** And does everyone in the accounting
02:30:24 financial department have access to the ERP
02:30:27 system?
02:30:28 **A.** Yes.
02:30:29 **Q.** Now, if you look at the text
02:30:35 relating to the highlights. Do you see that,
02:30:37 sir?
02:30:37 **A.** Okay. Yeah.
02:30:37 **Q.** And there's a -- there's some
02:30:43 language that states "Customers tighten belt
02:30:46 on spending (going with less)." Do you see
02:30:50 that, sir?
02:30:50 **A.** Yup.
02:30:51 **Q.** Is that something you wrote or Peter
02:30:54 Wisniowski wrote?
02:30:54 **A.** It could have been either one of us.
02:30:58 **Q.** And what was the basis that you used
02:31:01 to write that statement or Mr. Wisniowski used
02:31:03 to write that statement?
02:31:06 MR. O'KONSKI: Objection.

02:31:06 **A.** I don't know if it was the sentence
02:31:21 above that made him or I state that the
02:31:24 "Average sale of end user job decrease from
02:31:27 31K to 14K."
02:31:30 **Q.** Okay. Now, that statement "Average
02:31:32 sale of end user job decrease from 31K to 14K
02:31:36 from q2 to q3"; is that right?
02:31:39 **A.** Yes.
02:31:39 **Q.** And that's relating to an average
02:31:42 sale of an end user job of Savant equipment?
02:31:45 **A.** Yes.
02:31:47 **Q.** And it's decreased from 31,000 to
02:31:53 $14,000, and that's to the dealer?
02:31:56 **A.** On Q1 if I took -- let me just look
02:32:04 at this for a minute. Can I use a calculator?
02:32:10 Does that matter here?
02:32:10 **Q.** No. That's fine. You can use a
02:32:14 calculator.
02:32:14 **A.** I'm not sure, you know. Yup. Okay.
02:32:47 So all it is is if you look at -- and it's
02:32:54 just an assumption on his and I part -- it's
02:32:59 not necessarily the facts -- but when we look
02:33:02 at end user orders in Q2, there was
02:33:07 1.1 million in end user orders. Do you see

02:33:10 that?
02:33:10 **Q.** Yes. I see there.
02:33:11 **A.** And there was 36, I guess, customers
02:33:18 or orders -- it should be orders, not
02:33:21 customers 'cause then that would be wrong --
02:33:23 you know, so and then that would equal 31K if
02:33:28 you divide that in.
02:33:28 **Q.** Okay. Right.
02:33:29 **A.** Then if you took the amount 886 in
02:33:34 Q3 --
02:33:35 **Q.** Right.
02:33:35 **A.** -- and divided by 62 --
02:33:37 **Q.** Yup. I see that.
02:33:38 **A.** -- then that would be 14K.
02:33:40 **Q.** Right. So what you're seeing is a
02:33:42 decrease of the average?
02:33:44 **A.** For a very short period of time.
02:33:46 **Q.** And that's to these dealers,
02:33:49 correct, to your customers?
02:33:50 **A.** Those customers, yeah.

02:33:51 **Q.** Now, under that you say "Due to
02:33:57 reduce pricing on System 12 and over Savant
02:34:00 product line." Do you see that?
02:34:02 **A.** Yes.

02:34:02 **Q.** And I'm a little confused. What
02:34:04 does that mean, sir?
02:34:05 **A.** All I can assume from that is that
02:34:11 we reduced the sale price of System 12 during
02:34:16 that time frame, and maybe some other products
02:34:20 we reduced the pricing at that time.
02:34:23 **Q.** Now, if you look at the last
02:34:26 sentence here, it states "Dealers continue to
02:34:29 go out of business." Do you see that?
02:34:31 **A.** Yeah.
02:34:32 **Q.** As of the time you wrote this, you
02:34:35 understood that to be the case?
02:34:36 **A.** I believe so. Peter and I probably
02:34:40 believed that.
02:34:40 **Q.** And then this was a presentation
02:34:43 that you made to the board, correct?
02:34:45 **A.** Oh, yeah. Probably. Let me look.
02:34:48 Yes.
02:34:48 **Q.** So I take it that in presenting
02:34:52 information to the board, you wanted to be
02:34:54 truthful and accurate to the board members,
02:34:55 correct?
02:34:55 **A.** Yes.

**Regarding 2009 Revenue Summary Analysis,** 182:6-24**:**

02:49:47 **Q.** Now, if you look at the last pages
02:49:49 of the exhibit, there's a "2009 Revenue
02:49:53 Summary Analysis," correct?
02:49:53 **A.** Oh, I didn't see that. Okay. Yeah.
02:49:56 **Q.** It says "Not Updated." Do you see
02:49:58 that, sir?
02:49:58 **A.** Yes.
02:49:59 **Q.** What does that mean, sir?
02:50:00 **A.** He gave up on this report. He never
02:50:03 finished -- did this anymore. That's what it
02:50:07 looks like to me.
02:50:08 **Q.** So he's just telling you that this
02:50:10 has not been updated?
02:50:11 **A.** Yes.
02:50:12 **Q.** As of what date? November of 2009?

02:50:16 **A.** Looks like it. Yes.
02:50:17 **Q.** Do you know whether or not this was
02:50:20 ever finished?
02:50:22 **A.** I don't think it was.

**Regarding Different Scenarios,** 183:1-188:4

02:50:37 MR. PARK: I'm going to have
02:50:38 marked as the next exhibit
02:50:42 Exhibit 15, a document Bates labeled
02:50:44 SAVANT 0819935, which is produced in
02:50:49 native format, and the printout is
02:50:52 Bates labeled 0819935-1 through dash
02:50:59 8.
02:51:23 (Deposition Exhibit No. 15, Excel File
02:51:23 Bates stamped SAVANT 0819935 with
02:51:23 August 2009 Pack, 0819935-000001
02:51:23 through 000008, marked for
02:51:23 identification)
02:51:23 **Q.** So I'll short-circuit things, and
02:51:33 the question I'll ask you, after you review
02:51:36 it, is do you recognize this document, sir?
02:51:38 **A.** Yes.
02:51:54 **Q.** What is this document, sir?
02:51:56 **A.** Looks like -- let me just make sure
02:52:01 here -- looks like August 2009 --
02:52:09 **Q.** And so this --
02:52:11 **A.** -- Pack.
02:52:11 **Q.** So then this would have been
02:52:13 prepared in September 2009 or thereabouts?
02:52:16 **A.** Probably. Yes.
02:52:17 **Q.** And then it would be kept in the
02:52:20 Flash file -- Flash Report file, correct?
02:52:21 **A.** I would assume that. Yes.
02:52:22 **Q.** At this time, Peter Wisniowski would
02:52:25 have likely prepared this document, sir?
02:52:27 **A.** Yes.
02:52:28 **Q.** And you would have reviewed it for
02:52:30 accuracy and content, correct?
02:52:32 **A.** I would assume that the -- yeah. I
02:52:38 would always read his notes, I think.
02:52:40 **Q.** Now, if you look at the last page
02:52:43 again, there is, again, a spreadsheet relating
02:52:48 to "Capital Uses and Sources 2009-2010." Do
02:52:53 you see that, sir?
02:52:53 **A.** Yes.

02:52:54 **Q.** Now, in this document, there are
02:52:57 three columns with respect to three different
02:52:59 scenarios; do you see that, sir?
02:53:00 **A.** Uh-huh.
02:53:01 **Q.** And I believe in other documents
02:53:04 we've seen, there have been four scenarios.
02:53:08 Do you recall that?
02:53:08 **A.** Yes, I do.
02:53:09 **Q.** And can you explain to me why

02:53:13 sometimes there are three scenarios and why
02:53:16 other times there's four scenarios with
02:53:18 respect to capital uses and sources?
02:53:20 **A.** It's what Peter and I would
02:53:23 determine to look at for different scenarios.
02:53:28 **Q.** And why would -- well, let me strike
02:53:32 that.
02:53:33 What would go into determining for
02:53:36 you and Peter the different types of
02:53:39 scenarios?
02:53:40 **A.** We just wanted to see a range of
02:53:42 revenue and what would be at certain ranges of
02:53:46 revenue.
02:53:46 **Q.** And how would you pick or specify
02:53:48 the different ranges of revenue?
02:53:50 **A.** We would just talk about it.
02:53:51 **Q.** Would you get input from any other
02:53:55 Savant executives relating to the range of
02:53:57 revenues?
02:53:58 **A.** I don't think so.
02:53:58 **Q.** Would you get any input from Mr.
02:54:01 Madonna concerning the range of revenue he was
02:54:02 interested in?
02:54:03 **A.** I don't think so.

02:54:03 **Q.** What about from Mr. Carroll?
02:54:07 **A.** I'm not sure. But it's usually
02:54:14 Peter and I just trying different ranges of
02:54:17 revenue is what we do.
02:54:18 **Q.** And at the end of the day when you
02:54:23 come up with the results of the various
02:54:26 scenarios, how, if any, do you use those
02:54:30 results?
02:54:30 **A.** It's just something that we have in
02:54:37 our heads that, you know, what we would burn
02:54:45 for cash if we did X revenue level. That's

02:54:48 all we were looking to get.
02:54:50 **Q.** And as we discussed earlier, part of
02:54:54 the purpose would be to have the information
02:54:55 ready if you were asked about what additional
02:54:59 cash might be needed under certain scenarios,
02:55:01 correct?
02:55:02 **A.** Yes.
02:55:02 **Q.** So you would and Peter would try to
02:55:06 come up with a reasonable range of scenarios;
02:55:08 is that fair?
02:55:09 **A.** Yes.
02:55:10 **Q.** And that generally, as you include
02:55:14 that document and other data in connection

02:55:16 with the Pack reports, you would try to have
02:55:20 accurate information so as to answer questions
02:55:22 from Savant management, including, but not
02:55:25 limited to, Mr. Madonna; would that be fair?
02:55:27 **A.** Yeah. It would be my easiest way to
02:55:30 go look up information if someone asked me a
02:55:32 question was to go back to the Pack.
02:55:34 **Q.** And is that your typical procedure,
02:55:37 if someone comes to you and asks you a
02:55:39 question on revenue figures or capital figures
02:55:42 or other information, you would pop up the
02:55:46 most recent Pack and take a look at that?
02:55:48 **A.** That’s what I would try to do.
02:55:49 Yeah. Yup.
02:55:51 **Q.** In the past during the time that
02:55:53 you’ve been CFO of Savant, have you actually
02:55:55 done that?
02:55:56 **A.** No. Not really many people ask
02:55:58 about the numbers.
02:55:59 **Q.** Who asked about the numbers?
02:56:01 **A.** Not really anybody.
02:56:03 **Q.** Why not?
02:56:04 **A.** I don’t know. They just -- it’s not
02:56:08 -- I mean, we look at the numbers of where

02:56:11 we’re supposed to be in, but, you know, it’s
02:56:15 just not that way, it really isn’t.
02:56:18 **Q.** Okay. I’ll take your word for it,
02:56:20 sir.

**Regarding a board presentation, SAVANT0201502,** 202:6-203:7

03:15:25 **Q.** On the last bullet point of your
03:15:28 concerns is the “Economy.” Do you see that,
03:15:30 sir?
03:15:30 **A.** Yes.
03:15:31 **Q.** And what were you referring to with
03:15:33 respect to that particular point?
03:15:34 **A.** Just the economy in general, I
03:15:37 think, during this time frame. We had been in
03:15:40 a recession and it’s just the normal worry
03:15:46 that, you know, I don’t know when this was
03:15:49 done or whatever, but it was a couple years
03:15:54 ago, so yeah. Just the economy in general.
03:15:56 **Q.** And as we know, the recession hit
03:16:00 broadly across all industries, correct?
03:16:01 **A.** Sure. Yup. I think the one thing
03:16:04 that you see with our growth and everything is
03:16:07 that the people with money still bought, you
03:16:09 know, and, you know, that -- and you can see
03:16:12 as we’ve been growing, it’s -- that they were

03:16:16 still spending money.
03:16:18 **Q.** But nonetheless, you would agree
03:16:20 that the recession was sort of a major global
03:16:24 economic event?
03:16:26 MR. O’KONSKI: Objection.
03:16:28 **A.** I think you would have to look at it
03:16:31 and everyone personally, how it affected you.

203:12-20:

03:16:40 **Q.** Now, in terms of the growth that you
03:16:44 mentioned, sitting here today as Savant’s CFO,
03:16:48 would you say that Savant has experienced
03:16:50 growth since the time that you took over as
03:16:53 CFO in 2005?
03:16:54 **A.** Once we started shipping products,
03:16:59 yes.
03:16:59 **Q.** And that was in 2007 or so or 2008?
03:17:02 **A.** Yeah.

**Regarding SAVANT0178796,** 205:5-206:24
03:26:19 **Q.** Now, this document was sent to you
03:26:23 by Mr. Wisniowski on August 11, 2010, correct?
03:26:26 **A.** Yes.
03:26:28 **Q.** What does the attached Excel file
03:26:34 refer to, sir? What is it?

03:26:35 **A.** Looks like a detail income statement
03:26:42 -- not detailed, sorry -- summary income
03:26:46 statement. Half summary, half detail.
03:26:49 **Q.** And at this time, in August of 2010,
03:26:53 do you have an understanding why Mr.
03:26:55 Wisniowski was sending this to you?
03:26:58 **A.** I don't.
03:26:58 **Q.** Do you have an understanding as to
03:27:04 whether or not, pursuant to his e-mail, he
03:27:07 updated this file each month thereafter?
03:27:10 **A.** I don't know if he did update it
03:27:17 thereafter. I don't know.
03:27:19 **Q.** And was this something that was to
03:27:22 be contained in the Pack or the monthly
03:27:25 operating result summary?

03:27:26 **A.** Not -- you might be able to get some
03:27:31 of the numbers for the Pack out of the summary
03:27:36 on page one and two, and then I guess it goes
03:27:41 on to page three and four. I'm not quite sure
03:27:48 how this all rolls, but and then -- but once
03:27:52 you hit page seven, that just seems like a big
03:28:00 data dump.
03:28:02 **Q.** Do you know whether or not you asked
03:28:04 him to prepare this document?
03:28:06 **A.** I'm not sure if I did.
03:28:09 **Q.** And do you recall whether or not
03:28:11 this was done before or whether or not he had
03:28:14 prepared such documents in the past prior to
03:28:17 August of 2010?
03:28:18 **A.** I'm not sure.
03:28:22 **Q.** And as you sit here, do you have any
03:28:26 recollection as to if there was a specific
03:28:28 purpose for his transmission of this document
03:28:32 to you?
03:28:33 **A.** I think the only thing is is I like
03:28:42 to see a P&L this way, and he likes to see the
03:28:46 P&L with just spends. I like to see it by
03:28:50 department also. That's the only thing I
03:28:53 could think of.

**Regarding SAVANT0131349,** 240:15-243:2:

04:16:18 **Q.** Now, if you look at this same page,
04:16:21 page six, under the heading "Going Concern."
04:16:24 Do you see that paragraph?

04:16:26 **A.** Yes.
04:16:26 **Q.** And I think it's the third sentence,
04:16:32 it states, "Although the Company began
04:16:35 generating revenue in 2008, the Company
04:16:39 expects to continue to incur losses and cash
04:16:42 flow deficits as it continues to develop the
04:16:45 market for its product and expand its

04:16:47 production capabilities." Do you see that?
04:16:49 **A.** Yes.
04:16:49 **Q.** And this is something that the
04:16:52 DiCicco firm stated as of March 3, 2009,
04:16:57 correct?
04:16:58 **A.** Let me look at the -- yes.
04:17:07 **Q.** And is this information that you
04:17:11 provided to the DiCicco firm?
04:17:13 **A.** I believe I would.
04:17:15 **Q.** And at that time, what did you
04:17:21 expect with respect to the time period at
04:17:24 which -- during which the company would
04:17:26 continue to incur losses and cash flow
04:17:29 deficits as it continued to develop the market
04:17:31 for its product?
04:17:32 **A.** The timeline? I couldn't tell you.
04:17:40 I would be just guessing.
04:17:41 **Q.** But at that time, you told the
04:17:44 DiCicco firm for some period of time you
04:17:46 expected the company to incur losses and cash
04:17:50 flow deficits, correct?
04:17:51 **A.** Correct.
04:17:51 **Q.** And that was because the company was
04:17:55 starting up and beginning to market its

04:17:58 product; is that fair?
04:17:59 **A.** Correct.
04:18:00 **Q.** So at least for some period of time,
04:18:03 you thought it would be normal for the company
04:18:05 to incur such losses and cash flow deficits;
04:18:09 is that correct?
04:18:09 **A.** Correct.
04:18:10 **Q.** And would it be fair to say that
04:18:13 part of your concern with respect to tracking
04:18:17 capital uses and sources was to ensure the
04:18:20 continued funding and operation of the company
04:18:22 during that time period?
04:18:23 **A.** When we go back to that other

04:18:28 sheet --
04:18:28 **Q.** Yes.
04:18:28 **A.** -- that we used to do, that was just
04:18:31 me knowing what we think we were going to
04:18:32 spend at that particular time.
04:18:35 **Q.** Okay. Did the DiCicco firm ask any
04:18:40 questions to you with respect to what your
04:18:44 expectations were with respect to the time
04:18:46 period during which the company would continue
04:18:50 to incur losses and cash flow deficits?
04:18:53 **A.** I'm sure they did.

04:18:55 **Q.** And do you know what you told them?
04:18:58 **A.** I don't.

**Regarding SAVANT0200168,** 246:15-247:4:

04:23:59 **Q.** And under the paragraph, there's a
04:24:09 paragraph relating to "Going Concern." Do you
04:24:12 see that?
04:24:12 **A.** Yes.
04:24:13 **Q.** And again, here there's a sentence
04:24:20 that says "The Company expects to continue to
04:24:24 incur losses and cash flow deficits as it
04:24:27 continues to develop the market for its
04:24:29 products and expand its production
04:24:31 capabilities." Do you see that, sir?

04:24:33 **A.** I do.
04:24:34 **Q.** That's information that you or Peter
04:24:36 Wisniowski provided to DiCicco, correct?
04:24:40 **A.** Correct.

**Regarding a master forecast,** 250:1-255:9:

04:28:51 **Q.** Now, in 2008 at or about the time
04:28:59 when Savant began shipping products, were you
04:29:03 involved in discussions with senior management
04:29:05 in terms of planning Savant's future business
04:29:09 strategy?
04:29:09 **A.** I believe I would.
04:29:12 **Q.** Did you actually participate in
04:29:17 terms of creation of any sort of master plan
04:29:20 or master forecast for the company?
04:29:24 **A.** I could have.
04:29:27 **Q.** Sitting here today, do you recall

04:29:30 participating in any sort of --
04:29:31 **A.** In 2008?
04:29:32 **Q.** Yes.
04:29:32 **A.** I couldn't remember back that far.
04:29:34 **Q.** Well, do you recall whether or not
04:29:39 there was any document or strategic plan or
04:29:44 master plan prepared by Savant at that time?
04:29:46 **A.** I'm not sure.
04:29:48 **Q.** Do you know one way or the other?
04:29:50 **A.** I don't.
04:29:51 **Q.** And do you know one way or the other
04:29:54 whether or not you were, in fact, a
04:29:59 participant in any sort of preparation or

04:30:01 report?
04:30:01 **A.** I'm not sure.
04:30:02 **Q.** Okay. At any point in time since
04:30:06 you've been CFO of Savant, have you ever
04:30:10 participated in the preparation of any sort of
04:30:14 documentation relating to a plan, a revised
04:30:19 plan, or any sort of master forecast for the
04:30:23 company?
04:30:23 **A.** Besides all the stuff we went over
04:30:25 today?
04:30:25 **Q.** Right.
04:30:26 **A.** I'm not sure.
04:30:27 **Q.** I mean, is there a document that
04:30:29 sets forth -- for example, a strategic
04:30:32 planning document that has set forth, you
04:30:35 know, Savant's business plan and forecast for
04:30:39 a particular time period going forward?
04:30:41 **A.** I'm not sure. I'm not sure at all.
04:30:45 **Q.** Do you know whether or not it's
04:30:49 something that you've participated in?
04:30:51 **A.** I'm not sure.
04:30:51 **Q.** Would it be something that you would
04:30:53 have participated in given your role as CFO?
04:30:56 **A.** You would think I would have, but,

04:30:57 you know, I would have to see it or if --
04:31:00 whatever.
04:31:00 **Q.** Well, all I'm asking is, as you sit
04:31:03 here today, do you know of any such document
04:31:06 or plan?
04:31:06 **A.** I do not recall it at this
04:31:08 particular moment.

