# EXHIBIT 680

Cash For Settlement
SuperGreenAdvice.com/Cash
Invest in Financial Knowledge Find Top Settlement Providers Here.
AdChoices



# Control4 Corp files Form S-1 (IPO Registration) SEC Filing

Use these links to rapidly review the document
TABLE OF CONTENTS
INDEX TO CONSOLIDATED FINANCIAL STATEMENTS

Table of Contents

**As filed with the Securities and Exchange Commission on July 1, 2013**

**Registration No. 333-**

## UNITED STATES
## SECURITIES AND EXCHANGE COMMISSION
**WASHINGTON, D.C. 20549**

## FORM S-1
**REGISTRATION STATEMENT**
**UNDER**
**THE SECURITIES ACT OF 1933**

## Control4 Corporation
(Exact name of registrant as specified in its charter)

| **Delaware** | **3670** | **42-1583209** |
|---|---|---|
| (State or other jurisdiction of incorporation or organization) | (Primary Standard Industrial Classification Code Number) | (I.R.S. Employer Identification Number) |

**11734 S. Election Road**

**Salt Lake City, Utah 84020**
**(801) 523-3100**
(Address, including zip code, and telephone number, including area code, of registrant's principal executive offices)

**Martin Plaehn**
**President and Chief Executive Officer**
**11734 S. Election Road**
**Salt Lake City, Utah 84020**
**(801) 523-3100**
(Name, address, including zip code, and telephone number, including area code, of agent for service)

**Copies to:**

| | | |
|---|---|---|
| **William J. Schnoor**<br>**Richard A. Kline**<br>**Michael J. Minahan**<br>**Goodwin Procter LLP**<br>**135 Commonwealth Drive**<br>**Menlo Park, California 94025**<br>**(650) 752-3100** | **Greg Bishop**<br>**General Counsel and Chief Compliance Officer**<br>**11734 S. Election Road**<br>**Salt Lake City, Utah 84020**<br>**(801) 523-3100** | **Eric C. Jensen**<br>**Andrew S. Williamson**<br>**Cooley LLP**<br>**3175 Hanover Street**<br>**Palo Alto, California 94304**<br>**(650) 843-5000** |

**Approximate date of commencement of proposed sale to the public:**
**As soon as practicable after this registration statement becomes effective.**

If any of the securities being registered on this Form are to be offered on a delayed or continuous basis pursuant to Rule 415 under the Securities Act of 1933 check the following box: ☐

If this Form is filed to register additional securities for an offering pursuant to Rule 462(b) under the Securities Act, please check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. ☐

If this Form is a post-effective amendment filed pursuant to Rule 462(c) under the Securities Act, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. ☐

If this Form is a post-effective amendment filed pursuant to Rule 462(d) under the Securities Act, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company. See the definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act. (Check one)

| | | | |
|---|---|---|---|
| Large accelerated filer ☐ | Accelerated filer ☐ | Non-accelerated filer ☒<br>(Do not check if a small reporting company) | Smaller reporting company ☐ |

**CALCULATION OF REGISTRATION FEE**

| Title of Each Class of Securities to be Registered | Proposed Maximum Aggregate Offering Price(1) | Amount of Registration Fee(2) |
|---|---|---|
| Common Stock, par value $0.0001 per share | $60,000,000 | $8,184 |

(1) Estimated solely for the purpose of calculating the registration fee in accordance with Rule 457(o) under the Securities Act of 1933, as amended. Includes offering price

of additional shares that the underwriters have the option to purchase.

(2) Calculated pursuant to Rule 457(o) under the Securities Act based on an estimate of the proposed maximum offering price.

**The registrant hereby amends this registration statement on such date or dates as may be necessary to delay its effective date until the registrant shall file a further amendment which specifically states that this registration statement shall thereafter become effective in accordance with Section 8(a) of the Securities Act of 1933 or until the registration statement shall become effective on such date as the Securities and Exchange Commission, acting pursuant to said Section 8(a), may determine.**

Table of Contents

The information in this preliminary prospectus is not complete and may be changed. We may not sell these securities until the registration statement filed with the Securities and Exchange Commission is effective. This preliminary prospectus is not an offer to sell these securities and it is not soliciting an offer to buy these securities in any state where the offer or sale is not permitted.

Subject to Completion
Preliminary Prospectus dated July 1, 2013

PROSPECTUS

Shares

Control4

Common Stock

This is Control4 Corporation's initial public offering. We are selling shares of our common stock.

We expect the public offering price to be between $ and $ per share. Currently, no public market exists for the shares. After pricing of the offering, we expect that the shares will trade on The NASDAQ Global Market under the symbol "CTRL".

We are an "emerging growth company" as defined in the Jumpstart our Business Startups Act of 2012 and, therefore, may comply with certain reduced public company reporting requirements.

**Investing in the common stock involves risks that are described in the "Risk Factors" section beginning on page 13 of this prospectus.**

| | Per Share | Total |
|---|---|---|
| Public offering price | $ | $ |
| Underwriting discount[(1)] | $ | $ |
| Proceeds, before expenses, to us | $ | $ |

(1) See "Underwriting" for a description of the compensation payable to the underwriters.

The underwriters may also exercise their option to purchase up to an additional shares from us at the public offering price, less the underwriting discount, for 30 days after the date of this prospectus.

Neither the Securities and Exchange Commission nor any state securities commission has approved or disapproved of these securities or determined if this prospectus is truthful or complete. Any representation to the contrary is a criminal offense.

The shares will be ready for delivery on or about , 2013.

**BofA Merrill Lynch** **Raymond James**

**Canaccord Genuity** **Cowen and Company** **Needham & Company**

The date of this prospectus is , 2013.




Table of Contents

TABLE OF CONTENTS


| | Page |
|---|---|
| Prospectus Summary | 1 |
| Risk Factors | 13 |
| Special Note Regarding Forward-Looking Statements and Industry Data | 37 |
| Use of Proceeds | 38 |
| Dividend Policy | 38 |
| Capitalization | 39 |
| Dilution | 41 |
| Selected Consolidated Financial Data | 43 |
| Management's Discussion and Analysis of Financial Condition and Results of Operations | 47 |
| Business | 78 |
| Management | 95 |
| Executive Compensation | 103 |
| Certain Relationships and Related Party Transactions | 112 |
| Principal Stockholders | 115 |
| Description of Capital Stock | 119 |
| Shares Eligible for Future Sale | 124 |
| Material U.S. Federal Income and Estate Tax Consequences for Non-U.S. Holders | 127 |
| Underwriting | 131 |
| Legal Matters | 137 |
| Experts | 137 |
| Where You Can Find More Information | 137 |
| Index to Consolidated Financial Statements | F-1 |


You should rely only on the information contained in this prospectus and in any free writing prospectus prepared by or on behalf of us and delivered or made available to you. We have not, and the underwriters have not, authorized anyone to provide you with information different from, or in addition to, that contained in this prospectus or any related free writing prospectus. We do not take responsibility for, and can provide no assurance as to the reliability of, any other information that others may give you. This prospectus is an offer to sell only the shares offered hereby but only under circumstances and in jurisdictions where it is lawful to do so. The information contained in this prospectus is current only as of its date.

No action is being taken in any jurisdiction outside the United States to permit a public offering of our common stock or possession or distribution of this prospectus in that jurisdiction. Persons who come into possession of this prospectus in a jurisdiction outside the United States are required to inform themselves about, and to observe any restrictions as to, this offering and the distribution of this prospectus applicable to that jurisdiction.



Table of Contents

## PROSPECTUS SUMMARY

*This summary highlights information contained elsewhere in this prospectus. Because this is only a summary, it does not contain all of the information that may be important to you. You should read this entire prospectus and should consider, among other things, the matters set forth under "Risk Factors," "Selected Consolidated Financial Data," "Management's Discussion and Analysis of Financial Condition and Results of Operations" and our consolidated financial statements and related notes thereto appearing elsewhere in this prospectus before making your investment decision.*

**Overview**

Control4 is a leading provider of automation and control solutions for the connected home. We unlock the potential of connected devices, making entertainment systems easier to use, homes more comfortable and energy efficient, and families more secure. We provide our consumers with the ability to integrate music, video, lighting, temperature, security, communications and other functionalities into a unified home automation solution that enhances our consumers' daily lives. More than 75% of our consumers have integrated two or more of these functionalities with our solution. At the center of our solution is our advanced software platform, which we provide through our products that interface with a wide variety of connected devices that are developed both by us and by third parties.

Our solution functions as the operating system of the home, making connected devices work together to control, automate and personalize the homes of our consumers. For example, our solution can be configured so that:

- A half hour before you wake up in the morning, the thermostat adjusts to heat up the house, the lights slowly become brighter and the shades gradually open;
- As you leave for work, one push of a button locks the doors, arms the security system, turns off all the lights, powers down all non-essential devices and adjusts the temperature settings to the "away" mode;
- When you return home in the evening, the push of a button opens your garage door, unlocks the door and adjusts the thermostat to your preferred temperature;
- When you are ready to watch a movie, instead of having to use several remotes, a single interface—be it a touch screen, smartphone, tablet or simple remote—provides you with easy control of your entire entertainment system. As the movie starts, the window blinds close, the lights dim and the temperature adjusts to keep your family comfortable; and
- When it is time for bed, the press of a "goodnight" button closes the blinds, turns off the lights, locks the doors, arms the security system and turns off all televisions and game consoles.

At the center of the Control4 product line is the Control4 Home Operating System, which we refer to as the C4 OS. We embed our C4 OS in a range of products, including controller appliances, interfaces and connected devices that interact with various music, video, lighting, temperature, security, communications and other devices. We offer our 4Sight subscription service, which allows consumers to control and monitor their homes remotely from their smartphone, tablet or laptop, and allows our dealers to perform remote diagnostic services. For example, 4Sight allows a consumer to remotely unlock the front door to let in a repairman, to turn on the air conditioning on the way home, and to monitor the home security cameras from a smartphone. In addition, our 4Store application marketplace offers a range of third-party applications for use with our products. We derive virtually all of our revenue from the sale of products that contain our proprietary software, and a smaller portion from software licensing and annual service subscriptions.





We were founded in 2003 to deliver a home automation solution to the mainstream market by enabling consumers to unify their connected devices into a personalized system at an accessible and affordable entry point. Based on our analysis, through March 31, 2013, we estimate that we have automated more than 120,000 homes representing cumulative sales of more than 275,000 of our controller appliances, the brain of the connected home. We sell and deliver our solutions through an extensive worldwide dealer and distributor network and have solutions installed in 81 countries. Our top 100 dealers represented 24% of our total revenue in 2012.

We generated revenue of $74.9 million, $93.4 million and $109.5 million in 2010, 2011 and 2012, respectively, and $26.6 million for the three months ended March 31, 2013. We had a net loss of $16.3 million, $3.9 million and $3.7 million in 2010, 2011 and 2012, respectively, and $1.5 million for the three months ended March 31, 2013.

**Our Industry**

***Market Opportunity***

Consumers are becoming more reliant on network-aware devices in their everyday lives, contributing to the creation of a large opportunity in the mainstream home automation market. Growth in smart devices, such as smartphones and tablets, and the ubiquity of wireless networks have combined to create the "connected consumer." These consumers are seeking a connected home with expanded capabilities in the form of networks, connected devices and smart systems.

Historically, the home automation market was primarily comprised of luxury systems that were so expensive that only wealthy consumers could afford the programming and installation costs. As consumer awareness of home automation grows and expectations for interoperable and more affordable solutions increase, the mainstream segment of the home automation market is expected to expand rapidly. According to ABI Research, the mainstream segment of the home automation market was estimated to be a $571 million market in 2012 and a $2.6 billion market by 2017, representing a CAGR of 35%, as consumers look for centralized solutions to provide personalized control and automation of their homes.

***Consumer Requirements***

For mainstream consumers to embrace a home automation solution, we believe that the solution must have the following attributes:

- ***Easy to Use.*** Accustomed to easy-to-use smartphones, consumers want a simple, unified, yet powerful and innovative interface for the unique set of devices and systems they have in their homes;
- ***Interoperable.*** Consumers are looking for a single solution with the ability to manage their network of current and future devices, regardless of manufacturer, technology or communication protocol;
- ***Personalized and Flexible.*** Consumers want to be able to easily personalize the behavior of the devices in their homes to reflect their own lifestyles and preferences—now and into the future—providing flexibility as their needs and lifestyles change;
-

- ***Affordable and Future-Proof.*** Consumers want a home automation solution that delivers rich functionality at an affordable price point and that adapts to changing needs over time without significant cost or disruption; and

- ***Accessible Service and Support.*** Consumers are looking for solutions that are supported by local trained specialists who can provide both responsive initial consultation and installation, as well as ongoing service and support.





***Limitations of Traditional Approaches***

The home automation market has traditionally been comprised of:

- ***Luxury Installations.*** Generally found in the highest end segment of the market, these systems and installations are typically complex, lengthy, inflexible and expensive;

- ***Managed Services.*** Generally provided by a cable, telephone or security provider, these services come as a non-personalized, one-size-fits-all service with narrow capabilities and recurring monthly charges; and

- ***Point Products.*** Generally supplied by companies focused on a discrete function within the home, these products typically lack interoperability with other devices.

**Our Solution**

The Control4 solution, built around our advanced software platform, sits at the center of the fast-growing mainstream segment of the home automation market. Our solution functions as the operating system of the home, integrating music, video, lighting, temperature, security, communications and other devices into a unified automation solution that enhances our consumers' daily lives. Our solution provides the consumer with the following key benefits:

- ***Easy to Use.*** Our solution is designed to be simple and intuitive. For example, our easy-to-use interfaces can be as advanced as a smartphone, tablet, in-wall touch panel, television or multi-function remote control, or as simple as a single button or switch;

- ***Broad Device Interoperability.*** Our open and flexible solution provides consumers with access to a broad universe of over 6,400 discrete third-party devices. With our solution, consumers can connect and automate the devices they already own—as well as the devices they purchase in the future—and have the confidence that all of those devices will interoperate as seamlessly as if they were made by the same manufacturer;

- ***Advanced Personalization.*** Our adaptable solution enables consumers to personalize the features and functionality of their Control4 system. Our modular design also enables the smooth integration of new third-party products to meet the evolving needs of our consumers as their lifestyles change;

- ***Attractive Entry Point.*** According to ABI Research, the typical luxury home automation installation can cost $60,000 or more for whole-home systems. With our solution, consumers can start with a single-room multi-media automation experience for about $1,000 and scale to an integrated solution with an average cost of $26,000;

- ***Professional Installation and Support Through Our Global Dealer Network.*** We have built a global network of over 2,800 active direct dealers and distributors to help consumers develop and install their customized home automation experiences with the Control4 solution; and

- ***Remote Access and Specialized Apps.*** We have developed complementary services and applications offerings to provide consumers more access, control and enhanced functionality over their automated homes.





**Our Growth Strategy**

Our goal is to be the leading global provider of mainstream home automation solutions and the operating system of choice for the home. The following are key elements of our growth strategy:

- ***Enhance Our Software Platform and Products.*** We intend to continue to invest in our software platform to develop new products, features and capabilities that deliver exceptional performance and value to our consumers;

- ***Strengthen and Expand Our Global Dealer Network.*** We plan to continue to expand, train, support and optimize our global certified dealer network to ensure that we have sufficient geographic coverage across both existing and new markets;

- ***Increase Penetration of Our North America Core Market.*** We intend to continue to focus sales and marketing resources to increase penetration of the residential market in North America;

- ***Expand Our Focus on Adjacent Markets.*** We plan to continue making investments to capitalize on opportunities outside the residential market, including in the light commercial, multi-dwelling unit and hospitality markets, and internationally;

- ***Enhance Our Solution with Services and Apps.*** We intend to continue to enhance our 4Sight subscription services and to support third-party apps via our 4Store application marketplace to deliver more functionality and value to our consumers;

- ***Pursue Technology Licensing Opportunities.*** We plan to expand our licensing activities to leverage third-party distribution channels, grow our partner relationships, and simplify the home automation experience for dealers and consumers; and

- ***Pursue Strategic Acquisitions.*** We intend to identify, acquire and integrate strategic technologies, assets and businesses that we believe will enhance the overall strength of our business.

**Risks Related to Our Business**

Our business is subject to numerous risks and uncertainties, including those highlighted in "Risk Factors" immediately following this prospectus summary. These risks include, but are not limited to, the following:

- We have incurred operating losses in the past, may incur operating losses in the future, and may not achieve or maintain profitability;

- The markets in which we participate are highly competitive and many companies, including large technology companies, broadband and security service providers and other managed service providers, are actively targeting the home automation market. Our failure to differentiate ourselves and compete successfully with these companies would make it difficult for us to add and retain consumers, and would reduce or impede the growth of our business;

- Consumers may choose to adopt point products that provide control of a discrete home function rather than adopting our unified home automation solution. If we are unable to increase market awareness of the benefits of our unified solution, our revenue may not continue to grow, or it may decline;

- Many of the competitors in our market, including providers of luxury integrated solutions with long operating histories, established markets, broad user bases and proven consumer acceptance, may be successful in expanding into the mainstream home automation market, which may harm our growth and future prospects;





- Since we rely on third-party dealers and distributors to sell and install our solutions, we do not have a direct sales pipeline, which makes it difficult for us to accurately forecast future sales and correctly predict manufacturing requirements;

- Our quarterly results of operations have fluctuated and may continue to fluctuate. As a result, we may fail to meet or exceed the expectations of investors or securities analysts, which could cause our stock price to decline; and

- If we are unable to develop new solutions, sell our solutions into new markets or further penetrate our existing markets, our revenue may not grow as expected.

**Corporate Information**

We were incorporated in Delaware in 2003. Our principal executive offices are located at 11734 South Election Road, Suite 200, Salt Lake City, Utah 84020, and our telephone number is (801) 523-3100. Our principal website address is *www.control4.com*. Information contained on our website does not constitute a part of, and is not incorporated by reference into, this prospectus.

Control4, the Control4 logo, 4Sight, 4Store and Control4 MyHome are registered trademarks or trademarks of Control4 Corporation in the United States and, in certain cases, in other countries. This prospectus contains additional trade names, trademarks and service marks of other companies. We do not intend our use or display of these companies' trade names, trademarks or service marks to imply a relationship with, or endorsement or sponsorship of us by, these other companies.

We are an emerging growth company as defined in the Jumpstart Our Business Startups Act of 2012, or the JOBS Act. We will remain an emerging growth company until the earliest to occur of: the last day of the fiscal year in which we have more than $1.0 billion in annual revenue; the date we qualify as a "large accelerated filer," with at least $700 million of equity securities held by non-affiliates; the issuance, in any three-year period, by us of more than $1.0 billion in non-convertible debt securities; or the last day of the fiscal year ending after the fifth anniversary of our initial public offering.

Table of Contents

## THE OFFERING

| | |
|---|---|
| Common stock offered by Control4 Corporation | shares |
| Common stock to be outstanding after the offering | shares |
| Option to purchase additional shares offered by Control4 Corporation. | shares |
| Use of Proceeds | The net proceeds to us from this offering will be approximately $ million (or approximately $ million if the underwriters' option to purchase additional shares is exercised in full), based upon an assumed initial public offering price of $ share, which is the midpoint of the price range set forth on the cover page of this prospectus, and after deducting estimated underwriting discounts and commissions and estimated offering expenses payable by us. We intend to use the net proceeds from this offering for general corporate purposes, including working capital and capital expenditures. We intend to use $ million of the net proceeds from this offering to pay off the remaining amounts owed under a litigation settlement agreement. We may also use a portion of the net proceeds from this offering for acquisitions of complementary technologies, assets or businesses. |
| Risk Factors | See "Risk Factors" and the other information included in this prospectus for a discussion of factors you should carefully consider before deciding to invest in our common stock. |
| Proposed NASDAQ Global Market trading symbol | "CTRL" |

The number of shares of our common stock to be outstanding after the completion of this offering is based on:

- 92,566,014 shares outstanding as of March 31, 2013;
- 248,392 shares of common stock, on an as-converted basis, issuable upon the net exercise of a warrant to purchase 949,868 shares of preferred stock outstanding as of March 31, 2013 at an exercise price of $1.78, which would terminate upon this offering in accordance with its terms; and
- 508,839 shares of common stock issuable upon the net exercise of warrants to purchase 2,444,432 shares of common stock outstanding as of March 31, 2013 at an exercise price of $1.91, which would terminate upon this offering in accordance with their terms.

The number of shares of our common stock to be outstanding after the completion of this offering excludes:

- 23,972,031 shares of common stock issuable upon the exercise of options outstanding as of March 31, 2013 at a weighted average exercise price of $1.07 per share;



Table of Contents

- 370,000 shares of common stock issuable upon the exercise of a warrant to purchase common stock outstanding as of March 31, 2013 at an exercise price of $1.44 per share that will remain outstanding following this offering if not exercised;
- 60,926 shares of common stock, on an as-converted basis, issuable upon the exercise of warrants to purchase preferred stock outstanding as of March 31, 2013 at a weighted average exercise price of $1.48 per share that will remain outstanding following this offering if not exercised; and
- shares reserved for future issuance under our 2013 Stock Option and Incentive Plan, as well as shares originally reserved for issuance under our 2003 Equity Incentive Plan, but which may become available for awards under our 2013 Stock Option and Incentive Plan, which plan will become effective in connection with

this offering and contains provisions that will automatically increase its share reserve each year, as more fully described in "Executive Compensation—Employee Benefit Plans."

Except for historical financial statements or as otherwise indicated, information in this prospectus reflects or assumes the following:

- The filing of our amended and restated certificate of incorporation immediately prior to the closing of this offering;
- The conversion of all of our outstanding preferred stock into an aggregate of 79,528,755 shares of common stock immediately prior to the closing of this offering;
- No exercise after March 31, 2013 of outstanding options or warrants; and
- No exercise of the underwriters' option to purchase additional shares.





## SUMMARY CONSOLIDATED FINANCIAL DATA

We have derived the summary consolidated statements of operations data for the fiscal years ended December 31, 2010, 2011 and 2012 from our audited consolidated financial statements included elsewhere in this prospectus. We have derived the summary consolidated statements of operations data for the three months ended March 31, 2012 and March 31, 2013 and our consolidated balance sheet data as of March 31, 2013 from our unaudited interim consolidated financial statements included elsewhere in this prospectus. The unaudited interim financial statements reflect, in the opinion of management, all adjustments of a normal, recurring nature that are necessary for the fair presentation of the financial statements. Our historical results are not necessarily indicative of our future results. The following summary consolidated financial data should be read in conjunction with "Management's Discussion and Analysis of Financial Condition and Results of Operations" and our consolidated financial statements and related notes included elsewhere in this prospectus.

| | Years Ended December 31, | | | Three Months Ended March 31, | |
|---|---|---|---|---|---|
| | 2010 | 2011 | 2012 | 2012 | 2013 |
| | (In thousands, except per share data) | | | | |
| **Consolidated Statements of Operations Data:** | | | | | |
| Revenue | $ 74,925 | $ 93,376 | $ 109,512 | $ 22,628 | $ 26,571 |
| Cost of revenue | 43,357 | 50,534 | 57,225 | 12,466 | 13,550 |
| Cost of revenue—inventory purchase commitment | — | — | 1,840 | — | — |
| Gross margin | 31,568 | 42,842 | 50,447 | 10,162 | 13,021 |
| Operating expenses: | | | | | |
| Research and development | 15,922 | 19,211 | 20,310 | 4,813 | 6,066 |
| Sales and marketing | 22,491 | 17,546 | 20,182 | 5,038 | 5,605 |
| General and administrative | 8,876 | 9,805 | 10,150 | 2,532 | 2,828 |
| Litigation settlement | — | — | 2,869 | — | — |
| Total operating expenses | 47,289 | 46,562 | 53,511 | 12,383 | 14,499 |
| Loss from operations | (15,721) | (3,720) | (3,064) | (2,221) | (1,478) |
| Interest and other expense, net | (544) | (165) | (518) | (462) | (49) |
| Loss before income taxes | $ (16,265) | $ (3,885) | $ (3,582) | $ (2,683) | $ (1,527) |
| Income tax (expense) benefit | — | — | (141) | — | 56 |
| Net loss | $ (16,265) | $ (3,885) | $ (3,723) | $ (2,683) | $ (1,471) |
| Net loss per common share, basic and diluted | | | | | |

| | | | | | |
|---|---|---|---|---|---|
| | $ (1.91) | $ (0.39) | $ (0.30) | $ (0.23) | $ (0.11) |
| Weighted-average number of shares, basic and diluted | 8,531 | 10,014 | 12,286 | 11,708 | 13,022 |
| Pro forma net loss per common share, basic and diluted (unaudited)[1] | | | $ (0.04) | | $ (0.02) |
| Pro forma weighted-average number of common shares, basic and diluted (unaudited) | | | 92,575 | | 93,308 |
| **Other Non-GAAP Financial Data:** | | | | | |
| Adjusted gross margin | $ 31,596 | $ 42,891 | $ 52,365 | $ 10,179 | $ 13,037 |
| Adjusted gross margin percentage | 42.2% | 45.9% | 47.8% | 45.0% | 49.1% |
| Adjusted operating income (loss) | $ (14,252) | $ (1,707) | $ 4,514 | $ (1,490) | $ (640) |

(1) Pro forma net loss per common share has been calculated assuming the conversion of all outstanding shares of our preferred stock as of March 31, 2013 into 79,528,755 shares of common stock and the net exercise of outstanding warrants to purchase 3,394,300 shares of capital stock into an aggregate of 757,231 shares of common stock as of March 31, 2013 prior to the completion of this offering.



Table of Contents

Stock-based compensation expense included in the consolidated statements of operations data above was as follows:

| | Years Ended December 31, | | | Three Months Ended March 31, | |
|---|---|---|---|---|---|
| | 2010 | 2011 | 2012 | 2012 | 2013 |
| | (In thousands) | | | | |
| Cost of revenue | $ 28 | $ 49 | $ 78 | $ 17 | $ 16 |
| Research and development | 249 | 492 | 704 | 130 | 236 |
| Sales and marketing | 546 | 523 | 580 | 144 | 184 |
| General and administrative | 646 | 949 | 1,507 | 440 | 402 |
| Total stock-based compensation expense | $ 1,469 | $ 2,013 | $ 2,869 | $ 731 | $ 838 |

**Reconciliation of Non-GAAP Financial Data**

***Adjusted Gross Margin***

A reconciliation of Adjusted gross margin to gross margin, the most directly comparable GAAP financial measure, is presented below:

| | Years Ended December 31, | | | Three Months Ended March 31, | |
|---|---|---|---|---|---|
| | 2010 | 2011 | 2012 | 2012 | 2013 |
| | (Dollars in thousands) | | | | |
| Gross margin | $ 31,568 | $ 42,842 | $ 50,447 | $ 10,162 | $ 13,021 |
| Stock-based compensation expense included in cost of revenue | 28 | 49 | 78 | 17 | 16 |
| Cost of revenue—inventory purchase commitment | — | — | 1,840 | — | — |
| Adjusted gross margin | $ 31,596 | $ 42,891 | $ 52,365 | $ 10,179 | $ 13,037 |
| Adjusted gross margin percentage | 42.2% | 45.9% | 47.8% | 45.0% | 49.1% |

To provide investors with additional information regarding our financial results, we have disclosed in the table above and within this prospectus Adjusted gross margin, a non-GAAP financial measure. We have included Adjusted gross margin in this prospectus because Adjusted gross margin is a key measure used by our management and board of directors to understand and evaluate our operating performance and trends, to prepare and approve our annual budget, and to develop short- and long-term operational plans.

Adjusted gross margin is defined as gross margin less stock-based compensation expense and loss on inventory purchase commitment. Management believes that the use of Adjusted gross margin provides consistency and comparability with our past and future performance, facilitates period-to-period comparisons and also facilitates comparisons with other companies.

Management believes that it is useful to exclude stock-based compensation expense from gross margin because the amount of such expense in any specific period may not directly correlate to the underlying performance of our business operations. We believe it is useful to exclude loss on inventory purchase commitment because it is an expense that arose from our commitment to purchase energy-related products from our contract manufacturing partner that we will not use due to our decision to discontinue our energy product line for utility customers. We have not incurred that type of expense in past periods and we believe that past and future periods are more comparable if we exclude that expense from gross margin.





Our use of Adjusted gross margin has limitations as an analytical tool and you should not consider it in isolation or a substitute for our analysis of our results as reported under GAAP. Some of these limitations are:

- Adjusted gross margin does not reflect the potentially dilutive impact of equity-based compensation; and
- Although we have not incurred significant loss on purchase commitments in the past, there is no guarantee that we will not incur those expenses in the future and therefore Adjusted gross margin may not be indicative of future performance.

Because of these limitations, you should consider Adjusted gross margin alongside other financial performance measures.

***Adjusted Operating Income***

A reconciliation of Adjusted operating income (loss) to loss from operations, the most directly comparable GAAP financial measure, is presented below:

| | Years Ended December 31, | | | Three Months Ended March 31, | |
|---|---|---|---|---|---|
| | 2010 | 2011 | 2012 | 2012 | 2013 |
| | (In thousands) | | | | |
| Loss from operations | $ (15,721) | $ (3,720) | $ (3,064) | $ (2,221) | $ (1,478) |
| Stock-based compensation expense | 1,469 | 2,013 | 2,869 | 731 | 838 |
| Cost of revenue—inventory purchase commitment | — | — | 1,840 | — | — |
| Litigation settlement | — | — | 2,869 | — | — |
| Adjusted operating income (loss) | $ (14,252) | $ (1,707) | $ 4,514 | $ (1,490) | $ (640) |

To provide investors with additional information regarding our financial results, we have disclosed in the table above and within this prospectus Adjusted operating income, a non-GAAP financial measure. We have included Adjusted operating income in this prospectus because Adjusted operating income is a key measure used by our management and board of directors to understand and evaluate our operating performance and trends. We use it to prepare and approve our annual budget and to develop short- and long-term operational plans.

Adjusted operating income is defined as operating income less stock-based compensation expense, loss on inventory purchase commitment and litigation settlement expense. Management believes that the use of Adjusted operating income provides consistency and comparability with our past and future performance, facilitates period-to-period comparisons and also facilitates comparisons with other companies.

Management believes that it is useful to exclude stock-based compensation expense from operating income because the amount of such expense in any specific period may not directly correlate to the underlying performance of our business operations. We believe it is useful to exclude loss on inventory purchase commitment because it is an expense that arose from our commitment to purchase energy-related products from our contract manufacturing partner that we will not use due to our decision to discontinue our energy product line for utility customers. We have not incurred that type of expense in past periods and we believe that past and future periods are more comparable if we exclude that expense from operating income.

We believe it is useful to exclude litigation settlement expense from operating income because that expense was related to two separate legal settlements that were resolved in 2012. Those settlements are not indicative of past or future operating performance. We believe that past and future periods are more comparable if we exclude that expense from operating income.

Our use of Adjusted operating income has limitations as an analytical tool and you should not consider it in isolation or as a substitute for our analysis of our results as reported under GAAP. Some of these limitations are:

- Adjusted operating income does not reflect the potentially dilutive impact of equity-based compensation;
- Although we have not incurred significant loss on purchase commitments in the past, there is no guarantee that we will not incur those expenses in the future and therefore Adjusted operating income may not be indicative of future performance; and
- We are involved in litigation matters from time to time and we may incur litigation settlement expenses in future periods and, therefore, Adjusted operating income may not be indicative of future performance.

Because of these limitations, you should consider Adjusted operating income alongside other financial performance measures.





**Consolidated Balance Sheet Data**

The following table sets forth our summary consolidated balance sheet data as of March 31, 2013:

- On an actual basis;
- On a pro forma basis to reflect the conversion of all outstanding shares of our preferred stock into 79,528,755 shares of our common stock, which will occur immediately prior to the closing of this offering assuming our valuation prior to this offering is at least $225 million and the net proceeds to us from this offering are not less than $35 million, the net exercise of outstanding warrants to purchase 3,394,300 shares of capital stock into an aggregate of 757,231 shares of common stock as of March 31, 2013, the corresponding reclassification of our warrant liability to additional paid-in capital, which will occur immediately prior to the closing of this offering unless earlier exercised or expired, and the filing of our post-offering amended and restated certificate of incorporation, which will occur immediately prior to the closing of this offering; and
- On a pro forma as adjusted basis to reflect the pro forma adjustments described above and our receipt of the net proceeds from our sale of shares of common stock in this offering at an assumed initial public offering price of $ per share, which is the midpoint of the price range set forth on the cover page of this prospectus, after deducting estimated underwriting discounts and commissions and estimated offering expenses payable by us.

| | As of March 31, 2013 | | |
|---|---|---|---|
| | Actual | Pro forma | Pro forma as adjusted[(1)] |
| | (In thousands) | | |
| **Consolidated Balance Sheet Data:** | | | |
| Cash and cash equivalents | $ 14,573 | $ 14,573 | |
| Property and equipment, net | 3,566 | 3,566 | |
| Working capital, excluding deferred revenue | 21,582 | 21,582 | |
| Total assets | 49,455 | 49,455 | |
| Redeemable convertible preferred stock | 116,313 | — | |
| Total stockholders' equity (deficit) | (93,204) | 23,685 | |

(1) A $1.00 increase (decrease) in the assumed initial public offering price of $ per share, the midpoint of the range set forth on the cover page of this prospectus, would increase (decrease) cash and cash equivalents and each of working capital, excluding deferred revenue, total assets and total stockholders' equity (deficit) by $ million, assuming that the number of shares offered by us, as set forth on the cover page of this prospectus, remains the same, and after deducting estimated underwriting discounts and commissions payable by us. Each increase or decrease of 1.0 million shares in the number of shares offered by us would increase or decrease cash and cash equivalents and each of working capital, excluding deferred revenue, total assets and total stockholders' equity (deficit) by $ million assuming that the assumed

Restricted Confidential - Outside Counsel Only




price per share remains the same, and after deducting estimated underwriting discounts and commissions payable by us. The pro forma as adjusted information discussed above is illustrative only and will be adjusted based on the actual initial public offering price and other terms of this offering determined at pricing.





## RISK FACTORS

*Investing in our common stock involves a high degree of risk. You should consider carefully the risks and uncertainties described below, together with all of the other information in this prospectus, including our financial statements and related notes, before deciding whether to purchase shares of our common stock. If any of the following risks is realized, our business, financial condition, results of operations and prospects could be materially and adversely affected. In that event, the price of our common stock could decline, and you could lose part or all of your investment.*

### Risks Related to Our Business and Industry

***We have incurred operating losses in the past, may incur operating losses in the future, and may not achieve or maintain profitability.***

We began our operations in 2003. For substantially all of our history, we have experienced net losses and negative cash flows from operations. As of March 31, 2013, we had an accumulated deficit of $107.1 million. We expect our operating expenses to increase in the future as we expand our operations. Furthermore, as a public company, we will incur additional legal, accounting and other expenses that we did not incur as a private company. If our revenue does not grow to offset these increased expenses, we will not become profitable. We may incur significant losses in the future for a number of reasons, including without limitation the other risks and uncertainties described in this prospectus. Additionally, we may encounter unforeseen operating or legal expenses, difficulties, complications, delays and other unknown factors that may result in losses in future periods. If these losses exceed our expectations or our revenue growth expectations are not met in future periods, our financial performance will be harmed.

***The markets in which we participate are highly competitive and many companies, including large technology companies, broadband and security service providers and other managed service providers, are actively targeting the home automation market. Our failure to differentiate ourselves and compete successfully with these companies would make it difficult for us to add and retain consumers, and would reduce or impede the growth of our business.***

The market for automation and control solutions for the connected home is increasingly competitive and global. Many large technology companies have expanded into the connected home market by developing their own solutions, or by acquiring other companies with home automation solution offerings. For example, Microsoft Corporation recently acquired id8 Group R2 Studios Inc., a home entertainment technology company. These large technology companies already have broad consumer awareness and sell a variety of devices for the home, and consumers may choose their offerings instead of ours, even if we offer superior products and services. Similarly, many managed service providers, such as cable TV, telephone and security companies, are beginning to offer services that provide device control and automation capability within the home for an additional monthly service fee. For example, Comcast is expanding its Xfinity service to provide residential security, energy and automation services. These managed service providers have the advantage of leveraging their existing consumer base, network of installation and support technicians and name recognition to gain traction in the home automation market. In addition, consumers may prefer the monthly service fee with little to no upfront cost offered by some of these managed service providers over a larger upfront cost with little to no monthly service fees.

We expect competition from these large technology companies and managed service providers to increase in the future. This increased competition could result in pricing pressure, reduced sales, lower margins or the failure of our solutions to achieve or maintain broad market acceptance. To remain competitive and to maintain our position as a leading provider of automation and control solutions for the connected home, we will need to invest continuously in product development, marketing, customer service and support and product delivery infrastructure. We may not have





sufficient resources to continue to make the investments in all of the areas needed to maintain our competitive position. In addition, most of our competitors have longer operating histories, greater name recognition, larger consumer bases and significantly greater financial, technical, sales, marketing and other resources than us, which may provide them with an advantage in developing, marketing or servicing new solutions. Increased competition could reduce our market share, revenue and operating margins, increase our operating costs, harm our competitive position and otherwise harm our business and results of operations.

***Consumers may choose to adopt point products that provide control of discrete home functions rather than adopting our unified home automation solution. If we are unable to increase market awareness of the benefits of our unified solution, our revenue may not continue to grow, or it may decline.***

Many vendors have emerged, and may continue to emerge, to provide point products with advanced functionality for use in the home, such as a thermostat that can be controlled by an application on a smartphone. We expect more and more consumer electronic and consumer appliance products to be network-aware and connected—each very likely to have its own smart device (phone or tablet) application. Consumers may be attracted to the relatively low costs of these point products and the ability to expand their home control solution over time with minimal upfront costs, despite some of the disadvantages of this approach. While we have built our solution to be flexible and support third-party point products, these products may reduce the revenue we receive for each installation. It is therefore important that we have technical expertise and provide attractive top quality products in many areas, such as lighting and video, and establish broad market awareness of these solutions. If a significant number of consumers in our target market choose to adopt point products rather than our unified automation solution, then our business, financial condition and results of operations will be harmed, and we may not be able to achieve sustained growth or our business may decline.

***Many of the competitors in our market, including providers of luxury integrated installations with long operating histories, established markets, broad user bases and proven consumer acceptance, may be successful in expanding into the mainstream home automation market, which may harm our growth and future prospects.***

Many companies with which we directly compete have been operating in this industry for many years and, as a result, have established significant name recognition in the home automation industry. For example, Crestron, a provider of luxury integrated installations, has been in business for over 40 years and has become an established presence in the home automation industry. Another provider of luxury integrated installations is Savant Systems, which provides home automation based on the Apple iOS operating platform. To the extent these providers are able to develop more affordable products that compete more directly with our solution, our growth may be constrained and our business could suffer. In addition, given the strong growth potential of the market, we expect there to be many new entrants in the future.

***Since we rely on third-party dealers and distributors to sell and install our solutions, we do not have a direct sales pipeline, which makes it difficult for us to accurately forecast future sales and correctly predict manufacturing requirements.***

We depend on our dealer and distributor network to sell and install our solution. As a result, we do not develop or control our sales pipeline, making it difficult for us to predict future sales. In addition, because the production of certain of our products requires long lead times, we enter into agreements for the manufacture and purchase certain of our products well in advance of the time in which those products will be sold. These contracts are based on our best estimates of our near-term product needs. If we underestimate consumer demand, we may forego revenue opportunities, lose market share and damage our relationships. Conversely, if we overestimate consumer demand, we may purchase more inventory than we are able to sell at any given time, or at all. If we fail to accurately





estimate demand for our products, we could have excess or obsolete inventory, resulting in a decline in the value of our inventory, which would increase our costs of revenues and reduce our liquidity. Our failure to accurately manage inventory relative to demand would adversely affect our results of operations.

***We have relatively limited visibility regarding the consumers that ultimately purchase our products, and we often rely on information from third-party dealers and distributors to help us manage our business. If these dealers and distributors fail to provide timely or accurate information, our ability to quickly react to market changes and effectively manage our business may be harmed.***

We sell our solutions through dealers and distributors. These dealers and distributors work with consumers to design, install, update and maintain their home automation installations. While we are able to track orders from dealers and distributors and have access to certain information about the configurations of their Control4 systems that we receive through our controller appliances, we also rely on dealers and distributors to provide us with information about consumer behavior, product and system feedback, consumer demographics, buying patterns and information on our competitors. We use this channel sell-through data, along with other metrics, to assess consumer demand for our solutions, develop new products, adjust pricing and make other strategic business decisions. Channel sell-through data is subject to limitations due to collection methods and the third-party nature of the data and thus may not be complete or accurate. In addition, to the extent we collect information directly from consumers, for example through surveys that we conduct, the consumers who supply this sell-through data self select and vary by geographic region and from period to period, which may impact the usefulness of the results. If we do not receive consumer information on a timely or accurate basis, or if we do not properly interpret this information, our ability to quickly react to market changes and effectively manage our business may be harmed.

***Our quarterly results of operations have fluctuated and may continue to fluctuate. As a result, we may fail to meet or exceed the expectations of investors or securities analysts, which could cause our stock price to decline.***

Our quarterly revenue and results of operations may fluctuate as a result of a variety of factors, many of which are outside of our control. If our quarterly revenue or results of operations fall below the expectations of investors or securities analysts, the price of our common stock could decline substantially. Fluctuations in our results of operations may be due to a number of factors, including:

- Demand for and market acceptance of our solutions;
- Our ability to increase, retain and incentivize the certified dealers and distributors that market, sell, install and support our solutions;
- The ability of our contract manufacturers to continue to manufacture high-quality products, and to supply sufficient products to meet our demands;
- The timing and success of introductions of new products, solutions or upgrades by us or our competitors and the entrance of new competitors;
- The strength of regional, national and global economies;
- The impact of natural disasters or manmade problems such as terrorism;
- Changes in our business and pricing policies or those of our competitors;
- Competition, including entry into the industry by new competitors and new offerings by existing competitors;
- The impact of seasonality on our business;

- The amount and timing of expenditures, including those related to expanding our operations, increasing research and development, introducing new solutions or paying litigation expenses; and

- Changes in the payment terms for our solutions.

Due to the foregoing factors and the other risks discussed in this prospectus, you should not rely on quarter-to-quarter comparisons of our results of operations as an indication of our future performance. You should not consider our recent revenue growth as indicative of our future performance.

***If we are unable to develop new solutions, sell our solutions into new markets or further penetrate our existing markets, our revenue may not grow as expected.***

Our ability to increase sales will depend in large part on our ability to enhance and improve our solutions, to introduce new solutions in a timely manner, to sell into new markets and to further penetrate our existing markets. The success of any enhancement or new product or solution depends on several factors, including the timely completion, introduction and market acceptance of enhanced or new solutions, the ability to attract, retain and effectively train sales and marketing personnel, the ability to develop relationships with dealers and distributors and the effectiveness of our marketing programs. Any new product or solution we develop or acquire may not be introduced in a timely or cost-effective manner, and may not achieve the broad market acceptance necessary to generate significant revenue. Any new markets into which we attempt to sell our solutions, including new vertical markets and new countries or regions, may not be receptive. Our ability to further penetrate our existing markets depends on the quality of our solutions and our ability to design our solutions to meet consumer demand. Moreover, we are frequently required to enhance and update our solutions as a result of changing standards and technological developments, which makes it difficult to recover the cost of development and forces us to continually qualify new solutions with our consumers. If we are unable to successfully develop or acquire new solutions, enhance our existing solutions to meet consumer requirements, sell solutions into new markets or sell our solutions to additional consumers in our existing markets, our revenue may not grow as expected.

***Our success depends, in part, on our ability to develop and expand our global network of dealers and distributors.***

We have developed a global network of over 2,800 active direct dealers and 27 distributors to sell, install and support our solutions. We rely on our dealers and distributors to provide consumers with a successful Control4 home automation experience. In some cases, dealers may choose not to offer our solution and instead offer a product from one of our competitors or, in other cases, the dealer may simply discontinue its operations. In order to continue our growth and expand our business, it is important that we continue to add new dealers and distributors and maintain most of our existing relationships. We must also work to expand our network of dealers and distributors to ensure that we have sufficient geographic coverage and technical expertise to address new markets and technologies. While it is difficult to estimate the total number of available dealers in our markets, there are a finite number of dealers that are able to perform the types of technical installations required for home automation systems. In the event that we saturate the available dealer pool, or if market or other forces cause the available pool of dealers to decline, it may be increasingly difficult to grow our business. As consumers' home automation options grow, it is important that we enhance our dealer footprint by broadening the expertise of our dealers, working with larger and more sophisticated dealers and expanding the mainstream consumer products our dealers offer. If we are unable to expand our network of dealers and distributors, our business could be harmed.





***We rely on our dealers and distributors to sell our solution, and if our dealers and distributors fail to perform, our ability to sell and distribute our products and services will be limited, and our results of operations may be harmed.***

Substantially all of our revenue is generated through the sales of our solution by our dealers and distributors. Our dealers and distributors are independent businesses that voluntarily sell our products as well as the products of other companies to consumers. We provide our dealers and distributors with specific training and programs to assist them in selling our products, but we cannot assure that these steps will be effective. We have observed, and expect to continue to observe, high volatility in the monthly, quarterly and annual sales performance of individual dealers and distributors. Although we can make estimated forecasts of cumulative sales of large numbers of dealers and distributors, we cannot assure their accuracy collectively nor individually. Accordingly, we may not be able to reduce or slow our spending quickly enough if our actual sales fall short of our expectations. As a result, we expect that our revenues, results of operations and cash flows may fluctuate significantly on a quarterly basis. We believe that period-to-period comparisons of our revenues, results of operations and cash flows may not be meaningful and should not be relied upon as an indication of future performance.

Our dealers and distributors may be unsuccessful in marketing, selling, and supporting our products and services. If we are unable to develop and maintain effective sales incentive programs for our third-party dealers and distributors, we may not be able to incentivize them to sell our products to consumers and, in particular, to larger businesses and organizations. Our dealers and distributors may also market, sell and support products and services that are competitive with ours, and may devote more resources to the marketing, sales, and support of such competitive products. Our dealers and distributors may have incentives to promote our competitors' products to the detriment of our own, or may cease selling our products altogether. Our agreements with our dealers and distributors may generally be terminated for any reason by either party with advance notice. We cannot assure you that we will retain these dealers and distributors, or that we will be able to secure additional or replacement dealers and distributors. Further, if we alter our sales process in a region by switching from a distributor to a direct dealer model, our sales may be impacted leading up to or in connection with such change in sales process. In addition, while we take certain steps to protect ourselves from liability for the actions of our dealers and distributors, consumers may seek to recover amounts from us for any damages caused by dealers in connection with system installations, or the failure of a system to perform properly due to an incorrect installation by a dealer. In addition, our dealers and distributors may use our name and our brand in ways we do not authorize, and any such improper use may harm our reputation or expose us to liability for their actions.

If we fail to effectively manage our existing sales channels, if our dealers or distributors are unsuccessful in fulfilling the orders for our products, or if we are unable to enter into arrangements with, and retain a sufficient number of, high quality dealers and distributors in each of the regions in which we sell products, and keep them motivated to sell our products, our results of operations may be harmed. The termination of our relationship with any significant dealer or distributor may also adversely impact our sales and results of operations.

***We have entered into several strategic arrangements and intend to pursue additional strategic opportunities in the future. If the intended benefits from our strategic***

***relationships are not realized, our growth and results of operations may be harmed.***

We are in the process of growing our relationships with strategic partners in order to attempt to reach markets that we cannot currently address cost-effectively and to increase awareness of our solution. If these relationships do not develop in the manner we intend, our future growth could be impacted. Furthermore, the termination of our relationship with a partner may cause us to incur expenses without corresponding revenue, incur a termination penalty and harm our sales and results of





operations. For example, in 2012, we discontinued energy products for utility customers and, in connection with that decision, we incurred an expense related to an inventory purchase commitment and paid a fee to our counterparty to terminate the arrangement. Any loss of a major partner or distribution channel or other channel disruption could harm our results of operations and make us more dependent on alternate channels, damage our reputation, increase pricing and promotional pressures from other partners and distribution channels, increase our marketing costs, or harm buying and inventory patterns, payment terms or other contractual terms.

***If we do not maintain the compatibility of our solutions with third-party products and applications that our consumers use, demand for our solutions could decline.***

Our solutions are designed to interoperate with a wide range of other third-party products, including products in the areas of music, video, lighting, temperature and security. If we do not support the continued integration of our solutions with third-party products and applications, including through the provision of application programming interfaces that enable data to be transferred readily between our solutions and third-party products and applications, demand for our solutions could decline and we could lose sales. We will also be required to make our solutions compatible with new or additional third-party products and applications that are introduced into the markets that we serve. To help us meet this challenge, we have developed our Simple Device Discovery Protocol, or SDDP, designed to enable our devices to recognize and control third-party products by embedding software in such products at the manufacturer, making it easier for dealers and consumers to add them to their Control4 systems. Although we are making SDDP available on a royalty-free basis to product manufacturers, its adoption is not yet substantial, and may not achieve greater or broad market acceptance. In addition, companies that provide popular point solutions have and may continue to eliminate or restrict our ability to control and be compatible with these products. For example, a thermostat company has restricted the interoperability of its products with our solutions. As a result, we may not be successful in making our solutions compatible with these third-party products and applications, which could reduce demand for our solutions. In addition, if prospective consumers require customized features or functions that we do not offer, then the market for our solutions may be harmed.

***Our inability to adapt to technological change could impair our ability to remain competitive.***

The market for home automation and control solutions is characterized by rapid technological change, frequent introductions of new products and evolving industry standards. Our ability to attract new consumers and increase revenue from existing consumers will depend in significant part on our ability to anticipate changes in industry standards and to continue to enhance or introduce existing solutions on a timely basis to keep pace with technological developments. We are currently changing several aspects of our operating system, and may utilize Android open source technology in the future, which may cause difficulties including compatibility, stability and time to market. The success of this or any enhanced or new product or solution will depend on several factors, including the timely completion and market acceptance of the enhanced or new product or solution. Similarly, if any of our competitors implement new technologies before we are able to implement them, those competitors may be able to provide more effective products than ours, possibly at lower prices. Any delay or failure in the introduction of new or enhanced solutions could harm our business, results of operations and financial condition.





***We currently rely on contract manufacturers to manufacture our products and component vendors to supply parts used in our products. The majority of our components are supplied by a single source. Any disruption in our supply chain, or any our failure to successfully manage our relationships with our contract manufacturers or component vendors could harm our business.***

Our reliance on contract manufacturers reduces our control over the assembly process, exposing us to risks, including reduced control over quality assurance, production costs and product supply. We rely on a limited number of contract manufacturers to manufacture substantially all of our products. We also do business with a number of component vendors, and the parts they supply may not perform as expected. For certain of our products and components, we rely on a sole-source manufacturer or supplier. In 2012, two contract manufacturers, Sanmina and LiteOn, manufactured 82% of our inventory purchases. Certain of our contract manufacturers and component vendors are located outside of the United States and may be subject to political, economic, social and legal uncertainties that may harm our relationships with these parties. If we fail to manage our relationships with our contract manufacturers or component vendors effectively, or if our contract manufacturers or component vendors experience delays, disruptions, capacity constraints or quality control problems in their operations, our ability to ship products may be impaired and our competitive position and reputation could be harmed. In addition, any adverse change in our contract manufacturers' or component vendors' financial or business condition could disrupt our ability to supply quality products to our dealers and distributors. If we are required to change contract manufacturers or component vendors, we may lose revenue, incur increased costs or damage our relationships, or we might be unable to find a new contract manufacturer or component vendor on acceptable terms, or at all. In addition, qualifying a new contract manufacturer or component vendor can be an expensive and lengthy process. If we experience increased demand that our contract manufacturers or component vendors are unable to fulfill, or if they are unable to provide us with adequate supplies of high-quality products for any reason, we could experience a delay in our order fulfillment, and our business, results of operations and financial condition would be harmed.

***Growth of our business will depend on market awareness and a strong brand, and any failure to develop, maintain, protect and enhance our brand would hurt our ability to retain or attract consumers.***

Because of the early stage of development of the mainstream home automation market, we believe that building and maintaining market awareness, brand recognition and goodwill is critical to our success. This will depend largely on our ability to continue to provide high-quality solutions, and we may not be able to do so effectively. While we may choose to engage in a broader marketing campaign to further promote our brand, this effort may not be successful. Our efforts in developing our brand may be affected by the marketing efforts of our competitors and our reliance on our dealers, distributors and strategic partners to promote our brand. If we are unable

to cost-effectively maintain and increase awareness of our brand, our business, results of operations and financial condition could be harmed.

***We operate in the emerging and evolving home automation market, which may develop more slowly or differently than we expect. If the mainstream home automation market does not grow as we expect, or if we cannot expand our solutions to meet the demands of this market, our revenue may decline, fail to grow or fail to grow at an accelerated rate, and we may incur additional operating losses.***

The market for home automation and control solutions is in an early stage of development, and it is uncertain whether, how rapidly or how consistently this market will develop, and even if it does develop, whether our solutions will achieve and sustain high levels of demand and market acceptance. Some consumers may be reluctant or unwilling to use our solutions for a number of reasons, including satisfaction with traditional solutions, concerns for additional costs and lack of awareness of our solutions. Unified home automation solutions such as ours have traditionally been luxury purchases for the high end of the residential market. Our ability to expand the sales of our





solutions to a broader consumer base depends on several factors, including the awareness of our solutions, the timely completion, introduction and market acceptance of our solutions, the ability to attract, retain and effectively train sales and marketing personnel, the ability to develop relationships with dealers and distributors, the effectiveness of our marketing programs, the costs of our solutions and the success of our competitors. If we are unsuccessful in developing and marketing our home automation solutions to mainstream consumers, or if these consumers do not perceive or value the benefits of our solutions, the market for our solutions might not continue to develop or might develop more slowly than we expect, either of which would harm our revenue and growth prospects.

***Our consumers may experience service failures or interruptions due to defects in the software, infrastructure, third-party components or processes that comprise our existing or new solutions, or due to dealer errors in product installation, any of which could harm our business.***

Our solutions may contain undetected defects in the software, infrastructure, third-party components or processes. If these defects lead to service failures after introduction of or an upgrade to a product or solution, we could experience harm to our branded reputation, claims by our consumers, dealers, distributors, strategic partners or developers or lost revenue during the period required to address the cause of the defects. We may find defects in new or upgraded solutions, resulting in loss of, or delay in, market acceptance of our solutions, which could harm our business, results of operations and financial condition.

Since our solutions are installed by our dealers, if they do not install or maintain our solutions correctly, our solutions may not function properly. If the improper installation or maintenance of our solutions leads to service failures after introduction of, or an upgrade to, a product or solution, we could experience harm to our branded reputation, claims by our consumers, dealers, distributors, strategic partners or developers or lost revenue during the period required to address the cause of the problem. This could harm our business, results of operations and financial condition.

Any defect in, or disruption to, our solutions could cause consumers not to purchase additional products from us, prevent potential consumers from purchasing our solutions or harm our reputation. Although our contracts with our consumers limit our liability to our consumers for these defects, disruptions or errors, we nonetheless could be subject to litigation for actual or alleged losses to our consumers' businesses, which may require us to spend significant time and money in litigation or arbitration, or to pay significant settlements or damages. Defending a lawsuit, regardless of its merit, could be costly, divert management's attention and affect our ability to obtain or maintain liability insurance on acceptable terms and could harm our business. Although we currently maintain some warranty reserves, we cannot assure you that these warranty reserves will be sufficient to cover future liabilities. Furthermore, we may be required to indemnify our dealers, distributors and partners against certain liabilities they may incur as a result of defects of our products. In 2012, we incurred significant costs associated with the recall and replacement of a defective chip from a third-party component used within one of our products.

***We encounter seasonality in sales, which could harm the amount, timing and predictability of our revenue and cause our stock price to fluctuate.***

We have little recurring revenue or backlog and our revenue is generated from orders of our solutions from new and existing consumers, which may cause our quarterly results to fluctuate. We may experience seasonality in the sales of our solutions. Historically, our revenue is generally higher in the fourth quarter and lower in the first quarter. Seasonal variations in our sales may lead to significant fluctuations in our cash flows and results of operations on a quarterly basis. If we experience a delay in signing or a failure to sign a significant partner agreement in any particular quarter, then our results of operations for such quarter and for subsequent quarters may be below the expectations of securities analysts or investors, which may result in a decline in our stock price.





***We may not generate significant revenue as a result of our current research and development efforts.***

We have made and expect to continue to make significant investments in research and development and related product opportunities. In the year ended December 31, 2012, we spent $20.3 million on research and development expenses. High levels of expenditures for research and development could harm our results of operations, especially if not offset by corresponding future revenue increases. We believe that we must continue to dedicate a significant amount of resources to our research and development efforts to maintain our competitive position. However, it is difficult to estimate when, if ever, we will generate significant revenue as a result of these investments.

***Our strategy includes pursuing acquisitions and our potential inability to successfully integrate newly-acquired technologies, assets or businesses may harm our financial results.***

We believe part of our growth will be driven by acquisitions of other companies or their technologies, assets and businesses. Any acquisitions we complete will give rise to risks, including:

- Incurring higher than anticipated capital expenditures and operating expenses;

- Failing to assimilate the operations and personnel or failing to retain the key personnel of the acquired company or business;
- Failing to integrate the acquired technologies, or incurring significant expense to integrate acquired technologies into our solutions;
- Disrupting our ongoing business;
- Dissipating our management resources;
- Failing to maintain uniform standards, controls and policies;
- Incurring significant accounting charges;
- Impairing relationships with employees, dealers, distributors, partners or consumers;
- Finding that the acquired technology, asset or business does not further our business strategy, that we overpaid for the technology, asset or business or that we may be required to write off acquired assets or investments partially or entirely;
- Failing to realize the expected synergies of the transaction;
- Being exposed to unforeseen liabilities and contingencies that were not identified prior to acquiring the company; and
- Being unable to generate sufficient revenue from acquisitions to offset the associated acquisition costs.

Fully integrating an acquired technology, asset or business into our operations may take a significant amount of time. We may not be successful in overcoming these risks or any other problems encountered with acquisitions. To the extent we do not successfully avoid or overcome the risks or problems related to any such acquisitions, our results of operations and financial condition could be harmed. Acquisitions also could impact our financial position and capital needs, or could cause fluctuations in our quarterly and annual results of operations. Acquisitions could include significant goodwill and intangible assets, which may result in future impairment charges that would reduce our stated earnings. We may incur significant costs in our efforts to engage in strategic transactions and these expenditures may not result in successful acquisitions.



Table of Contents

***Future acquisitions of technologies, assets or businesses, which are paid for partially or entirely through the issuance of stock or stock rights, could dilute the ownership of our existing stockholders.***

We expect that the consideration we might pay for any future acquisitions of technologies, assets or businesses could include stock, rights to purchase stock, cash or some combination of the foregoing. If we issue stock or rights to purchase stock in connection with future acquisitions, net income (loss) per share and then-existing holders of our common stock may experience dilution.

***Our gross margins can vary significantly depending on multiple factors, which can result in fluctuations in our results of operations.***

Our gross margins are likely to vary due to consumer demand, product mix, new product introductions, unit volumes, commodity and supply chain costs, product delivery costs, geographic sales mix, foreign currency exchange rates, excess and obsolete inventory and the complexity and functionality of new product innovations. In particular, if we are not able to introduce new solutions in a timely manner at the cost we expect, or if consumer demand for our solutions is less than we anticipate, or if there are product pricing, marketing and other initiatives by our competitors to which we need to react that lower our margins, then our overall gross margin will be less than we project. The impact of these factors on gross margins can create unanticipated fluctuations in our results of operations, which may cause volatility in our stock price.

***If we are unable to substantially utilize our net operating loss carryforwards, our financial results will be harmed.***

As of December 31, 2012, our net operating loss, or NOL, carryforward amounts for U.S. federal income and state tax purposes were $83.6 million and $83.1 million, respectively. Under Section 382 of the Internal Revenue Code, a corporation that undergoes an "ownership change" may be subject to limitations on its ability to utilize its pre-change NOLs to offset future taxable income. Purchases of our common stock in amounts greater than specified levels, which will be beyond our control, could create an additional limitation on our ability to utilize our NOLs for tax purposes in the future. Limitations imposed on our ability to utilize NOLs could cause U.S. federal and state income taxes to be paid earlier than would be paid if such limitations were not in effect and could cause such NOLs to expire unused, in each case reducing or eliminating the benefit of such NOLs. Furthermore, we may not be able to generate sufficient taxable income to utilize our NOLs before they expire. If any of these events occur, we may not derive some or all of the expected benefits from our NOLs. In addition, at the state level there may be periods during which the use of NOLs is suspended or otherwise limited, which would accelerate or permanently increase state taxes owed.

***Governmental regulations affecting the import or export of products could harm our revenue.***

The U.S. and various foreign governments have imposed controls, export license requirements and restrictions on the import or export of some technologies, especially encryption technology, and may impose additional or broader controls, export license requirements and restrictions on the import or export of some technologies in the future. In addition, from time to time, governmental agencies have proposed additional regulation of encryption technology, such as requiring the escrow and

governmental recovery of private encryption keys. Although we do not believe that any of our products currently require an export license, if our products or components of our products become subject to governmental regulation of encryption technology or other governmental regulation of imports or exports, we may be required to obtain import or export approval for such products, which could increase our costs and harm our international and domestic sales and our revenue. In addition, failure to comply with such regulations could result in penalties, costs and restrictions on export privileges, which would harm our results of operations.





***If we are unable to manage our growth and diverse and complex operations, our reputation in the market and our ability to generate revenue from new or existing consumers may be harmed.***

Because our operations are geographically diverse and complex, our personnel resources and infrastructure could become strained and our reputation in the market and our ability to successfully implement our business plan may be harmed. We have experienced a period of rapid growth in our headcount and operations. The growth in the size, complexity and diverse nature of our business and the expansion of our product lines and consumer base have placed increased demands on our management and operations, and further growth, if any, may place additional strains on our resources in the future. Our ability to effectively compete and to manage our planned future growth will depend on, among other things:

- Maintaining continuity in our senior management and key personnel;
- Increasing the productivity of our existing employees;
- Attracting, retaining, training and motivating our employees, particularly our technical and management personnel;
- Maintaining existing relationships and developing new relationships with contract manufacturers;
- Improving our operational, financial and management controls; and
- Improving our information reporting systems and procedures.

If we do not manage the size, complexity and diverse nature of our business effectively, we could experience delayed product releases and longer response times for assisting our consumers with implementation of our solutions, and could lack adequate resources to support our consumers on an ongoing basis, any of which could harm our reputation in the market, our ability to successfully implement our business plan and our ability to generate revenue from new or existing consumers.

***If we fail to retain our key employees, our business would be harmed and we might not be able to implement our business plan successfully.***

Given the complex nature of the technology on which our business is based and the speed with which such technology advances, our future success is dependent, in large part, upon our ability to attract and retain highly qualified managerial, engineering and sales personnel. Competition for talented personnel is intense, and we cannot be certain that we can retain our managerial, engineering and sales personnel or that we can attract, assimilate or retain such personnel in the future. Our inability to attract and retain such personnel could harm our business, results of operations and financial condition.

***Downturns in general economic and market conditions and reductions in spending may reduce demand for our solutions, which could harm our revenue, results of operations and cash flows.***

Our revenue, results of operations and cash flows depend on the overall demand for our solutions. Concerns about the systemic impact of a potential widespread recession, energy costs, geopolitical issues, the availability and cost of credit and the global housing and mortgage markets have contributed to increased market volatility, decreased consumer confidence and diminished growth expectations in the U.S. economy and abroad. The current unstable general economic and market conditions have been characterized by a dramatic decline in consumer discretionary spending and have disproportionately affected providers of products and services that represent discretionary purchases. While the decline in consumer spending has recently moderated, these economic conditions could still lead to continued declines in consumer spending over the foreseeable future, and may have resulted in a resetting of consumer spending habits that may make it unlikely that such spending will return to prior levels for the foreseeable future.





During weak economic times, the available pool of dealers and distributors may decline as the prospects for home building and home renovation projects diminish, which may have a corresponding impact on our growth prospects. In addition, there is an increased risk during these periods that an increased percentage of our dealers will file for bankruptcy protection, which may harm our reputation, revenue, profitability and results of operations. We also face risks from international dealers and distributors that file for bankruptcy protection in foreign jurisdictions, in that the outcome of the application of foreign bankruptcy laws may be more difficult to predict. In addition, we may determine that the cost of pursuing any claim may outweigh the recovery potential of such claim. Likewise, consumer bankruptcies can detrimentally affect the business stability of our dealers and distributors. Prolonged economic slowdowns and reductions in new home construction and renovation projects may result in diminished sales of our solutions. Further worsening, broadening or protracted extension of the economic downturn could have a negative impact on our business, revenue, results of operations and cash flows.

***If our estimates or judgments relating to our critical accounting policies are based on assumptions that change or prove to be incorrect, our results of operations could fall below expectations of securities analysts and investors, resulting in a decline in our stock price.***

The preparation of financial statements in conformity with generally accepted accounting principles, or GAAP, requires management to make estimates and assumptions that affect the amounts reported in our consolidated financial statements and accompanying notes. We base our estimates on historical experience and on various other assumptions that we believe to be reasonable under the circumstances, as provided in "Management's Discussion and Analysis of Financial Condition and Results of Operations," the results of which form the basis for making judgments about the carrying values of assets, liabilities and equity, and the amount of revenue and expenses that are not readily apparent from other sources. Significant assumptions and estimates used in preparing our consolidated financial statements include, or may in the future include, those related to revenue recognition, allowance for doubtful accounts, inventories, product warranties, income taxes and stock-based compensation expense. Our results of operations may be harmed if our assumptions change or if actual circumstances differ from those in our assumptions, which could cause our results of operations to fall below the expectations of securities analysts and investors, resulting in a decline in our stock price.

***Changes in existing financial accounting standards or practices, or taxation rules or practices, may harm our results of operations.***

Changes in existing accounting or taxation rules or practices, new accounting pronouncements or taxation rules, or varying interpretations of current accounting pronouncements or taxation practice could harm our results of operations or the manner in which we conduct our business.

***Mergers or other strategic transactions involving our competitors could weaken our competitive position, which could harm our results of operations.***

Our industry is highly fragmented, and we believe it is likely that some of our existing competitors will consolidate or be acquired. In addition, some of our competitors may enter into new alliances with each other or may establish or strengthen cooperative relationships with systems integrators, third-party consulting firms or other parties. Any such consolidation, acquisition, alliance or cooperative relationship could lead to pricing pressure and our loss of market share and could result in a competitor with greater financial, technical, marketing, service and other resources, all of which could harm our business, results of operations and financial condition.



Table of Contents

***We will incur increased costs and demands upon management as a result of complying with the laws and regulations affecting public companies, which could harm our results of operations and our ability to attract and retain qualified executives and board members.***

As a public company, we will incur significant legal, accounting and other expenses that we did not incur as a private company, including costs associated with public company reporting and corporate governance requirements. These requirements include compliance with Section 404 and other provisions of the Sarbanes-Oxley Act of 2002, the Dodd-Frank Wall Street Reform and Consumer Protection Act, or the Dodd-Frank Act, as well as rules implemented by the Securities and Exchange Commission, or SEC, The NASDAQ Stock Market LLC, or NASDAQ, and other applicable securities or exchange-related rules and regulations. In addition, our management team will also have to adapt to the requirements of being a public company. We expect complying with these rules and regulations will substantially increase our legal and financial compliance costs and make some activities more difficult, time consuming or costly, particularly if we are no longer an "emerging growth company," as defined in the Jumpstart Our Business Startups Act of 2012, or the JOBS Act.

As a public company, we also expect that it may be more difficult and more expensive for us to obtain director and officer liability insurance, and we may be required to accept reduced policy limits and coverage or incur substantially higher costs to obtain the same or similar coverage. As a result, it may be more difficult for us to attract and retain qualified individuals to serve on our board of directors or as our executive officers.

***We are an "emerging growth company," and any decision on our part to comply with certain reduced disclosure requirements applicable to emerging growth companies could make our common stock less attractive to investors.***

We are an "emerging growth company," as defined in the JOBS Act, and we may take advantage of certain exemptions from various reporting requirements that are applicable to other public companies that are not "emerging growth companies" including not being required to comply with the auditor attestation requirements of Section 404 of the Sarbanes-Oxley Act, reduced disclosure obligations regarding executive compensation in our periodic reports and proxy statements, and exemptions from the requirements of holding an annual non-binding advisory vote on executive compensation and nonbinding stockholder approval of any golden parachute payments not previously approved. If we choose not to comply with the auditor attestation requirements of Section 404 of the Sarbanes-Oxley Act, our auditors will not be required to attest to the effectiveness of our internal control over financial reporting. As a result, investors may become less comfortable with the effectiveness of our internal controls and the risk that material weaknesses or other deficiencies in our internal controls go undetected may increase. If we choose to provide reduced disclosures in our periodic reports and proxy statements while we are an emerging growth company, investors would have access to less information and analysis about our executive compensation, which may make it difficult for investors to evaluate our executive compensation practices. We cannot predict if investors will find our common stock less attractive because we may rely on these exemptions and provide reduced disclosure. If some investors find our common stock less attractive as a result, there may be a less active trading market for our common stock and our stock price may be harmed. We will remain an "emerging growth company" for up to five years or such earlier time that we are no longer an emerging growth company. We will remain an emerging growth company until the earliest to occur of: the last day of the fiscal year in which we have more than $1.0 billion in annual revenue; the date we qualify as a "large accelerated filer," with at least $700 million of equity securities held by non-affiliates; the issuance, in any three-year period, by us of more than $1.0 billion in non-convertible debt securities; or the last day of the fiscal year ending after the fifth anniversary of our initial public offering.



Table of Contents

In addition, Section 107 of the JOBS Act provides that an emerging growth company can take advantage of the extended transition period provided in Section 7(a)(2)(B) of the Securities Act of 1933, as amended, or the Securities Act, for complying with new or revised accounting standards. In other words, an emerging growth company can delay the adoption of certain accounting standards until those standards would otherwise apply to private companies. However, we have chosen to "opt out" of such extended transition period, and as a result, we will comply with new or revised accounting standards on the relevant dates on which adoption of such standards is required for non-emerging growth companies. Section 107 of the JOBS Act provides that our decision to opt out of the extended transition period for complying with new or revised accounting standards is irrevocable.

***As a result of becoming a public company, we will be obligated to develop and maintain a system of effective internal controls over financial reporting. We may not complete our analysis of our internal control over financial reporting in a timely manner, or these internal controls may not be determined to be effective, which may harm investor confidence in our company and, as a result, the value of our common stock.***

We will be required, pursuant to Section 404 of the Sarbanes-Oxley Act of 2002, to furnish a report by management on, among other things, the effectiveness of our internal control over financial reporting in the second annual report we file with the SEC. This assessment will need to include disclosure of any material weaknesses identified by our management in our internal control over financial reporting. However, our auditors will not be required to formally attest to the effectiveness of our internal control over financial reporting pursuant to Section 404 until we are no longer an "emerging growth company" as defined in the JOBS Act if we take advantage of the exemptions available to us through the JOBS Act.

We are in the very early stages of the costly and challenging process of compiling the system and processing documentation necessary to perform the evaluation needed to comply with Section 404. We may not be able to remediate any future material weaknesses, or to complete our evaluation, testing and any required remediation in a timely fashion. During the evaluation and testing process, if we identify one or more material weaknesses in our internal control over financial reporting, we will be unable to assert that our internal controls are effective. If we are unable to assert that our internal control over financial reporting is effective, or if our auditors are unable to express an opinion on the effectiveness of our internal controls when they are required to issue such opinion, investors could lose confidence in the accuracy and completeness of our financial reports, which could harm our stock price.

***Our failure to raise additional capital or generate cash flows necessary to expand our operations and invest in new technologies in the future could reduce our ability to compete successfully and harm our results of operations.***

We believe that our existing cash and cash equivalents will be sufficient to meet our anticipated cash requirements for at least the next 12 months. We may need to raise additional funds, and we may not be able to obtain additional debt or equity financing on favorable terms, if at all. If we raise additional equity financing, our security holders may experience significant dilution of their ownership interests and the value of shares of our common stock could decline. If we engage in debt financing, we may be required to accept terms that restrict our ability to incur additional indebtedness, force us to maintain specified liquidity or other ratios or restrict our ability to pay dividends or make acquisitions. If we need additional capital and cannot raise it on acceptable terms, if at all, we may not be able to, among other things:

- Develop and enhance our solutions;
- Continue to expand our research and development, sales and marketing organizations;
- Hire, train and retain employees;





- Respond to competitive pressures or unanticipated working capital requirements; or
- Pursue acquisition opportunities.

Our inability to do any of the foregoing could reduce our ability to compete successfully and harm our results of operations.

***We may be subject to additional tax liabilities, which would harm our results of operations.***

We are subject to income, sales, use, value added and other taxes in the United States and other countries in which we conduct business, which laws and rates vary greatly by jurisdiction. Certain jurisdictions in which we do not collect sales, use, value added or other taxes on our sales may assert that such taxes are applicable, which could result in tax assessments, penalties and interest, and we may be required to collect such taxes in the future. Significant judgment is required in determining our worldwide provision for income taxes. These determinations are highly complex and require detailed analysis of the available information and applicable statutes and regulatory materials. In the ordinary course of our business, there are many transactions and calculations where the ultimate tax determination is uncertain. Although we believe our tax estimates are reasonable, the final determination of tax audits and any related litigation could be different from our historical tax practices, provisions and accruals. If we receive an adverse ruling as a result of an audit, or we unilaterally determine that we have misinterpreted provisions of the tax regulations to which we are subject, our tax provision, results of operations or cash flows could be harmed. In addition, liabilities associated with taxes are often subject to an extended or indefinite statute of limitations period. Therefore, we may be subject to additional tax liability (including penalties and interest) for a particular year for extended periods of time.

***Our business is subject to the risks of earthquakes, fire, power outages, floods and other catastrophic events, and to interruption by manmade problems such as terrorism.***

A significant natural disaster, such as an earthquake, fire or a flood, or a significant power outage could harm our business, results of operations and financial condition. Natural disasters could affect our manufacturing vendors or logistics providers' ability to perform services such as manufacturing products or assisting with shipments on a timely basis. Sanmina and LiteOn, two of our contract manufacturers that manufactured 82% of our inventory purchases in 2012, have manufacturing facilities located in China. In the event our manufacturing vendors' information technology systems or manufacturing or logistics abilities are hindered by any of the events discussed above, shipments could be delayed, resulting in missing financial targets, such as revenue and shipment targets, for a particular quarter. Further, if a natural disaster occurs in a region from which we derive a significant portion of our revenue, such as metropolitan areas in North America, consumers in that region may delay or forego purchases of our solutions from dealers and distributors in the region, which may harm our results of operations for a particular period. In addition, acts of terrorism could cause disruptions in our business or the business of our manufacturers, logistics providers, dealers, distributors, consumers or the economy as a whole. Given our typical concentration of sales at the end of each month and quarter, any disruption in the business of our manufacturers, logistics providers, dealers, distributors and consumers that impacts sales at the end of our quarter could have a greater impact on our quarterly results. All of the aforementioned risks may be augmented if the disaster recovery plans for us and our suppliers prove to be inadequate. To the extent that any of the above results in delays or cancellations of orders, or delays in the manufacture,

deployment or shipment of our products, our business, financial condition and results of operations would be harmed.





***Global or regional economic, political and social conditions could harm our business and results of operations.***

External factors such as potential terrorist attacks, acts of war, financial crises, trade friction or geopolitical and social turmoil in those parts of the world that serve as markets for our solutions, such as Europe or Asia, or elsewhere could harm our business and results of operations. These uncertainties may cause our consumers to reduce discretionary spending on their home and make it difficult for us to accurately plan future business activities. More generally, these geopolitical, social and economic conditions could result in increased volatility in worldwide financial markets and economies that could harm our sales. We are not insured for losses or interruptions caused by terrorist acts or acts of war. The occurrence of any of these events or circumstances could harm our business and results of operations.

***Failure to comply with laws and regulations could harm our business.***

Our business is subject to regulation by various federal, state, local and foreign governmental agencies, including agencies responsible for monitoring and enforcing employment and labor laws, workplace safety, product safety, environmental laws, consumer protection laws, anti-bribery laws, import/export controls, federal securities laws and tax laws and regulations. In certain jurisdictions, these regulatory requirements may be more stringent than in the United States. Noncompliance with applicable regulations or requirements could subject us to investigations, sanctions, mandatory product recalls, enforcement actions, disgorgement of profits, fines, damages, civil and criminal penalties or injunctions. If any governmental sanctions are imposed, or if we do not prevail in any possible civil or criminal litigation, our business, results of operations and financial condition could be materially harmed. In addition, responding to any action will likely result in a significant diversion of management's attention and resources and an increase in professional fees. Enforcement actions and sanctions could further harm our business, results of operations and financial condition.

**Risks Related to Our International Operations**

***In recent years, a significant amount of our revenue has come from sales outside of the United States, and we are therefore subject to a number of risks associated with international sales and operations.***

We have a limited history of marketing, selling, and supporting our products and services internationally. However, consumers in countries outside of North America accounted for 25% of our revenue for the year ended December 31, 2012 and we expect that percentage to grow in the future. As a result, we must hire and train experienced personnel to staff and manage our foreign operations. To the extent that we experience difficulties in recruiting, training, managing, and retaining an international staff, and specifically staff related to sales management and sales personnel, we may experience difficulties in sales productivity in foreign markets.

If we are not able to increase the sales of our solutions to consumers located outside of North America, our results of operations or revenue growth may be harmed. In addition, in connection with our expansion into foreign markets, we are a receiver of currencies other than the U.S. dollar. Accordingly, changes in exchange rates, and in particular a strengthening of the U.S. dollar, will negatively affect our net sales and gross margins as expressed in U.S. dollars. There is also a risk that we will have to adjust local currency product pricing due to competitive pressures when there has been significant volatility in foreign currency exchange rates.

Conducting and launching operations on an international scale requires close coordination of activities across multiple jurisdictions and time zones and consumes significant management resources. Our limited experience in operating our business outside of the United States increases the risk that our current and any future international expansion efforts will not be successful. Conducting





international operations subjects us to risks that, generally, we do not face in the United States, including:

- Fluctuations in currency exchange rates;
- Unexpected changes in foreign regulatory requirements;
- Longer accounts receivable payment cycles and difficulties in collecting accounts receivable;
- Difficulties in managing and staffing international operations, including differences in labor laws;
- Potentially adverse tax consequences, including the complexities of foreign value added tax systems and restrictions on the repatriation of earnings;
- Localization of our solutions, including translation into foreign languages and associated expenses;
- Localization of our customer agreements under applicable foreign law;
- The burdens of complying with a wide variety of foreign laws and different legal standards, including laws and regulations related to privacy and data security and limitations on liability;
- Increased financial accounting and reporting burdens and complexities;

- Political, social and economic instability abroad, terrorist attacks and security concerns in general; and
- Reduced or varied protection for intellectual property rights in some countries.

The impact of any one of these risks could harm our international business and, consequently, our results of operations generally. Additionally, operating in international markets also requires significant management attention and financial resources. We cannot be certain that the investment and additional resources required in establishing, acquiring or integrating operations in other countries will produce desired levels of revenue or profitability.

***Due to the global nature of our business, we could be harmed by violations of the U.S. Foreign Corrupt Practices Act, the U.K. Bribery Act or similar anti-bribery laws in other jurisdictions in which we operate, or various international trade and export laws.***

The global nature of our business creates various domestic and local regulatory challenges. The U.S. Foreign Corrupt Practices Act, or the FCPA, the U.K. Bribery Act 2010, or the U.K. Bribery Act, and similar anti-bribery laws in other jurisdictions generally prohibit U.S.-based companies and their intermediaries from making improper payments to non-U.S. officials for the purpose of obtaining or retaining business. In addition, U.S.-based companies are required to maintain records that accurately and fairly represent their transactions and have an adequate system of internal accounting controls. We operate in areas of the world that experience corruption by government officials to some degree and, in certain circumstances, compliance with anti-bribery laws may conflict with local customs and practices. Our global operations require us to import from and export to several countries, which geographically stretches our compliance obligations. In addition, changes in such laws could result in increased regulatory requirements and compliance costs which could harm our business, financial condition and results of operations. Our employees or other agents may engage in prohibited conduct and render us responsible under the FCPA, the U.K. Bribery Act or similar anti-bribery laws. If we are found to be in violation of the FCPA, the U.K. Bribery Act or other anti-bribery laws (either due to acts or inadvertence of our employees, or due to the acts or inadvertence of others), we could suffer criminal or civil penalties or other sanctions, which could harm on our business.





**Risks Related to Our Intellectual Property**

***From time to time, we are defendants in legal proceedings as to which we are unable to assess our exposure and which could become significant liabilities in the event of an adverse judgment.***

We are defendants in legal proceedings from time to time. Companies in our industry have been subject to claims related to patent infringement and product liability, as well as contract and employment-related claims. We may not be able to accurately assess the risks related to these suits, and we may be unable to accurately assess our level of exposure. In December 2012, we entered into a settlement agreement relating to alleged patent infringements, which included future royalty payments on certain products and the payment of a lump sum amount for alleged past damages.

***If we fail to protect our intellectual property and proprietary rights adequately, our business could be harmed.***

We believe that proprietary technology is essential to establishing and maintaining our leadership position. We seek to protect our intellectual property through trade secrets, copyrights, confidentiality, non-compete and nondisclosure agreements, patents, trademarks, domain names and other measures, some of which afford only limited protection. We also rely on patent, trademark, trade secret and copyright laws to protect our intellectual property. Despite our efforts to protect our proprietary rights, unauthorized parties may attempt to copy aspects of our technology or to obtain and use information that we regard as proprietary. Our means of protecting our proprietary rights may not be adequate or our competitors may independently develop similar or superior technology, or design around our intellectual property. In addition, the laws of some foreign countries do not protect our proprietary rights to as great an extent as the laws of the United States. Intellectual property protections may also be unavailable, limited or difficult to enforce in some countries, which could make it easier for competitors to capture market share. Our failure or inability to adequately protect our intellectual property and proprietary rights could harm our business, financial condition and results of operations.

To prevent substantial unauthorized use of our intellectual property rights, it may be necessary to prosecute actions for infringement and/or misappropriation of our proprietary rights against third parties. Any such action could result in significant costs and diversion of our resources and management's attention, and we cannot assure you that we will be successful in such action. Furthermore, many of our current and potential competitors have the ability to dedicate substantially greater resources to enforce their intellectual property rights than we do. Accordingly, despite our efforts, we may not be able to prevent third parties from infringing upon or misappropriating our intellectual property.

***An assertion by a third party that we are infringing its intellectual property could subject us to costly and time-consuming litigation or expensive licenses that could harm our business and results of operations.***

The industries in which we compete are characterized by the existence of a large number of patents, copyrights, trademarks and trade secrets, and by frequent litigation based on allegations of infringement or other violations of intellectual property rights. We have been subject to patent litigation in the past and we may be subject to similar litigation in the future. Given that our solution integrates with all aspects of the home, the risk that our solution may be subject to these allegations is exacerbated. As we seek to extend our solutions, we could be constrained by the intellectual property rights of others. In addition, our dealer and distributor contracts require us to indemnify them against certain liabilities they may incur as a result of our infringement of any third-party intellectual property.

We might not prevail in any intellectual property infringement litigation given the complex technical issues and inherent uncertainties in such litigation. Defending such claims, regardless of their merit, could be time-consuming and distracting to management, result in costly litigation or settlement, cause development delays or require us to enter into royalty or licensing agreements. In addition, we

currently have a limited portfolio of issued patents compared to our larger competitors, and therefore may not be able to effectively utilize our intellectual property portfolio to assert defenses or counterclaims in response to patent infringement claims or litigation brought against us by third parties. Further, litigation may involve patent holding companies or other adverse patent owners who have no relevant products or revenues and against which our potential patents provide no deterrence, and many other potential litigants have the capability to dedicate substantially greater resources to enforce their intellectual property rights and to defend claims that may be brought against them. If our solutions exceed the scope of in-bound licenses or violate any third-party proprietary rights, we could be required to withdraw those solutions from the market, re-develop those solutions or seek to obtain licenses from third parties, which might not be available on reasonable terms or at all. Any efforts to re-develop our solutions, obtain licenses from third parties on favorable terms or license a substitute technology might not be successful and, in any case, might substantially increase our costs and harm our business, financial condition and results of operations. If we were compelled to withdraw any of our solutions from the market, our business, financial condition and results of operations could be harmed.

***We are generally obligated to indemnify our dealers, distributors and partners for certain expenses and liabilities resulting from intellectual property infringement claims regarding our products, which could force us to incur substantial costs.***

We have agreed, and expect to continue to agree, to indemnify our dealers, distributors and partners for certain intellectual property infringement claims regarding our products. As a result, in the case of infringement claims against these dealers, distributors and partners, we could be required to indemnify them for losses resulting from such claims or to refund amounts they have paid to us. We expect that some of our dealers, distributors and partners may seek indemnification from us in connection with infringement claims brought against them. We evaluate each such request on a case-by-case basis and we may not succeed in refuting all such claims. If a dealer, distributor or partner elects to invest resources in enforcing a claim for indemnification against us, we could incur significant costs disputing it. If we do not succeed in disputing it, we could face substantial liability.

***The use of open source software in our solutions may expose us to additional risks and harm our intellectual property.***

Some of our solutions use or incorporate software that is subject to one or more open source licenses. Open source software is typically freely accessible, usable and modifiable. Certain open source software licenses require a user who intends to distribute the open source software as a component of the user's software to disclose publicly part or all of the source code to the user's software. In addition, certain open source software licenses require the user of such software to make any derivative works of the open source code available to others on potentially unfavorable terms or at no cost.

The terms of many open source licenses to which we are subject have not been interpreted by U.S. or foreign courts, and accordingly there is a risk that those licenses could be construed in a manner that imposes unanticipated conditions or restrictions on our ability to commercialize our solutions. In that event, we could be required to seek licenses from third parties in order to continue offering our solutions, to re-develop our solutions, to discontinue sales of our solutions or to release our proprietary software code under the terms of an open source license, any of which could harm our business. Further, given the nature of open source software, it may be more likely that third parties might assert copyright and other intellectual property infringement claims against us based on our use of these open source software programs.

While we monitor the use of all open source software in our products, solutions, processes and technology and seek to ensure that no open source software is used in such a way as to require us to disclose the source code to the related product or solution when we do not wish to do so, we are currently conducting a comprehensive audit of open source software contained in our solutions.





Although we are not aware of any use of open source software in our solutions that would require us to disclose all or a portion of the source code underlying our solutions, we have not completed our open source software audit; therefore, it is possible that such use may have inadvertently occurred in deploying our solutions. Additionally, if a third-party software provider has incorporated certain types of open source software into software we license from such third party for our solutions without our knowledge, we could, under certain circumstances, be required to disclose the source code to our solutions. This could harm our intellectual property position and our business, results of operations and financial condition.

***We rely on the availability of third-party licenses. If these licenses are available to us only on less favorable terms or not at all in the future, our business and results of operations may be harmed.***

We have incorporated third-party licensed technology into our products. It may be necessary in the future to renew licenses relating to various aspects of these products or to seek additional licenses for existing or new products. The necessary licenses may not be available on acceptable terms, or at all. The inability to obtain certain licenses or other rights, or to obtain those licenses or rights on favorable terms, or the need to engage in litigation regarding these matters, could result in our inability to include certain features in our products or delays in product releases until such time, if ever, as equivalent technology could be identified, licensed or developed and integrated into our products, which may have a material adverse effect on our business, results of operations and financial condition. Moreover, the inclusion in our products of intellectual property licensed from third parties on a nonexclusive basis could limit our ability to protect our proprietary rights in our products.

***Failure to maintain the security of our information and technology networks, including information relating to our dealers, distributors, consumers and employees, could adversely affect us.***

We are dependent on information technology networks and systems, including the Internet, to process, transmit and store electronic information and, in the normal course of our business, we collect and retain certain information pertaining to our dealers, distributors, consumers and employees. The legal, regulatory and contractual environment surrounding information security and privacy is constantly evolving and companies that collect and retain such information are under increasing attack by cyber-criminals around the world. A significant actual or potential theft, loss, fraudulent use or misuse of dealer, distributor, consumer, employee or other personally identifiable data, whether by third parties or as a result of employee malfeasance or otherwise, non-compliance with our contractual or other legal obligations regarding such data or a violation of our privacy and security policies with respect to such data could result in significant costs, fines, litigation or regulatory actions against us. Such an event could additionally result in adverse publicity and therefore adversely affect the market's perception of the security and reliability of our services. Security breaches of, or sustained attacks against, this infrastructure could create system disruptions and shutdowns that could result in disruptions to our operations. We cannot be certain that advances in cyber-capabilities or other developments will not compromise or breach the technology protecting the networks that access our products and services. If

any one of these risks materializes our business, financial condition, results of operations and cash flows could be materially and adversely affected.

***If security breaches in connection with the delivery of our services allow unauthorized third parties to obtain control or access of our consumers' appliances containing our products, our reputation, business, results of operations and financial condition could be harmed.***

Certain of our employees and dealers can access and update certain of our home automation products and services through the Internet. If security breaches in connection with the delivery of our services via the Internet allow unauthorized third parties to obtain control of our consumers' appliances containing our products, our reputation, business, results of operations and financial condition could be



Table of Contents

harmed. Furthermore, although we do not recommend or approve of port forwarding for remote access to our solutions, certain of our dealers have in the past and may in the future enable port forwarding, which could create security vulnerabilities in a consumer's home network. If security breaches in connection with the delivery of our solutions occur, our reputation, business, results of operations and financial condition could be harmed.

**Risks Related to Owning Our Common Stock and this Offering**

***Our share price may be volatile and you may be unable to sell your shares at or above the offering price.***

The initial public offering price for our shares was determined by negotiations between us and representatives of the underwriters and may not be indicative of prices that will prevail in the trading market. The market price of our common stock could be subject to wide fluctuations in response to many risk factors listed in this section, and others beyond our control, including:

- Actual or anticipated fluctuations in our financial condition and results of operations;
- Overall conditions in our industry and market;
- Addition or loss of consumers;
- Changes in laws or regulations applicable to our solutions;
- Actual or anticipated changes in our growth rate relative to our competitors;
- Announcements by us or our competitors of significant acquisitions, strategic partnerships, joint ventures or capital commitments;
- Additions or departures of key personnel;
- Competition from existing products or new products that may emerge;
- Issuance of new or updated research or reports by securities analysts;
- Fluctuations in the valuation of companies perceived by investors to be comparable to us;
- Disputes or other developments related to proprietary rights, including patents, litigation matters and our ability to obtain intellectual property protection for our technologies;
- Sales of our common stock by us or our stockholders;
- Share price and volume fluctuations attributable to inconsistent trading volume levels of our shares;
- The expiration of contractual lock-up agreements with our executive officers, directors and stockholders; and
- General economic and market conditions.

Furthermore, the stock markets have experienced extreme price and volume fluctuations that have affected and continue to affect the market prices of equity securities of many companies. These fluctuations often have been unrelated or disproportionate to the operating performance of those companies. These broad market and industry fluctuations, as well as general economic, political and market conditions such as recessions, interest rate changes or international currency fluctuations, may harm the market price of our common stock. If the market price of our common stock after this offering does not exceed the initial public offering price, you may not realize any return on your investment in us and may lose some or all of your investment. In the past, companies that have experienced volatility in the market price of their stock have been subject to securities class action litigation. We may be the target of this type of litigation in the future. Securities litigation against us

Table of Contents

could result in substantial costs and divert our management's attention from other business concerns, which could harm our business.

***No public market for our common stock currently exists and an active trading market may not develop or be sustained following this offering.***

Prior to this offering, there has been no public market for our common stock. An active trading market may not develop following the completion of this offering or, if developed, may not be sustained. The lack of an active market may impair your ability to sell your shares at the time you wish to sell them, or at a price that you consider reasonable. The lack of an active market may also reduce the fair market value of your shares. An inactive market may also impair our ability to raise capital to continue to fund operations by selling shares and may impair our ability to acquire other companies or technologies by using our shares as consideration.

***If securities or industry analysts do not publish research or reports about our business, or publish negative reports about our business, our share price and trading volume could decline.***

The trading market for our common stock will depend on the research and reports that securities or industry analysts publish about us or our business. We do not have any control over these analysts. If one or more of the analysts who cover us downgrade our shares or change their opinion of our shares, our share price would likely decline. If one or more of these analysts cease coverage of our company or fail to regularly publish research or reports on us, we could lose visibility in the financial markets, which could cause our stock price or trading volume to decline.

***Future sales of our common stock in the public market could cause our share price to fall.***

Sales of a substantial number of shares of our common stock in the public market after this offering, or the perception that these sales might occur, could depress the market price of our common stock and could impair our ability to raise capital through the sale of additional equity securities. Based on the number of shares of common stock outstanding as of March 31, 2013, upon the closing of this offering, we will have shares of common stock outstanding, assuming no exercise of outstanding options or the underwriters' option to purchase additional shares.

All of the common stock sold in this offering will be freely tradable without restrictions or further registration under the Securities Act except for any shares held by our affiliates as defined in Rule 144 under the Securities Act. shares of common stock outstanding after this offering, or % based on shares outstanding as of March 31, 2013, will be restricted as a result of securities laws, lock-up agreements or other contractual restrictions that restrict transfers for at least 180 days after the date of this prospectus, subject to certain extensions.

The underwriters may, in their sole discretion, release all or some portion of the shares subject to lock-up agreements with the underwriters prior to expiration of the lock-up period. See "Shares Eligible for Future Sale."

The holders of shares of common stock, or % based on shares outstanding as of March 31, 2013, will be entitled to rights with respect to registration of such shares under the Securities Act pursuant to an investors' rights agreement between such holders and us. See "Description of Capital Stock—Registration Rights." If such holders, by exercising their registration rights, sell a large number of shares, the market price for our common stock could be harmed. If we file a registration statement for the purpose of selling additional shares to raise capital and are required to include shares held by these holders pursuant to the exercise of their registration rights, our ability to raise capital may be impaired. We intend to file a registration statement on Form S-8 under the Securities Act to register shares for issuance under our 2003 Equity Incentive Plan and 2013 Stock Option and Incentive Plan. Our 2013 Stock Option and Incentive Plan provides for automatic increases



Table of Contents

in the shares reserved for issuance under the plan which could result in additional dilution to our stockholders. Once we register these shares, they can be freely sold in the public market upon issuance and vesting, subject to a lock-up period of at least 180 days and other restrictions provided under the terms of the applicable plan and/or the option agreements entered into with option holders.

***Our management team may invest or spend the proceeds of this offering in ways with which you may not agree, or in ways which may not yield a positive return.***

The net proceeds from this offering may be used for working capital purposes and for other general corporate purposes, including the research and development of new solutions, sales and marketing activities, paying off remaining amounts owed under a litigation settlement agreement, financing acquisition opportunities and other capital expenditures. Although we may use a portion of the net proceeds to acquire complementary products, solutions, technologies or businesses, we have no current understandings, agreements or commitments to do so at this time.

Our management will have considerable discretion in the application of the net proceeds, and you will not have the opportunity, as part of your investment decision, to assess whether the proceeds are being used appropriately. The net proceeds may be used for corporate purposes that do not improve our results of operations or increase our market value.

***Purchasers in this offering will experience immediate and substantial dilution in the book value of their investment.***

The initial public offering price of our common stock is substantially higher than the net tangible book value per share of our outstanding common stock immediately after this offering. Therefore, if you purchase our common stock in this offering, you will incur immediate dilution of $ in net tangible book value per share from the price you paid. In addition, following this offering, purchasers in this offering will have contributed % of the total consideration paid by our stockholders to purchase shares of common stock, in exchange for acquiring approximately % of our total outstanding shares as of March 31, 2013 after giving effect to this offering. In addition, if outstanding options to purchase our common stock are exercised, you will experience additional dilution.

***Our directors, executive officers and principal stockholders will continue to have substantial control over us after this offering and could delay or prevent a change in corporate control.***

After this offering, our directors, executive officers and holders of more than 5% of our common stock, together with their affiliates, will beneficially own, in the aggregate, % of our outstanding common stock, assuming no exercise of the underwriters' option to purchase additional shares of our common stock in this offering. As a result, these stockholders, acting together, would have the ability to control the outcome of matters submitted to our stockholders for approval, including the election

of directors and any merger, consolidation or sale of all or substantially all of our assets. In addition, these stockholders, acting together, would have the ability to control the management and affairs of our company. Accordingly, this concentration of ownership might harm the market price of our common stock by:

- Delaying, deferring or preventing a change in corporate control;
- Impeding a merger, consolidation, takeover or other business combination involving us; or
- Discouraging a potential acquirer from making a tender offer or otherwise attempting to obtain control of us.



Table of Contents

***Anti-takeover provisions in our charter documents and under Delaware law could make an acquisition of us, which may be beneficial to our stockholders, more difficult and may prevent attempts by our stockholders to replace or remove our current management and limit the market price of our common stock.***

Provisions in our certificate of incorporation and bylaws, as amended and restated upon the closing of this offering, may have the effect of delaying or preventing a change of control or changes in our management. Our amended and restated certificate of incorporation and amended and restated bylaws, which will become effective upon the closing of this offering, include provisions that:

- Authorize our board of directors to issue, without further action by the stockholders up to 25,000,000 shares of undesignated preferred stock;
- Require that any action to be taken by our stockholders be effected at a duly called annual or special meeting and not by written consent;
- Specify that special meetings of our stockholders can be called only by our board of directors, the Chairman of the Board, the Chief Executive Officer or the President;
- Establish an advance notice procedure for stockholder approvals to be brought before an annual meeting of our stockholders, including proposed nominations of persons for election to our board of directors;
- Provide that directors may be removed only for cause;
- Provide that vacancies on our board of directors may be filled only by a majority of directors then in office, even though less than a quorum;
- Establish that our board of directors is divided into three classes—Class I, Class II and Class III—with each class serving staggered terms; and
- Require a super-majority of votes to amend certain of the above-mentioned provisions.

These provisions, alone or together, could delay or prevent hostile takeovers and changes in control. These provisions may also frustrate or prevent any attempts by our stockholders to replace or remove our current management by making it more difficult for stockholders to replace members of our board of directors, which is responsible for appointing the members of our management.

As a Delaware corporation, we are also subject to provisions of Delaware law, including Section 203 of the Delaware General Corporation law, which prevents some stockholders holding more than 15% of our outstanding common stock from engaging in certain business combinations without approval of the holders of substantially all of our outstanding common stock.

Any provision of our certificate of incorporation or bylaws or Delaware law that has the effect of delaying or deterring a change of control could limit the opportunity for our stockholders to receive a premium for their shares of our common stock, and could also affect the price that some investors are willing to pay for our common stock.

***We do not intend to pay dividends for the foreseeable future.***

We have never declared or paid any cash dividends on our common stock and do not intend to pay any cash dividends in the foreseeable future. We anticipate that we will retain all of our future earnings for use in the operation of our business and for general corporate purposes. Any determination to pay dividends in the future will be at the discretion of our board of directors. Accordingly, investors must rely on sales of their common stock after price appreciation, which may never occur, as the only way to realize any future gains on their investments.



Table of Contents

## SPECIAL NOTE REGARDING FORWARD-LOOKING STATEMENTS AND INDUSTRY DATA

This prospectus contains forward-looking statements that are based on our management's beliefs and assumptions and on information currently available to our management. The forward-looking statements are contained principally in, but not limited to, the "Prospectus Summary," "Risk Factors," "Management's Discussion and Analysis of Financial Condition and Results of Operations," "Business" and "Executive Compensation." Forward-looking statements include all statements that are not

historical facts and can be identified by terms such as "anticipates," "believes," "could," "seeks," "estimates," "expects," "intends," "may," "plans," "potential," "predicts, "projects," "should," "will," "would" or similar expressions and the negatives of those terms. Forward-looking statements include, but are not limited to, statements about:

- Our growth strategy;
- Our plans for future enhancements to our software platform and product offerings;
- Our results of operations;
- Our ability to anticipate future market demands and the needs of our consumers;
- Our ability to compete with other companies targeting the home automation market;
- Our ability to manage and expand the dealers and distributors we rely on to sell our solution;
- Our ability to effectively manage our growth;
- Our expectations regarding the use of proceeds;
- Our expectations regarding our expenses, sales and operations;
- Our anticipated trends and challenges in the markets in which we operate;
- Our ability to expand internationally;
- Our ability to successfully enter new markets; and
- Our intellectual property.

Forward-looking statements involve known and unknown risks, uncertainties and other factors that may cause our actual results, performance or achievements to be materially different from any future results, performance or achievements expressed or implied by the forward-looking statements. We discuss these risks in greater detail in "Risk Factors" and elsewhere in this prospectus. Given these uncertainties, you should not place undue reliance on these forward-looking statements. Also, forward-looking statements represent our management's beliefs and assumptions only as of the date of this prospectus. You should read this prospectus and the documents that we have filed as exhibits to the registration statement, of which this prospectus is a part, completely and with the understanding that our actual future results may be materially different from what we expect.

Except as required by law, we assume no obligation to update these forward-looking statements publicly, or to update the reasons actual results could differ materially from those anticipated in these forward-looking statements, even if new information becomes available in the future.

This prospectus also contains estimates and other information concerning our industry, including market size and growth rates, which are based on industry publications, surveys and forecasts, including those generated by ABI Research and IDC. These industry publications, surveys and forecasts generally indicate that their information has been obtained from sources believed to be reliable. The industry in which we operate is subject to a high degree of uncertainty and risk due to variety of factors, including those described in "Risk Factors."



Table of Contents

## USE OF PROCEEDS

We estimate that the net proceeds from our sale of shares of common stock in this offering at an assumed initial public offering price of $ per share, the midpoint of the price range set forth on the cover page of this prospectus, after deducting estimated underwriting discounts and commissions and estimated offering expenses payable by us, will be approximately $ million, or $ million if the underwriters' option to purchase additional shares is exercised in full. A $1.00 increase (decrease) in the assumed initial public offering price would increase (decrease) the net proceeds to us from this offering by $ million, assuming the number of shares offered by us, as set forth on the cover page of this prospectus, remains the same and after deducting the estimated underwriting discounts and commissions.

We intend to use the net proceeds of this offering primarily for general corporate purposes, including working capital and capital expenditures. We intend to use $ million of the net proceeds from this offering to pay off the remaining amounts owed under a litigation settlement agreement.

In addition, if appropriate opportunities arise to acquire or invest in complementary technologies, assets or businesses, we may use a portion of the net proceeds for such acquisition or investment. However, we are not currently discussing any such potential acquisition or investment with any third party. The amount and timing of these expenditures will vary depending on a number of factors, including competitive and technological developments and the rate of growth, if any, of our business.

Pending their use, we plan to invest our net proceeds from this offering in short-term, interest-bearing obligations, investment-grade instruments, certificates of

deposit or direct or guaranteed obligations of the U.S. government.

## DIVIDEND POLICY

We have never declared or paid cash dividends on our common stock. We currently intend to retain all available funds and any future earnings for use in the operation of our business and do not anticipate paying any dividends on our common stock in the foreseeable future. Any future determination to declare dividends will be made at the discretion of our board of directors and will depend on our financial condition, results of operations, capital requirements, general business conditions and other factors that our board of directors may deem relevant. In addition, our credit facility prohibits us from declaring or paying cash dividends on our capital stock.



Table of Contents

## CAPITALIZATION

The following table sets forth our capitalization as of March 31, 2013:

- On an actual basis;
- On a pro forma basis to reflect the conversion of all outstanding shares of our preferred stock into 79,528,755 shares of our common stock, which will occur immediately prior to the closing of this offering assuming our valuation prior to this offering is at least $225 million and the net proceeds to us from this offering are not less than $35 million, the net exercise of outstanding warrants to purchase 3,394,300 shares of capital stock into an aggregate of 757,231 shares of common stock as of March 31, 2013 and the corresponding reclassification of our warrant liability to additional paid-in capital, which will occur immediately prior to the closing of this offering unless earlier exercised or expired, and the filing of our post-offering amended and restated certificate of incorporation, which will occur immediately prior to the closing of this offering; and
- On a pro forma as adjusted basis to reflect the pro forma adjustments described above and our receipt of the net proceeds from our sale of shares of common stock in this offering at an assumed initial public offering price of $ per share, the midpoint of the price range set forth on the cover page of this prospectus, after deducting estimated underwriting discounts and commissions and estimated offering expenses payable by us.

The information below is illustrative only and our capitalization following the completion of this offering will be adjusted based on the actual initial public offering price and other terms of this offering determined at pricing. You should read this table together with "Management's Discussion and Analysis of Financial Condition and Results of Operations" and our financial statements and the related notes appearing elsewhere in this prospectus.

| | As of March 31, 2013 | | |
|---|---|---|---|
| | Actual | Pro Forma | Pro Forma As Adjusted |
| | (In thousands) | | |
| Total debt and settlement obligations | $ 7,233 | $ 7,233 | |
| Warrant liability | 576 | — | |
| Redeemable Convertible Preferred stock, $0.0001 par value, 83,163,408 shares authorized, 79,528,755 shares issued and outstanding, actual; 83,163,408 shares authorized, no shares issued and outstanding, pro forma; no shares authorized, issued, and outstanding, pro forma as adjusted | 116,313 | — | |
| Stockholders' equity (deficit) | | | |
| Preferred stock, $0.0001 par value, no shares authorized, issued, and outstanding, actual and pro forma; 25,000,000 shares authorized, no shares issued and outstanding, pro forma as adjusted | — | — | |
| Common stock, $0.0001 par value, 127,836,592 shares authorized, 13,037,259 shares issued and outstanding, actual; 500,000,000 shares authorized, 93,323,245 shares issued and outstanding, pro forma; 500,000,000 shares authorized, shares issued and outstanding, pro forma as adjusted | 1 | 9 | |
| Additional paid-in capital | 13,862 | 130,743 | |
| Accumulated deficit | (107,058) | (107,058) | |
| Accumulated other comprehensive loss | (9) | (9) | |
| Total stockholders' equity (deficit) | (93,204) | 23,685 | |
| Total capitalization | $ 30,918 | $ 30,918 | $ |

The number of shares of our common stock to be outstanding after the completion of this offering is based on:

- 92,566,014 shares outstanding as of March 31, 2013;
- 248,392 shares of common stock, on an as-converted basis, issuable upon the net exercise of a warrant to purchase 949,868 shares of preferred stock outstanding as of March 31, 2013 at an exercise price of $1.78 that would terminate upon this offering in accordance with its terms; and
- 508,839 shares of common stock issuable upon the net exercise of warrants to purchase 2,444,432 shares of common stock outstanding as of March 31, 2013 at an exercise price of $1.91 that would terminate upon this offering in accordance with their terms.

The number of shares of our common stock to be outstanding after the completion of this offering excludes:

- 23,972,031 shares of common stock issuable upon the exercise of options outstanding as of March 31, 2013 at a weighted average exercise price of $1.07 per share;
- 370,000 shares of common stock issuable upon the exercise of a warrant to purchase common stock outstanding as of March 31, 2013 at an exercise price of $1.44 per share;
- 60,926 shares of common stock, on an as-converted basis, issuable upon the exercise of warrants to purchase preferred stock outstanding as of March 31, 2013 at a weighted average exercise price of $1.48 per share; and
- shares reserved for future issuance under our 2013 Stock Option and Incentive Plan, as well as shares originally reserved for issuance under our 2003 Equity Incentive Plan, but which may become available for awards under our 2013 Stock Option and Incentive Plan, which plan will become effective in connection with this offering and contains provisions that will automatically increase its share reserve each year, as more fully described in "Executive Compensation—Employee Benefit Plans."

A $1.00 increase (decrease) in the assumed initial public offering price of $ per share, the midpoint of the range set forth on the cover page of this prospectus, would increase (decrease) cash and cash equivalents and total stockholders' equity (deficit) and total capitalization by $ million, assuming that the number of shares offered by us, as set forth on the cover page of this prospectus, remains the same, and after deducting estimated underwriting discounts and commissions payable by us. Each increase or decrease of 1.0 million shares in the number of shares offered by us, assuming that the assumed initial public offering price remains the same, would increase or decrease cash and cash equivalents and total stockholders' equity (deficit) and total capitalization by $ million.





## DILUTION

If you invest in our common stock, your interest will be diluted to the extent of the difference between the amount per share paid by purchasers of shares of common stock in this initial public offering and the pro forma as adjusted net tangible book value per share of common stock immediately after this offering.

At March 31, 2013, our net tangible book value was approximately $ million, or $ per share of common stock. Net tangible book value per share represents the amount of our total tangible assets less our total liabilities, divided by the shares of common stock outstanding at March 31, 2013. After giving effect to our sale of shares of common stock in this offering at an assumed initial public offering price of $ per share, the midpoint of the price range set forth on the cover page of this prospectus, and after deducting estimated underwriting discounts and commissions and estimated offering expenses payable by us, our pro forma as adjusted net tangible book value at March 31, 2013 would have been $ , or $ per share of common stock. This represents an immediate increase in pro forma as adjusted net tangible book value of $ per share to existing stockholders and an immediate dilution of $ per share to new investors.

The following table illustrates this dilution:

| | | |
|---|---|---|
| Assumed initial public offering price per share | | $ |
| Net tangible book value per share as of March 31, 2013 | $ | |
| Increase per share attributable to this offering | | |
| Pro forma as adjusted net tangible book value per share after giving effect to this offering | | |
| Net tangible book value dilution per share to investors in this offering | | $ |

If all our outstanding options had been exercised, the pro forma net tangible book value as of March 31, 2013 would have been $ million, or $ per

share, and the pro forma net tangible book value after this offering would have been $ million, or $ per share, causing dilution to new investors of $ per share.

If the underwriters fully exercise their option to purchase additional shares, the pro forma as adjusted net tangible book value per share after giving effect to this offering would be $ per share, and the dilution in pro forma net tangible book value per share to investors in this offering would be $ per share.

The following table summarizes, on a pro forma as adjusted basis as of March 31, 2013, the total number of shares of common stock purchased from us, the total consideration paid to us and the average price per share paid to us by existing stockholders and by new investors purchasing shares in this offering at the assumed initial public offering price of $ per share, the midpoint of the price range set forth on the cover page of this prospectus, before deducting estimated underwriting discounts and commissions and estimated offering expenses payable by us:

| | Shares Purchased | | Total Consideration | | Average Price |
|---|---|---|---|---|---|
| | Number | Percent | Amount | Percent | Per Share |
| Existing stockholders | | %$ | | %$ | |
| New investors | | | | | |
| Total | | 100.0%$ | | 100.0%$ | |

The foregoing calculations are based on:

- 92,566,014 shares outstanding as of March 31, 2013;





- 248,392 shares of common stock, on an as-converted basis, issuable upon the net exercise of a warrant to purchase 949,868 shares of preferred stock outstanding as of March 31, 2013 at an exercise price of $1.78 that would terminate upon this offering in accordance with its terms; and

- 508,839 shares of common stock issuable upon the net exercise of warrants to purchase 2,444,432 shares of common stock outstanding as of March 31, 2013 at an exercise price of $1.91 that would terminate upon this offering in accordance with their terms.

The foregoing calculations exclude:

- 23,972,031 shares of common stock issuable upon the exercise of options outstanding as of March 31, 2013 at a weighted average exercise price of $1.07 per share;

- 370,000 shares of common stock issuable upon the exercise of a warrant to purchase common stock outstanding as of March 31, 2013 at an exercise price of $1.44 per share;

- 60,926 shares of common stock, on an as-converted basis, issuable upon the exercise of warrants to purchase preferred stock outstanding as of March 31, 2013 at a weighted average exercise price of $1.48 per share; and

- shares reserved for future issuance under our 2013 Stock Option and Incentive Plan, as well as shares originally reserved for issuance under our 2003 Equity Incentive Plan, but which may become available for awards under our 2013 Stock Option and Incentive Plan, which plan will become effective in connection with this offering and contains provisions that will automatically increase its share reserve each year, as more fully described in "Executive Compensation—Employee Benefit Plans."

A $1.00 increase (decrease) in the assumed initial public offering price of $ per share, the midpoint of the range set forth on the cover page of this prospectus, would increase (decrease) our pro forma as adjusted net tangible book value by $ million, or $ per share, and the pro forma dilution per share to investors in this offering by the $ per share, assuming that the number of shares offered by us, as set forth on the cover page of this prospectus, remains the same, and after deducting estimated underwriting discounts and commissions payable by us. Each increase or decrease of 1.0 million shares in the number of shares offered by us would increase or decrease our pro forma as adjusted net tangible book value by approximately $ million, or $ per share, and the pro forma dilution to investors in this offering would be $ per share, assuming that the assumed initial public offering price remains the same, and after deducting estimated underwriting discounts and commissions payable by us. The pro forma information discussed above is illustrative only and will change based on the actual initial public offering price and other terms of this offering determined at pricing.





## SELECTED CONSOLIDATED FINANCIAL DATA

We have derived the selected consolidated statements of operations data for the fiscal years ended December 31, 2010, 2011 and 2012 and the selected consolidated balance sheet data as of December 31, 2011 and 2012 from our audited consolidated financial statements and related notes included elsewhere in this prospectus. We have derived the selected consolidated statements of operations data for the three months ended March 31, 2012 and March 31, 2013 and the selected consolidated balance sheet data as of March 31, 2013 from our unaudited interim consolidated financial statements included elsewhere in this prospectus. We have derived the selected consolidated statements of operations data for the fiscal years ended December 31, 2008 and 2009 from our audited consolidated financial statements not included in this prospectus. We have derived the selected consolidated balance sheet data as of March 31, 2012 from our unaudited consolidated financial statements not included in this prospectus. Our unaudited interim consolidated financial statements have been prepared on the same basis as our annual consolidated financial statements and include all adjustments, consisting of only normal recurring adjustments, necessary for the fair presentation of those statements. The following selected consolidated financial data should be read in conjunction with "Management's Discussion and Analysis of Financial Condition and Results of Operations" and our consolidated financial statements and related notes included elsewhere in this prospectus. Our historical results are not necessarily indicative of the results to be expected for any future period and the results for any interim period are not necessarily indicative of the results to be expected in the full year.

| | Years Ended December 31, | | | | | Three Months Ended March 31, | |
|---|---|---|---|---|---|---|---|
| | 2008 | 2009 | 2010 | 2011 | 2012 | 2012 | 2013 |
| | (In thousands, except per share data) | | | | | | |
| **Consolidated Statements of Operations Data:** | | | | | | | |
| Revenue | $ 57,098 | $ 67,742 | $ 74,925 | $ 93,376 | $ 109,512 | $ 22,628 | $ 26,571 |
| Cost of revenue | 35,330 | 41,674 | 43,357 | 50,534 | 57,225 | 12,466 | 13,550 |
| Cost of revenue—inventory purchase commitment | — | — | — | — | 1,840 | — | — |
| Gross margin | 21,768 | 26,068 | 31,568 | 42,842 | 50,447 | 10,162 | 13,021 |
| Operating expenses: | | | | | | | |
| Research and development | 12,013 | 10,862 | 15,922 | 19,211 | 20,310 | 4,813 | 6,066 |
| Sales and marketing | 15,079 | 16,483 | 22,491 | 17,546 | 20,182 | 5,038 | 5,605 |
| General and administrative | 8,225 | 6,690 | 8,876 | 9,805 | 10,150 | 2,532 | 2,828 |
| Litigation settlement | 3,937 | — | — | — | 2,869 | — | — |
| Total operating expenses | 39,254 | 34,035 | 47,289 | 46,562 | 53,511 | 12,383 | 14,499 |
| Loss from operations | (17,486) | (7,967) | (15,721) | (3,720) | (3,064) | (2,221) | (1,478) |
| Interest and other expense, net | (47) | (401) | (544) | (165) | (518) | (462) | (49) |
| Loss before income taxes | (17,533) | (8,368) | (16,265) | (3,885) | (3,582) | (2,683) | (1,527) |
| Income tax (expense) benefit | — | — | — | — | (141) | — | 56 |
| Net loss | $ (17,533) | $ (8,368) | $ (16,265) | $ (3,885) | $ (3,723) | $ (2,683) | $ (1,471) |
| Net loss per common share, basic and diluted | $ (2.28) | $ (1.04) | $ (1.91) | $ (0.39) | $ (0.30) | $ (0.23) | $ (0.11) |
| **Other Non-GAAP Financial Data:** | | | | | | | |
| Adjusted gross margin | $ 21,811 | $ 26,094 | $ 31,596 | $ 42,891 | $ 52,365 | $ 10,179 | $ 13,037 |
| Adjusted gross margin percentage | 38.2% | 38.5% | 42.2% | 45.9% | 47.8% | 45.0% | 49.1% |
| Adjusted operating income (loss) | $ (12,541) | $ (6,928) | $ (14,252) | $ (1,707) | $ 4,514 | $ (1,490) | $ (640) |



Table of Contents

Stock-based compensation expense included in the consolidated statements of operations data above was as follows:

Three Months Ended

| | Years Ended December 31, | | | | | March 31, | |
|---|---|---|---|---|---|---|---|
| | 2008 | 2009 | 2010 | 2011 | 2012 | 2012 | 2013 |
| | (In thousands) | | | | | | |
| Cost of revenue | $ 43 | $ 26 | $ 28 | $ 49 | $ 78 | $ 17 | $ 16 |
| Research and development | 167 | 229 | 249 | 492 | 704 | 130 | 236 |
| Sales and marketing | 245 | 339 | 546 | 523 | 580 | 144 | 184 |
| General and administrative | 553 | 445 | 646 | 949 | 1,507 | 440 | 402 |
| Total stock-based compensation expense | $ 1,008 | $ 1,039 | $ 1,469 | $ 2,013 | $ 2,869 | $ 731 | $ 838 |

***Adjusted Gross Margin***

A reconciliation of Adjusted gross margin to gross margin, the most directly comparable GAAP financial measure, is presented below:

| | Years Ended December 31, | | | | | Three Months Ended March 31, | |
|---|---|---|---|---|---|---|---|
| | 2008 | 2009 | 2010 | 2011 | 2012 | 2012 | 2013 |
| | (Dollars in thousands) | | | | | | |
| Gross margin | $ 21,768 | $ 26,068 | $ 31,568 | $ 42,842 | $ 50,447 | $ 10,162 | $ 13,021 |
| Stock-based compensation expense included in cost of revenue | 43 | 26 | 28 | 49 | 78 | 17 | 16 |
| Cost of revenue—inventory purchase commitment | — | — | — | — | 1,840 | — | — |
| Adjusted gross margin | $ 21,811 | $ 26,094 | $ 31,596 | $ 42,891 | $ 52,365 | $ 10,179 | $ 13,037 |
| Adjusted gross margin percentage | 38.2% | 38.5% | 42.2% | 45.9% | 47.8% | 45.0% | 49.1% |

To provide investors with additional information regarding our financial results, we have disclosed in the table above and within this prospectus Adjusted gross margin, a non-GAAP financial measure. We have included Adjusted gross margin in this prospectus because Adjusted gross margin is a key measure used by our management and board of directors to understand and evaluate our operating performance and trends, to prepare and approve our annual budget and to develop short- and long-term operational plans.

Adjusted gross margin is defined as gross margin less stock-based compensation expense and loss on inventory purchase commitment. Management believes that the use of Adjusted gross margin provides consistency and comparability with our past and future performance, facilitates period-to-period comparisons and also facilitates comparisons with other companies.

Management believes that it is useful to exclude stock-based compensation expense from gross margin because the amount of such expense in any specific period may not directly correlate to the underlying performance of our business operations. We believe it is useful to exclude loss on inventory purchase commitment because it is an expense that arose from our commitment to purchase energy-related products from our contract manufacturing partner that we will not use due to our decision to discontinue our energy product line for utility customers. We have not incurred that type of expense in past periods and we believe that past and future periods are more comparable if we exclude that expense from gross margin.



Table of Contents

Our use of Adjusted gross margin has limitations as an analytical tool and you should not consider it in isolation or a substitute for our analysis of our results as reported under GAAP. Some of these limitations are:

- Adjusted gross margin does not reflect the potentially dilutive impact of equity-based compensation; and
- Although we have not incurred significant loss on purchase commitments in the past, there is no guarantee that we will not incur those expenses in the future and therefore Adjusted gross margin may not be indicative of future performance.

Because of these limitations, you should consider Adjusted gross margin alongside other financial performance measures.

***Adjusted Operating Income***

A reconciliation of Adjusted operating income (loss) to loss from operations, the most directly comparable GAAP financial measure, is presented below:

| | Years Ended December 31, | | | | | Three Months Ended March 31, | |
|---|---|---|---|---|---|---|---|
| | 2008 | 2009 | 2010 | 2011 | 2012 | 2012 | 2013 |

| | (In thousands) | | | | | | |
|---|---|---|---|---|---|---|---|
| Loss from operations | $ (17,486) | $ (7,967) | $ (15,721) | $ (3,720) | $ (3,064) | $ (2,221) | $ (1,478) |
| Stock-based compensation expense | 1,008 | 1,039 | 1,469 | 2,013 | 2,869 | 731 | 838 |
| Cost of revenue—inventory purchase commitment | — | — | — | — | 1,840 | — | — |
| Litigation settlement | 3,937 | — | — | — | 2,869 | — | — |
| Adjusted operating income (loss) | $ (12,541) | $ (6,928) | $ (14,252) | $ (1,707) | $ 4,514 | $ (1,490) | $ (640) |

To provide investors with additional information regarding our financial results, we have disclosed in the table above and within this prospectus Adjusted operating income, a non-GAAP financial measure. We have included Adjusted operating income in this prospectus because Adjusted operating income is a key measure used by our management and board of directors to understand and evaluate our operating performance and trends. We use it to prepare and approve our annual budget and to develop short- and long-term operational plans.

Adjusted operating income is defined as operating income less stock-based compensation expense, less loss on inventory purchase commitment and litigation settlement expense. Management believes that the use of Adjusted operating income provides consistency and comparability with our past and future performance, facilitates period-to-period comparisons and also facilitates comparisons with other companies.

Management believes that it is useful to exclude stock-based compensation expense from operating income because the amount of such expense in any specific period may not directly correlate to the underlying performance of our business operations. We believe it is useful to exclude loss on inventory purchase commitment because it is an expense that arose from our commitment to purchase energy-related products from our contract manufacturing partner that we will not use due to our decision to discontinue our energy product line for utility customers. We have not incurred that type of expense in past periods and we believe that past and future periods are more comparable if we exclude that expense from operating income. We believe it is useful to exclude litigation settlement expense



Table of Contents

from operating income because that expense was related to two separate legal settlements that were resolved in 2012. Those settlements are not indicative of past or future operating performance. We believe that past and future periods are more comparable if we exclude that expense from operating income.

Our use of Adjusted operating income has limitations as an analytical tool and you should not consider it in isolation or a substitute for our analysis of our results as reported under GAAP. Some of these limitations are:

- Adjusted operating income does not reflect the potentially dilutive impact of equity-based compensation;
- Although we have not incurred significant loss on purchase commitments in the past, there is no guarantee that we will not incur those expenses in the future and therefore Adjusted operating income may not be indicative of future performance; and
- We are involved in litigation matters from time to time and we may incur litigation settlement expenses in future periods and therefore Adjusted operating income may not be indicative of future performance.

Because of these limitations, you should consider Adjusted operating income alongside other financial performance measures.

**Consolidated Balance Sheet Data**

The following table sets forth our selected consolidated balance sheet data as of the dates presented:

| | As of December 31, | | As of March 31, | |
|---|---|---|---|---|
| | 2011 | 2012 | 2012 | 2013 |
| | (In thousands) | | | |
| **Consolidated Balance Sheet Data:** | | | | |
| Cash and cash equivalents | $ 18,468 | $ 18,695 | $ 16,561 | $ 14,573 |
| Property and equipment, net | 2,127 | 2,666 | 2,262 | 3,566 |
| Working capital, excluding deferred revenue | 24,908 | 23,832 | 23,156 | 21,582 |
| Total assets | 43,534 | 50,638 | 42,126 | 49,455 |
| Long-term debt, including current portion | 2,320 | 3,159 | 2,388 | 3,394 |
| Redeemable convertible preferred stock and warrant liability | 116,660 | 116,914 | 117,059 | 116,889 |
| Total stockholders' deficit | (92,506) | (92,603) | (94,499) | (93,204) |

Table of Contents

## MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS

*You should read the following discussion and analysis of our financial condition and results of operations in conjunction with our consolidated financial statements and the notes thereto included elsewhere in this prospectus. The following discussion contains forward-looking statements that reflect our plans, estimates and beliefs. Our actual results could differ materially from those discussed in the forward-looking statements. Factors that could cause or contribute to these differences include those discussed below and elsewhere in this prospectus, particularly in the "Risk Factors" section.*

**Overview**

Control4 is a leading provider of automation and control solutions for the connected home. We unlock the potential of connected devices, making entertainment systems easier to use, homes more comfortable and energy efficient, and families more secure. We provide our consumers with the ability to integrate music, video, lighting, temperature, security, communications and other functionalities into a unified home automation solution that enhances our consumers' daily lives. More than 75% of our consumers have integrated two or more of these functionalities with our solution. At the center of our solution is our advanced software platform, which we provide through our products that interface with a wide variety of connected devices that are developed by us and by third parties.

We derive virtually all of our revenue from the sale of products that contain our proprietary software, which functions as the operating system of the home. Currently, we derive a smaller portion of our revenue from licensing our MyHome software, which allows consumers to access their home control system from their smartphone, tablet or laptop. In the future, we plan to bundle MyHome software licenses with our controller appliances. We also generate revenue from the sale of annual subscriptions to our 4Sight service, which allows consumers to receive alerts regarding activities in their home, and also allows dealers to perform remote diagnostic services. Although our subscription-based revenue is currently insignificant, we intend over time to develop additional subscription-based services and increase our subscription-based revenue.

We outsource the manufacturing of our hardware products to contract manufacturers. The majority of our hardware products are manufactured by Sanmina and LiteOn at their respective facilities in southern China, with additional manufacturing performed by six other contract manufacturers throughout Asia.

Consumers purchase our products from our worldwide network of certified independent dealers, regional and national retailers and distributors. These dealers design and install a solution to fit the specific needs of each consumer, whether it is a one-room home theatre solution or a whole-home automation solution that includes the integration of music, video, lighting, temperature, security and communications devices. Our products are primarily installed in both new and existing residences. A portion of our revenue is attributable to small commercial installations and multi-dwelling units, including hotels. During the year ended December 31, 2012, we sold our products directly to over 2,800 active direct dealers in the United States, Canada, the United Kingdom and 40 other countries, and partnered with 27 distributors to cover an additional 38 countries where we do not have direct dealer relationships. These distributors sell our solutions through dealers and provide warehousing, training, technical support, billing and service for dealers in each of those countries.

We were founded in 2003 and began shipping our products and generating revenue in 2005. Our revenue has increased from $23.0 million for the year ended December 31, 2006 to $109.5 million for the year ended December 31, 2012. Our revenue for the three months ended March 31, 2013 was $26.6 million, compared to $22.6 million for the three months ended March 31, 2012. Our revenue growth has resulted primarily from a combination of adding new dealers and distributors to our sales



Table of Contents

channel, as well as increasing revenue from existing dealers and distributors by enhancing and expanding our product offerings and solutions.

We refer to revenue from sales through our dealer and distributor network in the United States and Canada (which we refer to as North America) and outside of North America (which we refer to as International) as our Core revenue. Our Core revenue excludes revenue attributable to products we sell to hotels and other multi-dwelling units, and certain other revenue. Our North America Core revenue represented 74% and 77% of our revenue for the year ended December 31, 2012 and the three months ended March 31, 2013, respectively. Our International Core revenue has been growing at a faster rate than our North America Core revenue. Our International Core revenue for the three months ended March 31, 2013 increased by 20% compared to the three months ended March 31, 2012, primarily due to our addition of new international dealers and distributors.

To date, nearly all of our revenue growth has been organic. We have completed small acquisitions, but those acquisitions have been technology- and distribution-related and have not contributed materially to our revenue. We intend to identify, acquire and integrate strategic technologies, assets and businesses that we believe will enhance the overall strength of our business.

We have historically experienced seasonal variations in our revenue as a result of holiday-related factors that are common in our industry. Our revenue is generally highest in the fourth quarter due to consumers' desires to complete their home installations prior to the Thanksgiving and Christmas holidays. We generally see decreased sales in the first quarter due to the number of installations that were completed in the fourth quarter and the resulting decline in dealer activity in the first quarter. We generally expect these seasonal trends to continue in the future, which may cause quarterly fluctuations in our results of operations and certain financial metrics.

**Factors and Trends Affecting Our Performance**

A number of industry trends have facilitated our growth over the past several years, including the proliferation of connected devices and the ubiquity and growth of network-enabled homes. From 2006 through 2008, the majority of our sales were for use in new, single-family homes. During the slowdown in the new housing market beginning in 2008, our dealers redirected their focus to existing homes, and today, we estimate that the majority of our installations are in existing homes. We expect that future increases in either new home construction or existing home renovations will have a positive impact on our revenue.

We believe that the growth of our business and our future success are dependent upon many factors, including the rates at which consumers adopt our products and

services, our ability to strengthen and expand our dealer and distributor network, our ability to expand internationally and our ability to meet competitive challenges. While each of these areas presents significant opportunities for us, they also pose important challenges that we must successfully address in order to sustain or expand the growth of our business and improve our results of operations. These challenges include:

- ***Increasing Adoption Rates of Our Products and Services.*** We are focused on increasing adoption rates of our products and services through enhancements to our software platform and product offerings. We intend to accomplish these enhancements both organically and through acquisitions of complementary businesses and technologies;

- ***Optimizing Our North America Dealer Network.*** We intend to continue to optimize the performance of and expand our network of dealers in North America to ensure that we have geographic coverage and technical expertise to address our existing markets and new markets into which we plan to expand;

- ***Expanding our International Dealer and Distributor Network.*** We believe that our future growth will be significantly impacted by our ability to expand our dealer and distributor network





outside of North America, adapt our products and services to foreign markets and increase our brand awareness internationally. In particular, we believe that we will have significant opportunities to expand our business in emerging markets such as China and India; and

- ***Managing Competition.*** The market for home automation is fragmented, highly competitive and continually evolving. A number of large technology companies such as Apple, Google, Microsoft and Samsung offer home control capabilities among some of their own products, applications and services and are engaged in ongoing development efforts to address the broader home automation market. Our ability to gain significant market share in the home automation market and interoperate with the new technologies developed by other large technology companies over the next several years will be key factors in our ability to continue to grow our business and meet or exceed our future expectations.

**Key Operating and Financial Metrics**

We use the following key operating and financial metrics to evaluate and manage our business.

| | As of or for the Years Ended December 31, | | | | As of or for the Three Months Ended March 31, | |
|---|---|---|---|---|---|---|
| | 2009 | 2010 | 2011 | 2012 | 2012 | 2013 |
| Number of North America Dealers | 1,633 | 1,944 | 2,215 | 2,350 | 2,240 | 2,371 |
| Number of Direct International Dealers | 159 | 261 | 375 | 501 | 400 | 514 |
| Number of Controller Appliances Sold | 36,796 | 49,703 | 62,760 | 69,209 | 15,222 | 17,758 |
| Core Revenue Growth | 13% | 26% | 24% | 20% | 17% | 19% |
| International Core Revenue as a Percentage of Total Revenue | 9% | 14% | 18% | 22% | 20% | 20% |

***Number of North America and Direct International Dealers***

Because our dealers promote, sell, install and support our products, a broader dealer network allows us to reach more potential consumers across more geographic regions. We expect our dealer network to continue to grow, both in North America and internationally. While we have historically focused on dealers affiliated with the Custom Electronics Design and Installation Association, or CEDIA, we believe there is an opportunity to establish relationships with dealers outside of CEDIA, including electrical contractors, heating and cooling specialists, and security system installers. The number of dealers in the above table reflects active direct dealers that have placed an order with us in the trailing 12-month period.

Our international dealer network is growing at a faster rate than our North America dealer network, and we expect this trend to continue as we increase our presence in new and existing international markets. In addition, in some international markets, we plan to establish direct relationships with selected dealers that we previously served through distributors, which we expect will further increase our number of direct international dealers.

***Number of Controller Appliances Sold***

Our controller appliances contain our proprietary software and provide consumers with the essential software technology to enable home control, automation and personalization. Historically, on average, our consumers have purchased 2.26 controller appliances per installation. The number of controller appliances we sell in a given period provides us with an indication of consumer adoption of our technology. Our sales of controller appliances also create significant opportunity to sell our other products and services. Historically, for every one dollar of controller revenue we generate, we have recognized approximately two dollars of revenue from the sale of our other products and services,





although this varies from period to period. Once a consumer has deployed our controller appliances, we believe that the consumer is more likely to remain committed to

our technology platform and purchase more of our products, applications and services in the future.

***Core Revenue Growth***

The majority of our revenue comes from sales of our products through our distribution channels comprised of dealers in the United States and Canada and dealers and distributors located throughout the rest of the world. We refer to revenue attributable to sales through dealers located in the United States and Canada as North America Core revenue and revenue attributable to sales through dealers and distributors located throughout the rest of the world as International Core revenue. Core revenue does not include revenue from sales to hotels or multi-dwelling units, sales to utility customers and certification fees paid to us. Our revenue from sales to hotels, multi-dwelling units and other sources is generally project-based and has been significant in some periods and insignificant in other periods. In the future, we expect revenue from these sources to continue to be attributable to large projects and will continue to be significant in some periods and insignificant in other periods. We, therefore, believe that our core revenue growth is a good measure of our market penetration and the growth of our business.

***International Revenue as a Percentage of Total Revenue***

We believe that the international market represents a large and underpenetrated opportunity for us. In recent years, we have established offices in international regions, we have formed relationships with international dealers and distributors and we have expanded foreign language support for our solutions. We track International revenue as a percentage of total revenue as a key measure of our success expanding our business internationally.

**Basis of Presentation and Key Components of Results of Operations**

***Revenue***

We derive revenue primarily from the sale of products that contain our proprietary software. We generally recognize revenue upon the shipment of our products. We also license software that allows our customers to manage and control their homes from their smartphones, tablets or laptops. We recognize software license revenue at the time the software license is provided to the customer. In addition, we sell a subscription service, 4Sight, that allows consumers to control and monitor their homes remotely from their smartphones, tablets or laptops, and allows our dealers to perform remote diagnostic services. We defer subscription revenue at the time of payment and recognize it ratably over the term the service is provided. We record estimated reductions to revenue for dealer and distributor incentives at the time of the initial sale. We also record estimated reductions to revenue for estimated returns from our dealers and distributors at the time of the initial sale.





The following is a breakdown of our revenue between North America and International and a further breakdown between our Core revenue and other revenue:

| | Years Ended December 31, | | | | Three Months Ended March 31, | |
|---|---|---|---|---|---|---|
| | 2009 | 2010 | 2011 | 2012 | 2012 | 2013 |
| | (In thousands) | | | | | |
| North America Core Revenue | $ 50,134 | $ 60,245 | $ 71,472 | $ 81,130 | $ 17,257 | $ 20,470 |
| Other North America Revenue | 11,116 | 3,120 | 2,633 | 1,280 | 516 | 576 |
| Total North America Revenue | 61,250 | 63,365 | 74,105 | 82,410 | 17,773 | 21,046 |
| International Core Revenue | 6,106 | 10,699 | 16,797 | 24,471 | 4,507 | 5,386 |
| Other International Revenue | 386 | 861 | 2,474 | 2,631 | 348 | 139 |
| Total International Revenue | 6,492 | 11,560 | 19,271 | 27,102 | 4,855 | 5,525 |
| Total Revenue | $ 67,742 | $ 74,925 | $ 93,376 | $ 109,512 | $ 22,628 | $ 26,571 |
| North America Core Revenue as a % of Total Revenue | 74% | 80% | 77% | 74% | 76% | 77% |
| International Core Revenue as a % of Total Revenue | 9% | 14% | 18% | 22% | 20% | 20% |

***Cost of Revenue***

Cost of revenue is comprised primarily of the price we pay our contract manufacturers for the components and products that they produce on our behalf. We closely monitor our product costs and continually work to reduce the cost of our products through negotiation with our contract manufacturers and component vendors, and engineering design changes. Cost of revenue also includes all of the overhead expenses associated with procuring, warehousing and shipping our products (both inbound and outbound). Cost of revenue also includes estimated and actual expenses associated with excess and obsolete inventory, as well as warranty expenses and royalty fees paid to third-party licensors.

***Gross Margin***

As a percentage of revenue, our gross margin has been and will continue to be affected by a variety of factors. Our gross margin is relatively consistent across our products. Our gross margin is higher on software licensing and subscription revenue than it is on product sales. Our gross margin is also higher on our sales made directly through dealers than it is on our sales made through distributors. Gross margin may also be negatively affected by price competition in our target markets. Our gross margin on third-party products we sell through our online distribution platform is higher than our gross margin on our other product sales because we only recognize our net profit on these sales as revenue.

In the near term, we generally expect our gross margin to increase modestly as a result of our continued efforts to work with our contract manufacturers and component vendors to reduce the cost of components we purchase, engineer product design improvements, manage our supply chain and realize economies of scale as we grow our business. We also expect increased third-party product sales through our online distribution platform to have a positive impact on our gross margin going forward. From time to time, however, we may experience fluctuations in our gross margin as a result of the factors discussed in the preceding paragraph.

51

Table of Contents

***Operating Expenses***

*Research and Development*

Research and development expenses consist primarily of compensation for our engineers and product managers. Research and development expenses also include prototyping expenses incurred in the development of our products, including products used for testing. We also include fees paid to agencies to obtain regulatory certifications. We expect our research and development expenses to increase in absolute dollars for the foreseeable future as we continue to invest in the development of new solutions; however, we expect those expenses to fluctuate as a percentage of our revenue in future periods based on fluctuations in our revenue and the timing of those expenses.

*Sales and Marketing*

Sales and marketing expenses consist primarily of compensation and related travel expenses for our sales and marketing personnel. Sales and marketing expenses also include expenses associated with trade shows, marketing events, advertising and other marketing-related programs. We expect our sales and marketing expenses to increase in absolute dollars for the foreseeable future as we add sales personnel, particularly in our international channel, and continue to invest in advertising and promotions to increase awareness of our products. However, we also expect our sales and marketing expenses to fluctuate as a percentage of our revenue in future periods based on fluctuations in our revenue and the timing of those expenses.

*General and Administrative*

General and administrative expenses consist primarily of compensation for our employees in our executive administration, finance, information systems and legal departments. Also included in general and administrative expenses are outside legal fees, audit fees, facilities expenses and insurance costs. We expect our general and administrative expenses to increase in absolute dollars primarily as a result of the increased cost associated with being a public company. However, we also expect our general and administrative expenses to fluctuate as a percentage of our revenue in future periods based on fluctuations in our revenue and the timing of those expenses.

52

Table of Contents

**Results of Operations**

The following tables set forth our results of operations for the periods presented in absolute dollars and as a percentage of our revenue for those periods.

| | Years Ended December 31, | | | Three Months Ended March 31, | |
|---|---|---|---|---|---|
| | 2010 | 2011 | 2012 | 2012 | 2013 |
| | (In thousands) | | | | |
| Revenue | $ 74,925 | $ 93,376 | $ 109,512 | $ 22,628 | $ 26,571 |
| Cost of revenue | 43,357 | 50,534 | 57,225 | 12,466 | 13,550 |
| Cost of revenue—inventory purchase commitment | — | — | 1,840 | — | — |
| Gross margin | 31,568 | 42,842 | 50,447 | 10,162 | 13,021 |
| Operating expenses: | | | | | |
| Research and development | 15,922 | 19,211 | 20,310 | 4,813 | 6,066 |
| Sales and marketing | 22,491 | 17,546 | 20,182 | 5,038 | 5,605 |
| General and administrative | 8,876 | 9,805 | 10,150 | 2,532 | 2,828 |
| Litigation settlement | — | — | 2,869 | — | — |
| Total operating expenses | 47,289 | 46,562 | 53,511 | 12,383 | 14,499 |

| | | | | | |
|---|---|---|---|---|---|
| Loss from operations | (15,721) | (3,720) | (3,064) | (2,221) | (1,478) |
| Other income (expense): | | | | | |
| Interest expense, net | (404) | (392) | (264) | (62) | (75) |
| Other income (expense) | (140) | 227 | (254) | (400) | 26 |
| Total other expense | (544) | (165) | (518) | (462) | (49) |
| Loss before income taxes | (16,265) | (3,885) | (3,582) | (2,683) | (1,527) |
| Income tax (expense) benefit | — | — | (141) | — | 56 |
| Net loss | $ (16,265) | $ (3,885) | $ (3,723) | $ (2,683) | $ (1,471) |

Includes stock-based compensation expense as follows:

| | Years Ended December 31, | | | Three Months Ended March 31, | |
|---|---|---|---|---|---|
| | 2010 | 2011 | 2012 | 2012 | 2013 |
| | (In thousands) | | | | |
| Cost of revenue | $ 28 | $ 49 | $ 78 | $ 17 | $ 16 |
| Research and development | 249 | 492 | 704 | 130 | 236 |
| Sales and marketing | 546 | 523 | 580 | 144 | 184 |
| General and administrative | 646 | 949 | 1,507 | 440 | 402 |
| Total stock-based compensation expense | $ 1,469 | $ 2,013 | $ 2,869 | $ 731 | $ 838 |



Table of Contents

| | Years Ended December 31, | | | Three Months Ended March 31, | |
|---|---|---|---|---|---|
| | 2010 | 2011 | 2012 | 2012 | 2013 |
| | (As a percentage of revenue) | | | | |
| Revenue | 100% | 100% | 100% | 100% | 100% |
| Cost of revenue | 58 | 54 | 52 | 55 | 51 |
| Cost of revenue—inventory purchase commitment | 0 | 0 | 2 | — | — |
| Gross margin | 42 | 46 | 46 | 45 | 49 |
| Operating expenses: | | | | | |
| Research and development | 21 | 21 | 19 | 21 | 23 |
| Sales and marketing | 30 | 19 | 18 | 22 | 21 |
| General and administrative | 12 | 11 | 9 | 11 | 11 |
| Litigation settlement expense | 0 | 0 | 3 | — | — |
| Total operating expenses | 63 | 50 | 49 | 55 | 55 |
| Loss from operations | (21) | (4) | (3) | (10) | (6) |
| Other income (expense): | | | | | |
| Interest expense, net | (1) | 0 | 0 | 0 | 0 |
| Other income (expense) | | | | | |

| | | | | | |
|---|---|---|---|---|---|
| | 0 | 0 | 0 | (2) | 0 |
| Total other expense | (1) | 0 | (0) | (2) | 0 |
| Loss before income taxes | (22) | (4) | (3) | (12) | (6) |
| Income tax (expense) benefit | 0 | 0 | 0 | 0 | 0 |
| Net loss | (22)% | (4)% | (3)% | (12)% | (6)% |

**Comparison of the Three Months Ended March 31, 2012 and 2013:**

***Revenue***

| | Three Months Ended March 31, | | Change | |
|---|---|---|---|---|
| | 2012 | 2013 | $ | % |
| | (Dollars in thousands) | | | |
| Revenue | $ 22,628 | $ 26,571 | $ 3,943 | 17% |

Revenue increased by $3.9 million, or 17%, in the three months ended March 31, 2013 compared to the three months ended March 31, 2012. North America core revenue increased by $3.2 million, or 19%, from $17.3 million in the three months ended March 31, 2012 to $20.5 million in the three months ended March 31, 2013, while International core revenue increased by $900,000, or 20%, from $4.5 million in the three months ended March 31, 2012 to $5.4 million in the three months ended March 31, 2013. The increase in North America core revenue was due to a combination of the net increase in the number of active direct dealers selling our products and services and an increase in sales from existing direct dealers, both resulting in an increased number of system sales. The increase in International core revenue was primarily due to an increase in the number of dealers and distributors selling our products and services and the resulting increase in the number of system sales. Our International core revenue increased at a slower rate than it increased for the full year 2012 compared to 2011 primarily due to lower sales in China and certain countries in Latin America. Other revenue declined by $200,000 from $900,000 for the three months ended March 31, 2012 to $700,000 for the three months ended March 31, 2013. The decline in other revenue is due primarily to sales to energy-related customers in 2012 that did not recur in 2013.



Table of Contents

***Gross Margin***

| | Three Months Ended March 31, | | Change | |
|---|---|---|---|---|
| | 2012 | 2013 | $ | % |
| | (Dollars in thousands) | | | |
| Gross margin | $ 10,162 | $ 13,021 | $ 2,859 | 28% |
| Percentage of revenue | 45% | 49% | | |

As a percentage of revenue, our gross margin increased from 44.9% in the three months ended March 31, 2012 to 49.0% in the three months ended March 31, 2013. The increase in gross margin was due to a combination of component cost reductions, a decrease in fixed overhead as a percentage of revenue and higher sales of third-party products sold through our online distribution platform.

***Research and Development Expenses***

| | Three Months Ended March 31, | | Change | |
|---|---|---|---|---|
| | 2012 | 2013 | $ | % |
| | (Dollars in thousands) | | | |
| Research and development expenses | $ 4,813 | $ 6,066 | $ 1,253 | 26% |
| Percentage of revenue | 21% | 23% | | |

Research and development expenses increased by $1.3 million, or 26%, in the three months ended March 31, 2013 compared to the three months ended March 31, 2012. Research and development expenses increased as a percentage of revenue from 21% in the three months ended March 31, 2012 to 23% in the three months ended March 31, 2013. The increase in research and development expenses was due primarily to increased cash and stock compensation expense as a result of adding product development and product management personnel. Expenses associated with prototyping and test units associated with products announced or to be announced in 2013 also increased in the first quarter of 2013 compared to the first quarter of 2012.

***Sales and Marketing Expenses***

| Three Months Ended March 31, | | Change | |
|---|---|---|---|
| 2012 | 2013 | $ | % |



SAVANT3329686

| | | | | |
|---|---|---|---|---|
| | (Dollars in thousands) | | | |
| Sales and marketing expenses | $ 5,038 | $ 5,605 | $ 567 | 11% |
| Percentage of revenue | 22% | 21% | | |

Sales and marketing expenses increased by $567,000, or 11%, in the three months ended March 31, 2013 compared to the three months ended March 31, 2012. Sales and marketing expenses decreased as a percentage of revenue from 22% in the three months ended March 31, 2012 to 21% in in the three months ended March 31, 2013. The increase in sales and marketing expenses was due to increased compensation expense as a result of adding sales and marketing personnel, increased trade show-related expenses and increased credit card merchant fess associated with the increase in revenue.





***General and Administrative Expenses***

| | Three Months Ended March 31, | | Change | |
|---|---|---|---|---|
| | 2012 | 2013 | $ | % |
| | (Dollars in thousands) | | | |
| General and administrative expenses | $ 2,532 | $ 2,828 | $ 296 | 12% |
| Percentage of revenue | 11% | 11% | | |

General and administrative expenses increased by $296,000, or 12%, in the three months ended March 31, 2013 compared to the three months ended March 31, 2012. General and administrative expenses were 11% of revenue in the three months ended March 31, 2012 and 2013. The increase in general and administrative expenses was due primarily to increased consulting, accounting and legal fees. Compensation expense was also higher in the three months ended March 31, 2013 compared to the three months ended March 31, 2012 due to the addition of general and administrative personnel.

***Other Income (Expense)***

| | Three Months Ended March 31, | | Change | |
|---|---|---|---|---|
| | 2012 | 2013 | $ | % |
| | (Dollars in thousands) | | | |
| Other income (expense) | $ (462) | $ (49) | $ 413 | (89)% |

Other expense increased by $413,000 for the three months ended March 31, 2013 compared to the three months ended March 31, 2012. The increase is due primarily to the change in the fair value of the warrant to purchase Series G-1 redeemable convertible preferred stock.

**Comparison of the Years Ended December 31, 2010, 2011 and 2012**

***Revenue***

| | Years Ended December 31, | | | 2011 over | 2012 over |
|---|---|---|---|---|---|
| | 2010 | 2011 | 2012 | 2010 | 2011 |
| | (Dollars in thousands) | | | | |
| Revenue | $ 74,925 | $ 93,376 | $ 109,512 | 25% | 17% |

*2012 Compared to 2011*

Revenue increased by 17% in 2012 compared to 2011. North America core revenue increased by $9.7 million, or 14%, from $71.5 million in 2011 to $81.1 million in 2012, while International core revenue increased by $7.7 million, or 46%, from $16.8 million in 2011 to $24.5 million in 2012. The increase in North America core revenue was primarily due to the net increase in the number of active direct dealers and the resulting increase in the number of system sales. Our International core revenue increased at a faster rate than our North America core revenue primarily due to the growth rate being measured from a smaller base, increased dealer penetration into regions where we had previously done business, and our expansion into new regions. As of December 31, 2012, we had 2,350 active dealers in North America compared to 2,215 at the end of 2011. Similarly, we had 501 active direct International dealers compared to 375 at the end of 2011. Other revenue declined by $1.2 million, or 23%, from $5.1 million in 2011 to $3.9 million in 2012. The decline was primarily due to a decrease in revenue from sales to hotels and multi-dwelling units. Revenue from sales to hotels and multi-dwelling units is difficult for us to predict and we are uncertain as to how much revenue we will receive from these projects in the future.





*2011 Compared to 2010*

Revenue increased by 25% in 2011 compared to 2010. North America core revenue increased by $11.3 million, or 19%, from $60.2 million in 2010 to $71.5 million in 2011, while International core revenue increased by $6.1 million, or 57%, from $10.7 million in 2010 to $16.8 million in 2011. The increase in North America core revenue was primarily due to an increase in the number of dealers selling our products and the resulting increase in the number of system sales. International core revenue increased at a faster rate than North America core revenue primarily due to increased penetration in countries and regions where we had previously done

Restricted Confidential - Outside Counsel Only




business, as well as our expansion into new countries and regions.

***Gross Margin***

| | Years Ended December 31, | | | 2011 over | 2012 over |
|---|---|---|---|---|---|
| | 2010 | 2011 | 2012 | 2010 | 2011 |
| | (Dollars in thousands) | | | | |
| Gross margin | $ 31,568 | $ 42,842 | $ 50,447 | 36% | 18% |
| Percentage of revenue | 42% | 46% | 46% | | |

*2012 Compared to 2011*

As a percentage of revenue, our gross margin increased from 45.9% in 2011 to 46.1% in 2012. In 2012, our total cost of revenue included the loss on inventory purchase commitments of $1.8 million recorded in the third quarter of 2012. The loss on inventory purchase commitments was the result of our commitment to purchase energy-related products from our contract manufacturing partner that we will not use due to our decision to discontinue our energy product line in 2012 because the near- and mid-term demand of utility customers for the energy product line was lower than expected and the costs of developing and servicing the energy product line was higher than we expected. Our energy product line consisted of a wireless thermostat and an in-home controller device that connected wirelessly to the home's smart meter, allowing utility customers to monitor their energy usage and to modify their energy consumption. We generated less than 1% of our total revenue from our energy product line in each of 2010, 2011 and 2012. Excluding the loss on inventory purchase commitments, gross margin would have increased by $9.4 million, or 22%, in 2012 compared to 2011. Gross margin would have increased as a percentage of revenue from 45.9% in 2011 to 47.7% in 2012. That increase in gross margin as a percentage of revenue was due primarily to a combination of a decrease in fixed manufacturing overhead as a percentage of revenue and component cost reductions.

*2011 Compared to 2010*

As a percentage of revenue, our gross margin increased from 42.1% in 2010 to 45.9% in 2011. The increase in gross margin was due to a combination of favorable sales mix and component cost reductions. In 2011, we began selling MyHome software applications, which represented approximately 5% of our revenue in 2011 and contributed to the favorable sales mix compared to 2010. Fixed overhead as a percentage of revenue was relatively constant in 2011 compared to 2010.

***Research and Development Expenses***

| | Years Ended December 31, | | | 2011 over | 2012 over |
|---|---|---|---|---|---|
| | 2010 | 2011 | 2012 | 2010 | 2011 |
| | (Dollars in thousands) | | | | |
| Research and development expenses | $ 15,922 | $ 19,211 | $ 20,310 | 21% | 6% |
| Percentage of revenue | 21% | 21% | 19% | | |





*2012 Compared to 2011*

Research and development expenses increased by $1.1 million, or 6%, in 2012 compared to 2011. Research and development expenses declined as a percentage of revenue from 21% in 2011 to 19% in 2012. The increase in research and development expenses was due primarily to increased cash and stock compensation expense as a result of adding product development and product management personnel. Expenses associated with prototyping and compliance agency approvals also increased in 2012 compared to 2011 due to new products introduced in 2012 and new products that will be introduced in 2013.

*2011 Compared to 2010*

Research and development expenses increased by $3.3 million, or 21%, in 2011 compared to 2010 and remained at 21% of revenue in both 2010 and 2011. The increase was primarily due to increased compensation paid for product management and product development personnel in 2011 compared to 2010. The increase in compensation was partially offset by a reduction in contract labor expense and recruiting and relocation expense.

***Sales and Marketing Expenses***

| | Years Ended December 31, | | | 2011 over | 2012 over |
|---|---|---|---|---|---|
| | 2010 | 2011 | 2012 | 2010 | 2011 |
| | (Dollars in thousands) | | | | |
| Sales and marketing expenses | $ 22,491 | $ 17,546 | $ 20,182 | (22)% | 15% |
| Percentage of revenue | 30% | 19% | 18% | | |

*2012 Compared to 2011*

Sales and marketing expenses increased by $2.6 million, or 15%, in 2012 compared to 2011. Sales and marketing expenses declined as percentage of revenue from 19% in 2011 to 18% in 2012. The increase in sales and marketing expenses was due primarily to increased compensation expense as a result of adding marketing personnel. We also increased the amount spent on advertising and public relations and general marketing expenses in 2012 compared to 2011. These increases were partially offset by a reduction in the amount spent period-over-period on tradeshows, in particular due to our reduced investment in the Consumer Electronics Show, or

CES.

*2011 Compared to 2010*

Sales and marketing expenses decreased by $4.9 million, or 22%, in 2011 compared to 2010 and decreased as a percentage of revenue from 30% in 2010 to 19% in 2011. The decrease was primarily due to a decrease in advertising and other discretionary marketing expenses in 2011 compared to 2010 resulting from higher advertising and promotions expenses in 2010. There was also a reduction in sales and marketing compensation in 2011 compared to 2010, primarily resulting from reduced investment in resources associated with energy-related products for utilities in 2011 compared to 2010.

***General and Administrative Expenses***

| | Years Ended December 31, 2010 | 2011 | 2012 | 2011 over 2010 | 2012 over 2011 |
|---|---|---|---|---|---|
| | (Dollars in thousands) | | | | |
| General and administrative expenses | $ 8,876 | $ 9,805 | $ 10,150 | 10% | 4% |
| Percentage of revenue | 12% | 11% | 9% | | |



Table of Contents

*2012 Compared to 2011*

General and administrative expenses increased by $345,000, or 4%, in 2012 compared to 2011. General and administrative expenses declined as a percentage of revenue from 11% in 2011 to 9% in 2012. The increase in general and administrative expenses was due to increased cash and stock compensation expense resulting from the addition of administrative personnel. Professional services expenses, primarily external legal fees, were also higher in 2012 compared to 2011. These increased expenses were offset by lower facilities expenses resulting from the renegotiation of our corporate headquarters building lease and lower recruiting and relocation expenses in 2012 compared to 2011.

*2011 Compared to 2010*

General and administrative expenses increased by $929,000, or 10%, in 2011 compared to 2010 and declined as a percentage of revenue from 12% in 2010 to 11% in 2011. The increase was due to small increases in compensation, recruiting and relocation, and facilities expenses, as well as communications-related expenses. The increases were partially offset by a decrease in professional services fees, primarily outside legal fees.

***Litigation Settlement Expense***

In the third quarter of 2012, we recorded an expense of $2.9 million in connection with two separate legal settlements. In December 2012, we entered into a license agreement to settle a patent-related dispute resulting in an expense of $2.1 million. In addition, we made a payment of $750,000 to release our obligations under a long-term energy-related contract.



Table of Contents

**Unaudited Quarterly Results of Operations and Other Data**

The following tables present our unaudited quarterly consolidated results of operations and other data for each of the nine quarters ended March 31, 2013, both in absolute dollars and as a percentage of revenue. This unaudited quarterly consolidated information has been prepared on the same basis as our audited consolidated financial statements and, in the opinion of management, the statement of operations data includes all adjustments, consisting of normal recurring adjustments, necessary for the fair presentation of the results of operations for these periods. You should read this table in conjunction with our audited consolidated financial statements and related notes located elsewhere in this prospectus. The results of operations for any quarter are not necessarily indicative of the results of operations for a full year or any future periods.

| | Three Months Ended March 31, 2011 | June 30, 2011 | Sept 30, 2011 | Dec 31, 2011 | March 31, 2012 | June 30, 2012 | Sept 30, 2012 | Dec 31, 2012 | March 31, 2013 |
|---|---|---|---|---|---|---|---|---|---|
| | (In thousands) | | | | | | | | |
| Revenue | $ 19,745 | $ 23,772 | $ 24,906 | $ 24,953 | $ 22,628 | $ 27,614 | $ 28,605 | $ 30,665 | $ 26,571 |
| Cost of revenue | 10,830 | 12,593 | 13,308 | 13,803 | 12,466 | 14,326 | 14,918 | 15,515 | 13,550 |
| Cost of revenue—inventory purchase commitment | — | — | — | — | — | — | 1,840 | — | — |
| Gross margin | 8,915 | 11,179 | 11,598 | 11,150 | 10,162 | 13,288 | 11,847 | 15,150 | 13,021 |
| Operating expenses: | | | | | | | | | |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Research and development | 4,789 | 4,655 | 4,667 | 5,100 | 4,813 | 5,148 | 5,158 | 5,191 | 6,066 |
| Sales and marketing | 4,957 | 4,115 | 4,644 | 3,830 | 5,038 | 5,108 | 5,333 | 4,703 | 5,605 |
| General and administrative | 2,266 | 2,787 | 2,288 | 2,464 | 2,532 | 2,663 | 2,471 | 2,484 | 2,828 |
| Litigation settlement | — | — | — | — | — | — | 2,869 | — | — |
| Total operating expenses | 12,012 | 11,557 | 11,599 | 11,394 | 12,383 | 12,919 | 15,831 | 12,378 | 14,499 |
| Income (loss) from operations | (3,097) | (378) | (1) | (244) | (2,221) | 369 | (3,984) | 2,772 | (1,478) |
| Other income (expense): | | | | | | | | | |
| Interest expense, net | (133) | (124) | (67) | (68) | (62) | (73) | (63) | (66) | (75) |
| Other income (expense) | 75 | 33 | 93 | 26 | (400) | 223 | (45) | (32) | 26 |
| Total other income (expense) | (58) | (91) | 26 | (42) | (462) | 150 | (108) | (98) | (49) |
| Income (loss) before income taxes | $ (3,155) | $ (469) | $ 25 | $ (286) | $ (2,683) | $ 519 | $ (4,092) | $ 2,674 | $ (1,527) |
| Income tax (expense) benefit | — | — | — | — | — | — | — | (141) | 56 |
| Net income (loss) | $ (3,155) | $ (469) | $ 25 | $ (286) | $ (2,683) | $ 519 | $ (4,092) | $ 2,533 | $ (1,471) |



Table of Contents

Includes stock-based compensation expense as follows:

| | Three Months Ended | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | March 31, 2011 | June 30, 2011 | Sept 30, 2011 | Dec 31, 2011 | March 31, 2012 | June 30, 2012 | Sept 30, 2012 | Dec 31, 2012 | March 31, 2013 |
| | (In thousands) | | | | | | | | |
| Cost of revenue | $ 7 | $ 6 | $ 22 | $ 14 | $ 17 | $ 18 | $ 18 | $ 25 | $ 16 |
| Research and development | 152 | 109 | 117 | 114 | 130 | 129 | 202 | 243 | 236 |
| Sales and marketing | 153 | 139 | 109 | 122 | 144 | 138 | 139 | 159 | 184 |
| General and administrative | 191 | 249 | 165 | 344 | 440 | 356 | 363 | 348 | 402 |
| Total stock-based compensation expense | $ 503 | $ 503 | $ 413 | $ 594 | $ 731 | $ 641 | $ 722 | $ 775 | $ 838 |

| | Three Months Ended | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | March 31, 2011 | June 30, 2011 | Sept 30, 2011 | Dec 31, 2011 | March 31, 2012 | June 30, 2012 | Sept 30, 2012 | Dec 31, 2012 | March 31, 2013 |
| | (As a percentage of revenue) | | | | | | | | |
| Revenue | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| Cost of revenue | | | | | | | | | |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | 55 | 53 | 53 | 55 | 55 | 52 | 52 | 51 | 51 |
| Cost of revenue—inventory purchase commitment | 0 | 0 | 0 | 0 | 0 | 0 | 6 | 0 | 0 |
| Gross margin | 45 | 47 | 47 | 45 | 45 | 48 | 41 | 49 | 49 |
| Operating expenses: | | | | | | | | | |
| Research and development | 24 | 20 | 19 | 20 | 21 | 19 | 18 | 17 | 23 |
| Sales and marketing | 25 | 17 | 19 | 15 | 22 | 18 | 19 | 15 | 21 |
| General and administrative | 11 | 12 | 9 | 10 | 11 | 10 | 9 | 8 | 11 |
| Litigation settlement | 0 | 0 | 0 | 0 | 0 | 0 | 10 | 0 | 0 |
| Total operating expenses | 61 | 49 | 47 | 46 | 55 | 47 | 55 | 40 | 55 |
| Income (loss) from operations | (16) | (2) | 0 | (1) | (10) | 1 | (14) | 9 | (6) |
| Other income (expense) | | | | | | | | | |
| Interest expense, net | (1) | (1) | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Other income (expense) | 0 | 0 | 0 | 0 | (2) | 1 | 0 | 0 | 0 |
| Total other income (expense) | 0 | 0 | 0 | 0 | (2) | 1 | 0 | 0 | 0 |
| Income (loss) before income taxes | (16) | (2) | 0 | (1) | (12) | 2 | (14) | 9 | (6) |
| Income tax (expense) benefit | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Net income (loss) | (16)% | (2)% | 0% | (1)% | (12)% | 2% | (14)% | 8% | (6)% |



Table of Contents

**Reconciliation of Non-GAAP Financial Data**

***Adjusted Gross Margin***

| | Three Months Ended | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | March 31, 2011 | June 30, 2011 | Sept 30, 2011 | Dec 31, 2011 | March 31, 2012 | June 30, 2012 | Sept 30, 2012 | Dec 31, 2012 | March 31, 2013 |
| Gross margin | $ 8,915 | $ 11,179 | $ 11,598 | $ 11,150 | $ 10,162 | $ 13,288 | $ 11,847 | $ 15,150 | $ 13,021 |
| Stock-based compensation expense included in cost of revenue | 7 | 6 | 22 | 14 | 17 | 18 | 18 | 25 | 16 |
| Cost of revenue—inventory purchase commitment | — | — | — | — | — | — | 1,840 | — | |
| Adjusted gross margin | $ 8,922 | $ 11,185 | $ 11,620 | $ 11,164 | $ 10,179 | $ 13,306 | $ 13,705 | $ 15,175 | 13,037 |
| Adjusted gross margin percentage | 45.2% | 47.1% | 46.7% | 44.7% | 45.0% | 48.2% | 47.9% | 49.5% | 49.1% |

***Adjusted Operating Income***

Three Months Ended

| | March 31, 2011 | June 30, 2011 | Sept 30, 2011 | Dec 31, 2011 | March 31, 2012 | June 30, 2012 | Sept 30, 2012 | Dec 31, 2012 | March 31, 2013 |
|---|---|---|---|---|---|---|---|---|---|
| Income (loss) from operations | $ (3,097) | $ (378) | $ (1) | $ (244) | $ (2,221) | $ 369 | $ (3,984) | $ 2,772 | $ (1,478) |
| Stock-based compensation expense | 503 | 503 | 413 | 594 | 731 | 641 | 722 | 775 | 838 |
| Cost of revenue—inventory purchase commitment | — | — | — | — | — | — | 1,840 | — | — |
| Litigation settlement expense | — | — | — | — | — | — | 2,869 | — | — |
| Adjusted operating income (loss) | $ (2,594) | $ 125 | $ 412 | $ 350 | $ (1,490) | $ 1,010 | $ 1,447 | $ 3,547 | $ (640) |

We have historically experienced seasonal variations in our revenue as a result of holiday-related factors that are common in our industry. Our revenue is generally highest in the fourth quarter due to consumers' desire to complete their home installations prior to the Thanksgiving and Christmas holidays. We generally see decreased sales in the first quarter due to the number of installations that were completed in the fourth quarter and the resulting decline in dealer activity in the first quarter. In the fourth quarter of 2011, our revenue fell below our expectations and therefore did not increase at the rate it had in the fourth quarter of prior years. Our revenue in the fourth quarter of 2012 was representative of our historical percentage increase from the third quarter to the fourth quarter.

Our gross margin declined slightly in the fourth quarter of 2011 due to reserves that we recorded for excess and obsolete inventory in that quarter. Our gross margin in the first quarter of 2012 was equal to the fourth quarter of 2011, but lower than previous and subsequent quarters due to the mix of our product sales and higher fixed manufacturing overhead as a percentage of revenue. Our gross margin in the third quarter of 2012 was negatively impacted by the loss on inventory purchase commitments we recorded to recognize the loss resulting from our commitment to purchase energy-related products from one of our contract manufacturers that we will not use due to our decision to discontinue our energy product line for utility customers. Our gross margin in the fourth quarter of 2012 benefited from higher prices on product sales to international multi-dwelling unit customers and lower manufacturing overhead as a percentage of revenue.



Table of Contents

Research and development expenses were relatively flat in absolute dollars during the four quarters of 2011, although they were slightly higher in the fourth quarter of 2011 compared to the first three quarters due to higher prototyping expenses and compliance agency fees associated with new product introductions. The increase in research and development expenses in the second, third and fourth quarters of 2012 compared to the first quarter was primarily due to higher sales and wages and higher prototyping expenses. The increase in research and development expenses in the first quarter of 2013 compared to the fourth quarter of 2012 was due primarily to higher salaries and wages resulting from the addition of product management and product development personnel late in the fourth quarter of 2012 and early in the first quarter of 2013. In addition, spending on research and development-related tools and supplies and travel associated with new product development was higher in the first quarter of 2013.

Sales and marketing expenses are typically higher in the first and third quarters of each year due to the timing of trade shows. The Consumer Electronics Show, or CES, and Integrated Systems Europe, or ISE, trade shows occur in the first quarter and the CEDIA trade show occurs in the third quarter. In 2012, trade show expenses in the first quarter were lower than in previous years due to reduced investment in CES. In addition, increased spending on compensation, advertising and marketing promotions in the second quarter resulted in total sales and marketing expenses in the second quarter approximately equal to the first quarter of 2012. The increases in sales and marketing expenses in 2012 compared to 2011 was due to higher compensation expenses resulting from the increase in the number of sales and marketing personnel and higher discretionary marketing expenses. The decrease in sales and marketing expenses in the fourth quarter of 2012 compared to the third quarter of 2012 was due to lower trade show expenses, lower discretionary marketing expenses and lower bad debt expense.

General and administrative expenses were higher in the second quarter of 2011 due to increased recruiting and relocation expenses and higher external legal fees. General and administrative expenses were higher in the second quarter of 2012 due to higher external legal fees related to patent litigation that was settled in the fourth quarter of 2012.

**Liquidity and Capital Resources**

As of March 31, 2013, we had $14.6 million in cash and cash equivalents. We consider all highly liquid short-term investments with original maturities of three months or less at the time of purchase to be cash equivalents.

Since inception, we have funded our operations primarily through private sales of equity securities and, to a lesser extent, from borrowings under secured credit facilities. We have raised $118.2 million through the sale of preferred stock to financial and strategic investors. Our last financing round was completed in February 2011. In that financing round, we generated net proceeds of $19.8 million from the sale of Series H Preferred Stock.

Our cash flows from operating activities are impacted by our net income or loss and the timing of the major components of working capital, with the primary variances occurring in accounts receivable, inventory, accounts payable and accrued liabilities. We closely monitor our inventory, our days sales outstanding and our payment terms with our major vendors to maximize our cash flows from operating activities. We turn our inventory approximately 5 times per year. Our days sales outstanding has averaged 37 over the past 12 months. We have 45- and 60-day payment terms with our two major contract manufacturers.

Our cash flows from investing activities are primarily due to our purchase of fixed assets to support the growth of the business.

Our cash flows from financing activities are primarily from the sale of preferred stock as well as the net proceeds from equipment loans and our revolving line of credit. We have also generated cash from the exercise of common stock options by current and former employees.

We believe that our existing cash and cash equivalents, excluding the net proceeds from this offering, will be sufficient to fund our operations and make payments under our settlement agreements for at least the next 12 months. From time to time, we may explore additional financing sources to develop or enhance our product solutions, to fund expansion of our business, to respond to competitive pressures, or to acquire or invest in complementary products, businesses or technologies. We cannot assure you that any additional financing will be available to us on acceptable terms, if at all. If we raise additional funds through the issuance of equity or convertible debt or other equity-linked securities, our existing stockholders could suffer significant dilution, and any new equity securities we issue could have rights, preferences and privileges senior to those of holders of our common stock, including shares of common stock sold in this offering.

Summary cash flow information for the years ended December 31, 2010, 2011 and 2012 and for the three months ended March 31, 2012 and 2013 is set forth below.

| | Years Ended December 31, | | | Three Months Ended March 31, | |
|---|---|---|---|---|---|
| | 2010 | 2011 | 2012 | 2012 | 2013 |
| | (In thousands) | | | | |
| Cash and cash equivalents at beginning of period | $ 17,398 | $ 6,054 | $ 18,468 | $ 18,468 | $ 18,695 |
| Net cash provided by (used in) operating activities | (13,078) | (586) | 991 | (1,391) | (2,937) |
| Net cash used in investing activities | (2,344) | (1,989) | (2,360) | (542) | (1,431) |
| Net cash provided by financing activities | 4,042 | 14,999 | 1,624 | 68 | 272 |
| Effect of exchange rate changes on cash and cash equivalents | 36 | (10) | (28) | (42) | (26) |
| Net change in cash for the period | (11,344) | 12,414 | 227 | (1,907) | (4,122) |
| Cash and cash equivalents at the end of the period | $ 6,054 | $ 18,468 | $ 18,695 | $ 16,561 | $ 14,573 |

***Net Cash Used in Operating Activities***

Historically, we have experienced negative cash flows from operating activities primarily due to our continued investment in research and development and sales and marketing resources needed to design, develop, market and sell our solutions worldwide.

Our cash used in operating activities for the three months ended March 31, 2013 was comprised of the net loss of $1.5 million, offset by non-cash expenses of $1.5 million. Changes in working capital, other assets and long-term liabilities resulted in a net use of cash totaling $2.9 million. The non-cash expenses included in the net loss consist primarily of stock-based compensation expense of $838,000 and depreciation expense of $512,000. The changes in working capital were comprised primarily of an increase in other assets of $1.6 million and a decrease in accounts payable of $1.3 million. The increase in other assets was due primarily to deferred expenses related to this offering that have been recorded as other assets and will be offset against the proceeds of the offering. The decrease in accounts payable was due to the timing of payments to our vendors.

Our cash used in operating activities for the three months ended March 31, 2012 was comprised of the net loss of $2.7 million, offset by non-cash expenses of $1.7 million. Changes in working capital, other assets and long-term liabilities resulted in a net use of cash totaling $400,000. The non-cash expenses included in the net loss consist primarily of stock-based compensation expense of $731,000, depreciation expense of $407,000 and warrant liability expense of $399,000. The changes in working capital were comprised primarily of an increase in inventory of $492,000, a decrease in accrued





liabilities of $424,000 and a decrease in other long-term liabilities of $125,000. These uses of cash were offset by cash provided by an increase in accounts payable of $614,000.

Our cash provided by operating activities for the year ended December 31, 2012 was comprised of the net loss of $3.7 million, offset by non-cash expenses of $7.2 million. Changes in working capital, other assets and long-term liabilities resulted in a net use of cash totalling $2.5 million. The non-cash expenses included in the net loss primarily consist of a loss on inventory purchase commitments of $1.8 million, depreciation expense of $1.7 million, provision for doubtful accounts of $184,000 and stock-based compensation expense of $2.9 million. The changes in working capital were comprised of an increase in accounts payable and accrued liabilities of $6.7 million, offset by an increase in inventory of $4.9 million, an increase in accounts receivable of $2.6 million. In addition, we recognized a decrease in long-term liabilities of $621,000. These increases in inventory, accounts receivable, accounts payable and accrued liabilities were all a result of increased revenue, cost of revenue and expenses during 2012. The decrease in long-term liabilities was due to the payment of a liability resulting from a litigation settlement recorded in 2008.

Our cash used in operating activities for 2011 was comprised of net loss of $3.9 million offset by non-cash expenses of $3.8 million. Changes in working capital and long-term liabilities resulted in a net use of cash totalling $524,000. The change in working capital was due primarily to an increase in accounts receivable of

$2.6 million offset by a decrease in inventory of $2.3 million and changes in other components of working capital of $363,000. In addition, we recognized a decrease in long-term liabilities of $565,000. The increase in accounts receivable was due to the increase in revenue. The decrease in inventory was the result of our concerted effort to reduce inventory levels and increase inventory turns in 2011.

Our cash used in operating activities for 2010 was comprised of net loss of $16.3 million offset by non-cash expenses of $3.7 million. Changes in working capital and long-term liabilities resulted in a net use of cash totalling $506,000. The net loss in 2010 was a result of lower than planned revenue growth combined with increased investments in research and development expenses and sales and marketing expenses. A portion of these increased operating expense investments were tied to the start-up of our energy-related product development for utility customers and additional sales and marketing efforts. The changes in working capital and long-term liabilities was attributable primarily to an increase in inventory of $4.7 million offset by a decrease in in accounts receivable of $1.6 million and an increase in accounts payable of $2.5 million.

***Net Cash Used in Investing Activities***

Net cash used in investing activities has historically been due primarily to purchases of property and equipment needed to support the growth of our business. Our purchases of property and equipment have been for computer equipment and software used internally, manufacturing tooling and test equipment that we purchase and own, but is located with our manufacturing partners, furniture and fixtures for our facilities, lab and warehouse equipment for our engineering and supply chain organizations, marketing equipment that is primarily used for trade shows, and leasehold improvements to our facilities.

For the three months ended March 31, 2013, our cash used in investing activities was $1.4 million and consisted entirely of purchases of property and equipment for general business use.

For the three months ended March 31, 2012, our cash used in investing activities was $542,000 and consisted entirely of purchases of property and equipment for general business use.

For the year ended December 31, 2012, our cash used in investing activities was $2.4 million and consisted entirely of purchases of property and equipment for general business use.





Our cash used in investing activities in 2011 was $2.0 million, consisting of the purchase of property and equipment of $1.3 million and acquisition of intangible assets of $725,000. The purchases of property and equipment were for general business use and the acquisition of intangible assets related to technology that we purchased to allow our customers to access and control their homes via their mobile Android-based devices.

Our cash used in investing activities in 2010 was $2.3 million, consisting of the purchase of property and equipment of $2.0 million and acquisition of intangible assets of $319,000. The purchases of property and equipment were for general business use and the acquisition of intangible assets related to technology that we purchased to allow our customers to access and control their homes via their mobile iOS-based devices.

***Net Cash Provided by Financing Activities***

Net cash provided by financing activities for the three months ended March 31, 2013 was $272,000 and consisted primarily of $235,000 in net proceeds from borrowings under our equipment loan.

Net cash provided by financing activities for the three months ended March 31, 2012 was $68,000 and consisted of net proceeds from borrowings under our equipment loan.

Net cash provided by financing activities for the year ended December 31, 2012 was $1.6 million and consisted of $839,000 in net proceeds from borrowings under our equipment loan and $785,000 in cash generated from the exercise of common stock options.

Net cash provided by financing activities in 2011 was $15.0 million and consisted of $19.8 million in net proceeds from the sale of Series H Preferred Stock and $1.2 million in proceeds from the exercise of common stock options. These proceeds were offset by the payment against our revolving credit line and equipment loans of $6.0 million. In 2011, we paid off the entire balance outstanding on our revolving credit line and we did not borrow against that credit line in 2012.

Net cash provided by financing activities in 2010 was $4.0 million and consisted of net borrowings against our revolving credit line and equipment loans of $3.8 million and proceeds from the exercise of common stock options of $202,000.

***Debt Obligations***

In June 2013, we entered into an Amended and Restated Loan and Security Agreement with Silicon Valley Bank, or the SVB Agreement, which consists of a revolving credit facility of $13.0 million (subject to certain borrowing base restrictions) and term borrowings to fund purchases of property and equipment. All borrowings under the SVB Agreement are collateralized by our general assets. The credit facility has a variable rate of interest of prime (as published in the Wall Street Journal) or LIBOR plus 2.50%, as selected by us. The SVB Agreement provides for $2.75 million in term borrowings to fund purchases of property and equipment. Term borrowings are payable in 42 equal monthly payments of principal plus interest and bear interest at prime plus 0.50%, which was 3.75% at March 31, 2013.

Borrowing under the revolving credit facility is subject to certain collateral restrictions relating primarily to our accounts receivable and inventory levels. As of March 31, 2013, our total borrowing capacity was approximately $12.9 million. We have not borrowed against the revolving credit facility as of December 31, 2011 or 2012 or March 31, 2013. The revolving credit facility has a maturity date of May 29, 2015.

The SVB Agreement contains various restrictive and financial covenants and we were in compliance with each of these covenants as of December 31, 2011 and 2012 and March 31, 2013.

Table of Contents

Future principal payments on outstanding term borrowings as of December 31, 2012 are as follows (in thousands):

| | |
|---|---|
| 2013 | $ 1,321 |
| 2014 | 840 |
| 2015 | 588 |
| 2016 | 410 |
| | $ 3,159 |

**Off-Balance Sheet Arrangements**

We do not engage in off-balance sheet activities. We do not have any off-balance interest in variable interest entities, which include special purpose entities and other structured finance entities.

**Contractual Obligations**

We enter into long-term contractual obligations in the normal course of business, primarily debt obligations and non-cancellable operating leases. In addition, in 2008 and 2012, we entered into settlement agreements with two different parties relating to alleged patent infringements, which included future payment obligations.

Our contractual cash obligations at December 31, 2012 are as follows:

| | Total | Less than 1 year | 1-3 years | 3-5 years | More than 5 years |
|---|---|---|---|---|---|
| | (In thousands) | | | | |
| Long-term debt obligations, including interest | $ 3,397 | $ 1,620 | $ 1,414 | $ 363 | $ — |
| Operating lease obligations | 5,872 | 794 | 2,488 | 2,101 | 489 |
| Settlement agreements[(1)] | 4,200 | 2,400 | 1,200 | 600 | — |
| Purchase commitments | 19,479 | 19,479 | — | — | — |
| Total contractual obligations | $ 32,948 | $ 24,293 | $ 5,102 | $ 3,064 | $ 489 |

(1) The counterparty in one of the settlement agreements has the contractual right to accelerate $900,000 of the future obligation due in 2014 to a $700,000 payment in June 2013.

Changes in our contractual obligations during the three months ended March 31, 2013 are insignificant and consist primarily of fluctuations in our purchase commitments in the ordinary course of business.

**Quantitative and Qualitative Disclosures About Market Risk**

We are exposed to market risk in the ordinary course of our business. Market risk represents the risk of loss that may impact our financial position due to adverse changes in financial market prices and rates. Our market risk exposure is primarily a result of fluctuations in interest rates and foreign currency exchange rates. We do not hold or issue financial instruments for trading purposes.



Table of Contents

***Interest Rate Risk***

Our exposure to market risk for changes in interest rates relates primarily to our cash and cash equivalents as we do not have any short-term investments as of December 31, 2012 and March 31, 2013. Our cash and cash equivalents as of December 31, 2012 and March 31, 2013 were $18.7 million and $14.6 million, respectively, and consisted primarily of cash and money market funds. Our primary exposure to market risk is interest income sensitivity, which is affected by changes in the general level of the interest rates in the United States. However, because of the short-term nature of our interest-bearing securities, a 10% change in market interest rates would not be expected to have a material impact on our consolidated financial condition or results of operations.

***Foreign Currency Exchange Risk***

Our results of operations and cash flows are subject to fluctuations due to changes in foreign currency exchange rates, particularly changes in the Canadian dollar, the Euro and the British pound. The volatility of exchange rates depends on many factors that we cannot forecast with reliable accuracy. We believe that our operating activities act as a natural hedge for a substantial portion of our foreign currency exposure because we typically collect revenue and incur costs in the currency in the location in which we provide our solutions. Although we have experienced and will continue to experience fluctuations in our net income (loss) as a result of transaction gains (losses) related to transactions denominated in currencies other than the U.S. dollar, we believe that a 10% change in foreign exchange rates would not have a

material impact on our financial condition or results of operations. To date, we have not entered into any foreign currency hedging contracts, but we may consider entering into such contracts in the future. As our international operations grow, we will continue to reassess our approach to managing our risk relating to fluctuations in foreign currency exchange rates.

**Critical Accounting Estimates and Policies**

Our consolidated financial statements are prepared in accordance with GAAP. The preparation of these consolidated financial statements requires us to make estimates and assumptions that affect the reported amounts of assets, liabilities, revenue, expenses and related disclosures. We evaluate our estimates and assumptions on an ongoing basis. Our estimates are based on historical experience and various other assumptions that we believe to be reasonable under the circumstances. Our actual results could differ from these estimates.

We believe that the assumptions and estimates associated with our revenue recognition, allowance for doubtful accounts, inventories, product warranty, income taxes and stock-based compensation have the greatest potential impact on our consolidated financial statements. Therefore, we consider these to be our critical accounting policies and estimates. For further information on all of our significant accounting policies, please see Note 1 of the accompanying notes to our consolidated financial statements.

We are choosing to "opt out" of the extended transition period provided in Section 7(a)(2)(B) of the Securities Act for complying with new or revised accounting standards and, as a result, we will comply with new or revised accounting standards on the relevant dates on which adoption of such standards is required for non-emerging growth companies. Section 107 of the JOBS Act provides that our decision to opt out of the extended transition period for complying with new or revised accounting standards is irrevocable.

***Revenue Recognition***

We sell our products through a network of independent dealers and distributors and not directly to consumers. These dealers and distributors generally sell our products to the consumer as





part of a bundled sale, which typically includes other third-party products and related services, project design and installation services and ongoing support.

Our products include embedded software that is essential to the functionality of the hardware, but the software is not sold separately and doesn't have stand-alone value. Accordingly, the hardware and software are accounted for as a combined unit and revenue is recognized when both elements are delivered. We recognize revenue when persuasive evidence of an arrangement exists, delivery has occurred, the sales price is fixed or determinable, and collection is probable. Product is considered delivered to the customer once it has been shipped and title and risk of loss have been transferred. For most of our product sales, these criteria are met at the time the product is shipped. Payments received in advance of providing products are recorded as deferred revenue and recognized as revenue when the revenue recognition criteria are met and the earnings process is complete.

We record estimated reductions to revenue for dealer, retailer and distributor incentives, primarily comprised of volume rebates, at the time of the initial sale. The estimated reductions to revenue for rebates are based on the sales terms and our historical experience and trend analysis. The most common incentive relates to amounts paid or credited to customers for achieving defined volume levels or growth objectives.

Software license revenue represents fees earned from activating applications that allow consumers to manage and control their automation systems using tablets, smartphones and other third-party devices. Our perpetual software licenses do not include acceptance provisions, rights to updates or post-contract customer support. We generally recognize revenue at the time the software license is provided to the customer.

We offer a subscription service that allows consumers to control and monitor their homes remotely and allows our dealers to perform remote diagnostic services. Subscription revenue is deferred at the time of payment and recognized on a straight-line basis over the period the service is provided.

We recognize revenue net of cost of revenue for third-party products sold through our online ordering system. While we assume credit risk on sales to our customers, we do not determine the product selling price, do not retain associated inventory risks and are not the primary obligor to the customer.

Our agreements with dealers and distributors generally do not include rights of return or acceptance provisions. Even though contractual agreements do not provide return privileges, there are circumstances in which we will accept returns. In addition, agreements with certain retail customers contain stock rotation and other rights of return. We maintain a reserve for such returns based on retail sell-through and our historical return experience.

Shipping charges billed to customers are included in product revenue and related shipping costs are included in cost of revenue.

***Allowance for Doubtful Accounts***

We extend credit to the majority of our customers, which consist primarily of small, local businesses. Issuance of credit is based on ongoing credit evaluations by us of our customers' financial condition and generally requires no collateral. Trade accounts receivable are recorded at the invoiced amount and do not bear interest. We maintain an allowance for doubtful accounts to reserve for potential uncollectible receivables. The allowance is based upon the creditworthiness of our customers, the customers' historical payment experience, the age of the receivables and current market and economic conditions. Provisions for potentially uncollectible accounts are recorded in sales and marketing expenses. We write off accounts receivable balances to the allowance for doubtful accounts when it becomes likely that they will not be collected. As of December 31, 2011 and 2012 and





March 31, 2013, the allowance for doubtful accounts was $0.7 million, $0.6 million and $0.6 million, respectively.

***Inventories***

Inventories consist of hardware and related component parts and are stated at the lower of cost or market using the first-in, first-out method. We periodically assess the recoverability of our inventory and reduce the carrying value of the inventory when items are determined to be obsolete, defective or in excess of forecasted sales requirements. Inventory write-downs for excess, defective and obsolete inventory are recorded as cost of revenue and totaled $1.1 million, $1.3 million, $1.5 million and $0.4 million in 2010, 2011 and 2012 and for the three months ended March 31, 2013, respectively.

***Product Warranty***

We provide our customers a limited product warranty of two years, which requires us to repair or replace defective products during the warranty period at no cost to the customer. We estimate the costs that may be incurred to replace or repair defective products and record a reserve at the time revenue is recognized. Factors that affect our warranty liability include the number of installed systems, our historical experience and management's judgment regarding anticipated rates of product warranty returns. We assess the adequacy of our recorded warranty liability each period and make adjustments to the liability as necessary. Our warranty liability was $775,000, $1.0 million, $1.2 million and $1.2 million as of December 31, 2010, 2011 and 2012 and March 31, 2013, respectively.

***Income Taxes***

We recognize deferred tax assets and liabilities for the future tax consequences attributable to the differences between the financial statement carrying value of existing assets and liabilities and their respective tax bases. Deferred tax assets and liabilities are measured using enacted tax rates in effect for the fiscal year in which those temporary differences are expected to be recovered or settled. Valuation allowances are established when necessary to reduce deferred tax assets to the amount expected to be realized.

We operate in various tax jurisdictions and are subject to audit by various tax authorities. We provide for tax contingencies whenever it is deemed probable that a tax asset has been impaired or a tax liability has been incurred for events such as tax claims or changes in tax laws. Tax contingencies are based upon their technical merits, relative tax law and the specific facts and circumstances as of each reporting period. Changes in facts and circumstances could result in material changes to the amounts recorded for such tax contingencies.

We recognize uncertain income tax positions taken on income tax returns at the largest amount that is more-likely-than-not to be sustained upon audit by the relevant taxing authority. An uncertain income tax position will not be recognized if it has less than a 50% likelihood of being sustained.

Our policy for recording interest and penalties associated with uncertain tax positions is to record such items as a component of our income tax provision. During the years December 31, 2010, 2011 and 2012 and for the three months ended March 31, 2012 and 2013, we did not record any material interest income, interest expense or penalties related to uncertain tax positions or the settlement of audits for prior periods.

***Stock-Based Compensation***

Stock-based compensation is measured at the grant date based on the fair value of the award and is recognized as expense, net of estimated forfeitures, over the requisite service period, which is the vesting period of the respective award.





Determining the fair value of stock-based awards at the grant date requires judgment. We use the Black-Scholes option-pricing model to determine the fair value of stock options. The determination of the grant date fair value of options using an option-pricing model is affected by our estimated common stock fair value as well as assumptions regarding a number of other complex and subjective variables. These variables include the fair value of our common stock, our expected stock price volatility over the expected term of the options, stock option exercise and cancellation behaviors, risk-free interest rates and expected dividends, which are estimated as follows:

- ***Fair Value of Our Common Stock.*** Because our stock is not publicly traded, we must estimate the fair value of our common stock, as discussed in "Common Stock Valuations" below.
- ***Expected Volatility.*** As we do not have a trading history for our common stock, the expected stock price volatility for our common stock was estimated by taking the average of the historical volatilities of an index fund and industry peers based on daily price observations over a period equivalent to the expected term of the stock option grants. We did not rely on implied volatilities of traded options in our industry peers' common stock because the volume of activity was relatively low. We intend to continue to consistently apply this process using the same or similar public companies until a sufficient amount of historical information regarding the volatility of our own common stock share price becomes available.
- ***Risk-Free Interest Rate.*** The risk-free interest rate is based on the U.S. Treasury yield in effect at the time of the grant for zero-coupon U.S. Treasury notes with remaining terms similar to the expected term of the options.
- ***Expected Dividend Yield.*** We have never declared or paid any cash dividends and do not presently plan to pay cash dividends in the foreseeable future. Consequently, we used an expected dividend yield of zero.
- ***Expected Term.*** The expected term represents the period that the stock-based awards are expected to be outstanding. For our option grants, we used the simplified method to determine the expected term as provided by the SEC. The simplified method calculates the expected term as the average of the time-to-vesting and the contractual life of the options. We used the simplified method to determine our expected term because of our limited history of stock option exercise activity.

In addition to the assumptions used in the Black-Scholes option-pricing model, we must also estimate a forfeiture rate to calculate the stock-based compensation for our awards. Our forfeiture rate is based on an analysis of our actual forfeitures. We will continue to evaluate the appropriateness of the forfeiture rate based on actual

forfeiture experience, analysis of employee turnover and other factors. Quarterly changes in the estimated forfeiture rate can have a significant impact on our stock-based compensation expense as the cumulative effect of adjusting the rate is recognized in the period the forfeiture estimate is changed. If a revised forfeiture rate is higher than the previously estimated forfeiture rate, an adjustment is made that will result in a decrease to the stock-based compensation expense recognized in the financial statements. If a revised forfeiture rate is lower than the previously estimated forfeiture rate, an adjustment is made that will result in an increase to the stock-based compensation expense recognized in the financial statements.

We will continue to use judgment in evaluating the expected volatility, expected terms and forfeiture rates utilized for our stock-based compensation calculations on a prospective basis. As we continue to accumulate additional data related to our common stock, we may have refinements to the estimates of our expected volatility, expected terms and forfeiture rates, which could materially impact our future stock-based compensation expense. If any of the assumptions used in the Black-Scholes model changes significantly, stock-based compensation for future awards may differ materially compared with the awards granted previously.



Table of Contents

The following table presents the weighted-average assumptions used to estimate the fair value of options granted during the periods presented:

| | Years Ended December 31, | | | Three Months Ended March 31, | |
|---|---|---|---|---|---|
| | 2010 | 2011 | 2012 | 2012[(1)] | 2013[(1)] |
| Expected volatility | 70-71% | 71-73% | 59-63% | — | — |
| Expected dividends | —% | —% | —% | — | — |
| Expected term (in years) | 5.2-6.1 | 5.0-6.1 | 5.0-6.1 | — | — |
| Risk-free rate | 2.2-3.0% | 1.1-2.5% | 0.7-1.0% | — | — |
| Forfeiture rate | 8.1% | 11.6% | 7.9% | — | — |

(1) No options were granted during the three months ended March 31, 2012 or 2013.

***Common Stock Valuations***

The fair value of the common stock underlying our stock options was determined by our board of directors, which intended all options granted to be exercisable at a price per share not less than the per share fair value of our common stock underlying those options on the date of grant. The valuations of our common stock were determined in accordance with the guidelines outlined in the American Institute of Certified Public Accountants Practice Aid, *Valuation* of *Privately-Held-Company Equity Securities Issued as Compensation.* The assumptions we use in the valuation model are based on future expectations combined with management judgment. In the absence of a public trading market, our board of directors, with input from management, exercised significant judgment and considered numerous objective and subjective factors to determine the fair value of our common stock as of the date of each option grant, including the following factors:

- Independent third-party valuations of our common stock performed as of December 31, 2011, March 30, 2012, June 30, 2012, September 30, 2012, December 31, 2012 and March 31, 2013;
- The prices, rights, preferences and privileges of our preferred stock relative to our common stock;
- Our operating and financial performance;
- Current business conditions and projections;
- Our stage of development;
- The likelihood of achieving a liquidity event for the shares of common stock underlying these stock options, such as an initial public offering or sale of our company, given prevailing market conditions;
- The market performance of comparable publicly traded companies in the consumer technology, home automation and high-growth company spaces; and
- The U.S. and global capital market conditions.

In valuing our common stock, our board of directors determined the equity value of our business by taking a combination of the value indications under two valuation approaches, an income approach and a market approach.

The income approach estimates the fair value of a company based on the present value of the company's future estimated cash flows and the residual value of the company beyond the forecast period. These future values are discounted to their present values to reflect the risks inherent in the

Table of Contents

company achieving these estimated cash flows. Significant inputs of the income approach (in addition to our estimated future cash flows themselves) include the long-term growth rate assumed in the residual value, discount rate, terminal value and normalized long-term operating margin. To estimate the value of cash flows after the defined projection period, a terminal value, which represents the estimated perpetual cash flows, was also calculated. To calculate the terminal value, a perpetual growth rate is applied to the last year of forecasted cash flows. This estimated perpetual cash flow is then divided by the capitalization rate.

The market approach estimates the fair value of a company by applying market multiples of comparable publicly traded companies in the same industry or similar lines of business. The market multiples are based on key metrics implied by the price investors have paid for publicly traded companies. Given our significant focus on investing in and growing our business, we primarily utilized the revenue multiple when performing valuation assessments under the market approach. When considering which companies to include in our comparable industry peer companies, we focused on U.S.-based publicly traded companies with businesses similar to ours. The selection of our comparable industry peer companies requires us to make judgments as to the comparability of these companies to us. We considered a number of factors including business description, business size, market share, revenue model, development stage and historical results of operations. We then analyzed the business and financial profiles of the selected companies for relative similarities to us and, based on this assessment, we selected our comparable industry peer companies. Several of the comparable industry peer companies are our competitors and are generally larger than us in terms of total revenue and assets.

The valuation reports prepared for us were based on the income approach. Due to the limited comparability with the guideline firms, a market approach was performed to assess the reasonableness of the income approach conclusions.

For each valuation, the equity value was then allocated to the common stock using either the Option Pricing Method, or OPM, or Probability Weighted Expected Return Method, or PWERM.

The OPM treats common stock and preferred stock as call options on an enterprise value, with exercise prices based on the liquidation preference of the preferred stock. Therefore, the common stock has value only if the funds available for distribution to the stockholders exceed the value of the liquidation preference at the time of a liquidity event such as a merger, sale or initial public offering, assuming the enterprise has funds available to make a liquidation preference meaningful and collectible by the stockholders. The common stock is modeled to be a call option with a claim on the enterprise at an exercise price equal to the remaining value immediately after the preferred stock is liquidated. The OPM uses the Black-Scholes option pricing model to price the call option. The OPM is appropriate to use when the range of possible future outcomes is so difficult to predict that forecasts would be highly speculative.

The PWERM involves a forward-looking analysis of the possible future outcomes of the enterprise. This method is particularly useful when discrete future outcomes can be predicted at a high confidence level with a probability distribution. Discrete future outcomes considered under the PWERM included non-initial public offering market based outcomes as well as initial public offering scenarios. In the non-initial public offering scenarios, a large portion of the equity value is allocated to the preferred stock to reflect the preferred stock liquidation preferences. In the initial public offering scenarios, the equity value is allocated pro rata among the shares of common stock and each series of preferred stock, which causes the common stock to have a higher relative value per share than under the non-initial public offering scenario. The fair value of the enterprise determined using the initial public offering and non-initial public offering scenarios was weighted according to the board of directors' estimate of the probability of each scenario.



Table of Contents

Over time, as certainty developed regarding possible discrete events, including an initial public offering, or IPO, the allocation methodology utilized to allocate our enterprise value to our common stock transitioned away from exclusively the OPM, which was utilized for grants through December 31, 2011, to include a PWERM, which we utilized for grants beginning after September 26, 2012.

We granted stock options with the following terms between December 29, 2011 and the date of this prospectus:

| | Number of Options Granted | Exercise Price Per Share | Common Stock Fair Value Per Share at Grant Date |
|---|---|---|---|
| December 29, 2011 | 2,314,000 | $ 1.22 | $ 1.22 |
| June 19, 2012 | 425,000 | 1.70 | 1.70 |
| June 27, 2012 | 900,000 | 1.70 | 1.70 |
| September 26, 2012 | 460,000 | 1.76 | 1.76 |
| December 14, 2012 | 150,000 | 1.91 | 1.91 |
| December 26, 2012 | 495,000 | 1.91 | 1.91 |
| December 28, 2012 | 1,289,700 | 1.91 | 1.91 |
| April 25, 2013 | 449,500 | 2.17 | 2.17 |
| June 11, 2013 | 815,000 | 2.17 | 2.17 |
| June 23, 2013 | 762,500 | 2.17 | 2.17 |

The intrinsic value of all outstanding options as of March 31, 2013 was $ million, based on the estimated fair value for our common stock of $ per

Restricted Confidential - Outside Counsel Only


share, which is the midpoint of the price range set forth on the cover page of this prospectus.

***December 2011 Awards***

As of December 29, 2011, our board of directors determined the fair value of the common stock to be $1.22 per share. We relied upon a contemporaneous valuation report prepared for us in contemplation of such option grants, which report used the OPM valuation methodology described above given the difficulty of predicting possible future liquidity outcomes for the company at that time.

Total enterprise value was calculated using both the income approach and the market approach. With respect to the income approach, total enterprise value was calculated using estimated cash flows based on cash flow projections for the year ending December 31, 2011 through the year ending December 31, 2021, which were discounted based on a weighted average cost of capital, or WACC, of 18.0%, given our stage of development and inherent risks. With respect to the market approach, our board of directors analyzed the financial performance of publicly traded companies in the consumer technology, home automation and high growth company spaces.

Based on the process described above, our board of directors determined that it had greater confidence in the income approach compared to the market approach given the lack of comparable industry peers, so it gave more weight to the income approach to determine total enterprise value. The enterprise value was then allocated to the common stock utilizing an OPM methodology using the assumptions described above. As a result, the fair value of the common stock was determined to be $1.22 per share.

***June 2012 Awards***

As of June 19, 2012 and June 27, 2012, our board of directors determined the fair value of the common stock to be $1.70 per share. We relied upon an additional contemporaneous valuation report prepared for us in contemplation of such option grants, which report used the valuation methodology





described above. Due to the continued difficulty of predicting possible future liquidity outcomes for the company, we continued to apply the OPM valuation methodology described above.

Total enterprise value was calculated using both the income approach and the market approach. With respect to the income approach, total enterprise value was calculated using estimated cash flows based on cash flow projections for the year ending December 31, 2012 through the year ending December 31, 2022, which were discounted based on WACC of 17.0%. With respect to the market approach, our board of directors analyzed the financial performance of publicly traded companies in the consumer technology, home automation and high growth company spaces.

Based on the process described above, our board of directors determined that it had greater confidence in the income approach compared to the market approach given the lack of comparable industry peers, so it gave more weight to the income approach to determine total enterprise value. The enterprise value was then allocated to the common stock utilizing an OPM methodology using the assumptions described above. As a result, the fair value of the common stock was determined to be $1.70 per share. The increase in value from the December 2011 grants was primarily due to an additional year of cash flow projections, our first quarter results of operations and an adjustment to our WACC given the slight reduction in the perceived risk associated with our company.

***September 2012 Awards***

As of September 26, 2012, our board of directors determined the fair value of the common stock to be $1.76 per share. We relied upon an additional contemporaneous valuation report prepared for us in contemplation of such option grants, which report used a hybrid of the OPM and PWERM valuation methodologies described above. Since the date of the last report, we had begun considering the possibility of an initial public offering. As a result, the range of discrete events, specifically IPO and non-IPO scenarios, became easier to predict, therefore PWERM was utilized in part to estimate the fair value of our common stock during this period.

The expected outcomes were weighted between an IPO scenario occurring during early to middle of 2013, which was valued using the market approach, and a non-IPO scenario that involved remaining a private company, which was valued using the income approach. The enterprise value under each of these scenarios was, in part, based on cash flow projections for year ending December 31, 2012 through the year ending December 31, 2022, which were discounted by a WACC of 17.0%. As a result, the fair value of the common stock was determined to be $1.76 per share. The increase in fair value from June 2012 was primarily due to our results of operations and our preliminary planning for an IPO, including (i) management provided our board of directors with a preliminary initial public offering timeline for consideration, and (ii) the board of directors requested that management proceed with the beginning stages of commencing an initial public offering, including conducting preliminary meetings with various investment banks.

***December 2012 Awards***

As of December 28, 2012, our board of directors determined the fair value of the common stock to be $1.91 per share. We relied upon an additional contemporaneous valuation report prepared for us in contemplation of such option grants, which report used a hybrid of the OPM and PWERM valuation methodologies described above. Since the date of the last report, we had taken additional steps toward an initial public offering. Given the continued potential for an IPO scenario, PWERM was utilized in part to estimate the fair value of our common stock during this period.

The expected outcomes continued to be weighted between an IPO scenario occurring during early to middle of 2013, which was valued using the market approach, and a non-IPO scenario that involved remaining a private company, which was valued using the income approach. The enterprise value under each of these scenarios was, in part, based on cash flow projections for year ending





December 31, 2012 through the year ending December 31, 2022, which were discounted by a WACC of 16.0%. As a result, the fair value of the common stock was



SAVANT3329700

determined to be $1.91 per share. The increase in fair value from September 2012 was primarily due to our results of operations as well as our continued steps towards an IPO, including the selection of underwriters, an organizational meeting held in early December and the preparation of a registration statement on Form S-1.

***April 2013 Awards***

As of April 25, 2013, our board of directors determined the fair value of the common stock to be $2.17 per share. We relied upon an additional contemporaneous valuation prepared for us in contemplation of such option grants, which used a hybrid of the OPM and PWERM valuation methodologies described above. Since the date of the last award, we had taken additional steps toward an initial public offering. Given the continued potential for an IPO scenario, the PWERM was utilized in part to estimate the fair value of our common stock during this period.

The expected outcomes were weighted between an IPO scenario occurring during the middle of 2013, which was valued using the market approach, and a non-IPO scenario that involved remaining a private company, which was valued using the income approach. The enterprise value under each of these scenarios was, in part, based on cash flow projections for the year ending December 31, 2013 through the year ending December 31, 2022, which were discounted by a WACC of 16.0%. As a result, the fair value of the common stock was determined to be $2.17 per share. The increase in fair value from December 2012 was primarily due to our results of operations as well as our continued steps towards an IPO, including the continued preparation of a registration statement on Form S-1.

***June 2013 Awards***

As of June 11, 2013 and June 23, 2013, our board of directors determined the fair value of the common stock to be $2.17 per share. We relied upon an additional contemporaneous valuation prepared for us in contemplation of such option grants, which used a hybrid of the OPM and PWERM valuation methodologies described above. Given the continued potential for an IPO scenario, the PWERM was utilized in part to estimate the fair value of our common stock during this period.

The expected outcomes were weighted between an IPO scenario occurring during the middle of 2013, which was valued using the market approach, and a non-IPO scenario that involved remaining a private company, which was valued using the income approach. The enterprise value under each of these scenarios was, in part, based on cash flow projections for the year ending December 31, 2013 through the year ending December 31, 2022, which were discounted by a WACC of 16.0%. As a result, the fair value of the common stock was determined to be $2.17 per share.

**Recent Accounting Pronouncements**

In May 2011, the FASB issued new guidance for fair value measurements to provide a consistent definition of fair value and ensure that the fair value measurement and disclosure requirements are similar between GAAP and International Financial Reporting Standards. The guidance changes certain fair value measurement principles and enhances the disclosure requirements, particularly for level 3 fair value measurements. We adopted this guidance prospectively January 1, 2012 and noted no significant impact on our results of operations, financial position or cash flows.

In February 2013, the FASB issued ASU 2013-02, *"Comprehensive Income: Reporting of Amounts Reclassified Out of Accumulated Other Comprehensive Income."* The amended guidance requires an entity to present the effects on the line items of net income of significant reclassifications out of accumulated other comprehensive income if the amount being reclassified is required under U.S. generally accepted accounting principles to be reclassified in its entirety to net income in the same reporting period. The guidance is effective prospectively for the reporting periods beginning after





December 15, 2012. We do not anticipate the adoption of the amended guidance to have significant impact on its consolidated financial statements.

In June 2011, the FASB issued new guidance that improves the comparability, consistency, and transparency of financial reporting and increases the prominence of items reported in other comprehensive income, or OCI, by eliminating the option to present components of OCI as part of the statement of changes in stockholders' equity. The amendments in this standard require that all non-owner changes in stockholders' equity be presented either in a single continuous statement of comprehensive income or in two separate but consecutive statements. Subsequently, in December 2011, the FASB issued additional guidance, which indefinitely defers the requirement to present on the face of the financial statements reclassification adjustments for items that are reclassified from OCI to net income in the statement where the components of net income and the components of OCI are presented. The amendments to these standards do not change the items that must be reported in OCI, when an item of OCI must be reclassified to net income, or change the option for an entity to present components. This new guidance was effective for us beginning January 1, 2012 and was required to be applied retrospectively. The adoption of this guidance did not have an impact on our results of operations, financial position or cash flows as it relates only to financial statement presentation.





## BUSINESS

**Overview**

We are a leading provider of automation and control solutions for the connected home. We unlock the potential of connected devices, making entertainment systems easier to use, homes more comfortable and energy efficient, and families more secure. We provide our consumers with the ability to integrate music, video, lighting, temperature, security, communications and other functionalities into a unified home automation solution that enhances our consumers' daily lives. More than 75% of our consumers have integrated two or more of these functionalities with our solution. At the center of our solution is our advanced software platform, which we provide through our products that interface with a wide variety of connected devices that are developed both by us and by third parties.

Our solution functions as the operating system of the home, making connected devices work together to control, automate and personalize the homes of our consumers. For example, our solution can be configured so that:

- A half hour before you wake up in the morning, the thermostat adjusts to heat up the house, the lights slowly become brighter and the shades gradually open;
- As you leave for work, one push of a button locks the doors, arms the security system, turns off all the lights, powers down all non-essential devices and adjusts the temperature settings to the "away" mode;
- While you are at work, your Control4 system sends you a text message if your child has not returned home from school by the expected time, if the gaming system has been in use for more than an hour or if there is a water leak detected in the laundry room;
- When you return home in the evening, the push of a button opens your garage door, unlocks the door and adjusts the thermostat to your preferred temperature;
- When you are ready to watch a movie, instead of having to use several remotes, a single interface—be it a touch screen, smartphone, tablet or simple remote—provides you with easy control of your entire entertainment system. As the movie starts, the window blinds close, the lights dim and the temperature adjusts to keep your family comfortable; and
- When it is time for bed, the press of a "goodnight" button closes the blinds, turns off the lights, locks the doors, arms the security system and turns off all televisions and game consoles.

Consumer need for simplicity and a personalized experience, combined with advances in technology, are driving rapid growth in the connected home market. As a result of the significant growth in smart devices, mobile data networks, home broadband access and in-home wireless networking, consumers are more comfortable with ubiquitous connectivity and device interoperability. Accustomed to network connectivity and control of their digital lives, consumers are now looking for affordable ways to extend this functionality into their homes, driving growth in the mainstream home automation market. According to ABI Research, this mainstream segment of the home automation market was estimated to be $571 million in 2012, and is expected to grow at a compound annual growth rate, or CAGR, of 35% to $2.6 billion by 2017.

We were founded in 2003 to deliver a mainstream home automation solution by enabling consumers to unify their connected devices into a personalized system at an accessible and affordable entry point. Sold through our worldwide network of over 2,800 active direct dealers, our solution sits at the center of the mainstream home automation market by providing integrated and extensible control of over 6,400 third-party devices and services. These devices and services span a broad variety of product categories including music, video, lighting, temperature, security, communications and other





devices. Our platform capabilities provide consumers with solutions that are easy to use, comprehensive, personalized, flexible and affordable.

Based on our analysis, we estimate that we have automated more than 120,000 homes representing cumulative sales of more than 275,000 of our controller appliances, the brain of the connected home. We sell and deliver our solutions through an extensive worldwide dealer and distributor network and have solutions installed in 81 countries. Our top 100 dealers represented 24% of our total revenue in 2012.

We generated revenue of $74.9 million, $93.4 million and $109.5 million in 2010, 2011 and 2012, respectively, and $26.6 million for the three months ended March 31, 2013. We had a net loss of $16.3 million, $3.9 million and $3.7 million in 2010, 2011 and 2012, respectively, and $1.5 million for the three months ended March 31, 2013.

**Our Industry**

***Home Automation***

Within the last decade, the pace of innovation in the electronics industry has accelerated rapidly. Network-aware devices—such as televisions, smartphones, tablets, thermostats, appliances and security systems—that separately connect to a home network create the "connected home." Home automation technology integrates devices in the connected home, unlocking the collective potential of these devices working together to improve consumers' lives. The home automation market has reached a major inflection point and is becoming a mainstream offering accessible by a broad base of consumers.

Home automation solutions unify the control of music, video, lighting, temperature, security, communications and other devices in the connected home to provide consumers with improved convenience, comfort, energy efficiency and security. The key functional elements of home automation include:

- ***Control.*** Controlling devices is the most basic capability of home automation solutions. From a single interface, consumers can operate a wide array of devices using wired or wireless connections. With the recent growth in smartphones and tablets, control functionality is increasingly being extended to these mobile devices;
- ***Automation.*** After initial programming, automation enables devices to function without additional human intervention. Automation also enables various devices to work in concert to perform more complex tasks and to take actions based on external conditions; and
- ***Personalization.*** Personalization enables home automation solutions to be tailored to the unique lifestyle requirements of individual consumers and their families. Personalization unlocks the full potential of home automation to enhance, enrich and simplify the lives of consumers.

***Market Opportunity***

Consumers are becoming more reliant on network-aware devices in their everyday lives, contributing to the creation of a large opportunity in the mainstream home automation market. Growth in smart devices, such as smartphones and tablets, and the ubiquity of wireless networks have combined to create the "connected consumer." Accustomed to connectivity, centralized access to content and control from anywhere using any device, consumers are now looking for new areas where they can extend

the utility, security and enjoyment of this "always connected" capability. The home—with its increasing capabilities in the form of networks (such as broadband, ZigBee and Wi-Fi), connected





devices (such as tablets, smartphones, TVs and multi-room audio systems) and smart systems (such as lighting, temperature and security)—is the next center of attention for the connected consumer.

An automated home is created through technologies that unify and personalize the control of lighting, temperature, music, entertainment, security, consumer appliances and more, whether throughout the entire home or limited to a single room. The home automation market has traditionally been fragmented as participants offered point products that only control one application (such as entertainment or temperature), managed services (such as security) or luxury installations (such as an expensive whole home custom programming system that enables a single control point to turn off lights, arm the security system, lower the blinds and lock the doors). As consumers look for a unified solution at an affordable price point, they are looking beyond the traditional market participants.

The share of the market served by the mainstream home automation segment is expanding as a number of market dynamics evolve, including:

- ***Continued Growth of Home Networks.*** According to IDC, in 2012, there were 238.8 million home Wi-Fi networks, a number expected to reach 389.4 million by 2016, a CAGR of 13%;

- ***Growing Number of Connected Devices and Smart Appliances.*** According to IDC, since 2007, the number of smartphones sold has grown at a CAGR of 41%, with nearly 700 million smartphones sold in 2012 alone. Additionally, according to ABI Research, 1.5 billion Wi-Fi enabled devices shipped in 2012;

- ***Increased Consumer Awareness.*** The growing consumer awareness and expectation that a single device, such as a smartphone or tablet, can act as a personal control point for devices in the home; and

- ***Consumer Expectations of a Unified Solution.*** The growing consumer expectation that distinct networked devices and services should work together in a unified solution and ecosystem.

As consumer awareness of home automation grows and expectations for interoperable solutions increase, the mainstream segment of the home automation market is expected to expand rapidly. The mainstream segment of the home automation market was estimated to be a $571 million market in 2012 and to become a $2.6 billion market by 2017, representing a CAGR of 35%, as consumers look for centralized solutions to provide personalized control and automation of their homes.

***Consumer Requirements***

For the mainstream consumer to embrace a home automation solution, the solution must have the following attributes:

- ***Easy to Use.*** Consumers want a solution that is as easy to use as a smartphone. The trend in the market, made popular by smartphones and tablets, is for intuitive and easy-to-use devices. Consumers want a simple, yet powerful and innovative interface that is interoperable and personalized for the set of devices and systems that they have in their homes. Consumers unfamiliar with a particular system should be able to navigate that system with the touch of a button and set up automation events and actions through a simple user interface;

- ***Interoperable.*** The growing number of devices and smart appliances built by different manufacturers, based on different technologies and using different communication protocols leads to increasing chaos and incompatibility within the home. As a result, consumers are forced to learn and use multiple interfaces. Consumers are looking for a single solution with the ability to manage an ecosystem of devices, regardless of manufacturer, technology or communication protocol, allowing the consumer to continue to choose best-of-breed products;





- ***Personalized and Flexible.*** Consumers want to be able to easily personalize the behavior of the devices in their homes to reflect their own lifestyles. For example, parents may want to be notified when their children return home from school and monitor their entertainment usage, while other consumers may be more interested in assuring that their video, music, security and lighting systems are seamlessly integrated for entertaining. Additionally, as consumers move through different stages in their lives, they will purchase additional and replacement devices as well as develop new interests and preferences that require their home automation solution to be adaptable over time;

- ***Affordable and Future-Proof.*** Although consumer desire for home automation is increasing, widespread market adoption requires reasonable price points and support costs. Consumers want a home automation solution that is affordable, personalized and easy to use while at the same time providing rich functionality and broad device interoperability. Budget-conscious consumers also want a solution that can easily adapt to their changing requirements without the added cost, disruption or uncertainty of complete rip-and-replace projects; and

- ***Accessible Service and Support.*** Consumers are looking for solutions that are supported by trained specialists who can provide both responsive initial consultation and installation, as well as ongoing service and support. Local service and support remains the best resource for consumers looking to realize the full potential and functionality of their home automation systems.

*Limitations of Traditional Approaches*

The home automation market has traditionally been served by three categories that in general have been unable to meet all consumer requirements or overcome the impediments to broad market adoption.

- ***Luxury Installations.*** Generally found in the highest end segment of the market, these providers have delivered solutions for device integration and control that require extensive, intricate and time-consuming custom programming. These complex characteristics force the dealers and installers of these systems to start from square-one for each new consumer. As a result, these systems and installations are typically complex, lengthy, inflexible and expensive;

- ***Managed Services.*** Generally provided by a cable, telephone or security provider, these services provide a limited amount of device control capability for an additional monthly fee over the amount already charged for the provider's core business. These services are generally limited to providing remote monitoring functionality and control over a few select devices made by specific manufacturers. While such added services are generally perceived as affordable, they generally require an upfront investment and a non-cancelable subscription contract for 24 to 36 months. Moreover, these services typically have limited functionality, do not interoperate with a broad set of devices, and come as a non-personalized, one-size-fits-all service. The narrow focus of these services limits the types of devices that consumers can integrate into their connected homes; and

- ***Point Products.*** Point products provide a discrete function within the home without being integrated with other devices. Taking advantage of advancements in technology, certain vendors have emerged to provide enhancements to point products used in the home. For example, home entertainment systems that stream music within the home or provide access to a music library from any device are becoming more commonplace. Products that provide advanced temperature control (enabling smarter energy consumption) have also recently been introduced. Each of these individual or discrete connected home devices sits in a separate technical "silo," and typically lack interoperability with other devices.





**Our Solution**

The Control4 solution, built around our advanced software platform, sits at the center of the fast growing mainstream segment of the home automation market. We unlock the potential of connected devices, making entertainment systems easier to use, homes more comfortable and energy efficient, and families more secure. Our solution functions as the operating system of the home, integrating music, video, lighting, temperature, security, communications and other devices into a unified automation solution that enhances our consumers' lives.

**The Control4 Solution**



The Control4 solution integrates more than 6,400 third-party devices and systems into a unified, easy-to-use solution for mainstream consumers. As a result, our solution provides the consumer with the following benefits:

- ***Easy to Use.*** Our solution is designed to be simple and intuitive. For example, our easy-to-use interfaces can be as advanced as a smartphone, tablet, in-wall touch panel, television or multi-function remote control, or as simple as a single button or switch. Through our unified software platform, consumers can easily interact with their entire automated home without learning multiple interfaces or numerous remote controls. We have designed our solution so that anyone, from a young child to a grandparent, can pick up a Control4 device, push a button and watch a movie without any prior instruction;





- ***Broad Device Interoperability.*** Our open and flexible platform provides consumers with access to a broad universe of third-party devices that become connected and interoperable through our solution. The Control4 software platform currently operates with over 6,400 discrete third-party devices. With our solution, consumers can seamlessly connect and automate the devices they already own—as well as the devices they purchase in the future—and have the confidence that all of those devices will interoperate as seamlessly as if they were made by the same manufacturer;

- ***Advanced Personalization.*** Our adaptable solution enables our consumers to personalize the features and functionality of their Control4 system. For example, while you are away on vacation, our solution can be personalized to turn off non-essential appliances to save energy, turn lights on and off at night to simulate occupancy, and send you e-mail alerts of any status changes (such as a breach of the security system or a power outage). Our modular design also enables the smooth integration of new third-party products to meet the evolving needs of our consumers as their lifestyles change;

- ***Attractive Entry Point.*** According to ABI Research, the typical luxury home automation installation can cost $60,000 or more for whole-home systems. The Control4 solution is designed to be a much more affordable solution. Consumers can start with a single room multi-media automation experience for about $1,000 and scale to an integrated solution with an average cost of $26,000. Based on our research, more than half of our consumers have Control4 system configurations with one controller costing between $670 and $25,000 with an average cost of $3,500 (including estimated installation costs);

- ***Professional Installation and Support through Our Global Dealer Network.*** As the number and types of connected devices continues to grow, the need for local professional consultation, installation and support is currently essential for a successful home automation experience. We have built a global network of over 2,800 active direct dealers and distributors. Our certified dealers receive in-depth training, on-going education and support, enabling them to help consumers develop and install their personalized home automation experiences with the Control4 solution. To further increase consumer satisfaction, we also maintain a Customer Advocacy & Care Group that responds directly to consumer questions and concerns; and

- ***Remote Access and Specialized Apps.*** We have developed complementary services and applications offerings, 4Sight and 4Store, to provide consumers even more access, control and enhanced functionality over their automated homes. 4Sight subscription services provide consumers with the ability to remotely monitor and adjust settings in their homes (such as lights, temperature settings, door locks, gates and cameras) as well as receive event-based email alerts when predefined events either occur or do not occur by a specific time. With our 4Store online application marketplace, consumers can find and install new third-party apps that enhance their Control4 experience for specific devices, systems and media services.

**Our Growth Strategy**

Our goal is to be the leading provider of mainstream home automation solutions and the operating system of choice for the home. The following are key elements of our growth strategy:

- ***Enhance Our Software Platform and Products.*** We believe that our success to-date has been largely driven by the capabilities of our software platform. We will continue to invest in our software platform to develop and support new products, features and capabilities that deliver exceptional performance and value to our consumers;

- ***Strengthen and Expand Our Global Dealer Network.*** We have developed a global network of over 2,800 active direct dealers and 27 distributors to sell, install and support our solutions.





We will continue to expand and optimize our dealer network to ensure that we have sufficient geographic coverage across both existing and new markets. We will also continue to devote significant resources to increase the productivity and competency of our dealers and distributors by providing them with ongoing training, tools and support;

- ***Increase Penetration of Our North America Core Market.*** We intend to continue to focus on the residential market in North America, which represented approximately 77% of our revenue for the three months ended March 31, 2013. According to ABI Research, North America is currently the largest market for the mainstream segment of the home automation market, representing 69% of the total worldwide market based on revenues in 2012. We believe the mainstream market in North America remains significantly underpenetrated. We also believe the residential market offers us an opportunity for significant long-term growth, and we will continue to devote sales and marketing resources to increase penetration of that core market;

- ***Expand Our Focus on Adjacent Markets.*** We are also making investments to capitalize on opportunities outside the residential market and internationally. Internationally, our products are now available in 28 languages and distributed in 81 countries. Our international core revenue in 2011 and 2012 and for the three months ended March 31, 2013 increased 57%, 46% and 20% period-over-period, respectively. In addition, we have had initial success in the light commercial, multi-dwelling unit and hospitality markets, and we plan to increase our focus on these and other adjacent opportunities to expand our addressable market;

- ***Enhance Our Solution with Services and Apps.*** In addition to automating devices within the home, our solution also enables a wide variety of service and application opportunities. We will continue to enhance our 4Sight subscription services to provide consumers with enhanced home monitoring and control capabilities from any Internet-connected mobile device or computer. We will also continue to support apps developed by third parties, making them available through our 4Store application marketplace and our dealer network;

- ***Pursue Technology Licensing Opportunities.*** We plan to make our technology increasingly available to third parties through licensing agreements. For example, we recently announced that Sony integrated our home automation technology into its new ES line of home theater receivers. We have also begun making our device auto-discovery technology, Simple Device Discovery Protocol, or SDDP, available on a royalty-free basis to third parties to streamline and automate the setup, identification and configuration of their devices into our system. We also plan to expand our licensing activities to leverage third-party distribution channels, grow our partner relationships and simplify the home automation experience for dealers and consumers; and

- ***Pursue Strategic Acquisitions.*** We believe that our software platform has a strategic position as the operating system of the connected home. As a result, we believe we are ideally positioned to identify, acquire and integrate strategic acquisitions that are complementary to our current offerings, strengthen and expand our technology foundation, enhance our market positioning, distribution channels and sales, and are consistent with our overall growth strategy.



Table of Contents

**Our Products and Services**

The primary benefits we provide consumers and dealers lie in the value and competitive differentiation of our software platform. We deliver value and differentiation to consumers and generate revenues by embedding our software into a range of physical products. Our products sit at the center of the connected home and are designed to be:

- Easy to use from a variety of user interfaces;

- Adaptable to accommodate future devices and technologies;

- Compatible in new and existing homes;

- Affordable and cost-effective throughout installation and ownership; and

- Easy to install without major construction or remodeling.

***Software Platform***

At the center of the Control4 product line is the Control4 Home Operating System, which we refer to as the C4 OS, and the associated application software and software development kits, or SDKs. The high-level software components include:

- ***Director.*** Director is a real-time, extensible home operating system kernel that is responsible for monitoring and receiving events from numerous devices and services, processing those events according to consumer personalized settings, and then dispatching commands to the appropriate devices to perform predefined actions. Director runs on our controller appliances and certain authorized partner products such as Sony ES receivers;

- ***Navigator.*** Navigator displays intuitive and rich graphical user interfaces on televisions, in-wall and table-top touch panels, smartphones and tablets, as well as list-based devices such as a remote controls with LCD text-displays;

**Control4 Navigator Resides on Many Interface Devices**






Table of Contents

- ***Composer Professional Edition.*** Composer Professional Edition is a software application that enables trained and certified Control4 dealers and installers to design, configure and personalize a Control4 home automation system for consumers;

- ***Composer Home Edition and Composer Media Edition.*** Composer Home Edition and Media Edition enable consumers to view and configure their Control4 managed devices. These drag-and-drop programs provide the ability to manage digital media and create and modify simple programs and policies (such as changing lighting scenes, modifying custom buttons and controlling behaviors among devices based on schedules or times of the day);

- ***DriverWorks SDK.*** DriverWorks SDK is a software development kit that enables dealers, programmers and device manufacturers to independently develop and test custom two-way interface drivers to support the integration of a new device or device model into our system, or to customize and enhance an existing driver. DriverWorks SDK has enabled 6,400 different products and services to be incorporated into the Control4 ecosystem; and

- ***Navigator SDK and Application SDK.*** Navigator SDK and Application SDK are software development kits that enable third-party dealers and programmers to customize and deliver new application functionality within Navigator user interfaces on Control4 interface devices through the development of apps.

***Products with Embedded Software and Services***

Our products leverage our software platform to provide consumers with a comprehensive and easy-to-use connected home experience. We design and manufacture our products via contract manufacturers as well as certify partner products for sale through our dealers. Our products and services include:

- ***Controller Appliances.*** Our controller appliances run our Director software to monitor, process and automate events, statuses and actions for numerous devices and services, creating a comprehensive connected home experience. Currently we offer the HC-800, a whole home controller appliance, and the HC-250, a single-room controller appliance. We also license our Director software on the new Sony ES 5800 and 2800 receivers, transforming them into controller appliances with home theater audio and video capabilities;

- ***Interface Devices.*** We offer touch panels, handheld remote controls and keypads as interface devices. We also develop and deliver software applications for Apple iOS and Android smartphones and tablets that enable these personal devices to become control interfaces to Control4 connected homes, both on-premise and remotely;

- ***Audio/Video Equipment.*** We offer network-enabled 4x4 and 8x8 zone audio amplifiers, and a 16x16 audio matrix switch for versatile multi-room and whole-home audio distribution. We also offer an integrated digital media player for integration of local digital audio and video, as well as Wi-Fi and Ethernet amplified speaker points for streaming digital audio to speakers in areas without an audio receiver;

- ***Lighting Products.*** We offer a suite of lighting products that provide personalized control and energy management. Our suite of wireless light switches and dimmers can easily replace devices in an existing home or be installed in new homes. We offer in-wall wireless switches and dimmers for 120V, 240V and 277V electrical loads, which meet the requirements of North America and many international markets. We also plan to offer panelized systems, where all of the lighting control will be done on a remote panel. Our new Control4 lighting products will have the ability to measure how much energy each load is using and provide suggestions to the consumer on how to conserve energy and reduce costs;

- ***Thermostats.*** We offer devices that provide energy savings, convenience and efficiency for temperature control. Our wireless multi-stage thermostat is completely programmable with up to six set points per day and, using our 4Sight subscription service, is remotely accessible and controllable;
- ***Security Products.*** We provide a set of products and software services created by us as well as distribute certified third-party products, including deadbolts, door and window sensors, motion sensors, garage access systems and water leak detection systems, from our security partners such as Baldwin, Card Access, Kwikset and Yale;
- ***Communication Products.*** We offer full motion video and hi-fidelity audio intercom capability through our in-wall and tabletop touchscreens, as well as our exterior weather-resistant door stations; and
- ***Subscription Services.*** 4Sight is a subscription service that enables 24x7 home monitoring and control from virtually anywhere, remote home programming and support, and instant email alerts based on home events so that homeowners are always in-the-know. For example, 4Sight allows a consumer to remotely unlock the front door to let in a repairman, to turn on the air conditioning on the way home, and to monitor the home security cameras from a smartphone.

Sales of our controller appliances, including software, represented 39% of our total revenue in 2012.

Our installed solutions include functionalities in the following percentages:

| | |
|---|---|
| Video | 100% |
| Music | 57 |
| Lighting | 48 |
| Communications | 32 |
| Security | 29 |
| Temperature | 24 |

More than 75% of our consumers have integrated two or more of these functionalities with our solution.

**Our Distribution Network**

In 2005, we started selling our solutions through a network of over 450 independent dealers. Since that time, our distribution network has grown to over 2,800 active direct dealers and distributors in 81 countries. Dealers range in size from small family businesses to very large organizations.

Our dealers are home automation specialists that have significant experience in designing, installing and servicing both low- and high-voltage systems including music, video, security, communications and temperature control. Every Control4 dealer has gone through extensive training and has passed the necessary certification tests —either in one of our training facilities located in the United States or the United Kingdom, or in a training facility of one of our distributors. Every installer for each dealer must complete course work and pass pre-training examinations, as well as pass rigorous testing at the conclusion of the multi-day formal training in order to become certified to sell and install our solutions.

We sell directly through dealers in the United States, Canada, the United Kingdom and 40 other countries. We partner with 27 distributors to serve 38 additional countries where currently we do not have dealer training and support facilities. Our distributors recruit, train and manage dealers within their region and also help dealers find country specific solutions for unique needs based on the special home automation market characteristics within each country. In recent years, we have moved more toward a dealer-direct model in specific international regions as we have added and continue to add sales and support staff, namely in the United Kingdom, China and India.





During the years ended December 31, 2010, 2011 and 2012 and the three months ended March 31, 2013, none of our dealers or distributors accounted for more than 5% of our revenue. None of our dealers or distributors have minimum or long-term purchase obligations. Dealer orders are typically placed on a project-by-project basis. As such, our dealers do not typically carry significant levels of inventory. The resulting just-in-time model helps reduce dealer inventory investment and also reduces dealer returns. Our dealers around the world are each responsible for local marketing, selling, installing and servicing the consumer.

**Our Partners**

The home automation market is made up of a collection of thousands of electronically controllable products made by hundreds of key manufacturers. We believe that our success has come, in part, due to our success in forming relationships with many of these manufacturers. As of January 2013, we had agreements with over 130 manufacturers, of which 42 have formally submitted their devices to us for Control4 certification so that our worldwide dealer network can be assured that these third-party devices work well with our platform.

In addition to standard interoperability with Control4, more and more manufacturers are realizing the value our technology can bring when it is embedded inside their products. For example, we recently launched our device auto-discovery technology, SDDP, which enables seamless installation of devices by embedding code at the manufacturer, making it easier for dealers and consumers to add new products to existing systems. Sony recently launched two home theater receivers with our platform

embedded inside, giving consumers the full power of our software to automate the home.

Third-party manufacturers are currently selling 22 brands through our online store. This provides manufacturers valuable reach into our trained dealer network, and it helps our dealers gain easy access to 426 products that they know are certified by Control4. We also partner with other companies for purposes of strategic initiatives.



Table of Contents

**Our Technology**

***Core Automation Enabling Technology***

At the core of the Control4 platform is the C4 OS. The C4 OS consists of two main components, Director and Navigator software, that work in concert with different modules within the system to provide consumers with a unified and comprehensive connected home experience. These modules help our software platform manage media, update connected devices and interoperate using a variety of communication protocols including Ethernet, Wi-Fi, Bluetooth, ZigBee, Infrared, or IR, serial interfaces and more. Our software platform does not currently support the communication protocol Z-Wave. The following diagram shows the relationship between Director and Navigator software:

**Control4 OS Architecture**




- ***Director Software.*** Director is the brain of the C4 OS and interfaces with a Linux kernel. Director architecture includes a proprietary "driver pairing" technology that creates a hardware abstraction layer and exposes a single common software Applications Programming Interface, or API, for all devices of the same type. This enables an application developer to write an application to manage a lighting system that will work with any brand of lighting control equipment. Director also includes an advanced scheduling engine and astronomical clock that allows for time-based control of anything in a Control4 system. Director has a component called "Connection Manager" that is responsible for discovering new devices and maintaining connections with all of the diverse devices in an automation system.



Table of Contents

- ***Navigator Software.*** Navigator is the C4 OS user interface application. Navigator connects to Director through the Director API and based on what is in the system, automatically provides a customized user interface for control of the system. All Control4 controller appliances and touch panels run Navigator. When running on a controller appliance, Navigator produces an "On-Screen" interface for use on TVs and projection systems with a remote control. Navigator can also produce an interface that is touch-based. Navigator is also available for Macs, PCs, Apple iOS and Android devices.

- ***Media Manager.*** Media Manager discovers, scrubs and indexes media audio and video content across various sources—from local content spread across Macs, PCs, NAS drives, tablets, smartphones, cable boxes and satellite receivers to streaming content scattered across online services such as Rhapsody, TuneIn, Netflix, Vudu, Hulu and Amazon Prime. Using the C4 OS, a consumer can search for music by a particular artist and get a unified result of all content from that artist across

all devices and services.

- ***Update Manager.*** Update Manager manages complex device and system updates in a synchronized way. The Update Manager will automatically check for updates on devices connected to the Control4 system, and when prompted update all of the disparate devices in the correct order, whether or not they are directly connected to the Internet.

- ***Audio Server.*** Audio Server is the C4 OS component that manages music playback in a Control4 system. Audio Server implements Control4's patented audio synchronization system that enables synchronized music playback across traditional analog, wired digital and wireless digital audio devices.

- ***ZigBee Server.*** ZigBee Server creates an Internet Protocol-to-ZigBee bridge and maintains a robust wireless communications system through ZigBee's open wireless mesh networking standard. Our controller appliances use this bridge to communicate with low-bandwidth, low-cost and low-power applications such as thermostats, light switches and remote controls.

- ***IO Server.*** IO Server functions as an Internet Protocol bridge to various incompatible communication protocols such as IR, RS-232, RS-485 and contact closures. Our controller appliances implement these physical layers in order to handle the devices that do not implement Internet Protocol, allowing the connected home to communicate with more devices.

***Simple Device Discovery Protocol (SDDP)***

We have a patented device auto-discovery technology called Simple Device Discovery Protocol, or SDDP, that we developed to enable seamless installation of devices in our system. When a new SDDP-enabled device is installed in a home, the device sends out a signal that is immediately discovered by the system, thereby allowing the new device to easily be added.

***4Sight Subscription Service***

We offer a subscription service called 4Sight that enables remote access to the connected home without exposing the installer or consumer to the complexities of communicating around firewalls and private Internet Protocol addresses. This service facilitates connections between remote client devices and our systems through a cloud-based service. Using 4Sight, consumers can remotely monitor and control their Control4 systems as if they were at their homes.

**Our Research and Development**

Our flexible research and development model relies upon a combination of in-house staff and offshore design and manufacturing partners to improve and enhance our existing products and services,





as well as develop new products, features and functionality in a cost-effective manner. We believe that our software platform is critical to expanding our leadership position within the mainstream home automation market. As a result, we devote the majority of our research and development resources to software development. We work closely with our consumers to understand their current and future needs and have designed a product development process that captures and integrates feedback from our consumers.

As of March 31, 2013, we had 148 employees in our research and development organization, substantially all of whom were located at our headquarters in Salt Lake City, Utah. Our research and development expenses were $19.2 million in 2011, $20.3 million in 2012 and $6.1 million for the three months ended March 31, 2013. We intend to continue to significantly invest in research and development to expand our solutions and capabilities in the future.

**Our Manufacturing**

We outsource the manufacturing of our hardware products to contract manufacturers. The majority of our hardware products are manufactured by Sanmina and LiteOn at their respective facilities located in southern China, with additional manufacturing performed by six contract manufacturers located throughout Asia. Our agreement with Sanmina currently has no set term and may be terminated by us in writing at any time. Our agreement with LiteOn expires in December 2014, after which it automatically renews for successive one-year terms unless either party terminates the agreement with 180 days' notice. Our manufacturing partners assemble our products using our design specifications, quality assurance programs and standards, and procure components and assemble our products based on our demand forecasts. These forecasts represent our estimates of future demand for our products based upon historical trends and analysis from our sales and product management functions. We generally plan to have an average of six weeks of inventory on hand and in transit at any given time. We maintain fulfillment centers in Salt Lake City, Utah and York, England. Our manufacturing partners currently ship all hardware products to Utah and then we ship them directly to our dealers and distributors around the world.

We have multiple sources for most of our components. However, we do depend on single source manufacturers for certain critical components, including processors, memory modules and touch panels. We can choose to change processor and memory modules for any of our products but because of high implementation costs, we generally choose to make these changes only upon development of new products. We also rely on certain custom connectors, cables and mechanical enclosures for our hardware products that are single sourced because of the high tooling costs of sourcing the components from multiple suppliers. In each of these cases, we own the drawings and design of these custom components.

**Our Marketing**

Our marketing team supports our sales channel with dealer-directed advertising and promotions, lead-generation, social media engagements and training events, as well as the design and production of consumer-facing collateral, showroom signage and market-specific advertising. Our website is the anchor to our online and social media strategy, from which we direct leads to our dealers. Control4's bi-annual magazine, Home Smart Home, features lifestyle stories of Control4 installations from around the world and is available on iTunes and on our website. The publication is also reproduced and distributed to customers and prospects on our behalf by our dealers

and partners.

We are active participants at global industry conferences and maintain a significant presence at CEDIA trade shows. Beyond CEDIA in the United States, we sponsored the 2012 CEDIA Conference in London and an exhibit at Integrated Systems Europe, or ISE, the annual industry trade show held in





Amsterdam. We are frequently featured in the trade press and maintain strong relationships with the industry's key analysts and associations.

In 2012, we also initiated strategic marketing alliances with partners such as Sony and Sub-Zero Wolf to broaden our marketing reach beyond the sales channel and go directly to the consumer. We also recently completed our first Control4 showroom, constructed within ABT Electronics, to bring the Control4 experience to life to their broad customer base.

We believe that partnering with device manufacturers, leveraging co-marketing partnerships, expanding our sales channels and increasing our brand recognition among consumers are key components of our growth strategy.

**Our Competition**

The market for home automation systems is fragmented, highly competitive and continually evolving. Our current competitors fall into several categories:

- Providers that focus primarily on the luxury segment of the home automation market, including AMX, Crestron and Savant;
- Providers of point products that address a narrow set of control and automation capabilities, including Logitech, Lutron, Nest, Roku, Sonos and Universal Remote Control; and
- Providers of managed home automation and security services, including ADT, Comcast, Verizon and Vivint (which in turn may utilize third-party software from companies including Alarm.com and iControl).

Companies that provide popular point solutions have and may continue to eliminate or restrict our ability to control and be compatible with their products. For example, a thermostat company has restricted the interoperability of its products with our solutions.

In addition, large technology companies such as Apple, Google, Microsoft and Samsung offer control capabilities among their own products, applications and services, and have ongoing development efforts to address the broader home automation market. Given the growth dynamics of this market, there are many new and existing companies targeting portions of the mainstream home automation market. To the extent that consumers adopt products, applications and services from a single large technology company or any of these companies broaden their home automation capabilities, we will face increased competition.

The principal competitive factors in our market include the:

- Breadth of home automation capabilities provided;
- Simplicity of use and installation;
- Interoperability with third-party devices;
- Price and total cost of ownership;
- Sales reach and local installation and support capabilities; and
- Brand awareness and reputation.

We believe that our home automation solution competes favorably with respect to these factors. Nevertheless, many of our competitors have substantially greater financial, technical and other resources, greater name recognition, larger sales and marketing budgets, broader distribution channels, and larger and more mature intellectual property portfolios than we do.





**Our Intellectual Property**

Our success and ability to compete effectively depend in part on our ability to protect our proprietary technology and to establish and adequately protect our intellectual property rights. To accomplish these objectives, we rely on a combination of patent, trademark, copyright and trade secret laws in the United States and other jurisdictions, as well as license agreements, confidentiality agreements and other contractual protections.

As of March 31, 2013, we owned 34 issued United States patents (16 of which are design patents) that are scheduled to expire between 2025 and 2030, with respect to utility patents, and between 2020 and 2022, with respect to design patents. We continue to file patent applications in multiple jurisdictions and as of March 31, 2013, we had two patent applications allowed, 13 patent applications published and 11 patent applications pending in the United States. We also had five issued patents and 14

pending patent applications under foreign jurisdictions and treaties such as Canada, Australia, New Zealand, the United Kingdom and the European Patent Convention. The claims for which we have sought patent protection apply to both our hardware and software products. Our patent and patent applications generally apply to the features and functions of our C4 OS and the applications associated with our platform.

We also rely on several registered and unregistered trademarks to protect our brand. We have registered the trademarks Control4, Control4 My Home, the Control4 logo and design, 4Store and Everyday Easy in the United States, and Control4 in the European Union. We have an additional five unregistered trademarks in the United States and 15 in foreign jurisdictions such as the European Union, China, India, Mexico and Brazil.

We have filed for United States copyright protection for our source code for all major releases of our software. We also license software from third parties for integration into or use with our products, including open-source software and other commercially available software.

In addition, we seek to protect our intellectual property rights by requiring our employees and independent contractors involved in development to enter into agreements acknowledging that all inventions, trade secrets, works of authorship, developments, concepts, processes, improvements and other works generated by them on our behalf are our intellectual property, and assigning to us any rights, including intellectual property rights, that they may claim in those works.

**Our Employees**

As of March 31, 2013, we had 333 full-time employees, including 310 employees in the United States and 23 employees internationally. None of our employees are represented by a labor union with respect to his or her employment with us. We have not experienced any work stoppages and we consider our relations with our employees to be good.

**Our Facilities**

Our corporate headquarters are located in Salt Lake City, Utah, where we lease approximately 56,000 square feet of commercial space under a lease that expires on June 30, 2018. We use this space for sales, research and development, customer service and administrative purposes. We also lease approximately 35,000 square feet of warehouse space in Salt Lake City, Utah under a lease that expires on March 31, 2017. In addition, we lease approximately 5,624 square feet of commercial space in York, United Kingdom under two separate leases that expire on November 14, 2014 and January 1, 2016. We use these properties for sales and training purposes and as fulfillment centers for the United Kingdom.

In connection with our sales efforts in the United States and abroad, we lease office space typically on a short-term renewable basis domestically in San Jose, California, Santa Clara, California,



Table of Contents

Charlotte, North Carolina and Chicago, Illinois, and internationally in York, United Kingdom, Shanghai, China, Bangalore, India and Seoul, South Korea.

We believe that our facilities are suitable to meet our current needs. We intend to expand our existing facilities or add new facilities as we add employees and enter new geographic markets, and we believe that suitable additional or alternative space will be available as needed to accommodate any such growth. However, we expect to incur additional expenses in connection with such new or expanded facilities.

**Our Legal Proceedings**

From time to time, we may become involved in legal proceedings arising in the ordinary course of our business. We are not presently a party to any legal proceedings that, if determined adversely to us, we believe would individually or in the aggregate have a material adverse effect on our business, results of operations, financial condition or cash flows.



Table of Contents

## MANAGEMENT

**Executive Officers and Directors**

The following table sets forth the names, ages and positions of our executive officers and directors as of March 31, 2013:

| Name | Age | Position |
|---|---|---|
| Martin Plaehn | 55 | President, Chief Executive Officer and Director |
| Dan Strong | 54 | Chief Financial Officer |
| William B. West | 50 | Founder, Chief Strategy Officer and Chairman of the Board |
| Eric Anderson | 54 | Senior Vice President, Products |
| James B. Arnold | 56 | Senior Vice President, Sales |
| Greg Bishop | 54 | General Counsel and Chief Compliance Officer |
| Susan Cashen | 52 | Senior Vice President, Marketing |
| Jeff Dungan | 43 | Senior Vice President, Supply Chain Operations and Senior Vice President, Business Development |

| | | |
|---|---|---|
| Rob Born[(1)(3)] | 45 | Director |
| David C. Habiger[(2)(3)] | 44 | Director |
| Len Jordan[(2)] | 47 | Director |
| Christopher B. Paisley[(1)(3)] | 61 | Director |
| Scott Petty[(1)] | 50 | Director |
| Steven Vassallo[(2)] | 42 | Director |

(1) Member of the Audit Committee

(2) Member of the Compensation Committee

(3) Member of the Nominating and Corporate Governance Committee

*Martin Plaehn* has served as our President and Chief Executive Officer, and a member of our board of directors since September 2011. Prior to joining our company, Mr. Plaehn served as senior vice president of product and service development at RealNetworks, Inc., a provider of Internet media delivery software and services, from 2010 to 2011. Prior to that, Mr. Plaehn served as an advisor to chief executive officers, executive teams and investors for technology companies from 2008 to 2010. Prior to that, Mr. Plaehn served as the president and chief executive officer at Bungee Labs, a cloud computing and platform-as-a-service company, from 2006 to 2008. Prior to that, Mr. Plaehn served as executive vice president of technology products and services at RealNetworks, Inc., from 1999 through 2004, and then led RealNetworks, Inc.'s casual games division from 2004 to 2005. Prior to that, Mr. Plaehn served as chairman and chief executive officer of Viewpoint Digital, which was acquired by CA, Inc., an information technology management company, in 1998. Mr. Plaehn holds a Bachelor of Arts in mathematics from the University of California, San Diego and is a graduate of the Executive Program for Scientists and Engineers at the University of California, San Diego.

We believe that Mr. Plaehn is qualified to serve as a director based on the perspective and experience he brings as our President and Chief Executive Officer and his experience as a seasoned executive.

*Dan Strong* has served as our Chief Financial Officer since January 2008. Prior to joining our company, Mr. Strong served as the chief financial officer at iBAHN, a hospitality networking company, from 2004 to 2008. Prior to joining iBAHN, Mr. Strong served as vice president of financial planning and analysis, vice president and corporate controller, and interim chief financial officer at Iomega Corporation, a producer of storage hardware, from 1996 to 2004. Mr. Strong has also held executive-level corporate finance positions at Campus Pipeline, Inc., a developer of a software platform for colleges and universities. Mr. Strong holds a Bachelor of Science in accounting from the Eccles School of Business at the University of Utah.



Table of Contents

*William B. West* co-founded our company in March 2003 and has served as the Chairman of our board of directors since October 2011. From 2003 to 2011, Mr. West served as our chief executive officer. Prior to that, Mr. West co-founded STSN (now known as iBAHN), a broadband services company designed for business travelers, and PHAST Corporation, a manufacturer of high-end home automation equipment. Mr. West holds a Bachelor of Arts in finance from the University of Utah and a Master of Business Administration from the Wharton School at the University of Pennsylvania. Mr. West also holds the Chartered Financial Analyst designation.

We believe that Mr. West is qualified to serve as a director based on the perspective and experience he brings as one of our co-founders, his experience as a seasoned executive and his knowledge of the industry in which we operate.

*Eric Anderson* has served as our Senior Vice President, Products, since June 2012. Prior to joining our company, Mr. Anderson was vice president, product management at NetIQ Corporation, a software company, from 2011 to 2012. Prior to that, Mr. Anderson held various executive positions at Novell, Inc., a security management software company, from 2006 to 2011, including chief technology officer and vice president of product management. Prior to that, Mr. Anderson, served in various management positions at BMC Software, Inc., a business service management software company, and Compaq Computer Corporation. Mr. Anderson holds a Bachelor of Science in marketing and a Master of Business Administration from Brigham Young University.

*James B. Arnold* has served as our Senior Vice President, Sales, since February 2007. Prior to joining our company, Mr. Arnold served as senior vice president of sales and distribution at DIRECTV, Inc. from 2002 to 2006. Mr. Arnold holds a Bachelor of Arts in psychology and sociology from Washington University in St. Louis.

*Greg Bishop* has served as our Vice President and General Counsel since March 2008. In January 2013, Mr. Bishop was also named our Chief Compliance Officer. Prior to joining our company, Mr. Bishop operated his own legal consulting firm, Outsourced GC, PLLC, from 2004 to 2008. Prior to that, Mr. Bishop was general counsel of Murex S.A. in Paris, France, a developer of software solutions for large financial institutions, from 2002 to 2004. Prior to that, Mr. Bishop held executive-level legal positions at Campus Pipeline, Inc., a developer of a software platform for colleges and universities, and Iomega Corporation, a producer of storage hardware. Prior to that, Mr. Bishop worked as legal counsel for Corning, Incorporated. Mr. Bishop holds a Bachelor of Arts in English literature, a Master of Business Administration and a Juris Doctor from Brigham Young University.

*Susan Cashen* has served as our Senior Vice President, Marketing, since June 2010. Prior to that, Ms. Cashen managed marketing for our company's energy business unit from 2009 to 2010. Prior to joining our company, Ms. Cashen served as vice president of marketing at MyWaves, a mobile video service, from 2006 to 2009. Prior to that, Ms. Cashen served as the vice president of communications and vice president of marketing at TiVo Inc. from 2000 to 2005. Ms. Cashen holds a Bachelor of Arts in Russian studies from Hamilton College.

*Jeff Dungan* has served as our Senior Vice President, Business Development, since April 2010, and our Senior Vice President, Supply Chain/Manufacturing, since

June 2006. Prior to joining our company, Mr. Dungan held positions of senior director of information technology operations and general and administrative business solutions for BEA Systems, an enterprise infrastructure software products company, from 2001 to 2006. Mr. Dungan holds a Bachelor of Science in computer and electrical engineering from Colorado State University.

*Rob Born* has been a member of our board of directors since June 2011. Mr. Born joined Thomas Weisel Venture Partners in 2001 and is currently managing the fund as a partner. Mr. Born has served on the boards of several private companies in the past. Mr. Born also holds a Bachelor of Arts in English literature from Amherst College and a Master of Business Administration and a Juris Doctor from Duke University.





We believe that Mr. Born is qualified to serve as a director based on his experience as a seasoned investor, a manager of a fund and a current and former director of many companies and his knowledge of the industry in which we operate.

*David C. Habiger* has served as a member of our board of directors since September 2012. From 2011 to 2012, Mr. Habiger served as chief executive officer of NDS Group Ltd., a provider of video software and content security solutions, and served in that role until shortly prior to the time that the NDS business was acquired by Cisco Systems, Inc. Prior to that, Mr. Habiger served as chief executive officer of Sonic Solutions, Inc., a provider of software for digital media prior to its sale to Rovi Corporation, from 2005 to 2011. Mr. Habiger currently serves as a member of the board of directors of two public companies, RealD, Inc. and Echo Global Logistics, Inc., as well as several private companies. Mr. Habiger holds a Bachelor of Business Administration from St. Norbert College and a Master of Business Administration from the University of Chicago.

We believe that Mr. Habiger is qualified to serve as a director based on his service on other public company boards, his prior executive leadership and his experience in and knowledge of the industry in which we operate.

*Len Jordan* has been a member of our board of directors since June 2004. Mr. Jordan has served as the managing director of Madrona Venture Group since 2012 and joined Madrona Venture Group in 2010. Additionally, Mr. Jordan has served as a general partner of Frazier Technology Ventures since 2004. Prior to joining Frazier Technology Ventures, Mr. Jordan served as a senior vice president at RealNetworks, Inc. Mr. Jordan currently serves on the boards of several private companies. Mr. Jordan holds Bachelors of Science in finance and economics from the Eccles School of Business at the University of Utah.

We believe that Mr. Jordan is qualified to serve as a director based on his experience as a seasoned investor and a current and former director of many companies and his knowledge of the industry in which we operate.

*Christopher B. Paisley* has been a member of our board of directors since May 2006. Mr. Paisley served as chief financial officer of 3Com Corporation from 1985 to 2000. Mr. Paisley has served on the board of directors of Volterra Semiconductor Corporation, a semiconductor company, since 2000, Equinix, Inc., a networking company, since 2007, Ambarella Corporation, a semiconductor video processing solutions company, since 2012, Fortinet, Inc., a network security company, since 2012 and a member of its board of directors since 2004, and Bridge Capital Holdings, a holding company for venture capital banking, since 2011. Mr. Paisley served as a director of 3PAR Inc., a utility storage company that was publicly traded prior to its acquisition by Hewlett-Packard Company, from 2006 to 2010, and Electronics for Imaging, Inc., a digital printing company, from 2004 to 2008. Mr. Paisley currently also serves on the boards of several private companies. Mr. Paisley has been the Dean's Executive Professor of Accounting at the Leavey School of Business at Santa Clara University since 2001. Mr. Paisley holds a Bachelor of Arts in business economics from the University of California, Santa Barbara and a Master of Business Administration from the Anderson School at the University of California, Los Angeles.

We believe that Mr. Paisley is qualified to serve as a director based on his service on other public company boards, broad industry expertise, extensive financial leadership experience and insight into SEC reporting and compliance.

*Scott Petty* has served as a member of our board of directors since July 2003. Mr. Petty co-founded vSpring Capital (now Signal Peak Ventures) in 2000 and has been a managing director since its formation. Prior to that, Mr. Petty was chief operating officer and a member of the board of directors of Zuka Juice, Inc., a nutritional products company, from 1996 to 1999. Prior to that, Mr. Petty was a consultant with Bain & Company for seven years. Mr. Petty received a Bachelor of Science in economics from Brigham Young University and a Master of Business Administration from Harvard Business School.





We believe that Mr. Petty is qualified to serve as a director based on his experience as a seasoned investor and a current and former director of many companies and his knowledge of the industry in which we operate.

*Steven Vassallo* has served as a member of our board of directors since March 2011. Mr. Vassallo joined Foundation Capital in 2007 and has been a general partner since 2011. Prior to that, Mr. Vassallo helped launch Ning, Inc., a consumer Internet service, from 2004 to 2006. Prior to that, Mr. Vassallo was director of engineering at Immersion Corporation, from 1999 to 2002. Mr. Vassallo earned a Bachelor of Science in mechanical engineering from Worcester Polytechnic Institute, a Master of Science in mechanical engineering from Stanford University and a Master of Business Administration from the Stanford Graduate School of Business.

We believe that Mr. Vassallo is qualified to serve as a director based on his experience as a seasoned investor and a current and former director of many companies and his knowledge of the industry in which we operate.

There are no family relationships among any of our directors and/or executive officers.

**Board Composition**

Our board of directors is currently composed of eight members. Our amended and restated certificate of incorporation and bylaws provide that the number of our directors shall be fixed from time to time by a resolution of the majority of our board of directors. Our amended and restated certificate of incorporation to be effective upon completion of this offering will divide our board of directors into three staggered classes of directors. At each annual meeting of stockholders, a class of directors will

be elected for a three-year term to succeed the same class of directors whose terms are then expiring. The terms of the directors will expire upon the election and qualification of successor directors at the annual meeting of stockholders to be held during 2014 for the Class I directors, 2015 for the Class II directors and 2016 for the Class III directors.

- Our Class I directors will be Messrs. Jordan, Petty and Vassallo.
- Our Class II directors will be Messrs. Born and West.
- Our Class III directors will be Messrs. Habiger, Paisley and Plaehn.

The division of our board of directors into three classes with staggered three-year terms may delay or prevent a change of our management or a change of control. See "Description of Capital Stock—Anti-Takeover Effects of Delaware Law and Our Certificate of Incorporation and Bylaws" for a discussion of other anti-takeover provisions found in our amended and restated certificate of incorporation and bylaws.

**Director Independence**

NASDAQ rules require that independent directors must comprise a majority of a listed company's board of directors within a specified period of the completion of its offering. In addition, these rules require that, subject to specified exceptions, each member of a listed company's audit, compensation and nominating and corporate governance committees be independent. Audit committee members must also satisfy the independence criteria set forth in Rule 10A-3 under the Securities Exchange Act of 1934, as amended. In addition, NASDAQ rules state that a director will only qualify as an "independent director" if, in the opinion of that company's board of directors, that person does not have a relationship that would interfere with the exercise of independent judgment in carrying out the responsibilities of a director.

In order to be considered independent for purposes of Rule 10A-3, a member of an audit committee of a listed company may not, other than in his or her capacity as a member of the audit committee, the board of directors or any other board committee: (1) accept, directly or indirectly, any





consulting, advisory or other compensatory fee from the listed company or any of its subsidiaries, or (2) be an affiliated person of the listed company or any of its subsidiaries.

On January 24, 2013, our board of directors undertook a review of its composition, the composition of its committees and the independence of each director. Based upon information requested from and provided by each director concerning his background, employment and affiliations, our board of directors has determined that none of Messrs. Born, Habiger, Jordan, Paisley, Petty or Vassallo, representing six of our eight directors, has a relationship that would interfere with the exercise of independent judgment in carrying out the responsibilities of a director and that each of these directors is "independent" as that term is defined under NASDAQ rules. Our board of directors also determined that Messrs. Born, Paisley and Petty, who comprise our audit committee, Messrs. Habiger, Jordan and Vassallo, who comprise our compensation committee, and Messrs. Born, Habiger and Paisley, who comprise our nominating and corporate governance committee, satisfy the independence standards for those committees established by applicable SEC rules and NASDAQ rules. In making this determination, our board of directors considered the relationships that each non-employee director has with our company and all other facts and circumstances our board of directors deemed relevant in determining their independence, including the beneficial ownership of our capital stock by each non-employee director.

**Role of the Board in Risk Oversight**

One of the key functions of our board of directors is informed oversight of our risk management process. Our board of directors does not have a standing risk management committee, but rather administers this oversight function directly through the board of directors as a whole, as well as through its standing committees that address risks inherent in their respective areas of oversight. In particular, our board of directors is responsible for monitoring and assessing strategic risk exposure. Our audit committee is responsible for reviewing and discussing our major financial risk exposures and the steps our management has taken to monitor and control these exposures, including guidelines and policies with respect to risk assessment and risk management. Our audit committee also monitors compliance with legal and regulatory requirements, in addition to oversight of the performance of our external audit function. Our nominating and corporate governance committee monitors the effectiveness of our corporate governance guidelines. Our compensation committee reviews and discusses the risks arising from our compensation philosophy and practices applicable to all employees that are reasonably likely to have a materially adverse effect on us.

**Board Committees**

Our board of directors has an audit committee, a compensation committee and a nominating and corporate governance committee, each of which has the composition and responsibilities described below. The audit committee, compensation committee and nominating and corporate governance committee all operate under charters approved by our board of directors, which will be available on our website upon the closing of this offering. Our board of directors may from time to time establish other committees.

***Audit Committee.*** Our audit committee oversees our corporate accounting and financial reporting process and assists the board of directors in monitoring our financial systems and our legal and regulatory compliance. Our audit committee will also:

- Oversee the work of our independent auditors;
- Approve the hiring, discharging and compensation of our independent auditors;
- Approve engagements of the independent auditors to render any audit or permissible non-audit services;
-

Review the qualifications and independence of the independent auditors;





- Monitor the rotation of partners of the independent auditors on our engagement team as required by law;
- Review our financial statements and review our critical accounting policies and estimates;
- Review the adequacy and effectiveness of our internal controls; and
- Review and discuss with management and the independent auditors the results of our annual audit and our quarterly financial statements.

The members of our audit committee are Messrs. Born, Paisley and Petty. Mr. Paisley is our audit committee chairperson. Our board of directors has concluded that the composition of our audit committee meets the requirements for independence under, and the functioning of our audit committee complies with, the current requirements of applicable SEC and NASDAQ rules, and that Mr. Paisley is our audit committee financial expert as defined under applicable SEC rules.

***Compensation Committee.*** Our compensation committee oversees our corporate compensation programs. The compensation committee will also:

- Review and approve corporate goals and objectives relevant to compensation of our chief executive officer and other executive officers;
- Evaluate the performance of our executive officers in light of established goals and objectives;
- Review and recommend compensation of our executive officers based on its evaluations;
- Review and recommend compensation of our directors; and
- Administer the issuance of stock options and other awards under our stock plans.

The members of our compensation committee are Messrs. Habiger, Jordan and Vassallo. Mr. Habiger is the chairperson of our compensation committee. Our board of directors has determined that each member of our compensation committee is independent under the applicable NASDAQ rules and SEC rules and regulations.

***Nominating and Corporate Governance Committee.*** Our nominating and corporate governance committee oversees and assists our board of directors in reviewing and recommending corporate governance policies and nominees for election to our board of directors. The nominating and corporate governance committee will also:

- Evaluate and make recommendations regarding the organization and governance of the board of directors and its committees;
- Assess the performance of members of the board of directors and make recommendations regarding committee and chair assignments;
- Recommend desired qualifications for board of directors membership and conduct searches for potential members of the board of directors; and
- Review and make recommendations with regard to our corporate governance guidelines.

The members of our nominating and corporate governance committee are Messrs. Born, Habiger and Paisley. Mr. Born is the chairperson of our nominating and corporate governance committee. Our board of directors has determined that each member of our nominating and corporate governance committee is independent under the applicable NASDAQ rules.

**Director Compensation**

The following table sets forth information concerning compensation paid or accrued for services rendered to us by members of our board of directors for the fiscal year ended December 31, 2012. The table excludes Mr. Plaehn, who is one of our named executive officers, and Mr. West, who is one of our employees, neither of whom received any compensation from us in their role as directors in





the fiscal year ended December 31, 2012. The compensation received during 2012 by Mr. Plaehn for his service as an employee is reflected under "Executive Compensation—Summary Compensation Table" below.

| Name | Option Awards[(1)] | Total |
|---|---|---|
| Rob Born | — | — |

| | | |
|---|---|---|
| David C. Habiger[(2)] | $ 211,200 | $ 211,200 |
| Len Jordan | — | — |
| Thomas R. Kuhn[(3)] | — | — |
| Christopher B. Paisley[(4)] | — | — |
| Scott Petty | — | — |
| Steven Vassallo | — | — |

(1) The amounts reported in the Option Awards column represent the grant date fair value of the stock options granted to the non-employee directors during 2012, computed in accordance with ASC Topic 718. The assumptions used in calculating the grant date fair value of the stock options reported in the Option Awards column are set forth in Note 1 in the notes to our consolidated financial statements included elsewhere in this prospectus. The amounts reported in this column reflect the accounting cost for these stock-based awards, and do not correspond to the actual economic value that may be received by the non-employee directors from the awards.

(2) As of December 31, 2012, Mr. Habiger held an option to purchase 120,000 shares of our common stock.

(3) As of December 31, 2012, Mr. Kuhn held an option to purchase 243,538 shares of our common stock. Mr. Kuhn resigned from our board of directors effective on February 28, 2013.

(4) As of December 31, 2012, Mr. Paisley held options to purchase 183,004 shares of our common stock.



Table of Contents

Our policy has been and will continue to be to reimburse our non-employee directors for their travel, lodging and other reasonable expenses incurred in attending meetings of our board of directors and committees of the board of directors. In 2012, we did not maintain any standard fee arrangements for the non-employee members of our board of directors for their service as a director.

In June 2013, our board of directors approved the following annual cash and equity retainers for our non-employee directors based on the recommendation of the compensation committee of our board of directors:

***Annual Cash Retainers***

| | Cash Retainer |
|---|---|
| Non-Employee Directors | $ 36,000 |
| Board of Directors Chairperson | 24,000 |
| Audit Committee Chairperson | 22,000 |
| Audit Committee Non-Chairperson Member | 12,000 |
| Compensation Committee Chairperson | 12,000 |
| Compensation Committee Non-Chairperson Member | 6,000 |
| Nominating and Corporate Governance Committee Chairperson | 9,000 |
| Nominating and Corporate Governance Committee Non-Chairperson Member | 6,000 |

***Equity Retainers***

| | Fair Market Value on the Date of Grant of Equity Grants Delivered as | |
|---|---|---|
| | Stock Options | Restricted Stock Units |
| Initial Retainer for Non-Employee Directors, or Initial Grant | $ 70,000 | $ 70,000 |
| Annual Retainer for Non-Employee Directors, or Annual Grant | 37,500 | 37,500 |

The Initial Grant will be made to any new non-employee directors added to our board of directors following the completion of this offering. All shares subject to an Initial Grant for a non-employee director will vest annually over three years, provided such non-employee director continues to be a director on each such vesting date.

The Annual Grant will be made to our non-employee directors then serving on our board of directors on the date of the annual meeting of stockholders, beginning

with the annual meeting of stockholders to be held in 2014. All shares subject to an Annual Grant for a non-employee director will vest on the one-year anniversary of the grant date, provided such non-employee director continues to be a director on such date.

Directors who are employees do not receive any compensation for their service on our board of directors.

**Code of Business Conduct and Ethics**

Prior to the completion of this offering, we expect to adopt a code of business conduct and ethics that is applicable to all of our employees, officers and directors including our chief executive officer and senior financial officers, which will be available on our website upon the closing of this offering.

**Compensation Committee Interlocks and Insider Participation**

During 2012, our compensation committee was comprised of Messrs. Born, Jordan and Vassallo. None of the members of our compensation committee is an officer or employee of our company. None of our executive officers currently serves, or in the past year has served, as a member of the board of directors or compensation committee of any entity that has one or more executive officers serving on our board of directors or compensation committee.



Table of Contents

## EXECUTIVE COMPENSATION

The following table provides information regarding the compensation of our principal executive officer and each of the named executive officers as required by Item 402(m)(2) of Regulation S-K during our fiscal year ended December 31, 2012.

| Name and Principal Position | Year | Salary | Non-Equity Incentive Plan Compensation[(1)] | Option Awards[(2)] | All Other Compensation | Total |
|---|---|---|---|---|---|---|
| Martin Plaehn<br>President and Chief Executive Officer | 2012 | $ 360,000 | $ 25,571 | $ — | $ — | $ 385,571 |
| Eric Anderson<br>Senior Vice President, Products | 2012 | 123,000[(3)] | — | 1,530,000[(4)] | 3,025[(5)] | 1,656,025 |
| Jeff Dungan<br>Senior Vice President, Supply Chain Operations, and Senior Vice President, Business Development | 2012 | 200,000[(6)] | 15,271 | 176,000[(7)] | — | 391,271 |

(1) Amounts represent cash bonuses earned in 2012 and paid in 2013, based on the achievement of company performance objectives and other criteria deemed important by our board of directors. Our 2012 company performance objectives were related to the attainment of revenue, gross margin and net income targets.

(2) The amounts reported in the Option Awards column represent the grant date fair value of the stock options granted to our named executive officers during 2012 as computed in accordance with ASC Topic 718. The assumptions used in calculating the grant date fair value of the stock options reported in the Option Awards column are set forth in Note 7 in the notes to our consolidated financial statements included elsewhere in this prospectus. Note that the amounts reported in this column reflect the accounting cost for these stock options, and do not correspond to the actual economic value that may be received by the named executive officers from the options.

(3) Mr. Anderson joined us as our Senior Vice President, Products in June 2012 and received a prorated base salary based on an annual base salary of $240,000. In June 2013, Mr. Anderson's base salary was increased to $250,000 effective July 1, 2013.

(4) Represents an option to purchase 900,000 shares of our common stock. The shares underlying this option vest as follows: 25% of the shares underlying the option vest on June 27, 2013 and the remaining 75% of the shares vest in equal monthly installments over the next three years.

(5) Represents value of beta equipment provided to Mr. Anderson in 2012.

(6) In June 2013, Mr. Dungan's base salary was increased to $230,000 effective July 1, 2013.

(7) Represents an option to purchase 100,000 shares of our common stock. The shares underlying this option vest as follows: 25% of the shares underlying the option vest on September 28, 2013 and the remaining 75% of the shares vest in equal monthly installments over the next three years.

Table of Contents

**Benefits**

We provide the following benefits to our named executive officers, generally on the same basis provided to all of our employees:

- Medical, dental and vision insurance;
- 401(k) plan (see "Employee Benefit Plans—Retirement Plans" below for a description of our 401(k) plan);
- Employee assistance program;
- Short- and long-term disability, life insurance, accidental death and dismemberment insurance; and
- Health and dependent care flexible spending accounts.

We also allow our vice presidents and officers, including our named executive officers, to receive our beta equipment at no cost up to certain annual limits.

**Employment Agreements and Change of Control Arrangements**

We have executed offer letters with each of our named executive officers, which are summarized below.

***Mr. Plaehn***

We entered into an offer letter with Mr. Plaehn on August 20, 2011. Currently, Mr. Plaehn is entitled to receive $360,000 in annual base salary and is eligible for an incentive bonus of up to $126,000, based upon criteria established by our board of directors in its sole discretion. Mr. Plaehn is also eligible to participate in all employee benefit plans and vacation programs. For information relating to potential payments upon termination under Mr. Plaehn's offer letter, see "Potential Payments upon Termination or Change of Control."

***Mr. Anderson***

We entered into an offer letter with Mr. Anderson on August 14, 2012. Currently, Mr. Anderson is entitled to receive $250,000 in annual base salary and, if our board of directors determines that our company has achieved requisite development, revenue and/or profitability milestones, Mr. Anderson may be entitled to receive an annual incentive bonus of up to $84,000. Mr. Anderson is also eligible to participate in all company employee benefit plans and vacation programs.

***Mr. Dungan***

We entered into an offer letter with Mr. Dungan on August 1, 2006. Currently Mr. Dungan is entitled to receive $230,000 in annual base salary and, if our board of directors determines that our company has achieved requisite development, revenue and/or profitability milestones, Mr. Dungan may be entitled to receive an annual incentive bonus of up to $78,750. Mr. Dungan is also eligible to participate in all company employee benefit plans and vacation programs.

**Compensation Risk Assessment**

We believe that our executive compensation program does not encourage excessive or unnecessary risk taking. This is primarily due to the fact that our compensation programs are designed to encourage our executive officers and other employees to remain focused on both short-term and long-term strategic goals, in particular in connection with our pay-for-performance compensation



Table of Contents

philosophy. As a result, we do not believe that our compensation programs are reasonably likely to have a material adverse effect on our company.

**Potential Payments upon Termination or Change of Control**

Our compensation committee provides our executive officers with financial protection in the event of certain terminations of employment when it determines that such protection is necessary to attract or retain that executive. Under the terms of his offer letter, Mr. Plaehn is entitled to receive severance payments and benefits upon the occurrence of certain events, as set forth in his offer letter.

In the event that Mr. Plaehn's employment is terminated by our company without Cause or by him for Good Reason, he will be entitled to receive the continued payment of his base salary for six months (provided that if such termination occurs within 90 days prior to or 12 months after a Change of Control, he will be entitled to receive such continued payment for 12 months), continued medical, dental and vision coverage for him and his dependents for 12 months, and earned but unpaid salary, bonuses and unreimbursed business expenses. In addition, if such termination occurs within 90 days prior to or within 12 months after a Change of Control, Mr. Plaehn is entitled to accelerated vesting of 100% of the his unvested options to purchase shares of our common stock initially granted to him upon the commencement of his employment with us, as well as the greater of: (1) 50% of the then unvested portion of the second option to purchase shares of our common stock granted to him; and (2) 25% of the total number of shares of common stock subject to such stock option.

In addition, in the event Mr. Plaehn's employment with us is terminated by us without Cause or by Mr. Plaehn for Good Reason within 90 days prior to or within 12 months after a Change of Control, then 100% of the then unvested shares subject to the option granted to Mr. Plaehn on June 11, 2013 will vest and become exercisable.

"Cause" means: (1) an employee's repeated failure, in the reasonable judgment of our board of directors, to perform one or more of his essential duties and responsibilities to our company after written notice thereof from our board of directors to the employee describing the employee's failure to perform such duties or responsibilities and, if such failure is remediable, his failure to remedy same within 10 days of receiving written notice; (2) an employee's refusal or failure to comply with

the legal directives of our board of directors after written notice thereof from our board of directors to the employee describing the employee's failure to comply and, if such failure is remediable, his failure to remedy same within 10 days of receiving written notice; (3) an employee's material violation of any policy of our company; (4) an employee's commission or conviction of, or entry of a plea of nolo contendere to, any felony or any act of fraud, embezzlement, dishonesty, moral turpitude, misappropriation or any other misconduct that has caused or is reasonably expected to result in material injury to our company or its affiliates; (5) an employee's unauthorized use or disclosure of any proprietary information or trade secrets of our company or any other party to whom he owes an obligation of nondisclosure as a result of his relationship with our company; (6) an employee's material breach of any of his obligations under any written agreement or covenant with our company; or (7) an employee's violation of a federal or state law or regulation applicable to our company which violation was or is reasonably likely to be injurious to our company.

"Good Reason" means that the employee's continuous status as an employee was "constructively terminated" by our company if within 90 days after the occurrence of one of the following actions by our company (unless the employee consents in writing to such action(s)), and after providing us with a reasonable opportunity to cure such action(s), the employee resigns in writing from his employment with us: (1) a material reduction in the employee's base salary as in effect immediately before such reduction; or (2) the relocation by us of the employee's then-current work site that has the effect of increasing the employee's then-current commute by more than 50 miles (not including any



Table of Contents

regular business travel consistent with the business travel requirements of the employee's position with us).

"Change of Control" means our company's sale of all or substantially of its assets or property, our company's exclusive license of all or substantially all of its intellectual property, the acquisition of our company by another entity in which we are a party and pursuant to which our stockholders immediately prior to such transaction hold less than 50% of the voting power of the surviving or resulting entity.

Except as described above, there are currently no severance agreements or arrangements in place for Messrs. Plaehn, Anderson and Dungan.

**Outstanding Equity Awards at Fiscal Year-End**

The following table presents certain information concerning equity awards held by our named executive officers as of December 31, 2012.

| | Option Awards | | | | |
|---|---|---|---|---|---|
| | Number of Securities Underlying Unexercised Options | | | | |
| Name | Exercisable | Unexercisable | Option Exercise Price | Vesting Start Date | Option Expiration Date |
| Martin Plaehn | 981,924 | 2,160,234(1) | $ 1.18 | 9/29/2011 | 9/28/2021 |
| | 174,564 | 480,052(2) | 1.18 | 9/29/2011 | 9/28/2021 |
| Eric Anderson | — | 900,000(3) | 1.70 | 6/27/2012 | 6/29/2022 |
| Jeff Dungan | 250,000 | —(4) | 0.48 | 8/14/2006 | 9/20/2016 |
| | 25,000 | —(5) | 0.69 | 12/11/2007 | 12/10/2017 |
| | 25,000 | —(6) | 0.94 | 12/19/2008 | 12/18/2018 |
| | 36,458 | 13,542(7) | 0.94 | 1/1/2010 | 1/14/2020 |
| | 129,166 | 70,834(8) | 1.44 | 5/30/2010 | 7/8/2020 |
| | 23,958 | 26,042(9) | 1.18 | 1/1/2011 | 5/25/2021 |
| | 6,250 | 18,750(10) | 1.22 | 12/21/2011 | 12/28/2021 |
| | — | 100,000(11) | 1.76 | 9/28/2012 | 9/27/2022 |

(1) The shares underlying the option vest as follows: 25% of the shares underlying the option vested on September 29, 2012 and the remaining 75% of the shares vest in equal monthly installments over the following three years. If Mr. Plaehn's employment is terminated by our company without Cause (as defined in his offer letter) or by Mr. Plaehn for Good Reason (as defined in his offer letter) within 90 days prior to or 12 months after a Change of Control (as defined in his offer letter), 100% of the unvested shares underlying this option will immediately vest and become exercisable.

(2) The shares underlying this option vest as follows: provided that certain annual milestones agreed upon by Mr. Plaehn and our board of directors are achieved, then 25% of the shares underlying the option vest on September 29, 2012 and the remaining 75% of the shares vest in equal monthly installments over the following three years. If Mr. Plaehn's employment is terminated by the Company without Cause or by Mr. Plaehn for Good Reason within 90 days prior to or 12 months after a Change of Control, the greater of: (1) 50% of the unvested shares underlying this option; and (2) 25% of the total number of shares of underlying this option shall immediately vest and become exercisable.

(3) The shares underlying this option vest as follows: 25% of the shares underlying the option vest on June 27, 2013 and the remaining 75% of the shares vest in equal monthly installments over the following three years.



Table of Contents

(4) The shares underlying this option vested as follows: 25% of the shares underlying the option vested on August 14, 2007 and the remaining 75% of the shares vested in equal monthly installments over the following three years.

(5) The shares underlying this option vested as follows: 25% of the shares underlying the option vested on December 11, 2008 and the remaining 75% of the shares vested in equal monthly installments over the following three years.

(6) The shares underlying this option vested as follows: 25% of the shares underlying the option vested on December 19, 2009 and the remaining 75% of the shares vested in equal monthly installments over the following three years.

(7) The shares underlying this option vest as follows: 25% of the shares underlying the option vested on January 1, 2011 and the remaining 75% of the shares vest in equal monthly installments over the following three years.

(8) The shares underlying this option vest as follows: 25% of the shares underlying the option vested on May 30, 2011 and the remaining 75% of the shares vest in equal monthly installments over the following three years.

(9) The shares underlying this option vest as follows: 25% of the shares underlying the option vested on January 1, 2012 and the remaining 75% of the shares vest in equal monthly installments over the following three years.

(10) The shares underlying this option vest as follows: 25% of the shares underlying the option vested on December 21, 2012 and the remaining 75% of the shares vest in equal monthly installments over the following three years.

(11) The shares underlying this option vest as follows: 25% of the shares underlying the option vest on September 28, 2013 and the remaining 75% of the shares vest in equal monthly installments over the following three years.

On June 11, 2013, Martin Plaehn, our President and Chief Executive Officer, was granted an option to purchase 500,000 shares of our common stock at an exercise price per share of $2.17. This option was granted pursuant to our 2003 Equity Incentive Plan and is scheduled to vest, subject to Mr. Plaehn's continued role as a service provider to us, as to 25% of the total shares on September 29, 2016, with 1/48th of the total shares vesting monthly thereafter.

**Employee Benefit Plans**

***2013 Stock Option and Incentive Plan***

In June 2013, our board of directors, upon the recommendation of the compensation committee of the board of directors, adopted our 2013 Stock Option and Incentive Plan, or the 2013 Plan, which was subsequently approved by our stockholders. The 2013 Plan will replace the 2003 Equity Incentive Plan, or the 2003 Plan, as our board of directors has determined not to make additional awards under that plan following the consummation of our initial public offering. Our 2013 Plan provides flexibility to our compensation committee to use various equity-based incentive awards as compensation tools to motivate our workforce.

We have initially reserved shares of our common stock for the issuance of awards under the 2013 Plan. The 2013 Plan provides that the number of shares reserved and available for issuance under the plan will automatically increase each January 1, beginning on January 1, 2014, by 5% of the outstanding number of shares of our common stock on the immediately preceding December 31 or such lesser number of shares as determined by our compensation committee. This





number is subject to adjustment in the event of a stock split, stock dividend or other change in our capitalization.

The shares we issue under the 2013 Plan will be authorized but unissued shares or shares that we reacquire. The shares of common stock underlying any awards that are forfeited, cancelled, held back upon exercise or settlement of an award to satisfy the exercise price or tax withholding, reacquired by us prior to vesting, satisfied without any issuance of stock, expire or are otherwise terminated (other than by exercise) under the 2013 Plan and 2003 Plan are added back to the shares of common stock available for issuance under the 2013 Plan.

The 2013 Plan is administered by our compensation committee. Our compensation committee has full power to select, from among the individuals eligible for awards, the individuals to whom awards will be granted, to make any combination of awards to participants, and to determine the specific terms and conditions of each award, subject to the provisions of the 2013 Plan. Persons eligible to participate in the 2013 Plan will be those full or part-time officers, employees, non-employee directors and other key persons (including consultants and prospective employees) as selected from time to time by our compensation committee in its discretion.

The 2013 Plan permits the granting of both options to purchase common stock intended to qualify as incentive stock options under Section 422 of the Code and options that do not so qualify. The option exercise price of each option will be determined by our compensation committee but may not be less than 100% of the fair market value of our common stock on the date of grant. The term of each option will be fixed by our compensation committee and may not exceed 10 years from the date of grant. Our compensation committee will determine at what time or times each option may be exercised.

Our compensation committee may award stock appreciation rights subject to such conditions and restrictions as we may determine. Stock appreciation rights entitle the recipient to shares of common stock, or cash, equal to the value of the appreciation in our stock price over the exercise price. The exercise price is the fair market value of the common stock on the date of grant.

Our compensation committee may award restricted shares of common stock and restricted stock units to participants subject to such conditions and restrictions as we may determine. These conditions and restrictions may include the achievement of certain performance goals and/or continued employment with us through a specified

vesting period. Our compensation committee may also grant shares of common stock that are free from any restrictions under the 2013 Plan. Unrestricted stock may be granted to participants in recognition of past services or other valid consideration and may be issued in lieu of cash compensation due to such participant.

Our compensation committee may grant performance share awards to participants that entitle the recipient to receive shares of common stock upon the achievement of certain performance goals and such other conditions as our compensation committee shall determine.

Our compensation committee may grant cash bonuses under the 2013 Plan to participants, subject to the achievement of certain performance goals.

Our compensation committee may grant awards of restricted stock, restricted stock units, performance shares or cash-based awards under the 2013 Plan that are intended to qualify as "performance-based compensation" under Section 162(m) of the Code. Those awards would only vest or become payable upon the attainment of performance goals that are established by our compensation committee and related to one or more performance criteria. The performance criteria that would be used with respect to any such awards include: earnings before interest, taxes, depreciation and amortization, net income (loss) (either before or after interest, taxes, depreciation and/or amortization), changes in the market price of our common stock, economic value-added, funds from operations or similar measure, sales or revenue, acquisitions or strategic transactions, operating income (loss), cash





flow (including, but not limited to, operating cash flow and free cash flow), return on capital, assets, equity, or investment, stockholder returns, return on sales, gross or net profit levels, productivity, expense, margins, operating efficiency, customer satisfaction, working capital, earnings (loss) per share of stock, sales or market shares and number of customers, any of which may be measured either in absolute terms or as compared to any incremental increase or as compared to results of a peer group. From and after the time that we become subject to Section 162(m) of the Code, the maximum award that is intended to qualify as "performance-based compensation" under Section 162(m) of the Code that may be made to any one employee during any one calendar year period is 10,000,000 shares of common stock with respect to a stock-based award and $5,000,000 with respect to a cash-based award.

The 2013 Plan provides that in the case of, and subject to, the consummation of a "sale event" as defined in the 2013 Plan, all outstanding awards will be assumed, substituted or otherwise continued by the successor entity. To the extent that the successor entity does not assume, substitute or otherwise continue such awards, then (i) all stock options and stock appreciation rights will automatically become fully exercisable and the restrictions and conditions on all other awards with time-based conditions will automatically be deemed waived, and awards with conditions and restrictions relating to the attainment of performance goals may become vested and non-forfeitable in connection with a sale event in the compensation committee's discretion and (ii) upon the effectiveness of the sale event, all stock options and stock appreciation rights will automatically terminate. In the event of such termination, individuals holding options and stock appreciation rights will be permitted to exercise such options and stock appreciation rights prior to the sale event. In addition, in connection with a sale event, we may make or provide for a cash payment to participants holding options and stock appreciation rights equal to the difference between the per share cash consideration payable to stockholders in the sale event and the exercise price of the options or stock appreciation rights.

Our board of directors may amend or discontinue the 2013 Plan and our compensation committee may amend or cancel outstanding awards for purposes of satisfying changes in law or any other lawful purpose, but no such action may adversely affect rights under an award without the holder's consent. Certain amendments to the 2013 Plan require the approval of our stockholders.

No awards may be granted under the 2013 Plan after the date that is 10 years from the date of stockholder approval. No awards under the 2013 Plan have been made prior to the date hereof.

***2003 Equity Incentive Plan***

Our 2003 Equity Incentive Plan, or the 2003 Plan, was adopted by our board of directors and subsequently approved by our stockholders. We have reserved 33,480,595 shares of our common stock for issuance under the 2003 Plan. This number is subject to adjustment in the event of a stock split, stock dividend or other changes in our capitalization. Following the completion of this offering, any shares of common stock underlying any awards that are forfeited, cancelled, held back upon exercise or settlement of an award to satisfy the exercise price or tax withholding, reacquired by us prior to vesting, satisfied without any issuance of stock, expire or are otherwise terminated (other than by exercise) under the 2003 Plan will be added to the shares of common stock available for issuance under the 2013 Plan.

The 2003 Plan is administered by our board of directors. Our board of directors has the authority to delegate full power and authority to one or more committees of the board, to select the individuals to whom awards will be granted, to make any combination of awards to participants, to accelerate the exercisability or vesting of any award, to provide substitute awards and to determine the specific terms and conditions of each award.

The 2003 Plan permits us to make grants of incentive stock options, non-qualified stock options, stock appreciation rights, restricted stock units, shares of restricted stock or a direct award shares of stock to officers, employees, directors, consultants or other person providing us with services.





Upon a "Company Transaction" (as defined in the 2003 Plan) in which all awards are not assumed, substituted with awards issued by the successor entity, or substituted with cash consideration, the 2003 Plan and awards issued thereunder will be subject to accelerated vesting and, in the case of stock options, full exercisability, followed by the cancellation of such awards. For awards other than restricted stock, if the awards are assumed or substituted and the holder thereof is terminated without "cause" (as defined in the 2003 Plan) or resigns for "good reason" (as defined in the 2003 Plan) within six months of the sale event, then 50% of the unvested portion of such awards shall vest.

All stock option awards that are granted to employees are covered by a stock option agreement and vest in accordance with the vesting schedule set forth in such stock option agreement. Our board of directors may accelerate the vesting schedule in its discretion. We have not engaged in any option repricing or other modification to any of the outstanding equity awards.

Our board of directors has determined not to grant any further awards under the 2003 Plan after the completion of this offering. Following the completion of this initial public offering, we expect to make future awards under the 2013 Plan.

*Retirement Plans*

We maintain a tax-qualified 401(k) retirement plan for all employees who satisfy certain eligibility requirements. Under our 401(k) plan, employees may elect to defer up to 100% of their eligible compensation subject to applicable annual limits set pursuant to the Internal Revenue Code of 1986, as amended, or the Code. We may provide a discretionary employee matching contribution and discretionary profit sharing contribution under the 401(k) plan. We intend for the 401(k) plan to qualify, depending on the employee's election, under Section 401(a) of the Code so that contributions by employees, and income earned on those contributions, are not taxable to employees until withdrawn from the 401(k) plan.

**Limitation on Liability and Indemnification Matters**

Our amended and restated certificate of incorporation and bylaws that will become effective upon the completion of this offering contain provisions that limit the personal liability of our directors for monetary damages to the fullest extent permitted by Delaware law. Consequently, our directors will not be personally liable to us or our stockholders for monetary damages for any breach of fiduciary duties as directors, except liability for:

- Any breach of the director's duty of loyalty to us or our stockholders;
- Any act or omission not in good faith or that involves intentional misconduct or a knowing violation of law;
- Unlawful payments of dividends or unlawful stock repurchases or redemptions as provided in Section 174 of the Delaware General Corporation Law; or
- Any transaction from which the director derived an improper personal benefit.

Our amended and restated certificate of incorporation and bylaws, each of which will become effective upon the completion of this offering, provide that we indemnify our directors and officers to the fullest extent permitted by Delaware law. Our amended and restated bylaws, that will become effective upon the completion of this offering, also provide that we shall advance expenses incurred by a director or officer in advance of the final disposition of any action or proceeding, and permit us to secure insurance on behalf of any officer, director, employee or other agent for any liability arising out of his or her actions in that capacity, regardless of whether we would otherwise be permitted to indemnify him or her under the provisions of Delaware law. We have entered and expect to continue to enter into agreements to indemnify our directors, executive officers and other employees as determined





by the board of directors. With certain exceptions, these agreements provide for indemnification for related expenses including, among others, attorneys' fees, judgments, fines and settlement amounts incurred by any of these individuals in any action or proceeding. We believe that these bylaw provisions and indemnification agreements are necessary to attract and retain qualified persons as directors and officers. We also maintain directors' and officers' liability insurance.

The limitation of liability and indemnification provisions in our amended and restated certificate of incorporation and bylaws, that will become effective upon the completion of this offering, may discourage stockholders from bringing a lawsuit against our directors for breach of their fiduciary duty of care. They may also reduce the likelihood of derivative litigation against our directors and officers, even though an action, if successful, might benefit us and other stockholders. Further, a stockholder's investment may be adversely affected to the extent that we pay the costs of settlement and damage awards against directors and officers. At present, there is no pending litigation or proceeding involving any of our directors, officers or employees for which indemnification is sought, and we are not aware of any threatened litigation that may result in claims for indemnification.





## CERTAIN RELATIONSHIPS AND RELATED PARTY TRANSACTIONS

In addition to the director and executive compensation arrangements discussed above in "Management" and "Executive Compensation," we have been a party to the following transactions since January 1, 2010, in which the amount involved exceeded or will exceed $120,000, and in which any director, executive officer or holder of more than 5% of any class of our voting stock, or any member of the immediate family of or entities affiliated with any of them, had or will have a material interest. We also describe below certain transactions and series of similar transactions since January 1, 2010 with our directors, executive officers, holders of more than 5% of any class of our voting securities, or any member of the immediate family of or any entities affiliated with any of the foregoing persons to which we are party.

We have adopted a written policy, effective upon the completion of this offering, which provides that our executive officers, directors, holders of more than 5% of any class of our voting securities, and any member of the immediate family of and any entity affiliated with any of the foregoing persons, are not permitted to enter into a related party transaction with us without the prior consent of our audit committee, or other independent members of our board of directors in the case it is inappropriate for our audit committee to review such transaction due to a conflict of interest. Pursuant to such policy, any request for us to enter into a transaction with an executive officer, director, principal stockholder, or any of their immediate family members or affiliates, in which the amount involved exceeds $120,000 must first be presented to our audit committee for review, consideration and approval. In approving or rejecting any such proposal, our audit committee is to consider the relevant facts and circumstances available and deemed relevant to the audit committee, including, but not limited to, whether the transaction is on terms no less favorable than terms generally available to an unaffiliated third party under the same or similar circumstances and the extent of the related party's interest in the transaction. All of the transactions described below

were entered into prior to the adoption of this policy.

**Sales of Series H Preferred Stock**

In January and February 2011, we issued and sold an aggregate of 10,476,141 shares of our Series H Preferred Stock at a per share price of $1.91, for an aggregate consideration of approximately $20.0 million. We believe that the terms obtained and consideration received in connection with the Series H financing are comparable to terms available and the amounts we would have received in an arm's length transaction.

The table below summarizes purchases of shares of our Series H Preferred Stock by our directors, executive officers, holders of more than 5% of any class of our voting securities, or any member of the immediate family of or any entities affiliated with any of the foregoing persons. Upon the issuance of our Series H Preferred Stock, Cisco Systems, Inc., or Cisco, became a beneficial owner of more than 5% of our Series H Preferred Stock. Each outstanding share of our Series H Preferred Stock will be converted into one share of our common stock upon the completion of this offering.

| Purchasers | Shares of Series H Preferred Stock | Aggregate Purchase Price |
|---|---|---|
| Cisco Systems, Inc. | 7,857,106 | $ 15,000,000 |

**Warrants**

In January and February 2011, we issued warrants to purchase an aggregate of 2,444,432 shares of our common stock at an exercise price of $1.91 per share to Cisco. For a detailed description of these warrants, see "Description of Capital Stock—Warrants".





**Transactions with Our Significant Stockholders**

In January 2011, we entered into an OEM-in hardware (with software) purchase and license agreement with Cisco, which was amended and restated in February 2011 and further amended in June 2012. Our agreement with Cisco expires in February 2014, after which such agreement automatically renews for one-year terms unless either party receives notice of non-renewal at least 120 days prior to the expiration of the then-current term. Such notice of non-renewal by either party initiates a notice period, or Notice Period, in which the parties have agreed to define a mutually operable transition plan, which may include a new agreement. In addition, (i) either party may terminate the agreement immediately upon the bankruptcy or insolvency of the other party, (ii) either party may terminate the agreement for cause upon written notice of a material breach and if the other party does not cure such breach within 30 days of such notice, (iii) Cisco may terminate the agreement upon a change of control of our company, or (iv) we may terminate the agreement in certain situations if Cisco invests in a company that competes with our business, subject to applicable notice periods. In June 2013, we triggered the Notice Period with Cisco which will provide sufficient time to define an agreement for future periods. Although the parties intend to enter into a new agreement that would revise and optimize the current Control4 and Cisco collaboration, innovation and channel capabilities, there can be no assurance that such a revised agreement will be reached.

We have received revenues totaling approximately $477,538, $2,597,999 and $404,026 for the years ended December 31, 2011 and 2012 and the three months ended March 31, 2013, respectively, in connection with our commercial arrangements with Cisco. Our accounts receivable totaled approximately $51,106, $1,024,374 and $172,457 as of December 31, 2011 and 2012 and the three months ended March 31, 2013, respectively, in connection with our commercial arrangements with Cisco.

**Investors' Rights Agreement**

We have entered into an Eighth Amended and Restated Investors' Rights Agreement, or the Investors' Rights Agreement, with certain of our stockholders, including Christopher B. Paisley, William B. West, one or more entities affiliated with each of Cisco Systems, Frazier Technology Ventures, Foundation Capital, Thomas Weisel Partners and Signal Peak Ventures, and certain other stockholders. The Investors' Rights Agreement provides these and certain other holders of our capital stock certain information rights, a right of purchase in respect of certain issuances of our securities, including in connection with this offering (pursuant to which up to shares may be purchased by our existing stockholders under this right; provided however, the managing underwriters of this offering may reduce such number of shares as they deem necessary to complete this offering), and certain registration rights with respect to certain shares of stock held by them. The right of purchase and the information rights granted to such stockholders will terminate upon the consummation of this offering. The registration rights granted to such stockholders will terminate five years following the consummation of this offering, or earlier under certain circumstances in which such stockholders may sell the shares of stock held by them without registration in compliance with Rule 144 of the Securities Act of 1933, as amended. For more information regarding the registration rights granted under this agreement, see "Description of Capital Stock—Registration Rights."

**Employment Agreements**

We have entered into agreements containing compensation, termination and change of control provisions, among others, with certain of our executive officers as described under "Executive Compensation—Employment Agreements and Change of Control Arrangements."





**Advisor Agreement**

We entered into an advisor agreement, effective February 28, 2013, with Thomas R. Kuhn, who resigned from our board of directors effective on February 28, 2013. The advisor agreement provides that Mr. Kuhn will provide us with certain strategic consulting and customer relation services through April 2014, or such earlier date if the advisor agreement is terminated pursuant to its terms. Mr. Kuhn's unvested shares subject to outstanding options will continue to vest pursuant to their terms during the period Mr. Kuhn continues to provide services to us pursuant to the advisor agreement.

**Indemnification of Officers and Directors**

We have also entered into indemnification agreements with each of our directors and executive officers. The indemnification agreements and our certificate of incorporation and bylaws require us to indemnify our directors and executive officers to the fullest extent permitted by Delaware law. See "Executive Compensation—Limitations on Liability and Indemnification Matters."



Table of Contents

## PRINCIPAL STOCKHOLDERS

The following table sets forth information regarding beneficial ownership of our common stock as of March 31, 2013 and as adjusted to reflect the shares of common stock to be issued and sold in the offering assuming no exercise of the underwriters' option to purchase additional shares, by:

- Each person or group of affiliated persons known by us to be the beneficial owner of more than 5% of our common stock;
- Each of our named executive officers;
- Each of our directors; and
- All executive officers and directors as a group.

We have determined beneficial ownership in accordance with SEC rules. The information does not necessarily indicate beneficial ownership for any other purpose. Under these rules, the number of shares of common stock deemed outstanding includes shares issuable upon exercise of options and warrants held by the respective person or group which may be exercised or converted within 60 days after March 31, 2013. For purposes of calculating each person's or group's percentage ownership, stock options and warrants exercisable within 60 days after March 31, 2013 are included for that person or group but not the stock options or warrants of any other person or group. Certain options to purchase shares of our common stock included in the table below are early exercisable, and to the extent such shares are unvested as of a given date, such shares will remain subject to a right of repurchase held by us.

Applicable percentage ownership is based on 92,566,014 shares of common stock outstanding as of March 31, 2013, assuming the conversion of all outstanding shares of our preferred stock on a one-for-one basis into 79,528,755 shares of our common stock. For purposes of the table below, we have assumed that shares of common stock will be outstanding upon completion of this offering, based upon an assumed initial public offering price of $ per share.

Unless otherwise indicated and subject to applicable community property laws, to our knowledge, each stockholder named in the following table possesses sole voting and investment power



Table of Contents

over the shares listed. Unless otherwise noted below, the address of each person listed on the table is c/o Control4 Corporation, 11734 S. Election Road, Salt Lake City, Utah 84020.

| | Shares Beneficially Owned Prior to the Offering | | Shares Beneficially Owned Following the Offering | |
|---|---|---|---|---|
| Name and Address of Beneficial Owner | Shares | Percentage | Shares | Percentage |
| **5% Stockholders:** | | | | |
| Entities affiliated with Foundation Capital[1] | 26,402,314 | 28.5% | | |
| Entities affiliated with Thomas Weisel Venture Partners[2] | 15,185,232 | 16.4 | | |
| Entities affiliated with Signal Peak Ventures[3] | 11,776,741 | 12.7 | | |
| Frazier Technology Ventures II, L.P.[4] | 11,378,483 | 12.3 | | |
| Cisco Systems, Inc.[5] | 10,301,538 | 10.8 | | |
| **Named Executive Officers and Directors:** | | | | |
| Martin Plaehn[6] | 1,556,531 | 1.7 | | |
| Eric Anderson | — | — | | |
| Jeff Dungan[7] | 529,686 | * | | |
| Rob Born[8] | 15,185,232 | 16.4 | | |
| David C. Habiger[9] | 26,666 | * | | |
| Len Jordan[10] | | | | |

| | | |
|---|---|---|
| | 11,378,483 | 12.3 |
| Christopher B. Paisley[11] | 360,926 | * |
| Scott Petty[12] | 11,776,741 | 12.7 |
| Steven Vassallo[13] | 1,263,690 | 1.4 |
| William B. West[14] | 3,263,579 | 3.5 |
| All executive officers and directors as a group (14 persons)[15] | 47,644,205 | 48.2 |

* Represents beneficial ownership of less than 1%.

(1) Consists of (i) 195,328 shares held of record by FC IV Active Advisors Fund, LLC ("FC Active Advisors"); (ii) 209,908 shares held of record by Foundation Capital IV Principals Fund, LLC ("Foundation IV Principals"); (iii) 24,733,388 shares held of record by Foundation Capital IV, L.P. ("Foundation IV"); (iv) 13,959 shares held of record by Foundation Capital VI Principals Fund L.L.C. ("Foundation VI Principals"); and (v) 1,249,731 shares held of record by Foundation Capital VI, L.P. ("Foundation VI"). Foundation Capital Management Co. IV, LLC ("FC4M") serves as the sole manager of Foundation IV, Foundation IV Principals and FC Active Advisors. William Elmore, Kathryn Gould, Paul Koontz, Mike Schuh, Paul Holland and Warren Weiss are managing members of FC4M. FC4M exercises sole voting and investment power over the shares held by Foundation IV, Foundation IV Principals and FC Active Advisors. As managing members of FC4M, Ms. Gould and Messrs. Elmore, Koontz, Schuh, Holland and Weiss may be deemed to share voting and investment power over the shares held by Foundation IV, Foundation IV Principals and FC Active Advisors. Each of the managing members of FC4M disclaims beneficial ownership of the securities held by Foundation IV, Foundation IV Principals and FC Active Advisors, except to the extent of his or her pecuniary interest therein. Foundation Capital Management Co. VI, LLC ("FC6M") serves as the sole manager of Foundation VI and Foundation VI Principals. William Elmore, Paul Koontz, Mike Schuh, Paul Holland, Richard Redelfs, Ashmeet Sidana, Charles Moldow, Steve Vassallo, one of our directors, and Warren Weiss are managing members of FC6M. FC6M exercises sole voting and investment power over the shares held by Foundation VI and Foundation VI Principals. As managing members of FC6M, Messrs. Elmore, Koontz, Schuh, Holland, Redelfs, Sidana, Moldow, Vassallo and Weiss may be deemed to share voting and investment power over the shares held by Foundation VI and Foundation VI Principals. Each





of the managing members of FC6M disclaims beneficial ownership of the reported securities, except to the extent of his pecuniary interest therein. The address for these entities is 250 Middlefield Road, Menlo Park, California 94025.

(2) Consists of (i) 15,060,253 shares held of record by Thomas Weisel Venture Partners, L.P. ("TWVP") and (ii) 124,979 shares held of record by Thomas Weisel Venture Partners Employee Fund, L.P. ("TWVP Employee Fund"). Thomas Weisel Venture Partners LLC is the sole general partner of TWVP and Thomas Weisel Capital Management LLC is the sole general partner of TWVP Employee Fund. Rob Born, one of our directors, is the fund manager for TWVP and TWVP Employee Fund, and may be deemed to have voting and dispositive power of the shares held by TWVP and TWVP Employee Fund. The address for these entities is Thomas Weisel Venture Partners, One Montgomery Street, 37th Floor, San Francisco, California 94104.

(3) Consists of (i) 330,430 shares held of record by vSpring III D, L.P. ("vSpring III D"); (ii) 1,179,462 shares held of record by vSpring III, L.P. ("vSpring III"); (iii) 6,536 shares held of record by vSpring Partners III, L.P. ("vSpring Partners"); and (iv) 10,260,313 shares held of record by vSpring SBIC, L.P. ("vSpring SBIC"). vSpring Management III D, L.L.C. ("vSpring Management III D") is the sole general partner of vSpring III D. vSpring Management III D exercises sole voting and investment power over the shares held by vSpring III D. Each of Scott Petty, one of our directors, Dinesh Patel, Ron Heinz and Brandon Tidwell is a managing member of vSpring Management III D and may be deemed to share voting and investment power over the shares held by vSpring III D. vSpring Management III, L.L.C. ("vSpring Management III") is the sole general partner of vSpring III and vSpring Partners. vSpring Management III exercises sole voting and investment power over the shares held by vSpring III and vSpring Partners. Each of Scott Petty, Dinesh Patel, Ron Heinz and Brandon Tidwell is a managing member of vSpring Management III and may be deemed to share voting and investment power over the shares held by vSpring III and vSpring Partners. vSpring SBIC Management, L.L.C. ("vSpring SBIC Management") is the sole general partner of vSpring SBIC. vSpring SBIC Management exercises sole voting and investment power over the shares held by vSpring SBIC. Each of Scott Petty and Dinesh Patel is a managing member of vSpring SBIC Management and may be deemed to share voting and investment power over the shares held by vSpring SBIC. The address for these entities is 2795 E. Cottonwood Parkway, Suite 360, Salt Lake City, Utah 84121.

(4) All shares are held of record by Frazier Technology Ventures II, L.P. ("Frazier"). FTVM II, L.P. ("FTVM") is the sole general partner of Frazier, and Frazier Technology Management, L.L.C. ("Frazier Tech Management") is the sole general partner of FTVM. Frazier Tech Management exercises sole voting and investment power over the shares held by Frazier. Each of Scott Darling, Paul Bialek, Frazier Management LLC and Len Jordan, one of our directors, is a managing member of Frazier Tech Management and may be deemed to share voting and investment power of the shares held by Frazier. The address for Frazier is 601 Union Street, Suite 3200, Seattle, Washington 98101.

(5) Consists of (i) 7,857,106 shares held of record by Cisco Systems, Inc. ("Cisco") and (ii) warrants to purchase 2,444,432 shares exercisable within 60 days of March 31, 2013 held of record by Cisco. Cisco has sole voting and dispositive power over these securities. The address for Cisco is 170 West Tasman Drive, San Jose, California 95134.

(6) Consists of options to purchase 1,556,531 shares exercisable within 60 days of March 31, 2013.

(7) Consists of options to purchase 529,686 shares exercisable within 60 days of March 31, 2013.





(8) Consists of the shares held of record by TWVP and TWVP Employee Fund as disclosed in footnote (2) above. Mr. Born is a fund manager for TWVP and TWVP Employee Fund, and may be deemed to share voting and dispositive power of the shares held by TWVP and TWVP Employee Fund.

(9) Consists of options to purchase 26,666 shares exercisable within 60 days of March 31, 2013.

(10) Consists of the shares held of record by Frazier as disclosed in footnote (4) above. Mr. Jordan is a managing member of Frazier Tech Management and may be deemed to share voting and dispositive power of the shares held by Frazier.

(11) Consists of (i) 250,017 shares held of record by Mr. Paisley and (ii) options to purchase 110,909 shares exercisable within 60 days of March 31, 2013.

(12) Consists of the shares held of record by vSpring III D, vSpring III, vSpring Partners and vSpring SBIC as disclosed in footnote (3) above. Mr. Petty is a managing member of vSpring Management III D, the sole general partner of vSpring III D, and may be deemed to share voting and investment power over the shares held by vSpring III D. Mr. Petty is a managing member of vSpring Management III, the sole general partner of vSpring III and vSpring Partners, and may be deemed to share voting and investment power over the shares held by vSpring III and vSpring Partners. Mr. Petty is a managing member of vSpring SBIC Management, the sole general partner of vSpring SBIC, and may be deemed to share voting and investment power over the shares held by vSpring SBIC.

(13) Consists of the shares held of record by Foundation VI Principals and Foundation VI as disclosed in footnote (1) above. Mr. Vassallo is a managing member of FC6M, the sole general partner of Foundation VI and Foundation VI Principals, and may be deemed to have shared voting and investment power over the shares held by Foundation VI and Foundation VI Principals. Mr. Vassallo disclaims beneficial ownership of the securities held by Foundation VI and Foundation VI Principals, except to the extent of his pecuniary interest therein.

(14) Consists of (i) 1,420,000 shares held of record by Mr. West and (ii) options to purchase 1,843,579 shares exercisable within 60 days of March 31, 2013.

(15) Consists of (i) 41,274,163 shares beneficially owned by our current executive officers and directors and (ii) options to purchase 6,370,042 shares exercisable within 60 days of March 31, 2013.





## DESCRIPTION OF CAPITAL STOCK

### General

The following is a summary of the rights of our common stock and preferred stock and of certain provisions of our amended and restated certificate of incorporation and bylaws, as they will be in effect upon the completion of this offering. For more detailed information, please see our amended and restated certificate of incorporation and bylaws, which are filed as exhibits to the registration statement of which this prospectus is part.

Immediately following the completion of this offering, our authorized capital stock will consist of 525,000,000 shares, all with a par value of $0.0001 per share, of which:

- 500,000,000 shares are designated as common stock; and
- 25,000,000 shares are designated as preferred stock.

The number of authorized shares of our common stock or preferred stock may from time to time be increased or decreased (but not below the number of shares of such class outstanding) by the affirmative vote of the holders of a majority in voting power of our outstanding shares of capital stock such that the number of authorized shares of a class may be increased without the affirmative vote of the holders of such class.

As of March 31, 2013, we had outstanding 93,323,245 shares of common stock held of record by 118 stockholders, assuming (i) the conversion of all outstanding shares of our preferred stock on a one-for-one basis into 79,528,755 shares of common stock and (ii) the issuance of 757,231 shares of common stock, on an as-converted basis, upon the net exercise of warrants to purchase 3,394,300 shares of capital stock outstanding as of March 31, 2013. Pursuant to the terms of our amended and restated certificate of incorporation, our preferred stock will automatically convert into common stock effective upon the closing of this offering. In addition, as of March 31, 2013, 23,972,031 shares of our common stock were subject to outstanding options, 370,000 shares of our common stock were issuable upon the exercise of outstanding warrants

to purchase common stock and 60,926 shares of our common stock, on an as-converted basis, were issuable upon the exercise of outstanding warrants to purchase preferred stock.

**Common Stock**

The holders of our common stock are entitled to one vote per share on all matters to be voted on by our stockholders. Subject to preferences that may be applicable to any outstanding shares of preferred stock, holders of common stock are entitled to receive ratably such dividends as may be declared by our board of directors out of funds legally available for that purpose. In the event of our liquidation, dissolution or winding up, the holders of common stock are entitled to share ratably in all assets remaining after the payment of liabilities, subject to the prior distribution rights of preferred stock then outstanding. Holders of common stock have no preemptive, conversion or subscription rights. There are no redemption or sinking fund provisions applicable to the common stock.

**Preferred Stock**

Upon the closing of this offering, all currently outstanding shares of preferred stock will convert into shares of our common stock on a one-for-one basis, and there will be no shares of preferred stock outstanding.

Though we currently have no plans to issue any shares of preferred stock, upon the closing of this offering and the filing of our amended and restated certificate of incorporation, our board of directors will have the authority, without further action by our stockholders, to designate and issue up to 25,000,000 shares of preferred stock in one or more series. Our board of directors may also





designate the rights, preferences and privileges of the holders of each such series of preferred stock, any or all of which may be greater than or senior to those granted to the holders of common stock. Though the actual effect of any such issuance on the rights of the holders of common stock will not be known until such time as our board of directors determines the specific rights of the holders of preferred stock, the potential effects of such an issuance include:

- Diluting the voting power of the holders of common stock;
- Reducing the likelihood that holders of common stock will receive dividend payments;
- Reducing the likelihood that holders of common stock will receive payments in the event of our liquidation, dissolution, or winding up; and
- Delaying, deterring or preventing a change-in-control or other corporate takeover.

**Warrants**

The following table sets forth information about outstanding warrants to purchase shares of our capital stock as of March 31, 2013.

| Class of Stock | Number of Shares of Stock Subject to Warrant | Exercise Price per Share | Expiration Date |
|---|---|---|---|
| Common Stock | 2,095,228 | $ 1.91 | January 21, 2014 |
| Common Stock | 349,204 | $ 1.91 | February 15, 2014 |
| Series G-1 Preferred Stock | 949,868 | $ 1.78 | June 24, 2014 |
| Common Stock | 370,000 | $ 1.44 | October 25, 2015 |
| Series C Preferred Stock | 38,095 | $ 1.06 | December 29, 2015 |
| Series E Preferred Stock | 22,831 | $ 2.19 | June 12, 2017 |

Upon the conversion of all of our preferred stock into common stock immediately prior to the completion of this offering, other than the warrants with expiration dates of January 21, 2014, February 15, 2014 and June 24, 2014, which will expire upon the completion of this offering, each warrant to purchase shares of our preferred stock will be exercisable for an equivalent number of shares of common stock and will remain exercisable until the expiration date of such warrant.

**Exclusive Jurisdiction**

Unless we consent in writing to the selection of an alternative forum, the Court of Chancery of the State of Delaware will be the sole and exclusive forum for (i) any derivative action or proceeding brought on behalf of us, (ii) any action asserting a claim of breach of a fiduciary duty owed by any of our directors, officers or other employees to Control4 or our stockholders, (iii) any action asserting a claim arising pursuant to any provision of the Delaware General Corporation Law or our certificate of incorporation or bylaws, or (iv) any action asserting a claim against us governed by the internal affairs doctrine. The enforceability of similar choice of forum provisions in other companies' certificates of incorporation has been challenged in legal proceedings, and it is possible that, in connection with any action, a court could find the choice of forum provisions contained in our amended and restated certificate of incorporation to be inapplicable or unenforceable in such action.

**Registration Rights**

As of March 31, 2013, the holders of an aggregate of 83,880,898 shares of our common stock issued or issuable upon conversion of preferred stock are entitled to the following rights with respect to the registration of such shares for public resale under the Securities Act of 1933, as amended, or the

Table of Contents

Securities Act, pursuant to an Investors' Rights Agreement by and among us and certain of our stockholders. We refer to these shares collectively as "registrable securities."

The registration of shares of common stock as a result of the following rights being exercised would enable the holders to trade these shares without restriction under the Securities Act when the applicable registration statement is declared effective. Ordinarily, we will be required to pay all expenses, other than underwriting discounts and commissions, related to any registration effected pursuant to the exercise of these registration rights.

The registration rights terminate five years after completion of this offering, upon a Deemed Liquidation Event (as defined in our certificate of incorporation) or, with respect to the registration rights of an individual holder, when such holder's registrable securities represent 1% or less of our outstanding common stock and can be sold pursuant to Rule 144 of the Securities Act.

***Demand Registration Rights***

If at any time after 180 days following this offering the holders of the registrable securities then outstanding request in writing that we effect a registration that has a reasonably anticipated aggregate price to the public of at least $5,000,000, we may be required to register their shares. At most, we are obligated to effect two registrations for the holders of registrable securities in response to these demand registration rights, subject to certain conditions. Depending on certain conditions, however, we may defer such registration for up to 120 days. If the holders requesting registration intend to distribute their shares by means of an underwriting, the managing underwriter of such offering will have the right to limit the number of shares to be underwritten for reasons related to the marketing of the shares.

***Piggyback Registration Rights***

If at any time after this offering we propose to register any shares of our securities under the Securities Act, the holders of registrable securities will be entitled to notice of the registration and to include their shares of registrable securities in the registration, subject to certain exceptions relating to employee benefit plans and mergers and acquisitions. If our proposed registration involves an underwriting, the managing underwriter of such offering will have the right to limit the number of shares to be underwritten, subject to certain restrictions, for reasons related to the marketing of the shares.

***Form S-3 Registration Rights***

If at any time after 180 days following this offering we become entitled under the Securities Act to register our shares on Form S-3 and the holders of registrable securities then outstanding request in writing that we register their shares for public resale on Form S-3 with a reasonably anticipated aggregate price to the public of at least $1,000,000, we will be required to use our best efforts to effect such registration; provided, however, that if such registration would be seriously detrimental to us or our stockholders, we may defer the registration for up to 120 days. We are only obligated to effect up to two registrations on Form S-3 in any 12-month period.

**Voting Rights**

Under the provisions of our amended and restated certificate of incorporation to become effective upon completion of this offering, holders of our common stock are entitled to one vote for each share of common stock held by such holder on any matter submitted to a vote at a meeting of stockholders. Our post-offering amended and restated certificate of incorporation does not provide cumulative voting rights to holders of our common stock.



Table of Contents

**Anti-Takeover Effects of Delaware Law and Our Certificate of Incorporation and Bylaws**

Certain provisions of Delaware law and our restated certificate of incorporation and bylaws that will become effective upon completion of this offering contain provisions that could have the effect of delaying, deferring or discouraging another party from acquiring control of us. These provisions, which are summarized below, are expected to discourage certain types of coercive takeover practices and inadequate takeover bids. These provisions are also designed in part to encourage anyone seeking to acquire control of us to first negotiate with our board of directors. We believe that the advantages gained by protecting our ability to negotiate with any unsolicited and potentially unfriendly acquirer outweigh the disadvantages of discouraging such proposals, including those priced above the then-current market value of our common stock, because, among other reasons, the negotiation of such proposals could improve their terms.

***Certificate of Incorporation and Bylaws***

Our amended and restated certificate of incorporation and bylaws to become effective upon completion of this offering include provisions that:

- Authorize our board of directors to issue, without further action by the stockholders, up to 25,000,000 shares of undesignated preferred stock;
- Require that any action to be taken by our stockholders be effected at a duly called annual or special meeting and not by written consent;
- Specify that special meetings of our stockholders can be called only by our board of directors, the Chairman of our board of directors, the Chief Executive Officer or the President;
- Establish an advance notice procedure for stockholder proposals to be brought before an annual meeting of our stockholders, including proposed nominations of persons for election to our board of directors;
- Provide that directors may be removed only for cause and only by the affirmative vote of the holders of 75% or more of the outstanding shares of capital stock then entitled to vote at an election of directors;
- Provide that vacancies on our board of directors may be filled only by a majority of directors then in office, even though less than a quorum;

- Establish that our board of directors is divided into three classes—Class I, Class II and Class III—with each class serving staggered terms;
- Require that our bylaws be amended or repealed by the affirmative vote of at least 75% of the outstanding shares of capital stock entitled to vote on such amendment or repeal, except that if our board of directors recommends that stockholders approve such amendment or repeal, such amendment or repeal shall only require the affirmative vote of the majority of the outstanding shares of capital stock entitled to vote on such amendment or repeal; and
- Require a super-majority of votes to amend certain of the above-mentioned provisions.

***Delaware Anti-Takeover Statute***

We are subject to the provisions of Section 203 of the General Corporation Law of the State of Delaware regulating corporate takeovers. In general, Section 203 prohibits a publicly-held Delaware corporation from engaging, under certain circumstances, in a business combination with an interested





stockholder for a period of three years following the date the person became an interested stockholder unless:

- Prior to the date of the transaction, the board of directors of the corporation approved either the business combination or the transaction which resulted in the stockholder becoming an interested stockholder;
- Upon completion of the transaction that resulted in the stockholder becoming an interested stockholder, the interested stockholder owned at least 85% of the voting stock of the corporation outstanding at the time the transaction commenced, excluding for purposes of determining the voting stock outstanding, but not for determining the outstanding voting stock owned by the interested stockholder, (1) shares owned by persons who are directors and also officers, and (2) shares owned by employee stock plans in which employee participants do not have the right to determine confidentially whether shares held subject to the plan will be tendered in a tender or exchange offer; or
- At or subsequent to the date of the transaction, the business combination is approved by the board of directors of the corporation and authorized at an annual or special meeting of stockholders, and not by written consent, by the affirmative vote of at least 66 2/3% of the outstanding voting stock which is not owned by the interested stockholder.

Generally, a business combination includes a merger, asset or stock sale, or other transaction resulting in a financial benefit to the interested stockholder. An interested stockholder is a person who, together with affiliates and associates, owns or, within three years prior to the determination of interested stockholder status, did own 15% or more of a corporation's outstanding voting stock. We expect the existence of this provision to have an anti-takeover effect with respect to transactions our board of directors does not approve in advance. We also anticipate that Section 203 may discourage business combinations or other attempts that might result in a premium over the market price for the shares of common stock held by our stockholders.

The provisions of Delaware law and our restated certificate of incorporation and bylaws to become effective upon completion of this offering could have the effect of discouraging others from attempting hostile takeovers and, as a consequence, may also inhibit temporary fluctuations in the market price of our common stock that often result from actual or rumored hostile takeover attempts. These provisions may also have the effect of preventing changes in our management. It is possible that these provisions could make it more difficult to accomplish transactions that stockholders may otherwise deem to be in their best interests.

**Transfer Agent and Registrar**

Upon the completion of this offering, the transfer agent and registrar for our common stock will be American Stock Transfer & Trust Company, LLC.

**Listing**

We have applied to list our common stock for quotation on The NASDAQ Global Market under the trading symbol "CTRL".





## SHARES ELIGIBLE FOR FUTURE SALE

Before this offering, there has not been a public market for shares of our common stock. Future sales of substantial amounts of shares of our common stock, including shares issued upon the exercise of outstanding options, in the public market after this offering, or the possibility of these sales occurring, could cause the prevailing market price for our common stock to fall or impair our ability to raise equity capital in the future.

Upon the completion of this offering, a total of shares of common stock will be outstanding, assuming that there are no exercises of options after March 31, 2013. Of these shares, all shares of common stock sold in this offering by us, plus any shares sold upon exercise of the underwriters' option to purchase additional shares, will be freely tradable in the public market without restriction or further registration under the Securities Act, unless these shares are held by "affiliates," as that term is defined in Rule 144 under the Securities Act.

The remaining shares of common stock will be "restricted securities," as that term is defined in Rule 144 under the Securities Act. These restricted

securities are eligible for public sale only if they are registered under the Securities Act or if they qualify for an exemption from registration under Rules 144 or 701 under the Securities Act, which are summarized below.

Subject to the lock up agreements described below and the provisions of Rules 144 and 701 under the Securities Act, these restricted securities will be available for sale in the public market as follows:

| Date | Number of Shares |
|---|---|
| On the date of this prospectus | |
| Between 90 and 180 days after the date of this prospectus | |
| At various times beginning more than 180 days after the date of this prospectus | |

In addition, of the 23,972,031 shares of our common stock that were subject to stock options outstanding as of March 31, 2013, options to purchase shares of common stock were vested as of March 31, 2013 and will be eligible for sale 180 days following the effective date of this offering.

**Lock-Up Agreements**

We and all of our directors and officers, as well as the other holders of substantially all shares of common stock outstanding immediately prior to this offering, have agreed that, without the prior written consent of Merrill Lynch, Pierce, Fenner & Smith Incorporated and Raymond James & Associates, Inc. on behalf of the underwriters, we and they will not, during the period ending 180 days after the date of this prospectus:

- offer, pledge, sell, contract to sell, sell any option or contract to purchase, purchase any option or contract to sell, grant any option, right or warrant to purchase, lend or otherwise transfer or dispose of, directly or indirectly, any shares of our common stock or any securities convertible into or exercisable or exchangeable for shares of our common stock; or

- enter into any swap or other arrangement that transfers to another, in whole or in part, any of the economic consequences of ownership of our common stock;

whether any transaction described above is to be settled by delivery of shares of our common stock or such other securities, in cash or otherwise.



Table of Contents

The restrictions described in the immediately preceding paragraph do not apply to the following, provided that (1) Merrill Lynch, Pierce, Fenner & Smith Incorporated and Raymond James & Associates, Inc. receive a signed lock-up agreement for the balance of the lock-up period from each donee, trustee, distributee, or transferee, as the case may be, (2) any such transfer shall not involve a disposition for value, (3) the transfers are not required during the lock-up period to be reported with the Securities and Exchange Commission in accordance with Section 16 of the Securities Exchange Act of 1934, as amended, and (4) the equity holder does not otherwise voluntarily effect any public filing or report regarding such transfers during the lock-up period:

- a *bona fide* gift or gifts;

- a transfer to any immediate family member of the equity holder or any trust for the direct or indirect benefit of the equity holder or the immediate family of the equity holder;

- a distribution to limited partners, stockholders, members or other equity holders of the equity holder;

- a transfer to the equity holder's affiliates or to any investment fund or other entity controlled or managed by, or under common control or managed by, the equity holder;

- a transfer by operation of law, such as pursuant to a qualified domestic order or in connection with a divorce settlement; or

- a transfer by will or intestate succession upon the death of the equity holder.

Furthermore, an equity holder may (a) sell our shares purchased on the open market following this offering if and only if (i) such sales are not required during the lock-up period to be reported in any public report or filing with the Securities Exchange Commission, or otherwise and (ii) the equity holder does not otherwise voluntarily effect any public filing or report regarding such sales during the lock-up period, (b) exercise any rights to purchase equity securities, so long as the shares received upon such exercise shall remain subject to the terms of the lock-up agreement; and (c) sell shares in connection with a merger or sale of our company or our assets.

**Rule 144**

In general, under Rule 144 as currently in effect, once we have been subject to public company reporting requirements for at least 90 days, a person who is not deemed to have been one of our affiliates for purposes of the Securities Act at any time during 90 days preceding a sale and who has beneficially owned the shares proposed to be sold for at least six months, including the holding period of any prior owner other than our affiliates, is entitled to sell such shares without complying with the manner of sale, volume limitation or notice provisions of Rule 144, subject to compliance with the public information requirements of Rule 144. If such a person has beneficially owned the shares proposed to be sold for at least one year, including the holding period of any prior owner other than our affiliates, then such person is entitled to sell such shares without complying with any of the requirements of Rule 144.

In general, under Rule 144, as currently in effect, our affiliates or persons selling shares on behalf of our affiliates are entitled to sell upon expiration of the lock-up

Restricted Confidential - Outside Counsel Only




agreements described above, within any three-month period beginning 90 days after the date of this prospectus, a number of shares that does not exceed the greater of:

- 1% of the number of shares of common stock then outstanding, which will equal approximately shares immediately after this offering; or
- The average weekly trading volume of the common stock during the four calendar weeks preceding the filing of a notice on Form 144 with respect to such sale.





Sales under Rule 144 by our affiliates or persons selling shares on behalf of our affiliates are also subject to certain manner of sale provisions and notice requirements and to the availability of current public information about us.

**Rule 701**

Rule 701 generally allows a stockholder who purchased shares of our common stock pursuant to a written compensatory plan or contract and who is not deemed to have been an affiliate of our company during the immediately preceding 90 days to sell these shares in reliance upon Rule 144, but without being required to comply with the public information, holding period, volume limitation, or notice provisions of Rule 144. Rule 701 also permits affiliates of our company to sell their Rule 701 shares under Rule 144 without complying with the holding period requirements of Rule 144. All holders of Rule 701 shares, however, are required to wait until 90 days after the date of this prospectus before selling such shares pursuant to Rule 701.

As of March 31, 2013, shares of our outstanding common stock had been issued in reliance on Rule 701 as a result of exercises of stock options and stock awards.

**Stock Options**

We intend to file a registration statement on Form S-8 under the Securities Act covering all of the shares of our common stock subject to options outstanding or reserved for issuance under our stock plans and shares of our common stock issued upon the exercise of options by employees. We expect to file this registration statement as soon as practicable after this offering. In addition, we intend to file a registration statement on Form S-8 or such other form as may be required under the Securities Act for the resale of shares of our common stock issued upon the exercise of options that were not granted under Rule 701. We expect to file this registration statement as soon as permitted under the Securities Act. However, the shares registered on Form S-8 will be subject to volume limitations, manner of sale, notice and public information requirements of Rule 144 and will not be eligible for resale until expiration of the lock up agreements to which they are subject.

**Registration Rights**

Upon completion of this offering, the holders of an aggregate of 83,880,898 shares of our common stock issued or issuable upon conversion of preferred stock will be entitled to various rights with respect to the registration of these shares under the Securities Act. Registration of these shares under the Securities Act would result in these shares becoming fully tradable without restriction under the Securities Act immediately upon the effectiveness of the registration, except for shares purchased by affiliates. See "Description of Capital Stock—Registration Rights" for additional information.





## MATERIAL U.S. FEDERAL INCOME AND ESTATE TAX CONSEQUENCES FOR NON-U.S. HOLDERS

The following is a summary of the material U.S. federal income and estate tax considerations relating to the acquisition, ownership and disposition of common stock pursuant to this offering by non-U.S. holders. This summary deals only with common stock held as a capital asset (within the meaning of Section 1221 of the Internal Revenue Code of 1986, as amended, (the "Code")) by such a holder and does not discuss the U.S. federal income and estate tax considerations applicable to a holder that is subject to special treatment under U.S. federal income and estate tax laws, including, but not limited to: a dealer in securities or currencies; a financial institution; a regulated investment company; a real estate investment trust; a tax-exempt organization; an insurance company; a person holding common stock as part of a hedging, integrated, conversion or straddle transaction or a person deemed to sell common stock under the constructive sale provisions of the Code; a trader in securities that has elected the mark-to-market method of accounting; a person liable for alternative minimum tax; an entity that is treated as a partnership or other pass-through entity for U.S. federal income tax purposes; a person that received such common stock in connection with services provided; a U.S. person whose "functional currency" is not the U.S. dollar; a "controlled foreign corporation;" a "passive foreign investment company;" or a U.S. expatriate.

This summary is based upon provisions of the Code, applicable U.S. Treasury regulations promulgated thereunder, published rulings and judicial decisions, all as in effect as of the date hereof. Those authorities may be changed, perhaps retroactively, or may be subject to differing interpretations, which could result in U.S. federal income or estate tax consequences different from those discussed below. This summary does not address all aspects of U.S. federal income and estate tax, does not deal with all tax considerations that may be relevant to stockholders in light of their personal circumstances and does not address the Medicare tax imposed on certain investment income or any state, local, foreign, gift or alternative minimum tax considerations.

For purposes of this discussion, a "U.S. holder" is a beneficial holder of common stock that is: an individual citizen or resident of the United States; a corporation (or any other entity treated as a corporation for U.S. federal income tax purposes) created or organized in or under the laws of the United States, any state thereof or the District of Columbia; an estate the income of which is subject to U.S. federal income taxation regardless of its source; or a trust if it (1) is subject to the primary supervision of a court within the United States and one or more U.S. persons have the authority to control all substantial decisions of the trust or (2) has a valid election in effect under applicable U.S. Treasury regulations to be treated as a U.S. person.

For purposes of this discussion a "non-U.S. holder" is a beneficial holder of common stock that is neither a U.S. holder nor a partnership (or any other entity or

arrangement that is treated as a partnership) for U.S. federal income tax purposes. However, neither the term U.S. holder nor the term non-U.S. holder includes any entity or other person that is subject to special treatment under the Code. If a partnership (or an entity or arrangement that is treated as a partnership for U.S. federal income tax purposes) holds common stock, the tax treatment of a partner will generally depend upon the status of the partner and the activities of the partnership. A partner of a partnership holding common stock is urged to consult its own tax advisors.

**PROSPECTIVE INVESTORS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS CONCERNING THEIR PARTICULAR U.S. FEDERAL INCOME AND ESTATE TAX CONSEQUENCES IN LIGHT OFTHEIR SPECIFIC SITUATIONS, AS WELL AS THE TAX CONSEQUENCES ARISING UNDER ANY STATE, LOCAL OR NON-U.S. TAX LAWS AND ANY OTHER U.S. FEDERAL TAX LAWS (INCLUDING THE U.S. FEDERAL GIFT TAX LAWS).**





**Distributions on Our Common Stock**

Distributions with respect to common stock, if any, generally will constitute dividends for U.S. federal income tax purposes to the extent paid out of current or accumulated earnings and profits, as determined for U.S. federal income tax purposes. Any portion of a distribution in excess of current or accumulated earnings and profits will be treated as a return of capital and will first be applied to reduce the holder's tax basis in its common stock, but not below zero. Any remaining amount will then be treated as gain from the sale or exchange of the common stock and will be treated as described under "—Disposition of our Common Stock" below.

Distributions treated as dividends that are paid to a non-U.S. holder, if any, with respect to shares of our common stock will be subject to U.S. federal withholding tax at a rate of 30% (or lower applicable income tax treaty rate) of the gross amount of the dividends unless the dividends are effectively connected with the non-U.S. holder's conduct of a trade or business in the United States. If a non-U.S. holder is engaged in a trade or business in the United States and dividends with respect to the common stock are effectively connected with the conduct of that trade or business and, if required by an applicable income tax treaty, are attributable to a U.S. permanent establishment maintained by the non-U.S. holder, then although the non-U.S. holder will generally be exempt from the 30% U.S. federal withholding tax, provided certain certification requirements are satisfied, the non-U.S. holder will be subject to U.S. federal income tax on those dividends on a net income basis at regular graduated U.S. federal income tax rates in the same manner as if such holder were a resident of the United States. Any such effectively connected income received by a foreign corporation may, under certain circumstances, be subject to an additional branch profits tax equal to 30% (or lower applicable income tax treaty rate) of its effectively connected earnings and profits for the taxable year, as adjusted under the Code. To claim the exemption from withholding with respect to any such effectively connected income, the non-U.S. holder must generally furnish to us or our paying agent a properly executed IRS Form W-8ECI (or applicable successor form). A non-U.S. holder of shares of common stock who wishes to claim the benefit of an exemption or reduced rate of withholding tax under an applicable treaty must furnish to us or our paying agent a valid IRS Form W-8BEN (or applicable successor form) certifying such holder's qualification for the exemption or reduced rate. If a non-U.S. holder is eligible for a reduced rate of U.S. withholding tax pursuant to an income tax treaty, it may obtain a refund of any excess amounts withheld by filing an appropriate claim for refund with the Internal Revenue Service. Non-U.S. holders are urged to consult their tax advisors regarding their entitlement to benefits under a relevant income tax treaty.

**Disposition of Our Common Stock**

Non-U.S. holders may recognize gain upon the sale, exchange, redemption or other taxable disposition of common stock. Subject to the discussion below regarding backup withholding and foreign accounts, such gain generally will not be subject to U.S. federal income tax unless: (i) that gain is effectively connected with the non-U.S. holder's conduct of a trade or business in the United States (and, if required by an applicable income tax treaty, is attributable to a U.S. permanent establishment maintained by the non-U.S. holder); (ii) the non-U.S. holder is a nonresident alien individual who is present in the United States for 183 days or more in the taxable year of that disposition, and certain other conditions are met; or (iii) we are or have been a "U.S. real property holding corporation" for U.S. federal income tax purposes at any time during the shorter of the five-year period preceding the date of disposition or the holder's holding period for our common stock, and certain other requirements are met. We believe that we are not and we do not anticipate becoming a "U.S. real property holding corporation" for U.S. federal income tax purposes.

If a non-U.S. holder is an individual described in clause (i) of the preceding paragraph, the non-U.S. holder will generally be subject to tax on a net income basis at the regular graduated U.S. federal individual income tax rates in the same manner as if such holder were a resident of the United





States, unless an applicable income tax treaty provides otherwise. If the non-U.S. holder is an individual described in clause (ii) of the preceding paragraph, the non-U.S. holder will generally be subject to a flat 30% tax on the gain, which may be offset by U.S. source capital losses even though the non-U.S. holder is not considered a resident of the United States, provided that the non-U.S. holder has timely filed U.S. federal income tax returns with respect to such losses. If a non-U.S. holder is a foreign corporation that falls under clause (i) of the preceding paragraph, it will be subject to tax on a net income basis at the regular graduated U.S. federal corporate income tax rates in the same manner as if it were a resident of the United States and, in addition, the non-U.S. holder may be subject to the branch profits tax at a rate equal to 30% (or lower applicable income tax treaty rate) of its effectively connected earnings and profits.

**Information Reporting and Backup Withholding Tax**

We report to our non-U.S. holders and the IRS the amount of dividends paid during each calendar year and the amount of any tax withheld. All distributions to holders of common stock are subject to any applicable withholding. Information reporting requirements apply even if no withholding was required because the distributions were effectively connected with the non-U.S. holder's conduct of a United States trade or business or withholding was reduced or eliminated by an applicable income tax treaty. This information also may be made available under a specific treaty or agreement with the tax authorities in the country in which the non-U.S. holder resides or is established. Under U.S. federal income tax law, interest, dividends and other reportable payments may, under certain circumstances, be subject to "backup withholding" at the then applicable rate. Backup withholding, however, generally will not apply to distributions to a non-U.S. holder of our common stock, provided the non-U.S. holder furnishes to us or our paying agent the required certification as to its non-U.S. status, such as by providing a valid IRS Form W-8BEN or IRS Form W-8ECI, or certain

other requirements are met. Notwithstanding the foregoing, backup withholding may apply if either we or our paying agent has actual knowledge, or reason to know, that the holder is a U.S. person that is not an exempt recipient. Backup withholding is not an additional tax but merely an advance payment, which may be refunded to the extent it results in an overpayment of tax and the appropriate information is timely supplied to the IRS.

**Foreign Account Tax Compliance Act**

New rules in the Code generally will impose withholding taxes on certain types of payments made to "foreign financial institutions" (as specially defined under these rules), including when the foreign financial institution holds our common stock on behalf of a non-U.S. holder, and certain other non-U.S. entities if certification, information reporting and other specified requirements are not met. The legislation potentially imposes a 30% withholding tax on "withholdable payments" if they are paid to a foreign financial institution or to a foreign non-financial entity, unless (i) the foreign financial institution undertakes certain diligence and reporting obligations and other specified requirements are satisfied or (ii) the foreign non-financial entity either certifies it does not have any substantial U.S. owners or furnishes identifying information regarding each substantial U.S. owner and other specified requirements are satisfied. "Withholdable payment" generally means (i) any payment of interest, dividends, rents and certain other types of generally passive income if such payment is from sources within the United States, and (ii) any gross proceeds from the sale or other disposition of any property of a type that can produce interest or dividends from sources within the United States (including, for example, shares of our common stock). If the payee is a foreign financial institution, it generally will be required to enter into an agreement with the U.S. Treasury requiring, among other things, that it undertake to identify accounts held by certain U.S. persons or U.S.-owned foreign entities, annually report certain information about such accounts and withhold 30% on payments to account holders whose actions prevent it from complying with these reporting and other requirements. If an investor does not provide us with the information necessary to comply with the legislation, it is possible that





distributions to such investor that are attributable to withholdable payments, such as dividends, will be subject to the 30% withholding tax. Any withholding obligations with respect to dividends on our common stock, will not begin prior to January 1, 2014, and any withholding obligations with respect to gross proceeds from a sale or other disposition of our common stock will not begin prior to January 1, 2017. Prospective investors should consult their own tax advisers regarding this legislation.

**Federal Estate Tax**

An individual who at the time of death is not a citizen or resident of the United States and who is treated as the owner of, or has made certain lifetime transfers of, an interest in our common stock will be required to include the value thereof in his or her taxable estate for U.S. federal estate tax purposes, and may be subject to U.S. federal estate tax unless an applicable estate tax treaty provides otherwise. The test for whether an individual is a resident of the United States for federal estate tax purposes differs from the test used for U.S. federal income tax purposes. Some individuals, therefore, may be "Non-U.S. Holders" for U.S. federal income tax purposes, but not for U.S. federal estate tax purposes, and vice versa.





## UNDERWRITING

Merrill Lynch, Pierce, Fenner & Smith Incorporated and Raymond James & Associates, Inc. are acting as representatives of each of the underwriters named below. Subject to the terms and conditions set forth in an underwriting agreement among us and the underwriters, we have agreed to sell to the underwriters, and each of the underwriters has agreed, severally and not jointly, to purchase from us, the number of shares of common stock set forth opposite its name below.

| Underwriter | Number of Shares |
|---|---|
| Merrill Lynch, Pierce, Fenner & Smith Incorporated | |
| Raymond James & Associates, Inc. | |
| Canaccord Genuity Inc. | |
| Cowen and Company, LLC | |
| Needham & Company, LLC | |
| Total | |

Subject to the terms and conditions set forth in the underwriting agreement, the underwriters have agreed, severally and not jointly, to purchase all of the shares sold under the underwriting agreement if any of these shares are purchased. If an underwriter defaults, the underwriting agreement provides that the purchase commitments of the nondefaulting underwriters may be increased or the underwriting agreement may be terminated.

We have agreed to indemnify the underwriters against certain liabilities, including liabilities under the Securities Act, or to contribute to payments the underwriters may be required to make in respect of those liabilities.

The underwriters are offering the shares, subject to prior sale, when, as and if issued to and accepted by them, subject to approval of legal matters by their counsel, including the validity of the shares, and other conditions contained in the underwriting agreement, such as the receipt by the underwriters of officer's certificates and legal

opinions. The underwriters reserve the right to withdraw, cancel or modify offers to the public and to reject orders in whole or in part.

**Commissions and Discounts**

The representatives have advised us that the underwriters propose initially to offer the shares to the public at the public offering price set forth on the cover page of this prospectus and to dealers at that price less a concession not in excess of $ per share. After the initial offering, the public offering price, concession or any other term of the offering may be changed.

The following table shows the public offering price, underwriting discount and proceeds before expenses to us. The information assumes either no exercise or full exercise by the underwriters of their option to purchase additional shares.

| | Per Share | Without Option | With Option |
|---|---|---|---|
| Public offering price | $ | $ | $ |
| Underwriting discount | $ | $ | $ |
| Proceeds, before expenses, to us | $ | $ | $ |

The expenses of the offering, not including the underwriting discount, are estimated at $ and are payable by us, which includes an amount not to exceed $25,000 that we have agreed to reimburse the underwriters for certain FINRA-related expenses incurred by them in connection with this offering.





**Option to Purchase Additional Shares**

We have granted an option to the underwriters, exercisable for 30 days after the date of this prospectus, to purchase up to additional shares at the public offering price, less the underwriting discount. If the underwriters exercise this option, each will be obligated, subject to conditions contained in the underwriting agreement, to purchase a number of additional shares proportionate to that underwriter's initial amount reflected in the above table.

**No Sales of Similar Securities**

We, our executive officers and directors and our other existing security holders have agreed not to sell or transfer any common stock or securities convertible into, exchangeable for, exercisable for, or repayable with common stock, for 180 days after the date of this prospectus without first obtaining the written consent of Merrill Lynch, Pierce, Fenner & Smith Incorporated and Raymond James & Associates, Inc. Specifically, we and these other persons have agreed, with certain limited exceptions, not to directly or indirectly

- Offer, pledge, sell or contract to sell any common stock;
- Sell any option or contract to purchase any common stock;
- Purchase any option or contract to sell any common stock;
- Grant any option, right or warrant for the sale of any common stock;
- Lend or otherwise dispose of or transfer any common stock;
- Request or demand that we file a registration statement related to the common stock; or
- Enter into any swap or other agreement that transfers, in whole or in part, the economic consequence of ownership of any common stock whether any such swap or transaction is to be settled by delivery of shares or other securities, in cash or otherwise.

This lock-up provision applies to common stock and to securities convertible into or exchangeable or exercisable for or repayable with common stock. It also applies to common stock owned now or acquired later by the person executing the agreement or for which the person executing the agreement later acquires the power of disposition.

**NASDAQ Global Market Listing**

We expect the shares to be approved for listing on The NASDAQ Global Market, subject to notice of issuance, under the symbol "CTRL."

Before this offering, there has been no public market for our common stock. The initial public offering price will be determined through negotiations among us and the representatives. In addition to prevailing market conditions, the factors to be considered in determining the initial public offering price are

- The valuation multiples of publicly traded companies that the representatives believe to be comparable to us;
- Our financial information;
- The history of, and the prospects for, our company and the industry in which we compete;
- An assessment of our management, its past and present operations, and the prospects for, and timing of, our future revenues;

- The present state of our development; and





- The above factors in relation to market values and various valuation measures of other companies engaged in activities similar to ours.

An active trading market for the shares may not develop. It is also possible that after the offering the shares will not trade in the public market at or above the initial public offering price.

The underwriters do not expect to sell more than 5% of the shares in the aggregate to accounts over which they exercise discretionary authority.

**Price Stabilization, Short Positions and Penalty Bids**

Until the distribution of the shares is completed, SEC rules may limit underwriters and selling group members from bidding for and purchasing our common stock. However, the representatives may engage in transactions that stabilize the price of the common stock, such as bids or purchases to peg, fix or maintain that price.

In connection with the offering, the underwriters may purchase and sell our common stock in the open market. These transactions may include short sales, purchases on the open market to cover positions created by short sales and stabilizing transactions. Short sales involve the sale by the underwriters of a greater number of shares than they are required to purchase in the offering. "Covered" short sales are sales made in an amount not greater than the underwriters' option to purchase additional shares described above. The underwriters may close out any covered short position by either exercising their option to purchase additional shares or purchasing shares in the open market. In determining the source of shares to close out the covered short position, the underwriters will consider, among other things, the price of shares available for purchase in the open market as compared to the price at which they may purchase shares through the option granted to them. "Naked" short sales are sales in excess of such option. The underwriters must close out any naked short position by purchasing shares in the open market. A naked short position is more likely to be created if the underwriters are concerned that there may be downward pressure on the price of our common stock in the open market after pricing that could adversely affect investors who purchase in the offering. Stabilizing transactions consist of various bids for or purchases of shares of common stock made by the underwriters in the open market prior to the completion of the offering.

The underwriters may also impose a penalty bid. This occurs when a particular underwriter repays to the underwriters a portion of the underwriting discount received by it because the representatives have repurchased shares sold by or for the account of such underwriter in stabilizing or short covering transactions.

Similar to other purchase transactions, the underwriters' purchases to cover the syndicate short sales may have the effect of raising or maintaining the market price of our common stock or preventing or retarding a decline in the market price of our common stock. As a result, the price of our common stock may be higher than the price that might otherwise exist in the open market. The underwriters may conduct these transactions on The NASDAQ Global Market, in the over-the-counter market or otherwise.

Neither we nor any of the underwriters make any representation or prediction as to the direction or magnitude of any effect that the transactions described above may have on the price of our common stock. In addition, neither we nor any of the underwriters make any representation that the representatives will engage in these transactions or that these transactions, once commenced, will not be discontinued without notice.

**Electronic Distribution**

In connection with the offering, certain of the underwriters or securities dealers may distribute prospectuses by electronic means, such as e-mail.





**Other Relationships**

Some of the underwriters and their affiliates may in the future engage in investment banking and other commercial dealings in the ordinary course of business with us or our affiliates. They may in the future receive, customary fees and commissions for these transactions.

In addition, in the ordinary course of their business activities, the underwriters and their affiliates may make or hold a broad array of investments and actively trade debt and equity securities (or related derivative securities) and financial instruments (including bank loans) for their own account and for the accounts of their customers. Such investments and securities activities may involve securities and/or instruments of ours or our affiliates. The underwriters and their affiliates may also make investment recommendations and/or publish or express independent research views in respect of such securities or financial instruments and may hold, or recommend to clients that they acquire, long and/or short positions in such securities and instruments.

**Notice to Prospective Investors in the European Economic Area**

In relation to each Member State of the European Economic Area which has implemented the Prospectus Directive (each, a "Relevant Member State"), with effect from and including the date on which the Prospectus Directive is implemented in that Relevant Member State (the "Relevant Implementation Date"), no offer of shares may be made to the public in that Relevant Member State other than:

A. To any legal entity which is a qualified investor as defined in the Prospectus Directive;

B. To fewer than 100 or, if the Relevant Member State has implemented the relevant provision of the 2010 PD Amending Directive, 150, natural or legal persons (other than qualified investors as defined in the Prospectus Directive), as permitted under the Prospectus Directive, subject to obtaining the prior consent of the

representatives; or

C In any other circumstances falling within Article 3(2) of the Prospectus Directive, provided that no such offer of shares shall require the Company or the representatives to publish a prospectus pursuant to Article 3 of the Prospectus Directive or supplement a prospectus pursuant to Article 16 of the Prospectus Directive.

Each person in a Relevant Member State who initially acquires any shares or to whom any offer is made will be deemed to have represented, acknowledged and agreed that (A) it is a "qualified investor" within the meaning of the law in that Relevant Member State implementing Article 2(1)(e) of the Prospectus Directive, and (B) in the case of any shares acquired by it as a financial intermediary, as that term is used in Article 3(2) of the Prospectus Directive, the shares acquired by it in the offering have not been acquired on behalf of, nor have they been acquired with a view to their offer or resale to, persons in any Relevant Member State other than "qualified investors" as defined in the Prospectus Directive, or in circumstances in which the prior consent of the representatives has been given to the offer or resale. In the case of any shares being offered to a financial intermediary as that term is used in Article 3(2) of the Prospectus Directive, each such financial intermediary will be deemed to have represented, acknowledged and agreed that the shares acquired by it in the offer have not been acquired on a non-discretionary basis on behalf of, nor have they been acquired with a view to their offer or resale to, persons in circumstances which may give rise to an offer of any shares to the public other than their offer or resale in a Relevant Member State to qualified investors as so defined or in circumstances in which the prior consent of the representatives has been obtained to each such proposed offer or resale.

The Company, the representatives and their affiliates will rely upon the truth and accuracy of the foregoing representation, acknowledgement and agreement.





This prospectus has been prepared on the basis that any offer of shares in any Relevant Member State will be made pursuant to an exemption under the Prospectus Directive from the requirement to publish a prospectus for offers of shares. Accordingly any person making or intending to make an offer in that Relevant Member State of shares which are the subject of the offering contemplated in this prospectus may only do so in circumstances in which no obligation arises for the Company or any of the underwriters to publish a prospectus pursuant to Article 3 of the Prospectus Directive in relation to such offer. Neither the Company nor the underwriters have authorized, nor do they authorize, the making of any offer of shares in circumstances in which an obligation arises for the Company or the underwriters to publish a prospectus for such offer.

For the purpose of the above provisions, the expression "an offer to the public" in relation to any shares in any Relevant Member State means the communication in any form and by any means of sufficient information on the terms of the offer and the shares to be offered so as to enable an investor to decide to purchase or subscribe the shares, as the same may be varied in the Relevant Member State by any measure implementing the Prospectus Directive in the Relevant Member State and the expression "Prospectus Directive" means Directive 2003/71/EC (including the 2010 PD Amending Directive, to the extent implemented in the Relevant Member States) and includes any relevant implementing measure in the Relevant Member State and the expression "2010 PD Amending Directive" means Directive 2010/73/EU.

**Notice to Prospective Investors in the United Kingdom**

In addition, in the United Kingdom, this document is being distributed only to, and is directed only at, and any offer subsequently made may only be directed at persons who are "qualified investors" (as defined in the Prospectus Directive) (i) who have professional experience in matters relating to investments falling within Article 19 (5) of the Financial Services and Markets Act 2000 (Financial Promotion) Order 2005, as amended (the "Order") and/or (ii) who are high net worth companies (or persons to whom it may otherwise be lawfully communicated) falling within Article 49(2)(a) to (d) of the Order (all such persons together being referred to as "relevant persons"). This document must not be acted on or relied on in the United Kingdom by persons who are not relevant persons. In the United Kingdom, any investment or investment activity to which this document relates is only available to, and will be engaged in with, relevant persons.

**Notice to Prospective Investors in Switzerland**

The shares may not be publicly offered in Switzerland and will not be listed on the SIX Swiss Exchange ("SIX") or on any other stock exchange or regulated trading facility in Switzerland. This document has been prepared without regard to the disclosure standards for issuance prospectuses under art. 652a or art. 1156 of the Swiss Code of Obligations or the disclosure standards for listing prospectuses under art. 27 ff. of the SIX Listing Rules or the listing rules of any other stock exchange or regulated trading facility in Switzerland. Neither this document nor any other offering or marketing material relating to the shares or the offering may be publicly distributed or otherwise made publicly available in Switzerland.

Neither this document nor any other offering or marketing material relating to the offering, the Company, the shares have been or will be filed with or approved by any Swiss regulatory authority. In particular, this document will not be filed with, and the offer of shares will not be supervised by, the Swiss Financial Market Supervisory Authority FINMA (FINMA), and the offer of shares has not been and will not be authorized under the Swiss Federal Act on Collective Investment Schemes ("CISA"). The investor protection afforded to acquirers of interests in collective investment schemes under the CISA does not extend to acquirers of shares.





**Notice to Prospective Investors in the Dubai International Financial Centre**

This prospectus supplement relates to an Exempt Offer in accordance with the Offered Securities Rules of the Dubai Financial Services Authority ("DFSA"). This prospectus supplement is intended for distribution only to persons of a type specified in the Offered Securities Rules of the DFSA. It must not be delivered to, or relied on by, any other person. The DFSA has no responsibility for reviewing or verifying any documents in connection with Exempt Offers. The DFSA has not approved this prospectus supplement nor taken steps to verify the information set forth herein and has no responsibility for the prospectus supplement. The shares to which this prospectus supplement relates may be illiquid and/or subject to restrictions on their resale. Prospective purchasers of the shares offered should conduct their own due

diligence on the shares. If you do not understand the contents of this prospectus supplement you should consult an authorized financial advisor.





## LEGAL MATTERS

The validity of the shares of common stock offered hereby will be passed upon for us by Goodwin Procter LLP, Menlo Park, California. Certain legal matters in connection with this offering will be passed upon for the underwriters by Cooley LLP, Palo Alto, California. Cooley LLP has in the past provided, and continues to provide, legal services to us.

## EXPERTS

The consolidated financial statements of Control4 Corporation at December 31, 2011 and 2012, and for each of the three years in the period ended December 31, 2012 appearing in this prospectus and registration statement, have been audited by Ernst & Young LLP, independent registered public accounting firm, as set forth in their report thereon and appearing elsewhere herein, and are included in reliance on such report given on the authority of such firm as experts in accounting and auditing.

## WHERE YOU CAN FIND MORE INFORMATION

We have filed with the SEC a registration statement on Form S-1 under the Securities Act with respect to the shares of common stock we are offering. The registration statement, including the attached exhibits and schedules, contains additional relevant information about us and our common stock. This prospectus does not contain all of the information set forth in the registration statement and the exhibits and schedules thereto. The rules and regulations of the SEC allow us to omit from this prospectus certain information included in the registration statement.

For further information about us and our common stock, you may inspect a copy of the registration statement and the exhibits and schedules to the registration statement without charge at the offices of the SEC at 100 F Street, N.E., Washington, D.C. 20549. You may obtain copies of all or any part of the registration statement from the Public Reference Section of the SEC, 100 F Street, N.E., Washington, D.C. 20549 upon the payment of the prescribed fees.

You may obtain information on the operation of the Public Reference Room by calling the SEC at 1-800-SEC-0330. The SEC maintains a website at www.sec.gov that contains reports, proxy and information statements and other information regarding registrants like us that file electronically with the SEC. You can also inspect our registration statement on this website.

Upon the closing of this offering, we will become subject to the reporting and information requirements of the Exchange Act, and we will file reports, proxy statements and other information with the SEC.





## INDEX TO CONSOLIDATED FINANCIAL STATEMENTS


| | |
|---|---|
| Report of Independent Registered Public Accounting Firm | F-2 |
| Consolidated Balance Sheets | F-3 |
| Consolidated Statements of Operations | F-4 |
| Consolidated Statements of Comprehensive Loss | F-5 |
| Consolidated Statements of Redeemable Convertible Preferred Stock and Stockholders' Equity (Deficit) | F-6 |
| Consolidated Statements of Cash Flows | F-7 |
| Notes to Consolidated Financial Statements | F-8 |






## Report of Independent Registered Public Accounting Firm



SAVANT3329738

The Board of Directors and Stockholders of
Control4 Corporation

We have audited the accompanying consolidated balance sheets of Control4 Corporation as of December 31, 2012 and 2011, and the related consolidated statements of operations, comprehensive loss, redeemable convertible preferred stock and stockholders' equity (deficit), and cash flows for each of the three years in the period ended December 31, 2012. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audits.

We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. We were not engaged to perform an audit of the Company's internal control over financial reporting. Our audits included consideration of internal control over financial reporting as a basis for designing audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control over financial reporting. Accordingly, we express no such opinion. An audit also includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, and evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the financial statements referred to above present fairly, in all material respects, the consolidated financial position of Control4 Corporation at December 31, 2012 and 2011, and the consolidated results of its operations and its cash flows for each of the three years in the period ended December 31, 2012, in conformity with U.S. generally accepted accounting principles.

/s/ Ernst & Young LLP

Salt Lake City, Utah
March 15, 2013



Table of Contents

**CONTROL4 CORPORATION**

**CONSOLIDATED BALANCE SHEETS**

**(in thousands, except share data)**

| | December 31, | | | Pro Forma as of |
|---|---|---|---|---|
| | 2011 | 2012 | March 31, 2013 | March 31, 2013 |
| | | | (unaudited) | (unaudited) |
| **Assets** | | | | |
| Current assets: | | | | |
| Cash and cash equivalents | $ 18,468 | $ 18,695 | $ 14,573 | $ |
| Accounts receivable, net | 10,662 | 13,078 | 13,255 | |
| Inventories | 9,497 | 12,515 | 12,538 | |
| Prepaid expenses and other current assets | 1,519 | 1,871 | 2,183 | |
| Total current assets | 40,146 | 46,159 | 42,549 | |
| Property and equipment, net | 2,127 | 2,666 | 3,566 | |
| Intangible assets, net | 1,197 | 926 | 858 | |
| Other assets | 64 | 887 | 2,482 | |
| Total assets | $ 43,534 | $ 50,638 | $ 49,455 | |
| **Liabilities, redeemable convertible preferred stock and stockholders' equity (deficit)** | | | | |
| Current liabilities: | | | | |
| Accounts payable | $ 9,813 | $ 14,435 | $ 12,917 | |
| Accrued liabilities | 4,454 | 6,571 | 6,625 | |

| | | | | |
|---|---|---|---|---|
| Deferred revenue | 552 | 542 | 1,035 | |
| Current portion of notes payable | 971 | 1,321 | 1,425 | |
| Total current liabilities | 15,790 | 22,869 | 22,002 | |
| Notes payable | 1,349 | 1,838 | 1,969 | |
| Warrant liability | 347 | 601 | 576 | |
| Other long-term liabilities | 2,241 | 1,620 | 1,799 | |
| Total liabilities | 19,727 | 26,928 | 26,346 | 25,770 |
| Commitments and contingencies | | | | |
| Redeemable convertible preferred stock, $0.0001 par value; 83,163,408 shares authorized; 79,528,755 shares issued and outstanding at December 31, 2011 and 2012 and March 31, 2013 (unaudited); aggregate liquidation preference of $118,150 at December 31, 2011 and 2012 and March 31, 2013; no shares authorized, issued and outstanding, pro forma (unaudited) | 116,313 | 116,313 | 116,313 | — |
| Stockholders' equity (deficit): | | | | |
| Preferred stock, $0.0001 par value, no shares authorized, issued and outstanding, actual; 25,000,000 shares authorized, no shares issued and outstanding, pro forma (unaudited) | | | | |
| Common stock, $0.0001 par value; 117,836,592, 127,836,592 and 127,836,592 shares authorized; 11,677,127, 12,952,969 and 13,037,259 shares issued and outstanding at December 31, 2011 and 2012 and March 31, 2013 (unaudited), respectively; 500,000,000 shares authorized, 93,323,245 shares issued and outstanding, pro forma (unaudited) | 1 | 1 | 1 | 9 |
| Additional paid-in capital | 9,333 | 12,987 | 13,862 | 130,743 |
| Accumulated deficit | (101,864) | (105,587) | (107,058) | (107,058) |
| Accumulated other comprehensive income (loss) | 24 | (4) | (9) | (9) |
| Total stockholders' equity (deficit) | (92,506) | (92,603) | (93,204) | 23,685 |
| Total liabilities, redeemable convertible preferred stock and stockholders' equity (deficit) | $ 43,534 | $ 50,638 | $ 49,455 | $ 49,455 |

See accompanying notes to consolidated financial statements.



Table of Contents

## CONTROL4 CORPORATION

## CONSOLIDATED STATEMENTS OF OPERATIONS

**(in thousands, except per share data)**

| | Years Ended December 31, | | | Three Months Ended March 31, | |
|---|---|---|---|---|---|
| | 2010 | 2011 | 2012 | 2012 | 2013 |
| | | | | (unaudited) | |
| Revenue | $ 74,925 | $ 93,376 | $ 109,512 | $ 22,628 | $ 26,571 |
| Cost of revenue | 43,357 | 50,534 | 57,225 | 12,466 | 13,550 |
| Cost of revenue—inventory purchase commitment | — | — | 1,840 | — | — |
| Gross margin | 31,568 | 42,842 | 50,447 | 10,162 | 13,021 |
| Operating expenses: | | | | | |

| | | | | | |
|---|---|---|---|---|---|
| Research and development | 15,922 | 19,211 | 20,310 | 4,813 | 6,066 |
| Sales and marketing | 22,491 | 17,546 | 20,182 | 5,038 | 5,605 |
| General and administrative | 8,876 | 9,805 | 10,150 | 2,532 | 2,828 |
| Litigation settlement | — | — | 2,869 | — | — |
| Total operating expenses | 47,289 | 46,562 | 53,511 | 12,383 | 14,499 |
| Loss from operations | (15,721) | (3,720) | (3,064) | (2,221) | (1,478) |
| Other income (expense): | | | | | |
| Interest income | 7 | 4 | 13 | 3 | 3 |
| Interest expense | (411) | (396) | (277) | (65) | (78) |
| Other income (expense) | (140) | 227 | (254) | (400) | 26 |
| Total other expense | (544) | (165) | (518) | (462) | (49) |
| Loss before income taxes | (16,265) | (3,885) | (3,582) | (2,683) | (1,527) |
| Income tax (expense) benefit | — | — | (141) | — | 56 |
| Net loss | $ (16,265) | $ (3,885) | $ (3,723) | $ (2,683) | $ (1,471) |
| Net loss per common share, basic and diluted | $ (1.91) | $ (0.39) | $ (0.30) | $ (0.23) | $ (0.11) |
| Weighted-average number of shares, basic and diluted | 8,531 | 10,014 | 12,286 | 11,708 | 13,022 |
| Pro forma net loss per common share, basic and diluted | | | $ (0.04) | | $ (0.02) |
| Pro forma weighted-average number of common shares, basic and diluted | | | 92,575 | | 93,308 |

See accompanying notes to consolidated financial statements.





**CONTROL4 CORPORATION**

**CONSOLIDATED STATEMENTS OF COMPREHENSIVE LOSS**

**(in thousands)**

| | Years Ended December 31, | | | Three Months Ended March 31, | |
|---|---|---|---|---|---|
| | 2010 | 2011 | 2012 | 2012 | 2013 |
| | | | | (unaudited) | |
| Net loss | $ (16,265) | $ (3,885) | $ (3,723) | $ (2,683) | $ (1,471) |
| Other comprehensive income (loss): | | | | | |
| Unrealized gain (loss) on foreign currency exchange | 36 | (10) | (28) | (42) | (5) |
| Total other comprehensive income (loss) | | | | | |

Restricted Confidential - Outside Counsel Only




| | | | | | |
|---|---|---|---|---|---|
| | 36 | (10) | (28) | (42) | (5) |
| Comprehensive loss | $ (16,229) | $ (3,895) | $ (3,751) | $ (2,725) | $ (1,476) |

See accompanying notes to consolidated financial statements.



Table of Contents

## CONTROL4 CORPORATION

## CONSOLIDATED STATEMENTS OF REDEEMABLE CONVERTIBLE PREFERRED STOCK AND STOCKHOLDERS' EQUITY (DEFICIT)

**(in thousands, except share data)**

| | Redeemable Convertible Preferred Stock | | Stockholders' Equity (Deficit) | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | Common Stock | | | | Accumulated Other Comprehensive | Total Stockholders' Equity |
| | Shares | Amount | Number of Shares | Amount | Additional Paid-In Capital | Accumulated Deficit | (Loss) Income | (Deficit) |
| Balance at December 31, 2009 | 69,052,614 | $ 97,670 | 8,130,506 | $ 1 | $ 2,986 | $ (81,714) | $ (2) | $ (78,729) |
| Net loss | — | — | — | — | — | (16,265) | — | (16,265) |
| Other comprehensive income | — | — | — | — | — | — | 36 | 36 |
| Stock-based compensation | — | — | — | — | 1,469 | — | — | 1,469 |
| Issuance of common stock upon exercise of stock options | — | — | 522,821 | — | 202 | — | — | 202 |
| Issuance of common stock warrants in exchange for acquired assets | — | — | — | — | 313 | — | — | 313 |
| Balance at December 31, 2010 | 69,052,614 | 97,670 | 8,653,327 | 1 | 4,970 | (97,979) | 34 | (92,974) |
| Net loss | — | — | — | — | — | (3,885) | — | (3,885) |
| Other comprehensive loss | — | — | — | — | — | — | (10) | (10) |
| Issuance of Series H redeemable convertible preferred stock for cash in February 2011, net of issuance costs of $211 | 10,476,141 | 18,643 | — | — | — | — | — | — |
| Issuance of common stock warrants | — | — | — | — | 1,146 | — | — | 1,146 |
| Stock-based compensation | — | — | — | — | 1,988 | — | — | 1,988 |
| Issuance of common stock upon exercise of stock options | — | — | 3,002,792 | — | 1,204 | — | — | 1,204 |
| Issuance of common stock in exchange for services | — | — | 21,008 | — | 25 | — | — | 25 |
| Balance at December 31, 2011 | 79,528,755 | 116,313 | 11,677,127 | 1 | 9,333 | (101,864) | 24 | (92,506) |
| Net loss | — | — | — | — | — | (3,723) | — | (3,723) |
| Other comprehensive loss | — | — | — | — | — | — | (28) | (28) |
| Stock-based compensation | — | — | — | — | 2,869 | — | — | 2,869 |
| Issuance of common stock upon exercise of stock options | — | — | 1,275,842 | — | 785 | — | — | 785 |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Balance at December 31, 2012 | 79,528,755 | 116,313 | 12,952,969 | 1 | 12,987 | (105,587) | (4) | (92,603) |
| Net loss (unaudited) | — | — | — | — | — | (1,471) | — | (1,471) |
| Other comprehensive loss (unaudited) | — | — | — | — | — | — | (5) | (5) |
| Stock-based compensation (unaudited) | — | — | — | — | 838 | — | — | 838 |
| Issuance of common stock upon exercise of stock options (unaudited) | — | — | 84,290 | — | 37 | — | — | 37 |
| Balance at March 31, 2013 (unaudited) | 79,528,755 | $ 116,313 | 13,037,259 | $ 1 | $ 13,862 | $ (107,058) | $ (9) | $ (93,204) |

See accompanying notes to consolidated financial statements.



Table of Contents

## CONTROL4 CORPORATION

## CONSOLIDATED STATEMENTS OF CASH FLOWS

**(in thousands)**

| | Years Ended December 31, | | | Three Months Ended March 31, | |
|---|---|---|---|---|---|
| | 2010 | 2011 | 2012 | 2012 | 2013 |
| | | | | (unaudited) | |
| **Operating activities** | | | | | |
| Net loss | $ (16,265) | $ (3,885) | $ (3,723) | $ (2,683) | $ (1,471) |
| Adjustments to reconcile net loss to net cash (used in) provided by operating activities: | | | | | |
| Depreciation expense | 1,593 | 1,615 | 1,714 | 407 | 512 |
| Amortization of intangible assets | 21 | 139 | 271 | 68 | 68 |
| Provision for doubtful accounts | 470 | 283 | 184 | 114 | 70 |
| Loss on inventory purchase commitment | — | — | 1,840 | — | — |
| Loss on disposal of property and equipment | — | — | 107 | — | — |
| Stock-based compensation | 1,469 | 2,013 | 2,869 | 731 | 838 |
| Warrant liability (income) expense | 140 | (227) | 254 | 399 | (25) |
| Changes in assets and liabilities: | | | | | |
| Accounts receivable | 1,561 | (2,645) | (2,600) | (54) | (332) |
| Inventories | (4,705) | 2,323 | (4,858) | (492) | (94) |
| Prepaid expenses and other current assets | (212) | 396 | (352) | (1) | (338) |
| Other assets | (41) | 155 | (823) | 1 | (1,595) |
| Accounts payable | 2,464 | (975) | 4,622 | 614 | (1,319) |
| Accrued liabilities | 589 | 882 | 2,117 | (424) | 77 |
| Deferred revenue | 195 | (95) | (10) | 54 | 493 |
| Other long-term liabilities | (357) | (565) | (621) | (125) | 179 |
| Net cash (used in) provided by operating activities | (13,078) | (586) | 991 | (1,391) | (2,937) |
| **Investing activities** | | | | | |

| | | | | | |
|---|---|---|---|---|---|
| Purchases of property and equipment | (2,025) | (1,264) | (2,360) | (542) | (1,431) |
| Acquisition of intangible assets | (319) | (725) | — | — | — |
| Net cash used in investing activities | (2,344) | (1,989) | (2,360) | (542) | (1,431) |
| **Financing activities** | | | | | |
| Net proceeds from issuance of redeemable convertible preferred stock and common stock warrants | — | 19,789 | — | — | — |
| Proceeds from exercise of options for common stock | 202 | 1,204 | 785 | — | 37 |
| Net (repayment) borrowing against revolving line of credit | 4,314 | (6,314) | — | — | — |
| Proceeds from notes payable | 893 | 1,064 | 1,876 | 311 | 435 |
| Repayment of notes payable | (1,367) | (744) | (1,037) | (243) | (200) |
| Net cash provided by financing activities | 4,042 | 14,999 | 1,624 | 68 | 272 |
| Effect of exchange rate changes on cash and cash equivalents | 36 | (10) | (28) | (42) | (26) |
| Net increase (decrease) in cash and cash equivalents | (11,344) | 12,414 | 227 | (1,907) | (4,122) |
| Cash and cash equivalents at beginning of period | 17,398 | 6,054 | 18,468 | 18,468 | 18,695 |
| Cash and cash equivalents at end of period | $ 6,054 | $ 18,468 | $ 18,695 | $ 16,561 | $ 14,573 |
| **Supplemental disclosure of cash flow information** | | | | | |
| Cash paid for interest | $ 416 | $ 396 | $ 278 | $ 66 | $ 63 |
| Cash paid for taxes | — | — | 26 | — | 50 |

See accompanying notes to consolidated financial statements.



Table of Contents

## CONTROL4 CORPORATION

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

## (INFORMATION AS OF MARCH 31, 2013 AND FOR THE

## THREE MONTHS ENDED MARCH 31, 2012 AND 2013 IS UNAUDITED)

**1. Description of Business and Summary of Significant Accounting Policies**

Control4 Corporation ("Control4" or the "Company") is a leading provider of automation and control solutions for the connected home. We unlock the potential of connected devices, making entertainment systems easier to use, homes more comfortable, appliances more comfortable and energy efficient, and families more secure. The Company was incorporated in the state of Delaware on March 27, 2003.

***Reclassifications***

Certain prior-year amounts have been reclassified in order to conform to the current-year presentation. These reclassifications related primarily to customer rebates which in prior periods were included in accrued liabilities and have now been presented net with accounts receivable as well as reclassification of depreciation expense into the applicable functional captions on the statements of operations. These reclassifications had no effect on previously reported net loss.

***Unaudited Financial Information***

The accompanying interim consolidated balance sheet as of March 31, 2013, the consolidated statements of operations, comprehensive loss and cash flows for the three months ended March 31, 2012 and 2013, and the consolidated statement of redeemable convertible preferred stock and stockholders' equity (deficit) for the three months ended March 31, 2013 are unaudited. These unaudited interim consolidated financial statements have been prepared in accordance with U.S. generally accepted accounting principles ("GAAP") on the same basis as the audited consolidated financial statements and, in the opinion of management, reflect all adjustments, consisting of

only normal recurring adjustments, considered necessary to present fairly the Company's financial position as of March 31, 2013 and its results of operations and cash flows for the three months ended March 31, 2012 and 2013. The results of operations for the three months ended March 31, 2013 are not necessarily indicative of the results that may be expected for the year ending December 31, 2013, or any other future interim or annual period.

***Unaudited Pro Forma Balance Sheet***

The unaudited pro forma balance sheet gives effect to the conversion of all outstanding shares of redeemable preferred stock into 79,528,755 shares of common stock, the net exercise of warrants to purchase capital stock into an aggregate of 757,231 shares of common stock and the reclassification of the associated warrant liability to additional paid in capital as if an initial public offering occurred on March 31, 2013 and assuming the valuation of the Company prior to such initial public offering is at least $225 million and the net proceeds to the Company from such initial public offering are not less than $35 million.

***Basis of Presentation***

The consolidated financial statements include the accounts of the Company and its wholly owned subsidiaries. All intercompany balances and transactions have been eliminated in the consolidated financial statements.



Table of Contents

**CONTROL4 CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**(INFORMATION AS OF MARCH 31, 2013 AND FOR THE**

**THREE MONTHS ENDED MARCH 31, 2012 AND 2013 IS UNAUDITED)**

**1. Description of Business and Summary of Significant Accounting Policies (Continued)**

***Segment Reporting***

Operating segments are identified as components of an enterprise about which separate discrete financial information is available for evaluation by the chief operating decision-maker, the Chief Executive Officer, in making decisions regarding resource allocation and accessing performance. To date, the Company has viewed its operations and manages its business as one segment.

***Use of Accounting Estimates***

The preparation of financial statements in conformity with U.S. generally accepted accounting principles requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities as of the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. On an ongoing basis, the Company evaluates its estimates including those related to revenue recognition, sales returns, provisions for doubtful accounts, product warranty, inventory obsolescence, litigation, determination of fair value of stock options, deferred tax asset valuation allowances and income taxes. Actual results may differ from those estimates.

***Revenue Recognition***

The Company sells its products through a network of independent dealers, regional and national retailers and distributors. These dealers, retailers and distributors generally sell the Company's products to the end consumer as part of a bundled sale, which typically includes other third-party products and related services, project design and installation services and on-going support.

The Company recognizes revenue when persuasive evidence of an arrangement exists, delivery has occurred, the sales price is fixed or determinable, and collection is reasonably assured. Product is considered delivered to the customer once it has been shipped and title and risk of loss have been transferred. For most of the Company's product sales, these criteria are met at the time the product is shipped. Payments received in advance of providing products are recorded as deferred revenue and recorded as revenue when the revenue recognition criteria are met and the earnings process is complete.

The Company records estimated reductions to revenue for dealer, retailer and distributor incentives, primarily comprised of volume rebates, at the time of the initial sale. The estimated reductions to revenue for rebates are based on the sales terms and the Company's historical experience and trend analysis. The most common incentive relates to amounts paid or credited to customers for achieving defined volume levels or growth objectives.

Software license revenue represents fees earned from activating applications which allow end consumers to manage and control their automation systems using tablets, smartphones and other third-party devices. The Company's perpetual software licenses do not include acceptance provisions, rights to updates or post-contract customer support; the Company generally recognizes revenue at the time the software license is provided to the customer.

The Company offers a subscription service that allows consumers to control and monitor their homes remotely and allows the Company's dealers to perform remote diagnostic services.



Table of Contents

**CONTROL4 CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

(INFORMATION AS OF MARCH 31, 2013 AND FOR THE

THREE MONTHS ENDED MARCH 31, 2012 AND 2013 IS UNAUDITED)

**1. Description of Business and Summary of Significant Accounting Policies (Continued)**

Subscription revenue is deferred at the time of payment and recognized on a straight-line basis over the period the service is provided.

Total revenue for subscription services and software represents less than 10 percent of total revenue for all periods presented.

The Company recognizes revenue net of cost of revenue for third-party products sold through the Company's online ordering system. While the Company assumes credit risk on sales to its customers for third-party products, the Company does not determine the product selling price, does not retain associated inventory risks and is not the primary obligor to the end consumer.

The Company's agreements with dealers and distributors generally do not include rights of return or acceptance provisions. Even though contractual agreements do not provide return privileges, there are circumstances in which the Company will accept returns. In addition, agreements with certain retail customers contain stock rotation and other rights of return. The Company maintains a reserve for such returns based on the Company's historical return experience.

Shipping charges billed to customers are included in revenue and related shipping costs are included in cost of revenue.

***Cost of Revenue***

Cost of revenue includes the following: the cost of inventory sold during the period, inventory write-down costs, payroll and other direct installation services costs, purchasing costs, royalty obligations, shipping expenses to customers and warehousing costs, which include inbound freight costs from manufacturers, rent and payroll and benefit costs.

***Cash and Cash Equivalents***

The Company considers all highly liquid short-term investments with original maturities of three months or less at the time of purchase to be cash equivalents. Cash equivalents consist primarily of money market funds.

***Allowance for Doubtful Accounts***

The Company extends credit to the majority of its customers, which consist primarily of small, local businesses. Issuance of credit is based on ongoing credit evaluations by the Company of customers' financial condition and generally requires no collateral. Trade accounts receivable are recorded at the invoiced amount and do not bear interest. The Company maintains an allowance for doubtful accounts to reserve for potential uncollectible receivables. The allowance is based upon the creditworthiness of the Company's customers, the customers' historical payment experience, the age of the receivables and current market and economic conditions. Provisions for potentially uncollectible accounts are recorded in sales and marketing expenses. The Company writes off accounts receivable balances to the allowance for doubtful accounts when it becomes likely that they will not be collected.



Table of Contents

CONTROL4 CORPORATION

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)

(INFORMATION AS OF MARCH 31, 2013 AND FOR THE

THREE MONTHS ENDED MARCH 31, 2012 AND 2013 IS UNAUDITED)

**1. Description of Business and Summary of Significant Accounting Policies (Continued)**

The following table presents the changes in the allowance for doubtful accounts (in thousands):

| | Years Ended December 31, 2010 | 2011 | 2012 | Three Months Ended March 31, 2013 |
|---|---|---|---|---|
| Balance at beginning of period | $ 773 | $ 619 | $ 651 | $ 643 |
| Provision | 470 | 283 | 184 | 70 |
| Deductions | (624) | (251) | (192) | (68) |
| Balance at end of period | $ 619 | $ 651 | $ 643 | $ 645 |

***Concentrations of Risk***

Financial instruments that potentially subject the Company to a concentration of credit risk consist of cash and cash equivalents and accounts receivable. The Company deposits cash and cash equivalents with one high-credit-quality financial institution and maintains balances that exceed federally insured amounts. The Company has policies that limit its investments as to types of investments, maturity, liquidity, credit quality, concentration and diversification of issuers.

The Company's accounts receivable are derived from revenue earned from customers primarily located in the United States and Canada. The Company's sales to customers located outside the United States are generally denominated in United States dollars, except for sales to customers located in the United Kingdom, which are denominated in pounds sterling. There were no individual account balances greater than 10% of total accounts receivable at December 31, 2011 and 2012 and March 31, 2013.

No customer accounted for more than 10% of total revenue for the years ended December 31, 2010, 2011 and 2012 or for the three months ended March 31, 2012 and 2013.

The Company relies on a limited number of suppliers for its contract manufacturing. A significant disruption in the operations of these manufacturers would impact the production of the Company's products for a substantial period of time, which could have a material adverse effect on the Company's business, financial condition and results of operations.

***Geographic Information***

The Company's revenue includes amounts earned through sales to customers located outside of the United States. With the exception of Canada, no single foreign country accounted for more than 10% of total revenue during the years ended December 31, 2010, 2011 and 2012 or for the three





**CONTROL4 CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**(INFORMATION AS OF MARCH 31, 2013 AND FOR THE**

**THREE MONTHS ENDED MARCH 31, 2012 AND 2013 IS UNAUDITED)**

**1. Description of Business and Summary of Significant Accounting Policies (Continued)**

months ended March 31, 2012 and 2013. The following table sets forth revenue from U.S., Canadian and all other international customers combined (in thousands):

| | Years Ended December 31, | | | Three Months Ended March 31, | |
|---|---|---|---|---|---|
| | 2010 | 2011 | 2012 | 2012 | 2013 |
| | | | | (unaudited) | |
| Revenue—United States | $ 53,566 | $ 63,625 | $ 69,957 | $ 15,311 | $ 17,702 |
| Revenue—Canada | 9,799 | 10,480 | 12,453 | 2,462 | 3,345 |
| Revenue—all other international sources | 11,560 | 19,271 | 27,102 | 4,855 | 5,524 |
| Total revenue | $ 74,925 | $ 93,376 | $ 109,512 | $ 22,628 | $ 26,571 |
| International revenue (excluding Canada) as a percent of total revenue | 15% | 21% | 25% | 21% | 21% |

***Inventories***

Inventories consist of hardware and related component parts and are stated at the lower of cost or market using the first-in, first-out method. The Company periodically assesses the recoverability of its inventory and reduces the carrying value of the inventory when items are determined to be obsolete, defective or in excess of forecasted sales requirements. Inventory write-downs for excess, defective and obsolete inventory are recorded as a cost of revenue and totaled $1.1 million, $1.3 million, $1.5 million, $0.4 million and $0.4 million for the years ended December 31, 2010, 2011 and 2012 and for the three months ended March 31, 2012 and 2013, respectively.

In December 2012, the Company finalized termination of a sales contract and, as a result of the contract termination, recorded a $1.8 million expense associated with an anticipated loss on firm purchase commitments for components that would have been required to meet the Company's obligations under the terminated contract. The $1.8 million charge has been recorded as Cost of Revenue—Inventory Purchase Commitment in the accompanying consolidated statement of operations during the year ended December 31, 2012.

***Property and Equipment***

Property and equipment are recorded at historical cost, less accumulated depreciation. Depreciation is computed using the straight-line method over the following estimated useful lives:

| | |
|---|---|
| Furniture and fixtures | 5 years |
| Manufacturing tooling and test equipment | 2-3 years |
| Lab, marketing and warehouse equipment | 3 years |
| Computer equipment and software | 3 years |

| | |
|---|---|
| Marketing equipment | 1-3 years |



Table of Contents

CONTROL4 CORPORATION

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)

(INFORMATION AS OF MARCH 31, 2013 AND FOR THE

THREE MONTHS ENDED MARCH 31, 2012 AND 2013 IS UNAUDITED)

**1. Description of Business and Summary of Significant Accounting Policies (Continued)**

Maintenance and repairs that do not extend the life of or improve the asset are expensed in the year incurred. Leasehold improvements are depreciated over the estimated useful life (usually 3-5 years) or the life of the associated lease, whichever is less.

***Intangible Assets***

Intangible assets consist of acquired technology. The Company amortizes, to cost of revenue, definite-lived intangible assets on a straight-line basis over the life of the technology, which is estimated to be five years.

***Impairment of Long-Lived Assets***

The carrying value of long-lived assets is reviewed for impairment whenever events or changes in circumstances indicate that the carrying amount of an asset or asset group may not be recoverable. An impairment loss is recognized when the carrying amount of an asset exceeds the estimated undiscounted future cash flows expected to result from the use of the asset and its eventual disposition. The amount of the impairment loss to be recorded is calculated by the excess of the asset's carrying value over its fair value. Fair value is generally determined using a discounted cash flow analysis.

***Product Warranty***

The Company provides its customers a limited product warranty of two years, which requires the Company to repair or replace defective products during the warranty period at no cost to the customer. The Company estimates the costs that may be incurred to replace or repair defective products and records a reserve at the time revenue is recognized. Factors that affect the Company's warranty liability include the number of installed systems, the Company's historical experience and management's judgment regarding anticipated rates of product warranty returns. The Company assesses the adequacy of its recorded warranty liability each period and makes adjustments to the liability as necessary.

The following table presents the changes in the product warranty liability (in thousands):

| | Years Ended December 31, | | | Three Months Ended March 31, |
|---|---|---|---|---|
| | 2010 | 2011 | 2012 | 2013 |
| | | | | (unaudited) |
| Balance at beginning of period | $ 775 | $ 775 | $ 1,030 | $ 1,155 |
| Warranty costs accrued | 320 | 727 | 1,050 | 139 |
| Warranty claims | (320) | (472) | (925) | (140) |
| Balance at end of period | $ 775 | $ 1,030 | $ 1,155 | $ 1,154 |

***Redeemable Convertible Preferred Stock Warrant***

Freestanding warrants and other similar instruments related to shares that are redeemable are accounted for in accordance with ASC 480, "Distinguishing Liabilities and Equity." Under ASC 480, freestanding warrants that relate to the Company's redeemable convertible preferred stock are



Table of Contents

CONTROL4 CORPORATION

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)

(INFORMATION AS OF MARCH 31, 2013 AND FOR THE

THREE MONTHS ENDED MARCH 31, 2012 AND 2013 IS UNAUDITED)

**1. Description of Business and Summary of Significant Accounting Policies (Continued)**

classified as a liability on the balance sheet. The warrant to purchase Series G-1 redeemable convertible preferred stock is subject to re-measurement at each balance sheet date and any change in fair value is recognized as a component of other income or expense. Fair value is measured using the Black-Scholes option pricing model. The Company will continue to adjust the liability for changes in fair value until the completion of its planned initial public offering, at which time the redeemable convertible preferred stock warrants will expire or be exercised and converted into common stock and, accordingly, the liability will be reclassified to equity.

***Foreign Currency Translation***

The functional currency of the Company's subsidiaries in England, China and India are the pound sterling, the Chinese Yuan and the Indian Rupee, respectively. The subsidiary's assets and liabilities have been translated to U.S. dollars using the exchange rates in effect at the balance sheet date. Statements of operations amounts have been translated using the average exchange rate for each year. Resulting gains or losses from translating foreign currency financial statements are recorded as other comprehensive income (loss). Foreign currency transaction gains (losses) resulting from exchange rate fluctuations on transactions denominated in a currency other than the local currency are included in earnings.

***Stock-Based Compensation***

The Company recognizes compensation expense for all stock-based awards issued to employees and directors based on estimated grant date fair values. The Company selected the Black-Scholes option-pricing model to determine the estimated fair value at the date of grant for stock options. The Company elected to amortize compensation expense using the straight-line attribution method, under which stock-based compensation expense is recognized on a straight-line basis over the period the employee performs the related services, generally the vesting period of four years, net of estimated forfeitures. The Company has estimated forfeiture rates based on its historical experience and will update the rates, as necessary, in subsequent periods if actual forfeitures differ from initial estimates.

The Black-Scholes option-pricing model requires management assumptions regarding various factors that require extensive use of accounting judgment and financial estimates. The Company estimates the expected term for options using the simplified method, which utilizes the weighted average expected life of each tranche of the stock option, determined based on the sum of each tranche's vesting period plus one-half of the period from the vesting date of each tranche to the stock option's expiration, because the Company's options are considered "plain vanilla." The Company computed the expected volatility using multiple peer companies for a period approximating the expected term. The risk-free interest rate was determined using the implied yield on U.S. Treasury issues with a remaining term within the expected life of the award.

The Company accounts for stock-based instruments and awards issued to non-employees at fair value using the Black-Scholes option-pricing model. Management believes that the fair value of the stock-based awards is more reliably measured than the fair value of the services received. The fair value of each non-employee award is re-measured each period until a commitment date is reached, which is generally the vesting date.





**CONTROL4 CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**(INFORMATION AS OF MARCH 31, 2013 AND FOR THE**

**THREE MONTHS ENDED MARCH 31, 2012 AND 2013 IS UNAUDITED)**

**1. Description of Business and Summary of Significant Accounting Policies (Continued)**

***Income Taxes***

The Company recognizes deferred tax assets and liabilities for the future tax consequences attributable to the differences between the financial statement carrying value of existing assets and liabilities and their respective tax bases. Deferred tax assets and liabilities are measured using enacted tax rates in effect for the fiscal year in which those temporary differences are expected to be recovered or settled. Valuation allowances are established when necessary to reduce deferred tax assets to the amount expected to be realized.

The Company operates in various tax jurisdictions and is subject to audit by various tax authorities. The Company provides for tax contingencies whenever it is deemed probable that a tax asset has been impaired or a tax liability has been incurred for events such as tax claims or changes in tax laws. Tax contingencies are based upon their technical merits, relative tax law and the specific facts and circumstances as of each reporting period. Changes in facts and circumstances could result in material changes to the amounts recorded for such tax contingencies.

The Company recognizes uncertain income tax positions taken on income tax returns at the largest amount that is more-likely-than-not to be sustained upon audit by the relevant taxing authority. An uncertain income tax position will not be recognized if it has less than a 50% likelihood of being sustained.

The Company's policy for recording interest and penalties associated with uncertain tax positions is to record such items as a component of its income tax provision.

***Presentation of Certain Taxes***

The Company collects various taxes from customers and remits these amounts to the applicable taxing authorities. The Company's accounting policy is to exclude these taxes from revenue and cost of revenue.

***Net Loss Per Share and Unaudited Pro Forma Net Loss Per Share***

Basic net loss per share is computed by dividing the net loss by the weighted-average number of common shares outstanding during the period. Basic and diluted

net loss per share of common stock is calculated by dividing the net loss by the weighted-average number of common shares outstanding during the period. Diluted net loss per share of common stock is the same as basic net loss per share of common stock, since the effects of potentially dilutive securities are anti-dilutive. Potentially dilutive common shares result from the assumed exercise of outstanding stock options and the assumed conversion of outstanding convertible preferred stock and warrants using the if-converted method.

Pro forma basic and diluted net loss per common share have been computed to give effect to the conversion of the Company's convertible preferred stock and warrants into common stock (using the if-converted method) as though the conversion had occurred at the beginning of the period presented.



Table of Contents

**CONTROL4 CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**(INFORMATION AS OF MARCH 31, 2013 AND FOR THE**

**THREE MONTHS ENDED MARCH 31, 2012 AND 2013 IS UNAUDITED)**

**1. Description of Business and Summary of Significant Accounting Policies (Continued)**

The following table presents the reconciliation of the numerator and denominator used in the calculation of basic and diluted net loss per share and the shares of common stock used to compute pro forma net loss per common share (in thousands):

| | Years Ended December 31, | | | Three Months Ended March 31, | |
|---|---|---|---|---|---|
| | 2010 | 2011 | 2012 | 2012 | 2013 |
| | | | | (unaudited) | |
| **Numerator:** | | | | | |
| Net loss | $ (16,265) | $ (3,885) | $ (3,723) | $ (2,683) | $ (1,471) |
| **Denominator:** | | | | | |
| Weighted-average common shares outstanding, basic and diluted | 8,531 | 10,014 | 12,286 | 11,708 | 13,022 |
| Assumed conversion of convertible preferred stock into shares of common stock | | | 79,529 | | 79,529 |
| Assumed conversion of preferred warrants into shares of common stock | | | 760 | | 757 |
| Pro forma weighted-average number of common shares, basic and diluted | | | 92,575 | | 93,308 |

The following weighted-average common stock equivalents were anti-dilutive and therefore were excluded from the calculation of diluted net loss per share (in thousands):

| | Years Ended December 31, | | | Three Months Ended March 31, | |
|---|---|---|---|---|---|
| | 2010 | 2011 | 2012 | 2012 | 2013 |
| | | | | (unaudited) | |
| Convertible preferred stock | 69,053 | 79,338 | 79,529 | 79,529 | 79,529 |
| Options to purchase common stock | 18,119 | 20,556 | 22,449 | 22,560 | 24,069 |
| Warrants to purchase common stock | 68 | 2,650 | 2,814 | 2,814 | 2,814 |
| Warrants to purchase preferred stock | 1,011 | 1,011 | 1,011 | 1,011 | 1,011 |
| Total | 88,251 | 103,555 | 105,803 | 105,914 | 107,423 |

***Fair Value of Financial Instruments***

The carrying amounts reported in the accompanying consolidated financial statements for cash and cash equivalents, accounts payable and accrued liabilities approximate their fair value because of the short-term nature of the accounts. The fair value of the notes payable approximates its carrying value based on the variable

nature of interest rates and current market rates available to the Company. The fair value of the warrant liability is discussed in footnotes 3 and 7.



Table of Contents

CONTROL4 CORPORATION

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)

(INFORMATION AS OF MARCH 31, 2013 AND FOR THE

THREE MONTHS ENDED MARCH 31, 2012 AND 2013 IS UNAUDITED)

**1. Description of Business and Summary of Significant Accounting Policies (Continued)**

***Recent Accounting Pronouncements***

In June 2011, the FASB issued new guidance which improves the comparability, consistency, and transparency of financial reporting and increases the prominence of items reported in other comprehensive income ("OCI") by eliminating the option to present components of OCI as part of the statement of changes in stockholders' equity. The amendments in this standard require that all non-owner changes in stockholders' equity be presented either in a single continuous statement of comprehensive income or in two separate but consecutive statements. Subsequently in December 2011, the FASB issued additional guidance, which indefinitely defers the requirement to present on the face of the financial statements reclassification adjustments for items that are reclassified from OCI to net income in the statement where the components of net income and the components of OCI are presented. The amendments to these standards do not change the items that must be reported in OCI, when an item of OCI must be reclassified to net income, or change the option for an entity to present components. This new guidance was effective for the Company beginning January 1, 2012 and was required to be applied retrospectively. The adoption of this guidance did not have an impact on the Company's results of operations, financial position, or cash flows as it relates only to financial statement presentation.

In February 2013, the FASB issued ASU 2013-02, *"Comprehensive Income: Reporting of Amounts Reclassified Out of Accumulated Other Comprehensive Income."* The amended guidance requires an entity to present the effects on the line items of net income of significant reclassifications out of accumulated other comprehensive income if the amount being reclassified is required under U.S. generally accepted accounting principles to be reclassified in its entirety to net income in the same reporting period. The guidance is effective prospectively for the reporting periods beginning after December 15, 2012. The Company does not anticipate the adoption of the amended guidance to have significant impact on its consolidated financial statements.

In May 2011, the FASB issued new guidance for fair value measurements to provide a consistent definition of fair value and ensure that the fair value measurement and disclosure requirements are similar between GAAP and International Financial Reporting Standards. The guidance changes certain fair value measurement principles and enhances the disclosure requirements, particularly for level 3 fair value measurements. The Company adopted this guidance prospectively on January 1, 2012 and noted no significant impact on the Company's results of operations, financial position, or cash flows.



Table of Contents

CONTROL4 CORPORATION

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)

(INFORMATION AS OF MARCH 31, 2013 AND FOR THE

THREE MONTHS ENDED MARCH 31, 2012 AND 2013 IS UNAUDITED)

**2. Balance Sheet Components**

Inventories consisted of the following (in thousands):

| | December 31, | | March 31, |
|---|---|---|---|
| | 2011 | 2012 | 2013 |
| | | | (unaudited) |
| Finished goods | $ 8,044 | $ 12,306 | $ 12,185 |
| Component parts | 1,453 | 209 | 353 |
| | $ 9,497 | $ 12,515 | $ 12,538 |

Property and equipment, net consisted of the following (in thousands):

| | December 31, | | March 31, |
|---|---|---|---|
| | 2011 | 2012 | 2013 |

| | | | |
|---|---|---|---|
| | | | (unaudited) |
| Computer equipment and software | $ 3,157 | $ 3,518 | $ 3,635 |
| Manufacturing tooling and test equipment | 2,203 | 2,731 | 3,095 |
| Furniture and fixtures | 1,705 | 1,801 | 1,985 |
| Lab and warehouse equipment | 1,631 | 1,974 | 2,197 |
| Marketing equipment | 503 | 419 | 419 |
| Leasehold improvements | 598 | 803 | 1,277 |
| | 9,797 | 11,246 | 12,608 |
| Less: accumulated depreciation | (7,670) | (8,580) | (9,042) |
| | $ 2,127 | $ 2,666 | $ 3,566 |

Intangible assets, net consisted of the following (in thousands):

| | December 31, | | March 31, |
|---|---|---|---|
| | 2011 | 2012 | 2013 |
| | | | (unaudited) |
| Acquired technology | $ 1,357 | $ 1,357 | $ 1,357 |
| Less: accumulated amortization | (160) | (431) | (499) |
| | $ 1,197 | $ 926 | $ 858 |

Other assets consisted of the following (in thousands):

| | December 31, | | March 31, |
|---|---|---|---|
| | 2011 | 2012 | 2013 |
| | | | (unaudited) |
| Deferred offering costs | $ — | $ — | $ 1,522 |
| Prepaid licensing | — | 700 | 773 |
| Deposits | 64 | 187 | 187 |
| | $ 64 | $ 887 | $ 2,482 |



Table of Contents

CONTROL4 CORPORATION

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)

(INFORMATION AS OF MARCH 31, 2013 AND FOR THE

THREE MONTHS ENDED MARCH 31, 2012 AND 2013 IS UNAUDITED)

**2. Balance Sheet Components (Continued)**

Accrued liabilities consisted of the following (in thousands):

| | December 31, | | March 31, |
|---|---|---|---|
| | 2011 | 2012 | 2013 |
| | | | (unaudited) |
| Current portion of settlement obligations (see Footnotes 5 and 9) | $ 488 | $ 2,229 | $ 2,235 |
| Sales returns and warranty accrual | 1,924 | 2,045 | 2,122 |
| Compensation accruals | 1,254 | 1,495 | 1,131 |

| | | | |
|---|---|---|---|
| Other accrued liabilities | 788 | 802 | 1,137 |
| | $ 4,454 | $ 6,571 | $ 6,625 |

**3. Fair Value Measurements**

The Company's financial instruments that are measured at fair value on a recurring basis consist of money market funds and redeemable preferred stock warrants. The following three levels of inputs are used to measure the fair value of financial instruments:

Level 1: Quoted prices in active markets for identical assets or liabilities. The Company classifies its money market funds as Level 1 instruments as they are traded in active markets with sufficient volume and frequency of transactions.

Level 2: Observable prices that are based on inputs not quoted on active markets, but corroborated by market data. The Company did not have any Level 2 instruments during the reported periods.

Level 3: Unobservable inputs are used when little or no market data is available. The Company utilized a Black-Scholes option pricing model in order to determine the fair value of the redeemable preferred stock warrant, with such value determined on an as-converted basis. Certain inputs used in the model are unobservable. The fair values could change significantly based on future market conditions.

The fair values of these financial assets and the redeemable preferred stock warrant were determined using the following inputs (in thousands):

| | Fair Value Measurements at December 31, 2011 using | | | |
|---|---|---|---|---|
| | Level 1 | Level 2 | Level 3 | Total |
| **Cash equivalents:** | | | | |
| Money market funds | $ 12,539 | $ — | $ — | $ 12,539 |
| **Other liabilities:** | | | | |
| Redeemable preferred stock warrants | — | — | 347 | 347 |







**3. Fair Value Measurements (Continued)**

| | Fair Value Measurements at December 31, 2012 using | | | |
|---|---|---|---|---|
| | Level 1 | Level 2 | Level 3 | Total |
| **Cash equivalents:** | | | | |
| Money market funds | $ 15,554 | $ — | $ — | $ 15,554 |
| **Other liabilities:** | | | | |
| Redeemable preferred stock warrants | — | — | 601 | 601 |

| | Fair Value Measurements at March 31, 2013 using | | | |
|---|---|---|---|---|
| | Level 1 | Level 2 | Level 3 | Total |
| | (unaudited) | | | |
| **Cash equivalents:** | | | | |
| Money market funds | $ 12,407 | $ — | $ — | $ 12,407 |
| **Other liabilities:** | | | | |
| Redeemable preferred stock warrants | — | — | 576 | 576 |

The following table summarizes the change in value of the convertible preferred stock warrant liability (in thousands):

Years Ended

| | December 31, 2011 | December 31, 2012 | Three Months Ended March 31, 2013 (unaudited) |
|---|---|---|---|
| Balance at the beginning of the period | $ 574 | $ 347 | $ 601 |
| Change in fair value included in other (income) expense | (227) | 254 | (25) |
| Balance at the end of the period | $ 347 | $ 601 | $ 576 |

**4. Intangible Assets**

In 2011, the Company entered into a purchase agreement to acquire software technology to be used in certain software applications. The total purchase price was determined based on a revenue-sharing formula for software licenses sold with the acquired technology between December 2011 and November 2012. The purchase agreement includes a minimum purchase price of $725,000 and a maximum purchase price of $2.0 million. In 2011, the Company recorded a finite-lived intangible asset and corresponding obligation for the minimum purchase price of $725,000, based on estimated future license sales under the agreement. Based on sales during that period, the final purchase price was $725,000. The asset is being amortized and expensed to cost of revenue on a straight-line basis over the estimated life of the associated technology, which was determined to be five years.

In 2010, the Company completed the acquisition of software technology to be used in certain software applications for a total purchase price that consisted of a cash payment of approximately $0.3 million and the issuance of a warrant to purchase 370,000 shares of the Company's common stock. The warrant has a five-year term, was immediately exercisable in full and has an exercise price of $1.44 per share.



Table of Contents

**CONTROL4 CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**(INFORMATION AS OF MARCH 31, 2013 AND FOR THE**

**THREE MONTHS ENDED MARCH 31, 2012 AND 2013 IS UNAUDITED)**

**4. Intangible Assets (Continued)**

The fair value of the warrant, totaling approximately $0.3 million, was calculated based on the following assumptions:

| | |
|---|---|
| Dividend yield | 0% |
| Volatility | 71% |
| Risk-free interest rate | 1.20% |
| Remaining contractual term (in years) | 5.0 |

The total purchase price of approximately $0.6 million was recorded as a finite-lived intangible asset and is being amortized and expensed to cost of revenue on a straight-line basis over the estimated life of the associated technology which was determined to be five years.

Amortization of finite-lived intangible assets as of December 31, 2012 is as follows for the next four years:

| | |
|---|---|
| 2013 | $ 271 |
| 2014 | 271 |
| 2015 | 250 |
| 2016 | 134 |
| | $ 926 |

**5. Long-Term Obligations**

***Loan and Security Agreement***

The Company has entered into a borrowing agreement and related amendments with Silicon Valley Bank (the "SVB Agreement"), which consists of a revolving credit facility of $13.0 million (subject to certain borrowing base restrictions) and term borrowings to fund purchases of property and equipment. Borrowings under the SVB Agreement are collateralized by the general assets of the Company. The credit facility has a variable rate of interest of prime (as published in the Wall Street Journal) plus 0.25%, which was 3.50% at March 31, 2013. In addition, the Company pays an annual commitment fee of $20,000 and a quarterly unused line fee of 0.375% based on the difference between the borrowing commitment of $13.0 million and the then-current balance. Term borrowings are payable in 42 equal monthly payments of principal plus interest and bear interest at prime plus 0.50%, which was 3.75% at March 31, 2013.

Borrowing under the revolving credit facility is subject to certain collateral restrictions relating primarily to the Company's accounts receivable and inventory levels. As of March 31, 2013, total borrowing capacity was approximately $12.9 million. The Company had not borrowed against the revolving credit facility at December 31, 2011 or 2012 or March 31, 2013. The revolving credit facility has a maturity date of May 29, 2014.

The SVB Agreement contains various restrictive and financial covenants and the Company was in compliance with each of these covenants as of December 31, 2011 and 2012 and March 31, 2013.



Table of Contents

CONTROL4 CORPORATION

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)

(INFORMATION AS OF MARCH 31, 2013 AND FOR THE

THREE MONTHS ENDED MARCH 31, 2012 AND 2013 IS UNAUDITED)

**5. Long-Term Obligations (Continued)**

Future principal payments on outstanding term borrowings as of December 31, 2012 are as follows (in thousands):

| | |
|---|---|
| 2013 | $ 1,321 |
| 2014 | 840 |
| 2015 | 588 |
| 2016 | 410 |
| | $ 3,159 |

***Settlement Obligation***

The Company has entered into various settlement agreements (see Footnote 9) relating to alleged patent infringements, which included future payments under non-interest bearing, unsecured notes payable. The carrying value of the notes payable have been discounted using implied interest rates between 3.75% and 4.5%.

Future annual payments on the settlement obligations as of December 31, 2012 are shown in the table below (in thousands):

| | |
|---|---|
| 2013 | $ 2,400 |
| 2014 | 600 |
| 2015 | 600 |
| 2016 | 600 |
| | 4,200 |
| Less amount representing interest | (296) |
| Present value of settlement obligations | 3,904 |
| Less current portion of settlement obligations | (2,229) |
| Long-term portion of settlement obligations | $ 1,675 |

The long-term portion of the settlement obligations is included in Other Long-Term Liabilities in the accompanying consolidated balance sheets.

***Interest Expense on Long-Term Obligations***

The Company incurred $411,000, $396,000, $277,000, $65,000 and $78,000 of interest during each of the years ended December 31, 2010, 2011, and 2012, and for the three months ended March 31, 2012 and 2013, respectively.



Table of Contents

CONTROL4 CORPORATION

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)

(INFORMATION AS OF MARCH 31, 2013 AND FOR THE

THREE MONTHS ENDED MARCH 31, 2012 AND 2013 IS UNAUDITED)

**6. Income Taxes**

The domestic and foreign components of net income (loss) before income tax expense consists of the following for the periods shown below (in thousands):

| | Years Ended December 31, | | |
|---|---|---|---|
| | 2010 | 2011 | 2012 |
| Income (loss) before income taxes: | | | |
| Domestic | $ (16,394) | $ (4,697) | $ (4,055) |
| Foreign | 129 | 812 | 473 |
| Total loss before income taxes | $ (16,265) | $ (3,885) | $ (3,582) |

The provision (benefit) for income taxes consisted of the following components (in thousands):

| | Years Ended December 31, | | |
|---|---|---|---|
| | 2010 | 2011 | 2012 |
| Current: | | | |
| Domestic | | | |
| Federal | $ — | $ — | $ 15 |
| State | — | — | 57 |
| Foreign | — | — | 69 |
| Total current tax expense | — | — | 141 |
| Deferred: | | | |
| Domestic | | | |
| Federal | (5,397) | (1,773) | (710) |
| State | (587) | (280) | (65) |
| Foreign | 36 | 251 | 88 |
| Valuation allowance | 5,948 | 1,802 | 687 |
| Total deferred tax expense | — | — | — |
| Total income tax expense | $ — | $ — | $ 141 |

A reconciliation from the U.S. statutory federal income tax rate to the effective income tax rate follows:

| | Years Ended December 31, | | |
|---|---|---|---|
| | 2010 | 2011 | 2012 |
| Federal income tax rate | (34.0)% | (34.0)% | (34.0)% |
| State taxes, net of federal benefit | (3.0) | (4.1) | 1.1 |
| Stock-based compensation expense | 2.5 | 9.1 | 15.0 |
| Research and development credits | (3.2) | (16.0) | — |
| Change in valuation allowance | 36.8 | 46.4 | 17.3 |
| Other, net | 0.9 | (1.4) | 4.5 |
| Effective income tax rate | (0.0)% | (0.0)% | 3.9 % |

Table of Contents

CONTROL4 CORPORATION

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)

(INFORMATION AS OF MARCH 31, 2013 AND FOR THE

THREE MONTHS ENDED MARCH 31, 2012 AND 2013 IS UNAUDITED)

**6. Income Taxes (Continued)**

Deferred tax assets and (liabilities) are comprised of the following (in thousands):

| | December 31, | |
|---|---|---|
| | 2011 | 2012 |
| Deferred Tax Assets: | | |
| Reserves and accruals | $ 2,582 | $ 3,396 |
| Inventories | 472 | 606 |
| Net operating loss carryforwards | 31,020 | 30,165 |
| Property, plant and equipment | 909 | 1,054 |
| Stock-based compensation | 419 | 783 |
| Research and development credits | 3,239 | 3,254 |
| Other | 134 | 204 |
| Total deferred tax assets | 38,775 | 39,462 |
| Valuation allowance | (38,775) | (39,462) |
| Net deferred tax asset | $ — | $ — |

During the year ended December 31, 2012, the Company reversed the valuation allowance for deferred tax assets related to its subsidiary operating in England totaling $92,000. This subsidiary had a history of generating income and used its remaining net operating loss carryforwards in the year ended December 31, 2012.

At December 31, 2011 and 2012, the Company had a full valuation allowance against the deferred tax assets of its domestic and other foreign operations as it believes it is more likely than not that these benefits will not be realized. Significant judgment is required in making this assessment, and it is very difficult to predict when, if ever, the assessment may conclude that the remaining portion of the deferred tax assets are realizable. The net valuation allowance increased by approximately $1.8 million and $0.7 million during the years ended December 31, 2011 and 2012, respectively.

Net operating loss and tax credit carryforwards as of December 31, 2012 are as follows (in thousands):

| | Amount | Expiration Years |
|---|---|---|
| Net operating losses, federal | $ 83,612 | 2023-2031 |
| Net operating losses, state | 83,101 | 2018-2031 |
| Tax credit carryforwards, federal | 2,472 | 2023-2031 |
| Tax credit carryforwards, state | 1,162 | 2018-2025 |
| Net operating losses, foreign | 24 | None |

Approximately $2.7 million of the net operating losses reported above represents unrecorded tax benefits for stock-based compensation, which will be recorded in additional paid in capital when realized. Utilization of the net operating loss carryforwards and credits may be subject to a substantial annual limitation due to the ownership change limitations provided by the Internal Revenue Code of 1986, as amended (the "IRC"), and similar state provisions. The Company has not performed a detailed analysis to determine whether an ownership change under Section 382 of the IRC has occurred



Table of Contents

CONTROL4 CORPORATION

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)

(INFORMATION AS OF MARCH 31, 2013 AND FOR THE

**6. Income Taxes (Continued)**

or will occur. The effect of an ownership change would be the imposition of an annual limitation on the use of net operating loss carryforwards attributable to periods before the change.

The following is a reconciliation of the changes in the gross balance of unrecognized tax benefits, excluding interest and penalties (in thousands):

| | Years Ended December 31, | | |
|---|---|---|---|
| | 2010 | 2011 | 2012 |
| Balance at the beginning of the period | $ 1,477 | $ 1,862 | $ 2,318 |
| Current year additions | 385 | 456 | — |
| Balance at the end of the period | $ 1,862 | $ 2,318 | $ 2,318 |

The Company does not believe there will be any material changes in its unrecognized tax benefits over the next 12 months. As of December 31, 2012, the amount of unrecognized tax benefits that would, if recognized, impact the Company's effective income tax rate is approximately $2.3 million.

The Company files income tax returns in the United States, including various state and local jurisdictions. The Company's subsidiaries' file income tax returns in the United Kingdom. The Company is subject to examination in the United States, the United Kingdom and various state jurisdictions for periods since inception. As of December 31, 2012, the Company was not under examination by any tax authorities. Tax years beginning in 2008 are subject to examination by taxing United States tax authorities, although net operating loss and credit carryforwards from all years are subject to examinations and adjustments for at least three years following the year in which the attributes are used. Tax years beginning in 2009 are subject to examination by the taxing authorities in the United Kingdom.

At December 31, 2012, the Company had undistributed foreign earnings of $107,000, which the Company intends to permanently reinvest in the foreign subsidiary. The Company anticipates that future overseas earnings will also be reinvested indefinitely. In accordance with the indefinite reversal criteria, the foreign currency gains recorded in other comprehensive income related to foreign currency translation have not been tax effected.



Table of Contents



**7. Redeemable Convertible Preferred Stock and Stockholders' Deficit**

***Redeemable Convertible Preferred Stock***

Redeemable convertible preferred stock consisted of the following at December 31, 2011 and 2012 and March 31, 2013 (in thousands, except share data):

| | Shares Authorized | Shares Issued and Outstanding | Aggregate Liquidation Preference |
|---|---|---|---|
| Series A | 8,150,000 | 8,150,000 | $ 4,075 |
| Series B | 18,124,230 | 18,124,230 | 14,735 |
| Series C | 14,215,791 | 14,177,696 | 15,000 |
| Series D | 7,789,215 | 7,789,215 | 15,890 |
| Series E | 5,045,662 | 5,022,831 | 11,000 |
| Series F | 5,988,024 | 5,988,024 | 20,000 |
| Series G | 8,677,338 | 8,677,338 | 15,450 |
| Series G-1 | 2,073,148 | 1,123,280 | 2,000 |
| Series H | 13,100,000 | 10,476,141 | 20,000 |
| | 83,163,408 | 79,528,755 | $ 118,150 |

All redeemable convertible preferred stockholder agreements provide for the following:

- Voting with common stockholders in an amount equal to the number of common shares into which the preferred shares are convertible.
- Protective provisions that require the consent of holders of 50 percent of all Preferred Stockholders for certain transactions or events.
- Priority over any other class of outstanding capital stock of the Company with respect to dividend rights and liquidation, winding up or dissolution rights.

The Series A, Series B, Series C, Series D, Series E, Series F, Series G, Series G-1 and Series H redeemable convertible preferred stockholders (collectively, the "Preferred Stockholders") are entitled to receive, when, as and if declared by the Company's Board of Directors (the "Board of Directors"), dividends at a rate of $0.04, $0.06504, $0.08464, $0.1632, $0.1752, $0.2672, $0.1424, $0.1424 and $0.1527 per share per year, respectively. To the extent that additional dividends are declared by the Board of Directors, those amounts would be distributed equally among the Preferred Stockholders and common stockholders. As of December 31, 2012, no dividends had been declared by the Board of Directors.

In the event of any liquidation, dissolution or winding up of the Company, either voluntary or involuntary, the Preferred Stockholders are entitled to receive a liquidation preference payment prior to any distribution of any assets or surplus funds of the Company to the common stockholders. The



Table of Contents



**7. Redeemable Convertible Preferred Stock and Stockholders' Deficit (Continued)**

following table lists the payment priority and preference to the respective Preferred Stockholders in the event of a liquidation of the Company:

| | Payment Priority | Per Share Preference |
|---|---|---|
| Series H | 1 | $ 1.9091 |
| Series G-1 | 1 | 1.7805 |
| Series G | 2 | 1.7805 |
| Series F | 2 | 3.3400 |
| Series E | 3 | 2.1900 |
| Series D | 4 | 2.0400 |
| Series C | 5 | 1.0580 |
| Series B | 6 | 0.8130 |
| Series A | 6 | 0.5000 |

Each share of Preferred Stock may be converted, at the option of the holder, into common stock at a conversion ratio determined by dividing the original issuance price per share, as defined, by the effective conversion price for such share then outstanding. As of December 31, 2012, the effective conversion price per share for Series A, Series B, Series C, Series D, Series E, Series F, Series G, Series G-1 and Series H redeemable convertible preferred stock was $0.50, $0.813, $1.058, $2.04, $2.19, $3.34, $1.7805, $1.7805 and $1.9091, respectively. The effective conversion price per share is subject to certain anti-dilution provisions. The Preferred Stock will automatically convert to common stock upon the consent of holders of a majority of the shares of Preferred Stock outstanding or the closing of an initial public offering of common stock that reflects a pre-money valuation of at least $225 million and results in net proceeds to the Company of not less than $35 million.

The Company is obligated, upon election of a majority of the holders of Preferred Stock at any time on or after December 12, 2015, to redeem the Series A, Series B, Series C, Series D, Series E, Series F, Series G, Series G-1 and Series H redeemable convertible preferred stock at $0.50, $0.813, $1.058, $2.04, $2.19, $3.34, $1.7805, $1.7805 and $1.9091 per share, respectively, plus declared but unpaid dividends. If the Preferred Stockholders elect to redeem the preferred stock, the Series G-1 preferred shares will be redeemed 40 days following the redemption election date (the "Original Redemption Date"). Thereafter, the redemption of the remaining preferred shares will occur in three annual installments starting on the Original Redemption Date.



Table of Contents

(INFORMATION AS OF MARCH 31, 2013 AND FOR THE

THREE MONTHS ENDED MARCH 31, 2012 AND 2013 IS UNAUDITED)

**7. Redeemable Convertible Preferred Stock and Stockholders' Deficit (Continued)**

***Warrants to Purchase Stock and Preferred Stock Warrant Liability***

Warrants to purchase common and preferred stock at December 31, 2012 and March 31, 2013 are summarized in the following table:

| | Number of Shares Subject to Warrant | Exercise Price |
|---|---|---|
| Warrants to purchase common shares | 370,000 | $ 1.4400 |
| Warrants to purchase common shares | 2,444,432 | 1.9091 |
| Warrants to purchase Series C redeemable convertible preferred stock | 38,095 | 1.0580 |
| Warrants to purchase Series E redeemable convertible preferred stock | 22,831 | 2.1900 |
| Warrants to purchase Series G-1 redeemable convertible preferred stock | 949,868 | 1.7805 |
| | 3,825,226 | |

In 2011, the Company issued warrants to purchase 2,444,432 shares of common stock to one Series H investor. The warrants became immediately exercisable upon the closing of the Series H financing and have a term of three years. The total proceeds of $20 million from the Series H financing were allocated between the Series H redeemable preferred stock and the common stock warrants based on their relative fair market value. The fair value of the warrants was calculated using the Black-Scholes option pricing model based on the following assumptions:

| | |
|---|---|
| Dividend yield | 0% |
| Expected volatility | 82% |
| Risk-free interest rate | 1.05-1.39% |
| Remaining contractual term (in years) | 3.0 |

In 2009, the Series G-1 investors received warrants to purchase 949,868 shares of Series G-1 redeemable convertible preferred stock at a price of $1.7805 per share. The warrants became immediately exercisable upon the closing of the Series G-1 financing and the fair value of $0.4 million was recorded as a liability with the offsetting charge to expense. Because the holders of the preferred stock may elect to redeem the shares for cash, the Company's outstanding preferred stock warrants are classified as liabilities and are revalued at the end of each reporting period using the Black-Scholes option pricing valuation model. Changes in fair value are reflected in the Company's statements of operations as other income or expense. In the event of an initial public offering, the warrant to purchase Series G-1 redeemable convertible preferred stock must be either exercised or the warrant will expire upon the closing of the initial public offering. Upon exercise of the warrant, the purchased Series G-1 redeemable convertible preferred stock are convertible into shares of common stock. Since the strike price for the warrant equals the liquidation preference for the Series G-1 redeemable convertible preferred stock, it would only be optimal for the holder to exercise the warrant when the Company's enterprise value is high enough that it would be advantageous for the holders of the preferred stock to convert. As a result, the fair market value of the Company's common stock has been



Table of Contents

CONTROL4 CORPORATION

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)

(INFORMATION AS OF MARCH 31, 2013 AND FOR THE

THREE MONTHS ENDED MARCH 31, 2012 AND 2013 IS UNAUDITED)

**7. Redeemable Convertible Preferred Stock and Stockholders' Deficit (Continued)**

used to value the warrant liability using the Black-Scholes option pricing model. The fair value of the warrants was calculated using the income approach and is based on the following assumptions:

| | December 31, | | | March 31, |
|---|---|---|---|---|
| | 2010 | 2011 | 2012 | 2013 |
| Dividend yield | 0% | 0% | 0% | 0% |
| Expected volatility | 87% | 60% | 54% | 44% |
| Risk-free interest rate | 1.02% | 0.36% | 0.16% | 0.14% |
| Remaining contractual term (in years) | | | | |

| | | | | |
|---|---|---|---|---|
| | 3.5 | 2.5 | 1.5 | 1.2 |

***Stock Options***

In 2003, the Board of Directors adopted the 2003 Equity Incentive Plan (the 2003 Plan), which provides for the granting of nonqualified and incentive stock options, stock appreciation rights, stock awards and restricted stock. Under the 2003 Plan, the Company may grant nonqualified and incentive stock options to directors, employees and non-employees providing services to the Company. The Board of Directors, on an option-by-option basis, determines the number of shares, terms and exercise period. Options granted generally have a ten-year life and vest over a period of four years. The exercise price of options on the date of grant is equivalent to the estimated fair value of the stock as determined by the Board of Directors based upon information available to it at the time of grant. Because there has been no public market for the common stock, the Company's Board of Directors has determined the fair value of the Company's common stock based on a variety of factors, including periodic valuations of the Company's common stock, arm's-length sales of the Company's common stock, the Company's financial position, historical financial performance, projected financial performance, valuations of publicly traded peer companies and the illiquid nature of the Company's common stock. As of March 31, 2013, an aggregate of 33,480,595 shares are authorized for issuance under the 2003 Plan. The terms of the 2003 Plan allow for defined increases to the number of authorized shares available for grant.



Table of Contents

**CONTROL4 CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**(INFORMATION AS OF MARCH 31, 2013 AND FOR THE**

**THREE MONTHS ENDED MARCH 31, 2012 AND 2013 IS UNAUDITED)**

**7. Redeemable Convertible Preferred Stock and Stockholders' Deficit (Continued)**

A summary of stock option activity under the Plan for the years ended December 31, 2010, 2011 and 2012 and for the three months ended March 31, 2013 is presented below:

| | Shares Subject to Options Outstanding | Weighted Average Grant Date Fair Value | Weighted Average Exercise Price | Weighted Average Remaining Contractual Life (Years) |
|---|---|---|---|---|
| Balance at December 31, 2009 | 14,038,824 | $ 0.30 | $ 0.57 | 7.1 |
| Options granted | 5,283,843 | 0.62 | 1.00 | |
| Options exercised | (502,821) | 0.23 | 0.39 | |
| Options expired | (130,611) | 0.37 | 0.70 | |
| Options forfeited | (1,147,372) | 0.56 | 0.93 | |
| Balance at December 31, 2010 | 17,541,863 | 0.38 | 0.68 | 6.9 |
| Options granted | 10,338,775 | 0.76 | 1.19 | |
| Options exercised | (3,002,792) | 0.23 | 0.40 | |
| Options expired | (971,199) | 0.46 | 0.83 | |
| Options forfeited | (1,270,272) | 0.62 | 1.02 | |
| Balance at December 31, 2011 | 22,636,375 | 0.56 | 0.92 | 7.6 |
| Options granted | 3,719,700 | 1.02 | 1.82 | |
| Options exercised | (1,275,842) | 0.37 | 0.62 | |
| Options expired | (73,621) | 0.57 | 0.94 | |
| Options forfeited | (827,732) | 0.70 | 1.10 | |
| Balance at December 31, 2012 | 24,178,880 | 0.64 | 1.07 | 7.2 |
| Options granted | — | — | — | |
| Options exercised | (84,290) | 0.21 | 0.42 | |
| Options expired | (11,979) | 0.75 | 1.18 | |

| | | | | |
|---|---|---|---|---|
| Options forfeited | (110,580) | 0.84 | 1.40 | |
| Balance at March 31, 2013 | 23,972,031 | $ 0.64 | $ 1.07 | 6.9 |
| Exercisable options at December 31, 2012 | 13,729,450 | $ 0.48 | $ 0.82 | 5.8 |
| Vested during the year ended December 31, 2012 | 4,285,236 | $ 0.71 | $ 1.14 | |
| Vested and expected to vest at December 31, 2012 | 22,256,440 | $ 0.62 | $ 1.04 | |
| Non-vested options at December 31, 2012 | 10,449,430 | $ 0.84 | $ 1.40 | |
| Exercisable options at March 31, 2013 | 14,496,476 | $ 0.50 | $ 0.84 | 5.7 |
| Vested during the three months ended March 31, 2013 | 863,295 | $ 0.76 | $ 1.21 | |
| Vested and expected to vest at March 31, 2013 | 22,183,544 | $ 0.63 | $ 1.04 | |
| Non-vested options at March 31, 2013 | 9,475,555 | $ 0.85 | $ 1.42 | |



Table of Contents

**CONTROL4 CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**(INFORMATION AS OF MARCH 31, 2013 AND FOR THE**

**THREE MONTHS ENDED MARCH 31, 2012 AND 2013 IS UNAUDITED)**

**7. Redeemable Convertible Preferred Stock and Stockholders' Deficit (Continued)**

The following table summarizes information about stock options outstanding and exercisable at March 31, 2013:

| | Options Outstanding | | | Options Exercisable | |
|---|---|---|---|---|---|
| Range of Exercise Prices | Weighted Average Exercise Price | Number of Underlying Shares | Weighted-Average Remaining Contractual Life (in years) | Number of Underlying Shares | Weighted-Average Remaining Contractual Life (in years) |
| 0.0500 - 0.2500 | $ 0.11 | 1,021,273 | 1.7 | 1,021,273 | 1.7 |
| 0.2600 - 0.5000 | 0.42 | 2,496,536 | 3.2 | 2,496,536 | 3.2 |
| 0.5100 - 0.7500 | 0.62 | 1,775,113 | 4.3 | 1,775,113 | 4.3 |
| 0.7600 - 1.0000 | 0.94 | 5,104,516 | 6.0 | 4,672,957 | 5.9 |
| 1.0100 - 1.2500 | 1.19 | 9,305,355 | 8.5 | 3,953,348 | 8.4 |
| 1.2600 - 1.5000 | 1.44 | 618,538 | 7.3 | 443,203 | 7.3 |
| 1.5100 - 1.7500 | 1.70 | 1,270,000 | 9.2 | 84,994 | 9.2 |
| 1.7600 - 2.0000 | 1.88 | 2,380,700 | 9.7 | 49,052 | 9.6 |
| | | 23,972,031 | | 14,496,476 | |

The following table summarizes the aggregate intrinsic-value of options exercised, outstanding and exercisable (in millions):

| | Years Ended December 31, | | | Three Months Ended |
|---|---|---|---|---|
| | 2010 | 2011 | 2012 | March 31, 2013 (unaudited) |
| Options Exercised | $ 0.30 | $ 2.40 | $ 1.31 | $ 0.14 |
| Options Outstanding | $ 9.17 | $ 9.11 | $ 23.48 | $ 26.38 |
| Options Exercisable | $ 7.66 | $ 7.10 | $ 16.80 | $ 19.26 |

The fair value of each option award is estimated on the date of grant using the Black-Scholes option pricing model with the following assumptions:

| | Years Ended December 31, | | |
|---|---|---|---|
| | 2010 | 2011 | 2012 |
| Expected volatility | 70-71% | 71-73% | 59-63% |
| Expected dividends | —% | —% | —% |
| Expected term (in years) | 5.2-6.1 | 5.0-6.1 | 5.0-6.1 |
| Risk-free rate | 2.2-3.0% | 1.1-2.5% | 0.7-1.0% |
| Forfeiture rate | 8.1% | 11.6% | 7.9% |

Expected volatility is based on the average volatility of similar public companies. The expected term was calculated based on the average of the vesting period and contractual term. The risk-free interest rate was determined using the implied yield on U.S. Treasury issues with a remaining term within the expected life of the award. The Company uses historical data to determine forfeiture rates.



Table of Contents

**CONTROL4 CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**(INFORMATION AS OF MARCH 31, 2013 AND FOR THE**

**THREE MONTHS ENDED MARCH 31, 2012 AND 2013 IS UNAUDITED)**

**7. Redeemable Convertible Preferred Stock and Stockholders' Deficit (Continued)**

Total stock-based compensation expense has been classified as follows in the accompanying statements of operations (in thousands):

| | Years Ended December 31, | | | Three Months Ended March 31, | |
|---|---|---|---|---|---|
| | 2010 | 2011 | 2012 | 2012 | 2013 |
| | | | | (unaudited) | |
| Cost of revenue | $ 28 | $ 49 | $ 78 | $ 17 | $ 16 |
| Research and development | 249 | 492 | 704 | 130 | 236 |
| Sales and marketing | 546 | 523 | 580 | 144 | 184 |
| General and administrative | 646 | 949 | 1,507 | 440 | 402 |
| | $ 1,469 | $ 2,013 | $ 2,869 | $ 731 | $ 838 |

At March 31, 2013, there was $6.2 million of total unrecognized compensation cost related to non-vested stock option awards that will be recognized over a weighted-average period of 2.8 years.

**Reserved Shares**

At March 31, 2013, the Company had reserved shares of its common stock for future issuance as follows:

| | |
|---|---|
| Stock options under the 2003 Plan: | |
| Options outstanding | 23,972,031 |
| Reserved for future grants | 2,799,389 |
| Convertible preferred stock: | |
| Issued and outstanding (as-if-converted basis) | 79,528,755 |
| Warrants to purchase common and preferred stock | 3,825,226 |
| | 110,125,401 |

**8. Related Party Transactions**

The Company has entered into sales agreements with certain of its investors. The following table sets forth revenue from product sales to companies affiliated

with these investors (in thousands):

| | Years Ended December 31, | | | Three Months Ended March 31, | |
|---|---|---|---|---|---|
| | 2010 | 2011 | 2012 | 2012 | 2013 |
| | | | | (unaudited) | |
| Company 1 | $ 620 | $ 995 | $ 2,142 | $ 226 | $ 558 |
| Company 2 | — | — | 1,807 | — | 119 |
| Company 3 | 1,174 | 2,134 | 1,290 | 350 | 126 |
| Company 4 | — | 478 | 791 | 167 | 285 |
| | $ 1,794 | $ 3,607 | $ 6,030 | $ 743 | $ 1,088 |



Table of Contents

CONTROL4 CORPORATION

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)

(INFORMATION AS OF MARCH 31, 2013 AND FOR THE

THREE MONTHS ENDED MARCH 31, 2012 AND 2013 IS UNAUDITED)

**8. Related Party Transactions (Continued)**

As of December 31, 2011 and 2012 and March 31, 2013, the Company had accounts receivable from these companies totaling $0.6 million, $1.5 million and $0.8 million, respectively.

**9. Commitments and Contingencies**

***Operating Leases***

The Company leases office and warehouse space under operating leases that expire between 2013 and 2018. The terms of the leases include periods of free rent, options for the Company to extend the leases (three to five years) and increasing rental rates over time. The Company recognizes rental expense under these operating leases on a straight-line basis over the lives of the leases and has accrued for rental expense recorded but not paid.

Rental expense was approximately $0.9 million, $1.0 million and $1.1 million for the years ended December 31, 2010, 2011 and 2012, respectively.

In March 2012, the Company entered into a 66-month lease modification on its corporate office lease, which was set to expire on December 31, 2012. Future minimum rental payments required under non-cancelable operating leases with initial or remaining terms in excess of one year consist of the following as of December 31, 2012 (in thousands):

| | |
|---|---|
| 2013 | $ 794 |
| 2014 | 1,238 |
| 2015 | 1,250 |
| 2016 | 1,109 |
| 2017 | 992 |
| Thereafter | 489 |
| | $ 5,872 |

***Purchase Commitments***

The Company had non-cancellable purchase commitments for the purchase of inventory, which extend through August 2013 totaling approximately $19.5 million at December 31, 2012.

***Employment Agreements***

The Company has signed employment agreements with certain executive officers who are entitled to receive certain benefits if their employment is terminated by the Company, including severance payments, accelerated vesting of stock options and continuation of certain insurance benefits.

***Legal Matters***

The Company is subject to various lawsuits and other claims that arise from time to time in the ordinary course of business. These actions are based on alleged

patent infringement and other matters. The Company intends to defend itself vigorously against any such actions. The Company establishes reserves for specific liabilities in connection with legal actions that it deems to be probable and estimable.



Table of Contents

**CONTROL4 CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**(INFORMATION AS OF MARCH 31, 2013 AND FOR THE**

**THREE MONTHS ENDED MARCH 31, 2012 AND 2013 IS UNAUDITED)**

**9. Commitments and Contingencies (Continued)**

In December 2012, the Company entered into a settlement agreement relating to alleged patent infringements, which included future royalty payments on certain products and the payment of a lump sum amount totaling $2.9 million. The lump sum amount included a payment of $1.1 million which was made in December 2012 and future payments that are non-interest bearing and unsecured. The Company has recorded a liability of $1.7 million to reflect the carrying value of the future payments that have been discounted using an implied interest rate of 3.75%. The future payments are included in current liabilities as the licensor has the ability to request an accelerated but discounted payment at June 30, 2013. The lump sum amount was attributed to previous sales of products alleged to have infringed on the patents and to prepaid future sales of certain products. As a result, $700,000 has been recorded in other assets as of December 31, 2012.

In December 2012, the Company finalized termination of a sales contract and agreed to pay a $750,000 early termination penalty. As a result of the contract termination, the Company also recorded a $1.8 million expense associated with an anticipated loss on firm purchase commitments for components that would have been required to meet the Company's obligations under the terminated contract. The $750,000 penalty and the $1.8 million charge have been recorded as Litigation Settlement and Cost of Revenue—Inventory Purchase Commitment, respectively, in the accompanying consolidated statement of operations during the year ended December 31, 2012.

In management's opinion, the Company is not currently involved in any legal proceedings which, individually or in the aggregate, could have a material effect on the Company's financial condition, operations or cash flows.

**10. Subsequent Events**

The Company has evaluated subsequent events through March 15, 2013, the date on which the financial statements were available to be issued.

**11. Subsequent Events (Unaudited)**

For our interim consolidated financial statement as of March 31, 2013, and for the three months then ended, we have evaluated subsequent events through July 1, 2013, which is the date the financial statements were available to be issued.

In April 2013, the Company's Board of Directors approved an amendment to the Company's certificate of incorporation to authorize 500,000,000 shares of common stock and 25,000,000 shares of undesignated preferred stock effective on the closing of its planned initial public offering.



Table of Contents

**CONTROL4 CORPORATION**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**(INFORMATION AS OF MARCH 31, 2013 AND FOR THE**

**THREE MONTHS ENDED MARCH 31, 2012 AND 2013 IS UNAUDITED)**

**11. Subsequent Events (Unaudited) (Continued)**

Subsequent to March 31, 2013, the Company granted options to employees and consultants to purchase shares of common stock as summarized in the following table:

| | Number of Options Granted | Exercise Price per Share | Common Stock Fair Value at Grant Date |
|---|---|---|---|
| April 25, 2013 | 449,500 | $ 2.17 | $ 2.17 |
| June 11, 2013 | 815,000 | $ 2.17 | $ 2.17 |
| June 23, 2013 | 762,500 | $ 2.17 | $ 2.17 |

2,027,000

On June 17, 2013, the Company entered into an Amended and Restated Loan and Security Agreement with Silicon Valley Bank (the "New SVB Agreement") which amends and restates the Loan and Security Agreement, as amended, by and between Silicon Valley Bank and the Company. The New SVB Agreement extends the maturity date of the revolving credit facility to May 29, 2015 and changes the interest rate to either the published Wall Street Journal prime rate or LIBOR plus 2.50%, as selected by the Company. In addition, the New SVB Agreement provides for an additional $2.75 million in term borrowings to fund purchases of property and equipment.

On June 21, 2013, the Company entered into a purchase agreement to acquire the assets, which consist primarily of software technology, and assume certain liabilities of a software technology company. As consideration for the acquisition, the Company will pay approximately $100,000 in cash and issue options to acquire shares of common stock of the Company. The acquisition will be accounted for as a business combination and therefore, the purchase price will be allocated to the assets acquired and liabilities assumed, based on estimated fair values. The Company anticipates that the fair value of the total purchase consideration will be less than $500,000. The determination of the final purchase price is subject to potential adjustment, based on the finalization of the value of the equity options. Additionally, the allocation of the purchase price may change based upon the finalization of the fair value of the identified acquired intangible assets.





Table of Contents

Through and including, , 2013 (the 25th day after the date of this prospectus), all dealers effecting transactions in these securities, whether or not participating in this offering, may be required to deliver a prospectus. This is in addition to a dealer's obligation to deliver a prospectus when acting as an underwriter and with respect to an unsold allotment or subscription.

**Shares**

Control4™

**Common Stock**

**PROSPECTUS**

**BofA Merrill Lynch** | **Raymond James**

**Canaccord Genuity** | **Cowen and Company** | **Needham & Company**

**, 2013**

Table of Contents

**PART II**

**INFORMATION NOT REQUIRED IN THE PROSPECTUS**

**Item 13. Other Expenses of Issuance and Distribution.**

Estimated expenses, other than underwriting discounts and commissions, payable by the Registrant in connection with the sale of the common stock being registered under this registration statement are as follows:

| | | |
|---|---|---|
| SEC registration fee | $ | 8,184 |
| FINRA filing fee | | 9,500 |
| NASDAQ Listing fee | | * |
| Printing and engraving expenses | | * |
| Legal fees and expenses | | * |
| Accounting fees and expenses | | * |
| Blue Sky fees and expenses (including legal fees) | | * |
| Transfer agent and registrar fees and expenses | | * |
| Miscellaneous | | * |
| Total | $ | * |

* To be filed by amendment.

**Item 14. Indemnification of Directors and Officers.**

On completion of this offering, the Registrant's amended and restated certificate of incorporation will contain provisions that eliminate, to the maximum extent permitted by the General Corporation Law of the State of Delaware, the personal liability of the Registrant's directors and executive officers for monetary damages for breach of their fiduciary duties as directors or officers. The Registrant's amended and restated certificate of incorporation and bylaws will provide that the Registrant must indemnify its directors and executive officers and may indemnify its employees and other agents to the fullest extent permitted by the General Corporation Law of the State of Delaware.

Sections 145 and 102(b)(7) of the General Corporation Law of the State of Delaware provide that a corporation may indemnify any person made a party to an action by reason of the fact that he or she was a director, executive officer, employee or agent of the corporation or is or was serving at the request of a corporation against expenses (including attorneys' fees), judgments, fines and amounts paid in settlement actually and reasonably incurred by him or her in connection with such action if he or she acted in good faith and in a manner he or she reasonably believed to be in, or not opposed to, the best interests of the corporation and, with respect to any criminal action or proceeding, had no reasonable cause to believe his or her conduct was unlawful, except that, in the case of an action by or in right of the corporation, no indemnification may generally be made in respect of any claim as to which such person is adjudged to be liable to the corporation.

The Registrant has entered into indemnification agreements with its directors and executive officers, in addition to the indemnification provided for in its amended and restated certificate of incorporation and bylaws, and intends to enter into indemnification agreements with any new directors and executive officers in the future.

The Registrant has purchased and intend to maintain insurance on behalf of each person who is or was a director or officer of the Registrant against any loss arising from any claim asserted against him or her and incurred by him or her in any such capacity, subject to certain exclusions.





The Underwriting Agreement (Exhibit 1.1 hereto) provides for indemnification by the underwriters of the Registrant and its executive officers and directors, and by the Registrant of the underwriters, for certain liabilities, including liabilities arising under the Securities Act.

See also the undertakings set out in response to Item 17 herein.

**Item 15. Recent Sales of Unregistered Securities.**

During the last three years, we sold the following unregistered securities:

(1) From June 25, 2010 through June 24, 2013, we sold and issued to our employees, consultants or former service providers an aggregate of 4,616,654 shares of common stock pursuant to option exercises under the 2003 Equity Incentive Plan at prices ranging from $0.05 to $1.70 per share for an aggregate purchase price of $2,159,960.97.

(2) From June 25, 2010 through June 24, 2013, we granted options under our 2003 Equity Incentive Plan to purchase an aggregate of 16,704,013 shares of common stock to our employees, directors and consultants, having exercise prices ranging from $1.18 to $2.17 per share for an aggregate exercise price of $24,345,776.22.

(3) In May 2011, we issued to a consultant an aggregate of 21,008 shares of common stock at a purchase price of $1.18 per share for an aggregate purchase price of $24,789.44. The consultant paid for the purchase price of such shares of common stock with services rendered in connection with identifying certain employee candidates for us.

(4) In January and February 2011, we sold and issued 10,476,141 shares of Series H preferred stock to 3 accredited investors, at $1.91 per share, for a total consideration of $20.0 million.

None of the foregoing transactions involved any underwriters, underwriting discounts or commissions, or any public offering, and the registrant believes that each transaction was exempt from the registration requirements of the Securities Act in reliance on the following exemptions:

- with respect to the transactions described in paragraphs (1) and (2), Rule 701 promulgated under the Securities Act as transactions pursuant to a compensatory benefit plan approved by the registrant's board of directors or Section 4(2) of the Securities Act as transactions by an issuer not involving a public offering;
- with respect to the transactions described in paragraph (3), Section 4(2) of the Securities Act as transactions by an issuer not involving a public offering; and
- with respect to the transactions described in paragraph (4), Section 4(2) of the Securities Act, or Rule 506 of Regulation D promulgated thereunder, as transactions by an issuer not involving a public offering. Each recipient of the securities in these transactions represented his or her intention to acquire the securities for investment only and not with a view to, or for resale in connection with, any distribution thereof, and appropriate legends were affixed to the share certificates issued in each such transaction. In each case, the recipient received adequate information about the Registrant or had adequate access, through his or her relationship with the registrant, to information about the Registrant.

**Item 16. Exhibits and Financial Statement Schedules.**

***(a) Exhibits:***

See Exhibit Index immediately following the signature pages.

Table of Contents

***(b) Financial Statement Schedules.***

All other schedules have been omitted because the information required to be presented in them is not applicable or is shown in the consolidated financial statements or related notes.

**Item 17. Undertakings.**

The undersigned Registrant hereby undertakes to provide to the underwriters at the closing specified in the Underwriting Agreement, certificates in such denominations and registered in such names as required by the underwriters to permit prompt delivery to each purchaser.

Insofar as indemnification for liabilities arising under the Securities Act may be permitted to directors, officers and controlling persons of the Registrant pursuant to the foregoing provisions, or otherwise, the Registrant has been advised that in the opinion of the Securities and Exchange Commission such indemnification is against public policy as expressed in the Securities Act and is, therefore, unenforceable. In the event that a claim for indemnification against such liabilities (other than the payment by the Registrant of expenses incurred or paid by a director, officer or controlling person of the Registrant in the successful defense of any action, suit or proceeding) is asserted by such director, officer or controlling person in connection with the securities being registered, the Registrant will, unless in the opinion of its counsel the matter has been settled by controlling precedent, submit to a court of appropriate jurisdiction the question whether such indemnification by it is against public policy as expressed in the Securities Act and will be governed by the final adjudication of such issue.

The undersigned Registrant hereby undertakes that:

(1) For purposes of determining any liability under the Securities Act, the information omitted from the form of prospectus filed as part of this Registration Statement in reliance upon Rule 430A and contained in a form of prospectus filed by the Registrant pursuant to Rule 424(b)(1) or (4) or 497(h) under the Securities Act shall be deemed to be part of this Registration Statement as of the time it was declared effective.

(2) For the purpose of determining any liability under the Securities Act, each post-effective amendment that contains a form of prospectus shall be deemed to be a new registration statement relating to the securities offered therein, and the offering of such securities at that time shall be deemed to be the initial bona fide offering thereof.

(3) That, for the purpose of determining liability of the registrant under the Securities Act of 1933 to any purchaser in the initial distribution of the securities: the undersigned Registrant undertakes that in a primary offering of securities of the undersigned Registrant pursuant to this registration statement, regardless of the underwriting method used to sell the securities to the purchaser, if the securities are offered or sold to such purchaser by means of any of the following communications, the undersigned Registrant will be a seller to the purchaser and will be considered to offer or sell such securities to such purchaser:

(i) Any preliminary prospectus or prospectus of the undersigned Registrant relating to the offering required to be filed pursuant to Rule 424;

(ii) Any free writing prospectus relating to the offering prepared by or on behalf of the undersigned Registrant or used or referred to by the undersigned Registrant;

(iii) The portion of any other free writing prospectus relating to the offering containing material information about the undersigned Registrant or its securities provided by or on behalf of the undersigned Registrant; and

(iv) Any other communication that is an offer in the offering made by the undersigned Registrant to the purchaser.



Table of Contents

**SIGNATURES**

Pursuant to the requirements of the Securities Act of 1933, the registrant has duly caused this registration statement to be signed on its behalf by the undersigned, thereunto duly authorized, in the City of Salt Lake City, State of Utah, on July 1, 2013.

**CONTROL4 CORPORATION**

By: /s/ MARTIN PLAEHN

Martin Plaehn
*President and Chief Executive Officer*

**POWER OF ATTORNEY**

KNOW ALL MEN BY THESE PRESENTS, that each person whose signature appears below constitutes and appoints Martin Plaehn and Dan Strong, jointly and

severally, as his or her true and lawful attorneys-in-fact and agents, with full power of substitution and resubstitution, for him or her and in his or her name, place and stead, in any and all capacities, to sign this Registration Statement and any or all amendments (including post-effective amendments) thereto and any new registration statement with respect to the offering contemplated thereby filed pursuant to Rule 462(b) of the Securities Act, and to file the same, with all exhibits thereto, and other documents in connection therewith, with the Securities and Exchange Commission, granting unto said attorneys-in-fact and agents full power and authority to do and perform each and every act and thing requisite or necessary to be done in and about the premises hereby ratifying and confirming all that said attorneys-in-fact and agents, or his or her or their substitute or substitutes, may lawfully do or cause to be done by virtue hereof.

Pursuant to the requirements of the Securities Act of 1933, this registration statement has been signed by the following persons in the capacities and on July 1, 2013:

| Signature | Title |
|---|---|
| /s/ MARTIN PLAEHN | Director, President and Chief Executive Officer<br>*(Principal Executive Officer)* |
| Martin Plaehn | |
| /s/ DAN STRONG | Chief Financial Officer<br>*(Principal Financial and Accounting Officer)* |
| Dan Strong | |
| /s/ WILLIAM B. WEST | |
| William B. West | Chairman of the Board of Directors |
| /s/ ROB BORN | |
| Rob Born | Director |
| /s/ DAVID C. HABIGER | |
| David C. Habiger | Director |
| /s/ LEN JORDAN | |
| Len Jordan | Director |
| /s/ CHRISTOPHER B. PAISLEY | |
| Christopher B. Paisley | Director |
| /s/ SCOTT PETTY | |
| Scott Petty | Director |
| /s/ STEVEN VASSALLO | |
| Steven Vassallo | Director |



Table of Contents

## EXHIBIT INDEX

| Exhibit Number | Exhibit Title |
|---|---|
| 1.1 | Form of Underwriting Agreement. |

| | |
|---|---|
| 3.1 | Amended and Restated Certificate of Incorporation of the Registrant, as currently in effect. |
| 3.2 | Form of Amended and Restated Certificate of Incorporation of the Registrant, to be effective upon closing of the offering. |
| 3.3 | Bylaws of the Registrant, as currently in effect. |
| 3.4 | Form of Amended and Restated Bylaws of the Registrant, to be effective upon closing of the offering. |
| 4.1* | Specimen Common Stock Certificate of the Registrant. |
| 4.2 | Eighth Amended and Restated Investors' Rights Agreement, dated January 21, 2011. |
| 4.3 | Warrant to Purchase Shares of the Common Stock of the Registrant issued to Control UI, LLC, dated October 25, 2010. |
| 4.4 | Warrant to Purchase Stock of the Registrant issued to Silicon Valley Bank, dated December 29, 2005. |
| 4.5 | Warrant to Purchase Stock of the Registrant issued to Silicon Valley Bank, dated June 13, 2007. |
| 5.1* | Opinion of Goodwin Procter LLP. |
| 10.1# | Form of Director and Executive Officer Indemnification Agreement. |
| 10.2# | 2003 Equity Incentive Plan and forms of option agreements thereunder. |
| 10.3# | 2013 Stock Option and Incentive Plan and forms of option agreements thereunder to be in effect upon the closing of this offering. |
| 10.4# | Offer Letter to Martin Plaehn, dated August 20, 2011. |
| 10.5# | Employment Agreement, dated July 28, 2003 and as amended on June 17, 2004 and August 3, 2011, between the Registrant and William B. West. |
| 10.6# | Employment Agreement, dated on or about January 4, 2008, between the Registrant and Dan Strong. |
| 10.7# | Offer Letter to Jeff Dungan, dated August 1, 2006. |
| 10.8# | Offer Letter to Eric Anderson, dated June 19, 2012. |
| 10.9* | Letter of Agreement, dated May 14, 2005, between the Registrant and Sanmina-SCI Corporation. |
| 10.10 | OEM Supply Agreement: OEM Design, dated December 3, 2010, between the Registrant and Lite-On Electronic Company Ltd. |
| 10.11 | Amended and Restated Loan and Security Agreement, dated June 17, 2013, between the Registrant and Silicon Valley Bank. |
| 10.12 | Lease dated June 29, 2004 by and between the Registrant and WDCI, Inc., as amended on May 24, 2006, February 25, 2011 and November 7, 2011. |
| 10.13# | Advisor Agreement, effective as of February 28, 2013, by and between the registrant and Tom Kuhn. |
| 21.1 | List of Subsidiaries of the Registrant. |
| 23.1 | Consent of Ernst & Young LLP, Independent Registered Public Accounting Firm. |
| 23.2* | Consent of Goodwin Procter LLP (included in Exhibit 5.1). |
| 24.1 | Power of Attorney (see page II-4 to this registration statement on Form S-1). |

* To be filed by amendment.

# Indicates a management contract or compensatory plan.

**Exhibit 1.1**

Control4 Corporation

[ ] Shares of Common Stock

UNDERWRITING AGREEMENT

Dated: , 2013

Control4 Corporation

[ ] Shares of Common Stock

**UNDERWRITING AGREEMENT**

•, 2013

Merrill Lynch, Pierce, Fenner & Smith
Incorporated
Raymond James & Associates, Inc.

as Representatives of the several Underwriters

c/o
Merrill Lynch, Pierce, Fenner & Smith
Incorporated
One Bryant Park
New York, New York 10036

c/o
Raymond James & Associates, Inc.
One Embarcadero Center, Suite 650
San Francisco, CA 94111

Ladies and Gentlemen:

Control4 Corporation (the "Company") confirms its agreement with Merrill Lynch, Pierce, Fenner & Smith Incorporated ("Merrill Lynch"), Raymond James & Associates, Inc. ("Raymond James") and each of the other Underwriters named in Schedule A hereto (collectively, the "Underwriters," which term shall also include any underwriter substituted as hereinafter provided in Section 10 hereof), for whom Merrill Lynch and Raymond James are acting as representatives (in such capacity, the "Representatives"), with respect to (i) the sale by the Company and the purchase by the Underwriters, acting severally and not jointly, of the respective numbers of shares of Common Stock, par value $0.0001 per share, of the Company ("Common Stock") set forth in Schedule A hereto and (ii) the grant by the Company to the Underwriters, acting severally and not jointly, of the option described in Section 2(b) hereof to purchase all or any part of [ ] additional shares of Common Stock. The aforesaid [ ] shares of Common Stock (the "Initial Securities") to be purchased by the Underwriters and all or any part of the [ ] shares of Common Stock subject to the option described in Section 2(b) hereof (the "Option Securities") are herein called, collectively, the "Securities."

The Company understands that the Underwriters propose to make a public offering of the Securities as soon as the Representatives deem advisable after this Agreement has been executed and delivered.

The Company has filed with the Securities and Exchange Commission (the "Commission") a registration statement on Form S-1 (No. 333-•), including the related preliminary prospectus or prospectuses, covering the registration of the sale of the Securities under the Securities Act of 1933, as amended (the "1933 Act"). Promptly after execution and delivery of this Agreement, the Company will

---

prepare and file a prospectus in accordance with the provisions of Rule 430A ("Rule 430A") of the rules and regulations of the Commission under the 1933 Act (the "1933 Act Regulations") and Rule 424(b) ("Rule 424(b)") of the 1933 Act Regulations. The information included in such prospectus that was omitted from such registration statement at the time it became effective but that is deemed to be part of such registration statement at the time it became effective pursuant to Rule 430A(b) is herein called the "Rule 430A Information." Such registration statement, including the amendments thereto, the exhibits thereto and any schedules thereto, at the time it became effective, and including the Rule 430A Information, is herein called the "Registration Statement." Any registration statement filed pursuant to Rule 462(b) of the 1933 Act Regulations is herein called the "Rule 462(b) Registration Statement" and, after such filing, the term "Registration Statement" shall include the Rule 462(b) Registration Statement. Each prospectus used prior to the effectiveness of the Registration Statement, and each prospectus that omitted the Rule 430A Information that was used after such effectiveness and prior to the execution and delivery of this Agreement, is herein called a "preliminary prospectus." The final prospectus, in the form first furnished to the Underwriters for use in connection with the offering of the Securities, is herein called the "Prospectus." For purposes of this Agreement, all references to the Registration Statement, any preliminary prospectus, the Prospectus or any amendment or supplement to any of the foregoing shall be deemed to include the copy filed with the Commission pursuant to its Electronic Data Gathering, Analysis and Retrieval system or any successor system ("EDGAR").

As used in this Agreement:

"1934 Act" means the Securities Exchange Act of 1934, as amended.

"1934 Act Regulations" means the rules and regulations of the Commission under the 1934 Act.

"Applicable Time" means [ ]:00 P.M., New York City time, on [ ] or such other time as agreed by the Company and the Representatives.

"General Disclosure Package" means any Issuer General Use Free Writing Prospectuses issued at or prior to the Applicable Time, the most recent preliminary prospectus that is distributed to investors prior to the Applicable Time and the information included on Schedule B-1 hereto, all considered together.

"Issuer Free Writing Prospectus" means any "issuer free writing prospectus," as defined in Rule 433 of the 1933 Act Regulations ("Rule 433"), including without limitation any "free writing prospectus" (as defined in Rule 405 of the 1933 Act Regulations ("Rule 405")) relating to the Securities that is (i) required to be filed with the Commission by the Company, (ii) a "road show that is a written communication" within the meaning of Rule 433(d)(8)(i), whether or not required to be filed with the Commission, or (iii) exempt from filing with the Commission pursuant to Rule 433(d)(5)(i) because it contains a description of the Securities or of the offering that does not reflect the final terms, in each case in the form filed or required to be filed with the Commission or, if not required to be filed, in the form retained in the Company's records pursuant to Rule 433(g).

"Issuer General Use Free Writing Prospectus" means any Issuer Free Writing Prospectus that is intended for general distribution to prospective investors (other than a "*bona fide* electronic road show," as defined in Rule 433 (the "Bona Fide Electronic Road Show")), as evidenced by its being specified in Schedule B-2 hereto.



---

"Issuer Limited Use Free Writing Prospectus" means any Issuer Free Writing Prospectus that is not an Issuer General Use Free Writing Prospectus.

"Testing-the-Waters Communication" means any oral or written communication with potential investors undertaken in reliance on Section 5(d) of the 1933 Act.

"Written Testing-the-Waters Communication" means any Testing-the-Waters Communication that is a written communication within the meaning of Rule 405 under the 1933 Act.

SECTION 1. Representations and Warranties.

(a) *Representations and Warranties by the Company*. The Company represents and warrants to each Underwriter as of the date hereof, the Applicable Time, the Closing Time (as defined below) and any Date of Delivery (as defined below), and agrees with each Underwriter, as follows:

(i) Registration Statement and Prospectuses. Each of the Registration Statement and any amendment thereto has become effective under the 1933 Act. No stop order suspending the effectiveness of the Registration Statement or any post-effective amendment thereto has been issued under the 1933 Act, no order preventing or suspending the use of any preliminary prospectus or the Prospectus has been issued and no proceedings for any of those purposes have been instituted or are pending or, to the Company's knowledge, contemplated by the Commission. The Company has complied with each request (if any) from the Commission for additional information.

Each of the Registration Statement and any post-effective amendment thereto, at the time it became effective, complied in all material respects with the requirements of the 1933 Act and the 1933 Act Regulations. Each preliminary prospectus, the Prospectus and any amendment or supplement thereto, at the time each was filed with the Commission, complied in all material respects with the requirements of the 1933 Act and the 1933 Act Regulations. Each preliminary prospectus delivered to the Underwriters for use in connection with this offering and the Prospectus was or will be identical to the electronically transmitted copies thereof filed with the Commission pursuant to EDGAR, except to the extent permitted by Regulation S-T.

(ii) Accurate Disclosure. Neither the Registration Statement nor any amendment thereto, at its effective time, at the Closing Time or at any Date of Delivery, contained, contains or will contain an untrue statement of a material fact or omitted, omits or will omit to state a material fact required to be stated therein or necessary to make the statements therein not misleading. As of the Applicable Time, none of (A) the General Disclosure Package (B) any individual Issuer Limited Use Free Writing Prospectus, when considered together with the General Disclosure Package and (C) any individual Written Testing-the-Waters Communication, when considered together with the General Disclosure Package, included, includes or will include an untrue statement of a material fact or omitted, omits or will omit to state a material fact necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading. Neither the Prospectus nor any amendment or supplement thereto (including any prospectus wrapper), as of its issue date, at the time of any filing with the Commission pursuant to Rule 424(b), at the Closing Time or at any Date of Delivery, included, includes or will include an untrue statement of a material fact or omitted, omits or will omit to state a material fact necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading.



---

The representations and warranties in this subsection shall not apply to statements in or omissions from the Registration Statement (or any amendment thereto), the General Disclosure Package or the Prospectus (or any amendment or supplement thereto) made in reliance upon and in conformity with written information furnished to the Company by any Underwriter through Merrill Lynch and Raymond James expressly for use therein. For purposes of this Agreement, the only information so furnished shall be the information in the first paragraph under the heading "Underwriting—Commissions and Discounts," the information in the second, third and fourth paragraphs under the heading "Underwriting—Price Stabilization, Short Positions and Penalty Bids" and the information under the heading "Underwriting—Electronic Distribution" in each case contained in the Prospectus (collectively, the "Underwriter Information").

(iii) Issuer Free Writing Prospectuses. No Issuer Free Writing Prospectus conflicts or will conflict with the information contained in the

Registration Statement or the Prospectus, and any preliminary or other prospectus deemed to be a part thereof that has not been superseded or modified. The Company has made available a Bona Fide Electronic Road Show in compliance with Rule 433(d)(8)(ii) such that no filing of any "road show" (as defined in Rule 433(h)) is required in connection with the offering of the Securities.

(iv) Testing-the-Waters Materials. The Company (A) has not engaged in any Testing-the-Waters Communication other than Testing-the-Waters Communications with the consent of the Representatives with entities that are qualified institutional buyers within the meaning of Rule 144A under the 1933 Act or institutions that are accredited investors within the meaning of Rule 501 under the 1933 Act and (B) has not authorized anyone other than the Representatives to engage in Testing-the-Waters Communications. The Company reconfirms that the Representatives have been authorized to act on its behalf in undertaking Testing-the-Waters Communications. The Company has not distributed any Written Testing-the-Waters Communications other than those listed on Schedule B-3 hereto.

(v) Company Not Ineligible Issuer. At the time of filing the Registration Statement and any post-effective amendment thereto, at the earliest time thereafter that the Company or another offering participant made a *bona fide* offer (within the meaning of Rule 164(h)(2) of the 1933 Act Regulations) of the Securities and at the date hereof, the Company was not and is not an "ineligible issuer," as defined in Rule 405, without taking account of any determination by the Commission pursuant to Rule 405 that it is not necessary that the Company be considered an ineligible issuer.

(vi) Emerging Growth Company Status. From the time of the initial confidential submission of the Registration Statement to the Commission through the date hereof, the Company has been and is an "emerging growth company," as defined in Section 2(a) of the Securities Act (an "Emerging Growth Company").

(vii) Independent Accountants. To the Company's knowledge, the accountants who certified the financial statements and supporting schedules included in the Registration Statement, the General Disclosure Package and the Prospectus are independent public accountants with respect to the Company as required by the 1933 Act, the 1933 Act Regulations and the Public Accounting Oversight Board.



(viii) Financial Statements; Non-GAAP Financial Measures The financial statements included in the Registration Statement, the General Disclosure Package and the Prospectus, together with the related schedules and notes, present fairly in all material respects the financial position of the Company and its consolidated subsidiaries at the dates indicated and the statement of operations, stockholders' equity and cash flows of the Company and its consolidated subsidiaries for the periods specified; said financial statements have been prepared in conformity with U.S. generally accepted accounting principles ("GAAP") applied on a consistent basis throughout the periods involved. The supporting schedules included in the Registration Statement, if any, present fairly in all material respects in accordance with GAAP the information required to be stated therein. The selected financial data and the summary financial information included in the Registration Statement, the General Disclosure Package and the Prospectus present fairly in all material respects the information shown therein and have been compiled on a basis consistent with that of the audited financial statements included therein. All disclosures contained in the Registration Statement, the General Disclosure Package or the Prospectus regarding "non-GAAP financial measures" (as such term is defined by the rules and regulations of the Commission) comply in all material respects with Regulation G of the 1934 Act and Item 10 of Regulation S-K of the 1933 Act, to the extent applicable. Except as included therein, no historical or pro forma financial statements or supporting schedules are required to be included or incorporated by reference in the Registration Statement, the General Disclosure Package or the Prospectus under the 1933 Act or the 1933 Act Regulations.

(ix) No Material Adverse Change in Business. Except as otherwise stated therein, since the respective dates as of which information is given in the Registration Statement, the General Disclosure Package or the Prospectus, (A) there has been no material adverse change in the condition, financial or otherwise, or in the earnings, business affairs or business prospects of the Company and its subsidiaries considered as one enterprise, whether or not arising in the ordinary course of business (a "Material Adverse Effect"), (B) there have been no transactions entered into by the Company or any of its subsidiaries, other than those in the ordinary course of business, which are material with respect to the Company and its subsidiaries considered as one enterprise, and (C) there has been no dividend or distribution of any kind declared, paid or made by the Company on any class of its capital stock.

(x) Good Standing of the Company. The Company has been duly organized and is validly existing as a corporation in good standing under the laws of the State of Delaware and has corporate power and authority to own, lease and operate its properties and to conduct its business as described in the Registration Statement, the General Disclosure Package and the Prospectus and to enter into and perform its obligations under this Agreement; and the Company is duly qualified as a foreign corporation to transact business and is in good standing in each other jurisdiction in which such qualification is required, whether by reason of the ownership or leasing of property or the conduct of business, except where the failure so to qualify or to be in good standing would not result in a Material Adverse Effect.

(xi) Good Standing of Subsidiaries. Each "significant subsidiary" of the Company (as such term is defined in Rule 1-02 of Regulation S-X) (each, a "Subsidiary" and, collectively, the "Subsidiaries") has been duly organized and is validly existing in good standing (to the extent such concept exists) under the laws of the jurisdiction of its incorporation or organization, has corporate or similar power and authority to own, lease and operate its properties and to conduct its business as described in the Registration Statement, the General Disclosure Package and the Prospectus and is duly qualified to transact business and is in good standing (to the extent such concept exists) in each jurisdiction in which such qualification is required, whether by reason of the ownership or leasing of property or the conduct of business, except where the failure to so

qualify or to be in good standing would not result in a Material Adverse Effect. Except as otherwise disclosed in the Registration Statement, the General Disclosure Package and the Prospectus, all of the issued and outstanding capital stock of each Subsidiary has been duly authorized and validly issued, is fully paid and non-assessable and is owned by the Company, directly or through subsidiaries, free and clear of any security interest, mortgage, pledge, lien, encumbrance, claim or equity. None of the outstanding shares of capital stock of any Subsidiary were issued in violation of the preemptive or similar rights of any securityholder of such Subsidiary. The only subsidiaries of the Company are (A) the subsidiaries listed on Exhibit 21 to the Registration Statement and (B) certain other subsidiaries which, considered in the aggregate as a single subsidiary, do not constitute a "significant subsidiary" as defined in Rule 1-02 of Regulation S-X.

(xii) Capitalization. The authorized, issued and outstanding shares of capital stock of the Company are as set forth in the Registration Statement, the General Disclosure Package and the Prospectus in the column entitled "Actual" under the caption "Capitalization" (except for subsequent issuances, if any, pursuant to this Agreement, pursuant to reservations, agreements or employee benefit plans referred to in the Registration Statement, the General Disclosure Package and the Prospectus or pursuant to the exercise of convertible securities or options referred to in the Registration Statement, the General Disclosure Package and the Prospectus). The outstanding shares of capital stock of the Company have been duly authorized and validly issued and are fully paid and non-assessable. None of the outstanding shares of capital stock of the Company were issued in violation of the preemptive or other similar rights of any securityholder of the Company.

(xiii) Authorization of Agreement. This Agreement has been duly authorized, executed and delivered by the Company.

(xiv) Authorization and Description of Securities. The Securities to be purchased by the Underwriters from the Company have been duly authorized for issuance and sale to the Underwriters pursuant to this Agreement and, when issued and delivered by the Company pursuant to this Agreement against payment of the consideration set forth herein, will be validly issued and fully paid and non-assessable; and the issuance of the Securities pursuant to this Agreement is not subject to the preemptive or other similar rights of any securityholder of the Company or any such preemptive or other similar rights have been waived. The Common Stock conforms in all material respects to all statements relating thereto contained in the Registration Statement, the General Disclosure Package and the Prospectus and such description conforms in all material respects to the rights set forth in the instruments defining the same. No holder of Securities will be subject to personal liability by reason of being such a holder. The Company has no debt securities or preferred stock that is rated by any "nationally recognized statistical rating agency" (as that term is defined by the Commission for purposes of Rule 436(g)(2) under the 1933 Act).

(xv) Registration Rights. There are no persons with registration rights or other similar rights to have any securities registered for sale pursuant to the Registration Statement or otherwise registered for sale or sold by the Company under the 1933 Act pursuant to this Agreement, other than those rights that have been disclosed in the Registration Statement, the General Disclosure Package and the Prospectus and have been waived.

(xvi) Absence of Violations, Defaults and Conflicts. Neither the Company nor any of its subsidiaries is (A) in violation of its charter, by-laws or similar organizational document, (B) in default in the performance or observance of any obligation, agreement, covenant or condition contained in any contract, indenture, mortgage, deed of trust, loan or credit agreement, note, lease



---

or other agreement or instrument to which the Company or any of its subsidiaries is a party or by which it or any of them may be bound or to which any of the properties or assets of the Company or any subsidiary is subject (collectively, "Agreements and Instruments"), except for such defaults that would not, singly or in the aggregate, result in a Material Adverse Effect, or (C) in violation of any law, statute, rule, regulation, judgment, order, writ or decree of any arbitrator, court, governmental body, regulatory body, administrative agency or other authority, body or agency having jurisdiction over the Company or any of its subsidiaries or any of their respective properties, assets or operations (each, a "Governmental Entity"), except for such violations that would not, singly or in the aggregate, result in a Material Adverse Effect. The execution, delivery and performance of this Agreement and the consummation of the transactions contemplated herein and in the Registration Statement, the General Disclosure Package and the Prospectus (including the issuance and sale of the Securities and the use of the proceeds from the sale of the Securities as described therein under the caption "Use of Proceeds") and compliance by the Company with its obligations hereunder have been duly authorized by all necessary corporate action and do not and will not, whether with or without the giving of notice or passage of time or both, conflict with or constitute a breach of, or default or Repayment Event (as defined below) under, or result in the creation or imposition of any lien, charge or encumbrance upon any properties or assets of the Company or any subsidiary pursuant to, the Agreements and Instruments (except for such conflicts, breaches, defaults or Repayment Events or liens, charges or encumbrances that would not, singly or in the aggregate, result in a Material Adverse Effect), nor will such action result in any violation of any law, statute, rule, regulation, judgment, order, writ or decree of any Governmental Entity that would have a Material Adverse Effect or the provisions of the charter, by-laws or similar organizational document of the Company or any of its subsidiaries. As used herein, a "Repayment Event" means any event or condition which gives the holder of any note, debenture or other evidence of indebtedness (or any person acting on such holder's behalf) the right to require the repurchase, redemption or repayment of all or a portion of such indebtedness by the Company or any of its subsidiaries.

(xvii) Absence of Labor Dispute. No labor dispute with the employees of the Company or any of its subsidiaries exists or, to the knowledge of the Company, is imminent.

(xviii) Absence of Proceedings. Except as disclosed in the Registration Statement, the General Disclosure Package and the Prospectus, there is no action, suit, proceeding, inquiry or investigation before or brought by any Governmental Entity now pending or, to the knowledge of the Company, threatened, against or affecting the Company or any of its subsidiaries, which would reasonably be expected to result in a Material Adverse Effect, or which would reasonably be expected to materially and adversely affect their respective properties or assets or the consummation of the transactions contemplated in this

Agreement or the performance by the Company of its obligations hereunder; and the aggregate of all pending legal or governmental proceedings to which the Company or any such subsidiary is a party or of which any of their respective properties or assets is the subject which are not described in the Registration Statement, the General Disclosure Package and the Prospectus, including ordinary routine litigation incidental to the business, would not reasonably be expected to result in a Material Adverse Effect.

(xix) Accuracy of Exhibits. There are no contracts or documents which are required to be described in the Registration Statement, the General Disclosure Package or the Prospectus or to be filed as exhibits to the Registration Statement which have not been so described and filed as required.



---

(xx) Absence of Further Requirements. No filing with, or authorization, approval, consent, license, order, registration, qualification or decree of, any Governmental Entity is necessary or required for the performance by the Company of its obligations hereunder, in connection with the offering, issuance or sale of the Securities hereunder or the consummation of the transactions contemplated by this Agreement, except (A) such as have been already obtained or as may be required under the 1933 Act, the 1933 Act Regulations, the rules of the NASDAQ Stock Market LLC, state securities laws or the rules of the Financial Industry Regulatory Authority, Inc. ("FINRA") and (B) for such other filings with, or authorizations, approvals, consents, licenses, orders, registrations, qualifications or decrees of, any Governmental Entity the absence of which would not reasonably be expected, individually or in the aggregate, to have a Material Adverse Effect.

(xxi) Possession of Licenses and Permits. The Company and its subsidiaries possess such permits, licenses, approvals, consents and other authorizations (collectively, "Governmental Licenses") issued by the appropriate Governmental Entities necessary to conduct the business now operated by them, except where the failure so to possess would not, singly or in the aggregate, result in a Material Adverse Effect. The Company and its subsidiaries are in compliance with the terms and conditions of all Governmental Licenses, except where the failure so to comply would not, singly or in the aggregate, result in a Material Adverse Effect. All of the Governmental Licenses are valid and in full force and effect, except when the invalidity of such Governmental Licenses or the failure of such Governmental Licenses to be in full force and effect would not, singly or in the aggregate, result in a Material Adverse Effect. Neither the Company nor any of its subsidiaries has received any notice of proceedings relating to the revocation or modification of any Governmental Licenses which, singly or in the aggregate, if the subject of an unfavorable decision, ruling or finding, would result in a Material Adverse Effect.

(xxii) Title to Property. The Company and its subsidiaries do not own any real property. The Company and its subsidiaries have good and marketable title to all personal properties owned by them, in each case, free and clear of all mortgages, pledges, liens, security interests, claims, restrictions or encumbrances of any kind except such as (A) are described in the Registration Statement, the General Disclosure Package and the Prospectus or (B) would not, singly or in the aggregate, if title were so encumbered, result in a Material Adverse Effect; and all of the leases and subleases material to the business of the Company and its subsidiaries, considered as one enterprise, and under which the Company or any of its subsidiaries holds properties described in the Registration Statement, the General Disclosure Package or the Prospectus, are in full force and effect, and neither the Company nor any such subsidiary has any notice of any material claim of any sort that has been asserted by anyone adverse to the rights of the Company or any subsidiary under any of the leases or subleases mentioned above, or affecting or questioning the rights of the Company or such subsidiary to the continued possession of the leased or subleased premises under any such lease or sublease except to the extent that any impingement of the Company's rights thereto would not result in a Material Adverse Effect.

(xxiii) Possession of Intellectual Property. The Company and its subsidiaries own or possess, or can acquire on reasonable terms, adequate patents, patent rights, licenses, inventions, copyrights, know-how (including trade secrets and other unpatented and/or unpatentable proprietary or confidential information, systems or procedures), trademarks, service marks, trade names or other intellectual property (collectively, "Intellectual Property") necessary to carry on the business now operated by them, and neither the Company nor any of its subsidiaries has received any notice or is otherwise aware of any infringement of or conflict with asserted rights of others with respect to any Intellectual Property or of any facts or circumstances which would render any Intellectual Property invalid or inadequate to protect the interest of the Company or



---

any of its subsidiaries therein, and which infringement or conflict (if the subject of any unfavorable decision, ruling or finding) or invalidity or inadequacy, singly or in the aggregate, would result in a Material Adverse Effect.

(xxiv) Environmental Laws. Except as described in the Registration Statement, the General Disclosure Package and the Prospectus or would not, singly or in the aggregate, result in a Material Adverse Effect, (A) neither the Company nor any of its subsidiaries is in violation of any federal, state, local or foreign statute, law, rule, regulation, ordinance, code, policy or rule of common law or any judicial or administrative interpretation thereof, including any judicial or administrative order, consent, decree or judgment, relating to pollution or protection of human health, the environment (including, without limitation, ambient air, surface water, groundwater, land surface or subsurface strata) or wildlife, including, without limitation, laws and regulations relating to the release or threatened release of chemicals, pollutants, contaminants, wastes, toxic substances, hazardous substances, petroleum or petroleum products, asbestos-containing materials or mold (collectively, "Hazardous Materials") or to the manufacture, processing, distribution, use, treatment, storage, disposal, transport or handling of Hazardous Materials (collectively, "Environmental Laws"), (B) the Company and its subsidiaries have all permits, authorizations and approvals required under any applicable Environmental Laws and are each in compliance with their requirements, (C) there are no pending or, to the Company's knowledge, threatened administrative, regulatory or judicial actions, suits, demands, demand letters, claims, liens, notices of noncompliance or violation, investigation or proceedings relating to any Environmental Law against the Company or any of its subsidiaries and (D) to the Company's knowledge, there are no events or circumstances that

would reasonably be expected to form the basis of an order for clean-up or remediation, or an action, suit or proceeding by any private party or Governmental Entity, against or affecting the Company or any of its subsidiaries relating to Hazardous Materials or any Environmental Laws.

(xxv) Accounting Controls. The Company and each of its subsidiaries have taken all necessary actions to ensure that, in the time period required, the Company and its subsidiaries will comply with Rule 13-a15 and 15d-15 under the 1934 Act Regulations and a system of internal accounting controls sufficient to provide reasonable assurances that: (A) transactions are executed in accordance with management's general or specific authorization; (B) transactions are recorded as necessary to permit preparation of financial statements in conformity with GAAP and to maintain accountability for assets; (C) access to assets is permitted only in accordance with management's general or specific authorization; and (D) the recorded accountability for assets is compared with the existing assets at reasonable intervals and appropriate action is taken with respect to any differences. Except as described in the Registration Statement, the General Disclosure Package and the Prospectus, since the end of the Company's most recent audited fiscal year, there has been (1) no material weakness in the Company's internal control over financial reporting (whether or not remediated) and (2) no change in the Company's internal control over financial reporting that has materially affected, or is reasonably likely to materially affect, the Company's internal control over financial reporting.

(xxvi) Compliance with the Sarbanes-Oxley Act. The Company has taken all necessary actions to ensure that, upon the effectiveness of the Registration Statement, it will be in compliance with all provisions of the Sarbanes-Oxley Act of 2002 and all rules and regulations promulgated thereunder or implementing the provisions thereof (the "Sarbanes-Oxley Act") that are then in effect and with which the Company is required to comply as of the effectiveness of the Registration Statement, and is actively taking steps to enable it to be in compliance with other provisions of the Sarbanes-Oxley Act not currently in effect, upon the effectiveness of such



provisions, or which will become applicable to the Company at all times after the effectiveness of the Registration Statement.

(xxvii) Payment of Taxes. All United States federal income tax returns of the Company and its subsidiaries required by law to be filed have been filed and all taxes shown by such returns or otherwise assessed, which are due and payable, have been paid, except assessments against which appeals have been or will be promptly taken and as to which adequate reserves have been provided. The United States federal income tax returns of the Company through the fiscal year ended December 31, 2011 have been filed and no assessment in connection therewith has been made against the Company. The Company and its subsidiaries have filed all other tax returns that are required to have been filed by them pursuant to applicable foreign, state, local or other law except insofar as the failure to file such returns would not result in a Material Adverse Effect, and has paid all taxes due pursuant to such returns or pursuant to any assessment received by the Company and its subsidiaries, except for such taxes, if any, as are being contested in good faith and as to which adequate reserves have been established by the Company. The charges, accruals and reserves on the books of the Company in respect of any income and corporation tax liability for any years not finally determined are adequate to meet any assessments or re-assessments for additional income tax for any years not finally determined, except to the extent of any inadequacy that would not result in a Material Adverse Effect.

(xxviii) Insurance. The Company and its subsidiaries carry or are entitled to the benefits of insurance, with reputable insurers, in such amounts and covering such risks as is generally maintained by companies of established repute and of comparable size engaged in the same or similar business, and all such insurance is in full force and effect. The Company has no reason to believe that it or any of its subsidiaries will not be able (A) to renew if desired its existing insurance coverage as and when such policies expire or (B) to obtain comparable coverage from similar institutions as may be necessary or appropriate to conduct its business as now conducted and at a cost that would not result in a Material Adverse Effect. Neither of the Company nor any of its subsidiaries has been denied any insurance coverage that it has sought or for which it has applied.

(xxix) Investment Company Act. The Company is not required, and upon the issuance and sale of the Securities as herein contemplated and the application of the net proceeds therefrom as described in the Registration Statement, the General Disclosure Package and the Prospectus will not be required, to register as an "investment company" under the Investment Company Act of 1940, as amended (the "1940 Act").

(xxx) Absence of Manipulation. Neither the Company nor, to the Company's knowledge, any affiliate of the Company has taken, nor will the Company or any of its subsidiaries take, directly or indirectly, any action which is designed, or would reasonably be expected, to cause or result in, or which constitutes, the stabilization or manipulation of the price of any security of the Company to facilitate the sale or resale of the Securities or to result in a violation of Regulation M under the 1934 Act.

(xxxi) Foreign Corrupt Practices Act. None of the Company, any of its subsidiaries or, to the knowledge of the Company, any director, officer, agent, employee, affiliate or other person acting on behalf of the Company or any of its subsidiaries is aware of or has taken any action, directly or indirectly, that would result in a violation by such persons of the Foreign Corrupt Practices Act of 1977, as amended, and the rules and regulations thereunder (the "FCPA"), including, without limitation, making use of the mails or any means or instrumentality of interstate commerce corruptly in furtherance of an offer, payment, promise to pay or



authorization of the payment of any money, or other property, gift, promise to give, or authorization of the giving of anything of value to any "foreign official" (as such term is defined in the FCPA) or any foreign political party or official thereof or any candidate for foreign political office, in contravention of the FCPA and

the Company and, to the knowledge of the Company, its affiliates have conducted their businesses in compliance with the FCPA and have instituted and maintain policies and procedures designed to comply, and which are reasonably expected to continue to comply, therewith.

(xxxii) Money Laundering Laws. The operations of the Company and its subsidiaries are and have been conducted at all times in compliance with applicable financial recordkeeping and reporting requirements of the Currency and Foreign Transactions Reporting Act of 1970, as amended, the money laundering statutes of all jurisdictions, the rules and regulations thereunder and any related or similar rules, regulations or guidelines, issued, administered or enforced by any Governmental Entity (collectively, the "Money Laundering Laws"); and no action, suit or proceeding by or before any Governmental Entity involving the Company or any of its subsidiaries with respect to the Money Laundering Laws is pending or, to the best knowledge of the Company, threatened.

(xxxiii) OFAC. None of the Company, any of its subsidiaries or, to the knowledge of the Company, any director, officer, agent, employee, affiliate or representative of the Company or any of its subsidiaries is an individual or entity ("Person") currently the subject or target of any sanctions administered or enforced by the United States Government, including, without limitation, the U.S. Department of the Treasury's Office of Foreign Assets Control ("OFAC"), the United Nations Security Council ("UNSC"), the European Union, Her Majesty's Treasury ("HMT"), or other relevant sanctions authority (collectively, "Sanctions"), nor is the Company located, organized or resident in a country or territory that is the subject of Sanctions; and the Company will not directly or indirectly use the proceeds of the sale of the Securities, or lend, contribute or otherwise make available such proceeds to any subsidiaries, joint venture partners or other Person, to fund any activities of or business with any Person, or in any country or territory, that, at the time of such funding, is the subject of Sanctions or in any other manner that will result in a violation by any Person (including any Person participating in the transaction, whether as underwriter, advisor, investor or otherwise) of Sanctions.

(xxxiv) Lending Relationship. Except as disclosed in the Registration Statement, the General Disclosure Package and the Prospectus, the Company (i) does not have any material lending or other relationship with any bank or lending affiliate of any Underwriter and (ii) does not intend to use any of the proceeds from the sale of the Securities to repay any outstanding debt owed to any affiliate of any Underwriter.

(xxxv) Statistical and Market-Related Data. Any statistical and market-related data included in the Registration Statement, the General Disclosure Package or the Prospectus are based on or derived from sources that the Company believes, after reasonable inquiry, to be reliable and accurate and, to the extent required, the Company has obtained the written consent to the use of such data from such sources.

(b) *Officer's Certificates*. Any certificate signed by any officer of the Company or any of its subsidiaries delivered to the Representatives or to counsel for the Underwriters shall be deemed a representation and warranty by the Company to each Underwriter as to the matters covered thereby.



---

SECTION 2. Sale and Delivery to Underwriters; Closing.

(a) *Initial Securities*. On the basis of the representations and warranties herein contained and subject to the terms and conditions herein set forth, the Company agrees to sell to each Underwriter, severally and not jointly, and each Underwriter, severally and not jointly, agrees to purchase from the Company, at the price per share set forth in Schedule A, that number of Initial Securities set forth in Schedule A opposite the name of such Underwriter, plus any additional number of Initial Securities which such Underwriter may become obligated to purchase pursuant to the provisions of Section 10 hereof, subject, in each case, to such adjustments among the Underwriters as Merrill Lynch in its sole discretion shall make to eliminate any sales or purchases of fractional shares.

(b) *Option Securities*. In addition, on the basis of the representations and warranties herein contained and subject to the terms and conditions herein set forth, the Company hereby grants an option to the Underwriters, severally and not jointly, to purchase up to an additional [          ] shares of Common Stock, at the price per share set forth in Schedule A, less an amount per share equal to any dividends or distributions declared by the Company and payable on the Initial Securities but not payable on the Option Securities. The option hereby granted may be exercised for 30 days after the date hereof and may be exercised in whole or in part at any time from time to time upon written notice by the Representatives to the Company setting forth the number of Option Securities as to which the several Underwriters are then exercising the option and the time and date of payment and delivery for such Option Securities. Any such time and date of delivery (a "Date of Delivery") shall be determined by the Representatives, but shall not be later than seven full business days after the exercise of said option, nor in any event prior to the Closing Time. If the option is exercised as to all or any portion of the Option Securities, each of the Underwriters, acting severally and not jointly, will purchase that proportion of the total number of Option Securities then being purchased which the number of Initial Securities set forth in Schedule A opposite the name of such Underwriter bears to the total number of Initial Securities, subject, in each case, to such adjustments as Merrill Lynch and Raymond James in their sole discretion shall make to eliminate any sales or purchases of fractional shares.

(c) *Payment*. Payment of the purchase price for, and delivery of certificates for, the Initial Securities shall be made at the offices of Cooley LLP, 3175 Hanover Street, Palo Alto, California, or at such other place as shall be agreed upon by the Representatives and the Company, at 9:00 A.M. (New York City time) on the third (fourth, if the pricing occurs after 4:30 P.M. (New York City time) on any given day) business day after the date hereof (unless postponed in accordance with the provisions of Section 10), or such other time not later than ten business days after such date as shall be agreed upon by the Representatives and the Company (such time and date of payment and delivery being herein called "Closing Time").

In addition, in the event that any or all of the Option Securities are purchased by the Underwriters, payment of the purchase price for, and delivery of certificates for, such Option Securities shall be made at the above-mentioned offices, or at such other place as shall be agreed upon by the Representatives and the Company, on each Date of Delivery as specified in the notice from the Representatives to the Company.

Payment shall be made to the Company by wire transfer of immediately available funds to a bank account designated by the Company against delivery to the Representatives for the respective accounts of the Underwriters of certificates for the Securities to be purchased by them. It is understood that each Underwriter has authorized the Representatives, for its account, to accept delivery of, receipt for, and make payment of the purchase price for, the Initial Securities and the Option Securities, if any, which it has agreed to purchase. Merrill Lynch, individually and not as representative of the Underwriters, may (but shall not be obligated to) make payment of the purchase price for the Initial Securities or the Option



Securities, if any, to be purchased by any Underwriter whose funds have not been received by the Closing Time or the relevant Date of Delivery, as the case may be, but such payment shall not relieve such Underwriter from its obligations hereunder.

SECTION 3. Covenants of the Company. The Company covenants with each Underwriter as follows:

(a) *Compliance with Securities Regulations and Commission Requests*. The Company, subject to Section 3(b), will comply with the requirements of Rule 430A, and will promptly notify the Representatives, and confirm the notice in writing, (i) when any post-effective amendment to the Registration Statement shall become effective or any amendment or supplement to the Prospectus shall have been filed, (ii) of the receipt of any comments from the Commission, (iii) of any request by the Commission for any amendment to the Registration Statement or any amendment or supplement to the Prospectus or for additional information, (iv) of the issuance by the Commission of any stop order suspending the effectiveness of the Registration Statement or any post-effective amendment or of any order preventing or suspending the use of any preliminary prospectus or the Prospectus, or of the suspension of the qualification of the Securities for offering or sale in any jurisdiction, or of the initiation or threatening of any proceedings for any of such purposes or of any examination pursuant to Section 8(d) or 8(e) of the 1933 Act concerning the Registration Statement and (v) if the Company becomes the subject of a proceeding under Section 8A of the 1933 Act in connection with the offering of the Securities. The Company will effect all filings required under Rule 424(b), in the manner and within the time period required by Rule 424(b) (without reliance on Rule 424(b)(8)), and will take such steps as it deems necessary to ascertain promptly whether the form of prospectus transmitted for filing under Rule 424(b) was received for filing by the Commission and, in the event that it was not, it will promptly file such prospectus. The Company will use its reasonable efforts to prevent the issuance of any stop order, prevention or suspension and, if any such order is issued, to obtain the lifting thereof at the earliest possible moment.

(b) *Continued Compliance with Securities Laws*. The Company will comply with the 1933 Act and the 1933 Act Regulations so as to permit the completion of the distribution of the Securities as contemplated in this Agreement and in the Registration Statement, the General Disclosure Package and the Prospectus. If at any time when a prospectus relating to the Securities is (or, but for the exception afforded by Rule 172 of the 1933 Act Regulations ("Rule 172"), would be) required by the 1933 Act to be delivered in connection with sales of the Securities, any event shall occur or condition shall exist as a result of which it is necessary, in the opinion of counsel for the Underwriters or for the Company, to (i) amend the Registration Statement in order that the Registration Statement will not include an untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein not misleading, (ii) amend or supplement the General Disclosure Package or the Prospectus in order that the General Disclosure Package or the Prospectus, as the case may be, will not include any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements therein not misleading in the light of the circumstances existing at the time it is delivered to a purchaser or (iii) amend the Registration Statement or amend or supplement the General Disclosure Package or the Prospectus, as the case may be, in order to comply with the requirements of the 1933 Act or the 1933 Act Regulations, the Company will promptly (A) give the Representatives notice of such event; provided that the Representatives shall be deemed to have received notice without any required action by the Company if such determination was made by counsel for the Underwriters, (B) prepare any amendment or supplement as may be necessary to correct such statement or omission or to make the Registration Statement, the General Disclosure Package or the Prospectus comply with such requirements and, a reasonable amount of time prior to any proposed filing or use, furnish the Representatives with copies of any such amendment or supplement and (C) file with the Commission any such amendment or supplement; provided that the Company shall not file or use any such amendment or



supplement to which the Representatives or counsel for the Underwriters shall object. The Company will furnish to the Underwriters such number of copies of such amendment or supplement as the Underwriters may reasonably request.

(c) *Delivery of Registration Statements*. The Company has furnished or will deliver to the Representatives and counsel for the Underwriters, without charge, signed copies of the Registration Statement as originally filed and each amendment thereto (including exhibits filed therewith) and signed copies of all consents and certificates of experts, and will also deliver to the Representatives, without charge, a conformed copy of the Registration Statement as originally filed and each amendment thereto (without exhibits) for each of the Underwriters. The copies of the Registration Statement and each amendment thereto furnished to the Underwriters will be identical to the electronically transmitted copies thereof filed with the Commission pursuant to EDGAR, except to the extent permitted by Regulation S-T.

(d) *Delivery of Prospectuses*. The Company has delivered to each Underwriter, without charge, as many copies of each preliminary prospectus as such Underwriter reasonably requested, and the Company hereby consents to the use of such copies for purposes permitted by the 1933 Act. The Company will furnish to each Underwriter, without charge, during the period when a prospectus relating to the Securities is (or, but for the exception afforded by Rule 172, would be) required to be delivered under the 1933 Act, such number of copies of the Prospectus (as amended or supplemented) as such Underwriter may reasonably request. The Prospectus and any amendments or supplements thereto furnished to the Underwriters will be identical to the electronically transmitted copies thereof filed with the Commission pursuant to EDGAR, except to the extent permitted by Regulation S-T.

(e) *Blue Sky Qualifications*. The Company will use its reasonable best efforts, in cooperation with the Underwriters, to qualify the Securities for offering and sale under the applicable securities laws of such states and other jurisdictions (domestic or foreign) as the Representatives may designate and to maintain such qualifications in effect so long as required to complete the distribution of the Securities; provided, however, that the Company shall not be obligated to file any general consent to service of process or to qualify as a foreign corporation or as a dealer in securities in any jurisdiction in which it is not so qualified or to subject itself to taxation in respect of doing business in any jurisdiction in which it is not otherwise so subject.

(f) *Rule 158*. The Company will timely file such reports pursuant to the 1934 Act as are necessary in order to make generally available to its securityholders as soon as practicable an earnings statement for the purposes of, and to provide to the Underwriters the benefits contemplated by, the last paragraph of Section 11(a) of the 1933 Act.

(g) *Use of Proceeds*. The Company will use the net proceeds received by it from the sale of the Securities in the manner specified in the Registration Statement, the General Disclosure Package and the Prospectus under "Use of Proceeds."

(h) *Listing*. The Company will use its reasonable best efforts to effect and maintain the listing of the Common Stock (including the Securities) on the Nasdaq Global Market.

(i) *Restriction on Sale of Securities*. During a period of 180 days from the date of the Prospectus, the Company will not, without the prior written consent of Merrill Lynch and Raymond James, (i) directly or indirectly, offer, pledge, sell, contract to sell, sell any option or contract to purchase, purchase any option or contract to sell, grant any option, right or warrant to purchase or otherwise transfer or dispose of any shares of Common Stock or any securities convertible into or exercisable or exchangeable for Common Stock or file any registration statement under the 1933 Act with respect to any of the foregoing or (ii) enter into any swap or any other agreement or any transaction that transfers, in



---

whole or in part, directly or indirectly, the economic consequence of ownership of the Common Stock, whether any such swap or transaction described in clause (i) or (ii) above is to be settled by delivery of Common Stock or such other securities, in cash or otherwise. The foregoing sentence shall not apply to (A) the Securities to be sold hereunder, (B) any shares of Common Stock issued by the Company upon the exercise of an option or warrant or the conversion of a security outstanding on the date hereof and referred to in the Registration Statement, the General Disclosure Package and the Prospectus, (C) any shares of Common Stock issued or options to purchase Common Stock granted pursuant to existing employee benefit plans of the Company referred to in the Registration Statement, the General Disclosure Package and the Prospectus, (D) any shares of Common Stock issued pursuant to any non-employee director stock plan or dividend reinvestment plan referred to in the Registration Statement, the General Disclosure Package and the Prospectus, (E) securities issued by the Company in connection with the acquisition by the Company or any of its subsidiaries of the securities, business, property or other assets of another person or entity or pursuant to any plan assumed by the Company in connection with such acquisition, (F) securities issued by the Company in connection with joint ventures, commercial relationships or other strategic transactions, or (G) the filing of a registration statement on Form S-8; provided however, that securities issued by the Company pursuant to clauses (E) and (F) shall be subject to the restrictions set forth in this Section 3(i); provided, further, that that securities issued by the Company pursuant to clauses (E) and (F) may not exceed, in the aggregate, 10% of the Company's shares of capital stock outstanding immediately following the completion of the transactions contemplated by this Agreement.

(j) If Merrill Lynch and Raymond James, in their sole discretion, agree to release or waive the restrictions set forth in a lock-up agreement described in Section 5(i) hereof for an officer or director of the Company and provides the Company with notice of the impending release or waiver at least three business days before the effective date of the release or waiver, the Company agrees to announce the impending release or waiver by a press release substantially in the form of Exhibit C hereto through a major news service at least two business days before the effective date of the release or waiver.

(k) *Reporting Requirements*. The Company, during the period when a Prospectus relating to the Securities is (or, but for the exception afforded by Rule 172, would be) required to be delivered under the 1933 Act, will file all documents required to be filed with the Commission pursuant to the 1934 Act within the time periods required by the 1934 Act and 1934 Act Regulations. Additionally, the Company shall report the use of proceeds from the issuance of the Shares as may be required under Rule 463 under the 1933 Act.

(l) *Issuer Free Writing Prospectuses*. The Company agrees that, unless it obtains the prior written consent of the Representatives, it will not make any offer relating to the Securities that would constitute an Issuer Free Writing Prospectus or that would otherwise constitute a "free writing prospectus," or a portion thereof, required to be filed by the Company with the Commission or retained by the Company under Rule 433; provided that the Representatives will be deemed to have consented to the Issuer Free Writing Prospectuses listed on Schedule B-2 hereto and any "road show that is a written communication" within the meaning of Rule 433(d)(8)(i) that has been reviewed by the Representatives. The Company represents that it has treated or agrees that it will treat each such free writing prospectus consented to, or deemed consented to, by the Representatives as an "issuer free writing prospectus," as defined in Rule 433, and that it has complied and will comply with the applicable requirements of Rule 433 with respect thereto, including timely filing with the Commission where required, legending and record keeping. If at any time following issuance of an Issuer Free Writing Prospectus there occurred or occurs an event or development as a result of which such Issuer Free Writing Prospectus conflicted or would conflict with the information contained in the Registration Statement, any preliminary prospectus or the Prospectus or included or would include an untrue statement of a material fact or omitted or would omit to state a material fact necessary in order to make the statements therein, in the light of the



---

circumstances existing at that subsequent time, not misleading, the Company will promptly notify the Representatives and will promptly amend or supplement, at its own expense, such Issuer Free Writing Prospectus to eliminate or correct such conflict, untrue statement or omission.

(m) Testing-the-Waters Materials. If at any time following the distribution of any Written Testing-the-Waters Communication there occurred or occurs an event or development as a result of which such Written Testing-the-Waters Communication included or would include an untrue statement of a material fact or omitted or would omit to state a material fact necessary in order to make the statements therein, in the light of the circumstances existing at that subsequent time, not misleading, the Company will promptly notify the Representatives and will promptly amend or supplement, at its own expense, such Written Testing-the-Waters Communication to eliminate or correct such untrue statement or omission.

(n) Emerging Growth Company Status. The Company will promptly notify the Representatives if the Company ceases to be an Emerging Growth Company at any time prior to the later of (i) completion of the distribution of the Securities within the meaning of the 1933 Act and (ii) completion of the 180-day restricted period referred to in Section 3(i) hereof.

SECTION 4. Payment of Expenses.

(a) *Expenses*. The Company will pay or cause to be paid all expenses incident to the performance of its obligations under this Agreement, including (i) the preparation, printing and filing of the Registration Statement (including financial statements and exhibits) as originally filed and each amendment thereto, (ii) the preparation, printing and delivery to the Underwriters of copies of each preliminary prospectus, each Issuer Free Writing Prospectus and the Prospectus and any amendments or supplements thereto and any costs associated with electronic delivery of any of the foregoing by the Underwriters to investors, (iii) the preparation, issuance and delivery of the certificates for the Securities to the Underwriters, including any stock or other transfer taxes and any stamp or other duties payable upon the sale, issuance or delivery of the Securities to the Underwriters, (iv) the fees and disbursements of the Company's counsel, accountants and other advisors, (v) the qualification of the Securities under securities laws in accordance with the provisions of Section 3(e) hereof, including filing fees and the reasonable fees and disbursements of counsel for the Underwriters in connection therewith and in connection with the preparation of the Blue Sky Survey and any supplement thereto if such fees and expenses are required to be incurred, provided that the amount payable by the Company pursuant to this clause (v) shall not exceed $10,000, (vi) the fees and expenses of any transfer agent or registrar for the Securities, (vii) the costs and expenses of the Company relating to investor presentations on any "road show" undertaken in connection with the marketing of the Securities, including without limitation, expenses associated with the production of road show slides and graphics, fees and expenses of any consultants engaged in connection with the road show presentations, travel and lodging expenses of the representatives and officers of the Company and any such consultants (provided that the travel, lodging and any car travel expenses of representatives of the Underwriters shall be paid for by the Underwriters), and the cost of aircraft and other transportation chartered in connection with the road show (provided that 50% of the cost of any aircraft chartered in connection with the road show shall be paid by the Underwriters and the 50% of the cost of any aircraft chartered in connection with the road show shall be paid by the Company), (viii) the filing fees incident to, and the reasonable fees and disbursements of counsel to the Underwriters in connection with, the review by FINRA of the terms of the sale of the Securities, provided that the amount payable by the Company pursuant to this clause (viii) shall not exceed $25,000, (ix) the fees and expenses incurred in connection with the listing of the Securities on the Nasdaq Global Market and (x) the costs and expenses (including, without limitation, any damages or



other amounts payable in connection with legal or contractual liability) associated with the reforming of any contracts for sale of the Securities made by the Underwriters caused by a breach of the representation contained in the third sentence of Section 1(a)(ii). If this Agreement is terminated by the Representatives in accordance with the provisions of Section 10 hereof, the Company shall reimburse the non-defaulting Underwriters for all of their reasonable documented out-of-pocket expenses, including the reasonable fees and disbursements of counsel for the Underwriters.

(b) *Termination of Agreement*. If this Agreement is terminated by the Representatives in accordance with the provisions of Section 5, Section 9(a)(i) or (iii) or Section 11 hereof, the Company shall reimburse the Underwriters for all of their reasonable documented out-of-pocket expenses, including the reasonable fees and disbursements of counsel for the Underwriters.

SECTION 5. Conditions of Underwriters' Obligations. The obligations of the several Underwriters hereunder are subject to the accuracy of the representations and warranties of the Company contained herein or in certificates of any officer of the Company or any of its subsidiaries delivered pursuant to the provisions hereof, to the performance by the Company of its covenants and other obligations hereunder, and to the following further conditions:

(a) *Effectiveness of Registration Statement; Rule 430A Information*. The Registration Statement, including any Rule 462(b) Registration Statement, has become effective and, at the Closing Time, no stop order suspending the effectiveness of the Registration Statement or any post-effective amendment thereto has been issued under the 1933 Act, no order preventing or suspending the use of any preliminary prospectus or the Prospectus has been issued and no proceedings for any of those purposes have been instituted or are pending or, to the Company's knowledge, contemplated by the Commission; and the Company has complied with each request (if any) from the Commission for additional information. A prospectus containing the Rule 430A Information shall have been filed with the Commission in the manner and within the time frame required by Rule 424(b) without reliance on Rule 424(b)(8) or a post-effective amendment providing such information shall have been filed with, and declared effective by, the Commission in accordance with the requirements of Rule 430A.

(b) *Opinion of Counsel for Company*. At the Closing Time, the Representatives shall have received an opinion, dated the Closing Time, of Goodwin Procter LLP, counsel for the Company, in form and substance satisfactory to counsel for the Underwriters, together with signed or reproduced copies of such letter for each of the other Underwriters to the effect set forth in Exhibit A hereto and to such further effect as counsel to the Underwriters may reasonably request.

(c) *Opinion of Counsel for Underwriters*. At the Closing Time, the Representatives shall have received the favorable opinion, dated the Closing Time, of Cooley LLP, counsel for the Underwriters, together with signed or reproduced copies of such letter for each of the other Underwriters with respect to such matters as the Representatives may require. In giving such opinion such counsel may rely, as to all matters governed by the laws of jurisdictions other than the law of the State of New York, the General Corporation Law of the State of Delaware and the federal securities laws of the United States, upon the opinions of counsel satisfactory to the Representatives. Such counsel may also state that, insofar as such opinion involves factual matters, they have relied, to the extent they deem proper, upon certificates of officers and other representatives of the Company and its subsidiaries and certificates of public officials.

(d) *Officers' Certificate*. At the Closing Time, there shall not have been, since the date hereof or since the respective dates as of which information is given in the Registration Statement, the General Disclosure Package or the Prospectus, any material adverse change in the condition, financial or otherwise, or in the earnings, business affairs or business prospects of the Company and its subsidiaries



---

considered as one enterprise, whether or not arising in the ordinary course of business, and the Representatives shall have received a certificate of the Chief Executive Officer or the President of the Company and of the chief financial or chief accounting officer of the Company, dated the Closing Time, to the effect that (i) there has been no such material adverse change, (ii) the representations and warranties of the Company in this Agreement are true and correct with the same force and effect as though expressly made at and as of the Closing Time, (iii) the Company has complied with all agreements and satisfied all conditions on its part to be performed or satisfied as set forth herein at or prior to the Closing Time, and (iv) no stop order suspending the effectiveness of the Registration Statement under the 1933 Act has been issued, no order preventing or suspending the use of any preliminary prospectus or the Prospectus has been issued and no proceedings for any of those purposes have been instituted or are pending or, to their knowledge, contemplated.

(e) *Accountant's Comfort Letter*. At the time of the execution of this Agreement, the Representatives shall have received from Ernst & Young LLP a letter, dated such date, in form and substance satisfactory to the Representatives, together with signed or reproduced copies of such letter for each of the other Underwriters containing statements and information of the type ordinarily included in accountants' "comfort letters" to underwriters with respect to the financial statements and certain financial information contained in the Registration Statement, the General Disclosure Package and the Prospectus.

(f) *Bring-down Comfort Letter*. At the Closing Time, the Representatives shall have received from Ernst & Young LLP a letter, dated as of the Closing Time, to the effect that they reaffirm the statements made in the letter furnished pursuant to subsection (e) of this Section, except that the specified date referred to shall be a date not more than three business days prior to the Closing Time.

(g) *Approval of Listing*. At the Closing Time, the Securities shall have been approved for listing on the Nasdaq Global Market, subject only to official notice of issuance.

(h) *No Objection*. FINRA has confirmed that it has not raised any objection with respect to the fairness and reasonableness of the underwriting terms and arrangements relating to the offering of the Securities.

(i) *Lock-up Agreements*. At the date of this Agreement, the Representatives shall have received an agreement substantially in the form of Exhibit B hereto signed by the persons listed on Schedule C hereto.

(j) *Conditions to Purchase of Option Securities*. In the event that the Underwriters exercise their option provided in Section 2(b) hereof to purchase all or any portion of the Option Securities, the representations and warranties of the Company contained herein and the statements in any certificates furnished by the Company and any of its subsidiaries hereunder shall be true and correct as of each Date of Delivery and, at the relevant Date of Delivery, the Representatives shall have received:

(i) Officers' Certificate. A certificate, dated such Date of Delivery, of the President or a Vice President of the Company and of the chief financial or chief accounting officer of the Company confirming that the certificate delivered at the Closing Time pursuant to Section 5(d) hereof remains true and correct as of such Date of Delivery.

(ii) Opinion of Counsel for Company. If requested by the Representatives, an opinion of Goodwin Procter LLP, counsel for the Company, in form and substance satisfactory to counsel for the Underwriters, dated such Date of Delivery, relating to the Option Securities to be



---

purchased on such Date of Delivery and otherwise to the same effect as the opinion required by Section 5(b) hereof.

(iii) Opinion of Counsel for Underwriters. If requested by the Representatives, the favorable opinion of Cooley LLP, counsel for the Underwriters, dated such Date of Delivery, relating to the Option Securities to be purchased on such Date of Delivery and otherwise to the same effect as the opinion required by Section 5(c) hereof.

(iv) Bring-down Comfort Letter. If requested by the Representatives, a letter from Ernst & Young LLP, in form and substance satisfactory to the

Representatives and dated such Date of Delivery, substantially in the same form and substance as the letter furnished to the Representatives pursuant to Section 5(e) hereof, except that the "specified date" in the letter furnished pursuant to this paragraph shall be a date not more than three business days prior to such Date of Delivery

(v) *Additional Documents*. At the Closing Time and at each Date of Delivery (if any) counsel for the Underwriters shall have been furnished with such documents and opinions as they may reasonably require for the purpose of enabling them to pass upon the issuance and sale of the Securities as herein contemplated, or in order to evidence the accuracy of any of the representations or warranties, or the fulfillment of any of the conditions, herein contained; and all proceedings taken by the Company in connection with the issuance and sale of the Securities as herein contemplated shall be satisfactory in form and substance to the Representatives and counsel for the Underwriters.

(k) *Termination of Agreement*. If any condition specified in this Section shall not have been fulfilled when and as required to be fulfilled, this Agreement, or, in the case of any condition to the purchase of Option Securities on a Date of Delivery which is after the Closing Time, the obligations of the several Underwriters to purchase the relevant Option Securities, may be terminated by the Representatives by notice to the Company at any time at or prior to Closing Time or such Date of Delivery, as the case may be, and such termination shall be without liability of any party to any other party except as provided in Section 4 and except that Sections 1, 6, 7, 8, 15, 16 and 17 shall survive any such termination and remain in full force and effect.

SECTION 6. Indemnification.

(a) *Indemnification of Underwriters*. The Company agrees to indemnify and hold harmless each Underwriter, its affiliates (as such term is defined in Rule 501(b) under the 1933 Act (each, an "Affiliate")), its selling agents and each person, if any, who controls any Underwriter within the meaning of Section 15 of the 1933 Act or Section 20 of the 1934 Act as follows:

(i) against any and all loss, liability, claim, damage and expense whatsoever, as incurred, arising out of any untrue statement or alleged untrue statement of a material fact contained in the Registration Statement (or any amendment thereto), including the Rule 430A Information, or the omission or alleged omission therefrom of a material fact required to be stated therein or necessary to make the statements therein not misleading or arising out of any untrue statement or alleged untrue statement of a material fact included (A) in any preliminary prospectus, any Issuer Free Writing Prospectus, any Written Testing-the-Waters Communication, the General Disclosure Package or the Prospectus (or any amendment or supplement thereto), or (B) in any materials or information provided to investors by, or with the prior written approval of, the Company in connection with the marketing of the offering of the Stock ("Marketing Materials"), including any roadshow or investor presentations made to investors by the Company



---

(whether in person or electronically), or the omission or alleged omission in any preliminary prospectus, Issuer Free Writing Prospectus, any Written Testing-the-Waters Communication, Prospectus or in any Marketing Materials of a material fact necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading;

(ii) against any and all loss, liability, claim, damage and expense whatsoever, as incurred, to the extent of the aggregate amount paid in settlement of any litigation, or any investigation or proceeding by any governmental agency or body, commenced or threatened, or of any claim whatsoever based upon any such untrue statement or omission, or any such alleged untrue statement or omission; provided that (subject to Section 6(d) below) any such settlement is effected with the written consent of the Company;

(iii) against any and all expense whatsoever, as incurred (including the fees and disbursements of counsel chosen by Merrill Lynch and Raymond James), reasonably incurred in investigating, preparing or defending against any litigation, or any investigation or proceeding by any governmental agency or body, commenced or threatened, or any claim whatsoever based upon any such untrue statement or omission, or any such alleged untrue statement or omission, to the extent that any such expense is not paid under (i) or (ii) above;

provided, however, that this indemnity agreement shall not apply to any loss, liability, claim, damage or expense to the extent arising out of any untrue statement or omission or alleged untrue statement or omission made in the Registration Statement (or any amendment thereto), including the Rule 430A Information, the General Disclosure Package or the Prospectus (or any amendment or supplement thereto) in reliance upon and in conformity with the Underwriter Information.

(b) *Indemnification of Company, Directors and Officers*. Each Underwriter severally agrees to indemnify and hold harmless the Company, its directors, each of its officers who signed the Registration Statement, and each person, if any, who controls the Company within the meaning of Section 15 of the 1933 Act or Section 20 of the 1934 Act, against any and all loss, liability, claim, damage and expense described in the indemnity contained in subsection (a) of this Section, as incurred, but only with respect to untrue statements or omissions, or alleged untrue statements or omissions, made in the Registration Statement (or any amendment thereto), including the Rule 430A Information, the General Disclosure Package or the Prospectus (or any amendment or supplement thereto) in reliance upon and in conformity with the Underwriter Information.

(c) *Actions against Parties; Notification*. Each indemnified party shall give notice as promptly as reasonably practicable to each indemnifying party of any action commenced against it in respect of which indemnity may be sought hereunder, but failure to so notify an indemnifying party shall not relieve such indemnifying party from any liability hereunder to the extent it is not materially prejudiced as a result thereof and in any event shall not relieve it from any liability which it may have otherwise than on account of this indemnity agreement. In the case of parties indemnified pursuant to Section 6(a) above, counsel to the indemnified parties shall be selected by Merrill Lynch and Raymond James, subject to the Company's approval, which shall not be unreasonably withheld or delayed, and, in the case of parties indemnified pursuant to Section 6(b) above, counsel to the indemnified parties shall be selected by the Company, subject to the Representatives' approval, which shall not

be unreasonably withheld or delayed. An indemnifying party may participate at its own expense in the defense of any such action; provided, however, that counsel to the indemnifying party shall not (except with the consent of the indemnified party) also be counsel to the indemnified party. In no event shall the indemnifying parties be liable for the reasonable fees and expenses of more than one counsel (in addition to any local counsel) separate from their own counsel for all indemnified parties in connection with any one action or separate but similar or related actions in the same jurisdiction arising out of the same general allegations



---

or circumstances. No indemnifying party shall, without the prior written consent of the indemnified parties, settle or compromise or consent to the entry of any judgment with respect to any litigation, or any investigation or proceeding by any governmental agency or body, commenced or threatened, or any claim whatsoever in respect of which indemnification or contribution could be sought under this Section 6 or Section 7 hereof (whether or not the indemnified parties are actual or potential parties thereto), unless such settlement, compromise or consent (i) includes an unconditional release of each indemnified party from all liability arising out of such litigation, investigation, proceeding or claim and (ii) does not include a statement as to or an admission of fault, culpability or a failure to act by or on behalf of any indemnified party.

(d) *Settlement without Consent if Failure to Reimburse*. If at any time an indemnified party shall have requested an indemnifying party to reimburse the indemnified party for fees and expenses of counsel, such indemnifying party agrees that it shall be liable for any settlement of the nature contemplated by Section 6(a)(ii) effected without its written consent if (i) such settlement is entered into more than 45 days after receipt by such indemnifying party of the aforesaid request, (ii) such indemnifying party shall have received notice of the terms of such settlement at least 30 days prior to such settlement being entered into and (iii) such indemnifying party shall not have reimbursed such indemnified party in accordance with such request prior to the date of such settlement.

SECTION 7. Contribution. If the indemnification provided for in Section 6 hereof is for any reason unavailable to or insufficient to hold harmless an indemnified party in respect of any losses, liabilities, claims, damages or expenses referred to therein, then each indemnifying party shall contribute to the aggregate amount of such losses, liabilities, claims, damages and expenses incurred by such indemnified party, as incurred, (i) in such proportion as is appropriate to reflect the relative benefits received by the Company, on the one hand, and the Underwriters, on the other hand, from the offering of the Securities pursuant to this Agreement or (ii) if the allocation provided by clause (i) is not permitted by applicable law, in such proportion as is appropriate to reflect not only the relative benefits referred to in clause (i) above but also the relative fault of the Company, on the one hand, and of the Underwriters, on the other hand, in connection with the statements or omissions which resulted in such losses, liabilities, claims, damages or expenses, as well as any other relevant equitable considerations.

The relative benefits received by the Company, on the one hand, and the Underwriters, on the other hand, in connection with the offering of the Securities pursuant to this Agreement shall be deemed to be in the same respective proportions as the total net proceeds from the offering of the Securities pursuant to this Agreement (before deducting expenses) received by the Company, on the one hand, and the total underwriting discount received by the Underwriters, on the other hand, in each case as set forth on the cover of the Prospectus, bear to the aggregate initial public offering price of the Securities as set forth on the cover of the Prospectus.

The relative fault of the Company, on the one hand, and the Underwriters, on the other hand, shall be determined by reference to, among other things, whether any such untrue or alleged untrue statement of a material fact or omission or alleged omission to state a material fact relates to information supplied by the Company or by the Underwriters and the parties' relative intent, knowledge, access to information and opportunity to correct or prevent such statement or omission.

The Company and the Underwriters agree that it would not be just and equitable if contribution pursuant to this Section 7 were determined by pro rata allocation (even if the Underwriters were treated as one entity for such purpose) or by any other method of allocation which does not take account of the equitable considerations referred to above in this Section 7. The aggregate amount of losses, liabilities, claims, damages and expenses incurred by an indemnified party and referred to above in this Section 7 shall be deemed to include any legal or other expenses reasonably incurred by such indemnified party in



---

investigating, preparing or defending against any litigation, or any investigation or proceeding by any governmental agency or body, commenced or threatened, or any claim whatsoever based upon any such untrue or alleged untrue statement or omission or alleged omission.

Notwithstanding the provisions of this Section 7, no Underwriter shall be required to contribute any amount in excess of the underwriting commissions received by such Underwriter in connection with the Shares underwritten by it and distributed to the public.

No person guilty of fraudulent misrepresentation (within the meaning of Section 11(f) of the 1933 Act) shall be entitled to contribution from any person who was not guilty of such fraudulent misrepresentation.

For purposes of this Section 7, each person, if any, who controls an Underwriter within the meaning of Section 15 of the 1933 Act or Section 20 of the 1934 Act and each Underwriter's Affiliates and selling agents shall have the same rights to contribution as such Underwriter, and each director of the Company, each officer of the Company who signed the Registration Statement, and each person, if any, who controls the Company within the meaning of Section 15 of the 1933 Act or Section 20 of the 1934 Act shall have the same rights to contribution as the Company. The Underwriters' respective obligations to contribute pursuant to this Section 7 are several in proportion to the number of Initial Securities set forth opposite their respective names in Schedule A hereto and not joint.

SECTION 8. Representations, Warranties and Agreements to Survive. All representations, warranties and agreements contained in this Agreement or in

certificates of officers of the Company or any of its subsidiaries submitted pursuant hereto, shall remain operative and in full force and effect regardless of (i) any investigation made by or on behalf of any Underwriter or its Affiliates or selling agents, any person controlling any Underwriter, its officers or directors or any person controlling the Company and (ii) delivery of and payment for the Securities.

SECTION 9. Termination of Agreement.

(a) *Termination*. The Representatives may terminate this Agreement, by notice to the Company, at any time at or prior to the Closing Time (i) if there has been, in the judgment of the Representatives, since the time of execution of this Agreement or since the respective dates as of which information is given in the Registration Statement, the General Disclosure Package or the Prospectus, any material adverse change in the condition, financial or otherwise, or in the earnings, business affairs or business prospects of the Company and its subsidiaries considered as one enterprise, whether or not arising in the ordinary course of business, or (ii) if there has occurred any material adverse change in the financial markets in the United States or the international financial markets, any outbreak of hostilities or escalation thereof or other calamity or crisis or any change or development involving a prospective change in national or international political, financial or economic conditions, in each case the effect of which is such as to make it, in the judgment of the Representatives, impracticable or inadvisable to proceed with the completion of the offering or to enforce contracts for the sale of the Securities, or (iii) if trading in any securities of the Company has been suspended or materially limited by the Commission or the Nasdaq Global Market, or (iv) if trading generally on the New York Stock Exchange or in the Nasdaq Global Market has been suspended or materially limited, or minimum or maximum prices for trading have been fixed, or maximum ranges for prices have been required, by any of said exchanges or by order of the Commission, FINRA or any other governmental authority, or (v) a material disruption has occurred in commercial banking or securities settlement or clearance services in the United States, or (vi) if a banking moratorium has been declared by either Federal or New York authorities.



---

(b) *Liabilities*. If this Agreement is terminated pursuant to this Section, such termination shall be without liability of any party to any other party except as provided in Section 4 hereof, and provided further that Sections 1, 6, 7, 8, 15, 16 and 17 shall survive such termination and remain in full force and effect.

SECTION 10. Default by One or More of the Underwriters. If one or more of the Underwriters shall fail at the Closing Time or a Date of Delivery to purchase the Securities which it or they are obligated to purchase under this Agreement (the "Defaulted Securities"), the Representatives shall have the right, within 24 hours thereafter, to make arrangements for one or more of the non-defaulting Underwriters, or any other underwriters, to purchase all, but not less than all, of the Defaulted Securities in such amounts as may be agreed upon and upon the terms herein set forth; if, however, the Representatives shall not have completed such arrangements within such 24-hour period, then the Company shall be entitled to a further period of 24-hours within which to procure other persons satisfactory to the Representative to purchase Defaulted Securities upon such terms. After giving effect to any arrangement for the purchase of the Defaulted Securities by the Representative and the Company as provided in the preceding sentence:

(i) if the number of Defaulted Securities does not exceed 10% of the number of Securities to be purchased on such date, each of the non-defaulting Underwriters shall be obligated, severally and not jointly, to purchase the full amount thereof in the proportions that their respective underwriting obligations hereunder bear to the underwriting obligations of all non-defaulting Underwriters, or

(ii) if the number of Defaulted Securities exceeds 10% of the number of Securities to be purchased on such date, this Agreement or, with respect to any Date of Delivery which occurs after the Closing Time, the obligation of the Underwriters to purchase, and the Company to sell, the Option Securities to be purchased and sold on such Date of Delivery shall terminate without liability on the part of any non-defaulting Underwriter.

No action taken pursuant to this Section shall relieve any defaulting Underwriter from liability in respect of its default.

In the event of any such default which does not result in a termination of this Agreement or, in the case of a Date of Delivery which is after the Closing Time, which does not result in a termination of the obligation of the Underwriters to purchase and the Company to sell the relevant Option Securities, as the case may be, either (i) the Representatives or (ii) the Company shall have the right to postpone Closing Time or the relevant Date of Delivery, as the case may be, for a period not exceeding seven days in order to effect any required changes in the Registration Statement, the General Disclosure Package or the Prospectus or in any other documents or arrangements. As used herein, the term "Underwriter" includes any person substituted for an Underwriter under this Section 10.

SECTION 11. Default by the Company. If the Company shall fail at the Closing Time or a Date of Delivery, as the case may be, to sell the number of Securities that it is obligated to sell hereunder, then this Agreement shall terminate without any liability on the part of any nondefaulting party; provided, however, that the provisions of Sections 1, 4, 6, 7, 8, 15, 16 and 17 shall remain in full force and effect. No action taken pursuant to this Section shall relieve the Company from liability, if any, in respect of such default.

SECTION 12. Notices. All notices and other communications hereunder shall be in writing and shall be deemed to have been duly given if mailed or transmitted by any standard form of telecommunication. Notices to the Underwriters shall be directed to Merrill Lynch at One Bryant Park,



---

New York, New York 10036, attention of Syndicate Department (facsimile: (646) 855-3073), with a copy to ECM Legal (facsimile: (212) 230-8730); notices to the

Company shall be directed to it at 11734 S. Election Road, Salt Lake City, Utah 84020, attention of General Counsel.

SECTION 13. No Advisory or Fiduciary Relationship. The Company acknowledges and agrees that (a) the purchase and sale of the Securities pursuant to this Agreement, including the determination of the initial public offering price of the Securities and any related discounts and commissions, is an arm's-length commercial transaction between the Company, on the one hand, and the several Underwriters, on the other hand, (b) in connection with the offering of the Securities and the process leading thereto, each Underwriter is and has been acting solely as a principal and is not the agent or fiduciary of the Company, any of its subsidiaries, or their respective stockholders, creditors, employees or any other party, (c) no Underwriter has assumed or will assume an advisory or fiduciary responsibility in favor of the Company with respect to the offering of the Securities or the process leading thereto (irrespective of whether such Underwriter has advised or is currently advising the Company or any of its subsidiaries on other matters) and no Underwriter has any obligation to the Company with respect to the offering of the Securities except the obligations expressly set forth in this Agreement, (d) the Underwriters and their respective affiliates may be engaged in a broad range of transactions that involve interests that differ from those of the Company, and (e) the Underwriters have not provided any legal, accounting, regulatory or tax advice with respect to the offering of the Securities and the Company has consulted its own respective legal, accounting, regulatory and tax advisors to the extent it deemed appropriate.

SECTION 14. Parties. This Agreement shall each inure to the benefit of and be binding upon the Underwriters and the Company and their controlling persons, officer and directors and their respective successors, heirs and legal representatives, as applicable. Nothing expressed or mentioned in this Agreement is intended or shall be construed to give any person, firm or corporation, other than the Underwriters and the Company and their respective successors and the controlling persons and officers and directors referred to in Sections 6 and 7 and their heirs and legal representatives, any legal or equitable right, remedy or claim under or in respect of this Agreement or any provision herein contained. This Agreement and all conditions and provisions hereof are intended to be for the sole and exclusive benefit of the Underwriters and the Company and their respective successors, and said controlling persons and officers and directors and their heirs and legal representatives, and for the benefit of no other person, firm or corporation. No purchaser of Securities from any Underwriter shall be deemed to be a successor by reason merely of such purchase.

SECTION 15. Trial by Jury. The Company (on its behalf and, to the extent permitted by applicable law, on behalf of its stockholders and affiliates) and each of the Underwriters hereby irrevocably waives, to the fullest extent permitted by applicable law, any and all right to trial by jury in any legal proceeding arising out of or relating to this Agreement or the transactions contemplated hereby.

SECTION 16. GOVERNING LAW. THIS AGREEMENT AND ANY CLAIM, CONTROVERSY OR DISPUTE ARISING UNDER OR RELATED TO THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF, THE STATE OF NEW YORK WITHOUT REGARD TO ITS CHOICE OF LAW PROVISIONS.

SECTION 17. Consent to Jurisdiction; Waiver of Immunity. Any legal suit, action or proceeding arising out of or based upon this Agreement or the transactions contemplated hereby ("Related Proceedings") shall be instituted in (i) the federal courts of the United States of America located in the City and County of New York, Borough of Manhattan or (ii) the courts of the State of New York located in the City and County of New York, Borough of Manhattan (collectively, the "Specified Courts"), and each party irrevocably submits to the exclusive jurisdiction (except for proceedings instituted in regard to the enforcement of a judgment of any such court (a "Related Judgment"), as to which such jurisdiction is



---

non-exclusive) of such courts in any such suit, action or proceeding. Service of any process, summons, notice or document by mail to such party's address set forth above shall be effective service of process for any suit, action or other proceeding brought in any such court. The parties irrevocably and unconditionally waive any objection to the laying of venue of any suit, action or other proceeding in the Specified Courts and irrevocably and unconditionally waive and agree not to plead or claim in any such court that any such suit, action or other proceeding brought in any such court has been brought in an inconvenient forum.

SECTION 18. TIME. TIME SHALL BE OF THE ESSENCE OF THIS AGREEMENT. EXCEPT AS OTHERWISE SET FORTH HEREIN, SPECIFIED TIMES OF DAY REFER TO NEW YORK CITY TIME.

SECTION 19. Counterparts. This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original, but all such counterparts shall together constitute one and the same Agreement.

SECTION 20. Effect of Headings. The Section headings herein are for convenience only and shall not affect the construction hereof.



---

If the foregoing is in accordance with your understanding of our agreement, please sign and return to the Company a counterpart hereof, whereupon this instrument, along with all counterparts, will become a binding agreement among the Underwriters, and the Company in accordance with its terms.

Very truly yours,

Control4 Corporation

By ______________________________
Title:

CONFIRMED AND ACCEPTED,
as of the date first above written:

MERRILL LYNCH, PIERCE, FENNER & SMITH
INCORPORATED

RAYMOND JAMES & ASSOCIATES, INC.

By: MERRILL LYNCH, PIERCE, FENNER & SMITH
INCORPORATED

By ______________________________
Authorized Signatory

By: RAYMOND JAMES & ASSOCIATES, INC.

By ______________________________
Authorized Signatory

For themselves and as Representatives of the other Underwriters named in Schedule A hereto.



---

SCHEDULE A

The initial public offering price per share for the Securities shall be $•.

The purchase price per share for the Securities to be paid by the several Underwriters shall be $•, being an amount equal to the initial public offering price set forth above less $• per share, subject to adjustment in accordance with Section 2(b) for dividends or distributions declared by the Company and payable on the Initial Securities but not payable on the Option Securities.

| Name of Underwriter | Number of Initial Securities |
|---|---|
| Merrill Lynch, Pierce, Fenner & Smith Incorporated | |
| Raymond James & Associates, Inc. | |
| Canaccord Genuity Inc. | |
| Cowen and Company, LLC. | |
| Needham & Company, LLC. | |
| Total | |



---

SCHEDULE B-1

Pricing Terms

1. The Company is selling • shares of Common Stock.

2. The Company has granted an option to the Underwriters, severally and not jointly, to purchase up to an additional • shares of Common Stock.

3. The initial public offering price per share for the Securities shall be $•.

Sch B-1 - 1

---

SCHEDULE B-2

Free Writing Prospectuses

[None.]

Sch B-2 - 1

---

SCHEDULE B-3

Written Testing-the-Waters Communication

[None.]

Sch B-3 - 1

---

SCHEDULE C

List of Persons and Entities Subject to Lock-up

| Name |
|---|
| Acomb, Stanford |
| Acton, David |
| Adams, Nathan |
| Aladjoff, Ivan |
| Allen, Ben |
| Allen, Jared |
| Alvord, Cortney |
| Anderson, Eric |
| Anderson, Nate |
| Andrews, Christopher |
| Armstrong, Scott |
| Arnold, Jim |
| Ashcroft, Alan |
| Avetta, James |
| Baker, David |
| Baker, Jeremy |
| Baker, Kevin |
| Baldwin, Brad |
| Banta, Alan |
| Barrus, David |
| Benack, Jaclyn |
| Bennett, Larry |
| Bernal, Balarama |
| Best Buy Co., Inc. |
| Bishop, Darren |
| Bishop, Greg |

Bjelde, Donald



| Name |
| --- |
| Bluemel, Thomas |
| Bolton, Matthew |
| Born, Rob |
| Borrowman, Ryan |
| Bowman, Timothy |
| Bray, Robert |
| Brown, Jonathan |
| Bruhn, Robert |
| Bryan, David |
| Burgoyne, Nathan |
| Bytheway, David |
| Cabrera, Carlos |
| Cabriales, Carlos |
| Cannon, Richard |
| Capell, Raymond |
| Cargile, JD |
| Cargile, Sara A. |
| Carnell, Christian |
| Carney, Shanan |
| Carpenter, Michael |
| Cashen, Susan |
| Chappidi, Lakshmi |
| Chase, Jodi |
| Chase, Jordan |
| Chaston, Tara |
| Chesley, Tyler |
| Christensen, Marc |
| Cisco Systems, Inc. |
| Clapp, Glenn |
| Clark, William |



| Name |
| --- |
| Clyde, Steven |
| Colburn, Kevin |
| Colburn, Michele |
| Collier, Michael P. |
| Conder, Craig |
| Connett, Joel |
| Cosenza, Peter |
| Coulter, Ernie |
| Cox, Curtis |
| Dailey, Michael |
| Danoyan, Alexander |
| Delgado, Marie |
| Demke, Caleb |
| Denney, Michael |
| Derry, David |
| Deru, Kimberly |
| Doubek, Joe |
| Drew, Kelly |
| Duff, Jennifer |
| Dungan, Jeff |

Dutson, Ryan
Dykhuizen, Alison
Eagar, John
Ellis, Joshua
Epeneter, John
Erbe, Lowell
Erickson, Jacob
Erickson, Ryan
Fallows, Tim
Fay, David



| Name |
|---|
| Fisher, Christopher |
| Flick, Nitai S. |
| Flint, Kevin |
| Floresca, Frederick |
| Fogg, Brian |
| Fowler, John |
| Frazier Technology Ventures II, L.P. |
| Freston, David |
| Frost, Jeremy |
| Fuller, Carole |
| Fuller, Robert |
| Gallegos, Chad |
| Garretson, Kevin |
| Girardier, Jason |
| Gomez, Luis |
| Gomm, Tom |
| Goodman, Katherine |
| Goodwin, Nicole |
| Gouff, Noel |
| Greenwood, Eldon |
| Griffith, David |
| Grow, John |
| Gull, Aaron |
| Habiger, David |
| Hale, Blake |
| Halloran, Michael |
| Haney, Keith |
| Hanks, Jesse |
| Harmer, Lisa |
| Harmon, Joe |



| Name |
|---|
| Harmon, Stephen |
| Hart, Daniel |
| Hart, Paul |
| Hatch, Matthew |
| Hawkins, Jamie |
| Hellewell, Wendell |
| Hemingway, Lauren |
| Heninger, Thane |
| Heninger, Troy |
| Hess, Darin |
| Hesson, Kevin |
| Heugly, Eric |

| |
|---|
| Higbee, Carrie |
| Hinrichsen, Heinee |
| Holt, Kelly |
| Holtby, Troy |
| Horsley, Rodney |
| Horton, Jeremy |
| Howell, Gregory |
| Hudson, Charles |
| Huebner, Troy |
| Hughes, Joseph |
| Hulick, Mark |
| Ingham, Mark |
| Jackson, Shaun |
| Jarvis, Charles |
| Jeffery, Scott |
| Jensen, Monty |
| Johnson, Brandon |
| Johnson, Kristin |



| Name |
|---|
| Johnson, Zara |
| Jones, Kieran |
| Jones, Suzanne |
| Jordan, Len |
| Josephson, James |
| Kearns, Steven |
| Kim, Casey |
| King, Sidney |
| Kinkade, Kevin |
| Kirby, Pauline |
| Kirk, Tracy |
| Kirsten, Cindy |
| Klekas, Michael |
| Knavel, Ryan |
| Knolle, Randy |
| Koutsky, Bryan |
| Kuhn, Tom |
| Larsen, Audrey |
| Larsen, Marti |
| Larsen, Ty |
| Lawrence, Brian |
| Leung, Jordan |
| Lewis, Jason |
| Liganor, Paul |
| Lind, David |
| Lindenlaub, Quyen |
| Liu, Chingyao |
| Livingston, Ross |
| Longaker, Amy |
| Lutz, Willis |



| Name |
|---|
| Mackay, Rachel |
| Madsen, Brent |
| Mahoney, Ben |

| |
|---|
| Major, John |
| Makkena, Sujatha |
| Mar, John |
| Martin, James |
| Martin, Jason |
| Mathis, Terry |
| McAllister, Michael |
| McBride, Dustin |
| McGeever, Jim |
| McNamara, Michael |
| Mears, Spencer |
| Mecklenburg, Robert |
| Mercato Partners |
| Mella, Gordon |
| Midgley, Roger |
| Mierkey, Brian |
| Miller, Todd |
| Milligan, Thomas |
| Molen, Brett |
| Moore, Joseph |
| Muenzenberger, Daniel |
| Murphy, Roy |
| Nagel, Paul |
| Munford, AJ |
| Neale, Hamish |
| Neilson, Natalee |
| Nelson, Christiana |



| Name |
|---|
| Nelson, Jon |
| Nelson, Michael |
| Nettles, Jason |
| Nguyen, Richard |
| Nielson, Alison |
| Nielson, Cheri |
| Nitzen, Leana |
| Norman, Jim |
| Novakovich, Mark S. |
| Noyce, Beverly |
| Ohlwiler, Mark |
| Osborn, Jaime |
| Oviatt, David |
| Owens, Fred |
| Painter, Jenni |
| Paisley, Chris |
| Parker, Andrew |
| Parker, Kim |
| Partridge, Ryan |
| Patten, James |
| Peasley, Sam |
| Peel, Nathan |
| Pendleton, David |
| Perez, Miguel |
| Perry, Clinton |
| Petty, Douglas |
| Petty, Scott |
| Pfeifer, Jeremy |
| Phelps, Parry |
| Pittard, Robert |

| Name |
|---|
| Plaehn, Martin |
| Plaehn, Michael |
| Primavera, Matthew |
| Prue, Lonn |
| Quinney, Eric |
| Radford, Coleman |
| Raghunathan, Archana |
| Raimer, Jason |
| Raymond, Jaclyn |
| Reams, Amy |
| Reay, Alan |
| Reed, Tyler |
| Renslow, Melvin |
| Renzema, David |
| Rice, Matthew |
| Riddle, Greg |
| Romney, Nathan |
| Rosado, Nicholas |
| Rose, Brian |
| Rowell, Russell |
| Rowland, Todd |
| Russell, James |
| Rutz, Paul |
| Salzman, Scott Don |
| Sanchez, Ricky |
| Sand, Matthew |
| Sandberg, Jeff |
| SAP Ventures |
| Sawyer, Michael |
| Schonle, Bill |



| Name |
|---|
| Schritter, Shannon |
| Schulz, Thomas |
| Severson, Monique |
| Seyler, Terry |
| Shake, Francis |
| Shaw, Christopher |
| Shetty, Roshan |
| Signal Peak Ventures |
| Skidmore, David |
| Slaughenhaupt, Dale |
| Smith, Allen |
| Smith, Allyson |
| Smith, Eric W. |
| Smith, Gregory |
| Soto, Victor |
| Spens, Tim |
| Spoerri, Christie |
| Stephenson, Michael |
| Stephenson, Scott |
| Strong, Dan |
| Tang, Cheng |
| Taylor, Timothy |

Thomas, Marion
Thomas Weisel Venture Partners
Tiffany, John
Timm, Richard
Tuke, Cassidy
Tyson, Misti
Van Cleave, Blake
Van Uitert, Andrew



---

| Name |
|---|
| Van Uitert, Scot |
| Vaughn, Kordon |
| Vernon, Bruce |
| Wade, Sandra |
| Walker, Benjamin |
| Wallengren, Eric |
| Watts, Crystal |
| Weight, Gordon |
| Wenet, Garey |
| West, Jennifer |
| West, William B. |
| Wheeler, Thomas M. |
| Whipple, Jacob |
| Whitman, Marc |
| Whitney, Colby |
| Williams, Eric |
| Williams, Paul |
| Winters, Nicole |
| Woebel, Eric |
| Woodall, Stephanie |
| Woods, Mike |
| Wright, Greg |
| Wright, Troy |
| Yanagihara-Brooks, Mark |
| Yogya, Stephen |
| Zekas, Dean |
| Zimmerman, Brent |
| Zollinger, Scott |



---

Exhibit A

FORM OF OPINION OF COMPANY'S COUNSEL
TO BE DELIVERED PURSUANT TO SECTION 5(b)

[ ], 2013

Merrill Lynch, Pierce, Fenner & Smith
Incorporated
Raymond James & Associates, Inc.
As Representatives of the
Several Underwriters

c/o
Merrill Lynch, Pierce, Fenner & Smith
Incorporated
One Bryant Park

New York, New York 10036

c/o
Raymond James & Associates, Inc.
One Embarcadero Center, Suite 650
San Francisco, California 94111

Re: Control4 Corporation

Ladies and Gentlemen:

We have acted as counsel for Control4 Corporation, a Delaware corporation (the "Company") in connection with the sale to the Underwriters (as defined below) by the Company of [ ] shares (the "Primary Shares") of common stock, $0.0001 par value per share (the "Common Stock"), of the Company. We are furnishing this opinion letter to you pursuant to Section 5(b) of the Underwriting Agreement, dated as of [ ], 2013 (the "Underwriting Agreement"), among the Company and the Underwriters listed on Schedule A to the Underwriting Agreement, for whom you are acting as Representatives (the "Underwriters").

The Company's Registration Statement on Form S-1 (File No. 333-[ ]) filed by the Company with the Securities and Exchange Commission (the "Commission") on [ ], 2013, as amended, in the form in which it became effective on [ ], including the information deemed to be included in it at the time of effectiveness pursuant to Rule 430A under the Securities Act of 1933, as amended (the "Securities Act"), is referred to in this opinion letter as the "Registration Statement," and the prospectus included in it, as filed pursuant to Rule 424(b) under the Securities Act on [ ], 2013, is referred to in this opinion letter as the "Prospectus."

We have reviewed the agreements filed as an exhibit to the Registration Statement (the "Listed Agreements") and made such investigation of law as we have deemed appropriate to give the opinions set forth below. We have relied, without independent verification, on certificates of public officials and, as to matters of fact material to the opinions set forth below, on representations made in the Underwriting Agreement, and certificates and other inquiries of officers of the Company.



---

Our opinion regarding valid existence and good standing in numbered paragraph 1 is based solely on a certificate of the Delaware Secretary of State and, in the case of valid existence, a review of the Company's certificate of incorporation (the "Certificate of Incorporation") and an officer's certificate confirming that the Company has taken no action looking to its dissolution. Our opinions in numbered paragraph 4 below regarding the due qualification and good standing of the Company as a foreign corporation are based solely on certificates of the Secretaries of State or other appropriate officials of the respective jurisdictions identified on Schedule A to this opinion letter in which the Company is qualified as a foreign corporation. We express no opinion as to the tax good standing of the Company in any jurisdiction.

In connection with our opinion in numbered paragraph 9 below, we have relied exclusively on the letter, dated [ ], 2013, from [ , of The NASDAQ Stock Market, Inc. to [NAME], [TITLE] of the Company, a copy of which has been made available to your counsel.

For purposes of our opinion in numbered paragraph 8(c), we have interpreted the terms of the contracts addressed by that opinion as they would be understood in California.

The opinions set forth below are limited to California law, the Delaware General Corporation Law and the federal law of the United States. Without limiting the generality of the foregoing, we express no opinion with respect to (i) state securities or "Blue Sky" laws, or (ii) state or federal antifraud laws.

Based upon the foregoing, and subject to the additional qualifications set forth below, we are of the opinion that:

1. The Company is validly existing as a corporation and in good standing under Delaware law.

2. The Company has the corporate power to own its properties and conduct its business as described in the Prospectus and to execute and deliver, and to perform its obligations under, the Underwriting Agreement.

3. The Company is duly qualified to do business and is in good standing as a foreign corporation in the jurisdictions set forth opposite its name on Exhibit A hereto.

4. The issued and outstanding shares of capital stock of the Company have been duly authorized and validly issued, and are fully paid and non-assessable.

5. Any required filing of the Prospectus pursuant to Rule 424(b) under the Securities Act has been made in the manner and within the time period required by such Rule.

6. The Underwriting Agreement has been duly authorized, executed and delivered by the Company.

7. The Primary Shares have been duly authorized and, when issued delivered and paid for in accordance with the Underwriting Agreement, will be validly

issued, fully paid and nonassessable. The issuance and sale of the Primary Shares is not subject to any preemptive right under the Delaware General Corporation Law or the Company's Certificate of Incorporation or the Bylaws of the Company (the "Bylaws"), or similar contractual rights under any of the Listed Agreements, except for any such preemptive or contractual rights that have been waived.

8. The execution and delivery by the Company of the Underwriting Agreement and its issuance and sale of the Primary Shares do not: (a) require any consent, approval, license or exemption by, order or authorization of, or filing, recording or registration by the Company with any Delaware governmental authority pursuant to the Delaware General Corporation Law or any California or federal

A-2

---

governmental authority, except those that have been obtained or made under the Securities Act, (b) violate the Certificate of Incorporation or the Bylaws, the Delaware General Corporation Law or any California or federal statute, rule or regulation, or (c) result in a breach of, or constitute a default under, any of the Listed Agreements.

9. The Primary Shares to be delivered in accordance with the provisions of the Underwriting Agreement have been approved for listing, subject to notice of issuance, on the NASDAQ Global Market.

10. The statements in the Prospectus under the captions "Description of Common Stock", insofar as such statements contain descriptions of statutes, rules or regulations, or the terms of agreements or the terms of the Company's Certificate of Incorporation or Bylaws, are correct in all material respects.

11. The Company is not, and after giving effect to the issuance of the Primary Shares and the application of the proceeds as described in the Prospectus, will not be, an "investment company," as that term is defined in the Investment Company Act of 1940, as amended.

This opinion letter and the opinions it contains shall be interpreted in accordance with the Legal Opinion Principles issued by the Committee on Legal Opinions of the American Bar Association's Business Law Section as published in 53 *Business Lawyer* 831 (May 1998).

This opinion letter is being furnished by us solely for the benefit of the several Underwriters as underwriters in connection with the issuance to the Underwriters of the Primary Shares, and neither it nor the opinions it contains may be relied on for any other purpose or by anyone else.

Very truly yours,

GOODWIN PROCTER LLP

A-3

---

**EXHIBIT A**

**Jurisdiction(s) in which the Company is Qualified as a Foreign Corporation**

California
Utah

A-4

---

[ ], 2013

Merrill Lynch, Pierce, Fenner & Smith
Incorporated
Raymond James & Associates, Inc.
As Representatives of the
Several Underwriters
c/o
Merrill Lynch, Pierce, Fenner & Smith
Incorporated

One Bryant Park
New York, New York 10036

c/o
Raymond James & Associates, Inc.
One Embarcadero Center, Suite 650
San Francisco, California 94111

Re: Control4 Corporation

Ladies and Gentlemen:

Reference is made to the registration under the Securities Act of 1933, as amended (the "Securities Act") of the offering and sale of [ ] shares of common stock, $0.0001 par value per share (the "Common Stock"), of Control4 Corporation (the "Company") pursuant to a registration statement on Form S-1 (No. 333-[ ]) (the "Registration Statement") that was declared effective under the Securities Act on [ ], 2013. When the Registration Statement was declared effective by the Securities and Exchange Commission (the "Commission"), the form of prospectus included in it omitted certain information in reliance upon Rule 430A under the Securities Act. That information is contained in the prospectus as filed pursuant to Rule 424(b)(4) of the Securities Act on [ ], 2013, which is deemed to be a part of the Registration Statement as of the time it was declared effective (the "Prospectus"). The Prospectus also updates or supplements certain information contained in the Registration Statement. Reference is also made to the preliminary prospectus included in the Registration Statement immediately prior to [8:30] p.m. (Eastern time) on [ ], 2013, (the "Applicable Time"), as supplemented by the documents (if any) listed on Appendix A hereto and the information contained in Appendix B hereto (collectively, the "Pricing Disclosure Package"). We are furnishing this letter to you pursuant to Section 5(b) of the Underwriting Agreement, dated as of [ ], 2013 (the "Underwriting Agreement"), among the Company and the several underwriters listed on Schedule A to the Underwriting Agreement, for whom you are acting as Representatives (the "Underwriters"), in connection with the sale to the Underwriters by the Company of [ ] shares of Common Stock (the "Shares").

As counsel to the Company, we reviewed the Registration Statement, the Prospectus and the Pricing Disclosure Package, and participated in discussions with your representatives, those of counsel for the several Underwriters, and those of the Company and its independent public accountants, at which the contents of the Registration Statement, the Prospectus and the Pricing Disclosure Package were discussed.



---

Between the Applicable Time and the time of the delivery of this letter, we participated in further discussions with your representatives, those of counsel for the Underwriters, and those of the Company and its independent public accountants, and we reviewed certain certificates of officers of the Company and public officials and letters from the Company's independent public accountants delivered to you today.

The purpose of our engagement was not to establish or to confirm factual matters set forth in the Registration Statement, the Prospectus and the Pricing Disclosure Package, and we have not undertaken any obligation to verify independently any of the factual matters set forth in the Registration Statement, the Prospectus and the Pricing Disclosure Package. Moreover, many of the determinations required to be made in the preparation of the Registration Statement, the Prospectus and the Pricing Disclosure Package involve matters of a non-legal nature.

Subject to the foregoing, we confirm to you that, on the basis of the information that we gained in the course of performing the services referred to above, nothing came to our attention that caused us to believe that: (a) the Registration Statement, as of its effective date, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading, (b) the Pricing Disclosure Package, at the Applicable Time, contained an untrue statement of a material fact or omitted to state a material fact necessary to make the statements therein in light of the circumstances under which they were made, not misleading, or (c) the Prospectus, as of its date and as of the date and time of delivery of this letter, contained or contains any untrue statement of a material fact or omitted or omits to state any material fact necessary to make the statements therein, in light of the circumstances under which they were made, not misleading; *provided, however*, that we do not assume any responsibility for the accuracy, completeness or fairness of the statements contained in the Registration Statement, the Pricing Disclosure Package or the Prospectus, and we do not express any belief as to the financial statements and related notes or financial statement schedules, or other financial, statistical or accounting data or information contained in or omitted from the Registration Statement, the Pricing Disclosure Package or the Prospectus. In the first sentence of this paragraph, "attention" refers to the conscious awareness of each of the lawyers in our firm who actively participated in the preparation of the Registration Statement, the Pricing Disclosure Package and the Prospectus; and "believe" refers to the actual, subjective, good faith belief of each of those lawyers. In addition, we express no opinion or belief as to the conveyance of the Pricing Disclosure Package or the information contained therein to investors.

We inform you that the Registration Statement became effective under the Securities Act on [ ], 2013 and, based solely on our review of the Commission's "Stop Orders" web page (http://sec.gov/litigation/stoporders.shtml), that no stop order suspending the effectiveness of the Registration Statement has been issued under the Securities Act.

We are not representing the Company in any pending litigation in which it is a named defendant that challenges the validity or enforceability of, or seeks to enjoin the performance of, the Underwriting Agreement.

Further, we confirm to you that the Registration Statement, as of its effective date, and the Prospectus, as of its date, appeared to us on their face to respond in all material respects to the requirements of the form on which the Registration Statement was filed, except that the foregoing statement does not address any requirement relating to

financial statements or related notes or financial statement schedules, or other financial or accounting data or information contained in or omitted from the Registration Statement or Prospectus.



---

This letter is being furnished by us solely for the benefit of the several Underwriters as underwriters in connection with the sale to you of the Shares pursuant to the Underwriting Agreement, and it may not be relied on for any other purpose by you or anyone else.

Very truly yours,

GOODWIN PROCTER LLP



---

Appendix A

[None.]



---

Appendix B

**Issuer**: Control4 Corporation (NASDAQ: CTRL) (the "Company")

**Shares Offered by the Company**:

**Shares Offered by the Company included in Underwriters' Option to Purchase Additional Shares**:

**Price to Public**:

**Underwriting Discount**:

**Proceeds to the Company before expenses and before exercise of Underwriters' Option to Purchase Additional Shares**:

**Trade Date**:

**Settlement Date**:



---

Exhibit B

, 2013

Merrill Lynch, Pierce, Fenner & Smith
Incorporated
Raymond James & Associates, Inc.
as Representatives of the several
Underwriters to be named in the
within-mentioned Underwriting Agreement

c/o
Merrill Lynch, Pierce, Fenner & Smith
Incorporated
One Bryant Park
New York, New York 10036

c/o
Raymond James & Associates, Inc.
One Embarcadero Center, Suite 650
San Francisco, CA 94111

Re: Proposed Public Offering by Control4 Corporation

Dear Sirs:

The undersigned, a stockholder of Control4 Corporation (the "Company"), understands that Merrill Lynch, Pierce, Fenner & Smith Incorporated ("Merrill Lynch") and Raymond James & Associates, Inc. ("Raymond James") propose to enter into an Underwriting Agreement (the "Underwriting Agreement") with the Company and the Selling Stockholders providing for the public offering of shares (the "Securities") of the Company's common stock, par value $0.0001 per share (the "Common Stock"). In recognition of the benefit that such an offering will confer upon the undersigned as a stockholder of the Company, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the undersigned agrees with each underwriter to be named in the Underwriting Agreement that, during the period beginning on the date hereof and ending on the date that is 180 days from the date of the Underwriting Agreement (the "Lock-Up Period"), the undersigned will not, without the prior written consent of Merrill Lynch and Raymond James, directly or indirectly, (i) offer, pledge, sell, contract to sell, sell any option or contract to purchase, purchase any option or contract to sell, grant any option, right or warrant for the sale of, or otherwise dispose of or transfer any shares of the Company's Common Stock or any securities convertible into or exchangeable or exercisable for Common Stock, whether now owned or hereafter acquired by the undersigned or with respect to which the undersigned has or hereafter acquires the power of disposition (collectively, the "Lock-Up Securities"), or exercise any right with respect to the registration of any of the Lock-Up Securities, or file or cause to be filed any registration statement in connection therewith, under the Securities Act of 1933, as amended (the "Securities Act"), or (ii) enter into any swap or any other agreement or any transaction that transfers, in whole or in part, directly or indirectly, the economic consequence of ownership of the Lock-Up Securities, whether any such swap or transaction is to be settled by delivery of Common Stock or other securities, in cash or otherwise. If the undersigned is an officer or director of the Company, the undersigned further agrees that the foregoing provisions shall be equally applicable to any issuer-directed Securities the undersigned may purchase in the offering.



---

If the undersigned is an officer or director of the Company, (1) Merrill Lynch and Raymond James agree that, at least three business days before the effective date of any release or waiver of the foregoing restrictions in connection with a transfer of shares of the Common Stock, Merrill Lynch and Raymond James will notify the Company of the impending release or waiver, and (2) the Company will agree in the Underwriting Agreement to announce the impending release or waiver by press release through a major news service at least two business days before the effective date of the release or waiver. Any release or waiver granted by Merrill Lynch and Raymond James hereunder to any such officer or director shall only be effective two business days after the publication date of such press release. The provisions of this paragraph will not apply if (i) the release or waiver is effected solely to permit a transfer not for consideration and (ii) the transferee has agreed in writing to be bound by the same terms described in this letter to the extent and for the duration that such terms remain in effect at the time of the transfer.

Notwithstanding the foregoing, and subject to the conditions below, the undersigned may transfer the Lock-Up Securities during the Lock-Up Period without the prior written consent of Merrill Lynch and Raymond James, provided that (1) Merrill Lynch and Raymond James receive a signed lock-up agreement for the balance of the Lock-Up Period from each donee, trustee, distributee, or transferee, as the case may be, (2) any such transfer shall not involve a disposition for value, (3) in the case of clauses (i) — (iv), such transfers are not required during the Lock-Up Period to be reported with the Securities and Exchange Commission ("SEC") on Form 4 in accordance with Section 16 of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), and (4) the undersigned does not otherwise voluntarily effect any public filing or report regarding such transfers during the Lock-Up Period:

(i) as a *bona fide* gift or gifts; or

(ii) to any immediate family member of the undersigned or any trust for the direct or indirect benefit of the undersigned or the immediate family of the undersigned (for purposes of this lock-up agreement, "immediate family" shall mean any relationship by blood, marriage or adoption, not more remote than first cousin); or

(iii) as a distribution to limited partners, stockholders, members or other equity holders of the undersigned;

(iv) to the undersigned's affiliates or to any investment fund or other entity controlled or managed by, or under common control or managed by, the undersigned;

(v) by operation of law, such as pursuant to a qualified domestic order or in connection with a divorce settlement; or

(vi) by will or intestate succession upon the death of the undersigned.

Furthermore, during the Lock-Up Period, the undersigned may (a) sell shares of Common Stock purchased by the undersigned on the open market following the offering if and only if (i) such sales are not required during the Lock-Up Period to be reported in any public report or filing with the Securities Exchange Commission, or otherwise and (ii) the undersigned does not otherwise voluntarily effect any public filing or report regarding such sales during the Lock-Up Period, (b) exercise any rights to purchase (including by means of a cashless exercise), exchange or convert any stock options granted pursuant to the Company's equity incentive plans or warrants or any other such securities convertible into or exchangeable or exercisable for Common Stock, so long as the shares of Common Stock received upon such exercise, exchange or conversion shall remain subject to the terms of this lock-up agreement; and (c) sell Lock-Up Securities in connection with a merger or sale of the Company or its assets regardless of how such a transaction is structured (it being further understood that this lock-up agreement shall not



restrict the undersigned from entering into any agreement or arrangement in connection therewith, including an agreement to vote in favor of any such transaction or take any other action in connection with any such transaction).

Notwithstanding anything herein to the contrary, nothing herein shall prevent the undersigned from establishing a 10b5-1 trading plan that complies with Rule 10b5-1 under the Exchange Act ("10b5-1 trading plan") or from amending an existing 10b5-1 trading plan so long as there are no sales of Lock-Up Securities under such plans during the Lock-Up Period; and provided that, the establishment of a 10b-5 trading plan or the amendment of a 10b5-1 trading plan shall only be permitted if (i) the establishment or amendment of such plan is not required to be reported in any public report or filing with the Securities Exchange Commission, or otherwise and (ii) the undersigned does not otherwise voluntarily effect any public filing or report regarding the establishment or amendment of such plan.

Notwithstanding anything herein to the contrary, nothing herein shall prevent the undersigned from selling shares of Common Stock to the underwriters pursuant to the Underwriting Agreement.

The undersigned agrees and consents to the entry of stop transfer instructions with the Company's transfer agent and registrar against the transfer of the Lock-Up Securities except in compliance with the foregoing restrictions.

This lock-up agreement shall automatically terminate, and the undersigned shall be released from its obligations hereunder, upon the earliest to occur, if any, of (i) the Company advises Merrill Lynch and Raymond James in writing, that it has determined not to proceed with the offering, (ii) the Company files an application to withdraw the registration statement related to the offering, (iii) the Underwriting Agreement is executed but is terminated prior to the closing of the offering (other than the provisions thereof which survive termination) prior to payment for and delivery of the shares of Common Stock to be sold thereunder, or (iv) December 31, 2013, in the event that the Underwriting Agreement has not been executed by such date.

[signature page follows]



Very truly yours,

Signature: ______________________

Print Name: ______________________



Exhibit C

FORM OF PRESS RELEASE
TO BE ISSUED PURSUANT TO SECTION 3(j)

Control4 Corporation
[Date]

Control4 Corporation (the "Company") announced today that BofA Merrill Lynch and Raymond James, the lead book-running managers in the Company's recent public sale of [          ] shares of common stock, are [waiving] [releasing] a lock-up restriction with respect to          shares of the Company's common stock held by [certain

officers or directors] [an officer or director] of the Company. The [waiver] [release] will take effect on , 20 , and the shares may be sold on or after such date.

**This press release is not an offer for sale of the securities in the United States or in any other jurisdiction where such offer is prohibited, and such securities may not be offered or sold in the United States absent registration or an exemption from registration under the United States Securities Act of 1933, as amended.**



---

**Exhibit 3.1**

**AMENDED AND RESTATED**
**CERTIFICATE OF INCORPORATION**
**OF**
**CONTROL4 CORPORATION,**
**a Delaware Corporation**

The undersigned docs hereby certify on behalf of Control4 Corporation (the "***Corporation***"), a corporation organized and existing under the Delaware General Corporation Law, at follows:

FIRST: That the undersigned is the duly elected and acting Chief Executive Officer of the Corporation.

SECOND: That the Certificate of Incorporation of the Corporation was originally; filed with the Secretary of State of the State or Delaware on March 27, 2003 under the name "Control4 Corporation."

THIRD: That pursuant to Sections 242 and 245 of the General Corporation Law, of the State of Delaware, the Certificate of Incorporation of the Corporation, as amended to the date of the filing of this certificate, is hereby amended and restated in its entirety as set forth in Exhibit A hereto.

FOURTH: That the Amended and Restated Certificate of Incorporation of this Corporation as set forth in Exhibit A hereto has been duly adopted and approval by the Board of Directors and stockholders of this Corporation in accordance with the applicable provisions of Sections 141, 228, 242 and 245 of the Delaware General Corporation law.

The undersigned hereby further declares and certifies under penalty of perjury that the facts set forth in the foregoing certificate ore true and correct to the knowledge of the undersigned, and that this certificate is the act and deed of the undersigned.

Executed in Draper, Utah on this 20th day of January, 2011.

By: /s/ William B. West
William B. West
Chief Executive Officer

---

**EXHIBIT A**

**ARTICLE I**

The name of this corporation is Control4 Corporation (the "***Corporation***").

**ARTICLE II**

The address of the registered office of the Corporation in the State of Delaware is 2711 Centerville Road, Suite 400, City of Wilmington, County of New Castle, 19808. The name of its registered agent at that address is Corporation Service Company.

**ARTICLE III**

The purpose of this Corporation is to engage in any lawful act or activity for which a corporation may be organized under the Delaware General Corporation Law.

**ARTICLE IV**

**(A)** **Classes of Capital Stock**

This Corporation is authorized to issue 201,000,000 shares of capital stock in the aggregate. The capital stock of this Corporation shall be divided into two classes, designated "***Common Stock***" and "***Preferred Stock***." The number of shares of Common Stock the Corporation is authorized to issue is 117,836,592. The number of shares of Preferred Stock the Corporation is authorized to issue is 83,163,408, 8,150,000 of which shall be designated as Series A Preferred Stock ("***Series A Preferred***"), 18,124,230 of which shall be designated Series B Preferred Stock ("***Series B Preferred***"), 14,215,791 of which shall be designated Series C Preferred Stock ("***Series C Preferred***"), 7,789,215 of which shall be designated Series D Preferred Stock ("***Series D Preferred***"), 5,045,662 of which shall be designated Series E Preferred Stock ("***Series E Preferred***"), 5,988,024 of which shall be designated Series F Preferred Stock ("***Series F Preferred***"), 8,677,338 of which shall be designated Series G Preferred Stock ("***Series G Preferred***"), 2,073,148 of which shall be designated Series G-l Preferred Stock ("***Series G-l Preferred***"), and 13,100,000 of which shall be designated Series H Preferred Stock ("***Series H Preferred***"). The Common Stock and Preferred Stock shall each have a par value of $0.0001 per share. The Corporation shall from time to time in accordance with the laws of the State of Delaware increase the authorized amount of its Common Stock if at any time the number of shares of Common Stock remaining unissued and available for issuance shall not be sufficient to permit conversion of the Preferred Stock. Subject to Section 5 of Division (B) below, the number of authorized shares of Common Stock may be increased or decreased (but not below the number of shares of Common Stock then outstanding or reserved for the exercise of options or warrants or conversion of the Preferred Stock) by the affirmative vote of the holders of a majority of the stock of the Corporation entitled to vote thereon, voting as a single class (and not as a separate individual class of solely holders of Common Stock, excluding those holders of equity securities who may be entitled to vote thereon as provided in this Certificate of Incorporation), as provided by Section 242(b)(2) of the Delaware General Corporation Law.

---

**(B)** **Rights, Preferences, Privileges and Restrictions of Preferred Stock**

The relative rights, preferences, privileges and restrictions granted to or imposed upon the respective series of Preferred Stock or the holders thereof are as follows:

**1.** **Dividends**.

(a) The holders of Preferred Stock shall be entitled to receive dividends at the rate of $0.04, $0.06504, $0.08464, $0.1632, $0.1752, $0.2672, $0.1424, $0.1424 and $0.1527 per share of Series A Preferred, Series B Preferred, Series C Preferred, Series D Preferred, Series E Preferred, Series F Preferred, Series G Preferred, Series G -1 Preferred and Series H Preferred, respectively (as adjusted for any stock dividends, combinations, stock splits, reclassifications and the like with respect to such shares) per annum, payable out of funds legally available therefor and in preference to any declaration or payment of any dividend (payable other than in Common Stock or other securities and rights convertible into or entitling the holder thereof to receive, directly or indirectly, Additional Shares of Common Stock of the Corporation, provided that an adjustment to the respective Conversion Price (as defined below) of such other securities or rights has been made in accordance with Section 3(d)(ii) below). Such dividends shall be payable when, as, and if declared by the Board of Directors, acting in its sole discretion. The right to receive dividends shall not be cumulative, and no right shall accrue to holders of any shares by reason of the fact that dividends on such shares are not declared and paid in any prior year. No dividend shall be paid or declared and set aside in any period with respect to the Common Stock unless and until dividends have been paid or declared and set aside for payment in such year with respect to every outstanding series of Preferred Stock in an amount for each such series of Preferred Stock equal to the annual dividend rates stated above.

(b) After payment of dividends at the annual rates set forth above, any additional dividends declared shall be distributed among all holders of Preferred Stock and Common Stock in proportion to the number of shares of Common Stock that would be held by each such holder if all shares of Preferred Stock were converted into Common Stock pursuant to Section 3 hereof.

(c) If at the time any shares of Preferred Stock are converted into Common Stock there are any accrued but unpaid dividends on such shares, then the Corporation at its option shall either pay the unpaid dividends or issue additional shares of Common Stock in the amount of the unpaid dividends at the applicable fair market value for such shares then in effect.

**2.** **Liquidation**. In the event of any liquidation, dissolution or winding up of the Corporation (including without limitation any "Deemed Liquidation" as defined below), either voluntary or involuntary, distributions to stockholders of the Corporation shall be made in the following manner:

(a) The holders of the Series H Preferred and the Series G-l Preferred shall be entitled to receive, prior and in preference to any distribution of any of the assets or surplus funds of the Corporation to the holders of the Series G Preferred, the Series F Preferred, the Series B Preferred, the Series D Preferred, the Series C Preferred, the Series B Preferred, the



---

Series A Preferred or Common Stock, the amount of $1.9091 per share of Series H Preferred and $1.7805 per share of Series G-l Preferred, respectively (as adjusted for any stock dividends, combinations, stock splits, reclassification or the like with respect to such shares), plus all accrued or declared but unpaid dividends on such shares. If the assets and funds available for distribution to the holders of the Series H Preferred and the Series G-1 Preferred shall be insufficient to pay the stated preferential amounts in full, then the entire assets and funds of the Corporation legally available for distribution shall be distributed to the holders of the Series H Preferred and Series G-l Preferred in proportion to the preferential amount each such holder is otherwise entitled to receive.

(b) After payment in full of the amount due the holders of Series H Preferred and Series G-1 Preferred under Article IV, Section B(2)(a) above, the holders of the Series F Preferred and Series G Preferred shall be entitled to receive, prior and in preference to any distribution of any of the assets or surplus funds of the Corporation to the holders of the Series E Preferred, Series D Preferred, the Series C Preferred, the Series B Preferred, Series A Preferred or Common Stock, the amount of $3.34 per share of Series F Preferred and $1.7805 per share of Series G Preferred, respectively (as adjusted for any stock dividends, combinations, stock splits, reclassification and the like with respect to such shares), phis all accrued or declared but unpaid dividends on such shares. If the assets and funds available for distribution to the holders of the Series F Preferred and Series G Preferred shall be insufficient to pay the stated preferential amounts in full, then the entire assets and funds of the Corporation legally available for distribution to the holders of the Series F Preferred and Series G Preferred shall be distributed to the holders of the Series F Preferred and the Series G Preferred in proportion to the preferential amount each such holder is otherwise entitled to receive.

(c) After payment in full of the amount due the holders of Series F Preferred and Series G Preferred under Article IV, Section B(2)(b) above, the holders of the Series E Preferred shall be entitled to receive, prior and in preference to any distribution of any of the assets or surplus funds of the Corporation to the holders of the Series D Preferred, the Series C Preferred, the Series B Preferred, Series A Preferred or Common Stock, the amount of $2.19 per share of Series E Preferred (as adjusted for any stock dividends, combinations, stock splits, reclassification and the like with respect to such shares), plus all accrued or declared but unpaid dividends on such shares. If the assets and funds available for distribution to the holders of the Series E Preferred shall be insufficient to pay the stated preferential amounts in full, then the entire assets and funds of the Corporation legally available for distribution to the holders of the Series E Preferred shall be distributed to the holders of the Series E Preferred in proportion to the preferential amount each such holder is otherwise entitled to receive.

(d) After payment in full of the amount due the holders of Series E Preferred under Article IV, Section B(2)(c) above, the holders of the Series D Preferred shall be entitled to receive, prior and in preference to any distribution of any of the assets or surplus funds of the Corporation to the holders of the Series C Preferred, the Series B Preferred, Series A Preferred or Common Stock, the amount of $2.04 per share of Series D Preferred (as adjusted for any stock dividends, combinations, stock splits, reclassification and the like with respect to such shares), plus all accrued or declared but unpaid dividends on such shares. If the assets and funds available for distribution to the holders of the Series D Preferred shall be insufficient to pay the stated preferential amounts in full, then the entire assets and funds of the Corporation legally



available for distribution to the holders of the Series D Preferred shall be distributed to the holders of the Series D Preferred in proportion to the preferential amount each such holder is otherwise entitled to receive.

(e) After payment in full of the amount due the holders of Series D Preferred under Article IV, Section B(2)(d) above, the holders of the Series C Preferred shall be entitled to receive, prior and in preference to any distribution of any of the assets or surplus funds of the Corporation to the holders of the Series B Preferred, Series A Preferred or Common Stock, the amount of $1.058 per share of Series C Preferred (as adjusted for any stock dividends, combinations, stock splits, reclassification and the like with respect to such shares), plus all accrued or declared but unpaid dividends on such shares. If the assets and funds available for distribution to the holders of the Series C Preferred shall be insufficient to pay the stated preferential amounts in full, then the entire assets and funds of the Corporation legally available for distribution to the holders of the Series C Preferred shall be distributed to the holders of the Series C Preferred in proportion to the preferential amount each such holder is otherwise entitled to receive.

(f) After payment in full of the amount due the holders of Series C Preferred under Article IV, Section B(2)(e) above, the holders of the Series A Preferred, and Series B Preferred shall be entitled to receive, prior and in preference to any distribution of any of the assets or surplus funds of the Corporation to the holders of the Common Stock, the amount of $0.50 and $0.813 per share of Series A Preferred and Series B Preferred, respectively (as adjusted for any stock dividends, combinations, stock splits, reclassification and the like with respect to such shares), plus all accrued or declared but unpaid dividends on such shares. If the assets and funds available for distribution to the holders of the Series A Preferred and the Series B Preferred shall be insufficient to pay the stated preferential amounts in full, then the entire assets and funds of the Corporation legally available for distribution to the holders of the Series A Preferred and Series B Preferred shall be distributed to the holders of the Series A Preferred and the Series B Preferred in proportion to the preferential amount each such holder is otherwise entitled to receive.

(g) After payment in full of the amount due the holders of Series A Preferred and Series B Preferred under Article IV, Section B(2)(f) above, all remaining assets of the Corporation legally available for distribution shall be distributed ratably among the holders of the Common Stock.

(h) Notwithstanding anything in this Section 2 to the contrary, if a holder of Preferred Stock would receive a greater liquidation amount than such holder is entitled to receive pursuant to Section 2(a), Section 2(b), Section 2(c), Section 2(d), Section 2(e), and Section 2(f) hereof by converting shares of Preferred Stock held by such holder into shares of Common Stock, then such holder shall not receive any amounts pursuant to Section 2(a), Section 2(b), Section 2(c), Section 2(d), Section 2(e), and Section 2(f) but shall be treated for purposes of this Section 2 as though such holder had converted into shares of Common Stock, whether or not such holder elects to so convert.

(i) For purposes of this Section 2, a liquidation, dissolution or winding up of the Corporation shall be deemed to include (i) the Corporation's sale of all or substantially

all of its assets or property; (ii) the Corporation's exclusive license of all or substantially all of its intellectual property; and (iii) the acquisition of the Corporation by another entity (other than a reincorporation for the sole purpose of changing the Corporation's domicile) by means of merger or consolidation (a "***Merger Transaction***") in which the Corporation is a constituent party and pursuant to which the stockholders of the Corporation immediately prior to such transaction hold less than fifty percent (50%) of the voting power of the surviving or resulting corporation, provided that any holdings of the acquiring entity held by a stockholder of the Corporation shall not be aggregated with such stockholder's holdings of the surviving or resulting entity as a result of such stockholder's holdings in the Corporation for purposes of calculating such voting power (any such event, a "***Deemed Liquidation***"). Notwithstanding the foregoing, the holders of a majority of the then outstanding Preferred Stock, voting together as a single class, may waive the classification of any transaction, as a liquidation, dissolution or winding up of the Corporation, including any Deemed Liquidation, and thereby waive the effects of this Section 2 with respect to such transaction; provided, however, that the holders of a majority of the then outstanding Series G-1 Preferred, voting together as a separate class, may elect to have the Series G-1 Preferred redeemed at the Series G-1 Original Issue Price (as defined below) prior to the consummation of any such transaction and the Corporation shall so redeem all Series G-1 Preferred in one installment prior to or concurrently with the consummation of any such transaction; provided, further, that the holders of a sixty-six and two-thirds percent (66-$^{2}/_{3}$%) of the then outstanding Series H Preferred, voting together as a separate class, may elect to have the Series H Preferred redeemed at the Series H Original Issue Price (as defined below) prior to the consummation of any such transaction and the Corporation shall so redeem all Series H Preferred in one installment prior to or concurrently with the consummation of any such transaction. For the sake of clarification, an equity financing transaction in which the Corporation is the surviving entity or a merger effected for the purpose of changing the Corporation's legal domicile shall not be considered a Deemed Liquidation hereunder.

(j) The Corporation shall not have the power to effect a Merger Transaction unless the agreement or plan of merger or consolidation for such transaction provides that the consideration payable to the stockholders of the Corporation shall be allocated among the holders of capital stock of the Corporation in a manner consistent with this Section 2.

(k) The value of any securities to be delivered to the stockholders pursuant to this Section 2 shall be determined as follows:

(i) If listed on a national securities exchange or the or the NASDAQ Stock Market, the value shall be based on the formula specified in the definitive agreements for the Deemed Liquidation or if no such formula exists, then the value of such securities shall be deemed to be the average of the closing prices of the securities on such exchange over the thirty day period ending three days prior to the closing;

(ii) If actively traded over the counter, the value shall be based on the formula specified in the definitive agreements for the Deemed Liquidation or if no such formula exists, then the value of such securities shall be deemed to be the average of the closing bid prices over the thirty day period ending three days prior to the closing; and



---

(iii) If there is no active public market, the value shall be the fair market value thereof as determined in good faith by the Corporation's Board of Directors, including the approval of at least a majority of the Corporation's authorized Directors.

(l) Notwithstanding Section 1 above and this Section 2, upon the approval of the Board of Directors, the Corporation may at any time, out of funds legally available for such purpose, repurchase shares of Common Stock issued to or held by officers, directors, employees or other service providers upon termination of their employment or services pursuant to agreements providing the Corporation such a right of repurchase at a price per share no greater than cost, whether or not all declared or accrued dividends have been paid or set aside for payment and whether or not all Preferred Stock required to be redeemed by the Corporation has been redeemed or funds set aside for such purpose.

**2.5 Redemption**.

(m) Upon the election in writing by the holders of a majority of the outstanding shares of Preferred Stock (the "***Redemption Election***") at any time on or after the date that is 40 days before January 21, 2016, the Corporation shall redeem the then outstanding Preferred Stock in three equal annual installments (each a "***Redemption Date***"), from any funds legally available for such purpose beginning on the date that is 40 days after the date of the Redemption Election (the "***Original Redemption Date***"). The redemption of the Preferred Stock shall occur in three annual installments, with the first such installment occurring on the Original Redemption Date, the second on the first anniversary thereof, and the third on the second anniversary thereof (each such date hereinafter referred to as a "***Redemption Date***"). ***Any*** redemption effected pursuant to this Section 2.5 shall be made on a pro rate basis among the holders of the Preferred Stock based upon the total Redemption Price (as defined below) applicable to each holder's shares of Preferred Stock. The number of shares to be redeemed from each holder of Preferred Stock on each Redemption Date shall equal the total number of shares of Preferred Stock held by such holder on the date of the Redemption Notice (as defined below), divided by the number of Redemption Dates remaining as of the date of the Redemption Notice, minus the number of shares of Preferred Stock that such holder converts into Common Stock after the date of the Redemption Notice and prior to such Redemption Date. The Corporation shall effect redemption on the applicable Redemption Dates by paying cash in an aggregate amount equal to $0.50, $0.813, $1.058, $2.04, $2.19, $3.34, $1.7805, $1.7805 and $1.9091 per share of Series A Preferred, Series B Preferred, Series C Preferred, Series D Preferred, Series E Preferred, Series F Preferred, Series G Preferred, Series G-1 Preferred and Series H Preferred, respectively (as adjusted for any stock dividends, combinations, stock splits, reclassification or the like with respect to such shares) plus all accrued or declared but unpaid dividends on such shares (the "***Redemption Prices***").

(n) If the funds of the Corporation legally available for redemption of shares of Preferred Stock on any Redemption Date are insufficient to redeem the total number of shares of Preferred Stock to be redeemed on such date, those funds that are legally available (the "***Legally Available Funds***") will be used to

redeem the maximum number of such shares from the holders of Preferred Stock ratably in proportion to the aggregate Redemption Price that would be payable to each holder if all shares required to be redeemed were being redeemed (such number, the "***Legally Redeemable Shares***"). The shares of Preferred Stock not redeemed shall



remain outstanding and entitled to all the rights and preferences provided herein, including the rights of conversion set forth herein. If any time thereafter additional funds become legally available for the redemption, such Legally Available Funds will immediately be used to redeem the balance of the shares which the Corporation has become obliged to redeem on any Redemption Date but which it has not redeemed.

(o) At least 30 days but no more than 40 days prior to each Redemption Date, the Corporation shall mail a redemption notice (the "***Redemption Notice***"), first class postage prepaid, to each holder of record of Preferred Stock as of the close of business two business days preceding the mailing date, at the address last shown on the records of the Corporation for such holder. The Redemption Notice shall specify the number of shares to be redeemed from such holder, the applicable Redemption Date, the Remaining Redemption Dates, the Redemption Price and the place at which payment may be obtained, and shall call upon such holder to surrender to the Corporation, in the manner and at the place designated, the certificate or certificates representing the shares to be redeemed. Except as provided in Section 2.5(b), on or after the Redemption Date, each holder of Preferred Stock to be redeemed shall surrender to the Corporation the certificate or certificates representing such shares (or a reasonably acceptable affidavit and indemnity undertaking in the case of a lost, stolen or destroyed certificate), in the manner and at the place designated in the Redemption Notice. Each surrendered certificate shall be cancelled, and the Redemption Price for such shares shall then be payable to the order of the person whose name appears on such certificate or certificates as the owner thereof. If less than all the shares represented by any such certificate are redeemed, a new certificate shall be issued representing the unredeemed shares. As soon as practicable after receipt of the surrendered certificate or certificates (and in no event more than 20 days following the applicable Redemption Date) the Corporation shall issue and deliver to or upon the written order of such holder, at such office or other place designated by the holder, a check for cash with respect to the shares so redeemed and, if applicable, the new certificate representing the unredeemed shares. Nothing herein shall be deemed to prevent a holder of Preferred Stock from converting all or part of such holder's shares into Common Stock in accordance with the terms of Section 3 hereof at any time prior to a Redemption Date covering such shares, and the provisions of this Section 2.5 shall not apply to any shares so converted.

(p) From and after the Redemption Date, unless there has been a default in payment of the Redemption Price, the shares of Preferred Stock designated for redemption (other man as set out in the last sentence of 2.5(c)) in the Redemption Notice shall cease to be outstanding and shall no longer be transferred on the books of the Corporation, and all rights of the holders with respect to such shares shall cease, except the right to receive the Redemption Price without interest upon surrender of their certificate or certificates.

(q) On or prior to each Redemption Date, the Corporation shall deposit, to the extent that the Corporation has Legally Available Funds, the aggregate Redemption Price of all shares of Preferred Stock designated for redemption on such Redemption Date which shares are not yet redeemed or converted and are Legally Redeemable Shares, with a bank or trust corporation having aggregate capital and surplus in excess of $100,000,000 as a trust fund for the benefit of the respective holders of the shares designated for redemption and not yet redeemed, with irrevocable instructions and authority to the bank or trust corporation to publish the notice of redemption thereof and pay the Redemption Price for such



shares to their respective holders on or after the applicable Redemption Date, upon receipt of notification from the Corporation that such holder has surrendered such holder's share certificate (or a reasonably acceptable affidavit and indemnity undertaking in the case of a lost, stolen or destroyed certificate) to the Corporation pursuant to Section 2.5(c) above. As of the date of such deposit (even if prior to a Redemption Date), the deposit shall constitute full payment of the Legally Redeemable Shares to their holders, and from and after the date of the deposit the Legally Redeemable Shares so called for redemption shall be redeemed and shall be deemed to be no longer outstanding, and the holders thereof shall cease to be stockholders with respect to such shares and shall have no rights with respect thereto except the rights to receive from the bank or trust corporation payment of the Redemption Price of the shares, without interest, upon surrender of their certificates therefor, and the right to convert such shares as provided herein. Such instructions shall also provide that any monies deposited by the Corporation pursuant to this Section 2.5(e) for the redemption of shares thereafter converted into shares of the Corporation's Common Stock prior to the Redemption Date shall be returned to the Corporation forthwith upon such conversion.

3. <u>Conversion</u>.

(a) <u>Right to Convert</u>. Each share of Preferred Stock shall be convertible, at the option of the holder thereof, at any time after the date of issuance of such share, at the office of the Corporation or any transfer agent for such stock, into such number of fully paid and nonassessable shares of Common Stock as is determined by dividing (x) the Original Issue Price for that series of Preferred Stock by (y) the then effective Conversion Price for that series of Preferred Stock (such result, the "***Conversion Rate***"). The "***Original Issue Price***" for each Series of Preferred Stock shall be as follows: the Series A Original Issue Price shall be $0.50; the Series B Original Issue Price shall be $0.813; the Series C Original Issue Price shall be $1.058; the Series D Original Issue Price shall be $2.04; the Series E Original Issue Price shall be $2.19; the Series F Original Issue Price shall be $3.34; the Series G Original Issue Price shall be $1.7805; the Series G-1 Original Issue Price shall be $1.7805; and the Series H Original Issue Price shall be $1.9091. The "***Conversion Price***" for each Series of Preferred Stock shall be as follows: the initial Series A Conversion Price shall be $0.50; the initial Series B Conversion Price shall be $0.813; the initial Series C Conversion Price shall be $1.058; the initial Series D Conversion Price shall be $2.04; the initial Series E Conversion Price shall be $2.19; the initial Series F Conversion Price shall be $3.34; the initial Series G Conversion Price shall be $1.7805; the initial Series G-1 Conversion Price shall be $1.7805; and the initial Series H Conversion Price shall be $1.9091. The Conversion Prices are subject to

adjustment as provided in this Section 3.

(b) Automatic Conversion. Each share of Preferred Stock shall automatically be converted into shares of Common Stock at the then effective Conversion Rate for such series (i) on the date specified with the approval, by affirmative vote, written consent, or agreement, of the holders of a majority of the outstanding Preferred Stock voting together as a single class, provided, however, that, in the event any such conversion is effected in connection with a Deemed Liquidation, the holders of the then outstanding Series G-1 Preferred and Series H Preferred will be entitled to the greater of (A) the amount of proceeds actually received by such holders upon consummation of the Deemed Liquidation and (B) the amount of proceeds such holders would have received but for the conversion of the Preferred Stock (with such proceeds



payable in accordance with the provisions of Sections 2(a) above), or (ii) upon the closing of the initial public offering of Common Stock for the account of the Corporation to the public at a pre-money valuation of the Corporation of at least $225,000,000 and with proceeds to the Corporation of not less than $35,000,000 (net of underwriter commissions and offering expenses). A public offering in which all of the Preferred Stock is automatically converted into Common Stock pursuant to this Section 3(b) shall be a "***Qualified IPO***".

(c) Mechanics of Conversion. No fractional shares of Common Stock shall be issued upon conversion of the Preferred Stock. In lieu of any fractional shares to which the holder would otherwise be entitled, the Corporation shall pay cash equal to such fraction multiplied by the then effective Conversion Price for such series of Preferred Stock. Conversion of Preferred Stock at the option of the holder thereof shall be effected by delivery, to the office of the Corporation or to any transfer agent for such shares, of duly endorsed certificates for the shares being converted (or a reasonably acceptable affidavit and indemnity undertaking in the case of a lost, stolen or destroyed certificate) and of written notice to the Corporation that the holder elects to convert such shares. Conversion shall be deemed to occur immediately prior to the close of business on the date (i) the shares and notice are delivered or (ii) as specified in Section 3(b)(i) above. Automatic conversion of the Preferred Stock pursuant to this section shall be effective without any further action on the part of the holders of such shares and shall be effective whether or not the certificates for such shares are surrendered to the Corporation or its transfer agent. Holders entitled to receive Common Stock upon conversion of Preferred Stock shall be treated for all purposes as the record holders of such shares of Common Stock on the date conversion is deemed to occur. The Corporation shall not be obligated to issue certificates evidencing shares of Common Stock issuable upon conversion of Preferred Stock unless either (i) the certificates evidencing such shares being converted are delivered to the Corporation or its transfer agent as provided above, or (ii) the holder (A) notifies the Corporation or its transfer agent that such certificates have been lost, stolen or destroyed and (B) executes an agreement, and at the Corporation's election provides a surety bond or other security, reasonably satisfactory to the Corporation to indemnify the Corporation from any loss incurred by it in connection with such certificates. The Corporation shall, as soon as practicable after the delivery of such certificates, or the agreement to indemnify in the case of a lost certificate, issue and deliver at such office to the holder of the shares of Preferred Stock being converted, a certificate or certificates for the number of shares of Common Stock to which the holder is entitled and a check payable to the holder for any cash due with respect to fractional shares.

(d) Adjustments of Conversion Price for Certain Diluting Issuances Splits and Combinations. The applicable Conversion Price for each series of Preferred Stock shall be subject to adjustment from time to time as follows:

(i) Adjustment of Conversion Price Upon Issuance of Additional Shares of Common Stock below the Conversion Price. If the Corporation issues Additional Shares of Common Stock (including Additional Shares of Common Stock deemed to be issued pursuant to Section 3(d)(i)(D)) without consideration or for a consideration per share less than the Conversion Price for any series of Preferred Stock in effect immediately prior to such issue, then and in such event, such Conversion Price for such series shall be reduced, concurrently with such issue, to a price (calculated to the nearest cent) as set forth herein, unless otherwise provided in this Section 3.



(A) Adjustment Formula. Whenever the Conversion Price for a given series of Preferred Stock is adjusted pursuant to this Section 3(d)(i), the new Conversion Price for such series shall be determined by multiplying the Conversion Price by a fraction, (x) the numerator of which shall be the number of shares of Common Stock outstanding immediately prior to such issue (the "***Common Stock Outstanding***") plus the number of shares of Common Stock which the aggregate consideration received by the Corporation for the total number of Additional Shares of Common Stock so issued would purchase at the Conversion Price in effect immediately prior to such issue, and (y) the denominator of which shall be the number of shares of Common Stock Outstanding immediately prior to such issue plus the number of such Additional Shares of Common Stock so issued. For the purpose of this paragraph, the number of shares of Common Stock Outstanding shall be deemed to include the Common Stock issuable upon conversion of all outstanding Preferred Stock, upon conversion of all other outstanding Convertible Securities and upon exercise of all outstanding Options (and assuming conversion of Convertible Securities issuable upon exercise of Options).

(B) Special Definitions. For purposes of this Section 3, the following definitions shall apply:

(1) "***Options***" shall mean rights, options or warrants to subscribe for, purchase or otherwise acquire Common Stock or Convertible Securities.

(2) "***Original Issue Date***" shall mean the date on which the first share of Series H Preferred was issued.

(3) "***Convertible Securities***" shall mean instruments of indebtedness or securities convertible into or exchangeable for Common Stock, including without limitation Preferred Stock.

(4) "***Additional Shares of Common Stock***" for any series of Preferred Stock shall mean all shares of Common Stock issued (or, pursuant to Section 3(d)(i)(D), deemed to be issued) by the Corporation after the Original Issue Date, other than as follows:

(I) upon conversion of shares of Preferred Stock;

(II) capital stock or Options issued to officers, directors, employees of and service providers to the Corporation pursuant to plans and arrangements approved by the Board of Directors;

(III) as a dividend or other distribution on the Preferred Stock or any other event for which adjustment is made pursuant to Section 3(d)(ii), (e), (f) or (g);

(IV) upon the exercise or conversion of outstanding Options as of the date of this Restated Certificate;



---

(V) capital stock or Options issued to financial institutions or lessors in connection with bona fide commercial credit arrangements, equipment financings, real property leases, or similar transactions, the terms of which have been approved by the Board of Directors of the Corporation, provided that such issuances are for other than primarily equity financing purposes;

(VI) capital stock or Options issued to strategic partners in connection with strategic collaborations, development agreements or licensing transactions, the terms of which have been approved by the Board of Directors of the Corporation, provided mat such issuances are for other than primarily equity financing purposes;

(VII) capital stock or Options issued in connection with bona fide acquisitions, mergers or similar transactions, the terms of which are approved by the Board of Directors of the Corporation, provided that such issuances are for other than primarily equity financing purposes;

(VIII) shares of capital stock issued or issuable in a Qualified IPO;

(IX) capital stock or Options issued with the approval of holders of a majority of the Preferred Stock then outstanding, voting as a single class, such approval to provide specifically mat such issuance is pursuant to this Subsection (IX); or

(X) by way of dividend or other distributions on securities referred to in subsections (I) through (IX) above.

(C) No Adjustment of Conversion Price. No adjustment in the Conversion Price for a series of Preferred Stock shall be made in respect of the issuance of Additional Shares of Common Stock unless the consideration per share for an Additional Share of Common Stock issued or deemed to be issued by the Corporation is less than the Conversion Price in effect for such series immediately prior to such issue.

(D) Deemed Issue of Additional Shares of Common Stock. If the Corporation at any time after the Original Issue Date shall issue any Options or Convertible Securities or shall fix a record date for the determination of any holders of any class of securities entitled to receive any such Options or Convertible Securities, then the maximum number of shares (as set forth in the instrument relating thereto without regard to any provisions contained therein for a subsequent adjustment of such number) of Common Stock issuable upon the exercise of such Options or, in the case of Convertible Securities and Options for Convertible Securities or for Preferred Stock, the conversion or exchange of such Convertible Securities or Preferred Stock, shall be deemed to be Additional Shares of Common Stock issued as of the time of such issue or, in case such a record date shall have been fixed, as of the close of business on such record date, provided that in any such case in which Additional Shares of Common Stock are deemed to be issued:

(1) no further adjustment in the Conversion Price for any series of Preferred Stock shall be made upon the subsequent issue of Convertible



---

Securities, or shares of Preferred Stock or Common Stock issued upon the exercise of such Options or conversion or exchange of such Convertible Securities or Preferred

Stock;

(2) if such Options or Convertible Securities by their terms provide, with the passage of time or otherwise, for any increase or decrease in the consideration payable to the Corporation, or increase or decrease in the number of shares of Common Stock issuable, upon the exercise, conversion or exchange thereof, the Conversion Price for each affected series of Preferred Stock computed upon the original issue thereof (or upon the occurrence of a record date with respect thereto), and any subsequent adjustments based thereon, shall, upon any such increase or decrease becoming effective, be recomputed to reflect such increase or decrease insofar as it affects such Options or the rights of conversion or exchange under such Convertible Securities;

(3) upon the expiration of any such Options or any rights of conversion or exchange under such Convertible Securities which shall not have been exercised, the Conversion Price for each affected series of Preferred Stock computed upon the original issue thereof (or upon the occurrence of a record date with respect thereto), and any subsequent adjustments based thereon, shall, upon such expiration, be recomputed as if:

(I) in the case of Convertible Securities or Options for Common Stock, the only additional shares of Common Stock issued were shares of Common Stock, if any, actually issued upon the exercise of such Options or the conversion or exchange of such Convertible Securities, and the consideration received therefor was the consideration actually received by the Corporation for the issue of all such Options, whether or not exercised, plus the consideration actually received by the Corporation upon such exercise, or for the issue of all such Convertible Securities which were actually converted or exchanged, plus the additional consideration, if any, actually received by the Corporation upon such conversion or exchange, and

(II) in the case of Options for Convertible Securities or Preferred Stock, only the Convertible Securities or Preferred Stock, if any, actually issued upon the exercise thereof were issued at the time of issue of such Options and the consideration received by the Corporation for the Additional Shares of Common Stock deemed to have been then issued was the consideration actually received by the Corporation for the issue of all such Options, whether or not exercised, plus the consideration deemed to have been received by the Corporation upon the issue of the Convertible Securities with respect to which such Options were actually exercised;

(4) no readjustment pursuant to subsections (2) or (3) above shall have the effect of increasing the Conversion Price for any series of Preferred Stock to an amount which exceeds the lower of (x) the Conversion Price for such series of Preferred Stock, on the original adjustment date, or (y) the Conversion Price for such series of Preferred Stock that would have resulted from any issuance of Additional Shares of Common Stock between the original adjustment date and such readjustment date, and no readjustment shall affect Common Stock issued on conversion of Preferred Stock prior to such readjustment; and



---

(5) in the case of any Options which expire by their terms not more than 90 days after the date of issue thereof, no adjustment of the Conversion Price for any series of Preferred Stock shall be made until the expiration or exercise of all such Options.

(E) Determination of Consideration. For purposes of this Section 3(d), the consideration received by the Corporation for the issue of any Additional Shares of Common Stock shall be computed as follows:

(1) Cash and Property. Such consideration shall:

(I) insofar as it consists of cash, be computed at the aggregate amount of cash received by the Corporation prior to amounts paid or payable for accrued interest or accrued dividends and prior to any commissions or expenses paid by the Corporation;

(II) insofar as it consists of property other than cash, be computed at the fair value thereof at the time of such issue, as determined in good faith by the Board of Directors (irrespective of any accounting treatment); and

(III) if Additional Shares of Common Stock are issued together with other snares or securities or other assets of the Corporation for consideration which covers both, be the proportion of such consideration so received for the Additional Shares of Common Stock, computed as provided in subsections (I) and (II) above, as determined in good faith by the Board of Directors.

(2) Options and Convertible Securities. The consideration per share received by the Corporation for Additional Shares of Common Stock deemed to have been issued pursuant to Section 3(d)(i)(D), relating to Options and Convertible Securities, shall be determined by dividing:

(I) the total amount, if any, received or receivable by the Corporation as consideration for the issue of such Options or Convertible Securities, plus the minimum aggregate amount of additional consideration (as set forth in the instruments relating thereto, without regard to any provision contained therein for a subsequent adjustment of such consideration) payable to the Corporation upon the exercise of such Option or the conversion or exchange of such Convertible Securities, or in the case of Options for Convertible Securities, the exercise of such Options for Convertible Securities and the conversion or exchange of such Convertible Securities by,

(II) the maximum number of shares of Common Stock (as set forth in the instruments relating thereto,

without regard to any provision contained therein for a subsequent adjustment of such number) issuable upon the exercise of such Options or the conversion or exchange of such Convertible Securities.

(ii) Adjustments for Stock Dividends. Combinations or Splits. If the outstanding shares of Common Stock are subdivided, by stock split or otherwise, into a



---

greater number of shares of Common Stock, or if the Corporation shall declare or pay any dividend on the Common Stock payable in shares of Common Stock, then the Conversion Prices in effect prior to such event shall be proportionately decreased upon the occurrence of such event If the outstanding shares of Common Stock are combined or consolidated, by reclassification, reverse stock split or otherwise, into a lesser number of shares of Common Stock, men the Conversion Prices in effect prior to such event shall be proportionately increased upon the occurrence of such event.

(e) Adjustments for Other Distributions. If the Corporation fixes a record date for the determination of holders of Common Stock entitled to receive any distribution payable in securities of the Corporation other than shares of Common Stock (excluding any distribution in which the Preferred Stock participates on an as-converted basis, and any distribution for which adjustment is otherwise made pursuant to this Section 3), then in each such case provision shall be made so that the holders of Preferred Stock receive upon conversion, in addition to the Common Stock issuable upon conversion of their shares, the property or other securities of the Corporation which they would have received had their shares of Preferred Stock been converted into Common Stock immediately prior to such event and had they thereafter retained such securities, subject to all other adjustments called for during such period under this Section 3.

(f) Adjustments for Reclassification. Exchange and Substitution. If the Common Stock is changed into the same or a different number of shares of any other class or series of stock, whether by capital reorganization, reclassification or otherwise (other than a Deemed Liquidation or an event treated under Section 2 as a liquidation, dissolution or winding up, and events for which adjustment is made pursuant to Sections 3(d)(ii) or 3(e) above), the Conversion Price then in effect shall, concurrently with the effectiveness of such reorganization, reclassification or change, be adjusted such that the Preferred Stock shall be convertible into, in lieu of the Common Stock which the holders would otherwise have been entitled to receive, a number of shares of such other class or series of stock equivalent to the number of shares of such other class or series, that such holders would have been entitled to receive in such reclassification, capital reorganization or change for the number of shares of Common Stock that the holders would have been entitled to receive upon conversion of their Preferred Stock immediately prior to such reclassification, capital reorganization or change.

(g) Certificate as to Adjustments. The Corporation shall promptly compute each Conversion Price adjustment and provide each holder of Preferred Stock a certificate describing such adjustment and showing in detail the facts upon which such adjustment is based. If requested in writing by any holder of Preferred Stock, the Corporation shall provide such holder a certificate describing any Conversion Price adjustments, the current Conversion Price and the amount of Common Stock or other property issuable upon conversion of each series of Preferred Stock.

(h) Notices of Record Date. If the Corporation shall propose at any time:

(A) to declare any dividend or distribution upon its Common Stock other than a distribution payable solely in Common Stock;



---

(B) to offer for subscription pro rata to the holders of any class or series of its stock any additional shares of stock of any class or series or other rights;

(C) to effect any reclassification or recapitalization of its Common Stock; or

(D) to merge or consolidate with or into any other corporation, or sell, lease or convey all or substantially all its property or business, to effect a Deemed Liquidation or to liquidate, dissolve or wind up;

then, in connection with each such event, the Corporation shall send to the holders of the Preferred Stock:

(1) at least 20 days' prior written notice of the date on which a record shall be taken for such dividend, distribution or subscription rights (and specifying the date on which the holders of Common Stock shall be entitled thereto) or for determining rights to vote in respect of the matters referred to in (C) and (D) above; and

(2) in the case of the matters referred to in (C) and (D) above, at least 20 days' prior written notice of the date when the same shall take place (and specifying the date on which the holders of Common Stock shall be entitled to exchange their Common Stock for securities or other

property deliverable upon the occurrence of such event).

Each such written notice shall be delivered personally or given by first class mail, postage prepaid, addressed to the holders of Preferred Stock at the addresses for such stockholders as shown on the books of this Corporation. Notwithstanding the other provisions of this Restated Certificate, all notice periods or requirements in this Restated Certificate may be shortened or waived, either before or after the action for which notice is required, upon the written consent of the holders of at least a majority of the Preferred Stock, voting together as a single class on an as-converted basis, that are entitled to such notice rights.

**4. Voting.**

(a) Except as expressly provided by tins Restated Certificate or as required by law, the holders of Preferred Stock shall have the same voting rights as the holders of the Common Stock and shall be entitled to notice of any stockholders' meeting in accordance with the Bylaws of the Corporation, and the holders of Common Stock and the Preferred Stock shall vote together as a single class on all matters. Each holder of Common Stock shall be entitled to one vote for each share of Common Stock held, and each holder of Preferred Stock shall be entitled to the number of votes equal to the number of shares of Common Stock into which such shares of Preferred Stock could then be converted. Fractional votes shall not be permitted. Any fractional voting rights resulting from the above formula (after aggregating all shares into which shares of Preferred Stock held by each holder could be converted) shall be rounded to the nearest whole number (with one-half being rounded upward).

(b) At each meeting of stockholders at which members of the Board of Directors are to be elected, or whenever members of the Board of Directors are to be elected by



written consent of the stockholders, (i) the holders of Series A Preferred, Series B Preferred, Series C Preferred, Series D Preferred, Series E Preferred, Series F Preferred, Series G Preferred, Series G-1 Preferred and Series H Preferred, voting together as a separate class, shall be entitled to elect four (4) members of the Board of Directors, (each such member, a "***Preferred Director***"), (ii) the holders of the Common Stock, voting together as a separate class, shall be entitled to elect two (2) members of the Board of Directors (each such member, a "***Common Director***"), and (iii) the holders of Common Stock and Preferred Stock, voting together as a single class on an as-converted basis, shall be entitled to elect the remaining members of the Board of Directors (each such member, a "***Joint Director***").

(c) In the case of any vacancy in the office of a Preferred Director, the remaining Preferred Director or Preferred Directors (or, if there is no remaining Preferred Director, the holders of Preferred Stock voting together as a separate class, holding a majority of the then outstanding shares of Preferred Stock), shall elect a successor or successors to serve for the unexpired term of the Preferred Director whose office is vacant. In the case of any vacancy in the office of a Common Director, the remaining Common Director or directors so elected by the holders of Common Stock (or, if there is no remaining Common Director, the holders of Common Stock voting together as a separate class, holding a majority of the then outstanding shares of Common Stock), shall elect a successor or successors to serve for the unexpired term of the Common Director whose office is vacant. In the case of any vacancy in the office of a Joint Director, the Preferred Directors and Common Directors (or, if there is no remaining Preferred Director, the holders of Common Stock and of Preferred Stock, voting together as a single class on an as-converted to Common Stock basis, holding a majority of the then outstanding Common Stock and Preferred Stock, determined on an as-converted to Common Stock basis) shall elect a successor or successors to serve for the unexpired term of the Joint Director whose office is vacant Any director who was elected by a specified class or classes of stock or series thereof may be removed during his or her term of office, either for or without cause, by, and only by, the affirmative vote of a majority of the holders of the shares of the class or classes of stock or series thereof that initially elected such director.

**5. Protective Provisions.**

(a) This Corporation shall not, without the approval of the holders of a majority of the then outstanding Preferred Stock voting together as a separate class on an as-converted to Common Stock basis take any action (by amendment, merger, consolidation or otherwise) that:

(i) authorizes or issues, or obligates the Corporation to sell or issue, any new class or series of securities having rights, preferences or privileges senior to or on a parity with any outstanding series of Preferred Stock whether as to liquidation preference, antidilution, redemption, conversion, voting, dividends or otherwise;

(ii) amends or waives any provision of the Restated Certificate or the Bylaws of the Corporation, unless such amendment or waiver is approved by the Corporation's Board of Directors;



(iii) redeems or repurchases shares (excluding repurchases of Common Stock approved by the Board of Directors upon termination of an officer, employee, director or consultant pursuant to plans and arrangements previously approved by the Board of Directors at no greater than cost) or pursuant to Subsection 2(i) or Subsection 2.5, of Section (B) of this Article IV;

(iv) authorizes, obligates the Corporation to pay or results in the payment of any dividend or make any other distribution in respect of the Corporation's capital stock (other than a dividend payable solely in shares of Common Stock for which an adjustment to the respective Conversion Rates has been made in accordance with Section 3(d)(ii));

(v) effects any increase in the number of shares of Common Stock issuable pursuant to the Corporation's stock option plan or the adoption of any new employee stock purchase plan, stock incentive compensation or similar stock option plan or arrangement;

(vi) increases or decreases the number of authorized directors;

(vii) effects a liquidation, dissolution or winding up of the Corporation, including without limitation any Deemed Liquidation;

(viii) effects any transaction with any of the Corporation's officers, directors, affiliates or any affiliate thereof, other than (a) standard employee benefits generally made available to all employees, (b) standard director and officer indemnification agreements approved by the Board of Directors and stockholders, and (c) the purchase of shares of the Corporation's capital stock and the issuance of options to purchase shares of the Corporation's Common Stock, in each instance, approved by the Board of Directors;

(ix) effects any material change to the nature of the business of the Corporation; or

(x) after the date hereof authorizes any borrowing or guarantee by the Corporation in excess of $500,000 individually or $1,000,000 in the aggregate in any twelve (12) month period unless approved by the Board including a majority of the Preferred Directors.

(b) As long as shares of any series of Preferred Stock are outstanding, the Corporation shall not, without first obtaining the approval (by vote or written consent as provided by law) of the holders of more than fifty percent (50%) of the outstanding shares of that series of Preferred Stock: (i) take any action that would alter the rights, preferences, privileges or powers of, or restrictions provided for the benefit of, that series in an adverse manner and that is differential and adverse to any contemporaneous alteration to the rights, preferences, privileged or powers or, or restrictions provided for the benefit of, any other series of Preferred Stock then outstanding (it being understood that such Preferred Stock shall not be deemed to be affected differently unless there is an express alteration to the rights, preferences, privileges or powers set forth herein, and in any event not because of proportional differences in the amounts of respective issue prices and liquidation preferences that arise out of differences in the original



---

issue price for each series of Preferred Stock); or (ii) increase or decrease (other than for decreases resulting from conversion of that series) the authorized number of shares of that series.

6. <u>**Status of Converted and Redeemed Shares**</u>.

In the event any shares of Preferred Stock shall be redeemed or converted pursuant to Sections 2(i), 2.5 or 3 hereof, the shares so redeemed or converted shall be canceled and shall not be issuable by the Corporation. The Restated Certificate shall be appropriately amended to effect the corresponding reduction in the Corporation's authorized capital stock.

**(C) <u>Rights, Preferences, Privileges and Restrictions of Common Stock</u>**

The relative rights, preferences, privileges and restrictions granted to or imposed upon the Common Stock or the holders thereof are as follows:

**1.** <u>**Dividends**</u>. Subject to the prior rights of holders of all classes of stock at the time outstanding having prior rights as to dividends, the holders of the Common Stock shall be entitled to receive, when and as declared by the Board of Directors, out of any assets of the Corporation legally available therefor, such dividends as may be declared from time to time by the Board of Directors.

**2.** <u>**Liquidation**</u>. Upon the liquidation, dissolution or winding up of the Corporation (including without limitation any Deemed Liquidation), the assets of the Corporation shall be distributed as provided in Section 2 of Division (B) of this Article IV.

**3.** <u>**Redemption**</u>. The Common Stock is not redeemable other than at cost in connection with the termination of service.

**4.** <u>**Voting**</u>. The holder of each share of Common Stock shall have the right to one vote, and shall be entitled to notice of any stockholders' meeting in accordance with the Bylaws of the Corporation, and shall be entitled to vote upon such matters and in such manner as may be provided by law.

**ARTICLE V**

(A) To the fullest extent permitted by the Delaware General Corporation Law, as the same exists or as may hereafter be amended, a director of the Corporation shall not be personally liable to the Corporation or its stockholders for monetary damages for breach of fiduciary duty as a director.

(B) The Corporation shall indemnify to the fullest extent permitted by law any person made or threatened to be made a party to an action or proceeding, whether criminal, civil, administrative or investigative, by reason of the fact that he, his testator or intestate is or was a director or officer of the Corporation or any predecessor of the Corporation, or serves or served at any other enterprise as a director or officer at the request of the Corporation or any predecessor to the Corporation.



---

(C) Neither any amendment nor repeal of this Article V, nor the adoption of any provision of the Corporation's Amended and Resulted Certificate of Incorporation inconsistent with this Article V, shall eliminate or reduce the effect of this Article V in respect of any matter occurring, or any action or proceeding accruing or arising or that, but for this Article V, would accrue or arise, prior to such amendment, repeal or adoption of an inconsistent provision.

**ARTICLE VI**

Subject to Section 5 of Division (B) of Article IV, the Board of Directors of the Corporation is expressly authorized to make, alter or repeal Bylaws of the Corporation, but the stockholders may make additional bylaws and may alter or repeal any bylaw whether adopted by them or otherwise.

**ARTICLE VII**

The Corporation is to have perpetual existence.

**ARTICLE VIII**

The number of directors which will constitute the whole Board of Directors shall be designated in the Bylaws of the Corporation.

**ARTICLE IX**

Elections of directors need not be by written ballot unless otherwise provided in the Bylaws of the Corporation.

**ARTICLE X**

Meetings of stockholders may be held within or without the State of Delaware, as the Bylaws may provide. The books of the Corporation may be kept (subject to any statutory provision) outside the State of Delaware at such place or places as may be designated from time to time by the Board of Directors in the Bylaws of the Corporation. Any action that could be taken at any annual or special meeting of the stockholder may be taken without a meeting, without prior notice and without a vote, if a written consent setting for the action to be taken is signed by stockholders of this Corporation holding of record not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting at which all shares entitled to vote thereon were present and voted.

**ARTICLE XI**

Except as expressly set forth in a written agreement between the Corporation and one or more stockholders that has been approved by the Board of Directors of the Corporation, preemptive rights shall not exist with respect to shares of capital stock or securities convertible into the capital stock of this Corporation, whether now or hereafter authorized.



---

**ARTICLE XII**

The books of the Corporation may be kept (subject to any statutory provision) outside the State of Delaware at such place or places as may be designated from time to time by the board of directors in the bylaws of the Corporation.

********



---

**CERTIFICATE OF AMENDMENT TO THE
AMENDED AND RESTATED
CERTIFICATE OF**

**INCORPORATION OF**
**CONTROL4 CORPORATION**

The undersigned does hereby certify on behalf of Control4 Corporation (the "***Corporation***"), a corporation organized and existing under the Delaware General Corporation Law, as follows:

FIRST: That he is the duly elected and acting Chief Executive Officer of the Corporation.

SECOND: That the Certificate of Incorporation of the Corporation was originally filed with the Secretary of State of the State of Delaware on March 27, 2003, under the name **"Control4 Corporation."**

THIRD: That pursuant to Section 242 of the General Corporation Law of the State of Delaware, Article IV(A) of the Certificate of Incorporation of the Corporation is hereby amended to read in its entirety as follows:

**"(A) Classes of Capital Stock**

This Corporation is authorized to issue 211,000,000 shares of capital stock in the aggregate. The capital stock of this Corporation shall be divided into two classes, designated "***Common Stock***" and "***Preferred Stock***." The number of shares of Common Stock the Corporation is authorized to issue is 127,836,592. The number of shares of Preferred Stock the Corporation is authorized to issue is 83,163,408, 8,150,000 of which shall be designated as Series A Preferred Stock ^***Series A Preferred***"), 18,124,230 of which shall be designated Series B Preferred Stock ("***Series B Preferred***"), 14,215,791 of which shall be designated Series C Preferred Stock ("***Series C Preferred***"), 7,789,215 of which shall be designated Series D Preferred Stock ("***Series D Preferred***"), 5,045,662 of which shall be designated Series E Preferred Stock ("***Series E Preferred***"), 5,988,024 of which shall be designated Series F Preferred Stock ("***Series F Preferred***"), 8,677,338 of which shall be designated Series G Preferred Stock ("***Series G Preferred***"), 2,073,148 of which shall be designated Series G-l Preferred Stock ("***Series G-l Preferred***"), and 13,100,000 of which shall be designated Series H Preferred Stock ("***Series H Preferred***"). The Common Stock and Preferred Stock shall each have a par value of $0.0001 per share. The Corporation shall from time to time in accordance with the laws of the State of Delaware increase the authorized amount of its Common Stock if at any time the number of shares of Common Stock remaining unissued and available for issuance shall not be sufficient to permit conversion of the Preferred Stock. Subject to Section 5 of Division (B) below, the number of authorized shares of Common Stock may be increased or decreased (but not below the number of shares of Common Stock then outstanding or reserved for the exercise of options or warrants or conversion of the Preferred Stock) by the affirmative vote of the holders of a majority of the stock of the Corporation entitled to vote thereon, voting as a single class (and not as a separate individual class of solely holders of Common Stock, excluding those holders of

---

equity securities who may be entitled to vote thereon as provided in this Certificate of Incorporation), as provided by Section 242(b)(2) of the Delaware General Corporation Law."

FOURTH: That the foregoing Certificate of Amendment to the Certificate of Incorporation of the Corporation has been duly adopted and approved by the Board of Directors and stockholders of the Corporation in accordance with the applicable provisions of Sections 141, 228 and 242 of the Delaware General Corporation Law.

IN WITNESS WHEREOF, the undersigned hereby further declares and certifies under penalty of perjury that the facts set forth in the foregoing certificate are true and correct to his own knowledge, and that this certificate is his own act and deed.

Executed on December 29, 2011.

By: /s/Martin Plaehn
Martin Plaehn
Chief Executive Officer



---

**Exhibit 3.2**

**SECOND AMENDED AND RESTATED**

**CERTIFICATE OF INCORPORATION**

**OF**

**CONTROL4 CORPORATION**

a Delaware corporation

Control4 Corporation, a corporation organized and existing under the laws of the State of Delaware (the "**Corporation**"), hereby certifies as follows:

1. The name of the Corporation is Control4 Corporation. The date of the filing of its original Certificate of Incorporation with the Secretary of State of the State of Delaware was March 27, 2003 (the "**Original Certificate**"). The name under which the Corporation filed the Original Certificate was Control4 Corporation.

2. This Second Amended and Restated Certificate of Incorporation (the "**Certificate**") amends, restates and integrates the provisions of the Amended and Restated Certificate of Incorporation that was filed with the Secretary of State of the State of Delaware on January 20, 2011, as amended (the "**Existing Certificate**"), and was duly adopted in accordance with the provisions of Sections 228, 242 and 245 of the General Corporation Law of the State of Delaware (the "**DGCL**").

3. The text of the Existing Certificate is hereby amended and restated in its entirety to provide as herein set forth in full.

ARTICLE I

The name of the Corporation is Control4 Corporation.

ARTICLE II

The address of the Corporation's registered office in the State of Delaware is 2711 Centerville Road, Suite 400, City of Wilmington, County of New Castle, 19808. The name of its registered agent at that address is Corporation Service Company.

ARTICLE III

The purpose of the Corporation is to engage in any lawful act or activity for which corporations may be organized under the DGCL.

---

ARTICLE IV

CAPITAL STOCK

The total number of shares of capital stock which the Corporation shall have authority to issue is 525,000,000, of which (i) 500,000,000 shares shall be a class designated as common stock, par value $0.0001 per share (the "**Common Stock**"), and (ii) 25,000,000 shares shall be a class designated as undesignated preferred stock, par value $0.0001 per share (the "**Undesignated Preferred Stock**").

Except as otherwise provided in any certificate of designations of any series of Undesignated Preferred Stock, the number of authorized shares of the class of Common Stock or Undesignated Preferred Stock may from time to time be increased or decreased (but not below the number of shares of such class outstanding) by the affirmative vote of the holders of a majority in voting power of the outstanding shares of capital stock of the Corporation irrespective of the provisions of Section 242(b)(2) of the DGCL.

The powers, preferences and rights of, and the qualifications, limitations and restrictions upon, each class or series of stock shall be determined in accordance with, or as set forth below in, this Article IV.

A. COMMON STOCK

Subject to all the rights, powers and preferences of the Undesignated Preferred Stock and except as otherwise provided by law or in this Certificate (or in any certificate of designations of any series of Undesignated Preferred Stock):

(a) the holders of the Common Stock shall have the exclusive right to vote for the election of directors of the Corporation (the "**Directors**") and on all other matters requiring stockholder action, each outstanding share entitling the holder thereof to one vote on each matter properly submitted to the stockholders of the Corporation for their vote; provided, however, that, except as otherwise required by law, holders of Common Stock, as such, shall not be entitled to vote on any amendment to this Certificate (or on any amendment to a certificate of designations of any series of Undesignated Preferred Stock) that alters or changes the powers, preferences, rights or other terms of one or more outstanding series of Undesignated Preferred Stock if the holders of such affected series of Undesignated Preferred Stock are entitled to vote, either separately or together with the holders of one or more other such series, on such amendment pursuant to this Certificate (or pursuant to a certificate of designations of any series of Undesignated Preferred Stock) or pursuant to the DGCL;

(b) dividends may be declared and paid or set apart for payment upon the Common Stock out of any assets or funds of the Corporation legally available for the payment of dividends, but only when and as declared by the Board of Directors or any authorized committee thereof; and

(c) upon the voluntary or involuntary liquidation, dissolution or winding up of the Corporation, the net assets of the Corporation shall be distributed pro rata to the holders of the Common Stock.

B. UNDESIGNATED PREFERRED STOCK

The Board of Directors or any authorized committee thereof is expressly authorized, to the fullest extent permitted by law, to provide by resolution or resolutions for, out of the unissued shares of Undesignated Preferred Stock, the issuance of the shares of Undesignated Preferred Stock in one or more series of such stock, and by filing a certificate of designations pursuant to applicable law of the State of Delaware, to establish or change from time to time the number of shares of each such series, and to fix the designations, powers, including voting powers, full or limited, or no voting powers, preferences and the relative, participating, optional or other special rights of the shares of each series and any qualifications, limitations and restrictions thereof.

ARTICLE V

STOCKHOLDER ACTION

1. No Action without Meeting. Any action required or permitted to be taken by the stockholders of the Corporation at any annual or special meeting of stockholders of the Corporation must be effected at a duly called annual or special meeting of stockholders and may not be taken or effected by a written consent of stockholders in lieu thereof.

2. Special Meetings. Except as otherwise required by statute and subject to the rights, if any, of the holders of any series of Undesignated Preferred Stock, special meetings of the stockholders of the Corporation may be called only by the Board of Directors acting pursuant to a resolution approved by the affirmative vote of a majority of the Directors then in office, and special meetings of stockholders may not be called by any other person or persons. Only those matters set forth in the notice of the special meeting may be considered or acted upon at a special meeting of stockholders of the Corporation.

ARTICLE VI

DIRECTORS

1. General. The business and affairs of the Corporation shall be managed by or under the direction of the Board of Directors except as otherwise provided herein or required by law.

2. Election of Directors. Election of Directors need not be by written ballot unless the By-laws of the Corporation (the "**By-laws**") shall so provide.

3. Number of Directors; Term of Office. The number of Directors of the Corporation shall be fixed solely and exclusively by resolution duly adopted from time to time by the Board of Directors. The Directors, other than those who may be elected by the holders of any series of Undesignated Preferred Stock, shall be classified, with respect to the term for which



they severally hold office, into three classes. The initial Class I Directors shall serve for a term expiring at the annual meeting of stockholders to be held in 2014, the initial Class II Directors shall serve for a term expiring at the annual meeting of stockholders to be held in 2015, and the initial Class III Directors shall serve for a term expiring at the annual meeting of stockholders to be held in 2016. At each annual meeting of stockholders, Directors elected to succeed those Directors whose terms expire shall be elected for a term of office to expire at the third succeeding annual meeting of stockholders after their election. Notwithstanding the foregoing, the Directors elected to each class shall hold office until their successors are duly elected and qualified or until their earlier resignation, death or removal.

Notwithstanding the foregoing, whenever, pursuant to the provisions of Article IV of this Certificate, the holders of any one or more series of Undesignated Preferred Stock shall have the right, voting separately as a series or together with holders of other such series, to elect Directors at an annual or special meeting of stockholders, the election, term of office, filling of vacancies and other features of such directorships shall be governed by the terms of this Certificate and any certificate of designations applicable to such series.

4. Vacancies. Subject to the rights, if any, of the holders of any series of Undesignated Preferred Stock to elect Directors and to fill vacancies in the Board of Directors relating thereto, any and all vacancies in the Board of Directors, however occurring, including, without limitation, by reason of an increase in the size of the Board of Directors, or the death, resignation, disqualification or removal of a Director, shall be filled solely and exclusively by the affirmative vote of a majority of the remaining Directors then in office, even if less than a quorum of the Board of Directors, and not by the stockholders. Any Director appointed in accordance with the preceding sentence shall hold office for the remainder of the full term of the class of Directors in which the new directorship was created or the vacancy occurred and until such Director's successor shall have been duly elected and qualified or until his or her earlier resignation, death or removal. Subject to the rights, if any, of the holders of any series of Undesignated Preferred Stock to elect Directors, when the number of Directors is increased or decreased, the Board of Directors shall, subject to Article VI.3 hereof, determine the class or classes to which the increased or decreased number of Directors shall be apportioned; provided, however, that no decrease in the number of Directors shall shorten the term of any incumbent Director. In the event of a vacancy in the Board of Directors, the remaining Directors, except as otherwise provided by law, shall exercise the powers of the full Board of Directors until the vacancy is filled.

5. Removal. Subject to the rights, if any, of any series of Undesignated Preferred Stock to elect Directors and to remove any Director whom the holders of any such series have the right to elect, any Director (including persons elected by Directors to fill vacancies in the Board of Directors) may be removed from office (i) only for cause and (ii) only by the affirmative vote of the holders of 75% or more of the outstanding shares of capital stock then entitled to vote at an election of Directors. At least forty-five (45) days prior to any annual or special meeting of stockholders at which it is proposed that any Director be removed from office, written notice of such proposed removal and the alleged grounds thereof shall be sent to the Director whose removal will be considered at the meeting.



---

ARTICLE VII

LIMITATION OF LIABILITY

A Director of the Corporation shall not be personally liable to the Corporation or its stockholders for monetary damages for breach of fiduciary duty as a Director, except for liability (a) for any breach of the Director's duty of loyalty to the Corporation or its stockholders, (b) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law, (c) under Section 174 of the DGCL or (d) for any transaction from which the Director derived an improper personal benefit. If the DGCL is amended after the effective date of this Certificate to authorize corporate action further eliminating or limiting the personal liability of Directors, then the liability of a Director of the Corporation shall be eliminated or limited to the fullest extent permitted by the DGCL, as so amended.

Any amendment, repeal or modification of this Article VII by either of (i) the stockholders of the Corporation or (ii) an amendment to the DGCL, shall not adversely affect any right or protection existing at the time of such amendment, repeal or modification with respect to any acts or omissions occurring before such amendment, repeal or modification of a person serving as a Director at the time of such amendment, repeal or modification.

ARTICLE VIII

EXCLUSIVE JURISDICTION OF DELAWARE COURTS

Unless the Corporation consents in writing to the selection of an alternative forum, the Court of Chancery of the State of Delaware shall be the sole and exclusive forum for (i) any derivative action or proceeding brought on behalf of the Corporation, (ii) any action asserting a claim of breach of a fiduciary duty owed by any director, officer or other employee of the Corporation to the Corporation or the Corporation's stockholders, (iii) any action asserting a claim arising pursuant to any provision of the Delaware General Corporation Law or the Corporation's Certificate of Incorporation or By-laws, or (iv) any action asserting a claim against the Corporation governed by the internal affairs doctrine. Any person or entity purchasing or otherwise acquiring any interest in shares of capital stock of the Corporation shall be deemed to have notice of and consented to the provisions of this Article VIII.

ARTICLE IX

AMENDMENT OF BY-LAWS

1. Amendment by Directors. Except as otherwise provided by law, the By-laws of the Corporation may be amended or repealed by the Board of Directors by the affirmative vote of a majority of the Directors then in office.

2. Amendment by Stockholders. The By-laws of the Corporation may be amended or repealed at any annual meeting of stockholders, or special meeting of stockholders called for such purpose, by the affirmative vote of at least 75% of the outstanding shares of capital stock entitled to vote on such amendment or repeal, voting together as a single class; provided, however, that if the Board of Directors recommends that stockholders approve such amendment



---

or repeal at such meeting of stockholders, such amendment or repeal shall only require the affirmative vote of the majority of the outstanding shares of capital stock entitled to vote on such amendment or repeal, voting together as a single class.

ARTICLE X

AMENDMENT OF CERTIFICATE OF INCORPORATION

The Corporation reserves the right to amend or repeal this Certificate in the manner now or hereafter prescribed by statute and this Certificate, and all rights conferred upon stockholders herein are granted subject to this reservation. Whenever any vote of the holders of capital stock of the Corporation is required to amend or repeal any provision of this Certificate, and in addition to any other vote of holders of capital stock that is required by this Certificate or by law, such amendment or repeal shall require the affirmative vote of the majority of the outstanding shares of capital stock entitled to vote on such amendment or repeal, and the affirmative vote of the majority of the outstanding shares of each class entitled to vote thereon as a class, at a duly constituted meeting of stockholders called expressly for such purpose;

provided, however, that the affirmative vote of not less than 75% of the outstanding shares of capital stock entitled to vote on such amendment or repeal, and the affirmative vote of not less than 75% of the outstanding shares of each class entitled to vote thereon as a class, shall be required to amend or repeal any provision of Article V, Article VI, Article VII, Article VIII, Article IX or Article X of this Certificate.



---

THIS AMENDED AND RESTATED CERTIFICATE OF INCORPORATION is executed as of this      day of            , 2013.

Control4 Corporation

By: ____________________

Name: ____________________

Title: ____________________

---

**Exhibit 3.3**

**BYLAWS**

**OF**

**CONTROL4 CORPORATION**

---

**CONTENTS**


| | | |
|---|---|---|
| ARTICLE I STOCKHOLDERS | | 1 |
| Section 1.1 | Annual Meetings | 1 |
| Section 1.2 | Special Meetings | 1 |
| Section 1.3 | Notice of Meetings | 1 |
| Section 1.4 | Adjournments | 1 |
| Section 1.5 | Quorum | 1 |
| Section 1.6 | Organization | 2 |
| Section 1.7 | Voting; Proxies | 2 |
| Section 1.8 | Fixing Date for Determination of Stockholders of Record | 2 |
| Section 1.9 | List of Stockholders Entitled to Vote | 3 |
| Section 1.10 | Inspectors of Elections; Opening and Closing the Polls | 3 |
| Section 1.11 | Action by Written Consent of Stockholders | 4 |
| ARTICLE II BOARD OF DIRECTORS | | 4 |
| Section 2.1 | Number: Qualifications | 4 |
| Section 2.2 | Election; Resignation; Removal; Vacancies | 4 |
| Section 2.3 | Regular Meetings | 4 |
| Section 2.4 | Special Meetings | 4 |
| Section 2.5 | Telephonic Meetings Permitted | 5 |
| Section 2.6 | Quorum; Vote Required for Action | 5 |
| Section 2.7 | Organization | 5 |
| Section 2.8 | Written Action by Directors | 5 |
| Section 2.9 | Powers | 5 |

| | | |
|---|---|---|
| Section 2.10 | Compensation of Directors | 5 |
| ARTICLE III COMMITTEES | | 5 |
| Section 3.1 | Committees | 5 |
| Section 3.2 | Committee Rules | 6 |
| ARTICLE IV OFFICERS | | 6 |
| Section 4.1 | Executive Officers; Election; Qualifications; Term of Office; Resignation; Removal; Vacancies | 6 |
| Section 4.2 | Powers and Duties of Executive Officers | 6 |
| Section 4.3 | Compensation | 6 |
| ARTICLE V STOCK | | 7 |
| Section 5.1 | Certificates | 7 |

| | | |
|---|---|---|
| Section 5.2 | Lost, Stolen or Destroyed Stock Certificates; Issuance of New Certificates | 7 |
| Section 5.3 | Other Regulations | 7 |
| ARTICLE VI INDEMNIFICATION | | 7 |
| Section 6.1 | Right to Indemnification | 7 |
| Section 6.2 | Prepayment of Expenses | 8 |
| Section 6.3 | Claims | 8 |
| Section 6.4 | Nonexclusivity of Rights | 8 |
| Section 6.5 | Other Sources | 8 |
| Section 6.6 | Amendment or Repeal | 8 |
| Section 6.7 | Other Indemnification and Prepayment of Expenses | 8 |
| Section 6.8 | Indemnification Contracts | 8 |
| Section 6.9 | Effect of Amendment | 9 |
| Section 6.10 | Insurance | 9 |
| Section 6.11 | Savings Clause | 9 |
| ARTICLE VII MISCELLANEOUS | | 9 |
| Section 7.1 | Fiscal Year | 9 |
| Section 7.2 | Seal | 9 |
| Section 7.3 | Waiver of Notice of Meetings of Stockholders, Directors and Committees | 9 |
| Section 7.4 | Interested Directors; Quorum | 10 |
| Section 7.5 | Form of Records | 10 |
| Section 7.6 | Reliance Upon Books and Records | 10 |
| Section 7.7 | Certification of Incorporation Governs | 10 |
| Section 7.8 | Severability | 10 |
| Section 7.9 | Amendments | 11 |



**BYLAWS**

**OF**

**CONTROL4 CORPORATION**

ARTICLE I

STOCKHOLDERS

Section 1.1 Annual Meetings. An annual meeting of stockholders shall be held for the election of directors at such date, time and place, either within or without the State of Delaware, as may be designated by resolution of the Board of Directors from time to time. Any other proper business may be transacted at the annual meeting.

Section 1.2 Special Meetings. Special meetings of stockholders for any purpose or purposes may be called at any time by the Board of Directors, or by a committee of the Board of Directors which has been duly designated by the Board of Directors and whose powers and authority include the power to call such meetings, but such special meetings may not be called by any other person or persons.

Section 1.3 Notice of Meetings. Whenever stockholders are required or permitted to take any action at a meeting, a written notice of the meeting shall be given which shall state the place, date and hour of the meeting, and, in the case of a special meeting, the purpose or purposes for which the meeting is called. Unless otherwise provided by applicable law or the Certificate of Incorporation, the written notice of any meeting shall be given not less than ten (10) nor more than sixty (60) days before the date of the meeting to each stockholder entitled to vote at such meeting. If mailed, such notice shall be deemed to be given when deposited in the mail, postage prepaid, directed to the stockholder at his or her address as it appears on the records of the Corporation.

Section 1.4 Adjournments. Any meeting of stockholders, annual or special, may adjourn from time to time to reconvene at the same or some other place, and notice need not be given of any such adjourned meeting if the time and place thereof are announced at the meeting at which the adjournment is taken. At the adjourned meeting the Corporation may transact any business which might have been transacted at the original meeting. If the adjournment is for more than thirty (30) days, or if after the adjournment a new record date is fixed for the adjourned meeting, a notice of the adjourned meeting shall be given to each stockholder of record entitled to vote at the meeting.

Section 1.5 Quorum. At each meeting of stockholders, except where otherwise provided by law or the Certificate of Incorporation or these Bylaws, the holders of a majority of the outstanding shares of stock entitled to vote at the meeting, present in person or by proxy, shall constitute a quorum. In the absence of a quorum, the stockholders so present may, by majority vote, adjourn the meeting from time to time in the manner provided in Section 1.4 of these Bylaws until a quorum shall attend. Shares of its own stock belonging to the Corporation or to another corporation, if a majority of the shares entitled to vote in the election of directors of

---

such other corporation is held, directly or indirectly, by the Corporation, shall neither be entitled to vote nor be counted for quorum purposes; provided, however, that the foregoing shall not limit the right of any corporation to vote stock, including but not limited to its own stock, held by it in a fiduciary capacity.

Section 1.6 Organization. Meetings of stockholders shall be presided over by the Chairman of the Board, if any, or in the absence of such person, the President, or in his or her absence by a Vice President, or in the absence of the foregoing persons,, by a chairman designated by the Board of Directors, or in the absence of such designation, by a chairman chosen at the meeting. The Secretary shall act as secretary of the meeting, but in his or her absence the chairman of the meeting may appoint any person to act as secretary of the meeting.

Section 1.7 Voting; Proxies. Unless otherwise provided by law or the Certificate of Incorporation, each stockholder entitled to vote at any meeting of stockholders shall be entitled to one vote for each share of stock held by him which has voting power upon the matter in question. Each stockholder entitled to vote at a meeting of stockholders may authorize another person or persons to act for him by proxy, but no such proxy shall be voted or acted upon after three years from its date, unless the proxy provides for a longer period. A duly executed proxy shall be irrevocable if it states that it is irrevocable and if, and only as long as, it is coupled with an, interest sufficient in law to support an irrevocable power. A stockholder may revoke any proxy which is not irrevocable by attending the meeting and voting in person or by filing an instrument in writing revoking the proxy or another duly executed proxy bearing a later date with the Secretary of the Corporation. Unless otherwise required by law, voting at meetings of stockholders need not be by written ballot and need not be conducted by inspectors unless the Board of Directors, or holders of a majority of the outstanding shares of all classes of stock entitled to vote thereon present in person or by proxy at such meeting shall so determine. At all meetings of stockholders for the election of directors a plurality of the votes cast shall be sufficient to elect. All other elections and questions shall, unless otherwise provided by law or by the Certificate of Incorporation or these Bylaws, be decided by the vote of the holders of a majority of the outstanding shares of stock entitled to vote thereon present in person or by proxy at the meeting.

Section 1.8 Fixing Date for Determination of Stockholders of Record.

(a) In order that tire Corporation may determine the stockholders entitled to notice of or to vote at any meeting of stockholders or any adjournment thereof, or entitled to receive payment of any dividend or other distribution or allotment of any rights, or entitled to exercise any rights in respect of any change, conversion or exchange of stock or for the purpose of any other lawful action, the Board of Directors may fix, in advance, a record date, which shall not precede the date such record date is fixed and shall not be more than sixty (60) nor less than ten (10) days before the date of such meeting, nor more than, sixty (60) days prior to any other action. If no record date is fixed, the record date for determining stockholders entitled to notice of or to vote at a meeting of stockholders shall be at the close of business on the day next preceding the day on which notice is given. The record date for any other purpose other than stockholder action by written consent shall be at the close of business on the day on which the Board of Directors adopts the resolution relating thereto. A determination of stockholders of record entitled to notice of or to vote at a meeting of stockholders shall apply to any adjournment

of the meeting; provided, however, that the Board of Directors may fix a new record date for the adjourned meeting.

(b) In order that the Corporation may determine the stockholders entitled to consent to corporate action in writing without a meeting, the Board of Directors may fix a record date, which record date shall not precede the date upon which the resolution fixing the record date is adopted by the Board of Directors, and which date shall not be more than ten (10) days after the date upon which the resolution fixing the record date is adopted by the Board of Directors. Any stockholder of record seeking to have the stockholders authorize or take corporate action by written consent shall, by written notice to the Secretary, request the Board of Directors to fix a record date. The Board of Directors shall promptly, but in all events within ten (10) days after the date on which such a request is received, adopt a resolution fixing the record date. If no record date has been fixed by the Board of Directors within ten (10) days of the date on which such a request is received, the record date for determining stockholders entitled to consent to corporate action in writing without a meeting, when no prior action by the Board of Directors is required by applicable law, shall be the first date on which a signed written consent setting forth the action taken or proposed to be taken is delivered to the Corporation by delivery to its registered office in the State of Delaware, its principal place of business, or any officer or agent of the Corporation having custody of the book in which proceedings of meetings of stockholders are recorded. Delivery made to the Corporation's registered office shall be by hand or by certified or registered mail, return receipt requested. If no record date has been fixed by the Board of Directors and prior action by the Board of Directors is required by applicable law, the record date for determining stockholders entitled to consent to corporate action in writing without a meeting shall be at tire close of business on the date on which the Board of Directors adopts the resolution taking such prior action.

Section 1.9 List of Stockholders Entitled to Vote. The Secretary shall prepare and make, at least ten days before every meeting of stockholders, a complete list of the stockholders entitled to vote at the meeting, arranged in alphabetical order, and showing the address of each stockholder the number of shares registered in the name of each stockholder. Such list shall be open to the examination of any stockholder, for any purpose germane to the meeting, during ordinary business hours, for a period of at least ten (10) days prior to the meeting, either at a place within the city where the meeting is to be held, which place shall be specified in the notice of the meeting, or, if not so specified, at the place where the meeting is to be held. The list shall also be produced and kept at the time and place of the meeting during the whole time thereof and may be inspected by any stockholder who is present. The stock ledger shall be the only evidence as to who are the stockholders entitled to examine the stock ledger, the list of stockholders or the books of the Corporation, or to vote in person or by proxy at any meeting of stockholders.

Section 1.10 Inspectors of Elections; Opening and Closing the Polls.

(a) If required by the Delaware General Corporation Law, the Board of Directors by resolution shall appoint one or more inspectors, which inspector or inspectors may include individuals who serve the Corporation in other capacities, including, without limitation, as officers, employees, agents or representatives of the Corporation, to act at the meeting and make a written report thereof. The procedures, oath, duties, and determinations with respect to inspectors shall be as provided under the Delaware General Corporation Law.



(b) The chairman of any meeting shall fix and announce at the meeting the date and time of the opening and the closing of the polls for each matter upon which the stockholders will vote at a meeting.

Section 1.11 Action by Written Consent of Stockholders. Unless otherwise restricted by the Certificate of Incorporation, any action required or permitted to be taken at any annual or special meeting of the stockholders may be taken without a meeting, without prior notice and without a vote, if a consent in writing, setting forth the action so taken, shall be signed by the holders of outstanding stock having not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting at which all shares entitled to vote thereon were present and voted. Prompt notice of the taking of the corporate action without a meeting by less than unanimous written consent shall be given to those stockholders who have not consented in writing.

## ARTICLE II

## BOARD OF DIRECTORS

Section 2.1 Number; Qualifications. The Board of Directors shall consist of one or more members, the number thereof to be determined from time to time by resolution of the Board of Directors. The initial number of directors shall be three (3), and thereafter shall be fixed from time to time by resolution of the Board of Directors. Directors need not be stockholders.

Section 2.2 Election; Resignation; Removal; Vacancies. The Board of Directors shall initially consist of the persons elected as such by the incorporator or named in the Corporation's Certificate of Incorporation. At the first annual meeting of stockholders and at each annual meeting thereafter, the stockholders shall elect Directors to replace those Directors who have resigned or been removed, or if applicable, whose terms have expired. Any Director may resign at any time upon written notice to the Corporation. Any vacancy occurring in the Board of Directors may be filled by the affirmative vote of a majority of the Board, although such majority is less than a quorum, or by a plurality of the votes cast at a meeting of stockholders, and each Director so elected shall hold office until the expiration of the term of office, if any, of the Director whom he or she has replaced.

Section 2.3 Regular Meetings. Regular meetings of the Board of Directors may be held at such places within or without the State of Delaware and at such times as the Board of Directors may from time to time determine. Notice of regular meetings need not be given if the date, times and places thereof are fixed by resolution of the Board of Directors.

Section 2.4 Special Meetings. Special meetings of the Board of Directors may be called by the Chairman of the Board, the President or a majority of the members of the Board of Directors then in office and may be held at any time, date or place, within or without the State of Delaware, as the person or persons calling the meeting shall fix. Notice of the time, date and place of such meeting shall be given, orally or in writing, by the person or persons calling the meeting to all directors at least four (4) days before the meeting if the notice is mailed, or at least twenty-four (24) hours before the meeting if such notice is given by telephone, hand delivery,



---

telegram, telex, mailgram, facsimile or similar communication method. Unless otherwise indicated in the notice, any and all business may be transacted at a special meeting.

Section 2.5 Telephonic Meetings Permitted. Members of the Board of Directors, or any committee designated by the Board, may participate in a meeting of such Board or committee by means of conference telephone or similar communications equipment by means of which all persons participating in the meeting can hear each other, and participation in a meeting pursuant to this bylaw shall constitute presence in person at such meeting.

Section 2.6 Quorum; Vote Required for Action. At all meetings of the Board of Directors a majority of the whole Board shall constitute a quorum for the transaction of business. Except as otherwise provided in these Bylaws, or in the Certificate of Incorporation or required by law, the vote of a majority of the directors present shall be the act of the Board of Directors.

Section 2.7 Organization. Meetings of the Board of Directors shall be presided over by the Chairman of the Board, if any, or in his or her absence by the Vice Chairman of the Board, if any, or in his or her absence by the President, or in their absence by a chairman chosen at the meeting. The Secretary shall, act as secretary of the meeting, but in his or her absence the chairman of the meeting may appoint any person to act as secretary of the meeting.

Section 2.8 Written Action by Directors. Unless otherwise restricted by the Certificate of Incorporation, any action required or permitted to be taken at any meeting of the Board of Directors, or of any committee thereof, may be taken without a meeting if all members of the Board or such committee, as the case may be, consent thereto in writing, and the writing or writings are filed with the minutes of proceedings of the Board or committee.

Section 2.9 Powers. The Board of Directors may, except as otherwise required by law or the Certificate of Incorporation, exercise all such powers and do all such acts and things as may be exercised or done by the Corporation.

Section 2.10 Compensation of Directors. Directors, as such, may receive, pursuant to a resolution of the Board of Directors, fees and other compensation for their services as directors, including without limitation their services as members of committees of the Board of Directors.

## ARTICLE III

## COMMITTEES

Section 3.1 Committees. The Board of Directors may , by resolution passed by a majority of the whole Board, designate one or more committees, each committee to consist of one or more of the directors of the Corporation. The Board may designate one or more directors as alternate members of any committee, who may replace any absent or disqualified member at any meeting of the committee. In the absence or disqualification of a member of the committee, the member or members thereof present at any meeting and not disqualified from voting, whether or not he, she or they constitute a quorum, may unanimously appoint another member of the Board of Directors to act at the meeting in place of any such absent or disqualified member. Any such committee, to the extent provided in the resolution of the Board of Directors, shall



---

have and may exercise all the powers and authority of the Board of Directors in the management of the business and affairs of the Corporation, and may authorize the seal of the Corporation to be affixed to all papers which may require it; but no such committee shall have power or authority in reference to amending the Certificate of Incorporation (except that a committee may, to the extent authorized in the resolution or resolutions providing for the issuance of shares of stock adopted by the Board of Directors as provided in Section 151(a) of the General Corporation Law, fix any of the preferences or rights of such shares, except voting rights of the shares), adopting an agreement of merger or consolidation, recommending to the stockholders the sale, lease or exchange of all or substantially all of the Corporation's property and assets, recommending to the stockholders a dissolution of the Corporation or a revocation of dissolution, or amending these Bylaws; and, unless the resolution expressly so provides, no such committee shall have the power or authority to declare a dividend or to authorize the issuance of stock.

Section 3.2 Committee Rules. Unless the Board of Directors otherwise provides, each committee designated by the Board may make, alter and repeal rules for the conduct of its business. In the absence of such rules each committee shall conduct its business in the same manner as the Board of Directors conducts its business pursuant to Article II of these Bylaws.

## ARTICLE IV

OFFICERS

Section 4.1 Executive Officers; Election; Qualifications; Term of Office; Resignation; Removal; Vacancies. The Board of Directors shall choose a President and Secretary, and it may, if it so determines, choose a Chairman of the Board and a Vice Chairman of the Board from among its members. The Board of Directors may also choose one or more Vice Presidents, one or more Assistant Secretaries, a Treasurer and one or more Assistant Treasurers. Each such officer shall hold office until the first meeting of the Board of Directors after the annual meeting of stockholders next succeeding this election, and until his or her successor is elected and qualified or until his or her earlier resignation or removal Any officer may resign at any time upon written notice to the Corporation. The Board of Directors may remove any officer with or without cause at any time, but such removal shall be without prejudice to the contractual rights of such officer, if any, with the Corporation. Any number of offices may be held by the same person. Any vacancy occurring in any office of the Corporation by death, resignation, removal or otherwise may be filled for the unexpired portion of the term by the Board of Directors at any regular or special meeting.

Section 4.2 Powers and Duties of Executive Officers. The officers of the Corporation shall have such powers and duties in the management of the Corporation as may be prescribed by the Board of Directors and, to the extent not so provided, as generally pertain to their respective offices, subject to the control of the Board of Directors. The Board of Directors may require any officer, agent or employee to give security for the faithful performance of his or her duties.

Section 4.3 Compensation. The salaries of all officers and agents of the Corporation shall be fixed from time to time by the Board of Directors or by a committee appointed or officer designated for such purpose, and no officer shall be prevented from receiving such compensation by reason of the fact that he is also a director of the Corporation.



---

ARTICLE V

STOCK

Section 5.1 Certificates. Every holder of stock shall be entitled to have a certificate signed by or in the name of the Corporation by the Chairman or Vice Chairman of the Board of Directors, if any, or the President or a Vice President, and by the Treasurer or an Assistant Treasurer, or the Secretary or an Assistant Secretary, of the Corporation, certifying the number of shares owned by him or her in the Corporation. Any of or all the signatures on the certificate may be a facsimile. In case any officer, transfer agent, or registrar who has signed or whose facsimile signature has been placed upon a certificate shall have ceased to be such officer, transfer agent, or registrar before such certificate is issued, it may be issued by the Corporation with the same effect as if he or she were such officer, transfer agent, or registrar at the date of issue.

Section 5.2 Lost, Stolen or Destroyed Stock Certificates; Issuance of New Certificates. The Corporation may issue a new certificate of stock in the place of any certificate theretofore issued by it, alleged to have been lost, stolen or destroyed, and the Corporation may require the owner of the lost, stolen or destroyed certificate, or his or her legal representative, to agree to indemnify the Corporation and/or to give the Corporation a bond sufficient to indemnify it against any claim that may be made against it on account of the alleged loss, theft or destruction of any such certificate or the issuance of such new certificate.

Section 5.3 Other Regulations. The issue, transfer, conversion and registration of stock certificates shall be governed by such other regulations as the Board of Directors may establish.

ARTICLE VI

INDEMNIFICATION

Section 6.1 Right to Indemnification. The Corporation shall indemnify and hold harmless, to the fullest extent permitted by applicable law as it presently exists or may hereafter be amended in a manner more favorable to indemnitees, any person (an "Indemnitee") who was or is made or is threatened to be made a party or is otherwise involved in any action, suit or proceeding, whether civil, criminal, administrative or investigative (a "proceeding"), by reason of the fact that he, she, or a person for whom he or she is the legal representative, is or was a director or officer of the Corporation or, while a director or officer of the Corporation, is or was serving at the request of the Corporation as a director, officer, employee or agent of another corporation or of a partnership, joint venture, trust, enterprise or nonprofit entity, including service with respect to employee benefit plans, against all liability and loss suffered and expenses (including attorneys' fees) reasonably incurred by such Indemnitee. Notwithstanding the preceding sentence, except as otherwise provided in Section 6.3, the Corporation shall be required to indemnify an Indemnitee in connection with a proceeding (or part thereof) commenced by such Indemnitee only if the commencement of such proceeding (or part thereof) by the Indemnitee was authorized by the Board of Directors of the Corporation.



---

Section 6.2 Prepayment of Expenses. The Corporation shall pay the expenses (including attorneys' fees) incurred by an Indemnitee in defending any

proceeding in advance of its final disposition, provided, however, that, to the extent required by law, such payment of expenses in advance of the final disposition of the proceeding shall be made only upon receipt of an undertaking by the Indemnitee to repay all amounts advanced if it should ultimately be determined that the Indemnitee is not entitled to be indemnified under this Article VI or otherwise; and provided, further, that the Corporation shall not be required to advance any expenses to a person against whom the Corporation directly brings a claim, in a proceeding, alleging that such person has breached his or her duty of loyalty to the Corporation, committed an act or omission not in good faith or that involves intentional misconduct or a knowing violation of law, or derived an improper personal benefit from a transaction.

Section 6.3 Claims. If a claim for indemnification or payment of expenses under this Article VI is not paid in full within sixty (60) days after a written claim therefor by the Indemnitee has been received by the Corporation, the Indemnitee may file suit to recover the unpaid amount of such claim and, if successful in whole or in part, shall be entitled to be paid the expense of prosecuting such claim. In any such action the Corporation shall have the burden of proving that the Indemnitee is not entitled to the requested indemnification or payment of expenses under applicable law.

Section 6.4 Nonexclusivity of Rights. The rights conferred on any Indemnitee by this Article VI shall not be exclusive of any other rights which such Indemnitee may have or hereafter acquire under any statute, provision of the Certificate of Incorporation, these Bylaws, agreement, vote of stockholders or disinterested directors or otherwise. Additionally, nothing in this Article VI shall limit the ability of the Corporation, in its discretion, to indemnify or advance expenses to persons whom the Corporation is not obligated to indemnify or advance expenses pursuant to this Article VI.

Section 6.5 Other Sources. The Corporation's obligation, if any, to indemnify or to advance expenses to any Indemnitee who was or is serving at its request as a director, officer, employee or agent of another corporation, partnership, joint venture, trust, enterprise or nonprofit entity shall be reduced by any amount such Indemnitee may collect as indemnification or advancement of expenses from such other corporation, partnership, joint venture, trust, enterprise or nonprofit enterprise.

Section 6.6 Amendment or Repeal. Any repeal or modification of the foregoing provisions of this Article VI shall not adversely affect any right or protection hereunder of any Indemnitee in respect of any act or omission occurring prior to the time of such repeal or modification.

Section 6.7 Other Indemnification and Prepayment of Expenses. This Article VI shall not limit the right of the Corporation, to the extent and in the manner permitted by law, to indemnify and to advance expenses to persons other than Indemnitees when and as authorized by appropriate corporate action.

Section 6.8 Indemnification Contracts. The Board of Directors is authorized to cause the Corporation to enter into indemnification contracts with any director, officer, employee or

8

---

agent of the Corporation, or any person serving at the request of the Corporation as a director, officer, employee or agent of another corporation, partnership, joint venture, trust or other enterprise, including employee benefit plans, providing indemnification rights to such person. Such rights may be greater than those provided in this Article VI.

Section 6.9 Effect of Amendment. Any amendment, repeal or modification of any provision of this Article VI shall be prospective only, and shall not adversely affect any right or protection conferred on a person pursuant to this Article VI and existing at the time of such amendment, repeal or modification.

Section 6.10 Insurance. The Corporation may purchase and maintain insurance on behalf of any person who is or was or has agreed to become a director, officer, employee or agent of the Corporation, or is or was serving at the request of the Corporation as a director, officer, employee or agent of another corporation, partnership, joint venture, trust or other enterprise against any liability asserted against him or her and incurred by him or her or on his or her behalf in any such capacity, or arising out of his or her status as such , whether or not the Corporation would have the power to indemnify him or her against such liability under the provisions of this Article VI.

Section 6.11 Savings Clause. If this Article VI or any portion hereof shall be invalidated on any ground by any court of competent jurisdiction, then the Corporation shall nevertheless indemnify each director and officer of the Corporation as to costs, charges and expenses (including attorneys' fees), judgments, fines and amounts paid in settlement with respect to any action, suit or proceeding, whether civil, criminal, administrative or investigative, including an action by or in the right of the Corporation, to the full extent permitted by any applicable portion of this Article VI that shall not have been invalidated and to the full extent permitted by applicable law.

ARTICLE VII

MISCELLANEOUS

Section 7.1 Fiscal Year. The fiscal year of the Corporation shall be determined by resolution of the Board of Directors.

Section 7.2 Seal. The corporate seal, if any, shall have the name of the Corporation inscribed thereon and shall be in such form as may be approved from time to time by the Board of Directors.

Section 7.3 Waiver of Notice of Meetings of Stockholders, Directors and Committees. Any written waiver of notice, signed by the person entitled to notice,

whether before or after the time stated therein, shall be deemed equivalent to notice. Attendance of a person at a meeting shall constitute a waiver of notice of such meeting, except when the person attends a meeting for the express purpose of objecting, at the beginning of the meeting, to the transaction of any business because the meeting is not lawfully called or convened. Neither the business to be transacted at, nor the purpose of any regular or special meeting of the stockholders, directors, or members of a committee of directors need be specified in any written waiver of notice.



---

Section 7.4 Interested Directors; Quorum. No contract or transaction between the Corporation and one or more of its directors or officers, or between the Corporation and any other corporation, partnership, association, or other organization in which one or more of its directors or officers are directors or officers, or have a financial interest, shall be void or voidable solely for this reason, or solely because the director or officer is present at or participates in the meeting of the Board or committee thereof which authorizes the contract or transaction, or solely because his or her or their votes are counted for such purpose, if: (1) the material facts as to his or her relationship or interest and as to the contract or transaction are disclosed or are known to the Board of Directors or the committee, and the Board or committee in good faith authorizes the contract or transaction by the affirmative votes of majority of the disinterested directors, even though the disinterested directors be less than a quorum; or (2) the material facts as to his or her relationship or interest and as to the contract or transaction are disclosed or are known to the stockholders entitled to vote thereon, and the contract or transaction is specifically approved in good faith by vote of the stockholders; or (3) the contract or transaction is fair as to the Corporation as of the time it is authorized, approved or ratified by the Board of Directors, a committee thereof, or the stockholders. Common or interested directors may be counted in determining the presence of a quorum at a meeting of the Board of Directors or of a committee which authorizes the contract or transaction.

Section 7.5 Form of Records. Any records maintained by the Corporation in the regular course of its business, including its stock ledger, books of account, and minute books, may be kept on, or be in the form of any information storage device, provided that the records so kept can be converted into clearly legible form within a reasonable time. The Corporation shall so convert any records so kept upon the request of any person entitled to inspect the same.

Section 7.6 Reliance Upon Books and Records. A member of the Board of Directors, or a member of any committee designated by the Board of Directors shall, in the performance of his or her duties, be fully protected in relying in good faith upon records of the Corporation and upon such information, opinions, reports or statements presented to the Corporation by any of the Corporation's officers or employees, or committees of the Board of Directors, or by any other person as to matters the member reasonably believes are within such other person's professional or expert competence and who has been selected with reasonable care by or on behalf of the Corporation.

Section 7.7 Certification of Incorporation Governs. In the event of any conflict between the provisions of the Corporation's Certificate of Incorporation and these Bylaws, the provisions of the Certificate of Incorporation shall govern.

Section 7.8 Severability. If any provision of these Bylaws shall be held to be invalid, illegal, unenforceable or in conflict with the provisions of the Corporation's Certificate of Incorporation, then such provision shall nonetheless be enforced to the maximum extent possible consistent with such holding and the remaining provisions of these Bylaws (including without limitation, all portions of any Section of these Bylaws containing any such provision held to be invalid, illegal, unenforceable or in conflict with the Certificate of Incorporation, that are not themselves invalid, illegal, unenforceable or in conflict with the Certificate of Incorporation) shall remain in full force and effect.



---

Section 7.9 Amendments. Stockholders of the Corporation holding a majority of the Corporation's outstanding voting stock shall have power to adopt, amend or repeal Bylaws. To the extent provided in the Corporation's Certificate of Incorporation, the Board of Directors of the Corporation shall also have the power to adopt, amend or repeal Bylaws of the Corporation, except insofar as Bylaws adopted by the stockholders shall otherwise provide.



---

**CERTIFICATION OF BYLAWS**

**OF**

**CONTROL4 CORPORATION**

KNOW ALL BY THESE PRESENTS:

I, William B. West, certify that I am the President of Control4 Corporation, a Delaware corporation (the "Company"), that I am duly authorized to make and deliver this certification, that the attached Bylaws are a true and correct copy of the Bylaws of the Company in effect as of the date of this certificate.

Dated: March 27, 2003.

/s/ William B. West

William B. West, President

---

**CERTIFICATE OF AMENDMENT TO THE**

**BYLAWS OF**

**CONTROL4 CORPORATION**

I, William B. West, certify that I am the Chief Executive Officer and President of Control4 Corporation, a corporation organized and existing under the laws of the State of Delaware (the "Company"), and do hereby further certify that:

1. Article I, Section 1.2 of the Bylaws of the Company shall be amended and restated in its entirety to read as follows:

"Section 1.2 Special Meetings. Special meetings of stockholders for any purpose or purposes may be called at any time by the Board of Directors, the Chairman of the Board, the President or by one or more stockholders holding shares in the aggregate entitled to cast not less than ten percent of the votes at that meeting. If a special meeting is called by any person or persons other than the Board of Directors, the President or the Chairman of the Board, the request shall be in writing, specifying the time of such meeting and the general nature of the business proposed to be transacted, and shall be delivered personally or sent by registered mail or by telegraphic or other facsimile transmission to the Chairman of the Board, the President, any Vice President, or the Secretary of the Corporation. No business may be transacted at such special meeting otherwise than specified in such notice. The officer receiving the request shall cause notice to be promptly given to the stockholders entitled to vote, in accordance with the provisions of Section 1.3 of this Article I, that a meeting will be held at the time requested by the person or persons calling the meeting, not less than ten (10) nor more than sixty (60) days before the date of the special meeting. If the notice is not given within twenty (20) days after the receipt of the request, the person or persons requesting the meeting may give the notice. Nothing contained in this Section 1.2 shall be construed as limiting, fixing, or affecting the time when a meeting of stockholders called by action of the Board of Directors may be held."

2. Article I, Section 1.11 of the Bylaws of the Company shall be amended and restated in its entirety to read as follows:

"Section 1.11 Action by Written Consent of Stockholders.

Unless otherwise restricted by the Certificate of Incorporation or these Bylaws, any action required or permitted to be taken at any annual or special meeting of the stockholders may be taken without a meeting, without prior notice and without a vote, if a consent in writing, setting forth the action so taken, shall be delivered by the holders of outstanding stock having not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting at which all shares entitled to vote thereon were present and voted.

A telegram, cablegram or other electronic transmission consenting to an action to be taken and transmitted by a stockholder or proxyholder, or by a person or persons



---

authorized to act for a stockholder or proxyholder, shall be deemed to be written, signed and dated for the purposes of this section, provided that any such telegram, cablegram or other electronic transmission sets forth or is delivered with information from which the Corporation can determine (i) that the telegram, cablegram or other electronic transmission was transmitted by the stockholder or proxyholder or by a person or persons authorized to act for the stockholder or proxyholder and (ii) the date on which such stockholder or proxyholder or authorized person or persons transmitted such telegram, cablegram or electronic transmission. The date on which such telegram, cablegram or electronic transmission is transmitted shall be deemed to be the date on which such consent was signed. No consent given by a telegram, cablegram or other electronic transmission shall be deemed to have been delivered until such consent is reproduced in paper form and until such paper form shall be delivered to the Corporation by delivery to its registered office in Delaware, its principal place of business or an officer or agent of the Corporation having custody of the book in which proceedings of meetings of stockholders are recorded. Any copy, facsimile or other reliable reproduction of a consent in writing may be substituted or used in lieu of the original writing for any and all purposes for which the original writing could be used, provided that such copy, facsimile or other reproduction shall be a complete reproduction of the entire original writing.

Prompt notice of the taking of the corporate action without a meeting by less than unanimous written consent shall be given to those stockholders who have not consented in writing."

3. Article II, Section 2.1 of the Bylaws of the Company shall be amended and restated in its entirety to read as follows:

"Section 2.1 Number; Qualifications. The Board of Directors shall consist of one or more members, the number thereof to be determined from time to time by resolution of the Board of Directors. The number of directors shall be five (5), and thereafter shall be fixed from time to time by resolution of the Board of Directors. Directors need not be stockholders."

4. Article II, Section 2.2 of the Bylaws of the Company shall be amended and restated in its entirety to read as follows:

"Section 2.2 Election; Resignation; Removal; Vacancies. The Board of Directors shall initially consist of the persons elected as such by the incorporator or named in the Corporation's Certificate of Incorporation. At the first annual meeting of stockholders and at each annual meeting thereafter, the stockholders shall elect Directors to replace those Directors who have resigned or been removed, or if applicable, whose terms have expired. Any Director may resign at any time upon written notice given in writing or by electronic transmission to the Corporation, and, subject to the Corporation's Certificate of Incorporation or these Bylaws, any Director or the entire Board of Directors may be removed, with or without cause, by the holders of a majority of the shares entitled to vote at the election of such Director or Directors. Unless otherwise provided in the Corporation's Certificate of Incorporation or these Bylaws:



(i) Vacancies and newly created directorships resulting from any increase in the authorized number of directors elected by all of the stockholders having the right to vote as a single class may be filled by the affirmative vote of a majority of the directors then in office, although such majority is less than a quorum, or by a sole director.

(ii) Whenever the holders of any class or classes of stock or series thereof are entitled to elect one or more directors by the provisions of the Corporation's Certificate of Incorporation, vacancies and newly created directorships of such class or classes or series may be filled by a majority of the directors elected by such class or classes or series thereof then in office, or by a sole remaining director so elected.

Each Director so elected shall hold office until the expiration of the term of office, if any, of the Director whom he or she has replaced."

5. Article II, Section 2.4 of the Bylaws of the Company shall be amended and restated in its entirety to read as follows:

"Section 2.4 Special Meetings. Special meetings of the Board of Directors may be called by the Chairman of the Board, the President or a majority of the members of the Board of Directors then in office, any Vice President, the Secretary or any two members of the Board of Directors then in office, and may be held at any time, date or place, within or without the State of Delaware, as the person or persons calling the meeting shall fix. Notice of the time, date and place of such meeting shall be given, orally or in writing, by the person or persons calling the meeting to all directors at least four (4) days before the meeting if the notice is mailed, or at least twenty-four (24) hours before the meeting if such notice is given by telephone, hand delivery, telegram, telex, mailgram, facsimile or similar communication method. Unless otherwise indicated in the notice, any and all business may be transacted at a special meeting."

6. Article II, Section 2.7 of the Bylaws of the Company shall be amended and restated in its entirety to read as follows:

"Section 2.7 Organization. Meetings of the Board of Directors shall be presided over by the Chairman of the Board, if any, or in his or her absence by the Vice Chairman of the Board, if any, or in his or her absence by the President, or in their absence by a chairman chosen at the meeting. The Secretary shall act as secretary of the meeting, but in his or her absence the chairman of the meeting may appoint any person to act as secretary of the meeting, and such secretary shall prepare minutes of such meeting, which shall be filed and maintained in the minute books of the Corporation."

7. Article II, Section 2.8 of the Bylaws of the Company shall be amended and restated in its entirety to read as follows:

"Section 2.8 Written Action by Directors. Unless otherwise restricted by the Certificate of Incorporation or these Bylaws, any action required or permitted to be taken at any meeting of the Board of Directors, or of any committee thereof, may be taken without a meeting if all members of the Board or such committee, as the case may be, consent thereto in writing or by electronic transmission, and the writing or writings or electronic



transmission or transmissions are filed with the minutes of proceedings of the Board or committee. Such filing shall be in paper form if the minutes are maintained in paper form and shall be in electronic form if the minutes are maintained in electronic form.

8. Article III, Section 3.2 of the Bylaws of the Company shall be amended and restated in its entirety to read as follows:

"Section 3.2 Committee Rules. Unless the Board of Directors otherwise provides, each committee designated by the Board may make, alter and repeal rules for the conduct of its business. In the absence of such rules each committee shall conduct its business in the same manner as the Board of Directors conducts its business pursuant to Article II of these Bylaws. Each committee shall maintain minutes of its meetings, which shall be filed in the minute books of the Corporation, and which shall be reported to the Board of Directors upon request."

9. Article IV, Section 4.1 of the Bylaws of the Company shall be amended and restated in its entirety to read as follows:

"Section 4.1 Executive Officer; Election; Qualifications; Term of Office; Resignation; Removal; Vacancies. The Board of Directors shall choose a President and Secretary, and it may, if it so determines, choose a Chairman of the Board and a Vice Chairman of the Board from among its members. The Board of Directors may also choose one or more Vice Presidents, one or more Assistant Secretaries, a Treasurer and one or more Assistant Treasurers. Each such officer shall hold office until his or her successor is elected and qualified, or until his or her earlier resignation or removal. Any officer may resign at any time upon written notice to the Corporation. The Board of Directors may remove any officer with or without cause at any time, but such removal shall be without prejudice to the contractual rights of such officer, if any, with the Corporation. Any number of offices may be held by the same person. Any vacancy occurring in any office of the Corporation by death, resignation, removal or otherwise may be filled for the unexpired portion of the term by the Board of Directors at any regular or special meeting."

10. Article VI, Section 6.3 of the Bylaws of the Company shall be amended and restated in its entirety to read as follows:

"Section 6.3 Claims. If a claim for indemnification or payment of expenses under this Article VI is not paid in full within twenty (20) days after a written claim therefor by the Indemnitee has been received by the Corporation, the Indemnitee may file suit to recover the unpaid amount of such claim and, if successful in whole or in part, shall be entitled to be paid the expense of prosecuting such claim. In any such action the Corporation shall have the burden of proving that the Indemnitee is not entitled to the requested indemnification or payment of expenses under applicable law."

11. Article VII, Section 7.9 of the Bylaws of the Company shall be amended and restated in its entirety to read as follows:

"Section 7.9 Amendments. Stockholders of the Corporation holding a majority, or such higher percentage as may be required by the Corporation's Certificate of Incorporation,



---

of the Corporation's outstanding voting stock shall have power to adopt, amend or repeal Bylaws. To the extent provided in the Corporation's Certificate of Incorporation, the Board of Directors of the Corporation shall also have the power to adopt, amend or repeal Bylaws of the Corporation, except insofar as Bylaws adopted by the stockholders shall otherwise provide."

12. This Certificate of Amendment of the Company's Bylaws has been duly adopted by the Company's Board of Directors in accordance with Section 109 of the General Corporation Law of Delaware.

**[Signature Page to Follow]**



---

Dated: July 29, 2003

CONTROL4 CORPORATION

By: /s/ William B. West

William B. West,
Chief Executive Officer and President

**Signature Page to**
**Certificate of Amendment to the Bylaws**

---

Certificate of Amendment to the Bylaws of
Control4 Corporation

I, William B. West, certify that I am the Chief Executive Officer and President of Control4 Corporation, a corporation organized and existing under the laws of the

State of Delaware (the "Company"), and do hereby further certify that:

1. Article II, Section 2.1 of the Bylaws of the Company shall be amended and restated in its entirety to read as follows:

"Section 2.1 Number; Qualifications. The Board of Directors shall consist of one or more members, the number thereof to be determined from time to time by resolution of the Board of Directors. The number of directors shall be seven (7), and thereafter shall be fixed from time to time by resolution of the Board of Directors. Directors need not be stockholders."

Dated: June 16, 2004

CONTROL4 CORPORATION

By: /s/ William B. West

William B. West,

President and Chief Executive Officer

---

**Certificate of Amendment to the Bylaws of**
**Control4 Corporation**

I, Dan Strong, certify that I am the Chief Financial Officer and Secretary of Control4 Corporation, a corporation organized and existing under the laws of the State of Delaware (the "Company"), and do hereby further certify that:

1. Article II, Section 2.1 of the Bylaws of the Company shall be amended and restated in its entirety to read as follows:

"Section 2.1 Number; Qualifications. The Board of Directors shall consist of one or more members, the number thereof to be determined from time to time by resolution of the Board of Directors. The number of directors shall be nine (9), and thereafter shall be fixed from time to time by resolution of the Board of Directors. Directors need not be stockholders."

Dated: September 29, 2011

CONTROL4 CORPORATION

By: /s/ Dan Strong

Dan Strong,

CFO and Secretary

---

**Exhibit 3.4**

**AMENDED AND RESTATED**

**BY-LAWS**

**OF**

**CONTROL4 CORPORATION**

(the "Corporation")

ARTICLE I

Stockholders

SECTION 1. Annual Meeting. The annual meeting of stockholders of the Corporation (any such meeting being referred to in these By-laws as an "Annual Meeting") shall be held at the hour, date and place within or without the United States which is fixed by the Board of Directors, which time, date and place may subsequently be changed at any time by vote of the Board of Directors. If no Annual Meeting has been held for a period of thirteen (13) months after the Corporation's last Annual Meeting, a special meeting in lieu thereof may be held, and such special meeting shall have, for the purposes of these By-laws or otherwise, all the force and effect of an Annual Meeting. Any and all references hereafter in these By-laws to an Annual Meeting or Annual Meetings shall be deemed to also refer to any special meeting(s) in lieu thereof.

SECTION 2. Notice of Stockholder Business and Nominations.

(a) Annual Meetings of Stockholders.

(1) Nominations of persons for election to the Board of Directors of the Corporation and the proposal of other business to be considered by the stockholders may be brought before an Annual Meeting (i) by or at the direction of the Board of Directors or (ii) by any stockholder of the Corporation who was a stockholder of record at the time of giving of notice provided for in this By-law, who is entitled to vote at the meeting, who is present (in person or by proxy) at the meeting and who complies with the notice procedures set forth in this By-law as to such nomination or business. For the avoidance of doubt, the foregoing clause (ii) shall be the exclusive means for a stockholder to bring nominations or business properly before an Annual Meeting (other than matters properly brought under Rule 14a-8 or Rule 14a-11 (or any successor rules) under the Securities Exchange Act of 1934, as amended (the "Exchange Act")), and such stockholder must comply with the notice and other procedures set forth in Article I, Section 2(a)(2) and (3) of this By-law to bring such nominations or business properly before an Annual Meeting. In addition to the other requirements set forth in this By-law, for any proposal of business to be considered at an Annual Meeting, it must be a proper subject for action by stockholders of the Corporation under Delaware law.

---

(2) For nominations or other business to be properly brought before an Annual Meeting by a stockholder pursuant to clause (ii) of Article I, Section 2(a)(1) of this By-law, the stockholder must (i) have given Timely Notice (as defined below) thereof in writing to the Secretary of the Corporation, (ii) have provided any updates or supplements to such notice at the times and in the forms required by this By-law and (iii) together with the beneficial owner(s), if any, on whose behalf the nomination or business proposal is made, have acted in accordance with the representations set forth in the Solicitation Statement (as defined below) required by this By-law. To be timely, a stockholder's written notice shall be received by the Secretary at the principal executive offices of the Corporation not later than the close of business on the ninetieth (90th) day nor earlier than the close of business on the one hundred twentieth (120th) day prior to the one-year anniversary of the preceding year's Annual Meeting; provided, however, that in the event the Annual Meeting is first convened more than thirty (30) days before or more than sixty (60) days after such anniversary date, or if no Annual Meeting were held in the preceding year, notice by the stockholder to be timely must be received by the Secretary of the Corporation not later than the close of business on the later of the ninetieth (90th) day prior to the scheduled date of such Annual Meeting or the tenth (10th) day following the day on which public announcement of the date of such meeting is first made (such notice within such time periods shall be referred to as "Timely Notice"). Notwithstanding anything to the contrary provided herein, for the first Annual Meeting following the initial public offering of common stock of the Corporation, a stockholder's notice shall be timely if received by the Secretary at the principal executive offices of the Corporation not later than the close of business on the later of the ninetieth (90th) day prior to the scheduled date of such Annual Meeting or the tenth (10th) day following the day on which public announcement of the date of such Annual Meeting is first made or sent by the Corporation. Such stockholder's Timely Notice shall set forth:

(A) as to each person whom the stockholder proposes to nominate for election or reelection as a director, all information relating to such person that is required to be disclosed in solicitations of proxies for election of directors in an election contest, or is otherwise required, in each case pursuant to Regulation 14A under the Exchange Act (including such person's written consent to being named in the proxy statement as a nominee and to serving as a director if elected);

(B) as to any other business that the stockholder proposes to bring before the meeting, a brief description of the business desired to be brought before the meeting, the reasons for conducting such business at the meeting, and any material interest in such business of each Proposing Person (as defined below);

(C) (i) the name and address of the stockholder giving the notice, as they appear on the Corporation's books, and the names and addresses of the other Proposing Persons (if any) and (ii) as to each Proposing Person, the following information: (a) the class or series and number of all shares of capital stock of the Corporation which are, directly or indirectly, owned beneficially or of record by such Proposing Person or any of its affiliates or associates (as such terms are defined in Rule 12b-2 promulgated under the Exchange Act), including any shares of any class or series of capital stock of the Corporation as to which such



---

Proposing Person or any of its affiliates or associates has a right to acquire beneficial ownership at any time in the future; (b) all Synthetic Equity Interests (as defined below) in which such Proposing Person or any of its affiliates or associates, directly or indirectly, holds an interest including a description of the material terms of each such Synthetic Equity Interest, including without limitation, identification of the counterparty to each such

Synthetic Equity Interest and disclosure, for each such Synthetic Equity Interest, as to (x) whether or not such Synthetic Equity Interest conveys any voting rights, directly or indirectly, in such shares to such Proposing Person, (y) whether or not such Synthetic Equity Interest is required to be, or is capable of being, settled through delivery of such shares and (z) whether or not such Proposing Person and/or, to the extent known, the counterparty to such Synthetic Equity Interest has entered into other transactions that hedge or mitigate the economic effect of such Synthetic Equity Interest; (c) any proxy (other than a revocable proxy given in response to a public proxy solicitation made pursuant to, and in accordance with, the Exchange Act), agreement, arrangement, understanding or relationship pursuant to which such Proposing Person has or shares a right to, directly or indirectly, vote any shares of any class or series of capital stock of the Corporation; (d) any rights to dividends or other distributions on the shares of any class or series of capital stock of the Corporation, directly or indirectly, owned beneficially by such Proposing Person that are separated or separable from the underlying shares of the Corporation; and (e) any performance-related fees (other than an asset based fee) that such Proposing Person, directly or indirectly, is entitled to based on any increase or decrease in the value of shares of any class or series of capital stock of the Corporation or any Synthetic Equity Interests (the disclosures to be made pursuant to the foregoing clauses (a) through (e) are referred to, collectively, as "Material Ownership Interests") and (iii) a description of the material terms of all agreements, arrangements or understandings (whether or not in writing) entered into by any Proposing Person or any of its affiliates or associates with any other person for the purpose of acquiring, holding, disposing or voting of any shares of any class or series of capital stock of the Corporation;

(D) (i) a description of all agreements, arrangements or understandings by and among any of the Proposing Persons, or by and among any Proposing Persons and any other person (including with any proposed nominee(s)), pertaining to the nomination(s) or other business proposed to be brought before the meeting of stockholders (which description shall identify the name of each other person who is party to such an agreement, arrangement or understanding), and (ii) identification of the names and addresses of other stockholders (including beneficial owners) known by any of the Proposing Persons to support such nominations or other business proposal(s), and to the extent known the class and number of all shares of the Corporation's capital stock owned beneficially or of record by such other stockholder(s) or other beneficial owner(s); and

(E) a statement whether or not the stockholder giving the notice and/or the other Proposing Person(s), if any, will deliver a proxy statement and form of proxy to holders of, in the case of a business proposal, at least the percentage of



voting power of all of the shares of capital stock of the Corporation required under applicable law to approve the proposal or, in the case of a nomination or nominations, at least the percentage of voting power of all of the shares of capital stock of the Corporation reasonably believed by such Proposing Person to be sufficient to elect the nominee or nominees proposed to be nominated by such stockholder (such statement, the "Solicitation Statement").

For purposes of this Article I of these By-laws, the term "Proposing Person" shall mean the following persons: (i) the stockholder of record providing the notice of nominations or business proposed to be brought before a stockholders' meeting, and (ii) the beneficial owner(s), if different, on whose behalf the nominations or business proposed to be brought before a stockholders' meeting is made. For purposes of this Section 2 of Article I of these By-laws, the term "Synthetic Equity Interest" shall mean any transaction, agreement or arrangement (or series of transactions, agreements or arrangements), including, without limitation, any derivative, swap, hedge, repurchase or so-called "stock borrowing" agreement or arrangement, the purpose or effect of which is to, directly or indirectly: (a) give a person or entity economic benefit and/or risk similar to ownership of shares of any class or series of capital stock of the Corporation, in whole or in part, including due to the fact that such transaction, agreement or arrangement provides, directly or indirectly, the opportunity to profit or avoid a loss from any increase or decrease in the value of any shares of any class or series of capital stock of the Corporation, (b) mitigate loss to, reduce the economic risk of or manage the risk of share price changes for, any person or entity with respect to any shares of any class or series of capital stock of the Corporation, (c) otherwise provide in any manner the opportunity to profit or avoid a loss from any decrease in the value of any shares of any class or series of capital stock of the Corporation, or (d) increase or decrease the voting power of any person or entity with respect to any shares of any class or series of capital stock of the Corporation.

(3) A stockholder providing Timely Notice of nominations or business proposed to be brought before an Annual Meeting shall further update and supplement such notice, if necessary, so that the information (including, without limitation, the Material Ownership Interests information) provided or required to be provided in such notice pursuant to this By-law shall be true and correct as of the record date for the meeting and as of the date that is ten (10) business days prior to such Annual Meeting, and such update and supplement shall be received by the Secretary at the principal executive offices of the Corporation not later than the close of business on the fifth (5th) business day after the record date for the Annual Meeting (in the case of the update and supplement required to be made as of the record date), and not later than the close of business on the eighth (8th) business day prior to the date of the Annual Meeting (in the case of the update and supplement required to be made as of ten (10) business days prior to the meeting).

(4) Notwithstanding anything in the second sentence of Article I, Section 2(a)(2) of this By-law to the contrary, in the event that the number of directors to be elected to the Board of Directors of the Corporation is increased and there is no public announcement naming all of the nominees for director or specifying the size of the



increased Board of Directors made by the Corporation at least ten (10) days before the last day a stockholder may deliver a notice of nomination in accordance

with the second sentence of Article I, Section 2(a)(2), a stockholder's notice required by this By-law shall also be considered timely, but only with respect to nominees for any new positions created by such increase, if it shall be received by the Secretary of the Corporation not later than the close of business on the tenth (10th) day following the day on which such public announcement is first made by the Corporation.

(b) General.

(1) Only such persons who are nominated in accordance with the provisions of this By-law or in accordance with Rule 14a-11 under the Exchange Act shall be eligible for election and to serve as directors and only such business shall be conducted at an Annual Meeting as shall have been brought before the meeting in accordance with the provisions of this By-law or in accordance with Rule 14a-8 under the Exchange Act. The Board of Directors or a designated committee thereof shall have the power to determine whether a nomination or any business proposed to be brought before the meeting was made in accordance with the provisions of this By-law. If neither the Board of Directors nor such designated committee makes a determination as to whether any stockholder proposal or nomination was made in accordance with the provisions of this By-law, the presiding officer of the Annual Meeting shall have the power and duty to determine whether the stockholder proposal or nomination was made in accordance with the provisions of this By-law. If the Board of Directors or a designated committee thereof or the presiding officer, as applicable, determines that any stockholder proposal or nomination was not made in accordance with the provisions of this By-law, such proposal or nomination shall be disregarded and shall not be presented for action at the Annual Meeting.

(2) Except as otherwise required by law, nothing in this Article I, Section 2 shall obligate the Corporation or the Board of Directors to include in any proxy statement or other stockholder communication distributed on behalf of the Corporation or the Board of Directors information with respect to any nominee for director or any other matter of business submitted by a stockholder.

(3) Notwithstanding the foregoing provisions of this Article I, Section 2, if the nominating or proposing stockholder (or a qualified representative of the stockholder) does not appear at the Annual Meeting to present a nomination or any business, such nomination or business shall be disregarded, notwithstanding that proxies in respect of such vote may have been received by the Corporation. For purposes of this Article I, Section 2, to be considered a qualified representative of the proposing stockholder, a person must be authorized by a written instrument executed by such stockholder or an electronic transmission delivered by such stockholder to act for such stockholder as proxy at the meeting of stockholders and such person must produce such written instrument or electronic transmission, or a reliable reproduction of the written instrument or electronic transmission, to the presiding officer at the meeting of stockholders.



---

(4) For purposes of this By-law, "public announcement" shall mean disclosure in a press release reported by the Dow Jones News Service, Associated Press or comparable national news service or in a document publicly filed by the Corporation with the Securities and Exchange Commission pursuant to Section 13, 14 or 15(d) of the Exchange Act.

(5) Notwithstanding the foregoing provisions of this By-law, a stockholder shall also comply with all applicable requirements of the Exchange Act and the rules and regulations thereunder with respect to the matters set forth in this By-law. Nothing in this By-law shall be deemed to affect any rights of (i) stockholders to have nominations or proposals included in the Corporation's proxy statement pursuant to Rule 14a-8 or Rule 14a-11 (or any successor rules), as applicable, under the Exchange Act and, to the extent required by such rule, have such nominations or proposals considered and voted on at an Annual Meeting or (ii) the holders of any series of Undesignated Preferred Stock to elect directors under specified circumstances.

SECTION 3. Special Meetings. Except as otherwise required by statute and subject to the rights, if any, of the holders of any series of Undesignated Preferred Stock, special meetings of the stockholders of the Corporation may be called only by the Board of Directors acting pursuant to a resolution approved by the affirmative vote of a majority of the Directors then in office. The Board of Directors may postpone or reschedule any previously scheduled special meeting of stockholders. Only those matters set forth in the notice of the special meeting may be considered or acted upon at a special meeting of stockholders of the Corporation. Nominations of persons for election to the Board of Directors of the Corporation and stockholder proposals of other business shall not be brought before a special meeting of stockholders to be considered by the stockholders unless such special meeting is held in lieu of an annual meeting of stockholders in accordance with Article I, Section 1 of these By-laws, in which case such special meeting in lieu thereof shall be deemed an Annual Meeting for purposes of these By-laws and the provisions of Article I, Section 2 of these By-laws shall govern such special meeting.

SECTION 4. Notice of Meetings; Adjournments.

(a) A notice of each Annual Meeting stating the hour, date and place, if any, of such Annual Meeting and the means of remote communication, if any, by which stockholders and proxyholders may be deemed to be present in person and vote at such meeting, shall be given not less than ten (10) days nor more than sixty (60) days before the Annual Meeting, to each stockholder entitled to vote thereat by delivering such notice to such stockholder or by mailing it, postage prepaid, addressed to such stockholder at the address of such stockholder as it appears on the Corporation's stock transfer books. Without limiting the manner by which notice may otherwise be given to stockholders, any notice to stockholders may be given by electronic transmission in the manner provided in Section 232 of the Delaware General Corporation Law ("DGCL").

(b) Notice of all special meetings of stockholders shall be given in the same manner as provided for Annual Meetings, except that the notice of all special meetings shall state the purpose or purposes for which the meeting has been called.

(c) Notice of an Annual Meeting or special meeting of stockholders need not be given to a stockholder if a waiver of notice is executed, or waiver of notice by electronic transmission is provided, before or after such meeting by such stockholder or if such stockholder attends such meeting, unless such attendance is for the express purpose of objecting at the beginning of the meeting to the transaction of any business because the meeting was not lawfully called or convened.

(d) The Board of Directors may postpone and reschedule any previously scheduled Annual Meeting or special meeting of stockholders and any record date with respect thereto, regardless of whether any notice or public disclosure with respect to any such meeting has been sent or made pursuant to Section 2 of this Article I of these By-laws or otherwise. In no event shall the public announcement of an adjournment, postponement or rescheduling of any previously scheduled meeting of stockholders commence a new time period for the giving of a stockholder's notice under this Article I of these By-laws.

(e) When any meeting is convened, the presiding officer may adjourn the meeting if (i) no quorum is present for the transaction of business, (ii) the Board of Directors determines that adjournment is necessary or appropriate to enable the stockholders to consider fully information which the Board of Directors determines has not been made sufficiently or timely available to stockholders, or (iii) the Board of Directors determines that adjournment is otherwise in the best interests of the Corporation. When any Annual Meeting or special meeting of stockholders is adjourned to another hour, date or place, notice need not be given of the adjourned meeting other than an announcement at the meeting at which the adjournment is taken of the hour, date and place, if any, to which the meeting is adjourned and the means of remote communications, if any, by which stockholders and proxyholders may be deemed to be present in person and vote at such adjourned meeting; provided, however, that if the adjournment is for more than thirty (30) days from the meeting date, or if after the adjournment a new record date is fixed for the adjourned meeting, notice of the adjourned meeting and the means of remote communications, if any, by which stockholders and proxyholders may be deemed to be present in person and vote at such adjourned meeting shall be given to each stockholder of record entitled to vote thereat and each stockholder who, by law or under the Certificate of Incorporation of the Corporation (as the same may hereafter be amended and/or restated, the "Certificate") or these By-laws, is entitled to such notice.

SECTION 5. Quorum. A majority of the shares entitled to vote, present in person or represented by proxy, shall constitute a quorum at any meeting of stockholders. If less than a quorum is present at a meeting, the holders of voting stock representing a majority of the voting power present at the meeting or the presiding officer may adjourn the meeting from time to time, and the meeting may be held as adjourned without further notice, except as provided in Section 4 of this Article I. At such adjourned meeting at which a quorum is present, any business may be transacted which might have been transacted at the meeting as originally noticed. The stockholders present at a duly constituted meeting may continue to transact business until adjournment, notwithstanding the withdrawal of enough stockholders to leave less than a quorum.



SECTION 6. Voting and Proxies. Stockholders shall have one vote for each share of stock entitled to vote owned by them of record according to the stock ledger of the Corporation as of the record date, unless otherwise provided by law or by the Certificate. Stockholders may vote either (i) in person, (ii) by written proxy or (iii) by a transmission permitted by Section 212(c) of the DGCL. Any copy, facsimile telecommunication or other reliable reproduction of the writing or transmission permitted by Section 212(c) of the DGCL may be substituted for or used in lieu of the original writing or transmission for any and all purposes for which the original writing or transmission could be used, provided that such copy, facsimile telecommunication or other reproduction shall be a complete reproduction of the entire original writing or transmission. Proxies shall be filed in accordance with the procedures established for the meeting of stockholders. Except as otherwise limited therein or as otherwise provided by law, proxies authorizing a person to vote at a specific meeting shall entitle the persons authorized thereby to vote at any adjournment of such meeting, but they shall not be valid after final adjournment of such meeting. A proxy with respect to stock held in the name of two or more persons shall be valid if executed by or on behalf of any one of them unless at or prior to the exercise of the proxy the Corporation receives a specific written notice to the contrary from any one of them.

SECTION 7. Action at Meeting. When a quorum is present at any meeting of stockholders, any matter before any such meeting (other than an election of a director or directors) shall be decided by a majority of the votes properly cast for and against such matter, except where a larger vote is required by law, by the Certificate or by these By-laws. Any election of directors by stockholders shall be determined by a plurality of the votes properly cast on the election of directors.

SECTION 8. Stockholder Lists. The Secretary or an Assistant Secretary, if any (or the Corporation's transfer agent or other person authorized by these By-laws or by law) shall prepare and make, at least ten (10) days before every Annual Meeting or special meeting of stockholders, a complete list of the stockholders entitled to vote at the meeting, arranged in alphabetical order, and showing the address of each stockholder and the number of shares registered in the name of each stockholder. Such list shall be open to the examination of any stockholder, for a period of at least ten (10) days prior to the meeting in the manner provided by law. The list shall also be open to the examination of any stockholder during the whole time of the meeting as provided by law.

SECTION 9. Presiding Officer. The Board of Directors shall designate a representative to preside over all Annual Meetings or special meetings of stockholders, provided that if the Board of Directors does not so designate such a presiding officer, then the Chairperson of the Board, if one is elected, shall preside over such meetings. If the Board of Directors does not so designate such a presiding officer and there is no Chairperson of the Board or the Chairperson of the Board is unable to so preside or is absent, then the Chief Executive Officer, if one is elected, shall preside over such meetings, provided further that if there is no Chief Executive Officer or the Chief Executive Officer is unable to so preside or is absent, then the President shall preside over such meetings. The presiding officer at any Annual Meeting or special meeting of stockholders shall have the power, among other things, to adjourn such meeting at any time and

from time to time, subject to Sections 4 and 5 of this Article I. The order of business and all other matters of procedure at any meeting of the stockholders shall be determined by the presiding officer.

SECTION 10. Inspectors of Elections. The Corporation shall, in advance of any meeting of stockholders, appoint one or more inspectors to act at the meeting and make a written report thereof. The Corporation may designate one or more persons as alternate inspectors to replace any inspector who fails to act. If no inspector or alternate is able to act at a meeting of stockholders, the presiding officer shall appoint one or more inspectors to act at the meeting. Any inspector may, but need not, be an officer, employee or agent of the Corporation. Each inspector, before entering upon the discharge of his or her duties, shall take and sign an oath faithfully to execute the duties of inspector with strict impartiality and according to the best of his or her ability. The inspectors shall perform such duties as are required by the DGCL, including the counting of all votes and ballots. The inspectors may appoint or retain other persons or entities to assist the inspectors in the performance of the duties of the inspectors. The presiding officer may review all determinations made by the inspectors, and in so doing the presiding officer shall be entitled to exercise his or her sole judgment and discretion and he or she shall not be bound by any determinations made by the inspectors. All determinations by the inspectors and, if applicable, the presiding officer, shall be subject to further review by any court of competent jurisdiction.

## ARTICLE II

## Directors

SECTION 1. Powers. The business and affairs of the Corporation shall be managed by or under the direction of the Board of Directors except as otherwise provided by the Certificate or required by law.

SECTION 2. Number and Terms. The number of directors of the Corporation shall be fixed solely and exclusively by resolution duly adopted from time to time by the Board of Directors. The directors shall hold office in the manner provided in the Certificate.

SECTION 3. Qualification. No director need be a stockholder of the Corporation.

SECTION 4. Vacancies. Vacancies in the Board of Directors shall be filled in the manner provided in the Certificate.

SECTION 5. Removal. Directors may be removed from office only in the manner provided in the Certificate.

SECTION 6. Resignation. A director may resign at any time by giving written notice to the Chairperson of the Board, if one is elected, the President or the Secretary. A resignation shall be effective upon receipt, unless the resignation otherwise provides.



SECTION 7. Regular Meetings. The regular annual meeting of the Board of Directors shall be held, without notice other than this Section 7, on the same date and at the same place as the Annual Meeting following the close of such meeting of stockholders. Other regular meetings of the Board of Directors may be held at such hour, date and place as the Board of Directors may by resolution from time to time determine and publicize by means of reasonable notice given to any director who is not present at the meeting at which such resolution is adopted.

SECTION 8. Special Meetings. Special meetings of the Board of Directors may be called, orally or in writing, by or at the request of a majority of the directors, the Chairperson of the Board, if one is elected, or the President. The person calling any such special meeting of the Board of Directors may fix the hour, date and place thereof.

SECTION 9. Notice of Special Meetings. Notice of the hour, date and place of all special meetings of the Board of Directors shall be given to each director by the Secretary or an Assistant Secretary, or in case of the death, absence, incapacity or refusal of such persons, by the Chairperson of the Board, if one is elected, or the President or such other officer designated by the Chairperson of the Board, if one is elected, or the President. Notice of any special meeting of the Board of Directors shall be given to each director in person, by telephone, or by facsimile, electronic mail or other form of electronic communication, sent to his or her business or home address, at least twenty-four (24) hours in advance of the meeting, or by written notice mailed to his or her business or home address, at least forty-eight (48) hours in advance of the meeting. Such notice shall be deemed to be delivered when hand-delivered to such address, read to such director by telephone, deposited in the mail so addressed, with postage thereon prepaid if mailed, dispatched or transmitted if sent by facsimile transmission or by electronic mail or other form of electronic communications. A written waiver of notice signed before or after a meeting by a director and filed with the records of the meeting shall be deemed to be equivalent to notice of the meeting. The attendance of a director at a meeting shall constitute a waiver of notice of such meeting, except where a director attends a meeting for the express purpose of objecting at the beginning of the meeting to the transaction of any business because such meeting is not lawfully called or convened. Except as otherwise required by law, by the Certificate or by these By-laws, neither the business to be transacted at, nor the purpose of, any meeting of the Board of Directors need be specified in the notice or waiver of notice of such meeting.

SECTION 10. Quorum. At any meeting of the Board of Directors, a majority of the total number of directors shall constitute a quorum for the transaction of business, but if less than a quorum is present at a meeting, a majority of the directors present may adjourn the meeting from time to time, and the meeting may be held as adjourned without further notice. Any business that might have been transacted at the meeting as originally noticed may be transacted at such adjourned meeting at which a quorum is present. For purposes of this section, the total number of directors includes any unfilled vacancies on the Board of Directors.

SECTION 11. Action at Meeting. At any meeting of the Board of Directors at which a quorum is present, the vote of a majority of the directors present shall constitute action by the Board of Directors, unless otherwise required by law, by the Certificate or by these By-laws.

10

---

SECTION 12. Action by Consent. Any action required or permitted to be taken at any meeting of the Board of Directors may be taken without a meeting if all members of the Board of Directors consent thereto in writing or by electronic transmission and the writing or writings or electronic transmission or transmissions are filed with the records of the meetings of the Board of Directors. Such filing shall be in paper form if the minutes are maintained in paper form and shall be in electronic form if the minutes are maintained in electronic form. Such consent shall be treated as a resolution of the Board of Directors for all purposes.

SECTION 13. Manner of Participation. Directors may participate in meetings of the Board of Directors by means of conference telephone or other communications equipment by means of which all directors participating in the meeting can hear each other, and participation in a meeting in accordance herewith shall constitute presence in person at such meeting for purposes of these By-laws.

SECTION 14. Presiding Director. The Board of Directors shall designate a representative to preside over all meetings of the Board of Directors, provided that if the Board of Directors does not so designate such a presiding director or such designated presiding director is unable to so preside or is absent, then the Chairperson of the Board, if one is elected, shall preside over all meetings of the Board of Directors. If both the designated presiding director, if one is so designated, and the Chairperson of the Board, if one is elected, are unable to preside or are absent, the Board of Directors shall designate an alternate representative to preside over a meeting of the Board of Directors.

SECTION 15. Committees. The Board of Directors, by vote of a majority of the directors then in office, may elect one or more committees, including, without limitation, a Compensation Committee, a Nominating & Corporate Governance Committee and an Audit Committee, and may delegate thereto some or all of its powers except those which by law, by the Certificate or by these By-laws may not be delegated. Except as the Board of Directors may otherwise determine, any such committee may make rules for the conduct of its business, but unless otherwise provided by the Board of Directors or in such rules, its business shall be conducted so far as possible in the same manner as is provided by these By-laws for the Board of Directors. All members of such committees shall hold such offices at the pleasure of the Board of Directors. The Board of Directors may abolish any such committee at any time. Any committee to which the Board of Directors delegates any of its powers or duties shall keep records of its meetings and shall report its action to the Board of Directors.

SECTION 16. Compensation of Directors. Directors shall receive such compensation for their services as shall be determined by a majority of the Board of Directors, or a designated committee thereof, provided that directors who are serving the Corporation as employees and who receive compensation for their services as such, shall not receive any salary or other compensation for their services as directors of the Corporation.

11

---

## ARTICLE III

### Officers

SECTION 1. Enumeration. The officers of the Corporation shall consist of a President, a Treasurer, a Secretary and such other officers, including, without limitation, a Chairperson of the Board of Directors, a Chief Executive Officer and one or more Vice Presidents (including Executive Vice Presidents or Senior Vice Presidents), Assistant Vice Presidents, Assistant Treasurers and Assistant Secretaries, as the Board of Directors may determine.

SECTION 2. Election. At the regular annual meeting of the Board of Directors following the Annual Meeting, the Board of Directors shall elect the President, the Treasurer and the Secretary. Other officers may be elected by the Board of Directors at such regular annual meeting of the Board of Directors or at any other regular or special meeting.

SECTION 3. Qualification. No officer need be a stockholder or a director. Any person may occupy more than one office of the Corporation at any time.

SECTION 4. Tenure. Except as otherwise provided by the Certificate or by these By-laws, each of the officers of the Corporation shall hold office until the regular annual meeting of the Board of Directors following the next Annual Meeting and until his or her successor is elected and qualified or until his or her earlier resignation or removal.

SECTION 5. Resignation. Any officer may resign by delivering his or her written resignation to the Corporation addressed to the President or the Secretary, and such resignation shall be effective upon receipt, unless the resignation otherwise provides.

SECTION 6. Removal. Except as otherwise provided by law, the Board of Directors may remove any officer with or without cause by the affirmative vote of a majority of the directors then in office.

SECTION 7. Absence or Disability. In the event of the absence or disability of any officer, the Board of Directors may designate another officer to act temporarily in place of such absent or disabled officer.

SECTION 8. Vacancies. Any vacancy in any office may be filled for the unexpired portion of the term by the Board of Directors.

SECTION 9. President. The President shall, subject to the direction of the Board of Directors, have such powers and shall perform such duties as the Board of Directors may from time to time designate.



---

SECTION 10. Chairperson of the Board. The Chairperson of the Board, if one is elected, shall have such powers and shall perform such duties as the Board of Directors may from time to time designate.

SECTION 11. Chief Executive Officer. The Chief Executive Officer, if one is elected, shall have such powers and shall perform such duties as the Board of Directors may from time to time designate.

SECTION 12. Vice Presidents and Assistant Vice Presidents. Any Vice President (including any Executive Vice President or Senior Vice President) and any Assistant Vice President shall have such powers and shall perform such duties as the Board of Directors or the Chief Executive Officer may from time to time designate.

SECTION 13. Treasurer and Assistant Treasurers. The Treasurer shall, subject to the direction of the Board of Directors and except as the Board of Directors or the Chief Executive Officer may otherwise provide, have general charge of the financial affairs of the Corporation and shall cause to be kept accurate books of account. The Treasurer shall have custody of all funds, securities, and valuable documents of the Corporation. He or she shall have such other duties and powers as may be designated from time to time by the Board of Directors or the Chief Executive Officer. Any Assistant Treasurer shall have such powers and perform such duties as the Board of Directors or the Chief Executive Officer may from time to time designate.

SECTION 14. Secretary and Assistant Secretaries. The Secretary shall record all the proceedings of the meetings of the stockholders and the Board of Directors (including committees of the Board of Directors) in books kept for that purpose. In his or her absence from any such meeting, a temporary secretary chosen at the meeting shall record the proceedings thereof. The Secretary shall have charge of the stock ledger (which may, however, be kept by any transfer or other agent of the Corporation). The Secretary shall have custody of the seal of the Corporation, and the Secretary, or an Assistant Secretary shall have authority to affix it to any instrument requiring it, and, when so affixed, the seal may be attested by his or her signature or that of an Assistant Secretary. The Secretary shall have such other duties and powers as may be designated from time to time by the Board of Directors or the Chief Executive Officer. In the absence of the Secretary, any Assistant Secretary may perform his or her duties and responsibilities. Any Assistant Secretary shall have such powers and perform such duties as the Board of Directors or the Chief Executive Officer may from time to time designate.

SECTION 15. Other Powers and Duties. Subject to these By-laws and to such limitations as the Board of Directors may from time to time prescribe, the officers of the Corporation shall each have such powers and duties as generally pertain to their respective offices, as well as such powers and duties as from time to time may be conferred by the Board of Directors or the Chief Executive Officer.



---

## ARTICLE IV

## Capital Stock

SECTION 1. Certificates of Stock. Each stockholder shall be entitled to a certificate of the capital stock of the Corporation in such form as may from time to time be prescribed by the Board of Directors. Such certificate shall be signed by the Chairperson of the Board, the President or a Vice President and by the Treasurer or an Assistant Treasurer, or the Secretary or an Assistant Secretary. The Corporation seal and the signatures by the Corporation's officers, the transfer agent or the registrar may be facsimiles. In case any officer, transfer agent or registrar who has signed or whose facsimile signature has been placed on such certificate shall have ceased to be such officer, transfer agent or registrar before such certificate is issued, it may be issued by the Corporation with the same effect as if he or she were such officer, transfer agent or registrar at the time of its issue. Every certificate for shares of stock which are subject to any restriction on transfer and every certificate issued when the Corporation is authorized to issue more than one class or series of stock shall contain such legend with respect thereto as is required by law. Notwithstanding anything to the contrary

provided in these Bylaws, the Board of Directors of the Corporation may provide by resolution or resolutions that some or all of any or all classes or series of its stock shall be uncertificated shares (except that the foregoing shall not apply to shares represented by a certificate until such certificate is surrendered to the Corporation), and by the approval and adoption of these Bylaws the Board of Directors has determined that all classes or series of the Corporation's stock may be uncertificated, whether upon original issuance, re-issuance, or subsequent transfer.

SECTION 2. Transfers. Subject to any restrictions on transfer and unless otherwise provided by the Board of Directors, shares of stock that are represented by a certificate may be transferred on the books of the Corporation by the surrender to the Corporation or its transfer agent of the certificate theretofore properly endorsed or accompanied by a written assignment or power of attorney properly executed, with transfer stamps (if necessary) affixed, and with such proof of the authenticity of signature as the Corporation or its transfer agent may reasonably require. Shares of stock that are not represented by a certificate may be transferred on the books of the Corporation by submitting to the Corporation or its transfer agent such evidence of transfer and following such other procedures as the Corporation or its transfer agent may require.

SECTION 3. Record Holders. Except as may otherwise be required by law, by the Certificate or by these By-laws, the Corporation shall be entitled to treat the record holder of stock as shown on its books as the owner of such stock for all purposes, including the payment of dividends and the right to vote with respect thereto, regardless of any transfer, pledge or other disposition of such stock, until the shares have been transferred on the books of the Corporation in accordance with the requirements of these By-laws.

SECTION 4. Record Date. In order that the Corporation may determine the stockholders entitled to notice of or to vote at any meeting of stockholders or any adjournment thereof or entitled to receive payment of any dividend or other distribution or allotment of any rights, or entitled to exercise any rights in respect of any change, conversion or exchange of



---

stock or for the purpose of any other lawful action, the Board of Directors may fix a record date, which record date shall not precede the date upon which the resolution fixing the record date is adopted by the Board of Directors, and which record date: (a) in the case of determination of stockholders entitled to vote at any meeting of stockholders, shall, unless otherwise required by law, not be more than sixty (60) nor less than ten (10) days before the date of such meeting and (b) in the case of any other action, shall not be more than sixty (60) days prior to such other action. If no record date is fixed: (i) the record date for determining stockholders entitled to notice of or to vote at a meeting of stockholders shall be at the close of business on the day next preceding the day on which notice is given, or, if notice is waived, at the close of business on the day next preceding the day on which the meeting is held; and (ii) the record date for determining stockholders for any other purpose shall be at the close of business on the day on which the Board of Directors adopts the resolution relating thereto.

SECTION 5. Replacement of Certificates. In case of the alleged loss, destruction or mutilation of a certificate of stock of the Corporation, a duplicate certificate may be issued in place thereof, upon such terms as the Board of Directors may prescribe.

## ARTICLE V

## Indemnification

SECTION 1. Definitions. For purposes of this Article:

(a) "Corporate Status" describes the status of a person who is serving or has served (i) as a Director of the Corporation, (ii) as an Officer of the Corporation, (iii) as a Non-Officer Employee of the Corporation, or (iv) as a director, partner, trustee, officer, employee or agent of any other corporation, partnership, limited liability company, joint venture, trust, employee benefit plan, foundation, association, organization or other legal entity which such person is or was serving at the request of the Corporation. For purposes of this Section 1(a), a Director, Officer or Non-Officer Employee of the Corporation who is serving or has served as a director, partner, trustee, officer, employee or agent of a Subsidiary shall be deemed to be serving at the request of the Corporation. Notwithstanding the foregoing, "Corporate Status" shall not include the status of a person who is serving or has served as a director, officer, employee or agent of a constituent corporation absorbed in a merger or consolidation transaction with the Corporation with respect to such person's activities prior to said transaction, unless specifically authorized by the Board of Directors or the stockholders of the Corporation;

(b) "Director" means any person who serves or has served the Corporation as a director on the Board of Directors of the Corporation;

(c) "Disinterested Director" means, with respect to each Proceeding in respect of which indemnification is sought hereunder, a Director of the Corporation who is not and was not a party to such Proceeding;

(d) "Expenses" means all attorneys' fees, retainers, court costs, transcript costs, fees of expert witnesses, private investigators and professional advisors (including, without



---

limitation, accountants and investment bankers), travel expenses, duplicating costs, printing and binding costs, costs of preparation of demonstrative evidence and other courtroom presentation aids and devices, costs incurred in connection with document review, organization, imaging and computerization, telephone charges, postage, delivery service fees, and all other disbursements, costs or expenses of the type customarily incurred in connection with prosecuting, defending, preparing to prosecute or defend, investigating, being or preparing to be a witness in, settling or otherwise participating in, a Proceeding;

(e) "Liabilities" means judgments, damages, liabilities, losses, penalties, excise taxes, fines and amounts paid in settlement;

(f) "Non-Officer Employee" means any person who serves or has served as an employee or agent of the Corporation, but who is not or was not a Director or Officer;

(g) "Officer" means any person who serves or has served the Corporation as an officer of the Corporation appointed by the Board of Directors of the Corporation;

(h) "Proceeding" means any threatened, pending or completed action, suit, arbitration, alternate dispute resolution mechanism, inquiry, investigation, administrative hearing or other proceeding, whether civil, criminal, administrative, arbitrative or investigative; and

(i) "Subsidiary" shall mean any corporation, partnership, limited liability company, joint venture, trust or other entity of which the Corporation owns (either directly or through or together with another Subsidiary of the Corporation) either (i) a general partner, managing member or other similar interest or (ii) (A) fifty percent (50%) or more of the voting power of the voting capital equity interests of such corporation, partnership, limited liability company, joint venture or other entity, or (B) fifty percent (50%) or more of the outstanding voting capital stock or other voting equity interests of such corporation, partnership, limited liability company, joint venture or other entity.

SECTION 2. Indemnification of Directors and Officers.

(a) Subject to the operation of Section 4 of this Article V of these By-laws, each Director and Officer shall be indemnified and held harmless by the Corporation to the fullest extent authorized by the DGCL, as the same exists or may hereafter be amended (but, in the case of any such amendment, only to the extent that such amendment permits the Corporation to provide broader indemnification rights than such law permitted the Corporation to provide prior to such amendment), and to the extent authorized in this Section 2.

(1) Actions, Suits and Proceedings Other than By or In the Right of the Corporation. Each Director and Officer shall be indemnified and held harmless by the Corporation against any and all Expenses and Liabilities that are incurred or paid by such Director or Officer or on such Director's or Officer's behalf in connection with any Proceeding or any claim, issue or matter therein (other than an action by or in the right of the Corporation), which such Director or Officer is, or is threatened to be made, a party to or participant in by reason of such Director's or Officer's Corporate Status, if such Director or Officer acted in good faith and in a manner such Director or Officer



reasonably believed to be in or not opposed to the best interests of the Corporation and, with respect to any criminal proceeding, had no reasonable cause to believe his or her conduct was unlawful.

(2) Actions, Suits and Proceedings By or In the Right of the Corporation. Each Director and Officer shall be indemnified and held harmless by the Corporation against any and all Expenses that are incurred by such Director or Officer or on such Director's or Officer's behalf in connection with any Proceeding or any claim, issue or matter therein by or in the right of the Corporation, which such Director or Officer is, or is threatened to be made, a party to or participant in by reason of such Director's or Officer's Corporate Status, if such Director or Officer acted in good faith and in a manner such Director or Officer reasonably believed to be in or not opposed to the best interests of the Corporation; provided, however, that no indemnification shall be made under this Section 2(a)(2) in respect of any claim, issue or matter as to which such Director or Officer shall have been finally adjudged by a court of competent jurisdiction to be liable to the Corporation, unless, and only to the extent that, the Court of Chancery or another court in which such Proceeding was brought shall determine upon application that, despite adjudication of liability, but in view of all the circumstances of the case, such Director or Officer is fairly and reasonably entitled to indemnification for such Expenses that such court deems proper.

(3) Survival of Rights. The rights of indemnification provided by this Section 2 shall continue as to a Director or Officer after he or she has ceased to be a Director or Officer and shall inure to the benefit of his or her heirs, executors, administrators and personal representatives.

(4) Actions by Directors or Officers. Notwithstanding the foregoing, the Corporation shall indemnify any Director or Officer seeking indemnification in connection with a Proceeding initiated by such Director or Officer only if such Proceeding (including any parts of such Proceeding not initiated by such Director or Officer) was authorized in advance by the Board of Directors of the Corporation, unless such Proceeding was brought to enforce such Officer's or Director's rights to indemnification or, in the case of Directors, advancement of Expenses under these By-laws in accordance with the provisions set forth herein.

SECTION 3. Indemnification of Non-Officer Employees. Subject to the operation of Section 4 of this Article V of these By-laws, each Non-Officer Employee may, in the discretion of the Board of Directors of the Corporation, be indemnified by the Corporation to the fullest extent authorized by the DGCL, as the same exists or may hereafter be amended, against any or all Expenses and Liabilities that are incurred by such Non-Officer Employee or on such Non-Officer Employee's behalf

in connection with any threatened, pending or completed Proceeding, or any claim, issue or matter therein, which such Non-Officer Employee is, or is threatened to be made, a party to or participant in by reason of such Non-Officer Employee's Corporate Status, if such Non-Officer Employee acted in good faith and in a manner such Non-Officer Employee reasonably believed to be in or not opposed to the best interests of the Corporation and, with respect to any criminal proceeding, had no reasonable cause to believe his or her conduct was



unlawful. The rights of indemnification provided by this Section 3 shall exist as to a Non-Officer Employee after he or she has ceased to be a Non-Officer Employee and shall inure to the benefit of his or her heirs, personal representatives, executors and administrators. Notwithstanding the foregoing, the Corporation may indemnify any Non-Officer Employee seeking indemnification in connection with a Proceeding initiated by such Non-Officer Employee only if such Proceeding was authorized in advance by the Board of Directors of the Corporation.

SECTION 4. Determination. Unless otherwise ordered by a court, no indemnification shall be provided pursuant to this Article V to a Director, to an Officer or to a Non-Officer Employee unless a determination shall have been made that such person acted in good faith and in a manner such person reasonably believed to be in or not opposed to the best interests of the Corporation and, with respect to any criminal Proceeding, such person had no reasonable cause to believe his or her conduct was unlawful. Such determination shall be made by (a) a majority vote of the Disinterested Directors, even though less than a quorum of the Board of Directors, (b) a committee comprised of Disinterested Directors, such committee having been designated by a majority vote of the Disinterested Directors (even though less than a quorum), (c) if there are no such Disinterested Directors, or if a majority of Disinterested Directors so directs, by independent legal counsel in a written opinion, or (d) by the stockholders of the Corporation.

SECTION 5. Advancement of Expenses to Directors Prior to Final Disposition.

(a) The Corporation shall advance all Expenses incurred by or on behalf of any Director in connection with any Proceeding in which such Director is involved by reason of such Director's Corporate Status within thirty (30) days after the receipt by the Corporation of a written statement from such Director requesting such advance or advances from time to time, whether prior to or after final disposition of such Proceeding. Such statement or statements shall reasonably evidence the Expenses incurred by such Director and shall be preceded or accompanied by an undertaking by or on behalf of such Director to repay any Expenses so advanced if it shall ultimately be determined that such Director is not entitled to be indemnified against such Expenses. Notwithstanding the foregoing, the Corporation shall advance all Expenses incurred by or on behalf of any Director seeking advancement of expenses hereunder in connection with a Proceeding initiated by such Director only if such Proceeding (including any parts of such Proceeding not initiated by such Director) was (i) authorized by the Board of Directors of the Corporation, or (ii) brought to enforce such Director's rights to indemnification or advancement of Expenses under these By-laws.

(b) If a claim for advancement of Expenses hereunder by a Director is not paid in full by the Corporation within thirty (30) days after receipt by the Corporation of documentation of Expenses and the required undertaking, such Director may at any time thereafter bring suit against the Corporation to recover the unpaid amount of the claim and if successful in whole or in part, such Director shall also be entitled to be paid the expenses of prosecuting such claim. The failure of the Corporation (including its Board of Directors or any committee thereof, independent legal counsel, or stockholders) to make a determination concerning the permissibility of such advancement of Expenses under this Article V shall not be a defense to an action brought by a Director for recovery of the unpaid amount of an advancement claim and



shall not create a presumption that such advancement is not permissible. The burden of proving that a Director is not entitled to an advancement of expenses shall be on the Corporation.

(c) In any suit brought by the Corporation to recover an advancement of expenses pursuant to the terms of an undertaking, the Corporation shall be entitled to recover such expenses upon a final adjudication that the Director has not met any applicable standard for indemnification set forth in the DGCL.

SECTION 6. Advancement of Expenses to Officers and Non-Officer Employees Prior to Final Disposition.

(a) The Corporation may, at the discretion of the Board of Directors of the Corporation, advance any or all Expenses incurred by or on behalf of any Officer or any Non-Officer Employee in connection with any Proceeding in which such person is involved by reason of his or her Corporate Status as an Officer or Non-Officer Employee upon the receipt by the Corporation of a statement or statements from such Officer or Non-Officer Employee requesting such advance or advances from time to time, whether prior to or after final disposition of such Proceeding. Such statement or statements shall reasonably evidence the Expenses incurred by such Officer or Non-Officer Employee and shall be preceded or accompanied by an undertaking by or on behalf of such person to repay any Expenses so advanced if it shall ultimately be determined that such Officer or Non-Officer Employee is not entitled to be indemnified against such Expenses.

(b) In any suit brought by the Corporation to recover an advancement of expenses pursuant to the terms of an undertaking, the Corporation shall be entitled to recover such expenses upon a final adjudication that the Officer or Non-Officer Employee has not met any applicable standard for indemnification set forth in the DGCL.

SECTION 7. Contractual Nature of Rights.

(a) The provisions of this Article V shall be deemed to be a contract between the Corporation and each Director and Officer entitled to the benefits hereof at any time while this Article V is in effect, in consideration of such person's past or current and any future performance of services for the Corporation. Neither amendment, repeal or modification of any provision of this Article V nor the adoption of any provision of the Certificate of Incorporation inconsistent with this Article V shall eliminate or reduce any right conferred by this Article V in respect of any act or omission occurring, or any cause of action or claim that accrues or arises or any state of facts existing, at the time of or before such amendment, repeal, modification or adoption of an inconsistent provision (even in the case of a proceeding based on such a state of facts that is commenced after such time), and all rights to indemnification and advancement of Expenses granted herein or arising out of any act or omission shall vest at the time of the act or omission in question, regardless of when or if any proceeding with respect to such act or omission is commenced. The rights to indemnification and to advancement of expenses provided by, or granted pursuant to, this Article V shall continue notwithstanding that the person has ceased to be a director or officer of the Corporation and shall inure to the benefit of the estate, heirs, executors, administrators, legatees and distributes of such person.



(b) If a claim for indemnification hereunder by a Director or Officer is not paid in full by the Corporation within sixty (60) days after receipt by the Corporation of a written claim for indemnification, such Director or Officer may at any time thereafter bring suit against the Corporation to recover the unpaid amount of the claim, and if successful in whole or in part, such Director or Officer shall also be entitled to be paid the expenses of prosecuting such claim. The failure of the Corporation (including its Board of Directors or any committee thereof, independent legal counsel, or stockholders) to make a determination concerning the permissibility of such indemnification under this Article V shall not be a defense to an action brought by a Director or Officer for recovery of the unpaid amount of an indemnification claim and shall not create a presumption that such indemnification is not permissible. The burden of proving that a Director or Officer is not entitled to indemnification shall be on the Corporation.

(c) In any suit brought by a Director or Officer to enforce a right to indemnification hereunder, it shall be a defense that such Director or Officer has not met any applicable standard for indemnification set forth in the DGCL.

SECTION 8. Non-Exclusivity of Rights. The rights to indemnification and to advancement of Expenses set forth in this Article V shall not be exclusive of any other right which any Director, Officer, or Non-Officer Employee may have or hereafter acquire under any statute, provision of the Certificate or these By-laws, agreement, vote of stockholders or Disinterested Directors or otherwise.

SECTION 9. Insurance. The Corporation may maintain insurance, at its expense, to protect itself and any Director, Officer or Non-Officer Employee against any liability of any character asserted against or incurred by the Corporation or any such Director, Officer or Non-Officer Employee, or arising out of any such person's Corporate Status, whether or not the Corporation would have the power to indemnify such person against such liability under the DGCL or the provisions of this Article V.

SECTION 10. Other Indemnification. The Corporation's obligation, if any, to indemnify or provide advancement of Expenses to any person under this Article V as a result of such person serving, at the request of the Corporation, as a director, partner, trustee, officer, employee or agent of another corporation, partnership, joint venture, trust, employee benefit plan or other enterprise shall be reduced by any amount such person may collect as indemnification or advancement of Expenses from such other corporation, partnership, joint venture, trust, employee benefit plan or enterprise (the "Primary Indemnitor"). Any indemnification or advancement of Expenses under this Article V owed by the Corporation as a result of a person serving, at the request of the Corporation, as a director, partner, trustee, officer, employee or agent of another corporation, partnership, joint venture, trust, employee benefit plan or other enterprise shall only be in excess of, and shall be secondary to, the indemnification or advancement of Expenses available from the applicable Primary Indemnitor(s) and any applicable insurance policies.



## ARTICLE VI

### Miscellaneous Provisions

SECTION 1. Fiscal Year. The fiscal year of the Corporation shall be determined by the Board of Directors.

SECTION 2. Seal. The Board of Directors shall have power to adopt and alter the seal of the Corporation.

SECTION 3. Execution of Instruments. All deeds, leases, transfers, contracts, bonds, notes and other obligations to be entered into by the Corporation in the ordinary course of its business without director action may be executed on behalf of the Corporation by the Chairperson of the Board, if one is elected, the President or the Treasurer or any other officer, employee or agent of the Corporation as the Board of Directors or the executive committee of the Board may authorize.

SECTION 4. Voting of Securities. Unless the Board of Directors otherwise provides, the Chairperson of the Board, if one is elected, the President or the Treasurer may waive notice of and act on behalf of the Corporation, or appoint another person or persons to act as proxy or attorney in fact for the Corporation with or without discretionary power and/or power of substitution, at any meeting of stockholders or shareholders of any other corporation or organization, any of whose securities are held by the Corporation.

SECTION 5. Resident Agent. The Board of Directors may appoint a resident agent upon whom legal process may be served in any action or proceeding against the Corporation.

SECTION 6. Corporate Records. The original or attested copies of the Certificate, By-laws and records of all meetings of the incorporators, stockholders and the Board of Directors and the stock transfer books, which shall contain the names of all stockholders, their record addresses and the amount of stock held by each, may be kept outside the State of Delaware and shall be kept at the principal office of the Corporation, at an office of its counsel, at an office of its transfer agent or at such other place or places as may be designated from time to time by the Board of Directors.

SECTION 7. Certificate. All references in these By-laws to the Certificate shall be deemed to refer to the Amended and Restated Certificate of Incorporation of the Corporation, as amended and/or restated and in effect from time to time.

SECTION 8. Amendment of By-laws.

(a) Amendment by Directors. Except as provided otherwise by law, these By-laws may be amended or repealed by the Board of Directors by the affirmative vote of a majority of the directors then in office.



---

(b) Amendment by Stockholders. These By-laws may be amended or repealed at any Annual Meeting, or special meeting of stockholders called for such purpose in accordance with these By-Laws, by the affirmative vote of at least seventy-five percent (75%) of the outstanding shares entitled to vote on such amendment or repeal, voting together as a single class; provided, however, that if the Board of Directors recommends that stockholders approve such amendment or repeal at such meeting of stockholders, such amendment or repeal shall only require the affirmative vote of the majority of the outstanding shares entitled to vote on such amendment or repeal, voting together as a single class. Notwithstanding the foregoing, stockholder approval shall not be required unless mandated by the Certificate, these By-laws, or other applicable law.

SECTION 9. Notices. If mailed, notice to stockholders shall be deemed given when deposited in the mail, postage prepaid, directed to the stockholder at such stockholder's address as it appears on the records of the Corporation. Without limiting the manner by which notice otherwise may be given to stockholders, any notice to stockholders may be given by electronic transmission in the manner provided in Section 232 of the DGCL.

SECTION 10. Waivers. A written waiver of any notice, signed by a stockholder or director, or waiver by electronic transmission by such person, whether given before or after the time of the event for which notice is to be given, shall be deemed equivalent to the notice required to be given to such person. Neither the business to be transacted at, nor the purpose of, any meeting need be specified in such a waiver.

**Adopted April 25, 2013, subject to effectiveness of the Corporation's Registration Statement on Form S-1.**



---

**Exhibit 4.2**

**CONTROL4 CORPORATION**

**EIGHTH AMENDED AND RESTATED INVESTORS' RIGHTS AGREEMENT**

**January 21, 2011**

---

**TABLE OF CONTENTS**

| | | |
|---|---|---|
| 1. | Registration Rights | 2 |
| 1.1 | Definitions | 2 |
| 1.2 | Request for Registration | 3 |
| 1.3 | Company Registration | 4 |

| | | | |
|---|---|---|---|
| | 1.4 | Form S-3 Registration | 6 |
| | 1.5 | Obligations of the Company | 7 |
| | 1.6 | Information from Holder | 8 |
| | 1.7 | Expenses of Registration | 8 |
| | 1.8 | Delay of Registration | 9 |
| | 1.9 | Indemnification | 9 |
| | 1.10 | Reports Under Securities Exchange Act of 1934 | 11 |
| | 1.11 | Assignment of Registration Rights | 11 |
| | 1.12 | Limitations on Subsequent Registration Rights | 12 |
| | 1.13 | Market Stand-Off Agreement | 12 |
| | 1.14 | Termination of Registration Rights | 13 |
| 2. | Covenants | | 13 |
| | 2.1 | Delivery of Financial Statements | 13 |
| | 2.2 | Inspection | 14 |
| | 2.3 | Termination of Information and Inspection Covenants | 14 |
| | 2.4 | Right of First Offer | 15 |
| | 2.5 | Board Observer Rights | 16 |
| | 2.6 | Expenses | 16 |
| | 2.7 | Director and Officer Insurance | 17 |
| | 2.8 | Legend | 17 |
| | 2.9 | Lock-Up Agreement of Future Security Holders | 17 |
| | 2.10 | Employee Stock | 17 |
| | 2.11 | Confidential Information, Invention Assignment and Non-Compete Agreements | 17 |
| | 2.12 | Key Person Insurance | 18 |
| | 2.13 | IPO Participation Rights | 18 |
| | 2.14 | Termination of Certain Covenants | 20 |
| 3. | Miscellaneous | | 21 |
| | 3.1 | Successors and Assigns | 21 |
| | 3.2 | Governing Law | 21 |
| | 3.3 | Counterparts | 21 |
| | 3.4 | Titles and Subtitles | 21 |
| | 3.5 | Notices | 21 |
| | 3.6 | Expenses | 21 |
| | 3.7 | Entire Agreement; Amendments and Waivers | 22 |
| | 3.8 | Severability | 22 |
| | 3.9 | Aggregation of Stock | 23 |
| | 3.10 | Arbitration | 23 |
| | 3.11 | Waiver of Right of First Offer | 23 |



---

**CONTROL4 CORPORATION**

**EIGHTH AMENDED AND RESTATED
INVESTORS' RIGHTS AGREEMENT**

This Eighth Amended and Restated Investors' Rights Agreement (this "***Agreement***") is made as of the 21st day of January, 2011, by and among Control4 Corporation, a Delaware corporation (the "***Company***"), and the investors listed on Schedule A hereto (individually, an "***Investor***" and collectively, the "***Investors***") and the holders of Common Stock listed on Schedule B hereto (the "***Common Holders***").

**RECITALS**

A. Certain existing investors of the Company (the "***Existing Investors***") hold shares of the Company's Series A Preferred Stock, Series B Preferred Stock, Series C Preferred Stock, Series D Preferred Stock, Series E Preferred Stock, Series F Preferred Stock, Series G Preferred Stock or Series G-1 Preferred Stock and possess registration rights, rights of first offer and certain other rights pursuant to that certain Seventh Amended and Restated Investors' Rights Agreement dated as of June 24, 2009 among the Company, the Existing Investors, and the Common Holders, (the "***Prior Agreement***");

B. The Existing Investors are holders of at least a majority of the outstanding Registrable Securities (as defined in the Prior Agreement) and desire to amend and restate the Prior Agreement and to accept the rights created pursuant hereto in lieu of the rights granted to them under the Prior Agreement;

C. The execution of this Agreement on or by the First Closing or a Subsequent Closing (each as defined in the Series H Preferred Stock Purchase Agreement of even date herewith (the "Series H Agreement")) is a condition of the Company's and certain of the Investors' mutual obligations at the First Closing or a Subsequent Closing, as applicable (each as defined in the Series H Agreement); and

D. In order to induce the Company and the Common Holders to approve the issuance of the Series H Preferred Stock and to induce certain of the Investors to invest funds in the Company pursuant to the Series H Agreement, the Investors, the Common Holders and the Company hereby agree that this Agreement shall govern the rights of the Investors and the Common Holders to cause the Company to register shares of Common Stock issued or issuable to them and certain other matters as set forth herein.

NOW, THEREFORE, in consideration of the mutual promises and covenants set forth herein, the parties hereto agree as follows:

---

**AGREEMENT**

**1. Registration Rights**

The Company covenants and agrees as follows:

**1.1 Definitions**

For purposes of this Section 1 and for purposes of this Agreement:

(a) The term "***Act***" means the Securities Act of 1933, as amended.

(b) The term "***Form S-3***" means such form under the Act as in effect on the date hereof or any registration form under the Act subsequently adopted by the SEC that permits inclusion or incorporation of substantial information by reference to other documents filed by the Company with the SEC.

(c) The term "***Holder***" means any person owning or having the right to acquire Registrable Securities or any assignee thereof to whom registration rights are assigned in accordance with Section 1.11 hereof; provided, however, that the Common Holders shall not be deemed to be Holders for purposes of Sections 1.2, 1.4, 1.12 and 3.7.

(d) The term "***Initial Offering***" means the Company's first firm commitment underwritten public offering of its Common Stock under the Act.

(e) The term "***1934 Act***" means the Securities Exchange Act of 1934, as amended.

(f) The terms "***register***," "***registered***" and "***registration***" refer to a registration effected by preparing and filing a registration statement or similar document in compliance with the Act, and the declaration or ordering of effectiveness of such registration statement or document.

(g) The term "***Registrable Securities***" means (i) the Common Stock issuable or issued upon conversion of the Series A Preferred Stock, Series B Preferred Stock, Series C Preferred Stock, Series D Preferred Stock, Series E Preferred Stock, Series F Preferred Stock, Series G Preferred Stock, Series G-1 Preferred Stock or Series H Preferred Stock, (ii) the shares of Common Stock issued to the Common Holders; provided, however, that such shares of Common Stock shall not be deemed Registrable Securities for the purposes of Sections 1.2, 1.4, 1.12 and 3.7, and (iii) any Common Stock of the Company issued as (or issuable upon the conversion or exercise of any warrant, right or other security that is issued as) a dividend or other distribution with respect to, or in exchange for, or in replacement of, the shares referenced in (i) and (ii) above; provided, however, that the foregoing definition shall exclude in all cases any Registrable Securities sold by a Holder in a transaction in which such Holder's rights under this Agreement are not assigned. In addition, Common Stock or other securities shall only be treated as Registrable Securities if and so long as (A) they have not been sold to or through a broker or dealer or underwriter in a public distribution or a public securities transaction, including sales made pursuant to Rule 144 promulgated under the Act, (B) they have not been sold in a

transaction exempt from the registration and prospectus delivery requirements of the Act under Section 4(1) thereof so that all transfer restrictions, and restrictive legends with respect thereto, if any, are removed upon the consummation of such sale or (C) the Holder's rights pursuant to this Section 1 have not terminated in accordance with Section 1.14 below. The number of shares of "Registrable Securities" outstanding shall be the sum of the number of shares of Common Stock outstanding that are Registrable Securities plus the number of shares of Common Stock issuable pursuant to then exercisable or convertible securities that are Registrable Securities.

(h) The term "***SEC***" shall mean the Securities and Exchange Commission.

**1.2 Request for Registration**

(a) Subject to the conditions of this Section 1.2, if the Company shall receive at any time after the earlier of (i) three (3) years after the date of this Agreement or (ii) six months after the effective date of the Initial Offering, a written request (the "***Initial Request***") from the Holders of Registrable Securities then outstanding (the "***Initiating Holders***") that the Company file a registration statement under the Act covering the registration of Registrable Securities with an anticipated aggregate offering price of at least $5,000,000, then the Company shall, within twenty days of the receipt of the Initial Request, give written notice of the Initial Request to all Holders, and subject to the limitations of this Section 1.2, file as soon as practicable, and in any event within 90 days, a registration statement under the Act covering the Registrable Securities that the Holders request to be registered in a written request received by the Company within twenty days after the mailing of the Company's notice pursuant to this Section 1.2(a), and to use best efforts to cause such registration statement to become effective within one hundred twenty days of the Initial Request.

(b) If the Initiating Holders intend to distribute the Registrable Securities covered by their request by means of an underwriting, they shall so advise the Company as a part of their request made pursuant to this Section 1.2 and the Company shall include such information in the written notice referred to in Section 1.2(a). In such event the right of any Holder to include its Registrable Securities in such registration shall be conditioned upon such Holder's participation in such underwriting and the inclusion of such Holder's Registrable Securities in the underwriting (unless otherwise mutually agreed by a majority in interest of the Initiating Holders and such Holder) to the extent provided herein. All Holders proposing to distribute their securities through such underwriting shall (together with the Company) enter into an underwriting agreement in customary form with the underwriter or underwriters selected for such underwriting by the Company (which underwriter or underwriters shall be reasonably acceptable to a majority in interest of the Initiating Holders). Notwithstanding any other provision of this Section 1.2, if the underwriter advises the Company in writing that marketing factors require a limitation of the number of securities underwritten (including Registrable Securities), then the Company shall so advise all Holders of Registrable Securities that would otherwise be underwritten pursuant hereto, and the number of shares that may be included in the underwriting shall be allocated among the participating Holders of such Registrable Securities on a pro rata basis based on the number of Registrable Securities held by all such Holders (including the Initiating Holders); provided, however, that the number of shares of Registrable Securities to be included in such underwriting shall not be reduced unless all other securities are first entirely



---

excluded from the underwriting. Any Registrable Securities excluded or withdrawn from such underwriting shall be withdrawn from the registration.

(c) The Company shall not be required to effect a registration pursuant to this Section 1.2:

(1) in any particular jurisdiction in which the Company would be required to execute a general consent to service of process in effecting such registration, unless the Company is already subject to service in such jurisdiction and except as may be required under the Act; or

(2) after the Company has effected two registrations pursuant to this Section 1.2, and such registrations have been declared or ordered effective, provided, that either (i) the distributions described in such registration statements have been completed or (ii) the registration statements continue to remain in effect and there are no "stop orders" in effect with respect to such registration statements; or

(3) during the period starting with the date sixty days prior to the Company's good faith estimate of the date of the filing of a Company-initiated registration subject to Section 1.3 hereof, provided the Company delivers notice to the Holders within thirty days of any request for registration under this Section 1.2, and ending on a date ninety days after such registration or in the case of the Initial Offering ending on a date one hundred eighty days after the effective date of such Initial Offering, provided that the Company is actively employing in good faith best efforts to cause such registration statement to become effective; or

(4) if the Initiating Holders propose to dispose of Registrable Securities that may be registered on Form S-3 pursuant to Section 1.4 hereof; or

(5) if the Company shall furnish to Holders requesting a registration statement pursuant to this Section 1.2, a certificate signed by the Company's Chief Executive Officer or Chairman of the Board stating that in the good faith judgment of the Board of Directors of the Company, it would be seriously detrimental to the Company and its stockholders for such registration statement to be effected at such time, in which event the Company shall have the right to defer such filing for a period of not more than one hundred twenty days after receipt of the Initial Request, provided that such right to delay any request of the Holders under this Section 1 shall be exercised by the Company not more than once in any twelve-month period.

**1.3 Company Registration**

(a) If the Company proposes to register (including for this purpose a registration initiated by the Company for stockholders other than the Holders)

any of its stock or other securities under the Act in connection with the public offering for cash of such securities (other than a registration relating solely to the sale of securities to participants in a Company stock plan, a registration relating to a corporate reorganization or other transaction under Rule 145 of the Act, a registration on any form that does not include substantially the same information as would be required to be included in a registration statement covering the sale of the Registrable Securities, or a registration in which the only Common Stock being registered is



---

Common Stock issuable upon conversion of debt securities that are also being registered), the Company shall, at such time, promptly give each Holder written notice of such registration. Upon the written request of each Holder given within twenty days after mailing of such notice by the Company, the Company shall, subject to the provisions of Section 1.3(c), use best efforts to cause to be registered under the Act all of the Registrable Securities that each such Holder has requested to be registered.

(b) **Right to Terminate Registration**. The Company shall have the right to terminate or withdraw any registration initiated by it under this Section 1.3 prior to the effectiveness of such registration whether or not any Holder has elected to include securities in such registration. The expenses of such withdrawn registration shall be borne by the Company in accordance with Section 1.7 hereof.

(c) **Underwriting Requirements**. In connection with any offering involving an underwriting of shares of the Company's capital stock, the Company shall not be required under this Section 1.3 to include any of the Holders' securities in such underwriting unless they accept the terms of the underwriting as agreed upon between the Company and the underwriters selected by it (or by other persons entitled to select the underwriters) and enter into an underwriting agreement in customary form with such underwriter or underwriters, and then only in such quantity as the underwriters determine in their sole discretion will not jeopardize the success of the offering by the Company subject to the terms of this Section 1.3(c). If the total amount of securities, including Registrable Securities, requested by stockholders to be included in such offering exceeds the amount of securities sold other than by the Company that the underwriters determine in their sole discretion is compatible with the success of the offering, then the Company shall be required to include in the offering only that number of such securities, including Registrable Securities, that the underwriters determine in their sole discretion will not jeopardize the success of the offering (the securities so included to be apportioned pro rata among the selling Holders according to the total amount of securities entitled to be included therein owned by each selling Holder or in such other proportions as shall mutually be agreed to by such selling Holders), but in no event shall (i) the amount of securities of the selling Holders included in the offering be reduced below twenty-five percent of the total amount of securities included in such offering, unless such offering is a "***Qualified IPO***" (as such term is defined in the Company's then current Amended and Restated Certificate of Incorporation, as amended (the "***Restated Certificate***")), in which case the selling Holders may be completely excluded if the underwriters make the determination described above and no other stockholder's securities are included, (ii) securities held by any Common Holder be included if any securities by any other selling Holder are excluded, or (iii) the number of shares of Registrable Securities to be included in such underwriting be reduced unless all other securities (other than those of the Company) are first entirely excluded from the underwriting. For purposes of the preceding parenthetical concerning apportionment, for any selling stockholder that is a Holder of Registrable Securities and that is a partnership, limited liability company or corporation, the partners, retired partners, members and stockholders of such Holder, or the estates and family members of any such partners, retired partners, members and any trusts for the benefit of any of the foregoing persons shall be deemed to be a single "***selling Holder***," and any pro rata reduction with respect to such "selling Holder" shall be based upon the aggregate amount of Registrable Securities owned by all such related entities and individuals.



---

**1.4 Form S-3 Registration**

In case the Company shall receive from any Holder(s) of Registrable Securities a written request or requests that the Company effect a registration on Form S-3 and any related qualification or compliance with respect to all or a part of the Registrable Securities owned by such Holder or Holders, the Company shall:

(a) promptly give written notice of the proposed registration, and any related qualification or compliance, to all other Holders; and

(b) use best efforts to effect, as soon as practicable, such registration and all such qualifications and compliances as may be so requested and as would permit or facilitate the sale and distribution of all or such portion of such Holders' Registrable Securities as are specified in such request, together with all or such portion of the Registrable Securities of any other Holders joining in such request as are specified in a written request given within fifteen days after receipt of such written notice from the Company; provided, however, that the Company shall not be obligated to effect any such registration, qualification or compliance, pursuant to this Section 1.4:

(1) if Form S-3 is not available for use by the Company with respect to such offering by the Holders;

(2) if the Holders, together with the Holders of any other securities of the Company entitled to inclusion in such registration, propose to sell Registrable Securities and such other securities (if any) at an aggregate price to the public of less than $1,000,000;

(3) if the Company shall furnish to the Holders a certificate signed by the Chief Executive Officer or Chairman of the Board of the Company stating that in the good faith judgment of the Board of Directors of the Company, it would be seriously detrimental to the Company and its stockholders for such Form S-3 Registration to be effected at such time, in which event the Company shall have the right to defer the filing of the Form S-3 registration statement for a period of

not more than one hundred twenty days after receipt of the request of the Holder or Holders under this Section 1.4; provided, however, that the Company shall not utilize such right to delay any request of the Holders under this Section 1.4 more than once in any twelve-month period;

(4) if the Company has, within the twelve-month period preceding the date of such request, already effected two registrations on Form S-3 for the Holders pursuant to this Section 1.4; or

(5) in any particular jurisdiction in which the Company would be required to qualify to do business or to execute a general consent to service of process in effecting such registration, qualification or compliance unless the Company is already subject to service in such jurisdiction and except as may be required under the Act; and

(c) Subject to the foregoing, file a registration statement covering the Registrable Securities and other securities so requested to be registered as soon as practicable, and in any event within 30 days, after receipt of the request or requests of the Holders.



---

Registrations effected pursuant to this Section 1.4 shall not be counted as requests for registration effected pursuant to Section 1.2.

**1.5 Obligations of the Company**

Whenever required under this Section 1 to effect the registration of any Registrable Securities, the Company shall, as expeditiously as reasonably possible:

(a) prepare and file with the SEC a registration statement with respect to such Registrable Securities and use best efforts to cause such registration statement to become effective, and keep such registration statement effective for a period of up to one hundred twenty days or, if earlier, until the distribution contemplated in the registration statement has been completed; provided that such 120 day period shall be extended for a period of time equal to the period of time that the underwriters or the Company requests that the participating Holders refrain from selling any securities included in such registration;

(b) prepare and file with the SEC such amendments and supplements to such registration statement and the prospectus used in connection with such registration statement as may be necessary to comply with the provisions of the Act with respect to the disposition of all securities covered by such registration statement;

(c) furnish to the Holders such numbers of copies of a prospectus, including a preliminary prospectus, in conformity with the requirements of the Act, and such other documents as they may reasonably request in order to facilitate the disposition of Registrable Securities owned by them;

(d) use best efforts to register and qualify the securities covered by such registration statement under such other securities or Blue Sky laws of such jurisdictions as shall be reasonably requested by the Holders, provided that the Company shall not be required in connection therewith or as a condition thereto to qualify to do business or to file a general consent to service of process in any such states or jurisdictions unless the Company is already subject to service in such jurisdiction and except as may be required under the Act;

(e) in the event of any underwritten public offering, enter into and perform its obligations under an underwriting agreement, in usual and customary form, with the managing underwriter(s) of such offering;

(f) notify each Holder of Registrable Securities covered by such registration statement at any time when a prospectus relating thereto is required to be delivered under the Act or the happening of any event as a result of which the prospectus included in such registration statement, as then in effect, includes an untrue statement of a material fact or omits to state a material fact required to be stated therein or necessary to make the statements therein not misleading in the light of the circumstances then existing;

(g) cause all such Registrable Securities registered pursuant to this Agreement to be listed on each securities exchange on which similar securities issued by the Company are then listed;



---

(h) provide a transfer agent and registrar for all Registrable Securities registered pursuant to this Agreement and a CUSIP number for all such Registrable Securities, in each case not later than the effective date of such registration; and

(i) use its best efforts to furnish, at the request of any Holder requesting registration of Registrable Securities pursuant to this Section 1, on the date that such Registrable Securities are delivered to the underwriters for sale in connection with a registration pursuant to this Section 1, if such securities are being sold through underwriters, or, if such securities are not being sold through underwriters, on the date that the registration statement with respect to such securities becomes effective, (1) an opinion, dated such date, of the counsel representing the Company for the purposes of such registration, in form and substance as is customarily given to

underwriters in an underwritten public offering, addressed to the underwriters, if any, and to the Holders requesting registration of Registrable Securities and (2) a letter dated such date, from the independent certified public accountants of the Company, in form and substance as is customarily given by independent certified public accountants to underwriters in an underwritten public offering, addressed to the underwriters, if any, and to the Holders requesting registration of Registrable Securities.

**1.6 Information from Holder**

It shall be a condition precedent to the obligations of the Company to take any action pursuant to this Section 1 with respect to the Registrable Securities of any selling Holder that such Holder shall furnish to the Company such information regarding itself, the Registrable Securities held by it, and the intended method of disposition of such securities as shall be required to effect the registration of such Holder's Registrable Securities.

**1.7 Expenses of Registration**

All expenses other than underwriting discounts and commissions incurred in connection with registrations, filings or qualifications pursuant to Sections 1.2, 1.3, 1.4 and 1.5 including (without limitation) all registration, filing and qualification fees, printer's and accounting fees, fees and disbursements of counsel for the Company, and the reasonable fees and disbursements not to exceed $35,000 of one counsel for the selling Holders selected by them with the approval of the Company, which approval shall not be unreasonably withheld, shall be borne by the Company. Notwithstanding the foregoing, the Company shall not be required to pay for any expenses of any registration proceeding begun pursuant to Section 1.2 or Section 1.4 if the registration request is subsequently withdrawn at the request of the participating Holders of a majority of the Registrable Securities to be registered (in which case all participating Holders shall bear such expenses pro rata based upon the number of Registrable Securities that were to be requested in the withdrawn registration) unless, in the case of a withdrawn registration requested under Section 1.2, the Holders of a majority of the Registrable Securities agree to forfeit their right to one demand registration pursuant to Section 1.2 or unless, in the case of a withdrawn registration requested under Section 1.4, the Holders of a majority of the Registrable Securities agree to forfeit their right to one registration on Form S-3 pursuant to Section 1.4 within the 12-month period after the date of the initial request for registration pursuant to Section 1.4; provided, however, that if at the time of such withdrawal, the Holders (i) have learned of a material adverse change in the condition, business, or prospects of the Company that was not



---

known to the Holders at the time of their request and (ii)have withdrawn the request with reasonable promptness following disclosure by the Company of such material adverse change, then the Holders shall not be required to pay any of such expenses.

**1.8 Delay of Registration**

No Holder shall have any right to obtain or seek an injunction restraining or otherwise delaying any such registration as the result of any controversy that might arise with respect to the interpretation or implementation of this Section 1.

**1.9 Indemnification**

In the event any Registrable Securities are included in a registration statement under this Section 1:

(a) To the extent permitted by law, the Company will indemnify and hold harmless each Holder, the partners or officers, directors and stockholders of each Holder, legal counsel and accountants for each Holder, any underwriter (as defined in the Act) for such Holder and each person, if any, who controls such Holder or underwriter within the meaning of the Act or the 1934 Act, against any losses, claims, damages or liabilities (joint or several) to which they may become subject under the Act, the 1934 Act or other federal or state laws, insofar as such losses, claims, damages, or liabilities (or actions, proceedings, or settlements in respect thereof) arise out of or are based upon any of the following statements, omissions or violations (collectively a "***Violation***"): (i) any untrue statement or alleged untrue statement of a material fact contained in such registration statement, including any preliminary prospectus or final prospectus contained therein or any amendments or supplements thereto, (ii) the omission or alleged omission to state therein a material fact required to be stated therein, or necessary to make the statements therein not misleading, or (iii) any violation or alleged violation by the Company of the Act, the 1934 Act, any state securities laws or any rule or regulation promulgated under the Act, the 1934 Act or any state securities laws; and the Company will reimburse each such Holder, underwriter or controlling person, as incurred, for any legal or other expenses reasonably incurred by any of them in connection with investigating or defending any such loss, claim, damage, liability or action, proceeding or settlement; provided, however, that the indemnity agreement contained in this Section 1.9(a) shall not apply to amounts paid in settlement of any such loss, claim, damage, liability or action or proceeding if such settlement is effected without the consent of the Company (which consent shall not be unreasonably withheld, conditioned or delayed), nor shall the Company be liable in any such case for any such loss, claim, damage, liability or action, proceeding or settlement to the extent that it arises out of or is based upon a Violation that occurs in reliance upon and in conformity with written information furnished expressly for use in connection with such registration by any such Holder, underwriter or controlling person.

(b) To the extent permitted by law, each selling Holder will indemnify and hold harmless the Company, each of its directors, each of its officers who has signed the registration statement, each person, if any, who controls the Company within the meaning of the Act, legal counsel and accountants for the Company, any underwriter, any other Holder selling securities in such registration statement and any controlling person of any such underwriter or



---

other Holder, against any losses, claims, damages or liabilities (joint or several) to which any of the foregoing persons may become subject, under the Act, the 1934 Act or other federal or state laws, insofar as such losses, claims, damages or liabilities (or actions, proceedings or settlements in respect thereto) arise out of or are based upon any Violation, in each case to the extent (and only to the extent) that such Violation occurs in reliance upon and in conformity with written information furnished by such Holder expressly for use in connection with such registration; and each such Holder will reimburse any person intended to be indemnified pursuant to this Section 1.9(b), as incurred, for any legal or other expenses reasonably incurred by such person in connection with investigating or defending any such loss, claim, damage, liability or action, proceeding or settlement; provided, however, that the indemnity agreement contained in this Section 1.9(b) shall not apply to amounts paid in settlement of any such loss, claim, damage, liability or action or proceeding if such settlement is effected without the consent of the Holder (which consent shall not be unreasonably withheld or delayed), and provided further, that in no event shall any indemnity under this Section 1.9(b) exceed the net proceeds from the offering received by an indemnifying Holder.

(c) Promptly after receipt by an indemnified party under this Section 1.9 of notice of the commencement of any action (including any governmental action), such indemnified party will, if a claim in respect thereof is to be made against any indemnifying party under this Section 1.9, deliver to the indemnifying party a written notice of the commencement thereof and the indemnifying party shall have the right to participate in, and, to the extent the indemnifying party so desires, jointly with any other indemnifying party similarly noticed, to assume the defense thereof with counsel mutually satisfactory to the parties; provided, however, that an indemnified party (together with all other indemnified parties that may be represented without conflict by one counsel) shall have the right to retain one separate counsel, with the reasonable fees and expenses to be paid by the indemnifying party, if representation of such indemnified party by the counsel retained by the indemnifying party would be inappropriate due to actual or potential differing interests between such indemnified party and any other party represented by such counsel in such proceeding. The failure to deliver written notice to the indemnifying party within a reasonable time of the commencement of any such action, if prejudicial to its ability to defend such action, shall relieve such indemnifying party of any liability to the indemnified party under this Section 1.9, but the omission so to deliver written notice to the indemnifying party will not relieve it of any liability that it may have to any indemnified party otherwise than under this Section 1.9.

(d) If the indemnification provided for in this Section 1.9 is held by a court of competent jurisdiction to be unavailable to an indemnified party with respect to any loss, liability, claim, damage or expense referred to herein, then the indemnifying party, in lieu of indemnifying such indemnified party hereunder, shall contribute to the amount paid or payable by such indemnified party as a result of such loss, liability, claim, damage or expense in such proportion as is appropriate to reflect the relative fault of the indemnifying party on the one hand and of the indemnified party on the other in connection with the statements or omissions that resulted in such loss, liability, claim, damage or expense, as well as any other relevant equitable considerations; provided, however, that an indemnifying Holder will not be obligated to contribute more than the net proceeds received by such indemnifying Holder from such offering. The relative fault of the indemnifying party and of the indemnified party shall be determined by reference to, among other things, whether the untrue or alleged untrue statement of a material



---

fact or the omission to state a material fact relates to information supplied by the indemnifying party or by the indemnified party and the parties' relative intent, knowledge, access to information, and opportunity to correct or prevent such statement or omission.

(e) The obligations of the Company and Holders under this Section 1.9 shall survive the completion of any offering of Registrable Securities in a registration statement under this Section 1, and otherwise.

**1.10 Reports Under Securities Exchange Act of 1934**

With a view to making available to the Holders the benefits of Rule 144 promulgated under the Act and any other rule or regulation of the SEC that may at any time permit a Holder to sell securities of the Company to the public without registration or pursuant to a registration on Form S-3, the Company agrees to:

(a) make and keep public information available, as those terms are understood and defined in SEC Rule 144, at all times after the effective date of the Initial Offering;

(b) take such action, including the voluntary registration of its Common Stock under Section 12 of the 1934 Act, as is necessary to enable the Holders to utilize Form S-3 for the sale of their Registrable Securities, such action to be taken as soon as practicable after the end of the fiscal year in which the registration statement filed by the Company for the Initial Offering is declared effective;

(c) file with the SEC in a timely manner all reports and other documents required of the Company under the Act and the 1934 Act; and

(d) furnish to any Holder, so long as the Holder owns any Registrable Securities, forthwith upon request (i) a written statement by the Company that it has complied with the reporting requirements of SEC Rule 144 (at any time after ninety days after the effective date of the first registration statement filed by the Company), the Act and the 1934 Act (at any time after it has become subject to such reporting requirements), or that it qualifies as a registrant whose securities may be resold pursuant to Form S-3 (at any time after it so qualifies), (ii) a copy of the most recent annual or quarterly report of the Company and such other reports and documents so filed by the Company, and (iii) such other information as may be reasonably requested in availing any Holder of any rule or regulation of the SEC that permits the selling of any such securities without registration or pursuant to such form.

**1.11 Assignment of Registration Rights**

The rights to cause the Company to register Registrable Securities pursuant to this Section 1 may be assigned (but only with all related obligations) by a Holder to a transferee or assignee of such securities, other than a competitor of the Company (as determined by the Company's Board of Directors in its reasonable discretion), that (i) is a subsidiary, parent or affiliate of a Holder that is an entity, (ii) is a family member of a Holder or a partner, limited partner, member, retired member, retired, partner or stockholder of a Holder or trust for the benefit of such an individual, (iii) held Registrable Securities prior to such transfer, or (iv) after such assignment or transfer, holds at least 1,000,000 shares of Registrable Securities (subject to



appropriate adjustment for stock splits, stock dividends, combinations and other recapitalizations) (or such lesser amount if the Holder is transferring all Registrable Securities held by the Holder), provided: (a) the Company is, within a reasonable time after such transfer, furnished with written notice of the name and address of such transferee or assignee and the securities with respect to which such registration rights are being assigned; (b) such transferee or assignee agrees in writing to be bound by and subject to the terms and conditions of this Agreement, including without limitation the provisions of Section 1.13 below; and (c) such assignment shall be effective only if immediately following such transfer the further disposition of such securities by the transferee or assignee is restricted under the Act.

**1.12 Limitations on Subsequent Registration Rights**

From and after the date of this Agreement, the Company shall not, without the prior written consent of the Holders of a majority in interest of the then outstanding Registrable Securities, enter into any agreement with any holder or prospective holder of any securities of the Company that would allow such holder or prospective holder any registration rights if (a) the terms of such registration rights are senior to or pari passu with the registration rights granted to the Holders pursuant to this Agreement or (b) such holder would not be bound by obligations similar to the obligations of the Holders set forth in Section 1.9 and 1.13. The Investors agree that the foregoing shall not be construed as to limit the Company's ability to extend the registration rights contained herein pari passu to subsequent purchasers of shares of Series H Preferred Stock who purchase such shares pursuant to and in accordance with the Subsequent Closing (as defined in the Series H Agreement) provisions of the Series H Agreement. Such purchasers shall be deemed a Holder and an Investor with all of the rights of a Holder and an Investor under this Agreement; provided that as a condition thereto such Holder or Investor shall sign a counterpart signature page to this Agreement.

**1.13 Market Stand-Off Agreement**

Each Holder hereby agrees that it will not, without the prior written consent of the managing underwriter(s), during the period commencing on the date of the final prospectus relating to the Company's Initial Offering and ending on the date specified by the Company and the managing underwriter (such period not to exceed one hundred eighty days) (i) lend, offer, pledge, sell, contract to sell, sell any option or contract to purchase, purchase any option or contract to sell, grant any option, right or warrant to purchase, or otherwise transfer or dispose of, directly or indirectly, any shares of Common Stock or any securities convertible into or exercisable or exchangeable for Common Stock (whether such shares or any such securities are then owned by the Holder or are thereafter acquired), or (ii) enter into any swap or other arrangement that transfers to another, in whole or in part, any of the economic consequences of ownership of the Common Stock, whether any such transaction described in clause (i) or (ii) above is to be settled by delivery of Common Stock or such other securities, in cash or otherwise. Each Holder further agrees to execute and enter into an agreement (such agreement to be in the form as may be requested by the managing underwriter(s)) with the managing underwriter(s) of such Initial Offering to reflect the foregoing. The foregoing provisions of this Section 1.13 shall apply only to the Company's Initial Offering of equity securities, shall not apply to the sale of any shares to an underwriter pursuant to an underwriting agreement, and shall only be applicable to the Holders if all officers, directors and greater than one percent



stockholders of the Company enter into similar agreements; provided, however, that if any provision of such agreement is waived or terminated with respect to any of the securities of any such officer, director or greater than one percent stockholder (in any such case of waiver or termination, such securities being the "***Released Securities***"), the foregoing provisions shall be waived or terminated, as applicable, to the same extent with respect to the same percentage of securities of each Holder as the percentage the Released Securities represent with respect to the securities held by the applicable officer, director or greater than one percent stockholder. The underwriters in connection with the Company's Initial Offering are intended third party beneficiaries of this Section 1.13 and shall have the right, power and authority to enforce the provisions hereof as though they were a party hereto. In order to enforce the foregoing covenant, the Company may impose stop-transfer instructions with respect to the Registrable Securities of each Holder (and the shares or securities of every other person subject to the foregoing restriction) until the end of such period.

**1.14 Termination of Registration Rights**

No Holder shall be entitled to exercise any right provided for in this Section 1 after five years following the consummation of a Qualified IPO or, as to any Holder, such earlier time at which all Registrable Securities held by such Holder (and any affiliate of the Holder with whom such Holder must aggregate its sales under Rule 144) can be sold in any three (3)-month period without registration in compliance with Rule 144 of the Act, provided that the shares held by such Holder are less than one percent (1%) of the Company's outstanding securities.

**2. Covenants**

The Company hereby covenants to each of the Investors as follows:

**2.1 Delivery of Financial Statements**

The Company shall deliver to each Investor who holds at least 1,000,000 shares of the Preferred Stock (or Common Stock issued upon conversion of the Preferred Stock) and as adjusted for splits, dividends, combinations and other recapitalizations (a "***Major Investor***"):

(a) as soon as practicable, but in any event within 120 days after the end of each fiscal year of the Company, an income statement for such fiscal year, a balance sheet of the Company and statement of stockholder's equity as of the end of such year, and a statement of cash flows for such year, such year-end financial reports (the "***Year-End Financial Reports***") to be in reasonable detail, prepared in accordance with generally accepted accounting principles ("***GAAP***") consistently applied, certified by the Company's Chief Executive Officer or Chief Financial Officer, and unless otherwise determined by the Board of Directors, audited and certified by an independent public accounting firm of nationally recognized standing approved by the Board of Directors;

(b) as soon as practicable, but in any event within 90 days after the end of each fiscal year of the Company, unaudited Year-End Financial Reports;

(c) as soon as practicable, but in any event within forty-five days after the end of each of the first three quarters of each fiscal year of the Company, an unaudited income



---

statement, statement of cash flows for such fiscal quarter and an unaudited balance sheet as of the end of such fiscal quarter, each of the foregoing income statement, statement of cash flows and balance sheet also to set forth in comparative form the budgeted amounts for such period and the corresponding figures for the period in the prior fiscal year, to be in reasonable detail, prepared in accordance with GAAP and to be certified, subject to normal year-end audit adjustments, by the Company's Chief Executive Officer or Chief Financial Officer that they are true and accurate in all material respects as of their dates;

(d) within thirty days of the end of each month, an unaudited income statement and statement of cash flows and balance sheet for and as of the end of such month, in reasonable detail, each of the foregoing income statement, statement of cash flows and balance sheet also to set forth in comparative form the budgeted amounts for such period and the corresponding figures for the period in the prior fiscal year, to be in reasonable detail, prepared in accordance with GAAP consistently applied and to be certified, subject to normal year-end audit adjustments, by the Company's Chief Executive Officer or Chief Financial Officer that they are true and accurate in all material respects as of their dates;

(e) as soon as practicable, but in any event at least thirty days prior to the end of each fiscal year, a budget for the next fiscal year, approved by the Board of Directors prepared on a monthly basis, including balance sheets, income statements and statements of cash flows for such months and, as soon as prepared, any other budgets or revised budgets prepared by the Company; and

(f) such other information relating to the financial condition, business, prospects or corporate affairs of the Company as any Major Investor may from time to time request, including a capitalization table and a list of the Company's stockholders and all holders of the Company's outstanding options, warrants or other securities; provided, however, that the Company shall not be obligated under this Section 2.1(f) to provide information that it deems in good faith to be a trade secret or similar confidential information.

**2.2 Inspection**

The Company shall permit each Major Investor, at such Major Investor's expense, to visit and inspect the Company's properties, to examine its books of account and records and to discuss the Company's affairs, finances and accounts with its officers, all at such reasonable times as may be requested by the Major Investor; provided, however, that the Company shall not be obligated pursuant to this Section 2.2 to provide access to any information that it reasonably considers to be a trade secret or similar confidential information.

**2.3 Termination of Information and Inspection Covenants**

The covenants set forth in Sections 2.1 and 2.2 shall terminate as to Major Investors and be of no further force or effect upon the earlier of (a) the closing of the Initial Offering, (b)when the Company first becomes subject to the periodic reporting requirements of Sections 12(g) or 15(d) of the 1934 Act, or (c) a "***Deemed Liquidation***" (as such term is defined in the Restated Certificate) of the Company, provided that in such Deemed Liquidation the Investors receive cash, cash equivalents or Marketable Securities (as defined below) in consideration for the



---

securities of the Company held by them, provided that this clause (c) shall not cause the information rights to terminate following a merger effected solely for the purpose of changing the domicile of the Company. The term "Marketable Securities" means securities that are (i) listed on a national securities exchange or listed on the NASDAQ National Market System and (ii) freely tradable by each of the Investors under applicable securities laws on such exchange or system.

**2.4 Right of First Offer**

Subject to the terms and conditions specified in this Section 2.4, the Company hereby grants to each Major Investor a right of first offer with respect to future sales by the Company of its New Shares (as hereinafter defined). For purposes of this Section 2.4, Major Investor includes any affiliates of a Major Investor. A Major Investor shall be entitled to apportion the right of first offer hereby granted it among itself and its affiliates as it deems appropriate. Each time the Company proposes to offer any shares of, or securities convertible into or exchangeable or exercisable for any shares of, any class of its capital stock ("***New Shares***"), the Company shall first make an offering of such New Shares to each Major Investor in accordance with the following provisions:

(a) The Company shall deliver a notice in accordance with Section 3.5 ("***Notice***") to the Major Investors stating (i) its bona fide intention to offer such New Shares, (ii) the number of such New Shares to be offered, and (iii) the price and terms upon which it proposes to offer such New Shares.

(b) By written notification received by the Company, within fifteen (15) calendar days after receipt of the Notice, the Major Investor may elect to purchase or obtain, at the price and on the terms specified in the Notice, up to that portion of such New Shares that equals the proportion that the number of shares of Common Stock issued and held, or issuable upon conversion and exercise of all convertible or exercisable securities of the Company then held, by such Major Investor bears to the total number of shares of Common Stock of the Company then outstanding (assuming full conversion of all outstanding convertible securities and the exercise of any outstanding options or warrants). The Company shall promptly, in writing, inform each Major Investor that elects to purchase all the New Shares available to it (a "***Fully-Exercising Investor***") of any other Major Investor's failure to do likewise. During the ten (10) day period commencing after such information is given, each Fully-Exercising Investor may elect to purchase all or a portion of the New Shares for which Major Investors were entitled to subscribe but which were not subscribed for by the Major Investors (such shares, the "***Remaining Shares***"), provided that to the extent the aggregate number of shares the Fully-Exercising Investors desire to purchase exceeds the number of Remaining Shares, then each Fully-Exercising Investor shall only be entitled to purchase that portion of the Remaining Shares that is equal to the proportion that the number of shares of Common Stock issued and held, or issuable upon conversion and exercise of all convertible or exercisable securities of the Company then held, by such Fully-Exercising Investor bears to the total number of shares of Common Stock issued and held, or issuable upon conversion of and exercise of all convertible or exercisable securities of the Company then held, by all Fully-Exercising Investors who wish to purchase the Remaining Shares.



(c) If all New Shares that Investors are entitled to obtain pursuant to Section 2.4(b) are not elected to be obtained as provided in Section 2.4(b) hereof, the Company may, during the forty-five (45) day period following the expiration of the period provided in Section 2.4(b) hereof, offer the remaining unsubscribed portion of such New Shares to any person or persons at a price not less than, and upon terms no more favorable to the offeree (individually or in the aggregate) than those specified in the Notice. If the Company does not enter into an agreement for the sale of the New Shares within such period, or if such agreement is not consummated within 45 days of the execution thereof, the right provided hereunder shall be deemed to be revived and such New Shares shall not be offered unless first reoffered to the Major Investors in accordance herewith.

(d) For purposes of this Section 2.4, "***New Shares***" shall not include, and therefore the right of first offer shall not be applicable to the issuance of, any securities that are specifically excluded from the definition of "***Additional Shares of Common Stock***" in the Restated Certificate, including, without limitation, shares of Series H Preferred Stock issued or issuable under the Series H Agreement at the First Closing or any Subsequent Closing and shares of Common Stock issuable upon conversion of any shares of Series A Preferred Stock, Series B Preferred Stock, Series C Preferred Stock, Series D Preferred Stock, Series E Preferred Stock, Series F Preferred Stock, Series G Preferred Stock, Series G-1 Preferred Stock or Series H Preferred Stock.

**2.5 Board Observer Rights**

Each Major Investor (or its representative), and Best Buy Co., Inc. ("***Best Buy***") if it is not a Major Investor but holds not less than 1,000,000 shares of Registrable Securities, shall have the right to attend all meetings of the Board of Directors in a nonvoting observer capacity (each such participant, an "***Observer***"), and to receive copies of all notices, minutes, consents, and other materials that the Company provides to its directors; provided, however, that the Company reserves the right, upon the advice of its counsel, to withhold any information and to exclude such Major Investor if (i) access to such information or attendance at such meeting could adversely affect the attorney-client privilege between the Company and its counsel; (ii) such Major Investor or its representative is a direct competitor of the Company; or (iii) a majority of the members of the Board of Directors deem it appropriate to exclude such Major Investor's representative from any meeting or from any portion thereof because attendance at such meeting or portion thereof (a) could reasonably be expected to raise issues as to a potential conflict of interest between such Major Investor or its representative and the Company or (b) if such Major Investor is a competitor or a potential competitor, or could gain a competitive advantage by reason of the subject matter to be addressed. Each Major Investor agrees, and any representative of each Major Investor will agree, to hold in confidence all information provided to it or learned by it in connection with its rights under this Section 2.5, except to the extent otherwise required by law and any other regulatory process to which such Major Investor is subject.

**2.6 Expenses**

The Company shall pay the reasonable out-of-pocket expenses incurred by non-employee directors in connection with their attendance at Board of Directors meetings or other Company-authorized business.

**2.7 Director and Officer Insurance**

The Company shall use commercially reasonable efforts to obtain from financially sound and reputable insurers and maintain at all times thereafter director and officer liability insurance with coverage limits customary for similarly situated companies, as determined by and on such terms as are approved by a majority of the directors.

**2.8 Legend**

Each certificate evidencing any of the Shares shall bear a legend substantially as follows:

"THE SHARES REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO THE TERMS AND CONDITIONS OF A CERTAIN INVESTORS' RIGHTS AGREEMENT, AS AT ANY TIME AMENDED, AND MAY NOT BE SOLD, TRANSFERRED OR ENCUMBERED EXCEPT IN ACCORDANCE WITH THE TERMS AND PROVISIONS OF SAID AGREEMENT, A COPY OF WHICH IS ON FILE AT THE PRINCIPAL EXECUTIVE OFFICE OF THE COMPANY AND WILL BE FURNISHED TO THE HOLDER OF THIS CERTIFICATE UPON REQUEST AND WITHOUT CHARGE."

**2.9 Lock-Up Agreement of Future Security Holders**

The Company shall cause each future holder of its securities to enter into an agreement substantially similar to the market stand-off agreement of the Holders set forth in Section 1.13.

**2.10 Employee Stock**

With respect to any shares issued or options or rights granted, unless the Board of Directors (including at least one of the Preferred Directors (as defined in the Restated Certificate) agrees otherwise, the Company shall cause each officer, director and employee of the Company to enter into an agreement (i) providing for vesting of such shares or options or rights over 48 months, with no shares or options or rights being vested for 12 months from the date of issuance or grant, as the case may be, at which time 12/48ths of the shares or options or rights shall be vested (provided, however, that director grants may vest monthly over 36 months); (ii) providing for the repurchase of such shares in the event the holder's employment with or service to the Company terminates; (iii) under which the holder agrees to a market standoff requested by the Company or the underwriters of any public offering of the Company's securities, substantially similar to that set forth in Section 1.13; and (iv) providing for a right of first refusal in favor of the Company with respect to both vested and unvested shares.

**2.11 Confidential Information, Invention Assignment and Non-Compete Agreements**

Each employee of and consultant to the Company shall, as a condition to the commencement and continuation of their employment with or service to the Company, execute a confidential information and invention assignment agreement in a form reasonably satisfactory



---

to the Board of Directors. Subject to the provisions of applicable law, each key employee of and consultant to the Company (as reasonably determined from time to time by the Board of Directors) shall enter into a non-compete agreement in a form reasonably satisfactory to the Investors.

**2.12 Key Person Insurance**

The Company shall use all reasonable efforts to maintain at all times hereafter, term life insurance on the life of William B. West in the amount of $1,000,000. Such policies shall name the Company as loss payee and shall not be cancelable without the prior approval of the Board of Directors.

**2.13 IPO Participation Rights**

(a) Grant of Right. In connection with the Initial Offering the Company shall, to the extent permissible under applicable law, use reasonable efforts to cause the managing underwriter(s) (the "***Managing Underwriter***") of the Initial Offering to offer to each of the holders of the Preferred Stock, including shares of Common Stock issued upon conversion of such Preferred Stock (each, a "***Preferred Holder***"), the right to purchase in the Initial Offering, at the offering price per share and upon the same terms and conditions which such shares of Common Stock are offered to the public in the Initial Offering, a number of shares of Common Stock determined pursuant to the terms of this Section 2.14. Subject to the terms and conditions specified in this Section 2.14, the aggregate number of shares that shall be subject to the Preferred Holders' rights under this Section 2.14 (the "***IPO Shares***") shall be determined by dividing (a) Ten Percent (10%) of the aggregate offering price to the public for all the shares offered in the Initial Offering by (b) the offering price per share to the public in the Initial Offering; provided, however, that in the event that the Managing Underwriter advises the Preferred Holders in writing that such level of participation would, in its opinion, materially adversely affect the offering price or the Managing Underwriter's ability to complete the offering and shall specify the number of IPO Shares which, in its opinion, can be purchased by the Preferred Holders in the Initial Offering without having such an effect, in which case the number of IPO Shares shall be reduced to the number specified in writing by the Managing Underwriter (the "***Managing Director's Cutback***").

(b) Initial Allocation of Shares. Each Preferred Holder shall initially have the right to purchase in the Initial Offering that portion of the IPO Shares (each Preferred Holder's "***IPO Pro Rata Portion***") which is equal to a fraction, the numerator of which shall be the number of shares of Common Stock issuable upon conversion of such Preferred Holder's shares of Preferred Stock (including any shares of Common Stock issued upon conversion of such Preferred Holders' shares of Preferred Stock), and the denominator of which shall be the number of shares of Common Stock issuable upon conversion of all outstanding shares of Preferred Stock held by Preferred Holders (including any shares of Common Stock issued upon conversion of such Preferred Holders' shares of Preferred Stock).

(c) Initial Offering Notice. Promptly following the date on which the Company's red herring preliminary prospectus is first distributed to investors in connection with the Initial Offering, the Company shall deliver written notice (the "***Initial Offering Notice***") to



---

each Preferred Holder stating the IPO Pro Rata Portion available to each Preferred Holder in terms of dollars.

(d) Initial Election Notice. Within five (5) business days after receipt of the Initial Offering Notice, each Preferred Holder desiring to purchase all or a portion of its IPO Pro Rata Portion in the Initial Offering shall deliver written notice to the Company (the "***Initial Election Notice***") indicating the amount of such Preferred Holder's IPO Pro Rata Portion in terms of dollars that the Preferred Holder desires to purchase in the Initial Offering, which indication shall be non-binding with respect to such Preferred Holder.

(e) Additional Allocation Shares. Each Preferred Holder that elected in its Initial Election Notice to purchase its full IPO Pro Rata Portion (a "***Fully-Exercising Preferred Holder***") shall have the right to purchase in the Initial Offering that portion (each Fully-Exercising Preferred Holder's "***Additional IPO Pro Rata Portion***") of the IPO Shares for which the Preferred Holders were entitled to subscribe but were not subscribed for by such Preferred Holders (the "***Unexercised IPO Shares***") which is equal to a fraction, the numerator of which shall be the number of shares of Common Stock issuable upon conversion of such Preferred Holder's shares of Preferred Stock (including any shares of Common Stock issued upon conversion of such Preferred Holder's shares of Preferred Stock), and the denominator of which shall be the number of shares of Common Stock issuable upon conversion of all outstanding shares of Preferred Stock then held by all Fully-Exercising Preferred Holders (including any shares of Common Stock held by Fully-Exercising Preferred Holders issued upon conversion of Fully-Exercising Preferred Holders' shares of Preferred Stock).

(f) Additional IPO Notice. The Company shall promptly deliver written notice (the "***Additional IPO Notice***") to each Fully-Exercising Preferred Holder stating such Fully-Exercising Preferred Holder's Additional IPO Pro Rata Portion in terms of dollars.

(g) Additional Election Notice. Within three (3) business days after receipt of the Additional IPO Notice, each Fully-Exercising Preferred Holder desiring to purchase all or a portion of its Additional IPO Pro Rata Portion in the Initial Offering shall deliver written notice to the Company indicating the amount of such Fully-Exercising Preferred Holder's Additional Pro Rata Portion in terms of dollars that the Fully-Exercising Preferred Holder desires to purchase in the Initial Offering, which indication shall be non-binding with respect to such Preferred Holder. A Preferred Holder may, in its Initial Election Notice, indicate its interest in purchasing all or a portion of its Additional IPO Pro Rata Portion (if any), which shall be deemed sufficient notice to the Company for purposes of this subsection (g).

(h) Sale of IPO Shares by the Company. The Company shall have the right to sell to the public (or, as applicable, the underwriters) in the Initial Offering all IPO Shares not elected to be purchased pursuant to this Section 2.14.

(i) Assignment. The right to purchase IPO Shares pursuant to this Section 2.14 may be assigned, in whole or in part, by a Preferred Holder only to limited or general partners, stockholders, members, unitholders or affiliates of such Preferred Holder, any beneficial owners of any interest in such Preferred Holder; provided, that in no event shall any of



---

the rights in this Section 2.14 be assigned prior to the time that the Company first distributes its red herring preliminary prospectus to investors in connection with an Initial Offering.

(j) Securities Law Compliance. Notwithstanding anything to the contrary contained in this Section 2.14, all action taken pursuant to this Section 2.14 shall be made in accordance with all federal and state securities laws, including, without limitation, Rule 134 of the Securities Act and all applicable rules and regulations promulgated by the National Association of Securities Dealers, Inc. and other such self-regulating organizations. This arrangement between the Company and each Preferred Holder is not an offer to sell or a solicitation of an offer to buy the IPO Shares, and any decision any Preferred Holder makes with respect to the IPO Shares shall be made only after delivery of the "red herring prospectus" related to the Initial Offering and shall be made in compliance with all securities laws and regulations. Each Preferred Holder also understands that the provisions of Section 16 of the Exchange Act and other statutory and regulatory provisions may limit such investor's ability to resell the IPO Shares. The Company shall be relieved of any obligations under this Section 2.14 if (a) regulatory authorities prohibit the consummation of the Initial Offering based on their objection to the provisions of this Section 2.14 after discussion with the Company and its legal counsel; (b) regulatory authorities allow the Company to fulfill its obligations under this Section 2.14 only on the condition that rescission rights or other extraordinary liability will be assumed by the Company or the

underwriters; or (c) the resolution with regulatory authorities relating to this arrangement would delay the Initial Offering more than ten (10) days beyond delays caused by other comments from regulatory authorities. Nothing in this Section 2.14 obligates the Company to make a registered public offering of its shares and this Section 2.14 applies only to the Initial Offering, if and when one occurs.

(k) Further Assurances. In connection with any potential purchase under this Section 2.14, each of the Preferred Holders agrees to take all actions that the Company or its counsel reasonably deems necessary, appropriate or desirable in connection with such potential purchase.

(l) Amendments and Waivers. Notwithstanding anything to the contrary herein, any provision of this Section 2.14 may be amended, and the performance or observance of any provision of this Section may be waived, only by a written instrument signed by (1) the Company, and (2) the holders of Preferred Stock holding not less than fifty-eight percent (58%) of the Common Stock issued or issuable upon conversion of the Preferred Stock issued to such Preferred Holders.

**2.14 Termination of Certain Covenants**

The covenants set forth in Sections 2.4 through 2.13 (except to the extent expressly set forth therein) shall terminate and be of no further force or effect upon: (a) the consummation of a Qualified IPO, or (b) a Deemed Liquidation (as defined in the Restated Certificate) of the Company, provided that in such Deemed Liquidation the Investors receive cash, cash equivalents or Marketable Securities in consideration for the securities of the Company held by them, and provided that this clause (b) shall not cause the covenants in Sections 2.4 through 2.13 to terminate following a merger effected solely for the purpose of changing the legal domicile of the Company.



---

**3. Miscellaneous**

**3.1 Successors and Assigns**

Except as otherwise provided herein, the terms and conditions of this Agreement shall inure to the benefit of and be binding upon the respective successors and assigns of the parties (including transferees of any shares of Registrable Securities). Nothing in this Agreement, express or implied, is intended to confer upon any party other than the parties hereto or their respective successors and assigns any rights, remedies, obligations, or liabilities under or by reason of this Agreement, except as expressly provided in this Agreement.

**3.2 Governing Law**

This Agreement shall be governed by and construed under the corporate laws of the State of Delaware and the laws of the State of California (where Delaware corporate law does not apply) as applied to agreements among California residents entered into and to be performed entirely within California, without giving effect to principles of conflicts of laws.

**3.3 Counterparts**

This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. Counterparts may be delivered via facsimile or other electronic transmission.

**3.4 Titles and Subtitles**

The titles and subtitles used in this Agreement are used for convenience only and are not to be considered in construing or interpreting this Agreement.

**3.5 Notices**

Unless otherwise provided, any notice required or permitted under this Agreement shall be given in writing and shall be deemed effectively given (a) upon personal delivery to the party to be notified, (b) upon receipt by the sender of a confirmation of a successful facsimile transmission, (c) one business day after deposit with a nationally recognized overnight courier service, prepaid for overnight delivery and addressed as set forth in (d) below, or (d) three days after deposit with the U.S. Postal Service, postage prepaid, registered or certified with return receipt requested and addressed to the party to be notified at the address indicated for such party on the Schedule A or Schedule B hereto, as the case may be, or at such other address as such party may designate by ten days' advance written notice to the other parties.

**3.6 Expenses**

If any action at law or in equity is necessary to enforce or interpret the terms of this Agreement, the prevailing party shall be entitled to reasonable attorneys' fees, costs and necessary disbursements in addition to any other relief to which such party may be entitled.



---

**3.7 Entire Agreement; Amendments and Waivers**

This Agreement (including the exhibits hereto) constitutes the full and entire understanding and agreement among the parties with regard to the subjects hereof and thereof. Without limiting the foregoing, this Agreement amends and restates the Prior Agreement in its entirety and all of the terms of the Prior Agreement as superseded by the terms of this Agreement. Any term of this Agreement may be amended and the observance of any term of this Agreement may be waived (either generally or in a particular instance and either retroactively or prospectively), only with the written consent of the Company and Investors holding a majority in interest of the then outstanding Registrable Securities; provided, however, that in the event that such amendment or waiver adversely affects the obligations and/or rights of the Common Holders in a different manner than the other Holders, such amendment or waiver shall also require the written consent of the Common Holders holding a majority of the Registrable Securities held by the Common Holders; provided, however, that in the event that such amendment or waiver adversely affects the obligations and/or rights of the Major Investors, such amendment or waiver shall also require the written consent of the Major Investors holding a majority of the Preferred Stock (or Common Stock issued upon conversion of the Preferred Stock) held by the Major Investors; provided further, that any waiver or amendment that has the effect of (i) imposing a new obligation on an Investor or Major Investor, (ii) increasing any existing obligation of an Investor, or (iii) diminishing or waiving any right, privilege or restriction provided for the benefit of an Investor or Major Investor (including, without limitation, a change to the number or percentage of securities that must be held to secure such rights) (other than as a result of any stock dividend, combination, split, reclassification or the like), in each case, without a corresponding modification to the obligations, rights, privileges or restrictions held by each other Investor or Major Investor, as the case may be, shall require the prior written consent of each such differently affected Investor or Major Investor, as the case may be; provided further, that any waiver or amendment that affects any Investor's observer rights as provided in Section 2.5 or information rights as provided in Section 2.1 shall require the prior written consent of such Investors; and provided further, that any Common Holder or Investor may waive any of such Common Holder's or Investor's own rights hereunder without obtaining the consent of any other Common Holders or Investors, as applicable. Any amendment or waiver effected in accordance with this Section 3.7 shall be binding upon each Holder of any Registrable Securities, each future Holder of any Registrable Securities and the Company. Notwithstanding anything in this Agreement to the contrary, the Company may amend this Agreement solely to add a party who after the date of this Agreement acquires shares of the Company's Series H Preferred Stock pursuant to the terms of the Series H Agreement. Any such additional party, by executing a counterpart signature page to this Agreement, shall become an Investor for all purposes and shall be bound by all of the applicable provisions under this Agreement.

**3.8 Severability**

If one or more provisions of this Agreement are held to be unenforceable under applicable law, such provision shall be excluded from this Agreement and the balance of the Agreement shall be interpreted as if such provision were so excluded and shall be enforceable in accordance with its terms.



---

**3.9 Aggregation of Stock**

All shares of Registrable Securities held or acquired by subsidiaries or affiliated entities or persons shall be aggregated together for the purpose of determining the availability of any rights under this Agreement.

**3.10 Arbitration**

Any claims arising under this Agreement shall be resolved in binding arbitration with a duly authorized representative of the American Arbitration Association ("AAA") in accordance with the provisions hereof and thereof. Either the Company, the Common Holder(s) or the Investor(s) may submit the matter to binding arbitration before the AAA in San Mateo County, California, which arbitration shall be final and binding on the parties and the exclusive method, absent agreement between the Company, such Common Holder(s) and such Investor(s), for purposes of determining the ability of the Company to satisfy such claim. All claims shall be settled by a single arbitrator appointed in accordance with the Commercial Arbitration Rules then in effect of the AAA (the "***AAA Rules***"). The arbitrator shall render a final decision pursuant to the AAA Rules within thirty (30) days after filing of the claim. The final decision of the arbitrator shall be furnished to such Common Holder(s), such Investor(s) and the Company in writing and shall constitute the conclusive determination of the issue in question binding upon such Common Holder(s), such Investor(s) and the Company, and shall not be contested by any of them. Such decision may be used in a court of law only for the purpose of seeking enforcement of the arbitrator's decision. The prevailing party shall be entitled to reasonable attorney's fees, costs and necessary disbursements in addition to any other relief that such party may be entitled. For purposes of this Agreement, the prevailing party shall be that party in whose favor final judgment is rendered or who substantially prevails, if both parties are awarded judgment.

**3.11 Waiver of Right of First Offer**

Each of the Existing Investors hereby waives any right of notice or right of first offer to which such Existing Investor may be entitled pursuant to the Prior Agreement. Such waiver shall be binding upon all parties to the Prior Agreement.

*[SIGNATURE PAGES FOLLOW]*



---

**EXHIBIT A**

**SCHEDULE OF INVESTORS**

**Name and Address of Investors**

Foundation Capital IV L.P.
250 Middlefield Road
Menlo Park, CA 94025
(650) 614-0505 Facsimile

FC IV Active Advisors Fund, LLC
250 Middlefield Road
Menlo Park, CA 94025
(650) 614-0505 Facsimile

Foundation Capital IV Principals Fund, LLC
250 Middlefield Road
Menlo Park, CA 94025
(650) 614-0505 Facsimile

Foundation Capital VI, L.P.
250 Middlefield Road
Menlo Park, CA 94025
(650) 614-0505 Facsimile

Foundation Capital VI Principals Fund, LLC
250 Middlefield Road
Menlo Park, CA 94025
(650)614-0505 Facsimile

Redelfs Family Trust UAD December 11, 2000
1108 Fremont Ave.
Los Altos, CA 94024

Thomas Weisel Venture Partners, L.P.
One Montgomery Street, Suite 3700
San Francisco, CA 94104

Thomas Weisel Venture Partners Employee Fund, L.P.
1950 University Avenue, Suite 501
East Palo Alto, CA 94303

vSpring III, L.P.
2795 E. Cottonwood Pkwy, Suite #360
Salt Lake City, Utah 84121

---

vSpring III (SP), L.P.
2795 E. Cottonwood Pkwy, Suite #360
Salt Lake City, Utah 84121

vSpring Partners III, L.P.
2795 E. Cottonwood Pkwy, Suite #360
Salt Lake City, Utah 84121

vSpring SBIC, L.P.
2795 E. Cottonwood Pkwy, Suite #360
Salt Lake City, Utah 84121

TWB Investment Partnership, L.P.
1201 Third Avenue, 40th Floor
Seattle, Washington 98101

Frazier Technology Ventures, L.P.
601 Union
Two Union Square, Suite 3200
Seattle, WA 98101

SAP Ventures Fund I, L.P.
4 West 4th Avenue, Suite 300
San Mateo, CA 94402

Snake River Ventures, LLC
263 Santa Rita Ave.
Palo Alto, CA 94301

South Fork Ventures LLC
791 Sunshine Dr
Los Altos, CA 94024

Christopher B. Paisley
14870 Three Oaks Court
Saratoga, CA 95070

TWB Investment Partnership II, L.P.
1201 Third Avenue, Floor 48
Seattle, Washington 98101

University Opportunity Fund, LLC
299 South Main, 8th Floor
Salt Lake City, UT 84111

University Opportunity Affiliates Fund, LLC
299 South Main, 8th Floor
Salt Lake City, UT 84111

**SIGNATURE PAGE TO**
**EIGHTH AMENDED AND RESTATED INVESTORS' RIGHTS AGREEMENT**

---

Mercato Partners, L.P.
6405 South 3000 East
Salt Lake City, UT 84121-6976

Mercato Partners Q.P., L.P.
6405 South 3000 East
Salt Lake City, UT 84121-6976

Best Buy Co., Inc.
7601 Penn Avenue South
Richfield, MN 55423
Attn: Vice President - Best Buy Capital
Fax No.: (952) 430-4817

Copies to:

Best Buy Co., Inc.
7601 Penn Avenue South
Richfield, MN 55423
Attn: Legal Department - Corporate and Securities
Fax No.: (612) 292-2323

And

Robins, Kaplan, Miller & Ciresi L.L.P.
2800 LaSalle Plaza
800 LaSalle Avenue
Minneapolis, MN 55402-2015
Attn: Kevin S. Spring
Fax No.: (612)339-4181

Cisco Systems, Inc.
170 West Tasman Drive
San Jose, CA 95134-1706
Attention: General Counsel Fax No.: 408-525-4757

With a copy to:

Attention: Business Development
Fax No.: 408-526-7864

Fenwick & West LLP
801 California Street
Mountain View, CA 94041
Attn.: Cynthia Clarfield Hess, Esq.
Fax No.: (650)938-5200

**SIGNATURE PAGE TO**
**EIGHTH AMENDED AND RESTATED INVESTORS' RIGHTS AGREEMENT**

---

Sony Electronics Inc.
16530 Via Esprillo, MZ 1106
San Diego, CA 92127
Attn: Head of Corporate Development

With a copy to:

Sony Electronics Inc.
16530 Via Esprillo, MZ 1105
San Diego, CA 92127
ATTN to General Counsel

**SIGNATURE PAGE TO**
**EIGHTH AMENDED AND RESTATED INVESTORS' RIGHTS AGREEMENT**

---

**SCHEDULE B**

**SCHEDULE OF COMMON HOLDERS**

**Name and Address**

William B. West
c/o Control4 Corporation
11734 South Election Road
Salt Lake City, Utah 84020

W. Eric Smith
c/o Control4 Corporation

11734 South Election Road
Salt Lake City, Utah 84020

Mark J. Morgan
c/o Control4 Corporation
11734 South Election Road
Salt Lake City, Utah 84020

**SIGNATURE PAGE TO**
**EIGHTH AMENDED AND RESTATED INVESTORS' RIGHTS AGREEMENT**

---

IN WITNESS WHEREOF, the parties have executed this Eighth Amended and Restated Investors' Rights Agreement as of the date first above written.

**COMPANY:**

**CONTROL4 CORPORATION**

By: /s/ William B. West
William B. West
Chief Executive Officer

Address: 11734 South Election Road
Salt Lake City, Utah 84020

**SIGNATURE PAGE TO**
**EIGHTH AMENDED AND RESTATED INVESTORS' RIGHTS AGREEMENT**

---

IN WITNESS WHEREOF, the parties have executed this Eighth Amended and Restated Investors' Rights Agreement as of the date first above written.

**INVESTOR:**

**CISCO SYSTEMS, INC.**

By: /s/ Ned Hooper
Name: Ned Hooper
Title: Chief Strategy Officer

Address:

170 West Tasman Drive
San Jose, CA 95134-1706

**SIGNATURE PAGE TO**
**EIGHTH AMENDED AND RESTATED INVESTORS' RIGHTS AGREEMENT**

---

IN WITNESS WHEREOF, the parties have executed this Eighth Amended and Restated Investors' Rights Agreement as of the date first above written.

**INVESTOR:**

**SAP VENTURES FUND I, UP.**

By: SAP Ventures (GPE) I, LLC
Its General Partner

By: /s/ Nino Marakovic
Name: Nino Marakovic
Title: Managing Member

Address: 4 West 4th Avenue, Suite 300
San Mateo, CA 94402

By: /s/ Jayendra Das
Name: Jayendra Das
Title: Managing Member

Address: 4 West 4th Avenue, Suite 300
San Mateo, CA 94402

**SIGNATURE PAGE TO**
**EIGHTH AMENDED AND RESTATED INVESTORS' RIGHTS AGREEMENT**

---

IN WITNESS WHEREOF, the parties have executed this Eighth Amended and Restated Investors' Rights Agreement as of the date first above written.

**INVESTOR:**

**SONY ELECTRONICS INC.**

By: /s/ Marjorie Thomas
Name: Marjorie Thomas
Title: Senior Vice President and Corporate Controller

Address: 16530 Via Esprillo
San Diego, CA 92127

**SIGNATURE PAGE TO**
**EIGHTH AMENDED AND RESTATED INVESTORS' RIGHTS AGREEMENT**

---

IN WITNESS WHEREOF, the parties have executed this Eighth Amended and Restated Investors' Rights Agreement as of the date first above written.

**INVESTOR:**

**BEST BUY CO., INC.**

By: /s/ Kuk Yi
Kuk Yi
Vice President, Best Buy Capital

---

IN WITNESS WHEREOF, the parties have executed this Eighth Amended and Restated Investors' Rights Agreement as of the date first above written.

**INVESTORS:**

**Foundation Capital IV, L.P.**
By: Foundation Capital Management Co. IV, LLC
its Manager

By: [Illegible]
Manager

**FCIV Active Advisors Fund, LLC**
By: Foundation Capital Management Co. IV, LLC
its Manager

By: [Illegible]
Manager

**Foundation Capital IV Principals Fund, LLC**
By: Foundation Capital Management Co. IV, LLC
its Manager

By: [Illegible]
Manager

**Foundation Capital VI, L.P.**
By: Foundation Capital Management Co. VI, LLC
its Manager

By: [Illegible]
Manager

**SIGNATURE PAGE TO**
**EIGHTH AMENDED AND RESTATED INVESTORS' RIGHTS AGREEMENT**

---

**Foundation Capital VI Principals Fund, LLC**
By: Foundation Capital Management Co. VI, LLC
its Manager

By: [Illegible]
Manager

**SIGNATURE PAGE TO**
**EIGHTH AMENDED AND RESTATED INVESTORS' RIGHTS AGREEMENT**

---

IN WITNESS WHEREOF, the parties have executed this Eighth Amended and Restated Investors' Rights Agreement as of the date first above written.

**INVESTORS:**

**THOMAS WEISEL VENTURE PARTNERS, L.P.**

**BY:** **THOMAS WEISEL VENTURE PARTNERS LLC**
**ITS:** **GENERAL PARTNER**

By: [Illegible]
Name:
Title:

Address:
One Montgomery Street, Suite 3700
San Francisco, CA 94104

**THOMAS WEISEL VENTURE PARTNERS EMPLOYEE FUND, L.P.**

**BY:** **THOMAS WEISEL CAPITAL MANAGEMENT, LLC**
**ITS:** **GENERAL PARTNER**

By: [Illegible]
Name:
Title:

Address:
One Montgomery Street, Suite 3700
San Francisco, CA 94104

**SIGNATURE PAGE TO**
**EIGHTH AMENDED AND RESTATED INVESTORS' RIGHTS AGREEMENT**

---

IN WITNESS WHEREOF, the parties have executed this Eighth Amended and Restated Investors' Rights Agreement as of the date first above written.

**INVESTORS:**

**vSpring SBIC, L.P.**
By: vSpring SBIC Management, L.L.C.
its General Partner

By: /s/ Scott Petty
Scott Petty, Managing Director

**vSpring III, L.P.**

By: vSpring Management III, L.L.C.
its General Partner

By: /s/ Scott Petty
Scott Petty, Managing Director

**vSpring III (SP), L.P.**

By: vSpring Management III, L.L.C.
its General Partner

By: /s/ Scott Petty
Scott Petty, Managing Director

**vSpring Partners III, L.P.**

By: vSpring Management III, L.L.C.
its General Partner

By: /s/ Scott Petty
Scott Petty, Managing Director

**SIGNATURE PAGE TO**
**EIGHTH AMENDED AND RESTATED INVESTORS' RIGHTS AGREEMENT**

---

IN WITNESS WHEREOF, the parties have executed this Eighth Amended and Restated Investors' Rights Agreement as of the date first above written.

**INVESTOR:**

**FRAZIER TECHNOLOGY VENTURES II, L.P.**

By FTVM II, L.P., its general partner

By Frazier Technology Management, L.L.C., its general partner

By: /s/ Len K. Jordan
Len K. Jordan, Managing Member

**SIGNATURE PAGE TO**
**EIGHTH AMENDED AND RESTATED INVESTORS' RIGHTS AGREEMENT**

---

IN WITNESS WHEREOF, the parties have executed this Eighth Amended and Restated Investors' Rights Agreement as of the date first above written.

**INVESTOR:**

/s/ Chris Paisley
Chris Paisley

**SIGNATURE PAGE TO**
**EIGHTH AMENDED AND RESTATED INVESTORS' RIGHTS AGREEMENT**

---

IN WITNESS WHEREOF, the parties have executed this Eighth Amended and Restated Investors' Rights Agreement as of the date first above written.

**COMMON HOLDERS:**

/s/ William B. West

William B. West

Address: Control4 Corporation
11734 South Election Road
Salt Lake City, UT 84020

Fax: (801) 523-3199

Phone: (801) 523-3103

**SIGNATURE PAGE TO**
**EIGHTH AMENDED AND RESTATED INVESTORS' RIGHTS AGREEMENT**

---

IN WITNESS WHEREOF, the parties have executed this Eighth Amended and Restated Investors' Rights Agreement as of the date first above written.

**COMMON HOLDERS:**

/s/ W. Eric Smith

W. Eric Smith

Address: Control4 Corporation
11734 South Election Road
Salt Lake City, UT 84020

Fax: (801) 523-3199

Phone: (801) 523-3103

**SIGNATURE PAGE TO**
**EIGHTH AMENDED AND RESTATED INVESTORS' RIGHTS AGREEMENT**

---

**Exhibit 4.3**

**THE SECURITIES REPRESENTED HEREBY HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED ("*33 ACT*" OR ANY STATE SECURITIES LAWS. THEY MAY NOT BE SOLD, OFFERED FOR SALE, PLEDGED, OR HYPOTHECATED UNLESS THERE IS AN EFFECTIVE REGISTRATION STATEMENT UNDER THE 33 ACT COVERING SUCH SECURITIES, THE TRANSFER IS MADE IN COMPLIANCE WITH RULE 144 PROMULGATED UNDER THE 33 ACT, OR THE COMPANY RECEIVES AN OPINION OF COUNSEL (WHICH MAY BE COMPANY COUNSEL) REASONABLY SATISFACTORY TO THE COMPANY STATING THAT SUCH REGISTRATION IS NOT REQUIRED UNDER THE 33 ACT, OR ANY APPLICABLE STATE SECURITIES LAWS.**

**WARRANT**

**To Purchase Shares of the Common Stock of**

**CONTROL4 CORPORATION**

**Dated as of October 25, 2010 (the "*Effective Date*")**

**WHEREAS**, pursuant to the certain asset purchase agreement (the "***Asset Purchase Agreement***") dated October 25, 2010 by and between Control4 Corporation, a Delaware corporation (the "***Company***") and Control UI, LLC, a Massachusetts limited liability company ("***Control UI***"), the Company agreed to grant to Control UI a warrant to purchase 370,000 shares of the Company's Common Stock; and

**NOW**, in consideration of the foregoing and in consideration of the premises and the mutual covenants and agreements contained herein, and other good and valuable consideration the receipt and sufficiency of which is hereby acknowledged the parties agree as follows:

**1. GRANT OF THE RIGHT TO PURCHASE COMMON STOCK; NUMBER OF SHARES; EXERCISE PRICE.**

The Company hereby grants to Control UI or its registered assigns (hereafter, the "***Warrantholder***"), upon the terms and subject to the conditions hereinafter set forth, to subscribe to and purchase from the Company 370,000 shares of the Company's Common Stock ("***Common Stock***"), in accordance with the vesting terms set forth below, subject to adjustment in accordance with Section 8 (collectively, the "***Warrant Shares***") at the exercise price of the lesser of $1.44 per share or the independent valuation for the Company shares dated September 30, 2010, as such valuation may be conducted by Company in its sole discretion, (as adjusted pursuant to the terms hereof, the "***Exercise Price***"). All defined terms not defined herein shall have the meaning ascribed to them in the Asset Purchase Agreement.

The Warrant Shares will be subject to forfeiture until the earlier of the successful integration of the Purchased Assets into Company's business (the "***Integration***") or one hundred thirty five (135) days after Effective Date (the "***Integration Period***"). Thereafter the Warrant Shares shall not be subject to forfeiture ("***Vesting Date***"). "Integration" means the completion by O'Brien, Hudson and Company of the following during the Integration Period: (1) delivery of the Purchased Assets to the Company; (2) provision to Company of the architectural

---

documentation for the Purchased Assets and documentation related to the major business processes for code development, registration and support of the Apple, Android, and Blackberry; and (3) submission of one version each of the iPhone & iPad applications to Apple for approval. Notwithstanding the foregoing, the Warrant Shares shall no longer be subject to forfeiture within the Integration Period if O'Brien and/or Hudson are terminated without cause.

For purposes of this section, "cause" shall mean and include:

(a) any act, whether or not involving Company or any affiliate of Company, of fraud or gross misconduct;

(b) dishonest statements or acts with respect to Company or any affiliate of Company;

(c) the commission of (i) a felony or (ii) any misdemeanor involving moral turpitude, deceit, dishonesty or fraud;

(d) failure to use commercially reasonable efforts, to the commercially reasonable satisfaction of the Board of Directors of Company, to conclude the Integration; *provided, however*, that Company will provide O'Brien and/or Hudson, as the case may be, with written notice to take corrective action to rectify the cause for termination hereunder and if such cause is not rectified to Company's commercially reasonable satisfaction within fourteen (14) business days thereafter, employment shall terminate immediately thereafter for cause; or

(e) gross negligence or willful misconduct.

Cause shall not include death or disability, nor O'Brien or Hudson leaving Company's employment, or a failure to complete the Integration, for good reason. For purposes of this section, "good reason" shall mean and include:

(a) a reduction of salary without consent;

(b) Company requiring O'Brien and/or Hudson to relocate their residence;

(c) Company failing to engage on commercially reasonable terms third parties necessary in the reasonable judgment of Company to complete the Integration, including without limitation, Alan Weiner, Jeremy Millers, and/or Steve Dow, as the case may be;

(d) During the Integration Period, Company has not applied for an Apple Developer account with Apple and does not have a new Macintosh computer (MacBook Pro, iMac, or PowerMac) dedicated to iPhone & iPad release engineering within fifteen (15) days of Closing, This will be the "build machine" used to build and

submit iOS apps to Apple and will be the responsibility of Company's release engineering to set up with the build tools, code source tools and certificates; or

(e) Company does not provide O'Brien and/or Hudson with commercially necessary technological and personnel assistance in order to complete the Integration.



---

Notwithstanding the foregoing, Company will have fourteen (14) business days after written notice thereof to take corrective action to rectify the good reason for O'Brien and/or Hudson to leave Company's employment.

Furthermore, the Warrant Shares shall no longer be subject to forfeiture if at any time within the Integration Period, Company undergoes an initial public offering or a change of control. A change of control shall be deemed to occur if: (a) the shareholders of Company approve (i) any consolidation, merger or sale of equity interests in Company (x) where the shareholders of Company immediately prior to the consolidation, merger or sale would not, immediately after the consolidation, merger or sale beneficially own, directly or indirectly, shares representing in the aggregate more than 50% of the combined voting power of all the outstanding securities of the corporation issuing cash or securities in the consolidation, merger or sale (or of its ultimate parent company, if any) or (y) where the members of the Board of Directors of Company, immediately prior to the consolidation, merger or sale would not, immediately after the consolidation, merger or sale constitute more than 50 % of the Board of Directors issuing cash or securities after the consolidation, merger or sale (or of its ultimate parent company, if any); (ii) any sale, lease, exchange, or other transfer (in one transaction or series of transactions contemplated or arranged by any party as a single plan) of all or substantially all of the assets of the Company; or (iii) any plan or proposal for the liquidation or dissolution of Company.

**2. TERM OF THE WARRANT; EXERCISE PERIOD.**

Subject to the terms and conditions set forth herein, Warrantholder shall be entitled to purchase and exercise this Warrant, in whole or in part, at any time on or after the Vesting Date until the Warrant shall expire on the earlier of (i) five (5) years from the Effective Date; or (ii) the consummation of a Sale Transaction (the date of such exercise referred to as the "***Exercise Date***"). For purposes of this Warrant, a "***Sale Transaction***" shall mean the closing of a merger, consolidation, reorganization, initial public offering or recapitalization of the Company or a sale of the outstanding shares of the Company which, in either case, will result in the Company's stockholders immediately prior to such transaction not holding (by virtue of such shares or securities issued or sold solely with respect thereto) at least 50% of the voting power of the surviving, continuing or purchasing entity, or a sale of all or substantially all of the assets of the Company.

The Company shall notify the Warrantholder twenty (20) days prior to the consummation of a Sale Transaction in accordance with the terms of Section 13(d)(ii) hereof and this Warrant shall terminate unless exercised prior to the date of consummation of such Sale Transaction. If the Company fails to deliver such written notice, then notwithstanding anything to the contrary contained in this Warrant, Warrantholder's right to purchase the Company's Common Stock pursuant to the terms of this Warrant shall not expire for a period of twenty (20) days after the Company complies with such notice provisions.

**3. EXERCISE OF THE PURCHASE RIGHTS.**

The purchase rights set forth in this Warrant shall be exercisable, in whole or in part, at any time, or from time to time, within the period set forth in Section 2 above, by tendering to the



---

Company at its principal office (i) a notice of exercise in the form attached hereto as Exhibit I (the "***Notice of Exercise***"), duly completed and executed, (ii) this Warrant for surrender, and (iii) payment of the purchase price in accordance with the terms set forth below. Promptly upon exercise as set forth in the preceding sentence, and in no event later than ten (10) days thereafter, the Company shall issue to the Warrantholder a certificate for the number of shares of Common Stock purchased and shall execute the acknowledgment of exercise in the form attached hereto as Exhibit II (the "***Acknowledgment of Exercise***") indicating the number of shares which remain subject to future purchases, if any.

The Exercise Price be paid at the Warrantholder's election either (i) by cash, cashier's check, or wire transfer of immediately available funds pursuant to the Company's wire instructions in an amount equal to the aggregate exercise price of the shares being purchased, or (ii) by the surrender of this Warrant ("***Net Issuance***") as set forth below. If the Warrantholder elects the Net Issuance method, the Company will issue Common Stock or other consideration, as the case may be, in accordance with the following formula:

$$X = \frac{Y(A - B)}{A}$$

Where: X = the number of shares of Common Stock to be issued to the Warrantholder pursuant to a Net Issuance.

Y = the number of shares of Common Stock requested to be exercised under this Warrant.

A = the current fair market value of one (1) share of Common Stock on the date of such calculation.

B = the Exercise Price.

For purposes of the above calculation, current fair market value of Common Stock shall mean with respect to each share of Common Stock:

(i) if the exercise is in connection with an initial public offering (an "*IPO*") and if the Company's registration statement relating to the IPO has been declared effective by the Securities and Exchange Commission ("*SEC*), then the current fair market value per share shall be the initial "***Price to Public***" specified in the final prospectus with respect to the IPO;

(ii) otherwise, the current fair market value of Common Stock shall be as determined in good faith by its Board of Directors. In the event that the Warrantholder disagrees with such valuation as determined by the Board of Directors, the Warrantholder shall be entitled to have the valuation determined by an independent appraiser mutually agreeable to the Company and the Warrantholder, the fees for which appraisal shall be borne solely by the Warrantholder.

Upon partial exercise by either cash or Net Issuance, the Company shall promptly issue an amended and restated Warrant representing the remaining number of shares purchasable



---

hereunder. All other terms and conditions of such amended Warrant shall be identical to those contained herein, including, but not limited to the Effective Date hereof.

**4. RESERVATION OF SHARES.**

(a) Authorization and Reservation of Shares. During the term of this Warrant, the Company will at all times have authorized and reserved a sufficient number of shares of its Common Stock to provide for the exercise of the rights to purchase Common Stock as provided for herein.

(b) Registration or Listing. If any shares of Common Stock required to be reserved hereunder require registration with or approval of any governmental authority under any Federal or State law (other than any registration under the 33 Act, as then in effect, or any similar Federal statute then enforced, or any state securities law, required by reason of any transfer involved in such conversion), or listing on any domestic securities exchange, before such shares may be issued upon conversion, the Company will, at its expense and as expeditiously as possible, use its best efforts to cause such shares to be duly registered, listed or approved for listing on such domestic securities exchange, as the case may be.

**5. NO FRACTIONAL SHARES OR SCRIP.**

No fractional shares or scrip representing fractional shares shall be issued upon the exercise of the Warrant, but in lieu of such fractional shares the Company shall make a cash payment therefor upon the basis of the Exercise Price then in effect.

**6. NO RIGHTS AS STOCKHOLDER.**

This Warrant does not entitle the Warrantholder to any voting rights or other rights as a stockholder of the Company prior to the exercise of the Warrant.

**7. WARRANTHOLDER REGISTRY.**

The Company shall maintain a registry showing the name and address of the registered holder of this Warrant.

**8. ADJUSTMENT RIGHTS.**

The Exercise Price and the number of shares of Common Stock purchasable hereunder are subject to adjustment, as follows:

(a) Reclassification of Shares. If there at any time shall occur, by combination, reclassification, exchange or subdivision of securities or otherwise, a change in any of the securities as to which purchase rights under this Warrant exist into the same or a different number of securities of any other class or classes, this Warrant shall thereafter represent the right to acquire such number and kind of securities as would have been issuable as the result of such change with respect to the securities which were subject to the purchase rights under this Warrant immediately prior to such combination, reclassification, exchange, subdivision or other change. Appropriate adjustments shall also be made to the purchase price payable per share, but



---

the aggregate purchase price payable for the total number of shares purchasable, under this Warrant (as adjusted) shall remain the same.

(b) Subdivision or Combination of Shares. If the Company at any time shall combine or subdivide its Common Stock, the number of shares that may be purchased pursuant to the terms of this Warrant shall be proportionately increased in the case of a subdivision, or proportionately decreased in the case of a combination. Appropriate adjustments shall also be made to the purchase price payable per share, but the aggregate purchase price payable for the total number of shares purchasable under this Warrant (as adjusted) shall remain the same. Any adjustment under this Section 8(b) shall become effective at the close of business on the date the subdivision or combination becomes effective.

(c) Stock Dividends. If the Company at any time shall pay a dividend payable in, or make any other distribution (except any distribution specifically provided for in the foregoing subsections (a) or (b)) of the Company's stock, then the Exercise Price shall be adjusted, from and after the record date of such dividend or distribution, to that price determined by multiplying the Exercise Price in effect immediately prior to such record date by a fraction (i) the numerator of which shall be the total number of all shares of the Company's stock outstanding immediately prior to such dividend or distribution, and (ii) the denominator of which shall be the total number of all shares of the Company's stock outstanding immediately after such dividend or distribution. The Warrantholder shall thereafter be entitled to purchase, at the Exercise Price resulting from such adjustment, the number of shares of Common Stock (calculated to the nearest whole share) obtained by multiplying the Exercise Price in effect immediately prior to such adjustment by the number of shares of Common Stock issuable upon the exercise hereof immediately prior to such adjustment and dividing the product thereof by the Exercise Price resulting from such adjustment.

**9. REPRESENTATIONS, WARRANTIES AND COVENANTS OF THE COMPANY.**

(a) Reservation of Common Stock. The Common Stock issuable upon exercise of the Wan-ant has been duly and validly reserved and, when issued in accordance with the provisions of this Warrant, will be validly issued, fully paid and non-assessable.

(b) Due Authority. The execution and delivery by the Company of this Warrant and the performance of all obligations of the Company hereunder, including the issuance to Warrantholder of the right to acquire the shares of Common Stock, have been duly authorized by all necessary corporate action on the part of the Company, and this Warrant is not inconsistent with the Company's charter or bylaws.

(c) Exempt Transaction. Subject to the accuracy of the Warrantholder's representations in Section 10 hereof, the issuance of the Common Stock upon exercise of this Warrant will constitute a transaction exempt from (i) the registration requirements of Section 5 of the 33 Act, in reliance upon Section 4(2) thereof, and (ii) the qualification requirements of the applicable state securities laws.



---

**10. REPRESENTATIONS AND COVENANTS OF THE WARRANTHOLDER.**

The Company has entered into this Warrant in reliance upon the following representations and covenants of the Warrantholder:

(a) Investment Purpose. The right to acquire Common Stock or the Common Stock issuable upon exercise of the Warrantholder's lights contained herein will be acquired for investment and not with a view to the sale or distribution of any part thereof, and the Warrantholder has no present intention of selling or engaging in any public distribution of the same except pursuant to a registration or exemption.

(b) Private Issue. The Warrantholder understands (i) that the Common Stock issuable upon exercise of this Warrant is not registered under the 33 Act or qualified under applicable state securities laws on the ground that the issuance contemplated by this Warrant will be exempt from the registration and qualification requirements thereof, and (ii) that the Company's reliance on such exemption is predicated on the representations set forth in this Section 10.

(c) Disposition of Warrantholder's Rights. In no event will the Warrantholder make a disposition of any of its (i) rights to acquire Common Stock under this Warrant, or (ii) Common Stock issuable upon exercise of such rights, unless and until (A) it shall have notified the Company of the proposed disposition, and (B) if requested by the Company, it shall have furnished the Company with an opinion of counsel satisfactory to the Company to the effect that (1) appropriate action necessary for compliance with the 33 Act has been taken, or (2) an exemption from the registration requirements of the 33 Act is available. The foregoing notice provisions shall expire as to any particular share of Common Stock when (a) such security shall have been effectively registered under the 33 Act and sold by the holder thereof in accordance with such registration or (b) such security shall have been sold without registration in compliance with Rule 144 under the 33 Act, or (c) a letter shall have been issued to the Warrantholder at its request by the staff of the SEC or a ruling shall have been issued to the Warrantholder at its request by the SEC stating that no action shall be recommended by the SEC or taken by the SEC, as the case may be, if such security is transferred without registration under the 33 Act in accordance with the conditions set forth in such letter or ruling and such letter or ruling specifies that no subsequent restrictions on transfer are required. Whenever the restrictions imposed hereunder shall terminate, as hereinabove provided, the Warrantholder or holder of a share of Common Stock then outstanding as to which such restrictions have terminated shall be entitled to receive from the Company, without expense to such holder, one or more new certificates for the Warrant or for such shares of Common Stock not bearing any restrictive legend.

(d) Financial Risk. The Warrantholder is aware of the Company's business affairs and financial condition, and has sufficient information about the Company to reach an informed and knowledgeable decision to acquire this Warrant and the Common Stock issuable hereunder. The Warrantholder has such knowledge and experience in financial and business matters as to be capable of evaluating the merits and risks of its investment, and has the ability to bear the economic risks of its investment.

(e) Risk of No Registration. The Warrantholder understands that if the Company does not register with the SEC pursuant to Section 12 of the Securities Exchange Act of 1934, as



---

amended (the "*34 Act*"), or file reports pursuant to Section 15(d) of the 34 Act, or if a registration statement covering the securities under the 33 Act is not in effect when Warrantholder desires to sell (i) the rights to purchase Common Stock pursuant to this Warrant, or (ii) the Common Stock issuable upon exercise of the right to purchase, Warrantholder may be required to hold such securities for an indefinite period. The Warrantholder also understands that any sale of its rights to purchase Common Stock or Common Stock which might be sold by it in reliance upon Rule 144 under the 33 Act may be made only in accordance with the terms and conditions of that Rule.

(f) Accredited Investor. Warrantholder is an "accredited investor" within the meaning of the Rule 501 of Regulation D of the 33 Act, as presently in effect.

(g) Legends. The Warrantholder understands that the share certificate(s) evidencing the shares issued hereunder shall be endorsed with legend(s) substantially similar to the following:

(i) THE SECURITIES EVIDENCED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, AND MAY NOT BE SOLD, TRANSFERRED, ASSIGNED OR HYPOTHECATED UNLESS THERE IS AN EFFECTIVE REGISTRATION STATEMENT UNDER SUCH ACT COVERING SUCH SECURITIES, THE TRANSFER IS MADE IN COMPLIANCE WITH RULE 144 PROMULGATED UNDER SUCH ACT OR THE COMPANY RECEIVES AN OPINION OF COUNSEL FOR THE HOLDER OF THESE SECURITIES REASONABLY SATISFACTORY TO THE COMPANY, STATING THAT SUCH SALE, TRANSFER, ASSIGNMENT OR HYPOTHECATION IS EXEMPT FROM THE REGISTRATION AND PROSPECTUS DELIVERY REQUIREMENT OF SUCH ACT.

(ii) Any legend required by any applicable state securities laws.

(h) Exercise Price. The Warrantholder further agrees and acknowledges that the Company makes no representation or warranties regarding the future value of such Common Stock.

**11. TRANSFERS.**

(a) The Company shall maintain a register containing the name and address of the registered holder(s) of this Warrant. The registered holder may change its address as shown on the warrant register by written notice to the Company requesting such change.

(b) Subject to the restrictions set forth in this Warrant, this Warrant and all rights hereunder are transferable, in whole or in part, upon surrender of this Warrant with a properly executed assignment in the form attached hereto as Exhibit III (the "***Transfer Notice***"). Such transfer shall be recorded on the books of the Company upon receipt by the Company of the Transfer Notice, addressed to the Company as set forth in Section 13(d) below, and the payment to the Company of all transfer taxes and other governmental charges imposed on such transfer.

(c) Until any transfer of this Warrant is made in the warrant register, the Company may treat the registered holder as the absolute owner hereof for all purposes; *provided, however*,



---

that if and when this Warrant is properly assigned in blank, the Company may (but shall not be obligated to) treat the bearer hereof as the absolute owner hereof for all purposes, notwithstanding any notice to the contrary.

**12. Intentionally Omitted.**

**13. MISCELLANEOUS.**

(a) Attorneys' Fees. In any litigation, arbitration or court proceeding between the Company and the Warrantholder relating hereto, the prevailing party shall be entitled to attorneys' fees and expenses and all costs of proceedings incurred in enforcing this Warrant.

(b) Governing Law. This Warrant shall be governed by and construed for all purposes under and in accordance with the laws of the State of Utah without regard to principles of conflicts of law.

(c) Counterparts. This Warrant may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall

constitute one and the same instrument.

(d) Notices.

(i) Notice of Adjustments. Whenever the Exercise Price or number of shares purchasable hereunder shall be adjusted pursuant to Section 8 above, the Company shall provide written notice to the Warrantholder of such adjustment. Each such written notice shall set forth, in reasonable detail, to the extent applicable, (A) the event requiring the adjustment, (B) the method by which such adjustment was calculated, (C) the Exercise Price, and (D) the number of shares subject to purchase hereunder after giving effect to such adjustment.

(ii) Notice as to Certain Events. In case: (A) the Company shall take a record of the holders of its Common Stock (or other stock or securities at the time receivable upon the exercise of this Warrant) for the purpose of entitling them to receive any dividend or other distribution, or any right to subscribe for or purchase any shares of stock of any class or any other securities, or to receive any other right; (B) of any voluntary dissolution, liquidation or winding-up of the Company; (C) of any redemption or conversion of all outstanding Common Stock; or (D) the Company shall propose to enter into any Sale Transaction (any of the foregoing, an "***Extraordinary Event***"), then, and in each such case, the Company will mail or cause to be mailed to the Warrantholder a notice specifying, as the case may be, (x) the anticipated date on which a record is to be taken for the purpose of such dividend, distribution or right, and stating the amount and character of such dividend, distribution or right, (y) the anticipated date on which such Sale Transaction, reclassification, dissolution, liquidation, winding-up, redemption or conversion is to take place, and the time, if any is to be fixed, as of which the holders of record of Common Stock (or such stock or securities at the time receivable upon the exercise of this Warrant) shall be entitled to exchange their shares of Common Stock (or such other stock or securities) for securities or other property deliverable upon such Sale Transaction, reclassification, dissolution, liquidation or winding-up, or (z) the anticipated date on which the Company expects its first registration statement with the SEC to become effective. Such notice shall be mailed at least ten (10) days prior to the anticipated date therein specified.



---

(iii) Timely Notice. Failure to timely provide the notice required by subsections (i) and (ii) above shall entitle Warrantholder to retain the benefit of the applicable notice period notwithstanding anything to the contrary contained in any insufficient notice received by Warrantholder. The notice period shall begin on the date Warrantholder actually receives a written notice containing all the information specified above.

(iv) Method of Giving Notice. Any notice required or permitted hereunder shall be given in writing and shall be deemed effectively given upon personal delivery or facsimile transmission (*provided* that the original is sent by personal delivery or mail as hereinafter set forth), one day after deposit with a nationally-recognized overnight courier, or three (3) days after deposit in the United States mail, by registered or certified mail, addressed (i) to the Warrantholder at Control UI, LLC, 167 Marlborough Street, Suite 3, Boston, MA 02116, Attention: Sean O'Brien, and (ii) to the Company at 11734 S. Election Road, Draper, Utah 84020, Attention: General Counsel, or at such other address as any such party may subsequently designate by written notice to the other party.

(e) Remedies. In the event of any default hereunder, the non-defaulting party may proceed to protect and enforce its rights either by suit in equity and/or by action at law, including but not limited to an action for damages as a result of any such default, and/or an action for specific performance for any default where Warrantholder will not have an adequate remedy at law and where damages will not be readily ascertainable. The Company expressly agrees that it shall not oppose an application by the Warrantholder or any other person entitled to the benefit of this Agreement requiring specific performance of any or all provisions hereof or enjoining the Company from continuing to commit any such breach of this Agreement.

(f) No Impairment of Rights. The Company will not, by amendment of its charter or through any other means, avoid or seek to avoid the observance or performance of any of the terms of this Warrant, but will at all times in good faith assist in the carrying out of all such terms and in the taking of all such actions as may be necessary or appropriate in order to protect the rights of the Warrantholder against impairment.

(g) Survival. The representations, warranties, covenants and conditions of the respective parties contained herein or made pursuant to this Warrant shall survive the execution and delivery of this Warrant.

(h) Severability. In the event any one or more of the provisions of this Warrant shall for any reason be held invalid, illegal or unenforceable, the remaining provisions of this Warrant shall be unimpaired, and the invalid, illegal or unenforceable provision shall be replaced by a mutually acceptable valid, legal and enforceable provision, which comes closest to the intention of the parties underlying the invalid, illegal or unenforceable provision.

(i) Amendments. Any provision of this Warrant may be amended or waived (either retroactively or prospectively and either generally or in a particular instance) by a written instrument signed by the Company and by the Warrantholder.

(j) Successors and Assigns. This Warrant shall inure to the benefit of, and be binding upon, the Company and the holders hereof and their respective successors and assigns.



---

(k) Prevailing Party. To the extent permitted by applicable law, in any action or suit to enforce any right or remedy (or to interpret) this Agreement, the prevailing Party will be entitled to recover its fees and costs, including reasonable attorneys' fees.

*[Remainder of page intentionally left blank]*

11

---

**IN WITNESS WHEREOF**, the parties hereto have caused this Warrant to be executed by its officers thereunto duly authorized as of the Effective Date.

**COMPANY:**

**CONTROL4 CORPORATION**

By: /s/ Dan Strong
Name: Dan Strong
Title: CFO

**WARRANTHOLDER:**

**CONTROL UI, LLC**

By: /s/Sean B. O'Brien
Name: Sean B. O'Brien
Title: Co-Founder

---

**EXHIBIT I**

**NOTICE OF EXERCISE**

To: Control4 Corporation; Attention: CFO

(1) The undersigned Warrantholder hereby elects to purchase shares of the Common Stock of Control4 Corporation, a Delaware corporation, pursuant to the terms of the Warrant effective as of , 2001 (the "***Warrant***") between Control4 Corporation and the Warrantholder, and tenders herewith payment of the purchase price for such shares in full, together with all applicable transfer taxes, if any. [This Notice of exercise is being delivered in connection with a proposed Sale Transaction and shall be effective immediately prior to the effective date of such Sale Transaction.]

(2) In exercising its rights to purchase the Common Stock of Control4 Corporation, the undersigned hereby confirms and acknowledges the investment representations and warranties made in Section 9 of the Warrant and the covenant made in Section 12 of the Warrant.

(3) Please issue a certificate or certificates representing said shares of Common Stock in the name of the undersigned or in such other name as is specified below.

(Name)

(Address)

Warrantholder

By: ______________________________

Name:

Title:

Date:

---

**EXHIBIT II**

**ACKNOWLEDGMENT OF EXERCISE**

The undersigned hereby acknowledge receipt of the "*Notice of Exercise*" from Control UI, LLC to purchase shares of the Common Stock of Control4 Corporation., a Delaware corporation, pursuant to the terms of the Warrant, and further acknowledges that shares remain subject to purchase under the terms of the Warrant.

**CONTROL4 CORPORATION**

By: ______________________________

Title:

Date:

---

**EXHIBIT III**

**TRANSFER NOTICE**

**(To transfer or assign the foregoing Warrant execute this form and supply required information. Do not use this form to purchase shares.)**

**FOR VALUE RECEIVED**, the foregoing Warrant and all rights evidenced thereby are hereby transferred and assigned to

______________________________

(Please Print)

whose address is ______________________________

Dated: ______________________________

Holder's Signature: ______________________________

Holders Address: ______________________________

Signature Guaranteed: ______________________________

**NOTE:** The signature to this Transfer Notice must correspond with the name as it appears on the face of the Warrant, without alteration or enlargement or any change whatever. Officers of corporations and those acting in a fiduciary or other representative capacity should file proper evidence, of authority to assign the foregoing Warrant.

---

**Exhibit 4.4**

THIS WARRANT AND THE SHARES ISSUABLE HEREUNDER HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), OR THE SECURITIES LAWS OF ANY STATE AND, EXCEPT AND PURSUANT TO THE PROVISIONS OF ARTICLE 5 BELOW, MAY NOT BE OFFERED, DISTRIBUTED, SOLD OR OTHERWISE TRANSFERRED, PLEDGED OR HYPOTHECATED UNLESS AND UNTIL REGISTERED UNDER SAID ACT AND APPLICABLE STATE SECURITIES LAW OR, IN THE OPINION OF LEGAL COUNSEL IN FORM AND SUBSTANCE SATISFACTORY TO THE ISSUER OF THESE SECURITIES, SUCH OFFER, SALE OR TRANSFER, PLEDGE OR HYPOTHECATION IS EXEMPT FROM REGISTRATION.

**WARRANT TO PURCHASE STOCK**

| | |
|---|---|
| Company: | Control4 Corporation, a Delaware corporation |
| Number of Shares: | 38,095 |
| Class of Stock: | Series C Preferred |
| Warrant Price: | $1.058 per share |
| Issue Date: | Is the Warrant Effective Date, which is the date in which the Holder executes this Warrant |
| Expiration Date: | The earlier of: (i) The 10th anniversary after the Issue Date or (ii) The 5th anniversary after the Company's Initial Public Offering, if any. |

THIS WARRANT CERTIFIES THAT, for the agreed upon value of $1.00 and for other good and valuable consideration, SILICON VALLEY BANK ("Holder") is entitled to purchase the number of fully paid and nonassessable shares of the class of securities (the "Shares") of the company (the "Company") at the Warrant Price, all as set forth above and as adjusted pursuant to Article 2 of this Warrant, subject to the provisions and upon the terms and conditions set forth in this Warrant.

ARTICLE 1. EXERCISE.

1.1 Method of Exercise. Holder may exercise this Warrant by delivering a duly executed Notice of Exercise in substantially the form attached as Appendix 1 to the principal office of the Company. Unless Holder is exercising the conversion right set forth in Article 1.2, Holder shall also deliver to the Company a check, wire transfer (to an account designated by the Company), or other form of payment acceptable to the Company for the aggregate Warrant Price for the Shares being purchased.

1.2 Conversion Right. In lieu of exercising this Warrant as specified in Article 1.1, Holder may from time to time convert this Warrant, in whole or in part, into a number of Shares determined by dividing (a) the aggregate fair market value of the Shares or other securities otherwise issuable upon exercise of this Warrant minus the aggregate Warrant Price of such Shares by (b) the fair market value of one Share. The fair market value of the Shares shall be determined pursuant to Article 1.3.

---

1.3 Fair Market Value. If the Company's common stock is traded in a public market and the Shares are common stock, the fair market value of each Share shall be the closing price of a Share reported for the business day immediately before Holder delivers its Notice of Exercise to the Company (or in the instance where the Warrant is exercised immediately prior to the effectiveness of the Company's initial public offering, the "price to public" per share price specified in the final prospectus relating to such offering). If the Company's common stock is traded in a public market and the Shares are preferred stock, the fair market value of a Share shall be the closing price of a share of the Company's common stock reported for the business day immediately before Holder delivers its Notice of Exercise to the Company (or, in the instance where the Warrant is exercised immediately prior to the effectiveness of the Company's initial public offering, the initial "price to public" per share price specified in the final prospectus relating to such offering), in both cases, multiplied by the number of shares of the Company's common stock into which a Share is convertible. If the Company's common stock is not traded in a public market, the Board of Directors of the Company shall determine fair market value in its reasonable good faith judgment.

1.4 Delivery of Certificate and New Warrant. Promptly after Holder exercises or converts this Warrant and, if applicable, the Company receives payment of the aggregate Warrant Price, the Company shall deliver to Holder certificates for the Shares acquired and, if this Warrant has not been fully exercised or converted and has not expired, a new Warrant representing the Shares not so acquired.

1.5 Replacement of Warrants. On receipt of evidence reasonably satisfactory to the Company of the loss, theft, destruction or mutilation of this Warrant and, in the case of loss, theft or destruction, on delivery of an indemnity agreement reasonably satisfactory in form and amount to the Company or, in the case of mutilation on surrender and cancellation of this Warrant, the Company shall execute and deliver, in lieu of this Warrant, a new warrant of like tenor.

1.6 Treatment of Warrant Upon Acquisition of Company.

1.6.1 "Acquisition". For the purpose of this Warrant, "Acquisition" means any sale, license, or other disposition of all or substantially all of the assets of the Company, or any reorganization, consolidation, or merger of the Company where the holders of the Company's securities before the transaction beneficially own less than 50% of the outstanding voting securities of the surviving entity after the transaction.

1.6.2 Treatment of Warrant at Acquisition.

A) Upon the written request of the Company, Holder agrees that, in the event of an Acquisition that is not an asset sale and in which the sole consideration is cash,

either (a) Holder shall exercise its conversion or purchase right under this Warrant and such exercise will be deemed effective immediately prior to the consummation of such Acquisition or (b) if Holder elects not to exercise the Warrant, this Warrant will expire upon the consummation of such Acquisition. The Company shall provide the Holder with written notice of its request relating to the foregoing (together with such reasonable information as the Holder may request in



connection with such contemplated Acquisition giving rise to such notice), which is to be delivered to Holder not less than ten (10) days prior to the closing of the proposed Acquisition.

B) Upon the written request of the Company, Holder agrees that, in the event of an Acquisition that is an "arm's length" sale of all or substantially all of the Company's assets (and only its assets) to a third party that is not an Affiliate (as defined below) of the Company (a "True Asset Sale"), either (a) Holder shall exercise its conversion or purchase right under this Warrant and such exercise will be deemed effective immediately prior to the consummation of such Acquisition or (b) if Holder elects not to exercise the Warrant, this Warrant will continue until the Expiration Date if the Company continues as a going concern following the closing of any such True Asset Sale. The Company shall provide the Holder with written notice of its request relating to the foregoing (together with such reasonable information as the Holder may request in connection with such contemplated Acquisition giving rise to such notice), which is to be delivered to Holder not less than ten (10) days prior to the closing of the proposed Acquisition.

C) Upon the closing of any Acquisition other than those particularly described in subsections (A) and (B) above, the successor entity shall assume the obligations of this Warrant, and this Warrant shall be exercisable for the same securities, cash, and property as would be payable for the Shares issuable upon exercise of the unexercised portion of this Warrant as if such Shares were outstanding on the record date for the Acquisition and subsequent closing. The Warrant Price and/or number of Shares shall be adjusted accordingly.

As used herein "Affiliate" shall mean any person or entity that owns or controls directly or indirectly ten (10) percent or more of the stock of Company, any person or entity that controls or is controlled by or is under common control with such persons or entities, and each of such person's or entity's officers, directors, joint venturers or partners, as applicable.

ARTICLE 2. ADJUSTMENTS TO THE SHARES.

2.1 Stock Dividends, Splits, Etc. If the Company declares or pays a dividend on the Shares payable in common stock, or other securities, then upon exercise of this Warrant, for each Share acquired, Holder shall receive, without cost to Holder, the total number and kind of securities to which Holder would have been entitled had Holder owned the Shares of record as of the date the dividend occurred. If the Company subdivides the Shares by reclassification or otherwise into a greater number of shares or takes any other action which increase the amount of stock into which the Shares are convertible, the number of shares purchasable hereunder shall be proportionately increased and the Warrant Price shall be proportionately decreased. If the outstanding shares are combined or consolidated, by reclassification or otherwise, into a lesser number of shares, the Warrant Price shall be proportionately increased and the number of Shares shall be proportionately decreased.

2.2 Reclassification, Exchange, Combinations or Substitution. Upon any reclassification, exchange, substitution, or other event that results in a change of the number and/or class of the securities issuable upon exercise or conversion of this Warrant, Holder shall be entitled to receive, upon exercise or conversion of this Warrant, the number and kind of securities and property that Holder would have received for the Shares if this Warrant had been



exercised immediately before such reclassification, exchange, substitution, or other event. Such an event shall include any automatic conversion of the outstanding or issuable securities of the Company of the same class or series as the Shares to common stock pursuant to the terms of the Company's Articles or Certificate (as applicable) of Incorporation upon the closing of a registered public offering of the Company's common stock. The Company or its successor shall promptly issue to Holder an amendment to this Warrant setting forth the number and kind of such new securities or other property issuable upon exercise or conversion of this Warrant as a result of such reclassification, exchange, substitution or other event that results in a change of the number and/or class of securities issuable upon exercise or conversion of this Warrant. The amendment to this Warrant shall provide for adjustments which shall be as nearly equivalent as may be practicable to the adjustments provided for in this Article 2 including, without limitation, adjustments to the Warrant Price and to the number of securities or property issuable upon exercise of the new Warrant. The provisions of this Article 2.2 shall similarly apply to successive reclassifications, exchanges, substitutions, or other events.

2.3 Adjustments for Diluting Issuances. The Warrant Price and the number of Shares issuable upon exercise of this Warrant or, if the Shares are preferred stock, the number of shares of common stock issuable upon conversion of the Shares, shall be subject to adjustment, from time to time in the manner set forth in the Company's Certificate of Incorporation with respect to the Company's Series C Preferred Stock as if the Shares were issued and outstanding on and as of the date of any such required adjustment. The provisions set forth for the Shares in the Company's Articles or Certificate (as applicable) of Incorporation relating to the above in effect as of the Issue Date may not be amended, modified or waived, without the prior written consent of Holder unless such amendment, modification or waiver affects the rights associated with the Shares in the same manner as such amendment, modification or waiver affects the rights associated with all other shares of the same series and class as the Shares granted to the Holder.

2.4 No Impairment. The Company shall not, by amendment of its Articles or Certificate (as applicable) of Incorporation or through a reorganization, transfer of assets, consolidation, merger, dissolution, issue, or sale of securities or any other voluntary action, avoid or seek to avoid the observance or performance of any of the terms to be observed or performed under this Warrant by the Company, but shall at all times in good faith assist in carrying out of all the provisions of this Article 2 and in taking all such action as may be necessary or appropriate to protect Holder's rights under this Article against impairment.

2.5 Fractional Shares. No fractional Shares shall be issuable upon exercise or conversion of this Warrant and the number of Shares to be issued shall be rounded down to the nearest whole Share. If a fractional share interest arises upon any exercise or conversion of the Warrant, the Company shall eliminate such fractional share interest by paying Holder the amount computed by multiplying the fractional interest by the fair market value of a full Share.

2.6 Certificate as to Adjustments. Upon each adjustment of the Warrant Price, the Company shall promptly notify Holder in writing, and, at the Company's expense, promptly compute such adjustment, and furnish Holder with a certificate of its Chief Financial Officer setting forth such adjustment and the facts upon which such adjustment is based. The Company shall, upon written request, furnish Holder a certificate setting forth the Warrant Price in effect upon the date thereof and the series of adjustments leading to such Warrant Price.



---

ARTICLE 3. REPRESENTATIONS AND COVENANTS OF THE COMPANY.

3.1 Representations and Warranties. The Company represents and warrants to the Holder as follows:

(a) The initial Warrant Price referenced on the first page of this Warrant is not greater than (i) the price per share at which the Shares were last issued in an arms-length transaction in which at least $500,000 of the Shares were sold and (ii) the fair market value of the Shares as of the date of this Warrant.

(b) All Shares which may be issued upon the exercise of the purchase right represented by this Warrant, and all securities, if any, issuable upon conversion of the Shares, shall, upon issuance, be duly authorized, validly issued, fully paid and nonassessable, and free of any liens and encumbrances except for restrictions on transfer provided for herein or under applicable federal and state securities laws.

(c) The Capitalization Table previously provided to Holder remains true and complete as of the Issue Date in all material respects.

3.2 Notice of Certain Events. If the Company proposes at any time (a) to declare any dividend or distribution upon any of its stock, whether in cash, property, stock, or other securities and whether or not a regular cash dividend; (b) to offer for sale any shares of the Company's capital stock (or other securities convertible into such capital stock), other than (i) pursuant to the Company's stock option or other compensatory plans, (ii) in connection with commercial credit arrangements or equipment financings, or (iii) in connection with strategic transactions for purposes other than capital raising; (c) to effect any reclassification or recapitalization of any of its stock; (d) to merge or consolidate with or into any other corporation, or sell, lease, license, or convey all or substantially all of its assets, or to liquidate, dissolve or wind up; or (e) offer holders of registration rights the opportunity to participate in an underwritten public offering of the Company's securities for cash, then, in connection with each such event, the Company shall give Holder: (1) at least 10 days' prior written notice of the date on which a record will be taken for such dividend, distribution, or subscription rights (and specifying the date on which the holders of common stock will be entitled thereto) or for determining rights to vote, if any, in respect of the matters referred to in (a) and (b) above; (2) in the case of the matters referred to in (c) and (d) above at least 10 days prior written notice of the date when the same will take place (and specifying the date on which the holders of common stock will be entitled to exchange their common stock for securities or other property deliverable upon the occurrence of such event); and (3) in the case of the matter referred to in (e) above, the same notice as is given to the holders of such registration rights.

3.3 Registration Under Securities Act of 1933, as amended. The Company agrees that the Shares or, if the Shares are convertible into common stock of the Company, such common stock, shall have certain incidental, or "Piggyback," registration rights pursuant to and as set forth in the Company's Investor Rights Agreement or similar agreement. The provisions set forth in the Company's Investors' Right Agreement or similar agreement relating to the above in effect as of the Issue Date may not be amended, modified or waived without the prior written consent of Holder unless such amendment, modification or waiver affects the rights



---

associated with the Shares in the same manner as such amendment, modification, or waiver affects the rights associated with all other shares of the same series and class as the Shares granted to the Holder.

3.4 No Shareholder Rights. Except as provided in this Warrant, the Holder will not have any rights as a shareholder of the Company until the exercise of this Warrant.

ARTICLE 4. REPRESENTATIONS, WARRANTIES OF THE HOLDER. The Holder represents and warrants to the Company as follows:

4.1 Purchase for Own Account. This Warrant and the securities to be acquired upon exercise of this Warrant by the Holder will be acquired for investment for the Holder's account, not as a nominee or agent, and not with a view to the public resale or distribution within the meaning of the Act. Holder also represents that the Holder has not been formed for the specific purpose of acquiring this Warrant or the Shares.

4.2 Disclosure of Information. The Holder has received or has had full access to all the information it considers necessary or appropriate to make an informed investment decision with respect to the acquisition of this Warrant and its underlying securities. The Holder further has had an opportunity to ask questions and receive answers from the Company regarding the terms and conditions of the offering of this Warrant and its underlying securities and to obtain additional information (to the extent the Company possessed such information or could acquire it without unreasonable effort or expense) necessary to verify any information furnished to the Holder or to which the Holder has access.

4.3 Investment Experience. The Holder understands that the purchase of this Warrant and its underlying securities involves substantial risk. The Holder has experience as an investor in securities of companies in the development stage and acknowledges that the Holder can bear the economic risk of such Holder's investment in this Warrant and its underlying securities and has such knowledge and experience in financial or business matters that the Holder is capable of evaluating the merits and risks of its investment in this Warrant and its underlying securities and/or has a preexisting personal or business relationship with the Company and certain of its officers, directors or controlling persons of a nature and duration that enables the Holder to be aware of the character, business acumen and financial circumstances of such persons.

4.4 Accredited Investor Status. The Holder is an "accredited investor" within the meaning of Regulation D promulgated under the Act.

4.5 The Act. The Holder understands that this Warrant and the Shares issuable upon exercise or conversion hereof have not been registered under the Act in reliance upon a specific exemption therefrom, which exemption depends upon, among other things, the bona fide nature of the Holder's investment intent as expressed herein. The Holder understands that this Warrant and the Shares issued upon any exercise or conversion hereof must be held indefinitely unless subsequently registered under the Act and qualified under applicable state securities laws, or unless exemption from such registration and qualification are otherwise available.



---

ARTICLE 5. MISCELLANEOUS.

5.1 Term. This Warrant is exercisable in whole or in part at any time and from time to time on or before the Expiration Date.

5.2 Legends. This Warrant and the Shares (and the securities issuable, directly or indirectly, upon conversion of the Shares, if any) shall be imprinted with a legend in substantially the following form;

THIS WARRANT AND THE SHARES ISSUABLE HEREUNDER HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), OR THE SECURITIES LAWS OF ANY STATE AND, EXCEPT AND PURSUANT TO THE PROVISIONS OF ARTICLE 5 BELOW, MAY NOT SBSTR0EFIFEK£D, SOLD OR OTHERWISE TRANSFERRED, PLEDGED OR HYPOTHECATED UNLESS AND UNTIL REGISTERED UNDER SAID ACT AND APPLICABLE STATE SECURITIES LAW OR, IN THE OPINION OF LEGAL COUNSEL IN FORM AND SUBSTANCE SATISFACTORY TO THE ISSUER OF THESE SECURITIES, SUCH OFFER, SALE OR TRANSFER, PLEDGE OR HYPOTHECATION IS EXEMPT FROM REGISTRATION.

5.3 Compliance with Securities Laws on Transfer. This Warrant and the Shares issuable upon exercise of this Warrant (and the securities issuable, directly or indirectly, upon conversion of the Shares, if any) may not be transferred or assigned in whole or in part without the prior written consent of the Company (but no such consent is required with respect to the transfer from Silicon Valley Bank to SVB Financial Group or any other affiliate of Holder), which consent shall not be unreasonably withheld, or compliance with applicable federal and state securities laws by the transferor and the transferee (including, without limitation, the delivery of investment representation letters and legal opinions reasonably satisfactory to the Company, as reasonably requested by the Company). The Company shall not require Holder to provide an opinion of counsel if the transfer is to Holder's parent company, SVB Financial Group (formerly Silicon Valley Bancshares), or any other affiliate of Holder. Additionally, the Company shall also not require an opinion of counsel if there is no material question as to the availability of current information as referenced in Rule 144(c), Holder represents that it has complied with Rule 144(d) and (e) in reasonable detail, the selling broker represents that it has complied with Rule 144(f), and the Company is provided with a copy of Holder's notice of proposed sale.

5.4 Transfer Procedure. Upon receipt by Holder of the executed Warrant, Holder will transfer all of this Warrant to Holder's parent company, SVB Financial Group, by execution of an Assignment substantially in the form of Appendix 2. Subject to the provisions of Article 5.3 and upon providing Company with written notice, SVB Financial Group and any subsequent Holder may transfer all or part of this Warrant or the Shares issuable upon exercise of this Warrant (or the Shares issuable directly or indirectly, upon conversion of the Shares, if any) to any transferee; provided, however, in connection with any such transfer, SVB Financial Group or any subsequent Holder will give the Company notice of the portion of the Warrant being transferred with the name, address and taxpayer identification number of the transferee and



---

Holder will surrender this Warrant to the Company for reissuance to the transferee(s) (and Holder if applicable). The Company may refuse to transfer this Warrant or the Shares to any person who directly competes with the Company, unless, in either case, the stock of the Company is publicly traded.

5.5 Notices. All notices and other communications from the Company to the Holder, or vice versa, shall be deemed delivered and effective when given personally or mailed by first-class registered or certified mail, postage prepaid, at such address as may have been furnished to the Company or the Holder, as the case may (or on the first business day after transmission by facsimile) be, in writing by the Company or such Holder from time to time. Effective upon receipt of the fully executed Warrant and the initial transfer described in Article 5.4 above, all notices to the Holder shall be addressed as follows until the Company receives notice of a change of address in connection with a transfer or otherwise:

SVB Financial Group
Attn: Treasury Department
3003 Tasman Drive, HA 200
Santa Clara, CA 95054
Telephone: 408-654-7400
Facsimile: 408-496-2405

Notice to the Company shall be addressed as follows until the Holder receives notice of a change in address:

Control4 Corporation
Attn:
11734 South Election Road, Suite 200
Draper, Utah 84020
Telephone:
Facsimile:

5.6 Waiver. This Warrant and any term hereof may be changed, waived, discharged or terminated only by an instrument in writing signed by the party against which enforcement of such change, waiver, discharge or termination is sought.

5.7 Attorneys' Fees. In the event of any dispute between the parties concerning the terms and provisions of this Warrant, the party prevailing in such dispute shall be entitled to collect from the other party all costs incurred in such dispute, including reasonable attorneys' fees.

5.8 Automatic Conversion upon Expiration. In the event that, upon the Expiration Date, the fair market value of one Share (or other security issuable upon the exercise hereof) as determined in accordance with Section 1.3 above is greater than the Warrant Price in effect on such date, then this Warrant shall automatically be deemed on and as of such date to be converted pursuant to Section 1.2 above as to all Shares (or such other securities) for which it shall not previously have been exercised or converted, and the Company shall promptly deliver a



---

certificate representing the Shares (or such other securities) issued upon such conversion to the Holder.

5.9 Counterparts. This Warrant may be executed in counterparts, all of which together shall constitute one and the same agreement.

*[Remainder of page intentionally left blank]*



---

"COMPANY"

CONTROL4 CORPORATION

By: /s/ William B. West
William B. West
Chairman of the Board, President or Vice President

By: /s/ W. Eric Smith
W. Eric Smith
Chief Financial Officer, Secretary, Assistant Treasurer or Assistant Secretary

"HOLDER"

SILICON VALLEY BANK

By: /s/ Shane Anderson
Shane Anderson
Relationship Manager

Warrant Effective Date: 12/29/05

---

**APPENDIX 1**

**NOTICE OF EXERCISE**

1. Holder elects to purchase shares of the Common/Series Preferred [strike one] Stock of pursuant to the terms of the attached Warrant, and tenders payment of the purchase price of the shares in full.

[or]

1. Holder elects to convert the attached Warrant into Shares/cash [strike one] in the manner specified in the Warrant. This conversion is exercised for of the Shares covered by the Warrant.

[Strike paragraph that does not apply.]

2. Please issue a certificate or certificates representing the shares in the name specified below:

Holders Name

(Address)

3. By its execution below and for the benefit of the Company, Holder hereby restates each of the representations and warranties in Article 4 of the Warrant as the date hereof.

HOLDER:

By: ____________________

Name: ____________________

Title: ____________________

(Date): ____________________

---

**APPENDIX 2**

**ASSIGNMENT**

For value received, Silicon Valley Bank hereby sells, assigns and transfers unto

Name: SVB Financial Group
Address: 3003 Tasman Drive (HA-200)

Santa Clara, CA 95054

Tax ID: 91-1962278

that certain Warrant to Purchase Stock issued by Control4 Corporation (the "Company"), on December , 2005 (the "Warrant") together with all rights, title and interest therein.

SILICON VALLEY BANK

By: ______________________

Name: ______________________

Title: ______________________

Date: December , 2005

By its execution below, and for the benefit of the Company, SVB Financial Group makes each of the representations and warranties set forth in Article 4 of the Warrant and agrees to all other provisions of the Warrant as of the date hereof.

SVB FINANCIAL GROUP

By: ______________________

Name: ______________________

Title: ______________________

---

**Exhibit 4.5**

THIS WARRANT AND THE SHARES ISSUABLE HEREUNDER HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), OR THE SECURITIES LAWS OF ANY STATE AND, EXCEPT AND PURSUANT TO THE PROVISIONS OF ARTICLE 5 BELOW, MAY NOT BE OFFERED, SOLD OR OTHERWISE TRANSFERRED, PLEDGED OR HYPOTHECATED UNLESS AND UNTIL REGISTERED UNDER SAID ACT AND APPLICABLE STATE SECURITIES LAW OR, IN THE OPINION OF LEGAL COUNSEL IN FORM AND SUBSTANCE SATISFACTORY TO THE ISSUER OF THESE SECURITIES, SUCH OFFER, SALE OR TRANSFER, PLEDGE OR HYPOTHECATION IS EXEMPT FROM REGISTRATION.

**WARRANT TO PURCHASE STOCK**

| | |
|---|---|
| Company: | Control4 Corporation, a Delaware corporation |
| Number of Shares: | 22,831 |
| Class of Stock: | Series C Preferred |
| Warrant Price: | $2.19 per share |
| Issue Date: | June 13, 2007 |
| Expiration Date: | The earlier of: (i) The 10th anniversary after the Issue Date or (ii) The 5th anniversary after the Company's Initial Public Offering, if any. |
| Credit Facility | This Warrant is issued in connection with the Loan and Security Agreement between Company and Silicon Valley Bank dated December 29, 2005 (as amended from time to time). |

THIS WARRANT CERTIFIES THAT, for good and valuable consideration, SILICON VALLEY BANK (Silicon Valley Bank, together with any registered holder from time to time of this Warrant or any holder of the shares issuable or issued upon exercise of this Warrant, "Holder") is entitled to purchase the number of fully paid and nonassessable shares of the class of securities (the "Shares") of the Company at the Warrant Price, all as set forth above and as adjusted pursuant to Article 2 of this Warrant, subject to the provisions and upon the terms and conditions set forth in this Warrant.

ARTICLE 1. EXERCISE.

1.1 Method of Exercise. Holder may exercise this Warrant by delivering a duly executed Notice of Exercise in substantially the form attached as Appendix 1 to the principal office of the Company. Unless Holder is exercising the conversion right set forth in Article 1.2, Holder shall also deliver to the Company a check, wire transfer (to an account designated by the Company), or other form of payment acceptable to the Company for the aggregate Warrant Price for the Shares being purchased.

1.2 Conversion Right. In lieu of exercising this Warrant as specified in Article 1.1, Holder may from time to time convert this Warrant, in whole or in part, into a number of Shares determined by dividing (a) the aggregate fair market value of the Shares or other securities otherwise issuable upon exercise of this Warrant minus the aggregate Warrant Price of such

---

Shares by (b) the fair market value of one Share. The fair market value of the Shares shall be determined pursuant to Article 1.3.

1.3 Fair Market Value. If the Company's common stock is traded in a public market and the Shares are common stock, the fair market value of each Share shall be the closing price of a Share reported for the business day immediately before Holder delivers its Notice of Exercise to the Company (or in the instance where the Warrant is exercised immediately prior to the effectiveness of the Company's initial public offering, the "price to public" per share price specified in the final prospectus relating to such offering). If the Company's common stock is traded in a public market and the Shares are preferred stock, the fair market value of a Share shall be the closing price of a share of the Company's common stock reported for the business day immediately before Holder delivers its Notice of Exercise to the Company (or, in the instance where the Warrant is exercised immediately prior to the effectiveness of the Company's initial public offering, the initial "price to public" per share price specified in the final prospectus relating to such offering), in both cases, multiplied by the number of shares of the Company's common stock into which a Share is convertible. If the Company's common stock is not traded in a public market, the Board of Directors of the Company shall determine fair market value in its reasonable good faith judgment.

1.4 Delivery of Certificate and New Warrant. Promptly after Holder exercises or converts this Warrant and, if applicable, the Company receives payment of the aggregate Warrant Price, the Company shall deliver to Holder certificates for the Shares acquired and, if this Warrant has not been fully exercised or converted and has not expired, a new Warrant representing the Shares not so acquired.

1.5 Replacement of Warrants. On receipt of evidence reasonably satisfactory to the Company of the loss, theft, destruction or mutilation of this Warrant and, in the case of loss, theft or destruction, on delivery of an indemnity agreement reasonably satisfactory in form and amount to the Company or, in the case of mutilation on surrender and cancellation of this Warrant, the Company shall execute and deliver, in lieu of this Warrant, a new warrant of like tenor.

1.6 Treatment of Warrant Upon Acquisition of Company.

1.6.1 "Acquisition". For the purpose of this Warrant, "Acquisition" means any sale, license, or other disposition of all or substantially all of the assets of the Company, or any reorganization, consolidation, or merger of the Company where the holders of the Company's securities before the transaction beneficially own less than 50% of the outstanding voting securities of the surviving entity after the transaction.

1.6.2 Treatment of Warrant at Acquisition.

A) Upon the written request of the Company, Holder agrees that, in the event of an Acquisition that is not an asset sale and in which the sole consideration is cash, either (a) Holder shall exercise its conversion or purchase right under this Warrant and such exercise will be deemed effective immediately prior to the consummation of such Acquisition or (b) if Holder elects not to exercise the Warrant, this Warrant will expire upon the consummation of such



---

Acquisition. The Company shall provide Holder with written notice of its request relating to the foregoing (together with such reasonable information as Holder may request in connection with such contemplated Acquisition giving rise to such notice), which is to be delivered to Holder not less than ten (10) days prior to the closing of the proposed Acquisition.

B) Upon the written request of the Company, Holder agrees that, in the event of an Acquisition that is an "arms' length" sale of all or substantially all of the Company's assets (and only its assets) to a third party that is not an Affiliate (as defined below) of the Company (a "True Asset Sale"), either (a) Holder shall exercise its conversion or purchase right under this Warrant and such exercise will be deemed effective immediately prior to the consummation of such Acquisition or (b) if Holder elects not to exercise the Warrant, this Warrant will continue until the Expiration Date if the Company continues as a going concern following the closing of any such True Asset Sale. The Company shall provide Holder with written notice of its request relating to the foregoing (together with such reasonable information as Holder may request in connection with such contemplated Acquisition giving rise to such notice), which is to be delivered to Holder not less than ten (10) days prior to the closing of the proposed Acquisition.

C) Upon the closing of any Acquisition other than those particularly described in subsections (A) and (B) above, the successor entity shall assume the obligations of this Warrant, and this Warrant shall be exercisable for the same securities, cash, and property as would be payable for the Shares issuable upon exercise of the unexercised portion of this Warrant as if such Shares were outstanding on the record date for the Acquisition and subsequent closing. The Warrant Price and/or number of Shares shall be adjusted accordingly.

As used herein "Affiliate" shall mean any person or entity that owns or controls directly or indirectly ten (10) percent or more of the stock of Company, any person or entity that controls or is controlled by or is under common control with such persons or entities, and each of such person's or entity's officers, directors, joint venturers or partners, as applicable.

ARTICLE 2. ADJUSTMENTS TO THE SHARES.

2.1 Stock Dividends, Splits, Etc. If the Company declares or pays a dividend on the Shares payable in common stock, or other securities, then upon exercise of this Warrant, for each Share acquired, Holder shall receive, without cost to Holder, the total number and kind of securities to which Holder would have been entitled had Holder owned the Shares of record as of the date the dividend occurred. If the Company subdivides the Shares by reclassification or otherwise into a greater number of shares or takes any other action which increase the amount of stock into which the Shares are convertible, the number of shares purchasable hereunder shall be proportionately increased and the Warrant Price shall be proportionately decreased. If the outstanding shares are combined or consolidated, by reclassification or otherwise, into a lesser number of shares, the Warrant Price shall be proportionately increased and the number of Shares shall be proportionately decreased.

2.2 Reclassification, Exchange, Combinations or Substitution. Upon any reclassification, exchange, substitution, or other event that results in a change of the number and/or class of the securities issuable upon exercise or conversion of this Warrant, Holder shall be entitled to receive, upon exercise or conversion of this Warrant, the number and kind of



securities and property that Holder would have received for the Shares if this Warrant had been exercised immediately before such reclassification, exchange, substitution, or other event. Such an event shall include any automatic conversion of the outstanding or issuable securities of the Company of the same class or series as the Shares to common stock pursuant to the terms of the Company's Articles or Certificate (as applicable) of Incorporation upon the closing of a registered public offering of the Company's common stock. The Company or its successor shall promptly issue to Holder an amendment to this Warrant setting forth the number and kind of such new securities or other property issuable upon exercise or conversion of this Warrant as a result of such reclassification, exchange, substitution or other event that results in a change of the number and/or class of securities issuable upon exercise or conversion of this Warrant. The amendment to this Warrant shall provide for adjustments which shall be as nearly equivalent as may be practicable to the adjustments provided for in this Article 2 including, without limitation, adjustments to the Warrant Price and to the number of securities or property issuable upon exercise of the new Warrant. The provisions of this Article 2.2 shall similarly apply to successive reclassifications, exchanges, substitutions, or other events.

2.3 Adjustments for Diluting Issuances. The Warrant Price and the number of Shares issuable upon exercise of this Warrant or, if the Shares are preferred stock, the number of shares of common stock issuable upon conversion of the Shares, shall be subject to adjustment, from time to time in the manner set forth in the Company's Articles or Certificate of Incorporation as if the Shares were issued and outstanding on and as of the date of any such required adjustment. The provisions set forth for the Shares in the Company's Articles or Certificate (as applicable) of Incorporation relating to the above in effect as of the Issue Date may not be amended, modified or waived, without the prior written consent of Holder unless such amendment, modification or waiver affects the rights associated with the Shares in the same manner as such amendment, modification or waiver affects the rights associated with all other shares of the same series and class as the Shares granted to Holder.

2.4 No Impairment. The Company shall not, by amendment of its Articles or Certificate (as applicable) of Incorporation or through a reorganization, transfer of assets, consolidation, merger, dissolution, issue, or sale of securities or any other voluntary action, avoid or seek to avoid the observance or performance of any of the terms to be observed or performed under this Warrant by the Company, but shall at all times in good faith assist in carrying out of all the provisions of this Article 2 and in taking all such action as may be necessary or appropriate to protect Holder's rights under this Article against impairment.

2.5 Fractional Shares. No fractional Shares shall be issuable upon exercise or conversion of this Warrant and the number of Shares to be issued shall be rounded down to the nearest whole Share. If a fractional share interest arises upon any exercise or conversion of the Warrant, the Company shall eliminate such fractional share interest by paying Holder the amount computed by multiplying the fractional interest by the fair market value of a full Share.

2.6 Certificate as to Adjustments. Upon each adjustment of the Warrant Price, the Company shall promptly notify Holder in writing, and, at the Company's expense, promptly compute such adjustment, and furnish Holder with a certificate of its Chief Financial Officer setting forth such adjustment and the facts upon which such adjustment is based. The Company



shall, upon written request, furnish Holder a certificate setting forth the Warrant Price in effect upon the date thereof and the series of adjustments leading to such Warrant

Price.

ARTICLE 3. REPRESENTATIONS AND COVENANTS OF THE COMPANY.

3.1 Representations and Warranties. The Company represents and warrants to Holder as follows:

(a) The initial Warrant Price referenced on the first page of this Warrant is not greater than (i) the price per share at which the Shares were last issued in an arms-length transaction in which at least $500,000 of the Shares were sold and (ii) the fair market value of the Shares as of the date of this Warrant.

(b) All Shares which may be issued upon the exercise of the purchase right represented by this Warrant, and all securities, if any, issuable upon conversion of the Shares, shall, upon issuance, be duly authorized, validly issued, fully paid and nonassessable, and free of any liens and encumbrances except for restrictions on transfer provided for herein or under applicable federal and state securities laws.

(c) The Company's capitalization table attached hereto as Schedule 1 is true and complete as of the Issue Date.

3.2 Notice of Certain Events. If the Company proposes at any time (a) to declare any dividend or distribution upon any of its stock, whether in cash, property, stock, or other securities and whether or not a regular cash dividend; (b) to offer for sale any shares of the Company's capital stock (or other securities convertible into such capital stock), other than (i) pursuant to the Company's stock option or other compensatory plans, (ii) in connection with commercial credit arrangements or equipment financings, or (iii) in connection with strategic transactions for purposes other than capital raising; (c) to effect any reclassification or recapitalization of any of its stock; (d) to merge or consolidate with or into any other corporation, or sell, lease, license, or convey all or substantially all of its assets, or to liquidate, dissolve or wind up; or (e) offer holders of registration rights the opportunity to participate in an underwritten public offering of the Company's securities for cash, then, in connection with each such event, the Company shall give Holder: (1) at least 10 days' prior written notice of the date on which a record will be taken for such dividend, distribution, or subscription rights (and specifying the date on which the holders of common stock will be entitled thereto) or for determining rights to vote, if any, in respect of the matters referred to in (a) and (b) above; (2) in the case of the matters referred to in (c) and (d) above at least 10 days' prior written notice of the date when the same will take place (and specifying the date on which the holders of common stock will be entitled to exchange their common stock for securities or other property deliverable upon the occurrence of such event); and (3) in the case of the matter referred to in (e) above, the same notice as is given to the holders of such registration rights. Company will also provide information requested by Holder reasonably necessary to enable Holder to comply with Holders accounting or reporting requirements.

3.3 Registration Under Securities Act of 1933, as amended. The Company agrees that the Shares or, if the Shares are convertible into common stock of the Company, such



---

common stock, shall have certain "piggyback," registration rights pursuant to and as set forth in the Company's Investor Rights Agreement or similar agreement. The provisions set forth in the Company's Investors' Right Agreement or similar agreement relating to the above in effect as of the Issue Date may not be amended, modified or waived without the prior written consent of Holder unless such amendment, modification or waiver affects the rights associated with the Shares in the same manner as such amendment, modification, or waiver affects the rights associated with all other shares of the same series and class as the Shares granted to Holder.

3.4 No Shareholder Rights. Except as provided in this Warrant, Holder will not have any rights as a shareholder of the Company until the exercise of this Warrant.

ARTICLE 4. REPRESENTATIONS, WARRANTIES OF THE HOLDER. Holder represents and warrants to the Company as follows:

4.1 Purchase for Own Account. This Warrant and the securities to be acquired upon exercise of this Warrant by Holder will be acquired for investment for Holder's account not as a nominee or agent, and not with a view to the public resale or distribution within the meaning of the Act. Holder also represents that Holder has not been formed for the specific purpose of acquiring this Warrant or the Shares.

4.2 Disclosure of Information. Holder has received or has had full access to all the information it considers necessary or appropriate to make an informed investment decision with respect to the acquisition of this Warrant and its underlying securities. Holder further has had an opportunity to ask questions and receive answers from the Company regarding the terms and conditions of the offering of this Warrant and its underlying securities and to obtain additional information (to the extent the Company possessed such information or could acquire it without unreasonable effort or expense) necessary to verify any information furnished to Holder or to which Holder has access.

4.3 Investment Experience. Holder understands that the purchase of this Warrant and its underlying securities involves substantial risk. Holder has experience as an investor in securities of companies in the development stage and acknowledges that Holder can bear the economic risk of such Holder's investment in this Warrant and its underlying securities and has such knowledge and experience in financial or business matters that Holder is capable of evaluating the merits and risks of its investment in this Warrant and its underlying securities and/or has a preexisting personal or business relationship with the Company and certain of its officers, directors or controlling persons of a nature and duration that enables Holder to be aware of the character, business acumen and financial circumstances of such persons.

4.4 Accredited Investor Status. Holder is an "accredited investor" within the meaning of Regulation D promulgated under the Act.

4.5 The Act. Holder understands that this Warrant and the Shares issuable upon exercise or conversion hereof have not been registered under the Act in reliance upon a specific exemption therefrom, which exemption depends upon, among other things, the bona fide nature of Holder's investment intent as expressed herein. Holder understands that this Warrant and the Shares issued upon any exercise or conversion hereof must be held indefinitely unless



---

subsequently registered under the Act and qualified under applicable state securities laws, or unless exemption from such registration and qualification are otherwise available.

ARTICLE 5. MISCELLANEOUS.

5.1 Term. This Warrant is exercisable in whole or in part at any time and from time to time on or before the Expiration Date.

5.2 Legends. This Warrant and the Shares (and the securities issuable, directly or indirectly, upon conversion of the Shares, if any) shall be imprinted with a legend in substantially the following form;

THIS WARRANT AND THE SHARES ISSUABLE HEREUNDER HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), OR THE SECURITIES LAWS OF ANY STATE AND, EXCEPT AND PURSUANT TO THE PROVISIONS OF ARTICLE 5 BELOW, MAY NOT SBSTR0EFIFEK£D, SOLD OR OTHERWISE TRANSFERRED, PLEDGED OR HYPOTHECATED UNLESS AND UNTIL REGISTERED UNDER SAID ACT AND APPLICABLE STATE SECURITIES LAW OR, IN THE OPINION OF LEGAL COUNSEL IN FORM AND SUBSTANCE SATISFACTORY TO THE ISSUER OF THESE SECURITIES, SUCH OFFER, SALE OR TRANSFER, PLEDGE OR HYPOTHECATION IS EXEMPT FROM REGISTRATION.

5.3 Compliance with Securities Laws on Transfer. This Warrant and the Shares issuable upon exercise of this Warrant (and the securities issuable, directly or indirectly, upon conversion of the Shares, if any) may not be transferred or assigned in whole or in part without compliance with applicable federal and state securities laws by the transferor and the transferee (including, without limitation, the delivery of investment representation letters and legal opinions reasonably satisfactory to the Company, as reasonably requested by the Company). The Company shall not require Silicon Valley Bank ("Bank") to provide an opinion of counsel if the transfer is to Bank's parent company, SVB Financial Group (formerly Silicon Valley Bancshares), or any other affiliate of Bank. Additionally, the Company shall also not require an opinion of counsel if there is no material question as to the availability of current information as referenced in Rule 144(c), Holder represents that it has complied with Rule 144(d) and (e) in reasonable detail, the selling broker represents that it has complied with Rule 144(f), and the Company is provided with a copy of Holder's notice of proposed sale.

5.4 Transfer Procedure. After receipt by Bank of the executed Warrant, Bank will transfer all of this Warrant to SVB Financial Group by execution of an Assignment substantially in the form of Appendix 2. Subject to the provisions of Article 5.3 and upon providing the Company with written notice, SVB Financial Group and any subsequent Holder may transfer all or part of this Warrant or the Shares issuable upon exercise of this Warrant (or the Shares issuable directly or indirectly, upon conversion of the Shares, if any) to any transferee; provided, however, in connection with any such transfer, SVB Financial Group or any subsequent Holder will give the Company notice of the portion of the Warrant being transferred with the name, address and taxpayer identification number of the transferee and Holder will surrender this



---

Warrant to the Company for reissuance to the transferee(s) (and Holder if applicable). The Company may refuse to transfer this Warrant or the Shares to any person who directly competes with the Company, unless, in either case, the stock of the Company is publicly traded.

5.5 Notices. All notices and other communications from the Company to Holder, or vice versa, shall be deemed delivered and effective when given personally or mailed by first-class registered or certified mail, postage prepaid, at such address as may have been furnished to the Company or Holder, as the case may (or on the first business day after transmission by facsimile) be, in writing by the Company or such Holder from time to time. Effective upon receipt of the fully executed Warrant and the initial transfer described in Article 5.4 above, all notices to Holder shall be addressed as follows until the Company receives notice of a change of address in connection with a transfer or otherwise:

SVB Financial Group
Attn: Treasury Department
3003 Tasman Drive, HA 200
Santa Clara, CA 95054
Telephone: 408-654-7400
Facsimile: 408-496-2405

Notice to the Company shall be addressed as follows until Holder receives notice of a change in address:

Control4 Corporation
Attn: William B. West, CEO
11734 South Election Road, Suite 200
Draper, Utah 84020
Telephone: (801) 523-3100
Facsimile: (801) 523-3199

5.6 Waiver. This Warrant and any term hereof may be changed, waived, discharged or terminated only by an instrument in writing signed by the party against which enforcement of such change, waiver, discharge or termination is sought.

5.7 Attorneys' Fees. In the event of any dispute between the parties concerning the terms and provisions of this Warrant, the party prevailing in such dispute shall be entitled to collect from the other party all costs incurred in such dispute, including reasonable attorneys' fees.

5.8 Automatic Conversion upon Expiration. In the event that, upon the Expiration Date, the fair market value of one Share (or other security issuable upon the exercise hereof) as determined in accordance with Section 1.3 above is greater than the Warrant Price in effect on such date, then this Warrant shall automatically be deemed on and as of such date to be converted pursuant to Section 1.2 above as to all Shares (or such other securities) for which it shall not previously have been exercised or converted, and the Company shall promptly deliver a certificate representing the Shares (or such other securities) issued upon such conversion to Holder.



---

5.9 Counterparts. This Warrant may be executed in counterparts, all of which together shall constitute one and the same agreement.

5.10 Governing Law. This Warrant shall be governed by and construed in accordance with the laws of the State of California, without giving effect to its principles regarding conflicts of law.

*[Remainder of page intentionally left blank]*



---

Date: June 13, 2007

"COMPANY"

CONTROL4 CORPORATION

By: /s/ William B. West
William B. West
President and CEO

By: /s/ W. Eric Smith
W. Eric Smith
Secretary and CTO

"HOLDER"

SILICON VALLEY BANK

By: /s/ Shane Anderson
Name: Shane Anderson
Title: Deal Team Leader

---

Control4 Corp files Form S-1 (IPO Registration) SEC Filing SEC Filing - MarketBrief

**SCHEDULE 1**

**CAPITALIZATION TABLE**

CAP Table - Control4, Inc

*All Values are in thousands except "$ Price per Share".*

| | Number of Employees | Date of Round | Board Member | Number of Shares Common | Number of Shares Preferred | $ Price per Share | $ Invested Total | Post-money valuation | # of shares - fully diluted | Ownership % | Cumulative ownership |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **1st Professional Round** | | **7/15/2003** | | | **8,150.0** | **$ 0.50** | **$ 4,100.0** | **$ 8,600.0** | **8,150.0** | **15.13%** | |
| Thomas Weisel Partners | | | | | 4,500.0 | | $ 2,300.0 | | 4,500.0 | 8.35% | |
| vSpring Capital | | | | | 3,600.0 | | $ 1,800.0 | | 3,600.0 | 6.68% | |
| **2nd Professional Round** | | **6/15/2004** | | | **18,124.2** | **$ 0.81** | **$ 14,700.0** | **$ 31,000.0** | **18,124.2** | **33.64%** | |
| Frazier Technology Ventures | | | | | 7,380.0 | | $ 6,000.0 | | 7,380.0 | 13.70% | |
| Thomas Weisel Partners | | | | | 6,150.0 | | $ 5,000.0 | | 6,150.0 | 11.42% | |
| vSpring Capital | | | | | 4,532.5 | | $ 3,700.0 | | 4,532.5 | 8.41% | |
| **3rd Professional Round** | | **7/15/2005** | | | **14,177.6** | **$ 1.05** | **$ 15,000.0** | **$ 57,000.0** | **14,177.6** | **26.32%** | |
| Foundation Capital | | | | | 9,357.2 | | $ 9,900.0 | | 9,357.2 | 17.37% | 17.37% |
| Thomas Weisel Partners | | | | | 1,923.7 | | $ 2,000.0 | | 1,923.7 | 3.57% | 23.34% |
| vSpring Capital | | | | | 1,469.0 | | $ 1,600.0 | | 1,469.0 | 2.73% | 17.82% |
| Frazier Technology Ventures | | | | | 1,333.0 | | $ 1,400.0 | | 1,333.0 | 2.47% | 16.17% |
| **Common Outstanding** | | | | **6,560.8** | | | | | **6,560.8** | **12.18%** | |
| **Warrants Outstanding** | | | | **92.2** | | | | | **92.2** | **0.17%** | |
| **Options Outstanding** | | | | **6,770.5** | | | | | **6,770.5** | **12.57%** | |
| **Total** | | | | **13,423.5** | **40,451.8** | | **$ 33,800.0** | | **53,875.3** | **100.00%** | |



---

**APPENDIX 1**

**NOTICE OF EXERCISE**

1. Holder elects to purchase shares of the Common/Series Preferred [strike one] Stock of pursuant to the terms of the attached Warrant, and tenders payment of the purchase price of the shares in full.

[or]

1. Holder elects to convert the attached Warrant into Shares/cash [strike one] in the manner specified in the Warrant. This conversion is exercised for of the Shares covered by the Warrant.

[Strike paragraph that does not apply.]

2. Please issue a certificate or certificates representing the shares in the name specified below:

Holder's Name

(Address)

3. By its execution below and for the benefit of the Company, Holder hereby restates each of the representations and warranties in Article 4 of the Warrant as the date hereof.

HOLDER:

http://marketbrief.com/control4-corp/s1/ipo-registration/2013/7/1/10240590/filing[8/5/2013 2:31:13 PM]

SAVANT3329884

By: ____________________
Name:
Title:
Date:

---

**APPENDIX 2**

**ASSIGNMENT**

For value received, Silicon Valley Bank hereby sells, assigns and transfers unto

| | |
|---|---|
| Name: | SVB Financial Group |
| Address: | 3003 Tasman Drive (HA-200) |
| | Santa Clara, CA 95054 |
| Tax ID: | 91-1962278 |

that certain Warrant to Purchase Stock issued by Control4 Corporation (the "Company"), on June , 2007 (the "Warrant") together with all rights, title and interest therein.

SILICON VALLEY BANK

By: ____________________
Name: ____________________
Title: ____________________

Date: June , 2007

By its execution below, and for the benefit of the Company, SVB Financial Group makes each of the representations and warranties set forth in Article 4 of the Warrant and agrees to all other provisions of the Warrant as of the date hereof.

SVB FINANCIAL GROUP

By: ____________________
Name: ____________________
Title: ____________________

---

**Exhibit 10.1**

**FORM OF INDEMNIFICATION AGREEMENT**

This Indemnification Agreement ("Agreement") is made as of [ ], 2013 by and between Control4 Corporation, a Delaware corporation (the "Company"), and [ ] ("Indemnitee").

RECITALS

WHEREAS, the Company desires to attract and retain the services of highly qualified individuals, such as Indemnitee, to serve the Company;

WHEREAS, in order to induce Indemnitee to provide or continue to provide services to the Company, the Company wishes to provide for the indemnification of,

and advancement of expenses to, Indemnitee to the maximum extent permitted by law;

WHEREAS, the Bylaws (as the same may be amended, restated or otherwise modified from time to time, the "**Bylaws**") of the Company require indemnification of the officers and directors of the Company, and Indemnitee may also be entitled to indemnification pursuant to the General Corporation Law of the State of Delaware (the "**DGCL**");

WHEREAS, the Bylaws and the DGCL expressly provide that the indemnification provisions set forth therein are not exclusive, and thereby contemplate that contracts may be entered into between the Company and members of the board of directors, officers and other persons with respect to indemnification;

WHEREAS, the Board of Directors of the Company (the "**Board**") has determined that the increased difficulty in attracting and retaining highly qualified persons such as Indemnitee is detrimental to the best interests of the Company's stockholders;

WHEREAS, it is reasonable, prudent and necessary for the Company contractually to obligate itself to indemnify, and to advance expenses on behalf of, such persons to the fullest extent permitted by applicable law, regardless of any amendment or revocation of the Certificate of Incorporation (as the same may be amended, restated or otherwise modified from time to time, the "**Charter**") or the Bylaws, so that they will serve or continue to serve the Company free from undue concern that they will not be so indemnified;

WHEREAS, this Agreement is a supplement to and in furtherance of the indemnification provided in the Bylaws and any resolutions adopted pursuant thereto, and shall not be deemed a substitute therefor, nor to diminish or abrogate any rights of Indemnitee thereunder; and

[WHEREAS, Indemnitee has certain rights to indemnification and/or insurance provided by [Name of Fund/Sponsor] which Indemnitee and [Name of Fund/Sponsor] intend to be secondary to the primary obligation of the Company to indemnify Indemnitee as provided in this

---

Agreement, with the Company's acknowledgment and agreement to the foregoing being a material condition to Indemnitee's willingness to serve or continue to serve on the Board.](1)

NOW, THEREFORE, in consideration of the premises and the covenants contained herein, the Company and Indemnitee do hereby covenant and agree as follows:

Section 1. Services to the Company. Indemnitee agrees to serve or to continue to serve as a director or officer of the Company. Indemnitee may at any time and for any reason resign from such position (subject to any other contractual obligation or any obligation imposed by law), in which event the Company shall have no obligation under this Agreement to continue Indemnitee in such position. This Agreement shall not be deemed an employment contract between the Company (or any of its subsidiaries or any Enterprise) and Indemnitee.

Section 2. Definitions.

As used in this Agreement:

(a) "**Change in Control**" shall mean:

(i) the date any "person," as such term is used in Sections 13(d) and 14(d) of the Securities Exchange Act of 1934, as amended (the "**Act**") (other than the Company, any of its subsidiaries, or any trustee, fiduciary or other person or entity holding securities under any employee benefit plan or trust of the Company or any of its subsidiaries), together with all "affiliates" and "associates" (as such terms are defined in Rule 12b-2 under the Act) of such person, becomes the "beneficial owner" (as such term is defined in Rule 13d-3 under the Act), directly or indirectly, of securities of the Company representing 50 percent or more of the combined voting power of the Company's then outstanding securities having the right to vote in an election of the Board ("**Voting Securities**") (in such case other than as a result of an acquisition of securities directly from the Company); or

(ii) the date a majority of the members of the Board is replaced during any 12-month period by directors whose appointment or election is not endorsed by a majority of the members of the Board before the date of the appointment or election; or

(iii) the date of consummation of (A) any consolidation or merger of the Company where the stockholders of the Company, immediately prior to the consolidation or merger, would not, immediately after the consolidation or merger, beneficially own (as such term is defined in Rule 13d-3 under the Act), directly or indirectly, shares representing in the aggregate more than 50 percent of the voting shares of the Company issuing cash or securities in the consolidation or merger (or of its ultimate parent corporation, if any), or (B) any sale or other transfer (in one transaction or a series of transactions contemplated or arranged by any party as a single plan) of all or substantially all of the assets of the Company.

(1) Note: to include for directors affiliated with funds.

---

Notwithstanding the foregoing, a "Change in Control" will not be deemed to have occurred for purposes of the foregoing clause (i) solely as the result of an acquisition of securities by the Company which, by reducing the number of shares of Voting Securities outstanding, increases the proportionate number of Voting Securities beneficially owned by any person to 50 percent or more of the combined voting power of all of the then outstanding Voting Securities; provided, however, that if any person referred to in this sentence will thereafter become the beneficial owner of any additional shares of Voting Securities (other than pursuant to a stock split, stock dividend, or similar transaction or as a result of an acquisition of securities directly from the Company) and immediately thereafter beneficially owns 50 percent or more of the combined voting power of all of the then outstanding Voting Securities, then a "Change in Control" will be deemed to have occurred for purposes of the foregoing clause (i).

(b) "**Corporate Status**" describes the status of a person as a current or former director or officer of the Company or current or former director, manager, officer, employee, agent or trustee of any other Enterprise which such person is or was serving at the request of the Company.

(c) "**Enforcement Expenses**" shall include all reasonable attorneys' fees, court costs, transcript costs, fees of experts, travel expenses, duplicating costs, printing and binding costs, telephone charges, postage, delivery service fees, and all other out-of-pocket disbursements or expenses of the types customarily incurred in connection with an action to enforce indemnification or advancement rights, or an appeal from such action. Expenses, however, shall not include fees, salaries, wages or benefits owed to Indemnitee.

(d) "**Enterprise**" shall mean any corporation (other than the Company), partnership, joint venture, trust, employee benefit plan, limited liability company, or other legal entity of which Indemnitee is or was serving at the request of the Company as a director, manager, officer, employee, agent or trustee.

(e) "**Expenses**" shall include all reasonable attorneys' fees, court costs, transcript costs, fees of experts, travel expenses, duplicating costs, printing and binding costs, telephone charges, postage, delivery service fees, and all other out-of-pocket disbursements or expenses of the types customarily incurred in connection with prosecuting, defending, preparing to prosecute or defend, investigating, being or preparing to be a witness in, or otherwise participating in, a Proceeding or an appeal resulting from a Proceeding. Expenses, however, shall not include amounts paid in settlement by Indemnitee, the amount of judgments or fines against Indemnitee or fees, salaries, wages or benefits owed to Indemnitee.

(f) "**Independent Counsel**" means a law firm, or a partner (or, if applicable, member or shareholder) of such a law firm, that is experienced in matters of Delaware corporation law and neither presently is, nor in the past five (5) years has been, retained to represent: (i) the Company, any subsidiary of the Company, any Enterprise or Indemnitee in any matter material to any such party (other than with respect to matters concerning Indemnitee under this Agreement, or of other indemnitees under similar indemnification agreements); or (ii) any other party to the Proceeding giving rise to a claim for indemnification hereunder. Notwithstanding the foregoing, the term "Independent Counsel" shall not include any person



---

who, under the applicable standards of professional conduct then prevailing, would have a conflict of interest in representing either the Company or Indemnitee in an action to determine Indemnitee's rights under this Agreement. The Company agrees to pay the reasonable fees and expenses of the Independent Counsel referred to above and to fully indemnify such counsel against any and all expenses, claims, liabilities and damages arising out of or relating to this Agreement or its engagement pursuant hereto.

(g) The term "**Proceeding**" shall include any threatened, pending or completed action, suit, arbitration, alternate dispute resolution mechanism, investigation, inquiry, administrative hearing or any other actual, threatened or completed proceeding, whether brought in the right of the Company or otherwise and whether of a civil, criminal, administrative, regulatory or investigative nature, and whether formal or informal, in which Indemnitee was, is or will be involved as a party or otherwise by reason of the fact that Indemnitee is or was a director or officer of the Company or is or was serving at the request of the Company as a director, manager, officer, employee, agent or trustee of any Enterprise or by reason of any action taken by Indemnitee or of any action taken on his or her part while acting as a director or officer of the Company or while serving at the request of the Company as a director, manager, officer, employee, agent or trustee of any Enterprise, in each case whether or not serving in such capacity at the time any liability or expense is incurred for which indemnification, reimbursement or advancement of expenses can be provided under this Agreement; provided, however, that the term "Proceeding" shall not include any action, suit or arbitration, or part thereof, initiated by Indemnitee to enforce Indemnitee's rights under this Agreement as provided for in Section 12(a) of this Agreement.

Section 3. Indemnity in Third-Party Proceedings. The Company shall indemnify Indemnitee to the extent set forth in this Section 3 if Indemnitee is, or is threatened to be made, a party to or a participant in any Proceeding, other than a Proceeding by or in the right of the Company to procure a judgment in its favor. Pursuant to this Section 3, Indemnitee shall be indemnified against all Expenses, judgments, fines, penalties, excise taxes, and amounts paid in settlement actually and reasonably incurred by Indemnitee or on his or her behalf in connection with such Proceeding or any claim, issue or matter therein, if Indemnitee acted in good faith and in a manner he or she reasonably believed to be in or not opposed to the best interests of the Company and, in the case of a criminal proceeding, had no reasonable cause to believe that his or her conduct was unlawful.

Section 4. Indemnity in Proceedings by or in the Right of the Company. The Company shall indemnify Indemnitee to the extent set forth in this Section 4 if Indemnitee is, or is threatened to be made, a party to or a participant in any Proceeding by or in the right of the Company to procure a judgment in its favor. Pursuant to

this Section 4, Indemnitee shall be indemnified against all Expenses actually and reasonably incurred by him or her or on his or her behalf in connection with such Proceeding or any claim, issue or matter therein, if Indemnitee acted in good faith and in a manner he or she reasonably believed to be in or not opposed to the best interests of the Company. No indemnification for Expenses shall be made under this Section 4 in respect of any claim, issue or matter as to which Indemnitee shall have been finally adjudged by a court to be liable to the Company, unless and only to the extent that the Delaware Court of Chancery (the "**Delaware Court**") shall determine upon application that, despite the



---

adjudication of liability but in view of all the circumstances of the case, Indemnitee is fairly and reasonably entitled to indemnification for such expenses as the Delaware Court shall deem proper.

Section 5. Indemnification for Expenses of a Party Who is Wholly or Partly Successful. Notwithstanding any other provisions of this Agreement and except as provided in Section 7, to the extent that Indemnitee is a party to or a participant in any Proceeding and is successful in such Proceeding or in defense of any claim, issue or matter therein, the Company shall indemnify Indemnitee against all Expenses actually and reasonably incurred by him or her in connection therewith. If Indemnitee is not wholly successful in such Proceeding but is successful as to one or more but less than all claims, issues or matters in such Proceeding, the Company shall indemnify Indemnitee against all Expenses actually and reasonably incurred by him or her or on his or her behalf in connection with each successfully resolved claim, issue or matter. For purposes of this Section and without limitation, the termination of any claim, issue or matter in such a Proceeding by dismissal, with or without prejudice, shall be deemed to be a successful result as to such claim, issue or matter.

Section 6. Reimbursement for Expenses of a Witness or in Response to a Subpoena. Notwithstanding any other provision of this Agreement, to the extent that Indemnitee, by reason of his or her Corporate Status, (i) is a witness in any Proceeding to which Indemnitee is not a party and is not threatened to be made a party or (ii) receives a subpoena with respect to any Proceeding to which Indemnitee is not a party and is not threatened to be made a party, the Company shall reimburse Indemnitee for all Expenses actually and reasonably incurred by him or her or on his or her behalf in connection therewith.

Section 7. Exclusions. Notwithstanding any provision in this Agreement to the contrary, the Company shall not be obligated under this Agreement:

(a) to indemnify for amounts otherwise indemnifiable hereunder (or for which advancement is provided hereunder) if and to the extent that Indemnitee has otherwise actually received such amounts under any insurance policy, contract, agreement or otherwise[; provided that the foregoing shall not affect the rights of Indemnitee or the Fund Indemnitors as set forth in Section 14(c)](2);

(b) to indemnify for an accounting of profits made from the purchase and sale (or sale and purchase) by Indemnitee of securities of the Company within the meaning of Section 16(b) of the Securities Exchange Act of 1934, as amended, or similar provisions of state statutory law or common law;

(c) to indemnify for any reimbursement of, or payment to, the Company by Indemnitee of any bonus or other incentive-based or equity-based compensation or of any profits realized by Indemnitee from the sale of securities of the Company pursuant to Section 304 of the Sarbanes-Oxley Act of 2002 ("**SOX**") or any formal policy of the Company adopted by the Board (or a committee thereof), or any other remuneration paid to Indemnitee if it shall be

(2) Note: to include for directors affiliated with funds.



---

determined by a final judgment or other final adjudication that such remuneration was in violation of law;

(d) to indemnify with respect to any Proceeding, or part thereof, brought by Indemnitee against the Company, any legal entity which it controls, any director or officer thereof or any third party, unless (i) the Board has consented to the initiation of such Proceeding or part thereof and (ii) the Company provides the indemnification, in its sole discretion, pursuant to the powers vested in the Company under applicable law; provided, however, that this Section 7(d) shall not apply to counterclaims or affirmative defenses asserted by Indemnitee in an action brought against Indemnitee; or

(e) to provide any indemnification or advancement of expenses that is prohibited by applicable law (as such law exists at the time payment would otherwise be required pursuant to this Agreement).

Section 8. Advancement of Expenses. Subject to Section 9(b), the Company shall advance, to the extent not prohibited by law, the Expenses incurred by Indemnitee in connection with any Proceeding, and such advancement shall be made within thirty (30) days after the receipt by the Company of a statement or statements requesting such advances (which shall include invoices received by Indemnitee in connection with such Expenses but, in the case of invoices in connection with legal services, any references to legal work performed or to expenditures made that would cause Indemnitee to waive any privilege accorded by applicable law shall not be included with the invoice) from time to time, whether prior to or after final disposition of any Proceeding. Advances shall be unsecured and interest free. Advances shall

be made without regard to Indemnitee's ability to repay the expenses and without regard to Indemnitee's ultimate entitlement to indemnification under the other provisions of this Agreement. Indemnitee shall qualify for advances upon the execution and delivery to the Company of an undertaking to repay the advance if and to the extent it is ultimately determined that Indemnitee is not entitled to indemnification, in the form attached hereto as Exhibit A. The right to advances under this paragraph shall in all events continue until final disposition of any Proceeding, including any appeal therein. Nothing in this Section 8 shall limit Indemnitee's right to advancement pursuant to Section 12(e) of this Agreement.

Section 9. Procedure for Notification and Defense of Claim.

(a) To obtain indemnification under this Agreement, Indemnitee shall submit to the Company a written request therefor specifying the basis for the claim, the amounts for which Indemnitee is seeking payment under this Agreement, and all documentation related thereto as reasonably requested by the Company.

(b) In the event that the Company shall be obligated hereunder to provide indemnification for or make any advancement of Expenses with respect to any Proceeding, the Company shall be entitled to assume the defense of such Proceeding, or any claim, issue or matter therein, with counsel approved by Indemnitee (which approval shall not be unreasonably withheld or delayed) upon the delivery to Indemnitee of written notice of the Company's election to do so. After delivery of such notice, approval of such counsel by Indemnitee and the retention of such counsel by the Company, the Company will not be liable to Indemnitee under this



Agreement for any fees or expenses of separate counsel subsequently employed by or on behalf of Indemnitee with respect to the same Proceeding; provided that (i) Indemnitee shall have the right to employ separate counsel in any such Proceeding at Indemnitee's expense and (ii) if (A) the employment of separate counsel by Indemnitee has been previously authorized by the Company, (B) Indemnitee shall have reasonably concluded that there may be a conflict of interest between the Company and Indemnitee in the conduct of such defense, or (C) the Company shall not continue to retain such counsel to defend such Proceeding, then the reasonable fees and expenses actually and reasonably incurred by Indemnitee with respect to his or her separate counsel shall be Expenses hereunder.

(c) In the event that the Company does not assume the defense in a Proceeding pursuant to paragraph (b) above, then the Company will be entitled to participate in the Proceeding at its own expense.

(d) The Company shall not be liable to indemnify Indemnitee under this Agreement for any amounts paid in settlement of any Proceeding effected without its prior written consent (which consent shall not be unreasonably withheld or delayed). The Company shall not, without the prior written consent of Indemnitee (which consent shall not be unreasonably withheld or delayed), enter into any settlement which (i) includes an admission of fault of Indemnitee, any non-monetary remedy imposed on Indemnitee or any monetary damages for which Indemnitee is not wholly and actually indemnified hereunder or (ii) with respect to any Proceeding with respect to which Indemnitee may be or is made a party or may be otherwise entitled to seek indemnification hereunder, does not include the full release of Indemnitee from all liability in respect of such Proceeding.

Section 10. Procedure Upon Application for Indemnification.

(a) To the extent that Indemnitee shall have been successful on the merits in any Proceeding to which it is a party or a participant or in defense of any claim, issue or matter therein, no determination shall be required to be made with respect to Indemnitee's entitlement to indemnification hereunder. In all other cases, a determination with respect to Indemnitee's entitlement to indemnification hereunder shall be made in the specific case by one of the following methods: (x) if a Change in Control shall have occurred, (i) by Independent Counsel in a written opinion to the Board or (ii) if the Indemnitee so requests in writing, by a majority vote of the disinterested directors, even though less than a quorum; or (y) if a Change in Control shall not have occurred: (i) by a majority vote of the disinterested directors, even though less than a quorum; (ii) by a committee of disinterested directors designated by a majority vote of the disinterested directors, even though less than a quorum; (iii) if there are no disinterested directors or if the disinterested directors so direct, by Independent Counsel in a written opinion to the Board; or (iv) if so directed by the Board, by the stockholders of the Company. For purposes hereof, disinterested directors are those members of the Board who are not parties to the action, suit or proceeding in respect of which indemnification is sought. In the case that such determination is made by Independent Counsel, a copy of Independent Counsel's written opinion shall be delivered to Indemnitee and, if it is so determined that Indemnitee is entitled to indemnification, payment to Indemnitee shall be made within thirty (30) days after such determination. Indemnitee shall cooperate with the Independent Counsel or the Company, as



applicable, in making such determination with respect to Indemnitee's entitlement to indemnification, including providing to such counsel or the Company, upon reasonable advance request, any documentation or information which is not privileged or otherwise protected from disclosure and which is reasonably available to Indemnitee and reasonably necessary to such determination. Any out-of-pocket costs or expenses (including reasonable attorneys' fees and disbursements) actually and reasonably incurred by Indemnitee in so cooperating with the Independent Counsel or the Company shall be borne by the Company (irrespective of the determination as to Indemnitee's entitlement to indemnification) and the Company hereby indemnifies and agrees to hold Indemnitee harmless therefrom.

(b) If the determination of entitlement to indemnification is to be made by Independent Counsel pursuant to Section 10(a), the Independent Counsel shall be selected by the Board if a Change in Control shall not have occurred or, if a Change in Control shall have occurred, by Indemnitee. Indemnitee or the Company, as

the case may be, may, within ten (10) days after written notice of such selection, deliver to the Company or Indemnitee, as the case may be, a written objection to such selection; provided, however, that such objection may be asserted only on the ground that the Independent Counsel so selected does not meet the requirements of "Independent Counsel" as defined in Section 2 of this Agreement, and the objection shall set forth with particularity the factual basis of such assertion. Absent a proper and timely objection, the person so selected shall act as Independent Counsel. If such written objection is so made and substantiated, the Independent Counsel so selected may not serve as Independent Counsel unless and until such objection is withdrawn or the Delaware Court has determined that such objection is without merit. If, within twenty (20) days after the later of (i) submission by Indemnitee of a written request for indemnification pursuant to Section 9(a), and (ii) the final disposition of the Proceeding, including any appeal therein, no Independent Counsel shall have been selected without objection, either Indemnitee or the Company may petition the Delaware Court for resolution of any objection which shall have been made by Indemnitee or the Company to the selection of Independent Counsel and/or for the appointment as Independent Counsel of a person selected by the court or by such other person as the court shall designate. The person with respect to whom all objections are so resolved or the person so appointed shall act as Independent Counsel under Section 10(a) hereof. Upon the due commencement of any judicial proceeding or arbitration pursuant to Section 12(a) of this Agreement, Independent Counsel shall be discharged and relieved of any further responsibility in such capacity (subject to the applicable standards of professional conduct then prevailing).

Section 11. Presumptions and Effect of Certain Proceedings.

(a) To the extent permitted by applicable law, in making a determination with respect to entitlement to indemnification hereunder, it shall be presumed that Indemnitee is entitled to indemnification under this Agreement if Indemnitee has submitted a request for indemnification in accordance with Section 9(a) of this Agreement, and the Company shall have the burden of proof to overcome that presumption in connection with the making of any determination contrary to that presumption. Neither (i) the failure of the Company or of Independent Counsel to have made a determination prior to the commencement of any action pursuant to this Agreement that indemnification is proper in the circumstances because Indemnitee has met the applicable standard of conduct, nor (ii) an actual determination by the Company or by Independent Counsel that Indemnitee has not met such applicable standard of



---

conduct, shall be a defense to the action or create a presumption that Indemnitee has not met the applicable standard of conduct.

(b) The termination of any Proceeding or of any claim, issue or matter therein, by judgment, order, settlement or conviction, or upon a plea of guilty, nolo contendere or its equivalent, shall not (except as otherwise expressly provided in this Agreement) of itself adversely affect the right of Indemnitee to indemnification or create a presumption that Indemnitee did not act in good faith and in a manner which he or she reasonably believed to be in or not opposed to the best interests of the Company or, with respect to any criminal Proceeding, that Indemnitee had reasonable cause to believe that his or her conduct was unlawful.

(c) The knowledge and/or actions, or failure to act, of any director, manager, officer, employee, agent or trustee of the Company, any subsidiary of the Company, or any Enterprise shall not be imputed to Indemnitee for purposes of determining the right to indemnification under this Agreement.

Section 12. Remedies of Indemnitee.

(a) Subject to Section 12(f), in the event that (i) a determination is made pursuant to Section 10 of this Agreement that Indemnitee is not entitled to indemnification under this Agreement, (ii) advancement of Expenses is not timely made pursuant to Section 8 of this Agreement, (iii) no determination of entitlement to indemnification shall have been made pursuant to Section 10(a) of this Agreement within sixty (60) days after receipt by the Company of the request for indemnification for which a determination is to be made other than by Independent Counsel, (iv) payment of indemnification or reimbursement of expenses is not made pursuant to Section 5 or 6 or the last sentence of Section 10(a) of this Agreement within thirty (30) days after receipt by the Company of a written request therefor (which shall include any invoices received by Indemnitee but, in the case of invoices in connection with legal services, any references to legal work performed or to expenditures made that would cause Indemnitee to waive any privilege accorded by applicable law shall not be included with the invoice) or (v) payment of indemnification pursuant to Section 3 or 4 of this Agreement is not made within thirty (30) days after a determination has been made that Indemnitee is entitled to indemnification, Indemnitee shall be entitled to an adjudication by the Delaware Court of his or her entitlement to such indemnification or advancement. Alternatively, Indemnitee, at his or her option, may seek an award in arbitration to be conducted by a single arbitrator pursuant to the Commercial Arbitration Rules of the American Arbitration Association. Indemnitee shall commence such proceeding seeking an adjudication or an award in arbitration within 180 days following the date on which Indemnitee first has the right to commence such proceeding pursuant to this Section 12(a); provided, however, that the foregoing time limitation shall not apply in respect of a proceeding brought by Indemnitee to enforce his or her rights under Section 5 of this Agreement. The Company shall not oppose Indemnitee's right to seek any such adjudication or award in arbitration.

(b) In the event that a determination shall have been made pursuant to Section 10(a) of this Agreement that Indemnitee is not entitled to indemnification, any judicial proceeding or arbitration commenced pursuant to this Section 12 shall be conducted in all



---

respects as a de novo trial, or arbitration, on the merits and Indemnitee shall not be prejudiced by reason of that adverse determination. In any judicial proceeding or arbitration commenced pursuant to this Section 12, the Company shall have the burden of proving Indemnitee is not entitled to indemnification or advancement, as the case may be.

(c) If Indemnitee is entitled to indemnification pursuant to Section 10(a) of this Agreement, the Company shall be bound by such provision and/or determination in any judicial proceeding or arbitration commenced pursuant to this Section 12, absent (i) a misstatement by Indemnitee of a material fact, or an omission of a material fact necessary to make Indemnitee's statement not materially misleading, in connection with the request for indemnification, or (ii) a prohibition of such indemnification under applicable law.

(d) The Company shall be precluded from asserting in any judicial proceeding or arbitration commenced pursuant to this Section 12 that the procedures and presumptions of this Agreement are not valid, binding and enforceable and shall stipulate in any such court or before any such arbitrator that the Company is bound by all the provisions of this Agreement.

(e) The Company shall indemnify Indemnitee to the fullest extent permitted by law against any and all Enforcement Expenses and, if requested by Indemnitee, shall (within thirty (30) days after receipt by the Company of a written request therefor) advance, to the extent not prohibited by law, such Enforcement Expenses to Indemnitee, which are incurred by Indemnitee in connection with any action brought by Indemnitee for indemnification or advancement from the Company under this Agreement or under any directors' and officers' liability insurance policies maintained by the Company in the suit for which indemnification or advancement is being sought. Such written request for advancement shall include invoices received by Indemnitee in connection with such Enforcement Expenses but, in the case of invoices in connection with legal services, any references to legal work performed or to expenditures made that would cause Indemnitee to waive any privilege accorded by applicable law shall not be included with the invoice.

(f) Notwithstanding anything in this Agreement to the contrary, no determination as to entitlement to indemnification under this Agreement shall be required to be made prior to the final disposition of the Proceeding, including any appeal therein.

Section 13. Non-exclusivity; Survival of Rights; Insurance; [Primacy of Indemnification;](3) Subrogation.

(a) The rights of indemnification and to receive advancement as provided by this Agreement shall not be deemed exclusive of any other rights to which Indemnitee may at any time be entitled under applicable law, the Charter, the Bylaws, any agreement, a vote of stockholders or a resolution of directors, or otherwise. No amendment, alteration or repeal of this Agreement or of any provision hereof shall limit or restrict any right of Indemnitee under this Agreement in respect of any action taken or omitted by such Indemnitee in his or her Corporate Status prior to such amendment, alteration or repeal. To the extent that a change in

(3) Note: to include for directors affiliated with funds.



Delaware law, whether by statute or judicial decision, permits greater indemnification or advancement than would be afforded currently under the Charter, Bylaws and this Agreement, it is the intent of the parties hereto that Indemnitee shall enjoy by this Agreement the greater benefits so afforded by such change. No right or remedy herein conferred is intended to be exclusive of any other right or remedy, and every other right and remedy shall be cumulative and in addition to every other right and remedy given hereunder or now or hereafter existing at law or in equity or otherwise. The assertion or employment of any right or remedy hereunder, or otherwise, shall not prevent the concurrent assertion or employment of any other right or remedy.

(b) To the extent that the Company maintains an insurance policy or policies providing liability insurance for directors, managers, officers, employees, agents or trustees of the Company or of any other Enterprise, Indemnitee shall be covered by such policy or policies in accordance with its or their terms to the maximum extent of the coverage available for any such director, manager, officer, employee, agent or trustee under such policy or policies. If, at the time of the receipt of a notice of a claim pursuant to the terms hereof, the Company has director and officer liability insurance in effect, the Company shall give prompt notice of the commencement of such proceeding to the insurers in accordance with the procedures set forth in the respective policies. The Company shall thereafter take all necessary or desirable action to cause such insurers to pay, on behalf of Indemnitee, all amounts payable as a result of such proceeding in accordance with the terms of such policies.

(c) [The Company hereby acknowledges that Indemnitee has certain rights to indemnification, advancement of expenses and/or insurance provided by [Name of Fund/Sponsor] and certain of its affiliates (collectively, the "**Fund Indemnitors**"). The Company hereby agrees (i) that it is the indemnitor of first resort (*i.e.*, its obligations to Indemnitee are primary and any obligation of the Fund Indemnitors to advance expenses or to provide indemnification for the same expenses or liabilities incurred by Indemnitee are secondary), (ii) that it shall be required to advance the full amount of expenses incurred by Indemnitee and shall be liable for the full amount of all Expenses, judgments, penalties, fines and amounts paid in settlement to the extent legally permitted and as required by the terms of this Agreement and the Charter and/or Bylaws (or any other agreement between the Company and Indemnitee), without regard to any rights Indemnitee may have against the Fund Indemnitors, and (iii) that it irrevocably waives, relinquishes and releases the Fund Indemnitors from any and all claims against the Fund Indemnitors for contribution, subrogation or any other recovery of any kind in respect thereof. The Company further agrees that no advancement or payment by the Fund Indemnitors on behalf of Indemnitee with respect to any claim for which Indemnitee has sought indemnification from the Company shall affect the foregoing and the Fund Indemnitors shall have a right of contribution and/or be subrogated to the extent of such advancement or payment to all of the rights of recovery of Indemnitee against the Company. The Company and Indemnitee agree that the Fund Indemnitors are express third party beneficiaries of the terms of this Section 8(c).](4)

(d) [Except as provided in paragraph (c) above,] [I/i]n the event of any payment under this Agreement, the Company shall be subrogated to the extent of such payment

(4) Note: to include for directors affiliated with funds.



---

to all of the rights of recovery of Indemnitee [(other than against the Fund Indemnitors)], who shall execute all papers required and take all action necessary to secure such rights, including execution of such documents as are necessary to enable the Company to bring suit to enforce such rights.

(e) [Except as provided in paragraph (c) above,] [T/t]he Company's obligation to provide indemnification or advancement hereunder to Indemnitee who is or was serving at the request of the Company as a director, manager, officer, employee, agent or trustee of any other Enterprise shall be reduced by any amount Indemnitee has actually received as indemnification or advancement from such other Enterprise.

Section 14. Duration of Agreement. This Agreement shall continue until and terminate upon the later of: (a) ten (10) years after the date that Indemnitee shall have ceased to serve as a director or officer of the Company or (b) one (1) year after the final termination of any Proceeding, including any appeal, then pending in respect of which Indemnitee is granted rights of indemnification or advancement hereunder and of any proceeding commenced by Indemnitee pursuant to Section 12 of this Agreement relating thereto. This Agreement shall be binding upon the Company and its successors and assigns and shall inure to the benefit of Indemnitee and his or her heirs, executors and administrators. The Company shall require and cause any successor (whether direct or indirect by purchase, merger, consolidation or otherwise) to all, substantially all or a substantial part, of the business and/or assets of the Company, by written agreement in form and substance satisfactory to Indemnitee, expressly to assume and agree to perform this Agreement in the same manner and to the same extent that the Company would be required to perform if no such succession had taken place.

Section 15. Severability. If any provision or provisions of this Agreement shall be held to be invalid, illegal or unenforceable for any reason whatsoever: (a) the validity, legality and enforceability of the remaining provisions of this Agreement (including, without limitation, each portion of any section of this Agreement containing any such provision held to be invalid, illegal or unenforceable, that is not itself invalid, illegal or unenforceable) shall not in any way be affected or impaired thereby and shall remain enforceable to the fullest extent permitted by law; (b) such provision or provisions shall be deemed reformed to the extent necessary to conform to applicable law and to give the maximum effect to the intent of the parties hereto; and (c) to the fullest extent possible, the provisions of this Agreement (including, without limitation, each portion of any section of this Agreement containing any such provision held to be invalid, illegal or unenforceable, that is not itself invalid, illegal or unenforceable) shall be construed so as to give effect to the intent manifested thereby.

Section 16. Enforcement.

(a) The Company expressly confirms and agrees that it has entered into this Agreement and assumed the obligations imposed on it hereby in order to induce Indemnitee to serve or continue to serve as a director or officer of the Company, and the Company acknowledges that Indemnitee is relying upon this Agreement in serving as a director or officer of the Company.



---

(b) This Agreement constitutes the entire agreement between the parties hereto with respect to the subject matter hereof and supersedes all prior agreements and understandings, oral, written and implied, between the parties hereto with respect to the subject matter hereof; provided, however, that this Agreement is a supplement to and in furtherance of the Charter, the Bylaws and applicable law, and shall not be deemed a substitute therefor, nor to diminish or abrogate any rights of Indemnitee thereunder.

Section 17. Modification and Waiver. No supplement, modification or amendment, or waiver of any provision, of this Agreement shall be binding unless executed in writing by the parties thereto. No waiver of any of the provisions of this Agreement shall be deemed or shall constitute a waiver of any other provisions of this Agreement nor shall any waiver constitute a continuing waiver. No supplement, modification or amendment of this Agreement or of any provision hereof shall limit or restrict any right of Indemnitee under this Agreement in respect of any action taken or omitted by such Indemnitee prior to such supplement, modification or amendment.

Section 18. Notice by Indemnitee. Indemnitee agrees promptly to notify the Company in writing upon being served with any summons, citation, subpoena, complaint, indictment, information or other document relating to any Proceeding or matter which may be subject to indemnification, reimbursement or advancement as provided hereunder. The failure of Indemnitee to so notify the Company shall not relieve the Company of any obligation which it may have to Indemnitee under this Agreement or otherwise.

Section 19. Notices. All notices, requests, demands and other communications under this Agreement shall be in writing and shall be deemed to have been duly given if (a) delivered by hand and receipted for by the party to whom said notice or other communication shall have been directed, (b) mailed by certified or registered mail with postage prepaid, on the third business day after the date on which it is so mailed, (c) mailed by reputable overnight courier and receipted for by the party to whom said notice or other communication shall have been directed or (d) sent by facsimile transmission, with receipt of oral confirmation that such transmission has been received:

(a) If to Indemnitee, at such address as Indemnitee shall provide to the Company.

(b) If to the Company to:

Control4 Corporation
11734 South Election Road
Salt Lake City, UT 84020
Attention: Greg Bishop, General Counsel &
Chief Compliance Officer

or to any other address as may have been furnished to Indemnitee by the Company.

Section 20. Contribution. To the fullest extent permissible under applicable law, if the indemnification provided for in this Agreement is unavailable to Indemnitee for any reason whatsoever, the Company, in lieu of indemnifying Indemnitee, shall contribute to the amount



---

incurred by Indemnitee, whether for judgments, fines, penalties, excise taxes, amounts paid or to be paid in settlement and/or for Expenses, in connection with any Proceeding in such proportion as is deemed fair and reasonable in light of all of the circumstances in order to reflect (i) the relative benefits received by the Company and Indemnitee in connection with the event(s) and/or transaction(s) giving rise to such Proceeding; and/or (ii) the relative fault of the Company (and its directors, officers, employees and agents) and Indemnitee in connection with such event(s) and/or transactions.

Section 21. Internal Revenue Code Section 409A. The Company intends for this Agreement to comply with the Indemnification exception under Section 1.409A-1(b)(10) of the regulations promulgated under the Internal Revenue Code of 1986, as amended (the "**Code**"), which provides that indemnification of, or the purchase of an insurance policy providing for payments of, all or part of the expenses incurred or damages paid or payable by the Indemnitee with respect to a bona fide claim against the Indemnitee or the Company do not provide for a deferral of compensation, subject to Section 409A of the Code, where such claim is based on actions or failures to act by the Indemnitee in his capacity as a service provider of the Company. The parties intend that this Agreement be interpreted and construed with such intent.

Section 22. Applicable Law and Consent to Jurisdiction. This Agreement and the legal relations among the parties shall be governed by, and construed and enforced in accordance with, the laws of the State of Delaware, without regard to its conflict of laws rules. Except with respect to any arbitration commenced by Indemnitee pursuant to Section 12(a) of this Agreement, the Company and Indemnitee hereby irrevocably and unconditionally (i) agree that any action or proceeding arising out of or in connection with this Agreement shall be brought only in the Delaware Court, and not in any other state or federal court in the United States of America or any court in any other country, (ii) consent to submit to the exclusive jurisdiction of the Delaware Court for purposes of any action or proceeding arising out of or in connection with this Agreement, (iii) consent to service of process at the address set forth in Section 19 of this Agreement with the same legal force and validity as if served upon such party personally within the State of Delaware, (iv) waive any objection to the laying of venue of any such action or proceeding in the Delaware Court, and (v) waive, and agree not to plead or to make, any claim that any such action or proceeding brought in the Delaware Court has been brought in an improper or inconvenient forum.

Section 23. Headings. The headings of the paragraphs of this Agreement are inserted for convenience only and shall not be deemed to constitute part of this Agreement or to affect the construction thereof.

Section 24. Identical Counterparts. This Agreement may be executed in one or more counterparts, each of which shall for all purposes be deemed to be an original but all of which together shall constitute one and the same Agreement. Only one such counterpart signed by the party against whom enforceability is sought needs to be produced to evidence the existence of this Agreement.

[Remainder of Page Intentionally Left Blank]



---

IN WITNESS WHEREOF, the parties have caused this Agreement to be signed as of the day and year first above written.

**CONTROL4 CORPORATION**

By: ______________________
Name:

Title:

[ ]

*[Signature Page to Indemnification Agreement]*

---

**Exhibit A**

**Form of Undertaking**

[Date]

Control4 Corporation
11734 South Election Road
Salt Lake City, UT 84020

**Re: Request for Advancement of Expenses**

Ladies and Gentlemen:

Reference is made to the Indemnification Agreement (the "**Agreement**") by and between Control4 Corporation (the "**Company**") and the undersigned, ("**Indemnitee**"). Capitalized terms not defined herein shall have those meanings as set forth in the Agreement. Pursuant to Section 8 of the Agreement, Indemnitee hereby requests advancement of Expenses incurred as a result of Indemnitee being, or being threatened to be made, a party in the following Proceeding(s):
.

In accordance with Section 8 of the Agreement, Indemnitee undertakes to repay the advancement of Expenses if it shall ultimately be determined that Indemnitee is not entitled to be indemnified by the Company as authorized by Section 145 of the General Corporation Law of the State of Delaware.

Very truly yours,

, Indemnitee



---

**Exhibit 10.2**

**CONTROL4 CORPORATION**

**2003 EQUITY INCENTIVE PLAN**

**SECTION 1. PURPOSE**

The purpose of the Control4 Corporation 2003 Equity Incentive Plan is to attract, retain and motivate employees, officers, directors, consultants, agents, advisors and independent contractors of Control4 Corporation and its Related Companies by providing them the opportunity to acquire a proprietary interest in the Company and to link their interests and efforts to the long-term interests of the Company's stockholders.

**SECTION 2. DEFINITIONS**

As used in the Plan,

"***Acquired Entity***" means any entity acquired by the Company or a Related Company or with which the Company or a Related Company merges or combines.

"***Acquisition Price***" means the fair market value of the securities, cash or other property, or any combination thereof, receivable upon consummation of a

Company Transaction in respect of a share of Common Stock.

"***Award***" means any awards of Options, Stock Appreciation Rights, Stock Awards, Restricted Stock or Stock Units, as may be designated by the Plan Administrator from time to time.

"***Board***" means the Board of Directors of the Company.

"***Cause***," unless otherwise defined in the instrument evidencing the Award or in a written employment, services or other agreement between the Participant and the Company or a Related Company, means dishonesty, fraud, serious misconduct, unauthorized use or disclosure of confidential information or trade secrets, or conduct prohibited by criminal law (except minor violations), in each case as determined by the Company's chief human resources officer or other person performing that function or, in the case of directors and executive officers, the Board, each of whose determination shall be conclusive and binding.

"***Code***" means the Internal Revenue Code of 1986, as amended from time to time.

"***Common Stock***" means the common stock, par value $0.0001 per share, of the Company.

"***Company***" means Control4 Corporation, a Delaware corporation.

"***Company Transaction***" unless otherwise defined in the instrument evidencing the Award or in a written employment, services or other agreement between the Participant and the Company or a Related Company, means consummation of

---

(a) a merger or consolidation of the Company with or into any other company or other entity,

(b) a sale in one transaction or a series of transactions undertaken with a common purpose of at least 50% of the Company's outstanding voting securities, or

(c) a sale, lease, exchange or other transfer in one transaction or a series of related transactions undertaken with a common purpose of all or substantially all of the Company's assets;

provided, however, that a Company Transaction shall not include a Related Party Transaction. Where a series of transactions undertaken with a common purpose is deemed to be a Company Transaction, the date of such Company Transaction shall be the date on which the last of such transactions is consummated.

"***Disability***" unless otherwise defined by the Plan Administrator or in the instrument evidencing the Award or in a written employment, services or other agreement between the Participant and the Company or a Related Company, means a mental or physical impairment of the Participant that is expected to result in death or that has lasted or is expected to last for a continuous period of 12 months or more and that causes the Participant to be unable to perform his or her material duties for the Company or a Related Company and to be engaged in any substantial gainful activity, in each case as determined by the Company's chief human resources officer or other person performing that function or, in the case of directors and executive officers, the Board, each of whose determination shall be conclusive and binding.

"***Effective Date***" has the meaning set forth in Section 18.

"***Eligible Person***" means any person eligible to receive an Award as set forth in Section 5.

"***Exchange Act***" means the Securities Exchange Act of 1934, as amended from time to time.

"***Fair Market Value***" means the per share fair market value of the Common Stock as established in good faith by the Plan Administrator or, if the Common Stock is publicly traded, the average of the high and low trading prices for the Common Stock on any given date during regular trading or, if not trading on that date, such price on the last preceding date on which the Common Stock was traded, unless determined otherwise by the Plan Administrator using such methods or procedures as it may establish.

"***Grant Date***" means the later of (a) the date on which the Plan Administrator completes the corporate action authorizing the grant of an Award or such later date specified by the Plan Administrator or (b) the date on which all conditions precedent to the Award have been satisfied, provided that conditions to the exercisability or vesting of Awards shall not defer the Grant Date.

"***Incentive Stock Option***" means an Option granted with the intention that it qualify as an "incentive stock option" as that term is defined in Section 422 of the Code or any successor provision.



---