# EXHIBIT 684

**From:** Ben Jamison
**To:** Sales Team; insidesales; Savant Sales Reps
**Sent:** 9/22/2009 6:17:58 PM
**Subject:** Dealer Pricing Level Program Welcome Letters
**Attachments:** ATT79829507.htm; ATT79829508.htm; ATT79829509.htm; ATT79829510.htm; ATT79829511.htm; Elite Dealer Level Welcome Letter.doc; image.jpg; Premier Dealer Level Welcome Letter.doc; Reference Dealer Level Welcome Letter.doc; Standard Dealer Level Welcome Letter.doc

Hello everyone,

Attached you will find four different dealer welcome letters introducing them to the tiered dealer pricing program and informing them of the initial levels they have been placed in.

There is one for each level---Standard, Premier, Elite, and Reference.

All you have to do is to replace the generic dealer name salutation at the top of the letter with the specific dealers name.

I would like for each of you to deliver these to the dealers personally if possible and discuss the program with them. In many cases we have placed them in much higher pricing levels than what they currently qualify for. You should let them know that this was based on a level of belief in their support based on quoting activity and sales as well as strategic value. Remind them that this is confidential information and not to be shared outside their organization.

Use this program to your advantage to pat dealers on the back for their support or to encourage dealers to engage more fully with us in order to earn higher rewards.

Please let me know if you have any questions.

Thank you,

Ben Jamison
Vice President of Sales
Savant Systems, LLC.
770 Main St.
Osterville, MA. 02655
T: (508) 683-2584
F: (508) 683-2600
C: (508) 648-6165
ben.jamison@savantav.com

savant 770 Main Street Osterville, MA 02655 T: 508.683.2500 F: 508.683.2600 www.savantav.com

# *Savant's Dealer Loyalty Program*

Dear ***"Dealer Name":***

On behalf of the entire Savant sales and management team, we would like to thank you for your business and dedication to Savant in 2009. We realize that it has been a tough year for everyone and we have both learned and benefited a great deal from our relationship. With our combined efforts and the strength of our relationships, we believe we are poised to rebound strongly together as partners in 2009 and 2010.

Using your feedback, we have established an exciting new program that provides immediate monetary rewards to dealers for their continuing and increased support of Savant's products. The premise of the program is very simple. The more you sell, the higher the rewards. Unlike typical VIR based programs that don't reward you until the end of the year, Savant will deduct all pre-pay and volume discounts directly from each invoice so you are rewarded immediately with each system you sell based on your dealer level.

Below are the guidelines and levels that we have established for the remainder of 2009 and for 2010:

| **Dealer Level** | **Standard** | **Premier** | **Elite** | **Reference** |
|---|---|---|---|---|
| Minimum Annual Business Level | $25,000 | $75,000 | $200,000 | $350,000 |
| Pre-Pay Discount | 2% | 2% | 2% | 2% |
| Volume Discount Level | | 1% | 4% | 8% |
| Free Freight (Ground Shipping) | N | N | N | Y |
| Total Program Discounts | 2% | 3% | 6% | 10% |

Based on your current level of total Savant sales and activity, we have initially placed you in the **Elite** Dealer Level category, recognizing you as a very strategic dealer partner for Savant.
In order to enjoy the benefits of the Elite dealer pricing level you will be required to take advanced training from Savant and you must be a member of our Platinum Service Subscription Program. If you have any questions about this, please ask your Savant representative for more information.

Savant will re-evaluate your dealer level status in three months to determine if, based on your sales performance and quoting activities, your dealer level will be modified. I hope you will take this opportunity to quote and sell Savant in all of your home automation opportunities and we will reward you to do so.

