# EXHIBIT 690

R. Smith

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 10-CV-11622-EFH

SAVANT SYSTEMS, LLC, )
Plaintiff, )
v. )
CRESTRON ELECTRONICS, INC., )
Defendant. )
CRESTRON ELECTRONICS, INC., )
Counterclaim Plaintiff, )
v. )
SAVANT SYSTEMS, LLC, )
Counterclaim Defendant. )

DEPOSITION OF RICHARD SMITH

Leesburg, Virginia

May 16, 2012

Reported by: Mary Ann Payonk, RDR-CRR

Job No. 48753

1999, 2000?

A. Yeah.

Q. Did that dealer agreement prevent you from handling any competing products?

A. Not -- not that I'm aware of.

Q. When did your relationship with Crestron terminate?

A. I think it was 2009 when we had a run-in with one of the reps.

Q. And what was the basis of that run-in?

A. Oh, he was badmouthing us to our client.

Q. And is -- is there any reason why you believe he was badmouthing you --

A. Because --

Q. -- to your client?

A. -- I think he wanted the other dealer to get the job, because they were sticking with the Crestron. And the client had asked us to bid a Lutron system for the lighting instead of a Crestron.

Q. What is Lutron?

A. A lighting control package.

R. Smith

A. No.

Q. Now, on September 5, you're at -- paragraph 11 states, "On September 15, Theatron received a written notice of termination of its dealer agreement with Crestron."

A. Right.

Q. A copy of the notice is attached as -- as Exhibit C. I'd like to direct your attention to Exhibit C. Is that the notice of termination --

A. Yes.

Q. -- that you received?

What were the consequences of your being terminated?

A. Well, I mean, we were unable to support our existing clients.

Shortly after that, we lost a -- a support contract we had that was about 2 grand a month to us for a huge Crestron system we had installed on an estate.

And then all of our other customers, we couldn't -- couldn't get equipment for to fix stuff, so --

Q. Did that cause any problems with your

R. Smith

the deposition of Mr. Smith. Off the record at 12:12, and it consists of 3 tapes.

(Deposition adjourned at 12:13 p.m.)

______________________________

RICHARD SMITH

SUBSCRIBED AND SWORN TO BEFORE ME

THIS ______ DAY OF _____________, 2012.

________________________________________

(Notary Public)

My Commission expires: ________________

EXHIBIT 691

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

C.A. No. 10-cv-11622-EFH

SAVANT SYSTEMS, LLC,

Plaintiff

vs.

CRESTRON ELECTRONICS, INC.,

Defendant

CRESTRON ELECTRONICS, INC.,

Counterclaim-Plaintiff

vs.

SAVANT SYSTEMS, LLC,

Counterclaim-Defendant

VIDEOTAPED DEPOSITION OF CRAIG SPINNER, a witness called on behalf of CRESTRON ELECTRONICS, INC., taken pursuant to the applicable provisions of the Federal Rules of Civil Procedure, before Virginia Dodge, Registered Merit Reporter, Certified Realtime Reporter and Notary Public in and for the Commonwealth of Massachusetts, at the law offices of CLEMENTS & PINEAULT, LLP, 24 Federal Street, 3rd Floor, Boston, Massachusetts, on Thursday, February 21, 2013, commencing at 9:25 a.m.

CURRAN COURT REPORTING
21 Rowe Hill Road
Stoneham, MA 02180
(781) 279-8400

And systems not set up by an end user. Not a DIY solution. These are -- are non-retail as well. This is -- these are products purchased through integration firms and sold, serviced and installed by professionals such as AViX.

Q. When you say "within the CEDIA realm," what do you mean by that?

A. Well, AViX was a CEDIA-certified installer; thus, have -- they've been through training or went through training. So that's a marketplace, an industry association that they were a part of. Hence my connection with the CEDIA realm.

Q. You just said they went through training. What training?

A. I'm not 100 percent certain what training, but I would venture to say it was installation training, general industry practices. There's a number of different CEDIA-certified training courses provided by the association CEDIA, and I was aware that as a company, some of the employees went through that training and passed and thus could state they were a CEDIA-certified dealer.

Q. You said that high-end clients buy systems in the thousands of dollars?

Q. And please let me know when you're ready to answer questions.
A. I notice there's some missing charts in this, in these documents, so I obviously cannot report on the missing charts.
Q. Yeah. That's how it was produced to us, but I'm not going to ask you about the charts.
A. Okay.
Q. Do you recognize the document?
A. I clearly -- I do recognize the document, though can't exactly remember when it was produced.
Q. Okay. Let's look at the first page. So Exhibit 2 is -- the first page of Exhibit 2 is an email from you, Craig Spinner, to Jim Carroll, right?
A. Mm-hmm.
Q. Sent on June 18, 2007, and the subject is marketing plan, right?
A. Correct.
Q. And it contains an attachment, Savant marketing plan, right?
A. Correct.
Q. And your message to Mr. Carroll is "Needs to be completed and updated," right?
A. That's what it says there.

Q. Well, did you write that?
A. I did.
Q. Now, did you write the attachment to this email?
A. Did I produce -- did I produce this document? Yes. I produced this document.
Q. When you say you produced it, does that mean that you wrote it?
A. I did the market research, and I put it together, and I wrote it.
Q. Okay. And then you sent it to Mr. Carroll with the message that it needs to be completed and updated?
A. Correct.
Q. Did anyone else have input into the -- well, I guess the document that's attached to the email is the Savant marketing plan, right? For as of June 18, 2007?
A. It -- what it looks to be is a draft of a marketing plan. It does not look to be in a -- to look like or act as the official marketing plan. That is my understanding.
Q. So it was a draft of a marketing plan?
A. Correct.
Q. What's the purpose of a marketing plan?
A. The purpose of a marketing plan is to set the land -- or discuss the landscape of the current

mark this as the next exhibit.

(Exhibit 5, Email dated 5/25/2010 8:28:41 AM, marked.)

Q. Mr. Spinner, would you please take a look at what the court reporter's marked as Exhibit 5, please.

A. Okay.

Q. All right. Exhibit 5 is a chain of emails between you and Philip Schoonover, right?

A. Yes.

Q. And the top email attaches a document titled Savant RFP, right?

A. Yes.

Q. The dates of the email chains are -- of the email chain is May 21 and 25, 2010. Right?

A. That's what I see. Yes.

Q. Who is Philip Schoonover?

A. Philip Schoonover, to my understanding, is a board member at Savant Systems.

Q. And does he have any particular role with regard to marketing at Savant?

A. He does not have an official role with marketing. No.

Q. Why are you -- well, first of all, what is an RFP?

A. That's a request for proposal.

Q. And what is the attachment to this chain of emails that's titled Savant RFP?

A. This attachment seems to be a overview, a very high level overview, of Savant. And we're talking about marketing agencies perhaps, I believe.

Q. Do you recognize the attachment to this chain of emails?

A. It looks familiar.

Q. Do you know if you wrote it?

A. I think I did put this together. I did write this. Yeah.

Q. If you look down the first page of Exhibit 5, the email at the bottom of the page, you see that?

A. Yeah.

Q. You write to Mr. Schoonover on May 21, 2010, "Give this a read. I've been so buried with dealer conference, press releases and dealer communications lately, so I have been a little late getting this out. It needs some polishing, which I will do this weekend, and send out next week. Signed Craig."

You see that?

A. Yes.

Q. Does that refresh your recollection whether you wrote this document?

have been affected much more.

But when we start talking about tens of thousands of dollars, I don't think Savant saw a -- or was impacted greatly by the recession.

MR. KAVANAGH: And Mr. Spinner, I have no further questions. Thank you very much for your time.

THE WITNESS: Thank you.

MR. O'KONSKI: I have no questions.

Can you just give me an elapsed time?

THE VIDEOGRAPHER: Four hours and 41 minutes.

The time is now 3:18. That concludes today's deposition, and we are now off the record.

(Deposition concluded at 3:18 p.m.)

# EXHIBIT 692

**From:** Craig Spinner
**To:** Jim Carroll
**Sent:** 6/18/2007 11:31:17 AM
**Subject:** Marketing plan
**Attachments:** Savant Marketing Plan.doc

Needs to be completed and updated

EXHIBIT 2
Spinner
2/21/13 Virginia Dodge, CRR

**1.0 Executive Summary**

Savant Systems LLC is currently designing and manufacturing a suite of products and services targeting the high-end residential (CEDIA). These products represent a highly programmable control system providing multi-room A/V, advanced digital audio and video processing, extremely flexible and scaleable A/V switching, redundancy, digital media server and jukebox capabilities, integrated applications, security surveillance and home automation and control. Savant is currently in the development mode (beta) and is scheduled to ship some product in late Q1 2007. A fundamentally engineering driven company, Savant is poised to create a whole new experience for the Consumer Electronics Industry.

**2.0 Situation Analysis**

Savant launched the company and product line on September 14th 2006 at the Custom Electronics Design and Installation Association (CEDIA) trade show. Clearly considered to be a successful show, Savant pulled in tremendous interest from Installers, Manufacturer Representatives, Manufacturers and the Press. At the show, Savant stated plans to ship limited product Q1 2007. Savant will be engaging only the top 200-300 dealers and a few strategically selected regional Manufactures Reps nation-wide for 2007. There are no current plans to sell any products or services through Distribution. Initial launch strategy aligned with licenses and safety and emissions restrictions, positions Savant to execute business relations and product shipments in the United States and Canada. 2008-2009 will breed new installments of the Savant product line in Europe and Latin America respectively. From an industry standpoint, Savant is introducing a competitive highly programmable audio/video and control solution for dealers generating $2 million + in yearly revenue, and who are currently installing AMX and Crestron systems.

**2.1 Market Summary**

For primary launch, Savant will focus on high-end system integrators and custom installers that are positioned at the top two tiers of the Consumer Electronics Industry Pyramid. More specifically, businesses with strong yearly revenue, currently using competitive control systems and that have a strong industry presence. These companies install audio, video and control equipment to residential and some commercial applications with jobs ranging from 30K-1M + depending on the end-consumers requirements.

**2.1.1 Target Markets**

Savant is designing, developing and manufacturing products with the specific and future capacity and ability to infiltrate 4 Market Segments:

- **Consumer Electronics (CE)**
  - Residential, MDU, SOHO, Security, etc.
- **Pro AV**
  - Live performances, Universities, House of Worship, Sporting, Museums, Distance Learning



RESTRICTED CONFIDENTIAL - Outside Counsel Only SAVANT0250395

- **Commercial**
  - Corporate, Retail, Restaurants, Healthcare, Transportation, Theme Parks, Telco IPTV
- **Industrial**
  - Telco, Manufacturing, Government, Legal, Military

Phase 1 of product implementation will focus on the Systems Integrators and Custom Installers, or 12% of total CE market share

QuickTime™ and a
TIFF (PackBits) decompressor
are needed to see this picture.

If a successful infiltration into the Systems Integrator and Custom Installer segments takes place in 2007, Savant has aspirations and initial plans (not firm) to broaden its reach into the CE market pyramid by opening strategically positioned high-end retail boutiques.

- Open 3-5 high-end retail stores in key locations
- Target Store Locations = next to / across the street from Apple Retail Stores

- Benefits:
  - Utilize Apple store traffic and revenue gains
  - Savant stores in major affluent cities, closest to highest U.S. population density
  - Cross / Co-marketing with and through Apple
  - Brand Recognition with high-end cliental
  - Understanding the consumer and consumer spending
  - Creates a bridge down the CE Market Pyramid (mass market)

### 2.1.2 Market Demographics

The top 200-300 systems integrators/dealers in the U.S.: Statistical data shows that the majority of the top dealers in the country are located all along the Eastern and Western U.S. coasts including Texas, Arizona and the Great Lakes region. Clearly, dealers position themselves in affluent communities, major cities, retirement hotspots and coastal environments. Savant must be well represented throughout the U.S., but initially aligned with the top dealer demographics.

QuickTime™ and a
TIFF (PackBits) decompressor
are needed to see this picture.

**States Most Represented:**

CA = 25



RESTRICTED CONFIDENTIAL - Outside Counsel Only SAVANT0250397

FL = 12
NY = 10
TX = 6
NJ = 4
PA = 4
Ariz. = 4
Ore = 4
Ohio = 4

NOTE: This source of this information: CE Pro magazine yearly - CE Pro 100. This resource ranks integrators based on yearly revenue totals. As always, there are several large companies that chose not to participate. Some do not want to show lower revenues, others do not want their higher revenues seen by competitors, which might be inclined to open offices in their territory. Others just care not to participate.

### 2.1.3 Market Analysis

Based on CE Pro's 100 figures, there are several key statistics and data findings.

- 23% increase in total revenues in 2005
- The average *CE Pro 100* firm produced $6.9 M in revenue
- An average of 2,325 installs per company
- The average-revenue-per-full-time employee benchmark was $57,265
- Average years in business in 2005 was 17

There continues to be a dominant trend in the revenue breakdown of dealers installing into residential markets.



RESTRICTED CONFIDENTIAL - Outside Counsel Only SAVANT0250398

QuickTime™ and a
TIFF (LZW) decompressor
are needed to see this picture.

Dealers on average are making 10% more on the installation rather than the hardware. This number is project to steadily rise in the coming years.

Multi-room audio systems continue to lead the way in 2005 revenues by product category. However, Home Theaters came in at a close 2nd, and by all reports will leap frog the audio category in 2007. The home-automation and control category continues to rise, and is up 5% from last year. Integrators rate Home Automation as the top fasting growing area for 2006 ahead of Media Servers (2) and Lighting Control (3)[1].

QuickTime™ and a
TIFF (LZW) decompressor
are needed to see this picture.

Albeit, an overwhelming percentage (94) of dealers install systems in single-family residences, the numbers show more diversity the internally expected.[2]

---

[1] CE Pro, June 2006

[2] Savant Marketing Dept.

QuickTime™ and a
TIFF (LZW) decompressor
are needed to see this picture.

These figures bode well for Savant given that our market focuses include many of the categories listed above. The true open and programmable nature of the Savant platform allows for adaptability to any environment, which gives dealers who boast a wide range of installation locations a strong incentive to carry a single control product line across all fields.

### 2.1.3 Product Marketing Analysis

The Savant product line, at its roots, is an open programmable control system. With this said, our main competitors out of the gate will be Crestron and AMX. For high-end integrators, Crestron and AMX are the most widely recognized and implemented control systems in the market place today. The Savant product line will also be offering multi-channel and home theatre amplifiers, plasmas, integrated A/V receiver and preamplifier, integrated media server, family of touch panels, remote controls, key pads and integrated applications and services. By 2007-2008 Savant plans to be a major player in all these fields.
Based on CE Pro 100 Product Analysis, here are the manufacturers leading in each related category.

**Whole-House Automation:**

- Crestron = 70%
- AMX = 19%
- Elan = 11%

- HAI = 11%
- Control4 = 7%

**Multi-room Amplifiers:**

- Crestron = 43%
- Speaker Craft = 33%
- Elan = 17 %
- Niles = 16 %
- Sonance = 16%

**Multi-room Audio Servers:**

- ReQuest = 40%
- Escient = 25%
- Elan = 15%
- Crestron = 14%
- Kaleidescape = 10%

**Home Theater Preamps / Processors:**

- Lexicon = 21%
- Integra = 15%
- Krell = 13%
- Rotel = 11%
- Crestron = 10%

**A/V Receivers:**

- Denon = 32%
- Integra = 30%
- Marantz = 26%
- Sony = 22%
- Yamaha = 20%

**Media Servers:**

- Kaleidescape = 31%
- ReQuest = 24%
- Escient = 19%
- Elan = 6%

**Flat-Panel TVs:**

- Sharp = 32%
- Fujitsu = 30%
- Sony = 30%
- Pioneer = 28%
- LG = 26%

**Important Takeaways:** Crestron is comfortably the dominant leader in whole-house automation and control (70%). AMX is a far 2nd at 19%, and is continuing to fall. With



RESTRICTED CONFIDENTIAL - Outside Counsel Only SAVANT0250402

the recent launch of the *Adagio*[3] line, Crestron has taken the lead in multi-room amplifiers. Crestron also has a share in the home theater preamps/processors and multi-room audio server categories. To further emphasize an industry consolidation, Crestron is the leader in HVAC controls (57%) and sits in 2nd place in the Lighting Systems arena (40%), a field once dominated by Lutron and Vantage. It is apparent that Crestron is working its towards industry dominance in many high volume fields. AMX is rapidly loosing market share in whole-home automation and control, their seat in the *residential*[4] space may soon be empty

### 2.1.4 Market Trends

The Systems Integration and Custom Installer industry is growing at a rapid pace; however, several factors are limiting market potential. The systems of today are either extremely programming intensive and/or lack customization. There are generally two approaches for control systems in the market now.

- Some system platforms require extensive software programming. This model offers the highest level of flexibility, but requires installers to write low-level code, which is resource intensive, complex and expensive. Most of this programming comes from costly 3rd party programming houses. With this model, integrators are not dealing directly with the manufacturer to either aid in systems set-up or systems amendments, resulting in discrepancies and communication problems. Presently, a system costing the end-user 200k, on average 10% of that cost is dedicated to 3rd party programming.
- Other system platforms are close scripted (resulting in less programming), but are fundamentally limiting in their flexibility, lacking the ability to change the graphical look and feel to the equipment.

These models are characterized as having complicated tools fro graphics, coding, debugging and remote management. Current solutions must be programmed and customized specifically for each application, causing repetitive work on each new deployment.

This is a very captive market, only a few large companies with a grasp on the majority of the industry. Demand is greater than supply, the complexity, programming costs and time it takes to correctly install systems results in fewer jobs for the dealer.
Customer Service for installers is not a priority for the manufacturers. Manufacturers are not proactive with many aspects important to dealers:

- Updates with product changes, resulting in unnecessary legwork for dealers
- Access to downloadable cut sheets and tech specs
- Purchase orders requests and shipping response is slow and unorganized
- Communication becomes a back-and-forth process between manufacturers and 3rd party programmers when problems arise with equipment

---

[3] Audio Distribution System, Entertainment System, Audio Expander, Audio Server, Key Pads and wall-mount LCD controller

[4] AMX has significant market value in commercial applications

There is an extremely high failure rate common with control systems; dealers have reported a 30% failure rate.
The lack of cohesiveness causes system changes, upgrades and replacement results in error with other equipment/functions. Systems are coded as a whole without full awareness of itself; therefore changes in one area are not automatically reflected in others.
Integrators in this market space experience resource intensive business models. The complexity of products and control systems require the majority of the installation to be completed by expensive high-level A/V technicians. System complexity and lack of openness prevent lower-level technicians from making modifications in the field.

### 2.1.5 Market Needs

Integrators have been trained to accept the current problems the plague this industry that in turn negatively affects their businesses: Complexity, Programming Costs/Time, Resource Utilization, Customer Service, Reliability, Lack of Openness, Product Adaptability, etc.
Dealers and Manufacture Reps. are looking for a strong value proposition that can solve many of the issues afflicting business:

- High Reliability
- Highly flexible open-architecture solution
- Dramatic reduction of 3rd party programming
- Seamless integration with 3rd party components
- Labor Efficiency
- Responsive and pro-active Customer Service
- Incremental Revenue Gains (other than installations)
- Seamless transition with hardware/software changes and upgrades
- Simple System Customization
- Inventory Control
- Manufactures willing to adapt
- Order Shipments online

Many of these challenges are slowly being addressed by manufacturers, but on a single-issue basis. Without fundamentally changes the core competencies of a company to address these issues at full force, which would entail a tremendous engineering and resource endeavor, manufactures and dealers are handcuffed to the current marketing trends.
At the core of Savant, is a philosophy that bleeds openness and programmability. With a fresh and determined approach, Savant is aimed to create a whole new experience for the CE Industry. Savant has emerged in the CEDIA marketplace with a solution set that addresses and overcomes many of the challenges facing systems integrators and custom installers. Savant provides for an unprecedented level of flexibility and ease of programming immediately enabling a more profitable business model for integrators right out of the gate. Savant's product line aligned with our applications and services create a stream of opportunity to generate incremental revenue from future and existing customers. By addressing the marketing needs of this industry, Savant has the opportunity to pave a path right to the peak of market place.

### 2.1.6 Market Forecast



RESTRICTED CONFIDENTIAL - Outside Counsel Only SAVANT0250404

The Consumer Electronics Association (CEA) is predicting that CE factory-to-dealer sales will reach $140 billion in 2006, which would be an eight percent growth from the total $128 billion in 2005, in the group's semi-annual U.S. Consumer Electronics Sales and Forecasts Report. Display technologies lead the industry, with revenues expected to top $22 billion in 2006.

QuickTime™ and a
TIFF (Uncompressed) decompressor
are needed to see this picture.

### 2.1.7 Market Growth

The U.S. Consumer Electronics Industry has shown steady growth for more than a decade. This informs us that regardless of economic concerns, national and international political issues and environmental matters consumers are consistently driven to spend money on electronics for various applications.

QuickTime™ and a
TIFF (Uncompressed) decompressor
are needed to see this picture.

### 2.1.8 Target Market Growth

Savants Target Market for phase one of product shipment (Q1 2007) will be the top 200-300 dealers/integrators in the U.S. Statistical Data from CE Pro 100 (top 100 dealers in the U.S. and Canada based on yearly revenue) reveals a significant overall increase.

- 23% overall increase in total revenues in 2005
- The top 100 integrators logged gross custom revenues of $704 M, up from $574 M one year ago.
- The Average CE Pro firm produced $6.9 M in revenue in 2005, up from $5.6 in 2004
- Once again, regional hybrid retailer Tweeter led the 2005 list. Tweeter publicly reported $80 million in custom revenues from its 154 stores. Which are primarily on the East Coast.
- Many dealers strongly believe that Tweeter does not belong on this list and from a pure marketing standpoint, does not belong in this statistical data (inflating the numbers). With this said, if Tweeter was excluded from this years data, the average revenue was $6,2 million, which is 27 % higher than 2004's average of $4.9 million in revenues sans Tweeter.
- **The 10 Fastest Growing Areas for 2006:**
    1. Home Automation
    2. Media Servers
    3. Lighting Control
    4. Multi-Room Audio
    5. Home Networks
    6. Dedicated Home Theaters
    7. Flat-Panel TV's
    8. Structured Wiring
    9. Multi-Dwelling Unit (MDU) Market
    10. Gaming
- The average revenue per installation is $2,998, which is 79% higher than the 2004 total of $1,675
- The top 100 dealers installed a total of 234,883 jobs in 2005, a figure that is way up from 2003's 97,857 total jobs. If the top two company's (Tweeter and Brinks) on the list are subtracted from the 2005 number of total jobs, the total number of jobs for 2005 equals 121,233, which is still a 6% increase from 2004.
- The average-revenue-per-full-time-employee benchmark was $57,265, a 12% increase over last year.
- Employment showed very strong results. The full time employment among the top 100 dealers is 12,300 for an average of 121 employees per company. If Tweeter and Brinks are excluded, the average integrator added 11 employees from last year (56 : 45).
- There is a continuing trend for company's having multiple locations. Two years ago, 27 of the top 100 dealers had more than one business locations. In 2005, 51 have more than one, up from 47 last year.
- Mergers and acquisitions have been a major trend in this industry in the last couple of years, both on the vendor and deals side. The top

100 dealers were asked what the effect of this trend will have on the industry in 2006-2007. *SEE GRAPH BELOW⇓*




**2.2 SWOT Analysis**



RESTRICTED CONFIDENTIAL - Outside Counsel Only SAVANT0250407

EXHIBIT 693

**From:** Philip Schoonover <pschoonover@msn.com>
**To:** Craig Spinner <Craig.Spinner@savantav.com>
**Sent:** 5/25/2010 8:28:41 AM
**Subject:** FW: RFP
**Attachments:** Savant - RFP .doc

Sorry , Notes on RFP attached

**Phil Schoonover**
pschoonover@msn.com
317 Tarpon Dr.
Fort Lauderdale , Fl.33301
Mobile(804)380-3711

---

From: pschoonover@msn.com
To: cspinner@savantav.com
Subject: RE: RFP
Date: Tue, 25 May 2010 07:23:00 -0400

Craig ,

This is fine. I made comments on what I think the big questions will be if you would like to be sure they get answered incorporate them in the RFP. I think this may be a two step process . Preliminary meetings in NY next week and final RFP due end of June . We want quality here and I don't think 1 meeting and attempting an RFP without hearing your goals , seeing the product in action and some discussion about what you have already done is fair.

I suggest preliminary meetings with everyone next week , and schedule "final"submissions end of month meetings just after the dealer show .

Thoughts?

**Phil Schoonover**
pschoonover@msn.com
317 Tarpon Dr.
Fort Lauderdale , Fl.33301
Mobile(804)380-3711

---

EXHIBIT 5
Spinner
2/21/13 Virginia Dodge, CRR

From: cspinner@savantav.com
To: pschoonover@msn.com
Subject: Re: RFP
Date: Fri, 21 May 2010 13:54:58 -0400

give this a read. I have been so buried with Dealer Conference, Press Releases and Dealer Communications lately so I have been a little late getting this out.

It needs some polishing, which I will do this weekend and send out next week.

Craig

savant

## Introduction

About Savant

*Technology should simplify your life – not complicate it.*
Savant is the only Apple®-based control and automation solution that unifies all of your audio, video, lighting, security, climate, communications, internet and other services into one seamless experience. Through visually engaging and completely customizable touch panels, remotes, mobile devices and keypads, Savant empowers you to effortlessly control and manage each service in your home.

Current Situation

It is an exciting time at Savant as we continue to accelerate sales and market growth. With this said, it is critical that our marketing efforts become proactive and compliment not just the growth of Savant, but also the general proliferation of home automation/control as hardware touch panel costs decrease and become more prevalent with main stream consumers (iPad, iPhone, iPod touch).

Apple is teaching consumers how to use touch screens via – iPhone, iPad, iPod touch. The perception of these devices in the consumers eyes is becoming or already can have an App controlling your home is becoming a reality.

Overall Marketing Mission

Savant Leads the Growth of Home Control & Automation in the eyes and" pockets" of the "general" consumer. Automation is not only for the ultra rich, it is here, now, and available at a starting investment of 10k (roughly). Also, Savant should not only be for the "Apple-heads" but for the general consumer interesting in Home Control & Automation – and willing to spend 30k on technology rather than a new car...The upper Middle Class!

Savant must help define what control and automation means to the consumer world. Multi-tasking touch screen devices are now readily available for well under 1000k. Savant is the only Apple-based control, automation and entertainment company in the world, thus is the best position to harness these powerful devices – technically and from a marketing perspective.

Key Points

It is also critical that the overall marketing plan and specific initiatives within the plan can be monitored in a way where the ROI is clear and presentable. Marketing's goal will be to(Generate enough strong leads that meet our overall sales budget..Savant will distributer , manage and follow up to insure the leads are converted we will need robust data on the customer as well as a customer profile to insure the pool is qualified)



RESTRICTED CONFIDENTIAL - Outside Counsel Only 

## Company Information

### General Information

- Name: Savant Systems LLC
- Address: 770 Main Street Osterville, MA 02655
  Website: www.savantav.com
- Ownership (Public or Private): Private
- Years of Operation: 5
- Number of Current Full time Employees: 100
- Total Revenue: over 15 million
- Sales Regions: North America 2010, World-wide 2011

### More About Savant

Savant designs, develops and manufactures a complete suite of integrated solutions that has defined the modern age of control, automation and entertainment. These products deliver an array of applications and services including home control, multi-room audio and video, advanced digital audio and video processing, extremely flexible and scalable audio/video switching, intelligent lighting and climate control, digital media server and jukebox capabilities, telephony and intercom, an array of integrated applications and services and much more.

Savant's smart home products, marketed under the ROSIE and Protégé product line, fulfill the technical and lifestyle needs of any customer. In addition to residential, Savant provides a wide variety of solutions for commercial markets such as Corporate/Business, Educational, Governmental, Health Care, Houses of Worship, MDU & Hotel, Transportation and Marine and Retail installations.

With some of the most advanced, attractive and fully customizable touchscreen remote controls and digital artwork available, Savant's products are changing the face of home integration technology and how homeowners interact with it.

Savant is the first company to introduce a native iPhone® and iPod touch® application delivering complete home control and automation. Savant also pioneered On–Screen Display (OSD) control and automation technology. OSD transforms any HD display in the home or office into a "control portal" with user interaction previously available only with touch panels.

