# EXHIBIT 1

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| SAVANT SYSTEMS, LLC<br>Plaintiff<br><br>v.<br><br>CRESTRON ELECTRONIC, INC,<br>Defendant.<br><br><br>CRESTRON ELECTRONICS, INC.,<br>Counterclaim- Plaintiff,<br><br>v.<br><br>SAVANT SYSTEMS, LLC,<br>Counterclaim- Defendant | ) | Civil Action<br><br>No. 10-CV-11622 MLW<br>Hon. Mark L. Wolf<br><br><br>**EXPERT REPORT OF**<br><br>**DR. RALPH Z. SORENSON** |

Respectfully submitted this 2nd day of May, 2014

Ralph Z. Sorenson

Dr. Ralph Z. Sorenson

**RESTRICTED CONFIDENTIAL**

**OUTSIDE COUNSEL ONLY**

**OUTSIDE COUNSEL ONLY**

**Table of Contents**

I. INTRODUCTION AND QUALIFICATIONS ........................3

II. ASSIGNMENT AND INFORMATION CONSIDERED..............5

III. SUMMARY OF OPINIONS.............................................6

IV. OPINIONS.........................................................................7

V. CONCLUSIONS...................................................................40

VI. EXHIBITS............................................................................42

VII. APPENDICES.......................................................................46

## I. INTRODUCTION AND QUALIFICATIONS

1. I, Dr. Ralph Sorenson, for the past twenty-one years have been Managing General Partner of the Sorenson Limited Partnership, LLLP. The Partnership is engaged in venture capital investing in a diverse group of entrepreneurial start-up companies. As Managing General Partner, I work closely with founder-CEO's providing advice and counsel on a wide variety of issues relating to all facets of their operations as well as to their respective leadership styles. Once I have invested in a company, I usually serve either on its board of directors or its advisory board. In those capacities, I help provide governance and oversight services to the enterprise. The types of issues I typically deal with include: marketing, sales, finance, accounting, manufacturing, operations, human relations, fund raising and governance.

Exhibit 1 contains my biography that lists 17 entrepreneurial start-up companies in which I have invested through the Sorenson Partnership and on whose Boards of Directors or Advisory Boards I serve or have served. It also lists 15 public companies on whose boards I have served. Working directly with these companies has greatly deepened my expertise in evaluating the operations of both entrepreneurial start-up firms and established firms. In addition, since 1993 I have reviewed and analyzed scores of business plans submitted by young start-up companies seeking equity or debt funding. These activities have further enhanced my firsthand knowledge of the entrepreneurship process and my ability to assess companies both in terms of overall performance and on a granular basis.

Prior to creating the Sorenson Limited Partnership, I served as Dean of the College of Business and Administration at the University of Colorado (CU). Stemming from my decades long involvement in the field of entrepreneurship, while Dean, I led the effort to establish the Deming Center for Entrepreneurship. Today, the Deming Center has become a major source of distinction at the CU Business School. I currently continue to be Professor Emeritus at CU and to serve on the Deming Center's Board of Trustees. In addition, I continue to teach occasional classes on entrepreneurship in both the MBA and undergraduate classes both at the University of Colorado and at other business schools.

From 1989 to 1992 I was an Adjunct Professor at the Harvard Business School where I taught a course entitled Management Policy and Practice. This was the only required course in the second year of the MBA program. It focused on the jobs of CEO's and general managers and aimed to help students think and act as general managers both in large established firms and in entrepreneurial start-up companies. Additionally, I taught from time to time in the Harvard Business School's executive education programs, including its Advanced Management Program (AMP), its Program for Management (PMD), and its Owners, President, and Managers program (OPM). During this period, I also developed a number of case studies, including several focusing on early stage start-up companies.

From 1981 to 1989, I was Chairman, CEO, and President of Barry Wright Corporation, a publicly traded New York Stock Exchange company. A diversified industrial manufacturing company, Barry Wright comprised seven unique divisions organized into two operating groups. Here I gained extensive first hand, real life experience overseeing every facet of the company's operations, including sales and marketing, finance, accounting, manufacturing , human resources, legal, and public relations. Several of the company's divisions sold their products through sales representatives and dealer organizations similar to those used by Savant and Crestron.

From 1974 to 1981 I served as President of Babson College. While at Babson, I spearheaded the college's decision to specialize in educating future entrepreneurs. To implement this initiative, Babson created the first Center for Entrepreneurship Education in the world. Today, based on studies by publications such as *U.S. News and World Report* and *The Financial Times*, Babson continues to rank number one worldwide in entrepreneurship education at both the undergraduate and MBA levels. This experience at Babson greatly deepened and broadened my fundamental understanding of the entrepreneurial process.

Prior to my presidency at Babson I served ten years on the faculty of the Harvard Business School. I taught marketing courses to MBA students and also served as Chairman of the required First Year Marketing Course. In addition, I created and taught an elective MBA course entitled "International Marketing." I also wrote and/or supervised the development of dozens of marketing case studies and teaching notes covering various facets of the marketing process, including: sales management, product design, pricing, advertising and promotion, market research, market segmentation, and competition. During my years at Harvard, I did extensive consulting and management development work for a variety of firms including: IBM, General Electric Corporation, Polaroid Corporation, SOHIO, ITEK Corp. Samsung (Korea) Marie Thumas (Belgium) GEA (Italy), SGV (Phillipines), Guyomarch'h (France). All of these experiences deepened my expertise in the areas of business, marketing and new venture creation.

From 1959 to 1963 I had two early career experiences that deepened my knowledge of the way businesses work. The first was as a research associate at IMEDE (The International Institute for Management Development) located in Lausanne, Switzerland. In this capacity, I traveled extensively throughout Europe gathering information and data from companies, writing marketing case studies on their operations, and developing comprehensive teaching notes analyzing the issues raised by each case. This experience sparked my interest in marketing and provided me with a "real world" introduction to the world of business.

The second experience was working two years at the headquarters of the Nestle Company in Vevey, Switzerland. As a marketing executive there, I served as executive assistant to Dr. Max Gloor, Nestle's overall head of worldwide marketing. Specifically, in addition to helping organize and implement a new headquarters marketing division, I created a worldwide annual planning, budgeting and control system that was adopted and that guided Nestle's annual marketing planning process for more than a decade after I designed it. The process of designing this planning and budgeting system further

strengthened my knowledge of the world of business in general, and marketing in particular.

2. Attached as **Exhibit 1** to this report is a complete copy of my current biography, which summarizes my qualifications and professional experience. I have not testified as an expert witness during the prior four years.

3. I am being compensated for my time at an hourly rate of $725. My compensation is not contingent on the outcome of this matter or on the opinions provided herein.

## II. ASSIGNMENT AND INFORMATION CONSIDERED

4. I have been retained as a business expert in this matter by Steptoe & Johnson LLP, counsel for Defendant and Counterclaim-plaintiff Crestron Electronics, Inc. ("Crestron" or the "Company"). I have been asked by Counsel to respond to certain arguments put forth in the Expert Report of Professor Einer Elhauge,[1] including, but not limited to, his conclusions regarding the projected earnings that he argues Savant would have achieved in a hypothetical "but-for" world in which Crestron was unable to engage in allegedly anticompetitive conduct.[2] In particular, I have been asked to consider whether, upon my review of Savant's business operations, its management's capabilities, its status as a start-up, new entrant to the market, and exogenous factors in the market unrelated to Crestron's alleged conduct, Savant as a business venture would have been capable of attaining the revenue and profit projections that Professor Elhauge sets forth in his model.

5. My work on this matter is ongoing. This report summarizes my current opinions given the information available to date. If additional information becomes available, I may modify or supplement my analyses and opinions. Further, in connection with my anticipated trial testimony in this action, I may create demonstrative exhibits which refer or relate to the matters discussed in this report or matters discussed in any forthcoming reports of Savant's experts, should reports be submitted.

6. I considered facts and data from a variety of sources, including deposition testimony and information produced by the parties in this litigation or filed with the court by the parties in this litigation. I have also considered information obtained through independent research and other publicly available sources.

7. The facts and data I considered are listed in **Appendix A**, as well as in the footnotes and other citations in this report.

---

[1] Expert Report of Professor Einer Elhauge, *Savant Systems LLC v. Crestron Electronics, Inc.*, March 28, 2014 ("Elhauge Report").

[2] Elhauge Report, ¶¶ 5, 6, 8, 20, and 156-168. For instance, in ¶ 164, Table 4 and ¶ 168, Table 7, Professor Elhauge concludes that Savant would have achieved "additional but-for revenues" totaling $41,167,438 from 2009 through September 2013, and totaling $51,900,771 from 2009 through March 2014.

## III. SUMMARY OF OPINIONS

8. I understand that Savant alleges that Crestron engaged in "exclusionary practices" and "anti-competitive behavior"[3] with respect to its relationships with dealers in the market for what Savant defines in its complaint as "...high-end programmable controller systems for residential automation...."[4] I also understand that Savant alleges that Crestron engaged in "...a campaign of making literally and/or implicitly false and misleading statements..."[5] about Savants products "...to dealers, end user customers and others in the industry...."[6] Lastly, I understand that Savant alleges that it lost profits and did not achieve its financial projections as a result of Crestron's alleged "unlawful acts."[7]

9. In his report, Professor Einer Elhauge concludes that "Crestron's exclusive dealing restricted dealers from freely purchasing Savant products," and that as a result, "Savant would have sold significantly more high-end system components had Crestron not engaged in exclusive dealing."[8] Professor Elhauge also concludes that "Savant's profits would have been higher (or losses lower) without Crestron's exclusive dealing primarily because it would have sold significantly more units if the market had been unrestricted."[9] He then performs a calculation of additional revenues—and, after accounting for a measure of costs, profits—that he concludes Savant would have achieved in the absence of certain alleged conduct by Crestron. In this Report, I do not offer an opinion with respect to Professor Elhauge's initial premise that Crestron in fact engaged in "exclusive dealing" or that Crestron's conduct had the effect of "restricting" the market, although that does not imply that I agree with his opinion as to these topics. Instead, I address below Professor Elhauge's conclusion that, in a hypothetical world, Savant would have achieved revenues and profits markedly greater than those it actually achieved.

10. Based on my analysis of the record in this case, as well as on my education, training, and professional experience with entrepreneurs and startup companies, it is my opinion that, as a startup company entering the home automation market, Savant encountered a myriad of problems, independent of any alleged "unlawful acts" taken by Crestron, that caused it to fail in achieving its financial expectations. Applying the tools relied upon by members of my profession to evaluate the performance, management, and ultimately, growth prospects of new business ventures, it is my conclusion that, wholly apart from any alleged conduct by Crestron, Savant lacked the capacity to achieve anything approaching the revenues that Professor Elhauge projects the firm would have achieved in the hypothetical "but-for" world he constructs.

---

[3] Civil Action No. 10-cv-11622 EFH Amended Complaint, Dkt. No. 14, ¶ 20.
[4] Civil Action No. 10-cv-11622 EFH Amended Complaint, Dkt. No. 14, ¶ 10.
[5] Civil Action No. 10-cv-11622 EFH Amended Complaint, Dkt. No. 14, ¶ 39.
[6] Civil Action No. 10-cv-11622 EFH Amended Complaint, Dkt. No. 14, ¶ 81.
[7] Civil Action No. 10-cv-11622 EFH Amended Complaint, Dkt. No. 14, VII. PRAYERS FOR RELIEF ¶ 3a-e.
[8] Elhauge Report, ¶ 158.
[9] Elhauge Report, ¶ 156.

11. As a result of more than fifty years of studying, observing, and being actively involved in the world of entrepreneurship and business, I have developed expertise in accepted principles of entrepreneurship and business administration, as well as the practical application of those principles in the real world. I have also developed expertise in generally accepted methodologies and in evaluating relevant data that are used by venture capitalists and other investors to evaluate the financial performance of new business ventures.

12. Professor Elhauge's conclusions regarding Savant's assumed performance in the hypothetical "but-for" world, as set forth in his report, fail to give any consideration to these factors as they relate to Savant's capacity to achieve earnings on the scale he projects for Savant's "but-for" performance. Indeed, notwithstanding the abundant evidence in the record regarding the problems facing Savant that were and are wholly unrelated to any alleged conduct by Crestron, that evidence is not even mentioned in his report. As a result, Professor Elhauge's conclusions regarding Savant's expected financial performance are fatally flawed, because they do not take into account any of the data, methodologies, and aspects of Savant's business operations that are recognized within the business community as central to any forecast of a startup venture's expected earnings, or the earnings of any business for that matter. It is my conclusion that Professor Elhauge's conclusion that in the hypothetical, "but-for" world, Savant would necessarily have realized the revenues that he projects is flawed and incorrect. In arriving at his revenue numbers, Professor Elhauge fails to consider factors that are crucial to assessing whether Savant as an enterprise would have been capable of hitting those numbers. It is my professional judgment that in this case, these relevant factors establish that Savant lacked that capacity, and would have irrespective of any of Crestron's alleged conduct.

