EXHIBIT 2

**In The Matter Of:**

*Savant Systems, Inc. v.*
*Creston Electronics, Inc.*

---

*Ralph Z. Sorenson, Ph.D.*
*June 3, 2014*

---

*195 State Street • Boston, MA 02109*
*Nationwide - Worldwide*
*888.825.3376 - 617.399.0130*
*www.court-reporting.com*

O'BRIEN & LEVINE
Court Reporting Services
*Making Your Case*

Original File Ralph Z. Sorenson, Ph.D. 6-3-14.txt
**Min-U-Script® with Word Index**

09:50a first contacted in late December -- early -- early
09:50a December. I'm sorry.
09:50a A. Early December.
09:50a Q. Okay. I apologize.
09:50a A. Yeah.
09:51a Q. So you were sent a copy early December --
09:51a A. After --
09:51a Q. -- after the initial call?
09:51a A. -- the initial conversation.
09:51a Q. What were you sent in the first installment
09:51a of documents after this first telephone call?
09:51a A. I was sent, initially, a copy of -- of the
09:51a complaint, and I was sent a -- approximately a --
09:51a what's this, about five inches (indicating)?
09:51a Q. Mm-hmm.
09:51a A. -- binder of -- with -- with documents that
09:51a had been produced in discovery to Steptoe & Johnson
09:51a that they then forwarded to me.
09:51a Q. And those documents were selected for you by
09:51a Steptoe & Johnson, correct?
09:51a A. I asked them to give me as complete a -- a
09:52a set of documents as they had pertaining to the case.
09:52a Q. Five inches, you felt that was as complete a
09:52a set of documents as they had for the case, is that --

09:52a A. I was also sent, in -- as they became available, copies of depositions that had been taken that were on the record, many of them being -- or depositions of primarily Savant executives.

09:52a Q. Mm-hmm. Now, when you were initially approached about this assignment, did you jump and accept it or did you mull it over for some period of time?

09:53a A. The best of my recollection, I said I'd like to hear more about what was involved in -- before giving a yes or no that I would be willing to serve in this capacity --

09:53a Q. Oh.

09:53a A. -- as expert witness.

09:53a Q. And what did you do before you actually said yes, I'll accept the assignment?

09:53a A. I thought about whether or not my schedule would permit it. I thought about whether this would be something that I thought I could make a -- a positive contri -- contribution in the sense of rendering an independent judgment and developing an independent report, and then I decided that I would say yes.

09:53a Q. Mm-hmm. How long did it take you between the

10:20a listed here, yes.
10:20a Q. And is that a complete list of the transcripts that you reviewed in connection with your report?
10:20a A. To the best of my knowledge.
10:20a Q. Did you review the entire transcripts in all 13 cases, or just excerpts of the depositions?
10:20a A. (Deponent viewing exhibit.) I think I -- I probably read all of them. I have, in any case, studied all of them.
10:21a Q. Pardon me?
10:21a A. I have studied all of them.
10:21a Q. Entire transcripts in each case?
10:21a A. To the best of my relection [sic], I -- I have read all of them and I have done the best job I could at studying them.
10:21a Q. Mm-hmm. Now, did you have access to any database of production documents for Savant and/or Crestron during the course of your assignment as an expert in this case?
10:21a A. What was the term? Can you repeat what the term of -- of --
10:21a Q. I'll repeat my question.
10:21a A. Yeah, repeat it.

Q. Did you have access to any database of production documents --
A. Mm-hmm.
Q. -- for Savant and/or Crestron during the course of your assignment as an expert in this case?
A. Well, I think the documents listed were probably in their database, and these are the documents that I had access to.
Q. Okay. But did you have access to any database of documents -- production documents of Savant beyond the documents that are listed in your report?
A. If I understand your -- could you -- could you clarify what you mean by database?
Q. Well, you don't know what a database is?
A. Well, I have my thought of what a database is, but I'm not sure that's what you're asking me.
Q. Okay. In connection with this case, there have been a lot of documents produced by each side.
A. Yes.
Q. I'm sure you realize that. And Savant alone has produced almost 4 million pages of documents in connection with this case.
Did you know that?

