# EXHIBIT 11

**UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF MASSACHUSSETTS**

| | |
|---|---|
| **SAVANT SYSTEMS, LLC,**<br>**Plaintiff,**<br>**v.**<br>**CRESTRON ELECTRONICS, INC.,**<br>**Defendant**<br><br>**CRESTRON ELECTRONICS, INC.,**<br>**Counterclaim-Plaintiff**<br>**SAVANT SYSTEMS, LLC,**<br>**Counterclaim-Defendant** | **Civil Action**<br><br>**No. 10-CV-11622 MLW**<br>**Hon. Mark L. Wolf** |

**CORRECTED EXPERT REPORT**

**PROFESSOR EINER ELHAUGE**

May 20, 2014

**RESTRICTED CONFIDENTIAL: OUTSIDE COUNSEL ONLY**
**SUBJECT TO PROTECTIVE ORDER**

## Table of Contents


EXECUTIVE SUMMARY .......... 3
QUALIFICATIONS .......... 8
I. HIGH-END RESIDENTIAL SYSTEM MARKET .......... 10
A. Market Definition .......... 10
1. Identifying the Set of Plausible Close Substitutes .......... 13
2. Ranking Plausible Close Substitutes from Closest to Most Distant .......... 18
3. Hypothetical Monopolist Test Confirms that High-End Market Limited to Crestron, AMX, and Savant is Sufficiently Broad .......... 27
4. Relevant Geographic Market is the United States and Canada .......... 30
5. Dealer Demand for High-end Systems Is Fragmented .......... 32
B. Market Shares .......... 33
C. Monopoly Power .......... 41
1. High Market Shares Coupled with High Barriers to Entry and Expansion 41
2. Crestron's Demonstrated Power to Exclude Rivals .......... 44
3. Crestron's Demonstrated Power over Price .......... 44
II. DESCRIPTION OF CRESTRON'S EXCLUSIVE DEALING .......... 45
A. Crestron's Executives Instituted a Corporate Policy of Telling Dealers That They Had to Make a Choice Between Crestron and Savant .......... 45
B. Crestron Implemented Its Exclusive Dealing Policy in Numerous Ways .......... 47
1. Distributing Comparison Guides .......... 47
2. Lawsuit Against Cyber Sound .......... 48
3. Direct Communications with Individual Dealers .......... 49
III. LACK OF PROCOMPETITIVE EFFICIENCIES .......... 51
IV. THEORIES OF ANTICOMPETITIVE HARM .......... 55
V. PROOF THAT CRESTRON'S CONDUCT HAS RESTRICTED THE HIGH-END RESIDENTIAL SYSTEM MARKET .......... 58
A. Relevant Baseline is the But-for World, not the Past .......... 59
B. Theory of How Exclusive Dealing Can Reduce Savant Sales Below But-For Levels .......... 60
C. Concrete Examples of Dealers Being Deterred from Purchasing Savant Because of Crestron Conduct .......... 63
D. Restricted Shares .......... 67
VI. PROOF OF ANTICOMPETITIVE EFFECTS FROM RESTRICTING THE MARKET .......... 69
A. Extraction of Consumer Welfare .......... 69

B. Maintaining Market Power over Local Dealers by Excluding Savant .......... 71
C. Exacerbating Buyer Switching Costs .......... 71
D. Deterring Investment and Innovation .......... 73
E. Impairing Rival Efficiency .......... 73
1. Economies of Scale in Purchasing and Production .......... 74
2. Economies of Scale in Regional Sales Force .......... 75
F. Impairing Rival Expandability .......... 76
VII. DAMAGES DUE TO EXCLUSIVE DEALING .......... 77
A. Additional But-For Revenue .......... 78
B. Additional But-for Costs .......... 82
C. Savant's Lost Profits from Creston's Exclusive Dealing .......... 85
VIII. THE ANTICOMPETITIVE EFFECTS OF DECEPTION .......... 86
IX. CRESTRON PROFITS DURING PERIOD OF ALLEGED DECEPTION .......... 89
CONCLUSION .......... 92
EXHIBIT A .......... 93
EXHIBIT B .......... 107

## EXECUTIVE SUMMARY

1. Crestron Electronics, Inc. ("Crestron"), the defendant, has competed in the North American high-end residential control system market for over two decades. Residential control systems are technological products comprised of many components that allow a homeowner to control multiple aspects of the home – such as the temperature, audio volume, TV display, and security system – from a single interface. As described below, the high-end residential system market is a properly defined relevant market, and excludes relatively inferior low-end systems. Savant Systems LLC ("Savant"), the plaintiff, was founded in 2005 and first started selling residential control systems (which were all high-end) in August 2007.[1] Since then the only three competitors in the high-end residential control system market have been Crestron, AMX, and Savant. As of 2007, Crestron's share was 80%.

2. Because installing and programming high-end residential control systems is complex and requires significant technical expertise, these products are always sold to intermediary specialized dealers with training in control system installation. These dealers then sell the systems to the ultimate customers and install them into their homes.

3. Around June 2008, Crestron started telling dealers that they were not allowed to sell both Crestron and Savant systems. In the economic literature, this conduct is generally referred to as "exclusive dealing" because an upstream supplier (here Crestron) tells downstream firms that they must sell that upstream supplier's products exclusively.

4. Plaintiff counsel has asked me to perform economic analysis of the evidence in this case to answer the following questions:

A. Did Crestron's exclusive dealing injure Savant?
B. Did Crestron's exclusive dealing anticompetitively harm consumers?
C. If Crestron's exclusive dealing reduced Savant's profits below but-for levels, approximately how much profit did Savant lose because of Crestron's exclusive dealing?
D. Can deception be anticompetitive?

[1] Savant's sales data shows that it first started selling systems to dealers in August 2007. *See* "11 First 100 Savant Sales.csv".

E. What were Crestron's profits from the sale of high-end residential control systems in the United States during the period that Savant alleges that Crestron made literally false statements to dealers, from May 11, 2009 to January 25, 2012? Additionally, what were Crestron's profits from the sale of high-end residential control systems in the United States to dealers that Crestron admits were sent at least one of the comparison or sales guides that Savant alleges contain literally false statements, starting from the day each received a guide, until January 25, 2012?

5. Economic analysis of the evidence in this case shows that Crestron's exclusive dealing both: (A) injured Savant, and (B) anticompetitively harmed consumers. I estimate that (C) Crestron's exclusive dealing has caused Savant to lose approximately $20 million in profits. I also explain (D) that deception can be anticompetitive, not only by distorting consumer decisions but also by depriving rivals of economies of scale. Finally, I calculate Crestron's profits from the sale of high-end systems in the United States as specified in question (E).

6. **A. Injury to Savant**. Crestron's exclusive dealing injured Savant by restricting a large portion of the high-end market and reducing Savant's sales below but-for levels (the level of sales Savant would have achieved on a free market but for Crestron's exclusive dealing). This reduction in Savant's sales in turn weakened Savant's ability to compete because decreasing Savant's sales increased its per-unit costs, reduced its expandability, and deterred Savant from investing in as much innovation.

7. **B. Anticompetitive Harm to Consumers**. Restricting a large portion of the high-end system market and weakening Savant's ability to compete also anticompetitively harmed consumers. Deterring dealers from carrying Savant not only extracts welfare from dealers (by reducing their profits) but also prevents the homeowners in the area who would prefer Savant from purchasing their preferred high-end residential control system. Further, weakening Savant by increasing its costs, reducing its expandability, and deterring its investments in research harms all consumers because weakening Savant both: (1) makes Savant a less attractive option to consumers (higher prices, lower quality), and (2) increases Crestron's market power, thus allowing Crestron to raise its prices more than if it were competing against a full-strength Savant. Although exclusive dealing can sometimes create procompetitive efficiencies that benefit consumers, there is no evidence that Crestron's exclusive dealing does in this case. In other words, Crestron's exclusive dealing increased Crestron's profits not by making Crestron

more efficient, reducing its prices, or increasing its quality, but instead by weakening Savant.

8. **C. Lost Profit Damages to Savant**. In Part VII below, I calculate the profits Savant lost due to Crestron's exclusive dealing. I find that, even if one conservatively ignores the fact that Savant would have been more efficient in the but-for world, Savant would have earned approximately $20million more in profits on high-end residential sales in the United States in the but-for world from June 7, 2008 to March 31, 2014.

9. **D. Anticompetitive Effects of Deception**. Savant also alleges that Crestron deceived dealers by claiming in various ways that Savant was inferior to Crestron. I do not opine on whether Crestron in fact deceived dealers because that is not an issue of economics. However, in Part VIII I explain why, as a matter of economics, deception by a firm with market power harms competition, both because it distorts buyer choice in a way that directly reduces market efficiency and because it shrinks rival market share and raises rival costs in a way that impairs rival efficiency and enhances incumbent market power. Part VIII also explains that deception has no offsetting efficiency justification.

10. **E. Crestron's Sales Profits.** Crestron's sales data shows that it earned approximately $107 million in profits on high-end residential sales in the United States from May 11, 2009 to January 25, 2012. Crestron data also shows that it earned approximately $3.7 million in profits on high-end residential sales to dealers that Crestron's discovery responses indicate received Crestron sales and comparison guides with allegedly false statements, starting from the date each dealer received a guide to January 25, 2012. I present these results below in Part IX.

11. I summarize the analysis I used to reach these conclusions in each Section below.

12. **I. Upstream High-end Residential Control System Market.** The relevant market in this case is the North American (U.S. & Canada) high-end residential control system market. Savant entered the high-end market in August 2007.[2] The defendant Crestron has had monopoly power in this market the entire

[2] Savant's sales data shows that it first started selling systems to dealers in August 2007. *See* "11 First 100 Savant Sales.csv".

time Savant has competed in it. From July 2007 to September 2013,[3] Crestron's market share has ranged from 66-83% in the high-end market. Crestron has had market power and monopoly power in this market throughout that time, evinced by: (a) high market shares coupled with high barriers to entry and expansion, (b) demonstrated power to exclude rivals, such as Savant, and (c) demonstrated power to control prices.

13. **II. Summary of Crestron's Exclusive Dealing**. The evidence indicates that, around June 2008, Crestron instituted a corporate policy of requiring its dealers to "choose" between Crestron and Savant, and threatening to terminate dealers if they continued to sell Savant. The evidence also shows that Crestron implemented this policy in three main ways: (1) distributing "comparison guides" with the statement "Remember you can't be a Crestron dealer and also sell Savant products!" to dealers, (2) filing a public legal complaint against the dealer Cyber Sound & Security, which communicated to dealers that Crestron believed that expending efforts to sell Savant products violated the "best efforts" clause in Crestron's dealer agreements, and (3) personally informing individual dealers about Crestron's policy.

14. **III. No Procompetitive Efficiencies that Benefit Customers**. Standard economics assumes that firms, such as Crestron, are always trying to maximize their profits. Thus, any economist would assume that Crestron engaged in exclusive dealing in order to increase its profits, and the evidence suggests that it did. But economists have also long recognized that many types of conduct that benefit a *firm* actually harm *consumers*. For example, burning down a rival's manufacturing plant would likely increase the arsonist's profits, but that would harm consumers by eliminating the rival product and allowing the arsonist to raise prices. In contrast, other types of conduct increase the firm's profits in a way that also benefits consumers. The most common example is conduct that allows the firm to reduce the quality-adjusted price of its product, for example by reducing the cost of making the product or improving the product's quality. An economist can use standard tools to determine whether a given type of conduct is anticompetitive - i.e., harms consumer welfare – or is procompetitive – i.e., benefits consumer welfare.

15. Here, the evidence affirmatively indicates that Crestron's exclusive dealing has no procompetitive efficiencies, for three reasons. First, I have found no evidence in Crestron's internal documents describing any procompetitive

[3] This is the only period for which Crestron produced complete data.

rationales for its exclusive dealing. Second, the procompetitive efficiency claim that Crestron's Chief Executive made at his deposition – that exclusive dealing is necessary to ensure that dealers do enough Crestron jobs to be sufficiently skilled – is not sound because exclusive dealing is not an effective way of achieving this goal. For example, suppose dealer A installed only one Crestron system ever, but that it had never installed a rival system, while in contrast dealer B had installed 20 Crestron systems, but also 10 Savant systems. Clearly dealer B's greater experience with Crestron systems would make it more skilled than dealer A, all else equal. But Crestron's exclusive dealing policy would perversely *terminate* Dealer B (the skilled dealer), and keep on dealer A (the unskilled dealer). In contrast, requiring that dealers install a minimum *number* of Crestron projects, or providing incentives for installing larger amounts of Crestron systems, would efficiently ensure that only skilled Crestron dealers could remain Crestron dealers. Third, the firms without market power in this market (Savant and AMX) do *not* engage in exclusive dealing. This affirmatively indicates that exclusive dealing is not procompetitive in this market because procompetitive conduct increases firm profits regardless of whether the firm has market power or not. Thus, if this conduct were actually procompetitive, firms without market power should be doing it too. To the contrary, the evidence shows that Savant and AMX only use volume discounts, not exclusive dealing.

16. The fact that Crestron's exclusive dealing has *no* procompetitive effects whatsoever means that this conduct will be on net anticompetitive if it has *any* anticompetitive effects.

17. **IV. Theory of Anticompetitive Harm to Savant and Consumers**. The economic literature shows that exclusive dealing can anticompetitively harm both rivals and consumers in several ways. For example, when exclusive dealing restricts a large share of the market and reduces rival sales below but-for levels, it can raise rivals' per-unit costs by depriving them of economies of scale. This in turn will cause both the rivals' and the monopolist's profit-maximizing prices to increase. Part IV below describes this theory of anticompetitive harm, in addition to several others.

18. **V. Proof that Crestron's Exclusive Dealing Restricted a Large Portion of the Market and Reduced Savant's Sales Below But-for Levels**. Crestron's exclusive dealing can restrict dealers from purchasing Savant, and reduce Savant sales below but-for levels, because it will often cause dealers to purchase 100% from Crestron even if the dealer would ideally prefer to buy a mix of Crestron and Savant in the but-for world. In Part V, I present concrete examples

confirming the economic theory that Crestron's exclusive dealing can restrict dealers from purchasing Savant products, and show that Crestron's exclusive dealing has restricted 51-77% of the market (depending on the year).

19. **VI. Proof that Restricting a Large Portion of the Market and Reducing Savant's Sales Below But-for Levels Anticompetitively Harmed Consumers**. By restricting a large share of the market and reducing Savant's sales below but-for levels, Crestron's exclusive dealing caused anticompetitive harm in six ways: (1) extracting consumer welfare, (2) maintaining market power over local dealers by excluding Savant, (3) impairing Savant's efficiency, (4) reducing Savant's expandability, (5) exacerbating dealer switching costs, and (6) deterring Savant from investing as much in research and innovation as it would in the but-for world.

20. **VII. Lost Profits Damages**. I estimate how much additional revenue Savant would have earned in the but-for world, and then subtract the additional costs Savant would have to incur to earn that additional revenue. I find that Crestron's exclusive dealing has caused Savant approximately $20 million in lost profits on high-end residential sales in the United States from June 7, 2008 to September 30, 2013.

21. **VIII. Deception is Anticompetitive**. Savant alleges Crestron engaged in deception. Although I do not opine on whether Crestron did in fact engage in deception, I explain in Part VIII the economics of why deception has anticompetitive effects.

22. **IX. Crestron's Profits Earned on the Sale of High-end Residential System Components in the United States.** I calculate Crestron's profits on residential high-end components as specified in question (E) based on Crestron sales data, which indicates both the net price Crestron charged each dealer and Crestron's cost of goods sold. I present the exact figures below in Part IX.

## QUALIFICATIONS

23. I am the Petrie Professor of Law at Harvard University, where I teach and write about the economic analysis of antitrust law, health policy, and various other subjects. I am the author of various books, including *U.S. Antitrust Law & Economics*; co-author of *Global Antitrust Law & Economics*, *Global Competition*

*Law & Economics*, and *Areeda, Elhauge & Hovenkamp, Vol X, Antitrust Law*; and editor of *The Research Handbook On The Economics Of Antitrust Law* and *The Fragmentation Of U.S. Health Care*. I am also the author of numerous articles on various topics involving the economic analysis of antitrust and other legal issues, including articles on monopolization and exclusionary conduct. My CV (attached as Exhibit A) lists all my publications, including all those in the past ten years. Exhibit B to this report describes my compensation and the cases in which I have testified at trial or in a deposition in the past four years.

24. I am also President of Legal Economics, LLC, which provides expert witnesses and support work on legal cases. I myself have testified as an expert witness on antitrust economics in dozens of federal cases, and I have been qualified as an expert in antitrust economics by all seven courts to rule on that question. I have also served as an expert witness on antitrust economics before Congress, arbitration panels, and competition agencies in the US, EC, Korea and Brazil. My testimony as an economics expert has spanned a wide range of topics, including mergers, horizontal agreements, vertical agreements, monopolization and exclusionary conduct, price discrimination, health economics, patent economics, and contract economics. My clients have included leading corporations, law firms, and the United States. I have been named one of the world's leading competition economists in the *International Who's Who of Competition Lawyers and Economists*.

25. I am a Member of Advisory Boards for the Journal of Competition Law & Economics, the Social Sciences Research Network on Antitrust Law & Policy, and the Social Sciences Research Network on Telecommunications & Regulated Industries. I have taken courses in economics, statistics, antitrust, and economic analysis of law, and I regularly read and use economic literature on antitrust economics, including books on industrial organization. I also regularly attend workshops on those and other topics regarding the economic analysis of law. I routinely use and teach economic analysis in my classes, including those that I regularly offer on antitrust law and economics and health law policy.

26. I am being compensated at a rate of $1045 per hour for my work on this case, and my consulting firm, Legal Economics LLC, is being compensated $235-475 per hour for the work of my staff on this report. None of my compensation in this case is contingent upon the outcome of the case or any aspect of the case.

## I. HIGH-END RESIDENTIAL SYSTEM MARKET

27. A relevant product market in this case is the high-end residential control system market ("High-End System Market"). This is the primary market in which Savant and Crestron compete. All suppliers in the High-End System Market sell their systems downstream to dealers, who then install and program them in the ultimate consumers' homes.[4] Part A describes the evidence showing that the High-End System Market is a properly defined relevant market. Part B summarizes the competitors, shares, and prices in this market. Part C shows that Crestron has market power and monopoly power in this market.

### *A. Market Definition*

28. When analyzing whether conduct has anticompetitively harmed consumers, economists regularly define a "relevant market." The technical definition of a "relevant market" in economic analysis of antitrust issues is precise and differs from the lay definition of "market."[5] The lay definition of "market" is broad and ambiguous – for example, both the phrases "residential control system market" and "high-end residential control market" are acceptable uses of the lay definition of the word "market." Thus, the lay definition of the word "market" is not useful for economic analysis in part because it is vague and subjective and not necessarily logically connected to any of the economic issues that are relevant to determining whether a given type of conduct helped or harmed consumers.

29. Antitrust economists generally define the relevant market in the following two-step process.[6] First, one ranks the products that are most similar to

---

[4] Klein 30(b)(6) Deposition at 111 ("Q: The dealers are critical in getting Crestron's products to the end users, correct? A: Yes. . . We don't sell to end users.").

[5] DOJ/FTC Horizontal Merger Guidelines §4 (2010) ("Relevant antitrust markets defined according to the hypothetical monopolist test are not always intuitive and may not align with how industry members use the term 'market.'").

[6] The DOJ/FTC Horizontal Merger guidelines describe this methodology, among other commonly used market definition methodologies in economic analysis of antitrust issues. Although the government enforcement agencies most often apply this methodology to merger analysis, it is also applicable to exclusionary conduct cases. *See* Horizontal Merger Guidelines n. 5 (noting that market definition is similar for non-merger conduct, such as monopolization, except that one cannot assume that the prices that exist in in the market are at competitive levels because the alleged anticompetitive conduct may have in fact elevated them above competitive levels).

the defendants' products at issue, from the closest substitutes to the most distant.[7] For example, in car markets, the closest substitute to one luxury sedan is another luxury sedan, the next closest substitute is probably a non-luxury sedan, and even more distant partial substitutes include motorcycles and bicycles.

30. Second, one starts with the smallest possible market that is potentially useful for analysis (in an exclusive dealing case, just the defendant's relevant product and its closest substitute), and tests whether that posited market would likely pass the "Hypothetical Monopolist Test." The Hypothetical Monopolist Test asks whether a hypothetical 100% monopolist in a posited market could profitably charge prices that were at least 5% higher than the prices that would prevail if the market were competitive.[8] If a hypothetical monopolist could, then the test is passed, meaning that the posited market is sufficiently broad (i.e., includes a sufficient number of substitutes) to be useful in economic analysis. If the test is failed, that tells the economist that the posited market is too narrow (i.e., includes an insufficient number of substitutes) to be useful in economic analysis. The economist should then expand the posited market to include the next closest substitute, and repeat the hypothetical monopolist test to see whether the slightly broader market is sufficiently broad.

31. For example, suppose the defendant sold "hand-churned" chocolate ice cream. Suppose the closest substitute to the defendant's product is another type of hand-churned chocolate ice cream, the next closest substitute is machine-churned chocolate ice cream, and the next closest is vanilla ice cream. An economist would start with the smallest possible market: just "hand-churned" chocolate ice cream, and ask whether it passed the Hypothetical Monopolist Test. A posited market for just "hand-churned" chocolate ice cream would probably fail the hypothetical monopolist test because so few people care about whether their ice cream is "hand-churned" that, if even a 100% monopolist in hand-churned chocolate ice cream tried to raise prices by 5%, so many customers would switch to machine-churned chocolate ice cream that the price increase would not be profitable. That tells the economist directly that impairing competition in just the hand-churned chocolate ice cream market could not significantly harm consumers,

---

[7] DOJ/FTC Horizontal Merger Guidelines §4.1.1 (2010) ("When applying the hypothetical monopolist test to define a market around a product offered by one of the merging firms, if the market includes a second product, the Agencies will normally also include a third product if that third product is a closer substitute to the first product than is the second product.").

[8] *See* DOJ/FTC Horizontal Merger Guidelines §4 (2010) (describing the hypothetical monopolist test).

and thus that using a hand-churned ice cream market would not be useful for competition analysis. The economist's next step would then be to add the next closest substitute to the market (machine-churned chocolate ice cream), and test whether this slightly broader market satisfied the hypothetical monopolist test. A posited market for "all chocolate ice cream" (both hand-churned and machine-churned) would probably pass the hypothetical monopolist test because many people have strong preferences for chocolate or vanilla ice cream, and consequently if a hypothetical 100% monopolist in chocolate ice cream raised prices by 5% above competitive levels, not enough customers would switch to vanilla ice cream to make the price increase unprofitable. This would directly indicate that impairing competition solely between chocolate ice cream suppliers could cause significant harm to consumers, and thus that a chocolate ice cream market is useful for competition analysis.

32. Markets defined using the hypothetical monopolist test usually "exclude some substitutes to which some customers might turn" in response to a price increase for the products in the relevant market.[9] Economists generally define markets narrowly to focus only on close substitutes because "defining a market broadly to include relatively distant product or geographic substitutes can lead to misleading market shares" that overstate the importance of distant substitutes.[10] This means that the mere fact that some customers substitute between Products A and B does not necessarily mean that Products A and B are in the same

---

[9] DOJ/FTC Horizontal Merger Guidelines §4 (2010) ("Market shares of different products in narrowly defined markets are more likely to capture the relative competitive significance of these products, and often more accurately reflect competition between close substitutes. As a result, properly defined antitrust markets often exclude some substitutes to which some customers might turn in the face of the price increase even if such substitutes provide alternatives for those customers."); *id.* §4.1.1 ("Groups of products may satisfy the hypothetical monopolist test without including the full range of substitutes from which customers choose."). Relatedly, official commentary to the Merger Guidelines explains that "Even when no readily apparent gap exists in the chain of substitutes, drawing a market boundary within the chain may be entirely appropriate when a hypothetical monopolist over just a segment of the chain of substitutes would raise prices significantly." DOJ/FTC, Commentary on the Horizontal Merger Guidelines 15 (2006). The Merger Guidelines likewise explain that "relevant markets need not have precise metes and bounds." DOJ/FTC Horizontal Merger Guidelines §4 (2010).

[10] DOJ/FTC Horizontal Merger Guidelines §4 (2010) ("Defining a market broadly to include relatively distant product or geographic substitutes can lead to misleading market shares. This is because the competitive significance of distant substitutes is unlikely to be commensurate with their shares in a broad market. Although excluding more distant substitutes from the market inevitably understates their competitive significance to some degree, doing so often provides a more accurate indicator of the competitive effects of the merger than would the alternative of including them and overstating their competitive significance").

market. Indeed, "The hypothetical monopolist test may identify a group of products as a relevant market even if customers would substitute significantly to products outside that group."[11]

33. Here, this hypothetical monopolist test methodology indicates that a high-end residential control system market limited to Crestron, AMX and Savant is a properly defined relevant market for competition analysis. Specifically, the evidence shows that: (1) Savant's and AMX's high-end systems are the closest substitutes to Crestron's high-end systems, and (2) a posited market that includes only Crestron, Savant, and AMX's high-end systems satisfies the hypothetical monopolist test. I also find that it is appropriate (and in fact conservative) to use a relevant geographic market limited to the United States and Canada.

### *1. Identifying the Set of Plausible Close Substitutes*

34. The first step in product market definition is ranking the potential substitutes for high-end Crestron residential control systems from closest to most distant. For clarity, when I discuss "Crestron high-end systems", I am referring to all Crestron residential control systems besides its "Prodigy" and "Adagio" line of systems, which are lower-cost, lower-function alternatives to Crestron's high-end systems.[12] To be clear, I am also excluding from my definition of "high-end systems" Crestron's products that are designed specifically to control only lighting and shading, rather than multiple different aspects of the house.[13]

---

[11] DOJ/FTC Horizontal Merger Guidelines §4.1.1 (2010).

[12] Klein 30(b)(6) Deposition 236 ("A: . . . we had a product line called Prodigy that was maybe a little less, not maybe, it was less in features and capabilities . . . . It was a much very, very small and short-lived portion of our product line. . . . that could have been deemed a lower end or not a high end."); Crestron0028569 at Crestron0028570 ("Our residential market has become very polarized – high end versus entry level, i.e. Adagio").