04:31:09 **Q.** And as you sit here today -- and I
04:31:12 can only ask for what you recall today -- do
04:31:16 you recall any sort of revised plan or master
04:31:19 forecast that you helped prepare?
04:31:24 MR. O'KONSKI: Other than --
04:31:25 **A.** Other than here? Like what we've
04:31:27 gone through today? That's what I'm getting
04:31:28 confused on.
04:31:29 **Q.** Yeah. No. I'm talking about --
04:31:31 we've seen a lot of different forecasts and
04:31:40 financials, et cetera, and what I'm asking is
04:31:36 is there, you know, a strategic plan document,
04:31:41 you know, that you helped prepare, sort of a
04:31:43 master plan, a master forecast, you know?
04:31:46 **A.** I'm not sure.
04:31:47 **Q.** It doesn't refresh your recollection
04:31:50 at all?

04:31:50 **A.** Doesn't ring a bell at the moment.
04:31:52 **Q.** So at you sit here today, you can't
04:31:55 identify any such plan or revised plan?
04:31:57 **A.** Not except for all the stuff we went
04:32:01 through today already.
04:32:02 **Q.** Apart from that, you can't think of
04:32:03 anything else?
04:32:04 **A.** I don't know. There could be more
04:32:05 of those, you know, I don't know if you showed
04:32:07 me all the different versions or whatever I
04:32:09 ever did, you know, but, you know, that's what
04:32:13 I -- what I know.
04:32:15 **Q.** Okay. So let's try to break it down
04:32:18 because I just want to make sure we're on the
04:32:21 same page here. Is that fair, sir?
04:32:22 **A.** That's fine.
04:32:23 **Q.** Today we've reviewed what are called
04:32:28 sort of monthly Packs or Flash Reports,
04:32:30 correct?
04:32:31 **A.** Correct.
04:32:31 **Q.** And those are something that you and
04:32:35 others in your group prepared on a periodic
04:32:37 basis and kept in the normal course of
04:32:41 business, correct?

04:32:41 **A.** Correct.
04:32:42 **Q.** And we've reviewed some documents
04:32:45 relating to the Project Einstein, correct?

04:32:47 **A.** Correct.
04:32:47 **Q.** And we've reviewed some documents
04:32:50 relating to, you know, year-to-date revenue
04:32:54 statements, correct?
04:32:55 **A.** Yes.
04:32:56 **Q.** And we've reviewed accountant
04:33:02 independent reports, correct?
04:33:03 **A.** Correct.
04:33:04 **Q.** As you sit here today, can you think
04:33:07 of any other documents, reports that you have
04:33:13 generated during the time that you've been CFO
04:33:19 in terms of the typical types of reports?
04:33:21 **A.** Those are pretty much what I use, I
04:33:24 think. I could have. I just don't know.
04:33:27 **Q.** I'm just saying as you sit here
04:33:30 today, just, you know, based upon, you know,
04:33:33 your tenure as CFO of Savant, are there any
04:33:36 other types of documents that you either
04:33:39 prepared or relied on in connection with your
04:33:42 duties and responsibilities as the chief
04:33:44 financial officer?

04:33:45 **A.** I'm not sure.
04:33:46 **Q.** You can't identify any of those?
04:33:48 **A.** Not off the top of my head right
04:33:50 now. No.
04:33:51 **Q.** And I guess to the extent that they
04:33:53 would exist, they would exist in the network
04:33:55 files for the accounting financial group,
04:33:57 correct?
04:33:57 **A.** Yes. Or on my laptop.

# EXHIBIT 594

UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
CIVIL ACTION
CASE NO. 1:10-cv-11622 (EFH)

SAVANT SYSTEMS, LLC,

Plaintiff,

vs.

CRESTRON ELECTRONICS, INC.,

Defendant.
_______________________________/

VIDEOTAPED DEPOSITION OF BRETT PRICE

Wednesday, December 5, 2012
9:30 a.m. - 2:14 p.m.

Marriott Courtyard Sarasota Bradenton Airport
850 University Parkway
Sarasota, Florida 34234

-------------------------------------------

REPORTED BY:
WENDY WEISE, RPR
Notary Public
State of Florida at Large
Esquire Deposition Services - Tampa, Florida
813-221-2535 (800-838-2814)
Esquire Job No.: 332921

had a contract, a very specific commercial contract that expired at ten, but in terms of our residential business in Florida, it's been in the eight to nine range and as low as six.

Q. Has the global economic downturn and recession affected Tempus?

A. Oh, yes. We had builders go from building 80 homes a year to 10, and most of our business is in new construction.

Q. And generally, what is the geographic region where Tempus does most of its business?

A. Basically, Naples to Brandon. West coast Florida. We do jobs -- almost every year, we'll do a job way outside our region. We do jobs in -- we've done jobs in the Bahamas, the Caymans, the Carolinas, Pennsylvania, Delaware.

It really -- we really get called in to do specific jobs from time to time remotely, but that's usually only one, maybe two jobs a year that are like that.

Q. Does that happen because of word of mouth or someone has a different house --

A. Usually -- usually, it's word of mouth or we've done a home in Florida for somebody, and they want us to do their home somewhere else.

It's has -- it's a trade organization, and local consumers don't really care about the trade organization.

Q. And based upon your experience in the industry, are there integrators and residential dealers who are not CEDIA members?

A. Yes.

Q. Do you have any understanding or estimate as to what proportion --

A. No.

Q. So it's possible to be an integrator and installer without being a member of CEDIA?

A. Yeah. It's a trade organization. Absolutely.

Q. In the area in which Tempus provides services and products, do you have an estimate as to how many other dealers or integrators there are that compete with Tempus?

A. Compete with Tempus? I'm probably going to give a number that's low, but I'm going to say a dozen.

Q. And in terms of size, whether it's personnel or annual revenues, you know, can you give me a range in terms of how big, small they are?

market to experience some growing pains and working out some technical difficulties?

MR. O'DONNELL: Objection; leading.

A. Yes.

BY MR. PARK:

Q. Have you seen other examples of that?

A. Control4.

THE COURT REPORTER: Control?

THE DEPONENT: Control4. The number 4.

BY MR. PARK:

Q. And can you describe what you observed with respect to Control4?

A. Control4 has been in business for approximately -- this is approximate -- 10 years. We were shown the Control4 product line in about the 2005, 2006 time frame.

It -- there were a lot of issues with the product at that time. They gave us a system to test in our labs. There were a lot of problems with the system, and today they're a 120 million dollar company. So they've been quite successful, but it's common in the control space. It's a very complex business. It's common for companies to have problems early on.

Q. And based upon your experience in the

Controls people. I don't recall him having another Savant person with him.

Q. Do you recall who from Clare Controls was present during that conversation that you had with Mr. Carroll at CEDIA?

A. I honestly do not.

Q. Would there be anything that might refresh your recollection as to who might be present?

A. I could ask. I mean, I know who was at the trade show. So it likely would be my marketing director or somebody of that level that was present during the conversation.

Q. And earlier you said that Mr. Carroll was upset during that conversation. Is that fair?

A. Yes. I don't know if he would characterize it upset, but he was disturbed maybe.

Q. How did that manifest in your conversation from your point of view during the conversation that you had with Mr. Carroll?

A. Could you ask that a different way?

Q. Sure. Why did you feel that he was disturbed?

A. Well, he asked me point-blank why he should allow Tempus to remain a Savant dealer when

we are building a company called Clare Controls.

Q. And what did you take from that comment? How did you understand that comment?

A. He was considering terminating Tempus.

Q. And did you take away anything from that comment as to the reason why Mr. Carroll might be considering terminating Tempus?

A. He felt Clare Controls was a competitive entity. I won't use the word "threat." It was a competitive entity to Savant.

Q. And as you sit here today, do you believe based upon your experience with Mr. Carroll that that had something to do with Tempus receiving the termination letter that is marked as Exhibit 2 to your deposition?

A. Yes.

Q. Why?

A. Jim's comments during the CEDIA discussion, the one- to two-minute conversation I had with him at O.J. Buigas's house and the explicit explanation I received from the outside sales rep, Orion Integrated Systems.

Q. Okay. Let me go back to the one- to two-minute conversation that you had with Mr. Carroll at the O.J. Buigas house. Can we

happen.

Secondly, there was a way for us to end the relationship but protect the consumer. That did not happen. So they put the projects -- they put the builders with whom these contracts -- the contracts with these jobs, one of the two jobs, was through a builder to us.

They put the consumer in jeopardy. They put the builder in jeopardy, and they put Tempus in jeopardy, but -- and if their final decision after a dialogue was to terminate our relationship, there was -- there was a much more graceful way to wind down the jobs and the commitments we had collectively made to these consumers.

Q. But according to your testimony, it seems like -- and correct me if I'm wrong, but Savant simply cut Tempus off?

A. With 10 days' notice.

Q. And what harm or damage, if any, did that cause Tempus or the builder or the consumer?

A. Well, when we -- very simple things. The programming tool was disabled. We no longer had access to the portal. So we had to contract third parties at extraordinary expense to program the

project.

Getting warranties -- and every manufacturer has problems. So I'm not painting Savant as a low quality manufacturer, but from time to time, manufacturers have problems. Crestron's had them. Savant had them, but they had significant problems with a couple of their products. I couldn't get them warranty serviced.

I had a hard time. I had to buy them through other dealers to replace them. I probably have 7 or $8,000 of these products sitting in a box that I can't get reimbursed for. Warranty, nothing. So -- and technical support was, of course, cut off.

So shortly -- to put -- it's hard to put your hands around it or quantify it, but we were basically just set adrift with a million and a half dollars in Savant projects under way with 10 days' notice, and I had to pay cash in advance for probably if I had to guess, the total purchase orders were in the order of a quarter of a million dollars.

Q. Now, you mentioned that you have some products that had suffered significant technical problems; is that correct?

Verizon and AT&T use, I consider Savant and Crestron to be much more similar to one another in the way that they deploy, the way you manage it, the way you handle the job site and the client.

This -- ours is more about we push an update automatically to the host controller. A new application appears in the iTunes store. They work automatically. Dealers don't have to roll trucks to the house to update firmware and things of that nature. So that -- those are some of the differences.

Q. Now, there have been other new players in the marketplace recently like BitWise Controls --

A. Uh-huh.

Q. -- and I guess it's Compass Control?

A. I don't know about that one.

Q. But I mean, how does BitWise Controls differ from Clare Controls or --

A. There's a category of products in the market whereby the brains of the operation are actually on the iPad, and then there are those where the iPad is simply a presentation device, and the brains are in a remote controller, a host controller.

So nearly all of your more advanced

systems use the latter format where the processing is done in a central host controller. Everybody from -- I say "advanced," but everybody -- those systems like BitWise border on glorified remote controls that happen to run on an iPad.

They're not really -- they're not really all home controllers. To do an all home control properly you really need to have a host controller.

So there are products like that out there. There's Elan that does use a host controller. There's Control4. There's -- there's a plethora of options in the market right now.

Q. And they -- do you run into -- does Tempus run into Elan and Control4 and others in competing for projects in this area?

A. Primarily we run into Control4.

Q. And how successful has Tempus been vis-à-vis --

A. Tempus or Clare Controls?

Q. Clare Controls.

A. How successful have they been?

Q. Yeah.

A. Well, the -- in my -- in my estimation, we've been quite successful, but you know, what

five-minute answer and the gory detail, the development team that worked with me in the '90s on the company I referred to earlier called Cheetah Technologies worked with me on contract nights and weekends.

And what we did is we -- we -- we identified a specific problem that we felt from my at that point eight or nine years experience in the market what problems the dealers were facing with the advent of the iPad and the expectations that customers were coming to us with.

You know, the 99 cent app download versus the $80,000 home control system was really becoming a significant selling obstacle. So we began to look at ways to deliver the Apple experience to home controls and automation and ways to make it more efficient and productive to deliver.

So in a sense, making the experience more friendly, more cost effective and making the efficiency -- improving the efficiency of the dealer were really the three core problems we set about to try to address and we spent about -- about eight months doing a lot of research.

We did a few prototypes and things of

Integrated.Com. Do you see that?
A. Yes, I do.
Q. And is that Scott Summers?
A. Yes, it is.
Q. And as you testified earlier, you've known Mr. Summers for some period of time; is that correct?
A. Yes, I have.
Q. Approximately how long have you known Mr. Summers?
A. Six to eight years.
Q. Now, is Mr. Summers still at Orion Integrated?
A. Yes.
Q. And have you spoken with him about Savant since the time of your termination?
A. Yes.
Q. And what have those discussions entailed?
A. When Savant gave us 10 days' notice and I had a million and a half dollars in projects going on, I had a near crisis on my hands, and I was working with Scott to try to get the orders placed on time, get the materials received.
When we had technical issues, Scott would help us. So Scott helped us through the process

in the automation control products, right?
A. There was -- weren't homes being built. Many builders went out of business in those days.
Q. Now, in terms of the pricing for controls and automation products that Tempus has purchased, has prices generally been stable or declined during the relevant time period?
A. Within a single manufacturer or --
Q. Right.
A. About the same. Been consistent. They have not come down.
Q. Has any manufacturer been able to raise prices during the time period from about 2007 to the present?
A. In the control systems space?
Q. Yes.
A. Not that I'm aware of.
Q. And to your understanding, has any manufacturer been able to artificially maintain higher prices than others in your opinion and experience?
MR. O'DONNELL: Objection.
A. I'm not aware of anybody in any industry that can do that. This industry is incredibly competitive. There's -- there's just too many

If you move one step up the channel into the relationship between the dealer and the manufacturer, the dealer's in a position where they have to offer the most competitive product at the most competitive price or they're going to go out of business, which is not unique to this industry.

And so they -- as a dealer, you do look for products that you can have a strong relationship with the manufacturer that you believe you can deliver that are effective and efficient and that are most importantly reliable.

And so the manufacturers that are able to deliver on those constructs are the manufacturers that succeed. I mean, I'm on the supply side and the dealer side. So I get that from both directions.

Q. In your experience and understanding, is there a price competition in the -- in the marketplace for various --

A. Is there price competition?

Q. Yes.

A. It's extreme.

Q. And has that price competition been present since 2007 to the present?

A. It's been worse because of the economy. The economy has made price competition between the dealer and the consumer or the dealer and the builder -- has made it more pervasive. So you know, the price competition is extraordinary.

Q. Has Tempus felt the effects of this extreme price competition during this time period 2007 to the present?

A. Without question.

Q. How has that been manifested or demonstrated?

A. Our average discount in 2008 prior was probably -- we rarely did discounts in excess of 5 percent. We -- we got to the point in the time period that you're describing where discounts were pushing into the 25 percent range.

We started looking at jobs less from a retail perspective at a discount and more from how much is each piece of material going to cost me, how much is labor going to cost, what margin do I need to make, what's my overhead, what margin do I need to make, et cetera, et cetera, et cetera.

So we did it cost up and if -- you know, that's more or less the way electricians estimate, but, you know, discounts were regularly running in

the 20, 25 percent range.

Q. And during that time period, did Tempus seek discounts off the product prices from manufacturers?

A. Very rarely. That's almost -- in my experience in one company, that is almost never done.

Q. Why is that?

A. This will come across negative to the manufacturing side of this marketplace. The general mentality across the board -- I'm not going to say Savant, Crestron or B&W Speakers -- is in markets that are quite lucrative, whether it be Miami, New York, Naples, there's a little bit of the mentality to make sure you have a lot of dogs in the fight. Dealers.

Q. I see.

A. So that if you've got five or six dealers representing your product, the margin compression comes out of the dealer channel, not out of the manufacturing side.

What you want to do is you want to make sure you win the job. One of your dealers wins the job and therefore, you get the business. So the -- only when the manufacturers are pit against

one another and the consumer is convinced that the two products are on par and that -- that -- that competition gets passed up the channel to the manufacturer, that's the only time discounts begin to become prevalent, but what tends to happen in the market is, somebody becomes wed to Crestron or Savant or Lutron.

And at the point the manufacturer knows or believes or feels they're a lock, their incentive to discount is absolutely zero.

Q. But there is competition in -- among the dealers, correct?

A. It's severe.

Q. And in terms of the price competition we talked about among the manufacturers, have you seen that manifested with respect to product prices in terms of list prices to dealers?

A. I haven't seen -- the best I can say is I know commodity prices have gone up. I have not seen a price increase from our major system suppliers in recent memory, number one, but I will -- I will amend my prior comment slightly by saying that when two manufacturers do know that they're competing with one another, they will address the market and -- and from time to time,

You can't look at Crestron or Savant and simply say, they're in the home automation business. They're not. They deliver -- they have -- they're in the lighting business, both of them are. Lighting control business.

Well, the largest lighting control manufacturer in the world is Lutron. Lutron is not going to stand by and let them run amok with pricing. Extron is not going to let them run amok with video switch pricing. So to look -- to look narrowly at the home control -- home automation space and say that you can some way control this is ignoring all of the market participants that participate in pieces of what these control systems companies participate in.

And Crestron integrates with Extron, Cramer, Atlona. So Crestron has to compete as does Savant, because they do the same thing, but you have to -- as Crestron. They have to complete not only to be the control systems supplier, but in each category they have competitors that bear -- that don't bear the name Savant, Control4 or AMX. They bear names like, as I said, Cramer, Atlona and Extron. You can't ignore those.

Q. So would it be fair to say what you're

saying is that the market dynamics in various product areas sort of would constrain pricing of the manufacturer?

MR. O'DONNELL: Objection.

A. Yes. For example, you cannot have an HDMI switch platform with an eight by eight, eight inputs and eight outputs, that's arbitrarily priced. The Crestron system is a very open platform.

So they can't come out with a video switch that's two-and-a-half times the price or twice the price or 50 percent more than a competitive product without a value proposition around that specific offering that merits the increase. They're just simply -- the market's just going to take care of that and -- and wipe it out.

Atlona has grown from a very small company to quite successful by entering the HDMI switch marketplace, and they're known as a credible alternative to Crestron switches within Crestron delivery, and we've done it. We've done it quite a bit.

Q. Now, you mentioned lighting controls. You, I take it, understand that recently Savant

A. Pardon me?
Q. Did you read it around the time it came out?
A. Probably, yeah. I mean, my marketing department e-mails me these things when they hit the press, and I look at them and delete them.
Q. And do you think that this is an accurate description of Clare Controls?
A. It's -- it's a little -- the media is hard to control. It's a little misleading. You know, what they're calling it as Mac & Cloud for the high end. The high end is on a system that starts at $3,000.
So it's high end relative to the reference to ADT. It's not high end in their reference to the home automation and control systems space. So I would say it's a little misleading, but other than that, it's relatively accurate.
Q. Well, is there an established definition of what high end means in the automation control space?
A. I don't believe there probably is. I think if you were to put three or four people in the room that were experienced in the industry,

you'd get some consistency, but not a -- it wouldn't be that explicit.

Q. And would it be fair to say that for each consumer, that what he or she may want in a system is highly variable?

A. No.

Q. Why do you say that?

A. When you really sit down and -- first of all, if you look at specific segments, I'll tell you the answer is -- in the sort of the mainstream consumer segment, it's very predictable.

The level at which they want to invest in the technology is variable, but there are only so many categories of things you can control in a home. There's only so much value you can subscribe to each one of those things.

Consumers are very predictable in terms of the things that they have an interest in. At the very high end of the market, all the same core requirements tend to exist.