Best Regards,

Ben Jamison

*Vice President of Sales*
Savant Systems
F: (508) 683-2600
C: (508) 648-6165
ben.jamison@savantav.com

savant 770 Main Street Osterville, MA 02655 T: 508.683.2500 F: 508.683.2600 www.savantav.com

# *Savant's Dealer Loyalty Program*

Dear ***"Dealer Name":***

On behalf of the entire Savant sales and management team, we would like to thank you for your business and dedication to Savant in 2009. We realize that it has been a tough year for everyone and we have both learned and benefited a great deal from our relationship. With our combined efforts and the strength of our relationships, we believe we are poised to rebound strongly together as partners in 2009 and 2010.

Using your feedback, we have established an exciting new program that provides immediate monetary rewards to dealers for their continuing and increased support of Savant's products. The premise of the program is very simple. The more you sell, the higher the rewards. Unlike typical VIR based programs that don't reward you until the end of the year, Savant will deduct all pre-pay and volume discounts directly from each invoice so you are rewarded immediately with each system you sell based on your dealer level.

Below are the guidelines and levels that we have established for the remainder of 2009 and for 2010:

| **Dealer Level** | **Standard** | **Premier** | **Elite** | **Reference** |
|---|---|---|---|---|
| Minimum Annual Business Level | $25,000 | $75,000 | $200,000 | $350,000 |
| Pre-Pay Discount | 2% | 2% | 2% | 2% |
| Volume Discount Level | | 1% | 4% | 8% |
| Free Freight (Ground Shipping) | N | N | N | Y |
| Total Program Discounts | 2% | 3% | 6% | 10% |

Based on your current level of total Savant sales and activity, we have initially placed you in the **Premier** Dealer Level category.

Savant will re-evaluate your dealer level status in three months to determine if, based on your sales performance and quoting activities, your dealer level will be modified. I hope you will take this opportunity to quote and sell Savant in all of your home automation opportunities and we will reward you to do so.

Best Regards,

Ben Jamison

*Vice President of Sales*
Savant Systems

F: (508) 683-2600
C: (508) 648-6165
ben.jamison@savantav.com

savant 770 Main Street Osterville, MA 02655 T: 508.683.2500 F: 508.683.2600 www.savantav.com

# *Savant's Dealer Loyalty Program*

Dear ***"Dealer Name":***

On behalf of the entire Savant sales and management team, we would like to thank you for your business and dedication to Savant in 2009. We realize that it has been a tough year for everyone and we have both learned and benefited a great deal from our relationship. With our combined efforts and the strength of our relationships, we believe we are poised to rebound strongly together as partners in 2009 and 2010.

Using your feedback, we have established an exciting new program that provides immediate monetary rewards to dealers for their continuing and increased support of Savant's products. The premise of the program is very simple. The more you sell, the higher the rewards. Unlike typical VIR based programs that don't reward you until the end of the year, Savant will deduct all pre-pay and volume discounts directly from each invoice so you are rewarded immediately with each system you sell based on your dealer level.

Below are the guidelines and levels that we have established for the remainder of 2009 and for 2010:

| **Dealer Level** | **Standard** | **Premier** | **Elite** | **Reference** |
|---|---|---|---|---|
| Minimum Annual Business Level | $25,000 | $75,000 | $200,000 | $350,000 |
| Pre-Pay Discount | 2% | 2% | 2% | 2% |
| Volume Discount Level | | 1% | 4% | 8% |
| Free Freight (Ground Shipping) | N | N | N | Y |
| Total Program Discounts | 2% | 3% | 6% | 10% |

Based on your current level of total Savant sales and activity, we have initially placed you in the **Reference** Dealer Level category, recognizing you as a very strategic dealer partner for Savant. In order to enjoy the benefits of the Reference dealer pricing level you will be required to take advanced training from Savant and you must be a member of our Platinum Service Subscription Program. If you have any questions about this, please ask your Savant representative for more information.

Savant will re-evaluate your dealer level status in three months to determine if, based on your sales performance and quoting activities, your dealer level will be modified. I hope you will take this opportunity to quote and sell Savant in all of your home automation opportunities and we will reward you to do so.