In addition to the numerous innovative and award-winning home automation and multi room audio/video products, Savant provides an intelligent open-programmable control and media management software solution called RacePoint Blueprint™ that configures and controls any whole house audio or video component or sub–systems without writing a single line of code. Savant's RacePoint Blueprint provides the CE, CEDIA and Commercial channels a solution that overcomes the complex nature of integrating various audio and video systems and the lack of standards in the industry. The bottom-line benefit to homeowners is a truly enhanced lifestyle, as well as dramatically reduced levels of frustration associated with system configuration and set-up time.

### Leadership

**Robert P. Madonna Chief Executive Officer**
A business and technology pioneer, Mr. Madonna is the founder and current Chief Executive Officer of Savant Systems LLC, which was founded in 2005. Robert's extensive and successful background in open, programmable, standards–based switching and processing systems is driving Savant to be a leader in the Audio/Video and Control Systems Industry. Mr. Madonna founded Excel Switching Corporation in 1988 where he served as Chairman, Chief Executive Officer, and President. Lucent Technologies purchased Excel in 1999. With the onset of de–regulation in the Telecommunications Industry, Mr. Madonna saw the opportunity to introduce an open, programmable and standards–based technology that would enable rapid deployment of new applications and features. Using this innovative approach, Excel Switching quickly became the leading provider of open–programmable switches to some of the largest Telecomm companies around the world. Eighteen years later, Mr. Madonna is applying the same principles of open and programmable systems at Savant that drove Excel Switching to the forefront of Telecom.

**Awards and Recognition**

Mr. Madonna was the 1999 National Finalist of the prestigious Ernst & Young Entrepreneur of the Year Award. Mr. Madonna is also a member of the University of Connecticut's Academy of Distinguished Engineers and Hall of Fame. In addition, Mr. Madonna holds more than a dozen engineering patents.

**James W. Carroll President**

Jim Carroll has over 23 years of executive experience in systems integration and engineering and is currently the Co–Founder and President of Savant Systems LLC. Jim is responsible for leading sales, marketing, engineering, and operations for Savant. Prior to Savant, Mr. Carroll held the position of President & Chief Executive Officer of AViX, Inc., a successful high–end Residential Audio/ Video Systems Contracting company. Before entering the A/V installation business, Jim was Executive Vice President & General Manager of the Open Networks System Switching Group at Lucent Technologies. Preceding Lucent, Mr. Carroll held executive positions at Excel Switching Corporation including: Vice President & General Manager of the Softswitch strategic business unit, Vice President of Customer Engineering and Vice President of Engineering. Mr. Carroll held various other management positions with Boston Technologies, Brite Voice, Voicetek, and Unitrode including supply chain management, process engineering and director of research and development.

Visit this link for the complete list: http://www.savantav.com/leadership.aspx

## Marketing Needs

### Overall

To create a marketing and PR plan that will bring Savant and Home Automation to the forefront; position Savant as unequivocal leader and top innovator of Control, Automation and Entertainment solutions in the eyes of the consumers, commercial industries, design and architectural communities and other technical organizations. This pan should encompass many different elements – from videos, brand positioning, advertisements, imagining, sales tools, brochures, media buying and positioning,

online and website material, social media/networking (Twitter, YouTube, Facebook), lead generation, customer definition, etc.

It is critical that this plan shows positive ROI based on, website traffic, social networking improvement, lead generation, and most significant sales generation. Savant will continue to invest the appropriate amount of resources to Market the company in order to achieve our goals - if we are experience successes based on the marketing agency's plans and execution.

## Specific Areas

Direct Consumer Marketing

**Key Savant Technologies:**

- Savant's iPad Solution
- iPhone & iPod touch Application
- Savant's On-Screen Display
- Savant & Apple
- Protégé?

**Videos**

- Bring Automation to Life

1. Overview of Savant
2. Residential Offerings & Technology Overview
3. Commercial Offerings & Technology Overview
4. Apple & Savant (maybe a part of Overview of Savant)
5. iPad Control
6. iPhone & iPod touch control
7. On-screen Display

8 Other Residential Technologies

8. Savant for Education
9. Savant for Business

**Who is Savant / What does Savant symbolize?**

Savant's Current Tag Line: **Now You Can**... what does that mean to the customer?

Savant is the future; lets create a new impression of automation above and beyond:

Control4's = "Home Control?is Everyday?Easy."

Crestron's = "Crestron started an industry when it introduced the world's first touch panel and for 40 years has been the world's leading manufacturer of advanced commercial control systems and home automation system..."

AMX = "Since our inception more than 25 years ago, the vision of AMX has remained the same – to develop innovative technologies that simplify the world."



RESTRICTED CONFIDENTIAL - Outside Counsel Only 

Website & New Media Marketing

Constant Website Improvement and enhancements

Social Media:

- Twitter
- Facebook
- YouTube

Pay for Click Program (search Engine Optimization)
Social Forums Social Networking
Blogging
Separate Commercial Website
Great use of Videos!!

Media Placement & Buying

**Who are we marketing too?:**

- Athletes
- Business Executives
- Women & Children
- Tech-heads
- Apple-heads,
- The everyday upper-middle class, (Control4 = Control everyday easy)
- Luxury Clientele

**Which outlets fit our audience? Who is our audience? Who should be our audience?**

Robb Report?
Or
Apple focused websites and blogs?

New York Times and Forbes
Or
Home Theater Magazine & Electronic House

MTV & E(Hollywood)
OR
ESPN & Sports Illustrated

Maxim & Playboy
OR
Architectural Digest & Dwell

*All of the Above...*

PR:

**What is the image that Savant is trying to create? Are we creating a new image or rewriting the old?**

- The Only-Apple-based control System...
- Apple, Apple, Apple?
- iPad, iPad, iPad?
- The most advanced, easy to use, Solution for everyone?
- Cost Effective Home Control?
- The next-generation of Automation?
- Control and Access of your Entertainment, Media Anywhere?
- Family Oriented, kid friendly?
- Luxury Automation?

Dealer Marketing (Savant's customers)

Sales and marketing materials (print/online) to enable the Dealer. They touch the consumer; Savant should be front and center on their website and collateral.

Dealer & Customer Testimonials, video tours of cool homes

## Market Place

### Top Competitors

Crestron – By far our biggest competitor, they are the world's largest Control and Automation Company. They are a privately held but we understand there sales to be roughly 400 million – 50% from Residential Sales, 50% Commercial (board rooms/corporate, education, government, house of worship, commercial lighting, hospitality/hotels, etc. Crestron represents the complete opposite of Savant from an image standpoint = Old, staunch, suit and tie corporate, the "big brother", utilizing 25-year-old technology at its core. They are using very aggressive tactics to stop the proliferation of Savant with the dealer and consumer base. www.crestron.com

1. Control4 – A much younger company than Crestron, they are aggressively going after the lower end market, as they are the cheapest automation solution of the big 4 (AMX, Crestron, Savant) From a technologies standpoint they are much closer to Savant than Crestron and AMX. They remove the burdensome need of low-level "code" to enable all systems. Control4 is offered at a much cheaper price that Savant, AMX and Crestron, thus win the most jobs when price is the number one selling point customer. They are cheap because they manufacture cheap looking products. There stuff is very solid and always works, it just cannot be customized and cannot handle large scale jobs with multiple AV zones. But I do see Control4 as being our biggest competitor in a few years. www.control4.com

2. AMX – Same product line, core technologies, and heritage as Crestron. They use to be number 1, until Crestron un-seated them some years ago. Since they offer virtually the same product

and functionality as Crestron, they are not considered a long-term competitor. Visit their website, it looks the same as Crestron – www.amx.com

## Clients / Customers & Sales Channel

Savant sells products to Dealers (Custom Installers, Systems Integrators). Dealers represent and install a number of products including: audio/video, lighting. security, HVAC, and of course Home Automation and Control. The end-customer interfaces with the Dealer directly; Savant supports the Dealer on behalf of customer.

In addition to world-class technical support, the best means in supporting the Dealer is – to provide them with quality end-user leads generating through out marketing executions.

## Agency Expectations

To present Savant a general proposal outlining a marketing plan / solutions to meet Savant's company sales goals and expectations.

## Timeline

Savant would like to identify Marketing Partner(s) by the end or June.

## Confidentiality

Attached is an NDA for you to please process and fax back to Craig Spinner @ 508-683-2613

Key Questions:

This is the gross list for full service houses .

1. What companies have you worked with that had similarity to Savant? Stage of growth, size, luxury goods status, consumer and commercial market potential, service related sale, technology slant, cool slant etc. What did you learn?
2. How would you position this brand and product? What is your first big idea?
3. Who is the Target cusomer?
4. What is the Savant value proposition?
5. What media would you use and why?



RESTRICTED CONFIDENTIAL - Outside Counsel Only 

6. How much would you spend year 1, 2, 3 etc.Why?
7. How would you use P.R. Trade?Consumer?Commercial? How much would this cost?
8. How would you propose we work together on a daily basis?
9. We have a marketing, PR, Trade show department of 1 (Me).How exactly how would you staff this effort and why?

EXHIBIT 694

# SAVANT SYSTEMS LLC

FINANCIAL STATEMENTS
AND SUPPLEMENTARY INFORMATION
TOGETHER WITH INDEPENDENT ACCOUNTANTS' REVIEW REPORTS

FOR THE YEARS ENDED DECEMBER 31, 2011 AND 2010

DiCicco, Gulman & Company LLP
CERTIFIED PUBLIC ACCOUNTANTS AND BUSINESS ADVISORS
Professional Excellence On A Personal Level℠

**SAVANT SYSTEMS LLC**

**FINANCIAL STATEMENTS AND SUPPLEMENTARY INFORMATION**

**FOR THE YEARS ENDED DECEMBER 31, 2011 AND 2010**

Table of Contents


| | |
|---|---|
| Independent Accountants' Review Report | 1 |
| Financial Statements: | |
| Balance Sheets | 2 |
| Statements of Operations | 3 |
| Statements of Changes in Members' Equity | 4 |
| Statements of Cash Flows | 5 |
| Notes to Financial Statements | 6 - 18 |
| Independent Accountants' Review Report on Supplementary Information | 19 |
| Supplementary Information: | |
| Schedule of Members' Interests | 20 - 22 |

DiCicco, Gulman & Company LLP
CERTIFIED PUBLIC ACCOUNTANTS AND BUSINESS ADVISORS
*Professional Excellence On A Personal Level*℠

Independent Accountants' Review Report

To the Board of Directors
**Savant Systems LLC**

We have reviewed the accompanying balance sheets of Savant Systems LLC as of December 31, 2011 and 2010, and the related statements of operations, changes in members' equity, and cash flows for the years then ended. A review includes primarily applying analytical procedures to management's financial data and making inquiries of company management. A review is substantially less in scope than an audit, the objective of which is the expression of an opinion regarding the financial statements as a whole. Accordingly, we do not express such an opinion.

Management is responsible for the preparation and fair presentation of the financial statements in accordance with accounting principles generally accepted in the United States of America and for designing, implementing, and maintaining internal control relevant to the preparation and fair presentation of the financial statements.

Our responsibility is to conduct the review in accordance with Statements on Standards for Accounting and Review Services issued by the American Institute of Certified Public Accountants. Those standards require us to perform procedures to obtain limited assurance that there are no material modifications that should be made to the financial statements. We believe that the results of our procedures provide a reasonable basis for our report.

Based on our reviews, we are not aware of any material modifications that should be made to the accompanying financial statements in order for them to be in conformity with accounting principles generally accepted in the United States of America.

As discussed in Note 1, certain conditions indicate that Savant Systems LLC may be unable to continue as a going concern. The accompanying financial statements do not include any adjustments to the financial statements that might be necessary should Savant Systems LLC be unable to continue as a going concern.

DiCicco, Gulman & Company LLP

April 19, 2012

# SAVANT SYSTEMS LLC

## BALANCE SHEETS

| December 31, | 2011 | 2010 |
|---|---|---|
| **ASSETS** | | |
| **Current assets:** | | |
| Cash | **$ 555,161** | $ 425,991 |
| Accounts receivable, net | **2,071,109** | 855,866 |
| Inventories | **4,854,948** | 4,837,978 |
| Vendor non-trade receivables | **195,982** | - |
| Prepaid expenses and other | **97,790** | 80,000 |
| Total current assets | **7,774,990** | 6,199,835 |
| **Restricted cash** | **251,023** | 250,000 |
| **Deposit** | **500,000** | - |
| **Equipment and improvements, net** | **1,562,238** | 1,930,037 |
| **Software development costs, net** | **434,200** | 862,200 |
| | **$ 10,522,451** | $ 9,242,072 |
| **LIABILITIES AND MEMBERS' EQUITY** | | |
| **Current liabilities:** | | |
| Accounts payable | **$ 739,010** | $ 928,496 |
| Accrued expenses and other | **2,732,756** | 1,796,363 |
| Deferred revenue | **665,397** | 34,524 |
| Due to member | **728,950** | 579,219 |
| Total current liabilities | **4,866,113** | 3,338,602 |
| **Commitments and contingencies** | | |
| **Members' equity** | **5,656,338** | 5,903,470 |
| | **$ 10,522,451** | $ 9,242,072 |

*See independent accountants' review report and notes to financial statements.*

**SAVANT SYSTEMS LLC**

**STATEMENTS OF OPERATIONS**

| **For the years ended December 31,** | **2011** | 2010 |
|---|---|---|
| **Net sales** | **26,621,551** | 12,832,318 |
| **Cost of sales:** | | |
| Cost of products | **19,499,702** | 11,868,503 |
| Cost of services | **4,543,541** | 3,400,687 |
| Amortization of software development costs | **428,000** | 428,000 |
| **Total cost of sales** | **24,471,243** | 15,697,190 |
| **Gross margin** | **2,150,308** | (2,864,872) |
| **Operating expenses:** | | |
| Engineering | **9,117,244** | 7,826,933 |
| General and administrative | **4,161,667** | 2,692,342 |
| Marketing and advertising | **2,875,051** | 1,727,857 |
| Sales | **4,566,519** | 3,444,012 |
| Depreciation | **1,064,838** | 885,072 |
| **Total operating expenses** | **21,785,319** | 16,576,216 |
| **Loss from operations** | **(19,635,011)** | (19,441,088) |
| **Other expenses:** | | |
| Interest expense | **46,338** | 52,352 |
| Other | **2,800** | 40,306 |
| Total other expenses | **49,138** | 92,658 |
| **Net loss** | **$ (19,684,149)** | $ (19,533,746) |

*See independent accountants' review report and notes to financial statements.*

## SAVANT SYSTEMS LLC

## STATEMENTS OF CHANGES IN MEMBERS' EQUITY

## FOR THE YEARS ENDED DECEMBER 31, 2011 AND 2010

| | Preferred Interest | Common Interest | Total |
|---|---|---|---|
| Members' equity, December 31, 2009 | 4,804,207 | - | 4,804,207 |
| Member contributions | 20,631,754 | 1,825 | 20,633,579 |
| Repurchase of membership units | - | (570) | (570) |
| Net loss | (19,532,491) | (1,255) | (19,533,746) |
| Members' equity, December 31, 2010 | 5,903,470 | - | 5,903,470 |
| **Member contributions** | **19,425,557** | **11,750** | **19,437,307** |
| **Repurchase of membership units** | **-** | **(290)** | **(290)** |
| **Net loss** | **(19,672,689)** | **(11,460)** | **(19,684,149)** |
| **Members' equity, December 31, 2011** | **$ 5,656,338** | **$ -** | **$ 5,656,338** |

*See independent accountants' review report and notes to financial statements.*

## SAVANT SYSTEMS LLC

## STATEMENTS OF CASH FLOWS

| For the years ended December 31, | 2011 | 2010 |
|---|---|---|
| **Cash flows from operating activities:** | | |
| Net loss | **$ (19,684,149)** | $ (19,533,746) |
| Adjustments to reconcile net loss to net cash used in operating activities: | | |
| Provision for allowance for doubtful accounts | **31,000** | 79,309 |
| Depreciation and amortization | **1,064,838** | 885,072 |
| Amortization of software development costs | **428,000** | 428,000 |
| Accrued interest on due to member | **46,338** | 52,352 |
| Loss on disposal of equipment | **2,550** | 13,416 |
| Loss on sale of investment, real estate | **-** | 40,452 |
| Changes in: | | |
| Accounts receivable | **(1,246,243)** | (837,923) |
| Inventories | **(16,970)** | (571,612) |
| Vendor non-trade receivables | **(195,982)** | - |
| Prepaid expenses and other | **(17,790)** | (38,961) |
| Deposit | **(500,000)** | - |
| Accounts payable | **(189,486)** | 794,832 |
| Accrued expenses and other | **886,393** | (81,521) |
| Due to member | **728,950** | 579,219 |
| Deferred revenue | **630,873** | (115,936) |
| Total adjustments | **1,652,471** | 1,226,699 |
| **Net cash used in operating activities** | **(18,031,678)** | (18,307,047) |
| **Cash flows from investing activities:** | | |
| Purchases of equipment and improvements | **(649,589)** | (1,458,500) |
| Proceeds from sale of real estate investment | **-** | 384,548 |
| Restricted cash | **(1,023)** | (250,000) |
| **Net cash used in investing activities** | **(650,612)** | (1,323,952) |
| **Cash flows from financing activities:** | | |
| Contribution from members | **18,811,750** | 19,926,825 |
| Repurchase of member units | **(290)** | (570) |
| **Net cash provided by financing activities** | **18,811,460** | 19,926,255 |
| **Net increase in cash** | **129,170** | 295,256 |
| **Cash, beginning** | **425,991** | 130,735 |
| **Cash, ending** | **$ 555,161** | $ 425,991 |

*See independent accountants' review report and notes to financial statements.*

**SAVANT SYSTEMS LLC**

**NOTES TO FINANCIAL STATEMENTS**

## Note 1 - Organization

### Organization and Basis of Presentation

Savant Systems LLC (the "Company") was formed on May 4, 2005 under the laws of the Commonwealth of Massachusetts. The Company will continue in existence unless terminated by the Preferred Unit Holder or, as otherwise required by law. Under the limited liability company form of organization, a member's liability for any debts of the Company is limited. In addition, except as otherwise provided in the Amended and Restated Operating Agreement or agreed to by the Preferred Unit Holder, the members have no further obligation to contribute additional amounts of capital to the Company.

### Description of Business

The Company designs, develops and manufactures a product suite for residential and commercial markets that provides a complete integrated solution to delivering automation and control, multi-room audio/visual, digital media and jukebox capabilities, and security surveillance. The Company sells its products globally though a network of authorized third-party resellers.

During 2011, approximately 90% of net sales were derived from the residential market and approximately 10% of net sales were derived from commercial markets which include corporate environments, education, government, arenas, healthcare, hotel, transportation, marine, retail and houses of worship.

### Going Concern

For the years ended December 31, 2011 and 2010, the Company incurred losses from operations of approximately $19.7 million and $19.5 million respectively, and negative cash flow from operations of approximately $18.0 million and $18.3 million, respectively. The Company expects to continue to incur losses and cash flow deficits as it continues to develop the market for its products and expand its production capabilities. Since inception, the Company's development and operations have been funded through the issuance of preferred units and loans received from the Preferred Unit Holder in the aggregate amount of $106.3 million. Additional funding from the Preferred Unit Holder cannot be assured and cash flow from operations may not be sufficient to sustain the Company. These circumstances raise doubt about the Company's ability to continue as a going concern. The Company is continuing to implement its strategic plan in an effort to increase its market presence, primarily in the commercial market space, and find strategies to lower operating costs. The success of these efforts may allow the Company to raise the necessary capital from the Preferred Unit Holder or other third parties to fund its continuing cash requirements. The accompanying financial statements do not include any adjustments that might be necessary should the Company be unable to continue as a going concern.

**SAVANT SYSTEMS LLC**

**NOTES TO FINANCIAL STATEMENTS**

## Note 2 - Summary of Significant Accounting Policies

### Use of Estimates

The preparation of financial statements in conformity with accounting principles generally accepted in the United States of America requires management to make estimates and assumptions that affect certain reported amounts and disclosures. Accordingly, actual results could differ from those estimates.

### Subsequent Events

The Company has evaluated subsequent events through April 19, 2012, the date the financial statements were approved and authorized for issuance by management. Except for the matter noted below, management has determined that there are no subsequent events that would require recognition in, or disclosure in the notes to the financial statements.

Subsequent to year end, the Company purchased the assets of an unrelated company for a purchase price of approximately $2.0 million.

### Concentration of Credit Risk

The Company maintains its cash in accounts with federally insured banks. At times, the balances in these accounts may exceed federally insured limits. The Company has not experienced any losses in such accounts and does not believe it is exposed to any significant credit risks with respect to its cash.

### Accounts Receivable

The Company carries its accounts receivable at invoiced amounts less an allowance for doubtful accounts, when required. On a periodic basis, the Company evaluates its accounts receivable for collectability and, if necessary, establishes an allowance for doubtful accounts based on past experience and current credit conditions. The Company has entered into a credit insurance program to insure 90% of the accounts receivable, up to $1,000,000 in the aggregate, for certain customers. At December 31, 2011 and 2010, the allowance for doubtful accounts was approximately $125,000 and $94,000, respectively. The Company generally does not accrue interest or require collateral on its accounts receivable. However, the Company maintains the right to charge interest on past due amounts.

### Vendor Non-Trade Receivables

The Company has non-trade receivables from a manufacturing vendor resulting from the sale of components to this vendor who manufactures and assembles final products for the Company (see Note 9). The Company purchases these components directly from suppliers. The Company does not reflect the sale of these components in net sales and does not recognize any profits on these sales until the related products are sold by the Company, at which time any profit is recognized as a reduction of cost of sales.

**SAVANT SYSTEMS LLC**

**NOTES TO FINANCIAL STATEMENTS**

**Note 2 - Summary of Significant Accounting Policies (Continued)**

**Inventories**

Inventories are stated at the lower of cost or market value with cost determined using a specific identification method. If the cost of the inventories exceeds their market value, provisions are made currently for the difference between the cost and the market value. The Company reviews the inventory on hand and records a provision for obsolete inventory based on the estimated utility of the inventory taking into consideration technological changes.

**Equipment and Improvements**

Equipment and improvements are stated at cost. Major additions are capitalized while repairs and maintenance are charged to expense as incurred. Depreciation is being provided using the straight-line method over the estimated useful lives of the related assets or the life of the lease, whichever is shorter. When assets are retired or disposed of, the asset's cost and related allowance for depreciation are eliminated from the accounts and the resulting gain or loss, if any, is reflected in the statement of operations. Internal-use software is stated at cost and amortized using the straight-line method over its estimated useful life.

**Software Development Costs**

Research and development costs are expensed as incurred. Costs for the development of software products to be sold, leased, or otherwise marketed, are subject to capitalization beginning when a product's technological feasibility has been established and ending when a product is available for general release to customers.

During 2011 and 2010, the Company's products were released soon after technological feasibility had been established. Costs incurred subsequent to achievement of technological feasibility during 2011 and 2010 were not significant, and were expensed as incurred.

Capitalized costs associated with the development of new software products from previous years are amortized to cost of sales on a straight-line basis over the estimated useful life of the underlying technology commencing when each respective product began shipping to customers.

Total amortization related to these capitalized software development costs was $428,000 in 2011 and 2010.

Research and development costs are included in engineering expense and consisted of the following:

| | **2011** | 2010 |
|---|---|---|
| Compensation costs | **$ 2,810,418** | $ 3,210,566 |
| Other research and development costs | **1,656,326** | 2,394,731 |
| | **$ 4,466,744** | $ 5,605,297 |

**Note 2 - Summary of Significant Accounting Policies (Continued)**

**Long-Lived Assets Including Intangible Assets**
The Company reviews long-lived assets and software development costs for impairment whenever events or changes in circumstances indicate the carrying amount of the asset may not be recoverable. Recoverability of an asset is measured by comparing its carrying amount to the future undiscounted cash flows the asset is expected to generate or could generate in a transaction specifically involving the intangible asset. If an asset is considered to be impaired, the impairment to be recognized equals the amount by which the carrying value of the assets exceeds its fair market value. No impairment loss has been recorded in the financial statements for the years ended December 31, 2011 and 2010.

**Revenue Recognition**
Net sales consist primarily of revenue from the sale of standalone products or services consisting of: (1) the Company's product suite, (2) software, (3) service and support contracts, and (4) professional services. The Company recognizes revenue when persuasive evidence of an arrangement exists, delivery has occurred, the sales price is fixed or determinable, and collection is probable.

The Company recognizes revenue from the sale of hardware products, and software bundled with hardware that is essential to the functionality of the hardware in accordance with general revenue recognition accounting guidance. The Company recognizes revenue in accordance with industry specific software accounting guidance for standalone sales of software products.

Revenue from the sales of the product suite is reported net of returns and allowances. Product is considered delivered to the customer once it has been shipped and title and risk of loss have been transferred. Under most circumstances, these criteria are met at the time the product is shipped.

Revenue from software sales is deemed to have occurred when the customer either has taken possession of the related software or has access to take immediate possession.

Revenue from service and support contracts, which include unspecified upgrade rights, and on-line and telephone support, is deferred and recognized ratably over the service coverage periods.

The Company records reductions to revenue for customer incentive programs and other sales programs and volume-based incentives. The estimated cost of these programs is accrued as a reduction to revenue in the period the Company has sold the product and is committed to a plan. The Company also records reductions to revenue for estimated future product returns based on the Company's historical experience.

**Shipping and Handling**
Shipping and handling costs are expensed as incurred and are included in cost of sales. Amounts billed to customers related to shipping and handling are included in net sales.

**Note 2 - Summary of Significant Accounting Policies (Continued)**

**Warranty Expense**
The Company provides limited warranties for defects in material and workmanship of its products from the date of purchase for a period of thirteen months. The Company generally provides for the estimated cost of warranties at the time the related revenue is recognized. Factors considered in determining appropriate accruals for product warranty obligations include historical and projected warranty claim rates, historical and projected cost per claim, and knowledge of specific product failures that are outside of the Company’s typical experience. The Company assesses the adequacy of its warranty liabilities and adjusts the amounts as necessary based on actual experience and changes in future estimates.

**Marketing and Advertising**
The Company expenses marketing and advertising costs as they are incurred.

**Income Taxes**
The Company is considered to be a partnership for federal and state income tax purposes. Accordingly, no provision for income taxes has been made in the accompanying financial statements because such taxes, if any, are the responsibility of the members.

Generally accepted accounting principles prescribe the threshold a tax position is required to meet before being recognized in the financial statements. The pass-through status of the entity at the federal and state level is considered a tax position. The Company has reviewed its pass-through status and has determined that this position is not subject to significant uncertainty.

The Company's income tax returns are subject to examination by taxing authorities. Because the application of tax laws and regulations to many types of transactions is susceptible to varying interpretations, amounts reported could be changed at a later date upon final determination by those authorities. The Company is no longer subject to examinations by tax authorities for years prior to 2008. Currently, there are no income tax audits in process.

**Foreign Currency Transactions**
The Company has entered into contracts with certain foreign customers that will be settled in the customer’s local currencies. Transaction gains and losses resulting from fluctuations in currency exchange rates on transactions denominated in currencies other than the U.S. dollar are recognized as incurred in the accompanying Statements of Operations. Net loss for the year ended December 31, 2011 includes exchange transaction losses of approximately $4,000. No currency exchange transactions occurred during 2010.

At each balance sheet date, the Company evaluates the outstanding accounts receivable and payable that will be settled in currencies other than the U.S. dollar for translation gain or loss adjustments. Translation adjustments resulting from this process are charged or credited to other comprehensive income if material. As of December 31, 2011, no translation gain or loss adjustments have been recorded.

SAVANT SYSTEMS LLC

NOTES TO FINANCIAL STATEMENTS

**Note 3 - Inventories**

Inventories consisted of the following at December 31:

| | **2011** | 2010 |
|---|---|---|
| Raw materials | **$ 1,292,317** | $ 3,045,802 |
| Work-in-process | **74,728** | 1,481,303 |
| Finished goods | **3,487,903** | 310,873 |
| | **$ 4,854,948** | $ 4,837,978 |

**Note 4 - Restricted Cash**

The Company has a contractual agreement with a credit card company in order to obtain credit cards in the name of the Company for certain employees. As collateral for any outstanding obligations, funds were required to be deposited into a certificate of deposit account under the agreement. Interest accrues on this certificate of deposit and is paid at maturity. This amount has been classified as restricted cash on the balance sheet.