## IV. OPINIONS

13. My role as an independent expert witness in this civil action has been to analyze Savant's allegations of harm and Professor Elhauge's supporting expert opinion from the point of someone who has had considerable experience in the world of business and entrepreneurship. Thus, I have looked at this case not from a legal point of view but from a practical business and management point of view. Within this backdrop, let me begin my analysis of Savant from the perspective of its overall performance as a new venture. In particular, I will analyze what factors have been involved in its failure to achieve the ambitious sales and profit goals that were forecast in its original business plan.

14. Launching and building a successful new enterprise is never easy. Professional and academic literature, as well as my own experience, offer several reasons why this is so. The first is that when entrepreneurs start new businesses, the process typically takes longer, costs more, and involves much more effort than the entrepreneurs originally anticipated when they formulated their business plans and pro-forma financial projections. This is documented by studies such as those authored by Professors Aaron Johnson and Rodney B. Holcomb entitled "Golden Rules of New

Venture Creation."[10] Indeed, it has been true of every one of the start-up companies in which the Sorenson Limited Partnership has invested.

15. An ongoing study put forth by Harvard Business School senior lecturer Shikhar Ghosh asserts that new ventures often fail because founders develop unrealistic and inflexible business plans.[11] Drawing on years of technology startup experience and research at Harvard, Ghosh reveals that entrepreneurs tend to take a single-minded approach in formulating their business plans by focusing exclusively on the merits of technology or sales without paying credence to the myriad of other factors required to formulate balanced business plans and operate successful businesses. Further, Ghosh states that 90 to 95 percent of startups fall short of meeting their projections. In Ghosh's words, "Very few companies achieve their initial projections." Lastly, within the context of describing venture funding to new startups, Ghosh explains that the availability of funding to startup companies by venture capitalists and other investors allows companies to brush over mistakes and enables management to "focus on things that aren't important to a company's success and ignore the things that are important."

16. A second reason is that launching a new venture is risky. A study done by *Inc. Magazine* and the National Business Incubator Association (NBIA) revealed that 80% of new businesses fail within the first five years.[12] Another study indicates that only 52% of manufacturing start-ups survive through year four.[13] Ghosh's study cited above also reveals that 90 to 95 percent of new ventures fail to meet their projections, 70 to 80 percent of new ventures fail to obtain their projected return on investment and 30 to 40 percent of them fail completely.[14]

17. A third reason is that obstacles and roadblocks often arise when a new business is started: the economy takes a downturn; competition proves tougher and more broad-based than expected; manufacturing costs are higher than expected; other expenditures, such as those on engineering, R&D, and G&A also turn out to be more costly than what was budgeted; the entrepreneur's team is not as capable as hoped; developing an effective sales and marketing program proves to be more difficult; market segmentation assumptions prove to be inaccurate; middlemen are not as supportive of the company's new products or services as had been anticipated; and complying with government regulations proves to be difficult. In short, the process of starting and successfully operating a new business is often more difficult than originally expected.

---

[10] Johnson, Aaron & Holcomb, Rodney D. "Golden Rules of Venture Creation," *Journal of Extension, Volume 44, Issue 2,* April 2006

[11] *See* Nobel, Carmen, "Why Companies Fail—and How Their Founders Can Bounce Back", *http://hbswk.hbs.edu/item/6591.html* (discussing Ghosh's study)

[12] http://www.inc.com/neal-cabage/6-things-a-successful-startup-needs.html: April, 4, 2014

[13] Knaup, Amy E., May 2005, "Survival and Longevity in the Business Employment Dynamics Data", *Monthly Labor Review*, pp. 50-56; *see also* Knaup Amy. E. and MC. Piazza, September 2007, Business Employment Dynamics Data: Survival and Longevity, Monthly Labor Review, pp. 3-10.

[14] *See supra*, note 10.

18. Venture capitalists and other professional investors considering whether to invest in a company have developed commonly accepted tools, principles and methods for assessing a company's past financial performance and its expected future performance. Important aspects of this inquiry are the evaluation of management's performance in operating the business, as well as evaluating market dynamics that would affect the company's prospects and revenue potential.

19. My application of these principles to the record in this case reveals that there are many reasons, quite apart from any actions on the part of Crestron, which could lead dealers to not promote Savant's products to the extent the company's management predicted, and why Savant's sales did not grow at a pace in line with the company's original overly optimistic projections.

## A. Savant failed to acknowledge the host of potential challenges that it could face as a new competitor.

20. Experienced investors and entrepreneurs follow certain commonly accepted guiding principles to assess the potential for a start-up business to succeed. I have developed extensive expertise in applying these principles, as it is my practice to utilize them whenever I am evaluating a start-up venture for potential investment. Below, I discuss some of the most pertinent of these principles, and consider them in relation to the facts of this case.

21. First, I evaluate the basic idea of a new venture, whether or not it is fundamentally sound and if the business is well-conceived and thoroughly thought through. I also attempt to identify any fatal flaws in the logic of the business and if the plans and goals put forth are realistic.

22. Second, I attempt to understand a company's market by gauging its size, whether it is growing, shrinking or stable, how the market is segmented and in which segment(s) a company intends to compete. Additionally, I attempt to discern if a company understands the nature of its target customers and outline the strengths, weaknesses, opportunities and threats a company may face as a new competitor in the market. Having evaluated these market-related issues, I review a company's financial projections to ensure that they comport with my independently developed views of the market and competitive landscape.

23. Third, since the success of any company depends largely on the people behind it, I also evaluate the entrepreneurs leading an organization. I review their reputation, intelligence, integrity and overall business sense. I assess their level of trustworthiness, experience, drive, persistence and patience. Moreover, I examine their skill sets, judgment and motives for starting a business including whether they are mission or money-driven, and whether they are striving for long-term solid growth or simply attempting to "get rich quickly." I also look at leadership qualities including whether a company's executives take a "command and control" or "servant" style of leadership in

running their businesses. Lastly, I gauge their ability to execute on time and in accordance with budgets and whether or not they are good at building a company or merely good at starting it.

24. In the same vein, I also investigate the larger team backing a company, including the skills and qualifications of the individuals filling the finance, marketing, sales, manufacturing, technical, research and development, product development, human resources and operational roles of the company. I look for buy-in amongst the team members, collective belief in the mission of a company and passion for the business. I assess whether team members are in it for the money, the satisfaction of building an excellent company or both. In short, I determine whether the team supporting a company is "bankable."

25. Other important factors I consider when evaluating a company are the quality, features and uniqueness of a given product or service. I attempt to ensure that a company and its team truly understand and cater to its target customer's needs. I focus on the timing of a company's entrance into the market, ensuring that it is neither too late nor premature in approaching the market and whether or not it maintains a first mover advantage. I also look at the underlying strength of a company's intellectual property, its manufacturing or product sourcing skills, its ability to achieve economies of scale, its strategies with respect to distribution and its ability to build strategic alliances within the supply chain. Further, I address the need for a company to build a strong sales team, robust technical support platform as well as effective pricing, marketing and advertising strategies. Lastly, I review the adequacy of the company's current and projected financial resources over time.

26. In my experience, failing to address any one of the foregoing factors can spell the difference between success and failure of an entrepreneurial venture. Some things can go right, but often times, many things can go wrong. Common mistakes many entrepreneurs make include failing to consider all of the above factors when formulating business plans, including over-estimating their ability to overcome the potential obstacles posed by the factors listed above, providing overly optimistic estimates of market size and forecasted revenues, costs and profits, underestimating the time, money and effort it will take to build a profitable enduring enterprise, and underestimating the strength, breadth and evolutionary nature of competition in the marketplace.

27. Applying these principles to the record in this case, I have identified numerous potential obstacles to Savant's success in the market. The following, non-exhaustive list is a summary of just some of the factors that are relevant to assessing Savant's actual and expected performance:

- Perceived quality of the Savant product line vis-à-vis Crestron products
- Savant's delays in technology, product, and systems development
- Brand awareness and credibility
- Quality, number, and effectiveness of Savant sales reps
- Savant's decision to employ independent, third-party sales reps that carried

multiple lines and hence might not be giving full attention to Savant, rather than to employ a dedicated sales force
- Dealers/end users not wanting to take a chance on products of a new and unproven market entrant
- Cutbacks and/or overruns in R&D and product development spending
- Exogenous factors such as the fact that Savant entered the market "during the worst economic times since the Great Depression" (See pages 166 & 169 of CEO Madonna's 2011 deposition)[15]
- Market forecast and pro-forma sales and profit projections that were significantly unrealistic from the beginning

28. Professor Elhauge's claims at ¶¶ 156-168 are, at bottom, a projection of what revenues he claims Savant would have achieved in a hypothetical "but-for" world. In essence, Professor Elhauge's model is an attempt to project Savant's earnings. But any reliable forecast of what sales revenues Savant and its management were capable of achieving—whether in an actual or "but-for" world—must consider the above factors, the steps taken by the company to address them, as well as other commonly accepted yardsticks that are used by members of my profession to assess a company's financial performance. In his report, Professor Elhauge fails to consider these factors, or any metrics relevant to assessing Savant's expected financial performance, at all. Instead, he attributes the shortfall between Savant's actual revenues and revenues that he forecasts to being solely the result of Crestron's alleged "exclusive dealing."[16] As a result, his projection of the company's hypothetical sales revenues is untethered to any reasonable evaluation of whether Savant in fact had the potential to reach such heights.

## B. Savant created overly optimistic and inaccurate forecasts of the market size, sales revenues, expenses and profits from the very beginning.

29. While any one of the foregoing factors in ¶ 27 could help explain why Savant did not achieve its sales projections and market penetration goals as quickly as it had hoped, the final factor mentioned is particularly relevant in this case.

30. It is a bedrock principle of entrepreneurship that any new venture requires a sound and well-conceived business plan to maximize the chances of success. An important step in the planning stage of any business is to develop an analysis of the size of the market in which that business will be competing, as well as reasonable budgets and growth forecasts.

---

[15] *See* October 25, 2012 Deposition of Savant Systems, LLC (Witness Robert P. Madonna), pp. 166-167

[16] *See* Elhauge Report, ¶¶ 156-158, and accompanying calculations at ¶¶ 159-168 (concluding that Savant's failure to attain the "Additional But-For Revenues" set forth in Table 4 of his Report was wholly the result of Crestron's alleged exclusive dealing).

31. In my professional experience in the evaluation of startup enterprises, I have found that notwithstanding the importance of such planning, many entrepreneurs fail to consider appropriate data in developing their market assessments and financial plans. Such failures can lead to start-up firms being overly optimistic in their pro-forma multi-year projections of sales, expenses, capital, manpower and time required to reach the break-even point and begin achieving profits. Hence, the famous "hockey stick" phenomenon commonly encountered in startup companies[17]:




18

[17] http://quatschtronauts.wordpress.com/2010/04/14/cheesy-business-plan/
[18] http://onstartups.com/tabid/3339/bid/9503/Flat-Is-The-New-Up-Introducing-Hockey-Stick-2-0-cartoon.aspx




32. Savant entered the market in late 2007 to early 2008. From the beginning, Savant experienced tough sledding in its efforts to achieve what turned out to be overly optimistic sales and profit projections that were built into their forecasts. Savant periodically revised its budgets, or at least its forecasts.[19] The following Table denotes Savant's annual budgeted sales, gross income and net income as reflected in several Savant financial documents[20] for the years 2008-2012 as compared to Savant's actual revenues.[21]

---

[19] March 20, 2013 Deposition of Bruce Myers 211:17-212:3 (testifying that "We try to look at the budget every quarter or every biannual, right, but it's never, like, really revise the budget, it's just the forecast. I know it says revised budget here, but it's really what we're going to forecast out, so it's always – sometimes that gets used the same.")

[20] *See* Appendix B for a list of documents supporting the figures for each year.

[21] For Savant's actual revenues, I used the figures set forth in Savant's financial statements, which were reviewed by the firm's outside accounting firm, DiCicco, Gulman & Company LLP. Savant Systems LLC Financial Statements, years 2007-2008 (SAVANT0131349); 2009-2010 (SAVANT0200168); and 2011-2012 (DGC0028584). I understand that, to the extent these financial statements contain Savant's revenues from its entire operations, they may be different from the revenue figures put forward by the economic experts of the parties in this litigation, which I understand are not the full universe of Savant's sales.