A. No.
Q. And --
A. Doesn't surprise me.
Q. Crestron has produced approximately 2 million pages of documents, maybe more, maybe 2.5 million pages of documents.
Did you have access to any database that allowed you to review any of those documents beyond the ones that you listed in your report?
A. The ones listed in my report are the documents that I reviewed.
Q. Only those documents?
A. To the best of my recollection, yes.
Q. Did you have access to any deposition transcripts other than the 13 that you reviewed during the course of preparing your report?
A. (Deponent viewing exhibit.) I believe these were the depositions that I --
Q. Mm-hmm.
A. -- I reviewed.
Q. Now, who selected the documents that are listed on Page 46 and 47 for you to consider in preparing your report?
A. They were sent to me in response to my

10:24a request to give me all the documents that would be
10:24a useful to me in -- in rendering my opinion.
10:24a Q. And sent to you by whom?
10:24a A. They were sent to me by -- they originated
10:24a with Steptoe & Johnson.
10:24a Q. Mm-hmm. When were they sent to you?
10:24a A. Over a period of the months between December
10:24a and -- and May and the end of April.
10:24a Q. Mm-hmm. Who at Steptoe sent you those
10:24a documents?
10:25a A. Well, the -- a number of the documents came
10:25a to me from -- from ARC and -- and Greg Welk --
10:25a Q. Mm-hmm.
10:25a A. -- and some of them came to me via Egnyte.
10:25a Q. What's Egnyte?
10:25a A. It's a database.
10:25a No. It's a -- Egnyte is -- is a service that
10:25a has the ability to send, as I understand it,
10:25a confidential documents. It's spelled E-G-N-Y-T-E.
10:25a Q. So it's just a a service that allows you to
10:25a transmit documents confidentially?
10:25a A. That's my understanding, yes.
10:25a Q. But the sender would've been Steptoe?
10:25a A. The sender would have -- some documents came

10:26a directly from Steptoe, some came from -- through Greg Welk, is the best of my --
10:26a Q. Mm-hmm.
10:26a A. -- my recollection.
10:26a Q. Mm-hmm. But you did not look at the entire universe of documents produced by Savant in this case and select from that universe of documents, documents that --
10:26a A. Mm-hmm.
10:26a Q. -- you would rely on or consider in connection with your report, correct?
10:26a A. These are the documents that I referred to (indicating).
10:26a Q. Okay. And those are -- documents were selected for you by the Steptoe lawyers, correct?
10:26a A. They were documents that were sent to me by -- by the Steptoe folks. Obviously, if you say that there were 4 million documents that were -- or pages of documents that were developed by Savant and -- and 2 million Crestron, no, I did not read 6 million pages of documents.
10:27a Q. And you had no one working with you as, like, an assistant or anything like that that reviewed documents beyond what you've listed in your report,

correct?
A. No. No, sir.
Q. So, for example, where you state in Paragraph 10, Page 6 of your report. If you'd turn to Page 10 or I'm sorry, Paragraph 10, Page 6, you say, "Based on my analysis of the record in this case," do you see that?
A. (Deponent viewing exhibit.) Yes.
Q. You really mean, based on your analysis of that part of the record selected for you by Steptoe, correct?
A. Based on my analysis of the documents listed in this -- in the appendix of my report, those were the documents that I -- I -- I reviewed.
Q. Right.
And those were selected by Steptoe for you.
A. Those were the documents that Steptoe sent to me.
Q. Right.
And that same is true for the depositions you looked at?
A. I --
Q. So -- so Steptoe selected the 13 depositions that you looked at, correct?

10:28a A. I asked that I be sent all of the depositions of the -- of the executives of Savant --
10:28a Q. Mm-hmm.
10:28a A. -- that pertained to my assignment in this case.
10:29a Q. Mm-hmm. And do you know that there were approximately 50 depositions, total, taken in connection with this case?
10:29a A. No, I don't know how many total --
10:29a Q. Mm-hmm.
10:29a A. -- depositions were taken in this case.
10:29a Q. Okay. So you looked at 13 --
10:29a A. I looked at the ones that were listed in my --
10:29a Q. Mm-hmm.
10:29a A. -- report.
10:29a Q. I looked at the documents you indicated that you considered on Page 46 and 47 and counted the pages --
10:29a A. Mm-hmm.
10:29a Q. -- just out of curiosity. It's 450 pages, so...
10:29a A. My recollection is that there probably were more, but that's your figure.

10:56a order by date.

10:57a (Discussion off the record.)

10:57a MR. O'KONSKI: Let's mark this document
10:57a as Exhibit 5.

10:57a (Exhibit 5 marked for identification.)

10:57a BY MR. O'KONSKI:

10:57a Q. Did you do any research outside of the
10:57a documents that were supplied to you by Steptoe's
10:57a lawyers in forming your independent opinion in your
10:57a report?