[13] Several facts make clear that specialized lighting control is a separate product from general home control. First, consumers cannot reasonably substitute specialized lighting control for general home control because the latter provides many functions the former omits. Second, the same customers will often obtain general home control from one firm and specialized lighting control from another, even though some firms, such as Crestron, offer both. *See* http://www.crestron.com/resources/product_and_programming_resources/catalogs_and_brochures/online_catalog/default.asp?jump=1&model=ST-LT&tab=specifications (describing a Crestron product that allows one to integrate a Crestron home control system with a Lutron lighting control system); http://www.crestron.com/products/green_light_residential_lighting_control/ (Crestron website describing its own residential lighting and shade control products). Third, some firms, such as Lutron, specialize solely in lighting control. *See* www.lutron.com. Even what Lutron calls its

35. A high-end residential control system is not a single item, but instead a set of components that a dealer can connect (often wirelessly) and program in a way that allows a homeowner to control multiple aspects of a home from a single user interface.[14] For example, in a Savant or Crestron system, a resident can use a single touchscreen interface to control any TV in the house, the music, the lighting, the thermostat, and the security system, among other things. A whole system usually consists of dozens of components, but the most important components are: (1) user interfaces that the residents use, (2) a "controller", "host", or "server" that receives the signal from the user interface and then sends a signal to the technology the user is trying to control (such as the TV),[15] and (3) the software dealers use to program the system.[16]

36. The products that are the closest substitutes to a Crestron high-end system are the products that provide the most similar functionality at similar price levels. To narrow the universe of potential substitutes down to those that are at least plausibly the closest substitutes to Crestron high-end systems, I analyzed Crestron's internal documents to see which products Crestron believed competed against its own products.

---

"Whole Home" solution only controls all *lighting* in the home. *See* http://www.lutron.com/en-US/Residential-Commercial-Solutions/Pages/Residential-Solutions/WholeHomeSolutions.aspx.

[14] Parks Associates, *Home Systems: Home Controls, 2007 Update* at 2 ("Advanced home control systems are typified by sophisticated and extensive control capabilities provided through significant processing power. Generally, they require additional wiring in the home, include computers with capable software, cost thousands and even tens of thousands of dollars, and require trained personnel for installation.").

[15] A "controller", "host", or "server" usually includes a CPU, several "switchers" that can change the input and output of different technologies, and wireless receivers and senders. *See* http://www.savantsystems.com/category/savant_host_and_controllers.aspx ("Savant Host & Controllers. The key components that deliver control and automation to every SmartSystem are a Savant Host and any one Savant Controller. The Savant Host, . . . a device containing Savant's powerful control software, provides numerous functions including: automation and control, user interface interpretations, system administration, monitoring, and can act as the digital media server housing and controlling the playback of any iTunes content (music, movies, etc.). All Savant Controllers includes a Linux processor that provides two-way communication to all connected components or subsystem within an installation. Supporting the most common control protocols (IR, Serial, IP IR, Relay, GPIO), and standards, several Savant Controllers also deliver audio/video switching, processing, video scaling and overlay and more.").

[16] Klein 30(b)(6) Deposition at 121 ("Q: Crestron has proprietary software that dealers use when they are setting up residential systems, correct? A: Yes."). Savant's programming software is called Racepoint Blueprint. *See* http://www.savantsystems.com/product-details/racepoint_blueprint.aspx.

37. Crestron's internal strategic documents often discussed its "competition," and only a small handful of suppliers were regularly listed as its key competitors. The set of firms Crestron lists among its "competitors" is likely to include some products that do not actually compete against Crestron's high-end residential systems because Crestron also has distinct commercial, lighting, and low-end residential products.[17] Looking at Crestron's internal strategic discussions of its "competition" will thus produce an over-inclusive list of plausible close substitutes for Crestron's high-end residential systems.

38. I instructed my staff to search Crestron's documents for internal strategic documents that listed which firms Crestron and Crestron dealers viewed as Crestron's competitors. My staff found thirteen unique documents.[18] These

[17] *See* www.crestron.com/markets/ (listing as one of Crestron's markets "Corporate Enterprise"); http://www.crestron.com/products/lighting_and_shade_control/ (showing Crestron's lighting control products); Klein 30(b)(6) Deposition 236 ("A: . . . we had a product line called Prodigy that was maybe a little less, not maybe, it was less in features and capabilities . . . . It was a much very, very small and short-lived portion of our product line. . . . that could have been deemed a lower end or not a high end.").

[18] Crestron0115828 (June 2, 2008 email from John Gutekunst, then a Regional Director at Crestron, now an Executive Director at Crestron, stating "I see Savant as posing a bigger threat to our high end business than any Control4 or Niles."); Crestron0078645 at Crestron0078670 (Crestron Southwest division "FY 2008 Sales Review", dated July 22, 2009. It lists "Crestron competitors" as "Control4, Savant, Extron, AMX"); Crestron0172730 at Crestron0172732 (January 28, 2011 Randy Klein meeting notes. One topic was "Competition (Savant)". The notes do not list any other competitors); Crestron0116465 (June 23, 2011 email from Michael Mongiardo, then a Crestron "Manager of Residential Design – Sales Support Services", stating "We are currently looking for any competitive price lists we can get our hands on so we can keep pumping out all those great competitive quotes and analysis! The ones we are looking for in particular are… Savant Control4 Extron AMX Lutron, Magenta Research, RGB Spectrum); Crestron0170247 (July 15, 2008 notes for a Crestron "Regional Directors Meeting". One note is "Competition – our position C4, AMX, Extron, Lutron, Savant"); Crestron0078637 (July 21, 2009 notes for a Crestron-Florida sales meeting. Under "Competition" it lists "Control4" and "Savant". It lists AMX and Extron separately under subheadings that appear to be about commercial, rather than residential, clients); Crestron0002697 (July 2011 outline for a Crestron "Regional Directors Meeting". Under "Competition", it lists "C4" "DM – Extron", "Savant", and "Other"); Crestron0214140 (July 22, 2009 "FY 2009 Annual Sales Review" for Crestron Southwest. Under "Competition", it lists "Control4", "Savant", and "Extron"); Crestron0170267 at Crestron0170268 (October 1, 2008 internal Crestron notes from a meeting including Randy Klein and other Crestron employees. One of the notes is titled "Competitors – what is our message to dealers? And lists "AMX", "Control4", "Savant", and "Extron"); Crestron0211119 (April 15, 2011 Crestron "Residential Sales Meeting Agenda". One note is "Competition", under which it lists "Control 4 / Savant / Lutron"); Crestron0346422 at

documents list multiple firms as competitors, but Savant is the only firm that is listed in every document. Indeed, one document even states that "I see Savant posing a bigger threat to our high end business than any Control4 or Niles."[19] Out of these thirteen documents, Control4 is listed as a competitor in twelve, and Extron and AMX are listed in seven. Lutron is listed in only three, Niles is listed in two, while Magenta Research, RGB Spectrum, URC, Elan, RTI, and HAI are each listed in only one of these documents.

39. Of these twelve firms, five do not provide any solutions designed for controlling entire homes (as opposed to offices, classrooms, or other settings): Extron, Lutron, Niles, Magenta, and RGB Spectrum. Extron only sells systems that are designed for commercial application, such as "boardrooms, presentation centers" and "university lecture halls."[20] Lutron only provides lights and lighting control.[21] Niles systems on their own can provide audio and video control, but not whole house control.[22] Magenta provides commercial video and audio switching, but not any residential interfaces or systems.[23] RGB Spectrum is likewise purely

---

Crestron0346474 (July 2011 Crestron slideshow. One slide is titled "Residential competition", and lists "Control4", "Savant", and "AMX"); Crestron0334416 at Crestron0334417 (Crestron meeting notes for July 13, 2011 meeting titled "Residential Market Development Discussion." One section is titled "Competition", and lists "Control 4" and "Savant"); Crestron0025959 at Crestron0025973 (this survey ranked, in order, Control4, Savant, AMX, URC, Elan, RTI, HAI, and Niles).

[19] Crestron0115828.

[20] *See* http://www.extron.com/product/index.aspx ("Extron manufactures computer-video interfaces, switchers, configurable control systems, distribution amplifiers, computer-video scan converters, scalers, signal processing equipment, and high resolution cables. These products are used to integrate computer, video, and audio into presentation displays for today's boardrooms, presentation/training centers, university lecture halls, and other applications."). Crestron's internal documents are consistent with Extron selling only commercial system components; the Crestron comparison guides I have found comparing Crestron components to Extron components always compare commercial components. *See, e.g.*, Crestron0058389 (May 1, 2009 Crestron document comparing "Crestron iMedia vs. Extron PoleVault" "Crestron iMedia is the only media control solution that transmits all audio, video, control and power over a single CAT5 wire. Amazingly simple, flexible, and scalable, iMedia is the perfect solution for all your basic classroom and meeting rooms.").

[21] *See* www.lutron.com. Even what Lutron calls its "Whole Home" solution only controls all *lights* in the home. *See* http://www.lutron.com/en-US/Residential-Commercial-Solutions/Pages/Residential-Solutions/WholeHomeSolutions.aspx.

[22] *See* Julie Jacobson, *Elan Gives Home Automation, iOS Control to Niles ICS*, CePro (August 30, 2011), available at http://www.cepro.com/article/elan_gives_home_automation_ios_control_to_niles_ics/.

[23] *See* http://www.magenta-research.com/.

non-residential.[24] Thus, the only remaining possible substitutes for Crestron's high-end residential systems are Savant, AMX, Control4, Elan, RTI, Universal Remote, and HAI.

40. Even among this set of potential substitutes, a survey Crestron conducted of its dealers indicates that Control4, Savant, and AMX are the largest "threats" to Crestron's product lines (the survey does not specify whether the dealers are comparing these competitors to all of Crestron's residential control systems, or only its high-end ones).[25] I therefore begin my analysis by ranking Savant, AMX, and Control4 from closest substitutes to most distant substitutes for Crestron's high-end residential control systems. As I show below in Part I.A.3, I ultimately find that a posited market limited to just Crestron's high-end systems, AMX, and Savant, is a properly defined relevant antitrust market, so in this case there is no need to rank the other more distant substitutes.[26]

---

[24] *See* www.rgb.com (listing under "Our Markets", "Commercial", "Control Rooms", "Education", "Medical", "Military", "Security", "Simulation & Training", "Command & Control", and "Oil and Gas.").

[25] Crestron0025959 at Crestron0025973 (this survey ranked, in order, Control4, Savant, AMX, URC, Elan, RTI, HAI, and Niles). Internal Savant documents similarly indicate that Savant views Crestron, AMX, and Control4 as its closest competitors. *See* Keynote Presentation Attached to SAVANT1661634 (internal Savant email dated January 29, 2011) at slide 3 (Slide titled "Market Share vs. Top 3 Competitors". It has two pie charts, one titled "Commercial" and another "Residential". The residential pie chart lists four firms, with the following "Market Shares", Crestron: 68.5; AMX: 4.1%; Control4: 21.92%; Savant: 5.48%).

[26] Crestron deposition testimony indicates that Niles, RTI, Universal Remote, Russound and Elan are all lower-end systems that are most comparable to Crestron's Prodigy system and Control4. Dave Sell Deposition at 126 ("Q: Was [Crestron's Prodigy line] designed with a particular purpose in mind? A: Yes. Q: Which was? A: Offer a lower-priced control solution. Q: Was it designed to compete with any particular brand? A: Yes. Q: Which? A: Control4, RTI, Universal Remote, Russound, Niles, Elan."). This is consistent with other sources, which for example indicate that Elan user interfaces are not fully customizable. Century Stereo, "Home Automation and Control" ("Elan G! is a home automation system that has a consistent user interface across a wide range of devices. It's out-of-the box pre-programmed user interfaces of Elan G! means it can be set up in a matter of hours versus the labor intensive programming of other automation systems and avoids some of the errors that can arise from a completely custom program."), available at http://www.centurystereo.com/audio-video-brands/controls-and-touch-panels/. Third party reports similarly indicate that HAI is relatively low-end. *See* 2007 Parks Report, appendix p. 64 ("In comparison to high-end systems such as Crestron and AMX, HAI is affordable with end user sales ranging between $4K and $7K."). According to the Crestron dealer survey, Control4 is the closest substitute to Crestron's products (primarily Crestron's Prodigy systems) of all these low-end systems, but I show below that even Control4 is a more distant substitute to Crestron's high-end systems than Savant or AMX are, and that a market

*2. Ranking Plausible Close Substitutes from Closest to Most Distant*

41. The products that are the closest substitutes to Crestron's high-end residential systems are the products that are most similar in function and price, and thus impose the greatest constraints on Crestron's ability to raise prices. One of Crestron's own documents suggests that Savant's products impose a larger competitive constraint on Crestron's "high-end" products than Control4 (the document does not mention AMX at all).[27] Analyzing the prices and functionalities of Savant's, AMX's and Control4's products confirms that Savant's high-end residential systems are the closest substitutes to Crestron's high-end residential systems.

42. Because several of these firms have multiple distinct product lines, one must really identify which *product lines* are the closest substitutes to Crestron's high-end control systems. For example, a firm's low-end product line might be a close substitute for Crestron's low-end systems, but fail to provide any reasonable substitute for Crestron's high-end systems.

43. As Table 1 below shows, AMX's only residential product line is high-end.[28] Savant's product line is likewise aimed at high-end customers.[29] Crestron

---

limited to Crestron, Savant, and AMX is sufficiently broad. This thus indicates that these other low-end systems are even more distant substitutes outside of the high-end systems market.

[27] Crestron0115828 (June 2, 2008 email from John Gutekunst, then a Regional Director at Crestron, now an Executive Director at Crestron, stating "I see Savant as posing a bigger threat to our high end business than any Control4 or Niles.").

[28] SAVANT0520194 at SAVANT0520232 (2010 report by Parks Associates describing AMX: "the Company's products are aimed at the high end market with each system costing between $25k to over $100k; with an average price tag of $50k"); 2007 Parks Associates Report at 35 (AMX is "One of the two established leaders in the section of the industry that targets only the high end market."); *id*. at 36 ("AMX does not choose to adapt their product for sale to high middle income customers. They consider themselves the Rolls Royce of remote controls and wish to remain in that niche.").

[29] *See* Parks Associates 2007 Report, Appendix p. 97 (listing the "Target Markets" for Savant as "High-end, whole home control systems in residential markets."). In contrast, this same report explains that Control4's strategy is "making automated home control available to the average home". *Id*. at 49. Crestron0116256 at Crestron0116257 (July 2010 email from Warren Lanza, then a regional employee at Crestron, to John Gutekunst, an Executive Director at Crestron, stating that "We have a high end Control System Competitor for 1st time in years. Savant will take some biz [sic]."). SAVANT3330221 at SAVANT3330222 (report on Control4 by Needham Co., an investment banking firm, describing "Savant" as an "ultra-premium solution"). Crestron0349081 at Row 6435 (September 9, 2011, entry by Jake Baley in the compilation of Crestron's SalesForce.com database regarding his visit to Listen Up Audio/Video

has both a high-end residential line and a low-end residential line. Crestron started selling its lower-end residential line under the brand name "Prodigy" in August 2009.[30] Crestron designed the Prodigy line specifically to be cheaper and lower in functionality so that it could compete more directly with Control4,[31] and has instructed its salespeople to try to sell Prodigy systems specifically to dealers who use Control4.[32] The analysis below confirms that, although Control4's systems

---

stating "Dave and the other executives at ListenUp have always looked at Crestron as only being the higher end solution where they use C4 and URC for entry level and SAVANT and Crestron for higher end.").

[30] *See* "12 First 100 Prodigy Sales.csv".

[31] Klein 30(b)(6) Deposition 236 ("A: . . . we had a product line called Prodigy that was maybe a little less, not maybe, it was less in features and capabilities . . . . It was a much very, very small and short-lived portion of our product line. . . . that could have been deemed a lower end or not a high end."). Julie Jacobson, *Crestron's Low-Cost Prodigy to Compete with Control4* (July 21, 2009) ("Crestron is working on a 'Control4 buster' called Prodigy". . . .It's no secret that Control4's rise in the home automation control business has rankled Crestron management. Crestron's first attempt at a more downscale system, Adagio, is still not cheap enough to compete. A Control4 automation system starts at about $300 for what amounts to a feature-rich universal remote control solution. Add a couple hundred dollars and you can get a system with two-way ZigBee remote including metadata. The Prodigy price points will be very similar. A 'media controller' with remote will list for about $700. An in-wall touchscreen costs less than $700. Wireless dimmers will sell for about $99. The system supports up to 16 zones of audio (not wireless. . . . Several high-end Crestron dealers such as Electronics Design Group . . . and Audio Advisors . . . have started new divisions for more down-scale installations. They are using Control4.") available at http://www.cepro.com/article/crestrons_low_cost_prodigy_to_compete_with_control4/. Internally, Crestron referred to their Prodigy system as "Control5", alluding to the fact that it was aimed specifically at Control4. *See* Crestron0091409 (August 2009 email from a Crestron regional sales manager to a dealer stating "We did refer to Prodigy as Control 5 for about the past 18 months. I was in a meeting with Randy Klein the first time I heard him say it."); Dave Sell Deposition at 126 ("Q: Was [Crestron's Prodigy line] designed with a particular purpose in mind? A: Yes. Q: Which was? A: Offer a lower-priced control solution. Q: Was it designed to compete with any particular brand? A: Yes. Q: Which? A: Control4, RTI, Universal Remote, Russound, Niles, Elan."); Crestron0171063 at Crestron0171063 (May 23, 2009 e-mail from Dave Sell, Director of Crestron West, to commercial and residential Regional Sales Managers, stating "Prodigy line (C4 killer)").

[32] Internal Crestron documents show that Crestron aimed its Prodigy sales specifically at dealers who were selling Control4. Crestron2506624 at Crestron2506639 (July 2009 Crestron slide showing that Crestron told its salespeople to focus its Prodigy sales on dealers that installed Control4 systems); Crestron0078637 (July 21, 2009 notes for a Crestron-Florida sales meeting. It notes under "Prodigy Distribution" "Residential Crestron dealers that sell or are affected by C4"); *id*. at Crestron0078637 (Under "Crestron dealers that take on C4", it states "Show them Prodigy – hardware and software." In contrast, it does not state anything about Prodigy in the Savant section.); Crestron0030809 (March 2011 internal Crestron email explaining that

were close substitutes for Crestron's low-end Prodigy systems, they were much more distant substitutes for Crestron's high-end residential systems.

| Table 1: Distinct Residential Product Lines | | |
|---|---|---|
| **Firm** | **Product Line** | **Name of Product Line** |
| Crestron | High-end | Non-Prodigy, Non-Adagio |
| Savant | High-end | Only product line |
| AMX | High-end | Only product line |
| Control4 | Low-end | Only product line |
| Crestron | Low-end | "Prodigy" and "Adagio" systems |

44. Several key characteristics differentiate these product lines: (a) price range, (b) customizability, (c) compatibility with third-party devices, and (d) speed/responsiveness. Additionally, the evidence indicates that there is a general perception that Crestron's, Savant's and AMX's high-end systems are higher in overall quality than Control4's systems and Crestron's low-end systems.

45. **<u>a. Price Range</u>**. Although the exact total price of any system depends on which components are included, there is a general consensus among competitors and third-party reports that AMX has the most expensive products, followed by Crestron's high-end products, then Savant's product line, with

"Control4 continues to be a pain but I am working to push the new Prodigy products to overtake that business." In contrast, the email did not propose pushing Prodigy products to overtake Savant); Crestron0144610 at Crestron0144613 (August 10, 2009 plan from a Crestron's Regional Sales Manager for Crestron West, John Yohanna. It states that "Prodigy will be a great way to increase sales by taking away business from Control 4, Universal, and RTI as well as generating plus business for the dealer. It will also help us protect ourselves from Control 4 by not leaving an open door to a dealer in the form of a whole in the product line."); Crestron0119571 at Crestron0119572 (August 2, 2009 email from Crestron's Chief Executive, Randy Klein, to the Regional Director of Crestron West, Dave Sell. Klein explains "We can try our best with C4 vs Prodigy. But if he is going to have to make a choice between Savant and us. If he wants to continue to sell Savant, we say goodbye on Wed[nesday] … plain and simple.").

Control4 and Crestron's Prodigy being the cheapest. Third-party reports refer to AMX as the "Rolls Royce" of control systems,[33] and internal Crestron documents note that AMX systems are more expensive than Crestron systems approximately 70% of the time.[34] Third party reports indicate that, after AMX and Crestron's high-end systems, the next most expensive is Savant.[35] Third-party reports and Crestron documents indicate that Control4's systems and Crestron's Prodigy systems are the cheapest.[36]

46. **<u>b. Customizability</u>**. The evidence indicates that Crestron's, Savant's and AMX's high-end systems are all more customizable than Control4 systems and

---

[33] Parks Associates, Home Systems: Home Controls 2007 Update at 21 (noting that AMX "Intends to remain the Rolls Royce of control systems."); Raymond James, August 27, 2013 Evaluation of Control 4 IPO at 20 (noting that AMX's main controller is $9,500, as compared to Crestron's PRO2 controller, priced at $3,600).

[34] Crestron1426865 at Crestron1426865 (internal Crestron document noting that "Of the 100 competitive quotes generated by Tech Sales, pitting AMX against Crestron in 2011, 71 out of 100 quotes Crestron was the cheaper quote.").

[35] *See* Raymond James, August 27, 2013 Evaluation of Control 4 IPO at 18 (classifying AMX, Crestron, and Savant in the "Luxury $10k-$100k+" segment of the "Home Automation Industry," which $10k-$100k+. In contrast, Control4 is classified in the "Mainstream $1-3k to start up to $20k+" segment); *id*. at 20-21 (noting that Savant's main host controller costs $2,800, while Control4's "retails for $600-1000," and that "Pricing for complete [Control4] projects is generally lower than Luxury/Mainstream providers like Savant.").

[36] *See* Raymond James, August 27, 2013 Evaluation of Control 4 IPO at 20-21 (noting that Savant's main host controller costs $2,800, while Control4's "retails for $600-1000, and that "Pricing for complete [Control4] projects is generally lower than Luxury/Mainstream providers like Savant."); Crestron0189488 at Crestron0189492 (Crestron "Fact Sheet" comparing Crestron and Control4. It states that "a customer might be initially attracted to Control4 based on price, however that customer will quickly find him/herself in a maze of system design and visual design dead ends."); Julie Jacobson, *Crestron's Low-Cost Prodigy to Compete with Control4* (July 21, 2009) ("Crestron is working on a 'Control4 buster' called Prodigy". . . . It's no secret that Control4's rise in the home automation control business has rankled Crestron management. Crestron's first attempt at a more downscale system, Adagio, is still not cheap enough to compete."). SAVANT3330221 (August 17, 2013 report on Control4 by Needham Co, an investment banking firm. The introduction states "Home automation has historically been dominated by ultra-premium solutions such as Crestron that can easily cost $40,000+ and require custom programming. Control4 is priced in the $3-4k range.") *id*. at SAVANT3330222 ("The pricing of [Control4] is starkly different from Crestron or Savant or AMX, which are all ultra-premium solutions"). Dave Sell Deposition at 126 ("Q: Was [the Crestron Prodigy line] designed with a particular purpose in mind? A: Yes. Q: Which was? A: Offer a lower-priced control solution. Q: Was it designed to compete with any brand? A: Yes. Q: Which? A: Control4, RTI, Universal Remote, Russound, Niles, Elan."); Crestron0095712 at Crestron0095712 (February 18, 2011, e-mail from Rob Christensen, Regional Sales Manager, to Jerrie Anderson, stating "we now offer a very cost effective 'value'oriented Prodigy solution").

Crestron's Prodigy system. Internal Crestron documents emphasize repeatedly that Control4's systems are less customizable than high-end Crestron systems.[37] Similarly, Crestron's public statements acknowledge that its Prodigy systems are less customizable than its high-end line.[38] In contrast, I have not found Crestron documents claiming that Savant or AMX systems were significantly less customizable than Crestron systems. Third-party statements confirm that Savant and AMX systems and user interfaces are completely customizable.[39] Dealer

---

[37] Crestron0064375 at Crestron0064383 (2009 Crestron document noting that "according to a Control4 dealer, the system must be a simple one to be easy for anyone to program, and Control4 instructs dealers not to 'go outside the box.'"); Crestron0544915 at Crestron0544918 ("Control4 allows portions of the UI [User Interface] screens to be configured – for instance to add additional buttons that may be required for specific devices, but major functionality cannot be added. This is an advantage for Crestron, because Control4 has much more strict limits on what can be added for individual customers." This document predates the entry of the Prodigy panel, so it is clearly comparing Control4 to Crestron's high-end systems); Crestron1404774 (internal Crestron spreadsheet titled "Crestron vs. Control4 Touchpanels. It indicates that Crestron touchpanels have "completely customizable GUI colors, buttons, etc.", while Control4 does not); Crestron0000527 (March 13, 2009 Crestron comparison guide with Control4, stating "Compare with Control4, only Crestron offers customization, larger format displays, video and streaming media capabilities, RF for long-range, reliable wireless communication, Web browsing and intercom. See the latest comparison guide to see how our extensive, award-winning family of touchpanels far exceeds what Control4 offers."); Crestron2467711 (Crestron "Comparison Guide" for Touchpanels "Crestron vs. Control4". It states that Crestron touchpanels have the following capabilities that Control4 touchpanels lack: "Completely customizable GUI colors, buttons, etc."). Dealer statements also indicate that Control4 is less customizable than high-end Crestron systems. *See, e.g.*, "Crestron vs Control4 - What's really the difference", http://callcharles.com/crestron-vs-control-4/ (Last accessed January 28, 2014)("Control4's software uses an auto-generated interface . . . and makes installation . . . extremely efficient. Crestron provides the ability for completely customized interfaces.").

[38] *See* Crestron, *Prodigy Products Now Exclusively Available Through Distribution* (November 1, 2011 Press Release) ("Prodigy is very simple and ideal for distribution, Crestron [i.e., non-prodigy Crestron] is full featured, expandable, and customizable, and is best served through the expertise of our value-added dealers."), available at http://www.crestron.com/about/press_room/press_releases/show_release.asp?press_release_id=1687. Crestron also recognized that its Prodigy less was less customizable internally. *See, e.g.*, Crestron0119464, "Fiscal Q4 '09" tab (July 23, 1009, Weekly Report of Landon Lovett, Director of Crestron South & Mid-Atlantic, stating "The strategy moving forward is to sell Prodigy for the simple solution (PMLX2, PMC2, some light switches, use a third party receiver for surround and an extra zone of audio, E-Control and I-Pod control); above that is Crestron core with all the value that line provides--expandibility, customization, seamless integration of lights, hvac, audio, video, switching, etc.).

[39] 2007 Parks Report at 36 ("Crestron and AMX are the two companies with the most flexible and customizable software. Software of both companies is difficult to program, at least from the perspectives of either a consumer or an unsophisticated dealer." This report was

testimony also confirms that Savant systems are more customizable than Control4 systems.[40]

47. **c. Compatibility with Third-Party Devices**. One of the main purposes of a home control system is to control multiple different types of technologies that are made by many different brands, such as televisions, audio systems, and security systems. If a control system is not compatible with a third-party device, then the homeowner will not be able to control that third-party device, which severely reduces the utility of the control system. The evidence indicates that Crestron's high-end systems and Savant's systems are compatible with more third-party devices than Control4 systems.[41] At this time I have not found any evidence comparing the compatibility of AMX and Crestron's low-end Prodigy system to any of the other product lines.

48. **d. Speed/Responsiveness**. The evidence indicates that some control systems are "faster" than others, in the sense that they will perform the action the user specifies faster. For example, a slower system may have a few-second delay between pressing a button that tells the control system to switch the TV input from Satellite to BluRay, while a faster system may do so almost instantaneously. The

---

published during the second quarter of 2007, which is right when Savant first started selling systems); "Home Automation — Savant Home Automation Denver and Control4 Denver Home Theater", http://www.theavspecialists.com/services/home-automation, (Last accessed January 28, 2014)(Savant has "Completely customizable graphics.").