They're just much larger, but then they get into a lot more -- that's where the variable from job to job does happen a lot more is when you go from, you know, a five million, 10 million, 15 million dollar house, you go house to house, they

A. It's a loaded host controller. Actually, I think it's $3,200. That's probably our most expensive product.
Q. In terms of controllers generally, in your experience on behalf of Tempus, what is the approximate price range for host controllers?
A. They can range from roughly $2,000. Well, actually, if you include Control4 -- you're talking about products that we've represented or in general?
Q. Just in general.
A. Oh. You can have controllers ranging from $500 to 6 or $7,000.
Q. How about in terms of products that you represent?
A. 2,000 to 7,000.
Q. Now you know, we -- we've talked about sort of your assessment as to sort of the typical configuration of a system.
A. Uh-huh.
Q. And we talked about lighting control and energy management, AV distribution, et cetera. Would it be fair to say that not all of those component products are usually from the same manufacturer or would that be incorrect?

A. It can be for larger suppliers and very, very small ones like us, if you're in that mainstream market that it can come from one supplier.

I mean, it was Savant's acquisition of Lite Touch that added a missing component to their product line. With Crestron, you could do audio distribution, heating and air-conditioning control, energy management, et cetera, audio/video and stay more or less within the Crestron product line. You could now largely do the same thing with Savant.

Q. What about Control4?

A. You can do the same thing with Control4.

Q. What about Niles or --

A. Not so much. The -- the larger -- your larger control systems companies -- and I would throw AMX in that category -- have -- and again, they're -- they're -- as I was describing earlier, if you go back eight or nine or ten years, control systems companies built control products.

There's a limit to how much you can generate in revenue in straight control, and they've added most of them -- what I call application products. Lighting, audio/video,

situations in where systems are mixed and matched with various components from different manufacturers, or is it typically folks try to stay with one manufacturer?

A. Different dealers will do it different ways. Generally speaking, just out of the sheer simplicity of the sale, it's easier to communicate a bill of materials from Savant or Crestron or Control4 than it is to say -- and this is residential.

In commercial, it's completely different, but in residential, residences -- residential buyers are more brand cognizant, or I should say they care more about brands than the commercial side does.

So there's a -- it's generally an easier sale to keep things consistent, but as you get into a competitive scenario, then you have to start getting creative about pulling out, you know, say, the switch and putting in an Altona switch, or you have to start getting creative with your budgets.

Q. And what would be considered a, quote, competitive scenario as you just referred to?

A. Oh, if the dealer's competing for a job

for Mr. and Mrs. Smith and they're either offering the same or different systems and the budget becomes a concern, then you've got to find ways to deliver the -- the same scope for a different number.

And if the particular features or functions of a -- say, the video switch are not relevant to that particular consumer or not important to them, I should say, then you take out switches and value engineering, as they say, which I hate.

Q. Why do you hate it?

A. It is an ungodly time consumer.

Q. Now, at any point did you review any documents in preparation for your deposition today?

A. The termination letter and the contract I produced for you.

Q. Anything else, sir?

A. No.

Q. And in preparation for your deposition today, did you talk with anyone?

A. No.

Q. And as we've already established, you -- you were not represented by counsel?

Second thing that they look at is, you know, can they -- what does the dealer base in my particular market segment look like. Am I going to be competing with nobody, one somebody or 10 somebodies? So it's a competitive landscape. Am I going to be able to use this product to differentiate my company in the eyes of the consumer?

And thirdly, and not necessarily in order of importance, but is a product going to be easy to sell. Does it have a compelling value proposition to the consumer? So am I going to be able to sell it? Am I going to be able to make money? What's the competitive landscape going to be, and is it going to be reliable? Can I keep the money in my pocket after its sold?

I would say those are probably the three things an average dealer, whether explicitly or implicitly, takes into consideration.

Q. Now we talked earlier about the fact that Tempus's sales declined for some period of time, correct?

A. Yes.

Q. Was that largely or primarily due to the economy or any other factors?

A. I would have to say it was largely the economy. We -- we were focused in a market segment in that category of, you know, a half million to two-and-a-half million dollar homes.

Probably -- when I say we were stretched between, you know, southern part of Tampa to Naples, up until 2008 about 80 percent of our revenue came out of Sarasota, Manatee County.

In that particular segment, you could see it stopping in 2007 and so we -- that's when we emphasized Naples was about that time, because that community is a different wealth spectrum than Sarasota is and is less affected by the overall economic downturn.

So -- but yeah. I mean, largely the economy drove us -- drove that and that segment we were in, that half a million to 1.5 million dollar segment, took this very severe hit in Sarasota, Manatee County.

Q. And in your opinion and experience, did that affect folks all up and down the distribution chain?

A. Yes.

Q. Were there particular players that were up and down the distribution chain that were

won't consume. I mean, there are a lot of factors that go into it, but reliability is probably the deal breaker.

Q. When you were first approached by a representative from Savant with respect to the Savant product, were you concerned about potential reliability of the Savant products?

A. Yes.

Q. And is --

A. May I extend to say --

Q. Sure.

A. -- not by experience. It was natural skepticism. I -- as I mentioned earlier, I spent a lot of years building complex products. I know what it takes to build a complex product.

I knew the frankly spectacular background of the founders of Savant that gave me some experience, but I'm a cautious person when it comes to things like that.

Q. And is that why you asked to see a Savant --

A. Yes.

Q. -- system up and running?

A. Yes, I did. Yes.

Q. I'm going to have marked as Exhibit 6 to

when you look at market segments, the appetite for a consumer moving into an $800,000 house for a 23 or $4,000 audio -- audio and video distribution switch is not very big.

Q. Uh-huh.

A. So it's really more about the market segment and the appropriate -- you know, why would we not build the kind of product that Savant and Crestron were likely to build because it's not our market. Our market doesn't buy those products.

Q. So you don't view Clare Controls as being in a high-end market?

A. No.

Q. You mentioned the term "high end" quite a few times. What do you mean by high end?

A. You know, it's funny. I read a lot of research, spent some money on it, and the term luxury market is -- ABI Research coins the term luxury markets.

They don't characterize the home value so much as the average system investment, and the number that they used in 2010 was in excess of $60,000 for an average system investment.

My experience in the last 10 years is technology going in homes -- and this is not

market research. This is simply looking at our several thousand jobs we've done and for those consumers that buy something and many buy nothing in new home construction, you'll range between 2 and 5 percent of the constructed cost of the home.

So if you're going to get into a $60,000 home, you know, that's a starting -- that's a starting price of, you know, a million to a million five, in that range. And then the ABI study, that was sort of the starting point of a luxury system.

Q. Uh-huh.

A. So I'm sure if you ask a different person, you get a very different answer.

Q. Sure. The 2 to 5 percent of the constructed cost for a -- this would be for home automation control?

A. And entertainment systems and televisions and security and networking. The whole composite, not just the Crestron, Savant piece.

Q. Uh-huh. And that would be 2 to 5 percent of these costs that would be at the cost from the manufacturer to the dealer, right?

A. No. That's retail.

Q. That's retail?

A. So if you had a 10 million dollar home, you could budget the home at retail for all the systems included, you're going to be in that two to $600,000 range.

Q. Uh-huh.

A. And you just knew it walking in. So you knew where to characterize or scope your proposals. Similarly, if you're in a two million dollar home, you know going in about where this homeowner is going to end up, if they're interested in anything.

Q. Uh-huh.

A. And there's exceptions to everything, of course, but the preponderance of customers lie in that window.

Q. For -- for the control and automation portion only, not counting, say, the televisions, the speakers, that kind of thing, what -- what would characterize this luxury market or high-end market as you used the term? What would be the price range to the dealer?

MR. PARK: Objection; calls for speculation.

A. That's -- I -- I -- I really -- I never track numbers like that. You know, again, if

Q. Uh-huh. Deal with integrators?
A. Yes.
Q. Okay. And throughout the United States?
A. And Canada.
Q. Okay. Now, you mentioned earlier that the Clare Controls products does have an audio distribution switch and that is -- that serves the function of a switcher for an audio, not -- not for video, but for audio; is that correct?
A. That's right.
Q. And the Savant systems switching system is through Crestron -- well, the Savant systems switching systems does handle audio distribution?
A. They do handle audio distribution.
Q. How does the software used in the Clare controller audio distribution system differ from the software used for the audio control portion in the Savant switching?
A. I'm trying to find a way to be succinct and specific. They really bear no resemblance. That's sort of my challenge. Could you be maybe a little more specific?
Q. Well, I'm asking you to compare the one to the other. The audio switching portions.
A. From an application perspective, they

demo system in our showroom.
Q. Uh-huh.
A. It's still sitting in the warehouse. We never turned it up because I didn't want them to have access to it.
Q. Uh-huh. But did Savant know this?
MR. PARK: Objection; calls for speculation.
A. But it was communicated to Scott.
BY MR. O'DONNELL:
Q. But you don't know if anyone at Savant directly was aware of this?
A. At Savant where?
Q. Directly. Savant headquarters?
A. No. I don't know that.
Q. Jim Carroll, Chuck Parrelli?
A. It's not the kind of -- not the kind of people that I -- I just didn't communicate with them very often or ever.
Q. So ultimately what it came down to is, you viewed Clare Controls as not a competitor to Savant, even though it was operating in a home control market because it was operating in a different segment --
A. Uh-huh.

Q. -- and Savant clearly had a very different view or at least they were concerned, right?

A. I would say they were concerned based on their behavior.

Q. And it ended up with an unfortunate misunderstanding?

MR. PARK: Objection; mischaracterization.

A. It ended up with a termination of our contract and exposing customer significant risk and with zero discussion between the two companies with how to resolve the problem in an amicable way.

BY MR. O'DONNELL:

Q. Uh-huh.

A. And it could have been the termination of -- of Tempus.

Q. Uh-huh.

A. And that could have been their decision. I'd rather it had been done in a more civil manner.

Q. Sure. If Savant had told you, say, at that September meeting with Mr. Carroll -- if Mr. Carroll had told you that they would not

MR. PARK: No further questions, sir.

MR. O'DONNELL: Thank you very much, Mr. Price.

THE VIDEOGRAPHER: This concludes today's deposition. We're going off the record at 2:08.

(A discussion was held off the record.)

THE COURT REPORTER: Martin, if this is ordered, did you want a copy?

MR. O'DONNELL: Yes.

THE COURT REPORTER: Are you going to order this?

MR. PARK: Yes.

(The reading and signing of this videotaped deposition is not waived, and the taking of this deposition was concluded at 2:14 p.m.)

EXHIBIT 595

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLORADO

Civil Action No. 1:10-cv-11622 (EFH)

DEPOSITION OF DAVID RAIFE

SAVANT SYSTEMS, LLC,

Plaintiff,

v.

CRESTRON ELECTRONICS, INC.,

Defendant.

PURSUANT to SUBPOENA and the Colorado Rules of Civil Procedure, the videotaped deposition of DAVID RAIFE was taken by the Defendant on February 8, 2013, taken at Residence Inn by Marriott Glenwood Springs, 125 Wulfsohn Road, Glenwood Springs, Colorado 81601, commencing at the hour of 9:34 a.m., before Barbara J. Gerbaz, Shorthand Reporter and Notary Public in and for the County of Pitkin, within and for the State of Colorado.

A. No. We differentiate ourself with service on our control systems.

Q. But you believe that you were qualified in your mind to be a dealer for Savant?

A. Absolutely.

Q. And what in your mind gave you the belief that you were qualified to be a Savant dealer?

A. I think we're qualified to be a dealer for any control system we have, at the time our programing department probably of six or seven very qualified people. And in the very beginning of Savant they reached out to us to become a dealer, and we were in hyper growth mode, so I wasn't able to go away to dealer conferences or things that they offered.

Q. You didn't want to divert your resources at that point in time, correct?

A. No.

Q. Would you say that the recession changed your mind a little bit?

A. Changed my mind?

Q. In terms of reaching out to Savant?

A. Possibly a little. Mainly just wanting to take care of our -- our clients.

Paragon Technology Group represent?
A. Crestron, AMX, Savant and Control 4.
Q. And I take it that for all those control brands, you and Paragon compete in the marketplace; is that correct?
A. Yes.
Q. And that there's competition between and among those brands, correct?
A. All of them, yes.
Q. And, in fact, for example, with Control 4, Mackie Electronic Systems is a robust competitor, correct?
A. Yes. We don't lead with Control 4. We picked it up as a line to service the clients that he didn't complete.
Q. But there are --
A. Yes, for every single brand.
Q. Now, at some point, is it true that you and Paragon tried to take over a project for Ambient Technologies and Chad Weuve?
A. Yes.
Q. And that was for the Teeta (ph.) residence; am I correct?
A. Yes.
Q. What happened in that regard?

Paragon Technology Group seek discounts from manufacturers off pricing in order to match up with bids for -- in -- in other competing dealers?

A. Of course. Yes.

Q. And I take it through the years you received discounts?

A. Yes.

Q. And I take it you've received discounts from Crestron?

A. Yes.

Q. Savant?

A. Not yet.

Q. Control 4?

A. Never asked.

Q. AMX?

A. Yes.

Q. So would you say that there's price competition for projects and products in -- in your marketplace, your area?

A. Yes.

Q. And that -- would you say that there's vigorous and aggressive price competition in your market?

A. More so than ever.

large. Their -- their goal is for the smaller systems which really doesn't fit with what we do.
Q. Have you seen Compass Control, like Key Digital?
A. Yes.
Q. And what do you think about their product?
A. Just not interested in it. Again, I think it's down market from where we want to be.
Q. Okay. What -- what are the upmarket products that you see in terms of control --
A. Crestron, AMX, Savant and Control 4.
Q. What about Elan g?
A. We never see it anywhere or compete against it, so.
Q. Any others, though, that are potentials?
A. I think those are the four.
Q. Now, in terms of the day-to-day competition that you see as the president of Paragon, how does that work? And what I'm asking, on a day-to-day basis, how do you compete for a project for -- or bid on a particular project?

upon your experience in the industry, did you come to any opinion or belief as to why that was occurring at that particular point in time?

A. I mean, we -- we saw some of it happening with architects prior to that time. They're the tip of the spear, so it was very exciting for the rest of us. And in Aspen in particular, clients were starting to spend more time there, which always leads to, you know, doing projects.

Q. So based upon your testimony right now in terms of your seeing this uptick with respect to all control brands, I take it then, then sort of the output of control products is expanding in -- in your marketplace?

A. Yes.

Q. And do you see that growth continuing, in your opinion and belief, based upon what you see now?

A. Yes.

Q. And is that tied to new housing or -- or construction in any way?

MR. JACOBS: Objection; compound, vague and ambiguous.

THE DEPONENT: I see it as new

A. The electricians installed it on those projects. Lighting is a shrinking part of our business right now. So the electricians are -- we can't compete with their pricing.

Q. What would you say would be the growing part of your business?

A. Shades and security.

Q. Now, in your 16 years with Paragon Technology Group, have you seen prod -- prices for products of homogenization of control products rise, stay stable or decline over that period of time?

MR. JACOBS: Objection; vague and ambiguous.

THE DEPONENT: The only increases would be new products. So taking the category up a level. Everything else, other than touch panels, seems to stay the same. Obviously touch panels have dropped since the iPad came out.

BY MR. PARK:

Q. Right. But typically, say, for example, a control processor, once it's introduced, manufacturers raise the price; is that right?

what?
A. It's a bigger factor in the decision than service in many cases.
Q. And has that always been the case or is that just a recent trend?
A. I don't know. It depends. I think it's always been the case for certain types of projects, our clients.
Q. And in the recent year or so, have you all not won product -- projects based upon the pricing?
A. Yes.
Q. And to whom have you lost those projects to?
A. Thul, Harrison Home Systems, ESC, Low Voltage Experts, Mackie. Trying to think. Conundrum, Artistic Systems, Media Ranch. I don't know, 12 more.
Q. Well, and let me ask you this: What control systems have been at issue with those pro -- projects?
A. AMX, Crestron, Savant and Control 4.
Q. So the whole --
A. Yeah.
Q. -- gamut?

A. Yeah.
Q. In those instances, you were not able to meet the price point that other dealers were able to meet?
A. Correct.
Q. And is that a function of higher labor costs on your end?
A. It's higher labor costs, more services offered, a properly engineered system that has everything in it to be a working system.
Q. And when you say all the products properly engineered to be a working system, can you explain that? Exactly what do you mean by that?
A. Our proposals are complete for a working system. So everything is in there for it to function properly, where we've seen or heard about -- you know, you can poke holes in other people's proposals when they're missing things like amplifiers or a control processor we've seen, you know. So that's the system. Of course it's less expensive when it's missing expensive pieces of hardware in addition to the cheaper labor.
Q. So you've seen proposals where people

distribution, correct?
A. Uh-huh.
Q. Yes?
A. Yes.
Q. And we talked also about security and energy management, correct?
A. Yes.
Q. Now, the bulk of the cost in any security system, where does that actually come from in terms of products?
MR. JACOBS: Objection; vague and ambiguous.
THE DEPONENT: It's different from project to project.
BY MR. PARK:
Q. Okay. Could you explain that?
A. The home has a home theater. That's usually the majority of the budget. Some homes barely have any audio video while they have a ton of shades for their big windows, so. A client from Mexico City, security could be the biggest portion of -- of the project. So it really varies from project to project.
Q. So it's variable depending upon the client's objectives and needs?

A. Yes.
Q. So I take it there's no rule of thumb in terms of how much a particular product set will cost, whether the control portion or the security system or the AV distribution switcher system?
A. There's nothing typical.
Q. I take it there's a wide range of, you know, costs across the various subsystem; is that fair, sir?
A. Yes, it is.
Q. Now, in terms of a high-end system, what would you consider a high-end system?
A. A fully integrated home with a home theater is typically --
Q. I'm sorry?
A. Is typically a high-end system. So the integration of all the low-voltage systems plus a home theater is what I consider high-end quality products.
Q. And would it be fair to say that your definition of high end might be different from another person's definition of high end?
A. Of course. Yeah.
Q. And in the -- in -- in the industry,

A. Yeah.
Q. Do you think that there might also be a -- a dollar value factor?
A. Yes.
Q. Okay. What sort of factor would that be?
A. I don't know, but you have to pay for quality or larger scope and more services. So you mean a bottom number?
Q. Well, I -- I assume there's no sort of top number you can --
A. Yeah.
Q. -- keep on spending until you run out of cash, I assume. But, yeah, let's see -- can you think of a bottom number?
MR. PARK: Objection; calls for speculation.
THE DEPONENT: No, because it depends on the size of a place. So maybe take a 5,000-square foot house, to have all these systems with high-end services and finishes and components, you know, I think $200,000 and above is a fairly high-end system for a house that size.

A. Correct.

Q. And it persisted until just last summer?

A. Correct.

MR. PARK: No further questions.

MR. JACOBS: I'm done.

THE DEPONENT: Sweet.

THE VIDEOGRAPHER: This will be the end of tape number three and the conclusion of the deposition of David Raife on February 8, 2013. We're off the record. The time is 12:49 p.m.

(The deposition concluded at the hour of 12:49 p.m.

EXHIBIT 596

This document is being provided for the exclusive use of MATTHEW ARPANO at SILVERCREST ASSET MGT GROUP LLC

RAYMOND JAMES®

U.S. Research
Published by Raymond James & Associates

# Control4 Corporation

August 27, 2013

(CTRL:NASDAQ)

Initiation of Coverage: Revised

**Tavis C. McCourt,** CFA, (615) 665-3644, Tavis.McCourt@RaymondJames.com
**Daniel Toomey,** CFA, Sr. Res. Assoc., (615) 665-3864, Daniel.Toomey@RaymondJames.com

**Communications Technology: Mobile Devices**

## Initiating Coverage of Smart Home Innovator With Outperform Rating

**Recommendation:** We are initiating coverage on Control4 Corporation with an **Outperform** rating and a $24 target price following its recent initial public offering. After more than 10 years of product development, we view Control4 as one of a few technology vendors in the "smart home" market well-positioned to serve homeowners looking to connect, automate, and control all of the electrical products/systems in their lives.