Best Regards,

Ben Jamison

*Vice President of Sales*
Savant Systems
F: (508) 683-2600
C: (508) 648-6165
ben.jamison@savantav.com

savant 770 Main Street Osterville, MA 02655 T: 508.683.2500 F: 508.683.2600 www.savantav.com

# *Savant's Dealer Loyalty Program*

Dear ***"Dealer Name":***

On behalf of the entire Savant sales and management team, we would like to thank you for your business and dedication to Savant in 2009. We realize that it has been a tough year for everyone and we have both learned and benefited a great deal from our relationship. With our combined efforts and the strength of our relationships, we believe we are poised to rebound strongly together as partners in 2009 and 2010.

Using your feedback, we have established an exciting new program that provides immediate monetary rewards to dealers for their continuing and increased support of Savant's products. The premise of the program is very simple. The more you sell, the higher the rewards. Unlike typical VIR based programs that don't reward you until the end of the year, Savant will deduct all pre-pay and volume discounts directly from each invoice so you are rewarded immediately with each system you sell based on your dealer level.

Below are the guidelines and levels that we have established for the remainder of 2009 and for 2010:

| **Dealer Level** | **Standard** | **Premier** | **Elite** | **Reference** |
|---|---|---|---|---|
| Minimum Annual Business Level | $25,000 | $75,000 | $200,000 | $350,000 |
| Pre-Pay Discount | 2% | 2% | 2% | 2% |
| Volume Discount Level | | 1% | 4% | 8% |
| Free Freight (Ground Shipping) | N | N | N | Y |
| Total Program Discounts | 2% | 3% | 6% | 10% |

Based on your current level of total Savant sales and activity, we have initially placed you in the **Premier** Dealer Level category.

Savant will re-evaluate your dealer level status in three months to determine if, based on your sales performance and quoting activities, your dealer level will be modified. I hope you will take this opportunity to quote and sell Savant in all of your home automation opportunities and we will reward you to do so.

Best Regards,

Ben Jamison

Ben Jamison

*Vice President of Sales*
Savant Systems

F: (508) 683-2600
C: (508) 648-6165
ben.jamison@savantav.com

EXHIBIT 685

savant 770 Main Street Osterville, MA 02655 T: 508.683.2500 F: 508.683.2600 www.savantav.com

For Immediate Release June 30, 2010

# Product Release Announcement

SAVANT® is pleased to announce the availability of the 'ROSIE on the Road' remote access feature on the iPad™ user theme with the release of da Vinci 4.1.2 ER1. This Engineering Release also provides overall improvements in performance of da Vinci 4.1.2 along with several Blueprint™ enhancements (see ReadMe note).

If you're currently using the iPad™ theme and are interested in remote access and control of your Savant System via ROSIE on the Road, we recommend that you migrate to da Vinci 4.1.2 ER1. The da Vinci 4.1.2 ER1 release is now available for immediate download:

- daVinci4.1.2-ER1-b116-RosieRacePointOSDistribution.pkg.zip
- daVinci4.1.2-ER1-b-1564-Themes-Version10.mpkg.zip

As a reminder, the objective of an *Engineering Release* is the ability to rapidly release and distribute a Savant Software release that addresses urgent issues without a major documentation revision, which can often be time consuming and not necessary. You will be notified of all Software Engineering Releases, which will include a single *ReadMe Note* documenting the issues or changes made to the prior release. As always, complete Savant Users Documentation is available for each major, minor or maintenance release and are posted on the Savant Dealer Portal.

If you are considering upgrading to da Vinci 4.1.2 ER1, please check the general upgrade instructions and the ReadMe note available in the Dealer Portal. If you have any questions regarding this release or upgrade procedures please contact Savant Support at: support@savantav.com

The Savant Team

The Savant software release versioning scheme is expressed as three numbers, separated by periods, such as da Vinci version 4.1.2. In subsequent releases, the major number will be increased when there are significant jumps in functionality, the minor number is incremented when only major features have been added, and the maintenance number incremented when minor features are added. In addition, Savant software Engineering Releases are designated and abbreviated by ER# and address bug fixes only. For example, 4.1.2 ER1 is an engineering release of da Vinci 4.1.2. Savant will now adhere to the following structure in subsequent releases: *major.minor.maintenance.ER#* (Example: 4.1.2 ER1).