**Note 5 - Deposit**

The Company has entered into a contractual agreement with a third party manufacturer to produce and ship the majority of the Company's products (see Note 9). In order to secure an open account credit line, the Company was required to deposit $500,000 with the third party manufacturer.

**Note 6 - Equipment and Improvements, Net**

Equipment and improvements, net consisted of the following at December 31:

| | **2011** | 2010 |
|---|---|---|
| Equipment | **$ 2,267,001** | $ 1,771,448 |
| Furniture and fixtures | **125,985** | 125,985 |
| Tradeshow equipment | **247,279** | 247,279 |
| Leasehold improvements | **2,619,819** | 2,446,383 |
| | **5,260,084** | 4,591,095 |
| Accumulated depreciation and amortization | **(3,697,846)** | (2,661,058) |
| | **$ 1,562,238** | $ 1,930,037 |

**Note 7 - Software Development Costs, Net**

Software development costs, net consisted of the following at December 31:

| | **2011** | 2010 |
|---|---|---|
| Software development costs | **$ 1,710,200** | $ 1,710,200 |
| Less accumulated amortization | **(1,276,000)** | (848,000) |
| | **$ 434,200** | $ 862,200 |

Approximate future amortization expense related to software development costs is as follows:

| | |
|---|---|
| 2012 | $ 296,700 |
| 2013 | 137,500 |
| | $ 434,200 |

**Note 8 - Preferred and Common Units**

In accordance with the terms of the Company's amended and restated operating agreement (the "Agreement"), the Company issued Preferred and Common Unit interests with the pertinent rights and privileges as follows:

**Preferred Units**

The following table summarizes the preferred member's capital contribution activity from the Company's inception. Capital contribution amounts are comprised of cash or the exchange of notes payable and other amounts due to the preferred member.

| | Capital Contribution | Units Issued |
|---|---|---|
| 2006 | $ 10,123,357 | 7,679,788 |
| 2007 | 4,376,643 | 3,320,212 |
| 2008 | - | - |
| 2009 | 50,964,019 | 37,006,947 |
| 2010 | 20,631,754 | 15,129,953 |
| 2011 | 19,425,557 | 14,245,408 |
| | $105,521,330 | 77,382,308 |

At various times during 2011, the Company issued 13,786,667 Preferred Units in exchange for cash contributions of $18,800,000. On December 31, 2011, the Company issued 458,741 Preferred Units in exchange for the contribution of amounts due to member and the related accrued interest in the aggregate amount of $625,557. At various times during 2010, the Company issued 14,611,667 Preferred Units in exchange for cash contributions of $19,925,000. On December 31, 2010, the Company issued 518,286 Preferred Unites in exchange for the contribution of amounts due to member and the related accrued interest in the aggregate amount of $706,754.

**Note 8 - Preferred and Common Units (Continued)**

**Preferred Units (Continued)**
Under the Agreement, the Preferred Unit Holder is entitled to receive an 8% cumulative preferred return on its preferred adjusted capital of $105,521,330 and $86,095,773, respectively, as of December 31, 2011 and 2010, as defined, if the Board of Directors of the Company elects to make distributions. As of December 31, 2011 and 2010, the Preferred Unit Holder's cumulative preferred return amounted to $20,794,068 and $13,101,913, respectively. No distributions were authorized by the Board of Directors in 2011 or 2010.

**Common Units**
The following table summarizes the common members' capital account activity from the Company's inception.

| | Capital Contribution | Repurchases | Units Issued | Units Repurchased |
|---|---|---|---|---|
| 2006 | $ 56,050 | $ - | 5,605,000 | - |
| 2007 | 4,100 | (190) | 410,000 | (18,598) |
| 2008 | 5,475 | (522) | 547,500 | (52,616) |
| 2009 | 5,644 | (161) | 564,400 | (16,075) |
| 2010 | 1,825 | (570) | 182,500 | (57,083) |
| 2011 | 11,750 | (290) | 1,175,000 | (29,062) |
| | $ 84,844 | $ (1,733) | 8,484,400 | (173,434) |

During 2009, the Company issued an additional 444,403 Common Units, valued at $4,444, to a unit holder in accordance with the anti-dilution provisions of the Unit Restriction Agreement.

When issued, Common Units vest at varying rates over a period that does not exceed 48 months from the date of issuance.

**Voting**
The Preferred and Common Unit Holders (together, "Unit Holders") are entitled to voting power based on their respective percentage ownership in the Company as set forth in the Agreement. These percentages are subject to adjustment with the addition of new membership interests. Prior consent of the Preferred Unit Holder is required for any and all transactions that would adversely affect the rights of the Preferred Unit Holder or the Company, including changes to the number of units authorized, any sale, merger or liquidation of the Company, or to amend any provision of the Agreement.

**Note 8 - Preferred and Common Units (Continued)**

**Distributions**

Distributions, including distributions based on taxable income allocable to the Unit Holders, are made in accordance with the Agreement. Under the Agreement, income allocations generally follow the amount of cash distributed to the respective Unit Holder. The Agreement provides that distributions shall be made in order of the following priority: first, the Preferred Unit Holder will receive all distributions until the Preferred Unit Holder has received cumulative distributions equal to its cumulative preferred return; second, distributions will be made to Preferred Unit Holder until its adjusted capital has been reduced to zero; third, distributions will be made to Common Unit Holders in proportion to their common adjusted capital until the capital has been reduced to zero; fourth, any remaining portion will then be distributed to both Preferred and Common Unit Holders in proportion to the units held.

**Liquidation Preference**

In the event of a liquidation, dissolution or winding up of the Company, the Preferred Unit Holder has a liquidating preference over the Common Unit Holders. The order and amount of liquidation follows that of distributions, as defined above.

**Member Allocations**

Net profits and losses of the Company are allocated to each Unit Holder in accordance with the terms of the Agreement.

**Note 9 - Commitments**

**Lease Commitments**

The Company is obligated under a non-cancelable operating lease for office, research, development, and storage space through October 2013. The lease provides for payments of real estate taxes and other operating costs.

The Company leases additional office space and testing facilities under a non-cancelable operating lease through September 2016. The lease provides for payments of real estate taxes, insurance, maintenance, utilities and other operating costs. During 2010, the Company subleased a portion of this space and rent expense was reduced by approximately $123,000, for payments received under this sublease agreement.

Rent expense related to these non-cancelable operating leases was approximately $662,000 in 2011 and $721,000 in 2010.

**Note 9 - Commitments (Continued)**

**Lease Commitments (Continued)**
Approximate future minimum rental payments under non-cancelable operating leases are as follows:

| | |
|---|---|
| 2012 | $ 941,000 |
| 2013 | 933,000 |
| 2014 | 802,000 |
| 2015 | 805,000 |
| 2016 | 609,000 |
| | $ 4,090,000 |

**Other Commitments**
The Company has entered into a contract with a third party manufacturer in order to produce and ship the majority of the Company's products. This agreement provides for a deposit of $500,000 which is classified as a non-current asset on the balance sheet. Under the agreement, the Company is responsible for freight, insurance, and a fee equal to 2.5% of the mutually agreed upon price of each product shipped. The agreement guarantees workmanship for a one year period from date of shipment. The agreement can be terminated by either party within 120 days written notice. The Company is financially responsible for certain purchase commitments entered into by the third party manufacturer. At December 31, 2011, these commitments approximate $10,445,000 which will expire at various times during 2012. The Company recorded a loss contingency related to this agreement at December 31, 2010 in the amount of approximately $220,500. The amount is included in accrued expenses and other on the balance sheet.

The Company uses other contract manufacturers and suppliers to provide raw materials for its products. During the normal course of business, the Company enters into agreements with these contract manufacturers and suppliers that allow the Company to acquire material based upon estimated material usage requirements. As of December 31, 2011, the Company has outstanding purchase commitments for amounts not exceeding $213,000 which will expire at various times during 2012.

**Accrued Warranty**
The warranty accrual, included as a component of accrued expenses and other, for the years ended December 31, 2011 and 2010 is as follows:

| | **2011** | 2010 |
|---|---|---|
| Beginning accrued warranty and related costs | **$ 249,000** | $ 500,000 |
| Cost of warranty claims | **(654,610)** | (235,352) |
| Accruals (adjustments) for product warranties | **1,105,610** | (15,648) |
| Ending accrued warranty and related costs | **$ 700,000** | $ 249,000 |

**Note 9 - Commitments (Continued)**

**Royalties and Licenses**
The Company has entered into perpetual royalty and licensing agreements that require either flat fee payments or payments based upon sales including a minimum annual payment of $10,000. Royalties and license fees included in cost of goods sold were approximately $77,000 and $35,000 for 2011 and 2010, respectively.

**Note 10 - Related Party Transactions**

**Administrative Services Agreement**
The Company has entered into an administrative services agreement with the Preferred Unit Holder. Under the administrative services agreement, the Preferred Unit Holder is to provide the Company with the professional services of certain employees and other administrative and management services. The Company is required to compensate the Preferred Unit Holder for the costs and expenses of each employee plus a management fee equal to 5% of the total professional service costs. In 2011 and 2010, the Company incurred management fees of $654,207 and $521,245, respectively, under the administrative services agreement. The costs associated with the professional and administrative services are reported in cost of sales and operating expenses for 2011 and 2010.

**Due to Member**
Due to member consists of amounts due to the Preferred Unit Holder for administrative and management services and certain operating expenses paid on behalf of the Company. The amounts are unsecured and due in accordance with the terms stated in the administrative services agreement. Amounts still outstanding forty-five days after year end are subject to interest at 8% per annum. The balance at December 31, 2011 and 2010 was $728,950 and $579,219, respectively.

On December 31, 2011 and 2010, the Company and the Preferred Unit Holder agreed to contribute the prior year due to member balance and the related accrued interest amounting to $625,557 and $706,754, respectively, to the capital of the Company in exchange for additional preferred units (see table below and Note 8).

| | **2011** | 2010 |
|---|---|---|
| Due to member balance at January 1, | **$ 579,219** | $ 654,402 |
| Interest expense on due to member balance | **46,338** | 52,352 |
| Amount contributed to capital at December 31, | **$ 625,557** | $ 706,754 |

**Due from Related Party**
Due from related party represents an amount due from an entity under common ownership for expenses paid by the Company on behalf of the related party. The amount does not bear interest. Payment on the amount due was received subsequent to year end.

**Note 10 - Related Party Transactions (Continued)**

**Rents**
The Company leases an office/training facility from an entity that is related to the Company through common ownership and management, under a tenant-at-will arrangement. For 2011 and 2010, approximately $60,000 of rent expense was incurred under this arrangement.

The Company leases a showroom facility with another entity that is related to the Company through common ownership. The non-cancelable lease provides for monthly rental payments of $40,000 through September 2012, as well as payments for utilities and other operating costs. For 2011 and 2010, rent expense includes $480,000 related to this lease. Management intends to amend this lease during 2012 to extend the terms of the lease.

**Note 11 - Cash Flow Information**

In 2011 and 2010, the Company entered into an agreement with the Preferred Unit Holder to contribute the following amounts to capital in exchange for additional preferred units:

| | **2011** | 2010 |
|---|---|---|
| Due to member | **$ 579,219** | $ 654,402 |
| Accrued interest | **46,338** | 52,352 |
| | **$ 625,557** | $ 706,754 |

During 2011, the Company disposed of equipment with a cost basis of $30,600 and accumulated depreciation of $28,050.

Accrued expenses and other at December 31, 2011 includes $50,000 related to equipment and improvements.

**Note 12 - Contingencies**

During 2010, the Company filed a claim against a competitor alleging violation of antitrust laws and unfair competition laws. The status of this legal proceeding is periodically reviewed by management and outside counsel. The Company filed the lawsuit in order to protect the Company and its customers and does not believe this will have a material adverse effect on its operations or financial condition as a whole.

The Company is also involved in various litigation matters arising out of the normal course of business. Management does not believe the outcome of these litigation matters will have a significant impact on the Company's financial position or results of operations.

**Note 13 - Risks and Uncertainties**

Certain key components including, but not limited to, various software and hardware are currently obtained by the Company from a single supplier or limited suppliers. The loss of one of these suppliers or a significant change in the compatibility of one of these key components with the Company's product suite could have a material effect upon the Company's business and financial performance.

**Note 14 - Concentration of Credit Risk**

One customer accounted for approximately 14% of accounts receivable as of December 31, 2010.

Revenue from foreign sales accounted for approximately 16% of the Company's net sales for the year ended December 31, 2011 and approximately 16% of the outstanding accounts receivable at December 31, 2011. Revenue from foreign sales accounted for approximately 6% of the Company's net sales for the year ended December 31, 2010 and approximately 2% of the outstanding accounts receivable at December 31, 2010.

SUPPLEMENTARY INFORMATION

DiCicco, Gulman & Company LLP
CERTIFIED PUBLIC ACCOUNTANTS AND BUSINESS ADVISORS
*Professional Excellence On A Personal Level℠*

# Independent Accountants' Review Report on Supplementary Information

To the Board of Directors
**Savant Systems LLC**

We have reviewed the financial statements of Savant Systems LLC for the years ended December 31, 2011 and 2010, and have issued our report thereon dated April 19, 2012. The review was made primarily for the purpose of obtaining limited assurance that there are no material modifications that should be made to the financial statements in order for them to be in conformity with accounting principles generally accepted in the United States of America. The supplementary information appearing on pages 20-22 is presented only for supplementary analysis purposes. This supplementary information has been subjected to the inquiry and analytical procedures applied in the review of the basic financial statements, and we are not aware of any material modifications that should be made thereto.

The accompanying supplementary schedule has been prepared assuming that Savant Systems LLC will continue as a going concern. As more fully described in Note 1, certain conditions indicate that Savant Systems LLC may be unable to continue as a going concern and the accompanying supplementary schedule does not include any adjustments that might result from the outcome of this uncertainty.

DiCicco, Gulman & Company LLP

April 19, 2012



150 PRESIDENTIAL WAY, SUITE 510 WOBURN, MA 01801 | TEL 781.937.5300 FAX 781.937.5100 | WWW.DGCCPA.COM

# SAVANT SYSTEMS LLC

## SCHEDULE OF MEMBERS' INTERESTS

## DECEMBER 31, 2011

| | | Adjusted Capital | Units Issued | Units Vested as of December 31, 2011 | Percentage of Fully-Diluted Voting Power |
|---|---|---|---|---|---|
| **Preferred Unit Holder:** | | | | | |
| 886 Ventures | | $ 105,521,330 | 77,382,309 | 77,382,309 | 90.08% |
| **Common Unit Holders:** | | | | | |
| Matthew Aguiar | | 150 | 15,000 | 13,229 | 0.02% |
| James Allen | | 6,000 | 600,000 | 600,000 | 0.70% |
| David Arnold | | 100 | 10,000 | 9,583 | 0.01% |
| Duarte Avelar | | 100 | 10,000 | 9,583 | 0.01% |
| Joseph Bailey | | 50 | 5,000 | 1,771 | 0.01% |
| Gary Baldino | | 150 | 15,000 | 13,437 | 0.02% |
| David Bates | (a) | 25 | 2,500 | 2,500 | 0.00% |
| Terrance Baumann | | 50 | 5,000 | 4,167 | 0.01% |
| Leon Beaulieu | | 100 | 10,000 | 10,000 | 0.01% |
| Peter Bennett | | 250 | 25,000 | 25,000 | 0.03% |
| David Benvenuti | (a) | 52.08 | 5,208 | 5,208 | 0.01% |
| John Billings | | 50 | 5,000 | 1,771 | 0.01% |
| Bryan Bonczek | (a) | 812.50 | 81,250 | 81,250 | 0.09% |
| Michael Botelho | | 200 | 20,000 | 18,854 | 0.02% |
| James Boyce | | 250 | 25,000 | 25,000 | 0.03% |
| Ed Breslow | | 750 | 75,000 | 35,938 | 0.09% |
| Shawn Briere | | 50 | 5,000 | 3,438 | 0.01% |
| Joshua Brimdyr | (a) | 12.50 | 1,250 | 1,250 | 0.00% |
| Brenda Bryant | | 50 | 5,000 | 5,000 | 0.01% |
| Heather Cahoon-Gustafson | | 50 | 5,000 | 3,438 | 0.01% |
| Wilson Callan | | 950 | 95,000 | 90,417 | 0.11% |
| Deborah Campbell | | 50 | 5,000 | 1,875 | 0.01% |
| James Carroll | | 14,444 | 1,444,403 | 1,444,403 | 1.69% |
| Daniel Chapman | (a) | 50 | 5,000 | 2,500 | 0.01% |
| Nicholas Cipollo | | 500 | 50,000 | 45,417 | 0.06% |
| Kevin Colgan | | 50 | 5,000 | 1,771 | 0.01% |
| David Correia | | 100 | 10,000 | 10,000 | 0.01% |
| Peter Corsini | | 4,000 | 400,000 | 400,000 | 0.47% |
| Rachael Corsini | (a) | 13.54 | 1,354 | 1,354 | 0.00% |
| Curtis Couture | | 50 | 5,000 | 2,708 | 0.01% |
| Kyle Couture | | 50 | 5,000 | 2,500 | 0.01% |
| John Crawford | | 75 | 7,500 | 5,000 | 0.01% |
| Michael Cross | (a) | 368.75 | 36,875 | 36,875 | 0.04% |
| Gary Delponte | (a) | 35.42 | 3,542 | 3,542 | 0.00% |
| Matthew DiTrolio | (a) | 36.46 | 3,646 | 3,646 | 0.00% |
| Kathleen Dore | | 100 | 10,000 | 10,000 | 0.01% |
| Zev Eisenberg | | 50 | 5,000 | - | 0.01% |
| Timothy Ellis | | 150 | 15,000 | 15,000 | 0.02% |
| Beth Erickson | | 100 | 10,000 | 10,000 | 0.01% |
| Siegmer Eschholtz | | 6,000 | 600,000 | 600,000 | 0.70% |
| Philip Evans | | 50 | 5,000 | 625 | 0.01% |
| Robert Exconde | | 50 | 5,000 | 3,229 | 0.01% |
| Jon Fischer | (a) | 34.38 | 3,438 | 3,438 | 0.00% |
| David Fitzpatrick | (a) | 12.50 | 1,250 | 1,250 | 0.00% |

(a) Amount is net of repurchased units

*See accountant's review report on supplementary information.*

# SAVANT SYSTEMS LLC

## SCHEDULE OF MEMBERS' INTERESTS

## DECEMBER 31, 2011

| | | Adjusted Capital | Units Issued | Units Vested as of December 31, 2011 | Percentage of Fully-Diluted Voting Power |
|---|---|---|---|---|---|
| **Common Unit Holders: (Continued)** | | | | | |
| Justin Flammia | | $ 300 | 30,000 | 27,708 | 0.04% |
| Todd Foster | | 50 | 5,000 | 625 | 0.01% |
| Matt Frias | | 50 | 5,000 | 5,000 | 0.01% |
| Anthony Fritts | | 50 | 5,000 | 625 | 0.01% |
| Glenn Frost | | 50 | 5,000 | 3,854 | 0.01% |
| Jeffrey Garcia | | 25 | 2,500 | 2,500 | 0.01% |
| Timothy Gasquez | | 100 | 10,000 | 8,125 | 0.01% |
| Robert Giebenrath | | 100 | 10,000 | 8,125 | 0.01% |
| James Gorman | | 50 | 5,000 | 3,438 | 0.01% |
| Elanie Gray | | 50 | 5,000 | - | 0.01% |
| Suzanne Greenough | | 150 | 15,000 | 15,000 | 0.02% |
| Charles Guistwite | | 50 | 5,000 | 1,354 | 0.01% |
| Ben Gulacsi | | 50 | 5,000 | 625 | 0.01% |
| Cory Haflett | | 50 | 5,000 | 3,021 | 0.01% |
| Christopher Hammers | | 100 | 10,000 | 8,333 | 0.01% |
| Kyler Hanzie | | 50 | 5,000 | 1,771 | 0.01% |
| Gwomin Hao | | 300 | 30,000 | 30,000 | 0.04% |
| Bruce Hayes | | 200 | 20,000 | 8,750 | 0.02% |
| Derek Hill | | 50 | 5,000 | 1,667 | 0.01% |
| Robert Horton | | 50 | 5,000 | - | 0.01% |
| Kevin Huppert | | 50 | 5,000 | - | 0.01% |
| Arthur Jacobson | | 1,000 | 100,000 | 100,000 | 0.12% |
| John Jacobson | | 50 | 5,000 | 625 | 0.01% |
| Ben Jamison | (a) | 167 | 16,667 | 16,667 | 0.02% |
| Zoran Jevtic | | 75 | 7,500 | 2,031 | 0.01% |
| Jason Johnson | | 50 | 5,000 | 625 | 0.01% |
| Cliff Johnston | | 100 | 10,000 | 9,375 | 0.01% |
| Benjamin Jurow | | 50 | 5,000 | 625 | 0.01% |
| Brian Kalt | (a) | 6.25 | 625 | 625 | 0.00% |
| George Katsiris | | 100 | 10,000 | 8,333 | 0.01% |
| Kevin Kicklighter | | 6,000 | 600,000 | 600,000 | 0.70% |
| David Krinitt | | 50 | 5,000 | 625 | 0.01% |
| Kathleen Lacey | | 300 | 30,000 | 30,000 | 0.04% |
| Chun Lau | (a) | 43.75 | 4,375 | 4,375 | 0.01% |
| Desiree Lavallee-Spinner | | 25 | 2,500 | 2,031 | 0.00% |
| Timothy Locascio | | 2,000 | 200,000 | 162,500 | 0.23% |
| Jason Madden | | 100 | 10,000 | 9,167 | 0.01% |
| Martin Maganiezin | | 50 | 5,000 | 1,667 | 0.01% |
| Michael Mahoney | | 100 | 10,000 | 10,000 | 0.01% |
| Thomas Sean Manzanares | (a) | 58.33 | 5,833 | 5,833 | 0.01% |
| Ryan Martin | | 50 | 5,000 | 3,021 | 0.01% |
| Paul McGuire | | 100 | 10,000 | - | 0.01% |
| Tim McInerney | | 300 | 30,000 | 27,917 | 0.04% |
| Edward McKenna | | 50 | 5,000 | - | 0.01% |
| David McKinley | | 200 | 20,000 | 20,000 | 0.02% |
| Dino Mevoli | | 50 | 5,000 | 625 | 0.01% |
| Josh Miller | | 50 | 5,000 | 625 | 0.01% |
| Marco Montez | | 100 | 10,000 | 7,708 | 0.01% |
| John Murphy | | 8,950 | 895,000 | 111,875 | 1.04% |

(a) Amount is net of repurchased units

*See accountant's review report on supplementary information.*

## SAVANT SYSTEMS LLC

## SCHEDULE OF MEMBERS' INTERESTS

## DECEMBER 31, 2011

| | | Adjusted Capital | Units Issued | Units Vested as of December 31, 2011 | Percentage of Fully-Diluted Voting Power |
|---|---|---|---|---|---|
| **Common Unit Holders: (Continued)** | | | | | |
| Anton Musco | | $ 50 | 5,000 | 5,000 | 0.01% |
| Christopher Nelson | | 50 | 5,000 | - | 0.01% |
| Michael Noonan | | 6,000 | 600,000 | 600,000 | 0.70% |
| Thomas O'Brien | | 50 | 5,000 | - | 0.01% |
| Jeffery Oliver | | 150 | 15,000 | 12,708 | 0.02% |
| Alejandro Orellana | | 100 | 10,000 | 7,292 | 0.01% |
| Charles Parrelli | | 500 | 50,000 | 21,875 | 0.06% |
| Lori Pass | | 200 | 20,000 | 20,000 | 0.02% |
| Frank Pease | | 100 | 10,000 | 10,000 | 0.01% |
| John Pedranti | | 50 | 5,000 | 2,604 | 0.01% |
| Christopher Perry | | 150 | 15,000 | 13,437 | 0.02% |
| Cameron Pulsford | | 50 | 5,000 | 1,875 | 0.01% |
| Debra Quigley | | 150 | 15,000 | 15,000 | 0.02% |
| Justin Riley | (a) | 12.50 | 1,250 | 1,250 | 0.00% |
| Jeffrey Rogers | (a) | 25 | 2,500 | 2,500 | 0.00% |
| Daniel Ross | | 50 | 5,000 | 1,771 | 0.01% |
| Robert Ross | | 1,000 | 100,000 | 100,000 | 0.12% |
| Irfaan Sameja | | 50 | 5,000 | 625 | 0.01% |
| Victor Saverino | | 6,000 | 600,000 | 600,000 | 0.70% |
| Jacqueline Sayer | | 50 | 5,000 | 5,000 | 0.01% |
| Dan Schillinger | | 75 | 7,500 | 6,406 | 0.01% |
| Phil Schoonover | | 750 | 75,000 | 35,938 | 0.09% |
| Beth Ann Schroeder | | 50 | 5,000 | 2,917 | 0.01% |
| Donald Sehulster | | 50 | 5,000 | 3,021 | 0.01% |
| Robert Seifert | | 75 | 7,500 | 7,344 | 0.01% |
| Ron Shafrir | | 50 | 5,000 | 3,438 | 0.01% |
| Radif Sharafullin | (a) | 6.25 | 625 | 625 | 0.00% |
| Gerald Shields | | 450 | 45,000 | 42,708 | 0.05% |
| Michael C. Silva | | 6,000 | 600,000 | 600,000 | 0.70% |
| Adam Sinuc | | 50 | 5,000 | 2,604 | 0.01% |
| Craig Spinner | | 1,000 | 100,000 | 100,000 | 0.12% |
| Benjamin Stevens | (a) | 6.25 | 625 | 625 | 0.00% |
| Mark Stratford | (a) | 37.50 | 3,750 | 3,750 | 0.00% |
| Rose Anne Sullivan | | 75 | 7,500 | 7,344 | 0.01% |
| David Waizenegger Tatzel | | 50 | 5,000 | 625 | 0.01% |
| Nathan Trapp | | 50 | 5,000 | 1,667 | 0.01% |
| Michael Verkinder | | 75 | 7,500 | 938 | 0.01% |
| Meghan Wallace | | 50 | 5,000 | 625 | 0.01% |
| William Waters | | 50 | 5,000 | 2,188 | 0.01% |
| Bart Wesp | | 50 | 5,000 | 1,771 | 0.01% |
| Peter Wisniowski | | 500 | 50,000 | 50,000 | 0.06% |
| Stephanie York | | 100 | 10,000 | 10,000 | 0.01% |
| Yue Zhou | | 50 | 5,000 | 1,458 | 0.01% |
| | | 83,110 | 8,310,966 | 7,140,292 | 9.92% |
| | | **$ 105,604,440** | **85,693,275** | **84,522,601** | **100.00%** |

(a) Amount is net of repurchased units

*See accountant's review report on supplementary information.*

EXHIBIT 695

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
---------------------------------------X
SAVANT SYSTEMS, INC.,
Plaintiff,
- against -
CRESTRON ELECTRONICS, INC.,
Defendant,
and
CRESTRON ELECTRONICS, INC.,
Counterclaim-Plaintiff,
- against -
SAVANT SYSTEMS, INC.,
Counterclaim-Defendant.
Civil Action No. 10-cv-11622-EFH
---------------------------------------X

101 Constitution Avenue, N.W.
Washington, D.C.

June 6, 2014
9:20 a.m.

in this case?

MR. PARK: Objection, form.

A I missed the negative in the -- I think it's a double negative. Can you just --

BY MR. PATTERSON:

Q Yeah.

A -- ask it again?

Q And I'll tell you, what I'm trying to understand is, I understand that you disagree with how Professor Elhauge applied the methodology in this case and how he identified his benchmark.

My question is: Do you disagree with the setting of a benchmark and the determination of but-for sales and but-for profits as a way to measure damages in a case such as this?

MR. PARK: Objection, form.

A The general terms to use a benchmark and to use the benchmark to estimate damages, I don't disagree with. It is a very common method, but all of the action is in how you choose the benchmark. The problems we were having before was linking it to antitrust damages.

What Professor Elhauge has done is attempted to calculate alleged harm to Savant from

03:44:04 THE WITNESS: Thank you.

03:44:04 MR. PARK: No questions.

03:44:07 VIDEO TECHNICIAN: This ends the deposition
03:44:10 at 3:43.

(Deposition concluded at 3:43 p.m.)