**SAVANT SYSTEMS LLC**
**BUDGET V. ACTUAL (in thousands)**

| | 2008 | 2009 | 2010 | 2011 | 2012 |
|---|---|---|---|---|---|
| **Revenue** | | | | | |
| Budget | $ 5,071 | $ 22,000 | $ 15,000 | $ 40,000 | $ 58,000 |
| Actual | $ 1,380 | $ 5,357 | $ 12,832 | $ 26,622 | $ 42,875 |
| Budget vs. Actual | $ (3,691) | $ (16,643) | $ (2,168) | $ (13,378) | $ (15,125) |
| **Gross Income (Loss)** | | | | | |
| Budget | $ 1,478 | $ 10,370 | $ 4,894 | $ 14,753 | $ 24,485 |
| Actual | $ (1,613) | $ (6,421) | $ (2,865) | $ 2,150 | $ 13,768 |
| Budget vs. Actual | $ (3,091) | $ (16,791) | $ (7,759) | $ (12,603) | $ (10,717) |
| **Net Income (Loss)** | | | | | |
| Budget | $ (15,314) | $ (3,100) | $ (13,970) | $ 1,597 | $ (7,200) |
| Actual | $ (21,893) | $ (18,664) | $ (19,534) | $ (19,684) | $ (17,390) |
| Budget vs. Actual | $ (6,579) | $ (15,564) | $ (5,564) | $ (21,281) | $ (10,190) |

{Table 1}

33. It is important to call attention to the fact that during his deposition, Bruce Myers, CFO of Savant and the executive who was responsible for preparing Savant's budgets and forecasts, was asked to review one of Savant's forecasts. That document included "most likely, worst case, and catastrophic" sales and profit forecasts for the company. When asked "how do you come up with the figures or what assumptions do you use to come up with these cases?" Mr. Myers's reply was: "Just pull it out of my rear end."[22]

34. From a standpoint of evaluating the company's earnings potential, the process and approach used by management in deriving those forecasts is an important data point in evaluating the firm's potential for success, and indeed reveals much more than the numbers standing alone.[23] This is because the precision and rigor with which a firm approaches its forecasts and business planning—or the lack thereof—is a key indicator of its management's efforts to understand relevant market dynamics. More fundamentally, it is revealing of management's overall competence and approach to operating the company. As I discuss below, the glaring deficiencies here in management's efforts to forecast its operations, and to derive and adhere to sound expense budgets betray incompetence at best, and at worst, an inexcusable lack of concern for steps that are essential to building a sustainable, profitable business.

35. In addition to its inability to forecast its own sales, expenses and profits, Savant also failed to accurately forecast the overall size of the market it was competing in, as acknowledged by the testimony of Mr. James Carroll, Former President/Executive Vice-President and General Manager of Savant's residential business. At his deposition in March 2013, Mr. Carroll was questioned about the

[22] Deposition of Bruce Myers (March 20, 2013) at 159.
[23] It is my understanding that Savant is no longer taking the position that the shortfall between its actual earnings versus the original earnings forecast developed by management are an appropriate measure of its damages in this case. January 22, 2014 Deposition of Savant Systems, LLC (Witness James Carroll), at 221:23-222:6.

differences between two successive market analyses presented at meetings of Savant's upper-level management (Exhibits 3 and 4 to his deposition). The first analysis was from a presentation that Mr. Carroll testified he prepared for Savant's January 2009 management meeting; the second was from a written presentation that he prepared for a subsequent management meeting just six months later in July 2009. These analyses took the form of pyramids representing the total size of the residential control market, in Savant's estimation, with that market divided into three segments.[24] Mr. Carroll testified that in the January 2009 presentation, his assessment of the entire control market was $800 million, but in the July 2009 presentation, he had revised that figure to $480 million. He further testified that the size of the top segment of the pyramid was revised from $300-$350 million in the January 2009 presentation, downward to $180-$210 million in the July 2009 presentation.[25]

36. This testimony is eye-opening, in that it illustrates how inept management was from the beginning in its ability to prepare realistic estimates of the size of the market for its control product and, as a result, to prepare realistic sales, expense, or profit forecasts. In just six short months, Savant had to cut its estimates of both the total market and what it believed to be the top segment of that market by ***40%***. This shows that Savant, from the beginning, was basing its business plans on wishful thinking. From the standpoint of an experienced investor evaluating Savant's performance and earnings potential, it is troubling that management could be so far off in both its analysis of the market size,[26] and that its efforts and processes to develop sales, expense, and profits forecasts could be so sorely lacking. Such fundamental errors demonstrate serious deficiencies in management's understanding of the relevant market and ability to effectively control expenses and manage capital expenditures efficiently so as to maximize growth.

37. The record also reflects that third party companies with whom Savant held discussions about the possibility of a merger, acquisition, or other business combination also called the validity of Savant's forecasts into question. For example, Savant entered into discussions with a company called Leviton in August or September of 2010. In response to questioning by Savant's counsel during his deposition in this litigation, Mr. Robert Becker, an executive at Leviton who was involved in his firm's discussions with Savant, offered a blunt assessment of what his company perceived to be "aggressive" projections by Savant for its revenue growth[27]:

---

[24] I understand that Savant claims that it competes in a "high-end" segment of the market that is the relevant market for purposes of this lawsuit and is distinct from any market for "low-end" control products. Civil Action No. 10-cv-11622 EFH Amended Complaint, Dkt. No. 14, ¶ 10. In this report, I do not offer any opinion as to the whether Savant's position is correct, or any opinion as to the appropriate definition of the relevant market for purposes of any antitrust analysis.

[25] March 22, 2013 Deposition of James Carroll 117-118.

[26] In this Report, I do not reach any opinion on what is the relevant market size for purposes of economic analysis in this litigation.

[27] October 11, 2012 Deposition of Robert Becker, *Savant Systems, LLC vs. Crestron Electronics,*

> Q: Well, you testified that Savant's business plan anticipated revenues might have been aggressive. Why did Leviton believe those numbers were aggressive?
>
> MR. BLONDER: Objection.
>
> A: I think when anybody ever shows me 400 percent growth or 250 percent growth, it is always difficult unless somebody has concrete tactical plans to get there. It is easy to put numbers on a sheet of paper. It's difficult to implement.

38. Given that Savant's forecast of market size was unrealistic from the beginning, Savant's original revenue projections were founded on faulty assumptions. This is because a company's expected revenue streams depend, in part, on the size of the market and the share of that market that the firm is able to capture. Jim Carroll of Savant testified that he, Mr. Madonna, and Mr. Myers developed Savant's original revenue forecasts in 2007 and 2008,[28] yet Savant was operating on what its management later concluded was an incorrect assumption of the size of the relevant market until sometime between January 2009 and July 2009. Because Savant's initial assumptions about the size of that market prior to that point were vastly inflated, it follows that so too were its revenue projections.

39. Similarly, the evidence shows that Savant failed to devote necessary attention developing reasonable budgets and controlling costs so to stay within budget. For example, an Expectations Memo[29] prepared by Savant's outside accounting firm DiCicco Gulman covering the year ending December 31, 2010 year-end states:

> Savant has incurred approximately $15.6 million in expenses. It should be noted that there are still significant expenses related to the research and development of new products. In addition, Savant has not yet found ways to reduce operating expenses. During 2010, Savant was concentrating on ramping up sales and little effort was put into cost saving ideas.

40. And a year later, the Expectations Memo for the year ending December 31, 2011 contained an identical statement that Savant had not yet found ways to reduce its operating expenditures, showing a continued inability on the part of management to

---

*Inc.*, at 185:25-186:13

[28] March 22, 2013 Deposition of Jim Carroll 337-343.

[29] *See* DGC Savant Systems Expectations Memo, December 31, 2010, DGC 0077946.

address Savant's operational problems.[30] These statements document a troubling inability on the part of Savant to control costs and reduce operating expenses. This appears to be true particularly in the area of research and development. Management appeared to be doing little to identify and implement cost saving ideas.

41. Further evidence of Savant's internal inability to accurately forecast its sales and profits, or control its expenses is contained in a presentation prepared for a meeting on July 27, 2009 of Savant's Advisory Board.[31] The page marked "Ed Breslow 299" contains several comments regarding the "Full Year Budget." The first comment states, "Full year operating expense budget increased by $2.6 million," and is followed by a string of bullet points enumerating the specific budget increases:

| | |
|---|---|
| • Salaries and benefits increased 800k due to AVIX employees coming over and three new hires | $800K |
| • Engineering expense increased by 200k due to material expense and internal orders for test and professional services engineering | $200K |
| • Sales and marketing increased by $800k due to dealer conference ($325K) and CED1A ($425) | $800K |
| • Travel expense increased by $400K due to professional services expected travel | $400K |
| • Other | $200K |

Total full year operation expense budget increases: $2,600K

42. In my judgment, as someone who has had considerable experience working with early-stage start-up companies, these are unusually high mid-year expense increases that should have been reasonably foreseen at the time the original budget was prepared.[32] Expense revisions of this magnitude would likely raise a red flag to an outside investor or independent board member and call into question management's ability to forecast financial performance and

[30] *See* DGC Savant Systems Expectations Memo, December 31, 2011, DGC0066224 .
[31] Q3 Advisory Board Meeting, July 27, 2009, EDBRESLOW 0000294.
[32] Incidentally, when Mr. Carroll was asked about the reasons why the Savant 2009 expense budget had been increased so dramatically after only six months, he did not attribute a single expense increase to any actions on the part of Crestron to inhibit Savant from signing up Crestron dealers to carry its products. Indeed, on page 85 of his deposition Mr. Carroll testified that the $400k increase in "travel expenses" was required to send more Savant engineers to train dealer personnel than originally planned "because the demand was so great for the product." March 22, 2013 Deposition of Jim Carroll 85.

manage costs. This is just one more example of the fact that just as Savant was inept at forecasting the size of the market it served, it was also inept in forecasting and controlling its operating expenses. Perhaps more important, failing to adequately plan and manage expenditures is a key indicator that management is not devoting sufficient attention to the steps needed to build a sustainable business that is capable of driving and supporting its own growth.

43. In short, in my opinion, Savant's cost control problems were symptoms of a start-up company that did not meet projections for reasons quite unrelated to any alleged restrictive actions on the part of Crestron vis-à-vis dealers. And of particular relevance to my assessment of Professor Elhauge's earnings projections, such repeated failures by Savant's management to *address* these issues goes the their basic competence in running the firm. Management competence is a critically important factor in forecasting a firm's earnings, and the record casts serious doubts on management's competence in this case. Professor Elhauge's failure to even address the issue of management's competence as it relates to the firm's capacity to generate earnings is a fundamental shortcoming of his projections.

## C. Savant experienced obstacles common to a start-up and the effects of a global economic downturn.

44. As noted above, I understand that Professor Elhauge concludes that Crestron's alleged anticompetitive behavior had the effective of "restricting" a portion of the relevant market.[33] Professor Elhauge concludes that as a result, Savant's sales and profits were substantially less than they would have been in a hypothetical "but-for" world wherein Crestron did not engage in any of the challenged conduct. Again, in this Report, I do not offer any opinion with respect to the question of whether the market was or was not "restricted." But based on my experience with startups and evaluating the financial and market performance of new business ventures, I conclude that the revenue growth that Savant achieved during its first five years on the market was in line with what could reasonably be expected for the company to achieve in its first few years of operations, regardless of any alleged conduct by Crestron.

45. In a section of his report captioned "Relevant Baseline is But-for World, not the Past," Professor Elhauge states that "Savant started with a 0% share when it first entered [the market] in 2007, so by definition its share could only increase." Continuing, he opines that "merely observing that a rival's share has increased somewhat does not show that the rival was not restricted. One instead has to ask whether the rival would have grown faster but-for the restriction."[34] In this Report, I do not render any opinion as to the validity of Professor Elhauge's statement for purposes of rendering an antitrust opinion as to whether

[33] Elhauge Report, ¶¶ 156 and 158.
[34] Elhauge Report, ¶ 124.

the relevant market is "restricted." However, for purposes of projecting the earnings of a business venture like Savant, Savant's status as both a startup and new entrant to the market in 2007/2008 is *absolutely* relevant to developing a reliable estimate of its expected performance (whether one refers to this as a "baseline" consideration or otherwise). Yet in the section of his report (¶¶ 156-168) setting forth his projection of Savant's "but-for" revenues, Professor Elhauge seemingly does not account at all for the fact that, when it newly arrived to the market in 2007/2008, Savant had zero market penetration, and had in front of it the substantial tasks of, among other things, building a distribution channel from scratch, building its brand and developing a reputation for product reliability, and developing and demonstrating its sales and technical support capacity. Such capabilities take time to develop, and as I discuss in other sections of this Report below, there is every indication that Savant had serious deficiencies in each of these areas, wholly apart from any alleged conduct by Crestron.