10:57a A. I formed my opinion on the basis of the
10:58a documents that I included in the appendix of my -- of
10:58a my report and on the documents that were referenced in
10:58a my report, together with my personal judgment and
10:58a experience in the -- in the world of business.

10:58a Q. So the answer is no, you didn't do any
10:58a independent analysis or research, correct?

10:58a A. My --

10:58a MR. PINEAULT: Objection.

10:58a A. My research was independent.

10:58a Q. What research? You looked at the stuff that
10:58a Steptoe sent you, including documents and transcripts,
10:58a and that's it, right?

10:58a A. And I --

10:58a MR. PINEAULT: Objection.
10:58a BY MR. O'KONSKI:
10:58a Q. And what?
10:58a A. I did my -- my independent analysis of the documents that are included in this -- in my report.
10:59a Q. And you didn't look at anything else, correct? Correct?
10:59a A. I did the research based on the information included in the report, together with my analysis of that information --
10:59a Q. You can --
10:59a A. -- based on my knowledge of how the world of business works, how relationships with dealers work.
10:59a Q. All right. Take a look -- take a look at Page 2 of this document, would you, please? Do you rec -- do you know what Inside Track is?
10:59a A. (Deponent viewing exhibit.) It appears to be a -- a report that you just handed me that's entitled, Inside Track Retailer.
11:00a Q. Well, it's an independent research group that conducts and publishes survey results in the AV industry. I -- I will represent that that's the case.
11:00a And if you look at the top block -- right-hand block on the second page, Custom Installation, do

11:00a you see that, there's a Specialist Oriented Business Programs, you see the ranking of competitors there? Where does Savant place?

11:00a A. (Deponent viewing exhibit.) I am not familiar with this publication and I can't attest to whether or not it's accurate or not.

11:01a Q. Well, you can read, can't you? Where does Savant place?

11:01a MR. PINEAULT: Objection.

11:01a A little respect, please, Mr. O'Konski.

11:01a BY MR. O'KONSKI:

11:01a Q. Where does Savant place, please?

11:01a A. (Deponent viewing exhibit.) It says in terms of 2011 -- it appears that in 2010 Savant was not even ranked, must have been below Sonos and then in 2011, according to this the column there, it says two.

11:01a But I have no idea -- you've handed me this report. I have no idea and cannot attest as to whether there's any accuracy to that report or not.

11:02a Q. Where does Crestron rank in this particular survey?

11:02a A. (Deponent viewing exhibit.) Number 3 in 2010. It says Number 8 in 2011.

11:02a It would be very interesting to see what the

11:02a rankings were in 2008, 2009 because it appears that
11:02a these rankings jump around quite a bit.
11:02a MR. O'KONSKI: Let's mark the -- this as
11:02a Exhibit 6.
11:02a (Exhibit 6 marked for identification.)
11:02a BY MR. O'KONSKI:
11:03a Q. This is another -- Exhibit 6 is another
11:03a Inside Track report.
11:03a If you look at the survey report at the top
11:03a of Page 2, left-hand column, this is Distribution
11:03a Policies that Support Specialists.
11:03a Where does Savant rank in that survey?
11:03a A. (Deponent viewing exhibit.) It's unranked in
11:03a 2010. I don't know whether that implies that it was
11:04a at the bottom of the list then. It is -- in that list
11:04a it says two and it says that Crestron was eight.
11:04a Again, I cannot opine with respect to the
11:04a validity or acc -- accuracy, and I have no knowledge
11:04a on which, in terms of what went into the preparation
11:04a of their rankings, what was considered, so I am not
11:04a prepared at this stage to make a -- a judgment one way
11:04a or another --
11:04a Q. Mm-hmm.
11:04a A. -- on this information.

Q. Had you seen these prior to issuing your report, would you investigate -- would you have investigated further?

A. It's --

Q. I gotta mark it first.

A. It's a hypothetical question. It would depend on whether or not, in -- in looking at it, I knew more about their methodology and what -- what they were ranking. It -- it doesn't -- the way you've asked the question doesn't even say what the ranking means.

Q. Mm-hmm.

A. (Deponent viewing exhibit.) What the -- what the heading is on it. The heading on it is Custom Installation and it just say -- says Loyalty Test. I have no idea what loyalty test means.

MR. O'KONSKI: Let's mark this as eight -- Exhibit 8. Seven? Exhibit 7.

(Exhibit 7 marked for identification.)

BY MR. O'KONSKI:

Q. And in Exhibit 7 we're gonna look at the third block on the second page, right-hand column, third block from the top, Custom Installation Product Innovation.