[40] Clancy Deposition at 61 (dealer testifying that "with C4, you're living in a finite world. The customization level is – is restricted. Q: What about comparing C4 to Savant? A: With Savant, you get more customization, essentially, than you do with C4.").

[41] *Crestron vs Control4*, http://www.c9ny.com/control4_vs_crestron (Last accessed January 28, 2014)("Crestron can control more brands. . . . Control4 works with the most common brands. If you want to control something unusual (i.e. a wine cellar), it's likely that Crestron will be the only option [when choosing between Crestron and Control4]"); Crestron0544915 at Crestron0544918 ("Unlike Crestron – Control4 strictly limits who can write drivers for third-party devices. This is because their driver language is much more complex than Crestron's SIMPL and SIMPL + - and their dealers have less technical ability. Normal dealers cannot add their own custom drivers for other devices. This is a significant limitation because they only support about 40 2-way devices as of August 2008 (most of which are security systems or I/O extenders."); *Control4 vs. Savant for Today's Smart Home*, http://residentialsystemsinc.com/control4-vs-savant-for-todays-smart-home/ (Last accessed January 28, 2014)(One of the strengths of Savant in comparison to Control4 is its "[e]asy ability to integrate with other world-class smart-home products including Lutron, Vantage, HAI and others").

evidence indicates that Crestron's high-end systems are faster than AMX's,[42] and that Savant's systems are faster than Control4's.[43] I have not been able to find any speed comparisons between Crestron and Savant.

49. **Summary: Crestron, Savant, and AMX High-end Systems are the Closest Substitutes for Each Other, While Control4 is a Closer Substitute to Crestron's Low-end Prodigy System**. In sum, AMX's systems, Savant's systems, and Crestron's high-end systems are more expensive and higher quality than Control4's systems and Crestron's low-end Prodigy system. This is consistent with competitor and industry statements indicating that these three high-end product lines are generally superior to Control4 and Crestron Prodigy systems.[44] It is also consistent with numerous internal Crestron strategic

---

[42] Crestron1426865 (internal Crestron document titled "What makes Crestron better than … AMX?" It lasts as one reason, "AMX has a slower and older lineup (control processors are slower, touchpanels are older by the day). Our processors are still 3x faster eve AFTER their recent upgrades. The MVP-8400 panel is a dinosaur, and it's the heart of their lineup.").

[43] Cloud9 Smart Home, *Control4 vs. Savant* (February 8, 2013) ("a Savant system will usually be faster than a Control4 system. A couple of years ago this difference was more significant, but Control4 has upped the horsepower in their latest home controllers, catching up on speed. Savant is still faster, but we're talking a second or two difference in response times (if both systems are smartly designed and adequately powered") available at http://www.c9ny.com/control4_vs_savant; *Control4 vs. Savant for Today's Smart Home*, http://residentialsystemsinc.com/control4-vs-savant-for-todays-smart-home/ (Last accessed January 28, 2014)("Savant's HDMI switching products are some of the best in the world, so if a client is particular about that, we recommend Savant [over Control4]").

[44] *See, e.g.*, Residential Systems Inc. Blog, *Control4 vs. Savant For Today's Smart Home* (November 22, 2013), available at http://residentialsystemsinc.com/control4-vs-savant-for-todays-smart-home/ (authorized dealer of both Savant and Control4 explaining that "we tend to recommend Savant [over Control4] in applications where quality is the utmost importance to our clients . . . For example – Savant's HDMI switching products are some of the best in the world so if a client is particular about that, we will recommend Savant. Our clients recognize the premium price for that, but they also recognize that they get incredibly quality, as well." In contrast, the dealer states that "we tend to use Control4 in applications where price/budget is more of a consideration."); Crestron0189488 ("Crestron Fact Sheet: Crestron vs. Control4". It notes that Control4's pitch is that "current solutions [i.e., solutions other than Control4] only address customers who are building high-end customer homes or doing major reconstruction on an existing home. Homeowners need a more affordable way to automate their existing homes without the headaches and expense of major remodeling." Crestron notes that Control4's "aim is existing homes, and low cost. In other words, they know that they do not have competitive products in installations where there is the opportunity to pull cable."); Parks Associates 2007 Report, Appendix p. 36, 63, 49, 97 (listing the "Target Markets" for Savant as "High-end, whole home control systems in residential markets.", for Crestron "Very upscale households . . . via high-end custom installers", for AMX "high level income groups – those living in homes worth

statements indicating that it designed its low-end Prodigy systems specifically to compete with Control4's low-end systems,[45] and instructed its salespeople to target Prodigy sales at dealers who used Control4.[46]

50. To be sure, some Crestron documents express concern that it lost sales when Control4's systems became available, but that does not necessarily indicate that Control4's systems are closer substitutes to Crestron's high-end systems, for two reasons.

51. First, Crestron also has a low-end line, the "Prodigy," which the evidence indicates competes more directly with Control4's line.[47] The evidence indicates both that: (1) Crestron decided to make a lower-end system like the Prodigy specifically in response to competition from Control4,[48] and (2) Crestron targeted its Prodigy sales specifically at dealers who were selling Control4, but did

---

$2M+". In contrast, it lists Control4's strategy as "making automated home control available to the average home." Crestron had not yet introduced its lower-end Prodigy line when this report was published); Crestron0116256 at Crestron0116257 (July 2010 email from Warren Lanza, then a regional employee at Crestron to John Gutekunst, an Executive Director at Crestron, stating that "We have a high end Control System Competitor for 1st time in years. Savant will take some biz [sic]. Not much, hopefully, but some. C-4 is still here too.").

[45] Crestron0544915 (internal Crestron document stating "Control4 – a new competitor in the lower-end residential control system market has gained traction in the hotel and low-end home theater markets. . . . Crestron should create a new series of products based on cheap control system/remote control combination to regain the competitive edge in this area.") id. at Crestron0544917 ("Control4 is targeted towards the lower-end home automation market, which is mostly retrofit installations instead of new construction and tends to be serviced by lower-cost dealers with less technically skilled staff."); Crestron1539445 (March 27, 2009 email from Randy Klein regarding the dealer Crescendo. It states "I approved an order yesterday with a large discount in order to compete effectively with C4. That's OK, because it's short term. Once we come out with our new Prodigy line (60 days or so), we won't have to do that. . . . Until we ship Prodigy, if they have a C4 customer or competitive situation, we will match the C4 price. We need the C4 BOM in order to make an accurate comparison and Crestron BOM. Once Prodigy is released, that product line will replace the competitive discount program."); Sean Riordan Deposition at 26-27 (dealer testifying that, if a customer asked for an alternative to Crestron, he would tell them that that there were "three companies that [he] felt were building quality control systems . . . Crestron, AMX, and Savant.").

[46] *See supra* note 32 (collecting sources).

[47] Third-party reports also state that Control4 competes most directly with Crestron's Prodigy line. *See, e.g.*, ABIResearch Report, Home Automation and Control (2010) at 8 ("in August 2009, Crestron introduced the Prodigy system at the CEDIA trade show. The Prodigy system competes on price more directly with the system on offer from Control4 and the other 'mainstream' vendors.").

[48] *See supra* note 45.

not target its Prodigy sales at dealers who sold just AMX or Savant.[49] Thus, at least part of Crestron's concern about Control4 is that it is losing sales in its *lower-end* Prodigy product line, rather than because Crestron believes that Control4 is a closer substitute to its high-end product line than Savant or AMX.[50]

52. Second, economic theory would predict that the new entry of the *first* major "low-end" competitor, Control4, would cause a large decline in incumbent high-end sales because until then high-end systems did not have to compete with low-end systems for customers who did not get much value from the high-end features. Before Control4 came along in late 2004,[51] high-end suppliers like AMX and Crestron (Savant had not entered the market yet) were essentially the only options for whole-house control.[52] Thus, if a customer wanted a residential control system, its only options were the high-end Crestron and AMX options, even if the customer did not place significant value on the aspects of high-end systems that make them superior to low-end systems (such as greater customizability, compatibility, and speed). Consequently, before Control4 entered, a portion of Crestron's sales were to customers who valued home control enough to be willing to pay the high price for high-end systems (the only option), even though they did not place much value on the *high-end* characteristics, and thus would prefer a lower-end system at a lower price. When Control4 entered, this type of customer who did not value the high-end characteristics now had a significantly cheaper and lower quality option, which is what they would have preferred all along had it been

---

[49] *See supra* note 32.

[50] Dealers have also stated that Control4 was primarily a threat to Crestron's low-end line, and that Savant was a much greater threat to Crestron's high-end market power. *See, e.g.*, Crestron0119657 at Crestron0119659 (August 4, 2009 email from a Crestron dealer, Stereo One, to Crestron. The dealer states "I think the threat of Savant is in the order of magnitude of ten times the threat created by Control4 and should be treated as such. Losing the high end of the business will have a dramatic impact on Crestron's mid-tiered components and those components will need to be discounted . . .Losing this position will sting a lot harder and a lot longer than Control4 taking the low(er) end of the market").

[51] *See* Julie Jacobson, *Introducing Control4: Automation Vets Plan 'Unrivaled' Product Launch* (June 1, 2004 article, stating that "When it rolls out product in the fourth quarter of this year, Control4 will offer its own subsystems such as lighting, multiroom audio, and HVAC control, but it will also support subsystems from other manufacturers."). Available at: http://www.cepro.com/article/introducing_control4_automation_vets_plan_unrivaled_product_launch/.

[52] *See* Raymond James, August 27, 2013 Evaluation of Control4 IPO at 1 ("Control4 has disrupted the sleepy luxury world of home automation, which has been dominated by very expensive solutions for the last 30 years"); Control4 S1 filing at 2 ("Historically, the home automation market was primarily comprised of luxury systems that were so expensive that only wealthy consumers could afford the programming and installation costs.").

available. Economic theory would predict that incumbent high-end suppliers would then lose this group of customers to the newly available low-end product (here Control4). Indeed, when the first low-end supplier enters, the size of the decrease in high-end system sales can actually be greater the *more* distant the low-end substitute is because great distance can mean the low-end substitute much better satisfies a wide range of consumer preferences that previously were not met. Industry reports are consistent with this economic theory: one explained in 2009 that Crestron's introduction of the Prodigy system made "perfect sense" because, now that the lower-end Control4 was an option, it was "more difficult to sell a $100k Crestron system to someone who wants a basic feature set."[53]

53. **Final Ranking**. The above evidence indicates that AMX and Savant's product lines are clearly the closest substitutes in terms of functionality and price range for Crestron's high-end systems. However, the evidence does not clearly indicate whether Savant or AMX is the closest substitute to Crestron's high-end systems. Nonetheless, in this case there is almost no practical difference between ranking Savant before AMX or the opposite – even if one conservatively assumes that Crestron, Savant, and AMX are all in the same market, Crestron has maintained dominant share in the market and restricted a large share of the market.

### *3. Hypothetical Monopolist Test Confirms that High-End Market Limited to Crestron, AMX, and Savant is Sufficiently Broad*

54. Given that the above analysis showed that Savant's and AMX's high-end systems are the closest substitutes to Crestron's high-end systems, I start by determining whether a posited market that included only high-end systems from Crestron, Savant, and AMX would satisfy the Hypothetical Monopolist Test.

55. A posited market definition satisfies the Hypothetical Monopolist Test if the evidence indicates that a hypothetical, 100% monopolist in the posited market could profitably raise prices at least 5% above competitive levels.[54] Although sometimes there is data available that allows one to statistically estimate exactly how much a hypothetical 100% monopolist could raise prices if all

---

[53] Julie Jacobson, *Crestron's Low-Cost Prodigy to Compete with Control4* (July 21, 2009) (noting that a Crestron dealer said that Crestron's introduction of the Prodigy system "makes perfect sense. It will continue to become more difficult to sell a $100k Crestron system to someone who wants a basic feature set."), available at http://www.cepro.com/article/crestrons_low_cost_prodigy_to_compete_with_control4/.

[54] DOJ/FTC Horizontal Merger Guidelines §4.1-4.2 (2010).

competition were eliminated, the hypothetical monopolist test is still useful when the necessary data is not available.[55] In those cases, economists look to other types of evidence that can indicate whether a hypothetical 100% monopolist could likely raise prices significantly above competitive levels.

56. Here, two types of evidence indicate that a posited market that includes only Crestron's high-end systems, Savant's high-end systems, and AMX's high-end systems would likely satisfy the hypothetical monopolist test.

57. **<u>a. Significant Functional Differences</u>**. First, the significant functional differences between high-end systems, such as Crestron's high-end systems, Savant, and AMX, and low-end systems like Control4, makes it unlikely that a large enough percentage of customers would switch to Control4 in response to a hypothetical 100% high-end monopolist raising prices by 5% above the competitive level to make the price increase unprofitable. As I explained above in Part I.A.2, the next closest substitute for Crestron's high-end systems (after Savant and AMX) is Control4, but Control4 systems have several major functional disadvantages, including less customizability, compatibility, and speed.[56] These functional differences would deter many high-end system customers from switching to Control4 in response to a price increase by a 100% high-end monopolist. To be sure, when Control4 entered the market and provided a low-end option for the first time, many customers did switch, but those were customers with low-end preferences who otherwise would have been stuck buying a high-end product. The issue here is whether, now that Control4 already has captured the customers with low-end preferences, a 5% price premium over competitive levels in high-end system prices would cause a large number of *additional* high-end customers to switch to Control4 even though, by definition, their preferences were sufficiently high-end not to switch because of the mere existence of the low-end option.

---

[55] DOJ/FTC Horizontal Merger Guidelines § 4.1.3 (2010) ("Even when the evidence necessary to perform the hypothetical monopolist test quantitatively is not available, the conceptual framework of the test provides a useful methodological tool for gathering and analyzing evidence pertinent to customer substitution and to market definition.").

[56] Functional differences are one of the factors economists analyze when determining whether a market likely satisfies the hypothetical monopolist test. *See* DOJ/FTC Horizontal Merger Guidelines § 4.1.3 ("In considering consumers' likely responses to higher prices, the Agencies take into account any reasonably available and reliable evidence, including but not limited to: . . . objective information about product characteristics and the costs and delays of switching products, especially from switching from products in the candidate market to products outside the candidate market.").

58. **b. Significant Crestron Price Cuts in Response to Competition from Savant**. A second source of evidence that indicates eliminating all competition between Crestron, Savant, and AMX (or even just Crestron and Savant) would significantly raise prices is that Crestron has often significantly reduced the prices of its high-end systems specifically in response to competition from Savant.

59. For example, Savant gained a major foothold in the Phoenix area when Phoenix's biggest dealer, Cyber Sound & Security, started buying Savant products in December 2009.[57] Cyber Sound had previously purchased significant amounts of high-end products from Crestron, but by April 2011 had switched almost entirely to Savant.[58] Crestron responded in May 2011 by providing 50% discounts to dealers whenever they were bidding for a client against Savant in Phoenix.[59] As one example, in July 2011 Crestron reduced its price by 50% (equal to a $1,162.50 reduction in value) to the dealer "Acoustic Designs" in Phoenix in response to competition from Savant.[60] Similarly, in August 2011 Crestron reduced its price by 50% (equal to $14,700 in value) to the dealer Theater X in Scottsdale (right outside Phoenix) in response to competition from Savant.[61] These 50% discounts in response to competition from Savant indicate that Creston's normal pricing is double (i.e., 100% higher than) the competitive level, which far exceeds the 5% level at which economists usually consider a market sufficiently broad under the Hypothetical Monopolist test.

60. A similar story occurred in Park City, Utah. On April 30, 2010, Crestron learned that one of its dealers in Park City, S3, could not obtain a particular client's business at Crestron's normal prices because the client was very interested in Savant.[62] In response, Crestron's Regional Sales Manager for the area

[57] Cyber Sound & Security has customer number 10284 in the Savant sales data and 1000584 in the Crestron sales data. *See* "15 Concrete Examples.xlsx", "Cyber Sound" tab.

[58] *See* "15 Concrete Examples.xlsx", "Cyber Sound" tab

[59] Crestron0133959 (May 2011 internal Crestron e-mail stating that "6 dealers have been chosen and notified of our special deal of 50% off Creston to steal business from Cybersound. They are: Dennis Sage Home Entertainment, Avalon Audio, Creative Sound & Integration, Theater X, Acme AV, Elite Home Technologies. All have been told that this discount is exclusively to be used for winning projects against Cybersound when selling Savant and C4.").

[60] Crestron0031251.

[61] Crestron0145231.

[62] Crestron0081616.

requested that Crestron reduce its price to this dealer by 10%.[63] This 10% discount specifically in response to competition from Savant indicates that Creston's normal pricing is at least 11% above the competitive level, which far exceeds the 5% level at which economists usually consider a market sufficiently broad under the Hypothetical Monopolist test.

61. The same thing happened in New York as well. On June 2, 2010, Crestron provided a 20% "competitive discount" to the dealer "Bri-Tech" specifically in order to "sell against Savant."[64] This 20% discount specifically in response to competition from Savant indicates that Crestron's normal pricing is at least 25% above the competitive level, which again far exceeds the 5% level at which economists usually consider a market sufficiently broad under the Hypothetical Monopolist test.

*4. Relevant Geographic Market is the United States and Canada*

62. Three sources of evidence in this case indicate that it is conservative but appropriate to use a relevant geographic market limited to the United States and Canada.

63. **a. Crestron's Region-Specific Responses to Savant Competition**. First, evidence that Crestron provides significant discounts in regions of the United States where Savant is able to gain a significant foothold indicates that even smaller regional markets are sufficiently broad to properly constitute distinct relevant markets under the hypothetical monopolist test. The Merger Guidelines explain that it is proper to define markets based on the locations of customers when the products are shipped to customers and hypothetical monopolists are able to price discriminate between customers based on their location.[65] Specifically, the Merger Guidelines state that a regional market defined by customer location is sufficiently broad if a hypothetical monopolist to customers in the region "would impose at least a [5% increase above competitive levels] on some customers in that

[63] Crestron0081616 ("I am requesting a 20% non-DRP eligible sale. That means we are giving up 10% above what we would normally give S3 as they are at a 10% DRP level.").

[64] Crestron0138644 at Crestron0138645.

[65] DOJ/FTC Horizontal Merger Guidelines §4.2.2 (2010) ("When the hypothetical monopolist could discriminate based on customer location, the Agencies may define geographic markets based on the locations of targeted customers. Geographic markets of this type often apply when suppliers deliver their products to customers' locations.").

region."[66] Here, the evidence shows that: (1) high-end control system suppliers such as Crestron and Savant ship their systems to dealers,[67] and (2) Crestron has actually provided discounts in excess of 5% to dealers in particular regions specifically in response to competition from Savant, meaning that eliminating competition between Crestron and Savant would cause those dealers to suffer at least a 5% increase in prices.[68] This evidence thus indicates that regional markets that were even smaller than the United States would be sufficiently broad to satisfy the hypothetical monopolist test.

64. Because regional markets smaller than the United States would satisfy the hypothetical monopolist test, by definition a larger market that includes multiple regional submarkets would also satisfy the hypothetical monopolist test. Using a market definition that is broader that the narrowest market that satisfies the hypothetical monopolist test tends to produce market shares that conservatively *under*estimate market power,[69] meaning that using a broader geographic market that consists of the United States and Canada biases this analysis towards finding that Crestron does not have market power. In this case, I use the geographic market definition of the United States and Canada because: (a) it simplifies the analysis, (b) it is congruent with the geographic economies of scope in this industry, and (c) conservatively using this broader market definition does not alter my conclusion that Crestron has monopoly power and market power.

65. **b. Evidence Indicates There are Economies of Scope Within the U.S. and Canada That Do Not Extend Elsewhere**. A geographic market limited to the United States and Canada is appropriate also because the evidence indicates that there are economies of scope within the United States and Canada that do not extend elsewhere. Crestron deposition testimony indicates that there are economies of scope in the United States and Canada that do not extend elsewhere. For example, Crestron's Chief Financial Officer explained that, from an

---

[66] DOJ/FTC Horizontal Merger Guidelines §4.2.2 (2010) ("The hypothetical monopolist test requires that a hypothetical profit-maximizing firm that was the only present or future seller of the relevant product(s) to customers in the region would impose at least a SSNIP on some customers in that region.")

[67] Savant and Crestron's detailed sales databases both show that they ship their products to the dealers' addresses.

[68] *See infra* Part I.A.3.c.

[69] DOJ/FTC Horizontal Merger Guidelines § 4.1.1 ("Because the relative competitive significance of more distant substitutes is apt to be overstated by their share of sales, when the Agencies rely on market shares and concentration, they usually do so in the smallest relevant market satisfying the hypothetical monopolist test.").

operational standpoint, Crestron considers the U.S. and Canada to be part of the same region, but does not consider any other countries to be part of the same region.[70] Similarly, one of Savant's regional residential sales territories covers both the U.S. and Canada, but none of Savant's regional sales territories in the U.S. also cover any other foreign countries.[71] This indicates that there are regional economies of scope in the United States and Canada that do not extend elsewhere.

66. **<u>c. Crestron Statements Indicate Demand for Home Control is Different Elsewhere</u>**. A third reason why it is proper to use a geographic market limited to the United Stata and Canada is that the evidence indicates that demand for control systems is significantly different elsewhere. For example, a third-party report from 2007 attributes to Crestron the position that "Crestron continues to see the highest growth rates in the U.S., but perceives that Europe has future potential (3-7 years) for high growth rates."[72] These differential rates of growth indicate that the demand for control systems is significantly different between the United States and Europe.

*5. Dealer Demand for High-end Systems Is Fragmented*

67. The fact that a relevant market exists does not mean it is an undifferentiated market, where homogeneous products each have the same appeal to all buyers for all their purchases. Although all high-end systems are reasonably interchangeable substitutes for each other in most situations, dealer demand for high-end systems is differentiated because some end-users prefer Crestron's brand or a particular Crestron system so much that they are not willing to switch to rival products at all, or would be willing to switch only if the rival high-end systems were priced substantially lower than the Crestron systems. As I explain further in Part V.B, this fragmented demand within each relevant market means that many

---

[70] Deposition of Dave Hakula at 34-35 ("Q: Does Crestron include Canada in its domestic sales data? A: For operational reporting, yes, we do. Q: Why? A: Because we just consider it an extension of the U.S. . . . From an operational standpoint, to us Canada is no different that the western region [of the United States], okay. . . Q: Operationally, are other foreign countries also included with the domestic sales? A: No.").

[71] SAVANT1543753 at slide 3 (October 1, 2012 internal Savant slideshow titled "Sales Organization & Channel Alignment: Draft Execution Plan". A slide titled "Residential Regional Sales Managers Territories notes that a single Regional Sales manager is responsible for the "New York Metro and Canada" region): id. at 2 (distinguishing "North American Residential Regional Sales Team" form "International Team.").

[72] Parks Associates, Home Systems: Home Controls 2007 Update, Appendix page 63.

dealers cannot avoid Crestron's disloyalty penalties by immediately switching 100% of their system purchases to rival products.

68. Crestron deposition testimony confirms that some homeowners prefer Crestron, others prefer Savant, and still others are essentially indifferent between the two.[73] Crestron's internal documents also confirm that it recognizes that its systems have problems and are arguably inferior to Savant's systems in several ways. For example, one Crestron salesperson wrote in July 2011 that many of his dealers are "becoming disinterested in Crestron" and "have expressed utter disgust with our [Crestron's] product failures this year and subsequent complications (time) used up for completing any Crestron system now."[74] He explained that "some dealers are . . . having to go back on EVERY job to replace multiple failed input/output cards and room boxes."[75] He continued, explaining that Savant's "super simple programming" would allow dealers to "dump their $100k+ per year 'Crestron guy' and replace him or her with 1 or 2, $33k per year, untrained bodies."[76]

### *B. Market Shares*

69. Crestron has had a dominant share in the high-end systems market from January 2007 to the present.

[73] Klein 30(b)(6) Deposition at 128-129 ("Q: Sometimes homeowners ask for a specific automation and control brand such as Crestron, is that right? A: Sometimes they ask for specific brands? Q: Yes. A. Yes. Q: Is it your experience that sometimes end user will ask specifically for Crestron? A: Yes. Q: And in your experience sometimes end user will ask for Savant; is that correct? A: Yes. Q: And then at other times the end users simply seek input from the dealer as to which brands the dealers think would be appropriate; is that correct? A: I believe so. . . . "Q: And sometimes those end users would prefer to have a Crestron over a Savant system, correct? A: Sometimes, yes. Q: And sometimes the other way around, sometimes an end users might want Savant instead? A. Yes.").

[74] Crestron0177497 at Crestron0177498 (internal Crestron document written by regional sales employee, dated July 24, 2011. It states "The key reasons for dealers becoming disinterested in Crestron is purely dollars. Even my most trained dealers (AVD, Kiwi, Newport A/V, SaiTech, Henry's TV, etc…) have all expressed utter disgust with our product failures this year and subsequent complications (time) used up for completing any Crestron system now. Some dealers are spec'ing double hours on DM bids now just due to having to go back on EVERY job to replace multiple failed input/output cards and room boxes. This is unacceptable, especially when our tech support response is to just swap product.").

[75] Crestron0177497 at Crestron0177498.

[76] Crestron0177497 at Crestron0177498.

70. Crestron's own past statements indicate that it has a dominant share of high-end residential sales. Crestron's own litigation position is that, at least as of May 4, 2011, it had "approximately a 50% share of the 'high end' residential market", though it is unclear which products it included in its definition.[77] In August 2010, a Crestron employee emailed a potential business partner and stated that "Crestron control systems are at the heart of the integrated home (80% market share in the high end category)."[78] On July 10, 2009, notes for a Crestron Regional Director meeting instructed salespeople to tell dealers that "We can handle Savant, we have a 98% market share."[79] Similarly, Crestron's Director of Business Development sent a letter to Pandora Internet Radio in December 2010 stating that "in additional to our mainstream products, Crestron's high performance solutions enjoy 85% market share in the ultra high-end residences."[80] A Crestron slideshow meant to be presented to dealers likewise states that "Crestron has a 95% market share in the CEDIA marketplace."[81] (CEDIA is the "Custom Electronic Design & Installation Association," and includes many dealers).[82] This is also consistent with a third-party industry report from June 2007 stating that "Crestron holds 80% of the unit high end customer whole house controller sales."[83]

71. Savant and Crestron sales data confirm that Crestron has had a dominant share relative to Savant since Savant's inception. To focus solely on high-end residential system sales, I removed from Crestron's database any lighting products (which are in a distinct lighting market) and low-end products (Prodigy

[77] May 4, 2011 Declaration of Randy Klein In Opposition to Plaintiff's Motion for an Order Setting a Scheduling Conference ¶3 ("At the present time, Creston holds approximately a 50% share of the 'high end' residential market.").

[78] Crestron0172688.