- **Here comes the smart home:** Control4 has disrupted the sleepy luxury world of home automation, which has been dominated by very expensive solutions for the last 30 years, by introducing a low cost controller that is simple to install, program, and service. Together with a significant marketing push by service providers looking to add additional revenue streams, home automation is becoming increasingly mainstream, and morphing into a concept called the "smart home." Home automation vendors such as Control 4 sit at the epicenter of this smart home concept, which serves as a meaningful disruption to the consumer electronics and home appliance industries.
- **Major opportunity, potentially fierce competition:** As one of the lowest priced hardware options in the market and the ability to interoperate with more than 6,500 existing third party devices, Control4 is well-positioned to become the platform of choice in the rapidly expanding home automation or smart home market. However, it faces significant and well-funded competition from traditional home automation vendors, service providers, and potential encroachment from the larger tech companies and home appliance/consumer electronics manufacturers.
- **Ten years of investment in technology, now scale economies drive profits:** Founded in 2003, the company has spent the last 10 years singularly focused on perfecting the operating system and supporting technology. Now with the IPO in the rearview mirror the company can focus on attacking the open ended opportunity of making home automation standard in high end homes, while shareholders should benefit from the company's increased scale and operating leverage, which should allow it to grow EPS at a very high rate for the next several years.
- **Estimates:** We are currently estimating 2013/2014/2015 non-GAAP EPS for Control4 of $0.28/$0.46/$0.75, respectively.

**Valuation:** We are initiating coverage with an **Outperform** rating and $24 price target, which equates to an EV/LQA (last quarter annualized) revenue multiple of 4.0x on 2013E. Given its growth rates relative to peers, outlined on page 28, we believe 4.0x is a reasonable EV/LQA revenue, which is still a 42% discount to the few other publicly traded technology vendors with 30% or more expected EPS growth in 2013 and 2014.

| Non-GAAP EPS | Q1 Mar | Q2 Jun | Q3 Sep | Q4 Dec | Full Year | GAAP EPS Full Year | Revenues (mil.) |
|---|---|---|---|---|---|---|---|
| 2012A | $(0.08) | $0.04 | $0.05 | $0.13 | $0.15 | $(0.18) | $110 |
| 2013E | (0.02)A | 0.08 | 0.09 | 0.12 | 0.28 | 0.10 | 129 |
| 2014E | (0.01) | 0.11 | 0.15 | 0.20 | 0.46 | 0.33 | 151 |
| 2015E | UR | UR | UR | UR | 0.75 | 0.62 | 176 |

Rows may not add due to rounding. Non-GAAP EPS excludes stock-based compensation expense. Initial public offering within last 12 months; trailing 12-month share price figures represent range since that time.

**Rating**

Outperform 2

**Current and Target Price**

| | |
|---|---|
| Current Price (Aug-23-13) | $21.78 |
| Target Price: | $24.00 |
| 52-Week Range | $23.40 - $18.14 |
| Suitability | High Risk |

**Market Data**

| | |
|---|---|
| Shares Out. (mil.) | 25.7 |
| Market Cap. (mil.) | $560 |
| Avg. Daily Vol. (10 day) | 87,854 |
| Dividend/Yield | $0.00/0.0% |
| Book Value (Mar-13) | -$4.76 |
| LT Debt (mil.)/% Cap. | NM |

**Earnings & Valuation Metrics**

| | 2012A | 2013E | 2014E | 2015E |
|---|---|---|---|---|
| P/E Ratios (Non-GAAP) | NM | 77.8x | 47.3x | 29.0x |
| EBITDA (mil.) | $2 | $9 | $15 | $22 |

**Company Description**

Control4, headquartered in Salt Lake City, Utah, is a leading vendor of home automation software and products globally. The company sells controllers, software, tablets, lighting systems, thermostats, and other products needed to allow consumers to automate and control almost any electrical device in their home.




Source: Thomson Reuters.

**Please read domestic and foreign disclosure/risk information beginning on page 39 and Analyst Certification on page 39.**

© 2013 Raymond James & Associates, Inc., member New York Stock Exchange/SIPC. All rights reserved.

This document is being provided for the exclusive use of MATTHEW ARPANO at SILVERCREST ASSET MGT GROUP LLC



# Industry Overview & Outlook

## Historical Backdrop and Market Segmentation

The home automation industry has been around for more than 40 years with the advent of Crestron in the late 1960s followed by AMX in the early 1980s. For most of that time, it remained very small niche industry serving primarily very high end luxury homes. Given the cost of home automation solutions from these two providers, market growth remained limited for many years. In the past 10 years, with the addition of Control4 and other lower cost providers, including Savant, Elan URC and several service providers, among others, the market has begun to expand significantly, finally beginning to reach broader mainstream adoption.

**Subdivisions of Home Automation Industry**




Source: Control4 and Raymond James research.

As shown in the graphic above, the industry can be sub-divided into four groups, luxury, mainstream, point products and managed services. Though historically, the luxury portion of the market has dominated both units and revenues over the years, due to mass market adoption, the vast majority of the growth over the next several years is expected to take place at lower price points near the bottom of the pyramid above.


© 2013 Raymond James & Associates, Inc., member New York Stock Exchange/SIPC. All rights reserved.
International Headquarters: The Raymond James Financial Center | 880 Carillon Parkway | St. Petersburg, Florida 33716 | 800-248-8863

EXHIBIT 597

**Restricted Confidential**
**Outside Counsel Only**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| **SAVANT SYSTEMS LLC,**<br>**Plaintiff,**<br>**v.**<br><br>**CRESTRON ELECTRONICS, INC.,**<br>**Defendant**<br><br>**CRESTRON ELECTRONICS, INC.,**<br>**Counterclaim-Plaintiff**<br>**v.**<br><br>**SAVANT SYSTEMS LLC,**<br>**Counterclaim-Defendant** | ) | **Civil Action**<br>**No. 10-CV-11622 MLW**<br>**Hon. Mark L. Wolf** |

**<u>REBUTTAL EXPERT REPORT OF DR. ANDREW S. JOSKOW</u>**

**May 2, 2014**

correctly and, as a result, his conclusions regarding the extent of competition are flawed. In short, Professor Elhauge makes the fundamental error of focusing on *firms* as a starting point for defining the product market instead of focusing on the *product* as a starting point. This is not mere semantics, as starting with firms leads to conclusions that do not show the full extent of competition in a market. This is what has occurred in the case of Professor Elhauge's analysis.

22. I agree with Professor Elhauge that the *DOJ/TC Horizontal Merger Guidelines* ("*Merger Guidelines*") provide the proper basis for defining product markets.[18] I use the methodology for product market definition that is in the *Merger Guidelines*, as I have done in other antitrust matters, both at the Department of Justice and at NERA, and that is the accepted methodology among antitrust practitioners.

## A. Professor Elhauge has Not Performed the Product Market Definition Exercise Correctly

23. The exercise of defining a product market is about analyzing demand substitution by customers between one product and another.[19] Only after the product market has been defined would the firms producing the products within that market be determined. The next step would then be to calculate the market shares that should be attributed to each of the firms in the product market.[20]

24. Professor Elhauge purports to look at demand-side product substitution[21] by looking at products that are "the closest substitutes to a Crestron high-end system" – i.e., those "products that provide the most similar functionality at similar price levels."[22] However, this is not what Professor Elhauge actually does. He does not study the universe of residential home automation products that are reasonably interchangeable with Crestron's residential home automation products. He excludes Crestron's Adagio and Prodigy products as "low-end" although he offers no evidence to suggest that these products are not sold against Savant's products (which he identifies as all "high-end").[23]

25. Instead of studying which non-Crestron products are reasonably interchangeable with Crestron's residential home automation products, he looks first at which *firms* he

---

[18] U.S. Department of Justice and the Federal Trade Commission, *Horizontal Merger Guidelines*, August 19, 2010 ("Merger Guidelines").

[19] *Merger Guidelines*, Section 4 ("Market definition focuses solely on demand substitution factors, i.e., on customers' ability and willingness to substitute away from one product to another in response to a price increase or a corresponding non-price change such as a reduction in product quality or service. The responsive actions of suppliers are also important in competitive analysis. They are considered in these Guidelines in the sections addressing the identification of market participants, the measurement of market shares, the analysis of competitive effects, and entry").

[20] This discussion assumes a geographic market has already been determined.

[21] Elhauge Report, ¶29.

[22] Elhauge Report, ¶36.

[23] Elhauge Report, ¶34.

63. Further, consistent with my discussion above that Professor Elhauge's market definition is too narrow, and that components used in what he characterizes as "low-end" systems are substituted for components used in "high-end" systems, using Professor Elhauge's data I have calculated market shares in a broader market that includes all of these components, including lighting which is part of "high-end" systems. I have conservatively excluded the sales of home automation products from companies other than AMX, Control4, Crestron, Elan, HAI, and Savant because these are the only firms for which data are available. See **Exhibit 7**.[76] As a result, **Exhibit 7** overstates the shares of the listed firms because it excludes revenues for other firms, such as Lutron, that also sell home automation components in the U.S. and Canada.

**Exhibit 7. Residential Home Automation Market Shares in the U.S. and Canada**




[76] This includes all of Crestron's revenues for all products (i.e., lighting, shades, Adagio, and Prodigy) and all of Savant's revenues, including lighting. Similarly, it includes all residential revenues in the U.S. and Canada for Control4, Elan, and HAI (note that HAI revenues are limited to the U.S.).

64. As is readily apparent from **Exhibits 6 and 7** above, Crestron's share in either a narrow market or a broader market has been declining over time, and it has fallen below 50% in the broader market (**Exhibit 7**). By comparison, both Control4's and Savant's shares have grown over this same time period. These market shares support the conclusion that Crestron does not possess monopoly power. I discuss this evidence and other indicators that point to the absence of monopoly power in the next section.

## VIII. MONOPOLY POWER

65. Savant claims that Crestron has the "power to raise prices that Crestron charges to dealers substantially above competitive levels."[77] However, Professor Elhauge provides no evidence that Crestron had the power to control prices. In fact, Professor Elhauge does not study the actual prices charged by Crestron or Savant for any of the products in his product market. To address whether Crestron has monopoly power, I first look at both Crestron's and Savant's prices over time for what Savant calls "high-end" products.

66. **Exhibits 8 through 10** show Crestron's and Savant's annual average prices for what Professor Elhauge classifies as "high-end" products. I have looked at the annual average prices for three product categories: Audio-Visual Components and Controllers, Non-Audio-Visual Controllers and Host Controllers, and Touch Panels.[78]

[77] Amended Complaint, ¶18.

[78] Consistent with Professor Elhauge's product market definition, annual average prices for Crestron exclude Prodigy, Adagio, lighting, and shading products, while the annual average prices for Savant exclude lighting. Average prices for 2007 are based on data for July through December, while average prices for 2013 are based on data for January through September.

**Exhibit 8. Crestron and Savant Annual Average Prices for Professor Elhauge's "High-End" Audio/Video Components and Audio/Video Controllers**




**Exhibit 9. Crestron and Savant Annual Average Prices for Professor Elhauge's "High-End" Non-A/V Controllers and Host Controllers**



**Exhibit 10. Crestron and Savant Annual Average Prices for Professor Elhauge's "High-End" Touch Panels**




67. On average, Savant's prices for Audio/Video Components and Audio/Video Controllers – **Exhibit 8** – were twice as high as Crestron's prices for comparable products. Savant's prices for other, Non-Audio/Video Controllers and Host Controllers (**Exhibit 9**) were 8% *higher* on average than Crestron's prices prior to 2011 and 10% higher in 2012. For Touch Panels (**Exhibit 10**), Savant's prices were almost 15% higher than Crestron's prices until the introduction of the iPad in 2010.[79]

68. Savant claims to have developed "user-friendly and reliable control and automation components" and that it was able to "provide such systems at a price significantly less than heretofore obtainable."[80] However, **Exhibits 8 through 10** show that the prices charged by Crestron were *lower* than the prices charged by Savant at the time Savant entered in 2008 and beyond. For Audio/Video Components and Audio/Video Controllers in Professor Elhauge's product market, Crestron's prices were systematically and consistently *lower* than the prices charged by Savant. Furthermore, between July 2007 and September 2013 Crestron's prices for products in all three categories decreased, on average, by 35%.

---

[79] This breakdown of products is consistent with documents prepared by Crestron and Savant in the ordinary course that compare Savant's and Crestron's prices for certain audio/video components and controllers, touch panels, and non-audio/video controllers and host controllers. See, for example, 886_003482-3501; 886_0002458-2459; SAVANT0170232; Crestron0001677-79; and Crestron0002800-01.

[80] Amended Complaint, ¶6.

**Restricted Confidential**
**Outside Counsel Only**

69. Instead of looking at prices, Professor Elhauge points to "differences" in Crestron's and Savant's U.S. gross margins as evidence of Crestron's monopoly power. Professor Elhauge argues that Crestron's margins always exceeded 53%, while Savant's margins "have never exceeded 48%."[81] Looking at Professor Elhauge's supporting documentation for his 48% Savant margin[82] shows that Savant's margin *did* exceed 48%. In 2011, 2012, and 2013 Savant's margins were *higher* than 48%. In fact, in 2012 both Crestron's and Savant's gross margins totaled 54%.[83] See **Exhibit 11**. Professor Elhauge's conclusions are contrary to the own data on which he relies and cites in support of those conclusions.[84] Furthermore, Savant's gross margins were similar to those reported by Control4 over the same time period.[85]

**Exhibit 11. Savant's U.S. Gross Margins Based on Cost of Goods Sold (COGs)[86]**

| Year *(year)* (a) | Savant Revenue *(actual_revenue)* (b) | Savant Cost of Goods Sold *(cogs)* (c) | Savant Profits *(profits)* (d) (b)-(c) | Savant Gross Margin *(n.a.)* (e) (d)/(b) |
|---|---|---|---|---|
| 2008 | $ 1,065,341 | $ 769,997 | $ 295,344 | 28% |
| 2009 | 4,487,803 | 2,792,018 | 1,695,784 | 38% |
| 2010 | 10,424,591 | 6,373,063 | 4,051,528 | 39% |
| 2011 | 18,646,884 | 9,283,823 | 9,363,061 | 50% |
| 2012 | 26,379,946 | 12,161,846 | 14,200,000 | 54% |
| 2013 | 24,798,166 | 12,593,232 | 12,200,000 | 49% |

[81] Elhauge Report, ¶89.

[82] Elhauge Report, Footnote 112, "48 total incremental costs.csv."

[83] Elhauge Report, Footnote 111 "16 Crestron Gross Profit Margins.xlsx."

[84] Professor Elhauge's gross profit calculation for Savant in ¶89 is based on his measure of total incremental costs that he employs in his damages calculation (Elhauge Table 6). Professor Elhauge's incremental cost includes the cost of goods sold (COGs), as well as additional incremental costs that Professor Elhauge has identified as variable costs that change as the quantity manufactured/sold changes. Unfortunately, Professor Elhauge is comparing that margin for Savant to a much simpler margin calculated for Crestron that is based on COGs *only*. Generating Savant's margin using the same definition, contradicts Professor Elhauge's argument in ¶89. To do the comparison he would like, he must define both margins on an equivalent basis.

[85] Control4 Investor Overview, February 2014, Slide 19 available at http://files.shareholder.com/downloads/AMDA-1X1NEN/2975493988x0x726585/578663f4-76ea-4bbf-b57e-0a2225acef29/CTRL%20Investor%20Overview%20Feb-14-14%20Final.pdf and accessed on April 3, 2014.

[86] Professor Elhauge's variable names are included in the column titles (inside parentheses and in italics). This table is based on Professor Elhauge's "48 total incremental costs.csv" produced in support of his Expert Report.

anticompetitive harm …"[159] Yet, as I have shown in **Exhibit 12** above, a modified calculation of Professor Elhauge's notion of "restricted shares" based on evidence related to dealers that Savant claims are restricted shows a *small* share of the market that is *potentially* restricted. This result is consistent with the growth that has been shown by Savant and other firms.

116. A core feature of any argument regarding the competitive effects of "foreclosure" is that the alleged behavior (in this case, exclusive dealing) has impaired the efficiency of rivals to such an extent that they are deprived of economies of scale. As a theoretical matter, being forced to operate below efficient scale could force the rival to operate at a higher cost, making it a less effective competitor, ultimately reducing competition and consumer welfare.

117. Professor Elhauge states that as a result of Crestron's alleged "exclusive dealing" Savant was unable to achieve economies of scale in production.[160] But Professor Elhauge provides *no* evidence that Savant has been deprived of economies of scale as a result of Crestron's behavior. Professor Elhauge only provides a data anecdote that indicates that Savant might experience economies of scale through volume purchases. Professor Elhauge uses an example of a stereo preamplifier output module that Savant purchased from CTS to support his point regarding economies of scale. He argues that if Savant's sales had been 1.23 times higher in the but-for world, Savant would have paid 12% less for this product.[161]

118. Whether this example is correct or not, it does not show that Savant has been deprived of economies of scale. Professor Elhauge shows no connection between his restricted share calculation and a reduction in the efficiency of Savant or other rivals. Moreover, given that I have calculated that the restricted share of the market is so low, Savant's economies of scale could not be so high as to have had its efficiency impaired. As a result, the argument that there are anticompetitive effects as a result Crestron's behavior collapses entirely.[162]

Andrew Joskow
May 2, 2014

[159] Elhauge Report, ¶140.

[160] Elhauge Report, ¶¶150-152.

[161] Elhauge Report, ¶151.

[162] In addition to economies of scale in purchasing and production, Professor Elhauge provides a theoretical discussion of other anticompetitive effects of "exclusive dealing," such as: reduced R&D expenditures; reduced efficiency in sales force; and the inability of rivals to expand. In those cases as well, Professor Elhauge established no link between a loss in Savant's efficiency and Crestron's behavior.

EXHIBIT 598

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| SAVANT SYSTEMS, LLC<br>Plaintiff<br><br>v.<br><br>CRESTRON ELECTRONIC, INC,<br>Defendant. | ) | Civil Action<br><br>No. 10-CV-11622 MLW<br>Hon. Mark L. Wolf |
| CRESTRON ELECTRONICS, INC.,<br>Counterclaim- Plaintiff,<br><br>v.<br><br>SAVANT SYSTEMS, LLC,<br>Counterclaim- Defendant | ) | **REBUTTAL EXPERT REPORT OF TRICIA PARKS, REVISED ON MAY 21, 2014 TO INSERT ADDITIONAL FACT CITATIONS AT REQUEST OF SAVANT'S COUNSEL** |

Originally submitted May 2nd 2014, resubmitted at request of Savant counsel May 21, 2014

Tricia Parks

Tricia Parks

directing the system integrator for any but the most expensive and complex system installations. In ¶22, Mr. Kippycash notes that project bidders must usually provide confirmation of their experience and references for the specific type of project being bid as well as proof of their financial health. I agree with this statement. The volume and the extent of references often relates to the size of the project, but nearly all buyers preparing to select an integrator for this type of project require proof of competency through references.

**15.** Manufacturers themselves seek proof of expertise and financial health before allowing a dealer to sell their products.