EXHIBIT 686

**VOLUME: I**
**PAGES: 1 - 154**
**EXHIBITS: 1 - 6**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

C.A. No. 10-cv-11622-EFH

****************************************
SAVANT SYSTEMS, LLC,
Plaintiff,

vs.

CRESTRON ELECTRONICS, INC.,
Defendant.

CRESTRON ELECTRONICS, INC.
Counterclaim-Plaintiff

vs.

SAVANT SYSTEMS, LLC,
Counterclaim-Defendant
****************************************

**AUDIOVISUAL DEPOSITION OF PHILIP SCHOONOVER**, a witness called on behalf of the Defendant and Counterclaim-Plaintiff, Crestron Electronics, Inc., taken pursuant to the applicable provisions of the Federal Rules of Civil Procedure, before Jacqueline Curran, Registered Merit Reporter and Notary Public in and for the Commonwealth of Massachusetts, at the law offices of Clements & Pineault, LLP, 24 Federal Street, Boston, Massachusetts, on Wednesday, August 1, 2012, commencing at 12:56 p.m.

CURRAN COURT REPORTING
21 Rowe Hill Road
Stoneham, Massachusetts 02180
(781) 279-8400

the hard copy slides?
A. No. Not that I'm aware of.
MR. O'KONSKI: When you have a convenient --
A. They don't hand those out.
Q. Ever?
A. I've never taken anything from that board room, except for brochures or pamphlets and consumer-related things.
Q. And Mr. Carroll is typically the person that puts forth presentations on sales revenue and market share data?
A. Yes.
Q. Anyone else, to your recollection?
A. Bruce Myers may have touched on those early on, but Jim generally does those specific disciplines. It's usually Jim.
Q. And these are generally in the form of Power Point presentations that are projected for the benefit of you and other advisors?
A. Generally.
Q. And is it your understanding that Savant's revenues have increased year over

year since you started your association with Savant?

A. Yes.

Q. And is it your understanding that Savant has gained dealers year after year since your association with Savant?

A. Yes.

Q. And is it your understanding that Savant has gained market share year over year since your association with Savant?

A. Yes.

MR. PARK: All right. Why don't we take a quick break.

THE VIDEOGRAPHER: The time is 2:10 p.m., and we are going off the record.

(Recess was taken from 2:10 p.m. to 2:16 p.m.)

THE VIDEOGRAPHER: The time is now 2:16 p.m., and we are back on the record.

Q. Mr. Schoonover, in your mind, how does your role as an advisor for Savant on business issues differ in any way or separate

make a particular sale or transaction or purchase, that that may constitute a lost sale?

A. Yes. That is true.

Q. And so I'm asking you, as you sit here today, can you identify a specific lost sale of a product that Savant suffered as a result of a specific Crestron action?

A. No, sir.

MR. PARK: I have no further questions.

MR. O'KONSKI: Done?

MR. PARK: I'm done.

MR. O'KONSKI: Okay.

THE VIDEOGRAPHER: The time is now 3:51 p.m., and the deposition is concluded. We are now going off the record.

(Whereupon, the deposition concluded at 3:51 p.m.)

EXHIBIT 687

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

CA No. 10-cv-11622-EFH

------------------------------
SAVANT SYSTEMS, LLC,
Plaintiff,

VS.

CRESTRON ELECTRONICS, INC.,
Defendant.

CRESTRON ELECTRONICS, INC.
Counterclaim-Plaintiff,

VS.

SAVANT SYSTEMS, LLC,
Counterclaim-Defendant.
-------------------------------

VIDEOTAPE DEPOSITION OF
JOHN L. SELBY

April 5, 2012
9:20 a.m.