EXHIBIT 696

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| SAVANT SYSTEMS, LLC,<br><br>Plaintiff,<br><br>vs.<br><br>CRESTRON ELECTRONICS, INC.,<br><br>Defendant.<br><br>CRESTON ELECTRONICS, INC.,<br><br>Counterclaim-Plaintiff,<br><br>vs.<br><br>SAVANT SYSTEMS, LLC,<br><br>Counterclaim-Defendant. | Deposition of:<br><br>**CRAIG STULCE**<br><br>Civil No. 10-CV-11622-EFH |

**September 20, 2012 * 9:45 a.m.**

Location: Holiday Inn Express
712 South Utah Valley Drive
American Fork, UT 84003

Reporter: Sharon Morgan, RPR, CRR
Notary Public in and for the State of Utah

it in the marketplace and good demos and those kinds of things.

I think that it was also a product of our internal problems that we were having as a company. We were having to restructure the company over and over because of the financial issues that we were dealing with. So it was pushing back the time frame. We badly needed to be able to get up and going with Savant and to be able to have that revenue coming in, but it was a pretty big hill to climb. So that's why.

Q. So you had received the demo gear from Savant on July 6th, 2009?

A. It could be right.

Q. And in approximately three months, you had not sold any Savant products, correct?

A. Not to my knowledge, no.

Q. Do you know if anyone had come in requesting Savant?

A. I don't think that there was -- no. The only time that I remember actually having a conversation about that was one time our V.P. of sales said, I got a call today from an architect from Idaho who was designing a system for a person in Salt Lake someplace, I think it was Olympus Cove, as I

remember, and he said that person specifically asked for Savant today. And we were kind of happy about that, to be honest with you, because it was like, okay, well, they are starting to get their name out there a little bit. It was starting to build.

Q. And what happened with that lead?

A. Never got the deal. I think it was -- I think we put together a proposal. I think it went all the way down and I think it actually expired by the time we went out of business. I don't think we ever got the deal.

Q. Do you know who did get the deal?

A. No idea.

Q. Do you know if the person purchased Savant products?

A. I don't know.

Q. Does looking at this e-mail in Exhibit 8, the sentence that mentions commitment, does that jog your memory at all with regard to any commitment on sales you had made to Savant?

A. No, nothing specific.

Q. If you can't recall specific numbers or dollar-wise or number of sales, do you recall making any commitment to Savant at all?

A. The commitment that I made to Savant was

A. Yes.

MR. JACOBS: Objection.

MR. KAVANAGH: I have no further questions.

MR. JACOBS: I'm out. We'll read and sign.

(Deposition at concluded 12:48 p.m.)

-oOo-

EXHIBIT 697

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
No. 10-CV-11622-EFH
- - - - - - - - - - - - - - - - - - - - - - - - -
SAVANT SYSTEMS, LLC,
Plaintiff
vs.
CRESTON ELECTRONICS, INC.,
Defendant
- - - - - - - - - - - - - - - - - - - - - - - - -
CRESTON ELECTRONICS, INC.,
Counterclaim Plaintiff
vs.
SAVANT SYSTEMS, LLC,
Counterclaim Defendant
- - - - - - - - - - - - - - - - - - - - - - - - -

VIDEOTAPED DEPOSITION OF GADI TAMARI
Monday, July 30, 2012 9:36 a.m.
Courtyard Cape Cod Hyannis
707 Iyannough Road, Hyannis, MA

Reporter: Janet M. McHugh, RMR, CRR, CLR

Q. I see. So your understanding is that there was a division of the roles with Mr. Carroll devoting more to marketing and Mr. Murphy more to sales; is that right?
A. Correct. Mr. Carroll before that was both, marketing and sales, and decided to separate the two functions.
Q. In your opinion, that was a good move?
A. I thought it was a good move. We need more -- I thought we need more power in the sales situation.
Q. Now, you mentioned the economy, correct?
A. Yes.
Q. And as a veteran of the high-tech industry, would it be fair that the economic problems that started in 2008 has affected high-tech industry?
A. As far as I know, it affected everybody.
Q. And you also mentioned the term "organic growth."
A. Yes.
Q. And could you explain what you meant from the -- by that?
A. Well, there's a limit to what a company can do. For instance, we focus right now, until now, mostly on the residential market. Maybe we could

have done more.

Q. And in your opinion and given your dealings with Savant and your role on the board, is Savant growing?

A. It's not a matter of opinion. I know that the company is going very well, based on the numbers.

Q. And it's growing in other markets? You mentioned the international market?

A. We are moving into international market, and no way close to covering everything we could. It's again, there's a limit to what a company can do.

Q. And have you been involved in providing any advice with respect to growth and expansion of Savant?

A. Yes. I -- I advised and was helping to go to the Asian market. I thought it's an important move for the company.

Q. Given China and --

A. Exactly.

Q. -- other economies?

A. China, Korea, Japan, India.

Q. Do you have any opinions with respect to the continued potential for growth or any limits to growth in the domestic market in the U.S.?

A. I'm sorry. This is not my expertise.

Q. Does he ever give you a reason as to why he doesn't take your advice?

A. Yes, he does. He says he doesn't think so. It's different opinions, just difference of opinions.

Q. But is there a basis for the difference of opinions as opposed to just the opinion, itself, or there are data that -- that either one of you point to to support your opinions?

A. It's -- I -- I can't speak for him or myself. I have limited data. He has more data. He has more knowledge on what's going on. He is more optimistic. I am more skeptical.

That's just difference of opinion, data, and general attitude. My attitude is usually more conservative.

Q. At any point in time have you told him or anyone on the board of Savant that, you know, these forecasts were fiction and not particularly reliable?

A. We don't use those words, but I will tell him that I think he should reduce his expectation sometimes.

It's not -- excuse me. It's not -- you have to understand, it's usually a discussion that is after we get some forecasts from the sales people. My opinion would regard the forecast by the sales

business then.

Q. Right. Now, your response on April 13th, 2009, is that, "One and two both requires a new strategy. I don't think it will happen unless Bob agrees that CEDIA is a dead end. He emphatically doesn't. I, at least, feel I failed to convince him about that."

Do you see that?

A. Yes.

Q. Does it reflect a disagreement of opinion that you and Mr. Madonna had?

A. Yes. I thought, and I still think, that we should go beyond CEDIA.

Q. And is it something you're continually having discussion with Mr. Madonna about?

A. Yes. He claims we don't have the -- one, that CEDIA is still strong; and, two, that at that point we didn't have the resources or the bandwidth to go after it.

Q. Now, if you read Mr. Madonna's response to you, it states, "CEDIA is not dead."

Do you see that?

A. Yes.

Q. And then the second paragraph, "There's no question in anyone's mind about CEDIA for the short

A. Yeah. There was -- the important thing was a list of documents.
Q. Yes. It's right there, sir (indicating).
A. Somewhere. Yes. That's the one.
Q. Yes. And as we talked about it, you searched for those documents?
A. Right.
MR. PARK: Thank you, sir. And I have no further questions.
MR. O'KONSKI: I have no questions.
THE WITNESS: Thank you.
THE VIDEOGRAPHER: The time now is 2:24 p.m. End of Tape 4. Also concludes the deposition of Gadi Tamari. Off the record.
(Deposition concluded at 2:24 p.m.)

EXHIBIT 698










TECHNOLOGY

# The Costs to Automate Home Tech

Email Print 2 Comments

By HEIDI MITCHELL

Updated Jan. 10, 2012 7:34 p.m. ET

Whole-house automated systems that control televisions, temperature and even feed the fish can be a hefty investment. In the past few years, some products have emerged that promise the same functions at a fraction of the cost.

Pete Pedone, who installs AV systems in the New York tri-state area, says he used to suggest to clients a $25,000 hard drive that uploads DVDs and feeds them to any TV in the home. Now he encourages clients to purchase an Apple AAPL +0.31% TV box for $99, a Sonos Wi-Fi speaker system that accesses the Internet for music and starts at $2,500 for six rooms of sound, and a Crestron "brain" for $899 to make them all talk to one another.

Related Readinf
- Cutting Edge Today, Passé Tomorrow

Sonos spokesman Eric Nielsen says the Santa Barbara, Calif.-based company has launched in over 6,300 U.S. stores including Target and Best Buy since it was introduced in 2005. Upgrades are "pushed" to clients, so they never have to call their AV guy, at added cost, to upgrade software.

Apple-based automation system Savant was born out of frustration. Former telecom executive Robert Madonna launched Savant after hours in his kitchen with a programmer writing code for his legacy control systems.

"This guy was working on this for days, and I thought there has to be a better way," he says. Hyannis, Mass.-based Savant has brought the entry price for automation systems down from around $30,000 to $4,000.

"The biggest difference has been the iPad," says Mr. Madonna. "The $3,800 custom control panel built into the wall now just costs the $500 for the iPad," he says. "And no one has to ever write code to get your new Blu-ray or plasma screen working."

Email Print 2 Comments Order Reprints




Popular Now What's This?

ARTICLES

1 Israel Outflanks White House Over Gaza

2 The Comedian and the Bike Builder

3 Missouri Governor to Make Changes in Ferguson Response

4 Low-Salt Diets May Pose Health Risks

5 Why the Library Beats Amazon—for Now

VIDEO

1 Violence in Ferguson: Police Fire Tear Gas


WSJ In-Depth


Low-Salt Diets May Pose Health Risks

The Internet Is Outgrowing Its Gear

The Humble Potato Falls From Grace

Can 'Warcraft' Skills Help Land a Job?

Tech's Fiercest Rivalry: Uber vs. Lyft


Credit-Score Math Recalculated

SPONDSORED RESULTS

2 **Do You Really Need Microsoft Office?**



3 **Lauren Bacall: A Retrospective**



4 **Pope Francis Arrives in South Korea**



5 **Can Iraqi Kurdistan Defend Itself?**







THE WALL STREET JOURNAL.

Subscribe / Login

Back to Top

**Customer Service**
- Customer Center
- New! Live Help
- Contact Us
- WSJ Weekend
- Contact Directory
- Corrections

**Policy**
- Privacy Policy
- Cookie Policy
- Data Policy
- Copyright Policy
- Subscriber Agreement & Terms of Use
- Your Ad Choices

**Ads**
- Advertise
- Place a Classified Ad
- Sell Your Home
- Sell Your Business
- Commercial Real Estate Ads
- Recruitment & Career Ads
- Franchising
- Advertise Locally

**Tools & Features**
- Apps
- Emails & Alerts
- Graphics & Photos
- Columns
- Topics
- Guides
- Portfolio
- Old Portfolio

**More**
- Register for Free
- Reprints
- Content Partnerships
- Conferences
- SafeHouse
- Mobile Site
- News Archive

Jobs at WSJ

Copyright ©2014 Dow Jones & Company, Inc. All Rights Reserved.

RECOMMENDED STORIES OPEN

EXHIBIT 699

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

Civil Action No. 1:10-cv-11622(EFH)

---

VIDEOTAPE DEPOSITION OF: DAVID THOMAS
February 7, 2013

---

SAVANT SYSTEMS, LLC,

Plaintiff,

v.

CRESTRON ELECTRONICS, INC.,

Defendant.

---

PURSUANT TO SUBPOENA, the deposition of DAVID THOMAS was taken on behalf of the Defendant at 1900 Grant Street, Suite 1025, Denver, Colorado 80203, on February 7, 2013, at 9:26 a.m., before Sharon L. Szotak, Registered Professional Reporter, Certified Realtime Reporter, and Notary Public within Colorado.

11:39:05 **"She has an interest in becoming a certified Savant**
11:39:08 **programmer." In the fourth line you say, "I am not**
11:39:12 **inclined to authorize her as a dealer." Right?**
11:39:15 A. That's correct.
11:39:15 **Q. So her interest is in becoming a**
11:39:17 **certified Savant programmer. But in the next line you**
11:39:21 **say you're not inclined to authorize her as a dealer.**
11:39:24 **Is there a distinction between the two?**
11:39:25 A. Yes.
11:39:26 **Q. Okay. What's the distinction?**
11:39:27 A. A programmer programs controls systems
11:39:30 but does not necessarily sell them to an end user.
11:39:35 **Q. So did she want to become a dealer?**
11:39:39 A. It appears that way. I don't recall who
11:39:41 she is, but it appears that way. Actually, strike
11:39:45 that.
11:39:46 I don't know that she wanted to become a
11:39:47 a dealer. She wanted to become a programmer.
11:39:51 **Q. Does Savant have programmers?**
11:39:52 A. No, not certified third-party
11:39:54 programmers.
11:39:59 **Q. So she was seeking to become a**
11:40:01 **programmer, and you said you did not -- you were not**
11:40:03 **inclined to authorize her as a dealer.**
11:40:05 A. Correct.

12:55:59 A. He's talking about audio and video switching.

12:56:15 **Q. At the top of Mr. Miller's e-mail he says, "By the way, on a room-by-room basis, Savant HDMI is even more than Crestron digital media."**

12:56:29 **Is it your understanding that he was referring to cost there?**

12:56:32 A. I don't know if he was referring to cost or retail.

12:56:37 **Q. Well, he's returned to -- referring to pricing, right?**

12:56:40 A. That's correct.

12:56:41 **Q. And the pricing of Savant HDMI is even more than Crestron digital media on a room-by-room basis?**

12:56:49 A. On a room-by-room basis, that's correct.

12:56:53 **Q. When a company has higher prices than a company it competes against, it can encounter resistance in the market, right?**

12:57:00 A. But that's not what's going on here. He's referring to room-by-room basis.

12:57:07 **Q. And if -- so if a piece of equipment costs more, on a room-by-room basis, than its competitor's equipment, what's the difference between that and other --**

12:57:21 A. What I was referring to is, as you scale
12:57:23 into multiple rooms, which is what our product goes
12:57:25 into the vast majority of the time.
12:57:30 **Q. But when you're talking about an entire**
12:57:33 **job and it's seven rooms, you would presume you divide**
12:57:38 **the total cost by seven, wouldn't you?**
12:57:40 A. No. That's not what he's referring to.
12:57:42 **Q. How do you know?**
12:57:43 A. Because I believe -- well, I have a
12:57:44 relationship with the dealer -- he's referring to the
12:57:46 cost on a room. That's my understanding. That's how
12:57:49 I'm reading the e-mail and how I recollect the
12:57:51 conversation.
12:57:51 **Q. Okay. So he's saying, on a room-by-room**
12:57:54 **basis, Savant's HDMI costs more than Crestron.**
12:57:58 A. I believe so. I believe he's referring
12:58:00 to if you looked at the cost per room, not on a scale
12:58:04 job in multiple rooms.
12:58:09 **Q. Do higher prices for products against**
12:58:14 **competing products, in your experience, face**
12:58:18 **resistance in the market?**
12:58:22 A. On a preliminary basis. But, no, not
12:58:25 necessarily. It depends on the value of the product.
12:58:28 **Q. So there are many factors --**
12:58:30 A. Many factors.

13:25:02 referring to by flipping.
13:25:11 **Q. Do you have a general understanding what**
13:25:13 **flipping means?**
13:25:15 A. I believe he's referring to getting
13:25:16 Savant placed in the account.
13:25:20 **Q. Is it your understanding that he's**
13:25:22 **talking about converting jobs that were specified for**
13:25:25 **Crestron to Savant?**
13:25:27 A. I don't know that.
13:25:33 **Q. You can set that aside, please.**
13:25:52 MR. KAVANAGH: We're up to 18.
13:25:53 (Deposition Exhibit 18 was marked.)
13:26:14 **Q. (BY MR. KAVANAGH) Mr. Thomas, could you**
13:26:14 **please take a look at Exhibit 18 and let me know when**
13:26:17 **you're ready.**
13:26:18 A. Uh-huh.
13:26:19 (The deponent perused the exhibit.)
13:26:29 I'm ready.
13:26:30 **Q. Do you recognize this e-mail?**
13:26:31 A. I do not.
13:26:33 **Q. Joe Wood is an employee of Momentum Reps?**
13:26:37 A. He is a former employee.
13:26:39 **Q. What happened to him?**
13:26:41 A. He took another job, other opportunities.
13:26:45 **Q. Was he terminated?**

13:39:32 has any.

13:39:33 MR. JACOBS: I'm done.

13:39:34 THE VIDEOGRAPHER: This is the end of

13:39:35 Media 2 of 2. Going off the record. The time is

13:39:38 1:40.

WHEREUPON, the within proceedings were concluded at the approximate hour of 1:40 p.m. on the 7th day of February, 2013.

* * * * * *

EXHIBIT 700

41791.322340

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

Civil Action No. 10-CV-11622-EFH

---

SAVANT SYSTEMS, LLC,

Plaintiff,

vs.

CRESTRON ELECTRONICS, INC.,

Defendant.

CRESTRON ELECTRONICS, INC.

Counterclaim-Plaintiff,

vs.

SAVANT SYSTEMS, LLC,

Counterclaim-Defendant.

---

VIDEOTAPE DEPOSITION OF MICHAEL THUL

April 12, 2012

Pursuant to Notice taken on behalf of Savant Systems, LLC, at Holiday Inn Express, 10101 West 48th Avenue, Wheat Ridge, Colorado 80033, at 9:29 a.m., before Joanne Blair, Registered Professional Reporter and Notary Public within Colorado.

three categories -- is it three or four categories?
A. Well, the first category is total purchase price.
Q. So each of the three categories?
A. Yeah.
Q. In order to achieve the purchase reward shown in the rightmost column?
MR. KAVANAGH: Objection to form.
Q. (BY MR. O'DONNELL) Is that correct?
A. That is correct. The overall dollar volume -- the section that's circled, the overall dollar volume is $300,000. That is the total purchases from Crestron that you need to achieve. The next three categories are the minimum amounts within those -- distributed within those. So if you look at -- the $300,000 needs to be made up of at least $100,000 of audio/video distribution, $150,000 of touch panels and controls, $50,000 of lighting to achieve that four star rating and the corresponding $40,000 purchase reward.
Q. Thank you. Did there come a time when you started handling Savant products?
A. Yes, absolutely.

the company might be.

We're very skeptical of new electronic products because they come out every month. And we're just continually bombarded with products that it becomes very clear that they will never succeed.

We had a number of criteria that we wanted to place upon this product line before we felt like it was a viable product. And by that time it seemed like it had a chance.

Q. Did it in fact prove to be a viable product in your business?

A. It has, yes, indeed, yes. It's a very, very integral part of our product offerings at this point.

Q. Could you roughly estimate, say, the percentage of sales of Savant products as opposed to the percentage of sales of Crestron products in your business?

MR. KAVANAGH: Objection to form.

A. I would estimate that our new sales and installation of products at this point in time -- of the control portion of those products, that probably 75 percent is Savant and 25 percent is Crestron.

nature, and how he was not representing Crestron anymore, he said, You know, if Crestron finds out that you're -- that you have a Savant system in here and that you are representing that product line and showing that product to potential customers, there's going to be a problem. You are going to have a problem with them.

So for literally as long as we could, we just hid this -- I mean, we made sure that when the new person who actually worked at Crestron, the new rep, who was actually a Crestron employee -- we always put away any Savant equipment that would have been out on display, and we always shuttled them away -- shuffled them away from the portion of our building that had any Savant associated with it.

I suspected that he knew and probably wanted to -- he wanted not to find the Savant stuff. We had a good relationship. We were still an important client of Crestron. And since he was commission-based, I felt comfortable that he didn't want to make any waves and not bring up the issue.

Q. Was this the old rep or the new rep?

Hank said -- Hank came to us and said, Well, it is a problem. And Crestron's position is that you can't have -- you can't sell Savant and continue to be a Crestron dealer. And I said, Well, just ignore it, Hank. That's the best for you and for me. Just ignore it. And he said, I can't. I've already -- I've already told everybody, and now they're not going to give up on this issue.

I said, Hank, we're still buying significant amounts of Crestron. We've never actually even sold a Savant system. The only Savant equipment we've ever even purchased from Savant is our demo here. I don't know if we'll ever sell a Savant system. I said, I don't think that's right that Crestron can make that kind of a demand. They are certainly a critical part of our business, but don't I have the right to choose what it is that I offer to my customers? Isn't that -- that's what I do with every other segment of my business; why wouldn't I do that here?

Q. And what was his response?

A. His response was that Crestron doesn't see it that way, that Crestron had

it was my opinion that that was really none of Crestron's business, but they insisted that that was their business and that we were going to discuss it. So Jerrie was the one who said, you know, we, Crestron, allowed Control 4 to increase their market share to where they have now become the second or third sales volume leader in the control automation market.

And he said -- Jerrie said, Crestron's position is that we created this market, and we're not going to allow that kind of activity to happen again. And so as part of that, as part of our policy we're not going to allow you to continue to sell Crestron if you continue to sell Savant. Jerrie was emphatic that there was no negotiation on that point and that they had terminated bigger dealers than me and that they wouldn't hesitate to terminate our agreement as well.

Q. What did you do in response to this?

A. I said that I was going to need to think about that. I didn't feel like it was their business what products I sold, and I specifically asked -- I said, We have a project, the largest project we've ever had in the

Electronics as a dealer, correct?
A. Didn't I answer that question?
Q. If we are trying to jump ahead, I'm trying to short-circuit here.
A. I'll humor you, yes. Crestron never terminated Thul Electronics. Thul Electronics never dropped Savant. Is there another way we could go over that?
Q. If I figure that there is another way that we have to go over it, I'll come back.
A. Good.
Q. Your decision not to drop Crestron was your choice?
A. Drop Crestron?
Q. I'm sorry. Your decision not to drop Savant as a manufacturer was your choice as the owner of Thul Electronics, correct?
A. Yes.
Q. Do you recall the volume of your purchases of Crestron equipment in 2010 for Thul Electronics?
A. No.
Q. Would it have been around $500,000?
A. Do you have -- if you tell me that that's what it was, I won't dispute it.

Q. In 2011 do you recall whether your purchases from Crestron increased or decreased?
A. I'm certain they decreased.
Q. Why are you certain of that?
A. My rep told me.
Q. Do you know how much they decreased?
A. No.
Q. So far in 2012, have your sales of Crestron Electronics increased or decreased from 2011?
A. I suspect they decreased.
Q. So you believe since 2010 your sales -- your purchases of equipment from Crestron Electronics have decreased?
A. I believe that to be the case.
Q. Since 2010 -- in 2010 do you recall the volume of your purchases from Savant?
A. No.
Q. Any idea to the nearest hundred thousand?
A. No.
Q. Do you recall the volume of your purchases from Savant in 2011?
A. You know, I sent you all that stuff. I spent hours copying all that stuff. You've

A. Yes.
Q. And are maintained in the ordinary course of business?
A. Yes.
Q. No further questions.
THE VIDEOGRAPHER: This adjourns the April 12, 2012, video deposition of Michael Thul. Time is approximately 11:44 a.m. and we're now off the record. Thank you, everyone.
(The proceedings concluded at 11:44 a.m.)

EXHIBIT 701

US007930644B2

(12) **United States Patent**
**Silva et al.**

(10) **Patent No.: US 7,930,644 B2**
(45) **Date of Patent: Apr. 19, 2011**

(54) **PROGRAMMING ENVIRONMENT AND METADATA MANAGEMENT FOR PROGRAMMABLE MULTIMEDIA CONTROLLER**

(75) Inventors: **Michael C. Silva**, Centerville, MA (US); **Robert P. Madonna**, Osterville, MA (US); **Bryan S. Bonczek**, Osterville, MA (US); **David M. Benvenuti**, Osterville, MA (US); **Kevin C. Kicklighter**, Centerville, MA (US); **Arthur A. Jacobson**, Osterville, MA (US); **Nicholas Cipollo**, Osterville, MA (US); **Gerald W. Shields**, Osterville, MA (US)

(73) Assignee: **Savant Systems, LLC**, Osterville, MA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 149 days.

(21) Appl. No.: **11/520,215**

(22) Filed: **Sep. 13, 2006**

(65) **Prior Publication Data**

US 2008/0127063 A1 May 29, 2008

(51) **Int. Cl.**
***G06F 3/048*** (2006.01)

(52) **U.S. Cl.** ........................................................ **715/771**

(58) **Field of Classification Search** .................. 715/734, 715/735, 736, 771, 738
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 6,182,094 B1 * | 1/2001 | Humpleman et al. | ........ | 715/234 |
| 6,266,098 B1 | 7/2001 | Cove et al. | | |
| 6,469,633 B1 | 10/2002 | Wachter | | |
| 7,234,115 B1 * | 6/2007 | Sprauve et al. | ............... | 715/746 |
| 2003/0035010 A1 * | 2/2003 | Kodosky et al. | ............. | 345/771 |
| 2003/0088852 A1 | 5/2003 | Lacas et al. | | |
| 2003/0103088 A1 | 6/2003 | Dresti et al. | | |
| 2004/0143349 A1 | 7/2004 | Roberts et al. | | |
| 2007/0055976 A1 * | 3/2007 | Ward et al. | .................... | 719/329 |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| WO | WO 00/17737 | 3/2000 |
| WO | WO-03/019560 A2 | 3/2003 |
| WO | WO 03/044625 A2 | 5/2003 |

OTHER PUBLICATIONS

National Instruments Corporation: "Labview User Manual," XP002227650, Jul. 2000, pp. 1-7. "Notification of Transmittal of the International Search Report and the Written Opinion of the International Searching Authority, or the Declaration," International Filing Date: Sep. 13, 2007, International Application No. PCT/US2007/019912, Applicant: Savant Systems LLC, Date of Mailing: Mar. 11, 2008, pp. 1-4.
"Notification of Transmittal of the International Search Report and the Written Opinion of the International Searching Authority, or the Declaration," International Filing Date: Sep. 13, 2007, International Application No. PCT/US2007/019912, Applicant: Savant Systems LLC, Date of Mailing: May 13, 2008, pp. 1-18.
International Search Report for PCT/US2008/003434 mailed Sep. 19, 2008, 12 pages.

* cited by examiner

*Primary Examiner* — Thanh T Vu
(74) *Attorney, Agent, or Firm* — Cesari and McKenna, LLP

(57) **ABSTRACT**

A multimedia controller, based on a general purpose computer, which is capable of interfacing with, controlling or managing a wide variety of audio, video, telecommunications, data communications or other devices. A configuration tool, based on a graphical user interface, provides a simple, schematic way to configure even highly complex systems having numerous components or devices which are to be interconnected with or interfaced to the multimedia controller. A user interface programming tool enables a user to customize the appearance and functionality of a graphical user interface to the multimedia controller. A metadata manager automatically collects metadata that is available within the multimedia controller, automatically detects the presence of new media and collects metadata from it, and may also access web resources to locate additional pertinent metadata.