46. Savant's primary complaint in this lawsuit—as well as Professor Elhauge's own theory, as stated in ¶124 of his Report—seems to be that, notwithstanding its triple-digit rate of growth each year from 2008-2011, it believes it should have grown even faster. Savant appears to have made the assumption that because they had developed certain technologies, and because they had what they considered a superior product, and because they were an Apple partner, and because they had what they considered to be an experienced team, that it would be relatively easy to sign up dealers for its products, and that these dealers would willingly and immediately shift their sales efforts away from other competitors' systems and start concentrating on selling Savant products.[35] As explained in ¶ 15 of this Report, such assumptions are common among startups, and often result in the entrepreneur devoting insufficient resources and focus to other aspects of the business that are essential to growing sales and developing a sustainable enterprise.

47. However, in assessing Savant's success in developing a distribution channel, an experienced professional investor assessing the company's performance would consider the fact that, prior to when the company first began shipping product in 2008, it effectively was starting without any established dealer base, or at least without a dealer base that had experience deploying Savant products in the market. The evidence in this case shows that, regardless of Crestron's alleged conduct, Savant was able to steadily add dealers to its ranks each year from 2008-2013.

48. Indeed, notwithstanding Savant's apparent inability to achieve its revenue projections, control costs and achieve profitability since inception, the evidence shows that Savant has been successful in generating revenue since introducing its products to the market in 2008. Although I understand that Professor Elhauge excludes Control4 as a

[35] See ¶¶ 92-93, below, in which I discuss the testimony of Savant's executives claiming that Crestron's alleged conduct was the sole cause of the company's failure to reach the revenue numbers set forth in the company's original sales forecasts. As discussed above, those projections were unrealistic, and premised on flawed assumptions and faulty data.

meaningful competitor for the purposes of this civil action,[36] a review of the revenues generated by Control4, per publicly filed statements with the Securities and Exchange Commission, demonstrates a very similar revenue growth curve to what Savant achieved during this period, as shown in the following chart[37]:




49. Lastly, a review of Crestron's revenues in the residential market from 2008 through 2012 period reveals a declining revenue trend[38]:

[36] In this report, I do not express an opinion whether, for antitrust purposes, Control4 and Savant are properly deemed competitors, though that does not imply that I agree with Professor Elhauge's conclusions in this regard.
[37] Each firm's rate of growth is reflected by the slope for its revenue curve. The revenue figures reflected here are as stated in Savant Systems LLC Financial Statements for years 2007-2008 (SAVANT0131349); 2009-2010 (SAVANT0200168); and 2011-2012 (DGC0028584). Those for Control4 are as stated in Control4's public filing with the SEC, Control 4 Inc. S-1 Registration Filing and 2013 10-K.
[38] *See* Crestron Residential P&L (Crestron2558639). It is my understanding that this document reflects Crestron's revenues from sales of residential productions in the United States.




50. Acknowledging that the graph following ¶ 48 depict total company-wide revenues for Savant and Control 4 on the one hand, while on the other hand the figures for Crestron are limited to residential revenues, I understand that during this period, both of the former companies earned a large majority of their sales in the residential market.[39] Accordingly, the observation can be made that the revenues of Savant and Control 4 were growing during a period when Crestron's residential sales were falling. This suggests that Savant was doing reasonably well vis-à-vis its competitors.

51. To the extent that Savant did not sign up dealers at an even faster rate, or achieve sales from its dealers more rapidly, there are a number of reasons why this might be the case wholly apart from any alleged conduct by Crestron. In addition to the operational problems Savant was experiencing (as discussed in other sections of this Report), two key factors in this regard are the impact of the economic downturn on the market, coupled with the fact that dealers would have to make a significant investment to bring on the Savant line, at a time when many dealers were least equipped to do so.

52. With respect to the economic downturn, the rapid decline in new housing starts alone no doubt had a significant negative impact on the sales of residential controllers, particularly to the extent that many of these systems are installed in newly constructed homes. This coupled with the fact that overall consumer spending plummeted and

[39] *See* February 13, 2014 Deposition of Savant Systems (Witness Bruce Myers), at 117:14-21, 118:4-6 (testifying that in 2008-2009, Savant's revenues were approximately 90-95 percent, or potentially higher, from residential sales); Control 4 Inc. 424(b)(4) Prospectus, filed 8-2-2013, at 50 (defining the firm's "Core" revenue as excluding revenue from sales to hotels and other multi-dwelling units, and stating that the firm's North America Core revenue represented 75% of total revenues for the year ending December 2012, and that international core revenue has been growing at a faster rate than North American core revenue).

unemployment surged from about 5% in 2007 to the neighborhood of 10% in 2010.[40] This significantly impacted almost all manufacturing industries and consumer goods industries throughout the United States.

53. The evidence shows that in this case, Savant's growth was hampered by its entering into the market precisely at the height of the global economic downturn. For example, an Expectations Memo prepared by the Savant's outside accounting firm, DiCicco Gulman, covering the year ending December 31, 2009 contains the following statement[41]:

> *"Per discussions with Bruce Myers (CFO) the biggest challenge facing Savant is generating revenue. During the first two quarters of 2009, Savant had strong sales but Savant was hard hit in June and July. There were approximately $700,000 of sales and nothing in July. There were more shipments in Q3 of 2009 but the values of the shipments were down. The economic downturn has significantly affected Savant. The market is shrinking and big dealers are closing their doors. Savant is now on a "catastrophic" sales projection and may not be able to attain those numbers by year end. They have not met their budget or the revised plan. Most sales are residential sales but there have been some commercial sales (setting up conference rooms, etc.). Per Bruce there are a lot of opportunities in the commercial markets."*

This document reflects that in 2009, the primary reasons Savant, per its CFO Bruce Myers, gave for its significant shortfall in sales were that there was a significant economic downturn, the market was shrinking, and big dealers were closing their doors. Nowhere does the report make mention of restrictive actions on the part of Crestron vis-à-vis dealers as a reason for Savant's sales not meeting its "catastrophic sales projection" and not meeting its budget or its revised plan.

54. Similarly, Savant's Jim Carroll testified at his deposition that one of the reasons why he revised the company's estimates of the market's size was that "This is the period of time when the economy was in a downturn, so although there were still jobs out there, jobs were shrinking in their size and scope."[42] Similarly, in an email exchange dated August 21, 2010, Mr. Carroll, Mr. Madonna, and Philip Schoonover (a member of Savant's Board of Advisors) discussed questions to pose at an upcoming meeting with Leviton regarding the possible acquisition of Savant. Jim Carroll wrote, "I would add to this a discussion around the economic downturn and how did it effect most of these specific questions. If we think Lutron is down 30-40% from two years ago in high-end resi what does it look like for them[?]"[43]

55. In addition to statements made by its executives, Savant's independent sales reps

---

[40] Bureau of Labor Statistics, "Labor Source Statistics From the Current Population Survey," http://data.bls.gov/timeseries/LNS14000000 (last accessed April 24, 2014).
[41] *See* DGC Savant Systems Expectations Memo, December 31, 2009, DGC 0073418.
[42] March 22, 2013 Deposition of James Carroll, 118:16-119:6.
[43] SAVANT0952066.

were also reporting trouble on the ground as a result of the economic downturn. One of these representatives, a firm called Jarmac which represented Savant in the New England region, made a presentation to Savant regarding its upcoming operations for the year 2010.[44] In a section of that document captioned "What were the challenges in 2009?" Jarmac wrote, "the tough economy caused end users to hold off on many system proposals. There was nothing Savant, Jarmac or our dealers could do about it. Customers were scared and either holding on to their money, or cutting systems back to price levels Savant did not address. . . . A highly competitive market caused more bids on automation projects to flood into the market. Many times dealers stuck with what they were comfortable with not wanting to take any risks on their already fragile business." On the following page, captioned "2010 Challenges," the presentation states that "The state of the economy will still play a crucial role in our dealer's overall success this year…. Our larger dealers report that more and more they are being forced to bid jobs against their competition. Not only are dealers sticking to their comfort zone, but they are also being forced to shrink the potential of most jobs to stay competitive. Brands with lower price points such as Control4 are taking jobs that would have not gone their way in previous years."

56. One of the obstacles Savant appears not to have appreciated was that dealers could be reluctant to incur the costs of investing in carrying a new product line. During his deposition, Mike Pecar, one of Savant's former independent sales representatives, was asked about the reasons why some of the dealers he approached to sell Savant elected not to do so. He answered, "to take on another product line involves an investment in time, money, training, and so that would be – that would be a logical resistance to want to invest more time, money and training in something new."[45] He further testified that this problem could be exacerbated when a firm's business was down, because if "sales revenues are down, they often will concentrate on what they are already doing as opposed to sticking their neck out on something new."[46] Mr. Pecar also recounted a number of items a dealer had to invest in to become a Savant dealer, including a $1,500 software license and a demo system that was "somewhere north of $10,000," and that these costs could act as a barrier to entry for some dealers.[47]

57. Indeed, Professor Elhauge concedes the fact that dealers considering whether to take on a new product line faced a decision as to whether it was worthwhile to invest the necessary resources.[48] However, he does not consider at all the extent to which these investment costs hindered dealers' acceptance of Savant, irrespective of any alleged conduct by Crestron. Instead, he offers a multi-variable formula at ¶ 147 of his report, and asserts that Crestron's alleged conduct had the potential to "exacerbate" the switching costs that dealers would face in deciding whether to adopt Savant. Professor's Elhauge's theoretical analysis does not address the actual evidence that for some dealers, the cost of investing in Savant was simply too high, and that this factor hindered Savant's growth.

---

[44] SAVANT0262906 (attached to cover email dated February 8, 2010 at SAVANT0262905)
[45] Deposition of Michael Pecar, 61:13-20.
[46] Deposition of Michael Pecar, 81:13-24.
[47] Deposition of Michael Pecar, 87:13-90:1.
[48] Elhauge Report ¶ 84.

## D. Savant experienced significant problems with its sales force and marketing efforts.

58. In ¶ 153 of his Report, Professor Elhauge appears to offer a largely theoretical conclusion that Crestron's alleged conduct *may* have had the effect of deterring Savant from making necessary expansions to its residential sales force. I say "may have" because Professor Elhauge does not come out and say that Crestron's alleged conduct *did* have such an effect. Rather, he merely posits that "restricting Savant from gaining access to dealers in a given locality *can* make it unprofitable for Savant to employ regional sales people (or additional regional sales people), even if it would be profitable to do so if the regional dealer demand for Savant products was not restrained by Crestron's exclusive dealing" (emphasis added), without citing any evidence that Savant actually did forego any planned expansions of its sales force as a result of Crestron's alleged conduct. Professor Elhauge likewise does not conduct any analysis as to the profitability calculus he posits would guide Savant in this decision. As such, it is my understanding that Professor Elhauge has not reached any conclusion as to whether this supposed anticompetitive effect in fact occurred in this case, as opposed to merely being theoretically possible.

59. Nonetheless, when viewed from a business perspective, Professor Elhauge's conjecture as to Savant's decisions about investing in its sales force actually puts the cart before the horse. Specifically, although he appears to acknowledge that a firm's failure to make necessary investments in its sales force can negatively impact revenues, he considers this issue only through the lens of whether Crestron's alleged conduct could have had some speculative effect of reducing Savant's investment below optimal levels. What Professor Elhauge does not consider is whether Savant made the necessary investments in its sales force—or managed its sales force effectively—such that it was capable of achieving the ambitious revenue targets set in Savant's internal forecasts, or alternatively, the hypothetical earnings forecasts that Professor Elhauge projects for Savant in the "but-for" world.

60. When start-up companies establish sales organizations to market their products, they must make several strategic decisions. First they must consider whether the market they are trying to reach is segmented and if so, in what way - - by price, by function, by geography, by different types of end-users, etc. Next they must decide which segment(s) of the market they want to target. Then they must decide what channels of distribution they will use to reach the target segment or segments. Will they sell directly to end-users through a full-time, company-employed sales force? Or will they use middlemen – dealers, distributers, wholesalers, or retailers – to reach end-users? If the later, will they use full-time sales employees or independent sales representatives to sell to the middlemen? How will they provide technical sales support for their products –

through company employed technical sales engineers or through independent tech reps? Will they attempt to build their business geographically one region at a time, or will they attempt to establish national geographic coverage from the beginning?