Where does Savant rank in that?
A. Excuse me. What -- what page are you on?
Q. Second page of Exhibit 7, third block -- right-hand column, third block from the top.
Where does Savant rank in terms of product innovation?
A. (Deponent viewing exhibit.) Your -- you -- you preceded your question by saying, this is a -- a ranking of what? It just says Loyalty Test, Custom Installation.
Q. Custom Installation, Product Innovation.
A. Where does it say Product Innovation?
Q. Right in the title.
A. (Deponent viewing exhibit.) Oh. The same answer as for the other two you've given me.
Q. Savant ranks Number 1 in 2011?
A. (Deponent viewing exhibit.) Well, it ranks not at all in 2010.
Q. Mm-hmm. But in 2011 where does it rank?
A. (Deponent viewing exhibit.) The list says it was one.
Q. Okay. Where does Crestron rank?
A. Four.
Q. All right.

11:07a MR. O'KONSKI: Let's mark the next one as Exhibit 8.
11:07a (Exhibit 8 marked for identification.)
11:07a BY MR. O'KONSKI:
11:07a Q. Here we're gonna look at the top two blocks in the right-hand column on Page 2. The top block is Resolution of Service, Return and Repair Issues, and then the next one is, Dealer Training.
11:08a Where do the -- Crestron and Savant rank there?
11:08a MR. PINEAULT: I'm sorry. Are you asking about the left-hand column or the right-hand column?
11:08a MR. O'KONSKI: Right-hand column.
11:08a A. Which? Have you given me this one? What page?
11:08a Q. Page 2, right-hand column, top two blocks.
11:08a A. (Deponent viewing exhibit.) Ranks Crestron Number 4, Savant Number 5, Resolution of Service, Return, Repair Issues.
11:09a Q. And what about Dealer Training?
11:09a A. (Deponent viewing exhibit.) Savant two, Crestron three.
11:09a Again, I -- I feel compelled to say, I have no idea -- no judgement as to the credibility of -- of

this report.

MR. O'KONSKI: Let's mark this next one as Exhibit 9.

(Exhibit 9 marked for identification.)

BY MR. O'KONSKI:

Q. We're gonna look at Page 2 of this particular report, top block on Page 2. Actually, the top two blocks on -- left-hand column. It says, Quality of Sales Representatives.

Do you see that?

A. (Deponent viewing exhibit.) Top column?

Q. Yeah.

A. What page are we?

Q. Page 2, top block. See Quality of Sales Representatives?

A. (Deponent viewing exhibit.) I do. I don't see any familiar names.

Q. What do you mean you don't see any familiar names?

A. I'm on Page 2 of what's marked as Exhibit 9. It says, Number 1 is Magnepan, Def. Tech., JL Audio, Monitor A.

Q. Let me see.

A. (Deponent complied.)

11:11a MR. O'KONSKI: Where'd that come from?
11:11a Oh, it was at Page 3.
11:11a MR. SHEROFF: Page 3.
11:11a MR. O'KONSKI: Sorry. Page 3. Wrong
11:11a Page 2. Page 3.
11:11a BY MR. O'KONSKI:
11:11a Q. So there's a survey with respect to quality
11:11a of sales representatives.
11:11a Where does Savant rank?
11:11a A. (Deponent viewing exhibit.) Not ranked in
11:11a 2010, for some odd reason. Crestron is ranked Number
11:11a 2. In '11, Savant is ranked Number 1 and Crestron is
11:11a ranked Number 5.
11:12a Q. If you look over in the text in the right, it
11:12a says, "Newcomer to the Survey. Savant captured first
11:12a place for quality of sales reps with a perfect
11:12a 4.00/A."
11:12a Do you see that?
11:12a A. (Deponent viewing exhibit.) Yes. I'm
11:12a curious what happened in -- why, since Savant was on
11:12a the market, since 2000 -- December -- since 2008, why
11:12a they were not ranked in 2008, 2009, 2010.
11:12a Q. Well, if you had looked outside of the
11:12a documents that were selected for you by Steptoe, you

could've investigated that before you did your report.

What's the ranking in the next block, Ease of Doing Business; where's Savant ranked?

A. (Deponent viewing exhibit.) I think it's tied for second.

Q. And where's that --

A. Not ranked in 2010. Crestron 2000 -- Crestron is in this list as -- as five.

Q. All right. We got a few more and then we'll take our break. This is 10.

(Exhibit 10 marked for identification.)

BY MR. O'KONSKI:

Q. We're gonna look at the second page, third block in the left-hand column and the last page, top block. The third -- second page, third block in the left-hand column, it says, Overall Results.