[79] Crestron0085203 at Crestron0085204 (notes of July 10, 2009 Crestron Regional Director meeting. In response to a hypothetical dealer stating "Crestron must be worried about Savant given the position you are taking?" the notes respond "No, I am worried about you and your long term success. We can handle Savant, we have a 98% market share.").

[80] Crestron0170553.

[81] Crestron0170565 at Crestron0170571 (this document does not specify what time period it is referring to).

[82] CEDIA stands for "Custom Electronic Design & Installation Association"

http://www.cedia.net/about ("CEDIA, the Custom Electronic Design & Installation Association, is the leading global authority in the $14 billion home technology industry. CEDIA represents 3,500 member companies worldwide and serves more than 22,000 industry professionals that manufacture, design, and integrate goods and services for the connected home.").

[83] Parks Associates, *Home Systems: Home Controls 2007 Update* (June 2007) at 58 ("Today, Crestron holds 80% of the unit high end custom whole house controller sales with AMX at about 20%").

and Adagio). I similarly removed Savant's lighting products from its database. I limit my analysis to July 1, 2007 through September 30, 2013, which is the period of time for which I have complete sales data from both Savant and Crestron.[84]

72. Because Crestron did not produce detailed Canadian data, and AMX has not produced any data, I estimated the firms' shares by combining the US data from Creston and the Canadian and US data from Savant with other sources. I explain the steps below.

73. First, I calculated Crestron's and Savant's shares of high-end sales relative to each other (excluding AMX) and solely within the United States. Because both Crestron and Savant produced detailed sales data for the United States, I can calculate these figures solely using their data. Figure 1 below shows that Crestron's share of Crestron and Savant high-end residential sales in the United States has ranged from 68-100%.

**Figure 1: Crestron and Savant Shares of High-End Residential Sales in U.S. Relative to Each Other[85]**




[84] I also excluded maintenance and programming services, which are likewise in a separate market.

[85] *See* "27 Crestron Savant U.S. High-end Shares Calendar Year.csv".

74. Second, I calculated Crestron's and Savant's high-end residential shares relative to each other (excluding AMX) in both the U.S. *and* Canada based on: (1) detailed Savant sales data in the United States and Canada, (2) detailed Crestron sales data in the United States, and (3) estimates of Crestron's high-end residential sales in Canada. Crestron has produced aggregate data indicating that its sales of residential control system products (this aggregate data does not break it down between high-end and low-end) in the United States constituted approximately 92-95% of Crestron's total residential control system sales in the United States and Canada.[86] Using this information, I can estimate Crestron's high-end residential sales in Canada.[87] Figure 2 below shows that Crestron's share of Crestron and Savant high-end residential sales in the United States *and Canada* has ranged from 70-100%.

[86] Crestron2558639, row 13.

[87] To be exact, I calculate Crestron's high-end sales in the U.S. and Canada in any given year as its actual high-end residential sales in the U.S. (calculated using detailed Crestron sales data) divided by the percentage of Crestron's total residential revenue in the U.S and Canada that was to the United States (based on Crestron's aggregate data - Crestron2558639). Because Crestron's aggregate data is in fiscal years that run from July1 to June 30 (splitting the calendar years in half), I calculate an average aggregate percentage for each calendar year based on the two fiscal years that are in that calendar year. The exceptions are: (1) calendar year 2007, for which I rely only on aggregate data for the fiscal year spanning July 2007 to June 2008 because Crestron's detailed sales data starts in July 2007, (2) calendar year 2012, for which I rely only upon aggregate data for the fiscal year ending in June 2012 because Crestron did not produce aggregate data covering the fiscal year ending in June 2013, and (3) calendar year 2013, for which I rely on the aggregate data for the fiscal year ending in June 2012, for the same reason just noted.

**Figure 2: Crestron and Savant Shares of High-End Residential Sales in U.S. *and Canada* Relative to Each Other[88]**




75. Lastly, I calculated Crestron's, Savant's, *and* AMX's shares of high-end residential sales in both the U.S. and Canada based on estimates of AMX's share relative to Crestron and Savant. Although I do not have AMX's transactional sales data, information about its residential sales from other sources allows me to estimate Crestron's share of all high-end residential sales in the United States and Canada by Crestron, Savant, and AMX. As of 2007, independent industry reports indicate that AMX had approximately $25-27 million in U.S. residential control system sales.[89] By comparison, Crestron had $50.6 million in high-end sales in the U.S. *solely for the first half of 2007*,[90] meaning that its pro-rated annual sales for 2007 would be $100.2 million. Savant's sales were negligible, meaning that Crestron had approximately a 79-80% share of a market that included Crestron, AMX, and Savant in 2007. This calculation is consistent with third-party industry reports, which indicate that, in 2007, Crestron held "80%

---

[88] *See* "27 Crestron Savant U.S. & Canada High-end Shares Calendar Year.csv".

[89] 2007 Parks Report at appendix p. 35 ("Parks Associates estimates that [AMX's] RESIDENTIAL controls revenue are between $40-45M USD. 60% of sales in U.S.").

[90] *See* "27 Crestron Savant U.S. High-end Shares Calendar Year.csv". Crestron has produced complete data only from July 2007 to September 2013.

of the unit high end customer whole house controller sales with AMX at about 20%."[91] Later documents indicate that AMX's share of Crestron, Savant, and AMX high-end residential sales has decreased significantly since 2007. For example, one of Crestron's Regional Sales Managers stated in July 2010 that "AMX is a dead duck now and moving forward. They are struggling and are sinking pretty fast in the residential market."[92] Consistent with AMX's share dropping significantly, a January 2011 Savant presentation indicates that, between Crestron, Savant, and AMX, AMX had only a 5.3% share, as compared to 87.7% for Crestron and 7.0% for Savant.[93]

76. Based on this data, I estimate AMX's share of high-end residential sales between Crestron, Savant, and AMX as shown below in Table 2. In short, I assume that AMX's share decreased linearly from 2007, when I know it to be 20%, to 2011, when I know it to be 5.3%. I also assume that AMX's share did not decrease further in 2012 and 2013, which is likely a conservative assumption given Crestron's assessment that AMX was "sinking pretty fast in the residential market."[94]

---

[91] Parks Associates Report 2007, Appendix Page 58.

[92] Crestron0003284 (July 2010 internal Crestron email from Rob Christensen, a regional sales manager at Crestron, explaining that a residential dealer "can't go to AMX" because "AMX is a dead duck now and moving forward. They are really struggling and are sinking pretty fast in the residential market. If [the dealer] said SAVANT, that would be a more effective threat.").

[93] Keynote Presentation Attached to SAVANT1661634 (internal Savant email dated January 29, 2011) at slide 3 (Slide titled "Market Share vs. Top 3 Competitors". It has two pie charts, one titled "Commercial" and another "Residential". The residential pie chart lists four firms, with the following "Market Shares", Crestron: 68.5; AMX: 4.1%; Control4: 21.92%; Savant: 5.48%). AMX's estimated share between Crestron, Savant, and AMX is thus 4.1/ (4.1 + 68.5 + 5.48), which equal 5.3%.

[94] *See supra* note 92.

| **Table 2: Estimates of AMX shares out of Crestron, Savant, and AMX High-end Residential Sales** | | |
|---|---|---|
| **Year** | **Estimate of Share** | **Source** |
| 2007 | 20.0% | 2007 Parks Report |
| 2008 | 16.3% | Linear approximation of share between 2007 and 2011 data points |
| 2009 | 12.6% | |
| 2010 | 8.9% | |
| 2011 | 5.3% | 2011 Savant Document |
| 2012 | 5.3% | Assumed same as 2011 |
| 2013 | 5.3% | |

77. Figure 3 below shows that Crestron share of Crestron, Savant, *and AMX* high-end residential sales in the United States and Canada has ranged from 66-83%.

**Figure 3: Shares of High-End Residential Control System Sales in U.S. and Canada**[95]




[95] *See* "27 Crestron Savant AMX U.S. & Canada High-end Shares Calendar Year.csv".

### *C. Monopoly Power*

78. Throughout the relevant period, Crestron has had monopoly power in the high-end system market. Three independently sufficient bases confirm this conclusion: (1) high market shares coupled with high barriers to entry and expansion; (2) direct evidence that Crestron has the power to exclude rivals; and (3) Crestron's demonstrated power to control prices.

#### *1. High Market Shares Coupled with High Barriers to Entry and Expansion*

79. Crestron's high market share combined with high barriers to entry and expansion supports an economic inference of monopoly power. From July 2007 to September 2013, Crestron's share has ranged from 66-83% of the high-end residential system market. These high market shares (coupled with entry barriers) indicates monopoly power because it makes it more likely that Crestron has power over price. Crestron's high market share also allows Crestron to act as a unitary actor and impose collective action problems on dealers without being hampered by a collective action problem itself.[96] Crestron's high market shares also indicate that (1) Crestron controls enough of the market to restrict a substantial share and (2) Crestron will profit from a successful exclusionary scheme more than firms with smaller market shares would.[97]

80. The high-end system market has at least six barriers to entry and expansion that make it hard for new rivals to enter and for existing rivals to expand in a way that could restrain Crestron's market power.

81. **a. Research and Development**. Because the high-end system market evolves quickly, firms must continue to invest in research and development to stay competitive. For example, Savant invested over $6 million in research and development in 2007,[98] $5.9 million 2008,[99] over $3.3 million in 2009,[100] over $7.8

[96] Einer R. Elhauge, *Defining Better Monopolization Standards*, 56 STAN. L. REV. 253, 336 (2003).

[97] *Id.* at 335.

[98] SAVANT0200133.

[99] SAVANT0200133.

[100] SAVANT0131365 at SAVANT0131369 (Savant 2008 and 2009 financial statements, indicating that Savant spent a total of $3,356,801 on "Research and Development" in 2009 and $5,973,208 in 2008).

million in 2010, and over $9.1 million in 2011.[101] Crestron's deposition testimony confirms that one must invest significantly in research and development to compete in the high-end system market.[102]

82. **<u>b. Intellectual Property Protection</u>**. Second, many of the necessary technologies for making high-end systems are covered by intellectual property protection. For example, both Savant's and Crestron's programming software is copyrighted, so a new firm trying to enter the high-end system market would have to develop brand new programming software.[103] Similarly, both Savant and Crestron hold patents for various designs and functionalities, such as Savant's TrueImage and On-Screen Display patents, which new entrants would have to design around.[104]

83. **<u>c. Economies of Scale</u>**. Economies of scale in production significantly limit the ability of new firms to enter and constrain larger firms' prices. There are economies of scale in the production of high-end systems, meaning that the per-unit cost of producing high-end systems is lower in time periods where the manufacturer produces more units of high-end systems. I show in Part VI.E below that Savant's per-unit costs are significantly lower at high volumes.

84. **<u>d. Dealer Switching Costs</u>**. Dealer switching costs also pose a significant barrier to entry and expansion in both relevant markets. Because programming and installing a high- or low-end system is complex, dealers must expend time and money to learn how to install a particular type of system.[105]

---

[101] *See* Statement of Operations, Savant Systems LLC Financial Statements for the Years Ended December 31, 2011 and 2010, prepared by DiCicco, Gulman & Company LLP.

[102] Klein 30(b)(6) Deposition at 23 ("A: . . . we [Crestron] invest a great deal in R& D and on developing new products. We're noted for that. We're noted as a new technology product. We win lots of awards for new products. And so as a company that invests a lot in new products, and we don't buy products from other people, typically we have a lot of research and development resources, we introduce these new products every year.").

[103] Klein 30(b)(6) Deposition at 121-122 ("A: . . . our software is copyrighted, and you have to be authorized to use it. And we authorize by signing the dealer agreement.").

[104] *See, e.g.* U.S. Patent No. 8,659,705 (Savant On Screen Display patent); U.S. Patent No 7,930,644 (Savant Racepoint Blueprint Graphical Programming Environment Patent); U.S. Patent No. 8,619,950 (Crestron patent video and digital audio transport patent.).

[105] Klein 30(b)(6) Deposition at 75-76 ("A: Many of these dealers are not – they are not large companies. They have – they are smaller companies, they have limited resources, and it takes a lot of day-to-day practice, and it takes a lot of dedication and commitment to be skilled at a product line, and if they take on multiple product lines, then that skill and that expertise

Further, installation methods vary by brand (e.g., Crestron vs. Savant). Consequently a dealer must expend time and money in order to learn how to program and install a new brand. These switching costs limit the ability of new firms to enter and expand in the market.

85. **e. Long Lead Times Prevent Immediate Expansion**. Another barrier to expansion is the long time it takes to manufacture high-end system components. For example, if Savant placed a new order for its top-selling product, item number VIM-30D4-06 (a video input module used with digital media switchers), that order would not be ready until about 140 calendar days later.[106] Consequently, if Crestron restricted its own output and raised prices, it would take at least 140 days for Savant to increase its output.

86. **f. Crestron's Exclusive Dealing**. I present the evidence showing that Crestron has engaged in exclusive dealing below in Part II. Crestron's exclusive dealing has restricted approximately 51-77% of the market from 2008 to 2013. This has significantly limited the ability of competitors such as Savant to expand their sales.

87. **g. Lack of Entry Confirms High Entry Barriers**. The existence of high entry barriers is confirmed by the fact that there were no new entrants in the high-end system market since Savant entered the market over six years ago in 2007.[107] This lack of successful entry indicates high barriers to entry, given the high profit margins earned by Crestron and other competitors. Savant currently earns a 43% profit margin,[108] and Crestron's profit-margin has always exceeded 53%.[109] If barriers to entry were low, then rivals would quickly enter to obtain those high profit margins. The absence of new entrants would not be a serious problem if the market were unconcentrated. But to the contrary, the high-end

---

becomes fragmented and the burden of customer support, and ultimately the ability to deliver a quality product to the end user is compromised."); Bargetzi Deposition at 49 ("A: in order to do Crestron well, and I think in order to do really any of the sophisticated products well, you have to be focused on it. You have to do it on a regular basis. It is not something that you can just pick up after a year or two or six months and get back into it and do the same job that you would do if you were doing it on a regular basis.").

[106] *See* "J03 Savant Product Leadtimes.csv". Savant's Salesforce database tracks the lead times of its products.

[107] In other words, no firm that was an equally close (or closer) substitute to Crestron's high-end systems than Savant or AMX has entered since Savant entered the market over six years ago.

[108] *See* "48 total incremental costs.csv".

[109] *See* "16 Crestron Gross Profit Margins.xlsx".

system market has had a Herfindahl-Hirschman Index ("HHI") of at least 5,222 (out of a maximum of 10,000), which indicates extreme concentration.[110]

### *2. Crestron's Demonstrated Power to Exclude Rivals*

88. Crestron's monopoly power is confirmed by direct evidence that it actually exercised that power to exclude rivals. Standard antitrust economics shows that firms that are able to exclude rivals from competing to win business have monopoly power. The reason is that, absent monopoly power, a firm's attempts to exclude rivals would be unavailing because the buyers would simply switch to purchasing from a rival firm. In contrast, buyers may not be able to switch from a firm that has monopoly power, giving the firm the ability to impose exclusionary conditions on its buyers that can adversely affect rivals. The evidence shows here that Crestron was able to restrict 51-77% of the market while maintaining a market share in excess of 66%. This ability to profitably restrict customer decisions confirms that Crestron has monopoly power.

### *3. Crestron's Demonstrated Power over Price*

89. Direct evidence of Crestron's power over pricing also confirms Crestron's monopoly power. The ability to increase prices above competitive levels is a hallmark of monopoly power. This means that evidence that Crestron's can raise its prices above competitive levels shows Crestron's has monopoly power. Sales data shows that Crestron earns higher profit margins on its high-end systems than Savant. Crestron's profit margins have always exceeded 53%,[111] whereas Savant's have never exceeded 48%.[112]

---

[110] The Herfindahl-Hirschman Index (HHI) is simply the summed squares of market shares. *See supra* Part I.B (calculating market shares); *See also* DOJ/FTC Horizontal Merger Guidelines §5.3 (2010) (merger guidelines presuming anticompetitive effects are likely with an HHI above 2,500). The minimum HHI in this market was in 2013, when Crestron's share was 66%, Savant's was 29%, and AMX's was 5%. The HHI for 2013 is thus 66^2 + 29^2 + 5^2, which equals 5,222.

[111] *See* "16 Crestron Gross Profit Margins.xlsx". This is consistent with Crestron's internal calculations indicating that it earned on average a 61.94% margin on its residential sales in the United States in 2012. *See* Crestron2558639.xlsx.

[112] *See* "48 total incremental costs.csv".

## II. Description of Crestron's Exclusive Dealing

90. The evidence indicates that Crestron has communicated to all of its dealers in the United States that they had to make a choice between selling Crestron or Savant – not both. The economic literature generally refers to this type of conduct as "exclusive dealing", and shows that exclusive dealing has both potential anticompetitive effects and potential procompetitive effects.[113] In this section, I present the evidence showing that Crestron has engaged in exclusive dealing. I then analyze whether this conduct has any procompetitive effects in Part III, and analyze whether it has anticompetitive effects in Parts IV-VI. I ultimately find that Crestron's exclusive dealing does not have any procompetitive effects, but has significant anticompetitive effects.

91. Part A of this section explains that, around June 2008, Crestron instituted a policy of telling its dealers that they had to make a choice between Crestron and Savant, and that Crestron would terminate their dealerships if they sold Savant. Part B then explains the numerous ways in which Crestron implemented this policy.

### *A. Crestron's Executives Instituted a Corporate Policy of Telling Dealers That They Had to Make a Choice Between Crestron and Savant*

92. Crestron's deposition testimony and documents show that its executives ordered its salespeople to check which dealers were selling Savant and tell dealers that they had to make a choice between Crestron and Savant.

93. **a. Deposition Testimony of Crestron's Chief Executive**. Crestron's Chief Executive, Randy Klein, testified at deposition that in general there was a "practice" of communicating the "message" that "we [Crestron] don't want our dealers . . . to represent competitive or Savant brands."[114] He similarly testified that Crestron made sure to "find out if they [dealers] are selling Control4 and Savant and ask them [the dealers] to choose" between Crestron and Savant.[115]

---

[113] *See, e.g.*, Bernheim & Whinston, *Exclusive Dealing*, 106 JOURNAL OF POLITICAL ECONOMY 64, 65 (1998) ("A manufacturer engages in exclusive dealing when it prohibits a retailer or distributor that carries its product from selling certain other products (typically those of its direct competitors).").

[114] Klein 30(b)(6) Deposition at 168-169.

[115] Klein 30(b)(6) Deposition at 216.

94. **b. Internal Crestron Statements by Executives Confirm Policy**. On June 7, 2008, Crestron's Chief Executive, Randy Klein, ordered Crestron employees to "poll every residential dealer to see if any of them are representing Savant."[116] Later that month, a regional director at Crestron emailed his sales team, explaining that "it is required that you visit your dealers and ask these questions, press them, look them in the eye and tell them we have a 'zero tolerance policy' on Savant."[117] Similarly, July 2009 internal notes from a Crestron "Regional Director meeting" includes the statement "Dealer: You cannot represent both Crestron and Savant. Zero Tolerance," indicating that Crestron was ordering its salespeople to tell this to dealers.[118] This continued into August 2010, when Randy Klein instructed another Crestron employee to make a dealer "make a decision now . . . they represent us or Savant, but not both."[119] And in January 2011, Randy Klein held another meeting with Crestron employees, and ordered that "we [Crestron] need to ask them [dealers] to commit to us", and to tell dealers "if you don't make that commitment, . . . we will review your dealership and you may be subject to termination."[120] Moreover, the evidence indicates that Randy Klein would not allow dealers to become Crestron dealers unless they agreed to "drop" Crestron's competitors.[121]

95. **c. Internal Crestron Statements by Lower-level Crestron Employees Confirm Crestron's Exclusive Dealing Policy**. Statements by Crestron salespeople confirm that Crestron had a general policy of making dealers choose between Crestron and Savant. For example, in May 2009, a Crestron salesperson reported to his supervisor that "I had to tell [a dealer] that it is our policy that you cannot be a Savant dealer and a Crestron dealer and if [the dealer] went forward with a demo order and dealer agreement with Savant that my boss would terminate their Crestron dealership."[122] The salesperson's supervisor

---

[116] Crestron0137437.

[117] Crestron0137437 (June 7, 2008 email sent from Dave Sell, the Regional Director of Crestron West, to his team).

[118] Crestron0085203 at Crestron0085205.

[119] Crestron0124727 (August 5, 2010 email from Crestron's Chief Executive, Randy Klein, to another Crestron employee stating "they [the dealer Interhome] need to make a decision now … they represent us or Savant, but not both. Their choice. But make them make it.").

[120] Klein 30(b)(6) Deposition 164.

[121] Crestron0192220 (October 22, 2007 email from Randy Klein to the Director of Crestron West, stating that "I cannot support [this dealer's] application [to become a Crestron dealer] without a firm knowledge of how much business they're doing with our competitors, and a firm commitment to drop them.").

[122] Crestron2558269 (May 15, 2009 internal Crestron email from the Director of Crestron Midwest stating "As Randy has told us many times our dealers cannot have Savant. Yes we will

affirmed this policy, stating that Crestron's Chief Executive, Randy Klein, has "told [Crestron employees] many times our dealers cannot have Savant," and affirmed to a salesperson that Crestron "will terminate [dealer] agreement if [the dealer] becomes a Savant dealer."[123] Similarly, in July 2009 Crestron salespeople reported to their managers that "any dealer signing up Savant, will be warned to choose: Crestron or Savant, not both. If they can't commit to us, they will be dropped."[124] Crestron salesperson likewise explained to a dealer in August 2009 that "Any dealer that carries Savant will not be able to continue with Crestron."[125] These examples show that Crestron's salespeople understood that there was a general policy of telling dealers that they had to choose between Crestron and Savant, and that they communicated this policy to dealers.

### *B. Crestron Implemented Its Exclusive Dealing Policy in Numerous Ways*

96. Crestron implemented its policy of telling dealers that they had to make a choice between Crestron and Savant in at least three ways: (1) distributing "comparison guides" to dealers that included the statement "you can't be a Crestron dealer and also sell Savant products!", (2) publicly filing a legal complaint against the dealer Cyber Sound, alleging that Cyber Sound's efforts to sell Savant violated the "best efforts" clause in Crestron's dealer agreements, and (3) direct communications with individual dealers.

#### *1. Distributing Comparison Guides*

97. One way Crestron communicated its exclusive dealing policy to dealers was by distributing "Comparison Guides" that included the statement "Remember, you can't be a Crestron dealer and also sell Savant products!"[126] Crestron's discovery responses state that it distributed these agreements to at least

terminate the Stereo One Crestron agreement if they become a Savant dealer." In this same email chain, a Crestron sales representative explains that "I had to tell [the dealer Stereo One] that it is our policy that you can not be a Savant dealer and a Crestron dealer and if he went forward with a demo order and dealer agreement with Savant that my boss would terminate their Crestron dealership.").

[123] Crestron2558269.

[124] Crestron0119464.

[125] Crestron0097982 at Crestron0097983 (August 21, 2009 e-mail from a Crestron employee to Entertainment Engineering, a dealer in Houston, stating "Any dealer that carries Savant will not be able to continue with Crestron.").

[126] *See* Exhibits E-H to Savant's Amended Complaint.

11 dealers, from at least May 11, 2009 to March 30, 2011.[127] However, the evidence indicates that more dealers received comparison guides with this exclusivity language than Crestron indicated in its discovery responses. For example, the evidence indicates that the dealer "Big Picture Solutions", in Palm Beach Florida, showed Savant comparison guides it had received that stated "Remember, you can't be a Crestron Dealer and also sell Savant products!",[128] but Crestron's discovery responses do not list that dealer as having received any comparison guides.

### *2. Lawsuit Against Cyber Sound*

98. Crestron also communicated its exclusive dealing policy to dealers by publicly filing a legal complaint against Cyber Sound & Security, a dealer in Phoenix, Arizona. Crestron requires all of its dealers to sign its Crestron dealer agreements,[129] and all of its dealer agreements include a standard clause that requires the dealer to "exercise its best efforts to promote the use and sales of Crestron Products."[130] On June 16, 2011, Crestron publicly filed a legal complaint against Cyber Sound alleging (among other things) that Cyber Sound & Security had violated its Crestron dealer agreement.[131] Specifically, Crestron alleged that "Cyber Sound agreed to exercise its best efforts to promote the use and sales of Crestron products,"[132] and that "Cyber Sound did not consistently exercise its best efforts to promote the use and sales of Crestron products" in part because it "actively worked" to "divert sales to a Crestron competitor."[133] This complaint

---

[127] *See* Crestron's April 18, 2012 Response to Savant's Second Set of Interrogatories, Response #12; Crestron's Further Supplemental Responses to Savant's Interrogatories, #12; "28 Comparison Guide Exclusive Range.csv".

[128] *See* SAVANT2882677.

[129] *See* Klein 30(b)(6) Deposition at 116-117 ("Q: So Crestron, in order to become a Crestron dealer, Crestron signs an agreement with those dealers, correct? A: After they go through the process, an agreement is signed, yes. Q: Why are they required to sign the agreement? A: The agreement – what the agreement does it is document and memorialize the terms and conditions of business . . . It is the contract or the agreement is general good business terms, represent us with best efforts, don't steal of trade, don't distribute or steal trade secrets, things like that.")

[130] *See, e.g.*, NU Systems 0000002 (also marked as Exhibit 2 to the Arceo Deposition) ("Dealer Obligations: Dealer shall, at its own expense: Maintain an adequate trained sales force and exercise its best efforts to promote the use and sales of Crestron Products;").

[131] *See* Crestron Complaint against Cyber Sound & Security, LLC. Case 2:11-cv-03492-FSH-PS, filed June 16, 2011.

[132] Crestron v. Cyber Sound & Security Complaint ¶16.

[133] Crestron v. Cyber Sound & Security Complaint ¶76.

was publicly available, and was in fact publicized in an online article by CEPro.com ten days later, on June 21, 2011.[134] This complaint thus indicates that Creston interpreted the best efforts clause to prevent its dealers from making active efforts to sell Savant until at least Feb 9, 2012, when a court ruled that this contract did not require exclusivity.[135] (In Cyber Sound's particular case, Crestron at first orally demanded an exclusivity condition, and then retracted it shortly thereafter).[136] This is consistent with Crestron's discovery response stating that Savant "induced . . . dealers to violate their agreements with Crestron. . . . to the extent Savant successfully converted Crestron dealers to become Savant dealers and shift their business to Savant."[137]

### *3. Direct Communications with Individual Dealers*

99. The evidence also confirms that Crestron told individual dealers that they could not sell both Crestron and Savant systems. Crestron does not appear to have a policy of memorializing every communication with dealers,[138] so Crestron's internal documents do not comprehensively memorialize every time a Crestron employee told a dealer in person that they could not sell both Savant and Crestron. Nonetheless, these examples confirm that Crestron salespeople did follow their executives' orders to make dealers choose between Savant and Crestron. There are hundreds of these documents – these are only a few representative ones.