**16.** In ¶23, Mr. Kippycash states his view that Crestron dominated the high-end whole-house automation system marketplace in 2006-2008. He uses a statement I wrote in a 2007 report as his evidence. In ¶69-¶70, Professor Elhauge similarly asserts that "Crestron has had a dominant share in the high-end systems market from January 2007 to the present." Among his sources, in ¶75, Professor Elhauge takes one sentence – the same sentence relied on by Mr. Kippycash – from the 2007 report I wrote. The sentence reads: "Today [2007], Crestron holds 80% of the unit high end custom whole house controller sales with AMX at about 20%." Both Mr. Kippycash and Professor Elhauge have taken what I wrote out of context. First, my exact words were for the CUSTOM (one-off and unique) high-end home automation controller marketplace, not for the entire high-end home automation marketplace. Second, the year my report discussed was 2006 and no other year. When I wrote my report in 2007, I did not report that Crestron had held a dominant market share in the high-end home systems industry forever or that it will hold that position in the future. I reported that at the specific time (2006, reported in 2007), Crestron and AMX, two long-time competitors, had recently shifted shares. Finally, I stated the cause of that imbalance was poor AMX decision making. Parks Associates forecasts and separates the high-end system marketplace into whole-house

EXHIBIT 600

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CASE NO: 10-CV-11622-EFH

SAVANT SYSTEMS, LLC, )
)
Plaintiff, )
)
vs. )
)
CRESTRON ELECTRONICS, INC., )
)
Defendant. )
_________________________________/ )
)

VIDEOTAPED DEPOSITION OF
SEAN RIORDAN

RESTRICTED CONFIDENTIAL

TAKEN ON BEHALF OF
THE Plaintiff

WEDNESDAY, SEPTEMBER 12, 2012

9:31 a.m. - 11:51 a.m.

515 EAST LAS OLAS BOULEVARD
FORT LAUDERDALE, FLORIDA 33301

Gary F. Monzillo, RPR-CP

make?
A. They make automation systems, lighting systems, drapes and blind systems, amplifiers, preamplifiers, touch screen controls, keypad controls. Pretty much anything that you want to try to automate they have a system for.
Q. Are there any other automation control products that you carry other than Crestron?
A. Entry level. We do some lines of universal remote controls.
Q. How would you distinguish those from Crestron?
A. As an analogy?
Q. However is easiest for you.
A. One is a bicycle, and the other one is a BMW.
Q. Do you have anything between the bicycle and the BMW?
A. Crestron now covers that.
Q. So is Crestron --
Other than the entry level universal remotes, are there any other automation and control systems that you carry?
A. No.
Q. Did you previously carry other

repeat business?
A. We have a lot of refit business, which is when boats get sold the new owner may be much different from the other owner and would like more or less or updates. But we've held on to some of our clients for well over 20 years.
Q. What percentage of your work would you say is refitting?
A. Ten percent.
Q. In your experience, do Crestron clients usually reinstall Crestron products?
A. Uh-huh, yes.
Q. Have you ever had clients ask for different sorts of products? If they have a Crestron system, have they ever asked about other control systems?
A. Yes.
Q. Can you think of some examples?
A. Specific vessels?
Q. Yes.
A. No. But it has occurred.
Q. Do you recall what systems these people ask for?
A. They asked if there were alternatives.
Q. What did you tell them?

A. I told them the three companies that I felt were building quality control systems.
Q. Which three companies are those?
A. Crestron, AMX, and Savant.
Q. Can you think of a particular instance when you did this?
A. No.
Q. Do you know when approximately was the last time you had this sort of conversation?
A. Six months ago, seven months ago.
Q. What did the client decide to do?
MR. KAVANAGH: Objection to form.
MR. JACOBS: That's actually a good objection.
Q. (BY MR. JACOBS) Do you --
MR. KAVANAGH: Thank you.
MR. JACOBS: You're welcome.
Q. (BY MR. JACOBS) What do you recall about this individual? Was this person an existing client of yours?
MR. KAVANAGH: Objection to form.
A. No.
Q. (BY MR. JACOBS) You said no?
A. No.
Q. How did this person find you?

ever discussed Savant with you?
A. Oh, sure.
Q. Did anyone from Crestron ever tell you that you shouldn't carry Savant products?
A. Yes.
Q. Who told you that?
A. Will Knapp.
Q. Will Knapp?
A. Yes.
Q. How do you spell his last name?
A. K-N-A-P-P.
Q. What did Mr. Knapp tell you?
A. Mr. Knapp post the boat show visited my office and said, "You kind of got to make a decision. You can support us and continue, or you're going to be a Savant dealer and support Savant."
Q. So this was immediately after the boat show?
A. Within a month or so.
Q. We're talking about the boat show in mid-2008?
MR. KAVANAGH: Objection to form.
A. I don't remember whether it was '07 or '08.

Q. (BY MR. JACOBS) What was your reaction to Mr. Knapp's ultimatum?

MR. KAVANAGH: Objection to form.

A. I told him I'd consider it.

Q. (BY MR. JACOBS) Did you consider it?

A. Yes.

Q. What was your decision?

A. To stay with Crestron.

Q. When did you make that decision?

A. Month or so afterwards.

Q. Why did you decide to stick with Crestron?

A. There was numerous reasons. Longevity with a company which allows me to have direct access to people I need to speak to when we engineer the product, when we have problems with the product. A broader scope of components that were fitting our needs on the vessel.

I had already established training and employees based on Crestron programming and installation techniques, and I had in due process at that juncture vessels of different stages of construction that were to receive or already had Crestron being implemented or in the future being implemented.

A. When you find something that works and you find something that works well and is stable and is accepted in the industry as a leader, if you put the salesman hat on it's an easier sell than try to sell them on something that does not have that recognition as the leader in the industry. And that's probably why.

Q. (BY MR. JACOBS) Outside of what Mr. Knapp said, did you personally believe there was any conflict in carrying both Savant and Crestron products?

MR. KAVANAGH: Objection to form.

A. Where Savant was at that point and where Crestron was at that point, no.

Q. (BY MR. JACOBS) So there was no conflict in carrying both?

A. Bicycle/BMW, it was a little bit more of a bicycle with a small motor on it at that juncture.

Q. Continuing the analogy, where would you say Savant is today?

A. I don't know.

Q. Would you say it's a Camry?

A. I don't know. Where our --

Our projects move. We really, really

my vendors, and a decision had to have been made and I made the decision and I supported it.

Q. The decision was made that you had to support Crestron?

A. The edict was asked, "Are you going to be a supporting dealer of Savant, or are you going to be a supporting dealer of Crestron?" And I took some time to consider it, and the decision was made that we would stay with Crestron.

Q. But for that edict, would there have been any harm to your company to have continued carrying both Crestron and Savant?

A. No.

Q. So is it fair to say that the reason you decided to stop carrying Savant was because of this edict from Mr. Knapp?

MR. KAVANAGH: Objection to form.

A. You need to clarify carrying and purchasing and implementing, because it wasn't at that stage yet. It was still a system at the boat show that didn't work, to the point where my van got towed away at 4:00 o'clock in the morning because these guys were still at it.

I had written a proposal and went down both paths, but we weren't carrying Savant at that

time. There was no proposal that was signed that was agreed to for us to implement Savant products. The only thing we had was a demo system that we had put together for the boat show.

So, when you define us being a Savant dealer, we were not quite there as far as a dealer yet. We were still just tiptoeing with them; you know?

Q. (BY MR. JACOBS) But you never got past the tiptoeing stage? Correct?

A. No.

Q. You had to give up your Savant dealer agreement because of this edict from Mr. Knapp? Is that correct?

MR. KAVANAGH: Objection to form.

A. I never gave up my dealership agreement with Savant. I just stopped participating with Savant in pretty much all forms.

Q. (BY MR. JACOBS) And that was because of the edict from Mr. Knapp?

MR. KAVANAGH: Objection to form.

A. That was because we made the decision to support the product.

Q. (BY MR. JACOBS) The Crestron product?

A. That's correct.

MR. JACOBS: You'll get a copy of the deposition. You can look at it. If there are any changes you think are necessary, you can put them in and then you can sign it.

THE WITNESS: Okay.

MR. JACOBS: I'm ordering. Just contact Jude at my office.

MR. KAVANAGH: I'll take a copy of everything.

(Thereupon, the deposition was concluded at 11:51 a.m.)

# EXHIBIT 601

| | | |
|---|---|---|
| **From:** | Marla Suttenberg | February 21, 2012 9:52:43 PM (-05) |
| **To:** | Katharine Wheeler | |
| **Cc:** | Chris Perkins | |
| **Bcc:** | | |
| **Subject:** | **FW: Crestron MTX-3 Hell** | |
| **Attachments:** | | |

Kat,

Do you know where this is at, i.e., have we scheduled on-site?

**Marla Suttenberg, DMC-D**

Technology Representatives

50 Tice Boulevard | 3rd Floor | Woodcliff Lake, NJ 07677

T: 201.476.1071

F: 201.476.1072

C: 201.694.4662

www.sapphiremarketing.com

The information contained in this email message, and any attachment therein, is privileged and confidential and for use by the addressee only. The unauthorized use, duplication, disclosure or distribution is strictly prohibited. If you are not the intended recipient, please return the email to the sender and delete it from your computer.

**From:** Mark Risi [mailto:mrisi@pi-mail.net]
**Sent:** Thursday, February 16, 2012 8:03 AM

**To:** Glenn Pernick; Marla Suttenberg
**Cc:** Chris Perkins; Rich Sasson; Katharine Wheeler; Cory Stene; Vincent Fama; Dean Ferrentino
**Subject:** RE: Crestron MTX-3 Hell

Moring Glenn,

Sure… we would be more than happy to have you come on site to review. I'll have Vincent and or Dean contact you to set something up.

Standby,

Mark A Risi

CEO / Founder

Performance Imaging

550 West Ave

Stamford, CT 06902

(203) 504-5234 Direct

(203) 504-5200 Main

mrisi@pi-mail.net

www.performanceimaging.net

**From:** Glenn Pernick [mailto:gpernick@crestron.com]
**Sent:** Wednesday, February 15, 2012 6:19 PM
**To:** Marla Suttenberg; Mark Risi
**Cc:** Chris Perkins; Rich Sasson; Katharine Wheeler; Cory Stene
**Subject:** RE: Crestron MTX-3 Hell

We are starting out reviewing all of the information regarding returns/rma's/cases so that we can get the foundation of what the scenario is. We would welcome any onsites to solve any of the problems and be able to swap out the technologies based on the environment. We can also pretest any equipment before sending it out to the field.

Cory will spearhead this from the support side. Do you have a list of the jobs and their problems?

Glenn S. Pernick, DMC-E

Director, Technical Support

**From:** Marla Suttenberg
**Sent:** Wednesday, February 15, 2012 9:22 AM
**To:** Mark Risi
**Cc:** Chris Perkins; Rich Sasson; Glenn Pernick; Katharine Wheeler
**Subject:** RE: Crestron MTX-3 Hell
**Importance:** High

Copying the people who can help us.

Crestron guys – since there's multiple customers, what's the best way to approach this – i.e., going on site, checking RA service history, etc.?

**Marla Suttenberg, DMC-D**

Technology Representatives

50 Tice Boulevard | 3rd Floor | Woodcliff Lake, NJ 07677

T: 201.476.1071

F: 201.476.1072

C: 201.694.4662

www.sapphiremarketing.com

The information contained in this email message, and any attachment therein, is privileged and confidential and for use by the addressee only. The unauthorized use, duplication, disclosure or distribution is strictly prohibited. If you are not the intended recipient, please return the email to the sender and delete it from your computer.

**From:** Mark Risi [mailto:mrisi@pi-mail.net]
**Sent:** Wednesday, February 15, 2012 8:40 AM
**To:** Marla Suttenberg
**Subject:** Crestron MTX-3 Hell

Marla, I'm desperate for your help.

I get these emails weekly (see below) from various clients. Last weekend, one of our mega client made me park myself in their house for hours and use their 5 MTX-3's remotes we just installed to get a feel for their frustration. Every remote had various problems that just would not work consistently which had nothing to do with the code, it was more the remotes themselves. Some wouldn't charge, some would lock up, some wouldn't turn on… it was just NUTS! We're losing so much valuable tech time which is costing us a ton of money! Below are some emails from clients in the last three days. All of these has three different programmers. The house with the 5 MTX-3 remotes was programmed by a programmer who has the highest level of Crestron programming, he's a DM-E level guy. It's a hardware issues, not programming. The first comment below is a client who started with TPMC-4X's, then TPMC-3X's and now a second round of MTX-3's. I can't get my final $30K on this project because of these remotes not working! We had a client Sunday night who's MTX-3 locked up before the Grammy's and they verbally flipped out on us. They are now questioning us whether to get us involved in their new townhouse they are now building which is a million dollar project for us, I had to pushed their architect so hard to convince them not to go with Savant.

*Hi Vin. Hi Mark. Vin, thanks for coming out the other day. And Mark -- thanks for sending out a new remote to see if this was a hardware issue. Unfortunately, the shut-down problem keeps occurring which makes me think this is either an "internal setting" on the remote or a software issue. What seems to happen is after a few hours of the remote being off the charger, it powers off or goes to sleep. The screen is blank and remote is totally unresponsive. After pressing the a few buttons, it eventually wakes up and re-boots and re-loads the software etc. I always check the battery after this occurs and this never seems to be a battery issue. In fact, once the remote reboots it works fine for the next several hours until it happens again.*

*I am sure you can imagine why this is frustrating. For example, we were watching the Super Bowl with a bunch of friends and wanted to replay something we just watched. I pick up the remote to rewind and its dead. Watching a movie and want to pause because the phone rings -- and remote is dead. Ridiculous -- right? Consumer electronics from Best Buy are way more reliable than this. Kids think its funny. But Royce -- not so much.*

*Ok -- so this is what I am going to do -- unless you guys have some other suggestion. I am going to keep track for a few days over the weekend of when we take the remote off the charger and when this"shutdown" occurs. That way, maybe I can give you guys some guidance on the timing and then you can take the remote and see for yourselves what is going on.*

*Guys, I appreciate your efforts in trying to fix this stuff. To me, its totally frustrating because Crestron is all about the controls. And its just crazy to me that their remote controls are so glitchy/ unreliable.*

*Anyway, just wanted to give your the update. Will be back in touch once I have some info on how to reproduce this.*

*David*

*Both Dean and Tyler diligently tried everything they knew to get the handhelds to connect, but to no avail. These would be the same handhelds whose batteries, cradles, etc., have failed multiple times apiece since their installation 18 months ago leading to multiple visits, work time lost, frustration on all sides, I'm sure. In short, I don't think these are good products and i wish that a more reliable system had been installed originally. As Lance has gotten emails and calls from me each time, he can attest to how many equipment/software failures we have had over the last 18 months.*

*Well, today's solution was so "out of the box", I felt I had to share it with you so you could get a sense why I, as a customer, get so frustrated with some of the "avoidable" issues. Things break, software needs to be changed, etc. I understand that. But, these Crestrons have probably cost me a day of work on average per month to host technicians since they were installed. So, the current issue appears to be that the handhelds occasionally lose "connectivity" with their remote connectors.*

*I am not writing to find fault with anyone. The technicians were pleasant and professional as always. That being said, this doesn't address the multiple hardware problems we've had and I would strongly encourage you not to recommend these handhelds to anyone else. I am open to reasonable solutions for a RELIABLE control device if you have any thoughts.*

Please help,

Mark A Risi

CEO / Founder

Performance Imaging

550 West Ave

Stamford, CT 06902

(203) 504-5234 Direct

(203) 504-5200 Main

mrisi@pi-mail.net

www.performanceimaging.net

This e-mail message and all attachments transmitted with it may contain legally privileged and confidential information intended solely for the use of the addressee. If you are not the intended recipient, you are hereby notified that any reading, dissemination, distribution, copying, or other use of this message or its attachments is strictly prohibited.

EXHIBIT 602

PAGES 1 - 278

EXHS. 15 - 43

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

* * * * * * * * * * * * * * *
Savant Systems, LLC, *
*
Plaintiff *
v. * Civil Action
* No. 10-cv-11622-EFH
Crestron Electronics, Inc., *
*
Defendant *
*
* * * * * * * * * * * * * * *

Rule 30(b)(6) Notice to Savant Systems, LLC
Video Deposition of James W. Carroll
Wednesday, January 22, 2014
Courtyard Marriott
707 Iyannough Road
Hyannis, Massachusetts 02601

----------- J. Edward Varallo, RMR, CRR ----------
Registered Professional Reporter
CURRAN COURT REPORTING
21 Rowe Hill Road, Stoneham, MA 02180
781.279.8400

the company?

A. I understand that.

Q. Sir, as you sit here today, what is your understanding or what is Savant's understanding as to through what channels it distributes its products?

A. We distribute our products today through the high-end luxury residential channel domestically; we use value-added distributors internationally.

Q. What about Best Buy?

A. There's two Best Buy customers we have. Can you be more specific?

Q. Sure. Which Best Buy customers do you have, sir?

A. Well, AudioVisions in southern California. We service them through our high-end luxury channel. Best Buy/Magnolia Design Centers, we service them -- Well, actually we changed it this year; it used to be through our retail sales team. Now that's been folded into the luxury high-end channel as well.

Q. In terms of the Magnolia/Best Buy relationship, when did that start?

A. We first started speaking with them in

2012, I believe.
Q. And in how many Magnolia/Best Buy locations are Savant products offered?
A. In all the existing design centers. I think there's 36 of them currently today.
Q. Is that across the country?
A. It's primarily West Coast through Dallas. I think they've opened some in Florida.
Q. And Savant products are offered, if you walk into a Magnolia center, you'll see Savant products?
A. That's correct.
Q. And that is the full line of Savant products?
A. I don't know if they display all products, but they've got the opportunity to sell all products.
Q. So I would have the opportunity if I walked into a Magnolia/Best Buy location at a participating store to purchase the full line of Savant's home automation products?
A. That's correct.
Q. Does Savant price its products that it sells through Magnolia/Best Buy differently than its

A. I don't think we discriminated against any of the CEDIA integrators, whether they had a retail outlet or not. I guess off the top of my head I don't recall if their earlier dealers had retail points of presence or not, but there is a high probability they did.

Q. In 2010 when Savant was discussing potential distribution through Magnolia to the retail channel, what ultimately occurred with respect to those discussions?

A. It was a two-pronged discussion. They were looking for technology for their video display walls where they sell TVs. Right? And we also had discussions with them about what is now Savant's smart media product as a solution to home theater in a box type of thing with automation.

Q. Was there discussion at that time of Savant distributing its products through Best Buy or Magnolia?

A. Through Magnolia, yes.

Q. In 2010?

A. 2010, that's correct.

Q. And from your prior testimony, Savant didn't start distributing its products through Best

Buy until around 2012. Is that correct?
A. That's correct.
Q. Why the time lag, sir?
A. The relationship never developed in the earlier discussions and then they just simply reached out to us and showed some interest. And they'd said clients were walking into their stores and looking for a Savant solution.
Q. And Best Buy/Magnolia also distributes the products of other control manufacturers?
A. That's correct.
Q. Which ones?
A. AMX, Control4, RTI, URC.
Q. Any others?
A. Lutron.
Q. So today if I were to actually get spousal authorization to make such a purchase, I could walk into a Best Buy location and choose among control and automation products. Correct?
A. That's correct.
MR. PARK: I am going to have marked as Exhibit 15 to your deposition, to this deposition, the following document.
(Savant Deposition Exhibit 15 marked for

A. I think someone in the market for home automation may look at the two, but it becomes a clear distinction in their mind which element they're looking for.

Q. So is it your testimony on behalf of Savant that Savant does compete or does not compete with Control4?

A. Not as a normal course of the luxury high-end business, no. There are times where clients will evaluate both systems.

Q. And so your testimony relative to that is Savant does not compete with Control4. Is that correct?

A. Not as a main part of our business, that's correct.

Q. But as some part of your business?

A. Right. As I've explained, when they're evaluating their choices for home automation. Because there's a broader market for that than the luxury high end.

Q. And how do you define luxury high end, sir? How does Savant define luxury high end?

A. Those wealthy clientele that have, you know, large-scale systems, large homes, often

multiple homes.

Q. How else? Any other distinction?

A. Typically systems ranging from hundreds of thousands of dollars to millions of dollars.

Q. So that's the distinction. The system has to be hundreds of thousands of dollars to millions of dollars to classify as luxury high end?

A. A total system. The automation content could be $10,000 to hundreds of thousands of dollars at the consumer price point, whereas a Control4 system, you know, is $7,000 potentially.