Cesari and McKenna, LLP
88 Black Falcon Avenue
Boston, Massachusetts

Cindy Falcon, CSR

important initiative for us and one that I felt that I personally I was going to drive to successful outcome.

Q. And what happened?

MR. KAVANAGH: Objection to form.

Q. You may answer.

A. Okay. What happened?

Q. Yes.

MR. KAVANAGH: Objection to form.

Q. Did you in fact proceed with Savant?

MR. KAVANAGH: Objection to form.

A. No, I did not.

Q. Any reason why?

A. I had a meeting with my Crestron rep, Craig Gulley, in June.

Q. June?

A. June 2009.

Q. June 2009.

A. Because I felt it was correct to inform another vendor partner that we had an agenda that could potentially be a conflict to them. I was told at that time that if the product went to display within 24 hours I would not be a Crestron dealer. This was at a time that was extremely vulnerable for

us. We had a million dollar project that was incomplete that was a Crestron control system. We had a couple of other high value projects that were not complete. So we basically couldn't take on Savant for that purpose.

The rep followed up the next day, made a phone call. He said: I've talked to Randy Klein. I just want to make sure you're aware that I checked or double-checked, and that is in fact our position. So when your first product goes on display, 24 hours later you won't be a Crestron dealer. I asked questions like support, warranty, completing projects, and the answer to that was no, could not get product. So we put the initiative on hold.

I asked for a little help from HTSA. That stands for Home Technology Specialists of America. We're part of a group of about 60 dealers, and Savant had just, Crestron had just pulled out of that group, Savant had just got involved with the group, and asked for some group support and basically got nothing. There was no one there that either wanted to take on that initiative or knew what to do.

So my Savant rep was asking me about some projects that were leads that he had and whether or

A. Okay.

Q. Could you please explain what is set forth there?

A. This is an outline that I had delivered that basically is a directory of what documents answered the specific questions that were requested by Savant.

Q. And looking at Item No. 4, could you read that, please?

A. Sure. The email thread attached which contains my comments to staff members after the June 13, 2009, meeting with our Crestron rep in my store. This meeting, this is the meeting where I broke the news to him that we plan to introduce Savant. His comment as best as I can recall was: As soon as your first piece of Savant goes on display, you'll be terminated as a Crestron dealer within 24 hours. He double-checked with the owner, he mentioned his name, Randy Klein as I remember now, and verified that this is Crestron's policy. You put Savant on dispay and you're done as a Crestron dealer.

Q. What was your reaction to that statement by the Crestron rep?

A. It was, I was stunned and disbelief and I guess the consequences were running through my head,

so it was quite surprising, to say the least.
Q. Now, the Crestron rep referred to there, who was that?
A. Craig Gulley.
Q. Craig Gulley?
A. Mm-hmm.
Q. G-U-L-L-E-Y?
A. Yes.
Q. Do you know whether he is an independent rep or employed wholly by Crestron?
A. He is employed by Crestron.
Q. And Randy Klein, who do you understand he is?
A. The owner of Crestron.
Q. Did you have any further discussions with the Crestron rep concerning this issue?
A. I went to -- I guess I had gone to a conference for HTSA members and I can't remember the dates, sometime after this, but had found that some of the dealers were in fact selling Crestron and Savant. And I had asked Craig about it, and Craig said that that was under the radar somehow and that would have gone unnoticed and dealt with, so I think the implication there was Crestron didn't know about those relationships and would not have allowed that.

Crestron sorted out. And once I determined that there was really not a defined end to this situation with Crestron, then I agreed to let Savant pursue whatever business interests they had in the market.

Q. That was very generous of you. Why couldn't you have just gone over to Crestron, to Savant, and dropped Crestron?

MR. KAVANAGH: Objection to form.