**33 Claims, 15 Drawing Sheets**




A/V RECEIVER 115
MICROPHONE 123
TELEVISION 120
SPEAKERS 122
VIDEO CAMERA 124
PERSONAL MEDIA PLAYER 125
DVD PLAYER 110
100
CD PLAYER 105
TELEPHONE NETWORK 130
REMOTE CONTROL 170
TELEPHONE HANDSETS 132
RECORDING EQUIPMENT 165
INTERNET 140
VIDEO GAME SYSTEM 150
LIGHTING/HOME AUTOMATION SYSTEMS 135
PERSONAL COMPUTER 145
SECURITY SYSTEM 175
MOTOR AND RELAY DEVICES 137
TOUCHSCREEN REMOTE CONTROL 112
MP3 PLAYER OR OTHER DEVICE 116
SIMPLE REMOTE CONTROL 114

FIG. 1


DIGITAL VIDEO INPUT MODULES WITH HMDI 600
VIDEO OUTPUT MODULE WITH HMDI 1000
DIGITAL AUDIO INPUT MODULES 400
DIGITAL AUDIO OUTPUT MODULES 900
PROCESSING SUBSYSTEM 240
MID PLANE 235
FRONT PANEL DISPLAY 1150
AUXILIARY AUDIO VIDEO PORT 700
ETHERNET SWITCH 230
AUDIO SWITCH 215
VIDEO SWITCH 220
SPI/I²C CONTROLLER 250
BUS 218
MICRO-CONTROLLER 210
FAN CONTROL-LER 251
TEMP. SENSOR 252
POWER MANAGER 253
DEVICE CONTROL INTERFACE 275
1394 SWITCH 248
1394 HUB 247
1394
1394
246
232
ETHERNET PORT
ETHERNET PORT
USB SWITCH 244
USB HUB 243
USB
USB
USB
USB
242
TELEPHONE INTERFACE 270
MEMORY CARD INTERFACE 225
RF INTERFACE 267
IR INTERFACE 260
RS 232 INTERFACE 265
EXPANSION PORT 280

FIG. 2


300
CONFIGURATION SETUP PLANE
314
USER CONFIGURATION TOOL
350
CONFIGURATION COMPILER
352
USER SERVICES CONTROL APPLICATION
354
WORKFLOW GENERATOR
356
SERVICE CONTROL WORKFLOW BROWSER, SEARCH ENGINE, CUSTOMIZATION APPLICATION
358
SYSTEM CONFIGURATION XML
360
XML AUTOMATOR WORKFLOW
362
XML SERVICES DEFINITION
364
XML COMPONENT PROFILE
366
MAC SETTINGS
368
CONTROL API ACCESS
WEB RF REMOTE TOUCHSCREEN PDA/CELLPHONE
306
UI SERVER
330
UI PLANE
304
SERVICE CONTROLLER
332
AUTOMATOR RUNTIME
334
SERVICE PLANE
APPLE_EVENTS
APPLE_EVENTS
AV COMPONENT CONTROLLER (AVC)
344
MAC APPS: ITUNES, iCHAT, iPHOTO, iDVD
342
3rd PARTY APPS: PVR, VOIP
340
OSD APP.
338
MAC DISPLAY CONTROLLER (MDC)
336
308
AV COMPONENTS / AVX
348
COMPONENT CONTROL PLANE
312
MAC I/O (DVI, ETHERNET, FIREWIRE, USB (AUDIO/VIDEO))
346
MEDIA PLANE
310
SYSTEM CONTROL PLANE
302
SYSTEM MANAGER
316
SYSTEM LAUNCHER
318
REDUNDANCY MANAGER
320
WEB SERVER
322
TOUCHSCREEN/ PDA SERVER
324
REMOTE SYSTEM ACCESS
326
LOGS
328

FIG. 3


400
406
408
Untitled
Tool Palette
Open
Save
Make Report
Print
Compile
Show Palette
Show inspector
Customize
402
404
Rosie
410
Room 1
412

FIG. 4



510
508
Components
All Components
All Manufacturers
manufacturer or model
Components
Panasonic
TH-42PHD8UK
Panasonic
TH-50PHD8UK
Pioneer
PDP-5040HD
Pioneer
PRO-800HD
Pioneer
PRO-810HD
Pioneer
PRO-1000HD
Pioneer
PRO-1010HD
Pioneer
PRO-1410HD
502
Pioneer
VSX-74TXVi
504
PureLink
HD5-4IR
506
RCA
DTC-100
ReQuest
AudioReQuest Tera 1200
Rotel
RDV-1080
Runco
CL-410
500


FIG. 5

TO FIG. 6B




FIG. 6A


Customize
Speaker 1
Assigned Inputs
SpeakerInput
5.1 StandardWire (5.1.S...
Speaker 2
Assigned Inputs
SpeakerInput
5.1 StandardWire (5.1.S...
amp1
Control Ports
R5-232C I/O IN
Inputs
ZONE 1 2 3 4 (47K) (R.
Outputs
ZONE 1 2 3 4 (7.1 Surrow.
amp2
Control Ports
R5-232C I/O IN
Inputs
ZONE 1 2 3 4 (47K) (R.
Outputs
ZONE 1 2 3 4 (7.1 Surrow.
Room 1 TV
Control Ports
R5-232C
Inputs
AV INPUT
AV INPUT ((Composite)
AV INPUT (RCA Stereo)
RCA-PC INPUT
RCA-PC INPUT (VGA)
RCA-PC INPUT (RCA St.
Outputs
EXTERNAL SPEAKER 8ohm (St.
Room 2 TV
Control Ports
IR
Inputs
HDMI
HDMI (HDMI)
HDMI (HDMI Audio)
PC2/COMPONENT2 (C.
PC2/COMPONENT2 (P.
COMPONENT1 (Compo.
PC1 (VGA)
VIDEO3 (S-VIDEO)
Outputs
EXT. SPEAKER L and R (Stereo.
Rosie
Control Ports
IR/Serial PWM Port 1
IR/Serial PWM Port 2
Serial Port 1
Serial Port 2
Trigger Port 1
Trigger Port 2
Relay Port 1
Relay Port 2
Assigned Inputs
Video Audio Input 1
VideoInput1
VideoInput1 (Co.
VideoInput1 (S-Video)
Video Audio Input 2
VideoInput2
VideoInput2 (Co.
VideoInput2 (S-Video)
Inputs
Assigned Outputs
Video Audio Output 1
VideoOutput1
VideoOutput1 (HDMI)
Video Audio Output 2
VideoOutput1
VideoOutput1 (HDMI)
Outputs
Data
400
402
602
604
606
608
610
FROM FIG. 6A

FIG. 6B


Inspecting "Rosie"
Edit
Hide Details
Class: RacePointMedia.controller
Manufacturer: Savant
Model: Rosie
Device Name: Rosie
Always On
Notes:
618
Show:
Assigned I/Os
Videoinput (Composite)
Digitalinput1 (Coax Digital)
Video Audio Input 2
Videoinput2
Videoinput2: (Components SCA)
Videoinput2 (S+Video)
Videoinput2 (Composite)
Digitalinput2 (Coax Digital)
Video Audio Input 3
Videoinput3
Videoinput3: (Components SCA)
Videoinput3 (S+Video)
Videoinput3 (Composite)
Assignable IO: Inputs
Assigned Connector: Audio input 10
Assigned Connector: Audio input 11
Assigned Connector: Audio input 12
Assigned Connector: Audio input 13
Assigned Connector: Audio input 14
Show Component user info
616

FIG. 6C


708
710
Services for 2Room
Toggle
Show Unrealized
Highlight Path
Generate
Services for:
Room 1
Service Resources
Service Requests
Use
Realized Services
CD Service
TV Service
DVD Service
Satellite TV Service
702
700
704
A service to control watching broadcast or cable television
Resources
Audio
Cable 1
706
TV Source
Rosie
Audio Switch Function
Surround Sound Processor Function
Volume Control Function
amp 1
Passive input
Amplifier Function
Speakers 1
Surround Sound Speakers Sink
Source Zone: Room 1
Outputs
Media Type: Coax Digital
Name: SPDIF

FIG. 7


802
710
Services for 2Room
Toggle
U
Show Unrealized
P
Highlight Path
Generate
Services for:
Room 1
Service Resources
Service Requests
Use
Realized Services
CD Service
TV Service
DVD Service
Satellite TV Service
Resources
FastForward
Exit
800
BSquare
SetListeningModeDTSNEOCinema
OSDSelect
NumberSeven
SetEffectsModeCathedral1
SetEffectsModeHall3
PowerOff
SetListeningModeDolbyPLIIXMatrix
SetEffectsModeNone
DecrementEffectsMode
OSDPageDown
SetListeningModeDT548_24
NumberNine
702
700
A service to control watching broadcast or cable television
704

FIG. 8


900
CONTROLLER INTERFACE
912
CONTENT SOURCE
914
DATA INTERPRETER
906
REQUEST FOR METADATA
MEDIA OBJECT
CONTENT SOURCE MANAGER
916
MEDIA OBJECT
METADATA MANAGER
902
MEDIA OBJECT
DATA MANAGER
904
NOTIFICATION
DATA WATCHER
908
REQUEST METADATA FOR NEW SONG OR ALBUM
REQUEST TO ADD/UPDATE/REMOVE METADATA FOR SONG OR REQUEST FOR METADATA
MEDIA OBJECT
STORAGE MANAGER
910

FIG. 9


400
ExampleUCT
Tool Palette
Open
Save
Make Report
Print
Compile
Show Palette
Show inspector
Customize
Rosie
404
Room 1
1000
kk's to...
kk's touch panel
Data
@Ethernet (Ethernet)
Edit users for: ExampleUCT
Screen:
EXAMPLE
controllerConfig.plist
Theme - Skin: Transparent - Football
Choose
Import...
Cancel
OK
Allowed Services:
Digital Audio Service
AM Radio Service
Digital Video Service
CD Service
TV Service
On Screen Display Service
Game Service
Lighting Control Service
DVD Service
Comcast
Theme:
Name:
Default Profile
Description:
Default theme for this system
Enabled Favorite Channel
Station
1 ON DEMAND
2 WGBH-2 (PBC)
3 CNB
4 WBZ-4 (CBS)
5 WCVB-5 (ABC)
6 WLNE-6 (ABC)
7 WHDH-7 (NBC)
All
None
All
None

FIG. 10


1100
PHOTOSHOP FILE:
PER BUTTON IMPLEMENTATION OF BUTTON PROPERTIES AND ACTIONS
1102
QUARTZ COMPOSER COMPOSITION:
EXTRACT, STORE AND COMPRESS
1104
CONTROL API ACCESS
306
UI SERVER
330
SERVICE CONTROLLER
332
EXTERNAL COMPONENTS
1106

FIG. 11



1102
Photoshop File
Input
Output
1202
RPMPSImport
inputExtract
inputRunCount
inputPSFile
inputDontExtract
outputPSFile
outputDone
outputRunCount
outputAllLayers
outputAllButtonNames
outputAllButtonNamesPSSorted
RPMPSLayersFromFile
inputExtract
inputRunCount
inputPSFileName
inputBackgroundDimensions
inputisBackground
inputMaintainAspectRatio
outputImage
outputX
outputY
outputDimensions
outputSubGroups
outputSuccess
Structure Key Member
Structure
Key
Member
RPMDummyRenderer 2
Enable
Input1
1208
Say Text 1
Enable
Text
Start
Stop
Queue
1210
Display Text 3
Enable
Image
Mask Image
X Position
Y Position
Send Service Request to SVC
Send
Send Count
Controller
TransportGroup
Source
Destination
Message
Send Type
Done
Run Count
1212
Image with String
String
Font Name
Font Size
Font Leading Offset
Font kerning Shift
Image Width
Image Height
Image
Display Width
Display Height
Line Count
Glyph Count
1214
Display 4
Enable
ButtonStatus
1216
1206
1204
1200


FIG. 12


Photoshop File Edit Image Layer Select Filter View Window Help
Tue 3:23 PM
Feather: 0 px
Anti-abas
Style: Normal
Width:
Height:
Brushes
Tool Presets
Layer Comps
CableBox.psd@ 66.7% (Speech=Mute Off, RCB/8)
Navigator
Info
Histogram
66.67%
Layer
Channels
Paths
Normal
Opacity: 0%
Lock:
Fill: 100%
Play
Information
1304
Display Type=Alpha
Command=Play
Speech=Play
Label=Play
Type=TwoState
Icon(iconOn)
Button (enable)
Button (rollover)
Button (pressed)
Pause
Information
power
info
on demand
help
guide
c+
c-
p-
1
2
3
4
5
6
7
8
9
last
0
enter
exit
mute
fav
sel
A
B
C
s
v+
v-
p+
66.67%
sRCB iEC61966-2.1 (Sbpc)
1300
1302
1306

FIG. 13

# PROGRAMMING ENVIRONMENT AND METADATA MANAGEMENT FOR PROGRAMMABLE MULTIMEDIA CONTROLLER

## RELATED APPLICATION

This application is related to co-pending application entitled "System and Method for a Programmable Multimedia Controller," filed Dec. 20, 2005, Ser. No. 11/314,664, and co-pending application entitled "Programmable Multimedia Controller With Programmable Services," filed Dec. 20, 2005, Ser. No. 11/314,112, both of which are assigned to a common assignee and both of which are hereby incorporated by reference in their entireties.

## BACKGROUND OF THE INVENTION

1. Field of the Invention

The present invention relates generally to the fields of multimedia and communications and, more specifically, to a programmable multimedia controller for home, commercial, professional audio or video, broadcast or film studio, security, automation or other use which is capable of interfacing with, controlling and managing a wide variety of audio, video, telecommunications, data communications and other devices.

2. Background Information

Commercial offerings of consumer electronic devices have expanded dramatically in response to the falling cost of electronic hardware and introduction of new media. For example, within only a few years, compact disk (CD) technology largely displaced vinyl records and magnetic tapes as the music recording medium of choice, but was in turn displaced by MP3 technology. Similarly, digital versatile disk (DVD) technology largely displaced videotape as the video recording medium of choice, while digital cameras have effectively replaced film cameras. The advent of new technologies and media, and the corresponding consumer demand for products based on the latest advances, drives manufacturers to rapidly introduce new products. As a result, an overwhelming number of product types and models permeate the market.

One long-standing problem which persists for many consumers is the complexity involved with interconnecting various electronic devices which are typically sold individually and not as parts of an integrated system. For example, a consumer may acquire an audio receiver, cable TV box, television, DVD player and surround sound system made by different manufacturers. The basic problem of interconnecting a group of components by a series of cables is challenging for many users, let alone sufficiently understanding the various modes of operations and features which, if properly used, will allow the components to work best together and produce the most enjoyable entertainment experiences.

Another long-standing problem with most, if not all, previous approaches to integrating disparate components is that some type of central controller is used which operates on software written in a high-level computer language. The use of a high-level computer language presents several difficulties. First, it is all but certain that the manufacturer will not make the source code available to the user, thus effectively preventing a user who wished to customize a system from doing so. Second, even if the source code is made available, the overwhelming majority of users do not have the technical expertise, time or inclination to write or modify source code.



Third, the introduction of new devices by manufacturers almost certainly necessitate that the source code be modified in order to make the central controller compatible with such devices.

Yet another long-standing problem is an absence of any widely adopted industry standard regarding control interfaces for consumer electronics devices. Manufacturers have incorporated varying communication protocols, most of which are proprietary in nature, do not conform to any standard, and are implemented with extremely detailed source code. This absence of standards greatly complicates the problem of how to integrate and centrally control a wide variety of consumer electronics devices such that they work together and are manageable by an average user who does not possess substantial technical expertise.

## SUMMARY OF THE INVENTION

In brief summary, the present invention provides a multimedia controller, based on a general purpose computer, which is capable of interfacing with, controlling or managing a wide variety of audio, video, telecommunications, data communications or other devices. In accordance with one aspect of the present invention, a configuration tool, based on a graphical user interface, provides a simple, schematic way to configure even highly complex systems having numerous components or devices which are to be interconnected with or interfaced to the multimedia controller.

The configuration tool has access to a library of component profiles. A component profile typically describes at least some of the physical characteristics of the component, the configuration of the component, the set of commands that the component recognizes, as well as the functions that the component is capable of performing. In one embodiment, the component library may be updated through on-line access to a designated website or on-line service.

Using the configuration tool, a user, dealer, installer or other person selects, typically be dragging and dropping, components of interest from the component library. In response, a photo or other image of each component and its connectors, including the connector names present on the physical component, is displayed. As multiple components are selected, the configuration tool uses color coding to graphically and visually indicate possible connections among the components. For example, an audio output connector of one component may be highlighted with the same color as a compatible audio input connector of another component. The configuration tool may also be used to select a connector of interest and display information regarding permissible and impermissible connections for that connector.

Working interactively with the displayed components, a user graphically "draws" desired connections between components. Once the desired connections are specified all component and connection information is supplied to a configuration compiler. The configuration compiler produces a list of services that the multimedia controller is capable of providing based on the specified components and configuration. A user may select desired services as well as customize various services to suit individual preferences.

The configuration tool may also generate an output report which contains detailed wiring or installation instructions for an installer; a component summary; a bill of materials for ordering and billing purposes; configuration instructions; information regarding third party equipment, such as input assignment settings for receivers; user notes; printed labels for cabling and other information.

In accordance with another aspect of the invention, the configuration tool and graphical user interface may be used to configure individual components or devices which interface with the programmable multimedia controller including a touchscreen remote control.

In accordance with another aspect of the invention, the multimedia controller includes a metadata management facility which is capable of working with diverse media types including CD, MP3 among others. In one embodiment, the metadata management facility automatically collects metadata that is available within the multimedia controller, automatically detects the presence of new media and collects metadata from it, and may also access web resources to locate additional pertinent metadata. By making use of a file system associated with the general purpose computer that is part of the multimedia controller, the metadata manager facility stores metadata in a structure which is well suited for queries. In addition, the metadata manager facility makes metadata available to all types of user remote controllers which may be interfaced with the multimedia controller.

In accordance with yet another aspect of the invention, a graphical programming environment is provided which enables a user to customize the appearance and functionality of a user interface to the multimedia controller. The graphical programming environment includes a library of radio buttons and other graphical controls which are accessible through an application programming interface (API). Through the API, a user may add or remove a radio button or control from the user interface as well as modify the appearance, functionality or other attributes of the button or control.

## BRIEF DESCRIPTION OF THE DRAWINGS

The invention description below refers to the accompanying drawings, of which:

FIG. **1** is block diagram of a programmable multimedia controller, interconnected to a number of devices, according to an illustrative embodiment of the present invention;

FIG. **2** is a schematic block diagram showing the high-level hardware architecture of the multimedia controller of FIG. **1**;

FIG. **3** is a schematic block diagram showing the high-level software architecture of the system of FIG. **1**;

FIG. **4** is a screenshot showing a graphical programming environment in which a user may create a system configuration using the configuration tool of FIG. **3**;

FIG. **5** is a screenshot of a component library used in conjunction with the configuration tool;

FIG. **6**A and FIG. **6**B together are a screenshot of a two room configuration created with the configuration tool;

FIG. **6**C is a screenshot of a component inspector tool by which a user may view detailed information on a component or customize or configure a component;

FIG. **7** is a screenshot showing a configuration compilation for the configuration of FIG. **6**A and FIG. **6**B;

FIG. **8** is a screenshot showing a tool by which a user may customize services;

FIG. **9** is a functional block diagram of a metadata management facility which may be incorporated in the programmable multimedia controller of FIG. **1**;

FIG. **10** is a screenshot showing the graphical programming environment of FIG. **4** in which a user may create a component configuration or modify a user interface appearance or user profile using the configuration tool;

FIG. **11** is a flowchart showing the high level architecture of the software used to define and display a graphical user interface for the programmable multimedia controller of FIG. **1**;

FIG. **12** is a graphical programming environment showing a series of patches which are used to implement a graphical user interface for the programmable multimedia controller of FIG. **1**; and

FIG. **13** is a screenshot showing the graphically programmable attributes of a button for performing a "play" function.

## DETAILED DESCRIPTION OF AN ILLUSTRATIVE EMBODIMENT

FIG. **1** is a block diagram of a programmable multimedia controller **100**, interconnected to a number of devices, according to an illustrative embodiment of the present invention. The term "programmable multimedia controller" should be interpreted broadly as a device capable of controlling, switching data between, and/or interoperating with a variety of electronic devices, such as audio, video, telephony, data, security, motor-driven, relay-driven, and/or other types of electronic devices . . . . By interacting with these devices the programmable multimedia controller may implement an integrated multimedia control solution.

In the illustrative embodiment, the programmable multimedia controller **100** is connected to a wide range of audio/video components, for example, a compact disk (CD) player **105**, a digital versatile disc (DVD) player **110**, an audio/video receiver **115**, a television **120**, a personal media player **125**, speakers **122**, a microphone **123**, and/or a video camera **124**. The programmable multimedia controller may also be connected to telephony devices such as a telephone network **130** and telephone handsets **132**. The telephone network **130** may be a publicly switched telephone network (PSTN), an Integrated Services Digital Network (ISDN) or other communications network.

In addition, the programmable multimedia controller may intercommunicate with variety of light and/or home automation systems **135**. These devices may operate via the X10 protocol developed by Pico Electronics, the INSTEON™ protocol developed by SmartHome, Inc, the CEBus standard managed by the CEBus Industry Council, or another well known home automation or control protocol. Similarly the controller may be connected to motor and/or relay operated devices **137** that may include, for example, a heating, ventilation and air conditioning system (HVAC) system, an irrigation system, an automatic shade or blind system, an electronic door lock, or other types of devices.

A computer network, such as the Internet **140**, is connected to the multimedia controller. In addition, a personal computer (PC) **145**, video game systems **150**, home recording equipment **165** or other devices may also be connected. Further, one or more remote control units **170** may be provided to manage the controller's functionality, and/or to control devices connected to the controller. Such remote control units may be interconnected to the controller via a wired network connection, an infra-red link, a radio-frequency link, a Bluetooth™ link, a ZigBee™ link or another appropriate data connection. Examples of such remote control units include a touchscreen remote control **112**, a simple remote control **114**, which may be electromechanical, and an MP3 player or other device **116**.

FIG. **2** is a schematic block diagram showing a high-level hardware architecture of the programmable multimedia controller. The various components shown may be arranged on a "motherboard" of the controller, or on a plurality of cards interconnected by a backplane (not shown). A microcontroller **210** manages the general operation of the system. In the illustrative embodiment, the microcontroller is a 32-bit model MCF5234 microcontroller available from Freescale Semi-

conductor Inc. The microcontroller **210** is coupled to an audio switch **215** and a video switch **220** via a bus **218**. The audio switch **215** and the video switch **220** are preferably crosspoint switches capable of switching a number of connections simultaneously. However many other types of switches capable of switching digital signals could be employed, for example Time Division Multiplexing (TDM) switches.

A mid plane **235** interconnects the switches and other devices to a variety of input and output modules such as, for example, Digital Video Input Modules with HDMI 600, Video Output Modules with HDMI 1000, Digital Audio Input Modules 400, and Digital Audio Output Modules 900. The mid plane **235** is further coupled to an Ethernet switch **230** that permits switching of 10BaseT, 100BaseT or Gigabyte Ethernet signals. The Ethernet switch **230** interconnects Ethernet ports **232** and a processing subsystem **240** to the microcontroller **210**. In one embodiment, the processing subsystem **240** includes a plurality of small form factor general purpose personal computers that provide redundant operation and/or load balancing. In some embodiments, the processing subsystem **240** may include one or more storage devices, external to the personal computers, to provide expanded storage capacity, for example, to store digital media.

Also, a number of Universal Serial Bus (USB) ports **242** are interconnected to a USB hub **243** for interconnection to the processing subsystem **240**. A memory card interface **225** may also be connected to the USB hub **243**. The interface accepts one or more well known memory card formats, for example CompactFlash™ cards, Memory Stick™ cards, Secure Digital™ (SD) cards, or other formats. A USB switch **244** is employed to switch USB links among the multiple processing components that may be present. In a similar manner, a number of IEEE 1394 (FireWire™) ports **246** are interconnected to an IEEE 1394 hub **247** and to an IEEE 1394 switch **248**.

The microcontroller **210** is further connected to a Serial Peripheral Interface (SPI) and Inter-Integrated Circuit ($I^2C$) distribution circuit **250**, which provides a serial communication interface to relatively low data transfer rate devices. The SPI/$I^2C$ controller **250** is connected to the mid-plane connector **235** and thereby provides control commands from the microcontroller **210** to the modules and other devices in the programmable multimedia controller **100**. Further connections from SPI/$I^2C$ controller **250** are provided to devices such as a fan controller **251**, a temperature sensor **252** and a power manager circuit **253**, which manage the thermal characteristics of the system and prevent overheating.

The microcontroller **210** is also connected to Infra-Red (IR) interface **260**, an RS232 interface **265**, and an RF interface **267**, that permit interconnection with external devices. Such interaction permits programmable multimedia controller **100** to control external devices. In addition the interfaces may receive control signals that control the operation of the programmable multimedia controller itself. It is expressly contemplated that various other interfaces, including WI-FI, Bluetooth™, ZigBee™ and other wired and wireless interfaces, may be used with the multimedia controller **100**.

In addition, an Auxiliary Audio/Video Port **700** is provided for interconnecting one or more video game systems, camcorders, computers, karaoke machines or other devices. A telephone interface **270** is provided for connecting to the PSTN or a private network, and to telephone handsets. Further, a device control interface **275** is provided to communicate with lighting, home automation, and motor and/or relay operated devices. As discussed in more detail below, an expansion port **280** is provided for linking several programmable multimedia controllers together to form an expanded system. Finally, a front panel display **1150** permits presentation of status, configuration, and/or other information to a user. In one embodiment the from panel can display video data originating from any input source connected to the system, such that one may preview video content on the display. In another embodiment the front panel display **1150** includes a touchscreen, and a user may enter control selections by selecting icons on the screen.

FIG. **3** is a block diagram of the high-level software architecture of the controller **100**. The software architecture is organized as a series of planes including a system control plane **302**, a user interface (UI) plane **304**, a control application programming interface (API) access **306**, a service plane **308**, a media plane **310**, a component control plane **312** and a configuration/setup plane **314**.

System control plane **302** includes the functionalities of a system manager **316**, a system launcher **318**, a redundancy manager **320**, a web server **322**, a touchscreen/PDA server **324**, a remote system access manager **326** and system logs **328**. UI plane **304** shares a UI server **330** with service plane **308**. Service plane **308** includes the functionalities of a service controller **332** which itself includes an automator runtime **334**. Service plane **308** also includes the functionalities of a Mac display controller **336**, an on-screen display (OSD) application **338**, third party applications **340**, Mac applications **342** and an audio/video component controller **344**. Through automator runtime **334**, service controller **332** is capable of controlling Mac applications including iTunes, iChat, iPhoto and iDVD that support Applescript, which enables application-to-application control. Similarly, through automator runtime **334**, service controller **332** is capable of controlling other third party applications which support AppleScript.

Media plane **310** includes the functionality of Mac input/output (I/O) in all supported formats (i.e., DVI, Ethernet, FireWire™, USB, etc.). Component control plane **312** includes the functionality of controlling audio/video components **348**.

Configuration/setup plane **314** includes the functionalities of a user configuration tool **350**, a configuration compiler **352**, a user services control application **354**, a workflow generator **356** and a service control workflow browser/search engine/customization application **358**. Configuration/setup plane **314** also passes several types of information to UI plane **304** and service plane **308** including system configuration **360**, automator workflow **362**, services definitions **364**, component profiles **366** and Mac settings **368**. As described in the above-referenced co-pending application Ser. No. 11/314, 112, in a preferred embodiment, XML files are used to represent system configuration **360**, automator workflow **362**, services definitions **364** and component profiles **366**.

Control API access **306** has responsibility for an API through which multimedia controller **100** may be controlled by a user who may choose to use a web-enabled device, an RF remote control type device, a touchscreen, a PDA or cell phone. UI plane **304** has functional responsibility for a user interface to multimedia controller **100**. Service plane **308** has functional responsibility for implementing services as described above. Automator runtime **334** is responsible for receiving requests or commands from users and mapping them to a workflow for a particular service.

Media plane **310** has functional responsibility for Mac I/O as well as the other internal and external communications interfaces supported by multimedia controller **100**. Component control plane **312** has functional responsibility for controlling the operations of audio or video components which may be interfaced with multimedia controller **100**. Configu-

ration/setup plane **314** has functional responsibility for enabling users to configure multimedia controller **100**; to select, create or modify services; and to select, create or modify component profiles.

FIG. **4** is a screenshot showing how a user would use configuration tool **350** to begin to create a system configuration. Displayed on a screen in a graphical programming environment **400** are a configuration workspace **402**, a zone map **404** and a toolbar **406**. An icon labeled "Rosie" and denoted by reference number **410** represents a programmable multimedia controller **100** (FIG. **1**). An icon labeled "Room **1**" and denoted by reference number **412** represents a first zone, which may physically include one or more rooms, within the configuration.

To begin to create a configuration, a user clicks on the on the show palette button **408**. As shown in FIG. **5**, this action causes a palette of icons representing components in a component library **500** to appear. In this example, several models of flat panel televisions **502** are available in the component library **500** as are a digital surround receiver **504**, an HDMI switcher **506**, and numerous other components. A user may simply drag and drop icons from component library **500** to a desired zone within zone map **404**. Thus, through a series of such drags and drops, a user may specify all of the components which he or she has or wishes to install in a specified zone. To expedite the process, a user may access a menu **508** to display only a particular type of component (e.g., receivers, DVD players, speakers, cable TV converters, etc.) or a menu **510** to display only components made by a particular manufacturer.

After the user has dragged and dropped components into the zone map **404**, those components are dragged and dropped from the zone map **404** into workspace **402**. As each component dropped into workspace **402**, a box appears as shown in FIG. **6**A and FIG. **6**B. For example, box **602** represents a programmable multimedia controller **100** within graphical programming environment **400**. Similarly, box **604** represents a flat panel television. As shown, each box contains a photograph or other image of the physical component to which it corresponds, which provides a convenient visual reference for the user. In addition, each box contains text and graphics which identify all inputs, outputs and control ports present on the corresponding component. The text also identifies signal type, connector type and other pertinent information about each input, output and control port. The graphics include color coding which matches the colors that appear on the physical component.