61. All these decisions involve trade-offs. For example, selling through a direct sales force is typically most effective, but it also tends to be more expensive than selling through independent sales representative organizations. On the other hand, although independent sales reps are typically less expensive since they usually work primarily on commission, they also can be less effective because they typically carry additional product lines of other companies and can't devote full attention to your company's products. The same trade-offs exist in the case of deciding whether to use company sales engineers or independent technical representatives. Another example pertains to geographic coverage. While ideally a start-up company might want to boost sales by achieving national coverage from the start, it may not be feasible because of cost or limited supply considerations. Hence, they may end up choosing to grow one geographic territory at a time. While all of the forgoing may seem like simple common sense, it has relevance in the case of Savant for the following reasons.

62. As discussed in more detail below, the record here shows that Savant made the strategic decision to rely, for several years, primarily on third-party, independent firms to serve as its sales representative to dealers, rather than to employ its own, dedicated sales force to work directly with dealers. Further, the record also reflects that Savant mismanaged its sales force in several respects, including by leaving high-level sales positions unfilled for extended periods of time, leaving regions encompassing multiple states without representation by either a sales force or dedicated direct sales employee, and failure to effectively manage those sales representative firms it did employee, leading to terminations for non-performance. In rendering his opinion that Savant's revenue shortfall in the actual world versus the projections in his "but-for" world was wholly caused by Crestron's alleged anticompetitive conduct, Professor Elhauge fails adequately to account for Savant's own mismanagement of its sales force—indeed, he does not even mention it in his analysis.

63. At the beginning of 2010, prior to Savant's filing its legal complaint against Crestron in September, 2010, Savant held an meeting to review its sales in the residential channel. The PowerPoint presentation that was made for this meeting provides evidence that Savant was experiencing very serious problems with its sales force and its relationships with its dealers. The presentation, titled "2010 Sales Review - Residential Channel" contains a long litany of non-Crestron related reasons for Savant's inability to sign up as many dealers as desired and reach its sales goals in 2010.[49]

[49] See Savant 2787208, Savant 2010 Sales Review Residential Channel

64. Savant's 2010 Sales Review indicates that Savant's management acknowledged that it was facing a host of sales and marketing challenges as it went into 2010 that were not the result of any alleged anti-competitive conduct by Crestron. Although the document does attribute some blame to Crestron, Crestron is mentioned only twice: once as being a diminishing threat, and secondly as being one of three competitors (Control4, Crestron, & AMX – in that order) from whom Savant wanted to capture more business.

65. On the other hand, the PowerPoint presentation documents the fact that Savant was facing a whole litany of non-Crestron related sales and marketing challenges that the Savant's management considered more important to address in the coming year.

These included:

- Continued decline in economic conditions
- Product stability issues
- Hardware failures
- Bad initial experience of dealers with Savant
- Tech support execution
- Lack of sufficient training
- Turnover of Savant sales personnel and reps
- Sales and Reps not doing a good enough job of resolving issues and regaining the confidence of the dealers
- Need to terminate regional managers
- Need to retrain sales team personnel and reps
- Need to cut about 60 non-performing dealers
- Need to re-vamp their training curriculum for dealers
- Overall lack of sufficient training
- Need to look at alternative distribution strategies

66. This litany of non-Crestron related problems regarding Savant's management of its sales force provides convincing proof that in the months before Savant initiated its lawsuit against Crestron in September 2010, its sales and marketing organization was in serious disarray and was facing a slew of weighty problems that had nothing to do with any actions on the part of Crestron. Indeed, Jim Carroll testified at length regarding extended vacancies in Savant's sales force, covering entire regions of the country.[50] As should be self-evident, these problems pointed to serious deficiencies in Crestron's sales organization. Any one of these deficiencies could have had seriously impacted Savant's ability to achieve its unrealistically high sales expectations in the period up to 2010 when Savant filed its lawsuit. For example, having no Regional Sales Managers in the Western, Rocky Mountain, and North Central territories, having no sales coverage at all in the Pacific NW, lacking sufficient training for dealers and sales personnel, cutting off 60 "non-performing" dealers all could -- and no doubt did -- have a material negative impact on Savant's revenues.[51]

[50] Deposition of James Carroll (March 22, 2013), 159-172.
[51] See Savant 2787208, Savant 2010 Sales Review Residential Channel

67. Deploying an effective sales program is critical to driving revenue. Without adequate training and support, sales representatives can become discouraged and quit, translating into subpar revenue growth and high employee turnover in an organization. Moreover, even the best of salespeople can face challenges if the product and brand they are selling is unknown to the market, lacks an established track record and exhibits stability issues from the outset. Such factors can lead to an exodus of talent and decrease sales even further. The compound effects of inadequate training and poor product quality can prove detrimental to a company and can quickly impact a company's long term revenue trajectory.

68. In addition, the failure to develop and manage a sales force can have a sustained, adverse impact on a company's capacity to drive sales. When a firm fails to provide adequate sales support to its distributors, those distributors will experience less success selling the product. The evidence discussed above, in particular Savant's failure to provide sufficient sales coverage for entire regions, is precisely the kind of mismanagement that can undermine a firm's revenue-generating potential for years to come.

69. In developing his hypothetical "but-for" earnings projections, Professor Elhauge fails to give any consideration to numerous ways in which Savant's failure to properly build and manage its sales force undercut its ability to generate the annual revenues he predicts. Instead of addressing this factor in his analysis, his model simply assumes that Savant would have had the necessary capability. This is a crucial and unjustified omission from Professor Elhauge's analysis, and consequently renders his projections unsound.

## E. Savant encountered problems independent of the alleged acts by Crestron as it tried to build its dealer network and grow its business.

70. New market entrants face the inherent challenge of establishing brand and product credibility. In the face of competition, such credibility is largely earned over time by delivering quality products to the market. Should a new entrant deliver products that are faulty or do not work as expected, it can hamper a company's ability to effectively compete and gain market share. New entrants do not enjoy the benefit of having a proven track record and are more susceptible to brand and product rejection should its products prove to be unreliable. While product quality is important to all market participants, it is especially important to new market entrants.

71. Upon examination of the evidence of what was happening internally at Savant as it attempted to build its business, it is clear that Savant was encountering myriad other problems unrelated to any alleged actions on the part of Crestron. In particular, as discussed further below, Savant experienced numerous technical problems with regard to the development of its products. These problems cannot

reasonably be attributed to any alleged conduct on the part of Crestron, and Savant's internal documents demonstrate that these problems had *actual, concrete* adverse effects on Savant's revenues and success in engaging dealers to aggressively promote its products. The ill effects of product failures and reliability problems can snowball for a new entrant like Savant, because such problems can cause lasting damage to the firm's reputation for quality that take considerable time to shake off. This is especially true in an industry such as the residential control and automation industry in which Savant competes, where reliability and product stability are key factors in dealer and end-user satisfaction. Notwithstanding their documented effects on Savant's revenues, Professor Elhauge's Report fails to set forth any consideration as to how these factors might impact his earnings projection for Savant in his hypothetical, "but-for" world. However, even in Mr. Elhauge's hypothetical world, these factors would have persisted as impediments preventing Savant from achieving greater revenues than it actually did. Failing to account for these factors at all is yet another reason why Professor Elhauge has failed to develop a plausible projection of Savant's earnings.

72. For example, the written General Overview section of the year-end Expectations Memo prepared by Savant's outside accounting firm, DiCicco Gulman & Company LLP (DCG) as of December 31, 2008 states:[52]

> *"Based on interim discussions with the CFO, DGC learned that the Company was not meeting its projected sales goal of $5,000,000 for 2008. Per the CFO, part of the reason was that the product was overheating and therefore redesigns were necessary. We therefore expect revenue from product sales to be significantly less than $5,000,000."*

73. Thus, Savant was encountering significant product overheating problems in 2008. No place in the Expectations Memo does it make mention of restrictive actions on the part of Crestron vis-à-vis dealers as being the cause of Savant's shortfall in sales in 2008.

74. A subsequent Expectations Memo for the following year ending December 31, 2009[53] states:

- *"Savant has discontinued the System 3. At this point in time, this product has no value."*
- *"Savant has continued to be heavily involved in research and development during 2009. Per Bruce 40% of engineering costs relate to tweaking products whereas 60% relate to new products."*

---

[52] *See* DGC Savant Systems Expectations *Memo,* December 31, 2008; DGC0072126.
[53] Savant Systems Expectations Memo, December 31, 2009, DGC0073418.

- *"RMA expense is significant during 2009. A significant amount of product was returned during 2009. One cause related to the 'extenders' that were supposed to be powered by a 9 volt but had been created using a 6 volt"*

- *"Bruce mentioned that there has been too much activity in debugging. There now will be preliminary tests on the boards on the line and testing will be moved up the chain."*

75. These comments by Bruce Myers (CFO) indicate that in 2009 Savant continued to be plagued by product problems that affected its sales and, presumably, its reputation in the market. These product problems could be a significant reason dealers might have been hesitant to take on Savant as a new product line. Again, none of these Savant's product problems was related to any restrictive actions on the part of Crestron vis-à-vis dealers. And for the reasons explained in ¶¶ 70-71 above, product defects such as those reflected here—particularly those that are impactful enough to be called out in the firm's year-end financials—could have lasting reputational effects on Savant's branding and perceived quality that could hinder earnings potential for years to come.

76. The reference to engineering costs relating to research and development (R&D) in the 2009 Expectations Memo is also notable. In ¶148 of his Report, Professor Elhauge advances a theoretical claim that Crestron's alleged conduct has (or may have) caused Savant to spend less on research and development than it would have in the "but-for" world, thus decreasing Savant's capacity to innovate.[54] I note that, as with several of the other theoretical claims in his Report, Professor Elhauge does not attempt to test whether theory is consistent with the evidence of what actually happened. In this case, there is no evidence of any reduction in Savant's R&D spends; on the contrary, Savant spent steadily on R&D throughout the period,[55] and Professor Elhauge does not identify any concrete foregone investments in R&D by Savant. On the other hand, Mr. Myers's comments to DGC are telling of another problem with R&D that had nothing to do with any alleged conduct on the part of Crestron, namely, that fully 40% of Savant's investments in R&D were required to be spent on "tweaking products," leaving only 60% for the development of new products.[56] The fact that Savant had to make such substantial R&D expenditures just to sustain its existing product lines is further evidence of the technical issues and design deficiencies that negatively impacted Savant's profitability and, ultimately, its revenue-generating potential.

77. Similarly, DiCicco Gulman's Expectations Memo dated December 31, 2011 contains the following statements that indicate further product problems and issues:[57]

---

[54] Elhauge Report, ¶ 148 (opining
[55] *See* Savant Systems LLC Financial Statements for years 2005-2006 (SAVANT2750606); 2007-2008 (SAVANT0131349); 2009-2010 (SAVANT0200168); and 2011-2012 (DGC0028584).
[56] Savant Systems Expectations Memo, December 31, 2009, DGC0073418.
[57] *See* DGC Savant Systems Expectations Memo, December 31, 2011, DGC0066224

- *"Discontinued Products: Per Bruce, the system 2, 24, Protégé, Video Cards and media docks have been discontinued. Per Bruce, Savant still used the circuitry related to these items, but the product design has all changed. DGC will review whether any of these items had been capitalized in the past and therefore should be written off as of December 31, 2011."*

- *"Returned Products: Per Bruce a significant amount of new docking systems were returned due to a design issue. Extenders also have seen significant returns."*

78. Once again, Savant was competing in an industry that valued product reliability and that required rapid and continuous changes in technology. These comments underscore the fact that even in 2011, Savant continued to experience product quality issues, problems that could and did impact the acceptance of the company's products in the market and influence the decision of dealers and/or residential owners. During its early years on the market, Savant appeared to struggle in this area of its operations. Once again, these Savant product quality and expense control problems were in no way caused by Crestron's actions vis-à-vis dealers.

79. Indeed, statements from Savant's sales personnel demonstrate that the host of technical problems afflicting Savant's products did have a significant and negative effect on the brand's reputation for quality, a crucial factor in the firm's ongoing earnings potential. In a letter dated August 5, 2009, Sean Manzanares, Savant's Regional Sales Manager for the Western Region provided a candid assessment of the real-world impact of this problem. He wrote:

> **Reliability image – major**:
> The Savant reliability history is still a problem that has permeated since I first reported back on December 16. . . . We had reliability issues last year and word was on the street of such, then and now. We have added 131 new dealers and I am assuming the % of reliability issues is about the same, but now a greater population is effected [sic]. This has also degraded the confidence of our Reps when they get pounded about quality issues and RMAs.

8/5/2009 Letter from Sean Manzanares to Bruce Myers, at SAVANT2760284; SAVANT2760297, Exhibit 5 to January 21, 2014 Deposition of Savant Systems (Witness Robert Madonna).