Where does Savant rank in overall results?

A. (Deponent viewing exhibit.) Third.

Q. Where does Crestron rank in overall results?

A. (Deponent viewing exhibit.) Sixth.

Q. And down in the text on the bottom of the page it says, "Savant took Number 1 for product innovation and quality of reps was also voted Number 1 for best price/value in this group."

Do you see that?

A. Excuse me. Where are you? Are you still on page --

Q. Yeah. I'm still on the second page in the text at the bottom.

Do you see that?

A. (Deponent viewing exhibit.) ADA, Lutron.

Q. Then Savant?

A. Savant third.

Q. Read that sentence, please.

A. (Deponent viewing exhibit.) "The three companies in the top tier overall, ADA --

Q. You don't have to read it from there. Just read from --

A. (Deponent viewing exhibit.) -- following by Lutron in second and newcomer-to-the-survey Savant in third place, share all 16 parameter first places between them.

Q. Jump down to Savant second occurrence.

A. (Deponent viewing exhibit.) "Recognition and Dealer Training. Savant took Number 1 for best product innovation and quality of reps and also voted Number 1 for best price value in this group."

Q. All right. Turn to the last page, please,

the block at the top, Offering the Best Price Value.
Where does Savant rank?
A. (Deponent viewing exhibit.) In this list, in this document, the purported inside track, it's ranked number -- not ranked in 2010, Number 11 -- in 2011 it was ranked Number 1.
Q. And where is Crestron ranked?
A. (Deponent viewing exhibit.) Three.
(Exhibit 11 marked for identification.)
BY MR. O'KONSKI:
Q. All right. This is what, 12, we just did? Eleven.
A. Eleven.
Q. Take a look at 11. There's a block at the top of the page, first page, that says, Most Frequently Added and Dropped Lines.
Where's Savant in that ranking?
A. (Deponent viewing exhibit.) Most Frequently Added or Dropped, yes. This is 2011. The newcomer Savant was second. They evidently were able to be adding dealers with no trouble.
Q. And then if you read the paragraph in the middle of the text it says, "The most frequently given reason for picking up Savant, paren, 12/13, end of

you.

BY MR. O'KONSKI:

Q. Doctor, do you consider yourself to be an antitrust economist?

A. No.

Q. Do you consider yourself to be qualified, based on your education, background and experience, to provide expert opinion on issues of antitrust economics?

A. I consider myself to have had extensive experi -- experience in the world of business. I do not consider myself to be a theoretical economist, an antitrust lawyer or specialist or a forensic accountant. I do not consider myself to be an ethicist.

I consider myself to be a business person with very expanse -- extensive experience in the -- in the world of business and how industries, such as these, work and it's in that context that I think I have been engaged to render an expert opinion.

Q. Do you consider yourself to be qualified, based on your education, background and experience, to provide expert opinion on antitrust?

A. I -- my mandate is to look at the report of

situation. That's why I'm offering -- I'm not accepting the fact that your allegation of exclusive dealing is -- is accurate.

Q. But you have no opinion on that one way or the other, as we established about 45 minutes ago, correct?

A. Well, it wasn't relevant to the original question. The original question was having to do with the prowess of Savant's management in terms of its ability to -- in terms of its ability to accurately forecast revenues, gross income, net income, expenses year after year.

Q. Doctor, you have no opinion on whether or not there was exclusive dealing engaged in by Crestron in this case, correct?

A. I -- I think earlier I stated that --

Q. Right.

A. -- was the case --

Q. Right.

A. -- and it would be helpful if -- if in the sen -- in the question, you say alleged exclusive dealing, because it's -- that's all it is. It's an allegation at this stage, as far as I can understand.

Q. We've recounted the pages in the documents

that you've listed and instead of 450 pages it's 510.
A. Oh, good, so...
Q. So you've gained 60 pages. I hardly think it affects the significance of the questioning previously, but I correct the record to note that the pa -- number of pages and the documents you looked at is 510 versus 450.
Now, have you ever started a company based on your own innovations -- technological innovations?
A. My own company? No.
Q. Have you ever started a company that you sold for a billion dollars?
A. Have I?
Q. Yeah.
A. No.
Q. Have you ever started a company that you sold for -- at all?
A. I have never started a company, sir.
MR. O'KONSKI: Okay. Can I get those?
THE DEPONENT: How's your back doing?
MR. O'KONSKI: Are you okay? We're -- we're just about done. Oh, you wanted to --
Yeah. These Polaroid, he's not gonna contest.