100. For example, in November 2008, Crestron's Chief Executive, Randy Klein, issued an "edict" to Intelect that it had to "make a decision. [Intelect] can support us [Crestron] and continue, or [Intelect is] going to be a Savant dealer and

[134] *See, e.g.*, Julie Jacobson, *Crestron Sues Big Savant Dealer*, CePro.com. Available at http://www.cepro.com/article/crestron_sues_big_savant_dealer/.

[135] Although Crestron also alleged in its complaint against Cyber Sound that "at no point has Crestron ever required a dealer – let alone CyberSound – to be an 'exclusive' Crestron dealer", Complaint ¶54, what matters for economic analysis is whether the agreement restrained dealer decisions, not whether the firm uses a particular word (such as "exclusive"). Here, the impact of Crestron's contract terms and complaint on dealers is that it indicated to dealers that Crestron viewed actively selling Savant as a breach of the "best efforts' clause and would terminate dealers who actively tried to sell Savant.

[136] Summer Declaration ¶¶8-10.

[137] Crestron's Response to Savant's Sixth Interrogatories at 11-12.

[138] For example, evidence from parties besides Crestron indicates the dealer Intelect was informed of Crestron's exclusivity policy by Randy Klein, *see infra* Part V.C., but I have found no evidence in Crestron's produced documents memorializing that.

support Savant."[139] Similarly, in February 2009 Crestron employees told the dealer SoCal Smart Home that it could not become a Crestron dealer unless it resigned its Savant dealership.[140] I explain below in Part V.D that that these two statements to dealers that they had to be exclusive to Crestron caused the dealers to stop or delay buying Savant products. More generally, Crestron salespeople relayed to their superior that Crestron salespeople had "told them [the salespeople's dealers] all that there is a zero tolerance to Savant."[141]

101. Crestron salespeople also used examples of dealers who had been terminated to convince dealers that Crestron would follow through on its threats. For example, in April 2009 a Crestron Regional Sales manager explained to his colleagues that Crestron can "spread the news on [the dealer] Safe and Sound" that "they were fired because they brought on Savant."[142] Similarly, in September 2010 a Crestron salesperson asked his supervisor if they could "start telling dealers that Cyber is no longer a dealer because they were flipping [business]? Make an example of them?"[143] The supervisor responded "Yes. Tell your dealers that Cybersound is NO LONGER AUTHORIZED to sell Crestron."[144]

102. Crestron internal documents also confirm that, the more Crestron told individual dealers about its exclusive dealing policy, the more dealers started to warn each other about the policy. For example, in August 2008 a Crestron employee reported that "someone on a blog was telling Crestron dealers to

---

[139] Sean Riordan Dep. at 57; *id*. at 64 ("A: The edict was asked, 'Are you going to be a supporting dealer of Savant, or are you going to be a supporting dealer of Crestron?' And I took some time to consider it, and the decision was made that we would stay with Crestron."); Crestron0118963 (Nov. 6, 2008 email from Randy Klein to John Gutekunst, both of Crestron, stating that "I just spoke with Sean [Riordan]; in short, he knows who his partner is – Crestron – and what his business is built around. He has no obligation to Savant, is not a dealer for their products and has no plan to sell it.").

[140] *See* Crestron0000632 at Crestron0000633 (Feb. 12, 2009 email from Brian Nachum to Dave Sell, both of Crestron, stating that "Yesterday . . . I told Jonathan, SoCal Smart Home owner, that to become a Crestron dealer, resigning the Savant line was necessary. Here is Jonathan's resignation letter to Savant."). *See also* Crestron0138196 (spreadsheet with the "Q4 Call Reports" tab including reports for the week of 11/3/08 – 11/7/08, noting at line 704 that SoCal Smart Home that "Dealer is doing C4 and Savant. Willing to drop both for Crestron.").

[141] Crestron0110398 at Crestron0110399 (July 31, 2009 email from a Crestron regional sales manager to the Director of Crestron west, referring to the Phoenix area market).

[142] Crestron0090368 at Crestron0090370 (April 2009 internal Crestron e-mail stating that "Now we can spread the news about Safe and Sound on 2 fronts. 1. They were fired because they brought on Savant. 2. They were fired because of C-4.").

[143] Crestron0030621.

[144] Crestron0030621.

consider their switch to Savant with caution as Crestron was telling dealers that if they picked up Savant they would lose their Crestron dealerships."[145]

103. In sum, Crestron's executives established a policy of requiring dealers to make a choice between Crestron and Savant, and Crestron's employees (including sometimes even its chief executive, Randy Klein) carried out that policy.

## III. Lack of Procompetitive Efficiencies

104. Conduct benefits consumer welfare when it causes prices to be lower, or quality to be higher, than they would be without the conduct. Many methods of competition, such as simple price cuts and increasing product quality, not only increase a firm's profits but also benefit consumers. However, economists have long recognized that other methods can increase the firm's profits but anticompetitively reduce consumer welfare. For example, burning down a rival's manufacturing plant would increase a monopolist's profits (if it got away with the arson), but clearly leaves consumers worse off. Thus, one cannot determine whether a particular type of conduct is procompetitive simply by looking at whether it increases the firm's profits. Instead, one has to ask whether this conduct has actually caused customers to pay lower prices or gain access to higher quality products. Although economic literature shows that exclusive dealing can sometimes procompetitively benefit consumers, I have not found any evidence in this case that Crestron's exclusive dealing has any procompetitive efficiencies.

105. At deposition, Crestron employees testified that the reason Crestron told dealers that they could not carry both Crestron and Savant (besides the simple fact that it would increase Crestron sales) is because: (a) Crestron is not willing to sell its products to dealers who are not sufficiently skilled to install Crestron systems competently, and (b) Crestron does not believe a dealer can become sufficiently skilled at installing Crestron systems unless it installs Crestron systems exclusively.[146] This asserted justification for Crestron's exclusive dealing conflicts

[145] Crestron0147517.

[146] Klein 30(b)(6) Deposition at 75-76 ("A: Many of these dealers are not – they are not large companies. They have – they are smaller companies, they have limited resources, and it takes a lot of day-to-day practice, and it takes a lot of dedication and commitment to be skilled at a product line, and if they take on multiple product lines, then that skill and that expertise becomes fragmented and the burden of customer support, and ultimately the ability to deliver a quality product to the end user is compromised."); Bargetzi Deposition at 49 ("A: in order to do

with the facts for three reasons: (1) there is no evidence in Crestron's internal documents indicating that this was the reason Crestron told dealers that they had to choose between Savant and Crestron, (2) there are clear less restrictive alternatives to exclusive dealing that would ensure that dealers are sufficiently skilled without foreclosing rivals, and (3) the fact that firms in this market that lack market power, such as Savant and AMX, do not engage in this same conduct indicates that it is not procompetitive.

106. **a. No Crestron Business Documents Indicate That Concerns About Dealer Skill Motivated Crestron to Engage in Exclusive Dealing**. If concerns that non-exclusive dealers would be insufficiently skilled were actually motivating Crestron's decision, then one would expect to see internal Crestron business documents stating that. To the contrary, I have not found a single Crestron business document stating such a thing.

107. **b. If Crestron Actually Wants to Ensure Minimum Dealer Competency, There are Clear Less Restrictive (and Superior) Alternatives to Exclusive Dealing**. Crestron's deponents asserted that, to be minimally competent at installing Crestron systems, dealers had to install Crestron systems on a regular basis.[147] Even if that is true, exclusive dealing is not even necessary, much less the best way, to ensure that dealers are minimally competent. If Crestron believes that dealers need to install systems at a certain minimum frequency to remain competent, then the obvious less restrictive alternative is to require dealers to install a minimum *number* of systems in a given time period (or perhaps simply require them to undergo additional training if they do not meet that minimum number).

108. For example, suppose hypothetically that any given dealer will be incompetent at installing Crestron systems unless it installs at least three Crestron systems per year. Requiring all dealers to install a minimum of three Crestron systems per year would ensure that all Crestron dealers were competent much better than exclusive dealing would. For example, suppose Dealer A installs only

---

Crestron well, and I think in order to do really any of the sophisticated products well, you have to be focused on it. You have to do it on a regular basis. It is not something that you can just pick up after a year or two or six months and get back into it and do the same job that you would do if you were doing it on a regular basis.").

[147] Bargetzi Deposition at 49 ("A: in order to do Crestron well, and I think in order to do really any of the sophisticated products well, you have to be focused on it. You have to do it on a regular basis. It is not something that you can just pick up after a year or two or six months and get back into it and do the same job that you would do if you were doing it on a regular basis.")

one Crestron system per year, but is exclusive to Crestron, while in contrast Dealer B installs five Crestron systems per year, but also installs five Savant systems per year. Thus, in this hypothetical Dealer A would be incompetent at installing Crestron systems (because it installs only 1 per year), while Dealer B would be competent (because it installs at least 1 Crestron systems per year). But exclusive dealing would perversely mean that Crestron *would* allow the incompetent Dealer A to install Crestron products, but would *not* allow the competent Dealer B to install Crestron products. In contrast, if Crestron had instead required all dealers to install a minimum of three Crestron systems per year, Crestron would efficiently prohibit the incompetent dealer A from selling Crestron systems, but allow the competent dealer A to sell Crestron systems. In short, when a dealer must install a certain minimum number of Crestron systems to be competent, exclusive dealing is not an efficient way of ensuring that only competent dealers can install Crestron products.

109. Similarly, another less restrictive alternative to exclusive dealing would be to provide dealers with financial incentives, such as discounts or rebates, for installing Crestron systems more frequently (and thus in theory better maintain their ability to install Crestron systems). Indeed, AMX and Savant both provide volume discounts that are not contingent on exclusivity.[148]

---

[148]Julie Jacobson, *AMX Sheds 700 Dealers, Rewards Most Committed* Group (March 10, 2010) ("AMX shed about 700 dealers recently as part of its new Bullseye program. The program, says CEO Rashid Skaf, 'is set up so those dealers that do the most amount of business with us and get the most training, get the most rewards.' Some integrators buying less than $25,000 per year from AMX were terminated in January. Others were relegated to 'bronze' level of the Bullseye program, in which margins are slimmer and tech support costs $1,200 per year for most dealers. For 'silver' dealers buying $25,000 to $50,000 per year with AMX, nothing changes this year, but in 2011 they'll lose margin if they don't make it to the magic $50,000 gold level. At that point, dealers are eligible for rebates and other goodies from AMX such as dedicated support personnel. . . . AMX maintains it's too expensive to support so many dealers, especially one=s that are doing a low volume of business and have minimal training.") available at http://www.cepro.com/article/amx_sheds_700_dealers_to_focus_on_most_committed_group/; "Elite Dealer" letter attached to SAVANT3519820 (describing Savant's "Dealer Loyalty Program" for 2009 and 2010. "The premise of the program is very simple. The more you sell, the higher the rewards." The letter explains that there four levels, each with a minimum "Annual Business Level": (1) "Standard" - $25,000, (2) "Premier" - $75,000, (3) "Elite" - $200,000, and (4) "Reference" - $350,000. All four levels provide a 2% pre-pay discount. The "Premier", "Elite", and "Reference" levels provide 1%, 4%, and 8% volume discounts, respectively.).

110. **c. The Fact that Only the Firm with Market Power (Crestron) Engages in Exclusive Dealing Indicates it is Anticompetitive, Not Procompetitive**. One way economists can test whether a certain type of conduct can have procompetitive effects in a particular market is to see whether firms *without* market power in that market engage in the same conduct. Smaller firms (such as Savant and AMX) without sufficient market power to exclude their rivals cannot increase their profits through anticompetitive means because they lack the market power to do so. Thus, if one observes a smaller firm engaging in a particular type of conduct, that indicates at least that this conduct could have some potential procompetitive effects in this market, because otherwise it would be unprofitable for a small firm to engage in that conduct.[149] Here, the evidence indicates that neither Savant nor AMX engages in exclusive dealing, which directly indicates that exclusive dealing is not procompetitive in this market.[150] Indeed, it suggests that exclusive dealing is affirmatively inefficient, and would cause the firm using the exclusive dealing to *lose* profits, unless the firm had sufficient market power to anticompetitively exclude rivals.

[149] Note importantly, however, that the mere fact that a small firm engages in a given type of conduct does not necessarily mean that this type of conduct is *always* procompetitive, that it actually has procompetitive efficiencies for other firms, or that the conduct is on net procompetitive when balanced against any anticompetitive effects when the conduct is engaged in by firms with market power.

[150] AMX and Savant both use volume discounts, not exclusive dealing. *See supra* note 148. I understand that Crestron has claimed that Savant has made certain dealers the sole distributor of the Savant brand in some regions (i.e., promising a dealer that Savant will not authorize other dealers in the area), Defendant's Mem. in Supp. of Def.'s Mot to Compel Answers to Interrogatory Nos. 4, 8 11 and 49-58 at 8-10 (Dkt. No. 336), but such sole outlet agreements do not have any of the anticompetitive effects of exclusive dealing. Promising a dealer that the upstream firm will not supply other dealers in the area restricts only *intra*brand competition among distributors; unlike exclusive dealing, it does not in any way restrict *inter*brand competition among suppliers by restricting rival upstream firms from selling to any dealers. *See* ELHAUGE, U.S. ANTITRUST LAW & ECONOMICS 443 & n.4 (2d. Ed. Foundation Press 2011) ("vertical territorial restraints, limiting dealers to a particular geographic area ... should be distinguished from exclusive dealing ... agreements, which limit the manufacturers the dealer can carry, and thus have possible foreclosing effects that may impede interbrand competition between manufacturers... This can lead to somewhat confusing terminology because an agreement that makes a dealer the ''exclusive dealer'' in a territory for a particular manufacturer is generally considered a vertical nonprice restraint on distribution rather than ''exclusive dealing'' ... The reason is that such an agreement does not bar that dealer from carrying other manufacturers and thus has intrabrand effects but not interbrand effects, where the manufacturers are the relevant competing ''brands.'' To minimize confusion, we will call such dealers ''sole outlets'' rather than ''exclusive dealers.''). When a firm simply makes certain dealers its sole dealer in certain areas, that does not in any way restrict those dealers from purchasing rival products.

111. In sum, I have not found any evidence indicating procompetitive efficiencies for Crestron's exclusive dealing, let alone the type of concrete evidence that quantifies those efficiencies and shows they are passed on to buyers. Instead, the evidence affirmatively conflicts with the claimed procompetitive efficiencies. If Crestron later offers additional procompetitive efficiency justifications for its conduct, I will examine them and consider whether they are persuasive and sufficient to change my conclusions.

## IV. THEORIES OF ANTICOMPETITIVE HARM

112. The fact that Crestron's exclusive dealing had no procompetitive effects raises the question: "how then did it increase Crestron's profits?" The economic literature shows that exclusive dealing can increase a firm's profits above but-for levels by anticompetitively reducing the rival's sales and weakening the rival's ability to compete.[151] Specifically, the economic literature shows that a dominant firm can increase its profits by restricting a large enough portion of the market to prevent rivals from becoming as efficient as they otherwise would have been, thus preventing rivals from constraining dominant firm prices as much as they would have.

113. For example, when rivals experience economies of scale, meaning that their per-unit costs are lower when their output is higher, restricting the rival to a small portion of the market can reduce the rival's output and thus increase its per-unit costs. This tends to both increase the rival's price and reduce the rival's ability to constrain the monopolist's prices. This method is analogous to a sports competitor winning a competition not by improving himself, but instead by injuring the competition, which we might call the Tonya Harding method of competition. It may help the dominant firm win, but it harms consumers.

114. In short, the two necessary conditions for this type of anticompetitive harm are that: (1) the exclusive dealing reduced Savant's sales below but-for levels, and (2) this reduction in Savant's sales reduced Savant's ability to compete in some way. I therefore test whether Crestron's exclusive dealing has actually reduced Savant's sales below but-for levels in Part V below, and, having found that it did, test whether this reduced Savant's ability to compete in Part VI. Below, I

---

[151] *See, e.g.* Carlton & Perloff, MODERN INDUSTRIAL ORGANIZATION 371 (4th ed. 2005) ("A firm may benefit from strategic behavior that raises its rivals' costs.").

quickly summarize several ways in which reducing a rival's sales below but-for levels can impair the rival's ability to compete and harm consumer welfare.

115. **a. Depriving Rivals of Economies of Scale**. As just described, reducing a rival's sales below but-for levels can raise its per-unit costs by depriving the rival of economies of scale.[152] Standard economics shows that, under almost any model of competition, increasing a rival's per-unit costs will increase the rival's price and in turn increase other competitors' prices. This anticompetitive effect can exist even if Crestron's rivals are equally (or more) efficient in the sense that they have the same (or better) cost curve, because the restriction can prevent rivals from growing to the point at which they would have achieved their natural efficiencies.[153] If the rival's costs increase so much that it is no longer profitable to remain in the market, then the rival will exit the market, which will cause prices to increase even further above but-for levels. Below, in Part VI.E, I show that Savant does in fact experience significant economies of scale, and would have had significantly lower per-unit costs had its sales not been restrained.

116. **b. Reduced Rival Expandability**. Exclusionary contracts that shrink rival market share can also have the anticompetitive effect of impairing rival ability to expand sales, even if shrinking rival share does not reduce rival efficiency. A monopolist's power over price stems from its ability to restrict output and raise prices without rivals rapidly expanding enough to replace the monopolist's lost output or undercut its prices. The more easily rivals can rapidly expand sales, the less the monopolist can restrict output to raise prices above the competitive level. Because in reality a smaller rival cannot expand as fast as a

---

[152] *See, e.g.*, MICHAEL D. WHINSTON, LECTURES ON ANTITRUST ECONOMICS 147 (MIT Press, Cambridge 2006) ("[S]cale economies need not be in the form of entry costs to get exclusionary effects"); Louis Kaplow & Carl Shapiro, *Antitrust*, HANDBOOK OF LAW AND ECONOMICS 1206 (A. Mitchell Polinsky & Steven Shavell, eds., Elsevier, 2007) (finding that even if restricted rivals are already on the market that anticompetitive effects can arise because an existing rival "may indeed conclude that making the necessary investments to expand its product line, manufacturing capacity, sales and distribution network, or advertising would not yield a sufficient return. [The dominant firm]'s exclusivity may render unprofitable a strategy under which [the existing rival] gradually increases its share at the retail locations where [the dominant firm] has been dominant.").

[153] *Accord* Louis Kaplow & Carl Shapiro, *Antitrust*, HANDBOOK OF LAW AND ECONOMICS 1204 (A. Mitchell Polinsky & Steven Shavell, eds., Elsevier, 2007) (finding that a multiple-buyer situation "supports an equilibrium in which all buyers agree to exclusivity, in exchange for an arbitrarily small transfer, and [the entrant] is excluded from the market … even if [the entrant] is more efficient than [the dominant firm]").

larger rival, standard economic models assume that rivals' ability to expand depends in part on how large they already are. Standard economic models therefore also assume that market power increases when rival market shares are lower or rivals have less ability to expand.[154] The result is that, unless the rival elasticity of supply is infinite, restraining rival market share in ways unrelated to product merits (such as by using exclusionary restrictions, reducing access to distributors, or deceiving buyers) leads to anticompetitive effects even if it does not lower rival efficiency. Below, in Part VI.F, I show that Savant does in fact have a limited ability to expand.

117. **c. Deterred Rival Investments**. In markets where competition by innovation is important, restricting rival sales can deny rivals economies of scale in recouping investments in research.[155] If a substantial share of customer purchases are restricted from purchasing rival products, then successful innovations will have a smaller payoff than they otherwise would have, which will discourage efficient investments and innovation.[156] Restricting a substantial share of a market can bar rivals from the potential market sales they need in order to raise the capital necessary to make efficient levels of investment in the research and development of new products. Investment in research and development is costly and risky, and capital markets will not provide the funding unless the expected net returns are positive. If firms are blocked from any significant share of the market, then successful innovations will have a smaller payoff than they otherwise would have, which will discourage capital markets from making efficient investments in research and innovation.

118. For example, suppose it would cost $1 million to invest in research with a firm that has a 50% chance of successfully innovating to create a product that would be sufficiently better than current market options that, if created, it would take all customers in a market with 2.1 million customers and earn the firm an additional $1 per customer.[157] Without any artificial restriction, capital markets would provide the firm with funding because the expected returns are $1.05 million, which exceeds the $1 million cost, and this is socially efficient since the

[154] *See* William M. Landes & Richard A. Posner, *Market Power in Antitrust Cases*, 94 HARV. L. REV. 937, 944–45, 985–86 (1981).

[155] ELHAUGE & GERADIN, GLOBAL ANTITRUST LAW & ECONOMICS 499 (2d ed. 2011).

[156] *Id.*

[157] For simplicity, costs here include normal returns on capital and earnings reflect the present value of future earnings. Capital markets are also assumed to be risk-neutral. Accounting for risk aversion would only exacerbate the anticompetitive effects of restriction by increasing the deterrent effect of risks faced by new innovative companies.

net benefits exceed the costs. But if even as little as 10% of the market were restricted, then capital markets would not provide the firm with funding for its research because the expected payoff would only be $945,000, which is less than the cost. Thus, in this example, restricting 10% of the market could preclude rivals from obtaining the capital funding they need to make efficient, socially desirable investments in research and development.

119. Because incentives for research investments are optimal if the entire market is open to a firm that succeeds with new innovation, agreements that restrict a significant share of the market will discourage some funding necessary to make efficient investments in innovation. This anticompetitive effect follows even if the unrestricted market is large enough that rivals can achieve economies of scale or scope in operations and have sufficient access to efficient means of distribution.

## V. Proof That Crestron's Conduct Has Restricted the High-End Residential System Market

120. As I just explained, a necessary condition for Crestron's exclusive dealing causing anticompetitive effects is that it reduces Savant's sales below but-for levels. I therefore investigate whether Crestron's exclusive dealing has in fact reduced Savant's sales below but-for levels, and calculate the share of the market that Crestron's exclusive dealing has restricted.

121. Basic common sense and economic theory both suggest that telling dealers that they cannot buy any Crestron products if they also buy Savant products should make dealers less willing to buy Savant products, all else equal. Economic theory also indicates that Crestron must have expected its exclusive dealing to affect customer decisions given that it had no procompetitive efficiencies. Crestron spent significant resources monitoring whether dealers were selling Savant products and telling dealers (usually in-person) that they could not buy Savant products.[158] Therefore, given that the exclusive dealing didn't have any procompetitive efficiencies that reduced Crestron's costs or increased its product value, the only way in which it could have increased Crestron's profits is by restraining rival competition in a way that increased Crestron's sales and/or prices. Indeed, any argument that Crestron's exclusive dealing did not affect dealers' purchasing decisions contradicts the incredibly weak assumption that, even if

[158] *See supra* Part II.B.3.

Crestron is not a perfect profit-maximizer, it at least prefers not to spend money for no reason.

122. The following sections rigorously confirm that Crestron's exclusive dealing restricted Savant's sales below but-for levels.

### *A. Relevant Baseline is the But-for World, not the Past*

123. As a matter of basic logic, if one wants to measure the effect of Crestron's exclusive dealing on Savant's sales, one would have to estimate the difference between: (1) Savant's actual sales, and (2) the sales Savant would have achieved in a hypothetical world where Crestron could not engage in exclusive dealing.

124. That is *not* the same as comparing Savant's sales in the present to Savant's sales at some point in the past. Savant started with a 0% share when it first entered in 2007, so by definition its share could only increase – even if Crestron's exclusive dealing were restricting it from growing as fast as it would have otherwise. In fact, one of the most common uses of restrictive contracts is to slow down what would otherwise be the faster growth of a new rival. Thus, merely observing that a rival's share has increased somewhat does not show that the rival was not restricted. One instead has to ask whether the rival would have grown faster but-for the restriction. Figure 4 below illustrates this graphically with hypothetical shares.

**Figure 4: Hypothetical Shares Showing the Effect of Restrictive Contracts on a Growing Rival**




### *B. Theory of How Exclusive Dealing Can Reduce Savant Sales Below But-For Levels*

125. The theory of how exclusive dealing can reduce rival sales is straightforward. In short, without Crestron's exclusive dealing, many dealers would buy some Savant and some Crestron high-end systems. In contrast, Crestron's exclusive dealing forces dealers to buy either 100% Crestron or 100% Savant, and because Crestron was the incumbent with significant incontestable demand, most dealers will choose 100% Crestron when faced with this choice, even if they would really prefer some Crestron and some Savant.

126. For example, take a hypothetical dealer who charged a $10,000 markup for any high-end system. Suppose that, in its region, this hypothetical dealer has 5 customers who are willing to pay a $10,000 markup only for a Crestron high-end system, 10 who are willing to pay a $10,000 markup for either a

Savant or a Crestron high-end system, and 2 who are willing to pay a $10,000 markup only for a Savant high-end system. In a world without exclusive dealing, this dealer would obviously maximize its profits by buying at least 5 Crestron systems, at least 2 Savant systems, and some mix of Savant and Crestron for the other 10 customers, netting the dealer 17 total customers and $170,000 in markup profits.

127. In contrast, if Crestron used exclusive dealing, this dealer would have to choose between using 100% Crestron or 100% Savant. If it chose 100% Crestron, it would sell to 15 customers (the 5 who would only choose Crestron and the 10 who are willing to buy either) netting it $150,000 in profits. If it chose 100% Savant, it would sell to 12 customers (2 who would only choose Savant and 10 who are willing to buy either), netting it $120,000 in profits. Thus, this dealer would be worse off if Crestron used exclusive dealing (a maximum $150,000 in profits versus $170,000 without the exclusive dealing), but if forced to choose between two inferior options, would choose 100% Crestron and 0% Savant.

128. In this hypothetical, the exclusive dealing not only reduces the dealer's profits, but also harms the two homeowners who would have bought Savant systems in the but-for world but do not have that option if their local dealer cannot carry Savant. The exclusive dealing also reduced Savant's sales in this region from 2-12 customers to zero customers. If Crestron's widespread exclusive dealing in total reduced Savant's sales enough, it could further harm consumers and Savant by weakening Savant's ability to compete, for example by depriving it of economies of scale.

129. This hypothetical also illustrates why some dealers will choose 100% Crestron while others will switch to 100% Savant: dealers with more incontestable demand for Crestron than for Savant will choose 100% Crestron, while customers with more incontestable demand for Savant will choose 100% Savant. Thus, differences in dealer responses to Crestron's exclusive dealing indicate that dealers have differing levels of incontestable demand. Crestron's exclusive dealing on net reduced Savant's sales below but-for levels because most dealers have more incontestable demand for Crestron than for Savant.