Q. It could be more, though. Correct?

A. It could be.

Q. And there are luxury high-end customers who could prefer Control4 over Savant. Correct?

A. For the price point, potentially, yes.

Q. And there are other customers who are not luxury high-end customers who could stretch their budgets and prefer Savant over Control4. Correct?

A. Those are personal choices. I think when you talk about a market, you talk about the mass of the market, not fringe cases.

Q. But generally the price of a Savant product is the same whether it is sold to an ultra

thousand dollars more than somebody. I've had a case where an end user called me from Florida saying that they were contacted by a Crestron executive who offered free equipment if they didn't go with Savant. Right? So you make decisions based on what the situation is at the time.

Q. And based upon Savant's assessment of the competitive situation?

A. That's correct.

Q. And what is in Savant's best interest?

A. That's correct always.

MR. PARK: I am going to have marked as Exhibit 16 a document Bates-labeled SAVANT0071076.

(Savant Deposition Exhibit 16 marked for identification.)

BY MR. PARK:

Q. Sir, let me know when you've had an adequate opportunity to review the document.

A. Okay, I will. (Pause) Okay.

Q. Sir, who is Charles Guistwite?

A. He works in the professional services group at Savant.

Q. And professional services is the group in Savant that provides technical support and services

Savant dealer at the time or independent representative?

A. They were a manufacturing representative.

Q. And the substance of this e-mail communication is potential discounts to a dealer on Savant products. Correct?

A. For what appears to be a demo order.

Q. But discounts. Correct?

A. Yes.

Q. And if you look at the top e-mail on the first page of the exhibit, Mr. Jamison is saying to Ms. Watson, quote, "Based on our conversation this morning, go ahead and agree to give him 50 percent off dealer cost on the OSD into the 15 percent on the System 12 and cards," end quote. Do you see that, sir?

A. Yes, I do.

Q. So at this point in time Mr. Jamison approved a 50 percent discount on one of Savant's products. Correct?

A. Yes. It looks like a demo order, which means this was being placed either into a showroom or into a builder's space or a show house or something like that.

was thinking more around mass distribution like AVAD and things like that.

Q. And there was some consideration within Savant about using AVAD to distribute Savant's products. Correct?

A. AVAD had approached us on that. Ben was in favor of that type of business.

Q. But ultimately Savant made a business decision not to distribute its products through AVAD. Correct?

A. That's correct.

Q. And do you recall who AVAD approached within Savant to begin those discussions?

A. I know I had direct discussions with them; I know Ben had approached me on it. I know Kathy Coyle had approached me on it as well.

Q. But at the end of the day, Savant made a business decision that it did not want to pursue that alternative distribution channel?

A. Right, not at that time, because that targeted the product towards what I would call tier three dealers, which was more the control for alarm type of space, not the Savant-AMX-Crestron type of space.

point underneath that that says, quote, "35 cut already, another 20 to 30 will most likely be cut," end quote. Do you see that?

A. That was primarily due to we believed the threats of Crestron. These were dealers that made every indication they were going to do a lot of business with us and suddenly stopped talking to us, went cold. It wasn't like they were calling to complain about things; it's just they were nonresponsive.

And in comment to the Control4-Crestron, Ben is referring to jobs like that Control4 job from Atlanta Home Theater, which is clearly beyond the scope of what a Control4 system could do. But dealers would be coming to us with a chance with legacy programming of systems, so it's....

Q. But you were seeking to take business away from Control4, Crestron, AMX?

A. But those type of jobs. We weren't targeting Control4. We weren't off trying to build 7,000-dollar control systems at that point.

Q. But you were trying to compete with Control4?

A. In those fringe cases there, yes.

understanding was incorrect?

A. That's correct. So I was counting on him as the manager of the group to provide me with accurate information.

Q. And your prior testimony was incorrect prior to my showing you this exhibit?

A. That's correct.

Q. Now, Savant also competes with Elan, correct, for jobs and sales of its products?

A. There may be fringe cases on it, but we never targeted their segment of the market as our business.

Q. But there are cases in which Savant competes with Elan. Correct?

A. Well, there are integrators out there who sell Control4 and alarms that dream of doing big jobs that are capable only really of AMX and Crestron and Savant, and they often will propose systems that, really, the technology is not going to meet the demands of those jobs. So to that extent, if that's competition, then yes, but I really don't consider that competition.

Q. Why not?

A. Because it's just, they will fail. They

A. Theatron, that's correct.

Q. And it is a discussion concerning Mr. Smith losing a job to Elan. Correct?

A. That's correct.

Q. And the gist of his communication to George Katsiris is that the job was lost because the end user preferred Elan's remotes versus Savant's remotes. Correct?

A. That is correct.

Q. And he is conveying that to George Katsiris at Savant. Correct?

A. That's correct.

Q. So for this particular project, Savant lost to competition because of the nature of its products. Correct?

A. Well, in Rick's case -- I know Rick very well -- he's always felt from the very beginning that Savant can provide a solution across all segments and that he could replace his other control products. As with most dealers, they'll carry a high-end luxury product, AMX, Crestron, Savant; a midmarket product, being Elan and Control4, Niles; and that he felt because we're so software-centric, we could cover that whole marketplace. And he's

it prematurely.
Q. Now, are you familiar with a company HomeLogic?
A. The manufacturer HomeLogic? Yes.
Q. What do they manufacture, sir?
A. A very low-end home automation system.
Q. This appears to be, this document, this exhibit appears to have two proposals contained within this document. Correct?
A. Correct.
Q. One is a HomeLogic bid. Correct?
A. Well, it's Elan and HomeLogic.
Q. Okay. And one is a Savant bid. Correct?
A. Yes. Which is kind of peculiar, because they have very low-end speakers and amplifiers in both bids, LG network DVD player. When I had my own dealership, I sold Elan and AMX, and you typically wouldn't mix junky -- it's like putting vinyl seats in a Bugatti. You know? This client wasn't being served very well by the combination of products here.
Q. Well, if you look at the Bates-label SAVANT 951, which has the project summary on it for the first bid --

I'm trying to add up the Savant contents here. And we should be 10 percent of the total job, 10 to 15 percent. It looks like we're much more than that, of the equipment cost. That's typically the rule of thumb in the high-end market, that the automation and control is 10 to 15 percent of the bill of material cost and it looks like, just roughly off this, we're closer to 30, 35 percent, which is kind of an indicator that it's a mismatch of markets there.

Q. Well, a mismatch of products and --

A. Products. It's lower-segment market products with higher-segment market products. In good conscience, I would not sell this as a dealer to a customer that way.

Q. But clearly some dealer in their own professional expertise, whether or not you agree or disagree with that, thought it was appropriate to present to an end user two separate proposals that had in your words a mishmash of home control and automation products. Is that right?

A. That's right.

Q. And in terms of going just from the price point, this appears to be priced in what you would

dealers did not call for Savant to go out and create new dealerships. Correct?

A. No. We never envisioned we were going to start an alternative channel. You try to take advantage of the channel that's in place.

Q. But Savant's strategy was not to have too many dealers. Correct?

A. That was never the case. We had goals of the minimum number of dealers we wanted.

Q. Well, Savant believed that its products, its product was a limited-distribution product. Correct?

A. Absolutely not.

Q. Didn't Savant promise certain dealers geographic exclusivity in a particular market?

A. Exclusivity from my seat was never promised. No sales guy was ever given the authority to give exclusivity. Anytime a dealer would ask me for exclusivity, you know, depending what market you were in, I would say "So if we think there's two million dollars' worth of controls sold in this market, you're going to pay me half a million dollars a quarter?" Yeah, you want exclusivity? And of course thev look at vou like vou're nuts

because they're buying three, four hundred thousand dollars' worth of control a year.

You can't give anyone exclusivity and just let the rest of the industry go to somebody else, the market go to somebody else.

Q. Well, Savant wanted to limit distribution of its products by limiting the number of dealers. Correct?

A. We never had a strategy to limit dealers. We had the minimum number of dealers we wanted to try to onboard at any given time. But we had business plans that said if we have this number of dealers, if they averaged $50,000, we would get to this revenue. But if someone came to me and said "Oh, you know, we've got ten dealers in this market, I think we're done," I would say "You're outta your mind. How much of the market do you own?"

Q. So Savant never advertised or told people that its product was a limited-distribution product?

A. If someone at Savant said that, they were speaking out of school, because that was not Bob's direction nor my direction.

MR. PARK: I am going to have marked as the next exhibit a document Bates-labeled SAVANT

A. Yes.

Q. And then you go on to state, quote, "This is a limited-distribution product and we believe and have seen the model work that we don't need as many dealers as our competitors, that our dealers can do more jobs quicker at a higher profit margin," end quote. Do you see that?

A. Yes, I do.

Q. And you wrote that. Correct?

A. Yes, I did.

Q. And then you go on to state, quote, "This translates to having fewer dealers with much less support overhead, hence a more profitable business for our integrators and Savant," end quote. Do you see that, sir?

A. Yes, sir.

Q. And you wrote that to Jason Beatty at Cyber Sound at the time, didn't you, sir?

A. Yes, I did.

Q. And in that e-mail you specifically on behalf of Savant, as president of Savant, characterized Savant's product as a, quote, limited-distribution product. Correct?

A. Correct.

Q. And then if you go down this page, there is an e-mail, an earlier e-mail from you to Jason Beatty dated March 30, 2009. Do you see that? The very bottom of the first page.

A. Yes.

Q. And you state, quote, "You guys are our number one target in the market. The total number depends on our success with the right guys." Do you see that?

A. Yes, sir.

Q. You continue to say, "We are not looking to overdistribute the product; we are only looking for 350 dealers nationally." Do you see that?

A. Yes, sir. So this whole communication --

Q. I'm sorry. There's no question pending, sir. I said do you see that?

A. Oh. Yes, yes.

Q. And this is a communication that you had with Jason Beatty in March of 2009. Correct?

A. It's a subset of a larger communication, yes.

Q. And it refers to an NDA signed by Jason Beatty and Jon Summer, doesn't it?

A. Yes, it does.

Q. And was it in March of 2009 that Cyber Sound signed to be a Savant dealer?

A. From this you would draw that conclusion, yes.

Q. And I take it in your communications with Jason Beatty at Cyber Sound that you were trying to be as truthful and as accurate as possible. Correct?

A. Absolutely, and to the point I used some of his own vocabulary when I make the reference to limited distribution. He was very concerned that Savant was going to sell to dealers other than tier one and tier two dealers. He was very frustrated at this time that Crestron specifically would open up to anybody that could fog a mirror, and he felt they were polluting the channel, that they were losing business because tier three guys that couldn't execute with a Crestron system were underpricing him. So he was concerned about, as he states here, that we don't go to mass distribution like AVAD.

Clearly I state here this is our yearly goal for 350 dealers for that year; that to get to our 350 dealers, which is the goal for the year, we don't necessarily need to bring on everybody. And

then I say our plans will be adjusted over time, which means as we grow and as we penetrate markets, he should expect not to be one of a few; he'll be one of many.

Q. Sir, in this e-mail to Jason Beatty you are writing to Jason Beatty. Correct?

A. Correct.

Q. Those are your words. Correct?

A. Correct.

Q. As president of Savant Systems at that time. Correct?

A. And as a communicator, it's important I speak in a vocabulary that he understands. So that's what I say. This is a document that reflects many verbal discussions I've had with Jason over time.

Q. Now, subsequent to 2009, though, Savant has had communications with Cyber Sound concerning Cyber Sound having some measure of exclusivity in the Phoenix market. Correct?

A. I recall a discussion with Jon Summer that he shared with me the level of threats from Crestron and was asking for us to slow down but never stop bringing on other dealers so he could try to have

some sort of leg up over Crestron dealers in the marketplace, strictly in response to the threats and coercions of Crestron, looking for our support to help him. But never did we say to Jon you'll be the only one or we're not going to open up more dealers.

Q. Didn't Mr. Madonna on behalf of Savant commit that Savant would not add any more dealers to the Phoenix area for at least a year in order to advantage Cyber Sound?

A. Jon Summer had mentioned that to me; and when I had talked to Bob about it, his memory was not that. It was the year he told Jon that we would offer him some more runway, I think was Bob's term, and to work those details out with me. But Jon was asking for a year.

Q. And he didn't want any competition, not from Crestron dealers but from Savant dealers. Correct?

A. Right. His concern was that if we opened up Crestron dealers with Savant, that they would use that against us, meaning that they would say to a client "I can sell you Savant but it's really not worth it to you, it's not a good product."

Q. Is that a problem?

actions of your client, asking for a little help from the manufacturer of their choice to go forward. And we're looking through these discussions to give him some level of consideration but I think being very clear that there will be other dealers. This isn't their town; we will bring on other dealers as the market demands.

Q. Now, others at Savant have termed Savant as a limited-distribution product or company. Correct?

A. In the application of that term, I think they're referring to in the early days our desire to have tier one and tier two dealers, not every dealer in the marketplace.

Q. So on behalf of Savant, do you agree that personnel within Savant such as yourself characterized to dealers and others that Savant was a limited-distribution product?

A. In the context of this type of communication, yes. As a broad discussion, especially today, no.

Q. So has Savant at any point told the press or the media or the trade publications that Savant was a limited-distribution product?

Correct?

A. My assumption here is that Residential Systems wants us to place ads and he's making an assertion that we will for some reason stop advertising and he's saying, well, you're just doing it for commercial and end users now. Like it looks like some sort of challenge, which I don't really follow that thought process. I find it confusing.

Q. If you look at the second page, there's an e-mail from Jeremy Glowacki to Craig Spinner. Do you see that, sir?

A. Yes.

Q. And in that, in the second paragraph he states -- and this is Craig Spinner at Savant states -- quote, "With Savant existing as a very limited-distributed product company (roughly 260 North American dealers and we are not looking for many more), it is imperative that we are doing everything we can to make our installers successful," end quote. Do you see that, sir?

A. Yes, I do.

Q. So in this e-mail as well to an outside party, a Savant executive is using the term limited-distributed product?

A. Craig is not an executive. Do you have -- ? I don't understand, because I don't have firsthand knowledge of this. Right? This is the first time I've seen this. It looks like Craig for some reason is being defensive with Jeremy about our decision to market more towards end users and commercial versus advertising in his trade magazine.

In this time frame the goal was to get 350 dealers, so this is early in that year, so Craig's personal assumption is that we'll get to the 350 without placing advertising is why he's using that vocabulary. And, honestly, at this point in time Craig's probably using it pretty naïvely.

Q. Well, at this point in time he's using the term roughly 260 North American dealers and we are not looking for many more?

A. So in the context of what they're talking about, a campaign ad that would probably run in the second part of the year. So if you're in February talking to a magazine about placing ads, the assumption is those ads would run at the end of the year. So Craig's looking at this knowing that we needed from 260 to 350, we needed roughly another hundred dealers, it's a waste of money to spend on a

magazine ad because by the time we get to that point in the year, they're probably already on board.

Q. Well, he also does tell this member of the trade press that Savant is a very limited-distributed-product company. Correct?

A. Yeah, and that's confusing. Like I say, every discussion we had internally was about how quickly can we onboard guys, where are they at, what are the barriers to entry, to get to our business plan how many dealers do we need that year? So I think it's -- I think it's a time-specific element.

Now I'm speaking for Craig without having firsthand knowledge of talking to him about this. So the way you're conjecturing into what this means, I'm conjecturing back, I guess. So he's stating we have 260 dealers. He's trying to in his naïve young way, instead of just telling Jeremy it's not part of our business plan right now, that's that, he's coming up with a little bit of a mealy-mouthed reasoning for that instead of being direct and just up front and telling him, hey, I'm telling you we're going to start with demand creation in the marketing space. That's how we're going to spend our marketing dollars versus trade press. Because by

this point, the majority of the dealers in the CEDIA space knew exactly who Savant was and what we were up to.

Q. You don't deny that he used the term "limited-distributed product," do you?

A. No. I'm defining for you how I think he was using it in his mind.

Q. And as we have seen, others, including yourself, have used that term in connection with communications?

A. Correct. You're trying to make it apply to a broad statement, when in both these cases they're very specific discussions going on talking about a very narrowly focused view of something.

MR. PARK: I am going to have marked as Exhibit 29 a document Bates-labeled SAVANT0078242.

(Savant Deposition Exhibit 29 marked for identification.)

BY MR. PARK:

Q. Sir, take a look at this document; let me know when you're prepared to discuss it.

A. Thank you. (Pause) Okay, sir.

Q. This is an e-mail between Chuck Parrelli and Michael Verkinder. Correct?

ongoing basis. I didn't give him a year, didn't tell him it was going to be a month or a week. He didn't like that. He wanted more latitude than that. But I said "Jon, you gotta -- you have to produce. Willing to support you but, you know, this is a big market. Phoenix is a big market. You'll never do the total -- You couldn't even give me 10 percent of that market."

Q. Well, in the Rocky Mountain area, though, you gave Mike Thul and ESC some space vis-à-vis Paragon. Correct?

A. No. My discussions with Paragon and Brad and company were pretty open about it. They expressed to me that they wanted to become a Savant dealer but were also honest and clear that they would never lead with Savant; they would not show it in their showroom. That the work that Thul and ESC had done, that most of the architects and builders were requiring Savant to be the product of choice. They needed the opportunity to at least say they have it, and this is why they should sell Crestron.

So we politely declined to do business with them, as they were not going to represent the product and sell it. It was just so they could be

part of the bid process and have an opportunity to present Crestron. That's why they were not brought on board from the beginning.

Q. And do you believe it is appropriate for a control manufacturer to make decisions as to taking on a dealer that was not going to lead with their product?

A. I think it's appropriate when someone tells you "My only reason for wanting your product is so I can sell against you"? Yes.

Q. And that is a decision that a control manufacturer can make in its business interest. Correct?

A. In regards to the onboarding of a certain dealer? Yes, absolutely.

Q. And in terms of parting ways with dealers, a control manufacturer can make decisions concerning which dealers it chooses to do business with. Correct?

A. Yes. This is America. You're free to do business with anybody you want.

MR. PARK: I am going to have marked as the next exhibit a document Bates-labeled SAVANT0258332.

Q. Is he reinstated?
A. Yes. We're a company of inclusion, not exclusion. It's probably fair to point out when we do have to terminate a dealer and if they do have fielded systems, we continue to provide technical support to them. So a terminated dealer still has the capability to support their ongoing customers that they sold Savant to in the past. Not a punitive effort.
Q. Now, at some point Savant terminated Tempus Electronic Lifestyles as a dealer. Correct?
A. That's correct.
Q. And that is Mr. Brett Price's firm. Correct?
A. That's correct.
Q. And Savant did so without providing the requisite notice required in the dealer agreement. Correct?
A. After Brett and I spoke.
Q. And the reason for that termination was because Brett Price had started Clare Controls, a competitive or competitor control manufacturer based on Apple OS. Correct?
A. No. The reason for the termination was

that when Brett brought me through his product, there appeared to be a lot of IP challenges that were going to be in front of us that Tom's team could talk to better than I, but that we felt there was clear violation on the intellectual property side of his new product.

Q. Has Savant pursued any sort of infringement or other enforcement action relating to intellectual property against Clare Controls?

MR. O'KONSKI: He is not being deposed for that.

A. I don't know if I can answer that.

Q. Unless you are instructed not to --

A. I don't even have firsthand knowledge of that. It's something Bob and Tom would deal with, not me.

Q. Well, sitting here as Savant.

A. As Savant, sitting here, this not being part of what I prepped for, no, I am not aware of that. I know Bob is aware of it. Bob's concerned about it. It's probably important to point out that as recent as last quarter, we provided products to Tempus so they could take care of customers that they had sold Savant systems to.

Humphries to George Katsiris that Savant should terminate this dealer?

A. That's correct.

Q. And the reason for the termination is that that integrator is focused on selling Control4. Correct?

A. Yes. My memory of this is that HTE had convinced us that they could sell higher-end jobs. The point here is that they haven't made an effort to and they continue to sell down in the lower market.