A. We were very vulnerable at the time. We had the largest Crestron project that we had ever done in midstream. The consequences would have been devastating for us to have been cut off, both financially and also potentially have a lawsuit for nonperformance of our duties under our contract with the customer.

And we also had, again, a couple of other projects that were in progress and a legacy customer base that we certainly could not abandon in terms of support for those customers.

Q. Well, if you switched to Savant, couldn't you have just continued to service the dealers you had already, the clients you had already installed systems for without necessarily seeking new Crestron business?

A. We would -- it would be highly compromised.

programmer.

Q. Were you ever able to program a Crestron system?

A. No.

Q. What is the relation of the cost of programming a system to the overall cost of a system including installation?

A. The industry number is somewhere seven percent of the system cost.

Q. Going back to the period of time that you were precluded from handling Savant products, could you estimate the amount of business you would have done had you been allowed to handle the Savant products?

MR. KAVANAGH: Objection to form.

A. I was pretty optimistic about the success of this, and my estimate was around half a million dollars of business the first year with Crestron. 200,000 of that would have been one project that was waiting for us to pick up. The other 300,000 would have been generated from other business.

Q. And that would be half a million of business with the Savant products?

A. Half a million of business as a result of

Savant products. The control system would be about 30 percent of that business. So the remainder would be audiovideo, lighting surveillance, not Savant products.

Q. What about subsequent years; do you have any estimate of the amount of business you would have done in subsequent years with Savant?

A. I was estimating ten percent growth in that product per year.

Q. Now, looking at your records included in Exhibit 1, your business seems to be declining over the years; is that correct?

A. Yes.

Q. Could you explain what was going on?

A. Well, the first and most impactful was the closing of our Springfield store. That was a larger market than Cape Girardeau. That was one thing.

The other part of it was after reducing one store, I made the comment earlier about quality versus quantity, some of the staff were not delivering the Stereo One experience the way that I thought they should, and I felt it was best for all concerned, including our vendors, to rebuild some of those entities, including our custom division.

Paragraph 4 of the June 13, 2009, email, bottom email on Page 11.
A. Okay, correct. Okay, that's right, okay, thank you for the refresh, yes.
Q. What is right?
A. That was prior to the meeting with Craig.
Q. Okay. So you spoke to someone from Cyber Sound prior to June 13, 2009, and the person from Cyber Sound told you that Crestron told them they did not want them selling Savant alongside Crestron, but Cyber Sound continued to sell Savant alongside Crestron, correct?
A. Either they were or their intention was to do it, yes.
Q. And why didn't you?
A. I'm sorry?
Q. Why didn't you decide to sell Savant alongside Crestron?
A. I had too much to lose if the outcome was, if these threats were followed through. It was, it would have been bad for me so --
Q. So you're the owner of Stereo One, right?
A. Yes.
Q. You made a business decision?

A. Retail.
Q. And so you believe that you could have sold $10,000 retail worth of Savant between June 30 and October 15.
A. That's, that's not the question. The question is, or at least in my interpretation, the question of what was sold, how much of that would have been Savant.
What's not taken into consideration here is the plus business that Savant would have added to this had we had the permission to market it with the level of intensity and commitment that I had to that product.
Q. Okay. So first of all, permission.
A. Yes.
Q. Who did you need permission from?
A. Crestron.
Q. You needed permission from Crestron to sell Savant.
A. Yes.
Q. Where is that written?
A. Yes, and I didn't -- well, in my conversation with Craig and also on some of the exhibits here of the literature that says you can't be a Crestron

dealer and a Savant dealer. So I think the message was pretty clear to us that that was not going to happen.

Q. Who made the choice of whether to sell Crestron or Savant if there had to be a choice at all?

A. I'm the one that made that choice.

Q. You made the choice.

A. Yes.

Q. John Selby, owner of Stereo One, made the choice?

A. That's right, correct. So given two bad scenarios, I chose the one that was the least damaging to my business.

Q. All right. So you claim that $10,000 worth of the $45,000 of home automation control products sold between June 30 and October 15, 2009, could have been Savant.