Another aid which is provided to assist the user in configuration is a component inspector tool. As shown in FIG. **6**A and FIG. **6**B, a user may select a component of interest in zone map **404** and then click on a button labeled "Show Inspector" denoted by reference number **614**. In response, a screen **616** as shown in FIG. **6**C will appear. A menu **618** permits a user to examine detailed information on inputs, outputs, control ports and other aspects of the selected component. Through screen **616** a user may also configure (i.e., for components that require configuration such as programmable multimedia controllers, modular receivers having programmable input/output slots and the like) or customize the selected component.

Using a mouse, a user "draws" connections between the boxes (components) appearing in workspace **402**. These connections appear as lines such as line **606**, which represents a connection between an output of an amplifier **608** and a set of surround speakers **610**. Another way a user may make connections is to right click on a connector (displayed within a box) and cause a popup menu to open which displays information on what types of connectors are compatible, directly or by way of conversion, as well as those which are incompatible and then select the desired connection from that menu.

A user may click on a "Make Report" button denoted by reference number **616**. This action causes the underlying software to generate an output report which may contain detailed wiring instructions for the specified configuration, a summary of the components in the configuration, special instructions, user-entered notes and the like. The output report may serve a bill of materials, wiring checklist and installation instruction sheet.

Once a user has completed necessary connections, he or she clicks on a "Compile" button **612**. This action causes the underlying software to automatically analyze the specified configuration to determine which "services" the configuration is capable of performing ("realized services") and to identify other services that might be available if the configuration is modified. For a more detailed description regarding "services" as well as "resources" and "requests" as used herein, reference should be made to co-pending application Ser. No. 11/314,112.

As shown in FIG. **7**, a list of realized services **700** is displayed to the user. When selected with a mouse, a description of a realized service appears in a panel **704**. A user may disable any realized service by use of a checkbox **702**. A panel **706** displays all of the resources that are associated with the selected service. By clicking on a "Show Unrealized" button **708**, a user may view "unrealized services" which are services that might be provided if the specified configuration is modified. Viewing unrealized services is useful as a tool for debugging a configuration as well as optimizing component usage and user experiences for a given set of components.

Once a user is satisfied with the configuration and customization, he or she clicks on a "Generate" button **710**. This action causes the underlying software to create the actual system configuration for the programmable multimedia controller **100** and to display a screen like that shown in FIG. **8**. As shown in FIG. **8**, the requests associated with the realized service "TV Service" are displayed in a panel **800**. Within panel **800**, a user may customize a realized service by adding or deleting requests.

In addition to the uses described above, graphical programming environment **400** and configuration tool **350** may be used to configure individual components or devices which interface with programmable multimedia controller **100**. As shown in FIG. **10**, for example, a touchscreen remote control **1000** which is sold by the assignee of the present invention may be included in component library **500** (FIG. **5**). Once dragged and dropped into zonemap **404**, configuration tool **350** may be used to configure options specific to such a touchscreen including user interface appearance (i.e., theme and skin) and user profiles. Detailed information regarding user profiles may be found in co-pending application Ser. No. 11/314,112.

In accordance with another aspect of the present invention, programmable multimedia controller **100** may include a metadata management facility for collecting, organizing and distributing metadata within controller **100** as well as to user remote controls which are interfaced to controller **100**. FIG. **9** is a functional block diagram of a metadata management facility **900**. A metadata manager **902** is responsible for several functions including responding to requests for metadata received from a controller interface **902**, receiving new metadata from a data manager **904** or content source manager **916**, and passing new metadata to a storage manager **910**.

A data watcher **908** is responsible for monitoring all possible media sources for the introduction of new media. For

example, data watcher **908** detects the loading of a new CD into a CD player which is connected to the programmable multimedia controller **100**, the connection of an MP3 player to controller **100**, the insertion of a thumb drive into controller **100** and the like.

When data watcher **908** detects the presence of new media, it generates a notification to data manager **904**. Data manager **904** responds to such a notification by creating a media object which initially contains information regarding the file type, file path (if applicable) and the physical source of the new media. Data manager then forwards the media object to a data interpreter **906** which corresponds to the type of media detected (e.g., MP3 file). Data interpreter **906** works to extract as much metadata as possible from the new media source. For example, in the case of an MP3 file, data interpreter **906** may use the collect as much metadata as possible from the ID3 tag which is part of the file. All extracted metadata is encapsulated in an object and returned to data manager **904** which forwards it to metadata manager **902**.

In many cases, the new media source that was detected by data watcher **908** will not contain all metadata that exists for a particular song or album. In an effort to capture the missing metadata, metadata manager **902** may issue a request to content source manager **916** which, in turn, may access one or more content sources **914** which are external to programmable multimedia controller **100**. Content source **914** may represent a website or other remote information source which can be accessed over the Internet or other network. Additional metadata which content source manager **916** captures is returned to metadata manager **902** and eventually passed to storage manager **910** for storage.

Storage manager **910** has overall responsibility for storing, retrieving, updating or removing metadata in response to queries or messages received from metadata manager **902**. In one embodiment in which programmable multimedia controller **100** includes a Mac computer from Apple Computer, Inc., as described in detail in co-pending application Ser. No. 11/314,664, storage manager **910** may be implemented as a database containing stub files. Such files may be indexed and queried very efficiently using Spotlight, a metadata search engine included in Mac OS X.

Controller interface **912** is responsible for communications between metadata manager **902** and user controllers such as touchscreen remote control **112** (FIG. **1**). Controller interface **912** is also responsible for ensuring that all user controllers have access to the most current metadata. This may be accomplished by using rsync, a synchronization function, which is party of Mac OS X.

In accordance with another aspect of the present invention, a graphical user interface for use with programmable multimedia controller **100** is based on a software architecture which enables easy modification of the appearance, functionality or other attributes of the interface. FIG. **11** shows a software architecture **1100** for a graphical user interface. In a preferred embodiment in which a Mac computer is incorporated within programmable multimedia controller **100**, Adobe Photoshop® software, which is included in Mac OS X, is used to create files **1102**. A Photoshop® file **1102** is preferably created for each element or screen of a graphical user interface, like the screen shown in FIG. **13**, or for some other convenient unit up to and including an entire user interface.

Each Photoshop® file **1102** contains information, preferably organized in "groups" and "layers," which define the appearance, functionality and other attributes of each element of a graphical user interface. The information in a file **1102** may include notes, labels, text-to-speech commands, system control commands, graphics corresponding to different states of a radio button or other user control (e.g., enabled, pressed, mouseover), display text, font size, color, sound effect and button/control type among others.

Files **1102**, which are typically stored on non-volatile media such as a hard drive, are read **1104** by Quartz Composer, another piece of software which is also included within Mac OS X, and a run-time environment that loads Quartz Composer compositions. Quartz Composer functions to parse Photoshop® files **1102**, thereby extracting all of the embedded groups and layers for the whole file, as well as for each radio button or other control.

Quartz Composer "patches" access the extracted information and, using a Quartz Composer function called "output ports", pass appropriate commands and information from a patch to control API access **306** (FIG. **3**) and user interface (UI) server **330**. This arrangement provides a powerful programming capability because it permits an author of a Quartz Composer composition direct access to multiple layers of graphics as well as any other information stored in a file **1102**. Stated another way, by simply altering the information contained in a file **1102**, an author, using widely available and familiar software, may easily and rapidly configure, modify or customize any aspect of the graphical user interface represented by that file.

In response to commands and information received from patches via output ports, control API access **306** and UI server **330** issue appropriate commands and information to service controller **332** (FIG. **3**). Service controller **332**, in turn, issues appropriate commands to external components **1106** to effect whatever action a user has indicated through the graphical user interface.

FIG. **12** shows a on-screen display **1200** of a series of Quartz Composer patches. A Photoshop® file **1102** is passed to an input of an "Import" patch **1202**. Import patch **1202** produces several outputs one of which is the extracted Photoshop® file ("outputPSfile") and the names of all of the buttons present in file **1102** ("outputAllButtonNames"). The extracted Photoshop® file is passed to four LayersFromFile patches **1204**. Multiple outputs of each of patches **1204** are passed, respectively, to four Structure Key Member patches **1206**.

An output from one of patches **1206** is passed to Say Text patch **1210**, which performs a text-to-speech function. Similarly, an output from another patch **1206** is passed to Send Service Request to SVC patch **1212**, which is responsible for sending appropriate commands and data to service controller **332**. The output of a third one of patches **1206** is passed to Image With String patch **1214**, which converts text (extracted from file **1102**) to an image for display. The output of the remaining patch **1206** is passed to a Display patch **1216** which is responsible for displaying a radio button.

FIG. **13** is a screenshot of a graphical programming environment **1300** in which a graphical user interface **1302** for an audio or video component is shown. In area **1304** of environment **1300**, the programmable "layers" of functionality and attributes of a "Play" button **1306** are shown. During runtime, when a Photoshop® file corresponding to button **1306** is loaded and a Quartz Composer patch requests the "Command" layer, the result will be the associated audio or video component will be commanded to play.

The foregoing description has been directed to particular embodiments of this disclosure. It will be apparent, however, that other variations and modifications may be made to the described embodiments, with the attainment of some or all of their advantages. Additionally, the procedures or processes described above may be implemented in hardware, software,

embodied as a computer-readable medium having program instructions, firmware, or a combination thereof. Therefore, it is the object of the appended claims to cover all such variations and modifications as come within the true spirit and scope of the invention.

What is claimed is:

1. A method of configuring a system which includes a programmable multimedia controller comprising the steps of:

providing a graphical programming environment;

creating a library of components which are available for inclusion in a system, each of the components having an associated component profile which contains information regarding the component's capabilities;

selecting, by a user, a plurality of components for inclusion in said system from said library of components and placing the selected components in a workspace of the graphical programming environment; and

using the graphical programming environment, by the user, to draw connections between particular ones of the selected components, and from particular ones of the selected components and a programmable multimedia controller, to interconnect the selected components with the programmable multimedia controller in a desired configuration, wherein the programmable multimedia controller is arranged to control the selected components.

2. The method of claim **1** further comprising the step of:

determining realized services that the programmable multimedia controller is capable of providing to a user based on the selected components and the desired configuration; and

displaying a list of the realized services to the user.

3. The method of claim **2** further comprising the step of:

identifying unrealized services that would be available if the desired configuration was modified; and

displaying an indication of the unrealized services to the user.

4. The method of claim **3** further comprising the step of:

modifying the desired configuration, thereby enabling one or more of the unrealized services to become realized services.

5. The method of claim **2** wherein each realized service is associated with one or more requests and the method further comprises the step of:

customizing a particular realized service by adding or deleting one or more requests associated with the particular realized service.

6. The method of claim **2** further comprising the step of:

selectively disabling one or more of the realized services in response to user input.

7. The method of claim **1** further comprising the step of:

generating wiring instructions in response to the selected components and the desired configuration.

8. The method of claim **1** further comprising the step of:

generating a bill of materials in response to the selected components and the desired configuration.

9. The method of claim **1** wherein the selecting the plurality of components for inclusion in the system comprises dragging and dropping the selected components from the library of components onto a workspace.

10. The method of claim **1** wherein selecting the plurality of components for inclusion in the system comprises associating each of the selected components with one or more zones, wherein each zone corresponds to one or more rooms in a structure.



11. The method of claim **1** wherein at least some of the components in the library of components correspond to physical components and the method further comprises the step of:

displaying an image of a corresponding physical component for at least some of the selected components.

12. The method of claim **1** wherein at least some of the components in the library of components correspond to physical components and are represented by a display including inputs, outputs and control ports provided by a corresponding physical component.

13. The method as in claim **1** wherein only a user-selected type of component in the library of components is displayed in the graphical programming environment.

14. The method of claim **1** further comprising the step of:

in response to selection of two or more particular components, graphically indicating possible interconnections between the particular components.

15. The method of claim **1** wherein at least some of the selected components include one or more connectors and the method further comprises the step of:

in response to selection of a particular connector, displaying information regarding permissible or impermissible connections for the particular connector.

16. The method of claim **1** wherein the selected components comprise audio/video components.

17. An apparatus for configuring a system which includes a programmable multimedia controller comprising:

a memory configured to store a library of components which are available for inclusion in a system, each of the components having an associated component profile which contains information regarding the component's capabilities; and

a processor configured to execute a graphical programming environment, the graphical programming environment including:

a workspace into which a plurality of selected components from the library are placed to indicate their inclusion in the system,

a drawing tool configured to draw desired connections between particular ones of the selected components, and from particular ones of the selected components and a representation of the programmable multimedia controller, to create a desired configuration, and

a configuration compiler configured to determine realized services that the programmable multimedia controller is capable of providing to a user based on the selected components and the desired configuration, and to display a list of the realized services to the user.

18. The apparatus of claim **17** wherein the configuration compiler is further configured to identify unrealized services that would be available if the desired configuration was modified and to display an indication of the unrealized services to the user.

19. The apparatus of claim **17** wherein each service of the list of realized services is associated with one or more requests and the configuration compiler is further configured to permit customization of a particular realized service by addition or deletion of one or more requests associated with the particular realized service.

20. The apparatus of claim **17** wherein the graphical programming environment further includes a report making tool operable to generate wiring instructions in response to the selected components and the desired configuration.

21. The apparatus of claim **17** wherein the graphical programming environment further includes a report making tool

operable to generate a bill of materials in response to the selected components and the desired configuration.

**22**. The apparatus of claim **17** wherein the graphical programming environment further includes a zone mapping tool operable to associate each of the selected components with one or more zones that correspond to one or more rooms in a structure.

**23**. The apparatus of claim **17** wherein the workspace is configured to display, in response to selection of two or more particular components, a graphical indication of possible interconnections between the particular components.

**24**. The apparatus of claim **17** wherein at least some of the selected components include one or more connectors and the workspace is configured to display, in response to selection a particular connector, information regarding permissible or impermissible connections for the particular connector.

**25**. The apparatus of claim **17** wherein the selected components comprise audio/video components.

**26**. A computer readable medium storing program instructions for execution on a processor, the program instructions operable to:

display at least a portion of a library of components that are available for inclusion in a system, each of the components having an associated component profile which contains information regarding the component's capabilities;

display a workspace into which a plurality of selected components from the library are placed to indicate their inclusion in a system;

provide a tool for drawing desired connections between particular ones of the selected components, and from particular ones of the selected components and a representation of a programmable multimedia controller, to create a desired configuration;

determine realized services that the programmable multimedia controller is capable of providing based on the selected components and the desired configuration; and

display an indication of the realized services.

**27**. The computer readable medium of claim **26**, wherein the program instructions are further operable to:

identify unrealized services that would be available if the desired configuration was modified; and

display an indication of the unrealized services.

**28**. A method of configuring a system which includes a programmable multimedia controller comprising the steps:

displaying at least a portion of a library of components that are available for inclusion in the system, at least some of the components corresponding to a physical component, and each of the components having an associated component profile which contains information regarding the component's capabilities;

displaying a workspace into which a plurality of selected components from the library are placed to indicate their inclusion in the system;

providing a tool for a user to draw desired connections between particular ones of the selected components, and from particular ones of the selected components and a representation of a programmable multimedia controller, to create a desired configuration for the system;

determining, by a processor, realized services that the programmable multimedia controller is capable of providing based on the selected components and the desired configuration; and

displaying an indication of the realized services.

**29**. The method of claim **28** further comprising the step of:

providing one or more of the realized services by the programmable multimedia controller.

**30**. The method of claim **29** wherein the step of providing further comprises the steps of:

detecting an introduction of new media;

extracting first metadata descriptive of the new media from a source of the new media;

accessing a content source external to the programmable multimedia controller and obtaining second metadata descriptive of the new media from the content source external to the programmable multimedia controller; and

storing the first and second metadata.

**31**. The method of claim **30** wherein the content source external to the programmable multimedia controller is accessible over the Internet.

**32**. The method of claim **28** further comprising the step of:

providing a graphical user interface of the programmable multimedia controller for utilizing the realized services.

**33**. The method of claim **32** wherein the step of providing further comprises the steps of:

accessing a graphics file containing a plurality of layers, wherein each layer includes information that defines an attribute of one or more graphic elements or user controls for a programmable multimedia controller;

extracting the information from the plurality of layers; and

rendering the graphic elements and user controls from the extracted information.

* * * * *

EXHIBIT 702

US008619950B1

(12) **United States Patent**
**Feldstein et al.**

(10) **Patent No.: US 8,619,950 B1**
(45) **Date of Patent: Dec. 31, 2013**

(54) **VIDEO AND DIGITAL AUDIO TRANSPORT**

(75) Inventors: **George Feldstein**, Cresskill, NJ (US); **Mark LaBosco**, New City, NY (US); **Krunoslav Estaban Draganovic**, Upper Nyack, NY (US); **Alexander J. Marra**, Hoboken, NJ (US)

(73) Assignee: **Crestron Electronics Inc.**, Rockleigh, NJ (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 929 days.

(21) Appl. No.: **12/728,381**

(22) Filed: **Mar. 22, 2010**

**Related U.S. Application Data**

(63) Continuation of application No. 10/707,023, filed on Nov. 14, 2003, now abandoned.

(51) **Int. Cl.**
***H04M 11/00*** (2006.01)

(52) **U.S. Cl.**
USPC .................. **379/93.01**; 379/88.13; 379/93.11; 379/93.08

(58) **Field of Classification Search**
USPC ........ 379/88.13, 93.11, 93.01, 93.08, 221.07, 379/326
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 7,065,190 B2 * | 6/2006 | Gershfeld | .................. | 379/93.01 |
| 2003/0169374 A1 * | 9/2003 | Cole et al. | ..................... | 348/621 |
| 2003/0201802 A1 * | 10/2003 | Young | .......................... | 327/108 |

* cited by examiner

*Primary Examiner* — Duc Nguyen
*Assistant Examiner* — Yosef K Laekemariam
(74) *Attorney, Agent, or Firm* — Crestron Electronics Inc.

(57) **ABSTRACT**

A video and digital audio transport system transports high resolution computer, video, computer video graphics and other video signals, as well as multiple channels of high quality audio, over extended lengths of unshielded twisted pair (UTP) cabling. Frequency compensation techniques are employed to extend the bandwidth of the UTP cables, and differential signaling over the common mode of a first two of the four twisted pairs comprising the UTP cable is used to transmit horizontal sync and differential signaling over the common mode of a second two of the four twisted pairs is used to transmit vertical sync. In addition, a unique digital encoding technique is applied to a standard digital audio encoding protocol to augment the number of available audio channels. A digitally controlled delay line is incorporated to compensate for the different lengths of each twisted pair.

**1 Claim, 4 Drawing Sheets**




10
11a
UTP CABLE
(CAT5E, etc.)
12a
13
UTP CABLE
(CAT5E, etc.)
14a
16
RGB-HV
VIDEO
AUDIO
QM
TRANSMITTER
UNIT
11b
12b
CROSS-POINT
MULTIPLEXER
X
QM
RECEIVER
RGB-HV
VIDEO
AUDIO
AUDIO
DISPLAY or
PROJECTOR
11c
12c
QM
RECEIVER
RGB-HV
VIDEO
AUDIO
AUDIO
Etc.
Etc.
14b
LOCAL AUDIO OUTPUTS
LOCAL AUDIO INPUTS
15

FIGURE 1


11a
17
20
RGB-HV
21
VIDEO
22
VIDEO SWITCH
RGB-HV or VIDEO
H and V SYNC
DIFFERENTIAL TRANSMITTERS
UTP CABLE to QM RECEIVER
AUDIO
AUDIO
AUDIO
AUDIO SWITCH
4 or MORE
AUDIO ENCODING
POWER
CONTROL
23
18
19

FIG. 2


24
14a
26
27
16
RGB-HV and VIDEO
FREQUENCY COMPENSATION
DELAY DIFFERENCE CORRECTION
VIDEO, RGB-HV and SYNC BUFFER
SWITCH
RGB HV to DISPLAY
VIDEO to DISPLAY
S-VIDEO to DISPLAY
Etc.
DISPLAY or PROJECTOR
DIGITAL CONTROL
DIGITAL CONTROL
UTP CABLE from QM SOURCE
DIFFERENTIAL RECEIVERS
H and V SYNC
FREQUENCY COMPENSATION
AUDIO DECODING
AUDIO SWITCH and MIXER
AUDIO
AUDIO
AUDIO
AUDIO
DIGITAL CONTROL
2
29

FIG. 3



COMMON MODE
INJECTION POINT
51
30a
VIDEO A
SYNC
VIDEO B
52
53a
53b
To
TWISTED
PAIR 1
To UTP
CABLE
To
TWISTED
PAIR 2
30b


FIG. 4



32a
31a
UTP PAIR
DFFERENTIAL MODE
RECOVERED (VIDEO A)
COMMON MODE
RECOVERED (SYNC)
COMMON MODE
RECOVERED
31c
UTP PAIR
DFFERENTIAL MODE
RECOVERED (VIDEO B)
31b
32b


FIG. 5


60
VIDEO IN
61
G=2
1ns
1ns
1ns
G=2
4ns
4ns
4ns
BINARY
CONTROL
4 X 1
MUX
63a
63b
62
BINARY
CONTROL
DELAYED
VIDEO OUT

FIG. 6

# VIDEO AND DIGITAL AUDIO TRANSPORT

## CROSS REFERENCE TO RELATED APPLICATIONS

This application is a substitution of U.S. patent Ser. No. 10/707,023 filed Nov. 14, 2003.

## STATEMENT REGARDING FEDERALLY SPONSORED RESEARCH OR DEVELOPMENT

Not Applicable

## PARTIES TO A JOINT RESEARCH AGREEMENT

Not Applicable

## BACKGROUND OF THE INVENTION

1. Technical Field

The present invention relates to an apparatus and method for transmitting audio and video signals over extended lengths of unshielded twisted pair cable.

2. Description of Related Art Including Information Disclosed Under 37 CFR 1.97 & 1.98

The prior art includes various transmission and receiving units for audio and visual signals. The combination of the unique systems of this invention to transport audio and visual signals over unshielded twisted pair cable is not believed to have been disclosed in the prior art.

More specifically, the prior art includes U.S. Pat. No. 7,064,190 to Gershfeld and Pat. Pub. 2003/0201802 to Young. However, both Gershfeld and Young distincty teach against transmitting synchronization signals wherein the first and second synchronization signals act as a differential signal across the common mode of the first and second pairs of the four twisted wire pairs and the common mode of said third and fourth pair of the four twisted pairs, respectfully. For example, Young teaches about a third common mode differential signal, that such a signal is "slower in speed", but still "may be useful for a number of things". Although Young lists specific possible uses for such a differential signal, including handshaking control, flow control, status, and functions not requiring a high-speed data rate; (real time) video synchronization is notably absent from this list.

Furthermore, Young teaches that the common mode differential signal (across two other differential data signals) can be used to transmit data when the "three data signals . . . do not have to be synchronized with each other". In stark contrast, the instant invention requires that both the first and second synchronization signals are tightly synchronized with the associated video information in order to produce an acceptable display.

This need to maintain close synchronization between the synchronization signals (i.e., horizontal and vertical sync) is inherently taught in Gershfeld where the horizontal sync is superimposed onto the green video signal and the vertical sync is superimposed onto the red video signal. On the other hand, the instant invention completely separates the synchronization signals from the associated video content.

Applicants' inventive video transport system comprises a transmit unit adapted to transmit first and second synchronization signals across the common modes of four twisted wire pairs. Synchronization signals by their nature are time sensitive signals. It would not be intuitive to one skilled in the art to transmit such signals on time skewed transmission paths, such as the common mode of twisted pairs.



The unique systems of applicants' invention to transport audio and visual signals over unshielded twisted pair cable is not believed patentable over the known prior art. Furthermore, the invention is not rendered obvious by any combination of multiple references from analogous fields.

## SUMMARY OF INVENTION

It is to be understood that both the general and detailed descriptions that follow are exemplary and explanatory only and are not restrictive of the invention.

## DISCLOSURE OF INVENTION

According to a first aspect, the present invention provides a system for transporting video signals and digital audio signals over extended lengths of a communication cable having four twisted wire pairs. This video and digital audio transport system includes a transmitter unit which processes input video and audio signals and a receiver unit which receives a first, second, and third video component signals and the digital audio signal from the communication cable. The transmitter unit transmits a first video component signal on a first twisted wire pair, a second video component signal on a second twisted wire pair, a third video component signal on a third twisted wire pair, and a digital audio signal on a fourth twisted wire pair. The transmitter unit transmits a first synchronization signal as a differential across the common mode of first twisted wire pair and the common mode of the second twisted wire pair. The transmitter unit also transmits a second synchronization signal as a differential across the common mode of third twisted wire pair and the common mode of the fourth twisted wire pair. The receiver unit processes the first, second, and third video component signals and the digital audio signal, recovers the first and second synchronization signals, and provides outputs to video and audio devices.

## BRIEF DESCRIPTION OF DRAWINGS

The above description illustrates the objects and advantages of the invention and it may be more clearly seen when viewed in conjunction with the accompanying drawings wherein:

FIG. **1** is a schematic illustration of a video and digital audio transport system in accordance with an illustrative embodiment of the present invention.

FIG. **2** shows a transmitter unit suitable for processing input video and audio signals for transmission over unshielded twisted pair cable.

FIG. **3** shows a receiver unit suitable for processing signals received over unshielded twisted pair cable and providing output video and audio signals to video and audio devices.

FIG. **4** shows an inventive circuit suitable for the differential encoding of horizontal and vertical sync signals as common mode signals on two (2) of the four (4) twisted pairs within an unshielded twisted pair cable.

FIG. **5** shows an inventive circuit for decoding the differentially encoded horizontal and vertical sync common mode signals of FIG. **4**.

FIG. **6** shows an inventive passive digitally controlled delay compensation line suitable for correcting the timing differences due to unequal electrical lengths of the four (4) twisted pairs within an unshielded twisted pair cable

## LIST OF REFERENCE NUMBERS FOR THE MAJOR ELEMENTS IN THE DRAWING

The following is a list of the major elements in the drawings in numerical order.

| | |
|---|---|
| 2 | audio decoding module (p/o receiver unit 14a); |
| 10 | video and digital audio transport system; |
| 11a | (first) transmitter unit; |
| 11b | (second) transmitter unit; |
| 11c | (third) transmitter unit; |
| 12a | (first) unshielded twisted pair cable (connected to 11a); |
| 12b | (second) unshielded twisted pair cable (connected to 11b); |
| 12c | (third) unshielded twisted pair cable (connected to 11c); |
| 13 | cross-point switch; |
| 14a | (first) receiver unit; |
| 14b | (second) receiver unit; |
| 15 | local audio outputs (from cross-point switch 13); |
| 16 | video display (driven from first receiver unit 14a); |
| 17 | video selector switch (p/o transmitter unit 11a); |
| 18 | audio selector switch (p/o transmitter unit 11a); |
| 19 | audio encoding module (p/o transmitter unit 11a); |
| 20 | system transmitter module (p/o transmitter unit 11a); |
| 21 | three component video signal; |
| 22 | (other) video signals; |
| 24 | differential receiver module (p/o receiver unit 14a); |
| 26 | video delay compensation line (p/o receiver unit 14a); |
| 27 | video buffers (p/o receiver unit 14a); |
| 29 | audio switch and mixer module (p/o receiver unit 14a); |
| 29 | audio switch and mixer module (p/o receiver unit 14a); |
| 30a | first differential line driver; |
| 30b | second differential line driver; |
| 31a | (first) differential receiver; |
| 31b | (second) differential receiver; |
| 31c | third differential receiver; |
| 32a | (first) termination network; |
| 32b | (second) termination network; |
| 51 | common mode injection point (of first differential line driver 30a); |
| 52 | differential sync driver; |
| 53a | (first) twisted pair (of UTP cable); |
| 53b | (second) twisted pair (of UTP cable); |
| 61 | video input line; |
| 62 | video output line; |
| 63a | (first) binary controlled multiplexer; |
| 63b | (second) binary controlled multiplexer. |

## DETAILED DESCRIPTION OF THE INVENTION

Referring to FIG. **1** of the drawings, the invention relates to a video and digital audio transport system **10** for transporting high resolution computer video as well as multiple channels of high quality audio over extended lengths of unshielded twisted pair (UTP) cable having four twisted cable pairs, including for example CAT5E, CAT6, and other types of local area network (LAN) cables. The system **10** comprises one or more transmitter units **11***a-c*, where each transmitter unit is coupled to an associated media source or computer (not shown). In an example embodiment, these inputs are labeled “RGB”, “video”, and “audio”. Each of the transmitter units **11***a-c* is suitable for processing input video and audio signals for transmission over the UTP cable.