80. Mr. Manzanares continued in his letter to address a string of serious technical problems that were affecting Savant's products, including both its hardware and its software profiles, and to recount the damaging reputational affects these failures were having on Savant. He also added, "I would guess that >60% of showroom installs in the West have encountered an RMA. This causes

apprehension by the dealers to not gamble their good name with a 1st Job, or flip job while they are trying to stay alive." Mr. Manzanares's observations of what was actually happening in the field is are clear proof that these rampant technical problems had a severe negative affect on Savant's reputation and caused dealers to balk at deploying the product in the field.[58]

81. George Katsiris, Savant's Director of Sales and formerly a regional sales manager for the company, provided additional evidence of the product issues that Savant was experiencing and their negative impact on Savant's revenues. In an email dated September 16, 2009,[59] addressed to Savant's Stephanie Waters and copied to CEO Robert Madonna, Mr. Katsiris provided his assessment of the firm's outlook following the recent CEDIA industry convention. Under the heading "The ugly," Mr. Katsiris wrote:

> [T]here were also several meetings I had that were simply embarrassing. Sometimes I would touch lights on the True Image panels and nothing would happen and other times there was a significant delay.... This is a very small industry and word travels fast so folks who have had issues with their demo systems or first installs were very critical when anything didn't work.... The hardware failure is directly impacting revenue but if a piece dies completely at least we have visibility and can address it. It is the more subtle examples like we saw at the booth that is killing us right now. . . . After a while, they develop an overall impression that these intermittent quirks are intrinsic to the Savant experience.

Once again, these statements from Savant's personnel corroborate the link between these product failures and the reputation of Savant's products in the marketplace. As a new entrant, it was particularly important for Savant to build an image of brand quality in order to generate revenues down the line. Missteps like these could greatly impact Savant's ability to do so.

82. In sum, the evidence clearly shows that Savant experienced reputational harm as a result of its widespread and well-known product failures that could and did damage its earning potential, in both the short and long term. The long term effects of such reputational problems are particularly significant for a start-up firm that does not have the benefit of a proven track-record in the market to fall back on. In Savant's case, these problems occurred at an early stage in its development,

---

[58] In this case, these technical issues were coupled with Mr. Manzanares's observation of what he believed was another "major" issue facing Savant, namely, that "We were flat out overpriced, and not competitive at a majority of jobs." 8/5/2009 Letter from Sean Manzanares to Bruce Myers, at SAVANT2760284; SAVANT2760297, Exhibit 5 to January 21, 2014 Deposition of Savant Systems (Witness Robert Madonna)

[59] Exhibit 10 (SAVANT0009897), Deposition of George Katsiris (Feb. 20, 2013).

when its future growth prospects depended in significant part on the development of its brand's reputation. Professor Elhauge's earnings projections do not take any account of this factor and its impact on Savant's potential to reach the revenue numbers he sets, which is yet another way in which his projections are untenable.

83. The foregoing analysis suggests that, quite apart from any marketing difficulties it was facing, Savant from the beginning was experiencing serious product and manufacturing problems. Documents discussed previously in this report point to product quality problems, product stability issues, high product return rates, product re-design problems, overheating problems, overruns in the cost of engineering materials, quality control problems, significant inventory write-offs, and elevated expenses for R&D and engineering. In turn, quite apart from any actions on the part of Crestron, this was yet another reason for dealers to hesitate before taking on the Savant product line or aggressively promoting it to end users.

## F. Savant's claimed revenue shortfall appears to be based on its failure to meet its founder's expectation of an unrealistically fast return on investment via sale of the company.

84. The evidence I have reviewed all leads me to the conclusion that Savant was built with one end-game in sight: to achieve a quick return on investment for Mr. Madonna by engineering a sale of the company. Indeed, the many deficiencies in Savant's management and operations that I have described above are symptomatic of a company that was built with an eye towards a quick flip, as opposed to building a sustainable business with a solid foundation for growth and profitability. Accordingly, it is my opinion that – in the real world – Savant did not have the capability to achieve the revenue projections that Professor Elhauge claims it would have achieved in his hypothetical world.

85. In Section IV(B) of this report, I discussed the abundant evidence in the record that, from the outset, Savant failed to develop realistic forecasts of its sales, expenses, and profits, and that consequently, management's dashed expectations for Savant's performance are a result of these faulty and unrealistic projections. The flaws in these projections include failing to follow acceptable methodologies, as well as to understand such fundamental questions as the size of the relevant market.

86. From my review of the record, it is clear that a primary driver of the firm's lofty expectations was its founder's interest in obtaining a sale of the company that, in his view, would provide him with a justifiable return on his investment of capital. For example, during the October 2012 Deposition of Savant, Mr. Madonna, acting as witness on behalf of the company, testified regarding discussions he and other Savant personnel had discussed efforts to arrive at a valuation for the company for use in upcoming talks between Savant and Harman,

another consumer electronics firm, regarding the possible acquisition of Savant.[60] In his words, those discussions were driven by "how much we had invested in the company and I discussed with Bruce what a fair return would be on that type of investment." Deposition of Savant Systems (October 25, 2012) 67:10-13. Mr. Madonna further testified that "there was 120 million dollars invested in the company and that a fair return on a six or seven-year investment like that with the type of investment that it was would be somewhere around 20 percent which – Plus we had a long discussion about synergies [between Savant and Harman]."[61]

87. Likewise, it is clear that Mr. Madonna's dissatisfaction with Savant's performance was the product of his expectations of an early return on investment. Later in that same deposition, Mr. Madonna was questioned regarding the extent of Savant's growth which, as noted in ¶ 48 above, was considerable throughout the period from 2008-2013. Asked whether he thought that the growth experienced by the company meant that it had been successful, Mr. Madonna answered, "Not in the market that – with 120 million dollar investment and that should have hit these numbers in the beginning, if it were not for them being blocked? The answer is no.... 140 million dollars with interest invested in the company which would have been a fair investment, had we not been blocked in the marketplace."[62] He later added, "the proof in the pudding is in companies that look at us to acquire us. Is that at the end of the day, you don't get the valuations where they should be or where they would have been, if it had not been for being blocked out of the marketplace."[63]

88. Upon review of the record, it is clear that, from the outset of Savant's operations, Mr. Madonna's plans to sell the company were a factor driving the company's strategy and development. As I explain below, this focus on acquisition as the means to achieve a return on investment is vital to understanding the way in which the company was managed. And in turn, management's decisions and focus in running the company in light of these objectives is of central importance to assessing Savant's earnings potential and whether it had the capability to meet the revenue figures that Professor Elhauge projects in his hypothetical "but-for" world. In the Expectations Memo prepared by the firm's outside accountant for the year ending December 31, 2008, the authors wrote:

---

[60] Deposition of Savant Systems, Witness Robert Madonna (October 25, 2012), 67:18-70:23

[61] *Id.* at 69:5-11. Mr. Madonna continued: "Normally high tech investments like this are considered risky, riskier than, say, investing in bonds or as an example. So we felt saying, you know, asking for a 20 percent return if I invested in any type of entity that, whatever high tech it was, would be fair to ask for. And for any entity I'm looking at acquiring the company because of how much money it has cost to develop the technology," and that "The total cranked up to two hundred million. So it was like if you had an investment of 20 percent, it would probably be compounded by – That's roughly the number we came up with. Plus some number to share in the synergies in the deal if there was a deal." *Id.* at 69:19-70:23.

[62] *Id.* at 123:10-124:6.

[63] Savant Systems Rule 30(b)(6) Deposition (Witness Robert Madonna) October 25, 2012, at 125:12-18.

> The primary users of these financial statements are the preferred member of 886 Holdings and the management of Savant Systems.... Our judgment regarding materiality has been influenced by the needs of the primary user. ***It should be noted that based on our understanding of the industry, a potential buyer would be more interested in the inherent value of Savant's product line and research and development capabilities rather than the actual results of the business.*** We also believe that a potential buyer would be more interested in management's ability to implement required accounting standards and apply proper accounting policies and procedures rather than the technical precision with which estimates were formulated."

Savant Systems Expectations Memo, December 31, 2008, DGC0072126 (emphasis added). A similar statement to the above regarding potential buyers of the company is repeated in each of the Expectations Memos for the years 2009-2012.[64]

89. This stated focus on the "inherent value" of Savant's product lines, rather than the "actual results of the business," is a common feature of many startup companies, in my experience. These statements indicate that Savant was focused on taking those steps that, in management's view, would make the company most attractive for a potential acquirer—even if that meant that the actual results of the business might take a back seat. Among my investor colleagues, this is sometimes referred to "fattening the pig for slaughter."

90. Interestingly, when Mr. Madonna was deposed in October 2012, Mr. Madonna offered a different view, claiming that the measure of success was actual results, in particular, *profitability*. In explaining his view of why Savant's growth did not show that Savant had been successful, Mr. Madonna testified, "You can't categorize a company going, oh, 50 percent growth top line is good. No, it's not good when you have a – It isn't good when you're not making any profit and all these models have one big assumption that you're not paying attention to. Cash flow analysis is useless if you don't have profit. We don't have a time of profit in this company. So that it not a successful company. So you can't look at just top line and go that's a success." Savant Systems Rule 30(b)(6) Deposition (Witness Robert Madonna) October 25, 2012, at 124:7-18.

91. Mr. Madonna's newly found emphasis on profitability and performance, however, is contradicted by the way the firm was actually run. If profitability

[64] See DGC0073418; DGC0077946; DGC0066224; and DGC0067407.

had been so important to management, then why, for example, does the Expectations Memo[65] for the calendar-year ending 2012 *yet again* reflect that, as in the years 2010 and 2011, "little effort was put into cost saving ideas"? By 2012, the damage to Savant's revenue-generating capacity from years of mismanagement had already been done.

92. In their depositions, Savant executives Robert Madonna and Jim Carroll initially contended that Savant had lost sales equal to the difference between its original sales forecasts and its actual performance. For example, in the same vein as his 2012 testimony, during a prior deposition in October 2011, Mr. Madonna cited Savant's revenue shortfall as compared to its original sales forecasts, and testified that "I believe our plan is off collectively over the years in north of a hundred million dollars in revenue," and later that "It was somewhere in the order of $168 to $238 million based on the projections that we believe we would have had." Deposition of Robert Madonna (October 26, 2011) 368:22-369:8, 372:19-373:5.

93. At his first deposition, Jim Carroll also made similar claims. Questioned at length about two different documents that he had helped prepare for this lawsuit regarding Savant's claimed damages, Mr. Carroll attempted to explain the basis for Savant's forecasts, and how Savant's actual performance had fallen short of those expectations. March 22, 2013 Deposition of James Carroll, 342-365 (Exhibits 11 and 12).[66] The projected revenues reflected in these documents, which Mr. Carroll claimed had been developed by Savant in 2008, project growth for Savant on a massive scale that is reminiscent of the hockey-stick phenomenon I described above. He testified that "I believe all those numbers were derived at the same time during the 2008 time period," but conceded that he could not identify a single document from 2008 that actually sets forth the figures reflected in this plan. He also claimed that the "modified" plan numbers reflected revisions Savant made to the plan in the end of 2008 or early 2009, which he claimed were prompted by Crestron's alleged conduct. March 22, 2013 Deposition of James Carroll, 346:24-347:3, 347:18-348:5. Regarding the process for developing Savant's original plans, Mr. Carroll testified that he, Mr. Madonna and Mr. Myers "had these numbers in our head," and emphasized that they were "from a number of different discussions and keep in mind, we were a very small company at this point, right, seven or eight employees. There wasn't big long-drawn out plans. It was Bob, Bruce and I having discussions and meetings talking about the type of dealers, the number of dealers, the type of revenue we could expect off of those type of things." March 22, 2013 Deposition of James Carroll, 340:7-18, 342:22-343:22.

---

[65] Savant Systems, LLC Expectations Memo, December 31, 2012 (DGC0067407).

[66] I understand that Savant is no longer relying on Mr. Carroll's calculations as the measure of its damages, and instead is relying on the numbers put forward by Professor Elhauge. In January 2014, Mr. Carroll testified on behalf of Savant regarding the same exhibits that they were "not an intent to finalize damages" and that "expert testimony, economic experts determine those numbers at a later date." Deposition of January 22, 2014 Deposition of Savant Systems (Witness James Carroll), at 221:23-222:6.

94. As noted in ¶ 35 of this Report, it was not until mid-2009 that Savant revised its estimate of the market size downward to *approximately half* the size assumed in Savant's original earnings projections. In other words, Savant's 2008 earnings projections assumed a market that was roughly twice as large what Savant later believed to be the correct size. As explained in Section IV(B) above, Savant's projections were marred by a number of flaws, including among other things a failure to collect basic data needed to understand the size of the market. Clearly, these mistakes fueled and inflated Savant's management's expectations for the company's earnings, and its executives reliance on these earlier projections as a basis for what they claimed are Savant's lost profits was clearly not justified.