130. In this case there are two main reasons why high-end dealers will have some incontestable demand: (1) varying homeowner preferences, and (2) upkeep of legacy Crestron systems. It is undisputed that some homeowners prefer Crestron systems, others prefer Savant systems, and still others are indifferent

between the two.[159] The homeowners who prefer Crestron create incontestable demand for Crestron; the dealer will not be able to best satisfy those homeowners without using a Crestron system, and indeed the homeowner may switch to a different dealer in order to get a Crestron system. The upkeep of legacy Crestron systems also creates additional incontestable demand for Crestron.[160] Because Crestron has been the dominant firm in the high-end market for over a decade, most dealers have already installed Crestron systems into customers' houses.[161] All high-end systems require the dealer to provide follow-up support on a regular basis, for example to fix a malfunctioning aspect of the system, to update the system to incorporate a new device (such as a new television), or to upgrade the system.[162] Because Savant products are not compatible with Crestron products, a dealer cannot use Savant products to fix or upgrade part of an already-installed Crestron system. Further, when Crestron terminates a dealer's agreements, the

---

[159] Klein 30(b)(6) Deposition at 128-129 ("Q: Sometimes homeowners ask for a specific automation and control brand such as Crestron, is that right? A: Sometimes they ask for specific brands? Q: Yes. A. Yes. Q: Is it your experience that sometimes end user will ask specifically for Crestron? A: Yes. Q: And in your experience sometimes end user will ask for Savant; is that correct? A: Yes. Q: And then at other times the end users simply seek input from the dealer as to which brands the dealers think would be appropriate; is that correct? A: I believe so."); ("Q: And sometimes those end users would prefer to have a Crestron over a Savant system, correct? A: Sometimes, yes. Q: And sometimes the other way around, sometimes an end users might want Savant instead? A. Yes.").

[160] Crestron sales reports show its sales representatives warning dealers about the risk of being unable to maintain legacy Crestron systems if they start selling rival high-end systems. *See, e.g.*, Crestron0170271, Tab "CMW QTR. 1 FY-09", Row 272 (entry titled "Week of September 15th, 2008, Residential." A Crestron sales representative reports that the dealer "Barretts" of Naperville, Illinois "advised me that HTSA has urged their members to look at Control 4 and Savant as viable replacements for Crestron. . . I asked how they would service their existing legacy Crestron customers if they did not have access to the line."); Bernard Deposition at 61-62 (dealer who had sold significant amounts of Crestron systems in the past stating that "with the high number of clients that we've installed systems in, the support required after sales was still required. Clients were still going to make changes to system, they're going to buy new televisions, they're going to want that new iPad as a remote now and get their system reprogrammed accordingly."); Richard Smith Deposition at 33 (a dealer was asked, "What were the consequences of your being terminated [by Crestron]?" The dealer responded "Well, I mean we were unable to support our existing clients. Shortly after that, we lost a – a support contract we had that was about 2 grand a month to us for a huge Crestron system we had installed on an estate. And then all of our other customers, we couldn't – couldn't get equipment for to fix stuff").

[161] The parties' sales data indicates that 92.5% of residential high-end system dealers (weighted by dollars sold) have purchased a Crestron system at some point from July 2007 to September 2013. *See* "45 Ever Bought Crestron.csv".

[162] Richard Smith Deposition at 33.

dealer's license to use Crestron's programming software is also terminated,[163] meaning that the dealer is not even legally allowed to reprogram legacy Crestron systems.

### *C. Concrete Examples of Dealers Being Deterred from Purchasing Savant Because of Crestron Conduct*

131. Although anecdotes are no substitute for statistical evidence, concrete examples do confirm that Crestron's exclusive dealing can deter dealers from buying Savant products.

132. **a. SoCal Smart Home**. For example, the dealer SoCal Smart Home ("SoCal") started buying Savant high-end control system components in January 2008.[164] It had never previously purchased Crestron high-end systems,[165] but in February 2009 wanted to start selling Crestron systems in response to several clients specifically requesting Crestron systems.[166] But when SoCal applied to be a Crestron dealer, Crestron employees told it on February 11, 2009 that, in order to become a Crestron dealer, "resigning the Savant line was necessary."[167] The next day, SoCal resigned its dealership with Savant, in an email it forwarded to Crestron as proof.[168] At his deposition, SoCal's owner stated that if Crestron had not

[163] Klein 30(b)(6) Deposition 122 ("Q: Once a dealer's contract with Crestron comes to an end, they are no longer allowed to use [Crestron's] software; is that correct? A: After the effective date of termination, yes.").

[164] "15 Concrete Examples.xlsx", "SoCal SmartHome" tab. SoCal Smart Home has customer number 10032 in the Savant sales data and 1007746 in the Crestron sales data.

[165] "15 Concrete Examples.xlsx", "SoCal SmartHome" tab.

[166] April 18, 2012 Deposition of Jonathan Lane at 157 ("A: in '08 when I reached out to Brian [Nachum, of Crestron], the only reason I reached out to Brian was . . . we had clients saying we're thinking about building a house, we want Crestron. And it was like okay, I guess we have to become a Crestron dealer.").

[167] *See* Crestron0000632 at Crestron0000633 (Feb. 12, 2009 email from Brian Nachum to Dave Sell, both of Crestron, stating that "Yesterday . . . I told Jonathan, SoCal Smart Home owner, that to become a Crestron dealer, resigning the Savant line was necessary. Here is Jonathan's resignation letter to Savant."). *See also* Crestron0138196 (spreadsheet with the "Q4 Call Reports" tab including reports for the week of 11/3/08 – 11/7/08, noting at line 704 that SoCal Smart Home that "Dealer is doing C4 and Savant. Willing to drop both for Crestron.").

[168] *See* Crestron0000632 at Crestron0000633 (Feb. 12, 2009 email from Jonathan Lane to MK Marketing and Daisy Lane, stating that "I wanted to give you formal notification that effective today, 02/12/2009 I am resigning my Savant dealership."). *See also* Crestron0000669 (Aug. 5, 2009 email from Brian Nachum to Dave Sell, both of Crestron, stating that "I did my first Prodigy demo today for Jonathan Lane of So Cal Smart Home. He is an active C4 dealer,

required him to drop Savant in order to become a Crestron dealer, he would have retained his Savant dealership and continued to make significant efforts to sell Savant products.[169] Savant and Crestron sales data confirm that SoCal started buying Savant high-end systems in 2008, and stopped completely when Crestron told SoCal it had to resign its Savant dealership in order to become a Crestron dealer, at which point SoCal started purchasing Crestron systems (see Figure 5 below).

**Figure 5: Crestron and Savant High-End Sales to SoCal Smart Home[170]**




133. As Figure 5 indicates, SoCal became a Savant dealer again in October 2011, about two years after Crestron required SoCal to stop selling Savant.[171] At

---

but I made him renounce his Savant dealership, he bcc'd us on the email, to become a Crestron dealer.").

[169] *See* April 18, 2012 Deposition of Jonathan Lane at 157-58 ("Q: Now, if Crestron had not told you that you could not be a Crestron dealer if you had handled the Savant products, you would have stayed a Savant dealer; is that correct? A: Correct, yeah. Q: And you would have, in fact, attempted to make significant efforts to sell Savant products? A: Of course, absolutely.").

[170] *See* "15 Concrete Examples.xlsx", "SoCal SmartHome" tab.

his deposition, the SoCal's owner explained that he switched back to Savant because he was hardly selling any Crestron systems.[172] This is consistent with Figure 5, which shows that SoCal hardly purchased any Crestron components in 2010 or 2011. It is also consistent with the economic theory of exclusion in this case. As I explained above in Part V.B, exclusive dealing can reduce Savant's sales below but-for levels when dealers have substantial incontestable demand for Crestron, and consequently would be better off selling only Crestron instead of only selling Savant, even if the dealer would ideally prefer to sell both. In February 2009, SoCal had significant incontestable demand for Crestron because several clients were asking specifically for Crestron systems, and consequently Crestron's exclusive dealing deterred SoCal from buying Savant components. In contrast, by 2011, SoCal had little-to-no incontestable demand for Crestron (as evinced by its inability to sell Crestron systems) and thus had significantly less Crestron sales to lose from switching to Savant and losing its right to sell Crestron.

134. **b. Intelect Integrated Electronics**. The evidence also indicates that Crestron's exclusive dealing caused the dealer Intelect Integrated Electronics ("Intelect") to purchase less Savant system components than it would have in the but-for world.[173] Since at least July 2007 (the beginning of Crestron's data), Intelect has purchased significant amounts of Crestron high-end system components.[174] In May 2008, Intelect started buying Savant high-end system components too, and created a demonstration system for potential customers.[175] But in November 2008, Crestron's Chief Executive (Randy Klein) issued an "edict" to Intelect that it had to "make a decision. [Intelect] can support us [Crestron] and continue, or [Intelect is] going to be a Savant dealer and support Savant."[176] Faced with this choice, Intelect decided to "stay with Crestron", which

---

[171] April 18, 2012 Deposition of Jonathan Lane at 158 ("Q: When did you again become a Savant dealer? A: October, November of last year.").

[172] April 18, 2012 Deposition of Jonathan Lane at 158-59 ("Q: What motivated your renewal efforts to become a Savant dealer? A: You know, after losing a couple of jobs because of other Crestron – of the price cutting of Crestron dealers").

[173] Intelect Integrated Electronics has customer number 1001044 in the Crestron sales database and 10035 in the Savant database.

[174] *See* "15 Concrete Examples.xlsx", "Intelect" tab.

[175] Sean Riordan Deposition at 64-65 ("The only [Savant] thing we had was a demo system that we had put together for the boat show.").

[176] Sean Riordan Deposition at 57; id. at 64 ("A: The edict was asked, 'Are you going to be a supporting dealer of Savant, or are you going to be a supporting dealer of Crestron?' And I took some time to consider it, and the decision was made that we would stay with Crestron."); Crestron0118963 (Nov. 6, 2008 email from Randy Klein to John Gutekunst, both of Crestron, stating that "I just spoke with Sean [Riordan]; in short, he knows who his partner is – Crestron –

meant no longer offering Savant.[177] Intelect has never bought Savant high-end system components since. Intelect's President explained at his deposition that, but for Crestron requiring Intelect to choose between Crestron and Savant, his business would not have been harmed in any way by carrying both Crestron and Savant,[178] and that he prefers to test out multiple products to determine which are the best for his clients.[179] The parties' sales data shows that Intelect started purchasing some Savant components in mid-2008, but has not purchased Savant components since Crestron issued its "edict."[180]

135. This example is also consistent with the economic theory of exclusion in this case. As I explained above in Part V.B, exclusive dealing can reduce Savant's sales below but-for levels when dealers have substantial incontestable demand for Crestron, such that they are better off selling only Crestron instead of selling only Savant, even if the dealer would ideally prefer to sell both. At his deposition, Intelect's President explained that he decided to "stay with Crestron," and therefore not offer Savant, because he had projects in various stages of development on which Crestron products were already being used, or would be used in the future.[181] This was a clear source of substantial incontestable demand for Crestron in November 2008, when Crestron's Chief Executive issued the "edict" to Intelect's President regarding Savant. If Intelect lost its right to sell Crestron products at this point in time, it could lose sales on projects that were in-progress or planned. Crestron was able to exploit this incontestable demand for Crestron's products to exclude Savant from this dealership, as economic theory would predict.

---

and what his business is built around. He has no obligation to Savant, is not a dealer for their products and has no plan to sell it.").

[177] Sean Riordan Deposition at 58.

[178] Sean Riordan Deposition at 64 ("Q: But for that [Crestron's] edict, would there have been any harm to your company to have continued carrying both Crestron and Savant? A: No.")

[179] Sean Riordan Deposition at 60:9-19 ("Q: If you had the choice, would you have continued to carry Savant products? A: Counsel, in the real world I'm always looking to find better products for my clients. And I'm going to continue to test and look and -- Otherwise, what's great today is no longer great three years from now. Had I would have liked to see Savant become successful and have a product that was viable in our market back then? Sure.").

[180] *See* "15 Concrete Examples.xlsx", "Intelect" tab.

[181] *See* Sean Riordan Deposition at 58:11-25 (Q: Why did you decide to stick with Crestron? A: … and I had in due process at that juncture vessels of different stages of construction that were to receive or already had Crestron being implemented or in the future being implemented.").

### *D. Restricted Shares*

136. In economic analysis of restrictive contract terms, such as exclusive dealing, it is useful to measure how much of the market has been restricted from purchasing rival products. The more of the market that is restricted, the more likely the conduct is to impair rival competitiveness and cause anticompetitive harm.

137. I began by determining which dealers were restricted and which were not. The evidence here indicates that, although Crestron had a general practice of telling dealers to make a "choice" between Crestron and Savant,[182] Crestron failed to track many of these statements. For example, the dealer Intelect testified in deposition that Crestron's Chief Executive, Randy Klein, issued an "edict" to Intelect that it had to "make a decision. [Intelect] can support us [Crestron] and continue, or [Intelect is] going to be a Savant dealer and support Savant",[183] but I have not been able to find any evidence in Crestron's internal documents memorializing this statement. Accordingly, I treat a dealer as restricted unless some evidence indicates that a particular dealer was an exception to this general rule. I therefore instructed my staff to review the documents, depositions, and declarations in this case for evidence affirmatively indicating that particular dealers were not told they had to be exclusive. This search indicated that approximately nine dealers (out of 2,444 who bought Crestron systems since June 7, 2008[184]) claimed that either: (1) Creston never told them they had to be exclusive, or (2) Crestron told them to be exclusive at one point, but later retracted that exclusivity requirement.[185] Although I have tried to find as many of these dealers as possible, a few may have slipped through the cracks simply because the record in this case is enormous.[186] In any event, if I or a defense expert finds additional affirmative evidence indicating that other dealers did not learn of Crestron's exclusivity policy, it is easy to update these restricted share calculations by simply marking those additional dealers as "unrestricted" in the computer programming code used to calculate these restricted shares. Note that even the few dealers who claim they were never told directly by Crestron to be exclusive may have nonetheless been

---

[182] *See supra* Part II.

[183] *See supra* Part V.C.

[184] *See* "46 Num Dealers Buying Crestron.csv".

[185] *See* "Dealers Not Threatened.xlsx" (summarizing evidence).

[186] I understand from counsel that Crestron has produced approximately 508,125 documents, totaling 2,494,830 pages, and that the document database I have been provided access to contains all of these documents.

restricted by learning from sources other than Crestron (such as other dealers) that Crestron had an exclusivity policy.

138. I also identified when dealers were restricted, to the extent some were restricted at some times but not at others. The evidence indicates that Crestron first instituted a practice of telling dealers to make a "choice" between Crestron and Savant on June 7, 2008.[187] I therefore consider all dealers unrestricted before June 7, 2008. Because of Crestron's exclusive dealing policy, I consider all dealers to have been informed about Crestron's exclusive dealing requirement from June 7, 2008 onward unless the evidence affirmatively indicates otherwise. To be conservative, I consider a dealer restricted in a given year for the purposes of calculating restricted shares only if the dealer was *completely* compliant to Crestron's exclusive dealing policy towards Savant, meaning that it did not purchase *any* Savant products that year. This is a conservative estimate of restricted share because many dealers who bought small amounts of Savant in a given year were still restricted by Crestron's exclusive dealing, either because: (1) they bought only a small amount early in the year, and Crestron reminded them of its exclusive dealing policy shortly after, or (2) they bought small amounts of Savant, but less than they would have in the but-for world because they were concerned that the probability of being detected and terminated would be higher if they purchased more Savant.

139. Having identified which dealers were restricted by Crestron's exclusive dealing, I then calculated the restricted share of the market. The denominator is the sum of all Crestron, Savant, and AMX high-end residential sales in the United States and Canada during the period of the restriction (June 7, 2008 to the most recent date with Crestron data, September 30, 2013). The numerator is the sum of Crestron's sales to restricted dealers in Crestron's data (while they were restricted). Crestron produced detailed dealer-level data only for the United States, but none of its statements about its exclusive dealing policy are limited to the United States,[188] and its employees have testified that Crestron operationally considers the United States and Canada part of the same region.[189] I therefore adjust for the fact that Crestron's detailed sales data excludes Canada by assuming that Crestron restricted dealers at an equal rate in Canada as it did in the United States.

---

[187] *See supra* Part II.
[188] *See supra* Part II.A.
[189] *See supra* Part I.A.4.

**Figure 6: Restricted Share of the High-End Residential Control Market**[190]




| | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 |
|---|---|---|---|---|---|---|
| Restricted Share | 77% | 72% | 64% | 59% | 54% | 51% |

## VI. Proof of Anticompetitive Effects from Restricting the Market

140. By restricting a large share of the market and reducing Savant's sales below but-for levels, Crestron's exclusive dealing caused anticompetitive harm in six ways: (1) extracting consumer welfare, (2) maintaining market power over local dealers by excluding Savant, (3) impairing rival efficiency, (4) reducing rival expandability, (5) exacerbating switching costs, and (6) deterring rival investment in research and innovation.

### *A. Extraction of Consumer Welfare*

141. Crestron's exclusive dealing extracts consumer welfare to increase Crestron's profits by bundling dealer's incontestable and contestable demand for

[190] *See* "29 Restricted Shares.xlsx". Even if one conservatively assumes that Crestron's Canadian sales are completely unrestricted, the restricted shares range from 47-73%. *Id*.

high-end systems. For example, Crestron's exclusive dealing extracted dealer profits and reduced homeowner welfare in the example presented above in Part V.B. Indeed, the economic literature confirms that bundling contestable and incontestable demand can extract consumer surplus in cases like this, where customers' contestable and incontestable demand each include multiple units of high-end systems and the amount of contestable demand is not necessarily equal to the amount of incontestable demand.[191]

> If buyers use varying amounts of the tying product, then tying can extract individual consumer surplus. The basic reason is that, even at a monopoly price for the tying product, each multi-unit buyer enjoys some consumer surplus because it values the last unit it purchases at the monopoly price and values the prior (or inframarginal) units at something more, given that any buyer rationally uses its initial units to meet its greatest needs first. The difference between each buyer's valuation of those inframarginal units and the monopoly price will be the consumer surplus enjoyed by each buyer at the monopoly price. A tying firm can expropriate that consumer surplus by allowing buyers to purchase the tying product at the monopoly price only if buyers agree to purchase their needs of some tied product at supracompetitive prices. Each buyer will accept the tie as long as the burden of paying supracompetitive prices on the tied product is less than the consumer surplus they would lose by being unable to buy the tying product at the monopoly price. This form of tying can increase profits without a substantial tied foreclosure share, but does require tying market power. Tying that extracts individual consumer welfare always reduces consumer welfare if the tying firm chooses profit-maximizing prices.[192]

142. This means Crestron's bundling of contestable and incontestable demand could extract consumer welfare even if, contrary to fact, Crestron's exclusive dealing had not restricted a substantial share of the high-end system market. After all, the fact that Crestron has extracted some welfare from a particular customer does not change whether Crestron does the same thing to every

[191] *See* Einer Elhauge, *Tying, Bundled Discounts, and the Death of the Single Monopoly Profit Theory*, 123 HARV. L. REV. 397, 407–413 (2009); EINER ELHAUGE, U.S. ANTITRUST LAW & ECONOMICS 361–362 (2d ed. 2011); M.L. Burstein, *The Economics of Tie-In Sales*, 42 REV. ECON. & STAT. 68, 68–69 (1960); M.L. Burstein, *A Theory of Full-Line Forcing*, 55 NW. U.L. REV. 62, 73–91 (1960); Nicholas Economides, *Tying, Bundling, and Loyalty/Requirement Rebates*, in RESEARCH HANDBOOK ON THE ECONOMICS OF ANTITRUST LAW 121, 127 (Einer Elhauge ed., 2012).

[192] EINER ELHAUGE, U.S. ANTITRUST LAW & ECONOMICS 361–362 (2d ed. 2011).

other customer or no other customers. However, restricting a substantial share of the market can exacerbate this consumer welfare extraction by enhancing the bundler's market power and impairing rival efficiency, as described in further detail below.

### *B. Maintaining Market Power over Local Dealers by Excluding Savant*

143. Crestron's exclusive dealing has also harmed consumer welfare by excluding Savant from many localities, which allowed Crestron to charge supracompetitive prices to dealers. I explained in Part I.A.3.b that, where Crestron has been able to gain significant footholds, Crestron has responded by providing large discounts (10-50%) specifically in response to competition from Savant. This indicates that excluding Savant from a region by restricting the dealers in that region from purchasing Savant, and thus precluding competition from Savant, would allow Crestron to continue to charge supracompetitive (i.e. not discounted in response to competition) prices.

### *C. Exacerbating Buyer Switching Costs*

144. Buyer switching costs also mean that substantial marketwide restrictions will have anticompetitive effects even if they do not raise rivals' costs. Natural buyer switching costs can impede the ability of rivals to expand sales, and thus mean that restricting rival shares lessens the rival's ability to constrain Crestron's market power even if the exclusive dealing does not increase those buyer switching costs.[193] As I explained above in Part I.C.1, there are substantial natural switching costs in the high-end residential system market, the main cost being that dealers must learn how to install a new brand of system to switch to selling that brand.

145. Because of these switching costs, a rival such as Savant cannot gain sales from a monopolist such as Crestron simply by offering an equivalent mix of price and quality. For example, suppose $V_M$ and $V_R$ are the values of the

[193] *See* Joseph Farrell & Paul Klemperer, *Coordination and Lock-In: Competition with Switching Costs and Network Effects*, in 3 HANDBOOK OF INDUSTRIAL ORGANIZATION 1977 (2007, Armstrong, Porter, eds.) ("A consumer faces a switching cost between sellers when an investment specific to his current seller must duplicate for a new seller. The investment might be in equipment, in setting up a relationship, in learning how to use a product, or in buying a high-priced first unit that then allows one to buy subsequent units more cheaply (when firms' prices are non-linear). Switching costs may be psychological.").

monopolist's and rival's products to consumers, respectively, $P_M$ and $P_R$ are their respective prices, and $S_N$ is the natural switching cost a consumer must incur to switch suppliers. Because of the switching cost, an incumbent customer will switch only if $V_R - P_R - S_N > V_M - P_M$, meaning that the rival must offer a price/quality mix that is better than the monopolist's by at least the amount of the switching cost in order to convince the customer to switch, and thus the greater the switching cost the more the rival's price/quality mix must exceed the monopolist's.[194] This also means that, even if the rival and monopolist products are of identical price and quality, the monopolist can raise its price by $S_N$ without losing any customers. Consequently, by restraining Savant's growth and inflating Crestron's market shares, Crestron's restrictions have increased the share of the market that has switching costs relative to the but-for world. This allows Crestron to elevate its prices and exclude equally (or more) efficient rivals.

146. Worse, Crestron's exclusive dealing inflates the size of dealer switching costs.[195] Specifically, exclusive dealing raises dealer switching costs by requiring a 100% switch. For almost all dealers, it is not optimal to switch all of the dealer's sales to a rival product because of the fragmented demand I described above in Part I.A.5. In those cases, exclusive dealing exacerbates buyer switching costs by requiring the dealer to choose a non-optimal mix of product purchases.

147. These extra artificial switching costs exacerbate the tendency of Crestron's exclusionary contracts to reduce pricing constraints on Crestron's market power. Because of the additional *artificial* switching cost $S_A$, a customer of a monopolist would switch only if $V_R - P_R - (S_N + S_A) > V_M - P_M$, meaning that

---

[194] That is, the rival must be able to satisfy the equation $(V_R - P_R) - (V_M - P_M) > S_N$, taking $V_M$, $P_M$, and $S_N$ as given, in order to induce the customer to switch.

[195] There is a wealth of literature explaining how exclusionary contracts can artificially raising switching costs. *See, e.g.*, Farrell & Klemperer, *supra* note 193, at 2001 n. 70 ("A larger issue is whether the switching costs are inevitable real social costs. They may instead by contractual (this includes those created by 'loyalty contracts', 'exclusive contracts' and 'bundling' or 'tying' etc."); *id.* at 2004 ("More generally, we have seen (section 2.7) that an incumbent firm may protect a monopoly position against entry by writing exclusionary contracts, or by artificially creating real switching costs through technological incompatibility with potential entrants"); *see also* Patrick Greenlee, David Reitman, & David S. Sibley, *An Antitrust Analysis of Bundled Loyalty Discounts*, 26 INT'L J. IND. ORGAN. 1132, 1134 (2007) ("Employing a bundled loyalty discount imposes switching costs because a customer that shifts some purchases to a rival seller pays a higher unit price for the quantity still purchased from the incumbent.").

even if the rival and monopolist products were of identical price and quality, the monopolist could raise its prices by $S_N + S_A$ without losing any customers.[196]

### *D. Deterring Investment and Innovation*

148. In markets where competition by innovation is important, restricting rival sales can deny rivals economies of scale in recouping investments in research.[197] If a substantial share of customer purchases is restricted from purchasing rival products, then successful innovations will have a smaller payoff than they otherwise would have, which will discourage efficient investments and innovation.[198] As I explained above in Part I.C.1, firms must continually innovate to stay competitive in the high-end residential system market, and consequently spend millions of dollars per year on research and development. However, because Crestron's exclusive dealing has restricted Savant's sales, it has significantly reduced Savant's return on investment on research and development below but-for levels. Economic theory therefore predicts that Savant's profit-maximizing amount of research and development would be significantly higher in the but-for world than it has been in the actual world. If Savant's profit-maximizing amount of research and development had been higher, then economic theory predicts that Savant would have engaged in more research and development, which would have resulted in better and/or cheaper products. This would have benefited consumers not only by making Savant a better option (better price-adjusted quality), but also by imposing a greater constraint on Crestron's ability to raise prices.

### *E. Impairing Rival Efficiency*

149. Crestron's exclusive dealing has impaired Savant's efficiency by depriving it of economies of share and scale. Markets often exhibit various economies of share, such as economies of scale and of scope, as well as research, learning, or network effects.[199] Here, restricting a large share of the market and

[196] That is, the rival must be able to satisfy the equation $(V_R - P_R) - (V_M - P_M) > (S_N + S_A)$, taking $V_M$, $P_M$, $S_N$, and $S_A$ as given, in order to induce the customer to switch.

[197] ELHAUGE & GERADIN, GLOBAL ANTITRUST LAW & ECONOMICS 499 (2d ed. 2011).

[198] *Id.*

[199] *See* Einer R. Elhauge *Defining Better Monopolization Standards*, 56 STAN. L. REV. 253, 320–23 (2003); Einer R. Elhauge, Antitrust Analysis of GPO Exclusionary Agreements, Comments Regarding Hearings on Health Care and Competition Law and Policy: Statement for DOJ-FTC Hearing on GPOs at 3–9 (Sept. 26, 2003), available at

reducing Savant's sales below but-for levels has impaired Savant's efficiency in at least two ways: (1) depriving it of economies of scale in production, and (2) depriving it of economies of scale in its regional sales force.

### *1. Economies of Scale in Purchasing and Production*

150. Savant experiences significant economies of scale in production, meaning that its per-unit costs are lower when its current output is higher. Savant outsources production of most of its products to a firm called CTS that specializes in manufacturing electronics equipment.[200] CTS is often able to produce Savant's products at lower per-unit costs at higher volumes, and consequently CTS charges Savant lower prices when Savant orders larger volumes.