Q. What Mike Pawlowski is saying is they are focused on Control4. Correct?

A. That lower-end market segment.

Q. So Savant terminated them?

A. I don't know that we actually took action on that.

Q. But the recommendation was fairly stark, to terminate them?

A. Right. I know George felt fairly strongly on a number of dealers that sold Control4, that he felt they had exposure to high-end luxury clients, that they could sell Savant to those clients as opposed to a Control4, bring those clients upscale

Q. And there are numerous personalities among the dealers across the country. Correct?
A. That's correct.
Q. So there are a lot of moving parts. Correct?
A. Absolutely.
Q. So Savant as a manufacturer of home control and automation products periodically reviews the good, the bad and the ugly among its dealer channel. Correct?
A. You strive for the good.
Q. Sometimes you get the bad. Right?
A. Sometimes they end up being bad, that's right.
Q. And sometimes you get the ugly. Correct?
A. That's correct.
Q. And as with any manufacturer distributing its products, Savant has to periodically review whether or not dealers are making the necessary resources to commit to selling Savant products. Correct?
A. That's correct.
Q. And Savant occasionally terminates dealers for nonperformance. Correct?

A. Nonperformance? If nonperformance in your definition they tell us they're going to do one thing and they do something drastically less and then when you follow up with them they say, you know, "I just don't have those clients, I'm not seeing that market, I can't reach it," yeah, you would terminate them along the way.

Q. For lack of sales?

A. For lack of sales. You know, for everybody's benefit you stop wasting time trying to call on them -- you don't put them on your call sheet, you don't follow up with them -- if they're really not going to be able to go execute.

Q. Because it takes time and money and resources away from a control manufacturer to devote to making calls on particular dealers if they're not going to actually sell your products?

A. Well, you build up a battle map, if you will, how much revenue you're going to get out; you got revenue next to a company's name. If the reality is going to be zero, you go find another name to fill that spot. Yes, in that sense.

Q. Now, Savant's relationships with its dealers are governed by a dealer agreement.

because they opened up someone else? I see the comparison. Why would you open this guy and not this one? But --

Q. So this is an instance in which Savant denied a dealer a dealership with Savant based upon particular criteria. Correct?

A. As we talked about earlier. We're looking for tier one/tier two dealers which, you know, typically have engineering staffs, have installation staffs, salespeople, an operations business; not a guy with his one-eyed dog.

Q. So Savant could make the business decision to offer dealerships to individuals with one-eyed dogs but could choose not to as well. Correct?

A. That's correct. This guy sounds like he's hardly a dealer. He's hardly a business.

Q. And that is a business decision that Savant makes with respect to the type and quality and nature of dealers that they want representing Savant products?

A. Clearly. And we had business plans for the total number of dealers we needed as a minimum in any given year, tier one, tier two dealers, that on average that pool of dealers could do $50,000 a

that Brad was holding back and felt he was holding back because some of the other sales guys were adamant, but they felt that Brad was going to go forward with Savant and they really thought they could do a big job with it.

Q. Now, in our previous discussion you mentioned HTSA. Correct?

A. HTSA.

Q. And they are a buying group. Correct?

A. They're a buying group.

Q. And at this time Richard Glikes was the head of HTSA. Is that correct?

A. That's correct.

Q. And Savant was and still is a member of HTSA. Correct?

A. I think 2010 we started, so about a year before this.

Q. And pursuant to its membership in HTSA as a manufacturer, Savant provides discounts to its members. Correct?

A. Prior to HTSA?

Q. No; during --

A. Oh, yeah, yeah. Well, being part of a buying group, to be a member, they wanted to

your products.

Q. Does Savant believe that its investments in these buying groups or participation in buying groups has been worthwhile or valuable through the years?

A. I can personally tell you I've had my moments with HTSA. The sales organization believes they're important. I'm of a mixed mind on it, but I yield to the people that are the experts.

Q. Membership in these buying groups does provide Savant continuing relationships and access to a broader array of tier one, tier two and other high-revenue dealers across the country. Correct?

A. That's the plan, yes.

MR. PARK: I am going to have marked as the next exhibit a document Bates-labeled 0264 -- I'm sorry -- 0246714 through 246716.

(Savant Deposition Exhibit 41 marked for identification.)

BY MR. PARK:

Q. Sir, take a look at this document and let me know when you're prepared to answer questions.

A. Okay. (Pause) Okay, sir.

Q. This is an e-mail from Craig Spinner to

has come to me and said "Jim, we're in this, you know, death grip with Lutron here." No one from Lutron has ever called me and said "What are you guys doing" or nothing like that. Right?

MR. PARK: Why don't we take a short break.

THE VIDEOGRAPHER: The time is 4:13 p.m. and we are off the record.

(Short recess taken.)

THE VIDEOGRAPHER: The time is 4:22 p.m. and we are on the record.

MR. PARK: Sir, I am going to have marked as an exhibit a declaration that you signed in connection with Opposition to Defendant Crestron Electronics' Motion for Partial Summary Judgment.

(Savant Deposition Exhibit 42 marked for identification.)

BY MR. PARK:

Q. Sir, review that document and let me know when you've had an adequate opportunity to review it and are prepared to answer questions.

A. (Pause) Okay, sir.

Q. Mr. Carroll, this is a declaration that you signed and was presented to the Court in

connection with legal proceedings in this case. Correct?

A. Correct.

Q. And I take it that, sitting here today, you still stand by the statements set forth in your declaration?

A. Absolutely.

Q. Now, if you look on page 4, paragraph 15. Are you there, sir?

A. Yes, I am.

Q. The last line of that paragraph states, "I estimate that at least 80 percent of Savant's revenue shortfall each year compared to its 2009 revised plan was a result of Crestron's interference." Do you see that, sir?

A. Yes, I do.

Q. Now, on what basis did you make that estimate of at least 80 percent of Savant's revenue shortfall as arising from Crestron's interference?

A. It's really a compounding factor. As I look at the Exhibit A, you see the dealer retainment, you see the dealers that bought, the dealers that were signed on but didn't buy. You gotta believe that that delta is because after they

got the product, Crestron threatened them and they pulled up.

I look at the example I give in this about Cyber Sound. Cyber Sound's role in HTSA, Hi Fi House, Gramophone, companies like that, that have upon first meetings expressed excitement about the brand, heard good things about it, and then either went quiet or actually came forward and said, "Hey, I just got threatened," a lot of stuff.

Those type of accounts, these type of dealers equaled millions of dollars of revenue that Crestron prevented us from getting through threats with the dealer. And most recently one of our sales guys shared with me that he was instructed from Crestron executives to find an HTSA member that would go crying back to them for the punishment they were about to receive for doing business with Savant.

I had subsequent discussions with Mark Goldman, who's a dealer, where he cried like a baby on the phone with me that we can't depose him, that what Crestron would do to him, to his business and his family. These guys, your clients, put the fear of God into these small business guys if they were

to do business with us.

Based on how we performed, our product, its capabilities, everything else, the economy, all their actions magnified the effects of all those things upon our efforts to be successful.

Q. So I'm asking you, sir, in terms of you have a specific estimate here of at least 80 percent of Savant's revenue shortfall arising from Crestron's interference as you have declared here in paragraph 15. And I'm asking, in addition to what you just testified to, what other basis did you have or use to make that estimate?

A. Everything I just said.

MR. O'KONSKI: Objection. Go ahead. You may answer.

A. Everything I just said, coupled with these plans. These plans seemed reasonable at the time; we were executing against them. If there was no interference from Crestron, there's no shadow of doubt in my mind that we wouldn't have been successful on this. And, you know, product issues, the economy, those things do come into play, but we would have gained economies of scale, we would have grown faster, would have reinvested those moneys

Q. Sir, you came up with a figure of at least 80 percent in your declaration. Correct?
A. That's correct.
Q. How did you come up with this figure of at least 80 percent that is set forth here in paragraph 15?
MR. O'KONSKI: Objection.
THE WITNESS: Do I have to answer that?
MR. O'KONSKI: Well, if you have something more to say, say it.
MR. PARK: You're under oath.
THE WITNESS: No, I think I've said everything I need to say.
BY MR. PARK:
Q. So sitting here today testifying on behalf of Savant, you can't provide me with any other basis for the 80 percent figure that is set forth in your --
A. I think what I've explained to you, if you backed into that math using these tables, using the lack of success with these dealers because of the actions of your client, you would see that those numbers get you pretty damn close to the 80 percent.
Q. And you have nothing else to add, sir?

Dealers, a lot of the tier twos, ACT comes to mind because we were talking about them, they bought I think $120,000 at most in their AMX gear. They do $400,000 with us. We enable them to do more business and be more successful with business and win more business.

So I believe every dealer that buys from us would have bought more than what they would have previously bought of their other control products, been more successful; and you have this compounding factor year over year.

Q. Now, in terms of other reasons for Savant's revenue shortfall apart from Crestron's interference, as you state in paragraph 15, what other reasons for the revenue shortfall did you include or factor into your estimate?

A. There was clearly some impact of the economy; although these clients, the economy didn't really impact them greatly. I think a lot of them were looking for better pricing knowing that things were more desperate.

I know there was a number of jobs where I'd hear from a dealer that they fired the builder because two-thirds of the way through the job the

economy got bad and they wanted a 30 percent discount and they found a builder that would finish it for cheaper. Dealers were coming back saying I'm getting squeezed by a billionaire, you know, for $20,000 or something like that.

So the economy played into this thing, but not as directly as it would to you or I. I think there are some features and stuff that could have enabled us to do more, but compounded by the fear of Crestron, the delay of our ability to generate revenue delayed things, the sort of engineering economies of sale associated with maximizing better product margins, and those margins get reinvested back into the business. So it's a very heavily intertwined compounding effect, a very complex formula.

Q. Any other reasons that you factored into your estimate that Savant did not make its revenues --

A. I believe those to be the major elements.

Q. And, again, aside from yourself, Mr. Madonna and Mr. Myers and perhaps Mr. Parrelli, can you state on behalf of Savant anyone else that was involved in coming up with this estimate?

a simplified version designed to keep lower-tier dealers from hurting themselves.

Our experience had been earlier on, when you offer full Blueprint to a tier-three dealer just out of the box, they do things exponentially greater than they can do with Elan, Control4, and in relatively the same amount of time they then start going off the deep end and start doing some esoteric things that led to a call to us or a scream for help. So we took the bullets out of the chamber so they don't hurt themselves.

Q. Is Blueprint Express still around?

A. It's still available, that's correct.

Q. Is it widely used by dealers?

A. No. The dealers that -- I think a lot of the original dealers that signed up to be Blueprint Express over a period of time demonstrated their capability to take the next step, came into full-blown training and have become productive dealers. It's a general statement about a community of people.

Q. Now, we talked earlier about HTSA and also Savant's dealer loyalty program. Correct?

A. Yes.

A. Yes.

Q. -- maintained in the ordinary course of business?

A. Yes.

MR. PARK: Thank you, sir. I have no further questions.

THE WITNESS: Thank you.

MR. O'KONSKI: Thank you.

THE VIDEOGRAPHER: The time is 6:16 p.m. and we are off the record.

(Deposition concluded at 6:16 p.m.)

# EXHIBIT 603

**From:** Ben Jamison
**To:** angie@network-sales.com
**CC:** Jim Carroll; Jon Fischer
**Sent:** 6/9/2009 9:48:41 AM
**Subject:** Re: Admit One

Hi Angie,

Based on our conversation this morning, go ahead and agree to give him 50% off dealer cost on the OSD in to the 15% on the System 12 and cards.

Jon will get you an exact quote on that shortly.

Thank Lance for his patience for me and for his support and thanks for your efforts as well.

Ben Jamison
Vice President of Sales
Savant Systems, LLC.
770 Main St.
Osterville, MA 02655
T: (508) 683-2584
F: (508) 683-2600
C: (508) 648-6165
ben.jamison@savantav.com

savant
NOW YOU CAN

EXHIBIT
PENGAD 800-631-6989
Savant
20
1-22-14 EV

On Jun 9, 2009, at 8:06 AM, Angie Watson wrote:

Hi Ben,

I got your message this morning. Thanks for getting back to me.

Please know that Lance has not asked for discounts on every order. He is bidding systems left and right and hasn't come to us on any of the projects except for his demo system. This one is just a lot more price sensitive and we are up against a large Crestron dealer in town who is bashing Savant and has also received almost a 30% discount from Crestron.

I was told by Savant that we do not want to lose due to pricing, so this is why I'm coming to you. We all know that we need an install to happen here in MN and this one would be the perfect start. Admit One has already lost a huge project to AMX and I don't want that to happen with this project, as I'm sure you don't either.

I think that Lance would be happy with just about anything you offer. It doesn't have to be a free OSD, that is just what he suggested. I would suggest doing 50% off dealer cost on an OSD...?

If you do decide to extend a special offer to Lance, I will make sure that he knows that we are not the company that will do this on a regular basis. He will respect that.

I have a meeting with Admit One at 9am today, so if you could get back to me with in the hour, I would greatly appreciate it

Thank you!!

Angie

On Monday, June 08, 2009 7:11 PM, Ben Jamison wrote:

**Date:** Mon, 8 Jun 2009 19:11:45 -0500
**From:** Ben Jamison
**To:** Angie Watson <angie@network-sales.com>
**cc:** Jon Fischer <jon.fischer@savantav.com>, Jim Carroll <jim.carroll@savantav.com>
**Subject:** Re: Admit One

Angie,

I apologize for not getting back to you on this today. I had a couple of delays in my flight home and have had no access to get this done, I WILL get it to you tomorrow AM.

Thx for got patience,

Sent from my iPhone

On Jun 8, 2009, at 3:06 PM, Angie Watson <angie@network-sales.com> wrote:

Ben,

I really need to get back to Lance today.

Will you please call me?

Thanks!
***Angie Watson***
NetWork Sales & Marketing
7568 Market Place Drive
Eden Prairie, MN 55344
Direct: (952) 946-5160
Mobile: (612) 202-1408
Fax: (952) 941-8038
angie@network-sales.com
www.network-sales.com

# EXHIBIT 604

**From:** Jim Carroll <Jim.Carroll@savantav.com>
**To:** Philip Schoonover <pschoonover@msn.com>;Robert Madonna <Bob.Madonna@savantav.com>
**Sent:** 8/21/2010 10:21:15 AM
**Subject:** Re:

Phil this is a great list.

I would add to this a discussion around the economic downturn and how did it effect most of these specific questions. If we think Lutron is down 30-40% from two years ago in high-end resi what does it look like for them (Lutron's core business would have been effected they same way).

1. What channels where effected the most?
2. Did the poor economic help any channels perform better? i.e DYI channel i.e home depot business improve?
3. How does Control and Switching compliment or leverage each of their channels?
4. Have acquired companies maintained their own channels?
5. Is sales integrated to each segment of the business or is one sales force selling everything?

On Aug 21, 2010, at 8:37 AM, Philip Schoonover wrote:

Guys,
I was thinking , whether you end up with an OEM , JV or something bigger here I think you have the right to ask reasonable questions of Leviton.Here is a first pass at some high evel questions for due diligence on these guys:

1. What channels does Leviton currently serve ?
2. What is the revenue size as defined by current Leviton products of each channel ?
3. What is the revenue size of incremental processing ,switching and control in each cannel?
4. What is Leviton's market share in each channel as defined by current products offered? $$ & units
5. Who are Leviton's top 10 current customers in each channel?
6. Who would they like to sell that does not do business with them today?
7. What is their plan for the high end residential market without Savant?
8. How much revenue do the get do with the high end electrician market ?
9. How much revenue does Leviton do with the security alarm market?
10. How do they distribute their product ...Direct$$, Distributer$$ rep$$$ direct sales agents$$????
11. What do their field sales organizations like ? Org charts??
12. What is their marketing effort?
13. How much $$ do they spend on marketing?
14. What trade shows do they currently exhibit at?
15. What trade press do you consume/advertise in?
16. How much business in control and processing does Leviton think Crestron does ?
17. What is split between us and international sales by product category for Leviton.
18. How do they manage credit line and collections with your dealers and distributers?
19. How do they manage tour manufacturing?
20. How do they manage logistics , warehousing and distribution ?
21. How do they think about Intellectual Property eg: patents?
22. What do they consider "core competencies" at Leviton?
23. What are they weak at executing?

**Phil Schoonover**
pschoonover@msn.com
317 Tarpon Dr.
Fort Lauderdale , Fl.33301
Mobile(804)380-3711

EXHIBIT
PENGAD 800-631-6989
SAVANT
39
1-22-14 EV

Jim Carroll

President
Savant Systems LLC
770 Main St.
Osterville, MA. 02655
Direct: 508.683.2502
www.savantav.com

Statement of Confidentiality
The contents of this e-mail message and any attachments are confidential and are intended solely for the addressee. The information may also be legally privileged. This transmission is sent in trust, and the sole purpose of delivery to the intended recipient. If you have received this transmission in error, any use, reproduction or dissemination of this transmission is strictly prohibited. If you are not the intended recipient, please immediately notify the sender by reply e-mail or at 508.683-2500 and delete this message and its attachments, if any.

EXHIBIT 605

PAGES 1 - 264

EXHS. 1 - 14

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

* * * * * * * * * * * * * * *

Savant Systems, LLC, *

Plaintiff *

v. * Civil Action No. 10-cv-11622-EFH

Crestron Electronics, Inc., *

Defendant *

* * * * * * * * * * * * * * *

Rule 30(b)(6) Notice to Savant Systems, LLC
Video Deposition of Robert P. Madonna
Tuesday, January 21, 2014
Courtyard Marriott
707 Iyannough Road
Hyannis, Massachusetts 02601

----------- J. Edward Varallo, RMR, CRR ----------
Registered Professional Reporter
CURRAN COURT REPORTING
21 Rowe Hill Road, Stoneham, MA 02180
781.279.8400

processors or lighting equipment, the dealers that Savant sought to engage in 2008 were already distributing and selling products of some other manufacturers?

A. Of various types of equipment, yeah, in a broad sense.

Q. So in 2008 Savant sought to distribute its products through an established network of dealers. True?

A. Yeah. There was a set of dealers in the marketplace, that's right.

Q. And at that time Savant made a business decision not to distribute its products through a national distributor such as AVAD. Is that fair to say?

A. That's correct.

Q. And at that point in time, in 2008, Savant made a decision not to distribute its products directly to end users through a retail channel. Correct?

A. That's correct.

Q. So Savant was in 2008 taking advantage of an already established network of independent dealers for its distribution. True?

distributing automation and control products of other manufacturers. True?

A. In the high-end space there were two other manufacturers.

Q. Who were they, in your opinion?

A. Crestron and AMX.

Q. So would it be your testimony that Savant targeted those dealers that were selling Crestron and AMX to sell its products?

A. We marketed our dealers in the CEDIA marketplace and the dealers came to us, and at our first trade show we were mobbed with interest because of the new technology and the innovative technology that we offered the dealer that no one else had. So it was really the dealers coming to us. We marketed exclusively really through the CEDIA trade show.

Q. So those were dealers that were at that time, though, selling products of other manufacturers?

A. They could or could not have been. I mean, the product was very unique where it didn't have the heady burden of some of the other companies in the space.

Q. Does Savant believe that it introduced any innovation into the marketplace?
A. Tons. But we also got stifled with innovation in the marketplace because of Crestron's blocking of the marketplace to us, which stifled our growth, which caused also a decrease in what the innovation would have been if not for their actions.
Q. Well, let me ask you this: In 2008 what innovation, if any, did Savant introduce in the marketplace?
A. The biggest -- There was quite a number of innovative angles on the product, the biggest being our software component of the product where a dealer, all different types of dealers could now use our Blueprint software to configure high-end complicated homes and bring automation into the space and shorten the expense of bringing technology into the space.
Q. What about in 2009? Did Savant introduce any innovative products or technology into the marketplace?
A. We continued to invest in the innovation of the company both in the software side relative to bringing the whole solution to the space where you

in the marketplace, regardless of all the lies that they published about our product. So I think over the years we innovate as much as we can and we still keep ahead, but we could innovate much more.