A. Could have been Savant. Maybe wouldn't have been Savant, but could have been Savant because I had no motivation to flip any Crestron business or Control4 business to Savant.

Q. Why would you ever flip any Crestron business to Savant?

A. Well, that's exactly my point. There would

A. Probably not. My opinion, and it's only my opinion, is we would have outperformed them, we would have outperformed them pretty substantially the first year due to our history and the customers we had. We had a 10,000 customer base and a few Mac enthusiasts in that group.

Q. Do you consider HD Media a rival?

A. Yes.

Q. Now, did anyone come into your office showroom in the period June 30, 2009, to October 15, 2009, asking about Savant?

A. No, not that I'm aware of.

Q. Did anyone call on the telephone and ask you about Savant?

A. Not that I'm aware of.

Q. Do you know if HD Media made any sales of Savant products in the period June 30, 2009, to October 15, 2009?

A. Well, there's an almost certain and certain, but I'm almost certain they did, but I'm not certain that they did.

Q. Okay.

(Exhibit No. 2 marked for identification.)

Q. Mr. Selby, I'm handing you what's been marked

March 13, 2012, with anyone from Cesari and McKenna that we have not discussed today?

A. No, not that we have not discussed.

MR. KAVANAGH: I have no further questions.

MR. O'DONNELL: I do.

FURTHER EXAMINATION BY MR. O'DONNELL:

Q. Mr. selby I'd like to get back to the issue of your choice.

A. Okay.

Q. If I came to you and put a gun to your head and said: Your money or your life and you gave me money, I suppose that would be your choice, right?

A. Yes.

Q. It wouldn't be free choice.

A. That's right.

Q. It was Crestron's choice to either stop being a Crestron dealer or handle Savant products. Was that a free choice for you?

MR. KAVANAGH: Objection to form.

A. No.

Q. I want to get back to what you said about the high-end market.

A. Mm-hmm.

Q. Let me turn back to Page 11. In the third

end user?

A. Yes.

Q. And the end user -- scratch that.

Not all home automation control systems are the same components, correct?

A. Correct.

Q. So looking at the components list on Page 41, 42, you could add components, which would increase the cost, right?

A. Yes.

Q. You could subtract components which would decrease the cost, right?

A. Correct?

MR. KAVANAGH: No further questions.

MR. O'DONNELL: None for me.

THE VIDEOGRAPHER: This marks the end of the videotape recording of the deposition of John L. Selby. We are going off the record. The time is 12:34

(Whereupon, the deposition was concluded at 12:34 p.m.)

EXHIBIT 688

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

SAVANT SYSTEMS, LLC, ) No. 1:10-CV-11622-EFH
)
Plaintiff, )
)
vs. )
)
CRESTRON ELECTRONICS, INC., )
)
Defendants. )
-------------------------------
AND RELATED CROSS ACTION. )
-------------------------------

DEPOSITION OF DAVID SELL, taken on behalf of the plaintiffs, at 1800 Avenue of the Stars, Suite 900, Los Angeles, California 90067, commencing at 8:48 A.M. Friday, December 7, 2012, before Cheryl L. Marquis, Certified Shorthand Reporter No. 6731.

MR. PARK: Objection.
MR. JACOBS: If you did.
THE DEPONENT: I can't recall I did.
BY MR. JACOBS:
Q To your knowledge, were they ever sent to anyone outside of Crestron?
A I have no idea.
Q Would you have approved of people doing so?
A No.
Q Why not?
A Because I believe that they are intended for internal purposes.
Q Let me show you what we're going to mark as Exhibit 14 to your deposition, which is Defendant and Counterclaim Plaintiff Crestron Electronics, Inc.'s Response to Plaintiff and Counterclaim Defendant's Second Set of Interrogatories.
(Exhibit No. 14 was marked for identification.)
BY MR. JACOBS:
Q And if you turn to page 6, you will see, at the bottom, there is an Interrogatory 12, which asked Crestron to "Identify each person not employed by Crestron to whom Crestron distributed a copy of any of

Exhibits E, F, G, H, I or K to the Amended Complaint, and for each said copy distributed, state whether the copy was of Exhibit E, F, G, H, I or K to the Amended Complaint, who at Crestron distributed the copy to the person and when it was distributed."