The output signal, from each of the transmitter units **11***a-c*, is fed over a corresponding unshielded twisted pair (UTP) cable **12***a-c* to a cross-point switch **13** which provides an output signal to each of several receiver units **14***a-b* as well as local audio outputs **15**. Most embodiments of the present invention include multiple transmitter units connected to respective inputs of cross-point switch **13** and multiple receiver units connected to respective outputs of cross-point switch **13**.

The first receiver unit **14***a* presents a set of signals to video display **16**, which may for example be a video projector. Other receiver units, such as the second receiver unit **14***b*, perform similar video signal output functions. Each of the receiver units **14***a-c* is suitable for processing signals received over the UTP cable and providing output video and audio signals to video and audio devices.

FIG. **2** shows further details of a first transmitter unit **11***a*, in accordance with the present invention. Transmitter unit **11***a* comprises a high bandwidth video selector switch **17** and an audio selector switch **18**. The audio selector switch **18** also incorporates a line level interface. An audio encoding module **19** creates an enhanced form of the industry standard “Sony/Philips Digital Interconnect Format” (SPDIF) format which is modified to include multiple audio channels in accordance with the present invention.

An incoming three component video signal **21**, such a ‘red’, ‘green’, and ‘blue’ (RGB) video signal including horizontal (H) and vertical (V) synchronization, and other video signals **22** are fed to the video selector switch **17**. The program audio **23** is selected at audio selector switch **18** and then fed to the audio encoding module **19**.

The system transmitter module **20** transmits the video component information, such as for example RGB, or brightness, blue-difference, and red-difference (YPbPr), over three (3) of the four (4) twisted pairs of the UTP cable. The digital audio signal is transmitted over the remaining fourth pair of the UTP cable. According to the present invention, each video synchronization signal is transmitted differentially using common mode signaling over two (2) of the four (4) twisted pairs. Thus, four twisted pairs provide two differential pathways to transport both horizontal (H) and vertical (V) synchronization information.

FIG. **3** shows further details of a first receiver unit **14***a*, in accordance with the present invention. Receiver unit **14***a* comprises a differential receiver module **24** which transforms and conditions incoming differential video signals, differential common mode sync signals, and digital audio stream into a set of single-ended signals suitable for decoding and video and audio routing. The receiver unit **14***a* also comprises a digitally controllable frequency compensation circuit for video/audio signals followed by a high bandwidth video delay compensation line **26** for the video signals and the audio decoding module **2** for the audio. The necessary video buffers **27** are provided to present the video signals to a video display **16**. The decoded audio signal is fed to an audio switch and mixer module **29**, amplified, and output as audio and speech audio.

In an illustrative embodiment, each receiver unit includes a digital audio processor, a mixer, and an audio amplifier and is designed to combine multiple audio channels into left, right, and speech outputs.

The transmission of component video signals in combination with synchronization signals using a differential injection onto the common mode of two of the video (or digital audio) pathways is shown in FIG. **4**. As shown, first differential line driver **30***a* has a common mode injection point **51**, and second differential line driver **30***b* also has a common mode injection point. By applying the two output phases of a differential sync driver **52** to the two differential line drivers **30***a* and **30***b*, the sync information is transported over the twisted pairs **53***a* and **53***b* to the UTP cable, according to a unique method of present invention.

In order to recover the differentially transmitted common mode synchronization signals, the arrangement shown in FIG. **5** is applied. Termination networks **32***a*, **32***b* are used to properly terminate the differential twisted pairs as well as establish a specific common mode impedance between them. Differential receivers **31***a*, **31***b* provide common mode signal recovery and frequency compensation. A third differential receiver **31***c* recovers the common mode sync information. In one embodiment, the frequency compensation consists of a

digitally controlled multi-pole "peaking" circuit which compensates for the cable attenuation as described in the following equation:

$$\text{Maximum Attenuation Cable}(db/100m)=0.2*(1.967*\text{Sqrt}(f)+0.023*f+0.05/\text{Sqrt}(f)); \quad \text{EQ. 1}$$

where f is the frequency from 0.772 to 200 MHz. The frequency response shown is typical of CAT 5E cable, manufactured by Belden, Inc.

The present invention corrects timing differences that are due to unequal electrical lengths of the UTP cable using a high bandwidth video delay compensation line **26**, as described above. In a preferred embodiment, this high bandwidth video delay compensation line **26** is implemented as a digitally controlled passive delay line circuit. The main features of this digitally controlled delay line circuit are revealed in FIG. **6**.

The input video signal on video input line **61** is delayed by a predetermined amount to provide a delayed video signal on video output line **62**. The 'delay time' is determined by lumped time constants which are switched in and out of the circuit by the binary controlled multiplexers **63***a* and **63***b*. Advantageously, this allows for the present invention to correct the timing differences due to unequal electrical lengths of the twisted pairs of the UTP cable.

In a preferred embodiment, each of the receiver units **14***a-b* includes a microprocessor that allows the frequency and delay line compensations to be controlled by using pre-calibrated presets, where each of these presets is based on the UTP crosspoint path selected (i.e. from each particular transmitter unit to each particular receiver unit).

The video and digital audio transport system, as shown in FIG. **1**, is designed to transmit at least three (3) high quality audio channels across one (1) of the four (4) twisted pairs within the UTP cable. In order to accomplish this, the audio is digitized, preferably at a sampling rate of at least 44 kHz and a sampling resolution of at least 16 bits.

According to the invention, multiple channels of audio are transmitted utilizing Time Division Multiplexing (TDM). As a result, the data rate on the UTP cable is increased in proportion to the number of transmitted audio channels, which include both data and clock information. Those skilled in the art are aware of several line coding techniques that may seem appropriate to accomplish this. For example, SPDIF is an industry standard that uses biphasic coding to send clock and data information and it is desirable to use such a standard format because both transmitters and receivers are readily available.

However, the SPDIF protocol, when used to send normal data, allows for transmission of only two audio channels. Therefore, it was necessary to develop an inventive mechanism to increase the number of audio channels that can be transmitted using a 'SPDIF-like' protocol.

There are two aspects to increasing the number of audio channels that can be transmitted using a SPDIF-like protocol: data rate and framing method. As the number of audio channels increase, the data rate must increase proportionally (i.e. sending more data while preserving the audio sampling rate). Standard SPDIF components are available with data transmission rates of both 96 kHz and 192 KHz. Therefore, we have determined that increasing the data rate only requires the choice of a higher speed standard SPDIF component.

The present invention uses a 'framing' method to indicate where in an SPDIF serial data stream each audio channel starts and ends. In a first embodiment, certain low order audio bits are used to create a framing pattern within the data stream. Advantageously, since these low order bits have very little weight, they can be manipulated to provide framing information with little overall effect on the audio quality.



In a second embodiment, several overhead bits that are offered by the SPDIF protocol are manipulated to generate a framing pattern. One of the SPDIF overhead signals is called the 'user bit'. This user bit is sampled and sent along with every audio sample. In certain embodiments of the present invention, a framing pattern is generated by changing the state of the user bit at the beginning of a frame.

With either embodiment, the SPDIF transmitter and receiver pair will faithfully transport and recreate a usable audio framing pattern at the destination. Once recreated at the destination, the serial data stream can be framed and each channel identified. Accordingly, the present invention allows for the transmission of three (3) or more audio channels across one (1) of the four (4) twisted pairs within a UTP cable

## INDUSTRIAL APPLICABILITY

To solve the aforementioned problems, the present invention is a unique system that includes at least one QM transmitter unit which supplies signals over UTP cable or the equivalent to switching means which feed signals to a QM receiver and then to a display device and/or audio device.

## LIST OF ACRONYMS USED IN THE DETAILED DESCRIPTION OF THE INVENTION

The following is a list of the acronyms used in the specification in alphabetical order.

| | |
|---|---|
| B | blue (video component) |
| CAT5 | category 5 cable (5th generation of standard Ethernet cabling) |
| CAT5E | category 5E cable (enhanced version of category 5 cable) |
| CAT6 | category 6 cable (6th generation of standard Ethernet cabling) |
| dB | decibel |
| f | frequency |
| G | green (video component) |
| kHz | kilohertz |
| LAN | local area network |
| m | meter |
| MHz | megahertz |
| Pb | blue-difference (B-Y) (video component) |
| Pr | red-difference (R-Y) (video component) |
| QM | Quick Media (Crestron brand name) |
| R | red (video component) |
| SPDIF | Sony/Philips Digital Interconnect Format |
| Sqrt | square root (mathematical function) |
| TDM | time division multiplexing |
| TIA/EIA | Telecommunications Industry Association and the Electronics Industry Association |
| UTP | unshielded twisted pair |
| Y | brightness (video component) |

While the invention has been explained by a detailed description of certain specific embodiments, it is understood that various modifications and substitutions can be made in any of them within the scope of the appended claims, which are intended also to include equivalents of such embodiments.

What is claimed is:

**1**. A video and digital audio transport system for transporting video signals and digital audio signals over extended lengths of a communication cable having four twisted wire pairs, said system comprising:

(a) a transmitter unit which processes input video and audio signals, said transmitter unit further comprising;

(i) a first differential driver adapted to transmit a first video component signal on a first one of said four twisted pairs of said communication cable,

(ii) a second differential driver adapted to transmit a second video component signal on a second one of said four twisted pairs of said communication cable,

(iii) a third differential driver adapted to transmit a third video component signal on a third one of said four twisted pairs of said communication cable,

(iv) a fourth differential driver adapted to transmit a digital audio signal on a fourth one of said four twisted pairs of said communication cable,

(v) a fifth differential driver adapted to transmit a first synchronization signal as a differential signal across the common mode of said first one of the four twisted wire pairs and the common mode of said second one of the four twisted wire pairs, and

(vi) a sixth differential driver adapted to transmit a second synchronization signal as a differential signal across the common mode of said third one of the four twisted wire pairs and the common mode of said fourth one of the four twisted wire pairs;

(b) a receiver unit which receives the first, second, and third video component signals and the digital audio signal from the communication cable, said receiver unit further comprising

(i) a digitally controllable high bandwidth passive delay compensation line for equalizing the transmission delays of the first, second, and third video component signals,

(ii) a microprocessor adapted to digitally control said delay compensation line in accordance with a plurality of pre-calibrated presets,

(iii) a first termination network and a corresponding first differential receiver connected to the first one of said four twisted wire pairs of said communication cable,

(iv) a second termination network and a corresponding second differential receiver connected to the second one of said four twisted wire pairs of said communication cable,

(v) a third termination network and a corresponding third differential receiver connected to the third one of said four twisted wire pairs of said communication cable,

(vi) a fourth termination network and a corresponding fourth differential receiver connected to the fourth one of said four twisted wire pairs of said communication cable,

(v) a fifth differential receiver connected across the common mode outputs of said first and second differential receivers, and being adapted to

(A) recover the differential mode signal representing the corresponding first synchronization signal, and

(viii) a sixth differential receiver connected across the common mode outputs of said third and fourth differential receivers, and being adapted to

(A) recover a differential mode signal representing the corresponding second synchronization signal;

(c) a cross-point switch having a plurality of inputs and a plurality of outputs, wherein

(i) each one of said plurality of inputs is configured to accept inputs from a corresponding transmitter unit; and

(ii) each one of said plurality of outputs is configured to provide outputs to a corresponding receiver unit; and

(d) wherein each of said plurality of pre-calibrated presets has a value determined by a particular cross-point path being selected.

* * * * *

EXHIBIT 703

US008199113B2

(12) **United States Patent**
**Madonna et al.**

(10) **Patent No.:** **US 8,199,113 B2**
(45) **Date of Patent:** **Jun. 12, 2012**

(54) **PROGRAMMABLE ON SCREEN DISPLAY AND REMOTE CONTROL**

(75) Inventors: **Robert P. Madonna**, Osterville, MA (US); **Kevin C. Kicklighter**, Centerville, MA (US); **Gerald W. Shields**, Wilton, NH (US); **Michael C. Silva**, East Sandwich, MA (US); **Michael E. Noonan**, Sandwich, MA (US)

(73) Assignee: **Savant Systems, LLC**, Hyannis, MA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 919 days.

(21) Appl. No.: **11/687,458**

(22) Filed: **Mar. 16, 2007**

(65) **Prior Publication Data**

US 2008/0158148 A1 Jul. 3, 2008

**Related U.S. Application Data**

(63) Continuation-in-part of application No. 11/520,215, filed on Sep. 13, 2006, now Pat. No. 7,930,644.

(51) **Int. Cl.**
***G06F 3/02*** (2006.01)
***H04N 5/50*** (2006.01)
***H03K 17/94*** (2006.01)

(52) **U.S. Cl.** ........... **345/172**; 345/169; 348/734; 341/22

(58) **Field of Classification Search** .................. 345/156, 345/168–169, 172–173, 184; 348/734; 341/21–23
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

5,450,079 A * 9/1995 Dunaway ........................ 341/23
6,266,098 B1 7/2001 Cove et al.
6,313,880 B1 * 11/2001 Smyers et al. ................ 348/552
6,469,633 B1 * 10/2002 Wachter ................... 340/825.69
7,330,189 B2 * 2/2008 Nichogi et al. ............... 345/589
2003/0035010 A1 2/2003 Kodosky et al.
2003/0088852 A1 5/2003 Lacas et al.
2003/0103088 A1 * 6/2003 Dresti et al. .................. 345/835
2003/0151538 A1 * 8/2003 Escobosa et al. ............. 341/176
2004/0143349 A1 7/2004 Roberts et al.

FOREIGN PATENT DOCUMENTS

WO WO 00/17737 3/2000
WO WO 03/019560 A2 3/2003
WO WO 03/044625 A2 5/2003

OTHER PUBLICATIONS

International Search Report for PCT/US2008/003434 mailed Sep. 19, 2008, 12 pages.
International Search Report for PCT/US2007/019912 mailed May 13, 2008, 18 pages.
National Instruments Corporation: "Labview User Manual passage" Labview User Manual, Jul. 2000, pp. 1-7.

* cited by examiner

*Primary Examiner* — Lun-Yi Lao
*Assistant Examiner* — Jarurat Suteerawongsa
(74) *Attorney, Agent, or Firm* — Cesari and McKenna, LLP

(57) **ABSTRACT**

Both an on screen display and a physical programmable remote control have buttons whose functionality may be dynamically reassigned in accordance with a user's navigation through menu levels, states or across different services. The physical programmable remote control, in conjunction with a TV or other video display, provides an intuitive, heads up experience for the user and eliminates the need for multiple physical remote controls. User profiles and zones may be used to customize a user's remote control functionality based on preferences, access controls, location and the like.

**16 Claims, 12 Drawing Sheets**






FIG. 1A




FIG. 1B




FIG. 1C




FIG. 1D




FIG. 2


PHOTOSHOP FILE:
PER BUTTON IMPLEMENTATION OF BUTTON PROPERTIES AND ACTIONS
300
QUARTZ COMPOSER COMPOSITION:
EXTRACT, STORE AND COMPRESS
302
304
CONTROL API ACCESS
UI SERVER
306
SERVICE CONTROLLER
308
EXTERNAL COMPONENTS
310

FIG. 3


playCableTv.psd@100%(Command-ChannelAnalogUp.RGB/8)
Layers X
Channels
Paths
Normal
Opacity
100%
Lock:
Fill
100%
Remote Select
Remote Mode
Remote Menu
Remote F1
Remote F2
Remote F3
Remote F4
Remote Navigate Up
Information
Type=Toggle
NonMoveable=Yes
Remote=Yes
ToggleCommand=ucUpHold
Command=ChannelAnalogUp
Button [Enabled]
Remote Navigate Down
Remote Navigate Right
Remote Navigate Left
Remote Candy Dish NonButton
RotationScreen
Background
MENU
ROSIE
100%
Doc. 2.93M/12.1M
400
402
404
406
408
410
412

FIG. 4

Case 1:10-cv-11622-WGY Document 421-60 Filed 08/18/14 Page 145 of 170






FIG. 5


602
Lab Station 1
Control Ports
IR/Serial PWM Port 1
IR/Serial PWM Port 2
IR/Serial PWM Port 3
IR/Serial PWM Port 4
Trigger 1
Trigger 2
Trigger 3
Trigger 4
Trigger 5
Trigger 6
Trigger 7
Relay 1
Relay 2
Relay 3
Relay 4
Assigned Inputs
Audio Input 1
Audio Input 2
Video Audio Input 1
Video Audio Input 2
Video Audio Input 3
Video Audio Input 4
Video Audio Input 5
Assigned Outputs
Video Audio Output 1
VideoOutput1
VideoOutput1 (hdmi)
AudioOutputs2
AudioOutputs3
AudioOutputs4
AudioOutputs5
AudioOutputs6
AudioOutputs7
AudioOutputs8
Data
Inspecting Lab Station 1
Edit
Device
Menus
Hide Details
Device Name Lab Station 1
Primary
Default User
610
Default Profile
612
Lab Station 1
606
PlayCableTv
PlayDigitalArt
PlayDVD
PlayFmRadio
PlayGames
PlayMediaManagement
PlayPhotos
PlaySatelliteTv
PlayWebBrowser
PlayWebInfo
PlayWebServices
PlayWidgets
RotateCableTv
RotateCableTvGuide
RotateConceirage
RotateDigitalArt
RotateDVD
RotateFavorites
RotateFmRadio
RotateGames
RotateHVAC
RotateLighting
RotateMultimedia
RotatePhotos
RotatePreferences
RotateSatelliteTvGuide
RotateServices
RotateZones
614
604
600
608
Lab Station 2
Control Ports
Serial Port 1 (HW)
Serial Port 2 (HW)
Serial Port 3 (HW)
Serial Port 4
Relay 1
Relay 2
Control connection: IR/Serial PWM Port 1
Control type:
Direction: output
Show user defined properties
Video OUT 3 (composite)

FIG. 6




FIG. 7




FIG. 8


900
Bobs
602
Lab Station 1
Control Ports
IR/Serial PWM Port 1
IR/Serial PWM Port 2
IR/Serial PWM Port 3
IR/Serial PWM Port 4
Serial Port 1 (HW)
Serial Port 2 (HW)
Serial Port 3 (HW)
Serial Port 4
Trigger 1
Trigger 2
Trigger 3
Trigger 4
Trigger 5
Trigger 6
Trigger 7
Relay 1
Relay 2
Relay 3
Relay 4
Assigned Inputs
Audio Input 1
DigitalInput1 (coaxial...
Audio Input 2
DigitalInput2 (optical_di...
Video Audio Input 1
VideoInput1 (hdmi)
Video Audio Input 2
VideoInput2 (hdmi)
Video Audio Input 3
VideoInput3 (compo)
Video Audio Input 4
VideoInput4 (s_video)
Video Audio Input 5
VideoInput5 (s_video)
Assigned Outputs
Video Audio Output 1
VideoOutput1
VideoOutput1 (hdmi)
VideoOutput1 (co...
VideoOutput1 (coaxi...
AudioOutput2
AudioOutput3
AudioOutput4
AudioOutput5
AudioOutput6
AudioOutput7
AudioOutput8
Data
604
Lab Station 2
Control Ports
IR/Serial PWM Port 1
IR/Serial PWM Port 2
IR/Serial PWM Port 3
IR/Serial PWM Port 4
Serial Port 1 (HW)
Serial Port 2 (HW)
Serial Port 3 (HW)
Serial Port 4
Trigger 1
Trigger 2
Trigger 3
Trigger 4
Trigger 5
Trigger 6
Trigger 7
Relay 1
Relay 2
Relay 3
Relay 4
Assigned Inputs
Audio Input 1
DigitalInput1 (coaxial_di...
Audio Input 2
Edit
Device
Device Name Lab Sta
Primary
Default Us
Lab
606
Properties
Command Send In
Display Ty
External Ima
Next Screen Na
Next Theme Na
Next Zone Na
Service Ty
Stereo O
Outputs
Data
BackMenu
BSquare
CCircle
ChannelAnalogDown
ChannelAnalogSelect
ChannelAnalogUp
ChannelDigitalDown
ChannelDigitalSelect
ChannelDigitalUp
ChannelNameSelect
DecrementContrast
DecrementDetailEnhancementLevel
DecrementDetailEnhancementThreshold
DecrementListeningMode
DecrementNoiseReduction
DirectTV
DownMenu
EndCall
Exit
FastForward
FavoriteChannel
Flash
Guide
Help
High
IncrementContrast
IncrementDetailEnhancementLevel
IncrementDetailEnhancementThreshold
IncrementListeningMode
IncrementNoiseReduction
Info
Lab 1 Cable_PowerToggle
LastChannel
LiveTV
Menu
Messages
More
Mute Off
Mute On
MuteOff
MuteOn
MuteTunerOff
MuteTunerOn
MyDVR
Number#
Number*
NumberEight
NumberFive
NumberFour
NumberNine
NumberOne
NumberSeven
NumberSix
NumberThree
NumberTwo
NumberZero
Off
On
OnDemand
OSDCursorDown
OSDCursorLeft
OSDCursorRight
OSDCursorUp
OSDDayDown
OSDDayUp
OSDPageDown
OSDPageUp
OSDSelect
Pause
PictureInChannelDown
PictureInChannelUp
PictureView
PictureOff
PictureOn
PictureSwap
Plasma
Play
PowerOff
PowerOn
ProfileDown
ProfileUp
qcDown
qcDownload
qcF1
qcF1Hold
qcF2
qcF2Hold
qcF3
qcF3Hold
qcF4
qcF4Hold
qcLeft
qcLeftHold
qcMenu
qcMenuHold
qcRight
qcRightHold
qcSelect
902

FIG. 9

# PROGRAMMABLE ON SCREEN DISPLAY AND REMOTE CONTROL

## RELATED CASES

The present application is a continuation-in-part of commonly assigned U.S. patent application Ser. No. 11/520,215, which was filed on Sep. 13, 2006 now U.S. Pat. No. 7,930,644, assigned to a common assignee for PROGRAMMING ENVIRONMENT AND METADATA MANAGEMENT FOR PROGRAMMABLE MULTIMEDIA CONTROLLER and is hereby incorporated by reference.

This application is related to the following copending U.S. patent applications: SYSTEM AND METHOD FOR A PROGRAMMABLE MULTIMEDIA CONTROLLER, filed Dec. 20, 2005 and assigned Ser. No. 11/314,664, PROGRAMMABLE MULTIMEDIA CONTROLLER WITH PROGRAMMABLE SERVICES, filed Dec. 20, 2005 and assigned Ser. No. 11/314,112, both of which are assigned to a common assignee and all of which are expressly incorporated herein by reference.

## BACKGROUND OF THE INVENTION

1. Field of the Invention

The present invention relates generally to a programmable on screen display and programmable remote control through which a user may command the operations of a programmable multimedia controller or other device.

2. Background Information

A now decades long expansion in the number and types of consumer electronic devices has generated pervasive use of radiofrequency (RF) and infrared (IR) remote controls. Originally developed for television, remote controls now accompany essentially every CD player, DVD player, audio receiver, TV, home theatre, camcorder and portable radio. To simply play a DVD and watch a movie on a TV, it may be necessary to operate three different remote controls in order to turn on and properly set the TV, DVD player and home theatre system for the performance.

One conventional approach to eliminating or reducing the number of physical remote controls is the so-called universal remote control. In general, a universal remote control works by "learning" the RF or IR signals to which various devices respond. Once the signals are learned and retained in memory, the universal remote control may control multiple devices.

Universal remote controls, however, present certain disadvantages beginning with a dizzying array of physical buttons, perhaps dozens, which are often marked with arcane, difficult to read labels. Due to the number of buttons, they are often so small they are difficult and annoying to use. Further, the physical layout of the buttons does not conform to any industry standard nor to an arrangement that most users find intuitive or even familiar. In addition, because of the small button size and counterintuitive layout, most users cannot operate a universal remote control by touch in a "heads up" manner but must instead frequently look down at the buttons to ensure the correct one is pressed. This represents a recurring, frustrating distraction for many users. Lastly, a conventional universal remote control has no capability to change its functionality based on different users' preferences, handicaps or other factors.

## SUMMARY OF THE INVENTION

In brief summary, the present invention provides both a programmable on screen display and a programmable remote control through which a user may command the operations of a multimedia controller or other device. Through a graphical programming environment, the function of each button in the programmable on screen display or physical button on the programmable remote control may be easily assigned or modified. A button's assigned function may vary by individual user to accommodate personal preferences, handicaps, parental controls or other factors. Similarly, a button's assigned function may vary according to a physical zone in which the user is present when using the button.



In accordance with one aspect of the invention, a button's assigned function is dynamically changed to provide appropriate functionality for the type of service that a user has selected. Similarly, a button's assigned functionality may dynamically change in response to a menu level or state to which a user has navigated within a service. Thus, for example, as a user progressively accesses different services, the same button's functionality may dynamically change from "up channel" (while controlling a cable TV converter box), to "initiate call" (while controlling video chat), to "dimmer" (while controlling a lighting system) to any of a number of other desired functionality.

The present invention provides numerous advantages including eliminating the need for separate remote controls for various components that are interconnected with the multimedia controller. The present invention effectively enables a simple remote control, having a small number of large buttons, into a robust, powerful remote control which is intuitively and easily operated in a heads up fashion.

Another advantage of the present invention is that it may effectively replace an expensive, bulky and nonportable touchscreen. Further, the programmable remote control provided by the present invention is sufficiently inexpensive that every member of a household may have one, each of which may be customized in terms of functionality, permitted access to services, preferences and the like.

## BRIEF DESCRIPTION OF THE DRAWINGS

The invention may be better understood by referring to the following description in conjunction with the accompanying drawings in which like reference numerals indicate identical or functionally similar elements:

FIGS. **1A-1D** show a series of on screen displays in which a rotating selection of programmable buttons, in the form of icons representing different available services, are presented to a user who may use the buttons to command a programmable multimedia controller, according to an illustrative embodiment of the present invention;

FIG. **2** is a top plan view of a programmable remote control according to an illustrative embodiment of the present invention;

FIG. **3** is a block diagram showing a high level architecture of a system for dynamically assigning functionality to buttons in the on screen display of FIGS. **1A-1D** or physical buttons of programmable remote control of FIG. **2**, according to an illustrative embodiment of the present invention;

FIG. **4** is a screen shot showing how the system of FIG. **3** may be used to assign functionality to physical buttons of a programmable remote control for use with a cable TV service;

FIG. **5** is a screen shot showing how the functionality assigned a physical button of a programmable remote control may be dynamically changed in response to a user's action;

FIG. **6** is a screen shot showing a graphical programming environment in which a collection of on screen display menus are associated with a particular zone;

FIG. **7** is a screen shot showing a graphical programming environment in which service requests for controlling a home lighting system are presented for assignment to on screen display buttons or physical buttons on a programmable remote control;

FIG. **8** is a screen shot showing a graphical programming environment in which service requests for controlling cable TV are presented for assignment to on screen display buttons or physical buttons on a programmable remote control; and

FIG. **9** is a screen shot showing a graphical programming environment in which all possible commands for controlling a cable TV converter box are presented for assignment to on screen display buttons or physical buttons on a programmable remote control.

## DETAILED DESCRIPTION OF AN ILLUSTRATIVE EMBODIMENT

FIG. **1**A shows an on screen display **2** for a programmable multimedia controller (not shown) or other device in which a rotating selection of programmable buttons are presented to a user (not shown). Details regarding the structure, operation and services which may be performed by the programmable multimedia controller are set forth in the above-referenced related applications. Also, for purposes of clarity, video images, graphics and other content are omitted from on screen display **2**, but it should be understood that such content may be displayed on the screen along with the on screen buttons using, for example, the system and methods described in copending application entitled "System and Method for Mixing Graphics with Video Images" filed concurrently herewith and assigned to a common assignee.

When pressed, button **4**, which appears as an icon of an old-fashioned diner music selector, will cause the programmable multimedia controller to initiate a "Play Media" service. Such a service may, for example, allow a user to play CDs, DVDs, MP3 files or other media. Button **6**, which appears as an icon of a thermostat, will when pressed cause the multimedia controller to initiate an HVAC service through which room temperature may be controlled. Button **8**, which appears as an icon of a game controller, will cause the multimedia controller to initiate a video game service.