95. Thus, the record makes clear the flawed assumptions and projections that were guiding Mr. Madonna's expectations when he made—and continued to make—his investments into the company. Tellingly, Savant could not manage to shake this kind of thinking even later on in the company's development. In August and September of 2010, in connection with its talks with Leviton regarding a possible acquisition, Savant presented Leviton with the same kinds of inflated financial projections that the company had developed in 2008. As noted in ¶ 37 above, Robert Becker, an Executive at Leviton, strongly questioned the reasonability of these projections. A slide deck that Savant presented to Leviton during these talks included Savant's "5 Year Forecast".[67] That forecast projected the following revenues (the figures appear to be in millions of dollars):

| | CY 2010E | CT 2011E | CY 2012E | CY 2013E | CY 2014E |
|---|---|---|---|---|---|
| Revenues | $13.6 | $53.8 | $135.9 | $277.1 | $498.8 |

96. When considered in light of the company's acquisition-driven strategy, the reasons behind these failings become clear. As alluded to above, the most troubling aspect of these projections is management's lack of concern as to what went into these projections. Errors and carelessness of the degree reflected in Savant's approach to planning its business reveal a fundamental lack of focus given to the most basic business principles, was and show that Savant paid little interest to following the steps that are needed to develop a viable plan to achieve sustainable, profitable operations. That is exactly the kind of planning that management failed to undertake. Competent management personnel who were motivated to build a self-sustaining enterprise would not have tolerated such errors. However, firms whose strategy is to concentrate on developing the "intrinsic value" of its product and R&D capabilities—even at the expense of planning for actual performance—frequently do make such mistakes.

97. Some of the tell-tale signs include Savant's failure to make meaningful investments in its own sales force, to develop the required support capabilities to sustain its dealers' projects, and the decision to go to market with the product before critical product reliability issues had been resolved. If management's primary goal was to generate visibility for its products and display its innovative potential to

[67] Exhibit 3, October 11, 2012 Deposition of Leviton, pg. LEV0000226

attract potential acquirers, these decisions are understandable, though not necessarily well-advised. But based on my experience, the decisions management made, and the myriad problems with Savant's operations that went overlooked for so long, simply are not compatible with a goal of developing a long-term successful enterprise capable of sustaining its own operations.

98. Mr. Madonna seemingly placed great faith in his belief that the experience of his management team's experience from Excel Switching would translate into successful management of Savant. Indeed, Mr. Madonna testified repeatedly to this belief during his depositions. For example, he testified that "from 2009 on, if it weren't for Crestron's activity, I believe we would have made the plan. It doesn't mean we wouldn't have had obstacles to overcome, but there wouldn't be an obstacle we couldn't overcome with the team I put in place. So I feel very strong about that because this team was a proven team."[68]

99. While it is perhaps true that the experience his Savant management team gained at Excel Switching might have had relevance in the areas of technology, R & D, operations, finance and accounting, there is little to indicate that the same would be true in the areas of sales and marketing. This is because the channels of distribution used to sell the products of Excel were quite different from those required to sell Savant's products, and crucially, the end user market for Savant's products was entirely different than in the case of Excel. Specifically, Excel's products were sold primarily to "OEMs" (original equipment manufacturers), value added resellers, and "self-developing service providers" in industrial and commercial markets. Excel had a total of only about 120 customers, all of them in industrial and commercial markets.[69] By contrast, Savant products are sold through a network of independent dealers who, in turn, resell them to homeowners and end-users in the *residential* market.

100. In the January 21, 2014 Deposition of Savant, Mr. Madonna, acting as witness for the company, testified himself to the importance of relevant industry experience in the success of a business venture. Mr. Madonna formed an investment firm known as 886 Ventures which, in addition to being the primary investor in Savant, also invested in a skincare company called Sampar. In explaining why that venture was not successful, Mr. Madonna testified that he had "failed to realize [] how much money you have to spend in sales and marketing to make it successful. So it's not technology and I think it was a lesson I learned that, at least for me personally, my love was in technology and that's what my background was in. So it was a venture outside my realm of expertise." Although both Excel Switching and Savant are "technology" companies, as noted above, they were also fundamentally different in that the former company served wholly industrial and commercial markets, whereas Savant was a consumer electronics firm whose business was primarily targeted to a residential audience. Indeed, given the readily-apparent failure by Savant to adequately develop its sales force, it seems that Mr. Madonna's underestimation of the importance of investing in sales at his skincare company may have transferred over to Savant.

---

[68] October 26, 2011 Deposition of Robert Madonna, 375:4-10.

[69] January 21, 2014 Deposition of Savant Systems (Witness Robert Madonna), at 63:12-64:2.

101. Moreover, even in those areas of the firm's operations that one would expect to benefit most greatly from the management team's experience at Excel, there were problems. Shortly before his expression of confidence in his team's capabilities as a reason for Madonna's certainty that Savant would perform according to its original projections, Mr. Madonna also acknowledged that "We didn't ship product until 2008.... We were a year late before we started selling, just 'cause we were off on the estimates and how long it would take to develop the software. . . . it's a lot of software in one of these products, and we underestimated the amount and time it took initially." Mr. Madonna then explained that as a result of this delay, 2009 was Savant's first full year of production. Deposition of Robert Madonna (October 26, 2011) 373:22-375:3. And as discussed above, the company had well-documented technical issues with its products, including the previously discussed overheating issues that required redesigns of the product in the year 2008, which CFO Myers stated had caused Savant to fall short of its revenue forecast that year. Savant Systems Expectations Memo, December 31, 2008, DGC0072126.

102. In addition, it should be noted that the story of Excel Switching did not have a fairy-tale ending. Savant Executive J.C. Murphy, who was also a member of the Excel team, testified that Excel Switching was sold to Lucent Technology in 1999 for a purchase price exceeding $1 billion worth of stock. However, just three years later, Lucent sold Excel Switching, including all of the assets that it had originally acquired from its acquisition of Excel Switching, in a management-led buyout for a price of seven to eight *million* dollars, plus the assumption of a five-million-dollar lease. Deposition of J.C. Murphy (January 24, 2014) 9:16-18, 12:18-13:12, 17:13-16. Although Mr. Murphy testified that part of the reason for the $7-8 million purchase price for Excel Switching's assets may have been attributable to market pressures facing Lucent, the precipitous decline in the market value of Excel Switching's assets just three years after it was sold for $1 billion worth of stock suggests that the real value of that firm may have been illusory.

103. In his Report, Professor Elhauge offers a theory of a anticompetitive harm that "If firms are blocked from any significant share of the market, then successful innovations will have a smaller payoff than they otherwise would have, which will discourage capital markets from making efficient investments in research and innovation." I offer no opinion in this report as to the validity of Professor Elhauge's statement as a matter of antitrust or economic theory. But in this case, Savant, unlike the vast majority of start-up firms, has had what appears to be almost unlimited access to capital that has been provided by 886 Holdings, an entity owned and controlled by Mr. Robert Madonna, CEO of Savant. A final statement in the December 31, 2009 Expectations Memo prepared by DiCicco Gulman contains the following "going concern" alert:

- *The ability of Savant to continue as a going concern is dependent on the willingness of the preferred member of 866 Holdings to continue to fund its*

*operations. DGC will inquire of management as to the preferred member's intentions and will consider the necessary disclosure requirements.*

104. This statement is identical to one that occurs in every year-end Expectation Memo prepared by Savant's outside accounting firm from 2008-2012, and a similar cautionary note is contained in Savant's financial statements spanning the same period.[70] These statements reveal that, from the beginning, Savant has been unable to stand on its own feet financially and has generated significant annual losses. From 2008 to 2012, these losses have ranged from $17.4 million to $21.9 million per year. Yet the record shows that 886 Holdings has continued to invest whatever sums the company needed to continue operations each year. In terms of its access to capital, this makes Savant more like the wholly-owned subsidiary of a deep-pocketed private equity firm or a large established corporation than a traditional start-up firm that has to stand on its own two financial feet and where much of senior management's time is spent seeking new equity investors or additional bank financing for the firm.

105. And although it may be the case that Savant was unable to convince suitors such as Leviton and Harman to acquire it, the real question is, why weren't they persuaded of the value of the business? As an experienced investor, I conclude that the answer is the approach with which management operated the company. The statements in the Expectations Memos that "a potential buyer would be more interested in the inherent value of Savant's product line" is a lens through which numerous aspects of Savant's strategy can be understood, as explained above in ¶112. The irony is that the decision to run Savant according to a particular strategy aimed at making it an attractive acquisition target appears to have had the opposite effect. By focusing on "inherent" business value rather than taking the steps needed to achieve actual results, Savant was perhaps successful in developing some innovative technology, but had failed to develop the foundation necessary to sustainably grow its revenues and operate profitably.

106. In sum, I conclude that as a result of numerous factors, including management's competence and pursuit of an acquisition strategy, Savant did not have the capability of achieving the lofty earnings projections set forth in Professor Elhauge's model. Rather than pursuing steps to maximize the company's ability to deliver actual results, Savant's management appears to have focused on an approach that was designed to maximize potential value in the eyes of acquisition partners, at the expense of developing Savant's capacity to grow its own revenues organically. Many actions by management, such as Savant's failure to invest adequately in developing its sales force, a demonstrated lack of interest in managing expenses and controlling costs, and deciding to go to market with a product that was not yet fully reliable and failing to respond adequately to

[70] Savant Systems Expectations Memos for 2008 (DGC0072126); 2009 (DGC0073418); 2010 (DGC0077946); 2011 (DGC0066224); and 2012 (DGC0067407); Savant Systems LLC Financial Statements for years 2007-2008 (SAVANT0131349); 2009-2010 (SAVANT0200168); and 2011-2012 (DGC0028584).

technical problems are just some of the many indicators showing that management's focus was not on building a business that could sustain itself. As a result, I conclude that quite apart from any alleged conduct by Crestron, Savant's actions and other exogenous factors left it without the capability to meet the revenue figures posited in Professor Elhauge's model. Because Professor Elhauge fails to consider the numerous factors relevant to measuring a firm's earning potential, it is fundamentally flawed and not a reasonably constructed revenue projection.

## V. CONCLUSIONS

107. Given the foregoing review of Savant's business operations, it is my view that the company encountered a number of problems wholly unrelated to any alleged anticompetitive conduct by Crestron that hindered Savant's growth, and which render Professor Elhauge's earnings projections for the "but-for" world untenable.

108. Savant was a new entrant to the market in 2008, and was founded with the backing of Robert Madonna, who also served as the company's CEO. Having been successful in launching, growing, and selling his first high-tech company, Excel Switching to Lucent, Mr. Madonna saw an opportunity to launch a second entrepreneurial venture in the field of residential controller products.

109. Unfortunately, however, from the beginning, the challenge of designing, developing, and marketing the new product line proved to be more difficult and costly than anticipated. In the early years in particular (2007 to 2010), there were serious problems with the products themselves, with the costs of manufacturing, and with the company's inability to control expenses of all types. As described above, these difficulties, self-identified by Savant, included:

- Product quality problems
- Product stability issues
- High product return rates
- Overheating problems
- Quality control problems
- Product re-design problems
- Cost overruns in engineering materials
- Elevated R&D and engineering expenses
- Significant manufacturing cost overruns
- Significant inventory write-offs

110. There were many reasons, quite unrelated to any actions on the part of Crestron, that dealers were understandably reluctant to sign up to carry the Savant product line. Indeed, internal documents from Savant itself (Savant 2787208) cite the following non-Crestron reasons why it was proving difficult to establish an effective dealer network:

- Continued decline in economic conditions
- Product stability issues
- Hardware failures
- Bad initial experience of dealers with Savant
- Turnover of Savant sales personnel and reps

- Poor performance of Sales and Reps
- Need to terminate regional managers
- Need to retrain sales team personnel and reps
- Need to cut about 60 non-performing dealers
- Need to revamp their training curriculum for dealers
- Overall lack of sufficient training
- Need to look at alternative distribution strategies

111. Internal Savant documents revealed that prior to the filing of the lawsuit, Savant did not have a strong sales organization capable of supporting an effective nationwide dealer network. Indeed, the document entitled 2010 Sales Review (see Savant 2787208) was remarkably candid about Savant's internal sales organization problems.

112. From the beginning and for several years Savant was significantly unrealistic and over-optimistic in its ability to estimate the size of the market or accurately forecast sales revenues, expenses, and profits. Notwithstanding all its allegations against Crestron, Savant has achieved substantial year-over-year revenue growth since it first entered the market in 2008. That growth, however, was not commensurate with its founder's lofty expectations.