151. For example, one of Savant's top-selling products, a stereo preamplifier output module that allows a Savant system to distribute audio from multiple inputs to multiple outputs,[201] is significantly cheaper for Savant to purchase at higher quantities than at lower quantities. An April 2011 quote from CTS to Savant states that CTS would charge Savant $198.23 per unit if it ordered

---

http://www.law.harvard.edu/faculty/elhauge/pdf/statement_ftcdoj.pdf [hereinafter Elhauge Statement to the DOJ/FTC]; *See also* DENNIS W. CARLTON & JEFFREY M. PERLOFF, MODERN INDUSTRIAL ORGANIZATION 36–40, 44–47 (3d ed. 2000) (discussing economies of scale and scope); XI HERBERT HOVENKAMP, ANTITRUST LAW 94–95 (1998); Louis Kaplow & Carl Shapiro, *Antitrust*, HANDBOOK OF LAW AND ECONOMICS 1206 (A. Mitchell Polinsky & Steven Shavell, eds., Elsevier, 2007) (stating that because of restriction, rivals to a dominant firm "may indeed conclude that making the necessary investments to expand its product line, manufacturing capacity, sales and distribution network, or advertising would not yield a sufficient return."); Thomas G. Krattenmaker & Stephen C. Salop, *Anticompetitive Exclusion: Raising Rivals' Costs to Achieve Power Over Price*, 96 YALE L.J. 209, 234–45 (1986); Stephen C. Salop & David T. Scheffman, *Raising Rivals' Costs*, 73 AM. ECON. REV. 267 (1983) (Special Issue); James E. Hodder & Yael A. Ilan, *Declining Prices and Optimality When Costs Follow an Experience Curve*, 7 MANAGERIAL & DECISION ECON. 229 (1986); A. Michael Spence, *The Learning Curve and Competition*, 12 BELL J. ECON. 49 (1981); David S. Evans & Richard Schmalensee, *A Guide to the Antitrust Economics of Networks*, ANTITRUST, Spring 1996, at 36; Michael L. Katz & Carl Shapiro, *Systems Competition and Network Effects*, 8 J. ECON. PERSP. 93 (1994); S.J. Liebowitz & Steve Margolis, *Network Effects and Externalities*, in THE NEW PALGRAVE DICTIONARY OF ECONOMICS AND THE LAW 671 (1998).

[200] *See* "32 Top Savant High-end Component Suppliers.csv".

[201] In the Savant product catalog and database, the product code for this item is "AOM-016U". This paragraph focuses on the sixth version of this product, "AOM-016U-05" (the first versions are marked "-00"). This particular version is Savant's 3rd best selling product of all time (in terms of total dollar sales). *See* "J03 Savant Product Leadtimes.xslx".

1,000 units per year, but only $176.88 if it ordered at least 2,000 units per year, and only $176.12 if it ordered 4,000 units or more per year.[202] Savant's purchase database indicates that this purchase contract was effective from March 10, 2011 to October 3, 2012.[203] During this period, with Crestron's exclusive dealing restraining Savant's sales, Savant purchased only 1,618 units on an annualized basis.[204] Thus, if Savant's sales would have been at least 1.23 times higher (2,000/1,618) in the but-for world, its per-unit costs for this product would have decreased by 12%.[205]

152. Depriving Savant of such economies of scale by restraining its sales impairs its efficiency and harms consumers in two ways. First, it worsens market options because increasing Savant's per-unit costs also increases its profit-maximizing prices. Second, it enhances Crestron's market power, and thus allows Crestron to raise prices above but-for levels, by impairing Savant's ability to constrain Crestron prices.

### *2. Economies of Scale in Regional Sales Force*

153. Savant also experiences economies of scale in its regional sales force. Regional salespeople can increase Savant's sales, but will increase profits only if demand in the region is sufficiently large to justify the cost of employing a regional sales person. As an extreme example, employing a regional salesperson in the middle of a desert with only one small customer would cost Savant more than it gained in sales. Here, the difference between Savant's residential and commercial sales territories indicates that Savant experiences economies of scale in its regional sales force. Savant's residential sales are significantly higher than its commercial sales,[206] and consequently Savant has seven different regional sales

[202] *See* "AOM-016U-05 (remake of 2010-0273-NH) 4-26-11.pdf"

[203] *See* "37 AOM-016U-05 purchases.csv". The "direct purchase cost" is equal to $198.23 – the price if Savant ordered 1,000 units per year in this quote – from March 10, 2011 to October 3, 2012. Neither the direct purchase cost before or after this period match any amounts in this quote ($191.04 for before, and $188.32 after).

[204] *See* "37 AOM-016U-05 Annualized Units Purchased.csv". As expected, Savant's annualized sales of this product are slightly lower (1,316), reflecting the fact that high-end system suppliers (such as Savant and Crestron) want to maintain some inventory due to the relatively long times it takes to obtain additional quantity. "37 AOM-016U-05 Annualized Units sold.csv".

[205] ($198.23 / $176.88 – 1).

[206] *See* "Savant – COGS Details.xls", 2010 tab. It indicates "Sales Product-Residential" as $12,887,992, as compared to only $969,737 for "Sales Product – Commercial".

managers for the residential market who each focus on a particular area of North America (the United States and Canada).[207] In contrast, Savant has only two regional sales managers for commercial (also called "Enterprise") sales, one taking each side of the country.[208] This is consistent with it being profit-maximizing for Savant to invest in more regional salesforce only when there is sufficient demand for the product in the region. Thus, restricting Savant from gaining access to dealers in a given locality can make it unprofitable for Savant to employ regional sales people (or additional regional salespeople), even if it would be profitable to do so if the regional dealer demand for Savant products was not restrained by Crestron's exclusive dealing. When Crestron's exclusive dealing deters Savant from employing additional regional salesforce, that weakens Savant's ability to compete in the region, which in turn allows Crestron to raise prices higher than it otherwise would.

### *F. Impairing Rival Expandability*

154. Exclusionary contracts that shrink rival market share can also have the anticompetitive effect of impairing rival ability to expand sales, even if shrinking rival share does not reduce rival efficiency. A monopolist's power over price stems from its ability to restrict output and raise prices without rivals expanding to replace the monopolist's lost output or undercut its prices. The more rivals can expand sales, the less the monopolist can restrict output to raise prices above the competitive level. Because in reality a smaller rival cannot expand as fast as a larger rival, standard economic models assume that rivals' ability to expand depends in part on how large they already are. Standard economic models therefore also assume that market power increases when rival market shares are lower or rivals have less ability to expand.[209] The result is that, unless the rival elasticity of supply is infinite, restraining rival market share in ways unrelated to product merits (such as by using exclusionary restrictions, reducing access to

---

[207] SAVANT1543753 at slide 3 (October 1, 2012 internal Savant slideshow titled "Sales Organization & Channel Alignment: Draft Execution Plan". A slide titled "Residential Regional Sales Managers Territories" shows seven different regional sales manager in the Residential sales channel splitting up the United States and Canada into smaller regions).

[208] SAVANT1543753 at slide 4 (October 1, 2012 internal Savant slideshow titled "Sales Organization & Channel Alignment: Draft Execution Plan". A slide titled "US Enterprise Regional Sales Managers Territories." There are only two regional sales managers listed, one taking the Western U.S. and the other taking the East).

[209] *See* William M. Landes & Richard A. Posner, *Market Power in Antitrust Cases*, 94 HARV. L. REV. 937, 944–45, 985–86 (1981).

distributors, or deceiving buyers) leads to anticompetitive effects even if it does not lower rival efficiency.

155. Here, Savant experiences constraints on its expandability because it takes significant amounts of time to manufacture its products. For example, if Savant placed a new order for its top-selling product, item number VIM-30D4-06 (a video input module used with digital media switchers), that order would not be ready until about 140 calendar days later.[210] Consequently, if Crestron restricted its own output and raised prices, it would take at least 140 days for Savant to increase its output in response.

## VII. Damages Due to Exclusive Dealing

156. Plaintiff counsel has asked me to estimate the profits Savant lost on high-end residential sales in the United States because of Crestron's exclusive dealing. Savant's lost profits equal the total profits (or losses) it would have earned in a but-for world without Crestron's exclusive dealing, minus the actual profits (or losses) it earned in the actual world with Crestron's exclusive dealing. Savant's profits would have been higher (or losses lower) without Crestron's exclusive dealing primarily because it would have sold significantly more units if the market had been unrestricted. Although Savant's profits would have been higher in the but-for world also because its per-unit costs would have been lower, in this damages analysis I conservatively assume that Savant's per-unit costs would remain the same.

157. Part A below estimates the additional revenues Savant would have earned in the but-for world. Part B then estimates the additional costs Savant would have to incur to earn that additional revenue. Lastly, Part C subtracts the additional costs Savant would incur in the but-for world from the additional revenues it would earn in the but-for world, which produces Savant's lost profits. I calculate damages from June 2008, when Crestron first started telling dealers to make a "choice" between Crestron and Savant, until March 31, 2013. I calculate damages separately for each calendar year.[211]

[210] *See* "J03 Savant Product Leadtimes.csv". Savant's Salesforce database tracks the lead times of its products.

[211] None of these damages figures include interest on lost profits from the time they were lost. However, I can estimate how much that interest would be at the Court's request.

### *A. Additional But-For Revenue*

158. Because Crestron's exclusive dealing restricted dealers from freely purchasing Savant products, Savant would have sold significantly more high-end system components had Crestron not engaged in exclusive dealing.

159. Ideally, one would calculate Savant's but-for sales by analyzing some control group of customers that were not exposed to Crestron's exclusive dealing. If Savant's share among these unrestricted customers were, for example, 40%, that would suggest that Savant would normally obtain a 40% share in an unrestricted marketplace (assuming there were no significant confounding factors). Here, because Crestron had a general policy of informing dealers of its exclusivity policy, the best available benchmark is the group of dealers for which there is affirmative evidence indicating that Crestron either: (1) never informed them of its exclusivity policy, or (2) initially informed them of its exclusivity policy, but later told them that they could buy Savant without being terminated. Here, comparing Savant's share at all dealers to the share at the nine dealers who claimed they were unrestricted (while they were unrestricted) shows that Savant has been able to grow significantly faster at the latter group. Figure 7 below shows that Savant's share among these dealers claiming to be unrestricted (only after they became unrestricted, if they were previously restricted),[212] grew significantly faster than its overall share from June 7, 2008 to September 30, 2013. These shares are all relative to Crestron because I do not have dealer-level data from AMX.[213]

[212] For example, Pro Design did not become unrestricted until September 30, 2010. Brian Moffett Declaration at ¶¶5-7. Similarly, Stereo One did not become unrestricted until September 2009. John Selby Deposition at 14. And Cyber Sound & Security did not become unrestricted until September 21, 2009. Jon Summer Declaration ¶10. For the dealers who claim they were always unrestricted, this statistic starts at June 7, 2008, which is the start of Crestron's exclusive dealing policy. *See supra* Part II.

[213] Because AMX's shares have recently been very low in the high-end systems market, *see supra* Part I.B, these relative shares are unlikely to be much different if one had access to dealer-level AMX data and included them.

**Figure 7: Savant's Share (Relative to Crestron) at Dealers Claiming to be Unrestricted, Compared to Savant's Share at All U.S. Dealers**[214]




| | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 |
|---|---|---|---|---|---|---|
| Unrestricted | 1% | 3% | 15% | 37% | 45% | 54% |
| All | 2% | 6% | 13% | 23% | 29% | 32% |

160. Figure 8 shows the individual shares of the five largest unrestricted dealers, which constitute 89% of total Crestron and Savant sales to these nine unrestricted dealers.[215] The thickness of the line is in proportion to the size of the dealer (meaning that that relatively thinner teal line for EDG indicates that it is smaller than the rest).

---

[214] *See* "47 Unrestricted Dealer Shares.csv".

[215] The sixth largest, Tempus, has a 0% Savant share except for a spike to 62% in 2012. Newport AV/Attack Communications, the seventh largest, has a 0 % Savant share the entire time. Although Newport AV/Attack Communications is so small that it does not significantly affect the overall shares, it should be noted that contemporaneous emails indicate that Steve Vickers of Attack Communications emailed Savant in 2008 stating that "Brian [Nachum, a sales representative at Crestron] was in to threaten me again today. He told me that Dave sell told him to cut off anyone that is selling Savant."). Savant0484583. The eight largest, Pro Design, had 100% Savant shares the entire time it was unrestricted. The smallest, Stereo One, had 0-1% shares the entire time it was unrestricted.

**Figure 8: Shares of Five Largest Individual Unrestricted Dealers**[216]




161. There is no evidence that this group of unrestricted dealers inherently preferred Savant more than dealers did in general. If anything, the evidence indicates the opposite: before Crestron started using exclusive dealing, none of these unrestricted dealers purchased Savant components.[217]

162. Using this subset of dealers as a benchmark for Savant's but-for market share will conservatively underestimate Savant's lost profits for three reasons. First, even if *Crestron* did not directly inform some of these dealers of its exclusivity policy, the evidence indicates that dealers heard about Crestron's policy through other channels as well (such as the Internet). This may have caused even this subset of dealers to be less willing to purchase Savant than if Crestron had never initiated an exclusivity policy. Second, Crestron's conduct reduced Savant's ability to compete for *every dealer* in the market by deterring Savant from

[216] *See* "47 Individual Unrestricted Dealer Shares.csv".

[217] *See* "47 Sav Shares Pre XD." Savant's share among all dealers from January 1, 2008 to June 6, 2008 (the last day before Crestron's exclusive dealing policy was instituted) was 0.5%.

investing as much in innovation and by raising Savant's per-unit costs. This equally impaired Savant's ability to sell to all dealers in the actual world, and thus comparing Savant's performance at one set of dealers to its performance at another will completely ignore this anticompetitive effect. Third, this group of dealers bought absolutely no Savant products before Crestron started using its exclusive dealing policy, suggesting that this group may on average inherently value Savant less than the market as a whole.

163. For each year and Savant product, I calculate the but-for revenues as actual revenues on high-end residential product sales in the United States times Savant's but-for market share in that year divided by Savant's actual market share in that year.[218] This methodology conservatively underestimates damages because it assumes that: (1) the market would not expand at all if Crestron's anticompetitive conduct were eliminated, and (2) Savant would not alter its prices in the but-for world if its costs were lower, even though doing so would increase Savant's profits.

**Table 3: Savant Total But-For Revenues[219]**

| Year | Actual Revenue [a] | But-for Share [b] | Actual Share [c] | [b]/[c] | But-for Revenue [d] |
|---|---|---|---|---|---|
| 2008 [220] | $1,077,279 | 0.9% | 2.0% | 0.45 | $484,776 |
| 2009 | $4,487,803 | 3.1% | 6.2% | 0.5 | $2,243,901 |
| 2010 | $10,424,591 | 14.7% | 13.4% | 1.1 | $11,435,931 |
| 2011 | $18,646,884 | 36.6% | 22.9% | 1.6 | $29,802,444 |
| 2012 | $26,379,946 | 45.1% | 28.7% | 1.57 | $41,454,200 |
| 2013 [221] | $24,798,166 | 53.5% | 32.4% | 1.65 | $40,947,588 |

[218] As noted above, these shares calculated based on subsets of dealers are all relative to Crestron because AMX has not provided dealer-level data.

[219] *See* "48 But-For Revenues.xlsx".

[220] I excluded from Savant's 2008 actual revenues any sales made before June 7, 2008, when Crestron first started engaging in exclusive dealing against Savant.

[221] 2013 only includes January 1 through September 30 because Crestron's sales data end son September 30, 2013.

164. Table 4 below shows the additional revenues Savant would have earned in the but-for world in each year. Because Savant's benchmark shares were slightly lower than its actual shares in 2008 and 2009, Savant's "additional revenues" are negative for those two years.

**Table 4: Additional Revenues Savant Would Have Earned in the But-for World**

| Year | Actual Revenues [a] | But-for Revenues [d] | Additional But-For Revenues [e] = [d] – [a] |
|---|---|---|---|
| 2008 | $1,077,279 | $484,776 | $(592,504) |
| 2009 | $4,487,803 | $2,243,901 | $(2,243,902) |
| 2010 | $10,424,591 | $11,435,931 | $1,011,340 |
| 2011 | $18,646,884 | $29,802,444 | $11,155,560 |
| 2012 | $26,379,946 | $41,454,200 | $15,074,254 |
| 2013 | $24,798,166 | $40,947,588 | $16,149,422 |

### *B. Additional But-for Costs*

165. In order to earn this additional revenue, Savant would also have to incur additional costs. The costs that would have changed in the but-for world, where Savant would have sold a significantly larger quantity of products, are the costs that Savant would have to incur to sell these additional products.[222] In other

[222] In contrast, the other costs that Savant incurred in the actual world would not have been any different in the but-for world. For example, if demand for Savant products suddenly increased because dealers were no longer restricted from purchasing Savant products, Savant would not have to incur any additional research and development costs to sell those additional products. However, note that, although Savant could satisfy this additional demand without incurring additional research and development costs, removing the restriction on the market would likely increase Savant's profit-maximizing amount of research and development because Savant would earn a greater return on any investments it made. By assuming that Savant would not increase its research and development costs in the but-for, I am conservatively assuming that

words, they are the costs Savant would have to incur if dealers suddenly started ordering more Savant products (economists usually call these "incremental" costs). For Savant, its main incremental costs are:[223]

A. Cost of purchasing or producing an additional unit
B. Costs of defective units that could not be sold, or repairing a defective unit[224]
C. The cost of shipping the product from the manufacturer to Savant
D. The cost of shipping the product from Savant to the dealer
E. The "Warranty cost" and "RMA" costs, which are the costs Savant must incur to repair and replace products
F. Commissions paid to salespeople.

166. Because Savant sells many different high-end system components, I calculated these average incremental costs across all of Savant's units as a percentage of sales revenue. These costs varied slightly over time, so I calculated these percentages separately for each year. I calculated Savant's average incremental cost of producing or purchasing additional units using Savant's sales and purchasing databases.[225] I obtained data on the other incremental costs from Savant's financial statements, and calculated the percentage of revenue each comprised by dividing each respective cost in each year by Savant's total revenue from products sold in that year.[226] Using Savant's actual profit margins conservatively underestimates damages because the evidence shows that Savant's

---

Savant would forego the additional profits it could earn by increasing its research and development expenditures from their actual levels (which are artificially restricted) to the levels that would be profit-maximizing in the but-for world. In other words, this assumption causes me to understate damages.

[223] Savant also pays small amounts of royalties, which I include in my damages calculations because they increase with the number of units sold (in contrast to the license fees it pays, which do not depend on the number of units it sells). In measuring Savant's additional incremental costs, I also account for discounts on Savant's purchases that are not accounted for in Savant's sales and purchase data. These are called "vendor discounts" in Savant's COGS spreadsheets. They are included in the "other incremental costs" group.

[224] For example, if 2% of purchased units are defective, purchasing 100 units will only yield 98 sellable units, and thus the purchase cost per sellable unit is actually 1/98% times the purchase cost per unit.

[225] For many products, Savant's sales database lists the cost of purchasing and producing the product. For the remaining products with positive incremental costs, I relied on Savant's purchasing data for its per-unit purchasing costs. For any given product and date, I used the most recent price at which Savant purchased that product.

[226] *See* "CORRECTED Savant Incremental Cost Spreadsheet.xlsx". To be conservative, I use Dr. Stiroh's estimates of Savant's commissions, and include accounting variances. *See* Stiroh Exhibits 7A-C.

per-unit costs would have been lower in the but-for world due to economies of scale.[227] Table 5 below summarizes Savant's incremental costs as a percentage of its total revenue, by year.

**Table 5: Savant's Incremental Costs as a Percentage of Net Revenue[228]**

| Year | Purchase/ Production | Other Incremental Costs | Total Incremental Costs [f] |
|---|---|---|---|
| 2008 | 73% | 47 | 120 |
| 2009 | 62% | 34% | 96% |
| 2010 | 61% | 17% | 78% |
| 2011 | 50% | 16% | 66% |
| 2012 | 46% | 13% | 59% |
| 2013 | 51% | 12% | 63% |

167. Multiplying Savant's additional but-for revenues times its incremental costs as a percentage of revenue produces the additional costs Savant would have to incur in the but-for world to earn this additional revenue. Table 6 shows the additional costs Savant would have incurred in the but-for world from June 2008 to September 2013. Because Savant's benchmark shares were lower than its actual shares for 2008 and 2009, these "additional costs" are negative for those years.

[227] *See supra* Part VI.E.
[228] *See* "CORR48 Total Incremental Costs.csv".

| Table 6: Additional But-For Costs[229] | | | |
|---|---|---|---|
| **Year** | **Additional But-for Revenues [e]** | **Incremental Costs as % of Revenue [f]** | **Additional But-for Costs [g] = [e] * [f]** |
| 2008 | $(592,504) | 120 | $(700,408) |
| 2009 | $(2,243,902) | 96% | $(2,161,025) |
| 2010 | $1,011,340 | 78% | $791,579 |
| 2011 | $11,200,000 | 66% | $7,386,353 |
| 2012 | $15,100,000 | 59% | $8,941,414 |
| 2013 | $16,100,000 | 63% | $10,199,174 |

### *C. Savant's Lost Profits from Creston's Exclusive Dealing*

168. Savant's lost profits equal the additional revenues it would have earned in the but-for world minus the additional costs it would have incurred in the but-for world. Table 7 below presents Savant's lost profits due to Crestron's exclusive dealing. I exclude 2008 from this damages calculation because Savant simultaneously had a negative profit margin and a benchmark share below its actual share in 2008, resulting in a tiny amount of lost profits ($108,000) due to selling fewer units in the but-for world. Likely because this methodology is so conservative, it also results in slightly negative damages for 2009 due to Savant's profit-margin being positive in that year but its actual share slightly exceeding its but-for share in that year. To be conservative, I include these reduced damages in my total estimate. The figures up to September 30, 2013 rely on Crestron and Savant detailed sales data, but Crestron has yet to produce data after that time. I therefore apply the monthly rate of lost profits in 2013 to the six months span from October 1, 2013 to March 31, 2014. If Crestron provides updated sales data, I will update my damages estimates accordingly.[230]

---

[229] *See* "CORR48 Addl costs.csv".

[230] The monthly rate of damages for January 1 to September 30, 2013 was $5,950,248 divided by 9, or $661,139. Multiplying this rate of damages times the six month span from October 1, 2013 to March 31, 2014 produces prorated damages for this period of $3,966,832.

| Table 7: Savant's Lost Profits due to Crestron's Exclusive Dealing[231] | | | |
|---|---|---|---|
| **Year** | **Additional But-for Revenues [e]** | **Additional But-for Costs [g]** | **Lost Profits [e] – [g]** |
| 2009 | $(2,243,902) | $(2,161,025) | $(82,877) |
| 2010 | $1,011,340 | $791,579 | $219,762 |
| 2011 | $11,200,000 | $7,386,353 | $3,769,207 |
| 2012 | $15,100,000 | $8,941,414 | $6,132,840 |
| Jan – Sep 2013 | $16,100,000 | $10,199,174 | $5,950,248 |
| **Total until Sep 2013** | $41,167,438 | $25,178,258 | $15,989,180 |
| Oct 2013 – March 2014, Prorated | $10,733,333 | $6,766,501 | $3,966,832 |
| **Total to until March 2014** | **$51,900,771** | $31,944,759 | $19,956,012 |

## VIII. THE ANTICOMPETITIVE EFFECTS OF DECEPTION

169. Savant alleges that Crestron deceived customers by claiming that Savant was inferior to Crestron in various ways. Because the truth of these allegations is not an economic question, I do not opine on whether Crestron's statements were deceptive. Instead, I explain how the alleged deception, if proven, would harm competition. Deception is wholly undesirable economic conduct that can cause serious competitive harm without any corresponding benefit or added efficiency.

170. There are no efficiency benefits to deception.[232] Deception neither lowers the deceiver's production costs nor improves the quality of the deceiver's product. In contrast, deception has strong anticompetitive effects because it

[231] *See* "CORR48 Lost profits.csv".

[232] *See* Maurice E. Stucke, *When a Monopolist Deceives*, 76 ANTITRUST L.J. 823, 825 (2010) ("Deception lacks any redeeming economic qualities or cognizable efficiency justifications."); *see also* Einer Elhauge, *Defining Better Monopolization Standards*, 56 STAN. L. REV. 253, 281 (2003) ("[D]eceptive conduct by a monopolist to enhance or maintain its monopoly power is patently undesirable…").

distorts buyer choices, thus reducing market efficiency and excluding rivals.[233] Market efficiency is directly impaired (even if rival efficiency is not) because the distortion of buyer choice means that some buyers will buy a product that they did not actually prefer given its true features or will pay more for that product than they would have without the deception. Rival efficiency can suffer because the deception either takes sales away from rivals, depriving rivals of economies of size,[234] or requires rivals to incur costly efforts to combat the deception.[235] This increase in rival costs will tend to increase rival prices and lessen the rival's ability to constrain the deceiver's pricing power, further raising the deceiver's prices as well and resulting in a marketwide increase in prices. Thus, deception can foster monopoly power and harm competition as readily as exclusionary contracts, if not more so.

171. The potential for deception to anticompetitively exclude rivals is especially great in industries that are driven by non-price considerations that are opaque and difficult to verify. In such industries, even a knowledgeable consumer can be deceived. For example, claims about certain products require extensive technical expertise and expensive testing to verify. Even a knowledgeable customer may rationally decide to rely on a seller's assertions rather than conducting burdensome verification.[236]

172. A simple example will illustrate the ability of deception to foster monopoly power. Suppose Firm A is the sole incumbent in a market and suddenly faces new competition from Firm B. Firm B is equally efficient as Firm A, in the sense that its per-unit costs are the same as Firm A's if they are both selling equal

---

[233] *See* Elhauge, *Defining Better Monopolization Standards*, *supra* note 232, at 281 ("Lying is cheap in the short run, and can immediately shift buyers away from rivals. The costs of lying are, if anything, likely to come in the long run, when the consumers figure out the lies, which should diminish the reputation of the lying firm in a way that may make consumers more reluctant to buy from it. But by then the anticompetitive exclusion of the rival may have already been achieved."); Stucke, *supra* note 232, at 824 (noting that when deceived, "[m]arket participants do not act with full and perfect knowledge … and enter suboptimal transactions").

[234] *See* Elhauge, *Defining Better Monopolization Standards*, *supra* note 232, at 321.

[235] *See* Stucke, *supra* note 232, at 825 (noting that deception's harms to rivals include "increasing the transaction costs for honest sellers to differentiate their products and to reap the financial, reputation-related rewards associated with their desirable products; … raising rival's costs (in having to respond to a competitor's deceptive statements); … increasing entry barriers for new products (whose qualities and risks cannot be quickly assessed); … and creating 'lemon' markets where lower-quality goods or services drive out higher-quality goods or services").

[236] *See id.* at 835 ("[E]ven sophisticated purchasers are at times overconfident and can be duped.").

quantities. However, there are significant economies of scale in the market, meaning that Firm B's per-unit costs will be higher if it is selling fewer units. If the deception reduced Firm B's sales below what would have occurred without the deception, then the deception will not only have distorted consumer choices, but also impaired Firm B's efficiency by depriving it of economies of scale. This will increase Firm B's per-unit costs above but-for levels, which under standard economic models will increase both Firm B's price and Firm A's price above but-for levels.