Q. So in 2011, 2012 and 2013 to today, is it your testimony Savant has been unable to innovate?

A. No, we've been innovating. It's just like I said, every company's amount that they invest in innovation is a function of their success. And if they're blocked from the marketplace, it has an effect on innovation. It just does. But, on the other hand, we have been able to also focus as much as we can with the limited market access we had to continue to innovate in the product line. Other technologies such as True Image and other things have been cutting edge in the marketplace.

Q. At some point in time Savant acquired LiteTouch. Correct?

A. That's true. We acquired the assets of LiteTouch.

Q. Correct. And Savant acquired LiteTouch for the technology?

A. It wasn't really for the technology that we acquired LiteTouch, but it was more for some of

and round and round you go.

I mean, we had the software technology that blew everybody away. Dealers wanted to use it. Because of, you know, stifling in the high-end channel, we got seriously harmed and so did the end users relative to being able to get innovative products.

So the video technology, the hardware capabilities, the switching capabilities, all this is evolving so fast in this marketplace, you have to be able continually to invest. You can't continue to invest if you're blocked out of a market and you're delayed into a market, because then you cannot accelerate that growth as the market is accelerating.

Q. Now, you mentioned the market would have grown even faster. Savant believes that this is a growing market?

A. The high-end luxury space that Savant, Crestron and AMX is is not growing at a great pace.

Q. But it is growing?

A. It's growing at a slow pace, that's correct.

Q. But it is growth. Correct?

A. It's -- Yes. However, the whole point of any company is being able to capture a market like in the high-end space. If you're blocked out of that marketplace, you can't grow. You can't grow the company. You can't innovate anymore to get you into a broader space. The whole concept of the company was to capture the high-end space, which we were on the road to doing until we got blocked. The technology we could've innovated more and more, growing the company at a much faster, greater rate.

Q. Now, earlier you stated that Savant's ability to innovate depended in part on capital. Is that right?

A. Yes.

Q. Would it be fair to say that you or entities that you own or control are the source of Savant's capital?

A. That's correct.

Q. And you have the ability, if you choose, whether personally or through entities that you own or control, to decide to contribute more capital to Savant. True?

A. Up to a point, that's true. I am in control of my own investment in the company, but the

A. I believe it's just the entity that owns the building.
Q. Owns the building, okay.
A. Most of the real estate.
Q. Same thing with Perseverance LLC?
A. Yeah, I'd have to check what that owns. I don't remember. I don't....
Q. Do you know who the members of 32 Wianno LLC are?
A. No, I do not. I'd have to look it up. Sorry.
Q. What about Perseverance LLC?
A. I don't.
Q. What is the entity 561 Broadway LLC?
A. 561 Broadway owns the real estate where the Savant Experience Center is.
Q. And who are the members of 561 Broadway LLC?
A. I don't remember.
Q. And for 32 Wianno, Perseverance and 561 Broadway LLC, are they related in any way to 886 Ventures or 886 Holdings?
A. Only in that -- The Perseverance is not related, I don't believe, but I'd have to check --

Q. Anything else you can tell me about?

A. We have stifled growth in many of the areas that really hurt the company across the board: As I mentioned earlier, innovation with engineers that we could have hired. So it actually stifles the growth. So not growing in certain areas so we don't have to cost-cut is something that we have been doing due to the situation we're in in the high-end marketplace.

Q. Savant has also expanded its product offerings. True?

A. We have. But, as I already said, it would have expanded much more if it were not for the actions of Crestron.

Q. And Savant has purchased assets. True?

A. I don't know what you mean by purchased assets.

Q. The assets of LiteTouch.

A. Oh, yes, we did. It was a decision that was made.

Q. Any other assets that Savant has purchased?

A. Not that I remember.

Q. Now, recently Savant has introduced a

you ready?
A. Yes.
Q. Savant's product offerings when it first entered the market were not as large as they are now, correct, in terms of --
A. They were as large as Crestron's when we came out on the marketplace.
Q. I'm not asking you that question.
A. Well, I'm just going by the sales literature that is packed with lies that claims that we didn't have a full offering against them, which is a lie. We had a full offering from day one. So I'm sorry. I don't know if that's what you were talking about.
Q. Let's deal with Savant itself as a company. Okay?
A. Okay, sure.
Q. As Savant, you have the familiarity and are designated to testify on behalf of Savant as to its products. Is that fair?
A. That's correct. I designed lots of them.
Q. And comparing let's say just the price list of Savant today versus back in 2008, would it be fair to say that you see a lot more products on

A. All the products have some aspect of control. That's why we're an automation and control company.

Q. Including thermostats?

A. Thermostats receive control, that's correct.

Q. And would you consider them part of a programmable controller system?

A. Not really. They're a peripheral. So it depends on what you mean by.... Technically it's a peripheral, so it's something we control. Or Crestron's the exact same. There's no difference.

Q. So Savant products, what would you as the head of Savant consider integral to a programmable controller system?

A. That's so broad. It could be all the pieces you control and the switching mechanism that you're distributing the video and audio through the house. It can be all the pieces that you're controlling also. So it's pretty broad.

I mean, it can be a control system that's controlling thermostats, security systems, smart locks, tools, spas. I mean, it's all over the place. I mean, that's what's so interesting about

didn't offer thermostats. That's nonsense. Nonsense. Thermostats were offered. Ours were more cost-effective because we offered multiple through our reps that sold the total solution to the dealer.

This is where you're playing legal word games rather than just admitting the slick sheets they had were lies. Lies! They had slick sheets that said we didn't offer these things. That's not true. That's not true at all! It's an outright lie and a distortion of the truth. It's the same way they distorted the Apple angle as far as Apple product. It's the same way they distorted where the company was. It's the same way they distorted our service capabilities.

They distorted every single truth about this company and its product, and now you're sitting here and are going to spend all day asking me ridiculous questions about offerings. Our sales guy would go to a dealer, they could offer the whole solution. That's why we picked the reps that we picked.

Now, if you want to get into it again, what Crestron put out there in the sales sheets was not true. They knew it wasn't true. They slanted

thermostats?

A. They were not branded Savant thermostats, but it didn't -- But to say they weren't offered is not correct, because it's implying that we don't offer those features. That is not true. And they did it across the board in everything they compared.

Q. At what point in time did Savant sell Savant-branded thermostats?

A. I'd have to look at what the date was. It's probably 2012 we branded Savant thermostats.

Q. At what point in time did Savant sell Savant-branded lighting control equipment?

A. When did we acquire LiteTouch? We acquired them in February of 2011. Sorry. Getting my dates messed up.

Q. So putting aside --

A. So sometime end of 2011 we offered lighting.

Q. And given my rudimentary understanding of the market and Savant's product offerings, I understand that Savant has a Partners in Excellence program. Correct?

A. That was correct, yeah.

Q. Is it still correct?

A. Yeah, we still have it. I just don't know if we call it that still.

Q. And you have products from third-party manufacturers that can be offered in conjunction with Savant's products. True?

A. We have products from third-party manufacturers that are what? I'm sorry.

Q. Can be offered with Savant's products.

A. Yes.

Q. So putting those aside, from 2008 to the present what additional control and automation products has Savant offered as Savant-branded products?

A. Amplifiers.

Q. Anything else?

A. Speakers.

Q. Anything else?

A. No. I don't.... No, that's it, but we also -- Again, even with speakers and amplifiers, it'll be offered with a slew of different amplifiers and speakers. And my frustration again is out of context, the way you're asking these questions.

If you put the slick sheet on the table of how they presented it to a dealer and that was one

A. I see the colors, yes.
Q. What does that represent, all of these?
A. Oh, I'd have to look at it, because I've never seen this before.
Q. Are these categories of products or services offered on this particular price list?
A. Yes. So it's different types of categories of product that you would buy to configure/install a home automation system. And you notice three-quarters of the way down there's all this cable there that you're going to need to wire things in.
Q. What about on the next page, if you flip over on 2183, professional services and documentation?
A. Yes. Those are more services that you would buy from us.
Q. Those are not products. Correct?
A. Well, service is a product. I mean, you buy service. You know, I don't want to split hairs, but it is a product. Companies can have a product that's all service or all.... It's not a piece of hardware, but it is certainly a service that we sell, which would be a product, so....

employees. Correct?
A. He sent this to Bruce Myers from Sean, so he was communicating with Bruce. He courtesy-copied himself, that's weird, and Jim Carroll and Ben, who was a sales manager. So they were Savant employees, that's correct.
Q. And he was detailing issues raised relating to the sale of Savant products. Correct?
A. He was relating issues to problems with the beta units in Savant products, the first systems we shipped and tried to install in the first year. So that's actually fairly common in a beta cycle. You're going to have -- And actually what happened with Sean was that Sean was a sales guy that we hired, to be honest, too soon. The product was still in beta sites and he was trying to go out and sell it.
So there's no question, hey, any type of product of this complexity, with this level of software, when you first introduce it, yeah, you're going to have issues in the field. And as I said earlier, it's just a function of numbers: That the more you can get out in the field, the more that you can quickly address the beta cycle to address the

bugs to get the system stable.

It took us longer than we had originally planned, but by the end of 2009, because this is 2008 and '9, if I read the dates right, things started to stabilize because we finally hit the numbers. You know, it takes numbers to get to the quality level that the software is today. And it's just that simple. If Microsoft Word only sold to a hundred people, you still would have a lot of bugs in it. If Microsoft -- You know, if Apple went around blocking the market from them and they wouldn't let them sell it because they blocked them from the dealer channel, they wouldn't be able to get enough mass up there to quickly address the bugs.

So this product when it first released was like any other software product of this complexity. It eventually stabled out, and absolutely, because in the field today any dealer will tell you our reputation on quality is premier, quality of the software. I get end users that come up to me just recently, and I was very proud of this, in New York City, one of the owners of the Steelers came up to me, his wife, and said "Thank you for building this

product. This is the most stable thing I've used," and was just thrilled.

I get those thank-yous all the time, because we are building the code. Now, when the code first hit the field, did it have bugs? I've already said yes. So you're going to pinpoint bugs and say oh, look, you can't scale? That's nonsense.

The only thing that stopped us from scaling was Crestron blocking the market from us. We had so many dealers that wanted to take this product and so many of them got frightened away, which limited the number of installs, which extended the time of debugging the code. We didn't expect that to happen.

In the beginning, when we first planned this, I had no idea this company was going to block us from the marketplace and delay our entry. And you delay the number of systems that are installed, which is going to delay your time to get to a stability point. And that's exactly what happened. And that's exactly what you're pointing to in this e-mail.

So I never sat here and said in the early days the system we shipped didn't have any bugs in

flat-out overpriced and not competitive at a majority of jobs," end quote. Do you see that?

A. Yeah.

Q. And in the summer of 2009 Savant's pricing was higher than competitors' pricing. Correct?

A. That's -- I don't believe that. My competitive analysis was we were pretty much somewhere, anywhere between 10 percent lower or 10 percent higher. When you added the programming charges in, we were cheaper. So we were much less than Crestron because there wasn't -- You know, a typical job that we looked at then, and even now, the programming charges can go up to 30 to 40 percent of the total job.

With this technology, you didn't have that, so the total solution with the programming, we were lower. I think the hardware, the actual hardware cost, we are between 5 and 10 percent higher or 10 percent lower, depending on what hardware you spec'd out. Those were the rough ranges.

So that meant to me we were hardwarewise compatible; the total solution was less.

I don't know what, again, Sean was

comparing to. The fact that Sean left the company, I don't know what his, you know, thinking was when he wrote this. But I know from market data that we were very competitive with Crestron. I mean, their own slick sheets, if you cull out the lies in it, shows us actually less in price than their platform or head to head, neck and neck in their price. Their own slick sheets show that.

So we were very competitive in price on the hardware. We were cheaper or, not cheaper, more cost-effective in the programming because there wasn't this big programming charge. And you have to consider that for the total job. Like when I put the first system in my home before I started this company, I think it was, you know, tens of thousands of dollars you pay for programming. Tens of thousands. It's not insignificant. And with this platform, you didn't have that big cost. So the total solution was much less.

Q. Do you believe that Mr. Manzanares was trying to mislead Mr. Myers or other Savant personnel?

A. I don't know. I'm just telling you what I know about the marketplace and what Jim Carroll

word "complete" that's important.

Q. And this is something that Savant sent out. Correct?

A. Yes.

Q. Okay.

Now, sir, you have talked about Crestron and what you refer to as the slick sheets. Correct?

A. Yes.

Q. And given the discussion earlier today, I take it Savant has issues with those slick sheets?

A. That's a good, heh, observation, yeah.

Q. Sitting here today, can Savant identify any individual who was actually deceived by Crestron's slick sheets?

A. I think we're still combing through all that with discovery on pieces that I don't have eyes to, naturally, because of the protective order and all that. So I think we're still evaluating that. But it does -- I mean, it's just logical too. You're a dealer; you get filled with lies about the company; on top of it, you get your business threatened. It's a one-two punch, and I think time will tell with our --

Q. I'm just asking you as of today. As we

sit here today, can Savant identify --

A. I'm telling you we're still investigating it. We're combing through all the.... And, again, I'm not privy to all the data.

Q. So the answer is no at this point in time?

A. No, it's not no. It's I'm not privy to the data yet and we're not done combing through it. That's not a no.

Q. Well, the question is whether or not you sitting here today can identify an individual who was actually deceived.

A. Personally?

Q. Yes.

A. I was on a sales call personally in New York City with an integrator that was just reciting off that slick sheet and we ended up losing the job on account of it; and it was, can't remember the guy's name, but it was a Bloomberg account.

So I witnessed it personally myself once. But in this field, we were getting that in from dealers going "This is going to hurt us." Now, dealers were handing us the slick sheets that they were getting and handing them out to everybody. They even got handed out internationally. Our

Brazilian distributor in Brazil, Henry -- can't remember his last name; he's our distributor in Brazil -- he actually sent it to us too because he was getting threatened and the sheets handed out.

So we are still investigating how they had an effect, but it definitely had an effect in the field on us. I think it's logical.

Q. Did Savant ever receive any of Crestron's information or slick sheets from any end users?

A. We don't deal with end users; our dealers do. I'd have to ask the dealers that question. Our customers are the dealers, not the end users. We don't have a direct relationship with the end users.

Q. And the dealers --

A. I wouldn't doubt it, but I don't have any.... Again, we don't deal with the end users.

Q. And the dealers are custom integrators and installers. Correct?

A. They are integrators and installers, yes.

Q. And I take it they have some level of technical expertise with respect to control and automation?

A. Or some expertise in audio and video. And it varies from dealer to dealer.

A. No, they wouldn't know that.

Q. Why not?

A. Because they're not software guys. I mean, HDMI, well, it depends. They had a certain level of knowledge; and most of them, their level of knowledge was more on the installation side. So they knew what an HDMI port was, yes. They knew that you connected the video output to the TV; they knew you connected the audio output to the amplifier and then you wired the speakers in. So they had that level of knowledge. They wouldn't have the engineering knowledge of the product is my point.

Q. Why did Savant decide not to distribute or sell its products through a national distributor such as AVAD?

A. It was our view then and now, in the high-end space the distribution channels like AVAD were frowned upon. We looked at different channels; and that's more for, I believe, a mid-level product than it is the high-end dealer space.

Q. You understand that HAI Leviton distributes through AVAD. Correct?

A. Leviton Lighting?

Q. Leviton, yes.

A. I understand, yes. Sorry about that. Go ahead.
Q. So my question -- and I'm sorry if I talk slowly; I'm just a lawyer -- is: Did Savant choose the timing of the filing of the lawsuit on the eve of CEDIA to maximize the publicity of the lawsuit?
A. No.
Q. Whose idea was it for you to provide an exclusive interview to CE Pro on the eve of CEDIA?
A. I believe it was myself.
Q. And why did you make that decision?
A. Because CE Pro is the magazine that everybody -- you know, it's the main magazine in the show. We didn't want to, you know, broadcast it out; we just wanted one easy message out to the dealer base that was very clear, very straightforward.
Q. And Savant also filed or issued a press release concerning the filing of the complaint against Crestron. Correct?
A. Yes, I believe we did, mm-hmm.
Q. And Savant sought to widely publicize the filing of its lawsuit against Crestron. Correct?
A. No. I don't know what you mean by widely

that?

A. Yes.

Q. And Mr. Carroll says in response to your forwarding the e-mail, quote, "This sounds good. We need to think about which outlets to send it to. Obviously the CE Pro and the other resi-oriented. We should also send it to the commercial trade and broader business wire." Correct? Do you see that?

A. Right. I read that.

Q. So earlier you said there was no press or --

A. Well, there was press on one thing that happened in the litigation, but that's still not publicizing it. I mean, there's going to be press at the end of this too, this case. And, again, it was very important for us across the business world, and it wasn't just residential that was getting threatened. The firsthand account that I witnessed was actually a commercial deal and that's why Jim is saying maybe we should get a message to the commercial world too.

I mean, it was important that we stood up to Crestron. This was a monopoly in the space bullying everybody, threatening dealer after dealer

us, we have documents, and then we did and no documents popped up.

So Jim called up Will and said "Will, you told us there were documents and we subpoenaed you and nothing was coughed up" and he said "Well, let me check on that," and he checked on that, and then documents were produced. And I believe that's the only conversation we've had with Control4.

Q. Has Savant had any communications with anybody else in the industry relating to this litigation?

A. Not in any depth. I mean, if somebody asked us how it's going, we usually say no comment or.... You know, not in depth.

Q. Has Savant made efforts to have CE Pro write articles about the litigation?

A. No, other than the first interview that we already discussed.

Q. In terms of Savant's products, are there plans to offer more Linux-based products?

A. We are in development developing a Windows-based software platform that can run on Windows hardware. We're right in the middle of it so we don't have it complete.

Q. And why is that?
A. It's just development. It's scheduled for release soon.
Q. And why is Savant departing from the OS, Apple OS?
A. We won't depart completely. We'll always support the Mac Mini in the high-end space, in the space that we compete with Crestron. We feel that there might be mid-level market streams we can go after with Savant -- with a Linux-based product, for cost reasons.
Q. And what is the cost threshold that you are looking for that demarcates midmarket versus high-end?
A. We are still investigating it. We really haven't nailed it down exactly yet, but the Mac is one price. The Linux processor we can get for cheaper cost and lower performance. Apples to apples, no pun intended, a Linux processor with like Mac Mini features and horsepower is about the same cost, but we can't get lower-performing Macs. The Mac Mini is the lowest-performing Mac and it's got tons of horsepower. So we have so much horsepower in the Mac, that's why it's perfect for the ultra

some point, though, that it needed to offer a fuller line of Savant-branded products such as lighting, thermostats, et cetera, to compete more effectively in the market?

A. To keep the innovation in the market, because it was -- That's a different subject. When it comes to lighting, when you look at what we've done with True Image and what we've done with Wi-Fi lighting, we're cutting edge. Again, it's my own opinion that it's a double-edged sword because we would've had more innovations had it not been for the blocking of Crestron and the delay of the company getting into the marketplace. But many times you will make a decision, say, for lighting like True Image and the Wi-Fi aspects of the lighting. You couldn't find that in the marketplace; it just doesn't exist.

Q. So Savant believes that is innovative lighting vis-à-vis Lutron, for example?

A. Yes.

Q. When was that introduced, sir?

A. Last quarter.

Q. What about Wi-Fi lighting? When was that introduced?

A. No, none.

MR. PARK: Okay, let me take a short break.

THE VIDEOGRAPHER: The time is 5:24 p.m. and we are off the record.

(Short recess taken.)

THE VIDEOGRAPHER: The time is 5:26 p.m. and we are on the record.

MR. PARK: Mr. Madonna, I have no further questions. I did look at the snow and as a concession to the shortness of life, I have finished my questioning.

THE WITNESS: Thank you.

MR. O'KONSKI: I have no questions.

THE VIDEOGRAPHER: The time is 5:27 p.m. and we are off the record.

(Deposition concluded at 5:28 p.m.)