10:24 A Uh-huh.

10:24 Q And then if you turn to the next page, you will see, on pages 7 through 16, a list of individuals who distributed copies of these exhibits. Do you see that, sir?

10:24 A I do.

10:24 Q Were you aware, for example, turning to the top of page 7, that Mr. Christensen distributed copies of Exhibits E, F, G and H on April 13th to Kelsey Bailey?

10:24 A No.

10:24 Q Okay. Or that Mr. Christensen distributed certain of these exhibits to Carter Rains, Dan Ray, Arthur Mayo and Mark Blundell?

10:25 A No. I don't recall that.

10:25 Q Are you surprised that these documents were distributed like that?

10:25 A Not really.

10:25 Q Why not?

11:25 A I think we covered that. It's a meeting where all the Regional Directors get together with --
Q Approximately how often does that happen?
11:25 A Quarterly.
11:25 Q It happens in New Jersey?
11:25 A Sometimes. Most often.
11:25 MR. JACOBS: I will mark, as the next exhibit, Exhibit 25. It's a document produced to us as Crestron0085203. It's identified as Regional Director Meeting, Thursday, July 9 through Friday, July 10, 2009.
11:26 (Exhibit No. 25 was marked for
11:26 identification.)
11:26 BY MR. JACOBS:
11:26 Q Do you recall whether you attended a Regional Director meeting during this time?
11:26 A I believe I would have, yes. I don't believe I missed this.
11:26 Q The second heading is "Prodigy." What is Prodigy?
11:26 A Prodigy product line. It was a product line. It is a product line for Crestron.
11:26 Q When did it come out?
11:26 A 2008, roughly 2008, 2009.

Q Was it designed with a particular purpose in mind?

A Yes.

Q Which was?

A Offer a lower-priced control solution.

Q Was it designed to compete with any particular brand?

A Yes.

Q Which?

A Control 4, RTI, Universal Remote, Russound, Niles, Elan.

Q A little ways down and underlined, it says, "This product cannot/is not to be mixed with Crestron product period." Do you know why that is?

A Do I know why?

Q Why Prodigy is not to be mixed with Crestron product.

A Well --

MR. PARK: Assumes facts.

THE DEPONENT: I believe I understand why.

BY MR. JACOBS:

Q Why is it?

A Because it is a lower-priced solution for smaller applications, and Crestron added this product

11:50 A No.

11:50 Q You believe it would be appropriate to require a dealer to drop Savant in order to become a Crestron dealer?

11:50 MR. PARK: Objection to form.

11:50 THE DEPONENT: Again, I don't -- you are asking me whether I think it's appropriate? Well, it would be the same as Savant asking Crestron -- a Crestron dealer to drop Crestron, or Lutron asking a Crestron dealer to drop Lutron.

11:50 BY MR. JACOBS:

11:50 Q What is your personal opinion as to that practice?

11:51 A It's accepted. It's a common talking point.

11:51 MR. JACOBS: Okay. I will mark, as Exhibit 29 to your deposition, a document produced as Crestron0000621. It's an e-mail from Brian Nachum to you dated February 12, 2009.

11:51 (Exhibit No. 29 was marked for

11:51 identification.)

11:51 BY MR. JACOBS:

11:51 Q Do you recall receiving this e-mail?

A No.

11:51 Q Who is Brian Nachum?

(The deposition concluded at 4:48 P.M.)

-o0o-

I have read the foregoing deposition transcript and, by signing hereafter, approve same.

Dated_______________________

___________________________

(Signature of Deponent)