Other buttons representing other available services are shown in FIG. **1**B. For example, a button **10**, which appears as an icon of a TV, will when pressed cause the multimedia controller to initiate a cable TV service. Button **12**, which appears as an icon of a widget, will when pressed initiate displaying Mac-based widgets on the screen. Button **14**, which appears as an icon of a compact disk (CD), will when pressed initiate a CD playing service. Also, it may be seen in FIG. **1**B that button **8** has rotated three positions to the right from where it appears in FIG. **1**A.

In a preferred embodiment, buttons **4-14**, as well as others that may be present, rotate on screen display **2** in response to a user action such as pressing a button or applying pressure to a scroll ring on a remote control, like that shown in FIG. **2**, or taking some other action. When a user wishes to "press" one of the on screen buttons **4-14**, he or she simply rotates the on screen buttons until the desired one appears in the front and center position (e.g., button **4** in FIG. **1**A or button **10** in FIG. **1**B) in on screen display **2**. At that point, the user may "press" the on screen button by pressing an appropriate button on a remote control, by touching the corresponding area if a touch-screen is being used, or by any of a number of other actions.

FIG. **1**C shows an on screen display **16** which might appear, for example, in response to a user pressing on screen button **10** (FIG. **1**B) to initiate a cable TV service. That is, on screen display **16** may be considered, in a hierarchical sense, as a submenu or sublayer with respect to button **10** of on screen display **2**. Three on screen buttons **22**, **24** and **26** are displayed, each assigned functionality that is appropriate for user control of cable TV. Pressing button **22**, for example, initiates access to "on demand" movies or other content available from a cable TV provider. Pressing button **24** initiates a cable service provider's "C" button and pressing button **26** initiates a cable TV converter box's DVR "stop" command. As before, additional buttons (two of which are partially visible at reference number **20**) may also be included in a rotating selection.

FIG. **1**D shows an on screen display **18** which might appear, for example, in response to a user pressing a button to initiate a satellite TV service. Button **28**, when pressed, initiates the cable service provider's "play" button. Button **30** when pressed initiates the cable service provider's "A" button. Button **32**, when pressed, initiates access to the cable service provider's "info" button. Pressing button **34** initiates the cable service provider's "exit" functionality, which typically is used when in "guide" mode.

FIG. **2** shows a preferred embodiment of a programmable remote control **200** which may be used to rotate or press the on screen display buttons of FIGS. **1**A-**1**B as well as otherwise command the operations of a programmable multimedia controller or other device. In top plan view, remote control **200** includes a rest **202**, five outer buttons **204**, **206**, **208**, **210** and **212**, and four inner buttons **214**, **216**, **218** and **220**. Remote control **200** also includes a central select button **222**. For simplicity, buttons **204-222** may be referred to individually or collectively herein as "physical buttons".

In operation, a user using remote control **200** may, in conjunction with a TV or other video display, command the operations of a multimedia controller or other device in a heads up fashion with the user looking generally at the display and not at remote control **200**. For example, by pressing button **208**, a user may cause on screen buttons of FIG. **1**A to rotate in one direction. By pressing in a circular motion around outer buttons **204-212**, the user may cause on screen buttons to rotate in the opposite direction. By pressing button **222**, a user may effectively "press" whichever one of on screen buttons **4-14** is displayed in the front and center position on the screen, thereby initiating whatever service or action is assigned to that on screen button.

FIG. **3** is a block diagram showing a high level architecture of a system for programming both appearance and functionality of the on screen display buttons of FIGS. **1**A-**1**D as well as the physical buttons of programmable remote control **200** of FIG. **2**. In a preferred embodiment in which a Mac computer from Apple, Inc. is incorporated within a programmable multimedia controller, as described in the above-referenced related applications, Adobe Photoshop® software, which is included in Mac OS X, is used to create files **300**. That is, a Photoshop® file **300** is preferably created for each menu state of each on screen button as well as each physical button.

In a preferred embodiment, each Photoshop® file **300** contains information, preferably organized in "groups" and "layers," which define the appearance, functionality and other attributes of each on screen or physical button for a given menu state. The information in a given Photoshop® file **300** may include notes, labels, text-to-speech commands, system control commands, graphics corresponding to different states of a button or other user control (e.g., enabled, pressed, mouseover), display text, font size, color, sound effect and button/control type among others.

Files **300**, which are typically stored on non-volatile media such as a hard drive, are read **302** by Quartz Composer,

another piece of software which is also included within Mac OS X, and a run-time environment that loads Quartz Composer compositions. Quartz Composer functions to parse Photoshop® files **300**, thereby extracting all of the embedded groups and layers for the whole file and the graphics, as well as for each on screen or physical button.

Quartz Composer "patches" access the extracted information and, using a Quartz Composer function called "output ports", passes appropriate commands and information from a patch to a control application programming interface (API) access **304** and user interface (UI) server **306**. Details regarding the structure and operation of control API access **304** and UI server **306** are set forth in the above-referenced related applications.

This arrangement provides a powerful programming capability because it permits an author of a Quartz Composer composition direct access to multiple layers of graphics as well as any other information stored in files **300**. Stated another way, by simply altering the information contained in a file **300**, an author, using widely available and familiar software, may easily and rapidly configure, modify or customize any aspect of the appearance or functionality of an on screen button or physical button.

In response to commands and information received from patches via output ports, control API access **304** and UI server **306** issue appropriate commands and information to service controller **308**. Service controller **308**, in turn, issues appropriate commands to external components **310** (e.g., devices which are interconnected with a programmable multimedia controller) to effect whatever action a user has indicated. Details regarding the structure and operation of service controller **308** are found in the above-referenced related applications.

FIG. **4** is a screen shot **400** that depicts how the system of FIG. **3** may be used to assign functionality to physical buttons of a programmable remote control for use with a particular service, specifically, a cable TV service. In the central portion of screen shot **400**, an image **402** of a programmable remote control, like that shown in FIG. **2**, is displayed as a visual reference. In a panel **404**, the "layers" of a Photoshop® file are displayed. That file defines the functionality of each physical button of the programmable remote control in connection with a particular service, which in this example is simply playing (watching) cable TV. As shown in panel **404**, the physical "navigate up" button **406** is assigned the function "ChannelAnalogUp" **408** which, within the environment of a programmable multimedia controller, operates to increment the channel on a cable TV converter box. Other attributes of button **406** may also specified by the Photoshop® file. For example, button **406** is identified as a button on a remote control **410** and is designated as a toggle type **412**.

To enable a user to navigate through multiple menu levels or states, a desired button on the programmable remote control may be programmed with the function "next menu." Similarly, a desired button may be programmed with the function "back" or "previous menu."

FIG. **5** is a screenshot similar to FIG. **4** which illustrates how the functionality of the "navigate up" button may be dynamically changed when the programmable remote is used in connection with a different service or menu state. In FIG. **5**, the physical "navigate up" button **506** is the same physical button as the "navigate up" button **406** of FIG. **4**. However, in FIG. **5**, a different Photoshop® file is displayed in panel **504**. This file defines functionality of each physical button of the programmable remote control in connection with playing FM radio. Here, the physical "navigate up" button **506** is assigned the function "IncrementPreset" **508** which, again within the environment of a programmable multimedia controller, operates to increment to the next preset channel on an FM tuner, audio receiver or similar device.

The foregoing description of how Photoshop® files may be used to assign and dynamically change the functionality of physical buttons on a programmable remote control is equally applicable to on screen buttons like those shown in FIGS. **1**A-**1**D.

In the related application PROGRAMMABLE MULTIMEDIA CONTROLLER WITH PROGRAMMABLE SERVICES, there is a detailed description regarding "user profiles" and "zones." In general, user profiles are files or other data which include information on an individual user's preferences, access rights or restrictions or other information. In general, zones are particular rooms or physical areas in which particular devices are present that are interconnected with and under the control of a programmable multimedia controller. In conjunction with the graphical programming environment described in the related application entitled PROGRAMMING ENVIRONMENT AND METADATA MANAGEMENT FOR PROGRAMMABLE MULTIMEDIA CONTROLLER, the present invention may be advantageously used to provide on screen or physical button functionality which may be dynamically changed in accordance with a user profile or zone in which a user is located or both.

FIG. **6** is a screen shot of a graphical programming environment **600**. A graphical representation of a zone named "Lab Station **1**" is depicted in a panel **602**. A partial graphical representation of a second zone named "Lab Station **2** is depicted in a panel **604**. A panel **606** is a graphical representation of on screen display menus which have been programmed to appear in the Lab Station **1** zone. As indicated generally by connector lines **608**, the on screen display menus in panel **606** are associated with appropriate control ports, inputs or outputs that are present in the Lab Station **1** zone. Similarly, the transitions between on screen display menus may be graphically programmed as desired.

As shown in panel **606**, a user named "Default User" **610** is identified and is hierarchically associated with a user profile named "Default Profile" **612**. At the next level of the hierarchy, the Lab Station **1** zone is associated with user profile **612** and, at the next level, on screen display menus **614** are associated with the Lab Station **1** zone. At the next lower level, although not visible in this figure, are the individual buttons associated with on screen menu **614**. Additional user profiles may be associated with a given zone by using a mouse to select the user row and then clicking on the "+" button located at the lower left of panel **606**.

The ability to associate user profiles with on screen display menus is highly advantageous in many ways. For example, a user who is lefthanded may prefer for the functionality assigned to buttons on a programmable remote control to be reversed as compared to a user who is righthanded. By specifying that preference in the user profile and dynamically adjusting the functionality assigned to on screen and physical buttons, the present invention effectively customizes and optimizes the user's experience. In another example, if the user is a child, by specifying that information in the user profile, the present invention enables the exercise of parent control to prevent certain on screen display menus from appearing, blocking access to certain media and the like.

FIG. **7** is a screen shot of a graphical programming environment **700** in which user actions, also referred to as "service requests" in the above-referenced related applications, for controlling a home lighting system (not shown) are presented for assignment to desired on screen display buttons or physical buttons on a programmable remote control.

In a dialog box **702**, a lefthand portion is a list of services **704** that may be provided by a programmable multimedia controller which is interconnected with appropriate external components. The first service listed is "Lighting Control Service" which is shaded to indicate that service requests **706** listed in a righthand portion of dialog box **702** correspond to the "Lighting Control Service." As shown, the available service requests **706** are named ButtonPress, ButtonPressAndRelease, ButtonRelease, DimmerSet, SwitchOff and SwitchOn. Stated another way, the available service requests **706** represent actions that a user may take in connection with the "Lighting Control Service" which will be recognized by the programmable multimedia controller as valid actions.

Any of the service requests **706** may be assigned to any of the on screen display buttons or physical buttons on a programmable remote control that appear in panel **606**, which is the same panel shown in FIG. **6** except that the on screen display menu named "RotateLighting" is now expanded and displayed. To assign a particular service request to a particular button, one simply uses a mouse to drag the service request **706** and drop it on the desired button **606**.

FIG. **8** shows a graphical programming environment **800** in which service requests **806** for controlling a cable TV service **804** are presented for assignment to desired on screen or physical buttons. As described above, any service request **806** may be assigned to any button present in panel **606** by a drag and drop operation. An on screen display menu named RotateCableTv is expanded and displayed in panel **606**.

FIG. **9** shows a graphical programming environment **900** depicting an alternative method for assigning a user command to an on screen display button or physical button. A panel **902** presents a list of all possible user commands **902** for controlling a cable TV converter box. Similar lists (not shown) may be provided for any desired group of devices (e.g., receivers, DVD players, TVs, etc.) up to an including a master collection of all devices for which necessary information can be collected. With panel **902** displayed, any of the listed commands may be assigned to any on screen display button or physical button in panel **606** by a drag and drop operation.

The foregoing description has been directed to particular embodiments of this invention. It will be apparent, however, that other variations and modifications may be made to the described embodiments, with the attainment of some or all of their advantages. Additionally, the procedures or processes may be implemented in hardware, software, embodied as a computer-readable medium having program instructions, firmware, or a combination thereof. Therefore, it is the object of the appended claims to cover all such variations and modifications as come within the true spirit and scope of the invention.

What is claimed is:

**1**. A method comprising the steps of:

defining functions that a user may initiate by pressing buttons on a physical remote control;

storing information representing said functions;

using a graphical programming environment to assign a function to at least one of said buttons based on a user profile which corresponds to said user and that includes information regarding said user's preferences, said function to be indicated in a first graphics file with layers of graphics that indicate said function is assigned to said at least one of said buttons, said function to be performed when said at least one of said buttons is pressed in connection with a first predetermined on screen display being shown on a display device separate from the physical remote control;



using the graphical programming environment to assign a different function to said at least one of said buttons based on said user profile, said different function to be indicated in a second graphics file with layers of graphics that indicate said different function is assigned to said at least one of said buttons, said different function to be performed in response to said user navigating with said physical remote control to a second predetermined on screen display shown on said display device separate from the physical remote control and said user pressing said at least one of said buttons in connection with said second predetermined on screen display being shown;

using software to parse said first graphics file or said second graphics file to extract the layers of graphics that indicate said function or said different function is assigned to said at least one of said buttons; and

passing commands to an application programming interface (API) to cause said function or said different function to be performed.

**2**. The method as in claim **1** wherein said user profile includes information regarding services which said user is authorized to access using said physical remote control.

**3**. The method as in claim **1** wherein said user profile includes information regarding whether said user has a handicap.

**4**. The method as in claim **1** wherein said user profile includes information regarding parental controls applicable to said user.

**5**. The method as in claim **1** wherein said function is dependent upon said user's physical location.

**6**. The method as in claim **1** wherein said different function is dependent upon said user's physical location.

**7**. The method as in claim **1** wherein said function is dependent upon said user's selection of a predetermined service provided by a programmable multimedia controller.

**8**. A method comprising the steps of:

defining functions that a user may initiate by interacting with one or more on screen displays shown on a display device;

storing information representing said functions;

using a graphical programming environment to assign a function to at least one user-operable control that appears in said one or more on screen displays based on a user profile which corresponds to said user and that includes information regarding said user's preferences, said function to be indicated in a first graphics file with layers of graphics that indicate said function is assigned to said at least one user-operable control that appears in said one or more on screen displays shown on said display device;

using the graphical programming environment to assign a different function to said at least one user-operable control that appears in said one or more on screen displays based on said user profile, said different function to be indicated in a second graphics file with layers of graphics that indicate said different function is assigned to said at least one user-operable control that appears in said one or more on screen displays shown on said display device, said different function to be performed in response to said user navigating through said one or more on screen displays shown on said display device;

using software to parse said first graphics file or said second graphics file to extract the layers of graphics that indicate said function or said different function is assigned to said at least one user-operable control; and

passing commands to an application programming interface (API) to cause said function or said different function to be performed.

**9**. The method as in claim **8** wherein said user profile includes information regarding services which said user is authorized to access using said one or more on screen displays.

**10**. The method as in claim **8** wherein said user profile includes information regarding whether said user has a handicap.

**11**. The method as in claim **8** wherein said user profile includes information regarding parental controls applicable to said user.

**12**. The method as in claim **8** wherein said at function is dependent upon said user's physical location.

**13**. The method as in claim **8** wherein said different function is dependent upon said user's physical location.

**14**. The method as in claim **8** wherein said function is dependent upon said user's selection of a predetermined service provided by a programmable multimedia controller.

**15**. A programmable multimedia system comprising:

a programmable multimedia controller including a general purpose computer and coupled to a display device;

said display device configured by the programmable multimedia controller to show one or more on screen displays which include one or more user-operable controls for commanding said programmable multimedia controller;

a graphical programming environment configured to assign a function to at least one of said one or more user-operable controls using a user profile which corresponds to said user and that includes information regarding said user's preferences, said function to be indicated in a first graphics file with layers of graphics that indicate said function is assigned to said at least one user-operable control and is performed in response to said user operating said at least one user-operable control, and to assign a different function to said at least one user-operable control using said user profile, said different function to be indicated in a second graphics file with layers of graphics that indicate said different function is assigned to said at least one user-operable control and is performed in response to said user navigating through said one or more on screen displays shown on said display device; and



software configured to parse said first graphics file or said second graphics file to extract the layers of graphics that indicate said function or said different function is assigned to said at least one user-operable control, and pass commands to said programmable multimedia controller to cause said function or said different function to be performed.

**16**. A programmable multimedia system comprising:

a programmable multimedia controller including a general purpose computer and coupled to a display device;

said display device configured by the programmable multimedia controller to show on screen displays for commanding said programmable multimedia controller;

a physical remote control separate from the programmable multimedia controller and said display device, said physical remote control having physical buttons usable in conjunction with said on screen displays shown on said display device; and

a graphical programming environment configured to assign a function to at least one of said physical buttons using a user profile which corresponds to said user and that includes information regarding said user's preferences, said function to be indicated in a first graphics file with layers of graphics that indicate said function is assigned to said at least one physical button and is performed in response to said user operating said at least one physical button on said physical remote control, and to assign a different function to said at least one physical button based on said user profile, said different function to be indicated in a second graphics file with layers of graphics that indicate said different function is assigned to said at least one physical button and is performed in response to said user navigating through said on screen displays shown on said display device and said user pressing said at least one physical button; and

software configured to parse said first graphics file or said second graphics file to extract the layers of graphics that indicate said function or said different function is assigned to said at least one physical button, and pass commands to said programmable multimedia controller to cause said function or said different function to be performed.

* * * * *

EXHIBIT 704

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

---------------------------------------------------------

SAVANT SYSTEMS, LLC,
Plaintiff,
-vs- Civil Actio No. 10-cv-11622-EFH
CRESTRON ELECTRONICS, INC.,
Defendant,
CRESTRON ELECTRONICS, INC.
Counterclaim-Plaintiff,
-vs-
SAVANT SYSTEMS, LLC,
Counterclaim-Defendant.

---------------------------------------------------------

Video examination of DAVID VATLAND, taken at the instance of the Plaintiff, under and pursuant to all applicable rules, before JESSICA R. WAACK, Certified Realtime Reporter, Registered Diplomate Reporter, Certified Shorthand Reporter and Notary Public in and for the State of Wisconsin, at Wingate By Wyndham, 2065 Airport Drive, Green Bay, Wisconsin, on Friday, April 20, 2012, commencing at 9:22 a.m. and concluding at 10:58 a.m.

REPORTED BY:
JESSICA R. WAACK
JOB NO. 47889

other areas, where it be speakers or whatever, and to get some more revenue in.

But, in general, we're working with electronic companies, whether it be Denon, Marantz, any of those names for parts of the electronic components. We're just controlling those components with either system, so.

Q Okay. Now, you mentioned the word GUI. Is that spelled G-U-I?

A Yes.

Q Graphic user --

A Yes.

Q -- interface?

A Yes.

Q Okay. After you started or announced your intention to deal with Savant, did you receive any response from Crestron?

MR. KAVANAGH: Objection to form.

BY MR. O'DONNELL:

Q You may answer.

A Yeah. You know, we probably knew in our background that, obviously, Crestron, just like any company, is not going to be happy with it. But it is a factor in our industry that -- you

DAVID VATLAND

know, you do handle competing lines.

And that is a fact to live off of, just one brand name, unless we probably had no competition in the marketplace, would be probably fine.

But because we do have competition in the marketplace, and it does happen that the competition right across the street does have Crestron -- so obviously part of the decision was a leg up, because Savant -- the distribution on Savant wasn't such.

But we did get a call from, actually, our install -- our custom install manager received a call from Craig Gully, who is our rep, out of the blue.

And Craig -- from what I heard, Craig was drilling him on the fact that he -- we -- he heard that we took on Savant, and that if we do that, that we can't be a Crestron dealer also at the same time.

And it was -- threatening him on the fact that this is true, that probably forget the fact that we're a Crestron dealer. So Johnny, our manager, told him, look, you're talking to the

DAVID VATLAND

wrong person. You need to talk to Dave, because he owns the company. I don't make these decisions, so best to talk to him.

So when I heard about this and got back to the store, I don't know if it was that same day, but a few days later possibly, I put a call in to Craig. Was pretty upset that he would even call and present it this way to us and everything. That it's, like, an ultimatum.

And put a call in to him. If I remember right, I did not get him the first time, so I left word. I remember when I talked to him and when I called him, I was on the road driving to a job site.

And he did call me back. And I just asked him, I said, what's up? And he sort of started going down the avenue of saying, you know, it's either Crestron or Savant, you can't be both and everything.

And I sort of stopped him going deeper into this. You know, I said, Craig, this is not something legally that you should be pursuing unless you really think that you're okay. I think you need to check with your legal department at

Crestron, because you're -- you're basically dealing with restraint of trade.

And we are a dealer, and we haven't done anything wrong. We have other competing lines, so why is this particular competing line a problem?

And I said, you know, if this is how you feel, I need this in writing, but I best -- best judge or guide you, say, do not put it in writing. But I said, you know, this is not a discussion you should be having -- or we should be having.

Q Why did you tell him that? What was your basis for that?

MR. KAVANAGH: Objection. Form.

THE WITNESS: Only because from experience with State of Wisconsin laws and stuff and some other issues we've had with manufacturers, that we know that, you know -- like I said, we know where our legal rights are in sense of handling the product line and stuff.

And that to dictate and start threatening or scaring us that we may lose the line and then -- you know, and our biggest issue was if we lost the line, what do we do with all our customers that we have very large systems in

DAVID VATLAND

50 percent markup on it.

Q You also said that for Crestron, it has three lines?

A Right.

Q Which are those lines?

A Mainline Crestron, which is Crestron itself, which is your high-end line. They also have an Adagio system, and then they have a smaller system than Adagio, which we have in the store, but we don't do.

And we have basically all three systems in the store. The smaller one, I forget what it's called, but we don't do a lot with that.

The Adagio we've done some with, but a lot of our installs are mainline Crestron. It is our -- you know, probably if we had to take proportions of sales.

Q When you said "mainline Crestron," you mentioned that often they sell for 40 to $50,000 for a system?

A They can on a -- if you're really doing a full automated house. Because a typical house, if we're really automating the whole house, is probably in that $150,000 range to the customer.

DAVID VATLAND

Q So when you say 40 to $50,000 for a mainline Crestron, is that 40 to $50,000 your cost --
A No.
Q -- to Crestron --
A No, at retail, at retail.
Q So you would sell it to an end user for 40 to 50,000?
A Yeah. And there, again, it's really hard, because it's not a set. You don't just go out and buy -- let's say, for example, you were doing a house.
It isn't like this house versus this house is using the same -- they might use some core pieces that are the same, but in the sense of all the other Crestron pieces or Savant, especially with Crestron, because they have so many -- being that their book is an inch thick, I mean, stray little modules that do all these items that I talked to you about and the fact that that's one reason why Crestron still has a place out there and also for commercial installs, the few we do, Crestron makes a lot of sense, because they deal with that very, very well, you know.
And that's why it's still an important line. It was never to take on Savant to replace

DAVID VATLAND

Crestron. It was just another avenue to give our customers an advantage in the sense of what they preferred.

Back to the question, it takes a lot of pieces -- no two systems are alike. It's not a cookie cutter. You're into custom. It's not a cookie cutter system.

Q So if no two systems are alike, no two systems cost the same?

A No. By no means.

Q Now, again, back to this 40 to $50,000 ballpark for top line Crestron, is that the amount that you would purchase equipment from Crestron for?

A No.

Q Okay.

A No.

Q What is that?

A That is the retail.

Q Okay. Retail?

A Yeah.

Q Now, if you retailed a Crestron system for 40 to $50,000, what would your dealership's cost be from Crestron?

A Probably in that 15 to $20,000 range.

DAVID VATLAND

Q Okay. Now, of course, if no systems are alike, the costs vary also, right?

A Right.

Q So earlier you mentioned that for some systems that you install, people have a remote control pool cover, right?

A Right.

Q But if you didn't have a pool, you wouldn't need that remote control or aspect in that system, right?

A That is correct.

Q And if you didn't have the feature for your pool cover, it would cost less, presumably?

A Yes and no. Pool covers are controlled with -- usually, typically pool covers are controlled with what is called a contact closure. So it's either open or closed.

So if I -- and I can set it up either way, but one way would be closing the pool cover. The other way would be opening it. What it is, is it's just a contact it makes.

So it's a relay box, but it has to communicate with the main Crestron unit. Now, some of the main -- the main units in both

DAVID VATLAND

September 30, 2011, correct?

A Right. Yes.

Q Okay. And if you look at Exhibit 2, are these the only products you ordered at this time?

A That is correct.

Q And this is for a demonstration system?

A This was our demo system, right.

Q Could someone put this demo system in their house?

A Yes, they could.

Q And it looks at the bottom that Sound World was charged $5,593, correct?

A That is correct.

Q Okay. And if you sold it to an end user, approximately how much would you sell it to them for?

A It would be probably right around the 11 to $12,000 range.

Q Have you sold any Savant products since becoming a Savant dealer?

A We've sold one system.

Q And when did you sell your first system?

A It actually went into the house on February 18 roughly, of this year.

Q Do you recall how much Sound World purchased the

Savant products for that job?

A Well, because it was a Parade of Home, which is a show home, we had gotten a discount off of it for the fact of promoting it and selling it for -- or using it for a Parade of Homes, which is a Saturday through a Sunday event, which usually filters about 5 to 6,000 people -- in these days, this time, about 5 to 6,000 people through.

And so we ordered it for that. A lot of manufacturers give us a discount for that, and we pass it on to the consumer as a thanks for the fact that we can let this many people go through their house and experience the system.

So I'd have to -- I'd have to call up the actual invoices. Probably close to the same discount that we had gotten for our demo also.

Q So how much ballpark do you figure you purchased the products for from Savant after the discount?

A Well, it wasn't -- I'd have to go back, honestly, and see all what we put in there. I know we didn't use -- we didn't use their -- their remote control.

We used iPads and iPods for that instead. So that cost wasn't in there. You

percent --

A Right.

Q -- you would be the person that makes that decision, is that right?

A That is correct.

Q And in making that decision, you would weigh a whole bunch of factors including construction costs, return on your investment, lost time and other things, right?

A Yes.

Q At what point did you actually offer Savant products for sale to consumers?

A It would have been in roughly the September-October time. Because that would have been the Parade of Home that we sold it to.

Q September-October time of 2011?

A Yes.

Q This September-October time frame would have been before your purchase of the Savant demo model that was invoiced November 15, 2011, correct?

A That is correct, yes.

Q Did you make any sales of Savant products at the Parade of Homes?

A Hard -- no, no, no direct sales off of that right

DAVID VATLAND

yet. You know, a lot of leads and a lot of interest, but no direct sales, no.

Q At what point did you purchase the Savant products that went into the Parade of Homes?

A We actually ended up having to, because of timing -- on product, we ended up taking our demo system off the floor to get it in there.

So we did the programming at the store -- some of the programming and then moved it into the house before Parade of Homes and utilized that system to get through the Parade of Homes. And then we had received our system for them for Parade of Homes.

Q So looking at Exhibit 2, the purchase order date is September 30, 2011. The invoice date is November 15, 2011.

At what point do you believe that the materials that are in Exhibit 2 were delivered to Sound World?

A That system would have came in probably four days later. Four or five days later.

Q So beginning of October?

A Well, no. It's -- it's actually November. Invoice date is 11/15/11. So we probably would

DAVID VATLAND

August or back in May of 2011, the sale would have happened in February 2012, right?

A That is correct.

Q Because that is when the Parade of Homes was?

A Right. And that's when they received product and that's when it was put in, yes.

Q Okay. So your conversation with Mr. Gully had no effect on your first sale, right?

MR. O'DONNELL: Objection.

THE WITNESS: No. I mean, that -- you know, I respect Craig, and it -- you know, I think it was the wrong thing for him -- I'm sure he was upset. I'm sure he wasn't happy.

Like I said, that's why I was trying to calm him down saying, don't go down this avenue with me. It's not -- it's not the right place and not the right, you know, means.

BY MR. KAVANAGH:

Q Okay. Do you believe you lost any sales of Savant because of your conversation with Mr. Gully?

A No, no, I don't -- I don't believe that at all.

Q And Crestron did not terminate your dealership, right?

A No, they did not.

DAVID VATLAND

of -- they want their privacy of their home. So, generally, that's not the rule of thumb.

Q Okay. No further questions.

MR. KAVANAGH: Thank you.

THE WITNESS: Yep.

MR. O'DONNELL: Thank you very much, Mr. Vatland.

THE VIDEOGRAPHER: This is the conclusion of the deposition. We are off the record at 10:58 a.m.

(Proceedings concluded at 10:58 a.m.)

______________________________

DAVID VATLAND

Subscribed and sworn to before me this ____ day of _________, 2012.

______________________________