113. Behind the complained-of shortfalls in Savant's revenues and profits lay all sorts of problems in manufacturing, product design and quality, operations, and in the company's efforts to build a strong and effective dealer network. These problems, in turn, were the result of management's failure to develop core operational capabilities that were essential to the firm's ability to generate revenue.

114. Management's failings in this regard stemmed from its focus on an acquisition-driven strategy that was aimed at achieving an early return on investment for the firm's founder and CEO. To that end, management pursued a strategy that it believed would pump up the intrinsic value of Savant in the areas of product development and R&D capabilities, and thereby make the firm more attractive as an acquisition target. In so doing, the firm devoted little to no efforts in measures like cost-control, sales force development, and effective business forecasting that are essential to building a foundation for growth. As is commonly the product of such strategies, Savant's focus on intrinsic value came at the expense of developing a self-sustaining business capable of achieving actual results.

115. Accordingly, it is my conclusion that as a result of the problems facing Savant described in this report, and unattributable to any of the alleged conduct by Crestron, Savant did not have and the capability to achieve the revenue numbers projected by Professor Elhauge in the hypothetical "but-for" world. Because Professor Elhauge's model fails to consider the impact of these factors on Savant's capacity to generate revenues, his revenue projections are flawed and untethered to any measure of Savant's actual ability to achieve them.

# VI. EXHIBITS

**Exhibit 1: Ralph Z. Sorenson Biography**

DR. RALPH Z. SORENSON
603 Spruce Street
Boulder, CO 80302
Phone & FAX: (303) 440-9752
e-mail: bud@boulder.com

**Career**

Since 1993, Dr. Ralph Z. Sorenson has been General Partner of the Sorenson Limited Partnership. He specializes in venture capital investing in a diverse range of entrepreneurial start-up companies. In addition, he serves or has served on the boards of directors or advisory boards of fifteen public companies and seventeen private companies

Dr. Sorenson is currently President Emeritus of Babson College and Professor Emeritus at the College of Business and Administration of the University of Colorado, Boulder, where he served as Dean of the College. He is also a Co-Founder of the Asian Institute of Management in the Philippines.

From 1989 to 1992, Dr. Sorenson was Adjunct Professor of Management at the Harvard Business School where he taught general management and leadership courses in the MBA program.

From 1981 to 1989, Dr. Sorenson served as Chairman, President, and CEO of Barry Wright Corporation, a diversified New York Stock Exchange Company. Barry Wright designed and manufactured industrial and computer related products for improving productivity in offices, factories, aircraft, and transportation equipment.

Prior to joining Barry Wright, Dr. Sorenson served from 1974 to1981 as President of Babson College in Wellesley, Massachusetts. Under his leadership, Babson launched its strategic initiative in the field of entrepreneurial studies. During his tenure, Babson created the first ever Center For Entrepreneurship Education in the world. Today, Babson continues to be consistently ranked by U.S. News and World Report and other publications as having the #1 entrepreneurship program in the country among both graduate MBA and undergraduate business schools.

Before Babson, Dr. Sorenson served for ten years as professor of marketing at the Harvard Business School from which he received an MBA degree (with Distinction) and a doctorate as a Ford Foundation Fellow. He received his AB degree (Magna Cum Laude and Phi Beta Kappa) from Amherst College in 1955. In 1985, he was awarded the Honorary Doctor of Laws degree from Babson College.

While at Harvard, Dr. Sorenson served from 1966 to 1968 as Director of the Harvard Advisory Group in Manila, the Philippines. This project, which was aimed at strengthening graduate level management education in Asia under a Ford Foundation grant, resulted in the creation of the Asian Institute of Management, of which Dr. Sorenson is a Co-Founder and continues to serve on its Board of Governors.

Early in his career, Dr. Sorenson served as a research associate the IMEDE Management Development Institute in Lausanne, Switzerland (1959-1961) where he researched and wrote case studies on companies throughout Europe. He served as a marketing executive and as assistant to the worldwide head of marketing at the headquarters of Nestle Alimentana in Vevey, Switzerland (1961-1963). A military veteran, he served two years (1955-1957) as a Lieutenant in the United States Air Force and later as a Captain in the U.S. Air Force Reserve.

**Public Company Directorships**:

Dr. Sorenson currently is a member of the board of directors of Whole Foods Market, Inc. He is the company's longest standing independent director, having served for 20 years since 1994. He is chairman of the company's Nominating and Governance Committee and past chairman of its Compensation Committee. His past public company directorships include:

Affiliated Publications Inc.
Amtel Inc.
EMC Corporation
Exabyte, Inc.
Foxboro Corporation
General Housewares, Inc.
Houghton Mifflin Company
Knapp King-Size Corporation
Polaroid Corporation
Mammoth Mart, Inc.
Springs Industries Corporation
Sweetwater, Inc.
The Boston Globe, Inc.
Xenometrix Inc.

**Private Company Directorships and Advisory Boards:**

Dr. Sorenson has investments in, and either serves or has served on the boards of directors or advisory boards of the following start-up and early stage companies:

AudioAdventures
Bioptix
Boulder Securities
Bright Horizons Children's Centers
ColorLink Inc.
EcoProducts
First Bank of Colorado
First Western Trust Bank of Colorado
Global Cooling-Japan, Inc.
Gold Systems, Inc.
Insight Photonic Solutions
1Yogi
National Eco Wholesalers
Net Library
RecycOil,
SourceLocal
Xyleme, Inc.

**Civic and Professional Non-Profit Organizations**:

Chairman of the Board and Life Trustee of the Boston Museum of Science
Chairman, Association of Independent Colleges and Universities in Massachusetts
Director of the Federal Reserve Bank of Boston
Chairman and Director, Simon Bolivar Foundation
Trustee and Trustee Emeritus, Babson College
Trustee of the Deming Center for Entrepreneurship, University of Colorado
Member of the Executive Committee, World Affairs Council
Trustee, The Nature Conservancy of Colorado and Colorado; Representative to its National Trustee Council
Director, Conservation Law Foundation
Governor of the Asian Institute of Management
Member of the President's Advisory Board of Olin College of Engineering
Member of Executive Committee, Machinery and Allied Products Institute
Member of the Corporation of Massachusetts General Hospital,
Overseer and Overseer Emeritus, the Boston Symphony Orchestra
Overseer of the Boston Museum of Fine Arts,
President, Amherst College Society of Alumni.

**Honors and Awards**:

Phi Beta Kappa, Amherst College
B.A. Magna Cum Laude, Amherst College
Doctor of Laws, LL.D, Honorary Degree, Babson College
Babson Medal for Outstanding Service, Babson College
Distinguished Citizen Award, Boy Scouts of America, Norumbega Council
Distinguished Eagle Scout Award, Boy Scouts of America
Testimonial Award of Appreciation, Asian Institute of Management

**Education**:

Amherst College, A.B., Economics, 1955
(Magna Cum Laude, Phi Beta Kappa)

Harvard University, Graduate School of Business Administration, MBA
(With Distinction), 1959

Harvard University, Graduate School of Business Administration, Doctor of Business Administration (DBA), 1967

Ford Foundation Fellow, Harvard Business School (1963-1966)

Babson College, Doctor of Laws (LL.D) Honorary Degree, 1985

**Military Service:**

First Lieutenant, United States Air Force, 1955-1957
Captain, USAF Reserve, 1958-1968

**Date of Birth**: September 20, 1933

**Personal**:

Dr. Sorenson and his wife, Charlotte, live in Boulder, Colorado and Cambridge, Massachusetts. They have three married children and six grandchildren.

# VII. APPENDICES

## Appendix A, List of Documents Considered

---

### Legal Pleadings

- Amended Complaint and Demand for Jury Trial, *Savant Systems, LLC v. Crestron Electronics, Inc., Civil Action No. 10-cv-11622-EFH*, November 8, 2010.

### Expert Reports

- Expert Report of Einer Elhauge, *Savant Systems, LLC v. Crestron Electronics, Inc.*, Civil Action No. 10-cv-11622-MLW, March 28, 2014, including all files data, and other materials produced by Professor Elhauge in support of his Expert Report.
- Expert Report of Daniel S. Kippycash, *Savant Systems, LLC v. Crestron Electronics, Inc.*, Civil Action No. 10-cv-11622-MLW, March 28, 2014.

### Documents

Corey Spencer0000008
Corey Spencer0000023-32
Corey Spencer0000264
Corey Spencer0000267
Corey Spencer0000268
Corey Spencer0000275-284
Corey Spencer0000392-396
Corey Spencer0000398-555
Crestron2558639
DGC0028584-28603
DGC0036834
DGC0066224-66229
DGC0067407-67411
DGC0070561-70562
DGC0072126-72128
DGC0073418-73423
DGC0077946-77950
EDBRESLOW 0000294
SAVANT0009897
SAVANT0042912-42914
SAVANT0047326-47327
SAVANT0131349
SAVANT0132469
SAVANT0132470
SAVANT0200168
SAVANT0262905
SAVANT0262906-262926
SAVANT0775317-775320
SAVANT0775324-775328
SAVANT0834876
SAVANT0834877
SAVANT0911820-911832
SAVANT0952066

SAVANT0954991-955010
SAVANT0955011-955032
SAVANT1003051-1003074
SAVANT1520589
SAVANT1529152-1529179
SAVANT1529180-1529206
SAVANT1671501
SAVANT1671775
SAVANT1673351
SAVANT1673362
SAVANT1717394
SAVANT1725918
SAVANT2606881
SAVANT2606885
SAVANT2750606
SAVANT2760284
SAVANT2770436-2770460
SAVANT2787208

## Deposition Transcripts and Exhibits

*Savant Employees/Associates*
- Robert Madonna (Savant Systems), October 26, 2011 and exhibits
- Savant Systems R. 30(b)(6) (Robert Madonna), October 25, 2012 and exhibits
- Savant Systems R. 30(b)(6) (Jim Carroll), January 22, 2014 and exhibits
- Savant Systems R. 30(b)(6) (Bruce Myers), February 13, 2014 and exhibits
- Savant Systems R. 30 (b)(6) (Robert Madonna), January 21, 2014 and exhibits
- Jim Carroll, March 22, 2013 and exhibits
- Bruce Myers, March 20, 2013 and exhibits
- Charles Parrelli, March 7, 2013 and exhibits
- George Katsiris (Savant Systems) and exhibits, February 20, 2013
- J.C. Murphy Deposition (Savant Systems), January 24, 2014 and exhibits
- Michael Pecar (Mike Pecar Sales), January 28, 2013 and exhibits
- David Slump (Harman International), February 11, 2013 and exhibits
- Leviton Manufacturing Company 30(b)(6) (Robert Becker), October 11, 2012 and exhibits

## Other Material

- Johnson, Aaron & Holcomb, Rodney D. "Golden Rules of Venture Creation," Journal of Extension, Volume 44, Issue 2, April 2006
- Nobel, Carmen, "Why Companies Fail—and How Their Founders Can Bounce Back", http://hbswk.hbs.edu/item/6591.html
- http://www.inc.com/neal-cabage/6-things-a-successful-startup-needs.html (last accessed April 4, 2014)
- Knaup, Amy E., May 2005, "Survival and Longevity in the Business Employment Dynamics Data", Monthly Labor Review, pp. 50-56
- Knaup Amy. E. and MC. Piazza, September 2007, Business Employment Dynamics Data: Survival and Longevity, Monthly Labor Review, pp. 3-10
- Control 4 Inc. S-1 Registration Filing and 2013 10-K
- Control 4 Inc. 424(b)(4) Prospectus, filed 8-2-2013
- Bureau of Labor Statistics, "Labor Source Statistics From the Current Population Survey," http://data.bls.gov/timeseries/LNS14000000 (last accessed April 24, 2014)

**Appendix B, Documents Supporting Financial Figures in Table 1, ¶ 32**

---

*Budgeted Figures*:

- 2008: Ex. 1 to Deposition of Bruce Myers
- 2009: Ex. 10 to Deposition of Bruce Myers
- 2010: Ex. 13 to Deposition of Bruce Myers
- 2011: Ex. 10 to Deposition of Bruce Myers
- 2012: Ex. 21 to Deposition of Bruce Myers

*Actual Figures*:

- 2008: Savant Systems Financial Statement, 2008, SAVANT0131349
- 2009: Savant Systems Financial Statement, 2009, SAVANT0200168
- 2010: Savant Systems Financial Statement, 2010, SAVANT0200168
- 2011: Savant Systems Financial Statement, 2011, DGC0028584
- 2012: Savant Systems Financial Statement, 2012, DGC0028584