173. Moreover, in this case, deception could also enhance the anticompetitive effects of Crestron's exclusive dealing. This is because deceptive claims as to the superiority of Crestron products could cause customers to form a preference for Crestron over Savant when they would otherwise be indifferent between the two (or even prefer Savant). This, in turn, would increase the incontestable portion of demand for high-end controllers, and reduce the contestable portion. As a result, any dealer that considered switching the contestable portion of its demand from Crestron to Savant would have to face the prospect of losing the ability to sell Crestron products to a larger portion of its total high-end system needs than it would absent the deception. This would lead Crestron's bundling of incontestable and contestable demand to restrict an even greater portion of the market than in the deception-free world.

## IX. Crestron Profits During Period of Alleged Deception

174. I understand that Savant alleges that Crestron disseminated literally false advertising statements about Savant. Because the truth of these allegations is not an economic question, I do not opine on whether Crestron actually made these statements, or whether they were false. I also understand that Savant seeks damages for these alleged statements in the form of a percentage of Crestron's profits earned on the sale of high-end control systems during the period Savant claims that Crestron disseminated these alleged statements. Savant has therefore asked me to use Crestron's sales data to calculate the profits Crestron earned from the sale of high-end residential control systems in the United States from May 11, 2009 to January 25, 2012. Table 8 below thus presents the profits Crestron earned on the sale of high-end residential control systems in the United States during this period according to Crestron's sales database.[237]

[237] The source for this table is "36 Crestron Monthly High-end Sales Profits.xlsx".

| **Table 8: Crestron Profits on High-End Residential U.S. Sales** | | | | |
|---|---|---|---|---|
| **Year** | **Month** | **Net Revenue** | **Cost of Goods** | **Sales Profits** |
| 2009 | 5 | $4,669,613 | $1,815,567 | $2,854,046 |
| 2009 | 6 | $9,654,922 | $3,817,479 | $5,837,443 |
| 2009 | 7 | $6,042,988 | $2,556,675 | $3,486,313 |
| 2009 | 8 | $4,997,945 | $2,114,132 | $2,883,813 |
| 2009 | 9 | $5,969,333 | $2,573,433 | $3,395,900 |
| 2009 | 10 | $5,764,811 | $2,397,739 | $3,367,072 |
| 2009 | 11 | $5,532,347 | $2,269,811 | $3,262,536 |
| 2009 | 12 | $5,691,778 | $2,355,451 | $3,336,327 |
| 2010 | 1 | $6,027,105 | $2,021,350 | $4,005,755 |
| 2010 | 2 | $4,614,695 | $1,969,468 | $2,645,227 |
| 2010 | 3 | $5,707,842 | $2,421,717 | $3,286,126 |
| 2010 | 4 | $7,114,591 | $2,398,897 | $4,715,694 |
| 2010 | 5 | $6,341,102 | $2,651,187 | $3,689,915 |
| 2010 | 6 | $9,315,903 | $4,052,924 | $5,262,979 |
| 2010 | 7 | $4,402,954 | $1,753,794 | $2,649,161 |
| 2010 | 8 | $5,071,418 | $1,996,828 | $3,074,591 |
| 2010 | 9 | $5,099,525 | $2,233,887 | $2,865,638 |
| 2010 | 10 | $5,368,241 | $2,366,087 | $3,002,154 |
| 2010 | 11 | $4,449,508 | $1,862,106 | $2,587,402 |
| 2010 | 12 | $4,860,941 | $2,063,046 | $2,797,896 |
| 2011 | 1 | $4,077,113 | $1,791,718 | $2,285,395 |
| 2011 | 2 | $4,343,316 | $1,877,380 | $2,465,936 |
| 2011 | 3 | $5,314,093 | $2,342,702 | $2,971,391 |
| 2011 | 4 | $4,840,229 | $2,239,170 | $2,601,059 |
| 2011 | 5 | $5,329,613 | $2,412,927 | $2,916,686 |
| 2011 | 6 | $8,972,682 | $3,963,251 | $5,009,432 |
| 2011 | 7 | $5,146,803 | $2,076,587 | $3,070,216 |
| 2011 | 8 | $5,388,319 | $2,180,305 | $3,208,014 |
| 2011 | 9 | $4,798,178 | $1,923,917 | $2,874,261 |
| 2011 | 10 | $5,539,623 | $2,375,750 | $3,163,873 |
| 2011 | 11 | $5,192,780 | $2,283,946 | $2,908,834 |
| 2011 | 12 | $4,861,025 | $2,155,046 | $2,705,980 |
| 2012 | 1 | $3,619,723 | $1,621,145 | $1,998,578 |
| **Total** | | **$184,121,060** | **$76,935,422** | **$107,185,638** |

175. Savant has also asked me to calculate the profits Crestron earned from the sale of high-end systems specifically to the dealers that Crestron states in its discovery responses received "comparison guides" from Crestron that Savant alleges to include literally false statements. Savant alleges that Exhibits E, F, G, H, I, and K to its Amended Complaint contain literally false statements about Savant. Crestron's discovery responses listed 89 dealers that it states received these comparison guides, and lists the date it sent each comparison guide to each dealer. I identified each of these dealers in Crestron's sales database and summed Crestron's profits on sales to each of these dealers from the day on which dealer received the comparison guide to January 25, 2012.

**Table 9: Crestron Profits to Dealers Listed as Receiving Exhibits E, F, G, H, I, or K in Crestron's Interrogatories From the Date Received First Comparison Guide to January 25, 2012**[238]

| Year | Net Revenue | Cost of Goods | Profits |
|---|---|---|---|
| 2009 | $60,597 | $29,049 | $31,548 |
| 2010 | $2,189,232 | $922,972 | $1,266,260 |
| 2011 | $4,202,057 | $1,877,391 | $2,324,666 |
| 2012 | $191,943 | $84,765 | $107,178 |
| **Total** | **$6,643,829** | **$2,914,177** | **$3,729,652** |

[238] *See* "36 Crestron Profits to Rog Dealers.csv".

## CONCLUSION

176. In sum, the evidence shows all of the following:

a. ***Relevant Market***. The relevant product market is the market for high-end residential control systems, in which the relevant firms are Crestron, AMX, and Savant. The relevant geographic market is the United States and Canada.
b. ***Monopoly Power***. In this market, Crestron has had monopoly power since Savant's entry to the present, as evinced by Crestron's 66-83% market share, its power to exclude Savant from the market, and its ability to elevate its prices well above cost.
c. ***Exclusive Dealing***. In June 2008, Crestron's executives instituted an exclusive dealing policy that required dealers to choose between Savant and Crestron, and communicated this policy to dealers in multiple ways.
d. ***No Procompetitive Efficiencies***. Crestron's exclusive dealing policy has no procompetitive efficiencies that benefit dealers or homeowners. There is no evidence in Crestron's internal documents indicating any procompetitive efficiencies. Crestron's claims at deposition that exclusive dealing is necessary to ensure dealers are sufficiently skilled is unsound because requiring dealers to install a minimum number of Crestron systems would better achieve this goal. And the fact that Crestron's smaller competitors (AMX and Savant) do not engage in exclusive dealing affirmatively indicates that exclusive dealing is not efficient in this market.
e. ***Large Restriction on Rivals Sales.*** Crestron's exclusive dealing has restricted 50-77% of the market, and concrete examples confirm it can reduce Savant sales below but-for levels.
f. ***Significant Anticompetitive Effects.*** By restricting a large share of the market, Crestron's exclusive dealing has (1) extracted consumer welfare, (2) maintained Crestron's market power over local dealers by excluding Savant, (3) impaired Savant's efficiency, (4) reduced Savant's expandability, (5) exacerbated dealer switching costs, and (6) deterred Savant investment in research and innovation. All of these effects harm consumer welfare.
g. ***Lost Profits from Exclusive Dealing.*** Crestron's exclusive dealing caused Savant damages of approximately $20 million in lost profits.
h. ***Deception.*** Deception, if proven, would be anticompetitive and has no redeeming efficiencies.
**i.** ***Crestron Profits.*** Creston earned profits of more than $107 million while it distributed sales guides that Savant alleges contain literally false statements.

**EXHIBIT A**

**Einer Richard Elhauge**
**Harvard Law School**
**1575 Massachusetts Ave.**
**Cambridge, Ma 02138**

**Tel: (617) 496-0860** **Hauser Hall 502**
**Fax: (617) 496-0861** **elhauge@law.harvard.edu**

## EMPLOYMENT

**Petrie Professor of Law, Harvard University**

Subjects: Antitrust, Contracts, Health Law Policy, Statutory Interpretation.

Founding Director, Petrie-Flom Center for Health Law Policy, Biotechnology and Bioethics.

Member, ABA Antitrust Section Transition Task Force 2012.

Chair, Obama Campaign's Antitrust Advisory Committee

Co-Chair, Obama Campaign's Blogs and Op-eds Committee

Member, Obama Campaign's Health Policy Advisory Committees.

Member, Editorial Board for Competition Policy International

Member, Advisory Board for the Journal of Competition Law & Economics.

Member, Advisory Board for the Social Sciences Research Network on Antitrust Law & Policy.

Member, Advisory Board for the Social Sciences Research Network on Telecommunications & Regulated Industries.

FTC Special Employee on Antitrust Issues.

Recipient, Jerry S. Cohen Memorial Fund Writing Award (for "Tying, Bundled

Discounts, and the Death of the Single Monopoly Profit Theory"), 2010.

## Books

ELHAUGE, ED., RESEARCH HANDBOOK ON THE ECONOMICS OF ANTITRUST LAW (EDWARD ELGAR PUBLISHING LTD. 2013).

ELHAUGE, OBAMACARE ON TRIAL (2012), available at www.amazon.com

ELHAUGE, U.S. ANTITRUST LAW & ECONOMICS (2d. Ed. Foundation Press 2011; 1st ed. 2008).

ELHAUGE & GERADIN, GLOBAL ANTITRUST LAW & ECONOMICS (2d. Ed. Foundation Press 2011; 1st ed. 2007).

ELHAUGE & GERADIN, GLOBAL COMPETITION LAW & ECONOMICS (2d. Ed. Hart Publishing 2011; 1st ed. 2007).

ELHAUGE, ED., THE FRAGMENTATION OF U.S. HEALTH CARE: CAUSES AND SOLUTIONS (Oxford University Press 2010).

ELHAUGE, STATUTORY DEFAULT RULES (Harvard University Press 2008).

AREEDA, ELHAUGE & HOVENKAMP, VOL X, ANTITRUST LAW (Little, Brown 1996).

## Academic Articles

Elhauge, *Treating RAND Commitments Neutrally* (Feb 2014), available at http://ssrn.com/abstract=2398579

Einer Elhauge, *Obamacare and the Theory of the Firm*, in THE FUTURE OF HEALTH CARE REFORM (Malani and Schill, eds., forthcoming U. Chicago Press

2014).

Elhauge, *Introduction and Overview to Current Issues in Antitrust Economics*, in Research Handbook on the Economics of Antitrust Law (Edward Elgar Publishing Ltd. 2013).

Elhauge & Krueger, *Solving the Patent Settlement Puzzle*, 91 TEXAS LAW REVIEW 283 (2012)

Elhauge & Wickelgren, *Robust Exclusion through Loyalty Discounts with Buyer Commitment*, Harvard Discussion Paper No. 722 (August 2012), available at http://ssrn.com/abstract=2125398

Elhauge & Wickelgren, *Anticompetitive Market Division through Loyalty Discounts without Buyer Commitment*, Harvard Discussion Paper No. 723 (August 2012), available at http://ssrn.com/abstract=2125428

Elhauge, *The Irrelevance of the Broccoli Argument Against the Insurance Mandate*, NEW ENGLAND JOURNAL OF MEDICINE (Dec 21, 2011)

Elhauge, *Why the Google Books Settlement Is Procompetitive*, 2(1) JOURNAL OF LEGAL ANALYSIS 1 (2010).

Elhauge, *The Failed Resurrection of the Single Monopoly Profit Theory*, 6(1) COMPETITION POLICY INTERNATIONAL 155 (Spring 2010).

Elhauge, *Why We Should Care about Health Care Fragmentation and How to Fix It*, in THE FRAGMENTATION OF U.S. HEALTH CARE: CAUSES AND SOLUTIONS 1 (Oxford University Press 2010).

Elhauge, *Tying, Bundled Discounts, and the Death of the Single Monopoly Profit*

*Theory*, 123 HARVARD LAW REVIEW 397 (2009).

Elhauge, *Framing the Antitrust Issues in the Google Books Settlement*, GLOBAL COMPETITION POL'Y, (October 2009 Release 2).

Elhauge, *How Loyalty Discounts Can Perversely Discourage Discounting*, 5 JOURNAL OF COMPETITION LAW & ECONOMICS 189 (2009)

Elhauge, *Disgorgement as an Antitrust Remedy*, 76 ANTITRUST LAW JOURNAL 79 (2009).

Elhauge, *Do Patent Holdup and Royalty Stacking Lead to Systematically Excessive Royalties?*, 4 JOURNAL OF COMPETITION LAW & ECONOMICS 535 (2008)

Elhauge, *How Should Competition Law Be Taught?*, 4(1) COMPETITION POLICY INTERNATIONAL 267 (Spring 2008)

Elhauge, *Harvard, Not Chicago: Which Antitrust School Drives Recent Supreme Court Decisions*?, 3(2) COMPETITION POLICY INTERNATIONAL 59 (Autumn 2007)

Elhauge, *Can Health Law Become a Coherent Field of Law?*, 41 WAKE FOREST L. REV. 365 (2006).

Elhauge, *Sacrificing Corporate Profits in the Public Interest*, 80 N.Y.U. LAW REVIEW 733 (2005)

Elhauge, *Corporate Manager's Operational Discretion to Sacrifice Corporate Profits in the Public Interest*, in ENVIRONMENTAL PROTECTION AND THE SOCIAL RESPONSIBILITY OF FIRMS 13-76 (Bruce Hay, Robert Stavins, & Richard Vietor eds., 2005)

Elhauge, *Defining Better Monopolization Standards*, 56 STANFORD LAW REVIEW 253 (2003)

Elhauge, *Why Above-Cost Price Cuts to Drive out Entrants Do Not Signal Predation or Even Market Power – and the Implications for Defining Costs*, 112 YALE LAW JOURNAL 681 (2003)

Elhauge, *Preference-Estimating Statutory Default Rules*, 102 COLUMBIA LAW REVIEW 2027 (2002)

Elhauge, *Preference-Eliciting Statutory Default Rules*, 102 COLUMBIA LAW REVIEW 2162 (2002)

Elhauge, *The Lessons of Florida 2000*, 110 POLICY REVIEW 15 (Dec 2001 -Jan 2002).

Elhauge, *What Term Limits Do That Ordinary Voting Cannot*, CATO POLICY ANALYSIS, No. 328 (Dec. 16, 1998).

Elhauge, *Are Term Limits Undemocratic?*, 64 U. CHIC. L. REV. 83 (1997).

Elhauge, Lott & Manning, *How Term Limits Enhance the Expression Of Democratic Preferences*, 5 SUPREME COURT ECON. REV. 59 (1997)

Elhauge, *The Limited Regulatory Potential of Medical Technology Assessment*, 82 VA. L. REV. 1525

(1996).

Elhauge, *Allocating Health Care Morally*, 82 CALIF. L. REV. 1449 (1994)

Elhauge, *Toward a European Sale of Control Doctrine*, 41 AM. J. COMP. LAW 627 (1993)

Bundy & Elhauge, *Knowledge About Legal Sanctions*, 92 MICH. L. REV. 261 (1993)

Elhauge, *The Triggering Function of Sale of Control Doctrine*, 59 U. CHIC. L. REV. 1465 (1992)

Elhauge, *Making Sense of Antitrust Petitioning Immunity*, 80 CALIF. L. REV. 1177 (1992)

Bundy & Elhauge, *Do Lawyers Improve the Adversary System? A General Theory of Litigation Advice and Its Regulation*, 79 CALIF. L. REV. 313 (1991)

Elhauge, *Does Interest Group Theory Justify More Intrusive Judicial Review?*, 101 YALE L.J. 31 (1991)

Elhauge, *The Scope of Antitrust Process*, 104 HARV. L. REV. 667 (1991)

<u>Media Publications</u>

"Roberts' Real Long Game?," The Atlantic (July 20, 2012)

"The Fatal Flaw In John Roberts' Analysis Of The Commerce Clause," The New Republic (July 1, 2012)

"The Killer Precedent For Today's Decision," The New Republic (June 28, 2012)

"Even The Most Conservative Supreme Court Justices Have Already Declared Mandates Constitutional," The New Republic (June 21, 2012) (with Emily Bass)

"What a Nobel Prize-Winning Economist Can Teach Us About Obamacare," The Atlantic (May 23, 2012) (with Kevin Caves)

"A Further Response to Critics on the Founding Fathers and Insurance Mandates", The New Republic (April 21, 2012)

"A Response to Critics on the Founding Fathers and Insurance Mandates", The New Republic (April 19, 2012)

"It's Not About Broccoli!: The False Case Against Health Care," The Atlantic (April 16, 2012)

"If Health Insurance Mandates Are Unconstitutional, Why Did the Founding Fathers Back Them?" The New Republic (April 13, 2012)

"Commentary: The Roberts-Kagan Compromise on Obamacare?:, The National Law Journal (March 28, 2012)

"Don't Blame Verrilli for Supreme Court Health-Care Stumble," The Daily Beast (March 28, 2012)

"Economists Argue Over the Cost of Caring for the Uninsured," The Daily Beast (March 26, 2012)

"The Broccoli Test," New York Times (Nov. 16, 2011)

"Coverage vs Coercion," The Huffington Post (March 3, 2008)

"Rewire This Circuit," The Wall Street Journal, A26 (Sept. 17, 2003)

"Soft on Microsoft," The Weekly Standard (March 25, 2002)

"Despite What the Critics Say, it Wasn't a Bag Job," Boston Globe (March 3, 2002)

"Florida 2000: Bush Wins Again!," Weekly Standard (November 26, 2001 )

"State Made The Right Call On Microsoft," The Hartford Courant (Nov. 9, 2001)

"States Should Seek More From Microsoft," San Francisco Chronicle (Nov. 6, 2001)

"A Smart Move on Microsoft," Boston Globe (Sept. 11, 2001)

"Competition Wins in Court," New York Times, (June 30, 2001)

"Bush v. Florida," New York Times, A31 (Nov. 20, 2000)

"Florida's Vote Wasn't 'Irregular,'" Wall Street Journal (Nov. 13, 2000)

"The New 'New Property'," San Francisco Chronicle (Nov. 6, 2000)

"The Real Problem with Independent Counsels," The Washington Times, A19 (Jun 30, 1999)

"Foul Smoke," The Washington Post, A15 (August 4, 1998)

"The Court Failed My Test," The Washington Times, A-19 (July 10, 1998)

"Microsoft Gets an Undeserved Break," The New York Times,A21 (June 29, 1998)

"Medi-Choice," The New Republic, 24 (November 13,1995)

"Term Limits: Voters Aren't Schizophrenic," Wall Street Journal, A-16 (March 14, 1995)

## Harvard Committees

Chair, Harvard Law School Lateral Appointments Committee (1998-99), Member (2003-05, 2011-present).

Member, Harvard Law School Entry Level Appointments Committee (2009-2011).

Member, Harvard University Standing Committee on the Degree of Doctor of Philosophy in Health Policy (1996-99, 2006-07).

Member, Harvard University Internal Advisory Board for the Interfaculty Initiative in Health Policy (1996-99).

Member, Harvard Law School Lecturers and Visitors Committee (1996-98).

**Past Academic Positions**

1988-95 Professor of Law, Boalt Hall, University of California at Berkeley

1995 Visiting Professor of Law, Univ. of Chicago Law School

1994 Visiting Professor of Law, Harvard Law School

1993 Visiting Olin Faculty Fellow, Yale Law School

1991-92 Visiting Scholar in Europe at the Karolinska Institute, the Centre for Health Economics, the Rockefeller Foundation Study Center, Cambridge University, the European University Institute and the University of Florence

**Clerkships**

1987-88 Clerk for Justice William J. Brennan, Jr., United States Supreme Court

1986-87 Clerk for Judge William A. Norris, U.S. Court of Appeals for the Ninth Circuit

1986 Clerk for U.S. Solicitor General's Office, Washington, D.C.

**Bar Admissions**: Massachusetts (2000); Pennsylvania (1986); United States Courts of Appeals for the Fourth (1997), Sixth (2008), and Ninth Circuits (1987); Supreme Court of the United States (1997).

## ECONOMICS EXPERT WORK

President, Legal Economics LLC, 2007 to present.

Senior Expert at Criterion Economics LLC, 2004-2007

Named One of World's Leading Competition Economists in the *International Who's Who of Competition Lawyers and Economists*.

Testifying Expert in *Castro et. al. vs Sanofi Pasteur*, a case alleging anticompetitive bundled loyalty contracts in the vaccines industry.

Testifying Expert in *In re Mushroom Direct Purchaser Antitrust Litigation*, a case alleging price-fixing in the fresh mushroom market.

Testifying Expert in *It's My Party, Inc. v. Live Nation, Inc.*, a case alleging anticompetitive conduct in markets for promotion and amphitheaters.

Testifying Expert in *Retractable Technologies v. Becton Dickinson*, a case alleging exclusionary contracts in syringe and IV catheter markets.

Testifying Expert in *Caldon v. Westinghouse Electric*, a case alleging attempted monopolization.

Testifying Expert in *King Drug v. Cephalon*, a case alleging that a reverse payment settlement of a patent dispute delayed entry and restrained competition.

Testifying Expert for the United States in *United States v. Wyeth*, a case involving claims of bundled sales and bundled discounts.

Testifying Expert in *BAE Holdings AH v. ArmorWorks Enterprises*, a case alleging price discrimination by a ceramic tile manufacturer resulting in harm to downstream competition.

Testifying Expert in *In re Marsh & Mclennan Companies, Inc. Securities Litigation*, a case alleging securities violations from failure to disclose bid steering.

Testifying Expert in *Tessera Technologies v. Hynix Semiconductor*, a case alleging conspiracy to exclude outside technologies from semiconductor markets.

Testifying Expert in *American Steel Erectors v. Local Union No. 7*, a case alleging boycott claims related to steel erection and labor markets.

Testifying Expert in *BP America v. Repsol*, an arbitration.

. Testifying Expert in *Food Lion v. Dean Foods Company*, a class action alleging conspiracies to restrict and foreclose competition in milk markets.

Testifying Expert in *Eisai Inc. v. Sanofi-Aventis U.S. LLC*, a case by a rival alleging foreclosure in anticoagulant pharmaceutical markets.

Testifying Expert in *Daniels v. Tyco*, a case by a rival alleging foreclosure from sharps containers and GPO markets.

Testifying Expert in *Natchitoches Parish Hospital v. Tyco*, a class action concerning sharps containers and GPO markets.

Testifying Expert in *Amgen v. F. Hoffman La Roche*, concerning erythropoietin-simulating agents (ESAs) and white blood cell simulators (WBCs) pharmaceutical markets.

Testifying Expert in *White v. NCAA*, concerning markets for athletic and educational services.

Testifying Expert in *Applied Medical Resources v. Ethicon, Inc*, concerning sutures, trocars, and GPO markets.

Testifying Expert in *Masimo Corp. v. Tyco Health Care Group*, concerning oximetry products and GPO markets.

Testifying Expert in *Rochester Medical v. Bard*, concerning catheter and GPO markets.

Testifying Expert in *Retractable Technologies, Inc. v. Becton Dickinson*, concerning syringes and GPO markets.

Testifying Expert in *Spartanburg v. Hill-Rom*, a class action concerning hospital beds and GPO markets.

Testifying Expert in *Mountain Area Realty v. Wintergreen Partners*, concerning conduct in the real estate brokerage services market.

Testifying Expert in *Louisiana Municipal Police Employees' Retirement System v. Crawford*, concerning merger in the pharmacy benefit manager market.

Testifying Expert in *Capital Credit Alliance v. National Automated Clearing House Association*, concerning electronic checks market.

Testifying Expert for Intel before EC and Korean antitrust authorities on microprocessor markets.

Testifying Expert for AmBev before the EC and Brazilian antitrust authorities on beer market.

Testifying Expert for 1-800-Contacts before the FTC on OSI-CooperVision merger and agreements restraining distribution by nonprescribing retailers.

Testifying Expert in *In Re Cardizem CD Antitrust Litigation*, concerning patents and pharmaceuticals.

Testifying Expert regarding the *B.F. Goodrich-Coltec* Merger, concerning the aerospace industry.

Testifying Expert regarding the *Alcoa-Reynolds* Merger, concerning the aluminum industry

Expert Consultant to National Cable Television Association on Internet Access Bills before Congress and Interactive Television Inquiry before FCC.

Expert for Royal Caribbean for proposed mergers of Princess with Royal Caribbean and Carnival, concerning the cruise industry.

Expert for the Medical Device Manufacturers Association, producing Report to U.S. Senate and Statement to FTC/DOJ regarding exclusionary agreements between medical device suppliers and Group Purchasing Organizations and their hospitals.

## EDUCATION

**Harvard Law School** J.D., June 1986

*Awards*

Fay Diploma -- for graduating first in class

Sears Prize -- Second Year -- to top two students in class

Sears Prize -- First Year -- to top two students in class

*Activities*

Harvard Law Review, Articles Office Co-Chair

Class Marshal

Author: *Modes of Analysis: The Theories and Justifications of Privileged Communications*, 98 HARV. L. REV. 1471-1500 (1985).

**Harvard College** B.A., June 1982

Graduated in three years, majoring in Biochemical Sciences. GPA 3.9

## PERSONAL

Born of Argentinian immigrants in New York City. First language was Spanish. Live with wife and 3 children in Newton, Massachusetts.

## EXHIBIT B

## STATEMENT OF PUBLICATIONS, PRIOR TRIAL AND DEPOSITION TESTIMONY, & COMPENSATION

### I. Publications

My publications from the last 10 years are listed on my CV, which is attached as Exhibit A.

### II. Trial and Deposition Testimony

Within the past four years, I have provided deposition testimony in *Southeastern Milk Antitrust Litigation* on April 22, 2010; *BAE Systems AH v. ArmorWorks Enterprises* on July 16, 2010; *King Drug Co. of Florence, Inc. v. Cephalon* on August 2, 2011; *United States v. Wyeth* on October 12, 2011; *Retractable Technologies v. Becton Dickinson*, on January 20, 2012, February 10, 2012, and February 20, 2013; *DOCA v. Westinghouse Electric Company*, on February 3, 2012; *Eisai v. Sanofi*, on March 1, 2013; *In re Mushroom Direct Purchaser Antitrust Litigation* on October 15, 2013 and *It's My Party vs. Live Nation* on November 18, 2013.

Within the past four years, I have also testified at trial in *Retractable Technologies vs. Becton Dickinson*, on September 10-18, 2013. Other cases in which I have filed expert reports in the last four years are listed in my CV, which is attached as Exhibit A.

### III. Compensation

I am being compensated at a rate of $1045 per hour for my work on this case, and my consulting firm, Legal Economics LLC, is being compensated $235-475 per hour for the work of my staff on this report.